

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

GOLDEN BETHUNE-HILL,
<u>et al.</u>,

     Plaintiffs,

v.                                    Civil Action No. 3:14cv852

VIRGINIA STATE BOARD
OF ELECTIONS, <u>et al.</u>,

     Defendants,

v.

VIRGINIA HOUSE OF DELEGATES,
<u>et al.</u>,

     Intervenor-Defendants.

## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND MEMORANDUM IN SUPPORT (Docket No. 48).  For the reasons set forth below, the motion will be granted in part and denied in part.

## BACKGROUND

In this case, Plaintiffs have challenged twelve Virginia House of Delegates districts as unlawful racial gerrymanders in violation of the Equal Protection Clause of the U.S. Constitution.  Plaintiffs filed this action against the Virginia State Board of Elections ("BOE") and various members thereof

(collectively, "Defendants"), but did not name any legislative body or individual legislator as a defendant. Soon after Plaintiffs filed their Complaint, however, the Virginia House of Delegates (the "House") and Speaker William J. Howell ("Speaker Howell") (collectively, "Intervenors") moved to intervene, (Docket No. 12), and that motion was granted, (Docket No. 26.). Intervenors have represented that they do not represent any individual delegate except Speaker Howell, and that the House does not speak on behalf of any individual legislator. See Tr. of Hr'g, Feb. 24, 2015, at 9:7-9.

During discovery, Plaintiffs served the House with requests for production of documents including, inter alia,

> 1. "[A]ll communications [related to the 2011 redistricting process] between or among the Virginia House of Delegates, including but not limited to those members who represent or represented" the challenged districts;

> 2. "[A]ll communications [related to the 2011 redistricting process] between, among, or with the Virginia House of Delegates and any other individual or entity, including, without limitation, political organizations, lobbyists, political operatives, consultants, constituents, voters, and government officials;" and

> 3. "[A]ll communications [related to the 2011 redistricting process] between the Virginia House of Delegates and any and all local, statewide, or national Republican groups, including without limitation the Republican National Committee, National Republican Congressional Committee,

> Republican State Leadership Committee,
> Republican Legislative Campaign Committee,
> current or former members of the local,
> state, or national Republican group, their
> staff members, agents, employees,
> consultants, advisors, experts, and
> personnel."

Decl. of Ryan Spear in Supp. of Pls.' Mot. to Compel Produc. of Docs., Ex. B (Docket No. 49). Plaintiffs also sought, more generally, "all documents related to the [2011 Virginia redistricting process], including without limitation all emails, letters, notes, press releases, and other documents." Id.

Plaintiffs have sought the communications of individual, non-party legislators and other documents directly from the Intervenors. The House is in possession of these legislators' communications because it maintains an email system that the delegates are encouraged to use for "communications between legislators, staff, state agencies, constituents, and others concerned with state business, including the transfer of documents and usage of electronic mail." Def.-Ints.' Mem. in Opp'n to Mot. to Compel, Ex. A, Virginia House Appropriate Use Policy (Docket No. 50-1). Counsel to the Intervenors, Baker Hostetler, is also in possession of other documents sought by the Plaintiffs, including files obtained from Mr. Christopher Marston (an attorney who worked for the House during 2010 and 2011 and provided legal and strategic advice concerning redistricting), Mr. John Morgan (an individual retained by the

3

House to assist with the 2011 redistricting process), and Mr. Chris Jones (a state legislator who expects to testify in this matter and is represented by Baker Hostetler in that capacity).

In response to Plaintiffs' requests, the House produced documents and served privilege logs reflecting other documents that it had withheld from production on the basis of the legislative privilege, the attorney-client privilege, and the work-product doctrine. In an effort to minimize disputes about the legislative privilege, the parties agreed to send a joint letter to delegates whose emails the House had withheld on legislative privilege grounds. That letter informed the affected delegates that the House had custody of responsive emails to or from the delegates; that the House did not represent the delegates; and that it was the responsibility of the individual delegates to waive or assert the legislative privilege. The notice was sent to the twenty-nine (29) delegates whose communications had been deemed relevant and privileged. The notice set a date by which the delegates were to indicate whether they intended to assert or waive their legislative privilege. However, the notice did not explain that to be successful, an assertion of the legislative privilege must be accompanied by proof that the documents actually are privileged. Nor did the notice explain how that showing should be made.

4

Of the 29 delegates who received the joint letter, twenty-one (21) responded to "assert" legislative privilege, four (4) responded by waiving legislative privilege, and four (4) failed to respond. The House produced the documents of the four legislators who expressly waived their legislative privilege but continues to withhold the documents of the four legislators who failed to respond. The House also continues to withhold the documents of the remaining 21 delegates, who have expressed a preference to assert their legislative privilege but have taken no steps to establish that the withheld documents do, in fact, satisfy the elements of the legislative privilege. Nor has the House sought to make that showing on behalf of those 21 delegates.

Following a telephone conference with the Court in an effort to resolve the claims informally, Plaintiffs filed a motion to compel the production of numerous purportedly "privileged" documents, arguing that the Intervenors have not established valid claims of privilege under the legislative privilege, the attorney-client privilege, or the work-product doctrine.

## DISCUSSION

### I.  Legislative Privilege

To understand the scope and strength of the state legislative privilege for state legislators, "it is necessary to

take a step back and examine the parallel concept of legislative immunity." E.E.O.C. v. Washington Suburban Sanitary Comm'n [WSSC II], 631 F.3d 174, 180 (4th Cir. 2011). In addition, it is important to identify how legislative immunity and legislative privilege differ between federal and state legislators as to the source of the privileges, their purpose, and the degree of their protection.

**A.   History and Purpose of the Legislative Privilege**

**1.   Federal Legislative Immunity and Privilege**

Legislative immunity and legislative privilege for federal legislators derive from the Speech and Debate Clause of the United States Constitution which provides that, "for any Speech or Debate in either House, they [Members of Congress] shall not be questioned in any other Place." U.S. Const. Art. I, § 6, cl. 1. The Speech and Debate Clause was "designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation" and has been read as a means to protect "the legislative process" and "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary," Gravel v. United States, 408 U.S. 606, 616, 617 (1972). Thus, two important principles animate legislative immunity at the federal level:  (1) the separation of powers, and (2) the protection of the legislative process. See Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 502 (1975) (observing

that "the clause . . . reinforc[es] the separation of powers so deliberately established by the Founders" and was "not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators").

Although the clause speaks only of "Speech or Debate," it shields federal legislators from liability for all "things generally done in a session of the House by one of its members in relation to the business before it," Kilbourn v. Thompson, 103 U.S. 168, 204 (1881), such as the production of committee reports, the passage of resolutions, and the act of voting, see Gravel, 408 U.S. at 617. To determine whether particular activities fall within this "legitimate legislative sphere," the party claiming the privilege must prove that the activities are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." Id. at 625. Such "legislative acts" typically involve "the adoption of prospective, legislative-type rules . . . that establish a general policy affecting the larger population. They also generally bear the outward marks of

public decisionmaking, including the observance of formal legislative procedures." WSSC II, 631 F.3d at 184 (internal quotations marks and citations omitted).

