```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                    RICHMOND DIVISION

 4

 5   ------------------------------------
                                        :
 6   GOLDEN BETHUNE-HILL, et al.        :
                                        :   Civil Action No.
 7   vs.                                :   3:14CV852
                                        :
 8   VIRGINIA STATE BOARD OF            :   June 4, 2015
     ELECTIONS, et al.                  :
 9   ------------------------------------

10

11       COMPLETE TRANSCRIPT OF THE CONFERENCE CALL

12        BEFORE THE HONORABLE ROBERT E. PAYNE

13              UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   Kevin J. Hamilton, Esquire
     Perkins Coie, LLP
17   1201 Third Avenue
     Suite 4800
18   Seattle, Washington  98101

19   Bruce V. Spiva, Esquire
     Aria C. Branch, Esquire
20   Perkins Coie, LLP
     700 13th Street, NW
21   Suite 600
     Washington, D.C.  20005
22   Counsel for the plaintiff

23

24              Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Anthony F. Troy, Esquire
      Eckert Seamans Cherin & Mellott, LLC
 3    707 East Main Street
      Suite 1450
 4    Richmond, Virginia  23219

 5    Daniel A. Glass, Esquire
      Eckert Seamans Cherin & Mellott, LLC
 6    1717 Pennsylvania Avenue, NW
      Suite 1200
 7    Washington, D.C.  20006

 8    Godfrey T. Pinn, Jr., Esquire
      Harrell & Chambliss, LLP
 9    707 East Main Street
      Suite 1000
10    Richmond, Virginia  23219
      Counsel for the defendants
11
      E. Mark Braden, Esquire
12    Jennifer M. Walrath, Esquire
      Baker & Hostetler, LLP
13    1050 Connecticut Avenue NW
      Suite 1100
14    Washington, D.C.  20036
      Counsel for the intervenor defendants
15

16

17

18

19

20

21

22

23

24

25
```

1                      P R O C E E D I N G S

2

3          JUDGE PAYNE:  Hello.  Do we have, to begin with,

4    Judge Lee and Judge Keenan?

5          JUDGE LEE:  Yes.

6          JUDGE KEENAN:  Yes, Judge Payne.

7          JUDGE PAYNE:  And then we have for the parties,

8    would you please identify yourself and who you represent,

9    and then each time that you speak, give your name, for we

10   have a court reporter here for these processes.  The court

11   reporter does not need the name of Judge Lee and Judge

12   Keenan spoken every time, but for the lawyers who are

13   unfamiliar to us, we need that.

14         MR. HAMILTON:  For the plaintiffs, Your Honor,

15   this is Kevin Hamilton from Perkins Coie, and with me on

16   the phone is Bruce Spiva and Aria Branch.

17         MR. TROY:  Your Honor, this is Tony Troy for the

18   defendants State Board of Elections and Department of

19   Elections, and I believe I also have on the phone with me

20   Dan Glass and Godfrey Pinn.  Dan, anybody else?

21         MR. GLASS:  That's it.

22         MR. BRADEN:  Your Honors, it's Mark Braden at

23   Baker and Hostetler.  I have Jennifer Walrath with me, and

24   we are here for the defendant intervenors the Speaker of

25   the House and the House of Delegates.

1          JUDGE PAYNE:  I'm sorry, your name is what?

2          MR. BRADEN:  Mark Braden.

3          JUDGE PAYNE:  And her name is what?

4          MR. BRADEN:  Jennifer Walrath.

5          JUDGE PAYNE:  Who just joined the meeting?

6          MR. PINN:  Godfrey Pinn joined.

7          JUDGE PAYNE:  All right, that's everybody.  You

8   have the order that was issued on the -- docket 58 to set

9   the agenda.  The process we'll follow is to ask you to

10  comment on each of the topics, and then any time one of

11  the judges wants to ask questions, they'll ask the

12  question that they want to ask, and if anybody thinks of

13  anything that needs to be dealt with, whether it's on the

14  agenda or not, it can be raised.

15          The best process, given the need for a record, is

16  if we speak, make sure we don't trample on each other's

17  lines when we talk.

18          So I will say that I have gotten the 60

19  privileged documents that were submitted in the notebook,

20  and I haven't had a chance to look at them yet.  I will

21  look at them, and then we'll be talking among the judges

22  about that, and you'll hear from us just as promptly as we

23  can.

24          I gather you've seen the order extending the time

25  for the filing of motions *in limine*.  All right, for the

1  plaintiffs, how many witnesses do you expect?

2       MR. HAMILTON:  Your Honor, we anticipate calling

3  four witnesses; three members of the House of Delegates

4  plus Steve Ansolabehere.  He's a professor from Harvard

5  University, and he'll be serving as our expert in this

6  case.

7       JUDGE PAYNE:  Who are the House members you're

8  calling?

9       MR. HAMILTON:  They'll be Delegate McClellan,

10  Delegate Dance, and Delegate Armstrong, although we may,

11  depending on how things progress, whether we call all

12  three of them or just two of them, we're not certain, but

13  those are the three.

14       JUDGE PAYNE:  Delegates McClellan, Dance, and

15  Armstrong, and then you have an expert, and who is that?

16       MR. HAMILTON:  His name is Dr. Stephen

17  Ansolabehere, and for the court reporter, it's spelled

18  A-n-s-o-l-a-b-e-h-e-r-e.

19       JUDGE PAYNE:  How long do you expect the

20  testimony -- let's assume for the moment that you call all

21  of the listed delegates.  How long is the testimony of

22  each expected to be, just approximately for planning

23  purposes?

24       MR. HAMILTON:  Sure.  Thank you, Your Honor.

25  Well, we anticipate the delegates to be relatively focused

 1    and straightforward, so I would anticipate somewhere

 2    between 30 and 60 minutes total including likely

 3    cross-examination, but I would say 30 to 60 minutes for

 4    planning purposes ought to be plenty.

 5            JUDGE PAYNE:  You mean all of them or each of

 6    them 30 to 60 minutes?

 7            MR. HAMILTON:  Sorry, each of them.

 8            JUDGE PAYNE:  You're mindful of Rule 611, aren't

 9    you, about duplicative testimony?

10            MR. HAMILTON:  Absolutely, Your Honor.  We have

11    no intention of duplicating testimony.  They will not be

12    testifying as to the -- they're going to be testifying

13    generally to similar topics, but they'll be -- they each

14    have separate and distinct factual knowledge that we think

15    will be helpful to the Court.

16            To the extent that it's duplicative, we will try

17    and streamline that so we don't waste the Courts' time.  I

18    remember the Court's admonition in the *Page* case to move

19    things along, and I haven't forgotten.

20            JUDGE PAYNE:  The expert, how long do you expect

21    the expert will be?

22            MR. HAMILTON:  Well, the parties are -- I know

23    this is a later topic on the subject, or on the agenda,

24    but the parties are discussing a stipulation to allow the

25    admission of virtually all the documents.  We're going to

1    certainly avoid calling any foundational witnesses from

2    the state for the purpose simply of identifying or

3    authenticating or laying a foundation for documents.

4           Instead, the approach -- counsel, speak up if I

5    misrepresent here, but I think all counsel have agreed

6    that it would be far better to simply stipulate to the

7    authenticity and foundational requirements for all of the

8    documents and probably the admissibility for all the

9    documents, but we haven't gotten quite that far yet.

10          As to the -- and the only reason I bring this up

11   is as to the expert report, so long as we get the expert

12   report in evidence through a stipulation, then I think we

13   can streamline Dr. Ansolabehere's testimony because we

14   won't have to go through everything, and instead, what I

15   would intend to do is focus on his primary conclusions,

16   his methodology for reaching that and explaining it,

17   answering any questions any member of the Court might

18   have, and then moving on.

19          So I think we ought to be able to present -- for

20   my planning purposes, I've put down three to four hours

21   ought to be plenty, and I'm guessing we can do it more

22   efficiently than that.

