IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(RICHMOND DIVISION)

GOLDEN BETHUNE-HILL, *et al.*,

      Plaintiffs,

      v.

VIRGINIA STATE BOARD OF
ELECTIONS, *et al.*,

      Defendants.

Civil Action No. 3:14-cv-00852-REP-GBL-BMK

## DEFENDANT-INTERVENORS' PRE-TRIAL BRIEF

E. Mark Braden (*pro hac vice*)
Jennifer M. Walrath (VSB No. 75548)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates
and Virginia House of Delegates Speaker
William J. Howell*

# TABLE OF CONTENTS

Facts ............................................................................................................................2

    A.  The House Begins New Redistricting Cycle ...................................................5

    B.  The Black Caucus Members Play a Lead Role in Crafting the
        Plan ...........................................................................................................8

    C.  No Alternative Plan Meeting the Criteria Is Proposed ...............................11

    D.  The Plan Passes Overwhelmingly and Is Precleared by DOJ ....................12

    E.  The Plan Implements Traditional Redistricting Principles .........................14

Argument ...................................................................................................................22

    I.   Plaintiffs Cannot Meet the High Burden Required for Strict
        Scrutiny To Apply Under *Shaw* ...............................................................22

    II.  There Is a Strong Basis in Evidence To Show That the Plan Is
        Narrowly Tailored To Comply with Sections 2 and 5 of the
        Voting Rights Act ......................................................................................28

Conclusion ................................................................................................................30

In *Wilkins v. West*, 264 Va. 447 (2002), the Virginia Supreme Court rejected a racial gerrymandering "*Shaw*" challenge to multiple districts in the 2001 House of Delegates redistricting plan (the "2001 Plan"), including the same numbered Districts challenged in this case (the "Challenged Districts"). The Court found that race was not the predominant motivation for the 2001 plan, given the numerous other factors that guided the legislature.

In 2011, the legislature made changes to the 2001 Plan in light of significant population shifts in Virginia. The legislature used essentially the same criteria that guided it in 2001. The 2011 House plan (the "Plan") is at least as compact, preserves communities of interest to the same degree, and respects other redistricting criteria to a greater extent than the 2001 Plan ratified in *Wilkins*. In fact, the legislature resolved district specific irregularities that were criticized in the 2001 Plan. Besides implementing the other traditional criteria, the Plan's architect, Delegate Jones, made incumbent protection and continuity of representation a priority. However, whenever there are substantial population shifts in a state, some incumbent members in any new plan will lose their seats, open seats will be created, and some will be paired in districts with other members. Democratic members bore the brunt of the changes necessitated by the continued population shift to northern Virginia. Still, the Plan passed with an overwhelming vote that included a majority of the Republican, Democratic and Black Caucus members. Why? Because the Plan was crafted to address the concerns of individual members and the communities they represent, an impossible task if race was the predominant factor.

The House now finds itself defending this Plan from the same arguments rejected in *Wilkins*. The redistricting process is political. Plaintiffs are unhappy with recent election results because too few Democrats won. Because there is no plausible claim based on the predominant considerations of electoral and legislative politics, Plaintiffs have framed their lawsuit as a

1

"*Shaw*" racial gerrymander claim. But consideration of race does not invalidate a plan. Race was *a* factor in drawing the Challenged Districts because it had to be: federal law—including the Voting Rights Act—is supreme. If that alone were the basis for applying strict scrutiny, every legislative plan, except possibly those in Vermont and Maine, would be constitutionally suspect. Because the Plan lacks any of the truly bizarre districts, the hallmark of "*Shaw*" claims, Plaintiffs cherry-pick facts, obfuscate on objective measures of compactness, and offer flawed statistical analyses in an effort to meet their heavy burden of showing that race predominated over all other factors in any district. As will be shown at trial, numerous other redistricting criteria shape the Plan and the challenged districts. Plaintiffs' challenge should be rejected, as it was in *Wilkins*.

## FACTS

The Virginia constitution vests all "legislative power" in "a General Assembly, which shall consist of a Senate and House of Delegates." Art. IV, Sec. 1. The House consists of one hundred Delegates, who are elected from "electoral districts established by the General Assembly." Va. Const. Art. II, Sec. 6. Districts are redrawn every 10 years. *Id.*

In redistricting, all state legislatures are bound by "two overarching conditions": (1) the equal representation standard under federal law and (2) the mandates of Sections 2 and 5 of the Federal Voting Rights Act, which prohibit dilution or diminution of the ability of minority groups to elect their preferred candidates of choice. *Jamerson v. Womack*, 244 Va. 506, 511 (1992); *accord Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1270 (2015). These conditions are "part of the redistricting background, taken as a given" in reapportionment. *See Alabama*, 135 S. Ct. at 1270. Additionally, the Virginia constitution requires that each district must be "composed of contiguous and compact territory" and must be drawn to give "as nearly as is practicable" equal representation to Virginia citizens. Va. Const., Art. II, Sec. 6; *see also*,

*e.g.*, *Jamerson*, 244 Va. at 514; *Wilkins*, 264 Va. at 461-64.

Additionally, all redistricting in Virginia occurs against the backdrop of Virginia's "history of public racial discrimination," including literacy tests, poll taxes, separation of candidate names by race on ballots, segregated schools, racial segregation, and a bar on interracial marriage. *See, e.g.*, *Neal v. Coleburn*, 689 F.Supp. 1426, 1428 (E.D. Va. 1988). Virginia government entities are frequently sued under Section 2. One example is *Henderson v. Board of Supervisors of Richmond County*, 1988 WL 86680, at *7-8 (E.D. Va. 1988), where this Court found Richmond County liable under Voting Rights Act Section 2 because the plan allowed the black population in a cohesive majority-minority district to fall to 63.1 percent from above 65 percent. Similarly, this Court in *McDaniels v. Mehfoud*, 702 F.Supp. 588, 591-96 (E.D. Va. 1988), held Henrico County liable under Section 2, finding, *inter alia*, severe racial bloc voting, a history of discrimination, discrimination in government services, and minimal representation in public office. *See also Collins v. City of Norfolk*, 883 F.2d 1232 (4th Cir. 1989).

Besides Section 2, Virginia was—until the Supreme Court's 2013 decision in *Shelby County v. Holder*—subject to Voting Rights Act Section 5, which required it to submit changes in voting laws to the U.S. Department of Justice ("DOJ") for preclearance or to file a declaratory judgment action in federal court. 52 U.S.C. § 10304. The burden was on Virginia to prove "the absence of discriminatory purpose and effect." *Pleasant Grove v. United States*, 479 U.S. 462, 469 (1987). In 2006, Congress amended Section 5 to adopt the position of Justice Souter's dissent in *Georgia v. Ashcroft*, 123 S. Ct. 2498, 1529 (2003), that Section 5 prohibits a covered jurisdiction from leaving "minority voters with less chance to be effective in electing preferred candidates than they were before the change." *See Alabama*, 135 S. Ct. at 1273

Over the past four decades, DOJ has objected to numerous Virginia redistricting plans submitted for preclearance, repeatedly citing "persistent and severe polarization along racial lines," a pattern it found at times "ha[d] intensified" from previous submissions.[1] Ex. 1, DOJ Voting Determination Letter ("DOJ Letter") (June 20, 1994); Ex. 2, DOJ Letter (Feb. 16, 1993). *See also, e.g.*, Ex. 3, DOJ Letter (May 19, 2003), Ex. 4, DOJ Letter (Apr. 29, 2002); Ex. 5, DOJ Letter (Sept. 28, 2001). One example is DOJ's 2002 objection to a board-of-supervisors redistricting plan in Cumberland County that had reduced the Black Voting Age Population ("BVAP") in a majority-minority district from 55.7 percent to 55.2 percent. Ex. 6, DOJ Letter (July 9, 2002).

