# Exhibit 1



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*         *Washington, D.C. 20035*

June 20, 1994

Martin M. McMahon, Esq.
Assistant City Attorney
P. O. Box 15225
Chesapeake, Virginia 23328-5225

Dear Mr. McMahon:

    This refers to the adoption of the at-large method of election for the board of education in the City of Chesapeake, Virginia, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. We received your responses to our request for additional information on March 3 and April 19, 1994; other supplemental information was received on May 13 and 23, 1994.

    We have considered carefully the information you have provided, as well as information from other interested persons. According to the 1990 Census, Chesapeake has total population of 151,976, of whom 27.2 percent are black. In addition, black residents comprise 25.6 percent of the city's voting age population. The city proposes to elect the city school board at large. It will be composed of nine members, serving four-year, staggered terms. Candidates will not run for designated posts and will be voted on in nonpartisan, plurality-win elections. The current school board, appointed by the city council, has three black members.

    In November 1993, immediately following a successful referendum vote approving a change from an appointed to an elected school board, the city council held two public meetings to discuss whether to adopt an at-large or a district method of election. Under the state enabling statute (Chapter 594 (1992)), the council was invested with the authority to make this decision.

- 2 -

It is our understanding that under the previous appointment system, the council had followed the informal practice of appointing school board members using residency districts. Chapter 594 provides that where school board appointments were made by district, the school board also should be elected in that manner, however, since the city's appointment system at least in formal terms was at large, the city apparently considered itself free to adopt an at-large election system. In this regard, the council was presented with a number of illustrative districting plans by a local demographer, including a nine-district plan with two districts with black voting age population majorities and a third district that was 47 percent black in voting age population.

The two black members of the city council urged that additional time be taken to consider this important issue. Several members of the black community supported the at-large option, but generally also urged that additional study be undertaken. The council, however, proceeded to adopt the submitted at-large method at the second November meeting, with the two black councilmembers voting against that method.

Our analysis of city elections raises significant concern as to whether the at-large method of election will allow black voters an equal opportunity to elect their candidates of choice to the school board. Since the proposed school board election method would be almost identical to the method by which the city council is elected, we have carefully examined voting patterns in past city council elections. Our analysis reveals persistent and severe polarization along racial lines. Over the past decade, it appears that in each election one or more black candidates have been the leading candidates of choice among black voters while these candidates generally have not finished among the group of candidates white voters favored for election to the council. A number of black candidates have been elected nonetheless, generally by receiving very strong support from black voters and a modicum of support among whites. This opportunity of black voters to elect some of their preferred candidates is fairly tenuous, however, as was demonstrated in the 1994 election when the black candidate that appears to have received nearly unanimous black support received almost no votes among white voters and thus was defeated.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. See <u>Georgia</u> v. <u>United States</u>, 411 U.S. 526 (1973); see also 28 C.F.R. 51.52. In addition, an objection must be interposed where

- 3 -

there is a "clear" violation of Section 2 of the Act, 42 U.S.C. 1973. 28 C.F.R. 51.55(b)(2). In light of the considerations discussed above, I cannot conclude, as I must under the Voting Rights Act, that the City's burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the at-large method of electing the Chesapeake board of education.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the at-large election method will have neither the purpose nor will have the effect of denying or abridging the right to vote on account of race or color. In addition, you may request that the Attorney General reconsider the objection. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the at-large election method continues to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10 and 51.45.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action the City of Chesapeake plans to take concerning this matter. If you have any questions, you should call Mark A. Posner (202-307-1388), Special Section 5 Counsel in the Voting Section.

Sincerely,

Gerald W. Jones
Acting Assistant Attorney General
Civil Rights Division