Exhibit 3



**U. S. Department of Justice**

Civil Rights Division

_Office of the Assistant Attorney General_                    _Washington, D.C. 20530_

May 19, 2003

Bruce D. Jones, Jr., Esq.
County Attorney
P.O. Box 690
Eastville, Virginia  23347-0690

Dear Mr. Jones:

This refers to the 2002 redistricting plan for the board of
supervisors and the realignment of voting precincts for
Northampton County, Virginia, submitted to the Attorney General
pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.
We received your responses to our February 10, 2003, request for
additional information through March 21, 2003.

With regard to the redistricting plan, we have considered
carefully the information provided, as well as information in our
files, census data, and comments from other interested persons.
According to the 2000 Census, Northampton County has a population
of 13,093, of whom 43.1 percent are black persons, and 3.5
percent are Hispanic.  From 1990 to 2000, the county's total
population remained virtually unchanged, while the black
percentage of the total population decreased slightly, from 46.2
percent to 43.1 percent.

Our analysis of the county's electoral history indicates
that prior to 1991, only two black candidates had ever been
elected to the board and their success came only with reliance on
single-shot voting.  Further, under the benchmark plan, black
voters had been able to elect candidates of choice in three
districts.  In two of the benchmark districts, black persons are
a majority of the voting age population [VAP].  The proposed plan
has no district in which black persons constitute a majority of
the VAP.  In the third viable district in the benchmark, black
residents constitute 47.8 percent of the VAP with all minority
residents totaling 52.8 percent of that population.  Under the
proposed plan, the combined minority voting population is 50.3

- 2 -

percent.  In the three benchmark districts, the lowest overall
minority VAP percent is 52.8, whereas the highest combined
minority VAP in any district in the proposed plan is 52.1
percent.

The county bases its determination that black voters will
continue to have the ability to elect candidates of their choice
in three of the six districts under the proposed plan on the
"evidence that voters in Northampton County do not vote on purely
racial grounds."  In support of this conclusion, the county
relies on four black-white races from 1983, 1987, and 1988,
purporting to show that "at least some African-American voters
were willing to vote for white candidates" and that "at least
some white voters were willing to vote for an African-American
candidate."

Our electoral analysis of these and other elections
precludes us from reaching a similar conclusion.  First, two of
the elections relied upon by the county, which were county-wide
elections in 1987, in fact, did suggest racial bloc voting.  The
analysis evidenced overwhelming support by black voters for black
candidates and very little white support of those candidates by
white voters (3% in one race and 7.2% in another).  The other two
elections relied on by the county were the races in 1983 and 1987
in which Mr. Godwin (B) successfully ran for the board of
supervisors.  Although Mr. Godwin does appear to have received
support from some white voters, the significance of the 1987
victory to the county's position is diminished significantly by
the fact that there were only two candidates running for two
seats.  In any event, the county's assertion that there is some
level of cross-over voting does not mean that, as a general
matter, white voters do not vote as a bloc to defeat black-
preferred candidates in Northampton County.  As noted above, our
analysis did not indicate a total absence of white support for
black-preferred candidates, only that the level of such support
was, in most instances, minimal, at best.

The election patterns within the county since 1991 do not
alter our view.  In the last ten years, no black-preferred
candidate has won in a district in which whites were a majority
of the VAP and in the district in which neither blacks nor whites
constitute a majority of the total VAP, a black-preferred
candidate has only won once in the past three elections.

The analysis of electoral behavior indicates that a
reduction of only a few percentage points has the potential for a
significant difference in the outcome.  Accordingly, the county

- 3 -

has not established that a plan that unnecessarily reduces the
black population percentage in these districts will afford them
the same ability to elect candidates of choice that they now
have.

The county has also suggested any retrogression was
unavoidable because the county's black VAP percentage dropped 2.4
points since 1990, and is now 40.6 percent.  We have examined the
county's argument and have determined that it does not withstand
scrutiny.

First, the county's proposed plan does not even maintain
black voting strength in two of the six districts, much less the
three existing districts.  Even considering black and other
minority voters together, the plan presently before us results in
a retrogression of black voting strength.  Second, as we informed
you on September 28, 2001, during our review of the county's 2001
redistricting plan, we devised an illustrative plan that was not
retrogressive as one means of determining whether the
retrogression that we discovered in your plan was avoidable.
*Guidance Concerning Redistricting and Retrogression under Section
5 of the Voting Rights Act of 1965*, 42 U.S.C. 1973c, 66 Fed. Reg
5411, 5413 (January 18, 2001).

We have discussed that plan with you on several occasions
since that time.  As you know, the purpose of the illustrative
plan is only to indicate that a non-retrogressive plan is
possible and the county has no obligation to consider the
illustrative plan for any purpose other than that.  However, the
reasons provided by the county for not adopting a non-
retrogressive plan similar to the illustrative plan are not
persuasive.  The county has indicated that certain features in
the illustrative plan (for example, the distances some voters
must drive to vote) make the plan, in its view unacceptable;
however, it concedes that these same features exist in its
proposed plan, the benchmark plan, or both.  Moreover, following
the April 10, 2002, meeting with Departmental employees, at which
the county identified, for the first time, several unincorporated
areas whose boundaries, although somewhat vague, could not be
split by district lines, we revised the illustrative plan to
address each of the concerns raised regarding community
boundaries, and developed a plan with black VAP percentages
similar to those in the benchmark.  Thus, despite the various

- 4 -

restraints that the county is operating under, the retrogression that would result from implementation of the 2002 plan is avoidable.

Under these circumstances, I am unable to conclude as I must under Section 5, that the county has met its burden of demonstrating that the redistricting plan does not have a discriminatory effect. <u>Georgia</u> v. <u>United</u> States, 411 U.S. 526 (1973); see also 28 C.F.R 51.52. Therefore, on behalf of the Attorney General, I must object to the 2002 redistricting plan for the board of supervisors of Northampton County.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the submitted plan continues to be legally unenforceable.  Clark v. <u>Roemer</u>, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

The Attorney General will make no determination regarding the submitted realignment of voting precincts because it is dependent upon the objected to redistricting plan.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Northampton County plans to take concerning this matter.  If you have any questions, you should call Mr. Robert P. Lowell (202-514-3539), an attorney in the Voting Section.

Sincerely,

Ralph F. Boyd, Jr.
Assistant Attorney General