# Exhibit 4



U.S. Department   Justice

Civil Rights Division

---

Office of the Assistant Attorney General

Washington, D.C. 20035

APR 29 2002

Mr. William D. Sleeper
County Administrator
Mr. Fred M. Ingram
Chairperson, Board of Supervisors
P.O. Box 426
Pittsylvania, Virginia  24531

Dear Mr. Sleeper and Mr. Ingram:

This refers to the 2001 redistricting plan for the board of supervisors and school board for Pittsylvania County, Virginia, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your responses to our September 14, 2001, request for additional information on February 26, 2002, and supplemental information through March 12, 2002. We have considered carefully the information you have provided, as well as census data, comments and information from other interested parties, and other information, including the county's previous submissions. Based on our analysis of the information available to us, I am compelled to object to the submitted redistricting plans on behalf of the Attorney General.

The 2000 Census indicates that Pittsylvania County has a population of 61,745, of whom 23.7 percent are black. The county's board of supervisors consists of a total of seven members elected from single member districts to serve four-year, concurrent terms. The county school board is coterminous with the county board of supervisor districts.

According to census data, under the redistricting plan currently in effect, the benchmark plan, there is one district, the Bannister District, in which black persons are a majority of the population. That district has a total black population of 51.3 percent and a black voting age population of 50.2 percent. Since 1991 black voters have had the ability to elect their candidate of choice in this district. The county is proposing a plan, which will reduce the black population in the district to below 50 percent black.

While the reduction in black population in the Banister District is relatively small, a variety of factors preclude the county from establishing, as it must under Section 5 of the Voting Rights Act, that the adoption of this plan is free from either discriminatory effect or purpose.

First, the impact of this reduction is retrogressive. Our analysis of county elections shows that the level of racial polarization is extreme, such that any reduction whatsoever would call into question the continued ability of black voters to elect their candidate of choice. Based on the high level of vote polarization in the county, dropping the percentage of the Banister District below 50 percent black is very likely to severely limit the ability black voters have had throughout the 1990s to elect their candidates of choice.

A proposed change has a discriminatory effect when it will "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." Beer v. United States, 425 U.S. 125, 141 (1976). If the proposed plan materially reduces the ability of minority voters to elect candidates of their choice to a level less than what they enjoyed under the benchmark plan, preclearance usually must be denied. State of Georgia v. Ashcroft, C.A. No. 2001-2111 (D.D.C. Apr. 5, 2002), slip op. at 117-18.

Also important to our conclusion that an objection is warranted is the availability of easily constructed alternative plans that not only are non-retrogressive and meet other traditionally recognized redistricting principles, but are ameliorative, in that they increase the voting strength of minority voters in the Banister District. While by no means dispositive, the Department has recognized this factor as important to an analysis of retrogression. Guidance Concerning Redistricting and Retrogression under Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c, 66 Fed. Reg 5411 (January 18, 2001).

With respect to the county's ability to demonstrate that the plan was adopted without a prohibited purpose, the starting point of our analysis is Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266 (1977). Under Arlington Heights, the Supreme Court identified the analytical structure for determining whether racially discriminatory intent exists. This approach requires an inquiry into 1) the impact of the decision; 2) the historical background of the decision, particularly if it reveals a series of decisions undertaken with discriminatory intent; 3) the sequence of events leading up to the decision; and 4) whether the challenged decision departs,

either procedurally or substantively, from the normal practice; and contemporaneous statements and viewpoints held by the decision-makers. Id. at 266-68.

Several factors establish that the county falls short of demonstrating the lack of retrogressive purpose. Chief among these are (1) it appears that the Board procedurally blocked formal consideration of alternative, ameliorative plans supported by at least one council member and members of the black community; (2) the county was aware of easily drafted, non-retrogressive and ameliorative alternatives, most of which were in fact similar to the county's own preferred plan; and (3) the apparently pretextual nature of the reasons given by the county for its decision to adopt the plan rather than a non-retrogressive alternative.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); Reno v. Bossier Parish School Board, 528 U.S. 320 (2000); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude that your burden has been sustained in this instance. Therefore, on behalf of the Attorney General, I must object to the submitted redistricting plan.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the changes continue to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

The Attorney General will make no determination regarding the submitted realignment of voting precincts, and four polling place changes because they are dependent upon the redistricting plan.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Pittsylvania County plans to take concerning this matter. If you have any questions, you should call Ms. Maureen Riordan (202) 353-2087, an

attorney in the Voting Section. Refer to File Nos. 2001-2026 and 2001-2501 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Ralph F. Boyd, Jr.
Assistant Attorney General
Civil Rights Division