# Exhibit 5



U.S. Department of Justice

Civil Rights Division

---

*Office of the Assistant Attorney General*  *Washington, D.C. 20035*

SEP 28 2001

Bruce D. Jones, Jr., Esq.
County Attorney
P.O. Box 690
Eastville, Virginia  23347-0690

Dear Mr. Jones:

    This refers to the change in the method of electing the board of supervisors from six single-member districts to three double-member districts; the 2001 redistricting plan for the board of supervisors; the realignment of voting precincts; and the polling place change for Northampton County, Virginia, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.  We received your responses to our July 18, 2001, request for additional information on July 30, 31, and August 2, 2001.

    The Attorney General does not interpose any objection to the polling place change.  However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the change.  See the Procedures for the Administration of Section 5 (28 C.F.R. 51.41).

    With regard to the remaining specified changes, we have considered carefully the information provided, as well as information in our files, Census data, and comments from other interested persons.  According to the 2000 Census, Northampton County has a population of 13,093, of whom 43.1 percent are black, and 3.5 percent are Hispanic.  Since 1990, it appears that the county's overall population increased by 32 persons.

- 2 -

Our analysis of the county's electoral history indicates that under the current method of election, which utilizes six single-member districts, black voters have been able to elect candidates of their choice to office in three districts. According to the 2000 Census, Districts 1, 3, and 6 are majority-minority in total and voting age populations. We note that the county changed its method of election from three double-member districts to six single-member districts in 1991, in response to concerns that the three double-member districts diluted the black vote in the county. Since 1991, black supervisors have been elected in all three of the majority-minority districts, and currently represent two districts.

The proposed redistricting plan contains no districts in which minorities constitute a majority of the voting age population. One district has a total minority population of 51.9 percent and a minority voting age population of 48.8 percent. The other two districts have minority voting age populations of 39.3 percent and 43.5 percent. The county maintains that the change to the three-district system was adopted in order to facilitate the inclusion of incorporated towns within single election districts and to make access to polling places more convenient to voters. According to the submission, the county determined that it was not feasible to maintain six districts and to include towns with recent annexations wholly within single districts.

However, our analysis does not support the county's position that maintaining six districts was not feasible. As provided for in the Department's Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 66 Fed. Reg. 5412, at 5413, (Jan. 18, 2001), we developed an illustrative six-district plan as part of our review of the county's submission. The plan is not significantly different from the existing benchmark plan. Under the illustrative plan, each town is wholly contained within a single district, the county's redistricting criteria are substantially met, and the one-person/one-vote requirement is satisfied.

-3-

Our analysis further reveals that the county failed to seriously consider any alternative plans that would not violate the non-retrogression requirement of Section 5. It appears that the county gave little or no serious consideration to the impact on the ability of minority voters to elect candidates of their choice, when it replaced a plan in which minorities constitute voting age majorities in three districts with a plan under which minorities of voting age do not constitute a voting age majority in any district. For reasons not fully explained, a six-district plan that had been prepared by the county was never completed.

The county maintains that the proposed plan is not retrogressive with regard to minority representation because there are currently two minority supervisors on the board, and that there were two on the board prior to the 1991 redistricting plan. This position misstates the standard that the county must meet under Section 5. Under the last precleared benchmark plan, against which the proposed plan must be measured, there are three districts, not two, in which minorities constitute a majority of the total and voting age populations, with a history of electing candidates preferred by minority voters in each of the three districts.

The county suggests that the minority community, with the use of single-shot voting, could still elect three candidates of choice under the proposed plan. Our analysis, however, does not indicate that minority voters will continue to have the same opportunity under the proposed plan that they currently have to elect even two candidates of choice. In our view, the available information concerning voting patterns within the county suggests the presence of racially polarized voting. An examination of the populations of the proposed districts indicates that it is unlikely that the minority community would be able to elect two, much less, three candidates of choice.

Given the demographics of the county and apparent voting patterns within it, the jurisdiction has not carried its burden to show that the proposed change in the method of election and the redistricting plan will not significantly reduce the ability of minority voters to elect candidates of their choice to the board of supervisors.

- 4 -

Under these circumstances, I am unable to conclude as I must under Section 5, that the county has met its burden of demonstrating that the submitted changes have neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also 28 C.F.R 51.52. Therefore, on behalf of the Attorney General, I must object to the change in the method of electing the board of supervisors from six single-member districts to three double-member districts and the 2001 redistricting plan for the board of supervisors of Northampton County.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed changes neither have the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the submitted plan continues to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

The Attorney General will make no determination regarding the submitted realignment of voting precincts because it is dependant upon the objected to change in the method of election and the redistricting plan.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Northampton County plans to take concerning this matter. If you have any questions, you should call Mr. Robert P. Lowell (202-514-3539), an attorney in the Voting Section.

Sincerely,

Ralph F. Boyd, Jr.
Assistant Attorney General
Civil Rights Division