Exhibit 6



U.S. Department of Justice

Civil Rights Division

*Office of the Assistant Attorney General*     *Washington, D.C. 20035*

July 9, 2002

Darvin Satterwhite, Esq.
County Attorney
P.O. Box 325
Goochland, Virginia  23063

Dear Mr. Satterwhite:

    This refers to the 2001 redistricting plan for the board of supervisors for Cumberland County, Virginia, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.  We received your most recent response to our October 15, 2001, request for additional information on May 10, 2002.

    We have carefully considered the information you have provided, as well as census data, and comments and information from other interested parties.  Based on the information available to us, I am compelled to object to the submitted 2001 redistricting plan on behalf of the Attorney General.

    According to the 2000 Census, black persons represent 37.5 percent of Cumberland County's total population and 35.9 percent of its voting age population.  The county's board of supervisors consists of five members elected from single-member, residency districts to serve four-year terms.  According to the 2000 Census, District 3 is the only district in which black persons constitute a majority of the total population.  Under the existing, or benchmark, plan, they constitute 55.9 percent of the total population, which, under the proposed plan would be reduced to 55.3 percent.  Additionally, 2000 Census data indicates that this district has a majority black voting age population of 55.7 percent which would be reduced to 55.2 percent under the county's proposed plan.

-2-

The county suggests that there was a thorough, complete, and exhaustive consideration of a variety of possible district boundaries. However, despite our repeated requests for alternative plans, the county has provided but a single alternative configuration of the district, which has virtually identical demographics as the one for which preclearance is sought. The benchmark and proposed plans that were included in the county's response are not considered alternative plans for purposes of our Section 5 review.

Under the benchmark plan, the district had a deviation of 9.7 percent, clearly necessitating the removal of some persons to bring it within the county's goal of a ±5 percent deviation. In order to comply with the one-person, one-vote standard, the county removed 213 persons from the district.

This action does not withstand scrutiny as support of the county's claim that its actions were taken without an intent to retrogress, and indeed the county has not carried its burden of proving a lack of retrogressive intent. In its initial submission the county claims to have reviewed 15 to 20 alternative plans, in an effort to ensure that black voting strength was maintained. Yet despite repeated requests for these materials the county has never produced them. Moreover, the magnitude of the population movement in the revised District 3 was excessive because it resulted in the district being transformed from the most overpopulated district to the most underpopulated, with a deviation of -2.3 percent. In addition, not only did the county remove more population than was necessary, but the areas that the county did choose to remove were those areas with a significantly higher level of black population concentration than of the district as a whole. Finally, the areas that were moved out of the district were the areas from which the black-preferred candidate in District 3 drew substantial support in the 1995 and 1999 elections.

It is especially important to view this change in light of alternative plans that could have been drawn. In part, because the county refused to provide us with all alternatives it considered, we sought to determine whether there were illustrative plans that meet the county's redistricting criteria, but which did not result in the retrogression evidenced by the proposed plan. See Guidance Concerning Redistricting and Retrogression Under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, 66 Fed. Reg. 5411, 5413 (Jan. 18, 2001). We created two illustrative plans, each drawn using a least-change approach involving the exchange of very few Census blocks and resulting in little to no impact on the boundaries of the benchmark plan.

-3-

Both plans remain within the county's deviation goals, avoid pitting incumbents against each other, and bring the boundaries of the district into greater conformance with the boundaries of the benchmark plan. And in each plan, the black total and voting age populations is maintained and increased in District 3 and the retrogression is eliminated. In one plan, the black population percentage in District 3 is 56.8 percent and in the other it is 57.1. In fact, given the demographics in the area, it was virtually impossible to devise an illustrative plan which did not increase the district's black population percentage.

Under Section 5 of the Voting Rights Act, the submitting authority has the burden of showing that a submitted change has neither a discriminatory purpose nor a discriminatory effect. Georgia v. United States, 411 U.S. 526 (1973); see also the Procedures for the Administration of Section 5 (28 C.F.R. 51.52). In light of the considerations discussed above, I cannot conclude that your burden has been sustained with regard to discriminatory purpose in this instance. Therefore, on behalf of the Attorney General, I must object to the 2001 redistricting plan.

We note that under Section 5 you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that the proposed change neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race, color, or membership in a language minority group. See 28 C.F.R. 51.44. In addition, you may request that the Attorney General reconsider the objection. See 28 C.F.R. 51.45. However, until the objection is withdrawn or a judgment from the District of Columbia Court is obtained, the submitted plan continues to be legally unenforceable. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.

To enable us to meet our responsibility to enforce the Voting Rights Act, please inform us of the action Cumberland County plans to take concerning this matter. If you have any questions, you should call Ms. Maureen Riordan (202-353-2087), an attorney in the Voting Section.

Sincerely,

Ralph F. Boyd, Jr.
Assistant Attorney General