Exhibit 8

U.S. Department of Justice

Civil Rights Division

Office of the Assistant Attorney General     Washington, D.C. 20530

March 12, 1982

Honorable Gerald L. Baliles
Attorney General
Commonwealth of Virginia
Supreme Court Building
101 North Eighth Street
Richmond, Virginia 23219

Dear Mr. Attorney General:

This is in reference to Chapter 16 of the 1981 Acts of Assembly (Special Session), which reapportions the Virginia House of Delegates, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C. 1973c. Your submission was completed on March 5, 1982. In accordance with your request expedited consideration has been given this submission pursuant to Section 51.32 of the Procedures for the Administration of Section 5 (46 Fed. Reg. 877).

We have given your submission careful attention. Our review has encompassed the materials forwarded by your office, relevant decisions of the federal courts, information and comments provided by a variety of interested individuals and groups across Virginia, and information obtained in connection with previous redistricting efforts. In this connection we must note that in 1981 we found it necessary to interpose objections to certain House and Senate district configurations which fragmented or submerged black population concentrations. In light of the alternatives that were available to the State, we were unable to conclude that these apparent departures from a consistent application of the racially neutral guidelines adopted by the Assembly were free of the racial purpose and effect proscribed by the Voting Rights Act.

- 2 -

While a thorough examination of all available information has persuaded us that Chapter 16 satisfies Section 5 requirements in most of the State, the plan's treatment of the following areas raises concerns similar to those which prompted our earlier objections. We note, for example, that Chapter 16 retains the City of Norfolk as a large multi-member district, despite the change to an otherwise uniform policy of utilizing single-member districts. It appears, that the stated rationale for separate treatment of Norfolk (the presence of a large population which does not vote locally) was not considered or applied uniformly throughout the state in this or any previous Virginia apportionment, and that indeed there appears to be no insurmountable impediment to the division of this population among two or more districts. Norfolk's anomalous treatment is of particular relevance in that a fairly apportioned plan of single member districts would provide for two districts with substantial black majorities. Absent a necessary and consistently applied basis for retaining a multi-member district, the proposed Norfolk multi-member district has the inevitable effect of limiting the potential of minorities electing candidates of their choice.

We are similarly concerned with the single-member districts drawn in Newport News, Hampton, Portsmouth, and the alternatively adopted districts in Norfolk. Chapter 16 "packs" most of the concentrated black population of Hampton and Newport News into one 75% black district, a level which appears to be well in excess of that necessary to give black voters a fair opportunity to elect a candidate of their choice, while the remainder of the black concentration is divided among three other districts, all of which have substantial white majorities. Our analysis shows that a fairly drawn plan in this area would contain two districts with substantial black majorities. The black community of Portsmouth is divided between two districts, both with white voting age majorities, even though any alternative plan which respected their strong local community of interest would contain one district with a large black majority.

- 3 -

Finally, while two of the alternative districts defined for the City of Norfolk by Chapter 16 contain sizeable black majorities, one of these, district 90, is so contorted as to be likely to confuse voters and candidates, and to exacerbate the financial and other disadvantages experienced by many black candidates. Each of these configurations would appear to have a potentially detrimental impact on the opportunities of black voters to elect candidates of their choice.

Our investigation has revealed no sound reasons for these departures from the general state policy of maintaining intact local communities of interest. It appears, moreover, that these communities were divided without significant consultation with local minority group members. Under the totality of circumstances, therefore, I am unable to conclude, as I must under Section 5, that the treatment by Chapter 16 of these areas has no discriminatory purpose or effect. Accordingly, I, must, on behalf of the Attorney General, interpose an objection to Chapter 16, 1981 Act of Assembly (Special Session).

Of course, as provided by Section 5 of the Voting Rights Act, you have the right to seek a declaratory judgment from the United States District Court for the District of Columbia that this change has neither the purpose nor will have the effect of denying or abridging the right to vote on account of race, color or membership in a language minority group. In addition, the Procedures for the Administration of Section 5 (Section 51.44, 46 Fed. Reg. 878) permit you to request the Attorney General to reconsider the objection. However, until the objection is withdrawn or the judgment from the District of Columbia Court is obtained, the effect of the objection by the Attorney General is to make the proposed reapportionment legally unenforceable.

- 4 -

To enable this Department to meet its responsibility to enforce the Voting Rights Act, please inform us of the course of action the Commonwealth of Virginia plans to take with respect to this matter. If you have any questions concerning this letter, please feel free to call Carl W. Gabel (202-724-8388), Director of the Section 5 Unit of the Voting Section.

Sincerely,

Wm. Bradford Reynolds
Assistant Attorney General
Civil Rights Division