**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 3:14-cv-00852-REP-GBL-BMK |
| | ) |
| VIRGINIA STATE BOARD OF | ) |
| ELECTIONS, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**<u>TRIAL BRIEF OF DEFENDANTS</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................ 2

    I.   THE REDISTRICTING PROCESS ......................................................... 2

    II.  PROCEDURAL HISTORY ..................................................................... 5

LEGAL OVERVIEW ....................................................................................................... 6

    I.   EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT ........ 7

    II.  THE VOTING RIGHTS ACT .................................................................. 8

        A.  Section 2.......................................................................................8

        B.  Section 5.......................................................................................8

ISSUES TO BE PRESENTED AT TRIAL .................................................................... 11

    I.   PLAINTIFFS MUST ESTABLISH RACIAL GERRYMANDERING IN VIOLATION OF THE EQUAL PROTECTION CLAUSE...................................... 11

        A.  Plaintiffs Must Prove that Race Predominated and the House of Delegates Subordinated Traditional Redistricting Principles to Race in Enacting the 2011 Plan. ............................................................................................12

        B.  Assuming that Plaintiffs Can Establish that Race Predominated, the 2011 Plan Survives Strict Scrutiny Because It Is Narrowly Tailored to Comply with the VRA. .........................................................................15

            1.  Compliance with the VRA required the House of Delegates to retain 12 majority African-American districts in the 2011 Plan. ............................ 16

            2.  The Challenged Districts have a minimum BVAP level of 55% to provide African-American voters "the ability to elect a representative of their choice.".................................................................... 19

    II.  PLAINTIFFS MUST ESTABLISH VOTE DILUTION UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT. .................... 22

CONCLUSION............................................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015) ............................................. passim

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, No. 03-CV-502 (NAM/DRH), 2003 U.S. Dist. LEXIS 11386 (N.D.N.Y July 7, 2003) ................................... 20

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ................................................................ 19, 20

*Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451 (N.D. Tex. 2010) ........................... 20

*Bush v. Vera*, 517 U.S. 952 (1996) ................................................................. 7, 12, 16

*City of Richmond v. United States*, 422 U.S. 358 (1975) ................................................. 17

*Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp. 2d 563 (N.D. Ill. 2011) ................................................................. 20

*Cousin v. Sundquist*, 145 F.3d 818 (6th Cir. 1998) ...................................................... 20

*Dickinson v. Ind. State Election Bd.*, 933 F.2d 497 (7th Cir. 1991) ..................................... 20

*Easley v. Cromartie*, 532 U.S. 234 (2001) .............................................................. 11

*Fabela v. City of Farmers Branch*, No. 3:10-CV-1425-D, 2012 U.S. Dist. LEXIS 108086 (N.D. Tex. Aug. 2, 2012) ..................................... 20

*Ga. State Conf. of the NAACP v. Fayette County Bd. of Comm'rs*, 996 F. Supp. 2d 1353 (N.D. Ga. 2014) ............................................................... 10

*Georgia v. Ashcroft*, 539 U.S. 461 (2003) ............................................................. 17

*Gonzalez v. Harris County*, 601 Fed. Appx. 255 (5th Cir. 2015) ....................................... 20

*Holder v. Hall*, 512 U.S. 874 (1994) ................................................................... 8

*Hunt v. Cromartie*, 526 U.S. 541 (1999) .............................................................. 12

*Jeffers v. Clinton*, 756 F. Supp. 1195 (E.D. Ark. 1990) ............................................... 20

*Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir. 1984) ..................................................... 20

ii

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ............................................................ 10

*Miller v. Johnson*, 515 U.S. 900 (1995) ................................. 9, 11, 13, 22

*Mobile v. Bolden*, 446 U.S. 55 (1980) ........................................ 7, 23, 24

*Montes v. City of Yakima*, 40 F. Supp. 3d 1377 (E.D. Wash. 2014) .......... 20

*NAACP v. Austin*, 857 F. Supp. 560 (E.D. Mich. 1994) ..................... 20, 24

*Neal v. Coleburn*, 689 F. Supp. 1426 (E.D. Va. 1988) ......................... 21

*Page v. Va. State Bd. of Elections*, No. 3:13cv678,
   2015 U.S. Dist. LEXIS 73514 (E.D. Va. June 5, 2015) .................. passim

*Parker v. Ohio*, 263 F. Supp. 2d 1100 (S.D. Ohio 2003) ....................... 20

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ......................... 24

*Pope v. County of Albany*, 687 F.3d 565 (2d Cir. 2012) ....................... 20

*Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471 (1997) ...................... 9, 23

*Reynolds v. Sims*, 377 U.S. 533 (1964) ........................................... 7

*Rossito-Canty v. Cuomo*, No. 15-CV-0568,
   2015 U.S. Dist. LEXIS 18796 (E.D.N.Y. Feb. 16, 2015) ..................... 20

*Shaw v. Hunt*, 517 U.S. 899 (1996) ............................................... 11

*Shaw v. Reno*, 509 U.S. 630 (1993) ............................................. 7, 22

*Shelby County v. Holder*, 133 S. Ct. 2612 (2013) ..................... 7, 8, 9, 10

*Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006) ............................. 21

*Smith v. Clinton*, 687 F. Supp. 1361 (E.D. Ark. 1988) ......................... 20

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) ........................... 8, 9

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ..................................... 7, 8

*Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848 (5th Cir. 1999) ...... 20

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ......... 23

*Washington v. Finlay*, 664 F.2d 913 (4th Cir. 1981) ........................................................ 7, 23, 24

*Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109 (5th Cir. 1991) .......... 20

*Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973) ................................................... 23

**Statutes**

52 U.S.C. §§ 10101, *et seq.* ........................................................................... 3, 4

52 U.S.C. § 10301 ...................................................................................... 8, 9, 19

52 U.S.C. § 10302 ........................................................................................... 8

52 U.S.C. § 10303 ...................................................................................... 8, 9

52 U.S.C. § 10304 ...................................................................................... 8, 9, 17

Va. Code Ann. § 24.2-103 ................................................................................. 2

Va. Code Ann. § 24.2-304.03 .............................................................................. 5

Va. Code Ann. § 24.2-404 ................................................................................. 2

**Other Authorities**

U.S. Const., Art. VI, cl. 2 ................................................................................. 6

Va. Const. Art. II, § 6 ..................................................................................... 2

## INTRODUCTION

This matter involves the constitutionally of twelve Virginia House of Delegate districts drawn and enacted by the Virginia General Assembly in 2011.  The Virginia State Board of Elections ("SBE"), and their members, and the Virginia Department of Elections ("ELECT"), and its Commissioner (collectively "the Defendants"), implement and oversee elections in the Commonwealth and set administrative policies related to those elections.  As administrative agencies, they had no substantive role in the drawing or enactment of the Virginia House of Delegates' 2011 redistricting legislation.

