# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, | Civil Action No. 3:14-cv-00852-REP-GBL-BMK |
| Plaintiffs, | |
| v. | |
| VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, | |
| Defendants, | |
| v. | |
| VIRGINIA HOUSE OF DELEGATES, *et al.*, | |
| Intervenor-Defendants. | |

## PLAINTIFFS' TRIAL BRIEF

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     EXPECTED EVIDENCE AT TRIAL .................................................. 2

     A.     Background ................................................................................. 2

     B.     The Record Is Replete With Direct and Circumstantial Evidence that Race Was the Predominant Consideration in the Drawing of the Challenged Districts ........................................................................ 3

           1.     The Direct Evidence of Racial Predominance Is Overwhelming ............. 3

                a.     The House Criteria Illustrate the Primacy of Race ........................ 3

                b.     Statements by the Delegates Demonstrate That Race Played a Predominant Role in the Design of The Challenged Districts .............................................................. 4

                     (i)     Statements by Delegate Jones ............................................ 4

                     (ii)    Statements by Other Delegates ......................................... 5

                c.     The Use of a "Nonnegotiable" Racial Threshold Vividly Demonstrates that Race Played a Predominant Role in the Design of the Challenged Districts ................................. 6

           2.     The Circumstantial Evidence of Race-Based Redistricting Is Equally Strong ......................................................... 9

                  a.     Compactness and Respect for Political Boundaries.................... 10

                  b.     Racial Sorting.................................................................. 11

     C.     The General Assembly's Use of Race Was Not Narrowly Tailored ................... 11

III.    ARGUMENT ..................................................................................... 13

     A.     Racial Gerrymandering Is Indisputably Unconstitutional ................................... 13

     B.     Race Was the Predominant Consideration in Drawing the Challenged Districts ...................................................................... 14

           1.     The Record Includes Numerous "Statements by Legislators Indicating that Race Was a Predominant Factor in Redistricting" .......... 15

           2.     There Is Indisputable "Evidence that Race or Percentage of Race Within a District Was the Single Redistricting Criterion that Could Not Be Compromised"........................................................... 17

LEGAL126568031.1

**TABLE OF CONTENTS**
**(continued)**

Page

3. Given the Overwhelming Direct Evidence of the General Assembly's Intent, the Circumstantial Evidence is Far Less Important (But in Any Event is Equally Compelling) ............................ 19

4. The Enacted Plan Created "Non-Compact and Oddly Shaped Districts Beyond What Is Strictly Necessary to Avoid Retrogression" ........................................................................................ 19

C. Politics Did Not Outweigh Race ........................................................... 22

D. The Challenged Districts Cannot Survive Strict Scrutiny .................. 23

1. Defendants Cannot Show that the Challenged Districts Serve a Compelling Interest ................................................................................ 24

2. The General Assembly's Use of Race Was Not Narrowly Tailored ....... 25

E. This Court Should Impose an Immediate and Effective Remedy ....................... 28

F. Plaintiffs Are Entitled to Reasonable Attorneys' Fees and Costs ....................... 29

IV. CONCLUSION ..................................................................................... 29

# TABLE OF AUTHORITIES

**Page**

### CASES

*Ala. Legislative Black Caucus v. Alabama*,
    135 S. Ct. 1257 (2015) ................................................................ passim

*Bethune-Hill v. Va. St. Bd. of Elections*,
    No. 3:14cv852, 2015 WL 3404869 (E.D. Va. May 26, 2015) ................................................ 12

*Bush v. Vera*,
    517 U.S. 952 (1996) ................................................................ 17, 18, 23

*Clark v. Putnam Cnty.*,
    293 F.3d 1261 (11th Cir. 2002) ................................................................ 18

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ................................................................ 29

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ................................................................ 28

*McDaniels v. Mehfoud*,
    702 F. Supp. 588 (E.D. Va. 1988) ................................................................ 28

*Miller v. Johnson*,
    515 U.S. 900 (1995) ................................................................ 13, 14, 24

*Page v. Va. St. Bd. of Elections*,
    No. 3:13cv678 (E.D. Va. June 5, 2015) ................................................................ 6, 7, 23

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ................................................................ 24

*Scott v. Germano*,
    381 U.S. 407 (1965) ................................................................ 28

*Shaw v. Hunt*,
    517 U.S. 899 (1996) ................................................................ 19, 22, 23, 24

*Shaw v. Reno*,
    509 U.S. 630 (1993) ................................................................ passim

LEGAL126568031.1

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Shelby County, Alabama v. Holder*,
   133 S. Ct. 2612 (2013) ........................................................................................24

*Smith v. Beasley*,
   946 F. Supp. 1174 (D.S.C. 1996) .............................................................17, 18, 27

*Texas v. United States*,
   831 F. Supp. 2d 244 (D.D.C. 2011) .....................................................................26

*Wise v. Lipscomb*,
   437 U.S. 535 (1978) .............................................................................................29

**STATUTES**

42 U.S.C. § 1973*l*(e) ................................................................................................29

42 U.S.C. § 1983 ......................................................................................................29

Voting Rights Act of 1965 ................................................................................. passim

**OTHER AUTHORITIES**

Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn
   Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131 (2005) ....................................28

U.S. Const. amend. XIV ...............................................................................................1

## I.   INTRODUCTION

This action arises from the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which indisputably forbids race-based redistricting absent a compelling state interest and, even then, only when narrowly tailored to meet that state interest.

In its 2011 House of Delegates redistricting plan, the Virginia General Assembly sorted voters by race into House districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 in order to meet or exceed a predetermined 55% threshold of Black voting age population ("BVAP") in each district. The author of the redistricting plan, Delegate Chris Jones, argued that the Voting Rights Act ("VRA") required that overt racial sorting of voters. But merely invoking the VRA does not shield race-based redistricting from constitutional scrutiny. And here, it underscores the General Assembly's intense focus on the racial composition of these districts. Thus, Plaintiffs will easily meet their burden of showing that race was the predominant consideration when the General Assembly drew the districts.

In contrast, Defendants and Intervenors (collectively, "Defendants") cannot possibly justify their race-based decisions under the exacting strict scrutiny standard. There is no evidence that the VRA required the map-drawers to apply the same racial floor to all 12 districts. In fact, the evidence will show significant *differences* between the districts. The map-drawers failed to recognize those differences, however, because they did not conduct any analysis of (or even inquiry into) the racial voting patterns, electoral history, or other unique features of each individual district. There is simply no legal precedent justifying the use of a fixed racial target under these circumstances. To the contrary, the Supreme Court has emphatically held that legislatures violate the Equal Protection Clause when they "rel[y] heavily upon a mechanically numerical view as to what counts as forbidden retrogression." *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1273 (2015).

That is precisely what happened here.

Plaintiffs respectfully request that this Court invalidate House districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 and ensure that constitutional districts are adopted for the upcoming House of Delegates elections.

## II.   EXPECTED EVIDENCE AT TRIAL

### A.   Background

As a result of the 2010 census, Virginia was required to redraw its House of Delegates districts to balance population totals within each district. That task was taken up by Delegate Chris Jones, a member of the House of Delegates who had been deeply involved in Virginia's last redistricting cycle. *See* Plaintiff's Exhibit ("Pl. Ex.") 35 at 46:18-48:21.

