## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

GOLDEN BETHUNE-HILL, *et al.*,

        Plaintiffs,

    v.

VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,

        Defendants,

    v.

VIRGINIA HOUSE OF DELEGATES, *et al.*,

        Intervenor-Defendants.

Civil Action No. 3:14-cv-00852-REP-GBL-BMK

### APPENDIX TO PLAINTIFFS' TRIAL BRIEF
### (EXCERPTS OF SELECTED TRIAL EXHIBITS)

       Plaintiffs respectfully submit this Appendix, which contains excerpts of selected trial exhibits, with key passages highlighted, for the convenience of the Court.  As discussed during the Pretrial Conference, Plaintiffs anticipate that all of these exhibits will be admitted pursuant to a stipulation of all counsel, although the parties have not yet finalized that stipulation.  Complete copies of these exhibits are reflected in Plaintiffs' List of Witnesses & Trial Exhibits, filed contemporaneously with this Appendix.

- 1 -

| Ex. No. | Description |
|---|---|
| Plaintiffs TX 007 | Email from C. Marston to K. Alexander Murray re RPV Leadership Roster, dated December 9, 2010 |
| Plaintiffs TX 009 | Federal Register - Department of Justice Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act; Notice [76 Fed. Reg. 7470-7473 (Feb. 9, 2011)] |
| Plaintiffs TX 017 | Email from G. Paul Nardo to Caucus Members re Messaging on House Redistricting Maps, dated March 29, 2011 |
| Plaintiffs TX 018 | Email from C. Marston to D. Oldham and dloesq@aol.com re Commission's 13 MM Plan, dated March 30, 2011 |
| Plaintiffs TX 022 | Email from C. Marston to C. Jones re HD61-HD75 Dale's Options, dated April 1, 2011 |
| Plaintiffs TX 030 (*selected pages*) | Email string between J. McClellan, K. Showalter, L. Haake and K. Stigall re HB5001 as passed Senate, dated April 8, 2011 |
| Plaintiffs TX 033 (*selected pages*) | Transcript of 2011 Special Session I Virginia House of Delegates Redistricting Floor Debates, dated April 4, 2011 |
| Plaintiffs TX 035 (*selected pages*) | Transcript of 2011 Special Session I Virginia House of Delegates Redistricting Floor Debates, dated April 5, 2011 |
| Plaintiffs TX 038 | Email from C. Marston to C. Jones re AP_Blk, dated April 6, 2011 |
| Plaintiffs TX 039 (*selected pages*) | Transcript of Privileges and Elections Redistricting Senate Hearing, dated April 7, 2011 |
| Plaintiffs TX 052 | Report of John B. Morgan Regarding Plaintiffs' Alternative Plan and the Enacted Plan, dated March 14, 2014 (re Page v. State Board of Elections) |
| Plaintiffs TX 068 (*selected pages*) | Transcript of Pretrial Hearing Conference Call, dated June 4, 2015 |

LEGAL126557170.1

DATED: June 19, 2015

By: */s/ Aria C. Branch*

John K. Roche (VSB # 68594)
Marc Erik Elias (admitted *pro hac vice*)
Bruce V. Spiva (admitted *pro hac vice*)
Elisabeth C. Frost (admitted *pro hac vice*)
Aria C. Branch (VSB # 83682)
**PERKINS COIE** LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone: 202.434.1627
Facsimile: 202.654.9106

Kevin J. Hamilton (admitted *pro hac vice*)
Abha Khanna (admitted *pro hac vice*)
Ryan Spear (admitted *pro hac vice*)
William B. Stafford
       (admitted *pro hac vice*)
**PERKINS COIE** LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Plaintiffs*

LEGAL126557170.1

## CERTIFICATE OF SERVICE

On June 19, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jennifer Marie Walrath
Katherine Lea McKnight
Baker & Hostetler LLP (DC)
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
202-861-1702
Fax: 202-861-1783
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com

Effrem Mark Braden
Baker & Hostetler LLP (DC-NA)
Washington Square
Suite 1100
Washington, DC 20036
202-861-1504
Fax: 202-861-1783
mbraden@bakerlaw.com

Of counsel:

Dale Oldham, Esq.
1119 Susan St.
Columbia, SC 29210
803-772-7729
dloesq@aol.com

*Attorneys for Intervenor-Defendants*

Jeffrey P. Brundage
Daniel Ari Glass
Kathleen Angell Gallagher
Eckert Seamans Cherin & Mellott LLC
1717 Pennsylvania Ave NW, Suite 1200
Washington, D.C. 20006
202-659-6600
Fax:  202-659-6699
jbrundage@eckertseamans.com
dglass@eckertseamans.com
kgallagher@eckertseamans.com

Godfrey T. Pinn, Jr.
Harrell & Chambliss LLP
Eighth and Main Building
707 East Main Street
Suite 1000
Richmond, VA 23219
gpinn@hclawfirm.com

