Exhibit 35

Exhibit 35



2011 SPECIAL SESSION 1

VIRGINIA HOUSE OF DELEGATES

REDISTRICTING FLOOR DEBATES

Tuesday, April 5, 2011

Job No.: 81658

Pages 1 - 174

Transcribed by: Daphne Hurley

DELEGATES: Aye.

MR. SPEAKER: Those opposed "No." Substitute agreed to. The gentleman from Suffolk.

DEL. JONES: Mr. Speaker and Ladies and Gentlemen of the House, the substitute that is before you for House Bill 5001 is the every 10 year bill that this body and the General Assembly must consider required by the Constitution and that is to reapportion and redistrict the 100 districts in the House of Delegates and the 40 districts in the Senate of Virginia.

The plan before you as amended, in my opinion, is a fair amendment. It's representative of all Virginians, including our minority communities.

This past decade we had serious population shifts within our Commonwealth. Yesterday I was trying to explain, I didn't do a very good job of explaining maybe the fall line. What I did last night, I prepared a map for us to look at.

If you look at the red, red means bad. That means you lost. Yellow means you lost as well.

So if you can see coming from Hampton Roads, across up through Lynchburg and on up into the great far reaches of southwest up in the hills that are so beautiful and down to the great far southwest, that is about 3.1 seats, I believe.

And blue is good. Blue means you picked up. This little area up here picked up 2.88 seats. It does not include Stafford, I do not believe. So if you can look at the map and what -- you know, like I said yesterday, you have to play it where it lies in golf.

This is what the numbers tell you. The numbers are very simple. You had some moderate growth compared to the overall growth of Virginia and coming up through central Virginia up into the Valley. You had tremendous growth up in the Northern Virginia area, especially Louden County and Prince William County.

But you had in reference to the balance of the Commonwealth tremendous loss of population proportionally. So no, this was not a plan to go just grab and put somebody in another district.

The map's pretty clear that you've got to move three seats. We had over a 1., 1.7 seat loss here in Hampton Roads. A 1.14 seat loss in Southwest Virginia and about a, between these three about an 8/10s of a loss in that part of our Commonwealth.

Just kind of wanted to give a visual so we can see what we have to work with when we're actually drawing the lines, which is required by our Constitution and the mandate of the one-person, one-vote.

You know, much has been written about a bipartisan map, bipartisan cooperation for the last several years. This is my 14th year in this body. 14th session. Excuse me. Not year. And I have heard since I guess I arrived the need for a bipartisan way of going about and redrawing the lines for this Commonwealth that the people have been left out of the process.

Well, we are the people's representative. We stand every two years. This is the people's House and every two years they decide if they want us to come back or not. When I got here in 1998 I think

I was Number 95. Today I'm Number 28. That tells you the turnover that we have had in this body in seven election cycles.

So giving -- given, excuse me, the task at hand and our Constitution the P&E Committee met a week-and-a-half ago on Friday and considered criteria and we had I believe five that we chose. They were of population equality, the Voting Rights Act, contiguity and compactness, single member districts and communities of interest.

I mention these because we've heard these terms kicked around in many different I guess meetings, forums, et cetera, and I think all these criteria are important as they do represent what is the fabric of the Commonwealth, our people.

But there's a couple of things from my perspective, and not just mine, but the Constitution, that require our utmost attention. Quite simply, the law; one-person, one-vote. That trumps the Voting Rights Act; equal protection under the 14th Amendment. That was our Number 1 criteria.

Number 2 was the Voting Rights Act. I can't say that I can relate to what occurred back in the '60s because I was just a young man, but I can tell you that the Voting Rights Act is something that has made a tremendous difference in America.

It has changed the fabric of this country because all people have an opportunity to participate in the process, as they should, as they well should. We heard a speaker, several speakers, one in Hampton and one yesterday, who was talking about the factual that he defended the rights of Americans when he felt like he did not have that right, full rights accorded or forwarded to him.

So Number 1 and Number 2 are the most important things to the P&E Committee. They were the most important things to me as I drew this map.

Yesterday we had another bill that was before us. That was I think the College Competition Plan. The young man did a fabulous job. I thought that he did exceptionally well. I think

the gentleman from Dickinson was laughing, he says, "Chris, that was you 40 years ago." He was being kind of polite. Maybe about 42 years ago, but I wasn't going to tell him that.

Their Number 1 criteria was communities of interest, contiguity and compactness. They're Number 3 and Number 5 on our list. They're Number 3 and Number 5 for a reason; because one-person, one-vote is the overarching principle of what this country stands for in my opinion.

So with that in mind, as I -- as we went to put a map together and criteria we took a 1 percent, plus or minus 1 percent deviation. Some say, "Why did you do plus or minor 1 percent? Why didn't you do plus or minus 2 percent from 10 years ago?"

Well, since the last time we were here with this exercise there have been several court cases that have spoken to that and when you look at the criteria in the court case that was decided, it was then Georgia. It was the Larios case. There was an intentional concentration of one party and

the under population of another party. There were four different sets of criteria that were violated. And so what used to be the plus or minor 5 percent safe harbor no longer exists.

And Virginia is very unique. We have a tight timeline. People think we have rushed this through. But I will tell from 10 years ago we got the data on like the 7th or the 8th of May -- or March. It made it very tight for us to get everything done, passed, and to DOJ in time to be able to have primary elections in the summer.

This year we got the data on I think the 8th or something of February, which afforded us an opportunity to have time for some public comment and public hearings across the State with plans in hand as we went to the public.

We had six public hearings last fall. As chairman of the Reapportionment Committee we had a public comment period the last week of session that took the existing districts as they stood and we pulled in the data that we -- that was given to us by the Census, from the April 1st, 2010 Census.

Then we had a series jointly with the Senate, eight public hearings. We received a bevy of testimony from all walks of life; local-elected officials, registrars, community leaders, members of this body and the other body, private citizens just concerned about their community.

So as we went through that process we heard a lot of comments about communities of interest, but also protecting the one-man, one-vote, or the one-person, one-vote, and I think most importantly not retrogressing with regards to the number of majority/minority districts or the effective voting strength of those communities.

We heard a gentlewoman from Petersburg yesterday speak of an effective voting strength. And when we looked at what was the best thing to do, demographic shifts, population shifts caused a reconfiguring of the map as has been alluded by the gentleman from Henry and a article that was in the Roanoke Times today and some individuals yesterday.

I did note when I looked at the gentleman

from Henrico, I stayed up again late last night and I studied the plans from the college students and I did look at their plans and I did test, put the test to it. Because it's not an academic exercise for us. We're bound by the law. I know when I was in college I used to always -- "Man, these guys are really smart" when a professor would tell me how things would work in the lab or, you know, a theory.

When I got out in the real world sometimes it didn't really work. Gosh, it makes sense in a clean, sterile lab, but when you put it out in the world it just doesn't happen. It just doesn't work.

So I thought I would peel back the onion, as we like to say back at home, and I looked at the first place winner in the competition division. They had 10 majority/minority districts. We currently have twelve. Their deviation was plus or minus 4 and 4.75 percent. A total deviation of 9.5 percent, where we have 2 percent.

And the low black voting age population of

registered votes, age eligible, I should say, was 50.6 percent to get 10 districts. If I wasn't constrained by the law I could draw the prettiest map in town. They could be concentric circles like the gentleman from Henrico would love to have. They could be compact and contiguous.

But we're not about compact and contiguous when it trumps the rights and I think the ability of the one-person, one-vote to be equally represented.

The gentleman from Prince William has 190,000 people in his district today. The gentleman from Henry has 68,000. He has enough for a Senate seat within their deviation. Now, some would say that, you know, that's not right. So that's why we're here today to reset the maps for the next 10 years.

Then I looked at the University of Richmond first place commission, the commission division and they had seven majority/minority seats. They had a 9.8 percent deviation and their low on the percentage was 50.2 percent. The University of

Virginia, they were the second place in the competition, had nine majority/minority seats. They had a better deviation, 2.94 percent, but they still were as low as 59.2 percent on the voting age population.

Now, everything that I have seen in my 25 years in elected office has indicated to me that in the minority community there, there are not as many registered per hundred as there are in the white community and then the turn out is different as well.

So if you don't -- as we heard in our testimony, and as Delegate Dance and Spruill and some other individuals and leaders in the community have said, if you don't have an effective voting strength then there's a good chance that over the time of 10 years you will see a dilution of their ability and there is the community.

Not that I am -- it's not my seat. I think the gentleman from Chesapeake, Mr. Spruill, would agree with this. He can probably get elected with

a lower percentage. But he represents the community and the law states it's the community's ability to elect the candidate of their choice.

So that's why the testimony led me when drawing this map to not retrogress with the number of seats, which we didn't, and to keep an effective voting majority within each and every district. We had to keep the core of those districts, because I think that's very important, and because of the population shifts you did see a decrease in some of the percentages, but all were above 55 percent.

So as I continued to work, work this map I tried to do the best I could to meet the plus or minor 1 percent. It's obvious to me that from comments I received from colleagues who called me, who stopped by my office, who wanted to discuss their community and what the bill as introduced last week would do to that community if it passed, I said, "I'll be glad to sit down with each and every one of you who want to meet with me" and I did and I think through that process you have this

Census data?

DEL. JONES: I do know that the second floor I believe compiled the '10 elections, the '09 elections and I think they just got the '08 elections put in their computer.

DEL. ARMSTRONG: Further questions, Mr. Speaker.

MR. SPEAKER: Will the gentlemen yield?

DEL. JONES: I yield.

DEL. ARMSTRONG: Can the gentleman share with me what data that he used in order to determine the minority/majority district voter participation, what retrogression data he would have used in consideration in adopting a plan that that would have had 12 minority/majority districts?

DEL. JONES: I'd say to the gentleman that I used the data as it was provided by the Census Bureau to look at percent black population and percent black voting age population.

DEL. ARMSTRONG: Further questions, Mr. Speaker.

MR. SPEAKER: Will the gentlemen yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Would the gentleman agree with me that just determining, in determining a majority-minority district is more than just determining what population that one has to analyze whether or not based on past voting patterns whether or not the minority population within such district has the ability to elect its candidate of choice and that requires more than just an analysis of raw Census data?

DEL. JONES: Mr. Speaker, I'd say to the gentleman he may be giving me more credit than he should. What I did, I listened to testimony that was provided during the process of all these public hearings that we had and I tried to respond to the community and what they felt was an effective percentage that they would need to have and effective representation of the candidate of they choice.

DEL. ARMSTRONG: Further questions,

Mr. Speaker.

MR. SPEAKER: Will the gentlemen yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So the gentleman I guess is suggesting that there was not an analysis of that data that went into the preparation of the plan that's related in HB 5001?

