Exhibit G

Exhibit G

04/24/2011   20:31   (b)(7)(C)                    DVW                                          PAGE   01/02

MINEVT

CIVI      WGICH

2011 APR 25  PM 0:39
SECTION 5 SUBMISSION

April 24, 2011                                                   NO. 2011-1805

To Mr. Chris Herren
Director, Voter Section
U.S. Department of Justice
1800 G Street, NW
Room 7264
Washington, DC 20006

Pursuant to a conversation with your office on Wednesday, April 20, 2011, I am
faxing this letter to you to be followed with a hard copy via U.S. mail.

Thanks you for your attention to the matters mentioned.

(b)(7)(C)      Designee
League of Women Voters, Williamsburg Area

Pages including this cover letter - 2

VSBE 000042

DEFENDANT-INTERVENORS TX 023 - Page 001

**League of Women Voters of the Williamsburg Area**
P.O. Box 1086    Williamsburg, VA 23187-1086    www.lwvwilliamsburg.org

April 23, 2011

Mr. Chris Herren, Director, Voter Section
U.S. Department of Justice
1800 G Street, NW
Room 7254
Washington, DC 20006

Dear Mr. Herren,

The League of Women Voters of the Williamsburg Area has reviewed the proposed redistricting maps presented to Governor Robert McDonnell. As a nonpartisan group, there are several things with the proposed plan that concern us.

First, Article II, Section 6 of the Virginia Constitution, titled Apportionment, provides for districts that are contiguous, compact, and with communities of interest. The proposed plan fails to meet these criteria.

Second, as long as the Virginia Constitution's redistricting criteria are ignored, the costs of delivery constituent services and the frustrations resulting from gerrymandering will remain high.

Finally, the General Assembly and the Governor have ignored the redistricting plans put forward by the Governor's Bi-partisan Commission and the nonpartisan plans drafted by various university and college student groups across the Commonwealth. The map and plan submitted by the student team from the College of William and Mary, for instance, received top ratings among all the plans submitted. [1]

These bi-partisan and nonpartisan plans deserve serious consideration by the General Assembly, the Governor, and the US Department of Justice prior to final approval of any of the plans and maps for redistricting to move forward.

We ask The U.S. Department of Justice to strongly urge the General Assembly and the Governor to comply with the highest criteria of the Voting Act so that all in the Commonwealth of Virginia are well served. The voter public should be able to be assured that the General Assembly of Virginia and the Governor will meet a higher expectation for this redistricting process and to be pleasantly surprised with a decision that places the Constitutional criteria ahead of personal and political expediency.

Thank you in advance for your time and careful scrutiny of all the plans available prior to the final judgment by the U.S. Department of Justice.

Yours Truly,

(b)(7)(C)
Designee, LWV/WA

cc: The Honorable Robert McDonnell
    The Honorable Thomas K. Norment, Jr.
    The Honorable William K. Barlow
    The Honorable Robin A. Abbott
    The Honorable Brenda L. Pogge

[1] http://docs.google.com/viewer?a=v&pid=sites&srcid=dmFyZWRpc3RyaWNWN0aW5nY29tcGV0GV0aXRpb24ub3Jnfml1Ymx3YXxneDo3Y3JhcHpvb0Yzq1NjNjNzl1OWYxOTk3M3&pli=1

TO PROMOTE ACTIVE AND INFORMED PARTICIPATION OF CITIZENS IN GOVERNMENT

VSBE 000043

DEFENDANT-INTERVENORS TX 023 - Page 002

## Fletcher, Michael (CRT)

| | |
|---|---|
| **From:** | Voting Section (CRT) |
| **Sent:** | Thursday, May 19, 2011 3:59 PM |
| **To:** | vot1973c (CRT) |
| **Subject:** | FW: Slice and Dice Prince William County, Virginia |

**From:** (b)(7)(C)
**Sent:** Tuesday, April 12, 2011 10:21 AM
**To:** district39@senate.virginia.gov
**Cc:** Voting Section (CRT); cstewart@pwcgov.org
**Subject:** Slice and Dice Prince William County, Virginia

Senator George L. Barker,

It is truly incredible that you could redistricted the Virginia State Senate Districts so that Prince William County (PWC) can't get a fair representation of our county citizens' common interests in our state senate. Shame on you!

I never thought until now that there was a need for the Federal Justice Department review process. You've proved that there is a need to protect our county citizens' civil rights.

PWC's 2010 US Census was 402,002 and has grown to over 411,000 since April 2010. PWC is the second largest county, and second fastest growing, in the Commonwealth of Virginia and by proportion of Virginia's population should have at least two senators who only represent the county. Making many minority PWC population segments (think there are 5 or 6 such segments in total) in other senate districts disenfranchises us, the PWC citizens.

Please revise your senate redistricting plan to insure we Prince William County residents have representation of our common interests in the Virginia Senate.

(b)(7)(C)

Gainesville, VA 20155- (b)(7)(C)

(b)(7)(C)

1

VSBE 000044

**Not Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/19/2011        **Attorney/Analyst:** John Powers        **File No.:** 2011-1805

**Other Party:** Kent Stigall        **Race:**        **Tel. No.:** 804-786-3591

**Title/Organization:** Virginia Legislative Services

**Jurisdiction:** State of Virginia

**Subject:** RED(2)

2:30 PM

Mr. Stigall calls to follow up on requests for information that the Department of Justice made to the Virginia Attorney General's office. He is confused about what the term "ASCII comma delimited import file" means. I refer him to a GIS staff member for additional information on that issue.

He says that he is able to election results from 2002 and 2003, but those elections are using old precincts from the 2000 cycle. The results are not available for the voting precincts as presently constituted.

Finally, he is able to get 2010 Census data for total population and voting age population by voting precinct for all races. He does not know if he is going to be able to get the same information for 2000 Census data. He asks if this is going to be a problem, and I promise to get in touch with our statistician and get back to him.

4:00 PM

Mr. Stigall says that he is on the same page and now realizes what maps he needs to provide. The information was previously provided to the Virginia Attorney General's office, and they should have sent it over. He promises to provide the maps by the end of the day.

For the election returns, he says that he may be able to create a file indexing the 2003 voting precincts for Senate districts 2, 5, 9, 16, and 18 to the current voting precincts. It may take him a few extra days to get this information.

For the election returns, he will try to get 2000 Census information for total population and black population. He thinks he can get it, but it will take some additional time.

VSBE 000045

DEFENDANT-INTERVENORS TX 023 - Page 004

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/19/2011     **Attorney/Analyst:** AAO

**File No.:** 2011-1805

**Other Party:** [(b)(7)(C)]                                **Race:** b

**Tel. No.:** [(b)(7)(C)]

**Title/Organization:** [(b)(7)(C)]

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005) (2011)

I called [(b)(7)(C)]          but was not able to leave a message, as there was no voicemail.

VSBE 000046

DEFENDANT-INTERVENORS TX 023 - Page 005

**Not Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/19/2011        **Attorney/Analyst:** John Powers        **File No.:** 2011-1805

**Other Party:** (b)(7)(C)                    **Race:** (b)    **Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)


(b)(7)(C)        says that (b)( did not know that Virginia had submitted its statewide redistricting plan for Section 5 review. (b)(7) is going to make a FOIA request of the submission and will get back to us about local contacts.

VSBE 000047

DEFENDANT-INTERVENORS TX 023 - Page 006

**Not Confidential**

## Memorandum of Telephonic Communication

Date: 5/19/2011     **Attorney/Analyst**: John Powers     **File No.**: 2011-1805

Other Party: (b)(7)(C)     **Race:**     **Tel. No.**: (b)(7)(C)

Title/Organization: (b)(7)(C)

Jurisdiction: State of Virginia

Subject: Chapter 1 (H.B. 5005) (2011)


I informed (b)(7)(C) that Virginia had submitted its 2011 state senate and house redistricting plans. (b)(7) asked if the State had also filed for judicial preclearance in D.C. District Court, which I confirmed. (b)(7) said that (b)(7) would review the complaint and look into whether (b) had any contacts with whom we should speak.

VSBE 000048

DEFENDANT-INTERVENORS TX 023 - Page 007

**Confidential**

# Memorandum of Telephonic Communication

Date: 5/19/2011     **Attorney/Analyst:** AAO

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)     **Race: b**

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005) (2011)

I called (b)(7)(C) and left him a detailed message.

VSBE 000049

DEFENDANT-INTERVENORS TX 023 - Page 008

Confidential

## Memorandum of Telephonic Communication

**Date:** 5/19/2011-5/25/2011     **Attorney/Analyst:** AAO

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)     **Race:** b

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

(b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005) (2011)

5/19/2011
I called and left a detailed message.

UPDATED: 5/25/2011
(b)(7)(C) would like for our conversations with (b)(7) to remain confidential so that (b)(7)(C) can speak candidly.

We will speak in more detail with (b)(7)(C) on (b)(7)(C) (b)(7)(C) encouraged us to ask (b)(7)(C) about specific districts that present concerns.

(b)(7)(C) said, speaking generally, that the dynamics of the redistricting processes in the House and the Senate were completely different. (b)(7)(C) has concerns about the House plan, but not as many about the Senate plan.

(b)(7)(C) said that because the House has an overwhelming Republican majority, delegates are trying to ensure that that party stays in power. (b)(7)(C) said that historically, rural interests have had significant amounts of representation in the House, but now, large contingents of the population are moving from rural areas into urban areas. (b)(7)(C) said that this has been difficult for rural legislators to reconcile. (b)(7)(C) said that the House is trying to "maintain as much of the character and integrity of their delegation as possible." (b)(7)(C) said that these efforts were set in motion in the previous redistricting, where they packed black voters into districts. (b)(7)(C) thinks that they are continuing to do so in this plan. (b)(7)(C) (b)(7) said that Virginia is about 20% black, but the House Districts have been packed, so the character of the house does not reflect the actual voting population in the state. In statewide elections, Democrats often get elected, but the House is disproportionately Republican, which does not make sense to (b)(7)(C)

(b)(7)(C) commends Senator Saslaw for being "bold and risky" in the Senate redistricting effort. (b)(7)(C) thinks Senator Saslaw wanted to de-concentrate the number of black voters in the majority black districts to allow for more black influence districts. (b)(7)(C) thinks that the black districts will be very competitive, but that black voters will still be able to elect candidates of choice in those districts. (b)(7)(C) said that black senators supported the proposed plan. However, (b)(7)(C) said (b) thought the redistricting process was highly partisan, and (b) would be in favor of more non-partisan redistricting in the future.

In general, though, (b)(7)(C) said that black senators lack the "dynamism" to ascend to leadership positions. (b)(7) said that a lot of senior black members of committees in the Senate will never be allowed to lead those committees. (b)(7) thinks that redistricting has limited black legislators' opportunities, and limited the opportunities for Democrats to hold office.

(b)(7)(C) thinks that there have been population shifts in the state overall, which have led to a loss of Democratic votes. (b)(7) said that the changes in the economy have led certain Democratic-controlled areas to lose population.

(b)(7)(C) is disappointed that the state did not push to create more coalition or influence districts in Northern Virginia, where there have been tremendous increases in the Hispanic and Asian populations. (b)(7) thinks that this should raise some concern.

(b)(7)(C) thinks that more controversy will come with the congressional plan.

UPDATED: 5/27/2011
(b)(7)(C) described general demographic changes in the state, which have created less of a black-white binary, and more of a racially and ethnically diverse state.

(b)(7)(C) thinks that the way redistricting is done is behind the times. (b)(7)(C) said that there is a history of packing in House districts, and that remains a concern in the proposed plan. The plan was mostly focused on protecting incumbents and partisan interests. (b)(7) thinks that the Voting Rights Act has been used by Republicans to maintain their own interests. (b)(7) thinks that race is used as a proxy for political party, and the house redistricting process is used to ensure that Republicans stay in power. (b)(7) thinks that this limits black participation in the political process, and prevents black Democrats from ascending to leadership positions in the legislature. However, (b)(7)(C) thinks that the plan does a decent job of protecting black voting interests.

(b)(7)(C) thinks that when Senate districts get below 55% BVAP, things become dicey for black candidates. (b)(7)(C) generated the 55% threshold from anecdotal evidence. There are numerous factors that make black voters in Virginia particularly sensitive to decreases in the BVAP. Felons are stripped of their voting rights in Virginia, and this negatively affects minority voting strength. And because state and federal elections are held in staggered years, there is always lower turnout for state elections, particularly among minority voters. (b)(7)(C) thinks there is a tradeoff

VSBE 000051

DEFENDANT-INTERVENORS TX 023 - Page 010

between having more minority districts and maintaining safe minority districts.

In 2007, (b)(7)(C) there was a special election in Henrico County and Charles City County, in which a white candidate (Delegate Morrissey) faced three black candidates, and prevailed. (b)(7)( thinks that this kind of situation could lead a black candidate to lose in the future.

(b)(7)(C) does not have concerns about racially discriminatory purpose. (b)(7) (C) does have concerns about excessive partisanship.

(b)(7)(C) thinks the opportunities for public input were adequate, if somewhat symbolic. It seemed like the legislators had already drawn the plans and made the decisions before the hearings were even held. However, notice was adequate, and (b)(7)(C) cannot fault the state for not providing sufficient opportunities for public comment.

(b)(7)(C) will have additional comments in the future about the congressional plan, and would like to be kept on file as a contact when that file is received.

VSBE 000052

DEFENDANT-INTERVENORS TX 023 - Page 011

**Not Confidential**

## Memorandum of Telephonic Communication

**Date**: 5/19/2011-5/27/2011          **Attorney/Analyst**: JP2, AAO, EAM

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)          **Race**: (b)     **Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: State of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

(b)(7)(C)

(b)(7)(C) has been heavily involved in redistricting since 1991. (b)(7)(C) (b)(7)(C) has not worked extensively on the state house and senate plans this cycle. At this time, (b)(7) does not have an overall view on the house and senate plans. (b)(7) will take some time to review them and will then provide any comments (b) has to Department staff.

UPDATED: 5/26/2011
We called and left a message.

UPDATED: 5/27/2011
We called and left a message.

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/19/2011-6/16/2011      **Attorney/Analyst:** JP2, AAO

**File No.:** 2011-1805

**Other Party:** [(b)(7)(C)]      **Race:** (b)      **Tel. No.:** [(b)(7)(C)]

**Title/Organization:** [(b)(7)(C)]

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

[(b)(7)(C)] says that [(b)] has been involved in redistricting in the past and is concerned about the impact it will have on the minority vote in Virginia. [(b)(7)] has not had a chance to review the state house and senate redistricting plans yet, as [(b)(7)] has been travelling. [(b)] expresses interest in making a FOIA request for the state's submission, and is provided with the appropriate email address and file number. After [(b)] conducts [(b)(7)] review, [(b)(7)] will contact us if [(b)] has any concerns about the plans.

[(b)(7)] is particularly concerned about the method of electing city council members in the City of Norfolk, and says that [(b)] would like for the Department to contact [(b)(7)] regarding that matter.

UPDATED: 6/10/2011
[(b)(7)(C)] called to check in on the status of [(b)(7)(C)]
[(b)(7)(C)] [(b)] may call back next week if [(b)(] has additional comments on the plan.

UPDATED: 6/16/2011
[(b)(7)(C)] said [(b)] was concerned about the congressional plan because [(b)(7)] does not understand how it can be reviewed under Section 5 when a final plan has not yet been adopted. I told [(b)(7)(C)] that we are reviewing the Virginia state house and senate plans right now, but not the congressional plan, as that has not been received.

[(b)(7)(C)] has not yet had a chance to go through the submission, but [(b)(] would like to file an objection. [(b)(7)] has concerns about redistricting in Virginia in general, and [(b)(7] was opposed to the 2001 plan. [(b)(7)] thinks that Virginia is always trying to disadvantage minority groups when it redistricts. [(b)(7)( is specifically concerned that the boundaries of districts do not follow natural boundary lines, and that the plan may dilute minority voting strength. [(b)(7)(C)] did not have any specific examples of how minority voting strength is being diluted.

[(b)(7)(C)] has major concerns about the at large method of election in the City of Norfolk. [(b)(7] believes this system is illegal, [(b)(7)(C)]

(b)(7)(C)

believes that the Norfolk method of election ought to be taken into consideration as a part of the statewide redistricting plan. (b)(7) believes that the City of Norfolk should have to justify its at large system before any statewide redistricting plan can be pre-cleared. Because the Norfolk area is part of the Bobby Scott district, (b)(7)(C) also thinks the City's method of election ought to be taken into account in reviewing the congressional plan. (b)(7)(C) also has concerns about the Virginia Beach area.

(b)(7)(C) believes there are several factors at work that disenfranchise minority voters, including higher rates of incarceration and conviction of felonies among minorities, and patterns of gentrification that break up minority communities. (b)(7)(C) is also concerned about racial segregation in the state.

(b)(7)(C) may have additional comments after (b)( has gone through the file. I told (b)(7)(C) should get in touch with me as soon as possible if (b)(7) has specific comments on the plan, and said that (b)(7) should feel free to submit a written comment.

VSBE 000055

## Fletcher, Michael (CRT)

| | |
|---|---|
| **From:** | (b)(7)(C) |
| **Sent:** | Monday, May 23, 2011 10:20 AM |
| **To:** | Voting Section (CRT); vot1973c (CRT) |
| **Subject:** | Virginia Redistricting Matter - 39th State Senate District 2011-1805 |
| **Attachments:** | 100 Voting 5-19-2011.pdf |

I would be grateful for the Voting Section's review of the attached.

(b)(7)(C)

1

VSBE 000056

DEFENDANT-INTERVENORS TX 023 - Page 015



May 19, 2011

voting.section@usdoj.gov
vot1973c@usdoj.com
Fax: 202 616 9514

T. Christian Herren, Jr., Esq.
Chief, Voting Section
U.S. Department of Justice
Civil Rights Division
Attn: Room 7254 - NWB
1800 G Street NW
Washington DC 20006

Dear Mr. Herren:

I write purely in my individual capacity[1] as a citizen and resident of and registered voter in the City of Alexandria, Virginia. The City of Alexandria is an incorporated independent city and political subdivision of Virginia, with a resident population of approximately 139,966 persons (2010 census), and is internally divided into 26 electoral precincts, each with a resident population of roughly 5,400 persons.

As a result of action undertaken in the last several weeks by the Governor and General Assembly of Virginia following the release of decennial Census results, one portion of the City of Alexandria is to be placed within Virginia's 39th State Senate district. This means that the City of Alexandria is now to be divided among three Virginia Senate districts, and thus represented in the Senate of Virginia by three different members of Virginia's 40-member Senate. The City of Alexandria is to be represented in Virginia's lower house, the House of Delegates, by two of Virginia's 100 Delegates.

As a result of these actions, it appears that:

- 7.5% of Virginia's Senators will represent portions of the City of Alexandria, whose resident population is approximately 1.7% of that of Virginia;
- 2% of Virginia's Delegates will represent portions of the City of Alexandria, whose resident population is approximately 1.7% of that of Virginia;
- One Virginia Senate district, the 39th Senate district, will lie within and/or immediately contiguous with and adjacent to the City of Alexandria, County of Fairfax, City of Fairfax, County of Prince William, and City of Manassas, as well as the Federal Fort Belvoir reservation;

(b)(7)(C)

1

DEFENDANT-INTERVENORS TX 023 - Page 016

- The 39th Senate district will include part or all of 38 local electoral precincts in the Counties of Fairfax and Prince William, and six precincts in the City of Alexandria;
- The 39th district Virginia Senator's district includes portions of the City of Alexandria that are not otherwise within other political subdivisions with the remainder of the 39th Senate district;
- No portion of the City of Alexandria is contiguous with or adjacent to any part of the County of Prince William, but portions of both are within the 39th Senate district;
- The six City of Alexandria precincts within the 39th Senate district are all located within the extreme northeast portion of the 39th district. See,
  http://www.senatorbarker.com/wp-content/uploads/2011/05/new-39th.png , d/l May 4, 2011;
- The northeast portion of the 39th Senate district is located substantially distant and remote from the central geographic core of the 39th Senate district;
- The portion of the City of Alexandria that will be within the 39th Senate district is surrounded within the City by precincts largely but not exclusively within the 35th Senate district;
- The City of Alexandria School Board district C will be divided between Virginia Senate district 39 and Virginia Senate district 35;
- Six of the City of Alexandria's 26 precincts will be within the 39th Senate district;
- Those six City of Alexandria precincts are adjacent to and partially surround a seventh City of Alexandria precinct that is within the 30th Senate district;
- Those six City of Alexandria precincts are adjacent to and partially surround four other City of Alexandria precinct that are within the 35th Senate district;
- A residents of a local precinct in the western portion of the City of Alexandria may be an elector in the 46th State Delegate district, and simultaneously any one of the 30th, 35th, or 39th State Senate districts;
- The portion of the right-of-way of U.S. Interstate highway I-395 that is within in the City of Alexandria (a key local geographic feature) is located entirely within the 46th State Delegate district, and simultaneously in part in each of the 30th, 35th, and 39th State Senate districts;
- The portion of the 39th Senate district that is within the City of Alexandria is within the 8th Congressional District of Virginia, while the bulk of the 39th Senate district is not.

I recently contacted my newly-designated state Senator, who will now represent almost one-quarter of the residents of Alexandria, with constituent inquiries. His failure to in any way acknowledge my constituent inquiry is, I believe, indicative that the portion of the City of Alexandria in which I live is effectively unrepresented in Virginia's Senate, since the 39th State Senate district's portion of the City of Alexandria is so small, so remote, and so unrelated to the rest of the 39th State Senate district. In effect, as a result of re-districting, my vote does not count.

I would be grateful for your review of the foregoing.

Very truly yours,

/S/

(b)(7)(C)

2

DEFENDANT-INTERVENORS TX 023 - Page 017

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/23/2011      **Attorney/Analyst:** AAO, EEK, JP2, EAM, JS2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)      **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

(b)(7)(C)

(b)(7)(C) was principally interested in protecting the 12
minority districts in the House of Delegates and the 5 minority districts in
the Senate.  The proposed plan does protect the minority districts.
However, there are concerns regarding (1) the lack of a 13th minority house
district and (2) the drop in the BVAPs of the minority senate districts.

With respect to the House of Delegates, there was talk of the possibility of
drawing a 13th minority district. (b)(7) is aware of a plan created by the
Governor's Commission that included a 13th minority district.  However, (b)(7)
has not seen the plan. (b)(7)(C) encouraged the creation of a 13th minority
district, but to little effect. (b)(7)(C) said, "If the numbers are justified, a
13th district should be drawn."

There are majority-minority districts that historically have not elected
minority candidates.  In fact, there are some districts in which a minority
has never run or won.  This typically happens because several minority
candidates split the minority vote. (b)(7) knows Delegate Morrissey (w) who
represents a minority house district - District 74.  Delegate Morrissey is
popular in the minority community and receives a significant level of
crossover voting.

With respect to the Senate, (b) is concerned about the drop in the BVAP of
the majority-minority districts.  A BVAP hovering around 50% - 51% is
dangerous and problematic.  It is a "set-up for failure," and (b)(7)(C)
(b)(7)(C)

(b)(7)(C) does not believe that packing minority voters into a few districts is an
issue in the present redistricting process.  Rather, the redistricting
process was all about "incumbent protection."  While (b) does not know for
certain, (b)(7)(C) says that minority senators may have chosen to support their
political party and sacrifice some minority population at the margins in
their own districts.  In the process of compromise, the Senate BVAPs went

VSBE 000059

**DEFENDANT-INTERVENORS TX 023 - Page 018**

from a comfortable position to an uncomfortable position. Generally
speaking, (b)(7) does not believe that the plans were adopted with a
discriminatory purpose.

The state did not improve in soliciting citizen participation and acting on
input from the public during the redistricting process. If anything, there
may have been a drop in participation. However, the lack of public
involvement was not a result of something the Governor or General Assembly
failed to do. Rather, this was more a result of the state of the economy -
people are busy looking for jobs and are more interested in saving gas money
than driving to a public hearing on redistricting. Absent a massive media
campaign, it is difficult to get people involved in the process.

(b)(7)(C)

VSBE 000060

DEFENDANT-INTERVENORS TX 023 - Page 019

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/23/2011     **Attorney/Analyst:** AAO, EEK, JP2, EAM, JS2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)     **Race:** (w)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** 2011 state house and senate redistricting plan

(b)(7)(C) said that (b)(7)(C) was deeply involved in the state redistricting process in 1991. In 2001, (b)(7)( were involved in some aspects of the redistricting process, but to a lesser extent. They have not been as involved in the 2011 process. (b)(7)(C) said that this was because there was not very much controversy surrounding the plan. (b)(7)(C) tends to defer to the black community's opinion on redistricting plans, and black legislators appeared to support the proposed plan. (b)(7)(C) said that there will likely be controversy surrounding the congressional plan. (b)(7)(C) (b)(7) has placed more of (b)(7) focus on that plan and on local redistricting plans.

(b)(7)(C) said that (b)(7)(C) is in the process of analyzing the proposed plan, so (b) cannot provide us with (b)(7)(C) official position on the plan (b)(7)(C) in general, given the general population shifts in the state, the plan is not so bad, though it is not particularly creative. There are some issues with the plan, including the partisan nature of the process by which it was drawn, but these do not raise Section 5-related concerns. In general, there has been a conflict between protecting minority interests and protecting partisan interests. (b)(7) thinks that no one is completely satisfied with the plan, but the plan is less controversial than others in the past. There were no alternative plans that were preferred by (b)(7)(C)

(b)(7)(C) said that (b)(7) is pleased that a multi-minority majority district has been drawn in Prince William County.

(b)(7)(C) does not think that packing of House districts has been an issue in this cycle. To (b)(7) the BVAPs in the House districts seem about right. In 1991, (b)(7)(C) ideal for a fair "ability to elect" district was one in which the bvap was 61-62%. That has been the framework through which (b)(7)(C) has viewed "ability to elect" districts, so (b)(7) personal tendency has been to try to keep the BVAPs in those districts relatively high. (b)(7) said that the desire to keep the BVAPs in majority black districts high has lost

VSBE 000061

traction among the black community over the years.  Black legislators are now more focused on making more black districts than on keeping the BVAPs in existing black districts high.

(b)(7)(C) thinks that the drops in the BVAPs in the Senate districts do present a concern.  However, (b) does not know that the state had any better alternatives. (b)(7)(C) thinks that it will be important for us to look closely at these drops and why black legislators continued to support the plan.

(b)(7)(C) thinks that black legislators may have supported the plan because they were putting their partisan, Democratic interests ahead of their racial concerns. (b)( said that race and partisanship became intertwined throughout the process, so it was hard to parse out which was which.  For this reason, (b)(7)(C) felt "muted," since all conversations seemed to be about political party, rather than about race.

(b)(7)(C) does not know of any particularly vulnerable black legislators, but said that (b) does not know enough about the black legislators in the state to speak definitively about it.

(b)(7)(C) said that the two white delegates representing majority black districts (Morrissey, 74th District and Carr, 69th District) enjoy substantial support from minority voters.  Mr. Morrissey is particularly popular among minority voters, as he is very outspoken and "votes the right way." (b)(7)(C) said that (b)( has been surprised by the lack of competition from minority candidates in these Districts, but (b)(7 suspects that a good minority candidate would be able to challenge either of these delegates.

(b)(7)(C) said that public involvement in the redistricting process has improved in some ways since the last redistricting cycle.  This is not because of any action on the part of the state, but rather because of technological advances that have allowed more individuals to draw their own plans.  Accordingly, more actors have been able to get involved in the process.

In terms of the legislative process, however, things have actually gotten worse.  In 1991, (b)(7)(C) said, the legislative process was more open, and there were more public hearings and opportunities for individuals to comment on plans.  The legislative process was not terrible this cycle, but it was not as open as it should have been.

(b)(7)(C) gave us the contact information for (b)(7)(C)
(b)(7)(C) . (b)(7)(C) has been very involved in both local and state redistricting efforts, and may be able to provide us with some additional feedback on the proposed plan. (b)(7)(C) is also going to give us contact information for (b)(7)(C) of the (b)(7)(C) with whom (b)(7)(C) says (b) has a good working relationship.

We asked (b)(7)(C) to contact us if (b) came across additional information. We also provided (b)(7) with instructions on how to submit a written comment, should (b)(7)( like to do so.

VSBE 000062

**Confidential**

# Memorandum of Telephonic Communication

**Date:** 5/24/2011    **Attorney/Analyst:** EEK

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)    **Race:** (w)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

Called and left message requesting a phone conference.

VSBE 000063

DEFENDANT-INTERVENORS TX 023 - Page 022

**Confidential**

## Memorandum of Telephonic Communication

**Date**: 5/24/2011     **Attorney/Analyst**: EEK

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)     **Race**: (w)

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: State of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

Called and left message requesting a phone conference.

VSBE 000064

DEFENDANT-INTERVENORS TX 023 - Page 023

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/24/2011       **Attorney/Analyst:** EEK

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)           **Race:** (W)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

Called and left message requesting a phone conference.

VSBE 000065

DEFENDANT-INTERVENORS TX 023 - Page 024

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/24/2011      **Attorney/Analyst:** EEK

**File No.:** 2011-1805

**Other Party:** [(b)(7)(C)]      **Race:** (b)

**Tel. No.:** [(b)(7)(C)]

**Title/Organization:** [(b)(7)(C)]

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

5/24  Called and left message requesting a phone conference.

5/31  Called and left message requesting a phone conference.

6/2   Called and left message requesting a phone conference.

VSBE 000066

DEFENDANT-INTERVENORS TX 023 - Page 025

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/24/2011    **Attorney/Analyst:** EEK

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)    **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

Called and left message requesting a phone conference.

VSBE 000067

DEFENDANT-INTERVENORS TX 023 - Page 026

Confidential

## Memorandum of Telephonic Communication

**Date:** 5/24/2011      **Attorney/Analyst:** EEK

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)      **Race:** (A)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

Called and left message requesting a phone conference.

VSBE 000068

DEFENDANT-INTERVENORS TX 023 - Page 027

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/24/2011     **Attorney/Analyst:** EEK

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)     **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

Called and left message requesting a phone conference.

VSBE 000069

DEFENDANT-INTERVENORS TX 023 - Page 028

**Confidential**

# Memorandum of Telephonic Communication

**Date:** 5/24/2011                    **Attorney/Analyst:** AAO

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)          **Race:**

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005) (2011)

I left (b)(7)(C)      a message.

VSBE 000070

DEFENDANT-INTERVENORS TX 023 - Page 029

Confidential

## Memorandum of Telephonic Communication

Date: 5/24/2011-5/27/2011      Attorney/Analyst: JP2, AAO, EAM

File No.: 2011-1805

Other Party: (b)(7)(C)      Race: w

Tel. No.: (b)(7)(C)

Title/Organization: (b)(7)(C)
(b)(7)(C)

Jurisdiction: Commonwealth of Virginia

Subject: Chapter 1 (HB 5005) (2011)

I left (b)(7)(C) a message.

UPDATED: 5/26/2011
We are scheduled to speak with (b)(7)(C) on Friday at 10:30 AM.

UPDATED: 5/27/2011
(b)(7)(C) did not approve of HB 5001 (the plan vetoed by the governor). (b)(7) said that this plan was drawn to maintain party advantage and protect incumbents. It did not consider communities of interest or compactness.

(b)(7)(C) found HB 5005 to be slightly more acceptable, but said the plan was based on partisan criteria rather than on compliance with the law and maintaining communities of interest.

(b)(7)(C)

(b)(7)(C) said that the commission was asked to provide a recommendation and model maps based on the following criteria: maintaining compact and contiguous districts; complying with the Voting Rights Act; maintaining communities of interest; and complying with the one person-one vote principle of the Constitution. Committee members went to public hearings around the state, and tried to comply with the concerns expressed by members of the public.

The commission determined that 6 black senate districts could be drawn, but this would have created two problems: it would have made the districts less compact, and would have lowered the BVAP below what had been the lowest BVAP pre-cleared in 2001 (53.2%, the "Bobby Scott

number"). The commission therefore did not recommend the drawing of a 6th black senate district.

In general, the commission used 53.2% as the threshold BVAP needed to maintain viability and gain pre-clearance. Some members of the black caucus said that they did not need BVAPS that high, and that they did not even need 50% BVAP in certain districts. The commission did not have the resources to do an election analysis; they simply based their threshold number on what had been pre-cleared in the 2001 cycle. When asked about the 55% threshold BVAP number presented by other individuals, (b)(7)(C) said that that number was not high enough to represent the packing of districts, but it was not necessary to maintain viability.

(b)(7)(C) thinks that the senate districts in HB 5005 are likely viable. (b)(7) thinks this has more to do with the fact that black candidates tend to be Democrats than anything else. In Democratic areas, black candidates will win the general election at anything above 40% BVAP. (b)(7)( thinks that a black candidate could only conceivably face trouble in a democratic primary. It could present an issue if there were multiple black candidates facing a white candidate in the Democratic primary, and the black vote was split (as occurred when Morrissey was elected to the House). However, in that case, Morrissey was very appealing to the black community, and he campaigned fiercely, so he was the candidate of choice.

(b)(7)(C) does not think that non-incumbent minority candidates would have any more trouble than incumbent minority candidates at getting elected. That might be an issue in the congressional plan, but not in this plan.

(b)(7)(C) indicated that Senator Marsh (D16) may face a challenge from Morrissey. (b)(7)(C) Morrissey is a strong campaigner, and could pose a threat. This is the only district that (b)(7)(C) thinks is potentially vulnerable.

With regards to the house plan, (b)(7)(C) said that there was a debate on the Commission over the drawing of a 13th black district. The Democrats on the Commission generally supported drawing this district, while the Republicans opposed it.

Those opposed the drawing of the 13th district said that it made the districts less compact, and made the BVAPS too low. The Republican legal counsel opposed it because he opposed race based gerrymandering. The Democratic legal counsel opposed it because he said there was no requirement under the law to maximize minority voting strength.

Those in favor said that the state needed another black district in order to be proportional. In the plan with the 13th district, none of the BVAPS went below 53.2%, the Commission's threshold number.

The Commission presented this debate in the report that it sent to the legislature. The Commission did not conduct any formal inquiry into whether districts were viable under the 13 district plan, because they did not have the resources to do so. Delegate Chris Jones said that the 13th district was considered, but rejected because it would have made the BVAPS too low.

(b)(7)(C)                knows that in the past, they were only able to get to 5 black senate districts and 12 black house districts against the will of the black caucus, which pushed against creating new black districts in favor of maintaining higher BVAPS in the existing districts. However, they haven't lost any black seats, even with the increased number of black districts and the lowered BVAPS.

(b)(7)(C)                was very surprised that the House did not more seriously consider the committee plan. (b)(7)( thinks that the proposed House plan was drawn based on partisanship, because it provides for more Republican districts than a neutral, bipartisan plan would have. (b)(7) thinks that House Republicans threatened non-minority Democrats by telling them that they could be drawn out of their districts if they did not support the plan. (b)(7)(C)                thinks that minority delegates supported the plan because they were pleased with the changes in their own individual districts, but did not think that they had the leverage to change the process as a whole.

(b)(7)(C)                does not think there were issues with racially discriminatory purpose. There was, however, complacency in not grappling with the possibility of drawing a 13th district.

DEFENDANT-INTERVENORS TX 023 - Page 032

**Confidential**

## Memorandum of Telephonic Communication

**Date**: 5/24/2011-5/27/2011     **Attorney/Analyst**: AAO, EAM

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)     **Race**: w

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)
(b)(7)(C)

**Jurisdiction**: Commonwealth of Virginia

**Subject**: Chapter 1 (HB 5005) (2011)

I left (b)(7)(C) a detailed message.

UPDATED: 5/24/2011
(b)(7)(C) left me a message.

UPDATED: 5/24/2011
I left (b)(7)(C) a second message, and proposed various times for a brief interview.

UPDATED: 5/26/2011
We are scheduled to speak with (b)(7)(C) at 1:30 PM on Friday.

UPDATED: 5/27/2011
(b)(7)(C) did not think the general assembly plans were as good as the commission's plans or the plans generated by college students. (b)(7) thinks that the assembly plans unnecessarily divided communities of interest. Others with whom (b) has spoken share (b)(7) disappointment that the commission plans were not more seriously considered.

The governor established the bipartisan commission, but did not live up to the goals he set when creating the commission when he signed HB 5005 into law. The commission was more sensitive to the Voting Rights Act, and to requests from the public to consider drawing a 13th black house district.

(b)(7)(C) thinks that the commission plan was not presented because of the accelerated schedule on which the general assembly had to approve a plan. (b)(7)(C) that the legislators also think that they know their districts, and that they do not think they need a bipartisan commission to tell them what is best for their districts. (b)(7)( also thinks that legislators were focused on incumbency protection and partisanship over other criteria.

VSBE 000074

(b)(7)(C) does not have a definitive answer for whether or not the senate districts remain viable. (b)(7)( thinks that there is not always racial bloc voting, and candidates of choice are not necessarily black candidates. However, the commission attempted to keep all BVAPS within the 55% range, because that is a number that has been accepted in past redistricting cycles.

With respect to the house plan, (b)(7)(C) does not know if the possibility of drawing a 13th district was seriously considered by the assembly. (b)(7) knows that some people tried to draw a 40% Latino district in Manassas. Drawing this district or a 13th black district would have made the districts much less compact.

(b)(7)(C) has no concerns about racially discriminatory purpose.

(b)(7)(C) does not think that opportunities for public input were quite adequate. Because of the rushed schedule, some of the public hearings were held on the same day that the legislature was voting on the plan. The Commission held some of its own hearings, but they were not that well attended.

(b)(7)(C) recommends that we speak with (b)(7)(C) , who has done a lot of election analysis, and (b)(7)(C) also recommends that we speak with (b)(7)(C) (b)(7)(C) , and (b)(7)(C) (b)(7)(C)

VSBE 000075

DEFENDANT-INTERVENORS TX 023 - Page 034

**Not Confidential**

## Memorandum of Telephonic Communication

**Date**: 5/25/2011      **Attorney/Analyst**: JP2, AAO, EAM

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)          **Race**: w

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: Commonwealth of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

(b)(7)(C) supported the proposed plan. (b)(7)(C) thought the plan was the best of the alternatives presented.

(b)(7)(C) one of the alternative plans (the William and Mary plan). This plan was produced in a college competition sponsored by the Judy Ford Watson School of Public Policy at Christopher Newport University. Ms. Watson, (b)(7)(C)
(b)(7)(C)

(b)(7)(C) thought the students deserved to have their plan presented. (b)(7)(C)
(b)(7)(C) it was not placed on the docket to be discussed on the Senate floor. (b)(7)(C) that this was the decision of the Chairman of the committee, but (b) does not know the reasoning behind that decision.

(b)(7)(C) favored H.B. 5005 over S.B. 5002. S.B. 5002 would have (b)(7)(C) (b)(7)(C) and would have combined urban Newport News with rural Smithfield.

(b)(7)(C) does not think that HB 5005 will have any kind of negative effect on minority voters. (b)(7) thinks that the plan passes all tests, and that the majority black Senate districts will continue to be able to elect candidates of choice.

When asked about the threshold BVAP needed to elect candidates of choice, (b)(7)(C) did not know of a specific threshold needed, since (b) is fairly new to this process. (b)(7)(C)
(b)(7)(C) and had very little real role in the redistricting process.

(b)(7)(C) does not think there are any concerns with discriminatory purpose. (b) said that if there had been concerns about purpose, those

concerns would have been raised by (b)(7)(C) does not believe any purpose concerns have been raised.

(b)(7)(C) thinks that opportunities for public input were sufficient. There were numerous public hearings, and they all had good turnout. At the Hampton hearing, there were a few hundred citizens in attendance.

**Fletcher, Michael (CRT)**

| | |
|---|---|
| **From:** | (b)(7)(C) |
| **Sent:** | Thursday, May 26, 2011 2:11 PM |
| **To:** | vot1973c (CRT) |
| **Subject:** | Comment: Virginia House of Delegates, Submission Number 2011-1805 |
| **Attachments:** | VA_House_Commission_Option_District_76.jpg (b)(7)(C) House Final - 13 Minority Districts (Commission).zip; (b)(7)(C) DOJ Letter.pdf |

To the United States of America Department of Justice Civil Rights Division,

I wish to submit a comment on the Virginia House of Delegates plan submitted for preclearance under Section 5 of the Voting Rights Act. I believe that the submission number is 2011-180S.

(b)(7)(C)                                                                                    (b)(7)(C)

The commission was tasked with drawing districts that were equal in population, respected the Voting Rights Act, compact, respected existing political boundaries, and respected communities of interest. The commission adopted two Virginia House of Delegates plans (b)(7)(C) one with twelve African-American majority voting-age population districts, and a second that only deviated in that it contained a compact 13th African-American majority voting-age population district located primarily within the independent city of Suffolk. In the Commission's adopted "Second Option" House of Delegates plan, this district is labeled District 76 and has an African-American voting-age population percentage of 54.2%. I am attaching to this e-mail a block equivalency file for the plan with 13 African-American majority voting-age population districts. I am also attaching an image of this district.

The plan submitted to the Department of Justice has twelve African-American majority districts. The plan was introduced by Republican Delegate Chris Jones, who represents what may be the closest equivalent to the 76th district in the 13 African-American majority districts option adopted by the Governor's Commission, a district that is also labeled the 76th district.
The district configuration in the submitted House of Delegates plan may have the effect of diminishing the voting power of the African-American community in and around the independent city of Suffolk. The Suffolk African-American community is split into two African-American majority voting-age population districts, District 77 (59.4% VAP) and District 80 (57.0% VAP). District 76 in the submitted plan has an African-American voting age population of 25.5%. The 77th and 80th Districts cross the Suffolk political boundary in non-compact configurations to join portions of Suffolk with African-American communities in the Norfolk area. Where one compact African-American majority VAP district that respects existing political boundaries could be drawn to allow the Suffolk African-American community an opportunity to elect a candidate of their choice, three districts are drawn to "crack" that community, two of which may be considered "packed" minority districts.

Reconfiguring the 77th and 80th Districts in the Governor Commission's adopted Second Option House of Delegates plan does not diminish the ability of the minority community to elect a candidate of their choice. The African-American voting-age populations of the equivalent districts are 54.6% for the 77th District and 54.9% for the 80th district. These districts Governor Commission's adopted Second Option House of Delegates plan -- and others throughout the Norfolk/Hampton Roads area -- are also significantly more compact than the submitted plan and therefore would perhaps better represent all communities in the area.

I urge you to consider under the purposeful discrimination language added to Section 5 by the Republican-controlled federal government during the 2006 reauthorization of the Voting Rights Act to investigate if purposeful discrimination has occurred in this instance.

1

(b)(7)(C)

(b)(7)(C)  that the Virginia legislature used the single-race African-American category only when evaluating the voting-age populations of districts. The Office of Management and Budget's Bulletin entitled "Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Monitoring and Enforcement" indicates that the single-race category must be combined with instances where a racial group appears in two or more combinations with other races. The legislature's calculation choice has the effect of lowering the racial voting-age population percentages, and therefore intentionally or unintentionally provides the appearance that African-American communities are less concentrated that they are under the OMB guidelines. Any racial statistics provided by the Virginia legislature should therefore be verified.

Sincerely,

(b)(7)(C)

VSBE 000079

DEFENDANT-INTERVENORS TX 023 - Page 038

(b)(7)(C)

May, 26, 20111

(b)(7)(C)

To the United States of America Department of Justice Civil Rights Division,

I wish to submit a comment on the Virginia House of Delegates plan submitted for preclearance under Section 5 of the Voting Rights Act. I believe that the submission number is 2011-1805.

(b)(7)(C)                                                    (b)(7)(C)

The Commission was tasked with drawing districts that were equal in population, respected the Voting Rights Act, compact, respected existing political boundaries, and respected communities of interest. The commission adopted two Virginia House of Delegates plans (b)(7)(C) one with twelve African-American majority voting-age population districts, and a second that only deviated from the first in that it contained a compact 13th African-American majority voting-age population district located primarily within the independent city of Suffolk. In the Commission's adopted "Second Option" House of Delegates plan, this district is labeled District 76 and has an African-American voting-age population percentage of 54.2%. I am attaching to this e-mail a block equivalency file for the plan with 13 African-American majority voting-age population districts. I am also attaching an image of this district.

The plan submitted to the Department of Justice has twelve African-American majority districts. The plan was introduced by Republican Delegate Chris Jones, who represents what may be the closest equivalent to the 76th district in the 13 African-American majority districts option adopted by the Governor's Commission, a district that is also labeled the 76th district. The district configuration in the submitted House of Delegates plan may have the effect of diminishing the voting power of the African-American community in and around the independent city of Suffolk. The Suffolk African-American community is split into two African-American majority voting-age population districts, District 77 (59.4% VAP) and District 80 (57.0% VAP). District 76 in the submitted plan has an African-American voting age population of 25.5%. The 77th and 80th Districts cross the Suffolk political boundary in non-compact configurations to join portions of Suffolk with African-American communities in the Norfolk area. Where one compact African-American majority VAP district that respects existing political boundaries could be drawn to allow the Suffolk African-American community an opportunity to elect a candidate of their choice, three districts are drawn to "crack" that community, two of which may be considered "packed" minority districts.

VSBE 000080

DEFENDANT-INTERVENORS TX 023 - Page 039

Reconfiguring the 77th and 80th Districts in the Governor Commission's adopted Second Option House of Delegates plan does not diminish the ability of the minority community to elect a candidate of their choice. The African-American voting-age populations of the equivalent districts are 54.6% for the 77th District and 54.9% for the 80th district. These districts Governor Commission's adopted Second Option House of Delegates plan -- and others throughout the Norfolk/Hampton Roads area – are also significantly more compact than the submitted plan and therefore would perhaps better represent all communities in the area.

I urge you to consider under the purposeful discrimination language added to Section 5 by the Republican-controlled federal government during the 2006 reauthorization of the Voting Rights Act to investigate if purposeful discrimination has occurred in this instance.

(b)(7)(C) that the

Virginia legislature used the single-race African-American category only when evaluating the voting-age populations of districts. The Office of Management and Budget's Bulletin entitled "Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Monitoring and Enforcement" indicates that the single-race category must be combined with instances where a racial group appears in two or more combinations with other races. The legislature's calculation choice has the effect of lowering the racial voting-age population percentages, and therefore intentionally or unintentionally provides the appearance that African-American communities are less concentrated that they are under the OMB guidelines. Any racial statistics provided by the Virginia legislature should therefore be verified.

Sincerely

(b)(7)(C)

VSBE 000081



DEFENDANT-INTERVENORS TX 023 - Page 041

VSBE 005578

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/26/2011     **Attorney/Analyst:** EEK, JP2, JS2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)      **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

(b)(7)(C)

(b)(7) said there was adequate public input. (b)(7)(C) attended a few public hearings and felt that everyone who wanted to speak did speak.  People were also able to post comments on the website. (b)(7) believes some of the comments were incorporated in the plan.  The NAACP and other voter rights groups spoke at the hearings.  The public was invited to come to Richmond to work with the interactive software. (b) felt the whole process was open and fair.

(b) also felt that the plan did not take a step backwards.  The minority districts were not eroded, and they "pretty much stayed intact." (b) does not have any concerns with respect to the individual minority districts.  Minority voters will be able to elect their candidates of choice.

A 13th district was considered, but there was no bill presented with a plan incorporating such a district.  Therefore, (b)(7)(C) does not know if (b)(7) would have (b)(7)(C).

(b) believes everything that needed to be considered was considered.

(b) has "no concern whatsoever" with regards to a possible discriminatory purpose in the creation of the plan.  Some comments were made on the House floor about intent, but (b) felt they were unfounded.

(b) does not prefer an alternative plan.

(b)( does not believe the Black Caucus or the Democratic Caucus took a position on the 55% BVAP issue.

With respect to Delegate Tyler's (b) district (75) (b) does not whether the prisons were already in her districts or were added to her district in the proposed plan.  He said, "She lives where she lives," and the prisons cannot

**Page 1 of 2**

be moved. (b)(7)(C) said the numbers used are the Census numbers, so if the Census includes the prison population, there is not much that can be done.

VSBE 005580

DEFENDANT-INTERVENORS TX 023 - Page 043

**Confidential**

## Memorandum of Telephonic Communication

**Date**: 5/26/2011    **Attorney/Analyst**: EEK, JP2, JS2

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)        **Race**: (w)

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: State of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

(b)(7)(C)                                                                                against
HB 5001 and HB 5005 (b)(7)(C)
against the proposed plan, (b)(7)(C)

Although not an expert, (b)(7)(C) and has studied the VRA and
redistricting. (b)(7) believes that in this redistricting process, there was
discriminatory purpose because (1) the process was rushed; (2) the House
chose too small of a deviation standard (+/-1%) and an unnecessarily high
BVAP, which resulted in the packing of minority districts and prevented a
13th minority district from being drawn; (3) the House ignored the bipartisan
commission's recommendations; and (4) the public was denied access to the
House redistricting software unless accompanied by a delegate. (b)(7) found
that in this redistricting process, incumbency status was more important
than VRA compliance.

(b)(7)( assessment of the redistricting process is that it was rushed. (b)(7)(C)
stated that the timing of elections in Virginia forced the process into a
rushed schedule.  The plans came out in late March, and the public had just
a few days to comment before there was a vote taken on the plans.  The full
process is less than 30 days from start to finish.

The redistricting committee selected a population deviation of +/- 1%.  This
may sound good to the public, but (b)(7) believes it had the effect of tying
hands.  The packing was done subtly; the +/-1% deviation resulted in the
packing of minority and Democratic districts, and this may signal a pattern
of discrimination. (b)(7)(C) knew they could not get too
greedy, so the low deviation was selected to pack minorities and create
Republican districts in the surrounding areas.  In 2001, the deviation was
+/-2%, and it was probably higher in 1991.  There was an attempt to change
the deviation for this plan to 2%, but the bill did not pass.

The redistricting committee also selected a 55% BVAP minimum for the
minority districts. (b)(7) does not think a 55% is a hard number.  Some

**Page 1 of 3**

VSBE 005581

**DEFENDANT-INTERVENORS TX 023 - Page 044**

districts may need a higher BVAP, and some may need less. Without the analysis, it is not possible to say. However, (b) believes 52-53% may be enough. A retrogression analysis needs to be done, but such an analysis was not done because the creators of the plan did not want to know the results. (b)( believes they selected the highest number they could get away with. The 55% number nullified the creation of the 13th district and justified packing.

(b)(7)(C)            prefers option #2 (thirteen minority districts) of the bipartisan plan.(b)(7)(is concerned that the proposed plan violates the VRA because the bipartisan commission created a plan with a viable 13th minority district, but no one gave consideration to the plan. There was also a suggestion that a 14th district could have been created near Henry County. In order to create the districts, the demographic performance numbers in the minority districts would have to be reduced. (b)(7) believes that the minority populations would have been able to elect candidates of choice even with the reduced numbers. However, there was not much support for the bipartisan plan because the plan lessened the ease with which incumbents could be reelected.

(b) believes another minority district should be created if the possibility exists. The number of minority districts increased in 1991 and 2001. There was another opportunity to do so this year.(b)(7) believes all the minority districts in option #2 will be viable. (b)(7)( basis is the bipartisan commission plan.(b)(7) believes the numbers under that plan are still sufficiently high and that minorities will be able to elect candidates of choice under that plan.

(b)(7)(C)                                                                it
became apparent to(b)(7)(C)            that the majority party did not perform an analysis to determine the viability of a 13th minority district. The legislature had the resources to do an analysis or someone could have been hired to do it, but an analysis was not completed.(b)(7) feels this may be a violation of the VRA. (b)(7)(C)
(b)(7)(C)

(b) asked the House if the general public could come in and use software to learn about the plan.(b)(7) was told a delegate would have to sit with them while they used the software. (b)(7) believes this had a chilling effect and essentially denied the public access to redistricting software.

Although the Virginia plans are said to be bipartisan because the Senate is controlled by the Democrats, and the House is controlled by the Republicans, there was basically a deal that each will pass the other's plan. Although (b) does not know much about the Senate plan, it is like the House plan in that it was created to protect incumbents. The GOP leadership never reached out to (b)  (b)(7)(C)                     , he feels (b)(7)(C)      were virtually locked out of the process.

VSBE 005582

DEFENDANT-INTERVENORS TX 023 - Page 045

With respect to the Delegate Tyler and District 75's prison population
issue, (b) does not know whether the numbers would allow minorities to elect
candidates of choice.  Again, an analysis needs to be done.

Page 3 of 3

DEFENDANT-INTERVENORS TX 023 - Page 046

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/26/2011      **Attorney/Analyst:** EEK, JP2, JS2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)      **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

(b)(7)(C)                                                      thought it
was a good plan.  However, (b)(7)(C) did not have a chance to study the plan in
great detail.

(b)(7)(C)                                            was made aware of some
of the precinct splits (b)(7)(C)    . This has made (b) develop some
reservations about the plan. (b)(7) cannot understand why some of the
precincts needed to be split.

(b)(7)(C)                                  can win with a 48% BVAP.  However, a majority
of the people who run for office say they need something closer to 55%.

(b)(7)(C) feels there was not enough time to study the university plans.  (b)(7)(C) also
did not get a chance to study the bipartisan commission's plan with a 13th
minority district.

(b)(7)(C) does not have any concerns with regards to a discriminatory purpose in
the redistricting process.  (b)(7) feels there was little minority involvement,
but that was the result of the Republicans being in power.

(b)(7)(C) does not believe there was enough time to get a lot of public input.

**VSBE 005584**

**Confidential**

## Memorandum of Telephonic Communication

**Date**: 5/26/2011     **Attorney/Analyst**: EEK, JP2, JS2, RP2

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)     **Race**: (w)

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: State of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

(b)(7)(C)

(b)(7)(C)

(b)(7)(C)

(b)(7)(C) felt the plan was in the best interest of the people in (b)(7)(C) district with respect to their ability to elect a candidate of choice.

(b)(7)(C) it was important for the twelve minority districts to maintain a BVAP of 55%. (b)(7)(C) experience told (b)(7)(C) that 55% was a number that would work.

(b)(7)(C) did not give much consideration to the possibility of a 13th minority district. (b)(7)(C) heard conversations on both sides of the issue, but (b)(7)(C) personally does not have a position on the issue.

(b)(7)(C) reviewed some university plans but did not see the plans created by the bipartisan commission. (b)(7)(C) recalls that one university plan looked good on paper at first, but (b)(7)(C) learned the plan separated communities of interest which were kept intact in the proposed plan.

The proposed plan was the only plan (b)(7)(C) studied very closely. But (b)(7)(C) does not recall if any analysis was performed with regards to (b)(7)(C) was given some figures about racial demographics, but (b)(7)(C) does not remember the specifics.

(b)(7)(C) does not believe there was a discriminatory purpose in creating the proposed redistricting plan.

**Confidential**

## Memorandum of Telephonic Communication

**Date**: 5/26/2011      **Attorney/Analyst**: EEK, JP2, JS2

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)         **Race**: (b)

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: State of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

(b)(7)(C) in favor of the plan because the demographics as presented looked fair. (b)(7)(C) believes people were able to contribute.

(b) believes the twelve minority districts were kept fairly consistent. (b)(7) (b)(7)(C) more Republican voters, but (b)(7)(C) district lost about 5,000 people.

(b)(7)(C)

Personally, (b)(7)( would always support more diversity.  However, (b)(7)( did not have a chance to look at any of the alternative plans. (b)(7) did not have a chance to review the bipartisan commission's plans. (b)(7) does not know what a plan with thirteen minority districts would look like. (b) did not have enough information to understand the demographics and the impact of the thirteen minority districts plan.

(b)(7) attended (b)(7) public hearings but was not greatly involved in the process. In the (b)(7)(C) someone said that comments were received from (b)(7)(C) but (b) does not know the content of any such comments.

(b)(7) does not know if a 55% BVAP is necessary.  It would depend on voter turnout.

(b)(7)(C) if not familiar with Delegate Tyler's (b) district (75).

Confidential

## Memorandum of Telephonic Communication

**Date:** 5/26/2011      **Attorney/Analyst:** EEK, JP2, JS2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)          **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

5/26/11

(b)(7) is unable to speak on the phone today and will like to reschedule for 2:00 p.m. on 5/31.

5/31/11

(b)(7)(C) for the plan. In hindsight, however, (b)( feels (b)(7) should have opposed the plan. The plan was presented in a way that suggested there was no better plan. (b)(7)(C) feels (b)( may have been coerced to believe there was no other choice. There was a "fear" that those who spoke against the plan would "get in trouble."

The BVAP (b)(7)(C) decreased because people (b)(7)(C) had to be moved to other districts. However, (b)(7) understands that this was necessary because the numbers (b)(7)(C) had decreased.

(b)(7)(C)                                                        (b)(7)(C)

believes the other minority districts will (b)(7) be able to elect candidates of choice.

However, (b)(7) does have a concern with regards to the 75th District, Delegate Tyler's district. It is (b) understanding that 8,000 prisoners were added to Delegate Tyler's district. (b)(7)(C) The district encompasses rural areas, and it takes about three hours to travel from one end to the other. (b)(7)(C) (b)(7)(C) does not know the exact numbers, (b)(7)(C) feels Delegate Tyler's district may not be a minority district.

(b)(7)(C) could have been more strategic and that more contiguous districts could have been created. (b)(7)(C)

Page 1 of 2

numbers required the districts to be drawn as such. In some conversations, (b)(7)(C) that not much was said against the plan because there was a sense that "if you make noise, you'll be dealt with later." (b)(7)(C) believes the Republicans tried to work with the members of (b)(7)(C) only because they feared the Department of Justice.

(b)(7)(C) the Republicans selected a few minorities to work with them, and they did just enough to silence any objections. (b)(7) does not believe they were objective. (b)(7) drew the lines and all that (b) could do was try to tweak them.

(b)(7) heard about the possibility of a 13th minority district, but (b) does not understand how the other districts would be impacted if a 13th district is created. Without the necessary information, it was difficult to move forward on this issue. There just was not enough information to make an intelligent decision.

(b)(7) does not believe there was a discriminatory purpose in the creation of the redistricting plan. (b)(7) does not know "what kind of discussions went on in the back room," but (b)(7) is not aware of anything. (b)(7) feels it was mostly about politics.

(b)(7) was aware of public hearings but feels more could have been done to gather public input.

VSBE 005588

DEFENDANT-INTERVENORS TX 023 - Page 051

Confidential

## Memorandum of Telephonic Communication

**Date**: 5/26/2011        **Attorney/Analyst**: EEK, JP2, JS2, RP2

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)        **Race**: (w)

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: State of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

(b)(7)(C) _____ (b)(7)(C) _____ against the proposed plan because (b)(7)(C) there was discriminatory purpose in failing to create an additional minority district.

(b)(7)(C)
(b)(7)(C) said the plan was not fair and that they wanted scrutiny from the Department of Justice. (b)(7)( discussed the possibility of creating one or two additional minority districts. (b)(7)(C) (b)(7)(C) to discuss the impact of additional minority districts. Because the additional districts would result in a decrease in (b)(7)(C) BVAP numbers, (b)(7)(C) said they are happy with twelve minority districts.

(b)(7)(C)
(b)(7)(C) and asked, "What do you want?" (b)(7)(C) had a four point strategy: (1) don't mess with the minority districts; (2) give a few crumbs to the Northern Virginia delegates; (3) get as much as you can; and (4) don't get greedy because the Department of Justice is out there.

(b)(7)(C) grabbed as much as they could get. There was an "I got mine, and I'm satisfied" attitude. This was perfect for the Republicans because they wanted to pack the minority districts. For example, (b) finds that Delegate Tyler (b) (75) was encouraged to pack her district with African-Americans because of the prison population.

(b)(7)(C) feels the 55% BVAP used by the redistricting committee is excessive. It is a number selected by selfish people with a selfish outlook. In 1991, (b)( recalls there was an opportunity to move from eight to ten minority districts. (b)(7)(C) did not want ten because (b)(7) feared that African-American incumbents would lose seats. The same thing is happening now. The Republicans "encouraged" (b)(7)(C) a 55% BVAP is necessary. (b)(7)(C) feels that even a 40% BVAP is

Page 1 of 2

enough and quoted (b)(7)(C) on that point. (b)(7)(C) said that
with a BVAP of 40%, the remaining 60% will be mixed but largely Democratic.
Then, a Democrat can still be elected.

(b)(7)(C) believes there was a strong Republican effort to keep districts intact.
It was an effort to protect incumbent interests. As a result, the number of
African-Americans that could and should be representing the public has been
decreased. (b)(7)(C) the effort to lock in
the number of African-Americans representing the Commonwealth.

(b)(7) believes the university plans and the bipartisan commission's plans were
all superior in their respective categories to the proposed plan, but no one
paid attention to the other plans. The bipartisan commission's plan that
created a 13th minority district assured the Governor of minority influence
in the districts created. The plan shows that a 13th minority district is
viable, and the plan also created a 14th minority district with a BVAP of
almost 50%.

(b)(7)(C) were safe under the
proposed plan, but (b)(7)(C) against it. The bipartisan commission's
plan would have (b)(7)(C) , but (b)(7)(C) still
supported it. (b)(7) would have preferred a plan like the Richmond plan which
had more influence districts.

(b) said it is "disgraceful" that there is no Hispanic district in the House.
For congressional seats, there is an effort being made to create another
minority seat. The same zealousness is lacking in the House. The House had
an opportunity to create additional minority districts, but there are only
twelve in the proposed plan. Although 20% of the population is African-
American, this means representation in the House is just 12%.

Page 2 of 2

VSBE 005590

DEFENDANT-INTERVENORS TX 023 - Page 053

Confidential

## Memorandum of Telephonic Communication

**Date:** 5/26/2011        **Attorney/Analyst:** EEK, JP2, JS2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)          **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

(b)(7)(C) ... (b)(7)(C) two major concerns.
(1) (b) wanted to make sure that the thirteen members of the Black Caucus
were safe. (2) (b)(7) had concerns for the overall Democratic Party.

The Republicans are in power, but because everyone knew the Department of
Justice would be reviewing the plans, (b)( believes the plan is as fair as
possible. (b)(7) believed the process was fair because those in power reached
out to the Democrats to find out their needs.

(b)(7)(C) a House of Delegates with 100% Democrats, but
that is not the state of things. But given the circumstances, it was fair.

(b)(7) feels that the thirteen districts currently represented by black
delegates are safe under the proposed plan. With respect to the non-
minority districts represented by black delegates, (b)(7)(C)
(b)(7)(C) believes their districts are safe. (b)(7)(C)
(b)(7)(C) district is safe because the it is heavily Democratic, and the
Republicans cannot take it back. Under the proposed plan. (b)(7)(C)
(b)(7)(C) (b)(7)(C) will also
be safe because the district is a Democratic district. (b)(7)(C)
(b)(7)(C)

(b)(7)(C) members of the Black Caucus were "tickled pink" with the proposed
plan. (b)(7)(C)
(b)(7)(C) later (b)(7)(C) were not
satisfied.

(b)(7)(C)                    (b)(7)(C)

Although the minority numbers in
Delegate Tyler's district decrease without the prison population, her
district is safer because it is also heavily democratic. There is a concern

VSBE 005591

**DEFENDANT-INTERVENORS TX 023 - Page 054**

that a white Democrat will take the seat, but [(b)(7)] feels that a black candidate will be able to hold the seat.

[(b)(7)(C)] is unhappy because [(b)(7)C] wanted [(b)(7)(C)], [(b)(7)(] described it as a "turf war."

There are two minority districts whose seats are filled by white delegates, [(b)(7)(C)] a district with approximately 60% bpop. [(b)(7)(C)] a district with approximately 65% bpop.

There have been several elections in those two districts, Districts 69 and 74, in which the minority vote was split among several minority candidates. However, [(b)(7)(C)] both delegates do a good job representing their minority districts, and they have the support of the minority constituents.

[(b)(7)(C)] raised the 13th minority district issue. [(b)(7)(C)]
[(b)(7)(C)] Districts 69 and 74 demonstrate that creating a black seat does not mean a black candidate will be elected to office.

[(b)(7)(C)] did not set a target BVAP number. The 55% is not an important number to [(b)(7)(C)] can win with 40%.

[(b)] does not think the minority districts are packed too tightly. [(b)(7)(C)] thinks they are just right. [(b)(7)] does not have any concerns about a discriminatory purpose in drawing the district lines. If there was such a concern, [(b)(7)] would have addressed it.

The public involvement and input in the redistricting process was an improvement from previous years. There were town meetings all over the state. [(b)(7)(C)] concerned about having "black input," and [(b)] was satisfied with the level of input received.

[(b)(7)(] is satisfied with the plan and believes it to be a good plan.

VSBE 005592

DEFENDANT-INTERVENORS TX 023 - Page 055

**Not Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/26/2011    **Attorney/Analyst:** AAO, EEK, JP2, JS2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)    **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

(b)(7)(C) in favor of HB 5005 because (b) had no objections to the redistricting plan (b)(7)(C) (b)(7)(C) did not look too closely at the minority numbers in the plan. (b) did not perceive that there were significant changes in the minority numbers.

(b)(7)(C) did not have much knowledge about the possibility of a 13th minority district until (b)(7)(C) (b)(7)(C) concluded that there was not much leeway to discuss the possibility of a 13th district.

(b)(7)(C) Without having an opportunity to analyze the numbers, (b) does not know if securing a 55% BVAP is more important than creating a 13th district. (b)(7) did not give great consideration to this issue.

(b)(7)(C) does not believe there was a discriminatory purpose. There might have been some party issues, but (b) believes (b)(7)(C) (b)(7)(C) worked hard to present an equitable plan.

(b)(7) felt the (b)(7)(C) was given an adequate opportunity to participate in the public hearings.

Confidential

## Memorandum of Telephonic Communication

**Date:** 5/26/2011     **Attorney/Analyst:** EEK, JP2, JS2, RP2

**File No.:** 2011-1805

**Other Party:** [(b)(7)(C)]     **Race:** (A)

**Tel. No.:** [(b)(7)(C)]

**Title/Organization:** [(b)(7)(C)]

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

[(b)(7)(C)]

[(b)(7)(C)] in favor of the plan because it complied with the one person, one vote principle and the VRA.

[(b)(7)(C)] believes the plan maintains the current number of minority districts, and the district residents will continue to be able to elect candidates of choice.

[(b)(7)(C)] does not believe a 55% BVAP is necessary. [(b)(7)(C)] does not believe color is an issue in getting elected to the House of Delegates because "if a candidate is electable, color doesn't matter."

[(b)(7)(C)] regarding the possibility of a 13th minority district was interesting. [(b)(7)(C)] several members of the [(b)(7)(C)] said that there is already a 13th seat and a 14th seat, but they are held by non-minority delegates.

[(b)(7)(C)] does not believe there was a discriminatory purpose in creating the redistricting plan.

[(b)(7)(C)] felt there was ample opportunity for public input. The attendance at public hearings was high. There was also a lot of press/blog coverage of the redistricting process.

Confidential

## Memorandum of Telephonic Communication

**Date:** 5/26/2011     **Attorney/Analyst:** EEK, JP2, JS2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)     **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

(b)(7)(C) against the redistricting plan because (b)(7) believed it was not a plan that the people would have wanted.  The plan was developed to protect incumbents.  It was not contiguous and did not protect communities of interest. (b)(7)(C)     (b)(7)(C)
(b)(7)(C)

(b)(7)( understands that the pattern of population growth required some seats to be lost.  But (b) does not understand why all of the five or six seats lost were Democratic seats.

(b)(7)(C) is not sure if statistical methods were used to draw the lines.  (b)(7)(C)
did not say how (b)(7)(C) drew the lines. (b)(7)( feels the lines were drawn to ensure that the Republicans will remain as the majority party.  This is not what the people requested.

(b)(7)(C) looked at a college plan which had another minority district. (b)(7)(C) understands that in order to create another district, the existing minority districts will lose some minority voters, but some districts may currently be over-packed. (b)(7)(C) can lose 5%, and others too, to create a 13th district. (b)(7)(C) "If we're 20% of the population, shouldn't we have 20% in representation?"

(b)(7)(C) would not like to go below a 55% BVAP, however, because of voter turnout issues.  There would be some cause for concern if the percentage dropped below 55%.

(b)(7) does not believe (b)(7)(C) looked at the bipartisan commission's 13th district plan very closely.  Things were moving too quickly.  Delegates who were not drawn out of their districts were pleased, so they voted in favor of the plan.  They didn't look at the potential.

VSBE 005595

DEFENDANT-INTERVENORS TX 023 - Page 058

(b)(7) would have liked to study the potential for a 13ᵗʰ district and whether the population levels with thirteen minority districts would have (b)(7)(C)
(b)(7)(C)

(b)(7 heard that in the Hampton Roads and Central Virginia area, a 13ᵗʰ district can be created if everyone in that area gives up a little bit of their current populations.  However, there was not much done to show whether this was true.

With respect to the twelve minority districts, no one seems to be very worried about the ability to hold a seat.  People are generally more worried about primaries.  Because the districts are Democratic, winning the primaries means one will usually win the seat.

(b)(7) knows that Delegate Tyler (b) (75) was concerned about the prison population in her district. (b)(7)(C) does not believe Delegate Tyler will have problems with reelection because Delegate Tyler is a hard worker.

(b)(7) believes the purpose of the redistricting plan is to protect incumbents and to ensure that the majority remains the majority. (b)(7) does not believe the incumbents should be drawing the lines.  In doing so, another "legislator-in-waiting" may have been blocked, and that legislator may have been a minority. (b)(7) does not have any other concerns about any race issues with respect to the plan.

VSBE 005596

DEFENDANT-INTERVENORS TX 023 - Page 059

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/26/2011     **Attorney/Analyst:** EEK, JP2, JS2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)     **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

(b)(7)(C)                                                    (b)(7)(C)
the proposed plan,
is better because the district is more compact, contiguous, and communities
of interest have been kept intact.

(b)(7)(C)     an African-American can be elected in (b)(7)(C) district even though
the racial demographics have not changed.

With respect to the other districts, (b)(7)(C) feels that everyone was satisfied
with the plan before the Governor's veto, so (b)(7)(C) does not know why some
people changed their votes. (b)(7)(C)
(b)(7)(C)

(b)(7)(C)     that Delegate Tyler (b) (75) wanted more African-Americans in her
district. (b)(7)(C)
(b)(7)(C)

(b)(7)(C)     having prisoners in the population means that there are less
people to worry about. (b)(7)(C) does not understand Delegate Tyler's logic
because if the prison population was not counted, more white Republicans
would have to be added to the district. Although she ran against a
Republican whose father served as the district's delegate for many years and
won, her district is already 65% leaning Republicans. Adding more
Republicans will hurt her.

(b)(7)(C) does not understand why people say that there are only twelve minority
districts (b)(7)(C)
(b)(7)(C)     are members of the House. (b)(7)(C) counted Delegate Tyler's district as
a non-minority district.

(b)(7)(C)     the redistricting plan with a 13th minority district never came
(b)(7)(C)     feels the 13th minority district may be a

**Page 1 of 2**

stronger Democratic district, but (b) is not sure if it will be a minority district. (b)(7)(C) the Democratic Caucus leadership "made up" a plan and told the Black Caucus to support it. (b) found that to be offensive.

(b)(7) believes a black candidate can get elected from a white district and vice-versa.

(b)(7)(C) the bipartisan commission's plans (b)(7)(C) (b)(7)(C) . The minority voting strength would have been diluted (b)(7)(C) the plans might not have taken all the factors into consideration. "Just crunching the numbers doesn't work."

(b)(7)(C) people differed on the intent of Delegate Chris Jones (w) (76). Some people said all he did was protect the members of (b)(7)(C) which the plan does do.

Page 2 of 2

VSBE 005598

DEFENDANT-INTERVENORS TX 023 - Page 061

(b)(7)(C)

Petersburg, VA 23805. (b)(7)(C)

May 23, 2011

U. S. Attorney General Eric H. Holder, Jr.
U. S. Department of Justice (DOJ)
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

SECTION 5 SUBMISSION
no. 2011-1805

SUBJECT: "**Virginia's Legislative Redistricting Plan**"

Dear Attorney General Eric H. Holder, Jr.

Please "**VETO**" the current "**Virginia's Legislative Redistricting Plan**". Five (5) Black-Majority Districts in the Senate is **not enough**. Twelve (12) Black-Majority Districts for the House of Delegates is **not enough**. Please disallow Virginia Attorney General Kenneth T. Cuccinelli, II pre-clearance with the three (3) – judge federal court. This **pre-clearance is a method of cheating, stalling, and wasting time**. Require Virginia to – **as usual** – send their plan directly to the U. S. Department of Justice (DOJ). **Virginia consistently discriminates heavily against Blacks (African Americans)**. The Black (African American) population in Virginia has increased. **We need seven (7) Black-Majority Districts in the Senate. We also need fourteen (14) Black-Majority Districts for the House of Delegates. I repeat, please, please, please "VETO"** the current "**Virginia's Legislative Redistricting Plan**".

Please provide me a written answer in fifteen (15) days.

My home telephone number is (b)(7)(C)
Thank you in advance for your assistance.

(b)(7)(C)

(b)(7)(C)

VSBE 005599

**DEFENDANT-INTERVENORS TX 023 - Page 062**

U. S. Attorney General Eric H. Holder, Jr.
U. S. Department of Justice (DOJ)
950 Pennsylvania Avenue, N. W.
Washington, DC 20530 — 000

X-RAYED

MAY 27 2011

20530+0001

DEFENDANT-INTERVENORS TX 023 - Page 063

(b)(7)(C)    (b)(7)(C)
Petersburg, VA 23805 (b)

Confidential

## Memorandum of Telephonic Communication

**Date**: 5/27/2011     **Attorney/Analyst**: AAO, EAM

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)          **Race**: W

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: Commonwealth of Virginia

**Subject**: Chapter 1 (HB 5005) (2011)

(b)(7)(C)                (b)(7)(C)
                          followed all legal requirements and strengthened
Democratic districts.

With respect to alternative plans, the Senate never discussed the
governor's commission plan on the floor. (b)(7)(C)        said that the
Watkins Vogel plan was designed to increase the number of Republican
districts, (b)(7)(C)        did not support it.

(b)(7)(C)        said that the 5 black districts remain viable.  Obama
received over 60% of the vote in each of these districts, and McEachin
also did well when he ran for attorney general.  The incumbent black
senators were in favor of the changes. (b)(7)(C)        said the
districts would also be viable for non-incumbent minority candidates.

(b)(7)(C)        said there was no discussion of a particular BVAP
threshold needed to maintain viability. (b)(7)(C)
(b)(7)(C)        indicated that the black districts did not need BVAPS
that were as high as they had been in 2001, because that was a waste
of black votes and represented packing. (b)(7)(C)        wanted to
undo the packing that was done in 2001.

(b)(7)(C)        said there were no concerns about racially
discriminatory purpose.

(b)(7)(C)        thought that the opportunities for public input were
more than adequate.  There were two rounds of public hearings: one in
November/December, and one after making the first draft of the bill
public.  These hearings were fairly well attended.  The committee
always asked for public comment at their meetings, and also read all
of the comments posted on the website.

[b](7)(C) interjected that at one of the public hearings, there had been a discussion of the threshold BVAP needed to maintain viability, and someone stated that the DOJ had objected when a district's BVAP had decreased from 58% to 56%. [b](7)(C) responded to this individual that the BVAPS in the benchmark plan were too high and would waste black votes, and that the BVAP decreases in the proposed plan would be a positive change.

[b](7)(C) began discussing redistricting last summer. [b](7)(C) [b](7)(C) were heavily involved. [b](7)(C) focused on the Richmond and Tidewater areas, and [b](7)(C) focused on the rest of the state. [b](7)(C) [b](7)(C) solicited public input, and attempted to include that input in the plan.

DEFENDANT-INTERVENORS TX 023 - Page 065

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/27/2011      **Attorney/Analyst:** JP2, AAO, EAM

**File No.:** 2011-1805

**Other Party:** [(b)(7)(C)]      **Race:** w

**Tel. No.:** [(b)(7)(C)]

**Title/Organization:** [(b)(7)(C)]

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005)

[(b)(7)(C)] said that HB 5005 was a compromise plan. [(b)(7)(C)] understands the reality that redistricting must be done every ten years.  HB 5005 had more bipartisan support (32 in favor-5 opposed) than HB 5001, the plan vetoed by the governor, which was adopted on partisan lines (22 Democrats in favor-18 Republicans opposed). [(b)] supported the plan in order to help produce a bipartisan compromise; not because [(b)(7)(] actually endorses the plan.

[(b)(7)(C)] alternative redistricting plan: the Watkins-Vogel plan. [(b)(7)(C)] The Watkins-Vogel plan was voted down, and the committee plan (HB 5001) was adopted.  The governor then vetoed HB 5001, and [(b)(7)(C)] [(b)(7)(C)]

[(b)(7)(C)] thought the Watkins-Vogel plan was preferable to the adopted plan for several reasons. [(b)(7)(C)] plan had better population deviations, and better protected the BVAPS in the 5 black districts. [(b)(7)(C)] plan better approximated the BVAPS that were pre-cleared in 2001.

[(b)(7)(C)] thinks that the BVAPS in the 5 black districts in the proposed plan are sufficient for those districts to remain viable, but only as long as incumbents are running. [(b)(7)] questions whether a non-incumbent minority candidate could win in those districts. [(b)(7)(] worries about how non-incumbent minority candidates would fare, particularly in those districts that have between 50% and 53% BVAPS.

[(b)(7)(C)] attempted to maintain the BVAPS in the black districts between 54 and 55%.

[(b)(7)(C)] [(b)(7)(C)] generated that threshold BVAP, [(b)(7)(C)] [(b)(7] has seen very few reports or analyses of the threshold BVAPS required to maintain viability. [(b)(] based that threshold number on anecdotes from [(b)(7)(C)] [(b)(7)(C)] election returns from other states, particularly Georgia and

**VSBE 005603**

**DEFENDANT-INTERVENORS TX 023 - Page 066**

Louisiana, and (b)(7) recollections of past Virginia redistricting cycles (b)(7) (C). (b)(7)(C) noted that in Georgia and Louisiana, there had been incidents in which BVAPS were lowered below that threshold level, and black voters lost their ability to elect. (b)(7)(C) said that maintaining the BVAP in black districts has always been a critical issue. Over the years, (b)(7)(C) minority participation in the electoral process increase. (b)(7)(C) minorities have maintained their ability to elect even as BVAPS have dropped. However, (b)(7)(C) never seen the BVAPS get lower than 53-55%, and so the proposed plan concerns (b)(7) (C).

(b)(7)(C) said that some level of gerrymandering has to be done to comply with the Voting Rights Act. Both Democrats and Republicans have tried to draw lines around certain segments of the population to ensure voting activity.

When asked about the packing of Senate districts, (b)(7)(C) said that (b)(7)(C) some allegations that (b)(7)( plan packs the black districts, but this is just a part of the normal legislative debate; there are differences of opinion (b)(7)(C).

(b)(7)(C) has no concerns about racially discriminatory purpose in the adoption of the Senate plan. (b)(7) did not look at the House plan.

(b)(7)(C) thinks redistricting needs to be a more bipartisan effort. Though the governor created a bipartisan commission, which sent two plans to the P & E committee, the plans were not introduced by either the House or the Senate. (b)(7) would have preferred the Commission plan. (b)(7) thinks that the adopted plan was more focused on protecting incumbents than on doing what was best for the general public.

VSBE 005604

DEFENDANT-INTERVENORS TX 023 - Page 067

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/27/2011      **Attorney/Analyst:** EEK, JS2

**File No.:** 2011-1805

**Other Party:** [(b)(7)(C)]      **Race:** (b)

**Tel. No.:** [(b)(7)(C)]

**Title/Organization:** [(b)(7)(C)]
[(b)(7)(C)]

**Jurisdiction:** State of Virginia

**Subject:** Virginia House and Senate Redistricting

[(b)(7)(C)]

[(b)(7)(C)]
[(b)(7)] had some concerns then about the tendency of concentrating African-Americans in the minority districts. [(b)(7)] feels this trend is continuing.

[(b)(7)(C)] believes that during the 2001 redistricting cycle, the BVAP numbers went from 54% (1991) to 57% (2001 current) to around 52-53% (2001 proposed) because the number of minority districts increased from ten to twelve.

[(b)(7)(] noticed that the BVAP numbers increased for the minority districts in the 2011 proposed plan. Virginia is changing, and there is an influx of younger, racially diverse people. In such an environment, [(b)(7)] feels that 52-53% is probably enough for minority districts to elect candidates-of-choice. [(b)(7)(] is concerned that the areas surrounding the minority districts will not be given the opportunity to grow.

[(b)(7)(C)] believes that when a BVAP reaches 60%, there is packing. 55% is in a gray area. [(b)(7)] does not know why the Senate and the House reached different conclusions about the necessary BVAP. In [(b)(7)] opinion, the numbers should be similar because a district is just roughly 2.5 to three times a House district.

[(b)(7)(C)] felt that there the House was operating with an understanding that under the VRA, there is no need to do more than maintain the existing number of minority districts.

[(b)(7)(C)] feels that HB 5001 and HB 5005 are essentially the same. There was some tweaking, but both bills present plans with twelve minority districts.

Page **1** of 2

VSBE 005605

DEFENDANT-INTERVENORS TX 023 - Page 068

In developing the bipartisan commission's plans, the commission used criteria similar to Virginia's criteria, i.e., compactness, contiguity, VRA compliance, and keeping minority districts safe. However, the commission used a +/-2% or +/-3% deviation and not the +/-1% that the House used. (b)(7)(C) does not know what kind of analysis was done in creating the commission's plan. (b)(7)(C) will probably have the information.

There was a lot of back and forth with regards to the possibility of creating a 13th minority district in the House. The commission found that it could be done while maintaining compactness and keeping more city/county/municipal lines intact. Some (b)(7)(C) supported the plan, and others did not. (b)(7)(C) is not sure how incumbents were affected by the commission's plan because (b)(7)(C) did not take incumbency into consideration.

(b)(7)(C) does not believe there was a discriminatory purpose in creating the House's proposed plan. (b)(7)(C) believes the purpose was to protect incumbent interests. It was a partisan process. (b)(7)(C) feels that there was an opportunity to do something progressive, but the House proposed plan does not take advantage of it.

(b)(7)(C) wanted to add that recent Census data shows that people are changing in how they identify themselves. People are selecting multiple and/or mixed racial categories. (b)(7)(C) is curious to see how this will affect the discussion on dilution and packing.

VSBE 005606

DEFENDANT-INTERVENORS TX 023 - Page 069

The Office of Senator A. Donald McEachin
General Assembly Building, Room 318
910 Capitol Street
Richmond, Virginia 23223
698-7509 – phone
698-7651 - fax

**SECTION 5 SUBMISSION**

*COMMENT*

NO. *2011-1805*

**VIA FACSIMILE**

May 31, 2011

To: Mr. Chris Herren
     Chief, Voting Section
     Department Of Justice, Civil Rights Division
     Fax – 202-307-3961

Pages (including cover – 5)

2011 MAY 31 AM 11: 42

CIVIL RIGHTS DIV
VOTING SECTION

VSBE 005607

DEFENDANT-INTERVENORS TX 023 - Page 070

# SENATE OF VIRGINIA

**A. DONALD McEACHIN**
9th SENATORIAL DISTRICT
ALL OF CHARLES CITY COUNTY
PART OF HENRICO COUNTY AND
PART OF THE CITY OF RICHMOND
4719 NINE MILE ROAD
RICHMOND, VIRGINIA 23223



COMMITTEE ASSIGNMENTS:
AGRICULTURE CONSERVATION AND
NATURAL RESOURCE
COMMERCE AND LABOR
COURTS OF JUSTICE
PRIVILEGES AND ELECTIONS

May 31, 2011

Mr. Chris Herren
Chief, Voting Section
Civil Rights Division
Room 7254 - NWB
Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530

Dear Mr. Herren:

I look forward to the opportunity to discuss the Virginia Senate redistricting plan that is pending for Section 5 preclearance review. Before our call I thought it might be helpful to share some information with you regarding the plan.

I am a Virginia State Senator, District 9, elected in 2007. Prior to that time, I was a Delegate in the Virginia House of Delegates from 1996 to 2002, and from 2006-2008. I ran statewide for Attorney General in 2001. I am Life Member of the National Association for the Advancement of Colored People (NAACP). I have am an attorney in the firm, McEachin & Gee. I hold a Masters of Divinity from Virginia Union University, 2008, a JD degree from the University of Virginia School of Law, 1986, and a BS, Political Science, from American University, 1982.

I worked with Senator George Barker in drafting the Senate map. At one time or another, Senator Barker or I contacted every Democratic Senator. Our Senate leadership reached out to many Republican Senators. George and I were part of the negotiation team that worked with the Republicans to put together the final map following the Governor's initial veto.

I spoke in detail with each of the other four African American members of the Senate about their districts. The five of us agreed that we would not allow these districts to be retrogressed in violation of the Voting Rights Act. We therefore started by looking at our old districts using updated 2010 census data in each.

VSBE 005608

DEFENDANT-INTERVENORS TX 023 - Page 071

Mr. Chris Herren
May 31, 2011
Page Two

Our goal was to make sure that our proposed plan would not reduce minority voters'
effective ability to elect their preferred candidate of choice. So a review of the "old plan"
showed that our five senate districts contained the following black voting age population
(BVAP):

District 2  Old Plan: 58.9%BVAP
District 5  Old Plan: 56.1%BVAP
District 9  Old Plan: 54.9%BVAP
District 16 Old Plan: 54.5%BVAP
District 18 Old Plan: 58.3%BVAP

We felt each of these districts were super safe for black voters. Indeed, we all agreed that
each of these five districts had far more black population than needed for black voters to
elect a candidate of choice. In other words, we felt our districts were packed and had
been packed by the Republicans when they were drawn ten years ago. This packing had
negative consequences for black voters in our districts. It meant the votes of black voters
in our districts were being "wasted". They could have played a far more significant role
in an adjoining district where they may well prove to be the decisive vote for a Democrat
to win election.

In 2001, the five black state senators were Yvonne Miller, Henry Marsh, Henry Maxwell,
Louise Lucas, and Benjamin Lambert. In 2003, Maxwell retired and after a competitive
Democratic primary between Mamie Locke and Verbena Askew (both black), Sen. Locke
replaced Maxwell. In 2007, I beat Ben Lambert in the Democratic primary by 17 points
and took office in 2008. I was the preferred candidate of choice of black voters in my
Senate election. Other than those primaries, not one of the black incumbents has had a
significant challenge. No white candidate has contested in these districts over the last
decade, in part because they were packed as super safe for black voters.

Because the Democrats often vote together in the Caucus, particularly on matters of
particularized interest to the black community, keeping our Democratic majority was
important. More important, however, was the goal of avoiding retrogression. So we set
about the business of reconstituting these five majority black districts in a way that would
keep them effective for black voters to elect their preferred candidate but unpacking them
to the degree we felt appropriate. And we did not just draw the districts so they would be
effective for the five black incumbent officeholders. We drew them so that if any of us
decide not to run for re-election, either in 2011 or beyond, black voters will still be able
to elect their preferred candidate of choice. We did not rely on any predetermined or
fixed demographic percent or threshold in creating these districts. Instead, we looked at
how past election results, plugged into the new districts, showed how these districts
would perform in future elections. We felt this approach was consistent with DOJ's
"functional" analysis of looking at whether a district is effective for black voters.

VSBE 005609

DEFENDANT-INTERVENORS TX 023 - Page 072

Mr. Chris Herren
May 31, 2011
Page Three

I met with each of the other senators who represent majority black districts while the plan
was being developed (I also met with other senators). The black incumbent senators
helped guide me in redrawing their districts. Eventually, we agreed on a map that
resulted in the following changes for these districts and this is the map that is pending
before you now for preclearance:

District 2  New Plan: 51.2%BVAP
District 5  New Plan: 53.6%BVAP
District 9  New Plan: 50.8%BVAP
District 16 New Plan: 53.1%BVAP
District 18 New Plan: 53.5%BVAP

Before this map was introduced in the Legislature, we had the districts vetted by our legal
counsel and an expert retained by the Caucus, Dr. Lisa Handley. I understand from
counsel that Dr. Handley will submit a report to you soon. Legal counsel and Dr.
Handley confirmed what we five black senators knew full well: that these districts as
redrawn would continue to be effective for black voters to elect their preferred candidate
of choice.

We did reduce the black voting age population in these districts in an effort to unpack
these 5 districts. If you examine each of the 5 proposed state senate districts, you find
that President Obama received between 65% and 75% of the vote in each of these newly
configured districts. In addition, reconstituted election returns in these five districts from
my 2001 race for AG show that I receive between 55.6% and 60.3% of the vote in these
five districts. Both President Obama and I were candidates of choice of black voters in
these five districts (and throughout Virginia). The five majority black districts are
strongly Democratic and black voters will dominate any Democratic primary in these
districts. Further, black voters will easily elect the preferred candidate of their choice in
the general election as these Obama and McEachin results show. From a demographic
standpoint, these five majority-minority districts are 42.3%, 39.7%, 44.2%, 39.3% and
43.1% white, respectively. Minority voters dominate these districts.

As noted above, we took a functional view of the political process in each district to
ensure there would be no retrogression. The political dynamics in the five majority black
districts is similar, but it also different. Thus, District 9, which I represent, contains the
lowest black voting age population percentage of any of the five majority black districts
(50.8%); yet that district performs more effectively for black voters in some elections
than the other four districts. For example, in District 9, I received 60.3% of the vote,
which exceeds the percent I received in any of the other districts. In President Obama's
2008 race, voters in District 9 cast a greater percent of the vote for Obama than some of
the other majority black districts.

VSBE 005610

DEFENDANT-INTERVENORS TX 023 - Page 073

Mr. Chris Herren
May 31, 2011
Page Four

We rejected a plan put forth by Republicans Watkins and Vogel because it would have repeated the packing of black voters in these five majority black districts as had occurred in 2001. That would have "wasted" black votes and would deny black voters from effectively using their votes in adjoining districts. This packing would have minimized black voting strength. It also packed Democrats and thus wasted Democratic votes as well. Just looking at the 2009 race for Governor, unsuccessful gubernatorial candidate Creigh Deeds received between 60% and 70% of the votes in the five majority black districts under the Watkins Vogel map.

We urge you to preclear the map. It was not enacted with a racially discriminatory purpose. In fact, black voters and their elected representatives had more input in drawing this senate redistricting map than any other state senate map ever enacted in the history of our state! And the plan is not retrogressive either, as all five majority black districts will continue to provide black voters with an effective opportunity to elect their preferred candidates of choice. And that effective opportunity for black voters will exist whether or not the districts have a black incumbent.

Thank you for your consideration of this matter.

Respectfully yours,

A. Donald McEachin

VSBE 005611

DEFENDANT-INTERVENORS TX 023 - Page 074

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/31/2011      **Attorney/Analyst:** JP2, AAO, EAM

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)        **Race:** b

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005)

(b)(7)(C) is comfortable with the changes (b)(7)(C)
BVAP in the proposed plan, which (b)(7)(C) is
more than adequate.

(b)(7)(C) thinks that all the black senate districts remain
viable.  When the 2001 election is overlaid on the proposed districts,
it is evident that black candidates would have prevailed in all 5
districts in that election. (b) thinks the districts remain viable even
for non-incumbent black candidates.  Black candidates have been
successful at numerous legislative levels (state, county, and city) in
the 5 districts.

In District 9, there have been numerous black county supervisors.  In
the Fairfield Magisterial District and the Verona Magisterial District
in Henrico County, all supervisors have been black, except for when
Morrissey won a 5-way primary to succeed Senator McEachin in one of
those seats.

(b)(7)(C) has no concerns about the changes in District 16.
There are numerous black city council members and county supervisors
in that district. (b)(7)(C) District 16 is safe for black
Democrats, though if a black Republican ran, he would probably be
defeated.

(b)(7)(C) does not have concerns about Senator Marsh being
defeated by a white candidate.  Though Delegate Morrissey may
challenge Marsh, (b)(7)(C) said that Morrissey has a record of
opposing health care and supporting pro-life causes, which will lead
black voters not to support him.  The election might be competitive,
but (b)(7)(C) is confident that Marsh would prevail,
particularly because of his 40+ years of experience.

VSBE 005612

(b)(7)(C) said that Virginia State University, a historically black university in the Petersburg area, is located in District 16. (b)(7)(C) estimated that the university has 4000-5000 students. This could affect the voter turnout in District 16.

(b)(7)(C) has no concerns about racially discriminatory purpose. (b)(7)(C) had the opportunity to help shape (b)(7)(C) is pleased with how it turned out.

(b)(7)(C) thinks that opportunities for public input were more than adequate. (b)(7) attended public hearings all over the state. These hearings were well publicized, and well attended. Comments were made at these hearings, and were taken into consideration in drawing the plan.

VSBE 005613

Confidential

## Memorandum of Telephonic Communication

**Date**: 5/31/2011      **Attorney/Analyst**: EEK, JP2

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)      **Race**: (b)

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: State of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

(b)(7)(C)                                                                    (b)(7)(C)
                                                                            in favor of the
plan. (b)(7)(C)
(b)(7)(C)

One of (b)(7)(C) main concerns was the preservation of the twelve minority
districts. (b)(7)(C)                                                       (b)(7)(C)
(b)(7)(C)                                                                   felt the
redistricting committee was receptive to many of the concerns presented by
the Black Caucus and by other members of the House.

(b)(7)(C)                                      the +/-1% deviation was an
important factor.  Ensuring that each of the minority districts had a 55%
BVAP was also important.  The 55% number was selected after reviewing
current percentages and voting strengths. (b)(7)(C)
(b)(7)(C)
(b)(7)(C)  Another important issue that was presented in many of the hearings
held throughout the state was the need to preserve communities of interests.

(b)(7)(C)                                      Delegate Tyler's (b) district
(75). (b)(7)(C)                                trending to become a non-
minority district. (b)(7)(C)                   make it a minority district.
(b)(7)(C)                                      (b)(7)(C)
agreed that 55% was important to ensure that a candidate of choice could be
elected in Delegate Tyler's district.

In order to create a minority district with a 55% BVAP, (b)(7)(C)
(b)(7)(C)
(b)(7)(C)
                    district would become more vulnerable, (b)(7)(C)
                    (b)(7)(C)

Page 1 of 3

(b)(7)(C)

With respect to the prison population issue, (b)(7)(C) feels that Delegate Tyler will be able to win even if the prison population is taken into consideration.  The district did not have a strong minority population to begin with, but Delegate Tyler was able to win the seat.

(b)(7)(C) was also unhappy because (b)(7)(C) wanted some of area, which (b)(7)(C) did not want to give-up.  There was friction between them.  In the end, (b)(7)(C) believes (b)(7)(C) against the bill to make a statement.

(b)(7)(C) said that at the end of the day, it was not a perfect plan.  If it was perfect, there would be more Democratic seats.  Because Republicans are in power, at the end of day, more Democratic seats were lost.  However, (b)(7)(C) ultimately, (b)(7)(C) members all got what they wanted.

(b)(7)(C) reviewed the plans presented by the bipartisan commission.  But (b)(7) feels a comparison of the bipartisan plan and the proposed plan is like comparing apples and oranges because the two plans were developed using two different sets of criteria.  The bipartisan plan used a higher deviation percentage, it did not look at incumbent seats, and it did not take into account the preservation of communities of interest.

The bipartisan plan and the other outside plans created minority districts with lower minority numbers.  Because the plans created weaker minority districts, they did not have the support of the Black Caucus.  (b)(7)(C) (b)(7)(C) when you try to get more minority districts, you actually end up with less because all the districts are weakened.

(b)(7) does not believe there was any discriminatory purpose in the creation of the proposed plan.

(b)(7)(C) Delegate Morrissey (w) (74), who represents a minority district.  (b)(7)(C) Delegate Morrissey is in his current seat because African-Americans are not informed. (b)(7)(C) (b)(7)(C) (b)(7)(C) targets minority districts where multiple minorities run and split the minority vote.

(b)(7)(C) Delegate Morrissey is planning to run for the Senate seat currently held by Senator Henry Marsh (b) (16).  Delegate Morrissey has begun collecting signatures.  Senator Marsh "is in trouble" and is in a dangerous position, especially in light of the fact that the proposed plan is taking his district's BVAP down below 55%.

Page 2 of 3

VSBE 005615

DEFENDANT-INTERVENORS TX 023 - Page 078

(b)(7)(C) Senator Marsh is "seasoned," and he is not working as hard as someone like Morrissey. Senate District 16 is a weak minority district, but Senator Marsh does not realize this because, like Delegate Tyler, he is not looking at the numbers but basing his beliefs on assumptions.

(b)(7)(C) the congressional districts and is concerned about two minority districts which may be drawn at 50% and 40%. (b)(7)(C) "taking it down below 55% is dangerous."

VSBE 005616

DEFENDANT-INTERVENORS TX 023 - Page 079

**Not Confidential**

## Memorandum of Telephonic Communication

**Date**: 5/31/2011     **Attorney/Analyst**: John Powers     **File No.**: 2011-1805

**Other Party**: (b)(7)(C)     **Race**: (H)  **Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: State of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

(b)(7)(C)

(b)(7) objects to the redistricting process as a whole. It is not fair that incumbents are allowed to pick and choose which precincts they want in their own districts. The redistricting plan breaks up communities of interest, and splits voting precincts unnecessarily. The Washington Post had an article saying that it will cost Virginia approximately $10 million over the next ten years to hold elections with the split precincts. (b)(7) tried to give (b)(7) opinion to (b)(7)(C), but (b)( did not get much of a response. Many of the house members who were heavily involved in the redistricting process did not have any prior experience in the area.

(b)(7)( also objects to the treatment of the Independent Bipartisan Advisory Redistricting Commission and its proposals. The Governor should have put together the Bipartisan Redistricting Commission faster, so it would have more time to deliberate. Once the commission put its plan forward, the state legislature should have given its proposals more credence.

(b)(7)(C)

VSBE 005617

DEFENDANT-INTERVENORS TX 023 - Page 080

**Confidential**

## Memorandum of Telephonic Communication

Date: 5/31/2011     Attorney/Analyst: AAO

File No.: 2011-1805

Other Party: (b)(7)(C)              Race: W

Tel. No.: (b)(7)(C)

Title/Organization:

Jurisdiction: Commonwealth of Virginia

Subject: Chapter 1 (HB 5005)

(b)(7)(C) is opposed to the state house plan because it splits (b)(7)(C) street in half. (b)(7)(C) was previously in the 57th District and now in the 58th District. (b)(7)(C) is displeased because (b)(7)(C) representative in the 57th District, and does not want to be removed from that district. Albemarle County, where (b) lives, does not like the plan because they have to set up two different voting places for that street.

(b)(7)(C) concerns do not have to do with race; (b)(7)(C) neighborhood is pretty much all white. (b)(7)(C) is concerned that the plan is breaking up the cohesiveness of the neighborhood. (b)(7)(C) resides in the (b)(7)(C) precinct in Albemarle County.

(b)(7)(C) would like to submit a written comment, and I gave (b)(7)(C) instructions on how to do so.

VSBE 005618

DEFENDANT-INTERVENORS TX 023 - Page 081

## Fletcher, Michael (CRT)

| | |
|---|---|
| **From:** | (b)(7)(C) |
| **Sent:** | Tuesday, May 31, 2011 11:02 PM |
| **To:** | vot1973c (CRT) |
| **Cc:** | (b)(7)(C) |
| **Subject:** | submission 2011-1778 2011-1805 |
| **Attachments:** | KEY WEST DO.(b)(7) Voting Rights letter.doc |

Please see attached letter to Ms. Abigail Olson of the Voting Section of the Civil Rights Division re the Commonwealth of Virginia's submission on proposed redistricting lines.

Thank you.

(b)(7)(C)

Charlottesville, VA 22911

1

**VSBE 005619**

**DEFENDANT-INTERVENORS TX 023 - Page 082**



(b)(7)(C)

**Charlottesville, VA 22911**

(b)(7)(C)

31 May, 2011

Ms. Abigail Olson
Re. submission 2011-1778
Voting Section
Civil Rights Division
Department of Justice
Washington, DC
Email vot1973c@usdoj.gov

Dear Ms. Olson,

Thanks for taking my call today to discuss the preparation of a letter of concern about the
State of Virginia Redistricting Plan, with reference to changes in the boundary between
the 57th and 58th House districts that are covered in submission 2011-1778. I live in
Albemarle County, (b)(7)(C) in the Key West Subdivision. The
proposed new dividing line goes right down the middle of my street, and we have been
moved from the 57th district to the 58th district while my neighbors across the street
remain in the 57th district.

The new line between the districts splits off a small handful of homes in an extremely
cohesive neighborhood, the Key West Subdivision, which is bordered on all sides by
farms or large estates. The vast majority of members of the Subdivision remain in the 57th
district, but a small minority has been moved. As evidence of our cohesion, the
subdivision has an active Neighborhood Association, and a swimming club.

I request that this situation be reviewed and this proposed change rejected on the basis of
the splitting of Key West Subdivision in the proposed redistricting plan.

My phone number is (b)(7)(C) I would be glad to hear from you by phone or email
if you have questions I might answer.

I expect that some of my neighbors will also be in touch with you about this matter.

Thank you in advance for your consideration of this request.

Sincerely,

(b)(7)(C)

**VSBE 005620**

**DEFENDANT-INTERVENORS TX 023 - Page 083**

(b)(7)(C)

VSBE 005621

DEFENDANT-INTERVENORS TX 023 - Page 084

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 6/1/2011     **Attorney/Analyst:** JP2, AAO

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)                    **Race:** b

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005)

(b)(7)(C) supports the plan, and thinks it was the best plan presented. This was partly based on (b)(7)(C) (b)(7)(C) remains safe in the proposed plan. (b)(7) looked carefully through the plan, and confirmed that all black districts were safe for both incumbent and non-incumbent minority candidates.

(b)(7)(C) the process of approving the plan. (b)(7) (b)(7)(C) had a chance to ask questions and make suggestions.

(b)(7)(C) does not think that a 55% BVAP is needed for districts to remain viable. Candidates must appeal to the voters in their district, and cannot assume that they will be elected because of their race, but (b)(7)(C) is confident that strong black candidates will prevail under the proposed plan.

(b)(7)(C) in 2001, certain members of the legislature tried to discourage (b)(7) from running for reelection by making major changes (b)(7)(C)     That has not happened in this redistricting cycle. This cycle has had the goal of optimizing voting opportunities for all Virginia citizens.

(b)(7)(C) not concerned about any of the Senate districts. (b)(7 said that the public was very vocal about wanting to maintain those districts, and that input was taken into consideration in drawing the plan.

(b)(7)(C) the rumors about Morrissey challenging Senator Marsh in District 16. (b)(7) does not think that the race would be close, as Morrissey is (b)(7)(C)   , and the African American community would therefore be suspicious of him.

VSBE 005622

DEFENDANT-INTERVENORS TX 023 - Page 085



(b)(7)(C) drawing a 6th black senate district was probably not possible without injuring existing black districts, though this remains an unknown.

(b)(7)(C) no concerns about racially discriminatory purpose. The public had an opportunity to make their voices heard at the public hearings. These hearings were well attended. (b)(7)(C) that the proposed plan protects the Senate from being accused of returning to its racist past.

VSBE 005623

DEFENDANT-INTERVENORS TX 023 - Page 086

**Confidential**

# Memorandum of Telephonic Communication

**Date:** 6/1/2011       **Attorney/Analyst:** AAO, EAM, JP2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)             **Race:** b

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)
(b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005)

(b)(7)(C)

(b)(7) supports it. (b)(7)(C) involved in the process from the beginning.
(b)(7)(C)                                                                 (b)(7)(C)

                                                                          the
proposed plan was the best of the plans presented.

The Watkins Vogel plan packed black districts, according to (b)(7)(C)
(b)(7)(C)   (b)(7)(C)          this would have limited black influence outside
of those districts.

(b)(7)(C)                     the college plans drew out numerous
incumbents, and only took into account contiguity and compactness.
(b)(7)(C)           did not support them.

(b)(7)(C)                          all five of the black districts remain
viable.  Obama and McEachin did well in all of these districts.
(b)(7)(C)            knew that there would be a drop in the BVAP (b)(7)(C)
(b)(7)(C)    and felt comfortable with that. (b)(7)(C)
(b)(7)(C)

(b)(7)(C)                       all of the districts remain viable for both
incumbent and non-incumbent minority candidates.

(b)(7)(C)                   does not have concerns about any of the districts. (b)(7)(C)
knows that Morrissey may challenge Senator Marsh, but (b) thinks that
given Morrissey's background, Senator Marsh will prevail. (b)(7)(C) said
the incumbent black senators "know how to win."

VSBE 005624

DEFENDANT-INTERVENORS TX 023 - Page 087

The possibility of drawing a 6th black district was discussed, but was rejected because it would have made the BVAPs (b)(7)(C)
(b)(7)(C) too low. (b)(7) thinks that they were able to draw in another Democratic seat around Richmond.

(b)(7)(C) has no concerns about racially discriminatory purpose.

(b)(7)(C) said that ample opportunities for public input were provided. There were hearings all over the state, which were well attended. (b)(7) thinks the plan is fair.

**VSBE 005625**

**DEFENDANT-INTERVENORS TX 023 - Page 088**

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 6/1/2011    **Attorney/Analyst:** AAO, EAM, JP2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)         **Race:** b

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005)

(b)(7)(C) supports the plan. (b)(7)(C) and discussed the plan, and everyone was in support. (b)(7)(C) thinks that the 2001 plan packed black districts, and the (b)(7)(C) wanted to unpack those districts this cycle. (b) thinks they drew the best plan they could, given the population shifts in the state.

(b)(7)(C) is confident that both incumbents and non-incumbent minority candidates will be able to get elected in all five majority-black districts. Black candidates have been successful in city, county, and state races, even when the BVAPs have been lower than they are in the proposed plan. (b)(7)(C)
(b)(7)(C)
(b)(7)(C) relied mostly on (b)(7)( past experience to make (b)(7)( determination that the districts remain viable.

(b)(7)(C) said that voters mostly choose their candidates based on qualifications, rather than race. All black candidates need to campaign and appeal to the voters; they cannot just assume they'll be elected because of their race. If a black candidate were not qualified and did not work to appeal to the voters, it is possible he would not be elected.

(b)(7)(C) said that the Watkins Vogel plan provided for unnecessarily high BVAPs. (b)(7)( had concerns about racially discriminatory purpose with the Watkins Vogel plan. (b)(7) said that that plan assumed that white voters would not vote for black candidates, which (b)(7) felt was discriminatory. (b)(7) said the Watkins Vogel plan also tried to limit black influence in other districts.

(b)(7)(C) no concerns about racially discriminatory purpose with the proposed plan.

.

[(b)(7)(C)]                said that the [(b)(7)(C)] did not focus throughout the
process on drawing a 6th black district.

[(b)(7)(C)]                thinks opportunities for public input were adequate.
The process was "as fair [(b)(7)(C)]                ."

[(b)(7)(C)]                has heard that Morrissey may challenge Senator Marsh in
District 16.  [(b)(7)] does not think that Marsh will have any trouble
beating Morrissey, so long as he works for it.  Morrissey has only won
when he has split the black vote.  In a head to head contest, Marsh
would prevail.

DEFENDANT-INTERVENORS TX 023 - Page 090

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 6/1/2011      **Attorney/Analyst:** AAO, EAM

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)           **Race:** w

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005)

(b)(7)(C)                                   (b)(7)(C)
                              to improve the marginal Democratic
districts and to comply with the Voting Rights Act. (b)(7)(C)
(b)(7)(C)

(b)(7)(C)                       All black senators were satisfied with
the plan.

(b)(7)(C)      focused on improving districts in Northern Virginia for
Democrats.  They also tried to improve the districts in the
Richmond/Tidewater area, which encompasses three black districts.

In 2001, black legislators were opposed to the Republican plan, which
packed them into districts with BVAPs in the high 50%'s.

(b)(7)(C)       thinks that barring any personal issues with a black
candidate, it would be almost impossible for a white candidate to
defeat a black candidate in any of the five black districts. (b)(7)(C)
(b)(7)(C)    to unpack the black districts, but keep them strong enough to
remain viable.

(b)(7)(C)      did not look at statistical reports in drawing the plan,
but relied on their attorneys to ensure that all guidelines were
followed and that the districts remained viable.

(b)(7)(C)      is not concerned about the changes in District 16.
Delegate Morrissey might challenge Senator Marsh, but according to
Lisa Handley's analysis, Senator Marsh should prevail.  It is also
unlikely that Morrissey would beat Marsh because of Morrissey's
background. (b)(7)(C)
(b)(7)(C)         thinks District 16 would also be safe for a non-
incumbent black candidate.

VSBE 005628

**DEFENDANT-INTERVENORS TX 023 - Page 091**



(b)(7)(C) not concerned about any of the other black districts either. (b) suspects that this will be (b)(7)(C) last term, but (b) anticipates that (b)(7)(C) (b) will succeed her.

(b)(7)(C) did not approve of any of the alternative plans. Most of the alternatives never made it (b)(7)(C). The college student plan and the commission plan drew many incumbents out of their districts. The Watkins Vogel plan would have wiped Democrats out and packed black districts.

(b)(7)(C) has concerns about partisanship, but no concerns about racially discriminatory purpose.

(b)(7)(C) thinks opportunities for public input into the plan were more than adequate. The public hearings were well attended.

**Confidential**

## Memorandum of Telephonic Communication

Date: 6/1/2011     Attorney/Analyst: EEK, JP2

File No.: 2011-1805

Other Party: (b)(7)(C)          Race: (b)(7)(C)

Tel. No.: (b)(7)(C)

Title/Organization: (b)(7)(C)
(b)(7)(C)

Jurisdiction: State of Virginia

Subject: 2011 Virginia House and Senate redistricting plans

(b)(7)(C)                                                  (b)(7)(C)
                                                           described the
development of the commission as follows:

The Governor had made a campaign promise to create a bipartisan
redistricting commission, but when the time came, he reneged. (b)(7)(C)
(b)(7)(C)                                                        (b)(7)(C)

                                                                When the
Governor learned about (b)(7)(C)          he formed the commission.

(b)(7)(C)          believes the commission was formed for political reasons to
fulfill purely political goals. (b) does not think the Governor had serious
intentions to actually give any consideration to the plans created by the
commission.  The Governor provided little to no funding and gave the
commission a tight timeline. (b)(7)(C)
(b)(7)(C)    Because of the tight schedule, (b) did not think the commission
would be able to produce any plans in time and was pleased with its work.

The Governor said that the commission was to be an advisor to the
legislature and instructed the commission to focus on compactness and the
preservation of jurisdictional boundaries.  He explicitly stated that
political considerations were to be left to the legislature.  As a result,
the plans created by the commission varied widely from the plans created by
the legislature. (b)(7)(C)          the goals of the commission
were different from those of the legislature. (b)(7)(C)  the commission was
"intended to fail."

(b)(7)(C)          maps for the commission plans, (b)(7)(C)          used the
following criteria: compactness, compliance with the VRA, and the respecting
of jurisdictional/political boundaries.  The commission used a +/-2%

Page 1 of 2

**DEFENDANT-INTERVENORS TX 023 - Page 093**



deviation standard.  The commission lacked the resources to conduct racial bloc voting analysis, so [(b)(7)(C)] the bvap numbers in the plans submitted and precleared in 2001.  Using the districts with the lowest minority populations under the 2001 benchmark plan as a basis, [(b)(7)(C)] a 53.4% bvap in creating the House minority districts, a 55.0% bvap in creating the Senate minority districts, and a 53.2% bvap in creating the congressional minority district.  [(b)(7)(C)] separate baselines based on what the Department of Justice precleared for the different legislative bodies because [(b)(7)(C)] to compare "apples to apples."

[(b)(7)(C)] thirteen minority districts for the House, and [(b)(7)] a 13th minority district in the Suffolk area.  The district was named District 76.  [(b)(7)(C)] the thirteen districts to be more compact and more respectful of jurisdictional and political boundaries and communities of interest than the House's proposed plan with twelve minority districts.  [(b)(7)(C)] [(b)(7) to create a 13th district; rather [(b)(7)(C) (C)] [(b)(7)(C)] to make the original twelve more compact.

With respect to the Senate, [(b)(7)(C)] it is possible to draw five minority districts with higher bvap numbers.  For example, [(b)(7)(C)] District 2 and District 9 with bvap numbers higher than those in the proposed plan.  On the other hand, the commission's bvap for District 16 was lower than that of the proposed plan [(b)(7)] does not believe it is possible to draw District 16 with a bvap much higher than that of the proposed plan, which is at 53.7%.  [(b)(7)(C)] the Senate minority districts as drawn by the legislature in the proposed plan will permit the election of candidates of choice.

[(b)(7)(C)] does not know if retrogression is an issue because there was no racial bloc voting analysis performed.  However [(b)] does not have any specific retrogression concerns.  [(b)(7)(C)] the proposed house and senate districts remain viable.

[(b)(7)(C)] restated his concerns regarding the legislature's use of the single-race category, [(b)(7)(C)] [(b)(7)(C)]

VSBE 005631

DEFENDANT-INTERVENORS TX 023 - Page 094

## Fletcher, Michael (CRT)

| | |
|---|---|
| **From:** | Berman, Robert (CRT) |
| **Sent:** | Wednesday, June 01, 2011 3:03 PM |
| **To:** | vot1973c (CRT) |
| **Cc:** | Kim, Elizabeth (CRT); McFarland, Ernest A (CRT); Olson, Abigail (CRT); Popper, Robert (CRT); Powers, John (CRT) Slade, Jared (CRT) |
| **Subject:** | FW: Report from Dr. Lisa Handley 2011-1805 |
| **Attachments:** | Handley VA Senate Report.pdf |

-----Original Message-----
From: J. Gerald Hebert [mailto:hebert@voterlaw.com]
Sent: Wednesday, June 01, 2011 2:22 PM
To: McFarland, Ernest A (CRT); Popper, Robert (CRT)
Subject: Re: Report from Dr. Lisa Handley

Gentlemen; see attached report from Dr. Lisa Handley.  In her report, Dr.
Handley analyzes the five majority African-American opportunity districts in the proposed
Virginia state senate plan.  She concludes:  "In conclusion, the proposed state senate plan
does not "retrogress minority voting strength with respect to their effective use of the
electoral franchise" (Beer) – black voters are provided with the same number of effective
districts under the proposed plan as they presently enjoy under the current state senate
plan."  Please confirm receipt.  Thank you.

J. Gerald Hebert
Legal Counsel to Virginia Senate Democratic Caucus Attorney at Law
191 Somervelle Street, #405
Alexandria VA 22304
(703) 628-4673 (office)

1

VSBE 005632

DEFENDANT-INTERVENORS TX 023 - Page 095

## A Voting Rights Analysis of the Proposed Virginia Senate Plan

Prepared by Dr. Lisa Handley
Principal, Frontier International Electoral Consulting

### Scope of Project

I prepared this analysis and report at the request of the Virginia Senate Majority (including, of course, the five African American Senators who represent majority-minority districts in the Senate) to evaluate the Virginia State Senate redistricting plan passed by the Virginia legislature to ascertain whether the proposed plan, in my expert opinion, satisfies the requirements of Section 5 of the Voting Rights Act of 1965. My analysis has led me to conclude that the proposed plan is not retrogressive under Section 5 of the Act. While I did not review the issue of racially discriminatory purpose, I am not aware of any allegations or concerns about racially discriminatory intent with respect to the State Senate plan adopted.

This conclusion is based on, among other things, the racial bloc voting analysis I conducted. My analysis indicates that voting is racially polarized and therefore effective minority districts (that is, districts that offer minority voters an effective opportunity to elect preferred candidates of choice) must be maintained. My analysis also shows that the proposed redistricting plan maintains the same number of effective minority districts as the current plan and is therefore not retrogressive.

### Professional Background and Experience

I have advised numerous jurisdictions and other clients on voting rights-related issues and have served as an expert in dozens of voting rights cases including redistricting, one person/one vote and partisan gerrymandering cases. My clients have included scores of state and local jurisdictions, a number of national civil rights organizations, the U.S. Department of Justice, and such international organizations as the United Nations.

I have been actively involved in researching, writing and teaching on subjects relating to voting rights, including minority representation, electoral system design and redistricting. I co-authored a book, Minority Representation and the Quest for Voting Equality (Cambridge University Press, 1992), and numerous articles, as well as co-edited a volume (Redistricting in Comparative Perspective, Oxford University Press, 2008) on these subjects. I have taught several political science courses, both at the undergraduate and graduate level, related to representation and redistricting. I hold a Ph.D. in political science from George Washington University.

I have been a principal of Frontier International Electoral Consulting since co-founding the company in 1998. Frontier IEC specializes in providing electoral assistance in transitional democracies and post-conflict countries.

## Section 5 of the Voting Rights Act

Because Virginia is a state covered by Section 5, the State is required to submit its redistricting plans to the US Department of Justice (or the DC Court) for preclearance before the plans can be implemented. The burden of proof rests with the State to demonstrate that the proposed plan will not result in a retrogression of minority voting strength relative to the current, or benchmark, redistricting plan.[1]

## The Benchmark Plan

There are five majority black senate districts (out of a total of 40 senate districts) under the current Virginia State Senate Plan: Districts 2, 5, 9, 16 and 18. The table below provides the total population, deviation from the ideal population and racial composition of these districts. As indicated by the table, four of these five districts are under-populated and require substantial changes to meet the requirement of one person, one vote.

*Table 1: Majority Black Senate Districts in Current Plan with 2010 Census Data*

| District | Total Population | Deviation from Ideal Population (200026) | Percent Deviation from Ideal Population | Black Population | Percent Black Population | Percent Black Voting Age Population |
|---|---|---|---|---|---|---|
| 2 | 177071 | -22955 | -11.5 | 108253 | 61.1 | 58.9 |
| 5 | 182068 | -17958 | -9.0 | 107971 | 59.3 | 56.1 |
| 9 | 201994 | 1968 | 1.0 | 118835 | 58.8 | 54.9 |
| 16 | 184330 | -15696 | -7.8 | 103439 | 56.1 | 54.5 |
| 18 | 174793 | -25233 | -12.6 | 104916 | 60.0 | 58.3 |

## The Proposed Plan

The proposed plan preserves the same number of majority black districts as the current plan. Table 2 lists the racial composition of these five districts. Despite the lower black voting age population percentage in each of the five proposed districts, the proposed plan offers black voters the same effective opportunity to elect preferred candidates as the current plan.

---

[1] In *Beer v .United States,* the U.S. Supreme Court held that "the purpose of Section 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effect exercise of the electoral franchise." The benchmark redistricting plan against which a proposed plan is compared is the last legally enforceable plan (inevitably the redistricting plan currently in place) with the demographics of the 2010 census data associated with each of the districts.

2

VSBE 005634

Table 2: Majority Black Senate Districts in Proposed Plan

| District | Total Population | Deviation from Ideal Population (200026) | Percent Deviation from Ideal Population | Black Population | Percent Black Population | Percent Black Voting Age Population |
|----------|------------------|-------------------------------------------|------------------------------------------|------------------|--------------------------|-------------------------------------|
| 2 | 200193 | 167 | .1 | 106265 | 53.1 | 51.2 |
| 5 | 200751 | 725 | .4 | 112929 | 56.3 | 53.6 |
| 9 | 198943 | -1083 | -.5 | 107925 | 54.2 | 50.8 |
| 16 | 200841 | 815 | .4 | 110339 | 54.9 | 53.1 |
| 18 | 199934 | -92 | 0 | 110861 | 55.4 | 53.5 |

**District by District Analysis**

This section provides a district by district analysis of the five proposed districts, including the results of the racial bloc voting analysis I conducted,[2] as well as an estimate of the percent black voting age population (VAP) needed for black voters to elect their preferred candidate of choice in each of the districts.

**District 2**  District 2 is currently 58.9% black VAP but is under-populated by 11.5%. The proposed District 2 is 51.2% black VAP.

An analysis of voting patterns in this district for general elections that included an African American candidate over the past ten years indicates that voting in this district is quite polarized, but that blacks turn out to vote at a higher rate than whites.[3] (See table 3, below.)

---

[2] There were only two general election contests statewide in the past ten years that included African American candidates: the 2001 contest for state attorney general that pitted an African American Democrat, AD McEachin, against a white Republican, JW Kilgore; and the 2008 US presidential race. In the presidential race, the percentage of votes for Barack Obama and John McCain do not add to 100% because some votes were cast for minor candidates in this contest (including Ralph Nader, Chuck Baldwin and Cynthia McKinney.) In addition to these two contests, I analyzed any contested state senate race that took place in the district in the previous ten years.

[3] Black turnout averaged approximately 18% of VAP, compared to approximately 10% of VAP for whites, in the state senate race analyzed. The difference was slightly less in the 2008 presidential contest (approximately 57% compared to approximately 51%), and was less still in the 2001 contest for state attorney general.

3

Table 3: Voting Patterns by Race in State Senate District 2

| Contest and Candidates | Candidate Information | | Estimate of the Percent of Black and White Voters Casting a Vote for Each of the Candidates | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Party | Race | Black Voters | | | White Voters | | |
| 2001 General: State Attn General | | | Homog Precinct | Bivariate Regress | Ecological Inference | Homog Precinct | Bivariate Regress | Ecological Inference |
| AD McEachin | DEM | Black | 95.0 | 100.0 | 93.4 | NA | 0.0 | 19.3 |
| JW Kilgore | REP | White | 5.0 | 0.0 | 4.4 | NA | 100.0 | 78.1 |
| Turnout | | | 30.4 | 26.8 | 27.1 | NA | 27.5 | 27.9 |
| 2008 General: US President | | | | | | | | |
| B Obama | DEM | Black | 99.0 | 100.0 | 99.5 | NA | 13.9 | 42.8 |
| J McCain | REP | White | .9 | 0.0 | .9 | NA | 84.3 | 53.6 |
| Turnout | | | 63.3 | 54.1 | 53.7 | NA | 51.0 | 51.1 |
| 2003 State Senate District 2 | | | | | | | | |
| ME Locke | DEM | Black | 89.4 | 90.9 | 88.2 | NA | 0.0 | 29.7 |
| PK Bomersheim | REP | | 1.9 | 0.0 | 2.9 | NA | 100.0 | 58.3 |
| JB Hobson | IND | | 8.7 | 14.6 | 10.1 | NA | 0.0 | 10.2 |
| Turnout | | | 18.8 | 17.6 | 17.0 | NA | 9.2 | 9.8 |

Furthermore, black voters are very cohesive in their support for black-preferred candidates – on average, approximately 95% of the black voters casting a ballot supported the black-preferred candidate. White crossover voting, on the other hand, is very low in this district.[4]

A calculation of the percent needed to win suggests that a district far less than 50% black VAP would be sufficient to elect a minority-preferred candidate given the higher turnout rate of black voters and the high degree of black support for the black-preferred candidate. This district, however, is slightly over 51% black VAP in the proposed plan.[5]

---

[4] White crossover voting for the black-preferred candidate is 18% on average.

[5] Using the turnout rates of black and white voters in the state senate contest (given the wide range in turnout rates, these estimates are likely to be the most indicative of turnout in any future senate contest), and estimating that the black-preferred candidate can expect, on average, approximately 95% of the black votes and approximately 18% of the white votes, the percent black VAP needed to elect the black-preferred candidate can be calculated as follows:

The estimated support for the black-preferred candidate is:

| Black votes for the black candidate = | 18% | x | .95 | = | 17.1 |
|---|---|---|---|---|---|
| White votes for the white candidate = | 10% | x | .18 | = | 1.8 |
| Total vote for the black candidate = | | | | | 18.9 |

4

VSBE 005636

DEFENDANT-INTERVENORS TX 023 - Page 099

In addition, recompiled election results for the two statewide contests that included African American candidates (the 2001 race for state attorney general and the 2008 presidential contest) indicate that the black-preferred candidate would have carried both of these elections in the proposed district: [6] McEachin by 56.3% and Obama by 69.9% of the vote.

**District 5**   This district is currently 56.1% black in voting age population (VAP). It is under-populated by 17,958 people (or -9.0%). Proposed District 5 is 53.6% black VAP.

An analysis of voting patterns in this district did not include a state senate contest because there were no contested races for this office in the past ten years. [7] At least one of the two contests that were analyzed was clearly polarized, the 2001 state attorney general's race. (It is

---

The estimated support for the white candidate is:

| | | | | |
|---|---|---|---|---|
| Black votes for the white candidate = | 18% | x | .05 | = | .9 |
| White votes for the white candidate = | 10% | x | .82 | = | 8.2 |
| Total vote for the white candidate = | | | | | 9.1 |

The percent black VAP needed to elect a black-preferred candidate is therefore:

$$\frac{\text{Support for non-preferred candidate}}{\text{Support for non-preferred candidate} + \text{support for preferred candidate}}$$

$$\frac{9.1}{9.1 + 18.9} = .325 = 32.5\%$$

This calculation indicates that any district with a black VAP greater than 32.5% should be able to elect a black-preferred candidate to office in Senate District 2.

[6] The recompiled election results were prepared by the National Committee for an Effective Congress (NCEC). NCEC has collected Virginia precinct election results and maintained a history of Virginia precinct changes over time as part of its general redistricting project. In order to derive estimates of the votes cast for candidates competing in previous elections in the proposed districts, historical election results were projected into the 2010 precincts (to reflect precinct lines that have changed over time), then disaggregated down to the census block level on the basis of proportion VAP, and finally reaggregated back to the proposed district.

[7] Although there were a couple of somewhat competitive Democratic primaries for state senate in the majority black senate districts (especially for the 2003 open seat for District 2), there has been no significant challenge to African American state senators, although both Mamie Locke (District 2) and Louise Lucas (District 18) faced Republicans in the 2003 general election. (The other two challengers to African American state senators in the general elections were independents, neither of whom received over 35% of the votes cast.)

5

VSBE 005637

DEFENDANT-INTERVENORS TX 023 - Page 100

difficult to determine if the 2008 presidential race was polarized: the bivariate regression estimate suggests that it was, however, the ecological inference estimate suggests that it was not.) See Table 4, below.

If the turnout in the single homogeneous white precinct is discounted as an aberration, as suggested by both the bivariate regression and ecological inference estimates, blacks turn out to vote at a higher rate than whites in Senate District 5.[8]  Black voters support black – preferred candidates at the very high rate of 93% on average.  The degree of white crossover voting is hard to gauge but may be in the neighborhood of around 23%.[9]

### Table 4: Voting Patterns by Race in State Senate District 5

| Contest and Candidates | Candidate Information | | Estimate of the Percent of Black and White Voters Casting a Vote for Each of the Candidates | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Party | Race | Black Voters | | | White Voters | | |
| | | | Homog Precinct | Bivariate Regress | Ecological Inference | Homog Precinct | Bivariate Regress | Ecological Inference |
| 2001 General: State Attn General | | | | | | | | |
| AD McEachin | DEM | Black | 94.1 | 92.0 | 78.3 | 39.7 | 10.0 | 19.3 |
| JW Kilgore | REP | White | 5.9 | 8.0 | 16.4 | 60.3 | 89.9 | 78.1 |
| Turnout | | | 23.1 | 25.4 | 24.8 | 64.1 | 16.0 | 19.7 |
| 2008 General: US President | | | | | | | | |
| B Obama | DEM | Black | 98.3 | 98.0 | 99.5 | 50.6 | 7.9 | 55.3 |
| J McCain | REP | White | 1.6 | 1.6 | .1 | 49.0 | 89.8 | 42.9 |
| Turnout | | | 56.7 | 59.6 | 59.2 | 74.6 | 20.7 | 27.9 |

The black percent needed to win suggests that a district less than 50% black VAP would be sufficient to elect a minority-preferred candidate. [10]  This is because of the higher turnout of

---

[8] Black turnout in the 2008 presidential contest was approximately 59%, compared to approximately 24% for white voters if the homogeneous precinct estimate for white voters is discounted.  In the 2001 state attorney general contest, black turnout was approximately 24% and white turnout was approximately 18%, again with the single white homogeneous precinct discounted.

[9] Removing the single white homogeneous precinct as an aberration and averaging the other four estimates for the 2001 and 2008 contests examined produces at average of 23% white crossover vote.  (Leaving the homogeneous precinct in produced an estimate of 30% white crossover.)

[10] Using the turnout rates of black and white voters in the state attorney general contest because there is no state senate contest to use, and estimating that the black-preferred candidate can expect approximately 93% of the black votes and the more conservative estimate of approximately 23% of the white votes, the percent black VAP needed for black voters to elect their preferred candidate of choice in this district is approximately 37%:

6

black voters, the high degree of black support for the black-preferred candidate, and the expected white crossover voting of approximately 23%. The district in the proposed plan is 53.6% black in VAP – more than sufficient to meet the percent needed for black voters to have an effective opportunity to elect their preferred candidate of choice.

Recompiled election results confirm this assessment, indicating that McEachin would have carried the proposed district with 56.3% of the vote in the contest for state attorney general and Obama would have won the district with 74.7% of the vote in the 2008 race for president.

**District 9** District 9 is 54.9% black VAP in the current district. Under the proposed plan, this district would be 50.8% black VAP.

The racial bloc voting analysis (see Table 5, below) indicates that voting, although polarized, exhibits a higher degree of white crossover voting than the other districts examined. In addition, black cohesion is high. On the other hand, white turnout is higher than black turnout in this district. Because of the high white crossover vote and the high black cohesion, the percent black VAP needed to win in this district is less than 50% black VAP.[11]

Reconstituted election results confirm this conclusion: McEachin would have received 62.8% of the vote and Obama 74.4% of the vote in proposed District 9.

---

The estimated support for the black-preferred candidate is:

| | | | | | | |
|---|---|---|---|---|---|---|
| Black votes for the black candidate = | 24% | x | .93 | = | 22.3 |
| White votes for the white candidate = | 18% | x | .23 | = | 4.1 |
| Total vote for the black candidate = | | | | | 26.4 |

The estimated support for the white candidate is:

| | | | | | | |
|---|---|---|---|---|---|---|
| Black votes for the white candidate = | 24% | x | .07 | = | 1.7 |
| White votes for the white candidate = | 18% | x | .77 | = | 13.9 |
| Total vote for the white candidate = | | | | | 15.6 |

$$= \frac{15.6}{15.6 + 26.4} = .371$$

[11] Using the average turnout rates estimated for the 2003 state senate contest (10% for blacks and 18% for whites), an average cohesion rate of 96%, and the average white crossover rates of 47% including the state senate race, and 41% without this contest included, the percent black VAP needed for black voters to elect their preferred candidate of choice is either 35% (with the 47% white crossover rate) or 39% (with the white crossover rate of 41%).

VSBE 005639

DEFENDANT-INTERVENORS TX 023 - Page 102

Table 5: Voting Patterns by Race in State Senate District 9

| Contest and Candidates | Candidate Information | | Estimate of the Percent of Black and White Voters Casting a Vote for Each of the Candidates | | | | | |
| | Party | Race | Black Voters | | | White Voters | | |
| | | | Homog Precinct | Bivariate Regress | Ecological Inference | Homog Precinct | Bivariate Regress | Ecological Inference |
| 2001 General: State Attn General | | | | | | | | |
| AD McEachin | DEM | Black | 94.0 | 96.1 | 88.3 | NA | 24.5 | 44.4 |
| JW Kilgore | REP | White | 6.0 | 3.9 | 8.2 | NA | 75.5 | 54.6 |
| Turnout | | | 24.5 | 27.7 | 28.9 | NA | 29.7 | 29.3 |
| 2008 General: US President | | | | | | | | |
| B Obama | DEM | Black | 98.3 | 100.0 | 98.6 | NA | 40.8 | 56.0 |
| J McCain | REP | White | 1.4 | 0.0 | .1 | NA | 57.8 | 43.1 |
| Turnout | | | 49.4 | 55.7 | 55.5 | NA | 54.0 | 53.8 |
| 2003 State Senate District 9 | | | | | | | | |
| AD McEachin | DEM | Black | 95.5 | 100.0 | 92.0 | NA | 57.3 | 61.5 |
| S Persinger | IND | | 4.5 | 0.0 | 4.3 | NA | 42.7 | 35.3 |
| Turnout | | | 7.8 | 10.3 | 11.9 | NA | 17.4 | 18.6 |

**District 16** This district is currently 54.5% black VAP and is under-populated by -7.8%. In the proposed plan, District 16 is 53.1% black VAP.

An analysis of voting patterns by race in this district (see Table 6, below) indicates that black turnout is lower than white turnout, with the black turnout rate quite varied. Voting is racially polarized, with an average black cohesion rate of over 97%. The white crossover rate for the three elections is approximately 34%, though this average may be overly high. If the state senate contest in District 16 in 2007 is removed from the calculation (as uncharacteristically high in white crossover voting), the degree of crossover voting is 29%. Regardless of which white crossover rate is used, the percent black VAP needed to elect black-preferred candidates in this district is less than 50%.[12]

Recompiled election results indicate that McEachin would have won proposed District 16 with 58.4% of the vote; Obama would have carried the district with 71.6% of the vote.

---

[12] Using the average turnout rates (26% for blacks and 39% for whites), the average cohesion rate of 97%, and the average white crossover rates of 34% including the state senate race and 29% without this contest, the percent black VAP needed for black voters to elect their preferred candidate of choice is either 41% (with the 34% white crossover rate) or 44% (with the white crossover rate of 29%).

8

*Table 6: Voting Patterns by Race in State Senate District 16*

| Contest and Candidates | Candidate Information | | Estimate of the Percent of Black and White Voters Casting a Vote for Each of the Candidates | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Party | Race | Black Voters | | | White Voters | | |
| 2001 General: State Attn General | | | Homog Precinct | Bivariate Regress | Ecological Inference | Homog Precinct | Bivariate Regress | Ecological Inference |
| AD McEachin | DEM | Black | 93.0 | 100.0 | 95.3 | NA | 14.6 | 25.8 |
| JW Kilgore | REP | White | 7.0 | 0.0 | 4.7 | NA | 85.4 | 74.2 |
| *Turnout* | | | *28.0* | *23.1* | *27.2* | *NA* | *31.4* | *30.1* |
| 2008 General: US President | | | | | | | | |
| B Obama | DEM | Black | 98.0 | 100.0 | 94.9 | NA | 24.0 | 51.0 |
| J McCain | REP | White | 1.5 | 0.0 | 7.4 | NA | 74.8 | 44.5 |
| *Turnout* | | | *50.1* | *40.8* | *48.7* | *NA* | *61.0* | *58.3* |
| 2007 State Senate District 16 | | | | | | | | |
| H Marsh III | DEM | Black | 95.6 | 100.0 | 98.8 | NA | 43.1 | 46.8 |
| R Owens | IND | | 4.4 | 0.0 | 4.2 | NA | 56.9 | 49.7 |
| *Turnout* | | | *9.4* | *3.5* | *6.9* | *NA* | *27.0* | *25.0* |

**District 18** Under the proposed plan, District 18 is 53.5% black in voting age population. It is currently 58.3% black VAP and is under-populated by more than 25,000 people (-12.6%).

The racial bloc voting analysis for this district (see Table 7, below) indicates that voting is consistently polarized in this district. The average turnout rates of blacks and whites are comparable: blacks turn out to vote on average at a rate of 37%; whites on average at a rate of 38%. The level of black cohesion is 95% and the average white crossover vote for the black-preferred candidate is 24%. The percent black VAP needed to elect a candidate of choice for black voters is less than 50% in this district, in large measure due to the high rate of cohesion.[13]

The reconstituted election results indicate that McEachin would have won the district with 55.5% of the vote and Obama with 65.6% of the vote.

---

[13] The calculation for the percent black VAP needed for black voters to elect their preferred candidate of choice this district is 41%.

9

VSBE 005641

## Table 7: Voting Patterns by Race in State Senate District 18

| Contest and Candidates | Candidate Information | | Estimate of the Percent of Black and White Voters Casting a Vote for Each of the Candidates | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Party | Race | Black Voters | | | White Voters | | |
| | | | Homog Precinct | Bivariate Regress | Ecological Inference | Homog Precinct | Bivariate Regress | Ecological Inference |
| 2001 General: State Attn General | | | | | | | | |
| AD McEachin | DEM | Black | 94.4 | 99.8 | 88.0 | 21.8 | 2.3 | 21.0 |
| JW Kilgore | REP | White | 5.6 | .2 | 12.2 | 78.2 | 97.7 | 78.7 |
| Turnout | | | 36.3 | 29.5 | 31.9 | 45.7 | 30.4 | 31.7 |
| 2008 General: US President | | | | | | | | |
| B Obama | DEM | Black | 98.2 | 100.0 | 95.9 | 31.8 | 14.5 | 31.0 |
| J McCain | REP | White | 1.6 | 0.0 | 3.7 | 66.6 | 83.8 | 67.5 |
| Turnout | | | 56.6 | 50.4 | 52.6 | 62.6 | 55.9 | 56.4 |
| 2003 State Senate District 18 | | | | | | | | |
| LL Lucas | DEM | Black | 93.9 | 94.8 | 91.4 | 32.2 | 19.3 | 38.5 |
| WD Brown | REP | | 6.1 | 5.2 | 8.7 | 67.8 | 80.7 | 61.5 |
| Turnout | | | 25.5 | 23.2 | 24.2 | 22.8 | 18.4 | 19.9 |

### Conclusion

The proposed state senate plan maintains the same number of effective minority districts as the current plan. Although the black population percentages are all lower in the five majority black districts in the proposed plan, all of the districts remain majority black in composition and all of the districts offer black voters an effective opportunity to elect their preferred candidates of choice to office. This conclusion is based on the analysis of black and white voting patterns in the five districts, as well as recompiled election results for the two general elections that included African American candidates. In conclusion, the proposed state senate plan does not "retrogress minority voting strength with respect to their effective use of the electoral franchise" (*Beer*) – black voters are provided with the same number of effective districts under the proposed plan as they presently enjoy under the current state senate plan.

10

VSBE 005642

DEFENDANT-INTERVENORS TX 023 - Page 105

**Fletcher, Michael (CRT)**

| | |
|---|---|
| **From:** | Lynchburg Democratic Committee (b)(7)(C) |
| **Sent:** | Thursday, June 02, 2011 11:42 AM |
| **To:** | vot1973c (CRT) |
| **Subject:** | Comments on Virginia Redistricting Plan 2011-1805 |

June 2, 2011

Chief, Voting Section
Civil Rights Division
Room 7254 - NWB
Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530

The Lynchburg Democratic Committee urges the Department of Justice to reject the redistricting plan for the Virginia House of Delegates.

The plan is retrogressive because the voting strength of African American voters in Lynchburg would be reduced.

Under existing House of Delegates district boundaries, all of Lynchburg is in the 23rd district and the percentage of African Americans in the district is approximately 29.3%. The district coincides with the city boundaries, plus 3 precincts in Amherst County.

Under the redistricting plan, Lynchburg would be split between the 22nd and 23rd districts. The two districts would also include portions of four counties. The percentage of African Americans in the 22nd and 23rd districts combined would be lower than the percentage in the current 23rd district. The data below demonstrating this is from the 2010 Census:

| | |
|---|---|
| Lynchburg Independent City | 29.3% |
| Amherst County | 19.0% |
| Bedford County | 5.7% |
| Campbell County | 14.2% |
| Franklin County | 8.1% |

Besides retrogression, we ask the Department of Justice to consider two additional factors under Section 5 of the Voting Rights Act. These factors are (1) inexplicably disregarding available natural or artificial boundaries and (2) inconsistency with the jurisdiction's stated redistricting standards. Both factors should be considered because Lynchburg is split. In his executive order establishing the Independent Bipartisan Advisory Commission on Redistricting, the Governor of Virginia required that "All districts, to the extent practicable, shall respect the boundary lines of existing political subdivisions. The number of counties and cities divided among multiple districts shall be as few as practicable."

We also urge the Department of Justice to consider less retrogressive alternative plans, especially the report of the Commission on Redistricting.

(b)(7)(C)

Lynchburg Democratic Committee

1

VSBE 005643

**DEFENDANT-INTERVENORS TX 023 - Page 106**

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 6/2/2011      **Attorney/Analyst:** JP2, AAO

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)          **Race:** b

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005)

(b)(7)(C) approves of the plan. (b)(7)(C) the plan satisfies the requirements of the Voting Rights Act and the Constitution.  The plan provides black voters the ability to elect candidates of choice, and was the best of all the alternatives provided.

In 2001, (b)(7)(C) the black districts were packed in order to oppress black voters.  The purpose of the 2011 redistricting effort was to unpack those districts.

(b)(7)(C) more black voters than (b)(7)( needs (b)(7)(C) (b)(7)(C) to get elected. (b)(7)(C) that would also hold true for any future minority candidates running (b)(7)(C) low voter turnout will present a challenge, but that a strong candidate would be able to overcome that. (b)(7)(C) black candidates can never assume they will get elected just because they are black; they have to work for it.

(b)(7)(C) said that under the benchmark plan, (b)(7)(C) (b)(7)(C) was not located in (b)(7)(C) but, (b)(7)(C) under the proposed plan, it has been moved into (b)(7)(C) levels of voter registration are fairly high at (b)(7)(C) so the addition should help (b)(7)(

(b)(7)(C) (b)(7)(C) the race will be competitive, but no more competitive than it would have been under the benchmark plan. (b)(7)(C) will prevail.

(b)(7)(C) asserted that all five black districts remain viable. those districts will be able to elect candidates of choice, though it's possible that those candidates of choice may not always be black.

VSBE 005644

(b)(7)(C) has no concerns about discriminatory purpose. (b)(7)(C)
that opportunities for public input were more than adequate.

VSBE 005645

DEFENDANT-INTERVENORS TX 023 - Page 108

Confidential

## Memorandum of Telephonic Communication

**Date:** 6/2/2011    **Attorney/Analyst:** AAO

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)    **Race:** w

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** Commonwealth of Virginia

**Subject:** Chapter 1 (HB 5005)

(b)(7)(C)

(b)(7)(C) supported the plan because it helped Democrats, was fair and balanced, and maintained minority voting strength.

(b)(7)(C) said that all five black districts remain viable under the proposed plan. (b) does not think that any of the districts are vulnerable. Most of the districts could have BVAPS lower than 50% and still elect candidates of choice. (b)(7)(C) analyses have indicated that there is significant white crossover voting in Districts 2, 5, and 9. There is some crossover voting in District 16, though not very much. District 18 has the least amount of white crossover voting. (b)(7)(C) black candidates have been successful on the local level even when the combined minority population was 20% or lower.

(b)(7)(C) Delegate Morrissey may challenge Senator Marsh in District 16, but (b)(7)(C) Marsh will prevail. Morrissey has only been successful when he has run against multiple black candidates who split the black vote.

(b)(7)(C) the possibility of drawing a 6th black district was considered, but it was determined that one could not be drawn without damaging the existing black districts. In particular, District 16 would have been reduced to below 50% BVAP. Given that there is not much crossover voting in that district, this might have hurt the ability of non-incumbent black candidates to get elected. (b)(7)(C) drawing a 6th district would also have violated Shaw v. Reno.

VSBE 005646

(b)(7)(C) has no concerns about purpose; in fact, (b)(7)(C)
the committee made every effort to be fair and maintain or improve
black voting strength. (b)(7)(C) opportunities for public input
into the plan were more than adequate. (b)(7)(C) the plan moves the
state forward.

(b)(7)(C) the proposed plan provides for three
districts that have a combined minority population that is over 50%:
Districts 29, 35, and 36.

VSBE 005647

DEFENDANT-INTERVENORS TX 023 - Page 110

Confidential

# Memorandum of Telephonic Communication

**Date**: 6/2/2011 **Attorney/Analyst**: JP2, EEK

**File No.**: 2011-1805

**Other Party**: (b)(7)(C) **Race**: (b)

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: State of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

(b)(7)(C) does not support the proposed plan because (b)(7)(C) the plan decreased the BVAP of (b)(7)(C) District 75, and effectively changed the district from a minority district to a non-minority district.

In 2001, the BVAP (b)(7)(C) was 58%. (b)(7)(C) 58% should be the target BVAP for all the minority districts. (b)(7)(C) this is especially true for District 75 because there are five correctional centers in the district with approximately 8,000 inmates.

Under the proposed plan, (b)(7)(C) a BVAP of 55%. (b)(7)(C) the BVAP is actually around 50% if the prison population is taken into account. (b)(7)(C) 50% is too low and will impact minority voting strength, (b)(7)(C) (b)(7)(C) will make it difficult for (b)(7)(C) minorities to be elected in District 75. (b)(7)(C) (b)(7)(C)

The prisons were not moved into the district; they were there before the 2011 redistricting cycle. But the prisons concern (b)(7)( because the prison population has increased. (b)(7) does not know the actual amount of increase.

(b)(7)(C) a few other plans that increased the BVAP in District 75 above 55%. (b)(7)(C) it would have been possible to move minority populations from District 63 (b)(7)(C) and/or District 64 (b)(7)(C) to District 75.

(b)(7)(C) unfamiliar with the bipartisan commission's plan with thirteen minority districts and does not have any particular thoughts or concerns regarding the possible 13th minority district.

(b)(7)(C)
does not believe (b)(7)(C) had a discriminatory purpose in creating the redistricting plan, but (b)(7)(C) believes the results of the plan discriminate against the minority voters of District 75.

Confidential

## Memorandum of Telephonic Communication

**Date**: 6/3/2011      **Attorney/Analyst**: EEK, JP2, JS2

**File No.**: 2011-1805

**Other Party**: (b)(7)(C)      **Race**: (w)

**Tel. No.**: (b)(7)(C)

**Title/Organization**: (b)(7)(C)

**Jurisdiction**: State of Virginia

**Subject**: Chapter 1 (H.B. 5005) (2011)

(b)(7)(C)

(b)(7)(C)                                        H.B. 5001 and H.B. 5005. (b)(7)(C)
                                                 (b)(7)(C)
5001. (b)(7)( primary focus was on the one person, one vote principle and on
VRA compliance.  The plan was completed around the end of March.  It was
immediately delivered to each delegate and released to the public.  Public
hearings were held a few days after the release – Thursday, March 31st,
Saturday April 2nd, and Monday, April 4th.  The public was also able to post
comments on the internet.  The process from the release of the bill to final
passage in the House took a total of nine days.

Compared to redistricting cycle in 2001, (b)(7)(C)       there were more
opportunities for public input in the current cycle because the Census data
was released sooner, and the plan was released prior to the hearings.
Although the timeline is still tight, it was not as tight as in 2001.

(b)(7)(C)
                                            receptive to concerns presented by other
delegates and by members of the general public.  For example, (b)(7)(C)
amendments to the plan (b)(7)(C)             in Districts 69, 70, and 71 when
someone commented on concerns about communities-of-interest being split in
those districts.

(b)(7)(C)                                   decided a 55% BVAP was necessary to
secure the minority voting strength of the twelve minority districts.  (b)(7)
(b)(7)(C)                           after listening to comments received from the public
and members of (b)(7)(C)        .

(b)(7)(C)              the final product meets the one person, one vote
principle, complies with the VRA, and enables minority districts to elect
candidates-of-choice.

Page 1 of 2

VSBE 005649

With respect to District 75, | (b)(7)(C) |

(b)(7)(C)

(b)(7)(C) _____ district was the same under both H.B. 5001 and H.B. 5005.

With regard to the bipartisan commission's plans, (b)(7)(C) the plans were supposed to be released before the House plan, but they were not available for review until four to five days after H.B. 5001 was released. (b)(7) did not favor the commission's plans because they did not meet the +/-1% deviation and the 55% BVAP criteria (b)(7)(C)

No voting analysis was conducted. (b)(7)(C) does not know if voting analysis was conducted in 2001.

VSBE 005650

DEFENDANT-INTERVENORS TX 023 - Page 113

Case 3:14-cv-00852-REP-AWA-BMK Document 81-2 Filed 06/25/15 Page 115 of 296 PageID# 1252

## Fletcher, Michael (CRT)

| | |
|---|---|
| **From:** | (b)(7)(C) |
| **Sent:** | Monday, June 06, 2011 12:25 PM |
| **To:** | vot1973c (CRT); johnpowers2@usdoj.gov |
| **Cc:** | Carl Wright |
| **Subject:** | Comments for 2011 1805: Virginia Beach NAACP/VB AAPAC Plans For The Creation Of A "Majority Minority District w/in the 21st District" ...... |
| **Attachments:** | New District Proposal Racial Profile Bruce revised 1 percent.xls, Precinct Numbers all minorities 2011.doc; VA Beech 21st Majority Minority District Proposal 3 map a111 (2).jpg, VA Beach 21st Majority Minority District Proposal 3 map b112 (2).jpg; VA Beach Minority District autoBound Plan.pdf; va_beach (1).pdf; Concerned African American Citizens of the 21st District DOJ.doc |

Good morning Mr. Powers,

Per your request via your phone conversation with Mr. Wright; several weeks ago; I am remitting the aforementioned plans to you regarding the creation of a "Majority Minority District w/in the 21st District".

Please see the 7 attachments............

Mr. Wright directed me to express to you on behalf of the VB NAACP/VB African American Political Action Council (AAPAC) how pleased he is that you and the "Department of Justice" have taken an interest in this important community issue.

If you have any questions or concerns please direct them to Mr. Carl Wright; I have included contact information at the close of this email for your records.

Respectfully;

VB AAPAC

Mr. Carl Wright,
1st Vice President VB NAACP/
Chairman, African American Political Action Committee (AAPAC)
(b)(7)(C)

1

**DEFENDANT-INTERVENORS TX 023 - Page 114**

*Concerned African American Citizens of the 21ˢᵗ District*

# POSITION

## 2011
## *STATE OF VIRGINIA REDISTRICTING*

*"Blessed is the leader who seeks the best for those he serves"*

*JUNE 6, 2011*

*Respectfully Submitted,*
## Carl Wright,

*1ˢᵗ Vice President Virginia Beach NAACP &*
*Chair Virginia Beach African American Political Action Council-(AAPAC)*

## Andrew Jackson,

*Community Advocate &*
*Chair Virginia Beach African American Leadership Forum*

### Bruce

## Williams

*President/ CEO of "A. Bruce Williams & Associates"*
*Research Advisor*

*VM*

**VSBE 005652**

**DEFENDANT-INTERVENORS TX 023 - Page 115**

## Introduction

There are many ways representatives can be chosen. The preferred choice would be in a way that is truly representative of all. What is commonly known is that making decisions in large groups is very difficult. Conversely, making decisions in small groups is easier and therefore people prefer to delegate some decisions. However, the underlying principle of *democracy* is that decisions that affect the people should largely accord with the will of the people. One way to improve the prospects of this is for representatives to be *elected*. The basis of representative democracy is that the collective views of the representatives reflect the collective views of *[all]* the people. Therein lays the importance of representation that is proportional to the electorate. The idea of representation that is proportional is simply a more precise statement of this ideal: the proportion of representatives that hold a particular view should be roughly the same as the proportion of the citizens that hold that view.

## Proposal

A goal of this proposal is to promote an **honest** and **true representative government**. As noted, the Voting Rights Act [generally] requires that when a district can be drawn that would have 51% or more of persons age 18 and above being minorities then such a district [MUST] be drawn. This is the proposal we are presenting herein as a redraw of House District 21. We truly believe that this proposal will meet the guidelines of both federal and state mandates and an amicable solution can be reached on this proposed matter. It is also plausible and open for consideration other alternatives to this plan in which we would be open for discussion to find common ground for a truly minority/majority district.

## Summation

Nearly 46 years after the passing of the Voter Rights Act, the quest for equal representation in this area of the State still goes unfulfilled and things such as the current State redistricting plan and the Virginia Beach **hybrid** voting system still impedes equal representation.

The disenfranchisement of any citizen is unacceptable and should not be tolerated.

**Majority Minority 21st District Proposal 3**

| Precincts | Population | Afro-Am | | Asian | | Hispanic | | Other | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bellamy (043) | 5,233 | 1,453 | 27.8% | 706 | 13.5% | 448 | 8.6% | 515 | 9.8% | 3,122 | 59.7% |
| Buckner (074) | 4,745 | 1,651 | 34.8% | 470 | 9.9% | 443 | 9.3% | 409 | 8.6% | 2,973 | 62.7% |
| Dahlia (073) | 7,710 | 2,424 | 31.4% | 733 | 9.5% | 755 | 9.8% | 642 | 8.3% | 4,554 | 59.1% |
| Glenwood (058) | 4,335 | 1,020 | 23.5% | 769 | 17.7% | 273 | 6.3% | 304 | 7.0% | 2,366 | 54.6% |
| Green Run (046) | 7,782 | 2,518 | 32.4% | 1,311 | 16.8% | 810 | 10.4% | 706 | 9.1% | 5,345 | 68.7% |
| Holland (029) | 7,820 | 2,509 | | | | | | | | 2,509 | 32.1% |
| Indian Lakes (078) | 3,963 | 943 | 23.8% | 423 | 10.7% | 276 | 7.0% | 271 | 6.8% | 1,913 | 48.3% |
| Lexington (091) | 5,257 | 1,379 | 26.2% | 405 | 7.7% | 457 | 8.7% | 458 | 8.7% | 2,699 | 51.3% |
| Rock Lake (081) | 5,758 | 1,468 | 25.5% | 836 | 14.5% | 529 | 9.2% | 477 | 8.3% | 3,310 | 57.5% |
| RosemontForest (064) | 5,723 | 1,366 | 23.9% | 384 | 6.7% | 405 | 7.1% | 405 | 7.1% | 2,560 | 44.7% |
| Round Hill (071) | 7,208 | 2,259 | 31.3% | 1,017 | 14.1% | 592 | 8.2% | 584 | 8.1% | 4,452 | 61.8% |
| Timberlake (045) | 6,534 | 2,509 | 38.4% | 695 | 10.6% | 577 | 8.8% | 660 | 10.1% | 4,441 | 68.0% |
| Windsor Oaks (036) | 6,507 | 1,709 | 26.3% | 321 | 4.9% | 531 | 8.2% | 548 | 8.4% | 3,109 | 47.8% |
| TOTALS | 78,575 800 79,375 | 23,208 | 29.5% | 8,070 | 10.3% | 6,096 | 7.8% | 5,979 | 7.6% | 43,353 Total Minorities | 55.2% |

Target 80,000 1% variance 800

VSBE 005654

DEFENDANT-INTERVENORS TX 023 - Page 117

| Precincts | Population | Afro-Am | Asian | Hispanic | Other |
|---|---|---|---|---|---|
| Bellamy (043) | 5,233 | 1,453 – 27.8% | 706 – 13.5% | 448 – 8.6% | 515 – 9.8% |
| Brandon (042) | 4,823 | 1,211 – 25.1% | 409 – 8.5% | 300 – 6.2% | 332 – 6.9% |
| Buckner (074) | 4,745 | 1,651 – 34.8% | 470 –9.9% | 443 – 9.3% | 409 – 9/6% |
| College Park (041) | 3,515 | 1,757– 50.0% | 116 – 3.3% | 231 – 6.6% | 258 – 7.3% |
| Dahlia (073) | 7,710 | 2,424 – 31.4% | 733 – 9.5% | 755 – 9.8% | 642 – 8.3% |
| Glenwood (058) | 4,335 | 1,020 – 23.5% | 769 – 17.7% | 273 –6.3% | 304 – 7.0% |
| Green Run (046) | 7,782 | 2,518 – 32.4% | 1,311 – 16.8% | 810 – 10.4% | 706 – 9.1% |
| Homestead (052) | 5,727 | 1,057 – 18.5% | 814 – 14.2% | 256 – 4.6% | 305 – 5.3% |
| Indian Lakes (078) | 3,963 | 943 – 23.8% | 423 – 10.7% | 276 – 6.0% | 271 – 6.8% |
| Lexington (091) | 5,257 | 1,379 – 26.2% | 405 – 7.7% | 457 – 8.7% | 458 – 8.7% |
| Reon (080) | 3,722 | 1,976 – 53.1% | 126 – 3.4% | 308 – 8.3% | 357 – 9.6% |
| Rock Lake (081) | 5,668 | 1,468 – 25.9% | 836 – 14.7% | 529 – 9.3% | 477 – 8.4% |
| RosemontForest (064) | 5,723 | 1,366 – 23.9% | 649 – 11.3% | 384 – 6.7% | 405 – 7.1% |
| Round Hill (071) | 7,208 | 2,259 – 31.3% | 1,017 – 14.1% | 592 – 8.2% | 584 – 8.1% |
| Timberlake (045) | 6,534 | 2,509 – 38.4% | 695 – 10.6% | 577 – 8.8% | 660 – 10.1% |
| Windsor Oaks (036) | 6,507 | 1,709 – 26.3% | 321 –4.9% | 531 – 8.2% | 548 – 8.4% |
| TOTALS: | 88,452 | 26,700 – 30.18% | 9,800 – 11.08% | 7,170 – 8.11% | 7,231 – 8.17% |

Total Minorities
50,901 = 57.55%

VSBE 005655

DEFENDANT-INTERVENORS TX 023 - Page 118



VSBE 005656

DEFENDANT-INTERVENORS TX 023 - Page 119

| Rep Gov '09 | Dem Gov '08 | Rep Lt Gov '09 | Dem Lt Gov '09 | Rep Att Gen '09 | Dem Att Gen '09 |
|---|---|---|---|---|---|
| 55% | 45% | 49% | 51% | 53% | 47% |

| TAPersons | Target | Difference | Dev. |
|---|---|---|---|
| 80293 | 200,026 | -119,733 | 59.9% |

| TAPersons | White | % White | Black | % Black | AIAN | % Asian | HawPI | % Other | Multi | % Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|
| 80293 | 39,783 | 49.5% | 25,725 | 32.0% | 588 | 13.2% | 167 | 2.7% | 1,274 | 6.1% |

| VAPersons | VAPWhite | % VAP White | VAPBlack | % VAP Black | VAPAIAN | % VAP Asian | VAPHawPI | % VAP Other | VAPMulti | % VAP Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|
| 58562 | 30,451 | 52.0% | 17,559 | 30.0% | 450 | 13.5% | 119 | 2.5% | 589 | 6.9% |



DEFENDANT-INTERVENORS TX 023 - Page 121



DEFENDANT-INTERVENORS TX 023 - Page 122

06/23/2009 13 07 FAX                                                    Ø001/010

SECTION 5 SUBMISSION
*COMMENT*

**Fax Cover Sheet**                    NO. *2011-1805*

To: Chris Herren, Chief,
Voting Section,
Civil Rights Division U.S. Department of Justice,
Washington, DC 205030
**From:** (b)(7)(C)
**Re:** Section 5 Preclearance of Virginia House of Delegates Redistricting Plan
**Pages:** 10


Dear Mr. Herren:

Enclosed is a comment letter regarding the Virginia House of Delegates plan currently pending
in your office for preclearance review under Section 5 of the VRA, 42 USC 1973c. I am a (b),
(b)(7) with a special interest in redistricitng plans. I respectfully urge you to object for the
reasons set forth in the attached memorandum. Please feel free to call me at (b)(7)(C) if you
have any questions or desire any additional information.

Respectfully submitted,

(b)(7)(C)

VSBE 005660

DEFENDANT-INTERVENORS TX 023 - Page 123

**Analysis of Virginia 2011 House of Delegates Redistricting Analysis by** (b)(7)(C)

    Leaving aside the possibility that Virginia's redistricting plan for the House of Delegates may have been enacted with a discriminatory purpose, the plan has a retrogressive effect on the ability of minority voters to elect candidates of choice and constitutes a violation of section 5 of the Voting Rights Act with respect to districts 14, 21, 23, and 93.

    Virginia is a covered under section 5 of the Voting Rights Act.[1] This means the United States Department of Justice or the DDC Court must pre-clear any changes Virginia makes to its election laws, including the enactment of new apportionment plans for the Virginia House of Delegates. In order to gain preclearance from the Department of Justice, the change in the election law must not have a retrogressive effect or be enacted with a discriminatory purpose.[2] To test for retrogressive effect, the Department of Justice compares the ability of minority voters to elect candidates of choice under the new law with the ability of minority voters to elect candidates of choice under the last legally enforceable law.[3] Thus, to determine if retrogression has occurred, one compares the ability of minority voters in Virginia to elect candidates to the House of Delegates under the new and old redistricting plans using current census data.[4] While "the Attorney General does not rely on any predetermined or fixed demographic percentages at any point in [a retrogression analysis]," an assessment of the number of minority-majority, coalition, and cross-over districts is relevant to this inquiry.[5] Overall, the Virginia House of

---

[1] 39 F.R. § 9897 (1964).
[2] 76 F.R. § 7470 (2011).*Beer v. U.S.*, 425 U.S. 130, 141 (1976).
[3] 76 F.R. § 7471 (2011).
[4] *Id.* Note all data in this report is from the 2010 Census as reported on Virginia's redistricting website. *Redistricting Plans*, Dep't of Leg. Serv., COMMONWEALTH OF VIRGINIA (June 10, 2011), http://redistricting.dls.virginia.gov/2010/RedistrictingPlans.aspx.
[5] *Cf. Bartlett v. Strickland*, 129 S. Ct. 1249 (2009).

Delegates maintains the number of majority-African American districts, while decreasing the number of coalition and influence districts.

<u>Overall Demographics</u>

According to the 2010 Census, Virginia has a total population of 8,001,024, of whom 1,653,563 (20.7%) are African American, 631,825 (7.9%), and 522,199 (4.3%) are Asian. Non-Latino whites comprise 66.8% of the state's population. There are 6,147,347 Virginia residents 18 years old or older, of whom 1,192,554 (19.4%) are African American, 426,857 (6.9%) are Latino 378,530 (4.2%) are Asian. During the past decade, the state's population increased 13%. Over half of that growth is due to growth in the state's minority population. As a result, the percentage of the state's white population decreased, while the African American, Latino, and Asian percentages increased.

<u>Minority Majority Districts</u>

These are so-called "safe districts" in which minority voters clearly have the ability to elect their preferred candidate of choice. For a district to be considered "an ability to elect district" means that "(1) minority voters need generally to unite behind a preferred candidate; and (2) the chosen candidates must usually prevail."[6] Both the 2001 and 2011 redistricting plans contain twelve districts where African Americans comprise more than 50% of the district's total population, but the 2001 plan had only eleven districts with an African American voting age population over 50%.

Overall, six of these twelve districts are have a higher proportion of African Americans than they did under the 2001 plan, and six contain a smaller proportion of African Americans

---

[6] Memorandum from the Department of Justice—Civil Rights Division—Voting Section on Section 5 Recommendation: House Bill 3 (Congressional redistricting plan enacted by the Texas Legislature) 26 (Dec. 12, 2003).

VSBE 005662

than in the 2001 plan. As a result of these changes, the African American voting age population in each district under the 2011 is at least 55% in each of the twelve districts.[7] The increase in the African American population in these district is unnecessary because black candidates of choice of African American voters were already being elected to the House of Delegates in these districts in each of the last three election cycles. The sole exception is the 2005 race in district 75 where Delegate Tyler (B) won her first term in office in a close open-seat contest against a candidate named Saunders.[8] Delegate Tyler has been unopposed in 2007 and 2009.

Furthermore, it is clear that old districts 71, 80, and 89 did not require additional minority voters to remain safe seats for minority candidates of choice, even if the incumbent delegate retired. In Richmond-based district 71, with a 50.7% total African American population and a 46.3% African American voting age population, Delegate Mcclellan (A) first won election to the House of Delegates without a general election opponent. In districts 80 (Portsmouth), Delegate James (A) was unopposed in his first election in 2009.[9] Old district 80 had an African American voting age population of only 54.4%. In district 89 (Portsmouth), Delegate Alexander (A) won her seat in 2002 special election in which she earned 72.6% of the vote. Old district 89 has an African American voting age population of only 52.5%. This constitutes clear evidence that the effect of Virginia's House of Delegates 2011 redistricting plan packed additional minority voters into districts that were already effective for minority voters. The Morrissey plan increases the African American populations in district 71 from 46.3% to 47.6%, increases the African American voting age population in district 80 from 54.4% to 59.3%, and decreases the minority

---

[7] See Table 1.

[8] See Table 2. Also, I do not have enough information to determine the Saunder's race or if other factors may have contributed to such a close election.

[9] James won the primary for District 80 with 45.2% of the vote. Doug Smith (W) won 35.6% of the vote and Elijah Sharp (A) won 19.2% of the vote. Thus, there is sufficient primary support for minority candidates in the district as well.

population in district 89 from 52.5% to 50.6%. The packing of minority voters into these districts constitutes retrogression because it has resulted in the loss of coalitional or opportunity districts.

Coalitional Districts

Packing Impacted Districts

**District 93 Retrogression**: The drop in the African American population in new district 93, due to the packing of African American voters in new districts 92 and 95, has a retrogressive effect on the ability of minority voters to effectively participate in the political process. The old district 93 had an African American total population of 36.9%. The old district 93 performed consistently for minority candidates of choice, at least since 2008. For instance, President Obama won over 57.4% of the vote in the old district 93. In addition, despite a good year for Republicans in Virginia in 2009, Delegate Abbott (W), a Democrat defeated the Republican incumbent, Delegate Hamilton (W) and was the candidate of choice of black voters. It appears that Abbott performed better in the Newport News precincts of the district which have a greater proportion of minority voters than she did in the district overall.

The new district 93 has an African American population of 24.9%, a substantial decrease. President Obama won only 54.7% of the vote in the new district 93. Furthermore, Delegate Abbott lives outside of the new district 93, although she plans to move into a precinct in the new district so that she can run for reelection.[10] The new district separates her from the minority voters who likely propelled her to win in 2009. The old district 93 bordered old districts 92 and 95, both of which are underpopulated majority African American districts. Thus, the old district 93 would have had to lose minority voters to districts 92 and 95. However, other proposed

---

[10] Steve Vaughan, *Abbott to Run in 93rd*, VIRGINIA GAZETTE (May 27, 2011), *available at:* http://www.vagazette.com/articles/2011/05/31/news/doc4ddf18a309ff9804344073.txt.

VSBE 005664

redistricting plans maintain districts 92 and 95 as "ability to elect" districts and district 93 as a coalitional district.

However, the new districts 92 and 95 remain heavily African American districts. In fact, African American voters remain packed both districts 92 and 95 under the proposed 2011 plan. The total African American population in district 92 decreases from 64.1% to 63.1%. The total African American population in district 95 decreases from 64.1% to 62.6%. It appears that the African American populations in the new districts 92 and 95 could have been reduced somewhat without jeopardizing the ability of minority voters in those districts to elect candidates of choice. Both district 92 and 95 remain districts where African American candidates of choice can safely win reelection. The incumbent delegates, Delegates Ward (A) and Bacote (A), have run unopposed in the last two elections and won re-election by an overwhelming margin in 2005. Both delegates were first elected in 2003. Delegate Ward defeated a Republican, listed as A. Bryant, by about 9%. Delegate Bacote defeated her 2003 general election challenger by a much wider margin, 65% to 35%, although Delegate Bacote had a close primary race in 2003 against a candidate named Rattley. Overall, it seems that a minority candidate of choice could win election in district 92 with a slightly lower African American population, and win district 95 with a significantly lower African American population even if the incumbent delegates in these seats were to retire.

Furthermore, the Morrissey plan would likely allow voters to continue to elect candidates of choice in districts 92 and 95 without significantly hindering the ability of minority voters to elect a candidate of choice in district 93. Under the Morrissey plan, district 92 would have an African American total population of 56.6% and an African American voting age population of 54.6%. District 95's total African American population would be reduced to 62.4% and African

VSBE 005665

American voting age population would be reduced to 59.8%. Both Districts 92 and 95 remain safe seats under the Morrissey plan. The area which comprises district 93 in Virginia's redistricting plan is within district 96 under the Morrissey plan. Morrissey plan district 96 would have an African American total population of 31.9% and an African American voting age population of 29.3%. In this district, black voters would continue to be an effective voting bloc in the district and be able to join in coalition with other voters to elect their preferred candidate of choice. Indeed, President Obama won 56.8% of the vote in this Morrissey district 96. Simply put, this district would better preserve the ability of minority voters to elect candidates of choice in this area.

Thus, in maintain districts 92 and 95 as ability to elect districts, Virginia chose to enact a redistricting plan that eliminated district 93 as a coalitional district, even though the Morrissey plan both maintains districts 92 and 95 as ability to elect districts and maintains district 93 as a coalitional district. As a result, the new district 93 retrogresses the ability of minority voters to participate effectively in the political process.

### Cracking Impacted Districts

*District 14*: The proportion of the voting age population that was African American decreased in district 14 from 37.7% to 34.1%. While this percentage change may seem small, it is not when one considers the political competitiveness of the old district. President Obama won the old District 14 with 53% of the vote. President Obama lost the new District 14, earning only 49.4%. Although Delegate Marshall (W) has represented District 14 in the House of Delegates since 2002, his margin of victory in 2007 was under 4%. It is fairly clear that Del. Marshall is not the candidate of choice of minority voters. While he routinely wins in the district, he underperforms in Henry County and Danville, where a greater portion of the population is

@008/010

African American. Thus, it appears that African American voters in the old District 14 were on
the verge of electing a candidate of choice and now that opportunity has been diminished in the
new district 14.

*District 21*: Here again, though there was only a minimal decrease in the percentage of
the African American total and voting age population, but it is clear that African American
voters in the new District 21 were placed in a district with voters who are less likely to vote for
the African American candidate of choice. In the old District 21, President Obama won with
52.6% of the vote. In the new District 21, President Obama won only 49.9% of the vote. In
2007, Mathieson (W) won 57.2% of the vote to unseat the incumbent delegate, Welch (W).
During this election, Mathieson won all of the precincts where non-Hispanic whites comprised
less than 50% of the voting age population. Thus, at least when minority voters are united behind
a single candidate, minority voters possessed an ability to elect a candidate of choice in the old
District 21.

*District 23*: Elections results from the last several cycles show an interesting history. A
Republican, Delegate Bryant (W) held the district until 2006. In 2006, Delegate Valentine (W), a
Democrat, won a special election. Delegate Valentine was unopposed in the 2007 election cycle.
In 2009, Delegate Garrett (W), a Republican, defeated Delegate Valentine by less than 1%.
President Obama received only 46.8% of the vote in old district 23.

This history shows that, while it is certain that minority voters cannot consistently elect a
candidate of choice from district 23, minority voters have played an important and decisive role
in the electoral process. Many of these minority voters live in neighborhoods in eastern
Lynchburg. Voters in these neighborhoods voted overwhelmingly for Delegate Valentine in
2009. In the Second Ward First Precinct which has an African American voting age population

of 62.1%, Valentine won 80.8% of the vote. In the Second Ward Second Precinct which has an African American voting age population of 69.8%, Valentine won 85.5% of the vote. In the Second Ward Third Precinct which has an African American voting age population of 70.3%, Valentine won 77.9% of the vote. These data indicate that Valentine was the African American candidate of choice. Thus, minority voters are able to elect candidates of choice for the House of Delegates at least some of the time in the old district 23.

The old district 23 was within 888 people of the ideal population for a Virginia House of Delegates districts and thus, no boundary changes were necessary for the district to comport with one person, one vote requirements. Nonetheless, the geographic boundaries and character of district 23 were changed dramatically. The total African American population plummets from 30.1% to 16.5% and the African American voting age population plummets from 29.5% to 14.9%. The result of these changes is that minority voters lose their ability to effectively participate in or influence elections. In the new district 23, President Obama won only 37% of the vote. Furthermore, it appears that the legislature targeted heavily African American precincts in Lynchburg and placed these precincts in district 22 which is now comprised almost solely of overwhelmingly white precincts in Bedford, Campbell, and Franklin Counties. In district 22, minority voters in Lynchburg will not be able to unite with other like-minded voters to elect a candidate of choice, where President Obama won only 39.5% of the vote.

These changes are quite unsettling for a variety of reasons. First, it appeared that minority voters could sometimes elect a candidate of choice in the old district 23, at least for the House of Delegates. Second, district 23 was listed in Virginia's 2001 submission to the Department of Justice as an influence district where minority voters could play a substantial, if not decisive role, in the electoral process. The ability of minority voters to play that substantial or decisive role in

VSBE 005668

DEFENDANT-INTERVENORS TX 023 - Page 131

the political process has certainly diminished within the new District 23. Third, no changes were needed to make to this district comport with one person, one vote. Fourth, the new district 22, in which the most heavily populated African American precincts from the old district 23 were placed, dilutes black voting strength by taking these voters from a district where they could form a coalition to one where they have no opportunity to influence the electoral outcome. Finally, Virginia, in its 2011 submission for preclearance, fails to meet its burden of proof because it provides no substantive explanation for why it extracted heavily minority precincts from the district and placed them in another district comprised almost solely of overwhelmingly white precincts.

## Conclusion

With respect to districts 14, 21, 23, and 93, Virginia's House of Delegates redistricting plan has a retrogressive effect on the ability of minority voters to participate effectively in the political process by electing candidates of choice. In each instance, enough minority voters are removed from these districts such that minority candidates of choice no longer have enough support to be elected. The decisive or key role that black voters in these districts previously enjoyed under the "old" map has been eliminated or substantially diminished in the "new" map. For these reasons, I urge you to interpose an objection under Section 5 of the Voting Rights Act.

VSBE 005669

DEFENDANT-INTERVENORS TX 023 - Page 132

## Fletcher, Michael (CRT)

| | |
|---|---|
| **From:** | (b)(7)(C) |
| **Sent:** | Wednesday, June 15, 2011 3:34 PM |
| **To:** | vot1973c (CRT) |
| **Cc:** | Doug Smith |
| **Subject:** | 2011-1805 Comment |
| **Attachments:** | VA Redistricting Coalition Letter.pdf; Chapter 1_house_compare_DOJ.xls; Chapter 1_senate_compare_DOJ.xls; Virginia Redistricting Coalition Members.pdf |

To Whom It May Concern:

On behalf of C. Douglas Smith, Chairman of the Virginia Redistricting Coalition, please find attached the comments of the Coalition regarding Virginia's request for preclearance, Submission No.
2011-1805.

Respectfully,

(b)(7)(C)

1

VSBE 005670

DEFENDANT-INTERVENORS TX 023 - Page 133

Chapter 1, 2011 Acts, House Plan Compare ALL

Racial Demographics

| DISTRICT | Total Population | White | % White | Black | % Black | 2001 | Change | Black UofR | Change | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 80,508 | 76,238 | 94.7% | 2,868 | 3.6% | 3.4% | 0.2% | 4.1% | 0.7% | |
| 2 | 79,491 | 45,289 | 57.0% | 20,362 | 25.6% | 2.4% | 23.2% | 1.7% | 0.7% | Packing in Chapter 1 |
| 3 | 80,583 | 77,178 | 95.8% | 2,400 | 3.0% | 2.5% | 0.4% | 3.4% | 0.8% | |
| 4 | 80,446 | 77,768 | 96.7% | 1,655 | 2.1% | 2.8% | -0.7% | 2.6% | -0.2% | |
| 5 | 80,600 | 76,060 | 94.4% | 2,580 | 3.2% | 2.6% | 0.6% | 2.4% | -0.1% | |
| 6 | 79,608 | 76,371 | 95.9% | 1,790 | 2.2% | 4.8% | -2.5% | 4.8% | 0.1% | |
| 7 | 80,146 | 74,108 | 92.5% | 3,612 | 4.5% | 5.6% | -1.0% | 4.9% | -0.7% | |
| 8 | 80,685 | 74,011 | 91.7% | 3,652 | 4.5% | 5.9% | -1.3% | 5.6% | -0.3% | |
| 9 | 80,574 | 68,709 | 85.5% | 8,389 | 10.4% | 9.4% | 1.0% | 7.8% | -1.6% | |
| 10 | 80,617 | 60,831 | 75.5% | 7,376 | 9.1% | 13.4% | -4.3% | 24.2% | 10.8% | |
| 11 | 80,132 | 47,632 | 59.4% | 27,648 | 34.5% | 37.1% | -2.6% | 33.0% | -4.1% | |
| 12 | 80,492 | 70,200 | 87.2% | 3,863 | 4.8% | 4.9% | -0.1% | 8.2% | 3.3% | |
| 13 | 80,579 | 48,642 | 60.4% | 11,369 | 14.1% | 11.0% | 3.1% | 12.5% | 1.5% | |
| 14 | 79,407 | 47,862 | 60.3% | 28,920 | 36.4% | 40.5% | -4.1% | | | |
| 15 | 80,630 | 75,913 | 94.1% | 1,904 | 2.4% | 2.5% | -0.2% | 4.5% | 1.9% | |
| 16 | 79,662 | 54,827 | 68.8% | 22,358 | 28.1% | 24.7% | 3.3% | | | |
| 17 | 80,631 | 71,273 | 88.4% | 5,839 | 7.2% | 6.8% | 0.5% | 6.9% | 0.1% | |
| 18 | 79,450 | 69,073 | 86.9% | 6,396 | 8.1% | 6.7% | 1.4% | 7.1% | 0.5% | |
| 19 | 80,080 | 73,554 | 91.8% | 5,114 | 6.4% | 6.4% | 0.0% | 4.9% | -1.4% | |
| 20 | 79,334 | 69,288 | 87.3% | 7,495 | 9.4% | 7.0% | 2.5% | 5.3% | -1.7% | |
| 21 | 79,608 | 45,487 | 57.1% | 20,209 | 25.4% | 25.9% | -0.5% | 23.2% | -2.7% | |
| 22 | 79,307 | 59,135 | 74.6% | 17,584 | 22.2% | 12.2% | 9.9% | 29.6% | 17.4% | |
| | | | | | | | | 29.4% | -0.6% | Cracking in Chapter 1 |
| 24 | 79,678 | 70,684 | 88.7% | 6,873 | 8.6% | 9.5% | -0.9% | 15.1% | 5.6% | |
| 25 | 80,011 | 73,736 | 92.2% | 3,153 | 3.9% | 6.2% | -0.9% | 5.8% | -0.3% | |
| 26 | 80,688 | 67,606 | 84.0% | 4,085 | 5.1% | 4.8% | 0.2% | 2.2% | -2.7% | |
| | | | | | | | | 27.5% | -0.6% | Cracking in Chapter 1 |
| 28 | 79,304 | 56,206 | 70.9% | 15,873 | 20.0% | 19.7% | 0.3% | 18.3% | -1.5% | |
| 29 | 79,851 | 68,575 | 85.9% | 5,482 | 6.9% | 7.0% | -0.1% | 7.1% | 0.2% | |
| 30 | 80,583 | 62,914 | 78.1% | 12,893 | 16.0% | 15.1% | 0.9% | 13.0% | -2.1% | |
| 31 | 79,210 | 50,345 | 63.6% | 16,867 | 21.3% | 24.1% | -2.8% | 32.5% | 8.4% | |
| 32 | 80,268 | 55,738 | 69.4% | 6,514 | 8.1% | 7.9% | 0.2% | 8.8% | 1.0% | |
| 33 | 80,550 | 70,393 | 87.4% | 4,468 | 5.5% | 7.3% | -1.7% | 8.0% | 0.7% | |
| 34 | 80,722 | 61,693 | 76.4% | 2,920 | 3.6% | 3.2% | 0.4% | 4.7% | 1.5% | |
| 35 | 80,213 | 53,780 | 67.0% | 4,175 | 5.2% | 4.8% | 0.4% | 3.6% | -1.2% | |
| 36 | 79,746 | 53,210 | 66.7% | 7,677 | 9.6% | 8.8% | 0.8% | 8.8% | 0.0% | |

VSBE 005671

DEFENDANT-INTERVENORS TX 023 - Page 134

Chapter 1, 2011 Acts, House Plan Compare ALL

Racial Demographics

| DISTRICT | Total Population | White | % White | Black | % Black | 2001 | Change | Black UofR | Change | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|
| 37 | 80,255 | 47,377 | 59.0% | 6,773 | 8.4% | 6.8% | 1.7% | 7.3% | 0.6% | |
| 38 | 80,758 | 42,448 | 52.6% | 8,220 | 10.2% | 10.8% | -0.7% | 10.4% | -0.5% | |
| 39 | 80,710 | 46,876 | 58.1% | 7,970 | 9.9% | 7.2% | 2.7% | 7.2% | 0.0% | |
| 40 | 80,729 | 55,837 | 69.2% | 5,581 | 6.9% | 6.9% | 0.0% | 8.1% | 1.2% | |
| 41 | 80,792 | 54,579 | 67.6% | 5,080 | 6.3% | 6.8% | -0.5% | 6.9% | 0.1% | |
| 42 | 79,964 | 55,174 | 69.0% | 8,668 | 10.8% | 15.3% | -4.5% | 17.6% | 2.3% | |
| 43 | 80,750 | 47,821 | 59.2% | 14,789 | 18.3% | 16.5% | 1.8% | 15.4% | -1.1% | |
| 44 | 80,796 | 44,799 | 55.4% | 18,328 | 22.7% | 22.3% | 0.3% | 21.6% | -0.7% | |
| 45 | 80,240 | 59,905 | 74.7% | 9,859 | 12.3% | 11.9% | 0.4% | 13.3% | 1.3% | |
| 46 | 80,333 | 41,531 | 51.7% | 23,285 | 29.0% | 30.0% | -1.0% | 29.7% | -0.3% | |
| 47 | 80,757 | 61,673 | 76.4% | 4,228 | 5.2% | 7.4% | -2.2% | 6.0% | -1.4% | |
| 48 | 79,492 | 63,919 | 80.4% | 3,596 | 4.5% | 5.9% | -1.4% | 4.2% | -1.8% | |
| 49 | 80,609 | 42,754 | 53.0% | 14,262 | 17.7% | 17.9% | -0.2% | 16.3% | -1.5% | |
| 50 | 80,677 | 50,040 | 62.0% | 12,052 | 14.9% | 14.9% | 0.0% | 10.9% | -4.0% | |
| | | | | | | | | 23.6% | 1.0% | Cracking in Chapter 1 |
| 52 | 79,290 | 33,564 | 42.3% | 25,067 | 31.6% | 29.8% | 1.8% | 27.4% | -2.4% | |
| 53 | 80,049 | 48,549 | 60.6% | 4,632 | 5.8% | 4.6% | 1.2% | 5.1% | 0.5% | |
| 54 | 80,155 | 58,394 | 72.9% | 15,091 | 18.8% | 17.5% | 1.3% | 18.2% | 0.7% | |
| 55 | 79,578 | 63,245 | 79.5% | 13,351 | 16.8% | 10.5% | 6.3% | 10.4% | -0.1% | Packing in Chapter 1. |
| 56 | 79,271 | 62,856 | 79.3% | 10,005 | 12.6% | 13.9% | -1.3% | 22.9% | 9.0% | |
| 57 | 80,778 | 55,937 | 69.2% | 14,615 | 18.1% | 17.7% | 0.4% | 17.0% | -0.7% | |
| 58 | 80,767 | 71,271 | 88.2% | 5,948 | 7.4% | 9.1% | -1.7% | 10.4% | 1.3% | |
| | | | | | | | | | | Cracking in Chapter 1. Cracking in UofR plan. |
| 60 | 79,219 | 50,287 | 63.5% | 27,103 | 34.2% | 35.1% | -0.9% | 34.7% | -0.5% | |
| 61 | 79,792 | 50,089 | 62.8% | 27,384 | 34.3% | 34.4% | -0.1% | 51.0% | 16.6% | Created Black Majority in UofR plan (See SD80) |
| 62 | 79,677 | 52,025 | 65.3% | 20,688 | 26.0% | 27.1% | -1.2% | 35.4% | 8.3% | |
| 63 | 79,602 | 28,243 | 35.5% | 48,039 | 60.3% | 58.7% | 1.7% | 51.9% | -6.8% | Current Black Majority District. |
| 64 | 79,262 | 57,100 | 72.0% | 19,728 | 24.9% | 22.1% | 2.8% | | | |
| 65 | 79,364 | 64,601 | 81.4% | 11,248 | 14.2% | 9.6% | 4.5% | 12.0% | 2.3% | |
| 66 | 79,397 | 60,025 | 75.6% | 14,125 | 17.8% | 18.2% | -0.4% | 20.5% | 2.3% | |
| 67 | 79,633 | 53,288 | 66.9% | 4,756 | 6.0% | 6.8% | -0.9% | 6.8% | -0.2% | |
| | | | | | | | | 11.2% | -1.6% | Cracking in Chapter 1. |
| 69 | 79,386 | 24,416 | 30.8% | 46,579 | 58.7% | 59.2% | -0.5% | 56.3% | -2.9% | Current Black Majority District. |
| 70 | 79,382 | 23,130 | 29.1% | 46,844 | 59.0% | 64.8% | -5.8% | 59.1% | -5.0% | Current Black Majority District. |
| 71 | 80,322 | 26,832 | 33.4% | 48,476 | 60.4% | 50.7% | 9.6% | 54.3% | 3.6% | Current Black Majority District. |
| 72 | 80,764 | 59,396 | 73.5% | 11,381 | 14.1% | 12.0% | 2.0% | 9.2% | -2.9% | |

Chapter 1, 2011 Acts, House Plan Compare ALL

Racial Demographics

| DISTRICT | Total Population | White | % White | Black | % Black | 2001 | Change | Black UofR | Change | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|
| 73 | 80,135 | 56,598 | 70.6% | 11,764 | 14.7% | 17.7% | -3.0% | 15.4% | -2.3% | |
| 74 | 79,594 | 26,427 | 33.2% | 48,211 | 60.6% | 65.7% | -5.1% | 52.9% | -12.8% | Current Black Majority District. |
| 75 | 79,295 | 32,792 | 41.4% | 44,635 | 56.3% | 58.1% | 0.2% | | | Current Black Majority District. Cracking in UofR plan. (See HD76) |
| 76 | 80,313 | 54,860 | 68.3% | 21,093 | 26.3% | 27.2% | -1.0% | 52.9% | 25.7% | Created Black Majority in UofR plan. (See HD75.) |
| 77 | 79,627 | 26,586 | 33.4% | 48,940 | 61.5% | 59.7% | 1.8% | 54.1% | -5.6% | Current Black Majority District. |
| 78 | 80,475 | 60,719 | 75.5% | 13,832 | 17.2% | 17.5% | -0.3% | 14.9% | -2.5% | |
| | | | | | | | | | | Cracking in Chapter 1. Cracking in UofR plan. |
| 80 | 80,705 | 28,912 | 35.8% | 47,835 | 59.3% | 57.7% | 1.6% | | | Current Black Majority District. Cracking in UofR plan. (See SD61.) |
| 81 | 79,438 | 58,121 | 73.2% | 15,414 | 19.4% | 16.2% | 3.2% | 14.3% | -1.9% | |
| 82 | 80,463 | 66,725 | 82.9% | 8,314 | 10.3% | 8.7% | 1.7% | 10.2% | 1.6% | |
| 83 | 79,538 | 58,152 | 73.1% | 13,407 | 16.9% | 21.0% | -4.2% | 16.6% | -4.5% | |
| 84 | 80,281 | 52,357 | 65.2% | 17,161 | 21.4% | 22.4% | -1.0% | 29.1% | 6.8% | |
| 85 | 80,800 | 53,934 | 66.8% | 16,822 | 20.8% | 22.0% | -1.2% | | | |
| 86 | 80,747 | 46,400 | 57.5% | 6,804 | 8.4% | 9.9% | -1.5% | 10.4% | 0.4% | |
| | | | | | | | | 28.6% | 1.4% | Cracking in Chapter 1 |
| 88 | 80,191 | 60,158 | 75.0% | 12,389 | 15.4% | 15.7% | -0.3% | 19.7% | 3.9% | |
| 89 | 79,614 | 27,929 | 35.1% | 46,676 | 58.6% | 55.8% | 2.8% | 52.8% | -3.0% | Current Black Majority District. |
| 90 | 80,425 | 25,163 | 31.3% | 46,097 | 59.8% | 60.1% | -0.2% | 53.1% | -7.0% | Current Black Majority District. |
| 91 | 79,229 | 56,058 | 70.8% | 16,428 | 20.7% | 16.8% | 3.9% | 27.2% | 10.4% | |
| 92 | 79,689 | 25,037 | 31.4% | 49,849 | 62.6% | 64.1% | -1.6% | 52.1% | -12.0% | Current Black Majority District. |
| | | | | | | | | | | Cracking in Chapter 1. Cracking in UofR plan |
| 94 | 79,429 | 53,846 | 67.8% | 18,342 | 23.1% | 28.9% | -3.8% | 32.8% | 5.8% | |
| 95 | 80,071 | 23,721 | 29.6% | 50,522 | 63.1% | 64.1% | -1.0% | 58.6% | -5.6% | Current Black Majority District. |
| 96 | 79,217 | 62,755 | 79.2% | 11,559 | 14.6% | 15.6% | -1.0% | 25.8% | 10.2% | Packing in UofR plan. |
| | | | | | | | | 18.7% | 0.1% | Cracking in Chapter 1 |
| 98 | 79,251 | 63,155 | 79.7% | 13,524 | 17.1% | 16.3% | 0.7% | 17.5% | 1.2% | |
| 99 | 80,332 | 56,601 | 70.7% | 20,397 | 25.4% | 25.4% | 0.0% | 24.3% | -1.1% | |
| 100 | 80,037 | 50,150 | 62.7% | 23,768 | 29.7% | 29.2% | 0.5% | 27.4% | -1.8% | |

Chapter 1, 2011 Acts, House Plan Compare ALL
Voting Age Population

| DISTRICT | Voting Age Population | VAP White | % VAP White | VAP Black | % VAP Black | 2001 | Change | Black UofR | Change | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 64,221 | 60,648 | 94.4% | 2,482 | 3.8% | 3.8% | 0.0% | 4.5% | 0.7% | |
| 2 | 56,163 | 33,408 | 59.5% | 13,688 | 24.4% | 2.4% | 21.9% | 1.8% | -0.7% | Packing in Chapter 1. |
| 3 | 64,745 | 62,065 | 95.9% | 1,932 | 3.0% | 2.6% | 0.4% | 3.2% | 0.6% | |
| 4 | 64,195 | 62,070 | 96.7% | 1,370 | 2.1% | 2.4% | -0.2% | 2.2% | -0.2% | |
| 5 | 64,337 | 61,274 | 95.2% | 1,725 | 2.7% | 2.2% | 0.5% | 2.1% | -0.1% | |
| 6 | 62,988 | 60,788 | 96.5% | 1,231 | 2.0% | 4.3% | -2.3% | 4.4% | 0.1% | |
| 7 | 64,401 | 59,855 | 92.9% | 2,606 | 4.0% | 5.0% | -1.0% | 4.4% | -0.6% | |
| 8 | 63,208 | 58,858 | 92.8% | 2,522 | 4.0% | 5.2% | -1.2% | 4.9% | -0.2% | |
| 9 | 64,142 | 56,131 | 87.5% | 6,385 | 10.0% | 9.1% | 0.8% | 7.5% | -1.7% | |
| 10 | 57,050 | 44,095 | 77.3% | 4,953 | 8.7% | 12.9% | -4.2% | 23.1% | 10.1% | |
| 11 | 62,356 | 39,559 | 63.4% | 19,412 | 31.1% | 33.7% | -2.6% | 29.7% | -4.0% | |
| 12 | 69,034 | 60,408 | 87.5% | 3,084 | 4.5% | 4.5% | -0.1% | 7.7% | 3.1% | |
| 13 | 58,290 | 36,735 | 63.0% | 7,701 | 13.2% | 10.4% | 2.8% | 11.9% | 1.4% | |
| 14 | 62,379 | 39,414 | 63.2% | 21,270 | 34.1% | 37.7% | -3.6% | 33.1% | -4.6% | |
| 15 | 62,907 | 59,863 | 95.2% | 1,209 | 1.9% | 2.1% | -0.2% | 4.0% | 1.8% | |
| 16 | 63,086 | 44,381 | 70.3% | 17,101 | 27.1% | 23.8% | 3.3% | | | Cracking in UofR plan. |
| 17 | 63,576 | 57,265 | 90.1% | 3,890 | 6.1% | 5.7% | 0.4% | 5.6% | -0.1% | |
| 18 | 59,886 | 52,508 | 88.0% | 4,602 | 7.7% | 6.2% | 1.5% | 6.9% | 0.8% | |
| 19 | 62,844 | 58,171 | 92.6% | 3,726 | 5.9% | 6.1% | -0.2% | 4.8% | -1.3% | |
| 20 | 62,717 | 55,842 | 89.0% | 5,214 | 8.3% | 6.5% | 1.8% | 4.6% | -1.9% | |
| 21 | 58,656 | 34,776 | 59.3% | 13,997 | 23.9% | 24.0% | -0.2% | 21.7% | -2.4% | |
| 22 | 61,467 | 47,057 | 76.6% | 12,606 | 20.5% | 11.8% | 8.7% | 28.3% | 16.6% | Packing in Chapter 1. Packing in UofR plan |
| | | | | | | | | 26.2% | -0.8% | Cracking in Chapter 1 |
| 24 | 64,424 | 57,333 | 89.0% | 5,506 | 8.5% | 9.0% | -0.4% | 14.7% | 5.7% | Packing in UofR plan. |
| 25 | 61,585 | 57,373 | 93.2% | 2,232 | 3.6% | 5.5% | -1.9% | 5.1% | -0.4% | |
| 26 | 65,566 | 56,466 | 86.1% | 2,921 | 4.5% | 4.2% | 0.2% | 1.7% | -2.5% | |
| | | | | | | | | 25.4% | -1.1% | Cracking in Chapter 1 |
| 28 | 58,388 | 43,126 | 73.9% | 10,643 | 18.2% | 17.9% | 0.3% | 16.1% | -1.8% | |
| 29 | 61,320 | 53,930 | 87.9% | 3,655 | 6.0% | 6.0% | -0.1% | 6.1% | 0.1% | |
| 30 | 61,276 | 48,944 | 79.9% | 9,288 | 15.1% | 14.4% | 0.7% | 12.0% | -2.4% | Packing in UofR plan. |
| 31 | 56,743 | 37,294 | 65.7% | 11,510 | 20.3% | 22.9% | -2.7% | 30.6% | 7.8% | |
| 32 | 55,263 | 39,133 | 70.8% | 4,398 | 8.0% | 7.6% | 0.3% | 8.6% | 0.9% | |
| 33 | 57,140 | 50,780 | 88.9% | 2,848 | 5.0% | 6.9% | -1.9% | 7.5% | 0.6% | |
| 34 | 57,978 | 44,921 | 77.5% | 2,037 | 3.5% | 3.2% | 0.3% | 4.6% | 1.4% | |
| 35 | 62,743 | 42,985 | 68.5% | 3,213 | 5.1% | 4.8% | 0.3% | 3.6% | -1.1% | |
| 36 | 61,859 | 43,038 | 69.6% | 5,363 | 8.7% | 8.0% | 0.7% | 7.9% | 0.0% | |

VSBE 005674

Chapter 1, 2011 Acts, House Plan Compare ALL
Voting Age Population

| DISTRICT | Voting Age Population | VAP White | % VAP White | VAP Black | % VAP Black | 2001 | Change | Black UofR | Change | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|
| 37 | 63,480 | 38,998 | 61.4% | 5,117 | 8.1% | 6.6% | 1.5% | 7.1% | 0.6% | |
| 38 | 62,463 | 33,887 | 54.3% | 5,892 | 9.4% | 10.2% | -0.7% | 9.7% | -0.4% | |
| 39 | 61,870 | 37,283 | 60.3% | 5,616 | 9.1% | 6.5% | 2.6% | 6.5% | 0.0% | |
| 40 | 58,415 | 41,056 | 70.3% | 3,843 | 6.6% | 6.6% | 0.0% | 7.6% | 1.0% | |
| 41 | 60,765 | 41,973 | 69.1% | 3,467 | 5.7% | 6.3% | -0.6% | 6.2% | -0.1% | |
| 42 | 58,066 | 41,053 | 70.7% | 5,682 | 9.8% | 14.1% | -4.3% | 16.4% | 2.4% | |
| 43 | 62,318 | 38,605 | 61.9% | 10,660 | 17.1% | 15.5% | 1.6% | 14.4% | -1.1% | |
| 44 | 59,112 | 33,967 | 57.5% | 12,991 | 22.0% | 21.4% | 0.6% | 20.8% | -0.6% | |
| 45 | 67,692 | 51,797 | 76.5% | 7,774 | 11.5% | 11.1% | 0.4% | 12.4% | 1.3% | |
| 46 | 66,262 | 35,868 | 54.1% | 18,343 | 27.7% | 28.5% | -0.8% | 28.2% | -0.3% | |
| 47 | 68,384 | 53,109 | 77.7% | 3,395 | 5.0% | 7.0% | -2.1% | 5.7% | -1.3% | |
| 48 | 64,068 | 51,895 | 81.0% | 2,962 | 4.6% | 6.0% | -1.4% | 4.2% | -1.8% | |
| 49 | 66,373 | 36,838 | 55.5% | 11,102 | 16.7% | 17.3% | -0.6% | 15.7% | -1.6% | |
| 50 | 55,689 | 35,574 | 63.9% | 7,997 | 14.4% | 14.1% | 0.2% | 10.3% | -3.8% | |
|  |  |  |  |  |  |  |  | 22.3% | 1.0% | Cracking in Chapter 1 |
| 52 | 56,592 | 25,644 | 45.3% | 17,160 | 30.3% | 28.5% | 1.8% | 26.2% | -2.3% | |
| 53 | 62,827 | 39,121 | 62.3% | 3,426 | 5.5% | 4.3% | 1.1% | 4.8% | 0.4% | |
| 54 | 57,249 | 42,858 | 74.9% | 10,139 | 17.7% | 16.5% | 1.2% | 17.1% | 0.6% | |
| 55 | 59,680 | 47,737 | 80.0% | 9,978 | 16.7% | 10.4% | 6.4% | 10.3% | 0.0% | Packing in Chapter 1. |
| 56 | 58,745 | 46,976 | 80.0% | 7,644 | 13.0% | 14.3% | -1.3% | 23.4% | 9.1% | Packing in UofR plan. |
| 57 | 68,024 | 48,829 | 71.8% | 10,826 | 15.9% | 15.4% | 0.5% | 14.8% | -0.6% | |
| 58 | 61,395 | 54,936 | 89.5% | 4,240 | 6.9% | 8.8% | -1.8% | 10.1% | 1.3% | |
| 59 | 62,208 | 48,415 | 77.8% | 12,466 | 20.0% | 24.8% | -4.8% |  |  | Cracking in UofR plan |
| 60 | 62,712 | 41,036 | 65.4% | 20,399 | 32.5% | 33.7% | -1.2% | 33.5% | -0.2% | |
| 61 | 63,280 | 40,447 | 63.9% | 21,215 | 33.5% | 33.4% | 0.1% | 49.8% | 16.4% | Packing in UofR plan. |
| 62 | 61,022 | 41,265 | 67.6% | 14,988 | 24.6% | 25.6% | -1.1% | 33.1% | 7.5% | |
| 63 | 61,404 | 22,534 | 36.7% | 36,553 | 59.5% | 58.1% | 1.4% | 51.0% | -7.2% | Current Black Majority District maintained |
| 64 | 61,722 | 45,123 | 73.1% | 14,961 | 24.2% | 20.8% | 3.4% |  |  | Cracking in UofR plan. |
| 65 | 59,232 | 48,341 | 81.6% | 8,666 | 14.6% | 9.7% | 4.9% | 11.2% | 1.5% | |
| 66 | 58,534 | 45,892 | 78.1% | 9,403 | 16.1% | 16.5% | -0.4% | 19.2% | 2.7% | |
| 67 | 57,154 | 39,122 | 68.5% | 3,270 | 5.7% | 6.6% | -0.9% | 6.6% | 0.0% | |
| 68 | 63,752 | 55,904 | 87.7% | 4,624 | 7.3% | 11.6% | -4.4% | 10.4% | -1.2% | |
| 69 | 62,538 | 21,882 | 34.7% | 34,514 | 55.2% | 56.3% | -1.1% | 53.7% | -2.6% | Current Black Majority District maintained |
| 70 | 58,654 | 19,204 | 32.7% | 33,063 | 56.4% | 61.8% | -5.4% | 55.4% | -6.3% | Current Black Majority District maintained |
| 71 | 66,230 | 24,970 | 37.7% | 38,658 | 55.3% | 46.3% | 9.1% | 49.5% | 3.2% | Current Black Majority District Restored in Chapter 1 |
| 72 | 62,008 | 46,792 | 75.5% | 8,308 | 13.4% | 11.4% | 2.0% | 9.2% | -2.1% | |

VSBE 005675

DEFENDANT-INTERVENORS TX 023 - Page 138

Chapter 1, 2011 Acts, House Plan Compare ALL

Voting Age Population

| DISTRICT | Voting Age Population | VAP White | % VAP White | VAP Black | % VAP Black | 2001 | Change | Black UofR | Change | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|
| 73 | 63,116 | 45,955 | 72.8% | 8,550 | 13.5% | 16.5% | -2.9% | 14.3% | -2.2% | Current Black Majority District maintained. |
| 74 | 60,478 | 22,359 | 37.0% | 34,617 | 57.2% | 62.7% | -5.5% | 49.9% | -12.8% | Current Black Majority District maintained. |
| 75 | 63,445 | 26,977 | 42.5% | 35,187 | 55.4% | 55.3% | 0.1% | | | Current Black Majority District. Cracked in UofR plan. (See HD76) |
| 76 | 59,747 | 41,918 | 70.2% | 15,023 | 25.1% | 26.2% | -1.0% | 51.5% | 25.4% | Black Majority District created in UofR plan. (See HD75) |
| 77 | 57,841 | 21,048 | 36.4% | 33,997 | 58.8% | 57.6% | 1.2% | 50.4% | -7.1% | Current Black Majority District maintained |
| 78 | 60,410 | 46,088 | 76.3% | 10,355 | 17.1% | 17.4% | -0.2% | 14.6% | -2.5% | |
| | | | | | | | | | | Cracking in Chapter 1. Cracking in UofR plan. |
| 80 | 60,871 | 23,739 | 39.0% | 34,288 | 56.3% | 54.4% | 1.9% | | | Current Black Majority District. Cracked in UofR plan. |
| 81 | 59,833 | 44,792 | 74.9% | 11,130 | 18.6% | 15.6% | 3.0% | 14.7% | -0.8% | Cracking in Chapter 1. Cracking in UofR plan. |
| 82 | 63,348 | 53,757 | 84.9% | 5,766 | 9.1% | 7.8% | 1.3% | 9.0% | 1.1% | |
| 83 | 62,818 | 47,638 | 75.8% | 9,500 | 15.1% | 18.9% | -3.8% | 14.9% | -4.0% | Packing in UofR plan. |
| 84 | 58,742 | 39,207 | 66.7% | 12,012 | 20.4% | 21.2% | -0.7% | 26.4% | 5.2% | Cracking in UofR plan. |
| 85 | 62,188 | 43,120 | 69.3% | 11,770 | 18.9% | 20.3% | -1.4% | | | |
| 86 | 59,286 | 34,944 | 58.9% | 4,930 | 8.3% | 9.7% | -1.4% | 10.1% | 0.4% | Cracking in Chapter 1 |
| | | | | | | | | 26.6% | 2.4% | Cracking in Chapter 1. Cracking in UofR plan. |
| 88 | 58,354 | 45,104 | 77.3% | 8,248 | 14.1% | 14.6% | -0.4% | 18.9% | 4.3% | |
| 89 | 61,070 | 23,417 | 38.3% | 33,869 | 55.5% | 52.5% | 3.0% | 49.9% | -2.6% | Current Black Majority District maintained. |
| 90 | 60,204 | 20,960 | 34.8% | 34,089 | 56.6% | 56.9% | -0.3% | 49.4% | -7.5% | Current Black Majority District maintained. |
| 91 | 59,281 | 43,142 | 72.8% | 11,626 | 19.6% | 15.9% | 3.7% | 28.1% | 10.2% | Packing in UofR plan. |
| 92 | 61,309 | 20,662 | 33.7% | 37,224 | 60.7% | 62.1% | -1.4% | 50.2% | -11.9% | Current Black Majority District maintained. |
| | | | | | | | | | | Cracking in Chapter 1. Cracking in UofR plan. |
| 94 | 62,412 | 44,092 | 70.6% | 13,120 | 21.0% | 24.4% | -3.3% | 29.5% | 5.1% | Packing in UofR plan. |
| 95 | 59,017 | 19,542 | 33.1% | 35,394 | 60.0% | 61.6% | -1.7% | 56.1% | -5.6% | Current Black Majority District. Comparatively packed in Chapter 1 |
| 96 | 61,067 | 49,447 | 81.0% | 8,373 | 13.7% | 14.7% | -1.0% | 24.1% | 9.4% | Packing in UofR plan. |
| | | | | | | | | 18.7% | 0.4% | Cracking in Chapter 1. |
| 98 | 62,740 | 50,614 | 80.7% | 10,318 | 16.4% | 15.7% | 0.7% | 16.8% | 1.1% | |
| 99 | 63,534 | 46,161 | 72.7% | 15,274 | 24.0% | 24.0% | 0.0% | 23.0% | -1.0% | |
| 100 | 63,027 | 41,380 | 65.7% | 17,393 | 27.6% | 28.1% | -0.5% | 25.6% | -2.5% | |

VSBE 005676

Chapter 1, Acts 2011, Senate Plan Compare ALL

Racial Demographics

| DISTRICT | Total Population | White | % White | Black | % Black | 2001 | Change | Black W&M | Change | Black Commis | Change | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 201,072 | 116,539 | 58.0% | 65,255 | 32.5% | 25.0% | 7.5% | 56.3% | -4.8% | 57.8% | -3.4% | Packing in Chapter 1. Cracking in W&M and Commission |
| 2 | 200,193 | 79,753 | 39.8% | 106,265 | 53.1% | 61.1% | -8.1% | 16.5% | -0.9% | 22.2% | 4.6% | Current Black Majority District maintained. |
|  |  |  |  |  |  |  |  |  |  |  |  | Cracking in Chapter 1 |
| 4 | 201,941 | 153,625 | 76.1% | 40,118 | 19.9% | 17.2% | 2.7% | 18.8% | 1.6% | 15.9% | -1.3% | Current Black Majority District maintained. |
| 5 | 200,751 | 73,698 | 36.7% | 112,929 | 56.3% | 59.3% | -3.0% | 54.5% | -4.8% | 59.9% | 0.6% | Current Black Majority District maintained |
| 6 | 196,367 | 123,902 | 63.1% | 55,125 | 28.1% | 26.9% | 1.1% |  |  |  |  | Cracking in W&M and Commission. |
| 7 | 199,020 | 131,555 | 66.1% | 44,850 | 22.5% | 20.5% | 2.1% | 24.6% | 4.2% | 23.0% | 2.5% | Packing in Chapter 1. |
| 8 | 196,279 | 141,564 | 71.4% | 35,589 | 17.9% | 15.0% | 2.9% | 17.0% | 2.0% | 15.4% | 0.4% | Cracking in Chapter 1. |
| 9 | 198,943 | 80,708 | 40.6% | 107,925 | 54.2% | 58.8% | -4.6% | 58.3% | -0.5% | 60.3% | 1.9% | Current Black Majority District maintained. |
| 10 | 199,977 | 138,475 | 69.2% | 45,465 | 22.7% | 13.7% | 9.0% | 13.7% | -0.1% | 13.7% | 0.0% | Packing in Chapter 1. |
|  |  |  |  |  |  |  |  |  |  |  |  | Cracking in Chapter 1. |
| 12 | 203,630 | 150,352 | 73.8% | 26,467 | 13.0% | 13.3% | -0.3% | 16.4% | 3.0% | 13.4% | 0.1% | Cracking in Chapter 1. |
|  |  |  |  |  |  |  |  |  |  |  |  | Cracking in W&M |
| 14 | 199,604 | 146,080 | 73.2% | 38,142 | 19.1% | 22.3% | -3.2% | 31.5% | 3.1% | 28.3% | -0.2% | Cracking in W&M |
| 15 | 196,759 | 135,016 | 68.6% | 56,510 | 28.7% | 31.3% | -2.5% | 21.5% | -0.9% | 20.6% | -1.8% | Current Black Majority District maintained |
| 16 | 200,841 | 74,207 | 36.9% | 110,339 | 54.9% | 56.1% | -1.2% | 52.1% | -4.0% | 54.6% | -1.5% | Cracking in W&M |
| 17 | 204,024 | 148,539 | 72.8% | 38,721 | 19.0% | 17.0% | 2.0% | 52.1% | -8.1% | 17.1% | 0.2% | Current Black Majority District maintained |
| 18 | 199,934 | 81,623 | 40.8% | 110,861 | 55.4% | 60.0% | -4.6% | 52.0% | 12.7% | 58.8% | -1.2% | Current Black Majority District maintained |
|  |  |  |  |  |  |  |  |  |  |  |  | Cracking in Chapter 1 and Commission. Packing in W&M. |
| 20 | 201,089 | 135,888 | 67.6% | 58,396 | 29.0% | 12.5% | 16.5% | 12.9% | 0.4% | 13.1% | 0.6% | Packing in Chapter 1. |
| 21 | 200,511 | 152,120 | 75.9% | 34,350 | 17.1% | 17.4% | -0.3% | 17.8% | 0.3% | 17.8% |  | Cracking in Commission |
| 22 | 196,185 | 138,035 | 70.4% | 52,344 | 26.7% | 5.4% | 21.3% | 4.9% | -0.5% | 17.7% | 12.3% | Packing in Chapter 1 and Commission. |
|  |  |  |  |  |  |  |  |  |  |  |  | Cracking in Chapter 1. |
| 24 | 204,024 | 181,909 | 89.2% | 15,056 | 7.4% | 6.4% | 0.9% | 5.6% | -0.9% | 8.8% | 2.4% | Packing in Commission. |
| 25 | 196,245 | 165,121 | 83.3% | 20,363 | 10.3% | 12.2% | -1.9% | 9.0% | -3.1% | 18.2% | 6.0% | Packing in Chapter 1 and Commission. |
| 26 | 201,484 | 180,374 | 89.5% | 8,075 | 4.0% | 4.0% | 0.0% | 5.5% | 1.5% | 4.4% | 0.4% |  |
| 27 | 203,166 | 174,454 | 85.9% | 15,584 | 7.7% | 6.9% | 0.8% | 9.2% | 2.3% | 11.2% | 4.3% |  |
| 28 | 200,017 | 150,618 | 75.3% | 30,569 | 15.3% | 19.9% | -4.6% | 17.2% | -2.7% | 21.3% | 1.4% |  |
| 29 | 203,888 | 104,501 | 51.2% | 48,210 | 23.6% | 16.8% | 6.9% | 17.9% | 1.1% | 27.1% | 10.4% | Packing in Chapter 1 and Commission. |
| 30 | 196,030 | 135,368 | 69.1% | 27,710 | 14.1% | 17.0% | -2.9% | 20.8% | 3.6% | 19.7% | 2.7% |  |
| 31 | 200,905 | 148,298 | 73.8% | 11,990 | 8.0% | 7.1% | -1.1% | 9.0% | 1.9% | 9.1% | 2.1% |  |
| 32 | 198,617 | 147,196 | 74.1% | 11,165 | 5.6% | 6.5% | -0.9% | 6.2% | -0.3% | 6.8% | 0.3% |  |
| 33 | 196,178 | 112,298 | 57.2% | 20,203 | 10.3% | 8.5% | -1.8% | 8.9% | 0.4% | 8.9% | 0.3% |  |
| 34 | 196,312 | 132,960 | 67.7% | 11,602 | 5.9% | 5.0% | 0.9% | 6.4% | 1.4% | 5.2% | 0.3% |  |
| 35 | 196,251 | 106,787 | 54.4% | 25,085 | 12.8% | 17.0% | -4.2% |  |  |  |  | Cracking in W&M and Commission. |
| 36 | 199,138 | 105,909 | 53.2% | 50,571 | 25.4% | 25.8% | -0.4% | 27.4% | 1.6% |  |  | Cracking in Commission. |

Chapter 1, Acts 2011, Senate Plan Compare ALL
Racial Demographics

| DISTRICT | Total Population | White | % White | Black | % Black | 2001 | Change | Black W&M | Change | Black Commis | Change | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 37 | 198,287 | 119,378 | 60.2% | 15,433 | 7.8% | 7.9% | -0.1% | 6.7% | -1.2% | 7.1% | -0.8% | |
| 38 | 201,414 | 189,958 | 94.3% | 8,283 | 4.1% | 3.1% | 1.0% | 3.3% | 0.2% | 2.3% | -0.8% | |
| 39 | 201,164 | 122,722 | 61.0% | 35,833 | 17.8% | 13.3% | 4.5% | 14.6% | 1.3% | 9.6% | -3.7% | |
| 40 | 198,458 | 189,689 | 95.6% | 5,203 | 2.6% | 3.2% | -0.6% | 3.4% | 0.2% | 4.0% | 0.8% | |

VSBE 005678

DEFENDANT-INTERVENORS TX 023 - Page 141

Chapter 1, Acts 2011, Senate Plan Compare ALL

Voting Age Population

| DISTRICT | Voting Age Population | VAP White | % VAP White | VAP Black | % VAP Black | Black 2001 | Change | Black W&M | Change | Black Commis | Change | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 154,958 | 95,081 | 61.4% | 46,018 | 28.7% | 22.9% | 6.8% | 53.5% | -5.3% | 55.4% | -3.5% | Packing in Chapter 1. Cracking in W&M and Commission. |
| 2 | 150,369 | 63,636 | 42.3% | 77,022 | 51.2% | 58.9% | -7.6% | 16.0% | 0.0% | 20.9% | 4.9% | Current Black Majority District maintained. |
| 3 | 157,697 | 133,375 | 84.6% | 17,955 | 11.4% | 16.0% | -4.6% | 17.4% | 0.5% | 15.7% | -1.2% | |
| 4 | 154,170 | 119,019 | 77.2% | 29,832 | 19.4% | 16.8% | 2.5% | 17.4% | 0.5% | 15.7% | -1.2% | |
| 5 | 149,582 | 59,413 | 39.7% | 60,221 | 53.6% | 56.1% | -2.5% | 51.3% | -4.8% | 57.0% | 0.9% | Current Black Majority District maintained. |
| 6 | 160,365 | 104,839 | 65.4% | 42,154 | 26.3% | 25.2% | 1.1% | 20.5% | -4.7% | 20.6% | 1.8% | Cracking in Commission. |
| 7 | 153,597 | 105,761 | 68.9% | 31,513 | 20.5% | 18.8% | 1.8% | 22.0% | 3.2% | 20.6% | 1.8% | |
| 8 | 149,629 | 110,669 | 74.0% | 24,261 | 16.2% | 13.6% | 2.6% | 15.8% | 2.2% | 14.6% | 1.0% | |
| 9 | 155,821 | 68,909 | 44.2% | 79,106 | 50.8% | 54.9% | -4.2% | 54.0% | -1.0% | 56.8% | 1.9% | Current Black Majority District maintained. |
| 10 | 157,128 | 111,093 | 70.7% | 34,108 | 21.7% | 13.5% | 8.2% | 12.8% | -0.8% | 13.4% | -0.1% | Packing in Chapter 1. |
| 12 | 154,608 | 116,600 | 75.4% | 19,279 | 12.5% | 12.7% | -0.2% | 30.4% | 5.1% | 22.7% | -2.6% | Cracking in Chapter 1. Packing in W&M. |
|  |  |  |  |  |  |  |  | 15.5% | 2.8% | 12.8% | 0.0% | Cracking in Chapter 1 |
| 14 | 148,997 | 110,637 | 74.3% | 28,069 | 18.8% | 21.6% | -2.7% | 28.8% | 2.1% | 26.5% | -0.3% | Cracking in Chapter 1 |
| 15 | 155,548 | 108,043 | 69.5% | 43,943 | 28.3% | 30.1% | -1.9% | 20.9% | -0.7% | 20.2% | -1.4% | Cracking in W&M. |
| 16 | 152,593 | 59,982 | 39.3% | 81,087 | 53.1% | 54.5% | -1.3% | 50.1% | -4.4% | 52.9% | -1.5% | Current Black Majority District maintained. |
| 17 | 154,318 | 116,071 | 75.2% | 27,031 | 17.5% | 15.9% | 1.6% | 16.4% | 0.5% | 16.5% | 0.5% | Cracking in W&M. |
| 18 | 153,104 | 65,917 | 43.1% | 81,987 | 53.5% | 58.3% | -4.7% | 57.0% |  | 57.0% | -1.3% | Current Black Majority District. Cracking in W&M |
| 20 | 158,633 | 110,813 | 68.9% | 43,490 | 27.4% | 11.8% | 15.6% | 35.2% | 12.3% | 12.5% | 0.7% | Cracking in Chapter 1 and Commission. Packing in W&M. |
|  |  |  |  |  |  |  |  | 12.2% | 0.4% |  |  | Packing in Chapter 1 |
| 21 | 162,817 | 127,589 | 78.4% | 24,254 | 14.9% | 15.2% | -0.3% | 15.8% | 0.7% | 15.7% | -0.4% | Cracking in Commission. |
| 22 | 164,751 | 111,289 | 71.9% | 39,385 | 25.4% | 4.8% | 20.7% | 4.4% | -0.4% | 16.3% | 11.0% | Packing in Chapter 1 and Commission. |
| 24 | 158,069 | 142,925 | 90.4% | 10,712 | 6.8% | 5.9% | 0.9% | 4.9% | -0.9% | 8.3% | 2.4% | Cracking in Chapter 1 |
| 25 | 160,398 | 135,056 | 84.2% | 15,328 | 9.6% | 11.2% | -1.6% | 8.4% | -2.7% | 17.0% | 5.8% | Packing in Commission. |
| 26 | 159,446 | 144,854 | 90.8% | 5,612 | 3.5% | 3.5% | 0.0% | 4.8% | 1.2% | 3.9% | 0.4% | |
| 27 | 153,073 | 133,915 | 87.5% | 10,732 | 7.0% | 6.3% | 0.8% | 8.7% | 2.5% | 10.6% | 4.3% | |
| 28 | 143,045 | 110,717 | 77.4% | 20,398 | 14.3% | 18.8% | -4.5% | 17.5% | -1.2% | 20.0% | 1.2% | |
| 29 | 145,014 | 78,009 | 53.8% | 32,726 | 22.6% | 15.9% | 6.7% | 17.0% | 1.1% | 25.8% | 9.9% | Packing in Chapter 1 and Commission. |
| 30 | 159,954 | 113,468 | 70.9% | 21,421 | 13.4% | 15.9% | -2.5% | 19.8% | 3.9% | 18.8% | 2.9% | |
| 31 | 161,054 | 120,879 | 75.1% | 9,359 | 5.8% | 6.7% | -0.9% | 8.6% | 1.9% | 8.7% | 2.1% | |
| 32 | 149,896 | 113,697 | 75.9% | 7,902 | 5.3% | 6.1% | -0.8% | 5.8% | -0.2% | 6.5% | 0.4% | |
| 33 | 142,710 | 84,442 | 59.2% | 14,108 | 9.9% | 8.3% | 1.6% | 8.6% | 0.3% | 8.5% | 0.2% | |
| 34 | 151,463 | 104,813 | 69.2% | 8,678 | 5.7% | 4.9% | 0.8% | 6.2% | 1.3% | 5.2% | 0.3% | |
| 35 | 153,812 | 86,599 | 56.3% | 18,896 | 12.3% | 16.3% | -4.1% |  |  |  |  | Cracking in W&M and Commission. |
| 36 | 144,164 | 80,457 | 55.6% | 34,856 | 24.2% | 24.5% | -0.3% | 25.9% | 1.4% |  |  | Cracking in W&M and Commission. |
| 37 | 149,996 | 92,692 | 61.8% | 10,840 | 7.2% | 7.4% | -0.1% | 6.3% | -1.0% | 6.6% | -0.7% | Cracking in Commission. |

Chapter 1, Acts 2011, Senate Plan Compare ALL
Voting Age Population

| DISTRICT | Voting Age Population | VAP White | % VAP White | VAP Black | % VAP Black | Black 2001 | Change | Black W&M | Change | Black Commis | Change | NOTES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 38 | 162,238 | 153,258 | 94.5% | 6,584 | 4.1% | 3.0% | 1.0% | 3.2% | 0.1% | 2.2% | -0.9% | |
| 39 | 153,134 | 96,636 | 63.1% | 25,726 | 16.8% | 12.3% | 4.5% | 13.7% | 1.4% | 9.1% | -3.2% | |
| 40 | 158,487 | 151,963 | 95.9% | 3,892 | 2.5% | 3.1% | -0.7% | 3.3% | 0.2% | 3.9% | 0.8% | |

VSBE 005680

DEFENDANT-INTERVENORS TX 023 - Page 143

# Virginia Redistricting Coalition Members

**Organizations**

AARP Virginia

Future of Hampton Roads

Greater Norfolk
Corporation

Greater Richmond
Chamber of Commerce

League of Women Voters
of Virginia

Richmond First Club

Virginia21

Virginia Business Council

Virginia Chamber of
Commerce

Virginia Interfaith Center
for Public Policy

Virginia League of
Conservation Voters

Virginia Organizing
Project

**Advisors**

(b)(7)(C)

(b)(7)(C)

**Leaders, Investors &
Supporters**

(b)(7)(C)

(b)(7)(C)

VSBE 005681

DEFENDANT-INTERVENORS TX 023 - Page 144

(b)(7)(C)

(b)(7)(C)

(b)(7)(C)

VSBE 005682

June 13, 2011

Mr. Chris Herren
Chief, Voting Section
Civil Rights Division
Room 7254 - NWB
Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530

Re: Submission 2011-1805 Comment

Dear Mr. Herren:

The Virginia Redistricting Coalition, a non-partisan organization that advocates a fair and public
redistricting process in the Commonwealth, calls on the Department of Justice to find Chapter 1, 2011 Va.
Acts (Special Session 1) non-compliant with the federal Voting Rights Act. Please accept these
comments regarding Virginia's request for preclearance, Submission No.2011-1805.

Operating under the self-serving motive of redrawing legislative districts to protect incumbents, the
Virginia General Assembly has produced a non-compliant plan. While its motive may be acceptable
under the Voting Rights Act, its result is not. This letter will discuss three elements of that failure.

*1. Chapter 1 would produce a new political map for Virginia that dilutes minority voting strength in
certain districts by either packing or cracking, and it improperly uses racial voting patterns to determine
"safe" districts for incumbents.*

The new district boundaries established by Chapter 1 dilute the influence of African-American voters in
two ways: by increasing the proportion of African-American voters in certain districts without
significantly increasing their ability to influence the outcome of elections in those districts; and by
decreasing the proportion of African-American voters in certain districts in which their ability to
influence the outcome of elections was (or was becoming) significant.

Using a change of greater than plus or minus 5 percent as the threshold of significance, the accompanying
spreadsheets compare Chapter 1 and the current (2001) districts according to their proportions of African-
Americans and African-Americans of voting age. This comparison does not consider an existing African-
American majority district to have been "cracked" if it remains a majority-minority district despite
reductions of more than 5 percent.

By this comparison, assessing total African-American population, Chapter 1 cracks 9 House districts and
packs 2. Assessing African-American voting age population, Chapter 1 cracks 7 House districts and packs
3 House districts. Assessing total African-American population, Chapter 1 cracks 5 Senate districts and

VSBE 005683

packs 4 Senate districts. Assessing African-American voting age population, Chapter 1 cracks 4 Senate districts and packs 5 Senate districts.

Chapter 1 maintains the number of African-American majority districts in the 2001 plan: 12 in the House and 5 in the Senate. This calculation, however, fails to account for the inappropriate redistribution of voters by race to maintain "safe" districts for incumbents. The polarization of voting by race in Virginia is manifest, and House and Senate district boundaries in Chapter 1 have been drawn to apply that historical pattern for partisan impact. This manipulation, in which the race of the potential voters is the primary consideration, should be unacceptable under the Voting Rights Act.

Illustrative of the manipulation of the districts to diminish the ability of minority voters to influence the outcome of elections is the reduction in the percentage of African-American voting age population in the 23rd House District centered in the city of Lynchburg and the corresponding increase in the African-American voting age population in the 22nd House District centered in Campbell County. In 2001, 27 percent of the voting age population in the 23rd House District was African-American. The Chapter 1 map reduces this percentage by 12 percentage points to 14.9 percent, a reduction of almost 45 percent. Instead of continuing the 23rd District's progress toward becoming a true minority influence district, the Chapter 1 plan cracks the district to ensure that minority voters cannot meaningfully affect the outcome of future elections. Thus, a district that has swung between Democrats and Republicans and has previously been represented by an African-American is now one in which the reelection of the white incumbent is assured. To achieve this result, the African-American population in the 22nd House District was increased from 11.8 percent to 20 percent, an insufficient increase to assure the ability to influence the election in the 22nd District, and one that is accomplished by dividing some African-American voters in Lynchburg from their community and assigning them to an incumbent white legislator whose electoral base is in Campbell County, which has long been at odds with the city.

Similarly, African-American and Hispanic voters in Prince William (and the two independent cities located in the county, Manassas City and Manassas Park) were allocated among the 13th, 31st, 50th, 51st and 52nd House districts in a manner that reduced minority influence in the 13th, 31st, 50th and 51st by packing minority voters into the 52nd. While Prince William County is majority minority (non-Hispanic white persons make up 48.7 percent of the county population according to the most recent Census figures), with about 20 percent African-American, 20 percent Hispanic and 7.5 percent Asian residents, only one of the nine members of the House and Senate who represent the county in the General Assembly is an African-American and there are no other minority members in the delegation.

*2. The General Assembly ignored, derogated or paid only lip service to non-partisan, publicly developed, alternative redistricting plans that would be comparable or preferable under the criteria of the Voting Rights Act.*

For the first time in Virginia history, non-partisan, publicly developed alternatives were available and presented for the record in the redistricting process. Alternative maps were devised by the Independent Bipartisan Advisory Commission on Redistricting (appointed by Gov. Robert F. McDonnell) and by the Virginia College and University Redistricting Competition.

VSBE 005684

As the accompanying spreadsheets indicate, these alternatives were comparable or even preferable when judged according to their tendencies to pack or crack districts based on African-American population and African-American voting age population. For this comparison, a deviation of greater than plus or minus 5 percent from the current (2001) proportion was defined as the threshold of packing or cracking, except where current majority-minority districts were maintained.

The districts in Chapter 1 and the alternative districts are not perfectly comparable because their numbering assignments do not always match the current (2001) district maps. But, taken as a whole, the alternative districts achieve better or equal performance in maintaining or enhancing African-American voting strength – and do so with districts that are more compact and respectful of existing communities of interest.

Although the Advisory Commission and College Competition alternatives were developed in public according to acceptable legal criteria, including Voting Rights Act criteria, they were dismissed by the leadership of the House and Senate. They were described as "too late," but what they lacked was insider status, not timeliness. The College Competition plans were completed and published a full week *before* the House leadership's map was introduced in the General Assembly and 13 days *before* the Senate leadership's map was introduced. The Advisory Commission maps were developed in open meetings and presented to the governor and the House and Senate leadership on the same day the Senate leadership map was introduced.

In addition, the Advisory Commission produced a House redistricting plan that increased the number of majority-minority House districts from 12 to 13. While the Voting Rights Act does not demand that majority-minority districts be created wherever possible, this prospect was never seriously considered by a General Assembly determined that the status quo would suffice to pass the non-retrogression test.

*3. Contrary to the assertion of Virginia's Solicitor General in his submission of Chapter 1 for preclearance, the General Assembly's process and timetable inhibited public participation. Restrictive rules and district boundaries were conceived and negotiated in private and voted on with virtually no opportunity for timely public comment or influence.*

Publicly reported comments by General Assembly leadership set the tone. In a radio interview, Senate Majority Leader Richard Saslaw candidly described the insiders-only process: "The House does theirs. The Senate does theirs. And I'm not gonna interfere with the lines the House draws for the House. And they're not gonna interfere with the lines I draw for the Senate." (WAMU-FM, March 4)

Although the Privileges and Elections Committees of both the House and the Senate advertised and held public hearings around the state in the 6-day window leading up to the 2011 Special Session, those hearings gave the public no real opportunity to participate. They began too soon for meaningful comment, only days after the House map was introduced. And they concluded too late for meaningful influence, on the day the Special Session opened and only two days before the full House passed its leadership's ready-made plan. As for the Senate, its leadership's plan was not even introduced until the opening day of the Special Session – when the public hearings concluded.

DEFENDANT-INTERVENORS TX 023 - Page 148

The actual mapmaking prior to and during the special session was conducted behind closed doors, without access by the press or the public. In the months leading up to the Special Session, the House map was devised by Del. Chris Jones and reviewed by consultants and lawyers paid by the Republican leadership. In the same period, the Senate map was devised by Sen. George Barker and reviewed by consultants and lawyers paid by the Democratic leadership. Although the maps were taking shape, the public was excluded from these proceedings. Likewise, negotiations and consultations with individual members were conducted privately leading up to and during the special session.

This preference for last-minute disclosure even applied to the criteria the House and Senate redistricting plans would apply in drawing the new district lines. The House Privileges &Elections Committee set its especially restrictive criteria on March 25, with the initial presentation and the vote on final passage in the same committee meeting. Later that same afternoon, the Senate Privileges & Elections Committee did the same, though its criteria were slightly less restrictive as to population deviation between districts. As for the public, however, these rules were adopted only 10 days before the Special Session convened.

In conclusion, the Virginia Redistricting Coalition opposes the Virginia Solicitor General's request for expedited review. In his transmittal letter, the Virginia Solicitor General urges such a review and approval in order not to disrupt the schedule for primary elections on August 23, 2011. The call for haste is ironic, in that Chapter 1 would disenfranchise voters through a political process in which party nomination or primary victory would be tantamount to victory in the general election. This is retrogression of a different type: reversion to a non-competitive electoral process that is a variation of Virginia's historical one-party rule. In this modern variant, the two parties have colluded to divide legislative seats as though they were spoils.

In passing Chapter 1, the Virginia General Assembly has failed its obligation to create legislative districts that promote free and fair elections. The Department of Justice should reject Chapter 1, even at the consequence of delayed elections or elections under the districts now in force.

Thank you for consideration of our comments.

Sincerely,

C. Douglas Smith.
Chairman
Virginia Redistricting Coalition

Attachments:
Chapter 1_House_compared_DOJ
Chapter 1_Senate_compared_DOJ
Virginia Redistricting Coalition Members

**Fletcher, Michael (CRT)**

| | |
|---|---|
| **From:** | UNITED FRONT FOR JUSTICE (b)(7)(C) |
| **Sent:** | Friday, June 17, 2011 9:10 AM |
| **To:** | vot1973c (CRT); (b)(7)(C) |
| | (b)(7)(C) |
| **Subject:** | May 11, 2011-1805 VA REDISTRICTING SUBMISSIONS |
| **Attachments:** | MR. R BEY.jpg; NOTICE OF APPEAL SUPREME COURT 2011.pdf; COMPLAINT 2008 CITY OF NORFOLK'S ILLEGAL AT LARGE VOTING.pdf; COLLINS.pdf; CITY OF NORFOLK, VIRGINIA, ET AL., PETITIONERS V. HERBERT M. SUPREME COURT.pdf; OBJECTION TO NORFOLK CITY COUNCIL NOVEMBER 2, 2010 SPECIAL ELECTIONS 2.pdf |

UNITED FRONT FOR JUSTICE
(b)(7)(C)
NORFOLK, VA 23505
(b)(7)(C)

June 17, 2011

U.S. Department of Justice
Civil Rights Division
Voting Section-NEB
950 Pennsylvania Avenue, NW
Washington, DC 20530

Re: May 11, 2011-1805 VA REDISTRICTING SUBMISSIONS

Dear Ms. Abigail Olson:

Per our phone conference on yesterday regarding our verbal comments and objection of the State of Virginia General Assembly's Congressional redistricting plan. We believe the bizarrely shaped districts (meaning districts shaped more strangely than those drawn elsewhere in the state where race could not have been a factor) and because of improper intent it deprives minority and registered voter in the State of Virginia the opportunity to participate meaningfully in the State's political process, to elect a preferred candidate in particular districts, to influence elections in particular districts, and to influence the decision-making of the State's elected officials. And because of possible racial gerrymandering the proposed plan it appears would fail to prevent a retrogression of existing majority minority districts and have a discriminatory effect in violation of Article 1, Section 2 of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

It's understood the State House and Senate plan is currently before the department for approval and not the congressional plan. However, the 2011 legislative plans appear more compact and contiguous than the 2001

1

VSBE 005687

DEFENDANT-INTERVENORS TX 023 - Page 150

plans which they replace.

Additionally, the failure to consider the demolition of public housing communities and traditional minority enclaves and failure to consider the City of Norfolk's illegal at large election system currently before the U.S. Supreme Court, See other attachment in support; and the fact the City of Norfolk and Virginia Beach long standing history and practice of denying non-white minorities the office of Mayor, and in Virginia Beach the office of City Council. Because these districts plan a vital role in the plans and we object to the submissions and the future congressional submission. Therefore, it is requested the department reject Virginia's submissions for preclearance.

We look forward to a timely response from your office in the near future.

Mr. Roy L. Perry-Bey

Sincerely,

cc: NAACP
Legislative Black Caucus Members
U.S. Rep. Robert C. Scott, 3rd District
Lawyers Committee for Civil Rights

2

## UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF VIRGINIA

#### NORFOLK DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| Christina Perry-Bey, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| City of Norfolk, | ) | No. 2:08cv100 |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## MOTION OF THE NORFOLK BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE FOR LEAVE TO FILE AS AMICUS CURIAE REGARDING MOTION TO DISMISS OF THE CITY OF NORFOLK

The Norfolk Branch of the National Association for the Advancement of Colored

People ("Norfolk NAACP") respectfully moves this Court for leave to file an *amicus*

curiae brief in the above captioned matter.    The brief the Norfolk NAACP seeks

permission to file is attached as Exhibit A.

The Norfolk NAACP was a plaintiff in *Collins v. City of Norfolk*. 883 F.2nd 1232

(4th Cir. 1989).

**VSBE 005689**

**DEFENDANT-INTERVENORS TX 023 - Page 152**

The Norfolk NAACP asks permission to submit an *amicus* brief because of its role as plaintiff in *Collins v. City of Norfolk*, a Section 2 vote dilution case litigated by the Lawyers' Committee for Civil Rights Under Law from 1983-1991 that resulted in an order barring at-large elections for Norfolk City Council.

Amicus asserts that the issues raised by both parties pertaining to the injunction issued by *Collins* are improperly before this Court in this matter. These issues need to be brought in a motion under Rule 60(b) of the Federal Rules of Civil Procedure in the *Collins* matter. Rule 60(b) requires the party seeking to be released from the injunction to set out various grounds for relief from an injunction, including that "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).

Amicus has requested and obtained the written consent to file this brief from Plaintiff, Perry-Bey. Defendant, City of Norfolk, refused consent.

Dated: July 11, 2008          Respectfully submitted,

s/Ellen Marcus
Ellen Marcus (Virginia Bar No. 44314)
Zuckerman Spaeder LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

Counsel of Record

2

VSBE 005690

DEFENDANT-INTERVENORS TX 023 - Page 153

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### NORFOLK DIVISION

|  |  |  |
|---|---|---|
| Christina Perry-Bey, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| City of Norfolk, | ) | No. 2:08cv100 |
| Defendant. | ) ) ) ) | |

## BRIEF OF AMICUS CURIAE NORFOLK BRANCH OF THE NATIONAL ASSOCIATON FOR THE ADVANCEMENT OF COLORED PEOPLE REGARDING MOTION TO DISMISS OF THE CITY OF NORFOLK

### I.   INTRODUCTION

After an eight year contest that included two published opinions from the district court, three published Fourth Circuit opinions, a remand from the United States Supreme Court, and a Supreme Court denial of a writ of *certiorari*, the federal courts compelled the City of Norfolk (the "City") to abandon at-large elections for its city council in *Collins v. City of Norfolk*, 883 F.2d 1232 (4th Cir. 1989). In 2006, the City added an eighth member to its city council that would be elected at-large, even though the *Collins*

1

DEFENDANT-INTERVENORS TX 023 - Page 154

EXHIBIT A

VSBE 005692

DEFENDANT-INTERVENORS TX 023 - Page 155

court had previously enjoined the City from holding at-large elections. The City neglected an essential step – it did not get permission from the *Collins* court as required by Rule 60(b) of the Federal Rules of Civil Procedure.

Plaintiff Perry-Bey and the City have both asked this Court to decide whether the addition of a mayor that is elected at-large as an eighth member of the city council conflicts with the 1991 injunction enjoining at-large elections in the City. *Amicus*, a plaintiff in the *Collins* case, respectfully submits that this question should not be decided by this Court in the present matter. Instead, *amicus* submits that these issues need to be brought within the *Collins* matter in a proceeding under Rule 60(b) of the Federal Rules of Civil Procedure that includes the entire record of the *Collins* case as well as the current factual circumstances. Accordingly, *amicus* requests that this Court decline to decide issues in the present case relating to the 1991 injunction and leave those issues for a later proceeding in the *Collins* matter under Rule 60(b).

## II.    ARGUMENT

### A.    The court in *Collins v. City of Norfolk* enjoined at-large elections for Norfolk City Council

Defendant is subject to a permanent injunction enjoining at-large elections to the Norfolk City Council. This injunction came about as a result of a 1983 lawsuit against the City on behalf of the Norfolk Branch of the NAACP and African American voters registered in the City of Norfolk. Plaintiffs successfully contended that the City's use of at-large elections violated Section 2 of the Voting Rights Act because the at-large elections diluted the vote of the City's African Americans. *Collins v. City of Norfolk v. Virginia*, 883 F.2d 1232, 1235 (4th Cir. 1989). Of the hundreds of Section 2 vote dilution

2

27, 1989); and Supreme Court review, *City of Norfolk v. Collins*, 498 U.S. 938 (1990),

the case was remanded to the district court for imposition of a remedy.

On January 3, 1991, the district court, following the mandate of the Fourth

Circuit, reversed its earlier judgment and enjoined the City from conducting at-large

elections for the city council. In relevant part, the district court's Order read:

> 1.    Within sixty-five days after receipt of the 1990 Census for the
> City, the City Council of the City of Norfolk shall duly adopt after
> opportunity for public comment a remedial election plan and shall submit
> the same to the United States Department of Justice Under Section 5 of the
> Voting Rights Act. . . .
>
> . . .
> 4.   Defendants are hereby enjoined from conducting at-large elections for
> the city council under the present plan under which all seven city council
> members are elected on an at-large basis and from implementation of a
> new plan until approved by this court.

*See* Exhibit B to Memorandum in Support of Motion of City of Norfolk to Dismiss

Complaint Under Fed.R.Civ.P. Rules 12(b)(5) and 12(b)(6) ("Norfolk Memo"). The City

and the *Collins* plaintiffs agreed on a remedial plan where the seven-member council

would be elected from five single-member districts (two with black population

majorities) and two superwards (one with a black population majority). On June 24,

1991, the Court entered a Final Judgment Order which entered this plan into effect:

> "it is ORDERED that [the hybrid single member ward – superward plan]
> is hereby approved as a remedy under Section 2 of the Voting Rights Act,
> and shall be implemented at the next regularly scheduled Norfolk City
> Council Election set for May 5, 1992.
>
> And it appearing that nothing further remains to be done in this cause,
> the Clerk shall enter this order upon the civil docket book as a Final
> Judgment Order and shall send a copy to each counsel of record.

*See* Norfolk Memo, Exhibit F.

4

VSBE 005694

## B.   The Addition of an At-Large Elected Mayor Serving on the Norfolk City Council Conflicts with the *Collins* Injunction

The City Charter, as amended in 2005, clearly identifies the mayor as the eighth member of the city council. *See* Va. 2005 Act 897 which is attached hereto for changes in the City Charter discussed below. According to Section 5.1 of the City Charter: "[T]he city council shall consist of seven members as provided in section 3.2[2] and a mayor elected at-large." The Mayor also presides at city council meetings and votes on measures before the council. *Id.* at § 17.1. Indeed, the City of Norfolk's website confirms that the city council is composed of seven members who are elected through the ward system and a mayor who is elected at-large.[3]

The main concern of the *Collins* court was that electing the city council at-large was discriminatory. Having a mayor elected at-large to the city council reinstates, at least in part, the method of election that was challenged in *Collins* and found by the Fourth Circuit to be unacceptable. The *Collins* court noted that the Voting Rights Act protects minority voters "from a system of at-large voting that, tested by the principles explained in *Gingles*, gives them 'less opportunity than other members of the electorate to participate in the electoral process and to elect representatives of their choice.'" *Collins* at 1243. The Court was explicit in its guidance to the District court: "[E]njoin at-large elections for city council." *Id.* at 1244.

---

[2] Section 3.2 states that "[t]he City of Norfolk shall be divided into five (5) single-member wards numbered one through five, and the city shall also be divided into two single-member superwards numbered six and seven. Norfolk City Charter § 3.2.

[3] The City of Norfolk, "City of Norfolk – City Council Information," http://www.norfolk.gov/mayor/Info_Center/CityCouncil.html (last accessed on July 10, 2008).

5

VSBE 005695

DEFENDANT-INTERVENORS TX 023 - Page 158

C. **Though Rule 60(b) provides a procedure for modifying a permanent injunction, the City has not reopened the *Collins* case to seek relief under Rule 60(b)**

Under Rule 60(b) of the Federal Rules of Civil Procedure, a party can move the

court for relief from a final judgment, order, or proceeding. The Rule sets out various

grounds for relief, including that:

> the judgment has been satisfied, released or discharged; it is based on an
> earlier judgment that has been reversed or vacated; or applying it
> prospectively is no longer equitable.

Fed. Rule of Civ. P. 60(b)(5). It is undisputed that the City has not sought relief under

Rule 60(b) for adding an at-large member to the Norfolk City Council.

D. **The City's arguments that at-large membership on the Norfolk City Council do not conflict with the *Collins* injunction are unavailing**

The City contends that adding an at-large member to the City council does not

violate the *Collins* injunction because: (1) the injunction is no longer in effect, (2) the

*Collins* court never said the injunction was permanent, (3) the *Collins* case is closed, and

(4) the court "did not say that the plan could never change." Defendants Memo, at 8-9.

Under the City's view, the *Collins* injunction terminated either at the time the *Collins*

case was closed or some undetermined time shortly thereafter. Thus, according to the

City, the City has had no legal obligation to follow the mandate of the Fourth Circuit and

the district court in *Collins* for the last fifteen years or so. This argument is totally

unavailing and contrary to law.

It is a basic legal tenet that "[p]ersons subject to injunctive order issued by the

court with jurisdiction are expected to obey that decree until it is modified or reversed,

6

DEFENDANT-INTERVENORS TX 023 - Page 159

even if they have proper grounds to object to the order." *GTE Sylvania, Inc. v. Consumers Union of the United States*, 445 U.S. 375, 386 (1980). Moreover, in *United States v. United Mine Workers of America*, 330 U.S. 258, 294 (1947), the court asserted that an injunctive order must be "obeyed until it is expired or set aside by appropriate court proceedings."

In this case, the purpose behind the *Collins* case and the orders of the Fourth Circuit and district court was to eliminate at-large elections for city council because at-large elections discriminated against African American voters. The suggestion that the City was free sometime thereafter to restore a discriminatory method of election without getting court approval makes no sense.

Moreover, the fact that the case was closed is irrelevant. There is no need for a court to permanently keep open a case involving Section 2 vote dilution remedy that changes the method of election -- once the method of election has been changed, there is nothing for the court to do. Indeed, there have been several Section 2 cases in the Eastern District that have resulted in a change in the method of election and the standard procedure has been to close them.[4]

---

[4] *See, Feggins v. Horne*, Civ. No. CA-88-0865-R (E.D. Va. June 19, 1989)(closed Oct. 23, 1989); *King v. Blalock*, Civ. No. CA-88-0811-R (E.D. Va. June 6, 1989)(closed Oct. 23, 1989); *Brunswick County League for Progress v. Town Council of Lawrenceville*, Civ. No. 3:91CV00091(E.D. Va. June 19, 1991)(closed Nov. 5, 1991); *McDaniels v. Mehfoud*, 702 F. Supp. 588 (E.D. Va. 1988), 927 F.2d 596 (4 Cir. 1991)(closed Dec. 27, 1991); *Harris v. City of Hopewell*, Civ. No. 82-0036-R (E.D. Va. 1983)(closed 1992).

Like *Collins,* the court in *Harris v. City of Hopewell* enjoined the defendant's from using an at-large electoral system, and closed the case. It appears from the docket, however, that the case was reopened in 1992. This was about the time the City received preclearance from the Department of Justice to revert to an at-large method of election, which suggests the City of Hopewell reopened the *Harris* case to obtain court approval.

7

VSBE 005697

DEFENDANT-INTERVENORS TX 023 - Page 160

The City is correct that the *Collins* court "did not say that the plan could not change." But as discussed above in the previous section, when a court issues a permanent injunction it is not ordering relief that cannot be changed; it is ordering relief that can be changed with court approval under Rule 60(b).

In its defense, the City also contends that it went through extensive procedures before changing its method of election and that minority voters can bring another Section 2 case. Norfolk Memo at 9-10. While the City went through several procedural steps in adding an at-large seat, it never sought approval from the judiciary, which had found that at-large elections for Norfolk City Council were discriminatory and ordered the City to stop using at-large elections. The procedural steps employed by the City might be relevant in a Rule 60(b) proceeding but should not substitute for such a proceeding. In addition, minority voters had to litigate a Section 2 case for several years in order to eliminate at-large elections for Norfolk City Council once already. A second lawsuit should not be required.

### E.      The Issue of the *Collins* Injunction Is Improperly Before this Court

Both parties are asking the court to address an issue that belongs to a different proceeding. This Court has neither the record from the *Collins* case before it nor the record of changes in demographic or political life of the City that can help it to make a proper determination of the question of whether the at-large election of the mayor violates the 1991 *Collins* order.

As discussed above, the record of the *Collins* case encompasses eight years of litigation on the issue of whether the at-large system of elections violates Section 2 of the Voting Rights Act. The final determination was that it did. The City is arguing before this Court that the final determination in *Collins* should no longer hold. But this Court

8

VSBE 005698

DEFENDANT-INTERVENORS TX 023 - Page 161

EXHIBIT A
to
Brief in Support of the Norfolk NAACP Motion

VSBE 005699

DEFENDANT-INTERVENORS TX 023 · Page 162

**VIRGINIA ACTS OF ASSEMBLY -- 2005 SESSION**

## CHAPTER 897

*An Act to amend and reenact §§ 8, 12, 18, 19, 22, 24, and 25, as severally amended, of Chapter 34 of the Acts of Assembly of 1918, which provided a charter for the City of Norfolk, to amend Chapter 34 by adding sections numbered 3.2, 5.1, 6.1, 7.1, 10.1, 14.1, and 17.1, and to repeal §§ 3.1, 5, 6, 7, 10, 14, and 17, as severally amended, of Chapter 34, relating to election of council and mayor.*

[H 2739]

Approved March 28, 2005

Be it enacted by the General Assembly of Virginia:
1. That §§ 8, 12, 18, 19, 22, 24, and 25, as severally amended, of Chapter 34 of the Acts of Assembly of 1918 are amended and reenacted and Chapter 34 is amended by adding sections numbered 3.2, 5.1, 6.1, 7.1, 10.1, 14.1, and 17.1 as follows:

*§ 3.2. Wards.*

*The City of Norfolk shall be divided into five (5) single-member wards numbered one through five, and the city shall also be divided into two single-member superwards numbered six and seven. The boundaries of such wards and superwards shall be established by ordinance of the city council as provided by law.*

*§ 5.1. Composition of council.*

*On and after July 1, 2006, the city council shall consist of seven members, each elected from single-member wards as provided in § 3.2, and a mayor elected at-large. Any member of city council shall be subject to recall in accordance with the provisions of this charter.*

*The council shall be a continuing body and no measure pending before such body shall abate or be discontinued by reason of the expiration of the term of office or removal of the members of said body or any of them.*

*§ 6.1. Qualification of members; conduct of candidates.*

*Beginning with the municipal election in 2006, any person qualified to vote in said city shall be eligible to the office of mayor or for the office of council member for the ward or superward in which such person resides. No person shall serve on council as both mayor and council member from a ward or superward, nor from more than one ward, including superwards. No candidate for the office of council member, including mayor, shall promise any money, office, employment, or other thing of value to secure a nomination or election, or expend in connection with his candidacy any money except as permitted by the general election laws of the state; and any such candidate violating this provision shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding $500, or imprisonment for a term not exceeding six months, or both, in the discretion of the jury, and shall forfeit his office, if elected; in which event, the person receiving the next highest number of votes from the voters for said office, who has not violated the said provision, shall be entitled to said office. Should there be no such candidate, the council shall fill the office with a person from the vacated ward or superward and, in the case of the office of mayor from the city at-large, in accordance with § 7, until a special election pursuant to general law is held.*

*§ 7.1. Vacancies.*

*Any vacancy in the council after July 1, 2006, except as otherwise provided in this Charter, shall be filled by the remaining members. Any person elected to fill an unexpired term for ward representative shall be elected only from among the qualified voters in the ward or superward where such vacancy exists. Any vacancy in the office of mayor shall be filled from among the qualified voters of the city at-large. No candidate shall be elected unless he receives at least five votes in his favor. If by reason of resignation, death, or other circumstances, except in the case of vacancies resulting from a recall election, five or more vacancies exist or occur at the same time in said council, then the members of the civil service commission shall at once convene a majority of said commission and, by a majority vote of the members of said commission present, forthwith make such number of appointments from the wards and superwards where such vacancies exist, or from the city at-large in the case of the mayor, as may be necessary to constitute a council of five qualified members, which five members shall at once proceed to fill the remaining vacancies with qualified members. And in any case the council shall fail to fill a vacancy therein for a period of thirty days after the occurrence of the vacancy, such vacancy shall be filled by said commission as provided herein. The city clerk shall act as the clerk of the commission so constituted, and shall cause his certificate of its action to be entered on the record of the council.*

*If the term of office so filled, either by the council or by said commission, does not expire for two years after the next regular election of council members following such vacancy, and such vacancy occurs more than one hundred twenty days prior to that election, an additional council member shall then be elected at such election only by the qualified voters of the ward or superward where such*

VSBE 005700

DEFENDANT-INTERVENORS TX 0.23 · Page 163

*vacancy exists, or in the case of the mayor from the city at-large and after the date of his qualification, succeed such appointee, and serve the unexpired term. When any vacancy is so required to be filled by election, the council or commission shall, within fifteen days of the occurrence of the vacancy, petition the circuit court to issue a writ of election to fill the vacancy at the next general election of council members. In the event that more than one vacancy is to be filled by election, the same provision shall apply. The foregoing provisions of this section are subject to the further provision that any vacancy resulting from a recall election shall be filled in the manner provided in such case.*

§ 8. Compensation of council members.

Each member of the council shall receive, subject to the provisions of this charter, a salary of forty-eight hundred dollars per year, except the president, whose salary shall be seventy-two hundred dollars per year, such salaries to be payable in equal monthly installments *such salary as shall be established by state law.*

*§ 10.1. Officers elected by council; rules.*

*Effective July 1, 2006, the council shall elect a city manager, a city clerk, a city attorney, a city auditor, and a high constable. The said council shall also appoint the members of such boards and commissions as are hereinafter provided for. All elections by the council shall be viva voce and the vote recorded in the record of the council. The mayor shall serve as chair of the council. The council may determine its own rules of procedure, may punish its members for misconduct, and may compel the attendance of members in such manner and under such penalties as may be prescribed by ordinance. It shall keep a record of its proceedings. A majority of all the members of the council, including the mayor, shall constitute a quorum to do business, but a smaller number may adjourn from time to time.*

*No member of the council shall be eligible, during the term of office for which he was elected or appointed, to hold any office filled by the council by election or appointment, except that a member of the council may be named a member of such other boards, commissions, and bodies as may be permitted by general law.*

§ 12. Meetings of council.

On the first day of July next following the regular municipal election, or if such day be Saturday or Sunday, then on the following Tuesday, the council shall meet at the usual place for holding meetings of the legislative body of the city, at which time the newly elected councilmen *council members* shall assume the duties of their office. The time for any such meeting shall be set by ordinance adopted by council not less than 30 *thirty* nor more than 45 *forty-five* days prior to the election. Thereafter the council shall meet at such times as may be prescribed by ordinance or resolution. It shall hold at least one regular meeting each week, provided that it may, by the affirmative vote of a majority of its members, dispense with any 12 *twelve* such regular meetings in any calendar year. The president of the council, any member thereof *mayor, any member of the council,* or the city manager, may call special meetings of the twelve council at any time upon at least 12 *twelve* hours' written notice to each member, served personally or left at his usual place of business or residence; or such meeting may be held at any time without notice, provided all members of the council attend. All meetings of the council shall be public *except where closed pursuant to the provisions of general law,* and any citizen may have access to the minutes and records thereof at all reasonable times.

*§ 14.1. Legislative procedure.*

*Except in dealing with questions of parliamentary procedure, the council shall act only by ordinance or resolution, which shall be introduced in writing, and all ordinances except ordinances making appropriations, or authorizing the contracting of indebtedness or issuance of bonds or other evidences of debt, shall be confined to one subject, which shall be clearly expressed in the title.*

*Ordinances making appropriations or authorizing the contracting of indebtedness or the issuance of bonds or other obligations and appropriating the money to be raised thereby shall be confined to those subjects respectively. Nothing herein shall be construed to prevent the council from authorizing in and by the same ordinance the making of any one public improvement and the issue of bonds therefore.*

*The enacting clause of all ordinances passed by the council shall be, "Be it ordained by the council of the City of Norfolk"; the enacting clause of all ordinances submitted to popular election by the initiative shall be, "Be it ordained by the people of the City of Norfolk." No ordinance, unless it be an emergency measure, shall be passed until it has been read by its title at two regular meetings not less than one week apart, or the requirements of such reading has been dispensed with by the affirmative vote of five of the members of the council. No ordinance, section, or subsection thereof shall be revised or amended by its title, section number, or subsection number only, but the new ordinance shall contain the entire ordinance, section, or subsection, as revised or amended. The ayes and noes shall be taken upon the passage of all ordinances or resolutions and entered upon the record of the proceedings of the council, and every ordinance or resolution shall require, on final passage, the affirmative vote of at least five of the members. No member shall be excused from voting except on matters involving the consideration of his own official conduct, or where his financial interests are involved.*

*In authorizing the making of any public improvements, or the acquisition of real estate or any interest therein; or authorizing the contracting of indebtedness or the issuance of bonds or other evidences of indebtedness (except temporary loans in anticipation of taxes or revenues or of the sale of*

VSBE 005701

DEFENDANT-INTERVENORS TX 023 - Page 164

*bonds lawfully authorized); or authorizing the sale of any property or rights in property of the City of Norfolk, or granting any public utility franchise, privilege, lease, or right of any kind to use any public property or easement of any description or any renewal, amendment or extension thereof, the council shall act only by ordinance; provided, however, that after any such ordinance shall have taken effect, all subsequent proceedings incidental thereof and providing for the carrying out of the purposes of such ordinance may, except as otherwise provided in this Charter, be taken by resolution of the council.*

*§ 17.1 Mayor.*

*Effective July 1, 2006, the mayor shall preside at meetings of the council, and perform such other duties consistent with his office as may be imposed by the council. He shall be entitled to a vote, but shall possess no veto power. He shall be recognized as the official head of the city for all ceremonial purposes, by the courts for the purpose of serving civil process, and by the governor for military purposes. He may use said title in any case in which the execution of contracts or other legal instruments in writing, or other necessity arising from the general laws of the state, may so require; but this shall not be construed as conferring upon him the administrative or judicial functions, or other powers or functions, of a mayor, under the general laws of the state. In time of public danger or emergency, he may, with the consent of the council, take command of the police and of the home guards hereinafter provided for and maintain order and enforce laws. During his absence or disability his duties shall be performed by another member appointed by the council.*

*The powers and duties of the mayor shall be such as are conferred upon him by this Charter, together with such others as may be conferred by the council in pursuance of the provisions of this Charter, and no others.*

§ 18. Time of holding municipal elections and conduct of elections.

A municipal election shall be held on the first Tuesday in May of the year 1992, and of every second year thereafter, which shall be known as the regular municipal election for the election of council members. Any matter which, by the terms of this charter, may be submitted to the electors of the city, at any special election, may be submitted at a regular municipal election.

An election to fill each of the ward and superward council seats shall be held at the regular municipal election in 1992. Those candidates elected from wards designated one through five shall serve on city council for a term beginning on the first day of July of the year 1992 and terminating two years hence or upon qualification of their successors. Those candidates elected from superwards designated six and seven shall serve on city council for terms beginning on the first day of July of the year 1992 and terminating four years hence or upon qualification of their successors. Thereafter, elections for council members from wards one through five shall be held every four years beginning on the first Tuesday in May, of the year 1994, and elections for superwards six and seven shall be held every four years beginning on the first Tuesday in May, of the year 1996, with persons so elected to begin their four-year terms on the first day of July following their election. Until July 1, 1992, the city council shall consist of the members of city council serving at the time of adoption of this amendment or their successors as provided in § 7 of this charter.

*Beginning in the year 2006, there shall be an election for the office of mayor to be held at the regular municipal election that year. The candidate receiving the most votes from the qualified voters of the city voting at-large for said office shall be elected mayor to serve for a term of four years beginning July 1, 2006, or upon qualification of his or her successor. Thereafter, elections for the office of mayor shall be held every four years beginning on the first Tuesday in May of the year 2010, with persons so elected to begin their four-year terms on the first day of July following their election.*

§ 19. Notice of Candidacy and Petition.

Candidates for the city council shall be qualified voters of the ward or superward from which they seek election, *or in the case of the election of the mayor, qualified voters of the city at-large.* Such candidates, subject to the provisions of § 21 of this charter, shall file their notices of candidacy and their petitions in the manner provided by law. No candidate may seek election for more than one seat in an election. A sitting member of council who files his or her candidacy for *mayor or for* election to a council seat other than reelection to his or her own seat and so appears on the ballot shall be deemed to have resigned his or her seat effective ~~July 1~~ *June 30* of the year in which the election is held whether or not he or she is elected to the new seat sought.

§ 22. Method of conducting municipal elections.

The candidate at any regular municipal election who receives the highest number of votes from the ward or superward to which election to city council is sought shall be elected the council member for that ward or superward. *Beginning with the municipal election in the year 2006, the candidate for mayor who receives the highest number of votes city-wide shall be elected mayor.* Each qualified voter shall be entitled to vote for no more than two council members in any election,: one member from the ward *or* superward, ~~numbered one through five,~~ in which the voter is qualified to vote ~~and one member from the superward, numbered six or seven, in which the voter is qualified to vote~~ *and the mayor.*

§ 24. Recall procedure.

Any member of city council may be recalled and removed from office only by the qualified voters of the ward or superward from which such member serves, *or in the case of the mayor from the qualified*

VSBE 005702

DEFENDANT-INTERVENORS TX 023 - Page 165

*voters of the city at-large,* and in accordance with the procedure described in this section. A petition for the recall of the council member designated, signed by at least three hundred qualified voters of the council member's ward or superward, *or on or after July 1, 2006, at least one thousand qualified voters city-wide in the case of the mayor,* and containing a statement in not more than two hundred words of the grounds of the recall, shall be filed with the city clerk, who shall immediately transmit a copy thereof to the city general registrar who shall examine the same, and ascertain and certify to the city clerk whether at least three hundred persons whose names are signed thereto are qualified voters of the said ward or superward *or on or after July 1, 2006, one thousand qualified voters city-wide in the case of the mayor.* Upon receipt of said certification, the city clerk shall forthwith notify such council member. Such council member may, within five days after such notice, file with such clerk a defensive statement not exceeding two hundred words. The city clerk shall, immediately upon the expiration of said five days, cause sufficient printed or typewritten copies of such petition, without the signatures, to be made, and to each copy he shall attach a printed or typewritten copy of such defensive statement or statements, if any such shall have been furnished him within the time provided. He shall preserve the original petition and shall cause one copy of such petition with a copy of the defensive statement, if any, attached to be conveniently placed in his office, and provide facilities for there signing the same, and shall also cause one copy, with a copy of the defensive statement, if any, attached to be placed in at least two public buildings designated by council and located within the council member's ward or superward, *or on or after July 1, 2006, in the case of the mayor, in each superward,* and provide facilities for there signing the same, and for the proper custody thereof. The city clerk shall immediately cause notice to be published in some newspaper of general circulation published in the city, of the places where the said copies may be found, and of the time within which the same may be signed.

    The said copies of such petition shall remain on file in the several places designated for a period of thirty days, during which time any one of them may be signed by any qualified voter of the designated council member's ward or superward, *or any qualified voter in the city in the case of the mayor,* including those who signed the original petition.

    § 25.  Notice.

    At the expiration of said thirty days, the city clerk shall assemble all of said copies, and shall file the same as one instrument with the clerk of the circuit court of said city, who shall immediately transmit a copy thereof to the city general registrar who shall examine the same, and ascertain and certify to the clerk of the circuit court whether the persons whose names are signed thereto are qualified voters of the said ward or superward, equal in number to fifteen percent of the number of voters in said ward or superward who cast their votes at the last preceding regular municipal election in which such council member was elected, *or on or after July 1, 2006, in the case of the mayor, fifteen percent of the number of voters city-wide who cast their votes at the last preceding regular municipal election in which the mayor was elected.* If such signatures do amount to fifteen percent, the clerk of the circuit court of said city shall at once serve notice of that fact upon the council member designated in the petition.

**2.  That §§ 3.1, 5, 6, 7, 10, 14, and 17, as severally amended, of Chapter 34 of the Acts of Assembly of 1918 are repealed, effective July 1, 2006.**

**3.  That the provisions of this act shall not become effective until approved under § 5 of the Voting Rights Act.**

**VSBE 005703**

**DEFENDANT-INTERVENORS TX 023 - Page 166**

(b)(7)(C)  P.1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

**February 27, 2008**    $2:08cv100$

**HAND DELIVERED**
**Fernando Galindo**
**Clerk, Rm. 193 B**
Walter E. Hoffman
**United States Courthouse**
**600 Granby Street**
**Norfolk, VA 23510**

**Re:** *Christina D. Perry-Bey v. City of Norfolk*

Dear Mr. Galindo.

Enclosed please find a Motion for Judgment and request for Injunctive Relief
In support and money order in the amount of $350.00 to cover the cost of the
filing fees to be filed in the above-entitled cause of action.

Thank you in advance for processing appropriately.

*Respectfully Submitted,*

Ms Rev T. Perry-Bey
(b)(7)(C)

Norfolk, VA 23523
(b)(7)(C)

DEFENDANT-INTERVENORS TX 023 - Page 167

MAR-16-2013 01:10A FROM:UFJ+                    (b)(7)(C)                            P.2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

CHRISTINA D. PERRY-BEY
ROY L. PERRY-BEY,
                    Plaintiffs,

Vs.                                    CIVIL ACTION NO: $\lambda : O 8cv l O O$

CITY OF NORFOLK, VIRGINIA

                    Defendants.

## I. MOTION FOR JUDGMENT AND INJUNCTIVE RELIEF

### I. INTRODUCTION

1. Currently, the City of Norfolk at large system of voting for Mayor violates *Collins*

*883 F.2d 1232: 1989 U.S. App. LEXS 12398*, and minimizes and dilutes their vote

in violation of Fourteenth and Fifteenth Amendments to the United States Constitution,

Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. 1973, and

42 U.S.C. 1983.

### II. JURISIDICTION

2. The court has jurisdiction pursuant to Section 2 of the Voting Rights Act of 1965, as

amended in ξ1982, 42 U.S.C. ξ1973, and 42 U.S.C. 1983.

(b)(7)(C)                                          P.3

## III. PARTIES

3. Christina D. Perry-Bey, at all times mentioned herein was, (and remains) a resident of the City of Norfolk and of the Commonwealth of Virginia and a citizen of the United States of America.

4. Roy L. Perry-Bey, at all times mentioned herein was, (and remains) a resident of the City of Norfolk and of the Commonwealth of Virginia and a citizen of the United States of America.

5. City of Norfolk among their duties and responsibilities is the protection, observance and safeguarding of the constitutions of the United States and of the Commonwealth by and through its City Council the duly elected representatives thereof:

## IV. FIRST CAUSE OF ACTION

6. Plaintiff's claim injury as result of defendants (1) illegal at large system of voting for Mayor which deprives plaintiffs of an equal opportunity to vote for a candidate of their choice as guaranteed by the Voting Rights Act and Fourteenth and Fifteenth Amendments to the United States Constitution while acting under color of law.

## V. SECOND CAUSE OF ACTION

7. City of Norfolk at large system of voting for Mayor violates *Collins* **883 *F.2d 1232: 1989 U.S. App. LEXS 12398***, and rights secured by the Voting Rights Act of 1965, as amended, 42 U.S. C.ξ 1973, and of the Fourteenth and Fifteenth Amendments to the United States Constitution and laws.

**VSBE 005706**

**DEFENDANT-INTERVENORS TX 023 - Page 169**

## √Ⱦ. RELIEF REQUESTED

8. **WHEREFORE**, plaintiff request the court grant the following relief:

A. Issue an injunction stating that:

1. City of Norfolk at large system of voting for Mayor violates *Collins 883 F.2d 1232: 1989 U.S. App. LEXS 12398*, and rights secured by the Voting Rights Act of 1965, as amended, 42 U.S. C.Ɛ 1973, and of Fourteenth and Fifteenth Amendments to the United States Constitution and laws.

2. Defendants' the ("cabal") official action caused and/or subjected plaintiff's to denial of their Voting Rights, *supra*:

3. Defendants by their acts and omissions, and in furtherance of their agenda, violated the Voting Rights Act of 1965, as amended, Title 42 U.S. C.Ɛ 1973, and the Fourteenth and Fifteenth Amendments to the United States Constitution and laws of the United States.

B. Issue an injunction ordering City of Norfolk and their agents:

1. Enjoined defendants from maintaining the current at large Mayor status as a direct conflict with *Collins v. City of Norfolk*, *supra*:

2. Issue an injunction prohibiting the holding of future city council at large system of voting in the City of Norfolk to comply with *Collins v. City of Norfolk*, *supra:*

3. Plaintiffs' Federal constitutional and statutory rights against violation of their voting rights can only be protected against immediate and certain violations in this case by the issuance of the requested injunction.

**VSBE 005707**

**DEFENDANT-INTERVENORS TX 023 · Page 170**

(b)(7)(C)                                    P.5



C. Plaintiff's does hereby give notice for leave to file an amended complaint pursuant to
[F.R.C.P.] and supplementary pleadings and, request competent legal counsel be timely
appointed pursuant to 28 U.S.C. ξ 1915 (d) to assist in the preparation of any further
responsive pleadings, affidavits, briefs, discovery, etc., on the ground that plaintiff's
lacks the financial capability to investigate the critical issues that are so complex that,
as a pro se litigate, they can not reasonably be required to present this case with any
effectiveness; that legal assistance is necessary and in the interest justice for the fair
presentation of a proper case to the Court.

February 27, 2008

Respectfully Submitted,

By: _____
MS. CHRISTINA D. PERRY-BEY

By: _____
MR. ROY L. PERRY-BEY
PETITIONERS

(b)(7)(C)

VSBE 005708



**DEFENDANT-INTERVENORS TX 023 - Page 172**

CITY OF NORFOLK, VIRGINIA, ET AL., PETITIONERS V. HERBERT M. COLLINS, ET AL.

No. 89-989

In The Supreme Court Of The United States

October Term, 1989

On Petition For A Writ Of Certiorari To The United States Court Of Appeals For The Fourth Circuit

Brief For The United States As Amicus Curiae

This brief is filed in response to the Court's invitation to the Solicitor General to express the views of the United States.

TABLE OF CONTENTS
Questions Presented
Statement
Discussion
Conclusion

## QUESTIONS PRESENTED

1. Whether a minority group's consistent ability to elect one representative of choice to a city council elected under an at-large voting system is necessarily sufficient to defeat a challenge to that system under Section 2 of the Voting Rights Act, when the minority group would have the opportunity to elect at least two representatives if the council were elected from fairly drawn single-member districts.

2. Whether an at-large electoral system, in which a minority group has the opportunity to elect candidates of its choice who are not members of the minority group, but the minority group has no opportunity to elect candidates of its choice who are members of the minority group, may be in violation of Section 2 of the Voting Rights Act.

3. Whether the court of appeals erred in reversing as clearly erroneous the district court's finding that no special circumstances explained the election of several black-preferred candidates to the City Council in Norfolk after this litigation was filed in 1983.

## STATEMENT

1. The City of Norfolk, Virginia uses an at-large system to elect its city council. The council has seven members who serve staggered four-year terms. Elections are held every two years, with three seats open one election year and four the next. Candidates run for all open seats, and the three (or four) candidates with the most votes win. Voters may vote for as many candidates as there are open seats, but they may also vote for fewer. Pet. App. 3a-4a, 42a.

Blacks constitute 35% of Norfolk's population and 31% of its voting age population (Pet. App. 4a). Until 1968, all members of the council were white (ibid.). A black was elected that year, and there has been

at least one black on the council ever since (id. at 4a-5a). Between 1970 and 1982, black candidates running in four elections in which the black incumbent was either not up for election or was himself also running for reelection received a majority of votes from black voters and lost (id. at 16a). In 1934, after this suit was filed, a second black, Foster, was elected, and two blacks have served on the council simultaneously since then (id. at 5a). Since 1968, two whites -- Howell and Staylor -- have been elected to the council with majority black support (Pet. 4). Howell was elected three times with majority black support; Staylor was elected once (ibid.).

2. Plaintiffs are seven black citizens of Norfolk and the Norfolk Branch of the NAACP (Pet. App. 2a). In 1983, they filed this suit alleging that the at-large method of electing members to the city council denies black voters an equal opportunity to elect candidates of their choice in violation of Section 2 of the Voting Rights Act, 42 U.S.C. 1973 (Pet. App. 2a, 3a n.2).

After a trial, the district court ruled for the City of Norfolk (Pet. App. 132a-193a), and the Fourth Circuit affirmed (id. at 114a-131a). This Court vacated and remanded to the Fourth Circuit for reconsideration in light of Thornburg v. Gingles, 478 U.S. 30 (1986) (Pet. App. 113a). In Gingles, this Court held that there are three preconditions to a finding that an at-large system violated Section 2: "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district. * * * Second, the minority group must be able to show that it is politically cohesive. * * * Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it -- in the absence of special circumstances * * * -- usually to defeat the minority's preferred candidate." 478 U.S. at 50-51. The Fourth Circuit in turn remanded the case to the district court to decide these issues (Pet. App. 99a-112a).

3. The district court once again ruled in favor of Norfolk (Pet. App. 38a-98a). It found Norfolk's black population sufficiently large and geographically compact to constitute an effective voting majority in two single-member districts (id. at 51a). The court also found that Norfolk blacks are politically cohesive (id. at 52a). The court found, however, that whites voting as a bloc are not usually able to defeat minority-preferred candidates (ibid.). In reaching this conclusion, the court relied on evidence that, since 1968, 11 of the 19 candidates receiving majority black support have won (id. at 66a-67a). The court also cited evidence that, at all times since 1974, at least two members of the council have been supported by a majority of black voters (id. at 68a).

The court rejected plaintiffs' contention that black voters did not actually favor Howell and Staylor since far more blacks voted for competing candidates than for them (Pet. App. 70a-72a). The court found it more significant that a majority of blacks voted for Howell and Staylor, that the most influential black civic group endorsed them, and that some black candidates received less black support than they did (ibid.).

The district court also rejected plaintiffs' assertion that only

special circumstances allowed Foster to win a second black seat in 1984 (Pet. App. 76a-79a). The court acknowledged that the Mayor had both endorsed Foster and publicly stated that his election might moot this case (id. at 76a). The court also noted that a civic group with which the Mayor was affiliated supported only two candidates (not including Foster) when three seats were vacant (id. at 78a; see also id. at 18a). The court found, however, that these events had not produced unusual white support for Foster (id. at 76a-79a). The court relied on evidence that the Mayor's decision to support Foster had predated the lawsuit (id. at 77a). It also cited evidence that other black candidates, including one who ran in 1984 without the Mayor's endorsement, had obtained approximately the same level of white support as Foster did in 1984 (id. at 77a-78a).

Finally, the court rejected plaintiffs' contention that the reelection of black incumbents should be attributed to the special advantages of incumbency (Pet. App. 80a). The court found that incumbency was not critical to black success since nonincumbents supported by a majority of black voters have also won (ibid.).

4. a. A divided panel of the court of appeals reversed. It agreed with the district court that Norfolk blacks are sufficiently compact to constitute a voting majority in at least two single-member districts and that they are politically cohesive (Pet. App. 9a). It held that the district court had erred, however, in finding the absence of legally significant white bloc voting.

The court concluded that the district court's error stemmed in part from its finding that Howell and Staylor were minority-preferred candidates (Pet. App. 9a-15a). The appellate court held that Howell's and Staylor's receipt of significantly less minority support than competing candidates created a presumption that they should not be considered minority-preferred (id. at 9a-10a). The evidence cited by the district court, the Fourth Circuit explained, was insufficient to show that black voters preferred Howell and Staylor over these other unsuccessful candidates (id. at 11a). The court also concluded that the district court's finding could not be reconciled with the evidence that the black community did not view Howell and Staylor as their representatives and the evidence that Howell and Staylor did not promote issues of concern to the minority community (id. at 11a-13a).

The court of appeals then proceeded to address the significance of white bloc voting, with Howell and Staylor no longer counted as minority successes. The court found that while black voters have achieved sustained success in electing one representative, "this case involves the community's inability to elect a second member until after the institution of this action" (Pet. App. 15a). For this reason, the court explained, the statistics showing that just over half of the black-supported candidates have won election since 1968 are misleading (ibid.). To use such statistics to defeat this action, the court concluded, would place "a stamp of approval on token representation" (ibid.).

To avoid this result, the court held that the inquiry into whether white bloc voting can usually defeat minority-preferred candidates should be applied to the black community's effort to obtain a second seat (Pet. App. 15a). Applying this analysis, the court found that

VSBE 005712

DEFENDANT-INTERVENORS TX 023 - Page 175

all black-supported candidates for a second seat between 1968 and 1984 were defeated and that this demonstrated legally significant white bloc voting (id. at 16a).

A second black -- Foster -- was elected to the council in 1984, but the court held that this did not undermine its conclusion (Pet. App. 17a-20a). The court concluded that the Mayor's unprecedented support for a second black, his statement that the election of a second black might moot the case, and the civic coalition's endorsement of two candidates for three vacancies (leaving a more open field for Foster) showed that special circumstances accounted for Foster's success (id. at 18a). The court held that the district court's finding that these events had not elicited unusual white support was based on its mistaken reliance on a comparison between the amount of white support received by Foster and the amount received by previous black candidates for the first seat (id. at 18a-19a). According to the court of appeals, Foster's white support should have been compared to that of previous second-seat candidates; when this comparison was made, it became clear that Foster's share of the white vote (26.6%) was nearly twice that of the next highest black second-seat candidate prior to 1984 (14.0%) (id. at 19a). That another black candidate in 1984 received almost as much white support as Foster, the court concluded, reinforced the inference that this litigation had produced unusual white support for black candidates (ibid.).

The court also concluded that the ability of black voters to retain two blacks on the council in 1986 and 1988 resulted from special circumstances (Pet. App. 21a). The court attributed the success of black candidates in these elections to the pendency of this litigation and to the candidates' incumbency (ibid.).

b. Judge Chapman dissented. He agreed with the district court that Howell and Staylor were minority-preferred candidates (Pet. App. 23a-29a). The relevant question, according to Judge Chapman, was whether "the elected candidate can be fairly considered as a representative of the minority community and not whether such candidate is the 'most preferred'" (id. at 24a (emphasis in original)). Judge Chapman noted that the candidates' positions on issues of concern to the minority community "has nothing to do with vote dilution" (id. at 26a), and that he would give "little weight" to testimony that Howell and Staylor were not viewed as representatives of the black community (ibid.). Judge Chapman was also convinced that the panel's treatment of Howell and Staylor was at least implicitly related to an assumption that a candidate's race is an important factor in determining whether he is minority-preferred (id. at 25a-26a).

Judge Chapman further concluded that even if Howell and Staylor are not counted as minority-preferred candidates, plaintiffs failed to prove legally significant racial bloc voting (Pet. App. 30a-34a). In Judge Chapman's view, the majority improperly embraced proportional representation as a Section 2 requirement in focusing on whether blacks have achieved success in electing a second representative (Pet. App. 30a). Judge Chapman would have applied the test of usual defeat to all contests, not just to those for the second seat (id. at 33a). Applying this standard, Judge Chapman found that, even excluding Howell and Staylor, over half of the minority-supported candidates

DEFENDANT-INTERVENORS TX 023 - Page 176

have been elected to office since 1968 (id. at 34a).

Judge Chapman also found that Foster's election in 1984 did not result from special circumstances (Pet. App. 34a-36a). In concluding otherwise, Judge Chapman stated, the majority had improperly restricted the comparison of Foster's white support to that of blacks who ran for the second seat (id. at 35a). In Judge Chapman's view, this comparison shares the same error as the panel's inquiry into whether blacks are able to elect someone to a second seat: it effectively establishes a right to proportional representation (ibid.). When compared to all black candidates, Judge Chapman noted, Foster's white support was not unusual. Beyond that, Judge Chapman concluded, the evidence that the level of white support for another black candidate in 1984 was comparable to the level of white support for Foster shows that the Mayor's endorsement of Foster did not produce unusual support for him (ibid.).

Finally, Judge Chapman concluded that the election of black incumbents should not be discounted as a special circumstance (Pet. App. 36a-37a). Judge Chapman read the panel as holding that when incumbents are successful and nonincumbents are not, incumbency is necessarily a special circumstance (id. at 36a). In Judge Chapman's view, this reasoning would turn virtually every election into one involving special circumstances (ibid.).

c. The court of appeals denied rehearing en banc by an equally divided vote (Pet. App. 197a).

### DISCUSSION

Despite racially polarized voting patterns, black voters in Norfolk have repeatedly elected at least one representative of their choice to the city's seven-member council. The court of appeals determined, however, that black voters do not have an opportunity -- absent special circumstances -- to elect a second representative. Because blacks would have the potential to elect two representatives under a fairly drawn single-member district plan, the court of appeals held that the City's use of an at-large election system dilutes black voting strength in violation of Section 2.

Petitioners contend that the court of appeals' inquiry into whether black voters have an opportunity to elect a second representative is inconsistent with Gingles and implicitly treats the absence of proportional representation as a violation of Section 2. They also argue that the Howell and Staylor elections and the post-lawsuit elections show that black voters not only have an opportunity to elect two representatives of their choice, but have in fact done so. Finally, they argue that the totality of the circumstances demonstrate the absence of a Section 2 violation.

These contentions, while serious, do not warrant this Court's review. Although the court of appeals' analysis is not without flaws, the court's errors, we believe, either do not affect the outcome of the case or are too closely tied to its particular facts to be of general significance. Moreover, there is no conflict among the circuits on the specific issues presented in this case. The petition for a writ of certiorari should therefore be denied.

That said, we would be remiss in failing to note that, as a general matter, the courts of appeals appear to be experiencing considerable difficulty in resolving a wide range of issues surrounding application of Section 2 of the Voting Rights Act to at-large election systems. See, e.g., U.S. Amicus Br. in Sanchez v. Bond, petition for cert. pending, No. 89-353. It is not insignificant that, in addition to the Fourth Circuit in this case, another circuit has recently divided evenly en banc in such a case. Solomon v. Liberty County, No. 87-3406 (11th Cir. Apr. 5, 1990); see also Whitfield v. Democratic Party, No. 88-1953 (8th Cir. May 4, 1990) (en banc court evenly divided on Section 2 challenge to majority vote requirement). For the reasons set forth in our amicus filings, we do not believe that either this case or Sanchez warrants this Court's review. At the same time, most voting rights cases are, by their nature, likely to be fact-intensive; persistent confusion and division in the circuits -- even on application of governing principles to particular facts -- may well call for further guidance from this Court at an appropriate time.

1. a. The court of appeals properly inquired into whether black voters have an opportunity to elect a second representative. That inquiry is not premised on the notion that Section 2 requires proportional representation, as petitioners contend. It is instead premised on the notion that an at-large system in which the evidence shows that white voters are willing to elect no more than one representative who is the choice of black voters is not immune from Section 2 scrutiny. Any contrary rule would, as stated by the court of appeals, "place() a stamp of approval on token representation." (Pet. App. 15a). For example, a 15-member city council elected at-large in a community with a geographically compact, 49% black population cannot be exempt from Section 2 scrutiny because a single black-preferred representative is consistently elected. In the terms of the statute, the fact that the black community can consistently elect a single council member would hardly prove that it has the same opportunity as the majority group "to participate in the political process and to elect representatives of (its) choice." 42 U.S.C. 1973(b).

The use of a fairly drawn single-member district plan as a benchmark for measuring the effect of an at-large system on minority voting strength is at the heart of Gingles. There, the Court held that "(t)he single-member district is generally the appropriate standard against which to measure minority group potential to elect." 478 U.S. at 50 n.17. It follows from this holding that, where the minority group challenging an at-large electoral system has shown that it is unable to elect as many representatives as it could in fairly drawn single-member districts, and where the defendant has failed to rebut this showing, a Section 2 violation can be made out. Cf. Gingles, 478 U.S. at 90-91 (O'Connor, J., concurring in the judgment).

The use of a single-member district plan as the benchmark for measuring undiluted voting strength is far different from a proportional representation standard. As was explained in Gingles, "(This standard) thus would only protect racial minority votes from diminution proximately caused by the districting plan; it would not assure racial minorities proportional representation." 478 U.S. at 51 n.17 (quotation marks and emphasis omitted). The Fourth Circuit has

VSBE 005715

DEFENDANT-INTERVENORS TX 023 - Page 178

expressly recognized this distinction. See McGhee v. Granville
County, 860 F.2d 110 (4th Cir. 1988) (rejecting a Section 2 challenge
to a fairly drawn single-member district plan even though it afforded
minority voters far less than proportional representation).

b. While the court of appeals properly sought to assess the
opportunity of blacks to elect a second representative, it
artificially narrowed its focus to contests for a second seat. A
minority group's repeated success in electing one representative can
be persuasive evidence that it fully participates in the electoral
process and has an opportunity to elect a second representative as
well. The force of this evidence is not necessarily dissipated by
evidence that the minority group has been unsuccessful in actually
electing a second representative. The lack of success could be
explained by factors other than the unyielding resistance of whites to
a second representative, such as the characteristics of a particular
candidate or the circumstances surrounding a particular election.
Because the court of appeals did not expressly consider all the
evidence bearing on the opportunity of blacks to elect a second
representative -- including the unquestioned and consistent success of
blacks in electing at least one representative to the council -- its
analysis of the "totality of circumstances" (42 U.S.C. 1973(b)) was
incomplete.

It is unclear, however, that a more complete analysis would have
affected the outcome of this case. The evidence shows that between
1970 and 1982, black voters made four unsuccessful attempts to elect a
second black to the council. These second-seat candidates received
just 8% to 14% of the white vote, for an average of 11%. In contrast,
black candidates for the first seat received between 22% and 32% of
the white vote, for an average of 27% (Pet. App. 16a, 208a-217a).
This wide and repeated disparity between white support for first-seat
candidates and white support for second-seat candidates is significant
evidence that black voters in fact did not have an opportunity to
elect a second representative before the filing of this suit.
Petitioners have pointed to nothing in the record about the
characteristics of the second-seat candidates or the circumstances of
these elections that adequately explains this white voting behavior,
leaving the opposition of whites to a second black representative as
the most persuasive explanation.

c. Petitioners contend that black voters have still elected more
than half of their preferred candidates and that plaintiffs therefore
failed to prove usual defeat as required by Gingles. This argument is
misguided. Petitioners approach the usual defeat inquiry as if it
involved nothing more than a strict mathematical count of past wins
and losses, with more losses than wins being an essential element of
plaintiffs' case. Petitioners' mathematical model, however, produces
a distorted picture.

Under petitioners' method of calculating a minority group's
opportunity to elect, there would be no violation as long as
first-seat successes outnumber second-seat losses, regardless of
whether the evidence undeniably shows that there is no opportunity to
elect a second candidate. As the court of appeals explained, to
accept such evidence as conclusive proof of the absence of a violation
would "place() a stamp of approval on token representation" (Pet. App.

15a]. It is significant that blacks in Norfolk can elect a candidate of their choice to the city council. But there are seven members on the council, and if discriminatory voting patterns account for the inability of blacks to elect more than one candidate -- in the absence of special circumstances -- then their success in electing one is no answer. If the political reality is that black voters have been relegated to a token seat, and that they have no real opportunity for increased representation, it would be inconsistent with the goals of Section 2 to mask this reality by melding first-seat and second-seat elections and concluding that there is no violation because blacks have won (consistently, for the first seat) more often than they have lost (consistently, for the second seat). Nothing in Gingles or common sense requires such a result.

To the contrary, as we have shown, the relevant inquiry under Gingles is whether blacks have an opportunity to elect a second representative. First-seat elections can inform that inquiry. When other evidence is more convincing, however, the first-seat elections can properly be discounted.

2. Petitioners contend, however, that the at-large election system does not limit black voters to token representation. In particular, they point to the elections of Howell and Staylor as evidence that blacks have elected at least two candidates of choice to the council since 1974. According to petitioners, the court of appeals plainly erred when it refused to find that Howell and Staylor were minority-preferred.

Gingles does not expressly address how to decide whether a candidate is minority-preferred. This Court's discussion of how to prove political cohesion, however, suggests the proper approach. One way to prove political cohesion, this Court held, is to show that "a significant number of minority group members usually vote for the same candidates." 478 U.S. at 56. This definition of political cohesion implies that there is no great mystery about how to identify minority-preferred candidates: they are simply those for whom a significant number of minority group members vote.

This is not to suggest that every candidate who receives more than 50% of the black vote is necessarily a candidate of choice. But Howell and Staylor did not receive bare majority support from blacks; black support for these white candidates ranged from almost 57% to approximately 73% (Pet. 4). Generally, support of these proportions should be sufficient to establish that a candidate has received bloc support and is therefore a candidate of choice.

The court of appeals concluded that Howell and Staylor were not minority-preferred primarily because competing candidates received a significantly higher percentage of the black vote and lost (Pet. App. 9a-15a). The court reasoned that black voters preferred these other candidates, rather than Howell and Staylor. /1/ The flaw in this reasoning is that the candidates did not compete for only one position. Each election had at least three vacancies. Accordingly, blacks could potentially have had at least three candidates of choice. In these circumstances, it makes little sense to say that someone cannot be a candidate of choice solely because another candidate receives a significantly higher percentage of the black vote. In such

DEFENDANT-INTERVENORS TX 023 - Page 180

multiple vacancy elections, if three candidates receive minority bloc support, it would generally seem fair to conclude that they are all candidates of choice. See Citizens for a Better Gretna v. City of Gretna, 834 F.2d 496, 502 (5th Cir. 1987) (recognizing more than one minority-preferred candidate in multiple-seat election), cert. denied, 109 S. Ct. 3213 (1989).

We nonetheless believe that there were sufficient grounds for the court of appeals' conclusion that the elections of Howell and Staylor did not demonstrate the absence of a Section 2 violation. That is because, as previously discussed, there is a clear pattern of defeat of candidates who are black and ran for a second seat between 1970 and 1982; at best, the elections of Howell and Staylor show that the minority voters had the opportunity to fill the second seat with a candidate of their choice so long as that candidate was white. /2/ As we have explained in our Brief as Amicus Curiae in Sanchez v. Bond, No. 89-353, while a candidate of choice of a minority group need not be a member of that group, an electoral system that restricts the opportunity of a minority group to elect candidates of choice who are members of the group violates Section 2 (Br. 13-14). Thus, while we do not embrace the court of appeals' reasoning on this issue, its ultimate conclusion that the Howell and Staylor elections do not suggest the absence of a Section 2 violation does not warrant this Court's review.

Contrary to the contention of petitioners, there is no conflict between the decision in this case and the result reached by the Fifth Circuit in City of Gretna. In Gretna, the Fifth Circuit held that a black candidate who received 67% of the black vote and lost was a minority-preferred candidate even though two competing white candidates who may have received 70% of the black vote won. 834 F.2d at 502 & n.14. The court further held, however, that the success of the two white candidates did not establish the absence of legally significant white bloc voting. The court explained that "(s)ignificance lies in the fact that the black candidate preferred by the minority was defeated by white bloc voting. That blacks also support white candidates acceptable to the majority does not negate instances in which white votes defeat a black preference." Id. at 502. As this discussion shows, the Fifth Circuit's result, although not its reasoning, is congruent with the result reached in this case; the success of blacks in electing white candidates to a second seat cannot rebut a clear showing that blacks have had no opportunity to elect black candidates to that seat.

3. Petitioners next contend that Foster's election in 1984 and the subsequent reelection of black candidates in 1986 and 1988 are sufficient to show that blacks enjoy an equal opportunity to elect candidates of their choice. This fact-bound contention does not warrant this Court's review.

a. Petitioners initially contend that the court of appeals' finding that this litigation produced unusual white support for Foster is based on an unduly restricted comparison to the white support for previous second-seat candidates. In petitioners' view, that analysis is premised on the same proportional representation standard that led the court to assess the opportunity of blacks to elect a second representative. For reasons already discussed, this criticism is

VSBE 005718

DEFENDANT-INTERVENORS TX 023 - Page 181

misdirected. Given the propriety of the second-seat inquiry and the significant difference between white support for previous first- and second-seat candidates, the court of appeals properly compared Foster's white support to that of the previous second-seat candidates. Because Foster received significantly more white support than previous black second-seat candidates, the court plausibly viewed Foster's white support as unusual, and the district court's contrary finding as clearly erroneous.

This conclusion, however, does not exhaust the special circumstances inquiry. It is also necessary to determine whether this unusual support is an artifact of the pending litigation or whether it reflects a more permanent change in the political climate in Norfolk. The evidence on this issue is inconclusive. On the one hand, the evidence that no black candidate was elected to a second seat until after this suit was filed, together with the evidence that the Mayor publicly stated that the election of a second black might moot the case and the civic group's endorsement of only two candidates for the three open seats in 1984, suggest that Foster's unusual support was a product of the litigation. On the other hand, the evidence that the Mayor's support for Foster predated this suit, and that black voters have now elected and reelected two black representatives through three successive elections, suggest that a more permanent shift in the political climate may be at work. The rest of the evidence can plausibly support either inference (compare Pet. App. 19a with id. at 35a).

Accordingly, after identifying the district court's error in failing to treat Foster's support from white voters as unusual, a proper application of Rule 52 of the Federal Rules of Civil Procedure should have led the court of appeals to remand for a new finding on whether Foster's unusual support was caused by the litigation or reflected a more permanent shift in the Norfolk political climate. See Pullman-Standard v. Swint, 456 U.S. 273 (1982). Because the court of appeals purported to apply the clearly erroneous standard, however, and because the manner in which it did so does not have any importance outside of this case, the court of appeals' treatment of Foster's election does not warrant this Court's review.

b. For similar reasons, the question whether the court of appeals properly treated incumbency as a factor that contributed to the retention of two blacks on the council in 1986 and 1988 is not worthy of this Court's review. Under Gingles, incumbency is among the factors that may justify a finding that the election of a minority-supported candidate is due to special circumstances. 478 U.S. at 57. The importance of incumbency in a particular case, however, is a factual issue governed by the clearly erroneous standard. Here, while it is plausible that the candidates' incumbency (along with the pendency of the litigation) explains the 1986 and 1988 ability of blacks to retain two seats on the council, it is equally plausible that blacks now enjoy an opportunity to elect a second representative of their choice to the council. They have, after all, done so in three successive elections. Accordingly, the court of appeals should not have substituted its judgment for that of the district court on this issue. Because this issue is so fact-bound and is unlikely to have any significance beyond this case, however, it too does not warrant this Court's review. /3/

VSBE 005719

DEFENDANT-INTERVENORS TX 023 - Page 182

4. Finally, petitioners contend that the court of appeals
improperly reversed the district court's finding that the totality of
the circumstances demonstrates the absence of a Section 2 violation.
Here, however, the district court's ultimate finding depended on its
treatment of the Howell, Staylor, and post-litigation elections.  Once
its findings on those elections were set aside, there was no longer
any basis for the district court's ultimate finding.  As petitioners
contend (Pet. 28), this Court did not hold in Gingles that the only
way a defendant may defeat a Section 2 claim is to show that one of
the Gingles factors has not been proven.  But in this case,
petitioners point to no other circumstance that would justify a
finding of no violation.  /4/ Thus, petitioners' argument on this
issue collapses into their arguments on the other issues.  For the
reasons already discussed, those contentions do not warrant this
Court's review.

## CONCLUSION

**The petition for a writ of certiorari should be denied.**

**Respectfully submitted.**

**KENNETH W. STARR**

   **Solicitor General**

**JOHN R. DUNNE**

   **Assistant Attorney General**

**JOHN G. ROBERTS, JR.**

   **Deputy Solicitor General**

**ROGER CLEGG**

   **Deputy Assistant Attorney General**

**JAMES A. FELDMAN**

   **Assistant to the Solicitor General**

**JESSICA DUNSAY SILVER**

**IRVING GORNSTEIN**

   **Attorneys**

**MAY 1990**

/1/ Petitioners' contention (Pet. 16 n.20, 22) that the court of
appeals' opinion "seems to incorporate the notion that black voters
must achieve proportional representation with black candidates" (Pet.
22 (emphasis in original)) is mistaken.  The court of appeals
expressly refrained from deciding whether the race of the candidate is
significant in determining who is a "candidate of choice" of the

VSBE 005720

DEFENDANT-INTERVENORS TX 023 - Page 183

minority group. Pet. App. 8a n.7. In fact, as Judge Chapman recognized in his dissent, the panel did not object to counting Howell as a black-preferred candidate in one of her bids for election. See Pet. App. 24a-25a. Although the portion of the court's opinion addressing the Howell and Staylor victories (id. at 9a-15a) does seem to rest on the assumption (incorrect, in our view) that minority voters may have only one defeated candidate of choice in a multiple-seat election, it does not rest on the assumption (also incorrect, in our view) that any candidate of choice of minority voters must be a member of the minority group.

/2/ As explained above (p. 11), although black candidates for the second seat received an average of just 11% of the white vote, black candidates for the first seat received an average of 27% of the white vote. It is this decline in the white vote for second-seat black candidates -- a decline for which petitioners offer no explanation -- that made it impossible for such candidates to be elected between 1970 and 1982.

/3/ Petitioners contend (Pet. 27-28) that the court of appeals improperly treated all election successes involving incumbents as special circumstances elections. While there is some ambiguity on this point, we read the court's discussion of incumbency as limited to the ability of blacks to elect and retain a second representative on the council (Pet. App. 5a, 20a-21a). There is no other way to explain the court's finding (Pet. App. 15a) that "this action would border on the frivolous" if the claim could have been defeated by showing that blacks had "the ability to elect a single candidate to the council."

/4/ The en banc Eleventh Circuit has recently divided evenly concerning the relationship between a finding that the three Gingles factors were proven in a given case and an ultimate "totality of the circumstances" finding of a Section 2 violation. See Solomon v. Liberty County, No. 87-3406 (Apr. 5, 1990). The question that divided the Eleventh Circuit in Solomon, however, is largely irrelevant in this case. The Solomon court was unanimous in holding that a plaintiff can make out a Section 2 violation simply by proving the existence of the three Gingles factors. See slip op. 2599 (Kravitch, J., specially concurring), 2615 (Tjoflat, C.J., specially concurring). The court, however, was unable to agree on whether a defendant may rebut a showing of the existence of the three Gingles factors by showing that a neutral explanation, relying on objective factors, demonstrates that "the voting community is not driven by racial bias." Id. at 2616 (Tjoflat, C.J., specially concurring); see id. at 2593 n.3 (Kravitch, J., specially concurring). In this case, however, although petitioners generally assert (Pet. 28) that the Fourth Circuit did not give proper deference to the district court's "totality of the circumstances" finding, they do not assert that they proffered a neutral, non-racial explanation for the racially polarized voting in Norfolk, or that the Fourth Circuit, having found the existence of legally significant racially polarized voting, erred in failing to recognize that such voting in this case was not the result of racial bias. This case, therefore, does not raise the issue that divided the Eleventh Circuit in Solomon.

VSBE 005721

DEFENDANT-INTERVENORS TX 023 - Page 184

**IN THE UNITED STATES SUPREME COURT
OF THE UNITED STATES OF AMERICA**

No. 10-1255

CHRISTINA D. PERRY-BEY,

      Plaintiff - Appellant,

v.                         CIVIL ACTION NO: 2:08CV100

CITY OF NORFOLK, VIRGINIA.

      Defendant - Appellee.

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs herein the above entitled
cause of action; hereby appeals to the Supreme Court of the
United States from the final order entered on February 22, 2011
from the United States Court of Appeals for the Fourth Circuit
for the Eastern District of Virginia, affirming the decision of
the United States District Court for the Eastern District of
Virginia, final order entered on April 6, 2010, dismissing
Plaintiff's Voting Rights cause of action with prejudice.
May 17, 2011 Tuesday

                     I ask for this,

                    MS. CHRISTINA D. PERRY-BEY
                                 PLAINTIFF,
                             P.O. BOX 9901
                    NORFOLK, VA 23505

cc: PATRICIA S. CONNOR, CLERK
UNITED STATES COURT OF APPEALS

**VSBE 005722**

**DEFENDANT-INTERVENORS TX 023 - Page 185**

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2011 a true copy of the foregoing Plaintiff's notice of appeal was mailed to counsel for defendants of record.


Paul W. Jacobs, II
CHRISTIAN & BARTON, LLP
900 EAST MAIN STREET, SUITE 1200
RICHMOND, VA 23219-3095


MS. CHRISTINA D. PERRY-BEY
PLAINTIFF,
P.O. BOX 9901
NORFOLK, VA 23505


VSBE 005723

JUL-19-2013 10:48A FROM:UFJ4CEJ     (b)(7)(C)     P.1

**UNITED FRONT FOR JUSTICE**
(b)(7)(C)

NORFOLK, VIRGINIA 23505

(b)(7)(C)

July 16, 2010

Chris Herren
Chief, Voting Section
Civil Rights Division Room -NWB
Department of Justice
900 Penn Sylvania Ave.,
Washington, D.C. 20530

**Re: Objection to the City of Norfolk's formal Request
to Hold a Special City Council Election on November 2,
2010**

Dear Mr. Herren:

This is an official objection to the City of Norfolk's
request for approval to hold a special City Council
election On November 2, 2010 based on the grounds as
follows:

1. The Pending Litigation challenging the legality of
the direct election of Mayor and vote dilution of
minority voting power. *See:* case #**10-1255** filed in the
United States Court of Appeals for the Fourth Circuit,
***CHRISTINA D. PERRY-HEY, v. CITY OF NORFOLK, VIRGINIA,
CIVIL ACTION NO: 2:08CV100.***

2. The Pending Litigation challenging the legality of
Norfolk City Council elections held under the direct
election of mayor since its improper charter approval,
Act No. 893 (2005) of the 2005 Virginia General
Assembly, which provides for an increase in the number
of members on the Norfolk City Council from seven as
ordered by the ***Collins,*** Court to eight which the Bush's
Department of Justice Attorney General John Tanner,
Chief Voting Section did not interpose any objection,
yet it exceeds existing federal law.

**VSBE 005724**

**DEFENDANT-INTERVENORS TX 023 -- Page 187**

3. The potential for non-minority racial block voting and vote dilution in **Ward 7** that could negatively impact the outcome.

4. The upcoming Congressional races and referendums on tax relief for veterans and seniors and reforms for fiscal policy.

5. The Congressional redistricting in 2011, already negatively impacted by the City of Norfolk's illegal at-large elections climate.

6. After an eight year contest represented by Attorney *James F. Gay, Esq., & Frank Parker, Esq.,* that included two published Fourth Circuit opinions, a remand from the United States Supreme Court, and a 9 majority Supreme Court denial of a writ of certiorari, the federal courts compelled the city of Norfolk (the "City') to abandon at-large elections for its city council in **Collins v. City of Norfolk, 883 F.2d 1232 (4th Cir. 1989)**.

7. In 2006, the City without seeking a declaratory judgment over-turning *Collins,* approved by the court violated the *Collins; mandate* added an eighth member to its city council body with voting power that would be elected at-large even though the *Collins* court had previously *enjoined* the City from holding at-large city council elections.

8. The 5-2 plan provided for seven wards, five regular wards and two "super-wards".

9. The Mayor shall be chosen by City Council from among its members as ordered on **January 3, 1991.**

10. Ms. Perry-Bey is petitioning the Court to enforce the *Collins, mandate* by deciding whether the illegal Mayor elected at-large as an eighth member of the city council violated the court order *enjoining* at-large city council elections. See; **Order attached.**

**VSBE 005725**

**DEFENDANT-INTERVENORS TX 023 - Page 188**

JUL-19-2013 10:43A FROM:UFJ+CEJ     (b)(7)(C)     P.3

11, The City in concert with certain members of the
General Assembly, deceived the Public and used cooked
submissions presented to the U.S. Department of Justice
Voting Rights Section by **omitting the recommendations
from Attorney J. Gerald Herbert, specialist in election
law and the Voting Rights Act, and a letter to the city
attorney from lawyer Paul W. Jacobs II, who lost the
city council at large elections under Collins, over 17
years ago, a specialist in voting rights stated that
White residents make up 52 percent of the voting-age
population to non white minority residents' 41 percent,
giving a white candidate the advantage in a city-wide
mayoral election.**

12. **So on eight-member council, minority residents
would only control three seats, or 38 percent of the
voting power. That's less power than they have now, and
less than their share of the population, so it's not
likely that the Justice Department will approve the
plan, Jacobs said.**

13. The City of Norfolk intentionally omitted the fact
that at large city council elections in Norfolk is
prohibited because it would have the purpose and the
effect of denying or abridging the right to vote on
account of race or color."**42 U.S.C. §1973(b)**.

14. And withheld the **2000 census** data and petitioner's
objection from the U.S. Department of Justice Voting
Rights Section and the required court's approval of its
at large city council elections change as required by
law. **See: City of Norfolk, 883 F.2d 1232 (4th Cir.
1989).**

15. The Supreme Court and Fourth Circuit Court of
Appeals have long recognized that at-large voting
schemes may "operate to minimize or cancel out the
voting strength of racial [*minorities in*] the voting
population" who are placed among a numerical majority
of white voters. *Gingles, 478 U.S. at 47-48 & n.13;
Collins v. City of Norfolk, 883 F.2d 1232, 1236 (4th
Cir.), cert. denied, 498 U.S. 938.*

VS|BE 0057.26

16. The non white minority voting population at large
is placed among a numerical majority of white voters,
in the City of Norfolk.

17. Thus at-large elections dilute the vote of the
city's African American population. *See: Collins v.
City of Norfolk, Virginia, 883 F.2d 1232, 1235 (4th
Cir. 1989).*

18. The evidence is over-whelming the city of Norfolk
has clearly violated federal law and seeks the Obama's
Department of Justice to approve its request to hold an
improper special city council elections.

19. Until a final order from the U.S. Supreme Court in
the pending case of *CHRISTINA D. PERRY-BEY, v. CITY OF
NORFOLK, VIRGINIA,* is handed down upholding or denying
Collins. *See: Gingles, 478 U.S. at 50-51, 106 S. Ct. at
2766.*

20. Including 1 thru 20 incorporated by reference
hereto but not limited thereto.

Thanking you in advance,

Mr. ROY L. PERRY-BEY
Director of Civil Rights

MS. CHRISTINA D. PERRY BEY
Director of Youth Civil Rights

Enclosure:

cc:
NAACP
SCLC
Hon. Eric H. Holder Jr., U.S. Attorney General
Hon. Robert F. McDonnell, Governor of Virginia
Hon. President Barack Hussein Obama II
Hon. Barbara Arnwine, Executive Director Lawyers' Committee for Civil Rights Under Law
Hon. Mark R. Warner, U.S. Senator (D-Va.)
Hon. Jim Webb, U.S. Senator (D-Va.)
Hon. Ms. Regina V.K. Williams, City Manager

VSBE 005727

DEFENDANT-INTERVENORS TX 023 - Page 190

(b)(7)(C)

FILED

⬛ ⁻ 3 1991

CLERK, U.S. D:.
NORFOLK, VA.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

HERBERT M. COLLINS, et al.,

        Plaintiffs,

RECEIVED JAN - 7 1991

v.

    CIVIL ACTION NO. 83-526-N

CITY OF NORFOLK, et al.,

        Defendants.

## ORDER

This day came the parties, by counsel, upon the mandate
of the United States Court of Appeals for the Fourth Circuit
effective November 2, 1990, reversing the judgment of this Court
and remanding for further proceedings consistent with the Court's
opinion of August 18, 1989. The Court of Appeals ruled that upon
remand this Court should afford the City of Norfolk ("the City")
a reasonable, specified time to prepare an election plan that
will remedy the vote dilution existing in the present plan and to
submit such plan for clearance under Section 5 of the Voting
Rights Act of 1965, and the Court has determined that the 1990
Census data should be available on or about January 31, 1991, for
use in devising a remedial plan and the regularly-scheduled city
council elections are not scheduled to be held until May, 1992.

Accordingly, it is hereby ORDERED as follows:

1. Within sixty-five days after receipt of the 1990
Census for the City, the City Council of the City of Norfolk
shall duly adopt after opportunity for public comment a remedial
election plan and shall submit the same to the United States

(b)(7)(C)

P.6

Department of Justice under Section 5 of the Voting Rights Act.
Defendants, through counsel, promptly shall advise counsel for
plaintiffs of the date of receipt of such Census data and shall
provide plaintiffs' counsel with a copy of such submission to the
Justice Department when made.

     2.    If the Department of Justice preclears the City's
plan, defendants' counsel promptly shall so notify plaintiffs'
counsel and this Court and defendants shall formally submit the
plan for this Court's consideration. Whereupon, the Court will
set a hearing date to hear any objections from the plaintiffs
concerning the City's plan and to establish a timetable for the
plan's implementation.

     3.    If the Department of Justice objects to the City's
plan, in whole or in part, the Court will set a hearing date to
consider proposed court-ordered single-member district plans for
the conduct of future city council elections. If such objections
are subsequently resolved and the plan, as amended, is
precleared, defendants may submit the City's plan as precleared
to the Court and such plan will be reviewed and considered by the
Court as a remedial legislative plan prior to implementation of
any proposed court ordered plan. Following adoption of a plan,
the Court will establish a timetable for implementation.

- 2 -

(b)(7)(C)

> 4.  Defendants are hereby enjoined from conducting
at-large elections for the city council under the present plan
under which all seven city council members are elected on an at-
large basis and from implementation of a new plan until approved
by this Court.

United States District Judge

Date:

We ask for this:

Counsel for Defendants

Counsel for Plaintiffs

- 3 -

VSBE 005730

DEFENDANT-INTERVENORS TX 023 - Page 193

JUL-19-2013 10:45A FROM:UFJ+CEJ

(b)(7)(C)

P.8

RECEIVED JUN 2 6 1991

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

HERBERT M. COLLINS, et al.,

Plaintiffs,

v.

CIVIL ACTION NO. 83-526-N

CITY OF NORFOLK, et al.,

Defendants.

## FINAL JUDGMENT ORDER

This day came the plaintiffs and the defendants, by
counsel, to be heard upon the Petition for Approval of Remedial
Election Plan by the City of Norfolk, and was argued by counsel.

The plan for the election of members to Norfolk City
Council as set forth in City Ordinance No. 36,374, adopted by
Norfolk City Council on March 26, 1991, having been submitted to
the United States Department of Justice, Civil Rights Division,
for pre-clearance under Section 5 of the Voting Rights Act, 42
U.S.C. § 1973c, pursuant to this Court's Order of January 3,
1991, and it appearing that such pre-clearance has been
accomplished as is evidenced by notification dated June 5, 1991,
and the Court having reviewed the plan and being of the opinion
that such plan is a proper remedial plan and noting that the
plaintiffs do not object to the implementation of this plan, it
is ORDERED that Ordinance No. 36,374 of Norfolk City Council is
hereby approved as a remedy under Section 2 of the Voting Rights

VSBE 005731

DEFENDANT-INTERVENORS TX 023 -- Page 194

(b)(7)(C)

Act, 42 U.S.C. § 1973, and shall be implemented at the next
regularly scheduled Norfolk City Council Election set for May 5,
1992.

And it appearing that nothing further remains to be
done in this cause, the Clerk shall enter this order upon the
civil docket book as a Final Judgment Order and shall send a copy
to each counsel of record.

United States District Judge

Date: June 24, 1991

We ask for this:

Counsel for Defendants

Counsel for Plaintiffs

- 2 -

VSBE 005732

DEFENDANT-INTERVENORS TX 023 - Page 195

JUL-19-2013 10:45A FROM:UFJ+CEJ        (b)(7)(C)                                    P.10

**U.S. Department of Justice**

Civil Rights Division

Office of the Assistant Attorney General              Washington, D.C. 20530

**OCT 2 8 2009**

Mr. Roy L. Perry-Bey
United Front for Justice
(b)(7)(C)
Norfolk, Virginia 23505

Dear Mr. Perry-Bey:

This responds to your letter, dated October 6, 2009, to the Attorney General regarding Act No. 893 of the 2005 Virginia General Assembly making certain changes in the method of election for the city council in Norfolk, Virginia. Thank you for bringing your concerns to our attention.

On August 8, 2005, the Department of Justice interposed no objection to the voting changes occasioned by Act No. 893, at the conclusion of our administrative review under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. With respect to your concerns regarding preclearance of Act No. 893, the case law under Section 5 provides that we cannot now revisit this determination, and accordingly, there is no further remedy under Section 5.

With respect to your concerns that Act No. 893 may violate legal requirements other than Section 5, we note that these issues have been raised in litigation in federal court in Virginia in *Collins v. City of Norfolk* (E.D. Va.), and *Perry-Bey v. City of Norfolk* (E.D. Va.). Because these matters are in litigation, it would not be appropriate for the Department of Justice to comment on the merits of these questions at this time.

We hope this information is helpful. Please do not hesitate to contact the Department if we may be of assistance with this, or any other matter.

Sincerely,

Thomas E. Perez/jrp

Thomas E. Perez
Assistant Attorney General

VSBE 005733

**DEFENDANT-INTERVENORS TX 023 - Page 196**

JUL-19-2013 10:46A FROM:UFJ+CEJ          (b)(7)(C)                          P.11

## COALITION FOR EQUAL JUSTICE
(b)(7)(C)

NORFOLK, VIRGINIA 23505
(b)(7)(C)

**HAND DELIVERED**

01 JUL 23 AM11:09    CIVIL RIGHTS DIVISION VOTING SECTION

July 23, 2001

William R. Yeomane
Acting Assistant Attorney General
Office of the Assistant Attorney General
Civil Rights Division
U. S. Department of Justice
Washington, D.C. 20035

Re: Violation of Voting Rights Act of 1965

Dear Mr. Yeomane:

This refers to Chapter 1 (2001 Special Session 1), which redistricts the Virginia House of Delegates, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. The Commonwealth of Virginia submission was received on May 2, 2001; supplemental information on June 4 and 7, 2001.

Our Coalition does object to the specified change. On the ground the General Assembly's adoption of the GOP's racially loaded redistricting plan was motivated primarily by a desire to effectively limit black congressional representation and dilute their voting strength. It would appear that the district lines could have been drawn more naturally to avoid the effect of adversely affecting the black voting base in violation of Section 5, the Federal preclearance requirement, of the Voting Rights Act of 1965, and the Fourteenth and Fifteenth Amendments.

Virginia has a history of voting rights discrimination, and must obtain pre-approval from the Justice Department before making changes to affected state laws. The officials clearly understand "there is a legal impediment" to the redistricting plans it seeks that needs to be done prior to the 2001 election cycle.

It is requested the Department strongly oppose certification of Virginia's redistricting scheme based on its significant racial ingredient and dilution effect. The department must act with urgency and make specific recommendations regarding state-wide redrawing of the district lines, this includes the City of Norfolk which should be consistent with the current ordered ward system creation of districts that should be as equal in population as possible. In order to avoid any possible dilution of minority voting strength by not unduly fragmenting or concentrating the minority population in the city and for the preservation of existing precinct lines.

JUL 23 2001

Virginia State Committee for

**DEFENDANT-INTERVENORS TX 023 - Page 197**

(b)(7)(C)     P.12

The ward system clearly is an effective remedy against such differential electoral impact, voting abuses and discrimination for which the City has a history. Moreover, under the previous apartheid citywide voting election system it enhanced the chances of electing white businessmen to office while eliminating blacks political will. And this would be one of the city's objectives among others to racially redraw its district lines.

Secondly, Mayor Fraim other white businessmen and politicians clearly, seek to turn the clock back on civil rights under a partisan political and racial effort to dilute the minority-majority voting base in hopes of abolishing the ward election system. Basically, because the City Attorney's office loss the legal battle to protect the long standing white run institution of at large elections.

Thirdly, City and State officials continue to use racial and political acts of discrimination against minorities in every respect, However blacks continue to register and vote in Virginia in spite of efforts to dilute its voting strength. While at least a large measure is disenfranchised form the voting rolls.

The fact is Virginia's deplorably history of voting and civil rights abuses against minority groups and women is basically, unchanged in large measure. The important question before the department now is whether officials have equitably redrawn the 3rd & 4TH district lines in racially divisive manner in violation of Section 5 of the Voting Rights Acts.

We look forward to a timely response from your office in the near future.

Sincerely,

Mr. Roy L. Perry-Bey
Public Affairs Chief

cc: NAACP
    SCLC
    Legislative Black Caucus Members
    U.S. Rep. Robert C. Scott, 3rd District
    Francis S. Ferguson, Deputy Attorney General of Virginia
    Lawyers Committee for Civil Rights

DEFENDANT-INTERVENORS TX 023 -- Page 198

MR. ROY L. PERRY-BEY
(b)(7)(C)
NORFOLK, VIRGINIA 23523
(b)(7)(C)

March 26, 2008

Chuck Rosenberg,
United States Attorney
Justin W. Williams United States Attorney's Building
2100 Jamieson Ave
Alexandria, Virginia 22314
Tel: (703) 299-3700   Fax: (703) 299-3980

Re: *Disobeying a Court order enjoining at large elections*

Dear Mr. Rosenberg:

This is a formal complaint and request upon your office to launch a full investigation into the official misconduct of Norfolk officials, specifically Mayor Paul D. Fraim and City Attorney Bernard A. Pishko, for abuse of public office by reason their deliberately implementing *an illegal at-large election for mayor scheme* as prohibited by the Voting Rights Act of 1965-Prohibiting vote dilution and discrimination and for undermining *Collins* **883 *F.2d 1232: 1989 U.S. App. LEXS 12398*,** and rights secured by the Voting Rights Act of 1965, as amended, 42 U.S. C.ξ 1973, and of the Fourteenth and Fifteenth Amendments to the United States Constitution and laws. Further, it is requested that your office notify and urge the Virginia State Bar to investigate the attorneys unethical conduct and ask Congress to strip the Mayor and City Attorney's immunity so they can face formal charges that they abused their power and public trust by ignoring a court order enjoining at-large elections for the city council until approved by the United States District Court. *See: Attached order/mandate for the injunction of at-large elections.*

Further, your office must take swift action to punish the mayor and city attorney for their direct and indirect contempt for disobeying an order of injunction to enforce obedience to the order, and to vindicate the honor and dignity of the U.S. District Court and to compel respect for its authority.

Thank you
Mr. Roy L. Perry-Bey
Ms. Christina Perry-Bey

cc: NAACP
    Lawyers Committee for Civil Rights Under Law
    Michael B. Mukasey, Attorney General U.S. Department of Justice
    United States Court of Appeals for the Fourth Circuit

VSBE 005736

DEFENDANT-INTERVENORS TX 023 - Page 199

JUL-19-2013 10:47A FROM:UFJ+CEJ        (b)(7)(C)                                    P.14

# UNITED FRONT FOR JUSTICE
(b)(7)(C)

NORFOLK, VIRGINIA 23505
(b)(7)(C)

March 5, 2010

**Neil H. MacBride,**
**Attorney General**
U.S. Department of Justice
Justin W. Williams United States Attorney's Building
2100 Jamieson Ave
Alexandria, VA 22314
Tel: (703) 299-3700 Fax: (703)299-2584

**Eric H. Holder, Jr.,**
**Attorney General**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
**Tel: (202) 514-2001**

Re: Violation of Voting Rights Act/*Gingles, mandate enjoining at large elections*

Dear Mr. MacBride & Mr. Holder, Jr:

This is a formal complaint and request upon your offices to launch a full scale
investigation into City of Norfolk officials and private attorneys, specifically Mayor Paul
D. Fraim, City Attorney Bernard A. Pishko, City Attorney Melvin Wayne Ringer,
Councilman Donald L. Williams, Paul W. Jacobs, II (VSB 16815), R. Harvey Chappell,
Jr. (VSB 05322), for engaging in possible unethical conduct and conspiracy to violate
minorities voting rights and the voting rights act and abuse of public office, trust by
reason of implementing *an illegal at-large election for mayor scheme* as prohibited by
*Gingles*, and the Voting Rights Act of 1965 as amended, 42 U.S. C.ξ 1973, prohibiting
vote dilution and discrimination and *Collins* **883** *F.2d 1232: 1989 U.S. App. LEXS*
*12398 a*nd laws.

Further, it is requested that your office ask Congress to strip the aforementioned officials
and Attorneys' immunity so they can face formal charges that they abused their power
and public trust by circumventing U.S. District Court thus ignoring a U.S. Supreme Court
mandate, *Gingles* enjoining at-large elections for the Norfolk City Council. *See attached*
*order/mandate prohibiting at-large elections.*

VSBE 005737

**DEFENDANT-INTERVENORS TX 023 - Page 200**

JUL-19-2013 10:47A FROM:UFJ+CEJ ___(b)(7)(C)___ P.15

Further, your offices must take swift action to punish the mayor and attorneys for deliberately, circumventing the *Collins,* mandate to enforce obedience of the law, and to vindicate the honor and dignity of the U.S. District Court and to compel respect for its authority.

Thank you,

Mr. Roy L. Perry-Bey

cc: NAACP
   Lawyers Committee for Civil Rights Under Law
   SCLC
   ACLU
   Senator James Webb
   President Barack Obama
   Senator Mark R. Warner
   Alfred Charles Sharpton, Jr.
   Senator Yvonne B. Miller
   Senator Louise L. Lucas
   Kenneth T. Cuccinelli II, Attorney General of Virginia

VSBE 005738

MR. ROY L. PERRY-BEY
(b)(7)(C)
NORFOLK VIRGINIA 23523
(b)(7)(C)

April 4, 2008

Hon: John Warner, (R)
225 Russell Building
Washington, D.C. 20510
Tel: (202) 224-2023
Fax: (202) 224-6295

### Re: City of Norfolk Disobeying a Court order enjoining at large elections

Dear Mr. Warner:

This is a formal complaint and request upon your office to make contact on our behalf
with the FBI and other appropriate agencies to launch a full scale investigation into the
possible official misconduct of Norfolk officials, specifically it appears Mayor Paul D.
Fraim and City Attorney Bernard A. Pishko, abuse their public office by reason of
deliberately enforcing *an illegal at-large election for mayor scheme* for political gain
in violation of the Voting Rights Act of 1965-which prohibits vote dilution and
discrimination and *Collins* **883** *F.2d 1232: 1989 U.S. App. LEXS 12398,* and rights
secured by the Fourteenth and Fifteenth Amendments to the United States Constitution
and laws. Further, it is requested that your office ask Congress upon a finding of official
wrong doing to strip the Mayor and City Attorney's immunity so they can face formal
charges that they abused their power and public trust by ignoring a court order enjoining
at-large elections for the city council until approved by the United States District Court.
*See Court Order in Support.*

Further, your office must make it clear to the FBI it must take swift action to investigate
and punish the mayor, city attorney and others involved operating above the law for their
direct and indirect contempt for disobeying an order of injunction to enforce obedience to
the order, and to vindicate the honor and dignity of the U.S. District Court and to compel
respect for its authority.

Thank you,
Mr. Roy L. Perry-Bey
Mr. Christina Perry-Bey

cc: NAACP
     Lawyers Committee for Civil Rights Under Law
     Michael B. Mukasey, Attorney General U.S. Department of Justice

VSBE 005739

DEFENDANT-INTERVENORS TX 023 - Page 202

(b)(7)(C)                                      P.17



MR. ROY L. PERRY-BEY
(b)(7)(C)
NORFOLK, VIRGINIA 23523
(b)(7)(C)

April 4, 2008

Hon: Del. Kenneth R. Melvin, (D)
801 Water Street, Suit 300
Portsmouth, VA 23704
Tel: (804) 698-1080

## Re: **City of Norfolk Disobeying a Court order enjoining at large elections**

Dear Mr. Melvin:

This is a formal complaint and request upon your office to make contact on our behalf
with the FBI and other appropriate agencies to launch a full scale investigation into the
possible official misconduct of Norfolk officials, specifically it appears Mayor Paul D.
Fraim and City Attorney Bernard A. Pishko, abuse their public office by reason of
deliberately enforcing *an illegal at-large election for mayor scheme* for political gain
in violation of the Voting Rights Act of 1965-which prohibits vote dilution and
discrimination and *Collins* **883 *F.2d 1232: 1989 U.S. App. LEXS 12398*,** and rights
secured by the Fourteenth and Fifteenth Amendments to the United States Constitution
and laws. Further, it is requested that your office ask Congress upon a finding of official
wrong doing to strip the Mayor and City Attorney's immunity so they can face formal
charges that they abused their power and public trust by ignoring a court order enjoining
at-large elections for the city council until approved by the United States District Court.
*See Court Order in Support.*

Further, your office must make it clear to the FBI it must take swift action to investigate
and punish the mayor, city attorney and others involved operating above the law for their
direct and indirect contempt for disobeying an order of injunction to enforce obedience to
the order, and to vindicate the honor and dignity of the U.S. District Court and to compel
respect for its authority.

Thank you,

Mr. Roy L. Perry-Bey
Ms. Christina Perry-Bey

cc: NAACP
    Lawyers Committee for Civil Rights Under Law
    Michael B. Mukasey, Attorney General U.S. Department of Justice

VSBE 005740

JUL-19-2013 10:48A FROM:UFJ+CEJ          (b)(7)(C)                                    P.18

# UNITED FRONT FOR JUSTICE
(b)(7)(C)
### NORFOLK VA 23505
(b)(7)(C)

March 12, 2010

President Barack Hussein Obama II
The White House
1600 Pennsylvania Ave NW
Washington, DC 20500

Re: *City of Norfolk, Illegal at Large Elections*

Dear Mr. President:

There is substantial reason to believe that the City of Norfolk, participated in efforts that violated non-white minorities voting rights and Section 2 of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments, as result of their enforcing at large elections, enjoined in *Thornburg v. Gingles*, **478 U.S. 30 106 S. Ct. at 2752 (1986)**, and *Collins v. City of Norfolk* **883 F.2d 1232 (4th Cir. 1989)**, which the **U.S. Supreme Court in *Gingles*, mandate upon the U.S. Fourth Circuit Court of Appeals ordered the United States District Court for the Eastern District of Virginia to enjoin at-large elections for city council on January 3, 1991.**

The Court ordered ward voting system is an effective legal remedy against discrimination and vote dilution against minorities. The City's implementation of the current illegal at large election system offends the Collin's mandate, a barrier against vote dilution, voting abuses, abuse of power and discrimination for which the city has a 287 year history.

Mr. President, the conduct complained of referenced above legally offends the Ethics of open, transparent, and accountable government, and compel your hand to order U.S. marshals to enforce the rule of law in the Commonwealth of Virginia.

Thanking you in advance,

Mr. Roy L. Perry-Bey
Director of Civil Rights

cc: NAACP
    U.S. Fourth Circuit Court of Appeals
    General Assembly of Virginia
    Barbara R. Arnwine, Lawyers Committee for Civil Rights
    Kenneth T. Cuccinelli II, Attorney General of Virginia
    Bob McDonnell, Governor of Virginia
    U.S. House of Representatives Committee on the Judiciary

JUL-19-2013 10:49A FROM:UFJ+CEJ          (b)(7)(C)                                    P.19

UNITED FRONT FOR JUSTICE
(b)(7)(C)
NORFOLK, VIRGINIA 23505
(b)(7)(C)

April 12, 2010

Eric H. Holder, Jr.,
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Tel: (202) 514-2001

Re: Violation of Voting Rights Act

Dear Mr. Holder, Jr:

This responds to your April 1, 2010 letter regarding our renewed request upon your office
to launch a full scale investigation into possible violation of the Voting Rights Act, and the
Department's improper review under Section 5 of the Voting Rights Act 42 U.S.C. 1973 c,
that interposed no objection to the voting changes occasioned by Act N0. 893.

The preclearance of Act N0. 893 improperly allowed the City of Norfolk based on cooked
incomplete submissions to increase the number of city council members from seven to
eight, with the eighth seat being that of the mayor, who would be elected at large. That
represents 5-3 white majority 17 years after *Collins.*

The Department preclearance of at large elections constitutes a total disregard of *Collins*
883 *F.2d 1232: 1989 U.S. App. LEXS 12398* and the fact the City's incapable of fulfilling
their constitutional and statutory obligation to respect the Voting Rights Act.

In other words, Department officials' approval was without any meaningful evaluation
of the 1991 federal court order that make it clear Norfolk is prohibited from electing its
council using the at large system and to adopt wards for "[a]ll future candidates to compete,
Collins v. City of Norfolk v. Virginia, 883 F.2d 1232, 1235 (4th Cir. 1989).

The approval of adding an additional at large city council seat in clear violation of federal
law and the Voting Rights Act, the fact a pending case involving possible violation of
Section 2 of the Voting Rights Act, is still in litigation of which I'm not a plaintiff simply
does not establish a basis upon your office to forgo discharging the duties entrusted you.

VSBE 005742

JUL-19-2013 10:50A FROM:UFJ+CEJ     (b)(7)(C)      P.20

Therefore, as we have clearly demonstrated violations of Federal law and the fact Bush's DOJ approved it demands redress and swift prosecution of DOJ Attorneys, City of Norfolk officials and others in concert with them without any further delay.

We have advised President Obama of this urgent matter and the fact DOJ must take immediate action and make it clear federal, state and local officials are not above the law.

Thanking you in advance,

Mr. Roy L. Perry-Bey

cc: NAACP
    Lawyers Committee for Civil Rights Under Law
    SCLC
    Congressman Bobby Scott
    Senator James Webb
    Senator Mark R. Warner
    Alfred Charles Sharpton, Jr.
    Jessie Jackson
    President Barack Obama
    Dr. Milton Reid
    Bishop Samuel L. Green, C.O.G.I.C
    Barbara Arnwine, Lawyers Committee for Civil Rights
    U.S. Congress

VSBE 005743

## UNITED FRONT FOR JUSTICE
(b)(7)(C)
NORFOLK, VA 23505
(b)(7)(C)

October 6, 2009

Hon: Mr. Eric Holder
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Re: *City of Norfolk, Illegal Direct Election of Mayor*

Dear Mr. Holder:

This refers to Chapter 893 (2005 Special Session), An Act to amend and reenact the City of Norfolk Charter and composition of council for mayor elected at-large on or after July 1, 2006.

We are renewing our request for an investigation in the Justice Department's Voting Section, NWB and City of Norfolk because of our objection to the specified illegal charter change and justice department's pre-clearance of the City of Norfolk under the Voting Rights Act, allowing for at-large elections of mayor, as contrary and offends both *Thornburg v. Gingles, 478 U.S. 30 (1986)*, *Collins v. City of Norfolk 883 F.2d 1232: 1989 U.S. App. LEXS 12398,* which the *U.S. Supreme Court directed the U.S. Fourth Circuit Court of Appeals to order the United States District Court to enjoin at-large elections for Norfolk City Council.*

The city attorneys, mayor and members of council openly sought for an improper purpose approval for direct election of mayor without the Court's approval, while having a legal duty, *done with full knowledge of their legal responsibility to move the U.S. District Court to review the Collins mandate as ordered by the Supreme Court of Virginia was un-Ethical to enforce at-large elections and possibly boarders on the criminal if not criminal.*

The officials circumventing the Court to prevent presenting sufficient evidence to the U.S. District Court showing at-large elections in the City of Norfolk would not dilute The minority voting power is evident. City officials' deliberately deceived the public into believing the General Assembly and Department of Justice's improper approval would settle its legal obligation to overcome the Court's mandate. Basically, In addition City officials would have to admit that its four at-large constitutional office holders are all white consistent with it's history of discrimination under an at-large elections system.

VSBE 005744

DEFENDANT-INTERVENORS TX 023 - Page 207

(b)(7)(C) P.22

Such evidence among others clearly establishes the fact it continues to discriminate and dilute the minority communities voting strength would not support overcoming the mandate.

The city's discriminatory history against minorities is reflective in the fact that well-over 287 years non-whites have not held the office of mayor reserved for white males only. Moreover, reluctant or otherwise it is requested the Department of Justice launch a full-scale investigation and rescind its approval allowing for at-large elections in conflict with the voting rights act, and *Collins v. City of Norfolk, supra:* In the above referenced matter.

It should be noted the ward system clearly is an effective remedy against such dilution electoral impact, voting abuses, abuse of power and discrimination for which the city has a long history. Moreover, under the previous apartheid at-large elections system it only enhanced the chances of electing rich white businesspersons to city council and in particular the office of mayor as Attorney Paul Fraim, while eliminating the minority voting power and political will.

*Secondly, Mayor Fraim and other white businessmen and politicians, have clearly sought to increase whites voting power on city council with the direct mayor scheme from 4-3 to 5-3,* in their continued efforts to turn the clock back on civil rights under an at-large racial mayor system disguised as giving citizens a greater voice in their government for the purpose of undermining and dismantling the ward system. It should be noted the city loss the legal battle to protect the long-standing white run institution of at large elections. *See: Collins v. City of Norfolk, supra:*

Thanking you in advance,


Mr. Roy L. Perry-Bey
Civil Rights Activist

c.c. NAACP
    SCLC
    Legislative Black Caucus of Virginia
    U.S. Rep. Robert C. Scott, 3rd District
    Barbara R. Arnwine, Lawyers Committee for Civil Rights
    Bob McDonnell, Attorney General of Virginia
    Timothy M. Kaine, Governor of Virginia
    U.S. House of Representatives Committee on the Judiciary

VSBE 005745

JUL-19-2013 10:52A FROM:UFJ+CEJ  (b)(7)(C)  P.23



**U.S. Department of Justice**

Civil Rights Division

JKT:MSR:TLS:jdh
DJ 166-012-3
2005-1365

*Voting Section - NWB.*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

August 8, 2005

Paul W. Jacobs II, Esq.
Christian Barton
909 East Main Street, Suite 1200
Richmond, Virginia 22319-3095

This refers to Act No. 893 (2005) of the 2005 Virginia General Assembly, which provides for an increase in the number of members on the Norfolk City Council from seven to eight, with the additional member, who will be elected on an at-large basis to be designated as the mayor, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your response to our June 7, 2005, request for additional information on June 22 and 23, 2005.

The Attorney General does not interpose any objection to the specified changes. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. See Procedures for the Administration of Section 5 of the Voting Rights Act (28 C.F.R. 51.41).

Sincerely,

John Tanner
Chief, Voting Section

VSBE 005746

**DEFENDANT-INTERVENORS TX 023 - Page 209**

**MR. ROY L. PERRY-BEY**
(b)(7)(C)
**NORFOLK, VIRGINIA 23523**
(b)(7)(C)

March 11, 2008

**Hon. Robert C. Scott, (D) 3rd**
1201 Longworth HOB
Washington, DC 20515
(202) 225-8351 Phone
(202) 225-8354 Fax

Re: *City of Norfolk, Direct Election of Mayor*

Dear Mr. Conyers:

Please be advised this is an official complaint against the City of Norfolk, Mayor, the City Attorney and members of council and request upon your office to urge the U.S. House of Representatives Committee on the Judiciary to launch a full scale investigation into possible violations of the Voting Rights Act, including but not limited thereto; the legality and purity in the election process and laws by City, State and Federal officials. This petition is made on the following ground that the 4th Circuit Court of Appeals ordered the United States District Court to enjoin at-large elections for city council known at all times to City, State and Federal Officials.

The evidence is overwhelming the direct election of Mayor in the City of Norfolk was deliberate and known would violate *Collins 883 F.2d 1232: 1989 U.S. App. LEXS 12398, and Section 2 of the Voting Rights Act of 1965, as amended in §1982, 42 U.S.C. §1973 and 42 U.S.C. §1983.*

It is further requested the Committee on the Judiciary issue an order directing the States Attorney General and Board of Election to suspend at-large elections of Mayor pending a final determination into possible political corruption and other election related crimes and violations against the citizens, peace and dignity of the State are resolved. It is well settled law the Justice Department neither Virginia General Assembly officials have the legal authority to dissolve an *injunction*, as officials have perpetrated because such matters as you know are reserved only for the Courts as result of our Government's separation of powers under the U.S. Constitution and of the Commonwealth of Virginia and laws.

Thanking you in advance,

Mr. Roy L. Perry-Bey
Ms. Christina D. Perry-Bey

VSBE 005747

DEFENDANT-INTERVENORS TX 023 - Page 210

(b)(7)(C)

# UNITED FRONT FOR JUSTICE

**Contact:** Mr. Roy L. Perry-Bey          **FOR IMMEDIATE RELEASE**

Director of Civil Rights

(b)(7)(C)

## Coalition Say City of Norfolk At Large Elections Exceed Existing Law

NORFOLK, VA-US District Court Judge Mark Davis, has not issued a final order dismissing at large case challenging, the legality of Norfolk's direct election of mayor as reported by the Virginia Pilot.

Coalition members are seeking Washington's intervention because of possible violation of the Voting Rights Act, and the District Court's failure to rule on the merits of the case and has used common law tactics in an attempt to dismiss the voting rights case due to Plaintiffs' refusal to change their claim the City violated **Gingles,** mandate upon **Collins,** enjoining at large city council elections, yet in the instant case *Perry-Bey v. City of Norfolk,* has seen more than 4 judges in two years.

The city according to the group in securing the charter change allowing at large elections by the General Assembly, Justice Department preclearance under Section 5 of the Voting Rights Act, and Attorney Generals refusal to file an objection to the voting election change, does not over-ride the US Supreme Court's ruling.

Attorneys for the city Paul Jacobs, admitted in a letter to the City Attorney Bernard A. Pishko in 2002, quoted in the Virginia Pilot, that justice official would not approve the change due to vote dilution, and Councilman Randy Wright, stated the city could get the Bush's justice departments approval, because the department does not care about civil rights.

(b)(7)(C) P.26

In their cooked justice submissions to the voting rights section the city quoted Councilman Paul Riddick, as not concerned about minorities losing their voting power but omitted Jacobs' professional recommendations that minorities would suffer under at large elections.

The city attorney has refused to inform the public and media it has no legal authority to supersede the US Supreme Court laws, and he will not without possible disbarment, Judge Davis, legal option the city did not violate Collins, ruling constitute a total disregard and disrespect of the law; that will be overturned.

City officials have enjoyed their will of media containment of their unlawful conduct, according to members but it will see the light of day, once the national media and justice officials' figures it.

Coalition members are seeking both federal and state investigations from the US Attorney General's office for possible conspiracy to violateᴜ the Voting Rights Act, and the Commonwealth's attorney's office, into councilman Barclay C. Winn, Winn Nursery and Conrad Brothers, for possible unethical conduct and violation of the state Conflicts of Interest Act; for filing a bid without approval from council and accepting $254,292 landscaping work at Town Point Park a city facility which in affect violated the state Conflict of Interest Act and laws.

Mr. Perry-Bey, said city officials as some legislators believe the Voting Rights Act, and the Civil Rights Act, infringes on State Sovereignty, a belief he cited as widely held by segregationist. The city's illegal at large elections exceed the limits of law pure and simple.

UFJ
(b)(7)(C)

VSBE 005749

JUL-19-2013 10:53A FROM:UFJ+CEJ    (b)(7)(C)    P.27



U.S. Departme of Justice

Civil Rights Division

RJW:MSR:CWS:maf
DJ 166-012-3
2005-1365

*Voting Section - NWB.*
*950 Pennsylvania Avenue, N.W,*
*Washington, DC 20530*

June 7, 2005

Paul W. Jacobs II, Esq.
Christian Barton
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095

Dear Mr. Jacobs:

This refers to the changes in the number of officials and
the method of selection of mayor for the City of Norfolk,
Virginia, submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act, 42 U.S.C. 1973c. We received your
submission on April 13, 2005.

Our analysis indicates that the information sent is
insufficient to enable us to determine that the proposed changes
do not have the purpose and will not have the effect of denying
or abridging the right to vote on account of race, color, or
membership in a language minority group, as required under
Section 5. The following information is necessary so that we may
complete our review of your submission:

1. The basis for the city's conclusion that the increase in
the council size resulting from the creation of a mayoral
position to be elected on an at-large basis, will not result in a
retrogression in African American voting strength. In this
regard, please provide any statistical analyses or other
information, not previously provided, concerning the ability of
African American voters within the city to elect candidates of
choice at large.

2. It is our understanding that the city considered other
methods of implementing the results of the referendum requiring
the direct election of the mayor, such as alternative
configurations of districts, or electoral structures. In that
regard, please:

JUL-19-2013 10:53A FROM:UFJ+CEJ         (b)(7)(C)                                    P.28

-2-

(a) Identify the criteria, policies, and procedures used to
develop the proposed method of election and the extent to
which these were publicized;

(b) Identify all such alternatives (whether formal or
informal proposals) that were prepared by the council or by
other persons and presented to the council;

(c) For each alternative, identified above, that the council
chose not to adopt, provide a copy of the plan or structure,
including maps and any relevant demographic data; and

(d) Set forth the basis for the city's determination that
the adopted plan better satisfied its criteria than any
other alternative.

The Attorney General has sixty days to consider a completed
submission pursuant to Section 5. This sixty-day review period
will begin when we receive the information specified above. See
the Procedures for the Administration of Section 5 of the Voting
Rights Act, 28 C.F.R. 51.37. However, if no response is received
within sixty days of this request, the Attorney General
may object to the proposed changes consistent with the burden of
proof placed upon the submitting authority. 28 C.F.R. 51.40 and
51.52(a) and (c). Changes which affect voting are legally
unenforceable unless Section 5 preclearance has been obtained.
Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10.
Therefore, please inform us of the action the City of Norfolk
plans to take to comply with this request.

    If you have any questions concerning this letter or if we
can assist you in obtaining the requested information, you should
call Ms. Cheryl White-Sewell (202-307-0791) of our staff. Refer
to File No. 2005-1365 in any response to this letter so that your
correspondence will be channeled properly.

                                    Sincerely,

                                    Rebecca J. Wertz
                                    Acting Chief, Voting Section

JUL-19-2013 10:54A FROM:UFJ+CEJ                    (b)(7)(C)                                    P.29



CHRISTIAN | BARTON, LLP

*Attorneys At Law*
Direct Dial: (804) 697-4110
Fax: 804-697-6110
E-mail: pjacobs@cblaw.com

SECTION 5 SUBMISSION

NO. 2005-1365

2005 JUN 23 PM 1: 05

CIVIL RIGHTS DIVISION
VOTING SECTION

June 22, 2005

## VIA TELEFAX and OVERNIGHT MAIL

Ms. Rebecca J. Wertz
Acting Chief, Voting Section
Civil Rights Division
Department of Justice
1800 G Street, N.W.
Room 7254-NWB
Washington, D.C. 20006

> *Re:*   *Submission under Section 5 of the Voting Rights Act by*
> *the City of Norfolk, Virginia*
> *Your File No. 2005-1365*

Dear Ms. Wertz:

Thank you for your letter of June 7, 2005, and the opportunity to expand upon the material furnished in the City of Norfolk's Submission of April 13, 2005, for preclearance of its plan for the direct election of the Mayor (the "Submission").

We address below the specific inquiries raised in your letter.

**Inquiry 1: "The basis for the city's conclusion that the increase in the council size resulting from the creation of a mayoral position to be elected on an at-large basis, will not result in retrogression in African-American voting strength. In this regard, please provide any statistical analyses or other information, not previously provided, concerning the ability of African American voters within the city to elect candidates of choice at large."**

We believe that the retrogression inquiry may be viewed from two perspectives. First, the ability of the African-American community in Norfolk to maintain at least a 42.8% representation on City Council (3 of 7) with the increase in Council membership by one, and second, the ability of the African-American community to be no worse off than currently with respect to the selection of the Mayor. We address the issue of retrogression from both of these perspectives below.

As to Council expansion, we noted in our Submission that the proposed plan will not change the existing ward lines, and, therefore, the three existing African-American controlled seats will still be in place and would be expected to elect African-American candidates of choice. With the addition of one seat, we recognize that if the African-American community cannot realistically win that seat then the percentage of those on the Council who are African-American

909 East Main Street, Suite 1200  |  Richmond, Virginia 23219-3095
804.697.4100 tel  |  804.697.4112 fax

VSBE 005752

DEFENDANT-INTERVENORS TX 023 - Page 215

(b)(7)(C)

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 2

candidates of choice would be 37.5%, but if it does win, then it will have improved its relative position by holding 50% of the seats. The question then is whether the African-American community has an equal **opportunity** to elect a representative to the one at-large seat.

The answer is absolutely yes. You will note from pages 13 and 14 of the Submission and the attached data that we pointed out two examples where, in City-wide voting, African-American candidates out polled white candidates by wide margins in head-to-head elections.[1] Material which was not included with the initial Submission and which lends additional strong support to the proposition that African-American candidates can win in an at-large environment is found in City Council elections pre-dating the ward system when the seven members ran at-large in staggered elections[2] as well as in other City-wide voting contests as recently as this month. Attached as Exhibit A are the election results for contests described below.[3]

As shown in Exhibit A, in 1968, Joseph Jordan, an African-American candidate, won one of three seats out a field of eight, defeating a white incumbent. He came in second in total votes cast. He won re-election in 1972 with the third highest vote total out of a field of twelve, again outpolling a white incumbent. In 1976, he won re-election receiving more votes than nine white candidates, including two white incumbents.

---

[1] We also presented data in Exhibit 12 but did not note in the text that in specific City Council elections for ward seats, there have been African-American and white candidates running for the same seat, and the African-American candidate prevailed. In this regard, we would point to the four elections 1992 and 1994 elections in Wards 3 and 4 where African-American candidates prevailed over white opponents. Frankly, however, we do not view these elections as greatly informing the analysis because they occurred in majority African-American wards where a win by an African-American candidate would be anticipated.

[2] The City recognizes that the City Council elections conducted during the pre-ward era were under an election scheme that ultimately was found in violation of Section 2 of the Voting Rights Act. The fact remains, however, that even under the pre-ward, at-large system, African-American candidates were able to defeat white incumbents and garner a majority of votes City-wide to win election. The principal flaw with the system, according to the U.S. Court of Appeals for the Fourth Circuit, was that once white candidates who had received majority black support were discounted, the African-American community did not win a second seat on City Council between 1970 and 1982. *See Collins v. City of Norfolk*, 883 F. 2d 1232 (4th Cir. 1989). While the Justice Department as Amicus Curiae before the United States Supreme Court did not believe that the "flaws" it recognized in the Court of Appeal's decision were of sufficient magnitude to warrant reversal, its brief written in May 1990, noted two points which make these contests relevant fifteen years later. First, it noted that "[d]espite racially polarized voting patterns, black voters in Norfolk have repeatedly elected at least one representative of their choice to the City's seven-member Council." Second, "black voters have now elected and reelected two black representatives through three successive elections [four counting the 1990 election], suggest[ing] that a more permanent shift in the political climate may be at work." *See* Brief for the United States as Amicus Curiae, No. 89-989, pp. 7, 16. That prediction of a permanent political shift is borne out by the many other election results disclosed as well as the continued growth in the proportion of African-Americans in Norfolk's voting age population.

[3] Results are subdivided by year as noted on the tabs. The label "B" denotes African-American candidates. Brackets have been placed around the names of incumbents.

DEFENDANT-INTERVENORS TX 023 - Page 216

(b)(7)(C)

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 3

In 1978, Reverend Joseph Green, an African-American candidate won one of four City Council seats, coming in second in vote count and out polling nine white candidates, including three white incumbents. In 1982, Reverend Green was the highest ranking candidate in a field of 14, again outpolling three white incumbents. In both 1978 and 1982, Reverend Green received more than 50% of the total votes cast in the City. In 1986, Reverend Green was ranked second for four seats among ten candidates, ahead of seven white candidates and receiving 49.5% of the overall vote.

In 1984, John Foster, an African-American candidate, won one of three seats to Norfolk City Council out of a field of ten and received 50% of the votes cast. In 1988, he was the first ranked candidate out of a field of nine with 68% of the voters supporting his re-election. He outpolled two white incumbents.

In 1990, in the last at-large City Council election before the change to the ward system, Joseph Green came in second for four seats out of a field of fourteen candidates. Notwithstanding the large field, he received 64% of the ballots cast City-wide.

While by the very nature of the at-large system, these were not head-to-head contests, the nine City Council elections described above present clear evidence that even with heavily white populations, African-American candidates possessed an ability to defeat white candidates in Norfolk, and indeed, win decisively with a majority of votes cast in fields with more than a dozen candidates. White voters demonstrated a willingness to vote in sufficient numbers to allow African-American candidates to be elected decisively.

During that same time period there were other City-wide elections for other offices in which African-American candidates vied against white candidates and won, bearing out the analytical relevance of the foregoing election results to the present inquiry. In the 1981 election for the office of Sheriff, African-American candidate David Mapp defeated three other opponents, all of whom were white. This was not simply a matter of splitting the white vote as Mr. Mapp received 52% of the vote. In 1989, African-American L. Douglas Wilder carried the City of Norfolk in the race for Governor by 64% of the votes cast over his white opponent, Marshall Coleman. Wilder's success in Norfolk was 14 percentage points higher than he obtained in the state as a whole. In his previous candidacy for Lieutenant Governor in 1985, Mr. Wilder carried Norfolk by 66% over his white opponent John Chichester.

These accomplishments need to be put in their demographic and electoral context. According to U.S. Census data, in 1970, African-Americans were only 24.07% of the voting age population and 28.3% of the total population in the City of Norfolk. In 1980, African-Americans were 31.48% of the voting age population and 35.2% of the total population. In 1990, African-Americans were 35.8% of the voting age population and 39% of the total population. What is obvious is that without strong white cross-over voting, these victories could not have occurred, yet they did, repeatedly. The success of these African-American candidates cannot be explained simply by the size of the field and the split of white votes since the totals received by these

VSBE 005754

(b)(7)(C)                                         P.32

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 4

candidates were far in excess of what would be expected in an evenly divided electorate with the
African-American winner receiving a majority of total votes in six of the multi-candidate fields
cited.

   The growth in the African-American population since these electoral successes has
brought about a decrease in the dependency of the African-American community on white cross-
over votes to achieve victory at the polls. Obtaining more than half the votes in an election for
Mayor in 2006 with 46% of the voting age population will be significantly easier for the African-
American community than it was in 1980 when the African American community comprised a
mere 31.48% of the voting age population. In sum, the three straight decades of African-
American growth in Norfolk as a percentage of the City's population and electorate make it clear
that black voters have an equal opportunity to participate effectively in the election of the Mayor.
More recent electoral victories lend further support.

   In 2001, Jerrauld Jones, an African-American, ran in the Democratic Primary for
statewide office against two white opponents. While he lost state wide, Jones carried the City of
Norfolk with 69% of the vote. Not simply splitting the white vote, Mr. Jones won more than
twice as many votes as his two white opponents combined. Moreover, both of his opponents had
significant name recognition with one being the Mayor of Richmond and the other being a
member of the House of Delegates from nearby Newport News. In that same 2001 primary,
African-American Donald McEachin defeated three white candidates for Attorney General with
42% of the votes. The next highest percentage was 24%.[4] Most recently, in the June 14, 2005,
Democratic Party primary for Lieutenant Governor, African-American candidate Viola
Baskerville won a four way race among Norfolk voters but came in second state-wide.[5]

   When these fifteen electoral races are considered in combination with the previous
information furnished, there is no doubt that African-American candidates, not only in theory,
but in practice can have City-wide appeal in Norfolk and prevail in a City-wide contest. Given
these results, African-American voters certainly have an equal opportunity to elect their choice
for the eighth counsel seat in the 2006 election and thereafter.

   As we noted above, we also view the retrogression analysis from another standpoint,
namely, whether there is a reduction of the chances to select the candidate of choice for Mayor.
As it stands now, there has never been an African-American Mayor in Norfolk, and, hence, the
plan cannot under any circumstances be considered retrogressive in the sense of making that

---

[4] As we pointed out in the Submission, in the November 2001 election for Attorney General, Mr. McEachin won
54% of the Norfolk electorate's votes to Mr. Kilgore's 46% even though Mr. Kilgore won 60% of the state-wide
vote.

[5] While the 2005 primary for the first time limited voters to selection of candidates for one party only and, thus,
these results only included those persons who asked for a Democratic ballot, there were almost twice as many
persons voting in the Democratic Primary than in the Republican Primary and as previous partisan election results
attest, most voters in Norfolk tend to vote for the Democratic candidate.

VSBE 005755

(b)(7)(C)

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 5

situation worse. Put another way, the current system for selection of Mayor has the mathematical potential to allow the four white members of Council to consistently out vote the three African-American members, if they decided to act in that manner, and there would never be an African-American Mayor until African-American members of Council constituted a majority. If you assumed extreme racial polarization in voting by Council members, (an assumption we believe is not warranted), one might argue that the current benchmark chance of African-Americans selecting a Mayor would be at zero percent. While the African-American members of Council have generally supported the members selected as Mayor,[6] that does not mean that the voters would necessarily have selected the same individuals. We believe that by putting the direct election of the Mayor in the hands of the voters, and with close to half of the City's voting age population being African-American when the 2006 elections are held, *there is a significant enhancement in the opportunity for the African-American community to express its choice and elect a mayoral candidate*.

      **Inquiry 2: "It is our understanding that the City considered other methods of implementing the results of the referendum requiring the direct election of the mayor, such as alternative configurations of districts, or electoral structures. In that regard:
(a) Identify the criteria, policies, and procedures used to develop the proposed method of election and the extent to which these were publicized;
(b) Identify all such alternatives (whether formal or informal proposals) that were prepared by the Council or by other persons and presented to the Council;
(c) For each alternative, identified above, that the Council chose not to adopt, provide a copy of the plan or structure, including maps and any relevant demographic data; and
(d) Set forth the basis for the city's determination that the adopted plan better satisfied its criteria than any other alternative."**

      Norfolk City Council did not adopt any formal written criteria specifically for this electoral change by which it judged the plan which was adopted. Members of City Council expressed various points of view during the consideration process as reflected in the press reports attached to the Submission at Tab 13, but none could be viewed as an over arching criterion except ultimately to adopt a plan now that could be implemented in 2006, rather than wait until after the results of the next Census. The plan that was adopted kept the existing ward plan intact; any other plan would have required revisions to the ward lines which in turn would require reliance on stale Census data. If any criterion might be viewed as driving the plan selection it would be the desire to implement promptly the referendum results while doing as little violence as possible to the existing system.

      The Council did have before it, however, a number of considerations that had been developed through the procedures used to reach the final plan adoption. These procedures

---

[6] In the last four elections of the Mayor by Council (1998, 2000, 2002 and 2004), Paul Fraim was elected unanimously. The three African-American Council members voted for him in the first three elections and two voted for him in 2004. Mr. Riddick was not present at the 2004 organizational meeting.

VSBE 005756

JUL-19-2013 10:57A FROM:UFJ+CEJ     (b)(7)(C)       P.34

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 6

---

included receipt from the City Manager in 2000 of data on the plans used by various cities in
Virginia and nationally for the election of a mayor (Submission Tab 6); the employment in 2002
of an outside expert to weigh the relative benefits of a 4-2-1 plan and a 5-2-1 plan (Submission
Tab 7); holding a public hearing to receive citizen input; holding a public hearing to comment
specifically on the plan advertised for adoption; and their own Council debates. As was shown
in Tab 12 of the Submission, the various possibilities were debated in the press from 2000
forward with the newspaper acting in some respects as a forum for various Council members to
put their own ideas before the public.

Council did not prepare nor did it have prepared alternative proposals in the form of
actual plans. It argued and debated the merits of alternatives only conceptually. Several
conceptual alternatives that were proposed but never voted upon by Council included the
following: 1) White Council member Randy Wright suggested keeping the wards the same as at
present and having a separate election whereby the voters could select the Mayor from among
the Council members who wanted to stand for election for Mayor; 2) African-American Council
member Paul Riddick suggested a nine member Council including the Mayor; and 3) African-
American Council member Anthony Burfoot proposed that the 5-2-1 concept would be improved
if the at-large Mayor had to win by a majority of four of the five wards rather than by a simple
majority City-wide.

The two proposals that received the most attention were a 4-2-1 proposal and the 5-2-1
plan ultimately adopted. No 4-2-1 map or data was presented to Council for consideration
although on September 9, 2002, the Virginian Pilot newspaper published 4-2-1 plans it had
drawn for comparative purposes noting that they were "far from perfect." It noted that "Black
voters would have less dominance in wards where they hold a majority. Some wards would have
many more people than others. Incumbents would be forced to compete for the same seat. And
the boundaries would shake up tradition – one scenario, for example, would place downtown and
part of Ghent, a majority-white area, in a majority-black ward." These plans were not formally or
informally presented to Council nor were they debated by Council, although they certainly were
in the public domain. See Submission Tab 13.

Ultimately, the method used by the City to adopt the plan was consistent with its normal
method of operation and prior plan adoptions except in three important respects. Consistent with
the requirements of State law, the City sought from the General Assembly and received the
requisite approval for a referendum and held a referendum on the issue of the direct election of
the Mayor; second, the City employed an outside expert to give it input on the two most
acceptable alternatives, and third, it held a public hearing separate and apart from regular City
Council meetings to obtain citizen input.

While the press raised the specter that a 5-2-1 plan might be dilutive, concerns were
expressed in the newspaper that altering the ward lines to accommodate a seven member 4-2-1
plan could be more damaging and retrogressive to voting rights in the African-American
community. According to one article of December 1, 2002, African-American Council member

DEFENDANT-INTERVENORS TX 023 - Page 220

JUL-19-2013 10:57A FROM:UFJ+CEJ     (b)(7)(C)     P.35

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 7

Paul Riddick was described as saying "he doesn't worry that black residents will lose power [under the eight member plan]. He prefers the eight-member Council because it keeps the existing ward boundaries. In a seven-seat system, he would fear being placed in the same ward as Vice Mayor Daun S. Hester," an African-American. Similarly, in the same article the president of the Inner-City Federation of Civic Leagues, "which represents predominantly black neighborhoods... said his members oppose the seven-member plan because they fear that a black seat will be lost."

In short, there were no suggestions by anyone that the plan contained in the Submission was adopted with the intent to dilute or retrogress African-American voting rights. To the contrary, the methods used for the adoption and the comments expressed in the press were fully supportive of the notion that the plan was the result of a robust debate on the best way to achieve the direct election of the Mayor which 83% of the African-American community and three quarters of the City as a whole favored.

We trust that these comments are responsive to your inquiries, but if you need additional information, let me know at your very earliest convenience. We would appreciate the opportunity to meet with you and the appropriate Voting Section staff to discuss the Norfolk Submission after you have had the opportunity to review the foregoing information and attachments. Please advise as to available dates in order that I can coordinate schedules among the appropriate attendees from the City.

With all best wishes, I remain

Sincerely yours,

Paul W. Jacobs, II

PWJ/wcv

attachments

cc:     Bernard A. Pishko, Esquire, Norfolk City Attorney
       Ms. Elisa Long, Norfolk City Registrar

**Fletcher, Michael (CRT)**

| | |
|---|---|
| **From:** | UNITED FRONT FOR JUSTICE (b)(7)(C) |
| **Sent:** | Sunday, June 19, 2011 2:02 PM |
| **To:** | vot1973c (CRT); votingsection2010@usdoj.gov; (b)(7)(C) |
| **Subject:** | May 11, 2011-1805 VA REDISTRICTING SUBMISSIONS |
| **Attachments:** | MR. R BEY.jpg; NOTICE OF APPEAL SUPREME COURT 2011.pdf; COMPLAINT 2008 CITY OF NORFOLK'S ILLEGAL AT LARGE VOTING.pdf; COLLINS.pdf; CITY OF NORFOLK, VIRGINIA, ET AL., PETITIONERS V. HERBERT M. SUPREME COURT.pdf; OBJECTION TO NORFOLK CITY COUNCIL NOVEMBER 2, 2010 SPECIAL ELECTIONS 2.pdf |

UNITED FRONT FOR JUSTICE
(b)(7)(C)
NORFOLK, VA 23505
(b)(7)(C)

June 17, 2011

U.S. Department of Justice
Civil Rights Division
Voting Section-NEB
950 Pennsylvania Avenue, NW
Washington, DC 20530

Re:
May 11, 2011-1805 VA REDISTRICTING SUBMISSIONS

Dear Ms. Abigail Olson:

Per our phone conference on yesterday regarding our verbal comments and objection of the State of Virginia General Assembly's Congressional redistricting plan. We believe the bizarrely shaped districts (meaning districts shaped more strangely than those drawn elsewhere in the state where race could not have been a factor) and because of improper intent it deprives minority and registered voter in the State of Virginia the opportunity to participate meaningfully in the State's political process, to elect a preferred candidate in particular districts, to influence elections in particular districts, and to influence the decision-making of the State's elected officials. And because of possible racial gerrymandering the proposed plan it appears would fail to prevent a retrogression of existing majority minority districts and have a discriminatory effect in violation of Article 1, Section 2 of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

It's understood the State House and Senate plan is currently before the department for approval and not the congressional plan. However, the 2011 legislative plans appear more compact and contiguous than the 2001

1

VSBE 005759

DEFENDANT-INTERVENORS TX 023 - Page 222

plans which they replace.

Additionally, the failure to consider the demolition of public housing communities and traditional minority enclaves and failure to consider the City of Norfolk's illegal at large election system currently before the U.S. Supreme Court, See; other attachment in support and the fact the City of Norfolk and Virginia Beach have a long standing history and practice of denying non-white minorities the office of Mayor, and in Virginia Beach the office of City Council. Because these districts play a vital role in the plans we object to the submissions and future congressional submissions.Therefore, it is requested the department reject Virginia's submissions for preclearance.

We look forward to a timely response from your office in the near future.

Mr. Roy L. Perry-Bey

Sincerely,

cc: NAACP
    Legislative Black Caucus Members
    U.S. Rep. Robert C. Scott, 3rd District
    Lawyers Committee for Civil Rights

2

### UNITED STATES DISTRICT COURT

#### FOR THE EASTERN DISTRICT OF VIRGINIA

##### NORFOLK DIVISION

|  |  |
|---|---|
| Christina Perry-Bey, | ) |
| Plaintiff, | ) |
| v. | ) |
| City of Norfolk, | ) No. 2:08cv100 |
| Defendant. | ) |

---

### MOTION OF THE NORFOLK BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE FOR LEAVE TO FILE AS AMICUS CURIAE REGARDING MOTION TO DISMISS OF THE CITY OF NORFOLK

The Norfolk Branch of the National Association for the Advancement of Colored

People ("Norfolk NAACP") respectfully moves this Court for leave to file an *amicus*

curiae brief in the above captioned matter.    The brief the Norfolk NAACP seeks

permission to file is attached as Exhibit A.

The Norfolk NAACP was a plaintiff in *Collins v. City of Norfolk*. 883 F.2nd 1232

(4th Cir. 1989).

The Norfolk NAACP asks permission to submit an *amicus* brief because of its role as plaintiff in *Collins v. City of Norfolk*, a Section 2 vote dilution case litigated by the Lawyers' Committee for Civil Rights Under Law from 1983-1991 that resulted in an order barring at-large elections for Norfolk City Council.

Amicus asserts that the issues raised by both parties pertaining to the injunction issued by *Collins* are improperly before this Court in this matter. These issues need to be brought in a motion under Rule 60(b) of the Federal Rules of Civil Procedure in the *Collins* matter. Rule 60(b) requires the party seeking to be released from the injunction to set out various grounds for relief from an injunction, including that "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).

Amicus has requested and obtained the written consent to file this brief from Plaintiff, Perry-Bey. Defendant, City of Norfolk, refused consent.

Dated: July 11, 2008                    Respectfully submitted,


                                        s/Ellen Marcus
                                Ellen Marcus (Virginia Bar No. 44314)
                                        Zuckerman Spaeder LLP
                                  1800 M Street, NW, Suite 1000
                                      Washington, DC 20036
                                   Telephone: (202) 778-1800
                                   Facsimile: (202) 822-8106

                                        Counsel of Record

2

VSBE 005762

DEFENDANT-INTERVENORS TX 023 - Page 225

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

### NORFOLK DIVISION

|  |  |
|---|---|
| Christina Perry-Bey, | ) |
| Plaintiff, | ) |
| v. | ) |
| City of Norfolk, | ) No. 2:08cv100 |
| Defendant. | ) |

---

## BRIEF OF AMICUS CURIAE NORFOLK BRANCH OF THE NATIONAL ASSOCIATON FOR THE ADVANCEMENT OF COLORED PEOPLE REGARDING MOTION TO DISMISS OF THE CITY OF NORFOLK

### I.    INTRODUCTION

After an eight year contest that included two published opinions from the district court, three published Fourth Circuit opinions, a remand from the United States Supreme Court, and a Supreme Court denial of a writ of *certiorari*, the federal courts compelled the City of Norfolk (the "City") to abandon at-large elections for its city council in *Collins v. City of Norfolk,* 883 F.2d 1232 (4th Cir. 1989). In 2006, the City added an eighth member to its city council that would be elected at-large, even though the *Collins*

1

DEFENDANT-INTERVENORS TX 023 - Page 226

EXHIBIT A

VSBE 005764

DEFENDANT-INTERVENORS TX 023 - Page 227

court had previously enjoined the City from holding at-large elections. The City neglected an essential step – it did not get permission from the *Collins* court as required by Rule 60(b) of the Federal Rules of Civil Procedure.

Plaintiff Perry-Bey and the City have both asked this Court to decide whether the addition of a mayor that is elected at-large as an eighth member of the city council conflicts with the 1991 injunction enjoining at-large elections in the City. *Amicus*, a plaintiff in the *Collins* case, respectfully submits that this question should not be decided by this Court in the present matter. Instead, *amicus* submits that these issues need to be brought within the *Collins* matter in a proceeding under Rule 60(b) of the Federal Rules of Civil Procedure that includes the entire record of the *Collins* case as well as the current factual circumstances. Accordingly, *amicus* requests that this Court decline to decide issues in the present case relating to the 1991 injunction and leave those issues for a later proceeding in the *Collins* matter under Rule 60(b).

## II.  ARGUMENT

### A.  The court in *Collins v. City of Norfolk* enjoined at-large elections for Norfolk City Council

Defendant is subject to a permanent injunction enjoining at-large elections to the Norfolk City Council. This injunction came about as a result of a 1983 lawsuit against the City on behalf of the Norfolk Branch of the NAACP and African American voters registered in the City of Norfolk. Plaintiffs successfully contended that the City's use of at-large elections violated Section 2 of the Voting Rights Act because the at-large elections diluted the vote of the City's African Americans. *Collins v. City of Norfolk v. Virginia*, 883 F.2d 1232, 1235 (4th Cir. 1989). Of the hundreds of Section 2 vote dilution

2

27, 1989); and Supreme Court review, *City of Norfolk v. Collins*, 498 U.S. 938 (1990),

the case was remanded to the district court for imposition of a remedy.

On January 3, 1991, the district court, following the mandate of the Fourth

Circuit, reversed its earlier judgment and enjoined the City from conducting at-large

elections for the city council. In relevant part, the district court's Order read:

> 1. Within sixty-five days after receipt of the 1990 Census for the City, the City Council of the City of Norfolk shall duly adopt after opportunity for public comment a remedial election plan and shall submit the same to the United States Department of Justice Under Section 5 of the Voting Rights Act. . . .
>
> . . .
> 4. Defendants are hereby enjoined from conducting at-large elections for the city council under the present plan under which all seven city council members are elected on an at-large basis and from implementation of a new plan until approved by this court.

*See* Exhibit B to Memorandum in Support of Motion of City of Norfolk to Dismiss

Complaint Under Fed.R.Civ.P. Rules 12(b)(5) and 12(b)(6) ("Norfolk Memo"). The City

and the *Collins* plaintiffs agreed on a remedial plan where the seven-member council

would be elected from five single-member districts (two with black population

majorities) and two superwards (one with a black population majority). On June 24,

1991, the Court entered a Final Judgment Order which entered this plan into effect:

> "it is ORDERED that [the hybrid single member ward – superward plan] is hereby approved as a remedy under Section 2 of the Voting Rights Act, and shall be implemented at the next regularly scheduled Norfolk City Council Election set for May 5, 1992.
>
> And it appearing that nothing further remains to be done in this cause, the Clerk shall enter this order upon the civil docket book as a Final Judgment Order and shall send a copy to each counsel of record.

*See* Norfolk Memo, Exhibit F.

4

VSBE 005766

DEFENDANT-INTERVENORS TX 023 - Page 229

## B.    The Addition of an At-Large Elected Mayor Serving on the Norfolk City Council Conflicts with the *Collins* Injunction

The City Charter, as amended in 2005, clearly identifies the mayor as the eighth member of the city council. *See* Va. 2005 Act 897 which is attached hereto for changes in the City Charter discussed below. According to Section 5.1 of the City Charter: "[T]he city council shall consist of seven members as provided in section 3.2[2] and a mayor elected at-large." The Mayor also presides at city council meetings and votes on measures before the council. *Id.* at § 17.1. Indeed, the City of Norfolk's website confirms that the city council is composed of seven members who are elected through the ward system and a mayor who is elected at-large.[3]

The main concern of the *Collins* court was that electing the city council at-large was discriminatory. Having a mayor elected at-large to the city council reinstates, at least in part, the method of election that was challenged in *Collins* and found by the Fourth Circuit to be unacceptable. The *Collins* court noted that the Voting Rights Act protects minority voters "from a system of at-large voting that, tested by the principles explained in *Gingles*, gives them 'less opportunity than other members of the electorate to participate in the electoral process and to elect representatives of their choice.'" *Collins* at 1243. The Court was explicit in its guidance to the District court: "[E]njoin at-large elections for city council." *Id.* at 1244.

---

[2] Section 3.2 states that "[t]he City of Norfolk shall be divided into five (5) single-member wards numbered one through five, and the city shall also be divided into two single-member superwards numbered six and seven. Norfolk City Charter § 3.2.

[3] The City of Norfolk, "City of Norfolk – City Council Information," http://www.norfolk.gov/mayor/Info_Center/CityCouncil.html (last accessed on July 10, 2008).

5

VSBE 005767

DEFENDANT-INTERVENORS TX 023 - Page 230

**C. Though Rule 60(b) provides a procedure for modifying a permanent injunction, the City has not reopened the *Collins* case to seek relief under Rule 60(b)**

Under Rule 60(b) of the Federal Rules of Civil Procedure, a party can move the

court for relief from a final judgment, order, or proceeding. The Rule sets out various

grounds for relief, including that:

> the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable.

Fed. Rule of Civ. P. 60(b)(5). It is undisputed that the City has not sought relief under

Rule 60(b) for adding an at-large member to the Norfolk City Council.

**D. The City's arguments that at-large membership on the Norfolk City Council do not conflict with the *Collins* injunction are unavailing**

The City contends that adding an at-large member to the City council does not

violate the *Collins* injunction because: (1) the injunction is no longer in effect, (2) the

*Collins* court never said the injunction was permanent, (3) the *Collins* case is closed, and

(4) the court "did not say that the plan could never change." Defendants Memo, at 8-9.

Under the City's view, the *Collins* injunction terminated either at the time the *Collins*

case was closed or some undetermined time shortly thereafter. Thus, according to the

City, the City has had no legal obligation to follow the mandate of the Fourth Circuit and

the district court in *Collins* for the last fifteen years or so. This argument is totally

unavailing and contrary to law.

It is a basic legal tenet that "[p]ersons subject to injunctive order issued by the

court with jurisdiction are expected to obey that decree until it is modified or reversed,

6

even if they have proper grounds to object to the order." *GTE Sylvania, Inc. v. Consumers Union of the United States*, 445 U.S. 375, 386 (1980). Moreover, in *United States v. United Mine Workers of America*, 330 U.S. 258, 294 (1947), the court asserted that an injunctive order must be "obeyed until it is expired or set aside by appropriate court proceedings."

In this case, the purpose behind the *Collins* case and the orders of the Fourth Circuit and district court was to eliminate at-large elections for city council because at-large elections discriminated against African American voters. The suggestion that the City was free sometime thereafter to restore a discriminatory method of election without getting court approval makes no sense.

Moreover, the fact that the case was closed is irrelevant. There is no need for a court to permanently keep open a case involving Section 2 vote dilution remedy that changes the method of election -- once the method of election has been changed, there is nothing for the court to do. Indeed, there have been several Section 2 cases in the Eastern District that have resulted in a change in the method of election and the standard procedure has been to close them.[4]

---

[4] *See, Feggins v. Horne*, Civ. No. CA-88-0865-R (E.D. Va. June 19, 1989)(closed Oct. 23, 1989); *King v. Blalock*, Civ. No. CA-88-0811-R (E.D. Va. June 6, 1989)(closed Oct. 23, 1989); *Brunswick County League for Progress v. Town Council of Lawrenceville*, Civ. No. 3:91CV00091(E.D. Va. June 19, 1991)(closed Nov. 5, 1991); *McDaniels v. Mehfoud*, 702 F. Supp. 588 (E.D. Va. 1988), 927 F.2d 596 (4 Cir. 1991)(closed Dec. 27, 1991); *Harris v. City of Hopewell*, Civ. No. 82-0036-R (E.D. Va. 1983)(closed 1992).

Like *Collins*, the court in *Harris v. City of Hopewell* enjoined the defendant's from using an at-large electoral system, and closed the case. It appears from the docket, however, that the case was reopened in 1992. This was about the time the City received preclearance from the Department of Justice to revert to an at-large method of election, which suggests the City of Hopewell reopened the *Harris* case to obtain court approval.

7

The City is correct that the *Collins* court "did not say that the plan could not change." But as discussed above in the previous section, when a court issues a permanent injunction it is not ordering relief that cannot be changed; it is ordering relief that can be changed with court approval under Rule 60(b).

In its defense, the City also contends that it went through extensive procedures before changing its method of election and that minority voters can bring another Section 2 case. Norfolk Memo at 9-10. While the City went through several procedural steps in adding an at-large seat, it never sought approval from the judiciary, which had found that at-large elections for Norfolk City Council were discriminatory and ordered the City to stop using at-large elections. The procedural steps employed by the City might be relevant in a Rule 60(b) proceeding but should not substitute for such a proceeding. In addition, minority voters had to litigate a Section 2 case for several years in order to eliminate at-large elections for Norfolk City Council once already. A second lawsuit should not be required.

**E. The Issue of the *Collins* Injunction Is Improperly Before this Court**

Both parties are asking the court to address an issue that belongs to a different proceeding. This Court has neither the record from the *Collins* case before it nor the record of changes in demographic or political life of the City that can help it to make a proper determination of the question of whether the at-large election of the mayor violates the 1991 *Collins* order.

As discussed above, the record of the *Collins* case encompasses eight years of litigation on the issue of whether the at-large system of elections violates Section 2 of the Voting Rights Act. The final determination was that it did. The City is arguing before this Court that the final determination in *Collins* should no longer hold. But this Court

8

VSBE 005770

DEFENDANT-INTERVENORS TX 023 - Page 233

EXHIBIT A
to
Brief in Support of the Norfolk NAACP Motion

VSBE 005771

DEFENDANT-INTERVENORS TX 023 · Page 234

## VIRGINIA ACTS OF ASSEMBLY -- 2005 SESSION

### CHAPTER 897

*An Act to amend and reenact §§ 8, 12, 18, 19, 22, 24, and 25, as severally amended, of Chapter 34 of the Acts of Assembly of 1918, which provided a charter for the City of Norfolk, to amend Chapter 34 by adding sections numbered 3.2, 5.1, 6.1, 7.1, 10.1, 14.1, and 17.1, and to repeal §§ 3.1, 5, 6, 7, 10, 14, and 17, as severally amended, of Chapter 34, relating to election of council and mayor.*

Approved March 28, 2005

[H 2739]

Be it enacted by the General Assembly of Virginia:

1. That §§ 8, 12, 18, 19, 22, 24, and 25, as severally amended, of Chapter 34 of the Acts of Assembly of 1918 are amended and reenacted and Chapter 34 is amended by adding sections numbered 3.2, 5.1, 6.1, 7.1, 10.1, 14.1, and 17.1 as follows:

*§ 3.2. Wards.*

*The City of Norfolk shall be divided into five (5) single-member wards numbered one through five, and the city shall also be divided into two single-member superwards numbered six and seven. The boundaries of such wards and superwards shall be established by ordinance of the city council as provided by law.*

*§ 5.1. Composition of council.*

*On and after July 1, 2006, the city council shall consist of seven members, each elected from single-member wards as provided in § 3.2, and a mayor elected at-large. Any member of city council shall be subject to recall in accordance with the provisions of this charter.*

*The council shall be a continuing body and no measure pending before such body shall abate or be discontinued by reason of the expiration of the term of office or removal of the members of said body or any of them.*

*§ 6.1. Qualification of members; conduct of candidates.*

*Beginning with the municipal election in 2006, any person qualified to vote in said city shall be eligible to the office of mayor or for the office of council member for the ward or superward in which such person resides. No person shall serve on council as both mayor and council member from a ward or superward, nor from more than one ward, including superwards. No candidate for the office of council member, including mayor, shall promise any money, office, employment, or other thing of value to secure a nomination or election, or expend in connection with his candidacy any money except as permitted by the general election laws of the state; and any such candidate violating this provision shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding $500, or imprisonment for a term not exceeding six months, or both, in the discretion of the jury, and shall forfeit his office, if elected; in which event, the person receiving the next highest number of votes from the voters for said office, who has not violated the said provision, shall be entitled to said office. Should there be no such candidate, the council shall fill the office with a person from the vacated ward or superward and, in the case of the office of mayor from the city at-large, in accordance with § 7, until a special election pursuant to general law is held.*

*§ 7.1. Vacancies.*

*Any vacancy in the council after July 1, 2006, except as otherwise provided in this Charter, shall be filled by the remaining members. Any person elected to fill an unexpired term for ward representative shall be elected only from among the qualified voters in the ward or superward where such vacancy exists. Any vacancy in the office of mayor shall be filled from among the qualified voters of the city at-large. No candidate shall be elected unless he receives at least five votes in his favor. If by reason of resignation, death, or other circumstances, except in the case of vacancies resulting from a recall election, five or more vacancies exist or occur at the same time in said council, then the members of the civil service commission shall at once convene a majority of said commission and, by a majority vote of the members of said commission present, forthwith make such number of appointments from the wards and superwards where such vacancies exist, or from the city at-large in the case of the mayor, as may be necessary to constitute a council of five qualified members, which five members shall at once proceed to fill the remaining vacancies with qualified members. And in any case the council shall fail to fill a vacancy therein for a period of thirty days after the occurrence of the vacancy, such vacancy shall be filled by said commission as provided herein. The city clerk shall act as the clerk of the commission so constituted, and shall cause his certificate of its action to be entered on the record of the council.*

*If the term of office so filled, either by the council or by said commission, does not expire for two years after the next regular election of council members following such vacancy, and such vacancy occurs more than one hundred twenty days prior to that election, an additional council member shall then be elected at such election only by the qualified voters of the ward or superward where such*

VSBE 005772

DEFENDANT-INTERVENORS TX 0.23 · Page 235

*vacancy exists, or in the case of the mayor from the city at-large and after the date of his qualification, succeed such appointee, and serve the unexpired term. When any vacancy is so required to be filled by election, the council or commission shall, within fifteen days of the occurrence of the vacancy, petition the circuit court to issue a writ of election to fill the vacancy at the next general election of council members. In the event that more than one vacancy is to be filled by election, the same provision shall apply. The foregoing provisions of this section are subject to the further provision that any vacancy resulting from a recall election shall be filled in the manner provided in such case.*

§ 8. Compensation of council members.

Each member of the council shall receive, subject to the provisions of this charter, a salary of forty-eight hundred dollars per year, except the president, whose salary shall be seventy-two hundred dollars per year, such salaries to be payable in equal monthly installments *such salary as shall be established by state law.*

*§ 10.1. Officers elected by council; rules.*

*Effective July 1, 2006, the council shall elect a city manager, a city clerk, a city attorney, a city auditor, and a high constable. The said council shall also appoint the members of such boards and commissions as are hereinafter provided for. All elections by the council shall be viva voce and the vote recorded in the record of the council. The mayor shall serve as chair of the council. The council may determine its own rules of procedure, may punish its members for misconduct, and may compel the attendance of members in such manner and under such penalties as may be prescribed by ordinance. It shall keep a record of its proceedings. A majority of all the members of the council, including the mayor, shall constitute a quorum to do business, but a smaller number may adjourn from time to time.*

*No member of the council shall be eligible, during the term of office for which he was elected or appointed, to hold any office filled by the council by election or appointment, except that a member of the council may be named a member of such other boards, commissions, and bodies as may be permitted by general law.*

§ 12. Meetings of council.

On the first day of July next following the regular municipal election, or if such day be Saturday or Sunday, then on the following Tuesday, the council shall meet at the usual place for holding meetings of the legislative body of the city, at which time the newly elected councilmen *council members* shall assume the duties of their office. The time for any such meeting shall be set by ordinance adopted by council not less than 30 *thirty* nor more than 45 *forty-five* days prior to the election. Thereafter the council shall meet at such times as may be prescribed by ordinance or resolution. It shall hold at least one regular meeting each week, provided that it may, by the affirmative vote of a majority of its members, dispense with any 12 *twelve* such regular meetings in any calendar year. The president of the council, any member thereof *mayor, any member of the council*, or the city manager, may call special meetings of the twelve council at any time upon at least 12 *twelve* hours' written notice to each member, served personally or left at his usual place of business or residence; or such meeting may be held at any time without notice, provided all members of the council attend. All meetings of the council shall be public *except where closed pursuant to the provisions of general law*, and any citizen may have access to the minutes and records thereof at all reasonable times.

*§ 14.1. Legislative procedure.*

*Except in dealing with questions of parliamentary procedure, the council shall act only by ordinance or resolution, which shall be introduced in writing, and all ordinances except ordinances making appropriations, or authorizing the contracting of indebtedness or issuance of bonds or other evidences of debt, shall be confined to one subject, which shall be clearly expressed in the title.*

*Ordinances making appropriations or authorizing the contracting of indebtedness or the issuance of bonds or other obligations and appropriating the money to be raised thereby shall be confined to those subjects respectively. Nothing herein shall be construed to prevent the council from authorizing in and by the same ordinance the making of any one public improvement and the issue of bonds therefore.*

*The enacting clause of all ordinances passed by the council shall be, "Be it ordained by the council of the City of Norfolk"; the enacting clause of all ordinances submitted to popular election by the initiative shall be, "Be it ordained by the people of the City of Norfolk." No ordinance, unless it be an emergency measure, shall be passed until it has been read by its title at two regular meetings not less than one week apart, or the requirements of such reading has been dispensed with by the affirmative vote of five of the members of the council. No ordinance, section, or subsection thereof shall be revised or amended by its title, section number, or subsection number only, but the new ordinance shall contain the entire ordinance, section, or subsection, as revised or amended. The ayes and noes shall be taken upon the passage of all ordinances or resolutions and entered upon the record of the proceedings of the council, and every ordinance or resolution shall require, on final passage, the affirmative vote of at least five of the members. No member shall be excused from voting except on matters involving the consideration of his own official conduct, or where his financial interests are involved.*

*In authorizing the making of any public improvements, or the acquisition of real estate or any interest therein; or authorizing the contracting of indebtedness or the issuance of bonds or other evidences of indebtedness (except temporary loans in anticipation of taxes or revenues or of the sale of*

VSBE 005773

DEFENDANT-INTERVENORS TX 023 - Page 236

*bonds lawfully authorized); or authorizing the sale of any property or rights in property of the City of Norfolk, or granting any public utility franchise, privilege, lease, or right of any kind to use any public property or easement of any description or any renewal, amendment or extension thereof, the council shall act only by ordinance; provided, however, that after any such ordinance shall have taken effect, all subsequent proceedings incidental thereof and providing for the carrying out of the purposes of such ordinance may, except as otherwise provided in this Charter, be taken by resolution of the council.*

*§ 17.1 Mayor.*

*Effective July 1, 2006, the mayor shall preside at meetings of the council, and perform such other duties consistent with his office as may be imposed by the council. He shall be entitled to a vote, but shall possess no veto power. He shall be recognized as the official head of the city for all ceremonial purposes, by the courts for the purpose of serving civil process, and by the governor for military purposes. He may use said title in any case in which the execution of contracts or other legal instruments in writing, or other necessity arising from the general laws of the state, may so require; but this shall not be construed as conferring upon him the administrative or judicial functions, or other powers or functions, of a mayor, under the general laws of the state. In time of public danger or emergency, he may, with the consent of the council, take command of the police and of the home guards hereinafter provided for and maintain order and enforce laws. During his absence or disability his duties shall be performed by another member appointed by the council.*

*The powers and duties of the mayor shall be such as are conferred upon him by this Charter, together with such others as may be conferred by the council in pursuance of the provisions of this Charter, and no others.*

§ 18. Time of holding municipal elections and conduct of elections.

A municipal election shall be held on the first Tuesday in May of the year 1992, and of every second year thereafter, which shall be known as the regular municipal election for the election of council members. Any matter which, by the terms of this charter, may be submitted to the electors of the city, at any special election, may be submitted at a regular municipal election.

An election to fill each of the ward and superward council seats shall be held at the regular municipal election in 1992. Those candidates elected from wards designated one through five shall serve on city council for a term beginning on the first day of July of the year 1992 and terminating two years hence or upon qualification of their successors. Those candidates elected from superwards designated six and seven shall serve on city council for terms beginning on the first day of July of the year 1992 and terminating four years hence or upon qualification of their successors. Thereafter, elections for council members from wards one through five shall be held every four years beginning on the first Tuesday in May, of the year 1994, and elections for superwards six and seven shall be held every four years beginning on the first Tuesday in May, of the year 1996, with persons so elected to begin their four-year terms on the first day of July following their election. Until July 1, 1992, the city council shall consist of the members of city council serving at the time of adoption of this amendment or their successors as provided in § 7 of this charter.

*Beginning in the year 2006, there shall be an election for the office of mayor to be held at the regular municipal election that year. The candidate receiving the most votes from the qualified voters of the city voting at-large for said office shall be elected mayor to serve for a term of four years beginning July 1, 2006, or upon qualification of his or her successor. Thereafter, elections for the office of mayor shall be held every four years beginning on the first Tuesday in May of the year 2010, with persons so elected to begin their four-year terms on the first day of July following their election.*

§ 19. Notice of Candidacy and Petition.

Candidates for the city council shall be qualified voters of the ward or superward from which they seek election, *or in the case of the election of the mayor, qualified voters of the city at-large.* Such candidates, subject to the provisions of § 21 of this charter, shall file their notices of candidacy and their petitions in the manner provided by law. No candidate may seek election for more than one seat in an election. A sitting member of council who files his or her candidacy for *mayor or for* election to a council seat other than reelection to his or her own seat and so appears on the ballot shall be deemed to have resigned his or her seat effective ~~July 1~~ *June 30* of the year in which the election is held whether or not he or she is elected to the new seat sought.

§ 22. Method of conducting municipal elections.

The candidate at any regular municipal election who receives the highest number of votes from the ward or superward to which election to city council is sought shall be elected the council member for that ward or superward. *Beginning with the municipal election in the year 2006, the candidate for mayor who receives the highest number of votes city-wide shall be elected mayor.* Each qualified voter shall be entitled to vote for no more than two council members in any election,: one member from the ward *or superward,* ~~numbered one through five,~~ in which the voter is qualified to vote ~~and one member from the superward, numbered six or seven, in which the voter is qualified to vote~~ *and the mayor.*

§ 24. Recall procedure.

Any member of city council may be recalled and removed from office only by the qualified voters of the ward or superward from which such member serves, *or in the case of the mayor from the qualified*

DEFENDANT-INTERVENORS TX 023 - Page 237

*voters of the city at-large,* and in accordance with the procedure described in this section. A petition for the recall of the council member designated, signed by at least three hundred qualified voters of the council member's ward or superward, *or on or after July 1, 2006, at least one thousand qualified voters city-wide in the case of the mayor,* and containing a statement in not more than two hundred words of the grounds of the recall, shall be filed with the city clerk, who shall immediately transmit a copy thereof to the city general registrar who shall examine the same, and ascertain and certify to the city clerk whether at least three hundred persons whose names are signed thereto are qualified voters of the said ward or superward *or on or after July 1, 2006, one thousand qualified voters city-wide in the case of the mayor.* Upon receipt of said certification, the city clerk shall forthwith notify such council member. Such council member may, within five days after such notice, file with such clerk a defensive statement not exceeding two hundred words. The city clerk shall, immediately upon the expiration of said five days, cause sufficient printed or typewritten copies of such petition, without the signatures, to be made, and to each copy he shall attach a printed or typewritten copy of such defensive statement or statements, if any such shall have been furnished him within the time provided. He shall preserve the original petition and shall cause one copy of such petition with a copy of the defensive statement, if any, attached to be conveniently placed in his office, and provide facilities for there signing the same, and shall also cause one copy, with a copy of the defensive statement, if any, attached to be placed in at least two public buildings designated by council and located within the council member's ward or superward, *or on or after July 1, 2006, in the case of the mayor, in each superward,* and provide facilities for there signing the same, and for the proper custody thereof. The city clerk shall immediately cause notice to be published in some newspaper of general circulation published in the city, of the places where the said copies may be found, and of the time within which the same may be signed.

The said copies of such petition shall remain on file in the several places designated for a period of thirty days, during which time any one of them may be signed by any qualified voter of the designated council member's ward or superward, *or any qualified voter in the city in the case of the mayor,* including those who signed the original petition.

§ 25. Notice.

At the expiration of said thirty days, the city clerk shall assemble all of said copies, and shall file the same as one instrument with the clerk of the circuit court of said city, who shall immediately transmit a copy thereof to the city general registrar who shall examine the same, and ascertain and certify to the clerk of the circuit court whether the persons whose names are signed thereto are qualified voters of the said ward or superward, equal in number to fifteen percent of the number of voters in said ward or superward who cast their votes at the last preceding regular municipal election in which such council member was elected, *or on or after July 1, 2006, in the case of the mayor, fifteen percent of the number of voters city-wide who cast their votes at the last preceding regular municipal election in which the mayor was elected.* If such signatures do amount to fifteen percent, the clerk of the circuit court of said city shall at once serve notice of that fact upon the council member designated in the petition.

**2. That §§ 3.1, 5, 6, 7, 10, 14, and 17, as severally amended, of Chapter 34 of the Acts of Assembly of 1918 are repealed, effective July 1, 2006.**

**3. That the provisions of this act shall not become effective until approved under § 5 of the Voting Rights Act.**

VSBE 005775

DEFENDANT-INTERVENORS TX 023 - Page 238

MAR-16-2013 01:09A FROM:UFJ+                    (b)(7)(C)                              P.1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

**February 27, 2008**                    $2:08 cv 100$

**HAND DELIVERED**
**Fernando Galindo**
**Clerk, Rm. 193 B**
Walter E. Hoffman
**United States Courthouse**
**600 Granby Street**
**Norfolk, VA 23510**

Re: *Christina D. Perry-Bey v. City of Norfolk*

Dear Mr. Galindo.

Enclosed please find a Motion for Judgment and request for Injunctive Relief
In support and money order in the amount of $350.00 to cover the cost of the
filing fees to be filed in the above-entitled cause of action.

Thank you in advance for processing appropriately.

*Respectfully Submitted,*

Mr. Roy L. Perry-Bey
1012 Hatton Street,
Norfolk, VA 23523
(757) 737-5199

VSBE #05776

(b)(7)(C)                                                    P.2

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# NORFOLK DIVISION

CHRISTINA D. PERRY-BEY
ROY L. PERRY-BEY,
                    Plaintiffs,

Vs.                                   CIVIL ACTION NO: $2 : 0\,8cv\,100$

CITY OF NORFOLK, VIRGINIA

                    Defendants.

## I. MOTION FOR JUDGMENT AND INJUNCTIVE RELIEF

### I. INTRODUCTION

1. Currently, the City of Norfolk at large system of voting for Mayor violates *Collins*

*883 F.2d 1232: 1989 U.S. App. LEXS 12398*, and minimizes and dilutes their vote

in violation of Fourteenth and Fifteenth Amendments to the United States Constitution,

Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. 1973, and

42 U.S.C. 1983.

### II. JURISIDICTION

2. The court has jurisdiction pursuant to Section 2 of the Voting Rights Act of 1965, as

amended in ξ1982, 42 U.S.C. ξ1973, and 42 U.S.C. 1983.

## III. PARTIES

3. Christina D. Perry-Bey, at all times mentioned herein was, (and remains) a resident of the City of Norfolk and of the Commonwealth of Virginia and a citizen of the United States of America.

4. Roy L. Perry-Bey, at all times mentioned herein was, (and remains) a resident of the City of Norfolk and of the Commonwealth of Virginia and a citizen of the United States of America.

5. City of Norfolk among their duties and responsibilities is the protection, observance and safeguarding of the constitutions of the United States and of the Commonwealth by and through its City Council the duly elected representatives thereof:

## IV. FIRST CAUSE OF ACTION

6. Plaintiff's claim injury as result of defendants (1) illegal at large system of voting for Mayor which deprives plaintiffs of an equal opportunity to vote for a candidate of their choice as guaranteed by the Voting Rights Act and Fourteenth and Fifteenth Amendments to the United States Constitution while acting under color of law.

## V. SECOND CAUSE OF ACTION

7. City of Norfolk at large system of voting for Mayor violates *Collins* **883 *F.2d 1232: 1989 U.S. App. LEXS 12398***, and rights secured by the Voting Rights Act of 1965, as amended, 42 U.S. C.ξ 1973, and of the Fourteenth and Fifteenth Amendments to the United States Constitution and laws.

**VSBE 005778**

**DEFENDANT-INTERVENORS TX 023 - Page 241**

MAR-16-2013 01:10A FROM:UFJ+     (b)(7)(C)     P.4

## ∨I. RELIEF REQUESTED

8. **WHEREFORE**, plaintiff request the court grant the following relief:

A. Issue an injunction stating that:

1. City of Norfolk at large system of voting for Mayor violates *Collins 883 F.2d 1232:*

*1989 U.S. App. LEXS 12398,* and rights secured by the Voting Rights Act of 1965, as

amended, 42 U.S. C.ξ 1973, and of Fourteenth and Fifteenth Amendments to the United

States Constitution and laws.

2. Defendants' the ("cabal") official action caused and/or subjected plaintiff's to denial

of their Voting Rights, *supra*:

3. Defendants by their acts and omissions, and in furtherance of their agenda, violated the

Voting Rights Act of 1965, as amended, Title 42 U.S. C.ξ 1973, and the Fourteenth and

Fifteenth Amendments to the United States Constitution and laws of the United States.

B. Issue an injunction ordering City of Norfolk and their agents:

1. Enjoined defendants from maintaining the current at large Mayor status as a direct

conflict with *Collins v. City of Norfolk, supra*:

2. Issue an injunction prohibiting the holding of future city council at large system of

voting in the City of Norfolk to comply with *Collins v. City of Norfolk, supra:*

3. Plaintiffs' Federal constitutional and statutory rights against violation of their voting

rights can only be protected against immediate and certain violations in this case by the

issuance of the requested injunction.

**VSBE 005779**

**DEFENDANT-INTERVENORS TX 023 - Page 242**



C. Plaintiff's does hereby give notice for leave to file an amended complaint pursuant to [F.R.C.P.] and supplementary pleadings and, request competent legal counsel be timely appointed pursuant to 28 U.S.C. § 1915 (d) to assist in the preparation of any further responsive pleadings, affidavits, briefs, discovery, etc., on the ground that plaintiff's lacks the financial capability to investigate the critical issues that are so complex that, as a pro se litigate, they can not reasonably be required to present this case with any effectiveness; that legal assistance is necessary and in the interest justice for the fair presentation of a proper case to the Court.

February 27, 2008

Respectfully Submitted,

By: _____
MS. CHRISTINA D. PERRY-BEY

By: _____
MR. ROY L. PERRY-BEY
PETITIONERS

(b)(7)(C)

VSBE 005780

DEFENDANT-INTERVENORS TX 023 - Page 244

CITY OF NORFOLK, VIRGINIA, ET AL., PETITIONERS V. HERBERT M. COLLINS, ET AL.

No. 89-989

In The Supreme Court Of The United States

October Term, 1989

On Petition For A Writ Of Certiorari To The United States Court Of Appeals For The Fourth Circuit

Brief For The United States As Amicus Curiae

This brief is filed in response to the Court's invitation to the Solicitor General to express the views of the United States.

TABLE OF CONTENTS
Questions Presented
Statement
Discussion
Conclusion

### QUESTIONS PRESENTED

1. Whether a minority group's consistent ability to elect one representative of choice to a city council elected under an at-large voting system is necessarily sufficient to defeat a challenge to that system under Section 2 of the Voting Rights Act, when the minority group would have the opportunity to elect at least two representatives if the council were elected from fairly drawn single-member districts.

2. Whether an at-large electoral system, in which a minority group has the opportunity to elect candidates of its choice who are not members of the minority group, but the minority group has no opportunity to elect candidates of its choice who are members of the minority group, may be in violation of Section 2 of the Voting Rights Act.

3. Whether the court of appeals erred in reversing as clearly erroneous the district court's finding that no special circumstances explained the election of several black-preferred candidates to the City Council in Norfolk after this litigation was filed in 1983.

### STATEMENT

1. The City of Norfolk, Virginia uses an at-large system to elect its city council. The council has seven members who serve staggered four-year terms. Elections are held every two years, with three seats open one election year and four the next. Candidates run for all open seats, and the three (or four) candidates with the most votes win. Voters may vote for as many candidates as there are open seats, but they may also vote for fewer. Pet. App. 3a-4a, 42a.

Blacks constitute 35% of Norfolk's population and 31% of its voting age population (Pet. App. 4a). Until 1968, all members of the council were white (ibid.). A black was elected that year, and there has been

DEFENDANT-INTERVENORS TX 023 - Page 245

at least one black on the council ever since (id. at 4a-5a).  Between 1970 and 1982, black candidates running in four elections in which the black incumbent was either not up for election or was himself also running for reelection received a majority of votes from black voters and lost (id. at 16a).  In 1934, after this suit was filed, a second black, Foster, was elected, and two blacks have served on the council simultaneously since then (id. at 5a).  Since 1968, two whites -- Howell and Staylor -- have been elected to the council with majority black support (Pet. 4).  Howell was elected three times with majority black support; Staylor was elected once (ibid.).

2. Plaintiffs are seven black citizens of Norfolk and the Norfolk Branch of the NAACP (Pet. App. 2a).  In 1983, they filed this suit alleging that the at-large method of electing members to the city council denies black voters an equal opportunity to elect candidates of their choice in violation of Section 2 of the Voting Rights Act, 42 U.S.C. 1973 (Pet. App. 2a, 3a n.2).

After a trial, the district court ruled for the City of Norfolk (Pet. App. 132a-193a), and the Fourth Circuit affirmed (id. at 114a-131a).  This Court vacated and remanded to the Fourth Circuit for reconsideration in light of Thornburg v. Gingles, 478 U.S. 30 (1986) (Pet. App. 113a).  In Gingles, this Court held that there are three preconditions to a finding that an at-large system violates Section 2:
"First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.  * * * Second, the minority group must be able to show that it is politically cohesive.  * * * Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it -- in the absence of special circumstances * * * -- usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.  The Fourth Circuit in turn remanded the case to the district court to decide these issues (Pet. App. 99a-112a).

3. The district court once again ruled in favor of Norfolk (Pet. App. 38a-98a).  It found Norfolk's black population sufficiently large and geographically compact to constitute an effective voting majority in two single-member districts (id. at 51a).  The court also found that Norfolk blacks are politically cohesive (id. at 52a).  The court found, however, that whites voting as a bloc are not usually able to defeat minority-preferred candidates (ibid.).  In reaching this conclusion, the court relied on evidence that, since 1968, 11 of the 19 candidates receiving majority black support have won (id. at 66a-67a).  The court also cited evidence that, at all times since 1974, at least two members of the council have been supported by a majority of black voters (id. at 68a).

The court rejected plaintiffs' contention that black voters did not actually favor Howell and Staylor since far more blacks voted for competing candidates than for them (Pet. App. 70a-72a).  The court found it more significant that a majority of blacks voted for Howell and Staylor, that the most influential black civic group endorsed them, and that some black candidates received less black support than they did (ibid.).

The district court also rejected plaintiffs' assertion that only

VSBE 005783

DEFENDANT-INTERVENORS TX 023 - Page 246

special circumstances allowed Foster to win a second black seat in 1984 (Pet. App. 76a-79a). The court acknowledged that the Mayor had both endorsed Foster and publicly stated that his election might moot this case (id. at 76a). The court also noted that a civic group with which the Mayor was affiliated supported only two candidates (not including Foster) when three seats were vacant (id. at 78a; see also id. at 18a). The court found, however, that these events had not produced unusual white support for Foster (id. at 76a-79a). The court relied on evidence that the Mayor's decision to support Foster had predated the lawsuit (id. at 77a). It also cited evidence that other black candidates, including one who ran in 1984 without the Mayor's endorsement, had obtained approximately the same level of white support as Foster did in 1984 (id. at 77a-78a).

Finally, the court rejected plaintiffs' contention that the reelection of black incumbents should be attributed to the special advantages of incumbency (Pet. App. 80a). The court found that incumbency was not critical to black success since nonincumbents supported by a majority of black voters have also won (ibid.).

4. a. A divided panel of the court of appeals reversed. It agreed with the district court that Norfolk blacks are sufficiently compact to constitute a voting majority in at least two single-member districts and that they are politically cohesive (Pet. App. 9a). It held that the district court had erred, however, in finding the absence of legally significant white bloc voting.

The court concluded that the district court's error stemmed in part from its finding that Howell and Staylor were minority-preferred candidates (Pet. App. 9a-15a). The appellate court held that Howell's and Staylor's receipt of significantly less minority support than competing candidates created a presumption that they should not be considered minority-preferred (id. at 9a-10a). The evidence cited by the district court, the Fourth Circuit explained, was insufficient to show that black voters preferred Howell and Staylor over these other unsuccessful candidates (id. at 11a). The court also concluded that the district court's finding could not be reconciled with the evidence that the black community did not view Howell and Staylor as their representatives and the evidence that Howell and Staylor did not promote issues of concern to the minority community (id. at 11a-13a).

The court of appeals then proceeded to address the significance of white bloc voting, with Howell and Staylor no longer counted as minority successes. The court found that while black voters have achieved sustained success in electing one representative, "this case involves the community's inability to elect a second member until after the institution of this action" (Pet. App. 15a). For this reason, the court explained, the statistics showing that just over half of the black-supported candidates have won election since 1968 are misleading (ibid.). To use such statistics to defeat this action, the court concluded, would place "a stamp of approval on token representation" (ibid.).

To avoid this result, the court held that the inquiry into whether white bloc voting can usually defeat minority-preferred candidates should be applied to the black community's effort to obtain a second seat (Pet. App. 15a). Applying this analysis, the court found that

all black-supported candidates for a second seat between 1968 and 1984 were defeated and that this demonstrated legally significant white bloc voting (id. at 16a).

A second black -- Foster -- was elected to the council in 1984, but the court held that this did not undermine its conclusion (Pet. App. 17a-20a). The court concluded that the Mayor's unprecedented support for a second black, his statement that the election of a second black might moot the case, and the civic coalition's endorsement of two candidates for three vacancies (leaving a more open field for Foster) showed that special circumstances accounted for Foster's success (id. at 18a). The court held that the district court's finding that these events had not elicited unusual white support was based on its mistaken reliance on a comparison between the amount of white support received by Foster and the amount received by previous black candidates for the first seat (id. at 18a-19a). According to the court of appeals, Foster's white support should have been compared to that of previous second-seat candidates; when this comparison was made, it became clear that Foster's share of the white vote (26.6%) was nearly twice that of the next highest black second-seat candidate prior to 1984 (14.0%) (id. at 19a). That another black candidate in 1984 received almost as much white support as Foster, the court concluded, reinforced the inference that this litigation had produced unusual white support for black candidates (ibid.).

The court also concluded that the ability of black voters to retain two blacks on the council in 1986 and 1988 resulted from special circumstances (Pet. App. 21a). The court attributed the success of black candidates in these elections to the pendency of this litigation and to the candidates' incumbency (ibid.).

b. Judge Chapman dissented. He agreed with the district court that Howell and Staylor were minority-preferred candidates (Pet. App. 23a-29a). The relevant question, according to Judge Chapman, was whether "the elected candidate can be fairly considered as a representative of the minority community and not whether such candidate is the 'most preferred'" (id. at 24a (emphasis in original)). Judge Chapman noted that the candidates' positions on issues of concern to the minority community "has nothing to do with vote dilution" (id. at 26a), and that he would give "little weight" to testimony that Howell and Staylor were not viewed as representatives of the black community (ibid.). Judge Chapman was also convinced that the panel's treatment of Howell and Staylor was at least implicitly related to an assumption that a candidate's race is an important factor in determining whether he is minority-preferred (id. at 25a-26a).

Judge Chapman further concluded that even if Howell and Staylor are not counted as minority-preferred candidates, plaintiffs failed to prove legally significant racial bloc voting (Pet. App. 30a-34a). In Judge Chapman's view, the majority improperly embraced proportional representation as a Section 2 requirement in focusing on whether blacks have achieved success in electing a second representative (Pet. App. 30a). Judge Chapman would have applied the test of usual defeat to all contests, not just to those for the second seat (id. at 33a). Applying this standard, Judge Chapman found that, even excluding Howell and Staylor, over half of the minority-supported candidates

VSBE 005785

DEFENDANT-INTERVENORS TX 023 - Page 248

have been elected to office since 1968 (id. at 34a).

Judge Chapman also found that Foster's election in 1984 did not result from special circumstances (Pet. App. 34a-36a). In concluding otherwise, Judge Chapman stated, the majority had improperly restricted the comparison of Foster's white support to that of blacks who ran for the second seat (id. at 35a). In Judge Chapman's view, this comparison shares the same error as the panel's inquiry into whether blacks are able to elect someone to a second seat: it effectively establishes a right to proportional representation (ibid.). When compared to all black candidates, Judge Chapman noted, Foster's white support was not unusual. Beyond that, Judge Chapman concluded, the evidence that the level of white support for another black candidate in 1984 was comparable to the level of white support for Foster shows that the Mayor's endorsement of Foster did not produce unusual support for him (ibid.).

Finally, Judge Chapman concluded that the election of black incumbents should not be discounted as a special circumstance (Pet. App. 36a-37a). Judge Chapman read the panel as holding that when incumbents are successful and nonincumbents are not, incumbency is necessarily a special circumstance (id. at 36a). In Judge Chapman's view, this reasoning would turn virtually every election into one involving special circumstances (ibid.).

c. The court of appeals denied rehearing en banc by an equally divided vote (Pet. App. 197a).

<center>DISCUSSION</center>

Despite racially polarized voting patterns, black voters in Norfolk have repeatedly elected at least one representative of their choice to the city's seven-member council. The court of appeals determined, however, that black voters do not have an opportunity -- absent special circumstances -- to elect a second representative. Because blacks would have the potential to elect two representatives under a fairly drawn single-member district plan, the court of appeals held that the City's use of an at-large election system dilutes black voting strength in violation of Section 2.

Petitioners contend that the court of appeals' inquiry into whether black voters have an opportunity to elect a second representative is inconsistent with Gingles and implicitly treats the absence of proportional representation as a violation of Section 2. They also argue that the Howell and Staylor elections and the post-lawsuit elections show that black voters not only have an opportunity to elect two representatives of their choice, but have in fact done so. Finally, they argue that the totality of the circumstances demonstrate the absence of a Section 2 violation.

These contentions, while serious, do not warrant this Court's review. Although the court of appeals' analysis is not without flaws, the court's errors, we believe, either do not affect the outcome of the case or are too closely tied to its particular facts to be of general significance. Moreover, there is no conflict among the circuits on the specific issues presented in this case. The petition for a writ of certiorari should therefore be denied.

VSBE 005786

DEFENDANT-INTERVENORS TX 023 - Page 249

That said, we would be remiss in failing to note that, as a general matter, the courts of appeals appear to be experiencing considerable difficulty in resolving a wide range of issues surrounding application of Section 2 of the Voting Rights Act to at-large election systems. See, e.g., U.S. Amicus Br. in Sanchez v. Bond, petition for cert. pending, No. 89-353. It is not insignificant that, in addition to the Fourth Circuit in this case, another circuit has recently divided evenly en banc in such a case. Solomon v. Liberty County, No. 87-3406 (11th Cir. Apr. 5, 1990); see also Whitfield v. Democratic Party, No. 88-1953 (8th Cir. May 4, 1990) (en banc court evenly divided on Section 2 challenge to majority vote requirement). For the reasons set forth in our amicus filings, we do not believe that either this case or Sanchez warrants this Court's review. At the same time, most voting rights cases are, by their nature, likely to be fact-intensive; persistent confusion and division in the circuits -- even on application of governing principles to particular facts -- may well call for further guidance from this Court at an appropriate time.

1. a. The court of appeals properly inquired into whether black voters have an opportunity to elect a second representative. That inquiry is not premised on the notion that Section 2 requires proportional representation, as petitioners contend. It is instead premised on the notion that an at-large system in which the evidence shows that white voters are willing to elect no more than one representative who is the choice of black voters is not immune from Section 2 scrutiny. Any contrary rule would, as stated by the court of appeals, "place() a stamp of approval on token representation." (Pet. App. 15a). For example, a 15-member city council elected at-large in a community with a geographically compact, 49% black population cannot be exempt from Section 2 scrutiny because a single black-preferred representative is consistently elected. In the terms of the statute, the fact that the black community can consistently elect a single council member would hardly prove that it has the same opportunity as the majority group "to participate in the political process and to elect representatives of (its) choice." 42 U.S.C. 1973(b).

The use of a fairly drawn single-member district plan as a benchmark for measuring the effect of an at-large system on minority voting strength is at the heart of Gingles. There, the Court held that "(t)he single-member district is generally the appropriate standard against which to measure minority group potential to elect." 478 U.S. at 50 n.17. It follows from this holding that, where the minority group challenging an at-large electoral system has shown that it is unable to elect as many representatives as it could in fairly drawn single-member districts, and where the defendant has failed to rebut this showing, a Section 2 violation can be made out. Cf. Gingles, 478 U.S. at 90-91 (O'Connor, J., concurring in the judgment).

The use of a single-member district plan as the benchmark for measuring undiluted voting strength is far different from a proportional representation standard. As was explained in Gingles, "(This standard) thus would only protect racial minority votes from diminution proximately caused by the districting plan; it would not assure racial minorities proportional representation." 478 U.S. at 51 n.17 (quotation marks and emphasis omitted). The Fourth Circuit has

DEFENDANT-INTERVENORS TX 023 - Page 250

expressly recognized this distinction. See McGhee v. Granville County, 860 F.2d 110 (4th Cir. 1988) (rejecting a Section 2 challenge to a fairly drawn single-member district plan even though it afforded minority voters far less than proportional representation).

b. While the court of appeals properly sought to assess the opportunity of blacks to elect a second representative, it artificially narrowed its focus to contests for a second seat. A minority group's repeated success in electing one representative can be persuasive evidence that it fully participates in the electoral process and has an opportunity to elect a second representative as well. The force of this evidence is not necessarily dissipated by evidence that the minority group has been unsuccessful in actually electing a second representative. The lack of success could be explained by factors other than the unyielding resistance of whites to a second representative, such as the characteristics of a particular candidate or the circumstances surrounding a particular election. Because the court of appeals did not expressly consider all the evidence bearing on the opportunity of blacks to elect a second representative -- including the unquestioned and consistent success of blacks in electing at least one representative to the council -- its analysis of the "totality of circumstances" (42 U.S.C. 1973(b)) was incomplete.

It is unclear, however, that a more complete analysis would have affected the outcome of this case. The evidence shows that between 1970 and 1982, black voters made four unsuccessful attempts to elect a second black to the council. These second-seat candidates received just 8% to 14% of the white vote, for an average of 11%. In contrast, black candidates for the first seat received between 22% and 32% of the white vote, for an average of 27% (Pet. App. 16a, 208a-217a). This wide and repeated disparity between white support for first-seat candidates and white support for second-seat candidates is significant evidence that black voters in fact did not have an opportunity to elect a second representative before the filing of this suit. Petitioners have pointed to nothing in the record about the characteristics of the second-seat candidates or the circumstances of these elections that adequately explains this white voting behavior, leaving the opposition of whites to a second black representative as the most persuasive explanation.

c. Petitioners contend that black voters have still elected more than half of their preferred candidates and that plaintiffs therefore failed to prove usual defeat as required by Gingles. This argument is misguided. Petitioners approach the usual defeat inquiry as if it involved nothing more than a strict mathematical count of past wins and losses, with more losses than wins being an essential element of plaintiffs' case. Petitioners' mathematical model, however, produces a distorted picture.

Under petitioners' method of calculating a minority group's opportunity to elect, there would be no violation as long as first-seat successes outnumber second-seat losses, regardless of whether the evidence undeniably shows that there is no opportunity to elect a second candidate. As the court of appeals explained, to accept such evidence as conclusive proof of the absence of a violation would "place() a stamp of approval on token representation" (Pet. App.

**DEFENDANT-INTERVENORS TX 023 - Page 251**

15a]. It is significant that blacks in Norfolk can elect a candidate of their choice to the city council. But there are seven members on the council, and if discriminatory voting patterns account for the inability of blacks to elect more than one candidate -- in the absence of special circumstances -- then their success in electing one is no answer. If the political reality is that black voters have been relegated to a token seat, and that they have no real opportunity for increased representation, it would be inconsistent with the goals of Section 2 to mask this reality by melding first-seat and second-seat elections and concluding that there is no violation because blacks have won (consistently, for the first seat) more often than they have lost (consistently, for the second seat). Nothing in Gingles or common sense requires such a result.

To the contrary, as we have shown, the relevant inquiry under Gingles is whether blacks have an opportunity to elect a second representative. First-seat elections can inform that inquiry. When other evidence is more convincing, however, the first-seat elections can properly be discounted.

2. Petitioners contend, however, that the at-large election system does not limit black voters to token representation. In particular, they point to the elections of Howell and Staylor as evidence that blacks have elected at least two candidates of choice to the council since 1974. According to petitioners, the court of appeals plainly erred when it refused to find that Howell and Staylor were minority-preferred.

Gingles does not expressly address how to decide whether a candidate is minority-preferred. This Court's discussion of how to prove political cohesion, however, suggests the proper approach. One way to prove political cohesion, this Court held, is to show that "a significant number of minority group members usually vote for the same candidates." 478 U.S. at 56. This definition of political cohesion implies that there is no great mystery about how to identify minority-preferred candidates: they are simply those for whom a significant number of minority group members vote.

This is not to suggest that every candidate who receives more than 50% of the black vote is necessarily a candidate of choice. But Howell and Staylor did not receive bare majority support from blacks; black support for these white candidates ranged from almost 57% to approximately 73% (Pet. 4). Generally, support of these proportions should be sufficient to establish that a candidate has received bloc support and is therefore a candidate of choice.

The court of appeals concluded that Howell and Staylor were not minority-preferred primarily because competing candidates received a significantly higher percentage of the black vote and lost (Pet. App. 9a-15a). The court reasoned that black voters preferred these other candidates, rather than Howell and Staylor. /1/ The flaw in this reasoning is that the candidates did not compete for only one position. Each election had at least three vacancies. Accordingly, blacks could potentially have had at least three candidates of choice. In these circumstances, it makes little sense to say that someone cannot be a candidate of choice solely because another candidate receives a significantly higher percentage of the black vote. In such

VSBE 005789

multiple vacancy elections, if three candidates receive minority bloc support, it would generally seem fair to conclude that they are all candidates of choice.  See Citizens for a Better Gretna v. City of Gretna, 834 F.2d 496, 502 (5th Cir. 1987) (recognizing more than one minority-preferred candidate in multiple-seat election), cert. denied, 109 S. Ct. 3213 (1989).

We nonetheless believe that there were sufficient grounds for the court of appeals' conclusion that the elections of Howell and Staylor did not demonstrate the absence of a Section 2 violation.  That is because, as previously discussed, there is a clear pattern of defeat of candidates who are black and ran for a second seat between 1970 and 1982;  at best, the elections of Howell and Staylor show that the minority voters had the opportunity to fill the second seat with a candidate of their choice so long as that candidate was white.  /2/ As we have explained in our Brief as Amicus Curiae in Sanchez v. Bond, No. 89-353, while a candidate of choice of a minority group need not be a member of that group, an electoral system that restricts the opportunity of a minority group to elect candidates of choice who are members of the group violates Section 2 (Br. 13-14).  Thus, while we do not embrace the court of appeals' reasoning on this issue, its ultimate conclusion that the Howell and Staylor elections do not suggest the absence of a Section 2 violation does not warrant this Court's review.

Contrary to the contention of petitioners, there is no conflict between the decision in this case and the result reached by the Fifth Circuit in City of Gretna.  In Gretna, the Fifth Circuit held that a black candidate who received 67% of the black vote and lost was a minority-preferred candidate even though two competing white candidates who may have received 70% of the black vote won.  834 F.2d at 502 & n.14.  The court further held, however, that the success of the two white candidates did not establish the absence of legally significant white bloc voting.  The court explained that "(s)ignificance lies in the fact that the black candidate preferred by the minority was defeated by white bloc voting.  That blacks also support white candidates acceptable to the majority does not negate instances in which white votes defeat a black preference."  Id. at 502.  As this discussion shows, the Fifth Circuit's result, although not its reasoning, is congruent with the result reached in this case;  the success of blacks in electing white candidates to a second seat cannot rebut a clear showing that blacks have had no opportunity to elect black candidates to that seat.

3. Petitioners next contend that Foster's election in 1984 and the subsequent reelection of black candidates in 1986 and 1988 are sufficient to show that blacks enjoy an equal opportunity to elect candidates of their choice.  This fact-bound contention does not warrant this Court's review.

a. Petitioners initially contend that the court of appeals' finding that this litigation produced unusual white support for Foster is based on an unduly restricted comparison to the white support for previous second-seat candidates.  In petitioners' view, that analysis is premised on the same proportional representation standard that led the court to assess the opportunity of blacks to elect a second representative.  For reasons already discussed, this criticism is

**VSBE 005790**

**DEFENDANT-INTERVENORS TX 023 - Page 253**

misdirected. Given the propriety of the second-seat inquiry and the significant difference between white support for previous first- and second-seat candidates, the court of appeals properly compared Foster's white support to that of the previous second-seat candidates. Because Foster received significantly more white support than previous black second-seat candidates, the court plausibly viewed Foster's white support as unusual, and the district court's contrary finding as clearly erroneous.

This conclusion, however, does not exhaust the special circumstances inquiry. It is also necessary to determine whether this unusual support is an artifact of the pending litigation or whether it reflects a more permanent change in the political climate in Norfolk. The evidence on this issue is inconclusive. On the one hand, the evidence that no black candidate was elected to a second seat until after this suit was filed, together with the evidence that the Mayor publicly stated that the election of a second black might moot the case and the civic group's endorsement of only two candidates for the three open seats in 1984, suggest that Foster's unusual support was a product of the litigation. On the other hand, the evidence that the Mayor's support for Foster predated this suit, and that black voters have now elected and reelected two black representatives through three successive elections, suggest that a more permanent shift in the political climate may be at work. The rest of the evidence can plausibly support either inference (compare Pet. App. 19a with id. at 35a).

Accordingly, after identifying the district court's error in failing to treat Foster's support from white voters as unusual, a proper application of Rule 52 of the Federal Rules of Civil Procedure should have led the court of appeals to remand for a new finding on whether Foster's unusual support was caused by the litigation or reflected a more permanent shift in the Norfolk political climate. See Pullman-Standard v. Swint, 456 U.S. 273 (1982). Because the court of appeals purported to apply the clearly erroneous standard, however, and because the manner in which it did so does not have any importance outside of this case, the court of appeals' treatment of Foster's election does not warrant this Court's review.

b. For similar reasons, the question whether the court of appeals properly treated incumbency as a factor that contributed to the retention of two blacks on the council in 1986 and 1988 is not worthy of this Court's review. Under Gingles, incumbency is among the factors that may justify a finding that the election of a minority-supported candidate is due to special circumstances. 478 U.S. at 57. The importance of incumbency in a particular case, however, is a factual issue governed by the clearly erroneous standard. Here, while it is plausible that the candidates' incumbency (along with the pendency of the litigation) explains the 1986 and 1988 ability of blacks to retain two seats on the council, it is equally plausible that blacks now enjoy an opportunity to elect a second representative of their choice to the council. They have, after all, done so in three successive elections. Accordingly, the court of appeals should not have substituted its judgment for that of the district court on this issue. Because this issue is so fact-bound and is unlikely to have any significance beyond this case, however, it too does not warrant this Court's review. /3/

4. Finally, petitioners contend that the court of appeals improperly reversed the district court's finding that the totality of the circumstances demonstrates the absence of a Section 2 violation. Here, however, the district court's ultimate finding depended on its treatment of the Howell, Staylor, and post-litigation elections. Once its findings on those elections were set aside, there was no longer any basis for the district court's ultimate finding. As petitioners contend (Pet. 28), this Court did not hold in Gingles that the only way a defendant may defeat a Section 2 claim is to show that one of the Gingles factors has not been proven. But in this case, petitioners point to no other circumstance that would justify a finding of no violation. /4/ Thus, petitioners' argument on this issue collapses into their arguments on the other issues. For the reasons already discussed, those contentions do not warrant this Court's review.

<div align="center">CONCLUSION</div>

**The petition for a writ of certiorari should be denied.**

**Respectfully submitted.**

**KENNETH W. STARR**

   **Solicitor General**

**JOHN R. DUNNE**

   **Assistant Attorney General**

**JOHN G. ROBERTS, JR.**

   **Deputy Solicitor General**

**ROGER CLEGG**

   **Deputy Assistant Attorney General**

**JAMES A. FELDMAN**

   **Assistant to the Solicitor General**

**JESSICA DUNSAY SILVER**

**IRVING GORNSTEIN**

   **Attorneys**

**MAY 1990**

/1/ Petitioners' contention (Pet. 16 n.20, 22) that the court of appeals' opinion "seems to incorporate the notion that black voters must achieve proportional representation with black candidates" (Pet. 22 (emphasis in original)) is mistaken. The court of appeals expressly refrained from deciding whether the race of the candidate is significant in determining who is a "candidate of choice" of the

<div align="right">VSBE 005792</div>

DEFENDANT-INTERVENORS TX 023 - Page 255

minority group. Pet. App. 8a n.7. In fact, as Judge Chapman
recognized in his dissent, the panel did not object to counting Howell
as a black-preferred candidate in one of her bids for election. See
Pet. App. 24a-25a. Although the portion of the court's opinion
addressing the Howell and Staylor victories (id. at 9a-15a) does seem
to rest on the assumption (incorrect, in our view) that minority
voters may have only one defeated candidate of choice in a
multiple-seat election, it does not rest on the assumption (also
incorrect, in our view) that any candidate of choice of minority
voters must be a member of the minority group.

/2/ As explained above (p. 11), although black candidates for the
second seat received an average of just 11% of the white vote, black
candidates for the first seat received an average of 27% of the white
vote. It is this decline in the white vote for second-seat black
candidates -- a decline for which petitioners offer no explanation --
that made it impossible for such candidates to be elected between 1970
and 1982.

/3/ Petitioners contend (Pet. 27-28) that the court of appeals
improperly treated all election successes involving incumbents as
special circumstances elections. While there is some ambiguity on
this point, we read the court's discussion of incumbency as limited to
the ability of blacks to elect and retain a second representative on
the council (Pet. App. 5a, 20a-21a). There is no other way to explain
the court's finding (Pet. App. 15a) that "this action would border on
the frivolous" if the claim could have been defeated by showing that
blacks had "the ability to elect a single candidate to the council."

/4/ The en banc Eleventh Circuit has recently divided evenly
concerning the relationship between a finding that the three Gingles
factors were proven in a given case and an ultimate "totality of the
circumstances" finding of a Section 2 violation. See Solomon v.
Liberty County, No. 87-3406 (Apr. 5, 1990). The question that divided
the Eleventh Circuit in Solomon, however, is largely irrelevant in
this case. The Solomon court was unanimous in holding that a
plaintiff can make out a Section 2 violation simply by proving the
existence of the three Gingles factors. See slip op. 2599 (Kravitch,
J., specially concurring), 2615 (Tjoflat, C.J., specially concurring).
The court, however, was unable to agree on whether a defendant may
rebut a showing of the existence of the three Gingles factors by
showing that a neutral explanation, relying on objective factors,
demonstrates that "the voting community is not driven by racial bias."
Id. at 2616 (Tjoflat, C.J., specially concurring); see id. at 2593
n.3 (Kravitch, J., specially concurring). In this case, however,
although petitioners generally assert (Pet. 28) that the Fourth
Circuit did not give proper deference to the district court's
"totality of the circumstances" finding, they do not assert that they
proffered a neutral, non-racial explanation for the racially polarized
voting in Norfolk, or that the Fourth Circuit, having found the
existence of legally significant racially polarized voting, erred in
failing to recognize that such voting in this case was not the result
of racial bias. This case, therefore, does not raise the issue that
divided the Eleventh Circuit in Solomon.

VSBE 005793

DEFENDANT-INTERVENORS TX 023 - Page 256

## IN THE UNITED STATES SUPREME COURT
## OF THE UNITED STATES OF AMERICA

No. 10-1255

CHRISTINA D. PERRY-BEY,

Plaintiff - Appellant,

v.                                    CIVIL ACTION NO: 2:08CV100

CITY OF NORFOLK, VIRGINIA.

Defendant - Appellee.

### NOTICE OF APPEAL

Notice is hereby given that Plaintiffs herein the above entitled

cause of action; hereby appeals to the Supreme Court of the

United States from the final order entered on February 22, 2011

from the United States Court of Appeals for the Fourth Circuit

for the Eastern District of Virginia, affirming the decision of

the United States District Court for the Eastern District of

Virginia, final order entered on April 6, 2010, dismissing

Plaintiff's Voting Rights cause of action with prejudice.

May 17, 2011 Tuesday

I ask for this,

MS. CHRISTINA D. PERRY-BEY
PLAINTIFF,
P.O. BOX 9901
NORFOLK, VA 23505

cc: PATRICIA S. CONNOR, CLERK
UNITED STATES COURT OF APPEALS

VSBE 005794

DEFENDANT-INTERVENORS TX 023 - Page 257

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2011 a true copy of the foregoing Plaintiff's notice of appeal was mailed to counsel for defendants of record.


Paul W. Jacobs, II
CHRISTIAN & BARTON, LLP
900 EAST MAIN STREET, SUITE 1200
RICHMOND, VA 23219-3095


                        MS. CHRISTINA D. PERRY-BEY
                                        PLAINTIFF,
                                    P.O. BOX 9901
                              NORFOLK, VA 23505

VSBE 005795

## UNITED FRONT FOR JUSTICE
(b)(7)(C)

NORFOLK, VIRGINIA 23505

(b)(7)(C)

July 16, 2010

Chris Herren
Chief, Voting Section
Civil Rights Division Room -NWB
Department of Justice
900 Penn Sylvania Ave.,
Washington, D.C. 20530

**Re: Objection to the City of Norfolk's formal Request to Hold a Special City Council Election on November 2, 2010**

Dear Mr. Herren:

This is an official objection to the City of Norfolk's request for approval to hold a special City Council election On November 2, 2010 based on the grounds as follows:

1. The Pending Litigation challenging the legality of the direct election of Mayor and vote dilution of minority voting power. *See:* case **#10-1255** filed in the United States Court of Appeals for the Fourth Circuit, **CHRISTINA D. PERRY-BEY, v. CITY OF NORFOLK, VIRGINIA, CIVIL ACTION NO: 2:08CV100.**

2. The Pending Litigation challenging the legality of Norfolk City Council elections held under the direct election of mayor since its improper charter approval, Act No. 893 (2005) of the 2005 Virginia General Assembly, which provides for an increase in the number of members on the Norfolk City Council from seven as ordered by the *Collins,* Court to eight which the Bush's Department of Justice Attorney General John Tanner, Chief Voting Section did not interpose any objection, yet it exceeds existing federal law.

VSBE 005796

DEFENDANT-INTERVENORS TX 023 - Page 259

(b)(7)(C)   P.2

3. The potential for non-minority racial block voting and vote dilution in **Ward 7** that could negatively impact the outcome.

4. The upcoming Congressional races and referendums on tax relief for veterans and seniors and reforms for fiscal policy.

5. The Congressional redistricting in 2011, already negatively impacted by the City of Norfolk's illegal at-large elections climate.

6. After an eight year contest represented by Attorney *James F. Gay, Esq., & Frank Parker, Esq.,* that included two published Fourth Circuit opinions, a remand from the United States Supreme Court, and a 9 majority Supreme Court denial of a writ of certiorari, the federal courts compelled the city of Norfolk (the "City') to abandon at-large elections for its city council in **Collins v. City of Norfolk, 883 F.2d 1232 (4th Cir. 1989)**.

7. In 2006, the City without seeking a declaratory judgment over-turning *Collins*, approved by the court violated the *Collins; mandate* added an eighth member to its city council body with voting power that would be elected at-large even though the *Collins* court had previously *enjoined* the City from holding at-large city council elections.

8. The 5-2 plan provided for seven wards, five regular wards and two "super-wards".

9. The Mayor shall be chosen by City Council from among its members as ordered on **January 3, 1991.**

10. Ms. Perry-Bey is petitioning the Court to enforce the *Collins, mandate* by deciding whether the illegal Mayor elected at-large as an eighth member of the city council violated the court order *enjoining* at-large city council elections. See; **Order attached.**

**VSBE 005797**

**DEFENDANT-INTERVENORS TX 0:23 - Page 260**

(b)(7)(C) P.3

11, The City in concert with certain members of the General Assembly, deceived the Public and used cooked submissions presented to the U.S. Department of Justice Voting Rights Section by **omitting the recommendations from Attorney J. Gerald Herbert, specialist in election law and the Voting Rights Act, and a letter to the city attorney from lawyer Paul W. Jacobs II, who lost the city council at large elections under Collins, over 17 years ago, a specialist in voting rights stated that White residents make up 52 percent of the voting-age population to non white minority residents' 41 percent, giving a white candidate the advantage in a city-wide mayoral election.**

12. **So on eight-member council, minority residents would only control three seats, or 38 percent of the voting power. That's less power than they have now, and less than their share of the population, so it's not likely that the Justice Department will approve the plan, Jacobs said.**

13. The City of Norfolk intentionally omitted the fact that at large city council elections in Norfolk is prohibited because it would have the purpose and the effect of denying or abridging the right to vote on account of race or color."**42 U.S.C. §1973(b).**

14. And withheld the **2000 census** data and petitioner's objection from the U.S. Department of Justice Voting Rights Section and the required court's approval of its at large city council elections change as required by law. **See: City of Norfolk, 883 F.2d 1232 (4th Cir. 1989).**

15. The Supreme Court and Fourth Circuit Court of Appeals have long recognized that at-large voting schemes may "operate to minimize or cancel out the voting strength of racial [**minorities in**] the voting population" who are placed among a numerical majority of white voters. *Gingles, 478 U.S. at 47-48 & n.13; Collins v. City of Norfolk, 883 F.2d 1232, 1236 (4th Cir.), cert. denied, 498 U.S. 938.*

VS|BE 005798

DEFENDANT-INTERVENORS TX 023 - Page 261

16. The non white minority voting population at large is placed among a numerical majority of white voters, in the City of Norfolk.

17. Thus at-large elections dilute the vote of the city's African American population. *See: Collins v. City of Norfolk, Virginia, 883 F.2d 1232, 1235 (4th Cir. 1989).*

18. The evidence is over-whelming the city of Norfolk has clearly violated federal law and seeks the Obama's Department of Justice to approve its request to hold an improper special city council elections.

19. Until a final order from the U.S. Supreme Court in the pending case of *CHRISTINA D. PERRY-BEY, v. CITY OF NORFOLK, VIRGINIA,* is handed down upholding or denying Collins. *See: Gingles, 478 U.S. at 50-51, 106 S. Ct. at 2766.*

20. Including 1 thru 20 incorporated by reference hereto but not limited thereto.

Thanking you in advance,

Mr. ROY L. PERRY-BEY
Diregtor of Civil Rights

MS. CHRISTINA D. PERRY BEY
Director of Youth Civil Rights

Enclosure:

cc:
NAACP
SCLC
Hon. Eric H. Holder Jr., U.S. Attorney General
Hon. Robert F. McDonnell, Governor of Virginia
Hon. President Barack Hussein Obama II
Hon. Barbara Arnwine, Executive Director Lawyers' Committee for Civil Rights Under Law
Hon. Mark R. Warner, U.S. Senator (D-Va.)
Hon. Jim Webb, U.S. Senator (D-Va.)
Hon. Ms. Regina V.K. Williams, City Manager

VSBE 005799

DEFENDANT-INTERVENORS TX 023 - Page 262

(b)(7)(C)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

3 1991

CLERK, U.S. D:.
NORFOLK, VA.

HERBERT M. COLLINS, et al.,

    Plaintiffs,

RECEIVED JAN - 7 1991

v.

CIVIL ACTION NO. 83-526-N

CITY OF NORFOLK, et al.,

    Defendants.

## ORDER

This day came the parties, by counsel, upon the mandate
of the United States Court of Appeals for the Fourth Circuit
effective November 2, 1990, reversing the judgment of this Court
and remanding for further proceedings consistent with the Court's
opinion of August 18, 1989. The Court of Appeals ruled that upon
remand this Court should afford the City of Norfolk ("the City")
a reasonable, specified time to prepare an election plan that
will remedy the vote dilution existing in the present plan and to
submit such plan for clearance under Section 5 of the Voting
Rights Act of 1965, and the Court has determined that the 1990
Census data should be available on or about January 31, 1991, for
use in devising a remedial plan and the regularly-scheduled city
council elections are not scheduled to be held until May, 1992.

Accordingly, it is hereby ORDERED as follows:

1.    Within sixty-five days after receipt of the 1990
Census for the City, the City Council of the City of Norfolk
shall duly adopt after opportunity for public comment a remedial
election plan and shall submit the same to the United States

VSBE 005800

(b)(7)(C)                                                                    P.6

JUL-19-2013 10:44A FROM:UFJ+CEJ

Department of Justice under Section 5 of the Voting Rights Act.
Defendants, through counsel, promptly shall advise counsel for
plaintiffs of the date of receipt of such Census data and shall
provide plaintiffs' counsel with a copy of such submission to the
Justice Department when made.

2.    If the Department of Justice preclears the City's
plan, defendants' counsel promptly shall so notify plaintiffs'
counsel and this Court and defendants shall formally submit the
plan for this Court's consideration. Whereupon, the Court will
set a hearing date to hear any objections from the plaintiffs
concerning the City's plan and to establish a timetable for the
plan's implementation.

3.    If the Department of Justice objects to the City's
plan, in whole or in part, the Court will set a hearing date to
consider proposed court-ordered single-member district plans for
the conduct of future city council elections. If such objections
are subsequently resolved and the plan, as amended, is
precleared, defendants may submit the City's plan as precleared
to the Court and such plan will be reviewed and considered by the
Court as a remedial legislative plan prior to implementation of
any proposed court ordered plan. Following adoption of a plan,
the Court will establish a timetable for implementation.

VSBE 005801

(b)(7)(C)

4.    Defendants are hereby enjoined from conducting
at-large elections for the city council under the present plan
under which all seven city council members are elected on an at-
large basis and from implementation of a new plan until approved
by this Court.

United States District Judge

Date:   Mar 3, 199

We ask for this:

Counsel for Defendants

Counsel for Plaintiffs

- 3 -

VSBE 005802

DEFENDANT-INTERVENORS TX 023 - Page 265

(b)(7)(C)                                    P.8

RECEIVED JUN 2 6 1991

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

HERBERT M. COLLINS, et al.,

         Plaintiffs,

v.                                        CIVIL ACTION NO. 83-526-N

CITY OF NORFOLK, et al.,

         Defendants.

## FINAL JUDGMENT ORDER

       This day came the plaintiffs and the defendants, by
counsel, to be heard upon the Petition for Approval of Remedial
Election Plan by the City of Norfolk, and was argued by counsel.

       The plan for the election of members to Norfolk City
Council as set forth in City Ordinance No. 36,374, adopted by
Norfolk City Council on March 26, 1991, having been submitted to
the United States Department of Justice, Civil Rights Division,
for pre-clearance under Section 5 of the Voting Rights Act, 42
U.S.C. § 1973c, pursuant to this Court's Order of January 3,
1991, and it appearing that such pre-clearance has been
accomplished as is evidenced by notification dated June 5, 1991,
and the Court having reviewed the plan and being of the opinion
that such plan is a proper remedial plan and noting that the
plaintiffs do not object to the implementation of this plan, it
is ORDERED that Ordinance No. 36,374 of Norfolk City Council is
hereby approved as a remedy under Section 2 of the Voting Rights

VSBE 005803

DEFENDANT-INTERVENORS TX 023 -- Page 266

(b)(7)(C)                                    P.9

Act, 42 U.S.C. § 1973, and shall be implemented at the next
regularly scheduled Norfolk City Council Election set for May 5,
1992.

        And it appearing that nothing further remains to be
done in this cause, the Clerk shall enter this order upon the
civil docket book as a Final Judgment Order and shall send a copy
to each counsel of record.

                                    _____
                                    United States District Judge

Date: June 24, 1991

We ask for this:

_____
Counsel for Defendants

_____
Counsel for Plaintiffs

- 2 -

VSBE 00580-4

**U.S. Department of Justice**

Civil Rights Division

*Office of the Assistant Attorney General*      *Washington, D.C. 20530*

**OCT 2 8 2009**

Mr. Roy L. Perry-Bey
United Front for Justice
(b)(7)(C)
Norfolk, Virginia 23505

Dear Mr. Perry-Bey:

    This responds to your letter, dated October 6, 2009, to the Attorney General regarding Act No. 893 of the 2005 Virginia General Assembly making certain changes in the method of election for the city council in Norfolk, Virginia. Thank you for bringing your concerns to our attention.

    On August 8, 2005, the Department of Justice interposed no objection to the voting changes occasioned by Act No. 893, at the conclusion of our administrative review under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. With respect to your concerns regarding preclearance of Act No. 893, the case law under Section 5 provides that we cannot now revisit this determination, and accordingly, there is no further remedy under Section 5.

    With respect to your concerns that Act No. 893 may violate legal requirements other than Section 5, we note that these issues have been raised in litigation in federal court in Virginia in *Collins v. City of Norfolk* (E.D. Va.), and *Perry-Bey v. City of Norfolk* (E.D. Va.). Because these matters are in litigation, it would not be appropriate for the Department of Justice to comment on the merits of these questions at this time.

    We hope this information is helpful. Please do not hesitate to contact the Department if we may be of assistance with this, or any other matter.

Sincerely,

Thomas E. Perez/gpe

Thomas E. Perez
Assistant Attorney General

VSBE 005805

DEFENDANT-INTERVENORS TX 023 - Page 268

JUL-19-2013 10:46A FROM:UFJ+CEJ | (b)(7)(C) | P.11

## COALITION FOR EQUAL JUSTICE

(b)(7)(C)

NORFOLK, VIRGINIA 23505
(b)(7)(C)

### HAND DELIVERED

01 JUL 23 AM 11: 09

CIVIL RIGHTS DIVISION
VOTING SECTION

July 23, 2001

William R. Yeomane
Acting Assistant Attorney General
Office of the Assistant Attorney General
Civil Rights Division
U. S. Department of Justice
Washington, D.C. 20035

Re: Violation of Voting Rights Act of 1965

Dear Mr. Yeomane:

This refers to Chapter 1 (2001 Special Session 1), which redistricts the Virginia House of Delegates, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. The Commonwealth of Virginia submission was received on May 2, 2001; supplemental information on June 4 and 7, 2001.

Our Coalition does object to the specified change. On the ground the General Assembly's adoption of the GOP's racially loaded redistricting plan was motivated primarily by a desire to effectively limit black congressional representation and dilute their voting strength. It would appear that the district lines could have been drawn more naturally to avoid the effect of adversely affecting the black voting base in violation of Section 5, the Federal preclearance requirement, of the Voting Rights Act of 1965, and the Fourteenth and Fifteenth Amendments.

Virginia has a history of voting rights discrimination, and must obtain pre-approval from the Justice Department before making changes to affected state laws. The officials clearly understand "there is a legal impediment" to the redistricting plans it seeks that needs to be done prior to the 2001 election cycle.

It is requested the Department strongly oppose certification of Virginia's redistricting scheme based on its significant racial ingredient and dilution effect. The department must act with urgency and make specific recommendations regarding state-wide redrawing of the district lines, this includes the City of Norfolk which should be consistent with the current ordered ward system creation of districts that should be as equal in population as possible. In order to avoid any possible dilution of minority voting strength by not unduly fragmenting or concentrating the minority population in the city and for the preservation of existing precinct lines

RECEIVED
JUL 23 2001
Review Committee for
VSBE 005806

DEFENDANT-INTERVENORS TX 023 - Page 269

(b)(7)(C)

P.12

JUL-19-2013 10:46A FROM:UFJ+CEJ

The ward system clearly is an effective remedy against such differential electoral impact, voting abuses and discrimination for which the City has a history. Moreover, under the previous apartheid citywide voting election system it enhanced the chances of electing white businessmen to office while eliminating blacks political will. And this would be one of the city's objectives among others to racially redraw its district lines.

Secondly, Mayor Fraim other white businessmen and politicians clearly, seek to turn the clock back on civil rights under a partisan political and racial effort to dilute the minority-majority voting base in hopes of abolishing the ward election system. Basically, because the City Attorney's office loss the legal battle to protect the long standing white run institution of at large elections.

Thirdly, City and State officials continue to use racial and political acts of discrimination against minorities in every respect, However blacks continue to register and vote in Virginia in spite of efforts to dilute its voting strength. While at least a large measure is disenfranchised form the voting rolls.

The fact is Virginia's deplorably history of voting and civil rights abuses against minority groups and women is basically, unchanged in large measure. The important question before the department now is whether officials have equitably redrawn the 3rd & 4TH district lines in racially divisive manner in violation of Section 5 of the Voting Rights Acts.

We look forward to a timely response from your office in the near future.


Sincerely,

*Mr. Roy L. Perry-Bey*

Mr. Roy L. Perry-Bey
Public Affairs Chief


cc: NAACP
    SCLC
    Legislative Black Caucus Members
    U.S. Rep. Robert C. Scott, 3rd District
    Francis S. Ferguson, Deputy Attorney General of Virginia
    Lawyers Committee for Civil Rights

JUL-19-2013 10:47A FROM:UFJ+CEJ    (b)(7)(C)                                    P.13

MR. ROY L. PERRY-BEY
(b)(7)(C)
NORFOLK, VIRGINIA 23523
(b)(7)(C)

March 26, 2008

Chuck Rosenberg,
United States Attorney
Justin W. Williams United States Attorney's Building
2100 Jamieson Ave
Alexandria, Virginia 22314
Tel: (703) 299-3700    Fax: (703) 299-3980

Re: *Disobeying a Court order enjoining at large elections*

Dear Mr. Rosenberg:

This is a formal complaint and request upon your office to launch a full investigation
into the official misconduct of Norfolk officials, specifically Mayor Paul D. Fraim and
City Attorney Bernard A. Pishko, for abuse of public office by reason their deliberately
implementing *an illegal at-large election for mayor scheme* as prohibited by the Voting
Rights Act of 1965-Prohibiting vote dilution and discrimination and for undermining
*Collins* 883 *F.2d 1232: 1989 U.S. App. LEXS 12398*, and rights secured by the Voting
Rights Act of 1965, as amended, 42 U.S. C.ξ 1973, and of the Fourteenth and Fifteenth
Amendments to the United States Constitution and laws. Further, it is requested that your
office notify and urge the Virginia State Bar to investigate the attorneys unethical
conduct and ask Congress to strip the Mayor and City Attorney's immunity so they can
face formal charges that they abused their power and public trust by ignoring a court
order enjoining at-large elections for the city council until approved by the United States
District Court. *See: Attached order/mandate for the injunction of at-large elections.*

Further, your office must take swift action to punish the mayor and city attorney for their
direct and indirect contempt for disobeying an order of injunction to enforce obedience to
the order, and to vindicate the honor and dignity of the U.S. District Court and to compel
respect for its authority.

Thank you,
Mr. Roy L. Perry-Bey
Ms. Christina Perry Bey

cc: NAACP
    Lawyers Committee for Civil Rights Under Law
    Michael B. Mukasey, Attorney General U.S. Department of Justice
    United States Court of Appeals for the Fourth Circuit

VSBE 005808

DEFENDANT-INTERVENORS TX 023 - Page 271

JUL-19-2013 10:47A FROM:UFJ+CEJ            (b)(7)(C)                              P.14

# UNITED FRONT FOR JUSTICE
(b)(7)(C)

NORFOLK, VIRGINIA 23505
(b)(7)(C)

March 5, 2010

**Neil H. MacBride,**
**Attorney General**
U.S. Department of Justice
Justin W. Williams United States Attorney's Building
2100 Jamieson Ave
Alexandria, VA 22314
Tel: (703) 299-3700 Fax: (703)299-2584

**Eric H. Holder, Jr.,**
**Attorney General**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
**Tel: (202) 514-2001**

### Re: Violation of Voting Rights Act/*Gingles, mandate enjoining at large elections*

Dear Mr. MacBride & Mr. Holder, Jr:

This is a formal complaint and request upon your offices to launch a full scale
investigation into City of Norfolk officials and private attorneys, specifically Mayor Paul
D. Fraim, City Attorney Bernard A. Pishko, City Attorney Melvin Wayne Ringer,
Councilman Donald L. Williams, Paul W. Jacobs, II (VSB 16815), R. Harvey Chappell,
Jr. (VSB 05322), for engaging in possible unethical conduct and conspiracy to violate
minorities voting rights and the voting rights act and abuse of public office, trust by
reason of implementing *an illegal at-large election for mayor scheme* as prohibited by
*Gingles*, and the Voting Rights Act of 1965 as amended, 42 U.S. C.ξ 1973, prohibiting
vote dilution and discrimination and *Collins* **883** *F.2d 1232: 1989 U.S. App. LEXS*
*12398 a*nd laws.

Further, it is requested that your office ask Congress to strip the aforementioned officials
and Attorneys' immunity so they can face formal charges that they abused their power
and public trust by circumventing U.S. District Court thus ignoring a U.S. Supreme Court
mandate, *Gingles* enjoining at-large elections for the Norfolk City Council. *See attached*
*order/mandate prohibiting at-large elections.*

**VSBE 005809**

**DEFENDANT-INTERVENORS TX 023 - Page 272**

(b)(7)(C)                                    P.15

Further, your offices must take swift action to punish the mayor and attorneys for
deliberately, circumventing the *Collins,* mandate to enforce obedience of the law, and to
vindicate the honor and dignity of the U.S. District Court and to compel respect for its
authority.

Thank you,

Mr. Roy L. Perry-Bey

cc: NAACP
    Lawyers Committee for Civil Rights Under Law
    SCLC
    ACLU
    Senator James Webb
    President Barack Obama
    Senator Mark R. Warner
    Alfred Charles Sharpton, Jr.
    Senator Yvonne B. Miller
    Senator Louise L. Lucas
    Kenneth T. Cuccinelli II, Attorney General of Virginia

VSBE 005810

DEFENDANT-INTERVENORS TX 023 - Page 273

(b)(7)(C)

MR. ROY L. PERRY-BEY
(b)(7)(C)
NORFOLK VIRGINIA 23523
(b)(7)(C)

April 4, 2008

Hon: John Warner, (R)
225 Russell Building
Washington, D.C. 20510
Tel: (202) 224-2023
Fax: (202) 224-6295

### Re: City of Norfolk Disobeying a Court order enjoining at large elections

Dear Mr. Warner:

This is a formal complaint and request upon your office to make contact on our behalf
with the FBI and other appropriate agencies to launch a full scale investigation into the
possible official misconduct of Norfolk officials, specifically it appears Mayor Paul D.
Fraim and City Attorney Bernard A. Pishko, abuse their public office by reason of
deliberately enforcing *an illegal at-large election for mayor scheme* for political gain
in violation of the Voting Rights Act of 1965-which prohibits vote dilution and
discrimination and *Collins* 883 *F.2d 1232: 1989 U.S. App. LEXS 12398*, and rights
secured by the Fourteenth and Fifteenth Amendments to the United States Constitution
and laws. Further, it is requested that your office ask Congress upon a finding of official
wrong doing to strip the Mayor and City Attorney's immunity so they can face formal
charges that they abused their power and public trust by ignoring a court order enjoining
at-large elections for the city council until approved by the United States District Court.
*See Court Order in Support.*

Further, your office must make it clear to the FBI it must take swift action to investigate
and punish the mayor, city attorney and others involved operating above the law for their
direct and indirect contempt for disobeying an order of injunction to enforce obedience to
the order, and to vindicate the honor and dignity of the U.S. District Court and to compel
respect for its authority.

Thank you,

Mr. Roy L. Perry-Bey
Ms. Christina Perry-Bey

cc: NAACP
    Lawyers Committee for Civil Rights Under Law
    Michael B. Mukasey, Attorney General U.S. Department of Justice

VSBE 005811



MR. ROY L. PERRY-BEY
(b)(7)(C)
NORFOLK, VIRGINIA 23523
(b)(7)(C)

April 4, 2008

Hon: Del. Kenneth R. Melvin, (D)
801 Water Street, Suit 300
Portsmouth, VA 23704
Tel: (804) 698-1080

### Re: **City of Norfolk Disobeying a Court order enjoining at large elections**

Dear Mr. Melvin:

This is a formal complaint and request upon your office to make contact on our behalf
with the FBI and other appropriate agencies to launch a full scale investigation into the
possible official misconduct of Norfolk officials, specifically it appears Mayor Paul D.
Fraim and City Attorney Bernard A. Pishko, abuse their public office by reason of
deliberately enforcing *an illegal at-large election for mayor scheme* for political gain
in violation of the Voting Rights Act of 1965-which prohibits vote dilution and
discrimination and *Collins* **883** *F.2d 1232: 1989 U.S. App. LEXS 12398,* and rights
secured by the Fourteenth and Fifteenth Amendments to the United States Constitution
and laws. Further, it is requested that your office ask Congress upon a finding of official
wrong doing to strip the Mayor and City Attorney's immunity so they can face formal
charges that they abused their power and public trust by ignoring a court order enjoining
at-large elections for the city council until approved by the United States District Court.
***See Court Order in Support.***

Further, your office must make it clear to the FBI it must take swift action to investigate
and punish the mayor, city attorney and others involved operating above the law for their
direct and indirect contempt for disobeying an order of injunction to enforce obedience to
the order, and to vindicate the honor and dignity of the U.S. District Court and to compel
respect for its authority.

Thank you,

Mr. Roy L. Perry-Bey

Ms. Christina Perry-Bey

cc: NAACP
    Lawyers Committee for Civil Rights Under Law
    Michael B. Mukasey, Attorney General U.S. Department of Justice

JUL-19-2013 10:48A FROM:UFJ+CEJ     (b)(7)(C)     P.18

# UNITED FRONT FOR JUSTICE
(b)(7)(C)

NORFOLK VA 22505

(b)(7)(C)

March 12, 2010

President Barack Hussein Obama II
The White House
1600 Pennsylvania Ave NW
Washington, DC 20500

Re: *City of Norfolk, Illegal at Large Elections*

Dear Mr. President:

There is substantial reason to believe that the City of Norfolk, participated in efforts that violated non-white minorities voting rights and Section 2 of the Voting Rights Act of 1965 and the Fourteenth and Fifteenth Amendments, as result of their enforcing at large elections, enjoined in *Thornburg v. Gingles*, **478 U.S. 30 106 S. Ct. at 2752 (1986)**, and *Collins v. City of Norfolk* **883 F.2d 1232 (4th Cir. 1989)**, which the U.S. Supreme Court in *Gingles*, mandate upon the U.S. Fourth Circuit Court of Appeals ordered the United States District Court for the Eastern District of Virginia to enjoin at-large elections for city council on January 3, 1991.

The Court ordered ward voting system is an effective legal remedy against discrimination and vote dilution against minorities. The City's implementation of the current illegal at large election system offends the Collin's mandate, a barrier against vote dilution, voting abuses, abuse of power and discrimination for which the city has a 287 year history.

Mr. President, the conduct complained of referenced above legally offends the Ethics of open, transparent, and accountable government, and compel your hand to order U.S. marshals to enforce the rule of law in the Commonwealth of Virginia.

Thanking you in advance,

Mr. Roy L. Perry-Bey
Director of Civil Rights

cc: NAACP
    U.S. Fourth Circuit Court of Appeals
    General Assembly of Virginia
    Barbara R. Arnwine, Lawyers Committee for Civil Rights
    Kenneth T. Cuccinelli II, Attorney General of Virginia
    Bob McDonnell, Governor of Virginia
    U.S. House of Representatives Committee on the Judiciary

VSBE 005813

DEFENDANT-INTERVENORS TX 023 -- Page 276

JUL-19-2013 10:49A FROM:UFJ+CEJ  (b)(7)(C)  P.19

UNITED FRONT FOR JUSTICE
(b)(7)(C)
NORFOLK, VIRGINIA 23505
(b)(7)(C)

April 12, 2010

Eric H. Holder, Jr.,
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
Tel: (202) 514-2001

Re: Violation of Voting Rights Act

Dear Mr. Holder, Jr:

This responds to your April 1, 2010 letter regarding our renewed request upon your office to launch a full scale investigation into possible violation of the Voting Rights Act, and the Department's improper review under Section 5 of the Voting Rights Act 42 U.S.C. 1973 c, that interposed no objection to the voting changes occasioned by Act N0. 893.

The preclearance of Act N0. 893 improperly allowed the City of Norfolk based on cooked incomplete submissions to increase the number of city council members from seven to eight, with the eighth seat being that of the mayor, who would be elected at large. That represents 5-3 white majority 17 years after *Collins.*

The Department preclearance of at large elections constitutes a total disregard of *Collins 883 F.2d 1232: 1989 U.S. App. LEXS 12398 a*nd the fact the City's incapable of fulfilling their constitutional and statutory obligation to respect the Voting Rights Act.

In other words, Department officials' approval was without any meaningful evaluation of the 1991 federal court order that make it clear Norfolk is prohibited from electing its council using the at large system and to adopt wards for "[a]ll future candidates to compete, Collins v. City of Norfolk v. Virginia, 883 F.2d 1232, 1235 (4th Cir. 1989).

The approval of adding an additional at large city council seat in clear violation of federal law and the Voting Rights Act, the fact a pending case involving possible violation of Section 2 of the Voting Rights Act, is still in litigation of which I'm not a plaintiff simply does not establish a basis upon your office to forgo discharging the duties entrusted you.

VSBE 005814

(b)(7)(C) P.20

Therefore, as we have clearly demonstrated violations of Federal law and the fact Bush's DOJ approved it demands redress and swift prosecution of DOJ Attorneys, City of Norfolk officials and others in concert with them without any further delay.

We have advised President Obama of this urgent matter and the fact DOJ must take immediate action and make it clear federal, state and local officials are not above the law.

Thanking you in advance,

Mr. Roy L. Perry-Bey

cc: NAACP
    Lawyers Committee for Civil Rights Under Law
    SCLC
    Congressman Bobby Scott
    Senator James Webb
    Senator Mark R. Warner
    Alfred Charles Sharpton, Jr.
    Jessie Jackson
    President Barack Obama
    Dr. Milton Reid
    Bishop Samuel L. Green, C.O.G.I.C
    Barbara Arnwine, Lawyers Committee for Civil Rights
    U.S. Congress

VSBE 005315

DEFENDANT-INTERVENORS TX 023 - Page 278

(b)(7)(C) P.21

## UNITED FRONT FOR JUSTICE
(b)(7)(C)
NORFOLK VA 23506

(b)(7)(C)

October 6, 2009

Hon: Mr. Eric Holder
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Re: *City of Norfolk, Illegal Direct Election of Mayor*

Dear Mr. Holder:

This refers to Chapter 893 (2005 Special Session), An Act to amend and reenact the City of Norfolk Charter and composition of council for mayor elected at-large on or after July 1, 2006.

We are renewing our request for an investigation in the Justice Department's Voting Section, NWB and City of Norfolk because of our objection to the specified illegal charter change and justice department's pre-clearance of the City of Norfolk under the Voting Rights Act, allowing for at-large elections of mayor, as contrary and offends both *Thornburg v. Gingles, 478 U.S. 30 (1986), Collins v. City of Norfolk 883 F.2d 1232: 1989 U.S. App. LEXS 12398,* which the *U.S. Supreme Court directed the U.S. Fourth Circuit Court of Appeals to order the United States District Court to enjoin at-large elections for Norfolk City Council.*

The city attorneys, mayor and members of council openly sought for an improper purpose approval for direct election of mayor without the Court's approval, while having a legal duty, *done with full knowledge of their legal responsibility to move the U.S. District Court to review the Collins mandate as ordered by the Supreme Court of Virginia was un-Ethical to enforce at-large elections and possibly boarders on the criminal if not criminal.*

The officials circumventing the Court to prevent presenting sufficient evidence to the U.S. District Court showing at-large elections in the City of Norfolk would not dilute The minority voting power is evident. City officials' deliberately deceived the public into believing the General Assembly and Department of Justice's improper approval would settle its legal obligation to overcome the Court's mandate. Basically, In addition City officials would have to admit that its four at-large constitutional office holders are all white consistent with it's history of discrimination under an at-large elections system.

VSBE 005816

(b)(7)(C)     P.22

Such evidence among others clearly establishes the fact it continues to discriminate and dilute the minority communities voting strength would not support overcoming the mandate.

The city's discriminatory history against minorities is reflective in the fact that well-over 287 years non-whites have not held the office of mayor reserved for white males only. Moreover, reluctant or otherwise it is requested the Department of Justice launch a full-scale investigation and rescind its approval allowing for at-large elections in conflict with the voting rights act, and *Collins v. City of Norfolk, supra:* In the above referenced matter.

It should be noted the ward system clearly is an effective remedy against such dilution electoral impact, voting abuses, abuse of power and discrimination for which the city has a long history. Moreover, under the previous apartheid at-large elections system it only enhanced the chances of electing rich white businesspersons to city council and in particular the office of mayor as Attorney Paul Fraim, while eliminating the minority voting power and political will.

***Secondly, Mayor Fraim and other white businessmen and politicians, have clearly sought to increase whites voting power on city council with the direct mayor scheme from 4-3 to 5-3,*** in their continued efforts to turn the clock back on civil rights under an at-large racial mayor system disguised as giving citizens a greater voice in their government for the purpose of undermining and dismantling the ward system. It should be noted the city loss the legal battle to protect the long-standing white run institution of at large elections. *See: Collins v. City of Norfolk, supra:*

Thanking you in advance,

Mr. Roy L. Perry-Bey
Civil Rights Activist

c.c. NAACP
    SCLC
    Legislative Black Caucus of Virginia
    U.S. Rep. Robert C. Scott, 3rd District
    Barbara R. Arnwine, Lawyers Committee for Civil Rights
    Bob McDonnell, Attorney General of Virginia
    Timothy M. Kaine, Governor of Virginia
    U.S. House of Representatives Committee on the Judiciary

VSBE 005817

(b)(7)(C)

P.23



**U.S. Department of Justice**

Civil Rights Division

JKT:MSR:TLS:jdh
DJ 166-012-3
2005-1365

*Voting Section - NWB.*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

August 8, 2005

Paul W. Jacobs II, Esq.
Christian Barton
909 East Main Street, Suite 1200
Richmond, Virginia 22319-3095

This refers to Act No. 893 (2005) of the 2005 Virginia General Assembly, which provides for an increase in the number of members on the Norfolk City Council from seven to eight, with the additional member, who will be elected on an at-large basis to be designated as the mayor, submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c. We received your response to our June 7, 2005, request for additional information on June 22 and 23, 2005.

The Attorney General does not interpose any objection to the specified changes. However, we note that Section 5 expressly provides that the failure of the Attorney General to object does not bar subsequent litigation to enjoin the enforcement of the changes. See Procedures for the Administration of Section 5 of the Voting Rights Act (28 C.F.R. 51.41).

Sincerely,

John Tanner

Chief, Voting Section

VSBE 005818

**DEFENDANT-INTERVENORS TX 023 - Page 281**

JUL-19-2013 10:52A FROM:UFJ+CEJ    (b)(7)(C)    P.24

**MR. ROY L. PERRY-BEY**
(b)(7)(C)
**NORFOLK, VIRGINIA 23523**
(b)(7)(C)

March 11, 2008

**Hon. Robert C. Scott, (D) 3ʳᵈ**
1201 Longworth HOB
Washington, DC 20515
(202) 225-8351 Phone
(202) 225-8354 Fax

#### Re: *City of Norfolk, Direct Election of Mayor*

Dear Mr. Conyers:

Please be advised this is an official complaint against the City of Norfolk, Mayor, the City Attorney and members of council and request upon your office to urge the U.S. House of Representatives Committee on the Judiciary to launch a full scale investigation into possible violations of the Voting Rights Act, including but not limited thereto; the legality and purity in the election process and laws by City, State and Federal officials. This petition is made on the following ground that the 4th Circuit Court of Appeals ordered the United States District Court to enjoin at-large elections for city council known at all times to City, State and Federal Officials.

The evidence is overwhelming the direct election of Mayor in the City of Norfolk was deliberate and known would violate *Collins 883 F.2d 1232: 1989 U.S. App. LEXS 12398, and Section 2 of the Voting Rights Act of 1965, as amended in §1982, 42 U.S.C. §1973 and 42 U.S.C. §1983.*

It is further requested the Committee on the Judiciary issue an order directing the States Attorney General and Board of Election to suspend at-large elections of Mayor pending a final determination into possible political corruption and other election related crimes and violations against the citizens, peace and dignity of the State are resolved. It is well settled law the Justice Department neither Virginia General Assembly officials have the legal authority to dissolve an *injunction*, as officials have perpetrated because such matters as you know are reserved only for the Courts as result of our Government's separation of powers under the U.S. Constitution and of the Commonwealth of Virginia and laws.

Thanking you in advance,

Mr. Roy L. Perry-Bey
Ms. Christina D. Perry-Bey

VSBE 005819

DEFENDANT-INTERVENORS TX 023 - Page 282

JUL-19-2013 10:52A FROM:UFJ+CEJ     (b)(7)(C)     P.25

# UNITED FRONT FOR JUSTICE

**Contact:** Mr. Roy L. Perry-Bey          **FOR IMMEDIATE RELEASE**
Director of Civil Rights
Tel: 804 972-3776

## Coalition Say City of Norfolk At Large Elections Exceed Existing Law

NORFOLK, VA-US District Court Judge Mark Davis, has not issued a final order dismissing at large case challenging, the legality of Norfolk's direct election of mayor as reported by the Virginia Pilot.

Coalition members are seeking Washington's intervention because of possible violation of the Voting Rights Act, and the District Court's failure to rule on the merits of the case and has used common law tactics in an attempt to dismiss the voting rights case due to Plaintiffs' refusal to change their claim the City violated *Gingles,* mandate upon *Collins,* enjoining at large city council elections, yet in the instant case *Perry-Bey v. City of Norfolk,* has seen more than 4 judges in two years.

The city according to the group in securing the charter change allowing at large elections by the General Assembly, Justice Department preclearance under Section 5 of the Voting Rights Act, and Attorney Generals refusal to file an objection to the voting election change, does not over-ride the US Supreme Court's ruling.

Attorneys for the city Paul Jacobs, admitted in a letter to the City Attorney Bernard A. Pishko in 2002, quoted in the Virginia Pilot, that justice official would not approve the change due to vote dilution, and Councilman Randy Wright, stated the city could get the Bush's justice departments approval, because the department does not care about civil rights.

VSBE 005820

**DEFENDANT-INTERVENORS TX 023 - Page 283**

In their cooked justice submissions to the voting rights section the city quoted Councilman Paul Riddick, as not concerned about minorities losing their voting power but omitted Jacobs' professional recommendations that minorities would suffer under at large elections.

The city attorney has refused to inform the public and media it has no legal authority to supersede the US Supreme Court laws, and he will not without possible disbarment, Judge Davis, legal option the city did not violate Collins, ruling constitute a total disregard and disrespect of the law; that will be overturned.

City officials have enjoyed their will of media containment of their unlawful conduct, according to members but it will see the light of day, once the national media and justice officials' figures it.

Coalition members are seeking both federal and state investigations from the US Attorney General's office for possible conspiracy to violate the Voting Rights Act, and the Commonwealth's attorney's office, into councilman Barclay C. Winn, Winn Nursery and Conrad Brothers, for possible unethical conduct and violation of the state Conflicts of Interest Act; for filing a bid without approval from council and accepting $254,292 landscaping work at Town Point Park a city facility which in affect violated the state Conflict of Interest Act and laws.

Mr. Perry-Bey, said city officials as some legislators believe the Voting Rights Act, and the Civil Rights Act, infringes on State Sovereignty, a belief he cited as widely held by segregationist. The city's illegal at large elections exceed the limits of law pure and simple.

UFJ
(b)(7)(C)

VSBE 005821

DEFENDANT-INTERVENORS TX 023 -- Page 284

JUL-19-2013 10:53A FROM:UFJ+CEJ     (b)(7)(C)     P.27



**U.S. Departme~~nt~~ of Justice**

Civil Rights Division

RJW:MSR:CWS:maf
DJ 166-012-3
2005-1365

*Voting Section - NWB.*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530*

June 7, 2005

Paul W. Jacobs II, Esq.
Christian Barton
909 East Main Street, Suite 1200
Richmond, Virginia  23219-3095

Dear Mr. Jacobs:

This refers to the changes in the number of officials and
the method of selection of mayor for the City of Norfolk,
Virginia, submitted to the Attorney General pursuant to Section 5
of the Voting Rights Act, 42 U.S.C. 1973c.  We received your
submission on April 13, 2005.

Our analysis indicates that the information sent is
insufficient to enable us to determine that the proposed changes
do not have the purpose and will not have the effect of denying
or abridging the right to vote on account of race, color, or
membership in a language minority group, as required under
Section 5.  The following information is necessary so that we may
complete our review of your submission:

1.  The basis for the city's conclusion that the increase in
the council size resulting from the creation of a mayoral
position to be elected on an at-large basis, will not result in a
retrogression in African American voting strength.  In this
regard, please provide any statistical analyses or other
information, not previously provided, concerning the ability of
African American voters within the city to elect candidates of
choice at large.

2.  It is our understanding that the city considered other
methods of implementing the results of the referendum requiring
the direct election of the mayor, such as alternative
configurations of districts, or electoral structures. In that
regard, please:

(b)(7)(C)  P.28

-2-

(a) Identify the criteria, policies, and procedures used to develop the proposed method of election and the extent to which these were publicized;

(b) Identify all such alternatives (whether formal or informal proposals) that were prepared by the council or by other persons and presented to the council;

(c) For each alternative, identified above, that the council chose not to adopt, provide a copy of the plan or structure, including maps and any relevant demographic data; and

(d) Set forth the basis for the city's determination that the adopted plan better satisfied its criteria than any other alternative.

The Attorney General has sixty days to consider a completed submission pursuant to Section 5. This sixty-day review period will begin when we receive the information specified above. See the Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. 51.37. However, if no response is received within sixty days of this request, the Attorney General may object to the proposed changes consistent with the burden of proof placed upon the submitting authority. 28 C.F.R. 51.40 and 51.52(a) and (c). Changes which affect voting are legally unenforceable unless Section 5 preclearance has been obtained. Clark v. Roemer, 500 U.S. 646 (1991); 28 C.F.R. 51.10. Therefore, please inform us of the action the City of Norfolk plans to take to comply with this request.

If you have any questions concerning this letter or if we can assist you in obtaining the requested information, you should call Ms. Cheryl White-Sewell (202-307-0791) of our staff. Refer to File No. 2005-1365 in any response to this letter so that your correspondence will be channeled properly.

Sincerely,

Rebecca J. Wertz
Acting Chief, Voting Section

JUL-19-2013 10:54A FROM:UFJ+CEJ                    (b)(7)(C)                                      P.29



CHRISTIAN | BARTON, LLP

*Attorneys At Law*
Direct Dial: (804) 697-4110
Fax: 804-697-6110
E-mail: pjacobs@cblaw.com

SECTION 5 SUBMISSION

NO. 2005-1365

2005 JUN 23 PM 1: 05

CIVIL RIGHTS DIVISION
VOTING SECTION

June 22, 2005

## VIA TELEFAX and OVERNIGHT MAIL

Ms. Rebecca J. Wertz
Acting Chief, Voting Section
Civil Rights Division
Department of Justice
1800 G Street, N.W.
Room 7254-NWB
Washington, D.C. 20006

> Re: **Submission under Section 5 of the Voting Rights Act by**
> **the City of Norfolk, Virginia**
> **Your File No. 2005-1365**

Dear Ms. Wertz:

Thank you for your letter of June 7, 2005, and the opportunity to expand upon the material furnished in the City of Norfolk's Submission of April 13, 2005, for preclearance of its plan for the direct election of the Mayor (the "Submission").

We address below the specific inquiries raised in your letter.

**Inquiry 1: "The basis for the city's conclusion that the increase in the council size resulting from the creation of a mayoral position to be elected on an at-large basis, will not result in retrogression in African-American voting strength. In this regard, please provide any statistical analyses or other information, not previously provided, concerning the ability of African American voters within the city to elect candidates of choice at large."**

We believe that the retrogression inquiry may be viewed from two perspectives. First, the ability of the African-American community in Norfolk to maintain at least a 42.8% representation on City Council (3 of 7) with the increase in Council membership by one, and second, the ability of the African-American community to be no worse off than currently with respect to the selection of the Mayor. We address the issue of retrogression from both of these perspectives below.

As to Council expansion, we noted in our Submission that the proposed plan will not change the existing ward lines, and, therefore, the three existing African-American controlled seats will still be in place and would be expected to elect African-American candidates of choice. With the addition of one seat, we recognize that if the African-American community cannot realistically win that seat then the percentage of those on the Council who are African-American

909 East Main Street, Suite 1200 | Richmond, Virginia 23219-3095
804.697.4100 tel | 804.697.4112 fax

VSBE 005824

**DEFENDANT-INTERVENORS TX 023 - Page 287**

(b)(7)(C)

P.30

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 2

candidates of choice would be 37.5%, but if it does win, then it will have improved its relative position by holding 50% of the seats. The question then is whether the African-American community has an equal **opportunity** to elect a representative to the one at-large seat.

The answer is absolutely yes. You will note from pages 13 and 14 of the Submission and the attached data that we pointed out two examples where, in City-wide voting, African-American candidates out polled white candidates by wide margins in head-to-head elections.[1] Material which was not included with the initial Submission and which lends additional strong support to the proposition that African-American candidates can win in an at-large environment is found in City Council elections pre-dating the ward system when the seven members ran at-large in staggered elections[2] as well as in other City-wide voting contests as recently as this month. Attached as Exhibit A are the election results for contests described below.[3]

As shown in Exhibit A, in 1968, Joseph Jordan, an African-American candidate, won one of three seats out a field of eight, defeating a white incumbent. He came in second in total votes cast. He won re-election in 1972 with the third highest vote total out of a field of twelve, again outpolling a white incumbent. In 1976, he won re-election receiving more votes than nine white candidates, including two white incumbents.

---

[1] We also presented data in Exhibit 12 but did not note in the text that in specific City Council elections for ward seats, there have been African-American and white candidates running for the same seat, and the African-American candidate prevailed. In that regard, we would point to the four elections 1992 and 1994 elections in Wards 3 and 4 where African-American candidates prevailed over white opponents. Frankly, however, we do not view these elections as greatly informing the analysis because they occurred in majority African-American wards where a win by an African-American candidate would be anticipated.

[2] The City recognizes that the City Council elections conducted during the pre-ward era were under an election scheme that ultimately was found in violation of Section 2 of the Voting Rights Act. The fact remains, however, that even under the pre-ward, at-large system, African-American candidates were able to defeat white incumbents and garner a majority of votes City-wide to win election. The principal flaw with the system, according to the U.S. Court of Appeals for the Fourth Circuit, was that once white candidates who had received majority black support were discounted, the African-American community did not win a second seat on City Council between 1970 and 1982. *See Collins v. City of Norfolk*, 883 F. 2d 1232 (4th Cir. 1989). While the Justice Department as Amicus Curiae before the United States Supreme Court did not believe that the "flaws" it recognized in the Court of Appeal's decision were of sufficient magnitude to warrant reversal, its brief written in May 1990, noted two points which make these contests relevant fifteen years later. First, it noted that "[d]espite racially polarized voting patterns, black voters in Norfolk have repeatedly elected at least one representative of their choice to the City's seven-member Council." Second, "black voters have now elected and reelected two black representatives through three successive elections [four counting the 1990 election], suggest[ing] that a more permanent shift in the political climate may be at work." *See* Brief for the United States as Amicus Curiae, No. 89-989, pp. 7, 16. That prediction of a permanent political shift is borne out by the many other election results disclosed as well as the continued growth in the proportion of African-Americans in Norfolk's voting age population.

[3] Results are subdivided by year as noted on the tabs. The label "B" denotes African-American candidates. Brackets have been placed around the names of incumbents.

(b)(7)(C) P.31

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 3

In 1978, Reverend Joseph Green, an African-American candidate won one of four City Council seats, coming in second in vote count and out polling nine white candidates, including three white incumbents. In 1982, Reverend Green was the highest ranking candidate in a field of 14, again outpolling three white incumbents. In both 1978 and 1982, Reverend Green received more than 50% of the total votes cast in the City. In 1986, Reverend Green was ranked second for four seats among ten candidates, ahead of seven white candidates and receiving 49.5% of the overall vote.

In 1984, John Foster, an African-American candidate, won one of three seats to Norfolk City Council out of a field of ten and received 50% of the votes cast. In 1988, he was the first ranked candidate out of a field of nine with 68% of the voters supporting his re-election. He outpolled two white incumbents.

In 1990, in the last at-large City Council election before the change to the ward system, Joseph Green came in second for four seats out of a field of fourteen candidates. Notwithstanding the large field, he received 64% of the ballots cast City-wide.

While by the very nature of the at-large system, these were not head-to-head contests, the nine City Council elections described above present clear evidence that even with heavily white populations, African-American candidates possessed an ability to defeat white candidates in Norfolk, and indeed, win decisively with a majority of votes cast in fields with more than a dozen candidates. White voters demonstrated a willingness to vote in sufficient numbers to allow African-American candidates to be elected decisively.

During that same time period there were other City-wide elections for other offices in which African-American candidates vied against white candidates and won, bearing out the analytical relevance of the foregoing election results to the present inquiry. In the 1981 election for the office of Sheriff, African-American candidate David Mapp defeated three other opponents, all of whom were white. This was not simply a matter of splitting the white vote as Mr. Mapp received 52% of the vote. In 1989, African-American L. Douglas Wilder carried the City of Norfolk in the race for Governor by 64% of the votes cast over his white opponent, Marshall Coleman. Wilder's success in Norfolk was 14 percentage points higher than he obtained in the state as a whole. In his previous candidacy for Lieutenant Governor in 1985, Mr. Wilder carried Norfolk by 66% over his white opponent John Chichester.

These accomplishments need to be put in their demographic and electoral context. According to U.S. Census data, in 1970, African-Americans were only 24.07% of the voting age population and 28.3% of the total population in the City of Norfolk. In 1980, African-Americans were 31.48% of the voting age population and 35.2% of the total population. In 1990, African-Americans were 35.8% of the voting age population and 39% of the total population. What is obvious is that without strong white cross-over voting, these victories could not have occurred, yet they did, repeatedly. The success of these African-American candidates cannot be explained simply by the size of the field and the split of white votes since the totals received by these

VSBE 005826

JUL-19-2013 10:55A FROM:UFJ+CEJ                    (b)(7)(C)                                          P.32

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 4

candidates were far in excess of what would be expected in an evenly divided electorate with the African-American winner receiving a majority of total votes in six of the multi-candidate fields cited.

The growth in the African-American population since these electoral successes has brought about a decrease in the dependency of the African-American community on white cross-over votes to achieve victory at the polls. Obtaining more than half the votes in an election for Mayor in 2006 with 46% of the voting age population will be significantly easier for the African-American community than it was in 1980 when the African American community comprised a mere 31.48% of the voting age population. In sum, the three straight decades of African-American growth in Norfolk as a percentage of the City's population and electorate make it clear that black voters have an equal opportunity to participate effectively in the election of the Mayor. More recent electoral victories lend further support.

In 2001, Jerrauld Jones, an African-American, ran in the Democratic Primary for statewide office against two white opponents. While he lost state wide, Jones carried the City of Norfolk with 69% of the vote. Not simply splitting the white vote, Mr. Jones won more than twice as many votes as his two white opponents combined. Moreover, both of his opponents had significant name recognition with one being the Mayor of Richmond and the other being a member of the House of Delegates from nearby Newport News. In that same 2001 primary, African-American Donald McEachin defeated three white candidates for Attorney General with 42% of the votes. The next highest percentage was 24%.[4] Most recently, in the June 14, 2005, Democratic Party primary for Lieutenant Governor, African-American candidate Viola Baskerville won a four way race among Norfolk voters but came in second state-wide.[5]

When these fifteen electoral races are considered in combination with the previous information furnished, there is no doubt that African-American candidates, not only in theory, but in practice can have City-wide appeal in Norfolk and prevail in a City-wide contest. Given these results, African-American voters certainly have an equal opportunity to elect their choice for the eighth counsel seat in the 2006 election and thereafter.

As we noted above, we also view the retrogression analysis from another standpoint, namely, whether there is a reduction of the chances to select the candidate of choice for Mayor. As it stands now, there has never been an African-American Mayor in Norfolk, and, hence, the plan cannot under any circumstances be considered retrogressive in the sense of making that

---

[4] As we pointed out in the Submission, in the November 2001 election for Attorney General, Mr. McEachin won 54% of the Norfolk electorate's votes to Mr. Kilgore's 46% even though Mr. Kilgore won 60% of the state-wide vote.

[5] While the 2005 primary for the first time limited voters to selection of candidates for one party only and, thus, these results only included those persons who asked for a Democratic ballot, there were almost twice as many persons voting in the Democratic Primary than in the Republican Primary and as previous partisan election results attest, most voters in Norfolk tend to vote for the Democratic candidate.

VSBE 005827

(b)(7)(C)

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 5

situation worse. Put another way, the current system for selection of Mayor has the mathematical potential to allow the four white members of Council to consistently out vote the three African-American members, if they decided to act in that manner, and there would never be an African-American Mayor until African-American members of Council constituted a majority. If you assumed extreme racial polarization in voting by Council members, (an assumption we believe is not warranted), one might argue that the current benchmark chance of African-Americans selecting a Mayor would be at zero percent. While the African-American members of Council have generally supported the members selected as Mayor,[6] that does not mean that the voters would necessarily have selected the same individuals. We believe that by putting the direct election of the Mayor in the hands of the voters, and with close to half of the City's voting age population being African-American when the 2006 elections are held, *there is a significant enhancement in the opportunity for the African-American community to express its choice and elect a mayoral candidate*.

**Inquiry 2: "It is our understanding that the City considered other methods of implementing the results of the referendum requiring the direct election of the mayor, such as alternative configurations of districts, or electoral structures. In that regard:
(a) Identify the criteria, policies, and procedures used to develop the proposed method of election and the extent to which these were publicized;
(b) Identify all such alternatives (whether formal or informal proposals) that were prepared by the Council or by other persons and presented to the Council;
(c) For each alternative, identified above, that the Council chose not to adopt, provide a copy of the plan or structure, including maps and any relevant demographic data; and
(d) Set forth the basis for the city's determination that the adopted plan better satisfied its criteria than any other alternative."**

Norfolk City Council did not adopt any formal written criteria specifically for this electoral change by which it judged the plan which was adopted. Members of City Council expressed various points of view during the consideration process as reflected in the press reports attached to the Submission at Tab 13, but none could be viewed as an over arching criterion except ultimately to adopt a plan now that could be implemented in 2006, rather than wait until after the results of the next Census. The plan that was adopted kept the existing ward plan intact; any other plan would have required revisions to the ward lines which in turn would require reliance on stale Census data. If any criterion might be viewed as driving the plan selection it would be the desire to implement promptly the referendum results while doing as little violence as possible to the existing system.

The Council did have before it, however, a number of considerations that had been developed through the procedures used to reach the final plan adoption. These procedures

---

[6] In the last four elections of the Mayor by Council (1998, 2000, 2002 and 2004), Paul Fraim was elected unanimously. The three African-American Council members voted for him in the first three elections and two voted for him in 2004. Mr. Riddick was not present at the 2004 organizational meeting.

VSBE 005828

(b)(7)(C) P.34

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 6

included receipt from the City Manager in 2000 of data on the plans used by various cities in
Virginia and nationally for the election of a mayor (Submission Tab 6); the employment in 2002
of an outside expert to weigh the relative benefits of a 4-2-1 plan and a 5-2-1 plan (Submission
Tab 7); holding a public hearing to receive citizen input; holding a public hearing to comment
specifically on the plan advertised for adoption; and their own Council debates. As was shown
in Tab 12 of the Submission, the various possibilities were debated in the press from 2000
forward with the newspaper acting in some respects as a forum for various Council members to
put their own ideas before the public.

Council did not prepare nor did it have prepared alternative proposals in the form of
actual plans. It argued and debated the merits of alternatives only conceptually. Several
conceptual alternatives that were proposed but never voted upon by Council included the
following: 1) White Council member Randy Wright suggested keeping the wards the same as at
present and having a separate election whereby the voters could select the Mayor from among
the Council members who wanted to stand for election for Mayor; 2) African-American Council
member Paul Riddick suggested a nine member Council including the Mayor; and 3) African-
American Council member Anthony Burfoot proposed that the 5-2-1 concept would be improved
if the at-large Mayor had to win by a majority of four of the five wards rather than by a simple
majority City-wide.

The two proposals that received the most attention were a 4-2-1 proposal and the 5-2-1
plan ultimately adopted. No 4-2-1 map or data was presented to Council for consideration
although on September 9, 2002, the Virginian Pilot newspaper published 4-2-1 plans it had
drawn for comparative purposes noting that they were "far from perfect." It noted that "Black
voters would have less dominance in wards where they hold a majority. Some wards would have
many more people than others. Incumbents would be forced to compete for the same seat. And
the boundaries would shake up tradition – one scenario, for example, would place downtown and
part of Ghent, a majority-white area, in a majority-black ward." These plans were not formally or
informally presented to Council nor were they debated by Council, although they certainly were
in the public domain. See Submission Tab 13.

Ultimately, the method used by the City to adopt the plan was consistent with its normal
method of operation and prior plan adoptions except in three important respects. Consistent with
the requirements of State law, the City sought from the General Assembly and received the
requisite approval for a referendum and held a referendum on the issue of the direct election of
the Mayor; second, the City employed an outside expert to give it input on the two most
acceptable alternatives, and third, it held a public hearing separate and apart from regular City
Council meetings to obtain citizen input.

While the press raised the specter that a 5-2-1 plan might be dilutive, concerns were
expressed in the newspaper that altering the ward lines to accommodate a seven member 4-2-1
plan could be more damaging and retrogressive to voting rights in the African-American
community. According to one article of December 1, 2002, African-American Council member

VSBE 005829

JUL-19-2013 10:57A FROM:UFJ+CEJ          (b)(7)(C)                                    P.35

CHRISTIAN | BARTON, LLP

Ms. Rebecca J. Wertz
June 22, 2005
Page 7

Paul Riddick was described as saying "he doesn't worry that black residents will lose power [under the eight member plan]. He prefers the eight-member Council because it keeps the existing ward boundaries. In a seven-seat system, he would fear being placed in the same ward as Vice Mayor Daun S. Hester," an African-American. Similarly, in the same article the president of the Inner-City Federation of Civic Leagues, "which represents predominantly black neighborhoods... said his members oppose the seven-member plan because they fear that a black seat will be lost."

In short, there were no suggestions by anyone that the plan contained in the Submission was adopted with the intent to dilute or retrogress African-American voting rights. To the contrary, the methods used for the adoption and the comments expressed in the press were fully supportive of the notion that the plan was the result of a robust debate on the best way to achieve the direct election of the Mayor which 83% of the African-American community and three quarters of the City as a whole favored.

We trust that these comments are responsive to your inquiries, but if you need additional information, let me know at your very earliest convenience. We would appreciate the opportunity to meet with you and the appropriate Voting Section staff to discuss the Norfolk Submission after you have had the opportunity to review the foregoing information and attachments. Please advise as to available dates in order that I can coordinate schedules among the appropriate attendees from the City.

With all best wishes, I remain

Sincerely yours,

Paul W. Jacobs, II

PWJ/wcv

attachments

cc:     Bernard A. Pishko, Esquire, Norfolk City Attorney
        Ms. Elisa Long, Norfolk City Registrar

VSBE 005830

**Confidential**

## Memorandum of Telephonic Communication

**Date:** 5/20/2011      **Attorney/Analyst:** AAO, EEK, JP2

**File No.:** 2011-1805

**Other Party:** (b)(7)(C)      **Race:** (b)

**Tel. No.:** (b)(7)(C)

**Title/Organization:** (b)(7)(C)

**Jurisdiction:** State of Virginia

**Subject:** Chapter 1 (H.B. 5005) (2011)

(b)(7)(C) resides in the Virginia Beach area. (b)(7)(C) has been involved in the redistricting process, (b)(7)(C) does not approve of either the redistricting plans for the house and senate because it is "not designed to be a fair plan." (b)(7)(C) objects because the plans (1) do not provide adequate representation to minorities in the Virginia beach area and (2) include gerrymandered districts. (b)(7)( said the plan is designed primarily to secure areas for incumbents.

It is possible to draw a minority district for House District 21 in Virginia Beach because solid numbers for such a district exist. (b)(7)(C) redistricting plan that included a majority-minority District 21. It was filed with the House and delivered to all the delegates. (b)(7)(C) the plan before the Governor's Committee. Legislators gave excuses for not creating a minority district in Virginia Beach. They argued other district lines would have to be altered to create a majority-minority district, but (b)(7)(C) that is not the case. (b)(7)(C)

(b)(7)(C)

Under the benchmark plan, Senator Miller (b) represents a small part of the Virginia Beach area. However, under the proposed plan, there will be no minority representation because Senator Miller has been drawn out of the area. Under the proposed plan, Senators Blevin (w), McWaters (w), and Wagner (w) will represent Virginia Beach.

(b)(7)(C) the five minority senators, Senators Locke, Lucas, Marsh, McEachin, and Miller. (b)(7) does not know why they did not object to the plan due to the drop in the minority population. It seems like the loss of minorities would make it more difficult for them to be reelected.

VSBE 005831

**DEFENDANT-INTERVENORS TX 023 - Page 294**

(b)(7)(C)

the legislature did not adequately consider the opinions of outside groups and individuals.  When asked about whether (b)( had knowledge of the Independent Bipartisan Advisory Commission on Redistricting, (b)(7)(C) did not address the question but spoke instead of the university plans.  The legislature ignored the university plans, and the public hearings were just formalities.

(b)(7)(C) also asked if we would be involved in reviewing the local redistricting plan for the City of Virginia Beach, and would like to be contacted about that issue in the future.  The local at-large, double-at-large system for electing city council members should not be legal.

.

VSBE 005832

DEFENDANT-INTERVENORS TX 023 - Page 295