## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, <br><br> Defendants, <br><br> v. <br><br> VIRGINIA HOUSE OF DELEGATES, *et al.*, <br><br> Intervenor-Defendants. | Civil Action No. 3:14-cv-00852-REP-GBL-BMK |

## <u>DECLARATION OF BRUCE V. SPIVA</u>

I, Bruce V. Spiva, swear under penalty of perjury that the following is true and correct.

1.       I am a partner with the law firm of Perkins Coie LLP in Washington, D.C.  I am one of the attorneys representing the Plaintiffs in this matter.

2.       I represent the Plaintiffs in this lawsuit and, in that capacity, noted and then took the deposition of Christopher M. Marston on May 18, 2015.

3.       Intervenor-Defendants' deposition counter-designations of Mr. Marston's testimony suggest that Intervenor-Defendants intend to take the position that Mr. Marston and the other hired consultants to the House Republican Caucus relied upon "advice of counsel" during the redistricting process.  I have attached a true and correct copy of the relevant counter-designation as Exhibit A hereto.  My colleague, Ms. Branch, raised this issue with counsel for Intervenor-Defendants in a telephone conference on June 26, 2015.  She suggested that

Intervenor-Defendants *either* (a) waive the privilege and produce the advice that Mr. Marston and the House of Delegates allegedly relied upon (if they wished to submit this portion of this deposition), *or* (b) withdraw the designation. Intervenor-Defendants declined both suggestions. I have attached as Exhibit B to this declaration a true and correct copy of counsel's confirming email.

4.      During the course of the deposition, counsel for the Intervenor-Defendants objected to several questions and instructed Mr. Marston not to answer on the grounds of the attorney-client privilege. I have attached true and correct copies of excerpts from the deposition to this declaration as Exhibit C. See Transcript at p. 11, ln. 3 - p 12, ln. 11; p. 85, ln. 16 - p. 86, ln. 3; p. 87, ln. 2 - 13; p. 141, ln. 2 - p. 143, ln. 8; p. 147, ln. 10 - p. 152, ln. 10. I did not quarrel with those objections or instructions at the time.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief and that this declaration was executed on the 26th day of June, 2015, in Washington, D.C.

DATED: June 26, 2015

_____*/s/ Bruce V. Spiva*_____
BRUCE SPIVA

## CERTIFICATE OF SERVICE

On June 26, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jennifer Marie Walrath
Katherine Lea McKnight
Baker & Hostetler LLP (DC)
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
202-861-1702
Fax: 202-861-1783
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com

Effrem Mark Braden
Baker & Hostetler LLP (DC-NA)
Washington Square
Suite 1100
Washington, DC 20036
202-861-1504
Fax: 202-861-1783
mbraden@bakerlaw.com

Of counsel:

Dale Oldham, Esq.
1119 Susan St.
Columbia, SC 29210
803-772-7729
dloesq@aol.com

*Attorneys for Intervenor-Defendants*

Jeffrey P. Brundage
Daniel Ari Glass
Kathleen Angell Gallagher
Eckert Seamans Cherin & Mellott LLC
1717 Pennsylvania Ave NW, Suite 1200
Washington, D.C. 20006
202-659-6600
Fax:  202-659-6699
jbrundage@eckertseamans.com
dglass@eckertseamans.com
kgallagher@eckertseamans.com

Godfrey T. Pinn, Jr.
Harrell & Chambliss LLP
Eighth and Main Building
707 East Main Street
Suite 1000
Richmond, VA 23219
gpinn@hclawfirm.com

Anthony F. Troy
Eckert Seamans Cherin & Mellott LLC
707 East Main Street
Suite 1450
Richmond, Virginia  23219
804-788-7751
Fax:  804-698-2950
ttroy@eckertseamans.com

*Attorneys for Defendants*

By */s/ Aria C. Branch*
Aria C. Branch (VSB No. 83682)
Perkins Coie LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone:  (202) 654-6338
Fax:  (202) 654-9106
ABranch@perkinscoie.com

*Attorneys for Plaintiffs*

Exhibit A

Exhibit A

45

1  American Community Survey.
2      Q   For what purpose did you collect that data?
3      A   To support our redistricting efforts,
4  including compliance with the Voting Rights Act.
5      Q   I take it from that answer that some of the
6  data you collected was data regarding race?
7      A   Yes.
8      Q   When you say to facilitate compliance with
9  the Voting Rights Act, tell me what you mean by that.
10     A   So I mean exactly that, compliance with the
11  Voting Rights Act.  It imposes requirements on states,
12  particularly those that require or required
13  preclearance from a Court or the Department of
14  Justice, and there are a host of judicial decisions
15  and administrative guidelines from the Department of
16  Justice regarding what it requires to be precleared,
17  and you have to provide data in that process.
18     Q   The demographic data that you collected, did
19  you use that in the map drawing function?
20     A   Yes.
21     Q   In what way did you use that data, the race
22  data?

