IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(RICHMOND DIVISION)

GOLDEN BETHUNE-HILL, *et al.*,

        Plaintiffs,

    v.

VIRGINIA STATE BOARD OF
ELECTIONS, *et al.*,

        Defendants.

Civil Action No. 3:14-cv-00852-REP-GBL-BMK

**DEFENDANT-INTERVENORS' RESPONSE TO
PLAINTIFFS' OBJECTIONS TO PROPOSED TRIAL EXHIBITS**

Defendant-Intervenors provide this brief to assist the Court in considering Plaintiffs'

Objection to Exhibit List filed on June 25, 2015 (Dkt. 81) ("Objs.").

**BACKGROUND**

The parties have indeed "worked cooperatively in an effort to try to stipulate to the

authenticity and admissibility of their proposed exhibits"—at least until Plaintiffs filed these

objections. Objs. at 1. The rationale behind this heretofore cooperative effort was that a judge

presiding over a bench trial is "presumably competent to screen out and disregard what he thinks

he should not have heard, or to discount it for practical and sensible reasons." *Multi-Med.*

*Convalescent & Nursing Ctr. of Towson v. N. L. R. B.*, 550 F.2d 974, 977 (4th Cir. 1977).

"[L]ittle harm can result from the reception of evidence that could perhaps be excluded." *Id.* That

is all the more true here where the case will be tried to *three* judges with over 80 years of

combined experience on the bench.

1

Furthermore, the judicial resources being devoted to this trial are better spent evaluating the parties' respective case presentations and arguments rather than adjudicating the admissibility of evidence, especially where evaluating the evidentiary objections will require the Court to review the very evidence sought to be excluded. To the extent the Court believes the presentations veer from what is relevant to the case, it is fully capable of limiting questioning or evidence during the trial. For these reasons, Defendant-Intervenors have registered no objections to Plaintiffs' proposed trial exhibits, despite having legitimate bases for doing so. *See, e.g.*, Pls. Tr. Exs. (ECF No. 76-1) 1, 7–8, 11–14, 17–18, 22, 24, 29–30, 38 (hearsay); Pls. Tr. Exs. 23, 52 (irrelevant and waste of time); and Pls. Tr. Exs. 2, 7–8, 11, 13–14, 18, 24, 65–67 (lacking foundation). Plaintiffs have taken a different approach and filed an 18-page brief objecting to 14 exhibits proposed by Defendant-Intervenors. Each objection is discussed on its own merits below. As a general matter, they can be categorized as follows:

**Rule 403.** One set of objections invokes Federal Rule of Evidence 403. To the extent Plaintiffs raise concerns about prejudice—such as the possibility that the proposed exhibit is "potentially confusing," Objs. at 2—the arguments are categorically excluded in bench trials. *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994). That is because "the same judge[s]" who would be "confuse[d]" by the proposed exhibit are those responsible "to discern and weigh the improper inferences" in a Rule 403 analysis. *Id.* (quoting *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981)). To the extent Plaintiffs purport to be concerned over potentially wasted time and resources, the objections are counterproductive because the Court will spend more time weighing the objections than considering the substantive arguments on their merits. Under these circumstances, Rule 403 is "a useless procedure." *Id.* (quoting *Gulf States*, 635 F.2d at 519).

2

**Information That Will Be Presented Regardless of Plaintiffs' Objections.** A second set of objections concerns evidence that will be presented to the Court in any event—as Plaintiffs largely concede—and the dispute boils down to whether the proposed exhibit will be admitted into evidence or presented in some other fashion, such as impeachment material or as a demonstrative. Notably, Plaintiffs have included in their exhibits some of the same kinds of exhibits (e.g., maps, a news article) that they object to here. For the sake of preserving judicial resources, Defendant-Intervenors are generally willing to present the proposed exhibits as impeachment or demonstrative material, where appropriate, and already have agreed to do so in a number of instances.[1]

**Alleged Hearsay.** A third set of objections concerns the hearsay rule and/or alleged lack of foundation. These objections are especially puzzling given that Defendant-Intervenors have conceded the admission of numerous exhibits proposed by Plaintiffs that obviously contain hearsay and lack foundation. To the best of Defendant-Intervenors' knowledge, the parties were in agreement that calling witnesses from across Virginia and beyond to establish foundation or to verify their prior statements would not be an efficient use of time. Apparently, this is not the case.

