1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                     RICHMOND DIVISION

4

5    -----------------------------------
                                        :
6    GOLDEN BETHUNE-HILL, et al.,       :
                                        :   Civil Action No.
7    Vs.                                :   3:14CV852
                                        :
8    VIRGINIA STATE BOARD OF            :   July 7, 2015
     ELECTIONS, et al.                  :
9    -----------------------------------:

10

11          COMPLETE TRANSCRIPT OF THE BENCH TRIAL

12          HEARD BEFORE:   THE HONORABLE ROBERT E. PAYNE
                            THE HONORABLE GERALD BRUCE LEE
13                          THE HONORABLE BARBARA M. KEENAN

14

15   APPEARANCES:

16   Kevin J. Hamilton, Esquire
     Perkins Coie, LLP
17   1201 Third Avenue
     Suite 4800
18   Seattle, Washington  98010

19   Bruce V. Spiva,  Esquire
     Aria C. Branch, Esquire
20   700 13th Street NW
     Suite 600
21   Washington, D.C.  20005
     Counsel for the plaintiffs

22

23

24              Peppy Peterson, RPR
               Official Court Reporter
25           United States District Court

```
 1    APPEARANCES:  (cont'g)

 2    Tony F. Troy, Esquire
      Eckert Seamans Cherin & Mellott, LLP
 3    707 East Main Street
      Suite 1450
 4    Richmond, Virginia  23219

 5    Daniel A. Glass, Esquire
      Eckert Seamans Cherin & Mellott, LLC
 6    1717 Pennsylvania Avenue, NW
      Suite 1200
 7    Washington, D.C.  20006

 8    Godfrey T. Pinn, Jr., Esquire
      Harrell & Chambliss, LLP
 9    707 East Main Street
      Suite 1000
10    Richmond, Virginia  23219
      Counsel for the Virginia State Board of Elections
11
      E. Mark Braden, Esquire
12    Katherine L. McKnight, Esquire
      Jennifer M. Walrath, Esquire
13    Richard B. Raile, Esquire
      Baker & Hostetler, LLP
14    1050 Connecticut Avenue, NW
      Suite 1100
15    Washington, D.C.  20036

16    Dalton L. Oldham, Jr., Esquire
      Dalton L. Oldham, LLC
17    1119 Susan Street
      Columbia, South Carolina  29210
18    Counsel for Virginia House of Delegates

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2

3          THE CLERK:  3:14 civil 852, Golden Bethune-Hill,

4  et al., versus Virginia State Board of Elections, et al.,

5  versus Virginia House of Delegates, et al.  Would counsel

6  please note your appearances for the record.

7          MR. HAMILTON:  Good morning.  Kevin Hamilton on

8  behalf of the plaintiffs, and with me today is Bruce

9  Spiva, my partner, and Aria Branch.

10          THE COURT:  Morning.

11          MR. TROY:  Anthony Troy on behalf of the

12  defendants State Board of Elections and the Department of

13  Elections, and with me is my partner Dan Glass, and also

14  Godfrey Pinn.

15          MR. BRADEN:  Your Honors, Mark Braden with the

16  defendant intervenors.  I'll let my co-counsel introduce

17  themselves.

18          MS. WALRATH:  Jennifer Walrath for intervenors.

19          MS. McKNIGHT:  Good morning, Your Honors.  Kate

20  McKnight on behalf of the defendant intervenors.

21          MR. RAILE:  Mark Raile on behalf of defendant

22  intervenors.

23          THE COURT:  Anybody else?

24          MR. OLDHAM:  Dale Oldham on behalf of defendant

25  intervenors, Your Honors.

1          THE COURT:  As they say, we are properly lawyered

2    up, and we can begin.  We'll have opening statements which

3    I believe -- in a moment, but as I look at your -- we've

4    looked at your objections.  We don't see any reason why we

5    can't deal with those when and as they come up given that

6    you resolved most of them, and the only thing that's

7    really going to come up in the plaintiffs' case right away

8    is the Exhibit 17 through 21, and you all seem to be in

9    accord about how those can be used; that how it sits with

10   the rest of you?

11         MR. HAMILTON:  Yes, Your Honor.

12         MR. BRADEN:  Yes, Your Honor.

13         JUDGE PAYNE:  Mr. Hamilton, will you be giving

14   the opening for the plaintiffs?

15         MR. HAMILTON:  I am, Your Honor.  Your Honor, I

16   have a handful of demonstrative exhibits we'd like to put

17   up on the easel if I can ask my paralegal to assist, and

18   if I have small copies for the Court and counsel.

19         JUDGE PAYNE:  They'll be handed up then.

20         MR. HAMILTON:  Good morning, Your Honors.  For

21   the record, my name is Kevin Hamilton, and I appear today

22   on behalf of the plaintiffs.

23         The equal protection clause of the Fourteenth

24   Amendment forbids race-based redistricting absent a

25   compelling state interest, and even then, only when

1  narrowly tailored to meet that state interest.  The

2  evidence will show that in 2011, the Virginia General

3  Assembly used race as a predominate factor in drawing

4  these 12 House of Delegates districts that are at issue in

5  this case had no compelling interest to do so, and even if

6  it had a compelling interest, failed to narrowly tailor

7  those districts to that state interested.

8         The evidence will show that the General Assembly

9  manipulated these 12 districts by moving voters in and out

10  of the districts, all with the admitted goal of achieving

11  a predetermined minimum percentage of black voters.

12         The target, the evidence will show, was defined

13  not by political performance but explicitly based on race.

14  The evidence will show that race, not politics, was a

15  predominate purpose of the redistricting plan from start

16  to finish.

17         This morning, I'd like to take just a few minutes

18  to briefly emphasize a handful of key facts that we

19  believe will be established by the evidence during the

20  course of the trial.

21         First, the evidence will show that the House of

22  Delegates utilized a mechanical 55 percent black

23  voting-age population rule in drawing these 12 districts.

24  The evidence of that overtly racial rule is, frankly,

25  overwhelming, and I've highlighted some of it in the

1   poster board here in front of the Court, and in the

2   handout.  The confirming evidence comes from a variety of

3   different sources:  Delegates will testify in this Court,

4   emails sent during the redistricting process, testimony on

5   the floor of the House of Delegates, and even the expert

6   reports submitted from the *Page* litigation by one of the

7   consultants, John Morgan, who worked on this house plan.

8           There, Mr. Morgan describes what happened, quote,

9   the General Assembly enacted with strong support of

10   bipartisan and black legislators a House of Delegates

11   redistricting plan with a 55 percent black voting-age

12   population as the floor for black majority districts

13   subject to Department of Justice preclearance under

14   Section 5, close quote.  That's exactly what happened.

15           Second, the evidence will show that Delegate

16   Chris Jones, the architect of the challenged districts,

17   himself repeatedly emphasized this mechanical 55 percent

18   black voting age threshold.  Again, we've highlighted some

19   of Delegate Jones's statements on the board before you.

20           Now, Delegate Jones apparently intends to come

21   into this courtroom and testify he used a different method

22   of calculating black voting-age population, and using that

23   method some of the districts fell slightly below

24   55 percent and, therefore, couldn't have been a 55 percent

25   rule.

1        This is nothing but a distinction without a

2   difference.  The plaintiffs knowledge not once during any

3   legislative hearings or debates did he make that

4   distinction, but it really doesn't matter whether he did

5   or didn't.  The evidence will make plain that a black

6   voting-age population rule was used and that the rule was

7   used for no reason other than to sort voters based on the

8   color of their skin.

9        No matter what method of calculation is used to

10  implement that sort of rule, that sort of racial sorting

11  is plainly unconstitutional.  The Supreme Court's recent

12  decision in the Alabama case, and, of course, this Court's

13  recent decision in the *Page* case, makes it plain that that

14  sort of racial rule is inappropriate and unconstitutional.

15       Third, the evidence will show that the minority

16  preferred candidates holding these seats in these 12

17  districts were safe and winning reelection by large

18  margins of victory.  It's undisputed that the General

19  Assembly did not conduct a racially polarized voting

20  analysis prior to adopting this 55 percent black

21  voting-age population rule, but even if they had conducted

22  a simple review of election returns, it would have been

23  demonstrated that such an across-the-board rule was

24  unnecessary to prevent retrogression.

25       Fourth, the evidence will show that the

1    55 percent black voting-age population rule predominated

2    over all other criteria used.  The evidence will show that

3    it was fixed and nonnegotiable.  In a telling example,

4    when the Richmond registrar asked for a slight change to

5    avoid splitting a voting tabulation district -- that's

6    synonymous with a precinct -- Delegate Jones rejected the

7    change because it would have dropped the black voting-age

8    population in one of the districts to 54.8 percent, just

9    0.2 percent below the 55 percent threshold, or as the

10   Richmond registrar responded, a measly 0.2 percent,

11   unquote.

12           One can hardly imagine clearer evidence of race

13   predominating over traditional redistricting criteria like

14   not splitting the VTDs.  Intervenors apparently intend to

15   present evidence that they considered political factors in

16   drawing the map, and they may well have done so.  But it

17   was only half satisfying this nonnegotiable 55 percent

18   racial threshold.

19           It's hardly an accident that every single one of

20   these 12 legislative districts exceeded 55 percent black

21   voting-age population.  That, indeed, was the whole point

22   of the exercise.

23           Fifth, the evidence will show that the

24   intervenors cannot identify a compelling state interest to

25   justify this explicit use of race.  Intervenors contend

1    that the General Assembly's goal of complying with Section

2    5 justified its use of race, Section 5 of the Voting

3    Rights Act.

4          The only way to survive strict scrutiny, at least

5    sine the Supreme Court's decision in *Miller v. Johnson*, is

6    to show that the plans were actually required by Section

7    5.

8          There's no plausible argument that Section 5,

9    properly interpreted, required at least 55 percent black

10   voting-age population in each of these districts, all of

11   which, the evidence will show, was already performing for

12   the minority-preferred candidate with large winning

13   majorities.

14         The question under Section 5 is whether there's

15   been retrogression; that is under the proposed plan, would

16   it reduce the minority voters' effective ability to elect

17   candidates of their choice.  Section 5 most assuredly does

18   not command that a state preserve, much less increase, the

19   preexisting minority population in the districts.  If

20   that's what the House of Delegates or the General Assembly

21   or Delegate Jones believed, then they were wrong.

22         The burden is on the state to establish that it

23   had a, quote, strong basis in evidence, close quote, for

24   believing that Section 5 required it to draw districts

25   with this level of black voting-age population.  In the

1    absence of such a showing, the plan necessarily fails

2    strict scrutiny.

3            But Delegate Jones will admit that there was no

4    racial block analysis done, and, in fact, no analysis of

5    racial voting patterns whatsoever was conducted in advance

6    of drawing this plan.  The evidence, instead, will show

7    that the author simply chose to guess and adopts an

8    unvarying racial floor that was uniform across all 12

9    districts regardless of political performance or

10   population in those districts, but this guesstimation

11   approach, no matter how well intentioned, cannot supply a

12   strong basis in evidence for believing that Section 5

13   required these districts.

14           Now, because there's overwhelming direct evidence

15   of that -- that race predominated over politics, there is

16   no need to examine any alternative maps as is sometimes

17   suggested where a case involves only circumstantial

18   evidence.  But in any event, there's certainly alternative

19   maps in the record, maps introduced in the House, maps

20   introduced by the independent bipartisan commission, that

21   have been convened by the Governor, and all of those maps

22   eschewed a mechanical 55 percent or any kind of racial

23   rule that the General Assembly used, and all of them would

24   allow the General Assembly to achieve their after-the-fact

25   goal of disadvantaging democrats.  They could have done

1   that without using a racial rule.

2          Sixth, even if the defendants could identify a

3   compelling state interest, they can't meet their burden of

4   proving that these 12 districts and the one-size-fits-all

5   racial rule that they used to create them is narrowly

6   tailored to achieve that interest.

7          The Supreme Court, long ago, declared that a

8   reapportion plan would not be narrowly tailored with the

9   goal of avoiding retrogression if the state went beyond

10  what was reasonably necessary to avoid retrogression.  The

11  evidence will show that in many of these districts,

12  there's just no dispute that there is no polarized voting

13  going on.

14         Even intervenors' expert, Dr. Katz, will admit he

15  doesn't dispute Dr. Ansolabehere's conclusions with

16  respect to five of the districts.  He agrees with Dr.

17  Ansolabehere's conclusions that there's no racially

18  polarized voting in four of the remaining seven, and that

19  there are significant differences in white crossover

20  voting in the three remaining districts he looked at.

21         In some of the challenged districts, intervenors'

22  own expert will admit that African American's candidates

23  received over 70 percent of the white vote.  The Supreme

24  Court, in *Miller*, wrote that the essence of the equal

25  protection clause recognized in *Shaw* that the states used

1    race as a basis for separating voters into districts.  The

2    *Shaw* court condemned those plans because, quote, they

3    threatened to carry us further from the goal of a

4    political system in which race no longer matters, a goal

5    of that 14th and 15th Amendment embodied to which this

6    nation continues to aspire, close quote.  So, too, will

7    the evidence condemn the plans before you.

8         At the conclusion of this trial, plaintiffs will

9    ask this Court to invalidate these 12 districts and

10   implement appropriate immediate and effective remedies for

11   the General Assembly's constitutional violations.

12        JUDGE PAYNE:  Thank you.  Who is going to speak

13   for the defendants?

14        MR. TROY:  Your Honor, on behalf of the

15   defendants, first, as I indicated, we are representing the

16   two defendants, State Board of Elections and the

17   Department of Elections.  I'd like to, if I may, introduce

18   to the Court Commissioner Edgardo Cortés who is here on

19   behalf of both defendants.

20        As I've mentioned previously, the defendants are

21   administrative agencies that implement elections.  They do

22   not draw the districts.  So there comes a time when

23   there's an issue as to implementations, an issue that is

24   currently, I believe, premature, then we will be available

25   to assist.  But beyond that, let me just state that I

1   believe the evidence will demonstrate that race --

2           JUDGE LEE:  If you come to the podium, I'll hear

3   you better.  Thank you very much.

4           MR. TROY:  I apologize.

5           JUDGE LEE:  We prefer using the podium up here.

6           MR. TROY:  Yes, sir, Your Honor.  Your Honors,

7   beyond introducing Commissioner Cortés, as I indicated, we

8   believe on behalf of the defendants that race was not the

9   predominate factor in drawing the districts.  We believe

10  that the evidence will demonstrate that, and, thus, I

11  believe that the Commonwealth's districts are, in fact,

12  valid.

13          I know the defendant intervenors will be

14  presenting a lot more substantive information on that, and

15  we believe in that position.

16          JUDGE LEE:  Thank you.

17          MR. TROY:  Thank you.

18          JUDGE PAYNE:  For the intervenor defendant, Mr.

19  Braden?

20          MR. BRADEN:  Mark Braden.  May it please the

21  Court, the plaintiffs have provided you with a trial brief

22  and an opening statement devoid of context and devoid of

23  history.  I really cannot imagine how one can be involved

24  in a redistricting case in the Old Dominion and not talk

25  about history.  You have to put this case in the context

1    of Virginia political and racial history.

2            Now, we don't have to go back very far.  I think

3    the first lesson is current history.  There's not a word

4    in their briefs, not a word in the opening statement about

5    *Wilkins v. West*.  That's the last cycle.  That's the

6    exact, for all intents and purposes, virtually the same 12

7    majority/minority districts.  Not a word about that, the

8    exact same claims rejected by the Virginia Supreme Court,

9    not a word.

10           There's not a word about Section 2 of the Voting

11   Rights Act.  There's not a word about the history of

12   Section 2 litigation in the State of Virginia, numerous

13   plans being thrown out and election laws being

14   invalidated.  Not a word about Section 2.

15           Except the defendant intervenors, the House have

16   to comply with Section 2 and Section 5.  Did we hear any

17   discussion or see anything their briefs about the numerous

18   rejections by the Department of Justice about prior

19   Virginia plans and prior Virginia election laws?  Not a

20   word about that.

21           And, of course, not a word of Virginia's long and

22   unattractive history of one-party rule with the

23   suppression of African Americans.  Not a word about that

24   discussion here.  So you've got to put the plan and your

25   review of the plan in that historical context.

1          These 12 majority/minority districts have been in

2     existence in the state since 1991.  They are, in fact,

3     traditional representative units.  Even without Voting

4     Rights Act consideration, simply the notion of traditional

5     status quo redistricting, these districts should be

6     affirmed.

7          Now, the question before this Court, really the

8     threshold question, is whether or not this plan is subject

9     to strict scrutiny.  The test question for that, though,

10    is not the one posed by them.  It's not whether or not

11    this plan was drawn using race as a consideration.  The

12    answer to that question is yes, it was, absolutely clearly

13    yes.

14         How could it have not been?  Let's start out,

15    drawing plans, what do you get from the federal

16    government?  You get PL 94-171 data.  The government gives

17    you the data that they tell you you should use to draw the

18    plans.  What's in that data?  Population, race.  I wonder

19    why they gave us race.  We get race because you have to

20    consider race.

21         I would tell this Court, and I think the experts

22    will all agree, their expert and our experts, that every

23    state drawing state legislative lines, with the exception

24    of maybe Vermont and Maine, use race in the process.

25    That's 98 out of 100.

1        The question is not whether we have a criteria as

2    adopted by the state to comply with the Voting Rights Act.

3    And even if that compliance is nonnegotiable, unless I

4    missed something about the supremacy clause, it has to be

5    nonnegotiable.  The State of Virginia has to comply with

6    the Voting Rights Act.  Not just retrogression, but

7    Section 2, too.

8        The question for this Court, the question you

9    must answer to get to strict scrutiny, is whether the use

10   of race resulted in any district which violated Virginia

11   law or traditional redistricting criteria of the state,

12   or, as the state did here, their specifically adopted

13   criteria.

14       If there's no conflict between the use of race

15   and those criteria, then how can race predominate?  How

16   can it subordinate, be subordinate, the criteria, if

17   there's no conflict?

18       The plaintiffs will provide this Court with

19   actually no evidence to a whole list of criteria adopted

20   by the state.  Their expert looks at race and politics and

21   compactness, but we will present to this Court the

22   specific criteria adopted by the state which included a

23   whole variety of other traditional criteria which their

24   expert didn't look at whatsoever.  So how can you use his

25   expert report to say that race is predominant over this

1    other list of criteria which nobody looks at?

2           The architect of the plan, who we're going to

3    bring into the courtroom, put up in the chair, can pull

4    this Court a little bit into the political thicket because

5    you have to be in the political thicket to do a

6    redistricting case.  You have to watch a little bit of the

7    sausage-making.

8           This is a political process, so the architect of

9    the plan, and also through the floor speeches

10   contemporaneously with the passage of the plan, the folks

11   in the legislator who voted for this plan will go district

12   by challenged district to explain politics and geography

13   of those districts and prove, I believe, clearly to this

14   Court that race was not the predominate factor.

15          That is a complicated process.  Normally you

16   don't want to pull a courtroom too deep into the political

17   process, especially legislative, because it involves some

18   horse-trading, and it does.  But at the back end of this

19   process, an amazing thing happened.  A number of us around

20   this room have been involved in a lot of redistricting

21   litigation.  I don't think it's too bold to say that's an

22   extremely politically contentious process.  Some people

23   will say it's the most politically contentious process for

24   a legislative body.

25          This plan passed with an overwhelming majority

1    vote in the House of Delegates, a majority of the

2    Republican caucus -- we're not surprised by that -- an

3    overwhelming majority of the Democratic caucus, and an

4    overwhelming majority of the black caucus.

5         Hundreds of hours were spent drawing this plan

6    balancing different interests, following those criteria.

7    There is no strict scrutiny unless they prove to this

8    Court how we validated and made race more important to

9    those criteria.  These districts exist as geographic

10   units.

11        Now, we've got to do a belt-and-suspenders

12   argument, so let me talk about the notion if should

13   disagree with me and that you feel the need to look a step

14   beyond this as to whether the plan is narrowly tailored to

15   address compelling state interests.

16        I think the notion of what a compelling state

17   interest is is a pretty simple:  Compliance with the

18   Voting Rights Act, Section 5, retrogression, true, but

19   also Section 2 which is a very important consideration.

20   If you don't meet Section 2, you don't have a plan that

21   survives.

22        There's a long history in Virginia, as I pointed

23   out earlier, of Section 2 litigations and districts and

24   plans and laws being thrown out.  That's our criteria.

25   Didn't talk about retrogression, it talked about

1  compliance with the Voting Rights Act.

2          So we've got a compelling interest, what's

3  narrowly tailored.  Narrowly tailored isn't a magic

4  number.  I totally reject the notion it's a magic number.

5  It's not whether it's 51.1 or 50.001, or 55, or 54, or 60.

6  It's not a magic number.  Narrowly tailoring is if you

7  have a compelling interest, you have to use race.  It's

8  the degree to which you violate the traditional

9  redistricting criteria.  That's what counts, how far you

10  are away from what the state has established, what the

11  politics of the body wants.  That is narrow tailoring.

12          They need to provide this Court with an example

13  of a plan, an alternative that meets those goals, because

14  the test why they need that is no one disputes in this

15  case -- again, their expert will agree with our expert --

16  that there's a direct correlation between race and

17  politics.

18          Frankly, you don't need expert witnesses.  Three

19  people on this bench know that.  Every adult person in the

20  State of Virginia that is involved in politics in any

21  sense knows that as a fact, that there is a correlation

22  between race and politics in Virginia.

23          They have no alternative plans.  In the first

24  argument to the Court, they provided the Court with

25  suggestions that they were going to use the two plans

1    before the legislator.  The Court will hear this as 5002

2    and 5003.  Those are laughable plans.  5002 pairs 48

3    members of a hundred member chamber.  It has a population

4    deviation four times the population in the criteria.

5         The other one is much better.  It only pairs 32

6    members of a 100-member chamber and, again, totally

7    ignores the variety of other criteria including the

8    population criteria besides the fact that both those plans

9    decimate the black caucus.

10        The answer to this Court is not to accept this

11   argument -- I guess it's been covered up now.  We have

12   their demonstrative that talks about a 55 percent rule,

13   and somehow or another that 55 percent rule makes this

14   plan invalid.  First of all, I think it's quite

15   interesting, you notice on the quotes?  There's a

16   55 percent rule at the top but not a single one of the

17   quotes is a quote there's a rule.

18        There wasn't any rule.  There was an aspiration

19   to get the 55 percent.  How would you draw a plan without

20   a goal as to what a minority district ought to be?  Where

21   does that come from?  It comes from the people who know

22   the most about the voting in those districts, the black

23   members.  That's where it comes from.

24        It's a totally logical number from a series of

25   hearings.  You'll see the speeches on the floor.  You'll

1    hear the architect, the explanation for this plan.

2    Frankly, the explanation for the plan is the fact that it

3    passed with only nine, nine no votes.  If this plan is not

4    constitutional, then you're going to have to put into your

5    agenda a period where you get to draw the lines every

6    time.  This is, frankly, as good as it gets for a

7    political process.  Thank you.

8          JUDGE PAYNE:  Are you ready with your first

9    witness?

10          MR. SPIVA:  Yes, Your Honor.  Bruce Spiva for the

11    plaintiffs.  I just wanted to raise two matters before we

12    call our first witness.  One is that the parties have

13    submitted a factual stipulation, and I just wanted to note

14    that for the record.

15          And as Your Honor mentioned, most of the exhibits

16    have been stipulated to, and I just wanted to verify that

17    we can assume that those stipulated exhibits have all been

18    admitted into evidence.

19          JUDGE PAYNE:  They are.  Does the stipulation

20    have an exhibit number?

21          MR. SPIVA:  I don't believe it does.

22          THE COURT:  At the end of the day, give us a

23    number for it so we'll know what it is.

24          MR. SPIVA:  Will do.

25          THE COURT:  It doesn't makes any difference what

1    it is.

2              MR. SPIVA:  Will do, Your Honor.  Are you ready

3    for me to call the witness?  Plaintiffs call Delegate

4    Jennifer McClellan.

5              JUDGE PAYNE:  Do you have notebooks with the

6    exhibits that you're going to use with each witness like

7    you did the last time?

8              MR. SPIVA:  We do, Your Honor, and also, I

9    believe we're going to have them all appearing on the

10   screen, so if you want, I can mention the notebooks that

11   we're going to use in this examination.  If you all --

12             THE COURT:  Hand them up --

13             MR. SPIVA:  They're right behind you.  I believe

14   the only notebooks are the plaintiffs' notebook that has

15   Exhibits 1 through 42 in it, and also we will be using

16   defendant intervenors' notebook that has Exhibit 94 in it.

17             JUDGE PAYNE:  Shouldn't I be looking one tailored

18   specifically for Delegate McClellan?

19             MR. SPIVA:  No, Your Honor.

20             JUDGE PAYNE:  We need another one through 25 for

21   Judge Keenan.  Two of us have them.

22             MR. SPIVA:  Okay, Your Honor.  Does everybody

23   have those two notebooks, the plaintiffs' first volume and

24   defendant intervenors' volume which has 94 in it?

25             JUDGE PAYNE:  Now you're just going to use the

1  first volume, one through 25?  You're not going to use 26

2  through 41.

3          MR. SPIVA:  I'm sorry, Your Honor.  We will use

4  both volumes of plaintiffs' exhibits, and then we're also

5  going to use the defendant intervenors' volume that has

6  Exhibit 94 in it.

7          JUDGE PAYNE:  Okay.  We can find that.  You're

8  not going to get to that right off the bat, are you?

9          MR. SPIVA:  Not off the bat, Your Honor, and we

10  will show it on the screen as well.  Your Honor, Mr.

11  Hamilton has alerted me to the fact the stipulation is

12  document number 83 -- I'm sorry, docket number 83.

13          JUDGE LEE:  Thank you.  You may proceed.

14

15          **JENNIFER LEIGH McCLELLAN,**

16  a witness, called at the instance of the plaintiffs,

17  having been first duly sworn, testified as follows:

18                  DIRECT EXAMINATION

19  BY MR. SPIVA:

20  Q    Good morning, Delegate McClellan.  Can you state your

21  full name for the record.

22  A    Yes.  Jennifer Leigh McClellan.

23  Q    Where are you from, Delegate McClellan?

24  A    I was born and raised in Petersburg and currently live

25  in the city of Richmond.

McClellan - Direct                                    24

1    Q    And I understand that you are an attorney?

2    A    Yes.

3    Q    Where did you go to law school?

4    A    University of Virginia.

5    Q    Where did you go to college?

6    A    University of Richmond.

7    Q    And where are you currently employed?

8    A    Verizon Communications.

9    Q    What do you do there?

10   A    I'm assistant general counsel for the mid-Atlantic

11   states.

12   Q    And I understand that you are a delegate to the

13   Virginia House of Delegates?

14   A    Yes, I am.

15   Q    Which district do you represent?

16   A    The 71st which is the northeast portion of the city of

17   Richmond and one precinct in Henrico County.

18   Q    And just for the record, Delegate McClellan, what is

19   your race?

20   A    African American.

21   Q    And can you tell me a little bit about where your

22   district, District 71, is located?

23   A    Yes.  In the City of Richmond, it starts with the Fan

24   neighborhood, goes east through downtown.  It's north of

25   the river up into the Church Hill, the eastern end of the

1   city, all of north side except for one precinct, and one

2   precinct in eastern Henrico County.

3   Q    I want to ask you a little bit about the history of

4   the demographics of your district.  Are you familiar with

5   the terminology black voting-age population?

6   A    Yes.

7   Q    And what was the black voting-age population of your

8   district immediately after the 2011 redistricting?

9   A    Right after 2011, it was slightly above 55 percent.

10  Q    And what was the black voting-age population of your

11  old district immediately prior to redistricting according

12  to the 2010 census?

13  A    It was slightly above 46 percent.

14  Q    And are you aware of what the black voting-age

15  population of your district was at the beginning of the

16  2000 cycle, in 2001?

17  A    It was slightly above 55 percent.

18  Q    When were you first elected to the House of Delegates?

19  A    2005.

20  Q    Did you have a primary opponent in that election?

21  A    Yes, I did.

22  Q    And what was his race?

23  A    African American.

24  Q    And what was the percentage that you prevailed by in

25  that race?

McClellan - Direct

1    A    It was about 65 percent.

2    Q    Did you have an opponent in either the 2005 or 2007

3    general election?

4    A    No, I didn't.

5    Q    Did you have an opponent in the 2009 general election?

6    A    Yes, I did.

7    Q    What was your opponent's race in that election, in the

8    2009 general election?

9    A    He was white.

10   Q    And what was his party?

11   A    He was running as an independent.

12   Q    And I take it you prevailed in that race.  What was

13   the percentage that you won by?

14   A    About 82 percent.

15   Q    Did you have an opponent in the 2011 primary or

16   general election?

17   A    No, I didn't.

18   Q    Did you have an opponent in the 2013 general election?

19   A    Yes, I did.

20   Q    And who was that?

21   A    His name was Matt Fitch.

22   Q    What was his party?

23   A    He was running as a Republican.

24   Q    What was his race?

25   A    He was white.

McClellan - Direct

1    Q    And what was your winning percentage in that race?

2    A    About 87 percent.

3    Q    Are you currently facing a general election challenger

4    in the 2015 election?

5    A    Yes, I am.

6    Q    And what is his race?

7    A    White.

8    Q    And party?

9    A    He's running as an independent.

10   Q    Do you have any understanding, Delegate McClellan, of

11   the reason why you had -- you haven't had an opponent in

12   many of your races?

13   A    The 71st district historically has had the highest

14   democratic performance index which is calculated based on

15   the results of prior elections.  It's always been the

16   highest in the state, since I've been in at least.  I

17   think that might encourage or discourage general election

18   challengers.  And I guess the democrats are satisfied with

19   my work, so I haven't had a primary challenger.

20   Q    Were you the first African American representative to

21   District 71?

22   A    No, I wasn't.

23   Q    Who was the first African American representative of

24   District 71?

25   A    Benjamin Lambert.

McClellan - Direct

1   Q    When was he -- when did he represent the district?

2   A    He was first elected to the House right after single

3   member districts were adopted in the late '70s.  At the

4   time, it was District 33.  He was in that office when it

5   became District 71.

6   Q    And has the districting been continuously represented

7   by an African American since Mr. Lambert was the delegate?

8   A    Yes.  He was succeeded by Jean Cunningham, and -- who

9   represented it in the '90s; then Viola Baskerville from

10  about '97 until 2005 when I was elected.

11  Q    The two individuals you mentioned in between Mr.

12  Lambert and yourself, what was their race?

13  A    They were African American.

14  Q    Let me turn to the 2011 redistricting process.  Who

15  led the redistricting process for the House of Delegates?

16  A    Delegate Chris Jones.

17  Q    What role, if any, did you have in the 2011

18  redistricting process?

19  A    I coordinated requests from democratic members of the

20  Richmond delegation for changes to be made to the bill as

21  it was originally introduced by Delegate Jones.

22  Q    When did you get involved?

23  A    Shortly after that plan was published, I guess it was

24  right after it was introduced, I looked at it and had a

25  number of concerns, and that's when I started talking to

McClellan - Direct

1  the other Richmond delegates and Delegate Jones about

2  making changes.

3  Q    And tell me about the communications or conversations

4  you had with Delegate Jones concerning those changes.

5  A    I expressed concerns about how the original map was

6  drawn, and his response was, you know, he didn't know the

7  Richmond area and that if we, meaning the Richmond

8  delegation -- had better ideas on how to draw the lines,

9  he would be open to them but that we would have to meet

10  two criteria.  We would have to meet the one percent

11  population deviation, and we would have to meet for the

12  69th, 70th, and 71st and 74th districts, we would have to

13  meet a 55 percent black voting-age population.

14  Q    And when you say a one percent population deviation,

15  that you would have to meet that, what was your

16  understanding of what he meant by that?

17  A    Each district under the one-man-one-vote rule has to

18  have equal population and that -- the criteria that were

19  adopted by the Privileges and Election Committee said that

20  you could vary from equal representation, so about 80,000

21  people, by up to one percent.

22  Q    And you also mentioned a 55 percent BVAP rule.  What

23  was your understanding of what he meant by that, Delegate

24  Jones?

25  A    That the population of black individuals over the age

1   of 18 had to be 55 percent or more of the population of

2   the district for the majority/minority districts.

3   Q    Did you ever hear from Delegate Jones or anyone else

4   about a difference between so-called DOJ black or DLS

5   black, the way that those -- the DOJ defined black versus

6   the way the DLS defined black?

7   A    No, and I was not aware there was a difference until

8   today or yesterday.

9   Q    Were there any criteria that were formally introduced

10  in the House by a committee that you were aware of?

11  A    Yes, the Privileges and Elections Committee, which is

12  the one that the redistricting bill went to, adopted a

13  resolution that outlines the criteria that any plan

14  adopted by the House had to meet.

15  Q    Okay.  Let me show you what has been marked and

16  stipulated as Plaintiffs' Trial Exhibit 16.  I believe you

17  have a notebook, Delegate Jones, up there.  It's in the

18  volume that has 16 in it.  It will also appear, and

19  actually already has appeared on your screen and, I

20  believe, on the screens of the judges as well.

21  A    Okay.

22  Q    Are you at Plaintiffs' Exhibit 16?

23  A    Yes.

24  Q    Okay.  This is a document that is titled House

25  Committee on Privileges and Elections Committee Resolution

1   Number One, House of Delegates District Criteria, and in

2   parentheses under that it says, Proposed By Delegate S.

3   Chris Jones, and it says on the upper right-hand corner,

4   approved 3/25/11.  Are you familiar with this document?

5   A    Yes.

6   Q    What is it?

7   A    This is a copy of the resolution I mentioned that the

8   Privileges and Elections Committee adopted.

9   Q    What was your understanding of how these criteria were

10   to be applied in the redistricting process?

11   A    My understanding is that the priority in which they

12   are listed, one to five, is the priority in which they

13   would be applied, and if you look at number six, it

14   actually says --

15   Q    That's on the second page of the exhibit?

16   A    Yes.  If you look at page two, number six priority

17   says that criteria number one and criteria number two will

18   trump all others.

19         JUDGE PAYNE:  Actually what it says shall be

20   given a priority in the event of a conflict among the

21   criteria.  That's what it says.  Is that what you

22   understood it to mean?

23         THE WITNESS:  Yes.  I was paraphrasing.

24         JUDGE PAYNE:  I understand you were, but the

25   words are preferable as opposed to a paraphrase unless you

McClellan - Direct

1   paraphrase your understanding.  That's what I was trying

2   to get at.  So you understood it to mean what it says on

3   the paper in paragraph six.

4                    THE WITNESS:  Yes.

5   Q    Let me direct your attention to the first page and

6   specifically the top Roman numeral I and Roman numeral II.

7   And what was your understanding of Roman numeral I

8   relating to population equality?

9   A    My understanding of number one was that each of the

10  100 districts had to have 80,000 people plus or minus one

11  percent.

12  Q    Let me direct your attention to Roman numeral II, and

13  actually, if I could ask you to just read the words that

14  are there on the page for Roman numeral II.

15  A    "Voting Rights Act, districts shall be drawn in

16  accordance with the laws of the United States and the

17  Commonwealth of Virginia including compliance with

18  protections against the unwarranted retrogression or

19  dilution of racial or ethnic minority voting strength.

20  Nothing in these guidelines shall be construed to require

21  or permit any districting policy or action that is

22  contrary to the United States constitution or the Voting

23  Rights Act of 1965."

24  Q    And, Delegate McClellan, what was your understanding

25  of the way in which that priority criteria number two was

McClellan - Direct

33

1   to be applied in practice?

2   A    My understanding is the way criteria two was to be

3   implemented was that each of the majority minority

4   districts would have to have a black voting-age population

5   of at least 55 percent.

6   Q    Where did you get that understanding?

7   A    Through conversations with Delegate Jones and with

8   Legislative Services, and I think he said it on the House

9   floor.

10  Q    Can you speak up a little bit?

11  A    I think he said it on the House floor.

12  Q    The "he" you are mentioning is Delegate Jones?

13  A    Yes.

14  Q    I'm going to move away from that exhibit, so if you

15  want, you can close your book, close that book.

16       You testified that you were involved in the process,

17  and I wanted to ask you whether you've had conversations

18  or interactions with other delegates in terms of your

19  involvement with the redistricting process.

20  A    Yes.  I spoke with and spent quite a bit of time in

21  Legislative Services drawing maps with Delegate Betsy Carr

22  and her legislative aid, delegate Delores McQuinn.  I had

23  some conversations with Delegate Manoli Loupassi whose

24  district adjoins mine to the west about a precinct that

25  would be swapped between his district and the 71st.

1          I had conversations with Delegate Bob Brink who sat

2     beside me on the House floor, used to be on the Privileges

3     and Elections Committee, introduced one of the alternative

4     bills, and he was coordinating requests from northern

5     Virginia delegates for changes to be -- or northern

6     Virginia democrats for changes to be made to the map.

7          We spent some time working -- we weren't working on

8     the same map but working on maps at the same time and

9     talking about the process.

10         I spoke with Delegate Jeion Ward who sits in front of

11    me on the House floor, and we sort of discussed our views

12    with the whole process, of our frustrations with parts of

13    the process, and I spoke with Delegate Jones.

14    Q    And you mentioned that you discussed with some of

15    these delegates your frustrations about the process.  Can

16    you tell me a little more about that?

17    A    Yes.  I spent a lot of time -- when the map was first

18    introduced, I was very concerned about the number of

19    precincts that were split.  There were neighborhoods that

20    were split, and I wanted to try to reunite as much of them

21    as possible, and --

22              JUDGE PAYNE:  Are you talking about in your

23    district now?

24              THE WITNESS:  I'm talking about both my district

25    and the other Richmond area districts.

McClellan - Direct

1           THE COURT:  Which are what numbered?

2           THE WITNESS:  Mine is 71.  Betsy Carr's is 69.

3   Delores McQuinn's is 70.  Manoli Loupassi is 68.  Joe

4   Morrissey, at the time, was 74.

5           THE COURT:  Those are the ones you were

6   expressing your concern about the splits in?

7           THE WITNESS:  Most of the split precincts that I

8   looked at were in the 71st, the 9th, and the 70th,

9   although there was a precinct that I think the split was

10  68.  And in particular, there were two neighborhoods on

11  each end of the 71st district that --

12  Q    Would it be helpful to see a map as you are answering

13  that question?

14  A    Yeah.

15          MR. SPIVA:  It might be helpful to the Court,

16  too, Your Honor --

17          JUDGE PAYNE:  I know where it is, but the others

18  don't.

19          MR. SPIVA:  You are familiar with the Richmond

20  area, Your Honor.  We would actually like to use one of

21  the defendant intervenors' exhibits, Exhibit 94, which is

22  also in the book there and it will also appear on the

23  screen.  In fact, it just popped up.

24  A    94?

25  Q    Yes, Delegate McClellan.

McClellan - Direct

36

1        MR. SPIVA:  Your Honors, also my colleague has

2   just pointed out that these maps are also in a big

3   notebook that I believe you have, and I'm going to be

4   directing Delegate McClellan to page four which is the one

5   that shows her district the clearest.  But it's in this

6   kind of a booklet as well if you'd prefer that to the

7   screen.

8        THE COURT:  While you're doing that, if you

9   wouldn't mind kind of taking hold of the examination by

10  asking specific questions which she can answer instead of

11  calling for narratives, it think it will be more efficient

12  and maybe more accurate.

13       MR. SPIVA:  Will do, Your Honor.

14  Q    Delegate McClellan, if you've got Defendant

15  Intervenors' Exhibit 94, page four in front of you?

16  A    Uh-huh.

17  Q    It's also on your screen, too, depending how you

18  prefer to look at it.  Let me just establish, you know,

19  try to establish with you what this is.  I take it you

20  have seen this before at your deposition?

21  A    Yes.

22  Q    And I take it that the yellow areas represent your

23  current district post-2011 redistricting?

24  A    Yes.

25  Q    And the hashmarked areas that don't have any yellow

1  underneath them, those are pieces that used to be part of

2  your district but that you no longer have in your

3  district?

4  A    Yes.

5         JUDGE LEE:  I'm completely confused.  Go over

6  that again, sir.

7         MR. SPIVA:  Yes, Your Honor.

8  Q    The hashmarked precincts that do not have any yellow

9  coloring underneath them, I take it that those are

10 precincts that used to be in your district prior to the

11 2011 redistricting but that are no longer part of your

12 district?

13        JUDGE PAYNE:  Are you talking about 301 where

14 there's a red hash mark and then 207, because there's a

15 whole bunch of hashmarks over yellow coloring.  Why don't

16 you use the number.  I think we can understand it better.

17        MR. SPIVA:  Okay.  It's just that there are a lot

18 of different numbers that are covered by it, Your Honor.

19 I don't want to -- I don't want to testify, but what I was

20 going to establish with the witness was that the hashmark

21 areas over yellow are areas that used to be part of her

22 old district that continue to be part of her current

23 district.

24        The hashmark that doesn't have yellow coloring

25 under it are pieces that she no longer has in her district

McClellan - Direct

1   that used to be in her district, and the yellow that has

2   no hash marking are pieces that are in her current

3   district but that she didn't have prior to the 2011

4   redistricting, and I can do that with the witness --

5           THE COURT:  Is that correct?

6           THE WITNESS:  Yes.  If it helps --

7           THE COURT:  I think we've got it unless

8   somebody's got something.

9           JUDGE LEE:  I don't have it.  Go ahead.

10           THE WITNESS:  If you look at the map, precinct

11   505, the part that's white on the map, precinct 207, the

12   Summit Court, Hilliard, and part of Stratford Hall

13   precinct at the top, precinct 301, were in the 71st

14   district prior to 2011 but no longer are.

15           Precincts 204, 604, ^ Radcliff, 701, 702, the

16   little yellow piece of 703, were not in the 71st district

17   prior to 2011 but currently are, and the rest of the --

18   what you see at District 71 was in District 71 both prior

19   to 2011 and after.

20   Q   So you mentioned, Delegate McClellan, that one of the

21   things you wanted to make changes to regarded the Church

22   Hill neighborhood.  Can you explain what you meant about

23   that?

24   A   Yes.  When the map was originally introduced, precinct

25   707, which is a large part of the Church Hill

McClellan - Direct

1   neighborhood, was split.  It was split along Broad Street

2   which historically has been a dividing line between where

3   whites lived and where blacks lived, and that raised a

4   number of concerns because I thought dividing that

5   neighborhood in that way would be divisive, so I wanted to

6   keep both 207, the precinct, whole, but as much of that

7   neighborhood whole as had been before.

8   Q    Were you able to do that?

9   A    Yes.

10  Q    And let me ask you, was there a precinct or precincts

11  that you wanted to keep that you were not able to keep as

12  part of the -- as a result of the redistricting process?

13  A    Yes.

14  Q    Tell me about that.

15  A    Precinct 207 in the west, 207 and 208 are a majority

16  of the Fan neighborhood which is the neighborhood where I

17  live, and 207 was taken out of the 71st district both in

18  the original map as introduced and obviously in the final

19  one, and I wanted to keep precinct 207 in the 71st

20  district to keep as much of that neighborhood together,

21  and also because it was a very strong precinct for me.

22      It was -- it is densely populated and had high voter

23  turnout and highly democratic voter turnout and was part

24  of my neighborhood.  I have quite a base there and wanted

25  to keep that precinct in the 71st district.

McClellan - Direct

1    Q    Tell me about the demographics of the 207 precinct.

2    A    It is predominantly white.

3    Q    Why couldn't you keep that part of the Fan, precinct

4    207?

5    A    Every possible way, and I literally, even if it meant

6    splitting it, went street by street to see how much of

7    that precinct I could keep, and based on the other parts

8    of the district, any portion of 207 would push the black

9    voting-age population below 55 percent when I moved it on

10   the map.

11   Q    When you refer to moving it on the map, what are you

12   referring to?  Is this something to do with what you were

13   doing in the DLS office?

14   A    Yes.  In Legislative Services on the second floor,

15   they had a conference room with computers set up that had

16   the mapping software, and you could go in and move

17   precincts and move streets, go block by block if you

18   wanted, to draw the districts, and it would also show you

19   all of the demographics associated with that district.

20        So you could see as you added or subtracted an area,

21   you could see what the total population, all racial

22   populations and voting-age population were as you were

23   doing it.

24   Q    So did the computer you were working on show

25   percentages for black voting-age population?

McClellan - Direct

1    A    Yes.

2    Q    And why didn't you submit changes that included

3    precinct 207 despite the fact that it lowered the BVAP

4    below 55 percent?

5    A    Because I didn't believe they'd be accepted.

6    Q    Why was that?

7    A    Because the conversation that I had with Delegate

8    Jones was that if we submitted changes that met the

9    population deviation criteria and the 55 percent black

10   voting-age population, he would be open to it.  To me that

11   meant the corollary, if those two criteria weren't met,

12   then he wouldn't be.

13   Q    Did he say that to you?

14   A    Words to that effect, yes.

15   Q    Did you have concerns that if you kept precinct 207 in

16   your district, that you might be open to a white

17   challenger?

18   A    Not any more than I would have -- 207 had been in my

19   district when I got elected and had been in the district,

20   I believe, both when Delegates Cunningham and Baskerville

21   were there, and they never got a white challenger just

22   because they had 207 in their district, from that

23   district.  So that risk wouldn't have been any greater

24   with or without that precinct now.

25   Q    Were there any political reasons why you couldn't get

McClellan - Direct

1  207 in your district?  Was there any other reason other

2  than this BVAP percentage?

3  A    Again, 207 is very densely populated, very democratic,

4  and very high voter turnout, and so the district next to

5  it, 68, Manoli Loupassi who got that precinct, that

6  actually pushed more democrats into his district.  So it

7  didn't help him.  Losing it ultimately didn't hurt me

8  because my democratic performance index went up after

9  redistricting.  So I don't see any political reason why I

10 couldn't keep precinct 207.

11 Q    What party is Mr. Loupassi in?

12 A    He's a Republican.

13 Q    At the time of the redistricting, was your district

14 under or overpopulated?

15 A    Underpopulated.

16 Q    And as a result of giving up precinct 207, did you

17 need to pick up population somewhere else?

18 A    Yes.  You'll see precinct 204 I picked up because even

19 though that's also demographically similar to 207

20 racially, it's more sparsely populated.  But the

21 combination of 204, and you'll see where precinct 505 is

22 split --

23 Q    What part of the map is 505?

24 A    505 is south.  It is split between Betsy Carr's

25 district -- you'll see her name right next to it -- and

McClellan - Direct

