```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                    RICHMOND DIVISION

4

5    ------------------------------------
                                        :
6    GOLDEN BETHUNE-HILL, et al.,       :
                                        :   Civil Action No.
7    Vs.                                :   3:14CV852
                                        :
8    VIRGINIA STATE BOARD OF            :   July 8, 2015
     ELECTIONS, et al.                  :
9    ------------------------------------
                                        :
10

11         COMPLETE TRANSCRIPT OF THE BENCH TRIAL

12         HEARD BEFORE:   THE HONORABLE ROBERT E. PAYNE
                           THE HONORABLE GERALD BRUCE LEE
13                         THE HONORABLE BARBARA M. KEENAN

14

15   APPEARANCES:

16   Kevin J. Hamilton, Esquire
     Perkins Coie, LLP
17   1201 Third Avenue
     Suite 4800
18   Seattle, Washington  98010

19   Bruce V. Spiva,  Esquire
     Aria C. Branch, Esquire
20   700 13th Street NW
     Suite 600
21   Washington, D.C.  20005
     Counsel for the plaintiffs
22

23

24               Peppy Peterson, RPR
                Official Court Reporter
25              United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Tony F. Troy, Esquire
      Eckert Seamans Cherin & Mellott, LLP
 3    707 East Main Street
      Suite 1450
 4    Richmond, Virginia  23219

 5    Daniel A. Glass, Esquire
      Eckert Seamans Cherin & Mellott, LLC
 6    1717 Pennsylvania Avenue, NW
      Suite 1200
 7    Washington, D.C.  20006

 8    Godfrey T. Pinn, Jr., Esquire
      Harrell & Chambliss, LLP
 9    707 East Main Street
      Suite 1000
10    Richmond, Virginia  23219
      Counsel for the Virginia State Board of Elections
11
      E. Mark Braden, Esquire
12    Katherine L. McKnight, Esquire
      Jennifer M. Walrath, Esquire
13    Richard B. Raile, Esquire
      Baker & Hostetler, LLP
14    1050 Connecticut Avenue, NW
      Suite 1100
15    Washington, D.C.  20036

16    Dalton L. Oldham, Jr., Esquire
      Dalton L. Oldham, LLC
17    1119 Susan Street
      Columbia, South Carolina  29210
18    Counsel for Virginia House of Delegates

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3              JUDGE LEE:  Morning, counsel.

4              THE CLERK:  3:14 civil 852, Golden Bethune-Hill,

5      et al., versus Virginia State Board of Elections versus

6      Virginia House of Delegates, et al.

7              JUDGE LEE:  I didn't mean to leave you out, Dr.

8      Ansolabehere, and all the witnesses.  Good morning, as

9      well.

10             THE WITNESS:  Good morning.

11             JUDGE PAYNE:  All right, you may begin, and I

12     remind you, Dr. Ansolabehere, that you are under the same

13     oath that you took earlier yesterday, I guess it was.

14             THE WITNESS:  Yes.

15             MR. BRADEN:  Good morning, Your Honors.  Good

16     morning, Doctor.

17

18             **STEPHEN D. ANSOLABEHERE,**

19     a witness, called at the instance of the plaintiff,

20     having been previously duly sworn, testified as

21     follows:

22                      CROSS-EXAMINATION

23     BY MR. BRADEN:  (resuming)

24     Q    Are you familiar with public law data DL 94-171?

25     A    Yes.

Ansolabehere - Cross

1    Q    And what is that?

2    A    That's census data that's distributed as part of

3    redistricting.

4    Q    And what is contained in that data set?

5    A    Population data.

6    Q    And other data in that set?

7    A    Yeah.

8    Q    Race data?

9    A    Yeah.  Race of population.

10   Q    So it contains race and overall population of the --

11              JUDGE LEE:  It would help us all if you would

12   keep your voices up.  We're having trouble hearing you.

13              JUDGE PAYNE:  And both of you tend to drop off at

14   the end of whatever you are saying.  Try to keep it up,

15   and then it's easier to hear, please.

16              THE WITNESS:  Okay, thank you.

17              MR. BRADEN:  My apologies, Your Honor.

18   Q    It contains population data and also contains that

19   population data by race; correct?

20   A    Correct.

21   Q    Are there any other factors other than age in that

22   data?

23   A    Indicators of locality like census blocks and so

24   forth, yeah.

25   Q    So it's geography, population, and race?

1    A    I believe that's correct.

2    Q    Why does that data set include race?

3    A    For purposes of redistricting in certain areas, race

4    is a consideration.

5    Q    Have you ever worked in a case where race was not a

6    consideration in drawing of the plans?

7    A    The *Edward Aquifer Authority* case was a

8    one-person-one-vote case.

9    Q    But in drawing that, did the municipality have any

10   racial minority groups?

11   A    It did.

12   Q    And so was race considered in the drawing of those

13   representational districts?

14   A    No.  It was a question of which county had more power.

15   Q    But in the actual drawing of the districts, not the

16   substance of the case, but in the drawing of the

17   districts, do you know whether race was taken into

18   consideration?

19   A    Not to my knowledge.

20   Q    Are you aware of any plans adopted by a bipartisan

21   commission or some type of redistricting commission that

22   was actually adopted by a state that didn't consider race?

23   A    Not to my knowledge.

24   Q    Am I correct that you live in the Boston area?

25   A    I do.

Ansolabehere - Cross

1   Q    And am I correct there still are some Irish

2   neighborhoods in Boston?

3   A    Yes, there are.

4   Q    And in drawing city council districts in the city of

5   Boston, would it be appropriate for the people drawing

6   those districts to consider whether a particular

7   neighborhood was Irish and use that fact in drawing lines?

8   A    It may.  It depends on what Irish indicated to them, I

9   guess.

10  Q    You are not a lawyer, but I'll ask you this question

11  anyway.  Nothing unconstitutional about considering

12  whether a neighborhood is Irish or not as to whether it's

13  a community of interest?

14  A    I don't know the answer to that question.

15          MR. BRADEN:  At this time, I'd like to bring up

16  Plaintiff Exhibit 94, page four, which is District 97.

17  This is a map and a district this Court is already

18  familiar with.  If we can have permission to put it up on

19  the easel here.

20          JUDGE PAYNE:  Sure.

21          MR. BRADEN:  That will be in map book one,

22  District 97.  I mean -- yeah, District 71, map book one.

23          JUDGE PAYNE:  It's in Exhibit 94?

24          MR. BRADEN:  Exhibit 94, page four.  Defendant

25  Intervenors' 94.  My apologies.

Ansolabehere - Cross

1  Q    Doctor, do you recognize this district?

2  A    Yes, I do.

3  Q    And you were present for the testimony to this Court

4  from the individual who represents that district?

5  A    I was.

6  Q    Representative McClellan.  Earlier we discussed

7  Plaintiffs' Exhibit Number 16.  You may remember it being

8  the criteria adopted by the state for the redistricting in

9  this cycle?

10  A    Correct.

11  Q    If you could also possibly turn to that page in your

12  exhibit book, it's Plaintiffs' Exhibit 16, page one.

13  A    Okay.

14  Q    The first criteria, Roman numeral I, is population,

15  equality; correct?

16  A    Correct.

17  Q    Is there anything in your report indicating that this

18  district does not comply with that criteria?

19  A    No.

20  Q    Roman numeral III, contiguous and compact, is there

21  anything in the report about this district not being

22  contiguous?

23  A    No.

24  Q    Do you dispute whether or not this district is

25  compact?

Ansolabehere - Cross

1   A    The compactness score for it is in my report.

2   Q    Is this district not in about the mid range of all the

3   districts in the state?

4   A    I think it is.

5         JUDGE PAYNE:  The first question was, do you

6   contend that it's not compact.  What is your answer to

7   that, yes or no?

8         THE WITNESS:  No --

9         MR. HAMILTON:  Your Honor, that would be a

10  question I would object to.  It's a sliding scale, and the

11  witness has identified the numeric score.  It's not a

12  yes-or-no answer.

13        JUDGE PAYNE:  Overruled.

14        THE WITNESS:  No, it's not among the very low

15  compact districts.

16  Q    And you have no reason -- there's nothing in your

17  report that you could point to that indicates it's in

18  conflict with either *Jameson v. Womack* or *Wilkins v. West*?

19  A    Not that I know of.

20  Q    Roman numeral IV, single-member district, is it a

21  single-member district?

22  A    It is.

23  Q    Roman numeral V, communities of interest, is there

24  anything in your report addressing economic factors in

25  relation to this district?

Ansolabehere - Cross

1    A    No.

2    Q    Anything in your report talking about social factors

3    in this district?

4    A    No, not beyond race.

5    Q    Anything about cultural factors?

6    A    No.

7    Q    Geographic features?

8    A    There's some discussion about the location of the

9    district, voting tabulation districts and so forth.

10   Q    If you look, do you see a blue line going through the

11   map?

12   A    Correct.

13   Q    Do you know what that is?

14   A    I believe that's the -- if I'm looking at the legend

15   correctly, it's the 2011 enacted.

16   Q    My apologies.  There are lots of blues.  It can be

17   confusing.  I was thinking about the James River right

18   here.

19   A    Okay, yes.  That's the James River.

20   Q    Am I correct that that's the southern border of a

21   significant portion of the district?

22   A    It is.

23   Q    And do you know whether this has traditionally been

24   the southern border of this district?

25   A    It was in the previous version as well.

Ansolabehere - Cross

1   Q    And do you know whether it was the southern border in
2   the 1991 district?
3   A    I don't know for sure.
4   Q    Is there anything in your report about governmental
5   jurisdictions?
6   A    Yes, about cities and counties.
7   Q    And do you see a particular level of conflict with
8   this district on that community of interest -- I mean in
9   that particular standard?
10  A    Not in particular.  There are a few crossings of
11  county lines but about the same as there were in the
12  previous version of the district.
13  Q    If I could move your attention to this area right
14  here --
15          JUDGE PAYNE:  What area is that?
16          MR. BRADEN:  This is the three precincts that are
17  in Henrico County.
18          THE COURT:  Summit Court, Hilliard, and Stratford
19  Hall?
20          MR. BRADEN:  That's correct, Your Honor.
21  Q    Do you notice that there's a difference between the
22  precincts that are numbered and the ones that have names?
23  A    Yes.
24  Q    Does it appear that these three districts are from
25  Henrico County?

Ansolabehere - Cross

1   A    Correct.

2   Q    So am I correct that moving those districts out of

3   this made this more of a Richmond-centric district?

4   A    That was swapped with a cross -- a county crossing to

5   Henrico with Ratcliffe.  So the same number of county line

6   crossings occurs.

7   Q    But here, we're talking about three precincts, and

8   here we're talking about the addition of one precinct?

9   A    In terms of county line crossings, it's the same

10  number of crossings.  It doesn't matter how many precincts

11  are included in the county of the crossings.  It's about

12  the same geographic area for the two.

13          JUDGE PAYNE:  Mr. Braden, will you get somebody

14  to move that so Judge Keenan can see the big map, where

15  you are lasering?

16          JUDGE LEE:  Maybe put it inside the jury box.

17          JUDGE PAYNE:  It's going to have to be back

18  towards you.  Can you see it at all now?

19          JUDGE KEENAN:  I'm fine.

20          JUDGE PAYNE:  He's putting the laser on it.  You

21  know, I could hardly see it.

22          MR. BRADEN:  Sometimes I can be challenged.  I'm

23  going to venture back here and try in the future to use

24  the screen and see if I can get it right there, too.

25  Q    The four precincts we've been talking about, this

Ansolabehere - Cross

1    being larger in size, isn't that likely to be less dense

2    in population?

3    A    It might be.  The question is why does a county line

4    crossing matter, and one problem is just government

5    administration of elections.  The more crossings of

6    jurisdictions, the more different kinds of ballots that

7    the county election office has to produce and so forth.

8    Q    So by doing this and removing these three precincts,

9    we made the administration of election probably easier?

10   A    In that specific part of the district, yes.

11              JUDGE PAYNE:  Just so the record is clear, in

12   that specific part, you were pointing to Summit, Hilliard,

13   and Stratford; is that right?

14              THE WITNESS:  Correct.

15              JUDGE PAYNE:  And in the previous question, you

16   were directing or responding to a question that related to

17   Ratcliffe.

18              THE WITNESS:  Correct.

19   Q    Is there anything in your report about service

20   delivery areas?

21   A    No.

22   Q    Incumbency consideration?

23   A    No.

24   Q    You were unaware of the residency of the incumbents in

25   the district in the adjoining districts?

1    A    Correct.

2    Q    I've highlighted three residents of the three

3    incumbents, two in the adjoining districts, and the

4    residency of Delegate McClellan.  Would it be safe to say

5    that if you were trying to avoid pairing members, that

6    that would constrain your line-drawing process

7    significantly?

8    A    In the area around precinct 554 and 20 -- I can't read

9    it on here but 208 it looks like, or 204, yeah, because

10   they are next to each other.

11          JUDGE PAYNE:  The residence of McClellan is in

12   208.  The one next to it that's all yellow is 204.  Is

13   that the one you are talking about, sir, or are you

14   talking about the one above it which is 206?

15          THE WITNESS:  The one below is 554.

16          JUDGE PAYNE:  The one below 208 is 50; is that

17   what you are talking about, sir?

18          THE WITNESS:  Yes.

19          JUDGE PAYNE:  All right, thank you.

20          THE WITNESS:  So there is an incumbent there, and

21   that would constrain -- including that precinct

22   potentially and District 71.

23   Q    Is there anything in your report indicating that

24   incumbent considerations were not involved in drawing this

25   district?

Ansolabehere - Cross

1    A    No.

2    Q    Is it proper to consider changing demographic pattern

3    in drawing districts?

4    A    I'm unclear what you mean by that.

5    Q    Well, if you had a district where -- such as downtown

6    Richmond, where it was becoming gentrified, I guess, sort

7    of yuppified, or whatever the correct word is now, but was

8    changing, that was growing substantially more white, would

9    that be an appropriate consideration as to that district?

10   Should you consider changing demographic trends?

11   A    One might.  I've been in other cases, especially in

12   Texas, where the demographic trending was ultimately not

13   allowed to be considered, so...

14   Q    But do you believe it's inappropriate, as an expert in

15   redistricting, as a political scientist, is it illogical

16   for a legislature to decide to use this changing

17   demographic in an area in drawing their plan?

18   A    It depends on the circumstance.  For example, if an

19   area was increasing Hispanic population, it may be

20   inappropriate to consider that Hispanic district because

21   it will become a Hispanic but it's not currently an

22   Hispanic district.

23        So it depends on exactly what the circumstances and

24   what the problem is at hand, but, yeah, trends are

25   important in evaluating elections and electoral

1  performance and such.

2  Q   Let's go to a specific circumstance.  Downtown

3  Richmond.  Was there something inappropriate that the

4  legislature considered the changing demographics of

5  downtown Richmond in drawing this district?

6  A   I have no opinion on whether or not the legislature

7  considered a trend in downtown Richmond.  I didn't see any

8  reports to that effect.

9  Q   Did you review any alternative plans and discuss them

10  in your report?

11  A   No, I did not.  Just the benchmark and the enacted

12  map.

13  Q   So you did not review HB 5002 and 5003?

14  A   No, I did not.

15  Q   Are you aware of any other plan -- have you reviewed

16  any other legislative plans other than the benchmark plan

17  and the plan as passed?

18  A   As part of this litigation, no.

19  Q   Am I correct that you have written, coauthored an

20  article in Harvard Law Review where you state that voting

21  in Virginia has become more racially polarized?

22  A   I've published two pieces in Harvard Law Review on

23  this matter.  Are you referring to the 2010 piece or the

24  2012 piece?

25  Q   We can talk about both, but I'm just sort of asking

1   the question of, did you in either of those articles, or

2   possibly both, indicate that you believed race, racial

3   polarized voting was increasing in Virginia?

4   A    I'd have to look at the statistics and the table.  My

5   recollection offhand in those articles was that -- those

6   articles compared the covered and noncovered jurisdictions

7   throughout the United States, and my recollection actually

8   was that Virginia was somewhat exceptional because Obama

9   increased his vote share compared to Kerry among whites

10  from 2004 to 2008 and from 2004 to 2012.

11  Q    Do you remember me asking this question of you in your

12  deposition?

13  A    I don't recall that.

14  Q    I guess we're going -- do we have a copy of his

15  deposition?  His deposition, page 197, lines four through

16  16.  If we could go to your deposition, page 197, lines

17  four through 16.

18  A    Correct.

19  Q    Can you read those quickly to yourself and refresh

20  your recollection.

21  A    Okay.

22  Q    I don't know --

23  A    I read them.

24  Q    So, do you now remember that in 2001 you indicated

25  that there was a slight degree of racial polarization in

1   Virginia in that there was a slight increase?

2   A    That was my recollection at that time.  In part, it

3   was because the whites were moving and the blacks were

4   moving, so...

5   Q    What are VTDs?

6   A    Voting tabulation districts.

7   Q    Are they the same as precincts?

8   A    The terms are used interchangeably, but they're not

9   always the same as precincts.  Some states use VTDs as

10  their election precincts.  Some states and even some

11  jurisdictions within states use different precincts for

12  voting places.

13            JUDGE PAYNE:  How about Virginia?

14            THE WITNESS:  My understanding of Virginia is

15  that voting places and precincts are sometimes somewhat

16  different from VTDs, but the VTDs pretty much correspond

17  to the voting precincts.  The VTDs are -- it was a project

18  started by census in 1972 to try to make census data

19  integrate more seamlessly with election data for purposes

20  of redistricting, and states agreed to participate in that

21  census VTD project, and I think we're at about 42 or 45

22  states that agree to participate in the VTD process.

23            Census agreement is to abide by -- to create

24  blocks, census blocks, which are a lower unit of

25  aggregation for purposes of districting, and then the

Ansolabehere - Cross

1    states agree to try to abide by the VTDs in their

2    districting and the blocks to make the process more

3    seamless so that when the census produces data like the

4    public law data that was mentioned earlier, it's easier to

5    merge it in.  There's less headache.

6    Q    I'll go back to the district we have up on the podium,

7    HD 71, and simply ask a couple questions about Richmond.

8    Do you know how often Richmond redraws its precincts?

9    A    I don't know that.

10   Q    Did you -- when you were doing your tabulations, how

11   did you deal with the fact that the different precincts,

12   the different years may have changed?

13   A    I take the precinct -- there's a definition of the

14   precinct in geographic information system which concerns

15   the longitude and latitude of every precinct, and I

16   overlay the longitude and latitude of every precinct on

17   top of the longitude and latitude of the voting tabulation

18   districts, and a lot of them align quite closely, and

19   where there isn't alignment, an assumption is made about

20   what percentage of the population goes into which voting

21   tabulation district from the precinct and, therefore, what

22   percent of the vote is assigned that.

23       That's a standard assumption in merging data between

24   the census population data at the VTD level and the

25   election data at the voting level.

Ansolabehere - Cross

1   Q     And is that a task you perform yourself?

2   A     In constructing the data, I performed the task for

3   2013.  My RA did it for 2011, but that was part of the

4   Harvard election data archive.

5   Q     Approximately how long did it take you to do this?

6   A     About a week.

7           MR. BRADEN:  No further questions, Your Honor.

8           JUDGE PAYNE:  Redirect.

9

10                  REDIRECT EXAMINATION

11  BY MR. HAMILTON:

12  Q    I just have a couple of questions for you, Dr.

13  Ansolabehere.  First of all, Mr. Braden asked you a series

14  of questions yesterday about whether you interviewed House

15  members, whether you talked to party officials,

16  legislative staff, voters, read news accounts, those sorts

17  of things.  Do you recall those questions?

18  A     I do.

19  Q     And I believe you testified you didn't do any of that;

20  is that correct?

21  A     Correct.

22  Q     Was any of that necessary in order for you to perform

23  the analyses that you had been asked to prepare in order

24  to develop an opinion for this Court?

25  A     No.

1   Q    Would it all have been a waste of time?

2   A    It would not have been informative about the analysis.

3   Q    Would it have been relevant to your analysis?

4   A    Not to the analysis that I performed.

5   Q    Any reason for you to spend the time or money to do

6   that?

7   A    No.

8   Q    Thank you.  Now, a moment ago, Mr. Braden showed you a

9   copy of your dep transcript.  Can you pull that up?  And I

10  believe it was on page 197, line four through 16.  Could

11  you read that aloud, both the question and your complete

12  answer for the Court?

13  A    The question, "Have you attempted to determine whether

14  or not comparing earlier results whether racial voting has

15  become more or less polarized in Virginia since 2001?

16       "Answer:  Since 2001, so in the Harvard Law Review

17  article, we compare the racial polarization results in

18  states -- 2004 on, and Virginia is somewhat complicated

19  because there's a lot of variability inside the state.

20  That's my recollection of that analysis.  I think there

21  was a slight increase in 2012 in the degree of racial

22  polarization state-wide, but, again, I'm focusing on these

23  districts in my analysis."

24  Q    Focus on the phrase "a lot of variability within the

25  state."  Can you explain what you meant, sir?

Ansolabehere - Redirect

1    A    There's considerable variability in the patterns of

2    white voting throughout the state of Virginia.  So in some

3    areas, whites vote in line with the black preferred

4    candidates, and in some areas they're opposed which is not

5    common in other states that were covered under Section 5,

6    and that's what the Harvard Law Review article was about.

7    Q    And a lot of variability within the state, you said,

8    is a complicating factor in Virginia; is that right?

9    A    Correct.

10   Q    And this "lot of variability within the state," is

11   that consistent with your findings in your analysis in

12   your expert report presented to this Court?

13   A    It is.

14   Q    Did you see a lot of variability within the state of

15   Virginia, within the commonwealth of Virginia in the 12

16   specific districts that you analyzed?

17   A    I did.

18        MR. HAMILTON:  Thank you, sir.  No further

19   questions, Your Honor.

20        JUDGE PAYNE:  Can he be excused, or are you going

21   to keep him around?

22        JUDGE LEE:  I have a couple additional questions.

23   Do you have table four, Exhibit 50 of the plaintiff?

24        THE WITNESS:  Could I have that?

25        JUDGE PAYNE:  That's his expert report?

1          JUDGE LEE:  Yes.  I think it is.

2          JUDGE PAYNE:  Your expert report, table four.

3          JUDGE LEE:  Page 72 of Plaintiffs' 50.

4          MR. HAMILTON:  For the Court's convenience, we

5   put that on the screen.

6          JUDGE LEE:  That's fine.  I want to ask you a

7   question about the center where you have black voting-age

8   population, and you have benchmark and HB 5005.  What do

9   those two columns mean?

10         THE WITNESS:  The benchmark corresponds to the

11  benchmark map, and HB 5005 corresponds to HB 5005 and the

12  configuration of the districts in each of those, and the

13  black voting-age population is black voting-age population

14  calculated for each of the districts under each of those

15  plans.  That is the percentage of the voting-age

16  population that is black in each of those districts.

17         JUDGE LEE:  So then for District 69, the

18  benchmark plan was 56.3, and under the HB 5005 it was

19  55.2.  So it actually lowered the black population in that

20  district; is that right?

21         THE WITNESS:  Correct.

22         JUDGE LEE:  The same is true for 70?

23         THE WITNESS:  Correct.

24         JUDGE LEE:  74, it lowered it?

25         THE WITNESS:  Correct.

1          JUDGE LEE:  75 lowered it?

2          THE WITNESS:  75 increased by one-tenth of one

3     percent.

4          JUDGE LEE:  One-tenth of one percent.

5          THE WITNESS:  That's essentially the same.

6          JUDGE LEE:  Essentially the same, okay.  The same

7     for 92, lowered it.

8          THE WITNESS:  92 lowered it.

9          JUDGE LEE:  Okay.  And 95 lowered it.

10         THE WITNESS:  Correct.

11         JUDGE LEE:  Thank you.  I wanted to make sure I

12    understood those two columns.

13         JUDGE PAYNE:  90 lowered also?

14         THE WITNESS:  Yes, by three-tenths of a percent,

15    yes.

16         JUDGE LEE:  All of these are not 55, are they?

17         THE WITNESS:  What do you mean?

18         JUDGE LEE:  All of the HB 5005, all of them are

19    not 55; is that right?

20         THE WITNESS:  Correct.  They range from 55 to 60.

21         JUDGE LEE:  Thank you.

22         JUDGE PAYNE:  Any questions based on what the

23    bench asked?

24         MR. HAMILTON:  I do actually have a couple

25    follow-up questions at the risk of stating the obvious and

1    testing the patience of the Court.

2

3    BY MR. HAMILTON:   (resuming)

4    Q    There are a number of other districts in which the

5    black voting-age population was increased?

6    A    Yes, there are some districts where it increased.

7    Q    And the Court can figure that out by looking at these

8    two columns that Judge Lee pointed out just a moment ago?

9    A    Correct.

10   Q    Are any of them below 55 percent?

11   A    No.

12   Q    Is the result of HB 5005 consistent with an

13   application of a rule requiring 55 percent black

14   voting-age population or more in each of these districts?

15   A    It is.

16           MR. HAMILTON:   Thank you.  No further questions,

17   Your Honors.  Dr. Ansolabehere is -- we've identified him

18   as a rebuttal in our rebuttal case.  He may be excused.

19           JUDGE LEE:   There's no rule on witnesses; is that

20   right?

21           JUDGE PAYNE:   No.

22           MR. HAMILTON:   That's correct, Your Honor.

23           JUDGE LEE:   You can remain if you'd like, or come

24   back later.  Thank you.

25           JUDGE PAYNE:   Do you have any other witnesses?

1        MR. HAMILTON:  We don't, Your Honor.  The one

2   thing I'd point out, would only ask, is that the parties

3   stipulated to certain facts, and I believe it's docket

4   entry number 80 in the Court's docket.  We filed that, and

5   I believe all parties have stipulated.  They're all sort

6   of noncontroversial, date of the election and so on, and

7   the location residency and voting status of each of the

8   plaintiffs, so I'd just like to ask the Court that we

9   enter that stipulation.

10       We've already filed it.  I just want the Court to

11  take note that that's part of the plaintiffs' case as

12  well, and with that, the plaintiffs rest.

13       JUDGE PAYNE:  It will be accepted.  I thought you

14  were going to mark it as an exhibit.

15       MR. HAMILTON:  We hadn't planned on it.

16       JUDGE PAYNE:  That's all right.  We'll just -- is

17  it satisfactory to you if we just take note of -- what is

18  the docket entry?

19       MR. HAMILTON:  The docket entry is number 83.  I

20  misspoke.

21       JUDGE PAYNE:  Is that all right?

22       MR. BRADEN:  Yes, Your Honor.

23       JUDGE PAYNE:  Docket 83, all right.

24       MR. HAMILTON:  Thank you, Your Honor.

25       JUDGE PAYNE:  All right, Mr. Braden.

1      MR. BRADEN:  Your Honors, we would like -- the

2  defendant intervenors would like to call Delegate Chris

3  Jones at this time.  And, Your Honor, you'll be shocked to

4  hear that we're going to have a variety of maps to talk

5  about, so if it's permissible with the Court, one of our

6  assistants, associates, if they could sit over there, it

7  might facilitate the quick movement.

8      JUDGE KEENAN:  And then, Mr. Braden, you're going

9  to be putting the maps up on the screen as well; right?

10     MR. BRADEN:  Yes, Your Honor.

11     JUDGE KEENAN:  If you could please have the zoom

12  working the way it was working yesterday, that would be

13  very helpful.

14     MR. BRADEN:  Great.  I will make sure to have

15  someone here that can do it right.

16

17                    **STEVEN C. JONES,**

18  a witness, called at the instance of the defendants,

19  having been first duly sworn, testified as follows:

20

21     MR. BRADEN:  Your Honors, we're also passing out

22  now what we will hope will facilitate following the

23  testimony, witness binders for everyone.  Even with

24  electronics, we managed to kill a lot of trees.

25

```
 1                    DIRECT EXAMINATION

 2   BY MR. BRADEN:

 3   Q    Delegate, can you please tell the Court your name?

 4   A    Yes.  It's Steven Christopher Jones, Steven with a V.

 5   Q    And could you just briefly provide the Court with a

 6   little bit of your education, background, and your work.

