1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  RICHMOND DIVISION

4

5    -----------------------------------
                                        :
6    GOLDEN BETHUNE-HILL, et al.,       :
                                        :   Civil Action No.
7    Vs.                                :   3:14CV852
                                        :
8    VIRGINIA STATE BOARD OF            :   July 9, 2015
     ELECTIONS, et al.                  :
9    -----------------------------------:

10

11          COMPLETE TRANSCRIPT OF THE BENCH TRIAL

12          HEARD BEFORE:   THE HONORABLE ROBERT E. PAYNE
                            THE HONORABLE GERALD BRUCE LEE
13                          THE HONORABLE BARBARA M. KEENAN

14

15   APPEARANCES:

16   Kevin J. Hamilton, Esquire
     Perkins Coie, LLP
17   1201 Third Avenue
     Suite 4800
18   Seattle, Washington  98010

19   Bruce V. Spiva,  Esquire
     Aria C. Branch, Esquire
20   700 13th Street NW
     Suite 600
21   Washington, D.C.  20005
     Counsel for the plaintiffs

22

23

24               Peppy Peterson, RPR
                Official Court Reporter
25            United States District Court

```
 1    APPEARANCES:  (cont'g)

 2    Tony F. Troy, Esquire
      Eckert Seamans Cherin & Mellott, LLP
 3    707 East Main Street
      Suite 1450
 4    Richmond, Virginia  23219

 5    Daniel A. Glass, Esquire
      Eckert Seamans Cherin & Mellott, LLC
 6    1717 Pennsylvania Avenue, NW
      Suite 1200
 7    Washington, D.C.  20006

 8    Godfrey T. Pinn, Jr., Esquire
      Harrell & Chambliss, LLP
 9    707 East Main Street
      Suite 1000
10    Richmond, Virginia  23219
      Counsel for the Virginia State Board of Elections
11
      E. Mark Braden, Esquire
12    Katherine L. McKnight, Esquire
      Jennifer M. Walrath, Esquire
13    Richard B. Raile, Esquire
      Baker & Hostetler, LLP
14    1050 Connecticut Avenue, NW
      Suite 1100
15    Washington, D.C.  20036

16    Dalton L. Oldham, Jr., Esquire
      Dalton L. Oldham, LLC
17    1119 Susan Street
      Columbia, South Carolina  29210
18    Counsel for Virginia House of Delegates

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1

2

3       THE CLERK:  3:14CV852, Golden Bethune-Hill, et

4   al., versus Virginia State Board of Elections, et al.,

5   versus Virginia House of Delegates.

6       JUDGE LEE:  Good morning, counsel.  Good morning,

7   Delegate Jones.

8       JUDGE PAYNE:  Good morning.

9       MR. HAMILTON:  Your Honors, good morning.  I

10  wanted to bring to the Court's attention two items:

11  Number one, there was a docket entry last night

12  referencing the stipulation, the factual stipulation of

13  the parties, and I believe the clerk made an error.  The

14  correct docket number is 83, not 80, and that's, no doubt,

15  due to my fault because I misspoke when I first said 80

16  and then corrected it to 83.  So the correct docket entry

17  should be docket 83, and I just wanted to correct that for

18  the record.

19      JUDGE PAYNE:  Thank you, Mr. Hamilton.

20      MR. HAMILTON:  And then second, I neglected to

21  point out to the Court and bring to the Court's attention

22  the previously submitted deposition designations filed by

23  both parties.  It's been previously filed.  That's docket

24  entry number 90, and that, of course, is part of our case.

25      JUDGE PAYNE:  You mean as part of your case.

1          MR. HAMILTON:  Yes.

2          JUDGE PAYNE:  All right.  I guess technically

3    we'll reopen the case and allow those entries in.  You

4    have no objection, Mr. Braden?  I take it you knew they

5    were coming.

6          MR. BRADEN:  I have no objection, Your Honor.

7          JUDGE PAYNE:  All right, they're part of the

8    case, and thank you very much, Mr. Hamilton, for catching

9    that.  Sometimes in the heat of these things, we overlook

10   a few things.  No harm, no foul.

11         MR. HAMILTON:  Thank you, Your Honor.

12         JUDGE PAYNE:  Mr. Spiva, are you going to pick

13   up?

14         MR. SPIVA:  Yes, Your Honor, thank you.

15         JUDGE PAYNE:  Delegate Jones, I remind you, you

16   are under the same oath you took yesterday.

17         MR. JONES:  Yes, sir.

18

19                  **STEVEN C. JONES,**

20   a witness, called at the instance of the defendant,

21   having been previously duly sworn, testified as

22   follows:

23                  CROSS-EXAMINATION

24   BY MR. SPIVA:  (resuming)

25   Q    Good morning, Delegate Jones.  How are you doing?

Jones - Cross

1    A    Great.  Good morning to you.

2    Q    Thank you.  I think yesterday when we stopped,

3    Delegate Jones, we were looking at Plaintiffs' Exhibit 35.

4    Do you still have that notebook in front of you?

5    A    Yes, sir.

6    Q    Could you turn to Plaintiffs' Exhibit 35, please.

7    A    I'm there.

8    Q    And if you could turn to page 72, I'd appreciate it.

9          MR. SPIVA:  Your Honors, would it be all right if

10   we put a demonstrative exhibit?  It was one we've used

11   previously.

12         JUDGE PAYNE:  Sure.  No objection, Mr. Braden?

13   You know what it is?

14         MR. BRADEN:  Actually, I do object to that, Your

15   Honor.  I have no problem with everything below the top

16   line, but on the 55 percent rule, it does not seem to

17   be --

18         JUDGE PAYNE:  You mean the caption?

19         MR. BRADEN:  The caption is incorrect.

20         JUDGE PAYNE:  Take it down if he's objected to it

21   unless you want to cover up the caption.

22         MR. SPIVA:  That's fine, Your Honor.

23         JUDGE PAYNE:  All right.  I think he's right.

24   That's your argument, and he's got a different position.

25   We can't go both ways.

Jones - Cross

1          MR. SPIVA:  Understood.

2          JUDGE PAYNE:  Take that off the slide, please.

3   Thank you.

4   Q   So, Delegate Jones, if I could turn your attention to

5   page 72 of Exhibit 35, starting at line five, Delegate

6   Armstrong asks you a question.  He says, "So the gentleman

7   has stated that in his opinion nothing below a 55 percent

8   minority-majority district would be sufficient for the

9   minority community to elect its candidate of choice?"

10          Delegate Armstrong asked you that question; correct?

11   A   That is correct.

12   Q   And in the next line, starting line ten, you answer,

13   "I'm not sure he was listening closely.  I said it's my

14   opinion from the testimony that was received during our

15   public hearings that the community felt that they needed a

16   percentage of 55 percent or better.  That was my response

17   to the gentleman."

18          And that was your response and statement on the floor

19   of the House; is that correct?

20   A   That is correct.

21   Q   Okay.  Let me ask you to turn in the same exhibit,

22   Plaintiffs' Exhibit 35, to page 107, and I'm going to

23   start with the statement of yours on line 16, Mr. Jones.

24   It says, "Mr. Speaker, I must admit to the gentleman -- I

25   told my wife I wouldn't use any versus from songs, so I

Jones - Cross

1   won't.  I'm a little dazed and confused.  I'm looking here

2   at the -- what I have for the commission plan, option one,

3   and I have a high percentage of black voting-age

4   population of 56.8 and a low of 52.7.

5        "Now, I can tell the gentleman in House Bill 5001 that

6   is substituted before this body, we -- every single,

7   solitary district majority-minority is over 55 percent.

8   Now, I know I wasn't that good at math.  I'm not a math

9   major, but from my reading of this and my double-checking

10  it, that's what I have.

11       "So maybe we just have -- you know, numbers can say

12  different things to different people, and I can stand to

13  be corrected based upon what I've had available to me

14  throughout this process and I have -- and I am a detail

15  person.  I double-check it twice.  You know, I'm not a

16  very good carpenter, so I always measure three times

17  before I cut one time.

18       "So I'm looking at it, and I do not agree with that

19  statement.  As a matter of fact, the average black

20  voting-age population is 54.4 percent in the 12 plan from

21  the commission."

22       That was also your statement in the floor of the

23  House; isn't that right?

24  A    That is correct, and I was speaking in reference to

25  the 55 percent that was the DLS which rounded to greater

Jones - Cross

1   than 100 percent.

2   Q   Okay, fair enough, but you didn't say in that

3   statement that you -- there was this different

4   calculation, that there was a DOJ black calculation that

5   was less than 55 percent, did you?

6   A   No, I did not, but I did know that the method I

7   introduced had three districts that were below the

8   55 percent.

9   Q   But you didn't note that in the statement in the

10  House, did you --

11       JUDGE PAYNE:  Mr. Spiva, we can read and

12  understand what he did not say.  There's no need to ask

13  him what he didn't say.  You can make that in your

14  argument, but you don't need to take up time doing that.

15  Q   Let me ask you to turn to page 113 of the same

16  exhibit.  It's starting on line one.  Delegate Morrissey

17  asks you a question.  He says, "Given that the gentleman

18  then studied the plan, I would ask him, does he

19  distinguish as there being a difference between a

20  55 percent BVAP versus 53 BVAP," and you say, "Mr.

21  Speaker," and Delegate Morrissey continues, "That is, does

22  the gentleman consider that a significant and meaningful

23  difference," and you respond, "Mr. Speaker, I would say

24  based on the testimony that we have, that we heard during

25  the process, I would say yes, based on the testimony from

Jones - Cross

1    the community."

2         Is that -- that was your response to Mr. Morrissey on

3    the floor of the House?

4    A    Yes.  That was based on testimony from the community

5    and also just election returns that -- in elections that I

6    had observed over the years.

7    Q    And let me ask you, you've mentioned testimony from

8    the community.  Are you referring to the community

9    meetings that you held around the state at -- as part of

10   the redistricting process?  You had testified, I think,

11   about that yesterday, that there were these community

12   meetings that you held, public meetings?

13   A    That and from the members of the black caucus, yes.

14   Q    Okay.  But in terms of input from the community, you

15   are primarily talking about these public hearings that you

16   had?

17   A    And the black caucus, yes, sir.

18   Q    So if we scour the transcripts of those hearings,

19   those public documents, isn't it fair to say that we won't

20   find one reference to the need for a 55 percent or greater

21   BVAP in the 12 challenged districts?

22   A    I did not read -- I did not attend every public

23   hearing.  I did not read the transcripts from every one of

24   those public hearings.

25   Q    Do you recall a specific instance of a community

Jones - Cross

1    member coming into one of these public hearings and saying

2    that their district, one of these challenged districts

3    needed to have a 55 percent or greater BVAP?

4    A    No, I don't, but I do recall the black members of the

5    black caucus telling me that they felt they needed north

6    of 55 percent based on some personal experience by the

7    black caucus members, and other elections that had

8    occurred in districts that they currently finally won by

9    being a Caucasian.

10   Q    Understood, but my question was directed specifically

11   to community members.  Let me shift for a minute, and I'd

12   like to have you turn to a different exhibit, if you will.

13   It's Plaintiffs' Exhibit 48 in your book.

14   A    I don't have 48 in my book.

15            JUDGE PAYNE:  He's getting you a book.  While

16   he's looking at that, are you through with this volume for

17   awhile?

18            MR. SPIVA:  Yes, Your Honor.

19   Q    Delegate Jones, I can, if you need this, I can direct

20   you to another exhibit which will demonstrate that this is

21   part of the 2011 preclearance submission to the DOJ from

22   the Commonwealth, but do you recognize it as such?

23   A    I recognize it as a submission.  I did not read it.

24   That would have been done by the Attorney General's Office

25   working with Legislative Services.  My job would have been

Jones - Cross

1    officially done as a patron of the bill.

2    Q    I see.  But it was prepared in order to try to obtain

3    preclearance for the plan?

4    A    It was required -- it was prepared as required by law,

5    yes, sir.

6    Q    Right.  And presumably the idea was to encourage DOJ

7    to preclear the plan.

8    A    I think that's self-evident.

9    Q    And I assume that the House tried to provide DLS and

10   DLS provided DOJ accurate information?

11   A    I would say the House didn't provide anything.  We

12   work with the Division of Legislative Services on a bill.

13   The bill has to go through enrolling -- drafting first,

14   and then it goes to the process of being approved, signed

15   by the president of the Senate, signed by the speaker of

16   the House, goes to the governor for signature, and then is

17   enrolled.  The House members have nothing to do with that

18   part of the enrollment.  Then it becomes law.

19   Q    Fair enough, but this is the submission that was done

20   on behalf of the Commonwealth to try to get the plan

21   pre-cleared.  Why don't I turn your attention to page 11

22   of this document, which I should have mentioned for the

23   record is titled "Legislative History of 2011 Virginia and

24   General Assembly Redistricting Plans."  It's attachment 17

25   to the preclearance submission, and let me just turn

Jones - Cross

1    your --

2              JUDGE LEE:  I'm sorry.  Did he say that he wrote

3    this?

4              MR. SPIVA:  He did not write it.  This was an

5    official document that was submitted to the DOJ for the

6    preclearance.

7              JUDGE LEE:  I thought I heard him say that the

8    Attorney General prepared this.  Is that right?

9              THE WITNESS:  They did -- I'm sorry.  If I may --

10   in conjunction with Division of Legislative Services

11   working with the Attorney General.  They then file to the

12   Department of Justice, and I believe they also

13   simultaneously file with the district court.

14             JUDGE LEE:  So is this your document?

15             THE WITNESS:  No, it's not my document.  It

16   belongs to the House.  It's a, quote unquote -- when a

17   bill is enrolled and then it becomes law, this document

18   was prepared because of the requirement for preclearance

19   with the Department of Justice.

20             JUDGE LEE:  Go ahead.

21             JUDGE PAYNE:  Have you read it before today?

22             THE WITNESS:  No, sir.

23   Q    I just want to turn your attention to one sentence

24   that is in the document that was prepared by DLS and the

25   Attorney General.  In the second full paragraph, the

Jones - Cross

1   paragraph that begins "As outlined in attachment five,"

2   and a few lines down you'll see all --

3            JUDGE LEE:  Page 11?  Are you referring to page

4   11?

5            MR. SPIVA:  Yes, sir.  Yes, Your Honor.

6   Q    And then second full paragraph, six lines down you see

7   a sentence that says, "All 12 black majority districts

8   were maintained in chapter one with greater than

9   55 percent black VAP -- a range of 55.2 percent to

10  60.7 percent."

11       And so it's fair to say that the Attorney General and

12  DLS submitted, as part of the Commonwealth's submission to

13  the DOJ, a document that affirmed that all 12 black

14  majority districts had a 55 percent BVAP or higher; is

15  that fair?

16           MR. BRADEN:  I object to the form of that

17  question.  It isn't fair to ask him a question about a

18  document that, one, he didn't author; two, he's never read

19  before.  It seems to me to be the wrong way to phrase that

20  question.

21           JUDGE PAYNE:  Sustained.  Objection sustained.

22  Q    So, Delegate Jones, were you aware that this statement

23  that I just read was made to the DOJ?

24  A    I would say knowing that they used a population total

25  that exceeded 100 percent based on the documents that they

Jones - Cross

1   had, that that's what they would have presented.  That's

2   not what DOJ would have seen when they put the block

3   assignment file into their computer to run their analysis.

4            JUDGE PAYNE:  I think the question was, were you

5   aware that this statement had been made.

6            THE WITNESS:  No, I was not aware the statement

7   had been made, but I would assume it would have been made.

8   Q    Let me ask you to turn -- and I apologize, Your

9   Honors, because I think I do need to go back to the other

10  notebook which is -- to Plaintiffs' Exhibit 9 which is in

11  the notebook that everybody was just looking at.  Do you

12  have it, Delegate Jones?

13  A    I do.

14  Q    All right.  And you see that the cover of this is from

15  the Federal Register, Wednesday, February 9th, 2011,

16  Department of Justice, and if you flip through to the

17  second page, it says "Guidance Concerning Redistricting

18  Under Section 5 of the Voting Rights Act," and at the top,

19  it's dated Wednesday, February 9th, 2011.  I take it you

20  saw this document during the period that you were involved

21  in redistricting in 2011?

22  A    I was aware that the document existed, yes.

23  Q    And you actually looked at it, didn't you?

24  A    I can't say that I looked at it.  I don't recall.  I

25  had attorneys who were assisting me and helping me along

Jones - Cross

1    the way.

2    Q    Have you seen it before?

3    A    I believe that I have.  I recall a document that I

4    got, I think the week before.  I think it was dealing

5    maybe with the census numbers that were official, and I'm

6    certain that I received this at some point along the way,

7    but I can't say with 100 percent certainty that I read it

8    in that regard.  It's only, what, about four pages, I

9    guess, but I can't say that I read it.

10   Q    You can't say that you read every line of it?

11   A    I'm certain I did not read every line.  I would have

12   perused it, if anything, to be quite honest with you.

13   Q    Okay, but you did receive it?

14   A    I received it.  I'm certain that I did.

15   Q    Okay.  Thank you.  Let me ask you to -- let me direct

16   your attention, I guess, to the second printed page, so

17   page 7471, page three of the document.  That would be a

18   little easier.  Look at the bottom, it says page three.

19       And the right-hand column -- there are three columns.

20   The right-hand column, and about, I guess, it's the second

21   full paragraph, it says, um, "In determining whether the

22   ability to elect exists in the benchmark plan and whether

23   it continues in the proposed plan, the Attorney General

24   does not rely on any predetermined or fixed demographic

25   percentages at any point in the assessment."

Jones - Cross

1     Were you aware of that guidance by the DOJ in terms of

2  Section 5, that they don't use predetermined or fixed

3  demographic percentages at any point in the assessment?

4  A    I recall from reading "Drawing the Lines," Mary

5  Spain's document, Legislative Services, that there were

6  certain things you looked to consider, and one would

7  certainly be what the benchmark districts were, but there

8  was no predetermined number that had to be met.

9  Q    And you were concerned about retrogression in the

10  drawing of the new map; is that correct?

11  A    I was concerned about compliance with the Voting

12  Rights Act, yes, sir.  Voting Rights Act and the

13  constitution.

14  Q    And that includes avoiding retrogression?

15  A    Absolutely.

16  Q    And this is the DOJ guidance on that question; is that

17  right?

18  A    I think partly their guidance.  I can't speak to if

19  it's their total guidance.

20  Q    Do you know whether it's the guidance or not?

21  A    No, no.  I think there are many things that guide the

22  Voting Rights Act.  This is certainly one of them.  I

23  would not say it's all of the items that you have to

24  consider when you are doing that.

25  Q    My question wasn't that.  It actually was this:  Were

Jones - Cross

1   you aware that this was the DOJ's guidance on that

2   question, compliance with the Voting Rights Act under

3   Section 5?

4   A    That there was a functional analysis required?

5   Q    No.  My question is, were you aware that this was the

6   DOJ's guidance on the question of compliance with the

7   Voting Rights Act, specifically Section 5?

8   A    I was aware that you could not retrogress to give

9   the -- I think it's the effective election --

10  Q    I want to make sure --

11       JUDGE PAYNE:  Wait a minute, Mr. Spiva.  You all

12  are getting back into the habit of stepping on each

13  other's discussions, and the court reporter can't take

14  both of you.  So, Delegate Jones, give Mr. Spiva a chance

15  to finish his question.  Mr. Spiva, give Delegate Jones a

16  chance to finish his answer and listen -- as John Wayne

17  said, Delegate Jones, listen tight, answer just the

18  question that's been asked.  All right, Mr. Spiva, go

19  ahead.

20       MR. SPIVA:  Thank you, Your Honor.

21  Q    So the question, Delegate Jones, is just, were you

22  aware that this was DOJ's guidance concerning compliance

23  with the Voting Rights Act, specifically Section 5?

24  A    I think I said yes a few minutes ago.  It was one of

25  the items that they consider, yes.

Jones - Cross

1    Q    This was the DOJ's guidance on that issue.

2    A    I said yes, yes, sir.

3    Q    But you didn't read it?

4    A    I didn't say that.  I said that I didn't read this

5    line for line.  I indicated that Mary Spain had given us

6    some guidance and documents.

7    Q    Let me just turn your attention to the -- continuing

8    that same paragraph, it says, "Rather, in the department's

9    view, this determination requires a functional analysis of

10   the electoral behavior within the particular jurisdiction

11   or election district.  As noted above, census data alone

12   may not provide sufficient indicia of electoral behavior

13   to make the requisite determination.  Circumstances, such

14   as differing rates of electoral participation within

15   discrete portions of a population may impact on the

16   ability of voters to elect candidates of choice, even if

17   the overall demographic data show no significant change."

18        Were you aware that was part of the guidance by the

19   DOJ of what you should consider to determine whether a

20   plan complied with the Voting Rights Act?

21   A    Yes, I was aware of a functional analysis being

22   required.

23   Q    And further, in the next paragraph it says, "Although

24   comparison of the census population of districts in the

25   benchmark and proposed plans is the starting point of any

Jones - Cross

1   Section 5 analysis, additional demographic and election

2   data in the submission is often helpful in making the

3   requisite Section 5 determination," and cites to a

4   regulation.

5       "For example, census population data may not reflect

6   significant differences in group voting behavior.

7   Therefore, election history and voting patterns within the

8   jurisdiction, voter registration and turnout information,

9   and other similar information are very important to an

10  assessment of the actual effect of redistricting plan."

11      Were you aware that that was part of the DOJ guidance?

12  A   Yes, and that was the reason that I spoke directly

13  with all the members of the black caucus.

14  Q   And, so, you were aware that census population data

15  alone may not reflect significant differences in group

16  voting behavior; correct?

17  A   Correct.

18  Q   You also have to look at election history and voting

19  patterns; is that fair?

20  A   Which I did, yes.

21  Q   Within each district -- is that something you have to

22  look at within each district?

23          JUDGE LEE:  That's a compound question.  Would

24  you ask one question at a time, please.

25          MR. SPIVA:  Sorry.

Jones - Cross

1    Q    Is election history within each district something

2    that you have to look at as part of the analysis?

3    A    I would say what I did was look at the election

4    results and the contested races that you had in primaries

5    for the members of the majority-minority districts, but I

6    cannot say that I did an analysis of voting behavior in

7    each and every 12 districts, no, sir.

8    Q    It also talks about, the part that I just read,

9    looking at the voter registration and turnout information.

10   Were you aware that looking at voter turnout and

11   registration information within each district was

12   something that was part of the DOJ guidance?

13   A    I would assume that it was.  I was not totally aware

14   of that, but we did have discussions and met with some of

15   the -- I think very good discussions we had with members

16   of the black caucus and their frustration with Caucasians

17   beating black members in majority districts previously in

18   the Commonwealth.

19   Q    Let's talk about that.  Did you, at any time, compile

20   all of the election results from the challenged districts

21   over the previous ten years?

22   A    I did not.

23   Q    Sitting here today, can you tell us the last time a

24   minority-preferred candidate lost an election in

25   challenged District 63?

Jones - Cross

1  A    I would say that would be in 1991 or 1993, Joe

2  Preston, who actually just served in the House and ran for

3  the Senate seat in the primary against Senator Dance.

4  Q    So it was 1991 or 1993, that was the last time that a

5  minority-preferred candidate in District 63 lost an

6  election?

7  A    In that situation, yes, but the rule in Virginia had

8  been, from my recollection, with Frank Hall, which is

9  House District 69, Betsy Carr, and House District 63,

10 which used to be Jay DeBoer and then Senator Dance, that

11 once you win in the primary, that the election is pretty

12 much decided.  So Frank Hall had won and defeated a

13 minority candidate when it was a black majority-minority

14 in '91 and, I think, '93.

15 Q    In 1993, okay.

16 A    I believe it was '93.

17         JUDGE PAYNE:  Wait a minute.  Was Frank Hall in

18 63?

19         THE WITNESS:  No, sir.  I'm sorry.  I answered

20 his question with a compound answer.  Mine was, did I do

21 an analysis of all the districts.

22         JUDGE PAYNE:  Going back to Frank Hall, Frank

23 Hall was elected when?

24         THE WITNESS:  He was elected in 1976, and when --

25         JUDGE PAYNE:  That was a majority black district?

Jones - Cross

```
 1           THE WITNESS:  I don't believe, not at the time.
 2   I think it became in the 1980s, I believe.
 3           JUDGE PAYNE:  He continued to be reelected until
 4   he resigned when?
 5           THE WITNESS:  Yes, sir.  He resigned in 2007, but
 6   when they redrew the line significantly in 1991, he had a
 7   challenger, and he won in that primary and never had a
 8   primary challenger after that.
 9           JUDGE PAYNE:  The number of that district was
10   what?
11           THE WITNESS:  69.
12   Q    I was going to ask you about 69 next, but I take it
13   your answer with respect to 69 to my question, which is
14   sitting here today, can you tell us the last time a
15   majority-preferred candidate has lost an election --
16   before I said in District 63, but so the record is clear,
17   in District 69, is it 1993?
18   A    1993 was Frank Hall, and I believe -- I can't recall
19   if there was another primary after that in the 2000s.  I
20   don't believe there was from my recollection.
21   Q    Sitting here today, can you tell us the last time a
22   minority-preferred candidate lost an election in District
23   63?  That was the one I started with, but I think you
24   answered regarding 69.
25   A    63, I believe it was Joe Preston to Jay DeBoer, and I
```

Jones - Cross

1    don't believe that DeBoer had any other challenges until

2    he retired in 2001.

3              JUDGE PAYNE:  Joe Preston lost to Jay DeBoer.

4              THE WITNESS:  Yes, sir, who was Caucasian, and

5    then he ran unopposed, if I recall correctly, Jay DeBoer

6    did, and he retired when we redrew the lines in 2001, and

7    then Delegate Fenton Bland, I believe, won that seat who

8    is African American.

9    Q    Let me ask you, Delegate Jones, are you equating the

10   candidate being African American with the

11   minority-preferred candidate?

12   A    I'm equating the -- when you looked at the results in

13   the -- there were several races.  You had Betsy Carr,

14   which was a three- or four-way race -- I think it was a

15   four-way race.  When you look at the one-on-one race, I

16   believe, that occurred in the primary, the overwhelming

17   majority of the African Americans chose from the -- I

18   think the work that was done or was looked at in the

19   Loewen report that they overwhelmingly preferred Joe

20   Preston, but Jay DeBoer won.  That's 63rd which, I think,

21   was your question.

22   Q    Thank you, sir.  So you don't equate African-American

23   candidate with minority-preferred candidate?

24   A    No, not at all, sir.  I think I answered that in a

25   deposition as well.

Jones - Cross

