```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                      RICHMOND DIVISION

 4

 5    ------------------------------------
                                        :
 6    GOLDEN BETHUNE-HILL, et al.,      :
                                        :   Civil Action No.
 7    vs.                               :   3:14CV852
                                        :
 8    VIRGINIA STATE BOARD OF           :   July 13, 2015
      ELECTIONS, et al.                 :
 9    ------------------------------------
                                        :
10

11          COMPLETE TRANSCRIPT OF THE BENCH TRIAL

12          HEARD BEFORE:  THE HONORABLE ROBERT E. PAYNE
                           THE HONORABLE GERALD BRUCE LEE
13                         THE HONORABLE BARBARA M. KEENAN

14

15    APPEARANCES:

16    Kevin J. Hamilton, Esquire
      Perkins Coie, LLP
17    1201 Third Avenue
      Suite 4800
18    Seattle, Washington  98010

19    Bruce V. Spiva,  Esquire
      Aria C. Branch, Esquire
20    700 13th Street NW
      Suite 600
21    Washington, D.C.  20005
      Counsel for the plaintiffs
22

23

24                 Peppy Peterson, RPR
                   Official Court Reporter
25                United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Tony F. Troy, Esquire
      Eckert Seamans Cherin & Mellott, LLP
 3    707 East Main Street
      Suite 1450
 4    Richmond, Virginia  23219

 5    Daniel A. Glass, Esquire
      Eckert Seamans Cherin & Mellott, LLC
 6    1717 Pennsylvania Avenue, NW
      Suite 1200
 7    Washington, D.C.  20006

 8    Godfrey T. Pinn, Jr., Esquire
      Harrell & Chambliss, LLP
 9    707 East Main Street
      Suite 1000
10    Richmond, Virginia  23219
      Counsel for the Virginia State Board of Elections
11
      E. Mark Braden, Esquire
12    Katherine L. McKnight, Esquire
      Jennifer M. Walrath, Esquire
13    Richard B. Raile, Esquire
      Baker & Hostetler, LLP
14    1050 Connecticut Avenue, NW
      Suite 1100
15    Washington, D.C.  20036

16    Dalton L. Oldham, Jr., Esquire
      Dalton L. Oldham, LLC
17    1119 Susan Street
      Columbia, South Carolina  29210
18    Counsel for Virginia House of Delegates

19

20

21

22

23

24

25
```

P R O C E E D I N G S

THE CLERK:  3:14 civil 852, Golden Bethune-Hill, et al., versus Virginia State Board of Elections, et al., versus Virginia House of Delegates, et al.

JUDGE PAYNE:  Good morning.  We have a witness, Mr. Braden?

MR. BRADEN:  Yes, we do.

MS. McKNIGHT:  Good morning, Your Honors.  We'd like to call Dr. Thomas Hofeller to the stand.

JUDGE PAYNE:  Dr. Hofeller.

MS. McKNIGHT:  Your Honors, for reference, we've placed witness binders for this witness at your places. Your clerks have copies, and opposing counsel also has a copy.


**THOMAS HOFELLER,**

a witness, called at the instance of the intervenor defendants, having been first duly sworn, testified as follows:


MR. SPIVA:  Sorry, Your Honors.  I don't know exactly the appropriate place to raise this, but I object to Dr. Hofeller testifying.  He's entirely duplicative of Dr. Hood and portions of Dr. Katz.  He's been proffered to

1    talk about contiguity and compactness, and so I think this

2    violates the Court's order that there should only be one

3    expert per discipline.

4           MS. McKNIGHT:  Your Honors, we've taken great

5    effort to make sure that Dr. Hofeller will not duplicate

6    testimony that you've already heard here in court.  We

7    suggest that if opposing counsel finds an issue along the

8    way, we can address it at that time.

9           JUDGE PAYNE:  I think that's the best way to

10   proceed given the conversation that we had in the

11   telephone scheduling conference about how we would deal

12   with this matter, Mr. Spiva.

13          JUDGE LEE:  I think the issue is the Polsby test

14   and the Reock scores, you can address.  This is in your

15   report, so go on.

16          MR. SPIVA:  Thank you, Your Honor.

17          MS. McKNIGHT:  Thank you, Your Honor.

18

19                  DIRECT EXAMINATION

20   BY MS. McKNIGHT:

21   Q    Good morning, Dr. Hofeller.

22   A    Good morning.

23   Q    Could you turn to what is labeled Defendant

24   Intervenor's Exhibit 14 in your witness binder.  Could you

25   identify this document for the Court.

Hofeller - Direct

1    A     This is the declaration that I filed with the Court in

2    this case.

3    Q     And could you turn to page 26 of that document.  Is

4    that your résumé?

5    A     It is.

6    Q     And is that copy of your résumé current and complete?

7    A     Yes, it is.

8    Q     And in what field do you have your Ph.D.?

9    A     Government.

10   Q     Dr. Hofeller, could you take a moment to give the

11   Court an overall summary of your experience in the field

12   of redistricting.

13   A     I've been involved with redistricting for about

14   50 years, from 1965.  I've been involved in almost all the

15   states in the United States in one capacity or another

16   primarily analyzing plans.  I've offered expert testimony

17   and done expert reports.  I've done a lot of work advising

18   people on the redistricting process, how to prepare for

19   it, what data to gather, how to format it, and also

20   involved in design and use of geographic information

21   systems which are actually used to draw the lines.  I've

22   experienced interactions with legislators while they are

23   drawing lines.  I guess that would cover most of it.

24        MS. McKNIGHT:  Your Honors, the parties have

25   stipulated that Dr. Hofeller is an expert in the field of

Hofeller - Direct

 1    redistricting and have also stipulated to his treatment as

 2    an expert witness under Federal Rule of Evidence 702.

 3              JUDGE PAYNE:  All right.

 4    Q    Dr. Hofeller, have you testified as an expert witness

 5    in other redistricting cases?

 6    A    Yes.

 7    Q    Approximately how many?

 8    A    I don't remember how many, but it's been quite a few.

 9    Two cases that are notable are the *Gingles* case and the

10    *Shaw* case, but also cases in other states and

11    jurisdictions.

12    Q    What were you retained to do in this case?

13    A    I was retained to look at the issues of compactness

14    and contiguity and to also look at other factors that

15    influence particularly compactness of districts and why

16    those districts would have been drawn in the manner in

17    which they have been drawn.

18    Q    And what materials did you use or review to develop

19    your opinion?

20    A    Basically I used the census data from the 2010

21    decennial census.  I used the geographic data files from

22    the Census Bureau which were called the TIGER files, and I

23    used a geographic mapping system called Maptitude for

24    redistricting which is the real industry standard in

25    redistricting.

Hofeller - Direct

1    Q    And did you review any court case materials such as

2    opinions or related expert reports?

3    A    Yes.  I looked at -- well, I actually looked at

4    *Jamerson* and *Wilkins*.  I also looked at the last three

5    House of Delegates redistricting plans in the state of

6    Virginia, '91, 2001, and 2011.

7    Q    And did you review any expert reports in your

8    preparation of your opinion?

9    A    I looked at all the expert reports that were submitted

10   by the experts in this case.  I looked at the Webster

11   report in *Wilkins*.  That's really it.

12   Q    Did you review any deposition transcripts?

13   A    Yes, I read all the deposition transcripts from all

14   the expert witnesses.

15   Q    Have you reviewed the plan at issue in this

16   litigation?

17   A    Yes.

18   Q    Dr. Hofeller, in general, who have your clients been?

19   A    Probably most of the clients I've worked for have been

20   in the Republican party, but I've also worked for

21   Democratic clients.  I've worked for some minority

22   clients.  I've worked for nonpartisan county governments,

23   and I've worked in city governments where, again, the

24   offices are nonpartisan.

25   Q    And what is your experience in drawing redistricting

Hofeller - Direct

1    plans?

2    A    I've -- I think I can honestly say to the Court that

3    I've drawn hundreds of plans in one form or another.  One

4    of the things that I do a lot during redistricting is to

5    look at states when the census data first comes out and

6    analyze them to see what we can expect during the

7    redistricting process in those states.

8    Q    Have you ever drafted any state legislative plan?

9    A    I have.

10   Q    Have you ever drafted any representational plans at a

11   county level?

12   A    Yes.

13   Q    Have you ever drafted any representational plans at a

14   municipal level?

15   A    Yes.

16   Q    Have you ever drafted any plan that was adopted by any

17   representational body anywhere?

18   A    Yes.

19   Q    Have you drafted a plan that was approved by any state

20   or federal court?

21   A    Yes.

22   Q    And what is your background in measuring compactness?

23   A    Well, along this process, I've looked at compactness

24   of plans over the last 40 years, and I also co-authored an

25   article with Richard Niemi and Bernie Grofman and Carl

Hofeller - Direct

1    Carulcci on compactness which is still, I believe, used as

2    a standard for compactness measurements.

3    Q    Let me ask you a basic question.  How do you go about

4    drawing a redistricting map?

5    A    Well, there are lots of components that go into

6    drawing a redistricting map, particularly when you're

7    drawing a plan for a legislative body of any type.  You

8    have to gather all of the relevant data which usually

9    consists of census data, the census mapping data, primary

10   and general elections as required, and these have to be

11   loaded into a redistricting system which people have to

12   learn and you have to learn.

13       You often draw a number of rough maps, and in the

14   legislative session, you have to interact with all the

15   legislators to draft a plan, of course the main imperative

16   being that the plan has to pass, has to get enough votes

17   to pass.

18       Part of it as an expert is you have to advise your

19   clients on what sort of pitfalls they might run into while

20   they're drawing the map and how the map may be viewed

21   after it's actually enacted.

22   Q    And we've heard reference to GIS before in this case.

23   What is GIS?

24   A    It's literally a geographic information system.

25   Maptitude for redistricting is built on one of those

Hofeller - Direct

1   platforms, and it's a way of presenting data such as

2   census data, political data, election data, and

3   registration data in a mapping format so it can be viewed

4   and so that units of geography can be moved from one

5   district to another or originally done to create

6   districts.

7   Q    And in your work drawing plans, what is the different

8   data you've used?

9   A    Not to be repetitive here, again, it's census data,

10  it's geographic data which the Census Bureau also supplies

11  us, and, again, it's the election results over multiple

12  election years along with the accompanying registration

13  figures.

14  Q    Is information about race included in that data that

15  you consider?

16  A    Well, the data is provided by the Bureau of Census for

17  redistricting specifically, and it constitutes the racial

18  and ethnic breakdowns for all of the units of geography

19  within the census down to the block level for both the

20  total population and for the adult population.

21  Q    So race is a consideration while drawing plans?

22  A    Race always has to be a consideration for the most

23  part, because even before you start drafting plans, you

24  have to look at the effects that plans might have on the

25  Voting Rights Act in particular but just to know in

Hofeller - Direct

1    general.  So in almost all states where I've been

2    involved, it's been an issue, and if you're going to

3    advise somebody or help somebody draft a map, you have to

4    be knowledgeable about the demographics of the state.

5        And have you heard that there is a dispute in this

6    case about BVAP or black voting-age population and which

7    BVAP figure to use?

8    A    I have.

9    Q    And what do you know about that?

10   A    Well, I mean, to be frankly honest, BVAP is a specific

11   measurement given to the states by the United States

12   Census Bureau.  It literally means the black voting-age

13   population of those people who responded to the

14   questionnaire indicating themselves to be African American

15   alone, and the confusion that came in this case is that

16   the Legislative Services in Virginia decided that they

17   were going to calculate it using two different data fields

18   in the race record which confused the issue.  So there's

19   only one BVAP, and Virginia didn't -- the Virginia

20   legislative people didn't use it.

21           MR. SPIVA:  Objection, Your Honor, and I move to

22   strike that last response.  There isn't a word in his

23   expert report about what he just testified about.

24           JUDGE PAYNE:  Is there, Ms. McKnight?

25           MS. McKNIGHT:  Your Honors, what we'll get to

Hofeller - Direct

1   later on in questioning is that plaintiff's expert, Dr.

2   Ansolabehere, drew Dr. Hofeller into the issue of BVAP

3   with several of his points saying that Dr. Hofeller did

4   not disagree with Dr. Ansolabehere on those points.  So if

5   Your Honors would prefer, I can address this question

6   after we get to those points.

7        JUDGE PAYNE:  I think probably so since he didn't

8   affirmatively testify to it, and if Dr. Ansolabehere

9   accused him of testifying to certain things, he can say I

10  didn't do that and that's wrong.  An affirmative showing

11  at this stage is probably what you need to do given that

12  he didn't opine on it in his opinion to begin with.

13       MS. McKNIGHT:  Thank you, Your Honor.

14  Q   Dr. Hofeller, I'd like to show you what is labeled

15  Plaintiff's Exhibit 16.  Now, Delegate Jones testified

16  earlier that this was the criteria used by the House

17  Committee on Privileges and Elections to draw the 2000

18  plan.

19       Now, you've opined on compactness and factors that

20  affected compactness.  In your experience drawing and

21  analyzing maps, do you agree with these criteria?

22  A   I do.

23  Q   Dr. Hofeller, all things being equal, is it easier to

24  draw a Congressional map of 11 districts or a legislative

25  map of 100?

Hofeller - Direct

1    A    Strictly from the standpoint of drafting the plan,

2    Congressional maps are always less difficult to draw

3    because there are fewer districts in play and fewer

4    personalities in play.  The pieces of the puzzle, so to

5    speak, are easier to put together.  The only more

6    difficult thing on Congressional maps is the populations

7    have to be precisely equal, Congressional maps.

8    Q    Now, do you have any quarrels with how compactness has

9    been measured by other experts in this case?

10   A    No.

11   Q    Why not?

12   A    Well, as I stated in my expert report, there are many,

13   many ways to measure compactness, and different people

14   have different favorites as to the way they want to do it

15   that have come out in many articles which has been

16   testified to before, and compactness is just really a way

17   of looking at the districts.  It's more like a flag than a

18   conclusion about whether a district is too compact or

19   compact enough.

20   Q    Now, we've heard testimony about the Reock and

21   Polsby-Popper scoring system.  Do you have anything

22   additional that would be helpful to the Court?

23   A    I think the only thing that I would say, since I used

24   both those scores in my expert report, was that Reock and

25   Polsby-Popper were the scores used in the two Virginia

685

1   Supreme Court cases, *Jamerson* in -- after the '91

2   redistricting and *Wilkins* on the 2001 redistricting, and

3   so I thought that they would be better to use, and they

4   are generally easier to understand than the way the other

5   scores are actually computed.

6   Q    Could you turn to pages 39 and 40 of your expert

7   report.  This is Defendant Intervenor's Exhibit 14.

8   A    Are those the pages at the bottom, or the pages in the

9   report?

10  Q    So let me just confirm.

11  A    I see it on the screen.

12  Q    On the bottom, yeah.  And they're Bates numbered.

13  A    I'm sorry.

14  Q    That's fine.  What do these figures show the Court?

15  A    These are just demonstrations of how Reock and

16  Polsby-Popper work on actually four different sample

17  districts, fairly simplified figures, although the one you

18  are showing me, which is my figure two which is on page

19  40, is a rather complex figure with a lot of indentations.

20       I've put up for demonstration purposes the

21  Polsby-Popper circle and the Reock circle to show how

22  those circles change as they relate to different

23  districts.

24       So, again, you can see primarily for Reock, Reock

25  penalizes districts that are long and narrow, and

1    Polsby-Popper generally penalizes districts that have a

2    lot of indentations like the figure on page 40.

3    Q    You can move away from that exhibit.   Thank you for

4    your testimony.   Dr. Hofeller, I'd like to ask you about

5    compactness issues in Virginia.   Have you ever lived in

6    Virginia before?

7    A    Oh, yes.   My wife and I moved to Virginia in 1981 and

8    lived in Virginia except for three years we actually spent

9    in Washington state, and I just recently moved from

10   Virginia down to North Carolina last October.

11   Q    And during that time, had you drawn any Virginia

12   redistricting plans?

13   A    I've studied Virginia after the census data has come

14   out each decade and drawn plans myself to see what was

15   possible in Virginia.   I've drawn multiple plans.

16   Q    Is it fair to say you've become well acquainted with

17   Virginia geography and jurisdictions during that time?

18   A    For the most part, yes.   There's always something new

19   to learn.

20   Q    And how does Virginia's geography present challenges

21   in computing compactness?

22   A    Well, I have to say it isn't so much with computing

23   compactness, just with compactness in general.   Is that

24   what you meant to ask me?

25   Q    Sure.

Hofeller - Direct

1   A    Virginia has an irregular shape and the counties in

2   Virginia are not square and rectangular like the counties

3   are particularly in some Midwest states.  There are a lot

4   of rivers in Virginia which shape county lines.

5        In some instances, one of the criteria with the

6   legislature is to avoid crossing certain prominent water

7   features, that's a challenge, too, which also would

8   include the Eastern Shore.

9   Q    And could you tell the Court how population shifts in

10  Virginia affected compactness.

11  A    I'd have to state by saying that the redistricting map

12  that was drawn is a map which represents tension between

13  all of the criteria which the legislature has sought to

14  apply to the process, one-person-one-vote, of course, and

15  the Voting Rights Act, but also communities of interest,

16  and in the case of compactness, their desire to maintain

17  cores of districts and to avoid putting multiple

18  incumbents within the same districts also affected it

19  because in Virginia, there was uneven growth over the last

20  decade.

21       Some areas, particularly in the Washington, D.C.

22  suburbs, Fairfax County, Loudoun County, Prince William

23  County at a very, very rapid rate compared to the state's

24  overall population, and there were sections along the

25  southern Virginia border and the West Virginia border

Hofeller - Direct

1    along with the city areas of Richmond and Hampton and

2    Newport News, and, let's see, Portsmouth, Chesapeake, and

3    Norfolk and Virginia Beach that had districts that were

4    underpopulated in terms of the new ideal population size.

5         So, generally, what you see when these population

6    imbalances show up in the baseline plan when you are

7    drawing the new plan is the boundaries of the districts

8    have to migrate away from those areas of under-population

9    towards areas that have more populations.

10        This sets up a ripple effect on the districts.

11   Sometimes the imbalance of population is so great that the

12   map drafters will choose to collapse a district in an area

13   of high under-population and resurrect it in an area with

14   high population.  This happened for several districts in

15   Virginia through this process.

16   Q    So when you are looking to redraw a map in the

17   redistricting process, if you have some districts that

18   have near perfect population, can you just leave those

19   alone while you are redrawing the plan?

20   A    Certainly incumbents would like you to do that, but

21   first of all, you have to consider the populations of

22   those districts, but the problem is you have to look at

23   all the districting around those districts to see what the

24   configuration is all the way around, and if you say right

25   off the bat that any district that is almost right on

1    population is going to stay pretty much the way it is, and

2    you're rippling the population from the areas of

3    under-population to overpopulation, you would have to go

4    around those districts, and that would actually create

5    greater demographic problems, and it also would probably

6    affect the core retention.

7        So the districts might get stretched out even more if

8    you did that.  It's simply unrealistic to think that the

9    districts that are right exactly on population can remain

10   where they are.

11   Q    Now, specific to the challenged districts, you've

12   prepared several demonstratives labeled Defendant

13   Intervenor's Exhibit 72 through 75.  We'll take these one

14   at a time.  Starting with the first in that series,

15   Exhibit 72, could you tell the Court what this map shows.

16   A    This map shows the districts in the Norfolk area, the

17   greater Norfolk area.  They are shaded according to their

18   percentage of deviation along the rainbow scale, and each

19   district has the district number in it and the deviation

20   of the baseline district.

21       These are the baseline districts from the new ideal

22   district population for 2010.  It shows, once again, that

23   there was a huge core of underpopulated districts in the

24   Norfolk area.  It actually amounted to about an

25   under-population slightly over one full district, and so

1    that shows the problem there.  This problem is further

2    compounded by the fact that this area is bounded by North

3    Carolina on the south, by the Atlantic Ocean on the east,

4    and by the Chesapeake Bay and the James River on the

5    north, and so the only way that these under-population

6    issues can be resolved is by pushing districts generally

7    westerly up in that space between the James River and the

8    North Carolina border on the south.

9    Q    Could you turn to the Exhibit Number 73 and tell the

10   Court what that map shows.

11   A    This is essentially the same map as the one that was

12   up before with the same coloring and the same information

13   in each of the districts.  The important thing to remember

14   about this, again, is that the districts at the southern

15   end of the peninsula, that area between the York River and

16   James River, was very highly underpopulated, and that had

17   to be resolved by moving districts generally northwesterly

18   between the two rivers.

19   Q    And could you turn to Defendant Intervenor's

20   Exhibit 74.  This is another demonstrative.  Could you

21   tell the Court what this shows.

22   A    Again, it's the same map in the Richmond area which,

23   again, shows the under-population of the core districts of

24   Richmond and demonstrates, again, where the districts

25   would have to migrate in order to pick up their needed

Hofeller - Direct

1   populations.

2   Q    And could you turn to --

3               JUDGE PAYNE:  Which way is that?  Which direction

4   would they have to migrate in order to pick up the core

5   populations?

6               THE WITNESS:  Your Honor, they would have to

7   migrate to the blue colored district and kind of the aqua

8   colored district to the south and somewhat to the east.

9   I'm sorry, to the west.  I misspoke myself there.

10  Q    And could you look at Defendant Intervenor's

11  Exhibit 75, please, and tell the Court what that shows.

12  A    Your Honors, this is, again, the same map showing

13  northern Virginia demonstrating a rather wide range of

14  deviations particularly in inner Fairfax County and

15  Arlington County and the extremely highly overpopulated

16  districts in Loudoun -- Prince William and Loudoun County.

17  Did I say that already?

18      There are also some overpopulated districts in outer

19  Fairfax, but there are a lot of ways that those districts

20  could actually go, but what we saw on this map was

21  particularly District 13, I believe, if I see it

22  correctly, which had actually enough population to form

23  two full districts within it and another third of a

24  district, so it's 138 percent over the ideal population

25  size.  Huge growth.

Hofeller - Direct

```
 1   Q    Shifting focus a little bit, plaintiff's expert, Dr.
 2   Ansolabehere, stated that you did not challenge or dispute
 3   the points he made in paragraph 115 of his reply report.
 4   We're going to put this paragraph on the screen.  You can
 5   also locate it in your binders in Plaintiff's Exhibit 51
 6   at page 42.  Could you read it to yourself and then tell
 7   the Court if you dispute anything in that paragraph.
 8   A    I guess I have to begin by saying that wasn't a part
 9   of my original analysis, but I dispute his conclusion in
10   this.  There are several things wrong with it.  First of
11   all, I tried to actually replicate his assertion that if
12   you didn't add any majority BVAP population to any of the
13   districts, that they would come to at least 50 percent.  I
14   didn't find that to be the case.  Some of them dropped
15   below 49 percent.
16        The problem you have is, again, that district is not
17   staying in place.  The districts are moving, so territory
18   is  being added and territory is being subtracted because
19   of the ripple effect, and you are trying to balance out
20   the voting age, the total voting-age population against
21   the African American voting-age population.
22   Q    Now, I understand that you were not --
23   A    I'm just reading farther.  Again, I have a general
24   problem with Dr. Ansolabehere's analysis of preferred
25   candidates.  Having used general election data, he is not
```

1   really measuring preferred candidates of African

2   Americans.  He's measuring preferred party choice,

3   partisan, the partisan tag on candidates.  In order to do

4   the preferred candidates of choice, you have to go back to

5   primary data, and so I think that's something that follows

6   generally through his entire analysis.

7         Also, as I think I heard before, also the elections

8   he's analyzing are even-year elections which are elections

9   for governor, for president, and they don't fall in the

10  same years as the House of Delegates, and the dynamics in

11  the House of Delegates elections are much different than

12  they are in those elections, particularly in the on-year

13  which, Your Honors, is what we call the even numbered

14  years.

15  Q   Now, do you see in paragraph 115 Dr. Ansolabehere's

16  reference to BVAP?

17  A   I do.

18  Q   And what do you know about a dispute in this case in

19  which -- over which BVAP figure to use?

20  A   Once again, I have to restate that there is only one

21  BVAP that is the actual BVAP, and that's the one that

22  comes from the United States Census Bureau which includes

23  only those African Americans 18 years and older who

24  designated African American solely as their race.

25        MR. SPIVA:  I would object to that last answer,

Hofeller - Direct

1    Your Honors, and move to strike.  I don't think that's

2    responsive to anything in the paragraph that we just saw,

3    the definition of BVAP, DOJ definition of BVAP, and

4    there's certainly nothing in Dr. Hofeller's report about

5    that.

6           JUDGE PAYNE:  Overruled.

7    Q    You mentioned an inability to replicate Dr.

8    Ansolabehere's analysis.  Could part of that inability be

9    related to his BVAP category?

10   A    It could be.  Not to a particularly great extent, but

11   I did the analysis on the true BVAP.  I might add, too,

12   the plaintiff's attorney mentioned DOJ BVAP.  It's not DOJ

13   BVAP.  It's DOJ VAP which is an entirely different

14   percentage.  DOJ recognizes the same BVAP that I recognize

15   as being the true BVAP.

16   Q    Now, I'd like to put up for you plaintiffs'

17   demonstrative that they used in their direct examination

18   of Dr. Ansolabehere on these points.  Could you look at

19   this demonstrative and explain to the Court what this

20   chart shows.

21   A    Well, it's his projected vote share, I believe, for

22   African American preferred candidates.  Again, the

23   50 percent line is up at about 53 and a half percent.  I

24   think that was just a mistake in drafting that line, but

25   it, perhaps, gives a different presentation to the chart.

Hofeller - Direct

1   Once again, I have to dispute his mention of African

2   American preferred candidates.  It really is the

3   candidates -- preferred partisan candidate.  We're looking

4   at Republican versus Democrat here, and it's not really

5   their preferred candidate of choice.  It was really the

6   only choice they had which was between a Republican and a

7   Democratic candidate laying aside that there might be some

8   Independents and other minor parties.

9   Q    So does this chart show that only a 50 percent BVAP

10  level in any of these districts would be sufficient for

11  the majority-minority district to elect its preferred

12  candidate of choice?

13  A    I would say that there simply isn't enough -- the data

14  used for all these analyses was incorrect.  You have to

15  use primary data to ferret that out, and there's very

16  limited primary data for Virginia's House of Delegates

17  districts, and so I don't think there's any way to

18  determine what that line would be.

19  Q    So is that a no, just for the court record?

20  A    I guess so, yes.  I'd have to have the question again.

21  Q    I'll read it one more time.

22  A    I'm sorry.

23  Q    Does this chart show that only a 50 percent BVAP level

24  in any one of these districts would be sufficient for the

25  majority-minority district to elect its preferred

Hofeller - Direct

1   candidate of choice?

2   A    Again, I'd say no but with the same qualification.

3   The preference is for the political party of the

4   candidate, not necessarily that it's preferred by African

5   Americans for that district.

6   Q    Dr. Ansolabehere stated that you did not challenge or

7   dispute the points he made in paragraph 93 of his report.

8   This includes paragraphs 92, 93, and 94.  This is on page

9   34, by the way, of Plaintiff's Exhibit 51.

10       I'm going to put these paragraphs on the screen.

11  Could you read them to yourself and then tell the Court if

12  you dispute anything in them.

13  A    I will.  Again, I disagree with these two paragraphs,

14  in that I once again have to mention that the data that

15  was used is not the correct data to make that judgment.

16  You have to turn to primary data to make this judgment.

17  These exogenous elections won't actually show what he's

18  purporting to show.

19           JUDGE PAYNE:  You say these two paragraphs.

20  She's referred -- I guess 92 and 93; is that what you are

21  talking about?

