IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(RICHMOND DIVISION)

GOLDEN BETHUNE-HILL, *et al.*,

      Plaintiffs,

    v.

VIRGINIA STATE BOARD OF
ELECTIONS, *et al.*,

      Defendants.

Civil Action No. 3:14-cv-00852-REP-GBL-BMK

**DEFENDANT-INTERVENORS' POST-TRIAL BRIEF**

E. Mark Braden (*pro hac vice*)
Jennifer M. Walrath (VSB No. 75548)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates
and Virginia House of Delegates Speaker
William J. Howell*

# TABLE OF CONTENTS

Argument ........................................................................................................................2

I. Plaintiffs Failed To Establish That Race Predominated Over Other
   Factors...........................................................................................................................2

    A. Plaintiffs Failed Even To Identify a Cognizable Injury Under
       *Shaw* ..............................................................................................................7

    B. Plaintiffs' Claim Fails for Failure To Present an Alternative
       Plan ................................................................................................................9

    C. Evidence of a 55 Percent Rule of Thumb—or Even a Rule—
       Proves Nothing.............................................................................................10

    D. Plaintiffs' Expert Provided No Information Useful to the Court.................13

    E. There Is No District-Specific Evidence Establishing
       Predominance................................................................................................19

        1. Overview...................................................................................................19

        2. The Richmond Districts ...........................................................................23

            i. HD74..................................................................................................24

            ii. HD71..................................................................................................25

        3. Southside Virginia ...................................................................................27

        4. South Hampton Roads ..............................................................................31

            i. HD77..................................................................................................32

            ii. HD90..................................................................................................33

            iii. HD89..................................................................................................33

            iv. HD80..................................................................................................34

        5. North Hampton Roads ..............................................................................35

II. The Plan Is Narrowly Tailored Under Sections 2 and 5 of the Voting
    Rights Act......................................................................................................................36

Conclusion ....................................................................................................................40

Delegate Chris Jones spent hundreds of hours preparing a 2011 House redistricting plan (the "Plan") that would obtain supermajority bipartisan support. He adhered to criteria that were substantially identical to past criteria. He attended hearings throughout the state and met with about 80 Delegates to learn about their districts, seeking to balance numerous competing requests and goals in an effort to better respect local community interests. His Plan resolved defects criticized in the 2001 Plan. The Plan drew districts that were compact and contiguous under Virginia law as far as possible given Virginia's irregular landscape and municipal and county lines. The Plan united communities of interest that were split under former plans. The Plan achieved a remarkable 2 percent population deviation despite dramatic population shifts in Virginia. And the Plan preserved 12 majority-minority districts in substantially the same forms and covering substantially the same constituencies as they have for over 20 years. On the House floor, Democratic Delegates expressed, in glowing terms, support for the process by which the competing concerns were resolved. The "no" votes did not reach double digits. All of this was a rare achievement in the hyper-contentious arena of redistricting.

In return for these efforts, Jones now faces the charge that *race* predominated over all those considerations. There is no credible evidence on the record to prove this charge. The evidence shows that Jones's concerns in drawing the Challenged Districts aligned exactly with the concerns of the Supreme Court in *Shaw I* and its subsequent cases: that individuals should be grouped together in districts according to meaningful shared interests and sound redistricting principles. The "discriminatory intent" requisite to an equal-protection claim is absent, and so is the requisite "discriminatory effect."

Plaintiffs' challenge is neither about communities, nor geography, nor shared interests, nor even district lines. It is about numbers, "ecological regression," and the opinions of a CBS

1

News analyst who lacks any historical perspective or personal knowledge of the Commonwealth. Plaintiffs complain about the levels of black voting age population ("BVAP") in the Challenged Districts and ask that districts be redrawn—not to better respect communities of interest—but to reflect flawed statistical anslyses. That remedy may provide them a partisan advantage, especially when a new plan would be subject to the veto of the state's Democratic governor, but this supposed injury and this remedy have nothing to do with the a *Shaw* claim, which, as the Supreme Court recently reaffirmed in the *Alabama* decision, "applies to the boundaries of individual districts" and requires a showing that race had "a direct and significant impact on the drawing of at least some…boundaries."

Having failed to show that any district line either *would* be different but for consideration of race or *should* be different because of a cognizable "discriminatory effect"—both of which showings require an alternative map—Plaintiffs cannot prove their racial-gerrymandering claim.

## ARGUMENT

### I.     Plaintiffs Failed To Establish That Race Predominated Over Other Factors

Plaintiffs' sole claim is under the Fourteenth Amendment. "[O]rdinary equal protection standards" require Plaintiffs to establish "a discriminatory effect" that was "motivated by a discriminatory purpose."[1] *Wayte v. United States*, 470 U.S. 598, 609 (1985) (citing, *inter alia*,

---

[1] The standard applies except as to an equal-protection claim concerning "an overtly discriminatory classification." *Wayte*, 470 U.S. at 609 n. 10. "Districting legislation ordinarily, if not always, classifies tracts of land, precincts, or census blocks, and is race neutral on its face." *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999) (*Cromartie I*). Accordingly, the standard of *Wayte* and *Arlington Heights* has served "as the framework for examining discriminatory purpose in cases brought under the Equal Protection Clause for…decades," including "in [the] context of

*continued on next  page…*

*Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977), and *Washington v. Davis*, 426 U.S. 229 (1976)). As the language "motivated by" suggests, the subjective mental state and the real-world "discriminatory effect" must be causally related. *See also Washington v. Davis*, 426 U.S. at 240 (affirming "the basic equal protection principle that the invidious equality of a law claimed to be racially discriminatory must *ultimately be traced to* a racially discriminatory purpose") (emphasis added); *Keyes v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 198 (1973) ("plaintiffs must prove not only that segregated schooling exists but also that *it was brought about or maintained by* intentional state action") (emphasis added); *Hartman v. Moore*, 547 U.S. 250, 260 (2006) ("If there is a finding that retaliation was not the but-for cause of the [state action], the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.").

 *Shaw v. Reno* adopted these foundational principles. 509 U.S. 630, 642–44 (1993) (*Shaw I*). Like all equal-protection cases since *Washington v. Davis*, the *Shaw* cases require "a racial purpose or object." *Miller v. Johnson*, 515 U.S. 900, 913 (1995). But that is not enough. The *Shaw* cases also require a showing of discriminatory effect causally related to that racial purpose. *E.g.*, *Bush v. Vera*, 517 U.S. 952, 962, 965 (1996) (principal opinion).[2]

---

*...continued from previous page*

Equal Protection Clause challenge[s] to [alleged] racial gerrymander of districts." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488 (1997).

[2] The Supreme Court continues to cite the "principal opinion" in *Vera* as providing the correct principles for racial gerrymandering claims, including on the issue of the predominance test. *See, e.g.*, *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1270 (2015). The principal opinion is cited throughout unless otherwise indicated.

As to discriminatory effect, *Vera* clarified that "the neglect of traditional districting criteria is…necessary" to prove a *Shaw* claim. 517 U.S. at 962 (emphasis added). That standard follows from *Shaw I*, which condemned "effort[s] to segregate the races for purposes of voting, without regard for traditional districting principles." 509 U.S. at 613. The subordination or transgression of traditional principles to race can result in "impermissible racial stereotypes" by joining "in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries and who may have little in common with one another but the color of their skin." *Shaw I*, 509 U.S. at 647; *see also Miller*, 515 U.S. at 911. For instance, the plan condemned in *Miller* drew residents of the Atlanta metro region into a congressional district with residents of Savannah 260 miles away and "worlds apart in culture," based on their race. 515 U.S. at 908; *see also Shaw I*, 509 U.S. at 635–36 (similar description of North Carolina district); *Vera*, 517 U.S. at 980 ("Significant deviations from traditional districting principles…cause constitutional harm insofar as they convey the message that political identity is…predominantly racial.").

That kind of injury, however, is not present where a legislature follows traditional criteria, "including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests." *Miller*, 515 U.S. at 916. That is because adherence to such criteria ensures that people are grouped according to meaningful shared interests—such as their "education, economic status, [and] the community in which they live"—not according to racial stereotypes. *Shaw I*, 509 U.S. at 647. Accordingly, states "may avoid strict scrutiny altogether by respecting their own traditional districting principles." *Vera*, 517 U.S. at 978; *see also Miller*, 515 U.S. at 919 ("a legislature's compliance with 'traditional districting principles…' may well suffice to refute a claim of racial gerrymandering"), *Miller*,

4

515 U.S. at 928 (O'Connor, concurring) ("To invoke strict scrutiny, a plaintiff must show that the State has relied on race in substantial disregard of customary and traditional districting practices.").[3]

As to causation, *Vera* clarified that a showing of "neglect" of traditional criteria is "not sufficient" to prove a *Shaw* claim; "traditional criteria must be *subordinated to race*." *Vera*, 517 U.S. at 962. Subordination of traditional criteria to something other than race—such as political considerations—defeats a racial gerrymandering claim. *Id.* at 968. And "[i]f district lines merely correlate because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify, just as racial disproportions in the level of prosecutions for a particular crime may be unobjectionable if they merely reflect racial disproportions in the commissions of that crime." *Id.* at 968; *see also Easley v. Cromartie*, 532 U.S. 234, 243, 258 (2001) (*Cromartie II*).

