**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, | Civil Action No. 3:14-cv-00852-REP-GBL-BMK |
| Plaintiffs, | |
| v. | |
| VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, | |
| Defendants, | |
| v. | |
| VIRGINIA HOUSE OF DELEGATES, *et al.*, | |
| Defendant-Intervenors. | |

**<u>PLAINTIFFS' POST-TRIAL OPENING BRIEF</u>**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. ARGUMENT ....................................................................................................... 2

    A. This Court Should Reject Defendants' Attempt to Rewrite the Law of
    Racial Predominance ................................................................................... 3

        1. Race "Predominates" When It Is the Most Important Criterion ............... 3

        2. Plaintiffs Are Not Required to Prove Invidious Intent ............................. 4

        3. Plaintiffs Are Not Required to Show That the General Assembly
        Violated Traditional Districting Criteria ................................................... 4

    B. The Evidence of Racial Predominance Is Overwhelming .................................... 6

        1. Evidence of Racial Predominance Applicable to All Challenged
        Districts ................................................................................................ 7

            a. Direct Evidence Applicable to All Challenged Districts ............... 7

                (i) The House's Official Declaration of Redistricting
                Policy Elevates Race Above All Other
                Considerations ................................................................ 7

                (ii) Virginia's 2011 Preclearance Submission Reveals a
                Preoccupation with Race ................................................ 9

                (iii) Delegate Jones Confirmed the Primacy of Race ............... 9

                (iv) The General Assembly Used "Mechanical Racial
                Targets" to Draw All of the Challenged Districts ........... 10

            b. Indirect Evidence Applicable to All Challenged Districts ........... 14

                (i) Compactness and Respect for Political Boundaries ......... 14

                (ii) Racial Sorting ................................................................ 16

        2. Evidence of Racial Predominance Applicable to Individual
         Districts .............................................................................................. 17

            a. House District 63 ........................................................................ 17

            b. House District 75 ........................................................................ 18

            c. House District 69 ........................................................................ 19

            d. House District 70 ........................................................................ 19

            e. House District 71 ........................................................................ 20

# TABLE OF CONTENTS
## (continued)

Page

      f.    House District 74 ....................................................................... 21

      g.   House District 77 ....................................................................... 22

      h.   House District 80 ....................................................................... 23

      i.    House District 89 ....................................................................... 24

      j.    House District 90 ....................................................................... 24

      k.   House Districts 92 and 95 ......................................................... 25

C.    Race Outweighed Politics and All Other Non-Racial Considerations................ 25

D.    The Challenged Districts Cannot Survive Strict Scrutiny ................................. 27

    1.    Evidence of Lack of Narrow Tailoring Applicable to All Challenged Districts............................................................................ 28

      a.    The General Assembly Failed to Perform a Functional Analysis for *Any* of the Challenged Districts.............................. 28

      b.   The Challenged Districts Are Not Constitutional Merely Because Incumbents Approved of Them ..................................... 32

    2.    Evidence of Lack of Narrow Tailoring Applicable to Individual Districts ................................................................................ 33

      a.    House District 63 .......................................................... 33

      b.   House District 75 .......................................................... 33

      c.    House District 69 .......................................................... 34

      d.   House District 70 .......................................................... 35

      e.    House District 71 .......................................................... 36

      f.    House District 74 .......................................................... 36

      g.   House District 77 .......................................................... 37

      h.   House District 80 .......................................................... 37

      i.    House District 89 .......................................................... 38

      j.    House District 90 .......................................................... 38

      k.   House District 92 .......................................................... 39

      l.    House District 95 .......................................................... 39

III.    CONCLUSION................................................................................................ 40

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ala. Leg. Black Caucus v. Alabama*,
  989 F. Supp. 2d 1227 (M.D. Ala. 2013), *vacated and remanded*, 135 S. Ct.
  1257 (2015) ......................................................................................................................14

*Ala. Leg. Black Caucus v. Alabama*,
  135 S. Ct. 1257 (2015) ................................................................................. passim

*Backus v. S. Carolina*,
  857 F. Supp. 2d 553 (D.S.C. 2012) ...........................................................................5

*Bush v. Vera*,
  517 U.S. 952 (1996) ...................................................................................................4

*Clark v. Putnam Cnty.*,
  293 F.3d 1261 (11th Cir. 2002) ...............................................................................12

*Hays v. Louisiana*,
  839 F. Supp. 1188 (W.D. La. 1993), *vacated on other grounds*, 512 U.S. 1230
  (1994) ....................................................................................................................5, 27

*Miller v. Johnson*,
  515 U.S. 900 (1995) ..................................................................................... passim

*Moon v. Meadows*,
  952 F. Supp. 1141 (E.D. Va. 1997), *aff'd mem.*, 521 U.S. 1113 (1997) .................................32

*Page v. Va. St. Bd. of Elections*,
  No. 3:13cv678, 2015 WL 3604029 (E.D. Va. June 5, 2015) ......................................... passim

*Shaw v. Barr*,
  808 F. Supp. 461 (E.D.N.C. 1992) ...........................................................................11

*Shaw v. Hunt*,
  517 U.S. 899 (1996) ..................................................................................... passim

*Shaw v. Reno*,
  509 U.S. 630 (1993) ..................................................................................... passim

*Shelby County, Alabama v. Holder*,
  133 S. Ct. 2612 (2013) ........................................................................................2, 28

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Smith v. Beasley*,
   946 F. Supp. 1174 (D.S.C. 1996)......................................................................... passim

*Texas v. United States*,
   831 F. Supp. 2d 244 (D.D.C. 2011)......................................................................29

*Wilkins v. West*,
   264 Va. 447 (2002) .........................................................................................15, 16

**OTHER AUTHORITIES**

U.S. Const. amend. XIV ...............................................................................................1

Va. Dep't of Corr., State Responsible Offender Demographic Profile FY 2012
   (May 2013).......................................................................................................34

## I.      INTRODUCTION

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution indisputably forbids race-based redistricting absent a compelling state interest and, even then, only when narrowly tailored to advance that state interest. Virginia violated that consititutional prohibition when, in 2011, it purposely sorted voters by race into House of Delegates districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 (the "Challenged Districts").

At trial, Plaintiffs presented overwhelming *direct evidence* showing that race predominated over all other factors. The official criteria that governed the redistricting effort, for example, ranked "compliance with [the Voting Rights Act ("VRA")], and accordingly, consideration of race" as the first and most important criterion. *Page v. Va. St. Bd. of Elections* ("*Page II*"), No. 3:13cv678, 2015 WL 3604029, at *1 (E.D. Va. June 5, 2015). And in a misguided effort to satisfy that criterion, the General Assembly "expressly adopted and applied a policy of prioritizing mechanical racial targets" for every Challenged District. *Ala. Leg. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1267 (2015). Thus, as in *Page II* and *Alabama*, the General Assembly's racial goals predominated because they were "baked into" the redistricting process from the outset. The *circumstantial evidence*, while unnecessary, confirms that point.

By contrast, politics did not play a substantial role in the formation of the Challenged Districts. Delegate Chris Jones, the chief mapdrawer, admitted at trial that unseating Democrats simply "wasn't a goal." Transcript of Trial ("Tr.") 483:1-2. Nor does it matter if Delegate Jones weighed myriad other non-racial factors, such as incumbency protection, in drawing the Challenged Districts. "That the legislature addressed [other] interests does not in any way refute the fact that race was the legislature's predominant consideration" where, as here, non-racial goals were pursued only to the extent that they did not interfere with the General Assembly's overriding racial goals. *Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 907 (1996).

1

Finally, Defendants and Defendant-Intervenors (collectively, "Defendants") cannot show that Virginia's race-based redistricting was narrowly tailored to advance a compelling state interest. Defendants admit that, to avoid retrogression under Section 5 of the VRA, the General Assembly sought to ensure that all of the Challenged Districts had at least 55% Black Voting Age Population ("BVAP"). But even assuming Section 5 remains a compelling interest in the wake of *Shelby County, Alabama v. Holder*, 133 S. Ct. 2612 (2013), the General Assembly did not have a "strong basis in evidence" to believe that 55% BVAP was required to avoid retrogression in *any* of the Challenged Districts, let alone *all* of them. *Alabama*, 135 S. Ct. at 1274 (internal quotation marks and citation omitted). Defendants' halfhearted invocation of Section 2 of the VRA, meanwhile, is a made-for-litigation excuse with no record support.

Ultimately, this is a simple case. The General Assembly declared that race was the most important factor when it drew the Challenged Districts. It then failed to tailor its admitted use of race in favor of a one-size-fits-all approach focused on meeting or exceeding the same racial target in every Challenged District. As a result, even if it had the best of intentions, the General Assembly violated the Equal Protection Clause. This Court should therefore invalidate the Challenged Districts and order an immediate and effective remedy.

## II.    ARGUMENT

"As with any law that distinguishes among individuals on the basis of race, 'equal protection principles govern a State's drawing of [electoral] districts.'" *Page II*, 2015 WL 3604029, at *6 (quoting *Miller v. Johnson*, 515 U.S. 900, 905 (1995)). "Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters[.]" *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 657 (1993). Thus, "race-based districting by our state legislatures," regardless of motive, "demands close judicial scrutiny." *Id.*

"To successfully challenge the constitutionality of the [Challenged Districts] under the Equal Protection Clause, Plaintiffs first bear the burden of proving that the legislature's predominant consideration in drawing its electoral boundaries was race." *Page II*, 2015 WL 3604029, at *6. "If [Plaintiffs] make this showing, the assignment of voters according to race triggers the court's 'strictest scrutiny.'" *Id.* (quoting *Miller*, 515 U.S. at 915). The burden then shifts to Defendants "to demonstrate that the redistricting plan was narrowly tailored to advance a compelling state interest." *Id.* A race-based redistricting plan is narrowly tailored only if "the legislature [has] a strong basis in evidence in support of the (race-based) choice that it . . . made." *Alabama*, 135 S. Ct. at 1274 (internal quotation marks and citation omitted).

