IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(RICHMOND DIVISION)

| | |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, <br><br> Defendants. | <br><br><br><br><br><br> Civil Action No. 3:14-cv-00852-REP-GBL-BMK |

**DEFENDANT-INTERVENORS' POST-TRIAL REPLY BRIEF**

Dalton Lamar Oldham, Jr. (*pro hac vice*)
Dalton L Oldham LLC
1119 Susan Street
Columbia, SC 29210
Tel: (803) 237-0886
dloesq@aol.com

E. Mark Braden (*pro hac vice*)
Jennifer M. Walrath (VSB No. 75548)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates
and Virginia House of Delegates Speaker
William J. Howell*

# TABLE OF CONTENTS

Argument ....................................................................................................................1

I.   Plaintiffs Failed Yet Again To Show Predominance of Race Over
     Other Criteria ........................................................................................................1

     A.  *Cromartie II* Confirmed That the Equal Protection Clause
         Remedies Harm Resulting From Discriminatory Motive, Not
         Motive in and of Itself.................................................................................2

     B.  *Cromartie II* Rejected Plaintiffs' Arguments ............................................3

     C.  Purported "Direct" Evidence of Motive Does Not Supplant the
         Need for Plaintiffs To Show Discriminatory Effect ....................................5

     D.  The Cases Plaintiffs Cite Do Not Support Their Arguments.......................8

     E.  Plaintiffs' Evidentiary Arguments Fail To Establish
         Predominance..............................................................................................13

II.  The Plan Is Narrowly Tailored Under Both Sections 2 and 5 ................................23

Conclusion ..................................................................................................................25

Four years and two election cycles have lapsed since the 2011 House redistricting Plan took effect. Plaintiffs now ask the Court to delve headfirst into this "most vital of local functions"[1] and order a do-over. They identify no flaws in the current House Plan and disclaim any intention of doing so. The sole purpose of their demand would be to give the legislature a second go-around, this time with pure hearts and minds purged of the 55 percent number. As far as Plaintiffs are concerned, the resulting map may as well be exactly the same (except, they hope, it will be more favorable to Democrats).

Their demand flies in the face of every equal-protection case since *Washington v. Davis*, not the least of which is *Cromartie II*, the most recent Supreme Court case that reached a holding on the validity of a plan. In two trial briefs, Plaintiffs have failed even to cite *Cromartie II*. These cases establish that the federal Constitution is concerned with real harms, and the *Shaw* cases in particular are concerned with the injury caused when people without actual shared interests are grouped in districts based on their race. Delegate Chris Jones had to address the real-world politics of obtaining the support of a majority of the legislature and therefore had to be concerned with what communities actually exist within Virginia and how they might best be formed into districts. The evidence shows that the Plan is not broken, and there is no need to fix it.

## ARGUMENT

## I.     Plaintiffs Failed Yet Again To Show Predominance of Race Over Other Criteria

One would never guess from Plaintiffs' briefing that, in redistricting, "States must have discretion to exercise the political judgment necessary to balance competing interests," that federal courts "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus" and be wary of "the intrusive potential of judicial intervention into the

_____

[1] *Miller v. Johnson*, 515 U.S. 900, 915 (1995).

legislative realm," that the legislature is entitled to a "presumption of good faith," that courts should exercise "extraordinary caution" in adjudicating allegations of racial gerrymandering, or even that Plaintiffs bear the burden in this case. *Miller v. Johnson*, 515 U.S. 900, 915–17 (1995); *see also Easley v. Cromartie*, 532 U.S. 234, 241–42 (2001) (*Cromartie II*). One would also never guess that "[a]pplication of the [*Shaw*] standard does not throw into doubt the vast majority of the Nation's [districts] where presumably the States have drawn the boundaries in accordance with their customary districting principles." *Miller*, 515 U.S. at 928–29 (O'Connor, J., concurring).

Instead, Plaintiffs place the federal courts in the invasive roles of psychoanalyst and father confessor to all state legislatures by imposing strict scrutiny where race is "*the most important criterion*" in the legislature's mind, Pls. Br., Dkt. 105, at 4 (quoting nothing)—a redistricting sin that can occur in thought or word alone, Pls. Br. at 4, 6 & n.2, 8. Even Plaintiffs do not know what this formulation means. They told the Court in closing that they "are not even remotely suggesting" that any of the Challenged Districts should cease to be "healthy performing majority-minority districts," Tr. 818:10–17, and then represented one week later that their first example of "abundant direct evidence" of improper racial motive was that "the General Assembly sought to maintain all of the Challenged Districts as majority-minority districts," Pls. Br. at 7; *see also id.* at 12 n.7 (asserting that a 50 percent black district would trigger strict scrutiny). Whatever this means, it is clear that the role of the federal courts, if Plaintiffs prevail, will be anything but the role described in *Miller*. Plaintiffs' standard invites endless litigation.

### A.    *Cromartie II* Confirmed That the Equal Protection Clause Remedies Harm Resulting From Discriminatory Motive, Not Motive in and of Itself

The most recent Supreme Court case to consider the ultimate validity of a *Shaw* claim, *Cromartie II*, reaffirmed that race must be the "*predominant* factor motivating the legislature's

districting decision" for there to be a constitutional harm. 532 U.S. at 241 (quotation marks omitted). *Cromartie II* clarified that "predominance" turns on whether "the legislature drew [a district's] boundaries because of race *rather than* because of political behavior (coupled with traditional, nonracial districting considerations)." *Id.* at 257 (emphasis in original). Inherent in that phrase—"because of race *rather than* because of" other factors—is "an element of causation that is a necessary part of [a] plaintiff's showing" in every equal-protection case. *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995). That element links "purpose" and "effect" into a real harm for which the law can provide a real remedy. *Wayte v. United States*, 470 U.S. 598, 609 (1985); *see also Miller*, 515 U.S. at 916 ("Discriminatory purpose…implies that the decisionmaker selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' *its adverse effect*.") (quotation and edit marks omitted) (emphasis added). If there were any doubt that a racial-gerrymandering claim applies to real-world effects and not merely subjective motives, *Cromartie II* explicitly rejected a proposed subjective-intent standard proposed by the dissent, 532 U.S. at 257, and required that a plaintiff present meaningful alternatives that "could have achieved [the legislature's] legitimate political objectives in alternative ways," and that "would have brought about significantly greater racial balance," but for the use of race, *id.* at 258.

