# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

GOLDEN BETHUNE-HILL, *et al.*,

        Plaintiffs,

    v.

VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,

        Defendants,

    v.

VIRGINIA HOUSE OF DELEGATES, *et al.*,

        Defendant-Intervenors.

Civil Action No. 3:14-cv-00852-REP-GBL-BMK

## PLAINTIFFS' POST-TRIAL REPLY BRIEF

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................ 1

II.   ARGUMENT ............................................................................................. 1

    A.   The Challenged Districts Are Subject to Strict Scrutiny ....................... 1

        1.   Plaintiffs Are Not Required to Show That Anyone Acted with Invidious Discriminatory Intent to Show That Race Predominated ......... 2

        2.   Plaintiffs Are Not Required to Show That the General Assembly Violated Race-Neutral Criteria to Show That Race Predominated .......... 3

        3.   Plaintiffs Have Identified a Cognizable Injury ......................................... 5

        4.   Plaintiffs Are Not Required to Produce an Alternative Plan .................... 6

        5.   The General Assembly's Use of Mechanical Racial Targets Is Strong Evidence of Racial Predominance................................................. 8

    B.   Defendants' Attacks on Plaintiffs' Circumstantial Evidence Are Meritless ....... 11

    C.   Plaintiffs Have Shown That the General Assembly Subordinated Race-Neutral Criteria to Its Racial Goals in Specific Districts...................................... 14

        1.   House Districts 63 and 75 ...................................................................... 14

        2.   House Districts 69 and 70 ...................................................................... 15

        3.   House District 71 ................................................................................... 16

        4.   House District 74 ................................................................................... 17

        5.   House District 77 ................................................................................... 18

        6.   House District 80 ................................................................................... 18

        7.   House District 89 ................................................................................... 19

        8.   House District 90 ................................................................................... 20

        9.   House Districts 92 and 95 ...................................................................... 21

    D.   Because the Challenged Districts Are Not Narrowly Tailored to Advance a Compelling State Interest, They Violate the Equal Protection Clause ................ 22

        1.   Defendants Cannot Rely on Section 2 of the Voting Rights Act............. 22

        2.   Defendants Cannot Rely on Section 5 of the Voting Rights Act............. 22

III.   CONCLUSION.......................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Ala. Leg. Black Caucus v. Alabama*,
   989 F. Supp. 2d 1227 (M.D. Ala. 2013) .................................................................................11

*Alabama Leg. Black Caucus v. Ala.*,
   135 S. Ct. 1257 (2015) ................................................................................................... passim

*Bush v. Vera*,
   517 U.S. 952 (1996) .........................................................................................................4

*Easley v. Cromartie*,
   532 U.S. 234 (2001) ..........................................................................................6, 7, 8, 12

*Hays v. State of La.*,
   839 F. Supp. 1188 (W.D. La. 1993) ...............................................................................2, 4, 7

*Miller v. Johnson*,
   515 U.S. 900 (1995) ................................................................................................... passim

*Page v. Va. St. Bd. of Elections*,
   No. 3:13cv678, 2015 WL 3604029 (E.D. Va. June 5, 2015) ........................................... passim

*Shaw v. Hunt*,
   517 U.S. 899 (1996) ................................................................................................... passim

*Shaw v. Reno*,
   509 U.S. 630 (1993) .........................................................................................2, 3, 5, 23

*Smith v. Beasley*,
   946 F. Supp. 1174 (D.S.C. 1996) ................................................................................ passim

*United States v. Hays*,
   515 U.S. 737 (1995) .........................................................................................................6

*Wayte v. United States*,
   470 U.S. 598 (1985) .........................................................................................................2

## I.      INTRODUCTION

As Plaintiffs noted in their opening post-trial brief ("Pl. Br.") (Dkt. 105), the record before this Court contains overwhelming direct and circumstantial evidence that race predominated in the configuration of the Challenged Districts. Moreover, Defendants and Defendant-Intervenors (collectively, "Defendants") cannot identify a compelling state interest justifying that race-based redistricting. Even if they could, Defendants could not show that the use of a predetermined, across-the-board racial threshold was narrowly tailored to advance that interest. Nothing in Defendant-Intervenors' post-trial brief ("Def. Br.") (Dkt. 104) changes that analysis. The Challenged Districts, accordingly, violate the Equal Protection Clause.

## II.      ARGUMENT

### A.      The Challenged Districts Are Subject to Strict Scrutiny

The record is replete with evidence that race predominated in the drawing of the Challenged Districts: The House's official declaration of redistricting policy literally and explicitly ranks racial considerations above all others; Virginia's preclearance submission acknowledges that the General Assembly sought to create 12 majority-minority districts at or above 55% Black Voting Age Population ("BVAP"); Delegate Chris Jones, the chief map-drawer, repeatedly confirmed the primacy of race during the redistricting process (as did several of his colleagues, including Delegate Lionell Spruill); the overriding importance of race was confirmed by the trial testimony of several participants in the redistricting process; and—last but certainly not least—the General Assembly "expressly adopted and applied a policy of prioritizing mechanical racial targets" for every Challenged District. *Ala. Leg. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1267 (2015). That *direct evidence* leaves little doubt that race was the single most important factor in drawing the Challenged Districts, and the equally clear *indirect evidence*—discussed in more detail below—confirms that race predominated.

- 1 -

Hoping to escape that conclusion, Defendants, in their post-trial brief, both misstate the law and misrepresent the evidence at trial. Neither approach is persuasive.

### 1. Plaintiffs Are Not Required to Show That Anyone Acted with Invidious Discriminatory Intent to Show That Race Predominated

Defendants again argue that Plaintiffs must show that Delegate Jones and his colleagues—including, presumably, the *African-American* delegates who voted to enact the Challenged Districts—were "'motivated by a discriminatory purpose.'" Def. Br. at 2 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). It is time to put that misguided argument—which is tellingly untethered from cases about *redistricting*—to rest.