The sweeping language of the Clause renders federal legislative immunity for such activities applicable in both civil and criminal actions. See Eastland, 421 U.S. at 503 (noting both "the absoluteness of the terms 'shall not be questioned,' and the sweep of the term 'in any other Place'"). "Just as a criminal prosecution infringes upon the independence which the Clause is designed to preserve, a private civil action, whether for an injunction or damages, creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks to defend the litigation." Id.

Of course, this does not mean that federal legislators are immune from criminal or civil law in any general sense. See, e.g., United States v. Gillock, 445 U.S. 360, 373 n.11 (1980). Rather, the Clause means that legislative activities may not constitute a basis for liability, either as the predicate of the cause of action, see Doe v. McMillan, 412 U.S. 306, 312 (1973) ("[T]he actions upon which petitioners sought to predicate liability were 'legislative acts,' and, as such, were immune from suit.") (internal citation omitted), or as evidence in support thereof, United States v. Helstoski, 442 U.S. 477, 487

8

(1979) ("[E]vidence of a legislative act of a Member may not be introduced by the Government in a prosecution under [18 U.S.C.] § 201 [to show bribery of a public official]."). Due to the Clause's constitutional stature, the Speech and Debate Clause poses an absolute bar to liability if a federal legislator is acting within the "legitimate legislative sphere." Eastland, 421 U.S. at 503.

In addition to this substantive and evidentiary use immunity, the Supreme Court has also upheld the existence of a federal legislative privilege prohibiting the use of compulsory process to elicit testimony from federal legislators and their immediate staff with respect to their legislative activities. See Gravel, 408 U.S. at 621. This privilege similarly prohibits the production of documents pertaining to legislative activities. See United States v. Rayburn House Office Bldg., Room 2113, Washington, D.C. 20515, 497 F.3d 654, 660 (D.C. Cir. 2007) cert. denied, 552 U.S. 1295 (2008). This is because federal legislators engaged in the sphere of legitimate legislative activity are "protected not only from the consequences of litigation's results but also from the burden of defending themselves." Dombrowski v. Eastland, 387 U.S. 82, 85 (1967).

In short, federal legislators are entitled to an absolute legislative immunity grounded in the Constitution for any civil

9

or criminal action based in substance or evidence upon acts performed within the "sphere of legitimate legislative activity." This immunity is further safeguarded by an absolute legislative privilege preventing compelled testimony or documentary disclosure regarding legislative activities in support of such claims.

### 2. State Legislative Immunity and Privilege

State legislators and other legislative actors also possess legislative immunity, _Tenney v. Brandhove_, 341 U.S. 367, 372 (1951), based upon the concept's "historical pedigree and practical importance," see _WSSC II_, 631 F.3d at 180-81 (collecting cases). After all, the "practical import" of legislative immunity is "difficult to overstate." _Id._ at 181. Because "legislators bear significant responsibility for many of our toughest decisions," legislative immunity "provides legislators with the breathing room necessary to make these choices in the public's interest" without fear of undue judicial interference or personal liability. _Id._ This immunity applies "even where the legislative body to which the individual legislator belongs lacks immunity for its legislative acts[.]" _Id._ at 181 (comparing the holding in _Owen v. City of Independence_, 445 U.S. 622, 657 (1980), that municipalities do not enjoy immunity under § 1983, with the holding in _Bogan v._

10

Scott-Harris, 523 U.S. 44, 49 (1998), that municipal legislators do enjoy legislative immunity).

State legislative immunity differs, however, from federal legislative immunity in its source of authority, purposes, and degree of protection.  Unlike federal legislative immunity, which is grounded in constitutional law, state legislative immunity in federal court is governed by federal common law. Gillock, 445 U.S. at 372 n.10.  Moreover, the principles animating immunity for state legislators under common law - while significant - are distinguishable from those principles underlying the constitutional immunity afforded federal legislators.

For example, the separation of powers principle "gives no support to the grant" of evidentiary use immunity to state legislators in "those areas where the Constitution grants the Federal Government the power to act" because "the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power."  Gillock, 445 U.S. at 370. And while "principles of comity command careful consideration," id. at 373, any concern with "federal interference in the state legislative process is not on the same constitutional footing with the interference of one branch of the Federal Government in the affairs of a coequal branch," id. at 370.

11

Similarly, the need to protect legislative independence and the legislative process for state legislators may be somewhat tempered when federal statutory law comes into conflict with federal common law. In United States v. Gillock, the Supreme Court acknowledged its grant of "common-law absolute immunity from civil suit" to state legislators in Tenney v. Brandhove, but qualified its holding. Id. at 372. The Court noted that "Tenney was a civil action brought by a private plaintiff to vindicate private rights," and that the common-law immunity "survived the passage of the Civil Rights Act" because the Court could not believe that Congress "would impinge on a tradition so well grounded in history and reason" without expressly indicating as much. Id. (emphasis added).

Thus, while state legislators "are entitled to absolute immunity from federal damages liability" in civil actions as a matter of routine judicial "interpretation of federal law," Lake Country, 440 U.S. at 406, 404, the Supreme Court's case law teaches that, "where important federal interests are at stake," legislative immunity for state actors may be curtailed, Gillock, 445 U.S. at 373. For example, "[f]ederal prosecutions of state and local officials, including state legislators, using evidence of their official acts are not infrequent." Id. at 373 n.11 (collecting cases). Thus far, cases have "drawn the line [for immunity] at civil actions" with respect to state legislative

12

immunity from personal liability.  Id.  See also Marylanders for Fair Representation, Inc. v. Schaefer, 144 F.R.D. 292, 297 (D. Md. 1992) ("The Tenney Court created absolute immunity from civil suit for state legislators acting within 'the sphere of legitimate legislative activity.'  The protection against civil liability extends to suits for injunctive and declaratory relief[.]") (internal citation omitted).

The state legislative privilege – like state legislative immunity – likewise may become qualified based on the nature of the claim at issue.  This is because both state legislative immunity and privilege are not founded on the United States Constitution, but rather are based on an interpretation of the federal common law that is necessarily abrogated when the immunity or privilege is incompatible with federal statutory law.  See Owen, 445 U.S. at 647 ("Congress [is] the supreme sovereign on matters of federal law[.]"); Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 626 (1978) ("[W]e have no authority to substitute our views for those expressed by Congress in a duly enacted statute.").

Intervenors are not wrong to observe that "legislators are entitled to absolute immunity when acting in a legislative capacity" under Fourth Circuit precedent, Def.-Ints.' Mem. in Opp'n to Mot. to Compel at 11 (Docket No. 50) (citing Burtnick v. McLean, 76 F.3d 611, 613 (4th Cir. 1996)), and that the

13

Fourth Circuit has applied a legislative privilege in such cases to bar compulsory testimony, Burtnick, 76 F.3d at 613. But, this precedent does no more than recognize the default state of absolute common-law immunity accorded in civil cases in the absence of contrary federal law and the application of the common-law privilege in support thereof. See United States v. Cartledge, 928 F.2d 93, 96 (4th Cir. 1991) (acknowledging that the Gillock Court "employed a balancing test" to weigh the state legislative privilege against the need to enforce federal law). As in Tenney, the Burtnick Court was faced "with a civil action brought by a private plaintiff to vindicate private rights." Gillock, 445 U.S. at 372 (discussing Tenney). And, as in Tenney, the Burtnick Court held that absolute state legislative immunity and privilege should be preserved under such circumstances. See Burtnick, 76 F.3d at 613; accord Hollyday v. Rainey, 964 F.2d 1441, 1443 (4th Cir. 1992).