23          JUDGE PAYNE:  That, however, assumes that there's

24   an agreement that the report comes in; is that what you

25   are saying?

```
 1          MR. HAMILTON:  Yes, Your Honor.

 2          JUDGE PAYNE:  Because the report is hearsay and

 3   doesn't ordinarily come in, and in the Page case,

 4   everybody agreed to it so they came in.

 5          MR. HAMILTON:  That's right.  And the parties

 6   have agreed so far that we would follow the same approach

 7   here.

 8          JUDGE PAYNE:  All right.  All right, Mr. Troy,

 9   for the state defendants, the Board of Elections clients

10   that you have, how many witnesses do you anticipate?

11          MR. TROY:  Your Honor, we will be relying upon

12   the witnesses presented by the defendant intervenors and

13   so anticipate not putting on any witnesses.  One witness

14   we have would be the head of the Department of Elections

15   only if there's a technical question, and I cannot

16   anticipate that.  So the answer is, we will not be

17   presenting evidence other than relying upon the witnesses

18   of the defendant intervenors.

19          JUDGE PAYNE:  Well, if you do that, will you be

20   questioning them yourself as well?

21          MR. TROY:  I do not anticipate that, Your Honor,

22   no.

23          JUDGE PAYNE:  All right, the intervenor

24   defendant, how many witnesses do you have, and at this

25   juncture, who do you think they'll be?
```

1        MR. BRADEN:  Mark Braden.  Your Honors, we

2   anticipate either four or five witnesses.  The witnesses

3   would be Delegate Jones, who is the sponsor of the bill;

4   John Morgan, who is the technician who worked with him in

5   crafting the bill at his direction; and the three expert

6   witnesses, Dr. Hofeller, Dr. Hood, and Dr. Katz.

7        So we don't know whether it will be necessary to

8   call both Morgan and Jones or whether we would simply call

9   Delegate Jones.  And to walk through the time --

10       JUDGE PAYNE:  Excuse me just a minute.  Is that

11   John Morgan, is he the expert who worked with him?

12       MR. BRADEN:  Well, he's -- he will not be an

13   expert witness in this case.  He is an expert -- he was a

14   consultant who worked with Delegate Jones in the crafting

15   of the plan.  It's the same John Morgan who testified in

16   the other case, but in this case, he actually was involved

17   in the crafting of the plan at the direction of Delegate

18   Jones.

19       JUDGE PAYNE:  All right, and what's Hofeller --

20   what are Hofeller, Hood, and Katz, basically what are they

21   going to address respectively?

22       MR. BRADEN:  Dr. Hofeller is an expert on drawing

23   plans and compactness in comparison to other plans.  So

24   he'll be talking about the construction of the plan and

25   their compactness in comparison to other plans either in

1    Virginia or other locations or in other litigation.  So

2    talking about compactness, contiguous, sort of standard

3    issues like that.

4         Dr. Hood will be talking about the construction

5    of plans.  He's been an expert witness in many cases in

6    this area.  He will be talking about the political nature

7    of the plan, the underlying communities of interest,

8    traditional communities of interest, and other sort of

9    traditional criteria for the line-drawing process, and Dr.

10   Katz is a political science and statistician from Cal

11   Tech, and he will principally be testifying disputing the

12   expert witness testimony of the plaintiffs.

13        He has serious questions about their analysis on

14   both compactness, but most importantly on the statistical

15   analysis of VTD, vote tabulation districts, and the notion

16   of racial block voting.  He has questions about the

17   methods used by the other professor, and he's a well-known

18   statistician from Cal Tech.  That's what he's testifying

19   to.

20        JUDGE PAYNE:  How long do you anticipate the

21   testimony of these witnesses to be?

22        MR. BRADEN:  I would anticipate Delegate Jones'

23   testimony to be four to five hours at least.  It's a

24   hundred districts.  He doesn't have to talk about every

25   district, but to be candid with you, to describe the plan

1   and the underlying reasons will be quite lengthy

2   testimony, so I would expect four to five hours.  I would

3   expect Mr. Morgan, if he testifies, to probably take

4   approximately an hour.  The expert witnesses I would

5   expect to be two to three hours each.

6            JUDGE PAYNE:  All right.  Judge Keenan and Judge

7   Lee, do you have any questions on those topics at this

8   point?

9            JUDGE KEENAN:  No.

10           JUDGE LEE:  I don't have any questions.  Thank

11   you.

12           JUDGE PAYNE:  As to the number of exhibits and

13   the objections, are you all -- when are you going to know

14   whether you stipulate the admissibility of all exhibits

15   and/or whether there needs to be a ruling on any

16   objections?  What is your timetable for doing that?

17           MR. HAMILTON:  Your Honor, this is Kevin Hamilton

18   for the plaintiffs.  The exhibit list is due, I believe,

19   on June 19th.

20           JUDGE PAYNE:  Yes.

21           MR. HAMILTON:  And so I, speaking for the

22   plaintiffs, I anticipate we'll be using all that time to

23   identify and compile our exhibits, and it will be the week

24   after June 19th that we'll be reviewing the intervenor's

25   exhibits, they'll be reviewing ours, and we'll come to a

1    stipulation.

2          We are already -- I've already forwarded to the

3    other parties in the case a partial list to start the

4    dialogue going, and Mr. Braden has expressed an interest

5    in, you know, providing similar early lists to plaintiff.

6    So the idea would be that we would be -- as we build our

7    witness list toward the filing on June 19th, we'd be

8    exchanging exhibit lists back and forth and hopefully

9    reaching as much agreement as we can.

10         So I would anticipate, in answer to the Court's

11   question, the week after June 19th that we'd be able to

12   identify to the Court whether we've successfully navigated

13   that issue or whether there are any areas remaining in

14   dispute.

15         And, Your Honor, before we move on, I did want to

16   say, I do anticipate a rebuttal case, responding to the

17   three different experts that defendants are calling.

18         JUDGE PAYNE:  So what kind of rebuttal case do

19   you think you're going to have?

20         MR. HAMILTON:  I anticipate that it would be

21   simply calling Dr. Ansolabehere to respond to the expert

22   testimony.

23         JUDGE PAYNE:  For approximately how long do you

24   think?

25         MR. HAMILTON:  You know, if I heard Mr. Braden

1    right, he's going to be presenting six to nine hours of

2    expert testimony between the three of them, so, you know,

3    maybe a couple hours to respond to that, at most.

4         I honestly think there's an awful lot of

5    duplicative testimony between the three, so we should be

6    able to respond to it fairly, fairly promptly.  By that

7    time, I'm quite certain that the Court will be ready to

8    have us moving it along, and I'll do the best I can, but

9    it's difficult, not having heard what they're going to say

10   for nine hours or eight hours or six to nine hours, I

11   don't know in advance how long it will take to rebut that.

12        JUDGE PAYNE:  All right.  So you're going to

13   check back with us after the 19th about whether you've

14   agreed on things; is that correct?

15        MR. HAMILTON:  That's correct, Your Honor, and I

16   guess I would propose maybe perhaps that -- the 19th is a

17   Friday -- perhaps by the 26th, I guess I could propose

18   that we could file something with the Court to let the

19   Court know the status of those discussions.

20        JUDGE PAYNE:  Well, I'd like to hear before then

21   so that we can build in time to rule on any objections if

22   we need to.  I guess that can all be done on the 26th; is

23   that what you are thinking?

24        MR. HAMILTON:  I was thinking on the -- just the

25   proposal would be that on the 26th, the parties would

1    submit hopefully a joint document that simply says, you

2    know, the parties have met and conferred and stipulate to

3    the admission, to the authenticity, and admissibility of

4    all of the documents under respective exhibit lists with

5    the exception of, if there is any, Exhibits 12, 17, 39,

6    and 84.