The Challenged Districts evolved in this context. In 1981, DOJ objected to the newly passed House of Delegates plan because districts covering Southside Virginia (including Brunswick, Greensville, Sussex, Surry, Nottoway and Dinwiddie Counties) drew multiple majority-black counties into majority-white districts. Ex. 7, DOJ Letter (July 31, 1981). The House responded with a new plan, but that plan was rejected by this Court on population-inequality grounds in *Cosner v. Dalton*, 522 F. Supp. 350 (E.D. Va. 1981). The House passed yet another plan, and DOJ objected again, this time to districts in the Tidewater region, asserting that the use of multi-member districts would dilute black voting power where "a fairly apportioned plan of single member districts would provide for two districts with substantial black majorities." Ex. 8, DOJ letter (March 12, 1982). Then, in 1991, DOJ objected to the House redistricting plan passed that year because it submerged a compact 4,000-member black community in Charles City County into a majority-white district, when it could be drawn into the majority-black districts in the Richmond area. Ex. 9, DOJ Letter (July 16, 1991).

---

[1] DOJ Voting Determination Letters for Virginia are also available at http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=va.

Since 1991, Virginia House plans have included 12 majority-minority districts (the Challenged Districts): two in Southside (HD63, HD75), six in Tidewater (HD77, HD80, HD89, HD90, HD92, HD95), and one (HD74) connecting Charles City County to the Richmond suburbs. The other three cover the Richmond area (HD69, HD70, HD71). In *Wilkins v. West*, 264 Va. 447 (2002), the Virginia Supreme Court upheld all of these districts against claims that they were racially gerrymandered. Déjà vu, they are all challenged again here.

A.     **The House Begins New Redistricting Cycle**

Virginia's House districts had to be redrawn in 2011. Va. Const. Art. II, Sec. 6. Virginia is unusual in that it conducts elections in odd-numbered years, including for all House seats. The time frame for assimilating the census data, drawing and passing a redistricting law, and obtaining preclearance is "very, very tight," the shortest of any state. Ex. 10, Public Hr'g Tr. 5-6, Dec. 2, 2010. DOJ was permitted 60 days to review preclearance submissions, and it spent 59 days for that review in 2001. *Id.* at 6. Primaries in Virginia are typically scheduled for June.

On February 3, 2011, the federal government released the census counts for Virginia, the first release of the 2010 data. Portions of that data were erroneous. The Census Bureau required an additional two weeks to make official notification of the error and partial corrections. Because the data were released toward the end of the regular legislative session, a special session was called, requiring the part-time Delegates to remain in Richmond to work on the new districts.

Growth was uneven across Virginia, and all districts had to be reworked due to a general trend of higher population growth in northern Virginia compared to other areas. Population deviations ranged from 19.9 percent below the ideal of equal population, to 138.3 percent of the

ideal. Hood 3.[2] Most Challenged Districts lagged in population, and altogether they "only contained enough population to draw 11 districts." Hofeller ¶ 68.

The House of Delegates Committee on Privileges and Elections (the "Committee") was responsible for managing the redistricting process and evaluating redistricting plans. The Committee conducted two rounds of public hearings statewide: one prior to the release of census data and another after that release. Hearings were conducted statewide, including in Roanoke, Norfolk, Fairfax County, Danville, Fredericksburg, Richmond, Hampton, Leesburg, and Abingdon , among other places, with some localities holding more than one hearing. Hearings were attended by Committee members and other Delegates, who received comments from residents and local officials. Some meetings were conducted jointly with the Virginia Senate. Public comments also were submitted to the Committee by e-mail.

Delegate Chris Jones, a Republican from Suffolk (HD76), was a Committee member and chaired a joint reapportionment committee that also included Senate members. Other Committee members included Black Caucus leaders Lionel Spruill (HD77) and Rosalyn Dance (HD63).

In March 2011, The Committee adopted a list of criteria for redistricting. The resolution is similar to those used for past Virginia House plans, including the 2001 Plan. *See Wilkins*, 264 Va. at 468 n.7; *Jamerson*, 244 Va. at 512. The first criterion was compliance with a "one-person-one-vote" deviation of plus-or-minus one percent from perfect equality. *See* Ex. 11, House Committee on Privileges and Elections Committee Resolution No. 1 – House of Delegates District Criteria ("Committee Resolution"). The second criterion was compliance with the Voting Rights Act and the U.S. Constitution. The requirement included no numerical threshold for BVAP in any districts. Additionally, since states may not choose whether or not to comply

---

[2] Cites to "Hood," "Hofeller," "Katz," and "Ansolabehere" are to the respective expert reports of those individuals, submitted to the Court during the week of June 15, 2015.

with federal law, *see* Const. Art. VI, Par. 2, the first two criteria were controlling in the event of conflict, *see Jamerson*, 244 Va. at 514. The third criterion required districts to be contiguous and compact as defined by Virginia law. The fourth criterion required that all districts be single-member districts. The fifth criterion adopted the custom of protecting communities of interest, which incorporated considerations including "incumbency protection."[3]

Politics played a key role in the Plan. The Republican Party held a strong majority of House seats. Per request of House leadership, Jones took responsibility for crafting a Plan that would be accepted by as many Delegates as possible. He was assisted by consultant John Morgan. They prepared for this process in 2010 before the census release with workshops and research, and they obtained the most commonly used redistricting mapping software, "Maptitude." Jones devoted hundreds of hours to the process. He met with most Delegates, including Delegates from the Challenged Districts, some on multiple occasions. Delegates made requests, inquiries, and suggestions about their district, and some played an active role in drawing lines. Jones consulted with legal counsel with redistricting experience and expertise.

Jones and others involved in the process also benefitted from a wealth of statistical information, including information on voting patterns in the Maptitude system and in the possession of the Virginia Division of Legislative Services ("DLS"). DLS information could be accessed by all Delegates in the DLS office through another software package, AutoBound. Delegates who had redistricting requests for Jones were able to visit DLS, review a copy of the draft map, enter changes to propose to Jones, and review the effect of those changes as to a number of political and demographic categories.