The Virginia General Assembly, which consists of the House of Delegates and Senate, are responsible for drawing and enacting redistricting legislation.  Once HB 5005, the bill setting forth the 2011 redistricting plan, was passed by the General Assembly and signed into law by the Governor, Defendants were legally bound to implement the new districts and administer elections consistent with the law.

Upon the filing of the complaint in this matter, the Defendants were the sole defendants and began to mount a defense.  However, the House of Delegates and its speaker William J. Howell ("Defendant-Interveners") – the parties that actually drew the House districts enacted by HB 5005 – quickly intervened in the matter and are defending the plan they created and enacted.  To avoid duplicating efforts, conserve state and judicial resources in the defense of this action, and avoid potentially contradictory defenses that could undermine one another, Defendants, representing the SBE and ELECT in their official capacity and thus the Commonwealth, will allow Defendant-Interveners' to lead the defense of this matter.   Accordingly, Defendants have withdrawn their

designated expert witness and do not intend to present witnesses or exhibits at trial beyond that which will be presented by Defendant-Interveners.

## FACTUAL BACKGROUND

Defendants SBE and ELECT are administrative agencies created for the sole purpose of implementing and overseeing elections in the Commonwealth and setting administrative policies related to those elections:

> The State Board, through the Department of Elections, shall supervise and coordinate the work of the county and city electoral boards and of the registrars to obtain uniformity in their practices and proceedings and legality and purity in all elections. It shall make rules and regulations and issue instructions and provide information consistent with the election laws to the electoral boards and registrars to promote the proper administration of election laws . . . .

Va. Code Ann. § 24.2-103; *see also* § 24.2-404 *et seq.* (ELECT shall provide for operation and maintenance of voter registration system). The SBE and ELECT have no substantive role in drawing or enacting of the Commonwealth's redistricting legislation.

The Virginia Constitution requires that the General Assembly reapportion and redistrict electoral districts in 2011 and each tenth year thereafter. Va. Const. Art. II, § 6. Each district "shall be composed of contiguous and compact territory and shall be so constituted as to give, as nearly as is practicable, representation in proportion to the population of the district." *Id.* To comply with Article II, § 6 of the Constitution, the General Assembly was required to enact new electoral House of Delegates districts in 2011.

## I.    THE REDISTRICTING PROCESS

The General Assembly began preparing for the decennial legislative redistricting by reviewing census geography, incorporating Virginia's voting precincts in the census geography, reviewing census redistricting data at the voting precinct level, building a geographic information

2

system, and acquiring software to enhance the system used in 2001.  Department of Justice

Submission Attachment 17 – Legislative History of 2011 Virginia General Assembly Redistricting

Plans (hereinafter "Attachment 17").[1]  In 2010, the House of Delegates Committee on Privileges

and Elections scheduled a series of six different public hearings throughout Virginia encouraging

public input on the redistricting process.  *Id.*  This was the first time the Commonwealth had ever

actively sought out public comment in the redistricting process.

On February 3, 2011, Virginia received redistricting data from the U.S. Census Bureau in

the form of Public Law 94-171.  *Id.*  From February 27 to April 4, 2011, the General Assembly

convened for a redistricting special session.  *Id.*  In March and April 2011, eight public hearings

were held throughout the Commonwealth.  *Id.*  Throughout the redistricting process, members of

the public testified to all aspects of the process of redistricting and the effect it may have on

communities of interest throughout the Commonwealth, the protection of the equal population

principle, and the avoidance of retrogressing majority-minority districts.  H.D. 2011 Spec. Sess. I,

at 38 (Va. April 5, 2011) (statement of Del. Jones).  This testimony and information was received

both through comments made at the public hearings as well as written and oral submissions made

to the Committee on Privileges and Elections and individual representatives.

---

[1]  In this brief, Defendants reference exhibits that both Defendant-Interveners and Plaintiffs will
be presenting and relying on at trial, namely, the § 5 preclearance submission to the Department
of Justice with regard to the 2011 Plan and legislative testimony by Delegates Jones, Armonstrong,
Morrissey, and Tyler at the April 5, 2011 Special Session.  Because exhibit lists are due the same
day as trial briefs, Defendants have not referenced the exact exhibit number in the citations set
forth herein.  After the exhibits are filed and if the Court requests, Defendants will supplement this
Trial Brief with updated record citations.

On March 25, 2011, the House Committee on Privileges and Election adopted a resolution setting out the criteria that the committee would follow in reviewing redistricting plans for the House of Delegates.  Department of Justice Submission Attachment 4 – Committee Resolution No. 1 (hereinafter "Attachment 4").  The guidelines included compliance with population equality principles based on the 2010 census data, federal and state constitutional requirements, the Voting Rights Act of 1965, 52 U.S.C. §§ 10101 *et seq*. ("VRA"), and traditional redistricting factors such as contiguity, compactness, and communities of interest.  *Id.*  The guidelines further expressly stated that the foregoing criteria "shall be considered in the districting process, but population equality among districts and compliance with federal and state constitutional requirements and the Voting Rights Act of 1965 shall be given priority in the event of conflict among the criteria."  *Id.*

On April 18, 2011, Delegate Jones introduced House Bill 5005, the bill setting forth Virginia's 100 House of Delegates districts (the "2011 Plan").  Attachment 17.  On April 25, 2011, the House voted to engross HB 5005 and on April 27, 2011, the House passed HB 5005 by a vote of 80-9.  *Id.*