On April 11, 2011, the House and Senate adopted HB 5001. The legislation included a redistricting plan for Virginia's House districts (authored by Delegate Jones) and a redistricting plan for Virginia's Senate districts (which originated in the Senate). *See* Pl. Ex. 48 at 10. Governor McDonnell vetoed HB 5001 based on his objections to the Senate plan. *See id.* The House and Senate subsequently adopted HB 5005, which included a substantially similar House plan (again authored by Delegate Jones) and a significantly revised Senate plan. *See id.* 10-11. Governor McDonnell signed HB 5005 (the "Enacted Plan") on April 29, 2011. *See id.* at 12.

Like the plan adopted in 2001 (the "Benchmark Plan"), the Enacted Plan includes 12 districts in which Blacks are a majority of the voting age population: House districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 (the "Challenged Districts"). Pl. Ex. 45 at 1. When the Benchmark Plan was adopted in 2001, BVAP in the Challenged Districts ranged from 53.4% to 59.7%. *See id* at tbl. 5.1. Immediately before the Enacted Plan was passed, BVAP in the Challenged Districts ranged from 46.3% to 62.7%. *See id.* Under the Enacted Plan, BVAP in all of the Challenged Districts exceeds 55%. *See id.*

- 2 -

**B.     The Record Is Replete With Direct and Circumstantial Evidence that Race Was the Predominant Consideration in the Drawing of the Challenged Districts**

**1.     The Direct Evidence of Racial Predominance Is Overwhelming**

In most racial gerrymandering cases, determining whether race predominated or not requires careful scrutiny of circumstantial evidence—the shape of districts; deviations from contiguity; split precincts, cities or counties; and similar markers that might suggest that race played a central role. But that type of indirect evidence pales almost to irrelevance where, as here, overwhelming *direct* evidence shows that the legislature employed a mechanical racial threshold to sort voters by the color of their skin into electoral districts. That direct evidence of race-based redistricting emphatically answers one of the central questions in this case:  whether race was the predominant consideration in the drawing of the Challenged Districts.[1]

**a.     The House Criteria Illustrate the Primacy of Race**

Before any redistricting plans were introduced in the House, the House Committee on Privileges and Elections adopted official criteria to govern the redistricting process. *See* Pl. Ex. 16 (the "House Criteria"). Notably, the House Criteria were proposed by Delegate Jones—the undisputed architect of the Enacted Plan. Delegate Jones later confirmed that he dutifully followed the House Criteria in drawing the Enacted Plan, including the Challenged Districts. *See* Pl. Ex. 40 at 46:1-3 ("[I]n putting this plan together, we tried to make sure that the criteria was followed, and I think it was.").

---

[1] Plaintiffs have attached as an Appendix to this Trial Brief selected excerpts from their proposed trial exhibits, with key passages highlighted for the convenience of the Court. Complete copies of these exhibits are contained in Plaintiffs' proposed trial exhibits, a list of which is filed contemporaneously with this Trial Brief. As discussed at the pretrial conference, Plaintiffs' counsel anticipates that all of these exhibits (as well as those proposed by Defendants and Intervenors) will be admitted into evidence by way of a stipulation, although that stipulation has not yet been finalized.

The House Criteria clearly describe the House's legislative priorities. "Population Equality" among districts is the first and most important priority. *See* Pl. Ex. 16 at 1 ("The population of each district shall be as nearly equal to the population of every other district as practicable."). The second priority is avowedly racial. Titled "Voting Rights Act," it requires that "[d]istricts shall be drawn" to avoid "the unwarranted retrogression or dilution of racial or ethnic minority voting strength." *See id.*

All other redistricting considerations and principles—including compactness, incumbency protection, "voting trends," and "political beliefs"—are subordinate to those two prime directives. *See id.* at 1-2. Indeed, to avoid any doubt on that score, the House Criteria declared the primacy of the one-person, one-vote principle and the VRA not once but twice. *See id.* ("Nothing in these guidelines shall be construed to require or permit any districting policy or action that is contrary to . . . the Voting Rights Act of 1965."); *id.* at 2 (stating, in a section titled "Priority," that "population equality among districts and compliance with federal and state constitutional requirements and the Voting Rights Act of 1965 shall be given priority in the event of conflict among the criteria").

### b.  Statements by the Delegates Demonstrate That Race Played a Predominant Role in the Design of The Challenged Districts

#### (i)  Statements by Delegate Jones

Delegate Jones, the author of the House Criteria and the Enacted Plan, repeatedly emphasized that race was central to his redistricting decisions. At one early hearing, for example, Delegate Jones explained that population equality and complying with the VRA were "*the most important things* to [him] as [he] drew this map." Pl. Ex. 35 at 35:15-18 (emphasis added). That was no slip of the tongue. In fact, Delegate Jones repeated the same sentiment several times. *See, e.g.*, *id.* at 45:21-46:4 ("[T]he most important thing for me and for us is the principle that one-

- 4 -

person, one-vote and compliance with the Voting Rights Act and I am confidence [sic] that what is before us does exactly that."); *id*. at 81:11-13 ("I was trying to put together a map and a plan that would meet those two tenants [sic]; the one-person, one-vote and the Voting Rights Act."); *id*. at 121:6-11 ("[B]ut I will say . . . the bill that is before this body, does two things and I think it does two things well. It represents the one-person, one-vote and it further complies with the Voting Rights Act[.]").[2]

Equally important, Delegate Jones made clear that compliance with the VRA outweighed all other race-neutral considerations (except for population equality). *See id*. at 56:2-4 (Delegate Jones explaining that "communities of interest, while important . . . were not the overarching driver of this plan"); *id*. at 137:9-19 ("I would just let the gentleman know that . . . we in the [Privileges and Elections] Committee had communities of interest, Number 5 [in the House Criteria]. . . . Number 2 is compliance with the Voting Rights Act."); *id*. at 138:21-139:1 ("I would say to the gentleman that again compactness . . . was Number 3 on the list.").

### (ii)     Statements by Other Delegates

Delegate Jones was hardly alone in expressing these views. To the contrary, many of his colleagues were equally forthright about the centrality of race in the 2010-11 redistricting cycle, particularly with respect to the Challenged Districts.

For example, evidence at trial will show that Delegate Jones relied heavily on certain delegates, including Delegate Lionell Spruill and former Delegate (now Senator) Rosalyn Dance, to help him draw the Challenged Districts or communicate with affected delegates. The views of Senator Dance and Delegate Spruill are therefore especially probative. And both publicly

---

[2] Further underscoring his focus on race at that hearing, Delegate Jones criticized redistricting maps created by university students, *see id*. at 39:15-40:1-6; 40:18-41:5, and redistricting maps created by Governor McDonnell's Bipartisan Advisory Redistricting Commission, *see id*. at 69:12-70:10, mainly because, in his view, those maps did not impose high enough BVAP levels in their majority-minority districts.

acknowledged the central importance of race in the configuration of the Challenged Districts. *See* Pl. Ex. 35 at 148:4-7 (Delegate Spruill praising Delegate Jones because "[w]hat other plan, what other group has come to the Black Caucus and [said], 'Hey, we have a plan to increase the black minority votes. We have a plan to make sure that you're safe.'"); *id*. at 157:2-11 (then-Delegate Dance advocating for HB 5001 because "it does support the 12 minority districts that we have now and it does provide that 55 percent voting strength that I was concerned about").