Anthony F. Troy
Eckert Seamans Cherin & Mellott LLC
707 East Main Street
Suite 1450
Richmond, Virginia  23219
804-788-7751
Fax:  804-698-2950
ttroy@eckertseamans.com

*Attorneys for Defendants*

By */s/ Aria C. Branch*
   Aria C. Branch (VSB No. 83682)
   Perkins Coie LLP
   700 13th St. N.W., Suite 600
   Washington, D.C. 20005-3960
   Phone:  (202) 654-6338
   Fax:  (202) 654-9106
   ABranch@perkinscoie.com

*Attorneys for Plaintiffs*

Exhibit 7

Exhibit 7

**From:** Chris Marston <chris.marston@gmail.com>
**To:** Katie Alexander Murray <katiegalex@yahoo.com>
**Subject:** Re: RPV Leadership Roster
**Date:** 12/9/2010 6:28:17 PM
**Attachments:**

E-mail is okay too. Just be careful in how you describe what you're seeking. We need to keep out any hint of unfairness (except the fundamental unfairness of the Voting Rights Act) or partisanship.

For example, "I'm working on an important project for Speaker Howell and the House Republican Caucus. In order to develop redistricting plans for Virginia in full compliance with the Voting Rights Act, we need to collect data for Racial Block Voting analysis. One way to analyze the data is to look for elections in which an African-American candidate and a White candidate both compete (either in one party's primary, or in a general election)."

I think that's pretty safe. Some of these folks may try to engage you in a conversation about what they think new maps should look like. Do your best to politely decline to have that conversation. You might say, "I am just responsible for collecting this important data for Racial Block Voting and the Caucus is committed to a fair redistricting process that complies with applicable laws and results in districts with as nearly equal population as practicable."

If they push and push, feel free to tell them to call me.

Thanks,
Chris

On Thu, Dec 9, 2010 at 5:21 PM, Katie Alexander Murray <katiegalex@yahoo.com> wrote:
> Thanks Chris,
>
> I noticed on the list that their email addresses are listed.  Would it be ok if I sent an initial email, or would you prefer for me to do everything over the phone?
>
> Katie

---

**From:** Chris Marston <chris.marston@gmail.com>
**To:** katiegalex@yahoo.com
**Sent:** Wed, December 8, 2010 9:26:16 AM
**Subject:** RPV Leadership Roster

Katie,

Here's the RPV Leadership Roster. The unit chairs are listed after the state central committee.

Feel free to identify yourself as calling from the House Republican Caucus.

The information you need is whether any election, including Democrat primaries, featured a black and a white candidate. Elections for state House, state Senate, Boards of Supervisors/City Councils, Constitutional Officers (Sheriff, Commonwealth's Attorney, Clerk of Court, Treasurer, Commissioner of the Revenue), School Boards, and even Soil and Water Conservation District Directors.

What I need back is the Election Year (whether it was a general or a special election, most will be general), the office, and which candidate was black and which was white. If a chair just remembers that there was a contest with a black and a white, but doesn't remember names, the State Board of Elections website has results for many elections, especially in recent years, so we can check there for names.

Let me know if you have any questions.

Thanks,
Chris

Exhibit 9

Exhibit 9



# FEDERAL REGISTER

| Vol. 76 | Wednesday, |
| No. 27 | February 9, 2011 |

Part III

## Department of Justice

Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act; Notice

**Plaintiffs001495**

**PLAINTIFFS TX 009 - page 1**

## DEPARTMENT OF JUSTICE

## Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act; Notice

**AGENCY:** Office of the Assistant Attorney General, Civil Rights Division, Department of Justice.

**ACTION:** Notice.

**SUMMARY:** The Attorney General has delegated responsibility and authority for determinations under Section 5 of the Voting Rights Act to the Assistant Attorney General, Civil Rights Division, who finds that, in view of recent legislation and judicial decisions, it is appropriate to issue guidance concerning the review of redistricting plans submitted to the Attorney General for review pursuant to Section 5 of the Voting Rights Act.

**FOR FURTHER INFORMATION CONTACT:** T. Christian Herren, Jr., Chief, Voting Section, Civil Rights Division, United States Department of Justice, Washington, DC 20530, (202) 514–1416.

**SUPPLEMENTARY INFORMATION:** Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, requires jurisdictions identified in Section 4 of the Act to obtain a determination from either the Attorney General or the United States District Court for the District of Columbia that any change affecting voting which they seek to enforce does not have a discriminatory purpose and will not have a discriminatory effect.

Beginning in 2011, these covered jurisdictions will begin to seek review under Section 5 of the Voting Rights Act of redistricting plans based on the 2010 Census. Based on past experience, the overwhelming majority of the covered jurisdictions will submit their redistricting plans to the Attorney General. This guidance is not legally binding; rather, it is intended only to provide assistance to jurisdictions covered by the preclearance requirements of Section 5.

## Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c

Following release of the 2010 Census data, the Department of Justice expects to receive several thousand submissions of redistricting plans for review pursuant to Section 5 of the Voting Rights Act. The Civil Rights Division has received numerous requests for guidance similar to that it issued prior to the 2000 Census redistricting cycle concerning the procedures and standards that will be applied during review of these redistricting plans. 67 FR 5411 (January 18, 2001). In addition,

in 2006, Congress reauthorized the Section 5 review requirement and refined its definition of some substantive standards for compliance with Section 5. In view of these developments, issuing revised guidance is appropriate.

The "Procedures for the Administration of Section 5 of the Voting Rights Act," 28 CFR Part 51, provide detailed information about the Section 5 review process. Copies of these Procedures are available upon request and through the Voting Section Web site (*http://www.usdoj.gov/crt/ voting*). This document is meant to provide additional guidance with regard to current issues of interest. Citations to judicial decisions are provided to assist the reader but are not intended to be comprehensive. The following discussion provides supplemental guidance concerning the following topics:

• The Scope of Section 5 Review;
• The Section 5 Benchmark;
• Analysis of Plans (discriminatory purpose and retrogressive effect);
• Alternatives to Retrogressive Plans; and
• Use of 2010 Census Data.

### The Scope of Section 5 Review

Under Section 5, a covered jurisdiction has the burden of establishing that a proposed redistricting plan "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in [Section 4(f)(2) of the Act]" (i.e., membership in a language minority group defined in the Act). 42 U.S.C 1973c(a). A plan has a discriminatory effect under the statute if, when compared to the benchmark plan, the submitting jurisdiction cannot establish that it does not result in a "retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States,* 425 U.S. 125, 141 (1976).

If the proposed redistricting plan is submitted to the Department of Justice for administrative review, and the Attorney General determines that the jurisdiction has failed to show the absence of any discriminatory purpose or retrogressive effect of denying or abridging the right to vote on account of race, color or membership in a language minority group defined in the Act, the Attorney General will interpose an objection. If, in the alternative, the jurisdiction seeks a declaratory judgment from the United States District Court for the District of Columbia, that court will utilize the identical standard

to determine whether to grant the request; i.e., whether the jurisdiction has established that the plan is free from discriminatory purpose or retrogressive effect. Absent administrative preclearance from the Attorney General or a successful declaratory judgment action in the district court, the jurisdiction may not implement its proposed redistricting plan.

The Attorney General may not interpose an objection to a redistricting plan on the grounds that it violates the one-person one-vote principle, on the grounds that it violates *Shaw* v. *Reno,* 509 U.S. 630 (1993), or on the grounds that it violates Section 2 of the Voting Rights Act. The same standard applies in a declaratory judgment action. Therefore, jurisdictions should not regard a determination of compliance with Section 5 as preventing subsequent legal challenges to that plan under other statutes by the Department of Justice or by private plaintiffs. 42 U.S.C. 1973c(a); 28 CFR 51.49.

### The Section 5 "Benchmark"

As noted, under Section 5, a jurisdiction's proposed redistricting plan is compared to the "benchmark" plan to determine whether the use of the new plan would result in a retrogressive effect. The "benchmark" against which a new plan is compared is the last legally enforceable redistricting plan in force or effect. *Riley* v. *Kennedy,* 553 U.S. 406 (2008); 28 CFR 51.54(b)(1). Generally, the most recent plan to have received Section 5 preclearance or to have been drawn by a Federal court is the last legally enforceable redistricting plan for Section 5 purposes. When a jurisdiction has received Section 5 preclearance for a new redistricting plan, or a Federal court has drawn a new plan and ordered it into effect, that plan replaces the last legally enforceable plan as the Section 5 benchmark. *McDaniel* v. *Sanchez,* 452 U.S. 130 (1981); *Texas* v. *United States,* 785 F. Supp. 201 (D.D.C. 1992); *Mississippi* v. *Smith,* 541 F. Supp. 1329, 1333 (D.D.C. 1982), appeal dismissed, 461 U.S. 912 (1983).

A plan found to be unconstitutional by a Federal court under the principles of *Shaw* v. *Reno* and its progeny cannot serve as the Section 5 benchmark, *Abrams* v. *Johnson,* 521 U.S. 74 (1997), and in such circumstances, the benchmark for Section 5 purposes will be the last legally enforceable plan predating the unconstitutional plan. Absent such a finding of unconstitutionality under *Shaw* by a Federal court, the last legally enforceable plan will serve as the benchmark for Section 5 review. Therefore, the question of whether the

**Plaintiffs001496**

**PLAINTIFFS TX 009 - page 2**

benchmark plan is constitutional will not be considered during the Department's Section 5 review.

**Analysis of Plans**

As noted above, there are two necessary components to the analysis of whether a proposed redistricting plan meets the Section 5 standard. The first is a determination that the jurisdiction has met its burden of establishing that the plan was adopted free of any discriminatory purpose. The second is a determination that the jurisdiction has met its burden of establishing that the proposed plan will not have a retrogressive effect.