DEL. JONES: Mr. Speaker, I would say to the gentleman that I gave him very succinctly what I used. His question to me was what did I use in my preparation of the plan to present to this body and I just gave him the answer of the process.

DEL. ARMSTRONG: Further question, Mr. Speaker.

DEL. JONES: I have not finished my answer.

DEL. ARMSTRONG: I apologize, Mr. Speaker.

DEL. JONES: I think it's called a PL. I always get it backwards, the data that comes from the Census Bureau. It has 264 categories. It's got every iteration you can think of combination of percentages. And simply what I looked at was

the existing core districts that were in place for the 12 majority-minority districts and I saw that in the 71st District in particular that the majority percentages dropped from almost 60 percent to 50 percent.

And so in putting together a plan I felt communities of interest were very important and that the percent of black and black voting age population were the two things that would drive putting those districts back to a competitive level where they might have retrogressed over the 10 years period.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman tell me whether he or any persons that worked with him in the development of the plan that resulted in HB 5001 took into account any retrogress analysis regarding minority performance in any of the 12

majority-minority districts that are part of HB 5001?

DEL. JONES: I would say to the gentleman I'm not aware of any.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: Yes, sir.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: The gentleman just mentioned that communities of interest were an extremely important criteria. Would the gentleman say that that was a more important criteria in the development of the 12 majority -- majority-minority districts than would have been the racial voting pattern and whether or not the minority population of those districts can elect their candidate of choice?

DEL. JONES: No, sir. I'd say to the gentleman, as I stated in my opening remarks on the bill itself, that the most important items were one-person, one-vote plus or minus 1 percent

deviation, full compliance with the Voting Rights Act, and communities of interest, while important, are not the overarching, were not the overarching driver of this plan.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: Oh, yes, sir, I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Could the gentleman tell me though where in terms of development of the 12 majority-minority districts what were the most important criteria that were considered of those that were developed?

DEL. JONES: Mr. Speaker, I would say to the gentleman there wasn't a most important criteria. You know, I'm not a very sophisticated person. I'm not the smartest guy in the room most of the time. And I looked at what had happened over the last 10-year period given the existing population and demographic shifts and I tried to restore back to the best of my ability to the levels that were

existing after House Bill 1 one passed in 2001.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: So if gentleman indicates there was not a full retrogression analysis done, how does, how can the gentleman assure us that the 12 majority-minority districts that are comprised in HB 5001 are actually districts in which the minority population is able to select its candidate of choice?

DEL. JONES: Mr. Speaker, I would say to the gentleman that typically as I understand it, that is done in your process when you file with DOJ. I had to look at given the tight time frame that we had to deal with the percentage of black population and the percentage of black voting age population and that was the approach that I used.

10 years ago I don't -- didn't use the methods that the gentleman is suggesting. I am

confident from the testimony in the community that what is before you is a plan that will allow the minority community to elect a candidate of their choice based on the input received during the public hearing process and from the individual members of the Black Caucus and the black community.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: Yes, sir.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Well, would the gentleman not agree with me that he had available to him the resources of the Division of Legislative Services; that if the gentleman had requested a full retrogression analysis of the majority-minority districts it could have been accomplished?

DEL. JONES: Mr. Speaker, I would say to the gentleman that if he says so, I'll believe him.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: So the gentleman would not dispute that statement, the affirmative statement that I just made?

DEL. JONES: Mr. Speaker, I do not have enough knowledge to agree or disagree. That is his opinion. I certainly -- he certainly is entitled to it.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: The gentleman alluded in his answer that given the "time constraints." Is the gentleman suggesting that there was insufficient time in which to conduct a full analysis of the majority-minority districts in their population and whether they're able to select their candidate of choice?

DEL. JONES: No, sir, that was not what I was answering to his question. He's a very accomplished attorney and I understand where he's going with his questioning. My comment was just a statement of fact.

As a matter of fact, let me read -- gosh, I think I've got a couple quotes here that might help as we look at the, what we're having to deal with. This is Bob Gibson from the Sorenson Institution. "The Voting Rights Act for all practical purposes guarantees that districts with a majority of black or Hispanic residents stay about as strongly majority-minority or considerably Hispanic for the next 10 years as they were during the past decade."

And I think that that's pretty obvious to those who follow the process; that if you don't get it back as best as you can to the previous strengths that there's a chance that they might not perform as they should. Hence, the valuable nature I think of the testimony that we received from the minority community during the whole

DEL. ARMSTRONG: Well, in determining compliance with the Voting Rights Act and whether or not these majority-minority districts are able to select its candidate of choice, did the gentleman do anything more than speak with the members that may represent those particular districts at the present time?

DEL. JONES: Yes, sir. I spoke with several citizens along the way who came to see me or called me and I listened to what they had to say. We had individuals at the public hearings who stated their concern; that the dilution of the percentage of voting age population would greatly diminish their chance to be able to elect a candidate of their choice.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: But the gentleman did not include any type of retrogression analysis? And

by retrogression analysis I would mean an analysis of voting patterns of particular minority districts over, say, the last five to 10 years that would indicate that those districts would continue to be able to select its candidate of choice.

DEL. JONES: Mr. Speaker, I'd said to the gentleman of the plans that have been submitted and/or circulated around that were complete and total plans, the plan that is before you, in my opinion, fully complies with the Voting Rights Act as 55 percent or higher, which is testimony that we heard during the public hearings of percentage voting age population.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: But again, just to make certain I'm clear, that the gentleman believes it is in compliance, but the gentleman didn't, he or

his colleagues or members of the majority party, develop any empirical data that would tend to establish that?

DEL. JONES: I would say to the gentleman, Mr. Speaker, that I think anyone who thinks they know exactly what will be in full compliance probably hasn't been doing this very long. Because the process is that you have to submit to the voting right -- the section of the Department of Justice, the voting section, for preclearance. If there were certain litmus tests that had to be met you would not need to have preclearance.

So I think I've answered the gentleman's questions with regards to the retrogression analysis and I'd be glad to answer any other questions that he would have, but I have finished answering those questions.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield, yes, sir.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Is the gentleman familiar that the Governor of the Commonwealth, Robert McDonnell, appointed a commission to develop a number of redistricting plans for the House of Delegates, the State Senate and congressional districts?

DEL. JONES: I am, I would say to the gentleman.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: I would ask the gentleman if he is familiar that, that two of the plans issued by the Commission dealt with the redrawing or redistricting of House of Delegates lines?

DEL. JONES: I would say yes, sir, I am aware.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Is the gentleman aware that one of those two plans developed by the Commission created a 13th majority-minority district?

DEL. JONES: I would say to this the gentleman, Mr. Speaker, yes, I am.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Does the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman explain to me the reasonings in his putting together HB 5001 as to why he did not create a 13th majority-minority district?

DEL. JONES: Mr. Speaker, I'd say to the gentleman I think he's answered his own question with his line of questioning earlier about an effective -- I think he's conflicted or he's confused in his approach here.

I think his line of questioning earlier was

taking into the fact that I didn't do a high enough percentage to be -- to ensure that one would elect, a community could elect the candidate of their choice. I have looked at the 12 and the 13th plan, Option 1 and Option 2, and neither one of those plans met what I think from the testimony that we heard throughout this process that the effective voting age population needed to be north of 55 percent. Each of those plans had a low of I think 52, 52 percent.

And from my experience in 25 years of running for office, having gone door-to-door, I know from analyzing quote, unquote my election results where there's a lower voter turn out, and in my opinion based on what we had heard from testimony, something of in the 52 percent, I do not think would be an effective voting strength for that community to be able to elect their candidate of choice.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman cite to me any empirical data on any of the 12th or potential 13th minority-majority district that would indicate that something less than a 55 percent minority-majority district would not allow the minority community in those districts to elect their candidate of choice?

MR. JONES: Mr. Speaker, I think I've answered this question earlier and I'm not going to -- it is my opinion from what I have experienced and my belief and the testimony received from the community that they would like to have the best possible opportunity to elect the candidate of their choice and that further dilution of the voting age population would do, would do a couple of things, but maybe allow them not to have the ability to elect the candidate of their choice either in a primary or in a general election.

DEL. ARMSTRONG: Further question,

Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So the gentleman has stated that in his opinion nothing below a 55 percent minority-majority district would be sufficient for the minority community to elect its candidate of choice?

MR. JONES: I'm not sure he was listening closely. I said it's my opinion from the testimony that was received during our public hearings that the community felt that they needed a percentage of 55 percent or better. That was my response to the gentleman.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: The testimony the gentleman is referring to, was that testimony that was

received during official public hearings of the House Privileges & Elections Committee?

MR. JONES: Yes, sir, it was. I believe it was probably in the court record. We had a court reporter at all of our meetings.

DEL. ARMSTRONG: Further question, Mr. Speaker.

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So the gentleman is stating that the entire basis of his opinion was garnered at those public opinion -- public hearings in which evidence was received and the record and transcript made?

MR. JONES: No, sir, I didn't say the entire. The entirety ws not.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman share with

Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I would yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So while the gentleman received testimony from various groups, the gentleman did not affirmatively contact any such groups?

MR. JONES: I would say to the gentleman that I did not affirmatively contact anybody, mainly because I was trying to put together a map and a plan that would meet those two tenants; the one-person, one-vote and the Voting Rights Act.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: I would say to the gentleman that one of my concerns has been that this process is rushed and that there has been insufficient time for the public to comment once plans were

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield, yes, sir.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Prefacing my question with a comment that I've got the empirical data in front of me of every single district and the percentage of VAP, black voting age population, with the House plan as compared with the percentage of the black voting population in the Commission's plan, can you tell me why in every single one of the districts, with the exception of two or three that are tied, the population in the House plan did not reach the same number as the population of the black voting age population in the Commission's plan?

MR. JONES: Mr. Speaker, I must admit to the gentleman -- I told my wife I wouldn't use any versus from songs, so I won't. I'm a little dazed and confused. I'm looking here at the -- what I have for the Commission plan, Option 1, and I have a high percentage of black voting age population of 56.8 and the low of 52.7.

Now, I can tell the gentleman that in House Bill 5001 that is substituted before this body, we -- every single, solitary district majority-minority is over 55 percent. Now, I know I wasn't that good at math, I'm not a math major, but from my reading of this and my double-checking it, that's what I have.

So maybe we just have -- you know, numbers can say different things to different people and I can stand to be corrected based upon what I've had available to me throughout this process and I have -- and I am detail person. I double-check it twice. You know, I'm not a very good carpenter, so I always measure three times before I cut one time.

So I'm looking at it and I do not agree with that statement. As a matter of fact, the average black voting age population is 54.4 percent in the 12 plan from the Commission.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. MORRISSEY: Given that the gentleman then studied the plan, I would ask him does he distinguish as there being a difference between a 55 BVAP versus 53 BVAP?