46

1      A   Along with political data, population data
2  and the like, it was part of the data view we would
3  have as we would draw districts so we could have
4  descriptive characteristics of districts as we drew
5  them.
6      Q   Why did that matter, what the race data was,
7  in terms of the drawing of the districts?
8      A   The Voting Rights Act imposes various
9  requirements about racial composition of districts,
10  and we needed to know if we were complying.
11     Q   What is your understanding of the
12  requirements that the Voting Rights Act imposes in
13  terms of redistricting?
14     A   Four years on, my recollection is a little
15  rusty.  I know you can't have retrogression, and I
16  know that -- that's pretty much what I know.
17     Q   Fair enough.
18         What's your understanding of the term
19  "retrogression"?
20     A   My recollection is that it means that a
21  minority group can't have a less of an opportunity to
22  elect a candidate of their choice than under a prior

47

1  plan.
2      Q   The data collection and analysis you've been
3  referring to, at least with regard to race, was that
4  aimed at determining whether the map would cause
5  retrogression?
6      A   Yes.
7      Q   How did you determine whether a minority
8  group or minority groups would have a lesser
9  opportunity to elect a candidate of their choice?
10     A   We didn't have a hard-and-fast rule to
11  determine that.  As with many things in the law, it's
12  a bit of a judgment call.
13         I don't recall how many court decisions I
14  read, but I couldn't get the same answer out of all of
15  them as to what I needed to do, so we did our best and
16  sought legal advice to see if what we were doing
17  appeared to be compliant.
18     Q   Did you do -- when I say did "you" do, I
19  mean did you do or direct or interact with one of your
20  consultants who was doing any data analysis to
21  determine whether a proposed plan would cause
22  retrogression?

48

1      A   Yes.
2      Q   Tell me about that.
3      A   As we were preparing a plan and when we
4  finished a plan, we would ask our attorneys for their
5  opinion as to whether or not they thought that there
6  was retrogression and, more importantly, whether it
7  could be precleared.
8      Q   I guess I'm asking more of a factual
9  question, which is, how did you use the data to
10  determine whether or not there was retrogression?
11     A   So we would prepare a list of the 100
12  districts and their racial composition and consult
13  with our attorneys to see what they thought about
14  whether or not we could successfully get the plan
15  precleared.
16     Q   Did you do any other data analysis or
17  gathering other than creating a list of the 100
18  districts and the racial composition in terms of
19  trying to determine whether there would be
20  retrogression?
21     A   I gathered, but never used, information
22  about election contests that featured a Black and a

Exhibit B

Exhibit B

**Roberts, Rachel M.  (Perkins Coie)**

| | |
|---|---|
| **Subject:** | RE: Bethune-Hill, et al. v. Virginia State Board of Elections, et al: Plaintiffs' Discovery Designations |

---

**From:** McKnight, Katherine L. [mailto:kmcknight@bakerlaw.com]
**Sent:** Friday, June 26, 2015 3:26 PM
**To:** Branch, Aria C. (Perkins Coie)
**Cc:** Hamilton, Kevin J. (Perkins Coie); Spiva, Bruce V. (Perkins Coie); Spear, Ryan M. (Perkins Coie); Braden, E. Mark; Tony F. Troy (TTroy@eckertseamans.com); DGlass@eckertseamans.com; jbrundage@eckertseamans.com; Raile, Richard; Stafford, William B. (Ben) (Perkins Coie); Walrath, Jennifer M.
**Subject:** RE: Bethune-Hill, et al. v. Virginia State Board of Elections, et al: Plaintiffs' Discovery Designations

Dear Aria,

It was nice speaking with you.  We received your second e-mail sent at roughly 2:40pm, but not the first. Though we discussed this on the phone, for a clear record, here are our responses.