In any event, the exhibits at issue fall under hearsay exceptions and will be admissible for purposes other than proving the truth of the matter asserted. Hence, these objections may at most

---

[1] To be clear, Defendant-Intervenors believe that Plaintiffs' objections are not meritorious, as outlined below, and that *all* proposed exhibits discussed in this brief should be admitted into evidence. Defendant-Intervenors' concessions are offered in an effort to reach consensus and streamline the process. Defendant-Intervenors understand that Plaintiffs may have other ideas and may continue to object to the materials—even if used for demonstrative or impeachment purposes—and Defendant-Intervenors will continue to assert the relevance, reliability, and admissibility of all proposed exhibits if that occurs.

result in limiting the weight of this admissible evidence. In a bench trial, this exercise has minimal value.

**Alleged Discovery Violations.** Plaintiffs claim that certain exhibits should be excluded because of alleged discovery violations by Defendant-Intervenors. These allegations are unfounded and, frankly, hypocritical when (1) Plaintiffs' expert failed to produce in discovery the political data he used for his racial bloc voting analysis, and (2) Plaintiffs have introduced in their trial exhibits documents that are not Bates stamped and were not provided to Defendant-Intervenors in discovery.

As outlined below, Defendant-Intervenors are willing to make certain concessions for the sake of efficiency and judicial economy. As to Plaintiffs' remaining objections, Defendant-Intervenors request that the Court overrule them.

## ARGUMENT

### A.     PROPOSED EXHIBIT 13: DOJ Guidance

Proposed Exhibit 13 is DOJ Guidance from 2001 concerning preclearance submissions. Objs. Ex. A. In 2001, the census form was altered to include for the first time "counts of persons who have identified themselves as members of more than one racial category." *Id.* at 3. The 2001 Guidance responded to this new development with the procedure for calculating minority populations, known as "DOJ Black," that is used by the software "Maptitude." *See* Intervenors' Tr. Br. at 7–8. Delegate Jones testified at his deposition and will testify at trial that he relied on the Maptitude DOJ Black figure in drawing the Plan. DOJ Black BVAP in three Challenged Districts in the Plan was below 55 percent, and evidence as to the relevant BVAP formula tends to refute Plaintiffs' assertion that a rigid and mechanical BVAP quota was adopted and applied by the House. Intervenors' Tr. Br. at 7–8, 25–26.

4

Plaintiffs are incorrect in representing that there is no evidence that Jones relied on DOJ Guidance in drawing the Challenged Districts. Objs. at 2. Jones testified at his deposition and will testify at trial that "the BVAP I used in '11 was the DOJ black voting population." Jones Dep. at 48. Plaintiffs' counsel made every effort to *avoid the issue* of differences in the calculation of BVAP by quarrelling with Jones at his deposition when Jones tried to explain the calculation that he used:

> Q And you believed that [BVAP] had to be north of 55 percent?
>
> A That it had to be higher than 52, actually due to the original map with two districts in the 54 percent range.
>
> Q You said right here, line 6, I think from the testimony that we heard throughout this process that the effective voting age population needed to be north of 55 percent. That's what you said?
>
> A That's based on a black voting age population number that exceeds a hundred percent. [*i.e.*, not DOJ Black.]
>
> Q That's fine. I understand that you have this distinction that you're concerned about. I'm only going to be asking you about the DOJ guidelines way of collecting. And if you have an issue with the Department of Justice in the way that they calculate black voting age population, we can litigate that separately.
>
> MR. BRADEN: That's -- I object to this. He's answered the questions; you have asked the same question now about five different ways. He's sort of answered it the same way every time. Maybe you ought to ask another question.
>
> MR. HAMILTON: Well, I disagree with that and I -- he keeps bringing up this difference. ***With all due respect to the Delegate -- I appreciate your concern about the difference in the calculation, but you have made the point and I'm trying to put it aside because it's not relevant to this case.***
>
> THE WITNESS: ***I feel that it is and I'm going to answer the same way I have because that's how I drew the map***.

Jones Dep. 126–28 (emphasis added). Plaintiffs can hardly complain that Defendant-Intervenors will introduce evidence to educate the Court on an issue about which Delegate Jones will testify.