```
 1   mine.  That was split so that I got the VCU portion which
 2   is very densely populated, and she got the Oregon Hill
 3   neighborhood.  So the combination of those two plus some
 4   of the new precincts I picked up in the east made up for
 5   losing the population in 207.
 6   Q    And tell me about the demographics of the precincts in
 7   the east that you picked up.
 8              JUDGE PAYNE:  Which precincts are we talking
 9   about now by number?
10   Q    Can you provide for the Court the number or name of
11   the precincts in the east that you picked up?
12   A    Yes.  It was 604, Radcliff, 701, 702, and you'll see
13   703, there's that blue line, and I have the little piece
14   underneath 702 of 703.  Those are the new districts in the
15   east -- new precincts in the east that I picked up.
16        They are heavily, heavily African American, highly --
17   very densely populated.  There are housing projects in
18   those areas, so it's very densely populated.  But they're
19   all predominantly African American.
20   Q    Was it unavoidable that you would need to pick up
21   those precincts in the east given that your district had
22   been underpopulated at the time of the redistricting?
23   A    It was when -- there are a couple ways you could have
24   gone.  When the map was first introduced, I went a little
25   bit to the west.  If you look up in --
```

1      JUDGE PAYNE:  Excuse me just a minute.  I think

2 the question was, was it avoidable, and the answer to that

3 is yes or no, it wasn't.

4      THE WITNESS:  Yes, I'm sorry.

5      JUDGE PAYNE:  If he wants to know why, okay, but

6 your answer said there were two alternatives, so I'm

7 assuming your answer was that it was not unavoidable; is

8 that what you meant to say?

9      THE WITNESS:  I apologize.  It was avoidable that

10 I would go to those particular precincts.

11 Q    Why is that, Delegate McClellan?

12 A    There were a number of options.  When the map was

13 first introduced, I shifted northeast -- I'm sorry,

14 northwest a little bit.  If you look at the top left, I

15 picked up Greendale, Johnson, and Glenside.

16 Q    Sorry to interrupt you, but when you say you picked

17 up, you mean these were test maps that you were doing?

18 You ultimately didn't pick them up in the final map.

19 A    Right.  Delegate Jones's original bill included those

20 precincts from Henrico County.  It went west a little bit.

21 I also could have kept Summit Court, Hilliard, Stratford

22 Hall.  I could have kept precinct 301.  I could have

23 shifted further to the west in the city of Richmond.  I

24 think one of -- the map that had been introduced shifted

25 me into the 100 number precincts, or I could have gone

McClellan - Direct

1   east.

2        I don't think -- I could have gone south, but Delegate

3   Carr also had lost population, so if I had shifted south,

4   she would have had to make that up somewhere, and

5   traditionally the river has been a natural boundary for

6   the 71st district, so I'm not sure it would have been good

7   for me to go south.

8   Q    Okay.  You mentioned that you could have gone west.  I

9   just want to make sure that I and the Court understands

10  your answer.  I take it that includes retaining the 207

11  precinct?

12  A    Yes.

13  Q    Now, you've testified that you had frustrations in

14  terms of precinct splits.  Were there any other issues

15  that made you frustrated with the 55 percent BVAP

16  requirement in terms of precinct splits?

17  A    The two biggest frustrations were an effort to keep

18  neighborhoods from being further split and keep precincts

19  from being split.

20  Q    Was there an issue with the registrar of Richmond?

21  A    Yes.

22  Q    Can you tell us about that.

23  A    The Richmond and Chesterfield registrars had a number

24  of split precincts in their jurisdictions that they wanted

25  reunited, and they approached me to see if they could do

1    that, and the Richmond registrar, Kirk Showalter, actually

2    came to Legislative Services, and she and I tried to draw

3    maps that reunited as much of those precincts as possible.

4    Q    What happened?  Were you able to make those fixes?

5    A    We were not.

6    Q    Why was that?

7    A    When -- what they wanted to do would have pushed the

8    black voting-age population, at least in my district,

9    possibly others that I don't remember, would have pushed

10   it below 55 percent of black voting-age population.

11   Q    By how much would it have pushed it below 55 percent?

12   A    For the 71st district, it would have been

13   54.8 percent.

14   Q    Let me ask you to --

15        JUDGE LEE:  Are you saying you asked Delegate

16   Jones to make that change and he said no?

17        THE WITNESS:  Yes and no.  What happened --

18        JUDGE LEE:  Tell me about the conversation you

19   had.  What did he say and what did you say?

20        THE WITNESS:  Can I tell you what we did first?

21        JUDGE LEE:  No.  I want to answer my question

22   which is whether you ever asked him to make a change for

23   the registrars.  Answer that question.

24        THE WITNESS:  The change was submitted and was

25   supposed to be adopted in the Senate amendment to the plan

McClellan - Direct

1    and was --

2            JUDGE LEE:  My question was very precise.  Did

3    you ask him to make that change to move -- for Ms.

4    Showalter to move the district?

5            THE WITNESS:  I asked him why the change was not

6    made.

7            JUDGE LEE:  You never asked him that question,

8    did you?

9            THE WITNESS:  No.

10           JUDGE PAYNE:  That is exactly an example of what

11   I've been trying to say rather subtly.  Would you not ask

12   a question that generally allows a lot of rambling, a lot

13   of hearsay to come in particularly where it was clear,

14   very important what Judge Lee asked.  And the question has

15   to be precise and the answer has to be limited to yes or

16   no, and if you want an explanation, they can get an

17   explanation.  If it calls for an explanation she can give

18   the explanation, and we'll be here -- if we allow a novel

19   to be written we'll be here a long time and distracted

20   from our principle purpose.

21           So let's get hold of the examination, if you

22   will, and please confine your answers to what he's asked

23   and be precise, and if he wants more information, he'll

24   ask it, and he can get it unless there is an objection.

25           THE WITNESS:  I apologize.  I've never been on

McClellan - Direct

1   this side.

2            JUDGE LEE:  It's appropriate to ask a question

3   based on mine which I'm sure you will.

4            MR. SPIVA:  Yes, Your Honor.  I'm going to try to

5   get some clarity here.

6   Q   Delegate McClellan, when you submitted proposed

7   changes, how did you do that?  Literally, what was the

8   manner in which you submitted those changes?

9   A   I drafted a map on the software and submitted that map

10  to Legislative Services with the question that that be

11  adopted.

12  Q   And when you transmitted it to Legislative Services,

13  did that go to Delegate Jones?

14  A   In at least one instance, yes.

15  Q   And in which instance is that?

16  A   I don't remember whether it was when the map was still

17  on the House side or when the map was on the Senate side,

18  but there was a time where I met with Delegate Jones in

19  his office, and we were looking at the maps that included

20  changes that were requested by the original delegation --

21  Q   Okay.

22  A   -- in his office.

23  Q   Let me ask you to turn to Plaintiffs' Exhibit 30 in

24  your binder.  I think you still have -- maybe you don't

25  have that up there.  It's going to be on the screen as

McClellan - Direct

1  well.

2  A    I can look on the screen.

3  Q    This is Plaintiffs' Exhibit 30, and I'd like to start

4  with the email that begins at the bottom of page three and

5  carries over to page four of the document, and this should

6  be an email from -- I'm sorry, you are still tell me when

7  you've got it.  Like I say, it is on the screen as well.

8         JUDGE LEE:  Exhibit 30?

9         MR. SPIVA:  It is Exhibit 30.

10         JUDGE LEE:  Mine does not have that page.

11         MR. SPIVA:  Doesn't have page three and four?

12         JUDGE LEE:  Oh, wait a minute.  Yes, it does.

13         MR. SPIVA:  Thank you, Your Honor.

14         JUDGE PAYNE:  Is there a blue page in between?

15         MR. SPIVA:  There may be, Your Honor, yes.

16         JUDGE PAYNE:  So it's still part of the same

17  document.  As long as it's under the tab.

18         MR. SPIVA:  The blue page is not part of the

19  original document.  It was produced all as one piece.

20         JUDGE PAYNE:  All right.

21  Q    The email that I'd like to direct your attention to,

22  Delegate McClellan, begins at the bottom of three from

23  Chris Jones to Paul Nardo dated 4/7/2011, 9:42 p.m., and

24  it says, "I followed up with Jennifer McClellan this

25  afternoon and she reconfirmed that the request of Kirk

McClellan - Direct

1    Showalter, Richmond registrar, exceeded the 55 percent

2    threshold when they did it on the second floor for all

3    affected districts and that she would have never requested

4    it if it didn't.  I'm not sure what got lost in

5    translation, but the good news is it is fixed now and

6    Jennifer will explain the Senate amendment on the floor

7    Monday if needed."

8         He's referring to a communication that he had with

9    you.  Does this reference the issue with the precinct

10   splits that you were testifying about a minute ago?

11   A    Yes.

12   Q    And what is the reference to the 55, exceeding the

13   55 percent threshold?

14   A    This is explaining what happened when we drew a map to

15   try to reunite those precincts.  When we were in

16   Legislative Services doing that, we made a mistake.  We

17   moved the wrong portion of a precinct, and when -- the

18   voting-age population, based on that, was above

19   55 percent.  That was the map that was submitted to

20   Legislative Services to be adopted by the Senate, because

21   at this point, the bill was in the Senate.

22        When the Senate adopted their amendment, that change

23   was not made because, when we discovered we moved the

24   wrong part of the precinct, we went back to the right part

25   of the precinct, and that pushed the black voting-age

McClellan - Direct

1    population below 55 percent, and because of that, the

2    changes to reunite those precincts were not adopted by the

3    Senate.

4         So that is what this email is referring to, is the

5    conversation that Delegate Jones and I had after the

6    Senate map was adopted and about what happened to the

7    changes that were requested by the Richmond and

8    Chesterfield registrar.

9    Q    And let me ask you to turn to page two of that same

10   exhibit, Plaintiffs' Exhibit 30, and direct your attention

11   to an email dated 4/8/2011 from Kirk Showalter to you.  I

12   take it you received that email?

13   A    Yes.

14   Q    And Ms. Showalter states in the email, "Dear Jennifer,

15   I saw the new version of HB 5001 that passed the Senate.

16   Unfortunately, (and unlike the Senate substitute version)

17   it did not include any of the fixes to the split precincts

18   that we worked on.  Was there a particular reason for

19   this?  Should I pursue Governor's amendments to make the

20   changes," and it goes on from there.  What was Registrar

21   Showalter asking you in that email?

22   A    She was asking why the map, as adopted by the Senate,

23   did not reunite the precincts that she and the

24   Chesterfield registrar, who is copied on the email,

25   requested.

McClellan - Direct

1   Q    And if you could turn to page one of Plaintiffs'

2   Exhibit 30, and directing your attention to the email that

3   you write back to Ms. Showalter the same day at 2:14 p.m.,

4   I take it you sent that email?

5   A    I did.

6   Q    And it says, "I spoke to Chris Jones and Kent Stigall.

7   Apparently, the changes we discussed based on the map

8   would have pushed the voting age African American

9   population in the 71st district down to 54.8 percent.  The

10  target criteria was 55 percent, so the change can't be

11  made.  When you and I were working in Legislative

12  Services, we indeed moved the wrong part of Davis which is

13  why the numbers looked correct to us," and you continue,

14  but I want to stop there and ask you, what were you

15  explaining to Ms. Showalter in that part of your email?

16  A    I was explaining to her why the Senate bill did not

17  adopt the changes that she requested and that the reason

18  was because of the black voting-age population in the 71st

19  district would have fallen below 55 percent as a result of

20  those changes.

21  Q    Am I understanding correctly that the changes were

22  rejected?

23  A    Yes.

24  Q    Who rejected them?

25  A    Well, ultimately the Senate.  There was a Senate

McClellan - Direct

1    substitute printed by Legislative Services which reflected
2    the changes, but what was adopted by the Senate rejected
3    that change.
4    Q    You go on in this email to say, "Given the time
5    constraints on this thing, I don't think we have enough
6    time to try to come up with a fix that keeps the 69th,
7    70th, and 71st all at 55 percent African American voting
8    population and within a one percent total population
9    deviation.  We can try to do some cleanup next year.  I
10   know that doesn't help you this election cycle, but that
11   may be the best we can do.  Jenn."  What were you saying
12   to Ms. Showalter in that part of your email?
13   A    We were at the point in the process, the Senate had
14   adopted amendments to the map, to the bill.  It was coming
15   back to the House floor, and we were going to vote on the
16   House floor whether to accept or reject the Senate
17   amendments, and given that there was not an opportunity to
18   offer any additional amendments, and I was explaining to
19   her that basically where we were in the process, we could
20   not make the changes that she and Mr. Haake were
21   requesting.
22   Q    And then Ms. Showalter, turning back to the exhibit,
23   writes back to you that same day on 4/8/11, and she says,
24   "Darned...so close and yet so far away.  A measly
25   0.2 percent.  Well, at least we gave it a good try and for

1   that I must thank you," and then she continues on.  I take

2   it you received that email?

3   A    I did.

4   Q    And what was your understanding of Ms. Showalter's email

5   to you?

6   A    That she was frustrated that she couldn't -- we

7   couldn't reunite those precincts.

8   Q    I want to turn away from that exhibit and just ask you

9   what your view was about whether a greater than 55 percent

10  BVAP was necessary to preserve the African American

11  community's ability to elect a candidate of choice in your

12  district?

13  A    I didn't think that 55 was necessary.

14  Q    And why was that?

15  A    Because the BVAP had fallen to 46 percent, and the

16  minority community, the African American community was

17  electing the candidate of its choice at 46 percent, and so

18  it probably could have stayed 46 percent.

19         MR. SPIVA:  Thank you, Delegate McClellan.  I

20  have no further questions.

21         MS. McKNIGHT:  Good morning, Your Honors, and

22  Delegate McClellan.  A brief point of housekeeping.  I

23  want to make sure everyone can see the board here because

24  I might like to point out -- are you able to see this

25  board?

```
 1                    THE WITNESS:  I can --

 2                    JUDGE PAYNE:  Is that 94?

 3                    MS. McKNIGHT:  No, it should be 71.  Pardon me.

 4       Yes, it's Exhibit 94, page four.

 5                    THE COURT:  The one we were looking at earlier.

 6                    MS. McKNIGHT:  Correct, the same one.

 7                    THE WITNESS:  I can see it, but I can't see the

 8       numbers from here.

 9                    THE COURT:  Does she have a book up there with it

10       in it?  That's Intervenor Defendants' Exhibit 94.

11                    MS. McKNIGHT:  Correct.

12                    THE WITNESS:  I think these are districts, so is

13       94 a different map?

14                    JUDGE LEE:  Page four.  Your name again?

15                    MR. McKNIGHT:  My name is Kate McKnight, and I

16       represent defendant intervenors in the case, and good

17       morning again, Delegate McClellan.

18

19                            CROSS-EXAMINATION

20       BY MS. McKNIGHT:

21       Q    I'm going to be asking you some questions about your

22       testimony earlier today and then about the 2011

23       redistricting process in general.