 7   A    I grew up in Suffolk and Chuckatuck and actually

 8   attended John Yeates High School and then attended

 9   Randolph-Macon in Ashland, Virginia, and then I went to

10   the Medical College of Virginia School of Pharmacy, and I

11   graduated in 1982.

12        In 1985, which was 30 years last month, I opened up

13   Bennett's Creek Pharmacy which I have been the pharmacist

14   and president since June 24th, 1985.

15             JUDGE PAYNE:  You might just pull that mic closer

16   to you.  It will be easier for you, and we can hear it

17   better.

18             THE WITNESS:  Yes, sir.

19             JUDGE LEE:  Speak like you would on the floor.

20   We want to hear you.

21             THE WITNESS:  Okay.  I will do that.

22             JUDGE PAYNE:  But not as long.

23             THE WITNESS:  My wife has told me that many times

24   in our 29 years together.

25   Q    Could you just briefly tell the Court your role in the
```

1   2011 process.

2   A    Yes, sir.  The speaker asked me would I consider

3   drawing the map and carrying the bill for the

4   redistricting process that occurs every ten years.

5   Q    And why were you chosen to lead the redistricting

6   process?

7   A    My previously experience in 2001 as a chief patron of

8   House bill one, which was chapter one, which were the

9   districts, the benchmark districts that, in fact, have

10  been mentioned over the last day and a half.

11  Q    And did you do some drafting in the 2001 plan?

12  A    Yes, I did.  I was responsible for the Hampton Roads

13  region, and then as time went on, I was given the task of

14  doing the entire state working with then-Speaker Vance

15  Wilkins.

16  Q    And so did your 2001 experience inform your 2011

17  decision-making in the process?

18  A    It did.

19  Q    So having worked in the 2011 process, you are familiar

20  with some of the subsequent litigation?

21  A    Yes, I am.

22  Q    And so are you aware of the *Wilkins v. West* case?

23  A    I was a defendant, named defendant in that case, and

24  I'm very familiar with that case.

25  Q    Are you familiar with the evidence in that case?

Jones - Direct

1  A    Yes, I am.  The ^ Lohan report was a report that dealt

2  with the issue of --

3        MR. SPIVA:  Objection.  Sorry to interrupt the

4  witness, but this deals with one of the two reports that

5  we have objected to, and so we object to any testimony on

6  this and object to the admission of those reports.

7        JUDGE PAYNE:  They haven't offered the reports

8  yet, and we haven't gotten the answer out to the question,

9  so maybe you'll hold your objection until we see what the

10 answer is.  He said are you familiar with it, he said yes,

11 the Lohan report is, and that's where the objection came

12 so --

13       MR. SPIVA:  Okay.  He sounded like he was going

14 to testify to the substance of the report.

15 Q    Did that report inform your decision-making in the

16 2011 process?

17 A    It most certainly did.

18       MR. BRADEN:  Your Honor, at this time we'd like

19 to have Defendant Exhibit 36 submitted.

20       MR. SPIVA:  Objection, Your Honor, since one of

21 the two reports that we objected to, it was not produced

22 in discovery despite the fact that we requested it.  Our

23 request for production --

24       JUDGE PAYNE:  Your objection is it wasn't

25 produced in discovery; is that right?

Jones - Direct

1          MR. SPIVA:  There are several other bases, Your

2     Honor.  It's hearsay --

3          JUDGE PAYNE:  He just said he relied on it.  He

4     took into it account and was aware of it, I think.

5          MR. SPIVA:  Right, and that is a discovery

6     violation.  It was not produced.  We requested all

7     materials that were relied upon by the mapmaker.

8          Number two, it's hearsay, and there's no

9     stipulation on this unlike the expert reports that were

10    prepared in this litigation.

11         Number three, it's regarding a 15-year-old map

12    that has no relevance to this proceeding whatsoever, and

13    so we would object on those three grounds.

14         JUDGE PAYNE:  Your response?

15         MR. BRADEN:  Well, I have to say I'm absolutely

16    astounded on the notion that the prior plan is not

17    relevant to the consideration of this Court.  I think the

18    only question here is the discovery question.  We didn't

19    produce it because we didn't have it.  Delegate Jones

20    didn't have a copy of it, and we didn't have a copy of it.

21    Took us quite awhile and only recently obtained it.

22         JUDGE PAYNE:  Once you obtained it, did you give

23    it to them?

24         MR. BRADEN:  I'm trying to remember the time

25    frame in which we got it.  We only got it very recently.

1    Let me double-check as to the exact time frame.

2          MR. SPIVA:  Your Honor, I can produce our

3    request --

4          JUDGE PAYNE:  Let's do one thing at a time.

5          MR. BRADEN:  I believe we got it the same day --

6    we physically got copies of it the same day we produced

7    the trial exhibits.

8          JUDGE PAYNE:  To them?

9          MR. BRADEN:  Yes.

10          JUDGE PAYNE:  They produced it the same day they

11    got it and gave it to you.  What objection do you have now

12    on the discovery question?

13          MR. SPIVA:  Well, we subpoenaed Delegate Jones,

14    Your Honor, so they had an obligation to produce this.

15          JUDGE PAYNE:  But he didn't have it, Mr. Braden

16    said.

17          MR. SPIVA:  He had an obligation to produce

18    anything under his custody or control, and obviously he

19    was able to procure it.  And if he relied upon it, and he

20    was going to come into court and testify --

21          JUDGE PAYNE:  Where did you get it?

22          MR. BRADEN:  We got it from the court record, I

23    believe.  We eventually obtained it from --

24          JUDGE PAYNE:  Was it under Delegate Jones's

25    custody and control is the issue.

Jones - Direct

1              THE WITNESS:  I'd be glad to answer that, Your

2    Honor.

3              JUDGE PAYNE:  Let's let your lawyer ask it.

4    Q    Was it under your custody and control?

5    A    No, sir.

6              JUDGE PAYNE:  That takes care of that.  Is there

7    anything else you've got on the discovery objection?

8              MR. SPIVA:  Well, I guess, Your Honor, the

9    exception to that part of it because he was able to obtain

10   it ultimately and they produced it, you know, you know,

11   after the cutoff, but I understand Your Honor's ruling on

12   that.

13             JUDGE PAYNE:  So what you just did was take

14   exception to it; is that what you were saying?  You don't

15   have to take exception in our court.

16             MR. SPIVA:  With respect, I'm not --

17             JUDGE PAYNE:  It's okay.  Let's go to the next

18   ground that you have.

19             MR. SPIVA:  The other ground is it's hearsay,

20   Your Honor.  By the way, we were not able to depose the

21   expert that they're producing this report for.  It's

22   hearsay.  We haven't stipulated to its admission.  It's

23   actually also irrelevant.

24             I didn't say that the benchmark map was not

25   relevant, but the report, using 15-year-old data, is

Jones - Direct

1   irrelevant.

2           JUDGE PAYNE:  Let's take it in order.  The report

3   is hearsay.  Do you agree?

4           MR. BRADEN:  Yes, Your Honor.

5           JUDGE PAYNE:  So you have to get it in if you're

6   offering it as an exhibit on some other basis.  What --

7           MR. BRADEN:  Yes, we're offering it on the basis

8   that Delegate Jones used the report to inform his

9   decision-making.  We are not necessarily offering it for

10  the views that are contained in the report by the expert.

11          What's at issue before this Court, in part, is

12  Delegate Jones' understanding of what he was doing and

13  understanding of the issues of racial polarization.

14          JUDGE PAYNE:  So you're offering it for a purpose

15  not intended to be the truth of the substance of the

16  document.

17          MR. BRADEN:  That is correct.

18          JUDGE PAYNE:  And for a limited purpose, and you

19  will confine your questioning about it to the particular

20  parts of it you are talking about, and you don't want us

21  to consider any of the opinions of the expert other than

22  how it may have informed him; is that right?

23          MR. BRADEN:  That is correct, and, in fact --

24          JUDGE PAYNE:  Why, then, do you need to admit it?

25          MR. BRADEN:  Well, really, it is, in fact -- what

1    I think is useful to this Court is for this Court to be

2    able to look at that report, and that report, if he reads

3    it and you understand he read it, you'll be able to

4    understand that, in fact, he was aware of racial

5    polarizing voting.

6            It's not a question of whether it was accurate or

7    not.  It's really a question of what he read.  He read

8    this report --

9            JUDGE PAYNE:  Why don't we hear his testimony

10   about the report and then decide whether or not it's

11   admissible or not based upon what foundation is laid in

12   his testimony.  Your objection will be reserved until that

13   point.

14           MR. SPIVA:  Thank you, Your Honor.

15   Q    Delegate Jones, did you use this report and the

16   Virginia Supreme Court decision to inform your 2011

17   decision-making process?

18   A    I did.  As a matter of fact, that was one of the

19   differences in the resolution from 2001 to 2011.  We

20   actually mentioned the *West v. Wilkins* case.

21   Q    The criteria adopted by the House makes specific

22   reference to this case.

23   A    It does.  That was added in 2011.

24   Q    And you were a defendant in that case?

25   A    That would be correct.  I drew the maps in 2001 and

Jones - Direct

1    2011, and I participated in the development of the

2    criteria both in '11 and in '01.

3    Q    Were you aware that the State of Virginia submitted

4    its redistricting plan in 2001 for preclearance to the

5    Department of Justice?

6    A    Yes.

7    Q    And you were also aware that Virginia submitted its

8    plans for legislature House of Delegates in 1991?

9    A    Yes.

10   Q    Did the process in 2001 inform your decision-making?

11   A    It most certainly did.

12   Q    Are you aware of any racial dilution or racial

13   polarized voting analysis submitted in either of those two

14   preclearance submissions?

15   A    No.  I did inquire with Legislative Services after

16   this question came up.  I believe it was in the deposition

17   I was asked by counsel about had that been done, and in

18   reviewing the tape from the floor where Delegate Armstrong

19   indicated that it was very easy to do, just go to the

20   second floor and ask them, I actually asked Mary Spain,

21   who is now retired, and Jack Austin, who is still with the

22   Commonwealth -- they both have 30-plus years experience in

23   this process, and to their knowledge --

24            MR. SPIVA:  Objection.  This is hearsay.

25            JUDGE PAYNE:  Excuse me, Delegate Jones.  Same

1    rule for you as for Mr. Hamilton.  Ask the question.

2    Please, Delegate Jones, just answer the questions he's

3    asked.  If he wants to follow up on it, he will.  If you

4    need to explain, we will, but then we don't get into a

5    long narrative, parts of which are objectionable as Mr.

6    Spiva has said.

7              THE WITNESS:  Yes, sir.

8              JUDGE PAYNE:  So the bottom line to the question

9    that was actually asked is, there was no -- in your view,

10   no racial dilution or racial polarization study submitted

11   with either preclearance; is that correct?

12             THE WITNESS:  That is correct.

13             JUDGE PAYNE:  All right, Mr. Braden.

14   Q    And you were able to confirm that by actually asking

15   the staff that has worked on that for a number of years?

16   A    That is correct.

17             MR. SPIVA:  Objection, Your Honor.

18             JUDGE PAYNE:  Withdrawn.

19             MR. SPIVA:  Withdrawn, he's answered the

20   question.

21   Q    I'd like to move now to a little bit of process.

22   Let's start at the beginning.  When did you prepare for

23   this process?  How did you prepare for this process?

24   A    I was appointed as the chair of the Reapportionment

25   Committee, which is a joint committee of both chambers, in

Jones - Direct

1    2009 or 2010.

2    Q    And did you need to -- did you go to any conferences

3    or other educational activities for this?

4    A    Yes.  The speaker asked me to attend the NCSL seminar

5    in Austin, Texas in March, I believe, of 2010.

6    Q    Did you have to hire staff to assist?

7    A    No.

8    Q    Then during the process, when it actually begins in --

9    did the process begin before the census data was

10   distributed?

11   A    It did.

12   Q    And what were the first processes that you undertook

13   for the state?

14   A    Well, if I may, to give a little background, we heard

15   after 2001 they wanted more public input.  So I believe

16   for the first time ever, the Commonwealth had public

17   hearings in the fall and winter prior to the release of

18   the census data.  We had about five public hearings around

19   the state on the House side.

20           JUDGE LEE:  Fall of what year?

21           THE WITNESS:  That would be fall of 2010, Your

22   Honor.

23           JUDGE PAYNE:  On redistricting?

24           THE WITNESS:  Yes, sir.  We went around the state

25   geographically, like Roanoke, northern Virginia, great

Jones - Direct

1    southwest, and south side, and Richmond city, and Hampton

2    Roads.

3                 JUDGE PAYNE:  Those were just for the House?

4                 THE WITNESS:  Yes, sir.  The Senate also did some

5    as well, Your Honor.

6    Q    So were you the principal crafter of the 2001 plan?

7    A    Yes.

8    Q    And so when you did the 2001 plan, were you putting

9    pen to paper?

10   A    I was.

11   Q    Or were you using the computer screen?

12   A    I was doing both.  I was using a computer screen.  We

13   used Maptitude redistricting software in 2001.

14   Q    And why did you use the Maptitude software?

15   A    It was what was recommended to us, and I don't know

16   how that recommendation got to us, but that's what we

17   ended up using back in 2001, and if I could, that was the

18   first time ever that the Republicans had been in a

19   position to draw the maps in the Commonwealth of Virginia.

20   Q    And it's the same software you used for drawing the

21   2011 plan?

22   A    Yes, sir, it is.

23   Q    I'd like to bring up Plaintiffs' Exhibit 16.  Do you

24   recognize Plaintiffs' Exhibit 16?

25   A    I do.

1  Q    What is Plaintiffs' Exhibit 16?

2  A    It is the adopted criteria by the Privileges and

3  Elections Committee of the House of Delegates.

4  Q    And I'd like to bring up Defendant Exhibit 27.  This

5  is -- the Court has seen this before.  This is the 2001.

6  Is it safe to say that the 2011 criteria are based upon

7  the 2001 criteria?

8  A    Yes, sir.

9  Q    Can you explain to the Court the difference?

10  A    The difference would be on the number one, Roman

11  numeral I, we did plus or minus one percent in 2011, and

12  we did plus or minus two percent in 2001.

13       We added in Roman numeral III.  We had added the *West*

14  *v. Wilkins* court case that I think started out as Gilmore,

15  *West v. Gilmore*.

16  Q    And I see that you made a change in the population

17  deviation criteria.  Why did you do that?

18  A    To more approximate the one-person-one-vote in the

19  Virginia constitution.

20  Q    Am I correct the basic building blocks of your plan

21  starts with census data?

22  A    It does.

23  Q    When did you receive the census data?

24  A    I believe we got it a little bit later this time than

25  we did in 2001.  I think it was mid to maybe the second

Jones - Direct

1    week in February.

2    Q    Let me bring up Defendants' Exhibit 28.   What is that,

3    Delegate Jones?

4    A    That is the immediate release of the census bureau --

5    Virginia census population totals.   That was February 3rd.

6    Q    Were you able to immediately use this census data to

7    begin the process?

8    A    Well, yes and no.   When the data was received, I knew

9    immediately that there was a mistake, because one of the

10   majority-minority districts actually was overpopulated in

11   Hampton Roads, and subsequently what happened, when DLS

12   did their research, they found that census had applied in

13   a wrong census block the population for the Norfolk Naval

14   Base, and that affected House District 80 and House

15   District 79.

16   Q    So this pushed back the timing of the process to some

17   degree?

18   A    Yes, sir, by a couple of weeks.   Had it not been a

19   majority-minority district, we probably could have done

20   more work, but we had to wait to get the correct and right

21   numbers from the census bureau.

22   Q    Were you concerned about timing issues?

23   A    Absolutely, yes, sir, I was.

24   Q    Why was that?

25   A    Well, Virginia has elections in the odd year, and we

Jones - Direct

1    didn't get the data until February.  We were mid February

2    starting.  Our session began in April, and we have to have

3    preclearance by the Justice Department, and they can take

4    up to 60 days.  We contemplated that by moving back our

5    primaries from June until August.

6    Q    Do you know of any state that has a shorter time frame

7    for doing this process than Virginia?

8    A    There are none to my knowledge.

9    Q    So after the release of the census data, did you do

10   additional hearings across the state?

11   A    We did.  We immediately, once we got the correct data

12   from census and it was appended in properly, we actually

13   had five or six public hearings across the Commonwealth.

14   Q    And in addition to the hearings, did you have meetings

15   with other delegates about their districts?

16   A    I did, yes, sir.

17   Q    Did you receive other communications about the

18   line-drawing process?

19   A    We did.  As a matter of fact, one of the complaints

20   back in '01 was there wasn't enough public input, so as my

21   duty as chairman of the reapportionment committee, we made

22   sure we had a portal, a public portal where people could

23   actually see and comment on the plans that were -- not

24   plans but the census information on the benchmark plan so

25   they could make comments to us on the communities of

1  interest and the other items that were of importance to

2  them.

3  Q   I'm sorry, I should have asked you this before.   In

4  addition to simply the timing, the need to have the plan

5  in place prior to the primary day, which I think is

6  self-evident, there are other considerations that make it

7  important to get it done much earlier than that such as

8  the circulation of petitions and, frankly, knowing what

9  districts you could run in.

10 A   We had to work very closely with the Board of

11 Elections at the time to make sure when you look at your

12 cutoff dates for filing and signatures, and, you know, for

13 primaries or conventions to elect a candidate of choice

14 for the party, and then have the general election occur in

15 November.

16 Q   At the beginning of this process, did you have a fixed

17 number in mind for majority-minority district black

18 voting-age population?

19 A   No.

20 Q   Was there a hard rule that every majority-minority

21 district would be 55 percent?

22 A   No.

23 Q   I'd like to show Plaintiffs' Exhibit 36, and this is a

24 video clip, a different video clip of Delegate Dance, and

25 it's -- the transcript is Plaintiffs' Exhibit 35, pages

Jones - Direct

1    156 to 159, and while we're queuing this up, to speed the

2    process up, what was her role in the process?

3    A    She was a member of the Joint Reapportionment

4    Committee, a member of the P&E Committee during the

5    process.

6

7             (Video clip played.)

8

9             MR. BRADEN:  Sorry, Your Honor.

10            JUDGE PAYNE:  That's the one we heard yesterday.

11            MR. BRADEN:  Yes.  The advantage we have is that

12   Representative -- Senator Dance, at that time

13   Representative Dance, had two different coats on, so this

14   is the red version.  We have a black version.  Our

15   apologies.

16

17            (Video clip played.)

18

19            MR. BRADEN:  My apologies.  I misspoke,

20   undoubtedly not the first time nor last time.  This would

21   be Plaintiffs' Exhibit 33.  It's page 41 to 46 in the

22   transcript.

23            JUDGE PAYNE:  That's in our book, too?

24            MR. BRADEN:  Yes.

25            JUDGE PAYNE:  Pages what?

Jones - Direct

```
 1            MR. BRADEN:  41 to 46.

 2            JUDGE PAYNE:  Thank you.

 3

 4            (Video clip resumed.)

 5

 6   Q    Delegate Jones, were you present for the speech?

 7   A    I was.

 8   Q    Anything the delegate, now-senator, said in that

 9   speech that you disagree with?

10   A    Nothing.

11   Q    Did your interviews and discussions with various

12   members of the black caucus inform your decision-making?

13   A    Absolutely.

14   Q    Any information you received from the black caucus

15   conflict with your understanding of the findings and

16   holdings in *Wilkins v. West*?

17   A    No.

18   Q    The plaintiffs began this litigation with an opening

19   argument saying that there was a 55 percent rule, that

20   there was a 55 percent racial floor.  Is that true?

21   A    No.

22   Q    In your view, not every district actually has a

23   55 percent black voting-age population?