```
 1   Q    Sitting here today, can you tell us the last time a
 2   minority-preferred candidate lost an election in
 3   challenged District 70?
 4   A    I don't believe that there has ever been one that's
 5   lost in -- no, 70, that would be McQuinn's.  During my
 6   tenure, it's always been held by an African American, to
 7   my knowledge.
 8   Q    And with respect to District 71, sitting here today,
 9   can you tell us the last time minority-preferred candidate
10   lost an election in District 71?
11   A    I don't believe they have because of the high affinity
12   of the democratic vote in that district.
13   Q    And can you tell us -- in fact, District 71 has been
14   represented by an African American since the early '80s?
15   A    I would say at least, yes, sir.
16   Q    Maybe late '70s?
17   A    Probably late '70s, but I don't know that for a fact,
18   so I don't want to misrepresent anything.
19   Q    Fair enough.  And can you tell us the last time a
20   minority-preferred candidate has lost an election in
21   District 74?
22   A    If I may, I believe when Delegate Morrissey ran in a
23   five-way primary, he was certainly not the candidate of
24   choice of the minorities at that point in time.  There
25   were four African Americans that ran against him.  He was
```

Jones - Cross

1   the only Caucasian, and he won.  Just like in the DeBoer

2   case, situation, Frank Hall case, typically, in those

3   situations, whoever wins the democratic primary will win

4   the general, and then they stay in that seat pretty much

5   as long as they want to.

6   Q    So Mr. Morrissey, though, won reelection in 2009, did

7   he not?

8   A    So did Jay DeBoer in the '90s, yes, sir.

9   Q    Right.  So Mr. Morrissey, at least as late as 2009,

10  was the African-American preferred candidate; isn't that

11  correct?

12  A    I would say based on the election returns of him being

13  sent back to Richmond, one would make that assumption,

14  yes, sir.

15  Q    And challenged District 75, can you tell us the last

16  time a minority-preferred candidate has lost an election

17  in District 75?

18  A    Well, Paul Council, Delegate Paul Council actually

19  held that seat for 31 years, I believe, or 32 years, and

20  it was African American in the '80s.  After the court

21  case, I believe it became for multi-member districts to

22  single-member districts.  He held that seat, had several

23  challenges throughout the, I think, those 20 years, and

24  then when he retired in 2005, I believe, Delegate Tyler

25  ran in the primary, and there were five contestants, two

Jones - Cross

1    which were Caucasian, and Delegate Tyler won by only less

2    than 300 votes.  And then the general election with a

3    Caucasian running against her, she won by less than one

4    and a half percent.

5    Q    So if I understood you correctly, the person who held

6    the seat before Delegate Tyler was an African American?

7    A    No, Caucasian.  He was Caucasian.

8    Q    Okay.  So Delegate Tyler, though, has not been

9    defeated in any election including the one you just

10   mentioned; correct?

11   A    I don't believe she's had an opponent after 2005.  She

12   barely won against a weak opponent, by all accounts, in

13   the election in 2005.

14   Q    But that's the last time that she's had an opponent?

15   A    Right, and that drove her concerns about her district

16   being much higher than 55 percent, yes, sir.

17   Q    And that was in 2005, so ten years ago?

18   A    2005.

19   Q    And challenged District 77, when was -- can you tell

20   us the last time a minority-preferred candidate lost an

21   election in District 77?

22   A    Yes.  I would say it was probably Willa Bazemore.  At

23   the time, after 1991 when the districts were redrawn, we

24   created two additional majority-minority districts, I

25   believe, during that cycle.  I believe Thomas Forehand,

Jones - Cross

1    who went on become a judge, actually defeated Willa

2    Bazemore in a general election by five or six points.

3    Q    So 1991 was the last time that a minority-preferred

4    candidate lost an election in District 77; is that what

5    your testimony is?

6    A    And to put it in the proper context, Delegate Spruill

7    would have won in 1993 and has served in that capacity

8    ever since.

9    Q    Thank you.  That's helpful.  Districts 80, can you

10   tell us the last time a minority-preferred candidate has

11   lost an election in District 80?

12   A    I believe that has been held by an African American as

13   long as I can remember.  Ken Melvin actually held that

14   seat prior to Matthew James.  I think Ken Melvin was there

15   for 20-plus years, 24 years, I think.

16              JUDGE PAYNE:  Melvin was what race?

17              THE WITNESS:  He was African American, Your

18   Honor.

19   Q    And it sounds like you can't precisely remember, but

20   can you give us kind of a decade and maybe early or late

21   part of the decade in terms of how far back that seat,

22   District 80, has been held by a minority-preferred

23   candidate?

24   A    I can't recall when it was first established because I

25   was still in high school probably, college, but to my

Jones - Cross

 1   knowledge, it has been held by an African American since

 2   the '80s, I believe.

 3   Q    Fair enough, thank you.  Can you tell us the last time

 4   a minority-preferred candidate has lost an election in

 5   District 89?

 6   A    I can't in that regard.  I can recall working with

 7   then-Delegate Alexander on the configuration of his

 8   district.

 9   Q    And can you tell us --

10            JUDGE LEE:  What race is Alexander?

11            THE WITNESS:  He is African American, Your Honor.

12   Q    Can you tell us the last time a minority-preferred

13   candidate has lost an election in District 90?

14   A    You know, we've lost three districts in that city, and

15   so to say that district is not the same as it might have

16   been, you know, 20 years ago because there were five seats

17   in the city of Norfolk.  I believe that has been held by a

18   minority candidate since the early '80s, I believe.

19   Q    Okay.  Thank you.  Can you tell us the last time a

20   minority-preferred candidate lost an election in District

21   92?

22   A    I do not -- I'm trying to think who her predecessor

23   was.  That would be Delegate Ward.  I would say probably

24   has been held by a minority since its inception, but I

25   stand to be corrected if I'm wrong.

Jones - Cross

1    Q    Can you tell us the last time a minority-preferred

2    candidate lost an election in District 95?

3    A    I believe Flora Crittenden was the member there, and

4    she served 30-plus years.  I believe the two -- there were

5    two African-American females that represented those two

6    districts on the peninsula for 30 -- probably between 24

7    and 30 years.  One was a schoolteacher and maybe

8    principal, and I forget what the other one did.

9    Q    You, of course, knew this election history when you

10   drew the enacted map; is that true?

11   A    I did.

12   Q    Did you consider minority registration rates in each

13   of the challenged districts when you were drawing the

14   enacted map?

15   A    Certainly.  That's part of the equation, the lower

16   voter turnout concern that many members, African-American

17   members had, and I think you heard that spoken to on the

18   floor of the House of Delegates in some of the clips you

19   saw yesterday.  It was certainly expressed to me during

20   the process, a lower registration and a lower voter

21   turnout.

22   Q    Did you look specifically at each district, at the

23   registration rate for each district, the black

24   registration rate?

25   A    You know, I did not, and I would say to maybe shorten

Jones - Cross

1    the line of questioning, I did not do an ecological

2    retrogression analysis.  I did a functional analysis of

3    the plan, talking with the community, with the members,

4    and looking at election results.  That was the extent of

5    what I did.

6    Q    Yes, Delegate Jones, I wasn't asking you about an

7    ecological regression analysis actually.  I was really

8    just asking you whether you had considered the voter

9    registration rates of African Americans in each of the

10   challenged districts before or during the time that you

11   were drawing the enacted plan.

12   A    I would say I did in the majority, but I can't say for

13   certain every one.  Listening to members come to me like

14   Delegate Tyler and Delegate Dance who lost as an

15   independent prior to going to the House.  They were very

16   concerned about the low turnout.

17        You saw Delegate Tyler's comments yesterday about the

18   prison facilities in her district that adversely would

19   affect the turnout and would not make a 55 percent really

20   an effective 55 percent for the African American to win in

21   a race.

22   Q    Beyond listening to the statements of the delegates,

23   of some of the delegates themselves, did you actually look

24   at the actual registration rates of African Americans and

25   compare those to the registration rates of whites in the

Jones - Cross

1    challenged districts?

2    A    No, I didn't, because I would say that registration

3    rates, while they might be a statistic to consider, it's

4    really who turns out to vote, and while you have to be

5    registered to vote, the number of registrants does not

6    equate into turnout.

7    Q    Fair enough.  You mentioned Delegate Tyler talking

8    about the prisons in her district, District 75, and you

9    recall they played a clip, I think it was yesterday, where

10   she said that there were, I think she said 8,000 prisoners

11   in her district; do you recall that?  I think that was the

12   number she used.

13   A    I do, and that was an issue that was discussed during

14   the process.  The way the census -- if I may, you don't

15   get the group quarters dispersion from the census until

16   May or June of that year, the year that ends in a one.  So

17   we could not reallocate where those residents were.  So

18   those were counted in her district as adult population,

19   black population and black voting-age population.

20       So that would have to be discounted, in my opinion,

21   pretty heavily to get an effective voting percentage, and

22   I think that's why, quite frankly, she voted against the

23   bill at the end of the day.  She didn't think there was

24   enough black population to be able to have her win that

25   seat through the balance of the decade.

Jones - Cross

1  Q    And, Delegate Jones, I appreciate that.  I just want

2  to ask you to listen to the actual question that I'm

3  asking, which all I asked is whether you had heard

4  Delegate Tyler say that there were about 8,000 prisoners

5  in her district.

6  A    I did.

7  Q    And did you do anything to check whether that number

8  was anywhere near accurate?

9  A    I did.

10 Q    You realize in terms of the way that would affect the

11 black voting-age population, that there are only about

12 4,000 black prisoners in her district?  And there are only

13 about 6,000 total prisoners?

14 A    That was not the population that I believe that I was

15 given.  I think -- I can't remember where it came from.

16 Probably DOC or maybe -- might have been DOC.  She gave me

17 the figure of 8,000, so I trusted her with that.

18 Q    You weren't aware that her figures were off, the total

19 figure was off by more than 20 percent, and in terms of

20 the black voting-age population, it would have been off by

21 half?

22           MR. BRADEN:  Your Honor, I'd object to that.  We

23 surely haven't had any evidence --

24           JUDGE PAYNE:  I can't hear you.

25           MR. BRADEN:  He just attempted to put something

Jones - Cross

1    into the record --

2            JUDGE PAYNE:  6,000 figure?

3            MR. BRADEN:  Yes.

4            JUDGE PAYNE:  There's no evidence of what the

5    population is.

6            MR. SPIVA:  It's just impeachment, but we are

7    happy to prove the impeachment in our rebuttal case, Your

8    Honor.

9            JUDGE LEE:  You do that.

10           MR. SPIVA:  Thank you.

11   Q    Let me move on from there.  Did you look at -- you

12   mentioned a minute ago that it was very important to look

13   at turnout rates; is that fair?

14   A    That's fair, yes.

15   Q    Did you look at minority turnout rates in each of the

16   challenged districts while you were drawing the map?

17   A    Not each of them, no.

18   Q    Did you look at minority registration -- I'm sorry,

19   turnout rates in District 63?

20   A    Did not.

21   Q    Did you look at minority turnout rates in District 69?

22   A    Did not.

23   Q    Did you look at minority turnout rates in District 70?

24   A    Did not.

25   Q    Did you look at minority turnout rates in District 71?

Jones - Cross

1    A    No.

2    Q    Did you look at minority turnout rates in District 74?

3    A    I did look at the precinct results for the primary,

4    yes.

5    Q    Did you look at minority turnout rates for District

6    75?

7    A    Yes, I did.  I think I mentioned that yesterday.

8    There were like five precincts that had single-digit votes

9    for the now-incumbent member who wanted to get rid of

10   those precincts because they were so heavily -- had a much

11   higher turnout than the white precincts in her district.

12   Q    Did you look at minority turnout rates for District

13   77?

14   A    No.  I talked directly with the member, Lionel

15   Spruill.

16   Q    But you didn't look at minority turnout rates?

17   A    No.  I'll answer -- blanketly I'll answer your

18   questions.  I didn't look at turnout rates except in two

19   or three of the districts.

20   Q    Do you recall which of those two or three districts

21   you looked at turnout rates?

22   A    It would have been the 74th because they had a

23   primary.  It would have been 75, and I believe I did look

24   at 63.  I think there was a primary.  I think I might have

25   looked at the race, the independent race when Delegate

Jones - Cross

1    Dance -- then-Mayor Dance ran as an independent.  I do

2    recall doing that.  So if you want to say the turnout

3    rate, I looked at the election results from that.  So I

4    did 63, 74, and 75.

5    Q    And the race you just mentioned with Delegate Dance,

6    what year was that in?

7    A    I'm trying to remember.

8    Q    Was it 2005?

9    A    I don't recall.

10   Q    And when you were drawing the challenged districts,

11   did you review the Senate districts, the state Senate

12   districts that were drawn at the same time in those areas?

13   A    I did not.

14   Q    Are you aware that the Senate map, that in the Senate

15   map all of the majority-minority districts are less than

16   55 percent BVAP?

17   A    I'll take you at your word on that.  I did not study

18   the Senate map at all, and I know that sounds strange, but

19   it wasn't -- even though it was in my bill, the deal was

20   the Senate would lay their bill on mine, it would come

21   back, the governor wouldn't mess with it.

22   Q    Fair enough.  And I take it, Delegate Jones, that you

23   did not analyze voter behavior and BVAP in prior Virginia

24   Congressional districts?

25   A    Did not.  I did not do the Congressional map.

Jones - Cross

1   Q    Did you review any maps that had been pre-cleared from

2   other Section 5-covered jurisdictions elsewhere in the

3   country?

4   A    I did not.  I had reference to the *Wilkins v. West*

5   case and the --

6   Q    My question just was just did you review any maps that

7   had been pre-cleared from other Section 5-covered

8   jurisdictions from elsewhere in the country.

9   A    I think I answered no.

10  Q    And did you review any maps that had been rejected by

11  DOJ?

12  A    No.

13  Q    Now, Delegate Jones, you know or understand what a

14  racially polarized voting analysis is?

15  A    I have heard of it, yes, sir.

16  Q    And in the 2011 redistricting process, you did not

17  perform, nor did you direct anyone to perform, a racially

18  polarized voting analysis to determine whether there was

19  racially polarized voting in any of the challenged

20  districts; is that correct?

21  A    I did not.  As a practice, the state has never done a

22  racial polarized voting study for a pre-submission, for

23  submission to DOJ.

24  Q    When you say that the state has never done one, I take

25  it you mean for the House or the Senate.

Jones - Cross

1    A    For a plan to be pre-approved.  There have been ones

2    done with court cases that have occurred, but I was

3    surprised when I talked to Jack Austin and Mary Spain.

4    They said in their 30-plus years each, they had never done

5    a racial polarized block vote study retrogression analysis

6    in any plan that was going to be submitted for

7    preclearance to DOJ.

8    Q    And is it your testimony then that in the 2011

9    process, that no racially polarized voting analysis was

10   done or submitted to DOJ?

11   A    That is correct.

12   Q    Okay.  Whether Senate or House.

13   A    That is correct.

14        MR. SPIVA:  Court's indulgence.  I'm trying to

15   get to a different place since we're talking about this

16   now.

17   Q    So you are not aware, Delegate Jones, I take it, that

18   there was -- excuse me one second.  Excuse me.  Court's

19   indulgence.

20        You are not aware, Delegate Jones, that there was an

21   RPV, a racially polarized voting analysis, that was done

22   by a political scientist for the Senate map in this 2011

23   cycle?

24   A    Not aware.  That's what I just testified.  I wasn't

25   aware of it.

1  Q    You weren't aware that there was one, in fact,

2  submitted to the DOJ?

3  A    No.

4          MR. BRADEN:  Objection, Your Honor.  Is there

5  something in the record on this submission?

6          JUDGE PAYNE:  Haven't got anything, do you?

7          MR. SPIVA:  Yeah, I do, actually.

8          JUDGE PAYNE:  There's not some exhibit or

9  something that's in the record?

10          MR. SPIVA:  It's not in the record.  I'm getting

11  ready to offer it up, Your Honor, right now, either to

12  refresh or impeachment as the case may be.  Would you -- I

13  can pass it up in hard copy.

14          JUDGE PAYNE:  I think he needs to see what you

15  are talking about.  It's up to him how he can read it.  If

16  you want to hand it up, hand it up, let him look at it,

17  see if he knows about it.  I thought he just said he

18  didn't but...  You are trying to refresh his recollection;

19  correct?

20          MR. SPIVA:  Should I pass ones up to the Court?

21          JUDGE PAYNE:  Do you have it on the screen?

22          MR. SPIVA:  We can put it on the screen.

23          JUDGE PAYNE:  It hasn't been admitted.

24          MR. SPIVA:  No.

25  Q    Delegate Jones, I take it you know Senator McEachin?

Jones - Cross

1    A    I do.

2    Q    And if you turn to the second page of this document,

3    um, it's a letter on Senate of Virginia letterhead; do you

4    see that?

5    A    I do.

6    Q    It's dated May 31st, 2011; do you see that?

7    A    I do.

8    Q    And it addressed to Mr. Chris Herron, Chief Voting

9    Section, Civil Rights Division; do you see that?

10   A    I do.

11   Q    Do you see the numbers down in the bottom right-hand

12   corner, VSBE 005608?

13   A    Yes, sir.

14   Q    I can tell you this was --

15            MR. SPIVA:  I just want to let the Court know

16   this was produced to us by the State.  We didn't actually

17   find it until this trial had already started and the

18   testimony came out about there not having been racially

19   polarized --

20            THE COURT:  I think you want to ask him

21   foundational questions to see if you can get it in, if you

22   want to impeach him or whatever you said you were going to

23   do.  Go ahead and do that.

24   Q    You see here that in the first paragraph, Delegate

25   Jones, that it says, "I look forward to the opportunity to

Jones - Cross

```
 1   discuss the Virginia Senate redistricting plan" --

 2              JUDGE LEE:  Do you want to ask him if he's seen

 3   this before.

 4   Q    Have you seen this before?

 5   A    I have not.

 6   Q    So you weren't aware of this letter submitting --

 7   submits a racially polarized voting analysis for the

 8   Senate plan?

 9   A    I was not.

10              MR. SPIVA:  I'm going to come back, because there

11   are a couple that go with this set.  I want to see if it

12   refreshes his recollection.

13              JUDGE PAYNE:  You can take that off.

14   Q    Delegate Jones, do you have in front of you a document

15   with -- an email from J. Gerald Hiebert to Ernest

16   McFarland and Robert Popper dated June 1st, 2011?

17   A    I do.

18   Q    And attached to that, there is a document entitled, "A

19   Voting Rights Analysis of the Proposed Virginia Senate

20   Plan," prepared by Dr. Lisa Handley, principal, Frontier

21   International Electoral Consulting; do you see that?

22   A    I do.

23   Q    Does this at all refresh your recollection that there

24   was such an analysis done for the Senate plan?

25   A    I have never seen this document before to my
```

Jones - Cross

1   knowledge.  It's dealing with the Senate plan, not the

2   House plan.

3         MR. SPIVA:  Your Honor, he obviously has never

4   seen these documents.  They were produced by the State,

5   though, as indicated by the Bates numbers, so we would --

6   there's no real dispute as to their authenticity given who

7   produced them.  They are official records of the state, so

8   we would ask that they be submitted on that basis.  We

9   didn't have them on our exhibit list.  We would have

10  but --

11        JUDGE PAYNE:  Excuse me, Mr. Spiva.  Now, since

12  he doesn't know anything about it, isn't that now part of

13  your rebuttal case?  Isn't that the time you would offer

14  them?

15        MR. SPIVA:  That's probably right, Your Honor.

16        JUDGE PAYNE:  All right, well, offer them then.

17        JUDGE LEE:  If you have a witness, of course.

18        JUDGE PAYNE:  Somebody proves them up or he

19  stipulates the authenticity or you lay a foundation, we'll

20  deal with it at the time, but this witness can't get it

21  in, apparently.

22        MR. SPIVA:  Thank you, Your Honor.

23        JUDGE LEE:  Mr. Braden, we didn't mean to take

24  your objection away, but objection sustained.

25        JUDGE PAYNE:  I think it became moot.

Jones - Cross

1          MR. SPIVA:  Mr. Braden is so good he can get his

2     objection without making it.

3          MR. BRADEN:  It's always safer when I don't

4     object.

5          JUDGE PAYNE:  All right, anything else?

6     Q    Now, Delegate Jones, were you aware that Chris

7     Marston, who worked with you and for Speaker Howell in the

8     redistricting process, that he actually gathered

9     information to do a racially polarized voting analysis?

10    A    I was not aware of that, no.  Not to my knowledge.  He

11    might have been, but I don't recall.

12    Q    So let me ask you to turn to Plaintiffs' Exhibit 7,

13    just see whether this refreshes your recollection.  This

14    is an email from Chris Marston to Katie Alexander Murray,

15    subject, RPV Leadership Roster, date, 12/9/2010.  And in

16    that, Mr. Marston -- sorry, give me one second.  He says,

17    "Email is okay, too.  Just be careful in how you describe

18    what you are seeking.  We need to keep out any hint of

19    unfairness," and in parentheses, Mr. Marston says, "except

20    the fundamental unfairness of the Voting Rights Act,"

21    close parens, "or partisanship."

22         Says, "For example, I'm working on an important

23    project for Speaker Howell and the House Republican

24    Caucus.  In order to develop redistricting plans for

25    Virginia in full compliance with the Voting Rights Act, we

Jones - Cross

1    need to collect data for racial block voting analysis.

2    One way to analyze the data is to look for elections in

3    which an African-American candidate and a white candidate

4    both compete either in one's primary or the general

5    election."

6        Does that refresh your recollection that Mr. Chris

7    Marston was gathering data in order to do a racially

8    polarized voting analysis?

9    A    I would note, I'm not copied on this, and as I

10   mentioned in my deposition, I have never been involved

11   with the leadership --

12            THE COURT:  Have you seen this before?

13            THE WITNESS:  No, sir, I have not.

14            JUDGE PAYNE:  Talked about it with anybody?

15            THE WITNESS:  No, sir.

16            JUDGE PAYNE:  Mr. Spiva, I thought it would be

17   helpful to say last night -- I may not have been clear.

18   Why don't you not read everything and tell him to read the

19   part that you want to read, then ask him a precise

20   question about the part that you want him to read.

21            JUDGE LEE:  He can read it to himself.  I think

22   he can read.

23            MR. SPIVA:  Okay.

24            JUDGE PAYNE:  We sort of have the ability to

25   read, too.

Jones - Cross

1          MR. SPIVA:  Okay, thank you, Your Honor.

2          JUDGE PAYNE:  You don't -- you haven't seen this;

3     is that your testimony?

4          THE WITNESS:  No, sir, I have not seen this

5     email.

6     Q    So I take it, Delegate Jones, that you weren't aware

7     that Mr. Marston, who worked with you, actually gathered

8     the information to do -- or began gathering the

9     information to do a racially polarized voting analysis,

10    but ultimately one was not done.

11         MR. BRADEN:  I would object.  I'm not sure that

12    there's anything in the record as a foundation for the

13    formation of that question.

14         JUDGE PAYNE:  What is it?  Are you relying on the

15    "for example" sentence for that proposition?

16         MR. SPIVA:  I'm relying on that.  I've got

17    several other documents I was going to skip over, but now

18    that I've got the objection, I probably need to go through

19    them.

20         JUDGE PAYNE:  You're going to go through

21    something else to lay a foundation, because the "for

22    example," he's quoting something which, I don't know, but

23    it looks to me like he's telling her how she can say

24    something.  He's not saying he's done it.

25         MR. SPIVA:  Your Honor, he's gathering

Jones - Cross

1    information for a racially polarized voting analysis, and

2    he's telling his assistant how to ask for that

3    information.

4            JUDGE PAYNE:  Well, maybe, but you need a witness

5    to testify to that.  I don't know that that's true, and

6    you can't discern that from this email.  So if you want to

7    prove it up, go right ahead, but the objection is

8    sustained to the question, the form of the question.

9            JUDGE LEE:  You can take that off the screen,

10   too.

11   Q    Let me ask you to turn to Exhibit 14 in that same

12   book.  On -- this is an email from Chris Marston to

13   Cortland Putbrese, subject, Help with Contested Election

14   Information, dated 3/11/2011, and if I could ask you to

15   read the, just the sentence that begins "To comply with

16   the Voting Rights Act," and -- just so the record is

17   clear, Your Honors, I'd like for you to read that aloud.

18           JUDGE LEE:  I guess the concern that we have

19   is -- if you ask him if he's ever seen it before -- just

20   having him read somebody else's emails is not admissible.

21           MR. SPIVA:  It's somebody he worked with.  It's

22   already admitted, Your Honor.  These are admitted

23   exhibits.  These are stipulated exhibits.

24           JUDGE LEE:  But if you're going to ask this

25   witness about other people's emails, you need to lay a

Jones - Cross

1    foundation that he's even seen it before.  Can you do that

2    first?  He hasn't shown that he has a vague recollection

3    yet, so you can't refresh recollection.  It's not

4    impeachment because it's not his statement, so lay a

5    foundation that he's even seen it before.

6    Q    Have you seen this email, Delegate Jones?

7    A    I have not.

8    Q    Were you aware of Chris Jones attempting to gather

9    information for a racially polarized voting analysis?

10   A    You meant Chris Marston.

11        JUDGE PAYNE:  Chris Marston.

12   Q    Sorry, Chris Marston.

13        JUDGE PAYNE:  Yes or no?

14        THE WITNESS:  I was not aware that he was doing a

15   racial polarized voting.  I know he was looking at

16   election returns, and the answer would be, yes, I knew he

17   was looking at election data, but I don't know for what

18   purpose, because I've never seen this email.

19   Q    Why don't we move -- still want to talk to you about

20   the racially polarized voting analysis.  Was there any

21   statistical analysis done whatsoever to determine the

22   degree of racially polarized voting in any of the

23   challenged districts?

24   A    No.

25   Q    Delegate Jones, you'd agree that for good government,

Jones - Cross

1    it's important that politicians generally don't do in

2    private something that's fundamentally different from what

3    they tell the public; would you agree with that?

4    A    You should comport yourself -- I think for anyone that

5    should be the rule.

6    Q    And you had, as we discussed earlier, you had public

7    hearings all over the Commonwealth prior to drawing the

8    map about the redistricting process; is that correct?

9    A    We did.

10   Q    Let me just direct your attention to one of the

11   transcripts from one of the hearings, Plaintiffs'

12   Exhibit 3.  Tell me when you've got it in front of you.

13   A    I'm ready.

14   Q    And this is -- on the cover it shows that this is the

15   Redistricting Subcommittee of the Privileges and Elections

16   Committee of the Virginia House of Delegates, date,

17   September 22nd, 2010; location, TCC Roper Performing Arts

18   Center in Norfolk, Virginia.  This was one of the hearings

19   that you spoke of?

20   A    Correct.

21   Q    And let me direct your attention to page five of the

22   transcript, and these are part of your opening remarks at

23   the hearing.  If you want to verify that, I think your

24   name appears a couple pages before, but I can represent to

25   you that this is part -- this is you talking.

Jones - Cross

1   A    Yes, sir.

2   Q    You can check me out if you want to.  And in here, is

3   it fair to say that you basically summarize three points

4   that you want to emphasize about the redistricting process

5   and that you kind of start towards the bottom of page

6   five?

7   A    Yes, sir.

8   Q    You said the first one is that the redistricting

9   process must be fair?

10  A    Correct.

11  Q    And then the second is that it must create districts

12  that are nearly equal in population as is practicable;

13  correct?

14  A    Yes, sir.

15  Q    And then finally, the third point is that the

16  districts must comply with the law, the federal U.S.

17  Constitution, and the Voting Rights Act; is that fair?

18  A    That's fair.

19  Q    And there's nothing in the opening remarks, I take it,

20  that suggests that part of the process is going to be to

21  try to unseat Democrats.

22  A    No.

23  Q    Or to do some kind of a partisan gerrymandering;

24  correct?

25  A    No.

Jones - Cross

1    Q    And if we search this whole transcript, we wouldn't

2    find anything like that, would we, that suggested that the

3    plan and the map that you were embarking on drawing, that

4    that was intended to unseat Democrats; is that fair?

5    A    That is fair.

6    Q    And probably, if we looked at each of these, we

7    wouldn't find anything -- each of these transcripts from

8    these various hearings, we wouldn't find anything like

9    that?

10   A    No, you would not.  I don't think one would expect

11   that we would treat Republicans worse than we treat

12   Democrats in the process since we had two-thirds of the

13   chamber.

14   Q    And but there's nothing in these transcripts that

15   suggests that, is there?

16   A    Nope.

17   Q    And you recall, we looked at the House criteria -- we

18   can turn to the exhibit if you need it, but you recall

19   what I'm talking about, the House criteria for the

20   redistricting?

21   A    I do.

22   Q    And that was in Plaintiffs' 16, but you know the

23   document I'm talking about.  It's fair to say that there's

24   nothing in those criteria that suggests that the goal of

25   the redistricting process is to unseat Democrats; correct?

Jones - Cross

1   A     That is correct.  It wasn't the goal.  It wasn't a

2   goal.

3   Q     And there certainly wasn't anything in there that said

4   the goal was to unseat white Democrats; correct?

5   A     I would say that the plan itself would have been a

6   status quo plan that had broad-base support from the

7   members of the caucus and the members of the black caucus.

8   We had only nine no votes.  We had 84 votes in favor of,

9   which was very remarkable and unprecedented in the history

10  of Virginia as far as a redistricting map.

11  Q     There were a lot of Democrats who voted for the plan;

12  correct?

13  A     A majority of Democrats voted for the plan, yes, sir.

14  Q     Even a super majority of the Democrats; right?

15  A     Very close, yes, sir.

16  Q     And in your experience, you've had a lot of experience

17  in politics, usually members don't -- don't vote for

18  something that's against their -- that they perceive to be

19  against their interest; is that correct?

20  A     My recollection of 2001, we didn't have anywhere near

21  as many Democrats voting for the plan as we did in 2011.

22  Q     Let me turn your attention -- actually, we don't need

23  the transcript for this, but you recall we reviewed

24  several times the April 5th floor debates.  This was

25  Exhibit 35.  Do you recall we've gone through that?

Jones - Cross

1    A    Yes, sir.

2    Q    And it's fair to say, right, that if we were to look

3    through every page of that transcript, we wouldn't find

4    anything about the goal of the plan to be to unseat

5    Democrats; correct?

6    A    You wouldn't because that wasn't the goal.

7              MR. SPIVA:  Court's indulgence.  I think I'm

8    almost done.

9    Q    I did have one more.  I guess you can never thrust a

10   lawyer who says he has one more question, but, Delegate

11   Jones, I think yesterday when you were testifying about

12   District 71, the subject of precinct 207 came up.  Do you

13   recall that?

14   A    I do.

15   Q    You remember the 207 is the precinct in the Fan that

16   Delegate McClellan and both -- both you and Delegate

17   McClellan testified about?

18   A    I think there's two precincts.  That's one of the two,

19   yes, sir.

20   Q    Yes, right, but do you recall 207 was the one that

21   Delegate McClellan said that she -- testified that she

22   wanted to keep in her district?

23   A    Correct.

24   Q    And you are aware, of course, that precinct 207 is a

25   majority democratic district; correct?

Jones - Cross

1    A    That's correct.

2    Q    I think you testified that Delegate Loupassi wanted

3    207 in his district?

4    A    That was my recollection, yes, sir.

5    Q    So he wanted a predominantly democratic precinct to be

6    moved into his district; is that correct?

7    A    He's somewhat like me.  He had a broad base support

8    from the democratic side of the aisle, or democratic

9    voters in his district, and he represented city council,

10   and I think most members who serve locally on city

11   councils actually have -- it's more the community of

12   interest and the individual as opposed to the party, and

13   that was the reason or my understanding as to why he

14   wanted the Fan district.

15            JUDGE PAYNE:  Delegate Loupassi is --

16            THE WITNESS:  He is a white Republican, yes, sir.

17   Q    Precinct 207, though, had been in HD 71 for 30 years?

18   A    I would say 20 years probably.  I can't speak back to

19   the '70s.

20   Q    But at least 20 years?

21   A    Yes, sir, I would say.

22   Q    And I think you had also testified yesterday that

23   there were changing demographics in downtown Richmond; is

24   that correct?

25   A    There was, and there still is.

Jones - Cross

1   Q    And I assume, though, that you would agree with me

2   that there's no reason why an African-American delegate

3   cannot represent a predominantly white area of the city of

4   Richmond; correct?

5   A    No.  As a matter of fact, if I may, Delegate Spruill,

6   some of the precincts that we put in in south Norfolk are

7   actually majority white that he wanted in his district.

8            MR. SPIVA:  I have no further questions.  Thank

9   you, Delegate Jones.

10           JUDGE PAYNE:  Redirect.

11           MR. BRADEN:  Your Honors, I will be very brief.

12   I will just ask basically questions in three areas.

13

14                   REDIRECT EXAMINATION

15   BY MR. BRADEN:

16   Q    One, HB 5001 was vetoed?

17   A    Correct.  It was vetoed by the governor because of his

18   concerns with the Senate districts that were overlaid on

19   my bill.

20   Q    So that plan is not before this Court; correct?

21   A    That is correct.

22   Q    And the discussions we had in regards to the emails

23   involving the Richmond registrar, all those emails were in

24   reference to 5001?

25   A    That is correct.

Jones - Redirect

1   Q    The matter at issue before this Court is HB 5005;

2   correct?

3   A    Yes, sir.

4   Q    And you made, to the best of your knowledge, the

5   changes that were requested by the registrar in the 5005

6   bill which is now the plan before this Court?

7   A    To the best of my knowledge, yes.

8   Q    I think there might be some question regarding some

9   names that you used, so in case the Court doesn't

10  recognize who they were, let me ask you two quick

11  questions.  Can you tell me who Mary Spain is and who Jack

12  Austin is?

13  A    Mary Spain, senior attorney in Legislative Services

14  who first came in the mid '70s, and she was doing

15  redistricting law then, and she went through the '80

16  cycle, the multi-member districts.  I think we had three

17  years in a row that they ran.  She was here in '90, 2000,

18  and then she was getting ready to retire in 2010.  So Mary

19  was -- we called the queen of redistricting.

20       And Jack came from UVa, I think, via VCU to

21  Legislative Services in 1979.  So they have collectively,

22  when we were doing the map, 60 years' experience between

23  the two of them.

24  Q    And they worked for both Republican and Democratic

25  members?

Jones - Redirect

1    A    That is correct.

2    Q    Unless my memory is wrong, they would have initially

3    been hired when the legislature was controlled by

4    Democrats?

5    A    That is correct.

6    Q    And you've inquired of them, and they have no memory

7    of the state ever doing any type of vote dilution --

8            MR. SPIVA:  Objection, Your Honor.  This calls

9    for hearsay.

10           JUDGE PAYNE:  Sort of does, doesn't it?

11           JUDGE LEE:  Sustained.

12           MR. BRADEN:  It sort of does.  I withdraw that

13   question.

14           JUDGE PAYNE:  It's already ruled on.

15   Q    If I could ask just really one more question which is,

16   in regards to -- I feel bad, because I feel that I

17   didn't -- he asked a number of questions I should have

18   asked of my witness, so let me go to one of the districts,

19   HD 90, and the question regards the minority candidate of

20   choice.  Do you believe that Billy Robinson was the

21   minority candidate of choice in HD 90?

22   A    He was.  He was defeated in 2002.

23   Q    And was he defeated by a Republican?

24   A    A Republican black female.

25           MR. BRADEN:  Thank you.