22           THE WITNESS:  Yes, Your Honor.

23           JUDGE PAYNE:  I see.

24  Q    Is there anything unique about Virginia that makes

25  polarization analyses difficult?

Hofeller - Direct

1    A    Well, again, if you are using primary election data,

2    there's a real dearth of primary election data in

3    Virginia.  Also, the fact that Virginia has a unique

4    primary system.  Republicans hardly ever have primaries,

5    and it's an open primary, so Republicans can come over and

6    vote in Democratic primaries, where there are primaries,

7    and also they have to be meaningful primaries where you

8    have candidates that were actually contesting.

9        Some people just throw their name in the ring and

10   don't really do much, so that unique system which allows

11   all the voters to vote in the democratic primary also

12   makes it even more difficult.  Of course, the other

13   problem you have in Virginia that you don't have in some

14   other states is they don't have partisan registration on

15   their registration roles, and they don't have race on

16   their registration roles which is present in other states

17   such as North Carolina where I live.

18   Q    As you are drawing a map, how often are you looking at

19   compactness scores?

20   A    I would say that the main measurement of compactness

21   scores while you are drawing a map is to look at the

22   shapes of districts, so-called eyeball test that was

23   mentioned in court before, and when I'm drawing districts,

24   I try to make them, to the extent possible, as compact as

25   I can make them in that manner, but the software, the

Hofeller - Direct

1    Maptitude software does not allow you to compute

2    compactness scores on the run, each time you move one unit

3    of geography from one district to another, so that isn't

4    something that comes up on the screen as you are drawing

5    districts.

6         So you may at some point look at it in some major --

7    look at the map at a certain plateau or something, but

8    I've never used them or seen anybody else use them as

9    they're actually drawing the districts.

10   Q    Now, Dr. Ansolabehere stated that you did not

11   challenge or dispute the points he made in paragraph 62 of

12   his reply report.  I'm going to put up paragraph 62 and 63

13   on your screen.

14        MS. McKNIGHT:  For the Court's reference, this is

15   Plaintiff's Exhibit 51 at pages 21 and 22.

16   Q    Dr. Hofeller, could you take a look at these

17   paragraphs and tell the Court if you dispute anything in

18   them.

19   A    I have several issues with this.  First of all, there

20   isn't exactitude in determining the partisanship levels in

21   the areas that are moved in and out, particularly in the

22   split precincts, because of the manner in which the data

23   is compiled.

24        Secondly, I state the same problem, that we should be

25   looking at primary data, and we should be looking at data

Hofeller - Direct

1    in the elections for the House of Delegates.  I also have

2    to add that when the maps are being drawn, although I

3    wasn't involved in this process but I know how it works,

4    people are interested in what's being moved and moved out

5    as it affects all of the surrounding districts as well.

6         So there are lots of choices that are being made.  In

7    general, redistricting is a game of margins, as I like to

8    tell people, and if the primary intent is partisan after

9    one-person-one-vote, then even a small change in the

10   partisan vote of an area is important for both the

11   Democratic and Republican districts.  So this type of

12   analysis is not being made as the map is actually being

13   drawn and the process is unfolding.

14   Q    So when you are drawing a map and you're look at VTDs

15   and deciding which ones to move in and out, are you asking

16   yourself how does this VTD vote?

17   A    Well, certainly, but this analysis implies that there

18   would be a discrete score for each precinct that's being

19   moved in and out, and in my experience, nobody has ever

20   put up those kinds of figures inside the precinct or VTD

21   to show as they're moving these VTDs in and out of the

22   district.  So this is an after-the-fact analysis.  And

23   once again, these changes of precincts are being

24   influenced by district cores, by population ripples, by

25   incumbent residences, and all of the other factors that go

1  into making the plan.

2  Q   As you are drawing a map, how often are you looking at

3  polarization or racial block voting analyses?

4  A   To the best of my knowledge, never as the map is being

5  drawn.  Once again, that analysis is not embedded in the

6  software, and if it were, every time you moved a unit, it

7  would take forever to draw the map.

8  Q   And Dr. Ansolabehere testified that it would have been

9  very easy to conduct a racial block voting analysis during

10  the map-drawing process.  Do you agree with him?

11           MR. SPIVA:  Objection, Your Honor.  This is way

12  outside the scope of Dr. Hofeller's expert report, and

13  this exercise of replying to Dr. Ansolabehere's reply

14  really doesn't give a justification either because Dr.

15  Ansolabehere's initial report was done before Dr.

16  Hofeller's report.  He had his chance to reply in his

17  report and didn't include any of this --

18           JUDGE PAYNE:  I didn't hear you.

19           MR. SPIVA:  Didn't include any of this opinion

20  about racial --

21           JUDGE PAYNE:  I thought we had already dealt with

22  that, though, and he's testified about it throughout.  So

23  what do you have to say about his objection that the

24  comment on Dr. Ansolabehere's particular statement is not

25  within the permissible range of examination?

Hofeller - Direct

1          MS. McKNIGHT:  Well, contrary to what plaintiffs'

2     counsel just said, all of these points that Dr.

3     Ansolabehere brought up were brought up in his reply

4     report, and he specifically said that Dr. Hofeller did not

5     dispute it.

6          This specific paragraph raises the issue of

7     racial and partisan composition and polarization, and

8     that's why we believe we're able to ask Dr. Hofeller

9     whether he agrees that an analysis of those factors could

10     have been done or would have been useful at the time.

11          MR. SPIVA:  The paragraph doesn't say anything

12     about doing a racial polarization analysis, Your Honor.

13     The other thing is, he's -- Dr. Ansolabehere's reply

14     report is saying Dr. Hofeller and Dr. Hood and Dr. Katz

15     did not dispute these points in their reports.  That's

16     what he's talking about, not that they didn't dispute it

17     in general.

18          JUDGE PAYNE:  Overruled.  Go ahead and ask the

19     question.

20     Q    Dr. Hofeller, Dr. Ansolabehere testified that it would

21     have been very easy to conduct a racial block voting

22     analysis during the map drawing process.  Do you agree

23     with him?

24     A    No.

25     Q    Why not?

1    A    Once again, because those analyses are not part of the

2    software that is used for redistricting, so, in essence,

3    if you did it while you were drawing, after you made each

4    move you'd have to export all the data from the

5    redistricting system and load it into a separate computer,

6    at least into a separate program if you had such a program

7    on your machine, and run it.

8         It would have been extremely slow because those

9    particular analyses don't run quickly, and, again, the

10   wrong data was used.

11   Q    Dr. Ansolabehere stated that you did not challenge or

12   dispute the points he made in paragraph 64 of his reply

13   report.  We're putting this paragraph on the screen.  For

14   the Court's reference, this is page 22 of Plaintiff's

15   Exhibit 51.  Could you read this paragraph to yourself and

16   then tell the Court if you dispute anything in it.

17   A    Once again, the party data is very hard to compute,

18   and we're looking at -- the only choice that the voters

19   had in these precincts, according to the analysis that was

20   presented by Dr. Ansolabehere, were general elections in

21   the on years.

22        The other problem that I have with this statement is

23   that, once again, as the map is being drawn, I'm

24   absolutely certain through my experience in redistricting,

25   that the map-drawers were not checking to see those

Hofeller - Direct

1   factors in these individual precincts as they were being

2   moved from one district to another, again, the balancing

3   out the factors of the population shifts, the incumbent

4   residences, the district cores, communities of interest,

5   all of those redistricting criteria which we saw

6   previously in my testimony.

7   Q    Plaintiff's expert also stated that you did not

8   challenge or dispute the points he made in paragraph 65 of

9   his reply report.  This is on page 22 and 23 of

10  Plaintiff's Exhibit 51.  Could you review this paragraph,

11  read it to yourself and tell the Court if your response is

12  similar to your response to paragraph 64 of Dr.

13  Ansolabehere's report.

14  A    Once again, I think some of the other witnesses for

15  defendants spoke to this, but I have generally the same

16  issues with it that I had before in above.

17  Q    Now, Dr. Ansolabehere --

18       JUDGE PAYNE:  You say in above.  You mean in what

19  you testified to about paragraph 64 or something else?

20       THE WITNESS:  What I testified in previous

21  questions in this testimony that again -- I'm sorry, Your

22  Honor, that there were a lot of other factors that were

23  much more important to the map-drafters in this plan than

24  were this specific analysis.  It wasn't on the map, they

25  probably weren't cognizant of this.  Again, if you look at

Hofeller - Direct

1    their stated criteria goals, it isn't in there.

2            MR. SPIVA:  Your Honor, move to strike,

3    speculation, lack of foundation.

4            JUDGE PAYNE:  Overruled.

5    Q    Dr. Ansolabehere stated that you did not challenge or

6    dispute the points he made in paragraph 52 of his reply

7    report.  This is on page 17 of Plaintiff's Exhibit 51.

8    I'm going to put this on the screen.  Could you read it to

9    yourself and let us know, does this make sense to you?

10   A    No.

11   Q    Why not?

12   A    Well, first of all, HD 100 is the district that comes

13   over from the Eastern Shore peninsula of Virginia which

14   does not include enough population for a single district.

15   So there's nowhere else for that District 100 to go except

16   across the bay, either across the mouth of the Chesapeake

17   Bay or across the bay somewhere else further north to pick

18   up its needed population.

19        So this statement is not -- doesn't make any sense to

20   me, because it doesn't really influence why 80 and 89 were

21   drawn the way they were drawn, and it certainly didn't

22   affect the -- his BVAP measurement of how these districts

23   were drawn.  It just didn't make any sense to me.  Perhaps

24   he was trying to say something a little different.

25   Q    Now, Dr. Ansolabehere stated that you did not

Hofeller - Direct

1  challenge or dispute the points he made in paragraph 26 of

2  his reply report.  This is on page eight of Plaintiff's

3  Exhibit 51.  We're putting this paragraph on the screen.

4  Could you read it to yourself and then tell the Court if

5  you dispute anything in it.

6  A    Would you ask that question directly again?  I want to

7  know if I need to give you a direct yes or no.

8  Q    Sure.  Could you read this paragraph to yourself and

9  then tell the Court if you dispute anything in it.

10 A    I do.

11 Q    What do you dispute?

12 A    Well, first of all, I looked at the 12 challenged

13 districts versus the rest of the state and the difference

14 in the averages is actually quite small.  It's not really

15 significant in my mind as being different, and I think if

16 you look at where all of the House of Delegates districts

17 rank on a chart under Reock, you'd find that, I believe,

18 seven of the districts fell -- the seven least compact

19 districts were in the first 50 districts going down that

20 chart and five in the last.  So these districts'

21 compactness scores fell all across that continuum from the

22 least compact to the most compact.

23 Q    Dr. Hofeller, we've just gone through a series of

24 specific examples in Dr. Ansolabehere's reply report where

25 he suggested that you did not dispute a point of his.

Hofeller - Direct

1    There are a few other examples, including paragraphs 11,

2    39, 68, and 87, but for the sake of efficiency, I'd like

3    to ask you, does an absence of dispute on your part in

4    your expert report suggest agreement with Dr.

5    Ansolabehere?

6    A    Certainly not.

7    Q    And you were here for the testimony by Drs. Katz and

8    Hood?

9    A    Yes.

10   Q    And in general you agreed with Dr. Katz's and Dr.

11   Hood's responses to Dr. Ansolabehere's reports?

12   A    Actually I think their testimony speaks for itself and

13   I have no issue.

14   Q    Dr. Hofeller, I'd like to turn to your expert report

15   in this matter.  For the Court's reference, we will be

16   working in different pages in Defendant Intervenor's

17   Exhibit 14.

18        To begin, Dr. Hofeller, could you look at pages 41 and

19   62 together.  I know we'll need to flip back and forth,

20   but that's 41 and 62.

21   A    Page 41 is a map of the North Carolina Congressional

22   districts that were enacted in 1992 which actually were

23   the subject of the *Shaw* litigation.  The two districts

24   were the African American majority districts that were

25   drawn by the State of North Carolina.  I know them well,

Hofeller - Direct

1    because I offered testimony in this case.

2        I was particularly interested in District 12 which is

3    the red district.  Many descriptions of this district,

4    including the fact that it was only contiguous by point,

5    and that's no longer actually allowed in North Carolina,

6    but I put in table one, which is actually Exhibit 14,

7    page -- sorry, my eyes.  62, I believe.  And interested in

8    District 12 which has a Reock score of .05 and a

9    Polsby-Popper score of .01, kind of the lowest

10   Polsby-Popper score you can actually have without being a

11   straight line, and I give this to the Court just as an

12   example of the type of compactness issues that the Court

13   was looking at in *Shaw*.

14   Q    Could you turn to pages 43 and 63 in your report and

15   tell the Court what these show.

16   A    This is an example from the state of Illinois on the

17   map.  I guess of particular interest is the red district,

18   which is District 4, which was actually a Latino district

19   in the city of Chicago.  The two Latino communities in

20   Chicago were separated by a black community, and this was

21   an attempt to draw them together in a district with enough

22   population for a full Congressional district.

23       This was actually not the specific map, but it was

24   very similar.  This was the subject of a federal court

25   case, three-judge panel case, and the Court actually

1    referred to this district as the earmuff district, which

2    everybody now calls it by, and it was ruled to be compact

3    enough in this situation.

4        But of other interest are District 1, which is the

5    blue district, and District 2, which is the green

6    district, which are African-American districts, and once

7    again, that's an example of districts which were found to

8    be acceptable.

9    Q    Now, could you turn to page 44 of your report.  Could

10   you tell the Court, what is this map and what does it

11   show?

12   A    This is a map of the 12 challenged districts showing

13   all of the challenged districts, the Richmond area, the

14   Southside, and Hampton Roads.

15   Q    And specific to challenged District 63 and 75, in your

16   opinion, did you see any compactness or contiguity issues

17   with either of those districts?

18   A    I did not.

19   Q    Now, could you turn to page 46 of your report.  What

20   is this map and what does it show the Court?

21   A    This is a blowup, so to speak, of the Richmond area

22   districts and also District 63.  It's, perhaps,

23   instructive because of the withdrawal of District 74 from

24   crossing the James River estuary.

25   Q    And regarding challenged Districts 69, 70, 71, and 74,

Hofeller - Direct

1    in your opinion, did you see any compactness or contiguity

2    issues with any of those challenged districts?

3    A    I did not.

4    Q    Could you turn to page 45 of your report.  What is

5    this map, and what does it show the Court?

6    A    Again, this is a blowup of the original map that

7    showed all of the challenged districts which shows the

8    Hampton area and the Norfolk area in the southeast corner

9    of the state.

10   Q    And specific to challenged Districts 77, 80, 89, or

11   90, did you see any compactness or contiguity issues with

12   those districts?

13   A    I did not.

14   Q    Could you turn to page 47 of your report.  What is

15   this map and what does it show the Court?

16   A    These are the two challenged districts on the

17   peninsula, namely Newport News and Hampton city, showing

18   those districts.

19   Q    And in your opinion, did you see any compactness or

20   contiguity issues with challenged Districts 92 or 95?

21   A    I did not.

22   Q    Could you turn to page 51 of your report.  What is

23   this map and what does it show the Court?

24   A    Again, this is a demonstrative map, and it shows some

25   non-challenged districts with some of the district

Hofeller - Direct

1   configurations which are also -- which also have low

2   compactness scores.  So it gives a sample of what was

3   going on in other portions of the state.  I presented some

4   other similar districts in my report.

5   Q    Could you turn to page 52 of your report and tell the

6   Court what this map is and what it shows?

7   A    These are two state Senate districts drawn in 1991

8   which were the subject of the *Jamerson* case, particularly

9   18 which had a very low compactness score.  What's

10  interesting about this district, of course, aside from its

11  general shape, is it had an arm going eastward out of the

12  Suffolk city portion of the district into Portsmouth and

13  Chesapeake.  That little arm that goes out actually goes

14  through the Great Dismal Swamp and does not have a road

15  connection.  There is actually a railroad on one side.

16  Q    Now, you testified earlier --

17  A    I'm sorry.  Could I say one more thing?  Again, in

18  *Jamerson*, this district was judged to be sufficiently

19  compact to fall within the legislature's discretion

20  balancing the other factors.

21  Q    Now, you testified earlier you had reviewed both the

22  *Jamerson* and *Wilkins v. West* cases in developing your

23  opinion in this matter, and you testified that you

24  reviewed the Webster expert opinion in the *Wilkins* case;

25  is that right?

Hofeller - Direct

1    A    I did.

2    Q    Why did you review that report?

3    A    Well, it was a report attached to the cases, and it

4    discussed compactness.  It had some maps I wanted to look

5    at, it had some correspondence I wanted to look at,

6    although I didn't depend on Webster's scores, but I did

7    check them against my scores to make sure I was in the

8    right ballpark, because the 1991 map is a little further

9    back in history, and I wanted to make sure I had the

10   correct shape file, and since my compactness scores

11   aligned with his, I was confident that I was dealing with

12   the correct map.

13   Q    I was going to ask you, how did it inform your

14   opinion, but I believe you just answered that; is that

15   right?

16   A    I believe I did, yes.

17   Q    We're going to put up Defendant Intervenor's

18   Exhibit 35.  This is the Webster report.  Is this what you

19   were just referring to, Dr. Hofeller?

20   A    It was.

21        JUDGE PAYNE:  Excuse me, Ms. McKnight.  He has an

22   objection, I think.

23        MR. SPIVA:  Yes, Your Honor.  I object to the use

24   of this report or any testimony about it really for the

25   same reasons we objected to the Loewen report that was

Hofeller - Direct

```
 1    excluded last week.  This was never disclosed during the
 2    discovery process.  It's an undisclosed expert report.
 3    It's not in his report, disclosed as something that he
 4    relied upon, and has never been disclosed to us as
 5    something he relied upon so we could ask questions of him.
 6         Obviously we couldn't ask questions of Dr.
 7    Webster since it wasn't disclosed to us.  It's hearsay.
 8    It's also a 13-year-old report about a different case, so
 9    it's irrelevant, and also the map-drawer, Delegate Jones,
10    did not rely on the Webster report.
11         MS. McKNIGHT:  Your Honor, this document was
12    produced in discovery -- I'll highlight the Bates number
13    for you -- in response to a request for any documents that
14    Dr. Hofeller relied on in forming his opinion.  He
15    did rely on this report --
16         JUDGE PAYNE:  You say the request actually asked
17    for production of documents that he relied on?
18         MS. McKNIGHT:  Pardon me.  I'm paraphrasing.  It
19    may have been reviewed, documents he reviewed.
20         JUDGE PAYNE:  Reviewed or saw or considered,
21    whatever?  Do you agree with that?  You all are at odds
22    over a very simple thing.  Either it was or it wasn't
23    asked for, and it was or wasn't provided, and we shouldn't
24    have to be dealing with that now.  Are you withdrawing
25    that in view of her proffer?
```

Hofeller - Direct

1            MR. SPIVA:  I don't have a quarrel with the

2      proffer, Your Honor, but there's not a word in his expert

3      report about --

4            JUDGE PAYNE:  Excuse me, Mr. Spiva.  That ground

5      then is overruled.  What else do you have to say?

6            MS. McKNIGHT:  Not only did he rely on it, he

7      referenced this by name in his report.

8            JUDGE PAYNE:  Where does he reference it in his

9      report?

10            MS. McKNIGHT:  Pardon me, Your Honor.  Let me

11      locate it for you.

12            JUDGE PAYNE:  Why don't you go onto another

13      question, and let's see if your team can find where it was

14      referenced.

15            MR. HAMILTON:  Your Honor, may I be heard?  The

16      document was first produced on May 14th.

17            JUDGE PAYNE:  Come to the lectern.  I'm sorry, I

18      was trying not to interrupt you when I was pointing.

19            MR. SPIVA:  Your Honor, it was produced on

20      May 14th of this year, and the deposition was two days

21      prior to that, so it was not produced as something that he

22      relied upon prior to the deposition.  The other thing

23      is --

24            JUDGE PAYNE:  That doesn't follow to me.  Let's

25      let her ask other questions, and then we'll see about

Hofeller - Direct

```
 1    this.  The first ground of your objection has been

 2    overruled.  That's how I prefer to proceed.  I think it

 3    makes more sense.  All right, go ahead.  Do you have

 4    questions to ask him about something other than this

 5    report?

 6              MS. McKNIGHT:  Something other than this --

 7              THE COURT:  Don't ask him about this report until

 8    it gets ruled on.

 9              MS. McKNIGHT:  I understand, Your Honor, and I'm

10    prepared to respond to his other arguments on that exhibit

11    at that time.

12              JUDGE PAYNE:  We'll do that all at the same time.

13    Q    Dr. Hofeller, could you turn to page 55 of your

14    report.  What is this map and what does it show the Court?

15    A    Again, this is an example of a 1991 Senate district,

16    District 16, and shows another one of the districts with a

17    very odd shape that also was acceptable in *Jamerson*,

18    according to the *Jamerson* standard I could call it.  I'll

19    leave the legalities up to the attorneys here.

20    Q    Okay, and could you turn to page 60 of your expert

21    report.  What is this map and what does it show the Court?

22    A    This map is interesting because it shows three

23    versions of House District 74, one in 1991, one in 2001,

24    and one in 2011, and how that district changed through

25    those three redistricting cycles.
```

Hofeller - Direct

 1      It's interesting to note that the general

 2  configuration of the district has remained the same.  As I

 3  look at the district, the 91 district doesn't include all

 4  of Charles City which is the case for 2011, and the

 5  district in 2001 actually crossed the James River into

 6  Hopewell, I think it was, and that was withdrawn from

 7  Hopewell in the 2011 configuration, and also -- where is

 8  the pen that I -- or do I just draw?

 9          JUDGE PAYNE:  You can use your finger.

10          THE WITNESS:  I'm sorry, I've never seen this

11  before.  If you look on this map, the 1991 map -- did that

12  come through?

13          JUDGE PAYNE:  Didn't look like it.

14          THE WITNESS:  There we go.  And the 2001 map,

15  you'll see that the district to the north comes over the

16  Henrico County line to grab a piece of that county.  This

17  county crossing is resolved in 2011 where you see

18  District 74 comes all the way and abuts the county line.

19          So I think that the district in 2011 is actually

20  truer to the criteria stated by the House of Delegates

21  than are the two previous maps, but really it's the same

22  map, and, of course, the low compactness scores caused by

23  the narrow long district, the Reock score.

24  Q    Thank you, Dr. Hofeller.  Could you turn to page 61 of

25  your report.  What are these maps, and what do they show

Hofeller - Direct

1    the Court?

2    A    These are districts from the 1991 House plan, again

3    showing some of the district configurations that were

4    drawn from that plan.

5    Q    Now, Dr. Ansolabehere opined that any Reock score

6    below .2 would be considered low compactness.  Do you

7    agree?

8    A    No.

9    Q    Why not?

10   A    First of all, I have no idea where he got that

11   arbitrary number, but there is no bright line score in any

12   of these compactness measures that I've seen that sets

13   districts as being unacceptable or being particularly

14   egregious in terms of low compactness scores.

15       Again, it's a continuum that goes from cold to hot or

16   whatever other graded measurement, gradiated measurement

17   you would like to give it, so I just simply don't

18   understand where that came from.

19           JUDGE LEE:  Are you saying that there's no

20   authoritative source that says a particular Reock score

21   somehow violates the law or is not compact?

22           THE WITNESS:  Your Honor, there certainly is no

23   score that I've seen experts state is unacceptable, and in

24   terms of other states, usually most states just say

25   districts shall be compact or something like that.  They

Hofeller - Direct

1    don't go into measurements.  A few states do.  A handful

2    of states try and make a little bit of an attempt to bow

3    to measurements, but no state has actually set an

4    arbitrary bright line.  It just isn't there.  Does that

5    answer your question, Your Honor?

6              JUDGE LEE:  Yes, thank you very much.

7    Q    Could you turn to page 64 of your expert report.  What

8    is this table and what does it show the Court?

9    A    This table shows actually the 1991, 2001, 2011 House

10   maps and the same years for the Senate maps and shows the

11   minimum, maximum, and mean Reock scores and the

12   Polsby-Popper scores.

13        So perhaps the important characterization I've put

14   actually in color there, which is the 1991 Senate map in

15   which the Court opined on compactness which had -- that

16   map had a minimum score for one of its districts of .02

17   for Reock and .09 for Polsby-Popper, and then I look at

18   the 2011 House map by means of comparison and see that the

19   lowest district was .14 for Reock, and for Polsby-Popper

20   it was .08.

21        And the means were the same for Reock and the means

22   were the same for Polsby-Popper.  So I simply don't see

23   that there's any appreciable, not even appreciable, any

24   real difference between those scores.

25              JUDGE PAYNE:  Between which scores?

Hofeller - Direct

1              THE WITNESS:  Your Honor, the minimum scores for

2      the 1991 Senate map and the 2011 House map.  And also the

3      mean scores and the same for Polsby-Popper.  Those two

4      maps which are shaded, the Senate map is shaded red and

5      the house map is shaded green.  I hope you have that

6      shading on your copies.

7              JUDGE PAYNE:  We do.

8              THE WITNESS:  Thank you.

9      Q    Dr. Hofeller, does this table show that the 2011 plan

10     was an outlier?

11     A    No, it certainly wasn't.

12     Q    And does this table show that the lowest scoring

13     districts in the 2011 plan were outliers?

14     A    No.

15     Q    Could you turn to page 81 of your report.  Could you

16     tell the Court what this table is and what it shows them.

17     A    This is essentially a core retention analysis using

18     two analyses.  One is the part of the old district which

19     you find in the new district, and the other one is the

20     part of the new district that's made up of the old

21     district.

22          There are two different measurements which measure

23     core retention, and I gave the average score for the

24     challenged districts of both of these scores.  I also

25     noted on the column on the right the deviations of the

1    baseline map for these districts which also underscores

2    some of the difficulties that the map-drafters of the new

3    map had in doing these core retentions because of these

4    underpopulated districts where a lot of population had to

5    be added to underpopulated districts that were, in many

6    cases, clustered together which makes that even more

7    difficult.

8    Q    Sorry to take a step back, but what is core retention?

9    A    Again, core retention is how much of the baseline

10   district, the old district, is found in the new district,

11   and, again, the second column there is how much of the new

12   district is made up of the old district.

13        Since the population changed, those two figures will

14   be different.  It's one of the criteria that the

15   legislature had to be looking at, and also, if you're

16   going to try and avoid pairing incumbents, you want to

17   give them the highest amount of core retention when

18   they're alone in their district.

19   Q    Now, could you turn to page 82 of your report.  What

20   is this table and what does it show the Court?

21   A    This shows one of the core retention scores for all

22   100 districts.  And I think probably the important figure

23   is found at the bottom of the report in the footnotes.

24   Q    We'll turn to that page for you and enlarge the

25   footnote.  What does this footnote show the Court?

Hofeller - Direct

1    A    The second note, the second note says that the average

2    core retention for the 100 districts was 67.09 percent,

3    and for the 97 districts which were not collapsed, it was

4    69.09 percent.  For the 12 African-American majority

5    districts, the contested districts, the average core

6    retention was 72.76.

7         Actually, if you look at core retention for the

8    remaining districts, excluding the contested districts or

9    African-American districts, the score for the other 88

10   districts would be even lower as compared to the contested

11   districts.

12        So core retention for the contested districts or the

13   majority African-American districts was significantly

14   higher, by almost ten percent, probably even more.

15   Q    Pardon me.  Did the numbers in this table and in your

16   footnote indicate that core retention was a key factor in

17   drawing the plan?