---

[3] *Miller*'s holding that "bizarre districts" are not a pre-requisite for a *Shaw* claim does not conflict with *Vera*'s holding. *Miller*, 515 U.S. at 911–15. Districts need not be bizarre to violate traditional criteria, as was the case in *Miller* where the district did not appear facially strange but united communities with no shared commonality—other than race—in substantial disregard for traditional criteria. *Id.* at 917, 919. Similarly, the majority in *Shaw v. Hunt*, 517 U.S. 899, 906–07 (1996) (*Shaw II*), rejected a dissenting argument that the state's respect for two race-neutral criteria should have saved the Georgia plan from strict scrutiny. This was *not* a rejection of *Vera*'s holding—*Vera* was released the same day as *Shaw II* and its principal opinion was signed by Justice Rehnquist, author of *Shaw II*. Rather, *Shaw II* made clear that adherence to *some* traditional criteria would not save a district drawn in substantial departure of others—the North Carolina district was bizarre and united communities with no common interests. *See also Vera*, 517 U.S. at 963 (condemning districts even though "[t]raditional districting criteria were not *entirely* neglected") (emphasis in original)). A plaintiff must show "substantial"—not complete—disregard for traditional principles. *Miller*, 515 U.S. at 928 (O'Connor, concurring).

That causation requirement is reflected in *Vera*'s analysis: even after finding both that "the State substantially neglected traditional districting criteria" and that the State "was committed from the outset to creating majority-minority districts," 515 U.S. at 962—*i.e.*, found both effect and purpose—the Court recognized that "race was not the only factor that motivated the legislature to draw irregular district lines" and determined that it must "scrutinize each challenged district to determine whether" race predominated in causing those irregular lines, *id.* at 965. Accordingly, a *Shaw* plaintiff must show that "race for its own sake, and not other districting principles," account for the line-drawing. *Miller*, 515 U.S. at 913.

The Court's recent opinion in *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1271 (2015), confirms this approach. In considering the predominance inquiry, the Court reaffirmed that a *Shaw* plaintiff "must prove that the legislature subordinated *traditional race-neutral districting principles*…to racial considerations." 135 S. Ct. at 1270 (quotation marks omitted). In applying this test to the facts, the Court found that "a primary redistricting goal was to maintain existing racial percentages in each majority-minority district." But that was not sufficient. ***The Court continued***: "There is considerable evidence that this goal had *a direct and significant impact on the drawing of at least some of District 16's boundaries*," including "change of [the] district's shape from rectangular to irregular," the transfer of 15,785 individuals of whom "just 36 were white," and the "[t]ransgressing [of] their own redistricting guidelines" by splitting precincts "clearly divided on racial lines." 135 S. Ct. at 1271 (emphasis added).

The analysis is identical with that required by *Vera*, *Miller*, and *Shaw I*, and each of the equal-protection elements was at least potentially present: evidence of racial motive, through the

goal of maintaining racial percentages; departure from traditional redistricting principles, including Alabama's own emphasis on voting district ("VTD") integrity;[4] and a "direct and significant" link between motive and effect in drawing actual lines and moving substantial numbers of voters. The Court determined that these facts may—*may*—have arisen to a *Shaw* violation. It remanded to allow the district court to make that determination. 135 S. Ct. at 1272.

### A.     Plaintiffs Failed Even To Identify a Cognizable Injury Under *Shaw*

Plaintiffs identify no injury cognizable under the standard that evolved from the *Shaw* cases. According to their counsel, Plaintiffs do not object to living in majority-black districts and believe it "essential that these all be healthy performing majority-minority districts," evidently referring to the Challenged Districts in roughly their current forms. 7/13 Tr. 818:10–24. Plaintiffs appear content with the representation they are receiving from current Delegates: they complain that it is *too easy* for minorities to elect their candidates of choice. 7/13 Tr. 818:19–24.[5] Plaintiffs' counsel appeared to disclaim any need to show "that the use of the 55 percent rough target affected how the districts were drawn[.]" 7/13 Tr. 833:21–835:4. Plaintiffs' case reflects no meaningful concerns about the real-world composition of the Challenged Districts, but rather with the purported lack of care applied in arriving at the levels of black population in their districts. They propose that, were such supposed care given, BVAP might even be higher than in the current Plan. 7/13 Tr. 821:15–18. But other than suggesting that BVAP levels should have

---

[4] As discussed below, VTDs were not prioritized among Virginia's criteria.

[5] If Plaintiffs are concerned about "packing" or "vote dilution" by drawing too many African-Americans into the Challenged Districts, they should have brought a Section 2 or vote-dilution claim. *Shaw* cases to not address that harm.

been marginally shaved off or increased, Plaintiffs do not suggest that any communities were improperly joined or severed on the basis of race, that any citizens have been grouped with other citizens sharing no commonalities other than skin color, or even that any Challenged District should be drawn in a meaningfully different form.

That is not a *Shaw* claim. The *Shaw* cases are concerned with districting that reinforces "the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls," which occurs when voters are grouped with other voters based on race "without regard for traditional districting principles." *Shaw I*, 509 U.S. at 642, 647. *Shaw* forbids race-based redistricting that fails to account for geography and communities, but does not create a right to districts with an ideal level of members of one or another race. *See id.*; *see also Wilkins v. West*, 264 Va. 447, 473–74, 477 (2002) (holding that proper BVAP level is an issue for narrow tailoring under strict scrutiny, not for the predominance threshold inquiry). But the Richmond-area Plaintiffs, for instance, offer no objection to being grouped into majority-black districts joining communities in urban and suburban Richmond communities—they apparently *want* that. Nor do any Plaintiffs so much as hint at a meaningful change as to their districts that would better respect local communities. Quite the opposite, they request that the District lines be redrawn according to—not real-world communities and natural boundaries—but flawed statistical analyses. That remedy would

advance the very stereotypes *Shaw* prohibited.[6] *Shaw* viewed individuals as members of communities in real geographic locations, not as racial statistics.

### B.      Plaintiffs' Claim Fails for Failure To Present an Alternative Plan

Plaintiffs also failed to meet their burden to show a meaningful alternative to Jones's Plan. The law could not be clearer: where majority-minority districts are at issue and racial identification correlates highly with political affiliation, the party challenging the districting plan must put forth an alternative plan illustrating that "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *Cromartie II*, 532 U.S. at 258. Expert witnesses for both sides testified that there is a substantial correlation between race and political affiliation in Virginia. 7/9 Tr. 507:12–18; 7/9 Tr. 661:19–22; 7/7 224:6–17. The requirement applies.

Plaintiffs believe they are excused from this rule because they have "direct evidence" of motive: a "flat rule" concerning BVAP is "the end of the inquiry." 7/13 Tr. 833:21–834:12. Nothing in *Cromartie II* suggests that distinction. The rule applies where "majority-minority districts…are at issue" and "where racial identification correlates highly with political affiliation." 532 U.S. at 258. Contrary to Plaintiffs' assertions at trial, 7/13 Tr. 834:9–11 ("this is

---

[6] To be sure, some Supreme Court concurrences have opined that the use of race *in itself* comprises the stereotyping identified in the *Shaw* cases as the cognizable harm. *See, e.g.*, *Vera*, 517 U.S. at 996–1003 (Kennedy, J., concurring). Under that view, *any* intentional grouping by race would trigger strict scrutiny, including the intentional drawing of *any* majority-minority district. *Id.* While it appeared from Plaintiffs' pre-trial brief that they would advance that view in this case, Dkt. 74 at 18. (quoting *Vera*, 517 U.S. at 996 (Kennedy, J., concurring) for that very proposition), they retreated from it in their post-trial argument—perhaps recognizing that a ruling along those lines would effect a revolution in voting rights law and subject virtually every state and congressional plan in the U.S. to strict scrutiny and would apply to the very relief they seek. 7/13 Tr. 818:10–25.

not a *Cromartie* case" because *Cromartie* had "no direct evidence"), *Cromartie II did* involve direct evidence of racial motive. 532 U.S. at 253.