Here, racial goals overshadowed all others, and Defendants cannot show that they used race to advance a compelling state interest. Even if they could, they could not possibly establish that they had a "strong basis in evidence" for subjecting 12 very *different* districts to the *same* BVAP target. The Challenged Districts, accordingly, cannot survive constitutional scrutiny.

**A.      This Court Should Reject Defendants' Attempt to Rewrite the Law of Racial Predominance**

Perhaps realizing that the law as it stands is decidedly against them, Defendants have repeatedly misstated the legal standard for assessing racial predominance. Thus, before turning to the actual evidence of racial predominance—which is overwhelming under any standard— Plaintiffs set forth the correct legal framework for evaluating that evidence.

**1.      Race "Predominates" When It Is the Most Important Criterion**

Race predominates when it is the "predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. That does not mean that race must be the legislature's *only* motivation. To the contrary, courts often find that race predominates even if non-racial factors are considered. For

example, in *Bush v. Vera*, the Supreme Court held that race predominated even though several other factors—including an "unprecedented" focus on "incumbency protection"—were "at work in the drawing of the districts." 517 U.S. 952, 963 (1996). As a result, even if non-racial criteria are considered, race predominates if it is *the most important* criterion—"the criterion that, in the State's view, could not be compromised." *Shaw II*, 517 U.S. at 907.

## 2. Plaintiffs Are Not Required to Prove Invidious Intent

Defendants have argued that race predominated only if the General Assembly was motivated by "invidious discriminatory purpose." Dkt. 88 at 7. That is flatly wrong. Plaintiffs do not question the good faith of Virginia's legislators. And Plaintiffs need not show that anyone acted maliciously to prevail.[1]

## 3. Plaintiffs Are Not Required to Show That the General Assembly Violated Traditional Districting Criteria

Defendants have also argued that race predominated only if Plaintiffs show that the General Assembly violated traditional districting criteria (or the specific districting criteria adopted by the House). *See* Tr. 827:21-23. But Defendants have not cited a single case so holding, and that novel theory has no support in either law or logic.

As an initial matter, Defendants' argument stands the law on its head by making *one type of evidence* of racial predominance (that is, violation of traditional districting criteria) a *threshold requirement* for establishing racial predominance. But the Supreme Court long ago explained that plaintiffs in racial gerrymandering cases need not prove that the legislature violated traditional criteria to show that race predominated:

---

[1] *See Page II*, 2015 WL 3604029, at *1 (race predominated even though chief mapdrawer "attempted to act appropriately under the circumstances"); *Smith v. Beasley*, 946 F. Supp. 1174, 1208 (D.S.C. 1996) ("[T]he good faith of the legislature does not excuse or cure the constitutional violation of separating voters according to race.").

> Shape is relevant not because bizarreness is a necessary element of the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines. The logical implication . . . is that parties may rely on evidence other than bizarreness to establish race-based districting.

*Miller*, 515 U.S. at 913. Thus, evidence that the General Assembly violated traditional criteria may be *sufficient* to show that race predominated, but it is not *necessary*. *See, e.g.*, *Backus v. S. Carolina*, 857 F. Supp. 2d 553, 559 (D.S.C.) ("Circumstantial evidence of a district's shape and demographics is only one way of proving a racial gerrymander."), *aff'd*, 133 S. Ct. 156 (2012).

Respectfully, Defendants' theory seems to arise from a basic misunderstanding of the predominance inquiry. That inquiry asks whether traditional districting criteria were "subordinated" to race. *Miller*, 515 U.S. at 916. But *subordination* does not require *open conflict* with "traditional" districting criteria or the criteria adopted by the legislature. It requires only that race is *more important* than other criteria. Indeed, because "parties may rely on evidence other than bizarreness to establish race-based districting," *id.* at 913, there is often no need to ask whether district lines comply with traditional criteria; direct evidence of racial motives will suffice. *See, e.g.*, *id.* at 916 ("The plaintiff's burden is to show, *either* through circumstantial evidence of a district's shape and demographics *or more direct evidence* going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.") (emphasis added); *Page II*, 2015 WL 3604029, at *10 (holding that race predominated based on direct evidence and examining compliance with traditional criteria only for "further support"); *Hays v. Louisiana*, 839 F. Supp. 1188, 1204 (W.D. La. 1993) ("We need not even consider the kind of indirect or inferential proof approbated in *Shaw* to reach the same point—a finding of racial gerrymandering."), *vacated on other grounds*, 512 U.S. 1230 (1994).

Aside from its lack of any legal basis, Defendants' theory would have dire consequences for the rights of voters in Virginia and beyond. Race-based redistricting manifests itself in many ways, not just oddly shaped districts. To hold that race predominates *only* if legislatures openly defy neutral criteria would immunize even the most egregious race-based redistricting from constitutional scrutiny. For example, on Defendants' view, a legislature could issue a press release titled "We Are Drawing District X for Racial Purposes Alone" and yet avoid strict scrutiny so long as it could gin up after-the-fact justifications for District X based on "traditional" districting criteria or criteria chosen by the legislature—criteria that are, of course, easy to manipulate. *See* Tr. 555:8-11 (Defendant-Intervenors' expert, Professor Jonathan Katz, testifying that "there's no generally accepted measure for compactness").

That is not the law, nor should it be. If a legislature's race-based goals are "baked into" the process from the beginning, and if all other goals are pursued only to the extent that they do not interfere with those racial goals, then race predominates—even if the legislature complies with some other criteria along the way. *See Miller*, 515 U.S. at 910 (rejecting the argument that "regardless of the legislature's purposes, a plaintiff must demonstrate that a district's shape is so bizarre that it is unexplainable other than on the basis of race").[2] That is what happened here.

## B. The Evidence of Racial Predominance Is Overwhelming

In light of this Court's order requiring the parties to "present [their] positions . . . on a district-by-district basis in addition to such other matters as they shall elect to present," Dkt. 103, Plaintiffs begin by discussing evidence of racial predominance applicable to *all* of the Challenged Districts. *See infra* § II.B.1. Plaintiffs then discuss additional evidence of racial predominance applicable to specific districts. *See infra* § II.B.2.

---

[2] A perfectly compact district (a circle), for example, would offend the Constitution if drawn for the purpose of separating voters on the basis of their race, even if it complied with all other "traditional" criteria and criteria adopted by the legislature.

1.      **Evidence of Racial Predominance Applicable to All Challenged Districts**

a.      **Direct Evidence Applicable to All Challenged Districts**

At trial, Plaintiffs presented abundant direct evidence showing that the General Assembly pursued two racial goals in drawing all of the Challenged Districts. First, the General Assembly sought to maintain all of the Challenged Districts as majority-minority districts. Second, the General Assembly sought to ensure that all of the Challenged Districts met or exceeded a predetermined 55% BVAP target. Those two goals were folded into the process from the beginning and applied equally to all of the Challenged Districts. Thus, while there is ample district-specific evidence of racial predominance (described below), this Court may also rely on more general evidence about the redistricting process to determine that race predominated in all of the Challenged Districts. *See Alabama*, 135 S. Ct. at 1265 ("Voters, of course, can present statewide evidence in order to prove racial gerrymandering in a particular district.") (emphasis omitted); *id*. at 1267 (legislature's use of across-the-board BVAP threshold "provide[d] evidence that race motivated the drawing of particular lines *in multiple districts*") (emphasis added).

(i)      **The House's Official Declaration of Redistricting Policy Elevates Race Above All Other Considerations**

Before any redistricting plans were introduced, the House Committee on Privileges and Elections adopted official criteria to govern the redistricting process. *See* Pl. Ex. 16 (the "House Criteria"). The House Criteria clearly describe the House's priorities, and clearly show that race was the most important priority. "Population Equality" is the first listed criterion. *See id*. at 1. But "an equal population goal . . . is part of the redistricting background, taken as a given." *Alabama*, 135 S. Ct. at 1270. Thus, the General Assembly's stated desire to achieve population equality has no weight in the predominance analysis. *See id*. at 1271.

The second criterion—and the only one that matters here—is avowedly racial. Titled "Voting Rights Act," it requires that "[d]istricts shall be drawn" to avoid "the unwarranted retrogression or dilution of racial or ethnic minority voting strength." *See* Pl. Ex. 16 at 1. All other factors—including compactness, incumbency, and "political beliefs"—are subordinate to that prime directive. *See id.* ("Nothing in these guidelines shall be construed to require or permit any districting policy or action that is contrary to . . . the Voting Rights Act of 1965.").

The House's official declaration of redistricting policy elevates race above all other factors. The predominance inquiry asks whether "the legislature placed race above traditional districting considerations." *Alabama*, 135 S. Ct. at 1271 (emphasis omitted) (internal quotation marks and citation omitted). That is *exactly* what the House Criteria do: they rank racial goals above all other goals. That is racial predominance. *See Page II*, 2015 WL 3604029, at *13 (race predominated in part because Senate's official redistricting criteria stated that compliance with the VRA would "be given priority in the event of conflict among the . . . criteria").[3]

Defendants argue that the House Criteria simply acknowledge the supremacy of federal law and do not show that race predominated. But the "fact that the legislature considered race a predominant concern only because it believed federal law compelled it to do so is of no current legal consequence." *Page II*, 2015 WL 3604029, at *8 n.13. The reasons *why* race may have predominated are not relevant to whether race *did* predominate.

Relatedly, Defendants have argued that race, like population equality, is a mere "background" consideration in the redistricting process. *See* Dkt. 72 at 2. The Supreme Court

---

[3] Indeed, the House Criteria at issue here are virtually indistinguishable from the legislatively adopted redistricting guidelines described in *Alabama, see* 135 S. Ct. at 1263, which the Supreme Court examined en route to concluding that "there is strong, perhaps overwhelming, evidence that race did predominate as a factor," *id*. at 1271. The House Criteria are also virtually indistinguishable from the criteria adopted by the Virginia Senate in *Page II*, which that court examined en route to the same conclusion. *See Page II*, 2015 WL 3604029, at *13.

long ago specifically rejected that argument, *see Miller*, 515 U.S. at 914 (rejecting the argument that the "general proscription on race-based decisionmaking does not obtain in the districting context because redistricting by definition involves racial considerations"), and it is no more persuasive when resurrected two decades after its interment.