How do Plaintiffs address this requirement? They ignore it and fail to cite *Cromartie II* even once in two rounds of trial briefing.

### B.   *Cromartie II* Rejected Plaintiffs' Arguments

Plaintiffs have good reason to hide from this binding authority: besides rejecting their standard of pure subjectivity, it rejected numerous other aspects of their case. The district in *Cromartie II* (unlike the Plan here) was already suspect because it was indisputably bizarre,

representing a substantial departure from traditional principles. 532 U.S. at 240. To make the necessary connection between that flaw and race, the *Cromartie II* plaintiffs presented expert testimony and "direct evidence" of legislative motive.

The Court rejected the expert testimony because it was riddled with the same flaws plaguing Dr. Ansolabehere's reports, including that the expert "was not aware of anything about political dynamics going on in the [legislature] involving" the redistricting process. *Id.* at 250. Likewise, the Court rejected the expert's testimony about the cause of a specific split precinct because the expert "had not considered whether" the incumbent "would have wanted the whole of [the] precinct…left in her own district" given its partisan makeup, and the expert had not "tested his conclusion" by "adjusting other boundary lines and determining the political, or other nonracial, consequences of such adjustments." *Id.* at 248. Moreover, the expert identified precincts—*within the relevant counties*—that should have been included in the challenged district if politics had predominated, but the Court rejected this argument because the expert failed to "specify" whether "the excluded white reliably-Democratic precincts were located near enough to" the district "or each other" for "the legislature as a practical matter to have drawn" them in. *Id.* at 247–48. Finally, the Court rejected the expert's alternative map because it made only minor improvements as to redistricting principles and did not achieve the legislature's political objectives. *Id.* at 249–50. All of that describes Dr. Ansolabehere's testimony, with one exception: Dr. Ansolabehere provided *no* alternative map and did not even review the two 'alternatives' reluctantly claimed, and apparently abandoned, by Plaintiffs here.

The Court also found that alleged "direct" evidence of racial gerrymandering, in the form of e-mail correspondence and legislative debate, failed to prove predominance because it was either ambiguous or suggested that race was considered "along with other partisan and

geographic considerations." 532 U.S. at 253–54. So too here, Plaintiffs' "direct evidence" consists of cherry-picking the factual record. For instance, Plaintiffs confronted Delegate Jones with his floor statement that all Challenged Districts "were above 55 percent," but in that very statement Jones represented that "[w]e had to keep the core of these districts because I think that's very important," and his testimony characterized his discussion of the number 55 percent as "stating factually what was before the body." Tr. 426:6–21. As in *Cromartie II*, this refutes a claim of predominance. In addition, *Cromartie II* held that, where race and politics are correlated, an alternative map is required. That correlation is present here, Tr. 507:12–18; 661:19–22; 224:6–17, and Plaintiffs' challenge cannot succeed.

### C. Purported "Direct" Evidence of Motive Does Not Supplant the Need for Plaintiffs To Show Discriminatory Effect

A plaintiff can prove racial gerrymandering through circumstantial and/or direct evidence. *Miller*, 515 U.S. at 916. The same is true as to a common-law tort claim, an antitrust claim, a criminal charge, or any other cause of action. Plaintiffs, however, conclude that, because direct evidence can preclude the need for circumstantial evidence, it also substitutes as the effect element of the underlying claim—as if a prosecutor could win a murder case with direct evidence of a confession but without showing that anyone died. Pls. Br. at 4–5.

This begs the question: "direct evidence" of what? *Miller*, in its discussion of "direct" and "circumstantial" evidence, defined the relevant constitutional harm to be proved as "subordinat[ion] [of] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." 515 U.S. at 916. *Cromartie II* stated that this occurs when boundaries are drawn as they are "because of race *rather than* because of" other considerations. 532 U.S. at 257. And *Bush v. Vera* identified "[s]ignificant deviations from

traditional districting principles" as the "constitutional harm" of racial gerrymandering, because such deviations (on account of race) "convey the message that political identity is… predominantly racial." 517 U.S. 952, 980 (1996).

These repeated holdings repudiate the unheard-of notion that a constitutional harm consists of race being "the most important thing" on the legislature's mind, Pls. Br. at 4, and occurs when the legislature "rank[s] racial goals above other goals," regardless of any meaningful effect on anyone, Pls. Br. at 8. Plaintiffs' argument rests on a contortion of *Miller's* holding that "bizarreness" in districts is not "a threshold showing" in a *Shaw* case. 515 U.S. at 913. Bizarre districts and a substantial disregard for traditional criteria are not one and the same. *see Vera*, 517 U.S. at 974. *Miller* itself stated that "a legislature's compliance with traditional districting principles…may well suffice to refute a claim of racial gerrymandering," 515 U.S. at 919 (quotation marks omitted). The concurrence of Justice O'Connor, the decisive fifth vote, states: "[t]o invoke strict scrutiny, a plaintiff must show that the State has relied on race in substantial disregard of customary and traditional districting principles," 515 U.S. at 928 (O'Conner, J., concurring). Likewise, *Shaw I* created a cause of action for race-based districting conducted "without regard for traditional districting principles" and distinguished the Supreme Court's previous decision in *United Jewish Orgs. of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 167 (1977), on the basis that the plan in that case "adhered to traditional districting principles." 509 U.S. at 651. And *Alabama Legislative Black Caucus v. Alabama* confirmed that a racial gerrymandering claim "applies to the boundaries of individual districts" and turns on a showing (at minimum) that a racial goal "had a direct and significant impact on the drawing of" actual district lines. 135 S. Ct. 1257, 1265, 1271 (2015). Plaintiffs must have evidence—direct or indirect—both of motive and of departure from traditional criteria to prevail.

Tellingly, the worst consequence Plaintiffs can imagine flowing from the standard articulated in these decisions is that a legislature might issue a press release stating that it used race alone in redistricting and then "gin up after-the-fact justifications" by inventing criteria that are "easy to manipulate" to survive a *Shaw* challenge. Pls. Br. at 6. Yet Plaintiffs are proposing a cause of action based entirely on the legislature's subjective view of the "most important thing" in redistricting. Could any standard be easier to manipulate?