Invidious intent is not an essential element of a *Shaw* claim. In *Shaw v. Reno* ("*Shaw I*"), for example, the Supreme Court addressed a challenge to "race-based state legislation designed to benefit"—not discriminate against—"members of historically disadvantaged racial minority groups." 509 U.S. 630, 633 (1993). The Supreme Court "conclude[d] that [plaintiffs] have stated a claim upon which relief can be granted under the Equal Protection Clause." *Id*. at 642. The mere fact that the districts were (purportedly) drawn to help minority voters was irrelevant; "district lines obviously drawn for the purpose of separating voters by race require careful scrutiny under the Equal Protection Clause *regardless of the motivations underlying their adoption*." *Id*. at 645 (emphasis added). Subsequent courts have reiterated that holding. *See Page v. Va. St. Bd. of Elections* ("*Page II*"), No. 3:13cv678, 2015 WL 3604029, at *1 (E.D. Va. June 5, 2015) (the court did not "question that all attempted to act appropriately under the circumstances as they understood them to be at the time," but race predominated); *Smith v. Beasley*, 946 F. Supp. 1174, 1208 (D.S.C. 1996) (the court did not "question the good faith of the legislature," but race predominated); *Hays v. State of La.* ("*Hays I*"), 839 F. Supp. 1188, 1195 (W.D. La. 1993) (race predominated because "[w]hatever the *motivations* of the Legislature or of

the individual legislators who passed the Plan, the evidence overwhelmingly indicates that the *specific intent* of the Legislature . . . was indisputably to enact a plan that included two black and five white majority districts"), *vacated on other grounds*, 512 U.S. 1230 (1994).[1]

In any case, even on Defendants' flawed understanding of the governing law, plaintiffs must establish invidious intent *only* in the absence of "an overtly discriminatory classification." Def. Br. at 2 n.1 (internal quotation marks and citation omitted). But all agree that this case involves an overtly discriminatory classification: Defendants *stipulated* that the General Assembly intended to draw districts with 55% or more *Black* Voting Age Population. *See* Tr. 74:19-23. That overtly racial "floor" did not classify voters according to their partisan preferences or where they lived. It classified voters based on the *color of their skin*—nothing else. Thus, Plaintiffs need not show that anyone acted with discriminatory intent because "[e]xpress racial classifications are immediately suspect." *Shaw I*, 509 U.S. at 642.

### 2. Plaintiffs Are Not Required to Show That the General Assembly Violated Race-Neutral Criteria to Show That Race Predominated

Defendants also claim that Plaintiffs must prove that the General Assembly *violated* traditional districting principles to show that the General Assembly "*subordinated* traditional race-neutral districting principles . . . to racial considerations." *Miller*, 515 U.S. at 916 (emphasis added). Defendants' "violation-equals-subordination" argument is misplaced and wrong.

Defendants' argument is misplaced because Plaintiffs have produced extensive evidence showing that the General Assembly did, in fact, violate traditional criteria in every Challenged District. *See* Pl. Br. at 17-25; *infra* at 14-22. Thus, even on Defendants' view of the law, Plaintiffs have more than met their burden of showing that race predominated.

---

[1] Of course, in making this argument, Plaintiffs acknowledge that racial predominance requires a showing that the General Assembly pursued a "racial purpose or object." *Miller v. Johnson*, 515 U.S. 900, 913 (1995). But that racial purpose need not be racial animus.

More importantly, Defendants' argument is just wrong. So far as Plaintiffs can tell, it is based almost entirely on *Bush v. Vera*, in which the Supreme Court struck down three Texas congressional districts as illegal racial gerrymanders. *See* 517 U.S. 952, 962 (1996). Defendants focus in particular on language from *Bush*'s plurality opinion, in which Justice O'Connor observes that "the neglect of traditional districting criteria is merely necessary, not sufficient," and that "[f]or strict scrutiny to apply, traditional districting criteria must be *subordinated to race.*" *Id.* (cited at Def. Br. at 4). That thin reed does not begin to support Defendants' argument.

**First**, *Shaw* plaintiffs can establish racial predominance without *any* showing that traditional criteria were violated. That issue was definitively resolved in *Miller*, where the Supreme Court held that "parties alleging that a State has assigned voters on the basis of race are neither confined in their proof to evidence regarding the district's geometry and makeup nor required to make a threshold showing of bizarreness." 515 U.S. at 915. Thus, Plaintiffs may prove racial predominance "*either* through circumstantial evidence of a district's shape and demographics *or more direct evidence going to legislative purpose.*" *Id.* at 916 (emphasis added). At the peril of stating the obvious, if Plaintiffs are not required to present *any* evidence regarding "a district's shape and demographics," then Plaintiffs most assuredly are not required to catalogue every instance in which the General Assembly violated "traditional" criteria.[2]

**Second**, to accept Defendants' argument would be to eviscerate the Equal Protection Clause in the redistricting context. If, as Defendants argue, the only way to trigger strict scrutiny is to show that a district openly violates "traditional" criteria, then a legislature could announce

___

[2] Defendants try to skirt that key holding in *Miller*, relegating it to one misleading footnote. *See* Def. Br. at 5 n.3. They also fail to cite, much less distinguish, the many post-*Miller* cases applying that key holding. *See, e.g.*, *Page II*, 2015 WL 3604029, at *10 (race predominated based on direct evidence); *Hays I*, 839 F. Supp. at 1195, 1204 (when "uncontroverted *direct* trial evidence establishes [a] racial classification" at work in the redistricting process, then a court "need not even consider the kind of indirect or inferential proof approbated in *Shaw*").

that race was its *only* purpose, yet avoid strict scrutiny by manufacturing after-the-fact justifications for the shape of a district based on inherently malleable criteria like "core retention" and "communities of interest." But that is not the law. Even a perfectly compact district that respects political subdivisions is subject to strict scrutiny if—like the districts at issue here—it is based on an expressly racial classification. *See Shaw I*, 509 U.S. at 642 ("Express racial classifications are immediately suspect.").

**Third**, Defendants read too much into *Bush*'s carefully limited language. *Bush* does not hold that plaintiffs must identify specific "violations" or "transgressions" of traditional criteria. Instead, it holds that race predominates if race "ha[s] a *qualitatively greater influence* on the drawing of district lines" than other factors. *Bush*, 517 U.S. at 969 (emphasis added). Plaintiffs respectfully submit that race undeniably has "a qualitatively greater influence" where, as here, the legislature's racial goals were "baked into" the process from the beginning, and race was the only "criterion that . . . could not be compromised." *Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 907 (1996). *See also Page II*, 2015 WL 3604029, at *9 (race predominated where legislators "were conscious of maintaining a 55% BVAP floor"); *Smith*, 946 F. Supp. at 1210 (same).

### 3. Plaintiffs Have Identified a Cognizable Injury

Defendants also contend that Plaintiffs do not allege a cognizable injury under *Shaw I* and its progeny because those cases forbid only "race-based redistricting that fails to account for geography and communities," Def. Br. at 8, and Plaintiffs have "no meaningful concerns about the real-world composition of the Challenged Districts," *see id* at 7.