However, the principles animating the default common-law presumptions for the state legislative privilege in cases brought against individual legislators and the state legislative privilege in cases brought against the State itself are not coterminous. In the former circumstance, the line for immunity is drawn between civil and criminal suits, with the legislator's privilege extending to provide absolute protection against compulsory process where liability against the individual would

14

itself be barred.   This not only eliminates "the burden of [legislators] defending themselves," Dombrowski, 387 U.S. at 85, but also directly supports the principle of legislative independence, which provides individual legislators immunity for the "public good," Lake Country, 440 U.S. at 404.   See also WSSC II, 631 F.3d at 181 ("Legislative privilege against compulsory evidentiary process exists to safeguard . . . legislative immunity and to further encourage the republican values it promotes.").

However, where the State faces liability, the legislative privilege becomes qualified when it stands as a barrier to the vindication of important federal interests and insulates against effective redress of public rights.   As the Supreme Court noted in Owen,

> At the heart of [the] justification for . . . immunity for the individual official is the concern that the threat of personal monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process, thus paralyzing the governing official's decisiveness and distorting his judgment on matters of public policy.   The inhibiting effect is significantly reduced, if not eliminated, however, when the threat of personal liability is removed.

Owen, 445 U.S. at 655-56.   In other words, there is little to no threat to the "public good" of legislative independence when a legislator is not threatened with individual liability.   The

15

only interest advanced by the legislative privilege in such cases is the legislator's interest in being free from the distraction of compulsory process. See WSSC II, 631 F.3d at 177 ("We recognize the great importance of protecting legislators from intrusive and costly inquiries into their legislative acts.").

Although it is clear that the absolute privilege will normally still apply in civil suits brought by private plaintiffs to vindicate private rights, see generally id., the authorities do not establish that the "distraction interest" standing alone is sufficient to justify an absolute legislative privilege in instances where a state legislator is not personally threatened with liability and an exercise of the privilege would frustrate the execution of federal laws protecting vital public rights.[1] In such situations, a privilege will still apply, see id. at 181 (noting that a "privilege applies whether or not the legislators themselves have been

---

[1] This is not to say that the distraction interest is not a significant one. See, e.g., Eastland v. U.S. Servicemen's Fund, 421 U.S. 491, 503 (1975); Dombrowski v. Eastland, 387 U.S. 82, 84-85 (1967). But the interest carries far greater weight for federal legislators where it is backed by constitutional authority. State legislators' distraction interest – grounded in federal common law – cannot outweigh an interest in the enforcement of federal statutory law. A presumption of absolute privilege may still prevail when plaintiffs seek private redress, but this presumption does not apply when plaintiffs seek to vindicate important, public rights.

sued"), but it will be qualified and subject to balancing in the face of great evidentiary need.

Thus, the controversy bedeviling the federal courts as to whether the state legislative privilege is either "absolute" or "qualified" may be beside the point. See Kay v. City of Rancho Palos Verdes, No. CV 02-03922, 2003 WL 25294710, at *11-14 (C.D. Cal. 2003) (collecting conflicting cases and noting that "the federal courts have not adopted a consistent approach to application of the legislative privilege in civil suits"). Rather, the answer depends upon the nature of the claim and the defendant. In civil suits against individual legislators – where legislators are presumed to be clothed in absolute immunity in the absence of an express congressional declaration to the contrary, see Gillock, 445 U.S. at 372-73[2] – the legislative privilege prevents compelled testimony or documentary disclosure in support of such claims. This privilege exists to safeguard the immunity and further the "public good" of legislative independence. See WSSC II, 631 F.3d at 181.

---

[2] The presumption is that Congress could not have intended to void this historical immunity sub silentio. Admittedly, the Tenney Court did not reach the question whether Congress would have such "constitutional power to limit the freedom of State legislators acting within their traditional sphere" in such cases, calling this "a big assumption." Tenney, 341 U.S. at 376. This Court need not – and does not – reach this question because the plaintiffs in this case are not seeking such relief against any individual state legislator.

However, in federal criminal cases brought against individual legislators, or where important federal interests are at stake, the presumption of absolute state legislative immunity or absolute state legislative privilege yields. See Gillock, 445 U.S. at 373 n.11, 373; E.E.O.C. v. Wash. Suburban Sanitary Comm'n (WSSC I), 666 F. Supp. 2d 526, 532 (D. Md. 2009), aff'd 631 F.3d 174 (4th Cir. 2011) ("[The] legislative privilege is one of non-evidentiary use of legislative acts against a legislator, not one of non-disclosure."); Page v. Virginia State Bd. of Elections (Page I), 15 F. Supp. 3d 657, 665 (E.D. Va. 2014) (quoting WSSC I, 666 F. Supp. 2d at 532) ("[T]he argument that 'legislative privilege is an impenetrable shield that completely insulates any disclosure of documents' is not tenable.").

Therefore, the state legislative privilege is a qualified one when evidence of forbidden criminal behavior is sought, see Gillock, 445 U.S. at 373, or when a plaintiff proceeds against the State and seeks evidence to vindicate important public rights guaranteed by federal law, see Schaefer, 144 F.R.D. at 304 (Murnaghan & Motz, JJ., concurring) ("The doctrine of legislative immunity . . . insulates legislators from liability for their official acts and shields them from judicial scrutiny into their deliberative processes[, but] . . . does not . . . necessarily prohibit judicial inquiry into legislative motive

18

where the challenged legislative action is alleged to have violated an overriding, free-standing public policy.").

Several federal courts have taken the same, or a similar, approach in finding that the privilege is a qualified one in redistricting cases. See Favors v. Cuomo (Favors I), 285 F.R.D. 187 (E.D.N.Y. 2012); Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections, No. 11 C 5065, 2011 WL 4837508 (N.D. Ill. 2011); Baldus v. Brennan, Nos. 11-CV-562, 11-CV-1011, 2011 WL 6122542 (E.D. Wis. 2011); Rodriquez v. Pataki, 280 F. Supp. 2d 89 (S.D.N.Y.) aff'd, 293 F. Supp. 2d 302 (S.D.N.Y. 2003); Schaefer, 144 F.R.D. at 304 (Murnaghan & Motz, JJ., concurring) ("[T]estimonial legislative immunity is not an absolute[.]"); United States v. Irvin, 127 F.R.D. 169 (C.D. Cal. 1989). But see Simpson v. City of Hampton, Va., 166 F.R.D. 16 (E.D. Va. 1996).[3] Although some courts analyze the propriety of disclosure or testimony under the deliberative process privilege[4] rather

---

[3] The court in Simpson was faced with a request for documentary evidence to challenge a city council's electoral plan. The court did not find the privilege absolute, but cited Burtnick for this proposition and found the privilege issue presented in its case to be "identical" to that presented in Burtnick. For the reasons discussed herein, this Court does not read Burtnick to equate a request for production of documents in a civil action to vindicate public rights as identical to a request for testimony in a civil action to vindicate private rights, and thus does not subscribe to the reading accorded Burtnick in Simpson.