7         JUDGE PAYNE:  I was just looking at my book here,

8    and I can't find -- I probably wrote it down somewhere

9    else.  Is there a final pretrial conference set here for

10   our case, and if so, when?

11        MR. HAMILTON:  Your Honor, again, it's Kevin

12   Hamilton for the plaintiff.  I am looking at the Court's

13   order -- the pretrial scheduling order of March 3rd.

14   Paragraph 12c has a deadline of June 25th, "Any objections

15   to exhibits shall be filed with the clerk no later than

16   June 25th."  That's a Thursday.

17        So I guess the Court has already set a deadline

18   for indicating whether there's objections with the Court,

19   and I guess we propose we adhere to that deadline.

20        JUDGE PAYNE:  I don't have that order in front of

21   me.  Is there a pretrial conference date in that order?

22        MR. HAMILTON:  I don't believe so.

23        MR. BRADEN:  This is Mark Braden.  We don't see a

24   date for that, no.

25        JUDGE PAYNE:  And is there a date in that order

1   for the hearing of motions *in limine*?

2           MR. HAMILTON:  I don't believe so, Your Honor.

3   This is Mr. Hamilton.  I don't believe so, Your Honor.

4           JUDGE PAYNE:  We probably need to set that date,

5   so we'll see how we proceed.  All right, it might be

6   helpful to discuss item five, the theories of the case for

7   each side, to kind of help get us oriented and thinking in

8   the right direction, and we may end up, each of us, of the

9   judges may have questions as you go along, so anybody,

10  just feel free to interject at such time as you want to.

11  So start with the plaintiff.

12          MR. HAMILTON:  All right.  Thank you.  Your

13  Honor, from the plaintiff's perspective, this is a really

14  straightforward case, and our case theory is fairly

15  simple.  The equal protection clause of the 14th Amendment

16  forbids race-based redistricting absent a compelling state

17  interest, and even then, even if the state does identify a

18  compelling state interest, it can use race only when it's

19  narrowly tailored to meet the state interest.  That's the

20  law.

21          Our theory of the case is that in 2011, the

22  Virginia General Assembly used race as the predominate

23  factor in drawing the 12 house districts that are at issue

24  in this case; B, had no compelling state interest for

25  doing so; and C, in any event, failed to narrowly tailor

1    those districts to meet whatever state interest defendants

2    or intervenors might identify.

3            The case, we think, is substantially easier and

4    clearer than the recent Page decision which involved the

5    Third Congressional District in Virginia last year before

6    this Court, and that's for two reasons.  First, to the

7    extent that there was any doubt about the controlling

8    legal standards for such a claim, they have been

9    emphatically laid to rest by this Court's decision in the

10   Page case last year and by the Supreme Court's decision in

11   the recently decided case of *Alabama Legislative Black*

12   *Caucus v. Alabama*.

13           There, the Supreme Court made it clear that a

14   legislature may not utilize, and I quote, mechanical

15   racial targets, close quote, in a misguided effort to

16   comply with the Voting Rights Act non-retrogression

17   standard.  That alines precisely with this Court's ruling

18   in Page to the same effect.

19           So that's the first reason, the law is

20   substantially --

21           JUDGE PAYNE:  Is it your view that there was some

22   mechanical formula or figure used?  Is that what you are

23   going to seek to prove?

24           MR. HAMILTON:  Exactly, Your Honor, and that's

25   the second reason why this is an easier and clearer case

1   than Page.  The record before the Court, the delegates,

2   Delegate McClellan, Delegate Dance, and Delegate Armstrong

3   will testify that they were aware and they were told of a

4   55 percent black voting age population threshold or floor

5   that was used in drawing all of the 12 majority/minority

6   districts, and you'll hear during the course of the trial

7   that black voting age population figure repeated over and

8   over again in testimony and in the documents, 55 percent

9   BVAP, B-V-A-P, is how, as you know, Your Honor, is how

10  it's referred to.

11          In addition, the chief map drawer, Delegate

12  Jones, who the intervenors intend to call, himself

13  repeatedly and emphatically articulated that 55 percent

14  BVAP floor in the floor debates before the House of

15  Delegates and in email communications that have been

16  produced during the course of discovery.

17          There are transcripts of several floor debates

18  and a committee hearing that we'll be presenting and

19  putting into evidence in which the delegate, Delegate

20  Jones, is responding to questions on the floor of the

21  House about how it was drawn.  The evidence will show that

22  when requests were made to fix a precinct split or a

23  voting tabulation district split, it was rejected.  Even

24  though the black voting age population resulting from

25  fixing that split would have been 54.8 percent, it was

1    rejected, and the reason given was because it didn't meet

2    the 55 percent target, and that's a quote from the

3    document, and we'll be presenting that in evidence.

4              Two-tenths of a percent was too much, and that

5    demonstrates how the black voting population threshold or

6    floor was used to trump all other considerations.

7              So we think the case is pretty straightforward.

8    The legal standards have been reiterated and clarified,

9    and the record is even clearer and stronger than the

10   record that was before the Court last year in Page.

11             JUDGE PAYNE:  All right.  Judge Lee or Judge

12   Keenan, do you all have any questions for the plaintiff on

13   that topic?

14             JUDGE LEE:  I don't have any questions.

15             JUDGE KEENAN:  I only had one question with

16   regard to the absence of a compelling state interest and

17   in any event no narrow tailoring.  Does the plaintiff

18   intend to present evidence in its case in chief, or is

19   that going to be saved for rebuttal?

20             MR. HAMILTON:  The expert witness -- I mean the

21   answer is, Your Honor, I believe we'll be presenting

22   evidence on that with respect to -- in our case in chief,

23   and this is how it works, or this is how it will be

24   presented, I think.

25             In these cases, often the explanation is -- I

1    think the explanation of the state here for using the

2    55 percent black voting age population is we needed to

3    prevent retrogression, meaning we needed to prevent any

4    retrogression in the ability of the minority community to

5    elect a candidate of their choice, to have opportunity to

6    elect the candidate of their choice, and typically, the

7    way that a state would do that in order to comply with the

8    Voting Rights Act is to conduct a racial block voting

9    analysis in order to determine what level of BVAP, of

10   black voting age population, do we need to have in this

11   district to ensure that the minority population has the

12   opportunity to elect its candidate of choice.

13           And the problem here is that the State did not do

14   a racial block voting analysis, and, of course, that's

15   obvious because they used a single number for 12 districts

16   across the board, and even the defendants -- I'm sorry,

17   the intervenor's own expert will say that he'd be shocked,

18   he'd be surprised if the level of white crossover voting

19   would be the same in all 12 districts such that black BVAP

20   were -- exactly the same for all 12 would have been

21   required.

22           So that's part of our case in chief of

23   identifying -- sort of blowing up -- you can't -- the

24   State cannot point to compliance with Section 5 of the

25   Voting Rights Act as their defense using race.

1          And the other -- the only other explanation

2    they'll come forward with is it was all about politics,

3    and that is not a defense to using race in violation of

4    the 14th Amendment.  That is not a legitimate -- that may

5    be a legitimate purpose in the course of redistricting,

6    but it's not a compelling state interest, and the problem

7    here is that the map drawers used race, not politics.

8          It's a 55 percent black voting age population

9    floor that was used.  They didn't use, you know, some

10   measure of democratic or republican political performance.

11   If they did, that would have been permissible.  That's

12   legal to do, but the 55 percent rule is not 55 percent

13   democratic performance or republican performance.  It's 55

14   percent black voting age population.

15         It's sorting people by the color of their skin.

16   It's forbidden by the 14th Amendment absent a compelling

17   state interest, and part of our case in chief through Dr.