The DLS software however, expressed BVAP differently from Maptitude, the most

---

[3] Unlike the 1991 House criteria, the 2001 and 2011 criteria provided that precincts lines would be entitled to no greater weight than other communities of interest. Committee Resolution.

widely used software designed exclusively for redistricting. Maptitude includes a demographic field termed DOJ Black VAP ("DOJ Black").[4] The census has numerous ethnic and racial data fields from the individual self-designation responses. DOJ Black is calculated by combining the two-question census format and is comprised of non-Hispanic single-race Black and non-Hispanic multi-race Black and White. The DLS system's Black VAP includes Hispanic Black responses, and thus, in the DLS numbers, some individuals are counted twice, meaning that the total population figures for districts will exceed 100 percent of the actual population. DOJ Black does not count anyone twice. DLS therefore reported a different calculation of BVAP than Jones used on his system for drafting. The DLS Black VAP figure is higher than DOJ Black. Most Delegates, assisted by DLS, were using the DLS—not the DOJ—calculation in plans, discussions, and floor speeches.[5]

However, Jones and Morgan had access to DOJ Black figures through Maptitude and used those figures in originally crafting the Plan, since DOJ would evaluate the plan using DOJ Black. Thus, when a given Delegate proposed a change to the Plan via the DLS software, Jones and the Delegate would have a slightly different understanding of how the change affected BVAP in a given district. Jones's understanding of the base number for the review to be conducted by DOJ was informed by the overstatement of the DLS BVAP number.

**B.    The Black Caucus Members Play a Lead Role in Crafting the Plan**

Delegate Jones worked closely with leaders in the Black Caucus in drawing the Plan, including Black Caucus leader Delegate Spruill. "[M]ostly every member of the Black Caucus"

---

[4] The Maptitude field name is NH18+_DOJ_Blk:Race (non-Hispanic, Age 18+): DOJ Summary: Black (including Black and White)|2000 PL94-171:P0040006 + P0040013.

[5] For a comparison of the DLS and DOJ BVAP figures, refer to Exs. 12 and 13, Black BVAP Percentages as reported by DLS and as calculated by DOJ Guidelines for the Benchmark Plan ("Benchmark BVAP") and Enacted Plan ("Plan BVAP"), respectively.

approached Delegate Jones with "concerns" about the redistricting Plan, and Jones "answered [their] concerns." Ex. 14, Floor Debate Tr. 142, Apr. 5, 2011; Ex. 26, Floor Debate Video, Apr. 5, 2011 (Del. Spruill).[6] Spruill's main concern "was to make sure that we have the numbers" of black voters in the Challenged Districts. Ex 14, Floor Debate Tr. 147, Apr. 5, 2011; Ex. 26, Floor Debate Video, Apr. 5, 2011 (Del. Spruill). That worry was warranted by specific facts and local concerns.

**Voter Turnout.** Black voter registration turnout is historically lower than white voter turnout in Virginia, meaning that bare majority voting strength would not necessarily avoid retrogression. Ex. 15, Floor Debate Tr. 45, Apr. 4, 2011; Ex. 24, Floor Debate Video, Apr. 4, 2011 (Del. Dance); Ex. 16, Comm. Hr'g Tr. 23-24, Apr. 4, 2011; Ex. 14, Floor Debate Tr. 41-42, Apr. 5, 2011; Ex. 25, Floor Debate Video, Apr. 5, 2011 (Del. Jones).

**Trend of Declining BVAP.** BVAP had declined over ten years in many Challenged Districts, and Black Caucus members believed that the Plan should account for the trend to continue—*i.e.*, "if you don't have an effective voting strength then there's a good chance that over the time of 10 years you will see a dilution of [the minority's] ability" to elect its candidate of choice until the next redistricting cycle. Ex. 14, Floor Debate Tr. 41, Apr. 5, 2011; Ex. 25, Floor Debate Video, Apr. 5, 2011 (Del. Jones).

**Past Elections.** Historically, it was questionable whether minorities had been able to elect their preferred candidates of choice in all Challenged Districts. Ex. 14, Floor Debate Tr. 144-45, Apr. 5, 2011; Ex. 26, Floor Debate Video, Apr. 5, 2011 (Del. Spruill). For example, Delegate Joseph Morrissey of Challenged District HD74, when he was first elected in 2007, he

---

[6] In addition to transcripts included here as exhibits, Defendant-Intervenors are sending the Court video clips of floor speeches cited herein, which are cited herein as Floor Debate Videos at Exs. 23 through 29.

won a Democratic primary split between five candidates with just under 38% of the vote.

Delegate Spruill remarked on the House floor that "[i]f my friend, Joe Morrissey, is concerned

about another [majority-minority] district…then he should have stepped down and give[n] [his

seat] to a black person and we'll have another seat." Ex. 15, Floor Debate Tr. 36, Apr. 4, 2011;

Ex. 23, Floor Debate Video, Apr. 4, 2011 (Del. Spruill).

**Future Candidates.** The electoral success of incumbent black Delegates in the

Challenged Districts is misleading because incumbents generally hold their seats. Jones

understood that the retrogression standard under Section 5 did not concern the minority

community's ability "to reelect the incumbent, but to elect the candidate of their choice." Ex. 16,

Comm. Hr'g Tr. 23, Apr. 4, 2011. For example, Delegates McClellan and Spruill could continue

to win their districts with a relatively low BVAP, but future candidates of choice of the minority

community would be unlikely to do so at the same levels, especially in contested primaries. Ex.

16, Comm. Hr'g Tr. 14, Apr. 4, 2011; Ex. 14, Floor Debate Tr. 41-42, Apr. 5, 2011; Ex. 25,

Floor Debate Video, Apr. 5, 2011 (Del. Jones).

For these reasons, members of the Black Caucus advanced the view that a cushion of

BVAP above a simplistic 50 percent +1 was required in the Challenged Districts. The Delegates

used a shorthand reference to 55 percent to achieve this goal. As both Dance and Jones observed,

55 percent was viewed as "aspirational" and as "a good number" to prevent retrogression. There

was no mechanical process. Jones was aware that the 55 percent BVAP referred to the DLS

figure and would not guarantee DOJ Black BVAP of 55 percent. Under the Plan eventually

adopted, half the Challenged Districts saw BVAP decreases and half saw increases. Jones and

the Black Caucus members sought, not a mechanical process with a no-change-or-increase only

rule for these Districts, but only a sufficient BVAP cushion to maintain minority voting strength in the Challenged Districts for 10 years under the facts as the Delegates understood them.

The Black Caucus members believed Jones's plan served that purpose and expressed their support on the floor. Delegate Dance called the redistricting "a truly fair process" and stated that she was "proud to be a part of this team." Ex. 15, Floor Debate Tr. 44, Apr. 4, 2011; Ex. 24, Floor Debate Video, Apr. 4, 2011 (Del. Dance). Delegate Spruill remarked: "You ask me, 'Do I believe that it was fair, that Chris Jones did the best that he could?' Yes." Ex. 15, Floor Debate Tr. 38, Apr. 4, 2011; Ex. 23, Floor Debate Video, Apr. 4, 2011 (Del. Spruill). In particular, Dance and Spruill believed the plan was fair for minority voters. Ex. 14, Floor Debate Tr. 149, Apr. 5, 2011; Ex. 26, Floor Debate Video, Apr. 5, 2011 (Del. Spruill); Ex. 14, Floor Debate Tr. 157, Apr. 5, 2011; Ex. 27, Floor Debate Video, Apr. 5, 2011 (Del. Dance). Spruill warned detractors, "when you go to court, don't say they tried to dilute the black folks," because the opposition to the Plan was "not about race." Ex. 14, Floor Debate Tr. 141-143 & 145-47, Apr. 5, 2011; Ex. 26, Floor Debate Video, Apr. 5, 2011 (Del. Spruill).