The official 2010 U.S. census data showed that from 2000 to 2010, Virginia's overall population growth rate was 13%.  Department of Justice Submission Attachment 5 – Statement of Minority Impact (hereinafter "Attachment 5").  The data also showed that Virginia's African-American population grew at a rate of 11.6%, increasing from 1,390,293 in 2000 to 1,551,399 in 2010.  *Id.*  In the case of the 12 districts that contained majority African-American population after the 2001 redistricting process, the 2010 data showed that most of the 12 districts experienced growth rates well below the state average and, in a few cases, actually lost population over the decade.  *Id.*  In fact one of the districts had such a dramatic change in demographics that in 2011,

4

prior to the passage of HB 5005, African-Americans no longer constituted a majority of the voters in that district. *Id.*, at Table 5.1. Despite demographic changes resulting in the loss of population in these districts, the 2011 Plan contained twelve majority African-American districts (the "Challenged Districts"),[2] the same number as the Commonwealth's prior plan. *See id.* Eleven of the 12 African-American majority districts in the prior plan were below the ideal population by a total of 79,310 and only one of these districts was above the ideal population by 143. Attachment 17. The 12 Challenged Districts had a black voting age population ("BVAP"), ranging from 55.2% to 60.7%. *Id.* All delegates from the Challenged Districts voted for final passage of HB 5005 with the exception of Delegates Morrissey (74th), Tyler (75th) and Ward (92nd).[3] *Id.*

HB 5005 was signed into law by Virginia Governor Robert F. McDonnell on April 29, 2011, codified at Va. Code Ann. § 24.2-304.03, and submitted to the Attorney General of the United States for preclearance as required by Section 5 of the VRA. On June 17, 2011, the 2011 Plan received preclearance from the U.S. Attorney General. On November 8, 2011, Virginia held its first series of elections under the 2011 Plan.

## II.   PROCEDURAL HISTORY

On December 22, 2014, Plaintiffs, individual voters residing in the Challenged Districts, filed a complaint against Defendants seeking declaratory and injunctive relief prohibiting Defendants from implementing or conducting further elections on the Challenged Districts of the

---

[2] The 12 Challenged Districts are districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95.

[3] Delegate Morrissey voted against the 2011 Plan not because of concern about his District but rather because of his distaste that the overall plan was designed by the Republican controlled House to eliminate seats of white Democratic Leaders of the House, including then Minority Leader, Delegate Ward Armstrong. H.D. 2011 Spec. Sess. I, at 19-21 (Va. April 5, 2011) (statement of Del. Morrissey).

2011 Plan.[4]  *See* Dckt. No. 1.  Plaintiffs filed an amended complaint on June 16, 2015.  *See* Dckt. No. 71.   Plaintiffs allege that African-Americans were unconstitutionally packed into the Challenged Districts through the General Assembly's adoption of a "55% African-American voting age population floor for each of the twelve Challenged Districts."  Am. Compl. ¶¶ 35, 40. Plaintiffs allege a single cause of action – Violation of the Equal Protection Clause of the United States Constitution – resulting in "racial gerrymandering" and illegal vote dilution in the form of packing.  *Id.* ¶¶ 1, 2.

Defendants, SBE and ELECT, however, do not have the power to redistrict or reapportion and thus are not the real party in interest.  Nevertheless, Defendants filed an Answer with the intent of defending the duly enacted 2011 Plan.  On January 23, 2015, the Virginia House of Delegates and Virginia House of Delegates Speaker William Howell, the parties that actually drew and enacted the 2011 Plan, filed a motion seeking leave to intervene in this case.  Dckt No. 12.  The Court granted the Motion to Intervene on February 3, 2015.  Dckt No. 26.   As discovery progressed, it became clear that Defendant-Interveners would zealously defend the 2011 Plan that they created and enacted.   To avoid duplicating efforts, conserve resources, and prevent contradictory defenses, Defendants will allow Defendant-Intervener's to present the primary defense of this matter.  Nevertheless, the following is the Defendants' position on the status of the law on redistricting as it stands today.

## LEGAL OVERVIEW

The Constitution and laws of the United States are "the supreme Law of the Land."  U.S. Const., Art. VI, cl. 2.  "The Supremacy Clause obliges the States to comply with all constitutional

---

[4] The general election for the House of Delegates will take place on November 3, 2015.

6

exercises of Congress' power." *Bush v. Vera*, 517 U.S. 952, 991-92 (1996).  The Supremacy Clause thus requires a State's redistricting legislation to comply with the Fourteenth Amendment and the Voting Rights Act.  *Page v. Va. State Bd. of Elections*, No. 3:13cv678, 2015 U.S. Dist. LEXIS 73514, at *80 (E.D. Va. June 5, 2015) (Payne, J., dissenting).

## I.    EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT

The Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution guarantees citizens the right to vote free of discrimination on the basis of race.  *Shelby County v. Holder*, 133 S. Ct. 2612, 2633 (2013) (Ginsburg, J., dissenting).  The Equal Protection Clause requires that both houses of a state legislature be apportioned on a population basis, reflecting "the fundamental principle of representative government in this country [which] is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State." *Reynolds v. Sims*, 377 U.S. 533, 560-61 (1964).  It further protects against (1) claims of racial gerrymandering where "the legislation, though race neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification", *Shaw v. Reno*, 509 U.S. 630, 649 (1993) ("*Shaw I*"), and (2) claims of vote dilution having a discriminatory effect and discriminatory purpose chargeable to the state, *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981) (citing *Mobile v. Bolden*, 446 U.S. 55, 66-70 (1980)).[5]

---

[5] A claim of vote dilution is recognized under the Equal Protection Clause as well as § 2 of the VRA. *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986).  Vote dilution of a racial minority group's voting strength may be caused by (1) the dispersal of African-American voters into districts in which they constitute an ineffective minority of voters or from (2) the packing or concentration of African-American voters into districts where they constitute an excessive majority.  *Thornburg*, 478 U.S. at 46 n.11.

## II.      THE VOTING RIGHTS ACT

In 1964, Congress exercised its power to enforce the Fourteenth and Fifteenth Amendment through its enactment of the VRA.  *Shelby*, 133 S. Ct. at 2634 (Ginsburg, J., dissenting).  The VRA was enacted "to banish the blight of racial discrimination in voting . . . ."  *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966).  The VRA creates a private cause of action allowing plaintiffs to file suit if they are an "aggrieved person."  52 U.S.C. § 10302.