Consistent with her contemporaneous statements, Senator Dance will testify at trial that race was the predominant consideration in the drawing of the Challenged Districts, and in particular that it was her paramount concern when collaborating with Delegate Jones on draft maps. Delegate Jennifer McClellan—another legislator who worked closely with Delegate Jones in drawing the Challenged Districts—will offer similar testimony, as will former delegate and minority leader Ward Armstrong.

     c.     **The Use of a "Nonnegotiable" Racial Threshold Vividly Demonstrates that Race Played a Predominant Role in the Design of the Challenged Districts**

Just weeks ago, a three-judge court in this district found that the Virginia General Assembly used a "55% BVAP floor" to draw Virginia's Congressional District 3 *and* the Challenged Districts. *Page v. Va. St. Bd. of Elections*, No. 3:13cv678, 2015 WL 3604029, at *9 (E.D. Va. June 5, 2015) ("*Page II*"). In reaching that conclusion, the *Page II* court relied on the report of the *Page II* defendants' expert John Morgan, who freely admitted that the House enacted "'a House of Delegates redistricting plan with a 55% Black VAP as the floor for black-majority districts.'" *Id*. (quoting Pl. Ex. 52 at 26).[3]

---

[3] Mr. Morgan has been identified as a fact witness in this case, likely to be called by the Intervenors during their case in chief.

The admission in Mr. Morgan's report is more than enough to establish the existence of the 55% BVAP threshold in this case. But the additional evidence confirming that racial rule is frankly overwhelming. The evidence at trial will show that Delegate Jones embraced and defended the 55% threshold at every turn—in private email, in committee hearings, and on the floor of the House of Delegates. *See, e.g.*, Pl. Ex. 35 at 42:8-12 (Delegate Jones explaining to his colleagues on the House floor that "[w]e had to keep the core of those [Challenged Districts], because I think that's very important, and because of the population shifts you did see a decrease in some of the percentages, *but all were above 55 percent*") (emphasis added).

Delegate Jones' remarks during a April 5, 2011 floor debate are especially revealing. There, Delegate Jones openly advocated for the 55% BVAP threshold, arguing that "the effective voting age population [in the Challenged Districts] needed to be *north of 55 percent*" in order to comply with the VRA. *Id*. at 70:7-9 (emphasis added). Thus, Delegate Jones assured his colleagues, he had drawn each of the Challenged Districts to "fully compl[y] with the Voting Rights Act *as 55 percent or higher*." *Id*. at 66:11-14 (emphasis added). As a result, "every single, solitary district majority-minority is *over 55 percent*." *Id*. at 108:3-4 (emphasis added).

It is undisputed that Delegate Jones did not conduct any analysis to determine whether the 55% BVAP threshold was necessary or appropriate in any of the Challenged Districts. *See id*. at 54:18-55:4 ("DEL. ARMSTRONG: Can the gentleman tell me whether he or any persons that worked with him . . . took into account any retrogress[ion] analysis regarding minority performance in any of the 12 majority-minority districts . . . ? DEL. JONES: I would say to the gentleman I'm not aware of any."). Nevertheless, Delegate Jones treated that racial threshold as a nonnegotiable, bright-line rule. For example, when asked whether he "distinguish[ed] as there being a difference between a 55 BVAP versus a 53 BVAP? . . . That is, does the gentleman

consider that a significant difference?," *id*. at 113:3-8, Delegate Jones replied: "I would say

yes[.]" *Id*. at 113:11.

Delegate Jones' private communications are equally candid. For example, in early April

2011, Delegate Jennifer McClellan asked to "unsplit," or keep whole, certain precincts in the

Richmond area. Delegate McClellan made the request on behalf of local election officials who

thought the splits complicated election administration. But in trying to draw a map that "unsplit"

those precincts, Delegate McClellan inadvertently dropped the BVAP in Challenged District 71

below Delegate Jones' predetermined 55% BVAP floor. Upon discovering that result, Delegate

Jones rejected the change. As Delegate McClellan later explained to one of the interested

election officials: "I spoke to Chris Jones . . . . Apparently, the changes we discussed . . . would

have pushed the voting age African American population in the 71st District down to 54.8%. *The

target criteria was 55%, so the change can't be made*." Pl. Ex. 30 (emphasis added). The

election official replied: "Darned . . . . . so close and yet so far away! A measly 0.2%!" *Id*.

Later, in an email titled "F/up" sent to the chief of staff for Speaker William Howell,

Delegate Jones confirmed Delegate McClellan's version of events:

> I followed up with Jennifer McClellan this afternoon and she reconfirmed that the
> request of the [election officials] exceeded the *55% threshold* when they did [it]
> for all affected districts *and that she would have never requested it if it didn't*. I
> am not sure what got lost in translation, but the good news is it is fixed now[.]

Id. (emphasis added).[4]

While Delegate Jones' statements are conclusive, this Court need not rely on them alone.

Evidence at trial will show that the 55% BVAP threshold was common knowledge among

---

[4] Delegate Jones may testify that some of these split precincts were "unsplit" in the final
version of the Enacted Plan because he found ways to keep the precincts whole while still
maintaining at least a 55% BVAP threshold in surrounding districts. At most, however, that
shows that Delegate Jones was willing to accommodate traditional, race-neutral redistricting
principles *only to the extent* that they could be reconciled with the 55% BVAP threshold.

legislators. For example, consistent with the exchange above, Delegate McClellan will testify that she discussed the 55% BVAP threshold with Delegate Jones on many occasions; that the 55% figure was fixed and "nonnegotiable"; and that the 55% BVAP threshold was a "primary consideration" in drawing the Challenged Districts. Delegate McClellan will also testify that she intentionally altered electoral boundaries in draft maps submitted to Delegate Jones to ensure that those maps complied with the 55% BVAP threshold. Similarly, Senator Dance will testify that Delegate Jones instructed her to comply with the 55% rule in drawing draft maps, and that she also understood the 55% threshold to be inflexible and "nonnegotiable."

Senator Jill Holtzman Vogel, too, explicitly acknowledged the 55% rule during floor debates in the Virginia Senate. *See* Pl. Ex. 39 at 33:4-6 ("But [the map-drawers in the House of Delegates] clearly believed that was the law, because if you look at the House Plan, they were careful not to retrogress below 55 percent[.]"). Like Delegate Jones, Senator Vogel apparently thought that the VRA demanded a fixed numerical percentage of BVAP throughout the Commonwealth. *See id*. at 33:17-20 ("And in the Commonwealth of Virginia right now in the Senate, 55 percent is the benchmark."). Moreover, she insisted that the U.S. Department of Justice had never precleared a plan with less than 55% BVAP. *See id*. at 18:13-16 ("The lowest amount of African Americans . . . that has ever been precleared . . . is 55.0").[5]

The direct evidence of a racial threshold is, in short, widespread and conclusive.

## 2.    The Circumstantial Evidence of Race-Based Redistricting Is Equally Strong

Given the overwhelming *direct* evidence that race was the predominant consideration in the drawing of the Challenged Districts, there is little need to examine *circumstantial* evidence

---

[5] Senator Vogel's statements were not only incorrect as a general rule (the Department of Justice has specifically disavowed specific numerical percentages), but they were also incorrect *as to Virginia itself*, where numerous districts have been precleared with less than 55% BVAP. *See* Pl. Ex. 45, tbl. 5.1. Putting aside the historical facts, it is now clear that adopting a state-wide BVAP threshold is flatly forbidden, as the Supreme Court made abundantly clear in *Alabama*.

bearing on the same issue. In any event, the circumstantial evidence is equally strong and only confirms what the direct evidence has already made obvious: race predominated and trumped all other considerations.