*Discriminatory Purpose*

Section 5 precludes implementation of a change affecting voting that has the purpose of denying or abridging the right to vote on account of race or color, or membership in a language minority group defined in the Act. The 2006 amendments provide that the term "purpose" in Section 5 includes "any discriminatory purpose," and is not limited to a purpose to retrogress, as was the case after the Supreme Court's decision in *Reno* v. *Bossier Parish* ("*Bossier II*), 528 U.S. 320 (2000). The Department will examine the circumstances surrounding the submitting authority's adoption of a submitted voting change, such as a redistricting plan, to determine whether direct or circumstantial evidence exists of any discriminatory purpose of denying or abridging the right to vote on account of race or color, or membership in a language minority group defined in the Act.

Direct evidence detailing a discriminatory purpose may be gleaned from the public statements of members of the adopting body or others who may have played a significant role in the process. *Busbee* v. *Smith*, 549 F. Supp. 494, 508 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983). The Department will also evaluate whether there are instances where the invidious element may be missing, but the underlying motivation is nonetheless intentionally discriminatory. In the *Garza* case, Judge Kozinski provided the clearest example:

Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination? Of course you have. Your personal feelings toward minorities don't

matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

*Garza and United States* v. *County of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part), *cert. denied*, 498 U.S. 1028 (1991).

In determining whether there is sufficient circumstantial evidence to conclude that the jurisdiction has not established the absence of the prohibited discriminatory purpose, the Attorney General will be guided by the Supreme Court's illustrative, but not exhaustive, list of those "subjects for proper inquiry in determining whether racially discriminatory intent existed," outlined in *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977). In that case, the Court, noting that such an undertaking presupposes a "sensitive inquiry," identified certain areas to be reviewed in making this determination: (1) The impact of the decision; (2) the historical background of the decision, particularly if it reveals a series of decisions undertaken with discriminatory intent; (3) the sequence of events leading up to the decision; (4) whether the challenged decision departs, either procedurally or substantively, from the normal practice; and (5) contemporaneous statements and viewpoints held by the decision-makers. *Id.* at 266–68.

The single fact that a jurisdiction's proposed redistricting plan does not contain the maximum possible number of districts in which minority group members are a majority of the population or have the ability to elect candidates of choice to office, does not mandate that the Attorney General interpose an objection based on a failure to demonstrate the absence of a discriminatory purpose. Rather, the Attorney General will base the determination on a review of the plan in its entirety.

*Retrogressive Effect*

An analysis of whether the jurisdiction has met its burden of establishing that the proposed plan would not result in a discriminatory or "retrogressive" effect starts with a basic comparison of the benchmark and proposed plans at issue, using updated census data in each. Thus, the Voting Section staff loads the boundaries of the benchmark and proposed plans into the Civil Rights Division's geographic information system [GIS]. Population data are then calculated for each district in the benchmark and the proposed plans using the most recent decennial census data.

A proposed plan is retrogressive under Section 5 if its net effect would be to reduce minority voters' "effective exercise of the electoral franchise" when compared to the benchmark plan. *Beer* v. *United States* at 141. In 2006, Congress clarified that this means the jurisdiction must establish that its proposed redistricting plan will not have the effect of "diminishing the ability of any citizens of the United States" because of race, color, or membership in a language minority group defined in the Act, "to elect their preferred candidate of choice." 42 U.S.C. 1973c(b) & (d). In analyzing redistricting plans, the Department will follow the congressional directive of ensuring that the ability of such citizens to elect their preferred candidates of choice is protected. That ability to elect either exists or it does not in any particular circumstance.

In determining whether the ability to elect exists in the benchmark plan and whether it continues in the proposed plan, the Attorney General does not rely on any predetermined or fixed demographic percentages at any point in the assessment. Rather, in the Department's view, this determination requires a functional analysis of the electoral behavior within the particular jurisdiction or election district. As noted above, census data alone may not provide sufficient indicia of electoral behavior to make the requisite determination. Circumstances, such as differing rates of electoral participation within discrete portions of a population, may impact on the ability of voters to elect candidates of choice, even if the overall demographic data show no significant change.

Although comparison of the census population of districts in the benchmark and proposed plans is the important starting point of any Section 5 analysis, additional demographic and election data in the submission is often helpful in making the requisite Section 5 determination. 28 CFR 51.28(a). For example, census population data may not reflect significant differences in group voting behavior. Therefore, election history and voting patterns within the jurisdiction, voter registration and turnout information, and other similar information are very important to an assessment of the actual effect of a redistricting plan.

The Section 5 Procedures contain the factors that the courts have considered in deciding whether or not a redistricting plan complies with Section 5. These factors include whether minority voting strength is reduced by the proposed redistricting; whether minority concentrations are fragmented

**Plaintiffs001497**

**PLAINTIFFS TX 009 - page 3**

among different districts; whether minorities are overconcentrated in one or more districts; whether alternative plans satisfying the jurisdiction's legitimate governmental interests exist, and whether they were considered; whether the proposed plan departs from objective redistricting criteria set by the submitting jurisdiction, ignores other relevant factors such as compactness and contiguity, or displays a configuration that inexplicably disregards available natural or artificial boundaries; and, whether the plan is inconsistent with the jurisdiction's stated redistricting standards. 28 CFR 51.56–59.