MR. JONES: Mr. Speaker --

DEL. MORRISSEY: That is; does the gentleman consider that a significant and meaningful difference?

MR. JONES: Mr. Speaker, I would say based on the testimony that we have, that we heard during the process I would say yes, based on the testimony from the community.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Is the gentleman aware that the Governor's Bipartisan Commission that, as he already agreed, constituted constitutional scholars, as well as other academicians and professor and judges, were able to create a 13th

for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: With respect to BVAPs, I note that the gentleman has repeatedly at least seven or eight times used the phrase "according to testimony that we received."

Not withstanding that, and given the fact that the gentleman just referred to the gentlewomen from Alexandria, Ms. Herring, Delegate Herring, who was able to win a district that had less than 50 percent BVAP, would you not agree that it is possible to elect an African-American representing 53 BVAP and not the mandated 55 BVAP?

MR. JONES: Mr. Speaker, I would say to the gentleman that I have in my 25 years of being in office -- when I first went to City Council we actually had an African-American who was representing now the fast growing area of Bennett's Creek in the Sleepy Hole Borough. And I would say yes.

I also had the chance when I served on the City Council to have a, a majority-minority district under perform and to elect a white person. Of course, four years later they elected a candidate of their choice. One would say that both were the candidates of choice.

So I would say to the gentleman, I would leave it to his devices to come to a conclusion. My job was to do the best I could to make sure we complied fully with the Voting Rights Act.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Not withstanding whatever conclusions that I come to, I'm more interested in the conclusions that you or the members of the P&E came to.

Would you not agree that if there is a district that was somewhere around 51 BVAP or 52 BVAP that they ought to have a, the opportunity to

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Is the gentleman aware that one of the student's plans that complied with compactness, contiguity, community of interest equal population and the Voting Rights Act had a county/city split that was half of what HB 5001 was?

MR. JONES: Mr. Speaker, I can't speak to what that plan was. I would just let the gentleman know that once again there was a reason that I had -- that we in the P&E Committee had communities of interest, Number 5. Because Number 1 was one-person, one-vote. Number 2 was compliance with the Voting Rights Act. Contiguity, compactness are required by I think our Constitution and code and single member districts we did -- we went there and did that back 30 years ago. So it was Number 5 for a reason.

DEL. MORRISSEY: Would the gentleman yield for another question, Mr. Speaker?

MR. SPEAKER: Will the gentleman yield?

floor.

DEL. DANCE: Thank you. As a member of the House Redistricting Committee I support House Bill 5001 in its substitute form as we have before us and it's again for more than just the one reason that it mirrors the -- or doesn't mirror, but it does support the 12 minority districts that we have now and it does provide that 55 percent voting strength that I was concerned about as I looked at the model and looked at the trending as far as what has happened over the last 10 years.

And one of the best examples I can give for that and most concern was the area that was mentioned prior and that is Delegate Tyler's area in the 75th. Because Delegate Tyler is an African-American that now finally sits in a minority seat that's been there for years, but there have been three tries by minorities in the past to win that seat and they were not able to do so.

And if that district is below that 55 percent voting strength, then I don't think she would be

able to hold the seat that she now holds today and I was really, really concerned about that. That issue was addressed and it is now in that House Bill 5001 and I'm glad it's there.

That is the -- and for the rest of the house -- or the minority districts, it shows 55 percent voting. And it's voting. Not just people being there, but the effective opportunity for them to hold minority seats. And not just for us incumbents that are in the seats, but for those that would come after us.

And as was mentioned by Delegate Hope and he was asking about the 27th, the 69, the 70, 71, they represent minority seats. Not the 27, but the 69, the 70, the 71; they represent minority seats (inaudible words) even though minorities might not be in there. And if we are to preserve the rights for minorities to have a voice, as to whether or not they want to have a minority serve them or someone of the majority persuasion, that they have that choice. And they could lose that choice if they did not have the voting strength

DEL. ARMSTRONG: Mr. Speaker, Ladies and Gentlemen of the House, I think that I oppose HB 5001 and there are public policy reasons why I would do so, but I'm not going to talk about those on engrossment.

What I would like to restrict my comments to is what I perceive as a legal analysis of where we are. Now, regardless of the comments that have been made here on the floor, Virginia is subject to the Voting Rights Act, Sections 2 and Section 5. Regardless of whether we've talked to one another, not talked to anyone, have extended courtesies, not extended courtesies; it doesn't matter. We either comply with the Voting Rights Act. The bill is flawed. It will not be approved at the Justice Department or, let's not forget, that the Attorney General has the option of filing in federal court in the District of Columbia.

What concerns me, Mr. Speaker, in listening to the debate here today is there appears to have been a failure to analyze the 12 minority-majority districts in terms of its voting pattern.

Certainly the gentleman from Suffolk, who clearly I think from the discussion here today, oversaw the bill and the process has heard a number -- or has had a number of public hearings where he listened to constituents, but that is antidotal information.

Without a, a, a, an analysis of retrogression of the voting patterns one can't tell, for example, whether or not a 53 percent minority district might actually be able to elect its candidate of choice. Somewhere else perhaps only 57 or 58 percent. And the gentleman has enunciated an arbitrary figure of 55 percent and nowhere that I can find in the case law or in the decisions that have come out of the Department of Justice have indicated that that is a magic number. It is arbitrary.

And that there appears to have been a failure to do this retro, retrogression analysis. We don't know whether or not these districts have been, I'll just the terms cracked or packed, which is the slang term for diluting minority districts

or putting too much minority population in there.

And I think that the reason that we have gotten to this point is there's been insufficient time for this analysis to be conducted. That this process has been rushed. We all know that Virginia by having -- virtue of the fact that our elections are in the off year and that occurs in 2011 immediately upon the presentation of the Census data.

Still, though, we're, we're essentially looking at one week from the time that these, this plan was developed until it's voted on. And with insufficient time for various civil rights organizations or other interest groups to conduct an analysis, what we don't know here today is whether or not a 13th or perhaps 14th minority district could be created and done so without dilution of the 12 existing minority-majority districts.

Certainly no one -- I nor anyone else is suggesting that we dilute the 12 existing ones, but if a 13th and certainly a 14th can be

created -- I received late yesterday information that a 14th district might be able to be created in Southside, Virginia with, with a 50.25 minority population. That without a retrogression analysis one would not know, that may very well -- that that district be able to elect its candidate of choice.

And so regardless of how we got to this point, if this bill doesn't comply with Sections 2 and 5 of the Voting Rights Act, this bill is going to be invalidated by DOJ or the first federal court that deals with it. And I think we -- and I don't demean the gentleman. I don't dispute him at that he stayed till 2:00 in the morning working on this, but if you haven't done the necessary analysis to determine what the minority impact is on the minority community, we have failed and this plan has serious potential of being rejected.

The other thing that lastly I would say, that the gentleman from Arlington and his questions, in my review of particularly districts in northern Virginia there appears that Republican districts

proposal, House Bill 5001, offer minorities the same or even a greater opportunity to elect candidates of choice as the current plan. I don't believe that it does, Mr. Speaker. I think it racially dilutes some competitive districts, and case is in part is in Northern Virginia, and I urge my colleagues to reject engrossment.

Thank you, Mr. Speaker.

MR. SPEAKER: The gentleman from Henrico, Mr. Morrissey.

DEL. MORRISSEY: Thank you, Mr. Speaker.

DEL. MORRISSEY: Mr. Speaker, I rise to speak in opposition to House Bill 5001.

MR. SPEAKER: The gentleman has the floor.

DEL. MORRISSEY: Thank you, Mr. Speaker. I'd also urge the body to vote against 500-, HB 5001. While during my remarks and others we spoke about compactness and we spoke about communities of interest. My focus, likewise, would be on complying with the Voting Rights Act. I think the empirical evidence is somewhat overwhelming, Mr. Speaker, that we could produce effectively a

13th and a 14th majority-minority district.

The 14th majority-minority district would be 50.25 black voting age population. As the minority leader said, the figure of 55 percent is something that was pulled out of the sky. We have people in this body that are elected with 53 and as the delegate from Suffolk said, even under 50 percent.

As my good friend and brother from Chesapeake, Delegate Spruill said, perhaps mistakenly, the goal isn't to elect people of color. The goal is pursuant to the Voting Rights Act to have enough majority-minority districts so that there is the opportunity to elect people of color. There is the opportunity under the Governor's plan, Mr. Speaker, that was decidedly nonpartisan. It was --

MR. SPEAKER: The House will come to order.

DEL. MORRISSEY: It constituted constitutional scholars who paid attention to the U.S. Constitution and the State Constitution. There were academics who went around the State

C E R T I F I C A T E

I, Daphne S. Hurley, Court Reporter, certify that I transcribed from digital recording of the proceedings held on the 5th day of April 2011.

I further certify that to the best of my knowledge and belief, the foregoing transcript constitutes a true and correct transcript of the said proceedings. Given under my hand this 3rd day of May 2015.

________________________

Daphne S. Hurley

My commission expires: August 20, 2018
Notary Public in and for
the State of Maryland

Exhibit 38

Exhibit 38

**From:** Chris Marston <chris.marston@gmail.com>
**Sent:** Wednesday, April 6, 2011 4:09 PM
**To:** scj <scj@schrisjones.com>
**Subject:** AP_Blk

---

Chris,

I ran the numbers on HB 5001 as engrossed--
AP_BVAP
Avg-58.2%
Hi-61.9%
Low-55.7%

BVAP
Avg-57%
Hi-60.14%
Low-55.02%

AP_ means all parts, so it includes anyone who checked Black in whatever combination with any other races.

It will take a considerable amount of time to run it for other plans.

Thanks,
Chris

Exhibit 39

# Exhibit 39

1

PRIVILEGES AND ELECTIONS

REDISTRICTING

SENATE HEARING

---

BEFORE: SENATOR JANET HOWELL, CHAIRWOMAN

PLACE: COMMONWEALTH OF VIRGINIA
GENERAL ASSEMBLY BUILDING
RICHMOND, VIRGINIA 23218

DATE: APRIL 7, 2011

TIME: 2:00 p.m.

Crane-Snead & Associates
4914 Fitzhugh Avenue, Ste 203
Henrico, Virginia 23230
804-355-4335

Crane-Snead & Associates, Inc.

PLAINTIFFS TX 039 - page 1

5.

MADAM CHAIR: Sure.

SENATOR VOGEL: When Senator Watkins and I undertook to do a map, we were basically going through the same exercises that anybody would go through, and that was to come up with a map that we felt was as clean as possible, was as considerate of the parameters set forth in the law, and trying, really, as a test, to see, could we get, for example, half a percent deviation districts that we believed were -- that met those criteria.