Regarding your objection to the Marston testimony, we will not withdraw that designation.  Moreover, and particularly in light of the fact that no inquiries were made at the time of the deposition about the legal advice at issue, we do not think it is appropriate now to produce the documents and communications containing that advice of counsel.

Regarding the new and additional designations made for the purpose of context, could you identify (either with a different color highlighting or by page and line) the new designations you propose?  We cannot readily identify the new designations as all of Plaintiffs' designations are now highlighted in yellow.  On these new designations, considering today's deadline, we reserve the right to object to these new designations until after we have had an opportunity to review them and meet and confer with you.

Thanks very much,

Kate

**Katherine L. McKnight**[bakerlaw.com] | **BakerHostetler**[bakerlaw.com]
Washington Square | 1050 Connecticut Avenue, N.W., Suite 1100 | Washington, D.C. 20036-5304
T 202.861.1618 | F 202.861.1783
kmcknight@bakerlaw.com

---

**From:** Branch, Aria C. (Perkins Coie) [mailto:ABranch@perkinscoie.com]
**Sent:** Friday, June 26, 2015 2:39 PM
**To:** Walrath, Jennifer M.
**Cc:** Hamilton, Kevin J. (Perkins Coie); Spiva, Bruce V. (Perkins Coie); Spear, Ryan M. (Perkins Coie); Braden, E. Mark; McKnight, Katherine L.; Tony F. Troy (TTroy@eckertseamans.com); DGlass@eckertseamans.com; jbrundage@eckertseamans.com; Raile, Richard; Stafford, William B. (Ben) (Perkins Coie)
**Subject:** RE: Bethune-Hill, et al. v. Virginia State Board of Elections, et al: Plaintiffs' Discovery Designations

Resending the email below in case the attachments did not go through because the file sizes were too big.  Thanks.

**Aria Branch** | **Perkins Coie LLP**
ASSOCIATE
700 Thirteenth Street, N.W. Suite 600
Washington, DC 20005-3960

D. +1.202.654.6338
F. +1.202.654.9996
E. ABranch@perkinscoie.com

---

**From:** Branch, Aria C. (Perkins Coie)
**Sent:** Friday, June 26, 2015 1:42 PM
**To:** 'Walrath, Jennifer M.'
**Cc:** Hamilton, Kevin J. (Perkins Coie); Spiva, Bruce V. (Perkins Coie); Spear, Ryan M. (Perkins Coie); 'Braden, E. Mark'; 'McKnight, Katherine L.'; 'Tony F. Troy (TTroy@eckertseamans.com)'; 'DGlass@eckertseamans.com'; 'jbrundage@eckertseamans.com'; 'Raile, Richard'; Stafford, William B. (Ben) (Perkins Coie)
**Subject:** RE: Bethune-Hill, et al. v. Virginia State Board of Elections, et al: Plaintiffs' Discovery Designations

Jennifer,

We have reviewed Defendant-Intervenors' additional designations to the Tyler and Marston depositions.

Plaintiffs have highlighted in yellow additional designations in the Tyler deposition to put Defendant-Intervenors' designations in context.  Please review the attached and let us know if these additional designations are agreeable.

Additionally, Plaintiffs are planning to object to Defendant-Intervenors' designation on page 47, line 15 through page 48, line 15 of the Marston deposition unless Defendant-Intervenors are willing to produce the documents and communications containing advice of counsel (regarding retrogression) that Mr. Marston references in that section.  However, if Defendant-Intervenors withdraw the designation at issue, Plaintiffs will not assert any objection.

Please let us know your thoughts as soon as possible as objections to designations are due today.

Thanks,
Aria

**Aria Branch** | **Perkins Coie LLP**
ASSOCIATE
700 Thirteenth Street, N.W. Suite 600
Washington, DC 20005-3960
D. +1.202.654.6338
F. +1.202.654.9996
E. ABranch@perkinscoie.com

Exhibit C

Exhibit C



# Transcript of **CHRISTOPHER MICHAEL MARSTON**

**Date:** May 18, 2015

**Case:** BETHUNE-HILL, ET AL v. VIRGINIA STATE BOARD OF ELECTIONS, ET AL

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

Case 3:14-cv-00852-REP-AWA-BMK Document 84-1 Filed 06/26/15 Page 11 of 16 PageID# 1752
DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

3 (Pages 9 to 12)

**9**

1     A  Okay.  Thank you.

2     Q  Any reason why you can't give accurate and

3 truthful testimony this morning?