Plaintiffs may want to dismiss this issue because it does not help their case, but that desire is insufficient grounds for a successful evidentiary objection.

Plaintiffs' only other argument is that the 2011 DOJ Guidance "superseded" the 2001 Guidance, resulting in potential confusion for the Court. *But see Schultz*, 24 F.3d at 632 (rejecting Rule 403 objections in the context of bench trials). Plaintiffs have no support for that contention, and neither document includes an expiration date or express revocation. Regardless, this is a legal argument, not an evidentiary argument, and the Court should not exclude the exhibit out of hand prior to trial.[2]

### B. EXHIBITS 17 THROUGH 21: ARTICLES BY PLAINTIFFS' EXPERT

Exhibits 17 through 21 are scholarly articles published by Plaintiffs' expert witness. Objs. Exs. B–F. The articles conclude that racial bloc voting remains a serious problem in the southern states and tend to refute Plaintiffs' implied argument that healthy majority-minority districts are no longer necessary in Virginia. The articles are highly probative given that the conclusion was offered by an individual who Plaintiffs believe is credible. Plaintiffs argue that the articles are hearsay even though the author of the articles *will testify in this case as Plaintiffs' expert* and can provide proper authentication and answer any questions about them. And Plaintiffs concede that the articles will be presentable to the Court on cross examination. Objs. at 3–4. The Court is capable of evaluating the credibility of Plaintiffs' expert and may choose to read the articles if

---

[2] The 2011 DOJ Guidance made small alterations to DOJ's method of race calculation, but the 2001 Guidance provides a more detailed description and necessary background for understanding the method.

6

they find them helpful.[3] Nonetheless, Defendant-Intervenors will not object to Plaintiffs'

proposed procedure of admitting them for the purpose of cross examination.

### C.    EXHIBITS 23 AND 24: DOJ RECORDS

Exhibits 23 and 24 are records produced by DOJ in response to a Freedom of Information

Act (FOIA) request made and fulfilled as statutorily provided. Objs. Ex. G. The DOJ production

consists of documents related to DOJ's preclearance investigation pursuant to federal regulation.

28 C.F.R. § 51.53. Documents include memoranda drafted by DOJ staff attorneys memorializing

phone interviews with various persons involved in the redistricting process—most of them are

Virginia Delegates—and communications to DOJ from various parties interested in the

redistricting process.

The memoranda in particular are highly probative as to the central issue in this case:

legislative motive. Pls. Tr. Br. at 13–14. Plaintiffs' sole challenge is under the Fourteenth

Amendment depends on a showing of "invidious discriminatory purpose." *Vill. of Arlington

Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *Reno v. Bossier Parish Sch. Bd.*,

520 U.S. 471, 488 (1997) (reaffirming that *Arlington Heights* framework applies to racial

gerrymandering cases). "[C]ontemporary statements by members of the decisionmaking body"

are "highly relevant" to that inquiry. *Arlington Heights*, 429 U.S. at 565. Statements by members

of the House as to why they supported or opposed the plan just weeks after the Plan was passed

are therefore highly probative to the central issue in this case and are excluded from hearsay

under Federal Rule Evidence 804(3) as a "statement of the declarant's then-existing state of mind

---

[3] Notably, Plaintiffs have now filed all these articles with the Court, and they are available for the judges to review, raising the question of what meaningful difference there is between admitting them and using them for cross-examination.

(such as *motive*, intent, or plan)" (emphasis added). *Powell v. Laborers Union No. 1271*, 426 F.

App'x 615, 621 (10th Cir. 2011), as amended on denial of reh'g (July 14, 2011) (holding that

comments offered "for the racial attitudes they revealed and not for the truth of any factual

assertions" were not hearsay).

Exhibit 24 is particularly probative because former-Delegate Rosalyn Dance, whom

Plaintiffs have called to testify at trial, will identify the document as recording a telephonic

interview of her by DOJ. She reviewed the memorandum at her deposition and testified that

"that's what I said, and that's it." Dance Dep. at 204. She went on to answer questions about

specific statements reflected in the memorandum, further indicating that the memorandum

memorialized her view of the Plan after its passage. Dance Dep. at 204–208. Presumably, she

will not contradict this testimony at trial, and Plaintiffs can hardly contend that statements Dance

made contemporaneous with relevant events are irrelevant or a waste of the Court's time when

*they will call her as a witness*.