24       A    Okay.  I can barely hear you.

25       Q    Okay.
```

1   A    You and I have the same problem.

2   Q    Delegate McClellan, this, which is marked as

3   Defendants' Exhibit 94, page four, is a depiction of your

4   House District 71; is that right?

5   A    Yes.

6   Q    And you saw a map like this in your deposition; is

7   that right?

8   A    Yes.

9   Q    Now, to re-orient the Court a little bit, the area

10  that's highlighted in yellow represents your district

11  after the 2011 redrawing process; is that right?

12  A    Yes.

13  Q    And the area with the crosshatching -- some of it is

14  under yellow, some of it is not -- that represents your

15  district after the 2001 redrawing process; is that

16  correct?

17  A    Yes.

18  Q    And, now, each of these areas outlined -- let me see

19  if I can highlight it for you -- outlined in the thin

20  black line, each of those areas outlined in the thin black

21  line, is that a voter district or a VTD or what's

22  sometimes called a precinct?

23  A    Yes.

24  Q    And I have a little bit of a shorthand for this area

25  of Virginia.  The precincts that are numbered, are those

1   in Richmond city?

2   A    Yes.

3   Q    And then the precincts with names, are those in

4   Henrico County?

5   A    Yes.

6   Q    Now, Delegate McClellan, I'd like to ask you more

7   questions about your map, but first just a few brief

8   questions regarding what happened between the 2000 and

9   2010 censuses.

10  A    Okay.

11  Q    I believe you just testified that following the 2000

12  census, the 2001 district, as represented with the

13  crosshatching, had a black voting-age population of about

14  55 percent; does that sound about right?

15  A    Yes.

16  Q    And, now, following the 2010 census, that same

17  district represented by the crosshatching, that 2001

18  district, that had a black voting-age population of around

19  46 percent; does that sound about right?

20  A    Yes.

21  Q    So the 2001 district as of the 2010 census was no

22  longer considered a majority-minority district; is that

23  right?

24  A    Yes.

25  Q    Furthermore, the 2001 district, again, the

1   crosshatching district, as of the 2010 census was

2   underpopulated by close to 6,000 people; does that sound

3   about right?

4   A    Yes.

5   Q    A little over seven percent.

6   A    Yes.

7   Q    What was happening in the district between 2000 and

8   2010?

9   A    Well, the population was not growing as fast as in the

10  rest of the state, but it was shifting.  There were people

11  moving downtown.  There were a lot of areas that in 2001

12  were either industrial or commercial or vacant that by

13  2010 had people living in them.

14       It was part of VCU, the college, which is in the Fan.

15  It's around 211, 208, and 505, was growing quite a bit.  I

16  think that's the bulk of what was happening between, in

17  those ten years.

18  Q    So in the 2011 redrawing, something had to be done to,

19  one, add population to ensure one-person-one-vote; is that

20  right?

21  A    Yes.

22  Q    And, two, increase the black voting-age population if

23  this district was going to continue as a majority-minority

24  district; is that right?

25  A    Yes.

1          JUDGE PAYNE:  Your answer?

2          THE WITNESS:  Yes.

3          JUDGE PAYNE:  Thank you.

4   Q    Now, turning to the map of your district considering

5   these two goals, let's see if this isn't too shaky.

6   Looking south, here, this is Delegate McQuinn's residence;

7   is that right?

8   A    The star, yes.

9   Q    So your district, if it had been drawn to pull in

10  either of these precincts, it would have paired you with

11  an incumbent, that is Delegate McQuinn; is that right?

12  A    Her house is in precinct 705, so if you had pulled in

13  705, yes, but if you had pulled in 703, no.

14         JUDGE PAYNE:  Pulled in what?

15         THE WITNESS:  If you pulled in precinct 705 which

16  is where she lives, then we would be in the same district,

17  but if you pulled in 703, we would not be in the same

18  district.

19  Q    Now, on the map looking south of your district, this

20  light blue line here, that's the James River; isn't that

21  right?

22  A    Yes.

23  Q    I believe you just testified that's a traditional

24  border, a southern border of District 71; is that right?

25  A    Yes, once you hit Belvidere Avenue.

McClellan - Cross

1   Q    Now, looking at your map, if you look over here to the

2   west, that star, that blue star right there on the border,

3   that was Delegate Carr's residence; is that right?

4   A    Yes.

5   Q    So if you had drawn your district to pull in this

6   district here where Delegate Carr's residence is, that

7   would have paired you with an incumbent, that is Delegate

8   Carr; is that right?

9   A    Yes.

10  Q    Now, looking north, there are three precincts in the

11  northwest that are named Summit Court, Hilliard, and

12  Stratford Hall, and those were drawn out of your district

13  in 2011; isn't that right?

14  A    Yes.

15  Q    Those were all in Henrico County; correct?

16  A    Yes.

17  Q    And this precinct over here that says Radcliff?

18  A    Yes.

19  Q    That was added to your district; correct?

20  A    Yes.

21  Q    So after the 2011 redrawing, you had dropped three

22  Henrico precincts from your district, and now you only had

23  one Henrico County precinct in your district; is that

24  right?

25  A    Yes.

McClellan - Cross

1  Q    Now, you just testified that an alternative plan could

2  have picked up Greendale -- I'll point you on the map,

3  Greendale, Johnson, and Glenside up here in the northwest,

4  but all three of those are in Henrico County; is that

5  correct?

6  A    Yes, and if I can clarify what I said earlier was that

7  the House bill 5001 as originally introduced included

8  those precincts.

9  Q    And if your district had been redrawn to include those

10  districts, that would have made your district longer; is

11  that right?

12  A    Not necessarily, because as originally introduced,

13  that map did not include all of the precincts that are

14  currently included.  So it would have shifted the

15  district, but it wouldn't necessarily have made it longer.

16  Q    Now, you testified in deposition that you don't

17  believe your district as drawn in 2011 is irregularly

18  shaped; is that right?

19  A    Yes.

20  Q    And you testified earlier today that your district is

21  the most democratic district in the state; is that right?

22  A    Yes.

23        THE COURT:  I think at this time we'll take the

24  morning recess for 15 minutes, and then we'll continue

25  with your cross-examination.

McClellan - Cross

1            (Recess taken.)

2

3            NOTE:  After the morning recess, the case

4    continues as follows:

5            JUDGE PAYNE:  All right, Ms. McKnight, you may

6    continue.

7            MS. McKNIGHT:  Thank you, Your Honors.

8    BY MS. McKNIGHT: (Continuing)

9    Q    Delegate McClellan, you had just testified prior to

10   the break that your district is the most democratic

11   district in the state.

12   A    Yes.

13   Q    So the real election in your district is the primary

14   as opposed to the general election is that fair to say?

15   A    Yes.

16   Q    And your only election /THAO was seriously contested

17   was your first election in 2005, is that fair to say?

18   A    Yes.

19   Q    Now, in deposition you discussed former Representative

20   Morrissey of House District 74, you mentioned him in your

21   direct testimony as well.  And he was not the preferred

22   candidate of choice for black constituents in District 74,

23   is that right?

24   A    I wouldn't say that.

25   Q    What would you say?

1  A    I would say that he was the candidate of choice of a

2  plurality of the voters in that district.

3  Q    So are you able to say that he was the candidate of

4  choice for black constituents in his district?

5  A    Well, based on -- yes, based on the most recent

6  special election and which he won, I would say in that

7  election for sure he was the candidate of choice of the

8  minority population.

9         JUDGE PAYNE:  Are you asking about the most

10  recent election, Ms. McKnight, or some other election?

11         MS. McKNIGHT:  Your Honor, it's fine, I can leave

12  it, I can leave the question.

13         JUDGE PAYNE:  All right.

14  BY MS. McKNIGHT: (Continuing)

15  Q    I just have two more questions for you, Delegate

16  McClellan.  Was HB 5001 vetoed?

17  A    I believe originally it was.

18  Q    And now you voted for the plan at issue in this

19  matter, is that correct?

20  A    Yes.

21         MS. McKNIGHT:  Thank you, Delegate McClellan.

22         Thank you, Your Honor's.

23         JUDGE PAYNE:  Any redirect?

24         MR. SPIVA:  No, Your Honor.

25         JUDGE PAYNE:  All right.  Can she be permanently

McClellan - Cross

1   excused -- do you have any?

2           MR. TROY:  I have no questions.  She is my

3   neighbor as well.

4           JUDGE PAYNE:  All right.  Can she be permanently

5   excused or do you need her to remain?

6           MR. SPIVA:  She can be permanently excused, Your

7   Honor.

8           JUDGE PAYNE:  Is that satisfactory to you, Mr.

9   Braden, Mr. Troy?

10          MR. BRADEN:  Yes, Your Honor.

11          JUDGE PAYNE:  Thank you for being with us,

12  Delegate McClellan, you are excused to go back to your

13  business.  Thank you.

14          NOTE:  The witness stood down.

15          JUDGE PAYNE:  Next witness.

16          MS. BRANCH:  May it please the Court, Your

17  Honor's, my name is Aria Branch, and I'm representing the

18  plaintiffs.  The plaintiffs call Senator Rosalyn Dance to

19  the stand, please.

20          NOTE:  The witness is sworn.

21          JUDGE PAYNE:  Go ahead, Ms. Branch.

22

23                  ROSALYN DANCE,

24  called by counsel for the plaintiffs, first being duly

25  sworn, testifies and states:

R. Dance - Direct

65

|   |   |
|---|---|
| 1 | DIRECT EXAMINATION |
| 2 | BY MS. BRANCH: |
| 3 | Q    Good morning, Senator Dance. |
| 4 | A    Good morning. |
| 5 | Q    I will give you a second if you would like to pour |
| 6 | some water. |
| 7 | A    Thank you. |
| 8 | Q    Okay.  All right.  Could you please state your name |
| 9 | for the record. |
| 10 | A    Rosalyn R. Dance. |
| 11 | Q    And where are you from, Senator Dance? |
| 12 | A    I was born in Chesterfield County, but been in |
| 13 | Petersburg since about the age of eight years old. |
| 14 | Q    Where do you currently work? |
| 15 | A    I am a retired health professional, but I work as |
| 16 | Senator, State Senator in the State of Virginia. |
| 17 | Q    And what district do you represent? |
| 18 | A    I represent the 16th Senatorial District. |
| 19 | Q    And when were you first elected to the Senate? |
| 20 | A    November 2014. |
| 21 | Q    Where did you work prior to becoming a State Senator? |
| 22 | A    I served as a member of the House of Delegates, |
| 23 | Virginia House of Delegates. |
| 24 | Q    Which House District did you represent? |
| 25 | A    The 63rd District. |

R. Dance - Direct

1    Q    How long did you serve in the House?

2    A    From April 6, 2005, until elected to the Senate

3    position in 2014.

4            JUDGE PAYNE:  Excuse me, what district were you

5    in when you were in the House, Senator?

6            THE WITNESS:  63rd District.

7            JUDGE PAYNE:  3rd?

8            JUDGE LEE:  63rd.

9    BY MS. BRANCH: (Continuing)

10   Q    Now I would like to briefly discuss your election

11   history with you.  When were you first elected to

12   represent House District 63?

13   A    I was elected in 2005.

14   Q    Now, you won five elections under the map of your

15   House district prior to the 2011 redistricting.  How would

16   you describe the results of those elections?

17   A    I won them.

18   Q    And what was the percentage of one of the elections

19   that you won, for example?

20   A    I would start with the first, it was a primary for the

21   special election, and I ran against two African-American

22   gentlemen.  And I don't know the exact number, but I know

23   if you put their numbers together I still had better

24   numbers than they did, and I won the primary.

25            The second one, 2005, I had to win then the

R. Dance - Direct

1    special election running as the democratic candidate.   And

2    that was -- there were two Euro-Americans, a male and a

3    female, and I garnered I think about 69 percent of the

4    vote.

5    Q    I think you're talking about the 2005 special general

6    election there?

7    A    Yes.

8    Q    Which parties did those two candidates that you ran

9    against, which ones did they represent?

10   A    The female was chair of the local Republican party.

11   And the male policeman, I think he was an independent.

12   Q    And have you ever lost an election to represent House

13   District 63?

14   A    I lost an election before 2005 when I ran as an

15   independent, but having run in the Democratic -- as a

16   Democratic candidate, no, I have not.

17   Q    And when was that election that you lost?

18   A    2001, I think.  I ran as an independent.

19   Q    All right.  And what was the race of the candidate

20   that you lost to?

21   A    I lost to an African-American male who ran as a

22   Democratic candidate.

23   Q    Great.  Now I would like to switch gears a bit to the

24   2011 redistricting.  Now, prior to that redistricting, had

25   you ever been involved in a redistricting process before?

R. Dance - Direct

1    A    No, I had not.

2    Q    And what role did you play in the 2011 redistricting?

3    A    I was appointed to serve as one of the six members of

4    the redistricting committee, there were like two

5    committees, one redistricting that dealt with the House;

6    and then there was a reapportionment that dealt with the

7    congressional districts.

8    Q    Who else was on the six-person committee that you were

9    on?

10   A    The one I represented for the House redistricting,

11   there were six of us.  And the other member representing

12   and I was representing House Democrats was Delegate Algie

13   Howell, the two of us.  And then there were four

14   Republicans.  And the chair was Delegate Chris Jones.  And

15   I don't remember the names of the other members.

16   Q    All right.  How would you -- you testified that

17   Delegate Jones was the Chair of that six-person committee.

18   How would you describe his role in terms of the final map

19   that was created?

20   A    He was the Chair, and he was the key person -- he

21   understood the mapping program that we used, he actually

22   had one in his office.  And we had one in legislative

23   services that the rest of us used.  But he had done this

24   before.  He had been a member on the one that was done,

25   prior ten-year redistricting, and he was really good with

1    what he was doing.

2    Q    And would you say that you deferred to his expertise

3    during the process?

4    A    I did because he was, as I say, he was knowledgeable.

5    He allowed us to ask questions, and feedback, and answered

6    any questions we had.  So I felt he did a good job with

7    what he was doing.

8    Q    And you said that you asked questions.  How often

9    would you say you talked to Delegate Jones during the

10   process?

11   A    It varied.  I could talk with him in the halls.  I

12   could talk with him, of course, in meetings.  I could call

13   him.  He made himself available to me.

14        We had a drop box -- if we were working on

15   something, my colleagues wanted him to look at something,

16   I could have Legislative Services transfer it to his box

17   so that he could look at that.

18   Q    Can you explain how that process worked a little more.

19   A    We had -- the majority -- we were able to use, go to

20   Legislative Services on the second floor, use their

21   mapping data to map out how our districts might look, if

22   you will.  And then we could then share that with the

23   Chair because he was the one who introduced the mapping.

24   And we were making changes to his House Bill 5001,

25   whatever it is, we were making changes to that.  And he

R. Dance - Direct

1    would look at that in alignment of the criteria that we

2    had established.  And that was the plus or minus 1 percent

3    deviation from the -- we went up from 74, I think it was

4    about 74,000 we had population for each of the 100

5    districts to now 80,000 was the plus or minus to get there

6    because some might have been 80,000, some might be a

7    little bit low, a little bit over, but it was a plus or

8    minus 1 percent deviation that we were working with.

9            And making sure that we were in -- for me it was

10   the 12 minority districts that I was concentrating on,

11   that they were all within the 55 percent area.

12   Q    What you say within 55 percent, what are you

13   referencing?

14   A    My understanding from Chris -- I mean Delegate Jones

15   is that what we were doing was going to have to be found

16   to be approved by the Department of Justice.  And that for

17   the voting rights strength of African-Americans, that's

18   the 12 areas that I was looking at, that we need to ensure

19   that we had at least 55 percent.

20   Q    Okay.  Can I please turn your attention to Plaintiffs'

21   Trial Exhibit 16.

22           And we've looked at this one before, so I'm just

23   going to zero in on the second section, which is titled

24   Voting Rights Act.

25   A    Yes.

R. Dance - Direct

1   Q    Now, do you recognize this document before we jump in?

2   A    It is House Committee on Privileges and Elections,

3   it's the Committee resolution number 1, House of Delegates

4   district criteria, and it is proposed by Delegate S. Chris

5   Jones, who was the Chair.  And this is the document that

6   as part of the committee of six, this was the criteria

7   that we recommended to be approved by the Privileges and

8   Elections to go to the floor.

9   Q    Now turning our attention to the second section called

10  Voting Rights Act, and I will just read it for the record.

11  A    Okay.

12           JUDGE PAYNE:  I think we've read it.

13           MS. BRANCH:  Okay.

14           JUDGE PAYNE:  And she can read it if she needs

15  to.

16           MS. BRANCH:  Okay, absolutely.

17  BY MS. BRANCH: (Continuing)

18  Q    Senator Dance, would you like to take some time to

19  read that section?

20  A    I'm familiar with it.

21  Q    Okay.  And how would you describe or how would you say

22  that criterion about the Voting Rights Act was actually

23  interpreted and practiced during the process?

24  A    This was to ensure that the voting strength of

25  African-Americans was represented in our redistricting

1    plan.  And that for me was the 12 minority -- the

2    African-American districts that we had to look at.  And

3    the voting strength that I was working on was the

4    55 percent.

5    Q    And when you say 55 percent, are you referring to

6    African-American voting-age population?

7    A    It was 55 percent of African -- of African-Americans

8    that voted.  Not children or whatever, it was voting

9    African-Americans.

10   Q    Thank you.  Can we now turn to Plaintiffs' Trial

11   Exhibit 35.

12   A    Okay.

13   Q    Are you at Exhibit 35?

14   A    Yes.

15   Q    Okay.  And the first page of this says 2011 Special

16   Session 1, Virginia House of Delegates, redistricting

17   floor debates, Tuesday, April 5, 2011.  And this is a

18   transcript of this debate.

19        Were you present at this debate, Senator Dance?

20   A    Yes.

21   Q    Can you turn your attention to page 66 of the

22   transcript.

23   A    I'm there.

24   Q    I'm going to direct your attention to line 7.  Where

25   Delegate Jones is speaking, and I will read it for the

R. Dance - Direct

1    record once everyone is there.  He says, quote:  Mr.

2    Speaker, I'd said to the gentleman of the plans that have

3    been submitted and or circulated around that were complete

4    and total plans, the plan that is before you, in my

5    opinion, fully complies with the Voting Rights Act as

6    55 percent or higher, which is testimony that we heard

7    during the public hearings of percentage voting-age

8    population.

9        Did I read that correctly?

10   A    Yes.

11   Q    And now when Delegate Jones used that 55 percent

12   number on the House floor, what did you understand him to

13   be referring to?

14   A    The 55 percent referred to the 12 minority

15   African-American districts, voting districts.

16   Q    And you testified earlier that you submitted changes

17   to the original map that was proposed by Delegate Jones.

18        Did this 55 percent rule affect the changes that

19   you made to those maps before you submitted them?

20   A    Yes.

21   Q    And how so?

22   A    Every one of the -- there were 12.  And eleven was

23   solid.  The twelfth was the one that gave us a little

24   trouble to try to get to the 55 percent.

25   Q    Which district was that?  What are you referring to?

R. Dance - Direct

1  A    That was referring to Delegate Roslyn Tyler's

2  district, I think it was 75 that she had.

3  Q    Okay.  And what do you mean by it gave you trouble?

4  A    The way her -- her numbers, her African-American

5  numbers had decreased in that area.  And to get her up to

6  the 55 percent required some drastic maneuvering to make

7  that happen because the way her district was, it boarded

8  North Carolina, she couldn't go across the border, and to

9  get African-Americans if she went east or west she would

10 run into problems.  And the only way she could come was to

11 come north.

12          And that was --

13 Q    We'll talk about that just a little bit later.

14 A    Yes.

15 Q    I just want to clarify, what was your understanding as

16 to why the 55 percent rule was necessary?

17 A    The 55 percent --

18          JUDGE PAYNE:  We haven't established that it is a

19 rule yet since that's the central point of the -- I think

20 everybody agrees that there was a 55 percent target.

21 Don't you stipulate to that?

22          MR. BRADEN:  There was an aspiration or a target

23 of 55 percent.

24          JUDGE PAYNE:  All right.  And the issue here is

25 whether it was a hard and fast rule.  And that's what

R. Dance - Direct                                                    75

1   you're trying to show, right?

2           MS. BRANCH:  That's correct, Your Honor.

3           JUDGE PAYNE:  All right.  Well then let the

4   witnesses testify about whether it was or wasn't.

5           MS. BRANCH:  Okay.

6           JUDGE LEE:  So far only the lawyers have said the

7   word "rule," no witness has said "rule" yet.

8           MS. BRANCH:  Absolutely.

9   BY MS. BRANCH: (Continuing)

10  Q    Senator Dance, how would you describe how the 55

11  percent black voting-age population target was applied?

12  A    I guess you would say using the definition that it was

13  the rule of thumb that we used to determine those 12

14  minority districts.  Because each one of them had to be

15  55 percent or greater, and we were trying to get to

16  55 percent.  And we had gotten there with eleven.  The

17  twelfth one was where the problem was, and that was

18  Delegate Tyler's district.

19  Q    And what was the purpose of the 55 percent rule?

20  A    To --

21  Q    I think she testified to that?

22          JUDGE PAYNE:  She said it was a rule of thumb.

23          MS. BRANCH:  Rule of thumb.

24          JUDGE PAYNE:  Why don't you just ask the

25  questions, let them answer.

R. Dance - Direct

1          MS. BRANCH:  I'm sorry.

2    BY MS. BRANCH: (Continuing)

3    Q    What was the purpose of the 55 percent?

4    A    The purpose of the 55 percent was to ensure that we

5    met the African-American voting strength that would ensure

6    that the Department of Justice would pass our plan.

7    Because that's what I understand from Delegate Jones we

8    had to do to get it passed.

9    Q    Okay, great.  And now we're going to turn our

10   attention to Plaintiffs' Exhibit 35, which is the exhibit

11   we were just in.  We are going to look at page 157,

12   please.

13   A    I'm there.

14   Q    Great.  And I will just direct your attention to line

15   2, and I will read it for the record.  It says:  Thank

16   you -- this is you speaking.

17          JUDGE LEE:  Why don't you let her read it.

18   Q    Okay.  Delegate Dance, could you read the section from

19   line 2 to line 11, please.

20   A    As a member of the House Redistricting Committee, I

21   support House Bill 5001 in its substitute form as we have

22   before us, and it's again for more than just the one

23   reason that it mirrors the -- or doesn't mirror, but it

24   does support the 12 minority districts that we have now

25   and it does provide that 55 percent voting strength that I

1    was concerned about as I looked at the model and looked at

2    the trending as far as what has happened over the last ten

3    years.

4    Q    Thank you.  And now, around line 8 you say that you

5    are concerned about the 55 percent voting strength.

6              Why were you concerned?

7    A    I was concerned because that was the strength that I

8    understood -- the 55 percent strength was the number that

9    we must meet if we were going to clear the bar with the

10   Department of Justice as far as our districting plan

11   having met the voting strength for African-Americans.

12   Q    And did you support that 55 percent target?

13   A    Yes, I did.

14   Q    All right.  And why?

15   A    Because I respect, and I still do, that Delegate Chris

16   Jones, who was the one that was chairing the committee,

17   expressed that this is what we needed to do.  He had done

18   this before, he had done it ten years -- the plan prior

19   to.  And this is what he said we needed to do.  And we

20   were working -- and we were meeting that, all but this one

21   area, and we had to make that happen if we were going to

22   have a plan that stood the test of the Department of

23   Justice.

24   Q    Did anyone ever show you any data or analysis that

25   would show that a 55 percent black voting-age population

R. Dance - Direct

1   was necessary for the plan to be cleared by the Department

2   of Justice?

3   A    I don't recollect anyone showing me that.

4   Q    Did anyone ever show you any racially polarized voting

5   analysis?

6   A    I don't recollect being shown any.

7   Q    Did Delegate Jones ever tell you that he relied on any

8   expert reports in coming to the 55 percent number?

9   A    No, I cannot remember him telling me that.

10  Q    Okay.  And you mentioned drawing maps at the Division

11  of Legislative Services.  Did anyone ever tell you that

12  the Division of Legislative Services calculated black

13  voting-age population differently than the Department of

14  Justice did?

15  A    No.

16  Q    And you talked a little bit before about Delegate

17  Tyler's district, and she is in District 75.  I would like

18  to discuss a little bit more about that and how your

19  district was drawn as a result of the 2011 redistricting.

20       Can you please turn to Defendant-Intervenor's Trial

21  Exhibit 94, and these are the maps that we looked at

22  earlier.  We are going to look at page 1.

23            And the same key to the map applies here.  So the

24  yellow cross-hatching part of your district is what was in

25  your district and what remained in your district after the

1   2011 redistricting.

2          The white cross-hatching represents part of your

3   district that was no longer part of your district after

4   2011.

5          And the bright yellow parts in the Northeast part

6   of the map represent the precincts or the areas that were

7   added to your district as a result of the 2011

8   redistricting.

9          Does that sound accurate?

10  A    Yes.

11  Q    And does this look like an accurate representation of

12  your district?

13  A    Yes.

14  Q    Now, which localities made up House District 63 prior

15  to the 2011 redistricting?

16  A    All of the county of Dinwiddie, all of the City of

17  Petersburg and parts of Chesterfield, in particular the

18  Ettrick and Matoaca area of Chesterfield County.

19  Q    And how did your localities change as a result of the

20  2011 redistricting?

21  A    I went from three localities to five localities.

22  Q    And which ones were added?

23  A    Parts of Prince George County and parts of the City of

24  Hopewell.

25  Q    And was Dinwiddie County in its entirety included in

R. Dance - Direct

80

1    your district after the redistricting?

2    A    After the redistricting I lost parts of Dinwiddie

3    County, maintained Ettrick/Matoaca area of Chesterfield

4    County, the City of Petersburg was in tact.  I picked up

5    parts of Prince George County.  And then parts of the City

6    of Hopewell.

7    Q    And where did the parts of Dinwiddie County that you

8    lost, where did they go?

9    A    That was -- it went to Delegate Tyler to try to get

10   her number up to 55 percent.

11   Q    And when you say her number, what you are you

12   referring to?

13   A    Of African-American voters up to 55 percent.

14   Q    And now why didn't Delegate Tyler's district extend to

15   the ease or west instead of coming into Dinwiddie County,

16   which was to the north, I think.

17   A    Even with all the little cities and towns that she

18   has, it wasn't giving her African-Americans -- the east

19   and west would have been Euro-Americans, and she needed

20   some African-Americans to get to that 55 percent.

21   Q    And how did you feel about giving up parts of

22   Dinwiddie County to Delegate Tyler?

23   A    I was not happy.

24   Q    Why were you not happy?

25   A    Because I had all of Dinwiddie County, that was an

R. Dance - Direct

1   area that I knew well, the people.  And I was not excited

2   about giving up Dinwiddie County.

3   Q    And how did you know those voters there?

4   A    My professional career, which I retired from, it

5   started in Dinwiddie County working for a facility there,

6   Southside Virginia Training Center, where I rose from the

7   level of nurse's aide to the point that I was interim

8   facility director.  And a lot of my employees came from

9   Dinwiddie County.

10          And so, that was more than just people, they were

11  like family.  But that's a part of my job, was to get her

12  to 55 percent and to increase from three localities to

13  five localities because that's what it took to get her to

14  the 55 percent strength of African-American voters.

15  Q    Now, as a result of losing population in Dinwiddie

16  County, did you pick up population elsewhere?

17  A    Yes, I did.  That was the population that I picked up

18  in Prince George because of it being contiguous, so I

19  picked up part of Prince George, that was to get more

20  African-Americans.  And then I picked up the concentration

21  of African-Americans in Hopewell, the City of Hopewell.

22  Q    Now, which precincts did you pick up in Hopewell?

23  A    Hopewell, it's on the map, you can see it's wards,

24  listed as Ward 2, 6, and then part of 7.

25          JUDGE PAYNE:  What was the last one, please,

R. Dance - Direct                                                     82

1   ma'am?

2              THE WITNESS:  Wards 6 and 2, and parts of Ward 7.

3              JUDGE PAYNE:  7.  Okay, thank you.

4   BY MS. BRANCH: (Continuing)

5   Q    Now, in order to get your district to Hopewell, can

6   you describe the route that it takes on the map.

7   A    To get from -- the map runs smooth when you get from

8   Petersburg, then you travel down 36 and you pick up the

9   Route 36.  You will see you pick up Prince George.  And

10  then continuing down, you cross over 295, and you're

11  still -- if you're doing a straight route, you could still

12  get to Hopewell by 36 as well.

13             So you can get to Hopewell through Prince George,

14  the way the lines were drawn, or if I traveled down 36, it

15  would not have been a contiguous route.  But if I were

16  staying within my district to get there, then I would have

17  gone through Prince George to get to Hopewell.

18  Q    And what is the racial makeup of the three precincts

19  that you picked up in Hopewell, the two parts -- or the

20  two full precincts and the one part?

21  A    The high percentage is African-American in those

22  areas.

23  Q    About what percentage would you say?

24  A    Of those precincts that I took?

25  Q    That are African-American?

R. Dance - Direct

1    A    They are African-Americans, if you ask me, right off I

2    would say at least 60 percent African-American.

3    Q    Okay.

4           JUDGE PAYNE:  Is that true, Senator, for each of

5    the two full precincts?

6           THE WITNESS:  The two full precincts in Hopewell.

7           JUDGE PAYNE:  In, okay.

8           MS. BRANCH:  I have no further questions.  Thank

9    you.

10          JUDGE PAYNE:  When you used the term "ward," were

11   you talking about precincts or voting tabulation

12   districts?

13          THE WITNESS:  In the City of Petersburg, because

14   that is one that at one point it was under the Department

15   of Justice and when they were voted, it's seven areas, and

16   they are called seven wards.

17          And I just have -- and in Hopewell, the same,

18   they are considered -- they are made up of seven wards.

19   And so --

20          JUDGE PAYNE:  That's the setup of the towns

21   themselves?

22          THE WITNESS:  Yes, right.

23          JUDGE PAYNE:  Without anything to do with your

24   district per se?

25          THE WITNESS:  No.  The precincts were like 27

R. Dance - Direct

1    precincts that made up the locality.

2              JUDGE PAYNE:  All right.  Thank you.

3              MS. WALRATH:  Good, I think it might actually be

4    afternoon now, Senator Dance, and Your Honor's.  I am

5    Jennifer Walrath on behalf defendant-intervenors, and this

6    will be pretty brief.

7              JUDGE PAYNE:  Could you pull that mike to you.

8              MS. WALRATH:  I can, yes.

9              JUDGE PAYNE:  Thank you.

10             MS. WALRATH:  I need to improve my diaphragm.

11                  CROSS EXAMINATION

12   BY MS. WALRATH:

13   Q    Senator Dance, I believe that you just testified at

14   the time of the 2011 redistricting you were a member of

15   the Virginia House of Delegates?

16   A    Yes.

17   Q    And that you served on the House of Delegates

18   Committee on Privileges and Elections?

19   A    Yes, I did.

20   Q    That was the committee that dealt with the

21   redistricting process in 2011?

22   A    That was a subcommittee of that committee.

23   Q    Okay.  And in your capacity on that committee, you

24   attended various public hearings across the State of

25   Virginia concerning redistricting?

R. Dance - Direct

1   A    Yes, I did.

2   Q    And we heard a bit of this earlier during your

3   testimony, but at this time I would like to play a video

4   clip from Plaintiffs' Exhibit 36.  And if you wish in the

5   transcript, it is at Plaintiffs' Exhibit 35.  It will be

6   begin where Delegate Dance, now Senator Dance, was reading

7   previously on page 157 line 2.  We believe it would be

8   beneficial for the court to see the entire speech.

9           JUDGE PAYNE:  What are you talking about playing,

10   the speech?

11          MS. WALRATH:  Yes.

12          JUDGE PAYNE:  Okay.

13          NOTE:  The audio clip is played into the record

14   as follows:

15          DELEGATE DANCE:  Thank you, Mr. Speaker.  And I

16   guess I wanted to speak to the bill, so maybe it's not the

17   right time.

18          MR. SPEAKER:  You want to speak to bill?

19          DELEGATE DANCE:  Yes.

20          JUDGE PAYNE:  You've got -- you've got the floor.

21          DELEGATE DANCE:  Thank you.  As a member of the

22   House Redistricting Committee I support House Bill 5001 in

23   its substitute form as we have before us.  And it's again

24   for more than just the one reason that it mirrors the --

25   or doesn't mirror, but it does support the 12 minority

R. Dance - Direct

1    districts that we have now and it does provide that

2    55 percent voting strength that I was concerned about as I

3    looked at the model and looked at the trending as far as

4    what has happened over the last ten years.

5         And one of the best examples I can give for that

6    and most concern was the area that was mentioned prior and

7    that is Delegate Tyler's area in the 75th.  Because

8    Delegate Tyler is an African-American that now finally

9    sits in a minority seat that's been there for years, but

10   there have been three tries by minorities in the past to

11   win that seat and they were not able to do so.

12        And if that district is below that 55 percent

13   voting strength, then I think she would be able to hold

14   the seat that she now holds today.  And I was really,

15   really concerned about that.  That issue was addressed and

16   it is now in that House Bill 5001, and I'm glad it's