24   A    No, and I don't want to get too deep in the weeds for

25   the Court, but the two software systems were different.
```

1  In Maptitude, it only calculated the DOJ black, not the

2  all-black.  And so when I actually had the shape file and

3  did the drawing on my computer, the shape file that I took

4  to Legislative Services had three districts that were

5  below 55 percent.

6      I was surprised when they ran their report and they

7  had all of them above 55 percent, but that was a system

8  that they used which included, as I subsequently found

9  out, all black which would include Hispanic which is an

10  ethnicity, not a race, according to census.

11     So that caused the confusion in the beginning and, of

12  course, went back and forth in a deposition if you recall.

13  I actually -- if it was a rule, then I violated it, was

14  what I actually submitted because my computer only showed

15  DOJ black.  It did not show all-black.

16  Q   Delegate Jones, I'd like to bring up Plaintiffs'

17  Exhibit Number --

18          JUDGE PAYNE:  Excuse me.  Which is it that showed

19  DOJ black?

20          THE WITNESS:  That would be the system, Your

21  Honor, that I used, the Maptitude, which is a specific

22  program for redistricting only.

23          JUDGE PAYNE:  What is the other system you are

24  talking about that shows all black?

25          THE WITNESS:  AutoBound.

Jones - Direct                                              282

1              JUDGE PAYNE:  AutoBound?

2              THE WITNESS:  Yes, sir, I think that's correct.

3              JUDGE LEE:  You said AutoBound included Hispanic

4    along with --

5              THE WITNESS:  It was all black, yes, sir, Your

6    Honor.

7              JUDGE LEE:  So for clarity, Hispanic was included

8    in African American under the all-black?

9              THE WITNESS:  Yes, sir, that is correct.

10             MR. BRADEN:  Your Honors, I know it can be a

11   little confusing, so we'd like to use Plaintiffs' Exhibit

12   60 to, hopefully, make this clear to the Court.  I'd like

13   to direct the Court, if we can scroll down to page 13 of

14   Exhibit 60, the Court will notice on the plaintiffs'

15   exhibit our favorite district, number 71, is the first

16   column on that page.

17             For some reason, and I don't really know why,

18   this column has been highlighted by the plaintiffs in

19   their exhibit, so we thought it was useful to use this

20   column to help explain this.

21   Q    Delegate Jones, do you recognize the numbers here?

22   A    I do, yes, sir.

23   Q    And can you just briefly tell the Court what it is?

24   A    Yep.  What this is, it takes all persons that are in a

25   district, and then it breaks down -- this is voting-age

Jones - Direct

1    population.  This is not all persons.  Then it gives you

2    the voting-age population white, then the percent voting

3    age population, and then VAP black, percent VAP black, and

4    then you get the Asian American, and then it goes Asian

5    and it goes across.  Then you have other, and you get

6    percent Hispanic, and that was a consistent table that we

7    saw after the bill had been introduced.

8              JUDGE PAYNE:  Excuse me, Mr. Braden.  Where did

9    these documents come from?

10             MR. BRADEN:  This is the plaintiffs' exhibit.

11             JUDGE PAYNE:  I know, but are they from the

12   census or from the Maptitude or who created them?  What's

13   the source?

14   Q    Delegate Jones?

15   A    Your Honor, this was after I took the file down to the

16   Legislative Services, they put it into their computer

17   system which was AutoBound, and then they produced that

18   from my shape file.

19             JUDGE PAYNE:  So this is produced by Legislative

20   Services on the AutoBound system; is that right?

21             THE WITNESS:  Yes, sir.

22             JUDGE KEENAN:  Mr. Braden, are you going to zoom

23   in on this?

24             MR. BRADEN:  Yes.

25             JUDGE KEENAN:  Thank you.

1          MR. BRADEN:  Somebody is going to kick me over

2     here.  What we intend -- yes, we're going to zoom in and

3     try to enlarge it for you.  I'm afraid that may be the

4     best technology, but I think our process here may help you

5     substantially on this, I believe.

6          JUDGE KEENAN:  You have to keep your voice up,

7     too, really, because I'm maybe in a dead zone here, but

8     I'm hearing about, I don't know, I don't want to give a

9     percentage for the record.  I'm really concerned I'm not

10     getting --

11          MR. BRADEN:  I will absolutely pull it closer and

12     speak louder.

13          JUDGE PAYNE:  Are you saying you can't include

14     this -- get it up any bigger?  Is that what we're saying?

15     It's not possible?

16          MR. BRADEN:  We can zoom in on parts of it, and

17     we'll do part by part.  We can't make it all zoom up in

18     one sheet because it's too broad.

19          JUDGE PAYNE:  Okay.

20          MR. BRADEN:  What we would like to do is do a

21     brief demonstration, a calculation for the Court simply

22     using these numbers on the top line.

23          JUDGE PAYNE:  All right.

24     Q    Delegate Jones, we'd like to bring up a calculator and

25     let it assist us in doing some simple math.

Jones - Direct

1    A    Yes, sir.

2    Q    And so if you could simply -- and we are assisting you

3    with the calculator.  You don't have to take your socks

4    and shoes off.  We'll just go through the lines and go

5    line by line.  Let's use the first column which is the

6    total population of the district; right?  We don't need to

7    add that.  That's presumably the number you're going to

8    get when you add all the numbers up; right?

9    A    Correct.

10   Q    Let's go column by column.  What is the first column?

11   A    Voting-age population white is 24,970.

12   Q    Next column?

13   A    Would be voting-age population black which is 36,658.

14   Q    Next column?

15   A    Would be Asian, 325.

16   Q    And the next column?

17   A    Voting-age population Asian, 3,069.

18   Q    And the next column?

19   A    Hawaiian would be 41.

20   Q    Next column?

21   A    Other is 566.

22   Q    And did I reach the last column?

23   A    You have two more.

24   Q    Two more.  Next column?

25   A    Voting-age population multi is 601.

Jones - Direct

1    Q    And the next column?

2    A    Hispanic is 1,616.

3    Q    The total is?

4    A    67,842 which is more than the 66,230.

5    Q    Is this one of the problems you had with using the

6    black population numbers from DLS?

7    A    It is.

8    Q    Why else did you decide -- would you think the DOJ

9    black numbers were important?

10   A    Because as I understood it, that's what the Department

11   of Justice was going to use in their preclearance of our

12   plan.

13   Q    Did you understand that the Department of Justice uses

14   the same software that you were using?

15   A    That was my understanding, but I don't know that for a

16   fact.

17   Q    Could you just briefly tell the Court what a block

18   assignment file is?

19   A    A block assignment file takes the entire geographical

20   area and is overlaid into a shape file, and it's got the

21   data for each block of the number of citizens that reside

22   there, their race, age, and -- I mean there's a lot of a

23   different data sets, combinations of racial data that's

24   collected, but that's generally what's in there.

25   Q    And are they actually block assignment files the

Jones - Direct

1    geography for which you created the plan?

2    A    Correct.  That actually is brought into the system,

3    and then it's overlaid in the entire Commonwealth, and

4    that tells you exactly where everybody might live.  Like

5    where my house is, it will tell me I have 110 people that

6    live in that block assignment file.

7    Q    And is your understanding that this block assignment

8    file is what you are required to submit to DOJ for

9    preclearance?

10   A    Yes, sir, that is correct.

11   Q    So, if we can now begin going through, district by

12   district, a discussion of the plan.  First, though, I'd

13   like to bring up Plaintiffs' Exhibit 16.  This provided

14   the framework for the drafting of all your districts?

15   A    That is correct.

16        MR. BRADEN:  I'd like now to show Plaintiffs'

17   Exhibit 36, and this will be on the transcript, pages 31

18   to 33.  That's Plaintiffs' Exhibit 35.

19        JUDGE PAYNE:  I lost what you said.  What do you

20   mean?  Which is 35 and which is 36?

21        MR. BRADEN:  36 is the video clip of Delegate

22   Jones' floor speech.  The transcript of it is Plaintiffs'

23   Exhibit 35, pages 31 -- I mean page 31 to 33.

24        JUDGE PAYNE:  Okay.  Thank you, sir.

25

Jones - Direct

1              (Video clip played.)

2

3    Q    Delegate Jones, was that you speaking in the floor of

4    the legislature?

5    A    Yes.

6    Q    Did that accurately describe the population problems

7    confronting you at the beginning of drawing the plan?

8    A    It did.

9    Q    Can you actually understand the drawing of the

10   state-wide plan by looking at any individual district's

11   population?

12   A    You cannot.

13   Q    So drawing every district affects every other

14   district?

15   A    It's a puzzle with a hundred pieces, and they have to

16   fit together precisely.

17              MR. BRADEN:  I'd like to bring up Defendant

18   Intervenors' Exhibit 62.

19              JUDGE PAYNE:  Does that have the zoom capability

20   on it?  Can you zoom in on that?

21              MR. BRADEN:  Yes, Your Honor, we can zoom in on

22   it.

23              JUDGE PAYNE:  If you can make it bigger, we can

24   see it better.  No, that reduced it.  We'll just look at

25   the book.

1    Q    Delegate Jones, can you tell us what is indicated in

2    this map?

3    A    These are the census results from 2010 on a

4    county/city population basis.

5    Q    And this, again, indicates some of the population

6    pressures in the line-drawing process?

7    A    Correct.  It's a percent change of population by

8    county.

9    Q    And I'd like to bring up Defendant Exhibit 63.  And

10   can you tell the Court what this exhibit is?

11   A    It's the same map, but it has the House districts that

12   were overlaid -- the benchmark House districts that were

13   overlaid on this.

14   Q    Again, it shows you the population problems and the

15   need to move districts?

16   A    It does.

17            MR. BRADEN:  I'd like to move the Court now to

18   regional maps.  I'd like to do Defendant Intervenors'

19   Exhibit 96 and 97.  In a way of explanation, the

20   Defendants' Exhibit 96 is a collection of four regional

21   maps.  It's map book one.  We have some ring binders,

22   large map books.  This is map book one.

23            JUDGE LEE:  What page number?

24            MR. BRADEN:  Well, it's the --

25            JUDGE LEE:  96.  I see it.  Thank you.

Jones - Direct

1           MR. BRADEN:  What map book one is simply -- we

2   start out with the four regional maps, and we'll move to

3   the regions, and I just wanted to get the Court the

4   opportunity to look at those.  It provides regional maps

5   for the Court.

6   Q    Delegate Jones, do you recognize these maps?

7   A    I do.

8   Q    Are they -- which regions are they?

9   A    This would be the -- part Southside and the

10  Petersburg/Dinwiddie area, and you can see on the far

11  right, you can see part of Hampton Roads.

12  Q    And if we can start on Defendants' Exhibit --

13  Defendant Intervenors' page four of 96 and 97, what area

14  of the state does this show us?

15  A    This is the Richmond area showing the 2001 districts

16  with the 2011 districts.

17  Q    These contain Districts 71, 69, 70, and 74?

18  A    That is correct.

19  Q    I'd like to go to Defendant Intervenors' Exhibit 37,

20  page one.  Delegate Jones, do you have that?

21  A    I'm there, yes, sir.

22  Q    What does this exhibit show you?

23  A    This shows you the current populations in the

24  benchmark districts.

25           JUDGE PAYNE:  Current as of when?

Jones - Direct

1          THE WITNESS:  The census, Your Honor.

2   Q    So, if we can begin with what has been the most talked

3   about district, House District 71, this is Defendant

4   Intervenors' Exhibit 56, page two, and Defendant

5   Exhibit 57, page two.

6          Can you tell us what this exhibit tells us in regards

7   to the Richmond area districts in regards to population --

8   A    This shows the voting-age population, which would be

9   on the first set -- the first numbers in the second column

10  would be the DOJ, which includes Hispanic black numbers

11  for the districts, and you can see in the 71st on

12  Exhibit 56, page two, that currently, according to DLS, it

13  was 46.3, but the DOJ black number that I was working with

14  was at 45.8.

15         That would be the district as it was configured when

16  the census was inputted into the Maptitude program for the

17  current district that existed as of 2010.

18  Q    So at the beginning of this process, House District 71

19  was significantly underpopulated?

20  A    Yes.  I believe it was over seven percent

21  underpopulated.

22  Q    And the benchmark black voting-age population was

23  above, just above or close to 46 percent?

24  A    That is correct.

25  Q    And according to the numbers that you were using, the

1  enacted black voting-age population in your new plan was

2  54.9?

3  A    That is correct.

4  Q    Are you familiar with where this district is?

5  A    I am.

6  Q    It's a district you can see outside your office?

7  A    I've got several connections to the district.  I

8  actually went to college there, MCV.  I think I'm

9  precinct -- I think five -- 605, I think.  I can't

10  remember, but my Capitol office actually is in the center

11  of that part of the district, and I have noticed over the

12  years the tremendous growth that has occurred since my

13  days at MCV in 1982.

14  Q    So has this, the demographic composition of this

15  district changed over the decade?

16  A    This part of the district, dramatically, yes, sir.

17  Q    Has it grown more white?

18  A    It has.

19  Q    So at the beginning of your line-drawing process, this

20  was no longer a majority-minority district?

21  A    That is correct.

22  Q    Did you have any reason to believe going into the

23  future this demographic change would not continue?

24  A    I felt it would continue if not accelerate.

25  Q    So was that part of the decision-making process as to

Jones - Direct

1    what the population, the black voting-age population of

2    this district should be?

3    A    It was.

4    Q    Did you hear anything from any member of the black

5    caucus arguing against that number in that district?

6    A    No one was comfortable with that number.  Nobody was

7    comfortable leaving that number at that district.

8              JUDGE PAYNE:  What number?

9              THE WITNESS:  Staying at the 46 percent black

10   voting-age population in the 71st district.

11             JUDGE PAYNE:  You mean people told you that?

12             THE WITNESS:  They felt -- I would say, Your

13   Honor, they felt that we needed to have a performing

14   majority-minority district, and from the members that I

15   spoke to, they felt that it needed to be north of

16   50 percent minimum.

17             JUDGE LEE:  Is that an objection?

18             MR. SPIVA:  I didn't want -- to interrupt.  I

19   move to strike that.  He's not identifying the person who

20   he's giving the hearsay testimony about, so hearsay

21   objection, Your Honor.

22             JUDGE PAYNE:  He's offering it, I gather, for

23   what reason?

24             MR. BRADEN:  I think it's pretty clear he's

25   offering it for how it informed his decision-making

Jones - Direct

1   process.

2           JUDGE PAYNE:  He's offering not for the truth of

3   the matter but for the views and how he got to 55 percent;

4   right?  Overruled.

5           MR. BRADEN:  We'd like to bring up our most

6   familiar map again of District 71.

7           THE WITNESS:  Okay.

8   Q   Were you present for the discussion, the testimony of

9   Delegate McClellan?

10  A   Yes.

11  Q   And do you remember some questions that were posed to

12  her about an email from you?

13  A   Yes, I do.

14  Q   And that was a discussion of violations or breaking

15  precinct lines and drawing a plan in Richmond?

16  A   Correct.

17  Q   Was that discussion over this district?

18  A   I would say it was more over the Richmond city.

19  Q   Was the discussion over the plan that was enacted but

20  vetoed that's identified as HB 5001?

21  A   Yes.

22  Q   And let me show you Defendant Intervenor Exhibit 6.

23  It appears in the transcript on page -- this is the video

24  clip, Defendant Intervenors' 6, and it's transcript page

25  two to page three.

Jones - Direct

1              JUDGE PAYNE:  The transcript is Exhibit 7?

2              MR. BRADEN:  Exhibit 7, yes, Your Honor.

3

4              (Video clip played.)

5

6    Q    Is that you speaking on the floor of the House?

7    A    It is.

8    Q    Does that video clip -- is that you addressing the

9    issue that was raised in those emails?

10   A    Yes, sir.

11   Q    So every issue that was raised in those emails about

12   splitting, to the best of your knowledge, were satisfied

13   in the changes from the 5005 plan?

14   A    To the best of my knowledge, yes.

15   Q    Do you have -- you used the --

16             JUDGE PAYNE:  Before you continue in another

17   vein, we'll just take the morning recess.  Be back at

18   11:45.

19

20             (Recess taken.)

21

22             NOTE:  After the morning recess is taken, the

23   case continues as follows:

24             JUDGE PAYNE:  Before you get started, we all have

25   sort of some clarification that needs to be made, and

Jones - Direct

1    Judge Lee is going to start the questioning.  So you will

2    mark your spot and then we'll get back to it.

3              JUDGE LEE:  Take us back to the exhibit that had

4    the spreadsheet of race including Asian and Hispanic.

5    What number was that?  Number 56, Defendants' 56.  No?

6              MR. BRADEN:  We're hunting for it right now, Your

7    Honor.

8              JUDGE LEE:  Okay.

9              JUDGE PAYNE:  I think you are looking at 60, the

10   one that was done by the Legislative Services using

11   AutoBound, and then there was another one about DOJ black,

12   because that's the one we're looking at.  Up there?

13             JUDGE LEE:  Yes.  Which one is that one?

14             JUDGE PAYNE:  That's 60.  Is that 60?  On

15   page 13.

16             JUDGE LEE:  Is that Plaintiffs' 60?

17             JUDGE PAYNE:  Yes, Plaintiffs' 60, it's in the

18   back there, in the back of our book.

19             MR. BRADEN:  Sure, Plaintiffs' 60, page 13.

20             JUDGE PAYNE:  We're confused a little bit about

21   the difference between what we understand the answer to be

22   and what the charts say, so help us out.

23             JUDGE LEE:  So who made -- can you tell us who

24   made this chart?

25             THE WITNESS:  That would have been the Division

Jones - Direct

1    of Legislative Services.

2                    JUDGE LEE:  Okay.  Is this -- are these the

3    numbers that you had that you submitted to them?

4                    THE WITNESS:  No, sir.  The numbers that I had

5    would be -- if I may, Your Honor.

6                    JUDGE LEE:  Please.

7                    THE WITNESS:  Would be I believe Exhibit 56.  And

8    if you look at the columns F, G, column F, that would be

9    the number that I saw when I was drawing the individual

10   districts on my computer using the Maptitude software.

11                   JUDGE LEE:  Hold on just one second.  I want to

12   turn back to 56.

13                   JUDGE PAYNE:  Page 2?

14                   THE WITNESS:  Yes, sir.  Excuse me, yes, sir,

15   page 2 and page 3, yes, sir, because they are the affected

16   districts.

17                   JUDGE PAYNE:  And it says up at the top:  DLS

18   includes Hispanic black.

19                   THE WITNESS:  Yes, sir.  Then if you look at --

20   let me put my glasses on.  If you look at on page 2, you

21   will notice that you have column C and then you have

22   column D and E, and then you have column F.

23                   And if you compare column C to column F, that

24   would in fact be the difference between what I was looking

25   at and what everyone else saw when they took my shape

Jones - Direct

1    file, which is just on a thumb drive, I took it down, that

2    was the bill, gave it to them in Legislative Services.

3    And then they put it into their system, in the geographic,

4    whatever those computers do, and it took and overlaid the

5    bloc assignment filing and it took all the assignments,

6    the district number, and put it in their computer.

7              So when they generated the map that was

8    Plaintiffs' Exhibit 60, that was from my data.  But I did

9    not have the data sets, Your Honors, that they had to do

10   the all black.  Mine was DOJ black.

11             And what I found after, had it been introduced, I

12   don't want to get too deep in the weeds, and I apologize,

13   and please cut me off if you need to--

14             JUDGE LEE:  No, we're trying to understand --

15             THE WITNESS:  Yeah --

16             JUDGE LEE:  Just one question.  You were using

17   DOJ black?

18             THE WITNESS:  That is correct.

19             JUDGE LEE:  Can you tell us what DOJ black

20   encompasses?  What racial composition does it encompass?

21             THE WITNESS:  It includes all black, black/white,

22   and excludes Hispanic partial black, as I understand it.

23             JUDGE PAYNE:  When you say black/white, you mean

24   multiracial?

25             THE WITNESS:  Yes, sir.

1           JUDGE PAYNE:  All right.

2           JUDGE LEE:  And then the Division of Legislative

3    Services, DLS, which is on Exhibit 56, page 2, what

4    software were they using?

5           THE WITNESS:  They were using AutoBound.

6           JUDGE PAYNE:  And they created that using the

7    information you gave them?

8           THE WITNESS:  Yes, sir.

9           JUDGE PAYNE:  Because you were using DOJ black?

10          THE WITNESS:  Correct.

11          JUDGE PAYNE:  All right.  Do you have any

12   questions, Judge Keenan?  Any more, Judge Lee?

13          I have one.  What then is 60?  What's the

14   significance of 60, Plaintiffs' Exhibit 60, I guess it is?

15          Is it just to show that the census numbers were

16   in error?  Is that the only purpose we're looking at 60

17   for?

18          Help me, Mr. Braden.  You all can -- it's not

19   fair for him to have to do it, but I don't understand why

20   we're using 60 then.

21          MR. BRADEN:  We used 60 to illustrate the problem

22   with the DLS number.  This is from --

23          JUDGE PAYNE:  In other words, not the census

24   data, but you had too many people, more than the total

25   population, and you were using this exhibit to show us

Jones - Direct

1   that that's what it was and, therefore, he had to do

2   something else, is that correct?

3           MR. BRADEN:  That is correct.

4           JUDGE KEENAN:  But you're not using it to draw

5   any highlights between the distinction between DOJ black

6   and black including Hispanics?  Or is that part of what

7   you're trying to illustrate here with regard to the

8   exhibit that's on the screen?

9           MR. BRADEN:  With regard to the exhibits on the

10  screen, I think what we're trying to do is to show the

11  reasonableness of using DOJ black and the sort of

12  misunderstanding at DLS as to the term "black voting-age

13  pop."  When you include -- and this is a little difficult

14  to follow sometimes.  But the census has race and

15  ethnicity.  So when you're just -- when you include

16  Hispanic black into the black population, you then

17  double-count them, they appear twice.

18          So that's when you just use the numbers

19  as they've got here -- well, to be candid with you, we're

20  probably ethnically principally talking about Puerto

21  Ricans.  If my memory is correct on this, is generally

22  Puerto Ricans often identify or a significant number of

23  Puerto Ricans identify as black Hispanic.

24          So they would get counted twice.  They would

25  check a box saying black and they would check another

Jones - Direct

1    block.  So the way it appears here is that they get

2    counted as two different people.

3            JUDGE PAYNE:  I think though what we're trying to

4    sort out is that you offered us Exhibit 60 to explain --

5    now I understand it to be two things.  One is you were

6    using Exhibit 60 to show that the census, that these, this

7    data was in error and to show the reasonableness of using

8    DOJ black, is that right so far?

9            MR. BRADEN:  One, we didn't create this

10   particular exhibit.  But we're using it not to show that

11   the census data is wrong.  The census data is correct.

12           JUDGE PAYNE:  Okay.

13           MR. BRADEN:  What is wrong is the use of the

14   census data.  Which is a mistake by DLS -- now, a minor

15   mistake, granted, but a mistake in DLS because when they

16   simply combined non-Hispanic black into it, they're

17   actually double-counting some people.

18           JUDGE PAYNE:  Okay.

19           MR. BRADEN:  So you come with more -- so this is

20   simply to illustrate basically that they made a mistake,

21   it was a minor mistake, granted, but it is a mistake.  And

22   these weren't the numbers he was using.  He was using a

23   system that the Department of Justice uses, and to his

24   understanding was the number that they look at.

25           JUDGE PAYNE:  All right.  Now, earlier I thought

Jones - Direct

1    Delegate Jones said that the Maptitude calculated using

2    only DOJ black.  Is that correct or not correct?

3              MR. BRADEN:  Well, actually the Maptitude system

4    could, if you wanted to, could show a number of different

5    fields.  With that --

6              JUDGE LEE:  What did you do, Delegate Jones?

7              THE WITNESS:  I only used the DOJ black.

8              JUDGE PAYNE:  And you were using what system to

9    do that?

10             THE WITNESS:  Maptitude.

11             JUDGE PAYNE:  Maptitude.

12             THE WITNESS:  Because, if I may, Your Honors,

13   when I was in Austin, it was clear that that's what the

14   Justice Department would be using for their calculation

15   for any preclearance map that would be submitted to them.

16             JUDGE PAYNE:  All right.  And it was AutoBound

17   that then included Hispanics within black, is that right?

18             THE WITNESS:  Yes, yes, sir.

19             JUDGE PAYNE:  Any questions, Judge Keenan?

20             JUDGE KEENAN:  No, thank you.

21             JUDGE LEE:  Sir, you have helped us greatly.

22   Thank you.

23             MR. BRADEN:  Thank you, Your Honor.

24             JUDGE LEE:  Just to understand it.

25             MR. BRADEN:  Don't feel bad.  I've got a bunch of

Jones - Direct                                                    303

1    lawyers back here who didn't understand it for quite a

2    long time either.  It is complicated to figure out.

3    BY MR. BRADEN:  (Continuing)

4    Q    If I could go to, back to our favorite map here.  If

5    you could look -- I believe you are obviously familiar

6    with this.

7         Does this map include the residence of the incumbent

8    members at the time the plan was adopted?

9    A    It does.

10   Q    And can you tell the Court how that information

11   informed your decision-making process?

12   A    Well, as you can see, and I will highlight it on the

13   screen --

14            JUDGE PAYNE:  Excuse me just a minute.  This is

15   what exhibit?  Is this 94, page 4?

16            MR. BRADEN:  Yes, 94.

17            JUDGE PAYNE:  Page 4.

18            MR. BRADEN:  Yes.

19            JUDGE PAYNE:  Use that instead of referring to it

20   as our favorite exhibit.

21            MR. BRADEN:  Yes.  My apologies, Your Honor.

22            And this is also in our Map Book, Map Book 1.

23   And we have it on a poster board.

24            THE WITNESS:  Okay to proceed?

25            MR. BRADEN:  As soon as --

Jones - Direct                                                    304

1              THE WITNESS:  I'm sorry.

2              JUDGE PAYNE:  Can you see it?

3              THE WITNESS:  Yes, sir, I can.

4              JUDGE LEE:  Restate your question.

5    BY MR. BRADEN:  (Continuing)

6    Q    Delegate Jones, does this map show the residence of

7    incumbent members at the time the plan was adopted?

8    A    It does.

9    Q    And how did their locations inform your decision

10   making in drafting the plan?

11   A    Well, as you can see, and I will circle it on the map,

12   Delegates McClellan and Carr live pretty much adjacent to

13   one another in adjacent precincts.

14        And if you look to your east, you will see that

15   Delores McQuinn lives in that precinct.

16        And so, it did influence where they lived with how I

17   could actually draw the map given the loss of population

18   in the Richmond area.

19   Q    Was one of your criteria to avoid the unnecessary

20   pairing of incumbents?

21   A    It was.

22             JUDGE LEE:  What were their party affiliations?

23             THE WITNESS:  They were all Democrats.  And two

24   of the three, if I might add, were African-American.  But

25   they are all three majority-minority districts.

Jones - Direct

1    BY MR. BRADEN:  (Continuing)

2    Q    It would appear that three precincts were removed from

3    the district from the northern end of the district.

4         Could you tell us why those particular precincts were

5    moved.

6    A    I was attempting to make it a more Richmond centric

7    district if possible.

8    Q    Were you here for the testimony of Delegate McClellan?

9    A    I was.

10   Q    Do you remember a discussion she had of an area called

11   The Fan?

12   A    I do.

13   Q    Are you familiar with that area?

14   A    I am very familiar with that area, yes, sir.

15   Q    Can you describe to the Court why that area is divided

16   up the way it is in the plan.

17   A    Well, if you look on the map, and I will point out

18   where Delegate Loupassi lives, he lives in what is the 1st

19   Ward of Richmond.  He used to be on City Council and was

20   actually the Council president.  And his former ward

21   abutted that precinct.  And that was a priority for him,

22   he wanted that precinct in his district.  And he is a

23   Republican member of the majority party.

24              JUDGE PAYNE:  He wanted which precinct in his

25   district?  What number?  111?

Jones - Direct

1              THE WITNESS:  I am sorry, Your Honor, I just

2       covered it up.  Can you erase this?

3              JUDGE LEE:  Usually there is a way to clear the

4       screen.  I am not sure.  Mr. Toliver, can you show him how

5       to clear the screen?

6              MR. BRADEN:  I have got it.

7              JUDGE LEE:  Oh, you did it.  Okay.  Thank you.

8              THE WITNESS:  That would be 207, Your Honor.

9              MR. BRADEN:  You can circle it again, I just

10      cleared it off.  It might be easier to spot.

11             JUDGE PAYNE:  He wanted 207 moved from The Fan to

12      his district?

13             THE WITNESS:  Yes, sir.

14             JUDGE PAYNE:  And where is that 207?

15             THE WITNESS:  207 --

16             JUDGE PAYNE:  I see it.  Where is it in the city?

17             THE WITNESS:  It is going to be on the Boulevard.

18      It's adjacent to VCU's main campus.  It's a very densely

19      populated multicultural --

20             JUDGE PAYNE:  It's from VCU to the Boulevard, did

21      you say?

22             THE WITNESS:  Approximately, yes, sir.

23             JUDGE PAYNE:  Okay.  And that had been his ward

24      when he was on the City Council?

25             THE WITNESS:  It had been adjacent to his ward.

Jones - Direct

 1   And I believe, Your Honor, he was concerned about getting

 2   too much of Chesterfield.  And he wanted more voters in

 3   the Richmond city area which would have been more

 4   favorable to him.

 5          JUDGE LEE:  You say he was Chair of the Council?

 6          THE WITNESS:  Yes, sir, he was.

 7   BY MR. BRADEN: (Continuing)

 8   Q    Would it be fair to describe this as a combination of

 9   politics and personal preference?

10   A    It would be.

11   Q    Was this driven principally by race?

12   A    No.

13          MR. SPIVA:  Objection, Your Honor.  I have let a

14   lot of the leading questions go without an objection, but

15   it's really kind of getting to be a lot.

16          JUDGE PAYNE:  You think that one was leading?

17          MR. SPIVA:  Yes, sir, Your Honor.

18          JUDGE LEE:  Questions that begin "did you" are

19   leading.  Stop it.

20          MR. SPIVA:  What's that, Your Honor?

21          JUDGE LEE:  Questions that begin "did you" are

22   leading, they suggest the answer.  Questions that begin

23   "what, how, or describe" are not leading.

24          MR. SPIVA:  I thought he asked was it presented

25   predominantly based on race, I maybe misheard.

1          JUDGE PAYNE:  Now you can answer the question.

2          THE WITNESS:  No.

3    BY MR. BRADEN:  (Continuing)

4    Q    But did you consider race in drawing this district?

5    A    Absolutely.  All the districts because of the criteria

6    in the Constitution and the supremacy clause of the

7    Constitution, our first two criteria were plus or minus 1