```
1              JUDGE LEE:  I'm sorry.  The name of that person
2    again?
3              THE WITNESS:  That was Billy Robinson.  He was
4    defeated by Winsome Sears who served, I think, one term in
5    the House.  She was the first female elected black
6    Republican.
7              JUDGE PAYNE:  Is that it?
8              MR. BRADEN:  No further questions, Your Honor.
9              JUDGE PAYNE:  I think the Court has some
10   questions.  Judge Keenan, do you want to ask yours first?
11             JUDGE KEENAN:  Delegate Jones, I have a couple
12   questions I'd like to ask you for clarification.  Part of
13   your testimony yesterday about the difference between the
14   Division of Legislative Services metric for black
15   voting-page population and the Department of Justice's
16   different metric, when did you first become aware that
17   there was a difference in these two metrics?
18             THE WITNESS:  I guess the day that the bill came
19   out which was really the day, I think, it went on the
20   floor.  I can't remember exactly, but when they did their
21   compilation, their report that showed all the
22   population --
23             JUDGE KEENAN:  You are saying when DLS --
24             THE WITNESS:  Yes, ma'am, not until then.
25             JUDGE KEENAN:  Did you ever discuss these
```

1    differences with the House members on the House floor?

2            THE WITNESS:  No, ma'am.  I did discuss it with

3    Kent Stigall who was running the computer program for DLS,

4    and he told me it included all black.

5            JUDGE KEENAN:  Then I recall from your testimony

6    that you said that members of the black caucus asked for

7    55 percent, and then you mentioned former Delegate Dance

8    by name.

9            THE WITNESS:  Yes, ma'am.

10           JUDGE KEENAN:  Do you recall any other delegates

11   who specifically asked for 55 percent?

12           THE WITNESS:  Delegate Tyler, to my knowledge, my

13   recollection, excuse me, and Delegate Spruill.

14           JUDGE KEENAN:  Okay.  And then I also wanted to

15   ask you, what role did 55 percent black voting-age

16   population, what role did that play in your map-drawing?

17           THE WITNESS:  It was certainly a consideration of

18   what the community and the black members had indicated to

19   me that they thought was a sufficient population to elect

20   the candidate of choice by the community.

21           In my conversation, with Delegate Spruill, and he

22   might have mentioned it on the floor -- I even had a

23   conversation with Delegate McClellan.  It's not about the

24   incumbent member.  The way I understood the law was that

25   it's not -- because I could win in my district or Lionel

1    could win in his district with a much lower percentage

2    because I have the name recognition.

3            Their concern, especially when I talked to Dance,

4    Spruill, Tyler, and Kenny Alexander, I believe, I recall

5    correctly, was that -- because Kenny was going to run for

6    the Senate which he is a senator now -- was that there be

7    a sufficient population in that district in a primary for

8    the candidate of choice to be able to win.

9            So it was aspirational.  It was a rule of thumb,

10    but the map that I created that I submitted to Legislative

11    Services had three that were actually in the 54 percent.

12            JUDGE KEENAN:  Did you talk about the 55 percent

13    aspirational threshold with each of the incumbents,

14    delegates in the 12 challenged districts?

15            THE WITNESS:  I can't say each of them, but it

16    was a conversation with the majority of them, I would say,

17    yes, ma'am.

18            JUDGE KEENAN:  Do you remember which ones?

19            THE WITNESS:  The ones I just mentioned, I

20    believe.  I'm trying to recall because I met collectively

21    with Betsy Carr, Delegate McQuinn, and Delegate McClellan.

22    I think we discussed it in that meeting.  I'm pretty

23    certain that we did, and I know that Delegate Spruill had

24    met with, I believe, Matthew James, Algie Howell, and

25    Kenny Alexander.  They were in 80, 89, and 90.  That was

```
1    his responsibility as far as talking with them, and I feel
2    confident that he brought that up with them.
3            I talked with Delegate Howell, I think, one or
4    two occasions, and I can't remember specifically if we
5    discussed that number, but he had a concern.  He was a
6    barber, so he was not worried about getting reelected
7    because he had probably cut everybody's hair in his
8    district and had been there for 35 years.
9            So their concern was that there be enough vote
10   there, if they were not still around, to be able to elect
11   the candidate of their choice.
12           JUDGE KEENAN:  Thank you.  That's all I have,
13   Judge Payne.
14           JUDGE PAYNE:  Judge Lee.
15           JUDGE LEE:  Was there a reason you did not
16   mention on the floor the difference between the DLS 55 and
17   the DOJ black?
18           THE WITNESS:  Well, I felt that it wasn't that
19   big -- it was between .1 percent difference to .4, or
20   maybe .3, if I recall, Your Honor.  I think the 95th
21   District might have been a one percent drop, but I think,
22   as we discussed yesterday, Delegate McClellan's was a
23   .4 percent.
24           So I didn't think that it was statistically
25   significant based on the testimony that we had heard,
```

 1   because DLS could not produce -- to my understanding, they

 2   just -- that's the way that they had their computer

 3   programed to be able to produce all black.  It was in

 4   their setup, I believe.  I think that's the same way they

 5   did it in 2001, but I was not aware they used a different

 6   metric than what I did, and my reasoning for using DOJ

 7   black was because we had to submit it to the Department of

 8   Justice, and I guess through conversations from the

 9   seminar I attended in Austin and talking, I guess, if I

10   recall, with maybe one of my attorneys, maybe Dale Oldham

11   about that.  I just don't recall specifically.  But mine

12   was set up for DOJ black, so mine did not match up with

13   theirs.

14          JUDGE PAYNE:  Anything else?  I have this

15   question, Delegate Jones.  First, you said you had met

16   jointly with Delegates Carr, McQuinn, and there was a

17   third person --

18          THE WITNESS:  McClellan.

19          JUDGE PAYNE:  And did you discuss with them the

20   55 percent, the need for 55 percent to be able to maintain

21   enough to elect the minority candidate if they weren't

22   there?

23          THE WITNESS:  I know I did with Delegate

24   McClellan specifically, I do recall that.  But I don't --

25   I can't say 100 percent it was discussed in that joint

 1    meeting, but I believe it was.  Based on the testimony,

 2    yes, sir.

 3              JUDGE PAYNE:  Where did the 55 percent figure

 4    come from in the first place?  How did we ever get that on

 5    to the table for discussion?

 6              THE WITNESS:  Well, Delegate Tyler, I know, had

 7    serious concerns, because I believe when she ran -- she

 8    ran in 2005, I believe her district was about 55 percent

 9    if I remember correctly from what it was four years

10    before.

11              That was a real concern because she struggled to

12    win.  She had a five-way primary race and then a general

13    election race and barely won, won with less than

14    51 percent of the vote.  That was important to her.

15              Delegate Spruill had mentioned it to me, and I

16    can't recall who else and at what specific time, but that

17    was what was gleaned out of the process.

18              JUDGE PAYNE:  Is it fair to say that the

19    55 percent figure came from your discussions with members

20    of the black caucus?

21              THE WITNESS:  I would say mainly, but also

22    comments that they might have shared with me about other

23    members in the community.  I know that Delegate Spruill

24    had talked to the NAACP in Suffolk and Chesapeake and I

25    think Portsmouth as well, because I asked him to talk to

1    the community and come back with their concerns.

2         JUDGE PAYNE:  Why was the decision made to use

3    plus or minus one percent as opposed to plus or minus two

4    percent which had been used in the 2001 plan or plus or

5    minus five percent which was constitutionally acceptable

6    at the time?

7         THE WITNESS:  We felt it better represented the

8    one-person-one-vote, and one of our districts, Your Honor,

9    had actually doubled in population over the balance of the

10   decade, I think Prince William, and we had -- almost every

11   one of the African-American majority-minority precincts

12   had decreased in population except for one, I believe.

13        That was a trend that we saw, Your Honor, in

14   2001, and I think that had been a trend over the last

15   couple of decades with the shifts in populations.

16        JUDGE LEE:  There was a table that somebody asked

17   a question about yesterday, table 13.  Do you know which

18   document that was?

19        JUDGE PAYNE:  I was the one that had the DLS

20   numbers at the top, we think.

21        JUDGE LEE:  I'm trying to compare the black

22   voting-age population before the 2011 plan and then with

23   the 2011 plan.

24        MR. HAMILTON:  Your Honor, it might be

25   Plaintiffs' 50, which is Dr. Ansolabehere's report.

1          THE COURT:  Isn't it 56 and 57?

2          MR. HAMILTON:  I think the report is 50 and 51.

3     I'm not sure that's the table --

4          JUDGE LEE:  That's it.

5          MR. BRADEN:  It might be Defendant Intervenors'

6     Exhibit.

7          JUDGE LEE:  I'm looking at what appears to be

8     Plaintiffs' 50, says Dr. Ansolabehere's report, table

9     four, I believe.  Yes, table four.

10          MR. HAMILTON:  Your Honor, it's Exhibit 50.

11     Table four shows the black voting-age population for the

12     benchmark districts as compared to the HB 5005 districts.

13          JUDGE LEE:  Correct, that's what I'm looking for.

14     Do you have that in front you?

15          THE WITNESS:  Can you give me the page number,

16     Your Honor?  I'm sorry.

17          JUDGE LEE:  Page 72 of Plaintiffs' 50.

18          THE WITNESS:  Yes, sir.

19          JUDGE LEE:  I'm looking at the column that says

20     black voting-age population, and the left reflects what?

21     The left column, what does that reflect?

22          THE WITNESS:  That would be the population.  He's

23     got benchmark.  That would be the population as it existed

24     when the plan -- when we got the census numbers from the

25     census bureau for the 2001 districts, as I understand it.

1          JUDGE LEE:  So then before the 2011 plan, all

2    these districts, except for one, were over 50 percent.

3          THE WITNESS:  Yes, sir, as far as -- that would

4    be column four, I guess, under black voting-age

5    population.

6          JUDGE LEE:  Yes.

7          THE WITNESS:  That would be correct.

8          JUDGE LEE:  Then the changes are reflected, I

9    guess, in HB 5005.

10          THE WITNESS:  That would be correct, Your Honor.

11          JUDGE LEE:  Okay.

12          JUDGE PAYNE:  Does that take care of what you

13    need?

14          JUDGE LEE:  It does, I think.

15          JUDGE PAYNE:  When you were answering yesterday

16    questions in response to Mr. Braden, you were referring to

17    benchmark populations and using two exhibits to do that

18    and to plan populations using DLS and black VAP.  Am I

19    correct that those were Exhibits 56 and 57 that you were

20    referring to?

21          THE WITNESS:  I believe so, Your Honor.

22          JUDGE PAYNE:  A housekeeping thing I was trying

23    to get straight in my notes.  I'm sorry to hold you up.

24    We'll take the morning recess, and if we have questions

25    we'll get them when we come back.

```
 1              (Recess taken.)

 2

 3              NOTE:  After the morning recess, the case

 4    continues as follows:

 5              JUDGE PAYNE:  Your next witness, Mr. Braden.

 6              MR. BRADEN:  Yes, Your Honor.

 7              JUDGE PAYNE:  Oh, we didn't excuse you, did we?

 8    I guess actually both sides have a right to cross-examine

 9    based on any questions the Court asked, and we haven't

10    given you that right.

11              So does anybody have a question based on any of

12    the questions we asked?

13              MR. BRADEN:  No, Your Honor.

14              JUDGE PAYNE:  Mr. Spiva?

15              MR. SPIVA:  No, Your Honor, we don't.

16              JUDGE PAYNE:  All right.  Thank you.  Next

17    witness.

18              You are through, thank you very much.  You are

19    welcome -- you can stay around.

20              MR. BRADEN:  Is he excused?

21              JUDGE PAYNE:  He's excused as far as -- Mr.

22    Hamilton, do you need him in your case, Mr. Jones?

23              MR. HAMILTON:  We do not.  Thank you, Your Honor.

24              JUDGE PAYNE:  Okay.  Delegate Jones, thank you

25    for being with us and giving us your testimony.
```

```
 1            NOTE:  The witness stood down.

 2            MR. BRADEN:  And we will call Dr. Jonathan Katz.

 3            And, Your Honors, we have witness binders that I

 4    think will assist the Court.

 5            JUDGE PAYNE:  Good, thank you.

 6            NOTE:  The witness is sworn.

 7

 8                    JONATHAN N. KATZ,

 9    a witness, called at the instance of the

10    defendant-intervenors, having been first duly sworn,

11    testified as follows:

12                    DIRECT EXAMINATION

13    BY MR. BRADEN:

14    Q    Can you provide the Court your name.

15    A    Jonathan Neil Katz.

16    Q    And briefly what your profession is.

17    A    I'm the Kay Sugahara Professor of Social Sciences and

18    Statistics at the California Institute of Technology.

19    Q    And I would like to bring up Defendant-Intervenors'

20    Exhibit number 16.

21            Could you identify this document for the Court.

22    A    That's my report in this case.

23    Q    And if we could turn to page 25 of that report.

24            And could you tell the Court what this is.

25    A    That is my curriculum vitae.
```

Katz - Direct

1   Q    And is it current and complete?

2   A    Yes, sir.

3   Q    And your expertise briefly is in what area?

4   A    Excuse me one second while I pour some water, please.

5        My areas of expertise are statistical analysis and

6   quantitative political science.

7   Q    Who were you originally employed by in this case?

8   A    I was originally retained by attorneys for the

9   defendant.

10  Q    And you prepared an expert report for them?

11  A    I did.

12  Q    And now you're testifying for the

13  defendant-intervenors?

14  A    That is also correct.

15  Q    And do you remember how many times you've been an

16  expert testimony in redistricting cases or voting rights

17  cases?

18  A    I've testified about 15 or 16 times, and I have been

19  involved in numerous other cases as a consultant.

20  Q    And am I correct in your experience that redistricting

21  is often contentious and often partisan?

22  A    That would be true.

23  Q    And so, from your experience, can you identify often

24  whether or not you're working for a Republican plan or for

25  a Democratic plan?

Katz - Direct

1  A    Yes.

2  Q    And have you been a witness for Republican and

3  Democratic stakeholders in the process?

4  A    Yes, I have served an expert witness in cases employed

5  predominantly by Democratic stakeholders and predominantly

6  by Republican stakeholders.

7       And then in California we have had numerous sets of

8  election law cases where nonpartisan local jurisdictions

9  are sued, and I've been retained by them.

10 Q    I would like to turn to the substance of your report.

11      What were you retained to do?

12 A    I was retained primarily to respond to the report of

13 Dr. Stephen Ansolabehere, pardon my pronunciation, Steve.

14 Particularly paying attention to compactness, racially

15 polarized voting in elections for the House of Delegates

16 in Virginia, and Dr. Ansolabehere's analysis of inclusion

17 of VTDs in the 12 challenged districts.

18      I should say overall the focus of my report is on a

19 reply and on those 12 challenged districts.

20 Q    And what work did you do in a general sense in

21 preparing for your opinions in this report and what

22 materials did you use?

23 A    Fairly standard.  I reviewed the other expert reports

24 that were available prior to my commencing work, election

25 data, demographic data, and so forth.

Katz - Direct

1   Q    Did you examine a part of the doctor's report that

2   deals with the division of VTDs?

3   A    I did.

4   Q    And I would like to turn to Defendant-Intervenors'

5   Exhibit 16, your report, I believe it's page 19.

6        Actually, I believe it starts on, it's

7   Defendant-Intervenors' Exhibit -- page 19.  As is often

8   the case, it's a little confusing because it shows up as

9   page 18 on your report, correct, at the bottom?

10  A    Yes, the bottom of 19, correct.

11  Q    So there is a section beginning at that mark 4.3.

12  What does that section do?

13  A    That's my examination of inclusion of voting

14  tabulation districts in the 12 contested districts and the

15  impact -- particularly examining the impact of racial

16  composition of the districts and partisan electoral

17  performance.

18  Q    And is this the part of your report that specifically

19  responds to the other doctor's claim -- and excuse me, I'm

20  trying to -- every time I pronounce Dr. Ansolabehere's

21  name, I pronounce it a different way.

22            JUDGE PAYNE:  Let's call him Dr. A, he will

23  forgive you.

24  Q    Dr. A.  Accept my apologies.  We need more Basques to

25  teach us how to say it.

Katz - Direct

1      And Dr. A.'s report, is this the section responding to

2   his VTD report section?

3   A    That is correct.

4   Q    And can you just give the Court a brief explanation as

5   to whether or not -- first of all, do you believe that

6   that section of his report is flawed?

7   A    Yes.  I have concerns with the underlying statistical

8   premise of that analysis.

9   Q    And can you explain to the Court why it's flawed.

10  A    Well, in his analysis the underlying, one of the

11  fundamental underlying assumptions is that a voting

12  tabulation district, a VTD, can be independently assigned

13  to a given district.  That's just not true.

14      Think about drawing a map.  It is like the kid's game

15  Othello, a for those of you who are math aficionados the

16  game Go, if I want to include the third VTD in a district

17  and I am starting at -- and I have already included VTD 1,

18  the only way I can include VTD 3 is also to include VTD 2

19  because I need a -- the districts need to be contiguous.

20      And so, there is an interrelated -- the assignment of

21  VTDs is interdependent.

22  Q    So do you believe that his report provides anything of

23  value to this Court in showing any issue regarding a

24  relationship between race and the VTDs that are chosen to

25  be included and not included?

Katz - Direct

1   A    Again, given that assumption, which is fundamental

2   analysis, I do not believe any valid inferences can be

3   drawn.

4   Q    Can we bring up Table 1.  It's on

5   Defendant-Intervenors' page 21.

6        And can you tell the Court what this table is an

7   attempt to do?

8   A    Certainly I will do my best.  And, Your Honors, if you

9   have any questions about the details, I am happy to fill

10  you in.

11       What this presents is similar to Dr. Ansolabehere's

12  report, presents a regression that predicts the

13  probability that a given voting tabulation district is

14  included in one of the 12 contested districts where the

15  predictors are the percent black voting-age population in

16  that VTD and the average Democratic vote for statewide

17  office.

18       What's different, how this analysis differs from Dr.

19  Ansolabehere's is that we also include, although not

20  reported here, another predictor, which is how far that

21  VTD is from the center of the district we're looking at.

22       Now, this is a not a perfect fix.  This is sort of a

23  crude or poor approximation, the best I could do given the

24  time, that allows for this dependence between districts.

25       So as districts get farther and farther from the core

1  of the district, their probability of being included in

2  that district must decline.  And that's what we find.

3  Q    And --

4         JUDGE PAYNE:  You mean as the VTD gets farther

5  and farther away in the district, it's less likely that

6  it's going to appear in the district?

7         THE WITNESS:  That's correct, Your Honor.  What

8  the model says is we take the core, the center of the

9  district, and we ask how far this VTD is.

10        So if you think about a district that is way on

11 the -- currently on the border of that district, that VTD

12 has a much lower probability of having been included in

13 that district, right, it could have been moved to the

14 adjacent district, than one that is very close to the

15 core.  Because again, the ones that are very close to the

16 core, since we need to generate a compact and contiguous

17 district, we need to include -- with high likelihood would

18 need to include the surrounding VTDs.

19        Does that make sense, Your Honor?

20        JUDGE PAYNE:  I understand.  Thank you.

21 BY MR. BRADEN: (Continuing)

22 Q    And can you tell the Court what the central finding

23 from this chart is as to race and party?

24 A    Yes.  So if you look at the -- let's pay attention to

25 just Specification 1, which includes both black voting-age

Katz - Direct

1    population and average Democratic vote performance.   The

2    bold numbers, the first numbers, are their coefficients.

3         Sounds like a scary word.  All it really means is

4    since we're predicting a probability, it says that a 1

5    percent -- so if we look at black voting-age -- the

6    coefficient on black voting-age population, which is

7    0.157, it says that a 1 percent increase in the black

8    voting-age population of that VTD increases the

9    probability that that VTD is included in one of the 12

10   contested districts by .15 percent.

11        And similarly, the average Democratic vote share,

12   as the vote share increases, say from 50 percent to

13   51 percent, that change increases the likelihood that that

14   voting tabulation district is included in the contested

15   district by about .136 percent.

16        JUDGE LEE:  Go over that again.

17        THE WITNESS:  Certainly.  So take a --

18        JUDGE LEE:  I just want you -- I'm sorry.  I just

19   want you to explain what you just were saying using your

20   chart.  I'm trying to follow you.

21        THE WITNESS:  Sure.  So the coefficient on

22   average Democratic vote share is 0.136.  All that means is

23   if I took the same district and I just increased its

24   Democratic vote performance, hypothetically, by 1 percent,

25   the likelihood that that district would now be included in

Katz - Direct

1    the vote tabulation district, holding everything else

2    constant, that is the black voting-age population and its

3    distance from the center of the district, it would

4    increase by about .136 percent.

5           Does that make sense, Your Honor?

6           JUDGE LEE:  Yes, it does, now that you have

7    explained it a second time.  Thank you.

8    BY MR. BRADEN: (Continuing)

9    Q    If you could explain the second column understood

10   Specification 2.

11   A    Again, to get some feel for the overall effect --

12   because the issue is that, as we've heard before,

13   testimony before, and I don't think of any surprise,

14   African-Americans are more likely to vote for Democratic

15   candidates in the Commonwealth of Virginia.

16       There is a correlation between black voting-age

17   population in a VTD and its average Democratic vote

18   performance.

19       So you see when we include either one of them

20   individually, that's what happens in these two

21   specifications, the effect is about the same.  That they

22   are taking the total effect of being either black -- an

23   additional black voting-age population or in average

24   Democratic vote performance, they are both about

25   .25 percent.

Katz - Direct

1      But the focus should really be on Specification 1,

2  which is similar to Dr. Ansolabehere's report, because

3  there the question is, is one of these two effects larger?

4  That is, in a formal sense, in the statistical sense, is

5  there a statistical difference between .157 and 0.136?

6      Substantively they are pretty close, but I am a

7  statistician, I care about are they statistically

8  different.  And I do that by looking at the numbers in the

9  parentheses, which are a measure of standard error.

10      Standard error, since we are estimating a model,

11  I don't know it for sure.  If we did, you don't need a

12  statistician.  And it's like when you often see poll

13  report numbers, polling reported, they say the population

14  approves of President Obama at 49 percent plus or minus

15  three percentage points.  That plus or minus three

16  percentage points is a measure of the statistical

17  uncertainty of that estimate.

18      So it says that the real number is highly likely

19  in the balance 49 percent plus or minus 3 percent.  That

20  plus or minus 3 percent comes from those numbers on the

21  side here.  Let me cut to the chase --

22      JUDGE PAYNE:  So the parenthetical are the margin

23  of error?

24      THE WITNESS:  Exactly.  And so, given the margin

25  of error, these two numbers are not statistically

Katz - Direct

1    distinguishable.  So that is, in perhaps simpler terms,

2    the impact of black voting-age population and average

3    Democratic vote performance have an equal-sized impact on

4    the likelihood that a VTD would be included in one of the

5    12 challenged districts.

6    BY MR. BRADEN: (Continuing)

7    Q    Could you conclude from this chart that race was

8    predominant over politics in the choosing of VTDs that

9    were in or out of a district?

10   A    You couldn't.  Although I would say something

11   stronger.  This is a very, one, very crude analysis.

12        And two, doesn't account for any other reasons we

13   might want to include or not include a figure of VTD in a

14   district.

15        But given this limited analysis, that's what this

16   analysis tells me.

17   Q    And is your crude analysis better than Dr. A.'s

18   analysis?

19   A    I clearly think so because, again, it allows for this

20   clearly obvious interdependence in the creation of a

21   district.  You can't, you can't randomly or independently

22   select a precinct to be in a district because I need it to

23   look -- I need it to be contiguous, I need it to be

24   compact.  There are other criteria.  It needs to maybe

25   perhaps maintain some communities of interest and other

Katz - Direct

1   factors which are going to constrain and jointly affect

2   numerous VTDs about whether or not they're included in a

3   given congressional district -- given, sorry, a

4   legislative district.

5          JUDGE PAYNE:  Does Specification 1 purport to

6   show the difference in the correlations between black

7   voting-age population and Democratic vote?

8          THE WITNESS:  Could I -- I'm going to be

9   specific, and then I'm going to try and give a more

10  intuitive answer.

11         The answer is yes.  What these are are not

12  correlations though.  These are really what in Dr.

13  Ansolabehere's testimony are partial correlations or

14  regression coefficients.

15         So really what we care about is the difference

16  between these two numbers, which is about .021 percentage

17  points.  So that's the difference between the effect.

18         And now one wants to ask is the difference, that

19  is that the black voting-age population is about -- has an

20  impact of about 0.21 percentage points, is that

21  statistically different from 0?  And the answer is, given

22  the uncertainty that we have, given the data and the

23  estimation, the answer is no.

24         So statistically these are a tie.  You should

25  treat these two numbers as if they're the same.

Katz - Direct

1          JUDGE PAYNE:  Which two numbers?

2          THE WITNESS:  The two numbers are 0.157 and

3     0.136.

4          JUDGE PAYNE:  And those two numbers are equal --

5     157 is identified with BVAP, and 136 is identified with

6     average Democratic vote, is that right?

7          THE WITNESS:  That's correct, Your Honor.

8          JUDGE PAYNE:  Okay.  I understand.  Sorry.

9          JUDGE LEE:  Can I ask a couple of follow

10    questions?

11         THE WITNESS:  Of course, Your Honor.

12         JUDGE LEE:  So then what you did in the bottom of

13    this Table 1, control for VTDs in challenged districts

14    under benchmark control for distance from the 12 benchmark

15    challenged districts, you analyzed the Democratic vote in

16    the 12 districts, is that right?

17         THE WITNESS:  Yeah.  It's actually all the

18    districts in the state, but yes.

19         JUDGE LEE:  But for this chart you did the 12

20    districts?

21         THE WITNESS:  Yes.

22         JUDGE LEE:  So they were heavily Democratic at

23    the start?

24         THE WITNESS:  Correct.

25         JUDGE LEE:  And then race was also a factor you

Katz - Direct

1    analyzed in the top part.  And you're saying that the

2    difference between being black and Democrat is basically

3    the difference between .15 percent and .13 percent in

4    terms of the performance of those districts, those 12

5    districts?

6         THE WITNESS:  Good question.  And so, I didn't

7    clearly explain this properly, so let me try one more

8    time, Your Honor.

9         So it is the case that the voting tabulation

10   districts in these 12 contested districts are on

11   average -- have higher black voting-age population and are

12   also higher, have higher Democratic vote performance.  But

13   the VTD, the numerous VTDs that comprise these districts

14   vary quite substantially actually on their -- on both

15   those dimensions.

16        And what this analysis is trying to do is to ask

17   how does that -- how does either being -- having more

18   black voting-age population in that VTD or having higher

19   Democratic vote performance increase the likelihood that a

20   given VTD is included into one of the 12 contested

21   districts.

22        And so, this is not about -- so the coefficients

23   are not about vote performance or black -- this is

24   actually saying, we would like to know the likelihood that

25   a given VTD is included in one of these majority-minority

1    districts.  And that becomes -- and not surprising, the

2    more African-Americans there are in that district, the

3    more likely that precinct is to be included in one of the

4    contested districts.

5           Also, probably not surprising, but probably maybe

6    less -- but maybe a little less, so is the higher the

7    Democratic vote performance is in a given VTD, the more

8    likely it is to be included in one of the

9    majority-minority districts in the Commonwealth of

10   Virginia House of Delegates map.

11          JUDGE LEE:  Thank you for answering my question.

12   BY MR. BRADEN: (Continuing)

13   Q    And again, let me make sure, I don't want to ask you

14   to explain something that's been explained to the Court,

15   but Specification 2, could you explain that again to the

16   Court.

17   A    Again, it was just -- perhaps I should have -- for

18   clarity I should not have included it.  But to look for

19   the overall -- it was just to show qualitatively --

20   actually quantitatively, pardon me, that the impact of

21   increasing independently and ignoring the other --

22   increasing either black voting-age population or average

23   Democratic vote performance, ignoring the impact of each

24   other, has about the same effect.

25          And that's statistically not a surprise because

Katz - Direct

1   black voting-age population is highly correlated with

2   voting -- high Democratic vote performance in a given VTD.

3           And so, another way of -- or maybe perhaps this

4   an easier way to think about it, .249 is basically the

5   same as 0.25, they are substantively close.  And again,

6   given their uncertainty, they are identical.

7           That is another way of thinking about these.  So

8   it is a different way of looking at the same thing in

9   Specification 1.

10          Does that help clarify things?

11          JUDGE LEE:  I think I understand your premise to

12  be that you've compared party and race as predictors that

13  a particular VTD would be included in one of 12 districts,

14  that's the point of this whole exercise?

15          THE WITNESS:  That's correct, Your Honor.

16          JUDGE LEE:  I got it, I think.  But don't quiz me

17  on it.  I don't have to take a test, do I?

18          MR. BRADEN:  Really?

19          JUDGE LEE:  They said there would be no math.

20  BY MR. BRADEN: (Continuing)

21  Q    Did you have an opportunity to review Dr. A.'s reply

22  expert report?

23  A    I did.  His central complaint -- pardon me.  His

24  central complaint about this analysis is that -- I do this

25  at the level of the entire state of Virginia and not in

Katz - Direct