18   A    It certainly wasn't by accident.  So somebody had to

19   set out to draw these districts with high core retention.

20   It's a very-often-used criteria or goal in many

21   redistricting plans but maybe can't be as high in every

22   plan.

23   Q    I'd like to refer you to the demonstrative that's

24   titled Compactness Demonstrative in your binder.  I

25   believe it's near the back of your binders.  Could you

Hofeller - Direct

1   tell the Court what this shows.

2   A    This particular table, the first part of the table

3   shows the Reock scores for the ten districts with the

4   lowest scores.  The blue districts are contested

5   districts, and the unshaded districts are uncontested

6   districts, and it shows of the ten, seven were uncontested

7   districts.

8        The bottom part says that if you separate the

9   districts into the 50 with the lowest scores and the 50

10  with the highest scores, that for the challenged

11  districts, seven of them appear in the bottom 50 and five

12  would appear, by subtraction, in the top.

13            JUDGE LEE:  What exhibit number is this?

14            MS. McKNIGHT:  This is a demonstrative, Your

15  Honor, and it would be in the back of your witness binder.

16  It's titled Compactness Demonstrative.

17            JUDGE LEE:  I see it.  Thank you.

18            MS. McKNIGHT:  Sure.

19  Q    Now, Dr. Hofeller, in this table, are the challenged

20  districts outliers?

21  A    Well, again, I think I indicated in response to a

22  previous question that I didn't think there were any

23  outliers particularly compared to the previous plans in

24  the state.  I mean, I would note, for instance, just by

25  observation, that the difference in compactness between

Hofeller - Direct

1    the least compact district is .014, and the tenth one down

2    there is .2.  That's not a very different compactness

3    score, so they are basically in the same area.

4    Q    Dr. Hofeller, could you summarize for the Court your

5    conclusions in your expert report?

6    A    Again, I'd say that I don't find any compactness

7    issues in the 2011 map.  I find that most of the district

8    configurations were caused by the other criteria which the

9    state enunciated, one person one vote, core retentions,

10   communities of interest, and resolving those ripple

11   effects caused from population gains and also the

12   political goals of the map-drawers.  So I don't see

13   compactness as an issue here.

14        The other thing that I conclude is that there really

15   were not contiguity issues on the map.  Some were

16   mentioned in the reply report to my report by Dr.

17   Ansolabehere, but these were really very minor crossings

18   of rivers without roads which nobody, in my experience in

19   the redistricting process, would ever be considered as a

20   contiguity problem, and also, with regard to the practice

21   in Virginia, it wouldn't be a contiguity problem.

22        The only time I've seen contiguity be a problem in

23   Virginia was when the portion of the district separated by

24   the waterway was not directly across the water.  Of

25   course, we already talked about District 100.

Hofeller - Direct

1   Q    And now, in your expert opinion, is there any

2   indication that race predominated over other redistricting

3   criteria in the drawing of the 2011 map?

4   A    Not in my expert opinion, no.

5          MS. McKNIGHT:  Your Honors, I have no further

6   questions.  We'd like to withdraw the offer of Defendant

7   Intervenor's Exhibit 35 as an exhibit.

8          JUDGE PAYNE:  All right.  At this time, we'll

9   take the morning recess.  Be back in 15 minutes.

10

11          (Recess taken.)

12

13          NOTE:  After the morning recess, the case

14   continues as follows:

15          JUDGE PAYNE:  Dr. Hofeller, you are under the

16   same oath that you took earlier.

17          All right, ready?

18          MR. SPIVA:  Your Honor, before I begin

19   cross-examination, I just wanted to correct one thing that

20   I said earlier.  I checked and I had made a mistake.  The

21   Webster report was actually produced before Dr. Hofeller's

22   deposition.  I have told opposing counsel about my error,

23   but I wanted to correct the record.

24          JUDGE PAYNE:  That's fine.  I don't know that it

25   needed correcting.  But in the heat of litigation, that

1   kind of thing happens every once in awhile.  I wouldn't
2   worry too much about it.  Go ahead and worry about the
3   thing you need to worry about.
4              MR. SPIVA:  Okay.  Thank you, Your Honor.
5              JUDGE LEE:  We appreciate you making the record
6   clear.
7              JUDGE PAYNE:  Yes.
8              MR. SPIVA:  Thank you.
9
10                    CROSS-EXAMINATION
11   BY MR. SPIVA:
12   Q    Good afternoon, Dr. Hofeller.  Good to see you again.
13   A    Thank you.  Good morning to you, too.
14   Q    Thank you.  Dr. Hofeller, you are not here to offer an
15   opinion on whether race was the predominant figure in the
16   drawing of the challenged districts, are you?
17   A    Well, actually, I think I am because, again, this was
18   the subject of the reply report of Dr. Ansolabehere which
19   I just offered testimony on.
20   Q    Let me ask you this, Dr. Hofeller.  In your expert
21   report you offered no opinion on whether race was the
22   predominant factor in the drawing of the challenged
23   districts, correct?
24   A    That's correct.
25   Q    And in your expert report you expressed no opinion on

Hofeller - Cross

1    whether any of the 12 challenged House districts need to

2    have at least a 55 percent black voting-age population in

3    order to preserve the African-American community's ability

4    to elect a candidate of its choice, that's correct also?

5    A    In my report?

6    Q    Yes.

7    A    My initial report, is that what you said?

8    Q    Yes, in your report.

9    A    I'm sorry, wrong question.

10   Q    Yes, I know.  Sorry.

11   A    That was not in my initial report.  The only thing

12   that I looked at those percentages for was to look at how

13   they related to compactness issues.

14   Q    And I take it you have not done any racial bloc voting

15   analysis of any of the challenged districts in the 2011

16   map, correct?

17   A    Yes, that's correct.

18   Q    Okay.  And you would agree with me, Dr. Hofeller, that

19   to determine whether a map protects the minority

20   community's ability to elect a candidate of its choice,

21   you would agree that one of the first things you probably

22   should do is look at racial bloc voting analysis for the

23   state to see whether or not that exists in the state,

24   correct?

25   A    Yes.  I would have to answer that by saying, unless

Hofeller - Cross

1    the redistricting authority has some reason to believe

2    that racial bloc voting was present or was found to be

3    present in the past and hasn't continued.  On hearing all

4    this, it might have been better if there had been such a

5    report.  But I think that was testified to by the other

6    witnesses.

7    Q    Dr. Hofeller, do you recall that you gave a deposition

8    in this case, correct?

9    A    Yes.

10   Q    Okay.  Let me turn your attention to page 175, line 21

11   of your deposition.  It will appear on the screen.

12        And do you recall in your deposition you were asked:

13   "What sort of analysis would you perform to determine

14   compliance with Section 2 and, when it was in effect,

15   Section 5?  Answer:  Once again, my preferred method is to

16   present the facts to the attorneys and let the attorneys

17   figure it out.  Question.  Right.  What sorts of facts or

18   analysis would you need to get that kind of advice?

19   Answer:  One of the first things you probably should do is

20   look at racial bloc voting analysis for the state to see

21   whether or not that exists in the state."

22        Do you recall giving that answer, Dr. Hofeller?

23   A    I do.

24   Q    In your report you did not look at election history or

25   voting patterns within each of the challenged districts,

Hofeller - Cross

1    correct?

2    A    That's true, I did not.

3    Q    Okay.  And in your report you did not look at voter

4    registration information in the challenged districts,

5    correct?

6    A    I would say that's correct, but I would qualify it a

7    little.  Again, Virginia just has vanilla type

8    registration.  There is no registration by party, nor is

9    there registration by race, which is broken down in other

10   states.

11   Q    Okay.  Fair enough.  And in your report though, Dr.

12   Hofeller, you did not look at voter turnout information in

13   the challenged districts, is that correct?

14   A    That's correct.

15   Q    Dr. Hofeller, I believe you testified on direct that

16   in order to do racially polarized or racial bloc voting

17   analysis, that you would have used primary elections, is

18   that fair?

19   A    I think my answer is a little more qualified than

20   that.  My problem with the racial bloc voting study that

21   was presented by your witness is that it looked at

22   statewide elections in even numbered years.  And it was

23   really determining how the minorities voted as compared to

24   the nonminorities for, in this case, I believe the

25   Democratic party's nominee.  It was a partisan bloc voting

Hofeller - Cross

1    study.

2    Q    Okay.  But I think you testified, and correct me if

3    I'm wrong, in order to determine the minority community's

4    ability to elect in a given district, that you would need

5    to look at primary elections for the House of Delegates

6    race, is that correct?

7    A    Again, I think the term you used to pose that question

8    is not really clear to me.  The ability to elect is kind

9    of ability to elect what?

10        So I wasn't referring to --

11   Q    Why don't I --

12   A    I don't believe I referred to the ability to elect in

13   my study.

14        JUDGE PAYNE:  Please give him a chance to finish

15   his answer.  And maybe you could get there more directly

16   if you didn't ask what he testified to.  We've kind of

17   kept up with that.  And just ask him the question you want

18   to ask, and it may go a little easier for you.

19        MR. SPIVA:  Will do, Your Honor.

20   BY MR. SPIVA: (Continuing)

21   Q    Had you completed your answer, Dr. Hofeller?

22   A    I believe so.  I think I've forgotten the question at

23   this point.

24   Q    So you would have looked at primary elections in order

25   to determine the minority community's ability to elect

Hofeller - Cross

1    their preferred candidate of choice, to clarify my last

2    question?

3    A    Again, I'm not sure I would use the same terminology

4    that you used.  But one of the issues that is involved in

5    looking at minority districts is can the preferred

6    candidate of choice of the community get nominated.

7         Once you have a Democratic and Republican nominee and

8    you're looking at those general election figures, you're

9    just really looking at what the preferred party of choice

10   is.  You're not really looking to see who that candidate

11   is.  And that's, I think, where there is a little bit of a

12   misnomer here in using those terms.

13        Does that answer your question?

14   Q    Well, I think in part.  I take it from that though,

15   then you would, if you were trying to determine the

16   minority community's preferred candidate of choice --

17   ability to elect their preferred candidate of choice, you

18   would look to primary election data, correct?

19   A    No.  I think I would use primary election data to

20   determine racial bloc voting, which I think in my mind is

21   somewhat different from performance.  Performance is

22   something you might measure after the plan has been done

23   and see if it will perform.

24        Well, what these reports have all shown is that in the

25   12 challenged districts, Democratic nominees have no

Hofeller - Cross

1    problem getting elected, getting a big majority of the

2    votes in those districts.  But that doesn't really signal

3    a preferred candidate.  It's preferred party nominee.

4    Q    You would look to primary elections to determine the

5    extent of racial bloc voting, correct?

6    A    If you're talking about the preliminary analysis

7    maybe, yes.

8    Q    Okay.  But you are aware that there is very limited

9    data for primary elections for the 12 challenged

10   districts, correct?

11   A    I think that's precisely correct, and that's the

12   problem.  There isn't enough data to do that analysis.

13   It's very difficult.  There are very few contests.  You

14   have to determine whether they were true contests.

15       So in my mind, you can't really do that study.  So

16   turning to general elections is a very poor substitute

17   because it doesn't prove what you're trying to find.

18       I'm not sure that if you look somewhere in Virginia in

19   those areas you might be able to find some of that data.

20   Q    Let me ask you, you would agree that Section 5 of the

21   Voting Rights Act does not require the maintenance of a

22   rigid black voting-age population percentage in a

23   majority-minority district from one redistricting cycle to

24   the next?  You would agree with that?

25   A    I would agree that that is not necessary.

1   Q    And let me turn your attention or let me ask you

2   questions about compactness briefly here.

3        You agree that the Reock and Polsby-Popper tests for

4   compactness are familiar to courts, correct?

5   A    Yes.

6   Q    And that they are widely cited by courts, correct?

7   A    Actually, I haven't read all the cases, so I don't

8   know how widely cited they are.  But when compactness

9   comes up in a detailed manner, those are the compactness

10  measures that we usually see, that I've seen.

11  Q    And in forming your opinion concerning the compactness

12  of the 2011 map, the Reock test and the Polsby-Popper

13  test, those two tests were the primary ones that you

14  relied upon in forming your opinions, correct?

15  A    I think they were the only ones I relied upon.

16  Q    Fair enough.  You did not use the Boyce-Clark measure

17  of compactness, correct?

18  A    No.  Dr. Katz used a modified Boyce score, but not the

19  exact Boyce score.

20  Q    But you did not use that measure, correct?

21  A    That's correct, I did not use it.

22  Q    Now, you mentioned that there is some difficulties or

23  complications with drawing compact districts in Virginia

24  because the Commonwealth is irregularly shaped to begin

25  with.

Hofeller - Cross

1      Is that a fair statement of what your opinion is?

2   A    I think that was the opinion that I wrote in my

3   report.  I don't know that I testified to that exact thing

4   in my testimony here today.

5   Q    Okay.

6   A    It's of course nice if your state is square like

7   Colorado or Wyoming.  But also, there is another factor

8   that influences compactness, and that's the way the state

9   is internally organized.

10      So if you're trying to follow county lines and the

11  counties are irregular in shape, that's really more

12  difficult.

13      The water really isn't all that difficult except if

14  the water is used as a regional boundary, like the three

15  major river estuaries, the James, the York, and the

16  Rappahannock River, and of course Chesapeake Bay.

17      So how you navigate the districts up and down those

18  rather closed areas is a compactness issue.

19  Q    Okay.  And you would agree with me, Dr. Hofeller, that

20  all those factors you just mentioned about the James River

21  and the Chesapeake Bay and the irregular shape, that those

22  have not changed in the past ten years with respect to

23  Virginia, correct?

24  A    Well, certainly the natural features of Virginia and

25  the state and county boundary lines have not changed for a

Hofeller - Cross

1   long time in Virginia.

2       How the legislature wishes to honor them or stay

3   within them may have changed.  I don't know what the -- I

4   don't believe I know what the criteria statements were in

5   '91 and 2001.

6   Q   But the irregular shape of Virginia and the waterways

7   that you mentioned, to the extent those are a constraint

8   on the construction of compact districts, they were a

9   constraint in the benchmark plan as well, correct?

10  A   Again, I would have to say yes, except with the caveat

11  that it depends on the extent to which the drafters of the

12  2001 plan honored those same geographic features.

13  Obviously, the state's boundary is the same and the county

14  boundaries are the same.

15          MR. SPIVA:  I have no further questions, Your

16  Honor.

17          JUDGE PAYNE:  All right.  Any redirect?

18          MS. McKNIGHT:  Yes, Your Honor.  Pardon me, Your

19  Honor, I will just take a moment, and then I will be very

20  brief.

21

22                  REDIRECT EXAMINATION

23  BY MS. McKNIGHT:

24  Q   Dr. Hofeller, in your review of the different maps

25  over the years in 2001 and 2011, were there any crossings

Hofeller - Redirect

1   of the James River in the 2001 plan?

2   A    Yes.

3   Q    And were there any crossings of the James River in the

4   2011 plan?

5   A    No.  At least not as far as Hopewell, which is the

6   estuary, I would say, the tidal region.

7          MS. McKNIGHT:  Your Honors, I have no further

8   questions.  And we also have no further witnesses.

9          And with the exception of one housekeeping

10  matter, we're prepared to rest.  Could I address that

11  matter now?

12         JUDGE PAYNE:  Yes.

13         MS. McKNIGHT:  Last week --

14         JUDGE PAYNE:  And may the witness step down?  Is

15  he through?

16         MS. McKNIGHT:  Oh, sure.  Yes.

17         JUDGE PAYNE:  Thank you very much.

18         JUDGE LEE:  Thank you for coming.

19         JUDGE PAYNE:  We appreciate your testimony.  And

20  you are excused.  Thank you, sir.

21         THE WITNESS:  Thank you, my pleasure.

22         NOTE:  The witness stood down.

23         JUDGE PAYNE:  Yes, Ms. McKnight.

24         MS. McKNIGHT:  So last week we offered that

25  docket number 83, which is the factual stipulation in this

```
 1    case --

 2              JUDGE PAYNE:  Right.

 3              MS. McKNIGHT:  We offered that as a joint

 4    exhibit.  We have discussed with plaintiffs, and 83 has an

 5    attachment to it which is located at docket 85.

 6              So when we prepare this exhibit and provide it to

 7    the Court, we'll be combining docket number 83 and docket

 8    number 85, which, among other things, includes a timeline.

 9              JUDGE PAYNE:  Okay.  So they are the stipulations

10    now, is that right?

11              MS. McKNIGHT:  Correct.

12              JUDGE PAYNE:  Do you agree with that, Mr.

13    Hamilton?

14              MR. HAMILTON:  We do, Your Honor.

15              JUDGE PAYNE:  All right.  Then that will be done.

16              MS. McKNIGHT:  Thank you, Your Honors.

17              JUDGE PAYNE:  We look forward to having it.  Now

18    you have a rebuttal witness, I believe you said, Mr.

19    Hamilton?

20              MR. HAMILTON:  We do, Your Honor.

21              JUDGE PAYNE:  Wait just a moment.

22              MS. McKNIGHT:  I'm sorry, Your Honor.  Okay.

23    Both of those items, I just wanted to make sure, are part

24    of our case.  They are part of our --

25              JUDGE PAYNE:  I think they are part of
```

1    everybody's case.

2             MS. McKNIGHT:  Right.

3             JUDGE PAYNE:  Okay.

4             MS. McKNIGHT:  Thank you.

5             MR. HAMILTON:  Just for the record, Your Honor,

6    joint Exhibit 1 is the deposition designations that the

7    parties have worked on jointly together prior to the trial

8    starting.

9             I do have a witness, Your Honor.  Before I call

10   that witness, I would like to clean up something that we

11   had sort of taken out of turn at the end of last week.

12   And that is, you will recall there were two documents.

13   The authenticity of those documents had been objected to,

14   so we called Mr. Hebert to the stand to lay the foundation

15   for the documents.

16            They have both been authenticated now.  I believe

17   the authentication objection has been withdrawn, but I

18   believe there is also an admissibility objection.

19            So I would like to offer those at this time.  And

20   I have copies for the Court so you can see what it is we

21   are looking at.

22            JUDGE PAYNE:  Exhibit numbers?

23            MR. HAMILTON:  They have not been marked by

24   exhibit number.

25            JUDGE LEE:  I think we should mark them for

1    identification so we know what we're talking about.

2              MR. HAMILTON:  Yes, sir, 69 and 70.

3              JUDGE LEE:  All right.  For identification.

4              MR. HAMILTON:  So with apologies to the Court, we

5    have hand marked them, the two exhibits, Exhibit 69 and

6    Exhibit 70.  Exhibit 69 is --

7              JUDGE LEE:  Just one second.  The judges don't

8    have them yet.

9              JUDGE PAYNE:  While she is doing that, 60 is a --

10   69 is a fax cover sheet and attaching a letter from

11   Senator McEachin to the addressee, Mr. Hebert, who

12   testified the other day?

13             MR. HAMILTON:  That's correct, Your Honor.

14             JUDGE PAYNE:  70 is an e-mail from somebody named

15   Robert Berman to a number of people?

16             MR. HAMILTON:  Correct, Your Honor.  It's

17   actually, the underlying e-mail is the relevant one, the

18   e-mail from Mr. Hebert who testified on Thursday, and it's

19   addressed to individuals at the Department of Justice.

20             JUDGE PAYNE:  Attached to that is a voting rights

21   analysis, attached to the second and subsequent pages of

22   70, right?

23             MR. HAMILTON:  Correct.

24             JUDGE PAYNE:  All right.  So you're offering it?

25             MR. HAMILTON:  I am, Your Honor.

```
 1            JUDGE PAYNE:  And do you object to it?

 2            MR. BRADEN:  Yes, we do, Your Honor.

 3            JUDGE PAYNE:  And the objection is what?

 4            MR. BRADEN:  Well, it is obviously hearsay unless

 5    they have someone who can come and testify in regards to

 6    the document as to what is contained in it.

 7            I am assuming they are planning on using it, I

 8    guess, for impeachment, but it in fact does not impeach a

 9    statement made by any witness.  It is clearly not a

10    submission by the State of Virginia.  On the very front of

11    the document, it's a comment.  And it does not impeach the

12    notion that nothing is ever done in advance.

13            The report has no date.  But if you read the very

14    first sentence of the Lisa Handley report, it's crystal

15    clear this was done after the plan was passed.

16            So there is nothing inconsistent whatsoever with

17    what's in the record.

18            JUDGE PAYNE:  Is that your way of saying that

19    your objection is to relevance?

20            MR. BRADEN:  Yes, to relevance.

21            JUDGE PAYNE:  Okay.  Objection is to relevance

22    and hearsay.  What relevance does it have?

23            MR. HAMILTON:  Your Honor, the representation was

24    made by several witnesses that they weren't aware of any

25    racial bloc voting analysis done at any time in the state
```

```
 1   of Virginia in connection with -- of course, they have

 2   also disputed that the racial bloc voting analyses are not

 3   done in advance or in connection with the actual

 4   redistricting itself.  I will address that in a moment

 5   with a different witness.

 6           But this is simply addressing the first point,

 7   that racial bloc voting analyses are these odd, esoteric

 8   things apparently done in universities unconnected from

 9   the actual redistricting process, which is --

10           JUDGE PAYNE:  So you're offering it to impeach

11   whom?

12           MR. HAMILTON:  I'm offering it to impeach

13   Delegate Jones.

14           JUDGE PAYNE:  Jones.

15           MR. HAMILTON:  And I'm offering it --

16           JUDGE PAYNE:  He said he wasn't aware of any.

17           MR. HAMILTON:  Correct.  And he said he didn't

18   think that there was any that had been done.

19           JUDGE PAYNE:  So he is not aware of any.  How

20   does this impeach him?

21           MR. HAMILTON:  It -- well, it demonstrates that

22   not only racial bloc voting analyses are done in

23   connection with preclearance Section 5, but they were done

24   in 2011 in the state of Virginia.

25           JUDGE PAYNE:  What it shows is that somebody in
```

1    the Senate had one done, right?

2            MR. HAMILTON:  And submitted it --

3            JUDGE PAYNE:  After it was done.

4            MR. HAMILTON:  Correct.

5            JUDGE PAYNE:  And you say that impeaches Jones?

6            MR. HAMILTON:  I believe it is relevant and does

7    tend to impeach Mr. Jones and the other experts who have

8    testified, including Dr. Katz, about the frequency with

9    which racial bloc voting analyses are prepared and

10   submitted to the Department of Justice in connection with

11   Section 5 preclearance.

12           JUDGE PAYNE:  Anything else?

13           MR. HAMILTON:  Yes.  I don't believe the hearsay

14   objection stands for two reasons.  First, it's a business

15   record.  These were produced by the Virginia State Board

16   of Elections.  You can tell that from the Bates stamp

17   number.  VSBE means the Virginia State Board of Elections

18   in this litigation.  They were prepared in the ordinary

19   course and maintained by the Department of Justice.

20           So they are records kept in the ordinary course

21   of business within the meaning of Federal Rule of Evidence

22   803(6).

23           JUDGE PAYNE:  Did some witness establish that?

24           MR. HAMILTON:  I believe Mr. Hebert did.  He

25   established that the documents were prepared and submitted

1     to the Department of Justice.

2               JUDGE PAYNE:  Yes.  All right.  Anything else?

3               MR. HAMILTON:  Yes.  Finally, they're not offered

4     for the truth of the matter asserted.  There are lots of

5     assertions in here, including the black voting-age

6     population of the Senate districts and so on.

7               We're not offering to prove the contents of the

8     report.  Simply it's a very small point, and that is these

9     reports were done and they were submitted.

10              JUDGE PAYNE:  These were part of your case in

11    chief?

12              MR. HAMILTON:  I believe -- well, no.  Actually,

13    we had taken them out of turn.  So I believe they are

14    actually part of the rebuttal case, but I'm happy --

15              JUDGE PAYNE:  I thought you reopened the case to

16    put them back in.  So it's out of turn for your reply

17    case.

18              MR. HAMILTON:  Yeah, but I'm happy to have them

19    admitted in either case, Your Honor.

20              JUDGE PAYNE:  All right.  Objection sustained on

21    the basis of lack of relevance to anything that is at

22    issue in this case.

23              MR. HAMILTON:  Thank you, Your Honor, for

24    considering it.  At this point --

25              JUDGE PAYNE:  That is 69 and 70.  So both are

1    objected over -- excuse me, rejected over objection.

2         MR. HAMILTON:  Thank you, Your Honor.

3         At this point the plaintiffs call Dr. Stephen

4    Ansolabehere.

5         JUDGE PAYNE:  Doctor, I remind you you're under

6    the same oath that you took earlier in these proceedings,

7    you not having been excused.  Thank you very much.  You

8    may have a seat.

9

10                  **STEPHEN ANSOLABEHERE,**

11   a witness, recalled at the instance of the plaintiffs,

12   having been previously duly sworn, testified as

13   follows:

14                  DIRECT EXAMINATION

15   BY MR. HAMILTON:

16   Q    Good afternoon, Dr. Ansolabehere.  Let's start with

17   the correct pronunciation of your name.  I think we've

18   heard it about five different ways.

19        How do you pronounce your last name?

20   A    Ansolabehere.

21   Q    And is that Basque in origin?

22   A    Yes.

23   Q    All right, thank you.  You will correct me if I

24   mispronounce it, I'm sure.

25   A    I've given up on correcting people.

Ansolabehere - Direct

1   Q    You have been sitting in the courtroom during the

2   course of this trial, correct?

3   A    I have.

4   Q    Okay.  Let's start with compactness.  Dr. Katz

5   testified that he prefers the Boyce-Clark measure for

6   compactness.

7        Do you recall that testimony?

8   A    I do.

9   Q    What is the ideal shape for a district as measured by

10  the Boyce-Clark measure?

11  A    The ideal shape of a district under Boyce-Clark is a

12  circle.

13  Q    Okay.  Dr. Katz' objection, or one of them, to the use

14  of Reock or Polsby-Popper was the tile theorem.

15       Do you recall that discussion in his report?

16  A    I do.

17  Q    Does that same problem exist with respect to the

18  Boyce-Clark measure?

19  A    Yes, in the sense that if you have -- if you get to

20  the ideal shape under Boyce-Clark, you get to a circle.

21  So it's the same issue.

22  Q    So why did you select Reock to use in your report?

23  A    Reock is the standard, it's probably the most commonly

24  used indicator in court cases that I've seen, and also in

25  academic research on this issue, along with Polsby-Popper.

Ansolabehere - Direct

1   Q    All right.  What was the Reock score of the original

2   gerrymander?

3   A    .19.

4   Q    I'm sorry?

5   A    .19.

6   Q    Dr. Hofeller just a few moments ago talked a little

7   bit about compactness.  As you were listening, did he

8   offer any statistical analysis in his report?

9   A    No.  He offered a set of numbers, but he didn't do any

10  statistical analysis.

11  Q    And that is a statistical analysis of the relative

12  compactness of the various districts?

13  A    Correct.  Where you might do a test comparing the two.

14  Q    Did he offer a statistical analysis or a test

15  comparing the two in his testimony in this court?

16  A    No.

17  Q    Did you?

18  A    I did in my reply report.

19  Q    And what did it show?

20  A    I compared the distribution of compactness scores

21  under the 12 challenged districts, and compared that to

22  the distribution of compactness scores in the 88 other

23  districts, and found that there were statistically

24  significantly different distributions for each of the

25  scores, Reock, Polsby-Popper, and Schwartzberg.

Ansolabehere - Direct

1   Q    So what does that tell us?  The difference, what does

2   it mean to be statistically significant?