There is no logical basis for Plaintiffs' distinction. It shows a failure to appreciate their burden as to all elements of an equal-protection claim. As *Cromartie II* made clear, an alternative map is the necessary means to establish the causal relation between a racial motive and neglect of redistricting criteria—*i.e.*, whether the predominant motive for grouping together individuals with little in common into a bizarre district was political (which is permissible) or racial (which is not). *Cromartie II*, 532 U.S. at 243 (citing *Vera*, 517 U.S. at 968). Causation—race or politics?—is at issue here, so *Cromartie II* applies. And the alternative-map requirement applies for yet another reason: this case concerns (in addition to causation) the anterior question of whether traditional criteria were ignored in the first instance—regardless of cause. Plaintiffs must show that it is possible to create better districts that better respect *real* communities as to "meaningful shared interests," or there is no point in ordering a new map. Plaintiffs cannot show this without an alternative plan. 7/13 Tr. 833:21–834:2. The only alternatives in this case, HB5002 and HB5003, failed to satisfy the House's criterion for political and incumbency considerations, including avoiding pairings, and its population-equality standard. 7/8 Tr. 376:22–379:17. Neither Plan was considered worthy of serious discussion in the House. *Id.*

## C.    Evidence of a 55 Percent Rule of Thumb—or Even a Rule—Proves Nothing

Plaintiffs' other evidence fails to establish a *Shaw* claim. The focus of their case is the House's "target" of 55 percent BVAP in the challenged districts. Yet the use of a "target" or "rule of thumb"—or even a "rule"—bears no relevance to whether or not the House substantially violated traditional redistricting criteria. *Vera*, 517 U.S. at 978; *Miller*, 515 U.S. at 919; *Shaw I*, 509 U.S. at 642. And evidence of a rule says nothing as to whether any substantial departures

10

that did occur—if there were any—were the result of the use of race or some other factor. *Vera*, 517 U.S. at 968; *Cromartie II*, 532 U.S. at 243, 258. Without evidence tethering the number 55 percent to actual deviations from sound redistricting principles, a mere number does not prove that racial considerations "had a direct and significant impact on the drawing" of actual lines or grouping people by race without regard to shared interests. *Alabama*, 135 S. Ct. at 1271.

The only conceivable relevance goes to "discriminatory intent." *Wayte*, 470 U.S. at 609. And even then it holds minimal probative value because BVAP in nine of twelve districts exceeded 55 percent immediately prior to redistricting, and BVAP levels in two of the three remaining districts rose by no more than three percentage points. PEX 50 at 72. The existence of a goal that is nearly accomplished from its inception and is otherwise not difficult to achieve suggests little if anything by way of its relative importance as against potentially competing goals. It would have required more extensive consideration of race to do—as Plaintiffs request— an analysis as to the ideal BVAP percent for each new district. 7/13 Tr. 819:2–6. And a BVAP threshold suggests little by way of predominance when every majority-minority district in the United States is already subject to a non-negotiable, fixed percentage threshold of minority voting population. *Bartlett v. Strickland*, 556 U.S. 1, 13, 18–19 (2009).

Plaintiffs suggest that ranking the Voting Rights Act as the second criterion on a list of descending importance establishes predominance. But that very same criterion prohibits "any districting policy or action that is contrary to the United States Constitution." PEX16 at 1. 7/8 Tr. 402:4–24. The clause has no probative value as to whether race was used for "its own sake"— which *the Constitution* prohibits. If that were not clear enough, Section VI of the criteria states that "[a]ll of the foregoing criteria shall be considered in the districting process," that departure from traditional criteria would be permissible only in the event of "conflict" with the Voting

11

Rights Act, and that a departure would be permissible only "as necessary, but not more than is necessary, to void such violation." PEX16 at 2. The words "55 percent" appear nowhere in the document. And the same language was adopted in the 2001 Plan that passed constitutional challenge in *Wilkins v. West*, 9/8 Tr. 275:1–19. Plaintiffs' expert reviewed the criteria and stated that he saw nothing objectionable, 9/7 Tr. 227:11–229:23, and the criteria merely states what has been the law since 1789 under the Supremacy Clause. This provision suggests nothing by way of racial predominance.

Counsel for Plaintiffs insinuated in closing arguments that he "suspect[s]" that other redistricting considerations testified to by Jones (see *infra*) in drawing the Plan may not have been race-neutral, being tainted by the 55 percent "rule," but he correctly represented that "we don't have a lot of evidence on that." 7/13 Tr. 833:4–6. That ends the matter. The burden was on Plaintiffs to prove predominance. It cannot be presumed.

Finally, everything said heretofore assumes that the 55 percent target was a hard and fast "rule," as Plaintiffs allege. It was not, and the number therefore is of minimal relevance for yet another reason: a "rule of thumb" or "aspiration" does not suggest the "nonnegotiable" standard that Plaintiffs contend triggers strict scrutiny. The Court recognized the difference, 7/7 Tr. 75:25–76:4, and both Delegate Jones and Delegate Dance testified to that difference. *See, e.g.* 7/7 Tr. 75:16–22; 7/8 Tr. 423:20. Discussion of the 55 percent number was *descriptive* of what had already been achieved in drafting the Plan, given that Jones unwittingly maintained BVAP above 55 percent and was unaware of this until the time HB5001 was introduced. 7/9 Tr. 489:11–491:11. The numbers he used while drawing the Plan showed three districts below that

supposed "rule," and he was surprised to see that the DLS calculation[7] placed them above the target. 7/8 Tr. 281:1–15.

### D.     Plaintiffs' Expert Provided No Information Useful to the Court

The cornerstone of Plaintiffs' case is testimony by an expert who has only testified for national Democratic Party interests, who has never drawn a redistricting map used for any meaningful purpose, who did not read the criteria adopted by the House prior to preparing his report, who knows nothing of Virginia communities, who made no effort to learn about them for this case, and who has no actual knowledge of why a single line in the 100 districts in the Plan was drawn the way it was. 7/7 Tr. 214:10–235:16. Plaintiffs' counsel and expert made a revealing admission when they agreed that none of this is relevant to their arguments. 7/9 Tr. 255:12–256:7. That is because their arguments are not relevant to a racial-gerrymandering claim, as shown above.

As relates to the predominance threshold, Dr. Ansolabehere's analyses consist of: (1) a VTD analysis purporting to show that race is a better predictor than politics as to the inclusion of VTDs in Challenged Districts, and (2) a compactness analysis purporting to show that the decrease in compactness was statistically more significant in the Challenged Districts than in

---

[7] The census asks two questions about race and ethnicity. The first question is "Is this person of Hispanic, Latino, or Spanish origin?" The second question is "What is this person's race?" A person who is Hispanic and African American would answer "Yes" to the first question and African American to the second question. Thus, Hispanics can be of any race. Should Hispanic Blacks be included in the Black category or in the Hispanic category? The testimony from Delegate Jones reflects his understanding that DOJ would count a Hispanic Black only once and in the Hispanic category. 7/8 Tr. 280:22–281:15.

other districts.[8] As an initial matter, both these analyses fail to establish Plaintiffs' burden because they are limited to inferences drawn from *averages* by viewing the Challenged Districts as a group and the remaining districts as a group. Under *Alabama*, 135 S. Ct. at 1265, "[a] racial gerrymandering claim…applies to the boundaries of individual districts." Plaintiffs cannot prove the predominance of race over politics—or over anything else—as a matter of averages because, under the very definition of average, some of the Challenged Districts fall above, and some fall below. The question remains: *which* lines were drawn in derogation of traditional criteria? *What* caused the drawing of *those* lines? And what voters and communities were affected? Showing that majority-black VTDs are, on average, more likely to be included among twelve Challenged Districts or that twelve Challenged Districts, on average, tended to become less compact than other districts provides little if any evidence as to the effect of race "on the boundaries of individual districts." *Id.* at 1265.[9]

**The VTD Analysis.** Dr. Ansolabehere's VTD analysis also fails to meet Plaintiffs' burden because it is limited to two variables. At no point has Dr. Ansolabehere opined that his VTD analysis shows race predominated over the other criteria adopted by the House of Delegates—he did not so much as read those criteria before writing his report. *See* PEX50 ¶¶ 123–129; PEX51 ¶¶ 62–72; 7/7 Tr. 124:15–234:6; 239:18–260:18; 7/13 742:11–808:20. His

---

[8] Other aspects of Dr. Ansolabehere's analyses relevant to the predominance threshold are addressed in the district-by-district analysis below. His racial bloc voting analysis is irrelevant unless the Court reaches the narrow-tailoring issue. It is addressed in Part II, below.

[9] A discussion of averages, of course, may be useful in providing context for evaluating many aspects of a redistricting Plan, and averages bear some relevance in a case like this. It is impossible, however, in light of *Alabama*, for a plaintiff to prove a racial gerrymandering claim based on averages.

analysis compares only *two* factors: race and partisan electoral performance. PEX50 at 26. There is no mention of incumbency considerations, economic factors, social factors, cultural factors, governmental jurisdictions,[10] compactness,[11] or any of the communities of interest identified in the House's redistricting criteria, and Dr. Ansolabehere admitted at trial that he did not consider any of these criteria in his VTD analysis. 7/7 Tr. 233:10–234:6; 248:19–249:1; 7/13 802:1–20; 803:2–805:7; *see also* 7/9 Tr. 509:12–14. As such, it is hardly surprising that Dr. Ansolabehere offers no opinion concerning whether race predominated over any factor other than party politics. 7/7 Tr. 155:10–156:9 (testifying that race predominated over party politics); 799:13-17 (same); 786:1-23 (same); 792:8–12 (testifying about Table 8 in PEX50, which compares BVAP and average Democratic vote share in certain federal elections); 793:12–17 (testifying that race "had stronger correlation than party"). Under the *Shaw* standard, that analysis does not even come into play unless there is a departure from the adopted criteria—which *then* requires a determination of whether race or politics caused that departure. Delegate Jones testified that no such departure occurred (*see infra*) and described how he drew each Challenged District consistent with those criteria, which included a myriad of factors ignored by Dr. Ansolabehere.