### (ii)   Virginia's 2011 Preclearance Submission Reveals a Preoccupation with Race

Virginia's 2011 preclearance submission also shows that race was a predominant factor. Notably, it includes a lengthy "Statement of Minority Impact," Pl. Ex. 45, and forthrightly identifies the General Assembly's two racial goals: (1) "maintain[ing] 12 black majority districts . . . despite demographic changes," and (2) ensuring that "[a]ll 12 black majority districts were maintained . . . with greater than 55% black VAP," Pl. Ex. 48 at 11.

Courts often find that race predominates where, as here, a preclearance submission suggests a preoccupation with race. *See Bush*, 517 U.S. at 960 (submission noted "that the three new congressional districts should be configured in such a way as to allow members of racial, ethnic, and language minorities to elect Congressional representatives"; race predominated) (internal quotation marks and citation omitted); *Shaw II*, 517 U.S. at 906 (submission stated that legislature's "overriding purpose" was "to create two congressional districts with effective black voting majorities"; race predominated) (emphasis omitted). This Court should do the same.

### (iii)   Delegate Jones Confirmed the Primacy of Race

Perhaps the most telling direct evidence of racial predominance comes from Delegate Chris Jones, the "principal crafter" of the Challenged Districts. Tr. 274:6-7.

Delegate Jones often emphasized the importance of race during the redistricting process. In one notable example, he declared on the House floor that "*the most important thing*[]" to him in drawing the Enacted Plan—not counting population equality—was complying with the VRA.

Pl. Ex. 35 at 35:1-5, 15-18 (emphasis added). He also candidly acknowledged that non-racial

factors took a backseat to that racial goal. *See, e.g.*, *id.* at 55:19-56:4 (stating that "communities

of interest, while important . . . were not the overarching driver of this plan").

At trial, Delegate Jones freely admitted that he considered race in the drawing of the

Challenged Districts. *See* Tr. 403:15-19. But he also went much further. He was asked: "And

would it be fair to say that the Voting Rights Act and compliance with the Constitution trumped

everything except the number one criteria, population equality?" Tr. 402:20-22. Delegate Jones's

answer was unequivocal: "I would say yes." *Id.* 402:23. That is a frank admission that race

played a central role in Delegate Jones's decisionmaking—an admission corroborated by

contemporaneous statements of Delegate Jones's colleagues.[4]

In *Page II*, the court concluded that race predominated in part because the author of the

challenged district stated that complying with the VRA was his "primary focus." 2015 WL

3604029, at *9, *10 (internal quotation marks and citations omitted). Delegate Jones's

statements are even more unequivocal; in his view, complying with the VRA was "the most

important" thing. Thus, like the court in *Page II*, this Court should "accept the explanation of the

legislation's author as to its purpose." *Id.* at *10.

> ### (iv)  The General Assembly Used "Mechanical Racial Targets" to Draw All of the Challenged Districts

The Supreme Court recently held that if a redistricting authority "expressly adopt[s] and

applie[s] a policy of prioritizing mechanical racial targets" for its electoral districts, then that

---

[4] *See, e.g.*, Pl. Ex. 35 at 148:4-7 (Delegate Lionell Spruill praising Delegate Jones and his redistricting plan because "[w]hat other plan, what other group has come to the Black Caucus and [said], 'Hey, we have a plan to increase the black minority votes. We have a plan to make sure that you're safe.'").

"provides evidence that race motivated the drawing of particular lines in multiple districts in the State." *Alabama*, 135 S. Ct. at 1267. That holding squarely applies here.[5]

The evidence at trial showed that the General Assembly "prioritized mechanical racial targets" by requiring all of the Challenged Districts—regardless of their unique geography, history, and racial voting patterns—to meet or exceed the same 55% BVAP target. Indeed, on the first day of trial, Defendant-Intervenors' counsel stipulated that "[t]here was an aspiration or a target of 55 percent." Tr. 74:22-23. Of course, it would have been more than a little difficult to do otherwise in light of Delegate Jones's frequent discussion and fervent defense of that racial target during the redistricting process. *See, e.g.*, Pl. Ex. 35 at 70:7-9 (Delegate Jones arguing that "the effective voting age population [in the Challenged Districts] needed to be *north of 55 percent*" in order to comply with the VRA) (emphasis added). Thus, this case includes precisely the kind of evidence that even the dissent in *Page II* would have found determinative: a formal concession "that the state legislature deliberately created [districts] in a way to assure black-voter majorities." *Page II*, 2015 WL 3604029, at *39 (Payne, J., dissenting) (quoting *Shaw v. Barr*, 808 F. Supp. 461, 470 (E.D.N.C. 1992)).

In addition, three other participants in the 2011 redistricting process testified at trial that the 55% BVAP target was a primary consideration, including two legislators—Delegate Jennifer McClellan and former delegate (now Senator) Rosalyn Dance—who worked closely with

---

[5] The fact that the Supreme Court remanded the case does not in any way detract from the force of that holding or render it dictum, as Defendants have argued. *See* Dkt. 72 at 26 n.11. The Supreme Court remanded the case because the three-judge court misunderstood the predominance inquiry and therefore (among other things) failed to give appropriate weight to the evidence of racial predominance, including the use of racial targets. Naturally, on remand, the three-judge court will be bound by the Supreme Court's holding that evidence of across-the-board racial targets strongly suggests that race predominated in all affected districts.

Delegate Jones.[6] Their testimony is corroborated by an expert report submitted in *Page II* by John Morgan (Pl. Ex. 52), a consultant who helped Delegate Jones draw the Challenged Districts. In his expert report, Mr. Morgan candidly acknowledges that the General Assembly enacted "'a House of Delegates redistricting plan with a 55% Black VAP as the floor for black-majority districts.'" *Page II*, 2015 WL 3604029, at *9 (quoting report).

In short, there is no genuine dispute that the General Assembly employed a predetermined racial target in drawing the Challenged Districts. That use of "mechanical racial targets" is strong evidence that race predominated. *Alabama*, 135 S. Ct. at 1267.[7] Faced with that crystal-clear record and well-established law, Defendants tried to muddy the waters with two creative arguments at trial. Neither has merit.

*First*, Defendants argued that Delegate Jones did not, in fact, require all Challenged Districts to meet or exceed a *55%* BVAP target. They reasoned as follows: (1) during the redistricting process, Delegate Jones calculated BVAP using two methods—a method used by the Division of Legislative Services ("DLS") and a method he called "DOJ Black"; (2) under the

---

[6] Delegate McClellan testified that her "understanding [of] the way criteria two [in the House Criteria] was to be implemented was that each of the majority minority districts would have to have a black voting-age population of at least 55 percent." Tr. 33:2-5. Similarly, Senator Dance testified that each of the Challenged Districts "had to be 55 percent or greater, and we were trying to get to 55 percent." *Id*. 75:14-16. And former delegate and minority leader Ward Armstrong testified that he and his colleagues understood that "the minority-majority districts would have to be at least 55 percent black voting-age population or he would not – or the committee would not support the plan." *Id*. 92:15-17.

[7] *See also Bush*, 517 U.S. at 996 (Kennedy, J., concurring) ("[W]e would no doubt apply strict scrutiny if a State decreed that certain districts had to be at least 50 percent white, and our analysis should be no different if the State so favors minority races."); *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1267 (11th Cir. 2002) (race predominated because mapdrawer's "predominant consideration . . . was to maintain the core of the existing majority minority districts and strive toward a 60% black VAP"); *Page II*, 2015 WL 3604029, at *9 (race predominated in part because legislators "were conscious of maintaining a 55% BVAP floor"); *Smith*, 946 F. Supp. at 1207 (race predominated in part based on "insistence on minimum [55%] racial percentages in certain districts").

DOJ Black method (but not the DLS method), three of the Challenged Districts had approximately 54% (not 55%) BVAP; and that, therefore, (3) because three of the Challenged Districts had 54% (not 55%) BVAP under the DOJ Black method, there was no **_55%_** target.

That argument conflicts with the record. Delegate Jones constantly invoked the 55% figure during the redistricting process; he never once mentioned any other figure. And there is no dispute that Delegate Jones's colleagues—including those who voted for the Enacted Plan— credited the 55% figure because Delegate Jones never mentioned any other figure.[8]

More importantly, none of this matters. Whether Delegate Jones used a 54% target or a 55% target has no legal significance. He admittedly strove to achieve *some* preordained level of BVAP. For predominance purposes, use of a racial target is what matters—not the target itself.[9]

***Second***, Defendants argued that the General Assembly did not apply a constitutionally suspect "rule" because it did not set BVAP at exactly 55% in every Challenged District and it did not follow any other bright-line rule in setting BVAP. That argument is equally misguided.

In *Alabama*, the Supreme Court condemned the use of racial targets to "maintain *roughly* the same black population percentage in existing majority-minority districts"—not *precisely* the same percentage. 135 S. Ct. at 1263 (emphasis added). Thus, by arguing that strict scrutiny applies only if the General Assembly used a bright-line rule or fixed quota to set BVAP,

---

[8] Although Delegate Jones at first testified that he viewed the distinction between the DLS method and the DOJ Black method as "critical," Tr. 406:12-14, he later admitted that it was not important enough to share with his colleagues, *see id.* 492:15-25 ("[JUDGE LEE]: Was there a reason you did not mention on the floor the difference between the DLS 55 and the DOJ black? [JONES]: Well, I felt that it wasn't that big – it was between .1 percent difference to .4, or maybe .3, if I recall, Your Honor. . . . So I didn't think that it was statistically significant[.]").

[9] Moreover, even if this argument had merit (which it does not), at most it shows that three districts were subjected to a different racial target than the other nine districts, and thus that race predominated slightly differently across the Challenged Districts. *Cf. Alabama*, 135 S. Ct. at 1266 ("A showing that race-based criteria did not significantly affect the drawing on *some* Alabama districts, however, would have done little to defeat a claim that race-based criteria predominantly affected the drawing of *other* Alabama districts[.]").