More than anything, this argument expresses "disdain for a process that" the Supreme Court has "cautioned courts to respect." *Cromartie II*, 532 U.S. at 250. A legislature that "gin[s] up" criteria after the fact would not be following traditional principles as described in the case law because the Supreme Court, unlike Plaintiffs, is of the opinion that traditional principles *mean* something. Traditional principles ensure that people "widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin" are not grouped together based on racial stereotypes. *Shaw I*, 509 U.S. at 647. Traditional principles are "wholly legitimate purposes" for redistricting, even where the legislature "concentrates members of [a racial] group in one district and excludes them from others." *Id.* at 646. Accordingly, traditional principles "cannot be said to have been 'subordinated to race'" when they are substantially followed—even where they "are substantially followed without much conscious thought." *Vera*, 517 U.S. at 967.[2]

_____

[2] Even if it were possible to substantially follow traditional principles and, at the same time, subordinate them to race—it is not possible—the residents of the resulting district would have no better a constitutional claim than would an individual targeted for prosecution and who subsequently claims in a Section 1983 suit that he was wrongly targeted based on an unconstitutional motive—but as to whom, incidentally, there *was* valid probable cause at the time of prosecution. The Supreme Court held in *Hartman v. Moore* that such an individual has no constitutional claim because, though it "may be dishonorable to act with an unconstitutional motive," there is no constitutional violation "if that action would have been taken anyway." 547 U.S. 250, 260, 265–66 (2006). In fact, the result would not change even if the plaintiff had

### D.        The Cases Plaintiffs Cite Do Not Support Their Arguments

Plaintiffs rely on several cases to support their various contorted legal and factual theories. Their reliance on each is misguided.

*Alabama Legislative Black Caucus*. The Supreme Court's recent *Alabama* decision is bifurcated into several questions, and only one of those involved actual application—or, actually, cursory consideration—of the predominance standard. 135 S. Ct. at 1270–72. The word "mechanical" does not appear in that section. The analysis shows that the threshold adopted by the state was anything but dispositive: the Court opined that the threshold may have "had a direct and significant impact on the drawing of at least some" of the challenged district's boundaries and identified specific apparent transgressions from Alabama's guidelines and thus remanded for further consideration. *Id.*

Moreover, the facts of *Alabama* are worlds apart from this case. Alabama's District 26 saw an influx of 15,785 people, of whom "just 36 were white," making the percentage of black population of those moved in 99.8. By contrast, the BVAP percentages moved into the Challenged Districts, according to Plaintiffs' expert, are: 52.0, 37.9, 44.7, 43.8, 72.1, 38.5, 44.2, 52.9, 43.9, 43.3, 47.3, and 43.7—nine do not even rise to 50 percent, and all are at least 27 percentage points behind the number in *Alabama*. PEX50 at 77–78. BVAP levels in *Alabama* were maintained above 70 percent; here, none rises above 60.7 percent, using the DLS number, and half the districts saw a decrease in BVAP. PEX50 at 72. Alabama's District 26 changed from "rectangular to irregular," 135 S. Ct. at 1271, and, as the Court can see, *id.* at 1290 (Appendix C), bears no resemblance to the former district. The districts here largely held their shape, had

---

"evidence of a direct admission" that "the sole purpose" for bringing the prosecution was unconstitutional motive. *Id.* at 263 n.10.

8

high core retention, and saw nothing like the substantial change of Alabama's District 26. IEX14 at 81. Nothing here raises the red flags requiring further review in *Alabama*.

 **Backus v. South Carolina.** Plaintiffs cite *Backus v. South Carolina* for the proposition that "'bizarre shape'" is "'only one way of proving a racial gerrymander,'" Pls. Br. at 5, but fail to appreciate that *Backus* disposes of their entire case. 857 F. Supp. 2d 553 (D.S.C. 2012), *aff'd* 133 S. Ct. 156 (2012). To begin, The *Backus* court dismissed a racial sorting exhibit similar to that presented in Dr. Ansolabehere's Table 8. *Id.* at 562. The exhibit in *Backus* identified districts where BVAP was increased or remained stable and examined whether traditional race-neutral principles were subordinated. The court found that the expert "relied on incomplete information when reaching his determination" and found it particularly "problematic" that "he failed to consider all the traditional race-neutral principles that guide redistricting in South Carolina." *Id.* at 562. "Particularly troubling is his admission that he failed to consider the guidelines and criteria that the General Assembly devised for the redistricting process"—an admission made by Dr. Ansolabehere. *Id.* at 562; 7/7 Tr. 227:22–24. Like Dr. Ansolabehere, the expert admitted that he "did not consider whether the General Assembly sought to keep communities of interest…intact," and "did not consider incumbency protection." 857 F. Supp. 2d at 562. Like Dr. Ansolabahere, the expert "admitted that all he considered in his analysis were geographic and demographic data and election results." *Id.* at 562–63. Thus, the expert "was unable to provide the Court a reliable opinion that the General Assembly subordinated traditional race-neutral principles to race." *Id.* at 563.

 Moreover, *Backus* considered testimony from legislators who believed that "BVAP is too high in many districts" and that "an African-American candidate of choice can be elected in particular districts without the district being a majority-minority district," and found it

9

unpersuasive because there was no "convincing proof that race predominated" in the drawing of any particular districts. *Id.* at 564. The Court also considered testimony—and tape-recorded evidence—that the legislature "relied on predetermined demographic percentages and described how it would table amendments that lowered BVAP in a district," and found it "insufficient to show that race predominated" because this amounted to no more than "generalized statements" of motive and lacked "any in-depth explanation as to where and how." *Id.* at 564. For instance, one district with a "bizarre horseshoe shape" was "consistent with how it looked under the Benchmark Plan." *Id.* In addition, the criteria used by the legislature in *Backus* subordinated traditional criteria to the Voting Rights Act. *Id.* at 565. As Plaintiffs agree, this case is on point, and the Court should reach the same conclusions here.

**Page II.** *Page v. Virginia State Board of Elections*, 2015 WL 3604029, (E.D. Va. June 5, 2015) (*Page II*), concerned a district with "an odd shape and a composition of a disparate chain of communities, predominantly African-American, loosely connected by the James River." *Id.* at *11. The Court found it doubtful that the district at issue in *Page II* could be considered meaningfully contiguous; an area in Norfolk is connected to areas miles away in Richmond, Charles City, and elsewhere only by the James River.[3] *Id.* The *Page II* court identified an extraordinary number of split cities and counties drawn along racial lines. *Id.* at *11–12. *Page II* turned on the question whether race or politics predominated as to these redistricting decisions, and, as to that inquiry, the Plaintiffs introduced an alternative map and were able to convince two members of the Court that the legislature could have achieved its political goals with a more racially balanced district. *Id.* at *7, 13–15 & n.12. The Court took all of that evidence into

---

[3] *See Page II*, 3:13-cv-00678-REP-LO-AD, Dkt. 1 (Complaint) ¶ 25. A perhaps clearer image is available on BallotPedia, at http://ballotpedia.org/Virginia's_3rd_Congressional_District.

consideration *after* finding that the legislature had adopted a strict 55 percent "BVAP floor," *Id.* at *9, confirming that a threshold is not the be-all-end-all of a racial gerrymandering claim.