Defendants' unsupported musings about what Plaintiffs think are flatly wrong. They are also contradicted by the evidence at trial, much of which illustrates Plaintiffs' "concerns about the real-world composition of the Challenged Districts," and shows that the Challenged Districts "should be drawn in a meaningfully different form." *Id*. at 7-8.

Defendants are equally wrong on the law. The *Shaw* cases do not merely forbid "race-based redistricting that fails to account for geography and communities." *Id*. at 8. They prohibit *all* unjustified race-based redistricting, whatever form it may take. *See Miller*, 515 U.S. at 913 (explaining that "[s]hape is relevant" not because it has constitutional significance but "because it may be persuasive circumstantial evidence that race . . . was the legislature's dominant and controlling rationale in drawing its district lines"); *United States v. Hays*, 515 U.S. 737, 744 (1995) (voters suffer stigmatization and representational harms when they are placed in districts meant "to effectuate the perceived common interests of one racial group") (internal quotation marks and citation omitted).

It follows that anyone who "resides in a racially gerrymandered district . . . has been denied equal treatment because of the legislature's reliance on racial criteria[.]" *Id*. at 744-45. Here, each Plaintiff lives in a Challenged District, and the Challenged Districts were racially gerrymandered. Plaintiffs have therefore articulated a quintessential *Shaw* injury.

### 4.      Plaintiffs Are Not Required to Produce an Alternative Plan

Finally, Defendants argue that Plaintiffs' claims fail because Plaintiffs did not submit a "meaningful alternative to Jones's Plan"—that is, an alternative plan. Def. Br. at 9 (citing *Easley v. Cromartie*, 532 U.S. 234, 258 (2001)). That argument fares no better.

***First***, Defendants fail to address the long line of cases that contradict their argument. If it is true, as Defendants argue, that an alternative plan is the *sine qua non* of a successful *Shaw* claim, then one would expect to find many cases rejecting *Shaw* claims for lack of such a plan. But Defendants cite no such cases. And they do not even try to explain the cases in which plaintiffs did not produce an alternative plan but the courts nevertheless held that race predominated. *See, e.g.*, *Bush*, 517 U.S. at 969-70; *Miller*, 515 U.S. at 919; *Smith*, 946 F. Supp. at 1210; *Hays I*, 839 F. Supp. at 1191. The silence is deafening.

- 6 -

*Second*, and relatedly, the logical implication of Defendants' argument is that every *Shaw* claim rises and falls on the merits of circumstantial evidence. But time and again, courts have held that direct evidence alone may establish racial predominance. *See supra* at 4 n.2. That route was not open to the *Easley* Court because there was no persuasive direct evidence of racial predominance in that case. *See Easley*, 532 U.S. at 253. This case is significantly different because the direct evidence of racial predominance is overwhelming. And *Easley* certainly did not hold that where, as here, there is overwhelming direct evidence of racial predominance, the court must nevertheless close its eyes to that evidence absent an alternative plan.

*Third*, even according to Defendants, plaintiffs need not produce an alternative plan in *every* case. Ultimately, the purpose of an alternative plan is to help determine whether "racial identification" or "political affiliation" had a greater effect on the legislature's decisions. *Easley*, 532 U.S. at 258. Here, however, Defendants do not claim that partisanship played a role. Delegate Jones expressly disclaimed partisan motives, *see* Tr. 483:1-2, and Defendants effusively praise Delegate Jones for pursuing "*supermajority bipartisan* support," Def. Br. at 1 (emphasis added).[3] Thus, there is no need to disentangle the effects of race and political affiliation because political affiliation was not a factor in Delegate Jones's decision-making. *See Alabama*, 135 S. Ct. at 1267 (*Easley* applies in the absence of direct evidence and where "the State argues that politics, not race, was its predominant motive"); *Page II*, 2015 WL 3604029, at *14 (accepting map-drawer's denial of partisan motivations).

---

[3] In addition, Delegate Jones testified about the many times he drew lines to help, not hurt, his political opponents. *See, e.g.*, Tr. 304:11-25, 311:14-312:2, 369:22-370:1 (avoided pairing Democratic incumbents); *id.* 317:13-17 (removed Republican-leaning precincts from Republican district); *id.* 326:2-15 (purportedly drew district to eliminate primary opponent for Democratic incumbent); *id.* 345:24-346:6 (granted Democratic incumbent's request to redraw district).

Even if Delegate Jones had not removed politics from the equation, an alternative plan would still be unnecessary. An alternative plan may help disentangle the effects of race and political affiliation *when those variables are highly correlated. See Easley*, 532 U.S. at 258. But here, Professor Ansolabehere analyzed the racial and partisan composition of the areas moved into and out of the Challenged Districts and showed that race and party were *not* highly correlated: "In every area BVAP is a statistically significant predictor of the likelihood that a VTD ends up in one of the Challenged Districts." Pl. Ex. 50 at 44, ¶ 120. "Party," in contrast, "is not a statistically significant predictor of whether a VTD is included in one of the Challenged Districts in each of the areas." *Id*. at 44, ¶ 121. Defendants quibble with that analysis, *see infra* at 11-12, but nowhere do they directly challenge Professor Ansolabehere's conclusions.

**Fourth**, there *are* alternative plans in this case. This Court may look to both HB 5002 and HB 5003, *see* Pl. Exs. 56-59, and the alternative plans from Virginia's bipartisan redistricting commission, *see* Pl. Ex. 23. Thus, there is no shortage of alternative plans against which to compare the Enacted Plan if this Court deems that comparison necessary.

### 5.   The General Assembly's Use of Mechanical Racial Targets Is Strong Evidence of Racial Predominance

Defendants stipulated at trial that the General Assembly set out to ensure that each and every one of the Challenged Districts would have at least 55% BVAP. *See* Tr. 74:19-23. There were no other criteria (save population equality) that were equally nonnegotiable. It is therefore beyond dispute—indeed, it is stipulated—that the General Assembly "adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria." *Alabama*, 135 S. Ct. at 1267. That admitted use of racial targets, in turn, "provides evidence that race motivated the drawing of particular lines in multiple districts in the State." *Id*.