[4] The deliberative process privilege traditionally applies to executive and administrative officials and protects the

than the legislative privilege, the privilege accorded to legislators is qualified all the same based on the important federal interests at play and the quintessentially public nature of the right. See, e.g., Comm. for a Fair & Balanced Map, 2011 WL 4837508, at *6 ("Given the federal interests at stake in redistricting cases, this court concludes that common law legislative immunity does not entirely shield Non-Part[y Legislators] here. . . . Voting rights cases, although brought by private parties, seek to vindicate public rights.").

Redistricting litigation presents a particularly appropriate circumstance for qualifying the state legislative privilege because judicial inquiry into legislative intent is specifically contemplated as part of the resolution of the core issue that such cases present. As the Supreme Court explained in Village of Arlington Heights v. Metropolitan Housing Development Corporation:

> Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. . . . [Although] courts [normally] refrain from reviewing the merits of [legislative] decisions, absent a showing of arbitrariness or irrationality[,] . . . [w]hen there is a

---

"decisionmaking processes of government agencies" to encourage "frank discussion of legal or policy matters" and ensure that the decisions and policies formulated are not rendered poorer by the chill that might result "if the discussion were made public." Ethyl Corp. v. U.S. E.P.A., 25 F.3d 1241, 1248 (4th Cir. 1994) (citing N.L.R.B. v. Sears, Roebuck & Co., 421 U.S. 132 (1975)).

> proof that a discriminatory purpose has been
> a motivating factor in the decision, this
> judicial deference is no longer justified.

429 U.S. 252, 265-66 (1977). See also Shaw v. Hunt, 517 U.S. 899, 905 (1996) ("The constitutional wrong occurs when race becomes the 'dominant and controlling' consideration. The plaintiff bears the burden of proving the race-based motive and may do so either through 'circumstantial evidence of a district's shape and demographics' or through 'more direct evidence going to legislative purpose.'"). And, while "judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of the other branches of government" and "[p]lacing a decisionmaker on the stand is therefore 'usually to be avoided,'" Arlington Heights, 429 U.S. at 268 n.18, it is nonetheless permissible "[i]n some extraordinary instances," id. at 268.[5] In redistricting cases, where the natural corrective mechanisms built into our republican system of government offer little check upon the very real threat of "legislative self-entrenchment," see Christopher Asta, Note, Developing A Speech or Debate Clause Framework for

---

[5] See also Rodriguez, 280 F. Supp. 2d at 95 ("[C]ourts have indicated that, notwithstanding their immunity from suit, legislators may, at times, be called upon to produce documents or testify at depositions."); Veasey v. Perry, No. 2:13-CV-193, 2014 WL 1340077, at *1 (S.D. Tex. 2014) (noting that Arlington Heights "limited, but did not foreclose, the possibility of piercing the privilege for state legislators in discriminatory-intent claims").

Redistricting Litigation, 89 N.Y.U. L. Rev. 238, 264 (2014), the courts are presented with just such an "extraordinary instance."

Thus, the Court is not inclined to hold that a judicially crafted evidentiary privilege based on federal common law can, with unflinching and absolute effect, trump the need for direct evidence that is highly relevant to the adjudication of public rights guaranteed by federal statutory law and the Constitution, especially where no threat to legislative immunity itself is presented. Although the Court will not lightly intrude upon the state legislative privilege, it must be a qualified privilege in such a scenario and yield in the face of an evidentiary need that lies at the core of the inquiry required by the Supreme Court in redistricting cases.

### B.  Qualified Privilege Analysis

The next question is the extent to which the legislators' claims of qualified legislative privilege may serve as a basis to withhold the requested evidence. Most courts that have conducted this qualified privilege analysis in the redistricting context have employed a five-factor balancing test imported from deliberative process privilege case law. See Rodriguez, 280 F. Supp. 2d at 101 (S.D.N.Y. 2003) (applying the "official information privilege" test from In re Franklin Nat'l Bank Secs. Litig., 478 F. Supp. 577, 583 (E.D.N.Y. 1979) to the legislative privilege); Comm. for a Fair & Balanced Map, 2011 WL 4837508, at

*7 (citing Rodriguez and applying the five-factor analysis); Favors I, 285 F.R.D. at 209-10 (same); Page I, 15 F. Supp. 3d at 666 (same).[6] This test examines: "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the 'seriousness' of the litigation and the issues involved; (iv) the role of government in the litigation;" and (v) the purposes of the privilege. Page I, 15 F. Supp. 3d at 666.

Of course, it is necessary to be mindful of the differences between the deliberative process privilege and the legislative privilege when applying the test to new circumstances. For example, most courts to apply the test in the legislative context have examined "the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable" when analyzing the fifth factor. See, e.g., Rodriguez, 280 F. Supp. 2d at 101. The threat of "chilled deliberation" is clearly the purpose of the deliberative process privilege, but it is not the primary purpose of the legislative privilege. See In re Grand Jury, 821 F.2d 946, 958 (3d Cir. 1987) ("[C]onfidentiality does not lie at the root of the concerns motivating a privilege for all legislative speech or

---

[6] "The 'official information privilege' is also known and referred to at common law as the 'deliberative process privilege' and/or 'executive privilege.'" Evans v. City of Chicago, 231 F.R.D. 302, 315 (N.D. Ill. 2005).

debate."). This distinction matters. Because the deliberative process privilege protects the uninhibited formulation of policies, it focuses on documents "reflecting advisory opinions, recommendations[,] and deliberations" and excludes documents reflecting the factual bases for these opinions unless they are "intertwined with the policy-making process." See Ethyl Corp., 25 F.3d at 1248-49. Factual content is excluded from the privilege entirely because disclosure of such content would not curtail the robust and vigorous debate necessary to the formulation of policy.

The legislative privilege, however, has a wider sweep based on different purposes. Because the privilege "protects a process," Favors I, 285 F.R.D. at 210, the activity of legislative fact-finding is encompassed within the privilege, see Gov't of Virgin Islands v. Lee, 775 F.2d 514, 521 (3d Cir. 1985) ("[F]act-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation. As such, fact-finding occupies a position of sufficient importance in the legislative process to justify the protection afforded by legislative immunity."). To advance legislators' interest in avoiding the distraction of compulsory process, the privilege should therefore extend to factual information relied upon in the legislative process and be subject to a balancing of

24

interests rather than wholesale exclusion. See Kay, 2003 WL 25294710, at *11. The principle of "legislative independence" may justify greater protection for "opinion" documents under the overlapping rationale of preventing timidity in the formulation of public policy,[7] but that does not mean that the production of "fact" documents poses no burden whatsoever.