18   Dr. Ansolabehere will be to explain that there was no

19   racially polarized voting analysis done here, and this was

20   not done in an effort to comply with the Voting Rights

21   Act.

22         JUDGE PAYNE:  Does that answer your question,

23   Judge Keenan?

24         JUDGE KEENAN:  Yes, thank you.

25         JUDGE PAYNE:  Do you propose to present, Mr.

1  Hamilton, as a part of your case, an alternative map to

2  show what it would have -- or should have looked like if

3  the proper procedures had been followed?

4          MR. HAMILTON:  Your Honor, it's Mr. Hamilton for

5  the plaintiffs.  We have not -- we have not prepared our

6  own map for use -- or maps from all 12 legislative

7  districts.  We do intend to offer maps that were before

8  the House of Delegates at the time.

9          JUDGE PAYNE:  The things that they had available

10 to them to consider.

11         MR. HAMILTON:  Correct.

12         JUDGE PAYNE:  But you're not offering your own

13 map to show what properly should have been done.

14         MR. HAMILTON:  Correct, Your Honor, we're not.

15         JUDGE PAYNE:  As I understand what you said in

16 discussing your case, you do not intend to take on each

17 district individually, because what you are doing is

18 striking at the one basic point, and that is the

19 application of the 55 percent BVAP figure as a floor, and

20 that permeated and controlled all of the drawing -- the

21 drawing of all the districts that are at issue, and you're

22 not really going to be attacking them district by

23 district; is that correct?

24         MR. HAMILTON:  Not really, Your Honor.  We will

25 be attacking them individually through the use of Dr.

1    Ansolabehere who goes through each individual one.  I

2    think the Court in *Alabama* made it clear, and perhaps

3    that's the genesis of the Court's question, made it clear

4    that you do -- it is a district-specific analysis that's

5    required, and that is exactly what Dr. Ansolabehere will

6    be doing.

7           You are absolutely correct, Your Honor, that the

8    same 55 percent rule is applied to all 12, and that, of

9    course, is a fact that's relevant to each of the 12

10   districts, but in addition, Dr. Ansolabehere is looking at

11   compactness of each of the 12 districts, and he's doing an

12   analysis of the VTD which is the -- or precincts that were

13   moved into and out of each one of the 12 districts in

14   order to analyze both race and politics to answer the

15   question, what's the more powerful explanation for which

16   precincts were included and which precincts were

17   excluded -- is it race or is it politics -- and the

18   conclusion that he comes to is that, by far, race is a far

19   more powerful explanation or predictor for explaining --

20   in other words, you can have similarly situated

21   politically performing districts, and if one is more

22   heavily black than the other, then the black district is

23   more likely included rather than excluded.

24          JUDGE PAYNE:  That's really a rebuttal point,

25   though.  Once they raise the issue of political reasons,

1    if they do that, then you put on your testimony about

2    that's not correct; isn't that how you go about it?

3              MR. HAMILTON:  I think it's an inherent part of

4    our case in chief, Your Honor, that we have to demonstrate

5    that race was the predominant factor in drawing these

6    districts, and one of the pieces of evidence that goes to

7    that point is how those precincts were selected.  I mean,

8    they were selected because of race.  I mean, I think it's

9    necessarily race, not politics --

10             JUDGE PAYNE:  But as to each of the 12 districts,

11   you are saying that the 55 percent is the controlling

12   factor, and the other factors that you are going to

13   discuss through the doctor, whose name has slipped my mind

14   now --

15             MR. HAMILTON:  Ansolabehere.

16             JUDGE PAYNE:  -- is really for the purpose of

17   explaining why race is the predominant question, issue.

18             MR. HAMILTON:  That's right.  That's exactly

19   right.

20             JUDGE PAYNE:  Okay.  How about the defendants?

21             MR. TROY:  Your Honor, Tony Troy.  We believe

22   that the plan is defensible.  I was going to emphasize,

23   but the discussion just verified that each and every

24   district has to be looked at and analyzed, and the

25   defendant intervenors are, I know, going to be presenting

1    evidence on each of those instances.

2           JUDGE PAYNE:  All right.  Mr. Braden.

3           MR. BRADEN:  Your Honor, this case, from our

4    point of view, is very much simply a replay of *Wilkins v.*

5    *West* from ten years ago.  The same attacks were made on

6    the Virginia redistricting plan following the last census.

7           This plan is, in many ways, like that plan except

8    the plan that was adopted following the last census is a

9    plan that is -- the House delegate is more compact.  It

10   doesn't have the contiguousness issues that were present

11   in the other plan, and it had much broader political

12   support.

13          The *Shaw* claim that's being made by the

14   plaintiffs in this case requires that they show that race

15   predominates over all other traditional race-neutral

16   principles for redistricting, that the plan itself is

17   unexplainable other than based upon race.

18          We're going to show the Court the various

19   districts that had been rejected in prior *Shaw*-style

20   litigation, and you'll see that they all involve plans

21   which have districts that, frankly, don't look like

22   districts.  They don't bear any resemblance to any notion

23   of geography.

24          Our intention is to go through district by

25   district and explain why the districts look the way they

1    are.  They are more compact, and, in fact, they are

2    compact as defined under the Virginia constitution.  The

3    Virginia constitution, unlike most states, has a very

4    specific provision about districts being compact and

5    contiguous.

6           The plan adopted by the legislature here clearly

7    meets those requirements as articulated in *Wilkins v.*

8    *West*.  It's a more compact plan, and the contiguous issues

9    that were raised in that litigation, frankly, were solved

10   in this plan.

11          So this is a plan under Virginia law that is

12   compact.  That's the basic principle we're talking about

13   here, that in all the *Shaw* cases is the beginning of the

14   process of an indication of this plan is not explainable

15   under traditional redistricting criteria.

16          So it's our intention simply to go district by

17   district and explain why the lines are drawn the way they

18   are.  The long and short of it is, yeah, is race

19   considered?  Absolutely race is considered, but race does

20   not get you to strict scrutiny unless you have ignored the

21   other traditional redistricting criteria and race is

22   predominant.

23          If race alone, if the consideration of race alone

24   resulted in strict scrutiny, then every single legislative

25   plan in the United States, with the exception of Vermont

1    and Maine, would be subject to strict scrutiny.

2           If you look at *Cromartie*, you look at the whole

3    line of *Shaw* cases which control here, the first step is

4    the plaintiffs have to show that race predominated over

5    all other, all other criteria.  It cannot prove that.  We

6    will walk through -- and that's the reason why we have the

7    architect of the plan.

8           The process of drawing a legislative plan is

9    complex, complex both legally and politically.  So, you

10   know, it's going to be -- we're talking about Delegate

11   Jones being on the stand for a lengthy period of time so

12   you can walk through the process of the line-drawing

13   process, why the districts look the way they do.

14          I hear that they're going to call Delegate

15   Armstrong, the minority leader, and one of the reasons why

16   the plan was drawn the way it was is now Delegate Jones is

17   no longer a member of the legislature.  He lost his seat

18   because of the way the lines were drawn.  He was a

19   minority leader.

20          So what we're talking about here is a process of

21   walking through for the Court why this plan is faithful to

22   a series of criteria which were adopted by the

23   legislature, very specific criteria adopted by the

24   legislature and very traditional.  So we just simply are

25   going to walk through the process and explain to the Court

1   the plans that are being attacked here look nothing like

2   the plans which had been rejected by the Supreme Court in

3   prior litigation.  We don't look anything like those.

4         This is a plan where race was most certainly

5   considered, but that doesn't get you strict scrutiny.  So

6   if you've got the strict scrutiny, we certainly believe we

7   could survive that, too, because it must be a compelling

8   state interest to comply with one-person-one-vote but also

9   to comply with the Voting Rights Act, and in this case,

10  we're not simply talking about compliance for purposes of

11  preclearance under Section 5, but we're also talking about

12  compliance under Section 2.