## C.    No Alternative Plan Meeting the Criteria Is Proposed

Only two alternative plans were introduced: HB5002 was drawn by a University of Richmond student group, and HB5003 was drawn by Governor Bob McDonnell's advisory commission. Neither was consistent with the Committee's criteria, the Virginia Constitution, or the Voting Rights Act. The population deviation ranges in the two plans were 9.83 and 9.50, or plus-or-minus five percent, respectively, compared to the plus-or-minus one percent deviation requirement. Exs. 19 & 20, Maptitude Standardized Reports: Population by District for HB5002 and HB5003. The number of majority-minority districts would have been reduced from 12 to 9 in HB5003 (a range of 50.9 to 61.2 percent DOJ Black) and to 6 in HB5002 (a range of 50.01 to

55.4 percent DOJ Black.) *Id.* The alternative plans blatantly ignored the House's interest in continuity of representation. HB5002 paired 48 incumbents—nearly *half the Delegates*—and HB5003 paired 32. Exs. 17 & 18, Maptitude Standardized Reports: Incumbent Pairings for HB5002 and HB5003. Each alternative plan also paired black incumbents or severely affected their districts. *Id.* The alternative plans were also introduced too late in the process for Delegates to review them. The alternative plans were guaranteed to fail and were never even formally proposed on the House floor.

**D.    The Plan Passes Overwhelmingly and Is Precleared by DOJ**

As to HB5001, the primary complaint of the small number of opponents, led by Delegates Joseph Morrissey and Minority Leader Ward Armstrong, was that the plan protected Republican incumbents at the expense of Democrats. They railed about partisanship in the Plan. *See, e.g.*, Ex. 21, Floor Debate Tr. 3-6, Apr. 6, 2011; Ex. 28, Floor Debate Video, Apr. 6, 2011 (Del. Armstrong); Ex. 15, Floor Debate Tr. 19-20, Apr. 4, 2011. Armstrong had particular reason to complain: the plan drew him out of his south-central district, an area that experienced population loss. He represented in floor debates that the Voting Rights Act was among the criteria because it had to be, but claimed that this was pretextual, because the "number one criteria" was protecting Republican incumbents. Ex. 21, Floor Debate Tr. 3-4, Apr. 6, 2011; Ex. 28, Floor Debate Video, Apr. 6, 2011 (Del. Armstrong).

No one objected to placing the requirements of the constitution and the Voting Rights Act above compactness, single-member districts, and communities of interest. Quite the opposite, Armstrong and Morrissey believed that the Voting Rights Act required maximization of majority-minority districts and faulted the Plan for not adding thirteenth and fourteenth majority-minority districts. Ex. 14, Floor Debate Tr. 64, 69, 74, Apr. 5, 2011. They objected that the plus-

or-minus-one-percent population deviation rule was overly restrictive and stood in the way of that goal. *E.g.*, *id.* at 96-97. That is, they thought race should trump *all* adopted criteria, including Virginia's constitutional requirement of population equality.

These arguments were not persuasive, and the House overwhelmingly voted in support of HB5001. That bill, however, also included a Senate redistricting plan that "failed to garner any votes in the Senate" from the Republican Party, and the Governor vetoed it. The House took this opportunity to make further modifications and proposed HB5005. HB5005 included a new plan for the Senate, was passed on April 28, 2011, and the governor signed it the next day.

The Virginia Attorney General's office made a preclearance submission to DOJ on May 10, 2011. The Attorney General's office worked in tandem with DLS to produce the submission. DOJ requires the submission of districting plans as a census block assignment file, which transfers the geographic makeup of the plan. Census blocks are the building blocks of any plan and provide DOJ with all the information it needs to review the racial and ethnic demographics from the census. The Virginia submission also included a "Statement of Minority Impact" with a chart containing statistics for the Challenged Districts, including BVAP. The BVAP numbers in the statement use the DLS calculation from its AutoBound system, not DOJ Black. The census block assignment file provided to DOJ—the only information required by its regulations in this regard—allowed DOJ to calculate that Challenged Districts 69, 71, and 89 were under 55 percent DOJ Black. On June 17, 2011, DOJ issued a letter stating that it had no objections to the Plan.

The Plan has now been in place for two election cycles, 2011 and 2013, and will be in place for the 2015 election cycle. Plaintiffs waited over three years, until December 2014, to file this case—after the Virginia governorship shifted from Republican to Democrat control.

E.       **The Plan Implements Traditional Redistricting Principles**

The Plan implemented the traditional redistricting principles adopted by the Committee. This will be confirmed through the lay testimony of Delegate Jones and the expert testimony of Doctors Jonathan Katz, Thomas Hofeller, and Trey Hood. Jones is the most knowledgeable individual as to the Plan and is the most credible witness as to what occurred during the drawing process. He will testify about his consultation with other members of the House of Delegates, application of the redistricting criteria on a district-by-district basis, and the political considerations necessary to ensure bipartisan support and timely passage of the Plan. Drs. Katz, Hofeller, and Hood have evaluated the Plan and will testify that it implements traditional redistricting criteria, including compactness, core retention of districts, protection of incumbents, and preservation of communities of interest. This evidence combined will show as follows:

**The Richmond Area.**  Challenged Districts HD69, HD70, HD71, and HD74 are in the Richmond area. HD69 and HD71 are principally in Richmond City. Hofeller Map 6. HD70 and HD74 are principally in Henrico County, which abuts Richmond City. *Id.* All but one of these districts was underpopulated, *i.e.*, below the ideal population for House districts. Hofeller ¶ 68; Hood 12-13. HD71 and HD69 were underpopulated by more than five percent, -7.3 and -10.9 percent, respectively. Hood 13. This required a shifting of population toward the Richmond City districts and away from the surrounding suburban districts. BVAP in HD71 had fallen below fifty percent, and it was no longer a majority-minority district under the Voting Rights Act, posing the risk of a Section 2 challenge. Ex. 12, Benchmark BVAP. *See Thornburg v. Gingles*, 478 U.S. 30, 50 (1986); *Bartlett v. Strickland*, 556 U.S. 1, 12 (2009). The Plan resolved these problems and, in doing so, preserved the districts' core constituencies and maintained, and even improved, the compactness of all four districts. *See* Hofeller ¶ 17; Hood 10–11.

14

The Plan improved upon the 2001 Plan by altering the districts to adhere more closely to municipal and county boundaries, thereby honoring the respective urban and suburban communities of interest. *E.g.*, Hood 4–5. HD70, which is principally a suburban district, shed Richmond City precincts and picked up suburban districts in Henrico County. HD71, which is an urban district, shed suburban precincts on its northwest edge and, save one precinct in Henrico County, now lies entirely within the bounds of Richmond City. HD71 is now more compact, and HD70 is comparably compact as to the 2001 Plan. Hofeller Tables 7 and 9; Hood 14.

The Plan also protects incumbent members residing in the Richmond area. None of the incumbents in the four Challenged Districts were paired. This was a feat as to HD69, HD70, and HD71 because the incumbents—Delegates Betsy Carr, Jennifer McClellan, and Delores McQuinn—live on the edges of their districts, near each other, and Delegate G. Manoli Loupassi (HD68) lives near the borders of HD69 and HD71. Their home precincts and some adjacent precincts were unavailable for shifting among districts to address population deficits or any other redistricting goals. HD71, for example, could not obtain additional population from the west (Loupassi's residence), southwest (Carr's) or southeast (McQuinn's). It could not move north, which would extend the district out of Richmond City, or south of the James River because the district traditionally has fallen north of it. Accordingly, HD71 picked up the bulk of its additional population to the east and took in just one precinct in Henrico County.