### A.      Section 2

Section 2 of the VRA prohibits the imposition of any electoral practice or procedure that "results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color . . . ."  52 U.S.C. § 10301(a).  A § 2 violation occurs when based on the totality of circumstances, the political process results in minority "members hav[ing] less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).  "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  *Thornburg*, 478 U.S. at 47.  Although there may be some overlap, a vote dilution claim under § 2 involves a separate inquiry from a § 5 violation.  *Holder v. Hall*, 512 U.S. 874, 884 (1994).  Thus, Plaintiffs cannot establish a § 2 violation merely by showing that the redistricting involved a retrogressive effect on the minority group.  *Id.*

### B.      Section 5

Section 5 of the VRA required States to submit any changes to its voting standards, practices, or procedures for federal preclearance.  52 U.S.C. § 10304.  Section 4 of the VRA sets

8

forth the coverage formula to determine which states must comply with § 5.  52 U.S.C. § 10303. Section 5 applied to States where Congress found "evidence of actual voting discrimination," in the form of "the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average." *Katzenbach*, 383 U.S. at 330. From 1965 until 2013, Virginia was a covered jurisdiction under § 4(b) of the VRA.

Section 5 prohibits any covered jurisdiction from enacting any changes to its voting laws that will have "the purpose of or will have the effect of diminishing the ability of" any minorities to elect their "preferred candidates of choice."  52 U.S.C. § 10304(b), (d).  Section 5 has a limited substantive goal: "to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Miller v. Johnson*, 515 U.S. 900, 926 (1995).  The determination whether a voting procedure or law is retrogressive requires a comparison of a jurisdiction's new voting plan with its existing plan. *Reno v. Bossier Parish Sch. Bd*., 520 U.S. 471, 478 (1997).

In *Shelby*, the Supreme Court declared that the coverage formula under § 4(b) was unconstitutional and that the coverage formula "can no longer be used as a basis for subjecting jurisdictions to preclearance."  133 S. Ct. at 2631.  This holding specifically stated that it left unaffected the state's continual requirements to comply with § 2 and § 5's non-retrogression principle:

> Our decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in §2. We issue no holding on § 5 itself, only on the coverage formula.

*Id.*  Accordingly, the legislature's obligation to comply with § 2 and to avoid retrogression in the ability of minority voters to elect their candidate of choice continues to this day. *See League of*

*Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 241 (4th Cir. 2014) (post-*Shelby*, rejecting district court's finding that "section 2 does not incorporate a 'retrogression' standard" and recognizing that § 2 requires "an eye toward past practices is part and parcel of the totality of the circumstances" and that "some parts of the [Section] 2 analysis may overlap with the [Section] 5 inquiry"); *Ga. State Conf. of the NAACP v. Fayette County Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1368 n.14 (N.D. Ga. 2014) (post-*Shelby,* rejecting Defendants contention that the retrogression requirements of § 5 no longer apply and stating that "§ 5 continues to apply to court-drawn redistricting plans as it always has.").   Further, as the Supreme Court specifically held in *Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1263 (2015), and this Court confirmed in *Page v. Va. State Bd. of Elections*, No. 3:13cv678, 2015 U.S. Dist. LEXIS 73514, at *18-19 (E.D. Va. June 5, 2015), § 5 compliance is still a necessary consideration in every challenge to a redistricting plan enacted pre-*Shelby*, such as HB 5005.

In drawing and enacting the 2011 Plan, the House of Delegates was required to and undertook to comply with the mandates of the Fourteenth Amendments and the VRA and did not subordinate race to traditional districting factors.   Plaintiffs cannot establish (1) racial gerrymandering because race was not the predominant consideration in enacting the 2011 Plan and compliance with the VRA was narrowly tailored; and (2) vote dilution because the 2011 Plan does not have a discriminatory effect and the House of Delegates did not act with a discriminatory purpose.

## ISSUES TO BE PRESENTED AT TRIAL

## I.   PLAINTIFFS MUST ESTABLISH RACIAL GERRYMANDERING IN VIOLATION OF THE EQUAL PROTECTION CLAUSE.

It is well-settled that "reapportionment is primarily the duty and responsibility of the State" and that "the States must have discretion to exercise the political judgment necessary to balance competing interests [in electoral districting]." *Miller*, 515 U.S. at 915. A court's review of districting legislation represents a "serious intrusion" on the State's function, *id.*, and a court must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race," especially where the State "has articulated a legitimate political explanation for its districting decision, and the voting population is one in which race and political affiliation are highly correlated", *Easley v. Cromartie*, 532 U.S. 234, 242 (2001). There is a presumption that the legislature conducts redistricting in good faith. *Miller*, 515 U.S. at 915. Plaintiffs must meet a "demanding" burden to overcome this presumption. *Easley*, 532 U.S. at 241.

To trigger strict scrutiny, plaintiffs first bear the burden of proving that the legislature's predominant consideration in drawing its electoral boundaries was race. *Miller*, 515 U.S. at 916. If plaintiffs meet their burden, strict scrutiny is triggered and the burden of production then shifts to defendants. Defendants can justify any race-based legislation by showing that the redistricting legislation is narrowly tailored to achieve a compelling state interest. *Miller*, 515 U.S. at 920. The Supreme Court has assumed, without deciding, that compliance with the VRA is a compelling state interest. *Bush*, 517 U.S. at 977 (""[W]e assume without deciding that compliance with the results test [of the VRA] . . . can be a compelling state interest."); *Shaw v. Hunt*, 517 U.S. 899, 915 (1996) ("We assume, arguendo, for the purpose of resolving this suit, that compliance with § 2

11

[of the VRA] could be a compelling interest . . . .").  A racial gerrymandering claim must be strictly scrutinized district-by-district.  *Ala. Legis. Black Caucus*, 135 S. Ct. at 1265.

In this case, Plaintiffs will attempt to show that race predominated through the House of Delegates' application of a 55% black voting age population ("BVAP") floor in drawing the 12 Challenged Districts, and that the 2011 Plan was not narrowly tailored because the House of Delegates failed to conduct a racial bloc voting analysis[6] to determine the appropriate BVAP level. However, Plaintiffs themselves concede that no Court has ever required a redistricting body to conduct such an analysis in order to satisfy the narrow tailoring requirement.  *See* Dckt No. 70.