### a.    Compactness and Respect for Political Boundaries

Lack of compactness often provides circumstantial evidence of race-based redistricting. *See, e.g.*, *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 646-47 (1993). Here, Plaintiffs' expert Professor Stephen Ansolabehere will testify that the Enacted Plan is significantly less compact than its predecessor.

The difference is especially stark with respect to the Challenged Districts. As Professor Ansolabehere will explain, under the commonly accepted Reock measure of compactness, the Enacted Plan reduces the average compactness of the Challenged Districts from .37 to .32—a 13.5% reduction. The reduction in the other 88 districts is far smaller. *See* Pl. Ex. 50 at 17. Professor Ansolabehere will also testify that:

- The Enacted Plan reduces the compactness of most of the Challenged Districts and makes one of the Challenged Districts (Challenged District 95) the least compact district in the Enacted Plan;

- The Enacted Plan reduces the compactness of Challenged Districts 74, 77, and 95 to "extremely low" levels; and

- The Enacted Plan results in "extremely large reductions" in the compactness of Challenged Districts 63, 80, 89, and 95.

*Id*. at 17, 18. Moreover, Professor Ansolabehere will testify that the Enacted Plan increased the number of split political boundaries. In particular, the Enacted Plan "increased the splitting of county boundaries in the areas covered by the Challenged Districts," *id*. at 20, and "increase[d] the number of [Voting Tabulation Districts ("VTDs")] that are split . . . , both statewide and among the VTDs in the Challenged District," *id*. at 21.

With the exception of minor methodological disputes, none of Defendants' experts will disagree with those conclusions. *See* Pl. Ex. 51 at 3.

### b.    Racial Sorting

Professor Ansolabehere will also show that the General Assembly resorted to extensive racial sorting to ensure that all of the Challenged Districts met or exceeded the predetermined 55% BVAP threshold. For example, Professor Ansolabehere will testify that:

- The BVAP in VTDs moved *into* the Challenged Districts is far higher than the BVAP in VTDs moved *out of* the Challenged Districts. *See* Pl. Ex. 50 at 27-37.

- The *partisan* differences between the VTDs moved into and out of the Challenged Districts are much smaller than the *racial* differences between the same VTDs. *See id.* at 38-43.

- Race is a strong predictor of which VTDs were placed in Challenged Districts and which were not. "Party," on the other hand, "is *not* a statistically significant predictor of whether a VTD is included in one of the Challenged Districts[.]" *Id.* at 43 (emphasis added).

Here again, with the exception of minor methodological disputes, Defendants' experts will not disagree with Professor Ansolabehere. *See* Pl. Ex. 51 at 3-4.

## C.    The General Assembly's Use of Race Was Not Narrowly Tailored

Finally, evidence will show that the General Assembly's use of a rigid racial threshold was not narrowly tailored to advance a compelling state interest.

As explained above, the General Assembly subjected all of the Challenged Districts to the same predetermined 55% BVAP threshold. Remarkably, however, *it made no effort to determine whether that threshold was actually necessary to avoid retrogression in any of the Challenged Districts.* Delegate Jones did not conduct or review any racially polarized voting analyses or similar statistical analyses to arrive at the 55% figure, as he will candidly admit. *See* Pl. Ex. 35 at 54:18-55:4 ("DEL. ARMSTRONG: Can the gentleman tell me whether he or any

persons that worked with him in the development of the plan that resulted in HB 5001 took into account any retrogress[ion] analysis regarding minority performance in any of the 12 majority-minority districts . . . ? DEL. JONES: I would say to the gentleman I'm not aware of any."). Nor did he consult other resources, or do any other type of analysis, to determine whether that particular figure was justified. For example, Delegate Jones will admit that he didn't review the contemporaneous redistricting plan for Virginia Senate districts, or review maps or election results from Virginia's prior redistricting cycles to evaluate their BVAP levels and compare them to the electoral results on a district-specific (or any other) basis, or review maps or election results from other jurisdictions to examine their BVAP levels and election results, or review maps from other jurisdictions that had been precleared (or rejected) by DOJ.  His lack of interest in such a review is, indeed, striking.

In short, although covered jurisdictions often perform racially polarized voting analyses or comparable "functional" analyses of voting behavior, and although such analyses are specifically discussed in the Department of Justice's Section 5 guidance, *see* Pl. Ex. 9, Delegate Jones performed no analysis whatsoever to determine whether the 55% BVAP threshold was "reasonably necessary 'in order to maintain the minority's present ability to elect the candidate of its choice[.]'" *Bethune-Hill v. Va. St. Bd. of Elections*, No. 3:14cv852, 2015 WL 3404869, at *11 (E.D. Va. May 26, 2015) (quoting *Alabama*, 135 S. Ct. at 1274).

Instead, Delegate Jones selected the 55% figure based on input from (unnamed) community members and a small number of delegates. *See* Pl. Ex. 35 at 169:11-15 ("The number that we have before us that has been called arbitrary was gleaned from testimony of the community[.]"). But nothing in the record indicates *why* those particular individuals believed that

a 55% BVAP threshold was necessary to avoid retrogression in their districts—let alone all of the Challenged Districts. And Delegate Jones never asked them.

At trial, Professor Ansolabehere will offer a district-by-district analysis of racial voting patterns in the Challenged Districts—precisely the sort of analysis Delegate Jones did not do. He will reach two crucial conclusions. First, he will conclude that racial voting patterns vary dramatically across the Challenged Districts, thereby undermining the map-drawers' one-size-fits-all-approach. *See* Pl. Ex. 50 at 47-51. Second, he will explain that "none" of the Challenged Districts "required a BVAP in excess of 55 percent in order to ensure that African Americans had the ability to elect their preferred candidates." *Id.* at 53-54.

Defendants' experts will not dispute those conclusions. Indeed, Defendants' expert, Dr. Katz, will concede that there were significant differences between each of the districts and his analysis, in fact, demonstrates those differences and largely serves to confirm Dr. Ansolabehere's conclusions.

### III.    ARGUMENT

#### A.    Racial Gerrymandering Is Indisputably Unconstitutional

"As with any law that distinguishes among individuals on the basis of race, 'equal protection principles govern a State's drawing of [electoral] districts.'" *Page II*, 2015 WL 3604029, at *6 (quoting *Miller v. Johnson*, 515 U.S. 900, 905 (1995)). As the Supreme Court has explained:

> Racial classifications with respect to voting carry particular dangers. Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters[.]

*Shaw I*, 509 U.S. at 657. Thus, "race-based districting by our state legislatures demands close judicial scrutiny." *Id.*

LEGAL126568031.1

"To successfully challenge the constitutionality of the [Challenged Districts] under the Equal Protection Clause, Plaintiffs first bear the burden of proving that the legislature's predominant consideration in drawing its electoral boundaries was race." *Page II*, 2015 WL 3604029, at *6. "If they make this showing, the assignment of voters according to race triggers the court's 'strictest scrutiny.'" *Id*. (quoting *Miller*, 515 U.S. at 915). The burden then shifts to Defendants "to demonstrate that the redistricting plan was narrowly tailored to advance a compelling state interest." *Id*. A race-based redistricting plan is narrowly tailored only if "the legislature [has] a strong basis in evidence in support of the (race-based) choice that it . . . made." *Alabama*, 135 S. Ct. at 1274 (internal quotation marks and citation omitted).