**Alternatives to Retrogressive Plans**

There may be circumstances in which the jurisdiction asserts that, because of shifts in population or other significant changes since the last redistricting (*e.g.*, residential segregation and demographic distribution of the population within the jurisdiction, the physical geography of the jurisdiction, the jurisdiction's historical redistricting practices, political boundaries, such as cities or counties, and/or state redistricting requirements), retrogression is unavoidable. In those circumstances, the submitting jurisdiction seeking preclearance of such a plan bears the burden of demonstrating that a less-retrogressive plan cannot reasonably be drawn.

In considering whether less-retrogressive alternative plans are available, the Department of Justice looks to plans that were actually considered or drawn by the submitting jurisdiction, as well as alternative plans presented or made known to the submitting jurisdiction by interested citizens or others. In addition, the Department may develop illustrative alternative plans for use in its analysis, taking into consideration the jurisdiction's redistricting principles. If it is determined that a reasonable alternative plan exists that is non-retrogressive or less retrogressive than the submitted plan, the Attorney General will interpose an objection.

Preventing retrogression under Section 5 does not require jurisdictions to violate the one-person, one-vote principle. 52 FR 488 (Jan. 6, 1987). Similarly, preventing retrogression under Section 5 does not require jurisdictions to violate *Shaw* v. *Reno* and related cases.

The one-person, one-vote issue arises most commonly where substantial demographic changes have occurred in some, but not all, parts of a jurisdiction. Generally, a plan for congressional redistricting that would require a greater overall population deviation than the submitted plan is not considered a reasonable alternative by the Department. For state legislative and local redistricting, a plan that would require significantly greater overall population deviations is not considered a reasonable alternative.

In assessing whether a less retrogressive plan can reasonably be drawn, the geographic compactness of a jurisdiction's minority population will be a factor in the Department's analysis. This analysis will include a review of the submitting jurisdiction's historical redistricting practices and district configurations to determine whether the alternative plan would (a) abandon those practices and (b) require highly unusual features to link together widely separated minority concentrations.

At the same time, compliance with Section 5 of the Voting Rights Act may require the jurisdiction to depart from strict adherence to certain of its redistricting criteria. For example, criteria that require the jurisdiction to make the least possible change to existing district boundaries, to follow county, city, or precinct boundaries, protect incumbents, preserve partisan balance, or in some cases, require a certain level of compactness of district boundaries may need to give way to some degree to avoid retrogression. In evaluating alternative or illustrative plans, the Department of Justice relies upon plans that make the least departure from a jurisdiction's stated redistricting criteria needed to prevent retrogression.

**The Use of 2010 Census Data**

The most current population data are used to measure both the benchmark plan and the proposed redistricting plan. 28 CFR 51.54(b)(2) (Department of Justice considers "the conditions existing at the time of the submission."); *City of Rome* v. *United States,* 446 U.S. 156, 186 (1980) ("most current available population data" to be used for measuring effect of annexations); *Reno* v. *Bossier Parish School Board,* 528 U.S. 320, 334 (2000) ("the baseline is the status quo that is proposed to be changed: If the change 'abridges the right to vote' relative to the status quo, preclearance is denied * * * .").

For redistricting after the 2010 Census, the Department of Justice will, consistent with past practice, evaluate redistricting submissions using the 2010 Census population data released by the Bureau of the Census for redistricting pursuant to Public Law 94–171, 13 U.S.C. 141(c). Thus, our analysis of the proposed redistricting plans includes a review and assessment of the Public Law 94–171 population data, even if those data are not included in the submission or were not used by the jurisdiction in drawing the plan. The failure to use the Public Law 94–171 population data in redistricting does not, by itself, constitute a reason for interposing an objection. However, unless other population data used can be shown to be more accurate and reliable than the Public Law 94–171 data, the Attorney General will consider the Public Law 94–171 data to measure the total population and voting age population within a jurisdiction for purposes of its Section 5 analysis.

As in 2000, the 2010 Census Public Law 94–171 data will include counts of persons who have identified themselves as members of more than one racial category. This reflects the October 30, 1997, decision by the Office of Management and Budget [OMB] to incorporate multiple-race reporting into the Federal statistical system. 62 FR 58782–58790. Likewise, on March 9, 2000, OMB issued Bulletin No. 00–02 addressing "Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Enforcement." Part II of that Bulletin describes how such census responses will be allocated by Federal executive agencies for use in civil rights monitoring and enforcement.

The Department will follow both aggregation methods defined in Part II of the Bulletin. The Department's initial review of a plan will be based upon allocating any multiple-item response that includes white and one of the five other race categories identified in the response. Thus, the total numbers for "Black/African American," "Asian," "American Indian/Alaska Native," "Native Hawaiian or Other Pacific Islander" and "Some other race" reflect the total of the single-race responses and the multiple responses in which an individual selected a minority race and white race.