So when it came to Section 5 -- I just want to be very clear about this -- that we believed that that was not really a question that was subject to any debate. The lowest amount of African Americans in any district that has ever been precleared by the Department of Justice is 55.0. And I think there is a legitimate reason for that, and that reason is if you want to afford minority districts the opportunity to elect a minority to the House or to the Senate. If you go back and you look over time in cases where legislators have argued that you can go below that percentage, the outcomes have been, in fact, pretty stark. And in these cases, African Americans have not been elected.

And I have -- if you'll just bear with me for a moment, I'm going to provide you with a couple of

examples. Senator Lucas in 2001 had a special election in the 4th Congressional District, where the district was over forty percent African American, but not over fifty percent, that failed to elect Senator Lucas. And while that's a much lower number than we're talking about, that's relevant.

In 1991, where her district was 56 percent black voting-age population, she was --

MADAM CHAIR: Excuse me. Was that congressional?

SENATOR VOGEL: Yes, that was congressional.

MADAM CHAIR: Thank you.

SENATOR VOGEL: In 1991 Senator Lucas had an election where her district was 56 percent black voting-age population, or BVAP, and she won that race. But, bear in mind, she only won that with 51.8 percent of the vote. So that's 56 percent.

In Georgia in 2002 -- and I think this is the one that's most instructive, and this is the one that we considered carefully in trying to determine, you know, are we going to break any new ground here at 55 percent, or should we not be consistent with the law and consistent with what the Department of Justice has said. That is, in Georgia, in 2002, the Senate majority plan dropped the black voting-age population of the Black Senate majority

leader's district to 51 percent BVAP, that's black voting-age population, and dropped the black voter registration percentage to about 49.5 percent.

Here is what's critical there. The Senate majority leader lost his election after he testified that his district would, in fact, elect an African American. I think that's very relevant here. There was no magic in us trying to break any new ground here. We were just simply following what, I believe, is not subject to any question; that is, as of today, the lowest percentage that the Department of Justice has ever approved is 55.0.

Thank you very much.

SENATOR MCEACHIN: Madam Chair.

MADAM CHAIR: Senator McEachin.

SENATOR MCEACHIN: In response to that -- and I'll be happy to share with you this information once I get my hands on it -- but first of all, I take issue with the fact that the lowest number that has ever been approved by the DOJ is 55.5. That's number one.

Number two, Madam Chair, what I would suggest to the Committee is that the comments that my good friend has just made about the Voting Rights Act has sort of turned the matter on its head. The purpose of the Voting Rights Act is not -- and I repeat not -- to elect African Americans. The purpose of the Voting Rights Act is to

give African Americans the opportunity to elect a candidate of their choice. The fact that the Senator from Georgia that you referenced lost the election simply means that that was not the candidate of their choice. That does not mean that the number 50.1 percent, or whatever the number was that you cited, was too low.

I would also suggest that you look at recent Virginia history and understand. Congressman Scott, when he was first elected to the General Assembly, was elected from a majority white district. I would also submit to you that, as I understand it -- if I'm wrong, someone please correct me -- that an African American mayor was elected in Portsmouth, elected in Newport News, and elected in Hampton, none of which have majority African American populations, and yet all were successfully elected mayor of their cities.

So what I would suggest to you is that the magic number that you're throwing out -- or that you're suggesting, pardon me -- is, in fact, not what is required. What is required is that districts allow African Americans to select a candidate of their choice.

SENATOR VOGEL: Madam chair.

MADAM CHAIR: Senator Vogel.

SENATOR VOGEL: I would just like to respond, if I may, in addressing that question. I don't disagree with

my colleague's comments about what the underlying mission is of Section 5. There is no question. It is to ensure that that population, the minority population, has the ability to elect a candidate of their choice. That is absolutely true.

But it has been the position of the Department of Justice, and I will speak to this very confidently, that 55.0 is the percentage that they believe is what is qualified, and that has been, at least in the past to date, their position regarding what it would take to be able to elect a candidate of your choice, whomever that might be.

Thank you, Madam Chair.

MADAM CHAIR: Thank you.

Senator Watkins, did you have more in your presentation?

SENATOR WATKINS: Yes, I did.

MADAM CHAIR: All right. Go ahead.

SENATOR WATKINS: I think that it's important. You know, this is an important statement of what we are trying to do here. There's no question about that. We have to comply with the law. But, also, this is Virginia. These are our citizens that we're dealing with, in terms of their representation. And it's all of the citizens. It's not one community or another.

If I could, I'll just discuss briefly the different regions of the state, and what we did, and the rationale behind it.

Hampton roads. This plan recognizes that Virginia Beach is Virginia's largest city. The population exceeds two full Senate districts. Accordingly, there is one district, District 2 -- and I will point out, if you notice, we renumbered all of the districts. We tried to use some rationale with starting in the east with one, moving through Virginia and mostly the twenties and thirties, and moving over into the southwest with the thirties and up to the forties. They are different numbers. So nobody gets wed to any number.

So District 2 is entirely within Virginia Beach, and in District 1, 75 percent of the population is from Virginia Beach. And this should allow Virginia Beach to have two Senators whose primary, if not exclusive, focus is on that city.

Planned districts, based primarily in Chesapeake, District 3; Norfolk, District 5; Portsmouth, District 4, allowing those cities to elect senators who represent them. The peninsula contains one entire Section 5, District 7, and the bulk of District 9. The 6th District runs between Norfolk and the peninsula, with the population between the localities relatively evenly split,

which should provide a healthy competition and a Senator who will give both parts of Hampton Roads their strong attention.

The slow population growth in Hampton Roads necessitates a district being lost from this region. Because slow population growth has impacted both the peninsula and South Hampton Roads, it makes sense that half of the loss should come from each side of the water.

All river, all water crossings in this area are over bridges. They're not merely water connections. District 1 uses the Chesapeake Bay Bridge Tunnel to connect with Virginia Beach in North Hampton County. District 6, using the Hampton Roads Bridge Tunnel, connects between Norfolk and Hampton. And the 8th District, using the James River Bridge, connects with between the Isle of Wight and Newport News. In the 9th District we use the Coleman Bridge to connect between York and Gloucester Counties.

The Metro Richmond population growth over the last decade has been comparable to that of the rest of the state. Accordingly, Metro Richmond is entitled to maintain the same representation that it currently has. That is achieved in this plan. It keeps two Section 5 Districts in 10 and 11. It keeps a compact district in Western Henrico, 15; and a compact District in

Chesterfield and Colonial Heights, 12.

The 16th and the 14th Districts are also representing parts of Metro Richmond. In Northern Virginia, the districts in Northern Virginia are drawn to respect jurisdictional boundaries and communities of interest. I understand Oakton and Senator Peterson don't particularly jive. One district, 24, is entirely within Arlington County, while Alexandria is kept whole in a neighboring district, 23.

Whenever possible, within the half-percent deviation, main thoroughfares are used to divide districts, such as I95, the Capital Beltway, the Dulles Toll Road, et cetera. Fairfax City, Falls Church, Arlington and Alexandria have a population of 1.46 million, enough to justify 7.32 seats in the Senate of Virginia.

There are seven districts that stay entirely within these localities, and only one district that comes into Fairfax from the south or west, 29. To pick up the remaining population, expanding out into Loudoun, Prince William, Manassas, Manassas Park, the localities of the Northern Virginia planning district had the population of 2.23 million people, enough to justify 11.15 Senate seats.

There are 11 districts entirely within this

region, with the 18th District coming into South Prince William to pick up some of the remaining population. Western and southwestern Virginia is drawn to keep counties intact. The 40th district has no split localities, while the neighboring 39th has only one split, and that's in Pulaski County, to keep within the half-percent deviation.

Currently, there are three rather large districts in Western Virginia; the 21, 22, and the 25, and this map makes two more important districts, the 35th, based around Roanoke, and the 33rd, based around Charlottesville. Much of the remaining population goes into the 34th District, which is the more rural district on the outskirts of Roanoke and Charlottesville. It was determined that two compact and one larger district would be preferable.

I would point out that what we wind up with, when all is said and done, is there are two pairings where incumbents wind up in the same district. In both of those pairings, it's a democrat and a republican, both of them. There are no pairings of two republicans or two democrats. It's a republican and a democrat, and there are two open seats that are available.

And, Madam Chairman, that is the synopsis, if you would. I apologize for it taking so long, but I think that it clearly gives us a good opportunity to -- a good

plan.

MADAM CHAIR: This is a very important subject, so thank you for giving us that explanation.

Senator Deeds.

SENATOR DEEDS: Madam chair.

Senator Watkins, the district that I represent, Bob Gibson, who is now at the Sorensen Institute, once called it a bat out of West Virginia. That was the district you all drew, the 25th, ten years ago. It looks like now the 34th district, which would be the one that I'm in, would be a boomerang district; wouldn't you agree?

SENATOR WATKINS: I'm not very good at art.

SENATOR DEEDS: Yes, I can tell. Ink spots.

SENATOR WATKINS: But I think you're in there on your own, and I think it's a democratic district.

SENATOR BARKER: Madam Chair.

MADAM CHAIR: Senator Barker.

SENATOR BARKER: Madam Chair, just a couple of comments, because I think the discussion on the Voting Rights Act is very significant.

My understanding is that there have been a number of districts approved with less than 55 percent African American, and, in fact, many of the districts we're looking at right now are less than 55 percent African American population, voting-age population, at this

particular time.

I think it's also important to point out that we do have a number of individuals, African Americans, who have been elected in districts that are far lower than fifty percent, than 55 percent African American voting-age population. Just in Northern Virginia alone I can think of many, many officials in districts that are less than 25 percent, and many incidents of less than ten percent who have been elected, including the Mayor of the City of Alexandria, two members of the House of Delegates, former County Board Chair, the Sheriff of Prince William County, School Board members at large, within Fairfax County School Board members, members from individual districts.

So I think it's important to ensure that African Americans have a chance to have influence in districts beyond just the Voting Rights Act Districts, and I think they certainly are exercising that to a substantial degree now.

I think it is important that we not pack African American voters into a very, very limited number of districts, or into a majority in any way that to some extent disenfranchises their opportunity to have influence in other districts.

SENATOR VOGEL: Madam Chair.

MADAM CHAIR: Yes, Senator Vogel.

SENATOR VOGEL: I wonder if you would indulge me for a moment just to speak more broadly to Senator Watkins' proposal.

MADAM CHAIR: Of course.

SENATOR VOGEL: I would just like to say that, in speaking broadly as an exercise in comparison, I would like to say that, in deference to the fact that Senator Watkins has done this four times, he brings a perspective to this that some of us don't have.

But I will say that he undertook this exercise -- and I was happy to participate in that process -- to, again, hearkening back to my earlier comments, really test to see how good a map can you draw, how low can you keep those deviations respecting One Person/One Vote. I would be remiss if I didn't just take a moment to talk about the deviation issue.