4     **A  No.**

5     Q  Oh, one other thing I guess I should

6 mention, if I ask you a question that you don't

7 understand, please let me know and I'll do my best to

8 rephrase it.  If you answer, though, I'll assume that

9 you understand the question that I'm asking.

10     Does that sound all right to you?

11     **A  Yes.**

12     Q  Great.

13     Should have started with this one.  Can you

14 please state your full name for the record?

15     **A  Christopher Michael Marston.**

16     Q  What's your residence address?

17     **A  110 Shooters, S-H-O-O-T-E-R-S, Court,**

18 **Alexandria, Virginia, 22314.**

19     Q  Mr. Marston, what did you do to prepare for

20 today's deposition?

21     **A  I met with counsel last week.**

22     Q  Which counsel did you meet with?

**10**

1     **A  Mr. Braden and Ms. Walrath.**

2     Q  Was there anybody else present other than

3 Ms. Walrath and Mr. Braden?

4     **A  Mr. Bensen.**

5     Q  Who is Mr. Bensen?

6     **A  Clark Bensen is a -- I suppose he describes**

7 **himself as a demographer.  He's a redistricting data**

8 **guy would be how I would refer to him.**

9     Q  Who does he work for?

10     **A  He's self-employed.**

11     Q  What's the name of his company, or if it is

12 a company?

13     **A  I believe it's called Polidata,**

14 **P-O-L-I-D-A-T-A.**

15     Q  Did you review any documents when you met

16 with Mr. Braden and Ms. Walrath?

17     **A  Yes.**

18     Q  What documents did you review?

19     **A  Several documents that were in the**

20 **production of materials for my e-mail.  From my**

21 **e-mail.**

22     Q  Do you recall specifically any documents

**11**

1 that you reviewed?

2     **A  No.  If I saw them, I would recognize them.**

3     Q  Let me ask, why was Mr. Bensen present at

4 the deposition preparation session?

5     **A  I don't know.**

6     Q  What did you all discuss?

7     MS. WALRATH:  I'm going to object on the

8 grounds of attorney/client privilege.

9     MR. SPIVA:  You're instructing him not to

10 answer?

11     MS. WALRATH:  I am instructing him not to

12 answer.

13     MR. SPIVA:  That's fine.  I guess I would

14 just ask a question, I mean is there some basis for

15 Mr. Bensen within the privilege?

16     MS. WALRATH:  There is.

17     MR. SPIVA:  Can you state that?

18     MR. BRADEN:  He works for us, works for

19 Baker & Hostetler.

20     MS. WALRATH:  He works for us.

21     MR. SPIVA:  He's like a consulting expert?

22     MR. BRADEN:  He's also a lawyer.

**12**

1     MR. SPIVA:  I take it he's not an attorney

2 at Baker Hostetler, is he?

3     MR. BRADEN:  But he's employed by

4 Baker Hostetler in this matter.

5     MS. WALRATH:  We can discuss this further

6 off the record if you would like.

7     MR. SPIVA:  I do want to get the basics on

8 the record.  I mean, is he an employee of

9 Baker Hostetler?

10     MR. BRADEN:  No.  He works for

11 Baker Hostetler as a consultant.

12     MR. SPIVA:  Oh, he's a consultant to

13 Baker Hostetler, okay.

14 BY MR. SPIVA:

15     Q  Mr. Marston, this is going to be marked as

16 Exhibit 1, and the Court Reporter will put a sticker

17 on it and we'll give it to you.

18     (Exhibit 1 was marked for identification and

19 is attached to the transcript.)