Plaintiffs claim that Dance "did *not* testify that she was the unidentified interviewee."

Objs. at 7 n.2. That is false, as the above-reference testimony makes clear. After leading

questions by Plaintiffs' counsel, Dance admitted that she "can't be certain" that the

memorandum reflects her conversation with DOJ, but Dance did not retract her sworn testimony

that she *believes* that Exhibit 24 reflects her statements or any of her specific testimony about

what was reflected in Exhibit 24. The Court is capable of listening to Dance at trial on this point

and according the Exhibit and any related testimony proper weight.

Plaintiffs claim that the DOJ memoranda entail a second layer of hearsay because the

statements were recorded by DOJ staff attorneys who will not testify, but this purported hearsay

layer falls under the public-records exception to hearsay. Fed. R. Evid. 803(8) (excluding from

8

hearsay a "record" of "a public office" that "sets out," *inter alia*, "a matter observed while under a legal duty to report" or "factual findings"). The Department of Justice is "a public office," the memoranda are "record[s]," and they "set[] out" both "a matter observed" while conducting the preclearance investigation under federal statute and "factual findings"—*i.e.*, the statements of those involved in the legislative process. *See, e.g.*, *U.S. ex rel. Wuestenhoefer v. Jefferson*, No. 4:10-CV-00012-DMB, 2014 WL 7185428, at *7 (N.D. Miss. Dec. 16, 2014) (finding that statements recorded in interview notes were "observed" for purposes of this exception); *Mason v. Mitchell's Contracting Serv., LLC*, 816 F. Supp. 2d 1178, 1191 (S.D. Ala. 2011) (admitting agency notes from telephone interview under this exception).

Because the public-records exception applies, the burden falls on Plaintiffs to show that DOJ memoranda are unreliable. *Zeus Enters., Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 241 (4th Cir. 1999). They cannot meet that burden. DOJ's investigation, which occurred within weeks of the passage of the plan, was timely; DOJ attorneys are skilled in conducting investigations in the course of the preclearance process; and there is no reason to believe DOJ was improperly or insufficiently motivated in conducting its duties. *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300–01 (4th Cir. 1984); *Diaz v. United States*, 655 F. Supp. 411, 416 (E.D. Va. 1987). The memoranda should be admitted.[4]

---

[4] Defendants also offer the Court a footnote on the "rule of completeness," Fed. R. Evid. 106, claiming that, "as a matter of fairness," the memoranda cannot be admitted in light of DOJ's redactions. But "Rule 106 does not prohibit admission of an incomplete document," *United States v. Phillips*, 543 F.3d 1197, 1203 (10th Cir. 2008), and there is no unfairness here because both parties are on an even playing field as to information made available by DOJ. Besides, the purpose of the rule of completeness "is to prevent a party from *misleading the jury* by allowing into the record relevant portions of the excluded testimony which clarify or explain the part already received." *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) (emphasis added). "[M]isleading the jury" is not a concern here.

The other preclearance-related materials in DOJ's FOIA production will not be offered for the truth of any matter asserted but rather to demonstrate that DOJ, in its preclearance investigation, solicits and considers the input of community members as to the question of retrogression. Plaintiffs contend in this case that a redistricting plan with majority-minority districts cannot be narrowly tailored based on the views of representatives of those districts or other community members, but rather must depend on the expert opinions of political scientists. Plfs. Tr. Br. at 27. Defendant-Intervenors contend that, because Section 5 liability and the preclearance process involve substantial reliance on evidence taken from representatives and community members, the strong-basis-in-evidence-standard can depend on such evidence. Intervenors' Tr. Br. at 30. The preclearance materials tend to refute Plaintiffs' view and support Defendant-Intervenors' view. The materials are therefore relevant, worthwhile to admit as evidence, and not hearsay.