17   there.

18        That is the -- and for the rest of the House --

19   or the minority districts, it shows 55 percent voting.

20   And it's voting, not just people being there, but the

21   effective opportunity for them to hold minority seats.

22   And not just for us incumbents that are in the seats, but

23   for those that would come after us.

24        And as mentioned by Delegate Hope and he was

25   asking about the 27th, 69th, 70, 71, they represent

R. Dance - Direct

1    minority seats.  Not the 27, but you the 69, the 70, the

2    71, they represent minority seats (inaudible) even though

3    minorities might not be in there.  And if we are to

4    preserve the rights for minorities to have a voice as to

5    whether or not they want to have a minority serve them or

6    someone of majority persuasion, that they have their

7    choice.  And they could lose that choice if they did not

8    have the voting strength that we now have in this.

9          And I also support this bill because I am on the

10   House side on the Democratic House side, and I know that

11   my colleagues, because I represented them and I tried to

12   be a voice for all of them in working with the Chair as he

13   developed his bill, that they gave me their suggestions.

14   I passed them on and they would look back, and the Chair

15   did work with them directly.  And I see a lot of us had a

16   lot of voice in House Bill 5001.  It's not just

17   African-Americans.  African-American, Euro-American, it

18   represents members of my side of the House as well, have a

19   voice in the bill that we have.  And I think it's the best

20   compromising bill that we could bring forward that truly

21   represents Virginians.  And that's the Commonwealth, not

22   just us, but the people that will come after us.

23          Thank you.

24          JUDGE PAYNE:  What exhibit is that?

25          MS. WALRATH:  That is a clip from Plaintiffs'

R. Dance - Direct

88

1    Exhibit 36.  And the transcript of that exhibit is at 35.

2    BY MS. WALRATH: (Continuing)

3    Q    Now, Senator Dance, that was you speaking, correct?

4    A    Yes.

5    Q    And the clip is accurate as to what was stated on the

6    floor?

7    A    Yes.

8    Q    And did you say anything that wasn't true?

9    A    No.

10   Q    And how much time did you spend with plaintiffs'

11   counsel preparing for today's testimony?

12   A    Not that much.  The only time I met with them -- do

13   you want time?  Do you want to give me --

14   Q    Approximation?

15   A    Maybe an hour 30 minutes, maybe up to two hours max.

16   You know, in a conversation or two, whatever.

17   Q    Okay.  Just one last question.  HB 5005, the plan at

18   issue here, you voted for that plan, right?

19   A    Yes.

20           MS. WALRATH:  Nothing further at this time.

21           JUDGE PAYNE:  Any redistrict?  None?  Yes?

22           MS. BRANCH:  No, Your Honor.

23           JUDGE PAYNE:  May she be permanently excused?

24           MS. BRANCH:  Yes, she may.

25           MR. BRADEN:  Yes, Your Honor.

W.L. Armstrong - Direct

1              JUDGE PAYNE:  Mr. Troy?

2              MR. TROY:  Yes, Your Honor.

3              JUDGE PAYNE:  Thank you, Senator, for being with

4    us.  We appreciate your testimony.  And you may step down

5    and be excused permanently to go about your business.

6              NOTE:  The witness stood down.

7              JUDGE PAYNE:  Your next witness.

8              MS. BRANCH:  Plaintiffs call Ward Armstrong.

9              NOTE:  The witness is sworn.

10

11              WARD L. ARMSTRONG,

12   called by counsel for the plaintiffs, first being duly

13   sworn, testifies and states:

14              DIRECT EXAMINATION

15   BY MS. BRANCH:

16   Q    Good afternoon, Mr. Armstrong.

17   A    Good afternoon.

18   Q    Would you please state your name for the record.

19   A    Ward L. Armstrong.

20   Q    And where are you from?

21   A    I am from Martinsville, Virginia.

22   Q    And where do you currently work, Mr. Armstrong?

23   A    I'm a trial attorney.  I am the senior partner in

24   Armstrong & Armstrong, attorneys at law, 1 Walnut Street,

25   Martinsville, Virginia.

W.L. Armstrong - Direct

1    Q    Are you currently a member of the House of Delegates?

2    A    I am not.

3    Q    And how long did you serve -- or did you serve in the

4    House of Delegates, I'm sorry?

5    A    I served for 20 years.  I was elected in '91, was

6    sworn in January 1992, and left office January 2012.

7    Q    What district did you represent?

8    A    The numbers changed.  The first ten years it was House

9    District 11.  The second ten years the House District

10   assigned or that I ran in was House District 10.  And then

11   I was defeated in my last election, I ran in House

12   District 9 in the newly reconstituted districts after the

13   2011 redistricting.

14   Q    All right.  And what leadership positions, if any, did

15   you hold during your time in the House?

16   A    I was the minority leader of the House from 2007 until

17   I left office in 2012.

18   Q    So you were the minority leader at the time of the

19   2011 redistricting?

20   A    I was.

21   Q    Now, prior to the 2011 redistricting, had you been

22   involved in a redistricting process before?

23   A    Yes.  I was in the House during the 2001 redistricting

24   process.

25   Q    And how would you describe your role during the 2011

W.L. Armstrong - Direct

1   redistricting process?

2   A    Very involved.  As the minority leader, I would have

3   been the person on my side of the aisle for the Democrats

4   that would have put forth both alternative plans to the

5   majority party as well as to make challenges to any

6   redistricting plan that was put forth by the majority

7   party.

8   Q    And did you speak with members of your caucus during

9   the process?

10  A    I did.

11  Q    And about how often?

12  A    Well, during the -- both the lead-up to the special

13  session in April of 2011 and during the special session,

14  daily.

15  Q    Who was the chief patron of the redistricting plan?

16  A    Delegate Chris Jones.

17  Q    Okay.  Now, can we please turn to Plaintiffs'

18  Exhibit 35.  This is the same one we've been looking at.

19  And we're going to look at page 66, please.

20  A    I'm sorry, counselor, what page?

21  Q    We're going to look at page 66 of Trial Exhibit 35.

22  A    All right.

23  Q    And I would like to direct your attention to line 7.

24  And there -- I can read it for the record.  I've already

25  read it, but I will read it if that's --

W.L. Armstrong - Direct

1          JUDGE PAYNE:  I think we've read it.  He can read

2     it to himself if you need to refresh his recollection, and

3     then you can go about your questioning.

4     A    I have read it.

5     Q    Great.  Now, what did you understand Delegate Jones to

6     be referring to with the 55 percent number on line 12?

7     A    The gentleman was referring to black voting-age

8     population in the various minority-majority districts in

9     the Commonwealth of Virginia.

10    Q    And what was your understanding as to the significance

11    of 55 percent?

12    A    Well, as a result of the exchange or the colloquy that

13    I had with Delegate Jones on the floor, 55 percent was not

14    aspirational.  It was a bright line rule.  That the

15    districts, the minority-majority districts would have to

16    be at least 55 percent black voting-age population or he

17    would not -- or the committee would not support the plan.

18    And that any plan coming forward would have at least a

19    55 percent black voting-age population or it would not be

20    put forth to the floor.

21    Q    And what made you think that?

22    A    Repeated questioning of Delegate Jones on the floor of

23    the House of Delegates, combined with my conversations

24    with my colleagues off the floor of the House.

25    Q    Great.  Did you ever advocate for increasing the

W.L. Armstrong - Direct

1   number of majority-minority districts?

2   A    Yes.  The plan that was put forward by the Democrats

3   created a thirteenth minority-majority district.

4   Q    And we can turn to again the same Plaintiffs' Trial

5   Exhibit 35, turning to page 70.

6   A    Yes, ma'am.

7   Q    And I would like to read a statement made by Delegate

8   Jones.  You can see that he is the one speaking if you

9   just turn back to 69, line 17.  And I would just like to

10  read a portion, starting on line 4 of page 70.

11          He says, quote:  I have looked at the 12 and the

12  13th plan, Option 1 and Option 2, and neither one of those

13  plans met what I think, from the testimony that we heard

14  throughout this process, that the effective voting-age

15  population needed to be north of 55 percent.  Each of

16  those plans had a low of I think 52, 52 percent, end

17  quote.

18          Can did I read that correctly?

19  A    You did.

20  Q    What was Delegate Jones referring to when he said the

21  12 and 13th plan Option 1 and Option 2?

22  A    He was referring to the democratic plan that would

23  have created a 13th minority-majority district.  And his

24  reference was that in his opinion because some of the

25  districts fell below 55 percent, that they would be

W.L. Armstrong - Direct

1    unacceptable.  That's what I gleaned from his testimony,

2    from his answer.

3    Q    And now the same exhibit, turning to page 72.

4    A    All right.

5    Q    On line 5, you asked the question on the House floor.

6    Could you read that question?

7    A    Yes.

8    Q    It goes from line 5 to line 9.

9    A    Yes.  DELEGATE ARMSTRONG:  So the gentleman has stated

10   that in his opinion nothing below a 55 percent

11   minority-majority district would be sufficient for the

12   minority community to elect its candidate of choice?

13   Q    Thank you.  Now, why did you ask that question?

14   A    I wanted to be clear that what the Privileges and

15   Elections Committee and what the purpose was behind HB

16   5001 with regard to the establishment of a percentage.

17          I would tell that personally I did not feel that

18   a bright line rule was necessary in order to comply with

19   the Voting Rights Act.  But I wanted to be sure that

20   that's what my understanding was of Delegate Jones and the

21   Privileges and Elections Committee of HB 5001 that they

22   were putting forth, that it had to comply with that bright

23   line rule.

24          And that's what I gleaned from not only this

25   answer, but from repeated questioning on the floor of the

W.L. Armstrong - Direct

1   House.

2   Q    And on line 12 of that same page, page 72, Delegate

3   Jones responds to your question.  And he says, quote:  I'm

4   not sure he was listening closely --

5            JUDGE PAYNE:  Excuse me, Ma'am.

6            JUDGE LEE:  We will take about a ten-minute

7   release.  Thank you.

8            NOTE:  At this point a recess is taken; at the

9   conclusion of which the case continues as follows:

10           JUDGE PAYNE:  Mr. Armstrong, I remind you again

11  of the same oath you took before the recess.

12           THE WITNESS:  Thank you, Your Honor.

13  BY MS. BRANCH: (Continuing)

14  Q    So, Mr. Armstrong, you read a question that you asked

15  on the House floor right before we took the recess.  And

16  Delegate Jones responds on page 72, line 10.  He says,

17  quote:  I'm not sure he was listening closely.  I said

18  it's my opinion from the testimony that was received

19  during our public hearings that the community felt they

20  needed a percentage of 55 percent or better.  That was my

21  response to the gentleman.

22           Was that Delegate Jones' response to your question?

23  A    It was.

24  Q    What was your understanding as to why the 55 percent

25  black voting-age population was necessary?

W.L. Armstrong - Direct

1   A    Well, I argue with the premise as to whether or not

2   it's necessary.  In my studies of the Voting Rights Act, I

3   have never seen in case law a bright line rule for any

4   percentage, 55 percent or otherwise.

5        I was a little surprised by the response in that

6   most of my experiences with the general public is you walk

7   into ten people on the street, nine of them don't know

8   what redistricting is, much less what percentage of black

9   voting-age population might be necessary for a

10  majority-minority district to elect its candidate of

11  choice.

12       So I was surprised that he would glean that from

13  a public hearing, at least one in which there wasn't some

14  form of expert testimony.  And I wasn't aware of any.

15  Q    All right.  And now we've heard the 55 percent, it's

16  been referred to as the target.  You've testified that it

17  was a bright line rule.

18       Whatever label that we put on it, was it always

19  applied during the redistricting process?

20  A    It was.  Not just HB 5001, but to the iterations that

21  followed.  The bill that was ultimately passed, there were

22  changes in the Senate redistricting plan, but essentially

23  the House plan stayed in tact throughout.

24  Q    In the final plan that was passed, did the 55 percent,

25  did that apply to every district?

W.L. Armstrong - Direct

1    A    It did to the 12 African-American or minority-majority

2    districts, yes.

3    Q    And was any majority-minority district below the

4    55 percent?

5    A    It was not.

6    Q    All right.  And you've referred to it already, but

7    what was your understanding about what Delegate Jones

8    relied on to create the final map?

9    A    Well, I questioned him about that.  And the answer

10   that I received was, well, we relied on the census data.

11   And there were two data points in particular, is my

12   recollection.  The black voting-age population was one of

13   the data points.

14          But I also asked him what retrogression analysis

15   was performed.  And was surprised to learn that there

16   wasn't any that was done on the particular data.

17          And so, I had -- what I had tried to question

18   Delegate Jones is how did he arrive at the 55 percent?

19   What basis did that have besides the anecdotal evidence

20   that you just read from page 72 transcript, lines 10

21   through 15.  And basically precious little empirical

22   evidence.  That he strictly, as far as I could tell, the

23   number was almost pulled out of thin air.

24   Q    Okay.

25   A    But it was strictly adhered to.  There was no plan

W.L. Armstrong - Direct

1    that would be considered that fell below the 55 percent,

2    period.

3    Q    Could you please turn to the same Plaintiffs'

4    Exhibit 35, page 51 of the transcript.

5    A    I'm sorry, the same 35, page 51.

6    Q    Page 51, yes, sir.

7    A    Yes, ma'am.

8    Q    And could you read your question which starts on line

9    10 and ends on line 16.

10   A    Yes.  Line 10, Delegate Armstrong:  Can the gentleman

11   share with me what data that he used in order to determine

12   the minority-majority district voter participation?  What

13   retrogression data he would have used in consideration in

14   adopting a plan that would have had 12 minority-majority

15   districts?

16   Q    What were you trying to find out by asking that

17   question?

18   A    Again, I was trying to learn how did we arrive at the

19   55 percent.  What retrogression analysis did he have that

20   indicated dropping below 55 would not allow

21   minority-majority districts to elect their candidate of

22   choice.

23          JUDGE PAYNE:  Excuse me, do you mean what

24   analysis about the topic of retrogression, not a

25   retrogression analysis, is that correct?

W.L. Armstrong - Direct

1          THE WITNESS:  I'm sorry, would you restate that.

2          JUDGE PAYNE:  A retrogression analysis is a term

3   of art that is mathematically applied to find out certain

4   data.

5          THE WITNESS:  Yes, sir.

6          JUDGE PAYNE:  You're not talking about that?

7   Your saying an analysis that would determine what kind of

8   retrogression might be in the black voting population, is

9   what you mean, is that right?

10          THE WITNESS:  Yes, sir.

11          JUDGE PAYNE:  Okay, thank you.

12          THE WITNESS:  In connection as well, Your Honor,

13   what data did he use to support --

14          JUDGE PAYNE:  I know, but I wasn't asking that.

15   I was just asking about the use of that term.  I was

16   concerned about whether or not there was some analysis

17   that was possible to be done of that particular kind.  And

18   you've answered my question.  Thank you.

19          You may resume.

20   BY MS. BRANCH:  (Continuing)

21   Q    On line 17 Delegate Jones responds to your question.

22   He says, quote:  I'd say to the gentleman that I used the

23   data as it was provided by the Census Bureau to look at

24   percent black population and percent black voting-age

25   population, end quote.

W.L. Armstrong - Direct

1              Did I read that correctly?

2    A    You did.  And those were the two data points that he

3    indicated that he used.

4    Q    And now, can we just flip the page to page 52.  You

5    asked a question on the House floor on line 4.  Could you

6    read that question, please.

7    A    Beginning line 4.  Delegate Armstrong:  Would the

8    gentleman agree with me that just determining -- in

9    determining a majority-minority district is more than just

10   determining what population that one has to analyze

11   whether or not based on past voting patterns whether or

12   not the minority population within such district has the

13   ability to elect its candidate of choice and that requires

14   more than just an analysis of raw census data.

15   Q    What types of data were you suggesting Delegate Jones

16   look at?

17   A    Well, I mean, it would seem to me that looking at

18   voting patterns would have been a necessary examination

19   more than just looking at the raw census data.  I'm not

20   certain that that tells you very much, just looking at

21   that one data point.

22   Q    And Delegate Jones responds to your question on

23   page 13 of the transcript.  He says, quote:  Mr. Speaker,

24   I'd say to the gentleman, he may be giving me more credit

25   than he should.  What I did, I listened to testimony that

W.L. Armstrong - Direct

1   was provided during the process of all these public

2   hearings that we had and I tried to respond to the

3   community and what they thought was an effective

4   percentage that they would need to have and effective

5   representation of the candidate of their choice, end

6   quote.

7   A    Yes.

8   Q    Now, what was your understanding based on that as to

9   what data or what Delegate Jones relied on in determining

10  whether or not the black voters in these majority-minority

11  districts could elect their candidate of choice?

12  A    Well, again, it appeared to me that it was more or

13  less anecdotal testimony at the various public hearings.

14  And I'm not certain that that was necessary or sufficient

15  in order to ensure that you could avoid retrogression,

16  avoid it by the Voting Rights Act, but yet also to avoid

17  racial packing in these districts.

18          I mean, yeah, you carry it to its logical

19  conclusion, if you want to be absolutely certain, then set

20  it at 60 or 65.  I think in many cases though that --

21          JUDGE PAYNE:  I think you need to get the

22  question out.  Please answer just the question and only

23  the question.  And then if she wants to follow up, she can

24  follow up.  I don't think speeches are helpful at this

25  point.

W.L. Armstrong - Direct

1        THE WITNESS:  Yes, Your Honor.

2   BY MS. BRANCH: (Continuing)

3   Q    So staying in that same exhibit, turning to page 65,

4   please.

5   A    Yes.

6   Q    We're going to look at line 1.  When you get there, if

7   you could read your question on line 1.

8   A    Delegate Armstrong:  Well, in determining compliance

9   with the Voting Rights Act and whether or not these

10  majority-minority districts are able to select its

11  candidate of choice, did the gentleman do anything more

12  than speak with the members that may represent those

13  particular districts at the present time?

14  Q    And why did you ask that question?

15  A    Well, I wanted to find out what he did besides talking

16  with the various members whose districts may be affected,

17  the Delegate Dances, or the Delegate McClellans, or the

18  Delegate Tylers.  Did he do more than that?

19  Q    And on line 8 of that same page Delegate Jones

20  responds.  He says, quote:  Yes, sir.  I spoke with

21  several citizens along the way who came to see me or

22  called me, and I listened to what they had to say.  We had

23  individuals at the public hearings who stated their

24  concern; that the dilution of the percentage of voting-age

25  population would greatly diminish their chance to be able

W.L. Armstrong - Direct                                              103

1   to elect a candidate of their choice, end quote.

2        Did Delegate Jones ever mention relying on anything

3   other than conversations with delegates and members of the

4   community to determine what percent black voting-age

5   population these majority-minority districts needed to

6   have in order for the voters to be able to elect their

7   candidate of choice?

8   A    He did not.

9   Q    Did Delegate Jones ever mention reviewing any expert

10  reports?

11  A    He did not.

12  Q    Did he mention reviewing any reports from a court case

13  called *Wilkins v. West*?

14  A    He did not.

15  Q    Can you please turn to page 54, please, of the same

16  exhibit.

17            JUDGE PAYNE:  Are you saying five-four, ma'am, or

18  six-four.

19            MS. BRANCH:  Yes, Your Honor, five-four.

20            JUDGE PAYNE:  Thank you.

21  BY MS. BRANCH: (Continuing)

22  Q    And can you read your question, starting on line 18.

23  A    Delegate Armstrong:  Can the gentleman tell me whether

24  he or any persons that worked with him in the development

25  of the plan that resulted in House Bill 5001 took into

W.L. Armstrong - Direct

1  account any retrogress -- it should be retrogression --

2  analysis regarding minority performance in any of the 12

3  majority-minority districts that are part of HB 5001.

4  Q    And now just to clarify for the record, what did you

5  mean by retrogression analysis?

6  A    Whether or not that he did any type of empirical data

7  analysis that would lead him to conclude what percentage,

8  if any, was necessary for a particular minority-majority

9  district to elect its candidate of choice.

10 Q    Great.  Now, Ms. Moreno, if you wouldn't mind just

11 putting the poster board up for us, please.

12       And we're just going to highlight Delegate Jones'

13 response to your question about whether or not any

14 retrogression analysis was performed.

15            On line 3 of the transcript on page 55 he says,

16 quote:  I would say to the gentleman, I'm not aware of

17 any.

18            Do you remember him saying that to you on the

19 floor?

20 A    I do.  The transcript is accurate.

21 Q    Great.  And could you please turn to page 58 of the

22 same transcript, five-eight.

23 A    All right.

24 Q    Line 13, could you read your question, please.

25 A    Delegate Armstrong:  Well, would the gentleman not

1    agree with me that he had available to him the resources

2    of the Division of Legislative Services.  That if the

3    gentleman had requested a full retrogression analysis of

4    the majority-minority districts, it could have been

5    accomplished?

6    Q    What was the point you were trying to make there?

7    A    The Division of Legislative Services is a group of

8    attorneys that provides support services to the General

9    Assembly.  Most of us are jack of all trades, masters of

10   none, and we turn to them for support in the various

11   subject matters that we are called upon to legislate.  And

12   if Legislative Services can't find an answer, they can

13   contact people and bring in experts who can.

14          So there was no doubt in my mind that resources

15   were available to the Privileges and Elections Committee

16   and Delegate Jones to conduct any type of retrogression

17   analysis that he wanted to undertake in order to determine

18   what would be necessary for each of the majority-minority

19   districts to elect its candidates of choice.

20   Q    Have you worked with staff at the Division of

21   Legislative Services before?

22   A    Frequently, daily.

23   Q    Do attorneys work there?

24   A    Yes.  I probably can't tell you the number, it's

25   probably north of three dozen.

W.L. Armstrong - Cross

1   Q    And do you know if any of those attorneys have any

2   expertise in the Voting Rights Act or any of the issues

3   that we've discussed today?

4   A    Absolutely.  They are -- those that deal with the

5   Privileges and Elections Committee are very well versed in

6   the Voting Rights Act and all state statutes dealing with

7   elections law.

8   Q    Were you surprised that according to Delegate Jones he

9   did not refer to the Division of Legislative Services to

10  perform any types of analysis?

11  A    I was.

12           MS. BRANCH:  I have no further questions.  Thank

13  you.

14           JUDGE PAYNE:  Any cross-examination?

15              CROSS-EXAMINATION

16  BY MR. RAILE:

17  Q    Good afternoon, Mr. Armstrong.  I'm Richard Raile,

18  counsel for the defendant-intervenors.

19  A    Nice to met you, sir.

20  Q    You may recall that we met at your deposition in May.

21  A    Yes, sir.

22  Q    Have you had communication with plaintiffs' counsel

23  since your deposition?

24  A    Limited communication, most of it of the nature of

25  logistics as to when I would be needed to be called as a

W.L. Armstrong - Cross

1   witness and where the hotel would be, et cetera.

2   Q    Understood.  You were House minority leader at the

3   time of the 2011 redistricting, right?

4   A    Yes, sir.

5   Q    Isn't it correct that you are no longer the minority

6   leader?

7   A    I am no longer the minority leader, and I am no longer

8   a member of the House.

9   Q    And that is due in large part to the plan at issue in

10  this litigation, isn't it true?

11  A    Well, it is due to a variety of factors.  I would say

12  that redistricting of my district in Southwest Virginia

13  played a role in that, yes, sir.

14  Q    And your district was House District 10, right?

15  A    It was.  And it was moved to Northern Virginia, I ran

16  in House District 9.

17  Q    Understood.  And that was not actually the district

18  that you were drawn into, right?  Didn't you have to move

19  over to that district?

20  A    Right.  I was drawn into District 14.  Basically my

21  district was fractured amongst the three.  And I decided

22  that District 9 would be the best district to run in.  It

23  was not a correct decision, or at least I did not win.

24  Q    I was going to ask you that.  That effort was not

25  successful, correct?

W.L. Armstrong - Cross

108

1   A    Right.

2   Q    Now, during the floor debates over the plan, you made

3   speeches against the plan, isn't that right?

4   A    I did.

5   Q    I'm going to show the Court a clip from what is marked

6   as Defendant-Intervenors' Exhibit 3, which I understand to

7   be the last of those.

8         JUDGE LEE:  We can do that right after lunch.  We

9   will recess now until 2 o'clock.  Thank you.

10        NOTE:  At this point, a lunch recess is taken; at

11  the conclusion of which the case continues as follows:

12        JUDGE PAYNE:  All right, Mr. Raile, you can

13  continue.  Mr. Armstrong, I remind you you are still under

14  oath.

15        THE WITNESS:  Yes, Your Honor.

16  BY MR. RAILE:  (resuming)

17  Q    Mr. Armstrong, as I was saying before the lunch, we're

18  going to show the Court a clip from Defendant Intervenors'

19  Exhibit 3, and if you're following along in the

20  transcript, that would be Defendant Intervenors' Exhibit 4

21  at pages two through seven.

22        THE WITNESS:  I'm sorry, sir.  I do not have

23  Exhibit 4.

24        JUDGE PAYNE:  What did you say, sir?

25        THE WITNESS:  I do not have Exhibit 4.

W.L. Armstrong - Cross

1          THE COURT:  It will be in a different book there,

2   intervenors defendant book.  It's a black book.

3          THE WITNESS:  Thank you, Your Honor.

4          JUDGE PAYNE:  Do you have it now, sir?

5          THE WITNESS:  Yes, Your Honor.  What page, sir?

6          MR. RAILE:  Two through seven.

7          THE WITNESS:  Thank you.  I'm ready.

8

9          (Video played as follows:

10

11          UNIDENTIFIED SPEAKER:  The hour is late.

12   Everyone in here is tired.  I will be brief, but this bill

13   will affect eight million people in this Commonwealth for

14   next decade.

15          Yesterday was about legal arguments.  Today we

16   talk about policy and what's right.  Last night, I had the

17   privilege of speaking at the ^ Sorenson Institute dinner

18   along with our speaker, the majority leader of the Senate

19   and the minority leader, and I told a joke about my good

20   friend from Henrico and Rorschach inkblot, and we kidded

21   about redistricting, but one of the things that I said to

22   the group in seriousness last night is that we are in sore

23   need of a nonpartisan commission to draw lines.

24          Now, in drawing a redistricting plan in this

25   Commonwealth when subject to the Voting Rights Act, the

W.L. Armstrong - Cross

1    first thing that one has to do is make it legal, and that

2    means compliance with Section 2 and Section 5 of the

3    Voting Rights Act, and so that was in the criteria.  But

4    we've all seen the criteria list that came out of the

5    Privileges and Election Committee about keeping

6    communities together and communities of interest in

7    contiguity and population deviations.

8           Let's not kid ourselves.  The number one criteria

9    in the drafting of a redistricting plan, 5001 or one down

10   the hall in the Senate, is protecting the incumbents of

11   the majority party, and when convenient, protecting

12   incumbents of the minority party.  That's what this is

13   about.

14          I was here in 2001 when it was done.  Some of you

15   were here in 1991 when it was done, some in '81 and '71

16   when it was done.  And whether it's gerrymandering by

17   Republicans or gerrymandering by Democrats, it's still

18   gerrymandering.  I'm not going to defend the same act when

19   it goes on down the hall.

20          It is the most selfish exercise in politics, in

21   government, one that will turn friend on friend.  You

22   know, when they train lifeguards -- and you've seen on Bay

23   Watch they have the red floats.  They tell a lifeguard,

24   when you get near a drowning person, don't touch them.

25   They'll grab you and pull you under.  Give them the float.

W.L. Armstrong - Cross

1   It is that much at stake.

2          And I suppose that it's easy to do and get away

3   with because the public either doesn't get it or doesn't

4   care.  It's not like raising their taxes or taking away

5   their pellet guns.  In fact, I would say if you walked up

6   to ten people on the street and said, they're doing

7   redistricting, what's that, nine of them couldn't tell you

8   what it was.

9          But it is the most basic of what we do, because

10  it is -- it affects everything we do because it affects

11  how we select ourselves.  You know, you know, some may

12  say, well, the only reason you're standing up is because

13  it gets you.  This isn't about Ward Armstrong.  You know,

14  you can replace the president of the United States, you

15  can replace me.  I won't be remembered ten minutes after

16  I'm gone.  And at the end of the day, that doesn't matter

17  either.

18         What does matter, though, is that people are able

19  to choose for themselves their own representatives, not

20  the other way around.  We carve these districts up so the

21  outcome is preordained, and we do it to protect ourselves.

22         Well, I suppose it will be what it will be.  I

23  know the outcome of this vote.  There probably won't be

24  single digits against it in a few minutes.  You know who

25  can stop this?  The guy that sleeps across the street,

W.L. Armstrong - Cross

1   and, in fact, I'll tell you that's what it's going to

2   take.

3          If Bob McDonnell said, I will veto any bill that

4   gets to my desk that's not the result of a nonpartisan

5   commission, it would end.  Either you send a nonpartisan

6   commission bill, or you can go to federal court, take your

7   choice, and that would end it.  But, no, we all know that

8   that isn't going to happen.

9          I heard earlier today that he keeps campaign

10  promises.  Well, he doesn't keep all of them.  He isn't

11  going to keep this one.

12         You know, when I leave this place on a lot of

13  days, I really feel good.  The day that we passed the bill

14  that created the new college back in Martinsville, I said,

15  you know, I really made a difference.

16         Is anybody really going to feel good when you

17  went out of here today and we've whacked these districts,

18  that we have deprived these people, the people living

19  there their ability to choose their own delegates?

20         You know, one other point that I want to make.  I

21  was laying in bed the other night, I thought about -- I

22  went around the chamber today during one of the breaks,

23  and I counted the number of women in this chamber.

24  There's 18.  With one fell swoop of the bill, you're going

25  to get rid of two of them.  That's ten percent of the

W.L. Armstrong - Cross

1   women in this chamber.  As hard as it is to elect women in

2   this state to these positions, and we're going to kick two

3   of them out the back door in just a few minutes.

4          Well, I don't know, Mr. Speaker.  I guess maybe

5   at this point in time anything more I say I'm going to go

6   to whining, but if anybody thinks that this is the General

7   Assembly's finest hour in cutting a bill like this, well,

8   they're sadly mistaken.  Do what you will.

9

10          (End of video clip.)

11

12  Q   Mr. Armstrong, is that you in the clip?

13  A   It was.

14          JUDGE PAYNE:  Pages three through seven of

15  Exhibit 4; right?

16          MR. RAILE:  I believe that's correct, Your Honor.

17  Q   Is the clip accurate to what you said?

18  A   It is.

19  Q   Was there anything you said in that speech on the

20  House floor that was not truthful?

21  A   No, sir.  I suppose that most of it was opinion, not

22  fact, but.

23  Q   You stated in the clip we just saw that there would

24  likely be few votes against the redistricting bill; right?

25  A   That's correct.  There were nine as I recall.

W.L. Armstrong - Cross

1    Q    So your prediction proved correct?

2    A    I meant to say it won't get into double digit, but,

3    yeah, I was one vote being correct.

4    Q    So the vote, as you say, was a foregone conclusion?

5    A    In my estimation, it was preordained.

6    Q    And didn't even most of the members of the democratic

7    party vote in favor of the plan?

8    A    They did, sir.

9    Q    Now, you didn't have a role in drawing the plan, I

10   assume?

11   A    Well, I was a sitting member of the House of Delegates

12   and I had a vote.  Was I the originator of House bill

13   5001, or did I alter the course of history?  No, sir, I

14   did not.

15   Q    There were a lot of meetings between delegates that

16   went on behind the scenes going to that plan; isn't that

17   correct?

18   A    Most assuredly.

19   Q    And isn't it correct that you were not part of those

20   meetings?

21   A    I was not a part of most of them.  The majority party

22   did not share its internal discussions with me.  I did

23   have some conversation with members of my own party about

24   the redistricting plan.

25   Q    Wasn't it the case that you also had a lot of trouble

W.L. Armstrong - Cross

1    that was unusual, given that you were the minority leader,

2    in getting information from Democratic party members?

3    A    No, sir, that was not a departure from the usual

4    course of business on about any subject matter.  I was not

5    included in the reindeer games if that's what you are

6    asking.

7    Q    That's what I'm asking.  Sorry.  I apologize for

8    misdirecting you, but what I'm getting at is, isn't it

9    correct that you didn't play a role, you didn't have a lot

10   of inside information about what was going on behind the

11   scenes; right?

12   A    That's a compound question.  I feel I played a role.

13   I did everything that I could and should, as the minority

14   leader, to set forth our position.  Was I included in the

15   private discussions of the majority party?  No, I was not.

16   Was I included in private discussions between members of

17   the majority party and some members of my own party?  No,

18   I was not.

19            JUDGE PAYNE:  I think that started out with a

20   different question, though, and I would be interested in