8    percent, and then compliance with the Voting Rights Act.

9    Q    Did your consideration of race in this district and

10   the drawing of this district require you to violate any of

11   the criteria adopted by the state?

12   A    No.

13   Q    Did you do anything to comply with the Voting Rights

14   Act that resulted in you violating any criteria in drawing

15   this district?

16   A    No.

17   Q    If we could move on to Defendant-Intervenors'

18   Exhibit 94, page 2.  And this is again in Map Book 1.

19        Delegate Jones, can you tell the Court where this

20   district is?

21   A    This is a Richmond city based House district.  It

22   mainly comprises on the Southside or the Manchester area

23   of the city, but it has a handful of precincts north of

24   the river.

25   Q    Is this district more Richmond centric now?

Jones - Direct

1    A    It is.

2    Q    And who represents this district?

3    A    Betsy Carr.

4    Q    And what is her race?

5    A    She is white.

6    Q    And what was the population of this district?  Did it

7    need to be increased in size?

8    A    Yes.  She was down almost 11 percent in population.

9    She had to pick up I think 8,700 individuals.

10   Q    So that would necessarily require increasing the

11   geography of the district?

12   A    It would.

13   Q    Is there anything in the creation of this district

14   that required you -- first, did you consider race in

15   drawing this district?

16   A    Yes.

17   Q    Is there anything in your consideration of race in

18   drawing this district that required you to violate any of

19   the state's adopted criteria?

20   A    No.

21   Q    Did your efforts to comply with the Voting Rights Act,

22   Section 2 or Section 5, result in you drawing any part of

23   this plan that doesn't meet the requirements of the

24   Virginia Constitution or the criteria adopted by the

25   House?

Jones - Direct

1   A    No.

2   Q    Can we head on to Defendants' Exhibit 94, page 3.

3   Again, this is in the Map Book.

4        Delegate Jones, can you identify this for the Court?

5   A    Yeah.  This is House District 70, which is a

6   majority-minority district.

7   Q    And was this district underpopulated at the beginning

8   of the process?

9   A    Actually, it was underpopulated, but it would have fit

10  within the plus or minus 1 percent.

11  Q    So you probably heard, I think the plaintiffs'

12  attorney suggested that that might mean you wouldn't have

13  to change that district.  Was that a conceivable process?

14  A    No, not in my opinion having drawn maps over a

15  ten-year period.

16  Q    That you would have to -- this process requires --

17  does it have a ripple effect?

18  A    Absolutely.  If you looked at the map we had earlier

19  about the changes in population shifts in the Commonwealth

20  by county, you can really take notice that the population

21  gains were in the suburbs.

22       And since both the 71 and 69 had about an 18 percent

23  need for population, they were underpopulated by probably

24  18, 19,000 people, there was certainly a need to get

25  additional population for those two districts.  And that

Jones - Direct

1    necessitated moving south and southwest and southeast a

2    little bit on this district.

3    Q    And if you could look at the map, can you identify the

4    residency of Delegate McQuinn?

5    A    I can.  And I will circle it on the map -- on the

6    screen, excuse me.  She lives right in the northern part

7    of the district.

8    Q    And how did that limit your line drawing process?

9    A    Well, had she not lived there, I could have actually

10   had all of the 71st District in the city of Richmond

11   because I could have taken these couple of precincts and

12   there wouldn't have been any going into the Radcliffe

13   precinct in Henrico County for 71.

14   Q    So one of the, am I correct, that one of the principal

15   factors affecting the shape of this district was the

16   residency of the incumbent?

17   A    Absolutely.

18   Q    And the population changes in this district -- and the

19   changes in this district are driven by population changes

20   in the surrounding districts?

21   A    Correct.

22          JUDGE PAYNE:  Delegate McQuinn is with what

23   party?

24          THE WITNESS:  Pardon me, I am sorry?

25          JUDGE PAYNE:  What's the party for Delegate

Jones - Direct

1    McQuinn?

2                THE WITNESS:  She is Democrat.

3                JUDGE PAYNE:  Is she -- what's her race?

4                THE WITNESS:  She is black.  And I might add, she

5    had served on the City Council prior to her going to the

6    House of Delegates.

7    BY MR. BRADEN: (Continuing)

8    Q    And to the best of your knowledge, does this district

9    generally meet her requests to the committee?

10   A    It did.  I actually sat down with her.  And I believe

11   every part of this district, I would say she was 95,

12   98 percent pleased with what the final product was.

13   Q    And she voted for the districts, passage?

14   A    She did.

15   Q    If we could move to Defendant-Intervenors' Exhibit 94,

16   and this is pages 5 and 6, this is in the Map Book, this

17   is District 74.

18   A    I'm there.

19               JUDGE PAYNE:  Which one are you all going to --

20   okay, you've got 5 on the board.  Okay.

21   Q    And just to get some population numbers, this is one

22   of the districts that was not significantly, one of the

23   few majority-minority districts that was not significantly

24   underpopulated?

25   A    I believe this was the only one that actually had a

Jones - Direct

1    positive population growth and didn't need any population

2    to meet the ideal number of 80,010 people.

3    Q    And what was the voting-age population of the

4    benchmark plan?  It's in Defendant-Intervenors'

5    Exhibit 56.

6    A    It was 62.7.  Which map was that?

7    Q    This would be District 74, Defendant-Intervenors' 56.

8    A    56.  Let me get to -- I have got a lot of different

9    charts up here.  So I apologize on that.

10              JUDGE PAYNE:  56 is not a map, I don't think.

11              MR. BRADEN:  No, it's a chart.

12              THE WITNESS:  It's a chart.  I just want to get

13   to it, Your Honor.

14              Okay.  The benchmark plan, it was 62.2, DOJ

15   black.

16   BY MR. BRADEN: (Continuing)

17   Q    And the enacted voting age, the black voting-age

18   population of the enacted plan?

19   A    56.8, DOJ black.

20              JUDGE PAYNE:  How much?

21              THE WITNESS:  56.8, Your Honor.

22              JUDGE PAYNE:  Are we talking about 74?

23              THE WITNESS:  Yes, sir, 74.

24              JUDGE LEE:  What page are you reading from?

25              THE WITNESS:  I'm sorry?

Jones - Direct

1          JUDGE LEE:  What page are you reading him?

2          THE WITNESS:  Okay.  I went to Exhibit 57,

3   Defendant-Intervenors' Exhibit 57.

4          JUDGE LEE:  Oh, okay, we were looking at 56.

5          THE WITNESS:  Page 2.  My apologies.

6          JUDGE LEE:  No, no problem.  I just want to make

7   sure we're on the same page.  Hold on.  Give us a minute

8   to digest this, please.

9          JUDGE PAYNE:  Now, help me again, we are in 74,

10   population 60,487.  And then you're going to DOJ --

11          THE WITNESS:  Yes, sir, DOJ black.

12          JUDGE PAYNE:  And that is 56.8 percent?

13          THE WITNESS:  Yes, sir.

14          JUDGE PAYNE:  But where did you get the 62.2?

15          THE WITNESS:  I'm sorry, Your Honor, if I may.

16   That was the benchmark plan as it existed with the census

17   numbers for the existing House district.  And that was in

18   Exhibit --

19          JUDGE PAYNE:  That was on Exhibit 56?

20          THE WITNESS:  Yes, sir.

21          JUDGE PAYNE:  And under the column DOJ black, F,

22   right?

23          THE WITNESS:  Yes, sir.

24          JUDGE PAYNE:  So we have to read 56 to get the

25   benchmark.  And then the other, the 5005, the House bill

Jones - Direct

1    at issue is 57?

2          THE WITNESS:  Yes, sir, 56.8.

3    BY MR. BRADEN: (Continuing)

4    Q    So a reduction of approximately five-and-a-half black

5    voting-age pop?

6    A    Right.

7    Q    Who represented this district at the time it was

8    enacted?

9    A    Oh, gosh.  In 2011?

10   Q    Yes.

11   A    Jim Morrissey.  I just want to be clear because I have

12   done two of them and I want to make sure I'm answering the

13   question.  Joe Morrissey.

14   Q    And what was his race?

15   A    White.

16   Q    Does this -- you seemed to stumble a little bit about

17   which district this was.  Is this district substantially

18   the same as the prior district?

19   A    The prior district and the one prior to that.  This is

20   essentially in the format that it was in 1991 I believe

21   when it was created.

22   Q    Maybe I can help you.  If we could bring up

23   Defendants' Exhibit No. 14, page 60.

24          This is Defendants' Exhibit 14, page 60.

25          Delegate Jones, have you seen these maps before?

Jones - Direct

1    A    I have.

2    Q    And can you just briefly tell the Court what these

3    maps are.

4    A    The top map was the map as instituted in the House

5    bill back in 1991.

6         And then the middle map was the map that was created

7    in Chapter 1 in the 2001 session.

8         And then the bottom map is the enacted map in House

9    Bill 5005.

10   Q    And can you briefly tell the Court, do you remember --

11   you do remember the *West v. Wilkins* litigation?

12   A    Yes.

13   Q    Am I correct that there is part of this district that

14   was criticized by the plaintiffs?

15   A    Yes, sir.  If I may, if you look at the 2001 district,

16   and I will circle this on the computer screen, you can see

17   right here there are several precincts, it is part of the

18   map that jumps across the James river.  And in the *West v.*

19   *Wilkins* case there was, when they are looking at

20   compactness and contiguity, there was an issue -- they

21   approved this, but they did denote the crossings of the

22   James River, river crossings, I would use that term.

23        And so, one of my personal goals when I started the

24   process of constructing the map in 2011 was to unwind the

25   two river crossings that had occurred in 2001.  One was in

Jones - Direct                                                    317

1    House District 64 and the other was in House District 74.

2          So, in essence, what I do, we took the two precincts

3    out of the House District 74, and we thickened the neck --

4    if I can show you on the screen, right here, with about

5    four or five precincts in 2011.

6          So we did make changes, brought it back across the

7    river, which I thought was the right thing to do to that

8    district.  But essentially it sits as it did in 1991, its

9    general configuration.

10   Q    Did race have anything to do with the changes about

11   the crossing of the rivers?

12   A    None.

13   Q    To use your words, the thickening of the neck, did

14   that have anything to do with race?

15   A    No.  Actually, I put some more good Republican

16   precincts in there that the gentleman in the 97th did not

17   want to lose, quite frankly.

18   Q    Do you know when Delegate Morrissey was first elected?

19   A    I believe it was 2005, or it could have been 2007.

20   Q    If I could bring up Defendant-Intervenors' Exhibit 93,

21   and pages 44 and 45.

22         Delegate Jones, were you able to get those pages up?

23   A    I am here, yes.

24   Q    Can you tell the Court what that is.

25   A    These are the official results from the June

Jones - Direct

1   Democratic primary in 2007.

2   Q    And to the best of your recollection, that's the first

3   time he was elected to the legislature?

4   A    That is correct.

5   Q    And what was -- was it a multi-candidate race?

6   A    It was a five-way race, yes, sir.

7   Q    And do you know the race of the four other candidates?

8   A    I believe they were African-American.

9   Q    And his percentage of winning vote?

10  A    Was 37 percent.

11  Q    I'd like to move on to -- well, before I move on, I

12  don't want to miss any of my districts here.

13       Did you use race in the drawing -- did you use race in

14  the drawing of this district, consider race?

15  A    I considered race.

16  Q    And did your use -- did your use of race require you

17  to violate any of the state criteria as adopted by the

18  legislature or the state Constitution?

19  A    No.

20  Q    Did your efforts to comply with the Voting Rights Act

21  require you to make any changes in this district?

22  A    No.

23  Q    Is this politically and racially the same district

24  that's been in place since 1991 fundamentally?

25  A    From my perspective, yes, it is.

Jones - Direct                                                    319

1   Q    Okay.  So I would now like to move to Southside.  And

2   if we could bring up Defendants' Exhibit 96 and 97.  And

3   this is page 1 of the Map Book.  It's in Map Book 1.

4        So it's Defendants' Exhibit 96 and 97.  And these are

5   regional maps that are in Map Book 1.

6        So can you --

7   A    Bear with me.  I have got too much stuff going on up

8   here.  I apologize.  Page 1?

9   Q    Yes.  This is the Map Book 1, 96 and 97.  This is

10  Southside.

11  A    Got it.

12  Q    And what is Southside?

13  A    Southside is going to be your counties like Sussex,

14  Southampton, Brunswick, Emporia, Greensville.  Isle of

15  Wight is considered just on the fringes of it.

16  Southampton would be part of Southside.  Otherwise known

17  as Western Tidewater to many that live down in that area.

18  Q    Probably to those people who live in Tidewater.

19  A    Yes, right.  Yeah, because you have Hampton Roads to

20  the east.  But this would be what I call Western Tidewater

21  and Southside.

22  Q    Can you tell the Court how population changes in this

23  area affected your line-drawing process.

24  A    Yes.  I believe the 63rd and the 75th had -- I think

25  the 75th was almost 12 percent underpopulated, which meant

Jones - Direct

1    they needed 9,500 individuals.  And the 63rd needed about

2    6,300 individuals.

3         So between the two of them, they had a need of almost

4    20, over 20 percent of population influx.

5    Q    So that would require increasing the size of these

6    districts to bring in additional population?

7    A    Geographically you would have to expand, especially in

8    the rural -- I mean, outside of Petersburg city and

9    Emporia, there is not a concentration really of population

10   until you get to Franklin City.

11   Q    Can we go to Defendant-Intervenors' Exhibit 94,

12   page 7.  And this is our proverbial yellow map of District

13   75.

14   A    Yes, sir.

15   Q    Page 7 of Defendant-Intervenors' Exhibit 94.

16        And who represented this district at the time it was

17   drawn?

18   A    Delegate Tyler.

19   Q    And how much was this district underpopulated?

20   A    Almost 12 percent.

21   Q    Again, to assist the Court, this is -- the

22   underpopulation is Defendants' Exhibit 37.  And the

23   benchmark numbers for black voting-age pop is Defendants'

24   Exhibit 56.  And enacted pop is Defendants' Exhibit 57.

25        As we go through all -- I should have done --

Jones - Direct                                              321

1    obviously I should have done this at the beginning to make

2    it easier for the Court.

3        Can you tell the Court what the benchmark black

4    voting-age population of this district was?

5    A    It was 55.1 DOJ black.

6    Q    And what the enacted black voting-age population was?

7    A    55.2.

8    Q    My addition on this one is simple, that's one-tenth of

9    1 percent change?

10   A    That would be correct.

11   Q    I would like to bring up Defendants' Exhibit 41.

12            JUDGE PAYNE:  Excuse me just a second.

13   Representative Tyler is what party?

14            THE WITNESS:  She is Democrat.

15            JUDGE PAYNE:  And what race?

16            THE WITNESS:  She is African-American.

17            JUDGE PAYNE:  All right.

18            MR. BRADEN:  We would like to go to a video clip

19   from Plaintiffs' Exhibit 41.  And this will also be on the

20   transcripts Plaintiffs' Exhibit 40, pages 38 to 39.

21            JUDGE LEE:  Just a second.

22            JUDGE PAYNE:  Ready?

23            JUDGE LEE:  Yes.

24            JUDGE PAYNE:  Okay, we're ready.  Thank you.

25            NOTE:  The video is played.

Jones - Direct

1   BY MR. BRADEN: (Continuing)

2   Q    Delegate Jones, were you present for this speech?

3   A    I was.

4   Q    And what did you understand to be Delegate Tyler's

5   problem with the district?

6   A    Well, if I may, she and I had met probably half a

7   dozen times to configure her district as she felt it

8   needed to be configured for her best chance for

9   re-election, best chance to elect a candidate of their

10  choice for her district.  And she was worried about too

11  low of a black voting-age population for her to be able to

12  be successful in an election.

13          JUDGE PAYNE:  It was too low because the

14  population count included 8,100 prisoners?

15          THE WITNESS:  Yes, sir.  That was the concern

16  that she raised.

17  BY MR. BRADEN: (Continuing)

18  Q    And what were the constraints on you addressing her

19  concerns since she needed to obviously add significant

20  population?

21  A    Well, I was under the impression that she was actually

22  going to be voting for the bill until she stood up on the

23  floor.

24          And if you look at the map, if I may, -- I don't know

25  if the map is up.  If you look at the North Carolina

1   border, we certainly couldn't go south.

2        And if you look to your north, we got population from

3   the north in Dinwiddie County right here.  I'm circling

4   that on the map.

5        And then what I had left then was a need for

6   additional population.  So you can see one of the criteria

7   was respecting jurisdictional boundaries.

8        And if I can for the Court, if you look in the bottom

9   left corner right there, the bright yellow, we made that

10  county whole.

11       And then we had two other counties whole until she

12  made a request between House Bill 5001 and 5005.  And I

13  will point that out for you now if it's okay.

14       If you see here, the Dendron precinct and then the

15  Wakefield precinct, she requested that we swap those two

16  out.  So we did.

17  Q   And that swap was in the hope that she would vote for

18  the bill?

19  A    Correct.  But she had real concerns.  And I recall

20  vividly because, you know, the VA Pilot, which is our

21  local paper, used to cover Western Tidewater, much more

22  than they do now due to their cuts in staffing, and I

23  remember the primary election and the general election

24  election when she ran in 2005.  In a five-way race in a

25  primary with two Caucasians, she won by less than 300

Jones - Direct

1    votes.

2        And then in the general election in 2005, one-on-one

3    with a Caucasian, she won, didn't break 51 percent.

4    Q    Let me ask a broader question.  I don't want to move

5    too much off track on the district-by-district narrative,

6    but you brought up a discussion.

7        Is it correct that most of the districts involved you

8    talking to individual members and many of changes are

9    based upon their individual member requests?

10   A    I talked to at least 75 to 80 of the individual

11   members.

12   Q    So this is an example of you making a change at a

13   member request?

14   A    Yes, sir.

15   Q    And that was in the hope of getting her vote?

16   A    Correct.

17            JUDGE LEE:  You mentioned that you changed

18   Dendron.  What other precincts did you mention?

19            THE WITNESS:  Wakefield.

20            JUDGE LEE:  Wakefield.

21            THE WITNESS:  And if I may, she only got, there

22   was like five or six precincts in 2005 in the primary she

23   didn't break double digits.  She only got like five votes,

24   seven votes or eight votes.  Wakefield is one of those,

25   which is right here circled.

1           And then below that right here is Berlin.

2           And then there were two precincts in Franklin

3    City, the 1st Precinct and the 6th Precinct, where she got

4    less than 20 votes combined I think in those two

5    precincts.

6           JUDGE PAYNE:  So you took Wakefield away from the

7    original plan and substituted in its stead Dendron?

8           THE WITNESS:  Yes, sir.

9           JUDGE PAYNE:  And she did gotten -- had performed

10   poorly in Wakefield in the preceding election?

11          THE WITNESS:  That's correct.

12          JUDGE PAYNE:  Why did you choose Dendron?

13          THE WITNESS:  It was next to it.  And I can't

14   recall, but that's one she requested.  I would have never

15   done that had it not been requested because I wanted to

16   split as few jurisdictional boundaries as I could, that

17   was important at the end of the day.

18   BY MR. BRADEN:  (Continuing)

19   Q    If I could ask you another very specific question.

20   There seems to be, for want of a better description, a

21   little hand up at the northern part of this district.

22          Could you point that out to the Court on the map and

23   explain to them the reasoning behind that.

24   A    Yes.  That was negotiated between Delegate Dance,

25   Delegate Tyler, and myself.  I would have never drawn that

Jones - Direct

1   finger.

2        The New Hope precinct -- if you can clear the screen

3   for me.  If you look at the New Hope precinct, which is

4   right here, it is directly adjacent to the city of

5   Petersburg.  And Delegate Dance, then Delegate Dance had

6   represented the city of Petersburg as mayor previously,

7   and I believe a tremendous amount of her employees or

8   constituents had family in that New Hope precinct, and she

9   did not want to give up that precinct, that was very, very

10  important to her.

11       And if my recollection is correct, she had a potential

12  primary opponent she wanted to draw out of her district.

13  Q   Was there significant discussion between those two

14  delegates and yourself over the line dividing those two

15  predicts?  They do abut, correct?

16  A   There was.  And I would note that that line did not

17  change between 5001 and 5005, that just stayed the same.

18       And that would be the bulk of, if I may, the bulk of

19  the splits in her district are right there.  And if I can

20  show the Court, we followed the Interstate 85 line,

21  highway boundaries here.  And I forget what the other

22  route number is a little bit north, but we did follow a

23  reasonable route as far as the road and interstate.

24  Q   Did you consider race --

25           JUDGE PAYNE:  In the original plan that you drew,

Jones - Direct

1   New Hope was in her district, Tyler's district?

2            THE WITNESS:  No.  It was in -- excuse me, it was

3   in Delegate Dance's district.  And that was important to

4   her because of its juxtaposition to Petersburg.

5            JUDGE PAYNE:  And keeping New Hope thus resulted

6   in the finger or the hook that appears up there near

7   Rohoic?

8            THE WITNESS:  Yes, sir.  Because I would have put

9   New Hope, quite frankly, in the 75th to have a more normal

10  shape.

11  BY MR. BRADEN: (Continuing)

12  Q    Delegate Jones, did you consider race in drawing this

13  district?

14  A    I did.

15  Q    Did that consideration of race require you to draw a

16  district that violated Virginia Constitution or any of the

17  adopted criteria?

18  A    No.

19  Q    Did your consideration of compliance with the Voting

20  Rights Act as you understood it require you to draw a

21  district that violated any of the state criteria or state

22  Constitution?

23  A    No.

24  Q    If we could move -- if we could move to District 63,

25  Defendant-Intervenors' Exhibit 94, page 1.  And I will try

Jones - Direct

1   to truncate this since we obviously don't need another

2   question about the finger.

3       Correct that this is a map of Senator Dance's old

4   district?

5   A    It is.

6   Q    Can you tell the Court whether this district was

7   underpopulated at the beginning of this process?

8   A    It was.

9   Q    Significantly?

10  A    Yes.  It was above 7 percent, maybe almost 8, I can't

11  remember, but I think that's right.

12  Q    And the bench voting age -- the black voting-age

13  population, the benchmark plan, which is on Defendants'

14  Exhibit 56 --

15  A    Was 57.7.

16  Q    And the enacted voting-age population, Defendants'

17  Exhibit 57?

18  A    Was 59.

19  Q    So her district needed to be expanded?

20  A    Correct.

21  Q    Can you briefly tell the Court about the expansion of

22  her district.

23  A    Yes, I can.  I took -- we went to the west -- we went

24  east, I mean, northeast to pick up the precincts in the

25  city of Hopewell that had previously been in House

Jones - Direct

1    District 74 that crossed the river.  And we put Ward 6,

2    Ward 2, and I think we split Ward 1.  And we put in

3    several precincts from Prince George County.  And that

4    gave her the population necessary to comply with the plus

5    or minus 1 percent.

6    Q    So, excuse me -- I highlighted an area.  Is that the

7    area that you removed from Morrissey's district to solve

8    the water crossing problem?

9    A    Yes, sir, that is.

10   Q    So the addition of this is in fact an effort to solve

11   a problem in another district that you perceived?

12   A    Correct.  And if I may, if you look at -- I can

13   probably do it here.  If you look right here, you can see

14   this is Interstate 295.  And that's the connector, Rives,

15   Courts Building, et cetera.

16   Q    And am I correct that now Senator Dance but then

17   Representative Dance voted for this plan?

18   A    She did.  She actively supported it and spoke on the

19   floor several times, to my recollection.

20   Q    And she played a very significant role in the drafting

21   of this district?

22   A    She did.  She had responsibility for the Richmond

23   area, Petersburg, Southside.

24   Q    And you needed her political support to pass the plan

25   probably?

Jones - Direct

1    A    I felt it very important that we have support of the

2    African-American caucus, black caucus.

3    Q    We can now move to the Norfolk/South Hampton Roads

4    area.  And this would be four districts, and we will look

5    at the regional maps 96 -- Defendant-Intervenors' 96 and

6    Defendant-Intervenors' 97, page 3.

7    A    Okay.

8    Q    Delegate Jones, do you recognize this area?

9    A    I do.

10   Q    And can you tell the Court what of the challenged

11   districts that are in this area?

12   A    Yes, there are four.  You have got on the map to the

13   right, you have got the 77th, which is here.  You have got

14   the 80th, which is here.  You have got the 89th, which is

15   here.  And the 90th, which is here.

16             So they are all really side by side.

17   Q    And is this an area of the state that has some

18   population pressures on the line-drawing process?

19   A    And I want to be clear, Hampton Roads had tremendous

20   population pressures for the greater Hampton Roads, but

21   Southside Hampton Roads or South Hampton Roads, which is

22   below the James River, had the loss of over one seat, we

23   lost over 1., I think it was 1.1 or 1.08 seats in

24   population.

25   Q    Maybe I could help you if we brought up

1  Defendant-Intervenors' Exhibit 72.

2  A    Okay.

3  Q    Do you recognize this exhibit?

4  A    I do.

5  Q    And how does this -- what does this illustrate for the

6  Court and how does it help the Court?

7  A    It demonstrates the population pressures that were

8  placed on South Hampton Roads as I mentioned earlier.  In

9  the 75th you had North Carolina to your south, which you

10  still have here.  We have the Atlantic Ocean to our east.

11  And we have the Chesapeake Bay/James River to our north.

12       So we were constricted from my perspective from going

13  across the river.  And so, you can see that of all the

14  districts that are listed, you can see the blue to the

15  left, that is 76.  That is in fact my district.  I was the

16  only district that had any significant population that

17  exceeded what the number needed to be, so I had to give

18  population back in certain cases.  And so, in essence, had

19  to fold away House District 87, which is at the top of the

20  map, where it says 87, minus 10.63 percent.

21  Q    Essentially the district had to disappear, so it had a

22  ripple effect, is that correct?

23  A    It had to, otherwise we would have had fingers that

24  would have strung out for miles and miles.

25            JUDGE LEE:  Go over that again.

Jones - Direct

1           THE WITNESS:  Yes, sir.  If you look at the --

2     I'll do it on the screen, Your Honor.  Right here is

3     District 87.  And the entire population loss in this area

4     starting like here back was over 80,000 people.

5           So, in essence, we had to lose a seat because we

6     didn't have the population to support the number of seats

7     that we had previously.

8           And just as a side note in 2001, two seats moved

9     from the Norfolk area to Northern Virginia.  So 14 years

10    ago there were five seats in Norfolk, and now there is

11    only two.

12    BY MR. BRADEN:  (Continuing)

13    Q    Safe to assume that when there are too few seats left,

14    there are some unhappy members in the area?

15    A    That's correct.  And that's why I started off on the

16    floor that day about the population, demographic shifts in

17    the Commonwealth.  I couldn't make up what wasn't the

18    truth, and we lost population to Northern Virginia.

19    Q    If we could go to Defendant-Intervenors' Exhibit 94,

20    page 8 and page 9.  And this is District 77.  And this is

21    obviously in the Map Book 1.

22          Can you tell us who represented this district?

23    A    Delegate Lionel Spruill.

24    Q    And can you tell us how much this district was

25    underpopulated?  Defendants' Exhibit 37 should have that

Jones - Direct

1   information.

2   A    It needed about 3,000 people.

3   Q    And what was the benchmark voting-age pop black?

4   A    I will go back.  It was 57 percent.

5   Q    And what was the enacted black voting-age pop?

6   A    58.2.

7   Q    The change was 1.2 percent?

8   A    That would be correct.

9          JUDGE PAYNE:  Delegate Spruill's party is what?

10         THE WITNESS:  He is Democrat and he is

11  African-American, Your Honor.

12  BY MR. BRADEN:  (Continuing)

13  Q    I would like to at this time bring up Plaintiffs'

14  Exhibit 37.  And the transcript is -- did I say 37?

15  Plaintiffs' Exhibit 34, which is a video clip.  And the

16  transcript of this video clip appears at Plaintiffs'

17  Exhibit 33, pages 34 through 38.

18         NOTE:  The video is played.

19  BY MR. BRADEN:  (Continuing)

20  Q    Delegate Jones, were you present for the speech?

21  A    I was.

22  Q    Are you familiar with the concern he expressed in the

23  division in earlier plans of Chesapeake?

24  A    I am.

25  Q    This is -- you have an adjoining district to this

Jones - Direct

1    district?

2    A    We share, we have the most geographical area that we

3    share between the 77th and the 76th, that is correct.

4    Q    Do you believe this plan addressed that concern?

5    A    It did.  And if you look -- if we get the map out,

6    I'll demonstrate.  I think there was a comment made

7    yesterday about how it got longer.

8         Well, of course it got longer because the gentleman

9    from Chesapeake, Delegate Spruill, requested that we

10   reunite the old city of South Norfolk.

11   Q    Can you highlight that on the map?  If you could

12   highlight it possibly.

13   A    I will show it.  Right here.

14             JUDGE PAYNE:  We are on page 8 of Intervenors'

15   Exhibit 94?

16             MR. BRADEN:  Yes, Your Honor.

17             JUDGE LEE:  Say that again.  He wanted to

18   reunite --

19             THE WITNESS:  He wanted to reunite what was the

20   old city of South Norfolk.  The city of Chesapeake was

21   formed back 50 or 60, 50-or-so years ago from the county,

22   Norfolk County and South Norfolk.  And so the precincts --

23             JUDGE LEE:  I am sorry, slow down, you're going

24   really fast.

25             THE WITNESS:  I'm sorry.

Jones - Direct

1          JUDGE LEE:  Chesapeake was created from South

2    Norfolk and Norfolk.

3          THE WITNESS:  South Norfolk and Norfolk County,

4    part of Norfolk County, I believe.

5          JUDGE LEE:  Thank you.

6          THE WITNESS:  And if you look at the Tanglewood,

7    Oaklette, Norfolk Highlands, and Indian River, they are

8    all in the city of Chesapeake, and they were all part of

9    South Norfolk.

10          And so, what I did was give those four precincts

11    here that I circled, I took them out of the 90th and gave

12    them to Delegate Spruill.

13          And then I took, if you look to the left, the

14    yellow Johnson Park, that was in the 80th, so I took those

15    five precincts and combined them at the request of

16    Delegate Spruill for compactness, contiguity, community of

17    interests, and the like.

18          And the last thing I will show you, and I will

19    stop to answer some of the questions, you can see Delegate

20    Spruill actually lives right on the edge of the district

21    in the Providence precinct, I think.

22    BY MR. BRADEN:  (Continuing)

23    Q    Would it be an -- we have an inset of this map on

24    page 9 that might assist the Court in the smaller details.

25    A    Okay.

Jones - Direct