```
 1   geographic regions as he did.  But this actually misses
 2   the point.
 3          I don't disagree that if there is -- there might
 4   be interesting local geography that might matter, but
 5   breaking it up into subgeographies -- and I am not even
 6   sure how he did it.  I am not an expert in Virginia
 7   political or social geography -- doesn't solve this
 8   interdependence.  That is, I can't -- if I want to have
 9   VTD 1 in, it's in the precinct, and I want to have VTD 3
10   that's out here, the only way I can do that is by also
11   including VTD 2 in my map.
12          And so, that doesn't -- doing this by subregions
13   doesn't solve that problem.
14   Q    And I would like to move to Defendants' Exhibit 16,
15   page 9.  Actually, it would be -- in the exhibit it is
16   page 10.  It is page 9 in the report.
17          And that section, beginning on page 9, it's number 3,
18   what does that deal with?
19   A    This deals with our examining Dr. Ansolabehere's --
20   I'm sorry, Dr. Ansolabehere's polarized -- vote
21   polarization study or ecological regression.
22   Q    Before we get to the simple stuff, the ecological
23   inference and ecological regression, let's do try
24   something more simple.
25          Do you think that Professor A. used the right
```

Katz - Direct

1  data in his analysis?

2  A    I have two concerns with the data he used.  First, we

3  were never -- myself and my RAs were never able to exactly

4  match the number of precincts he found.  And we never

5  received his data, so I have no way of verifying why that

6  was so.

7      But the second issue regards to which elections he

8  examines.  All of his focus is either on presidential

9  elections or gubernatorial elections in Virginia.

10  Presidential elections are on-year elections, whereas

11  House of Delegates elections are off-year elections in the

12  parlance of political scientists.

13      And there is no analysis about why voting in these two

14  types of elections are the same and, therefore,

15  informative of how -- whether or not there is racially

16  polarized voting in House of Delegates elections.

17  Q    In your experience, are these usually the same?

18  A    Typically not.  But again, ultimately that's an

19  empirical question which can be examined.

20  Q    And again, as a political scientist, I know you

21  haven't got the data, but would you think it's likely that

22  the fact that there was a black presidential candidate

23  might have influenced the turnout and results in some of

24  the elections?

25  A    That's more likely than not.

Katz - Direct

1   Q    You've been hired on many occasions in Section 2

2   litigation and asked to do vote dilution analysis.

3        What election data would you think you would need to

4   do that?

5   A    Well, let me start with the general answer, and then

6   we'll talk about Virginia, which raises some interesting

7   complications.

8        Typically, although I'm not -- looking at other races,

9   that is races other than the jurisdiction -- other than

10  the election type under litigation, is fine, but primarily

11  and the first thing I would look at would be the elections

12  under contest.

13       So in this case I would look at elections for House of

14  Delegates.  That's the general issue.

15       In practice, the problem in Virginia is that so few of

16  the House of Delegates races are contested.  Actually, I

17  haven't done an exhaustive search, it might actually have

18  the lowest number of contested elections per election

19  cycle that I have ever seen.

20  Q    In the general elections?

21  A    In general elections.

22  Q    So would primary data have been useful to you in this?

23  A    Well, yes, again because in an uncontested election, I

24  don't know who the preferred candidate is.  The voters

25  have not been given any choice.  So in a sort of

Katz - Direct

1   statistical sense, that is unknowable unless I make up the

2   answer effectively.

3        So in this -- so, therefore, I might want to look at

4   primaries.  Which again, from my rather casual perusal and

5   from hearing testimony, there seems to be at least more

6   challenged primaries.  And it seems to be often the point

7   of real decision making, especially in these 12 contested

8   districts.

9   Q    So if you had a report in a hypothetical case that had

10  no primary data and used a different election cycle, would

11  you be able to draw any conclusions from that?

12  A    I would be reluctant to draw any firm confusions --

13  conclusions, not confusions, about whether or not there is

14  racially polarized voting in the election under question.

15  Q    And what's the value of a report looking at

16  presidential data?

17  A    By itself, an interesting academic exercise, but I

18  don't quite understand what it bears on voting in House of

19  Delegates elections.

20  Q    Would knowing whether or not there were black

21  candidates in a primary and that information assist you in

22  doing it?

23  A    It would.

24  Q    So what other criticisms -- let me ask, using the data

25  that Dr. A. used, do you believe it's possible to do any

Katz - Direct

1    type of valid vote dilution analysis or retrogression

2    analysis of any type?

3    A    Again, that's probably a bit stronger than I would put

4    it, counsel.  I would say that that in isolation, without

5    further analysis showing that these elections were similar

6    in kind and in voting behavior, and without any actual

7    examination of House of Delegates elections, I would say

8    so.

9    Q    So what other criticisms do you have of Dr. A.'s

10   report?

11   A    One that the Court might find more pointed headed and

12   technical, it's the use of the statistical tools that he

13   used.  He used a tool called ecological regression which

14   was developed in the 1950s by Leo Goodman.  It was great

15   technology in 1950.  The world has come a long way in

16   those intervening six decades.

17        And it was mentioned during his testimony the

18   state of the art in this is something called ecological

19   inference, which solves some of the problems and better

20   exploits, that is, makes better use of the available data

21   in this type of ecological -- this type of ecological

22   data.

23   Q    If we can bring up Defendants' Exhibit 110, page 7.

24        Can you just briefly explain to the Court what this --

25   this is from -- can you tell the Court what this is.

Katz - Direct

1   A    Yes.  Again, I didn't have the underlying results from

2   Dr. Ansolabehere's report, so what we did is -- what I did

3   is we did ecological regression on the data, on our

4   replication -- on the data that we could put together on

5   the elections, in this case for House of Delegates

6   District 77, for the elections that we had data on.

7       So, for example, you see here, 2002 U.S. President.

8   And there are three points on this graph for that -- on

9   that vertical line.  The circle is the percent of our

10  estimate using ecological regression, the percent of

11  African-Americans that voted for President Obama, the

12  Democratic candidate.

13      And here we say that estimate 1.07.  That is

14  107 percent of African-Americans are estimated to have

15  voted for President Obama in this election in House

16  District 77.

17      I do not think elections in Virginia are fraught with

18  fraud, so that's not possible.  More than 100 percent of

19  the African-Americans could not have voted for President

20  Obama.

21      Similarly, the triangle is our estimate of whites.

22      And the square is the estimate for

23  nonwhite/non-African-Americans.

24  Q    Does this chart explain why most statisticians have

25  now probably replaced this method with ecological

Katz - Direct

1    inference?

2    A    Yes.  As you can --

3         MR. HAMILTON:  Object to the form of the question

4    as leading.  He can ask --

5         JUDGE PAYNE:  Let me ask you to rephrase your

6    question.

7    BY MR. BRADEN: (Continuing)

8    Q    Have most statisticians recently moved away from this

9    form of analysis?

10   A    Yes, they have.  Because, again, in part, as we see

11   here, we get blatantly incorrect answers.  And again, more

12   importantly from my perspective, it doesn't make use of

13   all the available information in these types of aggregated

14   data.

15   Q    Again I would like to move to Defendant-Intervenors'

16   111, figure 8.

17        And can you tell the Court what this chart is?

18   A    So in an attempt to look for whether or not there is

19   racially polarized voting, particularly in the 12

20   contested districts, we examined -- we did ecological

21   inference, which is this alternative.  Which again I am

22   happy to explain in detail if the Court would like.  That

23   estimates the voting behavior of again African-Americans,

24   whites, and others in voting for House of Delegates

25   elections.

1     Now, recall, we had data going back to 2007 and there

2   are 12 districts.  So in principle we could have had -- I

3   guess there is 12 times five, 60 possibly elections we

4   possibly could have examined.  There are only 11 on this

5   chart.  And that's because we can only do -- we can only

6   ask the voting preferences of the electorate in elections

7   where there was actually a contested election.

8     These are basically all the contested elections in the

9   12 districts that I had available data for.

10  Q    Is there really sufficient data available to do an

11  analysis that would inform this Court on these issues?

12  A    Again, given the lack of contested races, I am

13  reluctant to draw any firm conclusions.  We can draw the

14  conclusions in the districts and elections for which we

15  can observe, which are these 11 on this chart, and they

16  are indicative, and we can go through details if you like,

17  of racially polarized voting, at least in half of them.

18    But I would be hesitant to draw it for the entire

19  state without some additional analysis.

20  Q    If election data is thin or limited or unavailable,

21  are there other approaches that an individual might take

22  to reach conclusions on this?

23  A    Again, you would then be forced to think about -- I

24  would say there is lack of quantitative evidence we can

25  bring to bear on this.  Clearly politicians, pollsters,

Katz - Direct

1   there might be other available data to look at this.  That

2   was not available to me and it is obviously not what I do.

3   Q   So a member of a legislative body going to the

4   individuals who represented those particular districts and

5   asking them, would be a reasonable alternative approach?

6           MR. HAMILTON:  Object to the form of the

7   question, Your Honor.  A, it is not in his expert report,

8   so it is beyond the scope of this witness' knowledge that

9   he has been identified as an expert for.

10           And B, it's not in his area of expertise.  He is

11   not an expert on what legislators do or do not consider in

12   doing redistricting.

13           JUDGE PAYNE:  Sustained.  If you want to lay a

14   foundation, perhaps you can.

15           MR. BRADEN:  Sure.

16   BY MR. BRADEN: (Continuing)

17   Q   You've been hired many times to do racial bloc voting

18   analysis?

19   A   Yes.

20   Q   And the goal of those analyses is to determine the

21   relationship between race and voting and the ability of

22   candidates of choice to be elected?

23   A   That is correct.

24   Q   So if you had an inability to come up with all the

25   data to do that type of analysis, would you recommend to a

Katz - Direct

1    legislature a different approach?

2             MR. HAMILTON:  The same objection, Your Honor.

3    It is beyond the scope of the witness' identified

4    expertise.  It is not in his report.

5             JUDGE PAYNE:  Is it in his report?

6             MR. BRADEN:  It's not in his report.

7             JUDGE PAYNE:  Isn't that the rule?  You don't

8    have it in your report, you can't testify to it.

9             MR. BRADEN:  Yes, Your Honor.

10            JUDGE PAYNE:  Sustained.

11   BY MR. BRADEN: (Continuing)

12   Q    Let's turn to Dr. A.'s report, and this would be the

13   demonstrative that was presented to this Court.  And it is

14   page 21 of 22, I guess of the pdf.

15            JUDGE PAYNE:  Of which exhibit?

16            MR. BRADEN:  It's in the back of the witness

17   binder.  This was not an exhibit.  This was a

18   demonstrative provided by the plaintiff to this Court.

19            JUDGE PAYNE:  It's all the way in the back as a

20   demonstrative, right?

21            MR. BRADEN:  All the way in the back.

22            JUDGE PAYNE:  Okay.

23   BY MR. BRADEN: (Continuing)

24   Q    Do you recognize this document?

25   A    Yes, I saw it yesterday in court.

Katz - Direct

1    Q    And do you know what it purports to do?

2    A    Yes.  It's similar to an exercise that plaintiffs'

3    counsel had me do during my deposition.  Oh, there, thank

4    you.

5         And what it does is it takes my estimates, you see the

6    source on the bottom, of voting behavior in a given

7    election and asks the hypothetical question, what would

8    happen if we were to lower the percentage of the

9    African-American black voting-age population in that

10   district from whatever its current number is -- so, for

11   example, in House District 69, it is 55.2 percent black

12   voting-age population, and drop it down to 50 percent.

13        With the assumption that all the -- since we have to

14   maintain the overall constant population of the district,

15   that the increase would all go to whites.

16        And then ask the hypothetical question, what would the

17   election result have been in that district.

18   Q    And how -- in what way would this inform the Court's

19   decision making on any of the issues you normally study in

20   a vote dilution analysis?

21   A    Again, I think we need to back up a few steps.

22   Ecological inference or ecological regression for that

23   matter are asking a very particular question.  They are

24   asking how did voters vote -- how did a set of voters who

25   showed up to vote actually vote in that election.

Katz - Direct

1    Now, there is the trouble, and why we have to

2    estimation is, we have secret ballots.  And so, we try to

3    use statistical tools to basically back out how on average

4    various groups voted in that election.

5    What this table is being used for, as I understood it

6    during the testimony yesterday and in my deposition, was

7    as a way to characterize -- let's call it the normal or

8    expected Democratic vote performance.  And that's not a

9    valid use of the ecological inference or ecological

10   regression estimates.

11   Q   So is there any reference in this material to primary

12   elections?

13   A   I want to add one more thing, if I might, to this.  So

14   the key when you want to do this type of analysis, say ask

15   how a Democratic --

16        MR. HAMILTON:  Objection, Your Honor,

17   nonresponsive.  There is no question.  The question was

18   about primary elections.  And the witness is now

19   volunteering something else.

20   BY MR. BRADEN: (Continuing)

21   Q   What was the key in this report?

22        JUDGE PAYNE:  Sustained.

23   Q   What's the key factor you haven't been able to address

24   because of my inarticulate questioning?

25        MR. HAMILTON:  Well, that doesn't cure the

Katz - Direct

1    problem, Your Honor.  Now he's just asking him to

2    volunteer.  I think we have the same issue.  So I object.

3            JUDGE PAYNE:  Well, ask the question right.

4    BY MR. BRADEN: (Continuing)

5    Q    What's the key factor you haven't been able to address

6    to the Court on this demonstrative.

7            JUDGE KEENAN:  Mr. Braden, could you keep your

8    voice up, please.

9            MR. BRADEN:  My apologies, Your Honor.

10           JUDGE KEENAN:   Thank you.

11   A    Look, this is not -- we can do an analysis that would

12   ask how a -- say how the Democrat -- how a Democratic

13   candidate would do in this election, say in House District

14   69, but we'd need to -- the model would be much more

15   complex than just the ecological inference or ecological

16   regression results which are presented here.

17           They would need to account for the fact of whether or

18   not incumbents were running.  So in almost all of these,

19   all but one of these elections, incumbents are running.

20   And need to think -- because this is about a forecast of

21   how a district will perform over the election decade.

22   We'd want some measure of the uncertainty or the vote

23   swings between elections.

24           So we can think about it, there are good years for

25   Democrats, there are bad years for Democrats.  And those

Katz - Direct

1    types of swings vary by state, and we would want to, using

2    statistical tools, model that to get a reasonable

3    inference.

4        I have done such analyses before, but this isn't it.

5    Q    And how would you do such an --

6        JUDGE PAYNE:  Excuse me.  As I understand what

7    you're saying, is that this demonstrative is not a valid

8    use of the ecological inference reference because there

9    isn't enough data for it to be considered to be valid by

10   people in your profession?  Is that what you're saying?

11       THE WITNESS:  It's not the data.  It's not the

12   appropriate statistical model because it doesn't control

13   for other things that we know affect elections and will

14   affect elections in the future.

15       So to do that analysis, we need to observe

16   multiple elections, say historically, to get an idea of

17   the ebbs and flows we see in political fortunes of the

18   parties at the district level, which this doesn't do.

19       This is like a -- think of this, Your Honor, as a

20   snapshot in time, we're observing one election, and these

21   are perfectly valid inferences about a given election, but

22   it's not fully informative in a statistically valid way

23   about what future elections might look like.

24   BY MR. BRADEN: (Continuing)

25   Q    So does this demonstrative provide informative

Katz - Direct

1    information to the Court in regards to vote dilution, or

2    racial bloc voting, or the percentage of black voting-age

3    population necessary to elect a candidate of choice?

4    A    Again, no for several reasons.  One I've already

5    alluded to, which is we would like to know vote

6    performance not just in this election, but in future

7    elections.

8         A secondary problem, and obvious by the fact that we

9    only have seven districts up here, at the very least there

10   are 12 contested districts, so there are numerous

11   districts not here and actually numerous elections.  I

12   don't actually know which elections these are from, but

13   they are only a scattershot of elections.

14        I had said, going back to a point I have already made,

15   the real problem in analyzing House of Delegates elections

16   in Virginia is there so many uncontested races.  One would

17   want to look perhaps at primaries and other ways about the

18   political process because this is just not enough data to

19   draw any firm conclusions.

20   Q    Were you present for the testimony of Dr.

21   Ansolabehere?

22   A    I was.

23   Q    I think, and I hope I am not mischaracterizing that

24   we've heard some testimony from him that this is a

25   relatively quick process.

Katz - Direct

1       How long would it take you to do it?

2   A   Could you clarify what this is?  Sorry.

3   Q   Yeah, he did a racial bloc voting analysis for this

4   Court in his report.  To do one that you would think was

5   statistically valid, how long would it take you to do?

6   A   So there is multiple parts to that.  So it would take

7   weeks to get the data matching a census and political data

8   and verifying it.  That is typically not done by myself.

9   I typically ask counsel to hire data experts to do that.

10      Then once I received it, it would take -- the

11  ecological inference, one of the costs of it is that it is

12  very computationally intensive.  So running each election

13  can take between two and eight hours on a very high

14  performance computer.

15      So if we had election results say for every House of

16  Delegates election that we wanted to examine, each one of

17  those takes between two and eight hours of computer time.

18  And probably a couple of days of my time to code up and

19  to -- to code up the analysis and then to run diagnostics

20  and check on the other end.

21  Q   So have you ever been asked to do such an analysis

22  prior to the drafting of a redistricting plan?

23  A   I haven't personally, no.

24  Q   And how many years have you been involved in the

25  process?

Katz - Direct

1    A    I have been involved in the redistricting process for

2    about 16 years, 15 years.

3    Q    Could you find anything useful in Dr. Ansolabeher's

4    report in this area?

5    A    No.  Again, given that he did not examine House of

6    Delegates elections, and there are so few of them if he

7    had, I would draw serious concerns about any inferences

8    being drawn from his analysis.

9    Q    I would like to bring up Defendant-Intervenors' 112,

10   figure 9.

11       Can you explain to the Court what this is.

12   A    Yes.

13   Q    It's on page 18.

14   A    So, again, a concern and what I alluded to in my

15   discussion of that demonstrative is what you would really

16   like to know is the performance.  That is, how does the

17   ability in this case of a candidate of choice, which in

18   this simple analysis is going to be an African-American

19   delegate winning election -- that's a very complicated set

20   of analysis.  Which is challenged in the case of Virginia

21   in part because of the uncontested elections.

22       So what here is what I will call a crude or a poor

23   man's first take on this, it's probably the first thing I

24   would have done if I were retained in this case, which is

25   we just across all the elections we observed, we plotted

Katz - Direct

1   out on the horizontal access is the percent black

2   voting-age population.

3       On the vertical access is the -- it's misleading

4   because it goes from 0 to 1, but it's actually discrete.

5   That is, did the district elect an African-American

6   delegate in that election.

7       And so clearly a district is either on the horizontal

8   line at 1 or the horizontal at 0.  And then we ask, what

9   sort of the -- this analysis is called a logit analysis,

10  l-o-g-i-t.  And that curve in the middle is sort of the

11  best fitting curve we can do.  And it's telling you how as

12  you -- in a simple way, given the observed elections, how

13  does the change -- how does changing black voting-age

14  population in a precinct -- sorry, in a district change

15  the probability of an African-American delegate being

16  elected.

17      And as you see, not surprising again I think to this

18  Court, as the black voting-age population increases, that

19  probability increases.  That's why this curve is sloped

20  upwards.

21      In particular, at about -- since 55 percent seemed to

22  be an interesting number in this case, if you looked at

23  it, this curve, if you looked at 55 percent, it actually,

24  the probability that that district would elect an

25  African-American delegate is about 80 percent.

Katz - Direct

1          JUDGE LEE:  What is it at 50 percent?

2          THE WITNESS:  I would have to actually calculate

3     it, but it looks like at about 50 percent, it's actually

4     just close to 50 percent, maybe 52 percent.

5          JUDGE PAYNE:  You mean when the black voting-age

6     population is 50 percent, the chance of electing a black

7     candidate is 50 percent, is that what you are saying?

8          THE WITNESS:  That's correct, Your Honor, in

9     general election.  These are general election data.

10          JUDGE KEENAN:  Are you talking black candidate,

11     or minority-preferred, or are you drawing a distinction

12     between the two?

13          THE WITNESS:  Again, since -- I'm sorry, I cut

14     you off.

15          JUDGE KEENAN:  Are you drawing a distinction

16     between black candidates and minority-preferred

17     candidates?

18          THE WITNESS:  Normally we would want to do that,

19     but given we observed so few contested elections, it's

20     very difficult to identify.

21          So how the analysis would really proceed if we

22     were not data challenged in this case, is we would do

23     ecological inference for all the observed contested

24     elections to find out who the preferred black -- which

25     candidate African-Americans preferred in every district.

Katz - Direct

1    We would then, instead of coding this as black,

2  we would code that candidate and then ask -- and then do

3  this analysis on who won.  I didn't have the time, and

4  again, since we didn't have contested elections, that was

5  not possible.

6    So I really want to treat this analysis as a

7  crude, sort of best-we-can-do, short-notice analysis.

8  BY MR. BRADEN: (Continuing)

9  Q   So is this chart, although -- am I correct, you said

10  this was a crude chart, crude analysis.  Am I correct that

11  you just characterized this as a crude analysis?

12  A   Yes, I did.

13  Q   But is this chart alone better than anything in Dr.

14  Ansolabehere's report on this issue?

15  A   I believe so.

16    JUDGE LEE:  In your report on that same page you

17  have some summary there.  And I wanted to make sure that I

18  understood what you were saying here.

19    THE WITNESS:  Yes, Your Honor.

20    JUDGE LEE:  You said if the districts were being

21  packed to 55 percent, there would be a 100 percent chance

22  that the African-American would be elected in your report?

23    THE WITNESS:  That's correct, Your Honor.  That's

24  a hypothesis.  That's not what the data says.

25    JUDGE LEE:  Oh.  I thought just a moment ago you

Katz - Direct

1    said 80 percent?

2            THE WITNESS:  Yes.  So that was a hypothetical --

3    it's a hypothetical statement.  It says that one claim

4    that you're overpacking African-Americans in that

5    district, then one would expect to see 100 percent or

6    close -- that is probably too strong.  Close to

7    100 percent probability of electing an African-American

8    delegate.

9            What in fact we find from this simple analysis is

10   that it's actually about 80 percent.

11           JUDGE LEE:  Thank you.

12           THE WITNESS:  Is that clear, Your Honor?

13           JUDGE LEE:  Yes, it is.  Thank you.

14   BY MR. BRADEN: (Continuing)

15   Q    And in the interests of time, I will just ask a couple

16   of brief questions in regards to your compactness

17   analysis.

18       Is compactness a useful measure?

19   A    It's a problematic measure.  So typically when one

20   wants to talk about quantitatively measuring things, you

21   have a well-defined concept.  And then one asks, how does

22   a measurer or an estimator comport with that?

23       The problem is compactness is actually very neat

24   mathematically, but it's not what people mean in

25   redistricting.

Katz - Direct

1      So instead what happened is there has been 20-plus

2  suggested measures of compactness.  And depending upon

3  which one you use, you get different results.

4  Q    Is there any academic consensus as to what measure to

5  use?

6  A    Unfortunately there is not.  Again because there is no

7  underlying consensus but what the quantity -- what

8  compactness means formally in a mathematical sense.

9  Q    Can you look at any individual single district in

10  isolation to examine compactness?

11  A    Again, it's the same concern I raised with the

12  inclusion of a VTD in a given district.  Take a part of

13  the state near the coastline in Virginia.  It has a very

14  irregular shape.  Suppose just inland from it I draw very

15  compact, say a circle or a square, rectangular district.

16  We will ignore any other factors that might come in.

17      Well, since I have to enfranchise the rest of that

18  population, the resulting district to its say east will

19  need to be relatively uncompact just given the coastline.

20      So typically one wants to think about compactness

21  measures across an entire state and typically comparing a

22  crossplan as opposed to saying there is any sort of

23  absolute number of --

24  Q    Did it appear -- it appears that you used a different

25  measure for compactness.  Would you explain why you used

Katz - Direct

1    that different measure to the Court and what it was.

2    A    It's one called -- it's a center of -- it's the

3    Boyce-Clark measure, slightly modified to make it easier

4    to compute.  And all that point was to show that with a

5    different measure, which I think has some nice properties,

6    but it doesn't -- it's not perfect, that you get a

7    different finding about the relative compactness of the

8    challenged districts than you do from the noncontested

9    districts.

10   Q    Is there something about the shape of Virginia in

11   particular that makes that measure you think useful?

12   A    Well, the nice thing of these -- they're called, a

13   technical term called inertia or center of inertia

14   measures is that they don't impose a geometric shape.  So

15   that most of the, excuse me, Your Honors, most of the

16   compactness measures that have been discussed in the

17   reports are really about inscribing perfect shapes,

18   circles, mostly circles in this case.

19          The problem is, you actually can't draw a

20   circular district because since you can't have voters in

21   multiple districts, there is no way mathematically -- or

22   think about tiling your floor.  You couldn't tile your

23   floor in circles and get every inch of the floor.  There

24   would be leftover parts where there is grout, or in this

25   case leftover voters who are basically not allowed to vote

Katz - Direct

1    for a House delegate.  So that's the concern with these

2    so-called encompassing circle measures.

3         The nice thing about these center of gravity or

4    inertia measures is they don't put an optimal size.  They

5    just ask, how far is the farthest voter from the center of

6    the district.

7    Q    And if we could bring up Defendant-Intervenors'

8    Exhibit 61.

9         Your Honors, I believe you have seen this before.

10        If we could help you out and pull up the Tidewater

11   area.

12   A    I didn't know that was the Tidewater area.  Always

13   nice to learn something.

14        This is the same point I made before.  Which is, given

15   the sort of natural geography and the underlying county

16   structure in this part of Virginia, if you are going to

17   obviously not include the water and maintain some

18   semblance of these underlying counties, it can be very

19   hard to draw a pretty looking, i.e. compact districts.

20   Q    Your Honors, I would like to turn now to

21   Defendant-Intervenors' Exhibit 16, page 10.  It is the

22   report on page 10.

23        And am I correct on page 10 you have a summary of your

24   findings on these issues?

25   A    That is correct, Your Honor -- sorry, counsel.

Katz - Direct

1  Q    Could you just briefly provide the Court with the

2  summary of your findings on compactness.

3  A    Sure.  Essentially point one, in a comparison of the

4  challenged districts between the benchmark map, that is

5  the previous map, and in the new map, HB 5005, there is

6  essentially no substantive difference, about 4 percent

7  difference in compactness between those districts.

8       Point two --

9       JUDGE PAYNE:  Excuse me, just for the record,

10  we're talking about page 9 of the document, is that right?

11      MR. BRADEN:  Page 9 of the document, page 10 in

12  the exhibit.

13      JUDGE PAYNE:  Go ahead.

14      THE WITNESS:  Are you ready, Your Honor?

15      JUDGE LEE:  Yes.

16      THE WITNESS:  The second point, in the remaining

17  88 districts, those are the noncontested districts, again

18  there is basically no difference on this measure of

19  compactness between the benchmark map, i.e. the previous

20  map, and HB 5005.

21      The third point, there is no -- in the benchmark

22  map, there is no difference between -- there is no

23  substantial difference between the compactness of the

24  challenged districts -- sorry.  Let me rephrase that.

25      In the benchmark map there is no appreciable

Katz - Direct

1    difference between the challenged districts and the other

2    88 nonchallenged districts in terms of their compactness.

3         There is a slight, in HB 5005 the challenged

4    districts are actually slightly more compact than they

5    were in the original benchmark map.

6         And then the final point is nine of the 12

7    challenged districts saw increased compactness in HB 5005,

8    as did 39 of the remaining 88 districts of the

9    nonchallenged districts.

10   BY MR. BRADEN: (Continuing)

11   Q    Dr. Katz, did you have an opportunity to review the

12   reply report by Dr. Ansolabehere?

13   A    I did.

14   Q    And did you see where he indicated, I believe I'm

15   accurately summarizing, that he felt that your compactness

16   report was in some manner in conflict with the compactness

17   analysis provided by Dr. Hood and Dr. Hofeller?

18   A    I do recall that, reading that.

19   Q    Do you believe that this -- is this just a different

20   way of doing it, or are you in conflict with them?

21   A    Again, this goes back to my original point about these

22   compactness measures.  Which is, if you look at different

23   compactness measures, one will find different rankings and

24   amounts of compactness.

25        MR. BRADEN:  Thank you.

Katz - Direct

1              JUDGE PAYNE:  I think the criticism levied by Dr.

2      Ansolabehere was that you were in conflict with Hood

3      and -- what's the other person's name?

4              THE WITNESS:  Hofeller.

5              JUDGE PAYNE:  Hofeller.  Do you think you are in

6      conflict with them?  If so, why?

7              THE WITNESS:  No, I don't.  Again, it goes back

8      to this question.  Which is, using different measures,

9      choose your favorite of one of the 20 measures.  One will

10     come to different conclusions because there is not an

11     underlying consensus about what the right measure of

12     compactness should be.

13             JUDGE PAYNE:  Were your conclusions different

14     than reached by Hofeller and Hood?

15             THE WITNESS:  Yes, because I used a different

16     measure of compactness than they did.

17             JUDGE PAYNE:  Are they statistically significant

18     differences in your judgment?

19             THE WITNESS:  Again, the compactness measures

20     have no underlying statistical foundation, so there is no

21     way to make that claim.

22             JUDGE KEENAN:  So you're saying it's apples and

23     oranges?

24             THE WITNESS:  Yes, unfortunately.

25             JUDGE LEE:  Is there some definitive rule

Katz - Direct

1   concerning compactness?  That there is some special

2   measure that is authoritative that we should consider?

3           THE WITNESS:  No.  That's the whole problem, Your

4   Honor.  Since there is no agreement about the fundamental

5   quantity that is being measured, there is no way to

6   adjudicate which of these 20 measures which have various

7   pluses and minuses -- so there is no consensus.  Which I

8   know it doesn't do the Court any good, but in academic

9   literature there is no consensus.

10          JUDGE LEE:  Thank you.

11          MR. BRADEN:  If I can just ask one follow, two

12  follow-up questions.

13  BY MR. BRADEN: (Continuing)

14  Q    Are you familiar with a well-known political scientist

15  in this area by the name of Bernie Grofman?

16  A    Of course.

17  Q    And do you remember what Bernie Grofman's test of

18  compactness is?

19  A    Bernie said -- Professor Grofman said that basically

20  all these are are the intraocular test, people look at

21  districts maps, they figure out which districts they think

22  look ugly, and then they choose the compactness measure

23  which comports with their eyeball view of the mapping.

24          MR. BRADEN:  Thank you, Your Honor.

25

CROSS-EXAMINATION

BY MR. HAMILTON:

Q    Good afternoon, Dr. Katz.  It's nice to see you again.

     Let's start -- let's start right there.  In your
professional opinion, there is no professionally accepted
measure of compactness, correct?

A    That is correct.

Q    So the opinions that you stated just a moment ago
about the relative compactness, there is no professionally
accepted measure of compactness upon which those opinions
rest, correct?

A    No.  Given that use of measure, those conclusions are
correct.  There is no accepted measure.

Q    All right.  So, I mean, if we were to go to a
political science convention, there would be no consensus
on which of these measures to use, including the one you
used to generate those conclusions, correct?

A    That's correct.

Q    Okay.  Now, you talked a little bit about, just a
moment ago in Defendant-Intervenors' Exhibit 112 -- do you
recall that?  This was the crude or poor man's chart.
Looks like that.

A    Yes, of course.

Q    You recall that.  And you said something about a
52 percent chance of electing a candidate?

Katz - Cross

1   A    That was my eyeballing the intersection of 50 percent

2   black voting-age population and where that S curve crossed

3   it.

4   Q    Based on this crude and poor man's graph, what's the

5   probability of electing -- the minority community electing

6   the candidate of their choice in House District 69?

7   A    Again, the best estimate we would have would be about

8   52 percent.

9   Q    And how about House District 63, a different district,

10  what's your estimate there?

11  A    It would be identical.

12  Q    How about House District 75, a different district?

13  A    Again, they would all be the same, that's --

14  Q    Okay.  If I keep going --

15           JUDGE PAYNE:  Wait a minute, Mr. Hamilton.

16           MR. HAMILTON:  I'm sorry.

17           JUDGE PAYNE:  He was answering.  You all, don't

18  step on each other's lines.  We can hear better and

19  understand better if you do.  And the court reporter can

20  take it.

21           All right, go ahead.

22           MR. HAMILTON:  Thank you, Your Honor.

23           JUDGE PAYNE:  Now restate the question, please,

24  sir.

25  BY MR. HAMILTON: (Continuing)

Katz - Cross

1    Q    I don't want to waste the Court's time or stand

2    between now and lunch, but if I were to go through all 12

3    of these districts and ask you specifically with respect

4    to this House district or that House district, the answer

5    would be exactly the same, right, 52 percent?

6    A    Yes.   That's why it's a crude analysis.

7    Q    Okay.   And it's crude analysis because part of the

8    limitations here is because we have a limited data set?

9    A    That is also correct.

10   Q    And the data set that is limited is because we're

11   looking at House of Delegates elections, is that correct?

12   A    That is correct.

13   Q    If we were to look at some larger universe of

14   elections, and I know you don't want to do that, but if we

15   did look at larger universe of elections, then we might be

16   able to get to district specific projections, correct?

17   A    Actually, in this case I don't believe so.

18   Q    Okay.   But let me just ask you the abstract question.

19   If we look at a larger data set with more elections, then

20   we're going to get to specific predictions on a

21   district-by-district basis, or we could?

22   A    No.   You would have to have -- ultimately that

23   analysis, and I have done such analyses before, would rest

24   on creating a mapping between those higher level

25   elections, say federal elections, and district and House

Katz - Cross

1  of Delegates elections.

2      And since we don't observe contested House of

3  Delegates elections, there is no way to create that

4  mapping.

5  Q   So there is simply no -- so your testimony is, there

6  is no way to determine the probability of electing a

7  candidate of choice for the minority community in any one

8  of the 12 specific House of Delegates elections here, the

9  data is just not available?

10 A   The best you can do is some version of what I do in

11 that figure.

12 Q   In the poor man's graph that we were just looking at?

13 A   That is correct.

14 Q   All right.  Let's go back.  You're not a lawyer,

15 correct?

16 A   That's definitely so.

17 Q   No legal training.  In preparing for your testimony, I

18 gather then you didn't read the District Court opinion in

19 the *Page* case?

20 A   I did not.

21 Q   Or the Supreme Court's decision in the *Alabama* case?

22 A   I did not.

23 Q   Okay.  Didn't review the floor debates in the House of

24 Delegates?

25 A   No, I did not.

Katz - Cross

1    Q    Didn't review any of the materials submitted by the

2    Commonwealth of Virginia to the Department of Justice in

3    connection with preclearance of this plan?

4    A    No, I did not.

5    Q    Didn't review any of the e-mails or other

6    communications between the parties -- I am sorry, among

7    the delegates during the map drawing process?

8    A    No, I did not.

9    Q    Of course, you didn't talk with any of the delegates

10   or do an investigation into what they said during the

11   process?

12   A    That is also correct.

13   Q    You didn't take into account any of the statements

14   made by Delegate Jones about the existence or the

15   application of a 55 percent BVAP threshold, or aspiration,

16   or goal, correct?

17   A    With one slight caveat.  That's why we examined the

18   55 percent in that graph.

19   Q    Okay.  But you weren't looking at the statements made?

20   A    That's right.

21   Q    You were just looking at the number 55 percent as a

22   function of the black voting-age population?

23   A    That's correct.

24   Q    Okay.

25              JUDGE PAYNE:  Mr. Hamilton, we will take the

Katz - Cross

1    lunch recess at this time.

2              MR. HAMILTON:  Thank you.

3              NOTE:  At this point the lunch recess is taken;

4    at the conclusion of which the case continues as follows:

5              JUDGE PAYNE:  Mr. Hamilton.  Dr. Katz, I remind

6    you that you are under the same oath you took earlier

7    today.

8              THE WITNESS:  Yes, Your Honor.

9    MR. HAMILTON:  (resuming)

10   Q    Dr. Katz -- well, first of all, good afternoon.  I

11   hope you had a pleasant lunch.

12       Let's start with where we left off, your chart.  If I

13   could ask Ms. Marino to put it up on the screen.  This is

14   from Defendant Intervenors' Exhibit 112, and I believe

15   it's the S-shaped chart that you had prepared?

16             JUDGE PAYNE:  Same thing as figure nine to his

17   report; is that right?

18             MR. HAMILTON:  Correct.  That's, in fact, what

19   we've blown up, Your Honor.

20             JUDGE PAYNE:  Thank you.

21             MR. HAMILTON:  112, the intervenor defendants

22   have identified as a separate larger exhibit.  We don't

23   have it electronically.

24             JUDGE PAYNE:  Thank you.

25   Q    So, Dr. Katz, if you take a look at that chart, this

Katz - Cross

1  is a chart you prepared; correct?

2  A    That's correct.

3  Q    On the bottom of that, all those little dots, those

4  are individual elections, aren't they?

5  A    That's correct.

6  Q    And they're individual elections that correspond to

7  individual House of Delegates races; right?

8  A    That is correct.

9  Q    So on the bottom, way over in the right-hand side,

10  there's four little dots.  Do you see those?

11  A    Yes.  Right-hand side?

12  Q    On the right-hand side.

13  A    Yes.

14  Q    On the bottom.  That's Delegate Morrissey and Carr in

15  House District 74 and 69; correct?

16  A    I believe that's correct.

17  Q    They won the election?

18  A    Yes.

19  Q    They were -- both -- their race is both white;

20  correct?

21  A    That's correct.

22  Q    So let's take look at your report to see if they were

23  the black-preferred candidate of choice, and so what I'd

24  like to do is go to Intervenor Defendant Exhibit 16, table

25  four.  That's your report, table four?

Katz - Cross

1   A    I have it.

2   Q    So let's look at Morrissey first.  That's House

3   District 74, and it shows toward the bottom of table four;

4   right?

5   A    That's correct.

6   Q    And it shows in House District 74 that 93.1 percent of

7   the African Americans would have voted for that candidate;

8   correct?

9   A    That's correct.

10  Q    Fair to say that's the candidate of choice for the

11  African-American community?

12  A    Yes.

13  Q    Okay.  Let's move to Delegate Carr in House

14  District 69.  We're looking at the same chart here.  We'll

15  start with 2013, 97.3 percent of the African-American

16  community voted for Delegate Carr; isn't that true?

17  A    That's correct.

18  Q    And so not a difficult decision to say here that

19  Delegate Carr was the African American candidate of

20  choice?

21  A    In this election, that's correct.

22  Q    Let's look at the other election in that same House

23  district since you brought it up, 2007.  It's also the

24  data that's reported here, same House district,

25  92.9 percent of the African Americans voted for Delegate

Katz - Cross

1   Carr; correct?

2   A    Yes, that's correct.

3   Q    So in that election, too, Delegate Carr was the

4   African-American candidate of choice?

5   A    Yes.

6   Q    In both of these cases, even though Delegate Morrissey

7   and Carr were white, they were the African-American

8   candidate of choice?

9   A    That's correct in these elections.

10  Q    While we're looking at table four, there's -- you'll

11  agree with me there's nowhere on this table where you

12  account for incumbency; correct?  There's no column here

13  that's labeled that?

14  A    That's correct.  These are just based on the actual

15  election data we observed.

16  Q    And there's nothing here that accounts for whether it

17  was a good year for Democrats; correct?

18  A    That's correct.

19  Q    And there's nothing here that accounts for whether it

20  was a bad year for Democrats; correct?

21  A    That's also correct.

22  Q    And there's nothing here about any kind of future

23  elections.

24  A    That's correct.  As I said, this analysis is not

25  designed to do that.

Katz - Cross

1    Q    And, in fact, when a legislature is drawing

2    districting maps, they don't have access to future

3    election results; right?  You don't have that data?

4    A    I can probably make some money if I did.  We can,

5    however, generate forecasting models that do that.

6    Q    But you haven't done that here.

7    A    That is correct.

8    Q    Table four doesn't reflect anything like that.

9    A    That's correct.

10   Q    All right.  Now, your testimony today is based on --

11   your work in your report and your testimony before this

12   Court is based on an analysis of the maps, the census

13   numbers, demographic and racial data relating to the maps,

14   and related elections data; correct?

15   A    I believe that's an exhaustive collection, yes.

16   Q    And you also studied the expert reports from Dr. Hood,

17   Dr. Hofeller, and Dr. Ansolabehere; correct?

18   A    I would say I studied Dr. Ansolabehere's report.  I

19   read quickly the two other reports.

20   Q    But you are not here to offer an opinion about whether

21   race was a predominate purpose in the drafting of the

22   House of Delegates plans; that's beyond what you were

23   asked to do in this case.

24   A    That's correct.  All my opinions are contained in my

25   report.

Katz - Cross

1    Q    You simply just have no opinion on that subject that
2    you're here to offer the Court.
3    A    Correct.
4    Q    Okay.  So let's go back to your prior experience.
5    You, yourself, were not involved in redistricting in
6    Virginia at the time that the General Assembly drew these
7    maps that are before the Court today.
8    A    That's correct.
9    Q    So in that sense, you are similarly situated to Dr.
10   Ansolabehere?
11   A    I have -- I assume.  I don't really know if he was
12   involved priorly, prior.
13   Q    You weren't a consultant to any party, either the
14   Democrats or the Republicans, in the legislature during
15   the preparation of these maps?
16   A    That's correct.
17   Q    Didn't do an analysis for the state or anyone else at
18   the time the General Assembly was preparing these maps?
19   A    That's correct.
20   Q    And at the risk of beating a dead horse, you didn't do
21   any sort of polarized voting analysis for the General
22   Assembly at the time they were preparing the maps?
23   A    That's also correct.
24   Q    Okay.  So let's turn to your opinions about
25   compactness which we heard this morning.  This is the

Katz - Cross

1   first time that you've ever appeared in court offering an

2   opinion in a Voting Rights Act case with respect to

3   compactness; correct?

4   A    No.

5   Q    You've testified on other occasions on compactness in

6   a Voting Rights Act case?

7   A    Well, I don't actually know if it was a voting rights

8   case.  It was an early California case where the overall