3   A    That means that the chance of these differences

4   occurring just arbitrarily or by happenstance is less than

5   5 percent.

6        So 95 percent of the time if you drew maps with

7   compactness in mind, 95 percent of the time you would

8   expect to observe differences in compactness of this

9   large -- this much or larger if these districts were being

10  treated differently than other districts in the map.

11  Q    And Dr. Hofeller testified that we look at compactness

12  sort of as a flag.  Do you agree with that?

13  A    Correct.

14  Q    And what's it a flag for?

15  A    It's a flag to call your attention to maybe something

16  irregular happened over here and for closer examination of

17  what might have occurred.  Look at -- calls for looking at

18  the demographics, political performance of the districts,

19  and so forth.

20  Q    All right.  Now, let's switch gears to a different

21  topic.  We have heard various testimony about different

22  ways of calculating the black voting-age population.

23       Do you recall that?

24  A    Yes.

25  Q    Do you work with census data professionally?

Ansolabehere - Direct

1   A    I do.

2   Q    Do you work with the Department of Justice?

3   A    I do.

4   Q    Can you explain what your interface with the

5   Department of Justice is and when.

6   A    I am the Department of Justice's expert in the Texas

7   voter ID case both under the Section 5 proceedings and

8   under the Section 2 proceedings.

9   Q    They have hired you to be the expert witness for the

10  Department of Justice?

11  A    Correct.

12  Q    Okay.  Are you familiar with the way that they use

13  black voting-age population and calculate it?

14  A    I am.

15  Q    Okay.  Can you explain how black population data is

16  collected or African-American population data is collected

17  for the purposes of the United States Senate -- census.

18  Sorry.  Census.

19  A    When the census enumeration is sent to every

20  household, the questionnaire contains a question for race

21  and a question for ethnicity.

22  Q    Okay.  So let's focus just on the race piece.  What

23  are the choices that a citizen is asked to fill out when

24  they are asked about their race?

25  A    Under race, you are asked if you are white, black,

Ansolabehere - Direct

1    Asian-American, Pacific Islander, or native American.

2    Other race, you can fill in whatever you would like to

3    say.  Or multiple races, and you can identify different

4    racial categories.

5    Q    And when the census data is released, what is the

6    black population or black voting-age population, what is

7    that number?

8    A    That number is anyone who identified themselves as

9    black according to that racial question.

10   Q    Okay.  Now, we also heard about ethnicity.  How is

11   that -- that's a second question?

12   A    Second question is ethnicity, and it concerns

13   Hispanicity, are you Hispanic or not.

14   Q    And how does that relate to the black voting-age

15   population number, if at all?

16   A    Well, when Census releases its data sets to the states

17   for purposes of redistricting and other voter rights

18   questions, some states have large Hispanic populations and

19   also large black populations, and there has to be a

20   careful accounting of how blacks and Hispanics are treated

21   say in different part of the state.

22       Florida, Texas, and California all have pretty

23   substantial black populations that are both black and

24   Hispanic.

25       If you're constructing a black district, you would

Ansolabehere - Direct

1    want to pay attention to the black numbers.  But if you

2    are constructing a Hispanic district, you would want to

3    pay attention to that second question, which is

4    Hispanicity, and you might want to distinguish black

5    Hispanics from non-black Hispanics.

6        And that's why Census creates this separate category

7    of black Hispanics.  And I realize it can be confusing if

8    you are looking at the data to get the columns right and

9    do the addition of the columns correctly.

10   Q    So for the purposes of let's say, for example, your

11   expert testimony on behalf of the Department of Justice in

12   the Texas case, what number would you look at to determine

13   the black voting-age population?

14   A    I would look at black people who consider themselves

15   black on that first question without regard to the

16   Hispanicity question.

17   Q    Is there any difference between that number and the

18   number reported by the Department of Legislative Services

19   in Virginia?

20   A    No.

21   Q    It's the same?

22   A    Yep.

23   Q    Does it matter whether you use --

24            JUDGE PAYNE:  Which numbers are they?

25            MR. HAMILTON:  I'm sorry?

Ansolabehere - Direct

1          JUDGE PAYNE:  Between which number and the one

2   used by the DLS?

3   BY MR. HAMILTON: (Continuing)

4   Q    The number reported as to the black voting-age

5   population reported on the census information to the

6   Department of Justice and DLS.

7   A    The Census provides the entire questionnaire, and the

8   entire data set has many columns in terms of what's

9   provided.

10         What counts as black voting-age population from the

11   perspective of analyses of DOJ is consistent with what DLS

12   presented in terms of the black voting-age population.

13   Q    Does the number somehow change when you look at it

14   through the software program we've heard talked about

15   called Maptitude?

16   A    No, the program is not relevant.  You have a database,

17   like Excel or something, you upload your data into it.  It

18   doesn't matter which software program you're using.

19   Q    Does it matter if you're using a software program

20   called AutoBound?

21   A    No.  This is just a question about which fields or

22   columns in the spreadsheet you're looking at.

23   Q    Okay.  Let's take a look at, to maybe help clarify

24   this, Exhibit 47.  We'll call it up on the screen.  I know

25   it is very, very small, and I apologize for that.  That's

Ansolabehere - Direct

1    the data.  We're looking specifically at page 7.

2        Can you with your hand maybe circle where it is that

3    you would find the black voting-age population?

4            JUDGE PAYNE:  What is this?

5    Q   Well, this is part -- well, Dr. Ansolabehere, can you

6    identify what this document is?

7    A   It says HB 5005, passed April 28, 2011, House plan

8    voting-age population.

9    Q   This is an excerpt from the Commonwealth of Virginia's

10   report to the Department of Justice in connection with its

11   preclearance of the 2011 plan, correct?

12           JUDGE LEE:  What page?

13           MR. HAMILTON:  We're looking at page 7

14   specifically.

15           JUDGE LEE:  Thank you.

16           MR. HAMILTON:  But we're really just looking at

17   the form at the moment.

18           JUDGE PAYNE:  But it is Exhibit 47?

19           MR. HAMILTON:  It is Exhibit 47.  It's in

20   evidence.  It's just an excerpt from the preclearance

21   submission, Your Honor.

22   BY MR. HAMILTON: (Continuing)

23   Q   So where would you look if you wanted to see the black

24   voting-age population?

25   A   Percent BVAP.

Ansolabehere - Direct

1    Q    Okay.  And if you mark that on the --

2    A    Marked the top of the column, yeah.

3    Q    Okay.  For the record, can you count the columns over

4    so you could tell us which column it is, or maybe read the

5    heading of the column?

6    A    It says:  Percent VAP Black.

7    Q    Percent Black VAP.  Maybe move a little closer to

8    the --

9    A    Percent VAP Black.

10   Q    There you go.  Thank you.  Now, have you had an

11   opportunity to review Exhibit 47 and the numbers reported

12   on this spreadsheet for each of the 12 challenged

13   districts?

14   A    I have.

15   Q    And are they all above 55 percent black voting-age

16   population?

17   A    They are.

18   Q    Okay.  And you have confirmed that.  So let's just

19   look at one.  On this page, I think you can see House

20   District 63, is that right?

21   A    Correct.

22   Q    And what's the black voting-age population there?

23   A    59.5.

24   Q    Okay.  Thank you, sir.

25            JUDGE PAYNE:  Before you go any farther, I need

Ansolabehere - Direct

1   to understand something.  Excuse me for interrupting.

2           But there has been some testimony that DLS used a

3   population, a black voting-age population that included

4   Hispanic voters.

5           Are you saying that that did not occur?

6           THE WITNESS:  I don't know exactly what that

7   testimony was referring to because I didn't have the data

8   that they were looking at before me.

9           JUDGE PAYNE:  But apart from that, are you saying

10  that your understanding of this figure that was prepared

11  by DLS, when it says BVAP, does not include Hispanics?

12          THE WITNESS:  Their data include white includes

13  Hispanic, black includes Hispanic, Asian includes

14  Hispanic, because they are separate questions, they are

15  just separate columns.

16  BY MR. HAMILTON: (Continuing)

17  Q   So if you wanted to know the numbers --

18          JUDGE LEE:  I don't think you answered his

19  question.

20  A   So BVAP includes Hispanic.  White VAP includes

21  Hispanic.  Asian VAP includes it.  Because Hispanic is a

22  separate question.

23          JUDGE LEE:  He's asking about this chart.

24          THE WITNESS:  Right.

25          JUDGE LEE:  Does this chart include in black BVAP

Ansolabehere - Direct

1    Hispanic?

2           THE WITNESS:  Correct.  Because anybody who

3    identifies as black on the racial question is counted as

4    black, regardless of how they answered the Hispanic

5    question.

6           Similarly, anyone who answers white is counted as

7    white regardless of how they answered the Hispanic

8    question.

9           JUDGE LEE:  So you're saying the Hispanic and

10   black numbers are double-counting?

11          THE WITNESS:  Yes.  If you wanted to get a

12   complete separation of those, you would create another

13   category of black Hispanics, black non-Hispanics, white

14   Hispanics, white non-Hispanics, Asian Hispanics, Asian

15   non-Hispanics.  You would have to go through and separate

16   each of those.

17          JUDGE KEENAN:  So are you saying then that the

18   Department of Justice's designation of BVAP includes

19   Hispanic black, and that DLS's does likewise?  Is that

20   what you're saying?

21          THE WITNESS:  Correct.

22          JUDGE KEENAN:  You're saying that both metrics

23   include Hispanic blacks?

24          THE WITNESS:  Right.  When the Department of

25   Justice considers the performance of districts and the

1    racial composition of districts and the question is

2    whether it is a black district, they look at black

3    voting-age population, black Hispanic -- people who --

4    regardless of how people identified on the separate

5    ethnicity question.

6            JUDGE LEE:  So was there any real difference

7    between what Delegate Jones said about 55 percent on the

8    floor and what was submitted to the Department of Justice?

9            THE WITNESS:  I'm not sure I completely

10   understand the question, but --

11           JUDGE LEE:  Much has been made of the 55 percent

12   being a rule.  There were statements on the floor about

13   all the districts north of 55 percent.

14           My question is whether the 55 percent in this

15   submission to the Department of Justice, that's the same

16   number that they were talking on the floor, is that right?

17           THE WITNESS:  That's my understanding.

18           JUDGE PAYNE:  In your study of the record in this

19   case, do you understand that the percent BVAP stated in

20   this Exhibit 47 is the same number, the same percentage

21   number as what Delegate Jones called DOJ BVAP or DOJ

22   black?

23           THE WITNESS:  I heard Delegate Jones refer to a

24   54 percent number.  I don't know exactly which number that

25   was because I don't know what columns in the spreadsheet

Ansolabehere - Direct

1   he was referring to.

2          My interpretation of that is he was likely

3   looking at a separate column that is distinguishing people

4   who consider themselves black and non-Hispanic and black

5   and Hispanic, but that's --

6          JUDGE PAYNE:  Do you remember the testimony about

7   the Intervenor-Defendants' Exhibits 56 and 57?

8          THE WITNESS:  I don't remember exactly which 56

9   and 57.

10         JUDGE PAYNE:  Can you put them up for him?  Well,

11  I tell you, we'll do that later.  Somebody needs

12  ultimately to sort out what I perceive to be a difference,

13  and maybe the others don't.

14         But I understand that the black DOJ figures are

15  slightly different than the DLS black figures are.  And

16  you all have made a lot of it in cross-examination, and

17  nobody has -- and now he says they're the same.  So I'm

18  confused.

19         MR. HAMILTON:  Well, I think --

20         JUDGE PAYNE:  So maybe you can do that in your

21  questioning or --

22         MR. HAMILTON:  I will try.

23         JUDGE PAYNE:  Maybe you will have to do it in

24  your argument, but we'll see.

25         MR. HAMILTON:  Well, I will try both.

Ansolabehere - Direct

1    BY MR. HAMILTON: (Continuing)

2    Q    Dr. Ansolabehere, the numbers that are reflected on

3    this spreadsheet were the numbers utilized by the

4    Commonwealth of Virginia to report to the Department of

5    Justice for the purpose preclearance what the black

6    voting-age population was in each of the 12 districts,

7    correct?

8    A    Correct.

9    Q    So regardless of what DLS may or may not have done,

10   this was the number the Commonwealth reported to the

11   Department of Justice?

12   A    Correct.

13   Q    And in every case it was above 55 percent?

14   A    Correct.

15   Q    And that's consistent with everything that Delegate

16   Jones said on the floor in the transcripts that we've

17   heard about in this courtroom, correct?

18   A    That's consistent with everything I heard about the

19   floor testimony.

20   Q    All right.  In your experience, your professional

21   experience in calculating black voting-age population for

22   the purposes of doing any of these kinds of racial bloc

23   voting analyses, is this the number that you use?

24   A    Yes, I would use the percent black voting-age

25   population where it's just looking at the racial question.

Ansolabehere - Direct

1    Q    Sure.  And when we're looking at black Hispanic -- I'm

2    sorry, black voting-age population for Section 5 purposes

3    in a state in which that's the relevant question, do you

4    even care about the Hispanic -- the answers to the

5    Hispanic number?  Is that relevant?

6    A    If you were -- the only time the Hispanic would come

7    up is if you had a question about whether you were

8    creating a majority-minority district where it was black

9    plus Hispanic.  But in this case, they're all majority

10   black districts.

11   Q    So is it relevant to the analysis?

12   A    No.

13   Q    The answer to that question, do we even care?

14   A    No, not as -- not for this analysis.

15   Q    And -- okay.  Let's move on.  And I hope I've answered

16   the Court's questions.  If not, I will try --

17            JUDGE LEE:  The testimony is before us.  Thank

18   you very much.

19            MR. HAMILTON:  Thank you.

20            JUDGE PAYNE:  We will get into that a little bit

21   later.

22            MR. HAMILTON:  You got two different answers.

23   Thank you.

24   BY MR. HAMILTON:  (Continuing)

25   Q    Let's switch to some data issues.  Dr. Katz testified

Ansolabehere - Direct

1    that he and his teaching assistants had some difficulty in

2    replicating the data set that you used.

3         Do you recall hearing that testimony?

4    A    I heard that.

5    Q    Did he raise that point in his report?

6    A    No.

7    Q    Did he ask you for assistance or clarification?

8    A    No.

9    Q    Did he ask you for the data?

10   A    No.

11   Q    Did Dr. Hood have any trouble with replicating the

12   data set, to your knowledge?

13   A    No.

14   Q    He didn't report any in his report, did he?

15   A    No.

16   Q    Where would you be able to find this data?  Was it

17   publicly available?

18   A    I posted the data at the election data archive at

19   Harvard's Dataverse.

20   Q    What is that?

21   A    I manage a large data archive of election data where

22   we've taken all the census data and merged it in at the

23   precinct level or voting tabulation district level to all

24   of the election data.  So you can access the census and

25   election data for every state in the United States.  That

Ansolabehere - Direct

1   archive was started in 2008.

2           JUDGE LEE:  How do you find it?

3           THE WITNESS:  You can go to Dataverse, I think

4   it's .iq.harvard.edu.

5           JUDGE LEE:  Can you say that faster?

6           THE WITNESS:  If you just -- actually, just get

7   in Google and type Harvard election data archive

8   Dataverse, and you should get there.

9           JUDGE PAYNE:  You don't need a password?

10          THE WITNESS:  No, it's publicly acceptable, free

11  to the universe.

12  BY MR. HAMILTON:  (Continuing)

13  Q    You mentioned that in your deposition?

14  A    I did.

15  Q    Who funds that data archive?

16  A    The Sloan Foundation, Pew Foundation has provided us

17  some funds, and the Dean of the College of -- Dean of the

18  Faculty of Arts and Sciences at Harvard.

19  Q    And what's the purpose of it?

20  A    The purpose is to provide free publicly available data

21  for purposes of analyzing elections.  It helps the

22  academic community.  The New York Times has used it.  CBS

23  News has used it.  Huffington Post has used it.  Other

24  people who do graphics and so forth, info graphics, rely

25  on it just to make maps and do analyses.

Ansolabehere - Direct

1    Q    Is it something you utilize professionally in the

2    normal course of your work?

3    A    Yes, I do research using it.

4    Q    How many downloads have there been from that archive?

5    A    I think about 80,000.

6    Q    Anyone complain about data integrity issues?

7    A    No.  Every once in awhile we will get some questions

8    about how to use data or possibly a corrupted file.  We

9    fix the file and put it back up.

10   Q    Okay.  So Dr. Katz could have looked there if he had

11   wanted to?

12   A    I believe so.

13   Q    Now, Dr. Katz and I believe Dr. Hofeller this morning

14   have suggested that the real election in the House of

15   Delegates elections is at the primary level, and we ought

16   to be -- and that you've made a mistake because you looked

17   at the wrong elections and you should have been looking at

18   the primary elections.

19        Do you recall that testimony?

20   A    Yes.

21   Q    I think Dr. Hofeller called it the wrong data this

22   morning.  Do you agree with that?

23   A    Do I agree with which?

24   Q    That you were looking at the wrong data?

25   A    No.

Ansolabehere - Direct

1    Q    Why didn't you look at the primary data?

2    A    There are almost no contested primaries in these 12

3    challenged districts.  I looked up online at the Virginia

4    State Board of Elections when I started this project, the

5    number of primary contests and general elections contests

6    in House of Delegates elections, and found that from 2001

7    to 2013, so under the old plan and under the current plan,

8    there were only 12 challenged primaries, I believe, over

9    the entire 12-year period.  That is about one challenged

10   primary per district.

11   Q    Over which period of time?

12   A    2001 to 2013.

13   Q    Is that enough data to do a meaningful analysis?

14   A    No.  Most of the districts had no challenged

15   primaries.

16   Q    Okay.  Now, Dr. Hofeller this morning said you weren't

17   really doing an analysis to identify the candidate of

18   choice, you were just doing a partisanship analysis.

19        Do you agree with that?

20   A    No.  I think what I do is a standard sort of analysis

21   to identify candidate of choice in different elections.

22   Q    And how does that identify the candidate, the

23   candidate of choice for the minority population?

24   A    It asks for each election studied which candidate was

25   chosen by a majority of the minority population.

Ansolabehere - Direct

1   Q    And is this this regression analysis that we talked

2   about earlier?

3   A    Yes.

4   Q    And is that able to sort out the difference between

5   race -- or to identify the minority party candidate of

6   choice?

7   A    Correct.  For each election I would do a separate

8   analysis asking for each election which candidate was the

9   preferred candidate of the minority -- majority of the

10  minorities.

11       So most of the time 90-plus percent of the blacks

12  preferred the Democratic candidate.

13  Q    And how about the whites, did they have a similarly

14  consistent preference for a single party?

15  A    No.

16  Q    Was -- did you observe variation?

17  A    Yes.

18  Q    What was the range of that variation?

19  A    The range of that variation ranged, it went from about

20  35 percent of the whites in some districts preferred the

21  Democrat to the Republican to about 75 percent in some

22  districts, about 75 percent of the whites referred the

23  Democrat to the Republican.

24            JUDGE LEE:  Which part of Virginia was that?

25  Really, I mean, the Virginia legislature has been

Ansolabehere - Direct

1    Republican for years.  What district are you talking

2    about?

3           THE WITNESS:  I would have to look up the exact

4    table, but I think one of -- some of the Richmond

5    districts had that characteristic.

6           JUDGE PAYNE:  That's just Richmond, is that what

7    you're saying?  I didn't understand that.

8           THE WITNESS:  I think some of the Richmond

9    districts had very high white vote for black preferred

10   candidates.  I think it was down in the Greensville and

11   Dinwiddie areas that we saw the whites preferring the

12   opposite candidate.  So that's where, I think it was 63

13   and 75 is where I saw the lowest amount of white support

14   for the black preferred candidate.  And up in the Richmond

15   area in the city --

16          JUDGE LEE:  No, my observation had to do with

17   your saying that 75 percent of the whites preferred the

18   Democratic candidate.  Which part of Virginia is that?

19          THE WITNESS:  Again, I would have to look at the

20   report to look at which districts it was in, but --

21          MR. HAMILTON:  We are just going to get the

22   report here.  I will put it up on the screen in just a

23   moment.

24   BY MR. HAMILTON:  (Continuing)

25   Q    But while they're doing that, one of the criticisms

Ansolabehere - Direct

```
 1   that we heard this morning from Dr. Hofeller was that you

 2   were only looking at even year elections, which are

 3   different than the odd year elections for the House of

 4   Delegates.

 5        Do you recall that?

 6   A    I do.

 7   Q    And is that an accurate statement by Dr. Hofeller this

 8   morning?

 9   A    No.  I also looked at the governor in 2013, which is

10   an odd year election.  And there was a House and Senate,

11   House of Delegates and Virginia Senate election at the

12   same time.

13   Q    So what were the four elections that you looked at in

14   doing your analysis?

15   A    U.S. President in 2008.  U.S. President in 2012.  U.S.

16   Senate in 2012.  And governor in 2013.

17   Q    And which of those were done on even years?  Which of

18   those elections were held on even years?

19   A    The first three, the two presidential elections and

20   the U.S. Senate election.

21   Q    And one of them was held in an off year?

22   A    Correct.

23   Q    Okay.  Did you also look at the attorney general or

24   lieutenant governor race?

25   A    No.
```

1    Q    Did you examine them and then discard them, or just

2    never look at them at all?

3    A    I did examine them.  For each of these offices, I

4    looked at the relationship and the correlation and the

5    mean value for the vote share for the Democratic candidate

6    compared to the vote share for the Democratic candidate in

7    House of Delegates elections in each area.  And I found in

8    each of these districts there is a high correlation where

9    there was contested House of Delegates elections between

10   the vote for each of these offices, the ones that I

11   studied, and the House of Delegates election.

12   Q    So the purpose of that was to try and determine using

13   this other set of statewide elections whether those

14   closely aligned or did not closely align with contested

15   House of Delegates elections?  That's what you were

16   looking at?

17   A    Correct.

18   Q    And your conclusion was that they closely aligned?

19   A    The ones that I studied did.  Lieutenant governor and

20   attorney general did not, so I did not study those.

21   Q    Is that the reason you left them out of the study?

22   A    Correct.

23   Q    Okay.  And using that in your professional experience,

24   did you believe that to be an accurate way of determining

25   the candidate of choice in these elections where we have

Ansolabehere - Direct

1   such limited House of Delegates elections?

2   A    Yes.

3   Q    Okay.  Now, you testified a moment ago that there were

4   12 contested -- over a 13-year period, I think you said,

5   there were 12 contested primaries in these 12 challenged

6   districts, did I hear you correctly?

7   A    Correct.

8   Q    How many contested general elections were there?

9   A    Over that same time span from 2001 to 2013, there were

10  28.

11  Q    Okay.  So why didn't you use those 28 House of

12  Delegates elections in order to conduct your analyses?

13  A    A couple of reasons.  One is about half the House of

14  Delegates races, House of Delegates seats didn't have any

15  competition.  Most of those were concentrated in a couple

16  of those districts.

17       And also, the voting tabulation districts at stake in

18  the new map didn't always have contestation.  So because

19  they had taken like the district from 2009 and

20  reconfigured it, some of the VTDs in the new 2011 map

21  didn't have any competition in 2009 because they were from

22  another House of Delegates election.

23       So there just was not enough information from the

24  general elections or the primary elections for the House

25  of Delegates to really do an analysis of which candidates

Ansolabehere - Direct

1   were preferred and whether those were performing

2   districts.

3   Q    Now, Dr. Katz testified that he didn't know because he

4   didn't do an analysis to determine whether the results

5   from the statewide elections correlated with the results

6   from the contested House of Delegates elections data set

7   that he was looking at.

8        You did that analysis, correct?

9   A    I did.

10  Q    And that's what you just talked about a moment ago, we

11  don't need to go through it again, but there was a real

12  close correlation between the two?

13           JUDGE PAYNE:  Mr. Hamilton, I don't think we need

14  for you to summarize the testimony and then ask if he

15  agrees with it or not.  Just ask him the question you want

16  to ask him and then we'll be finished a lot quicker than

17  if you start to testify about what somebody else testified

18  to, if you will, please.

19           MR. HAMILTON:  All right.  Thank you, Your Honor.

20  BY MR. HAMILTON:  (Continuing)

21  Q    Dr. Ansolabehere, the table, we put up the results of

22  the ecological inference study done by the intervenors'

23  expert simply for convenience.

24        So in answer to Judge Lee's question, where was the

25  strong white crossover voting, in which districts?  If you

Ansolabehere - Direct                                      768

1   could just point that out.

2       And for the record, this is Intervenors' Exhibit 16 at

3   page 24.

4   A    So up around 75 percent or so, HD 71, that is

5   72 percent of the whites voting for the black preferred

6   candidate in that race.

7           JUDGE PAYNE:  That's Richmond, is it?

8           THE WITNESS:  In Richmond in 2009.  And then in

9   2013, it is 77.1.

10          JUDGE PAYNE:  That's Richmond again?

11          THE WITNESS:  Yeah.  And then again up in the

12  70's range, the whites in HD 69, bottom row, about

13  73 percent.

14          JUDGE PAYNE:  Where is that, 69?

15          THE WITNESS:  It's Richmond as well.  And then

16  there are other districts which are well above 50 percent.

17  For example, HD 95 in 2013 had 63 percent.  That's this --

18  sorry.  That's this figure right here, that's in the

19  Hampton area.  And so, 69 is also under the old district

20  67.5.

21  BY MR. HAMILTON: (Continuing)

22  Q    All right.  Maybe we could just briefly look at the

23  other side.  Can you identify where there is really low

24  white crossover voting?

25  A    Could you erase the red dots?

Ansolabehere - Direct                                    769

1        HD 75 has, in this analysis, 41.4, right there.

2   Sorry.   And 34.8.   That's down in the -- south of Richmond

3   in the Greensville area.

4   Q    All right.

5   A    Also District 80 has 36 percent.

6   Q    So this is another way of simply -- well, what we're

7   looking at here is different voting patterns, different

8   political preferences in different parts of the state, is

9   that right?

10  A    Correct.

11  Q    Let's take a look at Defendant-Intervenors'

12  Exhibit 16, I think it is the same exhibit, at page 19,

13  Figure 9.   There is that S-shaped table that Dr. Katz

14  prepared.

15       Do you recall that testimony?

16  A    I do.

17  Q    Now, he testified that the elections in the lower

18  right-hand corner, that all those little dots on the

19  bottom and all those little dots at the top represent

20  elections, and then they're plotted on this chart.

21       And he testified that the elections in the lower

22  right-hand corner represented Delegate Morrissey and

23  Delegate Carr's election.   Do you recall that?

24  A    Yes.

25  Q    Is that a yes?

Ansolabehere - Direct

1    A    Yes, I recall that.

2    Q    Are they -- what's their race, do you know?

3    A    They are white.

4    Q    Okay.  So are they properly reflected on this table?

5    A    If this is an analysis of the ability to elect

6    candidates preferred by minorities, candidates preferred

7    by black voters, no.

8    Q    Where should they have been -- if that's the purpose

9    of this table, how should they have been reflected on this

10   table?

11   A    They should be up here.  Because they won those

12   elections and they were preferred, according to the

13   ecological inference analysis, they were preferred by

14   large majorities of the minority community.

15   Q    And how would that affect the S-shaped curve that is

16   plotted by Dr. Katz in this table?

17   A    Well, I don't have the data before me, so I can't run

18   the analysis, but having done analyses like this -- not

19   this analysis, but having done logit analyses many times

20   over my career, it would shift the curve so that it ran

21   over here somewhere.