Additionally, the Court heard testimony from Dr. Katz highly critical of Dr. Ansolabehere's VTD analysis, calling it fundamentally "flawed" and unreliable. 7/9 Tr. 502:1-515:21; *see also* IEX-16 at 19–21. Dr. Katz stated that he does "*not* believe any valid inferences

---

[10] Although Dr. Ansolabehere considered VTD splits, he testified that VTDs are not governmental jurisdictions, and his consideration of VTD splits was not a factor in his analysis of whether race or politics was a greater predictor of assignment of VTDs. 7/7 Tr. 233:24–234:6.

[11] Again, although Dr. Ansolabehere looked at compactness, that criterion was not a factor in his analysis of whether race or politics was a greater predictor of assignment of VTDs.

can be drawn" from Dr. Ansolabehere's VTD analysis. 7/9 Tr. 504:1–3 (emphasis added). He explained that the entire analysis relies on a faulty statistical premise that a VTD "can be independently assigned to a given district," which "just [is] not true." 7/9 Tr. 503:9–504:3. Dr. Katz explained that "the assignment of VTDs is interdependent" because, since districts must be contiguous, the decision to include a particular VTD in a given district necessarily impacts which VTDs are more or less likely to also be chosen for inclusion in the same district. *See* 7/9 Tr. 503:9–21; 504:4–505:18. It does not resolve this fatal defect that Dr. Ansolabehere considered VTDs on a basis of "subgeographies" because even VTDs in a given region are not necessarily contiguous—or even near each other. 7/9 Tr. 514:21–515:13. The analysis does not provide the Court with any information from which valid conclusions can be drawn. 7/9 Tr. 503:9–504:3. Plaintiffs' counsel asked Dr. Katz zero questions about this critique on cross examination, indicating that there was no meaningful response. *See* 7/9 Tr. 543:1–594:8.

Indeed, Dr. Katz provided to the Court a similar, "very crude," yet statistically more reliable, analysis of race and partisan party performance. IEX16 at 21; 7/9 Tr. 504:4–505:2; 509:7–510:4.  Based on his analysis, Dr. Katz testified that there is no statistically significant difference between race and politics as predictors of which VTDs were included in the Challenged Districts, and no basis to conclude that race predominated over politics in the assignment of VTDs. 7/9 Tr. 505:22-509:16.

Besides all that, Dr. Ansolabehere's findings in his district-by-district analysis in Table 8 of his report, as described in Plaintiffs' rebuttal case, indicates that race was predominant over politics in only a handful of the Challenged Districts. His testimony provided a cursory classification of 8 of the 12 Challenged Districts with respect to differences between the average VTDs for his BVAP and Federal election indicators. 7/13 Tr. 792:8–793:3. He only identified a

meaningful "predominance" of race over politics in HD71, HD75, and HD77. *Id.* And HD77

only showed a difference of 1.3 percentage points between the VTD differential, which is the

same difference in HD70 that Dr. Ansolabehere testified was "about the same." 7/13 Tr. 24–25.

The classification is arbitrary and reveals that the table, besides the other flaws listed above,

lacks any standard providing context as to what these numbers mean.

     **The Compactness Analysis.** Dr. Ansolabehere's compactness analysis fares no better.

The Court need not consider its conceptual problems because the numbers speak for themselves.

The average Reock compactness of the Challenged Districts in the 2001 Plan was .38; their

average Reock compactness in 2011 was .36. PEX50 at 70. The maximum and minimum scores

are equally comparable. *Id.* By Dr. Ansolabehere's own measure, the Challenged Districts

underwent no meaningful change in compactness.

     A district-by-district approach confirms that no compactness problems exist. Dr.

Ansolabehere opined that a Reock score of "less than .20 is considered highly non-compact."

PEX50 ¶ 46. Only three Challenged Districts fall at or below that score. PEX50 ¶ 48; PEX51 ¶¶

23, 27. Of those, one (HD74) had the exact same score in 2001, another (HD77) *improved* under

that measure, and the third (HD95) underwent significant changes for race-neutral reasons, as

Jones's testimony (*infra*). These districts are not outliers compared with other Virginia districts,

7/13 Tr. 718:9–14; 705:8–22; 619:6–9, and there is no meaningful difference between the

compactness of the Challenged Districts in the 2011 Plan and those same districts in the 2001

Plan that were found to be sufficiently compact under Virginia state law in *Wilkins v. West*, 447,

465–66, 476–77 (2002). 7/9 Tr. 539:1–540:2; 618:6–619:6; 640:10–24.

     As to the conceptual problems, they are plentiful. First, Dr. Ansolabehere's choice of .20

as the standard for non-compactness is "arbitrary." 7/13 Tr. 716:5–14. Dr. Hofeller testified that

"there is no bright line score…that sets districts as being unacceptable or being particularly egregious in terms of low compactness scores." *Id.* The Virginia Supreme Court has approved districts with lower scores than .20, IEX14 ¶¶ 47, 50–53.

Second, all experts agreed that compactness can be measured in any number of ways to divergent results and conclusions depending on the measure chosen. 7/9 Tr. 535:15–536:8; 540:11–24; 541:25–542:9; 557:12–15; 609:4–9; 684:8–19. Dr. Katz chose the Boyce-Clark measure, and under that standard the Challenged Districts are more compact than in the 2001 Plan. IEX16 at  10; 7/9 Tr. 539:21–540:0. Views as to compactness are shaped by the hardly scientific "inter-ocular test," whereby experts identify which districts look ugly and then "choose the compactness measure which comports with their eyeball view of the mapping." 7/9 Tr. 542:14–23. This further undermines the use of a statistical analysis based on these scores, and the Court may as well look at the maps for itself to determine whether the districts are reasonably compact.

Third, Dr. Ansolabehere's "statistical comparison" of compactness was between the 12 Challenged Districts against the 88 other districts in the 2011 Plan, many of which do not face the same geographical challenges affecting compactness. PEX51 ¶¶ 26, 35–38; 7/13 Tr. 744:6– 745:10. As Dr. Hood testified, this is not an "apt comparison." 7/9 Tr. 638:17–639:9. The analysis did not take into account the geographic location of any of the districts, which is significant when half of the Challenged Districts are in the Tidewater region of Virginia, Tr. 806:14–807:5, and Reock and Polsby-Popper penalize long and narrow districts and geographical indentations, such as water inlets and bays. 7/13 Tr. 685:14–687:8.

Finally, a duel of experts is one arena in which credentials matter. Dr. Katz is a renowned expert in applied statistics from the California Institute of Technology and an experienced expert

witness, having testified more than a dozen times for Democrat, Republican, and non-partisan stakeholders in redistricting and voting rights litigation. IEX16 at 25–31; 7/9 Tr. 500:15-501:9. Dr. Ansolabehere's credentials are in the areas of social science and government, not mathematics or applied statistics, and simply are not comparable to those of Dr. Katz. PEX50 at 88. Tellingly, Dr. Ansolabehere has never "crossed the aisle" to testify for a Republican interest in the redistricting process. 7/7 Tr. 220:2–5. Dr. Katz detailed the serious shortcomings in Dr. Ansolabehere's techniques and methods, and those problems were not adequately addressed even in Plaintiffs' rebuttal.

### E.    There Is No District-Specific Evidence Establishing Predominance

The Court does not need statistics, averages, or regression analyses to decide this case. The district-by-district testimony by Delegate Jones and Defendant-Intervenors' experts—who studied in depth how the Plan fits within the real world of Virginia politics, history, and communities of interest—shows that sorting people based on race without regard to traditional criteria did not occur. The opposite occurred: Delegate Jones took care to understand the needs of each district. He attempted to respect Virginia's communities and the real-world interests of its citizens to the extent possible given all the competing considerations.

### 1.    Overview

Delegate Jones faced significant challenges in drawing the Plan. However, maintaining the 12 majority-black districts in their given geographies to provide minority voting strength to those historic black communities was a goal even Plaintiffs agree was worthwhile. 7/13 Tr. 818:16–17. Population growth in Northern Virginia significantly exceeded that of other regions, especially Hampton Roads, parts of Richmond, and southern Virginia. IEX99. The transfer of three seats from such areas to Northern Virginia "set[] up a ripple effect on the districts" as they

19

crawled towards new population, given that districts must be contiguous and compact within the meaning of Virginia law. 7/13 Tr. 688:1–15.