Defendants invite this Court to make exactly the same error that the three-judge court in *Alabama* made. There, the majority concluded that race did not predominate because the "Legislature avoided reducing significantly the proportion of black persons in each majority-black district, *but it followed no bright-line rule*" and "*employed no quota*." *Ala. Leg. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1294, 1295 (M.D. Ala. 2013) (emphasis added), *vacated and remanded*, 135 S. Ct. 1257 (2015). Of course, the Supreme Court did not find that argument persuasive. Neither should this Court.

In sum, the direct evidence makes abundantly clear that race predominated in all of the Challenged Districts. In addition, Plaintiffs presented indirect evidence of racial predominance in all of the Challenged Districts, and it too is persuasive. Plaintiffs now turn to that evidence.

### b.    Indirect Evidence Applicable to All Challenged Districts

### (i)    Compactness and Respect for Political Boundaries

"In addition to [direct] evidence of legislative intent," courts may "also consider the extent to which the district boundaries manifest that legislative will." *Page II*, 2015 WL 3604029, at *10. Thus, lack of compactness and similar circumstantial evidence may be sufficient to establish race-based redistricting. *See Shaw I*, 509 U.S. at 646-47.

Plaintiffs' expert, Professor Stephen Ansolabehere, convincingly demonstrated that the Challenged Districts violate traditional criteria in ways indicative of racial gerrymandering. Professor Ansolabehere's expert report and testimony showed that:

- The Enacted Plan substantially reduced the compactness of the Challenged Districts as a whole, and reduced the compactness of the Challenged Districts more than the compactness of the unchallenged districts, *see* Pl. Ex. 50 at 17, ¶¶ 44-45;

- The Enacted Plan "increased the splitting of county boundaries in the areas covered by the Challenged Districts," *id*. at 20, ¶ 55; and

- The Enacted Plan "increase[d] the number of [Voting Tabulation Districts ("VTDs")] that are split . . . , both statewide and among the VTDs in the Challenged Districts," *id.* at 21, ¶ 60.

Those undisputed facts strongly suggest that race predominated in all of the Challenged Districts. *See Page II*, 2015 WL 3604029, at *13 (holding that race predominated based in part on challenged district's "inconsistencies with respect to the traditional districting criteria").

Defendants contend that none of those facts suggest racial predominance because the Challenged Districts are similar to the districts upheld by the Virginia Supreme Court in *Wilkins v. West*, 264 Va. 447 (2002) (upholding benchmark majority-minority districts against claims that they violated compactness requirements of Virginia's constitution). Putting aside that *Wilkins* arose under state law, not federal law, that argument fails for three reasons.

*First*, at best, Defendants' *Wilkins*-based argument responds to Plaintiffs' circumstantial evidence. It does nothing to rebut the *direct* evidence of racial predominance in this case because *Wilkins* did not involve direct evidence.

*Second*, contrary to Defendants' claims, the Challenged Districts are *not* "virtually the same 12 majority/minority districts" addressed in *Wilkins*. Tr. 14:6-7 (Defendant-Intervenors' opening statement). In fact, as discussed below, many of the Challenged Districts changed dramatically under the Enacted Plan. To suggest that the Enacted Plan simply maintained the "status quo" in an attempt to evade judicial scrutiny is disingenuous at best—and, given the dramatic changes in the demographic profile of Virginia, wildly inaccurate. *Id.* 15:5.

*Third*, even if the Challenged Districts were "virtually the same 12 majority/minority districts" addressed in *Wilkins* (and they patently are not), that would hardly make them impervious to judicial review. Quite the opposite. As Defendants have reminded this Court on many occasions, the Challenged Districts must be judged in light of Virginia's history. That

includes *recent* history, which shows that Virginia as a whole—and the Challenged Districts in particular—have changed in the 13 years since *Wilkins* was decided. *See* Pl. Ex. 51, tbl. 5 (no racially polarized voting in several Challenged Districts according to Plaintiffs' expert and Defendant-Intervenors' expert). If the General Assembly simply re-enacted districts based on outdated assumptions about racial attitudes and voting patterns, then this Court should subject those districts to even more exacting scrutiny.

### (ii)    Racial Sorting

Professor Ansolabehere also showed that the General Assembly resorted to extensive racial sorting to ensure that all of the Challenged Districts met a predetermined BVAP threshold. In particular, Professor Ansolabehere's expert report and testimony showed that:

- The BVAP in VTDs moved *into* the Challenged Districts is far higher than the BVAP in VTDs moved *out of* the Challenged Districts, *see* Pl. Ex. 50 at 27-37, ¶¶ 81-109;

- The *partisan* differences between the VTDs moved into and out of the Challenged Districts are much smaller than the *racial* differences between the same VTDs, *see id.* at 38-43, ¶¶ 110-122; and

- Race is a strong predictor of which VTDs were placed in Challenged Districts and which were not. "Party," on the other hand, "is *not* a statistically significant predictor of whether a VTD is included in one of the Challenged Districts[.]" *Id.* at 43, ¶ 121 (emphasis added).

Of course, evidence that the General Assembly purposely sorted voters by the color of their skin is compelling evidence that race predominated. *See Alabama*, 135 S. Ct. at 1266-67 ("[Plaintiffs] presented much evidence at trial to show that the legislature had deliberately moved black voters into these majority-minority districts . . . in order to prevent the percentage of minority voters in each district from declining.").

At trial, Defendants offered only one substantial criticism of Professor Ansolabehere's racial sorting analysis. Professor Katz, Defendant-Intervenors' expert, testified that Professor

Ansolabehere failed to control for proximity and interdependency—in essence, geographical constraints on the General Assembly's ability to sort voters into districts. *See* Tr. 503:10-19. As Professor Ansolabehere later explained, however, Professor Katz was simply wrong on that score: Professor Ansolabehere *did* control for proximity and interdependency by analyzing racial sorting patterns both within specific regions and within the VTDs bordering the Challenged Districts. And the method he used to control for those constraints was *more* robust and sophisticated than Professor Katz's method, not *less*. *See id*. 785:11-19.

In sum, direct and circumstantial evidence applicable to all of the Challenged Districts shows "that race motivated the drawing of particular lines in multiple districts in the State," and this Court need inquire no further. *Alabama*, 135 S. Ct. 1267. That said, this Court may also rely on the district-specific evidence presented at trial, to which Plaintiffs now turn.

### 2. Evidence of Racial Predominance Applicable to Individual Districts

#### a. House District 63

Senator Rosalyn Dance represented District 63 during the 2011 redistricting process and helped Delegate Jones redraw that district. She testified that race played a central role in District 63. In particular, she testified that large parts of Dinwiddie County were removed from her district and added to District 75 for one purpose: "it went to Delegate Tyler to try to get her number up to 55 percent [BVAP]." Tr. 80:9-10. As Senator Dance explained, she was not happy with that "drastic maneuvering" because it deprived her of areas and voters she knew well and had represented in the past. *Id*. 74:4-11, 80:25-81:2. Nevertheless, because Delegate Jones had told her that every Challenged District needed to have at least 55% BVAP, *see id*. 70:14-19, Delegate Dance considered it "part of [her] job" to "get [Delegate Tyler] to 55 percent," *id*. 81:11-14.

Indirect evidence further illustrates that race predominated in District 63. For example, District 63 suffered the greatest compactness reduction in the entire Enacted Plan. Under the Benchmark Plan, District 63 had a Reock score of .61. *See* Pl. Ex. 50, tbl. 2. Under the Enacted Plan, District 63 has a Reock score of .25—a remarkable 59% drop. *See id*.

Much of that drop is attributable to District 63's haphazard northeastern expansion through Prince George County and up to the city of Hopewell. *See id*., Map A. That expansion allowed District 63 to incorporate heavily African-American communities around the city of Hopewell, offsetting the loss of African-American voters in Dinwiddie County. Here again, as Delegate Dance testified, the line-drawing was purposely racial: "I picked up part of Prince George, that was to get more African-Americans. And then I picked up the concentration of African-Americans in Hopewell." Tr. 81:18-21.

### b.    House District 75

The incumbent representative in District 75, Delegate Roslyn Tyler, believed that she needed more than 55% BVAP to ensure her re-election, in part because her district includes several prisons. *See* Pl. Ex. 40 at 38:17-39:21. Delegate Jones sought to "address Tyler's concerns" by redrawing her district "without dropping the %BVAP too low." Pl. Ex. 22 (email from consultant Chris Marston to Delegate Jones). Delegate Jones also met extensively with Delegate Tyler to find ways to increase the BVAP of her district. *See* Tr. 322:6-12.

Ultimately, Delegate Jones met Delegate Tyler's demand for additional African-American voters by removing large swaths of Dinwiddie County from District 63 and adding them to District 75. *See supra* at 17. Delegate Jones also granted Delegate Tyler's request to remove the Wakefield precinct and replace it with the more heavily African-American Dendron precinct. *See* Tr. 323:14-16. As Delegate Jones acknowledged, that swap ran afoul of traditional

districting criteria—but he made it nonetheless. *See id.* 325:14-16 ("I would have never done that had it not been requested because I wanted to split as few jurisdictional boundaries as I could[.]").

Indirect evidence provides additional evidence of racial predominance. For example, District 75 saw a massive increase in the number of split VTDs, going from 4 under the Benchmark Plan to a whopping 13 under the Enacted Plan. *See* Pl. Ex. 50, tbl. 2. No other district in the Enacted Plan has more VTD splits. *See id.*

### c.    House District 69

Delegate McClellan testified that District 69 was drawn to comply with the General Assembly's 55% BVAP target, *see* Tr. 29:5-13, and indirect evidence confirms that race predominated in this district. For example, while the Enacted Plan moderately increased the compactness of District 69, *see* Pl. Ex. 50, tbl. 2, it did so by expanding the district outward to incorporate African-American voters at the outskirts of the benchmark district, *see* Defendant-Intervenors' Exhibit ("DI Ex.") 94 at 2 (areas added); DI Ex. 65 at 1 (BVAP of areas added). Those areas were added even though African-Americans have long been able to elect their candidates of choice in District 69, and even though Professors Ansolabehere and Katz agree that there is no racially polarized voting in District 69. *See* Pl. Ex. 51, tbl. 5.