**Smith v. Beasley.** *Smith v. Beasley*, 946 F. Supp. 1174 (D.S.C. 1996), concerned the creation of "new, non-compact and oddly shaped districts" that "wind 'in snakelike fashion' until enough black neighborhoods are included to create a black-majority district." *Id.* at 1207. Traditional criteria were ignored. As to motive, the challenged districts in that case arose from a "'dream plan'" to create "thirty-two black-majority seats" in the state house, were drawn without any concern for "compactness, communities of interest, or contiguity," were described as being drawn with race "as the only factor for drawing the lines," and were drawn to comply with DOJ's demand to apply a policy of "seeking to maximize black representation in the South Carolina House of Representatives with little concern for compactness of districts, contiguity, or communities of interest." *Id.* at 1185, 1206–08. Plaintiffs skip over all of this and isolate a single fact: the case mentioned a 55 percent BVAP floor. Pls. Br. at 12 n.7. That was a very small part of a larger context not present here.

**Clark v. Putnam County**. *Clark v. Putnam County*, 293 F.3d 1261, 1268–69 (11th Cir. 2002), involved a plan drawn under an express instruction by the defendant county to the drafter to include "every contiguous census block available which would have the effect of increasing the black percentage in the two majority black districts." *Id.* at 1267. This order was carried out and resulted in splitting a county along racial lines and assigning 90 percent of the black population in the county into the majority-minority districts. *Id.* at 1267–68. "These percentages were obtained by the deliberate manipulation of district lines to maximize the number of black voters in the two challenged districts," resulting in a negative population deviation of over 11 percent. *Id.* at 1268–69, 71. All of this resulted in a district with a "smokestack" and "pie slice,"

drawn along racial lines. *Id.* at 1269. Plaintiffs ignore these facts showing substantial neglect of traditional principles and suggest that the case turned merely on the goal of achieving a BVAP threshold. Pls. Br. at 21 n.7. That is incorrect. *See Clark*, 293 F.3d at 1268–72.

**Moon v. Meadows**. *Moon v. Meadows*, 952 F. Supp. 1141 (E.D. Va. 1997), applied strict scrutiny to a district described as "an amalgamation principally of African–American citizens contained within the legislatively determined boundaries" that were "anchored in the tidewater cities of Norfolk, Suffolk, and Portsmouth." *Id.* at 1144. The "bizarre shape[d]" district crossed "the Chesapeake Bay to include portions of the cities of Hampton and Newport News where the African–American population is the majority," and "using only the open water of the Chesapeake Bay and the James River to connect the disparate and non-contiguous portions of these two small cities" joined black communities in Hopewell, Prince George County, and Henrico County with "the rural and agricultural counties of New Kent, New William, King and Queen," spanning roughly 225 miles. *Id.* at 1144–46. That is the epitome of "the neglect of traditional districting criteria" for predominantly racial reasons, *Vera*, 517 U.S. at 952, and the district court held that traditional principles were "ignored," *Moon*, 952 F. Supp. at 1147–48. These facts, among many others, *id.* at 1146–48, justified strict scrutiny. The case is not on point.

**Wilkins v. West.** Plaintiffs agree that *Wilkins v. West*, 571 S.E.2d 100 (Va. 2002), is relevant case law, Pls. Br. at 15, but attempt to distinguish it on several basis—all of which fail.

*First*, *Wilkins* applied federal law, not state law, as Plaintiffs claim. *Wilkins*, 571 S.E.2d at 111 ("[W]e applied standards of constitutionality developed under federal law. We neither stated nor applied a separate standard for resolution of the challenge under state law."). And, unlike Plaintiffs, *Wilkins* took *Cromartie II* as binding authority. *See id.* at 111, 118–19.

*Second*, contrary to Plaintiffs' assertions about direct and indirect evidence, *Wilkins* considered the same "direct evidence" that Plaintiffs believe is dispositive to this case, that the House "placed more minority voters in a district than necessary to provide such voters with a reasonable opportunity to elect candidates of their choice," *id.* at 114, 116, 117, and had BVAP levels that were too high, ranging from the mid-50 percent range to 64 percent, *id.* at 117. *Wilkins* correctly held that these arguments related to "whether [the] districts were narrowly tailored." *Id.*

*Third*, Plaintiffs' claim that that the Challenged Districts are "changed dramatically" from 2002 lacks any evidentiary support and is contradicted by the testimony of two expert witnesses. The percentage of each of the Challenged Districts that was retained from the Benchmark Plan, was very high—nearly 80 percent on average. Tr. 718:15–719:18; *see also* Tr. 613:12–14.

*Fourth*, Plaintiffs make the curious assertion that the high core retention of the Challenged Districts triggers "even more exacting scrutiny." Pls. Br. at 16 (citing nothing). They disregard Supreme Court precedent holding that core retention is a traditional criterion. *See Karcher v. Daggett*, 462 U.S. 725, 740 (1983); *see also Comm. for a Fair and Balanced Map v. Ill. State Elecs. Comm.*, 835 F. Supp. 2d 563, 590–92 (N.D. Ill. 2011).

Contrary to Plaintiffs' flailing arguments, *Wilkins* provides a necessary historical backdrop to for this case for all the reasons identified in Defendant-Intervenors' pre- and post-trial briefs, not least of which is the fact that Delegate Jones relied on *Wilkins* to draw the map at issue and cited *Wilkins* in the Criteria adopted by the House for redistricting. PEX16.