- 8 -

Defendants argue that the admitted use of a 55% BVAP target "says nothing as to whether" race predominated. Def. Br. at 10. But the Supreme Court's language could not be more clear: the use of "mechanical racial targets . . . provides evidence that race motivated the drawing of particular lines in multiple districts in the State." 135 S. Ct. at 1267. In fact, evidence of a fixed racial threshold, when coupled with other direct and circumstantial evidence like the evidence in this case, amounts to "*strong, perhaps overwhelming*, evidence that race did predominate as a factor." *Id*. at 1271 (emphasis added). Nor is that a new and surprising rule. It has been applied both in this district, *see Page II*, 2015 WL 3604029, at *9 (use of 55% BVAP floor to draw congressional district was compelling evidence that race predominated), and elsewhere, *see Smith*, 946 F. Supp. at 1210 (race predominated because legislature "insist[ed] that all majority-minority districts have at least 55% BVAP").

In truth, Defendants have no real answer to *Alabama*, *Page II*, or *Smith*, so they obfuscate. Rather than defend the racial target itself (which is indefensible), they claim that there is no evidence that the target "had a direct and significant impact on the drawing of actual lines." Def. Br. at 11 (internal quotation marks and citation omitted). But that, rather plainly, isn't so. Putting aside the extensive circumstantial evidence discussed below and in Plaintiffs' opening post-trial brief, examples of how the 55% BVAP floor affected district lines abound:

- Delegate Jones repeatedly advocated for the 55% BVAP target during the redistricting process, and *rejected alternative plans because they did not comply with that target*, *see* Pl. Ex. 35 at 39:15-40:6, 40:18-41:5, 69:12-70:10;

- Delegate Jones testified that he made extensive efforts to ensure that District 75 met or exceeded the 55% BVAP floor, *see* Tr. 322:6-12, and Senator Rosalyn Dance testified that large swaths of her former district (District 63) were ceded to District 75 solely for that racial reason, *see id*. 80:9-10; and

- Delegate Jennifer McClellan, who helped Delegate Jones draw the Richmond-area districts, testified that her "understanding [of] the way criteria two [in the House Criteria] was to be implemented was that each of the majority minority districts would have to have a black voting-age population of at least 55 percent," Tr. 33:2-5.

- 9 -

And, of course, there is the proof in the proverbial pudding:  After the redistricting process, all of the Challenged Districts met or exceeded the 55% BVAP floor.[4]

Defendants also argue that the admitted use of a 55% BVAP target "suggests little if anything" about the role of race because that goal was "nearly accomplished from its inception and [was] otherwise not difficult to achieve." Def. Br. at 11. Not 10 pages later, however, Defendants argue that maintaining 12 majority-minority districts—let alone maintaining all of those districts *with 55% BVAP*—was anything but a foregone conclusion. According to Defendants, "11 of 12 [Challenged Districts] were underpopulated"; "half were underpopulated by over 10 percent"; and the 12 Challenged Districts "had only enough population to draw 11 districts." *Id*. at 20. Delegate Jones overcame those challenges and achieved his racial goals, but only after devoting "hundreds of hours" to the task, *id*. at 1, and only after resorting to a variety of creative measures, including extracting tens of thousands of predominantly African-American voters from some Challenged Districts to increase the BVAP in other Challenged Districts. *See infra* at 16-17. In short, the suggestion that the ultimate racial composition of the Challenged Districts was all but inevitable is, to put it delicately, not credible.[5]

---

[4] At trial, Defendants sought to show that Delegate Jones relied on a slightly different racial threshold calculated with a slightly different mathematical method with respect to a few districts, suggesting that somehow blunted the force of the General Assembly's admitted use of a 55% BVAP floor. During Plaintiffs' rebuttal case, Professor Ansolabehere effectively disposed of that theory. *See* Tr. 746-757. Defendants' post-trial brief does not even attempt to revive it.

[5] Defendants continue to argue that only a "hard and fast" BVAP "rule" triggers strict scrutiny. Def. Br. at 12. As Plaintiffs have noted, *see* Pl. Br. at 13-14, that argument invites this Court down the very path that led to reversal in *Alabama*. *See Ala. Leg. Black Caucus v. Alabama*, 989 F. Supp. 2d 1227, 1294, 1295 (M.D. Ala. 2013) (race did not predominate in part because the "Legislature avoided reducing significantly the proportion of black persons in each majority black district, *but it followed no bright-line rule*" and "*employed no quota*") (emphasis added), *vacated and remanded*, 135 S. Ct. 1257, 1263 (2015) (legislature's use of racial targets to "maintain roughly the same black population percentage" strongly suggested that race predominated). This Court should politely decline Defendants' invitation to error.

**B.      Defendants' Attacks on Plaintiffs' Circumstantial Evidence Are Meritless**

Perhaps realizing that the direct evidence of racial predominance is overwhelming, Defendants focus most of their fire on Plaintiffs' circumstantial evidence and Plaintiffs' expert, Professor Ansolabehere. Those arguments need not detain this Court long.

*First*, Defendants argue that Professor Ansolabehere's statistical analyses considering the Challenged Districts collectively are entirely irrelevant. *See* Def. Br. at 14. The Supreme Court disagrees, *see Alabama*, 135 S. Ct. at 1265, and Defendants themselves rely on similar analyses when it suits their purposes, *see, e.g.*, Def. Br. at 17, 20-22.

*Second*, Defendants fault Professor Ansolabehere for not reading legislative materials, not knowing more about Virginia communities, and not talking to legislators. *See* Def. Br. at 13. Of course, the same could be said of Defendants' experts. *See, e.g.*, Tr. 546:17-547 (Professor Jonathan Katz did not review redistricting floor debates, did not read Virginia's preclearance submission, and did not speak to legislators); *id*. 515:6-7 (Professor Katz is "not an expert in Virginia political or social geography"). In any case, Defendants have never explained how that sort of information could have or should have changed Professor Ansolabehere's analyses.

*Third*, Defendants criticize Professor Ansolabehere's racial sorting analysis, which shows that race, not political affiliation, much more powerfully explains the assignment of Voting Tabulation Districts ("VTDs"). They argue, for example, that Professor Ansolabehere failed to opine as to whether "race predominated over any factor other than party politics," such as "social factors [and] cultural factors." Def. Br. at 15. But the purpose of Professor Ansolabehere's analysis was to analyze the two variables at issue in *Easley*: "racial identification" and "political affiliation." *Easley*, 532 U.S. at 253. The fact that Professor Ansolabehere did not also try to quantify the effect of other (unquantifiable) variables like "social factors" and "cultural factors" is wholly beside the point.