Similarly, because many privileges rest upon a "confidentiality" interest, disclosure to third parties normally results in a complete waiver of the privilege. The application of this rule is less strict when applied to the legislative privilege because, again, the privilege "protects a process" and encompasses "communications even as between political adversaries[.]" Favors I, 285 F.R.D. at 210. There are obviously limits to who falls within the legislative process, see Page I, 15 F. Supp. 3d at 668 (denying legislative privilege to consultant independently contracted by partisan political party), but even these boundaries may be subject to balancing, see Dombrowski, 387 U.S. at 85 ("Th[e] Court has held . . . that this doctrine is less absolute, although applicable, when applied to officers or employees of a legislative body, rather than to legislators themselves."); Favors I, 285 F.R.D at 213

---

[7] Some courts have simply applied the deliberative process privilege directly to legislators. See In re Grand Jury, 821 F.2d at 958 (applying the deliberative process privilege to state legislators instead of the legislative privilege).

("Retained consultants who aid legislators in the performance of their legislative duties fall within the scope of the qualified legislative privilege[.]"). Thus, whether the privilege should cover the factual bases of a legislative decision, protect the process of fact-finding, or extend in varying concentric degrees to third parties are questions to be addressed within the qualified balancing analysis rather than with any kind of "per se" rule.

Acknowledging these differences in the purpose and scope of the deliberative process privilege and the legislative privilege, the Court finds that the five-factor balancing test employed by other courts provides the proper analytical framework for decision on the legislative privilege issues presented here.

### 1. Relevance of Evidence

Under Rule 26 of the Federal Rules of Civil Procedure, parties "may obtain discovery of any nonprivileged matter that is relevant to any party's claim or defense[.]" Fed. R. Civ. P. 26(b). Here, "[t]he state government's role in the events giving rise to the present litigation is central to the Plaintiffs' claims." Page I, 15 F. Supp. 3d at 666. Unlike other cases, where the deliberative process privilege or the legislative privilege may be employed to "prevent [the government's] decision-making process from being swept up

26

unnecessarily into the public domain," this is a case where the decisionmaking process "is the case." Comm. for a Fair & Balanced Map, 2011 WL 4837508, at *8 (internal brackets and citations omitted).

In an Equal Protection Clause case, "proof of a legislative body's discriminatory intent is relevant and extremely important as direct evidence." Baldus, 2011 WL 6122542, at *1. "[A]ny documents containing the opinions and subjective beliefs of legislators or their key advisors would be relevant to the broader inquiry into legislative intent and the possibility of racially motivated decisions that were not adequately tailored to a compelling government interest." Page I, 15 F. Supp. 3d at 666. Even "purely factual material can shed light on what factors and considerations were foremost in the legislature's mind while the legislation was pending." Id. In this case, perhaps the most important inquiry will be whether the State sought to "maintain [or increase] present minority percentages in majority-minority districts" without regard to whether these percentages were reasonably necessary "in order to maintain the minority's present ability to elect the candidate of its choice[.]" See Alabama Legislative Black Caucus v. Alabama, 135 S. Ct. 1257, 1274 (2015).

It is true that "plaintiffs need not offer direct evidence of discriminatory intent," such as "statements made by the

decision making body or members thereto," in order to "demonstrate intentional discrimination." Comm. for a Fair & Balanced Map, 2011 WL 4837508, at *8. There are, in fact, "a variety of circumstantial factors" from which courts "may infer discriminatory intent." Id. at *3. However, those alternatives are properly considered under the second factor below and should not be used to discount the relevancy of the evidence sought.

Likewise, it may be true that "the individual motivations" of particular legislators may be neither necessary nor sufficient for Plaintiffs to prevail. See id. at *4 (citing Palmer v. Thompson, 403 U.S. 217, 224 (1971), for the proposition that "no case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it"); Edwards v. Aguillard, 482 U.S. 578, 638 (1987) (calling the evaluation of "the subjective intent of legislators . . . a perilous enterprise"). However, that does not mean the evidence cannot constitute an important part of the case presented against, or in favor of, the districting plan. See Washington v. Davis, 426 U.S. 229, 270 n.11 (1976) ("To the extent that Palmer suggests a generally applicable proposition that legislative purpose is irrelevant in constitutional adjudication, our prior cases as indicated in the text are to the contrary[.]"); Shaw v. Hunt, 517 U.S. 899, 923 (1996) (attributing to Palmer the lesson that

28

"racially motivated legislation violates the Equal Protection Clause only when the challenged legislation 'affect[s] blacks differently from whites.'") (emphasis added); Page v. Virginia State Bd. of Elections (Page II), 58 F. Supp. 3d 533, 2014 WL 5019686 (E.D. Va. 2014) vacated sub nom. Cantor v. Personhuballah, 135 S. Ct. 1699 (2015) ("The Supreme Court has cited several specific factors as evidence of racial line drawing[, including] statements by legislators indicating that race was a predominant factor in redistricting [and] . . . evidence that race or percentage of race within a district was the single redistricting criterion that could not be compromised[.]").

Moreover, the question of whether the State thought it appropriate to use specific racial percentages in an attempt to comply with the requirements of the Voting Rights Act is one that is particularly important to this litigation, regardless of the subjective motivations purportedly driving individual legislators' final voting decisions. Given the centrality of the "legislative purpose" inquiry to Plaintiffs' claim as well as the Supreme Court's recent guidance in Alabama Legislative Black Caucus, 135 S. Ct. 1257 (2015), the evidence sought is clearly relevant, and thus this factor weighs in favor of disclosure.

## 2.  Availability of Other Evidence

Direct evidence of discriminatory intent is not necessary to prevail. "[C]ourts may infer discriminatory intent from a variety of circumstantial factors." <u>Comm. for a Fair & Balanced Map</u>, 2011 WL 4837508, at *3. These factors include:

> [B]loc voting along racial lines; low minority voter registration; exclusion from the political process; unresponsiveness of elected officials to needs of minorities; . . . depressed socio-economic status attributable to inferior education and employment and housing discrimination[;] . . . the historical background of the decision; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; minority retrogression (i.e.[,] a decrease in the voting strength of a cohesive voting bloc over time); and manipulation of district boundaries to adjust the relative size of minority groups, including the "packing" of minority voters.

<u>Id.</u>  <u>See also</u> <u>Page II</u>, 2014 WL 5019686, at *6. For evidentiary purposes, Plaintiffs may resort to various sources of information, including "special interest group position papers," "press releases," "newspaper articles," "census reports," "registered voter data and election returns," etc. <u>Comm. for a Fair & Balanced Map</u>, 2011 WL 4837508, at *8.

That said, the availability of alternate evidence does not render the evidence sought here irrelevant by any measure. As one court held, "the second factor weighs slightly in favor of disclosure" despite the existence of other evidence "given the

practical reality that officials 'seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority.'" Veasey, 2014 WL 1340077, at *3 (citing Smith v. Town of Clarkton, N. C., 682 F.2d 1055, 1064 (4th Cir. 1982)). In other words, the availability of alternate evidence will only supplement – not supplant – the evidence sought by the Plaintiffs. Plaintiffs need not "confine their proof" to circumstantial evidence. Page I, 15 F. Supp. 3d at 667. "The real proof is what was in the contemporaneous record in the redistricting process." Id. The Court finds that this factor weighs in favor of disclosure.