13        *Thornburg v. Gingles* requires the creation of

14  districts where you have racial block voting present which

15  the history of Virginia certainly is an indication of

16  that.  We have a substantial legislative record where

17  we've gone around the state and gotten testimony.  There's

18  plenty of history of Section 2 litigation in the state of

19  Virginia where they found racial block voting.

20        So there's -- the *Thornburg v. Gingles* series of

21  cases most certainly means that we have to look at

22  discrete minority communities.  If we can draw a

23  reasonable district around them that's reasonably compact

24  and we have racial block voting and polarized voting, we

25  have to create those under Section 2.

1     So we're not only talking here about a compelling

2  interest under section -- to get the plan pre-cleared.

3  We're also talking about the needs of Section 2 to get the

4  plan so we're not in a piece of litigation where the same

5  plaintiffs lawyers we have right now are suing us because

6  we didn't create these districts.

7     JUDGE PAYNE:  Are you going to offer evidence

8  that all that was taken into account in constructing the

9  plan?

10     MR. BRADEN:  Absolutely.  No question about that

11  whatsoever.  We had a series of hearings around the state.

12  The 55 percent number doesn't come from thin air.  It

13  comes from testimony before the House of Delegates.

14  That's to find numbers needed to be able to create

15  functioning minority districts.

16     You know, this litigation -- we should all be

17  very candid.  This litigation is not about representation

18  of the minority community.  The problem the plaintiffs

19  have with the plan is the fact that after the plan was

20  drawn, it had the political effect that people intended it

21  to have.  The vast majority of the incumbents got

22  reelected except for a few democratic white members lost.

23     That's the predominant underlying purpose of the

24  plan.  We shouldn't pretend anything else.  This Court

25  should be well-aware of that.  That's what's going on

1    here.  This plan was drawn for political purposes.  The

2    effect of the plan in the actual following election was

3    just what was predicted was going to happen.

4           So the notion that race predominated simply flies

5    in the face of reality, both the way the plan looks, the

6    way the plan was constructed, the evidence underlying it,

7    and the effect of the plan.  The effect of the plan was

8    some white democratic members of the legislature lost.

9    Has nothing to do with race.  It had a lot do with

10   politics.

11          JUDGE PAYNE:  Are you saying that you're going to

12   offer evidence that the predominate purpose was to knock

13   out some democrats?  Is that what you are saying?

14          MR. BRADEN:  Absolutely.  That was one of the

15   predominate -- the magic word here, a predominate purpose,

16   the predominate purpose of the plan was to maintain the

17   status quo.  That is, in fact -- the recognized purpose of

18   the plan was to maintain the status quo.  Because of

19   population changes, certain districts had to be moved

20   around the state.

21          When you move districts around, there is losers.

22   Republicans were in charge.  The losers were white

23   democratic members, absolutely.  No one should -- we don't

24   need any political scientist from Harvard to tell us the

25   reality of what happened here.  The notion that somehow or

1   another there's some standard use of racial polarized

2   voting, I see no history -- the State of Virginia has

3   submitted a number of plans to the Department of Justice

4   for preclearance.  I can find no record of the State of

5   Virginia hiring a political science professor to do a

6   racial block voting before doing this submission.

7           The record, I believe even in the *Page* case, the

8   *Page* Court recognized that a racial block voting analysis

9   by political scientists was not necessarily better than

10  the elected members from those districts.

11          The 55 percent number comes from members elected

12  from those districts and people who live in those

13  districts as to what was necessary for the minority

14  community to elect their candidate of choice.  It's not a

15  number picked from thin air.

16          JUDGE PAYNE:  All right.  Now, Judge Lee, Judge

17  Keenan, do either one of you have any questions at this

18  point?

19          JUDGE LEE:  I'm ready to hear the evidence in

20  support of oral argument.  I think we've already heard

21  some closing arguments now.  Thank you.

22          JUDGE PAYNE:  We have, haven't we?  I have this

23  question:  What is the significance in the law of saying

24  that the political result, the objective was to knock

25  democrats out of seats?  Does that present a

1    quintessential political gerrymander case that we're

2    dealing with here?  If so, what does that do to the legal

3    construct of the case if we accept that view?  I'm sure --

4           MR. HAMILTON:  Your Honor, this is Mr. Hamilton

5    for the plaintiff.  It's no different than the argument

6    that was advanced in the *Page* case and that's always

7    advanced in the *Shaw* line of cases that it's politics, not

8    race, and that's exactly why courts look to the evidence,

9    and what the Court, the Supreme Court has held in these

10   cases is if you're going to use race, and your explanation

11   for using race is that you need to do it in order to

12   prevent retrogression under the Voting Rights Act, then

13   you have to have a strong basis in evidence for that

14   belief, and the strong basis of evidence typically is a

15   racial block voting analysis, and the absence of doing

16   that makes it awfully difficult for the State to say that

17   we had to do this in order to prevent retrogression in a

18   minority -- to allow -- to prevent retrogression from a

19   minority community's ability or opportunity to elect

20   candidates of their choice.

21          This isn't something that's been made up.  It's

22   in the Department of Justice regulations that were in

23   evidence last year before this Court and will be in

24   evidence again this year in this case.

25          JUDGE PAYNE:  But, Mr. Hamilton, no Court has

1    ever held that a block voting analysis case is the only

2    way to prove what they're proving; is that right?

3          MR. HAMILTON:  Fair enough, but it's certainly

4    not the case that it's the opposite.  It's not the case

5    that a court has ever said, oh, well, we've had some black

6    delegates say I need a higher number of -- again using

7    race -- black voters in my district in order to get

8    reelected.  The constitutional analysis is no different

9    than if you flip that around and you have white delegates

10   saying --

11         JUDGE PAYNE:  I understand.  I just was asking

12   the question if there's a case that I'm unaware of about

13   that, but the question -- I don't recall in *Page* that

14   there was any evidence or that it was the same as what Mr.

15   Braden just said.

16         In *Page*, it was a combination of the political

17   desire plus the traditional voting -- traditional

18   redistricting criteria that the defendants rode as their

19   defense.

20         Here, we seem to be talking about achievement of

21   a particular political result as the predominate purpose,

22   and to my knowledge, the Supreme Court has never upheld

23   political gerrymandering absent some purpose such as to

24   maintain a balance, fair balance or to achieve fairness.

25         That's why I was asking Mr. Braden the question,

1    whether or not that's what he was doing.  So neither one

2    of you see this construct -- this is raising a different

3    issue than is raised in *Page* which is fundamentally what

4    was the predominate purpose, and that's as far as you are

5    going, Mr. Hamilton, and that's as far as you are going;

6    is that correct, Mr. Braden and Mr. Hamilton?

7          MR. BRADEN:  It's our belief that you do not get

8    to strict scrutiny until the plaintiffs prove that the

9    predominant purpose was race.

10         JUDGE PAYNE:  Okay.

11         MR. BRADEN:  Until such time, the Court does not

12   need to consider the issue of strict scrutiny.  It's the

13   wrong construct at that stage.

14         JUDGE PAYNE:  All right, Mr. Hamilton, you're of

15   the same view, that you are trying this in the same mold

16   as *Page*, and your theory is race was the predominant

17   purpose, and there's no part of your complaint that's any

18   different than that; is that right?

19         MR. HAMILTON:  That's correct, Your Honor, and

20   it's very clear from the application of the uniform

21   55 percent --

22         JUDGE PAYNE:  You don't need to make the argument

23   again.  I think, as Judge Lee said, we heard it.  How

24   about these motions *in limine*, have you gotten any notion

25   yet as to whether you're going to have motions *in limine*,

1   how many they're going to be, et cetera?  Mr. Hamilton,

2   how about for the plaintiff?

3          MR. HAMILTON:  Your Honor, we have not finalized

4   a decision on that yet.  I think it's fair to say we are

5   disinclined to be filing any motions *in limine* at this

6   point, but we haven't made a final decision on that.