HD74 has existed in roughly its current form since 1991. It was the cornerstone of the challenge in *Wilkins*, because several precincts in Hopewell City across the James River were drawn into the district and allegedly made it non-compact and non-contiguous. The challenge failed. *Wilkins*, 264 Va. at 465-66, 476-77. Still, Jones determined that removing the Hopewell precincts was advisable to improve the compactness of the district. *See* Hofeller ¶ 16. Delegate

Jones further improved HD74's compactness by adding several Henrico County precincts, which also brought the district back within the permissible range of population deviation in light of the lost Hopewell precincts. Otherwise, HD74 preserves its core. Hofeller ¶ 72; Hood 15.

**Tidewater.**  Six Challenged Districts, HD77, HD80, HD89, HD90, HD92, and HD95, are in Tidewater. HD77, HD80, HD89, and HD90 are south of the James River and cover the cities of Portsmouth and Norfolk. HD92 and HD95 are north of the James River on "the Peninsula," which contains Hampton and Newport News.

Tidewater was significantly underpopulated. The Challenged Districts there were almost uniformly more than 10% below the ideal population. Hood 13. Accordingly, the Plan collapsed one district, HD87, and moved it to Northern Virginia. HD87 was represented by Delegate Paula Miller, a Democratic member, and the Plan paired her with another Democratic member, Delegate Lynwood Lewis, in District 100. Due to other underpopulated districts in the area, the collapse of HD87 pushed the search for population north and west along the James River.

On the south side of the James River, many of the changes were driven by the collapse of HD87 and the migration of HD79, which moved east to subsume a substantial portion of territory formerly within HD87, as well as some territory formerly in HD100. HD79 also picked up a small portion of HD92, which in the 2001 Plan, had crossed the James River from the Peninsula Delegate Jones removed this crossing and gave the area south of the James River to HD79, which made both HD79 and HD92 more compact and contiguous than under the 2001 Plan. *See* Hofeller ¶¶ 72-73 & Tables 7, 9.

As HD79 moved east, it left behind the western portion of its former territory, which was collected by HD80, a majority-minority district that was underpopulated by 11.8 percent. Hood 13. Although HD80 could have been drawn to take territory from HD76—represented by

Delegate Jones—the precincts there were Republican strongholds, and neither Jones nor HD80's representative, Democrat Matthew James, wanted that trade. Drawing HD80 into the former territory of HD79 gave those Democratic-leaning precincts to James, and not Jones. This arrangement made HD80 less compact than it would have been had it taken territory from Jones, but it was politically preferable. HD80 also was drawn to protect other incumbents, Johnny Joannou (HD79) and Kenneth Alexander (HD89), who resided near the borders they shared with HD80, making it impossible for HD80 to take territory to the north and northeast without pairing incumbents.

The two remaining Challenged Districts south of the James River—HD89 and HD77—both picked up territory and population to their east that was available following the collapse of HD87 and migration of HD79. HD77 added precincts at the request of Delegate Lionel Spruill, its longtime representative, in order to unify communities of interest in his neighborhood. Those precincts were obtained from HD90, such that HD90 no longer has any precincts in Chesapeake. The Plan preserves roughly 75 percent of the cores of HD77 and HD89. Hood at 15.

On the north side of the James River, the districts were severely underpopulated. Challenged Districts HD95 and HD92 were underpopulated by over 15 percent and 11 percent, respectively. Hofeller ¶ 73. Their location on the Peninsula limited sources of population, at least without a river-crossing. Another Peninsula district, HD64, had sardonically been dubbed the "Ferrymander" because two segments of the district were connected only by a ferry route, and Jones was intent on eliminating river-crossings if possible. He succeeded. *See* Hofeller ¶ 75.

To fix the "Ferrymander," the Plan moved HD64 off the Peninsula and back across to the south side of the James River. HD93 moved northwest to capture that contiguous territory, allowing other districts to assume some of its former population. *See* Hofeller Maps 17, 18.

The precise alterations were politically driven. HD93 was represented by Democrat Robin Abbott, who had defeated Republican incumbent Philip Hamilton in 2009, and the Plan drew her out of HD93 to create HD93 as an open seat. Abbott could have been paired with Mamye BaCote in HD95, but that option would have paired two female incumbents and put at risk the preferred candidate of choice in the black community in a majority-minority district. Instead, the Plan paired Abbott in HD94 with Republican Glenn Oder. For that move to be politically advantageous, however, Oder's district needed to maintain all available Republican-leaning precincts to solidify Oder's advantage in a potential race against Abbott, and HD93 needed to be drawn as a competitive seat. Thus, HD95 was crafted carefully to avoid taking HD94's Republican precincts and instead take Democratic-leaning population left behind by HD93 and reach into precincts surrounded by HD93 to dilute Democratic voting strength in that area.[7] Conveniently, both purposes could be achieved by drawing HD95 along Interstate 64, giving the communities to the east and west of the Interstate their own districts. Hofeller ¶ 74.

The shortchange in population in HD92 was resolved by adding contiguous precincts left behind by HD95, which improved the district's compactness scores, while preserving 77.2 percent of its core. Hood 14-15.

**Southside.** The area of Virginia referred to as "Southside" contains two majority-minority districts: HD 63 and HD 75. Hofeller Map 4. Both districts were significantly underpopulated as of 2010, at 7.9 and 11.9 percent below the ideal, respectively. Hood 13. The problem was exacerbated by the fact that HD75 shares its southern border with North Carolina. Thus, simply by virtue of state lines, any additional territory given to of HD75 had to come from the north, from HD 63, or from the west or east, from HD61 or HD64, both of which were

---

[7] Abbott subsequently moved into the new HD93 to compete for the open seat. She lost to Republican Michael Watson.

Republican-leaning districts. HD64 was represented by a Democrat, Delegate William Barlow, but the Plan added to HD64 several Republican precincts in Prince George, Sussex, and Southampton counties, and he was defeated in 2011. Additionally, HD75 itself had for 20 years been represented by a white Republican, Delegate Paul Council, until Delegate Tyler won the seat by a miniscule margin in 2005. As Jones will testify, Tyler was concerned about picking up any Republican-leaning precincts.

Remarkably, these complex problems were resolved with relatively minor changes, affecting *less than one quarter* of the constituents in HD63 and HD75, which retained stellar 82.1 and 79.3 percent of their constituents, respectively. Hood 15. Tyler met with Jones on multiple occasions concerning the shape of her district and made numerous, specific requests concerning which precincts or portions of precincts she would like to include or exclude, including in Franklin City to draw a potential primary opponent out of her district. Jones honored these requests—none of which entailed racial considerations—to the extent possible, which affected the nature of the boundaries on the east and west sides of HD 75. An additional concern of Tyler's was that HD75 contains five prisons, and that population counts towards the relevant equal-representation and Voting Rights Act standards—including BVAP—but does not produce actual votes. Ex. 22, Floor Debate Tr. 38-39, Apr. 27, 2011; Ex. 29, Floor Debate Video, Apr. 27, 2011 (Del. Tyler).