A.   **Plaintiffs Must Prove that Race Predominated and the House of Delegates Subordinated Traditional Redistricting Principles to Race in Enacting the 2011 Plan.**

To trigger strict scrutiny, Plaintiffs first must show that race was the House of Delegates' *predominant* consideration in drawing the electoral boundaries of each of the Challenged Districts. Plaintiffs must establish that a facially neutral law was "motivated by a racial purpose or object," or that it is "unexplainable on grounds other than race."  *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999).  Plaintiffs must prove that other, legitimate districting principles were "'subordinated' to race"; in other words, race must not simply have been a motivation: "race must be 'the predominant factor motivating the legislature's [redistricting] decision.'"  *Bush*, 517 U.S. at 959 (citations omitted).  Plaintiffs will only meet this burden

> either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant

---

[6] "A racial bloc voting analysis, which legislatures frequently use in redistricting, studies the electoral behavior of minority voters and ascertains how many African-American voters are needed in a congressional district to avoid diminishing minority voters' ability to elect their candidates of choice."  *Page*, 2015 U.S. Dist. LEXIS 73514, at *13.

> factor motivating the legislature's decision to place a significant number of voters
> within or without a particular district.

*Miller*, 515 U.S. at 916. To make this showing, a plaintiff must prove that the legislature subordinated all traditional race-neutral districting principles, including but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation, to racial considerations. *Ala. Legis. Black Caucus*, 135 S. Ct. at 1270 (citing *Bush*, 517 U.S. at 964, 968). The equal population goal, although mandated by the Equal Protection Clause, "is not a factor to be treated like other nonracial factors when a court determines whether race predominated over other, 'traditional' factors in the drawing of district boundaries." *Id.*

After receiving the 2010 census data, the House Committee on Privileges and Elections established various guidelines to govern the House of Delegates' redistricting process, which included compliance with population equality principles based on the 2010 census data, federal and state constitutional requirements, the VRA, and traditional redistricting factors such as contiguity, compactness, and communities of interest.

From 2000 to 2010, Virginia's overall population grew at a rate of 13%. Attachment 5. The pattern of growth was uneven across the Commonwealth. Department of Justice Submission Attachment 3 – Statement of Change (hereinafter "Attachment 3"). The data also showed that Virginia's African-American population grew at a rate of 11.6%, and in the case of the Challenged Districts, the 2010 census data showed that most of the 12 districts experienced growth rates well below the state average or, in a few cases, actually lost population over the decade. Attachment 5. In fact, one of the Challenged Districts, district 71, had such a dramatic change in population and

13

demographics that in 2011, prior to the passage of HB 5005, African-Americans no longer constituted a majority of the voters in that District. Attachment 5, Table 5.1. Eleven of the 12 majority African-American districts in the prior plan were below the ideal population by a total of 79,310 and only one of these districts was above the ideal population by 143. Attachment 17.

Consistent with the House Committee on Privileges and Elections guidelines and in light of population growth that was unevenly distributed, the General Assembly redrew Virginia's 100 House of Delegates districts to accommodate population shifts, "either to bring the district itself into conformity with population criteria or to facilitate necessary changes in adjoining districts." Attachment 3. Despite demographic changes resulting in the loss of population in the Challenged Districts, the 2011 Plan retained the same number of majority African-American districts as the Commonwealth's prior plan.

To comply with the equal population principle mandated by the Fourteenth Amendment and the House Committee on Privileges and Elections resolution, the 2011 Plan had a deviation range of +1.0% to -1.0%. Attachment 3. To comply with the VRA, as set forth in more detail below, the 2011 Plan retained 12 majority African-American districts, with BVAP levels ranging from 55.2% to 60.7%. *Id.* The House of Delegates heard, considered, and balanced many points of view on communities of interest, including those defined by "geographic features such as mountain ranges and valleys, by economic character, by social and cultural attributes, and by services." Attachment 3. Moreover, partisan and incumbency considerations were factors that influenced the drawing of the 2011 Plan. *Id.* ("partisan factors were present" and "[i]ncumbency was a consideration in redistricting"). Compactness was also a factor, and the compactness score in the 2011 Plan are comparable to the prior plan. *Id.*

14

Defendant-Interveners will go through each of the Challenged Districts to explain how the boundaries were drawn. For each Challenged District, Defendant-Interveners will present evidence showing that racial considerations did not predominate or control the traditional redistricting considerations that the House of Delegates considered, including political factors, maintaining the status quo, incumbency protection, and compactness and contiguity. Instead, race was merely a factor used to ensure compliance with the equal population goal and the VRA.[7]

### B. Assuming that Plaintiffs Can Establish that Race Predominated, the 2011 Plan Survives Strict Scrutiny Because It Is Narrowly Tailored to Comply with the VRA.

Plaintiffs will argue that the 2011 Plan was not narrowly tailored because of the application of a "mechanical" quota – a 55% BVAP floor, and the House of Delegates' failure to conduct a racial bloc analysis.

In *Ala. Legis. Black Caucus*, the Supreme Court recognized that a "mechanical interpretation" of § 5 can raise "serious constitutional concerns." *Ala. Legis. Black Caucus*, 135 S. Ct. at 1273. However, the Supreme Court also recognized that:

> we do not insist that a legislature guess precisely what percentage reduction a court or the Justice Department might eventually find to be retrogressive. The law cannot

---

[7] As Judge Payne recognized in his dissenting opinion upon remand in *Page*,

> To construe a legislator's (or the legislature's) acknowledgement of the role of the Supremacy Clause as a de facto trigger for strict scrutiny of majority-minority jurisdictions is to place the legislatures and their legislators in a 'trap[] between the competing hazards of liability.'" *Bush*, 517 U.S. at 992 (O'Connor, J., concurring)). Such an interpretation implies that legislatures are always subject to strict scrutiny.

*Page*, 2015 U.S. Dist. LEXIS 73514, at * at 81 (Payne, J., dissenting). Instead, racial predominance requires "*actual* conflict between traditional redistricting criteria and race that leads to the subordination of the former, rather than a merely hypothetical conflict that *per force* results in the conclusion that the traditional criteria have been subordinated to race." *Id.* at *72 (Payne, J., dissenting) (emphasis added).