Here, the evidence shows that racial goals overshadowed all others. Moreover, Defendants cannot establish that they used race to advance a compelling state interest. And even if they could, they could not possibly show that they had a "strong basis in evidence" for employing a predetermined, across-the-board 55% BVAP threshold. The Challenged Districts, accordingly, fail to pass constitutional muster.

**B.      Race Was the Predominant Consideration in Drawing the Challenged Districts**

"The Supreme Court has cited several specific factors as evidence of racial line drawing." *Page II*, 2015 WL 3604029, at *7. Those factors include "statements by legislators indicating that race was a predominant factor in redistricting," "evidence that race or percentage of race within a district was the single redistricting criterion that could not be compromised," the "creation of non-compact and oddly shaped districts beyond what is strictly necessary to avoid retrogression," and "creation of districts that exhibit disregard for city limits, local election precincts, and [VTDs]." *Id*. Here, as in *Page II*, "all of these factors are present," *id*., and race was plainly the predominant consideration in the drawing of the Challenged Districts.

LEGAL126568031.1

1.     **The Record Includes Numerous "Statements by Legislators Indicating that Race Was a Predominant Factor in Redistricting"**

In *Page II*, the court concluded that race predominated largely because the "legislative record [was] replete with statements indicating that race was the legislature's paramount concern." *Id*. at *8. Here, the legislative record is even more compelling.

*First*, the House Criteria show that race was the General Assembly's paramount concern. The House Criteria—the House's lone official expression of its redistricting priorities— expressly identify "compliance with Section 5 of the VRA . . . , and, accordingly, consideration of race" as an important requirement. *Id*. at *1. Indeed, in terms of importance, only population equality among districts outranks the VRA in the House Criteria. *See* Pl. Ex. 16 at 1.

But as the Supreme Court recently explained, "an equal population goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates'"; instead, "it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met." *Alabama*, 135 S. Ct. at 1270. Thus, for purposes of the predominance analysis, this Court must ignore the reference to population equality in the House Criteria. It follows that the *most important* requirement in the House Criteria is a *racial* requirement: namely, complying with the VRA. *See* Pl. Ex. 16 at 1. That official endorsement of race-based redistricting amounts to "a candid acknowledgment" that race predominated in the drawing of the Challenged Districts, *Page II*, 2015 WL 3604029, at *8, and leaves little doubt that race "was uppermost in the minds of Virginia's legislators" when they drew those districts, *id*. at 22 n.15.

*Second*, Delegate Jones—the architect of the Challenged Districts—routinely emphasized the importance of race both publicly and privately. Indeed, according to Delegate Jones, complying with the VRA was "*the most important thing*[] to [him] as [he] drew

this map" (not counting the background principle of population equality). Pl. Ex. 35 at 35:15-35:18 (emphasis added). He also candidly acknowledged that other considerations took a backseat to that racial goal. *See id.* at 56:2-4 (stating that "communities of interest, while important . . . were not the overarching driver of this plan"); *id.* at 137:9-19 ("I would just let the gentleman know that . . . we in the [Privileges and Elections] Committee had communities of interest, Number 5. Because Number 1 was one-person, one-vote. Number 2 is compliance with the Voting Rights Act."); *id.* at 138:21 (noting that "compactness . . . was Number 3 on the list").

In *Page II*, the court concluded that race predominated in part because Delegate William Janis, the author of the challenged congressional district, stated on the House floor that avoiding retrogression was his "primary focus," his "paramount concern," and a "nonnegotiable" requirement. *Page II*, 2015 WL 3604029, at *9, *10 (internal quotation marks and citations omitted). Here, Delegate Jones' statements to that effect are even more categorical. Thus, as in *Page II*, this Court should "accept the explanation of the legislation's author as to its purpose" and conclude that race predominated in the drawing of the Challenged Districts. *Id.* at *10.

**Third**, this Court may look to statements by other legislators to discern whether race predominated. Other delegates did more than acknowledge Delegate Jones' race-based approach; they applauded it. For example, Delegate Lionell Spruill urged his colleagues to vote in favor of HB 5001 because (according to Delegate Spruill) Delegate Jones told Delegate Spruill that "we have a plan to increase the black minority votes. We have a plan to make sure you're safe." Pl. Ex. 35 at 148:5-7. Similarly, then-Delegate Rosalyn Dance, another legislator who worked closely with Delegate Jones in drawing the Challenged Districts, urged her colleagues to vote for HB 5001 because "it does support the 12 minority districts that we have now and it does provide that 55 percent voting strength that I was concerned about." *Id.* at 157:2-11.

Faced with unambiguous legislative statements like these, courts routinely hold that race predominated in electoral line-drawing. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 961 (1996) (race predominated where "testimony of individual state officials confirmed that the decision to create the districts now challenged as majority-minority districts was made at the outset of the process and never seriously questioned"); *Page II*, 2015 WL 3604029 , at *9 (race predominated where author of challenged district stated that he was "most especially focused" on complying with the VRA when drawing challenged district); *Smith v. Beasley*, 946 F. Supp. 1174, 1194 (D.S.C. 1996) (race predominated where legislator stated that "any amendment [to a challenged district] could not go below 60% [Black population] and 57% BVAP").

This Court should do the same.

**2.      There Is Indisputable "Evidence that Race or Percentage of Race Within a District Was the Single Redistricting Criterion that Could Not Be Compromised"**

As explained above, evidence at trial will show that the General Assembly used a 55% BVAP threshold to draw the Challenged Districts. *See, e.g.*, Pl. Ex. 35 at 42:8-12 (Delegate Jones explaining that "because of the population shifts you did see a decrease in some of the [BVAP] percentages [in the Challenged Districts], *but all were above 55 percent*") (emphasis added); *id.* at 66:10-14 (Delegate Jones arguing that HB 5001 "fully complies with the Voting Rights Act *as 55 percent [BVAP] or higher*") (emphasis added); *id.* at 70:7-9 (Delegate Jones arguing that "the effective voting age population [in the Challenged Districts] needed to be *north of 55 percent*") (emphasis added); *id.* at 108:3-4 (Delegate Jones explaining that "every single, solitary district majority-minority is *over 55 percent*") (emphasis added).

Evidence will also show that both Delegate Jones and his colleagues considered that racial threshold to be nonnegotiable. And in fact, it appears that Defendants now admit as much. *See* Pl. Ex. 68 at 28:10-15 (Intervenors' counsel arguing that the "55 percent number doesn't

come from thin air. It comes from testimony before the House of Delegates. That's to find numbers needed to be able to create functioning minority districts.").

As the Supreme Court recently explained, using a predetermined racial target or threshold to draw electoral boundaries triggers strict scrutiny:

> That Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote) provides evidence that race motivated the drawing of particular lines in multiple districts in the State.