The Department will then move to the second step in its application of the census data to the plan by reviewing the other multiple-race category, which is comprised of all multiple-race responses consisting of more than one minority race. Where there are significant numbers of such responses, we will, as required by both the OMB guidance and judicial opinions, allocate these responses on an iterative basis to each of the component single-race categories for analysis. *Georgia* v. *Ashcroft,* 539 U.S. 461, 473, n.1 (2003).

As in the past, the Department will analyze Latino voters as a separate group for purposes of enforcement of the Voting Rights Act. If there are significant numbers of responses which

**Plaintiffs001498**

**PLAINTIFFS TX 009 - page 4**

report Latino and one or more minority races (for example, Latinos who list their race as Black/African-American), those responses will be allocated alternatively to the Latino category and the minority race category.

Dated: February 3, 2011.

**Thomas E. Perez,**

*Assistant Attorney General, Civil Rights Division.*

[FR Doc. 2011–2797 Filed 2–8–11; 8:45 am]

**BILLING CODE 4410–13–P**

**Plaintiffs001499**

**PLAINTIFFS TX 009 - page 5**

Exhibit 17

Exhibit 17

**From:** G. Paul Nardo <gpn740@gmail.com>
**To:** GMail <gpn740@gmail.com>
**Subject:** Fwd: Messaging on House Redistricting Maps
**Date:** 3/29/2011 7:09:50 PM
**Attachments:** 20110329 - Message Points on House Redistricting Plan & Maps.doc

---

Caucus Members,

**THIS E-MAIL IS VERY IMPORTANT; PLEASE READ, SAVE & USE**

As promised, I'm attaching suggested "messaging points" for your use in response to inquiries (media, constituents or others) about House Bill 5001, redistricting legislation introduced today by Delegate Chris Jones.

Like before, the Speaker, Chris & Rob Bell strongly encourage you to stick to these key points.

Remember:  the public record is open and anything you or your LAs say can and may be used in a possible lawsuit challenging a final enacted plan that's sent to DC.  Accordingly, to help ensure success on all fronts (legislative, legal, political, etc.), it is absolutely imperative that each and every one of us exercise diligent message discipline.

Further Heads Up:

A first and obvious question tonight that the media (and many of you) are asking is:  "Who got put in with whom in the Jones plan?  The answer:  *Dems Johnson & Phillips, Dems Miller & Lewis, Reps Athey & Sherwood, and Dem Abbott & Repub. Oder as well as Dem Armstrong and Repub Merricks.* Should someone ask a follow-up as to "Why?" the plain and honest answer is this:  *the Jones plan follows the dictates of population/demographic changes and the requirements of the federal Voting Rights Act.*

More specific "local" questions for you in your own individual district are likely to be along the lines of:  "Did you want to represent this or that area?" or "Do you like the way the Jones plan does this or that?" and so forth.  The smart answer would be something like:  *"I'm looking forward to introducing myself to these new people"* or *"I don't know why Del. Jones drew the map this or that way, you'll have to ask him.  But, the most important thing for me is my wanting to work hard to reach out to and work with these areas so I can most effectively represent them in the House."*

If you get asked a question that you cannot answer, just say so because it's Delegate Jones' legislation.  You look forward to finding out more about it when Special Session I on Redistricting begins in earnest next week.  Hopefully, you get the gist of what we're strongly suggesting.

Finally, if you have any specific questions and/or need help, please do not hesitate to call the Speaker, Chris Jones, Rob Bell or me.  Here's the appropriate contact numbers:

Speaker Howell (540) 840-0241
Del. Chris Jones (757) 676-4961
Del. Rob Bell (434) 249-8590

HOD011522

**PLAINTIFFS TX 017 - page 1**

GP Nardo (804) 840-6915

Hope this helps,

GP

---------- Forwarded message ----------
From: **G. Paul Nardo** <gpn740@gmail.com>
Date: Tue, Mar 29, 2011 at 5:58 PM
Subject: Heads Up -- House Redistricting Maps will be available on DLS Website in near future
To: House Majority Caucus Members

Caucus Members,

FYI.  The URL for the DLS website is http://redistricting.dls.virginia.gov/2010/

I'll have some macro messaging points around to everyone within the next hour.  The DLS website is overwhelmed presently as they try to get the House, and I believe Senate, map posted.  In the meantime, everyone is STRONGLY URGED to not talk to folks about things until you get the messaging points.

Thanks,

GP

HOD011523

**PLAINTIFFS TX 017 - page 2**

Exhibit 18

Exhibit 18

**From:** Chris Marston <chris.marston@gmail.com>
**To:** Dale Oldham - Redistricting <doldham@mchq.org>, dloesq@aol.com
**Subject:** Commission's 13 MM Plan
**Date:** 3/30/2011 6:03:36 PM
**Attachments:**

Dale,

I don't have the plan yet, but one of the commissioners tells me the lowest BVAP% is 53.5 and the highest is 58.