The deviation issue, as evaluated, is less about -- and I know we had this discussion, and I know Senator Puckett talked about this, and he was right to be very concerned about this notion of not breaking up towns, not splitting local jurisdictions. And, certainly I'm hearing a lot from some of my local jurisdictions about this. At the end of the day, the notion is that that is our underlying mission, is to try to keep those communities of interest, respecting local boundaries,

together.

And that deviation discussion -- is five percent appropriate, is two percent, does that have any bearing on that? One of the things we attempted to do was to see how low we could do it. We got it to half a percent, which I thought was fairly extraordinary, keeping more of these communities together. That, I thought, was pretty important.

But more than the percentage deviation, is there a pattern to that deviation, because when someone wants to come in and challenge you, they're not challenging you on your percentage nearly as much as they're challenging you on is there a pattern.

As we tried to do this around the state and keep that deviation at half a percent, we were very mindful, again, looking at the legal parameters. If we're trying to get through a plan that has the greatest likelihood of being precleared -- because I think all of us sitting here, no matter where we are in this process, would have to say that the underlying goal of this process is to pass out a map that will preclear, that will pass legal muster, whether it's with the Department of Justice, or, if it's in litigation, a Court will say is okay, legally okay, indefensible. Because all of us would like to have that certainty come November, what district we may or may not

be running in.

So, that said, this going back to the deviation issue, we were careful to be considerate of that and not create any situation where there's a pattern. By contrast, in the map that has been introduced, I do believe that there's a serious issue. And I know that Senator Watkins spoke to that briefly. That notion that there is a pattern to deviation, to the extent that those communities that are growing more slowly are underpopulated within that deviation, and the communities that are growing more quickly are overpopulated somewhat.

I think that that does pose a concern, somewhat. Again, getting to the place where we think we can preclear this plan, I think it's useful to be mindful of that consideration and mindful of that future objection, because if you are looking at this in the context of One Person/One Vote, that is something that's, after all, the whole mission of redistricting.

The notion that you have poor Mark Herring sitting in the 33rd District on two full Senate seats. That is both an undue burden on him as a legislator, and, two, an issue for the people he represents.

So where we don't want to be is in a position where we're starting right out of the box, and districts like this that Senator Herring represents, with those

deviations that already start with them being overpopulated. So I thought that was important to mention, just in terms of contrast and what your plan did.

I would like to go back and just one more time mention this whole notion of retrogression. I did not mean to get us off track there in the discussion of Section 5. I only mention that because I think it was raised, and because it is, again, key. I think it goes to the very core of what we're trying to do when we get out of the legislative session. I don't think any of us want to come back here in June and July and August, and then potentially run again next year, because we weren't careful enough about some minor tweaking to put forward a plan that we believe will pass legal muster.

And Senator Barker -- the Senator from Prince William, I apologize. I'm supposed to address you that way -- was correct in commenting about the elections that you referenced. That is absolutely true. People have been elected, even though they didn't have a majority in their district. But that isn't -- and I think I perhaps was not as clear as I should have been -- that isn't the underlying goal of what Section 5 preclearance, addressing retrogression, goes to.

The notion is that you're looking not to

retrogress the benchmark. That is where we are. And that is why I believe, and I have not discussed this with my colleagues in the House, this whole notion of what benchmark they used. But they clearly believed that was the law, because if you look at the House Plan, they were careful not to retrogress below 55 percent, which is the benchmark in the Commonwealth of Virginia.

And I think that is, under Section 5, it prohibits -- and let me just be clear about what Section 5 does -- it prohibits retrogression. It's not out there talking about any sort of arbitrary standards. But, more importantly, it is talking about retrogressing minority districts that change the voting practice or procedure that would leave minorities in a position worse off in the new plan than they were under the old benchmark plan.

That's nearly all that was about, keeping that 55 percent. And I assume my colleagues in the House undertook it for the exact same reason; it is a benchmark question. And in the Commonwealth of Virginia right now in the Senate, 55 percent is the benchmark.

I will tell you that the most recent Virginia redistricting rejection from DOJ was in 2002 -- and I went back and looked at this just for this issue -- where Cumberland County dropped the black total population, or BVAP, Voting-Age Population of the district from 55.9

percent to 55.3 to percent. Now, clearly, that's above 55. And they also dropped -- sorry, 55.9 to 55.3.

DOJ noted that, because the alternatives could be drawn in a way that didn't drop it, that would have, in fact, increased it, that the drop demonstrated an intent to retrogress, and it didn't preclear that proposal. That's pretty stark.

So I just thought I would mentioned this as an intent to be clear about this as an issue of benchmarking, and that was the whole notion of the 55 percent.

Thank you.

MADAM CHAIR: Yes, thank you, Senator Vogel. I couldn't agree with you more that we are all very eager to have our plan precleared, and I want to assure you that we meet all the legal requirements of both Federal and State law, as well as the Constitutions.

SENATOR WATKINS: Madam Chair, that's my plan.

MADAM CHAIR: Okay. Were there any other questions from members? Okay. Would anyone in the public like to address this amendment in the nature of a substitute or Senator Watkins?

Okay. Well, then we have on the floor a motion to adopt Senator Watkins' amendment in the nature of a substitute.

SENATOR MCEACHIN: Madam Chair.

enormous amount of dissatisfaction across all these cities. These cities have different interests, different economies, different conditions, as many cities across the Commonwealth do. I don't think that has been considered.

We've eliminated a seat. We've taken one, the remaining Senate seat is in Virginia Beach, and 65 percent of the voters from Virginia Beach will be represented by that seat, and, yet, 35 percent from Chesapeake, a city of 250 thousand.

So I'm not going to try to ramble on and on here, just to say that I do think also we have to work, and we must try to work, particularly given this two-percent variance, which we just committee-approved. I didn't vote for it, but to do a better job of putting cities and towns of interest and the people that are represented -- this is about people who are represented -- into a much more orderly, systematic way and make improvements.

I agree with the Senator from Bath County, that if we made mistakes ten years ago, we ought to try to improve upon them. I will guarantee we will be back here ten years from now -- maybe not us, but someone will be back here ten years from now, saying what were they thinking.

Thank you.

MADAM CHAIR: Thank you. Did anyone wish to

speak? If not, before us now is a motion to report an amendment in the nature of a substitute for House Bill 5001, as amended.

The Clerk will call the role.

CLERK: Senator Martin.

SENATOR MARTIN: No.

CLERK: Senator Deeds.

SENATOR DEEDS: Yes.

CLERK: Senator Whipple.

SENATOR WHIPPLE: Yes.

CLERK: Senator Obenshain.

SENATOR OBENSHAIN: No.

CLERK: Senator Puckett.

SENATOR PUCKETT: Yes.

CLERK: Senator Edwards.

SENATOR EDWARDS: Aye.

CLERK: Senator Blevins.

SENATOR BLEVINS: No.

CLERK: Senator McEachin.

SENATOR MCEACHIN: Aye.

CLERK: Senator Peterson.

SENATOR PETERSON: Aye.

CLERK: Senator Smith.

SENATOR SMITH: No.

CLERK: Senator Barker.

SENATOR BARKER: Yes.

CLERK: Senator Northam.

SENATOR NORTHAM: Yes.

CLERK: Senator Vogel.

SENATOR VOGEL: No.

CLERK: Senator McWaters.

SENATOR MCWATERS: No.

CLERK: Senator Howell.

MADAM CHAIR: Yes.

CLERK: Nine ayes, six nays.

MADAM CHAIR: The bill is reported, nine ayes, six nays. There being no more business to come before the Committee, the Committee will rise.

NOTE: At this time the hearing was adjourned.

CERTIFICATE OF COURT REPORTER

I, Kellie Milner, hereby certify that I was the court reporter in the Privileges and Elections Hearing for the Senate on the 7th day of April, 2011, at the time of the hearing herein.

I further certify that the foregoing transcript is a true and accurate record of the incidents of the hearing herein, to the best of my ability.

Given under my hand this 8th day of May, 2011.

________________________________
Kellie Milner, Court Reporter

Exhibit 52

Exhibit 52

**Report of John B. Morgan Regarding Plaintiffs' Alternative Plan and the Enacted Plan**

***Page v. State Board of Elections***

**Background Information**

My name is John B. Morgan. I have been retained by the defendants to offer an expert opinion regarding Plaintiffs' Alternative Plan and the Enacted Plan. I hold a B.A. in History from the University of Chicago. As detailed in my CV, attached as Exhibit A, I have extensive experience in the field of redistricting, working on redistricting plans in the redistricting efforts following the 1990 Census, the 2000 Census, and the 2010 Census. I have testified as an expert witness in demographics and redistricting. I am being compensated at a rate of $250 per hour for my services in this case.

In preparing this analysis, I considered the following: the legal briefs submitted to the court, reports by Dr. Michael McDonald and Dr. Thomas Brunell, court cases mentioned in the briefs and reports, relevant portions of the Sec. 5 preclearance submissions to the Department of Justice, various maps and datasets from the current and previous congressional districts, the Plaintiffs' Alternative Plan maps and data, the 2010 redistricting PL94-171 data and Census geography data from the Census Bureau, political and redistricting data from the Department of Legislative Services and the Virginia State Board of Elections, and the Maptitude for Redistricting geographic information system (GIS) software and manuals from Caliper Corporation.

The redistricting geographic information system (GIS) software package used for this analysis is Maptitude for Redistricting from Caliper Corporation. The redistricting software was loaded with the census PL94-171 data from the Census and the Census geography as well as available redistricting and political data from Department of Legislative Services and the Virginia State Board of Elections. The full suite of census geography was available, including Census Places, Voting Districts, water bodies, and

roads, as well as Census Blocks which are the lowest level of geography for which the Census Bureau reports population counts.

The Department of Legislative Services provided political data for 2008 and 2009 for use during the General Assembly redistricting process. I prepared reports and analysis based on this data for the Benchmark, Enacted and Alternative Plans. In addition, I was provided data for the 2012 presidential election by counsel and asked to analyze this data for the Benchmark, Enacted, and Alternative Plans.