20     Q  Mr. Marston, you've been handed what's been

21 marked Exhibit 1, which is the subpoena that was

22 served on you -- or it might have been served on your

81

1      Yeah, I'm sure Delegate Bell had a reason
2  for asking it. It's certainly relevant for purposes
3  of submitting for preclearance to have comparison of
4  Black voting age populations.
5      Q  Actually, did you have any involvement in
6  the Virginia congressional redistricting?
7      A  Only to the extent that I answered questions
8  like this providing public data. I didn't do any line
9  drawing or anything else.
10     Q  In terms of the Virginia House
11 redistricting, did you provide similar data, Black
12 voting age population data, comparing one map to the
13 other to the individuals involved in that?
14     A  I'm sure that I did.
15     Q  What was the reason for providing that kind
16 of data?
17     A  It related to preclearance by Justice or the
18 Court. That information needs to be included in
19 analysis that you send along with preclearance requests.
20     Q  Let me shift gears a little bit. You
21 mentioned a couple of trainings that you had attended.
22     Have you presented or given any

82

1  redistricting-related trainings yourself?
2      A  I assert attorney/client privilege on behalf
3  of my clients with regard to that question.
4      Q  Well, in this capacity, one of them has to
5  assert the privilege, but I guess the question I'm
6  asking, before you get into what was said, is just
7  a -- can answer it with a yes or no, which is, have
8  you ever provided any redistricting trainings?
9      A  Yes.
10     Q  When have you done that?
11     A  In 2010 or '11, or both.
12     Q  Who did you provide the training to?
13     A  My client.
14     Q  Who was your client?
15     A  The House Republican Caucus.
16     Q  Were you engaged as an attorney for the
17 House Republican Caucus?
18     A  Yes.
19     Q  Do you have an engagement letter --
20     A  No.
21     Q  -- with them?
22     A  No.

83

1      Q  How did you come to an agreement to be an
2  attorney for the House Republican Caucus?
3      A  Speaker Howell asked me to provide legal
4  advice as an attorney to the Caucus and I agreed.
5      Q  I take it that some of the advice you
6  provided to the Caucus was not specifically in terms
7  of these trainings but in terms of the whole
8  redistricting process, some of it was not legal
9  advice?
10     A  That is correct.
11     Q  How did you draw a line between advice that
12 you were providing -- legal advice that you were
13 providing as an attorney as opposed to policy advice
14 or --
15     A  If it involved a client asking a legal
16 opinion on a matter, it was legal advice; if it did
17 not, it was not.
18     Q  What was the subject of the redistricting
19 training that you provided to the House Republican
20 Caucus in 2010 and 2011?
21     A  Legal issues in redistricting.
22     Q  Did you provide them with any written

84

1  materials?
2      A  Yes.
3      Q  Was it more than one document or just one
4  document?
5      A  I believe it was a single-page memo with a
6  talking points note card attached.
7      Q  Who was on the To line of the single-page
8  memo?
9      A  The members of the House of Delegates and
10 the Republican Caucus.
11     Q  So all of the Republican members of the
12 House of Delegates?
13     A  Correct.
14     Q  I take it that you provided this training
15 also verbally?
16     A  Correct.
17     Q  Was there more than one session or just one
18 session?
19     A  With regard to that specific memo, just one
20 session. I believe that there may have been two times
21 when I addressed them as their attorney as a group.
22     Q  Who was present at these meetings where you

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

85

1  addressed them as their attorney?
2      A   Just Republican members, the Republican
3  Caucus, delegates only.
4      Q   There were no staffers there?
5      A   No.
6      Q   No consultants?
7      A   No.
8      Q   Who else was the single-page memo
9  distributed to, if anyone, other than members of the
10  House Republican Caucus?
11     A   No one.
12     Q   Who else was the talking points note card
13  distributed to other than the members of the House
14  Republican Caucus?
15     A   No one.
16     Q   What did you discuss in the single-page memo
17  of legal issues in redistricting that you provided to
18  the Republican Caucus?
19         MS. WALRATH:  Objection on the grounds of
20  attorney/client privilege.  That has been withheld in
21  this case.
22         MR. SPIVA:  Are you instructing him not to

86

1  answer?
2          MS. WALRATH:  I am instructing him not to
3  answer.
4          MR. SPIVA:  That, I assume, is on the
5  privilege log or one of the privilege logs?
6          MS. WALRATH:  It is.
7          MR. SPIVA:  Okay.
8  BY MR. SPIVA:
9      Q   What did you discuss in -- actually, let me
10  step back for a minute.
11         You mentioned I think three sessions total;
12  one related to the memo and two that weren't
13  specifically related to the memo; is that accurate?
14     A   I believe I said two.
15     Q   Oh, two total.
16     A   Yes.
17     Q   When did those occur?
18     A   One was at the House members' fundraising
19  retreat at the Homestead, which would have been in the
20  Spring of 2010.  The second would have been at a
21  members' planning retreat in the Fall of 2010.
22     Q   What did you discuss in -- well, take them