### D.    EXHIBIT 25: MCCLELLAN ARTICLE

Exhibit 25 is a news article quoting Delegate Jennifer McClellan as stating that she "voted for the plan because it was good for her district." Objs. Ex. I. Plaintiffs intend to call Delegate McClellan, indicating that they believe her views on the Plan to be relevant to this case. Her statement concerns her *motive* in voting for the Plan and will not be offered for the truth of the matter asserted. Anyway, Defendant-Intervenors anticipate that Delegate McClellan will testify—as she did in her deposition—that the statement in the article was accurate and continues to reflect her view of the Plan. The article therefore is reliable as to McClellan's state of mind at the time the Plan was adopted, and is no less reliable than the news article written by McClellan that is among Plaintiffs' exhibits and would raise the same supposed hearsay problems. Pls. Ex. 29. Nonetheless, because Plaintiffs have acknowledged that Defendant-Intervenors are "free to

10

attempt to cross-examine" McClellan with the article, Objs. Ex. 10, Defendant-Intervenors will agree to use the article in that manner if the Court prefers.

### E.    EXHIBITS 26 AND 27: PRECLEARANCE SUBMISSION

Exhibits 26 and 27 are the Commonwealth of Virginia's preclearance submissions from 1991 and 2001. Defendant-Intervenors principally intend to use these exhibits to establish that no racial bloc voting analysis or other statistical study was provided to DOJ in these submissions. The volume of these proposed Exhibits is indicative of the large volume of information evaluated by the House and DOJ in each redistricting cycle, and the absence of a formal racial bloc voting analysis is a strong indicator that such an analysis has not been prepared in Virginia in past redistricting cycles *prior* to the enactment of a redistricting plan and that it is extremely difficult to conduct one at that time—especially under Virginia's unusually tight timeframe. The evidence is directly relevant to this case and, in particular, Plaintiffs' contention that, "typically, the way that a state would" avoid retrogression prohibited under Voting Rights Act Section 5 "is to conduct a racial bloc voting analysis." Tr. Conference Call with Court at 19 (June 4, 2015). Evidence showing the contrary has more than "a tendency" to make Plaintiffs' contention less likely, defeating Plaintiffs' relevancy objection. Objs. at 11.

Plaintiffs' only other complaint concerns the volume of material. This is unavoidable. Exhibits 26 and 27 are proposed to prove *a negative*—that no racial bloc voting analysis was submitted—and to show that the House and DOJ typically rely on a host of data in making their determination of whether a redistricting Plan satisfies Section 5. A racial bloc voting analysis has not been viewed as necessary in the past in light of all the other information available. Excerpting from the proposed exhibits would not serve these purposes. However, the Court need not spend time rummaging through Exhibits 26 and 27, because the parties will direct them to

any specific portions they deem relevant.[5] The Court will likely spend less time evaluating those arguments on their substance than it will spend deciding this Rule 403 objection. And the Exhibits need not waste paper. As Plaintiffs acknowledge, Defendant-Intervenors have only submitted these Exhibits by electronic means, and, absent direction from the Court otherwise, Defendant-Intervenors will rely on the Court's electronic system to present this evidence and have no intention of submitting voluminous paper copies to the Court.

### F.    EXHIBITS 35 AND 36: *WILKINS V. WEST* EXPERT REPORTS

Exhibits 35 and 36 are expert reports by Dr. Gerald Webster and Dr. James Loewen submitted in *Wilkins v. West*, 264 Va. 447 (2002), which upheld the predecessor districts to those challenged in this case from a racial-gerrymandering challenge. Objs. Ex. M. The reports concluded that racial bloc voting persists across Virginia. The *Wilkins* Court likewise concluded that "the voting behavior of the [challenged] districts correlated highly with race." 264 Va. at 475.

These Exhibits are relevant to the question of narrow tailoring (should the Court reach that issue). Delegate Jones will testify that he was a lead architect of the plan challenged in *Wilkins*, that he was aware of the litigation and expert materials submitted to the Virginia courts, and that he was aware of racially polarized voting in Virginia based on his understanding of the expert evidence presented in, and the findings of, the *Wilkins* case. In fact, the *Wilkins* case is listed as providing relevant guidelines for the House in the criteria governing the 2011 redistricting process.

_____

[5] The materials were provided to the parties by the Virginia Attorney General's office, and Plaintiffs have had ample time to review them to try to refute Defendant-Intervenors' contentions that there is no racial bloc voting analysis in the submissions.