21   the answer.  The first question was whether you had

22   difficulty getting information from members of your own

23   party about what was going on in the deliberations on the

24   committee.  That was the beginning of the question.

25            THE WITNESS:  The answer to that question, Your

W.L. Armstrong - Cross                                          116

1   Honor, would be yes.

2              JUDGE PAYNE:  Yes?  Okay, sorry.

3              THE WITNESS:  Yes, sir.

4              JUDGE PAYNE:  All right, go ahead, Mr. Raile.

5              MR. RAILE:  Very good.  Thank you, Your Honor.

6   Q    Now, you say that you did your best to advance the

7   position of the democratic party in this process?

8   A    Well, that's a little harder to answer.

9   Q    I apologize.  I actually thought that's what you said.

10  I must have misunderstood you.

11  A    I think the Democratic party at large that I was

12  advancing the position that most Democrats would assert me

13  to take.  Whether or not that was also the majority

14  position of members of my own party, you could argue or

15  debate given the outcome of the vote.

16  Q    We know the outcome of the vote; right?

17  A    Yes, we do.

18  Q    It would be fair to say, though, that --

19             JUDGE LEE:  Excuse me.  Did I hit alarm?  I

20  apologize for the distraction.  I accidentally hit the

21  panic alarm, so the whole world is about to descend on us.

22  I apologize.

23             I accidentally hit the button I'm so sorry.  It's

24  my fault.  Thank you for coming So promptly.  I take full

25  responsibility for my actions.

W.L. Armstrong - Cross

1            JUDGE PAYNE:  Thank you, very much.

2            MR. RAILE:  Thank you, Your Honor.

3   Q    Mr. Armstrong, did the Democratic party propose an

4   alternative plan to the one adopted?

5   A    Yes, sir.

6   Q    What was the House bill number on that?

7   A    I don't know that I can remember the number of the

8   bill.  If you refresh my memory, I may not be able to

9   disagree with you but it may help.

10  Q    Was it HB 5002?

11  A    That would -- I would not dispute that that's not the

12  number.

13  Q    Okay.

14  A    It had a very short shelf life, so I don't remember

15  the number.

16  Q    Okay.  You referred in your -- in some of the

17  testimony we heard earlier to options one and options two

18  in a bipartisan commission redistricting report; is that

19  correct?

20  A    That's correct.

21  Q    Do you remember the House bill numbers for those?

22  A    I do not.

23  Q    Do you remember if they were introduced formally as

24  House bills?

25  A    I cannot recall that.  I do know that there were

W.L. Armstrong - Cross

1  alternative plans that created a 13th district and that I

2  had proposed one, yes.

3  Q    And did you -- do you have a degree in statistics?

4  A    No.  In fact, statistics was one of the worse courses

5  I had at my undergraduate.  I made a C.

6  Q    Have you ever performed a regression analysis?

7  A    No, sir.

8  Q    Do you know the difference between an ecological

9  regression analysis and an ecological inference analysis?

10 A    No, sir.

11 Q    Did the Democratic party ask anyone in the division of

12 Legislative Services to perform a regression analysis in

13 the preparation for the 2011 redistricting?

14 A    No, sir.  We had our own expert.

15 Q    Your own expert who performed a regression analysis?

16 A    It was my understanding that he did perform some level

17 of regression analysis, yes, sir.  Jeff ^ Weiss.

18 Q    Now, Jeff Weiss is a lawyer; isn't that right?

19 A    He is.

20 Q    Does he have a degree in statistics?

21 A    It's been five years since I've seen his CV, and I

22 don't know that I could tell you his educational

23 background.  I do know that he lectured at the National

24 Conference of State Legislatures on redistricting, and he

25 worked at the Justice Department on redistricting.

W.L. Armstrong - Cross                                                      119

1    Q    I asked a more narrow question, though, about whether

2    an ecological regression analysis or an ecological

3    inference analysis was performed leading up to the plan,

4    and you told me that a lawyer performed it.

5    A    I do not -- I do not know -- I doubt whether the

6    regression analysis that he did -- I don't know what it

7    would be termed, but he is the one that, working with my

8    office, we developed the plan that had the 13th

9    minority-majority district.

10   Q    Was the analysis that you are describing submitted to

11   the legislature?

12   A    No, sir.

13   Q    Mr. Armstrong, I'm going to show you a copy of your

14   deposition in this case, and we can pull it up on the

15   screen.  We also have extra copies for the judges if need

16   be.  If you'll turn to page 109 once you have the

17   document?

18   A    I have it on screen.

19   Q    And I am looking at the very last line starting at

20   line 25 and carrying over to page 110, and this, I

21   believe, was quoting you; is that correct?

22   A    To the best of my knowledge and belief.  I haven't

23   seen the front part of the deposition, but...

24   Q    Just to quote what you said, "I'm saying that if an

25   inquiry had been made to Legislative Services that we need

W.L. Armstrong - Cross

1    data and information in order to conduct either to obtain

2    a regression analysis or help us conduct a regression

3    analysis, that information could have been obtained."

4            MS. BRANCH:  Your Honor, plaintiffs would like to

5    request that you read the full --

6            JUDGE PAYNE:  Can you say that again?

7            MS. BRANCH:  Plaintiffs would request that you

8    read the question in addition to the answer.

9            JUDGE LEE:  You'll have a chance to redirect.

10           MR. RAILE:  That doesn't bother me either way.  I

11   was trying to save time.

12           JUDGE PAYNE:  Go ahead with the answer.

13   Q    And that the next question starting on line five is,

14   "It could have been obtained, but you never asked for it;

15   right?

16        "Answer:  I did not, no."

17        And the next question is, "Did anyone from the

18   Democratic party caucus ever ask for it?

19        "Answer:  Not to my knowledge."

20        Did I read that correctly?

21   A    You did.

22   Q    And were you under oath when you said that?

23   A    I did.  If you're asking me if the statement I made

24   was true, I never made a request of the Division of

25   Legislative Services for retrogression analysis.  Would

W.L. Armstrong - Cross

121

1    you like to know why?

2            JUDGE PAYNE:  All right, that will be enough now.

3            MR. RAILE:  I'm fine with that.  I thank you, Mr.

4    Armstrong.  I have no further questions at this time.

5            JUDGE PAYNE:  Redirect.

6

7                    REDIRECT EXAMINATION

8    BY MS. BRANCH:

9    Q    Mr. Armstrong, why didn't you ask the Division of

10   Legislative Services to perform a retrogression analysis?

11   A    Despite the fact that I had a wonderful working

12   relationship with most of my colleagues there, I couldn't

13   trust that the information wouldn't be leaked to the

14   majority party before it was ready to be disseminated to

15   the public, so we hired our own expert.

16   Q    And we listened to a video that defendant intervenors

17   put on of testimony that you gave on the House floor.  You

18   were opposed to the final map that was passed?

19   A    I was.

20   Q    And was one of the reasons that you opposed the map

21   because of the legalization of the 55 percent target or

22   rule?

23   A    Yes.  You'll notice that in the preceding remarks or

24   the early part of my remarks, I said yesterday was about

25   legal arguments where we had a great deal of discussion

W.L. Armstrong - Cross

1    about the 55 rule, the Voting Rights Act, et cetera.

2        My arguments on the floor had more to do with policy

3    and the overarching reasons which I felt much of what was

4    being done was unethical and possibly even immoral, but

5    the voting rights piece of it was, in my opinion,

6    unlawful.

7        But my comments on the floor were, I suppose, a

8    mixture of both policy and my opinion about the bill in

9    general.

10            MS. BRANCH:  No further questions.  Thank you.

11            JUDGE PAYNE:  Can he be excused permanently?

12            MS. BRANCH:  He may.

13            JUDGE PAYNE:  Mr. Troy?

14            MR. RAILE:  We have a couple redirect questions.

15            JUDGE PAYNE:  You have what?

16            MR. RAILE:  Just a couple redirect questions.

17            THE COURT:  Ordinarily we don't allow recross,

18    but we'll do it this time, and then everybody else will

19    know that's the rule.

20            MR. RAILE:  I apologize, Your Honor.  Thank you.

21            JUDGE PAYNE:  Those are California rules.

22

23                    RECROSS-EXAMINATION

24    BY MR. RAILE:

25    Q    And to be clear, so this regression analysis that you

W.L. Armstrong - Cross

1   had performed, you didn't want the public to see it?

2   A    No, sir, I didn't say that.  When it's a

3   work-in-progress, you don't want it leaked.  At some point

4   in time, just like with the introduction of the bill, you

5   have no problem with having it being disseminated.

6   Q    But it was not disseminated with the bill that you

7   proposed; right?

8   A    No.

9   Q    Did you produce this analysis with your subpoena for

10  your deposition?

11  A    No, and let me be clear.

12       JUDGE PAYNE:  Wait just a minute.

13  Q    It's a simple question.  Did you produce --

14  A    No.

15       MR. RAILE:  Thank you.  Those are all my

16  questions.

17       JUDGE PAYNE:  All right.  You may step down.  You

18  may be excused, Mr. Armstrong.  All right.  Thank you for

19  giving us your testimony.  You are certainly free to stay

20  if you'd like to.

21       THE WITNESS:  Thank you, Your Honor.

22       JUDGE PAYNE:  Your next witness?

23       MR. HAMILTON:  Your Honor, at this point the

24  plaintiffs call Dr. Stephen Ansolabehere, and, Your Honor,

25  while the Doctor is assuming the stand, I have some

W.L. Armstrong - Cross

1   illustrative exhibits I'd like to use with this witness,

2   so I'd like to hand them up.

3           JUDGE PAYNE:  The other side is in agreement with

4   them, we don't have any -- Mr. Hamilton, there is no

5   disputes over these exhibits?

6           MR. HAMILTON:  There are no disputes.  They've

7   all been either admitted into evidence already, or they're

8   merely for illustrative purposes and we're not offering

9   them as substantive evidence, Your Honor.

10

11          **STEPHEN D. ANSOLABEHERE,**

12  a witness, called at the instance of the plaintiff,

13  having been first duly sworn, testified as follows:

14

15          MR. HAMILTON:  Your Honor, the parties have

16  stipulated that Dr. Ansolabehere is an expert with respect

17  to redistricting.  May I assume the Court will accept him

18  as an expert without further foundation?

19          JUDGE PAYNE:  Yes.

20  Q    Thank you, Your Honor.  I will ask a few questions

21  about his background, but I just wanted to make sure that

22  was clear.  We're also going to be using a few slides.

23  They're all in the handout that I just handed out to the

24  Court.

25          JUDGE PAYNE:  All right.

W.L. Armstrong - Cross                                        125

                          DIRECT EXAMINATION

 2

 3   BY MR. HAMILTON:

 4   Q    Good afternoon, Dr. Ansolabehere.  Could you please

 5   state your full name and residential address for the

 6   record.

 7           JUDGE PAYNE:  He doesn't need to state his

 8   residential address because we just have to wash it out of

 9   the record.

10   Q    Would you state your full name then, please.

11   A    My name is Stephen Daniel Ansolabehere.

12   Q    Dr. Ansolabehere, you are an expert for the plaintiffs

13   in this litigation?

14           JUDGE PAYNE:  Why don't you get him to spell his

15   last name.

16           MR. HAMILTON:  It's the usual traditional

17   spelling.

18           JUDGE LEE:  No, for the court reporter.

19           THE COURT:  I just was a little unsure.

20   Q    Dr. Ansolabehere, could you please spell your last

21   name.

22   A    A-n-s-o-l-a-b-e-h-e-r-e.

23   Q    Thank you.  Dr. Ansolabehere, you are an expert for

24   the plaintiffs in this litigation?

25   A    I am.

W.L. Armstrong - Cross

126

1    Q    Could you please state take a look at Exhibits 50 and

2    51.  Should be in the notebooks in front of you.

3              JUDGE PAYNE:  Plaintiffs'?

4              MR. HAMILTON:  Plaintiffs' Exhibits 50 and 51.

5    Q    And the question is, while you're looking for them,

6    can you identify them for the Court?

7    A    Exhibit 50 is my expert report in this case dated

8    March 11th, 2015.  Exhibit 51 is my reply report in this

9    case dated April 24th, 2015.

10   Q    I'm going to ask you to raise your voice a little bit

11   so we can make sure everyone can hear you.  What was the

12   purpose of preparing these reports, sir?

13   A    The purpose for preparing these reports was to do an

14   evaluation of the --

15             JUDGE PAYNE:  Hold on just a minute, please.

16   Thank you.

17   Q    The purpose of the report, sir?

18   A    The purpose of the report was to perform an evaluation

19   of the districting map passed by the Virginia State

20   Legislature.

21   Q    Let's start with Exhibit 50.  You said that's your

22   initial report; correct?

23   A    Correct.

24   Q    If I could direct your attention to page 88 of that

25   exhibit.  What is that document, sir?

W.L. Armstrong - Cross

1  A    That's my curriculum vitae.

2  Q    Is it a complete and accurate summary of your

3  educational background and professional experience?

4  A    It is.

5  Q    The Court's already had a chance to look at it, and

6  you've already accepted as an expert, so let me just ask

7  you quickly, did you attend law school?

8  A    No.

9  Q    You are not a lawyer?

10 A    No.

11 Q    Where are you currently employed?

12 A    Harvard University.

13 Q    What are your principal areas of research?

14 A    American elections, representation, public opinion.

15 Q    Do you have any experience with redistricting outside

16 of academia?

17 A    Yes.  I have served as an expert witnesses in

18 approximately ten cases.

19 Q    Any other experience with redistricting outside of

20 serving as an expert witness?

21 A    No.

22 Q    Let me ask you about one item on your résumé at page

23 13 of your CV.  It says, CBS election decision desk, 2006

24 to the present.  Do you see that?

25 A    Yes.

W.L. Armstrong - Cross

1    Q    Could you describe that for the Court?  What do you do

2    in that role?

3    A    I work for CBS News, the national news, on election

4    night calling elections.  So as the data from the

5    precincts and the state is coming in, we do a live

6    projection of who is likely to have won each of the Senate

7    seats, House seats -- that's Congressional seats -- and

8    the presidential electoral college seats.

9    Q    Thank you, sir.  Let's move on to ask specifically,

10   what were you asked to do in this case?

11   A    In this case, I was asked to do three things.

12   Q    Is that summarized somewhere in your report?

13   A    Summarized on the second page of my report.  Page one

14   of the report but second page of the exhibit.

15   Q    Entitled Statement of Inquiry?

16   A    Yes.

17   Q    What was the first thing you were asked to do, sir?

18   A    I was asked to examine the geographic characteristics

19   of the districts, the racial composition, and the voting

20   patterns in the districts in HB 5005 and in the benchmark

21   map.

22   Q    When you say the districts, you are specifically

23   focusing on the 12 minority-majority districts?

24   A    Yes, the 12 challenged districts.

25   Q    What was the second task you were asked to perform?

W.L. Armstrong - Cross

1    A    The second task I was asked to do was looking at the

2    12 challenged districts to examine how they were changed

3    from the benchmark map to HB 5005.

4    Q    Were you asked what was the predominate purpose of

5    some of the changes?

6    A    Yes.  I was asked to examine the extent to which

7    race -- particular racial composition of the areas was a

8    stronger predictor of the changes in the map and/or

9    whether or not partisan composition or some other factor

10   was a stronger composition.

11   Q    Then the third task you were asked to perform?

12   A    The third task I was asked to perform was to examine

13   the voting patterns overall, and in the specific areas

14   where the districts were located, to determine whether or

15   not the districts were performing districts; that is

16   districts where African Americans could elect their

17   preferred candidates.

18          JUDGE PAYNE:  Can you pull that mic just a little

19   closer to you?

20          THE WITNESS:  Sure.

21   Q    What materials did you review in order to prepare this

22   report and conduct the analysis you were asked to perform?

23   A    In preparing this report, I reviewed census data,

24   election returns from the State Board of Elections, and I

25   reviewed various articles pertaining to how to do election

W.L. Armstrong - Cross

1    analyses, court cases such as the *Page* case, and the

2    recent Supreme Court case in Alabama.

3    Q    Do you feel you've had an opportunity to review the

4    materials necessary to reach the conclusions that you

5    provided in your report?

6    A    Yes.

7    Q    All right.  So I'd like to take a look at some of the

8    maps here.  So I'm going to ask you to take a look at

9    Plaintiffs' Exhibit 64, 65, 66, and 67.  We'll start with

10   64.  Are you there?

11   A    Yes.

12   Q    Can you identify what Exhibit 64 is?

13   A    64 is a series of maps corresponding to the benchmark

14   and the enacted map for each of the districts in question.

15   Q    What is the first one, first page of Exhibit 64?

16   A    First page is HD 63, the benchmark map.

17   Q    When you say benchmark, you mean the preexisting map

18   prior to redistricting?

19   A    Right.  The map that was passed, I think, in 2001,

20   yes.

21   Q    Page two would be the enacted map?

22   A    Correct.

23   Q    That's the one that came out of this redistricting

24   cycle; is that right?

25   A    Correct.

W.L. Armstrong - Cross

1    Q    And then is Exhibit 64 organized like that all the way

2    through for all of the 12 majority-minority districts?

3    A    Correct.  For each district, first the benchmark and

4    then the enacted map.

5    Q    Flip over to Plaintiffs' Exhibit 65, if you would,

6    please, and could you explain to the Court what that is.

7    A    65 is a map of the entire plan.

8    Q    Say again?

9    A    65 is the map of the entire plan.

10   Q    And how about Exhibit 66, what is that?

11   A    66 are maps of each of the districts, each of the

12   enacted districts of the 12 in question without other

13   boundaries, just the boundary for the district.

14   Q    Who prepared those?

15   A    I prepared those.

16   Q    For what purpose?

17   A    To see more clearly where the boundaries lay without

18   other boundaries interfering.

19            JUDGE PAYNE:  Are we supposed to have in what you

20   handed up anything other than 64?

21            MR. HAMILTON:  No, Your Honor.  What I handed up,

22   we're not looking at right now.  We're looking at the

23   actual exhibits.  What I've handed up and what I'll be

24   showing on the screen is just a handful of -- you know,

25   ones we're going to be talking about in a moment.

W.L. Armstrong - Cross

1   Q    Last one, Exhibit 67, Plaintiff's Exhibit 67, the very

2   next tab, what is this?

3   A    These are maps corresponding to the maps in Exhibit 66

4   but with the voting tabulation districts shaded according

5   to the percent black voting-age population in each VTD.

6   Q    And who prepared these?

7   A    I did.

8   Q    What was the purpose of these maps?

9   A    The purpose of these was to see more clearly how the

10  lines, the boundary lines of the districts corresponded

11  with the areas where there were higher concentrations of

12  African Americans or higher concentrations of whites.

13          JUDGE LEE:  You're referring to Plaintiffs' 67

14  right now?

15          MR. HAMILTON:  That's right, Your Honor.

16  Q    All right, Dr. Ansolabehere, I'd like to turn to your

17  opinions about the enacted plan for the 12 challenged

18  House districts.  The Court has had an opportunity to

19  study your reports in advance of the trial and as well as

20  the reports of the other experts, so we won't go through

21  them in detail, but I want to examines a few of your key

22  conclusions and opinions here.

23      I believe the first question you were asked was with

24  respect to geographical compactness, racial composition,

25  and voting patterns in the 12 challenged districts; is

W.L. Armstrong - Cross

1    that right?

2    A    That's correct.

3    Q    Let's start with geographical compactness, and maybe

4    we start with, why does compactness matter?

5    A    Compactness matters because it's a traditional

6    districting principle.  It's a principle that we commonly

7    associate with a coherent plan and evidence of highly

8    non-compact districts isn't taken as the be-all and

9    end-all in many voting rights cases, but it's a red flag

10   or signal that something happened to the district and

11   deserves some closer inspection.

12   Q    Were you able to reach a conclusion with respect to

13   the geographical compactness of these 12 districts?

14   A    I was.

15   Q    What was that opinion?

16   A    My conclusion was that the geographical compactness of

17   the 12 districts in question was lowered at a faster rate

18   than the other districts in the map.  The other districts

19   in the map -- the geographical compactness score they use

20   is Reock in this report, and the geographical compactness

21   of the districts in question was lowered from an average

22   Reock score of .36 to .32, and elsewhere in the map the

23   geographical compactness was lowered from .38 to .37.

24   Q    We're going to back up a little bit and talk about the

25   Reock test, and for the court reporter, that's R-e-o-c-k.

W.L. Armstrong - Cross

1    But let me ask you, did you also look at the number of

2    split voting tabulation districts or counties or cities?

3    A    I did.

4    Q    And what did you find there?

5    A    I found that the enacted map increased the number of

6    split towns and cities and the number of splits created by

7    those crossings.  I also found that the number of voting

8    tabulation districts splits had increased from the

9    benchmark map to the enacted map and that the increase

10   was -- occurred disproportionately in the challenged

11   districts.

12   Q    Disproportionately in the challenged districts?

13   A    Correct.

14   Q    As compared to outside the challenged districts.

15   A    Correct.

16   Q    So let's back up and talk about that Reock test that

17   you mentioned a minute ago.  How does a social scientist

18   measure compactness?  What does it mean to a social

19   scientist?

20   A    There are different measures for compactness.  Reock

21   is one that's been used since the 1960s.  It's fairly

22   commonly used, and it measures the area of a district or

23   the perimeter of a district -- well, generically

24   compactness scores measure the area or the perimeter of a

25   district relative to some idealized shape such as a circle

W.L. Armstrong - Cross                                    135

1   or a square.

2       The Reock test uses a circle because that's the most

3   compact shape possible, and so what Reock does is it takes

4   the smallest inscribing circle around that district and

5   measures the area of that smallest inscribing circle, and

6   that be would the idealized or normal district that you

7   could reach with that basically length.  You can think

8   about it as a diameter.

9       That measures the area of the actual district relative

10  to that idealized district.  Almost all the compactness

11  scores take that same approach of measuring the actual

12  shape compared to some idealized shape.

13  Q    In Reock test world, the lowest possible score is

14  zero?

15  A    Correct.

16  Q    Highest possible score is what?

17  A    One.

18  Q    And so higher means more compact?

19  A    Higher means more compact, and zero would be very,

20  very un-compact.

21  Q    Are there alternative ways of measuring compactness?

22  A    Yes, there are many.

23  Q    Which measure was used to report the compactness of

24  these districts in this redistricting cycle in the

25  Virginia preclearance submissions submitted to the

W.L. Armstrong - Cross

1    Department of Justice?

2    A    I believe it was Reock, Polsby-Popper, and

3    Schwartzberg.

4    Q    So Polsby-Popper, that's a different method of

5    measuring compactness in districts?

6    A    Correct.

7    Q    Can you briefly describe that one.

8    A    Reock measures geographic dispersion, how spread out

9    is the district.  Polsby-Popper measures kind of perimeter

10   dispersion, how jagged is the perimeter, and Polsby-Popper

11   takes the perimeter of the district in question and

12   constructs a circle with that perimeter -- Reock was

13   constructing an area with that diameter -- and then

14   measures the area of the district relative to the area of

15   the circle with that perimeter.

16   Q    And Schwartzberg, how does that work?

17   A    Schwartzberg, I'd have to look up the exact formula

18   for Schwartzberg.

19   Q    But it's a third alternative way of measuring

20   compactness?

21   A    Yeah.

22   Q    Those were the three that were used by the

23   Commonwealth of Virginia in its preclearance submission to

24   the Department of Justice?

25   A    Correct.

W.L. Armstrong - Cross

137

1    Q    All right.  Do you know which measure was used by this

2    Court in the *Page* decision?  You mentioned you read it.

3    A    The experts -- the Court's opinion in this case relied

4    on figures reported by experts that used, I think, Reock,

5    Polsby-Popper, and Schwartzberg.

6    Q    What criteria are generally considered to be

7    traditional redistricting criteria?  You mentioned that a

8    moment ago.

9    A    Compactness is one such criterion, contiguity.

10   Sometimes length is a criterion, equal population.

11   Q    Respect for local subdivision?

12   A    Respect for county boundaries, respect for city

13   boundaries.

14   Q    Why are those traditional redistricting criteria?

15   A    Districting starts by representing geographic areas,

16   and those geographic areas often correspond to certain

17   communities represented by counties and towns and cities,

18   and then also just wanting to keep the districts to be

19   more coherent would be kind of informative about the

20   extent to which the district boundaries are respecting

21   local communities.

22   Q    In reaching your conclusions, I believe you looked at

23   five different areas of the Commonwealth; is that right?

24   A    I did.

25   Q    What were those?  Let's start with what was the first

W.L. Armstrong - Cross

1    one?

2    A    The first one is in the area below Richmond covering

3    Dinwiddie and Greensville Counties.

4    Q    Which House districts are there?

5    A    Those are HD 63 and HD 75.

6    Q    What is the second area that you looked at?

7    A    Second area I looked at was the Richmond area.

8    Q    And what districts were there?

9    A    HD 69, HD 70, HD 71, and HD 74.

10   Q    What's the third area that you looked for, looked at?

11   A    The Portsmouth area.

12   Q    What House districts are there?

13   A    HD 77 and HD 80.

14   Q    What's the fourth area you examined?

15   A    Norfolk.

16   Q    Which House districts are located in Norfolk?

17   A    HD 89 and HD 90.

18   Q    And what's the last one?  What's the last area you

19   looked at?

20   A    The Hampton/Newport News area which is HD 92 and HD

21   95.

22   Q    Can you explain your conclusions with respect to

23   geography overall, and then we're going to back up and

24   look at each individual area.  So can you give us your

25   opinion with respect to the geography and changes in the

W.L. Armstrong - Cross

1   district overall?

2   A    Overall, there was a reduction in the compactness and

3   an increase in the split VTDs and split counties and

4   municipalities in the challenged districts and that that

5   increase occurred at a greater rate or at a higher

6   incidents in the challenged districts than elsewhere in

7   the map.

8   Q    So let's look at the Dinwiddie/Greensville area which

9   you think you said was the first area.  This is House

10  district 63 and 75, and I'm going to use the handout at

11  this point.  I'm also putting them up on the screen.  So

12  let's start with House district 63.  Could you tell us how

13  this changed between these two maps.

14       The first one would be the benchmark, and the second

15  map would be the enacted.  So tell us a little bit about

16  how that changed.

17  A    In the benchmark map which we see here, HD 63 covers

18  all of Dinwiddie County, a little bit of Chesterfield, and

19  city of Petersburg.  The district was changed so that it

20  no longer covered all of Dinwiddie County.  It splits the

21  county in half and has sort of an irregular cut out of the

22  middle of it.  It covers Petersburg and cuts through

23  Prince George and reaches up and captures about half of

24  Hopewell.

25  Q    How did that change the compactness or number of

W.L. Armstrong - Cross

1   locality splits in House district 63?

2   A   It decreased the compactness.  Reock decreased from

3   .63 to .26 which was the largest decrease in that

4   compactness score on the map, and it --

5   Q   Let me stop you there.  The largest --

6   A   Decrease in compactness.

7   Q   -- in the map of all hundred districts?

8   A   I believe so.

9   Q   I'm sorry.  Continue.

10  A   And then it splits Dinwiddie County, which it didn't

11  before, splits Prince George County, and splits Hopewell.

12  Also splits multiple VTDs.  The number of VTDs splits

13  increase in the redrawing.

14  Q   How about, let's look at House district 75.  Can you

15  describe the changes between the benchmark and the enacted

16  maps for House district 75?

17  A   House district 75 contained all of Greensville, all of

18  Sussex, almost all of Southampton, cuts -- extends over to

19  Lunenburg and captures a little bit -- captures Franklin

20  city, almost all of Franklin City.

21  Q   And how did the changes between the benchmark and the

22  enacted plan affect the compactness of the districts or

23  the locality splits?

24  A   The compactness of HD 75 is about the same between the

25  two plans, but there was a significant jump in the number

W.L. Armstrong - Cross

1    of splits.  We don't see the -- should we look at the

2    other -- there, that's helpful.

3         You can see that part of the Lunenburg area was

4    dropped.  The district now in the enacted map picks up

5    about half of the Dinwiddie County area from 63, but it

6    also drops parts from Sussex and extends over into Surrey,

7    and there's some boundary shifts around Franklin city,

8    too.

9    Q    All right.  Let's move to the Richmond area which I

10   think --

11   A    This district, I think, also had the highest increase

12   in the number of VTD splits.  It had 13 VTD splits.

13   Q    When you say "this district," you mean House district

14   75?

15   A    In the enacted map, yes.

16   Q    Highest number of VTD splits in the entire map?

17   A    Correct.

18   Q    All 100 districts?

19   A    Correct.

20   Q    Let's move to Richmond.  What specific House districts

21   are located in the Richmond area?

22   A    HD 69, HD 70, HD 71, and HD 74.

23   Q    Can you explain how these districts changed from the

24   benchmark to the enacted?

25   A    What we see is the benchmark version of HD 70, which

W.L. Armstrong - Cross

1   this district had one of the more substantial changes in

2   the Richmond area.  From the benchmark to the enacted map,

3   the change was to pull the district substantially out of

4   the City of Richmond and pull it into the Chesterfield

5   area and deeper into Henrico County.

6        In particular -- this isn't reflected in the

7   geography, but in the population counts, a plurality of

8   the population of this district was located in the city of

9   Richmond under the benchmark map.  It's now pulled out so

10  a plurality is in Chesterfield.  It's really substantially

11  shifted from being an urban -- plurality urban district to

12  being a plurality suburban district.  As that district got

13  pulled out, 69 shifted over to the east, 71 picked up some

14  of that population, 74 changed its boundary, especially up

15  in the northern part of Richmond city.

16  Q    Who did that change affect the compactness or locality

17  splits of House district 70?

18  A    70's compactness measure decreased somewhat from .47

19  to .40.  The other districts in the area, compactness

20  isn't changed substantially, but HD 74, which is the

21  Henrico part of this area, is -- was one of the least

22  compact districts under the benchmark map and remains one

23  of the least compact districts in this map.

24  Q    Let's move to the third area --

25            JUDGE PAYNE:  Excuse me.  74 was one of the least

W.L. Armstrong - Cross

1    compact under the benchmark and stayed that way?

2            THE WITNESS:  Correct.

3    Q    Let's move to the Portsmouth area.  What specific

4    House districts are located there?

5    A    HD 77 and 80.

6    Q    All right, can you explain how these districts changed

7    between the benchmark and the enacted?

8    A    HD 77 was a very non-compact district under the

9    benchmark map, and it became -- it remained non-compact.

10   It lost one precinct to the far west, the airport, and it

11   extended further to the west and dropped some of its

12   precincts right in the middle of it.

13           So it became -- it was a long, narrow district, and it

14   was remained a very long, narrow district.  It got a

15   little narrower in the middle.

16   Q    How did that affect the locality split?

17   A    The locality splits didn't really change in 77.  It

18   just remained very non-compact.

19   Q    Let's move to the Norfolk area, HD district there --

20   A    HD 80?

21   Q    I'm sorry, HD 80, yes.  Can you describe how House

22   district 80 changed between the benchmark map and the

23   enacted map?

24   A    HD 80 was kind of -- had a thick tail to it under the

25   benchmark map, and then under the enacted map, it became

W.L. Armstrong - Cross                                           144

1    much less compact.  It extends to the north of the

2    district and then again to the west.  Its compactness

3    score dropped from .39 to .26 which is a very large

4    compactness measure drop.  It also dropped some voting

5    tabulation districts to the east.

6    Q    That's House district 80 going back and forth between

7    the benchmark and the enacted?

8    A    Correct.

9    Q    All right.  Let's move to Norfolk.  The House

10   districts there are 89 and 90; is that right?

11   A    Correct.

12   Q    And can you describe how those districts changed.

13   A    HD 89 had a substantial reduction in its compactness

14   from .58 to .40.  It added some appendages to the -- both

15   to the west and to the south.  This is the enacted map.

16   And it hops across the river.  There's a bridge connector

17   there, but it has extensions up in the north it didn't

18   previously have and also goes back into the east.  So it

19   got spread out much further, wider geographically.

20              JUDGE PAYNE:  Much wider what?

21              THE WITNESS:  Geographically.

22   Q    How did that affect the compactness scores or measures

23   and locality splits?

24   A    Its locality splits didn't really change, but the

25   compactness measure drops considerably from .58, which it

W.L. Armstrong - Cross

1    made it very compact, and to the benchmark map to .40.

2    Q    If we look at House district 90, can you tell us how

3    that map changed between the benchmark and the enacted?

4    A    House district 90 got pushed further to the east.  It

5    has a piece that extends across the river.  That piece, a

6    large part of that piece is dropped, and parts of the east

7    is swapped in, and it just extends further into the

8    Virginia Beach area.

9    Q    And how did those changes affect the compactness

10   measure or the number of locality splits?

11   A    It became somewhat more compact, and the splits did

12   not increase.

13   Q    All right.  Let's move to Hampton.  The House

14   districts there were 92 and 95; correct?

15   A    Correct.