```
 1   Q    Would it be fair to say this new plan unites Delegate
 2   Spruill with a significant part of the neighborhood he
 3   lives in?
 4   A    Absolutely.
 5   Q    So there is no surprise that he wanted this section?
 6   A    Not at all.
 7   Q    What's at the western edge of this district?
 8   A    A pretty Republican precinct called Airport.
 9   Q    Where did that go?
10   A    It went into my district.
11   Q    That was good for you politically?
12   A    Correct.
13              JUDGE LEE:  Can you highlight Airport?  Is that
14   on the screen?
15              THE WITNESS:  Yes, sir, I will.
16              JUDGE PAYNE:  They have got a different map up.
17   Page 8 is up.  Airport is over to the left.
18              JUDGE LEE:  Page 8.  Oh, I see it now.  Thank
19   you.
20              So you drew your own line to add more to your
21   district?
22              THE WITNESS:  Pardon me?
23              JUDGE LEE:  You drew your own line to add more to
24   your district?
25              THE WITNESS:  Yes, sir.  I actually drew my
```

Jones - Direct

1    district at the very last, I believe I was number 100.

2              JUDGE PAYNE:  Which ones were added at Spruill's

3    request?  Tanglewood, Norfolk Highlands, and Indian River?

4              THE WITNESS:  Yes, sir.  Oaklette.

5              JUDGE PAYNE:  And Oaklette?

6              THE WITNESS:  Yes, sir.  And Johnson Park.

7              JUDGE PAYNE:  And he lives right at the border of

8    where Norfolk Highlands is and very near Oaklette and

9    Indian River?

10             THE WITNESS:  Yes, sir, he does.

11   BY MR. BRADEN: (Continuing)

12   Q    Delegate Jones --

13             JUDGE PAYNE:  I think this is probably as good a

14   place as any to break for lunch.  So we will resume at

15   2 o'clock.

16             NOTE:  At this point a lunch recess is taken;

17   whereupon the case continues as follows:

18             JUDGE PAYNE:  All right, sir.  I remind you,

19   Delegate Jones, you are under the same oath that you took

20   earlier today.

21             THE WITNESS:  Yes, sir.

22   BY MR. BRADEN:  (resuming)

23   Q    Delegate Jones, good afternoon.

24   A    Yes, sir.

25   Q    We're talking about District 77.  I am correct that

Jones - Direct

1    you are in the adjoining district?

2    A    That is correct.

3    Q    So one of the predominate factors in the lines of

4    Representative Spruill's district is their impact on you.

5    A    Correct.

6    Q    Let me ask you some questions.  Did you consider race

7    in drawing this district?

8    A    I did.

9    Q    Did your consideration of race require you to violate

10   any of the Virginia constitutional provisions or any of

11   the criteria adopted by the State of Virginia in drawing

12   this line?

13   A    It did not.

14   Q    Did your effort to comply with the Voting Rights Act

15   require you to draw this line in any manner that violated

16   either Virginia, the Virginia constitution, or the

17   criteria as adopted by the House?

18   A    No.

19   Q    I'd like to move now to Defendant Exhibit 94, page 12.

20   This is District 90 in the map books.  Delegate Jones, can

21   you tell the Court who was the representative from this

22   district when this plan was drawn?

23   A    Delegate Algie Howell.

24   Q    And can you tell the Court -- and again, these are the

25   same exhibits to help you, Defendant Intervenor 37, for

Jones - Direct

1  how much this district was underpopulated?

2  A    It was underpopulated by 11 point -- north of

3  11 percent.

4  Q    And this is the Defendant Intervenor Exhibit 56, and

5  the benchmark black voting-age population was?

6  A    For 90 was 56 percent.

7  Q    And the enacted voting-age population which is in

8  Defendant Exhibit 57?

9  A    Was 55.6.

10  Q    So the enacted plan had a marginally less voting-age

11  population; is that correct?

12  A    That would be correct.

13  Q    And how much input did you get in drawing this plan

14  from Delegate Howell?

15  A    I received extensive input from Delegate Howell and

16  then-Delegate Alexander.

17  Q    And is Delegate Howell an African American?

18  A    He is.

19  Q    And can you provide to this Court information about

20  the -- about how you drew the plan at the request of

21  Delegate Howell?

22  A    Yeah.  I can.  I think it might be helpful to explain

23  what was happening in the population if we can get the

24  regional map before and after.

25  Q    Yep, I think we can find you the regional map for this

Jones - Direct

1    area.  Does that one assist -- it's the other one.  I
2    think these are Defendant Intervenors' 96 and 97, if that
3    would assist you.
4    A    If you notice on, I think it's 96, you can see in the
5    purple or right here, that's District 87, and that
6    district went to northern Virginia.  So that caused -- on
7    the map to the left, you can see the green here, that
8    caused District 83 to go this way, and then House District
9    100 came down over here, and then that left really this
10   population here for Norfolk generally like this.
11        So when I had to draw House District 90, of course it
12   needed about 9,000 individuals to get to the ideal
13   population, and as I just mentioned, House District 77 on
14   the map that's on the easel there, we took four precincts
15   which were Oaklette, Tanglewood, Norfolk Highlands, and
16   Indian River out of the 90th.  So 90 picked up population
17   that used to be in the 87th in the city of Norfolk.
18   Q    Would it be useful for us to go back?
19   A    Yes, it would be.  I thought it was important to show
20   what happened to the general population shifts in that
21   region.  So as you can see here, I went north to pick up
22   population out of parts of 87, had dropped this portion
23   that was in Chesapeake, and then they picked up additional
24   voters in Virginia Beach which they were already in --
25   Q    I don't want to interrupt, but the part in Chesapeake

1    is basically what we talked about just before lunch?

2    A    That is correct.  And then they picked up over here in

3    the Baker side, like you go to the Hampton Roads -- I mean

4    to the Chesapeake Bay Tunnel, we added these two precincts

5    to it.

6        So it got a little geographically larger, I guess

7    might be the term, but it needed about 9,000 people to get

8    to the ideal population.

9            JUDGE PAYNE:  So on page 12 of Exhibit 94, you

10   added Tanner's Creek, Sherwood School, and Coleman Place

11   School; is that right?

12           THE WITNESS:  Yes, sir.

13           JUDGE PAYNE:  You've got circles around other

14   areas, but are those the only ones that were added in that

15   area?

16           THE WITNESS:  Yes, sir, in that area.

17           JUDGE PAYNE:  Then over on the far side, you

18   added Davis Corner, and does Davis Corner go around

19   Newtown?  It looks like it's cut off by Newtown.

20           THE WITNESS:  I believe, Your Honor, that is part

21   of Baker precinct, because the Baker precinct was split

22   back in 2001.

23           JUDGE PAYNE:  Which part of Baker?

24           THE WITNESS:  Right here.  I believe this is part

25   of Baker, part of this.

1          JUDGE PAYNE:  So the part north of Newtown is

2    really part of Baker, not part of Davis Corner.

3          THE WITNESS:  I believe so.

4          JUDGE PAYNE:  And you added Davis Corner to

5    District 90.

6          THE WITNESS:  Correct, yes, sir.

7          JUDGE PAYNE:  Did you add that part that's

8    circled above it at the tip also to 90 from 87?

9          THE WITNESS:  I believe that might have come from

10   83.  I have to go back and look at a comparison, but it

11   came either from 83 or 87.

12         JUDGE PAYNE:  And then you added down at the

13   bottom Sherry Park and College Park.

14         THE WITNESS:  Yes, sir, that's correct.

15         JUDGE PAYNE:  What did you say about -- that part

16   of Tanglewood and all that went to 70.

17         THE WITNESS:  Yes, sir.  That was part of the

18   request of Delegate Spruill.  That would be the south

19   Norfolk area.

20         JUDGE PAYNE:  Excuse me?

21   Q    Delegate Jones, did you consider race in drawing this

22   district?

23   A    I did.

24   Q    Did your consideration of race require you to violate

25   any of the Virginia constitutional provisions or any

Jones - Direct

1    criteria as adopted by the House?

2    A    It did not.

3    Q    Did your consideration of the Voting Rights Act and

4    your belief as to how to comply with the Voting Rights Act

5    require you to draw this district in any way in conflict

6    with the Virginia constitution or the adopted criteria of

7    the state?

8    A    No.

9    Q    And this district was drawn with the advice and, shall

10   we say, consent of Delegate Howell?

11   A    Yes, sir.

12   Q    We'd like to go to Defendant Exhibit 94, page 11.  And

13   this is District 89.  Delegate Jones, referring to the

14   separate exhibits we've been referring to, can you tell

15   this Court how underpopulated this district was?

16   A    It was about seven, a little over seven percent

17   underpopulated.

18   Q    This is Defendant Exhibit 37.  So about 5,700 people

19   underpopulated; is that correct?

20   A    Correct.

21   Q    And Defendant Exhibit 56, the benchmark voting-age

22   population was?

23   A    In the benchmark plan, it was 51.7 percent.

24   Q    And in the plan as adopted, Defendant Exhibit 57, the

25   voting-age black population is?

Jones - Direct

1   A    54.8.

2   Q    Was -- the delegate that represents this district is?

3   A    Former -- well, Senator Alexander.  He was a delegate

4   at the time.

5   Q    And at that time, did you get significant input from

6   Delegate Alexander in drawing this district?

7   A    I did.

8   Q    And can you explain the reasons for the changes in the

9   district?

10  A    Yes.  Of course it needed population, and so did its

11  neighbor and its neighbor to the south and to the east --

12  I mean to the west.  Well, all around needed population I

13  should say.

14       So we had to expand the footprint to be able to meet

15  the ideal population of 80,010, and so we went and picked

16  up Larchmont on the west side, northwest quadrant.  You

17  can see here, I'm circling now, Larchmont Library,

18  Larchmont Recreation Center, and Tucker House.  Those

19  precincts, in essence, came from the 79th and, I think,

20  the 80th, and then precincts in the southern part, they

21  basically came from the 90th which was Delegate Algie

22  Howell.

23  Q    Can I interrupt you for a second?  Am I correct that

24  this is a principal river crossing here?

25  A    It is.  And then we did have some cuts, precinct cuts

Jones - Direct

1    up here in this part of the district, I would add, and

2    that was at the request of now-Senator Alexander.  He

3    actually has a funeral home that's located on Granby

4    Street, and Granby Street is this road right here that

5    runs down the heart of the city.

6    Q    So am I correct to understand that you split those

7    VTDs so -- pursuant to his request to put a funeral home

8    in his district?

9    A    That is my recollection, yes, sir.

10   Q    Any other areas of the district that you want to point

11   out to the Court?

12   A    You can just see on the hash, these areas here, they

13   actually went into the other districts.  And if you notice

14   here -- I've got too many circles.  I apologize to the

15   Court, but this last circle I'm drawing here, that used to

16   be in the 87th, and that ended up going into the 100th for

17   population reasons.  That includes the Eastern Shore of

18   Virginia which is geographically isolated in the sense

19   that you have to go across the Bay-Bridge Tunnel to get to

20   it.

21          JUDGE PAYNE:  So you are talking about adding

22   Suburban Park, Wesley, and -- Titustown Center to the 100?

23          THE WITNESS:  Yes, sir.

24          JUDGE PAYNE:  You said that you split VTD at

25   Alexander's request to get his funeral home in a district.

Jones - Direct

1   What does that have to do with redistricting?

2           THE WITNESS:  Well, community of interest.  I

3   know, and if I may, I'm a pharmacist, and I have

4   represented in one form or another for almost 30 years,

5   and I'm in the community every day.  I see my constituents

6   and service them.

7           They come and ask me about how my wife's doing,

8   they have an issue with a pothole, and so he lives in the

9   community and has, I think, two funeral homes in the city

10  of Norfolk, and he thought he could better represent by

11  having part of that territory in his district.

12          JUDGE PAYNE:  People he represented in his

13  business; is that what you are saying?

14          THE WITNESS:  No, I think -- we're a part-time

15  citizen legislature, and I think our way of doing it in

16  Virginia is the best way.  I don't think full-time at the

17  state level is a good way to do it, and I think we're

18  closer to the people when we are in the community working.

19          JUDGE PAYNE:  Thank you, sir.

20  Q    Delegate Jones, did you consider race in creating this

21  district?

22  A    I did.

23  Q    Did your use of race require you to violate any

24  provisions of the Virginia constitution or the criteria as

25  adopted by the Virginia House?

Jones - Direct

1    A    It did not.

2    Q    Did your efforts to comply with the Voting Rights Act

3    in drawing this district, did it require you to violate

4    the Virginia constitution or any provision of the

5    criteria?

6    A    No.

7    Q    If we could move on to Defendant Intervenors'

8    Exhibit 94, page 11, and this is district -- oh, ten.

9              JUDGE PAYNE:  Page what?

10             MR. BRADEN:  Page ten.  Sorry.  Mistake on my

11   part.  Page ten.

12   Q    Defendant Intervenor Exhibit 94, page ten, this is a

13   representation of District 89?

14   A    No.

15             JUDGE LEE:  80.

16             JUDGE PAYNE:  80.

17             THE WITNESS:  80.

18   Q    Can you tell the Court who represented this district

19   at the time that it was enacted?

20   A    The current incumbent, Matthew James.

21   Q    And can you inform the Court on how much this district

22   was underpopulated?

23   A    Almost 12 percent.  It needed over 9,400 individuals

24   to get to the ideal population.

25   Q    And at the time that the plan was adopted, the

Jones - Direct

1    benchmark number was, of the black voting-age pop,

2    Defendant Exhibit 56?

3    A    Was 53.9.

4    Q    And in the enacted plan, the black voting-age

5    population is?

6    A    55.8.

7    Q    Is there a government facility in this area that might

8    be important to the line-drawing process?

9    A    Well, actually, it is.  I would refer the Court, and

10   this is not in the 80th but it is in the top corner here,

11   this is the Norfolk Naval Base which is what I had

12   referred to earlier when we received the census data that

13   was incorrect.

14       This was the House district in question that I knew

15   there was something incorrect with the data we had gotten

16   from the census bureau.  It was like 19,000 people in like

17   one census block.

18   Q    So am I correct that if one was to understand the

19   line-drawing process in this area, you would have to

20   actually be aware of where the naval base was that would

21   influence your process?

22   A    That is correct.

23   Q    Did Delegate Jones have some significant input into

24   drafting of this district?

25   A    You mean Delegate James?

Jones - Direct

1   Q    Delegate James, yep.

2   A    Yes, he did.

3   Q    And can you describe to the Court, I think it's fair

4   to say honestly that this district looks a little

5   irregular.  Can you explain as to why it has this shape?

6   A    Yes, I'll be glad to.  The dilemma, as I mentioned

7   earlier, was a loss of population and then how we dealt

8   with moving from the oceanfront back towards western --

9   move western to Suffolk, and so when we got to this

10  district, you can see that it had a need of about 9,400

11  people.

12       Its neighbor, I think, had a need of 6- or 7,000 as

13  well.  And so what I actually did was we took the 9th and

14  the 7th precincts here.  They came out and went into the

15  79th, and we, in essence, traded this territory right

16  here, which was currently in the 79th, and gave it to the

17  80th.  This is another case of population rolls because

18  of, you know, the suburban growth, vis-à-vis the decline

19  in the rate of growth in the inner cities.

20            JUDGE LEE:  I'm sorry.  I could not process as

21  fast as you said it.  Could you go through it again?

22            THE WITNESS:  The dilemma that I had was you've

23  got the city of Portsmouth which is here, city of Norfolk

24  which is here, then you have the city of Virginia Beach.

25  So these three cities --

Jones - Direct                                                          350

1   Q    See if that helps.  Sorry.

2   A    These three cities had not grown at the same rate the

3   rest of the Commonwealth had, Your Honor.  So even moving

4   the 87th seat out of the region, we still had a need for

5   additional population.  And I did not want to cross the

6   river.

7        That was one of my things that was noted in the *West*

8   *v. Wilkins* case, and so I was really constricted on three

9   sides; North Carolina, the ocean, and the James River.

10       So what I did in working with Delegate Joannou, who is

11  white, Democrat, who represents the 79th which is here,

12  and Delegate Matthew James who is African American in the

13  80th here, on a way to roll the population around like

14  this to make sure Delegate Joannou had a sufficient number

15  of residents in his district.

16       I will note that it is a narrow neck here, but I would

17  note if you see right here, that's where Delegate Joannou

18  lives, and then down here to your left on the bottom is

19  where Delegate James lives.  So geographically we were

20  somewhat restricted in that regard.

21  Q    You were attempting to not pair the two incumbent

22  members?

23  A    Obviously I was not looking to pair the two

24  incumbents.

25  Q    And that would be consistent with the criteria adopted

1   by the House committee?

2   A    That is correct.  We only paired incumbents where we

3   absolutely had to.

4          JUDGE PAYNE:  It's different to say you weren't

5   trying to pair incumbents, but were you trying not to pair

6   incumbents in making a decision on 80?

7          THE WITNESS:  I was trying not to pair

8   incumbents, yes, sir.

9          JUDGE PAYNE:  So the record is clear, what you

10  did over here, you circled this big area.  You took

11  some -- this precinct seven and precinct nine, you took

12  those out and gave them to whom?

13         THE WITNESS:  I gave them to Delegate Joannou.

14         JUDGE PAYNE:  In 79.

15         THE WITNESS:  Yes, sir, that is correct.

16         JUDGE PAYNE:  Then to compensate for that, you

17  added the areas in where, 38, Taylor Road and Yeates?

18         THE WITNESS:  Correct, yes, sir, and Harbor View

19  which is right above Yeates and Taylor Road.

20         JUDGE PAYNE:  Oh, yes, I see.  You also added --

21  I guess there's an area called 34 and 33.

22         THE WITNESS:  Yes, sir, that is correct.

23         JUDGE PAYNE:  Those aren't precincts.  That's by

24  number -- or are they numbered precincts?

25         THE WITNESS:  They are precincts in the city of

Jones - Direct

1    Portsmouth.

2             JUDGE PAYNE:  Okay.  Sorry.

3    Q    Why don't we -- we had a little discussion here

4    regionally, so let us pull back up the regional map.  This

5    might help the Court and might help him to be able to

6    illustrate it.  Is this more useful to you, Delegate

7    Jones?

8    A    I thought we had the other map that had the actual

9    district numbers with the percent loss in population.

10   That might be better.  Do you want to do them side by

11   side?  Okay, we'll do side by side.

12            JUDGE LEE:  Exhibit numbers?

13            MR. BRADEN:  Exhibit 72, Defendant Intervenors'

14   Exhibit Number 72, page one.

15            THE WITNESS:  All right, I'm there.

16   Q    So does this help you illustrate for the Court the

17   population pressures in that area?

18   A    Correct.

19   Q    Thank you.  If we could, let me talk real briefly,

20   when you drew this district, did you consider race?

21   A    I did.

22   Q    Did your consideration of race in the drawing of this

23   district require you to create any lines or any part of

24   this district that violates the criteria as adopted by the

25   House committee or the Virginia constitution?

Jones - Direct

1   A    It did not.

2   Q    And did your compliance with the Voting Rights Act

3   require you to violate any Virginia constitutional

4   provision or any Virginia criteria as adopted by the

5   House?

6   A    No.

7   Q    So let's jump over to District 89, and this is

8   Defendant Exhibit 94, page 11.

9        MR. BRADEN:  Wrong district.  My apologies.  So

10  we are ready to swim across, drive across, boat across to

11  the peninsula, and if we could bring up Defendant

12  Exhibit 96 and Defendant Intervenor Exhibit 97, and page

13  two.  This will also be in the regional map books.  Map

14  book one.

15       THE WITNESS:  What item number?

16  Q    This is Defendant Intervenor Exhibit 96, page two, and

17  Defendant Intervenor Exhibit 97, page two, and it's also

18  in that big regional map book.  These are the peninsula.

19  The two districts are 92 and 95.

20  A    I have them.

21  Q    So 96 and 97, can you briefly tell the Court what

22  those are.

23  A    96 and 97, 96, page two, is the actual districts, so

24  the benchmark districts that existed in 2010 when the

25  census data was received, and the next map, page two, is

1    actually the districts as they existed after the passage

2    of House bill 5005.

3    Q    And then can we bring up the Defendant Intervenor

4    Exhibit 73.  And what does this map show to the Court?

5    A    This shows the population deviations for that region,

6    which is a peninsula, as you can see by the -- I think

7    this is the York River here and this is the James River

8    here.

9    Q    And are the significant population pressures in the

10   line-drawing process here?

11   A    Absolutely.

12   Q    I'd like to bring up Defendant Exhibit, Intervenor

13   Exhibit 94, page 13, House District 92.  Can you tell the

14   Court what district this is.

15   A    This is House District 92 represented by Jeion Ward

16   who is African American and a Democrat.

17   Q    And can you tell the Court using Defendant Exhibit --

18   Defendant Intervenor Exhibit 37 how much this district was

19   underpopulated?

20   A    This was one of the more underpopulated.  It was

21   almost 9,000 people.

22   Q    So would it be an exaggeration to say it needed quite

23   significant changes?

24   A    It did, and I would note, not to go back and forth,

25   but the district immediately to its north, 91, actually

Jones - Direct                                                      355

1  had the greatest population loss, I think, in the

2  Commonwealth, in the region I know, of almost 19 percent.

3  Q    So to really understand the needs here, you have to

4  look beyond the single district but the whole region.

5  A    I looked at all five, and it was about a 55,000 or

6  52,000 difference that I needed to make up to keep the

7  number of seats on the peninsula as they existed.

8           JUDGE LEE:  Repeat that.

9           THE WITNESS:  Yes, sir.  The way the districts

10 existed before we started drawing the lines, if you go

11 back to the previous map, which I think was number 73, if

12 you can do that for me, I think that's right.

13           I'll show the Court, if you start going

14 clockwise, the 91st is down 19 percent.  Then you can see

15 the 92nd is down over 11 percent.  Then 95th is down

16 15 percent.  Then you can see the 94th is down over ten

17 percent, ten and a half percent, and then right here, the

18 93rd is down almost nine percent.

19           So those five districts together had a population

20 need of 52- or 53,000 individuals to keep them whole.

21 That was a dilemma that I faced when I was looking to draw

22 the lines on the peninsula.

23 Q    If you'll look to Defendant Intervenors' Exhibit 56,

24 page three, what was the benchmark voting-age population

25 of this district?

Jones - Direct

1   A    For 92, it was 61.1.

2   Q    And in the enacted plan, which is Defendant

3   Exhibit 57-4, what was the black voting-age population?

4   A    It was 59.8.

5   Q    So it went down in this district.

6   A    Yes, it did.

7   Q    And can you -- did you -- in the creation of this

8   district, were you in consultation with the incumbent

9   member?

10   A    I was.

11   Q    And can you discuss how you came up with this

12   configuration?

13   A    In working with her -- in working with her, it was a

14   priority for her to reunite downtown Hampton, which is all

15   around here, and so we took those precincts away from the

16   95th district, which was Delegate BaCote, and that

17   completed that part of Hampton and made it whole.  And as

18   you can see, the incumbent member lives right here.  She

19   lived up in the top part of the existing district when it

20   was completed.

21       So she had population needs and local requests as far

22   as reuniting certain parts of the city of Hampton.

23           JUDGE PAYNE:  You say you reunited -- did the

24   reuniting mean that you moved Kraft, Forrest, and Mallory

25   into it?

Jones - Direct

1          THE WITNESS:  Yes, sir.

2          JUDGE PAYNE:  Did you move anything else into it?

3          THE WITNESS:  Wythe at the bottom.

4          JUDGE PAYNE:  Wythe?

5          THE WITNESS:  Yes, sir, right there.

6   Q    And is part of this district on ward lines or the

7   interstate?

8   A    Yes.

9   Q    Let me clear it up for you.

10  A    I'll show it.  Clear it for me, please.  The

11  interstate runs like this.

12  Q    And some of the other lines in the district reflect

13  city ward lines?

14  A    Yes.

15  Q    In drafting this district, did you consider race?

16  A    I did.

17  Q    Did your consideration of race require you, in

18  drafting the district, to draw any lines that resulted in

19  a violation of the Virginia constitution or any of the

20  criteria adopted by the House of Delegates?

21  A    It did not.

22  Q    Your consideration of compliance with the Voting

23  Rights Act, did that require you to draw any -- this

24  district in a manner that violated the Virginia

25  constitution or any requirements of the criteria adopted

Jones - Direct

1   by the House of Delegates?

2   A    No.

3   Q    Would it -- in your opinion, is this district more

4   compact than its prior district?

5   A    In my opinion it is, yes, sir.

6        MR. BRADEN:  Can we go to District number 95.

7   This is Defendant Intervenor 94, page 14.  Would it be

8   fair to say this district is not more compact?

9   A    Yes, sir, that would be safe to say.

10  Q    Can you tell us who the member was that lived in this

11  district at the time it was enacted?

12  A    Delegate Mayme BaCote.

13  Q    And is that delegate an African American?

14  A    She is, and she's a member of the Democratic party.

15  Q    And did she have significant input in the crafting of

16  this district?

17  A    She did.

18  Q    And can you, by going to Defendant Exhibit, Intervenor

19  Exhibit 37, page one, can you tell the Court how much

20  underpopulated this district was?

21  A    She had a population need of over 12,000.

22  Q    And going to Defendant Exhibit, Defendant Intervenor

23  Exhibit 56, page three, the benchmark black voting-age

24  population was 60.9?

25  A    That is correct.

Jones - Direct

1    Q    And the enacted voting-age population in the present

2    plan is?

3    A    59.

4    Q    Is that a slight drop?

5    A    It is.

6    Q    Is part of the construction of this district

7    significantly political?

8    A    It is.

9            MR. BRADEN:  I'd like to bring up Defendant

10   Exhibit, Defendant Intervenors' Exhibit 92, pages 24 and

11   25.  And this exhibit appears in map book three.  So it's

12   a different ring binder that's behind you.

13           MR. SPIVA:  Excuse me, Your Honor.  This exhibit,

14   I don't believe, is in evidence.  I think this is one of

15   the ones that we objected to.

16           JUDGE PAYNE:  What was the number you objected to

17   under?

18           MR. SPIVA:  I think it's the same number,

19   Defendant Intervenors' 92.

20           JUDGE PAYNE:  I thought it was 93.  What are we

21   on, 92 or 93?

22           MR. BRADEN:  92, Your Honor.

23           JUDGE PAYNE:  Map book three.

24           MR. BRADEN:  Map book three.

25           JUDGE PAYNE:  As I understand it, you object to

Jones - Direct

1   this one?

2           MR. SPIVA:  Well, I guess the question, if

3   they're offering it into evidence --

4           JUDGE PAYNE:  They haven't offered anything yet.

5   They just identified it for us.  Do you want to wait and

6   see what comes and abide the event, and then you can make

7   an objection if and when it's necessary to do that?

8           MR. SPIVA:  Will do, Your Honor.

9           JUDGE PAYNE:  Okay.

10          MR. BRADEN:  Your Honor, we had originally

11  proposed this as an exhibit, and we believe that it's

12  appropriate as an exhibit, but if the Court would prefer,

13  we're happy to offer it as a demonstrative instead to

14  avoid the dispute.

15          JUDGE PAYNE:  Why don't you lay your foundation.

16  If it comes in, it comes in.  If it doesn't, it doesn't.

17  Q    Delegate Jones, do you recognize what these maps are?

18  A    I do.

19  Q    And are these maps similar to screen maps that you saw

20  during the drafting of the plan?

21  A    They are.

22  Q    Do they appear to be screen shots from your Maptitude

23  redistricting software?

24  A    They are screen shots from Maptitude software, not

25  from mine.

Jones - Direct

1   Q    And as part of that process, your Maptitude system had

2   layers of partisanship?

3   A    That is correct.

4   Q    Which could be displayed by different color

5   gradations?

6   A    That's correct, and that's the way that I did it when

7   I was doing the map.

8   Q    You also have a screen shot here of districts showing

9   another layer of information in your system which would be

10  race.

11          JUDGE PAYNE:  You are on pages 24 and 25 of this

12  document; is that where you are?

13          MR. BRADEN:  Yes, Your Honor.

14          JUDGE PAYNE:  All right.

15  Q    So during your map-drawing process, would you have

16  before you on the screen maps that were the same or

17  substantively the same as these when you were drawing?

18  A    Yes.

19  Q    And what would you use these for?

20  A    Republican performance.

21          JUDGE PAYNE:  What's that?

22          THE WITNESS:  Republican performance in the

23  general election in 2009 for governor.

24          JUDGE PAYNE:  You mean that's what page 24 was

25  used for?

Jones - Direct

1           THE WITNESS:  Yes, sir, I'm sorry.

2      Q    Page 25 is race?

3      A    Correct.

4      Q    So when you were drawing the maps, you could use a map

5      like this to determine what the good Republican areas

6      were?

7      A    Absolutely.

8      Q    And the bad Republican areas?

9      A    That would be correct.

10     Q    When you drew this plan, were there political

11     considerations, partisan political considerations involved

12     in drawing this plan?

13     A    There were.

14     Q    So if you could just briefly -- and I know that

15     there's a legend there --

16          JUDGE PAYNE:  Excuse me just a minute before you

17     do that.  This Exhibit Number 92, does it follow the same

18     pattern, and that is that it has for each district the

19     percent Republican as shown and the percent black BVAP as

20     shown?

21          MR. BRADEN:  Yes, Your Honor.

22          JUDGE PAYNE:  Each of the districts.  You are

23     focusing your questions now on 95 because we're on 95.

24          MR. BRADEN:  That's correct, Your Honor.

25          JUDGE PAYNE:  All right, now I see.  Yes, sir?

1          MR. SPIVA:  Your Honor, I guess I still object

2    because he is essentially offering it for the truth.  If I

3    can voir dire the witness -- because this did not exist at

4    the time.  This is not from the time when he was making

5    the maps.  This was created --

6          JUDGE PAYNE:  He hasn't offered it yet.  As best

7    I know, he was just asking him if he used these things,

8    and I suppose in an attempt -- or something like this in

9    an attempt to lay a foundation for this document

10   presumably on the basis that it's similar to a document

11   that doesn't exist anymore.  I gather that's, from your

12   briefing and his questions, what he's doing.

13         At that time then you can object, but he hasn't

14   done it yet, and if he gets into asking questions that are

15   substantive as opposed to did you see these documents,

16   then perhaps you may have an objection, but let's wait and

17   abide the event, if you will.

18         MR. SPIVA:  Will do, Your Honor.  Maybe I jumped

19   the gun a little bit there.

20         JUDGE PAYNE:  Well, all of us did at one time or

21   another including sometimes when you sit on this side of

22   the bench.

23         JUDGE LEE:  That's true.

24   Q    Am I correct that, to your knowledge, with the

25   exception of the color scheme, this is essentially

1    identical to the maps that you used in drawing the plan?

2    A    That is correct.

3    Q    And you understand the information to be simply census

4    information?

5    A    Census information on map -- on page 25.  On page 24,

6    it would have been voting -- political data in the sense

7    of election data that was being considered by me from the

8    2009 governor's race between Governor McDonnell and

9    Senator Deeds.

10          MR. BRADEN:  The value of this to the Court, it

11   seems to me, to be self-evident since it illustrates one

12   of the key issues in the dispute before this Court,

13   whether race predominated --

14          JUDGE PAYNE:  Are you asking him a question?

15          MR. BRADEN:  I'm offering it as evidence to this

16   Court.

17          JUDGE PAYNE:  Now it's been offered.  What is

18   your objection?

19          MR. SPIVA:  My objection -- I'd like the

20   opportunity to voir dire, Your Honor -- is that this was

21   not produced and didn't exist at the time that he was, um,

22   creating the map.

23          JUDGE PAYNE:  As I understand it from your

24   briefing papers, these documents were produced after the

25   fact by relying on his memory, telling his lawyers what he

Jones - Direct                                                365