9   criteria for drawing the state legislative maps was

10   involved, and compactness and traditional -- and I

11   testified about traditional redistricting criteria in that

12   case.  It was 2001.  It was one of my first cases.

13   Q    Do you recall when I asked you this question in your

14   deposition?

15   A    I do.

16   Q    So what I asked you was, "Is this the first time

17   you've been asked to give your professional opinion with

18   respect to compactness in a Voting Rights Act case," and

19   your answer was, "That is correct, to the best of my

20   knowledge."  Is that what you said in your deposition?

21   A    Yes.  Can I clarify?

22   Q    Sure.  Please do.

23   A    In that case, I did not present any numbers.  I was

24   asked in that case just to present to the Court what the

25   traditional redistricting criteria were that included

Katz - Cross

1    compactness.

2    Q    I see.  So you mentioned compactness in the course of

3    describing traditional redistricting criteria, but you

4    weren't offering an expert opinion about whether the

5    districts were compact or not?

6    A    That's correct.  So I just wanted to be explicit and

7    correctly answer your question.

8    Q    Thank you.  We covered this briefly, but in your

9    opinion, there's no generally accepted measure for

10   compactness?

11   A    That is my opinion.

12   Q    And you have fundamental problems with -- to the best

13   of your knowledge, there's about 20 different measures,

14   and the fundamental problem you have is that they all lead

15   to different answers?

16   A    There are at least 20, but, yes, I do agree with that

17   statement.

18   Q    And you have the same concern whether we choose

19   Boyce-Clark, the one you used, or Reock, the one that the

20   other experts used.

21   A    That's correct.

22   Q    I take it you disagree with the use of the Reock

23   measure by Dr. Ansolabehere?

24   A    I do for the same grounds.

25   Q    And you have the same objection to the use of the

Katz - Cross

1   Reock test by Dr. Hood?

2   A    Again, my concern is with the general measures of

3   compactness, yes.

4   Q    And you have the same concern with the use of the

5   Reock test by Dr. Hofeller?

6   A    Yes.

7   Q    Now, another compact measure is the Polsby-Popper

8   test; you know that one?

9   A    Yes.

10  Q    That measure compares the area of a district to its

11  perimeter?

12  A    That's actually incorrect.  Actually what

13  Polsby-Popper does is it takes the measured perimeter of

14  the district and asks -- compares the area of that

15  district to the area of a circle with the same size

16  perimeter.

17  Q    You have the same conceptual problem with the use of

18  Polsby-Popper as a measure of compactness that you do with

19  Reock and the others; correct?

20  A    That's correct.

21          JUDGE PAYNE:  Excuse me a minute.  The concern

22  that you have with respect to all of them is that there is

23  no definition of what compactness is?

24          THE WITNESS:  That's correct, Your Honor.

25          JUDGE PAYNE:  All right, thank you.

Katz - Cross

1    Q    So you disagree with the use of the Polsby-Popper

2    measure by Dr. Hood?

3    A    Disagree -- I disagree with the -- there's no accepted

4    measure, so, yes.

5    Q    And you disagree with the use of the Polsby-Popper

6    measure by Dr. Hofeller?

7    A    Again, for the same reasons.

8    Q    And as between the measure you used and the measure

9    they used, it's basically a coin toss on which to use?

10   A    As I said, the point of that was to show that using

11   different measures leads to different conclusions.

12   Q    There's no compelling argument scientifically why one

13   should be preferred to the other, in your opinion?

14   A    No compelling one.  They both -- all these measures

15   have pluses and minuses.

16   Q    Let's talk about the Schwartzberg test.  You are

17   familiar with that one as well?

18   A    I am.

19   Q    That's an alternative measure, another one of these

20   many tests?

21   A    Yes.

22        MR. HAMILTON:  I promise I won't go through them

23   all, Your Honors.

24   A    It's a bit more -- it's probably the most complicated

25   of the measures because it requires integral calculus.  I

Katz - Cross

1   don't know if you remember that from high school or

2   college.

3   Q    I don't.

4   A    Yes, it's another measure similar to the Boyce-Clark.

5   Instead of looking at average deviations, it's looking at

6   a normalized standard deviation of the distance from every

7   point to the center of the district.

8   Q    You have the same conceptual problem with the use of

9   this measure; right?

10  A    That's correct.

11  Q    And the same concern or same disagreement with its use

12  by Dr. Hood?

13  A    Yes.

14  Q    And the same concern or objection to the use by Dr.

15  Hofeller?

16  A    Correct.

17  Q    Okay.  Now, one of the things you talked about this

18  morning, and you described this a little bit in your

19  expert report, is that one of your concerns with the Reock

20  test was what you described as tile theorem; do you recall

21  that portion of your report?

22  A    I do.

23  Q    Because the ideal shape, as you described it, for a

24  Reock test is a circle, and you can't create maps of the

25  entire state using just circles; is that basically

Katz - Cross

1   correct?

2   A    Basically.  You can't draw a map of circles and

3   include every piece of territory in the state.

4   Q    Of course, Virginia isn't unique like that.  That

5   objection would be true as to the use of the Reock test in

6   North Carolina, in South Carolina, in California, and

7   every state in the union; correct?

8   A    Actually, it's a mathematical fact.  That theorem is

9   an actual mathematical theorem from geometry.

10  Q    You will agree with me that that mathematical theorem

11  of geography -- or geometry is equally true in every state

12  in the union; correct?

13  A    That's correct.

14  Q    Now, you mentioned earlier in Mr. Braden's examination

15  the shape of Virginia and that being a concern about using

16  compactness measures because Virginia, the way that it's

17  shaped; do you recall that testimony?

18  A    Again, that's not exactly what I said.  What I said

19  was there's concern about having absolute measures in a

20  state as irregularly shaped and especially with counties

21  as irregularly shaped as the Commonwealth of Virginia has.

22  Q    Now, the Commonwealth of Virginia -- correct me if I'm

23  wrong on my history here -- the shape of that state, the

24  Commonwealth, hasn't changed in the last ten years, has

25  it?

Katz - Cross

1    A    To the best of my knowledge, no.

2    Q    So if we're looking at comparing the way that these

3    districts changed from one redistricting to another

4    redistricting, the shape of Virginia is a constant between

5    the two efforts.

6    A    Yes.  I think -- again, to be clear, what I said in my

7    testimony was, I'd be concerned about setting any absolute

8    standard, but in comparing two maps for the same state, in

9    this case the Commonwealth of Virginia, that's a perfectly

10   reasonable thing to do.

11   Q    The shape of the State of Virginia is also going to

12   remain a constant regardless of which one of these

13   measures of compactness that we use; right?  If we use

14   Reock, the shape looks like it looks, and if we use

15   Polsby-Popper, the State of Virginia remains the same;

16   correct?

17   A    That's correct.

18   Q    Now, Dr. Ansolabehere calculated the Reock score for

19   each of the challenged districts.  Do you recall reading

20   that in his report?

21   A    Yes, I do.

22   Q    You don't disagree with Dr. Ansolabehere's actual

23   calculation of the scores; you have no reason to think

24   they're incorrect?

25   A    I didn't verify them, but I have no reason to think he

Katz - Cross

1    did that incorrectly.  They're a pretty straightforward

2    calculation.

3    Q    You don't have any reason to think that his

4    calculation of the Polsby-Popper or Schwartzberg scores

5    for the 12 challenged districts are incorrect either;

6    correct?

7    A    Not to the best of my knowledge, but, again, I did not

8    independently verify his numbers.

9    Q    In your report, you use the Boyce-Clark measure;

10   right?

11   A    That's correct.

12   Q    This is the first time you've done a compactness

13   analysis?

14   A    Yes.

15   Q    So I can't really ask you whether you always use the

16   Boyce-Clark measure, because I guess you have.  The one

17   time you've done it today, this is the one you used.

18   A    That's correct.

19   Q    At least as to the selection of which measure we're

20   going to use, you disagree with both of the other two

21   experts retained by the intervenor defendants, both of

22   whom didn't use the Boyce-Clark test.

23   A    Again, my take on this was that different measures

24   will lead to different rankings and orderings of the

25   districts.  That is what it was to illustrate.  None of

Katz - Cross

1    them are to be prioritized since there's no agreement

2    about what they're measuring.

3    Q    All right.  Let's turn your attention to Plaintiffs'

4    Exhibit 44.  It's in one of the notebooks behind you.

5    A    Not much space up here.

6                   JUDGE PAYNE:  44?

7                   MR. HAMILTON:  44, Your Honor.  Plaintiffs'

8    Exhibit 44, page ten.

9    Q    I'll represent to you -- do you have that there in

10   front of you, sir?

11   A    I do.

12   Q    I'll represent to you this is an excerpt from the

13   State of Virginia's preclearance submission prepared for

14   consideration by the Department of Justice.  On page ten,

15   it lists the average compactness scores for both the

16   benchmark and the enacted plan; do you see that?

17   A    If those -- if the -- as long as those comply with the

18   current plan in chapter one, yes.  The name is different.

19   Q    It's the same.  One of those measures is Reock; do you

20   see that?

21   A    That's correct.

22   Q    That's the one used by Dr. Ansolabehere?

23   A    Yes.

24   Q    And one of the measures that the Commonwealth used in

25   reporting to the Department of Justice for preclearance

Katz - Cross

1    purposes was the Polsby-Popper test; do you see that?

2    A    Yes.

3    Q    That was the one used by Dr. Hood and Hofeller?

4    A    Yes.

5    Q    And one of those measures was Schwartzberg?

6    A    Yes.

7    Q    And that's the one -- one of the ones used by Dr. Hood

8    and Hofeller?

9    A    Correct.

10   Q    And at least in this table, the state didn't use the

11   Boyce-Clark method at all?

12   A    That's correct.

13   Q    You can close that book.  We're done with that one.

14   Might make you a little more comfortable there.

15   A    It's a little tight fit.

16   Q    You didn't conduct a comprehensive analysis of split

17   VTDs in your report, did you?

18   A    That's correct.

19   Q    No effort to determine whether there was a larger

20   number of VTD splits within the 12 challenged districts

21   rather than elsewhere in the state?

22   A    That's correct.

23   Q    And you don't dispute Dr. Ansolabehere's points on

24   that -- analysis on that point; right?

25   A    Again, I haven't verified it, but I have no reason to

Katz - Cross

1    doubt it.

2    Q    You have no reason to disagree with it?

3    A    Correct.

4    Q    Same is true with respect to contiguity.  You didn't

5    analyze that; right?

6    A    No.

7    Q    And you don't dispute Dr. Ansolabehere's analysis on

8    that point.

9    A    Again, no.

10   Q    Okay.  So let's turn to what I think is probably the

11   most fascinating part of this all, and that is the

12   difference between ecological regression and ecological

13   inference.  You testified this morning about voting

14   behavior and racial polarization in the 12 challenged

15   districts; do you recall that?

16   A    Yes, I do.

17   Q    In your report, you said, "Central to the question of

18   whether or not increasing the African-American

19   voting-eligible population was warranted in the challenged

20   districts is an examination of whether or not African

21   Americans had the ability to elect the candidate of their

22   choice."  Do you recall that?

23   A    Yes.

24   Q    That's what you were asked to examine statistically?

25   A    In that part of my report in response to the analysis

Katz - Cross

1    of Dr. Ansolabehere, yes.

2    Q    Looking at voting behavior is important in order to

3    determine -- to answer the question about ability to

4    elect; right?

5    A    Yes.

6    Q    We know from the census data the demographic profile

7    of legislative districts, that is are they majority black,

8    are they majority white, or something else?

9    A    That's correct.

10   Q    We know from the elections data the political

11   performance of legislative districts, whether they're

12   predominately Democrat or predominately Republican; right?

13   A    Yes.  We actually know more than that.  We actually

14   know the quantity of numbers, but, yes.

15   Q    And what we try and do with this estimation is to ask,

16   how do members of particular ethnic or racial groups vote

17   in a particular set of elections; correct?

18   A    That is correct.

19   Q    The problem is that we don't have the data directly

20   because of the darn secret ballot.  We can't look it up

21   because it's all secret; right?

22   A    That is correct.

23   Q    So what we're doing is using census data and data

24   about ethnic or racial composition of a voting tabulation

25   district to infer what the voting rates were for various

Katz - Cross

1   members of ethnic or racial groups in a particular

2   election?

3   A    Yes.

4   Q    Now, if we're looking at election results through

5   whatever collection of elections we decide to pick, if we

6   look at 100 House of Delegates seats, the performance of

7   each district is going to be different from district to

8   district, the political performance; correct?

9   A    Sort of.  It will differ because the elections and the

10  candidates -- yes, it will differ for many reasons.

11  Q    It will differ in an election; yes?

12  A    Correct.

13  Q    And it will differ between elections?

14  A    Yes.

15  Q    Almost by definition.

16  A    I wouldn't say by definition but almost surely.

17  Q    In fact, you'd be pretty surprised to find the exact

18  same vote share for the parties or the exact same

19  demographic profile in more than -- in more than one or

20  two House of Delegates districts; isn't that true?

21  A    Exact -- if they were exact -- if you're talking about

22  exact matches, yes.

23  Q    You expect to see variation.

24  A    Yes, you do.

25  Q    We can even be stronger than that, can't we?  This is

Katz - Cross

1    an empirical question, and you can, in fact, affirm that

2    the demographic profile in each of the 12 House districts

3    that are at issue in this case, in fact, do vary from

4    district to district; correct?

5    A    Yes, they do.

6    Q    The same is true with respect to the actual observed

7    political results in the 12 House of Delegates districts

8    at issue in this case.  They do, in fact, vary from

9    district to district?

10   A    Yes.

11   Q    So whether we use ecological regression or ecological

12   inference to infer the vote share by racial or ethnic

13   group within the 12 challenged districts, that analysis,

14   in fact, generates results that are different among the 12

15   districts; true?

16   A    Potentially different, and in this case in practice,

17   for at least for the few elections we could check, they

18   are somewhat different.

19   Q    They are different?

20   A    Yes.

21   Q    Not a one-size-fits-all sort of thing?

22   A    What do you mean?  That's a little strong.  I don't

23   know what you mean by that.

24   Q    If we define crossover voting as cases where white

25   voters in a district are voting for the candidate of

Katz - Cross

1    choice for the African-American voters, that, too, varies

2    from district to district within the 12 challenged House

3    districts, doesn't it?

4    A    Just to correct your statement, I think you said --

5    when you say white voters voting for the black candidate

6    of choice, not black voters.

7    Q    Correct.

8    A    Yes, that would be crossover voting.

9    Q    Thank you.  You've heard the phrase racially polarized

10   voting before?

11   A    I have.

12   Q    When there isn't a lot of crossover voting and a

13   majority of blacks are voting one way and a majority of

14   whites are voting the other way, that's called racially

15   polarized voting; right?

16   A    In a simple case of a two-candidate election, that's

17   correct.

18   Q    The higher the level of racially polarized voting, the

19   more likely you're going to need a larger number of black

20   voting-age population in order to ensure the black

21   minority population has the ability to elect; right?

22   A    That's correct.

23   Q    And the opposite is also true.  If there's a lower

24   degree of racially polarized voting, then you're not going

25   to need as high a black voting-age population to allow the

Katz - Cross

1  minority population the opportunity to elect the candidate

2  of choice; correct?

3  A    Yes.

4  Q    But in any event, when we're looking at the level of

5  racially polarized voting, that is likely to and, in fact,

6  does vary between the 12 House of Delegates districts at

7  issue in this case; correct?

8  A    Again, I would put it differently.  We can actually --

9  at least -- we can't say it across all 12.  We can say it

10  across the elections that we observed in the handful -- in

11  the five districts we could actually estimate the voting

12  behavior.  In those five, there was variability.  I cannot

13  say anything about the other districts.

14  Q    Okay.  All right, well, let's take a look at your

15  report.  I'm going to go back to Intervenor Defendants'

16  Exhibit 16.  Do you have that there in front of you, sir?

17  A    I do.

18  Q    It's the same table we're going to look at there.

19  This is your ecological-inference-based estimates; right?

20  A    Yes, for the entire set that I could run on the House

21  of Delegates elections that were contested in the 12

22  contested districts.

23          JUDGE LEE:  Intervenor 16, page 24, is that what

24  you are looking at?

25          MR. HAMILTON:  Yes.  It's actually 23 of the

Katz - Cross

1    report.  The bold print on the bottom says 24.  That's

2    right.

3              JUDGE LEE:  Thank you.

4    Q    What's the projected white share of the vote in House

5    District 71 in 2013?

6    A    So, again, it's not projected.  It's the estimated

7    share of whites who voted for the democratic candidate,

8    and that election was, if I'm reading this correctly, 71

9    -- sorry, which district -- I just lost the district -- 71

10   in 2013, it was about 77.1 percent.

11   Q    How about House District 95 in 2013?

12   A    Approximately 56.9.  That one is -- actually you

13   should take some care.  We haven't spent much time talking

14   about it, but to the right are these measures of constants

15   intervals.  It's a measure of uncertainty, and we actually

16   don't know if that's above a half or slightly below a

17   half.

18             JUDGE LEE:  What line are you referring to again?

19             MR. HAMILTON:  I think --

20             JUDGE LEE:  I'm asking the witness.  What line

21   are you referring to?

22             THE WITNESS:  If you're looking at House election

23   95, it's the one that says black, white, 2011, District 95

24   for whites -- that's the vote race in the fifth column,

25   the estimate is .56, but if you look at the two estimates

Katz - Cross

1   labeled 2.5 percent and 97.5 percent, those are the lower

2   and upper estimates given the uncertainty of what the

3   number could be.  So it could be that less than a half

4   voted for him, could be more.

5          JUDGE LEE:  Okay.

6   Q   I'm sorry.  I think we misunderstood.  I asked for

7   2013 in House District 95.

8   A   I apologize.

9          JUDGE LEE:  That's what I was trying to figure

10  out.

11  A   That was about 62 percent.

12  Q   62.7 percent was the estimated white vote.

13  A   Correct.

14  Q   Now we're going to look at House District 74 in 2009.

15  A   Okay.  Do you want the white vote again?

16  Q   Please.

17  A   The estimated white vote is approximately

18  55.2 percent.

19  Q   Can you look at House District 75 in 2011.

20  A   Again, looking at the white vote, approximately

21  41.4 percent.

22  Q   How about House District 90 in 2009?

23  A   Again, the predicted white vote is approximately

24  35.3 percent.

25  Q   So if I can direct your attention to the screen, we

Katz - Cross

1  prepared an illustrative exhibit displaying this data, the

2  numbers you just read to us, and we presented a bar chart.

3  This is what it would look like; correct?

4  A    Yes, although it doesn't include all the data, but,

5  yes.

6  Q    Sure.  It just includes the data we just read into the

7  record.

8  A    Correct.

9  Q    So looking at the bar chart, this is the projected

10  white share of the vote in five of these House districts;

11  correct?

12  A    Again, I want to be very specific --

13  Q    What estimation?

14  A    In the actual election, the estimated fraction of

15  whites who voted for the democratic candidate.

16  Q    All right.

17        JUDGE PAYNE:  Looking at past, not projecting the

18  future.

19        THE WITNESS:  Yes, Your Honor.

20  Q    Looking in the past.  This is the estimated share of

21  the white vote.  We can certainly conclude from looking at

22  this table that there's variation.

23  A    Yes, there's some variation.

24  Q    Well, we can be a little stronger than some variation.

25  It goes all the way from 71.1 percent all the way down to

Katz - Cross

1   about half of that, 35.3 percent; isn't it?

2   A    Yes, again, but if you want to actually compare across

3   districts, you want to include the cost intervals, so.

4   Yes, as a simple bar chart, there is variability.  Given

5   the statistical uncertainty, it's less than you think it

6   is.

7   Q    All right.  There's statistical uncertainty as to the

8   71 percent figure; correct?

9   A    Correct.

10  Q    And there's statistical uncertainty as to the

11  62 percent number; correct?

12  A    Correct.

13  Q    And there's statistical uncertainty as to every single

14  one of these five numbers; correct?

15  A    That's correct.

16  Q    All right.  Well, we're just looking at the number

17  that you reported on your chart.  If we were to plot it on

18  a bar chart, this is what it would look like.

19  A    Just the means, yes.

20  Q    All right.  Now, Dr. Ansolabehere used a methodology

21  that we've been referring to as ecological regression.

22  That's sometimes called Goodman's regression; right?

23  A    That's correct.

24  Q    You know the Supreme Court utilized ecological

25  regression in the landmark case *Gingles v. Thornburg;*

Katz - Cross

1    right?

2    A    I know from secondhand knowledge, yes.

3    Q    Say that again?

4    A    I've never read the case, but, yes, I know that from

5    secondhand knowledge.

6    Q    You prefer an alternative sometimes called ecological

7    inference?

8    A    I don't prefer.  It is a better technology.

9    Q    In your opinion.

10   A    In my expert opinion, yes.

11   Q    You are not aware of any U.S. Supreme Court decisions

12   that have cited or approved the use of that statistical

13   technique?

14   A    Again, I don't often read Supreme Court decisions, so

15   I have no way of knowing that.

16   Q    You don't know one way or the other; could be they do,

17   could be they don't?

18   A    Correct.

19   Q    I guess we'll figure that out.  One of the -- the

20   issue that you discussed between these two statistical

21   measures is it is -- it has to do with bounding problems

22   in creating these estimations; right?

23   A    That's one issue, yes.

24   Q    EI combines information from Duncan and Davis methods

25   of bounds with statistical models to estimate average

Katz - Cross

1    support for particular candidates among members of

2    different racial groups throughout a district; right?

3    A    That's correct.

4    Q    The advantage, as you describe it, of EI, or

5    ecological inference, is that it uses information from all

6    districts and allows the comparison of the results between

7    the districts; is that right?

8    A    That's correct.

9    Q    So the first -- I'm going to leave it at that rather

10   than debate you on this.  I'm sure it would be

11   fascinating, but let's go with, the first step of the

12   analysis, regardless of which one of these tools we're

13   going to use, is picking the universe of elections that

14   we're going to examine; correct?

15   A    Yes.  That would be the first stage.

16   Q    And the elections that you selected to examine were

17   the general election results for the House of Delegates in

18   2007, 2009, 2011, 2013; right?

19   A    Yes, because those are the elections that we had data

20   for given the time constraints, yes.

21   Q    Didn't choose primaries?

22   A    That's correct.

23   Q    You didn't think that was necessary?

24   A    Again, the point of this report was to examine what

25   Dr. Ansolabehere did, and he didn't look at any primaries,

Katz - Cross

1   so I didn't either.

2   Q    And you didn't think it was necessary to look at any

3   primaries for the purposes of reaching the conclusions and

4   opinions that you are offering to this Court?

5   A    With regard to Dr. Ansolabehere's report, that is

6   correct.

7   Q    Do you know how many -- between 2001 and 2013, do you

8   know how many contested general elections there were in

9   these 12 challenged districts?

10  A    I'm sorry, what are the years again?

11  Q    Between the years 2001 and 2013.

12  A    I don't.  I only had data to 2007.

13  Q    Do you know -- it's a fact, isn't it, that there's a

14  lot more contested general elections than there are

15  primary elections in these 12 districts?

16  A    Again, I don't know since I haven't examined any

17  primary election data.

18  Q    Okay.  Let me ask you to assume that there's more than

19  twice as many contested general elections than there are

20  primary elections.  With that assumption in mind, whatever

21  limitations there might be in analyzing House of Delegate

22  elections at the general election level, it would be even

23  worse if we looked at the primary elections on that

24  assumption; isn't that true?

25  A    Worse is, again, a term.  Given the sparsity of data,

Katz - Cross

1    I would want to examine both for a complete analysis.

2    Q    Let's put it this way:  It would exacerbate the

3    problem of scarcity of data if you had half as much data.

4    A    I don't agree with the premise, so that's why I'm

5    saying no.

6    Q    You don't agree with the premise there were half as

7    many primary elections?  That was just a hypothetical.

8    I'll prove it later.

9    A    I'm sure it's true as a matter of fact.  You have no

10   reason to lie.  What I'm saying is, if you were doing an

11   analysis, I would include both given the lack of data.

12   You'd want to use any available -- for complete analysis,

13   you want to use any data you could get your hands on.

14   Q    Fair enough.  But that's not what you did here.  You

15   looked at the general elections.

16   A    Again, that's correct.

17   Q    And you didn't add the primary elections in because

18   you didn't think they were necessary.

19   A    Not they weren't necessary.  Given the time and what I

20   was asked to do, that was not -- not in my purview.

21   Q    Do you recall when I asked you about primary elections

22   in your deposition?

23   A    I recall we talked about it.  I don't recall what I

24   exactly answered, because I don't know the exact question.

25   Q    Let me read it and see if you agree.  Question -- this

Katz - Cross

1    is page 73, line 18.  "How about primary elections?  Did

2    you examine primary election results?"

3         Your answer was, "I did not."

4         My question, "Why not?"

5         Your answer, "I didn't think it was necessary."

6         Do you recall that?

7    A    I do since it's in front of me, but that's...

8    Q    All right.

9    A    It wasn't necessary because I wasn't asked to do it.

10            JUDGE PAYNE:  Just so I understand it, when you

11   say you weren't asked to do it, are you referring to the

12   fact that you were asked to criticize Dr. Ansolabehere's

13   report?  Is that what you are talking about when you say

14   that?

15            THE WITNESS:  That's exactly correct, Your Honor.

16            JUDGE PAYNE:  That was your charter, and because

17   he didn't, you didn't.

18            THE WITNESS:  That is correct, Your Honor.

19            JUDGE PAYNE:  All right.

20   Q    Well, let's talk about that he didn't use House of

21   Delegates elections either, did he?  Didn't use House of

22   Delegates general elections, he used a different set of

23   federal and state-wide state elections; isn't that true?

24   A    Yes.  I did the delegate analysis to show the

25   differences in voting behavior between federal, and that

Katz - Cross

1   was raising a particular concern I had with his report and

2   analysis he presented.

3   Q    Sure, but I'm only asking you about the data

4   selection.  You selected, you selected the general

5   election results from the House of Delegates elections.

6   You didn't select the primary elections because you didn't

7   think it was necessary; isn't that true?

8   A    It was not necessary given my task was to critique the

9   report of Dr. Ansolabehere.

10  Q    But you could have critiqued Dr. Ansolabehere's report

11  using both sets of elections and added them in, and since

12  data scarcity was the problem, that was a choice you made?

13  A    Correct, it was a choice I made.

14  Q    Let's -- it's different -- the approach you took was

15  different than the approach taken by Dr. Ansolabehere.  He

16  looked at state-wide elections; right?

17  A    That's correct.

18  Q    It's also different than the approach taken by Dr.

19  Hood?

20  A    I don't recall exactly what Dr. Hood did.

21  Q    You read his report?

22  A    Sometime ago, yes.

23  Q    I'll represent to you that he analyzed election

24  results for state-wide elections including governor,

25  lieutenant governor, and attorney general.  Assuming that

Katz - Cross

1    what I just said is true, that's different than what you

2    did?

3    A    That is correct.

4    Q    And assuming what I said is true, Dr. Hood's approach

5    is similar, or at least closer, to Dr. Ansolabehere's

6    approach than just looking at House of Delegate elections?

7    A    Again, since I don't -- haven't -- I haven't read Dr.

8    Hood's report in quite some time.  I don't know exactly

9    what he did, so I'm a little hesitant to say yes or no to

10   that question.

11   Q    Rather than take the time to look at his report, let

12   me just ask you this:  If we generalize it, looking at

13   state-wide elections as a general matter is something

14   that's closer to what Dr. Ansolabehere did rather than

15   what you did.

16   A    In that very general context, yes.

17   Q    Thank you.  Now, in your view, since the question

18   we're asking is how voters in Virginia vote in House of

19   Delegate elections, we should look at House of Delegate

20   elections primarily.  That's the reason you selected them;

21   right?

22   A    That's correct.

23   Q    Now, there's a difference between elections in 2007

24   and 2009 on the one hand and elections in 2011 and 2013 on

25   the other hand; right?

Katz - Cross

1   A    Gubernatorial elections, yes.  Different elections

2   above them, yes.

3   Q    Those two sets of elections, one was done under the

4   benchmark plan, and the other set of elections was done

5   under the enacted plan; correct?

6   A    That's correct.

7   Q    Now, you've identified one problem with using House of

8   Delegate elections is that there's a limited data set;

9   right?

10  A    Yes, because so few are contested.

11  Q    So in 2011, for example, only two of the 12 challenged

12  districts had a contest in which both the Democrat and

13  Republican were running; right?

14  A    That's correct.

15  Q    And in 2013, only three of the 12 challenged districts

16  had a contest in which both the Democrat and Republican

17  were running?

18  A    What year was that again?

19  Q    In 2013, only three of the 12 challenged districts had

20  a contest in which there was both a Democrat and a

21  Republican running?

22  A    That's correct.

23  Q    So let's go back to your -- from the data set that you

24  created, table four of your report which is Intervenor

25  Defendants' Exhibit 16.  This is the same data set we've

Katz - Cross

1    seen before.  You actually calculated, on a

2    district-by-district basis, the ecological inference

3    estimate, and that's what's reported here?

4    A    That is correct.

5    Q    So we can look at these districts, and I won't take

6    the time to go through them all, but in House District 95

7    in 2013 --

8    A    Yes.

9    Q    -- your estimation is that -- not estimate.  Your

10   inference-based estimate is that the Democrat would win

11   89 percent of the black vote; correct?

12   A    That's correct.

13   Q    And 62.7 percent of the white vote?

14   A    Correct.

15        JUDGE PAYNE:  Wait a minute.  Your question was

16   would win.  I thought you were referring backwards to did

17   win.

18        THE WITNESS:  That is correct.

19        JUDGE PAYNE:  We're going to avoid that problem

20   then in the future.  One is a projection, and one is

21   looking backwards in time, and he's talking about things

22   that have been looking backwards in time, I thought.

23        MR. HAMILTON:  With respect, Your Honor, I think

24   the estimate is used to project what, in a

25   two-candidates-running --

Katz - Cross

1        THE COURT:  I'm just saying what he said it

2   meant.  I haven't reached a conclusion on the bottom line

3   of what it does mean.  Maybe you can offer different

4   evidence, but this is how he proposed or articulated it,

5   so you need to keep your questions on what he articulated.

6        MR. HAMILTON:  Thank you, Your Honor.

7   Q    According to your estimate, the Democrat is estimated

8   to have won 89 percent of the black vote; correct?

9   A    In that election, correct.

10  Q    And 62.7 percent of the white vote.

11  A    That is correct.

12  Q    So just focusing on that district, it really doesn't

13  matter how we configure it as long as we keep the

14  population in it the same, because the Democrat's always

15  going to win, because he's winning or she's winning a

16  majority of both the black and the white vote?

17  A    I told you, this is how they voted in that particular

18  election with those particular candidates.  One would do a

19  different analysis, which I have not done, to make a

20  forecast about how future elections would be done.

21  Q    You provide estimates of the share of the vote for

22  seven of the challenged districts, seven of the 12?

23  A    I provide estimates -- again, I'd like to be very

24  specific.  I provide estimates for seven of the districts

25  in the elections where there were contests in those years.

Katz - Cross

1    Q    Fair enough.  Seven out of 12.

2    A    Yes.

3    Q    And to be precise for the record, the ones that you

4    provided data for were House District 69, 71, 74, 75, 80,

5    90, and 95?

6    A    That's correct.

7    Q    Now, there's --

8         JUDGE LEE:  I have a question about this.  When

9    you say contested election, do you mean that they were

10   contested in the sense that a Republican ran against a

11   Democrat, or do you just mean --

12        THE WITNESS:  No.  That at least one candidate

13   received -- yes, in this case, those were all Democrats

14   and Republicans, but what we mean by contested is that

15   there's at least -- besides the -- there's at least two

16   candidates who garner five percent of the vote, and these

17   elections, those were all a Democrat versus a Republican

18   to the best of my knowledge.

19        JUDGE LEE:  Okay, Thank you.

20   Q    You didn't do any analysis or report any results or

21   ecological inference estimates for the remaining five

22   districts.

23   A    Again, that was not possible given there were no

24   observed contested elections.

25   Q    So the answer is, correct, I didn't do any analysis

1    for those five districts?

2    A    Yes.

3    Q    And for the record, those are House District 63, 70,

4    77, 89, and 92.  There's nothing in your report that

5    concerns any of those five districts at all.

6    A    That is correct.

7    Q    And, again, the reason why is because those are the

8    only ones that you had data -- you only had data for seven

9    because you were looking at contested House of Delegate

10   elections; right?

11           JUDGE PAYNE:  Mr. Hamilton, he said that kind of

12   thing two or three times.  Can we avoid some of the

13   repetition and get on with the particular points that you

14   wish to make?

15           MR. HAMILTON:  Yes, Your Honor.

16   Q    If we wanted to look at all 12 challenged districts

17   and either apply an ecological inference or an ecological

18   regression analysis to them, we would need to pick a

19   different set of elections with more complete data;

20   correct?

21   A    Again, I disagree with the premise.  An ecological

22   inference or regression to do what?

23   Q    To develop an estimate just like you have here in

24   table four of Intervenor Defendants' Exhibit 16.  If we

25   wanted to generate that sort of result for all 12

Katz - Cross

1    districts, we would need more data.

2    A    You would need data that does not exist.  If your goal

3    is to understand voting behavior of blacks, whites, and

4    others in the contested districts in House of Delegates

5    elections, this is all you have.  I can say nothing for

6    any other district, and there's no other data I could

7    provide to do that.

8    Q    Well, sir, it's possible that we could select, like

9    the other experts, both by intervenors and by Dr.

10   Ansolabehere, we could use state-wide election data --

11   your problem or concern with that is that it might not

12   accurately estimate voter behavior in House of Delegate

13   elections; right?

14   A    I'm almost sure it wouldn't.

15   Q    But you don't know, because you didn't examine that

16   question.  You didn't examine the question whether a

17   particular set of federal or state elections aligned with

18   the observed results in House of Delegate elections?  You

19   didn't do that analysis, did you?

20   A    No, I did not.

21   Q    So it could be that they align.  You don't think it

22   does, but it could be?

23   A    It could be.

24   Q    And it could be that they don't align, but you don't

25   know?

Katz - Cross

1   A    That is correct.

2   Q    Okay.  So let's look at the analysis that you did do

3   for the seven districts that you, in fact, examined.  When

4   you were looking at them, of the seven that you looked at,

5   four of them you were looking at data under the benchmark

6   plan rather than under the enacted plan; correct?

7   A    That is correct.

8   Q    That's House District 71, 74, 80, and 90?

9   A    Correct.

10  Q    The set of VTDs in 2007 and 2009 in a given district

11  is going to be different than the set of VTDs that were

12  used in the same district in elections in 2011 and 2013?

13  A    Yes, as are the voters who showed up to vote

14  potentially, as are the candidates who potentially ran,

15  yes.

16  Q    Set of VTDs between the 2007 and 2009 elections in a

17  given district is different than the set of VTDs in the

18  same district in 2011, 2013; yes?

19  A    Correct.

20  Q    Now, there were only three districts out of the seven

21  that you analyzed under the ecological inference

22  methodology in which you found a majority of whites were

23  voting differently than a majority of black voters;

24  correct?

25  A    Three districts, four elections, yes.

Katz - Cross

1    Q    Another way to say that is, according to your

2    analysis, you only found three districts in which there

3    was racially polarized voting.

4    A    In at least one election, yes.

5    Q    And those were House Districts 80, 90, and 75?

6    A    Correct.

7    Q    So let's look at your table so we can make sure we

8    understand what that means.  We're looking at table four,

9    Intervenor Defendants' Exhibit 16.  With respect to House

10   District 80, and the year is 2009, 90.7 percent of the

11   African Americans you estimate voted for the democratic

12   candidate.

13   A    Black democratic candidate, yes.

14   Q    And 35.8 percent of the whites voted for the

15   democratic candidate.

16   A    Correct.

17   Q    And so -- because, if my math is right, 64.2 percent

18   of the whites were voting for the Republican and

19   90.7 percent of the African-American voters were voting

20   for the Democrat, that's polarization?

21   A    Correct.

22   Q    Okay, there's one.  House District 90, 2009,

23   90.8 percent of blacks voted for the Democrat according to

24   your estimate?

25   A    Correct.

Katz - Cross

1   Q    35.3 percent of whites voted for the democratic

2   candidate; correct?

3   A    Correct.

4   Q    So that means 64.7 percent of the whites voted for a

5   Republican while 90.8 percent of the blacks voted for the

6   Democrat; true?

7   A    Correct.

8   Q    That's polarization.

9   A    Yes.

10  Q    Last one, House District 75, 2011, 88.3 percent of

11  African-American voters voted for the Democrat; correct?

12  A    Correct.

13  Q    Only 41.4 percent of the whites voted for the

14  Democrat; correct?

15  A    No.  It's 34.8.  I'm sorry -- we're in --

16  Q    House District 75, the year is 2011.

17  A    You're correct.  Sorry, I looked at the wrong column.

18  Q    That's all right.  41.4 percent of whites voted for

19  the democratic candidate.

20  A    Yes.

21  Q    Again, because the majority of the white voters,

22  58.6 percent, were voting for the Republican candidate

23  while 88.3 percent of the African-American candidates were

24  voting for the democratic candidate.  That's another case

25  of polarization?

Katz - Cross

1    A    Yes.

2    Q    That's the only three in your table out of the seven

3    that are recorded here; correct?

4    A    One second, please.  There's four.  There's another

5    2013 -- the ones that were racially polarized -- elections

6    that showed racially polarized voting were 2013,

7    District 75; 2011, District 75; 2009, District 90; and

8    2009, District 80.

9    Q    So only three House districts?

10   A    Correct.

11   Q    You found racial polarization remained in House

12   District 75 consistent.  It was polarized in 2011, it was

13   polarized again in 2013, but it's the same House district;

14   correct?

15   A    That's correct.

16   Q    So just three out of the seven that you -- there's 12

17   challenged districts.  You looked at seven.  Only three

18   you found racially polarized voting?

19   A    Only three -- I found three were racially polarized.

20   Q    Fair enough.  And the corollary is true also.  In

21   four, you found no racially polarized voting?

22   A    That's correct.

23   Q    In other words, if we look at those four, we're going

24   to see, according to your analysis, a majority of

25   African-American voters are voting for the same candidate

Katz - Cross

1   as the majority of the white voters?

2   A    In those elections, yes.

3   Q    And we can go through this, and I won't, but if we

4   were to go through all four of those non-polarized voting,

5   what we would see is majorities of both African-American

6   voters and white voters all voting for the same candidate?

7   A    That's correct.

8   Q    Now, in your report on page 15, you wrote, "Central to

9   the question of whether or not increasing the

10  African-American voting eligible population was warranted

11  in the challenged districts is an examination of whether

12  or not African Americans had the ability to elect the

13  candidate of their choice."  You remember that?

14  A    Yes.

15  Q    That's the central question.  And that's an easy

16  question where a majority of both black and white voters

17  are voting for the same candidate?

18  A    In those particular elections.  The statement is

19  actually about future elections, but, yes.

20  Q    We can only look -- we don't -- we can all agree that

21  you can't tell us what's going to happen next year or the

22  year after, and if you can, maybe you can join me in Las

23  Vegas this weekend.  You can't.

24  A    We can generate statistical forecasting models which I

25  have not done in this case.

Katz - Cross

1  Q    For the purposes of this sort of analysis, the only
2  thing we have is looking backwards.
3  A    In my report, that's all we have, yes.
4  Q    And according to your ecological inference model, if
5  we just take an example of House District 69, for example,
6  according to your analysis, they certainly have the
7  ability to elect the candidate of their choice either year
8  that's reported, 2007 or 2013?
9  A    In those two years, yes.
10 Q    The same is true in House District 74; correct?  The
11 African-American population in House District 74 in 2009
12 had the ability to elect the candidate of their choice?
13 A    That is correct.
14 Q    That's an easy, easy question to answer.
15 A    It's answered.  I don't know easy or not.  It's a lot
16 of work to do these tables.
17 Q    The Democratic candidate won 93.1 percent of the
18 African-American vote; right?
19 A    Correct.
20 Q    And 52.5 percent of the white vote?
21 A    Yes.
22 Q    Same is true in House District 95; the
23 African-American voting population in House District 95
24 certainly had the ability to elect the candidate of their
25 choice in the 2013 election; isn't that true?

Katz - Cross

1    A    Yes.

2    Q    Democratic candidate won 89 percent of the

3    African-American vote?

4    A    Correct.

5    Q    And 62.7 percent of the white vote?

6    A    That's the estimate, correct.

7    Q    Same is true in House District 71?

8    A    In which year?

9    Q    Either one.  Both years the African-American voting

10   population in District 71 had the ability to elect the

11   candidate of their choice?

12   A    Yes.  In neither year was there presence of racially

13   polarized voting, that is correct.

14   Q    Democratic candidate won 97.5 percent of the

15   African-American vote?

16   A    Again, can you tell me which year you are looking at?

17   Q    Either one.

18   A    They vary.  That's why I asked.

19   Q    Sorry.  It's 2013.

20   A    In District 95?

21   Q    Democratic candidate won 97.5 percent of the

22   African-American vote in 2013 in House District 71?

23   A    That's the estimate, correct.

24   Q    And you estimate, according to your ecological

25   inference analysis, that the Democratic candidate won

Katz - Cross

1   77.1 percent of the white vote.

2   A    Correct.

3   Q    And that's another instance in that case where the

4   African-American population in that district certainly had

5   the ability to elect the candidate of their choice?

6   A    In that election, yes.

7   Q    In both of those elections.

8   A    Yes.

9             MR. HAMILTON:  Thank you, sir.

10

11                  REDIRECT EXAMINATION

12  BY MR. BRADEN:

13  Q    Some very brief redirect.  I'd like to remain on table

14  four.  Am I correct that table four deals simply with

15  general elections?

16  A    That is correct.

17  Q    And races all involved the districts that are the

18  challenged districts?

19  A    That is also correct.

20  Q    Those are all majority-minority black districts?

21  A    That is also correct.

22  Q    Am I right, or you can tell me I'm wrong, that these

23  would all, in a general election, be overwhelmingly safe

24  democratic districts?

25  A    It looks that way, yes.

Katz - Redirect

1   Q    What does this chart tell us about polarized voting in

2   primaries?

3   A    Absolutely nothing.

4   Q    And in safe elections, general elections, candidate of

5   choice of the black and white communities are always

6   likely to be the same in a safe district, democratically

7   safe district?  Occasionally polarized?

8   A    Occasionally polarized.  It would depend on the exact

9   fractions.

10  Q    This doesn't provide the Court with any information in

11  regards to polarized voting in primary elections in these

12  districts.

13  A    That is correct.

14  Q    You were asked to do what?

15  A    I was asked to essentially critique Dr. Ansolabehere's

16  report.

17  Q    You were not asked to do a racial block voting

18  analysis in regards to the level of black vote population

19  needed in any district to meet the requirements of the

20  Voting Rights Act?

21  A    I was not.

22            MR. BRADEN:  Thank you, Your Honor.

23            THE COURT:  Can he be excused?

24            MR. HAMILTON:  I have a few questions on redirect

25  if it's allowed --