22        I don't know if that's exactly where it would go, but

23   the idea is these values down here, sort of outliers that

24   are dragging the curve down, so they will affect the

25   estimated probabilities.  If those get swapped up to being

Ansolabehere - Direct

1   1s instead of 0s, the probability of electing an

2   African-American preferred candidate will go up out in

3   this -- out in this area of the chart.

4       And that would affect the curve, it would shift the

5   estimated curve this way.

6           JUDGE PAYNE:  So you are moving the curve on

7   Figure 9, keeping it roughly the same shape, but you're

8   moving it to the left margin, is that right?

9           THE WITNESS:  Correct, the same of the

10  function --

11          JUDGE PAYNE:  What would that do to the

12  conclusion of his testimony that at 50 percent BVAP it

13  would take 52 percent of the vote to elect a candidate of

14  choice, in your judgment?

15          THE WITNESS:  It would -- say that at 50 percent

16  BVAP, it would take a lower percentage of the vote to

17  elect the candidate.  Or at 50 percent BVAP, they would

18  have a higher probability of electing the candidate of

19  choice.

20          JUDGE PAYNE:  What percent of the vote?

21          THE WITNESS:  I don't know exactly because I

22  don't have the data before me to actually estimate the

23  curve.

24          JUDGE PAYNE:  All right.  Sorry.

25  BY MR. HAMILTON: (Continuing)

Ansolabehere - Direct

1  Q   So did this predictive business, this looking into the

2  future stuff of how a new district will perform, is that

3  essential to evaluating whether these House districts will

4  retain the ability to elect minority candidates of choice?

5  A   Say that again.

6  Q   Is this predictive analysis of how the new district

7  will perform in future elections, is that essential to

8  evaluating whether these House districts will retain the

9  ability to elect?

10 A   Some sort of predictive analysis is necessary.  Are

11 you referring to Dr. Katz' analysis or something else?

12 Q   Just in general.

13 A   In general, yes.

14 Q   Is there more than one way to do that?

15 A   Yes, there are two standard ways to do that.

16 Q   Okay.  Can you explain the first.

17 A   The first standard way to do that is to take elections

18 in that area, and they could be all sorts of elections, I

19 looked at those, the four already discussed, and examine

20 what the vote share would be in the reconfigured district.

21 That is, take the voting tabulation districts in the newly

22 configured district and simply calculate what percentage

23 of the vote for say U.S. President or governor, whatever

24 the key election is, would be.

25     The idea there is, black voters have expressed a

Ansolabehere - Direct

1   preference for this candidate.  Do they win a majority of

2   votes in the newly configured districts for the candidates

3   for which they expressed a preference?  And that's the

4   first analysis you would perform.

5   Q   And is that contained in your report, sir?

6   A   It is.

7   Q   And before we go to your report, is that similar to

8   what Dr. Hood did?

9   A   It is.

10  Q   Okay.  So which tables is this from your report?

11  A   In my original report, Tables 14A and 14B.

12  Q   Can you explain briefly how we should read -- what

13  these tables are telling us.

14  A   This tells you for the elections in question, the

15  election studied in this particular table, what percentage

16  of votes were won by the minority preferred candidate.  In

17  this case the Democrat for District 63, 69, 70, et cetera.

18  Those are the rows.

19       And then the columns are under the benchmark

20  configuration of the district, and under the configuration

21  of the District under HB 5005.  The first two columns of

22  calculated numbers are for President 2008.  Second two are

23  for President 2012.

24  Q   And what is your conclusion looking at the population

25  results analyzed this way?

Ansolabehere - Direct

1    A    In these districts, the minority preferred candidates

2    would win at least 62 or projected to have won 62 percent

3    or more of the vote in every one of these districts, and

4    it ranged from 62 up to 88 percent.

5    Q    Okay.  What's the second one -- you mentioned there

6    were two ways to look at this.  What's the second way to

7    look at it?

8    A    The second way, which I also provided in my original

9    report and in my reply report, is to take the -- rather

10   than start with the votes, to start with the racial

11   composition.  Estimate the voting behavior of each of the

12   racial groups.  And then based on the racial composition

13   of the district, project or estimate what the vote share

14   would be for each of the elections studied.

15   Q    And did you do that?

16   A    Yes.

17   Q    Is that an unusual form of analysis?

18   A    No.

19   Q    Is this one of the functional analyses that we've

20   heard about as described in the Department of Justice

21   regulations?

22   A    Yes, both of these analyses would be done as part of a

23   functional analysis for a district.

24   Q    Okay.

25          JUDGE PAYNE:  That's not the question.  The

Ansolabehere - Direct

1    question was whether they are described or mentioned, I

2    don't know which, in the Department of Justice

3    regulations?

4            THE WITNESS:  I don't know if they are in the

5    regulations, but they are part of the submissions to the

6    Department of Justice.

7    BY MR. HAMILTON: (Continuing)

8    Q   I think the question was, is this a form of the

9    functional analysis that is described in the Department of

10   Justice regulations?

11           JUDGE PAYNE:  That's not the question.  The

12   emphasis there is whether it is described by the

13   regulations.  You're talking about whether it's a

14   functional analysis.

15           MR. HAMILTON:  Correct, Your Honor.  I didn't

16   mean to ask him is it required by the Department of

17   Justice.

18   BY MR. HAMILTON: (Continuing)

19   Q   I just asked, is it a form of functional analysis as

20   described in the regulation?

21   A   It's a form of functional analysis.  I don't know if

22   it is prescribed by the regulations.

23   Q   And in doing this kind of analysis, you used

24   ecological regression, correct?

25   A   Correct.

Ansolabehere - Direct

1    Q    And Dr. Katz prefers ecological inference?

2    A    Correct.

3    Q    Which is the standard in the business, or is it just a

4    coin flip between using these two?

5    A    Ecological regression is the standard.

6    Q    And so, when was ecological inference first developed?

7    A    Ecological inference is also known as the method of

8    bounds, and it was developed in the mid-1970s.

9    Q    Has it gained wide acceptance since that time?

10   A    No.  In part because it is hard to calculate.

11   Q    What percentage of the analyses in this area uses

12   ecological regression versus ecological inference?

13   A    I would say about 90 to 95 percent of the analyses

14   that I have encountered use ecological regression.

15   Q    And which of the methods was utilized in *Thornberg*

16   *versus Gingles*, if you know?

17   A    Ecological regression.

18   Q    Is ecological inference stable, by the way, as a

19   statistical measure?

20   A    As a -- there is an algorithm for calculating it, and

21   it takes, as Dr. Katz testifies, it takes a long time to

22   converge.  It takes like six hours sometimes to get a

23   number, one number for one district.  So it is very

24   computer intensive.

25   Q    Dr. Katz criticized your analysis or certain results

Ansolabehere - Direct

1   of your analysis for being out of bounds, and he put up

2   some nice looking tables to try and show that.

3       Did your analyses violate any of the bounds in your

4   study?

5   A    No.

6   Q    Can you explain that.

7   A    So if the predicted -- the question is about the

8   parameter that comes out of a statistical model versus the

9   predicted value that you would use for doing an analysis.

10  And none of my predicted values violated the bounds.

11  Q    In this case specifically, you examined Dr. Katz'

12  ecological inference-generated results, right?

13  A    Correct.

14  Q    Did those differ from the ecological

15  regression-generated results that you conducted in your

16  original report?

17  A    As I mentioned in my reply report, the black

18  percentages are different by only a couple percentage

19  points.  I think the average was five percentage points

20  total.  And the differences, to the extent that there are

21  any difference, are in the white -- among white voters.

22  And those only arose in two House of Delegates districts.

23  Q    And if the Court wanted to find this analysis later,

24  where would they be looking in your reply report?

25  A    I don't remember the exact table.

Ansolabehere - Direct

1   Q    Was that Table 5?

2   A    That's Table 5 of my original report.

3   Q    Okay.  And which method of reviewing this showed more

4   racial polarization, the ecological inference analysis or

5   the ecological regression analysis?

6   A    The ecological inference analysis showed less racial

7   polarization.  The ecological regression analysis shows

8   somewhat more racial polarization.

9        In the two districts where we have a difference of

10  results, his analysis, Katz' EI analysis showed no racial

11  polarization, and mine showed some racial polarization.

12  Q    Now, another suggestion we heard last week was that

13  the presence of an American presidential candidate on the

14  ticket somehow distorted the results in the 2008 and 2012

15  elections.

16       Do you recall that?

17  A    I do.

18  Q    Does it matter?

19  A    I don't think so.  I analyzed the data -- that's

20  exactly why I was looking at the correlation between the

21  vote share in the presidential, Senate, and governor

22  election and in the House of Delegates elections in

23  question, just to make sure that there wasn't something

24  unique about one of those elections.

25       So that if I did all the analysis in terms of one

Ansolabehere - Direct

1   election, I might be skewed, but it didn't affect any of

2   the conclusions.

3   Q    Now, your choice, the way that you approached

4   identifying what were, for the lack of a better term, the

5   benchmark districts or the benchmark elections that you

6   were going to use to compare voter performance and do your

7   analysis, have you done that before?

8   A    Yes.

9   Q    Is that something you do for CBS News?

10  A    Yes.  For CBS News we're always looking for what are

11  the benchmark elections that will give us the most

12  accurate prediction of the coming congressional election

13  or the coming Senate election in a given state.  We're

14  always looking for which elections, like a presidential

15  election, correlate highly with congressional or lower

16  offices.

17  Q    And did you use that same method here in selecting

18  elections for their predictive ability?

19  A    Yes.

20  Q    And is it possible to take those election results and

21  project into the future and provide an estimate of how the

22  modified, the new enacted district will perform in the

23  future?

24  A    In the near future.  I wouldn't use it to project say

25  at the end of the decade because of population shifts and

Ansolabehere - Direct

1    so forth.  But in the near future.

2    Q    And when you are creating these predictive models for

3    CBS News, do you ecological regression in that analysis?

4    A    Yes.

5    Q    How accurate have your predictive modelings been over

6    the time that you have been with CBS News?

7    A    I started with CBS, working at CBS in 2006.  And I

8    handle Senate and congressional elections, as well as

9    presidential.  And so far, we haven't missed a state or a

10   district.

11   Q    Now, there has been some suggestion last week that the

12   racially polarized voting analysis is somehow unusual in

13   connection with redistricting even in states governed by

14   Section 5.

15        Do you recall that testimony?

16   A    I do.

17   Q    Do you agree with that testimony?

18   A    Which part of it?

19   Q    That it is unusual, that racially polarized voting

20   analyses are unusual and rarely done?

21   A    My experience in this area is that racially polarized

22   voting analyses are done commonly in assessing the

23   performance of plans.

24   Q    And in what specific states are you familiar with

25   racially polarized voting analysis being done in

Ansolabehere - Direct

1    connection with redistricting in the states covered by --

2           JUDGE PAYNE:  That wasn't what he answered, Mr.

3    Hamilton.  What he answered was that it was done in

4    connection with performance.

5           Now you're talking about drawing, and those are

6    two different things.  So --

7           MR. HAMILTON:  How about if I ask him both?

8           JUDGE LEE:  One at a time.

9           JUDGE PAYNE:  Just one would be good.

10   BY MR. HAMILTON:  (Continuing)

11   Q    All right.  Well, let's start first, are you familiar

12   with how often racially polarized voting analyses are done

13   in drawing maps during the process of doing redistricting

14   itself?

15   A    I only know of a couple of situations where I know

16   what they were actually using and looking at.

17   Q    Okay.  Can you explain what those are?

18   A    Well, I know Massachusetts because I was involved in

19   bidding for that, and they were looking for a racially

20   polarized voting analysis as well as basic data provision.

21          I know that the city council elections in New

22   York used racially polarized voting analysis as part of

23   their process.

24          I believe that Texas, from everything I heard at

25   various trials there, used racially polarized voting

Ansolabehere - Direct

1    analysis during the process of districting, but that was a

2    long process.

3    Q    Okay.  How about after the fact in connection with

4    Section 5 preclearance submissions to the Department of

5    Justice, are racially polarized voting studies often

6    utilized in preclearance submissions?

7    A    My understanding is that it's standard.  So it is very

8    common.

9    Q    And in addition to Texas, Massachusetts, New York, are

10   you familiar with any other states in which racially

11   polarized voting analyses have been submitted to the

12   Department of Justice?

13   A    Off the top of my head, I couldn't list them, but --

14   Q    Arizona?

15   A    I do know that Arizona had one.  It was --

16   Q    How about Virginia?

17   A    I learned from -- in the context of this trial that

18   there was something submitted in Virginia, but --

19   Q    Without doing some analysis of the extent of white

20   crossover voting, is it possible for the General Assembly

21   to determine whether the modified district preserved the

22   ability to elect of the minority community?

23   A    Could you rephrase that question?

24   Q    Without doing some analysis of the extent of white

25   crossover voting, could the General Assembly determine

Ansolabehere - Direct

1  whether the modified district preserved the ability to

2  elect?

3  A    You'd need to -- you'd need to know how all the racial

4  groups were voting if you were going to take the second

5  sort of analysis that I pursued.

6      You could do the first sort of analysis and look at

7  the reconfigured votes in different elections if you had

8  done a racially polarized voting analysis and knew who the

9  preferred candidates were of the minority.

10          JUDGE PAYNE:  We will take the lunch recess at

11  this time.

12          How much longer do you have, Mr. Hamilton?

13          MR. HAMILTON:  About 20 minutes I would think,

14  Your Honor.

15          JUDGE PAYNE:  All right.

16          NOTE:  At this point, the lunch recess is taken.

17          JUDGE PAYNE:  All right.  You are under the same

18  oath you've taken previously, sir.  Mr. Hamilton.

19          MR. HAMILTON:  Thank you, Your Honor.

20  BY MR. HAMILTON:   (resuming)

21  Q    Dr. Ansolabehere, you've testified this morning about

22  the functional analysis that's described in the Department

23  of Justice regulations.  Is asking incumbent

24  officer-holders what level of black voting-age population

25  they think they might need to ensure reelection a

Ansolabehere - Direct

1  functional analysis within the meaning of that regulation

2  in your experience?

3  A    Not in my experience, no.

4  Q    What might the General Assembly have looked at other

5  than a racially polarized voting analysis which we know

6  they didn't?

7  A    They could look at registration statistics, turnout

8  statistics, election returns along the lines of the first

9  analysis I described earlier.  There are a variety of

10  other statistical factors they could look at.

11  Q    How about just black voting-age population statistics

12  in, say, for example, the companion Senate plan, would

13  that be something to look at?

14  A    They could look at the black voting-age population

15  statistics, yes.

16  Q    How about black voting-age population statistics in

17  the enacted benchmark plan at the time it was adopted;

18  would that be something to look at?

19  A    Yes.

20  Q    Or the Congressional map that was adopted by the

21  legislature?

22  A    Yes, to the extent that was informative about voting

23  behavior in different areas of the state.

24  Q    How about black voting-age population and political

25  performance in other jurisdictions; would that sometimes

Ansolabehere - Direct

785

1    be relevant?

2    A    It can be, yes.

3    Q    Or other offices in the same area, like mayor or city

4    council?  Is that data that the General Assembly might

5    have looked at?

6    A    Yes.

7    Q    Okay.  Let me turn your attention to Dr. Katz's, what

8    I've referred to as distance critique and specifically

9    Plaintiff's Exhibit 50 and table 11 which appears on page

10   82 of your report.

11        Dr. Katz criticized your analysis in this table on the

12   grounds that it failed to take into account the

13   interdependency as it relates to proximity of these VTDs

14   in different districts.  I'm sure -- that's a summary.  Do

15   you recall that topic of conversation?

16   A    Yes.

17   Q    Did you fail to consider interdependency and

18   proximity, Doctor?

19   A    No.

20   Q    Can you explain that.

21   A    So table 11 is a plan-wide analysis done to sort of

22   set up table 12 which is looking at specific areas within

23   the state.  So that would take care of proximity and

24   distance and which districts are on the margins of each of

25   the districts.

Ansolabehere - Direct

1        In addition, the earlier tables that come before this

2   that are part of the same series of analyses analyzing

3   whether race or party is a more predominate factor all

4   look at the neighboring VTDs around the districts, which

5   VTDs are moved in and out.  Those are tables six, seven,

6   eight, nine, and ten.

7   Q    How did Dr. Katz approach this question of proximity?

8   A    Dr. Katz measured proximity by finding the geographic

9   center of the district and then measuring distance of VTDs

10  from that center.

11  Q    Is that appropriate?

12  A    No, because these districts are highly non-compact in

13  some areas, as I noted in my reply report, so a simple

14  distance measure is not going to capture the way the

15  districts are nested.  Also, that analysis, the analysis

16  he is doing, is a plan-wide analysis, so every VTD in the

17  entire state is included in his analysis.  Table 12, I

18  think, is the more appropriate analysis because that's

19  nested in each of the local areas.

20  Q    So let's take a look at table 12, if we might.  This

21  is the same exhibit, for the record, Plaintiff's

22  Exhibit 50, table 12, page 83.  Can you walk us through

23  what this table is telling us?

24  A    This table examines inside each of the regions whether

25  the racial composition, the black voting-age population of

Ansolabehere - Direct

1    each VTD or the partisan performance in each VTD is a

2    stronger predictor of which VTDs are included in a

3    district or not included in a district.

4    Q    So can you pick an example?  We won't go through all

5    five of the different areas, but give us one example and

6    walk us through the numerical -- the numbers on this

7    table.

8    A    So in the last column, for example, the Hampton area,

9    this means that a one-percent increase -- or area that's

10   one percent more -- has higher BVAP is one percent more

11   likely to be included.  That number is about -- .09 is

12   about one, so nine-tenths of a percentage point more

13   likely to be included given the partisanship of that

14   district.

15       The second number in that column, negative .275, means

16   that given the race of that district -- of that voting

17   tabulation district, a one percent higher democratic vote

18   share means it's a little less likely to be included in

19   the district in question, 95 or 92 in this case.  But

20   that's not a statistically significant coefficient.

21       So race is a significant factor in the first -- the

22   first number in that column is a significant factor.

23   Party is not a significant factor and even has the wrong

24   sign in that case.

25   Q    And does the same hold true for each of the five areas

Ansolabehere - Direct

1    that you studied?

2    A    Yes.   In each of the five areas, I found that race was

3    statistically significant given the partisanship of the

4    VTD in predicting whether that VTD was included in one of

5    the challenged districts in that area, and that party was

6    not a statistically significant factor given the race of

7    that VTD.

8    Q    And how does this respond to Dr. Katz's critique of

9    your analysis?

10   A    Well, this is looking within the specific area.   So

11   this is considering the local area, the proximity of the

12   VTDs to that, to each of those districts.

13   Q    So let's look at table 6A of your report.   You

14   mentioned that a moment ago.   Can you explain what this

15   table is telling us.

16   A    Table 6A is an analysis of VTDs that were in the

17   benchmark map or not in the benchmark map and were in the

18   HB 5005 or not in HB 5005, and in particular, the off

19   diagonals look at -- are the set of all VTDs that were in

20   a district under one version of the map and not in that

21   district under another version of the map, and the first

22   cell is all the VTDs that were in under both versions of

23   the map.

24        So it consists of all -- those three cells consist of

25   all the VTDs that were in the districts, so they'd have to

Ansolabehere - Direct

1  be proximate.

2  Q    Okay.  So I get that that -- I take it that addresses

3  the proximity critique raised by Dr. Katz?

4  A    Yes.  In fact, these are all -- those three cells

5  consist of all the VTDs that were proximate in the sense

6  they were in or out in one version of the map or not.  So

7  they were connected in one way or another to this

8  district, to benchmark or HB 5005.

9  Q    What conclusion can we draw from that table?

10  A    Again, there's a large difference between the

11  likelihood that a VTD is moved into a district in terms of

12  its BVAP and likelihood it was moved out of a district in

13  terms of its BVAP.  Those districts with higher BVAP were

14  moved -- disproportionately higher BVAP were moved in

15  compared to those that were moved out.

16  Q    What about politics, political performance of those

17  VTDs?

18  A    Table 6B looks at the political performance of those

19  VTDs, and the partisan differences were much smaller,

20  about half as large as the racial differences.

21  Q    And so what did you conclude from that?

22  A    I concluded that race was a predominate factor

23  compared to party.

24  Q    So in any of these two tables, table 6A, table 6B, did

25  Dr. Katz, his critique, even purport to challenge your

Ansolabehere - Direct

1    analysis in either of these two tables?

2    A    No, he offered no analysis.

3    Q    Is there a proximity challenge when you're looking

4    just at the border of VTDs that were moved either in or

5    out?  Is that a fair critique of your analysis in these

6    two tables?

7    A    No, it's not.

8    Q    How about table seven, same exhibit, can you explain

9    what this is?

10   A    Table seven summarizes the VTDs that were kept in the

11   same district from one version of the map to another, from

12   the benchmark to HB 5005.  One might think of that as the

13   core.  VTDs were moved between African-American districts,

14   between the challenged districts, so perhaps from 70 to 71

15   or 69 to 70.  VTDs were moved into one of the challenged

16   districts from non-challenged districts.  VTDs were moved

17   out of the challenged districts from -- out of a

18   challenged district into a non-challenged district, and

19   then all the VTDs that were not in either, under either

20   map in a challenged district.

21   Q    So looking just at the black voting-age population,

22   what are the differences between those that were moved in

23   and those that were moved out?

24   A    About a 12 percentage point difference.

25   Q    Is that statistically significant?

Ansolabehere - Direct

1    A    Yes.

2    Q    How about partisan performance?

3    A    About a six percentage point difference.

4    Q    So the difference is it's twice as large a difference.

5    Is that -- is that meaningful from a statistical

6    perspective?

7    A    Yes.  I did a statistical test, and it was a

8    statistically significant difference.

9    Q    Did you hear Dr. Katz raise any proximity or any other

10   kind of objection to table seven in the analysis presented

11   there?

12   A    No.

13   Q    Let's look at table eight.  Can you explain what this

14   table is?

15   A    Table eight does a similar analysis to tables 6A and

16   6B looking at each of the districts individually.

17   Q    What's the difference between seven -- between table

18   eight and the tables that preceded it that we've just been

19   looking at?

20   A    This is just a more detailed analysis, going district

21   by district.

22   Q    Okay.  District by district, and, again, you are

23   looking at the precincts that were moved in versus moved

24   out?

25   A    Correct.

Ansolabehere - Direct

1    Q    Is there any legitimate critique of this one on the

2    basis that you failed to account for contiguity or

3    proximity?

4    A    No.

5    Q    And, again, that's just because you're looking at the

6    margins of these districts?

7    A    Correct.

8    Q    What did you conclude about -- as a result of your

9    analysis that's reflected in table eight?

10   A    That race was a predominate factor in the movement of

11   VTDs in and out in most of the districts, and it was a

12   larger factor than partisanship.

13   Q    It was larger.  Was it statistically significant, the

14   difference between race as an explanatory factor and

15   partisanship?

16   A    On the whole.  There were some districts where both

17   were small, but where we saw racial differences, they were

18   significant.

19   Q    And for the record, just so we can be clear, can you

20   identify which districts where they were significant and

21   where they were both small?

22   A    63 was an example where both were -- I observed

23   significant differences on both scores.  75, race was

24   predominant.  69, partisanship had a larger effect.  70,

25   they were about the same.  71, race was very large and

Ansolabehere - Direct

1    predominate effect.  74, they were about the same and both

2    significant.  77, both were large, but race was slightly

3    larger.  80, they tended to be smaller.

4    Q    All right.  How about table ten, same report,

5    Exhibit 50?  What is this table?

6    A    These are the simple correlations and partial

7    correlations between each of these factors and the

8    likelihood of inclusion of a VTD in a district.

9    Q    Is there -- did you fail to consider proximity here?

10   A    No, because we're looking at whether they're included

11   in the areas.

12   Q    All right.  And what did you conclude as a result of

13   this analysis?

14   A    That race was a predominate factor, had stronger

15   correlation than party in both cases, and in the second

16   case, the partial correlations race, party was not a

17   significant factor.

18   Q    Did Dr. Katz criticize this table on proximity grounds

19   or any other grounds?

20   A    No, not in his report.

21   Q    So the only table that Dr. Katz leveled a criticism

22   about was your table 11, the analysis in your table 11?

23   A    That's correct.

24   Q    Now, Dr. Katz also faulted your analysis for failing

25   to consider incumbency; do you recall that testimony?

Ansolabehere - Direct

1    A    Correct.

2    Q    How did Dr. Katz -- or did Dr. Katz explain how he

3    would have considered incumbency?

4    A    I didn't hear a specific analysis suggested.

5    Q    Was it in his report?

6    A    No.

7    Q    Well, would considering incumbency be consistent with

8    the African-American delegates and what they said in the

9    videos that we were watching last week?

10   A    The African American delegates, from what I heard,

11   indicated that they wanted districts that would perform

12   even when there was no incumbent running.  So they wanted

13   districts that would perform quite apart from incumbency.

14   Q    Is incumbency relevant to the opportunity-to-elect

15   question that's before the Court?

16   A    Not in my analysis, no.

17   Q    Why not?

18   A    The question at hand is whether the minority voters

19   have the ability to elect their preferred candidates quite

20   apart from whether that person is an incumbent.  It's not

21   about the election of specific candidates.

22   Q    Just a couple more areas before we finish here.

23   Dr. Hofeller testified this morning about core retention.

24   Do you recall seeing core retention in the House criteria

25   for drawing these redistricting lines?

Ansolabehere - Direct

1    A    I don't recall that.

2    Q    What is the black voting-age population in the core if

3    we describe the core as what was kept in the enacted map

4    from what was in the benchmark map?

5    A    The black voting-age population in the core of these

6    districts was always -- was on average about 61,

7    62 percent, and always disproportionately higher BVAP than

8    the other areas.

9    Q    So what does retaining that core tell us?

10   A    One interpretation of that is that you can choose any

11   part of the district to maintain or retain which VTDs to

12   swap out and suggest that BVAP was also an important

13   consideration in how the core was defined.

14   Q    All right.  I want to switch to Delegate Jones's

15   testimony here for just a moment.  We heard some testimony

16   about the way that the districts were drawn in the Hampton

17   area; do you recall hearing that?

18   A    Yes.

19   Q    Delegate Jones said he drew it, in part, to

20   avoid pairing --

21             JUDGE PAYNE:  Mr. Hamilton, please don't

22   summarize the testimony of other witnesses.  Just ask the

23   question you want to ask.  We'll pick it up.  You can make

24   whatever arguments you want to make about it, but it just

25   doubles the amount of time that questions take.

1           MR. HAMILTON:  Thank you, Your Honor.

2    Q    You testified a moment ago that you studied the

3    movement of precincts in and out of the districts in the

4    Hampton area; is that right?

5    A    Yes.

6    Q    Did the enacted plan pair incumbents in HD 94?

7    A    My understanding from testimony and the maps shown

8    was, yes, it paired two incumbents.

9    Q    Which two?

10   A    Abbott and Oder, I think.

11   Q    Can you spell that for the record?

12   A    O-d-e-r, And I think Abbott is with two Bs and two Ts.

13           THE COURT REPORTER:  Thank you.

14   Q    When you looked at the movement of VTDs in and out,

15   was race or politics a better explanatory factor in that

16   area?

17   A    Race was a stronger factor.

18   Q    And did that include the specific line in House

19   District 94 involving the pairing of these two incumbents?

20   A    I'm not sure what the question is.

21   Q    The question is, you testified a moment ago that the

22   movement of VTDs, that race was a better -- the more

23   powerful explanation than politics in explaining the

24   movement of these VTDs in and out, and I'm asking, in this

25   specific area of HD 94, is that true?