The Challenged Districts were especially affected. When the 2010 Census counts were released in February of 2011, 11 of 12 were underpopulated and half were underpopulated by over 10 percent. IEX15 at 14. The 12 Challenged Districts had only enough population to draw 11 districts. IEX14 ¶ 68. The sole Challenged District with population above the ideal (HD74) exceeded that target by a mere 0.2 percent and bordered underpopulated districts. *Id.* Each Challenged District was drawn in a region with substantial under-population, meaning that neighboring districts were also grasping for additional people. The Challenged Districts in Hampton Roads and in southern Virginia also faced problems, given natural boundaries (bays, inlets, rivers, and the Atlantic Ocean) as well as state borders, and the Richmond districts faced the challenge of the oddly shaped Henrico County, which hugs Richmond on both sides. IEX96, IEX97. These boundaries limited the directions in which these districts could extend to obtain additional population, consistent with criteria of contiguity, compactness, and communities of interest. The Challenged Districts were, nevertheless, drawn in a manner consistent with their previous forms, with other districts statewide, and with race-neutral considerations:

**Compactness.** As discussed above, under objective measures of compactness, the Challenged Districts are comparable with the 2001 districts and districts statewide. Only three were below Dr. Ansolabehere's proposed .20 Reock threshold—two of them having the same or better scores than before. Six districts became more compact under the Reock score, and five became more compact under Polsby-Popper. IEX15 at 15. There is minimal change under either score, *id.*, and by Dr. Katz's compactness measure, Boyce-Clark, nine of the twelve Challenged Districts saw an improvement in compactness from  2001, IEX16 at 9.

**Core Retention.** The Challenged Districts had remarkably high retention of constituencies under each of the three measures of core retention offered by experts in this case. *See Karcher v. Daggett*, 462 U.S. 725, 740 (1983). One score measures the percent of the old district's population that is found in the new district, and the Challenged Districts had on average 79.11 percent core retention by this measure with many in the mid-80 percent range. IEX14 at 81. Another score measures the percent of the new population that was found in the old districts, and the Challenged Districts held on average 72.76 percent of their population by that score. IEX14 at 81. A third score measures the percent of the voting age population of the old district found in the new, and the Challenged Districts retained on average 73.2 percent of their cores by that standard. IEX15 at 16; 7/9 Tr. 613:1–8. Most of these districts are substantially similar to their forms in the 2001 Plan, and those with modestly lower retention (only slightly below the state average)—HD80, HD90, and HD95—are in the Hampton Roads region and required movement because of population loss, natural boundaries, and political considerations.

**Split Political Subdivisions.** There is no meaningful change in split subdivisions from the 2001 Plan. Even by Plaintiffs' expert's calculation, there was a measly increase in four "divisions" and two split cities or counties as to the Challenged Districts. PEX50 at 71. A review of the subdivision splits (together with trial testimony) demonstrates how minimal those changes were and why they occurred, as discussed district-by-district below.

As to VTDs, Dr. Ansolabehere provided a chart showing a modest increase in split VTDs from the 2001 Plan (split VTDs increased Plan-wide). PEX50 at 70. HD63 and HD75 accounted for most of the new splits, and, as discussed below, this occurred for complex political reasons at the request of the representatives of those districts. Besides, VTD splits are not referenced in the house criteria, and *precincts*—which are not necessarily the same—are identified as having low

21

priority as compared to other communities of interest. PEX16 at 2. Precincts exist for administrative convenience and may have little bearing on "actual shared interests."[12] *Miller*, 515 U.S. at 916.

**Incumbency Protection.** Delegate Jones was careful to avoid pairing incumbents where possible. 7/8 Tr. 304:19–21. Despite having 100 districts and encountering large population shifts, the Plan paired "very few incumbents." 7/9 Tr. 611:21–612:1. There were six pairs total, IEX15 at 11, two of which were "pro forma pairings" where one or the other delegate was set to retire, 7/8 Tr. 382:10–16. The alternative plans, HB5002 and HB5003, followed different criteria and paired dozens of incumbents. 7/8 Tr. 378:10–24. There is no way to know how many incumbents Plaintiffs' mythical ideal map would pair because they have not submitted one to the Court. Nor did Plaintiffs' expert so much as consider incumbency in any of his analyses related to this case. 7/7 Tr. 230:19–23. Incumbency is ignored entirely in Plaintiffs' case, with one exception: their fact witness, former-Delegate Ward Armstrong, represented on the House floor when the Plan was under consideration that incumbency protection—not compliance with the Voting Rights Act—was the "number one criteria" governing the Plan. 7/7 Tr. 110:8–13.

**Race.** The average BVAP in the Challenged Districts remained virtually unchanged from the 2001 Plan, increasing 0.1 percent. IEX15 at 14. As of redistricting, BVAP in nine of the twelve districts was above 55 percent, under the DLS numbers. *Id.* With only three exceptions, the change in BVAP in each district did not exceed plus or minus two percent. *Id.* Those exceptions are: (1) HD71, which was no longer a majority-minority district in 2011, (2) HD74,

---

[12] Even so, many precincts split in HB5001 were made whole in HB5005, the Plan at issue.

which saw a *decrease* in BVAP of 5.5 percent, and (3) HD89, which saw an increase of 3 percent. *Id.* The House attempted "to prevent retrogression from taking place"—and to comply with Section 2—in the Challenged Districts, "but not in a mechanical fashion," since half went up and half down in BVAP. IEX15 at17.

**Motive and Causation.** As to each and every district, individually, the Court heard Delegate Jones testify that the use of race and effort to comply with the Voting Rights Act did not result in departure from any of criteria adopted by the House. *See, e.g.*, 308:4–12; 309:13–20; 308:13–19. This was not conclusory: Jones testified as to specific race-neutral considerations involved in molding each Challenged District. The burden is on Plaintiffs, and there is no evidence controverting Jones's testimony.

## 2. The Richmond Districts

The Richmond-area Challenged Districts are HD69, HD70, HD71, and HD74. 7/8 Tr. 290:17–18. The Court can summarily dispense with the challenges to HD69 and HD70 because Plaintiffs have no relevant evidence as to these districts. By their own measure, HD69 *increased* in compactness by a substantial margin and HD70 retained a compactness score of .40, giving it twice the compactness score of Plaintiffs' expert's .20 standard for non-compactness. PEX50 at 70. Both districts remained in the same political subdivisions as in the 2001 Plan. PEX50 at 71. The Plan actually improved HD70 by moving most of its precincts to Henrico County to better align the suburban interest, but the residency of its representative in Richmond prevented Jones from removing it entirely from the city. 7/8 Tr. 311:3-17. Over 83 percent of the old HD69 can be found in the 2011 HD69, and over 67 percent of the old HD70 can be found in the new district. IEX14 at 81. There being no evidence that traditional redistricting criteria were neglected in the least—much less in a substantial or meaningful way—the *Shaw* claim fails.

23

Besides, Plaintiffs' own calculations show that politics predominated over race in moving

population in and out of HD69 and that there is no meaningful difference in the two as to HD70.

PEX50 at 77; 7/13 Tr. 792:8–793:3. BVAP decreased in both districts and by a substantial

margin in HD70. PEX50 at 72. The claims against HD70 and HD74 also fail:

### i.   House District 74

The evidence on HD74 is only slightly better for Plaintiffs than as to HD69 and HD70

only because of HD74's low compactness score. But this score is *identical* to the score for HD74

in the 2001 Plan, PEX50 at 70, the score is *improved* from the 1991 Plan, IEX14 at 67, and

HD74 has existed in nearly its current shape since 1991, IEX14 at 60. Nearly 80 percent of the

2001 HD74 constituency can be found in the 2011 HD74, IEX14 at 81. Because core retention is

a traditional redistricting criterion (and is further relevant as to incumbency considerations) and

because the same district in the same geography survived carefully scrutiny from the Virginia

Supreme Court in *Wilkins v. West*, 264 Va. 447, 465–66, 476–77 (2002), the odd shape of HD74

cannot be said to violate traditional redistricting criteria. *Comm. for a Fair and Balanced Map v.

Ill. State Elecs. Comm.*, 835 F. Supp. 2d 563, 590–92 (N.D. Ill. 2011). In fact, the 2011 Plan

*improved* HD74 by removing communities across the James River in Hopewell that had been

joined to the district in 2001 and by thickening the "neck" of the district. 7/8 Tr. 316:10–317:17;

IEX14 at 60.

Even if there were a departure from the House criteria, Plaintiffs' calculations show no

meaningful difference between racial affiliation and partisan voting patterns of the population

moved in and out of the district. PEX50 at77; 7/13 Tr. 792:8–793:3. BVAP decreased from the

2001 Plan. PEX50 at 72.

ii.      **House District 71**

Plaintiffs have two bases for the challenged to HD71: (1) expert analysis purporting to show a priority of race "over" politics in moving people in and out of HD71, and (2) the lay testimony of Delegate McClellan. Neither remotely establishes racial predominance.

**Expert Analysis.** Plaintiffs' expert's analysis purports to show that a high number of black residents were moved into HD71 and a high number of Democratic voters were moved out, PEX50 at 77, and concludes that race trumped politics in drawing the district. The numbers here are misleading because, as Delegate McClellan testified, HD71 was the most Democratic in Virginia, 7/7 Tr. 27:13–15, meaning that, by definition, the vast majority of voters taken out of HD71 would be Democrats and that the percentage of Democrats brought in to the district would be lower than the percentage of those taken out. Moreover, HD71, at the time of redistricting, was below the *Strickland* standard by several percentage points such that it was no longer a majority-minority district, and it bordered on districts with much higher BVAP levels on three sides (HD69, HD70, and HD71), and by Republican districts on the other side. 7/7 Tr. 57:21–24; 7/8 Tr. 292:19–21; 304:1–305:23. Given that set of facts, it would be hard to imagine anything else occurring.