### d.    House District 70

Delegate McClellan testified that District 70 was drawn to comply with the General Assembly's 55% BVAP target, *see* Tr. 29:5-13, and indirect evidence confirms that race predominated in this district as well.

District 70 was one of the few Challenged Districts that was not underpopulated at the time of the 2010 Census, *see* Pl. Ex. 50, tbl. 4, so there was no need to add or remove voters for the sake of population equality. Nevertheless, the Enacted Plan *added* about 26,000 people and *removed* about 26,000 people. *See id.*, tbl. 5. The racial pattern of that massive population swap

is telling. The BVAP of the areas moved into District 70 was 43.8%, while the BVAP of the areas moved out was 59.9%, *see id.*, tbl. 8—*and all of the areas moved out of District 70 were moved into other Challenged Districts, see id.*, tbl. 9. African-Americans were extracted from District 70 to increase BVAP in nearby districts—particularly District 71. *See id.* at 36, ¶ 102.

District 70 also eloquently rebuts the claim that "core preservation" was a factor. The General Assembly did not preserve the "core" of District 70, however that concept is defined. District 70 was an urban district centered in Richmond. Now, it is a suburban district centered in Chesterfield County. *See id.* at 11-12, ¶¶ 27-28. There was no racially polarized voting in District 70 before redistricting. It now exhibits significant racially polarized voting. *See id.* at 51, ¶ 146.

### e.    House District 71

At trial, Delegate McClellan testified that the one overriding requirement for her district and other Richmond-area districts was a *racial* requirement: "We would have to meet the one percent population deviation, and . . .*for the 69th, 70th, and 71st and 74th districts, we would have to meet a 55 percent black voting-age population*." Tr. 29:10-13 (emphasis added).

Delegate McClellan also offered vivid illustrations of how race affected the shape of her district. For example, she hoped to keep precinct 207, a reliably Democratic precinct in the Fan neighborhood that had been in her district for decades. *See* Tr. 39:15-25. But because precinct 207 is heavily white, keeping it would have dragged District 71's BVAP below 55%. Ultimately, Delegate Jones moved precinct 207 to neighboring District 68. *See id.* 41:2-12.[10]

---

[10] Delegate Jones testified that he moved heavily Democratic precinct 207 to District 68, represented by Republican Manoli Loupassi, because Delegate Loupassi once served on the Richmond City Council and precinct 207 "had been adjacent to his ward." Tr. 305:10-307:4. Respectfully, it strains credulity to think that Delegate Loupassi asked for the addition of a strongly Democratic precinct to his district because it held fond memories. The more credible explanation is that Delegate Jones removed precinct 207 from District 71 because precinct 207 was "too white" and would have dropped District 71's BVAP below the 55% BVAP target.

Notably, to make up for the lost population of precinct 207, the General Assembly did not add areas with similar racial composition to District 71. Instead, it added several "new precincts in the east" that are "heavily, heavily African American." *Id*. 43:15-17.

In another vivid example, Delegate McClellan testified that she proposed "unsplitting" certain precincts in the Richmond area. *See id*. 50:14-54:7. She made that request on behalf of local election officials because the splits complicated election administration. But in trying to draw a map that unsplit those precincts, Delegate McClellan inadvertently dropped the BVAP in District 71 below 55%. Her proposals were therefore rejected. As she explained to one of the election officials: "I spoke to Chris Jones . . . . Apparently, the changes we discussed . . . would have pushed the voting age African American population in the 71st District down to 54.8%. The target criteria was 55%, so the change can't be made." Pl. Ex. 30 at 1.[11]

The indirect evidence is equally persuasive. The areas moved *into* District 71 had 50.8% greater BVAP than the areas moved *out of* that district—clearly evincing an effort to increase the BVAP of District 71, even though African-Americans had been electing their candidates of choice handily. *See* Pl. Ex. 50 at 35, ¶ 102. The *Page II* court considered a similar pattern to be compelling evidence of racial predominance. *See Page II*, 2015 WL 3604029, at *12.

### f.    House District 74

Delegate McClellan testified that District 74 was drawn to comply with the General Assembly's 55% BVAP target, *see* Tr. 29:5-13, and indirect evidence confirms that race

---

[11] Delegate Jones testified that he eventually resolved these splits "[t]o the best of [his] knowledge." Tr. 295:14. He backed away from that testimony on cross-examination. *See id*. 412:7-11. But this Court need not wander that far into the weeds. Even if Delegate Jones did try to resolve the splits, *he insisted on doing so in a way that kept BVAP in House District 71 at or above 55%*. Thus, this episode demonstrates once again that race "was the criterion that . . . could not be compromised" in the drawing of the Challenged Districts. *Shaw II*, 517 U.S. at 907.

predominated in this district. In particular, District 74 is grossly noncompact. With a Reock score of .16, it is the second-least compact district in the entire Enacted Plan. *See* Pl. Ex. 50, tbl. 2.

At trial, Defendants boasted about "unwind[ing] . . . two river crossings" in the Benchmark Plan, one of which occurred in District 74. Tr. 316:23-317:9 (testimony of Delegate Jones). But that did nothing to improve the compactness of District 74, and it drastically reduced compactness elsewhere. Eliminating the river crossing in District 74 removed areas of the city of Hopewell from District 74. *See id.* 317:2-3. Those same areas were then incorporated into District 63 by way of a haphazard northeastern expansion through Prince George County. *See supra* at 18. The result? Largely because of the "Hopewell swap," District 63 suffered the greatest compactness reduction in the Enacted Plan. *See* Pl. Ex. 50, tbl. 2.

District 74 also belies the General Assembly's purported focus on "core preservation." Like District 70, District 74 was one of the few Challenged Districts that was not underpopulated, *see id.*, tbl. 4, so there was no need to add or remove voters for the sake of population equality. Nevertheless, the Enacted Plan *added* about 16,000 people to District 74 and *removed* about 16,000 people from District 74. *See id.*, tbl. 5. Defendants never explained that massive population shift, but the answer plainly appears in the racial composition of the affected voters. Much like the population shift in District 70, the population shift in District 74 extracted African-American voters and added them to other Challenged Districts, particularly District 71. *See* Pl. Ex. 50 at 35, ¶ 102; *see also id.*, tbl. 9. Thus, while Defendants claimed that District 74 essentially "remained the same," Tr. 715:1-2 (Richard Hofeller), in truth it underwent dramatic changes to serve the General Assembly's racial goals.

### g.   House District 77

District 77 is represented by Delegate Lionell Spruill, one of the delegates who (according to Delegate Jones) specifically requested that his district maintain a BVAP of 55% or

more, *see* Tr. 490:10-13, and whose statements on the House floor plainly revealed his racial priorities, *see* Pl. Ex. 35 at 148:4-7.

Indirect evidence confirms that District 77 was drawn with race as the predominant purpose. For example, despite the fact that District 77 was underpopulated by only 3,000 people, *see* Pl. Ex. 50, tbl. 4, the Enacted Plan moved 21,308 persons into the district and 18,608 persons out of the district. *See id.*, tbl. 5. Notably, the BVAP of areas moved into District 77 was 44.2%, while the BVAP of areas moved out was 25.9%—an 18.3% difference. *See id.*, tbl. 8. (Again, the *Page II* court considered a similar pattern to be compelling evidence of racial predominance. *See Page II*, 2015 WL 3604029, at *12.) As a result, District 77's BVAP increased from 57.6% to 58.8%, even though African-American voters in District 77 have elected their candidates of choice for more than two decades.

### h.    House District 80

The indirect evidence of racial predominance is especially strong in District 80.

District 80 was underpopulated by approximately 10,000 persons, *see* Pl. Ex. 50, tbl. 4, yet the General Assembly *removed* more than twice that number under the Enacted Plan, *see id*, tbl. 5. Tellingly, the areas moved out of District 80 and into other Challenged Districts had a sky-high BVAP of 78.1%. In contrast, the areas moved out of District 80 and into unchallenged districts had a BVAP of 30.4%. *See id.*, tbl. 9. As a result of that stark racial sorting, District 80 became dramatically less compact. Its Reock score fell 33%, from .39 to .26. *See id.*, tbl. 2.

Finally, the BVAP of District 80 increased under the Enacted Plan from 54.4% to 56.3%, *see id.*, tbl. 4, even though (as Delegate Jones acknowledged) District 80 has been represented by African-Americans' candidate of choice for "as long as [he] could remember." Tr. 460:9-18.

### i. House District 89

At trial, Delegate Jones testified that he asked Delegate Spruill to discuss the "55 percent aspirational threshold" with Delegate Kenneth Alexander, who represented District 89 at the time of the 2011 redistricting. Tr. 491:13; *id*. 491:15-492:2. Delegate Jones also testified that Alexander was among the delegates who advocated for applying the "55 percent aspirational threshold" in his district. *See id*. 491:3-8.

Indirect evidence also suggests that race predominated in this district. For example, District 89's compactness was drastically reduced. Its Reock score fell from .58 to .40, largely as a result of new sprawling appendages and a new river crossing. *See id*. 144:9-145:1.

In addition, there is strong evidence of racial sorting in the Norfolk area. The BVAP of the areas moved out of District 89 and into other Challenged Districts was 47.4%, while the BVAP of the areas moved out of District 89 and into unchallenged districts was just 27.2%—a difference of 20.2%. *See* Pl. Ex. 50, tbl. 9. And, as those numbers suggest, race predominated over party in predicting which VTDs were placed in District 89. *See id*., tbl. 12.

### j. House District 90

Delegate Jones testified that he asked Delegate Spruill to discuss the "55 percent aspirational threshold" with Delegate Algie Howell, who represented District 90 at the time of the 2011 redistricting. Tr. 491:13; *id*. 491:15-492:2.