### E.   Plaintiffs' Evidentiary Arguments Fail To Establish Predominance

Having failed to identify any cognizable harm, Plaintiffs unsurprisingly fail to prove an equal-protection claim. As discussed in Defendant-Intervenors' opening brief, Dkt. 104 at 10–13,

Plaintiffs' fixation on the number 55 percent and on the House criteria's reference to the Voting Rights Act ignores their burden to show meaningful *subordination* of traditional principles to race and, besides, has minimal bearing even on the issue of the relative subjective importance of race to the House. *See Backus*, 857 F. Supp. 2d at 562–64. Plaintiffs' case suffers from additional problems:

**55 Percent BVAP Was Negotiable.** Plaintiffs misstate the record by claiming that "Delegate Jones calculated BVAP using two methods." Pls. Br. at 12 (citing nothing). Actually, Jones made clear that he used one method. Prior to the introduction of HB5001, Jones received input from the Black Caucus and community leaders that 55 percent "was a sufficient population to elect the candidate of choice" in the Challenged Districts. Tr. 490:2–492:11. Jones drew the Plan using a *single* number on his Maptitude screen that he understood to be the number that DOJ would use in preclearance. Tr. 280:22–281:5 (Jones testifying that he used "only" DOJ Black). As he understood it, not all districts were above 55 percent—*i.e.*, it was an aspiration that he had not completely satisfied. *Id.* Subsequently, he took the census blocs of his Plan to the Division of Legislative Services and "was surprised when they ran their report and they had all of them above 55 percent." Tr. 281:1–10; *see also* Tr. 489:11–22 (Jones testifying that he first learned of the discrepancy "the day that the bill came out"). Then, in subsequent floor speeches he stated "factually what was before the body," that his Plan had achieved the goal—and, of course, he had little incentive to reveal that he had done so inadvertently. Tr. 426:6–21.

Ignoring this testimony, Plaintiffs nonsensically conclude that Jones actually had a non-negotiable "54 percent target." Pls. Br. at 13. In fact, he had a *negotiable* 55 percent target, which refutes Plaintiffs' contention that "Delegate Jones never compromised on one thing: *the*

*racial goal of maintaining 12 majority-minority districts with at least 55% BVAP*." Pls. Br. at 27 (citing nothing). The undisputed record shows that this *was* compromised.

Was any criterion completely non-negotiable? Yes, at least one: it is not disputed that every district in the Plan is a single-member district, in full compliance with the *fourth* criterion on the list, which fell below the Voting Rights Act. PEX16.

**Legal Significance of a "Non-Negotiable Threshold."** Even if Plaintiffs were able to prove that there was a 55 percent threshold, their legal view of its significance cannot stand. They make a revealing concession that the "use of a racial target is what matters—not the target itself." Pls. Br. at 13. Under Plaintiffs' flawed premise about the significance of racial targets, that conclusion would be correct, but it would mean that every majority-minority district in the United States would be subject to strict scrutiny because they all are subject to a fixed, non-negotiable, mechanical, one-size-fits-all, 50 percent plus 1 BVAP threshold that is legally indistinguishable from a 55 percent threshold.[4] *See Vera*, 517 U.S. at 996 (Kennedy, J., concurring) (arguing that strict scrutiny should apply to a "50 percent" racial threshold) (quoted at Pls. Br. at 12 n.7). Plaintiffs may want to effect a revolution in voting-rights law—contrary to their emphatic representations otherwise, Tr. 818:10–17—but that is a matter for the Supreme Court, not this Court.

**Plaintiffs' "Indirect Evidence."** Plaintiffs do not even purport to proffer evidence about real-world defects with the Challenged Districts and instead offer the flawed analyses of Dr. Ansolabehere as "indirect evidence" of racial motive. Pls. Br. at 14–16. Besides failing for the reasons stated in Defendant-Intervenors' opening post-trial brief, Dkt. 104 at 13–19, the evidence

---

[4] There is, after all, no question what would happen if the 50-percent threshold became "negotiable" and Challenged Districts were allowed to drop below that number (as was the case in the benchmark HD71): the House would be accused of "cracking" the minority vote and would be liable under Section 2. *See, e.g.*, *Baldus v. Members of Wis. Gov't Accountability Bd.*, 849 F. Supp. 2d 840, 854–58 (E.D. Wis. 2012) (invalidating two legislative districts).

is insufficient for the reasons stated in *Backus* and *Cromartie II*, discussed above (at I.D and I.B, respectively).

      **Politics, Not Race.** Plaintiffs' argument that race predominated over politics is chicanery. Pls. Br. at 25–26. They contort the testimony of Delegate Jones that "a goal" of the House was not to "unseat Democrats," Tr. 482:22–483:19, to mean the Plan was not "motivated by politics"—as if the only way "politics" can be a motivating factor is through an active campaign to "unseat" members of the other party. *Contrast Vera*, 517 U.S. at 967–68. The very exchange they cite also elicited testimony that "[a] majority of Democrats voted for the plan," which is, of course, a political feat, Tr. 386:25–387:20, and the record is loaded with evidence that political considerations drove the redistricting process. Jones testified that his software, Maptitude, had "layers of partisanship" data that were displayed by different color gradations that he viewed "when I was doing the map." Tr. 361:1–7. His screen included the same information on display in Intervenors' Exhibit 92 (which Plaintiffs themselves cite as providing useful information, Pls. Br. at 25) and Jones used this information to assess "Republican Performance" in the resulting districts—"what the good Republican areas were." Tr. 361:15–362:13. The colors were not for decoration. Jones testified that "there were political considerations, partisan political considerations involved in drawing this plan[.]" *Id.* And that is just the tip of the political iceberg.[5]

---

[5] *See also* Tr. 364:3–9 (Jones testifying that he used election data from 2009 race); Tr. 368:18–369:16 (Jones testifying that he drew HD95 in order to make HD93 a "swing seat"—and succeeded); Tr. 370:10–23 (Jones testifying that Republican and Democratic performance data drove the decision of what precincts to include in districts on the Peninsula); Tr. 373:1–11 (same); Tr. 304:19–25 (Jones testifying of goal of avoiding "unnecessary pairing of incumbents"); Tr. 305:8–307:12 (Jones testifying of Delegate Loupassi's political motives for requesting precinct 207 in his district); Tr. 311:3–312:7 (Jones testifying about careful line-drawing to avoid pairing incumbents); Tr. 312:8–14 (Jones testifying of efforts to please incumbent as to the make-up of her district); Tr. 342:7–16 (Jones testifying about meeting with 75 to 80 members to meet their requests and get their votes); Tr. 324:17–325:17 (Jones testifying

**District-Specific Analysis:** Plaintiffs' district-by-district analysis fares no better:

**HD69:** Plaintiffs concede that HD69 is more compact under the Plan and do not so much as mention any other criteria, let alone provide evidence of any departure from criteria. Pls. Br. at 19. They complain only that the population added was comprised of "African-American voters at the outskirts of the benchmark district," and that adding those voters was not necessary because minority voters "have long been able to elect their candidates of choice." Pls. Br. at 19. *Shaw* does not create a right to reside in a district with some mythical, idealized BVAP level, and this argument relates only to narrow tailoring or, perhaps, to a Section 2 claim that Plaintiffs did not bring. *Wilkins*, 571 S.E.2d at 114, 116–117. Regardless, Dr. Ansolabehere's testimony (ignored by Plaintiffs) shows that "partisanship had a larger effect" than race in the drawing of HD69. Tr. 792:8–24; PEX50 at 77.