- 11 -

Defendants also complain that Professor Ansolabehere's racial sorting analysis fails to account for geographical constraints on the General Assembly's ability to sort VTDs. *See* Def. Br. at 15-16. To the contrary, Professor Ansolabehere carefully controlled for those limitations by analyzing VTD sorting within specific regions. *See* Tr. 786:8-792:12. Professor Katz, in contrast, tried to control for those limitations with a simple proximity test—that is, "by finding the geographic center of the district and then measuring distance of VTDs from that center." Tr. 786:8-10. But that approach fails both as a matter of statistical analysis and common sense. All agree that many of the Challenged Districts are not compact. As a result, simple proximity to the center of a given district is a poor proxy for determining which VTDs were potential candidates for that district. *See id*. 786:12-15. And Professor Katz's method, unlike Professor Ansolabehere's method, bizarrely assumes that any VTD in the Commonwealth could have been included in the Challenged Districts. *See id*. 786:15-19. Moreover, Professor Katz admitted that his method is subject to the very same critique that Defendants level against Professor Ansolabehere's method: it "doesn't account for any other reasons we might want to include or not include a . . . VTD in a district." *Id*. 509:12-14.

Defendants' last objection to Professor Ansolabehere's racial sorting analysis is that it "indicates that race was predominant over politics in only a handful of the Challenged Districts." Def. Br. at 16. To the contrary, Professor Ansolabehere found that race predominated in the Challenged Districts collectively *and* individually. As his expert report shows, the BVAP in the 61 VTDs moved into the Challenged Districts was 41.6%, while the BVAP in the 36 VTDs moved out was 29.0%—a ***12.6%*** difference. The partisan difference between those two groups of VTDs was only about ***6%***. *See* Pl. Ex. 50, tbl. 6A, 6B; *see also id*. at 30-31, ¶¶ 84-87. Defendants do not dispute those conclusions or the stark pattern of intentional racial sorting that they reveal.

- 12 -

*See* Tr. 789:24-790:2. Similarly, in his district-specific analysis, Professor Ansolabehere found that "race was a predominate factor in the movement of VTDs in and out in most of the districts, and it was a larger factor than partisanship." Tr. 792:13-15; *see also* Pl. Ex. 50, tbl. 8. Defendants do not dispute that conclusion either.

*Fourth*, Defendants argue that Professor Ansolabehere's compactness analysis is worthless because compactness measures are "hardly scientific." Def. Br. at 18. But courts are not so willing to toss aside that criterion. *See Page II*, 2015 WL 3604029, at *33 (Payne, J., dissenting) (compactness is a "crucial variable" in the predominance inquiry). And many of the Challenged Districts (including, for example, Districts 63, 80, and 95) raise red flags even under Defendants' preferred compactness measure—that is, the "eyeball" measure. *See* Def. Br. at 18.

*Fifth*, and finally, Defendants attack Professor Ansolabehere's qualifications, referring to him derogatively as a "CBS News analyst" while extolling Professor Katz as a "renowned expert in applied statistics." *Id*. at 1-2, 18. In fact, Professor Ansolabehere is a professor of Government at Harvard University. *See* Pl. Ex. 50 at 88. He has published extensively in the areas of redistricting and racially polarized voting, *see id*. at 89-97, and has been retained by the Department of Justice as a redistricting expert, *see* Tr. 746:2-11. And while the brigade of experts summoned by Defendants surely quibbled with some of Professor Ansolabehere's conclusions, none of them questioned the integrity or accuracy of his analyses.[6]

Defendants' many and varied attempts to impugn Plaintiffs' circumstantial evidence, in short, only serve to highlight the compelling nature of that evidence.

---

[6] Professor Katz, by comparison, made a fundamental error: He failed to account for the fact that delegates Joseph Morrissey and Betsy Carr, while white, were nonetheless African-Americans' candidates of choice in the elections he studied. As a result, Professor Katz seriously underestimated the likelihood of minority-preferred candidates being elected with 50% BVAP in the Challenged Districts. *See* Tr. 769:11-771:24.

- 13 -

**C.    Plaintiffs Have Shown That the General Assembly Subordinated Race-Neutral Criteria to Its Racial Goals in Specific Districts**

Apart from their unsuccessful attempts to undermine Plaintiffs' evidence that the General Assembly's overarching racial goals caused race to predominate in all of the Challenged Districts, Defendants also try to rebut Plaintiffs' extensive district-specific evidence. That effort fails at the most fundamental level.

**1.    House Districts 63 and 75**

At trial, Senator Rosalyn Dance (who formerly represented District 63) testified that race played a predominant role in the configuration of Districts 63 and 75. In particular, she testified that large swaths of Dinwiddie County were removed from the southern part of District 63 and added to District 75, represented by Delegate Roslyn Tyler, for one reason: "to try to get [Delegate Tyler's] number up to 55 percent [BVAP]." Tr. 80:9-10. She also testified that the snake-like appendage added to District 63's northeastern corner, which allowed District 63 to incorporate heavily African-American communities around Hopewell, was driven by race: "And then I picked up the concentration of African-Americans in Hopewell." *Id*. 81:18-21. Defendants devote more than four pages to Districts 63 and 75, but somehow fail to confront or even address that testimony, hoping their silence might lull this Court into overlooking the same.

Delegate Jones confirmed Senator Dance's testimony. He admitted that he tried mightily to increase the BVAP of District 75, *see* Pl. Br. at 18, a goal he accomplished in part by removing much of Dinwiddie County from District 63 (see above) and by replacing the Wakefield precinct (13.7% BVAP) with the Dendron precinct (42.4% BVAP), *see* Pl. Ex. 63 at 94-95, ll. 1650, 1659. Delegate Jones agreed to the Wakefield-Dendron swap even though it conflicted with traditional districting criteria. *See* Pl. Br. at 19.

As a result of these and other race-based choices, District 63's Reock score dropped more than any other district in the Enacted Plan, *see id.* at 17-18, while District 75 saw the greatest increase in split VTDs in the entire Enacted Plan, *see id.* at 19. The results are stark under any measure of compactness, including Defendants' preferred "eyeball" measure:

| TABLE 1: BOUNDARIES OF DISTRICT 63 BEFORE AND AFTER REDISTRICTING[7] |
|---|

| BEFORE | AFTER |
|:---:|:---:|
|  |  |

Of course, Defendants are likely correct that Delegate Jones also considered non-racial factors to some degree. "[B]ut the fact '[t]hat the legislature addressed these interests [need] not in any way refute the fact that race was the legislature's predominant consideration,'" *Page II*, 2015 WL 3604029, at *13 (quoting *Shaw II*, 517 U.S. at 907), where, as here, the evidence shows "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," *Miller*, 515 U.S. at 916.