### 3. Seriousness of Litigation and Issues Involved

In a republican government, there is no more foundational right than meaningful representation. A legislature reflective of the democratic body is the root from which all rights and laws derive. As John Adams wrote, an assembly "should be, in miniature, an exact portrait of the people at large. It should think, feel, reason, and act like them." John Adams, Thoughts on Government: Applicable to the Present State of the American Colonies; In a Letter from a Gentleman to his Friend (April, 1776). Courts have readily recognized the "seriousness of the litigation" in racial gerrymandering cases. Page I, 15 F. Supp. 3d at 667 ("The right to vote and the rights conferred by the

Equal Protection Clause are of cardinal importance."); Favors I, 285 F.R.D. at 219 (observing that the third factor is "intended to give due consideration to some of the most invidious forms of government malfeasance"); Comm. for a Fair & Balanced Map, 2011 WL 4837508, at *8 ("There can be little doubt that plaintiffs' allegations are serious.  Plaintiffs raise profound questions about the legitimacy of the redistricting process[.]").

The Plaintiffs allege an undoubtedly serious deprivation of rights.  This factor weighs heavily in favor of disclosure.

### 4.  Role of the Government

The fourth factor in the balancing analysis cuts at cross purposes.  As discussed above, where the legislature - rather than the legislators - are the target of the remedy and legislative immunity is not under threat, application of the legislative privilege may be tempered.  On the other hand, the legislature's decision to "inject itself into the case" does not mean that the legislators have "voluntarily installed themselves as defendants."  See Powell v. Ridge, 247 F.3d 520, 525 (3d Cir. 2001).  Notwithstanding this distinction, the "decision-making process remains at the core of the plaintiffs' claims . . . [and] the legislature's direct role in the litigation supports overcoming the privilege."  Favors I, 285 F.R.D. at 220.  Based on these contrary factors, the Court finds that the factor weighs in favor of disclosure.

### 5.  Purposes of Privilege

The state legislative privilege protects a "distraction" interest - to guard legislators from the burdens of compulsory process - and a "legislative independence" interest - to encourage legislators to engage deeply in the legislative process and act boldly in the public interest without fear of personal consequence.

The distraction interest is not one to be taken lightly. However, a request for documents is less burdensome than a request for testimony, especially where, as here, the documents are collected and available in the hands of the Intervenors. Because even absolute legislative privilege "does not bar an inquiry into whether a legislator's activities and conversations were, in fact, legislative in nature," Lee, 775 F.2d at 517, some degree of documentary review is necessary for the privilege to be claimed in the first place. As such, an intrusion already exists and a request for production only varies the degree of the intrusion.  While any additional burden of compulsory process necessarily militates against disclosure, a request for documents is less burdensome than a request for testimony.

The legislative independence interest likewise weighs against disclosure.  Admittedly, the threat to this interest is substantially lowered when individual legislators are not subject to liability.  See Owen 445 U.S. at 656 ("The inhibiting

effect is significantly reduced, if not eliminated, however, when the threat of personal liability is removed."); Page I, 15 F. Supp. 3d at 665 ("In assessing the applicability of the legislative privilege, it is necessary to remember that the privilege is an outgrowth of the doctrine of legislative immunity because the privilege was thought necessary to effectuate the immunity.") (citing WSSC II, 631 F.3d at 181). Some courts have gone so far as to say that the Gillock decision negated the existence of a state legislative privilege altogether. See In re Grand Jury, 821 F.2d at 957 ("We do not believe . . . a state legislator's interest in avoiding the burdens of compliance with a subpoena is alone sufficient to justify creation of a speech or debate privilege.").

Moreover, to the extent that legislators' confidentiality is protected either as a component of the "legislative independence" principle or under a separately cognizable deliberative process privilege, the Court will consider the potential for "timidity" stemming from disclosure. This threat has been taken seriously by other courts in this context. See Page I, 15 F. Supp. 3d at 667 ("[A]ny effort to disclose the communications of legislative aides and assistants who are otherwise eligible to claim the legislative privilege on behalf of their employers threatens to impede future deliberations by the legislature."); Comm. for a Fair & Balanced Map, 2011 WL

4837508, at *8 ("Legislators face competing demands from constituents, lobbyists, party leaders, special interest groups and others. They must be able to confer with one another without fear of public disclosure."). Of course, contrary authority exists as well. <u>Irvin</u>, 127 F.R.D. at 174 ("This Court is not convinced that the occasional instance in which disclosure may be ordered in a civil context will add measurably to the inhibitions already attending legislative deliberations."); <u>Baldus</u>, 2011 WL 6122542, at *2 ("Allowing the plaintiffs access to these items may have some minimal future 'chilling effect' on the Legislature, but that fact is outweighed by the highly relevant and potentially unique nature of the evidence."); 26A Fed. Prac. & Proc. Evid. § 5680 (1st ed.) ("The deliberative process privilege should seldom be upheld in a case where there is any need for the evidence because it rests on such a puny instrumental rationale. . . . It rests upon . . . dubious empirical assumptions.").

Based on the analysis above, this Court finds that the fifth factor weighs against disclosure.

## C. Application

Balancing the competing, substantial interests at stake, the Court finds that the totality of circumstances warrant the selective disclosure of the assertedly privileged documents in the House's possession. In this context, where Plaintiffs

35

allege racial gerrymandering and seek an injunctive remedy from the legislature itself, and the intent of the legislature is the dispositive issue in the case, the balance of interests calls for the legislative privilege to yield. Under the facts in this record, the foregoing principles call for the following disclosure requirements and procedures.

First, the House must produce any documents or communications created after the redistricting legislation's date of enactment. The privilege only protects "integral steps" in the legislative process and does not extend to commentary or analysis following the legislation's enactment.

Second, the House must produce any documents or communications shared with, or received from, any individual or organization outside the employ of the legislature. The legislative privilege is strongest as applied to communications among legislators and between legislators and their immediate aides. Gravel, 408 U.S. at 616-17 ("The day-to-day work of such aides is so critical to the Members' performance that they must be treated as the latter's alter egos."). The privilege also applies, albeit with less strength, to "legislative staff members, officers, or other employees of a legislative body." See Schaefer, 144 F.R.D. at 298 (citing Dombrowski, 387 U.S. at 85 and Tenney, 341 U.S. at 378); Favors I, 285 F.R.D. at 212 ("[C]ommunications with technical employees who 'provide

36

information to legislators collectively,' but who 'do not advise a particular legislator as his or her personal staff,' at best deserve weak deference in the balancing of competing interests.").

However, "a conversation between legislators and knowledgeable outsiders, such as lobbyists, to mark up legislation is a session for which no one could seriously claim privilege." Rodriguez, 280 F. Supp. 2d at 101 (internal brackets omitted). As observed in Page I, "the Virginia Code specifically identifies the personnel that can be employed by individual legislators and standing legislative committees in the General Assembly, and the Code also specifies the procedures for appropriating the funds to compensate those staff members." 15 F. Supp. 3d at 663 (citing Va. Code § 30-19.4). Unless an individual or organization was retained by the House itself pursuant to this provision, any communications or documents with or from such person may not be withheld.

Third, for the following kinds of documents or communications "internal" to the House that were generated before the legislation's date of enactment, the following disclosure rules apply:

- All documents or communications reflecting strictly factual information - regardless of source - are to be produced. This includes all "materials and information available to lawmakers at the time a decision was made."