7          JUDGE PAYNE:  How about you, Mr. Braden, do you

8   see anything yet?

9          MR. BRADEN:  No, we do not.

10          JUDGE PAYNE:  All right.  If you all agree on the

11   exhibits and there aren't any motions *in limine*, we may

12   not need a final pretrial conference or -- we certainly

13   don't need any arguments on motions *in limine*, but maybe

14   we ought to look to setting a date to do that, and we can

15   do that later in just a few minutes.

16          I've done some quick math, and that's not my

17   strongest suit, but I hear, assuming we start at 10:00 and

18   quit at 1:00 and have a break in the middle, and 2:00 to

19   5:00 or thereabouts and have a break in the middle, we're

20   looking at six hours or so, five, six hours of trial time

21   a day.

22          That would mean, under your time estimates, three

23   full days at the low end.  Is that how you people see your

24   case, this case shaping up?  Mr. Hamilton?

25          MR. HAMILTON:  Your Honor, Mr. Hamilton for the

1   plaintiff.  I think that the three days that the Court has

2   scheduled ought to be fine.  I guess the one -- there's a

3   question that's hanging here, and that is, does the Court

4   anticipate either opening statements or closing arguments?

5           JUDGE PAYNE:  I don't know about the rest of the

6   judges, but I don't think any closing arguments are

7   necessary after a three-day trial when you're going to

8   have post-trial briefs keyed to the record on an expedited

9   basis.

10          MR. HAMILTON:  Again, Mr. Hamilton for the

11  plaintiff.  Assuming that there's no closing arguments and

12  that opening statements, which, at least from the

13  plaintiff's perspective, we think would be useful, you

14  know, a 15-minute orientation to the record from each of

15  the parties I think would be useful at the start of the

16  case, but assuming that, I think the three days ought to

17  be plenty of time to try this case.

18          JUDGE PAYNE:  I think in order to achieve that on

19  the schedule we're talking about, which is starting at

20  10:00 and going to 1:00 -- Judge Lee has a docket up there

21  that he's got to take care of, and he's got to do some

22  early work and has to do some evening work in order to get

23  ready for the next morning, et cetera, et cetera, so he's

24  proposed starting at 10:00, and if we go to 1:00 with,

25  say, a 15-, 20-minute break in the middle, that's two and

1   a half hours, and then you do the same thing, take an hour

2   for lunch because it takes awhile to get something to eat

3   up there in Alexandria, another two and a half hours,

4   you're looking at five hours maybe if we go over a little

5   bit or something happens, and it's an appropriate thing to

6   go over, you're looking at maybe five hours and a half or

7   six.

8        You all are going to have to do some real

9   tailoring through your questioning in order to get it in

10  in three days.  I think it is set for three days on the

11  docket; is it not?

12       MR. BRADEN:  I believe that to be the case, that

13  it's set for three days.  From our perspective, Your

14  Honor, I think you correctly perceived three days will be

15  extremely difficult.  I hate to be the person suggesting

16  lengthening it, but I have serious doubts as to whether we

17  can do it in three days.

18       The Supreme Court did require us to look at each

19  district, and from our perspective, looking at each

20  district frankly involves looking at the districts that

21  are surrounding it, too, to really understand why they

22  were drawn.  It's a long narrative for this plan, and it

23  has a lot of --

24       JUDGE PAYNE:  Well, it is, but I also note that

25  you have two experts talking about the same topic, and

1   that's drawing plans, and I don't understand -- ordinarily

2   in this district it's one expert per topic.

3          So why is there any overlap there with Mr.

4   Hofeller and Mr. Hood?  Maybe I just didn't understand

5   exactly what the scope of their testimony was, but we

6   don't need to hear from two experts on the same topic, I

7   don't think.

8          MR. BRADEN:  Your Honor, Mark Braden.  I believe

9   they are actually talking about slightly different topics.

10  We can most certainly -- there is some overlap in their

11  reports, and we can most certainly limit the experts to

12  only talk about the parts of their report that are

13  separate in analysis, Your Honor, but I do think that

14  Jones's testimony is likely to -- given the fact that he's

15  going to have to go through in some very substantial

16  detail the key here is we are -- he is going to have to

17  talk about 12 districts and then the districts that

18  surround them, and we have an expert report on the other

19  side saying, well, these statistics tell us X.

20         Unfortunately, from our viewpoint, to make our

21  case, Delegate Jones is going to say, no, really the

22  reason why we did this particular VTD is because the

23  incumbent member from the other district lives there.  The

24  problem we have with the plaintiff's expert report is the

25  plaintiff's expert, in fact, knows nothing other than the

1    numbers about the state.

2         JUDGE PAYNE:  You don't need -- I understand

3    that.  The point is -- Judge Lee and Judge Keenan can

4    weigh in about whether they think we need any duplicate

5    testimony by experts on the same topics.  I know both of

6    them are pretty -- pay attention to the record pretty well

7    when they're trying cases.  Do you share my apprehension

8    about overdoing the experts on the same topics?

9         JUDGE LEE:  I'm not sure -- I'm sure that we will

10   all be very hypersensitive to duplicative testimony, but I

11   think the way it's been described, some of it may be

12   necessary from the standpoint of particular districts and

13   the expert's opinion, but I think we can monitor that, and

14   the three of us will be able to be -- and the lawyers will

15   be able to focus that aspect of it.

16        I do have a concern that's been raised, and that

17   is whether or not three days is really enough to do all

18   the things you are talking about given the number of

19   experts, and one of the questions I had is whether you

20   would limit the examination of the witnesses by each side.

21   That's probably not possible in a case like this.  That is

22   my observation.

23        JUDGE PAYNE:  You think it's not possible?  Is

24   that what you said?

25        JUDGE LEE:  I don't think it is possible to tell

1   in advance how much time each plaintiff gets or defendant

2   gets on cross or direct, because you don't know what they

3   need to prove.  I don't know.

4          JUDGE PAYNE:  Let's assume it's necessary to go

5   over.  You have a full docket, Judge Lee, on the 10th of

6   July.  That would mean going to the next week, or you'd

7   have to change your docket.

8          JUDGE LEE:  Well, I didn't want to do this on the

9   phone with you.  I'm open to doing what you need to do,

10  and that is if that's carry over to the 13th, if I know

11  now, I can make some arrangements for that.

12         JUDGE PAYNE:  Well, that's what I'm doing, saying

13  I don't know -- I think maybe if we really think that it's

14  going to take an extra day, we ought to reserve that day

15  now so we are all on each other's dance card, and I don't

16  know what anybody's schedule is at this juncture, but,

17  Judge Keenan, if we had an extra day, would your

18  preference be Friday, the 10th, or Monday, the 13th?

19         JUDGE KEENAN:  It would be Friday, the 10th, but

20  I'm available either day, so I would leave it to you,

21  Judge Payne and Judge Lee, regarding your trial schedules.

22         JUDGE LEE:  If it's not terribly inconvenient,

23  the Friday docket that we have, I have to move.  I've been

24  out for several weeks, so if I could have my Friday

25  docket -- I could work Friday afternoon and work from 2:00

1    until 6:00 if you need that on Friday, if you needed to do

2    that, and then Monday, but I want to have from 8:00 to

3    1:00 to do my civil and criminal docket if possible.

4          JUDGE KEENAN:  I think we're asking too much of

5    you, Judge Lee.  It seems to me that you don't need to

6    pile on top of that on Friday afternoon.

7          JUDGE PAYNE:  I agree with that, and I think in

8    addition to that, what may happen is we may not even be

9    finished.  I think it's better to let you all regroup and

10   sort yourselves out so you can definitely be finished.

11   I'll have to make some changes for July 13th, but I can do

12   it.  Can you do it, Judge Keenan?