The northern border of HD75 abuts HD63. Because Tyler's district could not remain a safe seat by moving west or east, much of the new population added to HD75 came from territory in HD63. Since HD63 also had been underpopulated, it too had to pick up new population elsewhere and became a natural destination for the Hopewell City precincts shed by HD74 (discussed above). To have gone any other direction to pick up population would have

meant picking up Republican voters that Delegate Dance did not want, pairing Delegate Dance with another incumbent, and/or mingling communities with little in common. In addition to these changes, and in exchange for population given to Delegate Tyler (HD 75), Delegate Dance requested that a sliver of Dinwiddie County be drawn out of her district because a potential primary challenger lived there. The county was split in part to address population deficiencies in HD75, and in part to accommodate that request.

\* \* \*

On the whole, the Challenged Districts are comparable to non-majority-minority districts in the Plan, to those in the 2001 Plan, and to districts in other states.

On average, the Challenged Districts have comparable or improved compactness scores over the same districts in the 2001 Plan and the 1991 plan that was found to meet Virginia's compactness and contiguity standards in *Jamerson*. Hofeller ¶¶ 60-64. The mean Reock scores and standard deviations are equal in the Plan and the 1991 plan, Hofeller ¶ 60, and the Polsby-Popper scores are equal and the standard deviation improved, Hofeller ¶ 61.[8] The Challenged Districts on average are only somewhat less compact than before. Hood 14. Notably, the Challenged Districts are not the least compact districts in the Plan, even using Plaintiffs' expert's approach. HD13, HD17, HD22, and HD48, which have very small minority populations, are comparable to the least compact Challenged Districts. Hofeller ¶ 65 & Table 14.

In fact, the primary driver of low compactness scores from mythical perfect compactness scores is not race—or else the Challenged Districts would be the outliers—but rather Virginia's "irregular[] shape[]" given its "7,213 miles of tidal bay frontage, 123 miles of ocean coastline, and 457 miles of on-tidal river frontage." Hofeller ¶¶ 37-38. The compactness scores of the 2011

---

[8] Reock and Polsby-Popper scores are two standard measures of compactness utilized in redistricting litigation.

Plan "compare closely with" those of "8 other states"—Alabama, Florida, Georgia, Louisiana, Maryland, Mississippi, North Carolina, and South Carolina—"which all contain numerous minority districts in their maps." Hofeller ¶¶ 63-64. The Challenged Districts are not as irregular as those that have been rejected in past court challenges. *See* Hofeller ¶¶ 31-36. On average, the Challenged Districts retained 73.2 percent of voting-age population counts from the previous districts, compared to 67.2 percent core retention on average in the Plan, Hood 15, meaning that the Challenged Districts underwent *less change* on average than did other districts. Core retention in 9 of the 12 Challenged Districts was at or above that 67.2 percent mean. Hood 15.

On average, the number of split political subdivisions remained unaffected under the Plan from the 2001 Plan. Hood 4. The number of voting districts (VTDs) that remained whole in the Plan is an exceptional 95.1 percent, representing a statistically insignificant drop from the 2001 Plan. Hood 5-6. Many changes in the Plan were driven by politics: the Plan "purposefully concentrate[s] Republican voting strength in existing GOP-held districts while at the same time dispersing Democratic partisans. Democratic voting strength is so depleted in a number of districts as to put the probability of continued Democratic control of these seats in jeopardy." Hood 8. Incumbency protection also "was an important component of" the Plan. Hood 16.

As for race, the House did attempt "to prevent retrogression from taking place" in the Challenged Districts, "but not in a mechanical fashion"; rather, BVAP "was increased in districts having the lowest black percentages and lowered in those which had the highest concentrations." Hood 16. Three Challenged Districts were below 55 percent BVAP, and no Challenged District exceeded 60 percent BVAP. *Compare* Ex. 12, Benchmark BVAP *with* Ex. 13, Plan BVAP. Notably, race is not a good predictor of the inclusion *vel non* of any particular VTD, indicating that there was minimal conflict between race-neutral and race-based goals. Katz 18-19.

Nevertheless, the House had good reason to be concerned with preserving minority voting strength: voting in the Challenged Districts is racially polarized. Katz 17. Even with 55 percent BVAP in a given Challenged District, there is only an 80 percent likelihood of a correct prediction of the election of a black candidate in the Challenged Districts. Katz 18.

## ARGUMENT

### I.   Plaintiffs Cannot Meet the High Burden Required for Strict Scrutiny To Apply Under *Shaw*

Plaintiffs ask this Court to wade into "the most vital of local functions," which is "primarily the duty and responsibility of the State." *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (quotation marks omitted). The Court should be wary about "the hazards of" what the Supreme Court has called "the political thicket" and "a vast, intractable…slough" of state reapportionment disputes. *Gaffney v. Cummings*, 412 U.S. 735, 749 (1973). Because "States must have discretion to exercise the political judgment necessary to balance competing interests," "the good faith of a state legislature must be presumed," and it is incumbent on Plaintiffs to "make[] a showing" to rebut that presumption. *Miller*, 515 U.S. at 915. That burden is "a demanding one," and the court must "exercise extraordinary caution" in reviewing the Plan. *Id.* at 916. Plaintiffs must show "at a minimum that the [House] subordinated traditional race-neutral district principles to racial considerations." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (quotation marks and edits omitted). Plaintiffs cannot do this. The Challenged Districts were drawn to meet numerous redistricting criteria as enumerated in the Committee Resolution. *All* criteria were applied.

**Shapes Matter.** Plaintiffs' challenge relies on a line of cases beginning with *Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*), which created a cause of action for "race-conscious redistricting" that "is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting." *Id.* at 642. The *Shaw* cases have invalidated

districts the Court has described, in turn, as "a Rorschach ink-blot test" and as "a bug splattered on a windshield," *Shaw I*, 509 U.S. at 635 (quotation marks omitted), as a "monstrosity," *Miller*, 515 U.S. at 909, as a "serpentine district [that] has been dubbed the least geographically compact district in the nation," *Shaw v. Hunt*, 517 U.S. 899, 906 (1996), and as having "no integrity in terms of traditional, neutral redistricting criteria," *Bush v. Vera*, 517 U.S. 952, 960 (1996) (quotation marks omitted).[9] "[R]eapportionment is one area in which appearances do matter." *Shaw I*, 509 U.S. at 647. Accordingly, a showing of "neglect of traditional districting criteria" is "necessary"—though "not sufficient"—to prove a claim under *Shaw*. *Bush*, 517 U.S. at 962.

The Challenged Districts are compact and contiguous under Virginia law,[10] are comparable to—if not improvements upon—the 2001 districts upheld in *Wilkins v. West*, and are comparable to the shapes of other districts in the Plan. The Districts are not so irregular as to trigger strict scrutiny. This case is therefore indistinguishable from the Supreme Court's decision in *Lawyer v. Department of Justice*, 521 U.S. 567, 580-82 (1997), which rejected a *Shaw* challenge to districts in Florida because the shape of those districts "does not stand out as different from numerous other Florida House and Senate Districts" and because the water crossings that were allegedly problematic "are common characteristics of Florida legislative districts, being products of the State's geography." *See* Hofeller ¶ 38. As in that case, the Challenged Districts do not stand out from other Virginia districts, which are drawn to account for the complex geography of the Commonwealth, and are not unique compared to other districts

---

[9] A map of the original *Shaw* district invalided by the Supreme Court, NC-12, is contained in Dr. Hofeller's report as Map 1.