15

insist that a state legislature, when redistricting, determine precisely what percent minority population §5 demands. . . .   The law cannot lay a trap for an unwary legislature, condemning its redistricting plan as either (1) unconstitutional racial gerrymandering should the legislature place a few too many minority voters in a district or (2) retrogressive under §5 should the legislature place a few too few.

*Id.* at 1273-74.  Instead, Supreme Court merely reiterated that to pass strict scrutiny, "***the narrow tailoring requirement insists only that the legislature have a 'strong basis in evidence' in support of the (race-based) choice . . . .***"  *Id.* at 1274 (emphasis added).  The narrow tailoring requirement may be met "***even if a court does not find that the actions were necessary for statutory compliance.***"  *Id.* (emphasis added).

Further, at the June 4, 2015 Pretrial Conference, the Plaintiffs themselves conceded that no court has ever required a redistricting body to conduct a racial bloc voting analysis in order to satisfy the narrow tailoring requirement of the Equal Protection Clause.  Dckt. No. 70.  Indeed, this Court recently rejected such a claim.  *See Page*, 2015 U.S. Dist. LEXIS 73514, at *57 n.29 ("[W]hile the legislature did not conduct a racial bloc voting analysis in enacting the 2012 Plan, we do not find that one is always necessary to support a narrow tailoring argument.").

> 1. **Compliance with the VRA required the House of Delegates to retain 12 majority African-American districts in the 2011 Plan.**

Compliance with § 5's non-retrogression principle required that the House of Delegates retain 12 majority African-American districts.  The non-retrogression principle is satisfied if "minority voters retain the ability to elect their preferred candidates of choice."  *Ala. Legis. Black Caucus*, 135 S. Ct. at 1273.  A state is not required to maintain the same minority population percentages as in the prior plan, *id.*, nor is it required to increase the number of majority minority districts in order to ensure the electoral success of the minority voters, *see Bush*, 517 U.S. at 983

16

("Non-retrogression is not a license for the State to do whatever it deems necessary to ensure continued electoral success; it merely mandates that the minority's *opportunity* to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions.") (emphasis in original).  Thus, a plan that keeps the same levels of voting effectiveness by retaining the same number of majority minority districts is not retrogressive.  *See City of Richmond v. United States*, 422 U.S. 358, 388 (1975) (Brennan, J., dissenting) ("[The] fundamental objective of § 5 [is] the protection of *present* levels of voting effectiveness for the black population") (emphasis in original); H.D. 2011 Spec. Sess. I, at 63 (statement of Del. Armstrong) (discussing that the VRA requires that Virginia maintain, to the extent possible, all of its minority/majority districts.).

In determining what is required to avoid retrogression, Congress expressly rejected the Supreme Court's holding in *Georgia v. Ashcroft*, 539 U.S. 461, 482 (2003), which held that § 5 may be satisfied through the creation of influence or coalition districts.[8]  Instead, Congress accepted the views in Justice Souter's dissent and amended the VRA accordingly in 2006.  *Ala. Legis. Black Caucus*, 135 S. Ct. at 1274, 1287.  The 2006 amendments to § 5  prohibit voting changes with "any discriminatory purpose" as well as voting changes that diminish the ability of citizens, on account of race, color, or language minority status, "to elect their preferred candidates of choice."  52 U.S.C. § 10304(b)-(d).

---

[8]  A coalition district consists of a district in which minority voters do not consist of a majority but form coalitions with minority voters from other racial and ethnic groups in order to elect candidates of their choice.  *Georgia*, 539 U.S. at 481.  Influence districts are districts "where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process."  *Id.* at 482.

Consistent with these requirements, the House of Delegates sought and received preclearance of the 2011 Plan from the U.S. Attorney General who found that the 2011 Plan did not result in any retrogression in the ability of minorities to elect their candidates of choice.  The materials submitted to the U.S. Attorney General in the § 5 submission establish a "strong basis in evidence" in support of the House of Delegates' decision to retain 12 majority African-American districts.  *Ala. Legis. Black Caucus*, 135 S. Ct. at 1274.

The § 5 submission showed that under the official 2010 census data, from 2000 to 2010, Virginia's African-American population increased at a growth rate of 11.6% (less than the Commonwealth's overall population growth rate of 13%) and changed from 19.6% to 19.4% of the total population.  Attachment 5.  In the case of the 12 districts that had a majority African-American voting age population after the 2001 redistricting, the 2010 data showed that most of those districts experienced growth rates well below the state average or, in a few cases, actually lost population over the decade.  *Id.*  The below average growth and population decline left 10 of the 12 majority minority districts significantly below ideal district size.  *Id.*

To comply with § 5, the 2011 Plan retained each of the 12 majority African-American districts, even though the total and voting age minority percentage was reduced in half of the districts due to demographic trends from the last decade.  *Id.*  Due to these uneven population shifts, the 2011 Plan reduced the African-American total and voting age percentages in five of the 12 districts (districts 69, 70, 71, 74, 75) while the African-American total and voting age percentages were increased in the remaining seven districts (districts 63, 77, 80, 89, 90, 92, 95).  *Id.*

18

2.      **The Challenged Districts have a minimum BVAP level of 55% to provide African-American voters "the ability to elect a representative of their choice."**

The obligation to allow African-American voters "the ability to elect a representative of their choice" required the Challenged Districts to maintain, at the very minimum, a simple majority BVAP level consisting of 50% plus one voter.  52 U.S.C. § 10301(b); *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009).

In *Bartlett v. Strickland*, the Supreme Court found that "§ 2 can require the creation of [a majority-minority district,]" which consists of "a minority group compose[d of] a numerical, working majority of the voting-age population."  556 U.S. at 13.  There, the Court expressly rejected the state's claim that a crossover district[9] was sufficient to establish vote dilution under § 2.  *Id.* at 17.  Instead, the Supreme Court applied the majority-minority rule, which relies on an objective, numerical test: "Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?"  *Id*. at 18.  Numerous courts have required majority-minority districts to consist of a minority voting population ("MVAP") of greater than 50%.  *Id.*

---

[9] A crossover district is a district where "minority voters make up less than a majority of the voting-age population . . . . [b]ut . . . is [potentially] large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate."  *Bartlett*, 556 U.S. at 13.  The Supreme Court has used the terms "crossover" and "coalitional" districts interchangeably.  *Id.*

at 19 (and cases cited therein).[10]   Thus, the House of Delegates was required to maintain, at a minimum, a BVAP level greater than 50%.