*Alabama*, 135 S. Ct. at 1267. Nor is that a novel rule. Time and again, the Supreme Court has subjected rigid racial quotas to strict scrutiny in the redistricting context. *See Bush*, 517 U.S. at 996 (Kennedy, J., concurring) ("[W]e would no doubt apply strict scrutiny if a State decreed that certain districts had to be at least 50 percent white, and our analysis should be no different if the State so favors minority races."); *see also, e.g.*, *Page II*, 2015 WL 3604029, at *9 (use of 55% BVAP floor to draw Virginia's Congressional District 3 showed that race predominated); *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1267 (11th Cir. 2002) (statement by map-drawer that "her predominant consideration . . . was to maintain the core of the existing majority minority districts and strive toward a 60% black VAP" was evidence that race predominated); *Beasley*, 946 F. Supp. at 1206-07 (concluding that the map-drawers' "insistence on minimum racial percentages in certain districts" was strong "evidence of racial gerrymandering"). This case is no different.

Defendants will no doubt argue that Delegate Jones imposed the racial threshold solely to comply with the VRA. That may well be, but the point is irrelevant.  Plaintiffs do not contend, and will not seek to prove, that Delegate Jones acted with racial animosity and such a showing is decidedly irrelevant and unnecessary for Plaintiffs to succeed.  Even when acting in good faith and with the best of intentions, "[c]overed jurisdictions [do not have] *carte blanche* to engage in racial gerrymandering in the name of nonretrogression," *Shaw I*, 509 U.S. at 655, and therefore a

- 18 -

"racially gerrymandered districting scheme" is "constitutionally suspect" even if "the reason for the racial classification is benign or the purpose remedial," *Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 904-05 (1996). Thus, just as the General Assembly's use of a 55% BVAP threshold to draw a congressional district triggered strict scrutiny in *Page II*, so too its use of a 55% BVAP threshold to draw House districts triggers strict scrutiny here.

**3.    Given the Overwhelming Direct Evidence of the General Assembly's Intent, the Circumstantial Evidence is Far Less Important (But in Any Event is Equally Compelling)**

As noted, the direct evidence of racial predominance is overwhelming, clear, and conclusive. The House's official redistricting criteria exalt race above all other factors; Delegate Jones and other delegates repeatedly declared that race was their paramount concern in drawing the Challenged Districts; and Delegate Jones "relied heavily upon a mechanically numerical view as to what counts as forbidden retrogression" to configure the Challenged Districts. *Alabama*, 135 S. Ct. at 1273. Where, as here, the direct evidence leaves no doubt that race "was uppermost in the minds of Virginia's legislators," *Page II*, 2015 WL 3604029, at *8, that is the end of the inquiry. But, in any event, the available circumstantial evidence is equally compelling and confirms what the direct evidence conclusively establishes:  that race was the General Assembly's predominant consideration in drawing the Challenged Districts.

**4.    The Enacted Plan Created "Non-Compact and Oddly Shaped Districts Beyond What Is Strictly Necessary to Avoid Retrogression"**

"In addition to [direct] evidence of legislative intent," courts may "also consider the extent to which the [challenged] district boundaries manifest that legislative will." *Page II*, 2015 WL 3604029, at *10. Thus, "[e]vidence of a 'highly irregular' reapportionment plan 'in which a State concentrated a dispersed minority population . . . by disregarding traditional districting

principles such as compactness, contiguity, and respect for political subdivisions'" may provide evidence of impermissible racial gerrymandering. *Id*. (quoting *Shaw I*, 509 U.S. at 646-47).

Plaintiffs' expert Professor Ansolabehere will explain how the General Assembly subordinated race-neutral redistricting principles to the dictates of a rigid racial quota. That testimony, which will be largely undisputed, will provide additional circumstantial evidence that race was the predominant consideration in the drawing of the Challenged Districts. *See Page II*, 2015 WL 3604029, at *13 (finding that race predominated based in part on challenged district's irregular shape, disregard for political boundaries, and other "inconsistencies with respect to the traditional districting criteria").

Defendants appear to argue that race could not have predominated because the districts at issue here are equally compact or more compact than districts rejected in earlier cases in Virginia and elsewhere. *See* Pl. Ex. 68 at 27:1-3 (Defendants' counsel arguing that the districts "that are being attacked here look nothing like the plans which had been rejected by the Supreme Court in prior litigation"). There are at least two problems with such an argument.

*First*, it simply fails to grasp the significance of compactness. In the absence of direct evidence of legislative intent, lack of compactness may provide circumstantial evidence that race predominated. *See Shaw I*, 509 U.S. at 646-47. In other words, "[s]uch circumstantial evidence is one factor that contributes to the overall conclusion that the district's boundaries were drawn with a focus on race." *Page II*, 2015 WL 3604029, at *11. That certainly does not mean, however, that Plaintiffs must show that the Challenged Districts are non-compact to establish that race predominated. *See Alabama*, 135 S. Ct. at 1267 (plaintiffs' burden is to show, "either through circumstantial evidence . . . *or more direct evidence going to legislative purpose*," that "race was the predominant factor") (emphasis added) (internal quotation marks and citation

omitted). Thus, even if the Challenged Districts were in fact perfectly "compact" (which Plaintiffs most certainly dispute), that would hardly save them from constitutional challenge if drawn with race as the predominant consideration. It is the *predominant purpose* that subjects districts to strict scrutiny, not mere irregular shape. Once it is established that race did predominate (say, for example, by a legislator's express admissions to that effect or the use of a "mechanical" racial threshold), then the a district's shape becomes largely irrelevant.

Here, Plaintiffs will show that the General Assembly reduced compactness and disregarded political boundaries in drawing the Challenged Districts, thus providing additional circumstantial evidence that race predominated. But given the overwhelming direct evidence on that score, there is no need to attempt to divine legislative intent from lines on a map. The General Assembly *expressly said*—in many ways, and on many occasions—that race was its predominant consideration. Given that "direct evidence going to legislative purpose," academic disputes about compactness scores and compactness measurements are largely sideshows and should not consume inordinate amounts of time at trial.

**Second**, Defendants' argument fails on the merits. Defendants seem to believe that only extreme non-compactness may indicate racial gerrymandering. *See* Pl. Ex. 68, at 24:18-23 ("We're going to show the Court the various districts that had been rejected in prior *Shaw*-style litigation, and you'll see that they all involve plans which have districts that, frankly, don't look like districts. They don't bear any resemblance to any notion of geography."). Thus, Defendants' expert Thomas Hofeller devotes many pages of his expert report to the argument that the Enacted Plan complies with the compactness requirements of Virginia's Constitution.  He also tries to show that the compactness of the Enacted Plan compares favorably with redistricting plans in other states. But none of that is helpful. "To show that race predominated, Plaintiffs need not

establish that the legislature disregarded every traditional districting principle." *Page II*, 2015 WL 3604029, at \*11. Moreover, "[i]rregularities in shape need not be so extreme as to make the district an outlier nationwide; courts simply consider a 'highly irregular and geographically non-compact' shape evidence of the predominance of race." *Id.* at \*15 (quoting *Shaw II*, 517 U.S. at 905-06). Thus, much of the analysis Defendants apparently intend to offer will either be superfluous or flatly irrelevant.

## C.     Politics Did Not Outweigh Race

It seems that Defendants will also argue that politics, not race, was the predominant consideration in the drawing of the Challenged Districts. *See* Pl. Ex. 68, at 29:1-5 (Defendants' counsel arguing that "[t]his plan was drawn for political purposes," and that "the notion that race predominated simply flies in the face of reality"). That argument fails as well.