Thanks,
Chris

Exhibit 22

Exhibit 22

| From: | Chris Marston <chris.marston@gmail.com> |
| --- | --- |
| **Sent:** | Friday, April 1, 2011 10:33 PM |
| **To:** | scj <scj@schrisjones.com> |
| **Subject:** | HD61-HD75 Dale's Options |
| **Attach:** | DLO-Southside-3.pdf; DLO-Southside-2.pdf |

Someone's having trouble following directions.

Here are the two options that Dale proposes, neither of which fully address Tyler's concerns.

I'll try and generate another one that gets it done without dropping the %BVAP too low.

HOD008440

**PLAINTIFFS TX 022 - page 1**



| District | 075 |
|---|---|
| Population | 79,658 |
| Change - Population | 0 |
| Ideal Value | 80,010 |
| % Deviation | -0.44% |
| % Black | 56.84% |
| % 18+_Blk | 56.01% |
| % G05G_RV | 42.34% |
| % G05L_RV | 44.38% |
| % G09L_RV | 49.36% |

HOD008441

PLAINTIFFS TX 022 - page 2

| District | 075 |
|---|---|
| Population | 79,534 |
| Change - Population | 0 |
| Ideal Value | 80,010 |
| % Deviation | -0.59% |
| % Black | 56.79% |
| % 18+_Blk | 56.07% |
| % G05G_RV | 42.04% |
| % G05L_RV | 44.05% |
| % G09L_RV | 48.89% |

HOD008442

**PLAINTIFFS TX 022 - page 3**

Exhibit 30

Exhibit 30

| From: | Haake, Lawrence <HaakeL@chesterfield.gov> |
|---|---|
| Sent: | Friday, April 8, 2011 4:30 PM |
| To: | Showalter, Kirk - Voter Reg <Kirk.Showalter@Richmondgov.com>; Jennifer L McClellan <DelJMcClellan@house.virginia.gov> |
| Cc: | Kent Stigall <KStigall@house.virginia.gov> |
| Subject: | RE: HB5001 as passed Senate |

There are only 363 voters in the 70th part in Pct 515, too few legally to open a precinct, so I'm going to try to move it into another magisterial district and merge with another 70th House precinct.  If so, then my side is clear.

Thanks for the effort.

Larry Haake
GR Chesterfield

**From: Showalter, Kirk - Voter Reg [mailto:Kirk.Showalter@Richmondgov.com]**
**Sent:** Friday, April 08, 2011 16:10
**To:** Jennifer L McClellan
**Cc:** Haake, Lawrence; Kent Stigall
**Subject:** RE: HB5001 as passed Senate

Darned......so close and yet so far away!  A measly 0.2%!  Well, at least we gave it a good try and for that I must thank you!  I have some additional ideas how we might fix that and will work with you, Betsy, Delores and Larry over the coming months to see if we can address it next January.

J. Kirk Showalter
General Registrar
City of Richmond
(804) 646-5950

**From: Jennifer L McClellan** [mailto:DelJMcClellan@house.virginia.gov]
**Sent:** Friday, April 08, 2011 2:14 PM
**To:** Showalter, Kirk - Voter Reg
**Cc:** HaakeL; Kent Stigall
**Subject:** Re: HB5001 as passed Senate

Kirk,

I spoke to Chris Jones and Kent Stigall.  Apparently, the changes we discussed based on the map of the Davis precinct you sent would have pushed the voting age African American population in the 71st District down to 54.8%.  The target criteria was 55%, so the change can't be made.  When you and I were working in Legislative services, we indeed moved the wrong part of Davis, which is why the numbers looked correct to us.

Given the time constraints on this thing, I don't think we have enough time to try to come up with a fix that keeps the 69th, 70th, and 71st all at 55% African American voting population and within a 1% total population deviation.  We can try to do some cleanup next year.  I know that doesn't help you think election cycle, but that may be the best we can do.

Jenn

Jennifer L. McClellan

HOD011356

**PLAINTIFFS TX 030 - page 1**

Virginia House of Delegates
71st District
P.O. Box 406
Richmond, VA 23219
(804) 698-1071

To: "Jennifer L McClellan" <DelJMcClellan@house.virginia.gov>
From: "Showalter, Kirk - Voter Reg" <Kirk.Showalter@Richmondgov.com>
Date: 04/08/2011 12:34PM
Cc: "Haake, Lawrence" <HaakeL@chesterfield.gov>
Subject: HB5001 as passed Senate



Dear Jennifer:
I saw the new version of HB5001 that passed the Senate.  Unfortunately (and unlike the Senate substitute version)  it did not include any of the fixes to the split precincts that we worked on.  Was there a particular reason for this?  Should I pursue Governors' amendments to make the changes?
I would very much appreciate your guidance on this at your earliest convenience.  I am leaving early today, but can be reached on my cellphone at 387-7331.  Otherwise, I will be in my office during usual hours.  The number here is 646-5950.
J. Kirk Showalter
General Registrar
City of Richmond
(804) 646-5950

[attachment "image001.jpg" removed by Jennifer L McClellan/HDel/HOD]

HOD011357

PLAINTIFFS TX 030 - page 2

Exhibit 33

Exhibit 33



1

1

2

3

4

5

6

7

8            2011 SPECIAL SESSION I

9          VIRGINIA HOUSE OF DELEGATES

10         REDISTRICTING FLOOR DEBATES

11            Monday, April 4, 2011

12

13

14

15

16

17

18

19

20   Job#: 82096

21   Pages 1 - 51

22   Transcribed by:  Daphne Hurley

Plaintiffs002523

PLAINTIFFS TX 033 - page 1

42

1    for point of personal privileges.