**Table 1. Benchmark 2001 Congressional Districts Election Data**

| CD | Current Party | Rep. Gov '09 | Dem. Gov '09 | Rep. Lt. Gov '09 | Dem. Lt. Gov '09 | Rep. Att. Gen. '09 | Dem. Att. Gen. '09 | Rep. Pres. '08 | Dem. Pres. '08 | Other Pres. '08 | Rep. U.S. Sen. '08 | Dem. U.S. Sen. '08 | Other U.S. Sen. '08 | | Rep. Pres. '12 | Dem. Pres. '12 | Other Pres. '12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | R | 65% | 35% | 62% | 38% | 63% | 37% | 53% | 47% | 1% | 38% | 61% | 1% | | 52% | 47% | 1% |
| 2 | R | 62% | 38% | 56% | 44% | 60% | 40% | 50% | 50% | 1% | 34% | 64% | 1% | | 48% | 50% | 1% |
| 3 | D | 34% | 66% | 33% | 67% | 35% | 65% | 25% | 75% | 1% | 18% | 81% | 1% | | 23% | 75% | 1% |
| 4 | R | 61% | 39% | 59% | 41% | 61% | 39% | 50% | 49% | 1% | 37% | 61% | 1% | | 49% | 50% | 1% |
| 5 | R | 61% | 39% | 60% | 40% | 62% | 38% | 52% | 47% | 1% | 35% | 64% | 1% | | 52% | 46% | 2% |
| 6 | R | 67% | 33% | 66% | 34% | 67% | 33% | 58% | 41% | 1% | 41% | 58% | 1% | | 59% | 40% | 2% |
| 7 | R | 66% | 34% | 63% | 37% | 65% | 35% | 54% | 45% | 1% | 39% | 59% | 1% | | 54% | 44% | 1% |
| 8 | D | 39% | 61% | 37% | 63% | 36% | 64% | 32% | 67% | 1% | 25% | 73% | 1% | | 30% | 68% | 1% |
| 9 | R | 67% | 33% | 66% | 34% | 66% | 34% | 59% | 39% | 1% | 36% | 63% | 1% | | 64% | 34% | 2% |
| 10 | R | 61% | 39% | 58% | 42% | 58% | 42% | 48% | 51% | 1% | 38% | 61% | 1% | | 48% | 51% | 1% |
| 11 | D | 55% | 45% | 52% | 48% | 52% | 48% | 44% | 56% | 1% | 35% | 64% | 1% | | 42% | 57% | 1% |

**Table 2. Enacted Congressional Districts Election Data**

| CD | Current Party | Rep. Gov '09 | Dem. Gov '09 | Rep. Lt. Gov '09 | Dem. Lt. Gov '09 | Rep. Att. Gen. '09 | Dem. Att. Gen. '09 | Rep. Pres. '08 | Dem. Pres. '08 | Other Pres. '08 | Rep. U.S. Sen. '08 | Dem. U.S. Sen. '08 | Other U.S. Sen. '08 | | Rep. Pres. '12 | Dem. Pres. '12 | Other Pres. '12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | R | 66% | 34% | 63% | 37% | 64% | 36% | 53% | 46% | 1% | 39% | 60% | 1% | | 53% | 46% | 1% |
| 2 | R | 62% | 38% | 57% | 43% | 60% | 40% | 50% | 49% | 1% | 35% | 64% | 1% | | 49% | 50% | 1% |
| 3 | D | 31% | 69% | 29% | 71% | 31% | 69% | 22% | 78% | 1% | 16% | 83% | 1% | | 20% | 79% | 1% |
| 4 | R | 63% | 37% | 60% | 40% | 62% | 38% | 51% | 48% | 1% | 39% | 60% | 1% | | 50% | 49% | 1% |
| 5 | R | 62% | 38% | 61% | 39% | 62% | 38% | 52% | 47% | 1% | 36% | 63% | 1% | | 53% | 46% | 2% |
| 6 | R | 67% | 33% | 67% | 33% | 68% | 32% | 58% | 41% | 1% | 42% | 57% | 1% | | 59% | 39% | 2% |
| 7 | R | 68% | 32% | 65% | 35% | 67% | 33% | 56% | 43% | 1% | 41% | 58% | 1% | | 57% | 42% | 1% |
| 8 | D | 40% | 60% | 38% | 62% | 38% | 62% | 33% | 66% | 1% | 26% | 73% | 1% | | 31% | 68% | 1% |
| 9 | R | 66% | 34% | 66% | 34% | 66% | 34% | 59% | 40% | 1% | 36% | 63% | 1% | | 63% | 35% | 2% |
| 10 | R | 63% | 37% | 60% | 40% | 60% | 40% | 50% | 50% | 1% | 39% | 60% | 1% | | 50% | 49% | 1% |
| 11 | D | 50% | 50% | 47% | 53% | 47% | 53% | 38% | 61% | 1% | 30% | 68% | 1% | | 36% | 62% | 1% |

**Table 3. Plaintiffs' Alternative Congressional Districts Election Data**

| CD | Current Party | Rep. Gov '09 | Dem. Gov '09 | Rep. Lt. Gov '09 | Dem. Lt. Gov '09 | Rep. Att. Gen. '09 | Dem. Att. Gen. '09 | Rep. Pres. '08 | Dem. Pres. '08 | Other Pres. '08 | Rep. U.S. Sen. '08 | Dem. U.S. Sen. '08 | Other U.S. Sen. '08 | | Rep. Pres. '12 | Dem. Pres. '12 | Other Pres. '12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | R | 66% | 34% | 63% | 37% | 64% | 36% | 53% | 46% | 1% | 39% | 60% | 1% | | 53% | 46% | 1% |
| 2 | R | 57% | 43% | 52% | 48% | 55% | 45% | 44% | 55% | 1% | 31% | 68% | 1% | | 44% | 55% | 1% |
| 3 | D | 38% | 62% | 36% | 64% | 37% | 63% | 28% | 71% | 1% | 20% | 78% | 1% | | 25% | 73% | 1% |
| 4 | R | 63% | 37% | 60% | 40% | 62% | 38% | 51% | 48% | 1% | 39% | 60% | 1% | | 50% | 49% | 1% |
| 5 | R | 62% | 38% | 61% | 39% | 62% | 38% | 52% | 47% | 1% | 36% | 63% | 1% | | 53% | 46% | 2% |
| 6 | R | 67% | 33% | 67% | 33% | 68% | 32% | 58% | 41% | 1% | 42% | 57% | 1% | | 59% | 39% | 2% |
| 7 | R | 68% | 32% | 65% | 35% | 67% | 33% | 56% | 43% | 1% | 41% | 58% | 1% | | 57% | 42% | 1% |
| 8 | D | 40% | 60% | 38% | 62% | 38% | 62% | 33% | 66% | 1% | 26% | 73% | 1% | | 31% | 68% | 1% |
| 9 | R | 66% | 34% | 66% | 34% | 66% | 34% | 59% | 40% | 1% | 36% | 63% | 1% | | 63% | 35% | 2% |
| 10 | R | 63% | 37% | 60% | 40% | 60% | 40% | 50% | 50% | 1% | 39% | 60% | 1% | | 50% | 49% | 1% |
| 11 | D | 50% | 50% | 47% | 53% | 47% | 53% | 38% | 61% | 1% | 30% | 68% | 1% | | 36% | 62% | 1% |

The Enacted Plan preserves between 71% and 96% of the cores of the Benchmark districts, and preserves 83% or more of the cores of 9 of the 11 districts, including District 3.  The Enacted Plan preserves 85% of the core of District 2 and 83% of the core of District 3.

The Alternative Plan performs significantly worse than the Enacted Plan on this criterion.  The Alternative Plan preserves only 69.2% of the core of District 3, down from 83% in the Enacted Plan.  In other words, Alternative District 3 would be the *worst performing* district in terms of preservation of cores in either the Enacted or the Alternative Plan.  Dr. McDonald offers no explanation as to why the only majority-minority district in Virginia should be entitled to less continuity and respect for incumbency protection than every other district.

**Protection of Incumbents**

The Senate Criteria included the factor of "incumbency considerations."  Senate Criteria V.  This factor encompasses not just preserving the cores of districts but also strengthening incumbents politically.  As explained, the Enacted Plan respects this factor significantly, while the Alternative Plan undermines it, particularly in District 2, where Congressman Rigell would be gravely weakened in his re-election prospects.

**Compliance with the Voting Rights Act**

The Senate Criteria treated compliance with the Voting Rights Act, "including compliance with protections against unwarranted retrogression or dilution of racial or ethnic minority voting strength," as the highest priority for the Enacted Plan after compliance with the Constitutional equal-population requirement.  Senate Criteria II.  I understand that a redistricting plan complies with Section 5 only if it does not diminish the ability of minority voters to elect their candidates of choice.

The Enacted Plan increased District 3's Black VAP on both of Dr. McDonalds' preferred measures

3.2% (exclusive) and 3.3% (inclusive). 2/21/14 McDonald, page 8. The Enacted Plan thus did not diminish the ability of black voters to elect their candidates of choice. The Enacted Plan received preclearance from the Department of Justice.

In 2011, Virginia was one of the first states to complete its statewide legislative redistricting and seek Section 5 preclearance from the Department of Justice. The General Assembly passed a redistricting plan for the House of Delegates which required preclearance for the 2011 elections. The benchmark House of Delegates plan had 12 districts in which African-Americans formed a majority of the total and voting age populations. Many of those districts were located in the geography covered by Congressional District 3. During the redistricting process, the House of Delegates considered a number of proposed plans that preserved the 12 majority-black districts. Some of these alternative plans had Black VAP below 55%. House of Delegates Section 5 Submission, Statement of Minority Impact, page 5.

But the House of Delegates plan that the General Assembly enacted had a Black VAP of above 55% in all 12 majority-black districts – including the districts within Congressional District 3. This required increasing the Black VAP in some of the 12 majority-black benchmark districts from the Black VAP level at the time of the 2010 census. Eight of the 12 members of the House of Delegates Black Caucus voted in favor of the Enacted House of Delegates plan. House of Delegates Section 5 Submission, Statement of Minority Impact, page 5.

Thus, the General Assembly enacted, with strong support of bipartisan and black legislators, a House of Delegates redistricting plan with a 55% Black VAP as the floor for black-majority districts subject to Justice Department preclearance under Section 5, including districts within the geography covered by Congressional District 3. The General Assembly therefore had ample reason to believe that legislators of both parties, including black legislators, viewed the 55% black VAP for the House of Delegates districts as appropriate to obtain Section 5 preclearance, even if it meant raising the Black

VAP above the levels in the benchmark plan.  The General Assembly acted in accordance with that view for the congressional districts and adopted the Enacted Plan with the District 3 Black VAP at 56.3%

The Alternative Plan, by contrast, decreases District 3's Black VAP by 2.9% and drops it to a razor-thin majority of 50.2% (exclusive) and 51% (inclusive).  These levels are below the 55% that the General Assembly found appropriate to comply with Section 5 for House Districts.

Dr. McDonald states that "a racial bloc voting analysis" is required to prove what Black VAP is necessary to comply the Voting Rights Act. 1/20/14 McDonald, page 11.  Dr. McDonald provides no such analysis of the Alternative Plan.  Thus Dr. McDonald cannot – and does not – opine that the Alternative Plan could or would have received preclearance under Section 5.