87

1  one at a time.
2          What did you discuss in your presentation to
3  the House members' fundraising retreat in the Spring
4  of 2010?
5          MS. WALRATH:  Objection on the grounds of
6  attorney/client privilege, and I instruct the witness
7  not to answer.
8      Q   What did you discuss in your presentation to
9  the members of the planning retreat in the Fall of
10  2010?
11         MS. WALRATH:  Again, objection on the
12  grounds of attorney/client privilege, and I instruct
13  the witness not to answer.
14         MR. SPIVA:  It's a little formalistic, but I
15  have to get a clear instruction.  We can decide later
16  whether or not we fight about it.
17     Q   Mr. Marston, do you carry professional
18  liability insurance to provide legal advice?
19     A   I do.
20         MR. SPIVA:  If you guys are ready for lunch,
21  why don't we take a lunch break and come back.
22         (Luncheon recess taken at 11:53 a.m.)

88

1          AFTERNOON SESSION  (1:16 p.m.)
2  BY MR. SPIVA:
3      Q   Mr. Marston, earlier we talked about the
4  concept of retrogression; do you recall?
5      A   Yes.
6      Q   Tell me if I'm mis-summarizing, but I think
7  you confirmed that you understood that to mean that
8  there should be no retrogression in the ability of the
9  minority community in majority-minority districts to
10  be able to elect the candidates of their choice.
11         Is that a fair summary of what you said?
12     A   I'm not sure I was that specific.
13     Q   Is that your understanding of what the
14  term --
15     A   It seems about right.
16     Q   I know you already said that you never did a
17  racially polarized voting analysis and weren't aware
18  of one having been done, but I want to ask you a
19  slightly broader question, which is, did you undertake
20  to evaluate in any way the ability of the minority
21  community in majority-minority districts to be able to
22  elect the candidates of their choice?

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

141

1    **A   He is a member of the House of Delegates.**
2    Q   What was the nature of the -- were you
3    providing Mr. Peace with legal advice in this e-mail?
4    **A   I'm sure that I was.**
5    Q   Do you recall what the nature of that advice
6    was?
7        MS. WALRATH:  Objection.  Attorney/client
8    privilege.  I will instruct the witness not to answer.
9        And also just to -- for the benefit of the
10   record here, this is an e-mail that was at issue in
11   the motions practice in the Page case and was reviewed
12   in camera and ordered redacted by Judge Payne.
13       MR. SPIVA:  I mean, the problem is, the
14   privilege log doesn't have anything in the re -- the
15   subject line.
16       MS. WALRATH:  That is because the e-mail
17   does not have anything in the re subject line.  The
18   subject line is the actual subject line of the e-mail.
19   That was not redacted in this e-mail.  It literally is
20   just re.
21       MR. SPIVA:  This doesn't tell you anything
22   about the general nature of it.  I mean, typically

142

1    with a privilege log -- I mean, in order to validly
2    assert the privilege, you have to at least give a
3    general sense of the nature -- obviously, not the
4    specifics of the communications -- but the nature of
5    it so one can assess whether it actually is legal
6    advice.
7        MS. WALRATH:  Well, this is the subject of a
8    pending motion, I believe, but I'll also represent to
9    you, this is something that Judge Payne has already
10   ordered be redacted for attorney/client privilege in a
11   related proceeding.
12       MR. SPIVA:  If it's the subject of our
13   pending Motion to Compel, then --
14       MS. WALRATH:  At least in terms of the
15   assertion issue that you raise --
16       MR. SPIVA:  Right.
17       MS. WALRATH:  -- and the nature of this
18   e-mail.
19       MR. SPIVA:  Okay.
20       MS. WALRATH:  So to the extent that you have
21   questions about that, I just want to let you know
22   that's -- first of all, it's already been ordered by a

143

1    Federal judge also in this case that it be redacted,
2    and he's found it to be privileged, and also that the
3    assertion issues are at issue in the Motion to Compel.
4        Those are just facts I'm putting out in
5    general for asserting the attorney/client privilege.
6        MR. SPIVA:  Well, you've instructed him not
7    to answer.
8        MS. WALRATH:  I have.
9    BY MR. SPIVA:
10   Q   Then Delegate Peace writes back to you on
11   3/24/2011 that, "We're doing a joint piece."
12       Who is he talking about he's doing a joint
13   piece with?
14   **A   From the context, I believe it's**
15   **Chris Jones.**
16   Q   What does he mean by "a joint piece"?
17   **A   An article or a column in a newspaper signed**
18   **by both of them.**
19   Q   And was the subject -- I'm not asking for
20   the particulars -- but the subject of your original
21   e-mail a newspaper article or column?
22   **A   I don't recall.**