The Exhibits therefore will be offered, not for the truth of findings within the reports, but to establish the nature of Jones's knowledge and consideration in drafting the Plan, in particular the Challenged Districts.[6] The reports are not hearsay. *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d 1378, 1385 (4th Cir. 1995) (admitting reports prepared by third parties to establish that party was aware of their contents); *Worsham v. A.H. Robins Co.*, 734 F.2d 676, 687 (11th Cir. 1984) (same); *Anderson v. Radisson Hotel Corp.*, 834 F. Supp. 1364, 1370 (S.D. Ga. 1993) (same).[7]

In addition, Dr. Hofeller, one of Defendant-Intervenors' experts, relied on the Webster Report in preparing his expert report for this case, and he will testify as to the relevance of the Webster Report in his expert testimony.

There is also no basis for Plaintiffs to complain that Defendant-Intervenors failed to disclose the Reports under rules requiring disclosure of expert witnesses and materials. The Webster and Loewen Reports are not offered as expert reports in this case, and neither Webster nor Loewen will be presented as a witness, expert or otherwise. Nor is there a problem under Federal Rules of Civil Procedure 26(a) and 37(c)(1) for failure to disclose the reports. Those rules require disclosure of materials that are in the "possession, custody, or control" of the

---

[6] Plaintiffs contend that Jones could not have known about the reports because "nothing in Delegate Jones' deposition indicated that he considered any expert reports." Pls. Objs. at 14. But Delegate Jones repeatedly stated in his deposition that he was aware of the *Wilkins v. West* litigation, and Plaintiffs' counsel declined to ask further questions. Jones could only answer what he was asked. Besides, what matters is that *at trial* Jones will testify that he was aware of the conclusions of the Reports.

[7] To show that the Plan was narrowly tailored to comply with the Voting Rights Act, Defendant-Intervenors need merely show that "they have *good reasons* to believe [use of racial classifications] is required, even if the court does not find that the actions were necessary for statutory compliance." *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1274 (2015); *see also Bush v. Vera*, 517 U.S. 952, 978 (1996) ("deference is due to [the legislature's] reasonable fears of" Voting Rights Act liability). Evidence that Jones was aware of racial bloc voting in drawing the Plan is highly probative as to that inquiry.

disclosing party. Fed. R. Civ. P. 26(a). Neither report was in the possession of Defendant-Intervenors. The Webster Report was relied upon by Defendant-Intervenors' expert witnesses, and accordingly was produced to Plaintiffs on April 28, 2015, in response to subpoenas served on Drs. Hood and Hofeller. A copy of the Loewen Report was not in the possession or control of Defendant-Intervenors until the time that trial exhibits were disclosed. It was disclosed at the soonest possible moment.

Besides, Plaintiffs have little room to complain about nondisclosure when their expert did not produce the political data on which he relied for his expert report. Presumably, that was because the data were publicly available from Virginia's Department of Legislative Services. But so were the Webster and Loewen Reports: they were made public in the *Wilkins v. West* litigation.

Finally, Plaintiffs' Rule 403 argument is improper, *Schultz*, 24 F.3d at 632, and amounts to legal arguments couched in evidentiary terms. Plaintiffs claim that the reports are irrelevant because they concern the 2001 Plan and were 10 years old at the time of the 2011 redistricting. Objs. at 15. But Delegate Jones relied on the reports in drawing majority-minority districts in 2011, which is particularly relevant to the issue of racially polarized voting. *See Thornburg v. Gingles*, 478 U.S. 30, 52 (1986). And the House criteria specifically cited *Wilkins v. West* as providing relevant standards for the 2011 Plan. Plaintiffs cite no evidence indicating that the strong-basis-in-evidence standard requires a legislature to conduct formal statistical analyses *during each redistricting cycle*, and the Court should consider all evidence relevant to the issue before imposing this novel requirement. For the same reason, Plaintiffs' assertion that Jones "utilized a mechanical 55% BVAP threshold for all 12 districts" is no basis to exclude the evidence. Objs. at 14. That issue is hotly contested, Intervenors' Tr. Br. at 10, 21, 25, and

relevant evidence should not be excluded on the unfounded assumption that Plaintiffs' bald assertions will prevail.