16   Q    Can you describe how those House districts changed?

17   A    92 and 95 were located at the southern points of the

18   peninsula, city of Hampton and parts of Newport News.  The

19   most dramatic change is in 95 went from a fairly compact

20   district with a Reock score of .43 to the least compact

21   district in the map with a Reock score of .14.

22        The change in the district was to extend an arm all

23   the way up the center of the peninsula in a highly

24   non-compact way and to create six VTD splits along the

25   way.

W.L. Armstrong - Cross

1  Q    So just pausing for a moment on House district 95, if

2  we look back at the benchmark for a moment, what was the

3  compactness score there?

4  A    .43.

5           JUDGE PAYNE:  What?

6           THE WITNESS:  .43.

7  Q    .43, and how did that change to the enacted?

8  A    It dropped to .14.  So that is the area of the

9  district is 14 percent of the area of an idealized

10  circular district.

11  Q    And you said in sending this arm to the northwest, it

12  split a number of VTDs?

13  A    Correct.

14  Q    How many?

15  A    Six.

16  Q    All right, let's turn to your second opinion which I

17  think was examining the question of whether politics or

18  race was the predominate factor in the changes to the

19  districts.  Just to orient us all, where can we find this

20  discussion of your analysis in your report?

21  A    I believe it starts on page 26.

22           JUDGE LEE:  Can I ask a question?

23           MR. HAMILTON:  Absolutely.

24           JUDGE LEE:  Do you intend to cover the changes in

25  population and whether any of these districts had

W.L. Armstrong - Cross

1   under-population reported before the changes occurred?

2           MR. HAMILTON:  I didn't.  I'm happy to ask a few

3   questions about that if you'd like, but most of these

4   districts were underpopulated and needed to add

5   population.  I don't think that's in dispute.

6           JUDGE LEE:  If you would make a record, that

7   would help me.

8           MR. HAMILTON:  Sure.

9   Q   So Dr. Ansolabehere, how did the -- when the

10  legislature was looking at the benchmark districts,

11  population had obviously changed.  That's the reason we're

12  doing this.  How -- what was the task they were confronted

13  with in terms of population changes?

14  A   To make the districts equal population within, I

15  think, one percent.

16  Q   Did that require adding or subtracting population from

17  these 12 districts?

18  A   Two of the districts had almost exactly the right

19  amount of population --

20  Q   So did the --

21          JUDGE LEE:  You didn't let him finish.

22          MR. HAMILTON:  Okay, I'm sorry.

23          JUDGE LEE:  You said --

24          THE WITNESS:  Two had almost exactly the right

25  population total, and ten were underpopulated and needed

W.L. Armstrong - Cross

1    to have --

2              JUDGE LEE:  Were underpopulated --

3              THE WITNESS:  Yeah, needed to have additional

4    population.

5    Q    Which were the two that had just about perfect

6    population?

7    A    HD 70, which we saw before in the Richmond area, and

8    HD 74, which is the one that's in Henrico County and

9    extends north of Richmond.

10   Q    So I assume since they were already perfectly

11   populated, the legislature just left them alone in the

12   enacted map; right?  Didn't make any changes to those

13   districts because they didn't need to?

14   A    That's a possibility.

15   Q    Did they?

16   A    They made changes in those districts.  In fact, I

17   think they took 25,000 people -- the population shift of

18   HD 70 effectively removed 25,000 people and put in 25,000

19   people so that the population total at the end was

20   different by four people from the pre to the post.

21   Q    So 25,000 -- even though the population was perfectly

22   even and didn't need to change, they took 25,000 people

23   out and moved 25,000 other people in?

24   A    Correct.

25   Q    In your analysis, did you look at the racial

W.L. Armstrong - Cross

1    composition of the groups that were removed versus the

2    groups that were put in?

3    A    I did.

4    Q    You did.  We'll get to that in just a second then.

5              MR. HAMILTON:  Your Honor, is that a sufficient

6    record to answer your question?

7              JUDGE LEE:  I think so, and I'm waiting to hear

8    what you ask him about -- Delegate McClellan's district,

9    was it 71?

10             MR. HAMILTON:  I don't know the answer to that.

11             JUDGE PAYNE:  McClellan is 71.

12             JUDGE LEE:  Okay.  That's fine.  Go on.

13             MR. HAMILTON:  Thank you, Your Honor.

14   Q    Let's turn to the second question about whether race

15   or party composition was a predominate factor.  You

16   examined the VTDs that were moved in and out of the 12

17   districts; correct?

18   A    Correct.

19   Q    Why were you looking at that?

20   A    I looked at that to see how the changes in the --

21   shifts in the population from one version of the plan, the

22   benchmark plan to the enacted map moved people around and

23   whether or not those movements were sorting on racial

24   lines or sorting on partisan lines.

25   Q    So how did you go about examining that question?

W.L. Armstrong - Cross

1   A    Well, district -- one way to think about districting

2   is I have all these building blocks.  Those are voting

3   tabulation districts, so I'm looking at how these VTDs are

4   moved around.

5       Most of the time the VTDs are kept whole, so it's just

6   really a matter of how these VTDs get moved around.  So I

7   took the census data and the election data at the VTD

8   level, the voting tabulation district level, and then I

9   aggregated up how many -- I figured out which VTDs were

10  moved from one district to another, which VTDs were left

11  in a given district, and which VTDs were moved out of a

12  given district, and then I calculated the black

13  percentage, black voting-age population percentage in the

14  VTDs that were kept in the district, moved out of the

15  district, moved into the district, or were never included

16  in the district either under the benchmark or the enacted

17  map, and I did the same thing with respect to vote share.

18          JUDGE PAYNE:  Where did you get the black

19  voting-age population that you used in that calculation?

20          THE WITNESS:  I downloaded the data that the

21  census provided.

22          THE COURT:  From the census data.

23          THE WITNESS:  Correct.

24  Q    Let's start with the top line conclusion.  What did

25  you find as a result of that analysis, and I'm going to

W.L. Armstrong - Cross

1    walk back to how you got there, but what's your

2    conclusion?

3    A    I found that the areas moved into the districts, into

4    the 12 challenged districts, had a much higher black

5    concentration than the areas moved out, and the difference

6    is about 12 percentage points.  Comparing that with the

7    partisan difference was about twice as big as the

8    democratic vote share in different elections.

9         So race seemed to be a bigger factor, or there was

10   more sorting along racial lines in terms of VTDs moved in

11   and out of the districts.

12   Q    Why do you use the phrase racial sorting?

13   A    So the idea is, I'm looking at a VTD, and I have a

14   decision to make about where I put that VTD.  Suppose it's

15   a VTD that's in one of the 12 districts in question.  I

16   could keep that VTD in that district, I can move that VTD

17   into another African American district, I can move that

18   VTD into a white district, or -- that's the degree which

19   sorting is occurring, and the sorting is the degree to

20   which the movement is correlated with or a function of

21   percent black, and then same with percent democratic.  I

22   could look at it either way.

23   Q    And you found that the racial composition was a more

24   powerful explainer of where these districts were going; is

25   that right?

W.L. Armstrong - Cross

1    A    Correct.  I looked at that various ways.

2    Q    Let's start with your table seven from your report,

3    and it's in the handout that I handed up to the Court, and

4    I've also put it up on the screen in a -- I will admit to

5    putting some color in an otherwise all white and black

6    chart.  So could you describe what we're looking at here?

7    A    This is table seven from my report, and it shows the

8    racial composition and the voting patterns in the set of

9    VTDs that were kept in the same districts, so if it would

10   say VTD in HD 71 and it was left in HD 71, that would be

11   something that's in the same district.  It's not moved.

12        And then a VTD that was in 71 and, say, moved to 70,

13   that would be a VTD that's moved between two African

14   American districts.  Then a VTD that's, say, in 71 and

15   then moved to 63 or 68 or 23 or something that's not an

16   African American district, that would be the fourth

17   column, those are VTDs moved out of the districts.

18        Then if I was looking at a VTD in a district that

19   wasn't one of the African American districts and was moved

20   into an African American district, that would be the third

21   column.  Those are the VTDs moved into.

22        Finally, there are those VTDs that were never one in

23   of the African American districts in either plan.

24   Q    If we look at the black voting-age population, the

25   third line down, can you explain that first column, the

W.L. Armstrong - Cross

1    same House district under the benchmark and the House bill

2    5005.  You see the number 62.4, what does that mean?

3    A    That says if we look at the all the VTDs that were

4    left in their African American districts, not moved

5    between any other districts, just kept in that district,

6    those VTDs had a black voting-age population of

7    62.4 percent.

8    Q    How about the next column over?

9    A    The VTDs that were moved between the African American

10   districts, say from 70 to 71, would be -- had an average

11   black vote voting-age population of 55 percent.

12   Q    Okay.  Next column over?

13   A    The areas that were moved from a non-African American

14   district under the benchmark and into an African American

15   district under HB 5005 were 41.6 percent black voting-age

16   population.

17   Q    Next column over?

18   A    The areas that were -- the VTDs that were in an

19   African American district under the benchmark and moved

20   out of an African American district had a 29 percent black

21   voting-age population.

22   Q    And then finally?

23   A    And then the areas that were -- VTDs that were never

24   in an African American district under either plan had an

25   average black voting-age population of 14.1 percent.

W.L. Armstrong - Cross

1   Q    So can you explain the racial sorting piece, just

2   looking at just that line, what does that tell us?

3   A    So one way to think about -- there are two ways to

4   think about the sorting.  One way to think about the

5   sorting is as I explained earlier, I have a VTD and it's

6   in an African American district, what am -- where am I

7   going to put it.  Am I going to keep it where it is, move

8   it to another African American district, or move it out.

9        The areas that were kept in the African American

10  districts were either 62 percent black or 55 percent

11  black.  The areas that were moved out were 42 percent

12  black.  That's much lower.  You are moving out areas that

13  have lower -- sorry, 29 percent black.  You are moving

14  areas out that have much, much lower black voting-age

15  population.

16       The other comparison is the swaps.  I'm moving out a

17  VTD, I'm moving in a VTD.  I have to gain population

18  somehow, and the areas that are being swapped in have much

19  higher black voting-age population than the areas that are

20  moving out.  So those two kinds of sorting are creating

21  higher concentrations of black voting-age population in

22  these districts and lower concentrations out of these

23  districts.

24  Q    Could you display the same data in a bar graph?

25  A    Yes.

W.L. Armstrong - Cross

1    Q    So looking at what's up on the screen, is that an

2    example of the same data displayed with a random red line

3    I'm not quite sure why --

4    A    I touched the screen by accident.  I don't know if

5    there's a way to remove that.

6    Q    I think I can probably erase that.  Is that basically

7    the same data displayed in a --

8    A    Correct.  That's a bar chart corresponding to the

9    first row of table seven.

10   Q    Okay.  Let's go back to table seven and look at the

11   rest of the information on this table.  Could you explain

12   what you're doing with the other lines in table seven?

13   A    So one can look at similar comparisons, and just

14   looking at the areas swapped in and out, the areas that

15   I've -- VTDs that were taken out of the districts versus

16   the VTDs that were brought into the district, so the third

17   and fourth columns.

18       The difference here is about six percentage points in

19   the democratic vote share for federal offices where those

20   offices are U.S. president and U.S. Senate.  So it's about

21   a six point difference versus a 12 point difference for

22   black voting-age population in the row above it.  So the

23   black voting-age population difference is much larger in

24   those swaps than the vote share for the Democrats in the

25   federal offices, and I looked also at the governor in

W.L. Armstrong - Cross

1   2013, and, again, I saw a six-point difference.  So that's

2   the extent to which the sorting along racial lines is

3   bigger looking at those swaps than in the sorting along

4   voting lines.

5   Q    So just looking at the racial composition in the

6   political forms of these VTDs, the much more powerful

7   explanatory factor was race, not politics?

8   A    Yes.  By that analysis, that's the case.  There are

9   other analyses that I did to confirm that.

10  Q    Let's talk about the second way that you looked at

11  that and with specific attention to page 38 to 45 of your

12  report.  This is where you are looking at what's the

13  better explanation as to whether a VTD is included or

14  excluded; is that right?

15  A    Correct.

16  Q    Can you explain the purpose of this analysis?

17  A    So one analysis -- so one analysis to do is simple

18  correlations, what is the correlation between the

19  likelihood that a VTD is moved into the district and the

20  percent of black in that voting tabulation --

21  Q    Let me back you up.  I think we got a little ahead of

22  ourselves.  Tell us your conclusion on this.  Is the black

23  voting-age population or political performance the more

24  powerful explanatory factor in whether a VTD is included

25  or excluded in one of the 12 challenged districts?

W.L. Armstrong - Cross

1   A    The evidence that I looked at indicated that black

2   voting-age population was a much more powerful indicator

3   than partisan performance measured various ways.  In fact,

4   in some of the analyses, parties and performance wasn't

5   statistically significant at all.

6   Q    So you looked at this question, I believe, from your

7   report in several different way, and I think it's four

8   different ways to verify this analysis.  So let's talk

9   about the first pattern that you looked at.  What was

10  that?

11  A    The first pattern I looked at was just the movement of

12  areas in and out such as we just reviewed.  The second

13  sort of evidence I looked at was the raw or simple

14  correlation between the likelihood tat an area of VTD was

15  moved into a district and its racial composition is

16  percent black versus the correlation between the

17  likelihood that an area was moved in and its percentage

18  democratic.

19      The third type of analysis I looked at is called

20  partial correlation.  It's similar to simple correlation,

21  but it holds constant the other factors.  That is, given

22  how democratic an area is, how much does black voting-age

23  population correlate with the likelihood that it was moved

24  in, and given how black an area is, how does partisan vote

25  correlate with the likelihood that an area was moved in.

W.L. Armstrong - Cross

1          Finally, I did a multiple regression analysis where I

2     predicted which VTDs were moved in and which VTDs were not

3     moved into the 12 challenged districts as a function of

4     the black voting-age population, the partisan vote in the

5     district or the voting tabulation district, and whether or

6     not that VTD had been included in the district before.

7          That is allowing for some degree of inertia for the

8     districting process, and I did that both state-wide and

9     within each of the five areas where these districts were

10    located.

11    Q    So four different patterns, we're just going to

12    briefly walk through each one.  The first one was whether

13    the difference in black voting-age population between VTDs

14    moved in and out was greater than the difference in

15    democratic vote share between VTDs moved in and out; is

16    that correct?

17    A    Correct.

18    Q    What's the democratic vote share as you used it in

19    your report?

20    A    I used democratic vote share from several different

21    offices; U.S. president in 2008, U.S. president in 2012,

22    U.S. Senate in 2012, and governor in 2013.

23    Q    Where did you get that data?

24    A    I got that data from the website, Secretary of State,

25    election office.  Sorry.

W.L. Armstrong - Cross

1   Q    And what was your -- after examining the difference in

2   black voting-age population versus democratic vote share,

3   what did you find?

4   A    What I concluded was that the black voting-age

5   population difference was much larger than the average of

6   those federal offices and much larger than the vote share

7   for governor, the difference between the areas moved in

8   and the areas moved out.

9   Q    Was that consistent with your conclusion that race

10  rather than politics was a stronger explanatory factor?

11  A    Correct.

12  Q    What was the second pattern you examined?  You said it

13  was simple correlation.  Start with what does that mean?

14  A    So I correlated whether a VTD was moved in or moved

15  out, moved into one of these areas, one of these 12

16  challenged districts and what the percent black was and

17  also what the percent vote for the Democrats was in those

18  four federal offices and also the correlation to the vote

19  for the Democrat and governor race of 2013.

20  Q    What did that analysis show?

21  A    That showed that black voting-age population was a

22  much stronger correlate.

23  Q    So it was consistent with your first analysis?

24  A    Correct.

25  Q    The third, you said, was partial correlation.  What is

1    that?

2    A    Partial correlation correlates -- in the case of black

3    voting-age population, the correlation between black

4    voting-age population and inclusion of the VTD in the

5    district given how democratic that VTD was.

6    Q    Okay.  And what did that analysis show?

7    A    That analysis showed a significant and strong

8    correlation between black given party but no statistically

9    significant correlation between party given black.

10   Q    Could you explain that?

11   A    That means that the correlation we observe between --

12   any correlation we observe between party vote share and

13   inclusion of the district, the voting tabulation district

14   in one of the 12 challenged House districts is really

15   being explained by the black voting share rather than the

16   voting party share.

17   Q    It's a way of isolating which of these two factors is

18   driving the decision?

19   A    Correct.

20   Q    And that conclusion, as a result of that analysis, is

21   consistent with your other three patterns that you looked

22   at?

23   A    Correct.

24   Q    And that conclusion was that?

25   A    Black voting-age population is a much stronger, much

W.L. Armstrong - Cross

1   stronger indicator of the inclusion of VTDs in one of the

2   challenged districts than is party.

3   Q    The fourth pattern you said multiple regression which

4   makes my palms sweat when anybody says anything like that,

5   so could you explain to us what multiple regression

6   analysis is and how you employed it here.

7   A    Multiple regression analysis predicts whether or not a

8   VTD is in one of the challenged districts or out of one of

9   the challenged districts, has a function of black

10  voting-age population, party vote share, and whether that

11  VTD was already in a challenged district.  It estimates

12  the effect of each of those things at the same time, so

13  how much does one matter given the presence of the other

14  factors, and it measures how much a one percent increase,

15  say, in black voting-age population would increase the

16  likelihood that a VTD is included in the district.

17  Q    And what did that pattern show, that multiple

18  regression analysis?

19  A    That pattern showed state-wide, and in each of the

20  regions, that black voting-age population was a much

21  stronger indicator of which VTDs are included in the

22  challenged districts or not.  The state-wide analysis,

23  without controlling for which VTDs were in the districts

24  or not, had a coefficient of 1.0 on black voting-age

25  population versus 0.14 for party vote.

W.L. Armstrong - Cross

1    That indicated that a one percent change or one

2    percent increase in the black voting-age population in an

3    area would correspond with a one percent increase in the

4    likelihood that that voting tabulation district was

5    included in the precinct and voted in the House district.

6    As opposed to party, a one percent increase in the party

7    vote share would only correspond to a little more than a

8    one-tenth of a percentage point, increase in likelihood.

9    Seven times greater effect in that analysis.

10    I repeated that analysis within each of the local

11    areas and found it consistent with state-wide analysis

12    that black voting-age population was a very strong --

13    consistently significant indicator of which VTDs are

14    included in these House districts, and party was not

15    statistically significant in any of those local area

16    analyses.

17    Q    Party was not statistically significant; is that what

18    you said?

19    A    Right.  Party given race was not significant but race

20    given party was.

21    Q    And I take it that -- to ask the obvious question,

22    that is consistent with the prior three patterns you

23    examined?

24    A    Correct.

25            THE COURT:  Y'all are talking over each and I

W.L. Armstrong - Cross

1   can't hear what either one of you are saying.  Ask your

2   question again and wait until he answers before you give

3   the answer if you would, please.

4          MR. HAMILTON:  I will, Your Honor.  Thank you.

5   Q    This fourth multiple regression analysis conclusion is

6   consistent or inconsistent with the prior three analyses

7   you did?

8   A    It's consistent.  All four analyses point to the same

9   conclusion that black voting-age population is a strong

10  predictor of which VTDs are included in which -- in each

11  of the 12 House districts being challenged here, and party

12  is either not an important factor or not as important as

13  black voting-age population.

14  Q    In doing this analysis, Dr. Ansolabehere, did you

15  account or control for proximity of where these VTDs were

16  located?

17  A    Yes.  Because I did the analysis within each of the

18  local areas where the House districts are located, so

19  that's controlling for which VTDs could be put into these

20  House districts in the local areas.

21  Q    So, Doctor, let me ask you a hypothetical question.  I

22  want you to assume that the House of Delegates used the

23  mechanical 55 percent black voting-age population rule in

24  creating these 12 House of Delegates districts.  Are your

25  findings consistent with the application of that sort of

W.L. Armstrong - Cross

1   rule or inconsistent with the application of that sort of

2   rule?

3   A     They're consistent because every one of the districts

4   has 55 percent BVAP or higher, and the movement of

5   population into the, each of the House districts was

6   consistent with moving in black voting-age population to

7   increase those numbers as one increased the population in

8   the underpopulated districts.

9   Q     Thank you, Doctor.  Let's turn to the third issue you

10  were asked to examine and that is, quote, whether it was

11  necessary to have a black voting-age population in excess

12  of 55 percent in these districts in order to provide

13  African Americans the ability to elect the candidates they

14  prefer.  That's your third, the third thing you examined?

15  A     Yes.

16  Q     And this is sometimes called a polarized voting

17  analysis; is that correct?

18  A     A polarized voting analysis is informative about that

19  question, yes.

20  Q     What's the purpose of doing that, a polarized voting

21  analysis?

22  A     The purpose of studying the voting behaviors of blacks

23  and whites and measuring to what extent they are opposed

24  to each other or polarized is to help reach a conclusion

25  about which districts are performing districts for

W.L. Armstrong - Cross

1    purposes of allowing African Americans to elect their

2    preferred candidates and also to determine what vote --

3    what population composition would facilitate that.

4    Q    So can it tell you the minimum number of black

5    voting-age residents are needed in a district to preserve

6    the ability to elect candidates of choice?

7    A    Correct.

8    Q    Do you know whether any racial block voting analysis

9    was performed to the extent of your knowledge, anyone with

10   respect to the Virginia House of Delegates redistricting

11   in 2011?

12   A    Up until today, to my knowledge, no one had performed

13   that analysis, and I just heard that I guess the Democrats

14   had -- the Democratic minority leader had enlisted someone

15   to do that analysis.

16   Q    Delegate Jones and the majority as far as you know,

17   did they do one?

18   A    As far as I know, no.

19   Q    By the way, how difficult is it to do racial block

20   voting analysis?  Is this a month-long study?

21   A    No.  Once the data is together, couple hours.

22   Q    Okay.  How hard is it to get this data?

23   A    Census data is very easy.  You can just go to the

24   census website and download the requisite files, and I

25   think the files are at the House of Delegates web page as

W.L. Armstrong - Cross

1   well, and with election data, there's always data-cleaning

2   that goes on, but it's probably not more than a couple

3   days.

4   Q    Not more than a couple days to collect the data and

5   conduct the analysis?

6   A    Correct.

7   Q    How expensive?  Is this a terribly expensive thing?

8   A    Probably not.  If, as I just heard, there are onsite

9   people at the House of Delegates who can do the analysis,

10  it would be whatever their fees would be or whatever their

11  time would be.

12  Q    So if they wanted -- let's say that they didn't trust

13  the House -- the Division of Legislative Services for

14  whatever misguided reason, and they wanted to hire an

15  outside expert, they could hire someone like you to do it;

16  right?

17  A    Correct.

18  Q    You are hourly rate is what?

19  A    400 an hour.

20  Q    So for two days worth of work, approximately how much

21  money would it cost the Commonwealth of Virginia to hire

22  you to do this?

23  A    I work ten-hour days, $8,000.

24  Q    How frequently, to your knowledge, is this kind of

25  analysis done in connection with redistricting in states

W.L. Armstrong - Cross

1    that are governed by the Voting Rights Act?

2    A    I think all states are covered by the Voting Rights

3    Act under Section 2, so I guess whenever there's a

4    question involved, I think such analyses are commonly

5    performed.

6    Q    Is this a form of the functional analysis called for

7    by the Department of Justice, if you know?

8    A    Yes, from my experience dealing with the Department of

9    Justice and the Texas redistricting case and also working

10   for them on the Texas voter ID case, this kind of analysis

11   is what they would do.

12   Q    When these analyses are done, and putting aside

13   litigation like this one, they're usually done before the

14   legislature draws the maps or only after the map is drawn

15   and about to be submitted to the Department of Justice for

16   preclearance?

17   A    I think they're usually done while the map is being

18   constructed, because this is the information you use to

19   know which districts need to be treated which ways.  Which

20   areas in a state, you know, might require a Section 2

21   majority-minority district or which areas of the state do

22   you have to avoid retrogression.

23   Q    Can you explain that?

24   A    Which part?

25   Q    Both parts.  What do you mean by why is it -- why is

W.L. Armstrong - Cross

1  it relevant for the drawing of the districts in states

2  which are covered by Section 5 or in other states maybe

3  where there's only Section 2 coverage?

4  A    You don't want to reduce the ability of minorities to

5  elect in areas where they currently have that ability to

6  elect, and one threshold that's looked at by DOJ is

7  whether there was a majority black, say black voting-age

8  population district and that's been reduced to not a

9  majority black voting-age population district.

10      That would raise a red flag for the Department of

11  Justice and scrutiny, but also it's not like a 50 percent

12  or 55 percent is the single rule they would use.  They

13  would want to know how are people voting in this area, if

14  there's enough white crossover voting, enough whites who

15  vote for the black-preferred candidates, then maybe you

16  don't need to create certain kinds of districts, but if

17  the whites are really opposed to the blacks, maybe you

18  need to create those districts or maintain those districts

19  in order to protect African American voting rights.

20  Q    Your experience in this context, do those sorts of

21  differences between white crossover voting and racially

22  polarized voting, does that differ from district to

23  district, or is it typically the same all the way across

24  any given state?

25  A    My experience is it varies within states.

W.L. Armstrong - Cross                                        169

1    Q    And did you examine the extent to which it varied

2    here?

3    A    Yes, I did.

4    Q    And did it?

5    A    Yes, it varied considerably from district to district.

6    Q    All right.  Let's back up then and let me ask you

7    this:  How do you define racially polarized voting?  What

8    does that mean?

9    A    Racially polarized voting starts with two components:

10   The voting behavior of the African Americans or Hispanics

11   perhaps, and the voting behavior of white voters and the

12   extent to which those two groups are voting on the same

13   side with each other for candidates consistently or

14   opposed to each other.

15        So if the two groups are cohesive, say 95 percent of

16   blacks vote for Democrats and 95 percent of whites vote

17   for Republican candidates, that would be a pretty

18   polarized situation.  A Low polarization might be if the

19   whites were splitting their vote 50/50 and the blacks were

20   95 percent for the Democrats, that would be pretty low

21   polarization.

22             THE COURT:  How do you know which way I vote?

23             THE WITNESS:  Which way you personally vote?

24             JUDGE PAYNE:  Anybody?  How do you know how

25   anybody votes and whether or not -- what my race is, or do

W.L. Armstrong - Cross

1    you just take the statistics of how many people of a

2    different race live in a particular area and compare them

3    to the results and sort of hypothecate between who is

4    Democrat and who is voting Republican based on race?  How

5    do you do that?

6              THE WITNESS:  The vote is secret, so you can't do

7    that.  If exit polls exist, we look at exit polls, but

8    there are no exit polls in this situation.  So we're

9    looking at the correlation between the relationship

10   between the percent black and percent white in the voting

11   tabulation districts in a given area and the percent vote

12   for a specific candidates, black candidate or Democrat, so

13   it is the latter as you stipulated.

14   Q    So then he actually --

15             MR. HAMILTON:  Your Honor read the very next

16   question out of my outline, since the ballots are secret.

17   I won't read it again since you did it better than I did.

18             JUDGE PAYNE:  Do you know how I voted?

19             MR. HAMILTON:  I'm not going to offer to guess.

20   Q    So, there's a tool, a statistical tool we can use to

21   answer Judge Payne's question; correct?

22   A    Correct.

23   Q    And it's called?

24   A    We use ecological regression in this field, and it's

25   been the standard since *Thornburg v. Gingles* which the

1   Court referenced ecological regression is acceptable

2   evidence for measuring racial polarization and racial

3   block voting.

4   Q    Okay.  So we know -- we're trying to think about two

5   different things here.  One of them is racial information.

6   I guess we get that from the census bureau; is that right?

7   A    Correct.

8   Q    And then voting behavior, as Judge Payne points out,

9   is secret, but we know in VTDs -- by VTD how people vote;

10  correct?

11  A    Correct.

12  Q    So how do you put those two pieces of information

13  together with this ecological regression in order to

14  predict voter behavior?

15  A    So you look at the relationship between percent black

16  in an area, VTD, or cross-VTDs in an area, say State of

17  Virginia or a more localized area like a House district,

18  and the relationship of percent black and VTDs to the

19  percent, say, democratic in House delegates election or

20  U.S. presidential election, and fit -- find the best

21  fitting line, and from that line you infer what the -- in

22  a 100 percent black area, what percent black -- what

23  percent of the vote would be would be won by blacks.

24       In a 100 percent black area, all those people are

25  black so, therefore -- if you had a precincts that was

W.L. Armstrong - Cross

1    100 percent black and they voted 100 percent democratic,

2    you know how everybody voted in that precinct.

3         Similarly, if you had a hundred percent white area,

4    you project from the line, in that 100 percent white area

5    what was the projected voting behavior, and say it was

6    23 percent in that 100 percent white area, that would tell

7    you from the line, therefore, that 95 or 100 percent of

8    the blacks were voting one way and 23 percent of the

9    whites were voting that same way.

10   Q    You use that tool in particular VTDs in order to

11   assess the likelihood of voter behavior in that area?

12   A    Correct.  You can do it state-wide or in local areas.

13   And we usually look at either the local area surrounding a

14   VTD or -- surrounding House district or the House district

15   itself, and my analysis looked both state-wide and at the

16   House districts.

17   Q    There's some discussion about ecological inference as

18   an alternative statistical tool; is that correct?

19   A    Correct.

20   Q    What is the difference between the two?

21        JUDGE LEE:  It would help us if you told us what

22   they were.  You may know what it is, but I don't.

23   Q    That's true.  Why don't we start with what's

24   ecological inference as opposed to ecological regression?

25   A    They're similar.  The issue with ecological regression

W.L. Armstrong - Cross

1    is when you get to a bound of 100 percent, you don't want

2    to create a projection beyond 100 percent so you impose

3    the logical bounds.  You can't have more than 100 percent

4    of the vote for the Democrats in an area.

5         So it just says -- ecological regression says your

6    protection for the voting behavior of the group is bounded

7    between 100 and zero.  Ecological inference imposes that

8    bound not in the prediction stage, which is what

9    ecological regression does, but it imposes it in the

10   estimation stage.  So VTD by VTD, it imposes a set of

11   bounds.  That's really the difference between the two.

12   All the other assumptions are effectively the same.

13              THE COURT:  I think we'll take the afternoon

14   recess of 15 minutes at this time.

15

16              (Recess taken.)

17

18              NOTE:  After the afternoon recess is taken, the

19   case continues as follows:

20              JUDGE PAYNE:  All right, Mr. Hamilton.