```
 1    looked at, and they went or somebody went out, an

 2    assistant went out made this document.  Is that what

 3    happened?

 4              MR. SPIVA:  That's what they said, yes.

 5              JUDGE PAYNE:  Is that what happened, Mr. Braden?

 6              MR. BRADEN:  Yes, Your Honor.

 7              THE COURT:  So what is your objection?  He got

 8    that real loud.  About the only thing we can hear.

 9              MR. SPIVA:  The objection, Your Honor, is that

10    this was not the actual maps that he was looking at and

11    dealing with at the time.  I guess it's a relevance

12    objection.  It's also a discovery objection, because if

13    this was actually -- if this had been created at the time

14    and existed, it would have needed to be produced to us

15    during the discovery period.

16              JUDGE PAYNE:  The later doesn't work.

17              MR. SPIVA:  It's not disputed --

18              JUDGE PAYNE:  My question is this:  Was it given

19    to you as soon as they created it?

20              MR. SPIVA:  Yes, but that was years after --

21              JUDGE PAYNE:  I understand that, but that's not a

22    discovery issue.  They couldn't have produced something to

23    you that actually didn't exist.  So that's not an issue.

24    That objection is overruled.  Now your objection is its

25    relevance?
```

1            MR. SPIVA:  Yes, Your Honor.  It's irrelevant.

2    This was something that was created after the discovery

3    period had ended and then was produced to us at that

4    point.  That's not proper.

5            JUDGE PAYNE:  I think the relevance is overruled,

6    too.  I think it fits the definition of relevance, and we

7    can take into account, in ascribing what weight we want to

8    ascribe to it, the fact that it was prepared on the basis

9    of his memory as he's testified, but since he's testified

10   this replicates what he looked at, I don't see how it can

11   be irrelevant.  So the objection is overruled.

12   Q    Delegate Jones, I believe in addition to race and

13   politics and geography, this map also has an indication of

14   where the incumbents live?

15   A    It does.

16   Q    And can you illustrate to the Court where the

17   incumbents live that are in District number 94?

18   A    This might not be the best map to do that on, quite

19   frankly.

20           JUDGE PAYNE:  District 94?

21           MR. BRADEN:  Yes.

22           THE COURT:  What page is that on?

23           MR. BRADEN:  That's on this page.  It's the

24   adjoining district.  There's a dot right next to the

25   border of 95 going up.  It, frankly, explains why the

1    district looks that direction, goes that direction.

2         THE WITNESS:  I can circle it for you.  The

3    incumbent in the 94 was Delegate Glenn Oder, my seat mate,

4    right there, and then the incumbent in the 93rd lived

5    right here.  Then the incumbent in the 95th, which is

6    Delegate BaCote, lives right here.

7         JUDGE PAYNE:  Where you are saying these

8    delegates live, it looks like there's a circle with two

9    parts of it, two pieces of five colored black; is that

10   what you are indicating?

11        THE WITNESS:  This is not the best map, from my

12   perspective, to be doing this exercise.  If they can find

13   the one that actually is clearer.  I think what you have

14   in 94 might be a better way to demonstrate it, in my

15   opinion.  I think it would be page 14, Defendant

16   Intervenors' 94, page 14.  Thank you.

17   Q    Can you point out to the Court on this map, which I

18   think you are correct is clearer for that purpose, where

19   the incumbents live.

20   A    I can.  Glenn Oder lived right here.  Delegate Abbott

21   lived right here.  Excuse me, I didn't mean to drag my

22   finger.

23        JUDGE PAYNE:  Abbott is 93 and Oder is in 94?

24        THE WITNESS:  Yes, sir.  Then you can see down

25   here, Your Honor, that Mayme BaCote is right on the edge

Jones - Direct

1    of this right here.  She's down here in Newport News.

2              JUDGE PAYNE:  She is in 95?

3              THE WITNESS:  Yes, sir.  And then just for

4    illustrative purposes, you see that Delegate Ward in 92 is

5    right here.  So you had your four incumbents in the lower

6    part of the city, and my thought process of not wanting to

7    cross the river and not wanting to go across to the York

8    River up here, you know, my dilemma was I had 50-some

9    thousand people I needed to be able to make these four

10   districts hold on a peninsula, and I did not feel that was

11   probable or made sense in drawing a map for communities of

12   interest, because it would have been strung -- been very

13   long, stringy districts had I tried to keep four in that

14   lower part of the city.

15             JUDGE PAYNE:  The record will reflect that

16   Intervenor Defendant Exhibit 92 was admitted but over

17   objection.

18   Q    Can I ask, did this configuration create an open

19   district just north of 95?

20   A    It did.

21   Q    So if we can go back to Defendant Intervenors'

22   Exhibit 92, page 24 and page 25 of the map book, the -- am

23   I correct that the lighter-colored red, yellow, orange

24   reflect more heavily democratic areas?

25   A    It does.

Jones - Direct

1  Q    And it would -- am I correct that this district seems

2  to go up the peninsula to get all -- please jump in if I'm

3  wrong -- all the yellow precincts that are heavily

4  democratic?

5  A    It does.

6  Q    And was that particular district the open seat?  Did

7  you perceive that was likely to be a swing seat?

8  A    I did perceive it as a swing seat.  As a matter of

9  fact, the last two elections have indicated that is, in

10 fact, the case.  A Republican won in 2011, and a Democrat

11 won in 2013.

12 Q    So am I correct that stretching all the way up there

13 resulted in a district, an open seat that was

14 substantially more Republican than it otherwise would have

15 been?

16 A    Correct.

17 Q    And a little further down, sort of halfway up the leg,

18 there is an incumbent democratic member very close to the

19 border of 95?

20 A    That is correct.

21 Q    But is not in 95.

22 A    I did not want to pair the two female democratic

23 incumbents.

24 Q    So that decision was driven by the fact you didn't

25 want to pair two female members.

Jones - Direct

1   A    That is correct.

2   Q    If you could look at page 25, the facing page, am I

3   correct that the darker the green is, the more African

4   American it is?

5   A    Correct.

6   Q    The very -- if I could move all the way up 95 on this

7   map, that's sort of -- am I correct that's sort of medium

8   green, for want of a better description?

9   A    Yes.

10  Q    But on page 24 at the end, that last VTD, that last

11  precinct is very heavily democratic?

12  A    It is.

13  Q    Going down, a couple more precincts down, if you want

14  to compare the area that's in the district versus the area

15  that was cut out of the district using these two maps.

16  A    Yes.  You can see that the Republican performance on

17  the outskirts, on the border, I should say, of the lines

18  here, on this side and that side, you can see is better

19  Republican performing than contained within the 95th which

20  is right there (indicating).

21        JUDGE PAYNE:  Republican performance either side

22  of the 95th is elevated.

23        THE WITNESS:  Yes, sir, that is correct, and if I

24  can, I'd like to show maybe the one that shows the

25  interstate, because I think we followed that line when we

Jones - Direct

1    were making these precinct cuts to follow like we did in

2    House District 63 and 75, Interstate 85.

3            JUDGE PAYNE:  Now you are talking about

4    Interstate 64.

5            THE WITNESS:  Yes, sir, I am, that's correct.  So

6    if you look, you can see -- earlier when I was talking

7    about 92, interstate comes like this and goes like this

8    and goes straight up Bland Boulevard.  So you can see we

9    followed the contour of the population to the west of

10   Interstate 64 up here, and then I believe this is Route 60

11   which runs up into Williamsburg, and so we used that road

12   as our border to the far west.

13           And so we picked up that population using,

14   really, 64 as our line of demarcation.  And I would notice

15   it's obvious here where we jumped over.  I had to jump

16   over, quite frankly, so I would not include this incumbent

17   with this incumbent here, the two female incumbents that I

18   just mentioned.

19           JUDGE PAYNE:  What did you jump over where to not

20   include which incumbents?  A lot of indefinite pronouns,

21   and I didn't follow what you are saying.

22           THE WITNESS:  My apologies, Your Honor.  Sandy

23   Bottom right here --

24           JUDGE PAYNE:  Jumped over Sandy Bottom --

25           THE WITNESS:  No, no.  I picked up Sandy Bottom,

Jones - Direct

1   and I picked up Saunders, and then I went over and picked

2   up, I think it's Palmer.

3            JUDGE PAYNE:  Why did you do that?

4            THE WITNESS:  So I would not have included right

5   here.  If I had gone straight, up I would have included

6   Delegate Abbott in the district with Delegate BaCote.

7            JUDGE PAYNE:  And you wanted to avoid that?

8            THE WITNESS:  I wanted to avoid that, yes, sir.

9   That was my objective.

10           JUDGE PAYNE:  Those were the two females members

11  you wanted to keep from competing against each other.

12           THE WITNESS:  That is correct.

13  Q    Did you consider race in drawing this district, 95?

14  A    I did.

15  Q    And did that consideration of race require you to

16  violate any of the criteria of the state as adopted by the

17  House or the Virginia constitution?

18  A    It did not.

19  Q    And your effort to comply with the Voting Rights Act,

20  did that require, when you drew this district, for you to

21  violate any criteria?

22  A    No.

23  Q    Or the Virginia constitution?

24  A    No.

25  Q    And it's long and stringy for a significant, at least

Jones - Direct

1    in part, reason.  It was to create an open seat with fewer

2    Democrats in it above it?

3    A    That's correct, and also, if you look at the makeup of

4    the seat, it does have a vestige of 93.  This part right

5    here would be kind of a holdover from the 93rd, going

6    further up, but yes.

7            JUDGE LEE:  Which one is the open seat?

8            THE WITNESS:  93 which moved northwest.

9            JUDGE PAYNE:  That's part of -- which one is the

10   open seat?

11           THE WITNESS:  93.

12           JUDGE PAYNE:  93.  I thought you said 95.

13           THE WITNESS:  95 was Delegate BaCote's

14   majority-minority seat which is right here.

15   Q    And that particular district, that was the district

16   that was -- the open seat was -- is that the ferrymander

17   district?

18   A    Yes, it is.  That was the other district that crossed

19   the James River, and it was connected, Surry and

20   Williamsburg, by the Jamestown/Yorktown ferry.

21   Jamestown/Surry ferry, excuse me.

22   Q    So as part of drawing this plan, you eliminated that

23   ferrymandered part?

24   A    I did.  I took both river crossings out of play and

25   went back across to the north and back across to the

Jones - Direct

1    south.  North we went back across on the 74th, and we came

2    south on the 64th.

3    Q    And that particular configuration, quote unquote, the

4    ferrymander had been substantially criticized?

5    A    It had in the *West v. Wilkins* case, that is correct.

6              JUDGE LEE:  Where is that on this map?

7              THE WITNESS:  We can --

8              MR. BRADEN:  We'll pull up the regional map for

9    you, Your Honor.

10   Q    Does that work for you?

11   A    This works very well to illustrate.

12             JUDGE LEE:  Exhibit number?

13             MR. BRADEN:  96, page two.

14             JUDGE LEE:  Thank you.

15             JUDGE PAYNE:  Just so I understand it, and I may

16   be confused now, but are you saying that one of the things

17   you did in creating House District 95 was to -- was that

18   it helped to eliminate the ferrymander that previously

19   existed, or what is the relation of the ferrymander to 95?

20             THE WITNESS:  Population.  The need for

21   population.  As I mentioned earlier, Your Honor, we had

22   about a 52,000-person deficit on the peninsula, and it was

23   about 30,000 or so I think in the 64th, and I will show

24   here on the screen.  This part right here in the brown,

25   tan, that's actually what's part of the 64th which is

Jones - Direct

1    basically geographically located here on the Southampton

2    or south side of the river.

3           And so by moving this population over, I gave

4    this a population available to go into 97, and 93 went

5    from here -- it won't work -- to basically up here.  So

6    there was a need for population, so by undoing what was

7    done in 2001, I picked up additional population on the

8    peninsula that would help keep the same number of

9    districts on the peninsula that existed prior to House

10   bill 5005.  But it necessitated me moving that 93rd

11   district northwest because of geographical limitations on

12   the peninsula.

13          JUDGE LEE:  You added Williamsburg city.

14          THE WITNESS:  Yes, sir.

15          JUDGE LEE:  To the area including Surry.

16          THE WITNESS:  That was back in 2001.  So I

17   unwound Williamsburg and James City County from the

18   attachment to the south side.

19          MR. BRADEN:  It might help the Court if we can

20   bring up the new map side by side here, I believe.

21          JUDGE LEE:  As long as you blow it up.  I'm a

22   grownup.

23          MR. BRADEN:  Maybe we'll bring it up by itself.

24   Does that help the Court?  We can bring it up singly.

25          JUDGE LEE:  Bring it singly.  I want to make sure

Jones - Direct

1    I understand what you are saying.  I think I understand.

2    I want to make sure.

3        THE WITNESS:  Your Honor, this would be the new

4    districts as they exist because of House bill 5005.  So

5    what had to occur was because of the loss of population

6    down here, we moved the 93rd from, in essence, this part

7    of Newport News, from here up to here.  My dots won't

8    work, to Williamsburg.

9        And so you can see it just moved northwest in its

10   configuration and size, because it's not as populated, so

11   you can see this is the new configuration of the 93rd.

12   What existed previously was this part basically was on

13   this side of the river like this.  I didn't mean to draw a

14   heart, but I guess I did.  My wife might like that.

15       JUDGE LEE:  The point you are making is that you

16   were able to use the river as a natural boundary, and then

17   you expanded the 93rd up from Newport News up around the

18   coast.  You skipped over part of it to Williamsburg and

19   James City.

20       THE WITNESS:  That is correct, Your Honor.

21       JUDGE LEE:  I understand now.  Thank you.

22       MR. BRADEN:  And I can switch gears here a little

23   bit, Delegate Jones.

24   Q    Were there -- in addition to the two plans that passed

25   the House and one of which became law, HB 5005, were there

Jones - Direct

1   other plans introduced into the Virginia House?

2   A    There were.

3   Q    And do you remember what those two plans were?

4   A    There was House bill 5002, I believe, which was a

5   University of Richmond plan.  There was a contest that

6   Governor McDonnell's redistricting commission had, I guess

7   had all the institutions and interested parties provide

8   maps to the commission.

9   Q    So there was two plans, a 5002 and a 5003?

10  A    Right.

11  Q    What was 5004?

12  A    5004, I think, was Congressional, if I remember

13  correctly.

14  Q    And you had no role in the drafting of the

15  Congressional plan?

16  A    None, none whatsoever.

17          JUDGE LEE:  5002 was University of Richmond.

18  What did you say 5003 was?

19          THE WITNESS:  It was George Mason, if I recall,

20  Your Honor.

21  Q    And those were the only two plans introduced into the

22  legislature as House bills?

23  A    That is correct.

24  Q    And any member who wanted to could have introduced an

25  additional bill?

Jones - Direct

1    A    That is correct.

2            JUDGE PAYNE:  You mean the only two plans offered

3    as alternatives to what was 5005; is that right?

4            MR. BRADEN:  Your Honor, I think they were

5    originally alternatives to 5001, the plan that was vetoed

6    by the governor.  It think it wouldn't be unfair to say

7    that they were still alternatives to the 5005 as passed.

8            JUDGE PAYNE:  Is that right?

9            THE WITNESS:  Yes, sir, that's correct.

10   Q    Could either of those plans pass, be seriously

11   considered by the House of Delegates?

12   A    No.

13   Q    And why not?

14   A    Well, House bill 5002, if I recall correctly, paired,

15   I think, 40 incumbents together.

16   Q    Was it 40 or 48 incumbents; do you remember?

17   A    I think it was 48, but it was a whole bunch.

18   Q    And there are only 50 members in the chamber; right?

19   A    There's a hundred, so they got almost half of us.

20   Q    Would it have been easy to get to a majority with 48

21   paired members?

22   A    I doubt it.  And I believe they only had six

23   majority-minority districts in the map, the bill that was

24   presented by Delegate Brink.

25   Q    Do you remember whether the population deviation met

Jones - Direct

1    the two percent range in the criterion?

2    A    I think it -- I believe it was -- they had plus or

3    minus nine percent, I believe.  They were like minus 4.4,

4    4.7 to plus 4-something, so over nine percent deviation.

5    Q    Do you remember where that plan paired you with some

6    other members?

7    A    Yeah.  I was paired, I think, in both plans.

8    Q    And HB 5003, do you remember how many members were

9    paired in that?

10   A    I believe it was 32, maybe, or 34, something like

11   that.

12   Q    And did that plan meet the requirements of the

13   criteria for population deviation?

14   A    It did not.

15   Q    And do you remember how many majority-minority

16   districts were in that plan?

17   A    Either nine or ten.  It was not 12.

18   Q    Was any bill introduced in the legislature that you're

19   aware of that had 13 black voting-age population House

20   districts?

21   A    No.

22   Q    When former Delegate Ward Armstrong was talking about

23   option one and option two, do you know what he was talking

24   about?

25   A    I believe it was, again, from the commission, the

Jones - Direct

1    governor's redistricting commission.  I think one might

2    have been a 13 or maybe a 14 majority-minority seat map.

3    It wasn't a bill.  It was never introduced nor proposed.

4    Q    Ward Armstrong never introduced it as a bill?

5    A    No, never talked to me about it, never discussed it

6    with me, period.

7    Q    And no other member brought this to the floor as --

8    and presented it to the House of Delegates?

9    A    My recollection, there were no amendments offered to

10   the bill which is pretty unusual in my tenure in the

11   legislature.

12   Q    We heard, and I don't want to mischaracterize what he

13   said, but we heard some discussion from Delegate Armstrong

14   that he might have commissioned some type of study on

15   racial dilution or retrogression analysis.  I don't want

16   to mischaracterize what he said, but did Delegate

17   Armstrong present to you anything that could be

18   characterized as that?

19   A    I know he and I never, I don't think, talked to one

20   another, period, during the entire special session.

21   Q    Did he present such an analysis on the floor of the

22   House to the best of your recollection?

23   A    No.  I think he was just merely trying to set up the

24   debate for a court case.

25   Q    And to the best -- did any member of -- first of all,

Jones - Direct

1    during this process, you talked to a majority of the

2    members of the House?

3    A    Between 75 and 80 of the members individually.

4    Q    That would have been a majority of the Republican

5    members?

6    A    Yes.

7    Q    And a majority of the black caucus members?

8    A    Correct.

9    Q    And a majority of the democratic members?

10   A    Close to it.  I didn't keep score of everyone that I

11   talked to, but whether it's a meeting in the hallway,

12   giving me a napkin with a precinct on it or a letter, or,

13   you know, something of that nature, I talked to probably

14   75 of the members at least.

15   Q    And did any of those members tell you that they had

16   had a chance to review any type of vote dilution or

17   retrogression analysis that had been prepared for Delegate

18   Armstrong?

19   A    No.

20   Q    Do you remember how many members your plan pairs?

21   A    I believe it pairs six, if I'm not mistaken, six

22   pairs.  I believe we had -- the second district in the

23   great southwest moved to Prince William, so that member

24   was paired, and he retired, I think, and subsequently

25   became -- went on the bench, I believe.

1      We paired Delegate Armstrong because his district went

2  to Loudoun County, House district 10.  He was paired --

3  his district didn't exist anymore, I should say, and then

4  Delegate Paula Miller in the 87th in Norfolk, her district

5  went to Loudoun County as well.  Loudoun got two of the

6  three seats.

7          JUDGE LEE:  What's that House district?

8          THE WITNESS:  87.

9          JUDGE LEE:  Went to Loudoun.

10          THE WITNESS:  Yes, sir.  And then, just discussed

11  on the peninsula, House District 93 and 94, Delegates Oder

12  and Abbott, and then we had two pro forma pairings.  They

13  were Republicans, if I remember correctly, Delegate

14  Sherwood and Delegate Affee, he was retiring, and then,

15  quite honestly, I cannot remember the sixth, but I do

16  believe there was a sixth.

17          MR. BRADEN:  At this time, we'd like to show

18  Plaintiff's Exhibit Number 36, and the transcript is

19  Plaintiff Exhibit 35, page 141 through 149.

20          JUDGE LEE:  Repeat that.

21          MR. BRADEN:  Plaintiff Exhibit 35, pages 141

22  through page 149.

23

24          (Video clip played.)

25

Jones - Direct

1    Q    Delegate Chris Jones, were you present for the speech?

2    A    I was.

3    Q    And am I correct that Delegate Spruill also voted for

4    the passage of HB 5005?

5    A    He did.

6    Q    And just so there's no confusion, the changes from the

7    HB 5001 and 5005 were mainly technical changes and small

8    changes of requested members?

9    A    They were not just members, but the registrar in

10   Richmond probably did a couple dozen precincts and split

11   them, accommodated some voting -- moving of voting polling

12   places and made cuts, actually split precincts to comport

13   with the request for the Richmond and Chesterfield County

14   registrars.

15   Q    I'd like to go to Defendant Intervenor Exhibit

16   Number 3, and this would be defendant -- this would be

17   defendant intervenor -- it would be the transcript at

18   pages eight to 13.  Defendant Intervenor Exhibit 04 is the

19   transcript.  Defendant Intervenor 03 is the video clip.

20            MR. SPIVA:  Your Honor, I object.  I mean, we

21   haven't objected to all these video clips playing, but the

22   transcripts are in the record.  A lot of this is kind of a

23   bunch of irrelevant stuff that gets played and very little

24   connection to the question that's asked after the video.

25            JUDGE PAYNE:  What is the objection; I'm sorry?

Jones - Direct

1          MR. SPIVA:  Well, time and relevance, Your Honor.

2     I mean, my concern is we were hoping this would be a

3     three-day trial.  We have a substantial cross and rebuttal

4     case.  They've got three more witnesses after Mr.

5     Armstrong.

6          JUDGE PAYNE:  The basis of your objection is

7     what?

8          JUDGE LEE:  Relevance.

9          MR. SPIVA:  Relevance and time, Your Honor.

10          JUDGE PAYNE:  Overruled.

11          JUDGE LEE:  Repeat the docket we're using now.

12          MR. BRADEN:  This would be Defendant Intervenor

13     Exhibit 03, and the transcript is Defendant Intervenor 04,

14     pages eight to 13.  I promise the Court we won't subject

15     the Court, I don't believe, to any videos of any

16     Republicans speaking in favor of this plan.

17          JUDGE PAYNE:  04 is not in our books, is that

18     correct, our witness books for this witness?  We'll figure

19     it out.

20

21          (Video played.)

22

23          JUDGE PAYNE:  Are you through with that evidence?

24          MR. BRADEN:  Yes, Your Honor.

25          JUDGE PAYNE:  We'll take the afternoon recess, 15

1    minutes.

2

3              (Recess taken.)

4

5              NOTE:  After the afternoon recess is taken, the

6    case continues as follows:

7              JUDGE LEE:  Mr. Braden, why don't you move along.

8    Let's not make a federal case out of this.

9              MR. BRADEN:  Your Honor, I promise that we should

10   be done in the next 15 or 20 minutes, no more than that, I

11   believe.

12   BY MR. BRADEN: (Continuing)

13   Q    You have been in the legislature how long?

14   A    18 sessions, since 1998.

15   Q    In your experience, is redistricting one of the most

16   contentious processes?

17   A    It can be.

18   Q    And often a very partisan process?

19   A    It can be, yes.

20   Q    How many hours did you spend working on the plan?

21   A    Two or three hundred.

22   Q    I would like to go to Plaintiffs' Exhibit 41.  The

23   transcript is in Plaintiffs' Exhibit 40, pages 39 to 44.

24              JUDGE LEE:  Did you say 41 or 40?

25              JUDGE PAYNE:  Which exhibit?

Jones - Direct

1          MR. BRADEN:  The transcript is Plaintiffs'

2    Exhibit 41 -- 40 -- oh, yes, sorry.  41 is the video clip,

3    and Plaintiffs' Exhibit 40 is the transcript.  My

4    apologies.

5          JUDGE PAYNE:  It's in the back of the book.

6    Thank you.

7          MR. BRADEN:  Those are page numbers 39 to 44.

8          NOTE:  The video is played.

9    BY MR. BRADEN: (Continuing)

10   Q    Delegate Jones, were you present for this speech?

11   A    I was.

12   Q    And did you work with this particular delegate in

13   drafting his district?

14   A    Not directly.  Lionel Spruill had brought to me his

15   concerns.

16         MR. BRADEN:  Your Honor, I would like to bring up

17   a final video clip.  I have edited, as I said, edited out

18   the Republicans, and only have a video clip, it's

19   Plaintiffs' Exhibit 41, and a transcript is Plaintiffs'

20   Exhibit 40, pages 47 to 50.

21         NOTE:  The video is played.

22   BY MR. BRADEN: (Continuing)

23   Q    Delegate Jones, were you present for this speech?

24   A    I was.

25   Q    Do you remember how many members voted against the

387

1   bill in final passage?

2   A    I believe it was nine.

3   Q    And the majority of the Republican caucus voted for

4   it?

5   A    I believe -- yes, all, I believe everyone did.

6   Q    And the majority of the Democratic caucus voted for

7   the plan?

8   A    All except for one member, I believe.

9   Q    That was the black caucus?

10  A    The black caucus, I mean, excuse me.

11  Q    And the Democratic caucus voted, the majority, for the

12  plan?

13  A    Yes, I think two-thirds.

14           MR. BRADEN:  Your Honor, before I step aside --

15           JUDGE PAYNE:  The transcript says 80 ayes and

16  nine noes.  Where were the rest of them?

17           THE WITNESS:  It was -- we had some that were

18  absent, Your Honor, if I remember correctly.

19           JUDGE PAYNE:  The others were absent?

20           THE WITNESS:  Yes, sir.

21           MR. BRADEN:  Your Honor, before I dismiss the

22  witness, I think I was remiss in not moving the admission