```
 1              JUDGE PAYNE:  I thought we settled it with Mr.

 2   Raile that we don't do that here.

 3              MR. HAMILTON:  All right, Your Honor.  Thank you.

 4              JUDGE PAYNE:  Is he through?  Can he be excused

 5   permanently?

 6              MR. BRADEN:  Yes, Your Honor.

 7              THE COURT:  All right, we'll take the afternoon

 8   recess, 15 minutes.  Thank you, Doctor.  You are welcome

 9   to stay if you'd like to.

10

11              (Recess taken.)

12

13              NOTE:  After the afternoon recess is taken, the

14   case continues as follows:

15              JUDGE PAYNE:  Your next witness, Mr. Braden.

16              MS. WALRATH:  Defendant-intervenors call Dr. Trey

17   Hood.

18              JUDGE PAYNE:  Who is it?

19              MS. WALRATH:  Dr. Trey Hood.

20              JUDGE PAYNE:  Thank you.

21              JUDGE LEE:  We have the notebooks here.  You have

22   already given us the notebooks.  Thank you.

23              MS. WALRATH:  Yes, we do have witness notebooks

24   to aid the Court.

25
```

1          **M.V. HOOD, III,**

2     a witness, called at the instance of the

3     defendant-intervenors, having first duly affirmed,

4     testified as follows:

5                    DIRECT EXAMINATION

6     BY MS. WALRATH:

7     Q    Professor, are you ready?

8     A    I'm ready.

9     Q    All right.  Would you please introduce yourself to the

10    Court.

11    A    I'm M.V. Hood, III.  Most people call me Trey since I

12    am the Third.

13    Q    And for the benefit of the Court, we've already

14    identified a document, docket number 83, where in

15    paragraph 15 the parties have stipulated to Professor Hood

16    being an expert testimony in this case.

17              JUDGE PAYNE:  An expert in what area, Ms.

18    Walrath?  What is he an expert in, I think is what I was

19    trying to say and didn't say it very well.

20              MS. WALRATH:  Yes.  Well, our stipulation doesn't

21    specify.

22    BY MS. WALRATH: (Continuing)

23    Q    So, Professor Hood, would you please note what your

24    expertise is.

25    A    I'm an expert in issues revolving or relating to

Hood - Direct

1  election administration, including redistricting, Your

2  Honor.

3          JUDGE PAYNE:  Do you agree with that, Mr.

4  Hamilton?  Oh, excuse me, where did he go?  Mr. Spiva?

5          MR. SPIVA:  Yes, Your Honor.

6          JUDGE PAYNE:  He is so accepted.

7  BY MS. WALRATH (Continuing)

8  Q    And, Professor Hood, just briefly what do you do?

9  A    I am a professor of political science at the

10  University of Georgia.  I have been at the university

11  since 1999.

12  Q    And do you have any particular focus at the

13  university?

14  A    My general focus is in the area of American politics

15  and policy.  More specifically, I do research and teach in

16  the areas of Southern politics, racial politics, and

17  electoral politics and election administration.  And

18  redistricting is a special subset of election

19  administration.

20  Q    And have you been an expert witness before?

21  A    Yes.

22  Q    Multiple times?

23  A    Yes.

24  Q    Have you been an expert for private parties or state

25  parties?

Hood - Direct

1    A    Both.

2    Q    Now, turning to the substance of your -- well,

3    actually, let me bring up Defendant-Intervenors'

4    Exhibit 15.  Which I believe is in your witness book if

5    you want to, right there on your right, if you want to

6    take it and flip it open to DI-15.

7         And when you get there, if you could please identify

8    this document for me.

9    A    It's a copy of my expert report in this case.

10   Q    And if you could turn to the back of the report, it is

11   page i in your report, but also the trial exhibit number

12   page is 24.

13   A    Okay.

14   Q    What is that document?

15   A    It's a copy of my curriculum vitae.

16   Q    And is it current and complete?

17   A    Yes.

18   Q    Okay.  So turning to the substance of your report, if

19   we could turn to page 2 of your report, which is trial

20   exhibit page 3.

21        And in the sake of expediency, the pagination of the

22   trial exhibit is one page ahead of the page report.  I

23   will refer to the trial exhibit page for everyone's

24   convenience.

25        So looking at page 3, what were you retained to do?

Hood - Direct

1   A    I was asked to respond to the report issued in this

2   case by Professor Ansolabehere.  And in doing so, I

3   primarily looked at the benchmark plan and the enacted

4   plan and made comparisons between the two.

5   Q    Did you do your own assessment of the plans?

6   A    Yes.

7   Q    And what work did you do in coming to your opinions in

8   this report?

9   A    I gathered various data and performed different kinds

10  of analyses.

11  Q    What data did you rely on?

12  A    Several different, excuse me, several different pieces

13  of data, including census data, election data, and other

14  reports generated from the redistricting plans.

15  Q    Was there any material from the DLS Web site?

16  A    Yes, I did make use of I believe racial data from the

17  DLS Web site.

18  Q    Flipping to page 4 of your report, section 4, entitled

19  Plan Comparisons.  What did you compare?

20  A    I compared the benchmark plan and the enacted plan on

21  a number of metrics, including population, communities of

22  interest, VTDs, whether VTDs were split or kept whole.  I

23  made some partisan comparisons between the plans.  I

24  calculated some statistics involving compactness,

25  specifically the Reock and the Polsby-Popper tests.

Hood - Direct

1  Q    And we will go through those in a bit.  Did you reach

2  any general opinions as to the two plans compared?

3  A    Overall they were similar as we will see as we move

4  through the report.

5  Q    So let's do that.  Looking at the first subsection you

6  have here entitled Population Deviation.  What did you

7  conclude?

8  A    Well, I concluded the benchmark plan just prior to the

9  census cycle, districts -- population in the districts had

10 gotten off.  And so, they needed to be -- population

11 needed to be redistributed.  And I determined that looking

12 at what happened after the enacted plan was put in place,

13 that that did occur.  Population was equalized across

14 districts, between plus or minus 1 percent deviation.

15 Q    And I would like to bring up the next page of your

16 report, page 5, Table 1.

17      And could you please explain to the Court what this

18 table shows.

19 A    The 2009 districts would be the benchmark plan in the

20 year 2009.  And so, that's how far off the population had

21 gotten since 2001 when those districts were first drawn.

22      So negative 20 percent, approximately, to above

23 138 percent.

24      And the 2011 districts are after the plan was redrawn,

25 that's the enacted plan.  And you can see the population

Hood - Direct

1  deviation there then ranges between minus 1 percent and

2  plus .99 percent.

3  Q    Why was it necessary to bring the deviation to that

4  range?

5  A    That was part of the criteria that had been drawn up

6  in the House of Delegates for their redistricting plan.

7  Q    Is it fair to say that you had to redraw the benchmark

8  plan to get to that deviation?

9  A    Certainly.  It couldn't have been left as it was and

10  reach those numbers.

11  Q    And just one point, to make sure it was the same page,

12  when you say 2009 districts, I think you said this, but

13  are you referring to the 2001, what we have been calling

14  the benchmark plan?

15  A    Yes.

16  Q    So turning to the next section of your report entitled

17  Maintaining Communities of Interest.

18      What did you consider in that section?

19  A    Here I looked primarily at counties and independent

20  cities.  Independent cities in Virginia have the same type

21  of designation as a county.  And I was looking to see how

22  many counties and independent cities were split across

23  districts.

24  Q    And what did you determine?

25  A    I determined that they were essentially -- if you look

Hood - Direct

1    at the benchmark plan, which in Table 2 is labeled 2009

2    Plan --

3    Q    And really quickly, before you move on, we will bring

4    up that table, it's on the next page, on page 6 of the

5    report.

6    A    The number of counties and independent cities split

7    under the previous benchmark plan was 44 percent.  And the

8    number of counties and independent cities split under the

9    enacted plan was also 44 percent.

10   Q    And can you please explain what the not split or

11   unaffected portion of this table means.

12   A    That is another category.  So obviously if they are

13   split, they are split across counties or independent

14   cities.

15        There were a number of splits that occurred where

16   there was a geographic split but involved no population

17   split.

18        And so, I grouped any county or independent city that

19   was not split or was unaffected in terms of population in

20   that category.

21   Q    So looking at this chart, it looks like the splits are

22   about the same across the cycle?

23   A    Yes.  They are exactly the same by this chart.

24   Q    And is splitting of jurisdictions like this,

25   considering that, is this a traditional redistricting

Hood - Direct

1   criteria?

2   A     Where possible you want to try to maintain communities

3   of interest.  It's not always possible, especially when

4   you have other criteria like equalizing population, which

5   can sometimes trump that criteria.

6   Q     So looking at the equalization of population in this

7   criteria, do you have any conclusion as to the balancing

8   of the two?

9   A     Well, given that the population deviations in the

10  benchmark plan that were plus or minus two, then going

11  down to a population deviation of plus or minus one in the

12  enacted plan, it's -- I don't know if I should use the

13  word remarkable, but it's a positive that they were able

14  to keep the same number of essentially counties and

15  independent cities whole even while reducing the

16  population deviation across the plan.

17  Q     So moving on to the next section of your report, it is

18  subsection C, we are still on page 6, it is entitled VTD

19  Splits.

20        What did you -- oh, actually, before we start, can you

21  explain what a VTD is.

22  A     It's a voting district.  It's a piece of census

23  geography used for tabulation for census purposes.

24  Q     We've heard some mention of the term "precinct."  Are

25  precincts and VTDs the same?

Hood - Direct

1    A    They can, but they are not always the same.

2    Q    We were just talking about counties and independent

3    cities.  Are VTDs political subdivisions?

4    A    No.

5    Q    So going back to section C, looking at VTD Splits,

6    what did you look at?

7    A    Well, similar to the previous table, instead of using

8    counties and independent cities, I'm looking at the number

9    of VTDs or voting districts that are split.

10        So again, the 2009 column heading is the benchmark

11   plan.  There were 3.6 percent of all VTDs in that plan

12   were split.

13   Q    If I can stop you for just one moment.  For the

14   benefit of everybody, we're bringing up the Table 3 of his

15   report on page 7.

16        Please go ahead and continue explaining what this

17   table shows.

18   A    Okay.  So again, under the benchmark plan, which is

19   under the 2009 Plan heading there, you can see that

20   3.6 percent of the voting districts were split under that

21   plan.  Versus 4.9 percent of the voting districts under

22   the enacted plan.

23        So the number of split VTDs went up just slightly

24   across the two plans.

25   Q    And looking at the not split or unaffected category,

Hood - Direct

1  it look likes there is 95.1 percent for the 2011 plan.

2  A    Right.  For the enacted plan, 95.1 percent of VTDs

3  were unsplit or kept whole.

4  Q    Is it fair to say that's a majority of VTDs not split?

5  A    Yes.

6  Q    If you will move on to the next section here.

7  Actually I did have one further, before we move on, you

8  mentioned that there was a slight increase of VTD splits

9  between the two plans.

10      Can you speak to the distribution of the split VTDs.

11  A    The geographic distribution, is that fair?

12  Q    Correct.

13  A    They weren't necessarily cluttered in any one given

14  part of the state.

15  Q    So moving on to section D entitled District

16  Compactness, what did you evaluate?

17  A    Well, these are measures that we've discussed or that

18  have been discussed in court.  They are designed to

19  measure compactness of legislative districts, and

20  specifically there are measures here for Reock and

21  Polsby-Popper.

22  Q    So we turn to Table 4 of your report, which is on

23  page 8.

24      Please explain what this table shows.

25          MR. SPIVA:  Sorry, Your Honor, I should have

Hood - Direct

1    objected a little bit sooner.  Just to the compactness

2    part of this.  Because of the pretrial order, specifically

3    Schedule A that says there should be one expert witness

4    per discipline, and we've already had one expert from the

5    defendant-intervenors who has talked about compactness, so

6    I don't have any objection to the other things he is

7    talking about, but I do have objection to this portion of

8    the testimony.

9        MS. WALRATH:  Your Honor, these are -- Dr. Katz

10   testified only to one measure of compactness.  These are

11   different measures.

12       We will have a couple experts testifying as to

13   these measures, so we will keep it very brief so as not to

14   waste the Court's time.  But particularly given that Dr.

15   Ansolabehere took issue with certain aspects of both

16   Professor Hood and Professor Hofeller's reports on this

17   subject, it is noteworthy and relevant to hear testimony

18   on this subject.

19       JUDGE PAYNE:  I believe that we had a telephone

20   conference in which we discussed that he would not be able

21   to repeat Dr. Katz' testimony, but that people would be

22   able to address Dr. Ansolabehere's, the measures used in

23   Dr. Ansolabehere's testimony.

24       So that objection is overruled.

25       MR. SPIVA:  Thank you, Your Honor.

Hood - Direct

1          JUDGE PAYNE:  But that's all he can do.  He can't

2    retrace the ground of Dr. Katz, you understood that?

3          MS. WALRATH:  Understood.

4    BY MS. WALRATH: (Continuing)

5    Q    Dr. Hood, just very quickly, what does this table show

6    the Court?

7    A    This table shows the Court a comparison again of two

8    measures of compactness, Reock and Polsby-Popper, for all

9    districts in the enacted plan and in the benchmark plan.

10        And we can just run through a quick example.  Looking

11   at the average or the mean for these measures across the

12   two plans, we can see that the benchmark plan had a Reock

13   score of .38.  And the enacted plan had a Reock score of

14   .36.

15        So there was a very slight drop there of .02.

16        The benchmark plan had a Polsby-Popper score, average

17   score of .26.  And the enacted plan had a Polsby-Popper

18   score of .24.

19        So again, there was just a very slight drop from .26

20   to .24 across the two plans.

21   Q    And how would you characterize that difference?

22   A    Well, I guess, as I just said, very slight.  I mean,

23   we could calculate the difference of .02.  Actually .02

24   and .02.

25   Q    And we were just discussing Dr. Katz' testimony as to

Hood - Direct

1   the Boyce-Clark measure.  I believe you heard his

2   testimony in this court?

3   A    I did.

4   Q    And is there anything fundamentally wrong with his

5   approach?

6   A    I would agree with Professor Katz that there are quite

7   a few different types of ways or different measures for

8   compactness.  And there is not really sort of an agreed

9   upon standard amongst experts or social scientists.

10  Q    I think we will move on now to section E of your

11  report, which entitled Partisanship and Incumbent

12  Pairings.

13      What did you address in this section?  And I am on

14  page 9.

15  A    Here I looked at two different factors, they are

16  grouped under the same heading E.  I looked at a measure

17  of district partisanship that I calculated.  And I also

18  looked at the number of incumbents that were paired under

19  the enacted plan.

20  Q    And if we could pull up your Table 5, which is on

21  page 10 of your report.  There is quite a bit of

22  information in here.

23      Can you please explain to the Court what this table is

24  showing.

25  A    Let me back up just one second and explain very

Hood - Direct

1    briefly how I came up with this measure of district

2    partisanship.

3          In Virginia there is not party registration, so we

4    have to come up with a way to estimate partisanship.  I

5    did that by creating an index of the Democratic vote share

6    for three statewide elections in 2009.  And those are for

7    the three state constitutional offices in Virginia,

8    governor, lieutenant governor, and attorney general.  So

9    it is an average of those three.

10   Q    And why did you choose those elections?

11   A    They were the closest elections proximate to the end

12   of the benchmark plan and the beginning of the enacted

13   plan.

14         And they are also representative of the odd year

15   elections that Virginia has as opposed to using say a

16   mid-term congressional election or a presidential

17   election, those federal election cycles.

18   Q    So then referring to the table if you need to, can you

19   explain what you concluded based on your calculation of

20   the Democratic partisanship index?

21   A    Well, if you just look at the mean, so this would be

22   the mean Democratic vote share across all districts, if

23   you look at the average in 2009, it was 43.9.  In 2011 it

24   was 43.6.  So there is not much movement there.

25         And there is not much movement -- again, these

Hood - Direct

1    groupings are categorizing districts by the incumbent to

2    the party holding the seat.  So that's what Democrat,

3    Republican, and Independent mean across the top of the

4    header there.

5        Just in terms of average Democratic partisanship, if

6    you group districts by the incumbent of the party holding

7    the seat, there is not much movement there either.

8        For instance, 2009, or the benchmark plan 57.2 percent

9    on average Democratic, versus 57.1 percent in the enacted

10   plan in 2011.

11   Q    Is there any conclusion that we can draw from that?

12   A    Well, just on average again across the different types

13   of districts, the partisanship, the average partisanship

14   level remained about the same.

15   Q    In looking at your next table here, Table 6, what does

16   this table touch on?

17   A    These are the number of incumbent parings that were

18   produced by the enacted plan.  And you can see that there

19   are six different incumbent parings.  And it gives the

20   parties of the incumbents paired there.

21   Q    Is there any conclusion we can draw from this table?

22   A    Well, one of them is simply I would say that out of

23   100 potential, there are very few incumbents that are

24   paired together against one another by the enacted

25   redistricting plan.  Half of the incumbents paired are

Hood - Direct

1    Democrat, a Democrat versus a Democrat.

2    Q    I would like to turn briefly to a document that we've

3    seen many times in this courtroom so far, the Plaintiffs'

4    Exhibit 16.

5         And, Professor Hood, do you recognize this document?

6    A    Yes.

7    Q    Have you had a chance to read through it?

8    A    Yes.

9    Q    I would like to draw your attention to the fifth

10   criteria, Communities of Interest.  And in particular the

11   sentence that says, "These factors may include, among

12   others, economic factors, social factors, cultural

13   factors, geographic features, governmental jurisdictions

14   and service delivery areas, political beliefs, voting

15   trends, and incumbency considerations."

16        Is it fair to say that the tables that we were just

17   looking at in your report, Table 5 and Table 6, that they

18   show the plan takes into account things like political

19   beliefs, voting trends, and incumbency considerations?

20   A    Yes.

21   Q    I would like to go back to DI-15,

22   Defendant-Intervenors' Exhibit 15, the report.  Back to

23   page 11, to move on to your subsection F titled District

24   Core Retention.

25        What did you evaluate in this section of your report?

Hood - Direct

A    This particular section of the report looks at

district core retention, which can be thought of as the

percentage of the new district that is comprised of the

former district.  And it's measured in terms of voting-age

population.

So one of the ways to think about it is how many

constituents the member took across the election cycle

with them to their new district.

Q    If we could pull up what is marked as Table 7 on

page 12.  It looks like we have some data on this.

What does this show the Court?

A    I would say overall, overall the average across all

districts for district core retention would be two-thirds

or a little bit more than two-thirds, 67.2 percent.

So on average, the member would carry across about

two-thirds of their constituents from their former

district to their new district.

Core retention was a little bit higher for Republican

districts, Republican held districts.  A little bit lower

for Democratic districts.  And if we subdivide Democratic

districts by the race of the legislator, so minority

Democratic legislators versus white Democrats, white

Democratic districts actually had the lowest core

retention at 58 percent on average.

Q    Does core retention have any bearing on incumbency?

Hood - Direct

1  A    Core retention is an important component in

2  re-election for incumbents, especially across

3  redistricting cycles.

4       So, yes, it is related to the ability of incumbents to

5  get re-elected across redistricting cycles.

6  Q    And moving on, I think we're leaving the plan

7  comparisons section of your report, turn to page 13, you

8  have a brief Section V here.

9       And just quickly, what did you look at in this

10  section?

11  A    I looked at some documents, I believe they were on the

12  DLS Web site about preclearance for this plan.  At the

13  time, Section 5 was still in effect, of course.  And so,

14  the State of Virginia had to have the plan precleared by

15  the Department of Justice.

16  Q    And was it?

17  A    Yes.

18  Q    And did it -- at the time, to your knowledge, did

19  Virginia also have to comply with Section 2 of the Voting

20  Rights Act?

21  A    Yes, the plan needed to comply with that as well.

22  Q    And moving on to section VI, it looks like we're

23  focusing on the challenged districts.

24       What did you evaluate in this section of your report?

25  A    I did a little bit more specific analysis or pulled

Hood - Direct