Ansolabehere - Direct

1    A    HD 94 is neighboring HD 95, so the analysis concerning

2    the border of HD 95 and the Hampton area generally

3    suggests that race was a predominate factor in the drawing

4    of the districts in that area.

5    Q    All right.  Let's turn to HD 75, Delegate Tyler's

6    district.  Do you know -- there was a concern raised about

7    prisoners in her district.  Even accounting for those

8    prisoners, did HD 75 retain the opportunity to elect?

9    A    Yes.

10   Q    Is the presence of prisoners in the district relevant?

11   A    The analysis of past voting in other elections and in

12   House of Delegates elections already incorporates the

13   turnout level, and those prisoners can't vote to begin

14   with, so it's already factored in.

15   Q    In other words, the prison was there in the benchmark

16   and all the way through all the elections in between then

17   and the enacted map; is that what you're saying?

18   A    That's correct.  Those prisons are under --

19   Q    How about the --

20             THE COURT REPORTER:  I didn't understand that.

21             JUDGE LEE:  I didn't either.  Go back to what you

22   said about the prisons --

23             THE WITNESS:  The prisons were under both

24   versions of the map.  So if it was a performing district

25   before with those prisons, it was a performing district

Ansolabehere - Direct

1    after.

2    Q    In other words, the prisons weren't newly built in the

3    district.

4    A    Correct.

5              JUDGE LEE:  What did you say about turnout,

6    though?

7              THE COURT:  The turnout is already factored into

8    the election statistics study, the percent vote projected

9    to have been won under the benchmark map and under HB

10   5005.

11   Q    How many prisons are in HD 75?

12   A    Prisons and work houses, I think there are eight.

13   Q    And what's the total prison population?

14   A    About 7,000.

15   Q    How many are African American?

16   A    About 4,800.

17   Q    So if we factor that in and we drop the black

18   voting-age population to 50 percent, would Delegate

19   Tyler's district have retained the ability to elect?

20   A    My analysis is that it would.

21   Q    By what percentage of the vote?

22   A    I think hers was around 60 percent, 59.-something.

23   Q    Do the results differ if we use ecological regression

24   versus ecological inference in conducting that kind of an

25   analysis?

Ansolabehere - Direct

1   A    No, I reach the same conclusion either way.

2   Q    So does the presence of the prison population have any

3   material effect on the ability to elect in HD 75?

4   A    Not in my assessment, no.

5   Q    You've studied Dr. Katz, Hood, and Hofeller's report

6   and critiques of your work.  Did you use standard

7   methodology and statistical tools in conducting your

8   analysis in this case?

9   A    I did.

10  Q    Did you have access to all the data necessary to

11  formulate your opinions?

12  A    I did.

13  Q    And in your professional opinion after conducting the

14  study, did race or politics predominate in the drawing of

15  these 12 House districts?

16  A    My analysis and my conclusion is that race

17  predominated.

18          MR. HAMILTON:  Thank you.  No further questions.

19          MR. BRADEN:  Your Honors, I'll be mercifully

20  short.

21

22                  CROSS-EXAMINATION

23  BY MR. BRADEN:

24  Q    Were you present when the floor speech of

25  Representative Tyler was played?

Ansolabehere - Cross

1   A    I don't remember.  Which one was that?  I was

2   present -- I'm almost sure I was present for that.  That

3   was about HD 75?

4   Q    Yeah.  That was the discussion where she discussed the

5   prisoners in her district.

6   A    Yes.

7   Q    And do you know that she voted against the plan?

8   A    That's what I've heard in this courtroom, yes.

9   Q    Do you know why she voted against the plan?  I think

10  she expressed concern regarding it not having a large

11  enough black voting-age population?

12  A    That's what I heard testimony -- that's what I heard.

13  Q    So are you saying she was mistaken about what she

14  needed in that district for her to be reelected?

15  A    My analysis indicates that's true.

16  Q    So you are representing to the Court you have a better

17  understanding of electional politics in that district than

18  Representative Tyler does?

19  A    I don't know Representative Tyler's understanding of

20  elections in her district, and I don't know what the basis

21  for her judgment is about which areas she wanted in or

22  out, but my analysis indicates that this is a district

23  that would perform for an African-American candidate.

24  Q    Do you know whether she replaced an African-American

25  member in that district or a white member?

Ansolabehere - Cross

1    A    I don't recall.

2    Q    If we could bring up HD -- our favorite exhibit here,

3    the map of HD 71.

4              JUDGE PAYNE:  Is that Exhibit 94, Intervenors'?

5              MR. BRADEN:  Yeah, 94, page four.

6    Q    And if you could take a look at that map, have you

7    seen that before?

8    A    I have.

9    Q    And it's, you said -- I didn't hear what you said.

10   I'm sorry?

11   A    I have.

12   Q    So you understand the graphic and the legend for that

13   map?

14   A    Yes.

15   Q    Okay.  Were you present when Delegate Jones testified?

16   A    I was.

17   Q    And were you present when Delegate McClellan

18   testified?

19   A    I was.

20   Q    If I could go -- let's leave this up, and I just want

21   to ask you a question regarding table eight which you just

22   testified to from your report.  It's page nine of your

23   report.  It's Plaintiff's Exhibit 50, and I think there

24   was a discussion of the Richmond area.

25   A    Yes.

Ansolabehere - Cross

1    Q    And you pointed out in particular HD 17?

2    A    Correct.

3    Q    And did I hear correctly that your analysis showed

4    that this one had an especially strong showing of race

5    predominating over politics in the drawing of the

6    district?

7    A    Correct.

8    Q    Okay.  So let's look at the district for just a second

9    here.  Precinct 207, do you see that on the map?

10   A    Yes.

11   Q    Were you present for the testimony of Delegate Jones

12   that this particular precinct was moved out at the

13   specific request of an incumbent member who represented

14   that in city council or was city counsel president?

15   A    Yes.

16   Q    But your analysis doesn't examine that type of

17   politics?  You're only talking about electoral politics?

18   A    I'm talking about the racial composition of the

19   district and the voting patterns and strength in that

20   district, not about how an incumbent --

21   Q    You had --

22        JUDGE PAYNE:  Wait a minute.  He was answering

23   the question.  Not about what?

24        THE WITNESS:  Not about how the incumbent ran in

25   a city council election in the past or how they performed

Ansolabehere - Cross

1   in the past.

2   Q    So if Delegate Jones were to say that the principal

3   reason why this particular precinct was moved out of the

4   district was based upon a request of an incumbent member,

5   would you have any information to counter that?

6   A    No.

7   Q    So wouldn't you think that request was the predominate

8   factor in moving that district out -- that particular

9   precinct out?

10  A    But I don't know the basis of the request.  It could

11  have been race, it could have been party.  My analysis

12  indicates the movement of all these precincts in this area

13  is more strongly related to race than politics.

14  Q    I'm sorry, you answered a question I didn't ask.  I

15  was asking about this specifically.  You did not hear

16  Delegate Jones say he was asked by an individual who said

17  he wanted it because he had represented it as a city

18  council president; you didn't hear that testimony?

19  A    I heard that.

20  Q    Do you have any reason to doubt that testimony?

21  A    No.

22  Q    There are three precincts in the northern part of this

23  district.  They are Summit Court, Hilliard, and Stratford

24  Hall.  Do you see those?

25  A    I do.

Ansolabehere - Cross

1   Q    What county are they?

2   A    Henrico, I think.

3   Q    They are not part of Richmond, are they?

4   A    They're not in the Richmond -- city of Richmond, no.

5   Q    So those three districts were -- precincts were moved

6   out, and that made Henrico County whole.  Wouldn't that

7   comply with one of the criteria adopted by the state?

8   A    Potentially, yeah.

9   Q    Does this analysis tell us anything comparing race to

10  incumbency considerations?

11  A    I did not examine incumbency considerations.

12          JUDGE PAYNE:  So I guess the answer is no.

13          THE WITNESS:  No.

14          JUDGE PAYNE:  Is that right?

15          THE WITNESS:  No, just race.

16  Q    You didn't consider service areas?

17  A    No.

18  Q    You didn't consider communities of interest?

19  A    To the extent that I examined race, which is sometimes

20  identified as a community of interest, geography, such as

21  which counties these districts are nested in or local

22  areas, county line crossings, city crossings, I did

23  consider in that regard communities, but not beyond that.

24  Q    So not to beat a dead horse, or dead statistical

25  analysis, sorry, your VTD analysis is only comparing the

Ansolabehere - Cross

1   variable of race to election results; correct?

2   A    Correct.

3   Q    And you make no comparison to any other of the

4   criteria in this analysis other than those two; that's it?

5   A    Well, there is an analysis of split county lines,

6   whether the inclusion of a VTD split a county line, but

7   beyond that, nothing else.

8   Q    I have quickly, and it will be quick -- I'm trying

9   to -- at the beginning of your redirect testimony, you had

10  table two.  I believe that's on page 12 of your rebuttal

11  report.  Am I correct -- is this the statistical analysis

12  that you said that you did on compactness?

13  A    Below is a statistical analysis, and I think it's

14  table two if you would page down in the report.

15  Q    Where would be the statistical analysis?

16  A    Where I compare the rank of the compactness scores,

17  the point was made by one of the experts, I think

18  Dr. Hofeller, that the distribution of compactness scores

19  was not different for the challenged districts and the

20  non-challenged districts, but in my reply report, I had

21  conducted an analysis below this, below paragraph 37, of

22  the rank of the scores and found a  statistically

23  significant difference on all the scores.

24  Q    What variables did you use?

25  A    I used the Reock score, the Polsby-Popper score, and

Ansolabehere - Cross

1    the Schwartzberg score for all of the districts in the

2    state and for the 12 challenged districts.

3    Q    So I understand, because it's a long time since I've

4    had statistics, you looked at those scores, simply

5    comparing those scores and districts basically, just a

6    ranking effectively; am I correct?

7    A    You have two distributions.  You have the set of

8    Reock, Polsby-Popper, Schwartzberg scores for the

9    challenged districts, and then you have the set of

10   compactness scores for the non-challenged districts, and

11   you can do a statistical test between the averages or

12   between the full set of ranks, and I did a rank order

13   test.

14   Q    And would compactness of districts be impacted upon

15   where they are geographically in the state?

16   A    Potentially.

17   Q    So if you are on the peninsula or in Tidewater, you've

18   heard some testimony, do you disagree that compactness

19   scores there are likely to be -- more difficult to achieve

20   lower compactness scores?

21   A    Possibly.

22   Q    So --

23              JUDGE PAYNE:  Possibly it could happen --

24              THE WITNESS:  They could be --

25              JUDGE PAYNE:  Possibly it could happen or

Ansolabehere - Cross

1    possibly you disagree with it?  He asked if you disagreed.

2              THE WITNESS:  I agree that it's possible.

3    Q    So how did you control for the fact that half of the

4    challenged districts are on the peninsula or in Tidewater?

5    A    There's no control for that.

6              MR. BRADEN:  No further questions.

7              THE COURT:  Any redirect?

8              MR. HAMILTON:  Yes, Your Honor, but only briefly.

9

10                   REDIRECT EXAMINATION

11   BY MR. HAMILTON:

12   Q    Only because it wasn't shown to the Court, the average

13   rank analysis, that is table three in your rebuttal

14   report, which is Plaintiff's Exhibit 51; is that right?

15   A    Correct.

16   Q    And that's what we're looking at here?

17   A    Yes.

18   Q    Can you walk us through what this shows us?

19   A    So I took the Reock score of every district in the

20   plan, just looking at the first column, took the Reock

21   score of every district in the plan and ranked to order

22   those districts from the most compact to the least compact

23   in the plan, and then I computed the average of those

24   ranks for the 12 challenged districts and the average of

25   those ranks for the non -- the 88 non-challenged

Ansolabehere - Redirect

1    districts, and then I did a statistical test for the

2    difference between those ranks.

3    Q    And what was your conclusion?

4    A    For every one of the scores, there was a substantial

5    difference in the rank of which are more likely to be on

6    the -- think about it as which districts are more likely

7    to be on the less compact end of the spectrum or the more

8    compact end of the spectrum, and there's a statistically

9    significant difference regardless of which of the three

10   criteria are used, and it's highly significant.

11   Q    Result is the same regardless of which test we use?

12   A    The conclusion is the same, yes.

13   Q    If we're looking at compactness, as Dr. Hofeller said,

14   as a flag, which of these two groups is flagged; the 12

15   challenged districts or the rest of the state?

16   A    If it's a flag, I would suggest the 12 challenged

17   districts because there's more scrutiny, why are they more

18   on that end of the spectrum of less compactness.

19           MR. HAMILTON:  Thank you.  No further questions,

20   Your Honor.

21           JUDGE PAYNE:  All right, any other rebuttal

22   witnesses?  You may step down, sir.  Thank you for being

23   with us and giving us your testimony.

24           MR. HAMILTON:  No, Your Honor.

25           JUDGE PAYNE:  All right.

1          MR. HAMILTON:  Your Honor, two housekeeping

2   matters, and I don't know if you'd like to take them up

3   before closing or after.

4          JUDGE PAYNE:  Go right ahead.

5          MR. HAMILTON:  The first one is just clarifying

6   for the record what exhibits have been admitted and which

7   have not, and I'm happy to discuss it with the clerk when

8   we end just to make sure.  I just think it would be

9   helpful for all parties to have a clear understanding of

10  what exhibits have been admitted and what have not.

11         JUDGE PAYNE:  Well, the standard way of doing it

12  is to have the lawyers recite -- sit down and agree what

13  has been admitted and what hasn't with the clerk, and then

14  recite it into the record.  It's called the Lentz

15  approach.

16         MR. HAMILTON:  Would you like us to do that after

17  closing, Your Honor?

18         JUDGE PAYNE:  Yes.

19         MR. HAMILTON:  The second request is that because

20  we've -- the trial has continued on to this Monday, that

21  we slightly adjust the post-trial briefing schedule.

22  Currently, the opening briefs are due on July 20th with

23  replies due on the 27th, and I understand defendants have

24  no objection.  Intervenors, I don't think they object, but

25  we would like to move it back four days to the 24th and to

1    the 31st.

2            THE COURT:  I think we are in agreement here to

3    just leave the schedule like it is, please.

4            MR. HAMILTON:  Thank you.

5            JUDGE PAYNE:  Go ahead and argue your points now.

6    Remember each side has 30 minutes, and that includes the

7    questions you're going to get, too.

8

9            (Judges confer among themselves.)

10

11           JUDGE PAYNE:  15 minutes to make argument, and

12   then we'll have questions.

13           MR. HAMILTON:  All right.

14           THE COURT:  Remember, we've all read everything

15   that you all have submitted, and in the final analysis,

16   notwithstanding the statistical evidence which you all

17   have offered, it really isn't a particularly complex

18   thing.  So let's hear what you all have to say about it.

19   Maybe you do think it's complex.

20           JUDGE LEE:  The clerk is going to let us know

21   when you have five minutes left as well.

22           MR. HAMILTON:  Thank you, Your Honor.  There's a

23   lot to cover, and I want to start by thanking the Court

24   for the courtesy and patience over the course of the last

25   week.  It's been an honor to appear before you.

1           This case boils down to a very simple

2     proposition:  May Virginia's General Assembly utilize a

3     fixed numerical racial threshold in establishing district

4     lines across 12 House districts with significantly

5     different political and demographic properties.  The

6     answer to this question has been addressed and

7     definitively settled by the United States Supreme Court in

8     it's recent *Alabama* decision which unambiguously condemned

9     the use of racial thresholds in redistricting whether hard

10    and fast or merely rough targets.

11          This Court, too, addressed and resolved this very

12    issue in the *Page* decision rejecting a 55 percent

13    threshold on very similar facts in the Congressional map.

14    Neither decision was unusual.  Both follow along the line

15    of 14th Amendment cases.

16          The first question before the Court is whether

17    race predominated.  The key inquiry is what the

18    legislature intended, and here, that's easy because they

19    told us.  This is a direct evidence case.  This isn't a

20    case where you need to worry district lines or Reock

21    scores or locality splits or the other kind of

22    circumstantial evidence that is sometimes required to

23    decipher what the General Assembly was up to.  It told us

24    what it was doing and why when it drew these 12 challenged

25    districts, just like in Alabama, just like in *Page*.

1          Now, there's plenty of circumstantial evidence as

2     well, and it all confirms what the direct evidence so

3     plainly tells us.  So let's start with the direct evidence

4     that race predominated.

5          First, it's clear that other than population

6     equality, which the Court said in *Alabama* is a background

7     principle, the first and most important criteria was

8     compliance with the Voting Rights Act, and the means the

9     General Assembly used to that end was the explicit use of

10    the 55 percent racial BVAP threshold or target.

11         That's what all the evidence shows, all the

12    emails, the floor testimony, the testimony here in this

13    Court.  The redistricting, the General Assembly's

14    redistricting criteria places that number one, and it

15    prevailed over everything.

16         It's worth comparing the criteria adopted here by

17    this General Assembly to the criteria adopted in *Page*,

18    almost identical, and the criteria adopted in *Alabama*,

19    almost identical.

20         In *Alabama*, the legislature thought it needed to

21    maintain existing black voting-age populations and could

22    not drop below that.  Court said no.  In *Page*, the General

23    Assembly thought it needed to maintain at least 55 percent

24    black voting-age population in order to avoid

25    retrogression, and the Court said no.

1        Here, exactly as in *Page*, the General Assembly

2   thought it needed to maintain a floor of 55 percent BVAP

3   in order to avoid a retrogression, and the evidence showed

4   that not only did the General Assembly prioritize it over

5   all other factors, just like in *Alabama* and *Page*, the way

6   they chose to implement it was to have the overriding

7   criteria of the Voting Rights Act prevail over all others.

8        Now, we've heard a lot of evidence in this case

9   about the number 55 percent and what it meant.  On the

10  first day of trial, intervenors stipulated that the

11  General Assembly had, quote, an aspiration or target of

12  55 percent.  Delegate Jones called it a threshold and

13  testified it was a rule of thumb or aspiration.  Delegate

14  McClellan called it a target criteria and testified that

15  Delegate Jones told her that each of the majority-minority

16  districts would have to have at least 55 percent BVAP.

17       John Morgan, the consultant, called it a floor in

18  his expert report which is both here and cited in the *Page*

19  case.  Delegate Dance called it a rule of thumb, and, of

20  course, Delegate Armstrong called it a bright-line rule.

21       It's all interesting nomenclature, but the

22  question is not how do we call what they did, what's the

23  words that we use to describe.  We can call it a target as

24  Mr. Braden stipulated, or a threshold as Mr. Jones wrote

25  in his email and as found by the Court in *Page*.  We can

1    call it a floor.  We can call it an aspiration, a goal, an

2    objective, an ambition, a plan, anything else, but it

3    doesn't matter what we call it.

4         The point is, there is an acknowledged and

5    admitted use of race as a predominate factor in drawing

6    these districts through the use of that threshold, and the

7    issue is not whether it was a hard and fast rule.  The

8    intervenors seem to be under the impression that as long

9    as they permitted minor deviation from a fixed threshold

10   as measured by a secret and undisclosed DOJ black

11   measuring stick, then this was permissible, but with all

12   due respect, that's just not the law.

13        The use of racial targets without adequate

14   justification is equally forbidden, whether roughly

15   applied, like in *Alabama*, or fixed as a hard and fast rule

16   like in *Page*.  Justice Breyer, writing for the Court,

17   emphatically rejected that kind of an approach calling it

18   asking the wrong question.

19        Whatever else we might debate about in this

20   record before this Court, it's clear that the General

21   Assembly heavily relied upon a rough mechanically

22   numerical view just like as was rejected in *Alabama* and

23   *Page*.  Of course, it was uniformly applied, as Delegate

24   Jones wrote in his email, to every single solitary

25   district.

1              I won't read you the quotes from the cases, but,

2    of course, we can see the actual conflict between this

3    racial target and the other criteria in the change

4    requested by the Richmond registrar, Ms. Showalter.  She

5    asked for a slight change to avoid splitting a VTD, and

6    you recall Delegate Jones testified -- this was the measly

7    0.2 percent change.

8              Delegate Jones testified that he fixed this in

9    the last-minute amendment just before passage.  That

10   conflicts with what Delegate McClellan says, but it

11   doesn't matter.  Let's take what Delegate Jones said as

12   true.  It demonstrates the point.  We are looking at House

13   District 71.  When the request was made, please don't

14   split this VTD, it was rejected because it would go below

15   -- would drop the BVAP below 55 percent, so it couldn't be

16   done.  But then, when a way was found to unsplit that VTD

17   and keep the BVAP above 55 percent, it was allowed in

18   final passage.  That demonstrates the point.

19             And it also serves as an eloquent rebuttal of

20   something else we heard at trial, that Delegate Jones'

21   testimony about this DOJ black district, not once during

22   any of the legislative debates or hearings did he make

23   such a distinction or tell the other delegates that there

24   was this other measuring stick that he was using.

25             Delegate Jones also apparently didn't tell John

1    Morgan, the consultant, who discussed 55 percent.  Nor did

2    he tell DLS when they prepared that table we just looked

3    at this morning that reported all of the districts at

4    55 percent or higher.  But it doesn't really matter.

5         The distinction between how DLS or DOJ calculates

6    this is simply irrelevant, and it doesn't matter what we

7    call it.  They used a racial target, and whether that was

8    53 or 54 or 55 or 56, whether you measure it this way or

9    that way, it just doesn't matter.

10        Now, there's a bunch of circumstantial evidence,

11   and in the interest of time, I'm going to skip through it.

12   It's all contained in Dr. Ansolabehere's reports and

13   testimony which I know the Court was paying attention to.

14        So it brings us to the intervenors' claim that it

15   was politics, not race, that predominated, and there's a

16   lot of things I could say about that.  First, it's a post

17   hoc argument.  The criteria that the General Assembly

18   adopted couldn't be clearer.  All considerations are

19   subordinated to compliance with what was the Voting Rights

20   Act, one person one vote.

21        Indeed, political advantage appears nowhere in

22   the published criteria, and although Delegate Jones spent

23   a lot of time talking about all the many local factors he

24   considered, he said precious little about political

25   factors, and, indeed, admitted that unseating democrats

1   was, quote, not the goal, close quote.

2          To the extent that there's any evidence that

3   politics played a role, that does not show that these

4   factors predominated over race.  Delegate Jones made those

5   changes and weighed the political factors only subject to

6   the 55 percent threshold.  In other words, he wouldn't

7   make any change that he testified at trial if it had

8   caused the BVAP in the challenged districts to fall below

9   55 percent.  That was the one thing was not negotiable.

10         Because race was a predominate factor in drawing

11  these districts, intervenors have the burden of

12  identifying the compelling state interest to justify the

13  use of race and show that their use of race was narrowly

14  tailored to advance that compelling state interest, but

15  that's something they just can't do because these

16  districts differ significantly, and a one-size-fits-all

17  racial rule cannot be used to create these kinds of a

18  district.

19         They've identified two defenses, Section 2 and

20  Section 5 of the Voting Rights Act.  Mr. Braden took me to

21  task for failing to mention Section 2.  For starters,

22  there's not a floor -- not a mention in any of the floor

23  debates about any concern about a Section 2 claim.  It's

24  utterly silent.  When the Court asked Delegate Jones,

25  where did this 55 percent number come from, he answered

1    with a vague comment that the community felt that that was

2    what they needed to ensure their reelection and the

3    election of those that followed.  Not a word about Section

4    2, nothing about it.

5            In any event, it would be impossible to present a

6    Section 2 claim or a concern about a Section 2 claim

7    without going through the *Gingles* analysis which, of

8    course, requires a racially polarized voting study, and we

9    know that wasn't done.

10           Let's put all that aside and just focus on what

11   the plaintiffs are trying to accomplish here.  Let me be

12   as clear as I can be.  Plaintiffs are not even remotely

13   suggesting that any of these 12 districts should have had

14   their BVAP lowered below 55 percent.  We've never made

15   that claim, we never will make that claim.

16           It is essential that these all be healthy

17   performing majority-minority districts, just like CD 3

18   when it is redrawn and just like the Senate

19   majority-minority districts.  Determining -- maintaining

20   healthy and performing majority-minority districts hardly

21   requires applying a minimum BVAP threshold well above that

22   needed to win a majority of minority voters that would

23   guarantee winning percentages in the 60, 70, and

24   80 percent total vote.

25           That's not protecting African-American voters.

1    It's doing precisely the opposite, all under the guise of

2    helping.  A district-specific analysis is what's required

3    under the Voting Rights Act, and that's exactly what, even

4    by intervenor's own expert, shows significant variations

5    between each of these 12 districts and devastatingly

6    undercuts this flat rule applied to all 12 districts.

7         Section 5 isn't a compelling interest either,

8    because the only way to survive strict scrutiny is to show

9    that Section 5 actually required the use of the same

10   predetermined 55 percent BVAP threshold.  Remarkably, no

11   effort was made to determine whether that threshold was

12   actually required to avoid retrogression in the challenged

13   districts.

14        Delegate Jones didn't do a racially polarized

15   voting analysis.  He didn't do a simple statistical

16   analysis.  He looked at almost nothing other than to ask

17   the existing incumbents, hey, what do you think, and what

18   number should be included.

19        That's asking the wrong question under *Alabama*.

20   Justice Breyer, writing for the Court in *Alabama*, said how

21   can we -- the legislature had asked, how can we maintain

22   the present minority percentages in majority-minority

23   districts.  It should have asked, quote, to what extent

24   must we preserve existing minority percentages in order to

25   maintain the minorities' present ability to elect the

1    candidate of its choice.

2         See how close these two cases are?  Swap out

3    maintain -- maintain present minority percentages with

4    maintain black voting-age population at or above

5    55 percent, and the answer to this case becomes quite

6    clear.

7         By the way, that's not a recent decision

8    announced or not a new rule invented by Justice Breyer.

9    It's a long line of cases.  *Smith v. Beasley* specifically

10   so holds, and we talked about that in our briefing.

11        Dr. Ansolabehere provided the Court with

12   testimony about the tailoring in these different

13   elections, and Dr. Katz's testimony himself demonstrated

14   the significant variance between this.  Now, intervenors

15   claim that the real election is the primary, but even

16   intervenors, two of their experts said there's not enough

17   data there to do an analysis, and I submit to the Court

18   there has to be a way to answer this question.  It's not

19   enough to say that there isn't, and Dr. Ansolabehere did

20   that analysis using a different data set that closely

21   correlated with the behavior in a House of Delegates

22   district.

23        That's the way this analysis is done.  It's no

24   answer to say that the incumbents voted for the plan like

25   we saw and their speeches on the videotape.  Of course

 1    they liked it.  What incumbent wouldn't want their winning

 2    percentages run up to 70 or 80 percent?  But that's not

 3    the question.  The Voting Rights Act was not passed to

 4    protect their interest.  The Voting Rights Act was to

 5    protect the interest of the voters, not to create

 6    overwhelmingly safe districts.

 7         Second, the black voting-age population, we

 8    looked several times at tables showing that in some cases

 9    they dropped, some cases they went up, and in some cases

10    they held the same from the black -- from the benchmark.

11    Again, wrong question.  The question isn't how -- did it

12    go down, did it go up.  The question is what is the

13    percentage of black voting-age population that we need in

14    order to retain the ability to elect.

15         Sometimes that might mean dropping the BVAP.

16    Sometimes it might mean bringing it up, but the use of an

17    undifferentiated racial floor is inappropriate in all

18    circumstances.

19         In his opening statement, Mr. Braden complained

20    about our failure to consider history and context, but

21    what we know is that Virginia has changed.