More importantly, the question whether race or politics predominated in the deviation from traditional criteria only matters to the extent that *traditional criteria were actually violated*. HD71 improved in compactness by Plaintiffs' measure from 2001, PEX50 at 70, is not irregularly shaped, 7/7 Tr. 61:15–18, had core retention of between 78 and 84 percent (depending on the measure used), IEX14 at 81, and sits in the same number of political subdivisions as in the 2001 Plan, PEX50 at 74. Plaintiffs' expert was unable to identify any departures from the criteria or sound redistricting principles in HD71. *See* 7/8 Tr. 243:6–251:8.

25

**Lay Testimony.** Most of Delegate Jennifer McClellan's testimony concerned the 55 percent target, and her testimony was ambiguous on this point. 7/7 Tr. 41:7–14. As to evidence potentially suggesting a deviation from criteria *caused* by the use of that 55 percent target as to actual boundaries of the district, McClellan's testimony was limited to two observations. One observation concerned precinct splits in the HB5001 plan, which was vetoed by Governor McDonnell. McClellan admitted during trial that she did not ever ask Jones to fix the precinct splits, and that he was not responsible for rejecting the changes that she testified she had wanted. 7/7 Tr. 47:7–9.  Rather, when HB 5001 was before the Senate, McClellan proposed changes to the map to un-split certain precincts, and the proposal was not adopted. 7/7 Tr. 46:14–47:8; 50:13–51:7. When HB5001 was returned to the House, "there was not an opportunity to offer any additional amendments," 7/7 Tr. 53:3–20, and the splits therefore were not fixed in HB5001, 7/7 Tr. 46:1–4. When HB5001 was vetoed, Jones and McClellan took advantage of the opportunity for further modifications and resolved the problems to the satisfaction of the Richmond Registrar in HB5005, as a contemporaneous floor speech by Jones demonstrates. 7/8 Tr. 295:1–14. IEX7 at 2–3. There was no conflict between the criteria as to HB5005.[13]

McClellan's second observation concerned a division between precincts in the "Fan" neighborhood of Richmond. 7/7 Tr. 39:14–41:4. But Delegate Jones testified that this occurred for race-neutral reasons: Delegate Loupassi, a Republican, made a personal request that Richmond precinct 207 be placed in his district because he knew the precinct well from his time

---

[13] Besides, as described above, keeping VTDs whole was not a priority for the House because VTDs do not necessarily reflect communities of interest. PEX16 at 2.

as City Council president, and the request of a Republican took precedence over that of a Democrat. 7/8 Tr. 305:10–307:12.

Besides these observations, which do not establish predominance, McClellan's testimony demonstrated that traditional criteria controlled the drawing of her district. At her request, the Church Hill community was reunited, 7/7 Tr. 38:19–39:9; lines were drawn carefully to avoid pairing incumbents who resided in the same regions, *id.* 59:3–60:8; the district followed the traditional borders that had been in place for decades, *id.* 7/8 59:22–24; the district became more Richmond-centric, *id.* 60:14–24; and the district is not irregularly shaped, *id.* 61:15–18. The testimony reflects that what *should* occur in redistricting *did* occur: Jones and McClellan worked together to create a district that best reflected the history and changing demographics in downtown Richmond.

### 3.     Southside Virginia

Challenged Districts HD63 and HD75 lie in Southside Virginia, which includes Sussex, Southampton, Brunswick, Emporia, and Greensville. 7/8 Tr. at 319:1–16. These districts presented a significant challenge because they were underpopulated by roughly eight and twelve percent respectively, IEX15 at 14, requiring a "population influx" of "over 20 percent," 7/8 Tr. 320:1–10. HD75 borders North Carolina to the south and both HD63 and HD75 are bordered on all sides by precincts inhabited by rural Republicans. IEX92 at 2, IEX92 at 12. The Democratic Vote Average for HD63 and HD75 was 57.6 percent and 50.5 percent, respectively, IEX15 at 16, meaning that Democratic Delegates Rosalyn Tyler (HD75) had barely above 50 percent Democratic vote share in her district, and Delegate Dance had only a seven percent cushion above that threshold. These were the lowest Democratic Vote Index figures of all the Challenged

27

Districts. IEX15 at 16. Accordingly, there were substantial geographic and political challenges involved in redrawing these districts.

Neither expert analysis nor lay testimony suggests that the House violated its criteria in drawing these districts and, regardless, the politics predominated over race in the changes made.

**Expert Analysis.** By Plaintiffs' expert's measure of compactness, HD75 remained as compact in the 2011 Plan as in the 2001 Plan. PEX50 at 70. HD63 dropped in compactness, but remains above the .20 threshold identified by their expert as raising compactness concerns and remains well above the standard set in *Jamerson*. PEX50 at 70; IEX14 ¶¶ 50–53. The changes in these districts are deceiving to the eye because they cover rural areas that are sparsely populated. 7/9 Tr. 620:16–623:2. Both districts had high core retention by all measures. Over 86 percent of the 2001 HD63 population was retained in the 2011 district, and over 80 percent of the 2011 district's population existed in the 2001 district. IEX14 at 81. Over 88 percent of the 2001 HD75 population was retained in the 2011 HD75, and over 78 percent of the 2011 HD75 population existed in the 2011 HD75. IEX14 at 81. Remarkably, Plaintiffs would have the Court invalidate these districts over the movement of between roughly one or two of every ten (depending on the measure) individuals.

Even if there were a departure from traditional criteria, Plaintiffs are unable to prove that race predominated. Dr. Ansolabehere only compared two variables, and even then his showing is unpersuasive and unreliable. As to HD63, the differential between Democratic voters brought in and out of the district and the differential between the black voters brought in and out of the district are nearly the same and cannot show predominance of one over the other. PEX50 at 77. As to HD75, the differential between black voters brought in and out of the district—10.8 percentage points—is barely at the level that Plaintiffs' expert identified as a meaningful

differential in the first instance, PEX50 ¶ 96, and is only marginally higher than the differential as to Democratic voters drawn in and out of the district. Moreover, those numbers are not reliable because this measure is subject to the "caveat" that there was no way to know the distribution of population within VTDs, and the measure assumes that population is evenly distributed within these VTDs. PEX50 ¶ 86. It is unlikely that this assumption is accurate given that these are large, sparsely populated, rural VTDs. The "caveat" swallows any meaningful inference as to HD63 and HD75, which combine for 21 split VTDs (for reasons explained below). These numbers are no basis for establishing Plaintiffs' exacting burden.

Furthermore, the BVAP levels underwent minuscule changes from just prior to redistricting to the 2011 Plan: BVAP in HD75 and HD63 increased by .1 and 1.4 percent respectively. PEX50 at 72.

**Lay Testimony.** Lay testimony and a review of the maps demonstrates what actually occurred, and it had little to do with race. As to HD75, Delegate Jones testified that the Plan made a county whole, and made the district more regular, in the southwest corner by drawing in precincts called Brodnax, Tillman, Rock Stone, and Dromgoole. 7/8 Tr. 322:24–323:10; IEX94 at 7; JX. 1 (Tyler Transcript) at 84. Notably, these areas had lower concentrations of black population than did several precincts just to their west that were not included in the district. IEX92 at 13. Similarly, HD75 was expanded on its northwestern border to include precincts called Victoria Public Library, Plymouth, and Peoples Community Center. IEX94 at 7. Doing this picked up areas of low black population and bypassed areas of high black population. IEX92 at 13.

Likewise, HD75 was expanded on its eastern side to include a precinct called Dendron. IEX94 at 7. That precinct has a low level of black population, and the precincts just beyond its

borders to the east contain a higher black population. IEX92 at 13. This confirms Jones's

testimony that race had nothing to do with including Dendron: it was a personal request by

Delegate Tyler based on her past political performance in the region and her understanding of

what communities should be in the district. 7/8 Tr. 325:1–17. The lines connecting Dendron to

the core of the HD75 were drawn to avoid a pocket of Republican voters in Wakefield, 7/8 Tr.

325:6–8, who gave over 75 percent support for Governor McDonnell in 2009, IEX92 at 12, and

which had been in Tyler's district in the 2001 Plan, EIX94 at 7. Jones testified that he would not

have split precincts or counties in drawing either HD75 or HD63, but did so upon request of

Delegates Dance and Tyler. 7/8 325:1–18.

The line between HD75 and HD63 was carefully negotiated between Dance and Tyler to

meet a myriad of concerns, which resulted in the "bulk of the [VTD] splits" in the area, 7/8 Tr.

325:19–326:10, and in the Challenged Districts overall, PEX50 at 70. One contour of HD75 was

extended into VTDs called Rohoic and Edgehill to draw a potential primary challenger against

Dance out of HD63 without drawing New Hope into HD75, which Dance wanted in her district.

7/8 Tr. 325:24–326:12; *id.* 326:25–327:10; IEX94 at 1, 7. That "finger" was not drawn along any

evident racial lines, and this confirms this testimony. IEX92 at 13.