Indirect evidence also suggests that race predominated in this district. District 90 was underpopulated by 9,000 people at the time of the redistricting process, but the General Assembly nevertheless *removed* 18,469 people from the district. *See* Pl. Ex. 50, tbl. 5. Moreover, those sweeping alterations exhibited a (by now) familiar racial pattern. The BVAP of the areas moved out of District 90 and into other Challenged Districts was 44.6%, while the BVAP moved out of District 89 and into the unchallenged districts was a mere 29.5%. *Id*.

### k.      House Districts 92 and 95

On the Peninsula, the General Assembly took two relatively compact districts, Districts 92 and 95, and did radical surgery to keep their BVAP percentages elevated.

District 92 was substantially underpopulated. *See* Pl. Ex. 50, tbl. 4. That created a dilemma for the General Assembly and its racial goals. District 92 could not expand to the north, which had substantially lower BVAP. *See* DI Ex. 92 at 24. So it had to move to the west in order to absorb heavily African-American portions of District 95. As a result, District 95 (as described below) needed to be extended artfully to the northwest.

The boundaries between District 92 on the Peninsula divide high-BVAP districts from lower-BVAP districts to the north and southeast. *See id*. at 24-25. And there is clear statistical evidence of racial sorting as well. The BVAP of areas moved *into* District 92 was 47.3%; the BVAP of areas moved *out* was 36.8%. *See* Pl. Ex. 50, tbl. 8.

Meanwhile, District 95 was altered dramatically to accommodate those race-based changes. *Compare* DI Ex. 92 at 23 *with id.* at 25. Among other things, the General Assembly added a protuberant appendage extending up the center of the Peninsula, splitting six VTDs along the way and studiously avoiding heavily white areas. *See* DI Ex. 92 at 25. Largely as a result of those contortions, District 95 "went from a fairly compact district with a Reock score of .43 to the least compact district in the map with a Reock score of .14." Tr. 145:19-21.

### C.      Race Outweighed Politics and All Other Non-Racial Considerations

States subject to racial gerrymandering claims often argue that their decisions were motivated mainly by politics, not race. Not so here. Although Defendants have, in the past, flirted with a politics-not-race argument, it was effectively abandoned at trial when Delegate Jones admitted that unseating Democrats simply "wasn't a goal." Tr. 483:1-2. Delegate Jones's express disavowal of partisan considerations is consistent with the historical record. The House

- 25 -

Criteria give no weight whatsoever to partisan considerations, *see* Pl. Ex. 16, and not once during the redistricting process did Delegate Jones and his allies emphasize the importance of partisan politics. In fact, they *denied* that partisan politics played a substantial role. *See* Pl. Ex. 17 at 1. Thus, just as in *Page II*, there is no credible argument that politics predominated.

Given that record, Defendants had no choice but to go hunting for other non-racial explanations for the General Assembly's decisions. Thus, they had Delegate Jones testify extensively about the many traditional districting factors he purportedly considered in drawing the Challenged Districts. But that testimony simply does not help Defendants.

For starters, the vast majority of the decisions described in Delegate Jones's testimony were motivated primarily or entirely by the goal of population equality. *See, e.g., id.* 311:18-21; *id.* 319:22-320:10; *id.* 328:6-329:5. Those decisions are irrelevant because population equality is a mere "background rule against which redistricting takes place." *Alabama*, 135 S. Ct. 1271.

More fundamentally, the mere fact that Delegate Jones "addressed [other] interests does not in any way refute the fact that race was [his] predominant consideration." *Shaw II*, 517 U.S. at 907. Plaintiffs concede that not *all* of Delegate Jones's decisions were race-based. But that is not the relevant question. *See Page II*, 2015 WL 3604029, at *11 ("To show that race predominated, Plaintiffs need not establish that the legislature disregarded every traditional districting principle."). The relevant question is whether Delegate Jones's approach to drawing the Challenged Districts "placed race above traditional districting considerations in determining which persons were placed in appropriately apportioned districts." *Alabama*, 135 S. Ct. at 1271 (emphasis omitted) (internal quotation marks and citation omitted).

It undoubtedly did. Indeed, Delegate Jones himself testified that he often compromised his non-racial goals and priorities. For example, he willingly sacrificed compactness—in one

case to increase BVAP in District 75. *See* Tr. 325:14-17. He also disregarded traditional boundaries and partisan political considerations when it served his purposes. *See id*. 484:15-485:14 (discussing decision to remove heavily Democratic precinct 207 from District 71, where it had been for decades, and place it into a neighboring Republican district). And of course, Delegate Jones paired several incumbents, demonstrating that his incumbency protection goals were anything but absolute. *See* Tr. 381:20-22. But Delegate Jones never compromised on one thing: *the racial goal of maintaining 12 majority-minority districts with at least 55% BVAP*.

In short, "Defendants seem to believe that they can defeat a claim of racial gerrymandering under *Shaw* if *any* factor other than race played *any* cognizable role in the creation of a challenged redistricting plan." *Hays*, 839 F. Supp. at 1202. That is simply incorrect. Delegate Jones may have considered many factors when drawing the Challenged Districts, but only to the extent they did not conflict with his racial goals. Race therefore predominated.

Because race was the predominant factor, Defendants "must demonstrate that [the Challenged Districts are] narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 920. For the reasons below, Defendants cannot begin to meet that exacting standard.

D.     **The Challenged Districts Cannot Survive Strict Scrutiny**

Plaintiffs first discuss evidence showing that the General Assembly did not narrowly tailor its use of race to advance a compelling interest in *any* of the Challenged Districts. *See infra* § II.D.1. Plaintiffs then discuss "narrow tailoring" evidence related to individual districts. *See infra* § II.D.2.

1.      **Evidence of Lack of Narrow Tailoring Applicable to All Challenged Districts**

   a.      **The General Assembly Failed to Perform a Functional Analysis for *Any* of the Challenged Districts**

Virginia was subject to Section 5 of the VRA at the time the Challenged Districts were enacted. As a result, it was required to draw the Challenged Districts to avoid "retrogression"— that is, diminishment of the opportunity of African-Americans to elect the candidates of their choice. *See* Pl. Ex. 9 at 3 (Department of Justice Section 5 guidance).

Defendants contend that they drew the Challenged Districts to comply with Section 5, and that the Challenged Districts are narrowly tailored to serve that compelling interest. *See, e.g.*, Tr. 16:1-7 (Defendants-Intervenors' opening statement). But even assuming Section 5 remains a compelling interest after *Shelby County,* Defendants utterly failed to show that their use of race was narrowly tailored to comply with Section 5.[12]

A race-based redistricting plan is narrowly tailored only if "the legislature [has] a strong basis in evidence in support of the (race-based) choice that it . . . made." *Alabama*, 135 S. Ct. at 1274 (internal quotation marks and citation omitted). Thus, to survive strict scrutiny, Defendants must show that they had a "strong basis in evidence" for believing that all of the Challenged Districts needed to meet or exceed a predetermined BVAP target to avoid retrogression. *See, e.g.*, *Shaw I*, 509 U.S. at 655 ("A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression."). That they cannot do.

---

[12] In *Shelby County*, the Supreme Court held that the coverage formula of the VRA was unconstitutional, and accordingly Section 5 no longer applied to certain jurisdictions, including Virginia. *See* 133 S. Ct. 2612, 2631 (2013). Because Virginia is no longer subject to Section 5, it is unclear if Section 5 compliance is a compelling interest that justifies Virginia's race-based redistricting. Plaintiffs understand that this argument was rejected in *Page II*. *See* 2015 WL 3604029, at *16 & n.27. But the Supreme Court has not yet decided "whether, given [*Shelby County*], continued compliance with § 5 remains a compelling interest." *Id.* at *6 n.11.

"Section 5 requires a multi-factored, functional approach to gauge whether a redistricting plan will have the effect of denying or abridging minority citizens' ability to elect representatives of their choice." *Texas v. United States*, 831 F. Supp. 2d 244, 272 (D.D.C. 2011). Determining whether a redistricting plan is retrogressive "does not lend itself to formalistic inquiry," and the "ability to elect can rarely be measured by a simple statistical yardstick[.]" *Id.* As the Department of Justice has explained, the retrogression inquiry

> does not rely on any predetermined or fixed demographic percentages at any point in the assessment. Rather, . . . this determination requires a functional analysis of the electoral behavior with the particular jurisdiction or election district. . . . [C]ensus data alone may not provide sufficient indicia of electoral behavior to make the requisite determination. . . . Therefore, election history and voting patterns within the jurisdiction, voter registration and turnout information, and other similar information are very important[.]

Pl. Ex. 9 at 3 (Department of Justice Section 5 guidance). Of course, that does not mean that "a legislature [must] guess precisely what percentage reduction a court or the Justice Department might eventually find to be retrogressive." *Alabama*, 135 S. Ct. at 1273. But the legislature must have a "strong basis in evidence" to believe that a particular level of minority population is required, *id.* at 1274 (internal quotation marks and citation omitted), and it must "take account of all significant circumstances" in making that determination, *id.* at 1273.

In this case, the General Assembly did not have  a "strong basis in evidence" to believe that all of the Challenged Districts needed to meet or exceed the same BVAP target. In fact, Delegate Jones performed *virtually no analysis* on that score. For example, he did not:

- Compile election results from the Challenged Districts, *see* Tr. 453:19-22;

- Analyze African-American registration rates in the Challenged Districts, *see id*. 463:22-464:6;

- Analyze African-American turnout rates in the Challenged Districts (with the exception of "two or three" districts), *id*. 467:16-19;

- 29 -

- Review the majority-minority Senate districts enacted at the same time as the Challenged Districts, all of which had less than 55% BVAP, *see id.* 468:10-21;

- Analyze "voter behavior and BVAP in prior Virginia Congressional districts," *id.* 468:22-25;

- Review redistricting plans from other jurisdictions that had been precleared by the Department of Justice, *see id.* 469:1-4;

- Review redistricting plans from other jurisdictions that had been rejected by the Department of Justice, *see id.* 469:10-12; or

- Perform a racially polarized voting analysis to determine whether white voters and African-American voters tended to vote cohesively in the Challenged Districts as a whole or within individual Challenged Districts, *see id.* 469:16-21.