---

that precinct was removed from district because incumbent had poor election history there); Tr. 325:19–327:10 (Jones testifying that irregular shape was intended to remove a potential primary competitor to incumbent from her district); Tr. 329:16–330:2 (Jones testifying that he attempted to meet the requests of Delegate Dance because he needed her support to pass the Plan); Tr. 333:22–337:10 (Jones testifying that precinct was moved into his own district because it was a strong Republican precinct); Tr. 339:13–22 (Jones testifying that he attempted to meet the requests of Delegate Howell in drawing his district); Tr. 344:25–345:9 (Jones testifying that "precinct cuts" were made to move Delegate Alexander's small business into his district); Tr. 350:10–351:8 (Jones testifying that he was actively trying not to pair incumbents; Tr. 356:7–22 (Jones testifying that he worked with incumbent to meet "local requests"); Tr. 378:10–22 (Jones testifying that alternative plans that paired dozens of incumbents would not seriously be considered); Tr. 381:20–382:16 (Jones testifying that the Plan paired the minimum number of incumbents possible given the need to collapse districts); Tr. 385:15–19 (Jones testifying that redistricting is "a very partisan process"); Tr. 398:25–399:1 (Jones testifying that his "goal was to have a plan that was representative of the 100 members of the House of Delegates); Tr. 453–462 (Jones testifying from memory of Virginia elections that he took into consideration in drawing the Plan); Tr. 611:15–612:1 (Dr. Hood testifying that "there are very few incumbents that are paired together" in the Plan and that "[h]alf the incumbents paired are Democrat, a Democrat versus a Democrat"); Tr. 613:18–614:5 (Dr. Hood testifying that "white Democrats actually had the lowest core retention at 58 percent on average"); Tr. 623:23–624:2 (Dr. Hood testifying that "the plan takes into account things like political beliefs, voting trends, and incumbency considerations"); Tr. 630:18–631:7 (Dr. Hood testifying that the Plan was drawn to favor Republicans and resulted in seat gains for Republican Party).

17

**HD70:** Plaintiffs do not identify a single redistricting criterion that was subordinated to race. *See* Pls. Br. at 19–20. They claim only that the "core" of the district was not preserved because, according to Dr. Ansolabehere, it morphed into a suburban district. *Id.* at 20. Setting aside that Dr. Ansolabehere lacks any qualifications to opine on Virginia communities of interest, *see* Tr. 230:22–234:16, the claim is contradicted by two different measures of core retention which both show that HD70 retained more than 67 percent of its core, IEX14 at 81–84. Delegate Jones also testified that there was a sound redistricting reason for the changes to HD70: it was altered to unite Henrico County precincts to better represent the suburban interest. Tr. 311:3–21. Plaintiffs make the incredible argument that HD70 did not need to change because it was within the prescribed population deviation. Besides revealing that Plaintiffs do not grasp basic realities of redistricting, Tr. 688:10–15, 692:16–19, 699:24–25, the argument is refuted by Jones's testimony that significant population deficits in neighboring Richmond districts required changes in HD70, given the contiguity requirement. Tr. 310:4–311:2. In any case, Plaintiffs' expert concluded that race did not predominate, testifying that the impact of race and partisanship in HD70 "were about the same." Tr. 792:8–25.

**HD71:** Plaintiffs do not identify any criterion that was subordinated to race in redrawing HD71. Pls. Br. at 20–21. To the contrary, Delegate McClellan testified that her district satisfied all House criteria, including compactness and communities of interest. Tr. 57:10–60:24; 61:15–21. Plaintiffs complain that precinct 207 was transferred to HD68, but that was done at the request of Delegate Loupassi for race-neutral reasons. Tr. 305:10–307:12. Plaintiffs allege that precinct 207 was moved for racial reasons, but cite *nothing*, provide *no evidence*, and provide *no alternative map* showing an alternative configuration. They ask the Court to disbelieve Delegate Jones based on their own assumptions of what Loupassi would want. Pls. Br. at 20 n.10.

18

Assumptions do not prove a case. There is no need for guesswork because Delegate Jones explained why Loupassi requested the precinct: "He had a broad base support from the democratic side of the aisle" typical of former city council members and was concerned about "the community of interest." Tr. 485:7–14.[6] Plaintiffs' allegations about precinct splits fare no better. The Senate, not Jones, rejected McClellan's changes to HB5001, and eventually the issue was resolved in HB5005. Tr. 295:1–14; IEX7 at 2–3.

That leaves only Plaintiffs' contentions that the movement of precincts into and out of HD71 evinces racial motive and that it was unnecessary since African-American voters had been "handily" electing their candidates of choice. Pls. Br. at 21. But this argument goes to strict scrutiny, *Wilkins*, 571 S.E.2d at 114, 116–17, and Jones had good reason to increase BVAP: the district had fallen below the *Strickland* standard, and the district's demographics had changed "dramatically" in the past decade, becoming increasingly white, in a trend that Delegate Jones believed "would continue if not accelerate." Tr. 291:18–292:24.

**HD74:**  Plaintiffs focus their challenge to HD74 on its compactness score, but forget that the score is identical to the score for the 2001 HD74 that was upheld in *Wilkins v. West*, and was an improvement from the 1991 plan. Defs. Br., Dkt. 104, at 24. Moreover, Plaintiffs do not so much as assert that race is to blame. *See* Pls. Br. at 21–22. Astonishingly, Plaintiffs fault Jones for *removing* a water crossing (which had been the subject of past criticism) because this caused HD63, on the other side of the James River, to become less compact—as if adherence to sound districting principles were a matter of balancing abstract numerical values. The decision *improved* both HD74 and HD63 as to what matters, respecting communities with "actual shared interests," *Miller*, 515 U.S. at 916, and was a valid exercise of "discretion" in redistricting, *id.* at

---

[6] Additionally, the Loupassi family has for decades owned and operated a restaurant in precinct 207 called "Robin Inn," which is a fixture in the Fan neighborhood. *See* Nikki Loupassi's Robbin Inn, "About" http://www.robininnrva.com/about.html (visited July 27, 2015).