### 2.    House Districts 69 and 70

With respect to District 69, Defendants' main argument is that the district increased in compactness and retained its "core." *See* Def. Br. at 23. But District 69 became more compact only by incorporating heavily African-American communities at the outskirts of the benchmark district—even though African-Americans have long been able to elect their candidates of choice in District 69, and even though there is no racially polarized voting there. *See* Pl. Br. at 19.

---

[7] All images in this brief are taken from DI Ex. 98.

With respect to District 70, Defendants' main argument is that the General Assembly "mov[ed] most of its precincts to Henrico County to better align the suburban interest." Def. Br. at 23. But that is just Defendants' oblique way of admitting that the core of District 70 was not preserved; rather, District 70 was reconfigured from an urban district centered in Richmond to a suburban district centered in Chesterfield County. *See* Pl. Br. at 19. Even more telling, although District 70 was not underpopulated before the redistricting process, the General Assembly added about 26,000 people and removed about 26,000 people in redrawing the district. The end result of that unnecessary population shift was a major increase in BVAP in other districts—mainly District 71—engineered by removing African-American voters from District 70. *See id*. at 20.

### 3.    House District 71

At trial, Delegate Jennifer McClellan testified that her district was impacted by the 55% BVAP target in several concrete ways. At the most general level, neither Delegate McClellan nor Delegate Jones so much as discussed potential configurations that fell below the 55% threshold because Delegate McClellan understood (as a result of her conversations with Delegate Jones) that "for the 69th, 70th, and 71st and 74th districts, we would have to meet a 55 percent black voting-age population." Tr. 29:10-13. As Delegate McClellan testified, she and her colleagues viewed that requirement as a nonnegotiable framework within which all other decisions had to be made: "My understanding [of] the way criteria two [in the House Criteria] was to be implemented was that each of the majority minority districts would have to have a black voting-age population of at least 55 percent." *Id*. 33:2-5.

Delegate McClellan also testified that Delegate Jones's insistence on a minimum racial threshold drove many specific decisions:  the refusal to fully resolve certain split precincts, as requested by local election officials; the removal of the predominantly white (but reliably Democratic) precinct 207, which had resided in District 71 for decades; and the addition of

heavily African-American communities to replace the loss of the heavily white population in precinct 207. *See* Pl. Br. at 20-21. Notably, those decisions to augment the African-American population in District 71 were made even though there is no racially polarized voting in that district, and even though African-Americans' candidate of choice—Delegate McClellan—had handily defeated a white challenger with more than 80% of the vote in 2009, when the BVAP in the district was below 55%. *See id*. at 36.

Lastly, Professor Ansolabehere showed that the BVAP of areas moved into District 71 was 50.8% greater than the BVAP of areas moved out of District 71, clearly indicating an intent to increase the BVAP in District 71. *See id*. at 21. In response, Defendants argue that "it would be hard to imagine anything else occurring" given that District 71 had fallen below 50% BVAP and was "bordered on [on three sides with] districts with much higher BVAP levels." Def. Br. at 25. The first point further confirms that race was the General Assembly's predominant concern in District 71. And the second point does nothing to explain the *magnitude* of the difference in BVAP between the areas moved into and the areas moved out of District 71.

### 4.      House District 74

Defendants' defense of District 74 is both conclusory *and* contradicted by the record. Contrary to Defendants' arguments, District 74 was not maintained in its previous form. Even though District 74 was not underpopulated, the General Assembly added about 16,000 people to the district and removed about that same number. *See* Pl. Ex. 50, tbl. 5. Much like the massive population swap in District 70, the population swap in District 74 served the General Assembly's racial goals by extracting African-American voters from District 74 and injecting them into other Challenged Districts, especially District 71. *See id.* at 36, ¶ 102 ("Again, in order to accommodate the increase in BVAP in [District] 71, [Districts] 70 and 74 gave up areas with high concentrations of adult African Americans.").

- 17 -

### 5.    House District 77

Defendants argue that race did not predominate in District 77 because it was drawn to maintain the political strength of the incumbent, Delegate Lionell Spruill, and Delegate Jones, whose district borders District 77. *See* Def. Br. at 33. But the evidence shows that those goals were pursued only to the extent that they did not conflict with racial goals.

Even though District 77 was only underpopulated by 3,000 people before the redistricting process, the General Assembly moved more than 20,000 persons into the district and more than 18,000 persons out of the district. *See* Pl. Br. at 23. The BVAP of areas moved into the district was much higher than the BVAP of areas moved out of the district. *See id*. As a result, the BVAP in District 77 increased from 57.6% to 58.8%. *See* Pl. Ex. 50, tbl. 4.[8]

Defendants try to explain away these race-based changes by chalking them up to requests made by Delegate Spruill. *See* Def. Br. at 32-33. But it is undisputed that Delegate Spruill asked Delegate Jones to make sure his district met or exceeded the 55% BVAP floor. *See* Tr. 490:10-13. Delegate Jones and Delegate Spruill did cooperate in redrawing District 77. But that fact does not undermine Plaintiffs' claims—it strengthens them.

### 6.    House District 80

Defendants argue that there is "nothing suggesting racial predominance over traditional redistricting principles" in District 80. Def. Br. at 34. The record stands in stark contrast.

---

[8] In a misguided attempt to rebut the compelling evidence of racial sorting in District 77, Defendants claim that five "predominantly white" precincts were moved into District 77: Indian River, Norfolk Highlands, Oaklette, Tanglewood, and Johnson Park. Def. Br. at 32-33. That claim is misleading because most of those precincts had sizable African-American populations. Specifically, Indian River had 39.7% BVAP, Oaklette had 44.0% BVAP, and Johnson Park had 41.5% BVAP. *See* Pl. Ex. 63 at 106-07, ll. 1824, 1830, 1832. By contrast, one of the precincts removed from District 77—Airport—had a BVAP of only 31.7%. *See id.* at 133-34, l. 2257. Not surprisingly, the end result of that pattern was an increase in the BVAP of District 77, even though District 77 had long been a safe district for minority-preferred candidates.