> See <u>Comm. for a Fair & Balanced Map</u>, 2011 WL 4837508, at
> *9 (internal brackets omitted).

- All documents or communications produced by committee,
  technical, or professional staff for the House (excluding
  the personal staff of legislators) that reflect opinions,
  recommendations, or advice are to be produced.  Comments,
  requests, or opinions expressed by legislators or their
  aides in communication with such staff may be redacted,
  subject to the disclosure rule below.

Fourth, with respect to the four legislators who have
failed to respond to the parties' inquiry, any potential claim
to privilege is deemed to be waived.  <u>See Veasey</u>, 2014 WL
1340077, at *2 ("The privilege is also deemed to be waived as to
the 17 legislators who did not respond to defense counsel's
inquiry regarding the assertion of the privilege.").  The House
argues that it may not waive the legislators' privilege and that
by producing documents it would be doing so.  This is not the
case.  The House has reached out to the legislators in question
and advised them of their rights to waive or assert their
privilege.  Those that have not responded have failed to assert
the privilege.  Thus, the House is not "waiving" the privilege
against their wishes.  The legislators waived the privilege and
their documents must be produced.

Fifth, as to many of the remaining requested documents, the
record does not actually establish that there is a legislative
privilege.  As the Plaintiffs correctly contend "[a] party
asserting privilege has the burden of demonstrating its

applicability." N.L.R.B. v. Interbake Foods, LLC, 637 F.3d 492, 501 (4th Cir. 2011). "A conclusory assertion of privilege is insufficient to establish a privilege's applicability to a particular document." Page I, 15 F. Supp. 3d at 661. Thus, the proponent of a privilege must "demonstrate specific facts showing that the communications were privileged." RLI Ins. Co. v. Conseco, Inc., 477 F. Supp. 2d 741, 751 (E.D. Va. 2007). Because "[t]he privilege is a personal one and may be waived or asserted by each individual legislator," Schaefer, 144 F.R.D. at 298, the "legislator or an aide has the burden of proving the preliminary facts of the privilege." Legislative Privilege, 26A Fed. Prac. & Proc. Evid. § 5675 (1st ed.).

To be clear, one does not prove entitlement to legislative (or, indeed, any) privilege simply by asserting it. It must be proved. "The fact that making specific claims may impose a burden on the legislator when a mass of evidence is involved does not justify the making of blanket claims of privilege." Id. The privilege must be proved for each document withheld as privileged. Contrary to the Intervenors' arguments, this need not be a particularly difficult exercise. Intervenors implicitly represent that they have already done this analysis by attempting to withhold the documents on legislative privilege grounds. Thus, counsel for the Intervenors may work with individual legislators and/or their aides to help "prove up"

39

their claims of privilege and minimize the burden imposed.   The House cannot, however, undertake this analysis on its own.

Ordinarily, the inadequate showing made here would warrant an order requiring production of the documents at issue. However, this case presents a most unusual circumstance because the individual legislators (who must prove the privilege) are not parties and the notice drafted by the Plaintiffs and the Intervenors simply instructed the legislators to "assert" the privilege (or not) and did not instruct how the privilege, once asserted, must be proved.

Considering the importance of the legislative privilege and the confusing nature of the notice, the Court declines to impose the usual consequences of the failure of proof upon the non-party legislators.   Instead, the Court will require counsel for the Intervenors to work with the legislators to demonstrate the existence of the privilege for each document if, indeed, that can be done.   This process will be expedited.

To assist in expediting that process, the Court instructs as follows:

- All documents or communications produced by legislators or their immediate aides before the redistricting legislation was enacted (excepting those in paragraph "Third" above which must be produced) may be withheld, except to the extent any such document pertains to, or "reveals an awareness" of: racial considerations employed in the districting process, sorting of voters according to race, or the impact of redistricting upon the ability of minority voters to elect a candidate of choice.   In

40

such a situation the public interest in vindicating vital constitutional rights overcomes the presumption of common-law privilege and warrants production. See Favors v. Cuomo (Favors II), No. 11-CV-5632, Mem. & Order at 34 (E.D.N.Y. 2013) (Docket No. 559). Because considerations of race and ethnicity "are, in fact, necessary to ensure compliance with the [Voting Rights Act]," the Court will not require the disclosure of documents or communications produced by legislators or aides that merely reference or contain demographic data, although such data itself should be produced as "factual information" consistent with the requirement above unless it is inextricably intertwined with non-factual content. Id.[8]

Sixth, to the extent the Intervenors argue that all of the documents on their privilege logs are adequately described and reasonably withheld, they are incorrect. Counsel for the Intervenors must reevaluate the claims of legislative privilege and the adequacy of its privilege log descriptions in light of this Memorandum Opinion, provide a modified privilege log to Plaintiffs, and submit its revised set of proposed privileged documents to this Court for in camera review. See Favors I, 285 F.R.D. at 220 (collecting cases and noting that "the prudent course is for the Court to perform an analysis of the allegedly privileged documents, in camera, prior to ruling as to the specific documents (or categories of documents) over which the

---

[8] If individual legislators choose to introduce additional evidence of other motivations to dispel the notion that racial considerations predominated, they are welcome to waive their privilege with respect to other documents and communications with the understanding that some degree of subject matter waiver may apply to ensure that fair context is provided.

privilege has been invoked"). This process too will be expedited.

In crafting their modified privilege logs, the Intervenors should remember that there must be sufficient detail to allow the Plaintiffs to discern whether or not the documents withheld are withheld in compliance with the rules set out above. See Rambus, Inc. v. Infineon Techs. AG, 220 F.R.D. 264, 272 (E.D. Va. 2004) (privilege log descriptions insufficient if they "lack the information necessary to determine whether a privilege applies"); Favors I, 285 F.R.D. at 222 ("In assessing the adequacy of privilege logs, courts ask whether, 'as to each document, the privilege log sets forth specific facts that, if credited, would suffice to establish each element of the privilege.'") (internal brackets omitted). In that regard, a notation that merely indicates that a document relates to redistricting issues is insufficient. See id. at 223. The fact that a document relates to redistricting bespeaks its relevance, not its privilege. All documents withheld on the purported basis of the legislative privilege are subject to the rules set out above.

## II. Attorney-Client Privilege

The purpose of the attorney-client privilege is to "promote broader public interests in the observance of law and administration of justice . . . [t]he privilege recognizes that

42

sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." _ePlus Inc. v. Lawson Software, Inc._, 280 F.R.D. 247, 251 (E.D. Va. 2012) (quoting _Upjohn v. United States_, 449 U.S. 383, 389 (1981)). As with all privileges, the attorney-client privilege is narrowly construed and only recognized "to the very limited extent that . . . excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." _Rambus_, 220 F.R.D. at 271 (quoting _Hawkins v. Stables_, 148 F.3d 379, 383 (4th Cir. 1998)). The Fourth Circuit applies the "classic test" for determining the existence of the attorney-client privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

_United States v. Jones_, 696 F.2d 1069, 1072 (4th Cir. 1982). The attorney-client privilege does not, however, "apply to the

situation where it is the . . . understanding of the client that the communication is to be made known to others." See F.T.C. v. Reckitt Benckiser Pharm., Inc., No. 3:14MC5, 2015 WL 1062062, at *3 (E.D. Va. 2015) (citing In re Grand Jury Proceedings, 727 F.2d 1352, 1356 (4th Cir. 1984)). If the individual or entity requesting legal information had no expectation of confidentiality at the time of the communication, then that person cannot later seek to shield that information simply because it was regarding a legal issue.