13         JUDGE KEENAN:  Absolutely.

14         JUDGE PAYNE:  Then that will be the flow-over

15   day, but I think if you are careful, Mr. Braden, in

16   avoiding duplication of testimony with your experts -- the

17   way you sounded when you were describing them, there seems

18   to be some fair overlap, but each of them is addressing

19   some component of the traditional redistricting plan or

20   criteria, so maybe you could confine them to discrete

21   areas and not have them overlap and talk about the same

22   things that the other one has talked about.

23         MR. BRADEN:  Absolutely, Your Honor.  We'll take

24   your direction on that and most certainly attempt to

25   tailor their direct testimony in that way.

```
 1              MR. TROY:  Your Honor, this is Tony Troy.  Would
 2    it -- if we adjourned at 6:00 on the three days rather
 3    than 5:00, would that, do you think, accommodate everyone?
 4              JUDGE PAYNE:  Well, I think this is -- to tell
 5    you the truth, before Page, I would have said yes.  This
 6    is pretty dense stuff, frankly, and I think it's a little
 7    hard to take it all in and deal with it if you sit too
 8    long during the day, and I think Judge Lee has dockets at
 9    nine o'clock every morning, don't you, Judge Lee?
10              JUDGE LEE:  I do, and a docket on Friday to
11    prepare for, so I have other things to do.
12              JUDGE PAYNE:  So between 5:00 and 6:00, he's not
13    going out and having a drink, in other words.
14              JUDGE LEE:  Right.
15              MR. TROY:  That was Mark Braden who made that
16    suggestion, not Tony Troy.
17              JUDGE PAYNE:  Oh, okay.
18              JUDGE LEE:  Thank you for that.
19              JUDGE PAYNE:  Opening statements, you started
20    that.  How long -- you will have pretrial briefs, won't
21    you?
22              MR. HAMILTON:  We will, Your Honor.
23              JUDGE PAYNE:  So how long an opening statement do
24    you think you need?
25              MR. HAMILTON:  Ten to 15 minutes, Your Honor, to
```

1  orient the Court.

2        JUDGE PAYNE:  Mr. Braden?

3        MR. TROY:  Your Honor, we probably would take

4  five minutes to articulate our position, no more.

5        MR. BRADEN:  And, Your Honor, it's our view that

6  ten to 15 would be sufficient given the briefing.

7        JUDGE LEE:  I'll remind you that brevity is the

8  hallmark of great advocacy.

9        JUDGE PAYNE:  Do we need a separate order on

10 that?

11       MR. HAMILTON:  If I can make one other suggestion

12 with respect to the length of the trial, and I brought

13 this up with Mr. Braden before and I do not think we have

14 agreement on it, but in other trials where we're pressed

15 for time, I've seen courts utilize a chess clock where you

16 take the available time that is available to both the

17 parties, split it evenly, and charge the party who is on

18 their feet talking with the time.  So I would be charged

19 for direct examination of my own witnesses, Mr. Braden or

20 whoever would be charged for the cross-examination of my

21 witnesses, and then the reverse would be true during his

22 case, and that would be a fair way to allocate whatever

23 limited time we've got and force the parties to

24 concentrate on presenting their case efficiently.

25       JUDGE PAYNE:  I have used that before, but I

1   think Judge Lee said he thought this may be a difficult

2   case in which to operate in that fashion.  Did I mishear

3   that?

4              JUDGE LEE:  That's what I said, but I guess my

5   question would be to plaintiff's counsel, if you knew

6   starting on Tuesday that you had to be done by Wednesday

7   at lunch, could you do that?

8              MR. HAMILTON:  Well, I certainly could.  The

9   problem is the length of the cross, but, you know, a day

10  and a half is easy from my perspective as long as we have

11  pretrial briefs which we do, we have stipulation on the

12  evidence and we're not chewing up a lot of trial time

13  arguing about admissibility of materials which I don't

14  think I'll have that problem, but putting on our direct

15  evidence, I think, especially in light of this discussion,

16  we will do the best we can to be succinct, organized, and

17  as direct as we can, but, yeah, a day and a half.

18             That's the reason why I said, I think, three days

19  ought to be plenty, and I don't think that the

20  cross-examinations, honestly, should -- in other words,

21  the direct of the plaintiff and cross-examination of the

22  plaintiff ought to be able to happen in a day and a half,

23  and I think the reverse is true as well as during the

24  defense and intervenor's case.

25             JUDGE LEE:  The defense is going to be charged

1   with their time on cross, because their cross is really

2   going to be substantive evidence anyway as well as

3   whatever witnesses they call, so I think if we make that a

4   target with the idea that unless there's some really good

5   reason beyond that by lunchtime on the 8th, plaintiff

6   ought to be done.

7        MR. HAMILTON:  And there is an additional reason

8   here that I feel compelled to say, and that is my

9   co-counsel, Mr. Spiva, who is on the phone here, is in

10  trial, has a trial starting in North Carolina on that

11  Monday, the 13th.

12       JUDGE PAYNE:  Mr. Braden, that would mean, if

13  it's three days, you get a day and a half.

14       MR. BRADEN:  Yes, Your Honor, and, again, I hate

15  to be the one putting the fly into the soup or whatever

16  here, but I do believe our case is likely to take longer

17  than their case.  Delegate Jones is going to be a very

18  lengthy testimony before we get to direct.

19       We will have to walk through each district, and

20  each district will entail a discussion of most of its

21  boundaries, because they are alleging -- the only way we

22  can respond to it is to explain to the Court exactly why

23  this piece went that way and that piece went that way, and

24  that's an involved process, because it's not -- it is --

25  this is legislation, and we're going to have to go down

1    and look at which pieces go in which places to explain to

2    the Court that this was a political process, not this sort

3    of simple, you know, black people go here, white people go

4    there.  That was not the process.  It was much more

5    complex.  That is a more lengthy discussion than simply an

6    expert witness telling you what the numbers are.

7          So I think a day and a half, although we will do

8    whatever the Court directs, I think it is likely going to

9    be difficult for us to get our witnesses on in that time

10   frame.

11         JUDGE PAYNE:  Maybe the judges ought to talk

12   about this after having heard from both of you and decide

13   which way to go.  I gather from what you are saying you do

14   not -- and from what Mr. Hamilton said, that you do not

15   favor a clock approach.

16         MR. BRADEN:  I do not, because I think our case

17   involves a longer period of time.

18         JUDGE LEE:  Counsel, do you think it is going to

19   take you two and a half days?

20         MR. BRADEN:  I think it will take us two days.  I

21   think it could be done in two days, but I don't think it

22   can be done in a day and a half.

23         JUDGE LEE:  I had that impression.  Sounds like

24   you need two, two and a half.  That's fine.  We can have a

25   conversation offline, Judge Payne.

1          JUDGE PAYNE:  All right.  We'll let you know

2    right away.  Are you going to be, either one of you, using

3    deposition testimony?  Mr. Hamilton?

4          MR. HAMILTON:  Your Honor, we don't anticipate

5    putting in deposition testimony directly except we may be

6    using it, of course, for impeachment in cross-examination,

7    but otherwise, if we do, we would propose submitting it in

8    written form.  We have no intention of reading deposition

9    testimony to the Court.

10         JUDGE PAYNE:  I understand, but also that raises

11   the question about whether there are objections to it and

12   how to accomplish that.  So you need to fish or cut bait

13   fairly quickly about whether you're going to use

14   deposition testimony.  If you are, we need to make sure we

15   have the objections to it straightened out and a way to

16   rule on what comes in.

17         How about you, Mr. Braden, are you contemplating

18   the use of any -- or Mr. Troy, the use of any deposition

19   testimony in your case other than --

20         MR. BRADEN:  This is Braden, and the answer is

21   no.

22         MR. TROY:  This is Tony Troy, and the answer is

23   no.

24         JUDGE PAYNE:  So that doesn't look like it's an

25   issue.  Of course, in impeachment, you're welcome to use

1    whatever you need.