[10] Redistricting criteria are defined by state law and custom. *See Bush*, 517 U.S. at 977 (holding that states "may avoid strict scrutiny altogether by respecting *their own* traditional districting principles" and disclaiming any intention of "limiting a State's discretion to apply traditional districting principles") (emphasis added and quotation marks omitted). Virginia provides more guidance as to compactness and contiguity than other states. Hofeller ¶ 43.

in the Plan in terms of compactness of contiguity.

The limited changes that did occur (see "Core Preservation," below) generally improved the 2001 Plan in accord with traditional criteria. As described above, the Plan made improvements in protecting communities of interest, such as by consolidating suburban and urban districts in Richmond. The Plan generally avoided pairing incumbents, which was frequently difficult given the close proximity of incumbents to each other. The Plan resolved specific problems that were criticized in the 2001 Plan, such as the "Ferrymander" and the inclusion of Hopewell precincts in HD74. And the Plan otherwise adhered to traditional redistricting principles as understood in Virginia law and custom, such as by maintaining HD71 in Richmond north of the James River as it has existed traditionally. The House was able to make these changes without significantly impacting compactness scores or other marks of continuity. *Compare Comm. for a Fair and Balanced Map v. Ill. State Elecs. Comm.*, 835 F. Supp. 2d 563, 590-92 (N.D. Ill. 2011) (upholding bizarre "Earmuff District" in Chicago area where district preserved core territory from former plans and made modest improvements).

**Core Preservation.** The Challenged Districts largely preserve their cores, retaining on average over 73.2 percent of their former constituencies. Notably, *Wilkins v. West*, 264 Va. 447, 474-79 (2002), upheld the predecessor districts, in part because they retained much of their cores from 1991, so the Challenged Districts have now been in place in largely the same form for 12 election cycles. Core retention is a traditional redistricting criterion, *see, e.g.*, *Karcher v. Daggett*, 462 U.S. 725, 740 (1983), and it is inconceivable that race predominated the line-drawing here over other concerns where less than a third of the territory and constituencies of the Challenged Districts underwent change for any reason.

**Politics.** The Plan sought to achieve specific political goals. The alterations to HD95 and HD92 occurred as part of a plan to draw Democrat Robin Abbott out of her district and into a strong Republican district. The changes on the eastern border to HD75 were drawn to load heavily Republican precincts into the district of Democrat William Barlow, (who subsequently lost to a Republican in the 2011 election by 10 percentage points), and to protect Delegates Tyler's and Dances' Democratic seats in a growing sea of Republican control in Southside. Politics also explain the path of HD80, which was carefully drawn to keep Democratic precincts in the territory of Democrat Matthew James and out of the district of Republican Delegate Jones, who authored the plan. *See Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (rejecting *Shaw* challenge where protection of incumbent seats and other political considerations was not subordinate to race in reapportionment).

**Race.** Although race played a role in drawing the Plan, it was not predominant. That is self-evident from the above-described facts: if the average retention rate was over 73 percent of the constituents in the Challenged Districts and a host of political and traditional redistricting criteria account for the difference of the remaining 30 percent, then the role of race was minor indeed. *See Robertson v. Bartels*, 148 F. Supp. 2d 443, 456-57 & n.12 (D.N.J. 2001) (rejecting *Shaw* challenge where plan architect considered multiple criteria along with race).

Contrary to Plaintiffs' contentions that redistricting criteria were subordinate to a rigid and mechanical scheme to pack black voters into the majority-minority districts, *half the districts* saw a decrease in BVAP, and the changes in BVAP were not mechanically applied but rather were tailored to the BVAP levels in each district. *Wilkins*, 264 Va. at 476 (decrease in BVAP weighed against strict scrutiny). The *highest* BVAP in any challenged district here is 59.8 percent, and BVAP in three districts fell below the 55 percent number that Plaintiffs claim is a

"floor." For that reason, Plaintiffs' reliance on *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1271 (2015), is misplaced: the *Alabama* Court expressed suspicion about a redistricting plan that set out "to maintain existing racial percentages" in a district *with 70 percent black population* and identified several other fact-specific indicia of racial predominance—such as the addition of over 15,000 individuals to that district, of whom only 36 were white—that are not present in this case.[11] Even if the House had adopted a rigid threshold, *Alabama* does not condemn thresholds *per se*. Moreover, in *Alabama*, the state did not claim that political considerations drove the redistricting process, as is the case here.

An additional recurring racial subtext that drove the result in many *Shaw* cases is missing here: the Plan did not implement a so-called "max black" strategy designed to add majority-minority districts without regard to traditional criteria. *See, e.g.*, *Shaw*, 509 U.S. at 635 (condemning district added to comply with DOJ's view that another majority-minority districts was required); *Miller*, 515 U.S. at 907-08 (same). The only Delegates who came close to advocating a "max black" position for the 2011 House reapportionment cycle were Delegates Morrissey and Armstrong, and the House rejected their views that a 13th or even 14th majority-minority district was required under the Voting Rights Act. The House instead adopted the more reasonable view of the Black Caucus members—who were in the best position to understand the actual needs of the minority community—that the existing 12 majority-minority districts should be protected under the Plan by maintaining a cushion above 50 percent +1, consistent with other redistricting criteria. The cushion level was not mechanically applied.

**No Alternative Plan.** It is indisputable that racial identification correlates strongly with

---

[11] The discussion in *Alabama* concerning the racial predominance test is *dictum*. The Court held that population equality is not a criterion to be weighed in the balance and went on to suggest that the facts *may* have risen to the level of predominance, but remanded the case without adjudicating the merits. 135 S. Ct. at 1271.

political affiliation in the Challenged Districts and throughout the state—as even Plaintiffs' expert will testify. Ansolabehere ¶ 141. *See also Wilkins*, 264 Va. at 479 (finding the same). As a result, the burden is on Plaintiffs to show the court how "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *Cromartie*, 532 U.S. at 258.

Plaintiffs apparently will claim HB5002 and HB5003 as their alternatives, but these plans fail under the House's criteria. The deviation of plus-or-minus 5 percent is facially incompatible with the Committee Resolution requiring no more than a deviation of plus-or-minus 1 percent and demonstrates a complete disregard for the equal-population requirement of the Virginia constitution. VA Const. Art II, Sec. 6. These plans also paired dozens of incumbents in violation of the incumbency-protection criterion critical under the Committee Resolution and essential to gaining member support for the plan. *See Cromartie*, 532 U.S. at 247-48 (ruling out alternative plan that paired a single pair of incumbents in conflict with the legislature's political goals). These plans did not advance the House's redistricting goals.