Although a simple majority is all that is required under *Bartlett*, courts have found that more than a simple majority is often necessary to ensure minority voters' ability to elect their candidate of choice.  Factors such as minority population voter registration, whether persons within the population are eligible to vote, turn out, and population makeup often require a MVAP level of 60-65%.  *See Ketchum v. Byrne*, 740 F.2d 1398, 1415 (7th Cir. 1984) (discussing guideline of 65% MVAP which consists of 15% total increment to simple majority based on 5% increase for young population, low voter registration, and low voter turn-out); *NAACP v. Austin*, 857 F. Supp. 560, 575 n.13 (E.D. Mich. 1994) (". . .60% may be more appropriate than 65% as a rough benchmark for assessing the electoral effectiveness of majority-black districts."); *Jeffers v. Clinton*, 756 F. Supp. 1195, 1198 (E.D. Ark. 1990) ("something on the order of a 60% BVAP is required to remedy a vote-dilution violation of the Voting Rights Act."); *Smith v. Clinton*, 687 F. Supp. 1361, 1363 (E.D. Ark. 1988) ("A guideline of 65% of total population is frequently used,

---

[10] *See also Gonzalez v. Harris County*, 601 Fed. Appx. 255 (5th Cir. 2015); *Pope v. County of Albany*, 687 F.3d 565, 577 (2d Cir. 2012); *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853 (5th Cir. 1999); *Cousin v. Sundquist*, 145 F.3d 818, 828-29 (6th Cir. 1998); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1117 (5th Cir. 1991); *Dickinson v. Ind. State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991); *Rossito-Canty v. Cuomo*, No. 15-CV-0568, 2015 U.S. Dist. LEXIS 18796, at *24 (E.D.N.Y. Feb. 16, 2015); *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1391-92 (E.D. Wash. 2014); *Fabela v. City of Farmers Branch*, No. 3:10-CV-1425-D, 2012 U.S. Dist. LEXIS 108086, at *12 (N.D. Tex. Aug. 2, 2012); *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp. 2d 563, 581 (N.D. Ill. 2011); *Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010); *Parker v. Ohio*, 263 F. Supp. 2d 1100, 1104-05 (S.D. Ohio 2003); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, No. 03-CV-502 (NAM/DRH), 2003 U.S. Dist. LEXIS 11386, at *16 (N.D.N.Y July 7, 2003).

and is derived by supplementing a simple majority with an additional 5% to offset the fact that minority population tends to be younger than that of whites, 5% for the well-documented pattern of low voter registration, and 5% for low voter turnout among minorities. When voting-age population figures are used, a 60% nonwhite majority is appropriate.").  Indeed, in fashioning remedial plans for § 2 violations, courts have applied guidelines as high as 65% MVAP to ensure that the minority population had the ability to elect the candidate of their choice.  *See Neal v. Coleburn*, 689 F. Supp. 1426, 1438 (E.D. Va. 1988) ("Thus, the 65% figure is an approximation of the type of corrective super-majority that may be needed in any particular case."); *Shirt v. Hazeltine*, 461 F.3d 1011, 1023 (8th Cir. 2006) (affirming remedial plan affording more than a 65% and 74% MVAP in contested districts).

At trial, the Defendant-Interveners will present evidence showing that the House of Delegates discussed concerns that a simple majority BVAP level was insufficient to provide African-Americans "the ability to elect a candidate of their choice" in certain Challenged Districts. During the special session, the delegates discussed concerns that a simple majority would not be enough to provide African-American voters the opportunity to elect their preferred candidate of choice.  H.D. 2011 Spec. Sess. I, at 65 (Va. April 5, 2011) (statement of Del. Jones).  Delegate Jones also testified that he did not believe that the creation of a 13th majority African-American district would receive preclearance by the U.S. Attorney General or otherwise comply with the VRA.  *Id.* at 69-70.  Delegate Tyler (75th district), who ended up opposing the vote, testified that voter eligibility was of serious concern to her, as she had several prison facilities in her district which artificially inflated the BVAP level in her district.  H.D. 2011 Spec. Sess. I, at 38-39 (Va. April 27, 2011) (statement of Del. Tyler).  Delegate Tyler expressed serious concerns that the

21

African-American community could not elect the candidate of its choice with a BVAP level lower than 55%. *Id.* To determine the appropriate BVAP level in each Challenged District, the House of Delegates took into account African-Americans' voter registration and voter turnout, which affected their ability to elect their candidate of choice. H.D. 2011 Spec. Sess. I, at 41-42 (Va. April 5, 2011) (statement of Del. Jones).

Accordingly, the 55% BVAP level was not an arbitrary quota unsupported by evidence. Instead, there will be a basis in evidence to support the BVAP level in each Challenged District.

## II.    PLAINTIFFS MUST ESTABLISH VOTE DILUTION UNDER THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

Plaintiffs may claim that the House of Delegates' failure to create a 13th majority African-American district resulted in unconstitutional packing of African-American voters in the Challenged Districts, thereby diluting African-American voting strength.[11]

The essence of a vote dilution claim under the Fourteenth Amendment is "that the State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities.'"[12] *Miller*, 515 U.S. at 911 (citation omitted). Claims of racially discriminatory vote dilution "can only be established by proof (a) that vote dilution, as a special form of discriminatory effect, exists and (b) that it results from a racially discriminatory

---

[11] A typical packing claim consists of minorities that are swept out of surrounding districts and concentrated into the packed districts. Here, the districts surrounding the Challenged Districts consist of African-American influence districts. *See* DOJ Submission – Attachment 10: 2011 House Maps.

[12] A claim of racial gerrymandering as recognized in *Shaw I*, 509 U.S. at 652 is "analytically distinct" from a vote dilution claim. *Miller*, 515 U.S. at 911.

purpose chargeable to the state. *Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981); *see also Village of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 264-265 (1977).