*First*, to the extent that this defense amounts to a claim that the General Assembly purposely targeted White Democrats, it is nothing less than *another* admission that race was the General Assembly's predominant consideration. *See* Pl. Ex. 68, at 28:21-24 (Defendants' counsel arguing that the "vast majority of the incumbents got reelected except for *a few democratic white members lost. That's the predominant purpose of the plan*. We shouldn't pretend anything else.") (emphasis added). *Racial* gerrymandering, at the risk of stating the obvious, is impermissible.

*Second*, the record simply does not support that politics was the aim. Again, there is clear, conclusive, and overwhelming evidence, both direct and circumstantial, that race was the most important factor in the configuration of the Challenged Districts. In contrast, nothing in the record suggests that politics was the predominant consideration. In fact, the record makes clear that political factors played a marginal role at best. For example:

- The House Criteria expressly subordinate political considerations to racial considerations.

- Virginia's Preclearance Submission makes clear that "partisan factors were present *but muted* in establishing new districts." Pl. Ex. 44 at 12 (emphasis added).

- While the record is replete with statements about a rigid *racial* threshold, nothing in the record even hints at *partisan* thresholds, targets, or quotas.

- During the redistricting process, neither Delegate Jones nor his political allies emphasized politics. In fact, they downplayed politics. *See, e.g.*, Pl. Ex. 17.

- Plaintiffs' expert Professor Ansolabehere will testify that race is, by far, the most powerful predictor of which VTDs were placed in Challenged Districts, while partisan considerations are not.

Thus, Defendants cannot hide behind post hoc, made-for-litigation arguments that politics overshadowed race. *See Page II*, 2015 WL 3604029, at *14("While Defendants have offered post-hoc political justifications for the 2012 Plan in their briefs, neither the legislative history as a whole, nor the circumstantial evidence, supports that view to the extent they suggest.").

To be clear, Plaintiffs do not dispute that "partisan political considerations, as well as a desire to protect incumbents, played a role in drawing district lines. It would be remarkable if they did not." *Id*. at *13 But race may be the predominant consideration even if a legislature's redistricting process is not "purely race-based," *Bush*, 517 U.S. at 959, and the fact that "the legislature addressed [political concerns need not] in any way refute the fact that race was the legislature's predominant consideration," *Shaw II*, 517 U.S. at 907. Here, even if politics played some role, it was at best a secondary role, and it mattered only *after* compliance with the inflexible and "nonnegotiable" mechanical 55% BVAP threshold.

**D.      The Challenged Districts Cannot Survive Strict Scrutiny**

Because race was a predominant factor in the General Assembly's configuration of the Challenged Districts, Defendants "must demonstrate that [Virginia's] districting legislation is

narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 920. "[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) (internal quotation marks and citation omitted). Defendants cannot begin to meet that exacting standard.

### 1.      Defendants Cannot Show that the Challenged Districts Serve a Compelling Interest

Defendants will argue that the General Assembly's alleged goal of complying with Section 5 of the VRA justified its use of a rigid racial threshold in drawing the Challenged Districts.  Even if this Court were to disregard the intervening decision in *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013),[6] before compliance with Section 5 could possibly be a compelling interest, a defendant must show that advancing that interest was its "actual purpose," Shaw II, 517 U.S. at 908 n.4, and that it had "a strong basis in evidence . . . for believing" that the districting decision at issue was "'reasonably necessary under a constitutional reading and application of'" the VRA, *id.* at 911; *Miller*, 515 U.S. at 921. Here, Delegate Jones admittedly did not perform any analysis to determine whether a 55% BVAP threshold was required to avoid retrogression in any of the Challenged Districts, much less *all* of them.  As a result, Defendants cannot credibly argue that they were serving a compelling interest when they formulated and applied that "nonnegotiable" mechanical racial threshold.

---

[6] In *Shelby County*, the Court held that the coverage formula of the VRA was unconstitutional, and accordingly Section 5 no longer applied to certain jurisdictions, including Virginia. *See id*. at 2631. Because Virginia is no longer subject to Section 5, it is unclear whether Section 5 compliance can serve as a compelling interest that justifies Virginia's race-based redistricting. Plaintiffs understand that this argument was rejected in *Page II*. *See Page II*, 2015 WL 3604029, at *16 & n.27. But the Supreme Court has not yet decided "whether, given [*Shelby County*], continued compliance with § 5 remains a compelling interest." *Id*.

### 2. The General Assembly's Use of Race Was Not Narrowly Tailored

Even if the VRA remains a compelling interest, and even if Defendants could show that their rigid racial threshold advances that interest, Defendants cannot show that the "mechanically numerical" approach they chose was narrowly tailored. *Alabama*, 135 S. Ct. at 1273.

In *Alabama*, the Supreme Court addressed a case much like this one. The Alabama legislature set out to redraw its House districts in compliance with the VRA. At the outset, the legislature determined that "it was required to maintain roughly the same black population percentage in existing majority-minority districts" in order to avoid retrogression. *Id*. But the legislature did not perform any analysis to determine whether maintaining those levels was necessary to preserve minorities' ability to elect their candidates of choice. Instead, like the General Assembly in this case, the Alabama legislature simply "relied heavily upon a mechanically numerical view as to what counts as forbidden retrogression" without any evidence to support that view. *Id*. at 1273.

The Supreme Court held that Alabama's "mechanically numerical" approach was not narrowly tailored. In reaching that conclusion, it explained that a legislature must have a "*strong basis in evidence* in support of the (race-based) choice that it has made." *Id*. at 1274 (emphasis added) (internal quotation marks and citation omitted). Alabama's legislators, however, had no basis in evidence—let alone a strong basis—to believe that an inflexible racial floor was necessary. Nor was that surprising because, as the Supreme Court put it, Alabama's legislators simply asked the "wrong question":

> They asked: "How can we maintain present minority percentages in majority-minority districts?" But given § 5's language, its purpose, the Justice Department Guidelines, and the relevant precedent, they should have asked: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice?" Asking the wrong question may well have led to the wrong answer.

*Alabama*, 135 S. Ct. at 1274.

Here, like the legislature in *Alabama*, the General Assembly asked the wrong question. It should have asked: "'To what extent must we preserve existing minority percentages [in *each* of the Challenged Districts] in order to maintain the minority's present ability to elect the candidate of its choice?'" *Id*. And to answer that question, it should have performed—on a district-by-district basis—the sort of "functional analysis" outlined in the Department of Justice's Section 5 guidance and cited favorably in *Alabama*. *See id.* at 1272 (explaining that the Department of Justice's Section 5 guidance "state[s] specifically that the Department's preclearance determinations are not based 'on any predetermined or fixed demographic percentages. . . . Rather, in the Department's view, this determination requires a functional analysis of the electoral behavior within the particular jurisdiction or election district [and] census data alone may not provide sufficient indicia of electoral behavior to make the requisite determination"); *see also* Pl. Ex. 9 (Department of Justice Section 5 guidance). As the District Court for the District of Columbia has explained:

> Section 5 requires a multi-factored, functional approach to gauge whether a redistricting plan will have the effect of denying or abridging minority citizens' ability to elect representatives of their choice. It does not lend itself to formalistic inquiry and complexity is inherent in the statute. The ability to elect can rarely be measured by a simple statistical yardstick[.]