2         THE SPEAKER:  The gentlewoman has the floor.

3         DEL. DANCE:  Mr. Speaker and Members of the

4    House, I had what might be considered an honor and

5    a curse to have been assigned to be one of the

6    members, the six members that serve on the

7    Redistricting Committee for the House and one of

8    the six members that serve on the Reapportionment

9    Committee for the House.

10        And I can tell you that throughout this

11   process I've learned a lot about redistricting.

12   Wasn't here 10 years ago when the last lines were

13   drawn, but I, I will challenge anybody on my side

14   of the aisle as far as knowing as much about the

15   software and the demographics and statistically

16   how Virginia is laid out and what we had to deal

17   with as far as the plan, the House Bill that has

18   been introduced by Delegate Jones.

19        That is truly an example, I found out, to be

20   of bipartisanship, because there were no gray

21   lines.  Whether you're a Democrat or Republican

22   and you were assigned to draw those lines, you

Plaintiffs002564

43

1    would have found much difficulty.  I don't think

2    anybody will have pretty lines, nice neat bows in

3    a row, as they'd like to have.  And I don't think

4    anybody would say that whatever their lot is that

5    it's perfectly the way they would like it to be.

6         But I will say that as one had a lot of

7    impact from both sides of the aisle, I know

8    because I tried to reach out to all those that I

9    could on my side of the aisle, and I know that our

10   chair, Delegate Jones, was willing to listen to

11   anything and everything that we throw to him to

12   consider as he developed his plan.

13        And one of the things that I was most

14   concerned about of course as an African-American

15   was the 1965 Voting Rights Act as related to the

16   12 minority districts that we have in the House

17   and making sure that they were strong.  The

18   trending -- because we can't tell people where to

19   move or leave -- live, showed that a lot of the

20   populations were shifting into areas.

21        In order to maintain those 12 districts it

22   required some movement and sometimes not perfect

Plaintiffs002565

PLAINTIFFS TX 033 - page 43

44

1    adjustments between precincts.  There might have

2    been some split areas, but those were the kind of

3    things that were happening, but we were talking

4    with legislators as we went.  Things were not done

5    in a vacuum.

6        I know that even though a bill has been

7    introduced, that in working with our Chair that

8    there is going -- there are still options and, of

9    course, some amendments and I'm sure before a bill

10   is passed there will be some more amendments

11   there.

12       And I see this as truly a fair process.  It's

13   not a perfect process, but I don't think it's one

14   that will have us jumping up and down and have

15   fits.  We're not going to agree; but we can

16   respectfully agree or disagree as we go.

17       But I'm still proud to be a part of this

18   team.  I still hope that at the end of day that

19   there will be more of us in agreement than not and

20   that we will be able to pass a plan and leave this

21   House.  Because I think this is one of the most

22   important bills that we will pass and that is what

Plaintiffs002566

PLAINTIFFS TX 033 - page 44

45

1    the 100 House seats will look like in the next 10

2    years.

3            And I was pleased to be a part of that

4    committee and I'm not going to be jumping up and

5    down and say it's African-American or

6    Euro-Americans, but I do say that we need 55

7    percent at least voting African-Americans, not

8    just a population to show 55 percent

9    African-Americans.  Because a lot of us know that

10   statistics show that we don't always vote.

11           Even though I come -- I live in Petersburg,

12   predominantly African-American, if the percentage

13   might be -- it should be 100 percent.  It will be

14   40 percent.  If it was (unintelligible word) if I

15   live in the community and I was your American --

16   if it was 100 percent, you'd get about 60 percent.

17   And so you have to deal with those realities.

18   That's the realities we're dealing with as we

19   model, as we look at the statistics that we're

20   working with.

21           And hope you all will consider that.  And I

22   stand open even on my side; if those legislators

Plaintiffs002567

PLAINTIFFS TX 033 - page 45

52

1          C E R T I F I C A T E

2          I, Daphne S. Hurley, Court Reporter,

3  certify that I transcribed from digital recording

4  of the proceedings held on the 4th day of April

5  2011.

6          I further certify that to the best of my

7  knowledge and belief, the foregoing transcript

8  constitutes a true and correct transcript of the

9  said proceedings.  Given under my hand this 4rd

10  day of May 2015.

11

12

13          _Daphne S. Hurley_

14          Daphne S. Hurley

15

16  My commission expires:  August 20, 2018

17  Notary Public in and for

18  the State of Maryland

19

20

21

22

Plaintiffs002574

PLAINTIFFS TX 033 - page 52