Therefore the Alternative Plan would have presented obstacles to obtaining Section 5 preclearance that the Enacted Plan did not present.   The Alternative Plan drops District 3's Black VAP well below the 55% that the General Assembly believed was appropriate to obtain preclearance for House Districts and decreases District 3's Black VAP to a razor-thin majority below the Benchmark Black VAP level.  Had the Alternative Plan been before it, the General Assembly had ample reason to prefer the Enacted Plan, which increased District 3's Black VAP above 55% and faced none of these hurdles to achieving Section 5 preclearance.

**The Alternative Plan Does Not Bring About Significantly Greater Racial Balance Than the Enacted Plan**

I have been asked to analyze whether the Alternative plan brings about "significantly greater racial balance" than the Enacted Plan.  As I understand it, the purpose of this requirement is to cure the alleged racial gerrymander and turn the gerrymandered district into one that is not racially identifiable. The Alternative Plan fails that purpose because it preserves District 3 as a racially identifiable majority-

black district on both of Dr. McDonald's Black VAP measurements. The Alternative Plan District 3 replaces a black-majority district with a black-majority district and in doing so would not seem to cure the alleged racial predominance that Dr. McDonald criticizes in the Enacted Plan, including the changes to the Benchmark District 3 that the Alternative Plan replicates.

**The Enacted Plan is not a Racial Gerrymander**

Based on my review and analysis of the available data discussed throughout this report, I also conclude that the Enacted Plan is not a racial gerrymander. In my opinion, politics rather than race predominated and the Enacted Plan is consistent with traditional redistricting principles, including the criteria identified by the Virginia Senate and followed by the General Assembly.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on March 14, 2014 in Fairfax, Virginia.

John B. Morgan

Exhibit 68

Exhibit 68

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

-----------------------------------

| | | |
|---|---|---|
| GOLDEN BETHUNE-HILL, et al. | : | Civil Action No. 3:14CV852 |
| vs. | : | |
| VIRGINIA STATE BOARD OF ELECTIONS, et al. | : | June 4, 2015 |

-----------------------------------

COMPLETE TRANSCRIPT OF THE CONFERENCE CALL

BEFORE THE HONORABLE ROBERT E. PAYNE

UNITED STATES DISTRICT JUDGE

APPEARANCES:

Kevin J. Hamilton, Esquire
Perkins Coie, LLP
1201 Third Avenue
Suite 4800
Seattle, Washington 98101

Bruce V. Spiva, Esquire
Aria C. Branch, Esquire
Perkins Coie, LLP
700 13th Street, NW
Suite 600
Washington, D.C. 20005
Counsel for the plaintiff

Peppy Peterson, RPR
Official Court Reporter
United States District Court

for the hearing of motions *in limine*?

MR. HAMILTON: I don't believe so, Your Honor. This is Mr. Hamilton. I don't believe so, Your Honor.

JUDGE PAYNE: We probably need to set that date, so we'll see how we proceed. All right, it might be helpful to discuss item five, the theories of the case for each side, to kind of help get us oriented and thinking in the right direction, and we may end up, each of us, of the judges may have questions as you go along, so anybody, just feel free to interject at such time as you want to. So start with the plaintiff.

MR. HAMILTON: All right. Thank you. Your Honor, from the plaintiff's perspective, this is a really straightforward case, and our case theory is fairly simple. The equal protection clause of the 14th Amendment forbids race-based redistricting absent a compelling state interest, and even then, even if the state does identify a compelling state interest, it can use race only when it's narrowly tailored to meet the state interest. That's the law.

Our theory of the case is that in 2011, the Virginia General Assembly used race as the predominate factor in drawing the 12 house districts that are at issue in this case; B, had no compelling state interest for doing so; and C, in any event, failed to narrowly tailor

those districts to meet whatever state interest defendants or intervenors might identify.

The case, we think, is substantially easier and clearer than the recent Page decision which involved the Third Congressional District in Virginia last year before this Court, and that's for two reasons. First, to the extent that there was any doubt about the controlling legal standards for such a claim, they have been emphatically laid to rest by this Court's decision in the Page case last year and by the Supreme Court's decision in the recently decided case of *Alabama Legislative Black Caucus v. Alabama*.

There, the Supreme Court made it clear that a legislature may not utilize, and I quote, mechanical racial targets, close quote, in a misguided effort to comply with the Voting Rights Act non-retrogression standard. That alines precisely with this Court's ruling in Page to the same effect.

So that's the first reason, the law is substantially --

JUDGE PAYNE: Is it your view that there was some mechanical formula or figure used? Is that what you are going to seek to prove?

MR. HAMILTON: Exactly, Your Honor, and that's the second reason why this is an easier and clearer case

 than Page. The record before the Court, the delegates, Delegate McClellan, Delegate Dance, and Delegate Armstrong will testify that they were aware and they were told of a 55 percent black voting age population threshold or floor that was used in drawing all of the 12 majority/minority districts, and you'll hear during the course of the trial that black voting age population figure repeated over and over again in testimony and in the documents, 55 percent BVAP, B-V-A-P, is how, as you know, Your Honor, is how it's referred to.

In addition, the chief map drawer, Delegate Jones, who the intervenors intend to call, himself repeatedly and emphatically articulated that 55 percent BVAP floor in the floor debates before the House of Delegates and in email communications that have been produced during the course of discovery.

There are transcripts of several floor debates and a committee hearing that we'll be presenting and putting into evidence in which the delegate, Delegate Jones, is responding to questions on the floor of the House about how it was drawn. The evidence will show that when requests were made to fix a precinct split or a voting tabulation district split, it was rejected. Even though the black voting age population resulting from fixing that split would have been 54.8 percent, it was

rejected, and the reason given was because it didn't meet the 55 percent target, and that's a quote from the document, and we'll be presenting that in evidence.

Two-tenths of a percent was too much, and that demonstrates how the black voting population threshold or floor was used to trump all other considerations.

So we think the case is pretty straightforward. The legal standards have been reiterated and clarified, and the record is even clearer and stronger than the record that was before the Court last year in Page.

JUDGE PAYNE: All right. Judge Lee or Judge Keenan, do you all have any questions for the plaintiff on that topic?

JUDGE LEE: I don't have any questions.

JUDGE KEENAN: I only had one question with regard to the absence of a compelling state interest and in any event no narrow tailoring. Does the plaintiff intend to present evidence in its case in chief, or is that going to be saved for rebuttal?

MR. HAMILTON: The expert witness -- I mean the answer is, Your Honor, I believe we'll be presenting evidence on that with respect to -- in our case in chief, and this is how it works, or this is how it will be presented, I think.

In these cases, often the explanation is -- I

think the explanation of the state here for using the 55 percent black voting age population is we needed to prevent retrogression, meaning we needed to prevent any retrogression in the ability of the minority community to elect a candidate of their choice, to have opportunity to elect the candidate of their choice, and typically, the way that a state would do that in order to comply with the Voting Rights Act is to conduct a racial block voting analysis in order to determine what level of BVAP, of black voting age population, do we need to have in this district to ensure that the minority population has the opportunity to elect its candidate of choice.

And the problem here is that the State did not do a racial block voting analysis, and, of course, that's obvious because they used a single number for 12 districts across the board, and even the defendants -- I'm sorry, the intervenor's own expert will say that he'd be shocked, he'd be surprised if the level of white crossover voting would be the same in all 12 districts such that black BVAP were -- exactly the same for all 12 would have been required.

So that's part of our case in chief of identifying -- sort of blowing up -- you can't -- the State cannot point to compliance with Section 5 of the Voting Rights Act as their defense using race.

And the other -- the only other explanation they'll come forward with is it was all about politics, and that is not a defense to using race in violation of the 14th Amendment. That is not a legitimate -- that may be a legitimate purpose in the course of redistricting, but it's not a compelling state interest, and the problem here is that the map drawers used race, not politics.

It's a 55 percent black voting age population floor that was used. They didn't use, you know, some measure of democratic or republican political performance. If they did, that would have been permissible. That's legal to do, but the 55 percent rule is not 55 percent democratic performance or republican performance. It's 55 percent black voting age population.

It's sorting people by the color of their skin. It's forbidden by the 14th Amendment absent a compelling state interest, and part of our case in chief through Dr. Dr. Ansolabehere will be to explain that there was no racially polarized voting analysis done here, and this was not done in an effort to comply with the Voting Rights Act.

JUDGE PAYNE: Does that answer your question, Judge Keenan?

JUDGE KEENAN: Yes, thank you.

JUDGE PAYNE: Do you propose to present, Mr.

Hamilton, as a part of your case, an alternative map to show what it would have -- or should have looked like if the proper procedures had been followed?

MR. HAMILTON: Your Honor, it's Mr. Hamilton for the plaintiffs. We have not -- we have not prepared our own map for use -- or maps from all 12 legislative districts. We do intend to offer maps that were before the House of Delegates at the time.

JUDGE PAYNE: The things that they had available to them to consider.

MR. HAMILTON: Correct.

JUDGE PAYNE: But you're not offering your own map to show what properly should have been done.

MR. HAMILTON: Correct, Your Honor, we're not.

JUDGE PAYNE: As I understand what you said in discussing your case, you do not intend to take on each district individually, because what you are doing is striking at the one basic point, and that is the application of the 55 percent BVAP figure as a floor, and that permeated and controlled all of the drawing -- the drawing of all the districts that are at issue, and you're not really going to be attacking them district by district; is that correct?

MR. HAMILTON: Not really, Your Honor. We will be attacking them individually through the use of Dr.

Ansolabehere who goes through each individual one. I think the Court in *Alabama* made it clear, and perhaps that's the genesis of the Court's question, made it clear that you do -- it is a district-specific analysis that's required, and that is exactly what Dr. Ansolabehere will be doing.

You are absolutely correct, Your Honor, that the same 55 percent rule is applied to all 12, and that, of course, is a fact that's relevant to each of the 12 districts, but in addition, Dr. Ansolabehere is looking at compactness of each of the 12 districts, and he's doing an analysis of the VTD which is the -- or precincts that were moved into and out of each one of the 12 districts in order to analyze both race and politics to answer the question, what's the more powerful explanation for which precincts were included and which precincts were excluded -- is it race or is it politics -- and the conclusion that he comes to is that, by far, race is a far more powerful explanation or predictor for explaining -- in other words, you can have similarly situated politically performing districts, and if one is more heavily black than the other, then the black district is more likely included rather than excluded.

JUDGE PAYNE: That's really a rebuttal point, though. Once they raise the issue of political reasons,

 if they do that, then you put on your testimony about that's not correct; isn't that how you go about it?