144

1        MR. SPIVA:  You can instruct him not to
2    answer if you want to, I think I'm entitled to explore
3    that.  I mean, if he's given him advice about a
4    newspaper article, it's relevant to the privilege
5    dispute.
6        Anyhow, you've already answered that you
7    don't recall.
8        Let me have about five minutes and we may be
9    done.
10       THE WITNESS:  Okay.
11       (Break taken at 2:44 p.m.)
12       (Back on the record at 3:00 p.m.)
13   BY MR. SPIVA:
14   Q   Mr. Marston, we discussed earlier the
15   potential 13 majority-minority member plan that was
16   proposed by the Governor's Commission.
17       Did you have any discussions about that plan
18   with anyone?
19   **A   Yes.**
20   Q   Who did you discuss it with?
21   **A   I spoke to at least one of the Commissioners**
22   **about it, and I communicated with other folks, largely**

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

145

1    members who had questions about what the Commission
2    had proposed.  And I just relayed information in those
3    conversations.
4        Q   Who was the Commissioner that you spoke
5    with?
6        A   Cameron Quinn.
7        Q   What was the nature of your discussion?
8        A   I called her to get a heads-up on what was
9    coming out before it came out.
10       Q   Was there anything further to it other than
11   that?
12       A   Not to my recollection.
13       Q   Then you spoke with other members about this
14   13 minority-majority plan.  Which other members did
15   you speak with?
16       A   I know there's communication in what was
17   produced with Delegate David Englin, where he just
18   asked for a comparison of BVAP across a number of
19   different plans, including some of the Commission's
20   recommendations.
21           I don't have a specific recollection of any
22   other conversations; although, generally I recall

146

1    talking to people about the fact that the Commission
2    plans existed and what their general makeup was.
3        Q   Do you recall anything else about your
4    communications with Delegate Englin about the
5    comparison in terms of BVAP?
6        A   No, it was just an e-mail exchange where he
7    requested data and I sent it to him.
8        Q   Let me give you what will be marked as
9    Exhibit 24.
10           (Exhibit 24 was marked for identification
11   and is attached to the transcript.)
12       Q   This is a chain of I guess three e-mails.
13   Maybe it's two e-mails.  No, I'm --
14       A   Maybe it's four.
15       Q   Maybe it's four, okay.
16           I'll tell you what, let me ask you about the
17   one on the first page of the exhibit that's towards
18   the bottom.  It says from Chris Marston to
19   Jason Torchinsky, it cc's a number of people, it's
20   dated February 19, 2011, subject:  Redist. Call.
21           You say, "4:30 is fine for me."
22           Did you send that e-mail?

147

1        A   I did.
2        Q   Were you on the chain that starts below
3    that, that has a redaction for attorney/client
4    privilege on it?
5        A   I don't have a specific recollection of it,
6    and the header information's not here, but I suspect I
7    was.
8        Q   Who is Jason Eig?
9        A   Eig.  He was counsel to the Governor.
10       Q   Was the Governor one of your clients?
11       A   No.
12       Q   Do you know what the nature of the
13   information is that's redacted from this e-mail?
14           MS. WALRATH:  Objection.  Attorney/client
15   privilege, as it says in the redaction.  I will
16   instruct the witness not to answer.
17           MR. SPIVA:  Is he one of the recipients of
18   this e-mail?
19           MS. WALRATH:  As answered, he said he
20   believed he was.
21       A   Yeah, I'm not sure.
22           MR. SPIVA:  I mean, you're going to instruct