### G.     EXHIBIT 92: POLITICAL AND RACIAL COMPOSITION MAPS

Proposed Exhibit 92 contains maps illustrating various data sets to compare the political and racial composition of the Challenged Districts. As to each district, the Exhibit includes two maps: one expressing the percentage of individuals who voted for Republican Governor Bob McDonnell in 2009 and one expressing the percentage of non-Hispanic Black voting age population. This information is relevant in establishing a correlation between race and politics in the Challenged Districts, *see Easley v. Cromartie*, 532 U.S. 234, 258 (2001), and demonstrating multiple revealing instances in which *politics*—not race—governed the specific line-drawing decisions in the Challenged Districts.

The maps are merely illustrative of data that will be in evidence in agreed exhibits and/or that is publicly available from Virginia's Department of Legislative Services—which Defendant-Intervenors understand to be the source of Plaintiffs' unproduced expert's data. In fact, Plaintiffs made a FOIA request to the Department of Legislative Services in this litigation, and they declined to produce the materials they obtained from that request to the other parties. The Department of Legislative Services production almost certainly included the underlying data for Exhibit 92. Moreover, Plaintiffs' exhibits include several maps that Defendant-Intervenors have never seen before and that do not have Bates numbers and appear not to have been produced in discovery. *See* Pls. Tr. Exs. 66–67.[8] It makes sense for the parties to present statistical

_____

[8] Plaintiffs have also submitted as trial exhibits maps that appear to have been created by Virginia's Division of Legislative Services, but they also do not have Bates numbers and appear not to have been produced in this case. *See* Pls. Tr. Exs. 64–65.

information to the Court through maps like these, which are much easier to understand than rows of raw data.

Delegate Jones will testify that the maps are fair and accurate depictions of screens that he generated and viewed on the Maptitude software while drawing the Plan. There is therefore no legitimate objection as to foundation. Establishing foundation will, of course, add additional time to the trial—which is why Defendant-Intervenors believed the parties would not make foundation-related objections—but Defendant-Intervenors will seek to admit the maps under this procedure if necessary. Alternatively, the maps in Exhibit 92 qualify as demonstratives, and Defendant-Intervenors will use them in that manner if the Court determines not to admit them into evidence. Since both sides have reserved the right to create and use demonstratives at trial that will serve precisely that purpose, there is no basis for Plaintiffs to seek to exclude the exhibits on the basis of improper disclosure or prejudice.

## H.  EXHIBIT 100: APPENDIX C IN THE *ALABAMA* DECISION

Proposed Exhibit 100 is Appendix C from the Supreme Court's decision in *Alabama Legislative Black Caucus v. Alabama*. Plaintiffs rely extensively on the *Alabama* decision in their brief. Defendant-Intervenors believe the case supports their position and intend to distinguish it factually on several grounds, including on the difference of the shapes of the *Alabama* districts as compared to the Challenged Districts in this case. Appendix C depicts District 26 in the *Alabama* plan, which was the district that received the most extensive treatment in the Supreme Court's decision. Defendant-Intervenors believe it will be helpful for the Court to have a convenient copy of the image available in evidence to compare side-by-side with maps of the Challenged Districts.

Plaintiffs object on the basis that "Intervenors do not need to have Appendix C admitted into evidence in order to cite it." Objs. at 18. *But see* Plfs. Tr. Ex. 43 (statute that could be cited in any event). Defendant-Intervenors disagree that the Appendix is not admissible and are perplexed as to why this dispute is worthwhile. In the interest of judicial economy, Defendant-Intervenors are willing to use Appendix C as a demonstrative.

## CONCLUSION

For the foregoing reasons, the Court should overrule Plaintiffs' objections.

Dated: July 1, 2015                          Respectfully Submitted,

*/s/ Jennifer M. Walrath*
E. Mark Braden (*pro hac vice*)
Jennifer M. Walrath (VSB No. 75548)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Of Counsel:

Dalton L. Oldham, Esq.
1119 Susan Street
Columbia, SC 29210
Phone: (803)772-7729
dloesq@aol.com

*Attorneys for the Virginia House of*
*Delegates and Virginia House of Delegates*
*Speaker William J. Howell*

17

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of July, 2015, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.

*/s/ Jennifer M. Walrath*
E. Mark Braden (pro hac vice)
Jennifer M. Walrath (VSB No. 75548)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Of Counsel:

Dalton L. Oldham, Esq.
1119 Susan Street
Columbia, SC 29210
Phone: (803)772-7729
dloesq@aol.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker William J. Howell*