21              MR. HAMILTON:  Thank you, Your Honor.

22   BY MR. HAMILTON: (Continuing)

23   Q    Dr. Ansolabehere, when we left the break we were

24   talking, I'm sure everyone was fascinated, by the

25   difference between ecological regression and ecological

W.L. Armstrong - Cross

1    inference, the two statistical tools that are usable to

2    infer voter behavior here.  And you were telling us a

3    little bit about the difference, and I'm sure that this is

4    an important debate in academia, but out in the real world

5    do the two tests generate significantly different answers

6    to the question that you are asking?

7    A    In my analysis here I don't reach markedly different

8    conclusions about the ability of the districts in question

9    to perform for African-Americans; that is, for

10   African-Americans to elect their candidates of choice.

11   Q    There was or was not significant difference?

12   A    There was not a significant difference in using either

13   analysis in my assessment of whether any of the districts

14   were districts in which African-Americans could elect

15   their preferred candidates.

16   Q    All right.  So let's talk about the primary analysis

17   that you did, which was an ecological regression analysis.

18   The first step, I take it, from your report of that

19   analysis is to select some base line elections to use the

20   data to evaluate behavior, is that correct?

21   A    Correct.

22   Q    And what elections did you select to utilize in this

23   analysis?

24   A    I selected the governor election in the State of

25   Virginia or Commonwealth of Virginia for 2013.  The U.S.

W.L. Armstrong - Cross                                        175

1    presidential 2008 and U.S. presidential 2012.  And the

2    U.S. Senate 2012 election results in the Commonwealth.

3    Q    Why did you choose those elections?

4    A    Couple reasons.  One is those elections are very

5    commonly used to evaluate plans in redistricting cases.

6         And second, those elections I determined were

7    fairly highly correlated with and had approximately the

8    same average election return level as House of Delegates

9    districts in the delegate districts in question.

10   Q    So why not, since we're asking how people behave,

11   voters behave in House of Delegates elections, why not

12   examine House of Delegates election results instead of

13   these other statewide races?

14   A    Well, two reasons.  If I went back to 2011, there

15   wouldn't be any House of Delegate election results to use

16   to evaluate how the elections would perform because the

17   delegate districts would have changed and different VTDs

18   would be in different House of Delegates districts.  So

19   you couldn't have done that analysis in 2011 on the

20   districts that were created.

21        The second reason is that House of Delegates districts

22   have a very high percentage uncompetitive or uncontested

23   where there is no Republican party opponent or no opponent

24   of a Republican or nonpartisan.  So there is no data to

25   actually do an analysis if you only looked at House

W.L. Armstrong - Cross

1    Delegates elections.

2    Q    All right.  You mentioned evaluating whether these

3    statewide elections that you used in conducting your

4    analysis correlated to the actual observed voting behavior

5    in the contested House of Delegates elections, is that

6    right?

7    A    Correct.

8    Q    Did you analyze that?

9    A    So I took the elections where there was a contest in

10   2007, '9, '11 or '13 in the contested districts and looked

11   at the correlation between them.  I also looked at the

12   average vote to see if they were about the same.

13   Q    And what was the result, how closely correlated were

14   they?

15   A    They are very highly correlated.  I think they were

16   off by -- the difference in the average was off by like

17   less than a percentage point.

18   Q    And so, using -- what level of confidence did you have

19   in using that election return data to predict voter

20   behavior in House of Delegates elections?

21   A    I thought it was an extremely good predictor.  So what

22   likely would happen in those districts.

23   Q    All right.  So when you did this ecological regression

24   analysis in the 12 challenged districts using that

25   election data, were you able to confirm the existence of

1    racially polarized voting in all 12 of these districts?

2    A    No, some of the districts had polarized voting and

3    some of them did not.

4    Q    Which did not?

5    A    I would have to look at my report to flag which ones.

6    Q    All right.  Why don't you go ahead -- that would be

7    Exhibit 50, Plaintiff's Exhibit 50.

8    A    Table 13 in my report, which would be page 84.  Table

9    13, page 84.

10   Q    And what House districts showed no racially polarized

11   voting?

12   A    The way I see -- the way to look at the chart is in

13   the middle are two columns for white voters, white VAP,

14   and the estimated voting behavior of white voters under

15   the benchmark plan and under HB 5005.

16        And looking down the columns, we see that HD 69

17   has over 50 percent of the whites voting for the candidate

18   preferred by the blacks.  So there is no racial

19   polarization in that context.

20        And that's true under both the benchmark and

21   under HB 5005.

22   Q    So let me stop you there because the first question is

23   just which districts?

24   A    So they are 69, 71 --

25        JUDGE PAYNE:  63 is the first one or --

W.L. Armstrong - Cross

1        THE WITNESS:  69 is the first one with no

2   polarization.

3   BY MR. HAMILTON: (Continuing)

4   Q    And then I'm going to walk back and ask you how you

5   got there, but first tell me which districts showed no

6   racial polarization.  Just the number of the House

7   districts, please.

8   A    69, 71, 89.  And then under the benchmark map HD 70 as

9   well.

10  Q    All right.  So racial polarized voting means a

11  majority of black voters are voting for a different

12  candidate that a majority of white voters, is that right?

13  A    Correct.  They're opposed to each other, or polarized.

14  Q    Polarized.  So if we see a majority of white voters

15  voting for the same candidate as the majority of black

16  voters, that's not racially polarized voting?

17  A    Correct.

18  Q    Okay.  So now, looking at the table that you have

19  pointed us to, here Exhibit 50, page 84, Table 13, can you

20  show us where you find -- let's see, the first one you

21  identified as racially polarized was 69, is that right?

22  A    Correct.

23  Q    Okay.  Can you explain how the court can find the

24  evidence on that with respect to House District 69?

25  A    With respect to House District 69 under HB 5005,

W.L. Armstrong - Cross

1    ecological regression estimates imply that for blacks

2    97.8 percent voted for the democratic candidate in the

3    federal offices.

4    Q    Let me stop you there.  So that's in the column under

5    Average Federal, .978 means in 97.8?

6    A    Correct.

7    Q    Okay.  Where can we see the corresponding white vote?

8    A    The corroborating white vote is two columns over under

9    HB 5005, 65.4 percent of whites voted for democratic

10   candidates in the average federal election.

11   Q    Let me just stop you there.  So what you're saying is

12   in House District 69, 97.8 percent of the African-American

13   community is voting the same way as 65.4 percent of the

14   white community?

15   A    Correct.

16   Q    That's no racial polarized voting?

17   A    Correct.

18   Q    Okay.  So let's find an opposite example of one where

19   there is racially polarized voting so we can see what that

20   looks like.  Can you look us an example of that?

21   A    Immediately above HD 69 is HD 63.

22   Q    All right.

23   A    And in HB 5005 ecological regression estimates under

24   those lines that 89.4 percent of blacks in those VTDs

25   voted for the democratic candidate.

W.L. Armstrong - Cross

1              Moving over two columns, 16.8 percent of whites

2    in the VTDs in HD63 under HB 5005 voted for the democratic

3    candidate in the average federal election.

4    Q    So we could flip that around and say, whatever 100

5    minus 16.8 is, would be the Republican vote?

6    A    Yeah, 83.2 percent.

7    Q    83.2 percent of the white voters in District 63 were

8    voting for the Republican versus 89.4 percent of the

9    African-Americans were voting for the Democrat?

10   A    Right.  That's a very good, clear instance of

11   polarization because a very large majority of whites are

12   voting one way and a very large majority of blacks are

13   voting another way.

14              JUDGE PAYNE:  Which page of your report are you

15   working?  Still on 84?

16              THE WITNESS:  This table 13, page 84 of Exhibit

17   50.

18              JUDGE PAYNE:  Where is the 97 percent you're

19   talking about?

20              THE WITNESS:  Under HD 69, so the first two rose

21   of numbers correspond to HD 63.  The second two rows of

22   numbers correspond to HD 69.

23              JUDGE PAYNE:  Are you using the HB 5005 and the

24   number down there is .978 --

25              THE WITNESS:  Correct.

W.L. Armstrong - Cross

1          JUDGE PAYNE:  Is that your estimate?

2          THE WITNESS:  Correct.

3    BY MR. HAMILTON:  (Continuing)

4    Q    Right.  Which corresponds to 97.8 percent, is that

5    right, Doctor?

6    A    Correct.

7    Q    And if we looked over on the same line, Your Honor,

8    two boxes where it says .654 for HD 69, that is

9    65.4 percent, is that right?

10   A    Correct.

11          JUDGE PAYNE:  The difference between what

12   happened in the benchmark plan is .064, is that right?

13          THE WITNESS:  Correct.  Among the whites.  So the

14   two columns, benchmark and HB 5005, correspond to whites.

15          JUDGE PAYNE:  Yes.

16          THE WITNESS:  So why are they different?

17          JUDGE PAYNE:  No, I'm just asking if they're

18   different and what the difference is.  The magnitude is

19   .064, right?

20          THE WITNESS:  Correct.

21          JUDGE PAYNE:  There is a shift between the

22   benchmark and the other -- and the enacted plan, is that

23   figure, right?

24          THE WITNESS:  Correct.

25          JUDGE PAYNE:  Now what does that figure mean?

1              THE WITNESS:  That figure means --

2              JUDGE PAYNE:  What does it state?  Excuse me.

3              THE WITNESS:  That figure in this case for whites

4    in HD 69 states that the white voting tabulation districts

5    that were included in there had slightly different voting

6    patterns, and it differed by six-and-a-half percentage

7    points.

8              JUDGE PAYNE:  But not anymore than six-and-a-half

9    percent?

10             THE WITNESS:  Yes, among the whites.

11             JUDGE PAYNE:  Why isn't that figure the one that

12   you look at to determine whether there is polarization or

13   not as between the two plans, the benchmark plan and the

14   2005 plan?

15             THE WITNESS:  The agree of polarization is the

16   comparison between the African-American voting behavior

17   and the white voting behavior.

18             There is also changes that occur from plan to

19   plan depending upon which communities are put into the

20   districts.  And an interesting example is HD 70 where the

21   whites that were added to HD 70 were voting very

22   differently than the whites that were in HD 70 under the

23   benchmark.

24             Under the benchmark, it's estimated that

25   59.3 percent of the whites in the VTDs that were in

W.L. Armstrong - Cross

1    benchmark HD 70 voted for Democratic candidates, which is

2    the candidate preferred by 86 percent -- or, sorry,

3    98 percent of the blacks.

4          However, under HB 5005, continuing with the

5    examination of HD 70, only 28 percent of the whites are

6    estimated to have voted for Democratic candidates.

7          It's just different whites were put into that

8    district than were included in the prior version of that

9    map.

10   BY MR. HAMILTON: (Continuing)

11   Q    So the purpose of this analysis is to look at voting

12   behavior between the two different populations, the

13   population of African-American voters and the population

14   of white voters, correct?

15   A    Correct.

16   Q    And if they are both voting the same way, there is no

17   polarization.  There is no difference between them.  If

18   they are voting differently, there is polarization, and

19   that's what we're worried about?

20   A    Correct.

21   Q    Under the Voting Rights Act, that's why we have to

22   create majority-minority districts, it's one of the

23   *Gingles* factors, correct?

24   A    Correct.

25   Q    All right.

W.L. Armstrong - Cross

1          JUDGE PAYNE:  In HD 69, under the column Black in

2    the average federal, the difference between the bench and

3    5005 is .022, is that right?

4          THE WITNESS:  That's correct.

5          JUDGE PAYNE:  And I still go back to the

6    question, why don't you compare .022 to the difference

7    between what occurs in subtracting out what the

8    performance was under HD 69 for the white vote, which was

9    .64, and see what happens there?  Why isn't that the

10   relevant metric, I guess is what I'm trying to ask?

11         THE WITNESS:  So there are two different

12   questions that are commonly addressed with these data.

13   One question, which is the focus of my analysis here, is

14   in which of these districts performs as a district in

15   which African-Americans can elect their preferred

16   candidates?

17         So what's relevant is looking at say HB 5005, in

18   which districts did African-Americans prefer the

19   Democratic candidate?  It turns out every one of them.

20         Then the question is, using these figures, you

21   can multiple and figure out what percentage of the vote is

22   expected to have been won by African-American preferred

23   candidates given the white voting behavior, the other

24   persons' voting behavior, and the black voting behavior.

25         There is a second analysis under Section 2 of the

W.L. Armstrong - Cross

1    Voting Rights Act, which is to look for racial

2    polarization.  And this is one of the *Gingles* factors that

3    comes out of *Thornberg versus Gingles*.  If there is no

4    racial polarization, then one of the criteria under

5    *Gingles*, established under *Gingles* for creating a

6    majority-minority district doesn't exist.  That is, you

7    don't have to create a majority-minority district in that

8    context in order to protect African-American voters from

9    white voters because African-American voters -- majorities

10   of African-American voters and majorities white voters are

11   on the same side, there is no protection needed.

12          However, if you have racial polarization, such as

13   in HD 63, where a large majority of the whites are opposed

14   to a large majority of the blacks, then you might require

15   a majority-minority district in order to protect the

16   African-Americans' voting rights in that area.

17          Those are two different questions that are

18   addressed using these kinds of data.  And it is the first

19   question that I'm addressing in my report because I was

20   not asked to weigh in on the Section 2 *Gingles* question.

21   Q    And, Dr. Ansolabehere, just to make sure that we've

22   answered Judge Payne's question, he's saying there is a

23   difference in the amount of racial polarization in the

24   benchmark plan, and then there is racial polarization in

25   the enacted plan.

W.L. Armstrong - Cross

1          So why aren't we comparing how the degree of

2    racial polarization changes from one to the other?  I

3    think that's the question --

4          JUDGE PAYNE:  Why is it that that's not the

5    relevant inquiry to determine what happened here?  What I

6    got from your answer is you didn't do that, and you don't

7    do that as part of the analysis you did.  That's what I

8    interpreted from what you said.

9          MR. HAMILTON:  And I think --

10         JUDGE PAYNE:  And I may be wrong.

11         MR. HAMILTON:  -- at the risk of addressing the

12   Court directly and testifying rather than asking the

13   witness the question.

14   BY MR. HAMILTON: (Continuing)

15   Q    The question that we're examining here is whether --

16   what degree -- whether 55 percent black voting-age

17   population is necessary in order to protect the ability of

18   the African-American community to elect a candidate of

19   their choice, correct?

20   A    Correct.

21   Q    And for that, it doesn't matter how the district was,

22   it only matters how it is?  In other words, the change

23   doesn't matter unless the change made it better?  If there

24   is polarization in the benchmark or there is polarization

25   in the enacted plan, there is polarization and it doesn't

 1    make it any better if it's a small change or a large

 2    change as long as there is polarization, that's the

 3    problem, right?

 4    A    Correct.

 5    Q    All right.

 6    A    However, one analysis I do in my report is I do look

 7    and compare was there a change from a district where there

 8    wasn't polarization to a district where there was

 9    polarization.  And that's indicative of the kind of

10    movement of voting tabulation districts in and out of the

11    districts in ways that are altering the fundamental voting

12    pattern or voting alignments in the districts.

13              And HD 70 is an example of a district where there

14    was a substantial change in the composition of the whites.

15    The whites are really different under HD 70 in the

16    benchmark -- under HD 5005 than they were in the

17    benchmark.  And that's just another flag that is

18    consistent with the kind of analysis of people being moved

19    in and out of these districts are fundamentally different

20    in ways that are not preserving of the districts as they

21    were.

22              JUDGE PAYNE:  How do you know that they are

23    fundamentally different?  I thought you could only tell

24    how they voted?

25              THE WITNESS:  In their voting behavior.

W.L. Armstrong - Cross

1          JUDGE PAYNE:  Fundamental difference in the

2     voting behavior?

3          THE WITNESS:  Correct.

4          JUDGE PAYNE:  Okay.  I understand.  Sorry for the

5     detour.

6          MR. HAMILTON:  Your Honor, it's helpful.  If it's

7     a question on your mind, it's a question we would like to

8     answer.

9          JUDGE LEE:  Well, since you said that, Delegate

10    McClellan said that her district started out in the 2001

11    plan at 55 percent, that's my recollection.  Then she said

12    that the census had changed to 46.3 percent.  Which would

13    mean it was no longer a majority-minority district.  And

14    she says that her district was so Democratic, she could

15    get reelected on her own.

16         The question I have is whether, from the

17    standpoint of the change that took place, her district was

18    underpopulated?  So the district, the people that were

19    added to it were contiguous and were they

20    African-American?  That's two questions actually.

21         THE WITNESS:  Okay.  So the people added to her

22    district, if we look at -- there is an analysis of what

23    populations were added to her district by district, that

24    is parallel to the analysis we looked at before the break.

25    And that would be contained in Tables 8 and 9.

1         So if you look at HD 70 -- sorry.  Oops, Table--

2    yeah, 8 and 9, you can see that the population added to

3    her district, that is the area moved into, was

4    43.8 percent BVAP.

5              JUDGE PAYNE:  Which district?

6              THE WITNESS:  Oh, sorry.

7              JUDGE PAYNE:  71.

8              THE WITNESS:  71, sorry, I read the wrong one.

9              JUDGE PAYNE:  Okay.

10             THE WITNESS:  71 was 72 percent BVAP.

11   BY MR. HAMILTON: (Continuing)

12   Q    So let's stop there, Dr. Ansolabehere, because you're

13   going kind of quickly.  We are on Exhibit 50, page 77,

14   which is Table 8.  And you're discussing House District

15   71, which is in the middle of the page, is that right?

16   A    Correct.

17   Q    Let's hold on, I want to make sure that the Court is

18   with us.

19             Okay.  So you were just saying, the precincts --

20   the voting tabulation districts that were moved into House

21   District 71 had an average BVAP of 72.1 percent, is that

22   right?

23   A    Correct.

24   Q    And we're seeing that in the column labeled Into?

25   A    Correct.

W.L. Armstrong - Cross

1  Q    Okay.  Now please continue, but just a little bit

2  slower.

3  A    Then the column Out Of has BVAP of 21.3 percent.  So

4  the areas moved out were 21 percent black, and the areas

5  moved in were 72 percent black.  That's a net swap in

6  voting-age population of 50 percent.  Black voting-age

7  population is 50 percent higher in the areas moved in than

8  in the areas moved out.

9      The average federal -- the difference in the average

10  federal vote is only about 16 percentage points reading

11  across the line below it.

12          87 percent average federal vote in the areas

13  moved into the District, and 70 percent average federal

14  vote in the areas moved out.

15          So the change in the white voting population

16  composition and how they were voting was due to which

17  whites were left in the district, which whites were moved

18  out, and which whites were moved in.

19          And the net effect of those was to lower the

20  black -- the white vote share in the -- among Democrats in

21  that direct from whatever it was, 58 percent or so, down

22  to 23, whatever we had in the prior table we were looking

23  at.

24          That was -- that's what accounts for that change.

25          JUDGE KEENAN:  I have one question.  So the more

W.L. Armstrong - Cross

1  significant indicator of polarization would be the

2  benchmark plan because then you would have to determine

3  whether you needed to move more of the black voting-age

4  population in or out of the district in order to make it

5  able to elect -- blacks able to elect a candidate of their

6  choice?

7           THE WITNESS:  Correct.  If it was 2011 and we

8  were drawing a map, we would look at the benchmark

9  election statistics and voting patterns and the racial

10  composition --

11           JUDGE KEENAN:  Right.  So that's really what

12  we're concerned about as far as polarization?

13           THE WITNESS:  Right.

14           JUDGE KEENAN:  Polarization in the benchmark,

15  right?

16           THE WITNESS:  Right.

17           JUDGE KEENAN:  And what had to be moved as a

18  result of that polarization in order to secure the ability

19  to elect the candidate of their choice?

20           THE WITNESS:  Correct.

21           JUDGE KEENAN:  Okay.

22           JUDGE LEE:  But there was underpopulation in the

23  district, correct?

24           THE WITNESS:  In that district, yes.

25           JUDGE LEE:  So somebody had to make a choice

W.L. Armstrong - Cross

 1  about which population to add and which to take away?

 2          THE WITNESS:  Correct.

 3          JUDGE LEE:  Those are all my questions.  Thank

 4  you.

 5          MR. HAMILTON:  I'm happy to turn the floor over

 6  to the Court any time.

 7  BY MR. HAMILTON: (Continuing)

 8  Q    Let me go back to where we are here.  I would like to

 9  look at -- let's look at House Districts 80 and 95.  And

10  if you could tell us what your racial polarization study

11  showed with respect to voting behavior.

12          Let's start with House District 80.

13          JUDGE LEE:  Which table are you using?

14          THE WITNESS:  It is the same table, page 84 of

15  Plaintiff's Exhibit 50, Table 13.

16          JUDGE LEE:  Page 84, just a second.  Okay, I'm

17  there.

18  BY MR. HAMILTON: (Continuing)

19  Q    So the question is, what did you find with respect

20  to -- I am going to ask but 80 and 95, but let's start

21  with House District 80.

22  A    Okay.  In House District 80, under the benchmark map,

23  97 percent of blacks voted for Democrats in the federal

24  elections.

25          Under the benchmark map, 41.5 percent of whites

W.L. Armstrong - Cross

1    voted for Democrats in the federal offices.

2    Q    Okay.  How would you characterize that in terms of

3    polarization?

4    A    That's fairly low polarization.  A majority of whites

5    are opposed to a majority of blacks, but there is a fair

6    amount of what is termed crossover voting.  That is, a lot

7    of whites are voting for the black-preferred candidates.

8    Q    Right.  So in this case 41.5 percent of the white

9    voters would be voting for the same candidate as

10   97 percent of the African-American voters would be voting?

11   A    Correct.

12   Q    Okay.  How about 95, what did you find there?

13   A    95 looks somewhat similar.  There 100 percent -- it is

14   estimated that 100 percent of the blacks voted for the

15   Democrat in the average federal election.

16        And among the whites under the benchmark,

17   43.5 percent of whites voted for Democratic candidates in

18   the federal elections on average.

19   Q    So in these two instances, while there is

20   polarization, you would characterize it as weak

21   polarization?

22   A    Yeah, weak polarization, or high crossover vote, both

23   terms I've used.

24   Q    High crossover because there is such a large

25   percentage of the white vote voting for the

W.L. Armstrong - Cross

1    African-American preferred candidate?

2    A    Correct, but still not a majority.

3    Q    So were you able to reach a conclusion whether under

4    the benchmark maps African-Americans had the ability to

5    elect candidates of their choice in the 12 challenged

6    districts?

7    A    I have.

8    Q    Okay.  And what is that conclusion?

9    A    Under the benchmark, in all 12 challenged districts

10   African-Americans had the ability to elect their preferred

11   candidates.

12   Q    In all 12?

13   A    In all 12.

14   Q    Even the House District 71 where the black voting-age

15   population dropped to 46 percent?

16   A    Correct.

17   Q    Still had the ability to elect a candidate of their

18   choice?

19   A    Correct.

20   Q    Okay.  Were there other examples of House Districts

21   under the benchmark map where the black voting-age

22   population dropped below 55 percent and yet still had the

23   ability to elect African-American candidates of choice?

24   A    I believe there are two.

25   Q    Two?

W.L. Armstrong - Cross

1    A    I think two additional districts where the black --

2    Q    When you say additional, so the first one is House

3    District 71, we've just been talking about, right?

4    A    Correct.

5    Q    What are the other two?

6    A    There are two other districts in which under the

7    benchmark map the black voting-age population was less

8    than 55 percent.  I believe they are HD 80 and HD 89.

9    Q    Okay.  So let's look at 80, I think that's the one we

10   were just looking at a moment ago.

11   A    Correct.

12   Q    Again, it's Plaintiff's Exhibit 50, page 84, Table 13.

13   And that's the one where the African-American population

14   under the benchmark was voting 97 percent of the time for

15   the Democratic candidate, and 41.5 of the white voters

16   were voting for the same candidate under the benchmark

17   plan?

18   A    Correct.

19   Q    Okay.  And the black voting-age population had dropped

20   below 55 percent in that district?

21   A    Correct.

22   Q    What was it?

23   A    It was 54 percent.

24   Q    Okay.  How about House District 89?

25   A    Yes.

W.L. Armstrong - Cross

1    Q    Could you describe the extent of polarization in that

2    district.  And again, we're on the same page of

3    Exhibit 50, page 84, Table 13, for the record.

4    A    Ecological regression in this instance estimates that

5    100 percent of the blacks voted for the Democratic

6    candidates in the average federal election.  And 56.5

7    under the benchmark of whites voted for the Democratic

8    candidates in those elections.

9    Q    And what was the black voting-age population there?

10   A    52.5, I think.

11   Q    52.5.  In all three of these districts we've just been

12   talking about, 71, 80, 89, did the African-American

13   population have the ability to elect a candidate of their

14   choice under the benchmark plan even with BVAP levels as

15   low as 46 percent?

16   A    Yes, they did.

17   Q    Okay.

18            JUDGE PAYNE:  Who were the candidates in the

19   election you're talking about for HD 80 and 89?

20            THE WITNESS:  For --

21            JUDGE PAYNE:  Who were the candidates that were

22   being voted for at that time?

23            THE WITNESS:  In the analysis in this table?

24            JUDGE PAYNE:  In your regression analysis, Table

25   13.  Sorry.

W.L. Armstrong - Cross

1          THE WITNESS:  Table 13 covers the governor

2     candidates and the federal elections.  So that would be

3     the candidates for U.S. President in 2008, candidates for

4     U.S. Senate in 2012, and the candidates for U.S. President

5     in 2012.

6          JUDGE PAYNE:  Would your analysis be any

7     different if the candidate being considered was not

8     African-American in that, in your estimate?

9          THE WITNESS:  So in two of those elections,

10    President Obama was on the ticket.

11         JUDGE PAYNE:  Yeah.

12         THE WITNESS:  And then the U.S. Senate and the

13    governor elections did not have an African-American.

14         JUDGE PAYNE:  I guess my question is, did you

15    take into account in any way that in the elections you're

16    using as a barometer against which to measure polarization

17    involved an African-American candidate for President for

18    the first time?  And then you see that 100 percent of the

19    voters vote for the African-American President.

20         Did you take that into account in deciding the

21    validity vel non of the polarization conclusions that you

22    reached?

23         THE WITNESS:  So I looked at the correlation

24    between the House of Delegates elections at the voting

25    tabulation, whether they -- or at the voting tabulation

W.L. Armstrong - Cross

1    district, the correlation between the presidential vote,

2    the Senate vote, and the governor vote, and the House of

3    Delegates votes for those elections where there were

4    contested races for House of Delegates.  And I found a

5    very high correlation.

6           And I found that the average vote across the

7    federal elections was about the same as the average vote

8    for the House of Delegates elections.  And that is what I

9    took as evidence that these elections were indicative of

10   how these races -- how these seats would perform.

11          JUDGE LEE:  But do you understand -- I'm sorry.

12          JUDGE PAYNE:  You concluded that 100 percent of

13   African-Americans voted for the same candidate in Virginia

14   in those elections that you considered?

15          THE WITNESS:  In that -- in the voting tabulation

16   districts in that district, yes.

17          JUDGE PAYNE:  And then you did the same for

18   governor?  I understand.  Okay.

19          So the answer is, I guess, did you really take

20   that into consideration as affecting the validity of using

21   this polarization metric that you're using?  Or are you

22   just telling me you did some other comparisons to kind of

23   see if it matched up and got close to the same result?

24          THE WITNESS:  I did analysts in each of these

25   races separately, and I report here the average of the

W.L. Armstrong - Cross

1  federal elections.  And the analyzes were all lining up,

2  so they were all consistent with each other.

3          So I concluded that there wasn't a significant

4  effect in this area, in these districts of Obama on the

5  top of the ticket in terms of the estimated values in this

6  table.

7          JUDGE LEE:  Well, I guess the question that

8  occurs, and it may not be pertinent to your analysis, is

9  before 2008 Virginia had never voted for a Democrat since

10 1964 for President.  Does that figure at all?

11         Because 2008 was kind of unprecedented from the

12 standpoint of voter turnout in the state, I believe.

13         THE WITNESS:  Right.  So it would have been nice

14 to have pushed into earlier election years, but the

15 farther back in time you go, the more different the

16 populations are in these local areas.  As we saw, you get

17 people moving in and out of these areas.

18

19         So it's -- essentially looking earlier in history

20 would be been comparing less and less connected voters.

21         So when we, for example at CBS when we do

22 election forecasts for what is likely to happen in

23 congressional districts, U.S. Senate districts, we use

24 past vote as we're using here, but we don't go back

25 farther than a couple of elections.

1         JUDGE LEE:  What year was the benchmark plan?

2         THE WITNESS:  What year was it passed?

3         JUDGE LEE:  Yes.

4         THE WITNESS:  It was passed in 2001.

5         JUDGE LEE:  Okay.

6         THE WITNESS:  But there was population change, in

7    some areas quite substantial, from 2001 to 2010.  And so,

8    the voters in the voter tabulation -- the people in the

9    voting tabulation districts might be quite different in

10   2010 from the ones say in the 2010 election or the 2004

11   election.

12        JUDGE LEE:  This won't be my last question, but

13   my last question for right now.  And that is whether you

14   have here somewhere the numbers that show what the

15   increase in the black voting-age population was per

16   district between the 2000 census and the 2010 census?  Is

17   that in here somewhere?

18        THE WITNESS:  In the entire state or in --

19        JUDGE LEE:  For each of these districts.  Because

20   you focused on the changes and the increases in black

21   voting-age population.  I would like to know if there was

22   any increase geographywise like between like Hopewell and

23   Dinwiddie or Hopewell and--

24        THE WITNESS:  Yeah, Table 4 presents the

25   populations of the districts --

W.L. Armstrong - Cross

1              JUDGE LEE:  Are we still in Exhibit 50?

2              THE WITNESS:  In Exhibit 50, page 72.

3              JUDGE PAYNE:  What --

4              THE WITNESS:  Page 72.

5              JUDGE PAYNE:  Thank you.

6    BY MR. HAMILTON: (Continuing)

7    Q    So pause there, Dr. Ansolabehere, let the Court catch

8    up with you on the page.

9              Okay, go ahead.

10   A    Table 4 presents the populations of each of the

11   districts.  The black voting-age population in 2010, not

12   from 2001, but in 2010.  And the black voting-age

13   population -- and the Hispanic voting-age population.

14             JUDGE LEE:  So there is not one for 2000 that you

15   prepared?

16             THE WITNESS:  I did not prepare one for 2001.

17             JUDGE LEE:  Thank you.

18   BY MR. HAMILTON: (Continuing)

19   Q    Okay.  But we can look at this table, Table 4,

20   Plaintiff's Exhibit 50, page 72, and we can see, for

21   example, the black voting-age population of District 71 is

22   46.3.  And that's Delegate McClellan, who we heard from

23   this morning who we were talking about a little earlier

24   this afternoon, correct?

25   A    Correct.  And it had a total population of 74,000, and

W.L. Armstrong - Cross

1  it was increased by 6,000 to make it into a legal

2  district.

3  Q    So as long as we're here, looking at that table, if we

4  just run our thumb done the benchmark district, we can see

5  what the black voting-age population was just before the

6  redistricting.  And then under the column labeled HB 5005

7  we can see what the black voting-age population became

8  after the enacted -- or in the enacted plan, right?

9  A    Correct.

10         JUDGE LEE:  Give me just one second.

11  Q    All right.  So I think we've established that under

12  the benchmark plan in all 12 districts -- let me ask it

13  this way.

14         Under the benchmark plan, in all 12 districts did

15  the minority African-American community have the ability

16  to elect a candidate of their choice?

17  A    They did.

18  Q    Okay.  Was there any reason to have a 55 percent black

19  voting-age population rule in adopting the enacted plan

20  according to your analysis in order to preserve that

21  ability to elect?

22  A    According to my analysis, 55 percent was not needed in

23  every district in order to have the ability to elect.

24         JUDGE PAYNE:  In how many districts was

25  55 percent needed?

W.L. Armstrong - Cross

203

1          THE WITNESS:  I did a hypothetical calculation in

2     every district the black voting-age population was lowered