23  of the Loewen Report, Defendant-Intervenors' Exhibit 36.

24  I would move its acceptance now.

25           MR. SPIVA:  I object, Your Honor.  There was no

Jones - Direct

1    foundation laid for this report.  There is the report from

2    the previous court case in 2001.  It is hearsay.  It is

3    irrelevant.  And we still object.

4          MR. BRADEN:  Your Honor, it's not being admitted

5    for the purpose of the truth of it, although I don't doubt

6    that.  But it is being admitted because it was used by the

7    architect of the plan to inform his decision-making

8    process.

9          One of the arguments they make is that they

10   didn't have an analysis, that he didn't do a functional

11   analysis.  And since he was a defendant in that prior

12   plan, it doesn't seem unreasonable that he looked at an

13   analysts of a prior court case by an expert and that

14   informed his decision making.

15         MR. SPIVA:  Your Honor, I forgot to mention also,

16   it wasn't produced.  But this is an analysis of a former

17   plan using 14-year-old data.  And it has no relevance to

18   what he looked at in terms of drawing the 2011 maps.  I

19   mean, it's just -- there is no connection there.

20         JUDGE PAYNE:  Well, it may or may not be

21   relevant.  The troublesome thing to me, Mr. Braden, though

22   is that while you were given leeway to explore with him

23   the extent to which he relied on it, there was never any

24   real discussion about how he relied on it other than the

25   fact that he did rely on it.  And we're left then to read

Jones - Direct

1    the whole report and study it.

2            And as Mr. Spiva points out, there are goodly

3    numbers of that probably don't have any relevance to this

4    case and there may be things that do have relevance.  So

5    we do have a 403 problem here it looks to me like.

6            MR. BRADEN:  I actually don't think you have a

7    403 problem because I think throughout our case and we

8    will argue and have argued that the 12 challenged plans

9    are essentially the same as the 12 prior plans, really

10   only with minor population changes that were required.

11           These are the same 12 plans that have been in

12   existence since 1991.  That's the reason I started out

13   talking about history.  History is important here.  These

14   are the same 12 districts that existed in 1991.  They are

15   the same 12 districts that existed at the time of this

16   litigation.  And they are essentially the same

17   politically.

18           MR. SPIVA:  Your Honor, I have no --

19           JUDGE LEE:  Objection sustained.

20           MR. SPIVA:  Thank you, Your Honor.

21           JUDGE PAYNE:  What exhibit was that, so the

22   records reflects it?

23           MR. BRADEN:  Exhibit 36.

24           JUDGE PAYNE:  That is Intervenors' Exhibit 36.

25           MR. SPIVA:  Yes, Your Honor.

CROSS-EXAMINATION

1

BY MR. SPIVA:

2

Q    Good afternoon, Your Honors.  Bruce Spiva.

3

     Good afternoon, Delegate Jones.  You and I are from

4

the same part of the world.  I grew up in Virginia Beach,

5

Virginia.  So I know about some of those bridge crossings

6

and things that you've talked about today, and driven down

7

64 more times than I can count.

8

     I wanted to just start off, I was very interested

9

listening to the remarks of Delegate Spruill.  You recall

10

those, you heard those on direct?

11

A    He had two sets of remarks.

12

Q    Yes.  You heard both of them here today?

13

A    Yes.

14

Q    Right.  And you recall that at one point he was

15

talking about one district I guess that had previously

16

been represented by an African-American, but was no longer

17

represented by an African-American, do you recall that?

18

A    I think he was talking about two different districts

19

as well, if I recall correctly.

20

Q    Yeah, right.  But in one he said he is not of our

21

persuasion, talking about the person who had replaced the

22

African-American.  Do you recall that?

23

A    Correct.

24

Q    Yeah.  Now, I also was interested that we saw the clip

25

Jones - Cross

1    from Delegate Onzlee, I hope I am pronouncing his name

2    correct -- is that correct?

3    A    That is correct.

4    Q    Okay.  Mr. Onzlee, Delegate Onzlee Ware, who

5    represents a district in the Roanoke area, in the city of

6    Roanoke, is that fair?

7    A    Correct.  A heavily Democratic district, yes, sir.

8    Q    Right.  But it is not, as he said in his remarks, a

9    majority-minority district, correct?

10   A    No.  It is actually a heavily Democratic district.

11   Q    Okay.  Now, if a Delegate had stood up in the well of

12   the House of Delegates, a white delegate, and said, he's

13   not of our persuasion, would you view that as an offensive

14   remark?

15   A    I don't get into the hypotheticals, quite frankly.

16   Q    Well, it is not so hypothetical, right?  And this is

17   an African-American man, a delegate who is representing a

18   non-majority district.

19        And really I'm asking you if someone, you know, like

20   Delegate Spruill, except they were white, stood up in the

21   House of Delegates of the Commonwealth of Virginia and

22   said, he's not of our persuasion, wouldn't you view that

23   as offensive?

24        JUDGE PAYNE:  What issue does that go to?  What

25   relevance?  Let's get on with the questions that pertain

1    to the case, if you don't mind, please.

2             MR. SPIVA:  Okay, Your Honor, but they played a

3    clip of that.

4             JUDGE PAYNE:  Please.

5    BY MR. SPIVA: (Continuing)

6    Q    So, Delegate Jones, if I say the challenged districts,

7    you'll know that I'm referring to the 12 specific House of

8    Delegates districts that are challenged in this case?

9    A    Correct.

10   Q    Okay.  And if I use the terminology BVAP, you'll

11   understand that I'm referring to black voting-age

12   population?

13   A    No.  You need to clarify that.

14   Q    You don't understand that BVAP stands for black

15   voting-age population?

16   A    No.  There are two different BVAP populations that

17   have been discussed.

18   Q    Yeah.  I think you can probably appreciate, sir, that

19   that was not my question.  I was just asking whether the

20   initials BVAP stand for black voting-age population?

21   A    I would agree to that.

22   Q    Okay.  Now, you've testified that you were a

23   participant in the 2001 redistricting process, isn't that

24   correct?

25   A    I was.

Jones - Cross

1  Q    And you were the primary map drawer for what we've

2  been calling -- what my colleague on the other side I

3  believe has been calling the benchmark plan, the plan that

4  was adopted in 2001, is that fair?

5  A    That would be Chapter 1 of the Acts of the Assembly,

6  yes, sir.

7  Q    Okay.  And that was the 2001 map and plan that was

8  enacted for the House of Delegates in the Commonwealth of

9  Virginia, correct?

10 A    That is correct.

11 Q    And you were the primary map drawer for that map,

12 correct?

13 A    I was.

14 Q    Okay.  And the benchmark plan, if I refer to it as the

15 benchmark plan, you understand what I'm referring to,

16 correct?

17 A    I will.

18 Q    Okay.  And that included 12 majority-minority

19 districts, isn't that right?

20 A    Essentially that had been existence since 1991, that

21 is correct.

22 Q    Okay.  But not all of those districts in 2001 had a

23 BVAP of 55 percent or greater, isn't that correct?

24 A    That is correct.

25 Q    Okay.  In fact, HD 89 in 2001 had a BVAP of

Jones - Cross

1    53.4 percent, isn't that right?

2    A    My recollection, that would be correct.

3    Q    Okay.  And HD 90, which was a majority -- HD 89 was a

4    majority-minority district, correct?

5    A    Correct.

6    Q    In 2001?

7    A    Correct.

8    Q    Okay.  And HD 90 was also a majority-minority district

9    in 2001, correct?

10   A    That's correct.

11   Q    And HD 90 in 2001 had a BVAP of 54 percent, is that

12   fair?

13   A    That's fair, yes, sir.

14   Q    And those districts, 89 and 90, were obviously enacted

15   into law, they became part of the benchmark plan, fair?

16   A    They were the challenged districts in the *West versus*

17   *Wilkins* case, yes, sir.

18   Q    Okay.  And you were aware when you were drawing the

19   districts that they had under 55 percent BVAP, is that

20   fair?

21   A    Which plan are you talking about, sir?

22   Q    The 2001 plan.  That in 2001, districts 89 and 90 had

23   a BVAP of under 55 percent, you were aware of that,

24   correct?

25   A    That is correct.

Jones - Cross

1    Q    All right.  And you voted to enact them, correct?

2    A    Being the chief patron, that would be correct.

3    Q    All right.  And at that time you voted to enact those

4    two districts because you thought they did comply with the

5    Voting Rights Act, correct?

6    A    That would be correct.

7    Q    Okay.  And you thought that those two districts would

8    allow minorities to elect their candidates of choice,

9    isn't that fair?

10   A    Based on the testimony that we received back in 2001,

11   that would be correct.

12   Q    Okay.

13   A    And the fact that it was precleared by the Department

14   of Justice.

15   Q    Okay.  I just want to make sure -- I want to get back

16   to my question.  Which was, in 2001 you voted for these

17   two districts, HD 89 and 90, which had a BVAP of under

18   55 percent, because you thought that those two districts

19   would allow minorities to elect the candidates of their

20   choice, is that correct?

21   A    I voted for the plan because it fully complied in my

22   opinion with the Voting Rights Act.

23   Q    And that would include allowing the African-American

24   community in those two districts to -- the opportunity to

25   elect their candidates of choice, fair?

Jones - Cross

1  A    I think that's fair to say.

2  Q    Okay.  An opportunity doesn't mean always elect, would

3  you agree with that?

4  A    I would say that the opportunity is what the Voting

5  Rights Act I think requires.

6  Q    Right.  It doesn't mean 100 percent of the time, but

7  it means -- it means a fair opportunity to do so?

8  A    I don't know the exact term, but the Voting Rights Act

9  says they have to have the opportunity -- the effective

10  election of their electoral exercise, or something to that

11  effect.  I can find it if you like, I know it's in the

12  documents somewhere.

13  Q    Okay.  No, that's fair enough.  Now, I would like to

14  turn to the 2010/2011 redistricting process.  And you've

15  already testified that you served as the Chair of the

16  General Assembly's Joint Reapportionment Committee, that's

17  correct, right?

18  A    Correct.

19  Q    Okay.  And in that capacity, you were principally

20  responsible for drawing the enacted plan in 2011, correct?

21  A    No, that would not be correct.  Being chairman of that

22  commission did not indicate that I would be the chairman

23  or I would be the one who carried the bill.

24      My job as the chairman of the Joint Reapportionment

25  Committee/Commission was to make sure that we were

Jones - Cross

 1    prepared to receive the PL-94 data from the Census Bureau.

 2    Q    Okay.  Yeah, maybe I might have caused confusion by

 3    linking it to the Chair role.

 4         But you were, I think you've already testified, the

 5    architect, the chief architect of the enacted plan in

 6    2011, is that a fair term?

 7    A    I was.

 8    Q    Okay.  And if legislators wanted changes to the map or

 9    to their districts, they ultimately had to go through you,

10    is that correct?

11    A    As with any bill in the legislature, you would go to

12    the chief patron of that measure to receive any amendments

13    to the bill.

14         And that's in fact what an adjustment to a district

15    line, it would be an amendment to the bill itself.

16    Q    Okay.  I just want to make sure, that was a yes,

17    right?  If legislators wanted changes to the map or to

18    their districts, they had to go through you, correct?

19    A    Like any other bill, that would be correct.

20    Q    Correct, okay.  And would you say it's fair to say

21    that nobody else had more influence over the bill?

22    A    I would say that would be an accurate --

23    Q    And you worked, at least to some extent, with Delegate

24    Jennifer McClellan on the districts in the Richmond area,

25    is that true?

Jones - Cross

1    A    I worked with her, and Betsy Carr, and Delores

2    McQuinn, yes.

3    Q    Okay.  And in terms of Delegate McClellan, you

4    communicated with her frequently during the process?

5    A    I would not use the word "frequently," no, sir.

6    Q    But you communicated with her?

7    A    We communicated.

8    Q    Okay.  And did you communicate your goals and

9    priorities in the redistricting to her?

10   A    No.  I actually asked her what were we -- I think she

11   stated in her testimony on the floor, or even maybe

12   yesterday, that I indicated that I wasn't as familiar with

13   the Richmond neighborhoods, and I thought it important

14   that we receive input from those delegates, just like I

15   did in Northern Virginia to the extent that Delegate

16   Sickles, who we just saw in the exhibit, testified.

17   Q    Okay.  So you did not communicate to her your goals or

18   priorities in terms, in terms of the map, in terms of --

19   A    I asked her what was important to her district and to

20   the city of Richmond region.

21   Q    So I take it that's a no, you did not communicate your

22   goals and priorities to her?

23   A    I didn't have any goals in that regard.  It's not --

24   it's just my bill with my name on it.  My goal was to have

25   a plan that was representative of the 100 members of the

Jones - Cross

1    House of Delegates.

2    Q    So that's a no?

3    A    If you want to take it as a no.

4    Q    Well, is it a no or is it a yes?

5    A    I didn't give her my -- I didn't give her any

6    direction as to what was required, no, sir.

7    Q    Okay.  But if she, like you've testified about any

8    other legislator, wanted changes to the map, she

9    ultimately had to go through you, correct?

10   A    Yes, sir.  The only issue that was an absolute was the

11   plus or minus 1 percent, just like it was in 2001 plus or

12   minus 2 percent, that was the only absolute that was

13   contained in anything that was done.

14   Q    I see.  And you also said -- I think you've already

15   testified to this, that Senator Dance also played a role

16   in the redistricting process?

17   A    She did.

18   Q    Okay.  And she was a member of the Joint

19   Reapportionment Committee?

20   A    That is correct.

21   Q    She went to all of the public hearings that you held

22   around the Commonwealth over the map?

23   A    I don't believe she went -- I don't think any member

24   went to all.  We had a regional -- we had regional

25   meetings every one weekend where certain members went to

Jones - Cross

1    the Southwest and Valley and Southside, and other members

2    went to Richmond, Northern Virginia.  So we split up those

3    duties.

4    Q    Okay.  But she went to several of those meetings?

5    A    I would -- I didn't look at her attendance record, but

6    I would say yes, she did.

7    Q    If she testified, if the record reflects that she

8    testified that she went to all of them, do you have a

9    reason to doubt that?

10   A    I would have no reason.  But you asked me did I know

11   if she went to every one of them.  I did not.  So I can't

12   represent what's not true, what I don't know to be true.

13   Q    Fair enough, fair enough.  And did you communicate

14   your goals and priorities to Senator -- now Senator Dance?

15   A    We discussed what was presented at the public

16   hearings.  And we listened to the feedback.  And I

17   solicited input from the members of the black caucus.

18   Q    And she also submitted some proposed changes to the

19   districts in the Southside area, is that correct?

20   A    That is correct.

21   Q    And you had to approve or disapprove those changes

22   ultimately, correct?

23   A    As the patron of the bill, that would be correct.

24   Q    Okay.  Let's discuss for a minute the criteria that

25   you followed in creating the enacted plan.

Jones - Cross

1      Let me ask you to turn -- you should have an exhibit

2    book, and I think we'll also have it on the screen,

3    Plaintiffs' Exhibit 16.

4            JUDGE PAYNE:  Are you using the exhibit book of

5    something you handed him, or your own exhibit book?

6            MR. SPIVA:  Our own exhibit book, Your Honor,

7    plaintiffs' exhibit book.

8            JUDGE PAYNE:  Thank you.

9            MR. SPIVA:  Thank you.

10           THE WITNESS:  I have it, Your Honor.

11   BY MR. SPIVA: (Continuing)

12   Q    And this exhibit is the House Committee on Privileges

13   and Elections, Committee Resolution No. 1 - House of

14   Delegates District Criteria, correct?

15   A    That is correct.

16   Q    And these were proposed by you?

17   A    That is correct.

18   Q    And they were approved by -- they were approved on

19   3/25/2011, correct?

20   A    That is correct.

21   Q    And so, this is the committee's official statement on

22   the criteria for redrawing the House districts in 2010 and

23   2011, correct?

24   A    That is correct.

25   Q    Let's talk a minute about the content of the criteria.

Jones - Cross

1   As you mentioned a minute ago, population equality is the

2   number one criteria, correct?

3   A    That is correct.

4   Q    And the number two criteria is the compliance with the

5   Voting Rights Act?

6   A    And the United States Constitution supremacy clause.

7   Q    Right, right.  Yes, that's right.  Actually, why don't

8   we just read, why don't I read this, and I will ask you if

9   I've got it right rather than trying to paraphrase.  It

10  says, "District shall be drawn in accordance with the laws

11  of the United States and the Commonwealth of Virginia

12  including compliance with protections against the

13  unwarranted retrogression or dilution of racial or ethic

14  minority voting strength.  Nothing in these guidelines

15  shall be construed to require or permit any districting

16  policy or action that is contrary to the United States

17  Constitution or the Voting Rights Act of 1965."

18       Did I read that correctly?

19  A    You did.

20  Q    And would it be fair to say that the Voting Rights Act

21  and compliance with the Constitution trumped everything

22  except the number one criteria, population equality?

23  A    I would say yes.  We stated that actually in Roman

24  numeral VI in Priority.

25  Q    Okay, thank you.  And it follows that because the

1   Voting Rights Act trumped everything except population

2   equality and the Constitution -- if you don't mind, I'm

3   going to shorthand it.  If you want, I can say the Voting

4   Rights Act and the Constitution each time.

5        But the Voting Rights Act trumped everything except

6   population equality.  It follows that the Voting Rights

7   Act trumped contiguity and compactness, fair?

8   A    That's fair, yes, sir.

9   Q    All right.  And it trumped, the Voting Rights Act

10  trumped communities of interest as well?

11  A    Yes, sir.

12  Q    All right.  And that's consistent with the statements

13  that you made on the floor during the House debates?

14  A    Yes, sir.

15  Q    And you've already testified that you did consider

16  race in the drawing of each of the 12 challenged

17  districts, correct?

18  A    Yes, I did, as anyone else presenting a bill to the

19  chamber for consideration would have to do.

20  Q    Let me ask you to turn in the same notebook to

21  Plaintiffs' Exhibit 22.

22  A    I do not have that, Your Honor.  I go from --

23  Q    It should be in the same notebook as the one that you

24  found 16 in.

25  A    I go from 16 to 33.  I might have an abbreviated

Jones - Cross

1   version here.  I will take that one.

2   Q    Thanks.

3              JUDGE PAYNE:  What exhibit are you using?

4              MR. SPIVA:  Plaintiffs' Exhibit 22, Your Honor.

5              JUDGE PAYNE:  Okay.

6   BY MR. SPIVA: (Continuing)

7   Q    If everybody is there, are you at the exhibit,

8   Delegate Jones?

9   A    Yes, sir.

10  Q    Okay.  And this is an e-mail from Chris Marston to

11  yourself dated Friday, April 1, 2011, 10:33 p.m.

12       There is no reason to believe that you never received

13  that, correct?

14  A    I don't necessarily recall it, but certainly it has

15  got my e-mail address.  So I would assume that I received

16  it, yes, sir.

17  Q    And Chris Marston was somebody who was involved in

18  consulting and aiding you in the redistricting process, is

19  that correct?

20  A    He was an attorney.

21  Q    He is an attorney, yes.  And he was hired by the

22  speaker, by Speaker Howell to help with redistricting?

23  A    That is correct.

24  Q    And he also worked for you in the redistricting

25  process?

Jones - Cross

1   A    He didn't work for me.  He actually worked with me.

2   He was not employed by me.  So I worked with him.

3   Q    Okay, fair enough.  But he worked with you in

4   assisting you in drawing the new map?

5   A    Correct.

6   Q    Okay.  And let me just, let me just read the e-mail

7   from Chris Marston to yourself, Delegate Jones.  It says,

8   "Someone's having trouble following directions.  Here are

9   the two options that Dale proposes, neither of which fully

10  addresses Tyler's concerns.  I'll try and generate another

11  one that gets it done without dropping the percent BVAP

12  too low."

13       Did I read that correctly?

14  A    Yeah, you did.

15  Q    Okay.  And he's referring to Delegate Tyler's

16  district, that is District 75, is that correct?

17  A    That is correct, yes, sir.

18  Q    That's one of the majority-minority districts?

19  A    Correct.

20  Q    Okay.  And in your view, preventing retrogression,

21  that meant keeping the percent BVAP from dropping too low

22  in each of the challenged districts, is that a fair

23  statement?

24  A    I think that the Voting Rights Act requires that, yes,

25  sir.

Jones - Cross

1   Q    Okay.  And in fact, you required that districts that

2   were already above 55 percent, that they stay above

3   55 percent, isn't that correct?

4   A    That is not correct.

5   Q    Okay.  And so, you didn't require the districts that

6   were already above 55 percent, that they stay above

7   55 percent?

8   A    No.  Actually in my introduced map I had three

9   districts that were in the 54 percent DOJ black range.

10  Q    Okay.  That's the DOJ black definition you're talking

11  about?

12  A    That is correct.  That's why I wanted to clarify

13  earlier your BVAP black voting-age population.  It was

14  critical important in this case.

15  Q    Thank you for that clarification, Delegate Jones.  But

16  using the DLS definition, the one that everybody else saw,

17  all of the districts remained above 55 percent, fair?

18  A    That's fair, but that's not what the Department of

19  Justice would have been considering when they precleared

20  the map.

21  Q    Okay.  We'll take a look at that in a little while.

22          And actually, why don't we turn to your

23  deposition.  If I could get page 93 of Delegate Jones'

24  deposition.

25          Would Your Honors like us to hand up the hard

1    copy, or do you want see it on the screen?  It's on the

2    screen, but we can hand --

3            JUDGE LEE:  The screen is fine.

4            JUDGE PAYNE:  The screen is fine.

5            JUDGE LEE:  As long as long as it's about two or

6    three pages and not --

7            MR. SPIVA:  No, no.  And no video.

8    BY MR. SPIVA:  (Continuing)

9    Q    Now, let me ask you, before we turn to the deposition,

10   Delegate Jones, isn't it true that all --

11           JUDGE PAYNE:  Wait a minute.  The purpose of

12   turning to the deposition is to impeach him?  Is that what

13   you're doing with the deposition?

14           MR. SPIVA:  Well --

15           JUDGE PAYNE:  If you do, you need to go on and do

16   it.

17           MR. SPIVA:  Okay.

18           JUDGE PAYNE:  That's the question that you had on

19   the table.

20   BY MR. SPIVA:  (Continuing)

21   Q    Okay.  Let me ask you to turn to page 93, Delegate

22   Jones.

23   A    I'm sorry, I did not get the exhibit number.  If you

24   did --

25   Q    It's not an exhibit.  It's up on the screen, your

Jones - Cross

1   deposition.  If you want, I can hand you a hard copy.

2   Would you prefer that?

3   A    That would be helpful, yes.

4   Q    May we hand it up?  And specifically -- did I give you

5   the page number?  It is page 93.  And specifically if I

6   could direct your attention to line 9.

7        JUDGE PAYNE:  You know, it might be helpful given

8   the lapse of time and the shuffling of papers if you would

9   posit the question again --

10       MR. SPIVA:  Will do, Your Honor.

11       JUDGE PAYNE:  -- that you are trying to work an

12  impeachment on.  Then we will understand where you are.

13       MR. SPIVA:  Will do, Your Honor.  And we are

14  offering this, of course, as substantive evidence as well

15  because it is a statement of a party opponent, but why

16  don't I ask the question --

17       JUDGE PAYNE:  That's different, and it involves

18  different rules.  And I asked you were you using it for

19  impeachment, you said yes, and so we want a posit there.

20  If you're going to offer it in your case, you can offer

21  it.  If it qualifies, then we'll deal with it.

22       MR. SPIVA:  Okay.

23       JUDGE PAYNE:  But you didn't offer it in your

24  case in -- I guess it's in if it's not objected to.

25       MR. SPIVA:  Yes, I believe our --

Jones - Cross

1           JUDGE PAYNE:  Then if you're going to do it, go

2    ahead and do the impeachment the correct way, if you will.

3           MR. SPIVA:  Okay.  Thank you, Your Honor.

4    BY MR. SPIVA: (Continuing)

5    Q    Let me ask you the question, Delegate Jones, first and

6    I will turn you to the page.

7           Isn't it true that all of the challenged

8    districts have at least 55 percent BVAP because you

9    required that they all have at least 55 percent BVAP?

10   A    No, that is not true, no.

11   Q    Can I ask you to turn to page 93 of your deposition,

12   specifically line 9.  Are you there?

13   A    I'm there.

14   Q    And so the question was asked, "So you are explaining

15   here why it is that you are trying to keep the districts

16   above 55 percent, correct?  Answer:  That's correct.

17   Question:  Part of the reason that you adopted that

18   Guideline of 55 percent was from input from other members,

19   right?  Answer:  Correct."

20          Did I read that correctly?

21   A    That would be correct.

22          JUDGE PAYNE:  You did, Mr. Spiva, but it didn't

23   impeach the question.  That's precisely why we require

24   that impeachment match up to the question, marry it very

25   closely, not exactly.

Jones - Cross

1              So if you're going to use impeachment, it's sort

2    of like the old rule, if you're going to touch the king,

3    kill him.  Okay?

4              MR. SPIVA:  Understood, Your Honor.  We would --

5    it's in evidence, of course, and we would offer it as

6    substantive evidence anyhow.  But I take Your Honor's

7    point.

8              MR. BRADEN:  Your Honor, we question whether or

9    not this is in fact in evidence.

10             JUDGE PAYNE:  We will deal with that maybe when

11   he offers it in his case.  If it is not in evidence

12   already by virtue of the pretrial procedures.  But you

13   will make a note of that, deal with that at the time that

14   he offers it, or raise it on your own to contend that it

15   is not in the record.

16             MR. BRADEN:  Yes, Your Honor.

17             JUDGE PAYNE:  Go ahead with your examination, Mr.

18   Spiva.

19             MR. SPIVA:  Yes, Your Honor.

20   BY MR. SPIVA: (Continuing)

21   Q    Now, earlier Mr. Braden asked you about a transcript