```
1   together some more specific factors together just for the
2   12 challenged districts.  I looked at population
3   deviations.  Black voting-age population.  Again the
4   compactness scores.  I looked at my index of Democratic
5   vote strength or Democratic partisanship.  Core retention.
6   And the number of incumbents in the challenged districts
7   that were paired against another incumbent by the plan.
8   Q    So starting with the first couple of those, if we
9   could pull up Table 8 on page 14.
10       Which factors are addressed in this table?
11  A    This table looks at population and black VAP for the
12  challenged districts.
13  Q    So looking at just the population portion, what does
14  this table tell the Court?
15  A    The negative signs indicate that one of the challenged
16  districts was underpopulated, and population needed to be
17  added by the redistricting plan to bring it up to the
18  ideal district size or close to the ideal district size.
19       You can see that most of the districts were
20  underpopulated to some degree.
21  Q    Were there any districts that were more than 10
22  percent under the ideal population?
23  A    Yes, a number -- let me, it looks like six were more
24  than 10 percent.
25  Q    So half, is that correct?
```

Hood - Direct

1    A    Excuse me.   Yes.

2    Q    Briefly, I would like to bring up what has been marked

3    as Defendant-Intervenors' 102.   It is a demonstrative

4    exhibit.

5         What does this show?

6    A    This is just a rendering of Table 8, the population

7    deviations that we just discussed in Table 8.   So it's

8    just a graphic of that.

9         So that shows the degree to which these districts were

10   underpopulated, or maybe slightly overpopulated in at

11   least one case.   That .2 percent, one district, it looks

12   like 74 was .2 percent above the ideal district size.   The

13   others were underpopulated.

14        So it's just a graphic rendering of what we just

15   discussed.

16   Q    Looking like 11 out of the 12 are under -- going left

17   across the sheet?

18   A    Correct.   So some degree in most of these cases, some

19   degree of population is going to have to be added back by

20   the redistricting plan.

21   Q    Moving back to Table 8 on page 14 of your report.   The

22   second right half of the report looks like it is entitled

23   Black VAP.

24        What does this part of the chart show the Court?

25   A    This shows the Court the black voting-age population

Hood - Direct

1  in these 12 challenged districts just before enactment and

2  right after enactment of the new redistricting plan.

3  Q    Where did you all obtain your data for this portion of

4  the table?

5  A    This was from the Division of Legislative Services'

6  Web site page.

7  Q    Looking at the last come there on the right, what does

8  that show?

9  A    That just shows the difference between the two

10  columns, the 2009 and 2011 column.  Whether the black VAP

11  was increased or decreased across the redistricting cycle.

12      So some went up, some went down in terms of their

13  black voting-age population.  A few hardly changed at all

14  by maybe a fraction of a percentage point.

15  Q    To maybe help make this a little more visual, we are

16  going to pull up what has been marked as

17  Defendant-Intervenors' 103, also a demonstrative exhibit.

18      Please explain to the Court what this shows.

19  A    Again, this is just a graphic rendering really that

20  last column in Table 8, the plus or minus black VAP that

21  was added or subtracted to each one of these districts.

22      So you can see sometimes black VAP was added and

23  sometimes it was subtracted.

24  Q    For the one that I'm looking at, District 71, I

25  believe, it looks like it's is a rather long lie.  Is

Hood - Direct

1    there any reason why that one would have a greater jump?

2    A    Well, it was, it was underpopulated by 7.3 percent.

3         And also, this was the district that by definition was

4    no longer a majority black district prior to the

5    redistricting cycle.  So it was down at 46.3 percent.

6    Q    Moving back to your report, to page 15.  Pulling up

7    Table 9, and again we will be brief with this, what does

8    this table show?

9    A    These are the same compactness measures we discussed

10   just a few minutes ago, the Reock and the Polsby-Popper,

11   although they are again just calculated in this case for

12   the 12 challenged districts.  You can see what they were

13   at or where they were at on these measures with the

14   benchmark plan versus the enacted plan, and whether

15   compactness for each one of these districts increased or

16   decreased, that's the difference column there.

17        So again, similar to the black VAP, in some cases

18   compactness increased, in some cases it essentially stayed

19   the same, and in some cases it decreased.

20   Q    And actually how would you characterize the difference

21   between the two plans generally?

22   A    Well, I guess the easiest way to do that is to look

23   down at the mean, which would be the average of these 12

24   districts on these particular metrics.

25        And so, we can see for the Reock measure as a group,

Hood - Direct

 1   the compactness score went from .37 to .32.  So it went

 2   down slightly.

 3       And for the Polsby-Popper measure, the compactness

 4   scores across the redistricting cycle went from .23 to

 5   .19.  So again, a slight decrease in compactness as a

 6   group.  We look at these as a group.

 7   Q    Were the challenged districts the only ones that had

 8   lower scores or reductions in scores?

 9   A    No.  I mean, there were other districts in the state

10   that also had low compactness scores.

11   Q    So moving on to the next page of your report, page 16,

12   Table 10.  This is discussing a number of metrics as well.

13       What does this table show the Court?

14   A    This is the Democratic vote average or estimate of

15   partisanship for the districts that we discussed just a

16   few minutes ago as well.  You can see if the DVA went up

17   or down across the redistricting cycle.

18       Again, if you look at the challenged districts as a

19   group, as a whole, the DVA went down just slightly from

20   68.3 percent to 67.6 percent.

21       And then again, there is another column that just

22   shows the difference in terms of whether the DVA,

23   Democratic vote average for the districts, went up or down

24   across the redistricting cycle.

25       The next column -- or do you want me to --

Hood - Direct

1  Q   Well, actually, I was just sticking for a second with

2  the DVA.  Is there any conclusion that we can draw from

3  the data that you show in this table on that subject?

4  A   Well again, it doesn't seem as though that in terms of

5  trying to put additional Democrats in these districts, if

6  anything on average again, the Democratic -- the

7  Democratic vote average went down just slightly across the

8  redistricting cycle.

9  Q   So moving on to the category of Core Retention.

10      What is this column showing?

11  A   That's the same measure we talked about.  And again,

12  it shows that on average for these challenged districts,

13  these members retained about 73 percent of their

14  constituents across the redistricting cycle.  Which is

15  fairly high.

16  Q   And briefly, if we could go over to

17  Defendant-Intervenors' -- actually, sorry, I shouldn't

18  leave that just yet.  Can we pop back over to the table.

19      I want to focus in for a minute on the number for HD

20  63.  Am I correct in saying that is 82.1 percent core

21  retention?

22  A   Yes.

23  Q   Okay.

24  A   Yes.

25  Q   So then bringing up Defendant-Intervenors' Exhibit 94,

Hood - Direct

1    page 1.  This is in the exhibit book, the witness' exhibit

2    book here, but it's also in Map Book 1 if you would like

3    to have a bigger physical copy with you.

4    A    I can see it.  Thank you.

5    Q    I think everyone has found it.  Professor Hood, I

6    believe you were in the courtroom when we looked at these

7    earlier with Delegate Jones and some of the other

8    witnesses?

9    A    Yes.

10   Q    So you are generally familiar with what these maps

11   show?

12   A    Yes.

13   Q    And I won't belabor the point, but just that the parts

14   in yellow are the 2011 district?

15   A    Yes.

16   Q    And the parts that are in hatching and gray are the

17   parts that were removed from the district as between the

18   benchmark plan and the 2011 plan?

19   A    Yes.  The parts that are hatch marked without yellow

20   underneath, yes.

21   Q    So looking at this particular district as an example,

22   it looks like a lot of the territory geographically was

23   removed from the district, is that correct?

24   A    I couldn't give you a percentage, but geographically

25   these southern VTDs, yes, were removed from that district.

Hood - Direct

1    Q    And we just looked at on your chart that the core

2    retention of this district was 82.1 percent.  Which seems

3    rather high.

4         Could you explain to us how that works?

5    A    Again, the core retention measure is a measure of

6    where populations are moving.  The map is more a way of

7    looking at geography.

8         Now, we could code a map to show population density.

9    This is not coded for that.  But I have to constantly

10   remind myself when looking at a map that population is not

11   necessarily equally dispersed across the map unless the

12   map is coded to show us that or not.

13        So it would tell me that these southern VTDs here

14   didn't contain a whole lot of population because this

15   member was able to retain again about 82 percent of their

16   constituents.

17   Q    Thank you.  I think we will go back to your --

18        JUDGE PAYNE:  Are you basically saying that your

19   understanding is that the counties or the precincts --

20   VTDs, excuse me, that were cut out were basically not

21   populated?  They are among the ones that were either

22   unpopulated and removed or didn't have much population, is

23   that what you're saying?

24        THE WITNESS:  Well, from looking at the core

25   retention number and looking at the map, Your Honor, I

Hood - Direct

1    would have to infer that those VTDs that were removed

2    didn't have a lot of population.

3         JUDGE PAYNE:  Okay.

4    BY MS. WALRATH: (Continuing)

5    Q    Okay, going back to your report, which is

6    Defendant-Intervenors' Exhibit 15.  And just one final

7    thing on Table 10 to finish it out.

8         Looking at the last column there, entitled Incumbent

9    Paired, what does that show the Court?

10   A    That just shows that there were no incumbents

11   representing the challenged districts that were paired

12   against another incumbent by the enacted redistricting

13   plan.  That's what no means in that case.

14   Q    Okay.  So is there any conclusion we can draw about

15   that as to incumbency protection?

16   A    Well, obviously, if you are an incumbent paired

17   against another incumbent, you're going to be in for a

18   fight.

19        So the idea in terms of an incumbent protection plan

20   would be not to be paired against another incumbent.

21   Q    And I won't pull them up on the screen, but we did

22   discuss the 2011 criteria and the communities of interest.

23        Is it fair to say that with respect to the challenged

24   districts, that what we've looked at shows that the plan

25   takes into account things like political beliefs, voting

Hood - Direct

1    trends, and incumbency considerations?

2    A    Yes.

3    Q    Are there any notable differences in the challenged

4    districts versus the plan overall, in your estimation?

5    A    Well, I mean, obviously, they are majority black

6    districts.  So that would be one difference.

7        None of the, none of the incumbents in the challenged

8    districts were paired.  And they all had higher core

9    retention than the average district.

10       So there may have been a little bit more emphasis on

11   incumbent protection in these districts.

12   Q    We are going to turn now to page 17 of your report in

13   section VI.

14       What did you evaluate in this section of your report?

15   A    This was a legislative roll-call analysis that I

16   performed on the floor vote for HB 5005.

17   Q    Maybe it will help if we pull up on page 18, Table 11.

18       And just quickly for the record, I know on the top of

19   this table it says HB 5005, and on the left it says HB

20   5001.

21       Should be that 5005?

22   A    Yes.  I apologize, that is a typo.  The heading is

23   correct.  This is the vote on HB 5005.

24   Q    And what does this table shows with respect to the

25   vote on HB 5005?

Hood - Direct

1  A    I know some of this has been discuss previously, but

2  this just sort of encapsulates everything into a chart

3  that there was really overwhelming bipartisan support for

4  HB 5005.  Overall, just about 90 percent of members voted

5  in favor.  100 percent of Republicans.  Just under

6  three-quarters of Democrats.  Just under 85 percent of

7  black Democrats.  And there were two unaffiliated members

8  in the House that also voted for this.  So 100 percent of

9  the unaffiliated members.

10 Q    Am I reading this correctly that there were only nine

11 votes against the plan?

12 A    Nine total votes against the plan, yes.

13 Q    And just, we won't pull it up, but looking at Table 12

14 on page 19, this looks like it is upon final adoption.

15     Was this vote essentially the same as the initial

16 adoption vote that we just looked at?

17 A    Yes.  That was, Table 12 gives the final adoption.

18 And the numbers are very, very close to those for Table

19 11, 90 percent overall for the bill, 100 percent of

20 Republicans, 75 percent of Democrats, and 90 percent of

21 black Democrats.

22          JUDGE PAYNE:  Should HB 5001 be 5005 in Table 2

23 as it is in -- in Table 12 as it is Table 11.

24          THE WITNESS:  Yes, Your Honor.  I was at least

25 consistent in making the mistake.

Hood - Direct

| | |
|---|---|
| 1 | JUDGE LEE:  They call this practice for a reason. |
| 2 | THE WITNESS:  Yes, Your Honor. |
| 3 | MS. WALRATH:  Next time it will be perfect. |
| 4 | BY MS. WALRATH: (Continuing) |
| 5 | Q   So turning to page 19, the section VIII entitled |
| 6 | Election Analysis. |
| 7 | Actually let me ask you first, is what happens in |
| 8 | elections useful to determining anything regarding the |
| 9 | drawing of a plan? |
| 10 | A   Yes.  Certainly after an election occurs we can often |
| 11 | times look back on things and perhaps get some incite into |
| 12 | what was going on when the plan was being drawn up. |
| 13 | Q   Is that what you are looking at in this section of |
| 14 | your report? |
| 15 | A   Yes.  I am looking at the election cycle that occurred |
| 16 | right after enactment of HB 5005. |
| 17 | Q   If you pull up Table 13 on page 19 of your report, |
| 18 | what does this table show? |
| 19 | A   It basically shows from 2009 to 2011, which is the |
| 20 | across the redistricting cycle, this table just simply |
| 21 | shows that the number of Republican seats increased, the |
| 22 | number of Democratic seats decreased, and the number of |
| 23 | Independent members went from two to one. |
| 24 | Q   And so, if we flip to the next page, Table 14, what |
| 25 | does this table show? |

Hood - Direct

1   A    This Table 14 shows a little more detailed breakdown

2   of Table 13.  Here by race of the delegate.  And so, we

3   can see what happens in terms of -- by race of the

4   delegates in terms of who is winning these seats across

5   these election cycles.

6   Q    Is there any conclusion that we can draw from this

7   table?

8   A    Well, the number -- there are a couple.  The number of

9   black House of Delegates members remains the same across

10  the redistricting cycle at 13.  The number of Hispanic

11  House of Delegates members goes from zero to one.  And the

12  number of Asian House of Delegates members goes from one

13  to two.  And the number of Democrats, overall the number

14  of white Democrats decreases from 26 percent to

15  17 percent.

16  Q    And why did these Democratic seat losses occur?

17  A    Well, I think we may need to talk about some

18  subsequent tables to flesh that out.

19  Q    Of course.  I will move on to Table 15 on page 21 of

20  your report.  There are two tables here, but we'll start

21  with 15 and then move on to 16.  We might bring them up

22  together here.

23       So first with Table 15, can you explain what these

24  tables are showing.

25  A    Sure.  I hope they are simple enough.  What I have

Hood - Direct

1    done is taken my Democratic vote average and divided it up

2    into quartiles.  So 0 to 25, 25 to 50, 50 to 75, and 75 to

3    100 percent.

4        And then I've also categorized seats by the party

5    holding the seat.

6        So this is what things looked like after the

7    redistricting but just prior to the election based on the

8    party holding the seat at that time.

9        And so, if I could -- a couple of points to make about

10   this particular table.  And that is that no Republican

11   member at that time was in a district where there were a

12   majority of Democratic partisans.  That's why the cells in

13   the 50 to 75 percent range and the 75 to 100 percent range

14   are zero.  So --

15   Q    So looking at this and looking at the 25 to 50 percent

16   quartile, it says there is 58 members there, is that

17   correct?

18   A    Right.  So those members were in a district that had

19   less, obviously less than a majority of Democratic

20   partisans.  So by definition, they had a majority of

21   Republican partisans.  As to that one member over there in

22   the 0 to 25 percent range.

23   Q    A very safe seat.

24   A    Yes.  So that would be an extremely safe seat.

25   Q    Looking at the Democrat line, what does that show

Hood - Direct

1   about the same types of numbers?

2   A    Well, there were 28 Democratic held seats at that time

3   that were in districts where the Democratic vote share was

4   50 percent or greater.  So 26 plus two there.

5        There were 11 Democratic seats though that were in

6   more marginable seats.  They were in the Democratic vote

7   share of 25 to less than 50 percent, those 11 that are

8   there in bold.

9        And so, they are certainly in more marginal seats in

10  terms of partisanship.

11  Q    Okay.  So if we turn to look at what happened after

12  the election then in Table 16.

13  A    So Table 16 shows the same thing, but after the

14  election occurs.

15       And what we see, again, is a drop in the number of

16  Democratic held seats in that marginal range of 25 to less

17  than 50 percent.  Now there are only four.  So it goes

18  from 11 to 4.

19       And as well, one of the Independent members also in

20  that DVA range also drops out.  So we go from two

21  Independents in those marginally held Democratic seats to

22  one.

23  Q    And I think you testified earlier about the fact that

24  there was some lost seats in the Democratic party.

25       Does this quartile here, this 12.5 percent, four

Hood - Direct

1   seats, remain?  Is there any relationship between that
2   number and the number of seats lost?
3   A    Well, from the 11 to the four, yes.  Yes.  So the 11
4   up above in Table 15 to the four here, yes.  So I
5   definitely think there is a relationship here, a
6   correlation between Democrats holding more marginal seats
7   in terms of Democratic partisanship and Democratic losses
8   in the 2011 election cycle.
9   Q    And turning to the next page of your report here,
10  page 22.  This is the last section entitled Overall
11  Opinion.
12       So as the title suggests, what is your overall opinion
13  of the plan, including the challenged districts?
14  A    Okay.  Well, I guess I could back up and just say in
15  relation as well, that none of the incumbents in one of
16  the challenged districts lost, obviously, in 2011.  So
17  they were all retained.
18       So overall, looking, comparing the benchmark plan to
19  the enacted plan and being able to look at the plan over
20  at least one election cycle, there seems to be a fair
21  degree of incumbency protection going on in these plans by
22  just the very low number of incumbents that are paired,
23  the high core retention figures.
24       Secondarily, you know, again, it appears that
25  Republican voting strength was a little more concentrated

Hood - Direct

1    in some districts.  Democratic voting strength was a

2    little more dispersed.  That seems to have created a

3    number of Democratically held seats that were a little

4    more marginal.  And all of those seats, I may not have

5    stated this, but all those seats were held by white

6    Democrats, which I believe in part at least led to some

7    Republican seat pick ups in the 2011 election cycle.

8        Other things we could say, for instance, about the

9    plan as a whole, excuse me, is that, you know, it did

10   accomplish the goal of going from plus or minus 2 percent

11   deviation in the previous cycle to plus or minus 1 percent

12   deviation in terms of population in the next cycle or in

13   the enacted plan.

14   Q    And speaking of that, Professor Hood, are you aware of

15   any alternative plans to HB 5005?

16   A    Yes.

17   Q    And turning to your, back in your report a little bit,

18   to page 21.  Looking at footnote -- footnote 19.

19       Does this footnote refer -- well, it is kind of small,

20   but does this footnote refer to those alternative plans?

21   A    Yes.

22   Q    And it looks like you're saying here that there were

23   23 incumbent pairings in one plan and one in 26 -- or one

24   contained 16, excuse me?

25   A    Yes, that's what the footnote says.

Hood - Direct

1   Q    Does this mean at minimum 46 and 32 members

2   respectively were paired in those plans?

3   A    At a minimum.  And that would be assuming that just

4   one incumbent was paired against another incumbent.  It is

5   always possible to have more than that paired against one

6   another.  Maybe three, for instance.

7   Q    And in your opinion on that basis alone, would either

8   of these plans have met the criteria adopted by the House

9   that we were looking at before?

10  A    No, I don't believe so.  Not certainly in terms of

11  incumbent protection.

12       And not only that, of course, these are pieces of

13  legislation, and it would be very hard to pass a piece of

14  legislation I think that had that many incumbents paired

15  against one another because, of course, these are the

16  members voting on that piece of legislation.

17  Q    I would like to turn now -- I mentioned earlier Dr.

18  Ansolabehere's, hopefully I pronounced that close to

19  correctly, reply report, which is Plaintiffs' Exhibit 51.

20  He makes on a number of occasions claims that you agree

21  with him or don't dispute some areas.  I would like to

22  just discuss a few of those.

23       So if we could turn first to page 4 of Exhibit 51,

24  paragraph 9.  And for the sake of brevity, I would like

25  you to read the paragraph.  I will paraphrase for the

Hood - Direct

1   Court, but please do read it in its entirety.

2   A     Would you like me to read that?

3   Q    Yes, please.  Well, read it to yourself.  While you

4   are doing that, I will --

5              JUDGE PAYNE:  What page?

6              MS. WALRATH:  Page 4.

7              JUDGE PAYNE:  Page 4, I'm sorry.

8              MS. WALRATH:  Page 4, paragraph 9.

9   BY MS. WALRATH: (Continuing)

10  Q    Where he states that you and he are in agreement that

11  there were minimal changes in the Democratic vote share of

12  the challenged districts.

13        Do you agree?

14  A    Well, again, we were using different measures of

15  Democratic vote strength.  I explained my index, and it

16  did differ from Professor Ansolabehere's.

17        But by my index again, looking back at, it was Table

18  10 in my report, yes, using my index, the Democratic vote

19  average went from 68.3 to 67.6.  So I would call that

20  slight.

21  Q    I am trying to stay on the same subject here.  If we

22  turn to page 18, paragraph 53.  He says that Professors

23  Hood and Katz have offered assessments of party

24  performance, and that they are at odds, that you and Dr.

25  Katz are at odds over the sorts of elections to be

Hood - Direct

1    examined.

2         Are you at odds with Dr. Katz?

3    A    I don't believe so, no.

4    Q    And why not?

5    A    Well, I was calculating -- my measure was calculated

6    to be a proxy for Democratic voting strength or Democratic

7    partisanship in the legislative districts.

8         From Professor Katz' report and what he testified to

9    today, he was performing a different type of analysis.

10   Q    In looking right to the next page, page 19, in

11   paragraphs 56 and 57, he points out again that you argue

12   that there is no change in the average partisanship of the

13   districts.  And that your Table 10, that there is no

14   appreciable change in the Democratic performance in the

15   challenged districts between 2009 and 2011.

16        And he goes on to say that that analysis, although

17   using different elections than he chose, comports with his

18   conclusion that party was not an important factor in the

19   configuration of the challenged districts.

20        Do you agree with that?

21   A    I don't think I ever stated that party was not an

22   important factor, for one thing.  Again, if you just look

23   at the average scores, there is not a lot of change.  If

24   you look at the scores across all districts though, and

25   again I'm talking about my Democratic vote average, in

Hood - Direct

1    Table 5 -- I mean, the means don't change all that much,

2    that's true, but there are again, as I stated, looking at

3    my before and after election analysis, you know, in terms

4    of the variability, there is more variability across

5    Democratically held districts than across Republican

6    districts.

7        So there are difference across the election cycle.

8    Q    And then turning back to page 4 of Exhibit 51, look at

9    paragraphs 10 and 11.

10       Dr. Ansolabehere talks about how he provided a

11   correlation of analysis and the racial partisan

12   composition of VTDs and the likelihood that a VTD was or

13   was not included in a challenged district, and says that

14   you do not dispute his analysis about the VTDs.

15       Is that correct?

16   A    Well, I did not perform that analysis.

17   Q    Does that mean that you agree or disagree with his

18   analysis?

19   A    I don't necessarily agree with it.  I don't have a

20   basis to analyze it.  I didn't perform the same kind of

21   analysis.

22   Q    And turning to page 15, paragraph 44.  Dr.

23   Ansolabehere acknowledges that you examined VTD splits on

24   a statewide basis, but says that you offered no analysis

25   of the challenged districts.

Hood - Direct

1          Is that accurate?

2    A    Well, I provided an analysis for the challenged

3    districts on certain criteria.  I did not look at that

4    particular criteria, no.

5    Q    And why not?

6    A    Just I didn't think it was germane.

7    Q    Is there any reason why a statewide analysis is

8    better?

9    A    Well again, I think part of the issue overall is that,

10   you know, districts are not drawn in isolation from

11   another one.  It's part of a total plan, in this case

12   drawing 100 districts to represent the State of Virginia.

13   And that's one of the reasons I did an analysis primarily

14   of the entire benchmark plan versus the enacted plan.

15   Q    In looking at paragraph 45 on the same page, he

16   addresses your analysis of the divided counties or

17   independent cities and notes that -- well, I should

18   probably just read this instead of trying to paraphrase

19   since I am not an expert.

20        He says, "He offers no analysis of the challenged

21   districts.  In my analysis of the challenged districts, I

22   found an increase in the number of split counties from 17

23   to 19 and the number of divisions of counties created from

24   29 to 33.  Hence, even though the state as a whole was

25   unchanged by this measure, the challenged districts

Hood - Direct

1    witnessed an increase in geographic divisions."

2         Is that accurate?

3    A    That's an accurate reading of that paragraph, yes.

4    Q    Oh, I apologize.  Do you agree with that?

5    A    Not necessarily.  Again, I think it's important to

6    look at the challenged districts within the districting

7    plan as a whole.

8    Q    And looking at paragraph 46, it is a similar statement

9    about the number of VTD splits in the benchmark VAP versus

10   the HB 5005.  He says that there is no justification

11   offered for the increase in split VTDs.

12        Is that accurate?

13   A    Well, I certainly just offered a justification here.

14   And that is again, if you're going from plus or minus 2

15   percent population deviation to plus or minus 2 percent,

16   you're probably going to increase the number of VTDs that

17   may have to be split.

18        And again, across the state, we're talking about a

19   very, very small increase in the number of VTD splits from

20   the benchmark to the enacted plan.

21   Q    And briefly, I would like to go to Plaintiffs'

22   Exhibit 16 again.  And this time I would like to go there

23   to look at a particular sentence.  This is the 2011

24   criteria that we discussed earlier.

25        I'm going to look specifically at the last sentence of

Hood - Direct

1    Section V, which says, "Local government jurisdiction and

2    precincts lines may reflect communities of interest to be

3    balanced, but they are entitled to no greater weight as a

4    matter of state policy than other identifiable communities

5    of interest."

6        I think we talked about this earlier, are VTDs the

7    same as precincts?

8    A    Not necessarily, no.

9    Q    And so, do read this criteria as giving any particular

10   importance to splitting or not splitting VTDs?

11   A    It doesn't seem to be referring, in my opinion, to

12   VTDs, no.

13   Q    And going back to Dr. Ansolabehere's reply report,

14   Exhibit 51.  I would like to go to page 18, paragraph 53.

15       Actually, we already did this one, I apologize.

16   Losing myself in my own pace here.

17       Let's go to page 8, paragraph 26.  I'm looking at

18   paragraph 26.  Dr. Ansolabehere references yourself and

19   your compactness report measures for the Commonwealth

20   under the benchmark map in HB 5005, and states that you do

21   not offer an average compactness for the challenged

22   districts with respect to the remainder of the state, and

23   that you offer no evidence contrary to his conclusions

24   that using his measures, the challenged districts are on

25   average less compact than the remainder of the state.

Hood - Direct

1       Do you agree with him?

2   A   Well, I didn't provide those comparisons, no.  I

3   compared average compactness of the challenged districts

4   before and after or across the redistricting cycle, and I

5   compared the entire state, all 100 House of Delegates

6   districts before and after the redistricting.

7       So I didn't provide that comparison, I didn't view

8   that, what he is describing, as being the more apt

9   comparison.

10  Q   Does this mean anything in particular to the Court?

11  A   I wouldn't compare things in this manner.

12  Q   And why not?

13  A   I just don't think it's the best way to compare

14  things, again.

15  Q   And looking at the next paragraph, paragraph 27,

16  looking at the analysis that you did do of compactness.

17  He says that your analysis agrees with his analysis that

18  HD 74, 75, and -- excuse me, 74, 77, and 95 have certain

19  Reock scores and that the average compactness in the 12

20  challenged districts was decreased from the benchmark map

21  to 5005, and listed those districts that experienced

22  substantial reductions in compactness.

23      Do you agree with him?

24  A   Again, I can agree with parts of that.  The average

25  compactness score for the challenged districts does drop

Hood - Direct

1   slightly across the redistricting cycle.  We went over

2   that previously.

3        Again, compactness in some of the challenged districts

4   goes up and in some of them they go down.

5   Q    And did any other districts in the rest of the plan

6   experience similar reductions in compactness?  And by any

7   other districts I do mean non-challenged districts.

8   A    There were other districts statewide that had low

9   compactness scores as well.

10  Q    And just briefly turning to page 10, paragraphs 32 and

11  33.  If you could read them to yourself.

12            It looks like he is making similar points that he

13  did in paragraphs 26 and 27.  Does that sound right?

14  A    Yes.  I guess I would quibble with maybe some of the

15  adjectives he uses.  You know, we went over the mean --

16  let me just flip back here real quick.

17       So here we're talking about Polsby-Popper.  Again, the

18  mean for the challenged districts goes from .23 to .19.

19       So, yes, you could say the compactness scores go down,

20  that's true.  I don't know that on average that's a huge

21  drop.

22  Q    Is there any way that you would characterize it?

23  A    There is a slight reduction in compactness for the

24  challenged districts across the two plans.

25  Q    And finally, if we could turn to page 34.  This won't

Hood - Direct

1  be the last one, but it is the last topic.  Looking at

2  paragraphs 92 through 94.

3      He is talking about his racial voting patterns

4  analysis.  And can you please read paragraphs 92 and 93 to

5  yourself.

6  A    Okay.

7  Q    And in paragraph 94 he states that you do not dispute

8  his analysis or the conclusions derived therefrom.

9      Do you agree with that?

10  A    Well, for one, I did not perform a racial bloc vote

11  analysis or a vote dilution analysis for this particular

12  report.  I don't necessarily agree with his findings or

13  the way he conducted that analysis.

14  Q    And if you had been asked to do the analysis, would

15  you have done it differently?

16  A    Yes.

17  Q    How so?

18  A    Well, some of the things have been discussed today

19  already.  I would have -- again, I would have relied on a

20  closer look at the endogenous elections.  So the actual

21  House of Delegates elections versus other types of

22  elections or exogenous elections that are going on.

23      Typically if this were a sort of Section 2 vote

24  dilution analysis, those would be more probative.

25  Endogenous elections that is --

Hood - Direct