22         THE CLERK:  Time.

23         MR. HAMILTON:  Thank you, Your Honor.

24         MR. BRADEN:  May it please this Court, the

25    threshold issue for this Court is straightforward:  Is

1   this plan subject to strict scrutiny.  Now, the answer is

2   not found in whether or not the state used race.  It did

3   use race.  The fact is that race is used in virtually

4   every state, in every municipality in drawing plans.  So

5   that's not the test, and the test is not whether or not

6   the state tried to comply with the Voting Rights Act.

7         One would assume that virtually every state tries

8   to do that, too, so trying to comply with the Voting

9   Rights Act doesn't get you to strict scrutiny.  Using race

10  doesn't get you to strict scrutiny.  Having a rule of

11  thumb or threshold or a goal, I would suggest to you,

12  clearly doesn't get you to that either.  It doesn't get

13  you to strict scrutiny.

14        The Court Supreme Court, I believe, if it's ever

15  clear in this area, I think it's clear on this issue.  The

16  test is whether or not race predominates, requires the

17  subordination of, or departure from, or transgression from

18  the state criteria or state law.  That's the test.

19        How would you draw a plan when you have to

20  consider race without starting out with some goal or

21  threshold notion of what those numbers ought to be?  The

22  plaintiffs have the burden to get to strict scrutiny.  The

23  plaintiffs have the burden of proving that the state

24  violated its traditional criteria or state law because of

25  race.

1          What evidence have they provided to this Court to
2     carry that burden?  Three expert witnesses.  Let's bring
3     up District 71, our favorite district here.  Did Delegate
4     McClellan provide this Court with any evidence?  Did she
5     say, well, this part of the district isn't in because of
6     race?  Did she talk about any problem in this district
7     related to race?  Yes, we had some emails.  A bit of a
8     mystery to me what was going on in particular in those
9     emails, but let's be clear about what we do know about
10    those emails, is they relate to HB 5001 which was vetoed
11    by the governor, and 5005, we have uncontroverted
12    testimony in this Court and from the floor of the House
13    that those issues were solved.
14          McClellan's testimony I suggest the Court look at
15    closely because she was testifying about the inability to
16    solve those problems in the Senate during the amendment
17    process.  They were solved in the plan that's before this
18    Court.  All those emails are irrelevant as to what's
19    before this Court.
20          We have one complaint from the delegate.  That's
21    the division of the Fan.  I can understand that's a
22    neighborhood.  We have a Richmond judge here I'm sure
23    familiar with that area.  Why was it divided?  Not because
24    of race.  It was decided -- divided because of a
25    particular political decision.

1          The northern part of the district loses three

2   precincts.  Why?  To make a county whole.  What evidence

3   do we have that this district, any line in this district,

4   the predominate factor is race?  What evidence is before

5   this Court that this district violates any state criteria?

6   I would suggest there is none, none whatsoever.

7          This district is among the middle in compactness.

8   By the way, the delegate actually voted for the plan.

9   And, by the way, this district is growing more white as

10  every day goes by.  Isn't it appropriate for the state to

11  consider that factor in looking forward in drawing

12  districts?  Are we drawing the districts just for this

13  election, or are we drawing it looking forward?  Even

14  their expert admitted that demographic change is totally

15  appropriate to consider.  So we have no evidence here.

16         There are other witness, Senator Dance, again, we

17  could have called her as a witness.  We thought her

18  testimony from the floor, contemporaneous, was sufficient.

19  She came, and did she say there was a rule?  No, she

20  didn't say there was a rule.  Did she point to part of her

21  district or anybody else's district where the use of race

22  resulted in a violation of any of the state's criteria?  I

23  heard no testimony to that effect.

24         Delegate Armstrong, it's amazing they bring

25  Delegate Armstrong on to testify about drawing this plan

1    because, of course, he knew nothing about it.  He was on

2    the losing side, and by his own admission, let's be clear,

3    he was looped out of the process.  But what does he say

4    the primary purpose is?  You saw his contemporary

5    statement on the floor.  This was an incumbent-protection

6    plan.  That's the predominate motive of this plan,

7    maintaining the status quo.

8            So what do we have to prove that part of this

9    plan violates the state's criteria, what evidence?  We

10   have their expert.  He does a VTD analysis.  Let me bring

11   up Plaintiff's Exhibit 16.  You are familiar with this.

12   This is the list of state criteria.

13           So the plaintiffs' expert doesn't look at any of

14   the factors in Roman numeral V.  He purports to tell you

15   that race is predominant over politics.  He does not

16   purport to tell you anything else in regards to these

17   criteria.  So how can he tell you that race is predominant

18   over all the other traditional redistricting criteria when

19   he didn't look at them?

20           Now, his racial analysis in the division of the

21   VTDs, can I personally explain to the Court what's wrong

22   with it?  The answer to that is no.  That's the reason we

23   have a statistics professor from Cal Tech who, I would

24   suggest, not only testifies for us but regularly testifies

25   for Democratic attorneys and Democratic interests in

1    addition to Republican people defending plans, and he told

2    you that -- effectively his testimony was that this

3    analysis was worthless.  Can I explain that in detail?

4    No, I can't.  I would suggest you simply weigh the

5    credentials and his testimony versus their testimony from

6    their expert.

7          We don't -- we have a discussion of compactness.

8    I would suggest to the Court that you take a look at this

9    chart.  It's fairly simple, and it's using the analysis

10   that the plaintiffs' expert decided to use.  So it's the

11   one that's most beneficial to them.  Look at the division,

12   and the answer is you don't get much out of this.

13         We've got three of the ten least compact

14   districts are the challenged districts, and we have seven

15   of the 50 lowest in compactness, and, of course, we have

16   five on the other side.  Does that really tell us much?  I

17   would suggest it doesn't tell you anything other than the

18   fact that six of these districts are in Tidewater and on

19   the peninsula.  That's the compactness problems here.

20         This analysis we have, or I did a statistical

21   analysis, well, it's great that you did a statistical

22   analysis, but if you don't use the variable of where the

23   districts are, what do you get out of it?  Let's use the

24   least compact district, 95.  Defendant Exhibit 92,

25   District 95.

 1             We heard what I think is actually a preposterous

 2     notion that somehow that election data and politics wasn't

 3     considered except we had a witness talking about this

 4     exact map saying he was using something just like this to

 5     consider that in the process.

 6             How do you get to the reservoir precinct?  That's

 7     the last precinct right here.  If politics isn't the

 8     principal factor, if race was the principal factor, why do

 9     we pass by all these areas which have more black voters

10     that go up there?  It goes up there for exactly the reason

11     that was testified in this Court.  It was a political --

12     complex political reason involving an open seat, getting

13     rid of the ferrymander, and trying to avoid pairing two

14     women members of the legislature.

15             We don't hear any analysis from the other side on

16     that point.  There's no contradictory testimony.  What

17     drove the elongation of this district was a lot of

18     factors, but it wasn't principally race or all those black

19     neighborhoods would have been included in the district.

20             You simply don't get to all the statistical

21     analysis about this magic number.  You don't get the

22     strict scrutiny unless you prove we violated the criteria,

23     and they've provided no evidence to that effect.  But, I'm

24     conservative, as I said.  I've put a belt around my waist,

25     but now let me put the suspenders on.

```
 1              So if it is subject to strict scrutiny, then the
 2   question before the Court is, is there compelling state
 3   interest.  I would say there's two compelling state
 4   interests:  Obviously compliance with the Voting Rights
 5   Act, Section 2 and Section 5.  Section 2, let's be candid.
 6   I think this Court is sophisticated enough to understand
 7   that if we had drawn District 71 and left it the way it
 8   was at 46 percent, we would be in this courtroom today
 9   with probably the same lawyers and probably the same
10   experts defending a Section 2 challenge to the plan.
11              So I don't think this Court can have any doubt
12   that compliance with Section 2 and Section 5, which,
13   again, if you look at the criteria doesn't say
14   retrogression.  It says compliance with the Voting Rights
15   Act, both two and five, that's a compelling state
16   interest.  That's vital to the state.
17              What's narrowly tailored?  Well, the narrowly
18   tailoring analysis shouldn't be a magic number.  It's a
19   question of whether or not the violations of the state's
20   traditional criteria and the state law are the least you
21   need to do to comply with the Voting Rights Act.
22              It is not a statistical number.  It's not a magic
23   number.  We don't have to hire a political scientist, and
24   the truth is, if we hired a political scientist, depending
25   on which political scientist you hired, you get a
```

1    different number.  Oh, and by the way, you'd get a

2    different number between which races you use.

3           So I would suggest to this Court we have nonsense

4    when we try to get this number of what's the magic number

5    to elect if we're only looking at general elections.  I'll

6    finish with the suggestion to this Court to go outside,

7    walk around Alexandria and realize this particular city

8    hasn't elected a Republican mayor since before I was born,

9    before I was born.

10          So trying to figure out the votes of the black

11   community versus the white community in this area by

12   looking at general election results is a joke.  It is a

13   joke.  You need to look at primary results.  Simply

14   saying, well, since we don't have a primary, we'll look at

15   these other data, you know, it's 101 statistics, 101

16   science, bad data, bad results.

17          The fact that you don't have the right data to

18   make the analysis doesn't mean that you should make the

19   analysis.  Don't accept this invitation into the political

20   thicket.  If you use their analysis, if you accept their

21   analysis, then if we're going to subject all the plans

22   that use race to strict scrutiny, you're going to have to

23   have a big agenda for you redrawing plans across the

24   nation.  Thank you.

25          JUDGE PAYNE:  I think at this juncture, we will

1    switch court reporters.

2         MR. TROY:  For the record, the defendants would

3    join the defendant intervenors' argument.

4

5         (Brief pause in proceedings.)

6

7         JUDGE PAYNE:  All right.  Members of the Court

8    have some questions, and Judge Keenan will start.  When

9    you respond, please go to the lectern so that your answer

10   can be heard.

11        JUDGE KEENAN:  Thank you, Judge Payne.

12        Mr. Hamilton, would you please approach the

13   podium.

14        MR. HAMILTON:  Yes, Your Honor.

15        JUDGE KEENAN:  Mr. Hamilton, you just said that

16   there really isn't a difference in terms of evaluating the

17   evidence as to whether it's a rule, the 55 percent number,

18   or whether it's a rough target or a threshold.

19        Are you saying that there is no effect on our

20   predominance analysis in making that determination?

21        MR. HAMILTON:  There is no effect, Your Honor.

22   The Court in *Alabama* is quite clear that it was evaluating

23   a rough guideline.  And the question in *Alabama* was, do

24   we -- how can we keep the black voting-age population at

25   or above its existing number because they believed --

 1              JUDGE KEENAN:  Right, I understand that.  But

 2   isn't it a fact though that if you have -- isn't the

 3   direct evidence stronger if you have a rule than if you

 4   have a rough target?

 5              MR. HAMILTON:  Oh, sure.  I take your point --

 6              JUDGE KEENAN:  So that does affect our

 7   predominance analysis then as to the weight of the

 8   evidence in the case, would it not?

 9              MR. HAMILTON:  I suppose, I suppose that's true.

10   Here, of course, we have -- and I will stop from using the

11   word "rule, target, threshold," whatever we want to call

12   it.  We have a device that was set at 55 percent and

13   applied in such a way that the end of the sausage-making

14   process it spit out 12 districts at 55 percent or higher.

15              And it doesn't matter which way we calculate

16   this, whether we use -- you know, we've got all this kind

17   of confusing stuff about the way you calculate black

18   voting-age population.  All you need to look at is that

19   exhibit we were looking at this morning, I think it was

20   Exhibit 47, which is the black voting-age population data

21   presented by DLS, however they do it, to the Department of

22   Justice.

23              What do those numbers show?  Every single case,

24   55 percent or higher.

25              And Dr. Ansolabehere talked about the census

1     numbers.  What does that data show?  Every single one --

2               JUDGE KEENAN:  Okay, thank you.  Now, we've heard

3     a lot of evidence in the case, primarily from the

4     defendant-intervenors, that there were a lot of other

5     considerations going on here, not pairing incumbents,

6     putting additional population around the residences of

7     incumbents, putting additional businesses like into

8     Delegate Howell's neighborhood.  The ripple effect in

9     moving populations among districts.

10              Is this a binary consideration for the Court?  In

11    other words, is it simply traditional districting

12    principles versus race?  Or is there something else that

13    we need to consider regarding the use of race?

14              MR. HAMILTON:  Race was the overarching

15    nonnegotiable factor here.  You know, of course there were

16    all sorts of local considerations going into drawing these

17    districts, but none of them were done if they would drop

18    the BVAP below 55 percent.

19              That's going to be true in *Alabama.*  That was

20    certainly true in *Page.*  That is true every time a

21    legislature does a district, it's gong to look at the sort

22    of considerations that Your Honor just mentioned.  And so,

23    of course they were considered, and I don't dispute that.

24              But they were considered only if they complied

25    with the 55 percent rule.  And if they didn't, then that

1    was forbidden, and we saw that.

2           JUDGE KEENAN:  Were those considerations race

3    neutral in this case?

4           MR. HAMILTON:  Well, we don't have a lot of

5    evidence on that.  In some cases I suspect not.  In other

6    cases they may have been race neutral.

7           But we know that from Dr. Ansolabehere -- just

8    backing up, like let's look at the universe of changes

9    that were made and what effect did they have.  So, yes,

10   maybe somebody asked a favor for this one precinct line.

11          Of course, we know from Delegate Jones'

12   testimony, that was one of dozens and dozens of requests

13   that he got.

14          Now, why did he choose that one?  And can we back

15   up and look at a pattern from the whole Commonwealth?  And

16   we can, and we know what that pattern shows.  And that is

17   that race was correlated with the movement of these VTDs

18   in and out.  That's Dr. Ansolabehere, all those tables we

19   just went through this morning, statistically significant,

20   and they all point in the same direction.

21          JUDGE KEENAN:  Let me ask you the last question.

22   And that's the absence of an alternative plan in terms of

23   your case.  You didn't present an alternative plan.

24          Are you required to prove as part of your case

25   that the use of the 55 percent rough target affected how

1    the districts were drawn?  Or nearly you could show that

2    with an alternative plan, could you not?

3              MR. HAMILTON:  Well, you could.  The alternative

4    plan --

5              JUDGE KEENAN:  Now, in the absence of an

6    alternative plan, how do we grapple with that

7    consideration?

8              MR. HAMILTON:  The alternative plan requirement

9    is from *Cromartie*.  And this is not a *Cromartie* case.

10   *Cromartie* is where race closely correlates with politics

11   and there is no direct evidence.  *Cromartie* wasn't a

12   direct evidence.

13             Here, where you've got a flat rule, that's really

14   largely the end of the inquiry.  If it's --

15             JUDGE KEENAN:  How do we know it's a rule other

16   than the fact that there is circumstantial evidence?  We

17   know what Delegate Jones thought.  You presented about

18   three delegates who said it was a rule, and Jones says

19   it's a target.

20             MR. HAMILTON:  And I may --

21             JUDGE KEENAN:  And you say that doesn't matter.

22             MR. HAMILTON:  Exactly so, Your Honor.  And I

23   misspoke just then.  I didn't mean to use the forbidden

24   word.  We can call it a target.  I am perfectly happy to

25   embrace that and never again use the word "rule" because

1    it doesn't matter.  A target, a criteria, a threshold, a

2    goal, they all -- they are equally forbidden under the

3    *Alabama* decision and under the *Page* decision in this

4    court.

5              JUDGE KEENAN:  Okay.  That's all I have.

6              MR. HAMILTON:  Thank you, Your Honor.

7              JUDGE PAYNE:  Judge Lee.

8              JUDGE LEE:  If you would pull up Plaintiffs'

9    Exhibit 50, page 72, Table 4.  I want to you focus in on

10   two things.

11             First, what evidence do you have that before the

12   bill was introduced, that 55 percent was the rule, as you

13   say?

14             MR. HAMILTON:  I'm sorry, Your Honor, can you

15   read the question --

16             JUDGE LEE:  What evidence do you have that before

17   the plan was introduced, that 55 percent was the rule?

18             The testimony -- the floor debates were after the

19   plan had been prepared.  I'm asking, what do you have that

20   preceded the plan's preparation that shows 55 percent?

21             MR. HAMILTON:  Well, the evidence showed -- well,

22   first of all, we have the delegates who testified that

23   they were told as they were drawing the plan -- McClellan,

24   of course, was on the Privileges and Elections Committee,

25   so she was assisting in preparing the plan.  And she

```
1    testified that Delegate Jones told her that you needed to
2    have the floor being 55 percent or higher or a change
3    wouldn't be adopted.
4            Delegate Armstrong testified that way.  Delegate
5    Dance testified that way.  And of course, there is lots of
6    e-mail going back and forth as well during the preparation
7    of this plan about how it was and what changes were going
8    to be adopted and accepted and what were not.
9            JUDGE LEE:  You're referring to the election
10   registrar's e-mail --
11           MR. HAMILTON:  That's one.
12           JUDGE LEE:  -- that was written by the staff
13   member for Delegate Jones, correct?
14           MR. HAMILTON:  Correct.
15           JUDGE LEE:  Not Delegate Jones.
16           MR. HAMILTON:  Delegate Jones didn't, that's
17   true.
18           JUDGE LEE:  All right.  Now that you have Table 4
19   up, my first question is whether at the time the
20   redistricting process began, were nine of the districts
21   above 55 percent BAP?
22           MR. HAMILTON:  I am going to have to look at
23   that.
24           JUDGE LEE:  Yeah, take a look.
25           MR. HAMILTON:  I don't dispute the math if Your
```

1    Honor has done the --

2              JUDGE LEE:  Dr. Ansolabehere had the math.  I

3    want you to do your math using this table.

4              MR. HAMILTON:  I get six where the benchmark in

5    2010 was over 55 percent.

6              JUDGE LEE:  Six out of 12?

7              MR. HAMILTON:  Right.

8              JUDGE LEE:  Let's do them.  69, is that above 55?

9              MR. HAMILTON:  Well, the first one is 63.  But,

10   yes, 69 is, at the benchmark, it was 56.3 percent versus

11   55.2.  So that's one.

12             JUDGE LEE:  Okay.  All right.  The next one, 69,

13   is, right, above 55?

14             MR. HAMILTON:  Well, I'm --

15             JUDGE LEE:  I'm looking at the benchmark for 69.

16             MR. HAMILTON:  In 69, that's the first one we

17   just covered, right?  So that's --

18             JUDGE LEE:  No, 63 is the first one we covered.

19   At the top of this table --

20             MR. HAMILTON:  Okay.  63, the benchmark was 58.1

21   percent and --

22             JUDGE LEE:  That's above 55.

23             MR. HAMILTON:  Oh, I'm sorry.

24             JUDGE LEE:  Is my math right on that?

25             MR. HAMILTON:  Oh, I am sorry.  I'm sorry, I

1    misunderstood the question.

2              JUDGE LEE:  Is my math correct?

3              MR. HAMILTON:  I thought you meant the relative

4    movement --

5              JUDGE LEE:  I'm asking you, was 63 over

6    55 percent?

7              MR. HAMILTON:  Yes.

8              JUDGE LEE:  And so is 69?

9              MR. HAMILTON:  Yes.

10             JUDGE LEE:  70?

11             MR. HAMILTON:  Yes.

12             JUDGE LEE:  74?

13             MR. HAMILTON:  Yes.

14             JUDGE LEE:  77?

15             MR. HAMILTON:  Yes.

16             JUDGE LEE:  90?

17             MR. HAMILTON:  Yes.

18             JUDGE LEE:  92?

19             MR. HAMILTON:  Yes.

20             JUDGE LEE:  And 95?

21             MR. HAMILTON:  Yes.

22             JUDGE LEE:  So nine of the districts were above

23   55 percent --

24             MR. HAMILTON:  That's correct.

25             JUDGE LEE:  -- when they started, is that right?

1           MR. HAMILTON:  That's right.

2           JUDGE LEE:  So then 55, when you look at the next

3    column HB 5005, we did this before --

4           MR. HAMILTON:  Right.

5           JUDGE LEE:  They're not all exactly 55.  And in

6    some of them he went down -- the numbers went down, is

7    that right?

8           MR. HAMILTON:  That's right.

9           JUDGE LEE:  How does that show that there is a

10   rule?

11          MR. HAMILTON:  Because they're all --

12          JUDGE LEE:  How does that math show that there is

13   a rule?

14          MR. HAMILTON:  Well, I don't know that the --

15   well, the specific answer to your question is, they are

16   all converging on 55.  The ones that are below are coming

17   up over 55.  And the ones that are above are coming down

18   to 55.

19          So they are all converging on that.  That's

20   number one.

21          But number two, we don't need to look at this

22   data to know there is a rule.  The delegates told us there

23   was a rule.  Or, I am sorry, a threshold, a target.  It's

24   stipulated.

25          So we don't need to look at the numbers.  And the

1    movement, the relative movement of the numbers is

2    irrelevant.  Just like it was in *Page*, just like it was in

3    *Alabama*.

4              JUDGE LEE:  All right, final question, at least

5    for right now, has to do with whether race predominated

6    over the other factors in *Miller* that talks about the

7    racially neutral districting principles like compactness,

8    contiguity, respect for political subdivisions or

9    communities.  There was testimony a lot of testimony about

10   all those things from your experts as well as from

11   Delegate Jones.

12             How are we to weigh all of that against race?

13             MR. HAMILTON:  Well, I gather -- the first

14   question is, did they use a target criteria, whether

15   roughly applied or strictly applied.  And if they did,

16   then I take that is the end of the analysis under *Alabama*

17   because all these other factors -- it's not inconsistent

18   with race being the predominant factor.  Of course there

19   were other factors in drawing these districts, you

20   couldn't draw them without taking into account other

21   factors.

22             And that's why the Court has instructed this

23   Court to look at predominance.  And in *Page* this court

24   held, and in *Alabama* the Supreme Court held when a court

25   uses -- when a legislature uses a flat rule, whether

1    it's -- sorry a rule.  Threshold, target, measured by the

2    color of the voters' skin, that's predominance, especially

3    when they list it in their criteria as controlling above

4    all others.

5          And so, I think that's how you weigh it.  Because

6    you have to look at that.  And we're fortunate here today

7    because we have the Court's decision in *Alabama* which so

8    clearly addresses this issue.

9          JUDGE LEE:  Thank you.

10         JUDGE PAYNE:  If that's predominance, Mr.

11   Hamilton, then why did the Supreme Court in *Alabama* remand

12   the case for further consideration in view of all of the

13   evidence that then existed?

14         MR. HAMILTON:  I can't remember -- that's a good

15   question, Your Honor.  And I can't recall the specific

16   procedural posture, I apologize for that, but I believe

17   that the court had misapplied the rule, and the Court --

18   that is the rule of law.  And the Court defined the rule

19   and then sent it back down to allow the court in the first

20   instance to apply the correct legal rule on the facts.

21         JUDGE PAYNE:  But if the rule is that if you use

22   55 percent, which is your case, predominance is passed,

23   then why would the Supreme Court ever have sent it back to

24   Alabama to make a predominance analysis, is the question I

25   was trying to ask?

1          MR. HAMILTON:  Fair enough.  And I understood the

2     question.  But I think the answer is in that case they

3     didn't use a 55 percent target.  In that case it was, you

4     know, how do we keep the majority-minority districts at or

5     above 50 -- their existing levels and not drop them?  And

6     the Court said, you asked the wrong question.  Now go back

7     on this legal standard, the correct legal standard, and

8     either party, I believe they said at the end of the

9     opinion, is free to introduce additional testimony under

10    that legal standard.

11         JUDGE PAYNE:  All right.  You said that you do

12    not believe and never would ask that this Court in

13    resetting the district go below 50 percent.

14         So in your view, a 50 percent floor is sufficient

15    under the evidence of this case and it's sufficient to use

16    a 50 percent floor, is that correct?

17         MR. HAMILTON:  Well, that's *Bartlett versus*

18    *Strickland*, Your Honor.  That's the definition of --

19    Section 2 requires 50 percent plus one.

20         JUDGE PAYNE:  I understand.  That's your position

21    though, right?

22         MR. HAMILTON:  Well, of course, but that -- yes,

23    that's my position, Your Honor.

24         JUDGE PAYNE:  Where between 50 and 55 percent is

25    it permissible, in your judgment, to make a judgment for

1  any particular district?

2        MR. HAMILTON:  What the Court has said, Your

3  Honor, is that in drawing a district, a legislature, if it

4  uses racial numbers, must have a good basis, strong basis

5  in evidence for using that.

6        And the problem here is that the legislature

7  didn't.  The General Assembly used the same number across

8  12 very significantly different majority-minority

9  districts.

10        JUDGE PAYNE:  But that language comes not from

11  the predominance inquiry in *Alabama*, but from a strict

12  scrutiny and the narrow tailoring part of it.

13        MR. HAMILTON:  Oh, I think it's in both, Your

14  Honor.  I think the Court looked at the use of a rough

15  guideline both in the predominance analysis, and then it

16  certainly did, as I think the Court just suggested, in the

17  strict scrutiny analysis.

18        JUDGE PAYNE:  One other question.  The DLS --

19  well, it is a related question.  Would you put that table

20  back up there that was just up there.

21        Where does that come from?  It comes from Dr.

22  Ansolabehere's report?

23        MR. HAMILTON:  I'm sorry, this table here?

24        JUDGE LEE:  Yes.

25        JUDGE PAYNE:  All right.  He has got black

1    voting-age population one place, and then Hispanic voting

2    over in an entirely different category, yet he said the

3    proper way to look at things was to consider the black and

4    Hispanic the same.  Because if you answered black, you

5    were in that category in the census data.  And if you

6    answered Hispanic and were also black, you were in that

7    category.

8              MR. HAMILTON:  If you -- what he --

9              JUDGE PAYNE:  How do harmonize that with this?

10             MR. HAMILTON:  Yeah.  The two columns in the

11   center that we've been looking at, the black voting-age

12   population, that's the census data.  That is the same data

13   that is reported by the DLS in Exhibit 47, Plaintiffs'

14   Exhibit 47 to the Department of Justice for preclearance.

15   That is all the people who answered the race question

16   black.  And by checking the box, total it up, that's what

17   it is.

18             The Hispanic population in the other side is the

19   ethnicity population.  And that is the people who answered

20   the Hispanic question.

21             There is no overlap between, those are two

22   different questions on the census form, and they are

23   displayed here in two different ways.

24             JUDGE PAYNE:  Do you have any other questions?

25             JUDGE LEE:  I have an additional question having

1   to do with the issue of race.  And that is, is it your

2   view that *Alabama Black Caucus* or *Miller* says that if race

3   is a factor, that that would then mean that it violated

4   the Fourteenth Amendment?

5          MR. HAMILTON:  No.

6          JUDGE LEE:  Or can race be considered?

7          MR. HAMILTON:  Of course, yes, race can be

8   considered.

9          JUDGE LEE:  It can be considered.  Then how do

10  you get from race being a neutral consideration along with

11  traditional districting principles to predominance here?

12         MR. HAMILTON:  Here it's the use of a 55 percent,

13  unvarying 55 percent racial threshold.  It is admitted, it

14  is stipulated that's what was used in 12 different

15  districts.  And it predominated against all the rest

16  because -- I mean, we can look at that.  Just on the

17  different voting behavior in each of the 12 different

18  districts, it's uniform, it's applied across all of them.

19         JUDGE LEE:  Well, do you think it came out of the

20  clear blue sky that they came up with over 50 percent, or

21  do you think that the prior benchmark population had

22  anything to with it?  The number.  This is not *Shaw* --

23         MR. HAMILTON:  The 55 percent?

24         JUDGE LEE:  Yes.

25         MR. HAMILTON:  I don't think that the --

1      JUDGE LEE:  Let me start over.  In *Shaw* there was

2  a need to draw a new district after the Voting Rights Act.