Delegate Tyler's deposition designations confirm that her concerns in making the various

requests were primarily political, not racial. JX 1 (Tyler Transcript). She testified that 55 percent

referred to "Democratic performance"—"[m]ore Democratic performance. More so than black

minority voters." *Id.* 57:24–58:25. She went so far as to testify that 55 percent did *not* refer to

"minority voting strength." *Id.* 59:1–2. Eventually, after being asked the same questions by

Plaintiffs' counsel again and again, she modified her testimony by stating that 55 percent *did*

refer to black voting population, *id.* 63:10–15, but made crystal clear her view that "[w]hat I'm

saying is most of the time blacks vote Democratic," *id.* 62:17–25, and that "in [her] mind, the purpose of ensuring 55 percent BVAP was to help Democrats be elected," *id.* 63:19–23. This testimony and the maps, which show multiple pockets of heavy black population just beyond the borders of HD63 and HD75, IEX92 at 3, 13, confirm that, while race was considered, it did not predominate over Tyler's political and community-of-interest concerns.

Delegate Dance's trial testimony added very little specific information to this testimony. She testified that HD63 expanded to include two additional localities, 7/7 Tr. 79:25–80:3, which is hardly surprising given that HD63 was nearly 8 percent underpopulated, IEX15 at 13, and covers mostly rural territory. The Hopewell precincts were added to cure the criticized river crossing in the 2001 HD74 and provide the needed population to comply with the equal-population rule. 7/8 Tr. 328:23–329:11. The decisions that led to a less compact HD63 better reflects the geography and communities of Southside Virginia and fall within "a State's discretion to apply traditional redistricting principles." *Vera*, 517 U.S. at 978 (quotation marks omitted). And if the predominant purpose of the lines of HD63 had been racial, the district would have gone in multiple other paths in each direction to pick up black population that was bypassed in the configuration selected, which reflects little correlation to racial lines. IEX92 at 3. Indeed, the stretch of territory connecting the Hopewell precincts to HD63's core was drawn *around* an area of heavy black population in a precinct called Jefferson. IEX92 at 3; IEX94 at 1.

### 4.     South Hampton Roads

The Hampton Roads region south of the James River includes Challenged Districts HD77, HD80, HD89, and HD90. Plaintiffs presented no relevant evidence on these districts. Plaintiffs' expert only identified meaningful "racial sorting," PEX50 ¶ 79, in one district (HD77), but political sorting occurred in that district to nearly the same degree, PEX50 at 77, and

Plaintiffs cannot meet their heavy burden on that single slim reed. Plaintiffs having failed to demonstrate that race predominated over politics, the Court need not even ask the question whether it predominated over *all the other considerations* (such as traditional criteria) that Plaintiffs' expert failed to address. Plaintiffs' expert testified that he had no knowledge of many of the considerations that went into HD80—which was presented to him by way of example— and had no way to rebut any of the factual claims presented. 7/7 Tr. 232:4–234:10. Plaintiffs offered no fact witnesses on these districts.

Delegate Jones offered the only testimony about factors other than partisan voting patterns that motivated the drawing of these lines. This region "had tremendous population pressures" and the movement in the districts was caused largely by the collapse of HD87, which was moved to Northern Virginia. 7/7 Tr. 330:3–332:11. "So 14 years ago there were five seats in Norfolk, and now there [are] only two." 7/7 Tr. 332:8–11. The changes in the region were all driven by the movement of HD79 (which is not challenged in this case) to subsume portions of HD87 (which was moved to Northern Virginia), causing a flow of movement in districts into HD79's former territory, which accounts for the movement in HD80. 7/8 Tr. 350:1–22.

### i.      House District 77

Besides maintaining districts that were as contiguous and compact as possible given the need for substantial movement among the South Hampton districts, Delegate Jones made a priority of honoring the request of Delegate Spruill to limit representation of Chesapeake to two districts, *see* PEX50 at 71, and, more particularly, to unite representation of a portion of Chesapeake formerly known as "South Norfolk," which had its own community identity, 7/8 Tr.333:20–335:22. This was accomplished by removing the precincts Tanglewood, Oaklette, Norfolk Highlands, and Indian River from HD90 and placing them in Spruill's district, HD77.

*Id.*; IEX94 at 8. This effort also required moving Johnson Park from HD80 to HD77. All of these were predominantly white precincts. IEX92 at 15. At the eastern end of HD77, a Republican precinct called Airport was moved from Spruill's district into Delegates Jones's district, HD76. 7/8 Tr. 336:1–12. A "predominant purpose" in drawing this district was preserving the political voting strength of both Jones and Spruill. 7/8 Tr. 338:1–5.

Core retention in HD77 was roughly three of four constituents (varying slightly depending on the measure), IEX14 at 81, compactness of the 2011 district was nearly identical compared with the 2001 district, PEX50 at 70, and the district reduced split VTDs from the 2001 district, *id.* All of this refutes any suggestion that HD77 was drawn in contravention of traditional criteria. BVAP in HD77 rose a mere 1.2 percent from 2009. IEX15 at 14.

### ii.    House District 90

HD90 was over 11 percent underpopulated prior to redistricting, IEX15 at 14, and required nearly 9,000 persons be added, 7/8 Tr. 340:11–18. The issue was resolved simply by picking up contiguous precincts. 7/8 Tr. 340:11–18. IEX94 at 12. These changes made an already compact district *more* compact by Dr. Ansolobehere's standard. PEX50 at 70. There is no discernible correlation between the lines of the district and the lines of predominantly black neighborhoods, IEX92 at 21, and BVAP dropped in the district from 56.9 percent to 56.6 percent, IEX15 at 14. All this evidence indicates a run-of-the-mill application of ordinary districting principles, and there is no other evidence of this district on the record.

### iii.    House District 89

The 2011 iteration of HD89 is a virtual replica of the 2001 version. IEX94 at 11. The 2011 district retained over 82 percent of its 2001 constituents, and nearly 77 percent of the constituents of the new district were present in the old district. IEX14 at 81. The district is

compact. PEX50 at 70. All of that is remarkable given that the district was underpopulated by over 7 percent before redistricting. IEX15 at 14; 7/8 Tr. 343:12–344:13. The Plan did split some VTDs, but this was done at Delegate Algie Howell's request to place his small business (a funeral home) within his district. 7/8 Tr. 344:25–345:1–8. None of this suggests racial gerrymandering.

### iv. House District 80.

HD80 was over eleven percent underpopulated prior to redistricting, and required over 9,400 new persons to meet the equal-population criterion. IEX15 at 14; 7/8 Tr. 349:6–350:6. There were substantial geographic constraints, given the predominant goal of avoiding districts that crossed the James River. 7/8 Tr. 350:2–9. One limit was the Norfolk Naval base, another was the James River, another was the Atlantic Ocean, another was the close proximity of Delegates Matthew James and Johnny Joannou, and another was the low population in neighboring districts. 7/8 Tr. 348:7–22; 349:6–12; 350:1–351:8.

The resolution was "to roll" HD80 along the path left behind by HD79, which had moved into the space left behind by the collapsed HD87. 7/8 Tr. 350:1–22. That maneuver *bypassed* concentrated black population in a precinct called E.W. Chittum School. IEX94 at 10; IEX92 at 17. It also avoided capturing precincts such as Silverwood, Churchland, and Fellowship, which were strong Republican precincts in Delegate Jones's district (HD76). IEX92 at 16. This maneuver lowered the compactness score of HD80—for reasons unrelated to race—but it improved the compactness score of HD79. PEX50 at 70; IEX14 at 72; IEX14 at 77. BVAP in HD80 increased a mere 1.9 percent. There is no other meaningful evidence on this district on the record, and nothing suggesting racial predominance over traditional redistricting principles.

### 5. North Hampton Roads

Two Challenged Districts, HD92 and HD95, lie north of the James on the "Peninsula." The Court may summarily dismiss the challenges to both as Plaintiffs have no evidence to meet their burden of showing predominance. As to HD92, its compactness was improved from the 2001 Plan, PEX50 at 70, split VTDs were eliminated entirely, *id.*, the district inhabits only one political subdivision, PEX50 at 71, and the district had high core retention, IEX14 at 81. No traditional criteria were violated, and BVAP decreased. IEX15 at 14.

The Court may also summarily dismiss the claim against HD95 because even Plaintiffs' expert's report shows that race did not predominate the line drawing. PEX50 at 78. This confirms the testimony of Delegate Jones that HD95 was drawn as it was for race-neutral reasons. There was a population deficiency on the Peninsula, the district was drawn around Republican precincts to preserve a safe Republican district for Delegate Glenn Oder next door in HD94, the district captured its needed population by assuming territory left behind by HD93— which in turn was pulled up into the Williamsburg area to fix the "Ferrymander"—and curved around the residence of Robin Abbott to avoid pairing her with another female incumbent, Mamye Bacote. 7/8 Tr. 366:23–376:21. HD95 bypassed multiple areas of high black population to accomplish these race-neutral goals. IEX92 at 24, 25.