Instead, in formulating the level of BVAP he thought necessary to prevent retrogression, Delegate Jones relied exclusively on informal input from a few of his colleagues. *See, e.g.*, *id.* 431:4-7. At the risk of stating the obvious, anecdotes from incumbents cannot provide a "strong basis in evidence" for the requisite level of BVAP in any one district, let alone all 12.

Professor Ansolabehere conducted the functional analysis Delegate Jones did not conduct, and he reached two crucial conclusions. First, he concluded that racial voting patterns vary dramatically across the Challenged Districts, thereby undermining the General Assembly's one-size-fits-all-approach. *See* Pl. Ex. 50 at 47-51, ¶¶ 137-48. Defendant-Intervenors' expert, Professor Katz, similarly found that racial voting patterns vary dramatically across the Challenged Districts and that there is no racially polarized voting in several of them. *See* Pl. Ex. 51, tbl. 5. Second, Professor Ansolabehere concluded that "none" of the Challenged Districts required a BVAP in excess of 55% to avoid retrogression. *Id.* at 53-54, ¶¶ 155-57. (Dr. Katz agreed that an across-the-board 55% BVAP threshold was not necessary. *See* Tr. 590:16-594:9). The use of an across-the-board BVAP target was, accordingly, not narrowly tailored.

The Supreme Court addressed very similar facts in *Alabama*. There, the legislature determined that "it was required to maintain roughly the same black population percentage in existing majority-minority districts" in order to avoid retrogression. *Alabama*, 135 S. Ct. at 1263. But rather than undertaking the analysis needed to determine whether those BVAP levels were necessary, the legislature "relied heavily upon a mechanically numerical view as to what counts as forbidden retrogression." *Id*. at 1273. That was *not* a narrowly tailored use of race:

> [W]e conclude that . . . the legislature asked the wrong question with respect to narrow tailoring. They asked: "How can we maintain present minority percentages in majority-minority districts?" But given § 5's language, its purpose, the Justice Department Guidelines, and the relevant precedent, they should have asked: "To what extent must we preserve existing minority percentages in order to maintain the minority's present ability to elect the candidate of its choice?"

*Id*. at 1274. Here, as in *Alabama*, the legislature was required to "take account of all significant circumstances" in determining the level of BVAP necessary to avoid retrogression in each of the Challenged Districts. *Id*. at 1273. But the General Assembly did not take account of *any* significant circumstances with respect to *any* of the Challenged Districts. The Constitution requires more. *See, e.g.*, *Page II*, 2015 WL 3604029, at \*16-17 (legislature's 55% BVAP target was not narrowly tailored); *Smith v. Beasley*, 946 F. Supp. at 1210 (D.S.C. 1996) (use of race was not narrowly tailored "because of the insistence that all majority-minority districts have at least 55% BVAP").[13]

---

[13] Defendants also argue that the Challenged Districts are justified by Section 2 of the VRA, but that argument fails for two reasons. First, it is a post hoc excuse with no support in the record; at no point did any legislator voice substantial concern about potential Section 2 liability. Second, the General Assembly has no interest "in avoiding meritless [Section 2] lawsuits," *Shaw II*, 517 U.S. at 908 n.4, and it admittedly did not perform the racially polarized voting analysis required to establish a potential Section 2 claim, *Shaw I*, 509 U.S. at 653.

### b.   The Challenged Districts Are Not Constitutional Merely Because Incumbents Approved of Them

At trial, Defendants repeatedly noted that incumbent delegates supported the Enacted Plan, including representatives of the Challenged Districts. Defendants seem to believe that the support of incumbents shows that the Challenged Districts are narrowly tailored. That is wrong.

None of the Challenged Districts—not one—required 55% or greater BVAP to avoid retrogression. But by using that racial target, the General Assembly drew "super-safe majority-minority districts" that virtually ensured re-election for incumbents. *Smith*, 946 F. Supp. at 1210. (The description volunteered by Defendant-Intervenors' counsel at trial was "overwhelmingly safe." Tr. 594:23.) It is therefore no surprise that incumbents generally supported the Challenged Districts. But that hardly insulates them from constitutional scrutiny. The Equal Protection Clause and the VRA were not designed to protect incumbents; they were designed to protect voters. That is why courts routinely disapprove plans supported by incumbents.[14]

Simply stated, Defendants cannot carry their heavy burden of showing that the Challenged Districts are narrowly tailored because the General Assembly utterly failed to conduct the sort of analysis narrow tailoring requires with respect to *any* of the districts. Moreover, even if Defendants could somehow overcome that obstacle (and they cannot), a district-by-district review confirms that the General Assembly's reliance on mechanical racial targets predictably failed to produce narrowly tailored results.

---

[14] *See, e.g.*, *Alabama*, 135 S. Ct. at 1263 ("[W]hen the State adds more minority voters than needed," it may "harm the very minority voters" that the VRA "sought to help."); *Miller*, 515 U.S. at 907 (redistricting plan created for Georgia's Black Caucus by ACLU was not narrowly tailored); *Hays*, 839 F. Supp. at 1205 (plan was unconstitutional even though it was supported by "an uncommon alliance of legislators," some of whom "wanted a second super-majority black district," and others who "perceived various benefits in the correlative whitening of some districts that attends the intentional segregation of black voters into other adjacent districts"); *Moon v. Meadows*, 952 F. Supp. 1141, 1143-44 (E.D. Va.) (majority-minority district was not narrowly tailored even though it was supported by NAACP and members of the Black Caucus), *aff'd mem.*, 521 U.S. 1113 (1997).

### 2. Evidence of Lack of Narrow Tailoring Applicable to Individual Districts

#### a. House District 63

District 63 was a safe district for minority-preferred candidates before 2011. African-American Delegate Rosalyn Dance was not even challenged in 2007 or 2009. *See* Pl. Ex. 50, tbl. 14. Moreover, in the benchmark version of District 63, the Democratic candidate garnered more than 70% of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See id.*, tbls. 14A & 14B.

Nevertheless, BVAP in District 63 rose from 58.1% to 59.5% under the Enacted Plan. *See* id., tbl. 4. Because there was no need to set District 63's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 63 is narrowly tailored. *See Alabama*, 135 S. Ct. at 1273 (observing that it would be "difficult to explain" how maintaining a high BVAP in a district that has long performed for African-American preferred candidates is "'narrowly tailored' to achieve a 'compelling state interest'"); *Shaw I*, 509 U.S. at 655 ("A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression."); *Page II*, 2015 WL 3604029, at *4 (district was not narrowly tailored because three-point increase in BVAP was unnecessary to prevent retrogression); *Smith*, 946 F. Supp. at 1210 (districts were not narrowly tailored because legislature "insist[ed] that all majority-minority districts have at least 55% BVAP with no evidence as to registration or voter turnout").

#### b. House District 75

District 75 was a safe district for minority-preferred candidates before 2011. African-American incumbent Delegate Roslyn Tyler ran unopposed in 2007 and 2009. *See* Pl. Ex. 50, tbl.

14.[15] Moreover, in the benchmark version of District 75, the Democratic candidate received 60% or more of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See id.*, tbls. 14A & 14B.

Nevertheless, BVAP in District 75 rose from 55.3% to 55.4% under the Enacted Plan. *See id.*, tbl. 4. Because there was no need to set District 75's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 75 is narrowly tailored.

At trial, Defendants claimed that they (like Delegate Tyler) believed it was necessary to raise the BVAP in District 75 to account for the presence of prisons in that district. *See* Tr. 463:17-21 (Delegate Jones); Pl. Ex. 40 at 38:22-39:3 (Delegate Tyler stating that "I'm still overly concerned because in my district, we have five prisons with over 8,000 individuals that cannot vote"). But there is no evidence that anyone, including Delegate Jones, actually analyzed the effect of the prisoner population on African-Americans' ability to elect their candidates of choice. Plus, District 75 had long performed for minority-preferred candidates notwithstanding that prisoner population, so it hardly militated in favor of raising BVAP. *See* Tr. 797:10-798:4.[16]

### c.    House District 69

District 69 was a safe district for minority-preferred candidates before 2011. Minority-preferred candidate Delegate Betsy Carr won her 2009 contest with 72% of the vote. *See* Pl. Ex. 50, tbl. 14. That eye-popping margin is partly attributable to the fact that there is no racially

---

[15] Delegate Tyler drew challengers in 2011 and 2013, but she coasted to victory, winning 66% to 34% (in 2011) and 62% to 38% (in 2013). *See id.*, tbl. 14.

[16] In addition, it is important to note that Delegate Tyler's concerns about the prisoner population were exaggerated. She thought that there were "over 8,000" prisoners in her district. Pl. Ex. 40 at 38:22-39:3. In fact, there are only 7,200 prisoners in her district, of which 4,800 are African-American. *See* Tr. 797:5-798:16; *see also* Va. Dep't of Corr., State Responsible Offender Demographic Profile FY 2012 (May 2013), available at https://vadoc.virginia.gov/about/facts/research/VADOCDemographicReportFY2012.pdf.

polarized voting in District 69. According to Defendant-Intervenors' expert Professor Katz, 73.1% of white voters voted for Delegate Carr in her 2013 contest. *See* DI Ex. 16, tbl. 4. Statewide and federal elections tell a similar tale. In the benchmark version of District 69, the Democratic candidate garnered more than 80% of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See* Pl. Ex. 50, tbls. 14A & 14B. In short, under the benchmark version of District 69, there was virtually no chance of the minority-preferred candidate losing.

Nevertheless, in keeping with the General Assembly's 55% BVAP target, BVAP in District 69 was maintained above 55% (at 55.2%) in the Enacted Plan. *See id.*, tbl. 4. Because there was no need to set District 69's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 69 is narrowly tailored.