915. Jones's testimony as to why HD74 was altered also refutes Plaintiffs' nonsensical argument that no change was needed and their absurd assumption that, therefore, the changes were race based. Pls Br. at 22. And, once again, Plaintiffs' expert testified that the impact of "race" and "politics" was "about the same." Tr. 792:8–793:1.

**HD63:** Plaintiffs complain that HD63 became less compact, but this resulted from the legitimate balancing of interests in uniting Hopewell with contiguous regions on its own side of the James River, described above. Even at its current score, HD63 is not non-compact under Plaintiffs' analysis. PEX50 ¶ 46, *id.* at 70. The changes had minimal effect on the constituency of the district: it had the highest core retention score of all of the Challenged Districts. Tr. 620:19–22; Tr. 720:12–22. As to the split of Dinwiddie County, the line was carefully negotiated and agreed to by Delegates Dance and Tyler for *political* reasons: Tyler wanted to improve the Democratic performance of her district, and Dance to draw out a potential primary opponent. Defs. Br. at 30–31. Without an alternative map, Plaintiffs cannot dispute any of this.

**HD75:** Plaintiffs' sole complaint about this district is the county split on account of Delegate Tyler's request to swap the Wakefield precinct for the Dendron precinct. Pls. Br. at 18–19. Plaintiffs claim that the swap was made because Dendron is "more heavily African-American" than Wakefield, but *cite nothing* for that claim[7] and ignore Jones's testimony that Delegate Tyler requested the swap because of Wakefield's poor *political* performance for her during the 2005 general election, which she won over a Republican by fewer than 300 votes. Tr. 323:14–324:25. That fact comports with the demographic and electoral evidence, IEX92 at 12–13. Delegate Tyler's general concern over the level of BVAP in her district was political in

---

[7] Plaintiffs cite Tr. 323:14–16, which does *not* speak to the racial demographics of either precinct at issue. Delegate Jones merely stated: "If you see here, the Dendron precinct and then the Wakefield precinct, she requested that we swap those two out.  So we did."

nature, which is not unwarranted given partisan history of HD75, Tr. 322:11–16; 323:19–324:3, and the volume of prison population[8] in the district that cannot vote. Having failed to produce an alternative map, Plaintiffs have no basis for refuting any of this.

**HD77:** Plaintiffs do not identify a single redistricting criterion that was subordinated to race and their challenge should fail on that basis alone. Pls. Br. at 22–23. They claim that racial considerations predominate, but ignore the testimony of their own expert that they had only "slightly larger" impact than political considerations—not to mention *all other criteria* that Dr. Ansolabehere ignored. Tr. 792:8–793:3. The BVAP of HD77 increased by a paltry 1.2 percent from prior to redistricting. PEX50 at 72.

**HD80:** Plaintiffs address one criterion: compactness. Pls. Br. at 23. But HD80 is not (and Plaintiffs do not claim that it is) non-compact, and the district exhibited core retention scores on par with the Plan's average core retention. IEX14 at 81, 84. Further, Plaintiffs fail to take into account the ripple effect of the relocation of HD87 to Northern Virginia, which given the significant under-population of the districts in south of Hampton Roads, meant that HD80, to be contiguous, had to "roll" along the path left behind by HD79 after it acquired population in the space left behind by HD87. Defs. Br. at 34. In light of these dramatic shifts, HD80's high core retention is impressive, IEX14 at 81, and BVAP increased by a measly 1.9 percent, PEX50 at 72.

**HD89:** Plaintiffs address only the slight decline in HD89's Reock score, but its current score is 0.40, which is compact by any standard. Pls. Br. at 24; Defs. Br. at 33–34. The district

---

[8] Plaintiffs claim that Delegate Tyler's concerns about prison population "were exaggerated" because 2012 data shows there were only 7,200 (not 8,000) prisoners in her district. Pls. Br. 34 n.15; *see also* Tr. 798:11–16 (Dr. Ansolabehere testifying that there were about 7,000 prisoners in HD75). Plaintiffs are incorrect. They appear to have neglected to count population in the Lawrenceville prison, which, when included, brings the prison population to more than 8,000 in both 2011 and 2012. Thus, Delegate Tyler's stated belief as to the prison population in her district was reasonable.

21

also retained between 77 and 82 percent of its core, depending on the measure used, indicating that the geographic changes had hardly any impact on the constituency and the continuity of their representation. IEX14 at 81. Plaintiffs have no other evidence even purporting to show departure from redistricting criteria, and, contrary to their contention, Pls. Br. at 24, Dr. Ansolabehere's report shows that the impact of race and politics in the drawing of HD89 were about the same. *See* PEX50 at 77. Moreover, Plaintiffs wholly ignore evidence that HD89's configuration was drawn, in part, to honor the request of the incumbent member to include his small business in his district. Tr. 344:25–345:1–8.

**HD90:**  Plaintiffs do not identify a single redistricting criterion that was subordinated on account of race. *See* Pls. Br. at 24. The sole evidence provided as to HD90 is data from Dr. Ansolabehere's flawed VTD analysis, which does not become relevant without a showing that the House criteria were substantially ignored, and in any case, does not clearly conclude that race predominated over politics in the drawing of HD90. *See* PEX50 at 77.

**HD92:**  Plaintiffs do not identify a single redistricting criterion that was subordinated on account of race. *See* Pls. Br. at 25. HD92 is more compact than in the 2001 plan, it now represents only one political subdivision, it had high core retention, and it eliminated previous VTD splits. Defs. Br. at 35. Plaintiffs rely solely on Dr. Ansolabehere's flawed VTD analysis, which is not relevant absent evidence of a transgression of traditional criteria.

**HD95:** Plaintiffs devote a single paragraph to this district and complain only of its compactness score. Pls. Br. at 25. They ignore Jones's extensive testimony on the district, Tr. 366:23–376:21, and exhibits confirming that the changes were based on political and incumbency-protection considerations, IEX92 at 24, 25. There is no alternative map to show how

22

each and every political purpose Jones was attempting to accomplish could have otherwise been achieved, and Plaintiffs' claim must fail.

## II.   The Plan Is Narrowly Tailored Under Both Sections 2 and 5

The Challenged Districts are narrowly tailored under the Voting Rights Act.