The areas moved out of District 80 and into other Challenged Districts had an astronomically high BVAP of 78.1%. In contrast, the areas moved out of District 80 and into *unchallenged* districts had a 30.4% BVAP. *See* Pl. Ex. 50, tbl. 9. In other words, the racial sorting followed a now-familiar pattern: African-Americans were extracted from District 80 to increase BVAP elsewhere. As a result, District 80's Reock score plummeted by 33%. *See id.*, tbl. 2. Defendants' preferred "eyeball" measure tells a similar tale:

---

TABLE 2: BOUNDARIES OF DISTRICT 80 BEFORE AND AFTER REDISTRICTING

BEFORE                                          AFTER



---

Defendants make much of the fact that District 80 bypasses one predominantly African-American precinct. *See* Def. Br. at 34. But they fail to mention that District 80 winds its way around low BVAP precincts like Silverwood (14.9%), Churchland (8.3%), and Fellowship (14.2%) to capture high BVAP precincts such as Yeates (56.3%) and Taylor Road (48.8%). *See* Pl. Ex. 63 at 106-07, ll. 1810, 1827, 1833, 1841; *id.* at 133-34, l. 2269.

**7.    House District 89**

Defendants airily dismiss any attack on District 89 because it is purportedly "a virtual replica of the 2001 version." Def. Br. at 33. But merely showing the shapes of District 89 before and after the redistricting process is enough to rebut that argument:

- 19 -

---

**TABLE 3: BOUNDARIES OF DISTRICT 89 BEFORE AND AFTER REDISTRICTING**

| BEFORE | AFTER |
|:---:|:---:|
|  |  |

---

Racial sorting largely explains the marked differences illustrated above. During the redistricting process, 13,701 people were moved *out* of District 89, while 17,279 people were moved *into* the district, and the BVAP of the added population exceeded the BVAP of the removed population by 20.2%. *See* Pl. Br. at 24. The end result was that District 89's BVAP was pushed over the 55% threshold.

**8.     House District 90**

Defendants' principal defense of District 90 is that "[t]here is no discernible correlation between the lines of the district and the lines of predominantly black neighborhoods." Def. Br. at 33. That is simply not so.

In fact, the movement of population into and out of District 90 exhibited a distinctive racial pattern—the General Assembly moved African-American voters out of District 90 and into District 89, moved white voters to other districts, and replaced those "lost" voters with a disproportionately large number of "new" African-American voters. *See* Pl. Ex. 50, tbl. 9. The need to move African-American voters out of District 90 and into District 89 to boost the latter district above 55% BVAP explains why Delegate Jones asked Delegate Spruill to discuss the "55 percent aspirational threshold" with Delegate Algie Howell, who represented District 90 at the time. Tr. 491:13; *id.* 491:15-492:2.

### 9. House Districts 92 and 95

On the floor of the House, Delegate Jones explained how and why he used race to determine the basic contours of the Peninsula districts. In reference to various districts in this region—including District 93, which abuts District 95—Delegate Jones was asked: "Why do you think we're seeing this level [of] decrease among blacks in these districts?" Pl. Ex. 35 at 152:1-11. His answer was simple: "So what had to happen, the population had to be picked up, *had to try to maintain the voting strength for the black voting percentage*." *Id*. at 153:1-9 (emphasis added). In other words, the BVAP of surrounding districts was drained to "maintain" the BVAP of existing Districts 92 and 95.

That was no easy task, as a cursory examination of District 95 reveals:

| TABLE 4: BOUNDARIES OF DISTRICT 95 BEFORE AND AFTER REDISTRICTING |
|:---:|
| BEFORE         AFTER |



To repopulate District 92 while maintaining its BVAP level, Delegate Jones moved the district west instead of north. But that cannibalized the BVAP in District 95, which was also underpopulated. Thus, to maintain District 95's BVAP level, Delegate Jones was forced to expand District 95 through a northwest-running archipelago that swept in areas with relatively high BVAP. *See* DI Ex. 92 at 25. That give-and-take also answers Intervenors' erroneous claim that "even Plaintiffs' expert's report shows that race did not predominate the line drawing." Def. Br. at 35. To the contrary, Professor Ansolabehere's analysis shows that *all* of the relatively high

- 21 -

BVAP population taken out of District 95 was moved into District 92, with a significantly lower BVAP population moved *out* of District 92. *See* Pl. Ex. 50, tbl. 9.

**D.      Because the Challenged Districts Are Not Narrowly Tailored to Advance a Compelling State Interest, They Violate the Equal Protection Clause**

The evidence shows that race predominated in all of the Challenged Districts, and none of Defendants' attempts to rebut that evidence have any merit. Thus, the last question is whether the General Assembly's use of race was narrowly tailored. The answer is a resounding "no."

**1.      Defendants Cannot Rely on Section 2 of the Voting Rights Act**

Defendants cannot credibly argue that the Challenged Districts are narrowly tailored to comply with Section 2 of the Voting Rights Act ("VRA"), and the cursory treatment they give that argument shows that they themselves do not find it persuasive. Defendants have not cited a shred of evidence to show that Section 2 motivated the General Assembly in any way during the redistricting process. Moreover, Delegate Jones admitted that he did not perform a racially polarized voting analysis of any of the Challenged Districts, and a valid Section 2 claim requires a showing of racially polarized voting in the district at issue. *See Shaw II*, 517 U.S. at 908 n.4; *Shaw I*, 509 U.S. at 653. The bottom line is that Defendants' half-hearted reliance on Section 2 is a post hoc rationalization with no basis in the record, and it should be rejected as such.

**2.      Defendants Cannot Rely on Section 5 of the Voting Rights Act**

For different reasons, Defendants cannot show that the Challenged Districts are narrowly tailored to comply with Section 5 of the VRA—even assuming that Section 5 remains a compelling interest. *See* Pl. Br. at 28 n.12.

A district "is narrowly tailored under Section 5 when a legislature has a 'strong basis in evidence' to believe race-based measures are necessary to preserve the minority community's ability to elect its candidate of choice." Def. Br. at 36 (quoting *Alabama*, 135 S. Ct. at 1274).

Defendants cannot meet that exacting standard. After all, Delegate Jones *admittedly* did almost no analysis to determine the level of BVAP necessary to avoid retrogression in each of the Challenged Districts. He did not compile election results. *See* Tr. 453:19-22. He did not analyze voter registration data. *See id.* 463:22-464:6. He did not analyze voter turnout data. *See id.* 467:16-19. He did not review the Senate's contemporaneously drawn majority-minority districts, which were drawn with less than 55% BVAP. *See id.* 468:10-12. And he did not even try to assess racial voting patterns in each of the Challenged Districts. *See id.* 469:16-21.