As with the legislative privilege, the attorney-client privilege must be asserted and established by the privilege holder. The Intervenors may claim the privilege only in accord with the rule set by Jones and only if one of them or a legislator is the client. In other words, if a legislator requested legal advice from House counsel and/or House counsel provided legal advice to a legislator, then this may be protected. Similarly, if the House itself sought legal advice or such advice was provided to the House, then this may be protected.

The Intervenors may not assert the privilege on behalf of third parties, including individual delegates, campaign committees, or political parties. If the Intervenors are in possession of communications reflecting an individual delegate's request for outside legal advice, the proper course of action is

44

for the House to advise the delegate so that the delegate can properly claim and establish the privilege. The House's possession of such communications does not necessarily waive the privilege as between the individual delegate and outside counsel, so long as the delegate can demonstrate that there was a reasonable expectation of privacy in the emails sent using the House email system. See United States v. Hamilton, 701 F.3d 404, 409 (4th Cir. 2012). Most federal courts to have evaluated this question have relied upon the four-factor test from In re Asia Global Crossing, Ltd., which examines the following questions: (1) whether the institution maintains a policy banning personal or other objectionable use, (2) whether the institution monitors the use of the user's computer or e-mail, (3) whether third parties have a right of access to the computer or e-mails, and (4) whether the institution notified the user – or whether the user was aware – of the use and monitoring policies. See 322 B.R. 247, 257 (Bankr. S.D.N.Y. 2005).

Nor have the Intervenors made any kind of showing to support their claim that the House and any individual legislator requesting information shared a "common interest." "[T]he common interest doctrine applies when two or more parties consult or retain an attorney concerning a legal matter in which they share a common interest." Hanson v. U.S. Agency for Int'l Dev., 372 F.3d 286, 292 (4th Cir. 2004). This doctrine

45

typically "permits parties whose legal interests coincide to share privileged materials with one another in order to more effectively prosecute or defend their claims," Hunton & Williams v. DOJ, 590 F.3d 272, 277 (4th Cir. 2010), although "it is unnecessary that there be actual litigation in progress for this privilege to apply." Hanson, 372 F.3d at 292. However, "[m]erely satisfying the requirements of the common interest doctrine without also satisfying the requirements of a discovery privilege does not protect documents from disclosure." Hunton, 590 F.3d at 280. The Intervenors bear the burden of showing that the attorney-client privilege applies, and that this privilege was not waived as to a third party because of the operation of the common interest doctrine. That showing has not been made.

"[A]lthough a common interest agreement can be inferred where two parties are clearly collaborating in advance of litigation, mere 'indicia' of joint strategy as of a particular point in time are insufficient to demonstrate that a common interest agreement has been formed." Id. at 284-85. In other words, the Intervenors cannot simply point to a generalized interest in passing constitutional legislation to justify invoking the doctrine. It is dubious to argue that individual legislators and the Intervenors were operating under an implied common interest agreement if the individual legislators were

completely unaware of being part of such an agreement. This is especially important here because the Intervenors have assumed that they had a common interest with individual legislators all along. The Intervenors have made no effort to verify – even to this day – whether those parties in fact concurred in its assessment of their supposed common interest, and it is clear that any communications or document exchanged prior to the establishment of a common interest agreement are not protected from disclosure. See id. at 285.

Intervenors also may not claim privilege for communications shared freely with, or in the presence of, outside organizations, including campaign committees and political parties. Such documents must be produced. The Court will not, however, require production of communications where the only other parties to the otherwise privileged (as defined in Jones) communication were the House Republican Caucus, the Virginia Senate, or other entities internal to the legislative branch.

Communications seeking information from – or sharing information with – the Virginia Attorney General's office, however, do not fall within the attorney-client privilege. The Attorney General provides legal advice to the executive branch and its constituents. No legislator or legislative entity could reasonably expect that an attorney-client relationship would be created or that the attorney-client privilege would attach as a

result of a request for a legal opinion or position from the executive.

In order to provide individual legislators the opportunity to claim and establish attorney-client privilege with respect to their communications with outside counsel, the Court will forestall ruling on the Plaintiffs' motion to compel with respect to communications purportedly withheld pursuant to the attorney-client privilege. As with the legislative privilege, the Intervenors must review the claims of privilege in light of today's ruling, provide notice to any non-parties potentially affected, and revise its privilege log accordingly. This process will also be expedited.

## III. Work Product Doctrine

The work product doctrine embodies the principle that "the material which reflects an attorney's efforts to investigate and prepare a case are protected from discovery if such material was created in 'anticipation of litigation.'" See Conseco, 477 F. Supp. 2d at 746 (citing Hickman v. Taylor, 329 U.S. 495, 508-10 (1947)). The protections of the work product doctrine extend beyond the litigation for which the materials were prepared. Duplan Corp. v. Moulinage et Retorderie de Chavanoz, 487 F.2d 480, 483 (4th Cir. 1973) ("[W]e find no indication that the Court intended to confine the protection of the work product to

the litigation in which it was prepared or to make it freely discoverable in a subsequent law suit."). Otherwise identical work by an attorney is not protected, however, if it was created in the "ordinary course of business." Conseco, 477 F. Supp. 2d at 746. Legislative counsel could not, for example, withhold documents pertaining to pending legislation on the basis of the work product doctrine because "[t]he [l]egislature could always have a reasonable belief that any of its enactments would result in litigation. That is the nature of the legislative process." Baldus, 2011 WL 6385645, at *2.

Intervenors argue that Plaintiffs have sought the disclosure of work product from the proceedings in Page v. Virginia State Bd. of Elections, No. 3:13-CV-678. See Def.-Ints.' Mem. in Opp'n to Mot. to Compel at 18 (Docket No. 50). In response, Plaintiffs argue that the disputed documents "may have been protected by Rule 26(b)(4) in Page" but "appear on the privilege log of the House, which was not a party in Page," thus waiving the protection conferred by the work product doctrine. Pls.' Reply in Supp. of Mot. to Compel at 18 (Docket No. 51). The Intervenors, however, represent that the documents "have never been in the possession, custody, or control of the House or Speaker Howell." Def.-Ints.' Mem. in Opp'n to Mot. to Compel at 19. Because Baker Hostetler represents both the holder of the documents from Page as well as the Intervenors in the

49

current litigation, the House contends that the documents are only listed on the privilege logs because they "came within the scope of [Plaintiffs'] requests, which sought documents held by counsel to the House." Id. This is a fair explanation. The fact that counsel to the House may have reviewed the documents does not result in a waiver of the work product doctrine under these circumstances. Plaintiffs' motion will be denied with respect to these documents.

### CONCLUSION

For the foregoing reasons, PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND MEMORANDUM IN SUPPORT (Docket No. 48) will be granted in part and denied in part.

It is so ORDERED.

_____  /s/  *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 26, 2015

50