2          Intended use of the court's evidence presentation

3    system, do either one of you want to do that?  If you do,

4    we need to make sure you know how to use it.

5          Judge Lee, I don't know how you do it, but we

6    have them come a day beforehand and make sure they know

7    how to use it working with our IT people.  Is that what

8    you do up there?

9          JUDGE LEE:  Yes.  The person they need to call is

10   Lance Bachman.  He is our courtroom IT coordinator.  He

11   will set up training and schedule your training.  If you

12   have IT professionals who will be presenting your

13   electronic evidence, have that person come up, and make

14   sure you have duplicate systems.  That is to say if you

15   have one laptop and it goes down, we will keep going, so

16   you need to have a duplicate of whatever you present.

17         If you all have any PowerPoints or slides or

18   things like that, make sure you have three color copies

19   for each of the judges in addition to what you present

20   visually.

21         JUDGE PAYNE:  On the topic of exhibits --

22         JUDGE LEE:  I'm sorry.  They should have -- wait

23   a minute.  You should have at least six copies of whatever

24   it is you present for the law clerk and the judge.

25         JUDGE PAYNE:  All right.  And on the exhibits, we

1    need exhibit notebooks.  Do you have any idea at this

2    juncture what the volume of exhibits are, Mr. Hamilton --

3    I'm hoping you can consolidate them and make them a

4    unified set for the most part.  What are you looking at

5    right now?

6         MR. HAMILTON:  We anticipate -- I apologize for

7    the large range, but somewhere in the 100 to 150 exhibits,

8    but one of the exhibits, for example, is the Virginia

9    submission to the Department of Justice for preclearance

10   of these plans, and that's a really lengthy document.

11        So what we're intending to do is actually break

12   it up into multiple smaller exhibits so that it's easier

13   to use in trial, and it's easier for the Court to

14   understand which part of this massive document is relevant

15   to the issues before the Court.

16        JUDGE LEE:  Let me jump in one second.  The same

17   is true for exhibits.  You have to have a set for the

18   judges and the law clerks to look at.

19        JUDGE PAYNE:  And, of course, the witness.  The

20   other thing that you need to think about and work with,

21   perhaps you work with Judge Lee's courtroom deputy, but

22   getting that volume of documents into the courtroom and

23   available to the judges is something you need to focus on

24   so that it can be -- we won't spend a lot of time passing

25   documents around.

1         Typically, you'll need to make sure there's some

2    bookcases up there, small bookcases for the judges on the

3    bench so that we can handle the number of documents that

4    we have to handle.  If you have a large volume of

5    exhibits, and right now it's a little premature to ask

6    that, to ask you to give any answers to that with any

7    accuracy, but as you get closer to trial, you're going to

8    have to focus on how to get that accomplished, because

9    you're going to have three sets of exhibits up on the

10   bench, then three law clerks who will have desks, and then

11   you've got one for your witness and whatever you've got

12   for the other side and yourself.

13        That's a lot of documentation, so you need to

14   work with Judge Lee's -- is that how you do it, Judge Lee,

15   is have your courtroom --

16        JUDGE LEE:  Yes, you can contact chambers.  My

17   law clerk's name is Avier Gaitan.  Avier will be able to

18   coordinate with you, because my courtroom deputy will be

19   able get you in the courtroom and you all can set things

20   up, and hopefully we can -- if you're using electronic

21   evidence, that will make things go faster from the

22   standpoint of some of this.

23        I'm sure some of the judges will prefer to see

24   the documents themselves, but if you can put some of this

25   electronically, it may go faster, too.

1          JUDGE PAYNE:  It's one thing to read it in the

2    courtroom.  It's another thing to mark it up and take it

3    back home with you, because we're not going to have all of

4    what the courtroom has.

5          Let's go ahead and try to get a date for a

6    hearing on motions *in limine*.  What's the order say about

7    when those things are due now?  What did we do on that

8    order?

9          MR. HAMILTON:  File by June 9th, Your Honor.

10   This is Mr. Hamilton.

11         JUDGE PAYNE:  All right.  So why don't we --

12   maybe the judges can talk.  The way we did it in *Page* is

13   one of the judges -- in that case I happened to be the

14   designee -- dealt with the motion *in limine* unless we

15   thought it was something that all three of us, after

16   having had a chance to read it, needed to sit on.  Would

17   you all like to follow the same procedure?

18         JUDGE KEENAN:  As to the judges, Judge Payne?

19         JUDGE PAYNE:  Yes.

20         JUDGE KEENAN:  That's fine.

21         JUDGE LEE:  Judge Payne, I'm fine with that, too.

22         JUDGE PAYNE:  I'll put it on my calendar, and

23   then I'll be responsible for communicating with the other

24   judges once you file these things if there is anything,

25   and you're going to have them filed by the 19th, so I

1  would say the 24th or the -- I would say maybe the 24th in

2  the afternoon at 2:30.  Any reason you can't do that?

3          MR. HAMILTON:  No objection to that date, Your

4  Honor.

5          MR. BRADEN:  No objection.

6          MR. TROY:  Your Honor, Tony Troy.  We're not

7  filing any, so obviously no objection.

8          JUDGE PAYNE:  That will be the date for the

9  motion *in limine* if we need it.  And then your trial

10  starts the day after the -- two days after the holiday, so

11  final pretrial conference if we need one, I don't know --

12  it turned out in *Page* we really didn't need anything.

13          I'm not sure exactly what we're going to be doing

14  in the final pretrial conference, but I suppose it could

15  be objections to exhibits is about all I know.

16          JUDGE LEE:  I think we can go forward without a

17  final pretrial.  Objections to exhibits, I think we can

18  probably handle them in due course if we need to without

19  having to elongate it.  I don't need another pretrial

20  after this one.

21          JUDGE PAYNE:  All right, Judge Keenan?

22          JUDGE KEENAN:  That's fine.

23          JUDGE PAYNE:  Okay.  If there are any objections,

24  we'll resolve them at trial or tell you before the trial,

25  because they'll all be in writing anyway.  So we won't

1    need any other conference.  Is there anything else that

2    anybody needs to take up?

3           MR. BRADEN:  Your Honor, I'm assuming that the

4    trial, the pretrial brief will be limited to 30 pages?

5           JUDGE LEE:  30 pages, that's right, and that's

6    plenty.

7           JUDGE PAYNE:  I don't know that we need any more

8    than that.

9           MR. BRADEN:  I'm not suggesting that.  I just

10   wanted to confirm it.  So thank you, Your Honors.

11          JUDGE PAYNE:  Anything else that Judge Keenan or

12   Judge Lee need to take up?

13          JUDGE KEENAN:  No, thank you.

14          JUDGE LEE:  No, thank you.

15          JUDGE PAYNE:  We need to -- the judges need to

16   focus on the trial date, or are we satisfied that we will

17   carry to the 10th if we need or whatever that day, the

18   13th?

19          JUDGE LEE:  I'll make arrangements to carry to

20   the 13th.

21          JUDGE PAYNE:  All right.  Is that all right with

22   you, Judge Keenan?

23          JUDGE KEENAN:  Yes, it is.

24          JUDGE PAYNE:  Why don't we plan this, folks, and

25   then we won't have to have any more calls.  If there's a

1    need for a carryover day, it will be the 13th.  Counsel,

2    do you have anything?  Nobody.

3            MR. HAMILTON:  No, Your Honor.

4            JUDGE PAYNE:  Thank you very much.  We look

5    forward to working with you.

6            JUDGE KEENAN:  Thank you, Judge Payne.

7            JUDGE LEE:  Thank you all, counsel.

8

9            (End of proceedings.)

10

11

12        I certify that the foregoing is a correct

13   transcript from the record of proceedings in the

14   above-entitled matter.

15

16

17   _____/s/_____          _____

     P. E. Peterson, RPR          Date

18

19

20

21

22

23

24

25