**_Wilkins v. West._** For all these reasons, this case is the spitting image of *Wilkins v. West*. The House used the same criteria here as in 2001. 264 Va. at 468 n.7. The challengers here, as in *Wilkins*, complained that Delegates from the Challenged Districts were reelected by large margins. *Compare* 264 Va. at 474, 477 *with* Compl. ¶¶ 40, 44, 50, 56, 67, 73, 80, 87. The challengers here, as in *Wilkins*, complain that black voters were "packed" into majority minority districts. *Compare* 264 Va. at 477 *with* Compl. ¶¶ 38, 40. The challengers here as in *Wilkins* complain of "excessive splitting of jurisdictional lines, general disregard for keeping regions intact, abandoning the constitutional requirements of compactness and contiguity, and inordinate use of split precincts in majority minority districts." 264 Va. at 477; *see also id.* at 478 (similar

assertions). Yet the *Wilkins* court held that the facts did not rise to the level of establishing racial predominance under *Miller* and *Cromartie* because the evidence showed that the districts largely followed the core of the former districts, 264 Va. at 475, 476, 477, BVAP in challenged districts either fell or grew only slightly, 264 Va. at 479, the legislature sought to accomplish political and race-neutral redistricting goals, *id.* at 475, race was only one factor among many redistricting criteria, *id.* at 476-77, and the challengers were required to make alternative proposals and the others considered by the legislature did not match the criteria, *id.* at 479-80. So too here, the district cores are largely preserved, the House fixed irregularities in the 2001 Plan, the House had multiple race-neutral goals that it accomplished through the Plan, there is a high correlation of racial and political voting patterns, and there are no adequate alternate plans.

Because Plaintiffs cannot meet their burden of showing that race predominated in any of the Challenged Districts, strict scrutiny does not apply.

## II.    There Is a Strong Basis in Evidence To Show That the Plan Is Narrowly Tailored To Comply with Sections 2 and 5 of the Voting Rights Act

Even if the Court were to apply strict scrutiny, the Plan would pass because the House had a strong basis in evidence to believe the Challenged Districts should be drawn as they were to comply with Sections 2 and 5 of the Voting Rights Act. Virginia has a compelling interest in compliance with both Sections 2 and 5 of the Voting Rights Act. Section 2 requires the creation of majority-minority districts as to minority groups that are sufficiently compact and cohesive where, as here, there is racial bloc voting. *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Section 5 prohibits retrogression of those minority groups' ability to elect their candidates of choice. *Beer v. United States*, 425 U.S. 130, 141 (1976).

The Supreme Court has recently provided guidance for this test:

> [W]e do not insist that a legislature guess precisely what

> percentage reduction a court or the Justice Department might
> eventually find to be retrogressive. The law cannot insist that a
> state legislature, when redistricting, determine precisely what
> percent minority population § 5 demands. The standards of § 5 are
> complex; they often require evaluation of controverted claims
> about voting behavior; the evidence may be unclear; and, with
> respect to any particular district, judges may disagree about the
> proper outcome. The law cannot lay a trap for an unwary
> legislature, condemning its redistricting plan as either (1)
> unconstitutional racial gerrymandering should the legislature place
> a few too many minority voters in a district or (2) retrogressive
> under § 5 should the legislature place a few too few. *See Vera*, 517
> U.S., at 977, 116 S.Ct. 1941 (principal opinion). Thus, … a court's
> analysis of the narrow tailoring requirement insists only that the
> legislature have a "strong basis in evidence" in support of the
> (race-based) choice that it has made.

*Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1273-74 (2015).

The Challenged Districts are drawn around areas recognized since the 1990s as
containing sufficiently compact minority communities to require tailoring under Section 2 to
allow those communities the opportunity to elect their candidates of choice. *Gingles*, 478 U.S. at
49. In tailoring those districts, the House also believed that a BVAP greater than 50 percent +1
was necessary to prevent retrogression. It relied on the views of the Black Caucus members
themselves, who were in the best position to know the needs of their communities. The decision
was well founded in light of lower voter turnout, continuing BVAP decline, and the inability of
the black community to elect its candidate in some prior elections. In addition to the Black
Caucus members' views, the House took account of specific challenges in specific districts,
including HD75's five prisons and substantial minority population prohibited from voting,
HD71's decline below the Section 2 standard under *Gingles*, and the prison population in HD75.
And the House was justified in believing that voting was racially polarized in these districts
because the state's expert report found polarized voting in the *Wilkins* litigation, and the Virginia
Supreme Court accepted that evidence. *Wilkins*, 263 Va. at 475.

The expert testimony of Dr. Katz confirms that voting in the Challenged Districts remains polarized. In addition, his testimony indicates that a 55 percent BVAP did not guarantee black voters the opportunity to elect candidates of their choice, indicating the need both for majority-minority districts under Section 2 and to keep BVAP near or above that level. Dr. Katz's analysis is consistent with the views expressed on the House floor by the members of the Black Caucus. The Plan is therefore narrowly tailored.

Plaintiffs appear to believe that this evidence is insufficient because the House did not hire a professor of political science to conduct some form of regression analysis. That would be an anomalous requirement because liability under Section 2 and Section 5 can be established by "anecdotal evidence." *McDaniels v. Mehfoud*, 702 F. Supp. 588, 593 (E.D. Va. 1988); *Sanchez v. Bond*, 875 F.2d 1488, 1493 (10th Cir. 1989); *Hale Cnty., Ala. v. United States*, 496 F. Supp. 1206, 1217 (D.D.C. 1980); *Texas v. United States*, 887 F. Supp. 2d 133, 150 (D.D.C. 2012). Defendant-Intervenors are aware of no case law requiring a legislature to conduct a statistical analysis *before* drawing a majority-minority district, and this Court has clarified that the opposite is true. *Page v. Va. State Bd. of Elections*, No. 3:13CV678, 2015 WL 3604029, at *18 n.29 (E.D. Va. June 5, 2015). Virginia's preclearance submissions in the past 30 years have not included a formal political scientist's statistical analysis of racial voting behaviors.[12] Plaintiffs' newly invented requirement to hire a political scientist for a race statistical analysis is an unprecedented, arbitrary and unwarranted burden on Virginia's redistricting process.

**CONCLUSION**

For these reasons, the Court should enter judgment in favor of the State Defendants and Defendant-Intervenors.

---

[12] Defendant-Intervenors will submit preclearance submission as trial exhibits to confirm this.

Dated: June 19, 2015                          Respectfully Submitted,

                                              /s/ Jennifer M. Walrath
                                              E. Mark Braden (*pro hac vice*)
                                              Jennifer M. Walrath (VSB No. 75548)
                                              Katherine L. McKnight (VSB No. 81482)
                                              Richard B. Raile (VSB 84340)
                                              BAKER & HOSTETLER LLP
                                              1050 Connecticut Ave NW, Suite 1100
                                              Washington, DC 20036
                                              Tel: (202) 861-1500
                                              Fax: (202) 861-1783
                                              mbraden@bakerlaw.com
                                              jwalrath@bakerlaw.com
                                              kmcknight@bakerlaw.com
                                              rraile@bakerlaw.com

                                              *Counsel to the Virginia House of Delegates*
                                              *and Virginia House of Delegates Speaker*
                                              *William J. Howell*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of June, 2015, a copy of the foregoing was filed and

served on all counsel of record pursuant to the Court's electronic filing procedures using the

Court's CM/ECF system.

/s/ Jennifer M. Walrath
Jennifer M. Walrath (VSB No. 75548)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
jwalrath@bakerlaw.com

*Counsel to the Virginia House of*
*Delegates and Virginia House of*
*Delegates Speaker William J. Howell*