"The first inquiry in assessing proof of a vote dilution claim is whether there is – without regard to motivating purpose – a discriminatory 'effect' traceable to the challenged state action." *Washington*, 664 F.2d at 919.  To prove discriminatory effect, a plaintiff must show that the redistricting scheme impermissibly dilutes the voting rights of the racial minority. *Id*.  Generally, this requires proof that the racial minority's voting potential has been minimized or cancelled out or the political strength of such a group has been adversely affected. *Id*. (citing *Mobile*, 446 U.S. at 66 (1980)).  The following factors indicate a discriminatory effect: bare electoral defeat, disproportionate representation,

> lack of access to the process of slating candidates, the unresponsiveness of legislators to (the racial minority's) particularized interests, a tenuous state policy underlying the preference for … at-large districting, … the existence of past discrimination in general (precluding) the effective participation in the election system … (and such 'enhancing' factors as) large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts.

*Id. at 920* (citing *Zimmer v. McKeithen*, 485 F.2d 1297, 1305 (5th Cir. 1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636 (1976)).  Plaintiffs alleging vote dilution must offer "a reasonable alternative voting practice to serve as the benchmark 'undiluted' voting practice."  *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 480 (1997).  Here, there is no evidence to establish any of the factors related to discriminatory effect.  More importantly, Plaintiffs will not offer an alternative voting practice to serve as the benchmark "undiluted" voting practice.

23

To prove discriminatory purpose, the plaintiff must establish "that the disputed plan was 'conceived or operated as (a) purposeful (device) to further racial . . . discrimination.'" *Washington*, 664 F.2d at 920 (quoting *Mobile*, 446 U.S. at 66).  Here, there is no allegation nor any evidence that the 2011 Plan was conceived or operated purposefully to further racial discrimination.  Moreover, neither the VRA nor the U.S. Constitution requires "a districting plan that maximizes black political power or influence."  *NAACP*, 857 F. Supp. at 578.  And, even assuming that the House of Delegates did not draw the maximum number of majority African-American districts, such a fact is insufficient to prove intentional, unconstitutional discrimination. *Id.* (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279-81 (1979)).  Accordingly, Plaintiffs cannot establish a claim of vote dilution in the form of unconstitutional packing in violation of the Equal Protection Clause.

## CONCLUSION

As required by *Ala. Legis. Black Caucus*, this Court must review each and every one of the 12 Challenged Districts separately and independently to determine if the district in question was improperly racially gerrymandered.  In this case, the Plaintiffs will not be able to show that race predominated over all other factors in the drawing of HB 5005 and the Challenged Districts. Further, the evidence will show that as required by both federal law and the law of the Commonwealth, the House of Delegates undertook to comply with the mandates of the VRA and to the extent that race was a consideration in drawing the borders of the 12 Challenged Districts, such a consideration was narrowly tailored to support a compelling state interest.  The House of Delegates took into account all traditional redistricting considerations and thus there is a

substantial basis in evidence for such racial considerations.   Accordingly, this Court should affirm

HB 5005 and grant judgment in favor of the Defendants.

Dated: June 19, 2015

Respectfully Submitted,

By: */s/  Jeffrey P. Brundage*

Kathleen A. Gallagher  (*pro hac vice*)
Daniel A. Glass (*pro hac vice*)
Jeffrey P. Brundage
Virginia Bar # 80179
Attorneys for Defendants
**ECKERT SEAMANS CHERIN
   & MELLOTT, LLC**
1717 Pennsylvania Avenue, NW
Suite 1200
Washington, DC  20006
Tel:  (202) 659-6600
Fax: (202) 659-6699
kgallagher@eckertseamans.com
dglass@eckertseamans.com
jbrundage@eckertsemans.com

Anthony F. Troy
Virginia State Bar # 05985
Richard L. Savage, III
Virginia Bar # 37798
Attorneys for Defendants
**ECKERT SEAMANS CHERIN
   & MELLOTT, LLC**
SunTrust Center
Suite 1300
919 East Main Street
Richmond, VA  23219
Tel:  (804) 788-7740
Fax:  (804) 698-2950
ttroy@eckertseamans.com
rsavage@eckertseamans.com

Godfrey T. Pinn, Jr.
Virginia Bar # 43106
Attorney for Defendants
**HARRELL & CHAMBLISS LLP**
Eighth and Main Building
707 East Main Street,   Suite 1000
Richmond, VA  23219
Tel:  (804) 643-8401
Fax:  (804) 648-2707
gpinn@hclawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of June, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

John K. Roche
Virginia Bar # 68594
Aria Branch
Marc E. Elias (*pro hac vice*)
Elisabeth C. Frost (*pro hac vice*)
Bruce Van Spiva (*pro hac vice*)
Attorneys for Plaintiffs
**PERKINS COIE LLP**
700 13th Street, NW, Suite 600
Washington, DC  20005
Tel:  (202) 654-6200
Fax:  (202) 654-6211
jroche@perkinscoie.com
abranch@perkinscoie.com
melias@perkinscoie.com
efrost@perkinscoie.com
bspiva@perkinscoie.com

Kevin J. Hamilton (*pro hac vice*)
Abha Khanna (*pro hac vice*)
Ryan Spear (*pro hac vice*)
William Stafford (*pro hac vice*)
Attorneys for Plaintiffs
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101
Tel:  (206) 359-8312
Fax:  (206) 359-9000
khamilton@perkinscoie.com
akhanna@perkinscoie.com
rspear@perkinscoie.com
wstafford@perkinscoie.com

Jennifer M. Walrath
Virginia Bar # 75548
Katherine L. McKnight
Virginia Bar # 81482
E. Mark Braden (*pro hac vice*)
Richard B. Raile
Attorneys for Interveners
**BAKER & HOSTETLER LLP**
1050 Connecticut Avenue, NW, Suite 1100
Washington, DC  20036
Tel:  (202) 861-1500
Fax:  (202) 861-1783
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
mbraden@bakerlaw.com
rraile@bakerlaw.com

Dale Oldham, Esq.
Attorney for Interveners
1119 Susan St.
Columbia, SC  29210
Tel: (803) 772-7729
dloesq@aol.com

27

*/s/ Jeffrey P. Brundage*

Jeffrey P. Brundage, Esq.

Virginia Bar # 80179

Attorneys for Defendants

**ECKERT SEAMANS CHERIN
   & MELLOTT, LLC**

1717 Pennsylvania Avenue, NW, Suite 1200

Washington, DC  20006

Tel:  (202) 659-6600

Fax: (202) 659-6699

jbrundage@eckertsemans.com