*Texas v. United States*, 831 F. Supp. 2d 244, 272 (D.D.C. 2011) (emphasis added). Thus, at the very least, the General Assembly and Delegate Jones were obligated to "take account of all significant circumstances" in evaluating the necessity of a 55% BVAP threshold. *Alabama*, 135 S. Ct. at 1273.

But that is precisely what they *failed* to do. In fact, as discussed above, Delegate Jones did not consider *any* potentially relevant information. He did not perform a statistical analysis of

- 26 -

racial voting patterns in the Challenged Districts (or any other sort of functional analysis); he did not review the Senate's contemporaneous redistricting plan; he did not review potentially relevant electoral data from Virginia or other jurisdictions; and he did not review maps that had been precleared (or rejected) by DOJ.

Plaintiffs acknowledge the *Page II* court's passing observation that a racial bloc voting analysis [is not] always necessary to support a narrow tailoring argument. In this case, however, the General Assembly did not simply fail to conduct a racial bloc voting analysis. It failed to conduct *any* sort of analysis or make *any* sort of inquiry to establish the necessity of its overtly race-based redistricting decisions. Whatever else might be required to support a "narrow tailoring" argument, it most assuredly requires more than asking unnamed members of the "community" or sitting delegates what they wanted or what they thought necessary to ensure their own reelection. That is a far cry from the "strong basis in evidence" the Supreme Court requires to justify race-based decision making. *Alabama*, 135 S. Ct. at 1274.  And to rule otherwise would all but eviscerate the Supreme Court's repeated insistence that narrow tailoring for race-based redistricting must be justified by a "strong basis in *evidence*."

Here, Delegate Jones lacked a strong basis in evidence for his predetermined, across-the-board 55% BVAP threshold. *See Alabama*, 135 S. Ct. at 1273 (legislature's "mechanically numerical" approach to redistricting was not narrowly tailored); *Page II*, 2015 WL 3604029 , at *16-17 (legislature's 55% BVAP quota was not narrowly tailored); *Beasley*, 946 F. Supp. at 1210 (same). And if there was any doubt on this score, it is put to rest by the illegal results that necessarily flowed from the 55% BVAP threshold. For example, in order to comply with the threshold, the General Assembly increased the BVAP in some Challenged Districts (e.g., Challenged District 71) even though those districts had elected minorities' candidates of choice

- 27 -

for years. As the Supreme Court has made clear, however, a plan that augments minority voting strength more than necessary is unconstitutional. *See Shaw I*, 509 U.S. at 655 ("A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression.").

In sum, the evidence that will be placed before this Court at trial will demonstrate, in short, that race was the General Assembly's predominant purpose, and the General Assembly's race-based redistricting was anything but narrowly tailored. The Challenged Districts are therefore unconstitutional, and all that remains to decide is the proper remedy.

## E.    This Court Should Impose an Immediate and Effective Remedy

Plaintiffs respectfully submit that this Court should, following trial, promptly enter an immediate and effective remedy. Courts regularly exercise the "power . . . [either] to require valid reapportionment or to formulate a valid redistricting plan." *Scott v. Germano*, 381 U.S. 407, 409 (1965). If time allows, a court should give the appropriate legislative body an opportunity to enact a new plan that avoids the constitutional infirmities in the invalidated plan. *See McDaniels v. Mehfoud*, 702 F. Supp. 588, 596 (E.D. Va. 1988); Nathaniel Persily, *When Judges Carve Democracies: A Primer on Court-Drawn Redistricting Plans*, 73 Geo. Wash. L. Rev. 1131, 1133 (2005).

As the Supreme Court has explained, however, "[a]lthough the legislative branch plays the primary role in . . . redistricting, our precedents recognize an important role for the courts when a districting plan violates the Constitution." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 415 (2006). In particular, where it is clear that the appropriate legislative body will not or cannot enact a valid plan in time, as when the "imminence of . . . [an] election makes [referral to the legislative branch] impractical," then "it becomes the 'unwelcome obligation' of

the federal court to devise and impose a reapportionment plan pending later legislative action." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (principal opinion) (internal citation omitted).

**F.   Plaintiffs Are Entitled to Reasonable Attorneys' Fees and Costs**

Plaintiffs brought this lawsuit under 42 U.S.C. § 1983, and prevailing parties in § 1983 actions "should ordinarily recover an attorney's fee . . . ." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (internal quotation marks and citation omitted). Prevailing parties are also entitled to recover their expert fees. *See* 42 U.S.C. § 1973*l*(e). Plaintiffs request the opportunity—should they prevail—to demonstrate their attorneys' fees, expert fees, and costs by post-trial motion.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court invalidate Virginia House of Delegates districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 and ensure that constitutional districts are adopted for the upcoming House of Delegates elections.

DATED: June 19, 2015

By: */s/ Aria C. Branch*
    John K. Roche (VSB# 68594)
    Marc Erik Elias (admitted *pro hac vice*)
    Bruce V. Spiva (admitted *pro hac vice*)
    Elisabeth C. Frost (admitted *pro hac vice*)
    Aria C. Branch (VSB # 83682)
    **PERKINS COIE** LLP
    700 Thirteenth Street, N.W., Suite 600
    Washington, D.C.  20005-3960
    Telephone: 202.434.1627
    Facsimile: 202.654.9106

Kevin J. Hamilton (admitted *pro hac vice*)
Abha Khanna (admitted *pro hac vice*)
Ryan Spear (admitted *pro hac vice*)
William B. Stafford
     (admitted *pro hac vice*)
**PERKINS COIE** LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Plaintiffs*

LEGAL126568031.1

## CERTIFICATE OF SERVICE

On June 19, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jennifer Marie Walrath
Katherine Lea McKnight
Baker & Hostetler LLP (DC)
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
202-861-1702
Fax: 202-861-1783
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com

Effrem Mark Braden
Baker & Hostetler LLP (DC-NA)
Washington Square
Suite 1100
Washington, DC 20036
202-861-1504
Fax: 202-861-1783
mbraden@bakerlaw.com

Of counsel:

Dale Oldham, Esq.
1119 Susan St.
Columbia, SC 29210
803-772-7729
dloesq@aol.com

*Attorneys for Intervenor-Defendants*

Jeffrey P. Brundage
Daniel Ari Glass
Kathleen Angell Gallagher
Eckert Seamans Cherin & Mellott LLC
1717 Pennsylvania Ave NW, Suite 1200
Washington, D.C. 20006
202-659-6600
Fax:  202-659-6699
jbrundage@eckertseamans.com
dglass@eckertseamans.com
kgallagher@eckertseamans.com

Godfrey T. Pinn, Jr.
Harrell & Chambliss LLP
Eighth and Main Building
707 East Main Street
Suite 1000
Richmond, VA 23219
gpinn@hclawfirm.com

Anthony F. Troy
Eckert Seamans Cherin & Mellott LLC
707 East Main Street
Suite 1450
Richmond, Virginia  23219
804-788-7751
Fax:  804-698-2950
ttroy@eckertseamans.com

*Attorneys for Defendants*

By */s/ Aria C. Branch*
  Aria C. Branch (VSB #83682)
  Perkins Coie LLP
  700 13th St. N.W., Suite 600
  Washington, D.C. 20005-3960
  Phone:  (202) 654-6338
  Fax:  (202) 654-9106
  ABranch@perkinscoie.com

*Attorneys for Plaintiffs*