MR. HAMILTON: I think it's an inherent part of our case in chief, Your Honor, that we have to demonstrate that race was the predominant factor in drawing these districts, and one of the pieces of evidence that goes to that point is how those precincts were selected. I mean, they were selected because of race. I mean, I think it's necessarily race, not politics --

JUDGE PAYNE: But as to each of the 12 districts, you are saying that the 55 percent is the controlling factor, and the other factors that you are going to discuss through the doctor, whose name has slipped my mind now --

MR. HAMILTON: Ansolabehere.

JUDGE PAYNE: -- is really for the purpose of explaining why race is the predominant question, issue.

MR. HAMILTON: That's right. That's exactly right.

JUDGE PAYNE: Okay. How about the defendants?

MR. TROY: Your Honor, Tony Troy. We believe that the plan is defensible. I was going to emphasize, but the discussion just verified that each and every district has to be looked at and analyzed, and the defendant intervenors are, I know, going to be presenting

evidence on each of those instances.

JUDGE PAYNE: All right. Mr. Braden.

MR. BRADEN: Your Honor, this case, from our point of view, is very much simply a replay of *Wilkins v. West* from ten years ago. The same attacks were made on the Virginia redistricting plan following the last census.

This plan is, in many ways, like that plan except the plan that was adopted following the last census is a plan that is -- the House delegate is more compact. It doesn't have the contiguousness issues that were present in the other plan, and it had much broader political support.

The *Shaw* claim that's being made by the plaintiffs in this case requires that they show that race predominates over all other traditional race-neutral principles for redistricting, that the plan itself is unexplainable other than based upon race.

We're going to show the Court the various districts that had been rejected in prior *Shaw*-style litigation, and you'll see that they all involve plans which have districts that, frankly, don't look like districts. They don't bear any resemblance to any notion of geography.

Our intention is to go through district by district and explain why the districts look the way they

are. They are more compact, and, in fact, they are compact as defined under the Virginia constitution. The Virginia constitution, unlike most states, has a very specific provision about districts being compact and contiguous.

The plan adopted by the legislature here clearly meets those requirements as articulated in *Wilkins v. West*. It's a more compact plan, and the contiguous issues that were raised in that litigation, frankly, were solved in this plan.

So this is a plan under Virginia law that is compact. That's the basic principle we're talking about here, that in all the *Shaw* cases is the beginning of the process of an indication of this plan is not explainable under traditional redistricting criteria.

So it's our intention simply to go district by district and explain why the lines are drawn the way they are. The long and short of it is, yeah, is race considered? Absolutely race is considered, but race does not get you to strict scrutiny unless you have ignored the other traditional redistricting criteria and race is predominant.

If race alone, if the consideration of race alone resulted in strict scrutiny, then every single legislative plan in the United States, with the exception of Vermont

and Maine, would be subject to strict scrutiny.

If you look at *Cromartie*, you look at the whole line of *Shaw* cases which control here, the first step is the plaintiffs have to show that race predominated over all other, all other criteria. It cannot prove that. We will walk through -- and that's the reason why we have the architect of the plan.

The process of drawing a legislative plan is complex, complex both legally and politically. So, you know, it's going to be -- we're talking about Delegate Jones being on the stand for a lengthy period of time so you can walk through the process of the line-drawing process, why the districts look the way they do.

I hear that they're going to call Delegate Armstrong, the minority leader, and one of the reasons why the plan was drawn the way it was is now Delegate Jones is no longer a member of the legislature. He lost his seat because of the way the lines were drawn. He was a minority leader.

So what we're talking about here is a process of walking through for the Court why this plan is faithful to a series of criteria which were adopted by the legislature, very specific criteria adopted by the legislature and very traditional. So we just simply are going to walk through the process and explain to the Court

the plans that are being attacked here look nothing like the plans which had been rejected by the Supreme Court in prior litigation. We don't look anything like those.

This is a plan where race was most certainly considered, but that doesn't get you strict scrutiny. So if you've got the strict scrutiny, we certainly believe we could survive that, too, because it must be a compelling state interest to comply with one-person-one-vote but also to comply with the Voting Rights Act, and in this case, we're not simply talking about compliance for purposes of preclearance under Section 5, but we're also talking about compliance under Section 2.

*Thornburg v. Gingles* requires the creation of districts where you have racial block voting present which the history of Virginia certainly is an indication of that. We have a substantial legislative record where we've gone around the state and gotten testimony. There's plenty of history of Section 2 litigation in the state of Virginia where they found racial block voting.

So there's -- the *Thornburg v. Gingles* series of cases most certainly means that we have to look at discrete minority communities. If we can draw a reasonable district around them that's reasonably compact and we have racial block voting and polarized voting, we have to create those under Section 2.

So we're not only talking here about a compelling interest under section -- to get the plan pre-cleared. We're also talking about the needs of Section 2 to get the plan so we're not in a piece of litigation where the same plaintiffs lawyers we have right now are suing us because we didn't create these districts.

JUDGE PAYNE: Are you going to offer evidence that all that was taken into account in constructing the plan?

MR. BRADEN: Absolutely. No question about that whatsoever. We had a series of hearings around the state. The 55 percent number doesn't come from thin air. It comes from testimony before the House of Delegates. That's to find numbers needed to be able to create functioning minority districts.

You know, this litigation -- we should all be very candid. This litigation is not about representation of the minority community. The problem the plaintiffs have with the plan is the fact that after the plan was drawn, it had the political effect that people intended it to have. The vast majority of the incumbents got reelected except for a few democratic white members lost.

That's the predominant underlying purpose of the plan. We shouldn't pretend anything else. This Court should be well-aware of that. That's what's going on

here. This plan was drawn for political purposes. The effect of the plan in the actual following election was just what was predicted was going to happen.

So the notion that race predominated simply flies in the face of reality, both the way the plan looks, the way the plan was constructed, the evidence underlying it, and the effect of the plan. The effect of the plan was some white democratic members of the legislature lost. Has nothing to do with race. It had a lot do with politics.

JUDGE PAYNE: Are you saying that you're going to offer evidence that the predominate purpose was to knock out some democrats? Is that what you are saying?

MR. BRADEN: Absolutely. That was one of the predominate -- the magic word here, a predominate purpose, the predominate purpose of the plan was to maintain the status quo. That is, in fact -- the recognized purpose of the plan was to maintain the status quo. Because of population changes, certain districts had to be moved around the state.

When you move districts around, there is losers. Republicans were in charge. The losers were white democratic members, absolutely. No one should -- we don't need any political scientist from Harvard to tell us the reality of what happened here. The notion that somehow or

another there's some standard use of racial polarized voting, I see no history -- the State of Virginia has submitted a number of plans to the Department of Justice for preclearance. I can find no record of the State of Virginia hiring a political science professor to do a racial block voting before doing this submission.

The record, I believe even in the *Page* case, the *Page* Court recognized that a racial block voting analysis by political scientists was not necessarily better than the elected members from those districts.

The 55 percent number comes from members elected from those districts and people who live in those districts as to what was necessary for the minority community to elect their candidate of choice. It's not a number picked from thin air.

JUDGE PAYNE: All right. Now, Judge Lee, Judge Keenan, do either one of you have any questions at this point?

JUDGE LEE: I'm ready to hear the evidence in support of oral argument. I think we've already heard some closing arguments now. Thank you.

JUDGE PAYNE: We have, haven't we? I have this question: What is the significance in the law of saying that the political result, the objective was to knock democrats out of seats? Does that present a

quintessential political gerrymander case that we're dealing with here? If so, what does that do to the legal construct of the case if we accept that view? I'm sure --

MR. HAMILTON: Your Honor, this is Mr. Hamilton for the plaintiff. It's no different than the argument that was advanced in the *Page* case and that's always advanced in the *Shaw* line of cases that it's politics, not race, and that's exactly why courts look to the evidence, and what the Court, the Supreme Court has held in these cases is if you're going to use race, and your explanation for using race is that you need to do it in order to prevent retrogression under the Voting Rights Act, then you have to have a strong basis in evidence for that belief, and the strong basis of evidence typically is a racial block voting analysis, and the absence of doing that makes it awfully difficult for the State to say that we had to do this in order to prevent retrogression in a minority -- to allow -- to prevent retrogression from a minority community's ability or opportunity to elect candidates of their choice.

This isn't something that's been made up. It's in the Department of Justice regulations that were in evidence last year before this Court and will be in evidence again this year in this case.

JUDGE PAYNE: But, Mr. Hamilton, no Court has

ever held that a block voting analysis case is the only way to prove what they're proving; is that right?

MR. HAMILTON: Fair enough, but it's certainly not the case that it's the opposite. It's not the case that a court has ever said, oh, well, we've had some black delegates say I need a higher number of -- again using race -- black voters in my district in order to get reelected. The constitutional analysis is no different than if you flip that around and you have white delegates saying --

JUDGE PAYNE: I understand. I just was asking the question if there's a case that I'm unaware of about that, but the question -- I don't recall in *Page* that there was any evidence or that it was the same as what Mr. Braden just said.

In *Page*, it was a combination of the political desire plus the traditional voting -- traditional redistricting criteria that the defendants rode as their defense.

Here, we seem to be talking about achievement of a particular political result as the predominate purpose, and to my knowledge, the Supreme Court has never upheld political gerrymandering absent some purpose such as to maintain a balance, fair balance or to achieve fairness.

That's why I was asking Mr. Braden the question,

whether or not that's what he was doing. So neither one of you see this construct -- this is raising a different issue than is raised in *Page* which is fundamentally what was the predominate purpose, and that's as far as you are going, Mr. Hamilton, and that's as far as you are going; is that correct, Mr. Braden and Mr. Hamilton?

MR. BRADEN: It's our belief that you do not get to strict scrutiny until the plaintiffs prove that the predominant purpose was race.

JUDGE PAYNE: Okay.

MR. BRADEN: Until such time, the Court does not need to consider the issue of strict scrutiny. It's the wrong construct at that stage.

JUDGE PAYNE: All right, Mr. Hamilton, you're of the same view, that you are trying this in the same mold as *Page*, and your theory is race was the predominant purpose, and there's no part of your complaint that's any different than that; is that right?

MR. HAMILTON: That's correct, Your Honor, and it's very clear from the application of the uniform 55 percent --

JUDGE PAYNE: You don't need to make the argument again. I think, as Judge Lee said, we heard it. How about these motions *in limine*, have you gotten any notion yet as to whether you're going to have motions *in limine*,

need for a carryover day, it will be the 13th. Counsel, do you have anything? Nobody.

MR. HAMILTON: No, Your Honor.

JUDGE PAYNE: Thank you very much. We look forward to working with you.

JUDGE KEENAN: Thank you, Judge Payne.

JUDGE LEE: Thank you all, counsel.

(End of proceedings.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/
P. E. Peterson, RPR

Date