148

1    him however you're going to instruct him, but I'd just
2    ask, if the Governor is not his client, how a
3    communication that included him could be privileged?
4            MS. WALRATH:  This is on the redaction log,
5    and although the redaction log was produced subsequent
6    to filing the Motion to Compel at the request of
7    Kevin Hamilton, there are similar e-mails at issue in
8    the Motion to Compel that is on file right now
9    pending.
10           MR. SPIVA:  Okay.
11   BY MR. SPIVA:
12       Q   What is the general nature of the
13   communications that's redacted here?
14           MS. WALRATH:  Objection.  Attorney/client
15   privilege.  I'm going to instruct the witness not to
16   answer.
17           I just don't see the purpose of asking these
18   questions.  There's a reason as well if not
19   attorney/client privileged.
20           MR. SPIVA:  I just don't have any basis to
21   believe that it is attorney/client privilege.
22           MS. WALRATH:  That's perfectly fine, it's

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

149

1   being litigated right now.  As of today, though, it's
2   redacted for attorney/client privilege.
3   BY MR. SPIVA:
4       Q   Let me ask you, in the e-mail that's
5   redacted, did you communicate attorney/client
6   privileged information to a client?
7           MS. WALRATH:  Objection.  Form.  He did not
8   write this e-mail, but he may answer.
9       A   I didn't write this e-mail.
10      Q   So I take it the response is no, right?
11      A   No, I did not.
12      Q   Did Mr. -- somebody pronounce it for me.
13      A   Eig.
14      Q   Eig -- did he summarize attorney/client
15  advice from you to a client in this e-mail?
16          MS. WALRATH:  Objection.  Attorney/client
17  privilege.  I'm going to instruct the witness not to
18  answer.
19          I get where you're going with this, but it
20  is right now subject to a Motion to Compel, and I will
21  continue to instruct the witness not to answer
22  regarding the subject covered in this redaction.

150

1           MR. SPIVA:  But I asked him a yes-or-no
2   question which is, did Mr. Eig convey attorney/client
3   information -- attorney/client advice from him in this
4   e-mail.
5           MS. WALRATH:  As his attorney, I will refer
6   you to the privilege redaction log which states the
7   nature of what is redacted.
8           MR. SPIVA:  But I want to know from him, so
9   I'm going to ask it again.  You can do whatever you
10  want to do, but I think I'm entitled to know this.
11  BY MR. SPIVA:
12      Q   Did Mr. Eig convey attorney/client
13  privileged information -- sorry, attorney/client
14  advice from you to one of your clients in this e-mail?
15          MS. WALRATH:  I am going to object on two
16  grounds.  One, it asks for a legal conclusion, but
17  also it is attorney/client privileged and instruct the
18  witness not to answer.
19          MR. SPIVA:  I don't think it asks for a
20  legal conclusion; all I did was say, did he convey
21  your advice to a client in his e-mail.  Do what you
22  think is --

151

1           MS. WALRATH:  I will just say that's a
2   different question than the one that was asked, so if
3   you'd like to rephrase the question and ask it the way
4   you really want it to be on the record as being asked,
5   then we will object as appropriate.
6           MR. SPIVA:  I think that was the way I asked
7   it, but let me just -- to make it clear.
8   BY MR. SPIVA:
9       Q   Did Mr. Eig convey attorney/client advice of
10  yours in the e-mail?
11          MS. WALRATH:  And I will object and assert
12  attorney/client privilege and instruct the witness not
13  to answer.  I believe everything you need to know is
14  in the log, but ...
15          MR. SPIVA:  But I want to know it from him.
16          MS. WALRATH:  I instruct him not to answer.
17  So there you go.
18          MR. SPIVA:  All right.
19      Q   Well, the only other thing I'd ask, did
20  this -- the call that's the subject of this e-mail
21  chain, did that occur?
22      A   I don't have a specific recollection, but I

152

1   suspect that it did.
2       Q   Do you recall what the subject of the call
3   was?
4           MS. WALRATH:  Objection.  Attorney/client
5   privilege.  And I will instruct the witness not to
6   answer beyond what is already visible in the face of
7   the document.
8           MR. SPIVA:  So you're not going to let him
9   talk about what was discussed on the call?
10          MS. WALRATH:  Correct.
11      Q   Who was on the call, to your recollection?
12      A   I don't have a specific recollection.  I
13  assume that the folks who are indicated in the e-mail
14  as recipients were on the call.
15      Q   There's a Jill Holtzman Vogel.  Is she
16  somebody's attorney in this chain?
17      A   That's an interesting question.  She's a
18  State Senator.  She's also an attorney.
19      Q   I see.
20          Mr. Eig, he was counselor to the
21  then-Governor, I take it?
22      A   Correct.