3     to 50 percent, just kept it exactly majority-minority.

4     And in every one of those districts the expected vote

5     share for the black-preferred candidate was at 56 percent

6     or higher.

7          So it ranged from 56 percent I think up to

8     84 percent.  So in none of those districts was it needed

9     to maintain those as districts in which blacks have the

10    ability to elect their preferred candidates.

11         JUDGE PAYNE:  In no district was 55 percent

12    needed, none of these 12, is that what your opinion was?

13         THE WITNESS:  Yes.

14    BY MR. HAMILTON: (Continuing)

15    Q    So, Dr. Ansolabehere, I have put up on the screen an

16    illustrative exhibit, this is not in the exhibit

17    notebooks.  It is in the handout that I passed out at the

18    beginning of the examination though.

19         This is a result of -- this is your ecological

20    regression analysis, the hypothetical that you just said

21    we lower the black voting-age population to 50 and then

22    see what happens, is that right?

23    A    Correct.

24    Q    Okay.  And so, we're looking at this now.  Can you

25    describe what we are seeing.

W.L. Armstrong - Cross

1    A    So what we're seeing is the projected vote share for

2    Democratic candidates or who are the candidates preferred

3    by African-Americans in all of the elections studied in

4    each of the districts from HD 63 on the far right to HD 69

5    on the far left.

6              JUDGE PAYNE:  So the red line signifies what,

7    Doctor?

8              THE WITNESS:  50 percent.

9              MR. HAMILTON:  The red line is actually

10   misplaced, it is a little too high.  It is should be down

11   a little bit lower at the 50 percent mark.  So there is a

12   distortion in this.  And I apologize for that, Your Honor.

13   Obviously 50 percent is the winning margin of victory in

14   any election.

15   BY MR. HAMILTON: (Continuing)

16   Q    And the numbers at the top of each column, Doctor,

17   those refer to the total margin of the vote share that the

18   Democratic candidate could be expected to receive at

19   50 percent black voting-age population?

20   A    Correct.

21   Q    So let's just walk through these.  In HD 69, even be

22   we drop the 55 percent black BVAP rule and we drop the

23   population, instead of holding it at 55, we drop it down

24   to 50, what's the winning margin here?

25   A    84.1 percent.

W.L. Armstrong - Cross

1   Q    84 to 16?

2   A    Correct.

3   Q    Okay.  How about House District 71?

4   A    HD 71 would be just about 80 percent to 20 percent.

5   Q    89?

6   A    77.5 to 22.5.

7   Q    92?

8   A    70.8 to 29.2.

9   Q    How about House District 90?

10  A    HD 90, the Democrat is expected to get 68.8 percent of

11  the vote.

12  Q    And the Republican candidate?

13  A    Making me do math in my head.

14  Q    I am making you do math?

15  A    31.2.

16  Q    How about House District 74?

17  A    68 percent to 32 percent.

18  Q    House District 80?

19  A    67.6 to 32.4.

20  Q    House District 95?

21  A    66.8 to 33.2.

22  Q    House District 70?

23  A    62.4 to 37.6.

24  Q    House District 77?

25  A    61.6 to 28.4.

W.L. Armstrong - Cross

1    Q    House District 75?

2    A    59.3 to 40.7.

3    Q    And House District 73?

4    A    55.8 to 44.2.

5    Q    So if the General Assembly had used a 50 percent

6    instead of a 55 percent BVAP number for these for drawing

7    these districts, would the minority community in these 12

8    districts have retained the ability to elect the

9    candidates of their choice?

10   A    Correct.

11   Q    Any of them even close?

12   A    Not really.

13   Q    Now, you did this analysis using ecological

14   regression, which you described earlier, correct?

15   A    Correct.

16   Q    What if we used the other method, ecological inference

17   instead, and we looked only at House of Delegates

18   elections, but dropped the BVAP to 50 percent, again the

19   same thing, but just using the other -- making two

20   switches.  Number one, dropping BVAP to 50 percent.

21   Number two, using ecological inference.  And number three,

22   using House of Delegates elections.

23          Would that change the expected vote share in any

24   material way?

25   A    Not in any of the House Districts in which there are

W.L. Armstrong - Cross

1    contested House delegate elections.

2              JUDGE PAYNE:  Not any of the 12 at issue here?

3              THE WITNESS:  Well, the ones for which there are

4    estimates using the House of Delegates elections.  There

5    aren't contested House of Delegates elections, so we don't

6    have information about those from that analysis.

7    BY MR. HAMILTON: (Continuing)

8    Q    All right.  Did you prepare that sort of analysis?

9    A    I did.

10   Q    Okay.  So if I put it up on the board, you are

11   familiar with this slide?

12   A    Yes, I am.

13   Q    And could you describe what we're looking at here.

14   A    This is using ecological inference estimates in the

15   districts for which there are House of Delegates elections

16   between a Republican and a Democrat sometime between 2007

17   and 2013.

18   Q    Okay.  So let's just stop there.  So where there is

19   only seven boxes here, seven elections, that's because

20   there is only seven where there was a Democrat and a

21   Republican running against each other?

22   A    Correct, in at least one of these elections.  There

23   are five in which there were no contests between a

24   Democrat and a Republican.

25   Q    So if you're using -- at least if you're using House

W.L. Armstrong - Cross

1    of Delegates elections as the base line, you're not going

2    to be able to look at all 12, you can only look at seven?

3    A    Correct.

4    Q    All right.  So tell us a little bit about this

5    exhibit -- I am sorry, this is illustrative exhibit.

6    A    So in this exhibit the hypothetical is constructed by

7    lowering the black voting-age population from whatever it

8    was under HB 5005 to 50 percent, and moving that

9    population into the white voting-age population category.

10   So just imagine swapping whites in for the blacks until

11   you get to the point of a 50 percent BVAP district.

12           And then using the ecological inference estimates

13   of the black, white, and other group voting behavior,

14   project what percentage of -- how many black votes there

15   would be for the Democratic candidate, how many white

16   votes there would be for the Democratic candidate, how

17   many other votes there would be for the Democratic

18   candidate, and then sum those vote shares.

19           So in District 69, that calculation leads to a

20   projection of 85.37 percent for the Democratic candidate.

21   Q    Just so that we are all understanding how you

22   calculated this, let's just use House District 69 as the

23   example.

24           Under using ecological inference, you infer that

25   97.3 percent of the black population are going to vote for

W.L. Armstrong - Cross

1  the candidate of choice, so for the Democrat?

2  A    Correct.

3  Q    And then it shows that it is multiplied times .5.  Is

4  that because that's 50 percent BVAP?

5  A    Correct.

6  Q    And so, the resulting number is 48.65.  That's the

7  share of the total vote that is going to be attributable

8  to the African-American voters in that precinct?

9  A    Correct.

10  Q    And then the next line down, it looks like

11  73.1 percent of the voters -- of the white voters are

12  going to vote for that same Democratic candidate?

13  A    Correct.

14  Q    And you've dropped the BVAP level -- or, I am sorry, I

15  guess it would be the WVAP level, white voting-age

16  population, to 40 percent?

17  A    Just to highlight something at the very top, it

18  reports the BVAP level in this district under HB 5005.  So

19  it is 55.2.

20          So I take the 5.2, subtract it from that, and

21  allocate it to the whites.  That raises the white

22  voting-age population to 40 percent.

23          So .731 times .4 is 29.24.

24  Q    So in this House District 69, the African-American

25  voters are going to provide out of the total votes cast in

W.L. Armstrong - Cross

1    the election 48.65 percent for the Democratic candidate.

2    The white voters are going to provide another 29.24.  And

3    the other category is going to provide an additional

4    7.48 percent votes, all summing to 85.37?

5    A    Correct.

6    Q    Okay.  And you've done that analysis all the way

7    through for all five, or, I'm sorry, all seven of these

8    districts?

9    A    Correct.

10   Q    Now, is there a way to display this data in a bar

11   chart format?

12   A    Yes, there is.

13   Q    Have you done that?

14   A    Yes.

15   Q    Okay.  So I've put that up, and I again apologize to

16   the Court because our 50 percent line is a little skewed,

17   it looks like it is at about 53 or 54.

18       But this is just, this bar chart is displaying the

19   same information as the table we were just looking at?

20   A    Correct.

21   Q    And just for the record, because this is an

22   illustrative exhibit, I just want to make sure that we

23   have this.

24       HD 71 using ecological inference, and House of

25   Delegates elections, but dropping the black voting-age

W.L. Armstrong - Cross

1   population down to 50, you would expect what would be the

2   Democratic margin of victory in House District 71?

3   A    The Democrat is predicted to win 87.2 percent of the

4   vote.

5   Q    Versus the Republican?

6   A    12.8.

7   Q    Okay.  And House District 69, what would be the result

8   of the election?

9   A    The Democrat is protected to win 85.37 versus 14.63.

10   Q    Okay.  And in House District 95?

11   A    The Democrat is expected to 75.99 percent of the vote

12   versus 24.01.

13   Q    And in House District 74?

14   A    The Democrat is expected to win 74.53 percent of the

15   vote versus 25.47.

16   Q    And House District 75?

17   A    Democrat is expected to win 65.15 percent of the vote

18   versus the Republican vote share of 34.85.

19   Q    And in House District 90?

20   A    The Democrat is expected to win 64.72 percent of the

21   vote versus 35.28.

22   Q    And finally in House District 80?

23   A    The Democrat is expected to win 63.91 percent of the

24   vote versus 36.09 percent of the vote.

25   Q    So using ecological inference, the second statistical

W.L. Armstrong - Cross

212

1    tool, the other statistical tool, and the House of

2    Delegates election data, if the General Assembly had

3    dropped the BVAP level to 50 percent, would the minority

4    community, the African-American community have retained

5    its ability to elect a candidate of its choice?

6    A    Yes.

7    Q    In all 12 districts?

8    A    In these seven districts.  The ecological inference

9    estimates are not possible given that they are for House

10   of Delegates races for these -- the other five districts.

11   Q    By the way, before we leave this topic, let me ask you

12   this question.  This ability to elect, is it likely to be

13   the same in each of the 12 challenged districts?

14   A    No.

15   Q    Why?

16   A    Well, you have got varying degrees of white crossover

17   voting, or even a majority of whites voting the same way

18   as blacks.  So in those case where the black-preferred

19   candidates is winning all three groups, it's almost

20   certain they're going to win that election.

21        I think the most -- the districts where there is more

22   polarization, they are less sure because the

23   black-preferred candidate can't draw as many white voters

24   over.

25        So the ability to elect is going to vary with

W.L. Armstrong - Cross

1    polarization, that's why polarization is informative about

2    ability to elect.

3    Q    But regardless of which statistical measure we use,

4    even if we drop the black voting-age population to

5    50 percent, the minority community, the African-American

6    community in every one of the 12 challenged districts

7    retain the ability to elect, is that your conclusion?

8    A    That's my conclusion.

9         JUDGE PAYNE:  Mr. Hamilton, I think we have been

10   there and done that several times now.  Can we get on with

11   something else.

12   BY MR. HAMILTON: (Continuing)

13   Q    Does the historical record confirm your conclusion

14   about ability to elect?  That is, did you observe

15   elections in which African-American candidates won even

16   with less than 55 percent BVAP?

17   A    Well, the recent historical record concerning say

18   District 71 where a candidate only had 46 percent BVAP in

19   the district, but one I think 83 percent of the vote in

20   the last contested election, is confirmatory of the same

21   conclusion.

22        MR. HAMILTON:  All right.  Thank you, Doctor, no

23   further questions.

24        JUDGE PAYNE:  Mr. Braden.

25                    CROSS EXAMINATION

W.L. Armstrong - Cross

1   BY MR. BRADEN:

2   Q    May it please the Court.  Doctor, good to see you

3   again.  Mark Braden for the defendants intervenor.

4            I normally like to begin at the beginning, but in

5   this case I think I'll start at the end.  If we could

6   still look at Plaintiff's Exhibit 50 and your Table 13.

7            And this table, I'm correct, it lists all the

8   challenged districts?

9   A    Correct.

10  Q    Would I be correct to characterize them as all safe

11  Democratic districts?

12  A    Correct.

13  Q    So in a general election, often the Democratic

14  candidate wouldn't even be opposed?

15  A    For House of Delegates?

16  Q    Yes.

17  A    Correct.

18  Q    So in your chart here, do you have any primary data?

19  A    No.

20  Q    So how does this chart inform us on the difference

21  between white and black voting in a Democrat primary?

22  A    It concerns general elections only.  It does not

23  concern any primary election analysis.

24  Q    So it provides no information to this Court on the

25  preferred choice of the black community in a primary

W.L. Armstrong - Cross

1    election in these districts?

2    A    Correct.

3    Q    Were you present for Delegate McClellan's testimony?

4    A    Yes, I was.

5    Q    Did you her say that she was in one of the most

6    Democratic districts in the state?

7    A    Yes, I heard that.

8    Q    That's one of the challenged districts, 71?

9    A    Yes.

10   Q    And did you hear her say that she had no serious race

11   except for the one primary race at the beginning?

12   A    Correct.

13   Q    So your chart in your report gives us no information

14   on polarization between white and black voters in the

15   Democratic primary?

16   A    Correct.

17   Q    But that's the only significant election in these

18   districts, correct?

19   A    No.  You still have to --

20   Q    Is the general election important when there is not a

21   Republican running?

22   A    In some of these districts Republicans run, as

23   referred to in another table in my report.

24   Q    And what would they normally get, 20 percent,

25   30 percent of the vote?

W.L. Armstrong - Cross

1   A    It ranged from a low of 63 I think up to 88 for the

2   Democrat, and then minus that for the Republican.

3   Q    And what would be the normal range of contested races

4   that political scientists would think were seriously

5   contested?

6   A    We usually look at things between 55 and 45.

7   Q    So none of these were seriously contested?

8   A    They all seem to be safe districts.

9        JUDGE PAYNE:  Is your answer that they weren't

10  seriously contested in views of experts who practice in

11  your discipline?

12       THE WITNESS:  Other things are considered when we

13  think about serious contestation, like how much money is

14  spent and so forth.  And I haven't look at that.

15       JUDGE LEE:  Was there a percentage that you have

16  in mind that is acceptable among political scientists?

17       THE WITNESS:  We usually look at the range of

18  either 55 to 45 as very competitive or competitive races,

19  or sometimes 60/40.  But usually 55/45 is the range we

20  determine to be competitive races or competitive seats.

21       It doesn't mean that no candidate can be

22  defeated.  In fact, one of the first articles I published

23  in my career was an analysis of U.S. House elections

24  historically looking at the vote margin -- the past vote

25  margin and defeat rates.  And some people who have 100 --

W.L. Armstrong - Cross

1    or won 80 percent last time, lose in the next election.

2            But the defeat rates are highest in the range 45

3    to 55 percent.  Typically if a candidate gets between 45

4    and 55 percent in one election, say an incumbent wins with

5    say 53 percent of the vote, the chance of that incumbent

6    losing in the next election is about 20 percent.

7            Once you pass above 55 percent, it drops down to

8    about 5 percent.

9            So 55 percent is kind of an important threshold

10   look at projections about future elections and whether or

11   not there is a high chance of election or defeat.  It's

12   not a guarantee, but --

13   BY MR. BRADEN: (Continuing)

14   Q    Just extremely unlikely that any Republican candidate

15   would win in these districts in the general election?

16   A    Yes.

17   Q    So the significant election is in fact the Democrat

18   primary, correct?

19   A    It might be.

20   Q    Let me actually begin back at the beginning.  Did you

21   draft a Virginia legislative plan?

22   A    No, I did not.

23   Q    Neither this year nor any other year?

24   A    No.

25   Q    Have you been ever hired by a state to draft a

W.L. Armstrong - Cross

1  legislative plan?

2  A    I have never been hired by a state to draft a

3  legislative plan.

4  Q    Have you ever been hired by a county to draft some

5  type of redistricting plan?

6  A    No.

7  Q    Any municipality ever hired you?

8  A    No.

9  Q    Have you ever drafted a plan that was adopted by any

10 state legislature?

11 A    No.

12 Q    And have you ever submitted a plan to a state

13 legislature for them to review?

14 A    No.

15 Q    And have you ever been hired by a court to be a master

16 in drafting a plan?

17 A    No.

18 Q    How many times have you been an expert witness in

19 redistricting cases?

20 A    In redistricting, I think it's around ten.

21 Q    Around ten.  But you've only been an expert witness,

22 you have never been a fact witness because you have never

23 drawn any plans, correct?

24 A    Correct.

25 Q    Do you recognize that legislative plan drawing is

W.L. Armstrong - Cross

1  usually a partisan process?

2  A    Seems like the are parties involved most of the time.

3  So --

4              JUDGE PAYNE:  Well would that answer be a yes?

5              THE WITNESS:  Yeah.

6  BY MR. BRADEN: (Continuing)

7  Q    Have you ever testified in opposition to a plan

8  adopted by a Democratically controlled legislature?

9  A    Adopted by a Democratically -- I've testified -- I've

10  filed expert reports against a plan for a water district

11  in Texas that was drafted by a -- yeah, it was a

12  Democratically controlled legislature.

13  Q    Any state legislative plans?

14  A    No.

15  Q    So other than the water district in Texas, is that the

16  one involving the issue of Section 5 preclearance and its

17  constitutional?

18  A    No, it's one person/one vote violation.  And it does

19  have racial overtones as well because Hispanics are

20  affected disparately.

21              JUDGE PAYNE:  I cannot hear you.

22              THE WITNESS:  I'm sorry.  Because Hispanics are

23  affected disparately.

24              JUDGE PAYNE:  Pull the mike a little closer, I

25  think that would be helpful.

W.L. Armstrong - Cross                                              220

1   BY MR. BRADEN:  (Continuing)

2   Q    And have you ever worked as an expert testimony for an

3   identifiable Republican interest in the redistricting

4   process?

5   A    No.

6   Q    Okay.  And I believe you testified that state

7   legislatures often hire individuals to do racial bloc

8   voting analysis before drafting plans or during the line

9   drawing process, did I hear that testimony correct?

10  A    Correct.

11  Q    Have you ever been hired to do that?

12  A    No.  I put in -- I bid on the Massachusetts contract,

13  but I did not receive that contract.  They chose EDS.

14  Q    And so, EDS was hired to do the racial bloc voting

15  analysis for Massachusetts?

16  A    Correct.

17  Q    And other than Massachusetts, what are the other

18  states that you are familiar with who have done this and

19  who have they hired?

20  A    Texas did it.  I am not sure who they hired.  I think

21  it was done internally.

22            JUDGE PAYNE:  You think who?

23            THE WITNESS:  Pardon?

24            JUDGE PAYNE:  You think who?

25            THE WITNESS:  I think Texas did it internally.  I

W.L. Armstrong - Cross                                          221

1    think the Texas legislative counsel did that analysis.

2    BY MR. BRADEN: (Continuing)

3    Q    Any of the people in your field, political scientists

4    at universities you are familiar with who you could give

5    us a name?

6    A    Who do this sort of analysis?

7    Q    Who have done this during a state legislative drafting

8    process.

9    A    I don't know names offhand.  I believe Bernie Grofman

10   worked on the Minnesota legislative -- did a racial

11   analysis in Minnesota.  But who --

12   Q    During the drafting of the process, the lines?

13   A    I believe so.

14   Q    And have you had the opportunity -- in the Virginia

15   situation you're probably familiar with the fact that

16   Virginia has been filing preclearance applications for

17   these legislative plans since the passage of the Voting

18   Rights Act?

19   A    Correct.

20   Q    Do you know whether the State of Virginia has ever

21   submitted a racial bloc voting analysis in conjunction

22   with those preclearances?

23   A    I don't know that.

24   Q    Did you look at the most recent preclearance in 2001

25   for the 2001 plan?

W.L. Armstrong - Cross

1    A    I looked at some documents from the preclearance.

2    Q    Did you see any racial bloc voting analysis?

3    A    Not in the documents I looked at.  I did see

4    compactness scores.

5    Q    For your report, did you interview any Virginia House

6    members?

7    A    No.

8    Q    Did you interview any Virginia elected officials?

9    A    No.

10   Q    Any Virginia party officials?

11   A    No.

12   Q    Did you interview any of the legislative staff?

13   A    No.

14   Q    Did you interview any Virginia voters?

15   A    No.

16   Q    Did you read any of the news accounts of the process?

17   It did get some coverage.

18   A    No.

19   Q    Did you review any of the racial bloc voting analysis

20   in the prior Virginia redistricting litigation?

21   A    No.

22   Q    Did you read the *West v. Wilkins* case?

23   A    I believe I did.

24   Q    You did?

25   A    I am pretty sure I did.

W.L. Armstrong - Cross

1    Q    Did you notice whether there was racial bloc voting

2    analysis done in that?

3    A    I don't remember.

4    Q    Have you gone and -- I don't know, I always wondered

5    whether this is the right word.  Have you gone and like

6    Googled or done some type of search to see whether any of

7    the discussion in the newspapers or maybe in the political

8    science legislature criticizing parts of the Virginia's

9    prior plans?

10   A    No.

11   Q    Did you review any of the floor debates in the

12   Virginia legislature?

13   A    No.

14   Q    Did you attend any of the hearings?

15   A    No.

16   Q    Did you review any of the hearing transcripts?

17   A    No.

18   Q    Did the plaintiffs -- and it's been useful to us, I

19   believe the Court, procured DVDs of all the speeches on

20   the floor relating to the passage of this bill, and they

21   have been put in evidence.

22        Have you reviewed any of these DVDs other than

23   the ones you have seen so far today?

24   A    No.

25   Q    Do you have any specific knowledge of requests for

W.L. Armstrong - Cross

1    changes in districts made at a public hearing?

2    A    No.

3    Q    Of any discussions between members privately

4    discussing changes in the plan?

5    A    No.

6    Q    Do black Virginia citizens generally vote

7    overwhelmingly for Democratic candidates?

8    A    In all the evidence I've looked at, that's true.

9    Q    And generally, generally, Republican candidates

10   receive a majority of white votes in the seriously

11   contested statewide races?

12   A    Generally.

13   Q    Yeah, yeah.  So to use, I guess maybe this is a line

14   from political science, there is a significant correlation

15   between black votes and Democratic votes?

16   A    Yeah.  The correlation is less strong because the

17   white votes are not so reliably Democratic or Republican.

18   Q    And can you draw any conclusions of fact that 89 out

19   of 100 members voted for the plan?

20   A    I didn't do any study of the legislative process in

21   this case, so I can't draw a conclusion.

22   Q    Should we draw any conclusion from the fact that the

23   substantial majority of the black caucus voted for the

24   plan?

25   A    Again, I didn't do any study of the legislative

W.L. Armstrong - Cross

1    process, so I can't draw a conclusion.

2              JUDGE PAYNE:  I think he is asking a somewhat

3    different question now.  That is to assume that certain

4    members of the black caucus or all of it voted for the

5    plan.

6              Is there anything in your mind that should be

7    drawn or that is significant from that fact?

8              THE WITNESS:  I think it would be a starting

9    place for an investigation to think about, like what were

10   their motivations?  Was there a deal?  Or, you know, if I

11   was asked to dig into the legislative process, that's

12   where I would start.  But again --

13   BY MR. BRADEN: (Continuing)

14   Q    Some chance they thought it was good public policy?

15   A    Possibly.

16   Q    I would like to bring up exhibit,

17   defendant-intervenors -- two exhibits actually.  First

18   Defendant-Intervenors' Exhibit No. 24.  27.

19             JUDGE PAYNE:  What number?

20             MR. BRADEN:  My apologies, Defendant-Intervenors'

21   Exhibit No. 27.

22             And while those are being handed out, let me

23   explain to the Court what this is.  This a the criteria

24   adopted by the Virginia legislature in 2001.

25   Defendant-Intervenors' 27.  Did it do the wrong one?  It's

W.L. Armstrong - Cross

1    the -- oh, it is part of 27.

2            JUDGE PAYNE:  Excuse me, it is the same as

3    plaintiffs' what?  What is it, Mr. Hamilton?  It is the

4    same as plaintiffs' what?

5            MR. HAMILTON:  I don't know, Your Honor.  I'm

6    trying to understand which exhibit we're talking about.

7            JUDGE PAYNE:  All right.

8            MR. HAMILTON:  Oh.

9            MR. BRADEN:  It's an excerpt of the

10   Defendant-Intervenors' 27, it is just part of it.

11           MR. HAMILTON:  Your Honor, this is out of

12   Defendant-Intervenors' Exhibit 27.  This is one of the

13   ones we've objected to.

14           I don't object to these two particular pages, so

15   we can make life easy.

16           JUDGE PAYNE:  All right.

17           MR. HAMILTON:  And these two pages are not a

18   problem.  The rest of the thing -- this is the 27 boxes of

19   material that, you know, in 400 different electronic files

20   that were identified as exhibits.  We object to that

21   because I think it's irrelevant.  This is the criteria

22   that was used to draw the benchmark districts.  I don't

23   think this witness has ever seen it or knows anything

24   about it.  But I will let Mr. Braden discover that for

25   himself.

W.L. Armstrong - Cross

1          But I wanted to provide that context for what
2     this document was.
3          JUDGE LEE:  So you don't object to these two
4     pages?
5          MR. HAMILTON:  Are you going to offer it?
6          MR. BRADEN:  Yes.
7          MR. HAMILTON:  I don't object, Your Honor.
8          JUDGE LEE:  All right, let's go.
9          JUDGE PAYNE:  I thought we had gotten there.
10    BY MR. BRADEN: (Continuing)
11    Q    Doctor, have you seen this before?
12    A    At my deposition.
13    Q    And I would like to go to Plaintiffs' Exhibit No. 16.
14    I believe it's already up.
15          Have you seen this before?
16    A    I'm not sure.  This looks similar to 27.  So --
17    Q    Let me help you out here if the Court will give me
18    leave.  One is the criteria in 2001 and one is the
19    criteria adopted in 2011.
20    A    I had seen the second one at my deposition, not the
21    first.
22    Q    But did you review that criteria before you wrote your
23    report?
24    A    No.
25    Q    If we could just -- if you will review for 30 seconds

W.L. Armstrong - Cross

1    the two, and notice that they are virtually identical.

2    Would you say that's correct?

3    A    Yes, they are very similar.

4    Q    And the only principal difference benefit in two

5    locations, one in Population Equality, and the second one

6    is the inclusion of *Wilkins v. West* principally being the

7    differences?

8    A    Yeah.

9    Q    So one of the criteria adopted by the State of

10   Virginia for this process made a specific reference to the

11   decision in *Wilkins v. West*?

12   A    Correct.

13   Q    So if I could go through the criteria here and ask you

14   if you disagree with them.  Why don't we just do the one,

15   it would be easier to see.

16           JUDGE PAYNE:  Which one are we working on now?

17           MR. BRADEN:  We are working on 2011, which is

18   Plaintiffs' Exhibit 16.

19           JUDGE PAYNE:  All right, Plaintiffs' 16.

20           Do you have that in front of you, Doctor?

21           THE WITNESS:  Yes, I do.

22   BY MR. BRADEN: (Continuing)

23   Q    So there are a series of Roman numerals.  You have had

24   an opportunity to review this at your deposition, correct?

25   A    Correct.

W.L. Armstrong - Cross

1  Q   And so the first one talks about population equality.
2  Is there anything there that you disagree with?
3  A   No.
4  Q   Roman numeral II, the Voting Rights Act, is there
5  anything in that Roman numeral that you disagree with?
6  A   No.
7  Q   Roman numeral III, is there anything in that that you
8  disagree with?
9  A   No.
10  Q   And Roman numeral IV, single-member districts, I think
11  you probably will agree that the Virginia plan only has
12  single-member districts?
13  A   Correct.
14  Q   Do you know why this criteria actually appears in
15  here?
16  A   Historically some states have had multimember
17  districts.  So --
18  Q   Do you know whether Virginia has?
19  A   Has currently?
20  Q   Has had multimember districts.
21  A   In the past I believe it has.
22  Q   And Roman numeral V is titled Communities of Interest.
23  A   Correct.
24  Q   Is communities of interest a common/traditional
25  redistricting criteria that people talk about?

W.L. Armstrong - Cross

1  A    Yeah, it falls --

2  Q    Can you read that criteria and tell us if there is any

3  that you object to on their face?

4  A    It says:  Districts shall be based on legislative

5  consideration of the variety -- or, sorry, the varied

6  factors that can create or contribute to communities of

7  interest.  These factors may include, among others,

8  economic factors, social factors, cultural factors,

9  geographic factors, governmental jurisdictions and service

10 delivery areas, political beliefs, voting trends, and

11 incumbency considerations.

12 Q    Why don't we stop there because the Court, like

13 everyone else, is probably hungry or tired.  And so we

14 will stop right there and let me ask you some questions

15 about communities of interest.

16     It would appear that incumbency is one of the

17 considerations in the adopted criteria, is that correct?

18 A    Correct.

19 Q    Okay.  Did you in drafting your report examine where

20 any of the incumbent members lived?

21 A    No, I did not.

22 Q    Did you consider incumbency in any manner?

23 A    No.

24 Q    Let me bring up an exhibit here of a representative --

25 of a representative district.  Why don't we do, let's do

W.L. Armstrong - Cross

1    representative Spruill's district.

2             JUDGE PAYNE:  What are you doing?  I can't hear

3    you.

4             MR. BRADEN:  Oh, I am sorry, I was just talking

5    to her as to which exhibit to bring up.  And this would be

6    94, page 8.  And I believe these are the maps that were

7    prepared by the defendant-intervenors.

8             I request that you've seen a map like this

9    before?

10   A    I have.

11   Q    And you were present for the discussion, so I'm

12   guessing that you may understand to some degree how this

13   is set up?

14   A    Yes.

15   Q    Great.  So I would like to point -- when you were

16   doing your analysis, you didn't know where the incumbents

17   lived, correct?

18   A    Correct.

19   Q    So if you look on this map, I think you will see --

20   yeah, if you look on this map, I think you'll see that

21   there is a marking for the incumbent member Representative

22   Spruill.

23        Do you see it?  It's all the way at the eastern end.

24   A    Correct.

25   Q    And you might see that if you didn't look real close

1   it might appear that he wasn't in his old district?

2   A    It looks like he is right on the border, but I can't

3   tell if he is in or out.

4   Q    So would it be safe to say that there is a significant

5   new area that is added to his district that appears to go

6   around his house?

7   A    Potentially.

8   Q    Well, if it's where he lives, I assume it goes around

9   his, or am I wrong?

10  A    Well, I don't know what the neighborhood looks like

11  there.  So --

12  Q    Okay.  So if a representative were to testify or give

13  a speech on the floor talking about this unifying the

14  neighborhood that he lived in, you wouldn't be able to

15  dispute that?

16  A    No.

17  Q    And that might be a reason to have done this district

18  in this way other than race?

19  A    Potentially.

20  Q    And it might be more important to Representative

21  Spruill than whether these districts were black or white?

22  A    Potentially.

23  Q    Yeah.  And do you know the politics at the other end

24  of the airport district?

25  A    No.

W.L. Armstrong - Cross

1    Q    Do you know whose district it went into?

2    A    I don't know the name.

3    Q    Could you dispute if I told you it was Delegate Jones,

4    the architect of the plan?

5    A    I wouldn't dispute that.

6    Q    And you wouldn't be surprised to hear this is an

7    overwhelmingly Republican area?

8    A    I would have to look at the data.  But if you tell me

9    that, I will accept that.

10   Q    So, what did you do to look at the issue of

11   communities of interest in your report?

12   A    The communities of interest that I looked at were

13   geographic, the extent to which there are splits in

14   counties and cities.  To the extent that VTDs reflect

15   communities in terms of local areas, split VTDs.

16             Then also an analysis of Democratic vote share

17   and an analysis of race.

18   Q    So you didn't look at economic factors?

19   A    No.

20   Q    Social factors?

21   A    No.

22   Q    Cultural factors?

23   A    No.

24   Q    Governmental jurisdictions you did look at?

25   A    Yes.

W.L. Armstrong - Cross

1   Q    Are VTDs governmental jurisdictions?

2   A    No, but they are boundaries that are respected and

3   might correspond to -- in some locales VTDs might

4   correspond to a town or a neighborhood.  They usually are

5   drawn -- you know, sometimes they are drawn with the idea

6   of here is like a community.

7            JUDGE PAYNE:  I think this is a good place for us

8   to stop.

9            For administrative purposes, are you through with

10   your case in chief, Mr. Hamilton, when this witness is

11   finished being examined?

12           MR. HAMILTON:  After my redirect, yes, Your

13   Honor.

14           JUDGE PAYNE:  Yes, yes.

15           MR. HAMILTON:  Yes, Your Honor.

16           JUDGE PAYNE:  And are you -- how much longer do

17   you think you have got on cross-examination of Dr.

18   Ansolabehere?

19           MR. BRADEN:  Probably another 45 minutes, I would

20   guess, Your Honor.

21           JUDGE PAYNE:  And then you will be ready to

22   present your case?

23           MR. BRADEN:  Absolutely, Your Honor.

24           JUDGE PAYNE:  All right, thank you.  We will see

25   you 10 o'clock in the morning.

W.L. Armstrong - Cross

1            Can they leave their things in here.

2            COURT SECURITY OFFICER:  Yes.

3            JUDGE PAYNE:  You may leave anything you want to

4    in here.  The facilities will be locked until in the

5    night.

6            We will be adjourned.

7            NOTE:  The July 7, 2015 portion of the case is

8    concluded.