22   of a debate where you talked about fixing some precincts

23   in several of the Richmond area districts, do you recall

24   that?

25   A    I do.

Jones - Cross

1  Q    And you also talked about splitting a precinct in

2  anticipation of moving one of the -- one of the voting --

3  sorry.  In anticipation of moving a voting place.

4  A    Yes.  As I understood it from I think either Delegate

5  McClellan or maybe Delegate Carr, that they were going to

6  be moving the polling place at the War Memorial, has zero

7  population.  So we split that precinct so they would be

8  able to vote in that precinct.

9  Q    Okay.  And Delegate McClellan proposed a number of

10 changes in terms of fixing precinct splits, isn't that

11 correct?

12 A    She did.

13 Q    And a number of those came out of communications she

14 had with the registrar of Richmond, Mr. Showalter, and the

15 registrar of Chesterfield, is that right?

16 A    As I understand it, yes, sir.

17 Q    But sitting here today, you can't say that the changes

18 you referred to in that transcript that you reviewed

19 earlier, that those are the same as the precincts that

20 Delegate McClellan testified about, that she testified

21 about not being made, is that fair?

22 A    I would say the best of my recollection, the bulk of

23 the changes that occurred between House Bill 5001 and 5005

24 were to address the concerns that were raised by the

25 registrar, Delegates Carr, McClellan, and McQuinn.

Jones - Cross                                                        412

1    Q    But sitting here today, can you testify that all of

2    the precinct changes that were requested by Delegate

3    McClellan were made in the final HB 5005?

4    A    No, I don't think any member got all the requests that

5    they had made to me.  And I had literally hundreds of

6    requests made to me by members.

7    Q    Okay.  And sitting here today, you can't tell me that

8    the precincts that Delegate McClellan wanted fixed at the

9    request of Kirk Showalter, that all of those precinct

10   fixes were made?

11   A    No, I don't believe I represented that.

12   Q    Okay.  And at the time HB 5005, the 2011 map and plan,

13   was enacted, HD 71 had a, we will call it DLS black, a DLS

14   black BVAP of 55.3 percent, is that correct?

15   A    I believe that is correct.  And it was a 54.9 for the

16   DOJ black, I believe.

17   Q    So it was .4 percent calculated based on DOJ's method

18   of calculating BVAP?

19   A    For that district, yes.  Some were as big as 1 percent

20   delta in difference between.

21   Q    I think, Delegate, you probably appreciate that wasn't

22   my question.  I said it was a .4 percent difference

23   measured by the way that DOJ measures BVAP and the way

24   that the DLS measured BVAP, is that right?

25   A    For the district as it was configured, yes, that is

Jones - Cross

413

1    correct.

2    Q    In 2011, right?

3    A    For the 5005 bill that was passed, correct.

4    Q    Correct.  So it is the 2011 enacted plan?

5    A    Correct.

6    Q    Okay.  So whatever changes were made, it did not lower

7    the DLS BVAP below 55 percent, correct?

8    A    Those changes did not, correct.

9    Q    Let me ask you to turn to Plaintiffs' Exhibit 30,

10   which should be in the book that you have in front of you.

11            JUDGE PAYNE:  Is that up on the screen now?  Can

12   somebody put that on the screen?  Thank you.

13            MR. SPIVA:  It should be, Your Honor, yes.  Yes,

14   it is.

15   BY MR. SPIVA:  (Continuing)

16   Q    Let me ask you to turn to page 4 of Plaintiffs'

17   Exhibit 30.  And actually if you can first look at page 3

18   because the e-mail I want to ask you about begins at the

19   bottom of page 3 and continues over to page 4.

20   A    Did you say page 4?

21   Q    Yes, page 3 and 4 of Exhibit 30, Plaintiffs'

22   Exhibit 30.  Are you on Plaintiffs' Exhibit 30, Delegate

23   Jones?

24   A    It has a separator.

25   Q    Yes.  You can ignore those separators --

Jones - Cross

414

1    A    Normally that means it's a different document.

2    Q    No, it wasn't.  I can tell you it was produced

3    altogether to us.  And it was consecutively produced.

4         So are you on page 3, Delegate Jones, at the bottom of

5    the page?

6    A    I am.

7    Q    Okay.  And you see there, there is an e-mail dated

8    4/7/11 from you, Chris Jones, 9:42 p.m. to G. Paul Nardo,

9    subject F/up.  It says, "GP, I followed up with Jennifer

10   McClellan this afternoon and she reconfirmed that the

11   request of Kirk Showalter, Richmond registrar, exceeded

12   the 55 percent threshold when they did on the second floor

13   for all affected districts, and that she would have never

14   requested it if it didn't.  I'm not sure what got lost in

15   translation, but the good news is it is fixed now and

16   Jennifer will explain the amendment on the floor Monday if

17   needed."

18        And then you go on to discuss something else at the

19   bottom of the e-mail.

20        Did I read your e-mail correctly?

21   A    You did.

22   Q    Okay.  And I take it that Mr. Nardo is the chief of

23   staff for Speaker -- he was the chief of staff for Speaker

24   Howell at the time?

25   A    That is correct.

Jones - Cross

1   Q    Okay.  And you're telling Mr. Nardo in this e-mail

2   that you rejected a proposed change that Ms. McClellan had

3   submitted, isn't that correct?

4   A    Yeah, I believe we also had to deal with the plus or

5   minus 1 percent population threshold.

6   Q    Okay.  But in this e-mail you mentioned that the

7   change, that she thought that the change that she was

8   proposing exceeded the 55 percent, do you see that?

9   A    Yeah, that's what she indicated I think in our

10  conversation.

11  Q    And that's what you're relaying to Mr. Nardo, correct?

12  A    That's correct.

13  Q    She doesn't say anything about a 1 percent deviation

14  -- or you don't say anything about a 1 percent deviation

15  in this e-mail, correct?

16  A    I do not, but I know there is one later that does

17  speak to that.

18  Q    Okay.  But this one does not?

19  A    No.

20  Q    Okay.

21  A    But I think there is a chain of e-mails that went back

22  and forth.

23  Q    Okay.  But you are telling Mr. Nardo that you rejected

24  a proposal by Ms. McClellan because it did not meet the

25  55 percent threshold, isn't that correct?

Jones - Cross

1    A    I did not reject anything, I don't believe.

2    Q    Okay.  But you said that she wouldn't even have

3    proposed the change that she was requesting if she knew

4    that it was below the 55 percent threshold, isn't that

5    correct?

6    A    That's what she represented.  If I recall correctly,

7    and there was a whole lot happening in those last several

8    days, this was actually a Senate amendment, an amendment

9    on the Senate side, if I'm not mistaken.  And it was not

10   anything that was done during the formation of House Bill

11   5005 before -- 5001 before it passed the House, I believe.

12   That's my recollection, but I stand to be corrected if you

13   can demonstrate to me that.

14   Q    So your testimony reading this e-mail today is you

15   think that she is referring to a change on the Senate

16   side?

17   A    Yeah.  Excuse me, Your Honor, there were changes -- if

18   you recall in the sequence of the history of House Bill

19   5005, there was a conference report.  But there were also

20   amendments that were made in the Senate.

21   Q    Yes, I am aware of that.  I guess I have a narrow

22   question.  Which is, you're now saying that your best

23   recollection is that this e-mail, your e-mail to Mr. Nardo

24   is referring to a change that Delegate McClellan requested

25   to the Senate side of the bill?

Jones - Cross

1   A    To the best of my recollection right now.  If I have

2   time to read the other correspondence, I would be glad to

3   look at it.  But my best recollection right now.

4   Q    Okay.  So if that were the case though, then the

5   transcript that you reviewed earlier talking about

6   precincts being unsplit and one precinct being split in

7   the House, that would have nothing to do with this then,

8   would it?

9   A    No, it would be 5005.

10  Q    Correct.

11  A    I think this is speaking of 5001.

12  Q    Okay.  All right.

13  A    To the best of my knowledge, this is I think 5001.

14          JUDGE PAYNE:  You're saying that the

15  communication in Plaintiffs' Exhibit 30 pertains to House

16  Bill 5001, not 5005, according to your recollection?

17          THE WITNESS:  Yes, sir.  To the best by

18  recollection, but I will refresh my memory whenever we are

19  going to be breaking today and I will come back with --

20  BY MR. SPIVA: (Continuing)

21  Q    And your recollection is that Delegate McClellan asked

22  for a change to the Senate bill?

23  A    It would -- excuse me, Your Honor.  It would have been

24  the House Bill, but as any piece of legislation, I don't

25  want to get way down in the weeds, but any piece of

Jones - Cross

1   legislation has to be passed by both houses.

2           So what occurs is if there is any change made to

3   a bill, then what must happen if it's not made on the

4   chamber that it originates, when it gets to the other

5   chamber, an amendment is there.  And then if we, the other

6   chamber, doesn't agree to the amendment, it goes into what

7   we call -- it can go into like a conference report.

8   Q   I am trying to understand is that she was requesting a

9   change to the Senate districts?

10  A   No, sir, I did not say that.  Maybe I wasn't clear.

11  My wife says sometimes I'm not clear in my response.

12      What I said clearly was, I don't recall if this was a

13  request made prior to the passage of 5001 in the House or

14  if it was a change contemplated in the Senate to the House

15  bill.

16      Your earlier question dealt with 5005, which was done

17  later in the month because of the veto by Governor

18  McDonnell to House Bill 5001.

19  Q   Correct.

20  A   So to my recollection, I'm trying to give you the best

21  that I can recall on the spot looking at this document.

22  Q   Okay.  I think I have got it clear now though.  You

23  have no quarrel with the fact that what you're discussing

24  in your e-mail here is a requested change to House

25  districts, you just don't recall whether it was a change

Jones - Cross

1    that would have been reflected in the Senate amendment or

2    a Senate bill?

3    A    That is correct, Your Honor.  So I don't know the

4    timing.

5              JUDGE PAYNE:  He never said they were changes to

6    the House districts.  Let's go ahead.

7              I think you've stepped on your own line, so go

8    into another line of questioning, if you will.

9              MR. SPIVA:  Okay, Your Honor.  I mean, the

10   question is whether it's --

11             JUDGE PAYNE:  Mr. Spiva, it is a good idea to go

12   ahead and ask a question now.

13             MR. SPIVA:  Okay.

14   BY MR. SPIVA: (Continuing)

15   Q    Delegate Jones, this e-mail refers to changes to the

16   House districts, correct?

17   A    That is correct, yes, sir.

18   Q    And these were changes that you rejected, correct?

19   A    I testified a few minutes ago, I think this was a

20   request made when the House bill was on the Senate side.

21   That's the best of my recollection.

22   Q    And the 55 percent threshold that you refer to in your

23   e-mail, you didn't say that you were -- that these changes

24   couldn't be made because they didn't meet a 55 percent

25   BVAP aspiration, did you?

Jones - Cross

1   A    I don't recall the conversation with Delegate

2   McClellan about this amendment.  The best recollection

3   that I have is it was on the Senate side, they were

4   working with the registrars in Richmond and in

5   Chesterfield, and they were working with DLS.  And they

6   confused the splits to the precincts that they made.

7        And my understanding was that it exceeded the

8   plus or minus 1 percent as well.

9   Q    Okay.

10  A    And so, I do not recall having a direct conversation

11  with Delegate McClellan about this specific request.

12  Q    Okay.  Let me ask you to turn to page 1 of the

13  Exhibit 30.  And this is an e-mail from Jennifer McClellan

14  to Kirk Showalter dated Friday, April 8, 2011.

15       And her e-mail says, "Kirk, I spoke to Chris

16  Jones and Kent Stigall.  Apparently, the changes we

17  discussed based on the map of the Davis precinct you sent

18  would have pushed the voting-age African-American

19  population in the 71st district down to 54.8 percent.  The

20  target criteria was 55 percent.  So the change can't be

21  made.  When you and I were working in Legislative

22  Services, we indeed moved the wrong part of Davis, which

23  is why the numbers looked correct to us.  Given the time

24  constraints on this thing, I don't think we have enough

25  time to try to come up with a fix that keeps the 69th,

Jones - Cross

1    70th, and 71st all at 55 percent African-American voting

2    population and within a 1 percent total population

3    deviation.  We can try to do some clean-up next year.  I

4    know that doesn't help you think election cycle, but that

5    may be the best we can do."

6              Did I read that correctly?

7    A    Yes.  And that does refresh my memory.  I thought it

8    did have something to do with the plus or minus 1 percent

9    as well.

10   Q    Okay.  And it also has to do with the fact that the

11   changes pushed the BVAP in the 71st District down to

12   54.8 percent, right?

13   A    Obviously those two issues were being discussed by the

14   registrar and Kent Stigall at DLS, et cetera.

15   Q    And you rejected that change because it pushed it down

16   to 54.8 percent, isn't that correct?

17   A    I will -- I don't -- I won't answer once again.  I did

18   not reject the change.  I believe it was on the Senate

19   side, and it was a contemplated amendment to the bill.  I

20   think she just acknowledged that they made a mistake and

21   they picked the wrong precinct and could not stay within

22   the plus or minus 1 percent.

23   Q    Now, the e-mail we read, the first e-mail we read in

24   this chain, your e-mail to Mr. Nardo, you said that she

25   wouldn't have even suggested it if she thought that it

Jones - Cross

422

1    went below -- or rather if she didn't think it exceeded

2    the 55 percent threshold.

3         Do you recall that?

4    A    I just saw the e-mail, yes, I did.

5    Q    And the reason she wouldn't have even suggested it is

6    that she knew that it wouldn't meet -- that it would have

7    been rejected if it were under 55 percent, isn't that

8    correct?

9    A    That is what her e-mail, that's what she said.  I

10   would say that she indicated that it exceeded --

11   Q    I'm sorry, sir, that was your e-mail, right?  You were

12   describing what she said to you?

13   A    I am getting ready to explain, yes.  She indicated to

14   me that she would not have presented it had she known it

15   was going to exceed the 55 percent and/or exceed the plus

16   or minus 1 percent.

17   Q    Right.

18   A    That's the best of my recollection.  So there are two

19   pieces at work here.

20   Q    Right.  And the reason she told you that she wouldn't

21   have even done it if she had realized that it didn't

22   exceed the 55 percent threshold in your words was because

23   she knew that it would be rejected, isn't that correct?

24   A    That was one of the reasons.

25   Q    Okay.  Just one more on that one.  Let me ask you to

1  read the -- let me ask you to turn your attention to the

2  e-mail above that one.  This is Exhibit 30, page 1.  There

3  is an e-mail from Kirk Showalter to Jennifer McClellan

4  dated April 8, 2011.  And she says, "Darned, so close and

5  yet so far away.  A measly 0.2 percent.  Well, at least we

6  gave it a good try, and for that I must thank you.  I have

7  some additional ideas how we might fix that and will work

8  with you, Betsy, Delores, and Larry over the coming months

9  to see if we can address it next January."

10      Did I read that correctly?

11  A    You did.

12  Q    Okay.  And her e-mail doesn't refer to, I take it, to

13  anything about a DOJ black percentage, BVAP percentage,

14  does it?

15  A    It does not.

16  Q    And of course you did not make it a secret during the

17  floor debates that a minimum 55 percent BVAP was the rule

18  for the challenged districts, isn't that correct?

19  A    I never used the word "rule."  I said it was

20  aspirational based on the comments that had been received

21  from members and from the public.

22  Q    So you would agree though that you did not make it a

23  secret that there was a 55 percent aspiration, BVAP

24  aspiration for each of the 12 challenged districts, is

25  that correct?

Jones - Cross

1   A    I stated on the floor that based on testimony that had

2   been received, that that is what the community had

3   indicated to us that they felt would allow them to elect

4   the candidate of their choice.

5   Q    And that was the aspiration, I take it in your view,

6   of the comments that you heard, was that there would be

7   this 55 percent BVAP in each of the 12 districts, correct?

8   A    Correct, but there weren't.  Three of the districts

9   did not have 55 percent DOJ black in it.

10  Q    Okay.  Well, I'm talking about DLS black.

11  A    I just want to be clear what we're talking about.

12  Q    Okay.  So three of the districts had 54 percent BVAP

13  according to the DOJ definition, correct?

14  A    Correct, according to introduction and passage, yes,

15  sir.

16  Q    All right.  But using the DLS definition, all 12 of

17  them had 55 percent or more BVAP, correct?

18  A    That is correct.

19  Q    Okay.  And that was your aspiration as well, correct,

20  as the principal map drawer, that each of those 12

21  districts would have 55 percent or more BVAP?

22  A    No.  I wouldn't have introduced House Bill 5001 that

23  had three districts below 55 percent DOJ black.

24  Q    Okay.

25  A    Because that was the number that I was using based on

Jones - Cross

1    my time in Austin, that that's what the Department of

2    Justice would be looking at.  And then what would occur is

3    that when they received the file from DLS -- I should say

4    the Attorney General, my DOJ, they would input the shape

5    file -- I forget, it's the precinct or the census bloc

6    data would be inputted into their system and they would

7    come up with the DOJ black number.  And in that situation,

8    three of those districts were below 55 percent.

9    Q    Okay.  So was it your aspiration then that each of the

10   districts would have at least 54 percent DOJ black BVAP?

11   A    I felt based on the testimony that the bill as

12   introduced would, quote unquote, meet the test of not

13   retrogressing.

14   Q    Okay.  Let's turn to Plaintiffs' Exhibit 35.  I

15   believe it's in the same notebook that you have, and it

16   will appear on the screen.

17         This is the April 5, 2011, Special Session 1, Virginia

18   House of Delegates, Redistricting Floor Debates.

19         Do you have that?

20   A    Yeah.

21   Q    I just ask you to turn to page 42 in that Exhibit 35,

22   Plaintiffs' Exhibit 35.

23         And I want to read a portion of your statement on the

24   floor beginning at line 4 of page 42.

25              Now, Delegate Jones, if you want to verify that

Jones - Cross

1    that is in fact you speaking, I have to tell you that you

2    have to turn all the way back to page 31 because that's

3    where you begin your remarks.  You don't have to take my

4    word for it if you don't --

5    A    No, I take your word for it.

6    Q    Okay, fair enough.  So at page 42, starting on line 4,

7    you say, "so that's why the testimony led me, when drawing

8    this map, to not retrogress with the number of seats,

9    which we didn't, and to keep an effective voting majority

10   within each and every district.  We had to keep the core

11   of these districts because I think that's very important.

12   And because of the population shifts, you did see a

13   decrease in some of the percentages, but all were above

14   55 percent."

15        Do you see that?

16   A    Yes.

17   Q    And you said that, correct?

18   A    I was stating factually what was before the body, yes,

19   sir.

20   Q    Okay.  And you were referring to the 12 challenged

21   districts when you made that statement, correct?

22   A    That is correct, based on the DLS BVAP population,

23   yes, sir.

24   Q    Correct.  You were talking about the DLS BVAP numbers?

25   A    That is correct.

Jones - Cross

1    Q    Okay.  And you didn't say, but my fellow delegates,

2    there is another way to calculate BVAP, there is a DOJ

3    way, correct?

4    A    That's correct.  I think we saw this morning how

5    confusing the two can be.  And I felt that the DOJ when

6    they received the file would have the numbers in front of

7    them that would indicate what the percentage black

8    voting-age population was in there.

9    Q    So you didn't think your fellow delegates could

10   understand the difference between the DOJ black definition

11   and the DLS definition?

12   A    I didn't say that.  I said given the time that we have

13   to do this, the DLS was a number that everyone was using,

14   and that was the number that was before the body.

15   Q    Okay.  And in this statement you didn't say, well, you

16   know, three of these districts would actually be

17   54 percent BVAP if we looked at it from the DOJ BVAP

18   perspective, did you?

19   A    No, I did not.

20   Q    Okay.  Let me ask you, Delegate Jones, to turn to

21   page 66 of that same transcript, Plaintiffs' Exhibit 35,

22   and ask you to look, starting at line 7.

23        Are you there, Delegate Jones?

24   A    I am.

25   Q    And it says, "Mr. Speaker, I'd said to the gentleman

Jones - Cross

1   of the plans that have been submitted and/or circulated

2   around that were complete and total plans, the plan that

3   is before you, in my opinion, fully complies with the

4   Voting Rights Act as 55 percent or higher."

5       Did I read that correctly?

6   A    You did.

7   Q    And you were referring there also to the challenged

8   districts?

9   A    Yes.  Using the DLS numbers, that is correct.

10  Q    The DLS BVAP number, correct?

11  A    Yes, sir, that's correct.

12  Q    And there again, you didn't alert anybody that you

13  were -- that there were three districts that if you used

14  the DOJ number were at 54 percent?

15  A    No, I did not think it would make any difference,

16  quite frankly.

17  Q    Okay, fair enough.  If you could turn to page 70.  And

18  I would ask you to look, starting at line 4.  Again, this

19  is a part of your statement on the floor.  It says, "I

20  have looked at the 12th and the 13th plan, Option 1 and

21  Option 2, and neither one of those plans met what I think

22  from the testimony we heard throughout this process that

23  the effective voting-age population needed to be north of

24  55 percent."

25      Did I read that correctly?

Jones - Cross

1   A    Yes.

2   Q    And you are saying on the floor during this House

3   debate that the BVAP number needed to be north of

4   55 percent in each of the 12 challenged districts not to

5   retrogress, isn't that correct?

6   A    What I was saying based on the testimony we had heard

7   from the public during the process, that that would need

8   to be north of 55 percent.  That was the testimony that we

9   heard during the public hearings.

10  Q    Okay.  But you weren't just summarizing the testimony,

11  you were saying based on that testimony we need to be

12  north of 55 percent BVAP, correct?

13  A    Do you want to restate the question?

14  Q    Well, why don't I just say your words.

15       JUDGE PAYNE:  Well, if you're going to do that,

16  we've read them.  So maybe that's enough.

17       MR. SPIVA:  Okay, fair enough, Your Honor.

18  BY MR. SPIVA: (Continuing)

19  Q    And you also said here that you looked at two other

20  plans, the so-called Option 1 and Option 2 plans, correct?

21  A    Yes, sir.

22  Q    And that those two plans did not maintain a 55 percent

23  threshold for each of the challenged districts, is that

24  correct?

25  A    No, I believe I said each of those plans had a low of

Jones - Cross

1    I think 52 percent, 52 percent.

2    Q    Okay.  So neither of them though were north of

3    55 percent, correct?

4    A    It would be obvious because 52 --

5    Q    And you found them unacceptable as a result of that,

6    isn't that fair?

7    A    Yes, based on the testimony and the functional

8    analysis that I had done using the Tyler primary, for

9    example, and the Tyler general election in 2005.

10   Q    Let me ask you to turn a few lines down, starting at

11   line 11.  It says, "And from my experience in 25 years of

12   running for office, having gone door to door, I know from

13   analyzing, quote unquote, my election results where

14   there's a lower voter turn-out, and in my opinion based on

15   what we had heard from testimony, something of in the

16   52 percent, I do not think would be an effective voting

17   strength for that community to be able to elect their

18   candidate of choice."

19         And here again, you are referring to the

20   African-American community, Delegate Jones?

21   A    That is correct, that was part of my functional

22   analysis of the plan when we were putting it together.

23   Q    Okay.  When you refer to this functional analysis,

24   what are you referring to, Delegate Jones?

25   A    Well, I think in any district that you're going to

Jones - Cross

1    draw or any plan that is going to be introduced, you have

2    a requirement to look at voter turnout, demographics, et

3    cetera.

4              And based on then Senator, then Delegate Dance,

5    and Delegate Tyler, Delegate Spruill, and one or two

6    others, African-American members of the House, they felt

7    strongly that it needed to be north of 55 percent.

8              I do recall the election with Delegate Tyler that

9    I mentioned earlier where she had won in a five-way race

10   with two Caucasians in the race by less than 300 votes and

11   didn't win by -- didn't get 51 percent in the general

12   election.

13             So based on the testimony that had been received,

14   my looking at election returns, and the input from the

15   black caucus, it was felt that 52 percent would be

16   insufficient to allow the members of the district, excuse

17   me, the constituency to be able to elect their candidate

18   of choice.

19   Q    And Delegate Tyler has represented District 75 since

20   2005, do you agree?

21   A    That's correct.

22   Q    Okay.  And let me ask you to turn to -- actually let

23   me step back --

24             JUDGE PAYNE:  Mr. Spiva, that's a good place to

25   stop, I think.

1          MR. SPIVA:  Thank you, Your Honor.

2          JUDGE PAYNE:  How much longer do you think you

3    have so we can do some planning?

4          MR. SPIVA:  I would say probably another hour,

5    hour and a half, Your Honor.

6          JUDGE PAYNE:  Good.  Maybe tonight you could do a

7    little bit of honing and pruning and take a look at doing

8    things such as don't ask people if you read things

9    correctly.  Mr. Braden is over there, and if he is asleep

10   at the switch, he will get by with it or the witness will.

11   You don't need to go through all that kind of stuff.  Get

12   right to the question and go.

13         MR. SPIVA:  Thank you, Your Honor.

14         JUDGE PAYNE:  Thank you.

15         NOTE:  The July 8, 2015 portion of the case is

16   concluded.

17

18              (End of proceedings.)

19

20

21

22

23

24

25

1
2
3          I certify that the foregoing is a correct
4    transcript from the record of proceedings in the
5    above-entitled matter.
6
7
8    _____/s/_____              _____
     P. E. Peterson, RPR              Date
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25