```
 1              JUDGE KEENAN:  Excuse me, sir, could you keep
 2    your voice up a little bit.
 3              THE WITNESS:  Yes, Your Honor.
 4              JUDGE PAYNE:  Pull that microphone closer.  Are
 5    you saying endogenous?
 6              THE WITNESS:  Endogenous, yes, Your Honor.
 7              JUDGE LEE:  Meaning House elections?
 8              THE WITNESS:  Yes, yes, Your Honor.
 9    BY MS. WALRATH: (Continuing)
10    Q    And real quickly also --
11              JUDGE LEE:  You just gave one answer.  Were you
12    finished?
13    A    Not quite.
14    Q    Go ahead, please.
15    A    You know.  Again, I would also have relied on primary
16    elections as well.  It's very common to look at primary
17    elections if you're trying to determine the minority
18    preferred candidate.  Sometimes those candidates are found
19    in primary elections.
20         And I would have used as many election cycles as
21    possible, probably over something like a ten-year period
22    typically, to try to get a handle on that particular
23    issue.
24    Q    And on that subject as well, Professor Hood, have you
25    ever been asked by a state legislature or a municipality
```

Hood - Direct

1  to do a racial bloc voting analysis during the drawing or

2  enactment of a plan?

3  A    No.

4  Q    Then turning to page 42 of Dr. Ansolabehere's reply

5  report here, Exhibits 1 -- excuse me, paragraphs 115 to

6  116.  If you could please read paragraph 115 to yourself.

7  A    Okay.

8  Q    And just briefly, he references his ability to elect

9  analysis and his conclusion that in none of the House of

10 Delegates districts was a 55 percent threshold necessary

11 to have an expected vote in excess of 55 percent.  This is

12 a number we have been hearing a lot about.

13      And then in paragraph 116 he says that you do not

14 dispute that analysis.

15      Do you agree with his conclusion?

16 A    No.  Again, I didn't perform that type of analysis.

17 It doesn't necessarily mean that I agree with his

18 conclusions, certainly.

19 Q    And is there any particular reason why not?

20 A    Well again, for some of the reasons we just discussed,

21 I would have performed the analysis differently from what

22 Professor Ansolabehere did.

23      MS. WALRATH:  I have no further questions at this

24 time.

25      JUDGE PAYNE:  Cross-examination.

1              MR. HAMILTON:  Your Honor, Mr. Spiva is going to

2    do the cross-examination.  I rise just to raise a question

3    about logistics because it's 4:30 and we're running short

4    on time.

5              We have a rebuttal witness that we intended to

6    call just to lay the foundation for those two documents,

7    Gerry Hebert.  He is not available on Monday.  So if we're

8    not going past 5 o'clock, we would ask the Court's leave

9    to interrupt the proceeding for a very brief witness to

10   lay the foundation to admit those two documents in a

11   rebuttal case out of turn.

12             JUDGE PAYNE:  Any objection?

13             MR. BRADEN:  Your Honor, we object to his

14   production.  He was not noticed as a rebuttal witness.

15             JUDGE PAYNE:  He was not noticed as a witness in

16   your 26 disclosures or in any of the witness lists, is

17   that right?

18             MR. HAMILTON:  Well, of course not, Your Honor,

19   because he is a rebuttal witness.

20             JUDGE PAYNE:  Yes.

21             MR. HAMILTON:  We didn't know we needed him until

22   literally today when there was this issue.  And as Your

23   Honor will recall, you said, you know, move on, lay a

24   foundation, and if you can do that, then you can get them

25   in in your rebuttal case.

1          That's exactly what we intended to do.  I reached

2     out to Mr. Hebert, he is a former acting Chair of the

3     Voting section of the Department of Justice.  I anticipate

4     his examination will consist of about ten questions at

5     most.

6          JUDGE LEE:  From you, but then there will be

7     cross-examination.

8          MR. HAMILTON:  True, but given the scope, there

9     is not going to be much.

10         JUDGE LEE:  Well, I am not sure what you expect

11    us to do.  If the defense won't allow this witness to step

12    down and complete his testimony before you start cross,

13    I'm not -- I guess we could force him to do it.  I am not

14    sure that I would.

15         JUDGE PAYNE:  I wouldn't be inclined to force him

16    do it.  Just have him come on Monday.

17         MR. HAMILTON:  See, that's the problem, Your

18    Honor.  I wouldn't even ask for this, but Mr. Hebert is

19    not going to be in the Commonwealth on Monday and he is

20    not available.  I suppose we could take his deposition --

21         JUDGE PAYNE:  Take his deposition over the

22    weekend and do it that way then.

23         MR. HAMILTON:  All right.  Thank you, Your Honor.

24         JUDGE PAYNE:  That's the way that you do it

25    usually, isn't it?

1     MR. HAMILTON:  It is a pretty unusual situation.

2  I am happy to take his deposition over the weekend.

3     JUDGE PAYNE:  That will be fine.

4     MR. HAMILTON:  Okay, thank you.

5

6                    CROSS-EXAMINATION

7  BY MR. SPIVA:

8  Q    Good afternoon, Dr. Hood.  Good to see you again.

9  A    You as well.

10  Q    I am going to try to be brief.  Actually, Ms. Walrath

11  may have covered a number of the questions I had for you,

12  but I just want to make sure that I am clear.

13     You understand that one of plaintiffs' allegations in

14  this case is that the defendants engaged in racial

15  gerrymandering in the drawing of the 12 majority-minority

16  districts?

17  A    Yes, that's the allegation, yes.

18  Q    And if I refer to those as the challenged districts,

19  you understand what I am talking about?

20  A    Yes.

21  Q    Okay.  And you have performed no analysis of whether

22  any of the 12 challenged House districts need to have a

23  black voting-age population of 55 percent or greater in

24  order to preserve the African-American community's present

25  ability to elect its preferred candidate of choice, is

Hood - Cross

1   that correct?

2   A    That's correct.

3   Q    I know that was a mouthful.  And similarly, you have

4   not performed any analysis on whether any of the 12

5   challenged House districts needs to have any particular

6   BVAP percentage in order to preserve the minority

7   community's present ability to elect their candidate of

8   choice, correct?

9   A    Those two questions seem pretty similar.

10  Q    They are similar.  The first one was about 55 percent,

11  the second one was about whether you had done any analysis

12  in terms of any percentage, whether it is 55 percent or

13  anything else?

14  A    No, I have not performed that type of analysis.

15  Q    Okay.  And you would agree with me, Dr. Hood, that as

16  a general matter that there is no set BVAP percentage

17  required for an African-American community to elect its

18  candidate of choice, correct?

19  A    It could vary greatly.

20  Q    Right.  There is no rule of thumb to be applied to all

21  majority-minority districts in all places, correct?

22  A    Well, if it's a majority-minority district, there is

23  one rule at least.

24  Q    What's that one rule?

25  A    It has got to be 50.01 percent.

Hood - Cross

1    Q    Other than that rule, would you agree that there is no

2    rule of thumb to be applied in all places?

3    A    There is no strict rule, no.

4    Q    Okay.  And certainly no rule of thumb that would apply

5    for all time, would you agree with that?

6    A    Things are not necessarily time bound, no.

7    Q    That percentage may vary --

8    A    Things can change.

9    Q    I am sorry, I didn't mean to step on your--

10            JUDGE PAYNE:  Be careful, you're stepping on each

11   other.

12   Q    Yes, and it is my fault, Your Honor.

13        I apologize, Dr. Hood.  Please, you answer.

14   A    Things can certainly change over time, that's

15   possible.

16   Q    And it might vary based on the degree of racially

17   polarized voting, if any, would you agree with that?

18   A    Well, certainly that's one consideration, yes.  The

19   voter cohesion amongst different minority groups compared

20   to the majority group, yes.

21   Q    And it might vary in a state, let's take Virginia,

22   from place to place within the state, would you agree with

23   that?

24   A    It's possible, yes.

25   Q    Some parts of the state may have high degrees of

Hood - Cross

1   racially polarized voting and others may have lower

2   levels, is that correct?

3   A    Well, we're speaking just hypothetically here at this

4   point.  I have not conducted any type of subregional

5   analysis in the State of Virginia on that particular

6   question.

7       It's possible it could vary.  It's possible racial

8   polarization could be fairly constant across the state as

9   well.

10  Q    You would have to do a racially polarized voting

11  analysis to figure that out, wouldn't you?

12  A    That's fair, yes.

13  Q    And you've done that type of racial bloc voting

14  analysis previously, isn't that right?

15  A    Yes.  Maybe -- I sometimes use the term "vote dilution

16  analysis."  I'm assuming we're talking about the same

17  thing.  Trying to determine how one racial group is voting

18  and how another racial group is voting, and what kind of

19  effect that is having on the election, is that fair?

20  Q    That's fair.

21  A    Okay.

22  Q    And you have done that type of analysis before,

23  correct?

24  A    Yes.

25  Q    Okay.  And I take it in the analysis that you did do,

Hood - Cross

1  Dr. Hood, you didn't interview any of the particular

2  delegates in the challenged districts, is that correct?

3  A    That's correct, yes.

4  Q    And you didn't consider any statements by delegates on

5  the House floor, is that correct?

6  A    Not directly.  I saw some of the testimony, some of

7  the video testimony.

8  Q    Oh, okay, all right.  Did you consider that testimony

9  in forming your opinion?

10 A    It really didn't go to forming my opinion.  Again, the

11 primary purpose of my report was a comparison from the

12 benchmark plan to the enacted plan.

13 Q    Now, you would agree with me that prior to the 2011

14 redistricting, three of the challenged districts had lower

15 than 55 percent BVAP, correct?

16 A    Well, I could look in my report.

17 Q    Sure, if you want to look, it is

18 Defendant-Intervenors' Exhibit 15, and it's at page 13,

19 Table 8, I think you will find that information.

20     And it should be in your witness book too because I

21 think Ms. Walrath went over it with you.

22 A    Okay.

23 Q    So the question was, Dr. Hood, that you would agree

24 with me that prior to the 2011 redistricting, that three

25 challenged districts had lower than 55 percent BVAP, is

Hood - Cross

1   that correct?

2   A    Yes, that looks to be accurate.

3   Q    All right.  And the map drawers of the 2011 map, they

4   raised the BVAP in each of those three districts above

5   55 percent in the 2011 redistricting, that's true too,

6   isn't it?

7   A    71 went from 46.3 to 55.3.

8   Q    Maybe take a look at 89.

9   A    80 from 54.4 to 56.3.  And 89 went from 52.5 to 55.5.

10       So, yes, that would be an accurate answer to that

11  question.

12  Q    All right.  Thank you, Dr. Hood.  And you anticipated

13  my next question.  So I will move on to another one.

14       The map drawers did not lower the BVAP of any of the

15  challenged districts below 55 percent, is that correct?

16  A    With the enacted plan?

17  Q    Correct.  With the enacted plan, they did not lower

18  the BVAP of any of the challenged districts below

19  55 percent?

20  A    That's correct.

21  Q    Okay.  Now, you've opined, Dr. Hood, that

22  African-Americans were not packed into the 12 challenged

23  districts, isn't that right?

24  A    Well, I think I only used that term in reference to

25  Democratic partisans.

Hood - Cross

1    Q    Actually, can you take a look at your report, I think

2    it's in the same exhibit there, Defendant-Intervenors'

3    Exhibit 15 at 13.   And the text there, I believe you say

4    closer examination of Table 8 refutes the idea that the

5    new plan packed the black voting-age population into

6    districts.

7         Do you see that?

8    A    Okay, yes.

9    Q    Okay.   That's your opinion, isn't it?

10   A    Yes, as is stated there.

11   Q    And this is based in part on the fact that the average

12   BVAP across all 12 challenged districts increased by only

13   .1 percent, is that correct?

14   A    That's part of it.   I also make reference in the same

15   paragraph to the fact that the plan reduced the

16   concentration of blank Virginians in the most heavily

17   black districts, the ones that were more than 60 percent.

18   Q    Okay.

19   A    So I guess that gets back also to that graphic I

20   showed that black voting-age population went up in some

21   districts and went down in the some of these districts.

22   Q    But you didn't do any analysis of any of those

23   districts to determine whether the BVAP after the

24   redistricting was necessary to protect the

25   African-American community's present ability to elect

Hood - Cross

1    their candidate of choice, correct?

2    A    No, I did not perform that type of analysis.

3    Q    Okay.  And so, you do not know whether the

4    African-American community in any of those challenged

5    districts could have elected -- could have had the ability

6    to elect the candidate of their choice with a lower BVAP

7    percentage than that chosen by the map drawers, is that

8    fair?

9    A    Yes.  Again, I did not perform that analysis.

10   Q    You have opined in your report that the ability of

11   black Virginians to elect their preferred candidates was

12   retained by the new 2011 plan, is that correct?

13        And if you want to verify, just take a look at

14   page 20, I think it's the sentence right before Table 16.

15   A    Well, that would be -- yes, I did make that statement.

16   That's in reference to this election analysis I performed

17   that showed that all the incumbents from the challenged

18   districts were returned.

19   Q    Okay.  But you would agree that black Virginians in

20   the challenged districts had the ability to elect their

21   preferred candidates prior to the new 2011 plan, isn't

22   that right?

23   A    Well, I think to make that statement definitively I

24   would have -- to make that statement, I would have to

25   perform an analysis looking at that time period.

Hood - Cross

1    Q    And that's an analysis that you have not done?

2    A    Yes.  I said I didn't do that.  So --

3    Q    Okay.  And were you aware that every single delegate

4    representing a challenged district in 2009 was re-elected

5    in 2011?

6    A    Yes.

7    Q    Okay.  And every single delegate representing a

8    challenged district after the 2000 elections had been

9    first elected either in 2009 or earlier, isn't that right?

10   A    I would have to look that up to be honest with you.

11   Q    You don't know the answer to that?

12   A    I don't know the answer to that.

13              JUDGE PAYNE:  Hold on a minute.

14              COURT REPORTER:  Your Honor, I heard him say

15   2000.

16   Q    Oh, let me get you the exact question.  Actually, what

17   I said was every single delegate representing a challenged

18   district after the 2011 elections had been first elected

19   either in 2009 or earlier.  Sorry, thanks.

20         In calculating Democratic vote average, you used

21   election data from the statewide races for governor, I

22   take it, is one of the statewide races that you used?

23   A    Governor, lieutenant governor, and attorney general,

24   yes, from the 2009 election cycle.

25   Q    Okay.  Thank you.  Those were going to be my next

Hood - Cross

1    couple questions, so you covered it.

2         Can you take a look at page 15 of your declaration.

3    And you opined on page 15 that the political composition

4    of the challenged districts stayed about the same before

5    and after redistricting, is that correct?

6    A    Well, again, if you look at the means for those

7    districts as a whole, yes, there was little movement.

8    Q    Right.  In fact, in looking at the second sentence

9    from the top, you find that, "From 2009 to 2011 the

10   partisan composition of these challenged districts was

11   essentially unchanged."

12        That's your opinion?

13   A    Yes.

14   Q    Okay.  And the average Democratic vote average in the

15   challenged districts went from 68.3 percent in 2009 to

16   67.6 percent in 2011, is that correct?

17   A    That's correct.

18   Q    So on average the challenged districts got a little

19   less Democratic, isn't that right?

20   A    Just slightly, yes.

21   Q    And you conclude in fact that the new plan did not

22   seek to pack Democratic voters in these districts, isn't

23   that right?

24   A    Yes.  Looking at that statistic, yes.

25   Q    And you did not do any analysis of the extent to which

Hood - Cross

1    changes in any particular challenged districts --

2    district, I'm sorry, was driven by politics, correct?

3    A    Could you --

4    Q    Say it a little slower.  Sorry.

5    A    No, I got the question.  I mean, I guess could you

6    give me an example.

7    Q    No, I don't have an example.  I was just saying -- I

8    was asking, you did not do any analysis of the extent to

9    which changes in any particular challenged district was

10   driven by politics?  You didn't do that analysis?

11   A    Correct.

12   Q    All right.  And you wouldn't claim and it's not part

13   of your opinion that any specific change was made to any

14   specific challenged district based on partisanship,

15   correct?

16   A    Correct.  I didn't perform an analysis at that level.

17   Q    For HD 75 -- strike that.

18        You would agree that all but one of the challenged

19   districts was underpopulated according to the 2010 census,

20   correct?

21   A    Yes.

22   Q    Let me ask you to turn to Plaintiffs' Exhibit 50,

23   which is the initial expert report of Dr. Ansolabehere.

24             JUDGE PAYNE:  What page?

25             MR. SPIVA:  It is Table 4 on page 72, Your Honor.

Hood - Cross

1    And also, Dr. Hood, it's Table 4 on page 72 that I wanted

2    you to take a look at, please.

3            JUDGE PAYNE:  I think it's also up on the screen,

4    Doctor.

5            MR. SPIVA:  Yes, it's also on your screen, Dr.

6    Hood, if you want to look there.

7            THE WITNESS:  Okay.

8    BY MR. SPIVA: (Continuing)

9    Q    And you see that this has the population and racial

10   composition of the challenged districts in the benchmark

11   plan and in the new plan, HB 5005, is that correct?

12   A    Yes.

13   Q    And you see that HD 74 was very close to the ideal

14   population under the benchmark plan, correct?

15   A    Yes, that's close, yes.

16   Q    Can you take a look at, and I believe we can put it up

17   on the screen, at Table 5, which is on the next page,

18   page 73.

19           And you see that this table shows the numbers of

20   people moved into and out of each challenged district as

21   part of the 2011 redistricting, correct?

22   A    Yes.

23   Q    And you'll see that the map drawers removed 16,414

24   people from District 74 even though its population was

25   very close to ideal, correct?

Hood - Cross

1    A    Correct.  According to this table, yes.

2    Q    And you don't know and you don't have an opinion on

3    why the map drawers removed over 16,000 people from

4    District 74, correct?

5    A    Well, besides the fact that, again, I can just state

6    generally that altering one district, of course, has or

7    can have a ripple effect on surrounding districts.

8         So we heard testimony earlier to the fact that, you

9    know, in some areas a number of districts were

10   underpopulated.  And so, not only that, but there are many

11   considerations with drawing district boundaries.  And

12   there may have been, you know, a perfectly valid reason

13   for removing some of the population and then moving

14   population from other geographic areas into that district.

15   Q    I appreciate that, but actually I have a narrower

16   question.

17   A    Okay.

18   Q    Which is that you have not looked at, and so,

19   therefore, you have no opinion on the reason for removing

20   16,414 people from District 74, isn't that correct?

21   A    I did not do an analysis like this, no.

22   Q    Okay.  And turning back to Table 4.  You see that HD

23   70 was also close to ideal under the benchmark plan.

24        Do you see that?

25   A    Yes, yes.

Hood - Cross

1   Q    And if you would look at Table 5, and we will put that

2   up on the screen again -- sorry, we're going to have to do

3   a little flipping back and forth just for a minute.

4        You have see the map drawers took almost 26,000 people

5   out of HD 70, correct?

6   A    25,946, yes.

7   Q    Almost exactly 26,000, right?

8   A    Yes.

9   Q    Just a little below.  And you haven't done an analysis

10  and have no opinion as to why 26,000 people were removed

11  from District 70 even though its population also was close

12  to the ideal population prior to redistricting?

13  A    I can't comment specifically, no.

14  Q    Okay.  And we could go through a few more, but I take

15  it the answer would be the same, with respect to any

16  individual district, you can't opine on why population was

17  moved out or moved into any of these particular challenged

18  districts?

19  A    Correct.

20  Q    Okay.  And you don't draw any conclusions in your

21  opinion concerning whether the map drawers sacrificed

22  compactness in any of the challenged districts in order to

23  attempt to comply with the Voting Rights Act?

24  A    I don't draw any conclusions specifically on that

25  point, no.

1    MR. SPIVA:  Okay.  Thank you, Dr. Hood, I

2  appreciate it.  I have no more questions.

3    JUDGE PAYNE:  Any redirect?

4    MS. WALRATH:  I have a few questions.

5

6    REDIRECT EXAMINATION

7  BY MS. WALRATH:

8  Q   Given the time, I will keep this very brief.

9    Professor Hood, I would just like to turn briefly back

10  to your report, Defendant-Intervenors' Exhibit 15, and

11  your Table 8.  It is on page 14 of the trial exhibit

12  stamped page numbers.

13    JUDGE PAYNE:  What exhibit?

14    MS. WALRATH:  Defendant-Intervenors' 15.

15    JUDGE PAYNE:  His report?

16    MS. WALRATH:  It is his report, yes.  Page 14,

17  Table 8.

18  BY MS. WALRATH: (Continuing)

19  Q   And I believe you testified to this earlier, but just

20  for the sake of reminding everyone, what is the source of

21  the numbers in this table for the black voting-age

22  population?

23  A   These are DLS numbers.

24  Q   So as between the discussion I think you have heard in

25  this courtroom, there is DLS numbers versus a DOJ number,

Hood - Redirect

1    this is the DLS numbers?

2    A    Yes.  Yes.

3    Q    And in this report I think we just heard you testify

4    that the black voting-age population of many of these

5    challenged districts was largely unchanged, is that

6    correct?

7    A    Well, are we going district by district?

8    Q    No, as a general proposition for the drawing of

9    districts.

10   A    Yes, if look at the averages there, 57.1 percent in

11   the benchmark plan versus 57.2 percent in the enacted

12   plan.

13       So, yes, I would call a tenth of a percentage point

14   hardly any change at all.

15   Q    And similarly, when we were speaking about the

16   Democratic performance of these districts, I believe that

17   was largely unchanged as well?

18   A    Yes, that is accurate.

19   Q    And isn't there in your opinion a correlation in

20   Virginia between race and politics?

21   A    Yes.  There is a correlation in most of the South

22   between race and politics, certainly.

23   Q    And finally, we don't necessarily need to bring this

24   up on the screen, but we discussed the 2011 criteria

25   previously?

Hood - Redirect

1   A    Yes.

2   Q    And that you had had a chance to review the criteria?

3   A    Yes.

4   Q    And in your opinion, are the challenged districts in

5   any way in conflict with the communities of interest in

6   any of the criteria that you evaluated in your report?

7   A    I don't believe so, no.

8           MS. WALRATH:  Thank you.  I have nothing further.

9           JUDGE PAYNE:  May he be excused?

10          MS. WALRATH:  Yes.

11          JUDGE PAYNE:  I don't see any reason why at this

12  juncture -- you have got another witness, Mr. Braden?

13          MR. BRADEN:  Yes, we do, Your Honor.

14          JUDGE PAYNE:  I don't see any reason why at this

15  juncture we couldn't let that fellow come testify since he

16  is not interrupting a witness.

17          JUDGE LEE:  Well, the problem is that

18  cross-examination would have to occur.  And if he is

19  not -- and we're not going to be here until 6 o'clock

20  because I have a docket tomorrow.

21          JUDGE PAYNE:  Why do you need -- can't you

22  stipulate to authenticity?  That's all you're going to do,

23  isn't it, Mr. Hamilton, with this witness, is the

24  authenticity?  Yes or no?

25          MR. HAMILTON:  Yes.

1          JUDGE PAYNE:  Okay.  Will you stipulate the

2    authenticity or --

3          JUDGE LEE:  Can you come to the podium, Mr.

4    Hamilton.  What is it you have?

5          JUDGE PAYNE:  Why do you have ten questions?

6          JUDGE LEE:  What is it you have?

7          MR. HAMILTON:  We have two documents, Your Honor.

8    One of them is a letter from Senator McEachin to the

9    Department of Justice in connection with the preclearance

10   of the Senate plan in 2011.

11         And the second is an e-mail from Mr. Hebert, who

12   was then a private attorney representing Senator McEachin

13   and the black caucus in the Senate providing a racially

14   polarized voting study in connection with the preclearance

15   to the Department of Justice.

16         It is simply to prove the point that in fact in

17   Virginia racially polarized voting studies have been done

18   and have been submitted to the Department of Justice in

19   connection with preclearance.  It is a simple point.

20         And so, if they will stipulate to authenticity --

21         JUDGE PAYNE:  The rest of it is whether it can be

22   admitted, and you didn't mark it as an exhibit, et cetera.

23   Those are the issues that need to be argued later.

24         The only question I was trying to deal with was

25   his authenticity.  Do you stipulate to the authenticity?

1  If you do, we don't have to worry the gentlemen.  If not,

2  take his deposition.

3  JUDGE LEE:  But that does not obviate any

4  objection he might have to relevance.

5  JUDGE PAYNE:  Right, obviously not.

6  MR. BRADEN:  I have no objection to the

7  authenticity of the document.  Frankly, without him

8  present, I don't know how we would determine the date, the

9  date of the actual report itself.  There is no date.

10  So I have no clue as to how we would know an

11  actual date on which the report is done.  It is a matter

12  of some significance.

13  JUDGE PAYNE:  So you do have objection to the

14  authenticity or not of that report?

15  MR. BRADEN:  I have no objection to that.

16  JUDGE PAYNE:  All right.  Then we will deal with

17  the admissibility later.

18  MR. HAMILTON:  Well, I think what he has just

19  said is he is reserving the ability or the admissibility

20  without the foundation.  I mean, he is raising a

21  foundation problem that I am going to need the call the

22  witness for.

23  JUDGE PAYNE:  Well, it's five minutes to 5, five

24  minutes until.  I suggest maybe you just take his

25  deposition and let him be done with it later or bring him

1    in next week.

2                Come ahead.

3                JUDGE LEE:  Well give you 15 minutes.

4                MR. HAMILTON:  Okay.  Thank you, Your Honor, that

5    should be all we need.

6                JUDGE LEE:  Thank you, Dr. Hood.

7                THE WITNESS:  Thank you.

8                NOTE:  The witness stood down.

9                MR. HAMILTON:  Your Honor, we would call Gerry

10   Hebert.

11               NOTE:  The witness is sworn.

12

13                    **JOSEPH GERALD HEBERT,**

14   a witness, called at the instance of the plaintiffs,

15   having been first duly sworn, testified as follows:

16                    DIRECT EXAMINATION

17   BY MR. HAMILTON:

18   Q    Thank you, Mr. Hebert, for being here.

19        Can you please state your name for the record.

20   A    Joseph Gerald Hebert.

21   Q    Where are you currently employed?

22   A    I have several positions.  I am an attorney in private

23   practice, solo practice here in Alexandria, Virginia.

24        I also am the executive director and director of

25   litigation at a nonpartisan nonprofit organization called

Hebert - Direct

1   The Campaign Legal Center in Washington, D.C.

2       And I also teach law school at Georgetown University

3   Law Center and New York Law School in New York City.

4   Q   Are you the former acting chief of the Voting section

5   of the Department of Justice?

6   A   Yes.

7   Q   I would like to direct your attention to two

8   documents, I believe you have them in your hand.  Do you

9   have them?

10  A   Yes, I do.

11  Q   Okay.  So could you identify them just briefly by

12  title.  What are the two documents we're looking at here?

13  A   The two documents that I have are first a fax cover

14  sheet sent to the Justice Department by the office of

15  Senator A. Donald McEachin which is dated May 31, 2011,

16  attaching to the fax cover sheet a four-page letter by

17  Senator McEachin to the chief of the Justice Department.

18      The second document is an e-mail that I had sent to

19  the Justice Department attorneys who were reviewing the

20  Senate redistricting map.  And that e-mail is the cover

21  page.

22          And attached to it is a report by an expert that

23  I retained on behalf of the Senate Democratic caucus to

24  analyze the Senate redistricting plan.  And that is Dr.

25  Lisa Handley's report which was attached to my e-mail

Hebert - Direct

1   submitted to the Justice Department on June 1.

2   Q    Are these -- you are familiar with both of these

3   documents?

4   A    Yes, I am.  I reviewed them, I reviewed Dr. Handley's

5   report, which was prepared at my request.

6   Q    Let me stop you there.  When was that report prepared?

7   A    The initial analysis in the report was done before the

8   plan was introduced in the Senate, in the legislature.  So

9   it was probably done sometime in April or May.

10  Q    And do you know why it was done before the plan was

11  introduced in the Senate?

12  A    Well, we had drawn a map and we had wanted to

13  determine whether the districts, the five majority

14  African-American Senate districts would continue to

15  perform as effective districts for African-American voters

16  under the plan.

17          JUDGE LEE:  I'm not clear.  So what was your job?

18  You hired Dr. Handley to do a report.  Were you working

19  for the Virginia Senate or for the Department of Justice?

20          THE WITNESS:  I worked for the Virginia Senate

21  Democratic caucus at that time.

22          JUDGE LEE:  Okay.

23          THE WITNESS:  My tenure at the Justice Department

24  ended a long time ago, in 1994.

25          JUDGE LEE:  So you were working for the VA Senate

Hebert - Direct

1    as a consultant?

2            THE WITNESS:  That's correct, legal counsel.

3            JUDGE LEE:  All right, legal counsel.  Thank you.

4    I'm sorry.

5    BY MR. HAMILTON: (Continuing)

6    Q    In the analysis --

7            MR. BRADEN:  Your Honor, I hate to interrupt, but

8    I think that's a mischaracterization of what his position

9    was.  I think there was a misunderstanding on your part.

10   I don't think he was actually working for the Senate.  Am

11   I correct?

12           THE WITNESS:  I worked for the Senate Democratic

13   caucus, which was the majority party in the Senate at that

14   time.

15   BY MR. HAMILTON: (Continuing)

16   Q    Now let's turn to Senator McEachin's letter.  Can you

17   -- you are familiar with this document as well, sir?

18   A    Yes.

19   Q    How are you familiar with this letter?

20   A    Well, I was legal counsel to Senator McEachin.  He

21   drafted this letter.  And as his counsel, he asked me to

22   review it before he sent it.

23   Q    Are these true and accurate copies of that letter and

24   the racially polarized voting analysis?

25   A    Yes.  They are true and accurate copies of those

1  documents.

2         MR. HAMILTON:  Your Honor, I would offer these

3  two exhibits into evidence.

4         JUDGE LEE:  I wasn't sure you were going to do

5  admissibility.  Go ahead, Mr. Braden.

6         JUDGE PAYNE:  I think he is entitled to -- you're

7  going to cross-examine -- you are offering testimony on

8  the authenticity and the predicate for admissibility.

9         MR. HAMILTON:  Correct.

10        JUDGE LEE:  Right.

11        JUDGE PAYNE:  He gets a chance to cross-examine.

12  We cross the bridge of ruling on it later.

13        MR. HAMILTON:  I would like to ask --

14        JUDGE PAYNE:  The point being there may be

15  argument.

16        MR. HAMILTON:  I am refraining from asking one or

17  two questions about the content of the analysis until it

18  gets admitted into evidence.

19        JUDGE PAYNE:  The analysis is whatever it is, Mr.

20  Hamilton.  You all don't -- we can read it.

21        Let's go, Mr. Braden.

22        JUDGE LEE:  If it is admitted.

23        JUDGE PAYNE:  If it comes in, we can read it.

24        Let's go, Mr. Braden, have you got a question?

25        MR. BRADEN:  Your Honor, we will accept the

 1    authenticity of the document, but we still object to its

 2    admissibility.

 3           JUDGE PAYNE:  All right, we know that.  We will

 4    deal with that later.

 5           We will see you all -- you have got a witness

 6    that begins on Monday?

 7           MR. BRADEN:  Yes.

 8           JUDGE PAYNE:  How much longer is that witness?

 9           MR. BRADEN:  I would expect our witness on Monday

10    on direct to be about an hour-and-a-half.

11           JUDGE PAYNE:  All right.  How long is your

12    rebuttal?  Recognizing that rebuttal in this district

13    really means rebuttal.  It doesn't mean rehash everything

14    that has been done.

15           MR. HAMILTON:  Understood, Your Honor.  I have

16    tried a case in this district before, and I remember the

17    rules.  We anticipate no longer than an hour in rebuttal.

18           JUDGE PAYNE:  We would like to hear argument from

19    you.

20           JUDGE LEE:  We have motions hearings and

21    sentencing in this courtroom tomorrow, so everything needs

22    to be cleared out.  I think you can probably keep your

23    book shelves as long as they are organized.

24           I am a little concerned about them being so close

25    to the door where the lockup is because we will prisoners

1   in and out of here.  But everybody is going to have to

2   clear out, we have to clear out too.

3          JUDGE PAYNE:  Your argument will be 30 minutes a

4   side.  I guess the plaintiff has the burden, they can

5   split it whichever way you want to do it, but it's

6   30 minutes each.  And then there will be questions too.

7          MR. HAMILTON:  30 minutes a side on Monday, Your

8   Honor?

9          JUDGE PAYNE:  On Monday.  As soon as you finish

10  presenting evidence, if you would be prepared to do that.

11  It would help us while all this is fresh in our mind.

12         We will probably not need any argument after you

13  file your briefs.  But if we do, we will call for that.

14         MR. HAMILTON:  Thank you so much, Your Honor.

15         JUDGE PAYNE:  All right, we will be adjourned.

16

17                (End of proceedings.)

18

19         I certify that the foregoing is a correct

20  transcript from the record of proceedings in the

21  above-entitled matter.

22

23

24  _____/s/_____                    _____
    P. E. Peterson, RPR                Date
25