3  We're not dealing with that here.

4      We're dealing with existing districts that are

5  majority-minority.  Help me with your view of what action,

6  if any, the legislature should have done in 71 where the

7  population had gone down?

8      We had Delegate McClellan's testimony that she

9  would have been elected with 46 percent, she says.  And

10  she would have.

11      But the question is whether there would be an

12  issue here of dilution if there was not a chance -- not a

13  determination to adjust population and it had to be done

14  in 11 districts.

15      MR. HAMILTON:  Of course they had to consider the

16  population in order to comply with the one person/one vote

17  principle.  So in some districts that meant adding

18  population.  In some districts that meant taking

19  population out.

20      They also had to comply with Section 2.  So they

21  needed to maintain the black voting-age population of at

22  least 50 percent.

23      So they certainly, certainly needed to consider

24  race, that's not a question.  I think Mr. Braden and I are

25  in agreement on that.

```
 1              Race cannot predominate though.  When you say --
 2    moreover, it's not just 50 percent.  It's 55 percent.  And
 3    it doesn't matter what the differences are between any one
 4    of these districts, how they're performing, how much white
 5    crossover voting there is, it just matter, we're going to
 6    keep it all at 55 percent.  That's just straight
 7    impermissible race predominance because you're
 8    subordinating everything else to race.
 9              And it doesn't mean that they didn't consider
10    other factors.  Of course they did.  But they subordinated
11    in these 12 districts everything to at least maintaining
12    55 percent.
13              It's really not any different than in Alabama
14    where they subordinated everything to maintaining the
15    existing black voting-age population.  It's not a one-way
16    ratchet that never adjusts.
17              And it's not a magic number.  The legislature
18    doesn't have to be precise, but it has to have a strong
19    basis in evidence for making the decisions that it makes.
20    And it had no basis in evidence for adopting a uniform
21    rule, a uniform threshold, or target to all 12 districts.
22    That's the opposite of having a strong basis in evidence.
23    That is having no basis in evidence.
24              And going to the incumbents and saying, what do
25    you need?  What do you want?  What would you like?  What
```

1    do you need in order to be re-elected.  That's not a
2    strong basis.  That's no evidence at all.
3            JUDGE PAYNE:  I think Judge Keenan has another
4    question.
5            JUDGE KEENAN:  No, I'm fine.  No, thank you.
6            JUDGE PAYNE:  Do you have a particular
7    articulation of how we would go about making a
8    predominance finding?
9            If we don't accept your premise that merely using
10   55 percent gets you to a finding of predominance, what
11   formulation could we use, in your judgment?
12           MR. HAMILTON:  Well, I think that the best model
13   and the most recent and applicable model is the majority
14   opinion in the just rereleased *Page* decision, which looked
15   at predominance by the use of a racial -- ironically, the
16   same redistricting, the same General Assembly, and same
17   racial BVAP floor of 55 percent.
18           And there the Court looked at the use of the
19   threshold, number one.  But then, in addition, the
20   circumstantial evidence.
21           I mean, I made much that this case -- we sort of
22   have a confession.  You know, we don't need to look for
23   the fingerprints.  We don't need to look for the DNA
24   evidence, all that sort of circumstantial stuff that you
25   might otherwise look at.

1          But here, we've got both, just like we did in

2    *Page*.  So you've got the use of the racial floor, coupled

3    with all of the analysis that we talked about.  Gee, isn't

4    it ironic that most of the least compact districts are all

5    in these 12 districts.  Isn't it ironic that most of the

6    locality splits are in these districts.  Isn't it ironic

7    that if you look at the VTDs that were moved in and moved

8    out, it's a funny thing, most of the African-American

9    districts were moved in, the predominantly

10   African-American districts, in order to concentrate -- it

11   was race that was the predictor of moving VTDs in or out.

12   And that's Dr. Ansolabehere.

13         JUDGE PAYNE:  We would follow the *Page* model, in

14   your judgment?

15         MR. HAMILTON:  That's what I would recommend,

16   Your Honor.

17         JUDGE PAYNE:  All right.  Either one?

18         JUDGE LEE:  No, I am done.

19         JUDGE PAYNE:  Thank you all very much and I --

20         JUDGE LEE:  Well, there is Mr. Braden.

21         JUDGE KEENAN:  The defendants.

22         THE COURT:  What?

23         JUDGE LEE:  We will hear from Mr. Braden.  Come

24   up, Mr. Braden.

25         JUDGE PAYNE:  Oh, we have questions --

1          JUDGE KEENAN:  Yes.

2          JUDGE PAYNE:  Oh, I thought you meant you didn't

3     have any questions for Mr. Braden.

4          JUDGE KEENAN:  Oh, no, we're not letting him off

5     that easy.

6          JUDGE PAYNE:  Okay.  He was ready to leave.

7          MR. HAMILTON:  Thank you, Your Honor.

8          JUDGE KEENAN:  Mr. Braden, is it correct then

9     that your theory of the case is that the predominant

10    consideration was incumbency protection?

11         MR. BRADEN:  Well, I think you have to go

12    district by district to know what the predominant

13    consideration was in each district in each line, but

14    certainly one of the predominant considerations,

15    predominant over race, was incumbency.

16         JUDGE KEENAN:  Was it your position that

17    incumbency considerations predominated over racial

18    considerations?

19         MR. BRADEN:  Absolutely.

20         JUDGE KEENAN:  Okay.  Now, I'm concerned about

21    the fact of how *Miller* defines traditional redistricting

22    principles and whether your theory of the case might run

23    afoul of *Miller*.

24         If you look at *Miller* on page 915, it talks about

25    traditional race neutral districting principles.

```
 1              And so, my question for you is, if we have here a
 2    use of a 55 percent target for incumbency protection
 3    purposes or other traditional reasons, how can they be
 4    race neutral if you're injecting this 55 percent threshold
 5    even though they would otherwise be traditional
 6    considerations?
 7              MR. BRADEN:  Well, the state here adopted a
 8    series of very specific criteria.  And among those
 9    criteria are a variety of ones I think that everyone would
10    view as race neutral.
11              So the question really here is the transgression,
12    by using race did you transgress -- this is the language
13    from the *Alabama* Court.  In *Alabama* the case goes back and
14    the Supreme Court on page 19 of its opinion basically
15    says, well, the question here is, Alabama possibly
16    transgressed its own guidelines, it's very specific
17    guidelines.
18              So the question here is, and I think a very
19    specific question is, if you have these neutral
20    guidelines, and I would suggest Roman numeral V --
21              JUDGE KEENAN:  Right, but if race is the
22    yardstick -- I mean, if the target is 55 percent in each
23    of these districts, how can it not predominate when *Miller*
24    says that traditional race neutral principles are the ones
25    that can predominate over race?
```

1          MR. BRADEN:  Predominate by definition I think

2    requires it to be over something.  To make something

3    subordinate, make it less important.

4          So here, does race require the state to

5    subordinate any of these criteria?  Do we draw -- do we

6    divide up, as an example, do we divide up any community,

7    any vote tabulation district, any precinct, did we cross

8    any river to get race?  And the answer to that is no.

9          JUDGE KEENAN:  Okay.  But what about the fact --

10   what I'm really concerned about, among other things in

11   this case, and perhaps you can address it, is 63 and 75.

12   You have former Delegate Dance, now Senator Dance saying,

13   I need 55 percent, my people don't all vote.

14         Okay.  How is that race neutral?

15         MR. BRADEN:  Do I believe that's race neutral?

16         JUDGE KEENAN:  Yes.

17         MR. BRADEN:  I absolutely don't think that's race

18   neutral.

19         JUDGE KEENAN:  Okay.

20         MR. BRADEN:  She was absolutely considering race.

21   But did that result in a district that violated the

22   state's traditional redistricting criteria?

23         JUDGE KEENAN:  Why does it have to be a

24   violation?  Because the next step is strict scrutiny.  It

25   doesn't get overturned automatically.

 1              Why doesn't it get you into strict scrutiny

 2     because the delegate said, my people don't vote, I've got

 3     to have 55 percent?

 4              MR. BRADEN:  You don't get to strict scrutiny

 5     unless you can point to somewhere where race required you

 6     to transgress the state's traditional criteria.  It's not

 7     enough to consider race.  Absolutely --

 8              JUDGE KEENAN:  Okay.  Where in the case law does

 9     the Supreme Court say there has to be a violation of the

10     traditional principle that race causes you to violate

11     other traditional principles?

12              MR. BRADEN:  I think that's the definition of the

13     word "predominant," you have to subordinate.  But I would

14     suggest the *Alabama* case --

15              JUDGE KEENAN:  Subordinate, you're saying

16     subordinate and violate are the same things?

17              MR. BRADEN:  Well, I would say the Supreme Court

18     in its most recent opinion on this subject sends it back

19     because of a transgression, a possible transgression of

20     its own guidelines.  That's what the Supreme Court says.

21              JUDGE KEENAN:  But the Supreme Court was

22     concerned in *Alabama* with the fact that they used equal

23     population as a calculus, weren't they?

24              And what they said is, equal population is a

25     given.  And you can't use these rough targets, you can't

1    use these mechanically applied percentages.  You have got

2    to go back and review it because equal population is not

3    even something that goes into the balancing test.

4           MR. BRADEN:  Oh, I agree totally.  I think the

5    *Alabama* case is in fact principally a procedural case and

6    an evidentiary case and doesn't change the underlying law.

7           But the language they use when they send it back

8    to Alabama, they talk about Alabama transgressing its own

9    state guidelines, its own state criteria.

10          If you look at *Shaw*, you look at *Cromartie*, it's

11   all about drawing districts.  Really the process here --

12   if I could take a step back.  The process here is

13   geographic representation.  And if a district exists as a

14   geographic representational unit under the state's

15   criteria, then it should be created whether or not race is

16   a driving factor or not.

17          There is nothing -- there is nothing necessarily

18   wrong with drawing a line around a black neighborhood and

19   making it a district if it is a geographic entity.  And

20   all of these meet those criteria.  These all exist in

21   reality.

22          JUDGE KEENAN:  Okay.  Now, if the Court were to

23   disagree with you regarding any of these districts, for

24   example, 63 and 75, where is the strong basis in evidence

25   that 55 percent was necessary to preserve an opportunity

1    for election of a preferred minority -- a candidate

2    preferred by the minority?

3            MR. BRADEN:  Well, we know for a fact that we're

4    not --

5            JUDGE KEENAN:  Do you have any straight -- do you

6    have any narrow tailoring evidence in your case at all?

7            MR. BRADEN:  Oh, I believe the answer to that is

8    for surely yes.

9            JUDGE KEENAN:  Okay.  With regard to 63, where is

10   your narrow --

11           MR. BRADEN:  My view is straightforward, that the

12   actual members of the legislature, they are the most

13   informed people --

14           JUDGE KEENAN:  Where is your narrow tailoring,

15   strong basis in evidence for District 63?

16           MR. BRADEN:  I guess my answer to that is

17   straightforward, the narrowly tailoring, I guess it's a --

18   we have a disconnect.  I don't think that narrowly

19   tailoring is a number analysis.

20           Narrowly tailoring is how much that district

21   violates the state's criteria.  And we don't even have any

22   evidence that it violates it whatsoever.  We don't have a

23   line anywhere, a VTD, a town, a river crossed that it

24   shouldn't be.

25           If you don't -- so if you have narrowly

1    tailored -- narrowly tailored isn't driven at a magic

2    number.  It's driven how much you violate the state's

3    criteria.

4              JUDGE PAYNE:  Are you saying that political

5    incumbency is a race neutral factor even if the political

6    incumbent being protected is of a minority race and you

7    are making the change to perpetuate that incumbent's seat?

8              MR. BRADEN:  That is absolutely correct, Your

9    Honor.

10             JUDGE PAYNE:  And that is because that the real

11   inquiry to be made is whether that decision, the decision

12   to use race in connection with political incumbency,

13   resulted in a district that offends all of the race

14   neutral criteria?

15             MR. BRADEN:  That's correct.  The analysis is all

16   about whether or not these districts meet the state's

17   redistricting criteria.

18             In the end, it isn't so much about the number of

19   African-Americans in the district or non-Hispanic whites.

20   It's all about looking at the districts and saying, do

21   they exist under the state's criteria.

22             And we haven't heard any evidence to blow these

23   districts up on that basis.  Or what we have heard, we

24   have deep suspicions about.

25             JUDGE LEE:  Can you pull back up that table

1    again, Table 4 from Dr. Ansolabehere's expert report.  It

2    is Exhibit 50, page 72.

3            Starting with District 63 that was raised by my

4    colleague, the benchmark in that district was 58 percent,

5    is that right?

6            MR. BRADEN:  Yes, Your Honor.

7            JUDGE LEE:  So it moved under the new plan

8    1.59 percent to 59.

9            MR. BRADEN:  Yes, Your Honor.

10            JUDGE LEE:  Not 55 percent, right?

11            MR. BRADEN:  Yes.

12            JUDGE LEE:  And if you look at District 75, the

13    benchmark black population was 55.3, is that right?

14            MR. BRADEN:  Yes, Your Honor.

15            JUDGE LEE:  And under the new plan it's 55.4?

16            MR. BRADEN:  Yes, Your Honor.

17            JUDGE LEE:  1 percent difference?

18            MR. BRADEN:  One-tenth of a percent.

19            JUDGE LEE:  One-tenth of a percent difference.

20    Now, all these 11 of these districts had to be repopulated

21    because they were all underpopulated, correct?

22            MR. BRADEN:  Yes, in the end all the districts

23    had to be changed.

24            JUDGE LEE:  One of these delegates, I am not sure

25    if it was Dance or not, said that when they were drawing

1    the lines, they wanted to make sure that they drew a line

2    around a potential opponent's house.

3            Was that Dance?

4            MR. BRADEN:  That was the Dance district,

5    absolutely.  That's the little finger, if you saw it

6    sticking up, yes, out of the southern district.  Drawn

7    into Taylor's district.

8            JUDGE LEE:  As it relates to the James River,

9    House District 71, there was a river crossing there

10   before.  It was eliminated under HB 5005, is that right?

11           MR. BRADEN:  That is correct, Your Honor.

12           JUDGE LEE:  And the same is true down in

13   Williamsburg where the James River crosses into Surry,

14   that was eliminated as well?

15           MR. BRADEN:  Yeah, we got rid of the ferrymander

16   district, as it was described.

17           JUDGE LEE:  And in HD 71 were you pointed out

18   earlier, Henrico was removed from HD 71?

19           MR. BRADEN:  That's correct, Your Honor.

20           JUDGE LEE:  Trying to get Henrico back together?

21           MR. BRADEN:  That's correct.

22           JUDGE LEE:  Would that be contiguity?

23           MR. BRADEN:  Yeah, that would be totally

24   consistent with the criteria.  It would make the district

25   more in compliance with any types of -- not just the

1    stated criteria of the state, which I think are the

2    starting points, but clearly under any traditional

3    analysis 71 is the district that should be there.

4         I mean, if we're going to draw some other type of

5    district, then the blank community in downtown Richmond

6    isn't going to get represented, let's not fool ourselves.

7         JUDGE LEE:  What are we supposed to do with all

8    this testimony about the number 55?  How does that help me

9    with processing that from the standpoint of predominance?

10   Because if it is *Alabama Black Caucus*, then 55 is hard and

11   fast rule and this plan has to go to strict scrutiny.

12        MR. BRADEN:  A couple things from *Alabama*.  One,

13   *Alabama* talks specifically about a mechanical process.

14   And we're talking about districts that are more than

15   70 percent black.  And we're talking about districts that

16   go from fairly compact to significantly ugly.

17        So we don't have a mechanical process here.  Half

18   the districts go up, half the districts go down.  That's a

19   classic random walk.

20        JUDGE KEENAN:  Right.  But aren't we talking here

21   about legislative intent?  You see, that's what has been

22   bothering me all along, whether race predominated in terms

23   of the legislative intent.

24        I mean, I agree with you, there are all sorts of

25   reasons why things were done, but doesn't it all come back

1    to proof of legislative intent and whether race

2    predominated.   I am feeding into Judge Lee's question on

3    that.

4            MR. BRADEN:   Absolutely there was an intent to

5    draw majority-minority districts, and there was a goal to

6    draw them around the 55 percent.   There is no reason to

7    beat around the bush, absolutely.

8            But the answer is, did that intent predominate

9    over traditional redistricting criteria?   This whole *Shaw*

10   line of cases, I would suggest the Court should start its

11   analysis by looking at the *Shaw* districts.   This is all

12   about creating districts that don't exist as geographic

13   units, that don't exist under traditional redistricting

14   criteria.

15           All 12 of these districts are the same 12

16   districts that had been around since 1991.   The same 12

17   districts that were approved by the state Supreme Court

18   ten years ago in that decision.

19           So I just don't see a conflict between these

20   districts and any state policy whatsoever.   The

21   consideration of race, did it occur?   Absolutely.   Was

22   there a goal, a hope, an aspiration, a rule of thumb?

23   Absolutely.   But just having that alone doesn't mean you

24   transgress, to use the word from *Alabama*, that you

25   transgressed anything.

1          You've got to prove that we transgressed

2     traditional criteria to get to strict scrutiny.

3          JUDGE PAYNE:  Your basic argument on that point

4     then is that from *Alabama* we are to rely on the part that

5     says the predominance question concerns which voters the

6     legislature decides to choose, and specifically whether

7     the legislature predominantly uses race as opposed to

8     other traditional factors when doing so?  That is, to

9     choose to put districts -- put them into different

10    districts?

11         MR. BRADEN:  That's correct.  And I would also

12    suggest the Court look at page number 18 where they are

13    talking about the possibility that the state transgressed

14    its own guidelines and the evidence of that.

15         And then *Hunt v. Cromartie* is abundantly clear on

16    these issues too, it's predominance.  And you can only --

17    to be predominant, it has got to be predominant over

18    something else, the predominance over traditional

19    redistricting criteria.

20         JUDGE PAYNE:  Excuse me.  How do you get -- what

21    do we do with this discrepancy in the evidence between

22    DLS -- I think the vernacular has been DLS black and DOJ

23    black.  How do you suggest we can harmonize what we've

24    heard on that topic from all these witnesses?

25         MR. BRADEN:  Two things.  One, if we're focused

1    on intent, I think the evidence is undisputed that the

2    person drawing the plan thought these districts were, as

3    far as he knew, less than 55 percent DOJ black numbers.

4            So if we're focused on intent, clearly the line

5    drawer thought that at least three of these districts

6    didn't have a 55 percent voting age-pop black as defined

7    under DOJ.

8            Do I believe the difference between these two

9    numbers is in reality meaningful in actual reality?  No,

10   it isn't a significant difference one way or the other,

11   let's be candid.

12           And also, just think about the process we're

13   talking about.  We're talking about redrawing lines now.

14   These are all numbers from 2010.  Do we think these

15   numbers have any meaning as you sit there today as to what

16   these districts look like?

17           So this is -- this fine distinction where we have

18   to come up with a magic number between 50 plus one --

19   55 percent is too high, but we know we have to be above

20   50, so we have to hire a political scientist to come up

21   with that magic number.

22           Which political scientist do we hire?  Do we hire

23   Dr. Katz?  He is going to come up with a different number

24   than theirs.

25           We don't want to be -- think of how far this

1    pulls the Court into what you don't want to get into,

2    which is this my minutia of racial fine-tuning.  Surely

3    the Court doesn't want to be trying to decide whether it

4    should have 55 or 54 or 51 or 50.1.

5              JUDGE PAYNE:  Thank you.

6              MR. BRADEN:  That's a process for the

7    legislature.

8              JUDGE PAYNE:  All right.  Judge Keenan would like

9    to hear, and I would too, Mr. Hamilton, if you would

10   respond to the question that comes from *Alabama* respecting

11   the definition of the predominance question.  Where the

12   Court says -- it begins in the paragraph -- it's on

13   page 1271.  I don't know which you have.

14             MR. HAMILTON:  I only have the slip opinion, Your

15   Honor.

16             JUDGE PAYNE:  It's right at the beginning of

17   section Roman numeral IV.  Go to the first full column,

18   and there is a paragraph near the bottom that says, "But

19   we have not listed equal population objectives."  Do you

20   see that?

21             Right below where they talk about the background

22   factor.

23             MR. HAMILTON:  Under Roman numeral IV that

24   begins, "The District Court held in the alternative that

25   the claims of racial gerrymandering must fail because race

 1   was not the predominate" --

 2          JUDGE PAYNE:  Yes, that's the Roman numeral.  Now

 3   go over two columns.

 4          MR. HAMILTON:  I'm in a slip opinion so I can't

 5   see where the columns are.  Where the paragraph begins --

 6          JUDGE PAYNE:  "But we have not listed."

 7          JUDGE KEENAN:  That's on page 16, if that helps.

 8          MR. HAMILTON:  Do you have the slip opinion?

 9          JUDGE PAYNE:  Yeah, we have the slip opinion.

10   Yeah, right there.  Okay.  All right, now go -- have you

11   found that paragraph, Mr. Hamilton?

12          MR. HAMILTON:  I haven't.  I have found the

13   paragraphs start, in Section IV, it starts "The District

14   Court held" --

15          JUDGE LEE:  Page 16.

16          MR. BRADEN:  I hate to do this, but I will be

17   happy to help you.

18          JUDGE PAYNE:  You should do it.  And in fact,

19   it's the way it's done with barristers in England.

20          MR. HAMILTON:  The first paragraph begins, "The

21   the District Court held in the alternative" --

22          JUDGE PAYNE:  That's the first paragraph of Roman

23   numeral IV.  Go down about four paragraphs.

24          MR. HAMILTON:  Four.  "But we have not" -- got

25   it.

1        JUDGE PAYNE:  Now go on over to the continuation

2   of that paragraph.  "It is not about whether a legislature

3   believes that the need for equal population takes ultimate

4   priority.  Rather, it is, as we said, whether the

5   legislature placed race above traditional districting

6   considerations in determining which persons were placed in

7   appropriately apportioned districts.  In other words, if

8   the legislature must place 1,000 or so additional voters

9   in a particular district in order to achieve an equal

10  population goal, the predominance question concerns which

11  voters the legislature decides to choose and specifically

12  whether the legislature predominantly uses race as opposed

13  to other traditional factors when doing so."

14       And my question was, how does he -- is that what

15  his argument was?

16       JUDGE KEENAN:  And if I could just supplement

17  that by saying, how does the existence of a 55 percent

18  target even address the question of which voters the

19  legislature was choosing unless you're solely relying on

20  Dr. Ansolabehere's report?

21       I mean, is there any other evidence in your case

22  that supports which voters the legislature was choosing?

23       MR. HAMILTON:  If I understand the question --

24       JUDGE LEE:  Recite it so we can make sure.

25       MR. HAMILTON:  Wow, that's a task.  I'm not sure

1    I can, Your Honor.   The Court quoted --

2              JUDGE PAYNE:   I guess the bottom line is, what

3    proof do you have about which voters were placed where and

4    why other than the fact that 55 percent was used?

5              That's what we're looking for an answer to.

6              MR. HAMILTON:   I think I understand.   The

7    evidence is twofold.   Number one, what did the legislature

8    say it was doing?   And what it said it was doing was

9    adopting the 55 percent as a target or goal threshold for

10   all of these majority-minority districts.

11             So number one is, they told us what they were

12   doing.   And in the redistricting criteria, they said that

13   that predominates against everything.   In the event of a

14   conflict, this controls, this is the thing.   Number one.

15             Number two, we can look at what they did.   What

16   they did is they moved some voters out, they moved some

17   voters in, and then they swapped some voters between

18   different districts.   All with the goal, again, consistent

19   with what they've told us, of maintaining 55 percent black

20   voting-age population.   And of course they were successful

21   doing it.

22             So what they told us, what they did, and then the

23   third piece of it is what did Dr. Ansolabehere say in his

24   study.   And his study looked at it several different ways.

25   Looking at the border precincts.   Okay, you have a

1    precinct that was in the old district and moved out, or

2    not in the old district and moved in.

3            And what defines, what is it that better

4    explains, was it politics or was it race, political

5    performance or race that explained the movement of those

6    VTDs?

7            So I think all three of those pieces of evidence

8    line up and point to the same point, and prove the same

9    thing as racial predominance.

10            JUDGE PAYNE:  I think we would all like to thank

11    the lawyers for the help you've given us.  And thank in

12    particular to the legal assistants without whose

13    assistance we would not be where we are today.  And we are

14    very grateful for an excellent job.  Thank you so much.

15            One request.  And that is, you all have a bunch

16    of boxes -- just a minute, Mr. Troy.  And I need, we all

17    need some boxes to haul these things around.  If you have

18    got them out in the hall somewhere, let us have them so we

19    can haul them.

20            Yes, Mr. Troy.

21            MR. TROY:  Your Honor, may I inquire whether the

22    Court in the posttrial briefing anticipates anything about

23    the remedies?

24            I ask specifically because of the plaintiffs'

25    briefing, anything to do with the upcoming November

1    election?

2         And on behalf of my defendants, there are matters

3    going on daily already implementing that election.  I did

4    not know if the Court wanted to have that addressed or not

5    addressed.

6         JUDGE PAYNE:  We'll talk about that question and

7    let you know by an order or a conference call.

8         MR. TROY:  Thank you, Your Honor.

9         JUDGE PAYNE:  All right.

10        MR. HAMILTON:  Your Honor, apropos of our

11   discussion just before the closing, can we leave the

12   record open so that the parties can talk about which --

13   not the record.  Well, the record.  So that we can talk

14   about which exhibits are in and then read them into the

15   record with the court reporter?

16        JUDGE PAYNE:  Yes, you all are to do that.

17        JUDGE LEE:  And let us know if there is any

18   issue, we will come back if you need us.

19        MR. HAMILTON:  Okay.  I don't anticipate that,

20   Your Honor.  But thank you.

21        JUDGE LEE:  I don't expect there will be.

22        NOTE:  At this point a recess is taken; at the

23   conclusion of which counsel appear in the absence of the

24   Court as follows:

25        MR. HAMILTON:  Okay.  For the record, this is

1    Kevin Hamilton on behalf of the plaintiffs, and we're just

2    going to read into the record the documents that have been

3    admitted.

4              First, as listed in the stipulation regarding

5    exhibits, which has been filed in docket number 87,

6    Plaintiffs' Proposed Trial Exhibits 1 through 68 inclusive

7    have all been offered and admitted.

8              And Defendant-Intervenors' Proposed Trial

9    Exhibits 1 through 12, 14 through 16, 22, 28 through 34,

10   37 through 91, and 93 to 99 have all been admitted.

11             In addition, Intervenor-Defendants' Exhibit 92

12   has been admitted.

13             And Intervenor-Defendants' Exhibit 27, two pages

14   of it, have been admitted.  And those two pages have been

15   placed in the clerk's file of original exhibits.

16             All other exhibits have either been not offered,

17   offered but withdrawn, or offered and refused.

18             Do you want to say you agree?

19             MS. WALRATH:  This is Jennifer Walrath, counsel

20   for defendant-intervenors.  And we concur with Mr.

21   Hamilton's reading of the exhibits that are in evidence.

22             NOTE:  The case is concluded.

23

24

25                   (End of proceedings.)

```
 1
 2
 3          I certify that the foregoing is a correct
 4   transcript from the record of proceedings in the
 5   above-entitled matter.
 6
 7
 8   _____/s/_____            _____
     P. E. Peterson, RPR              Date
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```