Having identified no district where traditional criteria were ignored *because of race*, Plaintiffs failed to meet their heavy burden of establishing racial predominance. For that reason, the Court should enter judgment in favor of Defendants and Defendant-Intervenors.

II.     **The Plan Is Narrowly Tailored Under Sections 2 and 5 of the Voting Rights Act**

Because Plaintiffs have not met their burden through their supposedly direct or flawed and conclusory circumstantial evidence, the Court need not reach strict scrutiny. Regardless, the Plan is narrowly tailored to comply with Sections 2 and 5 of the Voting Rights Act.

**Section 2.** "Plaintiffs are not even remotely suggesting that any of the[] 12 [Challenged Districts] should have their BVAP lowered below [50] percent" and agree that "[i]t is essential that these all be healthy performing majority-minority districts," so there is no dispute that Section 2 is a compelling interest.[14] 7/13 Tr. 818:12–24. A district is narrowly tailored under Section 2 when it is "*reasonably* compact and regular, taking into account traditional districting principles such as maintaining communities of interest and traditional boundaries…." *Vera*, 517 U.S. at 977. That is, narrow tailoring under Section 2 concerns, not the level of BVAP in a district, but the degree to which the legislature departs from traditional criteria to create a majority-minority district. *See id* at 977–81. As described above, Plaintiffs have shown *no* deviation from traditional districting principles and the Challenged Districts largely cover the same geography and communities for 20 years. They are narrowly tailored under Section 2, which provides a basis independent of Section 5 for rejecting Plaintiffs' challenge.

**Section 5.** A district is narrowly tailored under Section 5 when a legislature has a "strong basis in evidence" to believe race-based measures are necessary to preserve the minority community's ability to elect its candidate of choice. *Alabama*, 135 S. Ct. at 1273–75. The

---

[14] Plaintiffs' counsel is quoted in the July 13 transcript as stating that BVAP should not be lowered "below 55 percent," which would be an odd admission in a case claiming that the use a 55 percent target was the Plaintiffs' injury. In context, it appears he meant to say "50 percent."

Virginia House had copious evidence that a simple 50 percent majority would not suffice. They were aware of low voter turnout amongst minorities, PEX33 at 45, low registration, 7/9 Tr. 462:12–21, and declining BVAP in some districts likely to continue for the next decade, PEX35 at 41–42. Delegates doubted whether the minority communities were currently electing their *preferred* candidates of choice (not merely Democratic nominees in uncontested general elections). PEX35 at 144–45, PEX33 at 36. The Court heard Delegate Jones testify from his personal experience of defeats of the minority's preferred candidates of choice in five of the Challenged Districts in recent memory—and Plaintiffs' counsel asked only about 9 districts—7/9 Tr. 454:1–462:11, 488:14–25, a substantial number given the lack of contested races and strong incumbency performance, *see, e.g.*, 7/13 Tr. 766:11–16. For the same reason, the Delegates were concerned about the ability of future, non-incumbent, minority-preferred candidates to win, and the success of incumbents by itself is not sufficient evidence of that ability. PEX32 at 14, 23. Jones also had the expert reports and findings of the Virginia Supreme Court in *Wilkins v. West*, and these findings were consistent with the concerns of the Black Caucus members. 7/7 Tr. 264:11–265:16; 270:15–20; 280:14–17. Those considerations justify drawing districts at above simple majorities and to use the target 55 percent to meet that goal. In fact, one Delegate, Rosalyn Tyler, believed 55 percent was insufficient. 7/8 Tr. 321:1–323:16; PEX40 at 38–39.

There is nothing unusual about what occurred. The initial Supreme Court case on Section 5, *Beer v. United States*, 425 U.S. 130 (1976), "approved" a plan that "was drawn with the purpose of avoiding dilution of black vote by attaining at least a 54% majority of black voters in one district," and the Supreme Court subsequently ratified that approach in an equal-protection challenge because, "in the process of drawing black majority districts," a state "must decide how substantial those majorities must be," and, surely, the lead Section 5 case could not have ratified

37

a redistricting plan that was unconstitutional. *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 197, 160, 162 (1977) (*UJO*). *UJO* approved a plan that set the number at 65%, noting that there was no evidence that the number was an increase from the former voting strength. *UJO*, 430 U.S. at 163. *See also id* at 160 (discussing *City of Richmond v. United States*, 422 U.S. 358 (1975), which "created four out of nine wards with substantial black majorities of 64%"). Numerous courts, including in Virginia, have ordered or approved creation of districts with minority representation above 55 percent, *see* Defendants' Pre-Trial Br. at 19–22 (citing cases), and the Supreme Court's *Alabama* decision expressed concern at BVAP being maintained at *70 percent* when it would be "highly unlikely" that reducing it to "65% would have a significant impact" on minority voting strength. 135 S. Ct. at 1257. The Court said nothing about regression analysis or statistics. *See id.*

Plaintiffs nevertheless fault the House for failing to conduct a regression analysis or some other supposedly sophisticated statistical study. Undertaking such an analysis prior to drafting a plan requires sufficient information from relevant elections, in this case primary elections for the House, and the analysis of Dr. Ansolabehere's, aside from methodological shortcomings did not even use the most probative information.

Dr. Ansolabehere claimed that his Ecological Regression analysis was relevant to assessing racially polarized voting. PEX50 ¶ 133. But the purpose of polarization analysis is to "ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 31 (1986). Dr. Ansolabehere used only general election data from mostly "on-year" statewide elections to develop this analysis, rendering it meaningless for assessing House of Delegates elections. Without any information about whether

whites and blacks voted differently at the primary level in their House districts, Dr. Ansolabehere only demonstrated minority voters' support for Democratic nominees running against Republicans in Democratic districts, ignoring voting patterns that may be substantially different from the odd-year elections for House seats. 7/13 Tr. 692:23–693:14 (Dr. Hofeller opining that "[h]aving used general election data, he is not really measuring preferred candidates of African Americans.  He's measuring preferred party choice[.]"); 7/13 Tr. 702:9–10 (Dr. Hofeller stating that the "wrong data was used" by Dr. Ansolabehere); 7/9 Tr. 516:2–19 (Dr. Katz expressing skepticism about the use of "on-year" elections to analyze potential results in "off-year" House of Delegates elections).

Even Dr. Ansolabehere acknowledged that he did not have "enough data to do a meaningful analysis." 7/13 Tr. 761:1-15. When pressed about how he could identify the candidate of choice for a minority community, Dr. Ansolabehere stated that his analysis "asks for each election studied which candidate was chosen by a majority of the minority population." 7/13 Tr. 761 24–25. This circular and shallow logic—that the candidate of choice was the candidate chosen by the minority community, and the minority community voted for its candidate of choice—does nothing to show whether polarization existed between black and white Democrats when it came to their ***preferred*** candidates of choice. *See Collins v. City of Norfolk, Va.*, 883 F.2d 1232, 1240 (4th Cir. 1989) (*Collins VI*) (reversing lower court for failing to draw that distinction). That black and white Democrats voted for the Democrat nominee in the general election is of no use to the issues facing the House at redistricting—or the Court here.

Having begun with the wrong data, Dr. Ansolabehere made matters worse by using "ecological regression," a "discredited statistical method" that produces logically impossible results. IEX16 at 1, 9. Besides, the vehement disagreement among the various experts in this

39

case undermines any pretense that expert statistical methods are the best—let alone the *constitutionally required*—way to draw a majority-minority district. The *Alabama* Court held that the strong-basis-in-evidence standard does not require the legislature to "guess" to make this determination, and it is anyone's guess what statistical method is best and which experts will provide what information under any given set of circumstances. 135 S. Ct. 1273–74. As Dr. Katz testified, Dr. Ansolabehere's on-year, general-election analysis was nothing but "an interesting academic exercise" bearing no relevance to voting in House of Delegates elections and providing no useful information to this Court. 7/9 Tr. 518:17–19. It certainly cannot provide the standard for Virginia's compliance with the Voting Rights Act.

Plaintiffs argue that some statistical analysis is better than none because "there has to be a way to answer this question." 7/13 Tr. 820:14–22. Yes, the question must be answered, but do *statistics* really answer all questions? No. Bad data make for bad statistics that deliver a false sense of knowledge and certainty and are worse than no statistics at all. If good numbers are not available, the best course of action is, not to turn to bad numbers, but rather to do what the House of Delegates did: rely on the local knowledge of Delegates and others who understand the districts, the communities, and the people within them as to what minority voting strength was needed. *See Collins VI*, 883 F.2d at 1238–39.

## CONCLUSION

The Court should enter judgment in favor of Defendants and Defendant-Intervenors.

Dated: July 20, 2015

Respectfully Submitted,

/s/ Jennifer M. Walrath

E. Mark Braden (*pro hac vice*)
Jennifer M. Walrath (VSB No. 75548)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates
and Virginia House of Delegates Speaker
William J. Howell*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of July, 2015, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.

/s/ Jennifer M. Walrath
E. Mark Braden (*pro hac vice*)
Jennifer M. Walrath (VSB No. 75548)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates*
*and Virginia House of Delegates Speaker*
*William J. Howell*