### d.  House District 70

District 70 was a safe district for minority-preferred candidates before 2011. Delegate Delores McQuinn won in a landslide (78% to 22%) in 2009 and has not been challenged since then. *See* Pl. Ex. 50., tbl. 14. Moreover, in the benchmark version of District 70, the Democratic candidate earned 78% or more of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See id.*, tbls. 14A & 14B.

Nevertheless, in keeping with the General Assembly's 55% BVAP target, BVAP in District 70 was maintained above 55% (at 56.4%) under the Enacted Plan. *See id.*, tbl. 4. Because there was no need to set District 70's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 70 is narrowly tailored.

### e.     House District 71

District 71 was also a safe district for minority-preferred candidates before 2011. The current incumbent, African-American Delegate Jennifer McClellan, defeated white challengers in 2009 and 2013, both times with more than 80% of the vote. *See* Tr. 26:5-27:2.

Those lopsided results are partly attributable to the fact that there is no racially polarized voting in District 71. According to Defendant-Intervenors' expert Professor Katz, 72.1% of white voters voted for Delegate McClellan in her 2009 contest. *See* DI Ex. 16, tbl. 4. Statewide and federal elections are consistent with those results. In the benchmark version of District 71, the Democratic candidate garnered 83% or more of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See* Pl. Ex. 50, tbls. 14A & 14B. In short, under the benchmark version of District 71, there was virtually no chance of the minority-preferred candidate losing.

Nevertheless, BVAP in District 71 rose sharply from 46.3% to 55.3% under the Enacted Plan. *See id.*, tbl. 4. Because there was no need to set District 71's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 71 is narrowly tailored.

### f.     House District 74

District 74 was a safe district for minority-preferred candidates before 2011. Minority-preferred candidate Joseph Morrissey won in landslide (76% to 24%) in 2009, *see* Pl. Ex. 50, tbl. 14, in part because there is no racially polarized voting in District 74, *see* DI Ex. 16, tbl. 4. Moreover, in the benchmark version of District 74, the Democratic candidate garnered about 75% of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See id.*, tbls. 14A & 14B. In short, under the benchmark version of District 74, there was virtually no chance of the minority-preferred candidate losing.

Nevertheless, in keeping with the General Assembly's 55% BVAP target, BVAP in District 74 was maintained above 55% (at 57.2%) under the Enacted Plan. *See id.*, tbl. 4. Because there was no need to set District 74's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 74 is narrowly tailored.

### g.     House District 77

District 77, too, was a safe district for minority-preferred candidates before 2011. Incumbent Delegate Lionell Spruill ran unopposed in 2007, 2009, 2011, and 2013. *See* Pl. Ex. 50., tbl. 14. Moreover, in the benchmark version of District 77, the Democratic candidate earned 73% or more of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See id.*, tbls. 14A & 14B. Here again, under the benchmark version, there was virtually no chance of the minority-preferred candidate losing.

Nevertheless, BVAP in District 77 rose from 57.6% to 58.8% under the Enacted Plan. *See id.*, tbl. 4. Because there was no need to set District 77's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 77 is narrowly tailored.

### h.     House District 80

District 80 was also a safe district for minority-preferred candidates before 2011. African-American Delegate Matthew James crushed his opponent 69% to 21% in 2009 and has not been opposed since then. *See* Pl. Ex. 50., tbl. 14. Moreover, in the benchmark version of District 80, the Democratic candidate received no less than 74% or more of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See id.*, tbls. 14A & 14B. Delegate Jones even testified that District 80 "has been held by an African American as long as [he] can remember." Tr. 460:9-13.

Nevertheless, BVAP in District 80 rose from 54.4% to 56.3% under the Enacted Plan. *See* Pl. Ex. 50, tbl. 4. Because there was no need to set District 80's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 80 is narrowly tailored.

### i.      House District 89

District 89 was a safe district for minority-preferred candidates before 2011. African-American candidate Kenneth Alexander won overwhelmingly in his 2009 contest. *See* Pl. Ex. 50, tbl. 14. Moreover, in the benchmark version of District 89, the Democratic candidate earned no less than 80% of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See id.*, tbls. 14A & 14B. In short, there was virtually no chance of the minority-preferred candidate losing in this district.[17]

Nevertheless, BVAP in District 89 rose from 52.5% to 55.5% under the Enacted Plan. *See id.*, tbl. 4. Because there was no need to set District 89's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 89 is narrowly tailored.

### j.      House District 90

Like the other challenged districts, District 90 was a safe district for minority-preferred candidates before 2011. African-American candidate Algie Howell ran away with the 2009 election, winning 67% to 33%. *See* Pl. Ex. 50, tbl. 14. Statewide and federal elections are consistent with that result. In the benchmark version of District 90, the Democratic candidate received about 75% of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See id.*, tbls. 14A & 14B.

---

[17] Notably, in 2001, District 89 and District 90 were enacted into law with less than 55% BVAP, were precleared with less than 55% BVAP, and (as Delegate Jones acknowledged) fully complied with the VRA with less than 55% BVAP. *See* Tr. 393:14-396:1.

Nevertheless, in keeping with the General Assembly's 55% BVAP target, BVAP in District 90 was maintained above 55% (at 56.6%) under the Enacted Plan. *See id.*, tbl. 4. Because there was no need to set District 90's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 90 is narrowly tailored.

### k. House District 92

District 92 was a safe district for minority-preferred candidates before 2011. African-American incumbent Delegate Jeion Ward was not challenged in 2007, 2009, 2011, or 2013. *See* Pl. Ex. 50, tbl. 14. In addition, in the benchmark version of District 92, the Democratic candidate received about 75% of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See id.*, tbls. 14A & 14B. Not surprisingly, Delegate Jones could not recall the last time a minority-preferred candidate lost here. *See* Tr. 461:19-25.

Nevertheless, in keeping with the General Assembly's 55% BVAP target, BVAP in District 92 was maintained above 55% (at 60.7%) under the Enacted Plan. *See* Pl. Ex. 50, tbl. 4. Because there was no need to set District 92's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 92 is narrowly tailored.

### l. House District 95

Delegate Jones acknowledged that District 95 has been represented by an African-American delegate for more than 30 years. *See* Tr. 462:1-8. In the benchmark version of District 95, the Democratic candidate received at least 77% of the vote in the 2008 and 2012 presidential elections, the 2012 U.S. Senate contest, and the 2013 gubernatorial contest. *See* Pl. Ex. 50, tbls. 14A & 14B. (And, notably, African-American Delegate Mayme BaCote defeated a challenger in 2013 with more than 75% of the vote. *See* Pl. Ex. 50, tbl. 14.).

Nevertheless, in keeping with the General Assembly's 55% BVAP target, BVAP in District 95 was maintained above 55% (at 60.0%) under the Enacted Plan. *See id.*, tbl. 4. Because there was no need to set District 95's BVAP at that level to ensure that African-Americans could continue to elect the candidates of their choice, Defendants cannot meet their burden of showing that District 95 is narrowly tailored.

### III.   CONCLUSION

Virginia's General Assembly repeatedly declared that racial goals trumped all others in the drawing of the Challenged Districts, and it expressly relied on "mechanical racial targets" to achieve those goals. *Alabama*, 135 S. Ct. at 1267. Thus, race was the predominant factor in the drawing of the Challenged Districts, and the General Assembly's use of race was anything but narrowly tailored. The Challenged Districts therefore violate the Equal Protection Clause, and Plaintiffs respectfully request that this Court enter judgment for Plaintiffs.


DATED: July 20, 2015

By: */s/ Aria C. Branch*
　　John K. Roche (VSB# 68594)
　　Marc Erik Elias (admitted *pro hac vice*)
　　Bruce V. Spiva (admitted *pro hac vice*)
　　Elisabeth C. Frost (admitted *pro hac vice*)
　　Aria C. Branch (VSB # 83682)
　　**PERKINS COIE LLP**
　　700 Thirteenth Street, N.W., Suite 600
　　Washington, D.C.  20005-3960
　　Telephone: 202.434.1627
　　Facsimile: 202.654.9106

Kevin J. Hamilton (admitted *pro hac vice*)
Abha Khanna (admitted *pro hac vice*)
Ryan Spear (admitted *pro hac vice*)
William B. Stafford
   (admitted *pro hac vice*)
**PERKINS COIE** LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

On July 20, 2015, I will electronically file the foregoing with the Clerk of Court using the

CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jennifer Marie Walrath
Katherine Lea McKnight
Baker & Hostetler LLP (DC)
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
202-861-1702
Fax: 202-861-1783
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com

Effrem Mark Braden
Baker & Hostetler LLP (DC-NA)
Washington Square
Suite 1100
Washington, DC 20036
202-861-1504
Fax: 202-861-1783
mbraden@bakerlaw.com

Of counsel:

Dale Oldham, Esq.
1119 Susan St.
Columbia, SC 29210
803-772-7729
dloesq@aol.com

*Attorneys for* Defendant-Intervenors

Jeffrey P. Brundage
Daniel Ari Glass
Kathleen Angell Gallagher
Eckert Seamans Cherin & Mellott LLC
1717 Pennsylvania Ave NW, Suite 1200
Washington, D.C. 20006
202-659-6600
Fax:  202-659-6699
jbrundage@eckertseamans.com
dglass@eckertseamans.com
kgallagher@eckertseamans.com

Godfrey T. Pinn, Jr.
Harrell & Chambliss LLP
Eighth and Main Building
707 East Main Street
Suite 1000
Richmond, VA 23219
gpinn@hclawfirm.com

Anthony F. Troy
Eckert Seamans Cherin & Mellott LLC
707 East Main Street
Suite 1450
Richmond, Virginia  23219
804-788-7751
Fax:  804-698-2950
ttroy@eckertseamans.com

*Attorneys for Defendants*

By */s/ Aria C. Branch*
   Aria C. Branch (VSB #83682)
   Perkins Coie LLP
   700 13th St. N.W., Suite 600
   Washington, D.C. 20005-3960
   Phone:  (202) 654-6338
   Fax:  (202) 654-9106
   ABranch@perkinscoie.com

*Attorneys for Plaintiffs*

1