**Section 2.** Plaintiffs' 12-page discussion of narrow tailoring contains a single footnote on Section 2, which advances only two arguments.[9] First, Plaintiffs claim that invocation of Section 2 is a "post hoc" excuse, but the House criteria reference Section 2 explicitly: "Districts shall be drawn in…compliance with protections against unwarranted retrogression or dilution of racial or ethnic minority voting strength." PEX16. Plaintiffs do not dispute that the word "retrogression" refers to Section 5, but inexplicably fail to recognize that the phrase "dilution of racial or ethnic minority voting strength" refers to Section 2. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 43–51 (1986) (recognizing "dilution" claim under Section 2).

Second, Plaintiffs make the remarkable contention that the House has no interest in creating *any* majority-minority districts, in direct contradiction to their enthusiastic representation that *all* the Challenged Districts should be majority-black. Tr. 818:10–17. They argue that no Section 2 claim could be proven without a statistical analysis when, actually, a Section 2 claim can be established by "anecdotal evidence," *McDaniels v. Mehfoud*, 702 F. Supp. 588, 593 (E.D. Va. 1988). This looms all the larger as to the Virginia House because it is categorically impossible to produce a meaningful racial bloc voting analysis without contested primaries, *see Collins v. City of Norfolk, Va.*, 883 F.2d 1232, 1240 (4th Cir. 1989) (*Collins VI*). Contrary to Plaintiffs' assertions, the real world matters in Section 2 cases, as it does in *Shaw* cases, and the Section 2 analysis involves inquiries beyond "bare statistics," such as "how

---

[9] Notably, Plaintiffs have not raised the argument that the Plan is not narrowly tailored under Section 2.

political observers and the candidates themselves" view claims that given candidates are "the minority's preferred candidates of choice." *Collins VI*, 883 F.2d at 1238–39. Plaintiffs cite no authority for the proposition that a majority-minority district cannot be drawn without a pre-redistricting statistical analysis, and the sheer difficulty in conducting such an analysis refutes the notion that such a requirement can or should exist. Tr. 702:1–10.

**Section 5.** Plaintiffs' Section 5 argument, Pls. Br. at 28–31, complains of what Delegate Jones failed to do, evidently assuming a legislature must compile an administrative record before creating a majority-minority district. The Supreme Court has already rejected that argument. *Vera*, 517 U.S. at 966–67; *see also Alabama*, 135 S. Ct. at 1274.

In addition, Plaintiffs' allegation that Jones "performed *virtually no analysis*" is flat wrong. Jones *did* conduct a "functional" analysis as defined by the Department of Justice. *See* 76 F.R. 7470. DOJ considers "[w]hether minority voting strength is reduced," 76 F.R. at 7471, and Jones made sure that BVAP levels were above the level identified by Black Caucus members "to ensure that the voting strength of African-Americans" was protected, Tr. 71:21–72:4. DOJ considers "[w]hether minority concentrations are fragmented among districts," 76 F.R. at 7471–72, and Jones made sure to keep minority communities together, as evidenced by the Challenged Districts' high core retention, Tr. 720:12–22. DOJ considers whether minorities are "overconcentrated in one or more districts," 76 F.R. at 7472, and Jones ensured that the BVAP remained generally stable compared with the Benchmark Plan, that BVAP was reduced in six districts, and that no Challenged District has BVAP over 60.7 percent, PEX50 at 72. DOJ considers whether "alternative plans satisfying the jurisdiction's legitimate governmental interests exist," 76 F.R. at 7472, and Jones reviewed the few plans introduced and found that they did not satisfy the House's criteria. Tr. 378:14–379:7. DOJ considers whether "the proposed

plan departs from objective redistricting criteria" set by the jurisdiction, 76 F.R. at 7472, and Jones was careful to keep the configurations of each district consistent with the criteria. Tr. 308:13–15; 309:22–25; 327:19–23; 338:9–13; 343:3–8; 346:23–347:1; 372:15–18; 357:15–21. Other factors DOJ considers are "compactness and contiguity," which were complied with here, *see* Defs. Br. at 17–19, and whether a configuration "inexplicably disregards available natural or artificial boundaries," which did not occur, *see, e.g.*, Tr. 232:2–26; Tr. 316:15–25; Tr. 331:12–22; Tr. 371:5–12; Tr. 373:22–24; Tr. 375:3–12; Tr. 350:2–9. That is a "functional analysis."

Plaintiffs' arguments are *not* tethered to DOJ's guidelines, and are, in any event, misleading. Jones may not have "compiled" election results, but he "look[ed] at the election results and contested races" in the Challenged Districts. Tr. 453:1–7. Jones did not analyze black "registration rates" because no such rates exist, Tr. 727:3–10, but he *did* consider the low rates of black voter turnout in the Challenged Districts, Tr. 462:12–21. Jones did not review the Senate districts because they did not exist when he was drawing the Plan, and the Senate plan continued to undergo significant changes after HB5001 was vetoed. Tr. 294:19–20. Jones did not review plans from other jurisdictions—why that would be helpful is anyone's guess—but he was well aware of a plan *from Virginia* involving the same districts, which was approved by the Virginia Supreme Court in *Wilkins v. West*. Tr. 280:14–16. Jones did not perform a racially polarized voting analysis because it was not feasible to do so, Tr. 699:11–13; 700:1–5; 701:20–24, but he did review what was available: an analysis of the similar 2001 Plan. Tr. 264:22–265:1–2. The claim that Jones conducted "virtually no analysis" is disingenuous.

## CONCLUSION

For the above-stated reasons, the Court should enter judgment in favor of Defendants and Defendant-Intervenors.

Dated: July 27, 2015

Dalton Lamar Oldham, Jr. (*pro hac vice*)
Dalton L Oldham LLC
1119 Susan Street
Columbia, SC 29210
Tel: (803) 237-0886
dloesq@aol.com

Respectfully Submitted,

/s/ Jennifer M. Walrath
E. Mark Braden (*pro hac vice*)
Jennifer M. Walrath (VSB No. 75548)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates
and Virginia House of Delegates Speaker
William J. Howell*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of July, 2015, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.


Dalton Lamar Oldham, Jr. (*pro hac vice*)
Dalton L Oldham LLC
1119 Susan Street
Columbia, SC 29210
Tel: (803) 237-0886
dloesq@aol.com

/s/ Jennifer M. Walrath
E. Mark Braden (*pro hac vice*)
Jennifer M. Walrath (VSB No. 75548)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates and Virginia House of Delegates Speaker William J. Howell*