Instead, the evidence shows that Delegate Jones consulted informally with a few incumbent delegates; picked the 55% figure because it was higher than 50% and apparently "sounded good" to Delegate Jones and those he consulted; then applied that threshold to each and every Challenged District, regardless of their well-documented differences in geography, voting patterns, and electoral history. Delegate Jones had no basis in evidence for employing that "mechanical racial target[]" to every Challenged District, let alone a "strong basis in evidence." *Alabama*, 135 S. Ct. at 1267, 1274 (internal quotation marks and citation omitted). And, as it turns out, it was unnecessary to peg BVAP at or above 55% to avoid retrogression in *any* of the Challenged Districts, as Defendants' own expert conceded. *See* Pl. Br. at 30. Thus, Delegate Jones's use of a predetermined, across-the-board racial threshold is the antithesis of narrow tailoring. *See Alabama*, 135 S. Ct. at 1272-74 (use of mechanical racial targets was not narrowly tailored); *Page II*, 2015 WL 3604029, at *16-17 (same); *Smith*, 946 F. Supp. at 1210 (same).

Defendants offer a few excuses. None of them is persuasive. For example, Defendants claim that the General Assembly was "aware of low voter turnout amongst minorities." Def. Br. at 37. But as noted above, Delegate Jones did not actually analyze that issue, and assumptions and stereotypes, particularly when explicitly racial, can hardly supply a strong basis in *evidence*.

- 23 -

Defendants also argue that they had concerns about the ability of African-Americans to elect the candidates of their choice. *See id.* Those purported concerns are not borne out by the events of the last three decades, during which minority-preferred candidates have won virtually every election, including races against white challengers. In any case, Delegate Jones admittedly did not even gather the facts necessary to evaluate minority voting strength in any coherent or reliable way. Vague and unsupported misgivings do not amount to evidence.

Finally, Defendants attack Professor Ansolabehere, arguing that his racially polarized voting analyses are flawed because he relied on "general election data from mostly 'on-year' statewide elections to develop this analysis, rendering it meaningless for assessing House of Delegates elections." *Id.* at 38. Defendants also fault Professor Ansolabehere for using the ecological regression method rather than the ecological inference method. *See id.* at 39-40.

Those arguments are meritless. Professor Ansolabehere analyzed House of Delegates elections *and* other elections to assess racially polarized voting in the Challenged Districts, and his method for selecting elections is standard in the field. *See* Pl. Ex. 51 at 18-20, ¶¶ 53-58. Moreover, Defendants fail to acknowledge that Professor Ansolabehere's method accurately predicted the real-world results of elections in the Challenged Districts, while the competing method offered by Defendant-Intervenors' expert M.V. Hood was far less accurate. *See id.* at 20, ¶ 58. Moreover, academic disagreements about the relative merits of ecological regression and ecological inference are completely irrelevant. Ultimately, Professor Ansolabehere and Professor Katz reached very similar conclusions with respect to racially polarized voting patterns in the Challenged Districts. In fact, Professor Katz found *less* racially polarized voting, further undermining the General Assembly's claim that it was appropriate to use the same predetermined racial threshold in every district.

- 24 -

Finally, Defendants throw up their hands and claim that there was insufficient data to
determine the level of BVAP necessary to avoid retrogression in the Challenged Districts. *See*
Def. Br. at 40. But even if that is true (and the record shows that it is not), Defendants' argument
only confirms the General Assembly's constitutional error. There was abundant data that the
General Assembly *could have* considered—it just failed to do so. And it is no excuse to say that
the data that was available was imperfect. Every redistricting authority faces that same challenge.
The General Assembly was not required to adopt an explicitly racial, across-the-board "target."
Having done so, it was required to establish a "strong basis in evidence" for that choice. The
failure to do so condemns the General Assembly's use of racial targets as a matter of law.

###        III.        CONCLUSION

Virginia's General Assembly repeatedly declared that racial goals trumped all others in
the drawing of the Challenged Districts, and it expressly relied on "mechanical racial targets" to
achieve those goals. *Alabama*, 135 S. Ct. at 1267. Thus, race was the predominant factor in the
drawing of the Challenged Districts, and the General Assembly's use of race was anything but
narrowly tailored. Plaintiffs respectfully submit that the Challenged Districts offend the Equal
Protection Clause, and request that this Court enter judgment for Plaintiffs.

DATED: July 27, 2015

By: */s/ Aria C. Branch*
John K. Roche (VSB# 68594)
Marc Erik Elias (admitted *pro hac vice*)
Bruce v. Spiva (admitted *pro hac vice*)
Elisabeth C. Frost (admitted *pro hac vice*)
Aria C. Branch (VSB # 83682)
**PERKINS COIE** LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone: 202.434.1627
Facsimile: 202.654.9106

Kevin J. Hamilton (admitted *pro hac vice*)
Abha Khanna (admitted *pro hac vice*)
Ryan Spear (admitted *pro hac vice*)
William B. Stafford
    (admitted *pro hac vice*)
**PERKINS COIE** LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

On July 27, 2015, I will electronically file the foregoing with the Clerk of Court using the

CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jennifer Marie Walrath
Katherine Lea McKnight
Baker & Hostetler LLP (DC)
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
202-861-1702
Fax: 202-861-1783
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com

Effrem Mark Braden
Baker & Hostetler LLP (DC-NA)
Washington Square
Suite 1100
Washington, DC 20036
202-861-1504
Fax: 202-861-1783
mbraden@bakerlaw.com

Of counsel:

Dale Oldham, Esq.
1119 Susan St.
Columbia, SC 29210
803-772-7729
dloesq@aol.com

*Attorneys for* Defendant-Intervenors

Jeffrey P. Brundage
Daniel Ari Glass
Kathleen Angell Gallagher
Eckert Seamans Cherin & Mellott LLC
1717 Pennsylvania Ave NW, Suite 1200
Washington, D.C. 20006
202-659-6600
Fax:  202-659-6699
jbrundage@eckertseamans.com
dglass@eckertseamans.com
kgallagher@eckertseamans.com

Godfrey T. Pinn, Jr.
Harrell & Chambliss LLP
Eighth and Main Building
707 East Main Street
Suite 1000
Richmond, VA 23219
gpinn@hclawfirm.com

Anthony F. Troy
Eckert Seamans Cherin & Mellott LLC
707 East Main Street
Suite 1450
Richmond, Virginia  23219
804-788-7751
Fax:  804-698-2950
ttroy@eckertseamans.com

*Attorneys for Defendants*

By */s/ Aria C. Branch*
   Aria C. Branch (VSB #83682)
   Perkins Coie LLP
   700 13th St. N.W., Suite 600
   Washington, D.C. 20005-3960
   Phone:  (202) 654-6338
   Fax:  (202) 654-9106
   ABranch@perkinscoie.com

*Attorneys for Plaintiffs*

- 1 -