**No. 15-680**

IN THE

# Supreme Court of the United States

————

GOLDEN BETHUNE-HILL, CHRISTA BROOKS, CHAUNCEY BROWN, ATOY CARRINGTON, DAVINDA DAVIS, ALFREDA GORDON, CHERRELLE HURT, THOMAS CALHOUN, TAVARRIS SPINKS, MATTIE MAE URQUHART, VIVIAN WILLIAMSON, AND SHEPPARD ROLAND WINSTON,

*Appellants,*

v.

VIRGINIA STATE BOARD OF ELECTIONS, *ET AL.*,

*Appellees.*

————

**On Appeal from the United States District Court for the Eastern District of Virginia**

————

**JOINT APPENDIX**

**VOLUME I**

————

MARC E. ELIAS
   *Counsel of Record*
BRUCE V. SPIVA
ARIA C. BRANCH
PERKINS COIE LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C. 20005
(202) 654-6200
MElias@perkinscoie.com

*Counsel for Appellants*

PAUL D. CLEMENT
   *Counsel of Record*
ERIN E. MURPHY
MICHAEL D. LIEBERMAN
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Intervenor-Appellees*

[Additional Counsel Listed On Inside Cover]

**JURISDICTIONAL STATEMENT FILED NOVEMBER 20, 2015**
**REVIEW GRANTED JUNE 6, 2016**

KEVIN J. HAMILTON
ABHA KHANNA
RYAN SPEAR
WILLIAM B. STAFFORD
PERKINS COIE LLP
1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099
(206) 359-8000

*Counsel for Appellants*

EFREM M. BRADEN
KATHERINE L. MCKNIGHT
RICHARD B. RAILE
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
(202) 861-1504
mbraden@bakerlaw.com

*Counsel for Intervenor-Appellees*

DALTON LAMAR OLDHAM, JR.
DALTON L. OLDHAM LLC
1119 Susan Street
Columbia, SC 29210
(803) 237-0886
dloesq@aol.com

*Counsel for Intervenor-Appellees*

STUART A. RAPHAEL
   *Counsel of Record*
SOLICITOR GENERAL OF VIRGINIA
900 East Main Street
Richmond, VA 23219
(804) 786-7240
sraphael@oag.state.va.us

*Counsel for Defendant-Appellees*

TABLE OF CONTENTS

VOLUME I                                              Page

Opening Statement of Hon. Mark L. Cole,
    Chairman, Committee on Privileges and
    Elections, before Subcommittee on
    Redistricting, Virginia House of Delegates
    (Sept. 8, 2010) ............................................   1

Email from Chris Marston to Katie Alexander
    Murray re RPV Leadership Roster (Dec. 9,
    2010) ............................................................   5

Federal Register Notice – Dept. of Justice
    Guidance Concerning Redistricting Under
    Section 5 of the Voting Rights Act, 76 Fed.
    Reg. 7470 (Feb. 9, 2011) .............................   8

Email from Kent Stigall to Chris Jones re
    District demographics, with attachments
    (March 9, 2011) ...........................................   22

Email from James Massie to Mike Wade re
    Help with Contested Election Information,
    with attachments (March 10, 2011) ............   33

Email from Chris Marston to Cortland
    Putbreses re Help with Contested Election
    Information, with attachments (March 11,
    2011) ............................................................   35

House Committee on Privileges and Elections
    - Committee Resolution No. 1 -House of
    Delegates District Criteria (Proposed by
    Del. S. Chris Jones) (March 25, 2011) ........   36

Email from G. Paul Nardo to Caucus
    Members re Messaging on House
    Redistricting Maps, with attachments
    (March 29, 2011) .........................................   39

(i)

ii

## TABLE OF CONTENTS—Continued

Page

Email from Chris Marston to Chris Jones re HD61-HD75 Dale's Options, with attachments (April 1, 2011) ........................   42

*The Public Interest in Redistricting*, Report of the Independent Bipartisan Advisory Commission on Redistricting, Commonwealth of Virginia (April 1, 2011) ..............   43

Email from Chris Marston to Paul Haughton re FYI, with attachment (April 2, 2011).....   115

Public Hearing: Virginia House of Delegates, Subcommittee on Redistricting, Chaired by Del. Chris Jones – Danville, Va. (April 2, 2011)............................................   117

Email compilation among Chris Jones, Chris Marston, G. Paul Nardo, Jennifer McClellan, Kent Stigell, Kirk Showalter, Lawrence Haake, Mark Cole,and William Howell re HB5001 as Passed Senate; Status Update - House Redistricting; Redistricting fix; and, Redistricting plan comments (April 4-8, 2011) ........................   138

Public Hearing: Virginia House of Delegates, Committee on Privileges and Elections, Subcommittee on Redistricting– Richmond, VA. (April 4, 2011) ....................   157

Transcript: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 4, 2011)................................   190

iii

## TABLE OF CONTENTS—Continued

Page

Transcript: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 5, 2011)................................   255

Transcript: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 27, 2011)..............................   460

Video: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 4, 2011) (Part 1 of 2) .........................   n/a

Video: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 4, 2011) (Part 2 of 2) .........................   n/a

Video: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 5, 2011) .............................   n/a

Video: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 27, 2011) ............................   n/a

### VOLUME II

Chapter 1 of the Acts of Assembly (2011 Special Session 1), Statement of Change (2011) .........................................   526

Chapter 1 of the Acts of Assembly (2011 Special Session 1), Statement of Anticipated Minority Impact (2011) ...........   541

Table: HB 5005 Passed 4/28/11. House Plan – Population Totals .......................................   575

iv

TABLE OF CONTENTS—Continued

Page

Legislative History of 2011 Virginia General
    Assembly Redistricting Plan (May 4,
    2011)................................................................. 589

Legislative History of 2012 Virginia
    Congressional District Plan (Jan. 26,
    2012)................................................................. 603

Expert Report of Stephen Ansolabehere
    (March 11, 2015)............................................ 612

Reply Report of Stephen Ansolabehere (April
    24, 2015)......................................................... 704

Report of John B. Morgan Regarding
    Plaintiffs' Alternative Plan and the
    Enacted Plan (*Page v. State Board of
    Elections*) (March 14, 2014)......................... 740

HB5001- Committee Substitute, Chart:
    Political Subdivisions Split between
    Districts Reports (April 9, 2011)................. 774

Workspace: House Plans>>U of R Revised
    Plan (April 4, 2011) ..................................... 794

HB 5002 University of Richmond House
    Plans, Tables: Population Totals, Racial
    Demographics, Voting Age, and Election
    Data (April 4, 2011)..................................... 835

Table: HB 5003 Plan (April 1, 2011)............... 844

HB 5003 J. Morrissey, Tables: Population
    Totals, Racial Demographics, Voting Age
    Population, and Election Data (April 18,
    2011)................................................................. 883

Core Constituencies Report (March 23, 2015) 892

v

TABLE OF CONTENTS—Continued

Page

Workspace: House Plans>>HB5005 Copy 1 Plan (4/18/2011), Table: Measures of Compactness ................................................. 915

Table: Precinct Population / Voting Data ....... 919

Compilation of Maps: (1) HB 5005 Passed 4/28/11, House Plan; (2) Percentage of Total Population that are Black by Precinct; (3) Percentage of Voting Age Population that are Black by Precinct (April 28 – May 3, 2011) .............................. 929

Compilation of Enacted District Maps (including Districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, 95) ................................... 932

Compilation of Enacted BVAP Maps (including Districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, 95) ................................... 938

Public Hearing, Virginia Senate, Committee on Privileges and Elections, Subcommittee on Redistricting, Portsmouth, VA (Dec. 2, 2010) ............................................................... 945

House of Delegates Vote Tally: HB 5001 (April 5, 2011) ............................................... 991

Transcript: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 6, 2011) ............................... 993

House of Delegates Vote Tally: HB 5001 (April 6, 2011) ............................................... 1018

Transcript: 2011 Special Session I Virginia House of Delegates Redistricting Floor Debates (April 25, 2011) ............................. 1020

vi

## TABLE OF CONTENTS—Continued

VOLUME III                                  Page

House of Delegates Vote Tally: HB 5005
(April 7, 2011) [NOTE: log says 4/27/2011]   1046

House of Delegates Vote Tally: HB 5005
(April 28, 2011)............................................   1048

Governor's Veto: HB 5001 (April 15, 2011).....   1050

Division of Legislative Services Summary of
Legislative Activity: HB 5001 (March 19,
2015)............................................................   1054

Division of Legislative Services Summary of
Legislative Activity: HB 5005 (March 19,
2015)............................................................   1058

Declaration of Thomas Brooks Hefeller, Ph.
D. (April 10, 2015) .......................................   1061

Declaration of M.V. (Trey) Hood III (April 10,
2015)............................................................   1151

Expert Report of Jonathan N. Katz (April 10,
2015)............................................................   1203

House Committee on Privileges and Elections
Committee Resolution No. 1 (April 3,
2001)............................................................   1248

U.S. Census Bureau News: U.S. Census
Bureau Delivers Virginia's 2010 Census
Population Totals, Including First Look at
Race and Hispanic Origin Data for
Legislative Redistricting (Feb. 3, 2011)......   1251

Current House of Delegates Districts Tables:
District Population Summary, Demo-
graphic Population Totals, and Voting Age
Population Totals (March. 8, 2011) ...........   1257

vii

## TABLE OF CONTENTS—Continued

Page

HB 5005, House Plan Tables: Population
Totals, Racial Demographics, Voting Age
Population, and Election Data (March. 12,
2013).............................................................. 1264

Maptitude Standardized Report: Population
by District for HB 5005 as Enacted (April
9, 2015)........................................................ 1275

Maptitude Standardized Report: Population
Summary by District for Current 2010
(April 9, 2015).............................................. 1278

Maptitude Standardized Report: Population
Summary by District for HB 5001 as
Introduced by Delegate Chris Jones (April
9, 2015)........................................................ 1281

Maptitude Standardized Report: Population
Summary by District for HB 5001 House
Substitute (April 9, 2015)............................ 1284

Maptitude Standardized Report: Population
Summary by District for HB 5001 Senate
Substitute (April 9, 2015)............................ 1287

Maptitude Standardized Report: Population
Summary by District for HB 5001 as
Passed Senate (April 9, 2015) ..................... 1290

Maptitude Standardized Report: Population
Summary by District for HB 5002 (April 9,
2015).............................................................. 1293

Maptitude Standardized Report: Population
Summary by District for HB 5003 (April 9,
2015).............................................................. 1296

viii

TABLE OF CONTENTS—Continued

Page

Maptitude Standardized Report: Population Summary by District for HB 5005 as Introduced by Del. Jones (April 9, 2015).... 1299

Maptitude Standardized Report: Population Summary by District for HB 5001 Conference (April 9, 2015).......................... 1302

Maptitude Standardized Report: Population Summary by District for HB 5005 Senate Substitute (April 9, 2015)........................... 1305

VOLUME IV

Maptitude Standardized Report: Incumbent Pairings for HB 5002 (March 17, 2015)...... 1308

Maptitude Standardized Report: Incumbent Pairings for HB 5003 (March 17, 2015)...... 1312

Benchmark Plan: Black VAP Percentages as reported by DLS and as calculated by DOJ Guidelines ................................................... 1316

Enacted Plan: Black VAP Percentages as reported by DLS and as calculated by DOJ Guidelines ................................................... 1319

Map of Virginia Counties................................ 1322

Virginia – 2010 Census Results: Total Population by County .................................. 1323

Virginia – 2010 Census Results: Percent Change in Population by County, 2000 to 2010............................................................. 1324

Virginia 2010 Census Results: Percent Change in Population by House District, 2000 to 2010................................................ 1325

ix

TABLE OF CONTENTS—Continued

Page

Virginia Counties and Independent Cities ..... 1326

Richmond Area—2011 Plan: Racial and Political Demographics................................. 1338

2001 House Districts 2010 Deviations – Southeastern Virginia ................................. 1339

2001 House Districts 2010 Deviations – Northern Virginia........................................ 1340

2001 House Districts 2010 Deviations – Norfolk Area Virginia.................................. 1341

2001 House Districts 2010 Deviations – Richmond Area Virginia.............................. 1342

2011 House District 79 – Showing Water Crossing Between Portions of District........ 1343

2011 House District 90 – Showing Water Crossing Between Portions of District........ 1344

2001 House Districts 2010 Deviations – Norfolk Area Virginia.................................. 1345

2001 House Districts 2010 Deviations – Deviations Hampton-Newport w Pcts. ........ 1346

2001 House Districts 2010 Deviations – Deviations Richmond Area w Pcts.............. 1347

2001 House Districts 2010 Deviations – Deviations Fairfax Arlington Alexandria Area w Pcts. ................................................ 1348

2011 House District 77 – Showing Water Crossing Between Portions of District........ 1349

x

TABLE OF CONTENTS—Continued

Page

2011 House District 80 – Showing Water Crossing Between Portions of District........ 1350

2011 House District 83 – Showing Water Crossing Between Portions of District........ 1351

2011 House District 94 – Showing Water Crossing Between Portions of District........ 1352

2011 House District 76 – Showing Water Crossing Between Portions of District........ 1353

Map: The Original Gerrymander .................... 1354

Map: The Original Gerrymander – Without Water and Islands ....................................... 1355

Table: The Original Gerrymander, Measures of Compactness (June 19, 2015)................. 1356

Table: The Original Gerrymander – Without Water and Islands, Measures of Compactness (June 19, 2015)..................... 1357

Table: 2001 House Plan Deviations, Norfolk Area................................................................ 1358

Table: 2011 House Plan, Districts Not Connected by Road with Water or River Crossings.................................................... 1359

Table: 2011 House of Delegates Plan, Combined Compactness Score .................... 1360

Table: State of Virginia – 1991 House of Delegates Plan, Districts with Minor River Crossing without Roads ............................. 1363

District Maps for the Benchmark Plan (2010) and the Enacted Plan (2011)...................... 1364

xi

TABLE OF CONTENTS—Continued

Page

Maps Showing Multi-Year Political/Racial Data for Districts: 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 .................................. 1481

Collection of Data: Virginia Department of Elections, Elections Results 2000-2015 ...... 1493

Maps of Challenged Districts – Old HDs & Enacted HDs (HB 5005) for Districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 ...................................................... 1557

Maps of HDs 27, 62, 69, 70, 71 – Vetoed (HB 5001 Conf. Report) & Enacted HDs (HB 5005) ............................................................ 1564

Maps of Districts by Region – 2001 Plan ........ 1567

Maps of Districts by Region – 2011 Plan ........ 1569

Contrasting Silhouette Maps of Districts 5, 13, 17, 20, 22, 35, 48, and 96 for Year 2001 and 2011 Plan .............................................. 1571

Map of Statewide Deviation for Change in Seats, Population 2010 ............................... 1579

VOLUME V

Transcript –Bethune-Hill Bench Trial (July 7, 2015) (Day 1) ...................................... 1580

Opening Statement:
    Plaintiffs .................................................. 1583
    Defendant Intervenors ............................. 1590

Testimony of Jennifer Leigh McClellan ....... 1598
    Direct Examination ................................. 1598
    Cross Examination ................................... 1625

xii

TABLE OF CONTENTS—Continued

Page

Testimony of Rosalyn Dance.........................  1633
    Direct Examination ..................................  1633
    Cross Examination ..................................  1650

Testimony of Ward L. Armstrong.................  1654
    Direct Examination ..................................  1654
    Cross Examination ..................................  1669
    Redirect Examination..............................  1681
    Recross Examination................................  1683

Testimony of Stephen D. Ansolabehere .......  1684
    Direct Examination ..................................  1684
    Cross Examination ..................................  1760

Transcript –Bethune-Hill Bench Trial (July 8, 2015) (Day 2)...............................................  1780

Testimony of Stephen D. Ansolabehere .......  1782
    Cross Examination ..................................  1782
    Redirect Examination..............................  1796

Testimony of Steven Christopher Jones.......  1802
    Direct Examination ..................................  1803
    Cross Examination ..................................  1913

VOLUME VI

Transcript –Bethune-Hill Bench Trial (July 9, 2015) (Day 3)......................................  1951

Testimony of Steven Christopher Jones.......  1954
    Cross Examination ..................................  1954
    Redirect Examination..............................  1995

Testimony of Jonathan Neil Katz.................  2006
    Direct Examination ..................................  2006
    Cross Examination ..................................  2043
    Redirect Examination..............................  2088

xiii

## TABLE OF CONTENTS—Continued

                                                                      Page

Testimony of M.V. (Trey) Hood, III ..............   2090
   Direct Examination ...................................   2090
   Cross Examination ...................................   2132
   Redirect Examination................................   2145

Testimony of Gerald Herbert........................   2149
   Direct Examination ...................................   2149

Transcript –Bethune-Hill Bench Trial
(July 13, 2015) (Day 4)....................................   2156

Testimony of Thomas Hofeller......................   2158
   Direct Examination ...................................   2159
   Cross Examination ...................................   2199
   Redirect Examination................................   2207

Testimony of Stephen D. Ansolabehere .......   2214
   Direct Examination ...................................   2214
   Cross Examination ...................................   2264
   Redirect Examination................................   2270

Closing Arguments:
   Plaintiffs...................................................   2273
   Defendant Intervenors .............................   2282

Members of the Court Final Questions........   2288

1

OPENING STATEMENT

THE HONORABLE MARK L. COLE
CHAIRMAN, COMMITTEE ON PRIVILEGES AND
ELECTIONS
VIRGINIA HOUSE OF DELEGATES

**SUBCOMMITTEE PUBLIC HEARING HOUSE
P&E SUBCOMMITTEE ON REDISTRICTING**

NATURAL SCIENCE CENTER, VIRGINIA
WESTERN COMMUNITY COLLEGE
ROANOKE, VIRGINIA

WEDNESDAY SEPTEMBER 8, 2010 7:00 P.M.

Ladies and gentleman, colleagues: It's my pleasure tonight to WELCOME everyone to the *first* hearing of the House of Delegates Redistricting Subcommittee. This is the first of six opportunities the Subcommittee will have this year to *gather input* from experts. . . advocacy groups. . ., and, *most importantly*, the people of Virginia on the every-10-years process of drawing new boundaries for state legislative and congressional districts.

The General Assembly and Governor – as officials who submit to voters at elections and, therefore, are *directly accountable* to the public – are responsible for drawing legislative boundaries. That mandate is clearly spelled out in the Virginia Constitution. This time-tested and *inclusive* process ensures that *every Virginian has a VOICE in redistricting* since every Virginian is represented in the General Assembly by a delegate or state senator.

After every decennial census by the federal government, the Virginia General Assembly and Governor – like every other state – must draw lines for U.S. House, Senate of Virginia, and Virginia House of

2

Delegates districts. Likewise, many localities also must draw lines for county board, city council and school board districts.

That much everyone already knows from our civics classes. So, <u>where are we</u> in the current redistricting process?

The key task of the 2010 Census – the April 1 enumeration – is now complete. However, the U.S. Census Bureau continues its work towards releasing *statewide* total population counts for Virginia and the other 49 states by December 31, 2010.

Then, the data used for actually drawing lines – the so-called "Public Law 94-171" data – comes later, most likely in February or March of 2011.

Speaker Howell and I decided to schedule and convene these public hearings to <u>encourage greater *civic awareness*</u>. . . and <u>facilitate more *active participation*</u> by the public in Virginia's latest redistricting process.

At these public hearings, this Subcommittee wants to gather input from the public on what <u>PRINCIPLES</u> the General Assembly and Governor should consider in using the detailed data – once it becomes available next year – to redraw district lines.

Of course, redistricting is an endeavor presenting many challenges. It also *can be* a contentious process.

In fact, litigation over districts drawn in 2001 after the last federal Census continued through most of the last decade in some states. But, in Virginia, not a single court case challenging the current House of Delegates, state Senate or Congressional maps successfully passed legal muster.

3

Nevertheless, the decisions produced by all of that litigation, whether in Virginia or across the nation – as well as the complicated body of law and the many players involved in redistricting – make it *vital* that my colleagues & I <u>learn what is most important to Virginians</u>. . . *BEFORE* lines are redrawn and legislation is ultimately passed.

The General Assembly, the Governor, the Attorney General, the U.S. Dept. of Justice, and, perhaps, state and federal judges, will all have an opportunity to impact this process.

But again, BEFORE we get involved in the work of line drawing or seeking legal opinions or whatever lees, the Speaker and I, along with our House colleagues, we want to hear from you about *YOUR* <u>PRIORITIES</u> and *YOUR* <u>SUGGESTIONS</u> for redistricting.

As we get underway, I believe it is incumbent upon me to articulate – and I hope my House colleagues will agree with – <u>*my* touchstones</u> on this very important public policy issue.

1) **The redistricting process must be <u>FAIR</u>**. It must include opportunity for input from all and serious deliberation about a fair outcome.

2) **The redistricting process must create districts as nearly <u>EQUAL IN POPULATION AS PRACTICABLE</u>**, giving effect to the constitutional "one person-one vote" principle.

3) **The final district maps must <u>COMPLY WITH THE LAW</u>** – with the U.S. Constitution, the Virginia Constitution,

4

the federal Voting Rights Act, and court decisions applying them.

Within those *critical constraints*, I look forward to learning from everyone giving testimony here tonight and at subsequent hearings.

Now, here are several logistical but important requests to ensure as smooth and efficient a process for public input as possible.

Some materials already distributed and/or online have been made available by staff from the Division of Legislative Services. But, I've directed staff NOT to make any formal presentations tonight in the interest of maximizing participation by citizens who are here.

I would ask that each of you who speak to please try to keep your remarks brief (*4 minutes tops*) – as a courtesy to others and to please try NOT to repeat what others already have said. . , so we may accommodate as many speakers as possible. Like at other legislative hearings, staff will be the "keeper of the clock."

I also invite everyone to submit any written comments for the Subcommittee by giving a hard copy to our clerk here tonight. Or, statements may be e-mailed, faxed or sent by regular mail to Scott Maddrea, Deputy Clerk for Committee Operations at the Virginia House of Delegates. That information is available at the table near the entrance, along with the complete list of all public hearings that this subcommittee is holding this fall.

Finally, please be sure to identify yourself before your remarks and on any materials submitted. *Now, let's get started. . . . .*

5

**From:** Chris Marston <chris.marston@gmail.com>
**To:** Katie Alexander Murray <katiegalex@yahoo.com>
**Subject:** Re: RPV Leadership Roster
**Date:** 12/9/2010 6:28:17 PM
**Attachments:**

---

E-mail is okay too. Just be careful in how you describe what you're seeking. We need to keep out any hint of unfairness (except the fundamental unfairness of the Voting Rights Act) or partisanship.

For example, "I'm working on an important project for Speaker Howell and the House Republican Caucus. In order to develop redistricting plans for Virginia in full compliance with the Voting Rights Act, we need to collect data for Racial Block Voting analysis. One way to analyze the data is to look for elections in which an African-American candidate and a White candidate both compete (either in one party's primary, or in a general election)."

I think that's pretty safe. Some of these folks may try to engage you in a conversation about what they think new maps should look like. Do your best to politely decline to have that conversation. You might say, "I am just responsible for collecting this important data for Racial Block Voting and the Caucus is committed to a fair redistricting process that complies with applicable laws and results in districts with as nearly equal population as practicable."

If they push and push, feel free to tell them to call me.

Thanks,

Chris

6

On Thu, Dec 9, 2010 at 5:21 PM, Katie Alexander Murray <katiegalex@yahoo.com> wrote:

Thanks Chris,

I noticed on the list that their email addresses are listed. Would it be ok if I sent an initial email, or would you prefer for me to do everything over the phone?

Katie

---

**From:** Chris Marston <chris.marston@gmail.com>
**To**: katiegalex@yahoo.com
**Sent:** Wed, December 8, 2010 9:26:16 AM
**Subject:** RPV Leadership Roster

Katie,

Here's the RPV Leadership Roster. The unit chairs are listed after the state central committee.

Feel free to identify yourself as calling from the House Republican Caucus.

The information you need is whether any election, including Democrat primaries, featured a black and a white candidate. Elections for state House, state Senate, Boards of Supervisors/City Councils, Constitutional Officers (Sheriff, Commonwealth's Attorney, Clerk of Court, Treasurer, Commissioner of the Revenue), School Boards, and even Soil and Water Conservation District Directors.

What I need back is the Election Year (whether it was a general or a special election, most will be general), the office, and which candidate was black and which was white. If a chair just remembers that there was a contest with a black and a white, but doesn't remember names, the State Board of Elections website

7

has results for many elections, especially in recent years, so we can check there for names.

Let me know if you have any questions.

Thanks,

Chris

8

[LOGO]

Federal Register
Vol. 76 No. 27
Wednesday, February 9, 2011

Part III

DEPARTMENT OF JUSTICE

Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act; Notice

AGENCY: Office of the Assistant Attorney General, Civil Rights Division, Department of Justice.

ACTION: Notice.

SUMMARY: The Attorney General has delegated responsibility and authority for determinations under Section 5 of the Voting Rights Act to the Assistant Attorney General, Civil Rights Division, who finds that, in view of recent legislation and judicial decisions, it is appropriate to issue guidance concerning the review of redistricting plans submitted to the Attorney General for review pursuant to Section 5 of the Voting Rights Act.

FOR FURTHER INFORMATION CONTACT: T. Christian Herren, Jr., Chief, Voting Section, Civil Rights Division, United States Department of Justice, Washington, DC 20530, (202) 514-1416.

SUPPLEMENTARY INFORMATION: Section 5 of the Voting Rights Act, 42 U.S.C. 1973c, requires jurisdictions identified in Section 4 of the Act to obtain a determination from either the Attorney General or the United States District Court for the District of Columbia that any change affecting voting which they seek to enforce does not have a discriminatory purpose and will not have a discriminatory effect.

9

Beginning in 2011, these covered jurisdictions will begin to seek review under Section 5 of the Voting Rights Act of redistricting plans based on the 2010 Census. Based on past experience, the overwhelming majority of the covered jurisdictions will submit their redistricting plans to the Attorney General. This guidance is not legally binding; rather, it is intended only to provide assistance to jurisdictions covered by the preclearance requirements of Section 5.

Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 42 U.S.C. 1973c

Following release of the 2010 Census data, the Department of Justice expects to receive several thousand submissions of redistricting plans for review pursuant to Section 5 of the Voting Rights Act. The Civil Rights Division has received numerous requests for guidance similar to that it issued prior to the 2000 Census redistricting cycle concerning the procedures and standards that will be applied during review of these redistricting plans. 67 FR 5411 (January 18, 2001). In addition, in 2006, Congress reauthorized the Section 5 review requirement and refined its definition of some substantive standards for compliance with Section 5. In view of these developments, issuing revised guidance is appropriate.

The "Procedures for the Administration of Section 5 of the Voting Rights Act," 28 CFR Part 51, provide detailed information about the Section 5 review process. Copies of these Procedures are available upon request and through the Voting Section Web site (*http://www.usdoj.gov/crt/voting*). This document is meant to provide additional guidance with regard to current issues of interest. Citations to judicial decisions are provided to assist the reader but are not intended to be comprehensive. The

10

following discussion provides supplemental guidance concerning the following topics:

- The Scope of Section 5 Review;

- The Section 5 Benchmark;

- Analysis of Plans (discriminatory purpose and retrogressive effect);

- Alternatives to Retrogressive Plans; and

- Use of 2010 Census Data.

The Scope of Section 5 Review

Under Section 5, a covered jurisdiction has the burden of establishing that a proposed redistricting plan "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in [Section 4(f)(2) of the Act]" (i.e., membership in a language minority group defined in the Act). 42 U.S.C 1973c(a). A plan has a discriminatory effect under the statute if, when compared to the benchmark plan, the submitting jurisdiction cannot establish that it does not result in a "retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States*, 425 U.S. 125, 141 (1976).

If the proposed redistricting plan is submitted to the Department of Justice for administrative review, and the Attorney General determines that the jurisdiction has failed to show the absence of any discriminatory purpose or retrogressive effect of denying or abridging the right to vote on account of race, color or membership in a language minority group defined in the Act, the Attorney General will interpose an objection. If, in the alternative, the jurisdiction seeks a declaratory judgment from the United States

11

District Court for the District of Columbia, that court will utilize the identical standard to determine whether to grant the request; i.e., whether the jurisdiction has established that the plan is free from discriminatory purpose or retrogressive effect. Absent administrative preclearance from the Attorney General or a successful declaratory judgment action in the district court, the jurisdiction may not implement its proposed redistricting plan.

The Attorney General may not interpose an objection to a redistricting plan on the grounds that it violates the one-person one-vote principle, on the grounds that it violates *Shaw v. Reno*, 509 U.S. 630 (1993), or on the grounds that it violates Section 2 of the Voting Rights Act. The same standard applies in a declaratory judgment action. Therefore, jurisdictions should not regard a determination of compliance with Section 5 as preventing subsequent legal challenges to that plan under other statutes by the Department of Justice or by private plaintiffs. 42 U.S.C. 1973c(a); 28 CFR 51.49.

The Section 5 "Benchmark"

As noted, under Section 5, a jurisdiction's proposed redistricting plan is compared to the "benchmark" plan to determine whether the use of the new plan would result in a retrogressive effect. The "benchmark" against which a new plan is compared is the last legally enforceable redistricting plan in force or effect. *Riley v. Kennedy*, 553 U.S. 406 (2008); 28 CFR 51.54(b)(1). Generally, the most recent plan to have received Section 5 preclearance or to have been drawn by a Federal court is the last legally enforceable redistricting plan for Section 5 purposes. When a jurisdiction has received Section 5 preclearance for a new redistricting plan, or a Federal court has drawn a

12

new plan and ordered it into effect, that plan replaces the last legally enforceable plan as the Section 5 benchmark. *McDaniel v. Sanchez*, 452 U.S. 130 (1981); *Texas v. United States*, 785 F. Supp. 201 (D.D.C. 1992); *Mississippi v. Smith*, 541 F. Supp. 1329, 1333 (D.D.C. 1982), appeal dismissed, 461 U.S. 912 (1983).

A plan found to be unconstitutional by a Federal court under the principles of *Shaw v. Reno* and its progeny cannot serve as the Section 5 benchmark, *Abrams v. Johnson*, 521 U.S. 74 (1997), and in such circumstances, the benchmark for Section 5 purposes will be the last legally enforceable plan predating the unconstitutional plan. Absent such a finding of unconstitutionality under *Shaw* by a Federal court, the last legally enforceable plan will serve as the benchmark for Section 5 review. Therefore, the question of whether the benchmark plan is constitutional will not be considered during the Department's Section 5 review.

### Analysis of Plans

As noted above, there are two necessary components to the analysis of whether a proposed redistricting plan meets the Section 5 standard. The first is a determination that the jurisdiction has met its burden of establishing that the plan was adopted free of any discriminatory purpose. The second is a determination that the jurisdiction has met its burden of establishing that the proposed plan will not have a retrogressive effect.

### *Discriminatory Purpose*

Section 5 precludes implementation of a change affecting voting that has the purpose of denying or abridging the right to vote on account of race or color, or membership in a language minority group defined

13

in the Act. The 2006 amendments provide that the term "purpose" in Section 5 includes "any discriminatory purpose," and is not limited to a purpose to retrogress, as was the case after the Supreme Court's decision in *Reno v. Bossier Parish* ("*Bossier II*"), 528 U.S. 320 (2000). The Department will examine the circumstances surrounding the submitting authority's adoption of a submitted voting change, such as a redistricting plan, to determine whether direct or circumstantial evidence exists of any discriminatory purpose of denying or abridging the right to vote on account of race or color, or membership in a language minority group defined in the Act.

Direct evidence detailing a discriminatory purpose may be gleaned from the public statements of members of the adopting body or others who may have played a significant role in the process. *Busbee v. Smith*, 549 F. Supp. 494, 508 (D.D.C. 1982), *aff'd*, 459 U.S. 1166 (1983). The Department will also evaluate whether there are instances where the invidious element may be missing, but the underlying motivation is nonetheless intentionally discriminatory. In the *Garza* case, Judge Kozinski provided the clearest example:

> Assume you are an anglo homeowner who lives in an all-white neighborhood. Suppose, also, that you harbor no ill feelings toward minorities. Suppose further, however, that some of your neighbors persuade you that having an integrated neighborhood would lower property values and that you stand to lose a lot of money on your home. On the basis of that belief, you join a pact not to sell your house to minorities. Have you engaged in intentional racial and ethnic discrimination?

14

> Of course you have. Your personal feelings toward minorities don't matter; what matters is that you intentionally took actions calculated to keep them out of your neighborhood.

*Garza and United States v. County of Los Angeles*, 918 F.2d 763, 778 n.1 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part), *cert. denied*, 498 U.S. 1028 (1991).

In determining whether there is sufficient circumstantial evidence to conclude that the jurisdiction has not established the absence of the prohibited discriminatory purpose, the Attorney General will be guided by the Supreme Court's illustrative, but not exhaustive, list of those "subjects for proper inquiry in determining whether racially discriminatory intent existed," outlined in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977). In that case, the Court, noting that such an undertaking presupposes a "sensitive inquiry," identified certain areas to be reviewed in making this determination: (1) The impact of the decision; (2) the historical background of the decision, particularly if it reveals a series of decisions undertaken with discriminatory intent; (3) the sequence of events leading up to the decision; (4) whether the challenged decision departs, either procedurally or substantively, from the normal practice; and (5) contemporaneous statements and viewpoints held by the decision-makers. *Id.* at 266-68.

The single fact that a jurisdiction's proposed redistricting plan does not contain the maximum possible number of districts in which minority group members are a majority of the population or have the ability to elect candidates of choice to office, does not

15

mandate that the Attorney General interpose an objection based on a failure to demonstrate the absence of a discriminatory purpose. Rather, the Attorney General will base the determination on a review of the plan in its entirety.

*Retrogressive Effect*

An analysis of whether the jurisdiction has met its burden of establishing that the proposed plan would not result in a discriminatory or "retrogressive" effect starts with a basic comparison of the benchmark and proposed plans at issue, using updated census data in each. Thus, the Voting Section staff loads the boundaries of the benchmark and proposed plans into the Civil Rights Division's geographic information system [GIS]. Population data are then calculated for each district in the benchmark and the proposed plans using the most recent decennial census data.

A proposed plan is retrogressive under Section 5 if its net effect would be to reduce minority voters' "effective exercise of the electoral franchise" when compared to the benchmark plan. *Beer v. United States* at 141. In 2006, Congress clarified that this means the jurisdiction must establish that its proposed redistricting plan will not have the effect of "diminishing the ability of any citizens of the United States" because of race, color, or membership in a language minority group defined in the Act, "to elect their preferred candidate of choice." 42 U.S.C. 1973c(b) & (d). In analyzing redistricting plans, the Department will follow the congressional directive of ensuring that the ability of such citizens to elect their preferred candidates of choice is protected. That ability to elect either exists or it does not in any particular circumstance.

16

In determining, whether the ability to elect exists in the benchmark plan and whether it continues in the proposed plan, the Attorney General does not rely on any predetermined or fixed demographic percentages at any point in the assessment. Rather, in the Department's view, this determination requires a functional analysis of the electoral behavior within the particular jurisdiction or election district. As noted above, census data alone may not provide sufficient indicia of electoral behavior to make the requisite determination. Circumstances, such as differing rates of electoral participation within discrete portions of a population, may impact on the ability of voters to elect candidates of choice, even if the overall demographic data show no significant change.

Although comparison of the census population of districts in the benchmark and proposed plans is the important starting point of any Section 5 analysis, additional demographic and election data in the submission is often helpful in making the requisite Section 5 determination. 28 CFR 51.28(a). For example, census population data may not reflect significant differences in group voting behavior. Therefore, election history and voting patterns within the jurisdiction, voter registration and turnout information, and other similar information are very important to an assessment of the actual effect of a redistricting plan.

The Section 5 Procedures contain the factors that the courts have considered in deciding whether or not a redistricting plan complies with Section 5. These factors include whether minority voting strength is reduced by the proposed redistricting; whether minority concentrations are fragmented among different districts; whether minorities

17

are overconcentrated in one or more districts; whether alternative plans satisfying the jurisdiction's legitimate governmental interests exist, and whether they were considered; whether the proposed plan departs from objective redistricting criteria set by the submitting jurisdiction, ignores other relevant factors such as compactness and contiguity, or displays a configuration that inexplicably disregards available natural or artificial boundaries; and, whether the plan is inconsistent with the jurisdiction's stated redistricting standards. 28 CFR 51.56-59.

Alternatives to Retrogressive Plans

There may be circumstances in which the jurisdiction asserts that, because of shifts in population or other significant changes since the last redistricting (*e.g.*, residential segregation and demographic distribution of the population within the jurisdiction, the physical geography of the jurisdiction, the jurisdiction's historical redistricting practices, political boundaries, such as cities or counties, and/or state redistricting requirements), retrogression is unavoidable. In those circumstances, the submitting jurisdiction seeking preclearance of such a plan bears the burden of demonstrating that a less-retrogressive plan cannot reasonably be drawn.

In considering whether less-retrogressive alternative plans are available, the Department of Justice looks to plans that were actually considered or drawn by the submitting jurisdiction, as well as alternative plans presented or made known to the submitting jurisdiction by interested citizens or others. In addition, the Department may develop illustrative alternative plans for use in its analysis, taking into consideration the jurisdiction's redistricting principles. If it is determined that a

18

reasonable alternative plan exists that is non-retrogressive or less retrogressive than the submitted plan, the Attorney General will interpose an objection.

Preventing retrogression under Section 5 does not require jurisdictions to violate the one-person, one-vote principle. 52 FR 488 (Jan. 6, 1987). Similarly, preventing retrogression under Section 5 does not require jurisdictions to violate *Shaw v. Reno* and related cases.

The one-person, one-vote issue arises most commonly where substantial demographic changes have occurred in some, but not all, parts of a jurisdiction. Generally, a plan for congressional redistricting that would require a greater overall population deviation than the submitted plan is not considered a reasonable alternative by the Department. For state legislative and local redistricting, a plan that would require significantly greater overall population deviations is not considered a reasonable alternative.

In assessing whether a less retrogressive plan can reasonably be drawn, the geographic compactness of a jurisdiction's minority population will be a factor in the Department's analysis. This analysis will include a review of the submitting jurisdiction's historical redistricting practices and district configurations to determine whether the alternative plan would (a) abandon those practices and (b) require highly unusual features to link together widely separated minority concentrations.

At the same time, compliance with Section 5 of the Voting Rights Act may require the jurisdiction to depart from strict adherence to certain of its redistricting criteria. For example, criteria that

19

require the jurisdiction to make the least possible change to existing district boundaries, to follow county, city, or precinct boundaries, protect incumbents, preserve partisan balance, or in some cases, require a certain level of compactness of district boundaries may need to give way to some degree to avoid retrogression. In evaluating alternative or illustrative plans, the Department of Justice relies upon plans that make the least departure from a jurisdiction's stated redistricting criteria needed to prevent retrogression.

The Use of 2010 Census Data

The most current population data are used to measure both the benchmark plan and the proposed redistricting plan. 28 CFR 51.54(b)(2) (Department of Justice considers "the conditions existing at the time of the submission."); *City of Rome v. United States*, 446 U.S. 156, 186 (1980) ("most current available population data" to be used for measuring effect of annexations); *Reno v. Bossier Parish School Board*, 528 U.S. 320, 334 (2000) ("the baseline is the status quo that is proposed to be changed: If the change 'abridges the right to vote' relative to the status quo, preclearance is denied* * * .").

For redistricting after the 2010 Census, the Department of Justice will, consistent with past practice, evaluate redistricting submissions using the 2010 Census population data released by the Bureau of the Census for redistricting pursuant to Public Law 94-171, 13 U.S.C. 141(c). Thus, our analysis of the proposed redistricting plans includes a review and assessment of the Public Law 94-171 population data, even if those data are not included in the submission or were not used by the jurisdiction in drawing the plan. The failure to use the Public Law 94-171

20

population data in redistricting does not, by itself, constitute a reason for interposing an objection. However, unless other population data used can be shown to be more accurate and reliable than the Public Law 94-171 data, the Attorney General will consider the Public Law 94-171 data to measure the total population and voting age population within a jurisdiction for purposes of its Section 5 analysis.

As in 2000, the 2010 Census Public Law 94-171 data will include counts of persons who have identified themselves as members of more than one racial category. This reflects the October 30, 1997, decision by the Office of Management and Budget [OMB] to incorporate multiple-race reporting into the Federal statistical system. 62 FR 58782-58790. Likewise, on March 9, 2000, OMB issued Bulletin No. 00-02 addressing "Guidance on Aggregation and Allocation of Data on Race for Use in Civil Rights Enforcement." Part II of that Bulletin describes how such census responses will be allocated by Federal executive agencies for use in civil rights monitoring and enforcement.

The Department will follow both aggregation methods defined in Part II of the Bulletin. The Department's initial review of a plan will be based upon allocating any multiple-item response that includes white and one of the five other race categories identified in the response. Thus, the total numbers for "Black/African American," "Asian," "American Indian/Alaska Native," "Native Hawaiian or Other Pacific Islander" and "Some other race" reflect the total of the single-race responses and the multiple responses in which an individual selected a minority race and white race.

21

The Department will then move to the second step in its application of the census data to the plan by reviewing the other multiple-race category, which is comprised of all multiple-race responses consisting of more than one minority race. Where there are significant numbers of such responses, we will, as required by both the OMB guidance and judicial opinions, allocate these responses on an iterative basis to each of the component single-race categories for analysis. *Georgia v. Ashcroft*, 539 U.S. 461, 473, n.1 (2003).

As in the past, the Department will analyze Latino voters as a separate group for purposes of enforcement of the Voting Rights Act. If there are significant numbers of responses which report Latino and one or more minority races (for example, Latinos who list their race as Black/African-American), those responses will be allocated alternatively to the Latino category and the minority race category.

Dated: February 3, 2011
Thomas E. Perez,
*Assistant Attorney General. Civil Rights Division.*
[FR Doc. 2011-2797 Filed 2-8-11; 8:45 am]
BILLING CODE 4410-13-P

22

From: Kent Stigall <kstigall@dls.virginia.gov>

Sent: Wednesday, March 2, 2011 2:02 PM

To: Chris Jones <chris@schrisjones.jones>; Chris Jones <DelCJones@house.virginia.gov>

Subject: District demographics

Attach: 2001POP_house.xls; 2010 house.xls

---

I wasn't sure where you wanted the files sent so you have them at both addresses.

Give me a shout if you need anything else.

Kent

23
(Insert Fold-In)

2001 Data - House

| DISTRICT | TOTALPOP | WHITE | % White | BLACK | % Black | AMIND | % AmInd | ASIAN | % Asian | HAWPI | OTHER | MULTI | HISP | % Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 69,144 | 67,806 | 98.10% | 615 | 0.90% | 366 | 0.50% | 158 | 0.20% | 16 | 124 | 59 | 381 | 0.60% |
| 2 | 69,917 | 67,535 | 96.60% | 1,737 | 2.50% | 234 | 0.30% | 163 | 0.20% | 13 | 200 | 35 | 476 | 0.70% |
| 3 | 69,754 | 67,789 | 97.20% | 1,317 | 1.90% | 227 | 0.30% | 250 | 0.40% | 9 | 121 | 41 | 351 | 0.50% |
| 4 | 69,839 | 67,180 | 96.20% | 1,838 | 2.60% | 305 | 0.40% | 262 | 0.40% | 20 | 179 | 55 | 503 | 0.70% |
| 5 | 71,025 | 67,333 | 94.80% | 2,440 | 3.40% | 312 | 0.40% | 188 | 0.30% | 11 | 692 | 49 | 1,405 | 2.00% |
| 6 | 72,137 | 67,718 | 93.90% | 3,315 | 4.60% | 307 | 0.40% | 377 | 0.50% | 21 | 304 | 95 | 583 | 0.80% |
| 7 | 70,575 | 65,106 | 92.30% | 3,428 | 4.90% | 318 | 0.50% | 1,118 | 1.60% | 32 | 416 | 157 | 784 | 1.10% |
| 8 | 70,024 | 65,297 | 93.20% | 2,942 | 4.20% | 237 | 0.30% | 1,103 | 1.60% | 18 | 337 | 90 | 644 | 0.90% |
| 9 | 71,196 | 63,187 | 88.80% | 7,073 | 9.90% | 259 | 0.40% | 230 | 0.30% | 19 | 314 | 114 | 837 | 1.20% |
| 10 | 72,191 | 60,082 | 83.20% | 10,521 | 14.60% | 259 | 0.40% | 168 | 0.20% | 36 | 1,022 | 103 | 1,993 | 2.80% |
| 11 | 71,296 | 44,002 | 61.70% | 24,857 | 34.90% | 393 | 0.60% | 799 | 1.10% | 35 | 800 | 410 | 1,139 | 1.60% |
| 12 | 71,248 | 63,343 | 88.90% | 3,759 | 5.30% | 297 | 0.40% | 2,907 | 4.10% | 35 | 652 | 255 | 925 | 1.30% |
| 13 | 69,993 | 58,203 | 83.20% | 6,229 | 8.90% | 376 | 0.50% | 2,495 | 3.60% | 62 | 2,258 | 370 | 4,351 | 6.20% |
| 14 | 71,021 | 42,702 | 60.10% | 27,060 | 38.10% | 216 | 0.30% | 424 | 0.60% | 16 | 447 | 156 | 1,055 | 1.50% |
| 15 | 69,858 | 66,813 | 95.60% | 1,500 | 2.10% | 336 | 0.50% | 264 | 0.40% | 26 | 848 | 71 | 1,564 | 2.20% |
| 16 | 70,269 | 51,497 | 73.30% | 17,579 | 25.00% | 212 | 0.30% | 283 | 0.40% | 5 | 587 | 106 | 1,351 | 1.90% |
| 17 | 70,453 | 65,619 | 93.10% | 2,853 | 4.00% | 264 | 0.40% | 1,148 | 1.60% | 17 | 435 | 117 | 760 | 1.10% |
| 18 | 70,610 | 64,331 | 91.10% | 4,631 | 6.60% | 398 | 0.60% | 535 | 0.80% | 39 | 563 | 113 | 1,511 | 2.10% |
| 19 | 71,715 | 65,790 | 91.70% | 4,930 | 6.90% | 330 | 0.50% | 382 | 0.50% | 16 | 178 | 89 | 462 | 0.60% |
| 20 | 71,422 | 65,187 | 91.30% | 5,055 | 7.10% | 269 | 0.40% | 314 | 0.40% | 13 | 478 | 106 | 986 | 1.40% |
| 21 | 71,694 | 45,119 | 62.90% | 17,263 | 24.10% | 500 | 0.70% | 6,660 | 9.30% | 108 | 1,370 | 674 | 3,215 | 4.50% |
| 22 | 70,192 | 60,044 | 85.50% | 8,963 | 12.80% | 311 | 0.40% | 471 | 0.70% | 14 | 263 | 126 | 602 | 0.90% |
| 23 | 70,383 | 46,967 | 66.70% | 21,218 | 30.10% | 360 | 0.50% | 930 | 1.30% | 34 | 548 | 326 | 933 | 1.30% |
| 24 | 69,520 | 61,255 | 88.10% | 6,895 | 9.90% | 482 | 0.70% | 461 | 0.70% | 31 | 272 | 124 | 614 | 0.90% |
| 25 | 72,317 | 67,101 | 92.80% | 3,777 | 5.20% | 349 | 0.50% | 417 | 0.60% | 17 | 534 | 122 | 1,361 | 1.90% |
| 26 | 70,945 | 63,857 | 90.00% | 2,865 | 4.00% | 235 | 0.30% | 1,671 | 2.40% | 28 | 2,091 | 198 | 5,076 | 7.20% |
| 27 | 70,576 | 51,524 | 73.00% | 15,472 | 21.90% | 428 | 0.60% | 1,798 | 2.50% | 45 | 1,003 | 306 | 1,717 | 2.40% |
| 28 | 70,096 | 56,405 | 80.50% | 10,085 | 14.40% | 623 | 0.90% | 1,347 | 1.90% | 85 | 1,213 | 338 | 2,584 | 3.70% |
| 29 | 69,941 | 63,500 | 90.80% | 3,933 | 5.60% | 376 | 0.50% | 762 | 1.10% | 28 | 1,165 | 177 | 2,149 | 3.10% |
| 30 | 69,315 | 56,605 | 81.70% | 11,098 | 16.00% | 344 | 0.50% | 454 | 0.70% | 18 | 611 | 185 | 1,249 | 1.80% |
| 31 | 70,499 | 47,402 | 67.20% | 16,026 | 22.70% | 498 | 0.70% | 3,021 | 4.30% | 141 | 2,722 | 689 | 5,197 | 7.40% |
| 32 | 71,810 | 58,709 | 81.80% | 5,048 | 7.00% | 266 | 0.40% | 5,447 | 7.60% | 73 | 1,862 | 405 | 4,046 | 5.60% |
| 33 | 70,956 | 63,051 | 88.90% | 4,764 | 6.70% | 289 | 0.40% | 1,381 | 1.90% | 35 | 1,234 | 202 | 2,504 | 3.50% |
| 34 | 69,893 | 57,250 | 81.90% | 1,923 | 2.80% | 221 | 0.30% | 8,787 | 12.60% | 44 | 1,357 | 311 | 2,649 | 3.80% |
| 35 | 70,857 | 56,056 | 79.10% | 2,865 | 4.00% | 248 | 0.40% | 9,428 | 13.30% | 45 | 1,848 | 367 | 4,105 | 5.80% |

HOD009189

PLAINTIFFS TX 012 - page 2

24
(Insert Fold-In)

| 2001 Data - House | | | | | | | | | | | | | |
| DISTRICT | TOTALPOP | WHITE | % White | BLACK | % Black | AMIND | % AmInd | ASIAN | % Asian | HAWPI | OTHER | MULTI | HISP | % Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36 | 70,596 | 53,332 | 75.50% | 5,907 | 8.40% | 321 | 0.50% | 7,519 | 10.70% | 60 | 2,984 | 473 | 6,166 | 8.70% |
| 37 | 69,558 | 50,222 | 72.20% | 4,341 | 6.20% | 327 | 0.50% | 10,366 | 14.90% | 71 | 3,704 | 527 | 7,241 | 10.40% |
| 38 | 71,701 | 42,775 | 59.70% | 6,687 | 9.30% | 372 | 0.50% | 12,181 | 17.00% | 56 | 8,679 | 951 | 16,083 | 22.40% |
| 39 | 71,856 | 45,811 | 63.80% | 4,165 | 5.80% | 336 | 0.50% | 15,202 | 21.20% | 88 | 5,639 | 615 | 10,357 | 14.40% |
| 40 | 71,273 | 53,593 | 75.20% | 4,946 | 6.90% | 313 | 0.40% | 9,706 | 13.60% | 62 | 2,245 | 408 | 4,689 | 6.60% |
| 41 | 71,560 | 52,986 | 74.00% | 3,902 | 5.50% | 268 | 0.40% | 11,341 | 15.80% | 98 | 2,515 | 450 | 5,556 | 7.80% |
| 42 | 69,645 | 47,228 | 67.80% | 10,950 | 15.70% | 386 | 0.60% | 7,863 | 11.30% | 111 | 2,443 | 664 | 5,142 | 7.40% |
| 43 | 70,425 | 48,110 | 68.30% | 9,962 | 14.10% | 356 | 0.50% | 8,212 | 11.70% | 112 | 3,067 | 606 | 6,377 | 9.10% |
| 44 | 71,686 | 43,192 | 60.30% | 16,364 | 22.80% | 463 | 0.60% | 4,881 | 6.80% | 88 | 5,919 | 779 | 10,454 | 14.60% |
| 45 | 71,621 | 54,656 | 76.30% | 10,478 | 14.60% | 366 | 0.50% | 2,627 | 3.70% | 67 | 2,912 | 515 | 5,695 | 8.00% |
| 46 | 70,944 | 37,515 | 52.90% | 17,732 | 25.00% | 326 | 0.50% | 6,879 | 9.70% | 107 | 6,780 | 1,605 | 10,648 | 15.00% |
| 47 | 70,306 | 50,297 | 71.50% | 5,197 | 7.40% | 413 | 0.60% | 6,983 | 9.90% | 68 | 6,681 | 667 | 12,399 | 17.60% |
| 48 | 71,802 | 56,384 | 78.50% | 4,449 | 6.20% | 373 | 0.50% | 6,484 | 9.00% | 73 | 3,526 | 513 | 6,945 | 9.70% |
| 49 | 70,631 | 29,983 | 42.50% | 14,273 | 20.20% | 494 | 0.70% | 6,647 | 9.40% | 77 | 17,817 | 1,340 | 28,906 | 40.90% |
| 50 | 71,915 | 51,470 | 71.60% | 9,298 | 12.90% | 526 | 0.70% | 2,819 | 3.90% | 79 | 7,235 | 488 | 11,357 | 15.80% |
| 51 | 69,418 | 47,756 | 68.80% | 13,388 | 19.30% | 412 | 0.60% | 3,705 | 5.30% | 119 | 3,277 | 761 | 6,413 | 9.20% |
| 52 | 71,116 | 44,419 | 62.50% | 17,954 | 25.20% | 600 | 0.80% | 3,214 | 4.50% | 117 | 3,999 | 813 | 7,859 | 11.10% |
| 53 | 71,895 | 51,258 | 71.30% | 3,188 | 4.40% | 317 | 0.40% | 12,364 | 17.20% | 64 | 4,316 | 388 | 8,831 | 12.30% |
| 54 | 71,369 | 58,507 | 82.00% | 9,985 | 14.00% | 505 | 0.70% | 1,056 | 1.50% | 65 | 951 | 300 | 2,045 | 2.90% |
| 55 | 69,763 | 60,956 | 87.40% | 7,209 | 10.30% | 378 | 0.50% | 707 | 1.00% | 9 | 340 | 164 | 744 | 1.10% |
| 56 | 70,103 | 56,584 | 80.70% | 11,225 | 16.00% | 302 | 0.40% | 1,482 | 2.10% | 21 | 331 | 158 | 855 | 1.20% |
| 57 | 70,576 | 51,781 | 73.40% | 13,314 | 18.90% | 222 | 0.30% | 3,954 | 5.60% | 30 | 908 | 367 | 1,905 | 2.70% |
| 58 | 69,956 | 62,005 | 88.60% | 5,987 | 8.60% | 284 | 0.40% | 967 | 1.40% | 18 | 558 | 137 | 1,200 | 1.70% |
| 59 | 70,616 | 49,145 | 69.60% | 20,277 | 28.70% | 323 | 0.50% | 270 | 0.40% | 24 | 379 | 198 | 1,003 | 1.40% |
| 60 | 69,676 | 42,717 | 61.30% | 25,871 | 37.10% | 246 | 0.40% | 287 | 0.40% | 25 | 350 | 180 | 850 | 1.20% |
| 61 | 69,970 | 43,266 | 61.80% | 25,577 | 36.60% | 277 | 0.40% | 221 | 0.30% | 11 | 473 | 145 | 885 | 1.30% |
| 62 | 71,382 | 50,800 | 71.20% | 17,133 | 24.00% | 537 | 0.80% | 1,116 | 1.60% | 83 | 1,319 | 394 | 2,592 | 3.60% |
| 63 | 69,833 | 26,825 | 38.40% | 41,533 | 59.50% | 270 | 0.40% | 436 | 0.60% | 34 | 442 | 293 | 875 | 1.30% |
| 64 | 71,384 | 52,454 | 73.50% | 16,739 | 23.40% | 362 | 0.50% | 1,151 | 1.60% | 43 | 416 | 219 | 1,029 | 1.40% |
| 65 | 70,062 | 61,412 | 87.70% | 6,447 | 9.20% | 241 | 0.30% | 1,495 | 2.10% | 14 | 332 | 121 | 827 | 1.20% |
| 66 | 70,100 | 58,904 | 84.00% | 8,183 | 11.70% | 376 | 0.50% | 1,743 | 2.50% | 52 | 656 | 186 | 1,411 | 2.00% |
| 67 | 69,535 | 52,724 | 75.80% | 3,961 | 5.70% | 309 | 0.40% | 10,028 | 14.40% | 55 | 2,082 | 376 | 4,645 | 6.70% |
| 68 | 70,442 | 59,369 | 84.30% | 7,999 | 11.40% | 282 | 0.40% | 1,666 | 2.40% | 34 | 765 | 327 | 1,319 | 1.90% |
| 69 | 69,569 | 22,050 | 31.70% | 43,215 | 62.10% | 324 | 0.50% | 1,136 | 1.60% | 120 | 2,126 | 598 | 3,264 | 4.70% |
| 70 | 70,274 | 22,988 | 32.70% | 43,385 | 61.70% | 417 | 0.60% | 736 | 1.00% | 39 | 2,153 | 556 | 3,392 | 4.80% |

HOD009189

PLAINTIFFS TX 012 - page 3

25
(Insert Fold-In)

| 2001 Data - House | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DISTRICT | TOTALPOP | WHITE | % White | BLACK | % Black | AMIND | % AmInd | ASIAN | % Asian | HAWPI | OTHER | MULTI | HISP | % Hispanic |
| 71 | 69,540 | 24,789 | 35.60% | 42,230 | 60.70% | 277 | 0.40% | 1,256 | 1.80% | 32 | 539 | 417 | 921 | 1.30% |
| 72 | 70,775 | 59,440 | 84.00% | 5,670 | 8.00% | 243 | 0.30% | 4,352 | 6.10% | 44 | 825 | 201 | 1,580 | 2.20% |
| 73 | 71,553 | 55,495 | 77.60% | 10,269 | 14.40% | 403 | 0.60% | 3,567 | 5.00% | 38 | 1,368 | 413 | 2,450 | 3.40% |
| 74 | 70,867 | 23,216 | 32.80% | 44,929 | 63.40% | 978 | 1.40% | 681 | 1.00% | 28 | 616 | 419 | 1,141 | 1.60% |
| 75 | 69,867 | 28,987 | 41.50% | 39,977 | 57.20% | 179 | 0.30% | 238 | 0.30% | 26 | 318 | 142 | 713 | 1.00% |
| 76 | 71,957 | 52,829 | 73.40% | 16,910 | 23.50% | 437 | 0.60% | 1,072 | 1.50% | 40 | 421 | 248 | 1,064 | 1.50% |
| 77 | 71,285 | 27,162 | 38.10% | 42,122 | 59.10% | 398 | 0.60% | 740 | 1.00% | 39 | 452 | 372 | 1,005 | 1.40% |
| 78 | 70,798 | 55,975 | 79.10% | 11,037 | 15.60% | 481 | 0.70% | 2,232 | 3.20% | 60 | 711 | 302 | 1,752 | 2.50% |
| 79 | 70,758 | 41,114 | 58.10% | 26,091 | 36.90% | 543 | 0.80% | 1,647 | 2.30% | 93 | 759 | 511 | 1,604 | 2.30% |
| 80 | 70,554 | 27,225 | 38.60% | 41,288 | 58.50% | 452 | 0.60% | 661 | 0.90% | 70 | 461 | 397 | 1,047 | 1.50% |
| 81 | 72,077 | 54,786 | 76.00% | 12,708 | 17.60% | 640 | 0.90% | 1,967 | 2.70% | 109 | 1,332 | 535 | 3,119 | 4.30% |
| 82 | 71,737 | 62,490 | 87.10% | 5,940 | 8.30% | 435 | 0.60% | 1,491 | 2.10% | 100 | 1,001 | 280 | 2,351 | 3.30% |
| 83 | 71,766 | 51,613 | 71.90% | 14,471 | 20.20% | 541 | 0.80% | 3,107 | 4.30% | 87 | 1,317 | 630 | 2,938 | 4.10% |
| 84 | 72,047 | 49,194 | 68.30% | 15,118 | 21.00% | 583 | 0.80% | 4,820 | 6.70% | 109 | 1,561 | 662 | 3,497 | 4.90% |
| 85 | 72,039 | 50,669 | 70.30% | 13,672 | 19.00% | 429 | 0.60% | 5,634 | 7.80% | 81 | 1,072 | 482 | 2,410 | 3.30% |
| 86 | 71,069 | 46,825 | 65.90% | 6,452 | 9.10% | 350 | 0.50% | 10,375 | 14.60% | 64 | 6,300 | 703 | 10,979 | 15.40% |
| 87 | 72,192 | 47,349 | 65.60% | 18,562 | 25.70% | 784 | 1.10% | 2,727 | 3.80% | 122 | 1,866 | 782 | 3,601 | 5.00% |
| 88 | 70,544 | 58,628 | 83.10% | 8,394 | 11.90% | 522 | 0.70% | 1,430 | 2.00% | 85 | 1,074 | 411 | 2,427 | 3.40% |
| 89 | 71,727 | 26,910 | 37.50% | 41,166 | 57.40% | 472 | 0.70% | 1,687 | 2.40% | 81 | 852 | 559 | 1,727 | 2.40% |
| 90 | 71,743 | 26,156 | 36.50% | 41,847 | 58.30% | 390 | 0.50% | 1,718 | 2.40% | 63 | 947 | 622 | 1,990 | 2.80% |
| 91 | 71,410 | 56,069 | 78.50% | 11,743 | 16.40% | 521 | 0.70% | 1,652 | 2.30% | 96 | 900 | 429 | 2,016 | 2.80% |
| 92 | 70,108 | 23,620 | 33.70% | 42,998 | 61.30% | 477 | 0.70% | 1,331 | 1.90% | 78 | 788 | 816 | 1,772 | 2.50% |
| 93 | 69,465 | 41,702 | 60.00% | 22,215 | 32.00% | 482 | 0.70% | 2,415 | 3.50% | 121 | 1,760 | 770 | 3,480 | 5.00% |
| 94 | 71,484 | 47,985 | 67.10% | 18,085 | 25.30% | 508 | 0.70% | 2,263 | 3.20% | 124 | 1,750 | 769 | 3,221 | 4.50% |
| 95 | 70,644 | 24,622 | 34.90% | 43,284 | 61.30% | 381 | 0.50% | 959 | 1.40% | 54 | 604 | 740 | 1,462 | 2.10% |
| 96 | 69,533 | 54,811 | 78.80% | 10,780 | 15.50% | 428 | 0.60% | 2,281 | 3.30% | 87 | 773 | 373 | 1,838 | 2.60% |
| 97 | 71,205 | 55,426 | 77.80% | 13,831 | 19.40% | 884 | 1.20% | 428 | 0.60% | 17 | 357 | 262 | 679 | 1.00% |
| 98 | 70,444 | 56,373 | 80.00% | 12,494 | 17.70% | 555 | 0.80% | 510 | 0.70% | 33 | 323 | 156 | 840 | 1.20% |
| 99 | 71,978 | 50,550 | 70.20% | 19,715 | 27.40% | 458 | 0.60% | 410 | 0.60% | 37 | 629 | 179 | 1,381 | 1.90% |
| 100 | 72,110 | 43,261 | 60.00% | 23,737 | 32.90% | 543 | 0.80% | 1,154 | 1.60% | 76 | 2,994 | 345 | 4,514 | 6.30% |

HOD009189

PLAINTIFFS TX 012 - page 4

26
(Insert Fold-In)

| District | Total Population | Target | Difference | Deviation from ideal | District | Total Population | Target | Difference | Deviation from ideal |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 72,324 | 80,010 | -7,686 | -9.6% | 51 | 77,333 | 80,010 | -2,677 | -3.3% |
| 2 | 69,063 | 80,010 | -10,947 | -13.7% | 52 | 98,234 | 80,010 | 18,224 | 22.8% |
| 3 | 66,212 | 80,010 | -13,798 | -17.2% | 53 | 80,425 | 80,010 | 415 | 0.5% |
| 4 | 73,375 | 80,010 | -6,635 | -8.3% | 54 | 99,135 | 80,010 | 19,125 | 23.9% |
| 5 | 69,572 | 80,010 | -10,438 | -13.0% | 55 | 81,482 | 80,010 | 1,472 | 1.8% |
| 6 | 73,250 | 80,010 | -6,760 | -8.4% | 56 | 95,097 | 80,010 | 15,087 | 18.9% |
| 7 | 75,999 | 80,010 | -4,011 | -5.0% | 57 | 74,900 | 80,010 | -5,110 | -6.4% |
| 8 | 74,460 | 80,010 | -5,550 | -6.9% | 58 | 87,462 | 80,010 | 7,452 | 9.3% |
| 9 | 82,064 | 80,010 | 2,054 | 2.6% | 59 | 77,730 | 80,010 | -2,280 | -2.8% |
| 10 | 68,822 | 80,010 | -11,188 | -14.0% | 60 | 72,146 | 80,010 | -7,864 | -9.8% |
| 11 | 73,038 | 80,010 | -6,972 | -8.7% | 61 | 71,425 | 80,010 | -8,585 | -10.7% |
| 12 | 75,683 | 80,010 | -4,327 | -5.4% | 62 | 76,461 | 80,010 | -3,549 | -4.4% |
| 13 | 190,620 | 80,010 | 110,610 | 138.2% | 63 | 73,723 | 80,010 | -6,287 | -7.9% |
| 14 | 64,712 | 80,010 | -15,298 | -19.1% | 64 | 83,940 | 80,010 | 3,930 | 4.9% |
| 15 | 78,102 | 80,010 | -1,908 | -2.4% | 65 | 89,790 | 80,010 | 9,780 | 12.2% |
| 16 | 70,220 | 80,010 | -9,790 | -12.2% | 66 | 88,542 | 80,010 | 8,532 | 10.7% |
| 17 | 73,149 | 80,010 | -6,861 | -8.6% | 67 | 87,457 | 80,010 | 7,447 | 9.3% |
| 18 | 82,817 | 80,010 | 2,807 | 3.5% | 68 | 73,167 | 80,010 | -6,843 | -8.6% |
| 19 | 78,345 | 80,010 | -1,665 | -2.1% | 69 | 71,299 | 80,010 | -8,711 | -10.9% |
| 20 | 76,800 | 80,010 | -3,210 | -4.0% | 70 | 79,380 | 80,010 | -630 | -0.8% |
| 21 | 76,066 | 80,010 | -3,944 | -4.9% | 71 | 74,194 | 80,010 | -5,816 | -7.3% |
| 22 | 78,106 | 80,010 | -1,904 | -2.4% | 72 | 81,778 | 80,010 | 1,768 | 2.2% |
| 23 | 80,898 | 80,010 | 888 | 1.1% | 73 | 74,500 | 80,010 | -5,510 | -6.9% |
| 24 | 72,372 | 80,010 | -7,638 | -9.5% | 74 | 80,153 | 80,010 | 143 | 0.2% |
| 25 | 83,601 | 80,010 | 3,591 | 4.5% | 75 | 70,454 | 80,010 | -9,556 | -11.9% |
| 26 | 82,704 | 80,010 | 2,694 | 3.4% | 76 | 92,939 | 80,010 | 12,929 | 16.2% |
| 27 | 87,915 | 80,010 | 7,905 | 9.9% | 77 | 76,927 | 80,010 | -3,083 | -3.9% |
| 28 | 94,896 | 80,010 | 14,886 | 18.6% | 78 | 81,062 | 80,010 | 1,052 | 1.3% |
| 29 | 88,049 | 80,010 | 8,039 | 10.0% | 79 | 73,068 | 80,010 | -6,942 | -8.7% |
| 30 | 90,008 | 80,010 | 9,998 | 12.5% | 80 | 70,585 | 80,010 | -9,425 | -11.8% |
| 31 | 88,587 | 80,010 | 8,577 | 10.7% | 81 | 74,455 | 80,010 | -5,555 | -6.9% |
| 32 | 112,677 | 80,010 | 32,667 | 40.8% | 82 | 70,417 | 80,010 | -9,593 | -12.0% |
| 33 | 113,100 | 80,010 | 33,090 | 41.4% | 83 | 73,171 | 80,010 | -6,839 | -8.5% |
| 34 | 74,627 | 80,010 | -5,383 | -6.7% | 84 | 77,736 | 80,010 | -2,274 | -2.8% |
| 35 | 87,326 | 80,010 | 7,316 | 9.1% | 85 | 74,035 | 80,010 | -5,975 | -7.5% |
| 36 | 74,325 | 80,010 | -5,685 | -7.1% | 86 | 89,028 | 80,010 | 9,018 | 11.3% |
| 37 | 75,246 | 80,010 | -4,764 | -6.0% | 87 | 71,505 | 80,010 | -8,505 | -10.6% |
| 38 | 76,948 | 80,010 | -3,062 | -3.8% | 88 | 93,126 | 80,010 | 13,116 | 16.4% |
| 39 | 78,182 | 80,010 | -1,828 | -2.3% | 89 | 74,259 | 80,010 | -5,751 | -7.2% |
| 40 | 80,835 | 80,010 | 825 | 1.0% | 90 | 71,080 | 80,010 | -8,930 | -11.2% |
| 41 | 70,634 | 80,010 | -9,376 | -11.7% | 91 | 64,074 | 80,010 | -15,936 | -19.9% |
| 42 | 81,840 | 80,010 | 1,830 | 2.3% | 92 | 71,017 | 80,010 | -8,993 | -11.2% |
| 43 | 78,088 | 80,010 | -1,922 | -2.4% | 93 | 73,204 | 80,010 | -6,806 | -8.5% |
| 44 | 79,883 | 80,010 | -127 | -0.2% | 94 | 71,464 | 80,010 | -8,546 | -10.7% |
| 45 | 78,709 | 80,010 | -1,301 | -1.6% | 95 | 67,882 | 80,010 | -12,128 | -15.2% |
| 46 | 77,235 | 80,010 | -2,775 | -3.5% | 96 | 90,800 | 80,010 | 10,790 | 13.5% |
| 47 | 78,184 | 80,010 | -1,826 | -2.3% | 97 | 87,705 | 80,010 | 7,695 | 9.6% |
| 48 | 83,331 | 80,010 | 3,321 | 4.2% | 98 | 75,266 | 80,010 | -4,744 | -5.9% |
| 49 | 68,637 | 80,010 | -11,373 | -14.2% | 99 | 80,416 | 80,010 | 406 | 0.5% |
| 50 | 82,586 | 80,010 | 2,576 | 3.2% | 100 | 71,374 | 80,010 | -8,636 | -10.8% |

PLAINTIFFS TX 012 - page 5

27
(Insert Fold-In)

| District | Total Pop. | Black | % Black | White | % White | AIAN | % AIAN | Asian | % Asian | HawPI | % HawPI | Other | % Other | Multi | % Multi | Hispanic | % Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 72,324 | 2,462 | 3.4% | 68,697 | 95.0% | 417 | 0.6% | 259 | 0.4% | 38 | 0.1% | 373 | 0.5% | 78 | 0.1% | 897 | 1.2% |
| 2 | 69,063 | 1,656 | 2.4% | 66,506 | 96.3% | 284 | 0.4% | 246 | 0.4% | 5 | 0.0% | 320 | 0.5% | 46 | 0.1% | 649 | 0.9% |
| 3 | 66,212 | 1,687 | 2.5% | 63,801 | 96.4% | 257 | 0.4% | 274 | 0.4% | 16 | 0.0% | 127 | 0.2% | 50 | 0.1% | 348 | 0.5% |
| 4 | 73,375 | 2,025 | 2.8% | 69,960 | 95.3% | 354 | 0.5% | 399 | 0.5% | 28 | 0.0% | 517 | 0.7% | 92 | 0.1% | 1,096 | 1.5% |
| 5 | 69,572 | 1,782 | 2.6% | 66,204 | 95.2% | 360 | 0.5% | 219 | 0.3% | 16 | 0.0% | 883 | 1.3% | 108 | 0.2% | 1,999 | 2.9% |
| 6 | 73,250 | 3,489 | 4.8% | 68,477 | 93.5% | 368 | 0.5% | 508 | 0.7% | 18 | 0.0% | 299 | 0.4% | 91 | 0.1% | 816 | 1.1% |
| 7 | 75,999 | 4,220 | 5.6% | 68,874 | 90.6% | 410 | 0.5% | 1,580 | 2.1% | 43 | 0.1% | 648 | 0.9% | 224 | 0.3% | 1,712 | 2.3% |
| 8 | 74,460 | 4,367 | 5.9% | 66,841 | 89.8% | 343 | 0.5% | 2,069 | 2.8% | 35 | 0.0% | 643 | 0.9% | 162 | 0.2% | 1,516 | 2.0% |
| 9 | 82,064 | 7,693 | 9.4% | 72,357 | 88.2% | 438 | 0.5% | 420 | 0.5% | 30 | 0.0% | 1,042 | 1.3% | 84 | 0.1% | 2,038 | 2.5% |
| 10 | 68,822 | 9,253 | 13.4% | 57,357 | 83.3% | 321 | 0.5% | 216 | 0.3% | 16 | 0.0% | 1,565 | 2.3% | 94 | 0.1% | 2,387 | 3.5% |
| 11 | 73,038 | 27,077 | 37.1% | 41,641 | 57.0% | 388 | 0.5% | 1,273 | 1.7% | 45 | 0.1% | 2,119 | 2.9% | 495 | 0.7% | 4,387 | 6.0% |
| 12 | 75,683 | 3,722 | 4.9% | 66,051 | 87.3% | 362 | 0.5% | 4,738 | 6.3% | 58 | 0.1% | 535 | 0.7% | 217 | 0.3% | 1,718 | 2.3% |
| 13 | 190,620 | 20,901 | 11.0% | 124,874 | 65.5% | 1,316 | 0.7% | 32,384 | 17.0% | 226 | 0.1% | 9,183 | 4.8% | 1,736 | 0.9% | 23,028 | 12.1% |
| 14 | 64,712 | 26,230 | 40.5% | 36,383 | 56.2% | 286 | 0.4% | 573 | 0.9% | 15 | 0.0% | 1,032 | 1.6% | 193 | 0.3% | 1,812 | 2.8% |
| 15 | 78,102 | 1,978 | 2.5% | 73,483 | 94.1% | 474 | 0.6% | 451 | 0.6% | 30 | 0.0% | 1,525 | 2.0% | 161 | 0.2% | 3,254 | 4.2% |
| 16 | 70,220 | 17,354 | 24.7% | 50,595 | 72.1% | 313 | 0.4% | 401 | 0.6% | 28 | 0.0% | 1,332 | 1.9% | 197 | 0.3% | 2,352 | 3.3% |
| 17 | 73,149 | 4,964 | 6.8% | 64,912 | 88.7% | 414 | 0.6% | 1,879 | 2.6% | 52 | 0.1% | 750 | 1.0% | 178 | 0.2% | 2,054 | 2.8% |
| 18 | 82,817 | 5,514 | 6.7% | 73,286 | 88.5% | 654 | 0.8% | 1,229 | 1.5% | 68 | 0.1% | 1,781 | 2.2% | 285 | 0.3% | 4,377 | 5.3% |
| 19 | 78,345 | 4,976 | 6.4% | 71,686 | 91.5% | 485 | 0.6% | 761 | 1.0% | 23 | 0.0% | 321 | 0.4% | 93 | 0.1% | 1,079 | 1.4% |
| 20 | 76,800 | 5,343 | 7.0% | 69,159 | 90.1% | 339 | 0.4% | 708 | 0.9% | 31 | 0.0% | 1,061 | 1.4% | 159 | 0.2% | 2,046 | 2.7% |
| 21 | 76,066 | 19,674 | 25.9% | 44,120 | 58.0% | 559 | 0.7% | 8,530 | 11.2% | 160 | 0.2% | 1,912 | 2.5% | 1,111 | 1.5% | 5,840 | 7.7% |
| 22 | 78,106 | 9,564 | 12.2% | 66,298 | 84.9% | 470 | 0.6% | 947 | 1.2% | 33 | 0.0% | 591 | 0.8% | 203 | 0.3% | 1,359 | 1.7% |
| 23 | 80,898 | 24,387 | 30.1% | 52,271 | 64.6% | 512 | 0.6% | 2,074 | 2.6% | 49 | 0.1% | 1,136 | 1.4% | 469 | 0.6% | 2,409 | 3.0% |
| 24 | 72,372 | 6,894 | 9.5% | 63,377 | 87.6% | 803 | 1.1% | 587 | 0.8% | 54 | 0.1% | 455 | 0.6% | 202 | 0.3% | 1,279 | 1.8% |
| 25 | 83,601 | 5,149 | 6.2% | 75,378 | 90.2% | 450 | 0.5% | 910 | 1.1% | 31 | 0.0% | 1,482 | 1.8% | 201 | 0.2% | 3,287 | 3.9% |
| 26 | 82,704 | 4,002 | 4.8% | 69,835 | 84.4% | 526 | 0.6% | 2,322 | 2.8% | 78 | 0.1% | 5,617 | 6.8% | 324 | 0.4% | 9,972 | 12.1% |
| 27 | 87,915 | 24,950 | 28.4% | 53,835 | 61.2% | 672 | 0.8% | 3,326 | 3.8% | 91 | 0.1% | 4,267 | 4.9% | 774 | 0.9% | 7,454 | 8.5% |
| 28 | 94,896 | 18,738 | 19.7% | 67,409 | 71.0% | 875 | 0.9% | 3,227 | 3.4% | 114 | 0.1% | 3,614 | 3.8% | 919 | 1.0% | 8,156 | 8.6% |
| 29 | 88,049 | 6,131 | 7.0% | 75,005 | 85.2% | 572 | 0.6% | 1,608 | 1.8% | 49 | 0.1% | 4,376 | 5.0% | 308 | 0.3% | 7,986 | 9.1% |
| 30 | 90,008 | 13,596 | 15.1% | 71,208 | 79.1% | 687 | 0.8% | 1,211 | 1.3% | 88 | 0.1% | 2,839 | 3.2% | 379 | 0.4% | 5,431 | 6.0% |
| 31 | 88,587 | 21,329 | 24.1% | 50,876 | 57.4% | 980 | 1.1% | 6,136 | 6.9% | 166 | 0.2% | 8,006 | 9.0% | 1,094 | 1.2% | 17,440 | 19.7% |
| 32 | 112,677 | 8,882 | 7.9% | 78,639 | 69.8% | 546 | 0.5% | 18,265 | 16.2% | 129 | 0.1% | 5,239 | 4.6% | 977 | 0.9% | 12,650 | 11.2% |
| 33 | 113,100 | 8,216 | 7.3% | 91,930 | 81.3% | 705 | 0.6% | 6,839 | 6.0% | 91 | 0.1% | 4,607 | 4.1% | 712 | 0.6% | 11,020 | 9.7% |
| 34 | 74,627 | 2,378 | 3.2% | 56,389 | 75.6% | 260 | 0.3% | 14,115 | 18.9% | 65 | 0.1% | 1,025 | 1.4% | 395 | 0.5% | 4,083 | 5.5% |

Racial Demographics

HOD009190

PLAINTIFFS TX 012 - page 6

28
(Insert Fold-In)

| District | Total Pop. | Black | % Black | White | % White | AIAN | % AIAN | Asian | % Asian | HawPI | % HawPI | Other | % Other | Multi | % Multi | Hispanic | % Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35 | 87,326 | 4,222 | 4.8% | 61,455 | 70.4% | 372 | 0.4% | 17,851 | 20.4% | 64 | 0.1% | 2,809 | 3.2% | 553 | 0.6% | 7,687 | 8.8% |
| 36 | 74,325 | 6,557 | 8.8% | 53,192 | 71.6% | 421 | 0.6% | 10,226 | 13.8% | 55 | 0.1% | 3,353 | 4.5% | 521 | 0.7% | 8,166 | 11.0% |
| 37 | 75,246 | 5,089 | 6.8% | 50,420 | 67.0% | 501 | 0.7% | 15,072 | 20.0% | 84 | 0.1% | 3,571 | 4.7% | 509 | 0.7% | 9,596 | 12.8% |
| 38 | 76,948 | 8,355 | 10.9% | 42,145 | 54.8% | 633 | 0.8% | 14,029 | 18.2% | 84 | 0.1% | 10,981 | 14.3% | 721 | 0.9% | 22,423 | 29.1% |
| 39 | 78,182 | 5,640 | 7.2% | 42,855 | 54.8% | 602 | 0.8% | 19,256 | 24.6% | 98 | 0.1% | 9,036 | 11.6% | 695 | 0.9% | 18,721 | 23.9% |
| 40 | 80,835 | 5,583 | 6.9% | 50,362 | 62.3% | 385 | 0.5% | 20,260 | 25.1% | 116 | 0.1% | 3,473 | 4.3% | 656 | 0.8% | 8,745 | 10.8% |
| 41 | 70,634 | 4,820 | 6.8% | 48,861 | 69.2% | 376 | 0.5% | 13,025 | 18.4% | 89 | 0.1% | 2,992 | 4.2% | 471 | 0.7% | 8,758 | 12.4% |
| 42 | 81,840 | 12,530 | 15.3% | 50,066 | 61.2% | 506 | 0.6% | 14,166 | 17.3% | 179 | 0.2% | 3,534 | 4.3% | 859 | 1.0% | 9,713 | 11.9% |
| 43 | 78,088 | 12,903 | 16.5% | 47,719 | 61.1% | 516 | 0.7% | 11,514 | 14.7% | 106 | 0.1% | 4,606 | 5.9% | 724 | 0.9% | 11,333 | 14.5% |
| 44 | 79,883 | 17,844 | 22.3% | 43,977 | 55.1% | 618 | 0.8% | 6,180 | 7.7% | 107 | 0.1% | 10,269 | 12.9% | 888 | 1.1% | 19,646 | 24.6% |
| 45 | 78,709 | 9,386 | 11.9% | 60,868 | 77.3% | 507 | 0.6% | 4,149 | 5.3% | 94 | 0.1% | 3,224 | 4.1% | 481 | 0.6% | 7,724 | 9.8% |
| 46 | 77,235 | 23,170 | 30.0% | 38,614 | 50.0% | 456 | 0.6% | 7,692 | 10.0% | 113 | 0.1% | 6,247 | 8.1% | 943 | 1.2% | 13,313 | 17.2% |
| 47 | 78,184 | 5,813 | 7.4% | 56,589 | 72.4% | 739 | 0.9% | 8,838 | 11.3% | 90 | 0.1% | 5,475 | 7.0% | 640 | 0.8% | 11,875 | 15.2% |
| 48 | 83,331 | 4,937 | 5.9% | 66,164 | 79.4% | 449 | 0.5% | 9,303 | 11.2% | 107 | 0.1% | 1,905 | 2.3% | 466 | 0.6% | 6,829 | 8.2% |
| 49 | 68,637 | 12,258 | 17.9% | 34,706 | 50.6% | 863 | 1.3% | 6,508 | 9.5% | 109 | 0.2% | 13,295 | 19.4% | 898 | 1.3% | 25,906 | 37.7% |
| 50 | 82,586 | 12,298 | 14.9% | 48,105 | 58.2% | 759 | 0.9% | 5,727 | 6.9% | 145 | 0.2% | 14,685 | 17.8% | 867 | 1.0% | 27,713 | 33.6% |
| 51 | 77,333 | 17,487 | 22.6% | 44,042 | 57.0% | 848 | 1.1% | 6,257 | 8.1% | 143 | 0.2% | 7,443 | 9.6% | 1,113 | 1.4% | 16,105 | 20.8% |
| 52 | 98,234 | 29,307 | 29.8% | 48,570 | 49.4% | 958 | 1.0% | 7,833 | 8.0% | 216 | 0.2% | 9,736 | 9.9% | 1,614 | 1.6% | 20,277 | 20.6% |
| 53 | 80,425 | 3,711 | 4.6% | 53,510 | 66.5% | 527 | 0.7% | 17,541 | 21.8% | 58 | 0.1% | 4,505 | 5.6% | 573 | 0.7% | 11,102 | 13.8% |
| 54 | 99,135 | 17,358 | 17.5% | 73,991 | 74.6% | 752 | 0.8% | 2,809 | 2.8% | 181 | 0.2% | 3,318 | 3.3% | 726 | 0.7% | 7,451 | 7.5% |
| 55 | 81,482 | 8,557 | 10.5% | 69,898 | 85.8% | 571 | 0.7% | 1,457 | 1.8% | 42 | 0.1% | 718 | 0.9% | 239 | 0.3% | 1,793 | 2.2% |
| 56 | 95,097 | 13,209 | 13.9% | 73,809 | 77.6% | 483 | 0.5% | 6,259 | 6.6% | 51 | 0.1% | 873 | 0.9% | 413 | 0.4% | 2,512 | 2.6% |
| 57 | 74,900 | 13,245 | 17.7% | 53,060 | 70.8% | 452 | 0.6% | 5,661 | 7.6% | 51 | 0.1% | 2,009 | 2.7% | 422 | 0.6% | 4,670 | 6.2% |
| 58 | 87,462 | 7,960 | 9.1% | 73,991 | 84.6% | 520 | 0.6% | 2,817 | 3.2% | 55 | 0.1% | 1,826 | 2.1% | 293 | 0.3% | 3,736 | 4.3% |
| 59 | 77,730 | 19,957 | 25.7% | 55,777 | 71.8% | 457 | 0.6% | 528 | 0.7% | 38 | 0.0% | 721 | 0.9% | 252 | 0.3% | 1,699 | 2.2% |
| 60 | 72,146 | 25,345 | 35.1% | 45,053 | 62.4% | 375 | 0.5% | 439 | 0.6% | 26 | 0.0% | 689 | 1.0% | 219 | 0.3% | 1,381 | 1.9% |
| 61 | 71,425 | 24,572 | 34.4% | 44,755 | 62.7% | 467 | 0.7% | 367 | 0.5% | 27 | 0.0% | 984 | 1.4% | 253 | 0.4% | 1,972 | 2.8% |
| 62 | 76,461 | 20,756 | 27.1% | 50,920 | 66.6% | 708 | 0.9% | 1,363 | 1.8% | 158 | 0.2% | 1,947 | 2.5% | 609 | 0.8% | 4,620 | 6.0% |
| 63 | 73,723 | 43,266 | 58.7% | 28,027 | 38.0% | 363 | 0.5% | 570 | 0.8% | 42 | 0.1% | 1,031 | 1.4% | 424 | 0.6% | 2,229 | 3.0% |
| 64 | 83,940 | 18,549 | 22.1% | 60,932 | 72.6% | 530 | 0.6% | 2,184 | 2.6% | 80 | 0.1% | 1,198 | 1.4% | 467 | 0.6% | 2,992 | 3.6% |
| 65 | 89,790 | 8,659 | 9.6% | 76,337 | 85.0% | 428 | 0.5% | 3,398 | 3.8% | 52 | 0.1% | 620 | 0.7% | 296 | 0.3% | 2,204 | 2.5% |
| 66 | 88,542 | 16,104 | 18.2% | 66,178 | 74.7% | 628 | 0.7% | 3,076 | 3.5% | 94 | 0.1% | 1,863 | 2.1% | 599 | 0.7% | 4,383 | 5.0% |
| 67 | 87,457 | 6,052 | 6.9% | 55,307 | 63.2% | 415 | 0.5% | 21,113 | 24.1% | 147 | 0.2% | 3,879 | 4.4% | 544 | 0.6% | 9,540 | 10.9% |
| 68 | 73,167 | 9,335 | 12.8% | 58,903 | 80.5% | 430 | 0.6% | 2,749 | 3.8% | 43 | 0.1% | 1,352 | 1.8% | 355 | 0.5% | 3,293 | 4.5% |

Racial Demographics

HOD009190

PLAINTIFFS TX 012 - page 7

29

(Insert Fold-In)

| District | Total Pop. | Black | % Black | White | % White | AIAN | % AIAN | Asian | % Asian | HawPI | % HawPI | Other | % Other | Multi | % Multi | Hispanic | % Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 69 | 71,299 | 42,217 | 59.2% | 20,800 | 29.2% | 437 | 0.6% | 1,274 | 1.8% | 83 | 0.1% | 5,778 | 8.1% | 710 | 1.0% | 8,956 | 12.6% |
| 70 | 79,380 | 51,434 | 64.8% | 20,552 | 25.9% | 619 | 0.8% | 931 | 1.2% | 90 | 0.1% | 4,925 | 6.2% | 829 | 1.0% | 7,748 | 9.8% |
| 71 | 74,194 | 37,630 | 50.7% | 31,419 | 42.3% | 349 | 0.5% | 3,341 | 4.5% | 45 | 0.1% | 739 | 1.0% | 671 | 0.9% | 2,102 | 2.8% |
| 72 | 81,778 | 9,852 | 12.0% | 59,935 | 73.3% | 372 | 0.5% | 9,410 | 11.5% | 44 | 0.1% | 1,663 | 2.0% | 502 | 0.6% | 4,119 | 5.0% |
| 73 | 74,500 | 13,159 | 17.7% | 53,028 | 71.2% | 422 | 0.6% | 4,270 | 5.7% | 54 | 0.1% | 3,074 | 4.1% | 493 | 0.7% | 5,985 | 8.0% |
| 74 | 80,153 | 52,671 | 65.7% | 22,642 | 28.2% | 956 | 1.2% | 1,648 | 2.1% | 59 | 0.1% | 1,408 | 1.8% | 769 | 1.0% | 2,843 | 3.5% |
| 75 | 70,454 | 39,552 | 56.1% | 29,259 | 41.5% | 317 | 0.4% | 304 | 0.4% | 28 | 0.0% | 708 | 1.0% | 286 | 0.4% | 1,415 | 2.0% |
| 76 | 92,939 | 25,300 | 27.2% | 62,747 | 67.5% | 614 | 0.7% | 2,770 | 3.0% | 95 | 0.1% | 806 | 0.9% | 607 | 0.7% | 2,782 | 3.0% |
| 77 | 76,927 | 45,907 | 59.7% | 26,834 | 34.9% | 545 | 0.7% | 1,426 | 1.9% | 53 | 0.1% | 1,443 | 1.9% | 719 | 0.9% | 3,463 | 4.5% |
| 78 | 81,062 | 14,167 | 17.5% | 60,624 | 74.8% | 573 | 0.7% | 4,166 | 5.1% | 121 | 0.1% | 829 | 1.0% | 582 | 0.7% | 3,366 | 4.2% |
| 79 | 73,068 | 31,015 | 42.4% | 37,625 | 51.5% | 591 | 0.8% | 2,168 | 3.0% | 106 | 0.1% | 806 | 1.1% | 757 | 1.0% | 2,677 | 3.7% |
| 80 | 70,585 | 40,704 | 57.7% | 26,723 | 37.9% | 419 | 0.6% | 1,217 | 1.7% | 121 | 0.2% | 806 | 1.1% | 595 | 0.8% | 2,179 | 3.1% |
| 81 | 74,455 | 12,044 | 16.2% | 56,417 | 75.8% | 643 | 0.9% | 3,022 | 4.1% | 143 | 0.2% | 1,555 | 2.1% | 631 | 0.8% | 4,637 | 6.2% |
| 82 | 70,417 | 6,096 | 8.7% | 59,930 | 85.1% | 492 | 0.7% | 2,173 | 3.1% | 107 | 0.2% | 1,151 | 1.6% | 468 | 0.7% | 3,481 | 4.9% |
| 83 | 73,171 | 15,378 | 21.0% | 49,900 | 68.2% | 679 | 0.9% | 4,503 | 6.2% | 139 | 0.2% | 1,806 | 2.5% | 766 | 1.0% | 4,786 | 6.5% |
| 84 | 77,736 | 17,375 | 22.4% | 49,762 | 64.0% | 582 | 0.7% | 6,903 | 8.9% | 219 | 0.3% | 1,974 | 2.5% | 921 | 1.2% | 5,807 | 7.5% |
| 85 | 74,035 | 16,265 | 22.0% | 48,354 | 65.3% | 550 | 0.7% | 6,596 | 8.9% | 126 | 0.2% | 1,350 | 1.8% | 794 | 1.1% | 4,111 | 5.6% |
| 86 | 89,028 | 8,852 | 9.9% | 45,201 | 50.8% | 603 | 0.7% | 21,671 | 24.3% | 80 | 0.1% | 11,631 | 13.1% | 990 | 1.1% | 21,686 | 24.4% |
| 87 | 71,505 | 19,445 | 27.2% | 44,488 | 62.2% | 906 | 1.3% | 3,002 | 4.2% | 206 | 0.3% | 2,485 | 3.5% | 973 | 1.4% | 6,282 | 8.8% |
| 88 | 93,126 | 14,637 | 15.7% | 69,355 | 74.5% | 710 | 0.8% | 3,211 | 3.4% | 171 | 0.2% | 4,231 | 4.5% | 811 | 0.9% | 9,390 | 10.1% |
| 89 | 74,259 | 41,471 | 55.8% | 27,578 | 37.1% | 534 | 0.7% | 2,293 | 3.1% | 113 | 0.2% | 1,353 | 1.8% | 917 | 1.2% | 3,770 | 5.1% |
| 90 | 71,080 | 42,685 | 60.1% | 23,112 | 32.5% | 467 | 0.7% | 2,297 | 3.2% | 137 | 0.2% | 1,496 | 2.1% | 886 | 1.2% | 3,849 | 5.4% |
| 91 | 64,074 | 10,814 | 16.9% | 49,115 | 76.7% | 487 | 0.8% | 2,131 | 3.3% | 85 | 0.1% | 942 | 1.5% | 500 | 0.8% | 2,558 | 4.0% |
| 92 | 71,017 | 45,541 | 64.1% | 21,018 | 29.6% | 545 | 0.8% | 1,592 | 2.2% | 84 | 0.1% | 989 | 1.4% | 1,248 | 1.8% | 3,228 | 4.5% |
| 93 | 73,204 | 26,983 | 36.9% | 37,635 | 51.4% | 611 | 0.8% | 3,343 | 4.6% | 191 | 0.3% | 3,308 | 4.5% | 1,133 | 1.5% | 7,537 | 10.3% |
| 94 | 71,464 | 19,245 | 26.9% | 46,217 | 64.7% | 615 | 0.9% | 2,613 | 3.7% | 151 | 0.2% | 1,622 | 2.3% | 1,001 | 1.4% | 4,757 | 6.7% |
| 95 | 67,882 | 43,539 | 64.1% | 20,630 | 30.4% | 419 | 0.6% | 1,218 | 1.8% | 87 | 0.1% | 925 | 1.4% | 1,064 | 1.6% | 2,616 | 3.9% |
| 96 | 90,800 | 14,143 | 15.6% | 69,279 | 76.3% | 494 | 0.5% | 4,444 | 4.9% | 161 | 0.2% | 1,315 | 1.4% | 776 | 0.9% | 4,001 | 4.4% |
| 97 | 87,705 | 16,379 | 18.7% | 67,875 | 77.4% | 1,253 | 1.4% | 956 | 1.1% | 64 | 0.1% | 716 | 0.8% | 462 | 0.5% | 2,025 | 2.3% |
| 98 | 75,266 | 12,302 | 16.3% | 60,550 | 80.4% | 724 | 1.0% | 715 | 0.9% | 46 | 0.1% | 632 | 0.8% | 297 | 0.4% | 1,790 | 2.4% |
| 99 | 80,416 | 20,398 | 25.4% | 56,876 | 70.7% | 689 | 0.9% | 764 | 1.0% | 45 | 0.1% | 1,291 | 1.6% | 353 | 0.4% | 2,976 | 3.7% |
| 100 | 71,374 | 20,837 | 29.2% | 44,500 | 62.3% | 643 | 0.9% | 1,540 | 2.2% | 162 | 0.2% | 2,737 | 3.8% | 955 | 1.3% | 6,865 | 9.6% |

Racial Demographics

HOD009190

PLAINTIFFS TX 012 - page 8

30
(Insert Fold-In)

| District | Voting Age Pop. | VAP Black | % VAP Black | VAP White | % VAP White | VAP AIAN | % VAP AIAN | VAP Asian | % VAP Asian | VAP HawPI | % VAP HawPI | VAP Other | % VAP Other | VAP Multi | % VAP Multi | Total Hispanic | % VAP Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 57,833 | 2,462 | 4.3% | 54,688 | 94.6% | 354 | 0.6% | 187 | 0.3% | 24 | 0.0% | 286 | 0.5% | 68 | 0.1% | 2,229 | 3.9% |
| 2 | 54,630 | 1,656 | 3.0% | 52,627 | 96.3% | 231 | 0.4% | 183 | 0.3% | 4 | 0.0% | 219 | 0.4% | 32 | 0.1% | 1,812 | 3.3% |
| 3 | 53,177 | 1,687 | 3.2% | 51,247 | 96.4% | 224 | 0.4% | 219 | 0.4% | 15 | 0.0% | 70 | 0.1% | 25 | 0.0% | 2,352 | 4.4% |
| 4 | 58,842 | 2,025 | 3.4% | 56,463 | 96.0% | 281 | 0.5% | 292 | 0.5% | 17 | 0.0% | 343 | 0.6% | 61 | 0.1% | 1,699 | 2.9% |
| 5 | 55,154 | 1,782 | 3.2% | 52,877 | 95.9% | 286 | 0.5% | 161 | 0.3% | 12 | 0.0% | 544 | 1.0% | 60 | 0.1% | 1,718 | 3.1% |
| 6 | 58,276 | 3,489 | 6.0% | 54,886 | 94.2% | 274 | 0.5% | 373 | 0.6% | 15 | 0.0% | 181 | 0.3% | 54 | 0.1% | 3,293 | 5.7% |
| 7 | 62,214 | 4,220 | 6.8% | 56,718 | 91.2% | 337 | 0.5% | 1,390 | 2.2% | 38 | 0.1% | 449 | 0.7% | 160 | 0.3% | 4,383 | 7.0% |
| 8 | 58,528 | 4,367 | 7.5% | 53,302 | 91.1% | 262 | 0.4% | 1,411 | 2.4% | 27 | 0.0% | 416 | 0.7% | 81 | 0.1% | 7,454 | 12.7% |
| 9 | 65,128 | 7,693 | 11.8% | 57,791 | 88.7% | 343 | 0.5% | 279 | 0.4% | 25 | 0.0% | 670 | 1.0% | 62 | 0.1% | 8,956 | 13.8% |
| 10 | 54,788 | 9,253 | 16.9% | 46,325 | 84.6% | 255 | 0.5% | 143 | 0.3% | 15 | 0.0% | 917 | 1.7% | 55 | 0.1% | 2,204 | 4.0% |
| 11 | 56,244 | 27,077 | 48.1% | 34,278 | 60.9% | 328 | 0.6% | 924 | 1.6% | 28 | 0.0% | 1,409 | 2.5% | 302 | 0.5% | 3,849 | 6.8% |
| 12 | 64,081 | 3,722 | 5.8% | 56,094 | 87.5% | 300 | 0.5% | 4,130 | 6.4% | 52 | 0.1% | 419 | 0.7% | 175 | 0.3% | 4,637 | 7.2% |
| 13 | 131,503 | 20,901 | 15.9% | 88,513 | 67.3% | 873 | 0.7% | 21,357 | 16.2% | 146 | 0.1% | 5,979 | 4.5% | 896 | 0.7% | 3,463 | 2.6% |
| 14 | 51,053 | 26,230 | 51.4% | 30,437 | 59.6% | 221 | 0.4% | 413 | 0.8% | 12 | 0.0% | 598 | 1.2% | 117 | 0.2% | 2,179 | 4.3% |
| 15 | 61,155 | 1,978 | 3.2% | 58,102 | 95.0% | 354 | 0.6% | 332 | 0.5% | 23 | 0.0% | 943 | 1.5% | 87 | 0.1% | 3,366 | 5.5% |
| 16 | 55,023 | 17,354 | 31.5% | 40,488 | 73.6% | 241 | 0.4% | 277 | 0.5% | 18 | 0.0% | 793 | 1.4% | 113 | 0.2% | 2,782 | 5.1% |
| 17 | 58,033 | 4,964 | 8.6% | 52,464 | 90.4% | 317 | 0.5% | 1,317 | 2.3% | 32 | 0.1% | 492 | 0.8% | 112 | 0.2% | 2,677 | 4.6% |
| 18 | 62,954 | 5,514 | 8.8% | 56,490 | 89.7% | 477 | 0.8% | 831 | 1.3% | 46 | 0.1% | 1,083 | 1.7% | 148 | 0.2% | 20,277 | 32.2% |
| 19 | 61,053 | 4,976 | 8.2% | 56,236 | 92.1% | 374 | 0.6% | 464 | 0.8% | 13 | 0.0% | 196 | 0.3% | 56 | 0.1% | 16,105 | 26.4% |
| 20 | 60,846 | 5,343 | 8.8% | 55,420 | 91.1% | 259 | 0.4% | 479 | 0.8% | 23 | 0.0% | 627 | 1.0% | 93 | 0.2% | 2,025 | 3.3% |
| 21 | 55,998 | 19,674 | 35.1% | 33,867 | 60.5% | 428 | 0.8% | 6,324 | 11.3% | 111 | 0.2% | 1,298 | 2.3% | 518 | 0.9% | 1,793 | 3.2% |
| 22 | 61,006 | 9,564 | 15.7% | 52,306 | 85.7% | 357 | 0.6% | 626 | 1.0% | 28 | 0.0% | 381 | 0.6% | 133 | 0.2% | 5,431 | 8.9% |
| 23 | 64,845 | 24,387 | 37.6% | 44,229 | 68.2% | 408 | 0.6% | 1,565 | 2.4% | 36 | 0.1% | 827 | 1.3% | 287 | 0.4% | 4,670 | 7.2% |
| 24 | 58,206 | 6,894 | 11.8% | 51,393 | 88.3% | 609 | 1.0% | 472 | 0.8% | 42 | 0.1% | 312 | 0.5% | 143 | 0.2% | 1,972 | 3.4% |
| 25 | 64,291 | 5,149 | 8.0% | 58,808 | 91.5% | 326 | 0.5% | 594 | 0.9% | 20 | 0.0% | 855 | 1.3% | 129 | 0.2% | 9,390 | 14.6% |
| 26 | 67,195 | 4,002 | 6.0% | 58,129 | 86.5% | 390 | 0.6% | 1,923 | 2.9% | 76 | 0.1% | 3,625 | 5.4% | 203 | 0.3% | 4,757 | 7.1% |
| 27 | 64,804 | 24,950 | 38.5% | 41,598 | 64.2% | 486 | 0.7% | 2,366 | 3.7% | 59 | 0.1% | 2,713 | 4.2% | 413 | 0.6% | 2,038 | 3.1% |
| 28 | 70,257 | 18,738 | 26.7% | 51,913 | 73.9% | 627 | 0.9% | 2,251 | 3.2% | 82 | 0.1% | 2,363 | 3.4% | 450 | 0.6% | 897 | 1.3% |
| 29 | 66,863 | 6,131 | 9.2% | 58,376 | 87.3% | 400 | 0.6% | 1,156 | 1.7% | 38 | 0.1% | 2,700 | 4.0% | 171 | 0.3% | 1,096 | 1.6% |
| 30 | 67,963 | 13,596 | 20.0% | 54,866 | 80.7% | 501 | 0.7% | 805 | 1.2% | 60 | 0.1% | 1,752 | 2.6% | 203 | 0.3% | 4,377 | 6.4% |
| 31 | 63,042 | 21,329 | 33.8% | 37,754 | 59.9% | 646 | 1.0% | 4,255 | 6.7% | 128 | 0.2% | 5,207 | 8.3% | 593 | 0.9% | 1,712 | 2.7% |
| 32 | 78,679 | 8,882 | 11.3% | 56,041 | 71.2% | 351 | 0.4% | 12,180 | 15.5% | 88 | 0.1% | 3,462 | 4.4% | 544 | 0.7% | 9,972 | 12.7% |
| 33 | 79,525 | 8,216 | 10.3% | 65,772 | 82.7% | 459 | 0.6% | 4,351 | 5.5% | 68 | 0.1% | 3,052 | 3.8% | 354 | 0.4% | 8,156 | 10.3% |
| 34 | 55,355 | 2,378 | 4.3% | 42,350 | 76.5% | 180 | 0.3% | 10,066 | 18.2% | 52 | 0.1% | 696 | 1.3% | 254 | 0.5% | 2,992 | 5.4% |
| 35 | 66,402 | 4,222 | 6.4% | 47,589 | 71.7% | 260 | 0.4% | 12,944 | 19.5% | 53 | 0.1% | 2,054 | 3.1% | 332 | 0.5% | 2,558 | 3.9% |
| 36 | 57,195 | 6,557 | 11.5% | 42,307 | 74.0% | 293 | 0.5% | 7,397 | 12.9% | 43 | 0.1% | 2,302 | 4.0% | 301 | 0.5% | 816 | 1.4% |
| 37 | 59,812 | 5,089 | 8.5% | 40,905 | 68.4% | 365 | 0.6% | 11,585 | 19.4% | 65 | 0.1% | 2,612 | 4.4% | 344 | 0.6% | 1,999 | 3.3% |
| 38 | 59,896 | 8,355 | 13.9% | 34,059 | 56.9% | 463 | 0.8% | 10,842 | 18.1% | 53 | 0.1% | 7,896 | 13.2% | 494 | 0.8% | 27,713 | 46.3% |

Voting Age

HOD009190

PLAINTIFFS TX 012 - page 9

31
(Insert Fold-In)

| District | Voting Age Pop. | % VAP Black | % VAP Black | VAP White | % VAP White | VAP AIAN | % VAP AIAN | VAP Asian | % VAP Asian | VAP HawPI | % VAP HawPI | VAP Other | % VAP Other | VAP Multi | % VAP Multi | Total Hispanic | % VAP Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 39 | 60,143 | 5,640 | 9.4% | 34,022 | 56.6% | 442 | 0.7% | 14,795 | 24.6% | 70 | 0.1% | 6,467 | 10.8% | 434 | 0.7% | 2,409 | 4.0% |
| 40 | 59,244 | 5,583 | 9.4% | 37,817 | 63.8% | 270 | 0.5% | 14,415 | 24.3% | 67 | 0.1% | 2,404 | 4.1% | 378 | 0.6% | 1,516 | 2.6% |
| 41 | 52,989 | 4,820 | 9.1% | 37,325 | 70.4% | 256 | 0.5% | 9,641 | 18.2% | 61 | 0.1% | 2,097 | 4.0% | 269 | 0.5% | 649 | 1.2% |
| 42 | 59,031 | 12,530 | 21.2% | 37,264 | 63.1% | 352 | 0.6% | 10,175 | 17.2% | 122 | 0.2% | 2,377 | 4.0% | 436 | 0.7% | 2,616 | 4.4% |
| 43 | 59,703 | 12,903 | 21.6% | 37,859 | 63.4% | 368 | 0.6% | 8,491 | 14.2% | 78 | 0.1% | 3,224 | 5.4% | 423 | 0.7% | 3,228 | 5.4% |
| 44 | 59,332 | 17,844 | 30.1% | 34,015 | 57.3% | 423 | 0.7% | 4,622 | 7.8% | 76 | 0.1% | 6,929 | 11.7% | 559 | 0.9% | 3,736 | 6.3% |
| 45 | 65,973 | 9,386 | 14.2% | 52,192 | 79.1% | 402 | 0.6% | 3,324 | 5.0% | 76 | 0.1% | 2,313 | 3.5% | 352 | 0.5% | 2,976 | 4.5% |
| 46 | 64,174 | 23,170 | 36.1% | 33,773 | 52.6% | 385 | 0.6% | 6,410 | 10.0% | 97 | 0.2% | 4,563 | 7.1% | 657 | 1.0% | 2,387 | 3.7% |
| 47 | 65,989 | 5,813 | 8.8% | 48,804 | 74.0% | 583 | 0.9% | 7,184 | 10.9% | 68 | 0.1% | 4,250 | 6.4% | 471 | 0.7% | 2,512 | 3.8% |
| 48 | 71,185 | 4,937 | 6.9% | 56,759 | 79.7% | 369 | 0.5% | 7,804 | 11.0% | 94 | 0.1% | 1,514 | 2.1% | 369 | 0.5% | 1,381 | 1.9% |
| 49 | 54,485 | 12,258 | 22.5% | 28,619 | 52.5% | 683 | 1.3% | 5,137 | 9.4% | 85 | 0.2% | 9,874 | 18.1% | 657 | 1.2% | 7,986 | 14.7% |
| 50 | 59,678 | 12,298 | 20.6% | 36,435 | 61.1% | 523 | 0.9% | 4,223 | 7.1% | 96 | 0.2% | 9,474 | 15.9% | 499 | 0.8% | 2,054 | 3.4% |
| 51 | 56,572 | 17,487 | 30.9% | 33,900 | 59.9% | 576 | 1.0% | 4,437 | 7.8% | 102 | 0.2% | 4,898 | 8.7% | 599 | 1.1% | 2,046 | 3.6% |
| 52 | 69,541 | 29,307 | 42.1% | 36,230 | 52.1% | 615 | 0.9% | 5,553 | 8.0% | 150 | 0.2% | 6,342 | 9.1% | 830 | 1.2% | 3,287 | 4.7% |
| 53 | 62,455 | 3,711 | 5.9% | 42,414 | 67.9% | 379 | 0.6% | 13,218 | 21.2% | 49 | 0.1% | 3,297 | 5.3% | 388 | 0.6% | 7,451 | 11.9% |
| 54 | 70,835 | 17,358 | 24.5% | 54,222 | 76.5% | 539 | 0.8% | 1,867 | 2.6% | 119 | 0.2% | 2,064 | 2.9% | 351 | 0.5% | 5,985 | 8.4% |
| 55 | 60,698 | 8,557 | 14.1% | 52,470 | 86.4% | 381 | 0.6% | 952 | 1.6% | 26 | 0.0% | 442 | 0.7% | 135 | 0.2% | 4,119 | 6.8% |
| 56 | 70,975 | 13,209 | 18.6% | 55,525 | 78.2% | 362 | 0.5% | 4,110 | 5.8% | 38 | 0.1% | 550 | 0.8% | 249 | 0.4% | 2,102 | 3.0% |
| 57 | 62,660 | 13,245 | 21.1% | 45,958 | 73.3% | 350 | 0.6% | 4,943 | 7.9% | 38 | 0.1% | 1,432 | 2.3% | 293 | 0.5% | 2,843 | 4.5% |
| 58 | 67,486 | 7,960 | 11.8% | 57,799 | 85.6% | 370 | 0.5% | 2,088 | 3.1% | 45 | 0.1% | 1,120 | 1.7% | 158 | 0.2% | 7,748 | 11.5% |
| 59 | 61,131 | 19,957 | 32.6% | 44,565 | 72.9% | 364 | 0.6% | 369 | 0.6% | 29 | 0.0% | 472 | 0.8% | 155 | 0.3% | 4,620 | 7.6% |
| 60 | 57,699 | 25,345 | 43.9% | 37,024 | 64.2% | 297 | 0.5% | 328 | 0.6% | 23 | 0.0% | 439 | 0.8% | 135 | 0.2% | 9,596 | 16.6% |
| 61 | 56,775 | 24,572 | 43.3% | 36,317 | 64.0% | 353 | 0.6% | 259 | 0.5% | 15 | 0.0% | 680 | 1.2% | 166 | 0.3% | 17,440 | 30.7% |
| 62 | 58,854 | 20,756 | 35.3% | 40,463 | 68.8% | 536 | 0.9% | 1,041 | 1.8% | 97 | 0.2% | 1,325 | 2.3% | 317 | 0.5% | 11,102 | 18.9% |
| 63 | 58,013 | 43,266 | 74.6% | 22,535 | 38.8% | 291 | 0.5% | 442 | 0.8% | 29 | 0.0% | 684 | 1.2% | 309 | 0.5% | 1,790 | 3.1% |
| 64 | 67,121 | 18,549 | 27.6% | 49,790 | 74.2% | 409 | 0.6% | 1,747 | 2.6% | 58 | 0.1% | 829 | 1.2% | 295 | 0.4% | 3,254 | 4.8% |
| 65 | 65,205 | 8,659 | 13.1% | 56,651 | 85.6% | 301 | 0.5% | 2,240 | 3.4% | 29 | 0.0% | 385 | 0.6% | 159 | 0.2% | 21,686 | 32.8% |
| 66 | 65,915 | 16,104 | 24.4% | 50,876 | 77.2% | 442 | 0.7% | 2,253 | 3.4% | 67 | 0.1% | 1,138 | 1.7% | 294 | 0.4% | 9,540 | 14.5% |
| 67 | 63,998 | 6,052 | 9.5% | 41,542 | 64.9% | 297 | 0.5% | 14,811 | 23.1% | 105 | 0.2% | 2,681 | 4.2% | 330 | 0.5% | 11,020 | 17.2% |
| 68 | 58,611 | 9,335 | 15.9% | 48,194 | 82.2% | 328 | 0.6% | 2,064 | 3.5% | 32 | 0.1% | 939 | 1.6% | 229 | 0.4% | 23,028 | 39.3% |
| 69 | 55,216 | 42,217 | 76.5% | 18,031 | 32.7% | 353 | 0.6% | 1,102 | 2.0% | 59 | 0.1% | 4,137 | 7.5% | 459 | 0.8% | 12,650 | 22.9% |
| 70 | 59,060 | 51,434 | 87.1% | 17,415 | 29.5% | 479 | 0.8% | 736 | 1.2% | 67 | 0.1% | 3,354 | 5.7% | 529 | 0.9% | 4,387 | 7.4% |
| 71 | 62,649 | 37,630 | 60.1% | 28,944 | 46.2% | 320 | 0.5% | 3,199 | 5.1% | 41 | 0.1% | 612 | 1.0% | 544 | 0.9% | 6,865 | 11.0% |
| 72 | 62,711 | 9,852 | 15.7% | 47,072 | 75.1% | 263 | 0.4% | 6,786 | 10.8% | 27 | 0.0% | 1,123 | 1.8% | 315 | 0.5% | 1,079 | 1.7% |
| 73 | 59,008 | 13,159 | 22.3% | 43,286 | 73.4% | 312 | 0.5% | 3,225 | 5.5% | 38 | 0.1% | 2,124 | 3.6% | 300 | 0.5% | 1,359 | 2.3% |
| 74 | 60,325 | 52,671 | 87.3% | 19,112 | 31.7% | 748 | 1.2% | 1,218 | 2.0% | 38 | 0.1% | 935 | 1.5% | 452 | 0.7% | 348 | 0.6% |
| 75 | 56,367 | 39,552 | 70.2% | 24,072 | 42.7% | 233 | 0.4% | 230 | 0.4% | 20 | 0.0% | 469 | 0.8% | 170 | 0.3% | 1,279 | 2.3% |
| 76 | 69,266 | 25,300 | 36.5% | 48,008 | 69.3% | 463 | 0.7% | 1,809 | 2.6% | 56 | 0.1% | 508 | 0.7% | 308 | 0.4% | 1,415 | 2.0% |

Voting Age

HOD009190

PLAINTIFFS TX 012 - page 10

32
(Insert Fold-In)

| District | Voting Age Pop. | % VAP Black | % VAP Black | VAP White | % VAP White | VAP AIAN | % VAP AIAN | VAP Asian | % VAP Asian | VAP HawPI | % VAP HawPI | VAP Other | % VAP Other | VAP Multi | % VAP Multi | Total Hispanic | % VAP Hispanic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 77 | 56,134 | 45,907 | 81.8% | 20,967 | 37.4% | 387 | 0.7% | 994 | 1.8% | 37 | 0.1% | 1,044 | 1.9% | 399 | 0.7% | 6,282 | 11.2% |
| 78 | 60,892 | 14,167 | 23.3% | 46,102 | 75.7% | 421 | 0.7% | 2,885 | 4.7% | 74 | 0.1% | 529 | 0.9% | 294 | 0.5% | 3,770 | 6.2% |
| 79 | 54,594 | 31,015 | 56.8% | 29,973 | 54.9% | 424 | 0.8% | 1,670 | 3.1% | 58 | 0.1% | 549 | 1.0% | 427 | 0.8% | 3,481 | 6.4% |
| 80 | 55,645 | 40,704 | 73.1% | 22,856 | 41.1% | 333 | 0.6% | 1,053 | 1.9% | 88 | 0.2% | 662 | 1.2% | 383 | 0.7% | 4,786 | 8.6% |
| 81 | 55,612 | 12,044 | 21.7% | 42,905 | 77.2% | 480 | 0.9% | 2,148 | 3.9% | 100 | 0.2% | 999 | 1.8% | 319 | 0.6% | 4,111 | 7.4% |
| 82 | 56,016 | 6,096 | 10.9% | 48,540 | 86.7% | 378 | 0.7% | 1,554 | 2.8% | 79 | 0.1% | 800 | 1.4% | 278 | 0.5% | 5,840 | 10.4% |
| 83 | 57,417 | 15,378 | 26.8% | 40,910 | 71.3% | 501 | 0.9% | 3,376 | 5.9% | 99 | 0.2% | 1,228 | 2.1% | 439 | 0.8% | 5,807 | 10.1% |
| 84 | 57,150 | 17,375 | 30.4% | 37,686 | 65.9% | 439 | 0.8% | 4,957 | 8.7% | 156 | 0.3% | 1,325 | 2.3% | 472 | 0.8% | 7,724 | 13.5% |
| 85 | 56,846 | 16,265 | 28.6% | 38,396 | 67.5% | 431 | 0.8% | 5,069 | 8.9% | 96 | 0.2% | 917 | 1.6% | 403 | 0.7% | 25,906 | 45.6% |
| 86 | 66,342 | 8,852 | 13.3% | 35,076 | 52.9% | 414 | 0.6% | 15,537 | 23.4% | 59 | 0.1% | 8,175 | 12.3% | 643 | 1.0% | 13,313 | 20.1% |
| 87 | 54,818 | 19,445 | 35.5% | 36,228 | 66.1% | 690 | 1.3% | 2,236 | 4.1% | 140 | 0.3% | 1,745 | 3.2% | 516 | 0.9% | 7,537 | 13.7% |
| 88 | 66,826 | 14,637 | 21.9% | 51,312 | 76.8% | 492 | 0.7% | 2,161 | 3.2% | 110 | 0.2% | 2,598 | 3.9% | 417 | 0.6% | 4,001 | 6.0% |
| 89 | 56,922 | 41,471 | 72.9% | 23,198 | 40.8% | 429 | 0.8% | 1,815 | 3.2% | 89 | 0.2% | 1,000 | 1.8% | 526 | 0.9% | 6,829 | 12.0% |
| 90 | 52,752 | 42,685 | 80.9% | 18,964 | 35.9% | 348 | 0.7% | 1,779 | 3.4% | 81 | 0.2% | 1,053 | 2.0% | 503 | 1.0% | 11,875 | 22.5% |
| 91 | 49,375 | 10,814 | 21.9% | 38,682 | 78.3% | 376 | 0.8% | 1,526 | 3.1% | 63 | 0.1% | 610 | 1.2% | 286 | 0.6% | 11,333 | 23.0% |
| 92 | 54,472 | 45,541 | 83.6% | 17,406 | 32.0% | 422 | 0.8% | 1,246 | 2.3% | 69 | 0.1% | 731 | 1.3% | 745 | 1.4% | 19,646 | 36.1% |
| 93 | 55,175 | 26,983 | 48.9% | 30,636 | 55.5% | 462 | 0.8% | 2,524 | 4.6% | 130 | 0.2% | 2,346 | 4.3% | 577 | 1.0% | 9,713 | 17.6% |
| 94 | 55,572 | 19,245 | 34.6% | 37,716 | 67.9% | 475 | 0.9% | 2,045 | 3.7% | 110 | 0.2% | 1,133 | 2.0% | 556 | 1.0% | 8,758 | 15.8% |
| 95 | 51,008 | 43,539 | 85.4% | 17,021 | 33.4% | 331 | 0.6% | 913 | 1.8% | 56 | 0.1% | 642 | 1.3% | 601 | 1.2% | 18,721 | 36.7% |
| 96 | 68,293 | 14,143 | 20.7% | 53,461 | 78.3% | 476 | 0.7% | 3,030 | 4.4% | 110 | 0.2% | 798 | 1.2% | 414 | 0.6% | 8,745 | 12.8% |
| 97 | 67,243 | 16,379 | 24.4% | 52,599 | 78.2% | 923 | 1.4% | 667 | 1.0% | 40 | 0.1% | 461 | 0.7% | 247 | 0.4% | 22,423 | 33.3% |
| 98 | 59,650 | 12,302 | 20.6% | 48,573 | 81.4% | 539 | 0.9% | 494 | 0.8% | 36 | 0.1% | 428 | 0.7% | 197 | 0.3% | 4,083 | 6.8% |
| 99 | 63,601 | 20,398 | 32.1% | 46,220 | 72.7% | 527 | 0.8% | 521 | 0.8% | 33 | 0.1% | 809 | 1.3% | 217 | 0.3% | 7,687 | 12.1% |
| 100 | 61,071 | 20,837 | 34.1% | 38,910 | 63.7% | 551 | 0.9% | 1,362 | 2.2% | 145 | 0.2% | 2,046 | 3.4% | 874 | 1.4% | 8,166 | 13.4% |

HOD009190

PLAINTIFFS TX 012 - page 11

33

From: jmassie@jpmassie.com
To: Mike Wade <sheriffwade©comcast.net>
Subject: Help with Contested Election Information
Date: 3/10/2011 3:15:04 PM
Attachments: Richmond-Chesterfield-Henrico-Elections.xls

---

Mike. . . Please review the attached (open and then click on Henrico County elections tab) and let Chris Marston know (at his email address above in Cc or via cell at 703.627.4679) which contested elections featured a Black African American(s) running against a white European American(s)/other.

Chris needs this info for voting rights compliance as he is working on redistricting and I thought you would know a lot more about the past Henrico elections than I do.

I hope all the Wades/Woods are well!

Jimmie

James P. Massie, III
James P. Massie III, Inc.
700 East Main Street, Suite 1604
Richmond, Virginia 23219
(804) 649-0190
jmassie@jpmassie.com

-----Original Message-----

From: Chris Marston
[mailto:chris.marston@gmail.com]
Sent: Thursday, March 10, 2011 1:54 PM
To: johnobannon@comcast.net; Jimmie Massie;
Manoli Loupassi; Del. Cox; Bill Flanagan;
amcgiffin@comcast.net; jmassie@jpmassie.com
Subject: Help with Contested Election Information

34

Delegates Cox, Massie, and O'Bannon-- Bill, Meg, Archer--

I would appreciate your help. As part of the analysis required for compliance with the Voting Rights Act, we need to review results from contested elections in which a black candidate and a white candidate participated.

I've attached a spreadsheet listing all of the contested elections for local office--one tab per jurisdiction--over the last decade.

Could you review the spreadsheet and let me know, which, if any, of these races featured both a black and a white candidate?

You can just let me know which contests and which candidate is of which race in a reply e-mail. If you could also let me know if there are any elections about which you are unsure, that would be helpful.

If you could get back to me by Friday evening, I'd really appreciate it.

Thanks,

Chris

35

From: Chris Marston <chris.marston@gmail.com>
To: cortland.putbrese@morisonansa.com
Subject: Fwd: Help with Contested Election Information
Date: 3/11/2011 5:31:14 PM
Attachments: Richmond-Chesterfield-Henrico-Elections.xls

---

Cortland,

Hope all's well. You may not recall, but we did some work together on new media at the 09 Convention.

I'm still with Speaker Howell and I'm supporting the Caucus on redistricting.

To comply with the Voting Rights Act, we have to do some statistical analysis. One of the things we need to look at is election returns form races in which both black and white candidates competed.

I've attached a spreadsheet that lists candidates in all the contested races in the City of Richmond (as well as Henrico and Chesterfield).

Could you take a look and let me know if any of the races featured both black and white candidates? If you're not sure of any and you could reach out to one of your Richmond GOP colleagues to find out, I'd be really grateful.

Sorry for the short notice, but I'm hoping to have this back by Tuesday.

Thanks,

Chris

36

Approved 3/25/11

## HOUSE COMMITTEE ON PRIVILEGES AND ELECTIONS COMMITTEE RESOLUTION NO. 1 – House of Delegates District Criteria

(Proposed by Delegate S. Chris Jones)

RESOLVED, That after consideration of legal requirements and public policy objectives, informed by public comment, the House Committee on Privileges and Elections adopts the following criteria for the redrawing of Virginia's House of Delegates districts:

### I. Population Equality

The population of legislative districts shall be determined solely according to the enumeration established by the 2010 federal census. The population of each district shall be as nearly equal to the population of every other district as practicable. Population deviations in House of Delegates districts should be within plus-or-minus one percent.

### II. Voting Rights Act

Districts shall be drawn in accordance with the laws of the United States and the Commonwealth of Virginia including compliance with protections against the unwarranted retrogression or dilution of racial or ethnic minority voting strength. Nothing in these guidelines shall be construed to require or permit any districting policy or action that is contrary to the United States Constitution or the Voting Rights Act of 1965.

### III. Contiguity and Compactness

Districts shall be comprised of contiguous territory including adjoining insular territory. Contiguity by water is sufficient. Districts shall be contiguous and

37

compact in accordance with the Constitution of
Virginia as interpreted by the Virginia Supreme Court
in the cases of *Jamerson v. Womack*, 244 Va. 506
(1992) and *Wilkins v. West*, 264 Va. 447 (2002).

## IV.  Single-Member Districts

All districts shall be single-member districts.

## V.  Communities of Interest

Districts shall be based on legislative consideration
of the varied factors that can create or contribute to
communities of interest. These factors may include,
among others, economic factors, social factors,
cultural factors, geographic features, governmental
jurisdictions and service delivery areas, political
beliefs, voting trends, and incumbency considerations.
Public comment has been invited, has been and
continues to be received, and will be considered. It is
inevitable that some interests will be advanced more
than others by the choice of particular district
configurations. The discernment, weighing, and
balancing of the varied factors that contribute to
communities of interest is an intensely political
process best carried out by elected representatives of
the people. Local government jurisdiction and precinct
lines may reflect communities of interest to be
balanced, but they are entitled to no greater weight as
a matter of state policy than other identifiable
communities of interest.

## VI.  Priority

All of the foregoing criteria shall be considered in
the districting process, but population equality among
districts and compliance with federal and state
constitutional requirements and the Voting Rights Act
of 1965 shall be given priority in the event of conflict

38

among the criteria. Where the application of any of the foregoing criteria may cause a violation of applicable federal or state law, there may be such deviation from the criteria as is necessary, but no more than is necessary, to avoid such violation.

DL S/mrs
3/25/11

39

From: G. Paul Nardo <gpn740@gmail.com>
To: GMail <gpn740©gmail.com>
Subject: Fwd: Messaging on House Redistricting Maps
Date: 3/29/2011 7:09:50 PM
Attachments: 20110329 - Message Points on House Redistricting Plan & Maps.doc

---

Caucus Members,

THIS E-MAIL IS VERY IMPORTANT; PLEASE READ, SAVE & USE

As promised, I'm attaching suggested "messaging points" for your use in response to inquiries (media, constituents or others) about House Bill 5001, redistricting legislation introduced today by Delegate Chris Jones.

Like before, the Speaker, Chris & Rob Bell strongly encourage you to stick to these key points.

Remember: the public record is open and anything you or your LAs say can and may be used in a possible lawsuit challenging a final enacted plan that's sent to DC. Accordingly, to help ensure success on all fronts (legislative, legal, political, etc.), it is absolutely imperative that each and every one of us exercise diligent message discipline.

Further Heads Up:

A first and obvious question tonight that the media (and many of you) are asking is: "Who got put in with whom in the Jones plan? The answer: *Dems Johnson & Phillips, Dems Miller & Lewis, Reps Athey & Sherwood, and Dem Abbott & Repub. Oder as well as Dem Armstrong and Repub Merricks.* Should someone ask a follow-up as to "Why?" the plain and honest answer is this: *the Jones plan follows the dictates of*

40

*population/demographic changes and the require-ments of the federal Voting Rights Act.*

More specific "local" questions for you in your own individual district are likely to be along the lines of: "Did you want to represent this or that area?" or "Do you like the way the Jones plan does this or that?" and so forth. The smart answer would be something like: *"I'm looking forward to introducing myself to these new people"* or *"I don't know why Del. Jones drew the map this or that way, you'll have to ask him. But, the most important thing for me is my wanting to work hard to reach out to and work with these areas so I can most effectively represent them in the House."*

If you get asked a question that you cannot answer, just say so because it's Delegate Jones' legislation. You look forward to finding out more about it when Special Session I on Redistricting begins in earnest next week. Hopefully, you get the gist of what we're strongly suggesting.

Finally, if you have any specific questions and/or need help, please do not hesitate to call the Speaker, Chris Jones, Rob Bell or me. Here's the appropriate contact numbers:

Speaker Howell (540) 840-0241 Del. Chris Jones (757) 676-4961 Del. Rob Bell (434) 249-8590

41

GP Nardo (804) 840-6915

Hope this helps,

GP

 --------Forwarded message -------

From: G. Paul Nardo <gpn740@gmail.com>
Date: Tue, Mar 29, 2011 at 5:58 PM
Subject: Heads Up -- House Redistricting Maps will be available on DLS Website in near future
To: House Majority Caucus Members

Caucus Members,

FYI. The URL for the DLS website is http://redistricting.dls.virginia.gov/2010/

I'll have some macro messaging points around to everyone within the next hour. The DLS website is overwhelmed presently as they try to get the House, and I believe Senate, map posted. In the meantime, everyone is STRONGLY URGED to not talk to folks about things until you get the messaging points.

Thanks,

GP

42

From: Chris Marston <chris.marston@gmal.com>
Sent: Friday, April, 1 2011 10.33 PM
To: scj <scj@schrisjones.com>
Subject: HD61-HD75 Dale's Options
Attach: DLO-Southside-3.pdf; DLO-Southside-2.pdf

Someone's having trouble following directions.

Here are the two options that Dale proposes, neither of which fully address Tyler's concerns.

I'll try and generate another one that gets it done without dropping the %BVAP too low.





43

The Public Interest in Redistricting

A Report of the

Independent Bipartisan Advisory Commission on Redistricting

Commonwealth of Virginia

April 1, 2011

Bob Holsworth

Chair

<u>Commission Members</u>

Gary H. Baise

Viola O. Baskerville

Barry E. DuVal James W. Dyke Jean R. Jensen J. Samuel Johnston

Walter D. Kelley, Jr.

Sean T. O'Brien Cameron Quinn Ashley Taylor

<u>Commission Advisors</u>

Dustin A. Cable Charles W. Dunn Ernest C. Gates William H. Hurd Quentin Kidd Michael P. McDonald

Anthony T. Troy

Judy Ford Wason

<u>Commission Staff</u>

Steven M. Jones

44

Contents

Section 1    The Public Interest and Guiding Principles

Section 2    History of the Commission

Section 3    Public Forums

Section 4    Virginia College and University Redistricting Competition

Section 5    Constitutional and Legal Issues

Section 6    The 2010 Census: Demographic Shifts

Section 7    Metrics, Choices, and Maps

Acknowledgments

45

## Section 1

### The Public Interest and Guiding Principles

More than 300 citizens attended and more than 70 citizens testified during Public Forums conducted by the Independent Bipartisan Advisory Commission on Redistricting in Richmond, Roanoke, Northern Virginia, and Hampton Roads, and many other citizens submitted written testimony. These Virginians included private citizens, representatives of organizations, members of the General Assembly, mayors, and members of city councils and county boards. Besides the obvious conclusion that a large cross-section of citizens has a keen interest in redistricting, four other vital conclusions stand out from their testimony.

1. Reform. A common current in their testimony focused on changing the existing approach to redistricting, which on the whole leaves citizens out of the process. Many members of the public believe that elected representatives enjoy a reelection insurance policy, which enables them to choose their own constituencies in the drawing of district boundaries. Time and again citizens testified that voters should choose their elected representatives, rather than have elected representatives choose their voters. They frequently said that allowing elected representatives to draw district boundaries favorable to their own political interests undermines two vital ingredients of a democracy: vigorous competition and healthy debate.

46

2. Transparency. Many citizens testified that the current redistricting process lacks transparency, openness, and ease of understanding. They find themselves far removed from a process that they do not understand. But several other factors further complicate the basic process of drawing district boundaries, namely Virginia's economic, political and social diversity, its size, and its history that places the Commonwealth under Section 5 of the Voting Rights Act. Despite these complexities, however, a transparently open redistricting process would at a minimum enable citizens to understand available alternatives.

3. Compact Size, Contiguous Boundaries, Communities of Interest. Many witnesses before the Commission provided examples of gerrymandering that they felt egregiously violated one of three generally recognized tenets of appropriate district composition: compact size, contiguous boundaries, and communities of interest. Because so many districts throughout the Commonwealth violate these fundamentally and historically accepted tenets, citizens often do not know either who their representatives are or how they may contact them. Likewise, some elected representatives testified that they find it difficult to effectively represent far-flung districts which lack compact size, contiguous boundaries, and communities of interest.

4. Fairness. Witnesses before the Commission frequently invoked the word *fairness*. Now

47

is the time, they contend, to apply fundamental standards of fairness to the redistricting process that (1) enable constituents and their elected representatives to have easier access to one another, and (2) cause individual communities throughout the Commonwealth to have confidence that their interests receive proper representation.

Being fully cognizant of widespread citizen interest in redistricting and the preponderant views exhibited in their testimony, the Independent Bipartisan Advisory Commission on Redistricting chose to observe the following seven guidelines and principles in the conduct of its work and in the making of its recommendations.

First, the Commission's work should comply with the "one person, one vote requirements" of the U.S. Constitution as interpreted by the U.S. Supreme Court. Regarding the U.S. House of Representatives, the Court has ruled that states "must make a good faith effort to achieve precise mathematical equality" in population. However, at the state legislative level, the Court has allowed some deviations from the standard of "precise mathematical equality" if the rationale for those deviations are clearly stated in advance, conform to considerations of the Voting Rights Act and appropriately respect the stated rationale, which should involve the traditional criteria, such as political boundaries, communities of interest and other appropriate, articulated state interests.

Second, the Commission's work should comply with the Voting Rights Act. Of particular relevance are Sections 2 and 5, which contain significant

48

requirements for the Commonwealth of Virginia. First, Section 2 prohibits diluting minority vote through "manipulation of district lines," though it does not require maximizing minority voting strength. Second, Section 5 requires that Virginia's redistricting plan not regress from the number of majority-minority districts found in "baseline" plan. In the redistricting done pursuant to the 2000 census, Virginia had 1 majority-minority district in the U.S. House of Representatives, 5 majority-minority districts in the State Senate, and 12 majority-minority districts in the State House of Delegates. At the time of the 2010 census, the number of majority-minority districts was still 1 for the House of Representatives and 5 for the State Senate; however, population changes had reduced the number of majority-minority districts in the House of Delegates to 11. Although there may be some ambiguity as to which year furnishes the appropriate baseline – 2000 or 2010 – the Commission elected to use 2000 to maintain 12 majority-minority districts in the House of Delegates.

Third, the Commission's work, while recognizing the fundamental requirements of the Voting Rights Act, should ensure compliance with Article Two, Section Six of the Virginia Constitution, which directs that each district consist of contiguous and compact territory.

Fourth, the Commission's work should, to the maximum extent possible, maintain municipal and county boundaries and respect communities of interest, including economic communities of interest.

Fifth, the Commission's work should, to the maximum extent possible, respect Virginia's increasingly apparent regional identities in the 21st

49

Century, such as Northern Virginia, Hampton Roads, Central Virginia, and Southwestern Virginia.

Sixth, the Commission recognizes that any redistricting plan inevitably includes tradeoffs. Some of these, such as in Congressional redistricting, may require significant "stretching" of districts to meet population requirements. Others may require judgments that balance Voting Rights Act considerations with the maintenance of municipal and county boundary lines.

The Commission contends that appropriate trade-offs can be made without violence to the principles of equal population, Voting Rights Act requirements, compact size and contiguous boundaries, maintaining municipal and county boundaries, and respecting communities of interest.

Seventh, the Commission's work should comply with the expressed desires of citizens across the Commonwealth (1) that ordinary citizens have the opportunity to understand both the process and the results of redistricting, and (2) that the composition of districts facilitate rather than inhibit political interest and engagement in the democratic process.

Section 2

History of the Commission

The work of the Independent Bipartisan Advisory Commission on Redistricting stands out as a landmark in the movement toward an open, impartial redistricting process that actively engages the people in pursuit of the public interest. For the first time in Virginia's history, the Governor and the Virginia General Assembly have for their consideration alternative redistricting plans that meet

50

constitutional and legal standards and were developed in a manner that puts the public interest above partisan, parochial interests. But how did it all begin?

First, a cross-section of business and civic leaders identified two related problems: the lack of competition in state legislative and Congressional elections and hyper-partisanship in the legislative process. These leaders saw that the combination of these problems (1) fostered partisan gridlock in the legislative process and inhibited the achievement of practical solutions to problems, (2) eroded the accountability of elected representatives' to their constituents, and (3) undermined citizens' interest in voting or otherwise participating in their government.

Second, in 2007 these concerned citizens formed the Virginia Redistricting Coalition to advocate redistricting reform, which soon expanded to include other like-minded business and civic leaders and organizations throughout the Commonwealth, including the Virginia Chamber of Commerce, the League of Women Voters of Virginia, the Virginia Interfaith Center for Public Policy, AARP Virginia, the Virginia Business Council, Virginia 21, the Future of Hampton Roads Inc., Richmond First Club, and others. Prominent elected officials, including Governors Mark Warner and George Allen, also supported this endeavor.

Third, the Coalition proposed a "Virginia Model for Redistricting Reform," which focused on eliminating incumbency protection, controlling gerrymandering, providing for ample public comment and review, and adhering to the legal requirements of compactness, contiguity, equal population, and protection of minority voter rights.

51

Fourth, for several years the Coalition supported in the General Assembly a bill that would create an official bipartisan commission with the authority to devise redistricting plans subject to an up-or-down vote by the General Assembly.

Fifth, during the 2009 gubernatorial election, both the Democratic candidate, Senator Creigh Deeds, and the Republican candidate, now Governor Bob McDonnell, endorsed the creation of a bipartisan redistricting commission.

Sixth, on January 10, 2011, by Executive Order No. 31, Governor McDonnell fulfilled this campaign promise and created the Independent Bipartisan Advisory Commission on Redistricting, with instructions that it:

- Solicit broad public input;
- Function openly and independently of the executive and legislative branches; and
- Present its report and recommendations directly to the President Pro Tem of the Senate, the Speaker of the House, the chairs of the Senate and House Privileges and Elections Committees, and the Governor for consideration in advance of the reconvened session of the General Assembly.

Further, the Governor's Executive Order began with this preamble: "Legislative districts must be drawn in a way that maximizes voter participation and awareness and lines should reflect commonsense geographic boundaries and strong communities of interests."

As expressed in the Executive Order, here are the five criteria established by the Governor for the Commission to follow:

52

1. Consistent with Article II, Section 6 of the Constitution of Virginia, all districts shall be composed of contiguous and compact territory and shall be as equal in population as is practicable and in compliance with federal law. No district shall be composed of territories contiguous only at a point.

2. All districts shall be drawn to comply with the Virginia and United States Constitutions, applicable state and federal law, the Voting Rights Act of 1965, as amended, and relevant case law.

3. The population of legislative districts shall be determined solely according to the enumeration established by the 2010 federal census. The population of each district shall be as nearly equal to the population of every other district as practicable.

4. All districts, to the extent practicable, shall respect the boundary lines of existing political subdivisions. The number of counties and cities divided among multiple districts shall be as few as practicable.

5. To the extent possible, districts shall preserve communities of interest.

The guidelines in the Executive Order excluded political criteria, such as partisan political advantage and electoral competition. When delivering his charge orally to the Commission at its first meeting, the Governor emphatically reinforced that exclusion.

53

To read the full text of the Governor's Executive Order, please see: http://www.governor. virginia.gov/issues/executiveorders/2011/EO-31.cfm .

Section 3

Public Forums

To respect the Governor's charge that the Commission seek public input about the redistricting process, the Commission conducted Public Forums in four regions of Virginia:

- Richmond on March 11th at the Capitol;
- Roanoke on March 14th at Western Virginia Community College;
- Fairfax on March 15th at George Mason University; and
- Norfolk on March 21st at Norfolk State University.

Following a similar format at each venue,

1. The Commission Chair made opening remarks about the purpose and aims of the Commission;

2. The Commission's Legal Counsel presented the constitutional and legal principles undergirding redistricting in the United States and how these principles apply to Virginia;

3. The Commission then heard testimony from private citizens, elected officials, and representatives of organizations;

4. Students from local colleges and universities presented their redistricting maps and described how and why they had constructed them; and

54

   5. Commission members offered concluding
      remarks that expressed appreciation for the
      input they had received.

Critics of bipartisan redistricting contended that citizens have little interest in redistricting, but the facts belie the charge.

- More than 300 citizens attended the four Forums;
- More than 70 citizens, including 15 legislators, testified;
- Besides legislators, those testifying included representatives of organized political parties, interest groups and non-partisan associations, and elected officials at the local level;
- Others submitted written testimony; and
- During approximately two hours at each forum/hearing, hardly anyone left.

As these citizens testified eloquently and from the heart about the state of democracy in Virginia, their testimony developed several common themes of compelling interest to the Commission. One overarching conclusion, however, tied each of these themes together.

- The redistricting process urgently needs to be reformed.

First, many ordinary citizens neither understand the redistricting process nor do they know who represents them in the General Assembly. While technological advancements continue to make so many activities easier to understand and undertake, politics for many remains inexcusably opaque. Indeed, several members of the General Assembly testified (1) that their far-flung districts make it difficult for them to provide proper constituent service and representation,

55

and (2) that constituents frequently do not know who represents them.[1]

Second, Citizens feel that Congressional and state legislative districts separate communities of interest for inappropriate reasons. Time and again, citizens told the Commission that their districts divide rather than unite communities of interest. Bewildered by oddly drawn and befuddling district boundary lines, they could find no other reason for them than the advantage these bizarre districts give to incumbents running for office. That is, these districts are reelection insurance policies for incumbents. Many of these same citizens as well as others testified that emerging regional and economic similarities should find their expression in the drawing of district lines.

Third, the splitting of municipal and county jurisdictions drew the ire of citizens, who gave numerous examples of how several delegates and more than one senator represented one, sometimes small, locality. Understandably some might argue that localities may gain more effective representation by having more than one legislator look after their interests, but that was not the position of most, if not all, citizens who testified on this point. Instead, they pointed out the difficulties that citizens have in knowing who to contact, who to hold accountable, and who among several legislators should coordinate or lead the representation of local city and county interests in the General Assembly. Citizens who

---

[1] For a decade voters in Virginia have had electronic access to this information through the Virginia State Board of Elections. Those interested may check their information at http://www.sbe.virginia.gov/. In addition, the General Assembly website provides such information at http://legis.state.va.us/1_cit_guide/contacting_my.html.

56

testified feel that cities and counties receive more
effective representation from unity rather than
diversity or multiplicity of representation.

Illustrative of the testimony received by the
Commission:

Frank Jones, the Mayor of Manassas Park, sent the
Commission a unanimous recommendation from the
Town Council that the jurisdiction be represented by
only one delegate district and one senatorial district.

Michael Amyx, Executive Director of the Virginia
Municipal League, highlighted the importance of
having local governments work easily with their state
delegations, which current districts discourage. He
stated that "Slicing up cities, counties and towns in
order to protect political interests can leave
communities disconnected." As examples, he cited the
following illustrations:

- Four state senators and seven delegates
  represent portions of the City of Chesapeake;
- Five state senators and seven delegates
  represent portions of the City of Virginia Beach,
  which has twice the population of Chesapeake;
  and
- Two senators and two delegates represent
  portions of the 8,000 residents of the small City
  of Franklin.

Amyx then asked: "What are we trying to
accomplish here? How are the communities of interest
for Franklin and Chesapeake maintained by diluting
that representation to such an extent that the
community is either overwhelmed by its neighbors or
too chopped-up to voice a coherent message? Common
sense would seem to dictate that legislative district
lines should help foster a closer relationship between

57

local governments and state legislators. Ensuring that state elected officials and local governments share common communities of interest will better enable us to address our most pressing problems. A more effective working relationship would benefit all citizens in the Commonwealth."

Paul Fraim, the Mayor of Norfolk, reinforced this perspective, noting that three of Norfolk's six House districts have only a small minority of Norfolk residents in them, thus "severely reducing the ability of their voices to be heard in Richmond on issues of concern to them as Norfolk residents." He pointed out that in at least one instance a small number of Norfolk residents find themselves in a rural district with no recognizable interests.

In addition, Fraim mentioned that the present legislative redistricting in the City of Norfolk splits precincts so that in some instances people voting at the same polling place find themselves standing next to other people voting for different candidates in a different election. To illustrate, Mayor Fraim testified that:

> When Norfolk residents in precinct 106 (Zion Grace) go to the polls to vote for a member of the House of Delegates, one person in line may be handed a ballot for District 100 while the person behind may be given one for District 79. So part of the residents of that Norfolk precinct vote for someone who primarily represents Accomack and the rest get to vote for someone who primarily represents Portsmouth, even though all live in the same precinct in Norfolk. Living in the same neighborhood and even going to the same polling booth, they don't even get to vote

58

for the same slate much less for someone who clearly represents Norfolk's interests.

Besides the common themes expressed at the Commission's Forums, other matters received heightened attention at particular venues.

- In the Norfolk Forum, private citizens and members of the Legislative Black Caucus urged the creation of a second majority-minority Congressional district, and the exploration of options that would create more majority-minority state legislative districts.
- In the Northern Virginia Forum, various witnesses advocated consideration of common transportation lines, dense housing patterns, experience of immigration and/or economic disadvantage in determining communities of interest.
- In Roanoke, all but one person who testified stated that Roanoke properly belongs in a Congressional district that includes the Shenandoah Valley, not far southwest Virginia.

The Forums not only provided helpful guidance to the Commission in learning about matters of general concern regarding redistricting, but also helpful guidance regarding matters of unique concern to individual regions.

And occasionally citizens focused on matters important to redistricting, but outside the Governor's charge to the Commission.

- Perhaps the most prominent issue arose when the League of Women Voters, the Future of Hampton Roads and several private citizens advocated that the Commission propose

59

competitive districts. To implement competitiveness as a criterion might involve trade-offs between competitiveness on one hand and the maintenance of municipal and county boundaries and/or communities of interest on the other.

- In some instances citizens addressed issues of local interest, such as how redistricting might affect the location of a jail or a local magisterial district.

These two points, though worthy, fall outside the Commission's jurisdiction. But they did not detract from the indispensable benefit of the Forums in helping the Commission develop its guiding principles and specific recommendations.

## Section 4

### The Virginia College and University Redistricting Competition

The Virginia College and University Redistricting Competition, organized by Professors Michael McDonald (George Mason University) and Quentin Kidd (Christopher Newport University), had two goals: (1) to teach students how to participate in redistricting; and (2) to demonstrate that interested citizens can also participate.

Moreover, the Commission believes that the winning maps in the division of the competition that utilized the criteria that the Governor provided to the Commission should be granted serious consideration during the redistricting process. We commend these maps, which can be found at the following website: http://www.varedistrictingcompetition.org/results/

The competition included two divisions.

60

- Division 1 maps addressed the criteria of contiguity, equipopulation, the federal Voting Rights Act, communities of interest that respect existing political subdivisions, and compactness, but, in keeping with the Governor's Executive Order, they could not address electoral competition and representational fairness.

- Division 2 maps addressed the criteria of contiguity, equipopulation, the federal Voting Rights Act, and communities of interest that respect existing political subdivisions, compactness, electoral competition, and representational fairness.

Some 150 students on 16 teams from 13 colleges and universities submitted 55 plans for the U.S. House of Representatives, State Senate, and House of Delegates. Two judges, Thomas Mann (Brookings Institution) and Norman Ornstein (American Enterprise Institute), chose the winning maps.

All 55 maps appear on the following website, http://www.varedistrictingcompetition.org/.

The student competition provided invaluable assistance to the Commission in dealing with three important challenges:

1. How to address communities of interest;

2. How to adhere to the Voting Rights Act; and

3. How to implement the equal population requirement.

The 55 maps demonstrated the importance of (1) keeping communities of interest together, including ethnic and racial communities, (2) respecting traditional political boundaries, such as cities and

25

61

counties, (3) considering significant changes in Virginia's population, and (4) being cognizant of Virginia's existing and emerging regions. And in doing so to comply with the Voting Rights Act and the equal population requirement.

Communities of Interest. Teams viewed communities of interest on several levels. First, they saw Virginia as a grouping of regions and organized their redistricting plans around these identities. Second, they saw within those regions more specific communities of interest, normally centered on an urban area or large community, and some looked for communities of interest within larger urban areas.

1. One approach considered the socio-economic landscape, such as in "the western half of Richmond, half of Henrico, and other counties that are closely tied with the economic and social landscape of the Richmond metro area. Many of these areas have significant portions of their populations who either live in or commute to Richmond often and have relatively similar socio-economic statuses."

2. Another approach, as in the case of Hampton Roads, sought to maintain the regional identity of its military, shipbuilding, and tourism interests.

3. Then in western Virginia the student maps respected its historic rural and agricultural interests.

4. Finally, while all teams attempted to minimize the divisions of cities and counties, they recognized the impossibility of uniformly accomplishing this objective,

62

because it constrained efforts to achieve other objectives, such as the equal population criterion. Often, of course, they found that communities of interest overlapped these traditional political boundaries.

Voting Rights Act Requirements. Drawing compact majority-minority districts while maintaining communities of interest became the greatest challenge facing the student teams. So, given the requirements of the Voting Rights Act, student teams sometimes sacrificed compactness in order to achieve the appropriate number of majority-minority districts.

Equal Population Requirements. Believing that a compact district and an intact community of interest provide for better representation, the student maps placed a premium on district compactness and community of interest over the achievement of equal population. Despite this bias, however, in almost all instances their maps stayed within the plus-minus range of 5 percent for state legislative districts and adhered to the exact population equality required Congressional districts.

Commission members were extremely impressed by the student efforts throughout competition. The dedication of the student groups was exemplary. The thoughtfulness creativity of the teams helped to inform the dialogue and decisions that the Commission it reached. And one of the teams, the students from the Law School at the College of William Mary, actually assisted the Commission in its final weeks. The competition was ultimately a testimony to the extraordinary potential that is being developed at Virginia's colleges and universities.

63

Section 5

Constitutional and Legal Issues

In considering the legal principles applicable to redistricting, recognition must be given first foremost to the constitutional provisions in the Virginia Constitution and the Constitution of United States. Second, adherence must be given to the provisions of the Voting Rights Act, both Section 2 and Section 5 (the latter being applicable to Virginia as a "covered" state). Lastly consideration must also be given to additional redistricting principles not contained in constitutions or statutes but allowed and approved by case law.

Constitutional Principles

1.   Virginia Constitution

"Every electoral district shall be composed of *contiguous and compact territory* and shall be so constituted as to give, as nearly as is *practicable*, representation in proportion to the population of the district."

Article II, § 6 (emphasis added).

2.   Contiguity

"[A] district that contained two sections completely severed by *another land mass* would not meet this constitutional requirement [for contiguity]. . . . [L]and masses separated by *water* may nevertheless satisfy the contiguity requirement in *certain circumstances*."

*Wilkins v. West*, 264 Va. 447, 463-64 (2002) (emphasis added)

*Wilkins* rejected a trial court's requirement that there must be a bridge, road or ferry allowing full internal access to all parts of the district. As requested

64

by the Governor, however, if districts have land masses separated by water, then to the extent feasible such land masses should be connected by bridges.

### 3.   Compactness

In the *Wilkins* case, experts on both sides used two objective measures of compactness:

- Reoch/Geographic Dispersion Method: "measures the level of compactness by determining the ratio of the area of the district to the smallest circle that can be superimposed over the district." *Id.* at 464, n.6.
- Polsby/Popper/Perimeter Compactness Method: "computes a ratio based on the area of the district compared to a circle that equals the length of the perimeter of the district." *Id.*

Other quantifiable measures of compactness may also exist; however, no rules have been adopted favoring one method over another or adopting any bright lines for when a district is not sufficiently compact to pass constitutional muster.

### 4.   U.S. Constitution

"One man, one vote" is required

Article I, § 2

(pertains to Congressional Districts)

There is "no excuse for the failure to meet the objective of equal representation for equal numbers of people in congressional districting other than the practical impossibility of drawing equal districts with mathematical precision."

*Mahan v. Howell*, 410 U.S. 315, 322 (1973).

65

14th Amendment – Equal Protection Clause

(pertains to House of Delegates and State Senate Districts)

"[B]roader latitude has been afforded the States under the Equal Protection Clause in state legislative redistricting. . . ."

*Mahan*, 410 U.S. at 322.

Complete numerical equality of districts is not required for House of Delegates and State Senate Districts. *See Daly v. Hunt*, 93 F.3d 1212, 1218 (4th Cir. 1996) ("If the maximum deviation is less than 10%, the population differential will be considered *de minimis* and will not, by itself, support a claim of vote dilution.").

In 2001, General Assembly used plus or minus 2% (a total deviation of 4%) for House of Delegates and State Senate Districts. *See Wilkins*, 264 Va. at 468, n.7.

5.    Racial gerrymandering is prohibited.

"A party asserting that a legislative redistricting plan has improperly used race as a criterion must show that the legislature subordinated traditional redistricting principles to racial considerations and that race was not merely *a* factor in the design of the district, but was *the* predominant factor. The challenger must show that a facially neutral law is explainable on no other grounds but race."

*Wilkins*, 264 Va. at 467 (emphasis in original) (citing *Hunt v. Cromartie*, 532 U.S. 234, 241-42 (2001)).

Voting Rights Act, 41 U.S.C. § 1983(c)

The application of the Voting Rights Act ("the Act") to redistricting contains two major provisions –

66

Section 2 and Section 5 – these provisions work independently of each other.

1.   Section 2 of the Voting Rights Act

Section 2 is applicable nationwide and prohibits any State from imposing a "voting . . . standard, practice or procedure . . . in a manner which results in the denial or abridgment of the right to vote on account of race or color." 42 U.S.C. § 1973(a). There is a violation of Section 2 if, given the "totality of circumstances," members of a minority group "have less opportunity than other members of the electorate to elect representatives of their choice." 42 U.S.C. § 1973(b). **This is the source of the "no dilution" principle. "Dilution" of minority vote is prohibited.**

"When the voting potential of a minority group that is large enough to form a majority in a district has been thwarted by the manipulation of district lines, minorities may justly claim that their "ability to elect" candidates has been diluted in violation of Section 2 [of the Voting Rights Act.]"

*Hall v. Virginia*, 385 F.3d 421, 429 (4th Cir. 2004)

The U.S. Supreme Court however, has ruled that "[f]ailure to maximize cannot be the measure of Section 2 [of the Voting Rights Act]." *Johnson v. DeGrandy*, 512 U.S. 997, 1017 (1994). In other words, failure to maximize does not constitute dilution of minority voting.

The Supreme Court has also discussed two types of districts that seem pertinent here. First, there are "minority influence" districts in which the minority can influence the outcome of an election even if its preferred candidate cannot be elected. Second, there are "crossover" or "consolidated" districts, where a

67

large bloc of minority voters aided by sympathetic majority voters "crossing" over in sufficiently large numbers will elect the minorities' preferred candidate.

Neither "minority influence" nor "crossover" districts are required by Section 2 of the Voting Rights Act. See Bartlett v. Strickland, 129 S. Ct. 1231 (2009); LULAC v. Perry, 548 U.S. 399 (2006). In other words, failure to create such a district does not constitute dilution of minority voting in violation of Section 2.

2.   Illegal vote dilution based on race can occur through "cracking" or "packing."

Cracking: "the splitting of a group or party among several districts to deny that group or party a majority in any of those districts." *Id*. at n. 12 (*Thornburg v. Gingles* 478 U.S. 30, 50, n. 17).

Packing: "concentration of blacks into districts where they constitute an excessive majority." *Id*.

"On the other hand, when minority voters, as a group, are too small or loosely distributed to form a majority in a single-member district, they. . . cannot claim that their voting strength. . . has been diluted in violation of Section 2."

*Hall*, 385 F.3d at 429.

3.   Section 5 of the Voting Rights Act

Section 5 is the preclearance provision and is applicable only to certain States and jurisdictions, including Virginia. Changes in voting law and procedures – including redistricting – cannot go into effect until they are cleared by the Department of

68

Justice ("DOJ") or by the federal district court in the District of Columbia.[2]

Regardless of where preclearance is sought, the Commonwealth must show that the change in the law "neither has the purpose or effect of denying or abridging the right to vote on account of race. . ." 42 U.S.C. § 1973(c). This standard is met if there is **no retrogression** when comparing minority voting strength under the new plan with minority voting strength under the old plan.

**"Retrogression" is prohibited.**

"The plan must contain no fewer majority-minority districts than the prior plan."

*Wilkins*, 264 Va. at 468.

For purposes of applying the non-retrogression principle, the baseline could be determined, hypothetically, either by (a) the number of majority-minority districts existing when the last redistricting occurred in 2001 and/or (b) the number of majority-minority districts existing at the time of the 2011 census (thus, reducing or increasing the original number based on population changes). The U.S. Supreme Court has suggested that both the current and prior census should be reviewed in determining a "baseline" for measuring retrogression, Georgia v. Ashcroft, 539, U.S. 461 (2003), at least when the population changes

---

[2] Although Virginia has typically sought pre-clearance from the Department of Justice, it should be noted that another available option is to apply to the federal district court and seek expedited review. In general, Commission members support transparency in the redistricting process, including the review procedures. The Commission recognizes that Virginia's decision about which review route to pursue necessarily requires judgments about the overall best interest of the Commonwealth.

69

lead to an increase in the number of majority-minority districts. However, the Department of Justice, under its current guidelines, seems to suggest that it will use only the most current population data to measure both the benchmark plan and the proposed redistricting plan in determining issues of retrogression of minority-majority districts. See Federal Register, Vol. 76, No.27, at 7472, Feb. 9, 2011

Traditional Redistricting Principles

Traditional redistricting principles are basically outlined by case law. These basic principles are fully acceptable for implementation by a legislative body so long as constitutional principles – one man-one vote, compactness and contiguity are met. Recognizing and applying these principles – and declaring them to be important state interests – allows leeway from mathematical exactness in House of Delegate and State Senate redistricting plans (but not Congressional redistricting plans). However, if the legislature does not declare certain principles to be of importance – especially the recognition and preservation of political subdivision boundaries[3] – then less leeway is allowed and more exactness regarding allowed percentage deviations becomes required.

---

[3] In Virginia's redistricting following the 1970 census, the General Assembly articulated that respect for political subdivision boundaries – at least for the House of Delegates – was an important and traditional state policy. In redistricting following the 2000 census, the General Assembly declared, by statute, certain criteria to be of importance; however, respect for political subdivision boundaries was not set out as an important criterion. See Va. Code § 24.2-305.

70

The main criteria allowed by the courts are set out by the *Wilkins* and *Mahan* cases, excerpts of which are as follows:

"[T]he General Assembly must balance a number of competing constitutional and statutory factors when designing electoral districts. In addition, traditional redistricting elements not contained in the statute, such as **preservation of existing districts, incumbency, voting behavior, and communities of interest**, are also legitimate legislative considerations."

*Wilkins v. West*, 264 Va. 447, 463-64 (2002) (emphasis added).

Population deviations may also be justified by adherence to ". . .advance the rational state policy of respecting the boundaries of political subdivisions" provided that disparities of the plan do not ". . .exceed constitutional limits."

*Mahan v. Howell*, 410 U.S. 315, 328 (1973).

"[W]here majority-minority districts are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles. That party must also show that those districting alternatives would have brought about significantly greater racial balance."

*Wilkins*, 264 Va. at 467 (quoting *Cromartie*, 532 U.S. at 258).

71

## Conclusion

Although some clear constitutional and statutory rules apply to redistricting, there are a number of factors that a legislature – or a commission – may lawfully apply in its discretion, based on its own policy choices. Moreover, even where there is agreement about which factors should be considered, placing more emphasis on one factor may inevitably require less emphasis on another. In short, while some plans may deviate so far from accepted principles as to be readily subject to legal attack, there is no single legally correct answer to how redistricting lines should be drawn.

## Section 6

### The 2010 Census: Demographic Shifts

Virginia's population has grown steadily over the past 60 years. An increase of more than 900,000 between 2000 and 2010 continues a growth-rate trend of approximately 1 million per decade. Today's population, approximately 8 million, entitles Virginia to retain 11 seats in the U.S. House of Representatives.

This growth translates into increasing the populations of Congressional and state legislative districts. By dividing Virginia's total population by the number of districts, members of Virginia's Congressional delegation must now represent 727,366 people, an increase of nearly 100,000 from one decade ago. Each House of Delegates district must now contain about 80,000 people, and each Senate district, about 200,000.

But geographic unevenness marks Virginia's growth rate. Three major metropolitan areas account for 82

72

percent of the growth: Northern Virginia, 55 percent;
Metropolitan Richmond, 17 percent; and Hampton
Roads, 10 percent. While most parts of the state
experienced population gains, some lost population,
including Southside, Southwest, the Shenandoah
Valley, the Northern Neck, and the Eastern Shore.
Accomack and Buchanan counties and the cities of
Danville and Martinsville lost more than 10 percent
each. In Hampton Roads, both Portsmouth and
Hampton lost population.

Ethnically, Virginia's Hispanic population, now at 8
percent, nearly doubled from 2000 to 2010. By
location, 62 percent of Hispanics live in Northern
Virginia, with Manassas Park having the highest
percentage (33 percent), followed by Manassas and
Prince William County. Outside of Northern Virginia,
only Harrisonburg and Galax make the "Top Ten" list
of Virginia localities having the largest percentages of
Hispanics.

Racially, the Asian population continued to grow,
from 4 percent of the state total in 2000 to 6 percent in
2010. At 19 percent, the proportion of African
Americans in Virginia remains much the same as 10
years ago, both in percentage and in geographic
location. People who classify themselves as of mixed
racial background demonstrate some population
growth.

## Section 7

### Metrics, Choices, and Maps

The Commission identified two fundamental
problems in map making: a lack of transparency and
understandable standards for determining the impact
of alternative redistricting plans. Clarity generally
exists with regard to equal population standards and

73

the number of majority-minority voting districts, but not with regard to compactness and the splitting of municipal and county boundaries. To overcome this problem the Commission utilized four measures that helped to frame its choices and guide its recommendations.

## Metrics

1.   Voting Rights Act Considerations. Voting rights experts typically use two standard metrics for analyzing a redistricting plan's consistency with voting rights considerations: the number of minority opportunity districts and the level of minority voting-age population within them to provide a minority community the opportunity to elect a candidate of their choice.

The first metric focuses on the number of proposed majority-minority districts. In evaluating this metric, the Commission determined whether proposed plans established majority-minority voting districts in all places where required to do so in a manner that is consistent with the other essential redistricting criteria.

Section 5 of the Voting Rights Act requires that Virginia statewide redistricting plans must not reduce, or retrogress, the overall number of effective majority-minority districts. Redistricting plans are submitted to the U.S. Department of Justice or U.S. District Court for the District of Columbia for evaluation and can be rejected if they are found to be retrogressive. The baseline Section 5 requirement is the number of districts with a majority of a minority voting-age population; however, there may be some ambiguity as to which year furnishes the appropriate baseline – 2000 or 2010.

74

The second metric focuses on the percentage of minority population of voting age within a district. Typically, voting rights experts through careful analyses of racial voting patterns within a community determine these percentages. This percentage cannot be too low, so as to not provide a community with a chance to elect a candidate of their choice, but it cannot be too large, as to inefficiently waste minority votes in an overwhelming minority district. Without the resources to conduct such racial voting analyses, the Commission sought to include in its majority-minority districts a percentage of minority voting-age population within the range accepted by the Department of Justice in 2001.

2. Equal Population. The Commission recognized that equal population standards can be different for Congressional and state-level redistricting. The Commission adopted an equal population standard for Congressional redistricting consistent with recent federal court decisions that favor absolute population equality. That is, if it is possible to divide the Commonwealth's population evenly by the number of Congressional districts, all districts must have exactly the same population, absent the practical impossibility of drawing equal districts with mathematical precision.

The Commission recognized that the federal standard for state-level redistricting has generally been more flexible, allowing variations of as great as 10% to meet other essential redistricting goals. However, tradition in the Commonwealth has been to require a stricter population standard than allowed by the federal courts. The Commission initially used a plus or minus 2% permissible variation in population for the Senate and House plans, and then explored

75

how relaxing this requirement further intersected with respecting county and city boundaries.

3. Compactness. Redistricting scholars have developed metrics that enable comparisons between different plans regarding the level of compactness of their districts. The Commission used one such metric, known as the Schwartzberg measure, to assess how the plans it developed compared to the plans that were adopted in 2001.[4]

4. Splitting of Counties and Independent Cities. The Commission was consistently asked by members of the public to recommend plans that kept municipal and county boundaries intact as much as possible. The Commission developed a simple metric that counted the number of times one or more districts split a county or independent city in the plans it produced[5] and compared this to the number of such splits in the plans adopted in 2001.

Choices

Redistricting is a balancing act. Each criterion that the Commission was directed to employ is, by itself, an expression of a value that is widely supported in the

---

[4] The Schwartzberg measure is the ratio of the perimeter of a circle with the same area as a district to the perimeter of the district. The best scoring district would have a Schwartzberg measure equal to 100% and the least would have a measure equal to 0%. This measure gives a higher score to districts that have shorter perimeters, or in other words, have fewer oddly shaped extensions from the district.

[5] For example, if a county has only one district, the number of splits is zero. If a county has two districts, it is split twice; if it has three districts, it is split three times; and so on. Some larger counties and independent cities must be split because they cannot support a single district with the ideal population within their boundaries.

76

Commonwealth. Most citizens surely care about equal representation, complying with the Voting Rights Act, maintaining district lines that respect communities of interest and municipal and county boundaries, and having political districts that are compact and contiguous.

Yet striving to implement each of these criteria inevitably involves balancing a set of choices and tradeoffs. When a Congressional district requires 727,366 Virginians to be included in a single district, small rural jurisdictions may be put together with geographically distant areas where a community of interest may not have previously been perceived. As districts for the House and the Senate are drawn to approach mathematically equal populations, it becomes increasingly difficult not to split municipal and county lines in the composition of the districts. It is possible that creating majority-minority districts to give historically underrepresented populations the capacity to elect a candidate of their choice can result in a tradeoff regarding compactness and keeping municipal and county boundaries together.

Redistricting is also an evolving process. Legislatures may modify the criteria that they employ on a decennial basis, instituting small tweaks that have major effects. Definition of a community of interest may change over time and different regions of the Commonwealth may define this notion in varying ways. Voting rights considerations evolve over every redistricting cycle and new policy views are advanced once there is time to reflect upon and assess the results of litigation brought, and the prior redistricting plans. For example, the Commission heard from African-American elected officials at both the state and local levels who observed that they felt it was possible to

77

reduce the majority percentage in existing majority-minority districts and still retain full compliance with the Voting Rights Act.

The Commission continuously grappled with the choices and tradeoffs that are inevitably present in striving to apply the criteria under which it operated. These tradeoffs were especially apparent in the Commission's discussion of reducing city and county splits and possibly creating an additional majority-minority district in the Senate.

While the Commission identified these tradeoffs, the Commission recognized that redistricting is an extremely complicated process and that other plans may exist that improve upon one or all of the criteria the Commission used to guide its drawing of districts.

Voting Rights Act Considerations. The principal Section 5 requirement is the number of districts with a majority of a minority voting-age population using the most recent census. Using this metric, then Section 5 of the Voting Rights Act requires the following number of majority-minority districts in Virginia: 1 Congressional district, 5 Senate districts, and 11 House of Delegates districts. However, the Commission noted that the Department of Justice approved a House of Delegates plan in 2001 that had 12 majority-minority districts using the 2000 census. In the decade between 2000 and 2010, the minority voting-age population of one district had dipped below 50 percent, and the Commission elected to restore that district to majority-minority status, thereby avoiding any dispute as to which decennial census provides the appropriate baseline.

The Commission discovered in the course of its deliberations that it is possible to draw only one

78

majority-minority Congressional district. However, the Commission discovered there is more than one way to draw this district. The Commission decided to propose three configurations, as they represent different approaches to tying together minority communities and alter the way by which adjoining districts may be drawn.

The Commission also discovered that it is possible to draw as many as 6 Senate and 13 House of Delegates majority-minority districts. The effectiveness of these districts to elect a candidate of choice is dependent on a second Voting Rights metric employed by the Commission.

The Commission believes that the minority voting-age population within the 6th majority-minority Senate district *would not* be effective at electing a candidate of their choice using the 2001 baseline approved by the Department of Justice. The Commission decided to note this option, in case further exploratory mapping by others reveals a way to draw 6 effective majority-minority Senate districts.[6]

---

[6] The Commission discussed a map proposal that presented a sixth majority-minority Senate District, which involved three specific tradeoffs. First, it reduced the overall compactness of the map and required splitting additional counties and independent cities. Second, it required reducing the overall minority populations in most of the other existing majority-minority districts from 55% to 52%. Third, the introduction of a sixth majority-minority Senate District necessitated districts that jumped predominant water boundaries in the Norfolk and Hampton area. In sum, it may be possible to create a sixth majority-minority district. But the tradeoff entails reducing compactness, increasing district splits, jumping water boundaries and lowering the level of minority population to slightly above 52% in many of the existing majority-minority districts.

79

The Commission found that the minority voting-age population within the 12 and 13 majority-minority House districts alternatives *would* be effective at electing a candidate of choice using the minimum minority percentage approved by the Department of Justice in 2001. The Commission decided to include both options in this report, recognizing that 12 majority-minority districts would be consistent with the legal requirements in place in 2001.

The 13 majority-minority district plan was the source of a substantive disagreement among the Commission members. A number of Commission members strongly believe that the creation of the 13th majority-minority district is consistent with the principle of enabling African-Americans to have a candidate of their choosing, that the proposed district is more compact than the ones in the map approved by the Assembly in 2001, and that the tradeoffs with other criteria such as compactness and keeping city and county lines intact is permissible. At the same time, a number of Commission members believe equally strongly that the impact of creating a 13th majority-minority district is not consistent with the outlook on compactness and keeping city and county lines intact that has guided the Commission's work. In addition, they believe that legal counsel's caution about the viability of a potential challenge to the creation of districts where race is utilized as the predominant factor without a compelling defense is relevant here.

Population Equality. The Commonwealth's population growth over the last decade has primarily been located in the exurban areas of Northern Virginia, particularly in Loudoun and Prince William counties. Districts must have equal population to

80

ensure equal representation for all Virginia residents across the state. As a consequence, district boundaries must follow this population growth.

Virginia did not gain or lose a Congressional seat to apportionment. Congressional district boundaries must thus shift northward to equalize district populations. The state legislature also continues to have the same number of districts, but because the 40 Senate and 100 House of Delegates districts are significantly smaller in size than the 11 Congressional districts, whole districts must be collapsed within the slower-growing areas found in the southeast and southwest corners of the Commonwealth and new districts – essentially one Senate and three House of Delegates districts – must be created in the Northern Virginia exurban areas.

Reducing the Number of Districts Where County and Independent City Boundaries Are Split. The Commission recognized in the course of its deliberations that there is a trade-off between balancing districts' populations and respecting county and independent city boundaries within the state legislative districts. At the Congressional level, there is no tradeoff between equal representation and maintaining municipal and county lines because Congressional lines must be drawn with absolute population equality, absent the practical impossibility of drawing equal districts with mathematical precision.

Little public attention has been paid to this possible tradeoff in previous redistricting processes in the Commonwealth, but it became apparent during the Public Forums held by the Commission and in the Commission's review of maps in the Virginia College and University Redistricting Competition, that the

81

choice of what population variation to permit is an important decision point.

The Commission is providing one set of maps for the House and Senate that essentially uses the plus or minus 2% population variance that was employed by the General Assembly during the 2001 redistricting process. At this level, the Commission maps are able to make considerable improvement on the existing district lines in terms of the number of county and independent city splits in both the House and the Senate. In the House, city and county splits are reduced from the existing number of 194 to 153. In the Senate, the number of splits is reduced from 110 to 72.

The Commission further explored a plan with a plus or minus 3% or greater variation for the Senate (including two districts more than 3% but less than 5%) that is able to reduce the number of city and county splits even more dramatically. The existing Senate map has 110 splits. The 2% map" in this report has 72 splits. The "3% map" in this report reduces the number of city and county splits to 40. In the House, such trade-offs are less severe, as the Commission identified only a single district that split a county boundary in order to stay within a 2% population variance.

In summary, it is certainly possible to make a substantial reduction in the number of city and county splits using the plus or minus 2% deviation criterion applied in 2001. This can be accomplished without any tradeoff with Voting Rights Act criteria. But it is likely that achieving even more dramatic reductions in the number of municipal and county lines that are crossed by districts would require movement toward a plus or minus 3% variation or more from the equal population standard, which deviation would be permissible.

82

Maps

After consideration, the Commission decided to propose a set of its own "model maps" that would represent its thinking about how the criteria under which it operated could be applied. The Commission members certainly do not believe that these are the only possible maps that could be drawn in a manner consistent with these criteria.

The Commission has recommended earlier in the report that the winning maps in the student competition that used the Governor's criteria be considered by the Governor and the General Assembly during the redistricting process. And we believe that others could certainly use the available software to produce different yet entirely credible ways of accomplishing the tasks with which the Commission was charged.

In addition, Commission members fully recognized that they serve in an advisory capacity during the 2011 redistricting process. Political considerations such as electoral competitiveness, and the promotion of partisan advantage were not part of the charge presented to the Commission. As the Governor noted in his remarks, these are matters that are the purview of the General Assembly during the 2011 process. The Commission recognizes that the Assembly would adjust any maps that it might examine to reflect these considerations in its obligation to protect the interests of Virginia in the redistricting process.

The Congress

The Commission grappled with the "stretching" of rural districts and other areas where population growth was either negative or not at the same level as in the fast-growing regions of the Commonwealth.

83

Ultimately, the Commission concluded that there is no "perfect choice" or sometimes even a "desirable choice," and that localities had to be grouped with others that were geographically quite separate and where many residents might not initially see a natural community of interest. In almost every imaginable configuration, a Commission member could point to an apparently incongruous matching. The Commission ultimately went with ideas that members felt made sense, such as creating an "extended valley district" and not linking Roanoke to the Far Southwest. However, the Commission recognizes that different choices could legitimately be made.

The Commission focused on drawing three Northern Virginia districts to reflect the increased growth in some sections there. A majority of the Commission felt that the best way to reflect communities of interest, county and city boundaries, and compactness was to draw these districts as concentric semi-circles moving away from Washington. DC, recognizing that communities closer to the capital have more in common with each other than with communities farther from it.

Finally, Commission members wrestled with the best means of drawing the Commonwealth's single majority-minority Congressional District. Under any circumstance, the existing district must be modified because its rate of population growth was lower than the Commonwealth's average over the previous decade.

The Commission explored a number of alternatives, from suggestions that came from the Commission staff and from maps submitted in the Virginia College and University Redistricting Competition. One proposed alternative involved a significant relocation of the

84

majority-minority Congressional District in Virginia in a manner that excluded most of the population areas around the city of Richmond, expanded the district's scope in Hampton Roads and extended its boundaries considerably farther south and west toward Brunswick and Dinwiddie counties.

The Commission proposed three model Congressional maps, each focusing on aspects of the issues discussed above.





This map makes significant changes to the current districts. First, it respects Richmond and the surrounding counties as a community of interest by keeping them together in a single "Capital area" District. It also creates the "extended valley district" and the three Northern Virginia concentric semi-circle districts. Finally, and perhaps most uniquely, it moves the majority-minority district to the south. By doing this, it creates a more compact majority-minority district in which the population is closer in geography and the other interests that bind a community.

**Congress**
**3rd District Option 1**

| Average Compactness (Schwartzberg Measure) | |
| --- | --- |
| Model Plan | Current (2001) Plan |
| 53.29% | 41.32% |

| Number of County and City Jurisdictional Splits | |
| --- | --- |
| Model Plan | Current (2001) Plan |
| 41 | 47 |

| Compactness Range (Schwartzberg Measure) | | |
| --- | --- | --- |
| | Model Plan | Current (2001) Plan |
| Minimum | 35.68% | 30.89% |
| Maximum | 62.58% | 51.75% |

| District | Population | Percent Deviation from Ideal Size | Compactness | County/City Splits |
| --- | --- | --- | --- | --- |
| 1 | 727,366 | 0.000% | 52.01% | 7 |
| 2 | 727,366 | 0.000% | 49.30% | 4 |
| 3 | 727,366 | 0.000% | 37.68% | 11 |
| 4 | 727,366 | 0.000% | 62.19% | 3 |
| 5 | 727,366 | 0.000% | 62.58% | 2 |
| 6 | 727,366 | 0.000% | 41.51% | 2 |
| 7 | 727,366 | 0.000% | 49.16% | 6 |
| 8 | 727,365 | 0.000% | 58.60% | 1 |
| 9 | 727,366 | 0.000% | 48.33% | 1 |
| 10 | 727,366 | 0.000% | 47.76% | 3 |
| 11 | 727,365 | 0.000% | 49.40% | 1 |

| Number of Majority-Minority Districts: 1 | | |
| --- | --- | --- |
| Percent of Voting Age Population that is Black | | |
| District | 2010 Census (Model Shape) | 2000 Census (Old Shape) |
| 3 | 53.6% | 53.2% |

This map improves upon the current (2001) plan in several significant ways. First, this map increases compactness by 22.46% over the current plan (from 41.32% for the current plan to 53.29% for the model map). The least compact district is 35.68% while the most compact district is 62.58%. Second, this map retains the black voting-age population of the majority-minority district at 53.6% (from its current 53.2%). Third, this map reduces the number of split jurisdictions by almost 13%, reducing the number of split jurisdictions from 47 in the current plan to 41 in this model map.

86



**Congressional Model Map Option #2**

This map makes many of the same changes as Option 1, creating an "extended valley district" and reorganizing the Northern Virginia districts into more compact geographical areas. On the other hand, it creates a majority-minority district similar to the one in the 2001 map. This design would allow most voters in the current majority-minority district to remain in such a district. This map also improves upon the current (2001) plan in several significant ways. First, this map increases compactness by 16.38% (from 41.32% for the current plan to 49.41% for the model map). The least compact district is 32.43% while the most compact district is 62.58%. Second, this map increases the black voting-age population of the majority-minority district from 53.2% to 55.1%. Third, this map reduces the number of split jurisdictions by 19%, from 47 in the current plan to 38 in this model map.

87



Congressional Model Map Option #3



This map maintains the general shape of the two previous options but with an alternative shape for the 3rd District and an alternative reconfiguration of Northern Virginia. In this model, the 3rd District does not encompass parts of Norfolk but instead stretches from the eastern portion of Richmond through Petersburg and counties along the south side of the James River, crossing to include Newport News and Hampton. This alternative has a 52.5% African-American voting-age population percentage, which is less than the 53.2% met or exceeded in the other

88

models in this report. It has a 5-person deviation from
the ideal Congressional district population. The
tradeoff is that this map respects municipal
boundaries by putting Portsmouth entirely within the
4th District and Norfolk entirely within the 2nd
District. The reconfigured 4th District has a 30.5%
African-American voting-age population percentage.

In Northern Virginia, the 8th District is completely
enclosed, with the Interstate 495 beltway along much
of its southern border and extending to the Loudoun
County boundary to the west. The 11th District is
contained within Fairfax County in its entirety and
encompasses Fairfax City. District 10 contains most of
Prince William and Loudoun counties, with additions
in surrounding areas.

Compared with the current (2001) Congressional
map, this model increases compactness by 17.01%
(from 41.32% for the current plan to 48.35% for this
model). The least compact district in this plan
measures 35.60% and the most compact district
measures 58.33%. Also, this map reduces the number
of split jurisdictions by 21%, from 47 in the current
plan to 37 in this model. Of the three model
Congressional maps, this is the greatest reduction in
split jurisdictions.

89

## Congress
### 3rd District Option 3

| Average Compactness (Schwartzberg Measure) | |
| --- | --- |
| Model Plan | Current (2001) Plan |
| 48.35% | 41.32% |

| Number of County and City Jurisdictional Splits | |
| --- | --- |
| Model Plan | Current (2001) Plan |
| 37 | 47 |

| Compactness Range (Schwartzberg Measure) | | |
| --- | --- | --- |
| | Model Plan | Current (2001) Plan |
| Minimum | 35.60% | 30.89% |
| Maximum | 58.33% | 51.75% |

| Number of Majority-Minority Districts: 1 | | |
| --- | --- | --- |
| Percent of Voting Age Population that is Black | | |
| District | 2010 Census (Model Shape) | 2000 Census (Old Shape) |
| 3 | 52.5% | 53.2% |

| District | Population | Percent Deviation from Ideal Size | Compactness | County/City Splits |
| --- | --- | --- | --- | --- |
| 1 | 727,365 | 0.000% | 53.48% | 5 |
| 2 | 727,365 | 0.000% | 57.33% | 1 |
| 3 | 727,369 | 0.000% | 35.60% | 9 |
| 4 | 727,365 | 0.000% | 40.61% | 5 |
| 5 | 727,365 | 0.000% | 58.33% | 3 |
| 6 | 727,364 | 0.000% | 40.17% | 1 |
| 7 | 727,366 | 0.000% | 43.60% | 5 |
| 8 | 727,367 | 0.000% | 53.21% | 1 |
| 9 | 727,365 | 0.000% | 48.86% | 1 |
| 10 | 727,365 | 0.000% | 44.69% | 4 |
| 11 | 727,368 | 0.000% | 55.93% | 2 |

The Virginia Senate

The Commission recognized that drawing the Virginia Senate maps, like the Congressional maps, involved balancing predominant demographic trends with the requirements of the Voting Rights Act and the equal population standard. Unlike the Congressional maps, however, greater latitude in the percentage deviation in population for each district was allowed in order to better meet the Commission's other goals of compactness and reducing the number of split jurisdictions.

The Commission recognized that drawing 5 majority-minority districts to maintain the number of districts with a majority of African-Americans of voting-age population must be balanced against the other criteria. The shape and location of these majority-minority districts have distinct effects on the shape of the surrounding districts and the overall look of the entire Senate map.

90

The Commission presented two model maps, one with most districts under 2% population deviation and another with most districts under 3% population deviation, to illustrate the trade-offs between population equality and respecting county and independent city boundaries.

Virginia Senate Model Map Option #1: 2% Population Deviation



The plus or minus 2% alternative offered by the Commission presents 5 majority-minority districts that maintain majority African-American voting-age populations. Two of these districts are located around the Richmond metropolitan area with one, District 9, that stretches from the eastern part of the city to the boundaries of Charles City County, and another, District 16, that starts south of the James River in Richmond, encompasses the cities of Hopewell and Petersburg, and stretches to the southern border of Dinwiddie County. District 18, the third majority-minority district, is located along much of Virginia's southern border and extends northward around Nottoway County and eastward around a portion of the city of Portsmouth. The remaining two majority-minority districts, Districts 2 and 5, are located in the Hampton-Newport News and Norfolk areas. District 2 starts along the southern border of Newport News and Hampton and moves north along Interstate 64. District 5 encompasses many of the African-American

91

communities in the eastern portion of the city of Norfolk.

The 5 majority-minority districts are the least compact of the model Senate Districts in this plan and cut across the most jurisdictional boundaries due to the combined requirements of the equal population standard and the Voting Rights Act. Surrounding districts must accommodate the sometime awkward boundaries of these districts. Even so, the shapes of these model districts are often clear improvements upon their current shapes in terms of compactness and jurisdictional splits.

The rest of the map attempts to adhere to the criteria of achieving compactness and minimizing jurisdictional splits while also grouping communities of interest. The Southwest region of Virginia is almost entirely covered by two model Senate Districts, 40 and 38, which perfectly conform to county boundaries. Surrounding districts in Southside Virginia and the Valley are far more compact then their current shapes and attempt to conform to county and city boundaries as much as is feasible while still keeping within a 2% population deviation. For instance, the cities of Salem and Roanoke are grouped together in District 22, but must cut Roanoke County in order to maintain population equity.

Central Virginia is primarily covered by Senate Districts 25, 17, 26 and 27. Every attempt was made to reduce the number of county boundaries that are split for these districts. However, the 2% population deviation requirement for this map necessitated significant splits in Albemarle, Prince Edward and Warren Counties.

92



**Richmond detail**
**Senate Model Map Option #1: 2% Population Deviation**

93



**Hampton Roads detail**
**Senate Model Map Option #1: 2% Population Deviation**

In the Northern Neck, Middle Peninsula and Eastern Shore, Districts 28, 4, and 8 were able to be drawn almost entirely along county boundaries, with splits necessary in Stafford, Gloucester, and Virginia Beach.

In Northern Virginia, the primary goal was to minimize districts that cut county and independent city boundaries. Arlington County must be split as is has too much population to fall within a 2% deviation. However, the cities of Falls Church, Alexandria, Fairfax, Manassas and Manassas Park are entirely contained within a single Senate District. The districts also attempt to group communities of interests that may exist along common highways or in towns or ethnic enclaves.

94



**Northern Virginia detail**
**Senate Model Map Option #1: 2% Population Deviation**

This map includes 26 districts under 1% deviation and 14 additional districts under 2% deviation. This deviation approach allows for an improvement in the compactness of districts by 9.53% (from 48.21% in the current plan to 53.29% in the proposed map). The least compact district in this map is 35.68% while the most compact district is 70.00%. This map includes 5 majority-minority districts ranging from 57.8% black voting-age population (District 5) to 53.5% black voting-age population (District 16). Finally, this map reduces the number of city and county splits by 34.53%, from 110 splits in the current plan to 72 splits in the model map.

95



## Senate Option 1
## 2% Population Deviation

| | Districts Under 1% Deviation | Districts Under 2% Deviation |
|---|---|---|
| Number | 26 | 40 |
| Percent | 65% | 100% |

| Average Compactness (Schwartzberg Measure) | |
|---|---|
| Model Plan | Current (2001) Plan |
| 53.29% | 48.21% |

| Compactness Range (Schwartzberg Measure) | | |
|---|---|---|
| | Model Plan | Current (2001) Plan |
| Minimum | 35.68% | 35.75% |
| Maximum | 72.00% | 64.09% |

**Number of Majority-Minority Districts: 5**
**Percent of Voting Age Population that is Black**

| District | 2010 Census (Model Shape) | 2000 Census (Old Shape) |
|---|---|---|
| 2 | 56.5% | 55.8% |
| 5 | 57.8% | 55.9% |
| 9 | 57.5% | 55.0% |
| 16 | 53.5% | 55.9% |
| 18 | 57.4% | 58.5% |

## Senate Option 1
## 2% Population Deviation

| Number of County and City Jurisdictional Splits | | |
|---|---|---|
| Model Plan | | Current Plan |
| 72 | | 110 |

| District | Population | % Deviation from Ideal Size | Compactness | County/City Splits | District | Population | % Deviation from Ideal Size | Compactness | County/City Splits |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 200,699 | 0.34 | 37.27% | 2 | 21 | 200,497 | 0.24 | 45.91% | 2 |
| 2 | 200,274 | 0.12 | 41.83% | 2 | 22 | 200,786 | 0.38 | 62.00% | 1 |
| 3 | 198,898 | -0.56 | 63.57% | 4 | 23 | 201,856 | 0.91 | 56.12% | 1 |
| 4 | 197,941 | -1.04 | 50.05% | 1 | 24 | 201,475 | 0.72 | 52.18% | 1 |
| 5 | 199,820 | -0.95 | 44.52% | 3 | 25 | 202,450 | 1.21 | 50.09% | 2 |
| 6 | 197,092 | -1.47 | 48.04% | 3 | 26 | 198,622 | -0.70 | 63.89% | 1 |
| 7 | 198,077 | -0.97 | 44.69% | 2 | 27 | 199,368 | -0.33 | 58.62% | 2 |
| 8 | 203,869 | 1.92 | 56.27% | 1 | 28 | 199,215 | -0.41 | 46.13% | 1 |
| 9 | 202,682 | 1.33 | 41.42% | 2 | 29 | 202,040 | 1.01 | 55.40% | 2 |
| 10 | 200,177 | 0.08 | 45.60% | 3 | 30 | 202,260 | 1.12 | 53.52% | 2 |
| 11 | 196,346 | -1.84 | 56.84% | 1 | 31 | 200,796 | 0.38 | 72.00% | 1 |
| 12 | 198,644 | -0.69 | 56.44% | 1 | 32 | 202,734 | 1.35 | 49.95% | 1 |
| 13 | 197,891 | -1.07 | 46.37% | 6 | 33 | 197,631 | -1.20 | 54.42% | 1 |
| 14 | 199,238 | -0.39 | 65.57% | 2 | 34 | 199,088 | -0.47 | 63.73% | 1 |
| 15 | 201,984 | 0.98 | 58.56% | 3 | 35 | 201,159 | 0.57 | 67.56% | 1 |
| 16 | 200,731 | 0.35 | 35.68% | 4 | 36 | 200,335 | 0.15 | 63.47% | 1 |
| 17 | 202,958 | 1.47 | 57.64% | 0 | 37 | 201,234 | 0.60 | 60.48% | 1 |
| 18 | 197,473 | -1.28 | 41.00% | 5 | 38 | 198,113 | -0.96 | 45.37% | 0 |
| 19 | 200,811 | 0.39 | 57.17% | 1 | 39 | 198,294 | -0.87 | 53.99% | 3 |
| 20 | 196,546 | -1.74 | 66.84% | 1 | 40 | 201,420 | 0.70 | 41.36% | 0 |

96

Virginia Senate Model Map Option #2: 3%-plus Population Deviation



The 3%-plus Senate alternative presents the same basic shape for all of the districts in the 2% alternative, but with fewer jurisdiction splits and more compact district boundaries. Most of the previous county splits in Southside and Southwest Virginia have been removed and the boundaries for District 22 were made to conform to the path of Interstate 81 around Salem and Roanoke cities.

District 31 around Arlington County was modified to fit entirely within the Arlington County boundaries and the surrounding districts were adjusted to accommodate this change.

97



**Northern Virginia detail**
**Senate Model Map Option #2: 3%-plus Population Deviation**

Perhaps the most dramatic changes in the 3%-plus alternative are the new configurations of Districts 26 and 27, which are now entirely within county boundaries and more compact. Splits in Shenandoah, Warren and Prince William counties were removed.

This map includes 17 districts under 1% deviation, 13 additional districts under 2% deviation, 8 additional districts under 3% deviation, and 1 additional district each under 4% and 5% deviation. This deviation approach allows for an improvement in the compactness of districts by 10.69% (from 48.21% in the current plan to 53.98% in the model map). The

98

least compact district in this map is 35.68% while the most compact district is 71.80%. This map includes 5 majority-minority districts ranging from 57.8% black voting-age population (District 5) to 53.5% black voting-age population (District 16). Finally, this map reduces the number of city and county splits by 63.64%, from 110 splits in the current plan to 40 splits in the model map.

## Senate  Option 2
## 3%+ Population Deviation

|  | Districts Under 1% Deviation | Districts Under 2% Deviation | Districts Under 3% Deviation | Districts Under 4% Deviation | Districts Under 5% Deviation |
|---|---|---|---|---|---|
| Number | 17 | 30 | 38 | 39 | 40 |
| Percent | 42.5% | 75.0% | 95.0% | 97.5% | 100.0% |

| Average Compactness (Schwartzberg Measure) | |
|---|---|
| Model Plan | Current (2001) Plan |
| 53.98% | 48.21% |

| Compactness Range (Schwartzberg Measure) | | |
|---|---|---|
|  | Model Plan | Current Plan |
| Minimum | 35.68% | 35.75% |
| Maximum | 71.80% | 64.09% |

Number of Majority-Minority Districts: 5
Percent of Voting Age Population that is Black

| District | Model Shape | 2000 Data (Old Shape) |
|---|---|---|
| 2 | 56.5% | 55.8% |
| 5 | 57.8% | 55.9% |
| 9 | 57.5% | 55.0% |
| 16 | 53.5% | 55.9% |
| 18 | 57.4% | 58.5% |

99

| | | Senate  Option 2 | | | | | | | | |
| | | 3%+ Population Deviation | | | | | | | | |

| | | Number of County and City Jurisdictional Splits | | | | | | | | |
| | | Model Plan | | | Current Plan | | | | | |
| | | 40 | | | 110 | | | | | |

| District | Population | % Deviation from ideal Size | Compactness | County/City Splits | District | Population | %Deviation from ideal Size | Compactness | County/City Splits |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 200,699 | 0.34 | 37.27% | 2 | 21 | 197,914 | -1.00 | 47.85% | 1 |
| 2 | 200,274 | 0.12 | 41.83% | 2 | 22 | 204,931 | 2.45 | 70.64% | 1 |
| 3 | 201,634 | 0.80 | 62.74% | 4 | 23 | 205,308 | 2.64 | 56.27% | 0 |
| 4 | 195,205 | -2.41 | 50.16% | 1 | 26 | 204,796 | 2.38 | 52.30% | 0 |
| 5 | 199,320 | -0.35 | 44.52% | 3 | 27 | 208,499 | 4.24 | 71.80% | 0 |
| 6 | 194,413 | -2.81 | 47.12% | 1 | 28 | 196,763 | -1.63 | 46.53% | 1 |
| 7 | 200,733 | 0.35 | 44.06% | 2 | 29 | 195,857 | -2.08 | 59.29% | 2 |
| 8 | 201,213 | 0.59 | 55.91% | 1 | 30 | 195,038 | -2.49 | 57.27% | 1 |
| 9 | 202,642 | 1.33 | 41.42% | 2 | 31 | 207,627 | 3.80 | 71.08% | 0 |
| 10 | 200,177 | 0.08 | 45.60% | 1 | 32 | 202,734 | 1.35 | 49.95% | 1 |
| 11 | 196,346 | -1.84 | 56.84% | 1 | 33 | 197,325 | -1.35 | 59.87% | 1 |
| 12 | 198,644 | -0.69 | 56.44% | 1 | 34 | 199,088 | -0.47 | 63.73% | 1 |
| 13 | 197,892 | -1.07 | 46.44% | 6 | 35 | 201,292 | 0.63 | 60.29% | 1 |
| 14 | 199,238 | -0.39 | 65.57% | 2 | 36 | 200,591 | 0.28 | 64.08% | 1 |
| 15 | 195,599 | -2.21 | 62.03% | 1 | 37 | 201,234 | 0.60 | 60.48% | 1 |
| 16 | 200,731 | 0.35 | 35.68% | 4 | 38 | 198,113 | -0.96 | 45.57% | 0 |
| 17 | 202,958 | 1.47 | 57.64% | 0 | 39 | 197,815 | -1.11 | 56.42% | 3 |
| 18 | 197,472 | -1.28 | 41.04% | 5 | 40 | 201,420 | 0.70 | 41.36% | 0 |
| 19 | 197,605 | -1.21 | 58.27% | 1 | | | | | |
| 20 | 194,984 | -2.52 | 68.87% | 0 | | | | | |

The House of Delegates

The Commission was confronted with similar trade-offs between the redistricting criteria in the House of Delegates, but discovered the population requirements are less in conflict with respecting county and independent city boundaries, perhaps because the districts are of a smaller – and fortuitous – size that facilitates respecting these boundaries. The Commission identified only one case, a district straddling Smyth and Grayson counties, where relaxing a 2% population deviation from the ideal of 80,010 would reduce the number of county splits.

The Commission proposed two model maps, one with 12 majority-minority districts and another with 13 majority-minority districts. These plans were exactly similar except for four districts that must be altered to create a 13th majority-minority district.

100

Additionally, the Commission unsuccessfully explored the possibility of drawing a Hispanic-majority district. The Commission decided to maintain the current 49th district – which was significantly under-populated with a population of 68,637 – in a configuration that limited a reduction of its Hispanic population from a current 35.1% to 34.9% while bringing its population into balance.



House of Delegates Model Map Option #1: 12 Majority-Minority Districts

The first consideration was to create majority-minority districts to be in compliance with the Voting Rights Act. In 2001, the Commonwealth created 12 House of Delegates districts where African-Americans constituted a majority of the 2000 census voting-age population. According to the 2010 census, one of these districts, District 71, had fallen below 50% to 47.0% African-American voting-age population. The Commission decided to boost the population of this district to create a 12 majority-minority district option (Districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95). All 12 districts are drawn within a 2% population deviation. All are more compact than in their counterparts in the current map while crossing an aggregate fewer county and independent city lines.

101



**Hampton Roads detail**
**House of Delegates Model Map Option #1: 12 Majority-Minority Districts**

These districts have a profound effect on their neighbors. In the Norfolk area, the remaining districts generally revolve around the four majority-minority districts, following the shoreline,

while respecting existing county and independent city boundaries and maintaining a compact shape. It is impossible to draw an Eastern Shore district within the permitted population deviation, so a district must extend across the Chesapeake Bay Bridge.

Two majority-minority districts are located in Newport News and Hampton, and the adjacent districts follow the peninsula northward through Williamsburg and beyond. Two districts to the north also generally follow peninsulas.

Two majority-minority districts are located to the south of Richmond, encompassing African-American communities in Petersburg and Emporia, respectively.

102

These districts must cross county and independent city boundaries to maintain the African-American voting-age populations.

Four majority-minority districts are located in the Richmond area. Of particular note is District 74, which the Commission reconfigured to be more compact and located entirely within Henrico County, whereas the current district extends into Charles City County. Elsewhere in the region, districts generally respect county and independent city lines where possible in a compact manner. However, the presence of the majority-minority district requires some boundaries to be crossed.



Richmond detail
House of Delegates Model Map Option #1: 12 Majority-Minority Districts

103

The Commission's next step following the drawing of majority-minority districts and their neighbors was to draw the remainder of the Commonwealth. Generally, if a district within the 2% population deviation could be drawn to be composed of whole counties or independent cities, such a district was created. If a county had to be split in order to achieve the proper population deviation in a district, lines were drawn to minimize the splits among adjacent counties and independent cities and to keep districts as compact as possible. Where choices were available, districts were drawn to respect communities of interest, such as by following transportation corridors or other natural features such as water or mountains. None of the districts were drawn with the intent of crossing a body of water without a bridge.

It was not possible to balance all the competing goals in all circumstances. Some jurisdictions must be split. In Northern Virginia, Arlington County has too much population for two districts. The Commission decided to cross the Arlington County and Fairfax County lines where the current District 49 is located in order to tie together Hispanic communities in that area. To keep these communities together, another split with District 45 was formed in the southern tip of Arlington across to Alexandria. The two Arlington County districts evenly divide the county as best as possible.

104



**Northern Virginia detail**
**House of Delegates Model Map Option #1: 12 Majority-Minority Districts**

The Fairfax County line must be crossed because there is not the right amount of population from the county line to Washington, DC, to draw districts entirely contained within Fairfax County. Within the Fairfax County region, the independent cities of Fairfax City and Fall Church were kept together with their immediate environs. A second Alexandria split is required to achieve population balance, and was done with a district extending to the south of the city. Elsewhere, districts were drawn to respect communities of interest in Centreville, Clifton, Herndon, Vienna, Fair Lakes, Lorton and Springfield, among others.

In the exurbs, the Commission drew a Manassas/Manassas City district, districts extending along the Route 7 corridor to and beyond Leesburg, a

105

predominantly Woodbridge district, and districts generally following the Prince William Parkway.

Districts in the western part of the state generally followed the natural valleys in a way that respects county and city boundaries in a compact manner. Some boundary splits must happen, such as in the areas of Harrisonburg, Roanoke and Winchester. The Roanoke area presented a puzzle in minimizing county and independent city splits that was best solved by combining Salem and Christiansburg in a single district extending along I-81. Another district combines Radford and Blacksburg. Roanoke itself has too much population, so it must be split once.

In the Piedmont region, Charlottesville has too little population for its own district, so it must extend into Albemarle County. Two other splits of Albemarle County are necessary to reduce splits in surrounding counties. The Commission drew one district consolidating the area to the south of Charlottesville and a second district extending to the west. Culpeper and Orange counties together form a district of the ideal population size, which the Commission decided to draw. However, this configuration then requires county splits in adjoining counties.

Further to the South, Lynchburg is too small for its own district, so the Commission decided to cross the Amherst County line to the north. Similarly, Danville must be fortified with population from Pittsylvania County. Here, the remainder of the county can be rounded with Campbell County without creating another county split, which is why the Lynchburg configuration is desirable. Elsewhere, counties and independent cities in the Southwest were generally respected because they are smaller in population size. However, some splits, such as those of Patrick and

106

Wise counties were required to bring districts into population balance.

This map includes 68 districts under 1% deviation and 32 additional districts under 2% deviation. This deviation approach allows for an improvement in the compactness of districts by 15.08% (from 49.78% in the current plan to 58.57% in the model map). The least compact district in this map is 35.78% while the most compact district is 82.54%. This map includes 12 minority-majority districts ranging from 58.0% black voting-age population (District 92) to 53.5% black voting-age population (District 90). Finally, this map reduces the number of city and county splits by 21.13%, from 194 splits in the current plan to 153 splits in the model map.

## House Option 1
## 12 Majority-Minority Districts

| | Districts Under 1% Deviation | Districts Under 2% Deviation |
|---|---|---|
| Number | 68 | 100 |
| Percent | 68% | 100% |

| Average Compactness (Schwartzberg Measure) | |
|---|---|
| Model Plan | Current (2001) Plan |
| 58.57% | 49.78% |

| Compactness Range (Schwartzberg Measure) | | |
|---|---|---|
| | Model Plan | Current (2001) Plan |
| Minimum | 35.75% | 30.87% |
| Maximum | 82.54% | 76.31% |

| Number of Majority-Minority Districts: 12 Percent of Voting Age Population that is Black | | |
|---|---|---|
| District | 2010 Census (Model Shape) | 2000 Census (Old Shape) |
| 63 | 56.1% | 57.8% |
| 69 | 55.2% | 57.6% |
| 70 | 54.4% | 57.2% |
| 71 | 54.0% | 55.5% |
| 74 | 56.8% | 59.7% |
| 75 | 54.7% | 56.2% |
| 77 | 54.6% | 55.9% |
| 80 | 54.9% | 55.3% |
| 89 | 54.2% | 53.4% |
| 90 | 53.5% | 54.0% |
| 92 | 58.0% | 59.3% |
| 95 | 55.3% | 58.1% |

107

## House Option 1
### 12 Majority-Minority Districts

| District | Population | % Deviation from Ideal Size | Compactness | County/City Splits | District | Population | % Deviation from Ideal Size | Compactness | County/City Splits |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 81,469 | 1.82% | 61.33% | 1 | 26 | 78,709 | -1.63% | 69.10% | 1 |
| 2 | 81,603 | 1.99% | 51.92% | 1 | 27 | 81,315 | 1.63% | 55.70% | 1 |
| 3 | 78,703 | -1.63% | 54.60% | 2 | 28 | 79,347 | -0.83% | 53.40% | 1 |
| 4 | 78,412 | -2.00% | 68.47% | 1 | 29 | 79,690 | -0.40% | 56.53% | 1 |
| 5 | 81,558 | 1.98% | 63.19% | 1 | 30 | 80,170 | 0.20% | 54.03% | 0 |
| 6 | 80,272 | 0.33% | 40.90% | 1 | 31 | 78,477 | -1.92% | 63.62% | 2 |
| 7 | 81,561 | 1.94% | 52.82% | 3 | 32 | 79,590 | -0.52% | 69.94% | 1 |
| 8 | 81,277 | 1.58% | 52.58% | 1 | 33 | 78,768 | -1.55% | 48.73% | 2 |
| 9 | 79,357 | -0.82% | 54.58% | 1 | 34 | 80,951 | 1.18% | 54.09% | 1 |
| 10 | 78,746 | -1.58% | 59.07% | 1 | 35 | 81,034 | 1.28% | 71.09% | 1 |
| 11 | 81,594 | 1.98% | 50.55% | 1 | 36 | 80,910 | 1.12% | 74.78% | 1 |
| 12 | 79,559 | -0.56% | 42.31% | 0 | 37 | 80,903 | 1.12% | 64.18% | 1 |
| 13 | 81,589 | 1.97% | 50.50% | 1 | 38 | 80,164 | 0.19% | 76.73% | 1 |
| 14 | 81,060 | 1.31% | 71.48% | 1 | 39 | 80,539 | 0.65% | 65.14% | 1 |
| 15 | 79,568 | -0.55% | 58.71% | 0 | 40 | 79,361 | -0.81% | 55.09% | 1 |
| 16 | 80,601 | 0.74% | 60.91% | 1 | 41 | 79,878 | -0.16% | 57.57% | 1 |
| 17 | 81,583 | 1.97% | 38.68% | 1 | 42 | 78,559 | -1.81% | 61.07% | 1 |
| 18 | 78,465 | -1.93% | 56.41% | 3 | 43 | 81,610 | 2.00% | 73.77% | 1 |
| 19 | 78,496 | -1.89% | 56.79% | 1 | 44 | 81,110 | 1.37% | 71.16% | 1 |
| 20 | 78,413 | -2.00% | 57.49% | 2 | 45 | 81,478 | 1.83% | 67.25% | 2 |
| 21 | 80,017 | 0.01% | 67.28% | 1 | 46 | 80,884 | 1.09% | 57.04% | 2 |
| 22 | 78,543 | -1.83% | 58.28% | 1 | 47 | 79,831 | -0.22% | 70.98% | 1 |
| 23 | 79,492 | -0.65% | 58.46% | 1 | 48 | 78,864 | -1.43% | 70.26% | 1 |
| 24 | 78,944 | -1.33% | 51.37% | 1 | 49 | 79,508 | -0.63% | 50.07% | 3 |
| 25 | 79,174 | -1.04% | 64.58% | 2 | 50 | 81,102 | 1.36% | 47.00% | 1 |

## House Option 1, continued
### 12 Majority-Minority Districts

| District | Population | %Deviation from Ideal Size | Compactness | County/City Splits | District | Population | %Deviation from Ideal Size | Compactness | County/City Splits |
|---|---|---|---|---|---|---|---|---|---|
| 51 | 78,516 | -1.87% | 73.86% | 1 | 76 | 81,568 | 1.95% | 71.27% | 1 |
| 52 | 80,560 | 0.69% | 68.39% | 1 | 77 | 79,445 | -0.71% | 56.30% | 4 |
| 53 | 79,605 | -0.51% | 74.50% | 1 | 78 | 79,370 | -0.80% | 72.05% | 1 |
| 54 | 80,576 | 0.71% | 56.51% | 2 | 79 | 78,841 | -1.46% | 54.69% | 3 |
| 55 | 81,482 | 1.84% | 50.42% | 1 | 80 | 79,382 | -0.78% | 59.36% | 2 |
| 56 | 80,195 | 0.23% | 63.20% | 2 | 81 | 81,280 | 1.59% | 75.47% | 2 |
| 57 | 79,430 | -0.72% | 48.89% | 1 | 82 | 81,475 | 1.83% | 82.54% | 1 |
| 58 | 78,552 | -1.82% | 43.36% | 2 | 83 | 79,106 | -1.13% | 57.08% | 1 |
| 59 | 78,440 | -1.96% | 51.29% | 2 | 84 | 80,866 | 1.07% | 65.91% | 2 |
| 60 | 80,343 | 0.42% | 60.53% | 1 | 85 | 79,890 | -0.15% | 59.78% | 2 |
| 61 | 80,181 | 0.21% | 65.12% | 2 | 86 | 79,619 | -0.49% | 60.31% | 3 |
| 62 | 80,728 | 0.90% | 46.98% | 3 | 87 | 81,205 | 1.49% | 64.14% | 1 |
| 63 | 78,461 | -1.94% | 69.50% | 3 | 88 | 79,297 | -0.89% | 57.74% | 1 |
| 64 | 80,517 | 0.63% | 49.22% | 4 | 89 | 80,634 | 0.78% | 52.04% | 1 |
| 65 | 79,296 | -0.89% | 57.50% | 2 | 90 | 80,671 | 0.83% | 50.69% | 3 |
| 66 | 78,557 | -1.82% | 55.24% | 1 | 91 | 78,684 | -1.66% | 74.67% | 2 |
| 67 | 78,964 | -1.31% | 70.64% | 1 | 92 | 78,809 | -1.50% | 48.01% | 1 |
| 68 | 79,272 | -0.92% | 53.55% | 2 | 93 | 78,946 | -1.33% | 52.88% | 2 |
| 69 | 81,299 | 1.61% | 56.84% | 2 | 94 | 78,628 | -1.73% | 53.18% | 2 |
| 70 | 79,162 | -1.06% | 43.66% | 3 | 95 | 80,702 | 0.86% | 63.25% | 2 |
| 71 | 81,076 | 1.33% | 50.43% | 2 | 96 | 81,077 | 1.33% | 49.31% | 0 |
| 72 | 81,502 | 1.86% | 56.03% | 1 | 97 | 79,673 | -0.42% | 35.75% | 4 |
| 73 | 80,431 | 0.53% | 52.44% | 2 | 98 | 79,108 | -1.13% | 51.42% | 1 |
| 74 | 81,579 | 1.96% | 41.41% | 2 | 99 | 81,144 | 1.42% | 46.84% | 1 |
| 75 | 79,061 | -1.19% | 56.73% | 4 | 100 | 81,018 | 1.26% | 63.85% | 2 |

108

House of Delegates Model Map Option #2: 13 Majority-Minority Districts

In the course of devising a redistricting plan with 12 majority-minority districts, it became apparent that the current District 77, which joins minority communities in Chesapeake and Suffolk, could be reconfigured to create two districts that may provide African Americans an opportunity to elect candidates of their choice. As the comparison below shows, the only changes to the 12 majority-minority map are in Hampton Roads, where Districts 64, 76, 78 and 79 are reconfigured.



Hampton Roads, 7 majority-minority House districts (76, 77, 80, 89, 90, 92, 95)

109



Hampton Roads, 6 majority-minority House districts (77, 80, 89, 90, 92, 95)

The reconfigured districts split fewer jurisdictional boundaries and are more compact than the current (2001) configuration; however, they are less compact and split more jurisdictional boundaries than the model plan for 12 majority-minority districts. Here is a comparison of House Option 1 with House Option 2:

| District | Compactness | | City/County Split | |
|---|---|---|---|---|
| | 12 districts | 13 districts | 12 districts | 13 districts |
| 64 | 49.22 | 48.41 | 4 | 4 |
| 76 | 71.27 | 52.11 | 1 | 3 |
| 78 | 72.05 | 50.32 | 1 | 2 |
| 79 | 54.69 | 49.73 | 3 | 3 |

Although the non-retrogression standard of Section 5 of the Voting Rights Act does not bind the Commonwealth to create a thirteenth African-American majority district, the Commission determined that it would be informative to demonstrate how to create such a district.

Statewide, the 13 majority-minority map includes 67 districts under 1% deviation and 33 additional districts under 2% deviation. This deviation approach

110

allows for an improvement in the compactness of
districts by 14.32% (from 49.78% in the current plan
to 58.10% in the model map). The least compact
district in this map is 35.75% while the most compact
district is 82.54%. This map includes 13 majority-
minority districts, ranging from 58.0% black voting-
age population (District 92) to 53.5% black voting-age
population (District 90). Finally, this map reduces the
number of city and county splits by 19.5%, from 194
splits in the current plan to 156 splits in the model
map.

## House Option 2
## 13 Majority-Minority Districts

|        | Districts Under 1% Deviation | Districts Under 2% Deviation |
|--------|------------------------------|------------------------------|
| Number | 67                           | 100                          |
| Percent| 67%                          | 100%                         |

| Average Compactness (Schwartzberg Measure) | |
|------------|--------------------|
| Model Plan | Current (2001) Plan |
| 58.10%     | 49.78%             |

| Compactness Range (Schwartzberg Measure) | | |
|---------|------------|---------------------|
|         | Model Plan | Current (2001) Plan |
| Minimum | 35.75%     | 35.75%              |
| Maximum | 82.54%     | 64.09%              |

| Number of Majority-Minority Districts: 13 Percent of Voting Age Population that is Black | | |
|----------|----------------------------|--------------------------|
| District | 2010 Census (Model Shape)  | 2000 Census (Old Shape)  |
| 63       | 56.1%                      | 57.8%                    |
| 69       | 55.2%                      | 57.6%                    |
| 70       | 54.4%                      | 57.2%                    |
| 71       | 54.0%                      | 55.5%                    |
| 74       | 56.8%                      | 59.7%                    |
| 75       | 54.7%                      | 56.2%                    |
| 76       | 54.2%                      | 55.9%*                   |
| 77       | 54.6%                      | 55.9%                    |
| 80       | 54.9%                      | 55.3%                    |
| 89       | 54.2%                      | 53.4%                    |
| 90       | 53.5%                      | 54.0%                    |
| 92       | 58.0%                      | 59.3%                    |
| 95       | 55.3%                      | 58.1%                    |

* Proposed 76th District was part of old 77th District.

111

## House Option 2
## 13 Majority-Minority Districts

| District | Population | %Deviation from Ideal Size | Compactness | County/City Splits | District | Population | %Deviation from Ideal Size | Compactness | County/City Splits |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 81,469 | 1.82% | 61.33% | 1 | 26 | 78,709 | -1.63% | 69.10% | 1 |
| 2 | 81,603 | 1.99% | 51.92% | 1 | 27 | 81,315 | 1.63% | 95.70% | 1 |
| 3 | 78,703 | -1.63% | 54.60% | 2 | 28 | 79,347 | -0.83% | 53.40% | 1 |
| 4 | 78,412 | -2.00% | 68.47% | 1 | 29 | 79,690 | -0.40% | 56.53% | 1 |
| 5 | 81,558 | 1.93% | 63.19% | 1 | 30 | 80,170 | 0.20% | 54.03% | 0 |
| 6 | 80,272 | 0.33% | 40.90% | 1 | 31 | 78,477 | -1.92% | 63.62% | 2 |
| 7 | 81,561 | 1.94% | 52.82% | 3 | 32 | 79,590 | -0.52% | 69.94% | 1 |
| 8 | 81,277 | 1.58% | 52.58% | 1 | 33 | 78,768 | -1.55% | 48.73% | 2 |
| 9 | 79,957 | -0.82% | 54.58% | 1 | 34 | 80,951 | 1.18% | 54.09% | 1 |
| 10 | 78,746 | -1.58% | 59.07% | 1 | 35 | 81,034 | 1.28% | 71.09% | 1 |
| 11 | 81,594 | 1.98% | 50.55% | 1 | 36 | 80,910 | 1.12% | 74.73% | 1 |
| 12 | 79,559 | -0.56% | 42.31% | 0 | 37 | 80,903 | 1.12% | 64.18% | 1 |
| 13 | 81,589 | 1.97% | 50.50% | 1 | 38 | 80,164 | 0.19% | 76.73% | 1 |
| 14 | 81,060 | 1.31% | 71.48% | 1 | 39 | 80,533 | 0.65% | 65.14% | 1 |
| 15 | 79,568 | -0.55% | 58.71% | 0 | 40 | 79,361 | -0.81% | 55.09% | 1 |
| 16 | 80,601 | 0.74% | 60.91% | 1 | 41 | 79,878 | -0.16% | 57.57% | 1 |
| 17 | 81,583 | 1.97% | 38.68% | 1 | 42 | 78,558 | -1.81% | 61.07% | 1 |
| 18 | 78,465 | -1.93% | 56.41% | 3 | 43 | 81,610 | 2.00% | 78.77% | 1 |
| 19 | 78,496 | -1.89% | 56.79% | 1 | 44 | 81,110 | 1.37% | 71.16% | 1 |
| 20 | 78,413 | -2.00% | 57.49% | 2 | 45 | 81,478 | 1.83% | 67.25% | 2 |
| 21 | 80,017 | 0.01% | 67.28% | 1 | 46 | 80,884 | 1.09% | 57.04% | 2 |
| 22 | 78,543 | -1.83% | 58.28% | 1 | 47 | 79,831 | -0.22% | 70.98% | 1 |
| 23 | 79,492 | -0.65% | 58.46% | 1 | 48 | 78,864 | -1.43% | 70.26% | 1 |
| 24 | 78,944 | -1.33% | 51.37% | 1 | 49 | 79,508 | -0.63% | 50.07% | 3 |
| 25 | 79,174 | -1.04% | 64.58% | 2 | 50 | 81,102 | 1.36% | 47.00% | 1 |

## House Option 2, continued
## 13 Majority-Minority Districts

| District | Population | % Deviation from Ideal Size | Compactness | County/City Splits | District | Population | %Deviation from Ideal Size | Compactness | County/City Splits |
|---|---|---|---|---|---|---|---|---|---|
| 51 | 78,516 | -1.87% | 73.86% | 1 | 76 | 78,999 | -1.26% | 52.11% | 3 |
| 52 | 80,560 | 0.69% | 68.39% | 1 | 77 | 79,445 | -0.71% | 56.36% | 4 |
| 53 | 79,605 | -0.51% | 74.50% | 1 | 78 | 81,023 | 1.27% | 50.32% | 2 |
| 54 | 80,576 | 0.71% | 56.53% | 2 | 79 | 78,709 | -1.63% | 49.78% | 3 |
| 55 | 81,482 | 1.84% | 50.42% | 1 | 80 | 79,982 | -0.78% | 59.36% | 2 |
| 56 | 80,195 | 0.23% | 63.20% | 2 | 81 | 81,280 | 1.59% | 75.47% | 2 |
| 57 | 79,430 | -0.72% | 48.89% | 1 | 82 | 81,475 | 1.83% | 82.54% | 1 |
| 58 | 78,552 | -1.82% | 43.36% | 2 | 83 | 79,106 | -1.13% | 57.88% | 1 |
| 59 | 78,440 | -1.96% | 51.29% | 2 | 84 | 80,866 | 1.07% | 65.91% | 2 |
| 60 | 80,343 | 0.42% | 60.53% | 1 | 85 | 79,890 | -0.15% | 59.78% | 2 |
| 61 | 80,181 | 0.21% | 65.12% | 2 | 86 | 79,619 | -0.49% | 60.31% | 3 |
| 62 | 80,728 | 0.90% | 46.98% | 3 | 87 | 81,205 | 1.49% | 64.14% | 1 |
| 63 | 78,861 | -1.94% | 69.50% | 3 | 88 | 79,297 | -0.89% | 57.74% | 1 |
| 64 | 81,565 | 1.94% | 48.41% | 4 | 89 | 80,634 | 0.78% | 52.04% | 1 |
| 65 | 79,296 | -0.89% | 57.50% | 2 | 90 | 80,671 | 0.83% | 50.69% | 3 |
| 66 | 78,557 | -1.82% | 55.24% | 1 | 91 | 78,684 | -1.66% | 74.67% | 2 |
| 67 | 78,964 | -1.31% | 70.64% | 1 | 92 | 78,809 | -1.50% | 48.01% | 1 |
| 68 | 79,272 | -0.92% | 53.55% | 2 | 93 | 78,946 | -1.33% | 52.88% | 2 |
| 69 | 81,299 | 1.61% | 56.84% | 2 | 94 | 78,628 | -1.73% | 53.18% | 2 |
| 70 | 79,162 | -1.06% | 43.66% | 3 | 95 | 80,702 | 0.86% | 63.25% | 2 |
| 71 | 81,076 | 1.33% | 50.43% | 2 | 96 | 81,077 | 1.33% | 49.31% | 0 |
| 72 | 81,502 | 1.86% | 56.03% | 1 | 97 | 79,673 | -0.42% | 35.75% | 4 |
| 73 | 80,431 | 0.53% | 52.44% | 2 | 98 | 79,108 | -1.13% | 51.42% | 1 |
| 74 | 81,579 | 1.96% | 41.41% | 2 | 99 | 81,144 | 1.42% | 46.84% | 1 |
| 75 | 79,061 | -1.19% | 56.73% | 4 | 100 | 81,018 | 1.26% | 63.95% | 2 |

112

## Acknowledgments

The Commission wishes to acknowledge Governor Robert F. McDonnell for establishing the first Independent Bipartisan Advisory Commission on Redistricting in the history of the Commonwealth. Commission members were privileged to be chosen to participate in this landmark activity.

The Commission's work over the past two and a half months would have been impossible without the assistance and support of an extraordinary number of individuals, groups and firms from all corners of Virginia. We wish to express the depth of our gratitude to the many people and organizations who assisted, informed, and advised us.

- The 300 citizens of Virginia who came to the Commission's four public meetings and told us what they wanted to see in redistricting. Many of those people not only shared their personal stories and experiences but also demonstrated a deep concern for their communities and for the Commonwealth.
- The 18 professors from colleges and universities across Virginia, and their 150 students who participated in the Virginia College and University Redistricting Competition. They demonstrated the best in our higher education system; their talent, energy, and commitment makes us feel comforted in the next generation of leaders. We wish to particularly acknowledge the team from the William & Mary Law School, who stepped in to work with the Commission's map-drawing at the end of the competition. Brian Cannon, Nick Mueller, and Brian Rothenberg were extraordinarily helpful.

113

- The advisors to the Commission, including Dustin A. Cable, Charles W. Dunn, Ernest C. Gates, William H. Hurd, Quentin Kidd, Michael P. McDonald, Anthony T. Troy, and Judy Ford Wason. The Commission could not have begun to have completed its task without the countless hours these individuals dedicated to its work.
- The Wason Center for Public Policy at Christopher Newport University for providing administrative support to the Commission, including hosting the Commission's website.
- Regent University for enabling Professor Charles W. Dunn to be available to the Commission.
- The Weldon Cooper Center at the University of Virginia for providing demographic briefings to the Commission and loaning Dustin Cable to the Commission to help with map-drawing.
- CRT/tanaka and Brian Ellis, its executive vice president, for providing pro bono assistance in the charting and presentation of the Commission's work product in a remarkably timely manner.
- Troutman Sanders for providing the Commission with the stellar legal assistance of Bill Hurd and Tony Troy.
- Norfolk State University, Virginia Commonwealth University, George Mason University, Germanna Community College and Virginia Western Community College for making their facilities available to the Commission for its meetings and public forums.
- The League of Women Voters, the Richmond First Club and other members of the Virginia Redistricting Coalition for publicizing the Commission's meetings and forums.

114

- William A. Royall Jr. for his generous support of this privately funded initiative.

Finally, the Commission's work would not have been possible without the able, talented, and energetic assistance of the Commission's sole staff member, Steven Jones.

115

From: Chris Marston <chrismarston@gmail.com
To: Paul Haughton <phaughton@delphiccomm.com>
Subject: Re: FYI
Date: 4/2/2011 4:08:32 PM
Attachments:

---

Well, they're Republicans, so Jones won't help them. We only work hard to accomodate Democrats now. We just tell our guys to pound sand. After all, why give our guys good districts for the decade when we can spent our time making Democrats lives easier.

Chris did make some Carrico-requested changes on Friday.

On Sat, Apr 2, 2011 at 3:57 PM, Paul Haughton <phaughton@delphiccomm.com> wrote:

> Anne B and Bill Carrico had a meeting among themselves on Thursday about redistricting. It was after the APCO rate increase hearing and they invited Will to attend but Will didn't feel the need to. He didn't know what they discussed or the agenda but they told him they were upset and the three of them needed to band together if they were going to get it changed. Will is happy with his district so did not attend.

Regards,

Paul

C: 703-501-0768
Fax: 703-842-8731

This email is not to be forwarded without the consent of the sender.The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the

116

person(s) named above. If you are not the intended
recipient, you are hereby notified that any review,
dissemination, distribution or duplication of this
communication is strictly prohibited. If you are not the
intended recipient, please contact the sender by reply
email and destroy all copies of the original message.

117

Attachment 15-Joint

VIRGINIA HOUSE OF DELEGATES
REDISTRICTING PUBLIC HEARING

APRIL 2, 2011
7:00 P.M. - 7:32 P.M.

CHAIRED BY: DELEGATE CHRIS JONES

Other Members in Attendance:              ORIGINAL

      Delegate John O'Bannon
      Delegate Johnny Joannou
      Delegate Rosalind Dance
      Delegate. D.W. Marshall
      Delegate Don Merricks
      Senator Mary Margaret Whipple
      Senator Harry Blevins Senator Roscoe Reynolds

CENTRAL VIRGINIA REPORTERS

P.O. BOX 12628

ROANOKE, VA 24027

(540) 38D-5017

[2] (700 p.m.)

PROCEEDINGS

DELEGATE JONES: I call the Joint Public Hearing to order.. My name is Chris Jones, and I represent the 76th District in Suffolk and Chesapeake.

Before I make my opening remarks, I have the Members of the General Assembly that traveled here by plane. This is our third public hearing today. We've been in Harrisonburg, Shenandoah, and then we went to Abingdon by way of Tennessee–we couldn't land in Virginia and we're finishing up here this evening in

118

Danville, and we thank you for coming out- Mr. Blevins?

SENATOR BLEVINS: I'm Harry Blevins. I represent the 14th Senate District. Can you hear me?

AUDIENCE: No. '

SENATOR BLEVINS: I'm Harry Blevins. I represent the 14th Senate District, which is primarily Chesapeake, with a small part of Virginia Beach.

DELEGATE JOANNOU: My name is Johnny Joannou.

[3] I represent the 79th District. It includes portions of the Cities of Norfolk, Chesapeake, Portsmouth, and Suffolk.

SENATOR WHIPPLE I'm Mary Margaret Whipple from Arlington. I'm in Senate District 31, which represents most of Arlington, the City of Falls Church, and the eastern part of Fairfax County.

DELEGATE DANCE: My name is Rosalind Dance. I serve in the 63rd House District, which encompasses the City of Petersburg, Dinwiddie County, and parts of Chesterfield, Ettrick and Matoaca.

DELEGATE O'HANNON: Good evening. Thank you all for coming out tonight. My name is John O'Bannon. I'm on the Privileges and Elections Committee. I represent Henrico County and two precincts in the City of Richmond, and about 50 years ago I was up the road at Hargrove Military Academy.

CHAIRMAN JONES: We also have in the audience D.W. Marshall and Don Merricks Thank you for being such great hosts to us this afternoon, and thank you for dinner as well.

119

Ladies and Gentlemen, Colleagues, and Engaged Citizens, good evening. It is my pleasure tonight [4] to welcome you to the seventh of our eight public hearings on redistricting plans and maps that have been introduced in the Virginia House of Delegates and the Senate of Virginia.

Tonight's public hearing is sponsored by the Privileges and Election Committee of the House and

Senate meeting jointly. It underscores our belief and our commitment in following an open and fair process.

Let me be absolutely clear about our primary purpose of these hearings We went to listen to what you have to say. We are here to listen to your feedback and reaction to the maps that have been posted on the website and the maps you have before you this evening.

We're here to seek input from local elected officials, from experts, from advocates and the people of Virginia about the new boundaries in the state legislative districts. We want to know what's important to you in redistricting.

The General Assembly and the Governor are the officials who submit to the voters at elections, and therefore are directly accountable to the public, and are responsible for drawing legislative [5] boundaries.

That mandate is clearly spelled out in the Virginia Constitution, which each of us takes an oath of office to uphold. It is one of the most important duties we have as elected government officials.

The time tested process of updating legislative boundaries every ten years ensures that every Virginian has a voice in redistricting Every Virginian

120

is represented in the General Assembly by a delegate and a senator.

Last fall the House and Senate P&E Committees proactively sought to foster greater citizen engagement and involvement through six public hearings across Virginia.

This unprecedented action then underscores our desire to encourage greater civic awareness and facilitate more active participation by the public in Virginia's 2011 redistricting process. That commitment continues this evening.

For more information about redistricting, you can go Co our website under the Division of Legislative Services and google that. In Virginia you'll have a web page, and on the left banner you [6] will see a link called Redistricting. You'll see the maps that have been proposed, and you can actually go to your area of the state and see exactly what's happening in your neighborhood.

The primary difference between last year's six public hearings and this year's eight is that now there are actually bills and maps before you.

There are three that have introduced so far; one by myself; House Bill 5001 and two others patroned in the Senate by Senator Janet Howell of Northern Virginia and John Watkins of Richmond. All were made available to the public on the General Assembly's website this past Tuesday.

Redistricting plans and maps are actually pieces of legislation- Like so many in the General Assembly– like so many the General Assembly considers year in and year out. That means amendments in committee

121

or on the floor are likely, as is normal in the give and take of the legislative process.

Both the House and the Senate introduced redistricting plans to draw districts of equal population as nearly as practicable, in accordance with the Constitution and the principle of one [7] person and one vote,

The House plan deviates from the ideal of district size of about 80,000, plus or minus I percent, The House–Senate plan deviates from its ideal district size of about 200,00·0, by only plus or minus 2 percent. The plan by Senator Watkins is plus/minus .5 percent.

Either of these House and Senate plans also maintain other traditional redistricting principles, such as compactness, contiguity, communities of interest, and political subdivision boundaries, in full compliance with the Voting Rights Act and all other applicable federal and state laws, as well as the court decisions applying them.

There are several logistical requests to ensure a smooth and as efficient process as may be possible. In order to respect the time of everyone who is here tonight to provide input, I'd ask each of you who speak to keep your comments to four, five minutes tops, as a courtesy to others.

Also, please do not–try not to repeat what others have already said, so we may accommodate as many speakers as possible. I've asked staff to [8] keep a timer, which I don't think we'll need, previously have not been keeping it.

Also because we want to maximize participation by the citizens who are here, we're here to listen to you and to not answer your questions directly. Again, this

122

will be a process and you stand where you are If you would like, you might want to talk louder. Some of us who don't hear quite as well as we used to, me included, that would be very helpful.

I have a signup sheet. And Senator Reynolds, I believe–Well, he's trying to hide. He's sitting kind of low there in the back. (Laughter) Thanks for joining us. Was it the traffic that got you?

SENATOR REYNOLDS I went to Bill's place. CHAIRMAN JONES: We did too. (Laughter) Our first speaker this evening is Mr. James Snead. Mr. Snead?

MR. SNEAD: Yeah. I represent the Pittsylvania County Board of Supervisors. I represent the Dan River District. If you just leave here and go 15 east, you'll be in my district in just a few minutes.

[9] I've been looking at this for a number of week8 on the log, and I have nothing against Senator Roscoe Reynolds, first of all; but the fact is this redistricting we're doing is splitting my district that I represent. I have one polling place in another district and two polling places in another district.

A little bit of confusion. People in my district have been contacting me quite a bit about how are we going to go about voting for this? Eveh though We'll still, according to the bill here, we'll still be voting on the 14th and the ˙16th, which is Mr. Merricks and which we are very familiar about and want to keep our delegates in Pittsylvania County as much as possible.

The Senate bill, it's very confusing. It splits the City of Danville, which in turn splits my district. That's the one that's confusing to my constituents in my district on the voting.

123

Like I said, it's very confusing for them. They don't know or 144derstand. Roscoe Reynolds will be in the 20th, from what I understand, and Senator Ruff is the other part, which I would live in Senator Ruff's district, but my two precincts, [10] voting precincts would be in another. Do you see what I'm saying?

So it's a little bit confusing. I don't know who's drawn the lines, but I know you're trying to work it out as best you possibly can, but it's drawn a lot of confusion by not having Pittsylvania County wholly in one particular Senate race, the whole county. It would help, I think, the whole county.

I think we have another one here from the Pittsylvania County Board of Supervisors, and he may elaborate on that also but it will be a little less confusing.

That's the only draw back that I see that I've been looking at, is particularly for my district. Thank you.

CHAIRMAN JONES: Next we have Kurt Feiyel? I apologize.

MR. FEIGEL: Did you say Feigel?

CHAIRMAN JONES: Is that a G or a Y?

MR. FEIGEL: Sorry. I went to public school. (Laughter)

CHAIRMAN JONES: My writing is terrible. I thought it was a Y too.

[11] MR. FEIGEL: 24502, is that the area?

CHAIRMAN JONES That's what I have. Do you want to see?

MR. FEIGEL: Thank you. My name is Kurt Feigel. I'm a member of the Tea Party, and I came down here

124

with one of our other Members. Just wanted to see kind of an example of what was going on.

I looked over it a little bit. The concerns I have when I looked at it from a split of, split precincts is really the big one that I see. You know, you look at some of these other things, they're shifted around.

Well, the 19th Senate District is pretty much, I think the numbers are 67 percent Republican. And so it's really shifted the balance of power towards, towards conservatives in that area. Hey, I'm a conservative, that-is great; but what about the other people who basically have no representation in their eyes now?

There's a huge chunk of people there, some 3-0-some percent that are not going to have the representation I think that they really feel they would deserve.

[12] And some of the other areas I've heard complaints on from people I know within the Tea Party are the Virginia Beach area where the senators, I know in my case I'm actually going to lose a senator. And I mean I currently have Steve Newman. I understand that's going to change.

And so I just think that when we look at this and look at the idea of gerrymandering, I see, I see a lot of interesting direction here.

We've got tiny little slivers that go so that we can then reach up into other areas, and that's not something I think that is when We talk about common interest, I don't think so0e of these areas really 'have common interests. They don't. Some of them are rural and farming, and then you've got huge chunks of city next to them.

125

So that was, that's all I have to say. CHAIRMAN JONES: Next we have Charlie Ferguson,

MR. FERGUSON: No, I'm passing.

CHAIRMAN JONES: You'll pass, okay. We have Fred Shanks. Good evening.

MR. SHANKS: Good evening. Thank you all for coming to Danville. Welcome to Danville. I'm a [13] member of the Danville City Council. I'm a member Of the Danville Pittsylvania County Regional Industrial Facilities Authority, the Danville Pittsylvania County Metropolitan Planning Organization, and the Danville Utilities Commission, which serves a large portion of Pittsylvania County.

I'm here because 1 have concerns about the Senate map as it's drawn, in particular the 19th District, which is the district ˑwe are currently in. And we're concerned or I'm concerned about the lines that have been created to create the 2-0th and the 15th districts.

The lines, the purpose of the lines as they're created are obvious and their intent is obvious, and that is not in the best interest of communities of interest and compactness.

I don't see how anyone can look at that map as it's drawn–and I'm not referring to the Watkins map–the map as it's drawn and see anything but lines drawn to pick up different areas for a particular reason, with not the interest of the community in mind.

My only comments after that are that it is [14] important to us in Southside Virginia and this district that Danville remain whole and that Pittsylvania County remain whole.

In my opinion, they both should remain together, because we are an example of "low communities work

126

together to develop a plan for the region. And to split this region would be, would be a terrible thing to do.

So I ask you to look at our Pittsylvania County and Danville Regional cooperation, not try to split that up. Look at the lines, make sure they make sense, and they don't have the political purpose that's obvious right now. Thank you. CHAIRMAN JONES: Thank you. Mr. Darriel ˙Burkett?

MR. BURNETT: Burnett, I'm Darryl Burnett. I went to public schools, and I can't read the pharmacist's writing. (Laughter)

First, I'm with the Danville Tea Party. Take the banner away, we're a bunch of conservative people; but let me state this: I am apparently amazed at the amount of work involved to produce this plan, we'll call it.

I commend the effort of those that worked on [15] it. It's apparently indefeasible–indefeatable (sic) work ethic. However, it's unfortunate; it strikes me as being self serving.

I am amazed also that this was published as a viable answer for redistricting, when the real reason is *so* blatantly obvious-, right down to the finite ˙cutting of precincts, 12 right here in Pittsylvania County. That still leaves the State of Virginia.

It strikes me as an effort of intent for 22 Virginia senators to control the destiny of nearly eight million Virginia citizens. The elected officials have been put on notice for some time now, and the electorate is not as dumb as John Curry thinks.

Whether they're in Danville, Pittsylvania County, Richmond, Washington, DC, this product is exemplary of the driving force behind people, their involvement

127

to get involved, the desire to be educated–and the people are. They're getting educated.

This endeavor, you stretch the limits of contiguous. By definition you're there. As for logic, common sense, any thought of cost [16] consciousness; there's a complete void, this is an expensive proposal.

This is .a tool the people in the Commonwealth of Virginia established so as to get fair and equitable representation throughout this region. It is not to be a shackle for the Virginia Senate at the cost and the behest of those in the northern part of the state.

If this is, and I think it is, a power play, I urge you to go back to Richmond. You can redeem yourself. You can go back to Richmond, go back to Work, get it fair, get it equitable; present it to the people when it's right. Thank you.

CHAIRMAN JONES: Thank you. All right, did anyone else? I believe, Mr. Lancet, you have time to speak. I do have a George Stanhope. Yes, sir? Good evening.

MR. STANHOPE: Yes. I just wanted to reiterate some of what all of these other people have said, and that is I think this is an abomination.

There is no reason why Pittsylvania County and Danville aren't large enough, with maybe a little addition, if necessary. And these lines look [17] almost like somebody took and tried to adjust or gerrymander things to come up to exactly what they were looking for.

I spent some time in Massachusetts, where the Word "gerrymander" came up from, and this looks a lot like what they did up there with Cohasset and

128

areas like that to make a particular voting district. Thank you.

CHAIRMAN JONES: Thank you. Anyone else, wishing to speak in the audience? Yes, sir, please.

MR. FRANKEN All right. My name is Fred. Franken. Can you hear me?

CHAIRMAN JONES: Yes, sir, I can.

MR, FRANKEN: I'm incensed with the work out of Richmond, purely incensed. Anyone can look at lines and with the numbers you're working with Shift them out or in, or a. little bit over and back; but when you start cutting communities, it just doesn't make sense. It makes for Stupidity.

You're cutting Danville. You're cutting the little community of Ringgold. You're cutting the little community of Kentuck. They're nice communities out there, and you've squiggled the [18] lines to cut those little communities. I don't think the state guide says to do that.

So remove stupidity from the operation. Remove criminal politics from the operation and get on with the work of the people, for pity's sakes. That's the reason we're' out there on the battle field, so you folks can play around with crap like that. Get it right, or we'll sue and litigate and get some folks to do some technical study to balance the lines.

I agree directly with the sentiment we've heard from some of the gentlemen here, and I'm very upset with that Very upset. It is giving me anger to get on the street and do a hell of a lot of volunteering, I'll tell you that,

And I appreciate you taking My comment's.

129

CHAIRMAN JONES: Yes, sir, thank you very much for coming out. Anyone else wishing to speak?

MR. BELLINGER: Yes, sir, please. My name's Nate Bellinger. I'm with the local chapter of Virginia Organizing. I just wanted to voice my support for the Bipartisan Advisory. Commission findings. There are other options out there.

MR. FRANKEN: He's an ACORN worker,

[19] MR. BELLINGER: No that is absolutely not true.

CHAIRMAN JONES: There's no debate.

MR. BELLINGER: But there is a Bipartisan Advisory Commission appointed by the Governor that has studied this subject without gerrymandering. It's appointed by the Republican governor. It doesn't take into account the Republican/Democrat' gain, but instead they're actually looking at ways that we can keep communities together and find a way that isn't as politicized.

So I'd just like to say that I wish the commission had some teeth to it. Instead of just advising, I wish they could actually have some, have a little bit of a mandate behind it, instead of going through the legislative process and being tilted around like that. Thank you.

CHAIRMAN JONES: Anyone else wishing to speak? Yes, sir, please.

MR. DANIEL: Good evening-. My name is Chris Daniel. I'm a citizen of the City of Danville.

I'm personally very pleased at the prospect of being represented in the state senate by Senator Roscoe Reynolds. I personally would be very [20] pleased to

130

have state Senator Roscoe Reynolds as m3 member of the state senate.

It's interesting that there's only one plan offered from the House of Delegates, and all the charges about gerrymandering, which may or may not be true, of the two competing Senate plans, one perhaps more so than the other one, but the same can certainly be said, and I apologize, but believe it's your plan, Delegate Jones.

It's harder to see the gerrymandering, when you're looking at a hundred sets of lines on a map of the Commonwealth of Virginia on an 8 1/2 x 11 sheet of paper, but I know from previous experience ten years ago and again in 2011 that the gerrymandering occurs.

In 2001, the gerrymandering enabled the House of Delegates, the Republican Party membership in the House of Delegates to place three outstanding members of the Democratic Party in the 10th Rouse District together. This time the same folks in charge have managed to place that esteemed member of the House of Delegates in with one of his Republican colleagues.

So while we're looking at gerrymandering, if [21] it's true in the Senate plan, it's also true of the House plan as well. I would champion, maybe a day late and a dollar short, but I will join Mr. Bellinger and suggest that perhaps moving in the direction of looking at some sort of mandated bipartisan effort would certainly avoid the splitting of communities of interest. It would certainly avoid many of the problems we pee.

I was reminded recently that in 1981 we were unable to reach a redistricting plan quickly enough. I don't remember all the details, but apparently there were state, Senate and House of Delegate elections in 1981 and again in 1982. Oh my gosh; there would be

131

two sets of election t in two years; but if we drew fair lines that were equitable and represented all of the citizens, that would be a worthwhile game. Thank you.

CHATRMAN JONES: Thank you. Anyone else wishing to speak? Yes, sir, please.

MR. WARREN: I don't even know Senator Reynolds –

CHAIRMAN JONES.: Your name, please?

MR. WARREN: Tom Warren,

CHAIRMAN JONES: Thank you.

[22] MR. WARREN: I find that I can't even conceive how you would split up a city of 43,000, I can understand you people in Northern Virginia, where you have such a population that you have to do it; but not in Danville and Pittsylvania County,

The 19th District, senatorial district is not even anywhere close by, as I read this map. That does not make a great deal of sense to me,

You know; if, if this gentleman back here is, is willing to have Roscoe Reynolds represent him in Danville, he needs to figure out a lot of things.

We've got 17 polling districts in Danville. How do you split that up? I can't believe that our registrar is not here like screaming. You know, how do you do that? That means in any given year we're going to have two senate races, a delegate race, and then the federal years God only knows what we're going to wind up with, as far As representation is concerned.

This does not in my opinion make any sense at all. It has got to be done better.

CHAIRMAN JONES: Thank you. Yes, sir?

132

MR. TUCKER: My name is Bobby Tucker. And forgive me; I'm kind of new at this, learning [23] process.

CHAIRMAN JONES: Okay.

MR. TUCKER: Although I do commend you for your work, because from the way I see it you almost in a no win situation. So thank you for listening first.

I do want to say being in a part of Pittsylvania County that in the House of Delegates being represented by the Honorable Charles Poindexter, I would like to say with Pittsylvania County being square miles probably the largest, one of the largest counties in the state, we have multiple districts no matter which plan comes up, it seems.

While I do like the, the Watkins plan in the Senate there, with our Board of Supervisors, House of Delegates and Senate, we have an older population, which I'm now moving into. It is very confusing to some of the older people to get out and vote, when they don't know really what district they in, who they're voting for, until they get to the polling places, quite honestly. I've heard those comments.

I would ask that you do take into [24] consideration of trying to keep the counties and districts, as best you can even in the Senate districts and the House districts, any way we can keep those lines as close as we can to each other to, to help alleviate some of this confusion with people voting, and hopefully that would create voter turnout. And that's what we really want. We want everybody to have a voice. Thank you

CHAIRMANJONES: Thank you. Anyone else wishing to speak?

133

MR. HEDRICK: I want to speak, but not as a member of the media speak as a citizen.

My name is Bruce Hedrick. I represent WMDV-TV in Danville, and I'm speaking as a private citizen on this.

If 1990 was bad and 2000 was an anomaly, I hope that this understands that the Legislature and the citizens realize this redistricting needs to done by a bipartisan process. The victor goes the spoils is good when your party's in power, and I hope that everybody knows Governor McDonnell set a bipartisan redistricting. I think it's time for that

Now also I also have dismay that tonight [25] while you're doing a great job, and I understand you have to schedule as many meetings as possible in all the different places; tonight's a Saturday night at 7 p.m. in this area which has got so many other activities going on, not to mention Martinsville race weekend. We've got a lot of people that would love to be here and tell you what's going on, but unfortunately due to the scheduling, this is the crowd that you get.

The Southside cannot be ignored. The Southside cannot be ignored from Richmond, not from Northern Virginia. We are here, we vote. We want to hear from you. (Applause)

CHAIRMAN JONES: Anyone else wishing to speak?

Okay.

DELEGATE DANCE: Mr. Chairman, even though I am a member of the Redistricting Committee, this is the third public hearing we've had today; and I feel compelled to speak as an African American, because I represent quite a few.

134

In your opening statement, you mentioned the fact that Virginia is under the Voting Rights Act that went into place in 1965, which says minorities must have an opportunity to select who they would [26] like to serve.

There are 12 current minority districts, and what has happened in the last 10 years is that there has been a major shift. Trending, we can't tell people where they want to live. They move according to their life-style, economics, or whatever.

But tight now we're required to have 12 minority districts, and our districts have switched. They changed from like seven to more than 12,000 people that have moved.

And so in order for this, whatever redistricting plan we have to meet the test must be reviewed by the Department of justice, and therefore there should show that we as minorities have an opportunity to compete.

In the last month I've spent time with my colleagues, and we've looked at the lines and we've drafted a fair and equitable is what we're looking at, and looking at how our areas have trended.

I can tell you that if we don't–whatever redistricting plan comes nut, if we don't have at least a 55 percent variance as far as minorities, then we don't really stand much of a chance to be [27] able to live up to what the Department of Justice says we have a right to have. And that also impacts the whole State of Virginia, as far as how things have to be shifted.

The numbers grew in Northern Virginia. So on the borders facing North Carolina, you felt that in the Southwest. We felt it in the Tidewater area. Minorities

135

had to move forward, and we're all moving towards the North, okay, because that's where the numbers are.

So in order to make this happen, it requires some shifting, if you will. It's not a perfect thing, but there is a mandate that those 12 minorities from the Senate and–it's five minority positions that have to be here.

So all that is in the mix, when we're trying to develop the right fit for us. I respect the bipartisan committee, and I'm also concerned about, though, the community of interest, and the community of interest says that we are African Americans.

There is a population of hispanics that have come. In 1965, it was African Americans they're referring to. I am an African American, and I [28] represent quite a few African Americans, and we are expected to be able to obtain this.

So we're listening to all you say, and I tell you, everything you say is important, and there will be some amendments made as a result of what you said today. I assure that's going to happen. Don't have to beat us up; but it's important that you understand and review it, if you need to, the Voting Rights Act of 1965 and what it requires Virginia to do.

UNIDENTIFIED SPEAKER: I've got a question. Do these three plans that are being offered, do they all meet that guideline? So they all do meet that guideline. Thank you.

CHAIRMAN JONES: And you were speaking about 5.5 percent voting population?

DELEGATE DANCE: Yes, voting age, because you know you can have a minority, but they can't vote. That doesn't help you much, as far as being

136

competitive and being able to ensure that you're representing. Good point, I appreciate it.

CHAIRMAN JONES: Another comment?

MR. FEIGEL: I have a question. What is the, how does the equation work for–I don't know; [29] providing equitable voting, or whatever you just said? You have to have so many black people, hispanics, Whites?

DELEGATE DANCE: If you had enough–If you had an opportunity to go to the General Assembly's website and look at legislative link, you can actually look at the demographics and you can break it down by each precinct, each block. It will tell you how many African Americans live there, how many new Americans, asians, hispanics, and the whole population from that area.

So as you cobble together to make sure that there are 12 minority House districts and five minority Senate districts, that's got to be in the mix, and that has to impact what they have to do to make sure everybody is called to be as responsible as possible but still address that mandate. Any plan that we have must go to the Department of Justice first.

UNIDENTIFIED SPEAKER: This block, is this like a majority/minority–

CHAIRMAN JONES: We're not going to, we're not going to do question and answer. She was making a statement, so if you'd like to make a statement,

* * * *

137

[31] CERTIFICATE

COMMONWEALTH OF VIRGINIA

COUNTY OF FRANKLIN

I, Cynthia N. Stiles, Notary Public in and for the Commonwealth of Virginia, at Large, do hereby certify that the foregoing proceedings were by me reduced to machine shorthand in the presence of the named participants, afterwards transcribed by me by means of computer, and that to the best of my ability the foregoing is a true and correct transcript of the proceedings as aforesaid.

I further certify that these proceedings was taken at the time and place specified in the foregoing caption.

I further certify that I am not a relative, counsel or attorney for either party, or otherwise interested in the outcome of this action.

IN WITNESS WHEREOF, I have hereunto set my hand at Rocky Mount, Virginia on the 15th day of April, 2011.

/s/ Cynthia N. Stiles
CYNTHIA N. STILES
NOTARY PUBLIC

My Commission expires December 31, 2014

Notary Registration Number: 266666

138

From:  Haake, Lawrence <HaakeL@chesterfield.gov>

Sent:  Friday, April 8, 2011 4:30 PM

To:   Showalter, Kirk - Voter Reg <Kirk.Showalter@ Richmondgov.com>;   Jennifer   L   McClellan <DelJMcClellan@house.virginia. gov>

Cc:  Kent Stigall <KStigall@house.virginia.gov>

Subject:  RE: HB5001 as passed Senate

There are only 363 voters in the 70th part in Pct 515, too few legally to open a precinct, so I'm going to try to move it into another magisterial district and merge with another 70th House precinct. If so, then my side is clear.

Thanks for the effort.

Larry Haake
GR Chesterfield

From:   Showalter, Kirk - Voter Reg [mailto: Kirk. Showalter©Richmondgov.com]

Sent:  Friday, April 08, 2011 16:10

To:  Jennifer L McClellan

Cc:  Haake, Lawrence; Kent Stigall

Subject:  RE: HB5001 as passed Senate

Darned.....so close and yet so far away! A measly 0.2%! Well, at least we gave it a good try and for that I must thank you! I have some additional ideas how we might fix that and will work with you, Betsy, Delores and Larry over the coming months to see if we can address it next January.

J. Kirk Showalter
General Registrar

139

City of Richmond
(804) 646-5950

......................................................................................

From: Jennifer L McClellan [mailto: DelJMcClellan@
house.virginia.gov]

Sent: Friday, April 08, 2011 2:14 PM

To: Showalter, Kirk - Voter Reg

Cc: HaakeL; Kent Stigall

Subject: Re: HB5001 as passed Senate

Kirk,

I spoke to Chris Jones and Kent Stigall. Apparently,
the changes we discussed based on the map of the
Davis precinct you sent would have pushed the voting
age African American population in the 71st District
down to 54.8%. The target criteria was 55%, so the
change can't be made. When you and I were working
in Legislative services, we indeed moved the wrong
part of Davis, which is why the numbers looked correct
to us.

Given the time constraints on this thing, I don't
think we have enough time to try to come up with a fix
that keeps the 69th, 70th, and 71st all at 55% African
American voting population and within a 1% total
population deviation. We can try to do some cleanup
next year. I know that doesn't help you think election
cycle, but that may be the best we can do.

Jenn
Jennifer L. McClellan
Virginia House of Delegates
71st District
P.O. Box 406
Richmond, VA 23219
(804) 698-1071

140

To: "Jennifer L McClellan" <DelJMcClellan@house. virginia.gov>

From: "Showalter, Kirk - Voter Reg" <Kirk.Showalter@ Richmondgov.com>

Date: 04/08/2011 12:34PM

Cc: "Haake, Lawrence" <HaakeL@chesterfield.gov>

Subject: HB5001 as passed Senate

Dear Jennifer:

I saw the new version of HB5001 that passed the Senate. Unfortunately (and unlike the Senate substitute version) it did not include any of the fixes to the split precincts that we worked on. Was there a particular reason for this? Should I pursue Governors' amendments to make the changes?

I would very much appreciate your guidance on this at your earliest convenience. I am leaving early today, but can be reached on my cellphone at 387-7331. Otherwise, I will be in my office during usual hours. The number here is 646¬5950.

J. Kirk Showalter General Registrar City of Richmond (804) 646-5950

[attachment "image001.jpg" removed by Jennifer L McClellan/HDel/HOD]

141

From: gpnardo@house.virginia.gov

To: Chris Marston <chris.marston@gmail.com>

Subject: Fw: Status Update - House Redistricting

Date: 4/7/2011 10:31:27 PM

Attachments:

Meant to send this to you a moment ago. GP

----- Original Message -----

From: "G. Paul Nardo" [gpn740@gmail.com]

Sent: 04/07/2011 10:29 PM AST

To: Chris Jones <chris@schrisjones.com>

Subject: Re: Status Update - House Redistricting

Chris,

Yes, let's talk in am.

What would be need to come back for the week of April 18? Gov reax? I'm betting that he won't have his amdts back until later that week -- expect Bolling (with 3rd Floor pressure) to drag his heels in signing (he has up to 3 days).

Glad Richmond is OK.

Congressional Districts is a total Janis production and Ldrshp is in process of getting on top of it now that House plan is over to Senate (and coming back on Monday). Will talk to him in am too to see what he learned up in DC today and what all he's thinking.

Thanks,
GP

142

On 4/7/11, Chris Jones <chris@schrisjones.com> wrote:

> 

> 

> S. Chris Jones

> 

> Begin forwarded message:

> 

>> From: Chris Jones <chris@schrisjones.com>

>> Date: April 7, 2011 9:42:45 PM EDT

>> To: "G. Paul Nardo" <gpn740@gmail.com>

>> Subject: F/up

>> 

>> 

>> GP,

>> I followed up with Jennifer McCllelan this afternoon and she reconfirmed that the request of Kirk Showalter, Richmond Register, exceeded the 55% threshold when they did on the 2nd floor for all affected districts and hat she would have never requested it if it didn't. I am not sure what got lost in translation, but the good news is it is fixed now and Jennifer will explain the Senate amendment on floor Monday if needed.

>> 

>> Janet Howell called and wanted to discuss schedule for Congressional plan and if we would come back the week of 18th to deal with HB 5001 if needed. I know it is the week of Easter, so we need to discuss tomorrow am if possible.

143

>>

>> So much for some R & R, lets chat mid morning. Thanks for sending out the >> e-mail for the 1pm mtg on Monday.

>> Cheers,

>>

>> CJ

>>

>> S. Chris Jones

>

--

Sent from my mobile device

G. Paul Nardo

Chief of Staff

Office of Speaker William J. Howell

Virginia House of Delegates

State Capitol

GAB Suite 635A

Richmond, Virginia 23219

0: (804) 698-1228

F: (804) 698-1828

M: (804) 614-0687 (legislative issues)

M: (804) 840-6915 (non-legislative issues)

E: gpnardo@house.virginia.gov (legislative)

E: gpn740@gmai1.com (non-legislative)

W: www.williamjhowell.org

144

From:      Jennifer L McClellan

To:        Kent Stigall

Sent:      4/6/2011 4:57:02 PM

Subject:   Re: Redistricting fix

Thanks.

Sent from my iPad

On Apr 6, 2011, at 3:52 PM, "Kent Stigall" <kstigall@ dls.virginia.gov> wrote:

Yes.

On Wed, Apr 6, 2011 at 1:26 PM, Jennifer L McClellan <De1JMcClellan@house.virginia.gov> wrote:

Kent,

When you make the change, could you email the new map for the 69, 70, and 71 so I can show it to the Richmond and Chesterfield registrars to be sure we captured what they intended? Thanks.

Jenn

Sent from my iPad

On Apr 6, 2011, at 8:26 AM, "Kent Stigall" <kstigall@ dls.virginia.gov> wrote:

Jennifer,

Thanks for the map image. I'm glad our web site is being put to use!

Kent

On Wed, Apr 6, 2011 at 4:04 AM, Jennifer L McClellan <De1JIMcClellan@house.virginia.gov> wrote:

145

Kent,

FYI. Let me know if you have any questions or if this changes the plan I gave you yesterday.

Jennifer

Sent from my iPad

Begin forwarded message:

From: "Showalter, Kirk - Voter Reg" <Kirk.Showalter@Richmondgov.com>

Date: April 5, 2011 6:43:37 PM EDT

To: "Jennifer L McClellan" <DelJMcClellan@house.virginia.gov>

Cc: "Haake, Lawrence" <HaakeL@chesterfield.gov>

Subject: Redistricting fix

Dear Jennifer:

I am a little nervous that we didn't get the right area of the Chesterfield Davis precinct when we drew the new map. (We probably did, but better safe than sorry.) Accordingly, attached is a PDF file showing what I believe is the area in question I hope it helps clarify things. Thanks again for all your hep!

J. Kirk Showalter
General Registrar City of Richmond
(804) 646-5950
--

W. Kent Stigall
804-786-3591
Division of Legislative Services
General Assembly Building
910 Capitol St.
Richmond, VA 23219

146

--

W. Kent Stigall
804-786-3591
Division of Legislative Services
General Assembly Building
910 Capitol St.
Richmond, VA 23219

From: "Showalter, Kirk - Voter Reg" <Kirk.Showalter@ Richmondgov.com>

Date: April 5, 2011 6:43:37 PM EDT

To: "Jennifer L McClellan" <DelJMcClellan@house. virginia.gov>

Cc: "Haake, Lawrence" <HaakeL@chesterfield.gov>

Subject: Redistricting fix

  Dear Jennifer:

  I am a little nervous that we didn't get the right area of the Chesterfield Davis precinct when we drew the new map. (We probably did, but better safe than sorry.) Accordingly, attached is a PDF file showing what I believe is the area in question I hope it helps clarify things. Thanks again for all your hep!

J. Kirk Showalter
General Registrar City of Richmond
(804) 646-5950

147



| From: | Showalter, Kirk - Voter Reg |
|---|---|
| To: | Jennifer L McClellan |
| Sent: | 4/5/2011 12:54:35 PM |
| Subject: | RE: Redistricting plan comments |

Anytime something that important comes up, don't hesitate to contact me at home. Wouldn't be the first time I've worked on a weekend! My personal cellphone (the most reliable way to reach me outside of work) is 387-7331.

J. Kirk Showalter
General Registrar
City of Richmond
(804) 646-5950

From: Jennifer L McClellan [mailto:DelJMcClellan@house.virginia.gov]

Sent: Tuesday, April 05, 2011 12:53 PM

To: Showalter, Kirk - Voter Reg

Subject: Re: Redistricting plan comments

148

Thanks. I wish we had had time to consult you on the changes that resulted in the committee substitute, but the bulk of that work happened over the weekend!

Sent from my iPad

On Apr 5, 2011, at 12:51 PM, "Showalter, Kirk - Voter Reg" <Kirk.Showalter@Richmondgov.com> wrote:

You are the absolute best. In the meantime, I'll work on my end to identify what might work.

My direct number is 646-6486. If it goes off into strange places (because I don't have voicemail), then that means I'm not at my desk. In that case call 646-5950. I should be here all day.

J. Kirk Showalter
General Registrar
City of Richmond
(804) 646-5950

From: Jennifer L McClellan [mailto:DelJMcClellan@house.virginia.gov]

Sent: Tuesday, April 05, 2011 12:45 PM

To: Showalter, Kirk - Voter Reg

Cc: DelBCarr©house.virginia.gov; Haake, Lawrence; Delores McQuinn

Subject: Re: Redistricting plan comments

We are sitting on the House floor, and Chris Jones just explained why they adopted a 1% deviation. There was an attempt to move it to 2% in committee, but that failed.

If we set up some time to sit down with Legislative Services, we may be able to work with the software to come up with a fix, but i will need to figure out

149

procedurally how to make them. Theoretically, we could present it to the

Governor, or we could put in a cleanup bill with Chris' ok. Since the bill is on 2nd reading now, it is too late to work out floor amendments. If all else fails, we can do a cleanup bill next year, but I know that won't do any good for this election cycle.

I will give you a call when we get off the floor today.

Jennifer

Sent from my iPad

On Apr 5, 2011, at 12:23 PM, "Showalter, Kirk - Voter Reg" <Kirk.Showalter@Richmondgov.com> wrote:

Dear Jennifer:

Thanks so much for your response. The 2% criteria that I quoted was according to the House adopted criteria of 4/3/11 shown on the Division of Legislative Services' website. The earlier House approved criteria (3/25/11) was, indeed 1%, but apparently something changed. I will check with Division of Legislative Services to verify which it is. Here is the website from which I got my information (http://redistricting.dls. virginia.gov/2010/Criteria.aspx).

I may have an idea about other adjustments between the 69th and 70th that would work, but it would take City Council's approval and there isn't enough time to get that before the state's plan is adopted.

As to "healing" the precincts involved, 208 might be possible, but 505 is not because of its location and lack of a polling place within the smaller part.

Unfortunately, the only data that I have is the total population affected as listed in the reports that I have.

150

I don't have access to the state's redistricting software so can't quickly look at the impact on voting age population or minority population with the proposed change, but the numbers are so small with what I proposed that I can't imagine it would be very large.

Will take a look at the latter questions and get back to you as quickly as I can. Thanks for looking out for us localities in this!

J. Kirk Showalter
General Registrar
City of Richmond
(804) 646-5950

From: Jennifer L McClellan [mailto:DelJMcClellan@house.virginia.gov]

Sent: Tuesday, April 05, 2011 1:39 AM

To: Showalter, Kirk - Voter Reg

Cc: DelBCarr@house.virginia.gov; Haake, Lawrence; Delores McQuinn

Subject: Re: Redistricting plan comments

Kirk,

Betsy, Delores, and I have been working to try to resolve the issues with split precincts. Unfortunately, the House adopted a 1 % deviation criteria rather than 2%. To adopt your suggestion would require Betsy to pick up a few more people, either in Richmond or Chesterfield. Do you have any ideas on where we could make that up? Are there any precincts split between the 70 the and 69th districts that could be consolidated to make up the difference?

Also, we have to be careful not to reduce the African American population or voting age population through any changes to avoid Voting Rights Act issues.

151

Delegate Jones has expressed a preference to maintain voting age population for all majority-minority districts above 55%. Do you know what your proposal does to those numbers for the 71st and 69th districts?

If we can propose an additional swap to Delegate Jones that maintains his target numbers, we may be able to get him to agree to your proposed change. In the alternative, could we resolve the issue through changes to precinct boundaries? Will the City change any precinct boundaries when it does it's redistricting?

Sincerely,

Jennifer

Jennifer L. McClellan
Virginia House of Delegates
71st District

Sent from my iPad

On Apr 4, 2011, at 10:13 PM, "Showalter, Kirk - Voter Reg" <Kirk.Showalter@Richmondgov.com> wrote:

<M1.2.jpg>

Dear Ladies and Gentlemen:

The attached document contains comments on the currently proposed redistricting plans from the perspective of the City of Richmond, Office of the General Registrar. I appreciate your consideration of these comments as you move forward with redrawing the House of Delegates and Senate Districts.

J. Kirk Showalter
General Registrar
City of Richmond
(804) 646-5950

152

<City of Richmond Redistricting Comments.pdf

<Fairfax EB Redistricting Concerns 04-04-11.pdf>

| | |
|---|---|
| From: | Showalter, Kirk - Voter Reg |
| To: | William J. Howell; Mark Cole; Chris Jones; District29; District32 |
| CC: | Manoli Loupassi; Betsy B Carr; Jennifer L McClellan; Delores L McQuinn; Joe D Morrissey; John O'Bannon; District16; District10; District09; District12; GWmThomas@aol.com; Ernesto V Sampson; ernestosampson@gmail.com; Jones, Dwight C. - Mayor; Palmer, Don (SBE); Charlie Judd; Graziano, Kathy C. - Council Member; Hilbert, Chris A. - Council Member; Samuels, Charles R. - Council Member; Tyler, Bruce W. - Council Member; Jewell, E. Martin . - Council Member; Robertson, Ellen F. - Council Member; Newbille, Cynthia I. - Council Member; Trammell, Reva M. - Council Member; Conner, Douglas G. - Council Member; Haake, Lawrence; Wicker, Jennifer M. - Mayor's Office |
| Sent: | 4/4/2011 10:12:32 PM |
| Subject: | Redistricting plan comments |
| Attachments: | City of Richmond Redistricting Comments.pdf; Fairfax EB Redistricting Concerns 04-04-11.pdf |

153

Dear Ladies and Gentlemen:

The attached document contains comments on the currently proposed redistricting plans from the perspective of the City of Richmond, Office of the General Registrar. I appreciate your consideration of these comments as you move forward with redrawing the House of Delegates and Senate Districts.

J. Kirk Showalter
General Registrar
City of Richmond
(804) 646-5950

154

[Logo] Office of the General Registrar

City of Richmond

Room 105, City Hall 900 East Broad Street

P.O. Box 61037

Richmond, Virginia 23261-1037

(804) 646-5950

April 4, 2010

The Honorable Robert F. McDonnell, Governor, Commonwealth of Virginia

The Honorable Charles J. Colgan, President pro tempore, Senate of Virginia

The Honorable William J. Howell, Speaker, Virginia House of Delegates

The Honorable Janet D. Howell, Chairman, Senate Privileges and Elections Committee

The Honorable Mark L. Cole, Chairman, House of Delegates Privileges and Elections Committee

The Honorable S. Chris Jones, Member, Virginia House of Delegates

(All via electronic mail)

Dear Governor McDonnell, President Colgan, Speaker Howell, Chairman Howell, Chairman Cole and Delegate Jones:

As a long time elections administrator, I was deeply concerned when I reviewed HB5001, as introduced. The City of Richmond has accommodated three precincts split between election districts for the past decade and has learned that when you conduct two separate elections in the same precinct (as is required when a precinct is split between election districts), you

155

run into more than a few difficulties. These were fully enumerated by Mr. Larry Haake, President of the Voter Registrars Association of Virginia (during today's comments before the Privileges and Elections committees) and the Fairfax County Electoral Board (via electronic letter, copy attached). Thus, I will not elaborate further, except to say that I fully share their concerns regarding split precincts.

I was, therefore, very glad to see the committee substitute for HB5001 as it vastly reduces the number of split precincts. Unfortunately, the City of Richmond would still be left with five precincts split between House of Delegates districts and – under Senator Howell's proposals – one precinct split between Senate districts, for a total of six split precincts.

The Honorable Robert F. McDonnell, The Honorable Charles J Colgan, The Honorable William J. Howell, The Honorable Janet D. Howell, The Honorable Mark L. Cole, and The Honorable S. Chris Jones, Member, Virginia House of Delegates Page Two April 4, 2011

I believe that the number of split precincts can be even further reduced for the City of Richmond if the following actions are taken:

- Place all of precinct 208 in the 71st House of Delegates district and all of precinct 505 in the 69th House of Delegates district. The total population for the 71st district would then be 80,304 which is 0.37% deviation from the ideal. The total population for the 69th district would become 78,774 which is - 1.5% deviation from the ideal. The deviation of both districts remains within the 2.0% set forth in the House of Delegates' criteria.

156

- Place all of precinct 106 in the 8th Senate district. The total population for the 8th district would be 200,717 which Is 0.35% deviation from the ideal. The total population for the 9th district would become 200,842 which is 0.41% deviation from the ideal. This action actually improves the deviation for district 9, while still keeping the deviation for district 8 under 1%.

I thank you for considering these adjustments. They would very much help us better serve the citizens of the City of Richmond, which is a goal that I am sure we all share. Please call me at 646-5950 if you have any questions.

Sincerely,

/s/ J. Kirk Showalter
J. Kirk Showalter
General Registrar


c:   Members of the City of Richmond Electoral Board

Members of the City of Richmond City Council

The Honorable Dwight C. Jones, Mayor, City of Richmond Members of the City of Richmond General Assembly Delegation Don Palmer, Secretary, State Board of Elections

157

[1] PRIVILEGES AND ELECTIONS

REDISTRICTING

PUBLIC HEARING

BEFORE: JANET HOWELL, CHAIRWOMAN
            MARK COLE, CO-CHAIR

PLACE:    COMMONWEALTH OF VIRGINIA
           GENERAL ASSEMBLY BUILDING
           HOUSE ROOM C
           RICHMOND, VIRGINIA 23218

DATE:     APRIL 4, 2011

Crane-Snead & Associates
4914 Fitzhugh Avenue, Ste 203
Henrico, Virginia 23230
804-355-4335

[2] SENATOR HOWELL: Good morning, everyone. I'm Senator Janet Howell, and I represent the Senate Privileges and Elections Committee, and with me is Delegate Mark Cole, who chairs the House Privileges and Elections Committee. I want to thank you all for coming today and participating in our public hearing.

Last winter and fall, both the House and Senate Privileges and Elections Committees held public hearings across the state to hear from you about the redistricting process that is now before us. In addition, eight public hearings were held last week, this being the eighth and final.

During these hearings, we will be in a listening mode. We want to know what you are thinking. We welcome public comments, and they have been and will continue to be considered. In addition to these hearings, we will be reading the comments that are

158

being posted on the redistricting website at the Division of Legislative Services. These hearings are an opportunity for us to hear from the public and receive your input.

We are under considerable time constraints. Because of elections this year, unlike most states, which won't have assembly elections until 2012, the redistricting time table is short. It's only been one month since Virginia received corrected census numbers. [3] Looking forward, because we are a Voting Rights Act state, we must send our plans to the Department of Justice, which has 60 days to review and preclear them. We must also follow State and Federal laws for the timing of our primary and general elections. This has resulted in a very compressed time schedule.

This week, during our redistricting special session, bills will be introduced by legislatures, and those bills will go through the normal legislative process. The dramatic shifts in Virginia's population required changes in district lines. Some districts were grossly over-populated. Others were significantly under populated. Some regents will gain representation. Other regents will lose representation. This is due to the One Person/One Vote Federal and State requirements.

This past Tuesday afternoon, Senate democrats presented a proposed plan to the General Assembly's Division of Legislative Services. We have already made numerous changes to that plan, and, based on comments we've received, we expect we will make further modifications. This plan can be found on the Division of Legislative Services website.

We believe our proposed plan fully complies with all applicable Federal and State legal requirements,

159

including the One Person/One Vote Requirement of the [4] Federal and State Constitutions, the Voting Rights Act, and, as I said, the Virginia Constitution.

And now, Delegate Cole.

DELEGATE COLE: Thank you. I want to welcome everyone here for this public hearing. And, again, as the Senator said, this is our opportunity to hear from you, hear from the public on the redistricting plans that have been put forward. So there won't be a whole lot of comments or anything from the committee. And, again, I just look forward to hearing from everyone.

SENATOR HOWELL: Just for everyone's information, we have a court reporter who is taking down all the comments, and they will be posted on the website. Also, we would ask that each person speak for no more than three minutes. Now we begin, but I don't have the list. Thank you. Kirk Jones.

MR. JONES: Madam Chair and Chairman Cole, Members of the Joint Committee, my name is Kirk Jones. I'm president of the Central Virginia chapter of the Randolph Institute. I appear before you this morning to encourage you to not only maintain the majority of the voting districts that we have in the state, but try your best to create others.

Based on the census from 2010, we can see the drastic changes in the population of the state. We have [5] an increased minority population, not only Africa Americans, but also Hispanics in our state. These citizens deserve representation. They deserve to be given a chance to vote for representatives of their choice. This is my request to you today. Thank you.

DELEGATE COLE: Andrew Rivera.

160

MR. RIVERA: Thank you for the privilege of talking to this distinguished body. My name is Andrew Rivera. I am an attorney, and a resident of Alexandria, Virginia. I also happen to be of Puerto Rican birth and persuasion, and I'm here to talk about the Latino community here in Virginia. The 2010 census data shows that Latinos are ten percent of the Virginia population now, one out of every twelve residents, yet we have yet to elect a Latino to this distinguished body. And it is important that, as this distinguished body reviews the district lines, we know that there's yet to be an opportunity to draw a majority Latino district in the state, despite the best effort of the bipartisan commission, and of the college competition.

However, we do maintain some strong polarities with a voting-age population within at least twenty districts of the delegates and about ten in the Senate. I would also urge that we concentrate, but not dilute, the Latino community in the districts. I would also urge that [6] we re-exam the assembly plan, as written.

In the 21 districts that we have at least ten percent voting age population of Latinos, nine are represented by republicans. And, of those nine districts, the polarity of Latinos in those districts are reduced except for one, that of Delegate Marshall, who goes from ten percent Latino population, to a twenty percent population in his district.

And those are my comments at this time. Thank you very much.

DELEGATE COLE: Thank you. Juan Marcos Vilar.

MR. VILAR: Good morning. Thank you, Senator Howell and Delegate Cole. My name is Juan Marcos Vilar, and I live in Alexandria, Virginia. I've lived in

161

the State of Virginia for nine years now. I would like to re-emphasize what the previous two speakers have talked about today.

There's something that just stands out vividly from the census figures, and that is the growth of the diversity in this state. I think that the plan that you currently have could add two additional African American seats, if you were to spread the population around a little bit better and add some more representation on that line.

And, again, I'm concerned with the fact that so [7] many districts are being diluted of Latino population, whereas the concentration of the population would give us a more solid voice, even though we may not achieve to have a majority Hispanic district at this time.

Thank you very much for your time. Those are my comments.

DELEGATE COLE: Thank you. Sherry Blanton.

MS. BLANTON: Good morning. Thank you for having me. I know with the pretty nice weather, it's a shame to have to be inside, but it's spring, now, finally. My name is Sherry Blanton. I live in Herndon, Virginia, and, like the others, I just want to address some of the history of Virginia.

DELEGATE COLE: Could you move your microphone down a bit, please? Thank you.

MS. BLANTON: Sorry. Historically districts in Virginia have been gerrymandered to decrease the votes of African Americans. With the growth of the immigrant population over the past decade, the Virginia legislature is even less representative of our state's diversity.

162

Every Virginian has the right to a fair political district. Every ten years you have the opportunity to right these past wrongs. I hope you will act wisely this year to draw political boundaries that will create fair political districts.

[8] Thank you.

DELEGATE COLE: Thank you. Alex Vargas.

MR. VARGAS: Thank you, general. I would like to speak to you about the majority, as well. Especially being a northern Virginia resident, born and raised, we do see diversity growing, but the voice of – being able to speak to the public, going door to door, they don't feel like there is representation there. They don't feel like there is a purpose for them to vote, because they don't see the change that is happening in their communities.

A lot of times, people in those communities don't have the outreach to their youth. They don't have the opportunity to finding further enhancements on how to improve their youth. The first generation families here, especially the children, are falling into other kinds of incidents with gang involvement or drug use, things like that. We do need to do a little bit more outreach programs within our northern Virginia to help the youth that we have there. Thank you very much.

DELEGATE COLE: Thank you. Bob Matthias.

MR. MATTHIAS: Senators, Delegates, Bob Matthias from the City of Virginia Beach. City Council last week adopted a letter that you have in front of you. We also emailed it to you earlier, or last week, and some of you heard presentation by Council Member Glenn Davis at your [9] public hearing last Thursday. I'm not going to

163

read the whole letter. I'll just hit some of the high points.

Virginia Beach is currently represented by two senators who represent all of Virginia Beach, plus three senators that represent smaller portions of the City. We're very concerned that one of the plans put forth for Senate representation would only have one senator as sole representative of Virginia Beach.

We strongly believe that the city should be represented by two senators who represent only the City of Virginia Beach, plus other Senators who represent smaller portions of the population. We respectfully request that any redistricting plan that goes forward would, to the extent possible, address our concerns.

One other concern, and I know this is a very difficult process, but we also are concerned that the 14th district, Senator Quayle, stretches all the way up into Virginia Beach. I know committee assignments will change, but under the current plan, Senator Quayle would be the only senator representing the City of Virginia Beach on the Senate Finance Committee.

We tried to be a community of interest, and I think the only community of interest we could find was that we all would take 460 to go to the Virginia Diner, as far as the 14th District.

[10] Again, that's the concern, above and beyond what the Council expressed in their letter. Thank you very much, again. I know this is a very difficult task.

DELEGATE COLE: Thank you. Tom Van Auken.

MR. VAN AUKEN: Good morning, Mr. Chairman, Madam Chairman, members of the Committee. Thank you for taking your time to hear our concerns. My name is Thomas Van Auken. I've been a resident of

164

Bon Air in Chesterfield County since 1972, and I have survived three previous redistrictings. I'm particularly concerned with the Senate redistricting this year.

I have two major concerns regarding the Howell plan, which is obviously the only one we need to pay attention to. The first thing is community of interest and jurisdictional integrity. This plan doesn't seem to show any concern for our jurisdictional boundaries or for our community of interest. The districts in this plan cross county and city lines as if they weren't even there. It throws suburban and rural areas together with no apparent concern for the interest of the people in these districts. And, finally, it even splits precincts. I guess the only reason it doesn't split census tracts is no one has yet figured out how to do that.

Chesterfield County's population justifies somewhat over one and a half Senate seats, but [11] Chesterfield gets divided up among four Senate districts. Two of these seats are tied to large rural areas, which suburban Chesterfield has little in common with. Two are tied to urban and suburban areas north of the James River, areas that have long looked down on Chesterfield as "the southwest pasture."

What this does, in effect, is to weaken the voice of Chesterfield in the Senate of Virginia, since anyone holding one of these seats has to pay attention to the interests of the other parts of the district, as well the part that lies in Chesterfield.

Bluntly, we in Chesterfield are a little bit tired of being used as filler to complete legislative districts of some other jurisdiction, or to tie two blocks of population together. Surely you can treat us a little better than you have. And did you really have to run a new senatorial district, eight, into Chesterfield?

165

Secondly, the second major concern is the population imbalance between districts. The Howell plan, the current one, allows a population deviation of plus or minus two percent between districts. The maximum difference between district populations is almost eight thousand people. That's a lot of people.

The proposed House plan has district deviations of only plus or minus one percent, even though they're [12] working with smaller districts, which are harder to make equal. It's simply not fair to allow some districts to be significantly smaller than others. I guess some voters have louder voices than others. Surely you can do better than plus or minus two percent.

Finally, let me get back to the matter of splitting precincts. Times are tight. In Chesterfield County, we have some pretty tight county budgets out there. Every time you spit a precinct in Chesterfield, it costs the tax payers in Chesterfield $25,000 to start up a new precinct. Ouch. I'm paying for that, not you. How about trying to minimize the number of precincts you split up? That would be helpful.

Thank you very much for taking the time to listen to me.

DELEGATE COLE: Thank you. Angela Kelly-Wiecek.

MS. WIECEK: Wiecek.

DELEGATE COLE: I'm sorry.

MS. WIECEK: That's okay. Nobody gets it right.

Thank you. My name is Angela Kelly-Wiecek. I'm a resident of Hanover County, and a proud constituent in the fourth senatorial district, and it is to the senatorial redistricting plan that I come to speak to you today.

166

In Hanover we have been fortunate to always be represented by one senator. One senator. We are one [13] hundred thousand citizens. We would form one half of any senatorial district you plan to put us in. Unfortunately, the Howell plan splits Hanover into three disparate senatorial districts.

Now, I'm not here to comment on the particulars of those senatorial districts, but we have a very specific community in Hanover. We're primarily rural, interspersed with certain suburban pockets, and for the little country town of Ashland, with its quaint shops and allure to be then paired with the urban concerns of downtown Richmond and Varina doesn't seem to create a community of interest. At least, not in terms of anybody I have talked to.

Additionally, the western portion of our county, with the quiet and rural farming communities of Montpelier and Rockville to be combined then into the 12th district with the mega-hyper suburban development of Short Pump equally doesn't seem to make any sense.

So what you have in Hanover is a community of people who attend rotary clubs and Sunday school, soccer fields and roller hockey leagues. We all get together and have discussions, much like neighbors and friends do. Unfortunately, under this plan, we will be split as a community; split, and have no equal senatorial representation. It does not make any sense for the voice [14] of Hanover to be diluted and made an afterthought in three different Senate districts, rather than having our singular voice, as we have always enjoyed.

I really believe this is an egregious miscarriage of just representation, and I urge you, urge you in every

167

sense, to go back to the drawing board. Look again at this plan, what you are doing to the Hanover citizens. Hanover citizens deserve better. The Commonwealth deserves better. So, please go back, look again, and allow Hanover to be represented by one senator.

Thank you.

DELEGATE COLE: Thank you. Larry Haake.

MR. HAAKE: Good morning, Senator Howell, Delegate Cole, Members of the Committee. I'm Larry Haake, the General Registrar of Chesterfield County. I'm also the president of the Voter Registrars Association of Virginia.

First off, I want to, on behalf of the Registrars, to thank you for your quick work on this matter. Senator Howell quite accurately portrayed the short window that we all have. And, of course, I come from the world that has to implement what you ultimately decide. And we're ready. So we're anxious for you to make your decision.

Secondly, I wanted to talk about implementation, [15] in terms of split precincts. You heard Mr. Van Auken mention the cost to open a new precinct, and I don't think it's limited to Chesterfield County. It's $25,000. And I'm looking at the current House Plan, and the two dominant plans in the Senate. The cost to localities across the Commonwealth to implement the plans as they are would range from 6.2 million to 6.7 million, just to correct the split precincts.

And what we try to do is eliminate a split precinct, because split precincts provide another level of over-head that's difficult. It increases voter confusion, to the point that it can even slow down voting on election day. So the best remedy for a split precinct is to

168

eliminate it. And that's where that 6.2 million to 6.7 million right now exists. I don't think the localities are ready for that.

So I would ask you, in your deliberations, to mini-mize split precincts as much as you can. I recognize the difficulty of it. By minimizing them, we eliminate voter confusion. We keep things moving well on elec-tion day, and the whole system works better.

Thank you for your consideration.

DELEGATE COLE: I'm probably going to get this name wrong, too. Phaedra Jackson?

MS. JACKSON: That was actually very correct. [16] Chairpersons and Members of this Committee, my name is Phaedra Jackson. I'm a resident here in Richmond, and I'm here on behalf of the Virginia New Majority. I'm here to encourage the legislature to draw maps that truly reflect the population of Virginia.

The current political district lines have been drawn to force Virginia's communities to accept powerless-ness. We now have the opportunity to correct centuries of political exclusion through this redistricting pro-cess. We can all agree that the criteria like compact-ness, contiguity, and the keeping together of commu-nities of interest are crucial in this process, but we must also fight for competitiveness. To have a fully functional electorate, we must engage residents of the Commonwealth with political lines that reflect the population.

Virginia's communities of color have contributed heavily throughout history to making our state what it is today. Despite this, communities of color have persevered through decades of exclusion from the state's law-making institutions. I urge you to draw fair

169

and competitive maps. To that effect, Virginia New Majority would respectfully like to submit maps that allow for two African American districts that make up parts of rural Virginia.

[17] DELEGATE COLE: Just give them to the secretary there. Thank you very much. Robin Lind.

MR. LIND: Thank you, Mr. Chairman. Robin Lind for the Virginia Electoral Board Association. Speaking on behalf of the association, we would like to thank you all for the very difficult work that you have done in assembling all these districts. I would say that we are somewhat stupefied by the ability to achieve the less than one percent difference in your plan for the House District. But we also have to second the concerns of Larry Haake.

It is a substantial financial burden on members of the Association, the 134 counties and cities, and we were surprised at how many precincts were split. I understand from one of the members of the House that the Department of Justice told you that precinct lines are arbitrary and that you should not regard them any more than others.

And, now, stepping back from that, and reintroducing myself as Secretary of the Goochland County Electoral Board, I can give you a specific example in Goochland County, where we have one precinct that has a quarter of our border voters in it, approaching 4,000. We are required to split it, so we will be creating a new precinct there.

[18] Under the plan for the House, between the 56th and the 55th districts, one of our supervisor's districts, precincts, has been split without regard to the supervisor's line. We would like to very much move that split, take the very same number of people, so there is

170

no change, and move it to the new precinct that we are creating in the east. We will be submitting a map to the Community with that proposal. And I believe that both Delegate Janis and Delegate Ware would be along with that proposal.

DELEGATE COLE: Delegate Jones.

DELEGATE JONES: Sir, before you sit down, if you don't mind. Just so you know, since I have the House Bill, we have already received at previous public hearings that we've held across the Commonwealth. And we've already accommodated a hand full of requests. So if you could just provide it to us in writing, which I'm sure you will or you have, and we'll take care of that. And the admission of the substitute that we'll have before the House tomorrow.

MR. LIND: Thank you very much. I expected to meet with Delegate Ware this morning before you went into session to clear it with him, and I will then submit a proposal to you for the amendment to the bill.

DELEGATE JONES: And, as you all know, the [19] Electoral Boards tend to draw precinct lines to begin with. We have a large variation from ten years ago to now, so we have eight or nine thousand people, and some have eleven hundred. So we realize that you're going to be making cuts to those precincts. In years past, we would come back in subsequent years and then we can maybe make some tweaks when you do your supervisor or your next district lines.

MR. LIND: I appreciate that very much.

MR. JONES: Thank you.

DELEGATE COLE: All right. Eddy Aliff.

MR. ALIFF: Eddy Aliff, director of the Virginia Center of Independent Baptists. I appreciate especially

171

what I've heard from Chesterfield. I just returned from two churches this weekend in the Lone Oak area, and their concern was their votes being diluted, losing representation there.

Personally, I'm from Hanover. I'm concerned about the split, as well, as an individual in those areas. I appreciate the difficulties that you have, but I would prefer, as much as anything, nonpartisan maps to be drawn, with considerations of what these other gentlemen have said, the cost factors of those involved in the electoral process.

We appreciate, again, communities of interest [20] being maintained just as much as possible. Our folks live in varying communities of interest, and they're not limited to one specific area. They go to one particular church, but they still want their voice to be heard within their communities of interest. Thank you.

DELEGATE COLE: Thank you. The next one is Mayor Bryan Moore or Vice Mayor Horace Webb.

MR. MOORE: I am Bryan Moore. Vice Mayor Webb is not here.

Madam Chair, good morning, distinguished Legislators. Again, I am Brian Moore of the City of Petersburg, I am our newly-elected mayor, as of 2011. We are proudly represented by Rosalyn Dance in the House. She's a wonderful lady.

What I would like to ask you today, as a part of the 63rd district, we are currently a minority/majority district. With more than 80 percent of our community being African American, we would support and propose that any plan that you have or end up passing ensure that we remain intact as a community.

172

As our community, even though we have a strong voting strength of at least 55 percent, our statistics show that, with the voting percentages of 40 to 42 percent, it is important that we maintain the minority districts.

[21] I understand the importance of your task. Tomorrow night City Council will be doing our districts. We will begin that process. And we'll be working toward completing that on the 19th. So, again, we would ask that you support the supporting of the majority/minority districts, and Petersburg say thank you today.

DELEGATE COLE: Thank you very much. Next, is there a representative of the George Mason Redistricting Team that would like to speak?

MR. HUTCHIN: Hi. I'm Gabriel Hutchin with the George Mason Redistricting Team. Unfortunately, our students wanted to testify, but they've just been called out by Delegate Morrisey before he goes into caucus. Could we possibly bump them down the list a few slots so they can come back in?

DELEGATE COLE: All right. Steven C. Van Voorhees.

MR. VAN VOORHEES: It's that Dutch name with double vowels and double capitals. I'm a citizen of the City of Richmond, and I'm a little amazed that I'm here talking to you today.

Forty-some years ago, I taught high school history and U.S. Government, and when we got to this subject, and we talked about gerrymandering, it became a joke. And it was wrong. Gerrymandering was wrong, and [22] the students thought it was a joke. They thought it was all in history, and not in the current situation.

173

That was forty-some years ago. Most of those people are now in their forties and fifties. Some of them are getting close to sixty, my former students.

I'm hoping that you will just follow some principles, some of which had been touched on by all the speakers ahead of me, that you bear in mind cohesive, continuous communities of interest, easily recognizable by the voters of those areas, the people who actually vote. I appreciate that your job is not a good one. It's a hard one, and you've been working very, very hard with each other across party lines, to reach some agreement, but I urge you to make sense to voters, and not create districts that are gerrymandered and basically facilitate cherry picking by incumbents. I would like you to make us proud of this General Assembly. I'm proud to be a Virginian today, and I'm just hoping that you will remember your history and use these principles in your work.

One more thing. Some of you may have heard the iceberg theory. Icebergs are visible from the surface as only a fraction, some people say around ten percent, and there's another ninety percent below the surface. So you take all the speakers you've heard, in all eight sessions, [23] and you multiple that by ten times, and that's at least the measure of the concern that people have for this. Of course, a hundred percent of the people are affected by your work.

Thank you for your best efforts.

DELEGATE COLE: All right. Thank you very much. Is it Carl Wright? He stepped outside. All right. We'll pass that by temporarily. Todd Vander Pol.

MR. VANDER POL: Good morning. I'm Tom Vander Pol from Hanover County, and I want to thank you

174

all for your efforts. You have challenging positions. I understand that.

I, too, was thinking back on the gerrymandering, and, to me, that's from another age of political discussions, smoke-filled rooms, powerful individuals having their way with districts, and I really didn't expect to see it. But when I look at northern Virginia, Tidewater and Central Virginia, it seems silly. It seems outrageous.

I'm not an elected official. I don't represent the constituency, but I'm a small businessman in Hanover County, a father of four, and for the last 21 years I've seen how Hanover County works very well. The individuals have bought in to a common Board of Supervisors, a common Sheriff's Department. The school system does quite well, [24] and public utilities. In the past, ten years ago, we had a single delegate and a single senator. So we were able to very easily contact them to make our needs known, and that has worked well.

I would like to mention, I see the five percent allowance in the district, and you have attempted to go to either one percent or two percent. To me, that's a very, very small or unimportant difference. I would say if you can get within five percent, that you would much rather get a community of interest that has shared values and common interest in the political sector, rather than focus so on keeping the population where it's at.

The only other thing that I would like to comment on is that I'm saddened by the individuals who come up here advocating on the basis of race. My great-great-grandfather left Holland and took the train as far as it went in South Dakota and homesteaded. We

175

are Americans, and I think that it's sad that we continue to do that. Because I can categorically show you that those individuals or those groups that get the most government help are the least, the individuals that take advantage of the American citizens, or, excuse me, the American experience, are the least advantage to that group. That's just a fact. So for those individuals that are advocating for those districts, I'd say you're doing a disservice to [25] those individuals.

Thank you very much.

DELEGATE COLE: Thank you. Next is Jim Smyers; is that correct?

MR. SMYERS: That's correct. Thank you very much. I also am from Hanover County. But I had to take the day off of work today, because this plan of the Senate Redistricting was released after the close of business on Tuesday. And, here we are on Monday, and this is the last opportunity to publicly comment on this plan, which I find to be – and I'm going to use the word that Charles Schumer had to get from his caucus, but this plan is extremist. It's dividing my county into thirds.

We were always historically well-served with a single senator to whom we could raise our concerns and issues and promote our common goals. So I don't see that this plan is really promoting the idea of community of interest when Ashland, which is the center of the universe, is all of a sudden delegated to be a remote star of a distant eastern Richmond galaxy.

So, basically, I'm just reiterating what the rest of my Hanovarians are saying. Please don't split us into thirds. We're one senatorial district.

DELEGATE COLE: Thank you. Arthur Burton.

176

MR. BURTON: Good morning. My name is Arthur [26] Burton. I am the second vice chair of the Richmond Crusade for Voters, and I'm here on behalf of our president, and our membership, Sylvia Woods, to just say to this body that we appreciate all the work that you do, and that we want you to be aware that the Richmond Crusade for Voters is both vigilant and involved in this process.

It is our hope that you will continue to honor the Voting Rights Act and its provisions to ensure that there is equity and justice for all citizens in the City of Richmond, regardless of race, creed or color; and that, if you have the opportunity, that you will retain the current districts as they exist; and that, if you have the opportunity, that you would take a further step towards justice, to create a district that allows for more, a greater voice for all of the citizens. We will be watching for both stacking and packing, as well the unnecessary dilution of voting districts.

Again, on behalf of our president, Sylvia Woods, I would like to thank you for the opportunity to speak to you today, and continue to hope that God will bless you in your important work.

Thank you.

SPEAKER 1: Thank you. Venus Marshall.

MS. MARSHALL: Good morning. I am so privileged and glad to be here this morning to be able to speak [27] before you this morning on behalf of District 21, and I'm a resident of Virginia Beach, 25 years in the making. I'm here with the Virginia Beach African American Political Action Council, and I'm coming here to you all today to address you about the obvious situation of redistricting. I know it's a tremendous

177

challenge, and it presents just many, many opportunities to create a fair and equal representation in government.

As this Commonwealth State of Virginia steadfastly forges ahead with the process of remapping this state, please be mindful that blessed are the leaders that seek the best for those they serve, for all of the communities that they serve.

According to the census, we in Virginia Beach represent 19.4 percent of the population, and we are in agreement with creating a majority/minority district, so that we are being fairly represented. And joining other districts with a sizable minority population will help put Virginia's plans for redistricting in a greater compliance with Section II of the Voting Rights Act, which prohibits discrimination in voting in an election.

I won't be before you long. I want to say in closing, as this State, two days from now, on April 6th, stands to reaffirm it's commitment to our nation's motto, in God we trust, I want you all to remember and not forget [28] that the Commonwealth of Virginia means the common well being of all its citizens, that all are treated fairly and equally, and with a just system for redistricting this State.

Please know that we are taking the commitment to not only honor "In God we trust," but also taking that commitment to honor the people that have trusted you to make these decisions.

And the final words I want to say now is a scripture: "For the Lord our God is our shield and our sun. He gives us grace and glory. The Lord will withhold no good thing from those who do what is right." And that's Psalm 84:11.

178

Thank you, and God bless you.

DELEGATE COLE: Thank you very much. Reverend Lawrence Pollard.

REV. POLLARD: General panel members of the Committee. I'm Lawrence Pollard, past president of the Chesterfield NAACP. I'm standing here to support the City's third district. We're hoping that you will keep us with at least 55 percent of democratic voting in the district, so we may maintain our minority status.

Thank you.

DELEGATE COLE: Thank you. Going back to the people that we missed. Carl Wright.

[29] MR. WRIGHT: Good morning, Mr. Chairman, members. Thank you all for the work that you all do, particularly our Hampton Roads delegation. Thank you all for all the work that you all do.

My name is Carl Wright. I reside in Virginia Beach, Virginia. I come up here because I don't have representation in Virginia Beach. My children don't have representation, peer representation in the City of Virginia Beach. I came up here because it's time for all of Virginia Beach citizens to have representation.

Now, I know some folks have already made their minds up, and really, they really don't have an interest in what other folk's concerns of representation is. But I'm here to tell you that times have changed.

Partisanship only works when it works for the people, all of the people. I understand that a lot of folks believe power, power, power is what makes this world run. But, no, the people is what makes this world run.

179

In the City of Virginia Beach, the precedents have been set for the state level from the top down, that a certain segment of the community has no – obviously, to me, it says they don't have any value because they don't have a voice. I'm here to say that we have a voice. We will be heard, and we will continuously come and speak to our leadership to let them know that we're here.

[30] In the City of Virginia Beach – if you want a yard stick for gerrymandering, come to our City. I mean, you'll get a class in it. It's been gerrymandered, gerrymandered, re-gerrymandered, and gerrymandered again. I'm asking you all, this time, for the children's sake. This is a ten-year process. It goes ten years.

I appreciate the work that you're doing. But it's so frustrating when you talk to folks and it falls on deaf ears. And we have some nice folks. They're real nice. You just can't get them to do anything for you when you need them to do it. And I understand the position that they're in, but I'm asking you all today, when you look at Virginia Beach, please consider all of the citizens with a fair, fair and true representation when you draw these districts up. That's all I ask. And that's for all of the citizens.

And thank you, again, for all the hard work that you do. And I hope that I didn't come across as disrespectful in a manner, because I do respect you all. But I want you to understand that we have a passion and a strong drive to do what's right in our city for all of our citizens.

Thank you.

180

DELEGATE COLE: Thank you very much. Now is there someone from that George Mason Redistricting Panel [31] available?

MR. O'BOYLE: Esteemed Senators and Delegates, thank you for allowing us to speak with you today regarding redistricting the Commonwealth. My name is Nicholas O'Boyle, a junior at George Mason University, and from Danville, Virginia originally. And I'm a member of the winning House Delegates Map at a recent redirecting competition that took place about a week ago.

I'm here with my other teammates, Billy Leucht and Dominick Liberatore, to ask you to adopt our map, presented in a bill to be introduced later today by Delegate Morrisey. We feel that our map has more attractive features than the one proposed in House Bill 5001, in respect to competitiveness, contiguity and compactness.

MR. LEUCHT: In regards to competitiveness, our map has over thiry percent competitive districts. This feature better allows the voter to choose their representation with greater ease. The contiguity factor of our map is unmatched. We have districts that are representative of the geographical areas, with having them lined up and down the State.

MR. LIBERATORE: With respective compactness, our district minimized the amount of split counties to 161, versus the roughly 300 presented in HB 5001. We also did [32] not split precincts, except when necessary due to population in the more urban areas.

MR. O'BOYLE: In conclusion, we welcome the continued conversation on the redistricting process in this great Commonwealth. All of these concerns voiced at this hearing are addressed in our map, including the

181

reduced splits of Albemarle and Henrico Counties. We urge you to scrutinize all of the maps that have been presented, and choose the one that is most representative of the citizens of Virginia.

Thank you very much.

DELEGATE COLE: Thank you. All right. That's the end of the sign-up list. Is there anyone else who would like to speak before the committee? If so, come forward and identify yourself.

MR. BARNETTE: My name is Robert Barnette. I live in Hanover County. I'm here as the president of the Hanover branch of the NAACP. We are in support of increased minority representation in Hanover County. Many of our neighborhoods, African American neighborhoods in Hanover were split ten years ago. So the Howell plan offers a lot of ingenuity in helping us increase that minority representation.

We also are in support of continued oversight by the Justice Department. And, so, we in Hanover are very [33] eager to work with the senatorial version of the redistricting plan.

Thank you.

DELEGATE COLE: Okay. Thank you.

MS. BOONE: Good morning. My name is Sarah

Boone, and I'm a board member of the Montgomery County Chamber of Commerce. Thank you, Mr. Chairman and distinguished elected officials. On behalf of the Montgomery County Chamber of Commerce, we would like to express our appreciation for the Governor and everyone who is involved in this redistricting.

182

As the second most populated MSA in Southeastern Virginia, Montgomery County serves as an economic, commercial, educational, recreational and cultural hub for many surrounding communities. Because of our location and the resources we have, Montgomery County has a long history working with its neighbors on projects of regional significance.

For example, Virginia Tech is a land-grant university, where outreach, research and instruction, not only support the various rural areas, but is an economic engine for our county and the Commonwealth. The opening of the Virginia Tech Carilion School of Medicine and Research Institute is a great example of how we partner and support our surrounding communities and industries. [34] This example is among many.

With its history of regional collaboration, we support redistricting plans that will further enhance our ties with neighboring communities and strengthen our collective voice, in both the halls of Congress and the Virginia General Assembly.

The Chamber also believes that robust and substantial discussion is the backbone of sound public policy. Competitive electoral districts ensure that citizens can engage candidates in the marketplace of ideas. Reasonable steps should be taken to protect the fundamental tenants of our democratic system.

We believe that our elected officials can rise to this challenge, and the many challenges that will result from it. In fact, we think that this is one of those defining moments in an elected official's career, where doing the right thing can bring greater results than the effort that is required.

183

Montgomery County is presently divided by two delegates and two Senators. The House District proposal divides us up in three ways, mathematically, and you can see in the proposed district in the packet that I distributed. If you focus on Blacksburg and Christiansburg and the immediate surrounding areas, that can be one delegate district.

[35] The next larger community of interest is the New River Valley and Roanoke Valley. If you combine the New River Valley, being Montgomery County, Giles, Polaski and Floyd, and part of Roanoke County, that can be one Senate district, while the remaining part of Roanoke County, Roanoke City and Salem City can be another Senate district.

Moving on to the Congressional districts, if you take the New River Valley all the way up to Lynchburg, including Roanoke County and the surrounding counties, that can be one congressional district, while another congressional district can be from far southwest through Southside. That is all in the packet.

We want to thank you for this forum, and our elected officials, again, for the opportunity to share our prospective.

DELEGATE COLE: All right. Thank you. Next.

MR. McCOY: Good morning. My name is L.J. McCoy, president of the Chesterfield NAACP. I think you did a great job on the work that you have done. I think the individuals that had information on other redistricting maps were fine, also.

But right here in Chesterfield County, I begin to see a problem, especially with the 27th district, as far as the map has been drawn. It seems as though an [36] individual that would take the opportunity to begin a

184

campaign to run has been selectively drawn out of their particular district, in order that they won't be able to run, and I'm terribly disturbed about that. Where the line was, where the individual would be –

DELEGATE COLE: Excuse me. Can you tell me – the 27th district, there's a House 27th and a Senate 27th.

SPEAKER 2: I'm sorry. The House 27th.

DELEGATE COLE: House. Okay. Thank you.

MR. BARNETTE: Was selectively drawn out of that particular district. And I think that's one issue, a big issue, that I'm beginning to become concerned about.

Thank you very much. Have a nice day.

DELEGATE COLE: Thank you. Next.

MR. BEYER: I'm John Beyer from Virginia21. I'm also a student at Piedmont Community College.

Chair people, Members of the Committee, thank you very much for allowing me a time to speak. Also, thank you for the hard work you have already put into creating fair and balanced districts that best represent us.

I'd like to talk a bit about people. I've heard a lot of speeches so far today about populations, percentages, precincts, partisan, nonpartisan. I would like to step back for a second and focus on the people.

When we look at making districts, I want us to [37] look at districts that create the best way to represent the people of Virginia. As students, we're constantly concerned about not being represented, and I think that extends to the greater population of Virginia.

185

Creating districts that represent communities, rather than create partisan politics, using bipartisan to look at the best way to ensure the best future for Virginia, is what's going to enure the best future for our state. I would encourage you to spend the time to look at the best way, not to ensure the right percentages or the right populations in our districts, but the best way to represent the people of Virginia, both local and state-wide.

Thank you very much.

DELEGATE COLE: Thank you.

MR. FORREST: I'm Sam Forrest, and we're part of the same group. How about everybody stand up that has on a snake outfit. They are rebelling against this district that looks like a snake. Thank you.

I live about ten minutes from here at VCU. Bobby Scott is my representative, and he lives in Newport News. Our district looks like a centipede, not like a snake, and that's the only thing we have in common. So that's my major complaint.

I have another complaint. These are the people [38] that represent me: Jennifer McCallum, Donald McEachin, Bobby Scott, Senators Webb and Warner, Mayor Jones in Richmond, President Obama. And seldom to never do any of them vote for me, the way I want. And that's my other complaint.

DELEGATE JONES: We can't do anything about that.

MR. FORREST: You can do something. I want you all to – it's not that difficult to run a good government. I want you to step up to the plate, put your interests aside and treat us right. It's overdue.

Thank you.

186

DELEGATE COLE: All right. Thank you very much. Senator Martin.

SENATOR MARTIN: Mr. Chairman, our responsibility is to draw the lines, and we sometimes get the opportunity to speak to colleagues about how they ought to vote, but we can't dictate it to them.

DELEGATE COLE: Thank you.

MS. FINCH: I'm Nancy Finch. I'm president of the Richmond First Club. We're members of the redistricting coalition, and we have been working with the coalition for some time. They have been working for several years, as you know.

A couple of things. One, maps are submitted, lines have been drawn, and we have lots of folks here this [39] morning with big problems with the maps and with the lines. So I hope that things are not in concrete. I hope that the people here will be heard. They certainly brought up some legitimate concerns about, particularly about splitting districts.

The other thing. In the press we've read a couple of times that the plans from the students and from the governor's commission just came in too late. They couldn't help you all. Well, it was my understanding that everybody received the census figures, and they were waiting for the census figures in mid-February. So I'm wondering now how their plans were too late, but other people's plans were not too late.

And, third, in 2006, a group of senators and delegates submitted Senate Joint Resolution Number 84, and this is part of what it said. The senators were Senator Williams, Senator Martin Williams, Senators Hanger, Potts, Quayle, Stolle. The delegates were Delegates Callahan, Morgan and Parrish. I'm sure

187

those are familiar names to all of you. Maybe some of you are here.

One of the comments in this resolution said, whereas the best redistricting process followed by the General Assembly in 1991 and 2001 reflects new developments – everybody is saying the same thing this year – and problems now inherent in the process, [40] including the use of sophisticated technology, more frequent division of localities – which is still one of the concerns this year – among two or more districts, less attention to compactness and contiguity of districts, a more intense reliance on political data, increased protection for incumbents, a severe reduction in the number of competitive contests for State Legislative and Congressional seats – and this, to me, is the most important – a consequent decline in voter participation.

This is what has interested Richmond First Club and the coalition in working so hard on this effort. Voters are not turning out like they should. Some years ago I conducted a poll in the district that I lived in. Like 15 percent knew who their delegate was, of the voters.

We hope that this is going to change after this redistricting effort, that people will vote, they will know who their delegates are. And this resolution goes on to give a very, very low number of people turning out to vote. We're for whatever strengthens fair democracy, and I'm sure you are, too.

DELEGATE COLE: Thank you very much. Does anyone else wish to speak? All right. One more.

MR. UKROP: I'm Jim Ukrop, and I'm here to represent my children and my grandchildren. And I think [41] you all know our Virginia history. We are the

188

birthplace of America. The leaders of this country were from right here in Virginia. And I think this is a real opportunity for us to take a leadership position in our nation.

What would the news be like? We are in a divided country today. No one can agree on anything. But wouldn't it be a wonderful thing for the nation to read about the Virginia legislature stepped forward and did the right thing. You know, you are the leaders in this state. It's up to you, and I hope you do the right thing.

DELEGATE COLE: All right. Thank you. If no one else wishes to speak, I do have an announcement. There will be a House Privileges and Election Meeting this afternoon, probably at 3:00 or 4:00. We'll announce the time on floor. And – is this room available? It's across the hall in the other House room.

Do you wish to speak to the Committee?

DELEGATE TYLER: Yes, sir. Thank you,

Mr. Chairman, Members of the Committee. I'm Delegate Rosalyn Tyler. One thing that I would like the Committee to take into consideration as you look at the redistricting lines, is – also, as you look at the population for minority districts, I would also like you to look at the voting population in minority districts, as well.

[42] Because even though you might draw minority districts that may be 55 percent or more, but we need to actually look at the voting numbers in each district. And I would just like to recommend that to the committee, because, as a minority legislator repre-senting the district, it's not always included. And I guess I'm in great concern, because my district includes five prison populations. The population is

189

there, but my voter population is not. So I ask you just to take that into consideration.

DELEGATE COLE: All right. Thank you very much. If no one else wishes to speak, Senator Howell, do you have any announcements?

SENATOR HOWELL: I would just like to say that Senate P. and E. is meeting tomorrow at 10:00, and we, like I said originally, we have made numerous changes already, and I'm sure we will be making more before tomorrow afternoon.

At this time the hearing was adjourned.

[43] CERTIFICATE OF COURT REPORTER

I, Kellie Milner, hereby certify that I was the court reporter in the Privileges and Elections Hearing for the General Assembly on the 4th day of April, 2011, at the time of the hearing herein.

I further certify that the foregoing transcript is a true and accurate record of the incidents of the hearing herein, to the best of my ability.

Given under my hand this 20th day of March, 2011.

/s/ Kellie Milner, Court Reporter
Kellie Milner, Court Reporter

190

COMMONWEALTH OF VIRGINIA HOUSE OF
DELEGATES CONDUCTED ON MONDAY,
APRIL 4, 2011


2011 SPECIAL SESSION I
VIRGINIA HOUSE OF DELEGATES
REDISTRICTING FLOOR DEBATES
Monday, April 4, 2011


Job#: 82096
Pages 1 - 51
Transcribed by: Daphne Hurley


PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

[2] APPEARANCES

Rev. Anne N. Gimenez - Rock Church, Virginia Beach

DELEGATES PRESENT:

M. Kirkland Cox - Colonial Heights (R-66)

John A. Cosgrove - Chesapeake (R-78)

Joe Morrissey - Henrico (D-74)

S. Chris Jones - Suffolk (R-76)

Jeion A. Ward - Hampton (D-92)

Lionell Spruill, Sr. - Chesapeake (D-77)

Rosalyn R. Dance - Petersburg (D-63)

Tony O. Wilt - Rockingham (R-26)

Lynwood W. Lewis, Jr. - Accomack (D-100)

R.B. Bell - Albemarle (R-58)

191

[3] THE COURT: The House will come to order. Members, please take your seats.

Sergeant-at-Arms.

SERGEANT-AT-ARMS: The House of Delegates in now in session. All persons not entitled to privileges of the floor, please retire to the gallery.

THE SPEAKER: The members will rise and be led in prayer by the Reverend Anne N. Gimenez, senior pastor of the Rock Church in Virginia Beach, and remain standing for the Pledge of the Allegiance to the flag of the United States of America, which will be led by the gentleman from Colonial Heights, Mr. Cox.

PASTOR GIMENEZ: Dear Heavenly Father, we pause and thank you for a nation that allows us the privilege to pray for your blessings, to rest on our legislators, as well as to pray that each legislative session be filled with your presence.

Father, we ask you to bless this governing assembled here today with your wisdom, peace and creative solutions to the vast problems and issues [4] that face our Commonwealth and our nation today as we live in turbulent and often confusing times. Father, we ask you to guide them in discussions that do not divide them, but instead will heal all divisions that might already exist or try to develop as they consider each action that must be taken on behalf of your Commonwealth.

We also humbly request that you be so ever present with each legislator, not just on this floor; but in their offices, cars, homes. That they sense your answers, your direction and your methods to successfully implement each answer that you provide.

192

Father, we ask that your love, compassion and desire for all men to be free and to know you in your fullness be the guideline for all they enact.

Father, as they must make difficult discussions in regards to what they fund and what they will not, please let your standards be their gold standard as they formulate the actions they will take.

Father, may your manifest presence fill our [5] Commonwealth with peace and renewed desire for your justice and principles to prevail in all aspects of our society.

As this great Commonwealth was the original gateway to the first settlement of this nation and was as well the place it was first dedicated to your service, may this legislative session be the gateway for national change that will ensure this nation will always be one nation, under God, indivisible, with liberty and justice for all. And Father, may you bless and direct this august body to secure and enable that first dedication of its founding settlers to be the banner under which we and this nation live.

We further ask that you protect each legislator and their staff as they go about their duties; that they may serve without fear or worry, knowing that your hands surround them.

We further request that you protect all their families, protect for all–provide for all their needs as these legislators and staff members serve here away from their homes and on behalf of all of [6] our citizens of the great Commonwealth of Virginia. Amen.

DELEGATES: Amen.

I pledge allegiance to the flag of the United States of America and to the republic for which it stands, one

193

nation, under God, indivisible, with liberty and justice for all.

THE SPEAKER: The House will come to order. The members will answer the roll call by indicating their presence on the electronic voting board.

(Applause.)

THE SPEAKER: The Clerk will close the roll. The Clerk will close the roll.

THE CLERK: Mr. Speaker, a quorum is present.

THE SPEAKER: Pursuant to House Rule 3 I've examined and approved the Journal of the House of Delegates for February 27th, 2011. Motions and resolutions under Rule 39 are now in order.

Does the Clerk have any announcements or communications?

THE CLERK: Yes, sir, Mr. Speaker, I do.

[7] Communication from the Speaker dated March 9th, 2011 to the Clerk of the House of Delegates.

"Due to the resignation of Thomas D. Gear and the subsequent election of Gordon C. Helsel, Jr., I have made the following committee assignments and changes effective today.

"Clifford L. Athey, Jr. removed from the Committee on Health, Welfare & Institutions.

Gordon C. Helsel, Jr. appointed to the Committee on Health, Welfare & Institutions and the Committee on Science & Technology,

"Sincerely, William J. Howell, Speaker."

194

Mr. Speaker, meetings for Monday afternoon, April 4th, Privileges & Elections Committee will meet at 4:00 p.m. this afternoon in House Room C.

And the final announcement, Mr. Speaker, pursuant to the provisions of House Bill

Resolution 5002 members desiring to introduce either a commending or a memorial resolution must first get unanimous consent by the House to introduce a memorial or commending resolution. Again, if members wish to introduce a [8] memorial or commending resolution you must first get unanimous consent to introduce such to the House.

Mr. Speaker, that concludes the announcements and communications that I have.

THE SPEAKER: Thank you. The gentleman from Henrico, Mr. Janis.

DEL. JANIS: I rise for the purpose of a motion.

THE SPEAKER: The gentleman may state it.

DEL. JANIS: Thank you, Mr. Speaker, Members of the House. On behalf of myself and the gentleman from Richmond City, Mr. Loupassi, I would, I would request permission, unanimous consent to introduce a commending resolution commending St. Christopher's School wrestling team.

THE SPEAKER: Is that a Rule 69 thing for you? The gentleman from Henrico, Mr. Janis, asks for unanimous consent to introduce a commending resolution. As many that favor that motion will say "Aye."

[9] DELEGATES: Aye.

195

MR. SPEAKER: Those opposed "No." All right. Resolution is agreed to. The gentleman from Chesapeake, Mr. Cosgrove.

THE CLERK: Mr. Speaker, I rise for an announcement, two announcements.

THE SPEAKER: The gentleman has the floor.

DEL. COSGROVE: Thank you, Mr. Speaker. Ladies and Gentlemen of the House, tomorrow morning at 7:30 in 3 West I invite all of you to come by and have breakfast with the American Legislative Exchange Council. Just learn about the organization and enjoy some, some good food in the morning.

And Mr. Speaker, the second announcement would be, again I invite all members of the House to join us and hundreds of other Virginians on the portico of the Capitol on Wednesday morning at 9:30 as we have a call to prayer for the Commonwealth of Virginia. We'll be joined by the Governor, the Lieutenant Governor, Attorney General and many other delegates and senators as [10] we go and ask God's blessing on our Commonwealth.

So I hope that you will come out and join us for a very short period of time with us because we have a busy day Wednesday, but I invite all of you to be there. Thank you, Mr. Speaker.

THE SPEAKER: The gentleman from Henrico, Mr. Morrissey.

DEL. MORRISSEY: Morning, Mr. Speaker. I rise for a purpose of an introduction and for a point of personal privilege.

THE SPEAKER: The gentleman may proceed.

196

DEL. MORRISSEY: Thank you, Mr. Speaker. With respect to the introduction, Mr. Speaker, Ladies and Gentlemen of the House, Professor Quentin Kidd and many of his students throughout the Commonwealth participated in a recently completed Virginia colleges and university competition to redraw 140 of the districts and all of our congressional districts.

There were over 150 students who participated in this program and they collectively devoted almost 1,000 hours or over 1,000 hours to this [11] process. I observed two of their presentations and I've spoken to one of the presentations about the redistricting commission hearing and I've spoken to probably 15 of the students collectively and individually.

And Mr. Speaker, ladies and gentlemen, they are one impressive group. For those of who you are unfamiliar, Professor Kidd gave them their marching orders and he told them to draw redistricting–draw districts that were competitive, that were contiguous, that were compact, that complied with the Voting Rights Act, that preserved communities of interest and they did a magnificent job.

Mr. Speaker, several of those winning teams are with us today. First of all, from the–and I'd ask that they stand if they're in the gallery now. I can't see. Oh, there. We have students from the University of Richmond, Mr. Speaker. Dan Palazzo, Kayla Brauther, Andrew Slater, Karen Esby and Kate Lorenz. You may be familiar with

Mr. Slater, Mr. Speaker. He worked an as intern [12] for you. These students won first place in the House plan.

197

We also have in the gallery students from George Mason. They won first place in the House competitiveness, as well as five important areas planned. They are Gabe Hudson, Nick O'Boyle, Billy Lauch and Dominick Lipitor. We have some students from, we have some students from William & Mary; undergraduates David Braun, Alex Bramson, Eric Aims and Thomas Chapel. And finally we have some law students from William & Mary who won first place in the congressional plan; Brian Canon, Alex Crouch and Sam Robinson.

Mr. Speaker, ladies and gentlemen, these students did a magnificent job and they contributed mightily to the Commonwealth. I'd ask that the entire House give them a warm House welcome.

(Applause.)

THE SPEAKER: We appreciate all the effort and work that the students went through. We know it was not an easy task and it was probably a [13] pretty good learning experience as well.

Appreciate your time and appreciate your being with us today.

The gentleman from Henrico.

DEL. MORRISSEY: Thank you, Mr. Speaker. Mr. Speaker, point of personal privilege.

MR. SPEAKER: The gentleman has the floor.

DEL. MORRISSEY: Now, Mr. Speaker, when we come to the House we serve–we learn a certain lexicon. Part of that includes, "Heading down a slippery slope, Getting the camel's nose under the tent, Peace in the Valley." But perhaps there's no verbiage that we use more frequently than the following; "We are here to do the people's business."

198

Mr. Speaker, the two bills that are going to be before this body shortly, the House bill on redistricting, the Senate bill on redistricting are decidedly not that. They did–these two bills did anything and everything but the people's business.

What those bills did was our business. We [14] watched out for our own interests. The majority parties in both houses took a parochial self-centered, selfish, protect-the-incumbent approach that was decidedly and markedly not the people's business.

We applauded those students a few moments ago. They devoted thousands of hours and they did the people's business. And after we applaud them, we completely ignore them and we ignore there are some 30 plans that they put together by not even speaking to them, not adopting one iota of their respective plans. Shame on us.

Now, don't get me wrong, Mr. Speaker. The people on the Privileges & Elections Committee and others worked hard. They worked hard at listening to the members's interest. Members went to them and said, "I had a close race two years ago or four years ago. I need these Republican precincts. I need to jettison these Democratic precincts."

They didn't go to the members of the P&E and say, "You know, the Constitution and our orders [15] were to come up with compact, contiguous, competitive, ensure the community of interest plans, make sure we comply with the Voting Rights Act. None of that was done. It's "Watch out for me."

And I've got a confession because somebody's liable to bring it up; that I went and I asked and I spoke to a member of Privileges & Elections too. But let's be

199

certain, Mr. Speaker; when I did it I asked that they add three Republican precincts to my district.

Now, you know when the, when the members went there and they went and they asked for their special districts, it did one thing. It made the districts less competitive. Well, here's a new flash; elections aren't supposed to be easy.

They're supposed to be competitive. And a second news flash; competitiveness is good. It's a good thing. It raises the bar. It makes you better.

Green Bay Packers won the Super Bowl with a great quarterback. I guarantee you this. The general manager of the Green Bay Packers will [16] bring in a couple of young quarterbacks to challenge Aaron Rodgers to make him better.

Now, let me give you an idea of what we did.

And if I can ask my seat mate to help me.

Remember, one of the charging orders is compactness. Tell me if this district, which is my friend Delegate Cleveland's, looks compact to you. Does that look compact? That's what we came up with. It's not what the students came up with.

You know what, it looks like one of those ink blots that the psychiatrists give you when you're going through an anger management class.

(Laughter.)

DEL. MORRISSEY: Now, this is, this is my friend Delegate Massie's district. I mean, I don't know; is it the coast line of, of Libya. My friend from Henrico said it could be (unintelligible word) or it could be one of the Pacific Rim countries. It could just be a U. I don't know

200

what it is. I know it's a new district that just came up and I know it's not compact.

Now, this is not supposed to be a partisan [17] speech, but I bet it sounds like it so far. But I've got vinegar for everybody.

Over on the other side, they're just as guilty, the Senate Democrats. They and the House Republicans came up with districts that are not, that are none of the requirements that we asked of our students. Take the minority leader in the Senate, Thomas Norment, his district's stretched–they chopped it up. He's got tremendous institutional knowledge. Chopped him up. His new district stretches from Suffolk to the northern neck, leaving him little of the existing 3rd district.

The House minority leader, Ward Armstrong's district, chopped up. Tremendous institutional knowledge. And I'm just wondering, is there any coincidence that the two minority members had their districts chopped up? I don't think so. I'll tell you this though; the public gets it. The public understands when you do this.

Two words. George Allen. You know what they did to, the Democrats did to George Allen over a [18] decade ago and it came back to bit them, bite them. I would not want to be either of the minority leaders opponents in the fall because the public gets it. They know what you're doing.

Now when we look at the plan that we're about to vote on we also realize there's something else that we didn't do. Let me see who I–I'm losing lots of friends today. The Democrats in the House, the Republicans here. Who haven't I gone after? The Governor, the Governor.

201

Kudos to the Governor for setting up the bipartisan blue ribbon redistricting plan.

Wonderful gesture, Governor. And to all of your aides who are listening, "Great. You fulfilled a campaign pledge and promise." But then what did you do? You completely ignored them. You set up a commission, you took academicians, you took retired judges. You said, "Give me hours of your time. Go around the State. Give me a plan" and then completely and utterly ignore it.

I wonder how many people in this chamber right now or in the Senate chamber could raise [19] their hand and say, "I reviewed the Commission's plan sent to the Governor or I reviewed even one of the 30 to 35 students plans"? I doubt that that was done.

Mr. Speaker, we have an obligation and responsibility to do our job, to do the people's business, to do it in a nonpartisan fashion when we can. Mr. Speaker, your party had a noble and great opportunity to do that. It dropped the ball. It didn't do that and at the end of the day we come up with the same thing that the Democrats did for 100 years before; a very partisan, a very not the people's business map, and we did a disservice to the Commonwealth.

Thank you, Mr. Speaker.

THE SPEAKER: The gentleman from Richmond City, Mr. Loupassi. The gentleman from

Mr. Suffolk, Mr. Jones.

DEL. JONES: Mr. Speaker, point of personal privilege.

THE SPEAKER: The gentleman has the floor.

202

DEL. JONES: Mr. Speaker, I was interested ton [20] listen to the gentleman from Henrico and I've got a couple answers for him.

I've looked at the plans from the students. As a matter of fact, I believe as late as 10:00 last night I had staff down here trying to get the correct version of one of the student's plans so I could actually look at it.

The Governors's Commission promised plans last week. They came in at 8:30 on Saturday night. I left my daughter, who had a concert at William & Mary. Come up here yesterday and worked until 2:00 this morning trying to look at both of those plans that were supposedly going to be here last week. And I plan to look at those plans this afternoon.

Professor Kidd, he used to be a constituent of mine. A fine gentleman and I commend him for his getting the students involved in the process of government. So I have looked at both of the plans from the college competition. There were some flaws. There was a plus or minus deviation of 20 percent in one district so they were trying [21] to figure out, you know, where that really needs to be.

Because if you read what we did in House P&E Friday before last, we laid out our criteria, and the criteria is the most important thing that we do, I think, as a body. And the overarching principle 10 years ago, 20 years go and 30 years ago I believe was the one-person, one-vote. Our Constitution calls for that and demands that.

Then the next thing I think we're compelled to do is the Voting Rights Act. Full compliance. So the House plan, House Bill 5001, which I am the chief patron and the only patron on the bill, was arrived at over 200 hours on my part trying to put a plan together.

203

I sat down with members of my side of the aisle and your side of the aisle. Anyone that called me, that took the time to be interested enough to call who was going to be the chief patron, I sat down and spent hours with them.

I think the gentlewomen from Richmond can attest to that. I was supposed to have been home [22] all day Friday, but I came up here to spend time with them to listen to what their concerns were for their community. I came back yesterday. And I'm here today and will be here late tonight to try to listen to the concerns that the people of Virginia have.

And to say that we don't represent the people I think is unfair to the process. We are their voice and they get to vote for us every two years or every fours years. I was at a church yesterday. My daughter was singing. And they asked me were they going to still be in my district and I had to tell them no, I didn't think so because of the plus or minus 1 percent, the one-man, one-vote.

I've represented them in one form or fashion for about 20 years, but they understand because it's important that we have the Voting Rights Act, full of compliance, and the one-person, one-vote.

So I thank the gentleman for giving us some things to ponder. I want him to know that, yes, I have looked at the plans. I have spent the hours [23] to do the work to make sure that the plan that I have is fair. It's before us. And the seats that were actually rolled away to other parts of the Commonwealth were done because of loss of population.

There's an attitude in golf, you have to play it where the lies. And when you have a population loss taking Newport News across to Petersburg, across to

204

Lynchburg, and then up to the West Virginia line and you have an effective loss of population of three seats, it's pretty obvious what you have to do.

And I could string things, like maybe the other body did, and try to save a seat in a certain area; but I think it then gets to your compactness and your contiguity argument. So I would say to the gentleman that anyone that has any questions about the plan, it's out there. It's been online since last Tuesday.

Could have called me, but haven't. And I did, had the courtesy of calling the three or four individuals that were combined with other members [24] last Tuesday before the plan was made public. I thought that was the right thing to do because they are colleagues of ours. They're not a member of the other party; they're a colleague of mine in the House of Delegates.

And the seat that I've always held by Mills Godwin, who I think was one of the finest governors we've ever had in this Commonwealth–and we have an obligation to the people that we serve and that is what I have attempted to do so far. And I will listen to any concerns and questions or tweaks that individuals might like to make on the plan that's before them.

And Mr. Speaker, I thank the House for their time.

THE SPEAKER: Thank you. The gentleman from Richmond City, Mr. Loupassi.

DEL. LOUPASSI: Yes, sir, Mr. Speaker. I rise for the purpose of a motion.

THE SPEAKER: The gentleman may state it. DEL. LOUPASSI: Mr. Speaker, I'm asking the House to have unanimous consent for the purpose of [25] introducing a memorial resolution.

205

THE SPEAKER: The gentleman from Richmond City, Mr. Loupassi, asks for unanimous consent to introduce a memorial resolution. As many that favor that motion will say "Aye."

DELEGATES: Aye.

THE SPEAKER: Those opposed "No." That motion is agreed to. The gentleman from

Rockingham, Mr. Wilt.

DEL. WILT: Mr. Speaker, I rise for the purpose of an introduction.

THE SPEAKER: The gentleman has the floor.

DEL. WILT: Mr. Speaker, Ladies and Gentlemen of the House, today in the gallery we have with us Mrs. Karen Gowners and her 7th grade civics class and numerous chaperones that's accompanying them today. Cornerstone Christian School is located in Harrisonburg, Virginia and I ask that the House would give them a warm welcome.

(Applause.)

THE SPEAKER: I'm pleased to have the students from Harrisonburg visiting with us today [26] and hope you enjoy your time in the Capital.

The gentlewomen from Hampton, Ms. Ward.

DEL. WARD: Thank you, Mr. Speaker. I rise for a point of personal privilege and emotion.

THE SPEAKER: The gentlewoman has the floor.

DEL. WARD: Thank you, Mr. Speaker. Today we are commemorating the 42rd anniversary of the assassination of Dr. Martin Luther King. This is a day that many of us will never forget, but so many of us

206

really don't remember why Dr. King was in Memphis that day.

See, two months before Dr. King's assassination on February the 1st there were two black sanitation workers who were crushed and killed in a garbage truck accident as they tried to kind of escape some torrential rains. You see, the black workers were not afforded the same workplace rights as their white counterparts.

So when Dr. King heard of this injustice he cancelled a trip to Africa to join the sanitation workers in their fight for fairness, justice and a voice in their workplace and that he believed [27] could only be achieved through a collective bargaining agreement.

So on April the 3rd, less than 24 hours before his assassination, he was speaking against those who would deny workers fairness and justice on their jobs. And this is when Dr. King delivered his, "I've been to the mountaintop" address; where he recognized that we've just got some difficult days ahead of us.

And as he said, it doesn't matter to him because, as he said and I'll quote, he had been to that mountaintop and he said, "I don't mind. Like anybody, I would like to live a long life.

Longevity has its place, but I'm not concerned with that now. I just want to do God's will.

"And he allowed me to go to the mountain and I've looked over, I've seen the promised land. I may not get there with you, but I want you to know tonight that we as a people will get to that promised land. And I'm happy tonight. I'm not worried about anything. I'm not fearing any man because mine eyes have seen the glory of the [28] coming of the Lord."

207

And today, Mr. Speaker, Ladies and Gentlemen of the House, all across this Commonwealth and this nation people from all walks of life are joining together. There are people from our community, the labor community, from community organizations, the NAACP; all of them are coming together in prayer vigils, in rallies and marches just to say that "We are one and we stand in solitary with Dr. King for all who believe in fairness and justice in the workplace."

And that is why, Mr. Speaker, I move that when we adjourn today we do so in the honor and memory of Dr. King and all those who lost their life fighting for justice in the workplace.

Thank you, Mr. Speaker.

THE SPEAKER: The gentlewoman from Hampton, Ms. Ward, moves that when the House adjourn today it adjourn in the honor and the memory of

Dr. Martin Luther King and all of those who lost their lives fighting for their civil rights.

As many that favor that motion, will please [29] rise. That motion is agreed to.

The gentleman from Accomack, Mr. Lewis.

DEL. LEWIS: Mr. Speaker, rise for a request. THE SPEAKER: The gentleman may state it.

DEL. LEWIS: Mr. Speaker, request of the body of unanimous consent for the introduction of a commending resolution and then point of personal privilege too if I could after that, Mr. Speaker.

THE SPEAKER: Okay. Let me do this one first. The gentleman from Accomack, Mr. Lewis, moves, asks for unanimous consent to introduce a commending

208

resolution. As many that favor that motion will say "Aye."

THE DELEGATES: Aye.

THE SPEAKER: Those opposed "No." That resolution is agreed to. The gentleman from Accomack.

DEL. LEWIS: Mr. Speaker, Ladies and Gentlemen of the House, on May the 20th of this year the Mid-Atlantic Regional Space Port of Wallops Island will launch a satellite for the Operationally Responsive Space Office which was [30] established in 2007 by the Deputy Secretary of Defense in response to changing national security requirements.

This launch on May the 20th will be in honor of Medal of Honor recipients from the war on terror and Somalia. And so that is what this commending resolution which I just received unanimous consent for is about and commends this launch.

And also the resolution goes on to name the individual Medal of Honor winners and the circumstances under which they received the Medal of Honor. Several of their family members and the one surviving Medal of Honor winner will actually be in attendance at the launch.

So I would invite anyone who wants to sign on to this resolution, I'll have it back here at my desk if you want to and I'll try and circulate it also, to please feel free to do so.

Thank you, Mr. Speaker.

THE SPEAKER: Thank you. The gentleman from Spotsylvania, Mr. Cole.

[31] DEL. COLE: Thank you, Mr. Speaker. I rise for a motion.

209

MR. SPEAKER: The gentleman may say it. DEL. COLE: I request unanimous consent to introduce a commending resolution for the 50th anniversary of the Summerduck Ruritan Club. THE SPEAKER: The gentleman from Spotsylvania, Mr. Cole, asks for unanimous consent to introduce a resolution, a commending resolution celebrating the 50th anniversary of the Summerduck Ruritan Club. As many that favor, as many that favor that motion will say "Aye."

DELEGATES: Aye.

THE SPEAKER: Those opposed "No." The motion is agreed to. The gentleman from Grayson,

Mr. Carrico.

DEL. CARRICO: Rise for a motion.

THE SPEAKER: The gentleman may state it.

DEL. CARRICO: Rise to ask for unanimous consent to introduce a commending resolution for Daylights Boys, Daylights High School boys basketball's team first ever State championship.

[32] THE SPEAKER: The gentleman from Grayson, Mr. Carrico, asks for unanimous consent to introduce a commending resolution. As many that favor that motion will say "Aye."

DELEGATES: Aye.

THE SPEAKER: Those opposed "No." That resolution is agreed to. The gentleman from Arlington, Mr. Brink.

DEL. BRINK: Thank you, Mr. Speaker. Rise for a motion.

210

THE SPEAKER: The gentleman may state it. DEL. BRINK: Mr. Speaker, I would ask unanimous consent for the introduction of two memorial resolutions.

THE SPEAKER: A memorial resolution?

DEL. BRINK: Correct.

THE SPEAKER: The gentleman from Arlington, Mr. Brink, asks for unanimous consent to introduce a memorial resolution. Two. I don't thing (inaudible words). I only got one.

As many that favor that motion to introduce two memorial resolutions will please say "Aye."

[33] DELEGATES: Aye.

THE SPEAKER: Those opposed "No." That resolution is agreed to. The gentleman from Arlington, Mr. Hope.

DEL. HOPE: Thank you, Mr. Speaker. I rise for a motion.

THE SPEAKER: The gentleman may state it.

DEL. HOPE: I rise to request unanimous consent to introduce one memorial resolution and one commending resolution.

THE SPEAKER: Same person?

DEL. HOPE: No.

THE SPEAKER: The gentleman from Arlington, Mr. Hope, asks for unanimous consent to introduce a memorial resolution and a commending resolution. As many that favor that motion will say "Aye."

THE DELEGATE: Aye.

211

THE SPEAKER: Those opposed "No." That resolution is agreed to. The gentleman from Hanover, Mr. Cox.

DEL. COX: Mr. Speaker, I too rise for a motion.

[34] THE SPEAKER: The gentleman may state it.

DEL. COX: Mr. Speaker, I would ask this body for unanimous consent to the introduction a memorial resolution.

THE SPEAKER: The gentleman from Hanover, Mr. Cox, moves–asks for unanimous consent to introduce a memorial resolution. As many that favor that motion will say "Aye."

DELEGATES: Aye.

THE SPEAKER: Those opposed "No." That resolution is agreed to. That motion is agreed to. The gentleman from Chesapeake, Mr. Spruill.

DEL. SPRUILL: Mr. Speaker, I rise for point of personal privilege.

THE SPEAKER: The gentleman has the floor.

DEL. SPRUILL: Mr. Speaker, Members of the House, if I can–I guess the early '80s when the Democrats were in control of the House and they did a redistricting at that time, in Chesapeake we had one senator, Senator Parker. We had two delegates, Delegate Tom Fordham and Fred Crittmore.

[35] And when the Democrats drew the line and they chopped up Chesapeake, I said, "Why in the world are they adding these folks to Chesapeake that don't live in Chesapeake, from Norfolk, from Portsmouth and from Suffolk?" And I had some objection at that time because I felt like that those who live in the city, grew up in the city, not understanding that when things are

212

short in other areas, and we were growing in Chesapeake, they had to make up the numbers.

And then it came along the Justice Department was talking about the rights of blacks being represented in the Hampton Roads area of Richmond, parts of Roanoke, the vast majority in those areas and the Newport News area. And they were saying they want to make sure that the blacks have an opportunity to, to work on the floor, to be in this House, and we did that.

And then the Democrats lost the majority and the Republicans took over and now we're concerned that they're compacting everybody together. I heard my friend, Delegate Joe Morrissey, who [36] said–he drew up a little map about where he is. He also spoke of in a previous meeting about another minority district. And Number 1, I said to the members here, is that we don't need another minority district, Mr. Speaker, because if we want another minority district, as you all would call it, but let's say another black district, we don't need it.

Because my friend Joe Morrissey, where he live, that is a black district, and if the blacks want another district they should take that seat. If my friend, Joe Morrissey, is concerned about another district, which he is, he spoke up earlier about another minority seat, then he should have stepped down and give it to a black person and we'll have another seat.

Mr. Speaker, again, then the question came about the line that was drawn about with Delegate Chris Jones. I've had people to call me,

Mr. Speaker, both white and of course you all blacks, you're all minority blacks, as they call you all, both called me and said, "Do you know [37] Chris Jones?

213

Yes." The question was did he try to draw those lines fairly.

And I was concerned about the blacks who are in the–are not minority blacks who are in the seat now and my true main concern was not the district that would be approved by the Justice Department, but the seat that's been held by Lou Tyler, which is not a minority seat. I was concerned about that. The seat that's been held by Delegate Herring, not a minority seat.

See, those seats, they just happen to be black, but it's not a minority seat. The question is was Chris Jones fair to those folks, trying to accommodate what they need? Ask them. I believe he was. Ask some of them members who are die-hard Democrats on this side of the aisle who may complain about the plan; ask them did they call Chris Jones and ask them what was he fair to them of what they want. I believe if they did tell the truth they would. So compaction got a no.

My concern was that I was really upset with the Democrats in the '80s that cut up Chesapeake [38] and my concern is now, now you another party in control who's tried to work it out with everybody. You ask me, "Am I going to vote for this plan?" Yes. You ask me, "Do I believe that it was fair, that Chris Jones did the best that he could?" Yes.

To the Democrats; after all, he is a

Republican, you know. He's got to do something for them. He's got to lookout for himself first and then give us a bone and I believe he has given us two or three bones, Mr. Speaker.

So I just want you all to know that when these people just get up and yap, yap about it, remember

214

what goes around, come around. Remember when we were in control, the good Democrats. I don't know what I am right now, Mr. Speaker, but I want them to remember when they were in control how it was done. And that at least–I only use Chris Jones, because it's who I know, at least he is trying to be fair to everybody. I'm asking all my colleagues to vote for this plan.

Thank you, Mr. Speaker.

[39] THE SPEAKER: The gentleman from Albemarle, Mr. Bell.

DEL. BELL: Mr. Speaker, I rise for two motions.

THE SPEAKER: The gentleman may state it.

DEL. BELL: Mr. Speaker and Members of the House, I've come with sad news. On March 2nd, 2011 Americans across the country turned on their CNN or MSNBC or Fox News and heard of Airman First Class Zach Cuddeback, who was killed in a Frankfurt airport by a gunman and he was–the gunman had the intention of killing American soldiers. He went to the bus and said, "Where you headed?" and they said (unintelligible word) Iraq or Afghanistan and he pulled out a gun and shot two dead. Was captured by a third of the airmen.

What was not part of the national reports was that Zach Cuddeback was one of ours. He was a 2008 graduate of William Monroe High School in Green. And so Mr. Speaker, my first motion would be that we– I ask unanimous consent to introduce a memorial resolution for Zach Cuddeback. And [40] I'll have another motion after that.

THE SPEAKER: The gentleman from Albemarle, Mr. Bell, moves that the House grant the unanimous

215

consent to introduce a memorial resolution. As many that favor that motion will say "Aye."

DELEGATES: Aye.

MR. SPEAKER: Those opposed "No." That motion is agreed to. The gentleman from

Albemarle.

DEL. BELL: Mr. Speaker, I understand we already have a resolution in terms of who we will be adjourning in memory and honor of. I would like to add to that. I'd like to add that the House adjourn in memory and honor of Airman First Class Zachary Ryan Cuddeback. He as a 21-year old Virginian who died in service of his country and I hope we will adjourn in his honor. Thank you.

THE SPEAKER: The gentleman from Albemarle, Mr. Bell, moves that when the House adjourn today it adjourn in the honor and memory of Air Force Airman First Class Zachary Ryan Cuddeback. As many that favor that motion will please rise.

[41] That motion is agreed to.

The gentleman from Charlottesville,

Mr. Toscana.

DEL. TOSCANA: Thank you, Mr. Speaker. Rise for a motion.

THE SPEAKER: The gentleman may say it. DEL. TOSCANA: Mr. Speaker, Ladies and

Gentlemen of the House side, I'd move that I be granted unanimous consent to offer a commending resolution commending the city of Charlottesville on its 200-plus year anniversary.

216

THE SPEAKER: The gentleman from Charlottesville, Mr. Toscana, moves that the House grant unanimous consent to introduce a commending resolution commending the 200-plus years that they've been around. As many that favor that motion will say "Aye."

DELEGATES: Aye.

THE SPEAKER: Those opposed "No." That motion is agreed to. The gentlewoman from

Petersburg, Ms. Dance.

DEL. DANCE: Thank you, Mr. Speaker. I rise [42] for point of personal privileges.

THE SPEAKER: The gentlewoman has the floor.

DEL. DANCE: Mr. Speaker and Members of the House, I had what might be considered an honor and a curse to have been assigned to be one of the members, the six members that serve on the

Redistricting Committee for the House and one of the six members that serve on the Reapportionment Committee for the House.

And I can tell you that throughout this process I've learned a lot about redistricting. Wasn't here 10 years ago when the last lines were drawn, but I, I will challenge anybody on my side of the aisle as far as knowing as much about the software and the demographics and statistically how Virginia is laid out and what we had to deal with as far as the plan, the House Bill that has been introduced by Delegate Jones.

That is truly an example, I found out, to be of bipartisanship, because there were no gray lines. Whether you're a Democrat or Republican and you

217

were assigned to draw those lines, you [43] would have found much difficulty. I don't think anybody will have pretty lines, nice neat bows in a row, as they'd like to have. And I don't think anybody would say that whatever their lot is that it's perfectly the way they would like it to be.

But I will say that as one had a lot of impact from both sides of the aisle, I know because I tried to reach out to all those that I could on my side of the aisle, and I know that our chair, Delegate Jones, was willing to listen to anything and everything that we throw to him to consider as he developed his plan.

And one of the things that I was most concerned about of course as an African-American was the 1965 Voting Rights Act as related to the 12 minority districts that we have in the House and making sure that they were strong. The trending–because we can't tell people where to move or leave–live, showed that a lot of the populations were shifting into areas.

In order to maintain those 12 districts it required some movement and sometimes not perfect [44] adjustments between precincts. There might have been some split areas, but those were the kind of things that were happening, but we were talking with legislators as we went. Things were not done in a vacuum.

I know that even though a bill has been introduced, that in working with our Chair that there is going– there are still options and, of course, some amendments and I'm sure before a bill is passed there will be some more amendments there.

And I see this as truly a fair process. It's not a perfect process, but I don't think it's one that will have us jumping up and down and have fits. We're not going

218

to agree; but we can respectfully agree or disagree as
we go.

But I'm still proud to be a part of this team. I still
hope that at the end of day that there will be more of
us in agreement than not and that we will be able to
pass a plan and leave this House. Because I think this
is one of the most important bills that we will pass and
that is what [45] the 100 House seats will look like in
the next 10 years.

And I was pleased to be a part of that committee and
I'm not going to be jumping up and down and say it's
African-American or

Euro-Americans, but I do say that we need 55
percent at least voting African-Americans, not just a
population to show 55 percent

African-Americans. Because a lot of us know that
statistics show that we don't always vote.

Even though I come–I live in Petersburg,
predominantly African-American, if the percentage
might be–it should be 100 percent. It will be 40
percent. If it was (unintelligible word) if I live in the
community and I was your American - if it was 100
percent, you'd get about 60 percent. And so you have
to deal with those realities. That's the realities we're
dealing with as we model, as we look at the statistics
that we're working with.

And hope you all will consider that. And I stand open
even on my side; if those legislators [46] who have not
yet gone to, I call it the war room on the second floor,
to play with that software to see for yourself what it
looks like. I think with knowledge will come a change
in attitude and a more reasonableness as we move
forward.

219

And it's important that we do this. If you haven't already done it, go to the second floor; look at the software. Don't just look at it, but see how it works and see how it effects you and see what decisions had to be made to get us this far. Thank you.

THE SPEAKER: The gentleman from Chesapeake, Mr. Cosgrove.

DEL. COSGROVE: Mr. Speaker, I rise for a motion.

THE SPEAKER: The gentleman may state it.

DEL. COSGROVE: Mr. Speaker, I ask the House for unanimous consent to introduce a commending resolution for the Chesapeake teacher of the year.

THE SPEAKER: The gentleman from Chesapeake, Mr. Cosgrove, asks for unanimous consent to introduce a commending resolution. As many that [47] favor that motion will say "Aye."

DELEGATES: Aye.

THE SPEAKER: Those opposed "No." That motion is agreed to.

Are there further motions or resolutions under Rule 39?

Does the Clerk have any announcements?

THE CLERK: Yes, sir, Mr. Speaker. Meetings for Monday afternoon; the Democratic Caucus will meet 30 minutes after recess in House Room 2. The Democratic Caucus meeting 30 minutes after recess in House Room 2.

Mr. Speaker, the Privileges & Elections Committee will meet at 4:00 p.m. this afternoon in House Room C.

Mr. Speaker, that concludes the announcements that I have.

220

THE SPEAKER: The gentleman from Colonial Heights, Mr. Cox.

DEL. COX: Mr. Speaker, I would move the House stand in recess until 8:00 p.m. and I would like to speak to that motion if I could.

[48] MR. SPEAKER: The gentleman has the floor.

DEL. COX: Mr. Speaker, just from a timing standpoint, as you know P&E will go in at 4:00. I want to make sure the committee have got plenty of time to meet and so that is the reason for the 8:00 recess. It will be a pro forma session.

Basically what I want us to do is get us a supplemental calendar up if the bill passes committee and of course then we'll adjourn. So basically that will be the activity. It's a pro forma session.

THE SPEAKER: The gentleman from Colonial Heights, Mr. Cox, moves that the House stand in recess until 7:00.

DELEGATE: Mr. Speaker, parliamentary inquiry.

THE SPEAKER: 8:00. The gentleman may state it.

DELEGATE: Yes, Speaker. Would the gentleman from Colonial Heights or the Speaker, either one, advise us at what time when we come back at 8:00 anticipate that we will be adjourning for [49] tomorrow?

THE SPEAKER: Noon.

DELEGATE: Thank you, Mr. Speaker.

THE SPEAKER: The gentleman from Colonial Heights, Mr. Cox, moves the House stand in recess until 8:00 p.m. As many favor that motion will say "Aye."

221

DELEGATES: Aye.

THE SPEAKER: Those opposed "No." The motion is agreed to. The House stands in recess until 8:00 p.m.

(Whereupon, the House of Delegates stood recessed.)

THE SPEAKER: The House will come to order. Members, please take your seats. The–does the Clerk have any announcement?

THE CLERK: Yes, sir. Mr. Speaker, meetings for Tuesday morning, April 5th, the Conservative Caucus meets at 8:00 a.m. in the Speaker's

Conference Room. Press conference, Response to Tackle Women's Health, meets at 9:00 a.m. in the House Briefing Room. The Commission on Youth will [50] hold a meeting at 9:00 a.m. in House Room C.

Mr. Speaker, the Republican Caucus will meet at 10:00 in the morning, House Room 1. And this is a time change. And Mr. Speaker, the Democratic Caucus will meet at 10:00 a.m. in House Room 2. This is also a time change.

Mr. Speaker, this concludes the announcements that I have.

MR. SPEAKER: The gentleman from Colonial Heights, Mr. Cox.

DEL. COX: Mr. Speaker, I move that when the House adjourn today it adjourn to reconvene tomorrow at 12:00 noon.

THE SPEAKER: The gentleman from Colonial Heights, Mr. Cox, moves that when the House adjourns today it adjourn to reconvene tomorrow at 12:00 noon. As many that favor that motion will say "Aye."

222

DELEGATES: Aye.

THE SPEAKER: Those opposed "No." That motion is agreed to. The gentleman from Colonial Heights, Mr. Cox.

[51] DEL. COX: Mr. Speaker, I move the House do now adjourn.

THE SPEAKER: The gentleman from Colonial Heights, Mr. Cox, moves the House do now adjourn. As many that favor that motion will say "Aye."

DELEGATES: Aye.

THE SPEAKER: Those opposed "No." That motion is agreed to.

The House stands adjourned until 12:00 noon tomorrow.

(Whereupon, the House of Delegates stood adjourned.)

[52] C E R T I F I C A T E

I, Daphne S. Hurley, Court Reporter, certify that I transcribed from digital recording of the proceedings held on the 4th day of April 2011.

I further certify that to the best of my knowledge and belief, the foregoing transcript constitutes a true and correct transcript of the said proceedings. Given under my hand this 4rd day of May 2015.

/s/ Daphne S. Hurley
Daphne S. Hurley

My commission expires: August 20, 2018 Notary Public in and for the State of Maryland

223

**A**

| | |
|---|---|
| **Aaron** 16:2 | **able** 44:20 |
| **academicians** 18:17 | **accident** 26:15 |
| **Accomack** 2:13 29:2,10,17 | **accommodate** 37:14 |
| **accompanying** 25:16 | **achieved** 27:1 |
| **Act** 11:12 15:4 21:11 22:18 43:15 | **action** 4:6 |
| **actions** 4:20 | **activity** 48:10 |
| **add** 15:10 40:13,13 | **adding** 35:3 |
| **address** 27:8 | **adjourn** 28:13,18,19 40:14 40:17,19,20 48:9 50:12,12 50:16 51:2,4 |
| **adjourned** 51:9,12 | **adjourning** 40:12 48:22 |
| **adjourns** 50:16 | **adjustments** 44:1 |
| **adopting** 14:11 | **advise** 48:21 |
| **afforded** 26:17 | **Afghanistan** 39:15 |
| **Africa** 26:20 | **African-Americ...** 43:14 45:5,12 |
| **African-Americ...** 45:7,9 | **Afternoon** 7:13,15 20:15 47:9,14 |
| **Ago** 14:7,17,18 18:1 21:7,8 42:12 | **Agree** 44:15,16 |
| **Agreed** 9:3 25:8 29:1,16 31:15 32:7 33:3 33:19 34:11,11 40:8 41:1,20 47:4 49:10 50:21 51:8 | **agreement** 27:2 44:19 |
| **ahead** 27:9 | **aides** 18:14 |
| **Aims** 12:10 | **Air** 40:20 |
| **Airman** 39:9 40:14,21 | **airmen** 39:16 |
| **airport** 39:11 | **aisle** 21:17,17 37:16 42:14 43:7,9 |
| **Albemarle** 2:14 39:1 40:2,9 40:18 | **Alex** 12:9,13 |

224

| | |
|---|---|
| **allegiance** 3:12 6:4 | **Allen** 17:21,22 |
| **allowed** 27:16 | **allows** 3:16 |
| **Amen** 6:2,3 | **amendments** 44:9,10 |
| **America** 3:13 6:5 | **American** 9:11 39:12 45:15 |
| **Americans** 39:8 | **Andrew** 11:20 |
| **anger** 16:12 | **Anne** 2:2 3:9 |
| **anniversary** 26:7 31:6,10 41:11 | **announcement** 7:16 9:6,15 49:16 |
| **announcements** 6:20 8:4 9:6 47:7 47:16 50:7 | **answer** 4:12 6:9 |
| **answers** 4:11 20:2 | **anticipate** 48:22 |
| **anybody** 27:13 42:13 43:2 43:4 | **applaud** 14:8 |
| **applauded** 14:6 | **Applause** 6:12 12:19 25:20 |
| **appointed** 7:9 | **appreciate** 12:20 13:2,2 |
| **approach** 14:4 | **approved** 6:17 37:6 |
| **April** 1:11 7:14 27:3 49:18 52:4 | **area** 23:15 35:13,15 |
| **areas** 12:5 35:9,14 43:20 44:2 | **argument** 23:16 |
| **Arlington** 32:8,17 33:4,13 | **Armstrong's** 17:14 |
| **arrived** 21:14 | **asked** 15:7,10,13 17:6 22:12 |
| **asking** 24:21 38:20 | **asks** 8:19 25:3 29:11 31:8 32:2,18 33:14 34:6 46:21 |
| **aspects** 5:3 | **assassination** 26:8,13 27:4 |
| **assembled** 3:21 | **assigned** 42:5,22 |
| **assignments** 7:5 | **Athey** 7:7 |
| **attempted** 24:10 | **attendance** 30:15 |

225

| | |
|---|---|
| **attest** 21:22 | **attitude** 23:6 46:4 |
| **Attorney** 9:21 | **august** 5:12 52:16 |
| **Aye** 8:22 9:1 25:5,6 29:13,14 31:12 31:13 32:4,5,22 33:1,16,17 34:8 34:9 40:5,6 41:17,18 47:1,2 49:7,8 50:18,19 51:5,6 | **a.m** 49:19,21 50:1,5 |

**B**

| | |
|---|---|
| **Back** 18:1 22:3 30:17 48:21 | **ball** 19:10 |
| **banner** 5:14 | **bar** 15:19 |
| **bargaining** 27:2 | **basically** 48:7,10 |
| **basketball's** 31:22 | **Bay** 15:20,22 |
| **Beach** 2:2 3:11 | **Behalf** 4:7 5:22 8:12 |
| **Belief** 52:7 | **Believe** 20:4 21:8 28:10 37:14,19 38:4 38:10 |
| **believed** 26:22 | **Bell** 2:14 39:2,3,6 40:3,10,19 |
| **best** 38:5 52:6 | **bet** 17:1 |
| **better** 15:19 16:2 | **bill** 7:17 13:17,18 21:12,13 42:17 44:6,9 48:8 |
| **bills** 13:16,20,22 44:22 | **Billy** 12:7 |
| **bipartisan** 18:12 | **bipartisanship** 42:20 |
| **bit** 18:1 | **bite** 18:1 |
| **black** 26:14,17 36:7,10 36:15 37:12 | **blacks** 35:12,16 36:10,21 36:21 37:3,4 |
| **bless** 3:20 5:11 | **blessing** 10:1 |
| **blessings** 3:17 | **blots** 16:11 |
| **blue** 18:12 | **board** 6:11 |
| **body** 5:12 13:17 21:6 23:14 29:5 34:2 | **bone** 38:10 |

226

| | |
|---|---|
| **bones** 38:11 | **Bowl** 15:20 |
| **bows** 43:2 | **boys** 31:21,21 |
| **Bramson** 12:9 | **Braun** 12:9 |
| **Brauther** 11:20 | **breakfast** 9:11 |
| **Brian** 12:12 | **Briefing** 49:22 |
| **bring** 15:7 16:1 | **Brink** 32:8,9,12,16,18 |
| **Bus** 39:13 | **Business** 13:15,21,22 14:5 14:8 19:7,13 |
| **Busy** 10:4 | |

**C**

| | |
|---|---|
| **C** 2:1 7:4,9,15 47:15 50:1 52:1 52:1 | **calendar** 48:8 |
| **call** 6:9 9:19 21:19 36:6,19,21 37:17 46:1 | **called** 21:18 23:20 36:22 |
| **calling** 23:21 | **calls** 21:9 |
| **camel's** 13:11 | **campaign** 18:15 |
| **cancelled** 26:20 | **Canon** 12:13 |
| **Capital** 26:1 | **Capitol** 9:18 |
| **captured** 39:16 | **Carrico** 31:16,17,19 32:2 |
| **cars** 4:10 | **Caucus** 47:9,11 49:19 50:2,5 |
| **celebrating** 31:10 | **certain** 13:9 15:9 23:15 |
| **certify** 52:3,6 | **chair** 43:10 44:7 |
| **challenge** 16:2 42:13 | **chamber** 18:21,22 |
| **championship** 31:22 | **change** 5:8 46:4 50:4,6 |
| **changes** 7:6 | **changing** 30:2 |
| **Chapel** 12:10 | **chaperones** 25:16 |
| **charging** 16:5 | **Charlottesville** 41:2,10,13 |
| **Chesapeake** 2:6,10 9:4 34:12 34:19 35:2,3,4,9 37:22 46:12,19 46:20 | **chief** 21:13,19 |

227

| | |
|---|---|
| **chopped** 17:9,10,15,18 35:2 | **Chris** 2:8 36:19 37:1,13 37:18 38:5,19 |
| **Christian** 25:17 | **Christopher's** 8:16 |
| **church** 2:2 3:10 22:10 | **circulate** 30:18 |
| **circumstances** 30:12 | **citizens** 6:1 |
| **city** 8:13 19:17 24:17 25:3 35:7,7 41:10 | **civics** 25:15 |
| **civil** 28:21 | **class** 16:12 25:15 39:10 40:15,21 |
| **Clerk** 6:13,14,15,20,22 7:2 9:5 47:7,8 49:16,17 | **Cleveland's** 16:7 |
| **Clifford** 7:7 | **close** 6:13,14 14:17 |
| **Club** 31:6,11 | **CNN** 39:9 |
| **coast** 16:16 | **coincidence** 17:17 |
| **Cole** 30:22 31:1,4,8 | **colleague** 24:4 |
| **colleagues** 24:3 38:21 | **collective** 27:1 |
| **collectively** 10:21 11:4 | **college** 20:20 |
| **colleges** 10:17 | **Colonial** 2:5 3:14 47:18 48:12,20 49:4 50:9,14,21 51:3 |
| **combined** 23:22 | **come** 3:1 6:8 9:11 10:2 13:9 15:1 19:11 20:11 38:14 39:7 45:11 46:4 48:21 49:14 |
| **coming** 28:1,7 | **commemorating** 26:7 |
| **commend** 20:17 | **commending** 7:19,21 8:1,15,16 8:20 29:7,12 30:7 31:5,9,20 32:3 33:10,15 41:9,10,14,15 46:18,22 |
| **commends** 30:8 | **commission** 11:3 18:17 20:8 49:22 52:16 |
| **Commission's** 19:1 | **committee** 7:5,8,9,11,14 14:14 |

228

| | 42:7,9 45:4 47:14 48:4 48:9 |
|---|---|
| **Commonwealth** 4:1,7 5:1,4 6:1 9:20 10:1,16 12:16 19:14 23:4 24:8 28:3 | **Communication** 7:1 |
| **communications** 6:21 8:5 | **communities** 11:13 |
| **community** 15:2 22:3 28:6,6 28:6 45:15 | **compact** 11:12 15:1 16:7,8 16:21 |
| **compacting** 35:21 | **compaction** 37:20 |
| **compactness** 16:6 23:16 | **compassion** 4:14 |
| **compelled** 21:10 | **competition** 10:18 20:20 |
| **competitive** 11:11 15:2,15,17 | **competitiveness** 12:5 15:18 |
| **complain** 37:17 | **completed** 10:17 |
| **completely** 14:9 18:16,20 | **compliance** 21:11 22:19 |
| **complied** 11:12 | **comply** 15:3 |
| **concern** 37:5,21 38:1 | **concerned** 27:14 35:20 36:12 37:3,9 43:14 |
| **concerns** 22:2,5 24:11 | **concert** 20:10 |
| **concludes** 8:4 47:16 50:7 | **conference** 49:20,20 |
| **confession** 15:6 | **confusing** 4:2 |
| **congressional** 10:19 12:12 | **consent** 7:20 8:2,15,20 24:22 25:3 29:6 29:11 30:8 31:4 31:8,20 32:2,13 32:18 33:9,14 34:3,6 39:21 40:4 41:9,14 46:18,21 |
| **Conservative** 49:18 | **consider** 4:6 43:12 45:21 |

229

| | |
|---|---|
| **considered** 42:4 | **constituent** 20:16 |
| **constitutes** 52:8 | **Constitution** 14:22 21:9 |
| **contiguity** 23:16 | **contiguous** 11:11 15:1 |
| **contributed** 12:16 | **control** 34:18 38:2,15,17 |
| **Cornerstone** 25:17 | **correct** 20:6 32:16 52:8 |
| **Cosgrove** 2:6 9:4,8 46:13 46:14,17,21 | **Council** 9:12 |
| **counterparts** 26:18 | **countries** 16:19 |
| **country** 39:8 40:16 | **couple** 16:1 20:2 |
| **course** 36:20 43:14 44:9 48:9 | **Court** 3:1 52:2 |
| **courtesy** 23:21 | **Cox** 2:5 3:14 33:20,21 34:2,6 47:19,20 48:2,13 49:5 50:10,11,15,22 51:1,4 |
| **creative** 3:22 | **criteria** 21:4,5 |
| **Crittmore** 34:22 | **Crouch** 12:13 |
| **crushed** 26:14 | **Cuddeback** 39:10,18,22 40:15 40:21 |
| **curse** 42:5 | **cut** 37:22 |

**D**

| | |
|---|---|
| **D** 7:3 | **Dan** 11:19 |
| **Dance** 2:11 41:21,22 42:3 | **Daphne** 1:22 52:2,14 |
| **dated** 7:1 | **daughter** 20:10 22:11 |
| **David** 12:9 | **day** 10:4 19:10 22:1 26:9,11 44:18 52:4,10 |
| **Daylights** 31:21,21 | **days** 27:9 |
| **dead** 39:16 | **deal** 42:16 45:17 |
| **dealing** 45:18 | **Dear** 3:15 |
| **DEBATES** 1:10 | **decade** 18:1 |
| **decidedly** 13:19 14:4 | **decisions** 46:10 |

230

| | |
|---|---|
| **dedicated** 5:6 | **dedication** 5:13 |
| **Defense** 30:2 | **DEL** 8:8,11 9:8 10:8 10:12 13:5,8 16:14 19:19,22 24:18,21 25:10 25:13 26:3,6 29:3,5,18 31:1,4 31:17,19 32:9 32:12,16 33:5,8 33:12,21 34:2 34:13,16 39:3,6 40:10 41:4,7,22 42:3 46:14,17 47:20 48:2 50:11 51:1 |
| **Delegate** 16:7,15 33:17 34:21 35:22 36:18 37:10 42:18 43:10 48:15,19 49:3 | **delegates** 1:9 2:4 3:4 6:3,18 7:2 9:1,22 24:5 25:6 29:14 31:13 32:5 33:1 34:9,21 40:6 41:18 47:2 49:8 49:12 50:19 51:6,11 |
| **delivered** 27:7 | **demands** 21:9 |
| **Democrat** 42:21 | **Democratic** 14:19 47:9,11 50:4 |
| **Democrats** 17:4,22 18:8 19:11 34:18 35:1,19 37:16 37:22 38:7,15 | **demographics** 42:15 |
| **deny** 27:5 | **Department** 35:11 37:7 |
| **Deputy** 30:1 | **desire** 4:15 5:1 |
| **desiring** 7:18 | **desk** 30:18 |
| **develop** 4:6 | **developed** 43:12 |
| **deviation** 20:21 | **devoted** 10:21 14:7 |
| **died** 40:16 | **die-hard** 37:15 |
| **difficult** 4:17 27:9 | **difficulty** 43:1 |
| **digital** 52:3 | **direct** 5:11 |
| **direction** 4:11 | **disagree** 44:16 |
| **discussions** 4:4,18 | **disservice** 19:14 |

231

| | |
|---|---|
| **district** 15:11 16:6,15,20 17:11,13,15  20:22  22:13 36:3,5,6,7,10,11    36:13 37:6 | **districts**  10:18,19  11:10 15:14,15     17:5     17:18 43:16,21 |
| **district's** 17:8 | **divide** 4:4 |
| **divisions** 4:5 | **doing** 18:4 |
| **Dominick** 12:7 | **doubt** 19:3 |
| **Dr**    26:8,10,12,19    27:6 28:10,14 28:20 | **draw** 11:9,10 37:2 42:22 |
| **drawn** 36:18 42:13 | **drew** 35:1 36:1 |
| **dropped** 19:9 | **Due** 7:3 |
| **duties** 5:17 | **D-100** 2:13 |
| **D-63** 2:11 | **D-74** 2:7 |
| **D-77** 2:10 | **D-92** 2:9 |

**E**

| | |
|---|---|
| **E** 2:1,1 52:1,1 | **earlier** 36:13 |
| **early** 34:17 | **easy** 12:22 15:16 |
| **effective** 7:6 23:10 | **effects** 46:9 |
| **effort** 12:20 | **either** 7:19 18:2 48:20 |
| **election** 7:4 | **elections** 7:14 14:14 15:8 15:16 47:13 |
| **electronic** 6:10 | **emotion** 26:4 |
| **enable** 5:12 | **enact** 4:16 |
| **enjoy** 9:13 26:1 | **ensure** 5:8 15:2 |
| **entire** 12:17 | **entitled** 3:5 |
| **Eric** 12:10 | **Esby** 11:20 |
| **escape** 26:16 | **established** 30:1 |
| **Euro-Americans** 45:6 | **everybody** 17:2 35:21 38:2 38:20 |
| **examined** 6:17 | **example** 42:19 |
| **Exchange** 9:12 | **exist** 4:5 |
| **existing** 17:13 | **experience** 13:1 |
| **expires** 52:16 | **eyes** 27:22 |

232

**F**

| | |
|---|---|
| **F** 52:1 | **face** 4:1 |
| **fact** 20:4 | **fair** 23:2 37:13,18 38:4,20 44:12 |
| **fairly** 37:2 | **fairness** 26:21 27:5 28:11 |
| **fall** 18:3 | **familiar** 11:21 |
| **families** 5:20 | **family** 30:13 |
| **far** 17:1 24:11 42:14 42:17 46:11 | **fashion** 19:7 22:16 |
| **Father** 3:15,20 4:3,14,17 4:22 5:11 | **favor** 8:21 25:5 28:22 29:12 31:11,12 32:4,21 33:16 34:8 40:5,22 41:16 47:1 49:6 50:17 51:5 |
| **fear** 5:17 | **fearing** 27:21 |
| **February** 6:18 26:13 | **feel** 30:19 |
| **felt** 35:6 | **fight** 26:21 |
| **fighting** 28:15,21 | **figure** 21:1 |
| **fill** 4:22 | **filled** 3:19 |
| **final** 7:16 | **finally** 12:10 |
| **fine** 20:17 | **finest** 24:7 |
| **first** 5:5,6,12 7:20 8:1 11:16 12:1,4,12 29:10 31:22 38:9 39:9,20 40:14,21 | **fits** 44:15 |
| **five** 12:5 | **flag** 3:12 6:4 |
| **flash** 15:16,18 | **flaws** 20:21 |
| **floor** 1:10 3:6 4:10 9:7 13:7 19:21 25:12 26:5 34:15 35:17 42:2 46:2,7 48:1 | **folks** 35:3 37:13 |
| **following** 7:5 13:14 | **food** 9:13 |
| **Force** 40:20 | **Fordham** 34:21 |
| **foregoing** 52:7 | **forget** 26:9 |

233

| | |
|---|---|
| **form** 22:16 | **forma** 48:6,11 |
| **formulate** 4:20 | **forward** 46:5 |
| **found** 42:19 43:1 | **founding** 5:13 |
| **four** 14:18 23:21 | **fours** 22:10 |
| **Fox** 39:9 | **Frankfurt** 39:11 |
| **Fred** 34:21 | **free** 4:15 30:19 |
| **frequently** 13:13 | **Friday** 21:4 22:1 |
| **friend** 6:7,15,17 35:22 36:9,12 | **friends** 18:8 |
| **fulfilled** 18:14 | **full** 21:11 22:19 |
| **fullness** 4:16 | **fund** 4:18 |
| **further** 5:15,19 47:5 52:6 | |

**G**

| | |
|---|---|
| **Gabe** 12:6 | **gallery** 3:7 11:17 12:3 25:14 |
| **garbage** 26:15 | **gateway** 5:5,8 |
| **Gear** 7:3 | **general** 9:22 15:22 |
| **gentleman** 3:13 8:6,10,13,19 9:3,7 10:6,11 13:4,7 19:16,17 19:21 20:1,17 22:20 23:17 24:16,20 25:2,8 25:12 29:2,4,10 29:16 30:21 31:3,7,15,18 32:1,7,11,17 33:3,7,13,19 34:1,5,12,15 39:1,5 40:2,8,18 41:2,6,12 46:12 46:16,20 47:18 48:1,12,17,19 49:4 50:9,14,21 51:3 | **gentlemen** 9:9 10:14 11:6 12:14 25:13 28:2 29:19 41:8 |
| **gentlewoman** 26:5 28:17 41:20 42:2 | **gentlewomen** 21:21 26:2 |
| **George** 12:4 17:21,22 | **gesture** 18:13 |

234

| | |
|---|---|
| **getting** 13:11 20:18 | **Gimenez** 2:2 3:9,15 |
| **give** 12:17 16:3,11 18:18,19 25:19 36:15 38:10 | **given** 38:10 52:9 |
| **giving** 22:20 | **glory** 27:22 |
| **go** 5:16 10:1 14:21 18:19 21:7 27:16 44:16 46:7 48:3 | **God** 5:9 6:6 |
| **Godwin** 24:7 | **God's** 10:1 27:15 |
| **Goes z**30:10 38:14 | **Going** 13:16 16:12 20:13 21:19 22:12 38:3 44:8 44:15 45:4 |
| **gold** 4:20 | **golf** 23:6 |
| **good** 9:13 13:1 15:18 15:18 38:15 | **Gordon** 7:4,9 |
| **governing** 3:20 | **government** 20:19 |
| **Governor** 9:21,21 18:10,10 18:11,13 19:2 | **governors** 24:8 |
| **Governors's** 20:8 | **Gowners** 25:15 |
| **grade** 25:15 | **graduate** 39:19 |
| **grant** 40:3 41:14 | **granted** 41:9 |
| **gray** 42:20 | **Grayson** 31:15 32:1 |
| **great** 5:4 6:1 15:21 18:14 19:9 | **Green** 15:20,22 39:20 |
| **grew** 35:7 | **group** 11:7 |
| **growing** 35:9 | **guarantee** 15:21 |
| **guess** 34:17 | **guide** 4:3 |
| **guideline** 4:16 | **guilty** 17:4 |
| **gun** 39:15 | **gunman** 39:11,12 |

**H**

| | |
|---|---|
| **Hampton** 2:9 26:2 28:17 35:13 | **hand** 19:1 52:9 |
| **hands** 5:18 | **Hanover** 33:20 34:5 |
| **happen** 37:11 | **happening** 44:3 |

235

| | |
|---|---|
| **happy** 27:20 | **hard** 14:15,15 |
| **Harrisonburg** 25:18,22 | **headed** 39:14 |
| **Heading** 13:10 | **heal** 4:5 |
| **Health** 7:8,10 49:21 | **heard** 26:19 35:22 39:9 |
| **hearing** 11:3 | **Heavenly** 3:15 |
| **Heights** 2:5 3:14 47:19 48:13,20          49:5 50:10,15,22 51:4 | **held** 24:6 37:7,9 52:4 |
| **help** 16:4 | **Helsel** 7:4,9 |
| **Henrico** 2:7 8:7,19 10:6 13:4 16:17 20:1 | **Herring** 37:10 |
| **High** 31:21 39:19 | **hold** 50:1 |
| **home** 21:22 | **homes** 4:10 5:22 |
| **honor** 28:13,19 30:4,5 30:11,13,14 40:12,14,17,20 42:4 | **hope** 10:2 26:1 33:4,5 33:8,12,14 40:17 44:18 45:21 |
| **hours** 10:22,22 14:7 18:18 21:14,20 22:22 27:3 | **House** 1:9 3:1,4 6:8,16 6:17 7:2,15,17 7:20 8:3,12 9:9 9:16 10:14 12:2 12:4,17,17 13:9 13:17 17:4,14 18:9 21:3,12,12 24:5,14,22 25:14,18 28:3 28:18 29:19 34:17,18 35:18 39:7 40:3,14,19 41:8,13 42:4,7,9 42:17 43:16 44:21 45:1 46:17 47:10,12 47:15,21 48:13 49:5,10,12,14 49:22 50:1,3,5 50:12,15 51:1,4 51:9,11 |
| **houses** 14:2 | **Howell** 7:12 |
| **Hudson** 12:6 | **humbly** 4:8 |
| **hundreds** 9:17 | **Hurley** 1:22 52:2,14 |

236

## I

| | |
|---|---|
| **idea** 16:3 | **ignore** 14:9,9 18:20 |
| **ignored** 18:16 | **impact** 43:7 |
| **implement** 4:12 | **important** 12:5 21:5 22:18 44:22 46:6 |
| **impressive** 11:7 | **inaudible** 32:20 |
| **includes** 13:10 | **indicating** 6:10 |
| **individual** 30:11 | **individually** 11:5 |
| **individuals** 23:22 24:12 | **indivisible** 5:10 6:6 |
| **injustice** 26:19 | **ink** 16:10 |
| **inquiry** 48:16 | **institutional** 17:10,15 |
| **Institutions** 7:8,10 | **intention** 39:12 |
| **interest** 11:13 14:16 15:2 | **interested** 19:22 21:18 |
| **interests** 14:1 | **intern** 11:22 |
| **introduce** 7:18,21,22 8:2,15 8:20 25:4 29:11 31:5,9,20 32:3 32:18,21 33:9 33:14 34:7 39:21 40:4 41:14 46:18,22 | **introduced** 42:18 44:7 |
| **introducing** 25:1 | **introduction** 10:9,13 25:11 29:6 32:13 34:3 |
| **invite** 9:10,16 10:4 30:16 | **involved** 20:18 |
| **iota** 14:11 | **Iraq** 39:14 |
| **Island** 29:21 | **issues** 3:22 |

## J

| | |
|---|---|
| **J** 7:12 | **Janis** 8:7,8,11,19 |
| **Jeion** 2:9 | **jettison** 14:19 |
| **job** 1:20 11:14 12:15 19:6 | **jobs** 27:6 |
| **Joe** 2:7 35:22 36:9,12 | **John** 2:6 |
| **join** 9:17 10:2 26:20 | **joined** 9:20 |

237

| | |
|---|---|
| **joining** 28:5 | **Jones** 2:8 19:18,19,22 36:19 37:1,13 37:18 38:5,19 42:18 43:10 |
| **Journal** 6:17 | **Jr** 2:13 7:4,7,9 |
| **judges** 18:18 | **jumping** 44:14 45:4 |
| **justice** 5:2,10 6:7 26:21 27:5 28:11,15 35:11 37:6 | |

**K**

| | |
|---|---|
| **Karen** 11:20 25:15 | **Kate** 11:21 |
| **Kayla** 11:20 | **Kidd** 10:15 11:8 20:16 |
| **killed** 26:15 39:10 | **killing** 39:12 |
| **kind** 26:16 44:2 | **King** 26:8,10,19 27:6 28:10,14,20 |
| **King's** 26:12 | **Kirkland** 2:5 |
| **know** 4:15 12:21 14:22 15:12 16:10,16 16:20,20,21 17:21 18:4 21:1 22:21 27:18 36:22 38:8,12 38:16,19 43:7,9 44:6 45:9 48:3 | **knowing** 5:18 42:14 |
| **knowledge** 17:10,16 46:4 52:7 | **Kudos** 18:11 |

**L**

| | |
|---|---|
| **L** 7:7 | **labor** 28:6 |
| **ladies** 9:9 10:14 11:6 12:14 25:13 28:2 29:18 41:7 | **laid** 21:4 42:16 |
| **land** 27:17,20 | **late** 20:4 22:4 |
| **Lauch** 12:7 | **Laughter** 16:13 |
| **launch** 29:21 30:4,9,15 | **law** 12:11 |
| **leader** 17:7,14 | **leaders** 18:3 |
| **learn** 9:12 13:9 | **learned** 42:11 |
| **learning** 13:1 | **leave** 43:19 44:20 |

238

| | |
|---|---|
| **leaving** 17:12 | **led** 3:9,13 |
| **left** 20:10 | **legislative** 3:19 5:7 9:12 |
| **legislator** 4:9 5:16 | **legislators** 3:18 5:21 44:4 45:22 |
| **let's** 15:9 36:7 | **Lewis** 2:13 29:2,3,5,10 29:18 |
| **lexicon** 13:10 | **liable** 15:7 |
| **liberty** 5:10 6:7 | **Libya** 16:16 |
| **lies** 23:7 | **Lieutenant** 9:21 |
| **life** 27:13 28:4,15 | **line** 16:16 23:10 35:1 36:18 |
| **lines** 37:2 42:12,21,22 43:2 | **Lionell** 2:10 |
| **Lipitor** 12:7 | **listen** 20:1 22:2,5 24:11 43:10 |
| **listening** 14:15 18:14 | **little** 17:12 36:1 |
| **live** 4:2 5:14 27:13 35:4,7 36:10 43:19 45:11,15 | **lives** 28:21 |
| **located** 25:17 | **long** 27:13 |
| **Longevity** 27:14 | **look** 16:8 18:5 20:7,12 20:14 45:1,19 46:8,8 |
| **looked** 20:3,19 22:22 27:17 | **lookout** 38:9 |
| **looks** 16:7,10 46:3 | **Lord** 28:1 |
| **Lorenz** 11:21 | **losing** 18:7 |
| **loss** 23:4,8,10 | **lost** 28:14,20 35:19 |
| **lot** 42:11 43:4,6,19 45:9 | **lots** 18:8 |
| **Lou** 37:7 | **Loupassi** 8:13 19:17 24:17 24:18,21 25:3 |
| **love** 4:14 | **Luther** 26:8 28:20 |
| **Lynchburg** 23:9 | **Lynwood** 2:13 |

239

**M**

| | |
|---|---|
| **M** 2:5 | **magnificent** 11:14 12:15 |
| **main** 37:5 | **maintain** 43:21 |
| **majority** 14:1 35:14,19 | **making** 43:17 |
| **man** 27:21 | **management** 16:12 |
| **manager** 15:22 | **manifest** 4:22 |
| **map** 19:13 36:1 | **March** 7:1 39:7 |
| **marches** 28:8 | **marching** 11:9 |
| **markedly** 14:4 | **Martin** 26:8 28:20 |
| **Mary** 12:9,11 20:11 | **Maryland** 52:18 |
| **Mason** 12:4 | **Massie's** 16:15 |
| **mate** 16:4 | **matter** 20:4 27:10 |
| **mean** 16:15 | **Medal** 30:5,11,12,14 |
| **meet** 7:15 47:10,14 48:5 50:2,5 | **meeting** 36:2 47:11 50:1 |
| **meetings** 7:13 47:8 49:17 | **meets** 49:19,21 |
| **member** 15:8 24:3 | **members** 3:2,8 5:21 6:9 7:18,22 8:11 9:16 14:16,21 15:12 17:17 21:16 23:22 30:13 34:16 36:4 37:15 39:6 42:3,6,6,8 49:15 |
| **members's** 14:16 | **memorial** 7:19,21 8:1 25:1 25:4 32:14,15 32:19,22 33:9 33:15 34:4,7 39:22 40:4 |
| **memory** 28:14,19 40:12,14 40:20 | **Memphis** 26:11 |
| **men** 4:15 | **methods** 4:12 |
| **Mid-Atlantic** 29:20 | **mightily** 12:16 |
| **Mills** 24:6 | **mind** 27:12 |

240

| | |
|---|---|
| **mine** 20:17 24:4 27:22 | **minority** 17:7,14,17 18:3 36:3,5,6,14,21 37:4,8,10,12 43:16 |
| **minus** 20:21 22:14 | **minutes** 47:10,11 |
| **model** 45:19 | **moments** 14:6 |
| **Monday** 1:11 7:13 47:9 | **Monroe** 39:19 |
| **months** 26:12 | **morning** 9:10,14,18 10:8 20:12 49:18 50:3 |
| **Morrissey** 2:7 10:7,8,12 13:5,8 16:14 35:22 36:9,12 | **motion** 8:9,21 24:19 25:5 25:8 28:22 29:1 29:13 31:2,12 31:14,17 32:4 32:10,21 33:6 33:16,22 34:8 34:11 39:20 40:1,5,8,22 41:1 41:5,17,20 46:15 47:1,4,22 49:6,9 50:17,21 51:5,8 |
| **motions** 6:18 39:4 47:5 | **mountain** 27:16 |
| **mountaintop** 27:7,12 | **move** 28:12 41:8 43:19 46:5 47:20 50:11 51:1 |
| **movement** 43:22 | **moves** 28:18 29:11 34:6 40:3,19 41:13 48:13 49:5 50:15 51:4 |
| **MSNBC** 39:9 | |

**N**

| | |
|---|---|
| **N** 2:1,2 3:9 | **NAACP** 28:7 |
| **name** 30:10 | **nation** 3:16 4:1 5:5,9,9 5:14 6:6 28:4 |
| **national** 5:8 30:2 39:17 | **neat** 43:2 |
| **neck** 17:12 | **need** 14:18,19 36:4,8 37:14 45:6 |
| **needs** 5:21 21:1 | **never** 26:9 |
| **new** 15:15 16:20 17:11 | **Newport** 23:8 35:15 |

241

| | |
|---|---|
| **news** 15:18 23:8 35:15 39:7,9 | **nice** 43:2 |
| **Nick** 12:6 | **night** 20:5,10 |
| **noble** 19:8 | **nonpartisan** 19:7 |
| **noon** 49:2 50:13,17 51:9 | **Norfolk** 35:4 |
| **Norment** 17:8 | **northern** 17:12 |
| **nose** 13:11 | **Notary** 52:17 |
| **Number** 36:3 | **numbers** 35:10 |
| **numerous** 25:16 | |

**O**

| | |
|---|---|
| **O** 2:12 | **objection** 35:6 |
| **obligation** 19:5 24:9 | **observed** 11:1 |
| **obvious** 23:11 | **offer** 41:9 |
| **Office** 29:22 | **offices** 4:10 |
| **Oh** 11:18 | **Okay** 29:9 |
| **old** 40:15 | **one-man** 22:15 |
| **one-person** 21:8 22:19 | **one-vote** 21:8 22:15,19 |
| **online** 23:19 | **open** 45:22 |
| **Operationally** 29:22 | **opponents** 18:3 |
| **opportunity** 19:9 35:17 | **opposed** 9:2 25:7 29:15 31:14 32:6 33:2 33:18 34:10 40:7 41:19 47:3 49:9 50:20 51:7 |
| **options** 44:8 | **order** 3:1 6:8,19 43:21 49:14 |
| **orders** 11:9 14:22 16:5 | **organization** 9:13 |
| **organizations** 28:7 | **original** 5:4 |
| **overarching** 21:6 | **O'Boyle** 12:6 |

**P**

| | |
|---|---|
| **P** 2:1,1 | **Pacific** 16:19 |
| **Packers** 15:20,22 | **Pages** 1:21 |
| **Palazzo** 11:20 | **Parker** 34:20 |
| **parliamentary** 48:15 | **parochial** 14:2 |

242

| | |
|---|---|
| **part** 13:10 21:14 39:17 44:17 45:3 | **participated** 10:16,20 |
| **parties** 14:2 | **partisan** 16:22 19:12 |
| **parts** 23:3 35:14 | **party** 19:8 24:4 38:1 |
| **pass** 44:20,22 | **passed** 44:10 |
| **passes** 48:8 | **pastor** 3:10,15 |
| **patron** 21:13,13,20 | **pause** 3:16 |
| **peace** 3:21 5:1 13:12 | **people** 14:14 18:21 22:5 22:7 24:9 27:19 28:4,5 36:19 38:13 43:18 |
| **people's** 13:14,20 14:5,8 19:6,13 | **percent** 20:22 22:14 45:7 45:8,13,14,16 45:16 |
| **percentage** 45:12 | **perfect** 43:22 44:13 |
| **perfectly** 43:5 | **period** 10:3 |
| **permission** 8:14 | **person** 33:11 36:15 |
| **personal** 10:10 13:6 19:19 26:4 29:7 34:14 42:1 | **persons** 3:5 |
| **Petersburg** 2:11 23:8 41:21 45:11 | **place** 5:6 12:1,4,12 27:14 |
| **plan** 12:2,12 18:5,12 18:19 19:2 20:14 21:12,15 23:1,18 24:1,13 37:17 38:3,21 42:17 43:12 44:20 | **planned** 12:6 |
| **plans** 14:10,12 15:3 19:3 20:3,6,8,13 20:14,20 22:22 | **play** 23:6 46:2 |
| **please** 3:2,6 4:19 28:22 30:19 32:22 40:22 49:15 | **pleased** 25:21 45:3 |
| **pledge** 3:11 6:4 18:15 | **plenty** 48:4 |
| **plus** 20:21 22:14 | **point** 10:10 13:6 19:19 26:4 29:7 34:13 42:1 |
| **ponder** 22:21 | **population** 23:5,7,11 45:8 |

243

| | |
|---|---|
| **populations** 43:20 | **Port** 29:20 |
| **portico** 9:18 | **Portsmouth** 35:5 |
| **pray** 3:17,18 | **prayer** 3:9 9:19 28:8 |
| **precincts** 14:19,20 15:10 44:1 | **predominantly** 45:12 |
| **presence** 3:19 4:22 6:10 | **present** 2:4 4:9 6:15 |
| **presentations** 11:1,2 | **preserved** 11:13 |
| **Press** 49:20 | **pretty** 13:1 23:11 43:2 |
| **prevail** 5:2 | **previous** 36:2 |
| **principle** 21:7 | **principles** 5:2 |
| **privilege** 3:17 10:10 13:6 19:20 26:4 29:8 34:14 | **privileges** 3:6 7:14 14:14 15:8 42:1 47:13 |
| **pro** 48:6,10 | **probably** 11:4 12:22 |
| **problems** 3:22 | **proceed** 10:11 |
| **proceedings** 52:4,9 | **process** 11:1 20:18 22:8 42:11 44:12,13 |
| **Professor** 10:14 11:8 20:16 | **program** 10:21 |
| **promise** 18:15 | **promised** 20:8 27:17,20 |
| **protect** 5:15,19,20 | **protect-the-inc...** 14:3 |
| **proud** 44:17 | **provide** 4:13 5:20 |
| **provisions** 7:17 | **psychiatrists** 16:11 |
| **public** 17:19,20 18:4 24:1 52:17 | **pulled** 39:15 |
| **purpose** 8:8 10:9 24:19,22 25:11 | **pursuant** 6:16 7:17 |
| **put** 14:10 21:14 | **P&E** 14:21 21:3 48:3 |
| **p.m** 7:15 47:14,21 49:6,11 | |

**Q**

| | |
|---|---|
| **quarterback** 15:21 | **quarterbacks** 16:1 |
| **Quentin** 10:15 | **question** 36:17 37:1,12 |

244

| | |
|---|---|
| **questions** 23:18 24:12 | **quorum** 6:15 |
| **quote** 27:11 | |

**R**

| | |
|---|---|
| **R** 2:1,11 52:1 | **race** 14:17 |
| **rains** 26:16 | **raise** 18:22 |
| **raises** 15:19 | **rallies** 28:8 |
| **reach** 43:8 | **read** 21:3 |
| **realities** 45:17,18 | **realize** 18:6 |
| **really** 21:1 26:10 37:21 | **Reapportionme...** 42:8 |
| **reason** 48:5 | **reasonableness** 46:5 |
| **received** 30:7,12 | **recess** 47:10,11,21 48:6 48:14 49:5,10 |
| **recessed** 49:13 | **recipients** 30:5 |
| **recognized** 27:8 | **reconvene** 50:12,16 |
| **recording** 52:3 | **redistricting** 1:10 11:3,10 13:18,18 18:12 34:19 42:7,11 |
| **redraw** 10:18 | **regards** 4:18 |
| **Regional** 29:20 | **related** 43:15 |
| **remain** 3:11 | **remember** 16:5  26:10 38:14 38:14,17 |
| **removed** 7:7 | **renewed** 5:1 |
| **Reporter** 52:2 | **reports** 39:17 |
| **represent** 22:7 | **represented**        22:16 35:13 |
| **republic** 6:5 | **Republican** 14:18 15:10 38:8 42:21 50:2 |
| **Republicans**  17:5  18:9 35:20 | **request**  4:8  5:19  8:14 29:3,5 31:4 33:8 |
| **required** 43:22 | **requirements** 17:6 30:3 |
| **resignation** 7:3 | **resolution**      7:18,19,21 8:1,15  8:21  9:3  25:1,4 29:7,12,16 30:7 30:10,17 |

245

| | 31:5,9   31:9,20   32:3,7 32:15,19   33:3,9 33:10,15,15,19 34:4,7,11 39:22 40:4,11 41:10 41:15 46:19,22 |
|---|---|
| **resolutions** 6:19 32:14,22 47:5 | **respect** 10:13 |
| **respectfully** 44:16 | **respective** 14:12 |
| **response** 30:2 49:20 | **responsibility** 19:6 |
| **Responsive** 29:22 | **rest** 3:17 |
| **retire** 3:6 | **retired** 18:18 |
| **Rev** 2:2 | **Reverend** 3:9 |
| **reviewed** 19:1,2 | **ribbon** 18:12 |
| **Richmond** 8:13   11:19 19:16  21:21  24:17  25:2 35:13 | **right** 9:2   18:22   24:2 38:16 |
| **rights** 11:12 15:3 21:11 22:18 26:18 28:21 35:12 43:15 | **Rim** 16:19 |
| **rise** 3:8  8:8  9:5  10:9 24:19  25:10  26:3  29:1,3 31:1      31:17,19      32:9 33:5,8,21    34:13    39:3 40:22 41:4 41:22 46:14 | **Roads** 35:13 |
| **Roanoke** 35:14 | **Robinson** 12:13 |
| **Rock** 2:2 3:10 | **Rockingham** 2:12 25:9 |
| **Rodgers** 16:2 | **roll** 6:9,13,14 |
| **rolled** 23:3 | **room** 7:15   46:1   47:10 47:12,15    49:20    49:22 50:1,3,5 |
| **Rosalyn** 2:11 | **row** 43:3 |
| **Rule** 6:16,19 8:18 47:6 | **Ruritan** 31:6,11 |
| **Ryan** 40:15,21 | **R-26** 2:12 |
| **R-58** 2:14 | **R-66** 2:5 |

246

| | |
|---|---|
| **R-76** 2:8 | **R-78** 2:6 |
| **R.B** 2:14 | |

## S

| | |
|---|---|
| **S** 2:1,8 52:2,14 | **sad** 39:7 |
| **Sam** 12:13 | **sanitation** 26:14,20 |
| **sat** 21:16,20 | **satellite** 29:21 |
| **Saturday** 20:9 | **save** 23:14 |
| **saying** 35:15 | **School** 8:16 25:17 31:21 39:19 |
| **Science** 7:11 | **seat** 16:4 23:14 24:6 36:11,14,16 37:5,7,8,9,10,12 |
| **seats** 3:2 23:2,11 37:11 45:1 49:15 | **second** 9:15 15:17 46:2,7 |
| **Secretary** 30:1 | **secure** 5:12 |
| **security** 30:2 | **see** 11:18 18:7 26:12 26:16 37:11 44:12 46:3,9,9 46:10 |
| **seen** 27:17,22 | **selfish** 14:3 |
| **self-centered** 14:3 | **Senate** 13:18 17:4,8 18:22 |
| **senator** 34:20,20 | **senators** 9:22 |
| **senior** 3:10 | **sense** 4:11 |
| **sent** 19:2 | **Sergeant-at-Ar...** 3:3,4 |
| **serve** 5:17,21 13:9 24:10 42:6,8 | **service** 5:7 40:16 |
| **session** 1:8 3:5,19 5:7 48:6,11 | **set** 18:16 |
| **setting** 18:11 | **settlement** 5:5 |
| **settlers** 5:13 | **Shame** 14:12 |
| **Shifting** 43:20 | **short** 10:3 35:8 |
| **shortly** 13:17 | **shot** 39:15 |
| **show** 45:8,10 | **showed** 43:19 |

247

| | |
|---|---|
| **side** 17:3 21:16,17 37:16 41:8 42:13 43:9 45:22 | **sides** 43:7 |
| **sign** 30:16 | **Sincerely** 7:12 |
| **singing** 22:11 | **sir** 6:22 24:18 47:8 49:17 |
| **six** 42:6,8 | **Slater** 11:20,22 |
| **slippery** 13:11 | **slope** 13:11 |
| **society** 5:3 | **software** 42:15 46:2,8 |
| **soldiers** 39:13 | **solitary** 28:10 |
| **solutions** 3:22 | **Somalia** 30:6 |
| **somebody's** 15:6 | **sounds** 17:1 |
| **Space** 29:20,22 | **speak** 47:22 |
| **Speaker** 3:8 6:8,13,15,16 6:22 7:1,12,13 7:16 8:4,6,10,11 8:18 9:2,5,7,8 9:15 10:5,6,8,11 10:12,13 11:6 11:15,19,22 12:14,20 13:5,6 13:7,8,16 14:13 15:9 19:5,8,15 19:16,19,21,22 24:14,16,18,20 24:21 25:2,7,10 25:12,13,21 26:3,5,6 28:2,12 28:16,17 29:3,4 29:5,8,9,15,18 30:20,21 31:1,3 31:7,14,18 32:1 32:6,9,11,12,15 32:17 33:2,5,7 33:11,13,18,21 34:1,2,5,10,13 34:15,16 36:5 36:17,20 38:11 38:16,22 39:1,3 39:5,6,20 40:2,7 40:10,18 41:4,6 41:7,12,19,22 42:2,3 46:12,14 46:16,17,20 47:3,8,13,16,18 47:20 | **Speaker's** 49:19 |

248

| | |
|---|---|
| 48:1,2,12 48:15,17,19,20 49:2,3,4,9,14,17 50:2,4,7,9,11,14 50:20 51:1,3,7 | |
| **speaking** 14:11 27:4 | **special** 1:8 15:14 |
| **speech** 17:1 | **spend** 22:1 |
| **spent** 21:20 22:22 | **split** 44:2 |
| **spoke** 15:8 36:2,13 | **spoken** 11:2,4 |
| **Spotsylvania** 30:22 31:8 | **Spruill** 2:10 34:12,13,16 |
| **Sr** 2:10 | **St** 8:16 |
| **staff** 5:16,21 20:5 | **stand** 11:17 28:9 45:22 47:21 48:13 49:5 |
| **standard** 4:20 | **standards** 4:19 |
| **standing** 3:11 | **standpoint** 48:3 |
| **stands** 6:6 49:10 51:9 | **state** 8:10 18:19 24:20 29:4 31:18,22 32:11 33:7 34:1 39:5 46:16 48:17 52:18 |
| **States** 3:12 6:5 | **statistically** 42:15 |
| **statistics** 45:10,19 | **stepped** 36:15 |
| **stood** 49:12 51:11 | **stretched** 17:9 |
| **stretches** 17:11 | **string** 23:13 |
| **strong** 43:17 | **students** 10:15,20 11:4,18 12:1,3,8,8,11,15 12:21 14:6 16:9 17:7 19:3 20:3 20:18 25:22 |
| **student's** 20:6 | **subsequent** 7:4 |
| **successfully** 4:12 | **Suffolk** 2:8 17:11 19:18 35:5 |
| **Summerduck** 31:6,10 | **Super** 15:20 |
| **supplemental** 48:8 | **supposed** 15:16,17 16:22 21:22 |

249

| | |
|---|---|
| **supposedly** 20:13 | **sure** 15:3 23:1 35:16 43:17 44:9 48:4 |
| **surround** 5:18 | **surviving** 30:14 |

**T**

| | |
|---|---|
| **T** 52:1,1 | **Tackle** 49:21 |
| **take** 3:2 4:21 17:7 36:11 49:15 | **taken** 4:7 |
| **talking** 35:12 44:3 | **task** 12:22 |
| **teacher** 46:19 | **team** 8:17 31:22 44:18 |
| **teams** 11:15 | **Technology** 7:11 |
| **tell** 16:6 17:19 22:13 37:19 42:10 43:18 | **tent** 13:12 |
| **terms** 40:11 | **terror** 30:6 |
| **thank** 3:16 8:6,11 9:8 10:5,12 13:5 19:15 22:20 24:14,16 26:3,6 28:16 30:20,21 31:1 32:9 33:5 38:22 40:17 41:4,22 46:11 49:3 | **they'd** 43:3 |
| **thing** 8:18 15:14,19 19:11 21:5,10 24:2 32:19 | **things** 22:21 23:13 35:8 43:13 44:3 44:4 |
| **think** 17:18 21:6,10,21 22:8,13 23:15 24:7 43:1,3 44:13,21 46:3 | **third** 39:16 |
| **Thomas** 7:3 12:10 17:8 | **thought** 24:2 |
| **thousands** 14:7 | **three** 15:10 23:11,21 38:11 |
| **throw** 43:11 | **time** 10:3 13:2 18:19 21:18 22:1 24:15 26:1 34:19 35:6 48:5 48:21 50:4,6 |
| **times** 4:2 | **timing** 48:2 |
| **today** 3:21 4:1 7:6 11:16 13:3 18:8 22:4 25:14,17 | **told** 11:9 |

250

| | |
|---|---|
| 25:22 26:6 28:2 28:13,18 40:19 50:12,16 | |
| **Tom** 34:21 | **tomorrow** 9:9 49:1 50:13,16 51:10 |
| **tonight** 22:4 27:19,20 | **Tony** 2:12 |
| **torrential** 26:16 | **Toscana** 41:3,4,7,13 |
| **transcribed** 1:22 52:3 | **transcript** 52:7,8 |
| **tremendous** 17:10,15 | **trending** 43:18 |
| **tried** 26:15 38:2 43:8 | **trip** 26:20 |
| **truck** 26:15 | **true** 37:5 52:8 |
| **truly** 42:19 44:12 | **truth** 37:20 |
| **try** 4:6 22:5 23:14 30:18 37:1 | **trying** 20:5,12,22 21:14 37:13 38:20 |
| **Tuesday** 23:19 24:1 49:18 | **Turbulent** 4:2 |
| **turned** 39:8 | **tweaks** 24:12 |
| **two** 9:6 11:1 13:16,19 14:17 17:17,21 22:9 26:12,13 32:13,19,22 34:20 38:11 39:3,16 | **Tyler** 37:8 |

**U**

| | |
|---|---|
| **U** 16:19 | **unanimous** 7:20 8:2,14,20 24:22 25:3 29:6 29:11 30:8 31:4 31:8,19 32:2,13 32:18 33:8,14 34:3,6 39:21 40:3 41:9,14 46:18,21 |
| **undergraduates** 12:9 | **understand** 22:17 40:10 |
| **understanding** 35:8 | **understands** 17:20 |
| **unfair** 22:8 | **unfamiliar** 11:8 |
| **unintelligible** 16:18 39:14 45:14 | **United** 3:12 6:4 |
| **University** 10:17 11:19 | **upset** 37:21 |

251

| | |
|---|---|
| **use** 13:13 38:18 | **utterly** 18:20 |

**V**

| | |
|---|---|
| **vacuum** 44:5 | **Valley** 13:12 |
| **vast** 3:22 35:14 | **verbiage** 13:13 |
| **version** 20:6 | **vigils** 28:8 |
| **vinegar** 17:2 | **Virginia** 1:9 2:2 3:10 6:2 9:20 10:17 22:6 23:10 25:18 42:16 |
| **Virginian** 40:16 | **Virginians** 9:17 |
| **visiting** 25:22 | **voice** 22:9 26:22 |
| **vote** 18:6 22:9 38:3,21 45:10 | **voting** 6:10 11:12 15:3 21:11 22:18 43:15 45:7 |

**W**

| | |
|---|---|
| **W** 2:13 | **walks** 28:4 |
| **Wallops** 29:21 | **want** 18:2 22:21 27:15 27:18 30:18 35:16 36:5,11 37:19 38:12,17 48:4,7 |
| **wants** 30:16 | **war** 30:5 46:1 |
| **Ward** 2:9 17:14 26:2,3 26:6 28:18 | **warm** 12:17 25:19 |
| **Wasn't** 42:12 | **Watch** 15:4 |
| **watched** 14:1 | **way** 43:5 |
| **Wednesday** 9:18 10:4 | **week** 20:9,14 |
| **welcome** 12:18 25:19 | **Welfare** 7:8,10 |
| **went** 12:21 14:16 15:7 15:12,13 39:13 44:4 | **West** 9:10 23:9 |
| **we'll** 9:20 36:16 48:9 | **we're** 18:5 21:10 35:20 44:15 45:18,19 |
| **we've** 24:8 27:8 | **white** 26:18 36:20 |
| **William** 7:12 12:8,11 20:11 39:19 | **willing** 43:10 |
| **Wilt** 2:12 25:9,10,13 | **winner** 30:14 |

252

| | |
|---|---|
| **winners** 30:11 | **winning** 11:15 |
| **wisdom** 3:21 | **wish** 7:22 |
| **Women's** 49:21 | **won** 12:1,4,11 15:20 |
| **wonder** 18:21 | **Wonderful** 18:13 |
| **wondering** 17:16 | **word** 16:18 39:14 45:14 |
| **words** 17:21 32:20 | **work** 12:21 23:1 35:17 38:2 |
| **worked** 11:22 14:15,15 20:11 | **workers** 26:14,17,21 27:5 |
| **working** 44:7 45:20 | **workplace** 26:18,22 28:11,15 |
| **works** 46:9 | **world** 35:2 |
| **worried** 27:21 | **worry** 5:17 |
| **wrestling** 8:16 | **wrong** 14:13 |

**Y**

| | |
|---|---|
| **yap** 38:13,13 | **year** 29:20 41:11 46:19 |
| **years** 14:17,18 19:12 21:7,7,7 22:9,10 22:17 41:15 42:12 45:2 | **yesterday** 20:11 22:3,11 |
| **young** 16:1 | **Youth** 49:22 |

**Z**

| | |
|---|---|
| **Zach** 39:10 1822 | **Zachary** 40:1521 |

**1**

| | |
|---|---|
| **1** 1:21 22:14 36:3 50:3 | **1st** 26:13 |
| **1,000** 10:22,22 | **10** 21:7 42:12 45:1 |
| **10:00** 20:4 50:3,5 | **100** 19:12 45:1,13,16 |
| **12** 43:16,21 | **12:00** 50:13,17 51:9 |
| **140** 10:18 | **15** 11:4 |
| **150** 10:20 | **1965** 43:15 |

253

**2**

| | |
|---|---|
| **2** 47:10,12 50:5 | **2nd** 39:7 |
| **2:00** 20:12 | **20** 20:22 21:7 22:17 52:16 |
| **20th** 29:19 30:4 | **200** 21:14 |
| **200-plus** 41:11,15 | **2007** 30:1 |
| **2008** 39:19 | **2011** 1:8,11 6:18 7:2 39:8 52:5 |
| **2015** 52:10 | **2018** 52:16 |
| **21-year** 40:15 | **24** 27:3 |
| **27th** 6:18 | |

**3**

| | |
|---|---|
| **3** 6:16 9:10 | **3rd** 17:13 27:3 |
| **30** 14:10 19:3 21:7 47:10,11 | **35** 19:3 |
| **39** 6:19 47:6 | |

**4**

| | |
|---|---|
| **4** 1:11 | **4rd** 52:9 |
| **4th** 7:14 52:4 | **4:00** 7:15 47:14 48:3 |
| **40** 45:14 | **42rd** 26:7 |

**5**

| | |
|---|---|
| **5th** 49:18 | **50th** 31:5,10 |
| **5001** 21:12 | **5002** 7:18 |
| **51** 1:21 | **55** 45:6,8 |

**6**

| | |
|---|---|
| **60** 45:16 | **69** 8:18 |

**7**

| | |
|---|---|
| **7th** 25:15 | **7:00** 48:14 |
| **7:30** 9:10 | |

254

**8**

| | |
|---|---|
| **8:00** 47:21 48:6,17,21 49:6,11,19 | **8:30** 20:9 |
| **80s** 34:17 37:22 | **82096** 1:20 |

**9**

| | |
|---|---|
| **9th** 7:1 | **9:00** 49:21 50:1 |
| **9:30** 9:19 | |

255

COMMONWEALTH OF VIRGINIA HOUSE OF
DELEGATES CONDUCTED ON TUESDAY,
APRIL 5, 2011

2011 SPECIAL SESSION I
VIRGINIA HOUSE OF DELEGATES
REDISTRICTING FLOOR DEBATES
Tuesday, April 5, 2011

Job#: 81659
Pages 1 - 174
Transcribed by: Daphne Hurley

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

[2] APPEARANCES

Before the Honorable

    BETSY B. CARR

DELEGATES PRESENT:

    David L. Englin - Alexandria (D-45)
    Robert G. Marshall - Prince William (R-13)
    Ward L. Armstrong - Henry (D-10)
    Brenda L. Pogge - James City County (R-96)
    Adam P. Ebbin - Alexandria (D-49)
    David Albo - Fairfax (R-42)
    Mark L. Cole - Spotsylvania (R-88)
    Roxann L. Robinson - Chesterfield (R-27)
    S. Chris Jones - Suffolk (R-76)
    Joe Morrissey - Henrico (D-74)
    Lionell Spruill, Sr. - Chesapeake (D-77)
    Patrick A. Hope - Arlington (D-47)
    Rosalyn R. Dance - Petersburg (D-63)
    M. Kirkland Cox - Colonial Heights (R-66)
    Jennifer McClellan - Richmond City (D-71)

256

[3] SPECIAL SESSION

MR. SPEAKER: The House will come to order. Members, please take your seats. Sergeant-At-Arms.

SERGEANT-AT-ARMS: The House of Delegates is now in session. All persons not entitled to privileges of the floor, please retire to the gallery.

MR. SPEAKER: The Members will rise and be led in prayer by the Honorable Betsy B. Carr, the gentlewoman from Richmond City, and remain standing for the Pledge of Allegiance to the flag of the United States of America, which will be led by the gentleman from Colonial Heights, Mr. Cox.

DEL. CARR: Let us pray. Gracious Creator, thank you for bringing us together this day. Thank you for the opportunity, opportunity of serving you through those to whom we are the servants. We come from many places. We have many viewpoints. We are many members of one body that exist for our one Commonwealth.

Please keep us ever mindful that contained in [4] all the members of the body are the talents and gifts necessary to make this body healthy and whole. In this oldest legislative body in the western world the mace has been brought forward and placed in its cradle.

As we prepare to deliberate the matters before us we are heirs and beneficiaries of the legacy of leaders such as James Madison and Thomas Jefferson. While our actions today may not be equally notable in history, the energy and intent and spirit with which we carry out our work will be.

Please be with us here as we strive to do your will for the benefit of the people who have entrusted to us

257

the responsibility of representing them. In your name, we pray. Amen.

DELEGATES: Amen. I pledge allegiance to the flag of the United States and to the republic for which it stands, one nation, under God, indivisible, with liberty and justice for all.

MR. SPEAKER: The members will answer the roll call by indicating their presence on the [5] electronic voting board.

The Clerk will close the roll. The Clerk will close the roll.

THE CLERK: Mr. Speaker, a quorum is present.

MR. SPEAKER: Pursuant to House Rule 3, I've examined and approved the Journal of the House of Delegates for April 4th, 2011. Motions and resolutions under Rule 39 are now in order.

Does the Clerk have any announcements or communications?

THE CLERK: No, sir, Mr. Speaker.

MR. SPEAKER: The gentlewoman from

Chesterfield, Ms. Robinson.

DEL. ROBINSON: Mr. Speaker, I rise for a request.

MR. SPEAKER: The gentlewoman may state it. DEL. ROBINSON: I request the House give an unanimous consent for a memorial resolution. MR. SPEAKER: The gentlewoman from

Chesterfield moves the House grant unanimous consent for the introduction of a memorial resolution. As many that favor that motion will [6] say "Aye."

DELEGATES: Aye.

258

MR. SPEAKER: Those opposed, "no." That motion is agreed to.

The gentleman from Alexandria, Mr. Englin. DEL. ENGLIN: Mr. Speaker, I rise for point of personal privilege.

MR. SPEAKER: The gentleman has the floor.

DEL. ENGLIN: Mr. Speaker, Ladies and Gentlemen, I know that redistricting is what's on everybody's minds right now, but, but there are other arguably even more important issues facing the Commonwealth and one of those issues is the issue of adoption.

This morning we had a press conference responding to the Governor's proposal on another controversial issue related to abortion and I'll just say a word about that and you'll see how they connect.

Those of us who support a woman's right to choose and those of us who are Pro Life, one of, one of the areas where I think we can come [7] together and agree on is the idea that if we promote adoption then it's a way to reduce abortion. That ought to be something that we come together on and agree on.

Well, I was surprised to see that some of the groups that call themselves Pro Life are urging Governor McDonnell to overturn a rule that has been in the making – it is not yet a rule, but it is a rule that the Board of Social Services is in the process of developing related to who may or may not adopt in Virginia and this proposed rule would enable unmarried couples to adopt, even if that unmarried couple happens to be gay or lesbian.

In addition to the abortion issue, there are 5,815 foster children in Virginia right now. I, I called Social

259

Services and got the exact number as of March 1st, 2011. 5,815 young men and women in Virginia in foster care; everyone of whom has a right to a permanent family, a permanent loving home with a parent or parents who will take care of them, raise them, nuture them and help them [8] become productive adults and members of our society.

Even beyond that these are families that can help them into adulthood. All of us, even as adults, need the support of a parent and a permanent family. 5,815 children right now in Virginia who have a right to a permanent family. So why on earth would we deny them the ability to have that permanent family merely because the perspective parents are gay or lesbian?

Mr. Speaker, Ladies and Gentlemen, I ask you to think about your own relationships in your own life. Maybe you have a niece or a nephew who is gay. Maybe you have a brother or a sister who is guy or lesbian. Maybe an aunt or an uncle. Think about those individuals who you know and who you care about. Do you think that because they are gay or lesbian they would not be a fit parent? That's what these groups are arguing.

Fortunately, there's still time for a good outcome. Governor McDonnell has an opportunity to do the right thing. I read in the paper today his [9] spokesperson said that Governor McDonnell supports adoption. I believe that to be true. And that he supports the idea of letting a single person adopt where it's appropriate.

I think it is critical that we have systems in place to make sure that children are being adopted into families where they will – with their appropriate family where they will have the loving, nurturing

260

home they deserve. But this is a message that I'm sending out there to Governor McDonnell, and to anyone, who thinks that adoption needs to be something that we make available to prevent abortion and to ensure that these young men and women in foster care have homes into which they can be adopted.

Governor McDonald, I'm urging you, please, keep this proposed rule in place. Don't bow to the groups that are trying to focus on these controversial social issues instead of dealing with the needs of 5,800, 5,815 young men and women in Virginia in foster care who have a right to a permanent home. Those children don't care whether [10] the prospective parents are gay or lesbian and neither should we. Thank you, Mr. Speaker.

MR. SPEAKER: The gentleman from Prince William, Mr. Marshall

DEL. MARSHALL: Points of personal privilege, Mr. Speaker.

MR. SPEAKER: The gentleman has the floor.

DEL. MARSHALL: Thank you very much. Mr. Speaker, today I filed a brief in Virginia versus Sebelius, an amicus brief in support of the efforts of the Attorney General to challenge the Obamacare mandate.

We did say a few things that are different than what the Attorney General had. He organized from the point that because the Obamacare mandate requiring that everybody purchase health insurance by the federal government mandate or a plan approved, he said it was unconstitutional. I agree. He said, therefore, the entire Obamacare should fall down.

261

We argued the converse. We said the entire [11] effort is unconstitutional on the part of the Congress; therefore, the mandate should fall.

Let me tell you what we argued that the Attorney General did not. First we contended that Obamacare is not a constitutional regulation of commerce in which private business and individuals are engaged. In fact, the 1946 law forbids health insurance companies from competing in interstate commerce. But it is, Obamacare is a constitutionally impermissible government takeover of health care in which individuals are engaged in the wellness and health care businesses.

Two, we demonstrate how Obamacare is actually designed to work with the Secretary of Health actually functioning as if she were a CEO of a large corporation, making management and control decisions, rather than issuing government regulations.

Third, we presented to the court evidence that during the budget reconciliation process, and this was missed by a lot of people, by which Obamacare became law the Obamacare administration [12] slipped into here a public option which enables the government to go into the health care business on more favorable terms and compete with private insurers.

We made similar 10th Amendment claims that the Attorney General did, but we also point out that Obamacare will prevent individuals who seek medical care from homeopathy, acupuncture, herbal medicine or dietary supplements; therefore, violating their rights under the 9th and 10th Amendments.

How do we address the technical points that the federal government has made that the Attorney General has no right even to be in this court case? We

262

urge the court to go back to first principles of original intent as documented in the founding documents like the Federalist Papers.

We pointed out the following. The State government has a right to intervene on behalf of its citizens, not as parents patriate, but as covenant-bound to her sovereign citizens to defend them against an out-of-bounds federal government.

[13] Secondly, federal courts have a duty to apply relative principles of constitutional law and they cannot duck this. They govern the distribution of power between the federal and state and do so without partiality.

And I may add in closing, Mr. Speaker, that as an adoptive parent I found out about some regulations that started with the Kaine administration in December of 2009 and have been floating through the bureaucracy much to my surprise with no objections.

The point which the gentleman from Arlington missed is that these regulations would require churches, adoption agencies which have ethical or moral objections against the behavior of certain applicants to drop their objections and in fact place children with individuals who engage in behavior that is intrinsically disordered.

I find this an intrusion, Mr. Speaker, of the principles of religious liberty which are written on the wall right here behind me. Churches were in the adoption business, as it were, before the [14] State of Virginia existed. They should not be chased out of it by a requirement that they place children in foster care and for adoption with individuals whose behaviors constitute grave violations of the moral law.

263

MR. SPEAKER: The gentleman from Danville, Mr. Marshall.

DEL. MARSHALL: Mr. Speaker, I rise for request.

MR. SPEAKER: The gentleman may state it.

DEL. MARSHALL: Mr. Speaker, I ask for unanimous consent for two resolutions; the commending resolution and the memorial resolution.

MR. SPEAKER: The gentleman from Danville, Mr. Marshall, requests unanimous consent to introduce a commending resolution and a memorial resolution. As many will favor that motion will say "Aye."

DELEGATES: Aye.

MR. SPEAKER: Those opposed "no." That motion is agreed to. The gentleman from Henry, Mr. Armstrong.

[15] DEL. ARMSTRONG: Excuse me? Gentleman from Loudoun. Point of personal privilege.

MR. SPEAKER: The gentleman has the floor.

DEL. ARMSTRONG: Mr. Speaker, Ladies and Gentlemen of the House, the Roanoke Times is a newspaper of great circulation, but it doesn't cover the whole state, and there was a really good column in the Roanoke Times this morning from a reporter, an award winning reporter named Dan Casey.

The column today is a satirical memo by a fictitious electric industry lobbyist who's praised on APCO for raising its rates 66 percent in six years. It was so good, it's not too long, I thought I'd read it to you.

"Confidential memo to electric industry bigwigs from your fixer in Richmond. Subject: 2011 update. This year's been good for the Virginia electric power industry. Below we'll look at some of our successes,

264

their underlying history and future challenges and opportunities." The S in opportunities has a dollar sign.

[16] "First, we should recognize one of our principal clients, Appalachian Power Company, the monopoly that has 500,000 captive customers in the populated parts of western Virginia and some parts of Southside. As you know, APCO suffered for many years under the indignity of some of the lower electric rates not only in Virginia, but in the nation. At industry conferences it was the butt of many jokes cracked on the golf course.

"Consider how far APCO has come in just the past six years. It's raised its rates an impressive 66 percent. The only thing that even comes close is increases for instate tuition in Virginia's colleges and universities. A new 9.6 percent rate increase the company applied for just last week could give it the highest electric rates of any investor-owned electric utility in the Commonwealth. Some rural and city coops are higher, but they're buying from the big utilities, then passing costs along.

"It's about the only thing western Virginia will be able to claim as it's Number 1. A clever [17] advertising campaign is being planned to instill pride for that among APCO customers. The beauty of it is the customers will be indirectly paying for those ads too. Of course the guys from APCO will be buying the after golf drinks in the club house at our next conference.

"This could never have happened without a concerted multi-year strategy that began in the late 1990s. First, with straight faces, we sold Virginia legislators on the virtues of deregulation. They actually believed us when we told them it would lower

265

rates, improve service and raise profits all at the same time. Ha, ha. Deregulation never actually happened, of course.

"Years later when the legislature finally figured this out we stifled our, stifled our giggles and sold them on re-regulation. That allowed for much higher industry profits than before. It also required us to make our bills incomprehensible, a trick we learned from the hospital industry. Now you need a master's degree in accounting to decipher them. Ha, ha again.

[18] "Of all the power industry producers in the Commonwealth APCO has been best at taking advantage of re-regulation. For example, the rate increase the utility applied for last week is actually a stunning four different rate increases all at once. This may be an industry record. There was a minor setback in 2009 and early 2010 when APCO jacked rates in the middle of a cold snap without State Corporation Commission approval. It left many customers howling that their electric bills had doubled or tripled. That got the legislator's attention, but we were able to cut a deal with them in which those increases were temporarily rolled back. Later the SCC approved a lot of that.

"Throughout this period there's been one big thorn in the industry's side. His name is Delegate Ward Armstrong (D) Henry County. He's been trying to get our industry profits rolled back to the old pre-deregulation levels. That's not funny at all. So we're doing our best to boot Armstrong from the House of Delegates.

[19] "Some Richmond allies already have drawn one restricting map that puts him in the same district as another incumbent, Delegate Don Merricks, (R)

266

Chatham. Wait until you see the advertising we're planning for Merricks's 2011 reelection campaign. Thank you Citizens United. Indirectly electric customers will pay for that too.

"We need to be careful though. Some of our traditional Richmond cronies have been paying close attention since Armstrong got his electric rates bandwagon rolling. Even Attorney General Ken Cuccinelli is beginning to make noise about us.

"The lesson is this: You can shear sheep repeatedly, but when you trim off too much of their wool at once they get sunburned and quite angry. It's safer to nick them for a little less each time and keep them at a slow boil. It also makes it easier to pull the wool that's left over their eyes. See you on the links at the next conference."

Great article. Anybody that wants a copy [20] I'll be glad to provide you with one. Nero fiddled while Rome burned. Thank you, Mr. Speaker.

MR. SPEAKER: The gentlewoman from Richmond City, Ms. McClennan.

DEL. MCCLENNAN: Thank you, Mr. Speaker. I rise for a request.

MR. SPEAKER: The gentleman may state it.

DEL. MCCLENNAN: Mr. Speaker, I request unanimous consent to introduce a commending resolution for the VCU Rams.

MR. SPEAKER: The gentlewoman from Richmond City, Ms. McClennan, asks for a commending – for unanimous consent to introduce a commending

resolution. As many that favor that motion will say "Aye."

267

DELEGATES: Aye.

MR. SPEAKER: Those opposed "No." The motion is agreed to. The gentleman from Richmond City, Mr. Loupassi.

DEL. LOUPASSI: Mr. Speaker, I rise for the purpose of a motion.

[21] MR. SPEAKER: The gentleman may state it.

DEL. LOUPASSI: Mr. Speaker, I ask for unanimous consent to introduce a commending resolution for the Richmond Spotters.

MR. SPEAKER: The gentleman from Richmond City asks for unanimous consent for a much better commending motion. As many who favor that motion will say "Aye."

DELEGATES: Aye.

MR. SPEAKER: Those opposed "No." The motion is agreed to. The gentlewoman from James City, Ms. Pogge.

DEL. POGGE: Mr. Speaker, I rise for a point of personal privilege.

MR. SPEAKER: The gentlewoman has the floor.

DEL. POGGE: Thank you, Mr. Speaker. Mr. Speaker and Ladies and Gentlemen of the House, tomorrow is the Call to Prayer Virginia Rally on the Capitol steps. People of faith from across the State will be gathering for prayer for the Commonwealth and the Nation. Please join with us at 9:30 in the morning. We'll be gathering on the [22] portico. Congressman Randy Forbes and the Governor and the Lieutenant Governor and the Attorney General will all be there, as well as many pastors and churches and people of

268

faith from across the state. Again, that will be at 9:30 tomorrow morning. Thank you.

MR. SPEAKER: The gentleman from Alexandria, Mr. Evan.

DEL. EVAN: Thank you, Mr. Speaker. I rise for a personal privilege.

MR. SPEAKER: The gentleman has the floor.

DEL. EVAN: Mr. Speaker, since we're talking about adoption today, I have to respond. I would ask if it's better for a child to be in an orphanage rather a loving home?

And I've got to tell the body that some gay friends of mine are the best parents I know. One is a foster parent who raised a child while his father was in treatment for alcohol and drug abuse. The other child who's adopted is a high school senior whose relatives did not send him to school at all. Guidance counselors sent this [23] child to remedial classes and this father insisted that he be placed in classes on track to become an aircraft mechanic.

I know of two other parents, John and Barry. They left the State and they left the State with their taxes, they left the State with their jobs, and they left the State at the regret of their neighbors. They're not the only ones. Those who engage in adoption are agents of the state bound to follow state regulations.

Further, I would ask how dare a member of this body call me intrinsically disordered. Is it intrinsically disordered to provide love to a child? Is it wrong to provide a loving home and a good education to a child? Is it wrong to see that a child grow up as a productive member of society?

269

Am I intrinsically disordered? Thank you, Mr. Speaker.

MR. SPEAKER: The gentleman from Fairfax, Mr. Scott.

DEL. SCOTT: Mr. Speaker, I rise for a [24] request.

MR. SPEAKER: The gentleman may state it. DEL. SCOTT: Mr. Speaker, request the introduction of two commending resolutions for specific associations in Fairfax County.

MR. SPEAKER: The gentleman from Fairfax, Mr. Scott, asks for unanimous consent to introduce two commending resolutions. As many that favor that resolution will say "Aye."

DELEGATES: Aye.

MR. SPEAKER: Those opposed "No." The motion is agreed to. The gentleman from Suffolk, Mr. Jones.

DEL. JONES: I will rise for a request.

MR. SPEAKER: The gentleman may state it.

DEL. JONES: Mr. Speaker, I ask for unanimous consent to introduce a memorial resolution.

MR. SPEAKER: The gentleman from Suffolk asks for an unanimous consent to introduce a memorial resolution. As many as favor that motion will say "Aye."

DELEGATES: Aye.

[25] MR. SPEAKER: Those opposed "No." That motion is agreed to. Gentleman from Fairfax, Mr. Albo.

DEL. ALBO: Mr. Speaker, point of personal privilege, please.

270

MR. SPEAKER: The gentleman has the floor.

DEL. ALBO: Mr. Speaker, Members of the House, just because we've had a lot of debate on this regulation deal and adoption, I just wanted to make sure everybody understands that no one on the floor is telling you what the real law is.

The law is and has always been and for as long as I've ever known; that the child is placed where it is in the child's best interests. Every year people try to come to General Assembly and pass laws to make adoption or child custody more fair to Parent A or Parent B. That's not the law.

What we look at is what is in the best interests of the child. There is no law in Virginia that says a child could not be placed with a same sex couple. If it was in the best interests of the child, that could happen.

26

There is no law that says a child can't be placed in Religion X, Y or Z. If it's the best interest of the child, that can happen.

So I just wanted to make sure that while we were talking on the House floor and maybe if someone is listening other than the gentleman from Martinville's mom on the Internet that they would know what the law is. Thank you.

MR. SPEAKER: The gentleman from Spotsylvania, Mr. Cole.

DEL. COLE: Thank you, Mr. Speaker. I rise for an introduction.

MR. SPEAKER: The gentleman has the floor.

DEL. COLE: Mr. Speaker, I guess the – I don't know if they're still there or not, but we do have a group of

271

students, third, fourth and fifth graders from St. William of York School in Stafford County that are in the Capitol today and I'd hope we could give them a warm welcome to the Capitol.

(Applause.)

MR. SPEAKER: The gentlewoman from Richmond [27] City, Ms. McClennan.

DEL. MCCLENNAN: Mr. Speaker, I rise for a motion.

MR. SPEAKER: The gentlewoman has the floor.

DEL. MCCLENNAN: Mr. Speaker, I ask that Senate Joint Resolution 5007 be taken up out of order.

MR. SPEAKER: The gentlewoman from Richmond City moves that House Joint Resolution 5007 be taken up out of order. As many that favor that motion will say "Aye."

DELEGATES: Aye.

MR. SPEAKER: Those opposed "No." The Clerk will report a resolution.

THE CLERK: Yes, sir, Mr. Speaker. Senate Joint Resolution Number 5007, commending the (unintelligible words) University 2010/2011 men's basketball team.

MR. SPEAKER: Shall the resolution be agreed to? As many that favor that motion will say "Aye."

DELEGATES: Aye.

{28} MR. SPEAKER: Those opposed "No." The resolution is agreed to. The gentlewoman from Chesterfield, Ms. Robinson.

DEL. ROBINSON: Mr. Speaker, I rise for a motion.

272

MR. SPEAKER: The gentlewoman has the floor.

DEL. ROBINSON: I move the House adjourn today in the honor, excuse me, of Taylor Lane Anderson. Taylor is the young teacher who died in Japan in the tsunami and her family has been friends of mine for many, many years. She died because she stayed to help the children get to their families before she left the school.

And she is a graduate of St. Catherine's. She also a graduate of Randolph Macon College and she was there for two years teaching the Japanese children to speak English, as well as teach the older folks who are in her neighborhood to also speak English. And I would like for the House to adjourn in her honor today if that's possible.

[29] MR. SPEAKER: The gentlewoman from Chesterfield, Ms. Robinson, moves that when the House adjourns today that it adjourn in the honor and the memory of Taylor Anderson. As many that favor that motion will please rise. That motion is agreed to. The gentleman from Albemarle, Mr. Bell.

DEL. BELL: Mr. Speaker, I rise for a motion.

MR. SPEAKER: The gentleman may state it.

DEL. BELL: Mr. Speaker, I would ask unanimous consent of the body to allow the introduction of a commending resolution. The United Christian Academy's boy's basketball team won a state-wide title. I would like to give it to them before some of the seniors graduate, so I ask for unanimous consent.

MR. SPEAKER: The gentleman from Albemarle, Mr. Bell, moves, asks for unanimous consent to

273

introduce a commending resolution. As many that favor that resolution will say "Aye."

DELEGATES: Aye.

MR. SPEAKER: Those opposed "No." That [30] resolution – that motion is agreed to. Are there further motions or resolutions under Rule 39? If not, the clerk will call the calendar.

THE CLERK: Yes, sir, Mr. Speaker. Calendar of the House of Delegates 2011, Special Session 1 for Tuesday, April 5th, 2011. House bill on second reading, regular calendar. House Bill 5001, a bill to amend the code of Virginia by adding to Article 2 of Chapter 3 of Title 24.2 and Section Number 24.2-304.03 and repel Sections 24.2-304.01 and 24.2-304.02 of the Code of Virginia relating to House of Delegates districts report of (unintelligible word) election on April 4th with substitute.

MR. SPEAKER: The gentleman from Suffolk, Mr. Jones.

DEL. JONES: Mr. Speaker, I would move the committee substitute.

MR. SPEAKER: Questions on adoption of the committee substitute. As many that favor that will say "Aye."

[31] DELEGATES: Aye.

MR. SPEAKER: Those opposed "No." Substitute agreed to. The gentleman from Suffolk.

DEL. JONES: Mr. Speaker and Ladies and Gentlemen of the House, the substitute that is before you for House Bill 5001 is the every 10 year bill that this body and the General Assembly must consider required by the Constitution and that is to reapportion

274

and redistrict the 100 districts in the House of Delegates and the 40 districts in the Senate of Virginia.

The plan before you as amended, in my opinion, is a fair amendment. It's representative of all Virginians, including our minority communities.

This past decade we had serious population shifts within our Commonwealth. Yesterday I was trying to explain, I didn't do a very good job of explaining maybe the fall line. What I did last night, I prepared a map for us to look at.

If you look at the red, red means bad. That means you lost. Yellow means you lost as well. [32] So if you can see coming from Hampton Roads, across up through Lynchburg and on up into the great far reaches of southwest up in the hills that are so beautiful and down to the great far southwest, that is about 3.1 seats, I believe.

And blue is good. Blue means you picked up. This little area up here picked up 2.88 seats. It does not include Stafford, I do not believe. So if you can look at the map and what – you know, like I said yesterday, you have to play it where it lies in golf.

This is what the numbers tell you. The numbers are very simple. You had some moderate growth compared to the overall growth of Virginia and coming up through central Virginia up into the Valley. You had tremendous growth up in the Northern Virginia area, especially Louden County and Prince William County.

But you had in reference to the balance of the Commonwealth tremendous loss of population proportionally. So no, this was not a plan to go just grab and put somebody in another district. [33] The

275

map's pretty clear that you've got to move three seats. We had over a 1., 1.7 seat loss here in Hampton Roads. A 1.14 seat loss in Southwest Virginia and about a, between these three about an 8/10s of a loss in that part of our Commonwealth.

Just kind of wanted to give a visual so we can see what we have to work with when we're actually drawing the lines, which is required by our Constitution and the mandate of the one-person, one-vote.

You know, much has been written about a bipartisan map, bipartisan cooperation for the last several years. This is my 14th year in this body. 14th session. Excuse me. Not year. And I have heard since I guess I arrived the need for a bipartisan way of going about and redrawing the lines for this Commonwealth that the people have been left out of the process.

Well, we are the people's representative. We stand every two years. This is the people's House and every two years they decide if they want us to come back or not. When I got here in 1998 I think [34] I was Number 95. Today I'm Number 28. That tells you the turnover that we have had in this body in seven election cycles.

So giving – given, excuse me, the task at hand and our Constitution the P&E Committee met a week-and-a-half ago on Friday and considered criteria and we had I believe five that we chose. They were of population equality, the Voting Rights Act, contiguity and compactness, single member districts and communities of interest.

I mention these because we've heard these terms kicked around in many different I guess meetings, forums, et cetera, and I think all these criteria are

276

important as they do represent what is the fabric of the Commonwealth, our people.

But there's a couple of things from my perspective, and not just mine, but the

Constitution, that require our utmost attention. Quite simply, the law; one-person, one-vote. That trumps the Voting Rights Act; equal protection under the 14th Amendment. That was our Number 1 criteria.

[35] Number 2 was the Voting Rights Act. I can't say that I can relate to what occurred back in the '60s because I was just a young man, but I can tell you that the Voting Rights Act is something that has made a tremendous difference in America.

It has changed the fabric of this country because all people have an opportunity to participate in the process, as they should, as they well should. We heard a speaker, several speakers, one in Hampton and one yesterday, who was talking about the factual that he defended the rights of Americans when he felt like he did not have that right, full rights accorded or forwarded to him.

So Number 1 and Number 2 are the most important things to the P&E Committee. They were the most important things to me as I drew this map.

Yesterday we had another bill that was before us. That was I think the College Competition Plan. The young man did a fabulous job. I thought that he did exceptionally well. I think [36] the gentleman from Dickinson was laughing, he says, "Chris, that was you 40 years ago." He was being kind of polite. Maybe about 42 years ago, but I wasn't going to tell him that.

Their Number 1 criteria was communities of interest, contiguity and compactness. They're Number

277

3 and Number 5 on our list. They're Number 3 and Number 5 for a reason; because one-person, one-vote is the overarching principle of what this country stands for in my opinion.

So with that in mind, as I – as we went to put a map together and criteria we took a

1 percent, plus or minus 1 percent deviation. Some say, "Why did you do plus or minor 1 percent? Why didn't you do plus or minus 2 percent from 10 years ago?"

Well, since the last time we were here with this exercise there have been several court cases that have spoken to that and when you look at the criteria in the court case that was decided, it was then Georgia. It was the Larios case. There was an intentional concentration of one party and [37] the under population of another party. There were four different sets of criteria that were violated. And so what used to be the plus or minor 5 percent safe harbor no longer exists.

And Virginia is very unique. We have a tight timeline. People think we have rushed this through. But I will tell from 10 years ago we got the data on like the 7th or the 8th of May – or March. It made it very tight for us to get everything done, passed, and to DOJ in time to be able to have primary elections in the summer.

This year we got the data on I think the 8th or something of February, which afforded us an opportunity to have time for some public comment and public hearings across the State with plans in hand as we went to the public.

278

We had six public hearings last fall. As chairman of the Reapportionment Committee we had a public comment period the last week of session that took the existing districts as they stood and we pulled in the data that we – that was given to us by the Census, from the April 1st, 2010 Census.

[38] Then we had a series jointly with the Senate, eight public hearings. We received a bevy of testimony from all walks of life; local-elected officials, registrars, community leaders, members of this body and the other body, private citizens just concerned about their community.

So as we went through that process we heard a lot of comments about communities of interest, but also protecting the one-man, one-vote, or the one-person, one-vote, and I think most importantly not retrogressing with regards to the number of majority/minority districts or the effective voting strength of those communities.

We heard a gentlewoman from Petersburg yesterday speak of an effective voting strength. And when we looked at what was the best thing to do, demographic shifts, population shifts caused a reconfiguring of the map as has been alluded by the gentleman from Henry and a article that was in the Roanoke Times today and some individuals yesterday.

I did note when I looked at the gentleman [39] from Henrico, I stayed up again late last night and I studied the plans from the college students and I did look at their plans and I did test, put the test to it. Because it's not an academic exercise for us. We're bound by the law. I know when I was in college I used to always – "Man, these guys are really smart" when a

279

professor would tell me how things would work in the lab or, you know, a theory.

When I got out in the real world sometimes it didn't really work. Gosh, it makes sense in a clean, sterile lab, but when you put it out in the world it just doesn't happen. It just doesn't work.

So I thought I would peel back the onion, as we like to say back at home, and I looked at the first place winner in the competition division. They had 10 majority/minority districts. We currently have twelve. Their deviation was plus or minus 4 and 4.75 percent. A total deviation of 9.5 percent, where we have 2 percent.

And the low black voting age population of [40] registered votes, age eligible, I should say, was 50.6 percent to get 10 districts. If I wasn't constrained by the law I could draw the prettiest map in town. They could be concentric circles like the gentleman from Henrico would love to have. They could be compact and contiguous.

But we're not about compact and contiguous when it trumps the rights and I think the ability of the one-person, one-vote to be equally represented.

The gentleman from Prince William has 190,000 people in his district today. The gentleman from Henry has 68,000. He has enough for a Senate seat within their deviation. Now, some would say that, you know, that's not right. So that's why we're here today to reset the maps for the next 10 years.

Then I looked at the University of Richmond first place commission, the commission division and they had seven majority/minority seats. They had a 9.8 percent deviation and their low on the percentage was

280

50.2 percent. The University of [41] Virginia, they were the second place in the competition, had nine majority/minority seats. They had a better deviation, 2.94 percent, but they still were as low as 59.2 percent on the voting age population.

Now, everything that I have seen in my 25 years in elected office has indicated to me that in the minority community there, there are not as many registered per hundred as there are in the white community and then the turn out is different as well.

So if you don't – as we heard in our testimony, and as Delegate Dance and Spruill and some other individuals and leaders in the community have said, if you don't have an effective voting strength then there's a good chance that over the time of 10 years you will see a dilution of their ability and there is the community.

Not that I am – it's not my seat. I think the gentleman from Chesapeake, Mr. Spruill, would agree with this. He can probably get elected with [42] a lower percentage. But he represents the community and the law states it's the community's ability to elect the candidate of their choice.

So that's why the testimony led me when drawing this map to not retrogress with the number of seats, which we didn't, and to keep an effective voting majority within each and every district. We had to keep the core of those districts, because I think that's very important, and because of the population shifts you did see a decrease in some of the percentages, but all were above 55 percent.

So as I continued to work, work this map I tried to do the best I could to meet the plus or minor 1 percent. It's obvious to me that from comments I received from

281

colleagues who called me, who stopped by my office, who wanted to discuss their community and what the bill as introduced last week would do to that community if it passed, I said, "I'll be glad to sit down with each and every one of you who want to meet with me" and I did and I think through that process you have this [43] substitute today.

Now, the gentleman from Fairfax, Mr. Sickles, can speak to the amendments that are before you from Northern Virginia much better than I can. He knows where all the Metro stops are. I don't know. I know where to avoid traffic a certain time of day. The gentleman from Arlington, Mr. Brink, can certainly relate to his community much better than I can.

So once the map did come out those two individuals came to me and said, "You know, these two areas have kind of split up their community of interest. You know, what can we do to try to put those back together?" And as I weaved this, you know, theory or this concept of public input, last year was very important to the Reapportionment Committee, first to have an avenue for the public to have input. Not just to the public hearings, but along the way throughout the process.

So we decided to put a little feature online. You could go in and actually click and say, "In my neighborhood I don't like the fact that you have [44] done the following to me or to my neighborhood and we have been together for the last however many years."

Well, I read all of them that came in, just so you all know, and it was interesting that one of them, a couple of them we were able to do. I received a request on the 4th – or the 1st of April a question that we make a technical adjustment in the boundary line between

282

House district 29 and House district 10. And of course the gentlelady from Frederick, and my departing seat made unfortunately, came to me and said, "Can we fix this?" So we sat down and we did fix it.

Then there was e-mail that I received from a gentleman on the 3rd of April that said Mateo (ph) was split into two districts. Well, I really don't – didn't know what, you know, the Mateo district was. So I called the gentleman from Northern Virginia, I said, "Can you help me out? Can you explain it to me?"

So in this substitute before you have Mateo put back together. We actually – it came from [45] this comment that this individual made on the 3rd of April.

So this entire process has been open. We have taken comments from any and all who wish to make them and we have considered them. Have we been able to honor all of them? No, we haven't. Ask my daughter; I can't honor all her requests. Wish I could, but I can't. Her mom won't let me.

So when we get to today what brought us here to this point with the substitute was the fact that I sat down with members of the Northern Virginia delegation, members of the Black Caucus, some of our rural friends who had concerns about the mountains and where things are and where things aren't. And so you will notice that there are some amendments across the entire Commonwealth to this bill as far as where the precincts were in 5001 and are in the substitute that's before you.

Mr. Speaker, I would like to close because I know there will be some questions more than likely and some, some debate. I think in closing the most important thing for me and for us is the [46] principle that the one-person, one-vote and compliance with the

283

Voting Rights Act and I am confidence that what is before us does exactly that.

And point of order, if I can, Mr. Speaker, I believe we have, the substitute has been moved? Is that correct or not correct? It has been. That's what I thought. The substitute has been moved. So with that, I'll be glad to answer any questions. I'll be glad to sit down.

MR. SPEAKER: The gentleman from Henry, Mr. Armstrong.

DEL. ARMSTRONG: Will the gentleman from Suffolk yield for a question?

MR. SPEAKER: Will the gentlemen yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: I would ask the gentleman, the gentleman is the chief patron of the bill. Can the gentleman tell me how he came to be the chief patron of this legislation?

DEL. JONES: By walking to the second floor [47] and introducing a plan that I had drawn to have a bill generated, like any other bill that we have that comes before this body.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Was there any discussion amongst the majority party leadership that the

284

gentleman would be the one that would be drafting the lines and would oversee the redistricting process?

DEL. JONES: I would say to the gentleman that I guess given my experience from 10 years ago I was a logical one to consider to do that. I had an interest in it. So I took the initiative to – I enjoyed last time working with the software and I enjoyed it this time as well.

DEL. ARMSTRONG: Further question,

Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

[48] DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Was there conversation with the leadership of the majority party, and leadership would include the Speaker of the House of Delegates, the majority leader of the House of Delegates with the gentleman would be taking the lead on drafting the plan?

DEL. JONES: Mr. Speaker, I would say to the gentleman that there was never discussion that I would put the bill in. It was my desire from the very beginning – when I take on a task I do it one way; I'm all in and I'm going to make sure that it's done. I think my fellow budget conferees know that by the way I approach the budget and I think those that work with me at the pharmacy know that and I think my constituents know that.

So I would say to the gentleman I took it upon myself to put the bill in and that's what's before you.

DEL. ARMSTRONG: Further question, [49] Mr. Speaker.

285

MR. SPEAKER: Will the gentleman yield? DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman tell me what other members of the majority party that the gentleman worked with in the development of the plan?

DEL. JONES: Well, I can give him some of the minority party as well and I'll be glad to do all that, I'd be glad to list the names for him. I had input from the gentleman from Arlington, Mr. Brink; the gentleman from Fairfax, Mr. Sickles; the gentlewoman from Richmond, Ms. McClennan; the gentlelady from, gentlewoman from Petersburg; Ms. Dance; the gentleman from Chesapeake, Mr. Spruill. I had, let me see, the gentleman from Fairfax; Mr. Albo; the gentleman from Albemarle. I think he's over here. Mr. Bell. Any assorted other individuals. I made this a very open process and I think that any member that called to me, while they [50] might say I didn't always get back to them in a timely manner because of the fact at times I felt I was drinking water from a firehose, I got back to them and sat down with them.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman share with me today what data he had access to and what data he utilized in the development of his plan?

286

DEL. JONES: I had access to the data that the Census Bureau provided us.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Does the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman tell me was there any additional data that the gentleman used in the development of the plan besides the [51] Census data?

DEL. JONES: I do know that the second floor I believe compiled the '10 elections, the '09 elections and I think they just got the '08 elections put in their computer.

DEL. ARMSTRONG: Further questions, Mr. Speaker.

MR. SPEAKER: Will the gentlemen yield?

DEL. JONES: I yield.

DEL. ARMSTRONG: Can the gentleman share with me what data that he used in order to determine the minority/majority district voter participation, what retrogression data he would have used in consideration in adopting a plan that that would have had 12 minority/majority districts?

DEL. JONES: I'd say to the gentleman that I used the data as it was provided by the Census Bureau to look at percent black population and percent black voting age population.

DEL. ARMSTRONG: Further questions, Mr. Speaker.

287

[52] MR. SPEAKER: Will the gentlemen yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Would the gentleman agree with me that just determining, in determining a majority-minority district is more than just determining what population that one has to analyze whether or not based on past voting patterns whether or not the minority population within such district has the ability to elect its candidate of choice and that requires more than just an analysis of raw Census data?

DEL. JONES: Mr. Speaker, I'd say to the gentleman he may be giving me more credit than he should. What I did, I listened to testimony that was provided during the process of all these public hearings that we had and I tried to respond to the community and what they felt was an effective percentage that they would need to have and effective representation of the candidate of they choice.

DEL. ARMSTRONG: Further questions, [53] Mr. Speaker.

MR. SPEAKER: Will the gentlemen yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So the gentleman I guess is suggesting that there was not an analysis of that data that went into the preparation of the plan that's related in HB 5001?

DEL. JONES: Mr. Speaker, I would say to the gentleman that I gave him very succinctly what I used. His question to me was what did I use in my

288

preparation of the plan to present to this body and I just gave him the answer of the process.

DEL. ARMSTRONG: Further question, Mr. Speaker.

DEL. JONES: I have not finished my answer.

DEL. ARMSTRONG: I apologize, Mr. Speaker.

DEL. JONES: I think it's called a PL. I always get it backwards, the data that comes from the Census Bureau. It has 264 categories. It's got every iteration you can think of combination of percentages. And simply what I looked at was [54] the existing core districts that were in place for the 12 majority-minority districts and I saw that in the 71st District in particular that the majority percentages dropped from almost 60 percent to 50 percent.

And so in putting together a plan I felt communities of interest were very important and that the percent of black and black voting age population were the two things that would drive putting those districts back to a competitive level where they might have retrogressed over the 10 years period.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield? DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman tell me whether he or any persons that worked with him in the development of the plan that resulted in HB 5001 took into account any retrogress analysis regarding minority performance in any of the 12 [55] majority-minority districts that are part of HB 5001?

289

DEL. JONES: I would say to the gentleman I'm not aware of any.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: Yes, sir.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: The gentleman just mentioned that communities of interest were an extremely important criteria. Would the gentleman say that that was a more important criteria in the development of the 12 majority – majority-minority districts than would have been the racial voting pattern and whether or not the minority population of those districts can elect their candidate of choice?

DEL. JONES: No, sir. I'd say to the gentleman, as I stated in my opening remarks on the bill itself, that the most important items were one-person, one-vote plus or minus 1 percent [56] deviation, full compliance with the Voting Rights Act, and communities of interest, while important, are not the overarching, were not the overarching driver of this plan.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: Oh, yes, sir, I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Could the gentleman tell me though where in terms of development of the 12 majority-minority districts what were the most

290

important criteria that were considered of those that were developed?

DEL. JONES: Mr. Speaker, I would say to the gentleman there wasn't a most important criteria. You know, I'm not a very sophisticated person. I'm not the smartest guy in the room most of the time. And I looked at what had happened over the last 10-year period given the existing population and demographic shifts and I tried to restore back to the best of my ability to the levels that were [57] existing after House Bill 1 one passed in 2001. DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: So if gentleman indicates there was not a full retrogression analysis done, how does, how can the gentleman assure us that the 12 majority-minority districts that are comprised in HB 5001 are actually districts in which the minority population is able to select its candidate of choice?

DEL. JONES: Mr. Speaker, I would say to the gentleman that typically as I understand it, that is done in your process when you file with DOJ. I had to look at given the tight time frame that we had to deal with the percentage of black population and the percentage of black voting age population and that was the approach that I used. 10 years ago I don't – didn't use the methods that the gentleman is suggesting. I am [58] confident from the testimony in the community that what is before you is a plan that will allow the minority community to elect a candidate of their choice based on the input received during the

291

public hearing process and from the individual members of the Black Caucus and the black community.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: Yes, sir.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Well, would the gentleman not agree with me that he had available to him the resources of the Division of Legislative Services; that if the gentleman had requested a full retrogression analysis of the majority-minority districts it could have been accomplished?

DEL. JONES: Mr. Speaker, I would say to the gentleman that if he says so, I'll believe him.

DEL. ARMSTRONG: Further question, Mr. Speaker.

[59] Mr. Speaker: Will the gentlemen yield? DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: So the gentleman would not dispute that statement, the affirmative statement that I just made?

DEL. JONES: Mr. Speaker, I do not have enough knowledge to agree or disagree. That is his opinion. I certainly – he certainly is entitled to it.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

292

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: The gentleman alluded in his answer that given the "time constraints." Is the gentleman suggesting that there was insufficient time in which to conduct a full analysis of the majority-minority districts in their population and whether they're able to select their candidate of choice?

[60] DEL. JONES: No, sir, that was not what I was answering to his question. He's a very accomplished attorney and I understand where he's going with his questioning. My comment was just a statement of fact.

As a matter of fact, let me read – gosh, I think I've got a couple quotes here that might help as we look at the, what we're having to deal with. This is Bob Gibson from the Sorenson Institution. "The Voting Rights Act for all practical purposes guarantees that districts with a majority of black or Hispanic residents stay about as strongly majority-minority or considerably Hispanic for the next 10 years as they were during the past decade."

And I think that that's pretty obvious to those who follow the process; that if you don't get it back as best as you can to the previous strengths that there's a chance that they might not perform as they should. Hence, the valuable nature I think of the testimony that we received from the minority community during the whole [61] public hearing process.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

293

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Is the gentleman familiar with the Voting Rights Act?

DEL. JONES: I say to the gentleman, I am not an attorney, but I have a, you know, working knowledge of it.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Within that is the gentleman familiar with Sections 2 (sic) and Section 5 of the Voting Rights Act?

DEL. JONES: I would say to the gentleman, Mr. Speaker, I am – I have a general knowledge. Yes, sir.

[62] DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: The gentleman is aware that Virginia is one of 16 states that is presently required to comply with the Voting Rights Act in the development of its districting plans?

DEL. JONES: That's correct, I would agree, Mr. Speaker. Not all of Virginia, I would add, but Virginia itself. There are certain counties that are out of the Voting Rights Act, they've requested that, and so – but that's not a correct, totally correct statement. But I

294

would agree with him in general that is an accurate statement.

DEL. ARMSTRONG: I stand corrected that the State in terms of drawing legislative lines, House, Senate and congressional is within the voting rights, purview of the Voting Rights Act.

DEL. JONES: And I would agree with that.

[63] DEL. ARMSTRONG: Right. Is the gentleman aware that –

Mr. Speaker: Does the gentleman yield?

DEL. ARMSTRONG: – that the Voting Rights Act requires –

Mr. Speaker: Does the gentleman yield? The gentleman yields.

DEL. ARMSTRONG: I apologize, Mr. Speaker. Will the gentleman yield for a question?

DEL. JONES: Yes, sir, I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Okay. Would the gentleman agree with me that under Sections 2 and Section 5 of the Voting Rights Act that Virginia must maintain to the extent possible all of its majority-minority districts?

DEL. JONES: I would say that would be the goal, yes, sir.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

295

[64] Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Is the gentleman also aware that under Section 5 or possibly 2, but Section 5 of the Voting Rights Act that additional majority-minority districts must be created where practical?

DEL. JONES: I would agree with that statement, Mr. Speaker. I would emphasis, though, that to me practical, as we heard through the testimony, was an effective voting age population. And when I was mentioning earlier about the plans that were before us, I think – I don't believe but a handful of the districts that were drawn actually would meet the Bartlett versus Strickland test, which, which a minimum amount legally required to constitute Section 2 district would be 50 percent plus 1.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields. [65]

DEL. ARMSTRONG: Well, in determining compliance with the Voting Rights Act and whether or not these majority-minority districts are able to select its candidate of choice, did the gentleman do anything more than speak with the members that may represent those particular districts at the present time?

DEL. JONES: Yes, sir. I spoke with several citizens along the way who came to see me or called me and I listened to what they had to say. We had individuals at the public hearings who stated their concern; that the dilution of the percentage of voting age population

296

would greatly diminish their chance to be able to elect a candidate of their choice.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: But the gentleman did not include any type of retrogression analysis? And [66] by retrogression analysis I would mean an analysis of voting patterns of particular minority districts over, say, the last five to 10 years that would indicate that those districts would continue to be able to select its candidate of choice.

DEL. JONES: Mr. Speaker, I'd said to the gentleman of the plans that have been submitted and/or circulated around that were complete and total plans, the plan that is before you, in my opinion, fully complies with the Voting Rights Act as 55 percent or higher, which is testimony that we heard during the public hearings of percentage voting age population.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: But again, just to make certain I'm clear, that the gentleman believes it is in compliance, but the gentleman didn't, he or [67] his colleagues or members of the majority party, develop any empirical data that would tend to establish that?

297

DEL. JONES: I would say to the gentleman, Mr. Speaker, that I think anyone who thinks they know exactly what will be in full compliance probably hasn't been doing this very long.

Because the process is that you have to submit to the voting right – the section of the Department of Justice, the voting section, for preclearance. If there were certain litmus tests that had to be met you would not need to have preclearance.

So I think I've answered the gentleman's questions with regards to the retrogression analysis and I'd be glad to answer any other questions that he would have, but I have finished answering those questions.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield, yes, sir.

Mr. Speaker: The gentleman yields.

[68] DEL. ARMSTRONG: Is the gentleman familiar that the Governor of the Commonwealth, Robert McDonnell, appointed a commission to develop a number of redistricting plans for the House of Delegates, the State Senate and congressional districts?

DEL. JONES: I am, I would say to the gentleman.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

298

DEL. ARMSTRONG: I would ask the gentleman if he is familiar that, that two of the plans issued by the Commission dealt with the redrawing or redistricting of House of Delegates lines?

DEL. JONES: I would say yes, sir, I am aware.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

[69] DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Is the gentleman aware that one of those two plans developed by the Commission created a 13th majority-minority district?

DEL. JONES: I would say to this the gentleman, Mr. Speaker, yes, I am.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Does the gentlemen yield?

DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman explain to me the reasonings in his putting together HB 5001 as to why he did not create a 13th

majority-minority district?

DEL. JONES: Mr. Speaker, I'd say to the gentleman I think he's answered his own question with his line of questioning earlier about an effective – I think he's conflicted or he's confused in his approach here.

I think his line of questioning earlier was [70] taking into the fact that I didn't do a high enough percentage

299

to be – to ensure that one would elect, a community could elect the candidate of their choice. I have looked at the 12 and the 13th plan, Option 1 and Option 2, and neither one of those plans met what I think from the testimony that we heard throughout this process that the effective voting age population needed to be north of 55 percent. Each of those plans had a low of I think 52, 52 percent.

And from my experience in 25 years of running for office, having gone door-to-door, I know from analyzing quote, unquote my election results where there's a lower voter turn out, and in my opinion based on what we had heard from testimony, something of in the 52 percent, I do not think would be an effective voting strength for that community to be able to elect their candidate of choice.

DEL. ARMSTRONG: Further question, Mr. Speaker.

Mr. Speaker: Will the gentlemen yield?

[71] DEL. JONES: I yield.

Mr. Speaker: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman cite to me any empirical data on any of the 12th or potential 13th minority-majority district that would indicate that something less than a 55 percent minority-majority district would not allow the minority community in those districts to elect their candidate of choice?

MR. JONES: Mr. Speaker, I think I've answered this question earlier and I'm not going to – it is my opinion from what I have experienced and my belief and the testimony received from the community that they would like to have the best possible opportunity to elect the candidate of their choice and that further

300

dilution of the voting age population would do, would do a couple of things, but maybe allow them not to have the ability to elect the candidate of their choice either in a primary or in a general election.

DEL. ARMSTRONG: Further question, [72] Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So the gentleman has stated that in his opinion nothing below a 55 percent minority-majority district would be sufficient for the minority community to elect its candidate of choice?

MR. JONES: I'm not sure he was listening closely. I said it's my opinion from the testimony that was received during our public hearings that the community felt that they needed a percentage of 55 percent or better. That was my response to the gentleman.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: The testimony the gentleman is referring to, was that testimony that was [73] received during official public hearings of the House Privileges & Elections Committee?

MR. JONES: Yes, sir, it was. I believe it was probably in the court record. We had a court reporter at all of our meetings.

301

DEL. ARMSTRONG: Further question, Mr. Speaker.

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So the gentleman is stating that the entire basis of his opinion was garnered at those public opinion – public hearings in which evidence was received and the record and transcript made?

MR. JONES: No, sir, I didn't say the entire. The entirety ws not.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman share with [74] me what then additional information that he did not glean from the official Privileges & Elections Committee meetings which were recorded that led to his development of the 12 minority-majority district plans?

MR. JONES: Mr. Speaker, I think I answered the gentleman's question before in my earlier remarks and I will stand by those remarks.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

302

DEL. ARMSTRONG: Mr. Speaker, I would ask the gentleman whether there was any consideration given to the creation of a 14th minority-majority district in Southside, Virginia that would have included the city of Martinsville, the city of Danville and territory in both Henry and Pennsylvania counties.

MR. JONES: Mr. Speaker, I'd say to the gentleman, I believe that was what was presented [75] to us yesterday in the public hearing yesterday morning. And if I'm not mistaken, I don't believe it would meet the Bartlett versus Strickland test.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman tell me that in less than 24 hours the gentleman was able to conduct a retrogression analysis or develop data and information that would lead him to conclude that it wasn't a viable minority-majority district?

MR. JONES: No, sir. I guess, Mr. Speaker, he's not quite up on the law that – like I thought he was. Bartlett versus Strickland was a Supreme Court case and very clear in what their response was. 50 percent plus 1 is what is required from a Section 2 perspective to be able to draw a majority-minority district. It does not mean that it's an effective majority-minority [76] district.

And with the map that was provided it's pretty simple to go in and plug in the numbers and see where it, where it ends up and it did not meet the Bartlett versus Strickland test.

303

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield. And I would like to add, Mr. Speaker, if I could, that was just one district drawn independently of all the other 99 and I think we all must acknowledge that anyone – I had several members during this whole process that came to me, "Just between my neighbor and I, can we switch these couple of precincts around?"

And that reminds me of another maybe quote that I had that really is – I thought was pretty telling. A couple quotes, if you don't mind. Nancy Tate, the executive director of the League of Women Voters of the United States, was talking about the mapping software and talked about the challenges were the same as they always have been.

[77] This is really complicated. It is not self-evident what is a perfect plan. So while someone might have a district that they have drawn that would effect other districts, you can't in and on itself unless it fits into the overall quote, unquote plus or minus 1 percent necessarily make it work.

And I would add that I thought one of the seniors had a very interesting quote from Mary Washington University. More than once Mike Calbert, Mary Washington University senior, said he found himself in an unworkable map and had to start over. The second he moved the lines a little bit the population goes out of whack in other districts. Calbert says, "It's incredible how delicate the balance is."

DEL. ARMSTRONG: Further question, Mr. Speaker.

304

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Mr. Speaker, I would say to [78] the gentleman that data has been supplied to me that the Commission developed by the governor and the creation of a 13th minority district indicated that it would – it could be created without dilution of the other 12 districts with a 53 percent black voting age population and still be in compliance with a plus or minus 1 percent deviation. Does the gentleman agree or disagree with the conclusions of the Governor's commission?

MR. JONES: I think – I don't believe they said that it would pass and meet every test of the DOJ meeting and the Voting Rights Act. I think it was clear they wanted to show that, what the potential might be to draw a 13 plan.

Now, I can have someone go over to my office and get their report and I can go look at it, but I did highlight some. I didn't bring it with me. I believe that they said that's something for us to consider, but that they were not – they did not make it as a rock solid recommendation that it would be an effective, that those 13 districts [79] would be effective in representing – in allowing that community or those communities to elect the candidate of their choice.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

305

DEL. ARMSTRONG: Well, does the gentleman disagree – if the assertion from the Commission is that it is an effective minority-majority district, does the gentleman disagree with that assertion?

MR. JONES: Mr. Speaker, I would say to the gentleman that I don't do "ifs." The plan that is before this body in my opinion completely complies with the Voting Rights Act of the United States of America.

And I think that the plan, other plans that have been developed had a much wider deviation and that the 14th Amendment, the principle of one-person, one-vote trumps at the end of the day [80] and I am quite confident and satisfied that House Bill 5001, the substitute that's before this body, fully complies with the Voting Rights Act.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: Mr. Speaker, I didn't bring my attorney on the floor, but I will be glad to yield.

THE COURT: The gentleman yields.

DEL. ARMSTRONG: I would ask the gentleman, can the gentleman tell me whether are not he or anyone else on the House Privileges & Elections Committee who are members of the majority party reached out to any civil rights groups regarding development of the plan that resulted in HB 5001?

MR. JONES: Mr. Speaker, I would say to the gentleman that members of the NAACP did speak to the assembly of the P&E Committee in various forms and I have – they have provided their input and have stated what their wish would be.

306

DEL. ARMSTRONG: Further question, [81] Mr. Speaker.

MR. SPEAKER: Will the gentleman yield? DEL. JONES: I would yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So while the gentleman received testimony from various groups, the gentleman did not affirmatively contact any such groups?

MR. JONES: I would say to the gentleman that I did not affirmatively contact anybody, mainly because I was trying to put together a map and a plan that would meet those two tenants; the one-person, one-vote and the Voting Rights Act.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: I would say to the gentleman that one of my concerns has been that this process is rushed and that there has been insufficient time for the public to comment once plans were [82] developed. Would the gentleman respond to my premise?

MR. JONES: Yes, sir, I'll be glad too. Mr. Speaker, I would say that I heard that from other individuals. I guess about a year-and-a-half ago concern was brought to me during a bill that was presented to the subcommittee of P&E, the Elections subcommittee.

A gentlewoman from the League of Women Voters made the commitment then, which was followed

307

through last year and this year, to have a series of public hearings across the Commonwealth of Virginia, which we did six last year. We had one during the session this year and we've had eight during the last weeks.

And I would note that I believe for the first time ever we actually had a plan out prior to the public hearings and while it had been promised to us from the Commission and the like, their plan didn't come out until I think Friday night 8:30.

So I think I mentioned to the gentleman yesterday in the morning hour, I should say in [83] response to the gentleman from Henrico, that that's why I stayed up until 2:00 on Monday morning looking at those plans just to see what they had done, because I was interested to see because I had made a promise that I would consider and that we, this P&E Committee and this body would consider any and all public input that was provided to us.

I think the tool that we have that was utilized by citizens going online looking at the interactive maps was very helpful. The phone was very helpful. The public hearings were very helpful. Sometimes a pharmacy is very helpful. People would come in and say "Here," say "There." And we all know that we meet our constituents in the grocery store. So there's been public input provided along the way which was considered and is reflected in this map that is before this body.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

308

[84] MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Well, but would the gentleman agree with me that the plan that is the basis of House Bill 5001, albeit it's had some amendments since it was originally put out in the public, has only been publicly disseminated for less than a week?

MR. JONES: Mr. Speaker, I would say to the gentleman I think it would be more than a week, as this is Tuesday and it would be – seven days would have been yesterday. This would be the eighth day.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield? DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So the gentleman believes that seven days is sufficient for the public at large, and particularly civil rights groups and other groups that are interested in minority representation in this state to assimilate the [85] plan and to comment on the plan?

MR. JONES: Mr. Speaker, I think I was answering the gentleman's question what his opinion was. I was not providing my opinion. I was responding to his assertion that it was less than a week.

I would say to the gentleman that this is unprecedented, the amount of opportunity to have public input and those groups that have been interested in this for some time, as soon as the map was up online we were overwhelmed with activity. And I have received input from a lot of those groups as to a good job, not so good a job, but thank you for

309

putting it out there and having the – you know, to put it out there prior to the public hearings.

It was a concern that some said they would not be seen prior to the public hearings on, on Thursday. I felt very strongly that that needed to happen; hence, I stayed up till 3:00 on Tuesday morning to have a file to get to Legislative Services so it could be posted and on the web by [86] Tuesday afternoon.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Can the gentleman tell me the time frame or by which if the General Assembly approves this plan, assuming that the Attorney General files for preclearance with the Department of Justice, when this plan would have to be approved by DOJ in order for us to meet deadlines for primaries elections in this State?

MR. JONES: Mr. Speaker, I'd be glad to. 10 years ago when the plan was proved it took about seven to 10 days to have everything prepared for DOJ submission. DOJ is, as I think most of you know, has 60 days to either approve, to object to parts of, or to reject. Typically what they will do is object and give you a chance to correct.

So as I understand the timeline from the body at the other end of the Capitol and from the, I [87] think what our rules and procedures are, if this bill were to pass out of here tomorrow hopefully we will – I think we're coming in early tomorrow morning. It would be communicated on a supplemental calendar to the

310

Senate and they would then receive this bill and they would go along with their rules and procedures.

Now, never having served in the Senate I can't tell you exactly what those are. Since this would be a bill that would come back to us amended from the Senate I would think that the timeline would be sometime maybe next Wednesday, Thursday at the latest. And the Governor I believe, I believe has seven days to act on the bill itself.

So I would think that – let's do the math. That would be two weeks from today. That's what? Today's the 5th. 19th, submission. I would think by the last week in April we could have that submission ready. So by the 1st of May. They have their 60 days timeline. We have our primaries the 23rd of August. I think we all want to adhere to the 45 day notice so we can get [88] overseas ballots; even though required for the federal elections, I believe, and not state.

I think that is something that really has, you know, pressed and pushed the time; because we are an 11 cycle, 11 election cycle state; meaning we have elections this November.

So I think that time frame would allow us to have ample opportunity for the public, should they so chose, and if someone doesn't like what I've done to know what the district will look like and they can go decide to sign up against me either in a primary or a general election, so where we don't compress it to where the public doesn't have full input and opportunity to participate in their government.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

311

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Would the gentleman agree with me though that we could have spent an [89] additional week to two weeks in having public hearings or additional public input or an additional period in which the public could review these plans before voting and still be able to timely submit it to DOJ and timely receive DOJ approval before we ran afoul of any election deadlines?

MR. JONES: I would say to the gentleman, no.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Is the gentleman not aware that DOJ provides for an expedited review of 45 days that would shorten the period of review by 15 days?

MR. JONES: Mr. Speaker, I am certainly aware of that. I would say to the gentleman that I believe this is the first time that we have a different DOJ as far as being a different party. I think it was – I think the lawyers on both [90] sides of the aisle over the last forty years kind of got to know all the different players involved in the process and I think they could maybe accurately predict what might happen if it was just not – that it's not a different Justice Department, but that if they – if it was the same Justice Department as before.

I just feel like the sooner that we have the plan available to be filed to Justice; if they have some

312

objections we'd want to have an opportunity to address those and to get them back to them in a, in a timely manner. Because what could happen is they could object and they'd have another 60 days once they object and that could put you 120 days out, which would then put you - that would May, June, July. August. So I don't think you would be able to, in that point in time to have your primary in August.

And I think that would actually benefit the incumbent by having it drawn out longer because the public would not really know what, what the districts might look like.

[91] DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Mr. Speaker, I'd ask the gentleman, was he involved in the development of the criteria resolution that was utilized or ostensibly utilized for the Privileges & Elections Committee?

MR. JONES: I would with say yes.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Would the gentleman agree with me that it would – that criteria was used by the gentleman and the P&E Committee in the development of House Bill 5001?

313

MR. JONES: I would say that's accurate.

DEL. ARMSTRONG: Further question, [92] Mr. Speaker.

MR. SPEAKER: Will the gentleman yield? DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: The gentleman has already indicated, and I think we're all familiar, that the criteria included a number of things; communities of interest, contiguity, and of course, population deviation. Can the gentleman share with us how this criteria was developed?

MR. JONES: Yes. I would say to the gentleman that looking back over what has been done in the past 20 years ago and 10 years ago, reading the constitution, knowing what the law is basically, I drove this decision.

I think I mentioned in my opening remarks to the body that the only real change that you have here is the plus or minus 1 versus plus or minus 2 and that is due really to the Larios suit in Georgia; where it was a scheme by the party in charge to under populate and over populate for political gain. They over populated suburban [93] districts, under populated urban districts, over populated, you know, areas that would be favorable to one party versus the other.

So that really drove the change in the plus or minor 1 percent, because under the fact, under the – not fact. Excuse me. Under the scenario that if we did not get preclearance we would have a map that did not violate the Larios case, that would then allow a federal court to utilize the map that we had approved to address the objections of DOJ to make sure that the citizens would

314

be able to vote for individuals under the one-man, one-vote, one-person, one-vote principle and, hence, that's the main reason behind the 1, plus or minus 1 percent.

DEL. ARMSTRONG: Further question,

Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: When the gentleman refers to the Larios case, is he referring to Larios versus [94] Cox?

MR. JONES: It would be the one in Georgia. Yes, sir.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: Does the gentleman not read that opinion that the court is not imposing a mandatory or an inflexible population deviation, but whether or not there is any legitimate state interest for – or lack of a legitimate state interest for deviating from that population?

MR. JONES: Mr. Speaker, I would say to the gentleman I am not an attorney, but I believe – and I believe I can find it here. I thought he might ask that question. Let me see if I can find it. I believe there were four circumstances in how they under populated or over populated and I believe the comment was any

315

one, any one of those – here we go. I knew I had it somewhere.

[95] Let me see here. I'll be glad to give what my understanding is of the Larios case. There were four situations that – patterns. Excuse me. Wrong term. I want to – my lawyer here has advised me that you all are very precise in court. While I'm precise as a pharmacist in my general discussions, especially with my wife I tend to be more general and always – that way I stay out of trouble.

There were four patterns. The GOP – the Rs were over populated. The Ds were under populated. The rural community was under populated in south Georgia. The urban areas were over populated – were under populated as well. The suburban areas were over populated. The high growth areas were over populated. The slow growth areas were under populated. The black areas were under populated and the white areas were over populated.

And I believe what they said was any one of these violations of the, would be – of the 14th Amendment would be sufficient to say that they had violated the one-person, one-vote.

[96] Now, that's my reading. I'm not an attorney, but I did attend some of the conferences that the gentleman from Henry did. I think we saw each other down in Texas. So that was kind of my reading of that, but that's a non-lawyer response to a lawyer's question.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

316

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: I would preface my next question by saying my reading of Larios indicates that there were – the population deviations there were done in a way and a pattern that would have favored one particular political party over another; that is, that where there were populations that were deviated down, they were done so for entirely political purposes.

My question is there have been a number of other cases, including one that the United States Supreme Court upheld, the 1970s House plan of [97] Virginia, where there was a 16.4 percent deviation because there was a rational state policy for doing so.

And the question that I pose to the gentleman is; would he not agree with me that he could have better effected minority representation in the State, that is with better effective minority populations within the 12 existing minority districts, plus the ability to create a 13th, by using a deviation percentage higher than plus or minus 1 percent? Would the gentleman not agree?

MR. JONES: No, I would not agree. I would say to the gentleman that what they did in Larios was actually plus or minus 5 percent. The case he referenced back in the 1970s, that's 40 years ago. That was before I guess I even got out of high school.

And I am aware of that case. I think that dealt with the Eastern Shore, if I'm not, if I'm not mistaken and those two counties. And I think the overarching principle as I stated in my opening remarks is the one-person, one-vote. That [98] trumps the Voting Rights Act as far as the 14th Amendment of equal protection.

317

And I believe in the Larios case it was not just the way they went about it, but what the effect of it was to not just for political reasons; because when we get caught up on the political side of the equation we forget the people.

And the example I used of the gentleman from Prince William having 190,000 people and you having 68,000 people in your district I think is what we are trying to correct and the plus or minus 1 percent was done to better reflect, like we do in our congressional redistricting, the one-person, one-vote.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So the gentleman believes that the utilization of a plus or minus 1 percent [99] population deviation would achieve a better minority voting representation than utilization of higher population deviation?

MR. JONES: Mr. Speaker, I would say no. Maybe I didn't clearly give my response. My response was that the plus or minor 1 percent is a better reflection of the one-person, one-vote.

DEL. ARMSTRONG: Further question, Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

318

DEL. ARMSTRONG: So the gentleman then is, is not saying that a plus or minor 2 percent deviation would not have accomplished a better purpose in terms of minority representation? Does the gentleman take issue with that statement?

MR. JONES: Mr. Speaker, I would say to the gentleman that the plus or minus 1 percent I have spoken to directly. That is the one-person, one-vote.

DEL. ARMSTRONG: Further question, [100] Mr. Speaker.

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. ARMSTRONG: So the gentleman takes issue with my, my statement that plus or minus 2 percent would have done more to achieve minority representation?

MR. JONES: Mr. Speaker, I don't take issue with anything he just said. That's his opinion.

DEL. ARMSTRONG: Can I have just a moment, Mr. Speaker? I thank the gentleman.

MR. JONES: Thank you.

MR. SPEAKER: The gentleman from Henrico, Mr. Morrissey.

DEL. MORRISSEY: Thank you, Mr. Speaker. Would the gentleman from Suffolk yield for a question?

MR. SPEAKER: Will the gentleman yield?

MR. JONES: I'll be glad to.

MR. SPEAKER: The gentleman has yielded.

319

DEL. MORRISSEY: I would just like to begin [101] by thanking the gentleman for the number of hours that he put into this exercise.

(Applause.)

DEL. JONES: Mr. Speaker, I'd put forth –

DEL. MORRISSEY: First –

DEL. JONES: I'd just like to tell him I was telling some of my colleagues, and of course I didn't tell this to my wife, I think I did it for the pay, the praise and the free time it affords me to be at home with my family.

DEL. MORRISSEY: But I would like to ask the gentleman, with respect to his first initial remarks about the students' plans not complying with the Voting Rights Act, was the gentleman aware that there were thirteen colleges and universities, some thirty plans, and some of those plans were not – and those students' final plans who even won, they were not to comply with five categories, including equality of population, compactness, communities of interest, Voting Rights Acts and contiguity, but rather they were to focus on competitiveness? Were you aware of [102] that?

MR. JONES: Mr. Speaker, I would say to the gentleman I was aware of the fact that there were a plethora of plans that were introduced. I was also aware of the fact that the competition would include four winners, six if you count I believe the congressional. And so what I tried to focus on were the first and second place winners of both the division in competitive and I guess in the non – I guess it's the contiguity and communities of interest winners.

320

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

MR. JONES: Yes, sir.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: And the last question dealing with the students; what I'm trying to get the gentleman to agree with is that as he, he mentioned earlier that some of the plans only came up with some figure less than 12 majority-minority districts and I'm just inquiring whether or not [103] the gentleman is aware that with those plans the focus was on competitiveness as opposed to complying with the Voting Rights Act?

MR. JONES: Mr. Speaker, I would say to the gentleman that my comments, my opening comments were the fact that this is not an academic exercise. I'd ask for –

DEL. MORRISSEY: The -

MR. JONES: I am responding to the gentleman's question, if he would like for me to. Or I'd be glad not to and he can ask another question.

DEL. MORRISSEY: I'm sorry. I thought the gentleman was finished.

MR. JONES: This is not an academic exercise; therefore, we have to look at the Constitution. We have to the look at what – the code of Virginia, the Constitution of the United States of America and case law. I believe my comments were that of the plans that were submitted, and we only had one other plan that was submitted to the body for consideration, but I took

321

and looked at the [104] other three plans that were not submitted as a part of my analysis.

DEL. MORRISSEY: Would the gentleman yield for another question, Mr. Speaker?

MR. SPEAKER: Will the gentleman yield?

MR. JONES: Yes, sir.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Is the gentleman familiar with the work product of the governor's some would refer to it as blue ribbon, nonpartisan commission on redistricting?

MR. JONES: I would say yes. I was waiting to see that product on Wednesday and Thursday and Friday and Saturday of last week and I was pleased to know when we landed from the third of our three public hearings on Saturday, I got in about 10:00, that I was given notice that they had been filed and I came down here on Saturday – Sunday night and asked to be able to look at those to see exactly what was included in them.

DEL. MORRISSEY: Will the gentleman yield for another question?

[105] MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I will yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Given that the gentleman is familiar with the Governor's Commission's plan, is the gentleman also aware that that commission was comprised of academicians, constitutional law scholars, professors, retired judges, all of whom were

322

faithful to the State Constitution, the United States Constitution?

MR. JONES: Mr. Speaker, I would say to the gentleman that I don't personally know all the individuals. I do know several of them. And I would say that they are committed, concerned citizens who have the best interests of Virginia at heart when they do any task that they are asked to do.

DEL. MORRISSEY: Will the gentleman yield to another question?

MR. SPEAKER: Will the gentleman yield? DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

[106] DEL. MORRISSEY: Is the gentleman aware that in the last 26 hours Professor Mike McDonald of that commission called Legislative Services because he could not match the numbers of total residents in the Commission plan with the number of total residents in the House plan and upon inquiry determined after speaking with staff that the House Privileges & Elections's plan 5001 did not, emphasis on the word not, count mixed raced individuals? Is the gentleman aware of that?

MR. JONES: Mr. Speaker, I would say to the gentleman that I am aware of that and that's not correct. As a matter of fact, the gentleman who is in charge of this who has done a fantastic job, Kent Stigall, came to me yesterday morning and made me aware of that fact potentially.

I told him to just go find out what the facts were and bring it back to me. And he came back and said no, we did include it in the calculation and that it is correct.

323

DEL. MORRISSEY: Would the gentleman yield for another question?

[107] MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield, yes, sir.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Prefacing my question with a comment that I've got the empirical data in front of me of every single district and the percentage of VAP, black voting age population, with the House plan as compared with the percentage of the black voting population in the Commission's plan, can you tell me why in every single one of the districts, with the exception of two or three that are tied, the population in the House plan did not reach the same number as the population of the black voting age population in the Commission's plan?

MR. JONES: Mr. Speaker, I must admit to the gentleman – I told my wife I wouldn't use any versus from songs, so I won't. I'm a little dazed and confused. I'm looking here at the – what I have for the Commission plan, Option 1, and I have a high percentage of black voting age population of 56.8 and the low of 52.7.

[108] Now, I can tell the gentleman that in House Bill 5001 that is substituted before this body, we – every single, solitary district majority-minority is over 55 percent. Now, I know I wasn't that good at math, I'm not a math major, but from my reading of this and my double-checking it, that's what I have.

So maybe we just have – you know, numbers can say different things to different people and I can stand to be corrected based upon what I've had available to me throughout this process and I have – and I am detail

324

person. I double-check it twice. You know, I'm not a very good carpenter, so I always measure three times before I cut one time.

So I'm looking at it and I do not agree with that statement. As a matter of fact, the average black voting age population is 54.4 percent in the 12 plan from the Commission.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

[109] DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: I think the gentleman and I were speaking over each another. I'm not talking about the 12 majority-minority districts. Rather, I'm talking about each individual delegate's district, which the figures suggest that the black voting age population in your plan was undervalued, uncounted in each and every of the 100 districts that the Commission used.

And if you would like, I am prepared to go through it district by district. Was the gentleman aware of that point?

MR. JONES: Mr. Speaker, I would say to the gentleman that the concern that I had was, and I believe the court has ruled on this over the course of time, I think he's trying to get at the point of a majority – an influenced district and if you have 30 percent or 35 percent or something of that nature. That's not the argument that's before this body. I think that has been decided by the courts over time.

325

[110] But I would say to the gentleman that every attempt was made where possible to achieve and to have what were effective percentages in the 12 majority-minority seats to ensure that the community would be able to elect the candidate of their choice.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: Of course.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: I respect the fact that the gentleman wants to continue to focus on the 12 majority-minority districts and not answer my question. So I'll ask one question that I believe can be answered with "yes" or "No."

Isn't it a fact that your data did not count people of mixed races when contemplating the percentage of, of black voting age population people; yes or no?

MR. JONES: I would say yes, it did. If I can answer that question; I believe there are five [111] or four. You do a Black Specific Islander, you do Black Asian, you do Black White. I think that aggregates to what the numbers actually is what you include and consider when you look at the percentages.

DEL. MORRISSEY: Thank you. Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Would the gentleman then state categorically that his methodology followed the

326

Bush Justice Department method of counting African-Americans?

MR. JONES: Mr. Speaker, I would say to the gentleman that's a legal conclusion on his part. What I would say to him is from what I understand of what we – what you're looking at and contemplating as a state of counting the minority population, we have done what is required by law.

DEL. MORRISSEY: Would the gentleman yield for another question?

[112] MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Do I understand that the gentleman in response to the minority leader's questions said that yes, he and his fellow members on the Privileges & Elections Committee did have the time to study the Governor's Commission's plan not withstanding the late time of arrival?

MR. JONES: Mr. Speaker, I would say no. He didn't really hear what I said maybe. I did. I said I was the one who stayed up till 3:00 looking at it, because I knew that it would maybe be a question that might come up today and I had made the promise to look at all plans that were presented to be considered during the process of putting together this bill.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

327

[113] DEL. MORRISSEY: Given that the gentleman then studied the plan, I would ask him does he distinguish as there being a difference between a 55 BVAP versus 53 BVAP?

MR. JONES: Mr. Speaker –

DEL. MORRISSEY: That is; does the gentleman consider that a significant and meaningful difference?

MR. JONES: Mr. Speaker, I would say based on the testimony that we have, that we heard during the process I would say yes, based on the testimony from the community.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Is the gentleman aware that the Governor's Bipartisan Commission that, as he already agreed, constituted constitutional scholars, as well as other academicians and professor and judges, were able to create a 13th [114] majority-minority district that had a 53B VAP, 53 percent BVAP?

MR. JONES: Mr. Speaker I would say to the gentleman, I haven't agreed to anything of the composition of his district. I would say to him that they certainly came up with what they felt were plans they wanted to present to this body and they did and thank them for receiving that information.

DEL. MORRISSEY: Would the gentleman yield for another question?

328

MR. SPEAKER: Will the gentleman yield? DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Given that the Governor's Bipartisan Commission came up with a 13th majority-minority district, that according to their methodology included the following: It comprised a part of Suffolk. It included contiguous precincts in Portsmouth and Chesapeake. It did not unnecessarily split jurisdictions. It was compact. It was contiguous. It united, not [115] divided, communities of interest in eastern

Suffolk County and it did not jeopardize any other BVAP district in Hampton Roads or Southside.

Can the gentleman tell me why the panel or he, if he was the only one that reviewed it, rejected that 13th majority-minority district that seemed to comply with all constitutional requirements both state and U.S.?

MR. JONES: Mr. Speaker, I would say to the gentleman, that certainly is his opinion. But I would tell him, just correct him; I live in Suffolk, the city of. Born and raised. Live in Chuckatuck. I'm a (inaudible words). I looked at the plans. They came in and took out Ebenezer, took Driver and put it in with the 64th and they took and split the community of Chuckatuck away from other communities of interest; where I went to high school and where I've lived all of my life.

So it was obvious to me they did not keep nor unite communities of interest because they don't have the local knowledge that I do and I kind of [116] dismissed it out of hand as a play to really say, "Okay. We're going to go up and grab this certain population and then we're going to split a community and we're going

329

to try to see if we can (unintelligible word) there from here."

And what I would like to continue to add – and I didn't feel that is what should be done. So when I was contacted on another front – in the city of Richmond, for example, I sat down with the gentlelady, gentlewomen from Richmond and spent an inordinate amount of time going through neighborhood by neighborhood to make sure that we did not split the Fan, for example. We did not take and split this community.

So I would say to the gentleman that yes, I did see the plan. I thought it was interesting that they would go in and split up Chuckatuck and cut up this country – this city right in half and I don't consider that a community of interest. I think that the people in King's Fork, Eclipse, Hobson, Sandy Bottom would disagree with your assertion that they kept and put together [117] communities of interest.

And I would say from my perspective, sitting down with the members who represent the community, who know their constituents and are trying to work through to make sure you have a plan that makes sense, if you look at the city of Richmond now it's more compact, it's more contiguous, and I think it's a much better product having sat down and listened to the concerns of the people who represent the registered voters and the citizens of that area.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

330

DEL. MORRISSEY: I appreciate the fact that the gentleman knows far more than I will ever know about Suffolk City, the county, than I do. But also given the fact that it is indeed a fact that in the last decade the communities of interest in eastern Suffolk County have been divided, but that [118] the Governor's plan will unite it, would he not agree that that was something for consideration among the public and all of the town forums that you visited that would have allowed a 13th majority-minority district?

MR. JONES: I would, I would, I would say to the gentleman I would not agree with that and obviously you couldn't have asked a better question about my neighborhood. They took Bennett's Creek pharmacy, where I live, out. They put Ebenezer – I mean where my pharmacy is out. They put where I live in another district. They put where I grew up in another district.

And I think for 25 years, I would think the people of Suffolk would say I probably represent the community. I stood for election, got elected at 27, was mayor early 30s, and have stood for election I think 11 or 12 times. So I would think a map doesn't tell one anything about a community. It's the fabric of that community. It's what they believe is in their best interests and who represents them.

[119] So what I would say to the gentleman is that the plan that I saw when I looked at Option Number 2 did not meet the criteria of what we had heard from our public community. Therefore, I thought it would injure the ability of the African-American community to be able to elect the candidates of their choice. It would probably take them from 12 down to 11 or maybe 10 and not taking 13.

331

So I thank the gentleman for his question because that's right up my wheelhouse as far as where I live and where I've been for 52 years.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: With respect to the gentleman's comments about the fabric of the community, can the gentleman tell this body if there was one public meeting which was duly recorded where a citizen of Suffolk came forward [120] and said, "You know, we've looked at the Governors's plan. We like the fact, the way it unites a community, but we don't want you to do that. We want you to do it the way you proposed." Was there one single instance of record where that occurred?

MR. JONES: Mr. Speaker, I would say to the gentleman I had dozens of people come to me and say they wanted to keep me as their delegate. I think that answers his question.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Would the gentleman agree with me that the Governor's Commission's plan did not jeopardize any other BVAP district in Hampton

332

Roads or Southside? Would he agree with that statement?

MR. JONES: Mr. Speaker, I would not agree with anything that the – would not agree or [121] disagree because it's all hypothetical. It was an exercise based on a request and a promise that the Governor made.

And you are very eloquent in how you present yourself and what you're trying to accomplish in your line of questioning, but I will say to the gentleman that this plan, the bill that is before this body, does two things and I think it does two things well. It represents the one-person, one-vote and it further complies with the Voting Rights Act of the United States of America.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: With respect to his last comment about one-man, one-vote, can the gentleman articulate for me and this body and the folks around the State that are listening why we have 21 to 22 percent African-Americans in the Commonwealth, but their representation in this [122] body is 12 percent?

MR. JONES: Mr. Speaker, I would say to the gentleman there was a great article in the paper a couple weeks ago about how things have changed in the last 30 to 40 years and now what you're seeing in your newer developments is more of a 50/50 as far as, you know, black/white population.

Now, you still have pockets in Hampton Roads, for example, where you still have the segregation. But

333

what you've seen in last 10 to 15 to 20 years, which is a great thing, is the fact that you've got people of color living in the same community with people of other; whether they are Asian, whether they're American, you know, African-American, whether they're Caucasian.

And so I would say to the gentleman that the diversification of our Commonwealth and the growth patterns that have occurred in the last 10 years and 20 years, I would, I would say have caused an influx in various areas of – for example, in Richmond City. The gentlelady from Richmond, her voting age or her population dropped 10 percent [123] because of an increase in population of, I believe of a white influx of citizens into the city of Richmond.

So I would say to the gentleman that a number doesn't always indicate what strength you would have. I think we know that by looking at election results sometimes. You might say you got – your governor got a certain percentage. "How come, you know, I didn't get or do as well?" or "How come I did better than what the party might have done?"

So I think it's left to the gentleman from Henrico to determine whether 12 is enough, if 13 could be drawn. I don't think that it can. That would give you an effective representation based on the testimony that we heard throughout the very public process.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

334

DEL. MORRISSEY: I appreciate the gentleman's [124] response and using the language growth pattern and strength, but I would respectfully say he didn't answer my question. So I'll ask another question that perhaps is easier.

Given that there's 21 percent African-American population in the Commonwealth, would you agree that it would be desirous if this body was in turn represented by as close to that percentage figure as possible, emphasis on the word desirous and emphasis on yes or no?

MR. JONES: Mr. Speaker, I would say to the gentleman I have answered his question. I would say we have the gentleman from Roanoke City, Mr. Ware; we have the gentleman from Prince William, Mr. (unintelligible word). I have the gentlewoman from Alexandria, Ms. Herring, who actually represents districts that are not majority-minority and do a very good representing them.

And I think that that demonstrates where Virginia is as far as how views its elected officials. They look at the person. And so you [125] can have someone outperform what the numbers would formally indicate.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Since the gentleman, I would suggest, skirted that question, let me ask another perhaps even easier one.

335

Since Virginia is becoming more diversified with more Hispanics, more Latinos, more people of – from Pacific Rim countries, would you believe or do you believe it's desirous that those diverse populations, non-Caucasian populations be represented in this body of 100 by people from their own race or ethnic background?

MR. JONES: Mr. Speaker, I would say to the gentleman, yes, and that's the reason 10 years ago we created a district that actually had a combination of I believe African-American and Hispanic or Asian to approximate greater than 50 [126] percent. I think the gentleman from Fairfax, Mr. Keene, does a wonderful job and we're very blessed with what I would consider a body here that represents the fabric of the Commonwealth.

DEL. MORRISSEY: Thank you. Would the gentleman yield for another question, Mr. Speaker?

MR. SPEAKER: Will the gentlemen yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Moving onto a 14th majority-minority district that the minority leader just touched on briefly, were you aware of the Commission's methodology, the Governor's Commission, wherein they came up with a plan that could have created a 14th majority-minority district that would have united the communities on the Southside, which would have been a compact and contiguous district, and it would have given greater voice to rural, the rural black communities; were you aware of that suggestion a for 14th majority-minority district and did you consider same?

336

[127] MR. JONES: Mr. Speaker, I said to the gentleman that he said was totally aware of what I had said in this whole process was and of course anyone of the 100 of us could have put in any bill that we wanted and I would guess if someone had already done all the hard work someone could have put their name on it and had it before this body for our consideration and then I would have had maybe a better chance to look at that itself.

What I would say to the gentleman is that when you look at the 12 minority-majority districts that we have today, you look at what happened over the course of time in the last decade, there was a dilution from 60 percent to 50 percent in the 71st and I think the trends definitely show that if you do not, according to the testimony that we received, have a certain effective majority voting strength over the balance of the decade the minority community could lose, in fact lose the ability to elect the candidate of their choice.

DEL. MORRISSEY: Would the gentleman yield [128] for another question?

MR. SPEAKER: Will the gentleman yield? DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: With respect to BVAPs, I note that the gentleman has repeatedly at least seven or eight times used the phrase "according to testimony that we received." Not withstanding that, and given the fact that the gentleman just referred to the gentlewomen from Alexandria, Ms. Herring, Delegate Herring, who was able to win a district that had less than 50 percent BVAP, would you not agree that it is possible to elect an African-American representing 53 BVAP and not the mandated 55 BVAP?

337

MR. JONES: Mr. Speaker, I would say to the gentleman that I have in my 25 years of being in office – when I first went to City Council we actually had an African-American who was representing now the fast growing area of Bennett's Creek in the Sleepy Hole Borough. And I would say yes.

[129] I also had the chance when I served on the City Council to have a, a majority-minority district under perform and to elect a white person. Of course, four years later they elected a candidate of their choice. One would say that both were the candidates of choice.

So I would say to the gentleman, I would leave it to his devices to come to a conclusion. My job was to do the best I could to make sure we complied fully with the Voting Rights Act.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield? DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Not withstanding whatever conclusions that I come to, I'm more interested in the conclusions that you or the members of the P&E came to.

Would you not agree that if there is a district that was somewhere around 51 BVAP or 52 BVAP that they ought to have a, the opportunity to [130] elect an African-American to this august body?

MR. JONES: Mr. Speaker, I would say to the gentleman that I think any candidate that is, presents himself in a manner where they energize the population that they can get elected in an

338

overwhelming Republican district – they could be a rural Democrat.

The gentleman from Isle of Wight, Representative Barlow has represented Isle of Wight County for years. He is in a Republican district. He comes back each and every year because they respect him. I served with his brother when he was on the school board in Suffolk.

So I would say to the gentleman that the population, the electorate, they know and they base their decisions on the quality of the candidate in many cases, not withstanding what the trends might show you.

But what's before us is compliance with the Voting Rights Act and what case law dictates and what some would say is an effective minority [131] representation. So the testimony that we have received stated very clearly that given some of the facts that we had heard during that testimony – I think the gentlewoman from – I'm going to mess it up and get in trouble.

Delegate Tyler indicated that she has several facilities in her district that would effectively reduce the percentage of those who are eligible to vote, who are actually registered to vote because of their status and, therefore, she would have a lower effective percentage to elect the candidate of their choice.

DEL. MORRISSEY: Would the gentleman yield for another question, Mr. Speaker?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: I'd ask the gentleman this. Given that the gentleman has not quarrelled or

339

quibbled with the methodology used by the Governor's Commission once during this debate and given that the Governor's Commission came up with [132] a black voting age population in rural Virginia of 50.25 percent and given that the gentleman believes that rural black Virginians ought to be represented and their voice ought to be heard and given that it wouldn't impact any other minority-majority district, is it not a good thing that this body create a 14th majority-minority district that would represent the interests of 50.25 percent of African-Americans in rural, in rural Virginia?

MR. JONES: Mr. Speaker, I'd say to the gentleman just because I didn't quibble I do not – I have not passed judgment nor agreed with the Commission. It's not my job. My job is to have a bill before this body that complies with the Voting Rights Act, which complies, in my opinion, with the one-person, one-vote.

So you're not going to try to get me to answer a question that you want in a certain way. I stated my opinion very clearly. I think that – I'm not done.

DEL. MORRISSEY: Sorry.

[133] MR. JONES: I think that the ability of the community to elect the candidate of choice is the issue at hand. Oh, yeah, there's certainly occasions where you have a non-performing majority-minority district. There are certain occasions where you have a Republican that gets elected in a democratic-leaning district. There are certainly occasions where you have someone who might run in a three or four way primary that might win and would not necessarily be the candidate of their choice, but is the candidate that they have on the ballot.

340

So I would say to the gentleman, he can ask me all the questions he wants about the Governor's Commission; I have no opinion. Okay? And my opinion is the plans that were submitted do not - the testimony that was received meet the criteria of what is felt to be necessary to elect the candidate of their choice.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

[134] DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: I won't ask the gentleman anymore questions about the Governor's Commission and what he thinks of it. I'll ask the question I asked him a moment ago taking that out of it and I'll repeat it.

Given the fact that there is a community or a district that could be created in South,

Southside, Virginia that is composed of 50.25 percent African-Americans and that given that their voice ought to be heard in this chamber, would you not agree that we ought to create a majority-minority district for those 50.25 percent of rural African-Americans who need to be heard?

MR. JONES: Mr. Speaker, I would say to the gentleman he's drawing certain conclusions of community of interest which I can't speak to. I would say to the gentleman I have answered his question and I will continue to answer it the same way that I have.

DEL. MORRISSEY: Would the gentleman yield [135] for another question?

MR. SPEAKER: Will the gentleman yield?

341

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: With respect to community of interest and splitting cities and counties, would the gentleman agree that his county/city splits in the House plan 5001 totaled approximately 197?

MR. JONES: Are you talking about my plan? Are you talking about House Bill 5001?

DEL. MORRISSEY: Would the gentleman yield for a question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield, yes, sir.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: I am talking about HB 5001.

MR. JONES: Okay.

DEL. MORRISSEY: And I'm talking about the splits that often and necessarily can't be avoided with counties and towns and that are actually part of the process. It has to the occur to some degree.

[136] Would the gentleman agree that in his plan there were approximately 197 splits in various counties and cities, some of which could not be avoid?

MR. JONES: Mr. Speaker, I would say to the gentleman I would agree that if he says that's what his actual number is I would take that at face value. I don't have the report in front of me. I would indicate to the gentleman some are zero since this block, to zero population. Others were done for obvious reasons to meet the plus or minus 1 percent.

342

We had splits 10 years ago. Every plan that's before us has a split in it, if I'm not mistaken, and I would say that the splits in this plan are the ones that were drawn to comply with the criteria that was adopted by the P&E Committee.

DEL. MORRISSEY: Would the gentleman yield for another question, Mr. Speaker?

MR. SPEAKER: Will the gentleman yield? DEL. JONES: I yield, yes, sir.

[137] MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Is the gentleman aware that one of the student's plans that complied with compactness, contiguity, community of interest equal population and the Voting Rights Act had a county/city split that was half of what HB 5001 was?

MR. JONES: Mr. Speaker, I can't speak to what that plan was. I would just let the gentleman know that once again there was a reason that I had – that we in the P&E Committee had communities of interest, Number 5. Because Number 1 was one-person, one-vote. Number 2 was compliance with the Voting Rights Act. Contiguity, compactness are required by I think our Constitution and code and single member districts we did – we went there and did that back 30 years ago. So it was Number 5 for a reason.

DEL. MORRISSEY: Would the gentleman yield for another question, Mr. Speaker?

MR. SPEAKER: Will the gentleman yield?

[138] DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Does the gentleman recall those diagrams that I showed the body yesterday?

343

MR. JONES: I think his picture was in the paper today, but I probably can note – if you tell me what district you're talking about I can certainly probably tell you what it looks like.

DEL. MORRISSEY: Would the gentleman yield for another question?

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: The districts were Delegate Massie's, which I think was the 72nd, and Delegate Cleveland's, the number which I'm not familiar with right now.

But the point of my inquiry was when I asked him whether or not he observed them would he agree that they were anything but compact.

MR. JONES: I would say to the gentleman that again compactness was Number 5, I believe. I [139] mean, it was Number 3 on the list. The districts that have been drawn, in my opinion, comply with our Constitution, with the Voting Rights Act, and I'm satisfied with the map, the bill that's before this body.

DEL. MORRISSEY: Would the gentleman yield for another question, Mr. Speaker?

MR. SPEAKER: Will the gentleman from Suffolk yield on question?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. MORRISSEY: Given that the gentleman did see, recalled the diagrams and that he agrees that compactness is the one of the requirements, is the

344

gentleman aware that one of the student's plans increased compactness from 49.78 percent all the way up to 57.77 percent, far better than HB 5001?

DEL. JONES: Mr. Speaker, I would say to the gentleman some of the maps that I saw had taken I believe – let me see if I can find it here. I think the gentleman from Chesapeake, who will be speaking later, can speak to this.

[140] I think we combined members together. We actually took communities of interest, which they felt, just like in the one Matthew mentioned earlier about the Governor's competition. I'm not sure how he split Chuckatuck and Driver and Eclipse and Hobson. You can say that's a community of interest.

I would say to the gentleman what I did note that if you look at the priority; any of the foregoing criteria shall be considered, but population equality among districts in compliance with the federal and state constitutional

requirements and the Voting Rights Act of 1965 shall be given priority in the event of conflict among the criteria. I think that answers his question.

But I'd like to give him one quote that I think is very interesting and topical. Not mine. We've talked a lot about the students. Great quote. Hannah Nommi, 21, student, UVA said, "The exercise taught her that it's not always possible to draw maps with neat-looking compact districts [141] while still abiding by the terms of the Voting Rights Act and trying to respect county and city lines." Quote, unquote, "It's easy to justify to the public when you have these very compact districts," she said, one of the nine students on a team with a winning map, "but Virginia is not square. It's just not." And I think that pretty much says it all.

345

DEL. MORRISSEY: Mr. Speaker, I thank the gentleman for his answers.

MR. SPEAKER: The gentleman from Chesapeake, Mr. Spruill.

DEL. SPRUILL: Mr. Speaker (inaudible words).

MR. SPEAKER: The gentleman has the floor.

DEL. SPRUILL: Mr. Speaker and Members of the House, let me have your ears and please listen if you can.

I'm surprised all of a sudden this has come out to be a racist thing about blacks who are in the House. This is not about no race. We have 100 members in this House and we're talking about black minority districts. If we had wanted to do [142] that, we have three fine lawyers in the Black Caucus that can do that.

My lawyer next to me who represents me says, "Be careful of what you say." Some are saying, "Why are members making this a thing about blacks being represented?" They're not saying, "Well, that's fair enough. Let's see who came to us and say, 'This is what I propose.'"

From the Governor's plan did they come to us? No. Delegate Chris Jones, we went to him and we had some concerns, mostly every member of the Black Caucus. He answered our concerns; some we were satisfied with and some we were not, but at least we had input into Plan 5001. Where's the other plan that's coming to the Black Caucus and saying, "Hey, we're going to try to help you all"? Who else?

I'm the (inaudible words) Black Caucus. Who has come to me and said to the Black Caucus, "Hey, we've got a plan to look out for black folks." This is not a

346

thing about race. And I know somebody's standing there taking every word you [143] say because this is going to go to the court. Well, let's make it right.

To the members of this body, this is not about black folks, so don't let them, nobody put you on they're trying to save the black folks. That's not so. So okay. What is this is all about? Let's look at Plan 5002 that was submitted yesterday, that was talked to us yesterday. That plan had Delegate Kenneth Alexander, along with Delegate Ed Howell of the same district. That plan had Delegate Matthew James and Spruill, same district. That plan had my house in the 79th district.

No one has come to me or anybody and talked to us about this. So it's not about race. It's about representation of the folks. Delegate Chris Jones is the only one that came to us and says, "This is what" – what he was saying. We went to him and said, "We have a problem. Can you resolve those problems?"

Now you've got the Governor's plan. The Governor has not sent – well I wouldn't expect [144] the Governor to do it himself, but he asked no one to come to talk to us about it.

Let's talk about the 13th district. It was not taken up by the Black Caucus because we have not discussed it to talk about it, but by my friend here who spoke about it yesterday and this morning. The Governor's plan is talking about a 13th and 14th district. We do not need to create another black district.

Oh, I would love to see it happen. We already had one. Do you remember Flora Mass (ph)? Flora Mass was black. Guess who took Flora Mass's (unintelligible word)? Okay? And he is not of our persuasion.

347

Okay? Now you're talking about so that's the 13th seat. Now, I ask you to check and look what is a minority percentage of Delegate Joe Morrissey's district? Check it out. What is Morrissey's percent of the black district? But the people there in Richmond were so kind, they made him their choice. And that's a black district, but they made him their choice and I'm [145] glad for him. That's the 13th district he was talking about. That's a black district.

Oh, let's talk about the 14th district. Betsy Carr. That's a black district. They're your 13 and 14. But the people in Richmond made her their choice and I'm glad for her because she is doing a good job. That's a black district. So if those who are saying that "We've got to look out for the blacks, we got to create a 13 and 14 black district," we already have them. But the people in those black districts made their choice to support (inaudible words) and that's – there's nothing wrong with that. That's their choice.

So you need to create – (inaudible words) we do create another 13th district and you select another white. Then what? Then what you gonna do about that? Because the peoples have made their choice. So it's not about race. Please, don't hang this on the black folks. So when you go to court, don't say they tried to dilute the black folks.

Well, what are my concerns? My concerns is [146] this. And let me put my eyes on. 1887 to 1888 African-Americans, members of the General Assembly, eight members. Come here and look at it. And they're downstairs somewhere in the little corner where you can't see them. Eight members of the Black Caucus were elected one year from 1887 to 1888. Since 1888 and here it is in 2011 we've only increased five. Okay?

348

Ain't nothing to do with race. "Well, what's it got to do with Spruill?" Then we're saying, "Well, look at the public of Virginia." 20 percent, whatever it is. So tell me how can we create districts. We talk about a snake going around to make sure you've got black's representation. We have blacks who lost, that don't vote. If they don't vote – if you create a black district and they don't vote, then whose fault is that? Okay?

So we have what we're looking for. The (inaudible word) was saying "The NAACP, the representation, were they represented where they knew about it? Yes. Lue Ward, Lue Ward, NAACP in [147] Suffolk, NAACP in Chesapeake and Virginia Beach. I'm saying those because I know they're in a ruckus. I want to make sure I got it right. They are aware of it. I'm a member of the Men's (inaudible words) For Progress. Yes, we are aware of it.

So we are here today. I thought that if members of – let me use this body on this side of the aisle. I felt concern that we were looked at and saying, "Let's create – this is for everybody what's fair." But instead we're coming here and saying that we're talking about diluting the black folks and they be (inaudible words) representation. Don't do it.

My concern is to make sure that those blacks – I don't like to use the word minority towards us. Those blacks – my concern; have input with Delegate Chris Jones. My concern was to make sure that we have the numbers, to make sure that we keep what we got and can get more when we want to. Not because you're black. Because my concern is that we do not dilute.

[148] So I ask you all this; if the 5001 is the plan - and I ask you all this and those who are keeping records for us to turn to the court; ask them, "What

349

other plan, what other group has come to the Black Caucus and say, 'Hey, we have a plan to increase the black minority votes. We have a plan to make sure that you're safe'"?

There is no other plan. Where is it? Where is that plan? Ask yourself that. Who has presented another plan to us other than 5001? You go on what you know about it and that's important. As I've told it to the Speaker, we really don't have 12 anointed seats, as they say. You really don't. Delegate Herring, our friend to African-Americans, it's not the African-American seat, but the citizens of her area who the majority are white, they see fit to elect her. So don't count it as an African-American seat.

Delegate (inaudible words). It's not an African-American seat, but the citizens, both black and white, decide that he was the best choice. My friend Delegate Ware from Roanoke; [149] it's not an African-American seat, but the citizens, both black and white, decide that he was the choice. So it's not about that.

So I ask you all this; is there – if you're going to look at and look out for the black community, we ask you all look at who has come to us, look at who has worked with us to try to make sure that we maintain what we've got. Who has been that person? That person has been Delegate Chris Jones. I ask you all to support 5001. Thank you very kindly.

(Applause.)

MR. SPEAKER: The gentleman from Arlington, Mr. Hope.

DEL. HOPE: Thank you, Mr. Speaker. Would the gentleman from Suffolk resume the floor for a question?

350

MR. SPEAKER: Will the gentleman yield?

DEL. JONES: The gentleman from Suffolk will (inaudible word.)

MR. SPEAKER: Yeah.

DEL. JONES: I'm here to answer questions.

[150] MR. SPEAKER: Kind of like Norfolk. The gentleman yields.

DEL. HOPE: Thank you, Mr. Speaker. Let me preface my remarks by saying the concept of one-person, one-vote came out of what was happening in the south where votes of rural citizens were worth more than votes or urban citizens, which tend to be people that were minority.

With that in mind and looking at the proposed map, it races some questions to me in my mind. And just looking at Hispanics and Latino voters, let me also say, you know, all these districts that I'm going to mention are controlled by the majority party. The 51st district will decrease by over 30 percent for Latinos and Hispanics. The 31st district will decrease by nearly 30 percent. And the 50th district would decrease by over 20 percent.

My question for the gentleman is why is, why is there this kind of decrease when the 2010 Census shows that the population of Hispanics and [151] Latinos, particularly in Fairfax and Loudoun and Prince William, are – continues to rise significantly? Shouldn't this be the opposite trend that we're seeing?

DEL. JONES: I was going to say to the gentleman, 10 years ago when we created the additional we call it combination majority-minority district over the course of the 10 years what occurred was we had a I guess redevelopment.

351

I talked with a gentleman from Arlington, Mr. Brink, about how we could make, increase that population back to what it was performing 10 years ago. And you know, certainly an attempt was made to try to preserve that seat. I believe it's seat number 47. I could mess – I could be wrong in my number. And that was an attempt that was made to try to keep a combination majority-minority seat.

DEL. HOPE: A further question, Mr. Speaker.

MR. SPEAKER: Will the gentlemen yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentlemen yields.

[152] DEL. HOPE: Switching over to black voters, I note that when the new proposal, House Bill 5001, in the 93rd district, which is currently occupied by the gentlelady from Newport, which is – she's been drawn out, the district decreases black voters by over 30 percent. The 23rd district decreases by nearly 50 percent the number of black voters. And the 27th district decreases by over 30 percent.

Why do you think we're seeing this level decrease among blacks in these districts?

DEL. JONES: Mr. Speaker, that's a pretty simple answer. If you – give me the numbers again. I think you said 93; is that correct?

DEL. HOPE: 93, 23

DEL. JONES: 93 had an 8.5 percent population loss. Deviation, I should say. 92, which is next to it, had 11.24 percent loss. 93 had an 8.5 percent loss. 94 had a 10.68 percent loss. And believe it or not, the gentleman, our newest 100 member who give us 100 votes yesterday, had a 20 percent loss.

352

[153] If you're familiar with the geography down in our neck of the woods, in Norcross and Suffolk to the Peninsula, all those districts are down in the very bottom. So what had to happen, the population had to be picked up, had to try to maintain the voting strength for the black voting percentage. So naturally you would take some of those, those precincts and you had to move and change it to picked up population.

So if you noticed the 93rd district looks similar to what it does now, except we had to move up the Peninsula several miles. So that was not totally reconfigured. Had to move up the peninsula because you got four on each side. We decided to undo from 10 years ago the 64th, which went across at the ferry into James City County and Williamsburg. And so at the end of the day by bringing that population back across the river there's enough population to keep those same number of seats within the new Kent County line back down to downtown Newport News so that community of interest could be kept together and [154] there would be six seats within that area.

So that should answer, hopefully answer his question.

DEL. HOPE: Will the gentleman yield for another question?

MR. SPEAKER: Will the gentlemen yield?

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. HOPE: Thank, you Mr. Speaker. I'd ask the gentleman, and let me just be more specific and direct; you know, when I, when I look at these numbers and I see districts that are becoming more white, I see a trend here and I look at 51st, 26 percent more white;

353

23rd, 19 percent more white; the 27th, 18 percent more; the 42nd, 15 percent more and it goes on. The 86th district, 16 percent more.

My question to the gentleman is the top nine districts that got wider are districts that have been getting more diverse and more competitive since the last time we drew the maps. Why did you choose to make these most competitive seats [155] significantly less diverse and more white? And was this, was this the intent or was this just an effect of this process?

DEL. JONES: Mr. Speaker, I'd say to the gentleman, I'll use that golf analogy as (inaudible words) lefty. I'm a lefty. Can repeat this year's Masters champion. Last year when he was on the 13th hole and he had that hole to make, he decided to play it where it lied. People said, "He's lost his mind." So he hit the shot, hits the green, makes the putt and wins the Masters.

When you get the Census numbers back you have to play it where it lies and if you look at those districts that are surrounding the 27th, which I think was one of your examples, that would be the 69th, which was down 11 percent. That would be the 70th, which was down just a percent. That would also be the 71st, which was down 8 percent.

You have to pick up that population to maintain those numbers to be able to make sure that you don't fall out of compliance with the Voting Rights Act. That should hopefully simply [156] answer his question.

DEL. HOPE: Would the gentleman yield for a question?

MR. SPEAKER: Will the gentleman yield for a question?

354

DEL. JONES: I yield.

MR. SPEAKER: The gentleman yields.

DEL. HOPE: So my question is was this intentional or was this just the effect?

DEL. JONES: I would say to the gentleman I think I answered his question. I played it where it lied.

DEL. HOPE: Speak to the bill when appropriate.

MR. SPEAKER: At the appropriate time. The gentlewoman from Petersburg, Ms. Dance.

DEL. DANCE: Thank you, Mr. Speaker. And I guess I wanted to speak to the bill, so maybe it's not the right time.

MR. SPEAKER: You want to speak to the bill?

DEL. DANCE: Yes.

MR. SPEAKER: You've got, you've got the [157] floor.

DEL. DANCE: Thank you. As a member of the House Redistricting Committee I support House Bill 5001 in its substitute form as we have before us and it's again for more than just the one reason that it mirrors the – or doesn't mirror, but it does support the 12 minority districts that we have now and it does provide that 55 percent voting strength that I was concerned about as I looked at the model and looked at the trending as far as what has happened over the last 10 years.

And one of the best examples I can give for that and most concern was the area that was mentioned prior and that is Delegate Tyler's area in the 75th. Because Delegate Tyler is an African-American that now finally sits in a minority seat that's been there for

355

years, but there have been three tries by minorities in the past to win that seat and they were not able to do so.

And if that district is below that 55 percent voting strength, then I don't think she would be [158] able to hold the seat that she now holds today and I was really, really concerned about that. That issue was addressed and it is now in that House Bill 5001 and I'm glad it's there.

That is the – and for the rest of the house – or the minority districts, it shows 55 percent voting. And it's voting. Not just people being there, but the effective opportunity for them to hold minority seats. And not just for us incumbents that are in the seats, but for those that would come after us.

And as was mentioned by Delegate Hope and he was asking about the 27th, the 69, the 70, 71, they represent minority seats. Not the 27, but the 69, the 70, the 71; they represent minority seats (inaudible words) even though minorities might not be in there. And if we are to preserve the rights for minorities to have a voice, as to whether or not they want to have a minority serve them or someone of the majority persuasion, that they have that choice. And they could lose that choice if they did not have the voting strength [159] that we now have in this.

And I also support this bill because I am on the House side on the democratic house side and I know that my colleagues, because I represented them and I tried to be a voice for all of them in working with the chair as he developed his bill, that they gave me their suggestions. I passed them on and they were looked at and the chair did work with them directly. And I see a

356

lot of us had a lot of voice in House Bill 5001. It's not just African-Americans. African-American,

Euro-American, it represents members of my side of the House as well have a voice in the bill that we have and I think it's the best compromising bill that we could bring forward that truly represents Virginians. And that's the Commonwealth. Not just us, but the people that will come after us. Thank you.

MR. SPEAKER: The gentleman from Henry, Mr. Armstrong.

DEL. ARMSTRONG: Speaking to the bill.

MR. SPEAKER: The gentleman has the floor.

[160] DEL. ARMSTRONG: Mr. Speaker, Ladies and Gentlemen of the House, I think that I oppose HB 5001 and there are public policy reasons why I would do so, but I'm not going to talk about those on engrossment.

What I would like to restrict my comments to is what I perceive as a legal analysis of where we are. Now, regardless of the comments that have been made here on the floor, Virginia is subject to the Voting Rights Act, Sections 2 and Section 5. Regardless of whether we've talked to one another, not talked to anyone, have extended courtesies, not extended courtesies; it doesn't matter. We either comply with the Voting Rights Act. The bill is flawed. It will not be approved at the Justice Department or, let's not forget, that the Attorney General has the option of filing in federal court in the District of Columbia.

What concerns me, Mr. Speaker, in listening to the debate here today is there appears to have been a failure to analyze the 12 minority-majority districts in terms of its voting pattern.

357

[161] Certainly the gentleman from Suffolk, who clearly I think from the discussion here today, oversaw the bill and the process has heard a number – or has had a number of public hearings where he listened to constituents, but that is antidotal information.

Without a, a, a, an analysis of retrogression of the voting patterns one can't tell, for example, whether or not a 53 percent minority district might actually be able to elect its candidate of choice. Somewhere else perhaps only 57 or 58 percent. And the gentleman has enunciated an arbitrary figure of 55 percent and nowhere that I can find in the case law or in the decisions that have come out of the Department of Justice have indicated that that is a magic number. It is arbitrary.

And that there appears to have been a failure to do this retro, retrogression analysis. We don't know whether or not these districts have been, I'll just the terms cracked or packed, which is the slang term for diluting minority districts [162] or putting too much minority population in there.

And I think that the reason that we have gotten to this point is there's been insufficient time for this analysis to be conducted. That this process has been rushed. We all know that Virginia by having – virtue of the fact that our elections are in the off year and that occurs in 2011 immediately upon the presentation of the Census data.

Still, though, we're, we're essentially looking at one week from the time that these, this plan was developed until it's voted on. And with insufficient time for various civil rights organizations or other interest groups to conduct an analysis, what we don't know here today is whether or not a 13th or perhaps 14th

358

minority district could be created and done so without dilution of the 12 existing minority-majority districts.

Certainly no one – I nor anyone else is suggesting that we dilute the 12 existing ones, but if a 13th and certainly a 14th can be [163] created – I received late yesterday information that a 14th district might be able to be created in Southside, Virginia with, with a 50.25 minority population. That without a retrogression analysis one would not know, that may very well – that that district be able to elect its candidate of choice.

And so regardless of how we got to this point, if this bill doesn't comply with Sections 2 and 5 of the Voting Rights Act, this bill is going to be invalidated by DOJ or the first federal court that deals with it. And I think we – and I don't demean the gentleman. I don't dispute him at that he stayed till 2:00 in the morning working on this, but if you haven't done the necessary analysis to determine what the minority impact is on the minority community, we have failed and this plan has serious potential of being rejected.

The other thing that lastly I would say, that the gentleman from Arlington and his questions, in my review of particularly districts in northern Virginia there appears that Republican districts [164] have gotten racially whiter and democratic districts have gotten – persons of color have been placed into those and it would seem to suggest that if that was done in a failure to look at these minority-majority districts, that a lawyer could very easily make an argument of a pattern of discrimination. That there is a pattern of racial discrimination along those lines.

In any event, Mr. Speaker, for those reasons HB 5001, in my humble opinion, has serious voting rights

359

flaws and I would ask that it not be engrossed and past to its third reading.

THE SPEAKER: The gentleman from Arlington, Mr. Hope.

DEL. HOPE: Thank you, Mr. Speaker. I'll speak to the bill.

MR. SPEAKER: The gentleman has the floor.

DEL. HOPE: I just wanted to second the comments from the minority leader, the gentleman from Henry. You know, my, my point is that I'm looking at some of these seats that are very [165] competitive and have become competitive over the last 10 years, particularly in the areas of Northern Virginia.

And what's happening with the trends in north Virginia with the number of minorities, Latinos, for example, doubling every 10 years nearly and some of these districts, some of these counties even being considered majority-minority counties. And to see in this area, to see this type of racial dilution is of great concern to me.

Political equality, Mr. Speaker, demands more than just a mere mathematical compliance with the one-person, one-vote standard. Election districting schemes must ensure each voter an equally effective voice in the political process. Racial dilution can deny racial minorities and equal opportunity to participate in the district's political process. This proposal has the effect of canceling out or even minimizing the voting strength and I believe it violates the equal protection clause.

The question is for the body is does this [166] proposal, House Bill 5001, offer minorities the same or even a greater opportunity to elect candidates of choice

360

as the current plan. I don't believe that it does, Mr. Speaker. I think it racially dilutes some competitive districts, and case is in part is in Northern Virginia, and I urge my colleagues to reject engrossment. Thank you, Mr. Speaker.

MR. SPEAKER: The gentleman from Henrico, Mr. Morrissey.

DEL. MORRISSEY: Thank you, Mr. Speaker.

DEL. MORRISSEY: Mr. Speaker, I rise to speak in opposition to House Bill 5001.

MR. SPEAKER: The gentleman has the floor.

DEL. MORRISSEY: Thank you, Mr. Speaker. I'd also urge the body to vote against 500-, HB 5001. While during my remarks and others we spoke about compactness and we spoke about communities of interest. My focus, likewise, would be on complying with the Voting Rights Act. I think the empirical evidence is somewhat overwhelming, Mr. Speaker, that we could produce effectively a [167] 13th and a 14th majority-minority district.

The 14th majority-minority district would be 50.25 black voting age population. As the minority leader said, the figure of 55 percent is something that was pulled out of the sky. We have people in this body that are elected with 53 and as the delegate from Suffolk said, even under 50 percent.

As my good friend and brother from Chesapeake, Delegate Spruill said, perhaps mistakenly, the goal isn't to elect people of color. The goal is pursuant to the Voting Rights Act to have enough majority-minority districts so that there is the opportunity to elect people of color. There is the opportunity under the Governor's

361

plan, Mr. Speaker, that was decidedly nonpartisan. It was –

MR. SPEAKER: The House will come to order.

DEL. MORRISSEY: It constituted constitutional scholars who paid attention to the U.S. Constitution and the State Constitution. There were academics who went around the State [168] participating in this process, getting input, and we have ignored the only nonpartisan plan, either the house or the Senate, that fully complies with the mandates of the Voting Rights Act.

I would ask that this body reject for the reasons and the arguments and the questions posited to the gentleman from Suffolk earlier. Thank you, Mr. Speaker.

MR. SPEAKER: Any questions on the adoption, the engrossment passage of the third reading?

DEL. JONES: Mr. Speaker.

MR. SPEAKER: The gentleman from Suffolk, Mr. Jones.

DEL. JONES: Ha, ha, ha. I like that. Speaking to the bill.

MR. SPEAKER: The gentleman has the floor. DEL. JONES: Mr. Speaker, Ladies and Gentlemen of the House, I would ask that we would support this substitute that's before this body.

I heard a few comments in the last three speakers about an arbitrary figure. Nope, I'm not a statistician. I'm not a constitutional expert. [169] I'm not a scholar. Anyone that knows me when I grew up in high school knows I'm not a scholar.

362

I have been a representative of the people since I was 27 and have taken that duty to heart. The first vote I ever took was to elect to vote for a black man to be the mayor of the City of Suffolk because I thought he was the most qualified person at 28. I did that because I felt he had the qualifications to lead the city in a growing time.

The number that we have before us that has been called arbitrary was gleaned from testimony of the community and I've always done my best to listen to the community, even when it's not always maybe in my best political interests to do so.

Because you know what, every two years they get an opportunity to decide if they want me to come back; just like every one of us, all of us in this room. Never was the intent to make a district whiter. The attempt that was made to make sure that we did not dilute the ability of a minority community to elect the candidate of their [170] choice.

And we talk about diluting the existing. If you look at the plan that is before us, as the gentleman from Chesapeake just made comments, the concern is the dilution and ability of the community to elect candidate of their choice. Much has gone into this. This is bipartisan plan and I think we will see that in a few minutes with the vote on engrossment.

I know it's not a perfect plan. There's not a perfect plan. There have been amendments made to this plan, as I promised there would be. We have listen. We flew around the state, landed on Tennessee on Saturday, heard the concerns of the people in Abingdon. We tried to address that. We went to Augusta, heard their concerns. We tried to address that.

363

At every turn I have to – I have upheld the oath that I took many years ago to uphold the Constitution and to do the work of the people, because I truly believe this is the people's body. I would ask that we would engross and pass House [171] Bill 5001 onto its third reading. And Mr. Speaker, I would like call for ayes and nays.

MR. SPEAKER: Ayes and nays. Shall the bill be engrossed and pass to its third reading. The Clerk will close the role.

THE CLERK: Ayes, 87. Nos, 10.

MR. SPEAKER: Ayes, 87. Nos, 10. The bill is engrossed and passed to its third reading.

THE CLERK: Mr. Speaker, that completes the calendar.

MR. SPEAKER: Does the Clerk have any announcements?

THE CLERK: Yes, sir, Mr. Speaker. The meetings for Tuesday afternoon, Courts of Justice & Judicial Interviews will meet at 3:00 p.m. 3:15 in the House Room C; Court's Adjustors, Judicial Interviews meeting now at 3:15 in House Room C.

Mr. Speaker, meetings for Wednesday morning April 6th, 2011, the Republican Caucus will meet at 10:00 a.m. in House Room 1. The Democratic Caucus will meet at 10:30 in the morning in House Room 2. And a reminder, Mr. Speaker, for members; [172] that the reconvened session for the 2011 regular session convenes at 12:00 noon tomorrow.

MR. SPEAKER: The gentleman from Colonial Heights, Mr. Cox.

DELEGATE: Mr. Speaker.

364

MR. SPEAKER: The gentleman from Henrico, Mr. O'Bannon.

DEL. O'BANNON: Brief announcement.

MR. SPEAKER: The gentleman has the floor.

DEL. O'BANNON: Thank you, sir. Tonight at 5:00 you are all invited to a very special art exhibit over at our Virginia Holocaust Museum. This is going to open to the public tomorrow. It's entitled A Blessing to One Another. It's Pope John Paul, III and the Jewish People. It starts at 5:00. I hope everybody will have time to go by there. Thank you, sir.

MR. SPEAKER: Thank you. The gentleman from Colonial Heights, Mr. Cox.

DEL. COX: Mr. Speaker, I move that when the house adjourn today it adjourn to reconvene [173] tomorrow. Immediately upon adjournment CNADA (sic) of the reconvened session.

MR. SPEAKER: The gentleman from Colonial Heights, Mr. Cox, moves when the House adjourn today it adjourn to reconvene tomorrow. Immediately upon adjournment CNADA of the reconvened session. As many that favor that motion will please say "Aye."

DELEGATES: Aye.

MR. SPEAKER: Those opposed "No." The motion is agreed to the gentleman from Colonial Heights, Mr. Cox.

DEL. COX: Mr. Speaker, I move the House do now adjourn.

MR. SPEAKER: The gentleman from Colonial Heights moves that the House do now adjourn. As many as favor that motion will say "Aye."

365

DELEGATES: Aye.

MR. SPEAKER: Those opposed "No." That motion is agreed to. The House stands adjourned until tomorrow. Immediately upon adjournment CNADA of the reconvened session.

[174] CERTIFICATE

I, Daphne S. Hurley, Court Reporter, certify that I transcribed from digital recording of the proceedings held on the 5th day of April 2011.

I further certify that to the best of my knowledge and belief, the foregoing transcript constitutes a true and correct transcript of the said proceedings. Given under my hand this 3rd day of May 2015.

/s/ Daphne S. Hurley

Daphne S. Hurley

My commission expires: August 20, 2018 Notary Public in and for the State of Maryland

366

**A**

| | |
|---|---|
| **abiding** 141:1 | **ability** 8:8 40:8 41:18 42:3 52:10 56:22 71:19 97:9 119:5 127:20 133:1 169:21 170:5 |
| **Abingdon** 170:15 | **able** 16:22 18:12 37:11 44:6 45:6 57:12 59:21 65:3,14 66:5 70:18 75:10,20 89:4 90:17 93:12 104:19 110:5 113:22 119:6 128:12 155:20 157:19 158:1 161:10 163:2,6 |
| **abortion** 6:17 7:3,15 9:13 | **abuse** 22:20 |
| **academic** | 39:4 103:6,15 |
| **academicians** 105:7 113:21 | **academics** 167:22 |
| **Academy's** 29:13 | **access** 50:11,13 |
| **accomplish** 121:5 | **accomplished** 58:18 60:3 99:15 |
| **accorded** 35:13 | **account** 54:21 |
| **accounting** 17:22 | **accurate** 62:16 91:21 |
| **accurately** 90:4 | **achieve** 99:1 100:7 110:2 |
| **acknowledge** 76:12 | **act** 34:9,20 35:1,4 46:2 56:2 60:10 61:8,19 62:8,13 62:21 63:5,14 64:4 65:2 66:11 78:13 79:17 80:3 81:13 87:14 98:1 101:14 103:3 121:11 129:10 130:21 132:16 137:5,14 139:3 140:13 141:2 155:22 160:10 |

367

| | 160:15 163:10 166:20 167:13 168:4 |
|---|---|
| **actions** 4:9 | **activity** 85:12 |
| **Acts** 101:21 | **actual** 136:7 |
| **acupuncture** 12:8 | **Adam** 2:10 |
| **add** 13:6 62:11 76:10 77:8 116:6 | **adding** 30:10 |
| **addition** 7:15 | **additional** 50:21 64:4 74:1 89:1,2,3 151:7 |
| **address** 12:12 90:11 93:10 170:15,17 | **addressed** 158:3 |
| **adhere** 87:22 | **adjourn** 28:8,21 29:3 172:22,22 173:4 173:5,14,16 |
| **adjourned** 173:20 | **adjournment** 173:1,6,21 |
| **adjourns** 29:3 | **adjustment** 44:9 |
| **Adjustors** 171:16 | **administration** 11:22 13:9 |
| **admit** 107:16 | **adopt** 7:11,12 9:3 |
| **adopted** 9:7,15 22:20 136:17 | **adopting** 51:14 |
| **adoption** 6:14 7:2 9:2,11 13:14,22 14:3 22:13 23:9 25:9 25:16 30:20 168:9 | **adoptive** 13:7 |
| **ads** 17:4 | **adulthood** 8:4 |
| **adults** 8:1,5 | **advantage** 18:3 |
| **advertising** 17:1 19:4 | **advised** 95:5 |
| **affirmative** 59:5 | **affirmatively** 81:7,10 |
| **afforded** 37:13 | **affords\** 101:9 |
| **afoul** 89:6 | **African-Americ...** 119:6 122:15 124:6 125:21 128:14,19 130:1 |

368

| | 148:15,18,20 149:1 157:16 159:11 |
|---|---|
| **African-Americ...** 111:14 121:21 132:9 134:11,15 146:2 148:15 159:11 | **afternoon** 86:1 171:14 |
| **age** 39:22 40:1 41:5 51:20 54:8 57:19 64:10 65:13 66:14 70:8 71:17 78:6 107:7,14,21 108:18 109:8 110:19 122:22 132:1 167:3 | **agencies** 13:14 |
| **agents** 23:9 | **aggregates** 111:3 |
| **ago** 34:6 36:2,3,16 37:7 47:15 57:21 82:6 86:15 92:13,13 97:15 122:4 125:19 134:6 136:13 137:18 151:6,14 153:15 170:19 | **agree** 7:1,4 10:20 41:22 52:4 58:14 59:8 62:10,16,22 63:13 64:7 78:9 84:3 88:21 91:17 97:5,11 97:12 102:19 108:16 118:2,7 120:16,19,21,22 124:7 128:13 129:20 134:13 135:7 136:1,6 138:19 |
| **agreed** 6:4 14:21 20:19 21:11 24:12 25:2 27:19 28:2 29:6 30:1 31:3 113:20 114:4 132:13 173:11 173:20 | **agrees** 139:13 |
| **Ain't** 146:9 | **aircraft** 23:3 |
| **aisle** 90:1 147:9 | **albeit** 84:4 |
| **Albemarle** 29:7,17 49:19 | **Albo** 2:11 25:3,4,7 [176] 49:18 |
| **alcohol** 22:19 | **Alexander** 143:9 |
| **Alexandria** 2:6,10 6:5 22:7 124:16 128:11 | **allegiance** 3:12 4:17 |
| **allies** 19:1 | **allow** 29:11 58:2 71:7 71:18 88:7 93:9 |

369

| | |
|---|---|
| **allowed** 17:18 118:4 | **allowing** 79:1 |
| **alluded** 38:18 59:16 | **Amen** 4:16,17 |
| **amend** 30:9 | **amended** 31:12 87:10 |
| **amendment** 12:5 31:13 34:21 79:21 95:21 98:2 | **amendments** 12:11 43:3 45:16 84:5 170:11 |
| **America** 3:13 35:5 79:18 103:19 121:11 | **American** 122:14 |
| **Americans** 35:12 | **amicus** 10:11 |
| **amount** 64:15 85:8 116:11 | **ample** 88:8 |
| **analogy** 155:5 | **analysis** 52:12 53:6 54:21 57:8 58:17 59:19 65:22 66:1,1 67:15 75:11 104:2 160:7 161:7,19 162:4,15 163:4 163:16 |
| **analyze** 52:8 160:21 | **analyzing** 70:13 |
| **Anderson** 28:10 29:4 | **and/or** 66:9 |
| **angry** 19:17 | **announcement** 172:8 |
| **announcements** 5:9 171:12 | **anointed** 148:13 |
| **answer** 4:21 46:9 53:13 53:16 59:17 67:15 110:14,22 124:3 132:19 134:20 149:22 152:13 154:2,2 156:1 | **answered** 67:13 69:18 71:11 74:6 110:16 124:12 134:19 142:12 156:11 |
| **answering** 60:2 67:17 85:3 | **answers** 120:10 140:15 141:10 |
| **antidotal** 161:5 | **anybody** 19:22 81:10 143:14 |
| **anymore** 134:4 | **APCO** 15:13 16:5,10 17:2,4 18:2,8 |
| **apologize** 53:17 63:8 | **Appalachian** 16:2 |
| **appears** 160:20 161:18 163:22 | **Applause** 26:21 101:3 149:12 |
| **applicants** 13:16 | **applied** 16:15 18:4 |

370

| | |
|---|---|
| **apply** 13:1 | **appointed** 68:3 |
| **appreciate** 117:17 123:22 | **approach** 48:15 57:20 69:21 |
| **appropriate** 9:4,8 156:14,15 | **approval** 18:10 89:6 |
| **approve** 86:18 | **approved** 5:6 10:19 18:15 86:12 93:10 160:15 |
| **approves** 86:9 **approximate** 125:2 | **approximately** 135:8 136:2 |
| **April** 1:11 5:7 30:7,14 37:22 44:8,15 45:2 87:18 171:19 174:4 | **arbitrary** 161:13,17 168:21 169:12 |
| **area** 32:7,17 117:11 128:20 148:16 154:1 157:13,14 165:9 | **areas** 6:22 43:12 93:2 95:13,14,15,16 95:17,18 122:20 165:2 |
| **arguably** 6:12 | **argued** 10:22 11:3 |
| **arguing** 8:19 | **argument** 109:20 164:6 |
| **arguments** 168:6 | **Arlington** 2:17 13:12 43:7 49:12 149:13 151:11 163:20 164:14 |
| **Armstrong** 2:8 14:22 15:1,4 18:18,22 19:10 46:12,13,18 47:4,9,20 48:3 48:22 49:5 50:5 50:10,15,20 51:6,10,21 52:4 52:22 53:5,14 53:17 54:13,18 55:5,10 56:5,10 57:2,7 58:8,13 58:21 59:4,11 59:16 61:2,7,12 61:17 62:1,6,18 63:1,4,8,12,19 64:2,18 65:1,16 65:21 66:15,20 67:18 68:1,9,14 68:20 69:3,8,13 70:20 71:3,22 72:5,16,21 73:6 73:10,17,22 74:9,14 | **arrival** 112:9 |

371

| | |
|---|---|
| 75:4,9 76:6 77:17,22 79:4,9 80:4,11 80:22 81:5,14 81:19 83:19 84:2,13,18 86:2 86:7 88:16,21 89:9,14 91:1,6 91:12,17,22 92:5 93:16,21 94:4,9 96:7,12 98:16,21 99:8 99:13,22 100:5 100:11 159:20 159:21 160:1 | |
| **arrived** 33:15 | **art** 172:11 |
| **article** 19:22 30:10 38:19 122:3 | **articulate** 121:19 |
| **Asian** 111:2 122:13 125:22 | **asked** 104:19 105:16 118:8 134:6 138:18 144:1 |
| **asking** 158:13 | **asks** [177] 20:13 21:6 24:7 24:18 29:18 |
| **assembly** 25:15 31:7 80:19 86:8 146:3 | **assertion** 79:10,13 85:5 116:22 |
| **assimilate** 84:22 | **associations** 24:5 |
| **assorted** 49:20 | **assuming** 86:9 |
| **assure** 57:9 | **attempt** 110:2 151:14,17 169:20 |
| **attend** 96:2 | **attention** 18:12 19:10 34:18 167:20 |
| **attorney** 10:12,15 11:4 12:6,13 19:11 22:3 60:3 61:10 80:8 86:9 94:16 96:1 160:17 | **august** 87:21 90:16,18 130:1 174:20 |
| **Augusta** 170:16 | **aunt** 8:15 |
| **available** 9:12 58:14 90:9 108:11 | **avenue** 43:17 |
| **average** 108:17 | **avoid** 43:6 136:4 |
| **avoided** 135:19 | **award** 15:9 |

372

| | |
|---|---|
| **aware** 55:4 62:6 63:2 64:2 68:19 69:3 89:14,18 97:18 101:15,22 102:3 102:5 103:1 105:6 106:1,10 106:12,16 109:13 113:18 126:12,20 127:2 137:2 139:15 147:4,5 | **Aye** 6:1,2 14:18,19 20:16,17 21:8,9 24:9,10,21,22 27:11,12,21,22 29:20,21 30:22 31:1 173:8,9,17 173:18 |
| **ayes** 171:2,3,6,7 | **a.m** 171:20 |

**B**

| | |
|---|---|
| **B** 2:3 3:10 25:17 | **back** 12:15 18:14,20 33:22 35:2 39:15,16 43:14 44:22 50:1,3 54:10 56:21 60:18 87:10 90:11 92:12 97:15 106:18,18 130:11 137:18 151:13 153:18 153:21 155:12 169:18 |
| **background** 125:17 | **backwards** 53:19 |
| **bad** 31:21 | **balance** 32:19 77:16 127:19 |
| **ballot** 133:12 | **ballots** 88:1 |
| **bandwagon** 19:11 | **Barlow** 130:9 |
| **Barry** 23:4 | **Bartlett** 64:14 75:3,17 76:5 |
| **base** 130:17 | **based** 52:8 58:4 70:15 108:10 113:9,11 121:2 123:14 |
| **basically** 92:15 | **basis** 73:11 84:4 |
| **basketball** 27:18 29:13 | **Beach** 147:1 |
| **beautiful** 32:4 | **beauty** 17:2 |
| **becoming** 125:11 154:12 | **began** 17:8 |
| **beginning** 19:12 48:12 | **behalf** 12:19 |
| **behavior** 13:15,18 | **behaviors** 14:4 |

373

| | |
|---|---|
| **belief** 71:13 174:7 | **believe** 9:2 32:5,8 34:7 46:6 51:3 58:20 64:12 73:3 74:22 75:2 78:11,19 82:16 87:13,14 88:2 89:20 94:16,17 94:19,21 95:19 98:3 102:6 103:19 109:16 110:15,22 118:21 123:1 125:14,14,21 138:22 139:20 151:15 152:20 165:20 166:4 170:21 |
| **believed** 17:11 | **believes** 66:21 84:18 98:21 132:3 |
| **Bell** 29:7,8,10,18 49:20 | **beneficiaries** 4:7 |
| **benefit** 4:14 90:19 | **Bennett's** 118:10 128:21 |
| **best** 18:2,21 22:17 25:14,18,21 26:2 38:16 42:14 56:22 60:18 71:15 105:15 118:21 129:9 148:21 157:12 159:14 169:13,15 174:6 | **Betsy** 2:3 3:10 145:4 |
| **better** 21:6 22:14 41:3 43:4,9 72:14 97:6,7 98:13 99:1,7,15 117:8 118:8 123:10 127:9 139:17 | **bevy** 38:2 |
| **beyond** 8:3 | **big** 16:19 18:16 |
| **bigwigs** 15:17 | **bill** 30:7,8,9 31:6,7 35:19 42:18 45:17 46:19 47:2,2 48:11,20 55:21 57:1 80:2 82:7 84:4 87:2,6 87:10,14 91:20 108:2 112:17 121:7 127:4 132:15 135:10 139:4 152:2 156:13,18,20 157:3 158:4 159:2,6,10,13 159:14,21 |

374

| | 160:15 161:3 163:9,10 164:17 166:1,13 168:15 171:1,3,7 |
|---|---|
| **bills** 17:19 18:11 | **bipartisan** 33:12,12,16 113:19 114:16 170:7 |
| **bit** 77:14 | **black** 39:22 45:12 [178] 39:22 45:12 51:19,20 54:8,8 57:18,19 58:6,6 60:12 78:6 95:17 107:7,9 107:14,21 108:18 109:7 110:19 111:1,2 111:2 126:19 132:1,3 141:22 142:1,12,15,18 142:19,20 143:4 143:5 144:4,9 144:12,19,21 145:2,4,7,10,11 145:19,20 146:6 146:17 147:12 147:21 148:5,6 148:21 149:2,5 152:1,5,7 153:6 167:3 169:6 |
| **blacks** 141:19 142:5 145:9 146:15 147:16,17 152:11 | **black's** 146:14 |
| **black/white** 122:7 | **blessed** 126:3 |
| **Blessing** 172:14 | **block** 136:10 |
| **blue** 32:6,6 104:10 | **board** 5:1 7:9 130:13 |
| **Bob** 60:9 | **body** 3:20 4:1,2,3 22:16 23:12 29:11 31:7 33:14 34:2 38:5 38:5 47:3 53:12 79:16 80:2 83:6 83:18 86:21 92:17 103:21 108:2 109:21 114:7 119:20 121:8,19 122:1 124:8 125:16 126:3 127:7 130:1 132:7,15 138:4 139:5 143:3 147:8 165:22 |

375

| | |
|---|---|
| | 166:16 167:6 168:5,19 170:21 |
| **boil** 19:18 | **boot** 18:21 |
| **Born** 115:12 | **Borough** 128:21 |
| **bottom** 116:21 153:4 | **bound** 23:9 39:5 |
| **boundary** 44:9 | **bow** 9:17 |
| **boy's** 29:13 | **Brenda** 2:9 |
| **brief** 10:10,11 172:8 | **briefly** 126:12 |
| **bring** 78:18 80:7 106:18 159:15 | **bringing** 3:16 153:18 |
| **Brink** 43:8 49:13 151:12 | **brother** 8:14 130:13 167:9 |
| **brought** 4:4 45:9 82:6 | **budget** 11:20 48:14,16 |
| **Bureau** 50:14 51:19 53:20 | **bureaucracy** 13:10 |
| **burned** 20:2 | **Bush** 111:13 |
| **business** 11:6 12:2 13:22 | **businesses** 11:12 |
| **butt** 16:8 | **buying** 16:19 17:5 |
| **BVAP** 113:4,4 114:2 115:3 120:18 128:13,15,15 129:21,22 | **BVAPs** 128:5 |

**C**

| | |
|---|---|
| **C** 2:1 3:1 171:16,17 174:1,1 | **Calbert** 77:11,15 |
| **calculation** 106:19 | **calendar** 30:4,5,8 87:5 171:10 |
| **call** 4:22 7:6 21:18 23:12 30:3 151:7 171:2 | **called** 7:17 42:16 44:18 49:22 53:18 65:10 106:3 169:12 |
| **campaign** 17:1 19:5 | **canceling** 165:19 |
| **candidate** 42:3 52:11,20 55:18 57:13 58:3 59:21 65:4 65:15 | **candidates** 119:7 129:6 166:3 |

376

| | |
|---|---|
| 66:5 70:3 70:18 71:9,16 71:19 72:8 79:3 110:5 127:21 129:5 130:3,18 131:11 133:2,11 133:11,19 161:11 163:6 169:22 170:6 | |
| **Capitol** 21:19 26:18,20 86:22 | **captive** 16:3 |
| **care** 7:19,21 8:17 9:14 9:21,22 11:11 11:12 12:2,8 14:3 | **careful** 19:8 142:4 |
| **carpenter** 108:13 | **Carr** 2:3 3:10,15 145:4 |
| **carry** 4:11 | **case** 12:15 36:20,21 75:18 93:8,22 95:2 97:14,18 98:3 103:19 130:21 161:14 166:6 |
| **cases** 36:18 96:21 130:18 | **Casey** 15:10 |
| **categorically** 111:12 | **categories** 53:20 101:19 |
| **Catherine's** 28:15 | **Caucasian** 122:15 |
| **Caucus** 45:12 58:6 142:2 142:12,15,18,19 144:4 146:6 148:5 171:19,21 | **caught** 98:6 |
| **caused** 38:17 122:19 | **Census** 37:22,22 50:14 51:1,18 52:12 53:20 150:22 155:12 162:9 |
| **central** 32:15 | **CEO** 11:15 |
| **certain** 13:15 43:6 62:12 66:21 67:11 116:2 123:8 | 127:17 132:19 133:5 134:17 |
| **certainly** 43:8 59:9,9 89:18 114:6 115:10 133:3,8 138:8 151:14 161:1 162:20,22 | **certify** 174:3,6 |

377

| | |
|---|---|
| **[179] cetera** 34:13 | **chair** 159:6,8 |
| **chairman** 37:18 | **challenge** 10:12 |
| **challenges** 15:21 76:22 | **chamber** 134:12 |
| **champion** 155:7 | **chance** 41:17 60:19 65:14 86:20 127:9 129:1 |
| **change** 92:17 93:4 153:9 | **changed** 35:6 122:4 |
| **Chapter** 30:10 | **charge** 92:21 106:14 |
| **chased** 14:2 | **Chatham** 19:4 |
| **check** 144:16,18 | **Chesapeake** 2:16 41:21 49:17 114:20 139:21 141:11 147:1 167:10 170:4 |
| **Chesterfield** 2:13 5:13,20 28:3 29:2 | **chief** 46:19,21 |
| **child** 22:14,18,20 23:1 23:14,15,16 25:13,16,19,20 25:22 26:1,3 | **children** 7:16 8:6 9:6,22 13:17 14:3 28:13,18 |
| **child's** 25:14 | **choice** 42:3 52:11,21 55:18 57:13 58:4 59:22 65:4 65:15 66:6 70:4 70:19 71:9,16 71:20 72:9 79:3 110:6 119:7 127:21 129:5,6 131:12 133:2,11 133:19 144:21 144:22 145:6,11 145:13,18 148:22 149:3 158:21,22 161:11 163:7 166:3 170:1,6 |
| **choose** 6:21 154:22 | **chose** 34:7 88:9 |
| **Chris** 2:14 36:2 142:10 143:16 147:18 149:10 | **Christian** 29:13 |
| **Chuckatuck** 115:13,16 116:17 140:5 | **churches** 13:14,21 22:4 |
| **circles** 40:4 | **circulated** 66:9 |

378

| | |
|---|---|
| **circulation** 15:6 | **circumstances** 94:19 |
| **cite** 71:3 | **cities** 135:6 136:3 |
| **citizen** 119:22 | **citizens** 12:20,21 19:6 38:5 65:9 83:10 93:11 105:15 117:10 123:2 148:16,20 149:2 150:7,8 |
| **city** 2:9,20 3:11 16:18 20:5,13,19 21:6 21:12 27:1,9 74:18,18 115:12 116:9,18 117:6 117:19 122:21 123:2 124:13 128:18 129:2 141:2 153:16 169:6,9 | **civil** 80:15 84:20 162:13 |
| **claim** 16:22 | **claims** 12:5 |
| **classes** 23:1,2 | **clause** 165:21 |
| **clean** 39:12 | **clear** 33:1 66:21 75:18 78:14 |
| **clearly** 99:5 131:2 132:20 161:1 | **clerk** 5:2,2,4,9,11 27:13 27:15 30:3,5 171:5,6,9,11,13 |
| **Cleveland's** 138:16 | **clever** 16:22 |
| **click** 43:21 | **clients** 16:2 |
| **close** 5:2,3 16:13 19:10 45:19 124:8 171:5 | **closely** 72:11 |
| **closing** 13:6 45:21 | **club** 17:5 |
| **CNADA** 173:1,6,22 | **code** 30:9,12 103:17 137:16 |
| **cold** 18:8 | **Cole** 2:12 26:10,11,14 |
| **colleagues** 42:16 67:1 101:7 159:4 166:7 | **college** 28:16 35:20 39:2 39:6 |
| **colleges** 16:14 101:15 | **Colonial** 2:19 3:14 172:3 172:20 173:3,11 173:15 |
| **color** 122:12 164:2 167:12,15 | **Columbia** 160:18 |

379

| | |
|---|---|
| **column** 15:8,11 | **combination** 53:21 125:21 151:7,18 |
| **combined** 140:1 | **come** 3:2,19 6:22 7:3 16:10 25:15 33:22 43:10 82:20 83:14 87:10 112:14 120:8 123:8,9 129:8,17 141:18 142:9,19 143:14 144:2 146:3 148:4 149:6 158:11 159:17 161:15 167:18 169:18 |
| **comes** 16:13 47:3 53:19 130:11 | **coming** 32:1,15 87:3 142:15 147:11 |
| **commending** | 14:13,16 20:10,13 20:14 21:3,7 24:4,8 27:16 29:12,19 |
| **comment** 37:14,19 45:1 60:4 81:22 85:1 94:21 107:5 121:18 | **comments** 38:8 42:16 45:4 103:5,5,19 119:19 160:6,8 164:20 168:20 170:4 |
| **commerce** 11:6,9 | **commission** 18:9 40:19,19 68:3,16 69:4 78:2,10 79:10 82:19 104:10 105:6 106:3,5 [180] 107:20 108:19 109:10 113:19 114:16 126:14 131:21,22 132:14 133:15 134:4 174:20 |
| **Commission's** 105:5 107:9,14 112:8 120:17 126:13 | **commitment** 82:10 |
| **committed** 105:14 | **committee** 30:19,21 34:5 35:16 37:18 43:17 73:2 74:3 80:14,19 83:6 91:10,19 112:7 136:18 137:11 157:3 |

380

| | |
|---|---|
| **Commonwealth** 3:21 6:13 16:18 18:2 21:21 31:17 32:20 33:5,17 34:15 45:16 68:2 82:12 121:22 122:17 124:6 126:4 159:16 | **communicated** 87:4 |
| **communications** 5:10 | **communities** 31:15 34:10 36:5 38:8,13 54:7 55:11 56:2 79:2 92:8 101:20 102:10 115:1,17 115:21 117:1,21 126:16,20 137:12 140:2 166:18 |
| **community** 38:4,6 41:8,10,15 41:19 42:2,18 42:19 43:8,12 52:18 58:1,3,7 60:22 70:3,18 71:8,14 72:8,13 79:2 95:12 110:5 113:12 115:16 116:4,14 116:19 117:3 118:16,19,20 119:4,6,20 120:3 122:12 127:19 133:2 134:8,18 135:5 137:4 140:7 149:6 153:22 163:17 169:13 169:14,22 170:6 | **community's** 42:2 |
| **compact** 40:6,7 114:22 117:7 126:17 138:20 140:22 141:4 | **compactness** 34:9 36:6 101:20 137:4,15 138:22 139:14,16 166:18 |
| **companies** 11:8 | **company** 16:2,15 |
| **compared** 32:14 107:8 | **compete** 12:3 |
| **competing** 11:8 | **competition** 35:20 39:17 41:2 102:5 140:4 |
| **competitive** 54:10 102:9 154:20,22 165:1 165:1 166:5 | **competitiveness** 101:22 103:2 |

381

| | |
|---|---|
| **compiled** 51:3 | **complete** 66:9 |
| **completely** 79:16 | **completes** 171:9 |
| **compliance** 46:2 56:1 65:2 66:22 67:6 78:7 130:20 137:14 140:11 155:21 165:12 | **complicated** 77:1 |
| **complied** 129:10 137:3 | **complies** 66:11 79:16 80:3 121:10 132:15 132:16 168:3 |
| **comply** 62:8 101:18 115:7 136:16 139:2 160:14 163:9 | **complying** 101:13 103:3 166:20 |
| **composed** 134:10 | **composition** 114:5 |
| **compress** 88:13 | **comprised** 57:10 105:7 114:19 |
| **compromising** 159:14 | **computer** 51:5 |
| **concentration** 36:22 | **concentric** 40:4 |
| **concept** 43:15 150:4 | **concern** 65:12 82:6 85:17 109:15 147:9,15 147:17,18,22 157:13 165:10 170:5 |
| **concerned** 38:6 105:14 | 157:9 158:2 |
| **concerns** 45:13 81:20 117:9 142:11,12 145:22,22 160:19 170:14 170:16 | **concerted** 17:8 |
| **conclude** 75:13 | **conclusion** 111:16 129:8 |
| **conclusions** 78:10 129:17,18 134:17 | **conduct** 59:19 75:11 |
| 162:14 | **conducted** 162:4 |
| **conferees** 48:15 | **conference** 6:15 17:6 19:21 |
| **conferences** 16:8 96:2 | **confidence** 46:3 |
| **confident** 58:1 80:1 | **Confidential** 15:16 |

382

| | |
|---|---|
| **conflict** 140:14 | **conflicted** 69:20 |
| **confused** 69:21 107:19 | **Congress** 11:2 |
| **congressional** 62:20 68:5 98:14 102:7 | **Congressman** 22:1 |
| **connect** 6:19 | **consent** 5:18,21 14:12,15 20:10,14 21:3,6 24:7,17,19 29:11,16,18 |
| **consider** 16:10 31:8 47:16 78:20 83:5,7 111:4 113:7 116:19 126:3,22 | **considerably** 60:14 |
| **consideration** 51:14 74:15 103:22 118:2 127:8 | **considered** 34:6 45:5 56:13 83:17 112:16 140:10 165:8 |
| **constituents** 48:17 83:15 117:4 161:5 | **constitute** 14:4 64:16 |
| **constituted** 113:20 167:19 | **constitutes** 174:8 |
| **constitution** 31:8 33:9 34:5,18 92:14 103:16,18 105:9,10 137:16 139:3 167:21,21 [181] 170:20 | **constitutional** 11:5 13:2 105:7 113:20 115:7 140:12 167:20 168:22 |
| **constitutionally** 11:10 | **constrained** 40:3 |
| **constraints** 59:17 | **contact** 81:7,10 |
| **contacted** 116:8 | **contained** 3:22 |
| **contemplating** 110:18 111:19 | **contended** 11:4 |
| **contiguity** 34:9 36:6 92:8 101:21 102:10 137:4,15 | **contiguous** 40:6,7 114:20,22 117:7 126:18 |
| **continue** 66:5 110:13 116:6 134:20 | **continued** 42:13 |
| **continues** 151:2 | **control** 11:16 |
| **controlled** 150:14 | **controversial** 6:17 9:19 |
| **convenes** 172:2 | **conversation** 48:3 |
| **converse** 10:22 | **cooperation** 33:12 |

383

| | |
|---|---|
| **coops** 16:18 | **copy** 19:22 |
| **core** 42:8 54:1 | **corner** 146:5 |
| **corporation** 11:16 18:9 | **correct** 46:7,7 62:10,15 62:15 86:20 98:12 106:13,20 115:11 152:14 174:8 |
| **corrected** 62:18 108:10 | **costs** 16:20 |
| **Council** 128:18 129:2 | **counselors** 22:22 |
| **count** 102:6 106:9 110:17 148:18 | **counties** 62:12 74:20 97:20 135:6,20 136:3 165:7,8 |
| **counting** 111:13,19 | **countries** 125:13 |
| **country** 35:6 36:10 116:18 | **county** 2:9 18:18 24:5 26:18 32:17,18 115:2 117:19,22 130:10 141:2 153:16,20 |
| **county/city** 135:7 137:6 | **couple** 7:13 25:21 34:16 44:6 60:7 71:18 76:15,18 122:4 |
| **couples** 7:12 | **course** 16:9 17:4,14 44:10 92:9 101:7 109:17 110:10 127:3,13 129:4 151:8 |
| **court** 11:19 12:14,15 36:18,20 73:4,4 75:18 80:10 93:9 94:10 95:5 96:22 109:16 143:1 145:20 148:3 160:18 163:12 174:2 | **courtesies** 160:13,13 |
| **courts** 13:1 109:22 171:14 | **Court's** 171:16 |
| **covenant-bound** 12:21 | **cover** 15:7 |
| **Cox** 2:19 3:14 94:1 172:4,20,21 173:4,12,13 | **cracked** 16:9 161:21 |

384

| | |
|---|---|
| **cradle** 4:5 | **create** 69:15 97:9 113:22 132:7 134:13 144:8 145:9,14,15 146:13,16 147:10 |
| **created** 64:5 69:5 78:4 125:20 126:15 134:9 151:6 162:17 163:1,2 | **creation** 74:16 78:3 |
| **Creator** 3:15 | **credit** 52:14 |
| **Creek** 118:10 128:21 | **criteria** 34:7,14,22 36:5 36:12,20 37:2 55:12,13 56:13 56:16 91:8,18 92:7,10 119:3 133:17 136:17 140:10,15 |
| **critical** 9:5 | **cronies** 19:9 |
| **Cuccinelli** 19:12 | **current** 166:3 |
| **currently** 39:19 152:3 | **custody** 25:16 |
| **customers** 16:3 17:2,3 18:10 19:7 | **cut** 18:13 108:14 116:18 |
| **cycle** 88:5,5 | **cycles** 34:3 |

**D**

| | |
|---|---|
| **D** 18:18 | **Dan** 15:9 |
| **Dance** 2:18 41:13 49:16 156:16,17,21 157:2 | **Danville** 14:6,14 74:19 |
| **Daphne** 1:22 174:2,18 | **dare** 23:11 |
| **data** 37:8,12,21 50:11 50:11,13,21 51:1,11,13,18 52:12 53:7,19 67:2 71:4 75:12 78:1 107:5 110:17 162:9 | **daughter** 45:7 |
| **David** 2:6,11 | **day** 3:16 43:7 79:22 84:12 87:22 153:17 174:4,10 |
| **days** 84:10,19 86:16,18 87:14,20 89:16 89:17 90:14,15 | **dazed** 107:18 |

385

| | |
|---|---|
| **deadlines** 86:12 89:7 | **deal** 18:13 25:9 57:18 60:8 |
| **dealing** 9:19 102:18 | **deals** 163:12 |
| **dealt** 68:16 97:19 | **debate** [182] 25:8 45:21 131:21 160:20 |
| **DEBATES** 1:10 | **decade** 31:16 60:15 117:21 127:14 127:19 |
| **December** 13:9 | **decide** 33:21 88:11 148:21 149:2 169:17 |
| **decided** 36:20 43:20 109:21 153:15 155:9 | **decidedly** 167:16 |
| **decipher** 17:22 | **decision** 92:15 |
| **decisions** 11:17 130:17 161:15 | **decrease** 42:11 150:15,17 150:18,21 152:11 |
| **decreases** 152:5,7,8 | **defend** 12:21 |
| **defended** 35:11 | **definitely** 127:16 |
| **degree** 17:21 135:22 | **DEL** 3:15 5:14,17 6:6 6:9 10:6,9 14:8 14:11 15:1,4 20:6,9,21 21:2 21:13,16 22:9 22:12 23:22 24:3,14,16 25:4 25:7 26:11,14 27:2,5 28:4,8 29:8,10 30:18 31:4 46:13,16 46:18,22 47:4,7 47:9,14,20 48:1 48:3,9,22 49:3,5 49:9 50:5,8,10 50:13,15,18,20 51:2,6,9,10,17 51:21 52:2,4,13 52:22 53:3,5,9 53:14,16,17,18 54:13,16,18 55:3,5,8,10,19 56:5,8,10,15 57:2,5,7,14 58:8 58:11,13,19,21 59:2,4,7,11,14 59:16 60:1 |

386

| | 61:2 61:5,7,9,12,15 |
|---|---|
| | 61:17,20 62:1,4 |
| | 62:6,10,18,22 |
| | 63:1,4,8,10,12 |
| | 63:17,19,22 64:2,7,18,21 |
| | 65:1,8,16,19,21 |
| | 66:7,15,18,20 67:4,18,21 |
| | 68:1 68:7,9,12,14,18 |
| | 68:20 69:1,3,6,8 |
| | 69:11,13,17 70:20 |
| | 71:1,3,22 72:3,5,16,19,21 |
| | 73:6,8,10,17,20 73:22 |
| | 74:9,12 74:14 75:4,7,9 |
| | 76:6,9 77:17,20 77:22 |
| | 79:4,7,9 80:4,7,11,22 |
| | 81:3,5,14,17,19 83:19,22 |
| | 84:2 84:13,16,18 86:2,5,7 |
| | 88:16 88:19,21 89:9 |
| | 89:12,14 91:1,4 |
| | 91:6,12,15,17 91:22 |
| | 92:3,5 93:16,19,21 |
| | 94:4,7,9 96:7,10 96:12 |
| | 98:16,19 98:21 99:8,11 |
| | 99:13,22 100:3 |
| | 100:5,11,16,22 |
| | 101:4,5,6,11 102:12,17 |
| | 103:8 103:13 104:3,8 |
| | 104:21 105:2,4 105:18,21 |
| | 106:1 106:21 107:2,4 |
| | 108:20 109:1,3 |
| | 110:7,10,12 |
| | 111:6,9,11,21 |
| | 112:2,4,18,21 |
| | 113:1,6,13,16 113:18 |
| | 114:10 114:13,15 |
| | 117:12,15,17 |

387

| | 119:13,16,18 |
| | 120:11,14,16 |
| | 121:12,15,17 |
| | 123:17,20,22 125:3,6,8 |
| | 126:5 126:8,10 127:22 |
| | 128:3,5 129:11 129:14,16 |
| | 131:13,16,18 132:22 |
| | 133:20 134:1,3,22 |
| | 135:3,5,11,14 135:16,18 |
| | 136:19,22 137:2 137:20 |
| | 138:1,3 138:9,12,14 |
| | 139:6,10,12,18 |
| | 141:9,13,15 149:15,19,22 |
| | 150:3 151:5,19 151:21 |
| | 152:1,12 152:15,16 154:4 |
| | 154:7,9 155:4 |
| | 156:2,6,8,10,13 |
| | 156:17,21 157:2 159:21 |
| | 160:1 164:16,19 |
| | 166:11,12,15 167:19 |
| | 168:11 168:14,17 172:8 |
| | 172:10,21 173:13 |
| **delegate** 18:18 19:3 | **Delegates** 1:9 2:5 3:5 |
| 41:13 120:9 128:11 131:6 | 4:17 5:7 6:2 14:19 18:22 |
| 138:14,15 142:10 | 20:17 21:9 24:10,22 |
| 143:9,10 143:11,16 | 27:12,22 29:21 30:6,13 |
| 144:17 147:18 | 31:1,10 48:6,7 68:5,17 |
| 148:14,19,22 149:9 | 173:9,18 |
| 157:14,15 158:12 | |
| 167:7,10 172:5 | |
| **delegate's** 109:6 | **delegation** 45:12 |
| **deliberate** 4:6 | **delicate** 77:16 |
| **demands** 165:11 | **demean** 163:13 |
| **Democrat** 130:7 | **democratic** 159:3 164:1 |
| | 171:20 |

388

| | |
|---|---|
| **democratic-lea...** 133:7 | **demographic** 38:17 56:21 |
| **demonstrate** 11:13 | **demonstrates** 124:20 |
| **deny** 8:8 165:16 | **departing** 44:11 |
| **Department** 67:9 86:10 90:6,7 111:13 160:16 161:15 | **deregulation** 17:11,14 |
| **deserve** 9:9 | **designed** 11:14 |
| **desire** 48:11 | **desirous** 124:7,10 125:14 |
| **detail** 108:12 | **determine** 51:11 123:12 163:16 |
| **determined** 106:7 | **determining** 52:5,5,7 65:1 |
| **develop** | 67:2 68:3 75:11 |
| **developed** 56:14 69:4 78:2 79:20 82:1 92:10 159:6 | 162:12 |
| **developing** 7:10 | **development** 49:7 50:12,22 54:20 55:14 56:11 62:9 74:4 80:16 91:7,20 |
| [183] **developments** 122:6 | **deviated** 96:18 |
| **deviating** 94:14 | **deviation** 36:13 39:19,20 40:14,21 41:3 56:1 78:8 79:20 92:9 94:11 97:1 97:10 99:1,3,15 152:17 |
| **deviations** 96:14 | **devices** 129:8 |
| **diagrams** 138:4 139:13 | **Dickinson** 36:1 |
| **dictates** 130:21 | **died** 28:10,12 |
| **dietary** 12:9 | **difference** 35:5 113:3,8 |

389

| | |
|---|---|
| **different** 10:14 18:5 34:12 37:2 41:10 89:21,21 90:2,5 108:9,9 | **digital** 174:3 |
| **dilute** 145:20 147:22 162:21 169:21 | **dilutes** 166:5 |
| **diluting** 147:12 161:22 170:2 | **dilution** 41:18 65:12 71:17 78:5 127:14 162:18 165:10,16 170:5 |
| **diminish** 65:14 | **direct** 154:11 |
| **directly** 99:20 159:9 | **director** 76:19 |
| **disagree** 59:8 78:9 79:10 79:12 116:21 121:1 | **discrimination** 164:7,8 |
| **discuss** 42:17 | **discussed** 144:5 |
| **discussion** 47:9 48:10 161:2 | **discussions** 95:7 |
| **dismissed** 116:1 | **disordered** 13:18 23:12,13,18 |
| **dispute** 59:5 163:13 | **disseminated** 84:6 |
| **distinguish** 113:3 | **distribution** 13:3 |
| **district** 19:2 32:22 40:12 42:8 44:10,10 44:18 51:12 52:6,10 54:3 64:16 69:5,16 71:5,7 72:7 74:5 74:17 75:14,21 76:1,11 77:3 78:3 79:12 88:10 98:11 107:6 108:3 109:7,12,12,18 114:1,5,17 115:3,6 118:5 118:12,13 120:18 125:20 126:11,16,18,21 128:12 129:3,21 130:6,11 131:7 132:6,8 133:5,7 134:9,14 138:7 143:10,12,13 144:3,8,9,18,19 144:22 145:1,2 145:3,4,7,10,15 146:17 150:15 150:17,18 | **districting** 62:9 165:14 |

390

| | |
|---|---|
| 151:8 152:3,5,6,8 153:10 154:16 157:21 160:18 161:10 162:17 163:2,6 167:1,2 169:20 | |
| **districts** | 30:13 31:10,11 34:10 37:20 38:12 39:18 40:2 42:9 44:16 51:16 54:1,2,10 55:1,15,17 56:12 57:10,11 58:18 59:20 60:11 63:16 64:5,13 65:3,7 66:3,4 68:6 71:8 77:4,15 78:5,22 90:22 93:1,1 97:9 102:22 107:11 109:5,10 110:14 124:17 127:12 137:17 138:14 139:1 140:11,22 141:5 141:22 145:11 146:13 150:13 152:11 153:3 154:12,19,19 155:14 157:7 158:6 160:22 161:20,22 162:19 163:21 163:22 164:2,5 165:7 166:5 167:13 |
| **district's** 165:17 | **diverse** 125:15 154:20 155:1 |
| **diversification** 122:17 | **diversified** 125:11 |
| **divided** 115:1 117:22 | **division** 39:17 40:19 58:15 102:9 |
| **documented** 12:16 | **documents** 12:17 |
| **doing** 18:21 67:7 97:3 145:7 | **DOJ** 37:10 57:16 78:13 86:12,17 86:17 89:5,5,15 89:21 93:11 163:11 |
| **dollar** 15:22 | **Don** |
| 19:3 | **door-to-door** 70:12 |
| **doubled** 18:11 | **double-check** 108:12 |
| **double-checking** 108:6 | **doubling** 165:6 |

391

| | |
|---|---|
| **downstairs** 146:4 | **downtown** 153:21 |
| **dozens** 120:8 | **drafting** 47:11 48:8 |
| **draw** 40:3 75:21 78:15 140:22 | **drawing** 33:8 42:5 62:19 134:17 |
| **drawn** 19:1 47:1 64:13 76:11 77:3 90:20 123:13 136:16 139:2 152:5 | **drew** 35:17 154:21 |
| **drinking** 50:3 | **drinks** 17:5 |
| **drive** 54:9 | **driver** 56:4 115:15 140:5 |
| **drop** 13:16 | **dropped** 54:4 122:22 |
| **drove** 92:15 93:4 | **drug** 22:19 |
| **Ds** 95:11 | **duck** 13:3 |
| **due [184]** 92:19 | **duly** 119:21 |
| **duty** 13:1 169:4 | **D-10** 2:8 |
| **D-45** 2:6 | **D-47** 2:17 |
| **D-49** 2:10 | **D-63** 2:18 |
| **D-71** 2:20 | **D-74** 2:15 |
| **D-77** 2:16 | |

**E**

| | |
|---|---|
| **E** 2:1,1 3:1,1 174:1 174:1 | **earlier** 64:11 69:19,22 71:11 74:7 102:20 140:4 168:7 |
| **early** 18:7 87:3 118:17 | **ears** 141:16 |
| **earth** 8:8 | **easier** 19:19 124:4 125:10 |
| **easily** 164:6 | **eastern** 97:19 115:1 117:22 |
| **easy** 141:3 | **Ebbin** 2:10 |
| **Ebenezer** 115:14 118:11 | **Eclipse** 116:20 140:6 |
| **Ed** 143:10 | **education** 23:15 |
| **effect** 77:4 98:5 155:3 156:9 165:18 | **effected** 97:6 |

392

| | |
|---|---|
| **effective** 38:12,15 41:16 42:7 52:19,20 64:10 69:20 70:8,17 75:22 78:22 79:1,11 97:7 110:3 123:14 127:18 130:22 131:11 158:8 165:15 | **effectively** 131:7 166:22 |
| **effort** 11:1 | **efforts** 10:12 |
| **eight** 38:2 82:14 128:7 146:3,5 | **eighth** 84:12 |
| **either** 71:20 86:18 88:11 160:14 168:2 | **elect** 42:3 52:10 55:17 58:3 65:14 70:3 70:3,18 71:8,15 71:19 72:8 79:2 110:5 119:6 127:20 128:14 129:3 130:1 131:11 133:2,18 148:17 161:10 163:6 166:2 167:11,14 169:5 169:22 170:6 |
| **elected** 41:7,22 118:16 124:21 129:4 130:5 133:7 146:6 167:6 | **election** 30:14 34:3 70:13 71:21 88:5,12 89:6 118:16,18 123:6 165:13 |
| **elections** 37:11 51:3,4,5 73:2 74:2 80:13 82:8 86:13 88:2 88:6 91:9 112:7 162:7 | **Elections's** 106:8 |
| **electorate** 130:16 | **electric** 15:12,16,19 16:7 16:16,17 18:11 19:6,10 |
| **electronic** 5:1 | **eligible** 40:1 131:8 |
| **eloquent** 121:4 | **emphasis** 64:8 106:9 124:9 124:10 |
| **empirical** 67:2 71:4 107:5 166:21 | **enable** 7:12 |
| **enables** 12:1 | **ends** 76:4 |
| **energize** 130:4 | **energy** 4:10 |
| **engage** 13:17 23:9 | **engaged** 11:7,11 |

393

| | |
|---|---|
| **Englin** 2:6 6:5,6,9 | **English** 28:18,20 |
| **engross** 170:22 | **engrossed** 164:13 171:4,8 |
| **engrossment** 160:5 166:7 168:10 170:9 | **enjoyed** 47:18,19 |
| **ensure** 9:13 70:2 110:4 165:14 | **entire** 10:20,22 45:3,16 73:11,15 |
| **entirely** 96:19 | **entirety** 73:16 |
| **entitled** 3:6 59:10 172:14 | **entrusted** 4:15 |
| **enunciated** 161:13 | **equal** 34:20 98:2 137:5 165:17,20 |
| **equality** 34:8 101:19 140:11 165:11 | **equally** 4:10 40:9 165:15 |
| **equation** 98:7 | **especially** 32:17 95:7 |
| **essentially** 162:10 | **establish** 67:3 |
| **et** 34:13 | **ethical** 13:14 |
| **ethnic** 125:17 | **Euro-American** 159:12 |
| **Evan** 22:8,9,12 | **event** 140:14 164:10 |
| **everybody** 10:17 25:10 147:10 172:16 | **everybody's** 6:11 |
| **evidence** 11:19 73:13 166:21 | **exact** 7:17 |
| **exactly** 46:3 67:6 87:9 104:20 | **examined** 5:6 |
| **example** 18:3 98:9 116:9 116:13 122:9,20 161:9 165:6 | **examples** 155:15 157:12 |
| **exception** 107:11 | **exceptionally** 35:22 |
| **excuse** 15:1 28:9 33:14 34:4 93:6 95:3 | **executive** [185] 76:19 |
| **exercise** 36:18 39:5 101:2 103:7,15 121:2 140:21 | **exhibit** 172:12 |
| **exist** 3:21 | **existed** 14:1 |

394

| | |
|---|---|
| **existing** 37:20 54:1 56:20 57:1 97:8 162:18,21 170:2 | **exists** 37:4 |
| **expect** 143:22 | **expedited** 89:15 |
| **experience** 47:15 70:11 | **experienced** 71:13 |
| **expert** 168:22 | **expires** 174:20 |
| **explain** 31:18 44:20 69:13 | **explaining** 31:19 |
| **extended** 160:12,13 | **extent** 63:15 |
| **extremely** 55:11 | **eyes** 19:20 146:1 |
| **e-mail** 44:14 | |

**F**

| | |
|---|---|
| **F** 174:1 | **fabric** 34:15 35:6 |
| 118:20 119:19 126:4 | **fabulous** 35:21 |
| **face** 136:8 | **faces** 17:9 |
| **facilities** 131:7 | **facing** 6:12 |
| **fact** 11:7 13:16 43:22 45:10 50:2 60:5 60:6 70:1 93:5,6 102:3,5 103:6 106:13,16 108:17 110:12 110:17 117:17 117:20,20 120:2 122:11 127:20 128:9 134:8 162:6 | **facts** 106:17 131:3 |
| **factual** 35:11 | **failed** 163:17 |
| **failure** 160:21 161:18 164:4 | **fair** 25:17 31:13 142:7 147:11 |
| **Fairfax** 2:11 23:20 24:5,6 25:2 43:2 49:13 49:18 126:1 151:1 | **faith** 21:19 22:4 |
| **faithful** 105:9 | **fall** 10:21 11:2 31:19 37:17 155:21 |
| **familiar** 61:7,18 68:1,15 92:6 104:8 105:5 138:16 153:1 | **families** 8:3 9:7 28:14 |

395

| | |
|---|---|
| **family** 7:20 8:6,7,9 9:8 28:11 101:10 | **Fan** 116:13 |
| **fantastic** 106:14 | **far** 16:10 32:3,4 45:17 89:21 98:1 117:18 119:11 122:7 124:21 139:17 157:11 |
| **fast** 128:20 | **father** 22:19 23:1 |
| **fault** 146:18 | **favor** 5:22 14:17 20:15 21:7 24:8,20 27:10,20 29:5 29:20 30:21 173:7,17 |
| **favorable** 12:3 93:2 | **favored** 96:16 |
| **feature** 43:20 | **February** 37:13 |
| **federal** 10:18 12:13,22 13:1,4 88:2 93:9 140:12 160:18 163:11 | **Federalist** 12:17 |
| **feel** 90:8 116:7 | **fellow** 48:14 112:6 |
| **felt** 35:12 50:2 52:18 54:6 72:13 85:19 114:6 | 133:18 140:3 147:9 169:8 |
| **ferry** 153:16 | **fictitious** 15:12 |
| **fiddled** 20:2 | **fifth** 26:17 |
| **figure** 102:21 124:9 161:13 167:4 168:21 | **figured** 17:16 |
| **figures** 109:7 | **file** 57:16 85:21 |
| **filed** 10:10 90:9 104:17 | **files** 86:10 |
| **filing** 160:17 | **final** 101:17 |
| **finally** 17:15 157:16 | **find** 13:19 94:17,18 106:17 139:20 161:14 |
| **fine** 142:1 | **finished** 53:16 67:16 103:14 |
| **firehose** 50:3 | **first** 11:4 12:15 16:1 17:9 39:17 40:19 43:1 82:16 89:20 101:5,12 102:8 128:18 163:11 169:5 |

396

| | |
|---|---|
| **fit** 8:18 148:17 | **fits** 77:5 |
| **five** 34:7 66:3 101:18 110:22 146:8 | **fix** 44:13,13 |
| **fixer** 15:17 | **flag** 3:12 4:18 |
| **flawed** 160:15 | **flaws** 164:12 |
| **flew** 170:13 | **floating** 13:10 |
| **floor** 1:10 3:7 6:8 10:8 15:3 21:15 22:11 25:6,11 26:5,13 27:4 28:7 46:22 51:2 80:8 141:14 149:16 157:1 159:22 160:9 164:18 166:14 168:16 172:9 | [186] **Flora** 144:11,12,12 |
| **focus** 9:18 101:22 102:7 103:2 110:13 166:19 | **folks** 28:19 121:19 142:20 143:4,5 143:16 145:19 145:21 147:13 |
| **follow** 23:10 60:17 | **followed** 82:10 111:12 |
| **following** 12:18 44:1 114:18 | **Forbes** 22:1 |
| **forbids** 11:7 | **foregoing** 140:10 174:7 |
| **forget** 98:7 160:16 | **Fork** 116:20 |
| **form** 157:4 | **formally** 125:2 |
| **forms** 80:19 | **forth** 101:4 |
| **Fortunately** 8:20 | **forty** 90:1 |
| **forums** 34:13 118:3 | **forward** 4:4 119:22 159:15 |
| **forwarded** 35:13 | **foster** 7:16,19 9:14,21 14:3 22:18 |
| **found** 13:7 77:12 | **founding** 12:17 |
| **four** 18:5 37:2 94:19 95:3,10 102:6 111:1 129:4 133:9 153:14 | **fourth** 26:16 |
| **frame** 57:17 86:8 88:7 | **Frederick** 44:11 |
| **free** 101:9 | **Friday** 34:6 82:20 104:14 |

397

| | |
|---|---|
| **friend** 144:6 148:14,22 167:9 | **friends** 22:17 28:12 45:13 |
| **front** 107:5 116:8 136:8 | **full** 35:13 56:1 57:8 58:16 59:19 67:6 88:13 |
| **fully** 66:11 80:3 129:10 168:3 | **functioning** 11:15 |
| **funny** 18:21 | **further** 23:11 30:2 47:4 |
| 47:20 48:22 50:5,15 51:6,21 52:22 53:14 54:13 55:5 56:5 57:2 58:8,21 59:11 61:2,12 62:1 63:19 64:18 65:16 66:15 67:18 68:9,20 69:8 70:20 71:16,22 72:16 73:6,17 74:9 75:4 76:6 77:17 79:4 80:4 80:22 81:14 83:19 84:13 86:2 88:16 89:9 91:1,12,22 93:16 94:4 96:7 98:16 99:8,22 121:10 151:19 174:6 | **future** 15:21 |

G

| | |
|---|---|
| **G** 2:7 | **gain** 92:22 |
| **gallery** 3:8 | **garnered** 73:11 |
| **gathering** 21:20,22 | **gay** 7:13 8:10,14,18 10:1 22:16 |
| **general** 10:12,15 11:4 12:6,14 19:11 22:3 25:15 31:7 61:21 62:16 71:20 86:8,10 88:12 95:6,8 146:2 160:17 | **generated** 47:2 |
| **gentlelady** 44:11 49:15 116:10 122:21 152:4 | **gentleman** 3:14 6:5,8 10:4,8 13:12 14:6,10 14:14,21 15:1,3 20:8,19 21:1,5 22:7,11 23:20 |

398

| | 24:2,6,12,15,18 25:2,6 |
|---|---|
| | 26:6,9,13 29:7,9,17 30:16 |
| | 31:3 36:1 38:19 38:22 |
| | 40:5,11 40:12 41:21 |
| | 43:2,7 44:15,18 |
| | 46:11,13,17,18 46:19,20 |
| | 47:6,8 47:11,14,22 |
| | 48:2,7,10,19 |
| | 49:2,4,5,7,12,13 |
| | 49:16,18,18 |
| | 50:7,9,10,17,19 50:20,21 |
| | 51:10 51:17 52:3,4,14 |
| | 53:4,5,10 54:17 54:18 |
| | 55:3,9,10 55:12,20 56:9 |
| | 56:10,16 57:6,7 |
| | 57:9,15,22 |
| | 58:12,13,16,20 |
| | 59:3,4,15,16,18 |
| | 61:6,7,9,16,17 61:20 |
| | 62:5,6 63:1,3,6,7,9,11 |
| | 63:12 64:1,2,22 |
| | 65:5,20,21 66:8 |
| | 66:19,21,22 67:4,22 |
| | 68:1,8 68:13,14 69:2,3 |
| | 69:7,12,13,18 71:2,3 |
| | 72:2,4,5 72:15,18,20,21 |
| | 73:9,10,19,21 73:22 |
| | 74:11,13 74:15,22 75:6,8 |
| | 75:9,10 76:8 77:19,21 |
| | 78:1,9 79:6,8,9,12,15 |
| | 80:6,10,11,12 80:18 |
| | 81:2,4,5,7 81:9,16,18,19 |
| | 82:1,21 83:1,21 |
| | 84:1,3,9,15,17 84:18 85:7 |
| | 86:4 86:6,7 88:18,20 |
| | 88:21 89:8,11 |

399

89:13,14,19
91:3,5,7,14,16 91:17,19
92:2,4 92:5,9,12 93:18
93:20,21 94:6,8 94:9,16
96:3,9 96:11 97:4,11
97:13 98:9,18 98:20,21
99:10 99:12,13,17,19
100:2,4,5,12,14
100:17,19,21 101:1,12,14
102:3,12,14,16 102:19
103:1,5 103:14 104:3,5
104:7,8,21 105:1,3,4,6,12
105:18,20,22
106:1,10,12,13 106:21
107:1,3 107:17 108:1,20
108:22 109:2,3 109:13,15
110:1 110:7,9,11,13
111:7,8,10,11 111:16,21
112:1 112:3,5,18,20
112:22 113:1,6
113:13,15,17,18
114:4,10,12,14 115:4,10
116:15 117:12,14,16,18
118:7 119:1,10
119:13,15,17,20
120:8,11,13,15 120:16
121:7,12
[187]121:14,16,18
122:3,16 123:4
123:11,17,19,21
124:12,13,14
125:3,5,7,8,19 126:1,6,9
127:2 127:10,22 128:2
128:4,6,10,17
129:7,11,13,15
130:3,8,15

| | 131:13,15,17,18 131:19 132:2,12 133:13,20,22 134:2,3,17,19 134:22 135:2,4 135:7,11,13,15 136:1,6,9,19,21 137:1,2,10,20 137:22 138:2,3 138:9,11,13,21 139:6,8,11,12 139:15,19,21 140:8 141:10,11 141:14 149:13 149:16,18,19 150:2,20 151:6 151:11 152:20 154:4,8,10,18 155:5 156:2,4,7 156:10 159:19 159:22 161:1,12 163:13,20 164:14,18,20 166:9,14 168:7 168:12,16 170:4 172:3,6,9,19 173:3,11,15 |
|---|---|
| **gentleman's** 67:13 74:7 85:3 103:10 119:19 123:22 | **gentlemen** 6:10 8:11 15:5 21:17 31:5 46:15 51:8 52:1 53:2 54:15 55:7 56:7 57:4 58:10 59:1,13 61:4,14 62:3 63:21 64:20 65:18 66:17 67:20 68:11,22 69:10 70:22 126:7 151:20,22 154:6 160:2 168:18 |
| **gentlewoman** 3:11 5:12,16,19 20:4,12 21:11 21:15 26:22 27:4,8 28:2,6 29:1 38:14 49:14,15 82:9 124:16 131:4 156:16 | **gentlewomen** 116:10 128:11 |
| **geography** 153:1 | **Georgia** 36:21 92:20 94:2 95:13 |
| **getting** 154:20 168:1 | **Gibson** 60:9 |

401

| | |
|---|---|
| **gifts** 4:2 | **giggles** 17:17 |
| **give** 5:17 16:16 26:19 29:14 33:6 49:9 86:20 95:1 99:5 123:14 140:17 152:13,21 157:12 | **given** 34:4 37:21 47:15 56:20 57:17 59:17 74:16 104:17 105:4 113:1 114:15 117:20 124:5 126:18 128:9 131:2,19,22 132:2,5 134:8 134:11 139:12 140:14 174:9 |
| **giving** 34:4 52:14 | **glad** 20:1 42:20 46:9 46:10 49:10,11 67:15 80:8 82:3 86:14 95:1 100:20 103:11 145:1,6 158:4 |
| **glean** 74:2 | **gleaned** 169:12 |
| **go** 12:2,15 32:21 43:21 76:3 78:16,17 87:6 88:11 94:22 106:17 109:11 116:2,17 143:1 145:19 148:11 172:17 | **goal** 63:18 167:11,12 |
| **God** 4:19 | **goes** 77:14 154:16 |
| **going** 33:16 36:4 48:13 60:4 71:11 83:10 116:2,3,4 116:11 131:5 132:18 142:16 143:1 146:13 149:5 150:14 151:5 160:4 163:10 172:13 | **golf** 16:9 17:5 32:11 155:5 |
| **gonna** 145:16 | **good** 8:20 15:7,14,18 23:15 31:18 32:6 41:16 85:13,13 108:5 108:13 124:18 132:6 145:7 167:9 |
| **GOP** 95:10 | **gosh** 39:11 60:6 |
| **gotten** 162:3 164:1,2 | **govern** 13:3 |
| **government** 10:18 11:10,17 12:2,13,19,22 88:15 | **governor** 7:7 8:21 9:1,10 9:16 22:2,2 68:2 |

402

| | |
|---|---|
| | 78:2 87:13 121:3 123:8 143:22 144:1 |
| **Governors's** 120:2 | **governor's** 6:16 78:10 104:9 105:5 112:8 113:19 114:15 118:1 120:17 126:13 131:21 131:22 133:14 134:4 140:4 142:9 143:21 144:7 167:16 |
| **grab** 32:22 116:2 | **Gracious** 3:15 |
| **graders** 26:17 | **graduate** 28:15,16 29:15 **grant** 5:20 |
| **grave** 14:4 | **great** 15:6 19:22 32:3,4 122:3,11 140:19 165:10 |
| **greater** 125:22 126:19 166:2 | **greatly** 65:13 |
| **green** 155:11 | **grew** 118:13 169:2 |
| **grocery** 83:16 | **group** 26:16 148:4 |
| **groups** 7:6 8:19 9:18 80:15 81:6,8 84:20,21 85:9 85:13 162:14 | **grow** 23:16 |
| **growing** 128:20 169:10 | **growth** 32:14,14,16 95:15 95:16 122:17 124:1 |
| **guarantees** 60:11 | **guess** 26:14 33:15 34:12 47:15 53:5 75:15 82:5 97:16 102:9,10 127:5 144:12 151:9 156:18 |
| **Guidance** 22:22 | **guy** 8:15 56:18 |
| **guys** [188] 17:4 39:7 | |

**H**

| | |
|---|---|
| **ha** 17:13,13,22,22 168:14,14,14 | **half** 116:18 137:6 |
| **Hampton** 32:1 33:3 35:10 115:3 120:18 122:8 | **hand** 34:5 37:16 116:1 133:3 174:9 |
| **handful** 64:13 | **hang** 145:19 |

403

| | |
|---|---|
| **Hannah** 140:20 | **happen** 25:22 26:3 39:13 85:20 90:4,13 144:10 153:4 |
| **happened** 17:7,14 56:19 127:13 157:11 | **happening** 150:6 165:4 |
| **happens** 7:13 | **harbor** 37:4 |
| **hard** 127:6 | **HB** 53:8 54:20 55:1 57:11 69:14 80:16 135:16 137:6 139:17 160:2 164:11 166:16 |
| **health** 10:17 11:7,11,12 11:14 12:2 | **healthy** 4:2 |
| **hear** 112:11 | **heard** 33:15 34:11 35:9 38:7,14 41:12 64:9 66:13 70:7 70:15 82:4 113:10 119:3 123:15 131:3 132:4 134:12,15 161:3 168:20 170:14,16 |
| **hearing** 58:5 61:1 75:1 | **hearings** 37:15,17 38:2 43:18 52:17 65:11 66:13 72:13 73:1,12 82:12,18 83:12 85:16,18 89:2 104:16 161:4 **heart** 105:16 169:4 |
| **Heights** 2:19 3:14 172:4 172:20 173:4,11 173:16 | **heirs** 4:7 |
| **held** 174:4 | **help** 7:22 8:4 28:13 44:19 60:8 142:16 |
| **helpful** 83:11,12,13,13 | **Henrico** 2:15 39:1 40:5 83:1 100:14 123:12 166:9 172:6 |
| **Henry** 2:8 14:21 18:18 38:19 40:13 46:11 74:19 96:3 159:19 164:21 | **herbal** 12:8 |
| **Herring** 124:16 128:11,12 148:14 | **Hey** 142:16,19 148:5 |

404

| | |
|---|---|
| **high** 22:20 70:1 95:15 97:16 107:21 115:18 169:2 | **higher** 16:19 17:18 66:12 97:10 99:3 |
| **highest** 16:16 | **highlight** 78:18 |
| **hills** 32:3 | **Hispanic** 60:12,14 125:22 |
| **Hispanics** 125:12 150:12,16 150:22 | **history** 4:10 15:21 |
| **hit** 155:10 | **hits** 155:10 |
| **Hobson** 116:21 140:6 | **hold** 158:1,9 |
| **holds** 158:1 | **hole** 128:21 155:8,8 |
| **Holocaust** 172:12 | **home** 7:21 9:9,22 22:15 23:14 39:16 101:10 |
| **homeopathy** 12:8 | **homes** 9:14 |
| **honor** 28:9,22 29:3 45:6 45:7 | **Honorable** 2:2 3:10 |
| **hope** 2:17 26:19 149:14,15 150:3 151:19 152:1,15 154:4,9 156:2,8 156:13 158:12 164:15,16,19 172:16 **hopefully** 87:2 154:2 155:22 | **hospital** 17:21 |
| **hour** 82:22 | **hours** 75:10 101:1 106:2 |
| **house** 1:9 3:2,5 5:5,6,17 5:20 15:5 17:6 18:22 21:17 25:8 26:5 27:9 28:8,21 29:3 30:6,7,8,13 31:5 31:6,10 33:20 44:9,10 48:5,6 57:1 62:20 68:4 68:17 73:2 80:1 80:13 84:4 91:20 96:22 106:6,8 107:8 107:12 108:1 135:8,10 141:16 141:20,21 143:12 152:2 157:3,3 158:3,6 | **howling** 18:10 |

405

| | |
|---|---|
| 159:3,3,10,13 160:2 166:1,13 167:18 168:3,18 170:22 171:16 171:17,20,21 172:22 173:4,13 173:16,20 **Howell** 143:10 | |
| **humble** 164:11 | **hundred** 41:9 |
| **Hurley** 1:22 174:2,18 | **hypothetical** 121:1 |

**I**

| | |
|---|---|
| **idea** 7:1 9:3 | **ifs** 79:15 |
| **ignored** 168:2 | **III** 172:15 |
| **immediately** 162:8 173:1,6,21 | **impact** 132:5 163:16 |
| **impermissible** 11:10 | **important** 6:12 34:14 35:16 35:17 42:9 43:16 45:22 54:7 55:12,13 55:21 56:2,13 56:16 148:11 |
| **importantly** 38:10 | **imposing** 94:10 |
| **impressive** 16:12 | [189] **improve** 17:12 |
| **inaudible** 115:13 141:13 142:18 145:12 145:14 146:20 147:5,13 148:19 149:20 155:6 158:16 | **include** 32:8 48:5 65:22 102:6 106:19 111:4 |
| **included** 74:18 92:7 104:20 114:18 114:19 | **including** 31:14 96:21 101:19 |
| **incomprehensi...** 17:20 | **increase** 16:15 18:4 123:1 148:6 151:12 |
| **increased** 139:16 146:8 | **increases** 16:13 18:5,13 |
| **incredible** 77:15 | **incumbent** 19:3 90:20 |
| **incumbents** 158:10 | **independently** 76:11 |
| **indicate** 66:4 71:6 123:5 125:2 136:9 | **indicated** 41:7 78:3 92:6 131:6 161:16 |

406

| | |
|---|---|
| **indicates** 57:7 96:13 | **indicating** 4:22 |
| **indignity** 16:6 | **indirectly** 17:3 19:6 |
| **individual** 45:1 58:5 109:6 | **individuals** 8:16 11:6,11 12:7 13:17 14:4 38:20 41:14 |
| 43:11 49:20 65:11 82:5 93:12 105:13 106:10 | **indivisible** 4:20 |
| **industry** 15:12,16,19 16:8 17:18,21 18:1,6 18:19 | **industry's** 18:17 |
| **inflexible** 94:11 | **influenced** 109:18 |
| **influx** 122:20 123:2 | **information** 74:1 75:12 114:9 161:6 163:1 |
| **initial** 101:12 | **initiative** 47:17 |
| **injure** 119:5 | **inordinate** 116:11 |
| **input** 43:15,18 49:12 58:4 80:20 83:7 83:16 85:9,12 88:14 89:2 142:14 147:18 168:1 | **inquiring** 102:22 |
| **inquiry** 106:7 138:18 | **insisted** 23:1 |
| **instance** 120:5 | **instate** 16:13 |
| **instill** 17:1 | **Institution** 60:10 |
| **insufficient** 59:18 81:21 162:3,13 | **insurance** 10:17 11:8 |
| **insurers** 12:4 | **intent** 4:10 12:16 155:2 169:19 |
| **intentional** 36:22 156:9 | **interactive** 83:11 |
| **interest** 26:3 34:10 36:6 38:8 43:13 47:17 54:7 55:11 56:2 92:8 94:13,14 101:20 102:11 115:1,17 115:21 116:19 117:1,21 134:18 135:6 137:4,12 140:2,7 153:22 162:14 166:19 | **interested** 83:4 84:21 85:10 129:17 |

407

| | |
|---|---|
| **interesting** 44:5 77:9 116:16 140:18 | **interests** 25:14,19,22 105:15 118:21 132:8 169:15 |
| **Internet** 26:7 | **interstate** 11:8 |
| **intervene** 12:19 | **Interviews** 171:15,17 |
| **intrinsically** 13:18 23:12,13,18 | **introduce** 14:16 20:10,14 21:3 24:7,17,19 29:19 |
| **introduced** 42:18 102:4 | **introducing** 47:1 |
| **introduction** 5:21 24:4 26:12 29:12 | **intrusion** 13:19 |
| **invalidated** 163:11 | **investor-owned** 16:17 |
| **invited** 172:11 | **involved** 90:2 91:7 |
| **Islander** 111:1 | **Isle** 130:8,9 |
| **issue** 6:14,17 7:15 99:17 100:5,9 133:3 158:3 | **issued** 68:15 |
| **issues** 6:12,13 9:19 | **issuing** 11:17 |
| **items** 55:21 | **iteration** 53:21 |

**J**

| | |
|---|---|
| **jacked** 18:8 | **James** 2:9 4:8 21:12 143:11 153:16 |
| **Japan** 28:11 | **Japanese** 28:17 |
| **Jefferson** 4:9 | **Jennifer** 2:20 |
| **jeopardize** 115:2 120:18 | **Jewish** 172:15 |
| **job** 1:20 31:18 35:21 85:13,13 106:14 126:2 129:9 132:14,14 145:7 | **jobs** 23:6 |
| **Joe** 2:15 144:17 | **John** 23:4 172:15 |
| **join** 21:21 | **Joint** 27:6,9,16 |
| **jointly** 38:1 | **jokes** 16:9 |
| **Jones** 2:14 24:13,14,16 30:17,18 31:4 46:16,22 47:7 47:14 48:1,9 49:3,9 | **Journal** 5:6 |

408

50:8,13 [190] 50:18
51:2,9,17 52:2,13 53:3,9
53:16,18 54:16 55:3,8,19
56:8 56:15 57:5,14
58:11,19 59:2,7 59:14
60:1 61:5 61:9,15,20 62:4
62:10,22 63:10 63:17,22
64:7 64:21 65:8,19
66:7,18 67:4,21
68:7,12,18 69:1
69:6,11,17 71:1 71:10
72:3,10 72:19 73:3,8,15
73:20 74:6,12 74:21
75:7,15 76:9 77:20 78:11
79:7,14 80:7,17 81:3,9
81:17 82:3 83:22 84:8,16
85:2 86:5,14 88:19
89:8,12 89:18 91:4,11
91:15,21 92:3 92:11
93:19 94:2,7,15 96:10
97:12 98:19 99:4,11,18
100:3,9,13,20 101:4,6
102:2 102:15 103:4,9
103:15 104:6,12
105:2,11,21 106:11
107:2,16 109:1,14 110:10
110:21 111:9,15
112:2,10,21 113:5,9,16
114:3,13 115:9 117:15
118:6 119:16 120:7,14
120:21 121:15 122:2
123:20 124:11 125:6,18
126:8 127:1 128:3,16
129:14 130:2 131:16
132:11 133:1 134:1,16
135:3 135:9,14,17

409

| | |
|---|---|
| 136:5,22 137:8 138:1,5,12,21 139:10,18 142:10 143:17 147:18 149:10 149:19,22 151:5 151:21 152:12 152:16 154:7 155:4 156:6,10 168:11,13,14,17 | |
| **judges** 105:8 113:22 | **judgment** 132:13 |
| **Judicial** 171:15,16 | **July** 90:16 |
| **June** 90:16 | **jurisdictions** 114:21 |
| **justice** 4:20 67:10 86:11 90:5,7,9 111:13 160:16 161:16 171:14 | **justify** 141:3 |

### K

| | |
|---|---|
| **Kaine** 13:8 | **Keene** 126:2 |
| **keep** 3:22 9:17 19:18 42:6,8 115:20 120:9 147:20 151:18 153:19 | **keeping** 148:3 |
| **Ken** 19:12 | **Kenneth** 143:9 |
| **Kent** 106:15 153:20 | **kept** 116:22 153:22 |
| **kicked** 34:12 | **kind** 33:6 36:3 43:12 90:1 96:4 115:22 144:20 150:1,21 |
| **kindly** 149:11 | **King's** 116:20 |
| **Kirkland** 2:19 | **knew** 94:22 112:13 146:22 |
| **know** 6:10 8:16 16:5 22:17 23:4 26:8 26:15 32:9 33:11 39:5,9 40:15 43:6,6,11 43:13,15 44:5 44:17,17 45:20 48:15,17,18 51:2 56:17 61:10 67:6 70:12 83:15 85:15 86:18 88:4,10 90:2,21 93:2 104:15 | **knowing** 92:14 |

410

| | |
|---|---|
| 105:12,13 108:4 108:8,13 117:4 117:18 120:1 122:7,14 123:6 123:9 130:16 137:10 142:21 147:2 148:11 150:13 151:14 154:11 159:4 161:20 162:5,15 163:5 164:21 169:16 170:10 | |
| **knowledge** 59:8 61:11,21 | 115:22 174:7 |
| **known** 25:13 | **knows** 43:5 117:18 169:1,2 |

**L**

| | |
|---|---|
| **L** 2:6,8,9,12,13 3:1 | **lab** 39:8,12 |
| **lack** 94:13 | **Ladies** 6:9 8:11 15:4 21:17 31:4 160:1 168:17 |
| **landed** 104:15 170:13 | **Lane** 28:9 |
| **language** 124:1 | **large** 11:16 84:20 |
| **Larios** 36:21 92:19 93:8 93:22,22 95:2 96:13 97:13 98:3 | **lastly** 163:19 |
| **late** 17:9 39:1 112:9 163:1 | **latest** 87:13 |
| **Latino** 150:12 | **Latinos** 125:12 150:16 151:1 165:5 |
| **laughing** 36:1 | **law** 11:7,22 13:2 14:5\ 25:11,12,17,19 26:1,8 34:19 39:5 40:3 42:2 75:16 92:14 103:19 105:7 111:20 130:21 161:14 |
| **laws** 25:16 | **lawyer** 95:4 142:3 164:6 |
| **lawyers** 89:22 142:1 | **lawyer's** 96:6 |
| **lead** 48:8 75:12 169:9 | **leader** 48:6 126:12 164:20 167:4 |
| **leaders** 4:8 38:4 41:14 | **leadership** 47:10 48:4,5 |

411

| | |
|---|---|
| **leader's** 112:5 | **League** 76:19 82:9 |
| **learned** 17:20 | **leave** 129:8 |
| **led** 3:10,13 42:4 74:3 23:5,6,7 28:14 | **left** 18:10 19:19 23:5 33:18 123:11 |
| [191] **lefty** 155:6,6 | **legacy** 4:8 |
| **legal** 111:16 160:7 | **legally** 64:15 |
| **legislation** 46:21 | **legislative** 4:3 58:15 62:19 85:21 106:3 |
| **legislators** 17:10 | **legislator's** 18:12 |
| **legislature** 17:15 | **legitimate** 94:12,13 |
| **lesbian** 7:14 8:10,15,18 10:1 | **lesson** 19:14 |
| **letting** 9:3 | **let's** 87:15 142:7 143:2,7 144:3 145:3 147:10 160:16 |
| **level** 54:11 152:10 | **levels** 18:20 56:22 |
| **liberty** 4:20 13:20 | **lied** 155:9 156:12 |
| **lies** 32:11 155:13 | **Lieutenant** 22:2 |
| **life** 6:21 7:6 8:13 38:3 115:19 | **likewise** 166:19 |
| **line** 31:19 44:9 69:19 69:22 121:6 153:20 | **lines** 33:8,17 47:12 62:19 68:17 77:13 141:3 164:9 |
| **links** 19:20 | **Lionell** 2:16 |
| **list** 36:7 49:11 139:1 | **listen** 141:16 169:14 170:13 |
| **listened** 52:15 65:10 117:9 161:5 | **listening** 26:6 72:10 121:20 160:19 |
| **litmus** 67:11 | **little** 19:17 32:7 43:20 77:14 107:18 146:5 |
| **live** 115:11,12 118:10 118:12 119:12 | **lived** 115:18 |
| **living** 122:12 | **lobbyist** 15:12 |
| **local** 115:22 | **local-elected** 38:3 |
| **logical** 47:16 | **long** 15:14 25:13 67:7 |

412

| | |
|---|---|
| **longer** 37:4 90:20 | **look** 15:20 25:18 31:20,21 32:9 36:19 39:3 51:19 57:17 60:8 78:17 88:10 90:22 103:16,17 104:19 111:4 112:15 117:6 124:22 127:9,11 127:12 140:9 142:20 143:7 144:16 145:8 146:3,11 149:5 149:5,6,7 154:11,13 155:13 164:4 170:3 |
| **looked** 38:16,22 39:16 40:18 53:22 56:19 70:4 103:22 115:13 119:2 120:1 147:9 157:10,10 159:8 | **looking** 83:3,10 92:12 107:19 108:16 111:18 112:12 123:6 146:19 150:10,12 162:11 164:22 |
| **looks** 138:8 153:10 | **lose** 127:20,20 158:21 |
| **loss** 32:20 33:2,3,5 152:17,18,19,19 152:22 **lost** 31:22,22 146:15 155:10 | **lot** 11:21 18:15 25:8 38:8 85:12 140:19 159:9,10 |
| **Louden** 32:17 | **Loudoun** 15:2 151:1 |
| **Loupassi** 20:20,21 21:2 | **love** 23:13 40:5 144:10 |
| **loving** 7:20 9:9 22:15 23:14 | **low** 39:22 40:21 41:4 70:9 107:22 |
| **lower** 16:6 17:12 42:1 70:14 131:11 | **Lue** 146:22,22 |
| **Lynchburg** 32:2 | |

## M

| | |
|---|---|
| **M** 2:19 | **mace** 4:4 |
| **Macon** 28:16 | **Madison** 4:8 |
| **magic** 161:16 | **main** 93:14 |
| **maintain** 63:15 149:8 153:6 155:20 | **major** 108:5 |

| | |
|---|---|
| **majority** 42:7 47:10 48:4,6 49:6 54:4 55:14 60:12 67:1 80:14 109:18 127:18 148:17 150:15 158:20 | **majority-minor...** 52:6 54:2 55:1,15 56:12 57:10 58:17 59:20 60:13 63:16 64:5 65:3 69:5 69:16 75:21,22 102:21 108:4 109:5 110:4,14 114:1,17 115:6 118:5 124:18 126:11,15,21 129:2 132:7 133:5 134:14 151:8,18 165:8 167:1,2,13 |
| **majority/minor...** 38:12 39:18 40:20 41:2 | **making** 7:8 11:16 142:5 |
| **man** 35:3,21 39:6 169:6 | **management** 11:16 |
| **mandate** 10:13,16,18 11:2 33:9 | **mandated** 128:15 |
| **mandates** 168:4 | **mandatory** 94:11 |
| **manner** 50:2 90:12 130:4 | **map** 19:2 31:20 32:9 33:12 35:18 [192] 36:12 38:18 40:4 42:5,13 43:10 76:2 77:12 81:11 83:18 85:11 93:8,10 118:19 139:4 141:6 150:11 |
| **mapping** 76:21 | **maps** 40:16 83:11 139:19 140:22 154:21 |
| **map's** 33:1 | **March** 7:18 37:9 |
| **Mark** 2:12 | **Marshall** 2:7 10:5,6,9 14:7 14:8,11,15 |
| **Martinsville** 74:18 | **Martinville's** 26:7 |
| **Mary** 77:9,11 | **Maryland** 174:22 |
| **Mass** 144:11,12 | **Massie's** 138:15 |
| **Mass's** 144:12 | **Masters** 155:7,11 |
| **master's** 17:21 | **match** 106:4 |
| **Mateo** 44:15,17,21 | **math** 87:15 108:5,5 |
| **mathematical** 165:12 | **matter** 60:6 106:13 108:17 160:14 |

414

| | |
|---|---|
| **matters** 4:6 | **Matthew** 140:3 143:11 |
| **mayor** 118:17 169:6 | **McClellan** 2:20 |
| **McClennan** 20:5,6,9,13 27:1,2 27:5 49:15 | **McDonald** 9:16 106:2 |
| **McDonnell** 7:7 8:21 9:1,11 68:3 | **mean** 66:1 75:22 118:11 139:1 |
| **meaning** 88:5 | **meaningful** 113:7 |
| **means** 31:21,22,22 32:6 | **measure** 108:14 |
| **mechanic** 23:3 | **medical** 12:8 |
| **medicine** 12:9 | **meet** 42:14,21 64:14 75:3 76:4 78:12 81:12 83:15 86:12 119:3 133:17 136:11 171:15,19,21 |
| **meeting** 78:13 119:21 171:17 | **meetings** 34:13 73:5 74:3 171:14,18 |
| **member** 23:11,16 34:10 49:22 137:16 142:11 147:4 152:21 157:2 | **members** 3:3,9,20 4:1,21 8:1 25:7 38:4 45:11,12 49:6 58:6 65:6 67:1 76:13 80:14,18 112:6 117:3 129:18 140:1 141:15,21 142:5 143:3 146:2,3,6 147:8 159:12 171:22 |
| **memo** 15:11,16 | **memorial** 5:18,21 14:13,16 24:17,19 |
| **memory** 29:4 | **men** 7:18 9:14,20 |
| **mention** 34:11 150:14 | **mentioned** 55:10 82:21 92:16 102:20 140:3 157:14 158:12 |
| **mentioning** 64:11 | **men's** 27:17 147:4 |
| **mere** 165:12 | **merely** 8:9 |
| **Merricks** 19:3 | **Merricks's** 19:5 |
| **mess** 131:5 151:16 | **message** 9:10 |
| **met** 34:5 67:12 70:6 | **method** 111:13 |

415

| | |
|---|---|
| **methodology** 111:12 114:18 126:13 131:20 | **methods** 57:22 |
| **Metro** 43:5 | **middle** 18:8 |
| **Mike** 77:10 106:2 | **miles** 153:12 |
| **mind** 36:11 76:18 150:10,11 155:10 | **mindful** 3:22 |
| **minds** 6:11 | **mine** 22:17 28:12 34:17 140:18 |
| **minimizing** 165:19 | **minimum** 64:15 |
| **minor** 18:7 36:14 37:4 42:15 93:5 99:6 99:14 | **minorities** 157:18 158:16,18 165:5,16 166:1 |
| **minority** 31:14 41:8 49:10 52:9 54:22 55:17 57:12 58:3 60:22 66:2 71:8 72:8 78:3 84:21 97:6,7,8 99:2,16 100:7 111:19 112:5 126:11 127:19 130:22 141:22 144:17 147:16 148:6 150:9 157:7,17 158:6 158:9,14,15,19 161:9,22 162:1 162:16 163:3,16 163:17 164:20 167:4 169:22 | **minority-major..** 71:5,7 72:7 74:4 74:16 75:13 79:11 127:11 132:6 160:21 162:18 164:5 |
| **minority/major..** 51:12,15 | **minus** 36:13,15 39:20 55:22 77:6 78:7 92:18,18 93:15 97:11,14 98:13 98:22 99:19 100:6 136:12 |
| **minutes** 170:8 | **mirror** 157:6 |
| **mirrors** 157:6 | **missed** 11:21 13:13 |
| **mistaken** 75:2 97:20 136:15 | **mistakenly** 167:11 |
| **mixed** 106:9 110:18 | [193] **model** 157:10 |
| **moderate** 32:13 | **mom** 26:7 45:8 |
| **moment** 100:11 134:6 | **Monday** 83:2 |

| | |
|---|---|
| **monopoly** 16:3 | **moral** 13:15 14:5 |
| **morning** 6:15 15:8 21:22 22:6 75:2 82:22 83:3 85:21 87:4 106:15 144:7 163:14 171:18 171:21 | **Morrissey** 2:15 100:15,16,22 101:5,11 102:12 102:17 103:8,13 104:3,8,21 105:4,18 106:1 106:21 107:4 108:20 109:3 110:7,12 111:6 111:11,21 112:4 112:18 113:1,6 113:13,18 114:10,15 117:12,17 119:13,18 120:11,16 121:12,17 123:17,22 125:3 125:8 126:5,10 127:22 128:5 129:11,16 131:13,18 132:22 133:20 134:3,22 135:5 135:11,16,18 136:19 137:2,20 138:3,9,14 139:6,12 141:9 166:10,11,12,15 167:19 |
| **Morrissey's** 144:18,19 | **motion** 5:22 6:4 14:17,21 20:15,18,22 21:7,7,10 24:11 24:20 25:2 27:3 27:11,20 28:5 29:5,6,8 30:1 173:8,10,17,20 |
| **motions** 5:7 30:2 | **mountains** 45:14 |
| **move** 28:8 30:18 33:1 153:8,11,13 172:21 173:13 | **moved** 46:6,9 77:13 |
| **moves** 5:20 27:9 29:2,18 173:4,16 | **Moving** 126:10 |
| **multi-year** 17:8 | **Museum** 172:12 |

417

## N

| | |
|---|---|
| **N** 2:1 3:1 | **NAACP** 80:18 146:20,22 147:1 |
| **name** 4:16 18:17 127:7 | **named** 15:9 |
| **names** 49:11 | **Nancy** 76:19 |
| **nation** 4:19 16:8 21:21 | **naturally** 153:7 |
| **nature** 60:21 109:20 | **nays** 171:2,3 |
| **nearly** 150:17 152:7 165:6 | **neat-looking** 140:22 |
| **necessarily** 77:6 133:10 135:19 | **necessary** 4:2 133:18 163:15 |
| **neck** 153:2 | **need** 8:5 17:21 19:8 33:15 52:19 67:12 134:15 144:8 145:14 |
| **needed** 70:8 72:13 85:19 | **needs** 9:12,20 |
| **neighbor** 76:14 | **neighborhood** 28:19 43:22 44:1 116:12,12 118:9 |
| **neighbors** 23:8 | **neither** 10:2 70:5 |
| **nephew** 8:13 | **Nero** 20:1 |
| **never** 17:7,14 48:10 87:8 169:19 | **new** 16:14 152:2 153:20 |
| **newer** 122:6 | **newest** 152:20 |
| **Newport** 152:4 153:21 | **News** 153:21 |
| **newspaper** 15:6 | **nick** 19:17 |
| **niece** 8:13 | **night** 31:20 39:1 82:20 104:18 |
| **nine** 41:2 141:5 154:18 | **noise** 19:12 |
| **Nommi** 140:20 | **non** 102:10 |
| **nonpartisan** 104:10 167:17 168:2 | **non-Caucasian** 125:15 |
| **non-lawyer** 96:5 | **non-performing** 133:4 |
| **noon** 172:2 | **Nope** 168:21 |
| **Norcross** 153:2 | **Norfolk** 150:1 |

418

| | |
|---|---|
| **north** 70:8 165:4 | **northern** 32:17 43:4 44:19 45:11 163:21 165:3 166:6 |
| **Nos** 171:6,7 | **notable** 4:10 |
| **Notary** 174:21 | **note** 38:22 82:16 128:6 138:6 140:8 152:2 |
| **notice** 45:15 87:22 104:17 | **noticed** 153:10 |
| **November** 88:6 | **number** 7:17 16:22 27:16 30:11 34:1,1,21 35:1,15,15 36:5 36:7,7,7,8 38:11 42:5 68:4 92:7 96:20 101:1 106:5 107:13 119:2 123:4 136:7 137:12,13 137:13,18 138:16,22 139:1 151:16,17 152:7 153:20 161:3,4 161:17 165:5 169:11 |
| **numbers** 32:12,13 76:3 106:4 108:8 111:3 125:1 147:19 152:13 154:12 155:12 155:20 | **nurturing** 9:9 |
| **nuture** [194]7:22 | |

**O**

| | |
|---|---|
| **O** 3:1 | **oath** 170:19 |
| **Obamacare** 10:13,16,20 11:5 11:9,13,22,22 12:7 | **object** 86:18,20 90:13,14 |
| **objections** 13:11,15,16 90:10 93:10 | **observed** 138:19 |
| **obvious** 42:15 60:16 115:20 136:11 | **obviously** 118:8 |
| **occasions** 133:4,6,8 | **occupied** 152:3 |
| **occur** 135:21 | **occurred** 35:2 120:6 122:18 151:9 |

419

| | |
|---|---|
| **occurs** 162:7 | **offer** 166:1 |
| **office** 41:7 42:17 70:12 78:16 128:18 | **official** 73:1 74:2 |
| **officials** 38:4 124:22 | **Oh** 56:8 133:3 144:10 145:3 |
| **okay** 63:12 116:2 133:15 135:17 143:6 144:13,15 146:8,18 | **old** 18:20 |
| **older** 28:19 | **oldest** 4:3 |
| **once** 18:6 19:16 43:10 77:10 81:22 90:14 131:21 137:10 | **ones** 23:8 136:16 162:21 |
| **one-man** 38:9 93:12 121:18 | **one-person** 33:10 34:19 36:8 38:10 40:9 46:1 55:22 79:22 81:13 93:13 95:22 97:22 98:15 99:7,20 121:9 132:17 137:13 150:5 165:13 |
| **one-vote** 33:10 34:19 36:9 38:9,10 40:9 46:1 55:22 79:22 81:13 93:13,13 95:22 97:22 98:15 99:7,21 121:10 121:18 132:17 137:13 150:5 165:13 | **onion** 39:15 |
| **online** 43:20 83:10 | 85:11 |
| **open** 45:3 49:21 172:13 | **opening** 55:20 92:16 97:22 103:5 |
| **opinion** 31:13 36:10 59:9 66:11 70:14 71:12 72:6,11 73:11,12 79:16 85:4,4 94:10 100:10 115:10 132:17,20 133:15,16 139:2 164:11 | **opportunities** 15:21,22 |
| **opportunity** 3:17,17 8:21 35:7 37:14 71:15 | **oppose** 160:2 |

420

| | |
|---|---|
| 85:8 88:8,14 90:11 129:22 158:8 165:17 166:2 167:14,15 169:17 | |
| **opposed** 6:3 14:20 20:18 21:10 24:11 25:1 27:13 28:1 29:22 31:2 103:2 173:10,19 | **opposite** 151:3 |
| **opposition** 166:13 | **option** 12:1 70:5,5 107:20 119:2 160:17 |
| **order** 3:2 5:8 27:7,10 46:5 51:11 86:12 167:18 | **organizations** 162:14 |
| **organized** 10:15 | **original** 12:16 |
| **originally** 84:5 | **orphanage** 22:15 |
| **ostensibly** 91:9 | **ought** 7:3 129:22 132:3 132:4 134:12,13 |
| **outcome** 8:21 | **outperform** 125:1 |
| **out-of-bounds** 12:22 | **overall** 32:14 77:5 |
| **overarching** 36:9 56:3,3 97:21 | **oversaw** 161:2 |
| **overseas** 88:1 | **oversee** 47:12 |
| **overturn** 7:7 | **overwhelmed** 85:11 |
| **overwhelming** 130:6 166:21 | **O'Bannon** 172:7,8,10 |

P

| | |
|---|---|
| **P** 2:1,1,10 3:1 | **Pacific** 125:13 |
| **packed** 161:21 | **Pages** 1:21 |
| **paid** 167:20 | **panel** 115:4 |
| **paper** 8:22 122:3 138:6 | **Papers** 12:17 |
| **parent** 7:21 8:5,18 13:7 22:18 25:17,17 | **parents** 7:21 8:10 10:1 12:20 22:17 23:4 |
| **part** 11:1 33:5 55:1 104:2 111:16 114:19 135:20 166:6 **partiality** 13:5 | **participate** 35:8 88:14 165:17 |

421

| | |
|---|---|
| **participating** 168:1 | **participation** 51:13 |
| **particular** 54:3 65:6 66:2 96:16 | **particularly** 84:20 151:1 163:21 165:2 |
| **parts** 16:4,4 86:19 | **party** 36:22 37:1 47:10 48:4 49:6,10 67:1 80:14 89:21 92:20 93:3 96:16 123:10 150:15 |
| **pass** 25:16 78:12 87:2 170:22 171:4 | **passage** [195] 168:10 |
| **passed** 37:10 42:19 57:1 132:13 159:7 171:8 | **passing** 16:20 |
| **pastors** 22:4 | **patriate** 12:20 |
| **Patrick** 2:17 | **patron** 46:19,21 |
| **pattern** 55:16 96:15 124:1 160:22 164:7,8 | **patterns** 52:9 66:2 95:3,10 122:18 161:8 |
| **Paul** 172:15 | **pay** 19:7 101:9 |
| **paying** 17:3 19:9 | **peel** 39:15 |
| **peninsula** 153:3,12,14 | **Pennsylvania** 74:20 |
| **people** 4:14 11:21 21:19 22:4 25:15 33:17 34:15 35:7 37:6 40:12 83:14 98:8,10 98:11 108:9 110:18,20 116:20 117:9 118:15 120:8 122:12,13 125:12,16 144:20 145:5,11 150:8 155:9 158:7 159:17 167:6,11,14 169:3 170:15,20 172:15 | **peoples** 145:17 |
| **people's** 33:19,20 170:21 | **perceive** 160:7 |
| **percent** 15:13 16:12,15 36:13,13,14,15 37:4 39:20,21 39:21 40:2,21 40:22 41:3,4 42:12,15 51:19 51:20 54:5,5,8 | **percentage** 40:22 42:1 52:19 57:18,19 65:13 66:13 70:2 72:14 97:10 107:6,8,21 110:19 123:8 |

422

| | |
|---|---|
| 55:22 64:17 66:12 70:9,10 70:16 71:6 72:6 72:14 75:19 77:6 78:6,7 93:5 93:15 97:1,11 97:14 98:13,22 99:6,14,19 100:6 108:4,18 109:19,19 114:2 121:21 122:1,22 124:5 126:1 127:14,15 128:13 132:2,9 134:11,14 136:12 139:16 139:17 144:19 146:12 150:16 150:17,19 152:6 152:7,9,16,18 152:19,19,22 154:14,14,15,15 154:17 155:16 155:17,18 157:8 157:21 158:7 161:9,12,13 167:4,8 | 124:9 131:8,11 144:17 153:7 |
| **percentages** 42:11 53:22 54:4 110:3 111:5 | **perfect** 77:2 170:10,11 |
| **perform** 60:20 129:3 | **performance** 54:22 |
| **performing** 151:13 | **period** 18:16 37:19 54:12 56:20 89:3,16 |
| **permanent** 7:20,20 8:6,7,9 9:22 | **person** 9:3 56:17 108:12 124:22 129:4 149:9,9 169:8 |
| **personal** 6:7 10:6 15:2 21:14 22:10 25:4 | **personally** 105:12 |
| **persons** 3:6 54:19 164:2 | **perspective** 8:10 34:17 75:20 117:2 |
| **persuasion** 144:14 158:20 | **Petersburg** 2:18 38:14 49:16 156:16 |
| **ph** 44:15 144:11 | **pharmacist** 95:6 |
| **pharmacy** 48:17 83:13 118:10,11 | **phone** 83:11 |
| **phrase** 128:7 | **pick** 155:19 |

423

| | |
|---|---|
| **picked** 32:6,7 153:5,9 | **picture** 138:5 |
| **PL** 53:18 | **place** 9:6,17 13:17 14:2 39:17 40:19 41:1 54:1 102:8 |
| **placed** 4:5 23:2 25:13,20 26:2 164:3 | **places** 3:19 |
| **plan** 10:18 31:12 32:21 35:21 47:1 48:8 49:8 50:12,22 51:14 53:7,12 54:6,20 56:4 58:2 66:10 70:5 77:2 78:15 79:15,19 80:16 81:12 82:17,19 84:3 85:1,1 86:9 86:11,15 90:9 96:22 103:21 105:5 106:5,6,8 107:8,9,12,15 107:20 108:19 109:8 112:8 113:2 116:16 117:5 118:1 119:2 120:2,17 121:7 126:14 135:8,9 136:1 136:13,16 137:9 142:9,14,15,20 143:7,9,11,12 143:21 144:7 148:2,4,5,7,8,9 148:10 162:12 163:18 166:3 167:16 168:2 170:3,7,10,11 170:12 | **planned** 17:1 |
| **planning** 19:5 | **plans** 37:15 39:2,3 62:9 64:11 66:8,10 68:4,15 69:4 70:6,9 74:5 79:19 81:22 83:3 89:4 101:13,16,17,17 102:4,20 103:1 103:20 104:1 112:15 114:7 115:14 133:16 137:3 139:15 |
| **play** 32:10 116:1 155:9,13 | **played** 156:11 |

424

| | |
|---|---|
| **players** 90:2 | **please** 3:3,7,22 4:13 9:16 21:21 25:5 29:5 141:16 145:18 173:8 |
| **pleased** 104:14 | **pledge** 3:12 4:17 |
| **plethora** 102:4 | **[196] plug** 76:3 |
| **plus** 36:13,14,15 37:3 39:19 42:14 55:22 64:17 75:19 77:6 78:7 92:18,18 93:4 93:14 97:9,10 97:14 98:12,22 99:6,14,19 100:6 136:11 | **pockets** 122:8 |
| **Pogge** 2:9 21:12,13,16 | **point** 6:6 10:16 12:6 13:12 15:2 21:13 25:4 45:10 46:5 90:17 109:13,18 138:18 162:3 163:9 164:21 |
| **pointed** 12:18 | **points** 10:6 12:12 |
| **policy** 97:2 160:3 | **polite** 36:3 |
| **political** 92:22 96:16,19 98:5,7 165:11 165:15,18 169:15 | **Pope** 172:15 |
| **populate** 92:21,21 | **populated** 16:4 92:22 93:1,2 94:20,20 95:11 95:11,12,13,14 95:15,16,17,17 95:18 |
| **population** 31:16 32:20 34:8 37:1 38:17 39:22 41:5 42:10 51:19,20 52:7,9 54:9 55:17 56:20 57:12,19,20 59:20 64:10 65:13 66:14 70:8 71:17 77:14 78:6 92:9 94:11,14 96:14 99:1,3 101:19 107:7,9,12,13 107:14,21 108:18 109:8 110:19 111:20 116:3 122:7,22 | **populations** 96:18 97:8 125:15,15 |

425

| | |
|---|---|
| 123:1 124:6 130:5,16 132:1 136:10 137:5 140:11 150:22 151:13 152:16 153:5,9,18,19 155:19 162:1 163:4 167:3 | |
| **portico** 22:1 | **Portsmouth** 114:20 |
| **pose** 97:4 | **posited** 168:7 |
| **possible** 28:22 63:15 71:15 110:2 124:9 128:14 140:21 | **possibly** 64:3 |
| **posted** 85:22 | **potential** 71:4 78:15 163:18 |
| **potentially** 106:16 | **power** 13:4 15:19 16:2 18:1 |
| **practical** 60:11 64:6,9 | **praise** 101:9 |
| **praised** 15:13 | **pray** 3:15 4:16 |
| **prayer** 3:10 21:18,20 | **precincts** 45:17 76:15 114:20 153:8 |
| **precise** 95:5,6 | **preclearance** 67:10,12 86:10 93:7 |
| **predict** 90:4 | **preface** 96:12 150:4 |
| **Prefacing** 107:4 | **premise** 82:2 |
| **preparation** 53:7,12 | **prepare** 4:6 |
| **prepared** 31:20 86:16 109:11 | **presence** 4:22 |
| **present** 2:5 5:4 53:12 65:7 114:7 121:4 | **presentation** 162:8 |
| **presented** 11:19 74:22 82:7 112:16 148:10 | **presently** 62:7 |
| **presents** 130:4 | **preserve** 151:15 158:17 |
| **press** 6:15 | **pressed** 88:4 |
| **prettiest** 40:3 | **pretty** 33:1 60:16 76:3 76:17 141:7 152:12 |
| **prevent** 9:13 12:7 | **previous** 60:18 |

426

| | |
|---|---|
| **pre-deregulation** 18:20 | **pride** 17:2 |
| **primaries** 86:13 87:21 | **primary** 37:11 71:20 88:12 90:18 133:9 |
| **Prince** 2:7 10:4 32:18 40:11 98:10 124:14 151:2 | **principal** 16:2 |
| **principle** 36:9 46:1 79:21 93:13 97:21 | **principles** 12:16 13:2,20 |
| **prior** 82:17 85:15,18 157:14 | **priority** 140:9,14 |
| **private** 11:6 12:3 38:5 | **privilege** 6:7 10:6 15:2 21:14 22:10 25:5 |
| **privileges** 3:7 73:2 74:2 80:13 91:9 | 106:8 112:7 |
| **Pro** 6:21 7:6 | **probably** 41:22 67:7 73:4 118:15 119:7 138:6,8 |
| **problem** 143:19 | **problems** 143:20 |
| **procedures** 87:1,7 | **proceedings** 174:4,9 |
| **process** 7:10 11:20 33:18 35:8 38:7 42:22 43:19 45:3 47:13 49:21 52:16 53:13 57:16 58:5 60:17 61:1 67:8 70:7 76:13 81:20 90:3 108:11 112:16 113:11 123:16 127:3 135:21 155:3 161:3 162:5 165:15,18 168:1 | **produce** 166:22 |
| **producers** [197] 18:1 | **product** 104:9,13 117:8 |
| **productive** 8:1 23:16 | **professor** 39:7 106:2 113:22 |
| **professors** 105:8 | **profits** 17:13,18 18:19 |
| **Progress** 147:5 | **promise** 83:5 112:15 121:2 |
| **promised** 82:18 170:12 | **promote** 7:2 |

427

| | |
|---|---|
| **proportionally** 32:21 | **proposal** 6:16 152:2 165:18 166:1 |
| **propose** 142:8 | **proposed** 7:11 9:17 120:4 150:10 |
| **prospective** 10:1 | **protecting** 38:9 |
| **protection** 34:20 98:2 165:21 | **proved** 86:15 |
| **provide** 20:1 23:13,14 157:8 | **provided** 50:14 51:18 52:16 76:2 80:20 83:8,17 |
| **provides** 89:15 | **providing** 85:4 |
| **public** 12:1 37:14,15,16 37:17,19 38:2 43:15,17,18 52:17 58:5 61:1 65:11 66:13 72:12 73:1,12 73:12 75:1 81:22 82:12,18 83:7,12,16 84:6 84:19 85:9,16 85:18 88:8,13 89:1,2,3 90:21 104:16 118:3 119:4,21 123:16 141:4 146:11 160:3 161:4 172:13 174:21 | **publicly** 84:6 |
| **pull** 19:19 | **pulled** 37:21 167:5 |
| **purchase** 10:17 | **purpose** 20:22 99:16 |
| **purposes** 60:11 96:19 | **pursuant** 5:5 167:12 |
| **purview** 62:21 | **pushed** 88:4 |
| **put** 32:22 36:12 39:3 39:12 43:13,20 44:22 48:11,20 51:5 81:11 84:5 85:15 90:15,15 101:2,4 115:15 116:22 118:11 118:12,13 127:4 127:7 143:4 146:1 | **puts** 19:2 |
| **putt** 155:11 | **putting** 54:6,10 69:14 85:14 112:17 162:1 |

428

| | |
|---|---|
| **P&E** 34:5 35:16 80:19 82:8 83:6 91:19 129:18 136:17 137:11 | **p.m** 171:15 |

**Q**

| | |
|---|---|
| **qualifications** 169:9 | **qualified** 169:8 |
| **quality** 130:17 | **quarreled** 131:19 |
| **question** 44:8 46:14 47:4 47:20 48:22 50:5,15 53:11 53:14 54:13 55:5 56:5 57:2 58:8,21 59:11 60:2 61:2,12 62:1 63:9,19 64:18 65:16 66:15 67:18 68:9,20 69:8,18 70:20 71:11,22 72:16 73:6,17 74:7,9 75:4 76:6 77:17 79:4 80:4 80:22 81:14 83:19 84:13 85:3 86:2 88:16 89:9 91:1,12,22 93:16 94:4,18 96:6,7,13,20 97:4 98:16 99:8 99:22 100:18 102:13,17 103:10,12 104:4 104:22 105:19 106:22 107:4 108:21 110:8,15 110:15,22 111:7 111:22 112:14 112:19 113:14 114:11 117:13 118:9 119:10,14 120:10,12 121:13 123:18 124:3,3,12 125:4,9 126:6 128:1 129:12 131:14 132:19 133:21 134:5,20 135:1,12 136:20 137:21 138:10 139:7,9 140:16 149:17 150:20 151:19 | **questioning** 60:4 69:19,22 121:6 |

429

| | |
|---|---|
| 154:3,5 154:18 156:1,3 156:5,8,11 165:22 | |
| **questions** 30:20 45:20 46:10 51:6,21 52:22 67:14,16 67:17 112:6 133:14 134:4 149:22 150:11 163:20 168:6,9 | **quibble** 132:12 |
| **quibbled** 131:20 | **quite** 19:16 34:19 75:16 80:1 |
| **quorum** 5:4 | **quote** 70:13 76:16 77:6 77:9 140:17,20 141:3 |
| **quotes** 60:7 76:18 | |

**R**

| | |
|---|---|
| **R** 2:1,18 19:3 174:1 | **race** 125:17 141:20 142:21 143:15 145:18 146:9 |
| **raced** 106:9 | **races** 110:18 150:11 |
| **racial** 55:16 164:8 165:10,16,16 | **racially** 164:1 166:5 |
| **racist** 141:19 | **raise** 7:22 17:13 |
| **raised** 16:11 22:18 115:12 | **raising** 15:13 |
| **Rally** 21:18 | **Rams** 20:11 |
| **ran** 89:6 | **Randolph** 28:16 |
| **Randy** 22:1 | **rate** 16:15 18:3,5 |
| **rates** [198] 15:13 16:7,11 16:16 17:12 18:8 19:11 | **rational** 97:2 |
| **raw** 52:12 | **reach** 107:13 |
| **reached** 80:15 | **reaches** 32:3 |
| **read** 8:22 15:15 44:4 60:6 94:9 | **reading** 30:8 92:14 96:1,5 96:13 108:6 164:13 168:10 171:1,4,8 |
| **ready** 87:19 | **real** 25:11 39:10 92:17 |

430

| | |
|---|---|
| **really** 15:7 39:7,11 44:16 76:17 77:1 88:3 90:21 92:19 93:4 112:11 116:1 148:12,13 158:2 158:2 | **reapportion** 31:9 |
| **Reapportionme...** 37:18 43:16 | **reason** 36:8 93:14 125:19 137:10 137:19 157:5 162:2 |
| **reasonings** 69:14 | **reasons** 98:6 136:11 160:3 164:10 168:6 |
| **recall** 138:3 | **recalled** 139:13 |
| **receive** 87:6 89:5 | **received** 38:2 42:16 44:7 44:14 58:4 60:21 71:14 72:12 73:1,13 81:6 85:12 127:17 128:8 131:2 133:17 163:1 |
| **receiving** 114:8 | **recognize** 16:1 |
| **recommendation** 78:21 | **reconciliation** 11:20 |
| **reconfigured** 153:13 | **reconfiguring** 38:18 |
| **reconvene** 172:22 173:5 | **reconvened** 172:1 173:2,7,22 |
| **record** 18:6 73:4,13 120:5 | **recorded** 74:3 119:22 |
| **recording** 174:3 | **records** 148:3 |
| **red** 31:21,21 | **redevelopment** 151:10 |
| **redistrict** 31:9 | **redistricting** 1:10 6:10 47:12 68:4,17 98:14 |
| 104:11 157:3 | **redrawing** 33:16 68:16 |
| **reduce** 7:2 131:8 | **reelection** 19:5 |
| **refer** 104:10 | **reference** 32:19 |
| **referenced** 97:15 | **referred** 128:10 |
| **referring** 72:22 93:22 | **refers** 93:21 |
| **reflect** 98:13 | **reflected** 83:18 |
| **reflection** 99:7 | **regarding** 54:22 80:15 |

431

| | |
|---|---|
| **regardless** 160:8,11 163:8 | **regards** 38:11 67:14 |
| **registered** 40:1 41:9 117:10 131:9 | **registrars** 38:4 |
| **regret** 23:7 | **regular** 30:8 172:1 |
| **regulation** 11:5 25:9 | **regulations** 11:18 13:8,13 23:10 |
| **reject** 86:19 166:7 168:5 | **rejected** 115:6 163:18 |
| **relate** 35:2 43:8 | **related** 6:17 7:10 53:8 |
| **relating** 30:13 | **relationships** 8:12 |
| **relative** 13:2 | **relatives** 22:21 |
| **Religion** 26:2 | **religious** 13:20 |
| **remain** 3:11 | **remarks** 55:20 74:8,8 92:16 97:22 101:13 150:4 166:17 |
| **remedial** 23:1 | **remember** 144:11 |
| **reminder** 171:22 | **reminds** 76:16 |
| **repeat** 134:7 155:6 | **repeatedly** 19:15 128:6 |
| **repel** 30:11 | **report** 27:14 30:14 78:17 136:8 |
| **reporter** 15:9,9 73:5 174:2 | **represent** 34:14 65:6 117:3 117:10 118:15 132:8 158:14,15 |
| **representation** 52:20 84:22 97:6 99:2,16 100:8 121:22 123:14 131:1 143:16 146:15,21 147:14 | **representative** 31:13 33:19 130:9 169:3 |
| **represented** 40:10 124:8 125:16 130:9 132:4 142:6 146:21 159:4 | **representing** 4:15 79:1 124:18 128:15,20 |
| **represents** 42:1 118:22 121:9 124:17 126:4 142:3 159:12,15 | **republic** 4:18 |

432

| | |
|---|---|
| **Republican** 130:6,10 133:6 163:22 171:19 | **request** 5:15,17 14:9 20:7 20:9 24:1,3,14 44:7 121:2 |
| **requested** 58:16 62:14 | **requests** 14:15 45:7 |
| **require** 13:13 34:18 | **required** 17:19 31:8 33:8 62:8 64:16 [199] 75:20 88:1 111:20 137:15 |
| **requirement** 14:2 | **requirements** 115:8 139:14 140:13 |
| **requires** 52:11 63:5 | **requiring** 10:17 |
| **reset** 40:16 | **residents** 60:12 106:5,6 |
| **resolution** 5:18,22 14:13,13 14:16,17 20:11 20:15 21:4 24:9 24:17,20 27:6,9 27:14,16,19 28:2 29:12,19 29:20 30:1 91:8 | **resolutions** 5:8 14:12 24:4,8 30:2 |
| **resolve** 143:19 | **resources** 58:15 |
| **respect** 101:12 110:12 119:18 121:17 128:5 130:12 135:5 141:2 | **respectfully** 124:2 |
| **respond** 22:13 52:17 82:1 | **responding** 6:16 85:5 103:9 |
| **response** 72:15 75:19 83:1 96:5 99:5,6 112:5 124:1 | **responsibility** 4:15 |
| **rest** 158:5 | **restore** 56:21 |
| **restrict** 160:6 | **restricting** 19:2 |
| **resulted** 54:20 80:16 | **results** 70:13 123:7 |
| **resume** 149:16 | **retire** 3:7 |
| **retired** 105:8 | **retro** 161:19 |
| **retrogress** 42:5 54:21 | **retrogressed** 54:11 |
| **retrogressing** 38:11 | **retrogression** 51:13 57:8 58:17 65:22 66:1 67:14 75:11 161:7,19 163:4 |

433

| | |
|---|---|
| **review** 89:3,15,16 163:21 | **reviewed** 115:5 |
| **re-regulation** 17:17 18:3 | **ribbon** 104:10 |
| **Richmond** 2:20 3:11 15:17 19:1,9 20:4,12 20:19 21:4,5 26:22 27:8 40:18 49:14 116:9,10 117:6 122:21,21 123:3 144:20 145:5 | **right** 6:11,20 7:16,20 8:6,7,22 9:21 12:14,19 13:21 35:13 40:15 63:1 67:9 116:18 119:11 138:17 143:2 147:3 156:19 |
| **rights** 12:10 34:9,20 35:1,4,12,13 40:8 46:2 56:1 60:10 61:8,19 62:8,13,21,21 63:4,14 64:4 65:2 66:11 78:13 79:17 80:3,15 81:13 84:20 98:1 101:14,21 103:3 121:11 129:10 130:21 132:16 137:5,14 139:3 140:13 141:2 155:22 158:18 160:10,14 162:13 163:10 164:12 166:20 167:12 168:4 | **Rim** 125:13 |
| **rise** 3:9 5:14 6:6 14:8 20:7,21 21:13 22:9 23:22 24:14 26:11 27:2 28:4 29:5,8 151:2 166:12 | **river** 153:18 |
| **Roads** 32:1 33:3 115:3 120:19 122:8 | **Roanoke** 15:5,8 38:20 124:13 148:22 |
| **Robert** 2:7 68:2 | **Robinson** 2:13 5:13,14,17 28:3,4,8 29:2 |
| **rock** 78:21 | **role** 171:5 |
| **roll** 4:22 5:2,3 | **rolled** 18:14,19 |
| **rolling** 19:11 | **Rome** 20:2 |
| **room** 56:18 169:19 171:16,17,20,22 | **Rosalyn** 2:18 |

434

| | |
|---|---|
| **Roxann** 2:13 | **Rs** 95:10 |
| **ruckus** 147:3 | **rule** 5:5,8 7:7,8,9,11 9:17 30:3 |
| **ruled** 109:16 | **rules** 87:1,7 |
| **run** 133:9 | **running** 70:11 |
| **rural** 16:18 45:13 95:12 126:19,19 130:7 132:1,3,9 132:10 134:15 150:6 | **rushed** 37:6 81:21 162:5 |
| **R-13** 2:7 | **R-27** 2:13 |
| **R-42** 2:11 | **R-66** 2:19 |
| **R-76** 2:14 | **R-88** 2:12 |
| **R-96** 2:9 | |

**S**

| | |
|---|---|
| **S** 2:1,14 3:1,1,1,1 15:22 174:2,18 | **safe** 37:4 148:7 |
| **safer** 19:17 | **Sandy** 116:21 |
| **sat** 44:13 45:11 50:4 116:9 117:8 | **satirical** 15:11 |
| **satisfied** 80:1 139:4 142:13 | **Saturday** 104:14,16,18 170:14 |
| **save** 143:5 | **saw** 54:2 96:3 119:2 139:19 |
| **saying** 96:13 99:14 142:4,6,16 143:18 145:8 146:10,20 147:2 147:10,12 150:4 | [200] **says** 25:20 26:1 36:2 58:20 77:15 136:6 141:8 142:3 143:17 |
| **SCC** 18:14 | **scenario** 93:6 |
| **scheme** 92:20 | **schemes** 165:14 |
| **scholar** 169:1,2 | **scholars** 105:8 113:21 167:20 |
| **school** 22:21,22 26:17 28:14 97:17 115:18 130:13 169:2 | **Scott** 23:21,22 24:3,7 |

435

| | |
|---|---|
| **seat** 33:2,3 40:13 41:20 44:12 144:16 148:16 148:18,20 149:1 151:15,15,18 157:17,19 158:1 | **seats** 3:3 32:5,7 33:2 40:20 41:2 42:6 110:4 148:13 153:20 154:1,22 158:9,10,14,16 164:22 |
| **Sebelius** 10:11 | **second** 30:8 41:1 46:22 51:2 77:13 102:8 164:19 **Secondly** 13:1 |
| **Secretary** 11:14 | **section** 30:11 61:18 63:13 64:3,3,16 67:9,10 75:20 160:10 |
| **Sections** 30:11 61:18 63:13 160:10 163:9 | **see** 6:18 7:5 19:4,20 23:15 32:1 33:7 41:17 42:10 49:17 65:9 76:4 83:3,4 94:18 95:1 104:13,19 116:4,16 139:13 139:20 142:7 144:10 146:5 148:17 154:12 154:13 159:9 165:9,9 170:8 |
| **seeing** 122:5 151:4 152:10 | **seek** 12:7 |
| **seen** 41:6 85:18 122:10 | **segregation** 122:9 |
| **select** 57:12 59:21 65:4 66:5 145:15 | **self-evident** 77:2 |
| **Senate** 27:6,15 31:11 38:1 40:13 62:20 68:5 87:5 87:8,11 168:3 | **send** 22:21 |
| **sending** 9:10 | **senior** 22:21 77:11 |
| **seniors** 29:15 77:9 | **sense** 39:11 117:6 |
| **sent** 22:22 143:22 | **Sergeant-At-Ar...** 3:4,5 |
| **series** 38:1 82:11 | **serious** 31:16 163:18 164:11 |
| **servants** 3:19 | **serve** 158:19 |

436

| | |
|---|---|
| **served** 87:8 129:1 130:12 | **service** 17:12 |
| **Services** 7:9,17 58:15 85:22 106:3 | **serving** 3:18 |
| **session** 1:8 3:6 30:6 33:14 37:19 82:14 172:1,2 173:2,7,22 | **setback** 18:7 |
| **sets** 37:2 | **seven** 34:3 40:20 84:10 84:19 86:16 87:14 128:7 |
| **sex** 25:21 | **share** 50:10 51:10 73:22 92:10 |
| **shear** 19:14 | **sheep** 19:14 |
| **shifts** 31:17 38:17,17 42:10 56:21 | **Shore** 97:19 |
| **shorten** 89:16 | **shot** 155:10 |
| **show** 78:14 127:16 130:19 | **showed** 138:4 |
| **shows** 150:22 158:6 | **sic** 61:18 173:2 |
| **Sickles** 43:2 49:14 | **side** 18:17 98:7 147:8 153:14 159:3,3 159:12 |
| **sides** 90:1 | **sign** 15:22 88:11 |
| **significant** 113:7 | **significantly** 151:3 155:1 |
| **similar** 12:5 153:11 | **simple** 32:13 76:3 152:13 |
| **simply** 34:19 53:22 155:22 | **single** 9:3 34:9 107:6,10 108:3 120:5 137:16 |
| **sir** 5:11 27:15 30:5 55:8,19 56:8 58:11 60:1 61:22 63:10,18 65:8 67:21 68:18 73:3,15 75:15 82:3 94:3 102:15 104:6 107:2 135:14 136:22 171:13 172:10,18 | **sister** 8:14 |
| **sit** 42:20 46:10 | **sits** 157:16 |

437

| | |
|---|---|
| **sitting** 117:2 | **situations** 95:3 |
| **six** 15:14 16:11 37:17 82:13 102:6 154:1 | **skirted** 125:9 |
| **sky** 167:5 | **slang** 161:22 |
| **Sleepy** 128:21 | **slipped** 12:1 |
| **slow** 19:18 95:16 | **smart** 39:7 |
| **smartest** 56:18 | **snake** 146:13 |
| **snap** [201] 18:9 | **social** 7:9,17 9:19 |
| **society** 8:2 23:17 | **software** 47:18 76:21 |
| **sold** 17:9,17 | **solid** 78:21 |
| **solitary** 108:3 | **somebody** 32:22 |
| **somebody's** 142:22 | **somewhat** 166:21 |
| **songs** 107:18 | **soon** 85:10 |
| **sooner** 90:8 | **sophisticated** 56:17 |
| **Sorenson** 60:9 | **sorry** 103:13 132:22 |
| **south** 95:12 134:9 150:6 | **Southside** 16:5 74:17 115:3 120:19 126:17 134:10 163:3 |
| **southwest** 32:3,5 33:3 | **sovereign** 12:21 |
| **speak** 28:18,20 38:15 43:3 65:5 80:18 134:18 137:8 139:22 156:13 156:18,20 164:17 166:12 | **speaker** 3:2,9 4:21 5:4,5 5:11,12,14,16 5:19 6:3,6,8,9 8:11 10:3,4,7,8 10:10 13:6,19 14:6,8,10,11,14 14:20 15:3,4 20:3,4,6,8,9,12 20:18,21 21:1,2 21:5,10,13,15 21:16,17 22:7,9 22:11,12 23:19 23:20,22 24:2,3 24:6,11,15,16 24:18 25:1,4,6,7 26:9,11,13,14 26:22 27:2,4,5,8 27:13,15,19 28:1,4,6 29:1,8 29:9,10,17,22 30:5,16,18,20 31:2,4 35:9 |

438

| |
|---|
| 45:19 46:5,11 46:15,17<br>47:5,6 47:8,21,22 48:2<br>48:5,9 49:1,2,4<br>50:6,7,9,16,17 50:19<br>51:7,8,22 52:1,3,13<br>53:1,2 53:4,9,15,17<br>54:14,15,17 55:6,7,9<br>56:6,7 56:9,15 57:3,4,6<br>57:14 58:9,10<br>58:12,19,22<br>59:1,3,7,12,13 59:15<br>61:3,4,6 61:13,14,16,21<br>62:2,3,5,11 63:3<br>63:6,8,11,20,21<br>64:1,8,19,20,22<br>65:17,18,20<br>66:7,16,17,19<br>67:5,19,20,22<br>68:10,11,13,21 68:22<br>69:2,7,9 69:10,12,17<br>70:21,22 71:2 71:10<br>72:1,2,4 72:17,18,20<br>73:7,9,18,19,21<br>74:6,10,11,13 74:14,21<br>75:5,6 75:8,15 76:7,8<br>76:10 77:18,19 77:21,22<br>79:5,6 79:8,14 80:5,6,7<br>80:17 81:1,2,4<br>81:15,16,18 82:4<br>83:20,21 84:1,8,14,15,17<br>85:2 86:3,4,6,14<br>88:17,18,20<br>89:10,11,13,18<br>91:2,3,5,6,13,14 91:16<br>92:1,2,4 93:17,18,20<br>94:5,6,8,15 96:8 96:9,11 |

439

| | 98:17 98:18,20 99:4,9<br>99:10,12,18<br>100:1,2,4,9,12<br>100:14,16,19,21 101:4<br>102:2,14 102:16 103:4<br>104:4,5,7 105:1<br>105:3,11,20,22 106:11<br>107:1,3 107:16 108:22<br>109:2,14 110:9 110:11<br>111:8,10 111:15 112:1,3<br>112:10,20,22<br>113:5,9,15,17<br>114:3,12,14 115:9<br>117:14,16 119:15,17<br>120:7 120:13,15,21<br>121:14,16 122:2<br>123:19,21 124:11 125:5,7<br>125:18 126:6,7 126:9<br>127:1 128:2,4,16<br>129:13,15 130:2<br>131:14,15,17 132:11<br>133:22 134:2,16 135:2<br>135:4,13,15 136:5,20,21<br>137:1,8,21,22<br>138:2,11,13<br>139:7,8,11,18<br>141:9,11,13,14 141:15<br>148:12 149:13,15,18,21<br>150:1,3 151:19 151:20,22<br>152:12 154:6,8 154:9<br>155:4 156:4,7,15,17<br>156:20,22 159:19,22<br>160:1 160:19 164:10<br>164:14,16,18 165:11<br>166:4,8 166:9,11,12,14<br>166:15,22 167:16,18 |
|---|---|

440

| | 168:8 168:9,11,12,16 168:17 171:2,3 171:7,9,11,13 171:18,22 172:3 172:5,6,9,19,21 173:3,10,13,15 173:19 |
|---|---|
| **speakers** 35:10 168:21 | **speaking** 106:7 109:4 139:22 159:21 168:15 |
| **special** 1:8 30:6 172:11 | **specific** 24:5 111:1 154:10 |
| **spent** 88:22 116:10 | **spirit** 4:11 |
| **split** 43:12 44:16 114:21 115:16 116:3,13,14,17 136:14 137:6 140:5 | **splits** 135:7,19 136:2,13 136:15 |
| **splitting** 135:6 | **spoke** 65:8 144:6 166:17,18 |
| **spoken** 36:19 99:20 | **spokesperson** 9:1 |
| **Spotsylvania** 2:12 26:10 | **Spotters** 21:4 |
| **Spruill** 2:16 41:13,21 49:17 141:12,13 141:15 143:11 146:10 167:10 | **square** 141:7 |
| **Sr** 2:16 | **St** 26:17 28:15 |
| **staff** 106:7 | **Stafford** 26:18 32:8 |
| **stand** 33:20 62:18 74:8 108:10 | **standard** 165:13 |
| **standing** 3:12 142:22 | [202] **stands** 4:19 36:10 173:20 |
| **start** 77:13 | **started** 13:8 |
| **starts** 172:16 | **state** 5:16 12:18 13:4 14:1,10 15:7 18:9 20:8 21:1 21:20 22:5 23:5 23:5,6,7,9,10 24:2,15 29:9 37:15 62:19 68:5 84:22 86:13 88:2,5 94:12,13 97:2,7 105:9 |

441

| | |
|---|---|
| | 111:12,19 115:8 121:20 140:12 167:21 167:22 170:13 174:22 |
| **stated** 55:20 65:12 72:5 80:21 97:21 131:2 132:20 | **statement** 59:5,5 60:5 62:15 62:17 64:8 99:17 100:6 108:17 120:20 |
| **states** 3:13 4:18 42:2 62:7 76:20 79:17 96:21 103:18 105:10 121:11 | **state-wide** 29:14 |
| **stating** 73:10 | **statistician** 168:22 |
| **status** 131:10 | **stay** 60:12 95:8 |
| **stayed** 28:13 39:1 83:2 85:20 112:12 163:14 | **steps** 21:19 |
| **sterile** 39:12 | **stifled** 17:16,16 |
| **Stigall** 106:15 | **stood** 37:20 118:16,17 |
| **stopped** 42:17 | **stops** 43:5 |
| **store** 83:16 | **straight** 17:9 |
| **strategy** 17:8 | **strength** 38:13,15 41:16 70:17 123:5 124:2 127:18 153:6 157:9,22 158:22 165:20 |
| **strengths** 60:19 | **Strickland** 64:14 75:3,17 76:5 |
| **strive** 4:13 | **strongly** 60:13 85:19 |
| **student** 140:20 | **students** 26:16 39:2 101:13,17 102:18 140:19 141:5 |
| **student's** 137:3 139:15 | **studied** 39:2 113:2 |
| **study** 112:8 | **stunning** 18:5 |
| **subcommittee** 82:8,8 | **subject** 15:17 160:9 |
| **submission** 86:17 87:17,19 | **submit** 67:8 89:5 |
| **submitted** 66:8 103:20,21 104:1 133:16 143:7 | **substitute** 30:15,19,21 31:2 31:5 43:1 44:21 |

442

| | 45:10,18 46:6,8 80:2 157:4 168:19 |
|---|---|
| **substituted** 108:2 | **suburban** 92:22 95:14 |
| **successes** 15:20 | **succinctly** 53:10 |
| **sudden** 141:18 | **suffered** 16:5 |
| **sufficient** 72:7 84:19 95:21 | **Suffolk** 2:14 24:12,18 30:16 31:3 46:14 100:17 114:19 115:2,12 117:19,22 118:15 119:22 130:14 139:8 147:1 149:16,19 153:2 161:1 167:7 168:7,12 169:7 |
| **suggest** 109:7 125:9 164:4 | **suggesting** 53:6 57:22 59:18 162:21 |
| **suggestion** 126:20 | **suggestions** 159:7 |
| **suit** 92:19 | **summer** 37:11 |
| **sunburned** 19:16 | **Sunday** 104:18 |
| **supplemental** 87:5 | **supplements** 12:9 |
| **supplied** 78:1 | **support** 6:20 8:5 10:11 145:12 149:10 157:3,7 159:2 168:19 |
| **supports** 9:1,3 | **Supreme** 75:18 96:22 |
| **sure** 9:6 25:10 26:4 48:13 72:10 93:11 116:12 117:5 129:9 140:5 146:14 147:3,15,19,20 148:7 149:8 155:20 169:21 | **surprise** 13:11 |
| **surprised** 7:5 141:18 | **surrounding** 155:14 |
| **switch** 76:15 | **Switching** 152:1 |
| **systems** 9:5 | |

**T**

| **T** 174:1,1 | **take** 3:3 7:21 48:12 99:17 100:9 116:14 119:8 136:7 153:7 |
|---|---|

443

| | |
|---|---|
| **taken** 27:6,10 45:4 139:19 144:4 169:4 | **takeover** 11:10 |
| **takes** 100:5 | **talents** 4:1 |
| **talk** 144:2,3,5 145:3 146:13 160:4 170:2 | **talked** 76:21 140:19 143:8,14 151:11 160:11,12 |
| **talking** 22:12 26:5 35:11 76:20 109:4,6 135:9,10,16,18 138:7 141:21 144:7,15 145:2 147:12 | [203] **task** 34:4 48:12 105:16 |
| Tate 76:19 | **taught** 140:21 |
| **taxes** 23:6 | **Taylor** 28:9,10 29:4 |
| **teach** 28:18 | **teacher** 28:10 |
| **teaching** 28:17 | **team** 27:18 29:13 141:6 |
| **technical** 12:12 44:8 | **tell** 11:3 22:16 32:12 35:4 36:4 37:7 39:8 46:20 49:5 50:20 54:18 56:10 75:9 80:12 86:7 87:9 101:6,8 107:10 108:1 115:4,11 118:19 119:20 138:7,8 146:12 161:8 |
| **telling** 25:11 76:18 101:7 | **tells** 34:1 |
| **temporarily** 18:14 | **tenants** 81:12 |
| **tend** 67:2 95:7 150:8 | **Tennessee** 170:14 |
| **term** 95:4 161:22 | **terms** 12:3 34:12 56:11 62:19 99:16 141:1 160:22 161:21 |
| **territory** 74:19 | **test** 39:3,4 64:15 75:3 76:5 78:12 |
| **testimony** 38:3 41:13 42:4 52:15 58:1 60:21 64:10 66:12 70:6,15 71:13 72:12,21 72:22 | **tests** 67:11 |

444

| | |
|---|---|
| 81:6 113:10,12 123:15 127:17 128:8 131:1,4 133:17 169:12 | |
| **Texas** 96:4 | **thank** 3:16,17 10:3,9 19:6 20:2,6 21:16 22:6,9 23:18 26:8,11 85:14 100:12,13 100:16 111:6 114:8 119:10 126:5 141:9 149:11,15 150:3 154:9 156:17 157:2 159:18 164:16 166:8,11 166:15 168:8 172:10,18,19 **thanking** 101:1 |
| **theory** 39:9 43:15 | **they'd** 90:13 |
| **thing** 8:22 16:12,21 38:16 45:22 122:11 132:6 141:19 142:5,21 163:19 | **things** 10:14 34:16 35:16,17 39:8 45:14,15 54:9 71:18 92:7 108:9 121:8,9 122:4 |
| **think** 6:22 8:12,15,17 9:5 33:22 34:13 35:20,22 37:6 37:12 38:10 40:8 41:20 42:9 42:22 45:21 48:14,16,17 49:19,21 51:4 53:18,21 60:7 60:16,21 64:12 67:5,13 69:18 69:20,22 70:6 70:10,16 71:10 74:6 76:12 78:11,13 79:19 82:20,21 83:9 84:9 85:2 86:17 87:1,3,11,15,17 87:21 88:3,7 89:22,22 90:3 90:17,19 92:6 92:16 96:3 97:18,20 98:11 101:8 109:3,17 109:21 111:2 116:20 117:8 118:14,14,18,18 120:10 | **thinks** 9:11 67:5 134:5 |

445

| | |
|---|---|
| 121:8 123:6,11,13 124:20 126:1 127:15 130:3 131:4 132:20 133:1 137:15 138:5,15 139:21 140:1,15,18 141:7 152:10,14 155:15 156:11 157:22 159:14 160:2 161:2 162:2 163:12 166:4,20 170:8 | |
| **third** 11:19 26:16 104:15 164:13 168:10 171:1,4 171:8 | **thirteen** 101:15 |
| **thirty** 101:16 | **Thomas** 4:8 |
| **thorn** 18:17 | **thought** 15:15 35:22 39:15 46:8 75:17 76:17 77:8 94:17 103:13 116:16 119:4 147:7 169:7 |
| **three** 33:2,4 104:1,15 107:11 108:14 133:9 142:1 157:18 168:20 | **Thursday** 85:19 87:12 104:13 |
| **tied** 107:12 | **tight** 37:5,9 57:17 |
| **till** 85:20 112:12 163:14 | **time** |
| 8:20 17:13 19:18 36:17 37:10,14 41:17 43:7 47:18,19 56:19 57:17 59:17,19 65:7 81:22 82:17 85:10 86:8 88:4,7 89:20 90:17 101:9 108:15 109:17,22 112:8 112:9 116:11 127:13 154:21 156:15,19 162:4 162:11,13 169:10 172:16 | **timeline** 37:6 86:21 87:11 87:20 |
| **timely** 50:2 89:5,5 90:12 | **times** 15:5,8 38:20 50:2 108:14 118:18 128:7 |
| **title** 29:14 30:10 | **today** 4:9 8:22 10:10 15:11 22:13 26:18 |

446

| | |
|---|---|
| | 28:9,22 29:3 34:1 38:20 40:12,16 43:1 45:9 50:11 87:16 112:14 127:12 138:6 147:7 158:1 160:20 161:2 162:15 172:22 173:5 |
| **Today's** 87:17 | **told** 17:12 106:17 107:17 148:12 |
| **tomorrow** [204] 21:18 22:6 87:2 87:3 172:2,13 173:1,5,21 | **Tonight** 172:10 |
| **tool** 83:9 | **top** 154:18 |
| **topical** 140:18 | **total** 39:20 66:10 106:4,6 |
| **totaled** 135:8 | **totally** 62:15 127:2 153:13 |
| **touched** 126:12 | **town** 40:4 118:3 |
| **towns** 135:20 | **track** 23:2 |
| **traditional** 19:9 | **traffic** 43:6 |
| **transcribed** 1:22 174:3 | **transcript** 73:14 174:7,8 |
| **treatment** 22:19 | **tremendous** 32:16,20 35:5 |
| **trend** 151:4 154:13 | **trending** 157:10 |
| **trends** 127:15 130:19 165:4 | **trick** 17:20 |
| **tried** 42:14 52:17 56:21 102:7 145:20 159:5 170:15,16 | **tries** 157:18 |
| **trim** 19:15 | **tripled** 18:11 |
| **trouble** 95:9 131:5 | **true** 9:2 174:8 |
| **truly** 159:15 170:21 | **trumps**\ 34:20 40:8 79:22 98:1 |

447

| | |
|---|---|
| **try** 25:15 43:13 116:4 132:18 142:16 149:7 151:15,18 153:5 | **trying** 9:18 18:19 31:18 81:11 98:12 102:18 109:17 117:4 121:5 141:2 143:5 |
| **tsunami** 28:11 | **Tuesday** 1:11 30:7 84:10 85:20 86:1 171:14 |
| **tuition** 16:13 | **turn** 41:10 70:14 124:8 148:3 170:18 |
| **turnover** 34:2 | **twelve** 39:19 |
| **twice** 108:13 | **two** 11:13 14:12 23:4 24:4,8 28:17 33:20,21 43:10 43:12 44:16 54:9 68:15 69:4 81:12 87:16 89:1 97:20 107:11 121:8,8 169:16 |
| **Tyler** 131:6 157:15 | **Tyler's** 157:14 |
| **type** 65:22 165:9 | **typically** 57:15 86:19 |

U

| | |
|---|---|
| **unanimous** 5:18,20 14:12,15 20:10,14 21:3,6 24:7,16,19 29:11,16,18 | **uncle** 8:15 |
| **unconstitutional** 10:19 11:1 | **uncounted** 109:9 |
| **underlying** 15:20 | **understand** 57:15 60:3 86:21 111:17 112:4 |
| **understanding** 95:2 | **understands** 25:10 |
| **undervalued** 109:9 | **undo** 153:15 |
| **unfortunately** 44:12 | **unintelligible** 27:17 30:14 116:5 124:15 144:13 |
| **unique** 37:5 | **unite** 115:21 118:1 |
| **united** 3:13 4:18 19:6 29:13 76:20 79:17 96:21 103:18 105:10 114:22 121:11 126:16 | **unites** 120:3 |

448

| | |
|---|---|
| **universities** 16:14 101:16 | **University** 27:17 40:18,22 77:10,11 |
| **unmarried** 7:12,13 | **unnecessarily** 114:21 |
| **unprecedented** 85:8 | **unquote** 70:13 77:6 141:3 |
| **unworkable** 77:12 | **update** 15:18 |
| **upheld** 96:22 170:18 | **uphold** 170:19 |
| **urban** 93:1 95:13 150:7 | **urge** 12:15 166:7,16 |
| **urging** 7:6 9:16 | **use** 53:11 57:21 107:17 147:8,16 155:5 |
| **utilities** 16:19 | **utility** 16:17 18:4 |
| **utilization** 98:22 99:2 | **utilize** 93:9 |
| **utilized** 50:12 83:10 91:8 91:9 | **utmost** 34:18 |
| **UVA** 140:20 | **U.S** 115:8 167:21 |

**V**

| | |
|---|---|
| **Valley** 32:16 | **valuable** 60:20 |
| **value** 136:8 | **VAP** 107:7 114:1 |
| **various** 80:19 81:6 122:20 136:2 162:13 | **VCU** 20:11 |
| **versus** 10:11 64:14 75:3 75:17 76:5 92:18 93:3,22 107:18 113:4 | **viable** 75:13 |
| **viewpoints** 3:20 | **views** 124:21 |
| **violate** 93:8 | [205] **violated** 37:3 95:22 |
| **violates** 165:20 | **violating** 12:10 |
| **violations** 14:5 95:20 | **Virginia** 1:9 7:11,16,19 8:7 9:21 10:10 14:1 15:19 16:4 16:7,21 17:10 21:18 25:20 30:9,13 31:11 32:14,15,17 33:4 37:5 41:1 43:4 44:19 45:12 62:7,11 62:12 63:14 |

449

| | 74:17 82:13 97:1 103:18 105:15 124:21 125:11 132:1,10 134:10 141:6 146:11 147:1 160:9 162:6 163:3,22 165:3 165:5 166:6 172:12 |
|---|---|
| **Virginians** 31:14 132:3 159:16 | **Virginia's** 16:14 |
| **virtue** 162:6 | **virtues** 17:10 |
| **visited** 118:4 | **visual** 33:6 |
| **voice** 126:19 132:4 134:12 158:18 159:5,10,13 165:15 | **vote** 93:12 131:9,9 146:16,16,17 166:16 169:5,5 170:9 |
| **voted** 162:12 | **voter** 51:12 70:14 165:14 |
| **voters** 76:20 82:9 117:10 150:12 152:1,6,8 | **votes** 40:1 148:6 150:6 150:7 152:21 |
| **voting** 5:1 34:8,20 35:1 35:4 38:13,15 39:22 41:5,16 42:7 46:2 51:20 52:8 54:8 55:16 56:1 57:19 60:10 61:8,19 62:8,13,21,21 63:4,14 64:4,10 65:2,13 66:2,11 66:14 67:9,10 70:8,17 71:17 78:6,13 79:17 80:3 81:13 89:4 98:1 99:2 101:14,20 103:3 107:7,9,14,21 108:18 109:8 110:19 121:10 122:22 127:18 129:10 130:21 132:1,16 137:5 137:14 139:3 140:13 141:1 153:6,6 155:22 157:9,22 158:7 158:7,22 160:10 160:14,22 161:8 | |

450

| 163:10 164:11 165:19 166:20 167:3,12 168:4 | |
|---|---|

**W**

| | |
|---|---|
| **Wait** 19:4 | **waiting** 104:12 |
| **walking** 46:22 | **walks** 38:3 |
| **wall** 13:21 | **want** 33:21 42:21 87:21 90:10 95:4 120:3,4 132:19 147:3,21 156:20 158:19 169:17 |
| **wanted** 25:9 26:4 33:6 42:17 78:14 114:7 120:9 127:5 141:22 156:18 164:19 | **wants** 19:22 110:13 133:14 |
| **Ward** 2:8 18:18 146:22 146:22 | **Ware** 124:14 148:22 |
| **warm** 26:19 | **Washington** 77:10,11 |
| **wasn't** 36:4 40:2 56:16 75:13 108:5 | **water** 50:3 |
| **way** 7:2 33:16 43:19 48:13,15 65:9 83:17 95:8 96:15 98:4 120:2,4 132:19 133:9 134:21 139:17 | **weaved** 43:14 |
| **web** 85:22 | **Wednesday** 87:12 104:13 171:18 |
| **week** 16:16 18:4 37:19 42:19 84:7,9 85:6 87:18 89:1 104:14 162:11 | **week** 82:15 87:16 89:1 122:4 |
| **week-and-a-half** 34:6 | **welcome** 26:19 |
| **wellness** 11:12 | **went** 36:11 37:16 38:7 53:7 98:4 115:17 128:18 137:17 142:10 143:18 153:16 167:22 170:16 |
| **western** 4:4 16:4,21 | **we'll** 15:19 21:22 |

451

| | |
|---|---|
| **we're** 18:21 19:4 22:12 33:7 39:5 40:7 40:15 60:8 87:3 92:6 116:2,3,4 126:2 141:21 142:16 146:10 146:19 147:11 147:12 151:4 152:10 162:10 | 162:10 |
| **we've** 25:8 34:11 82:14 120:1 140:19 142:20 145:8 146:8 149:8 160:11 | **whack** 77:14 |
| **wheelhouse** 119:11 | **white** 41:10 95:18 111:2 123:2 129:3 145:16 148:17,21 149:2 154:13,14,14 155:1 |
| **whiter** 164:1 169:20 | **wider** 79:20 154:19 |
| **wife** 95:7 101:8 107:17 | **Wight** 130:8,10 |
| **William** 2:7 10:5 26:17 32:18 40:11 98:10 124:15 | 151:2 |
| **Williamsburg** 153:17 | **win** 128:12 133:10 157:19 |
| **winner** 39:17 | **winners** 102:6,8,11 |
| **winning** 15:9 141:6 | **wins** 155:11 |
| **wish** 45:4,8 80:21 | [206] **withstanding** 112:9 128:9 129:16 130:18 |
| **woman's** 6:20 | **women** 7:18 9:14,20 76:20 82:9 |
| **won** 29:14 101:18 | **wonderful** 126:2 |
| **woods** 153:2 | **wool** 19:16,19 |
| **word** 6:18 30:14 106:9 116:5 124:10,15 142:22 144:13 146:20 147:16 149:20 | **words** 27:17 115:13 141:13 142:18 145:12,14 147:5 147:13 148:19 155:6 158:16 |
| **work** 4:11 11:14 33:7 39:8,11,14 42:13,13 | **worked** 49:7 54:19 149:7 |

452

| | |
|---|---|
| 48:16 77:7 104:9 117:4 127:6 159:9 170:20 | |
| **working** 47:18 61:10 159:6 163:14 | **world** 4:4 39:10,13 |
| **worth** 150:7 | **wouldn't** 107:17 132:5 143:22 |
| **written** 13:20 33:11 | **wrong** 23:14,15 95:4 145:13 151:16 |
| **ws** 73:16 | |

## X

| | |
|---|---|
| **X** 26:2 | |

## Y

| | |
|---|---|
| **Y** 26:2 | **yeah** 133:3 149:21 |
| **year** 25:15 31:7 33:13 | 33:14 37:12 43:16 82:11,11 82:13,14 130:11 146:6 155:7 162:7 |
| **years** 15:14 16:6,11 17:15 28:12,17 33:13,20,21 36:2,3,16 37:7 40:17 41:7,17 44:3 47:15 54:12 57:21 60:14 66:3 70:11 86:15 90:1 92:13,13 97:15 118:14 119:12 122:5,10 122:18,19 125:19 128:17 129:4 130:10 136:13 137:18 151:6,9,13 153:15 157:11 157:17 165:2,6 169:16 170:19 | **year's** 15:18 155:7 |
| **year-and-a-half** 82:6 | **Yellow** 31:22 |
| **yesterday** 31:17 32:10 35:10,19 38:15 38:21 75:1,1 82:22 84:11 | **yield** 46:14,15,16 47:6 47:7,22 48:1 49:2,3 50:7,8,17 50:18 51:8,9 52:1,2 53:2,3 54:15,16 |

453

| 106:15 138:4 143:8,8 144:6 152:21 163:1 | 55:7 56:7,8 57:4,5 58:10 59:1,2,13 59:14 61:4,5,14 61:15 62:3,4 63:3,6,9,10,21 63:22 64:20,21 65:18,19 66:17 66:18 67:20,21 68:11,12,22 69:1,10,11 70:22 71:1 72:2 72:3,18,19 73:8 73:19,20 74:11 74:12 75:6,7 76:8,9 77:19,20 79:6,7 80:6,9 81:2,3,16,17 83:21,22 84:15 84:16 86:4,5 88:18,19 89:11 89:12 91:3,4,14 91:15 92:2,3 93:18,19 94:6,7 96:9,10 98:18 98:19 99:10,11 100:2,3,17,19 102:12,14 104:3 104:5,21 105:1 105:2,18,20,21 106:21 107:1,2 108:20,22 109:1 110:7,9 111:7,8 111:9,21 112:1 112:2,18,20,21 113:13,15,16 114:10,12,13 117:12,14,15 119:13,15,16 120:11,13,14 121:12,14,15 123:17,19,20 125:3,5,6 126:6 126:7,8 127:22 128:2,3 129:11 129:13,14 131:13,15,16 133:20,22 134:1 134:22 135:2,3 135:11,13,14 136:19,21,22 137:20,22 |
|---|---|

454

| | 138:1 138:9,11,12 139:6,9,10 149:18 151:20 151:21 154:4,6 154:7 156:2,4,6 |
|---|---|
| **yielded** 100:21 | **yields** 46:17 47:8 48:2 49:4 50:9,19 52:3 53:4 54:17 55:9 56:9 57:6 58:12 59:3,15 61:6,16 62:5 63:7,11 64:1,22 65:20 66:19 67:22 68:13 69:2,12 71:2 72:4,20 73:9,21 74:13 75:8 77:21 79:8 80:10 81:4,18 84:1,17 86:6 88:20 89:13 91:5,16 92:4 93:20 94:8 96:11 98:20 99:12 100:4 102:16 104:7 105:3,22 107:3 109:2 110:11 111:10 112:3,22 113:17 114:14 117:16 119:17 120:15 121:16 123:21 125:7 126:9 128:4 129:15 131:17 134:2 135:4,15 137:1 138:2,13 139:11 150:2 151:22 154:8 156:7 |
| **York** 26:17 | **young** 7:18 9:13,20 28:10 35:3,21 |

**Z**

| **Z** 26:2 | **zero** 136:10,10 |
|---|---|

**0**

| **08** 51:4 | **09** 51:3 |
|---|---|

455

**1**

| | |
|---|---|
| **1** 1:8,21 16:22 30:6 33:2 34:21 35:15 36:5,13 36:13,14 42:15 55:22 57:1 64:17 70:5 75:19 77:6 78:7 92:18 93:5,14 93:15 97:11 98:13,22 99:6 **[207]** 99:19 107:20 136:12 137:13 171:20 | **1st** 7:18 37:22 44:7 87:19 |
| **1.14** 33:3 | **1.7** 33:2 |
| **10** 31:6 36:15 37:7 39:18 40:2,16 41:17 44:10 47:15 51:3 54:12 57:21 60:14 66:3 86:14,16 92:13 119:8 122:10,18 122:22 125:19 136:13 151:6,9 151:13 153:15 157:11 165:2,6 171:6,7 | **10th** 12:5,10 |
| **10-year** 56:20 | **10.68** 152:19 |
| **10:00** 104:16 171:20 | **10:30** 171:21 |
| **100** 31:9 109:10 125:16 127:4 141:21 152:20 152:21 | **11** 88:5,5 118:18 119:8 155:16 |
| **11.24** 152:18 | **12** 51:15 54:2,22 55:14 56:11 57:10 70:4 74:4 78:5 97:8 102:21 108:19 109:5 110:3,13 118:18 119:8 122:1 123:12 127:11 148:13 157:7 160:21 162:18,21 |
| **12th** 71:4 | **12:00** 172:2 |
| **120** 90:15 | **13** 78:15,22 119:9 123:12 145:5,9 |
| **13th** 69:5,15 70:5 71:5 78:3 97:9 113:22 114:16 | **14** 145:5,9 |

456

| | |
|---|---|
| 115:6 118:4 144:3,8,16 145:1,15 155:8 162:16,22 167:1 | |
| **14th** 33:13,14 34:21 74:16 79:21 95:20 98:1 126:10,15,21 132:7 144:8 145:3 162:16,22 163:2 167:1,2 | **15** 89:16 122:10 154:15 |
| **16** 62:7 154:16 | **16.4** 97:1 |
| **174** 1:21 | **18** 154:15 |
| **1887** 146:1,7 | **1888** 146:1,7,7 |
| **19** 154:14 | **19th** 87:17 |
| **190,000** 40:11 98:10 | **1946** 11:7 |
| **1965** 140:13 | **197** 135:8 136:2 |
| **1970s** 96:22 97:15 | **1990s** 17:9 |
| **1998** 33:22 | |

2

| | |
|---|---|
| **2** 30:10 35:1,15 36:15 39:21 61:18 63:13 64:3,16 70:5 75:20 92:18 99:14 100:6 119:3 137:13 160:10 163:9 171:22 | **2.88** 32:7 |
| **2.94** 41:3 | **2:00** 83:2 163:14 |
| **20** 92:13 122:10,19 146:11 150:18 152:21 174:20 | **2001** 57:1 |
| **2009** 13:9 18:7 | **2010** 18:7 37:22 150:21 |
| **2010/2011** 27:17 | **2011** 1:8,11 5:7 7:18 15:18 19:5 30:6 30:7 146:8 162:8 171:19 172:1 174:5 **2015** 174:10 |
| **2018** 174:20 | **21** 121:20 124:5 140:20 |
| **22** 121:21 | **23** 152:15 |
| **23rd** 87:21 152:6 154:14 | **24** 75:10 |

457

| | |
|---|---|
| **24.2** 30:10 | **24.2-304.01** 30:12 |
| **24.2-304.02** 30:12 | **24.2-304.03** 30:11 |
| **25** 41:6 70:11 118:14 128:17 | **26** 106:2 154:13 |
| **264** 53:20 | **27** 118:17 158:14 169:4 |
| **27th** 152:8 154:15 155:14 158:13 | **28** 34:1 169:8 |
| **29** 44:10 | |

3

| | |
|---|---|
| **3** 5:5 30:10 36:7,8 139:1 | **3rd** 44:15 45:1 174:9 |
| **3.1** 32:5 | **3:00** 85:20 112:12 171:15 |
| **3:15** 171:15,17 | **30** 109:19 122:5 137:18 150:16 150:17 152:6,9 |
| **30s** 118:17 | **31st** 150:17 |
| **35** 109:19 | **39** 5:8 30:3 |

4

| | |
|---|---|
| **4** 39:20 | **4th** 5:7 30:15 44:7 |
| **4.75** 39:20 | **40** 31:10 36:2 97:15 122:5 |
| **42** 36:3 | **42nd** 154:15 |
| **45** 87:22 89:15 | [208] **47** 151:16 |
| **49.78** 139:16 | |

5

| | |
|---|---|
| **5** 1:11 36:7,8 37:4 61:18 63:13 64:3,3 97:14 137:12,18 138:22 160:11 163:10 | **5th** 30:7 87:17 174:4 |
| **5,800** 9:20 | **5,815** 7:16,18 8:6 9:20 |
| **5:00** 172:11,16 | **50** 54:5 64:17 75:19 125:22 127:14 128:13 152:7 167:7 |
| **50th** 150:18 | **50.2** 40:22 |

458

| | |
|---|---|
| **50.25** 132:2,9 134:10,14 163:3 167:3 | **50.6** 40:2 |
| **50/50** 122:6 | **500** 166:16 |
| **500,000** 16:3 | **5001** 30:9 31:6 45:18 53:8 54:21 55:2 57:11 69:14 80:2,16 84:4 91:20 106:8 108:2 135:8,10 135:16 137:6 139:17 142:14 148:1,10 149:10 152:2 157:4 158:4 159:10 160:3 164:11 166:1,13,16 171:1 |
| **5002** 143:7 | **5007** 27:6,9,16 |
| **51** 129:21 | **51st** 150:15 154:13 |
| **52** 70:10,10,16 119:12 129:21 | **52.7** 107:22 |
| **53** 78:5 113:4 114:1 128:15 161:9 167:6 | **53B** 114:1 |
| **54.4** 108:18 | **55** 42:12 66:12 70:9 71:6 72:6,14 108:4 113:4 128:15 157:8,21 158:6 161:13 167:4 |
| **56.8** 107:22 | **57** 161:12 |
| **57.77** 139:17 | **58** 161:12 |
| **59.2** 41:4 | |

**6**

| | |
|---|---|
| **6th** 171:19 | **60** 54:4 86:18 87:20 90:14 127:14 |
| **60s** 35:3 | **64th** 115:15 153:15 |
| **66** 15:13 16:12 | **68,000** 40:13 98:11 |
| **69** 158:13,15 | **69th** 155:16 |

**7**

| | |
|---|---|
| **7th** 37:8 | **70** 158:13,15 |
| **70th** 155:17 | **71** 158:13,15 |

459

| | |
|---|---|
| **71st** 54:3 127:15 | 155:18 |
| **72nd** 138:15 | **75th** 157:15 |
| **79th** 143:12 | |

**8**

| | |
|---|---|
| **8** 155:18 | **8th** 37:8,12 |
| **8.5** 152:16,18 | **8/10s** 33:5 |
| **8:30** 82:20 | **81658** 1:20 |
| **86th** 154:16 | **87** 171:6,7 |

**9**

| | |
|---|---|
| **9th** 12:10 | **9.5** 39:21 |
| **9.6** 16:14 | **9.8** 40:21 |
| **9:30** 21:22 22:5 | **92** 152:17 |
| **93** 152:14,15,16,18 | **93rd** 152:3 153:10 |
| **94** 152:19 | **95** 34:1 |
| **99** 76:11 | |

460

[1] 2011 SPECIAL SESSION I

VIRGINIA HOUSE OF DELEGATES

REDISTRICTING FLOOR DEBATES

Wednesday, April 27, 2011

Job No.: 81922
Pages: 1 - 60
Transcribed by: Jackie Scheer

[2] APPEARANCES

Before The Honorable

JOHN A. COSGROVE

Deputy Clerk of the House of Delegates

JEFF FINCH

DELEGATES PRESENT:

Harvey B. Morgan – Gloucester (R-98)

L. Scott Lingamfelter – Prince William (R-31)

Robert G. Marshall – Prince William (R-13)

Roxann L. Robinson – Chesterfield (R-27)

Adam P. Ebbin – Alexandria (D-49)

Charniele L. Herring – Alexandria (D-46)

Anne B. Crockett–Stark – Wythe (R-6)

Ron A. Villanueva – Virginia Beach (R-21)

Robert Tata – Virginia Beach (R-85)

Charles D. Poindexter – Franklin (R-9)

Robin Abbott – Newport News (D-93)

Joe Morrissey – Henrico (D-74)

Jeion A. Ward – Hampton (D-92)

Jennifer L. McClellan – Richmond City (D-71)

461

[3] APPEARANCES CONTINUED

DELEGATES PRESENT:

   Onzlee Ware - Roanoke City (D-11)

   S. Chris Jones - Suffolk (R-76)

   Mark D. Sickles - Fairfax (D-43)

   M. Kirkland Cox - Colonial Heights (R-66)

   Ben L. Cline - Rockbridge (R-24)

   Roslyn C. Tyler - Sussex (D-75)

[4] PROCEEDINGS

THE SPEAKER: The House will come to order. Members, please take your seats. The House will be at ease for a moment.

MALE VOICE: It's been a long time. Never.

MALE VOICE: I don't remember ever –

THE SPEAKER: The House will come to order. Sergeant arms.

SERGEANT ARMS: The House of Delegates is now in session. All persons not entitled to privileges of the floor, please retire to the gallery.

THE SPEAKER: The members will rise and will be led in prayer by the Honorable John Cosgrove, the gentleman from Chesapeake, and remain standing for the pledge of allegiance to the flag of the United States of America, which will be led by the gentleman from Colonial Heights, Mr. Cox.

MR. COSGROVE: Friends, please gather with us as we pray.

[5] Father, we are gathered in this chamber to perform the work of the people of the Commonwealth,

462

but, Lord, we're hobbled by grief and sorrow at the absence of our friend, Bruce Jamerson. We ask ourselves why and what could we have done differently to maybe have made a difference, but we must trust in you, O Lord. We must acknowledge that you are in control and you understand all things. We take special care to ask your – ask you for your blessings of comfort and understanding on Elizabeth and Ainsley as they deal with the loss of their husband and father. We also ask that you bless each of us here today as we deal with the grief and sense of loss that we all feel. We also ask that you comfort the House staff and help them through this very difficult time. Dear Father, to paraphrase the Prayer of Jabez, please bless us indeed. Please expand our ministry and our influence. Place your hand on us and show us your favor, and, Lord, please protect us from the pain of our sins. [6] Now as we move to do our appointed tasks as members of the House of Delegates of Virginia, please guide us and have our work conformed to your perfect will. Lord, we ask these things in the precious and holy name of my savior, Jesus, amen.

MULTIPLE VOICES: Amen.

I pledge allegiance to the flag of the United States of America, and to the republic for which it stands, one nation, under God, indivisible, with liberty and justice for all.

THE SPEAKER: The members will answer the roll call by indicating their presence on the electronic voting board.

(Beep.)

THE SPEAKER: Clerk will close the roll.

(Speaking out of hearing.)

463

THE SPEAKER: Pursuant to House Rule Three of examine to approve the Journal of the House of Delegates for April 25th, 2011. Motions and resolutions under rule 39 are now in order. Does the clerk have any announcements or [7] communications?

MR. FINCH: Yes, sir, Mr. Speaker.

Members will please take note on the presence on their desk a golden rod sheet that addresses the memorial service for Bruce on Friday. We need to ascertain a head count. There will be a reserved seating section for members, so we need to know if you are coming, if you're bringing a guest, or if you're not coming. And so if you'd please complete that and turn it in either to the front desk or to Jay Pearson in the back of chamber, we'd appreciate it. Thank you.

THE SPEAKER: Gentleman from Prince William, Mr. Anderson.

MR. ANDERSON: We'd ask for a request, Mr. Speaker.

THE SPEAKER: May state it.

MR. ANDERSON: Request that the journal reflect that my seat mate, the gentleman from Loudoun, is away on pressing personal business.

THE SPEAKER: Gentleman from Gloucester, [8] Mr. Morgan.

MR. MORGAN: Mr. Speaker, I would ask for a point of personal privilege and a request.

THE SPEAKER: Gentleman has the floor.

MR. MORGAN: Mr. Speaker, ladies and gentlemen of the House, most of you read about the tornadoes, plural, that hit Gloucester County and Middlesex County. There was one in Gloucester that cut a swath

464

about 300 yards wide from the York River all the way over to the Piankatank River, the whole width of the county, about a distance of about eight miles, and destroyed almost 200 homes and cost three lives. The other one, the same – the same tornado, really, continued in Middlesex County and cut across from the Piankatank River to the Rappahannock River and there about 60 – I think 80 – 80 homes and two – two tornadoes, one north in the – in the county. The devastation was just unbelievable, and I realize that we're not the only ones who've had this sort of thing lately. Other parts of the [9] Commonwealth have experienced this, but I wanna make mention of the host of volunteers that have come in and from high school students to church organizations from all over the eastern part of the Commonwealth. Hundreds of volunteers have don (inaudible) work and we are so grateful for that.

And I just wanna mention to the members how important it is when people come together and help each other, and – and I would ask that today when we adjourn, we adjourn in honor of – of volunteers who assist, especially in this particular situation, as well as the memory of those – of those two – two – three – three persons who lost their lives in this.

THE SPEAKER: The gentleman from Gloucester, Mr. Morgan, moves that when the House adjourn today it adjourn in the memory and honor of the victims of the tornado in the middle peninsula, as well as the volunteers and all of the emergency medical service people [10] that went well beyond the call of duty. If there's any in favor of that motion will say I.

MULTIPLE VOICES: I.

465

THE SPEAKER: Those opposed, no. That motion's agreed to.

MR. MORGAN: Mr. Speaker, with regard to the request, I request that – permission to – for unanimous consent to introduce two commending resolutions.

THE SPEAKER: The gentleman from Gloucester, Mr. Morgan, for a unanimous consent to introduce a commending resolution. As many in favor of that motion will say I.

MULTIPLE VOICES: I.

THE SPEAKER: Those opposed, no. That motion's agreed to. The gentleman from Prince William, Mr. Lingamfelter.

MR. LINGAMFELTER: Mr. Speaker, ask for a request.

THE SPEAKER: Gentleman may state it.

MR. LINGAMFELTER: Actually, Mr. Speaker, [11] it's a motion. I would like to make the motion to introduce a memorial resolution for a very, very brave marine who lost his life in Afghanistan this week.

THE SPEAKER: Gentleman from Prince William, Mr. Lingamfelter, asks for unanimous consent to introduce a memorial resolution. As many in favor of that motion will say I.

MULTIPLE VOICES: I.

THE SPEAKER: Those opposed will say no. That request is agreed to. The gentleman from Chesapeake, Mr. Spool.

MR. SPOOL: This is in regard for a request.

THE SPEAKER: Gentleman may state it.

466

MR. SPOOL: The (inaudible), my seat mate, Delegate Ward, is away on pressing personal business.

THE SPEAKER: The journal will so reflect. Gentlewoman from Sussex, Miss Tyler.

MS. TYLER: Thank you, Mr. Speaker. I rise for a request.

[12] THE SPEAKER: Gentlewoman may state it.

MS. TYLER: I would like to request unanimous consent in order to introduce a memorial resolution.

THE SPEAKER: Gentlewoman from Sussex, Miss Tyler asks for unanimous consent to introduce a memorial resolution. As many in favor of that request will say I.

MULTIPLE VOICES: I.

THE SPEAKER: Those opposed no. That's agreed to. The gentleman from Prince William, Mr. Marshall.

MR. MARSHALL: I rise for a request, Mr. Speaker.

THE SPEAKER: You may state it.

MR. MARSHALL: Request that the journal reflect that my seat mate, the gentleman from Hanover, is away on pressing personal business of a variety of which all of us would like to be doing right now, Mr. Speaker.

THE SPEAKER: The journal will so reflect. [13] The gentlewoman from Chesterfield, Miss Robinson.

MS. ROBINSON: I rise for a request, Mr. Speaker.

THE SPEAKER: Gentlewoman may state.

MS. ROBINSON: I would like the journal to reflect that my seat mate from Newport News, Delegate Oder, is away on pressing personal business.

467

THE SPEAKER: Journal will so reflect. Gentleman from Alexandria, Mr. Ebbin.

MR. EBBIN: Thank you, Mr. Speaker. I rise for two requests.

THE SPEAKER: So may state them.

MR. EBBIN: First I request unanimous consent to introduce a commending resolution.

THE SPEAKER: Gentleman from Alexandria, Mr. Ebbin, asks for unanimous consent which to introduce a commending resolution. As many in favor of that resolution will say I.

MULTIPLE VOICES: I.

THE SPEAKER: Those opposed no. [14] The request is agreed to. Gentleman from Alexandria.

MR. EBBIN: Thank you, Mr. Speaker. I request that the journal reflect that the gentleman from Montgomery is absent today due to pressing personal business.

THE SPEAKER: Journal will so reflect. The gentlewoman from Wythe, Miss Crockett-Stark.

MS. CROCKETT-STARK: Thank you, Mr. Speaker. I rise for two requests and an introduction.

THE SPEAKER: Gentlewoman has the floor.

MS. CROCKETT-STARK: Thank you. In the gallery today is the Covenant Christian Academy from Wythe County, and I would like everyone to please give them a hearty welcome. It's rare when my schools come four and a half hours, so I would appreciate a welcome. Thank you.

(Applause.)

468

MS. CROCKETT-STARK: I would thank you, Mr. Speaker. I request that – let the record [15] show that my seat mate from Halifax is away on pressing personal business today.

THE SPEAKER: Will so reflect.

MS. CROCKETT-STARK: And I would also like to request a commending resolution.

THE SPEAKER: The gentlewoman from Wythe, Miss Crockett-Stark, requests unanimous consent to introduce a commending resolution. As many in favor of that request will say I.

MULTIPLE VOICES: I.

THE SPEAKER: Those opposed, no. That request is agreed to.

MS. CROCKETT-STARK: Thank you.

THE SPEAKER: Gentleman from Virginia Beach, Mr. Villanueva.

MR. VILLANUEVA: Mr. Speaker, I rise for a request.

THE SPEAKER: So may state it.

MR. VILLANUEVA: I request that the journal reflect that the delegate from (inaudible) is on pressing personal business.

THE SPEAKER: Journal will so reflect. [16] The gentleman from Franklin, Mr. Poindexter.

MR. POINDEXTER: Thank you, Mr. Speaker. Mr. Speaker, I rise for a request.

THE SPEAKER: So may state it.

MR. POINDEXTER: Mr. Speaker, I'd ask the journal reflect that my seat mate, the gentleman from

469

Virginia Beach, is absent on pressing personal business today.

THE SPEAKER: Journal will so reflect. Gentleman from Virginia Beach, Mr. Tata.

MR. TATA: Thank you, Mr. Speaker. I rise for a request.

THE SPEAKER: Gentleman may state it.

MR. TATA: That my seat mate is away on pressing personal business. He may be here later.

THE SPEAKER: The – the journal will so reflect. (Laughter.)

THE SPEAKER: He's – he's done that to you before, hasn't he. [17] Gentlewoman from Alexandria, Miss Herring. MS. HERRING: Thank you, Mr. Speaker. I rise for a request.

THE SPEAKER: Gentlewoman may state it.

MS. HERRING: Will the journal reflect that my seat mate, the gentleman from Lancaster, Mr. Pullard, is away on pressing personal business. Thank you.

THE SPEAKER: The journal will so reflect. Gentlewoman from Newport News, Miss Abbott.

MS. ABBOTT: Thank you, Mr. Speaker. I rise for a request.

THE SPEAKER: Gentlewoman may state it.

MS. ABBOTT: Mr. Speaker, I ask for unanimous consent for a commemorative resolution.

THE SPEAKER: You're asking for unanimous consent to introduce a commending resolution?

MS. ABBOTT: Yes, sir. For the James City County firefighters who responded to the tornadoes last week.

470

[18] THE SPEAKER: Okay. Gentlewoman from Newport News, Miss Abbott, has asked – requested unanimous consent to introduce a commending resolution. As many in favor of that request will say I.

MULTIPLE VOICES: I.

THE SPEAKER: Those opposed no. That request is agreed to.

House will be at ease for a moment.

(Break.)

THE SPEAKER: House will come to order. Are there further motions or resolutions under rule 39? If not, the clerk will call the calendar.

MR. FINCH: Calendar of the House of Delegates for Wednesday, April 27th: House bill on third reading uncontested calendar. House bill 5005, a bill to amend the code related to decennial redistricting, mandated for article two, section six, by the constitution of Virginia.

THE SPEAKER: Shall the bill pass? That's [19] why we got these buttons to push. Gentleman from Henrico, Mr. Morrissey. Clerk will (inaudible).

MR. MORRISSEY: Thank you, Mr. Speaker. Speaking to the bill, Mr. Speaker.

THE SPEAKER: Gentleman has the floor.

MR. MORRISSEY: Thank you. Mr. Speaker, I rise to speak against House bill 5005, and I hope that this body will reject it. Mr. Speaker, the – the governor vetoed House bill 501, and this version is almost identical. To use my words and the architect's, Delegate Jones', words, a few minor

471

tweaks. Mr. Speaker, I'd like to be rather blunt and candid about House bill 5005. This work product, this piece of legislation, is as partisan as anything that has come down, including from the other side of the capital. Now, I realize that this bill got some by partisan support last time around, and even the governor said look at all the Democrats that – that supported it. But, Mr. Speaker, nobody is fooled, not the [20] Republicans, not the Democrats, not the media that's sitting in the back, and certainly most of all, not the public. Where the Republican members and with the architect could stick the knife in and twist it, they did. Our – our delegates, Billy Barlow, Robin Abbott, Paula Miller, Jim Shool, Joe Johnson, Bud Phillips, the minority leader, they all got it, they all got the knife, because they could do it.

MR. MARSHALL: Mr. Speaker. Mr. Speaker.

THE SPEAKER: Is this a parliamentary inquiry?

MR. MARSHALL: It's an objection.

THE SPEAKER: Okay.

MR. MARSHALL: Don't the rules forbid the naming of individuals in a debate such has been done right now, and especially when it's commingled with a statement of a kind of political assassination?

THE SPEAKER: The – probably the more proper way to do it would be to reference the gentleman or gentlewoman by their locality.

[21] MR. MORRISSEY: Thank you, Mr. Speaker. With respect to the minority leader from Henry County, his district was chopped up. I would call that political assassination. Good word. Now, the architect of the plan, my friend Delegate Jones, was – was masterful. He worked very hard. There's no question

472

about that, but the manner in which it went about was masterful. The gentleman from Suffolk followed a four point strategy and he did it very well. He listened to the lawyers on their side and the first thing they said was don't mess with any majority/minority district. It's the first thing you can't do. And the architect did just that. Went to the members of the majority/minority districts and said what do you want and he gave it to them. And what they wanted was exactly consistent with what Republicans in contiguous districts were willing to give up.

Next point that his attorney said was followed to a T was divide and conquer. Call [22] some of the Northern Virginia delegates up, ask them what they want, throw them a few crumbs, and let's get them on board so that the governor can later say this is a bipartisan support. But the rest of them, where you can get them, you do. And with the gentleman and the delegates that I mentioned earlier, that's exactly what happened.

And the last point of the strategy was don't get too greedy. You've already got -¬ we've already got 61. Let's not get too greedy because there's an 800 pound gorilla out there called the Department of Justice that's waiting to pounce. We can probably get up to 65 and 66. Anymore than that, it's hard to – to manage anyway, and it was a masterful strategy and it's worked so far.

However, the point was made to the architect whenever you're asked on the floor about one man, one vote, if you're ever asked about Hispanic, Latino, Asian, or other ethnic groups like the Filipino American, American [23] Indian, just come back with the same phrase again and again. I believe the House plan comports with the spirit and dictate of the Voting

473

Rights Act. And Delegate Jones said that again and again and again. Every time I asked a question about one man, one vote, I got the same answer. Mr. Speaker, no one was fooled. You know, has anybody wondered why my district wasn't put in a blender? Maybe put mine down in Tangier Island, chop it up? Speaker, 'cuz they couldn't. That would have violated that four point plan to not mess with any majority/minority districts. But where other people could be knifed, that's exactly what happened. I don't think they didn't do – gerrymander my district, Mr. Speaker, because I'm loved so much or they are my buddies or I'm just a warm and fuzzy person. They couldn't get away with it and they didn't.

At the end of the, day we have less diversity with House – House bill 5005 than we could have had. And let me just speak a moment [24] about diversity. This body used to be represented by rich, white, wealthy –

(Speaking out of hearing and applause.)

MR. MORRISSEY: Bar-jesses (phonetic). There came a point, Mr. Speaker, when they said, you know, that's probably not the best thing to do. Maybe we should get some Plebeians in there, and we did. And that worked out well. And it wasn't just the rich and the wealthy and the white. Then along the way they said, you know, maybe we should get some women in there. And that actually worked out pretty well, too, and became more diverse. And then post-reconstruction, they said, you know, it probably would be a good idea if we had some African Americans in there. And that hasn't worked out too bad either. And then this body became less of an aristocratic body and we had teachers and hog farmers and hay farmers and realtors and morticians. We had a people that represented the entire Commonwealth. Diversity, I

474

think, everybody [25] would say was good. But right now, we don't have a representative that's Hispanic, Latino. We don't have a majority/minority district that's Asian. I think it's good that this body has a Filipino American and an Asian American. I think it's good because it makes it more diverse. But, Mr. Speaker, there's folks out there that understand what's going on. All you have to do is read some of the recent editorials and more are coming.

Vivian Page, who's well known, wrote a very powerful piece about powerless in a partisan game. She wrote for the Virginia Pilot, an African American journalist that I thought her – her thoughts were very pressing. Quote in his letter explaining the veto, "the governor took pains to applaud the House for its bipartisan approach while finding significant issues for the Senate reapportionment plan." Quote, "I can't believe the governor wrote those words with a straight face." She went on to say an independent [26] review of the maps approved by the general assembly reported that legislative districts with this plan will be less compact, will split more communities and cities, and separate common sense communities of interest even more. The conclusion holds true for both the House and the Senate. She went on to say let's be very clear about this. Those plans that emerge from the toothless independent commission appointed by the governor and from those – from colleges redistricting competition were much better than anything that we did. Went on to say that those people that voted for this plan did a disservice to democracy and did a disservice to diversity.

Doug Wilder followed that up with a op-ed piece and he said something interesting. His point was diversity is good if you get more minority representation, you

475

get a better or a more diverse judiciary. You get more African Americans in the judiciary, more African Americans in secretariat positions, and he said [27] what's happening now isn't any different than happened 20 years ago. In 1990 he said I wanted to get ten seats. Folks resisted it. Only wanted to give eight, but we vote ten. Ten years later we wanted to get 12. Folks resisted it. Only wanted ten majority/minority districts but we got it, and this year, Mr. Speaker, we had a chance to get 14 seats. Still far below the population in the Commonwealth, and this plan doesn't do that. This plan pays no heed whatsoever to the governor's blue ribbon panel. Why create it at all. There's no reason for doing that. I don't have to say that what the Republicans did – excuse me, what the Democrats did on the other side of the aisle, other side of the building, chopping up Virginia Beach, breaking up that community of interest, and splitting two Republicans was disgraceful because I already said it.

I told our former – the minority leader who's not here today that in 2007 after winning [28] a primary and before I was even elected that if I ever had a chance to vote, if he ever became the speaker and I had a chance to vote for a nonpartisan commission to give up that power, I would vote for it. I'm really disappointed, Mr. Speaker, that that didn't happen. Mr. Speaker, and I say this respectfully, and I've said it as I always have to you, I think you had a great opportunity here. You could have marshalled your charges. You could have given heed to a bipartisan commission. You have the power and you could have given it up and in all due respect, I think a legacy that would last 20 or 30 years could have lasted a hundred, because they would have said you had the power and you did what was right and you gave it up. Some day, some time, some – somebody will – will do what –

476

the correct thing, because what's gonna happen, we're gonna continue someday to get a democratic majority, and if we don't change it, they'll do the same bipartisan knifing that is being done today. I ask Mr. [29] Speaker when is it going to stop. It's certainly not stopping with House bill 5005, and I'd ask the body to reject it. Thank you, Mr. Speaker.

THE SPEAKER: The gentlewoman from Hampton, Miss Ward.

MS. WARD: Thank you, Mr. Speaker. Mr. Speaker, I rise to speak about the bill.

THE SPEAKER: Gentlewoman has the floor.

MS. WARD: Mr. Speaker, ladies and gentlemen of the House, I truly rise with some fear and trepidation because I'm standing this time to speak against this bill. I know that what I'm doing, I've heard that it will not bode well for me to do this thing. But to be honest with you today, I just don't care. What I wanna do is the right thing. And I just feel compelled to speak today. First of all, I just wanna thank the gentleman from Suffolk, Mr. Jones, the gentleman from Chesapeake, Mr. Spool, and the gentlewoman from Petersberg. I think they did a fantastic job in giving each [30] one of us basically what we wanted. And I was right there on the frontline talking about what I wanted. But last week when we were here and we had an opportunity to vote on this bill, and I sat there and it was the hardest vote I've ever taken when I voted yes. Because I knew that what I was doing was for myself. The lines were drawn so it would be easier for me to get reelected and I just didn't think about anyone else. The other people, the gentlewoman from Newport News, gentlewoman from Norfolk, the minority leader, the gentleman from – throughout this

477

Commonwealth didn't even cross my mind. All I thought about was is this gonna be good for me. And I know as I'm standing up, I know there's gonna be so much talk and probably notes and texting going on behind my back right now for what I'm doing, but that's okay. It's okay. And I wanna say that I really do love this body, but no one knows and no one in my caucus realizes that I was gonna stand today, but I remember walking out of this [31] chamber after that vote. No one saw me. I ran down those back steps. I didn't even feel good enough to walk out those double doors out of this chamber because of what I had done.

When I ran for election, someone I really respect and whose seat I hold now told me that any time you start voting for something for yourself and you forget about the people, maybe it's time for you to go. And so I thought about that and I realized just as Dr. Martin Luther King said the night he was assassinated, the night before he was assassinated, that longevity does have its place. And I know I wanna have a very long legislative history. But today I just wanna do the will of the people of this Commonwealth, and that's why I'm standing. That's why I felt like it was important for me to stand up here today. And I've heard it all. I've heard all about when the Democrats were in control this is what they did, and that's the reason why Republicans are doing what they're doing, and if the Democrats [32] were in this position, they would be doing the same thing. But sometimes this has to stop. This may be a radical idea, but I feel like I'm from a radical people. And I can feel today as I sat here and I said all I have to do is just vote no and not say a word, but I thought that's a position of weakness. When I've got so many people, the blood of some radical people running through my vein, and for me to sit here and not say a word, would not be paying honor to these

478

people. I think of Fannie Lou Hamer, who said she was just sick and tired of being sick and tired of the same thing. She wanted to make sure that all the black people knew that they did have a right to vote so that their voices could be heard. That is the reason why I'm standing. And I also think of those brave women back in World War II where they didn't work in – in factories building war planes and bombs, but they did. And I'm thinking then of Rosie the Riveter and you've seen the posters of her with her little [33] arms, her fist clenched, and she's saying we can do this. So I believe that we can do this today. We can change the way, we can stop this as business as – as usual, and we can do exactly what the people of the Commonwealth sent us here to do, to be their voice.

The governor appointed a bipartisan commission and they travel throughout this state listening to what the voters said, and they all said that they wanted a very bipartisan redistricting plan. And I don't think that we have done that. And my final person whose blood I'd like to think is just rushing through my veins is that of Queen Esther, who found herself in a difficult situation, and she said that if she lived or if she died, and to paraphrase her, if I'm reelected or not, today I feel as if I have to go before all of these leaders and speak on behalf of the people of this Commonwealth. They've given us a job to do, and I don't believe that we've done it. And I recognize [34] that my one little vote won't make a difference, but I hope that in all the history books that somewhere people will remember me as someone who had the nerve to stand up and say no and vote no. Thank you, Mr. Speaker.

THE SPEAKER: The gentlewoman from Richmond City, Miss McClellan.

479

MS. MCCLELLAN: Thank you, Mr. Speaker, speaking to the bill.

THE SPEAKER: Gentlewoman has the floor.

MS. MCCLELLAN: Mr. Speaker, I felt I needed to stand and clarify the record, 'cuz we are creating a record here that may or may not find its way in a court of law. And I wanna be absolutely clear. The gentleman from Suffolk did not come to me or any of the gentleladies from the City of Richmond and ask what do you want. And, quite frankly, if I were drawing the map, my district wouldn't look like it looks in this map. And the entire map probably wouldn't look – definitely wouldn't look like this map does. But what the gentleman from [35] Suffolk did do was when the registrar from the City of Richmond, which we represent, called us as her representative to complain about the bill as it was originally introduced, because precincts were split in a way that would make it difficult for her to administer elections, and a member of the public does not have the right to go to legislative services and ask for changes, she had to go through us. And when the president of the Church Hill Neighborhood Association called me and said as originally introduced, the bill literally segregated Church Hill, literally segregated Church Hill, a neighborhood that already struggles to maintain a sense of community across Broad Street, and said that by segregating Church Hill between districts, that would make it difficult. And she as a citizen didn't have the right to call legislative services and ask for changes, but I did. Gentleman from Suffolk listened and to the extent he felt he could based on the criteria he was operating under, [36] whether I agree with that criteria or not, he listened to those changes.

480

I did not ask for a single thing for myself. My district as it exists right now is the most democratic in the state. Given the demographics of the City of Richmond, it doesn't matter what you do to my district, and, quite frankly, it's not my district. It belongs to the citizens of the City of Richmond. And I had a choice. I could rail against the process and rail against those in charge who had the pen and developed the criteria, or I could try to have some influence to take care of the concerns of the people I represent. I was sent here to represent them, to look after their interests, not my own.

Now, I will rail against the process a little bit. I would love to have bipartisan redistricting. I would love to have had maps introduced by the commission in time for them to be analyzed. I would loved to have been able to have had time before these bills were [37] introduced and acted on to get into the software and figure out what's the voting age African American population in the 14 member plan or the 13 member plan. What's the total population. Does it split precincts. Does it split neighborhoods. Does it keep communities of interest together. But that plan was not introduced in time for all one hundred of us to do that. I certainly couldn't. I'd be surprised if more than one or two people in this chamber have done that analysis. There was a whole series of questions asked by the minority leader about the current plan and what kind of analysis was done. I couldn't in good conscience criticize the plan we had before us for not having done an analysis on the basis of another plan where that analysis had not been done. Is this a perfect bill, absolutely not. Quite frankly, can we adopt the perfect bill given the time frame that we have and the process we have? Probably not. Is this the best we could have done? I don't know. Does [38] it violate the

481

Voting Rights Act, I don't know. We all – both sides have lawyers that'll figure that out and they'll argue that to a court, if necessary. But I just wanna be perfectly clear, and I'm sure the other members of the black caucus and the other members of the Northern Virginia Delegation will say the same thing. No one asked me what I personally wanted, nor did I personally ask for anything. So you vote your conscience on this bill. Thank you.

THE SPEAKER: The gentlewoman from Sussex, Miss Tyler.

MS. TYLER: Thank you, Mr. Speaker. Rise to speak to the bill.

THE SPEAKER: Gentlewoman has the floor.

MS. TYLER: Mr. Speaker, I rise to speak to House bill 5005, but first I wanna thank Delegate Jones and Delegate dance and – and Delegate Spool and Delegate Joanna for all their work in trying to come up with district lines for the 75th district. But, however, I'm [39] still overly concerned because in my district, we have five prisons with over 8,000 individuals that cannot vote. So when it comes down to looking at the voting age population and the calculation of – of blacks and whites in the district, the numbers doesn't play out when it comes to majority districts. I've looked at the numbers and with a 55 'cent population of black population, but without 8,000 individuals in prison, I'm one that do not like the way that is drawn. And maybe it's a possibility that it will not be drawn the way I like, but I think right there just looking at the prison population is such an inequality when you're talking about 8,100 in there are also included in that population. When you look at people coming to the voting registration or the fellas in the area, there's

482

some inequality there. Therefore, I just wanna thank them for their support, but I cannot support the bill as its written today.

THE SPEAKER: The gentleman from Roanoke [40] City, Mr. Ware.

MR. WARE: Thank you, Mr. Speaker. Mr. Speaker, you know, I rise for a point of personal privilege, Mr. Speaker. Speak to the bill, I'm sorry.

THE SPEAKER: Well, you'd have to – speak to the bill, gotcha.

MR. WARE: And as you can see, Mr. Speaker, I'm a little bit hesitant to even stand up and talk about this, and I certainly understand how African Americans feel. We've heard this bill bounced around and represented by, quite frankly, non-African Americans, and there's nothing wrong with that. But nobody ever came and asked me if I thought we needed two or three more African American minority districts and maybe they – they didn't have to ask me, Mr. Speaker. And – and I consciously tried to stay, as Miss – the delegate from Richmond City did, I tried to stay out of the process, because I was fearful that we would get to this point and then finger pointing [41] would be called. One thing I said when I came to the Virginia Journal (inaudible) House of Delegates, that my vote was the vote of the people of my district, and I've had tough times because of that philosophy. And so I stand up today, you know, not trying to bash anybody about however they vote. That's certainly your right. But what I can tell you is, Mr. Speaker, that, you know, it's great to say we are here for the good of the Commonwealth, and we all are familiar, but there are times when you have to look out for your people back home. And whether that be a minority district or

483

whether that be just a district. I can tell you, Mr. Speaker, I'm proud – I think I have the best district in Virginia. It is not a minority district. I happen to be a minority who represents 61 percent white folk. And when I cast a vote, I don't think about, well, it's a white vote or a black vote. It's a vote. And when I cast that vote, I wanna make sure that the vote that I cast represents the people [42] that live in the 11th district.

   As – as we think about the redistricting plan, I won't rehash some of the eloquent things that others have said, but what they did with this redistricting plan, they fixed my district from the atrocity that it was ten years ago. They made it compact. They made it contiguous. They made it a district of community interest. So should I, for the good of the cause, stand up and vote against the bill, or should I, because the right thing was done for the 11th district, should I vote for the bill because they took care and corrected a right – a wrong ten years later? I won that district regardless of what the configurations was. I said when this process started the reason why I didn't wanna be an intricate part of it, because when I ran eight years ago, I didn't pick the district and it didn't matter to me what district they gave me this time, that I would run again. But what I do find somewhat awkward is some of the statements as [43] though they're made to make African Americans feel ashamed of voting for a plan because it helped them. And I don't think that's fair because that – that'll – that assumes to me, as an African American man, that I don't have a mind and that I can't think for myself and someone else should. And so I rise to say that I've looked at this plan, I've thought of every way that the plan could be better, and there's certainly things that could have happened that were out of my control and out of a lot of our control. Certainly out of a lot of African American controls, so

484

for once in the history – if we get something that we want, why should we be ashamed of it? Why should I be upset about the fact that I got a good district with African American and white people in it. And so I simply say that I'm not ashamed to take a vote for what I think is a right thing for my people. Could things have been better, absolutely. I think we would be here on the floor, Mr. Speaker, had we used [44] every recommendation from the bipartisan commission, because it certainly wouldn't have made the district that I have now. And if I lose my district then it's my fault because then I didn't work hard enough to win it. And so I would say to anybody, you vote however you wanna vote today, but let's not get so sanctimonious and try to presume that we know how other people feel and how other people think. And I very seldom ask anybody to fight my battles. I'll fight my own. And so my vote today will be a vote for the people of the 11th district because I have no control over the entire process. Thank you, Mr. Speaker.

THE SPEAKER: Shall the bill pass?

MALE VOICE: Mr. Speaker. Mr. Speaker.

THE SPEAKER: Gentleman from Shenandoah, Mr.

MALE VOICE: Parliamentary inquiry. Are we getting ready to vote, and if so, should all the members who are in the lounge and other places come out and get in their seats?

[45] (Laughter.)

THE SPEAKER: That's a very good question. I hope everybody had a chance to finish.

MR. JONES: Mr. Speaker.

THE SPEAKER: Gentleman from Suffolk, Mr. Jones.

485

MR. JONES: Speaking to the bill.

THE SPEAKER: Gentleman has the floor.

MR. JONES: Speaking ladies and gentlemen of the House, I certainly appreciate the comments from the other side of the aisle, and I think any bill that is drafted gets amended along the way. I think as bills work their way through this process, there's input that's received from members, whether it's something coming out of the court's committee, out of the appropriations committee, out of the other – into the capital. And I would like to state that I am confident that this is the only bill that we have seen that approximate the one person, one vote premise, and fully complies with the Voting Rights Act. And I will say [46] that, you know, in putting this plan together, we tried to make sure that the criteria was followed, and I think it was. There were individuals who came to me and asked for certain considerations for their community, and I think the gentlelady from Richmond hit the nail on the head. It's not her district. She said not mine, it's the people's. And we have heard through the testimony from last fall through the spring there were certain things that people wanted us to do and look at, and I think we did that. We heard testimony about an effective percentage for representation for the majority/minority districts, and I think we have done that. I think we've improved the bill, especially in the gentlelady's from Hampton's situation. We unsplit three precincts, we moved it completely out of Newport News, and I did those things because I think they – they were the right things to do. We listened to comments from the registrar in Richmond and certainly understand the need to [47] be able to have elections run as smoothly as possible. We actually  split a precinct with a zero population block to

486

accommodate a voting place. So I think that the time spent on this bill with both sides of the aisle, Northern Virginia, Southwest Virginia, Richmond, et cetera, was done because I wanted to see a bill that was fair and that would be a good map and a fair map to make sure that the people's business was done in a manner that would be pleasing, I would hope, to all. And I would ask that we would pass the bill.

THE SPEAKER: Shall the bill pass.

MR. SICKLES: Mr. Speaker. (Inaudible.)

THE SPEAKER: Destroy the role. Gentleman from Fair fax.

MR. SICKLES: Speaking to the bill.

THE SPEAKER: Gentleman has the floor.

MR. SICKLES: Mr. Speaker, I'm sorry, everybody, I just wanted to make one last statement, especially since the gentleman from Suffolk just spoke, and – and this is my [48] eighth year here and I've been on the privilege and election committee the entire time and multiple times per year I've voted for nonpartisan or bipartisan or bills that would try to take politics out of this process and it – and it didn't pass. I wish it had passed. I offered a resolution for the criteria going into this session, into this redirecting plan that would have kept the deviation of two percent rather than the one percent that we did, because it's within the law to have up to a five percent deviation, plus or minus, and I thought that would help us divide fewer communities. We can only get two votes for that in committee, and so that failed. And I just wanna say that the gentleman from – from Suffolk has handled himself in such a professional manner dealing with this, because when I learned about how the districts in Northern

487

Virginia were being drawn, there were lots of – of lines
that were put on a map that were not – did not make
[49] sense from a community of interest standpoint
that did not lead to good places for people to represent,
and it's hard to do that in – in suburbia in Fairfax
County. It's a big place. We don't have clear
communities of interest, but the – the bill was not
perfect in that regard, so we did ask for things that put
things back together, put communities that go to the
same high school, some of the same neighborhoods,
and – and the gentleman was very good about doing
that, and I think we have a map now that in some
respects makes more sense than the districts that we
have now. There's some that – that don't, maybe
they're a little odd looking, but probably not anymore
odd than we have, and we have some that actually do
make more sense from a long term community of
interest standpoint. And there were many, many
hours that went into this, and – and when I think
about anything in life, I – I try to put myself in the
shoes of the other person and say how would I do this,
given [50] the facts and where we are now. What would
I do. And if I – if I were – had been in charge of this, I
would hope that I could have handled it in as
professional a manner as the gentleman from Suffolk.
So I just wanna thank him for that on the floor today.
I mean, I – I didn't like where we started out. Everyone
wants that, and I wish we had done it a different way,
but given the facts and where we are, the gentleman
did a good job of – of helping us put some districts
together that make sense in Northern Virginia, and
for that I – I thank him. Thank you, Mr. Speaker.

(Laughter.)

THE SPEAKER: Shall the bill pass?

(Beep and speaking out of hearing.)

488

MR. FINCH: Ayes 80, noes nine.

THE SPEAKER: Ayes 80, noes nine. The bill is passed.

MR. FINCH: Continuing on page two of the calendar. Memorial resolutions laid on speaker's table. House joint resolution 5025, [51] celebrating the life of Steven Douglas Hensley. House joint resolution 5026, celebrating the life of Major William O'Connor Smith, U.S. Air Force, retired. House joint resolution 5031, celebrating the life of Robert Phillip Jerralee (phonetic). House resolution 511, celebrating the life of Mark S. Wise.

THE SPEAKER: As many as favor the adoption of those resolutions will please rise. Resolutions are adopted.

MR. FINCH: Continuing on page two of the calendar. Commending resolutions laid on speaker's table. House joint resolutions 5027, 5028, 5029, 5030, and on page three of the calendar, House resolution 512.

THE SPEAKER: As many favor adoption of those resolutions will please say I.

MULTIPLE VOICES: I.

THE SPEAKER: Those opposed no. Resolutions are adopted.

MR. FINCH: That completes the calendar, Mr. Speaker.

[52] THE SPEAKER: Does the clerk have any announcements or communications?

MR. FINCH: Yes, sir, Mr. Speaker. Just a reminder of members to please turn in the golden rod sheet indicating whether you will be attending the

489

memorial service on Friday, please. That's all the announcements I have, Mr. Speaker.

THE SPEAKER: Gentleman from Colonial Heights, Mr. Cox.

MR. COX: Mr. Speaker, I would move the House stand in recess until 7 o'clock, and if I could explain that motion.

THE SPEAKER: Gentleman has the floor.

MR. COX: Mr. Speaker, I hope – certainly no guarantees in life, I hope that we're negotiating right now on a slade of judges. We hopefully at 7 o'clock might have something as far as a resolution goes, might not. But that's to give us much – hopefully resolve that, and so that's the reason why we're recessing until 7 o'clock.

[53] FEMALE VOICE: Mr. Speaker.

THE SPEAKER: The gentlewoman from Newport speaking to the motion?

FEMALE VOICE: Mr. Speaker, at the appropriate time could we return to the morning hour briefly?

THE SPEAKER: Okay. Let's vote on this one first, okay?

MR. MORRISSEY: Mr. Speaker?

THE SPEAKER: Speaking to the motion?

MR. MORRISSEY: Speaking to the motion, Mr. Speaker.

THE SPEAKER: Gentleman has the floor.

MR. MORRISSEY: Mr. Speaker, as I understand it, there are a slade of judges that have been recently voted upon and that we're going to be asked

490

to consider to vote on as a body in a few hours time. The gentlewoman from Richmond pointed out a few moments ago that one of the reasons that we had with the previous plan was that there was not a lot of time to consider it. Given that some of these judges [54] may serve on the Supreme Court of the Virginia Court of Appeals, I'd ask the gentleman from Colonial Heights, would it not be appropriate to give us some time to reflect on these senior appellate court judges who may serve for quite some time as opposed to having no time to reflect on it and have to vote on it as a body at 7 o'clock.

THE SPEAKER: Were you propounding a question to me or to the gentleman from Colonial Heights or just –

MR. MORRISSEY: – speaking – thank you, Mr. Speaker. I was speaking to the motion and the gentlemen – and the question I was propounding to the gentleman from Colonial Heights with respect to the time.

THE SPEAKER: Gentleman yield?

MR. COX: Well, I'll say several things (inaudible) gentleman from Rockbridge, I think, who's a little bit more intimate with the negotiations can certainly add to that. I think certainly a list can be made available to [55] the gentleman. I think from – I think Mary Kay Felch, if the gentleman would like it, this is traditionally the way it's been done. I think, you know, it doesn't very much – a lot of the lower court judges, I think, people are very familiar with. I think most people are pretty familiar with the slade of judges that are being considered for the other positions. And so certainly I think that is pretty standard procedure, but

491

if the gentleman from Rockbridge would like to add to that, he can feel free to.

MR. CLINE: Mr. Speaker.

THE SPEAKER: Gentleman speaking to the motion?

MR. CLINE: Speaking to the motion.

THE SPEAKER: Gentleman from Rockbridge, Mr. Cline.

MR. CLINE: Thank you, Mr. Speaker. Briefly I would just say that the individuals who expressed an interest in appellate level positions on the judiciary went before the [56] Courts of Justice Committee for interviews, and many who are not on the Courts of Justice Committee came to those interviews to sit and to listen and to hear about the interested candidates' philosophy on different issues and answer questions. And so on several different occasions we – we had interviews. So there has been an opportunity. The list is very, very well known, and we're happy to provide anyone with that list for their consideration.

THE SPEAKER: The question is on the motion to recess until 7 p.m. As many in favor of that motion will say I.

MULTIPLE VOICES: I.

THE SPEAKER: Those opposed no. Clerk have any announcements?

MR. FINCH: Mr. Speaker, been advised that there will be a Republican caucus at 6:30 p.m. in House room one. Democratic caucus at 6:30 p.m. in House room two. That's all the announcements I have, Mr. Speaker.

492

THE SPEAKER: The gentlewoman from Newport [57] News?

FEMALE VOICE: Mr. Speaker, I'll bring my request when we return.

THE SPEAKER: Okay.

FEMALE VOICE: Thank you.

THE SPEAKER: The house stands in recess until 7 p.m.

(Break.)

THE SPEAKER: Come to order. The gentleman from Rockbridge, Mr. Cline.

MALE VOICE:

MR. CLINE: Thank you, Mr. Speaker. Rise for an announcement.

THE SPEAKER: Gentleman has the floor.

MR. CLINE: Mr. Speaker, ladies and gentlemen of the House, the Senate has recessed until 8 o'clock out of desire by the clerk staff to go to the Jamerson visitation. And so they are not in right now. I think it'd be appropriate at this point, rather than wait until eight to do lower court judges because the appellate level judges are still in [58] negotiation, that we have all the judges go till tomorrow. I apologize, but I think that it would be more appropriate to come in tomorrow when we do redistricting and do judges at that point.

THE SPEAKER: Now, is it true that at 3 o'clock you knew this was gonna happen.

(Laughter.)

THE SPEAKER: Gentleman from Colonial Heights, Mr. Cox.

493

MR. COX: Mr. Speaker, I move that when the House adjourn today, it adjourn to reconvene Thursday at 2 p.m.

THE SPEAKER: The gentleman from Colonial Heights, Mr. Cox, moves that when the House adjourn today, it adjourn – reconvene tomorrow at 2 p.m. As many in favor of that motion will say I.

MULTIPLE VOICES: I.

THE SPEAKER: Those opposed no. The motion's agreed to. The gentleman from Colonial Heights, [59] Mr. Cox.

MR. COX: Mr. Speaker, I move the House to now adjourn.

THE SPEAKER: Gentleman from Colonial Heights, Mr. Cox, moves the House to now adjourn. As many in favor of that motion will say I.

MULTIPLE VOICES: I.

THE SPEAKER: Those opposed no. Those agreed to. The House stands adjourned until 2 p.m. tomorrow.

(The recording was concluded.)

[60] CERTIFICATE OF TRANSCRIBER

I, Jackie A. Scheer, do hereby certify that the foregoing transcript is a true and correct record of the recorded proceedings; that said proceedings were transcribed to the best of my ability from the audio recording as provided; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise in its outcome.

/s/ Jackie Scheer

JACKIE A. SCHEER

494

[61] **A**

| | |
|---|---|
| **Abbot** 2:19 17:11,12,15 17:20 18:2 20:6 | **ability** 60:6 |
| **able** 36:22 47:1 | **absence** 5:4 |
| **absent** 14:5 16:8 | **absolutely** 34:15 37:18 43:21 |
| **Academy** 14:15 | **accommodate** 47:3 acknowledge 5:8 |
| **Act** 23:4 38:1 45:22 | **acted** 37:1 |
| **Adam** 2:13 | **add** 54:21 55:11 |
| **addresses** 7:4 | **adjourn** 9:11,11,19,19 58:12,12,16,16 59:3,6 |
| **adjourned** 59:11 | **administer** 35:6 |
| **adopt** 37:19 | **adopted** 51:10,20 |
| **adoption** 51:9,16 | **advised** 56:17 |
| **Afghanistan** 11:4 | **African** 24:16 25:14 26:20,21 37:3 40:11,16 43:1,5 43:12,17 |
| **age** 37:2 39:4 | **ago** 27:2 42:7,18 53:19 |
| **agree** 36:1 | **agreed** 10:5,16 11:11 12:11 14:1 15:12 18:8 58:21 59:10 |
| **Ainsley** 5:12 | **Air** 51:3 |
| **aisle** 27:16 45:11 47:5 | **Alexandria** 2:13,14 13:11,17 14:2 17:1 |
| **allegiance** 4:17 6:8 | **amen** 6:6,7 |
| **amend** 18:18 | **amended** 45:12 |
| **America** 4:18 6:9 | **American** 22:22,22 25:5,5 25:14 37:3 40:16 43:5,13 43:17 |
| **Americans** 24:16 26:21,22 40:11,13 43:1 | **analysis** 37:11,14,16,17 |
| **analyzed** 36:21 | **Anderson** 7:15,16,19 |
| **Anne** 2:15 | **announcement** 57:13 |

495

| | |
|---|---|
| **announcements** 6:22 52:2,7 56:16 56:21 | **answer** 6:12 23:7 56:6 |
| **anybody** 23:8 41:6 44:6,10 | **anymore** 22:15 49:15 |
| **anyway** 22:16 | **apologize** 58:2 |
| **Appeals** 54:2 | **appellate** 54:5 55:21 57:22 |
| **applaud** 25:17 | **applause** 14:20 24:3 |
| **appointed** 6:1 26:10 33:7 | **appreciate** 7:12 14:19 45:10 |
| **approach** 25:18 | **appropriate** 53:5 54:3 57:20 58:3 |
| **appropriations** 45:17 | **approve** 6:19 |
| **approved** 26:1 | **approximate** 45:20 |
| **April** 1:11 6:20 18:16 | **architect** 20:4 21:5,14 22:19 |
| **architect's** 19:12 | **area** 39:18 |
| **argue** 38:3 | **aristocratic** 24:18 |
| **arms** 4:9,10 33:1 | **article** 18:20 |
| **ascertain** 7:6 | **ashamed** 43:2,15,19 |
| **Asian** 22:21 25:4,5 | **asked** 18:2 22:19,20 23:6 37:12 38:8 40:15 46:4 53:17 |
| **asking** 17:18 | **asks** 11:6 12:6 13:18 |
| **assassinated** 31:11,12 | **assassination** 20:19 21:4 |
| **assembly** 26:2 | **assist** 9:12 |
| **Association** 35:11 | **assumes** 43:4 |
| **atrocity** 42:6 | **attending** 52:6 |
| **attorney** 21:21 | **audio** 60:6 |
| **available** 54:22 | **awkward** 42:22 |
| **Ayes** 50:17,18 | |

**B**

496

| | |
|---|---|
| **B** 2:9,15 | **back** 7:12 20:2 23:1 30:18 31:2 32:18 41:12 49:8 |
| **bad** 24:17 | **Barlow** 20:6 |
| **Bar-jesses** 24:4 | **based** 35:22 |
| **bash** 41:6 | **basically** 30:1 |
| **basis** 37:16 | **battles** 44:11 |
| **Beach** 2:16,17 15:15 16:8,11 27:17 | **Beep** 6:15 50:16 |
| **behalf** 33:20 | **believe** 23:2 25:20 33:2 33:22 belongs 36:9 |
| [62] **Ben** 3:7 | **best** 24:6 37:22 41:16 60:5 |
| **better** 26:12,19 43:9,21 | **beyond** 10:1 |
| **big** 49:4 | **bill** 18:17,18,18,22 19:5,8,10,15,19 23:21 29:2,8,13 30:4 34:9 35:4 35:12 37:18,19 38:10,15,18 39:21 40:5,7,12 42:11,13 44:15 45:7,12,19 46:16 47:5,7,12 47:13,17 49:6 50:15,19 |
| **bills** 36:22 45:13 48:4 | **Billy** 20:6 |
| **bipartisan** 22:4 25:18 28:11 28:21 33:7,11 36:18 44:1 48:4 | **bit** 36:18 40:9 54:20 |
| **black** 32:15 38:6 39:9 41:20 | **blacks** 39:5 |
| **blender** 23:9 | **bless** 5:13,19 |
| **blessings** 5:10 | **block** 47:3 |
| **blood** 32:8 33:13 | **blue** 27:12 |
| **blunt** 19:14 | **board** 6:14 22:3 |

497

| | |
|---|---|
| **bode** 29:15 | **body** 19:9 24:1,18,18 25:4 29:3 30:20 53:18 54:7 |
| **bombs** 32:20 | **books** 34:3 |
| **bounced** 40:12 | **brave** 11:3 32:18 |
| **Break** 18:10 57:8 | **breaking** 27:17 |
| **briefly** 53:6 55:20 | **bring** 57:2 |
| **bringing** 7:9 | **Broad** 35:15 |
| **Bruce** 5:4 7:5 | **Bud** 20:7 |
| **buddies** 23:17 | **building** 27:17 32:20 |
| **business** 7:21 11:18 12:19 13:9 14:6 15:2 15:21 16:9,16 17:8 33:4 47:10 | **buttons** 19:1 |

C

| | |
|---|---|
| **C** 2:1 3:1,1,8 4:1 | **calculation** 39:5 |
| **calendar** 18:14,15,17 50:21 51:12,15,21 | **call** 6:13 10:1 18:13 21:4,22 35:19 |
| **called** 22:13 35:2,11 41:1 | **candid** 19:14 |
| **candidates** 56:5 | **capital** 19:18 45:18 |
| **care** 5:10 29:16 36:14 42:13 | **case** 60:8 |
| **cast** 41:19,21,22 | **caucus** 30:21 38:6 56:18 56:19 |
| **cause** 42:10 | **celebrating** 51:1,2,5,6 |
| **cent** 39:8 | **certain** 46:5,10 |
| **certainly** 20:2 29:2 37:9 40:10 41:7 43:10,12 44:2 45:10 46:22 52:15 54:21,22 55:9 | **CERTIFICATE** 60:1 |
| **certify** 60:2 | **cetera** 47:7 |
| **chamber** 5:1 7:12 31:1,4 37:11 | **chance** 27:8 28:2,3 45:3 |

498

| | |
|---|---|
| **change** 28:21 33:3 | **changes** 35:9,20 36:2 |
| **charge** 36:12 50:3 | **charges** 28:10 |
| **Charles** 2:18 | **Charniele** 2:14 |
| **Chesapeake** 4:16 11:12 29:20 | **Chesterfield** 2:12 13:1 |
| **choice** 36:10 | **chop** 23:10 |
| **chopped** 21:3 | **chopping** 27:17 |
| **Chris** 3:4 | **Christian** 14:15 |
| **church** 9:4 35:10,13,13 35:16 | **cities** 26:4 |
| **citizen** 35:18 | **citizens** 36:9 |
| **City** 2:22 3:3 17:20 34:7,17 35:2 36:6,9 40:1,20 | **clarify** 34:12 |
| **clear** 26:8 34:15 38:5 49:5 | **clenched** 33:1 |
| **clerk** 2:5 6:16,22 18:13 19:2 52:1 56:16 57:17 | **Cline** 3:7 55:13,16,18 55:19 57:10,12 57:15 |
| **close** 6:16 | **code** 18:18 |
| **colleges** 26:11 | **Colonial** 3:6 4:19 52:9 54:3,11,15 58:9 58:14,22 59:4 |
| **come** 4:2,8 9:3,9 14:18 18:11 19:17 23:1 34:16 38:21 44:22 57:9 58:3 | **comes** 39:3,7 |
| **comfort** 5:11,16 | **coming** 7:8,9 25:10 39:17 45:16 |
| **commemorative** 17:16 | **commending** 10:9,12 13:16,19 [63] 15:5,8 17:19 18:4 51:12 |
| **comments** 45:11 46:21 | **commingled** 20:18 |
| **commission** 26:9 28:4,11 33:8 36:20 44:2 | **committee** 45:16,17 48:2,15 56:1,3 |

499

| | |
|---|---|
| **common** 26:5 | **Commonwealth** 5:3 9:1,5 24:22 27:10 30:13 31:16 33:5,20 41:10 |
| **communications** 7:1 52:2 | **communities** 26:4,5 37:6 48:14 49:5,8 |
| **community** 27:18 35:15 42:9 46:5 49:1,18 | **compact** 26:3 42:7 |
| **compelled** 29:18 | **competition** 26:11 |
| **complain** 35:3 | **complete** 7:10 |
| **completely** 46:18 | **completes** 51:21 |
| **complies** 45:21 | **comports** 23:3 |
| **concerned** 39:1 | **concerns** 36:14 |
| **concluded** 59:13 | **conclusion** 26:6 |
| **confident** 45:19 | **configurations** 42:15 |
| **conformed** 6:4 | **conquer** 21:22 |
| **conscience** 37:15 38:10 | **consciously** 40:18 |
| **consent** 10:8,11 11:7 12:3 12:6 13:16,18 15:7 17:16,19 18:3 | **consider** 53:17,22 |
| **consideration** 56:10 | **considerations** 46:5 |
| **considered** 55:8 | **consistent** 21:18 |
| **constitution** 18:21 | **contiguous** 21:19 42:8 |
| **continue** 28:19 | **continued** 8:15 |
| **Continuing** 50:20 51:11 | **control** 5:8 31:20 43:11 43:12 44:13 |
| **controls** 43:13 | **correct** 28:18 60:3 |
| **corrected** 42:13 | **Cosgrove** 2:3 4:16,21 |
| **cost** 8:13 | **counsel** 60:7 |
| **count** 7:6 | **county** 8:8,8,12,15,19 14:16 17:21 21:3 49:4 |
| **court** 34:14 38:4 54:1,2 54:5 55:5 57:21 | **Courts** 56:1,2 |
| **court's** 45:16 | **Covenant** 14:15 |

500

| | |
|---|---|
| **Cox** 3:6 4:20 52:10,11 52:15 54:18 58:10,11,15 59:1,2,5 | **create** 27:12 |
| **creating** 34:13 | **criteria** 35:22 36:1,13 46:2 48:8 |
| **criticize** 37:15 | **Crockett-Stark** 2:15 14:9,10,14 14:21 15:4,7,13 |
| **cross** 30:13 | **crumbs** 22:2 |
| **current** 37:13 | **cut** 8:9,16 |
| **cuz** 23:11 34:12 | |

**D**

| | |
|---|---|
| **D** 2:18 3:1,5 4:1 | **dance** 38:19 |
| **day** 23:20 28:17 | **deal** 5:12,14 |
| **dealing** 48:18 | **Dear** 5:17 |
| **debate** 20:16 | **DEBATES** 1:10 |
| **decennial** 18:19 | **definitely** 34:21 |
| **delegate** 11:17 13:8 15:20 19:12 21:6 23:4 38:19,19,20,20 40:19 | **delegates** 1:9 2:5,8 3:2 4:10 6:2,20 18:16 20:6 22:1,7 41:3 |
| **Delegation** 38:7 | **democracy** 26:14 |
| **democratic** 28:20 36:5 56:19 | **Democrats** 19:21 20:1 27:15 31:20,22 |
| **demographics** 36:6 | **Department** 22:13 |
| **Deputy** 2:5 | **desire** 57:17 |
| **desk** 7:4,11 | **Destroy** 47:15 |
| **destroyed** 8:13 | **devastation** 8:20 |
| **developed** 36:12 | **deviation** 48:10,12 |
| **dictate** 23:3 | **died** 33:17 |
| **difference** 5:7 34:2 | **different** 27:1 50:9 56:5,6 |
| **differently** 5:6 | **difficult** 5:17 33:15 35:6 35:18 |
| **disappointed** 28:5 | **disgraceful** 27:19 |

501

| | |
|---|---|
| **disservice** 26:14,15 | **distance** 8:12 |
| **district** 21:3,13 23:9,16 25:3 34:19 36:4 36:7,8 38:21,22 39:1,6 41:4,13 41:14,16,17 42:1,6,8,12,15 42:19,20 43:17 [64] 44:3,4,13 46:7 | **districts** 21:16,19 23:13 26:2 27:7 35:17 39:7 40:17 46:14 48:20 49:13 50:11 |
| **diverse** 24:13 25:7 26:20 | **diversity** 23:21 24:1,22 26:15,18 |
| **divide** 21:22 48:14 | **doing** 12:21 27:13 29:14 30:7,18 31:22,22 32:1 49:11 |
| **don** 9:6 | **doors** 31:3 |
| **double** 31:3 | **Doug** 26:16 |
| **Douglas** 51:1 | **Dr** 31:10 |
| **drafted** 45:12 | **drawing** 34:18 |
| **drawn** 30:8 39:11,12 48:21 | **due** 14:5 28:13 |
| **duty** 10:1 | **D-11** 3:3 |
| **D-43** 3:5 | **D-46** 2:14 |
| **D-49** 2:13 | **D-71** 2:22 |
| **D-74** 2:20 | **D-75** 3:8 |
| **D-92** 2:21 | **D-93** 2:19 |

E

| | |
|---|---|
| **E** 2:1,1 3:1,1,1 4:1 4:1 | **earlier** 22:7 |
| **ease** 4:4 18:9 | **easier** 30:8 |
| **eastern** 9:4 | **Ebbin** 2:13 13:11,12,15 13:18 14:3 |
| **editorials** 25:10 | **effective** 46:13 |
| **eight** 8:12 27:4 42:18 57:21 | **eighth** 48:1 |
| **either** 7:11 24:17 | **elected** 28:1 |
| **election** 31:5 48:2 | **elections** 35:6 47:1 |
| **electronic** 6:14 | **Elizabeth** 5:11 |

502

| | |
|---|---|
| **eloquent** 42:3 | **emerge** 26:8 |
| **emergency** 9:22 | **employed** 60:8 |
| **entire** 24:21 34:20 44:14 48:2 | **entitled** 4:11 |
| **especially** 9:12 20:17 46:16 47:21 | **Esther** 33:15 |
| **et** 47:6 | **ethnic** 22:21 |
| **everybody** 24:22 45:3 47:20 | **exactly** 21:18 22:8 23:14 33:5 |
| **examine** 6:19 | **excuse** 27:15 |
| **exists** 36:4 | **expand** 5:19 |
| **experienced** 9:1 | **explain** 52:13 |
| **explaining** 25:16 | **expressed** 55:21 |
| **extent** 35:21 | |

F

| | |
|---|---|
| **face** 25:22 | **fact** 43:16 |
| **factories** 32:19 | **facts** 50:1,9 |
| **failed** 48:16 | **fair** 43:3 47:8,9,16 |
| **Fairfax** 3:5 49:4 | **fall** 46:9 |
| **familiar** 41:11 55:6,7 | **Fannie** 32:12 |
| **fantastic** 29:22 | **far** 22:17 27:9 52:19 |
| **farmers** 24:19,20 | **father** 5:1,13,18 |
| **fault** 44:4 | **favor** 5:21 10:2,13 11:8 12:8 13:20 15:9 18:4 51:8,16 56:12 58:17 59:6 |
| **fax** 47:16 | **fear** 29:12 |
| **fearful** 40:21 | **feel** 5:15 29:17 31:2 32:3,4 33:18 40:11 43:2 44:9 55:12 |
| **Felch** 55:2 | **fellas** 39:18 |
| **felt** 31:17 34:11 35:21 | **FEMALE** 53:1,4 57:2,5 |
| **fewer** 48:14 | **fight** 44:10,11 |
| **figure** 37:2 38:3 | **Filipino** 22:22 25:5 |
| **final** 33:12 | **financial** 60:9 |

503

| | |
|---|---|
| **FINCH** 2:6 7:2 18:15 50:17,20 51:11 51:21 52:3 56:17 | **find** 34:14 42:21 |
| **finding** 25:18 | **finger** 40:22 |
| **finish** 45:3 | **firefighters** 17:21 |
| **first** 13:15 21:12,13 29:18 38:18 53:8 | **fist** 33:1 |
| **five** 39:2 48:12 | **fixed** 42:5 |
| [65] **flag** 4:18 6:8 | **floor** 1:10 4:12 8:4 14:13 19:6 22:19 29:9 34:10 38:16 43:22 45:8 47:18 50:6 52:14 53:13 57:14 |
| **folk** 41:18 | **folks** 25:7 27:3,5 |
| **followed** 21:9,22 26:16 46:3 | **fooled** 19:22 23:8 |
| **forbid** 20:15 | **Force** 51:4 |
| **foregoing** 60:3 | **forget** 31:8 |
| **former** 27:21 | **found** 33:15 |
| **four** 14:18 21:10 23:12 | **frame** 37:20 |
| **Franklin** 2:18 16:1 | **frankly** 34:18 36:8 37:19 40:13 |
| **free** 55:12 | **Friday** 7:5 52:6 |
| **friend** 5:4 21:5 | **Friends** 4:21 |
| **front** 7:11 | **frontline** 30:2 |
| **fully** 45:21 | **further** 18:12 |
| **fuzzy** 23:18 | |

**G**

| | |
|---|---|
| **G** 2:11 4:1 | **gallery** 4:13 14:15 |
| **game** 25:13 | **gather** 4:21 |
| **gathered** 5:1 | **general** 26:1 |
| **gentleladies** 34:16 | **gentlelady** 46:6 |
| **gentlelady's** 46:16 | **gentleman** 4:16,19 7:14,20 7:22 8:4 9:17 10:10,17,21 11:5,12,15 12:12,18 13:11 13:17 |

504

| | |
|---|---|
| | 14:2,5 15:14 16:1,8,11 16:14 17:6 19:1 19:6 20:22 21:9 22:6 29:19,20 30:12 34:15,22 35:20 39:22 44:17 45:5,8 47:15,18,21 48:17 49:10 50:5,10 52:9,14 53:13 54:2,10 54:15,17,19 55:1,2,10,14,17 57:10,14 58:9 58:14,22 59:4 |
| **gentlemen** 8:6 29:11 45:9 54:14 57:16 | **gentlewoman** 11:20 12:1,5 13:1 13:5 14:8,13 15:6 17:1,4,10 17:14 18:1 20:22 29:5,9,21 30:10,11 34:6 34:10 38:12,16 53:2,18 56:22 |
| **gerrymander** 23:16 | **getting** 44:20 |
| **give** 14:17 21:20 27:4 28:4 52:20 54:4 | **given** 28:10,12 33:21 36:5 37:20 49:22 50:9 53:22 |
| **giving** 29:22 | **Gloucester** 2:9 7:22 8:7,9 9:18 10:11 |
| **go** 31:9 33:19 35:8,9 49:8 57:18 58:1 | **God** 6:10 |
| **goes** 52:19 | **going** 25:8 29:1 30:17 48:8 53:17 |
| **golden** 7:4 52:5 | **gonna** 28:19,19 30:14,16 30:21 58:7 |
| **good** 21:4 24:15 25:1,4 25:6 26:18 30:15 31:2 37:14 41:10 42:9 43:16 45:2 47:8 49:2,11 50:10 | **gorilla** 22:12 |
| **gotcha** 40:7 | **governor** 19:10,20 22:4 25:17,21 26:10 33:7 |
| **governor's** 27:12 | **grateful** 9:7 |
| **great** 28:9 41:9 | **greedy** 22:10,11 |

505

| | |
|---|---|
| **grief** 5:3,14 | **groups** 22:22 |
| **guarantees** 52:16 | **guest** 7:9 |
| **guide** 6:3 | |

## H

| | |
|---|---|
| **half** 14:18 | **Halifax** 15:1 |
| **Hamer** 32:12 | **Hampton** 2:21 29:6 |
| **Hampton's** 46:17 | **hand** 5:20 |
| **handled** 48:17 50:4 | **Hanover** 12:19 |
| **happen** 28:6,19 41:17 58:7 | **happened** 22:8 23:15 27:2 43:10 |
| **happening** 27:1 | **happy** 56:9 |
| **hard** 21:7 22:15 44:5 49:3 | **hardest** 30:5 |
| **Harvey** 2:9 | **hay** 24:19 |
| **head** 7:6 46:7 | **hear** 56:4 |
| **heard** 29:14 31:19,19 32:16 40:12 46:9,12 | **hearing** 6:17 24:3 50:16 |
| **hearty** 14:17 | **heed** 27:11 28:11 |
| **Heights** 3:6 4:20 52:10 54:3,11,16 58:10,15,22 59:5 | **help** [66] 5:16 9:10 48:13 |
| **helped** 43:3 | **helping** 50:11 |
| **Henrico** 2:20 19:2 | **Henry** 21:2 |
| **Hensley** 51:1 | **Herring** 2:14 17:1,2,5 |
| **hesitant** 40:9 | **high** 9:3 49:9 |
| **Hill** 35:10,13,13,17 | **Hispanic** 22:21 25:2 |
| **history** 31:14 34:2 43:14 | **hit** 8:7 46:6 |
| **hobbled** 5:3 | **hog** 24:19 |
| **hold** 31:6 | **holds** 26:6 |
| **holy** 6:5 | **home** 41:12 |
| **homes** 8:13,18 | **honest** 29:16 |
| **honor** 9:11,20 32:11 | **Honorable** 2:2 4:15 |
| **hope** 19:9 34:2 45:3 47:11 50:3 52:15,16 | **hopefully** 52:18,20 |

506

| | |
|---|---|
| **host** 9:2 | **hour** 53:6 |
| **hours** 14:18 49:19 53:18 | **house** 1:9 2:5 4:2,4,8,10 5:16 6:2,18,19 8:6 9:19 18:9,11 18:15,16,18 19:8,10,15 23:2 23:21,21 25:17 26:6 29:2,11 38:18 41:2 45:10 50:22 51:2,4,6,13,15 52:12 56:19,20 57:6,16 58:12 58:15 59:2,5,11 |
| **hundred** 28:14 37:8 | **Hundreds** 9:5 |
| **husband** 5:13 | |

**I**

| | |
|---|---|
| **idea** 24:15 32:3 | **identical** 19:11 |
| **II** 32:18 | **important** 9:9 31:18 |
| **improved** 46:15 | **inaudible** 9:6 11:16 15:21 19:3 41:2 47:14 54:19 |
| **included** 39:16 | **including** 19:17 |
| **independent** 25:22 26:9 | **Indian** 23:1 |
| **indicating** 6:13 52:5 | **individuals** 20:16 39:3,10 46:4 55:20 |
| **indivisible** 6:11 | **inequality** 39:14,19 |
| **influence** 5:20 36:13 | **input** 45:14 |
| **inquiry** 20:12 44:19 | **interest** 26:5 27:18 37:7 42:9 49:1,5,18 55:21 60:9 |
| **interested** 56:4 | **interesting** 26:17 |
| **interests** 36:16 | **interviews** 56:1,3,7 |
| **intimate** 54:20 | **intricate** 42:17 |
| **introduce** 10:8,12 11:2,7 12:3,7 13:16,19 15:8 17:19 18:3 | **introduced** 35:4,12 36:20 37:1,8 |
| **introduction** 14:12 | **Island** 23:10 |

507

| | |
|---|---|
| **issues** 25:19 56:5 | **it'd** 57:19 |

## J

| | |
|---|---|
| **Jabez** 5:18 | **Jackie** 1:22 60:2,18 |
| **Jamerson** 5:5 57:18 | **James** 17:20 |
| **Jay** 7:11 | **JEFF** 2:6 |
| **Jeion** 2:21 | **Jennifer** 2:22 |
| **Jerralee** 51:5 | **Jesus** 6:6 |
| **Jim** 20:7 | **Joanna** 38:20 |
| **job** 1:20 29:22 33:21 50:10 | **Joe** 2:20 20:7 |
| **John** 2:3 4:15 | **Johnson** 20:7 |
| **joint** 50:22 51:2,4,13 | **Jones** 3:4 19:13 21:6 23:4 29:20 38:19 45:4,6,7,9 |
| **journal** 6:19 7:19 11:19 12:17,22 13:6 13:10 14:4,7 15:20,22 16:7 16:10,18 17:5,9 41:2 | **journalist** 25:14 |
| **judges** 52:17 53:15,22 54:5 55:5,7 57:21,22 58:1,4 | **judiciary** 26:20,21 55:22 |
| **justice** 6:11 22:13 56:1,2 | |

## K

| | |
|---|---|
| **Kay** 55:2 | **keep** 37:6 |
| **kept** 48:9 | **kind** 20:18 37:14 |
| **King** 31:11 | **Kirkland** 3:6 |
| **knew** 30:6 32:15 58:7 | **knife** 20:5,9 |
| **knifed** 23:14 | **knifing** 28:22 |
| **know** 7:8 23:8 24:6,11 24:15 29:13 30:15,16 31:13 37:22 38:1 40:3 41:6,9 44:8 46:1 55:4 | **known** 25:11 56:9 |
| **knows** [67] 30:20 | |

508

## L

| | |
|---|---|
| **L** 2:10,12,14,22 3:7 | **ladies** 8:5 29:10 45:9 57:15 |
| **laid** 50:21 51:12 | **Lancaster** 17:7 |
| **lasted** 28:14 | **lately** 8:22 |
| **Latino** 22:21 25:2 | **Laughter** 16:20 45:1 50:14 58:8 |
| **law** 34:14 48:12 | **lawyers** 21:11 38:2 |
| **lead** 49:2 | **leader** 20:8 21:2 27:21 30:12 37:13 |
| **leaders** 33:19 | **learned** 48:19 |
| **led** 4:15,19 | **legacy** 28:13 |
| **legislation** 19:16 | **legislative** 26:2 31:14 35:8 35:19 |
| **letter** 25:16 | **let's** 22:3,11 26:7 44:7 53:7 |
| **level** 55:21 57:22 | **liberty** 6:11 |
| **life** 11:3 49:20 51:1,3 51:5,7 52:16 | **lines** 30:8 38:22 48:21 |
| **Lingamfelter** 2:10 10:18,19,22 11:6 | **list** 54:22 56:8,10 |
| **listen** 56:4 | **listened** 21:11 35:21 36:2 46:21 |
| **listening** 33:9 | **literally** 35:12,13 |
| **little** 32:22 34:1 36:18 40:9 49:15 54:20 | **live** 42:1 |
| **lived** 33:16 | **lives** 8:14 9:15 |
| **locality** 20:22 | **long** 4:5 31:14 49:17 |
| **longevity** 31:13 | **look** 19:20 34:19,21,21 36:16 39:17 41:12 46:11 |
| **looked** 39:8 43:8 | **looking** 39:4,13 49:15 |
| **looks** 34:20 | **Lord** 5:3,7,21 6:4 |
| **lose** 44:4 | **loss** 5:12,15 |
| **lost** 9:15 11:3 | **lot** 43:11,12 53:21 55:4 |
| **lots** 48:21 | **Lou** 32:12 |

509

| | |
|---|---|
| **Loudoun** 7:21 | **lounge** 44:21 |
| **love** 30:20 36:18,19 | **loved** 23:17 36:21 |
| **lower** 55:5 57:21 | **Luther** 31:11 |

## M

| | |
|---|---|
| **M** 3:6 | **maintain** 35:15 |
| **Major** 51:3 | **majority** 28:20 39:7 |
| **majority/minor...** 21:13,16 23:13 25:3 27:6 46:14 | **MALE** 4:5,7 44:16,19 57:11 |
| **man** 22:20 23:6 43:5 | **manage** 22:16 |
| **mandated** 18:19 | **manner** 21:8 47:10 48:18 50:4 |
| **map** 34:19,20,20,22 47:8,9 48:22 49:12 | **maps** 26:1 36:19 |
| **marine** 11:3 | **Mark** 3:5 51:7 |
| **Marshall** 2:11 12:13,14,17 20:10,13,15 | **marshalled** 28:10 |
| **Martin** 31:10 | **Mary** 55:1 |
| **masterful** 21:6,9 22:16 | **mate** 7:20 11:16 12:18 13:7 15:1 16:7 16:15 17:6 |
| **matter** 36:7 42:19 | **McClellan** 2:22 34:7,8,11 |
| **mean** 50:6 | **media** 20:1 |
| **medical** 9:22 | **member** 35:7 37:3,4 |
| **members** 4:3,14 6:2,12 7:3 7:7 9:8 20:4 21:15 38:5,6 44:21 45:15 52:4 | **memorial** 7:5 11:2,7 12:4,7 50:21 52:6 |
| **memory** 9:14,19 | **mention** 9:2,8 |
| **mentioned** 22:7 | **mess** 21:12 23:12 |
| **middle** 9:21 | **Middlesex** 8:8,15 |
| **miles** 8:12 | **Miller** 20:7 |
| **mind** 30:14 43:6 | **mine** 23:10 46:8 |
| **ministry** 5:20 | **minor** 19:13 |

510

| | |
|---|---|
| **minority** 20:8 21:2 26:19 27:21 30:12 37:13 40:16 41:13,17,17 | **minus** 48:13 |
| **moment** 4:4 18:9 23:22 | **moments** 53:19 |
| **Montgomery** 14:5 | **Morgan** 2:9 8:1,2,5 9:18 10:6,11 |
| **morning** 53:5 [68] 53:5 | **Morrissey** 2:20 19:2,4,7 21:1 24:4 53:9 53:11,14 54:12 |
| **morticians** 24:20 | **motion** 10:2,13 11:1,1,8 52:13 53:3,10 53:11 54:13 55:15,16 56:12 56:13 58:17 59:6 |
| **motions** 6:20 18:12 | **motion's** 10:5,16 58:21 |
| **move** 6:1 52:11 58:11 59:2 | **moved** 46:18 |
| **moves** 9:18 58:15 59:5 | **multiple** 6:7 10:3,14 11:9 12:9 13:21 15:10 18:6 48:3 51:18 56:14 58:19 59:8 |

**N**

| | |
|---|---|
| **N** 2:1 3:1,1,1 4:1 | **nail** 46:7 |
| **name** 6:5 | **naming** 20:16 |
| **nation** 6:10 | **necessary** 38:4 |
| **need** 7:6,8 46:22 | **needed** 34:12 40:15 |
| **negotiating** 52:17 | **negotiation** 58:1 |
| **negotiations** 54:21 | **neighborhood** 35:10,14 |
| **neighborhoods** 37:6 49:10 | **neither** 60:7 |
| **nerve** 34:4 | **Never** 4:6 |
| **Newport** 2:19 13:7 17:10 18:2 30:11 46:19 53:2 56:22 | **News** 2:19 13:7 17:10 18:2 30:11 46:19 57:1 |
| **night** 31:11,12 | **nine** 50:17,18 |

511

| | |
|---|---|
| **noes** 50:17,18 | **nonpartisan** 28:4 48:4 |
| **non-African** 40:13 | **Norfolk** 30:11 |
| **north** 8:19 | **Northern** 22:1 38:7 47:5 48:20 50:12 |
| **note** 7:3 | **notes** 30:17 |
| **numbers** 39:6,8 | |

**O**

| | |
|---|---|
| **O** 3:1 4:1 5:7 | **objection** 20:13 |
| **occasions** 56:7 | **odd** 49:15,16 |
| **Oder** 13:8 | **offered** 48:7 |
| **okay** 18:1 20:14 30:19 30:19 53:7,8 57:4 | **once** 43:13 |
| **ones** 8:21 | **Onzlee** 3:3 |
| **operating** 35:22 | **opportunity** 28:9 30:4 56:8 |
| **opposed** 10:4,15 11:10 12:10 13:22 15:11 18:7 51:19 54:6 56:15 58:20 59:9 | **op-ed** 26:16 |
| **order** 4:3,9 6:21 12:3 18:11 57:9 | **organizations** 9:4 |
| **originally** 35:4,11 | **outcome** 60:9 |
| **overly** 39:1 | **o'clock** 52:12,18,22 54:8 57:17 58:7 |
| **O'Connor** 51:3 | |

**P**

| | |
|---|---|
| **P** 2:1,1,13 3:1,1 4:1 | **page** 25:11 50:20 51:11,14 |
| **Pages** 1:21 | **pain** 5:22 |
| **pains** 25:17 | **panel** 27:12 |
| **paraphrase** 5:18 33:17 | **parliamentary** 20:11 44:19 |
| **part** 9:5 42:17 | **particular** 9:13 |

512

| | |
|---|---|
| **parties** 60:8 | **partisan** 19:16,19 25:13 |
| **parts** 8:22 | **pass** 18:22 44:15 47:12,13 48:6 50:15 |
| **passed** 48:7 50:19 | **Paula** 20:6 |
| **paying** 32:11 | **pays** 27:11 |
| **Pearson** 7:11 | **pen** 36:12 |
| **peninsula** 9:21 | **people** 5:2 9:9,22 23:14 24:21 26:13 30:10 31:8,16 32:4,8,9,11,15 33:5,20 34:3 36:14 37:10 39:17 41:4,12 41:22 43:17,20 44:9,9,12 46:11 49:2 55:5,6 |
| **people's** 46:8 47:9 | **percent** 41:18 48:10,11,12 |
| **percentage** 46:13 | **perfect** 6:4 37:18,19 49:6 |
| **perfectly** 38:5 | **perform** 5:2 |
| **permission** 10:7 | **person** 23:18 33:13 45:21 49:22 |
| **personal** 7:21 8:3 11:17 12:19 13:8 14:6 15:2,21 16:9,16 17:8 40:4 | **personally** 38:8,9 |
| **persons** 4:11 9:15 | **Petersberg** 29:21 |
| **Phillip** 51:5 | [69] **Phillips** 20:7 |
| **philosophy** 41:5 56:5 | **phonetic** 24:4 51:6 |
| **phrase** 23:1 | **Piankatank** 8:11,16 |
| **pick** 42:19 | **piece** 19:16 25:12 26:17 |
| **Pilot** 25:14 | **place** 5:20 31:13 47:4 49:4 |
| **places** 44:22 49:2 | **plan** 21:5 23:2,12 25:20 26:3,14 27:10,11 33:11 37:4,4,7,13,15 37:17 42:3,5 43:2,8,9 46:1 48:9 53:21 |

513

| | |
|---|---|
| **planes** 32:20 | **plans** 26:8 |
| **play** 39:6 | **please** 4:3,12,21 5:19,19 5:21 6:3 7:3,10 14:17 51:9,17 52:4,7 |
| **pleasing** 47:11 | **Plebeians** 24:8 |
| **pledge** 4:17 6:8 | **plural** 8:7 |
| **plus** 48:13 | **Poindexter** 2:18 16:2,3,6 |
| **point** 8:3 21:10,21 22:9 22:18 23:12 24:5 26:18 40:3 40:22 57:20 58:5 | **pointed** 53:19 |
| **pointing** 40:22 | **political** 20:19 21:4 |
| **politics** 48:5 | **population** 27:9 37:3,5 39:4 39:9,9,14,16 47:3 |
| **position** 32:1,7 | **positions** 26:22 55:8,22 |
| **possibility** 39:12 | **possible** 47:2 |
| **posters** 32:22 | **post-reconstruc...** 24:14 |
| **pounce** 22:14 | **pound** 22:12 |
| **power** 28:4,12,15 | **powerful** 25:12 |
| **powerless** 25:12 | **pray** 4:22 |
| **prayer** 4:15 5:18 | **precinct** 47:2 |
| **precincts** 35:5 37:5 46:18 | **precious** 6:5 |
| **premise** 45:21 | **presence** 6:13 7:3 |
| **PRESENT** 2:8 3:2 | **president** 35:10 |
| **pressing** 7:21 11:17 12:19 13:8 14:6 15:2 | 15:21 16:9,16 17:7 25:15 |
| **presume** 44:8 | **pretty** 24:13 55:7,9 |
| **previous** 53:20 | **primary** 28:1 |
| **Prince** 2:10,11 7:14 10:17 11:5 12:12 | **prison** 39:10,14 |
| **prisons** 39:2 | **privilege** 8:3 40:4 48:1 |

514

| | |
|---|---|
| **privileges** 4:12 | **probably** 20:20 22:14 24:6 24:15 30:17 34:20 37:21 49:15 |
| **procedure** 55:10 | **proceedings** 60:4,5 |
| **process** 36:11,17 37:21 40:21 42:16 44:14 45:14 48:5 | **product** 19:15 |
| **professional** 48:18 50:4 | **proper** 20:21 |
| **propounding** 54:9,15 | **protect** 5:22 |
| **proud** 41:15 | **provide** 56:9 |
| **provided** 60:6 | **public** 20:3 35:7 |
| **Pullard** 17:7 | **Pursuant** 6:18 |
| **push** 19:1 | **put** 23:9,9 48:22 49:7 49:8,21 50:11 |
| **putting** 46:1 | **p.m** 56:12,18,20 57:7 58:13,17 59:11 |

**Q**

| | |
|---|---|
| **Queen** 33:14 | **question** 21:7 23:6 45:2 54:10,14 56:11 |
| **questions** 37:12 56:6 | **quite** 34:18 36:8 37:19 40:13 54:5 |
| **Quote** 25:16,20 | |

**R**

| | |
|---|---|
| **R** 2:1 3:1 4:1 | **radical** 32:3,4,8 |
| **rail** 36:10,11,17 | **ran** 31:1,5 42:18 |
| **Rappahannock** 8:17 | **rare** 14:17 |
| **read** 8:6 25:9 | **reading** 18:17 |
| **ready** 44:20 | **realize** 8:21 19:18 |
| **realized** 31:10 | **realizes** 30:21 |
| **really** 8:15 28:5 30:20 31:5 | **realtors** 24:20 |
| **reapportionment** 25:20 | **reason** 27:13 31:21 32:17 42:17 52:21 |

515

| | |
|---|---|
| **reasons** 53:20 | **received** 45:15 |
| [70] **recess** 52:12 56:12 57:6 | **recessed** 57:16 |
| **recessing** 52:22 | **recognize** 33:22 |
| **recommendation** 44:1 | **reconvene** 58:13,16 |
| **record** 14:22 34:12,13 60:4 | **recorded** 60:4 |
| **recording** 59:13 60:6 | **redirecting** 48:9 |
| **redistricting** 1:10 18:19 26:11 33:11 36:19 42:2,5 58:4 | **reelected** 30:9 33:18 |
| **reference** 20:21 | **reflect** 7:20 11:19 12:18 12:22 13:7,10 14:4,7 15:3,20 15:22 16:7,10 16:19 17:5,9 54:4,7 |
| **regard** 10:6 11:13 49:7 | **regardless** 42:15 |
| **registrar** 35:1 46:21 | **registration** 39:18 |
| **rehash** 42:3 | **reject** 19:9 29:3 |
| **related** 18:19 60:7 | **remain** 4:17 |
| **remember** 4:7 30:22 34:3 | **reminder** 52:4 |
| **reported** 26:2 | **represent** 35:2 36:15,15 49:3 |
| **representation** 26:19 46:13 | **representative** 25:2 35:3 |
| **represented** 24:2,21 40:12 | **represents** 41:18,22 |
| **republic** 6:9 | **Republican** 20:3 56:18 |
| **Republicans** 20:1 21:19 27:14 27:19 31:21 | **request** 7:16,19 8:3 10:7 10:7,20 11:11 11:14,22 12:2,8 12:14,17 13:3 13:15 14:1,4,22 15:5,9,12,17,19 16:4,13 17:3,13 18:5,8 57:3 |

516

| | |
|---|---|
| **requested** 18:3 | **requests** 13:13 14:11 15:7 |
| **reserved** 7:7 | **resisted** 27:3,6 |
| **resolution** 10:12 11:2,7 12:4 12:7 13:16,19 13:20 15:5,8 17:17,19 18:4 48:7 50:22 51:2 51:4,6,15 52:19 | **resolutions** 6:21 10:9 18:12 50:21 51:9,10 51:12,13,17,20 |
| **resolve** 52:20 | **respect** 21:2 28:13 31:6 54:16 |
| **respectfully** 28:7 | **respects** 49:12 |
| **responded** 17:21 | **rest** 22:5 |
| **retire** 4:12 | **retired** 51:4 |
| **return** 53:5 57:3 | **review** 26:1 |
| **ribbon** 27:12 | **rich** 24:2,9 |
| **Richmond** 2:22 34:7,17 35:2 36:6,10 40:20 46:6,22 47:6 53:19 | **right** 12:21 20:17 25:1 28:16 29:17 30:2,18 32:15 35:8,19 36:4 39:13 41:8 42:11,14 43:20 46:20 52:17 57:19 |
| **Rights** 23:4 38:1 45:22 | **rise** 4:14 11:22 12:14 13:3,13 14:11 15:16 16:4,12 17:3,13 19:8 29:8,11 38:14 38:17 40:3 43:7 51:9 57:12 |
| **River** 8:10,11,16,17 | **Riveter** 32:21 |
| **Roanoke** 3:3 39:22 | **Robert** 2:11,17 51:5 |
| **Robin** 2:19 20:6 | **Robinson** 2:12 13:2,3,6 |
| **Rockbridge** 3:7 54:19 55:11 55:17 57:10 | **rod** 7:4 52:5 |
| **role** 47:15 | **roll** 6:13,16 |
| **Ron** 2:16 | **room** 56:19,20 |
| **Rosie** 32:21 | **Roslyn** 3:8 |
| **Roxann** 2:12 | **rule** 6:18,21 18:13 |
| **rules** 20:15 | **run** 42:21 47:1 |

517

| | |
|---|---|
| **running** 32:9 | **rushing** 33:14 |
| **R-13** 2:11 | **R-21** 2:16 |
| **R-24** 3:7 | **R-27** 2:12 |
| **R-31** 2:10 | **R-6** 2:15 |
| **R-66** 3:6 | **R-76** 3:4 |
| **R-85** 2:17 | **R-9** 2:18 |
| **R-98** 2:9 | |

**S**

| | |
|---|---|
| **S** 2:1 3:1,4 4:1 51:7 | **sanctimonious** 44:8 |
| **sat** 30:5 32:5 | **savior** 6:6 |
| **saw** 31:1 | **saying** 33:1 |
| **Scheer** 1:22 60:2,18 | **school** 9:3 49:9 |
| **schools** 14:18 | [71] **Scott** 2:10 |
| **seat** 7:20 11:16 12:18 13:7 15:1 16:7 16:15 17:6 31:6 | **seating** 7:7 |
| **seats** 4:3 27:3,8 44:22 | **secretariat** 26:22 |
| **section** 7:7 18:20 | **see** 40:8 47:7 |
| **seen** 32:22 45:20 | **segregated** 35:12,13 |
| **segregating** 35:16 | **seldom** 44:10 |
| **Senate** 25:19 26:7 57:16 | **senior** 54:4 |
| **sense** 5:15 26:5 35:15 49:1,13,17 50:12 | **sent** 33:6 36:15 |
| **separate** 26:4 | **Sergeant** 4:9,10 |
| **series** 37:12 | **serve** 54:1,5 |
| **service** 7:5 9:22 52:6 | **services** 35:8,19 |
| **session** 1:8 4:11 48:8 | **sheet** 7:4 52:5 |
| **Shenandoah** 44:17 | **shoes** 49:21 |
| **Shool** 20:7 | **show** 5:21 15:1 |
| **sick** 32:12,13 | **Sickles** 3:5 47:14,17,19 |
| **side** 19:18 21:11 27:16,16 45:11 | **sides** 38:2 47:5 |
| **significant** 25:19 | **simply** 43:18 |
| **single** 36:3 | **sins** 5:22 |

518

| | |
|---|---|
| **sir** 7:2 17:20 52:3 | **sit** 32:10 56:3 |
| **sitting** 20:2 | **situation** 9:13 33:16 46:17 |
| **six** 18:20 | **slade** 52:17 53:15 55:7 |
| **Smith** 51:3 | **smoothly** 47:1 |
| **software** 37:2 | **somebody** 28:17 |
| **someday** 28:20 | **somewhat** 42:22 |
| **sorrow** 5:4 | **sorry** 40:5 47:19 |
| **sort** 8:22 | **Southwest** 47:6 |
| **speak** 19:8 23:22 29:8 29:13,18 33:19 38:15,17 40:4,6 | **speaker** 4:2,8,14 6:12,16 6:18 7:2,14,17 7:18,22 8:2,4,5 9:17 10:4,6,10 10:15,19,21,22 11:5,10,15,19 11:21 12:1,5,10 12:15,16,21,22 13:4,5,10,12,14 13:17,22 14:3,7 14:11,13,22 15:3,6,11,14,16 15:18,22 16:3,4 16:5,6,10,12,14 16:18,21 17:2,4 17:9,12,14,15 17:18 18:1,7,11 18:22 19:4,5,6,7 19:10,14,22 20:10,10,11,14 20:20 21:1 23:7 23:11,16 24:5 25:7 27:8 28:3,6 28:7 29:1,4,5,7 29:8,9,10 34:5,6 34:8,10,11 38:12,14,16,17 39:22 40:2,3,4,6 40:9,18 41:9,15 43:22 44:14,15 44:16,16,17 45:2,4,5,8 47:13 47:14,15,18,19 50:13,15,18 51:8,16,19,22 52:1,3,8,9,11,14 52:15 |

519

| | |
|---|---|
| | 53:1,2,4,7 53:9,10,12,13 53:14 54:9,13 54:17 55:13,14 55:17,19 56:11 56:15,17,21,22 57:2,4,6,9,12,14 57:15 58:6,9,11 58:14,20 59:2,4 59:9 |
| **speaker's** 50:22 51:13 | **speaking** 6:17 19:5 24:3 34:9 45:7,9 47:17 50:16 53:3,10,11 54:12,13 55:14 55:16 |
| **special** 1:8 5:9 | **spent** 47:4 |
| **spirit** 23:3 | **split** 6:3 35:5 37:5,6 47:2 |
| **splitting** 27:18 | **spoke** 47:22 |
| **Spool** 11:12,13,16 29:21 38:20 | **spring** 46:10 |
| **staff** 5:16 57:18 | **stand** 30:22 31:18 34:4 34:12 40:10 41:5 42:10 52:12 |
| **standard** 55:10 | **standing** 4:17 29:12 30:15 31:17 32:17 |
| **standpoint** 49:1,18 | **stands** 6:10 57:6 59:11 |
| **start** 31:7 | **started** 42:16 50:7 |
| **state** 7:18 10:21 11:15 12:1,16 13:5,14 15:18 16:5,14 17:4,14 33:9 36:5 45:18 | **statement** 20:18 47:21 |
| **statements** 42:22 | **States** 4:18 6:9 |
| **stay** 40:19,20 | **steps** 31:2 |
| **Steven** 51:1 | **stick** 20:4 |
| **stop** 29:1 32:2 33:3 | **stopping** 29:2 |
| **straight** 25:21 | **strategy** 21:10 22:9,16 |
| **Street** 35:16 | [72] **struggles** 35:14 |
| **students** 9:3 | **suburbia** 49:4 |

520

| | |
|---|---|
| **Suffolk** 3:4 21:9 29:19 34:15 35:1,20 45:5 47:22 48:17 50:5 | **support** 19:19 22:5 39:20 39:21 |
| **supported** 19:21 | **Supreme** 54:1 |
| **sure** 32:14 38:5 41:21 46:2 47:9 | **surprised** 37:10 |
| **Sussex** 3:8 11:20 12:5 38:12 | **swath** 8:9 |

**T**

| | |
|---|---|
| **T** 3:1 21:22 | **table** 50:22 51:13 |
| **take** 4:3 5:9 7:3 36:14 43:19 48:5 | **taken** 30:6 |
| **talk** 30:16 40:10 | **talking** 30:2 39:15 |
| **Tangier** 23:10 | **tasks** 6:1 |
| **Tata** 2:17 16:11,12,15 | **teachers** 24:19 |
| **tell** 41:8,14 | **ten** 27:3,4,5,6 42:6,14 |
| **term** 49:17 | **testimony** 46:9,12 |
| **texting** 30:17 | **thank** 7:12 11:21 13:12 14:3,10,14,19 14:21 15:13 16:3,12 17:2,8 17:12 19:4,7 21:1 29:3,7,19 34:5,8 38:11,14 38:18 39:20 40:2 44:14 50:5 50:13,13 54:12 55:19 57:5,12 |
| **thing** 8:22 21:12,14 24:7 28:18 29:15,17 32:2 32:14 36:3 38:8 41:1 42:11 43:20 | **things** 5:9 6:5 42:4 43:10,20 46:10 46:19,20 49:7,8 54:18 |
| **think** 8:18 23:15 24:22 25:4,6 28:8,13 29:22 30:9 32:11,18 33:12 33:13 39:13 41:15,19 42:2 43:3,6,19,21 44:10 45:12,13 46:3,6,12,14,15 | **thinking** 32:21 |

521

| | |
|---|---|
| 46:20 47:4 49:11,20 54:19 54:22 55:1,1,4,5 55:6,9 57:19 58:2 | |
| **third** 18:17 | **thought** 25:15 30:14 31:9 32:6 40:15 43:8 48:13 |
| **thoughts** 25:15 | **three** 6:18 8:13 9:15,15 40:16 46:17 51:14 |
| **throw** 22:2 | **Thursday** 58:13 |
| **till** 58:2 | **time** 4:5 5:17 19:20 23:5 28:17 29:13 31:7,9 36:20,22 37:8 37:20 42:20 47:4 48:2 53:5 53:18,21 54:4,6 54:6,16 |
| **times** 41:4,11 48:3 | **tired** 32:13,13 |
| **today** 5:14 9:11,19 14:5 14:15 15:2 16:9 27:22 28:22 29:16,18 30:22 31:15,18 32:4 33:3,18 39:21 41:6 44:7,12 50:6 58:12,16 | **told** 27:21 31:6 |
| **tomorrow** 58:2,4,16 59:12 | **toothless** 26:9 |
| **tornado** 8:15 9:20 | **tornadoes** 8:7,18 17:22 |
| **total** 37:4 | **tough** 41:4 |
| **traditionally** 55:3 | **transcribed** 1:22 60:5 |
| **TRANSCRIBER** 60:1 | **transcript** 60:3 |
| **travel** 33:8 | **trepidation** 29:12 |
| **tried** 40:19,20 46:2 | **true** 26:6 58:6 60:3 |
| **truly** 29:11 | **trust** 5:7 |
| **try** 36:13 44:8 48:5 49:21 | **trying** 38:21 41:6 |
| **turn** 7:10 52:4 | **tweaks** 19:13 |
| **twist** 20:5 | **two** 8:18,18 9:14,14 10:8 13:13 14:11 18:20 27:19 |

522

| | 37:10 40:16 48:10,14 50:20 51:11 56:20 |
|---|---|
| **Tyler** 3:8 11:20,21 12:2 12:6 38:13,14 38:17 | |

**U**

| **U** 3:1 | **unanimous** 10:8,11 11:6 12:3 12:6 13:15,18 15:7 17:16,18 18:3 |
|---|---|
| **unbelievable** 8:20 | **uncontested** 18:17 |
| **understand** 5:9 25:8 40:11 46:22 53:15 | **understanding** 5:11 |
| **United** 4:18 6:9 | **unsplit** 46:17 |
| **upset** 43:16 | **use** 19:12 |
| **usual** 33:4 | **U.S** 51:3 |

**V**

| **variety** 12:20 | **vein** 32:9 |
|---|---|
| **veins** 33:14 | [73] **version** 19:11 |
| **veto** 25:16 | **vetoed** 19:10 |
| **victims** 9:20 | **Villanueva** 2:16 15:15,16,19 |
| **violate** 38:1 | **violated** 23:12 |
| **Virginia** 1:9 2:16,17 6:3 15:14 16:8,11 18:21 22:1 25:13 27:17 38:7 41:2,16 47:6,6 48:20 50:12 54:1 visitation 57:18 | **Vivian** 25:11 |
| **voice** 4:5,7 33:6 44:16 44:19 53:1,4 57:2,5,11 | **voices** 6:7 10:3,14 11:9 12:9 13:21 15:10 18:6 32:16 51:18 56:14 58:19 59:8 volunteers 9:2,6,12,21 |
| **vote** 22:20 23:6 27:4 28:2,3,5 30:4,5 31:1 32:6,16 34:1,5 38:10 39:3 | **voted** 26:13 30:6 48:3 53:16 |

523

| | |
|---|---|
| 41:3,3,7,19 41:20,20,20,21 41:22 42:10,12 43:19 44:6,7,11 44:12,20 45:21 53:7,17 54:7 | |
| **voters** 33:9 | **votes** 48:15 |
| **voting** 6:14 23:4 31:7 37:2 38:1 39:4 39:17 43:2 45:22 47:3 | |

**W**

| | |
|---|---|
| **wait** 57:20 | **waiting** 22:13 |
| **walk** 31:3 | **walking** 30:22 |
| **wanna** 9:1,8 29:17,19 30:19 31:14,15 34:14 38:4,18 39:19 41:21 42:17 44:7 48:16 50:5 | **want** 21:17 22:2 34:18 43:14 |
| **wanted** 21:18 27:3,4,5,6 30:1,3 32:14 33:10 38:9 46:11 47:7,20 | **wants** 50:8 |
| **war** 32:18,20 | **Ward** 2:21 11:17 29:6,7 29:10 |
| **Ware** 3:3 40:1,2,8 | **warm** 23:18 |
| **wasn't** 23:9 24:9 | **way** 8:10 20:21 24:11 33:3 34:14 35:5 39:11,12 43:9 45:13,13 50:9 55:3 |
| **weakness** 32:7 | **wealthy** 24:2,10 |
| **Wednesday** 1:11 18:16 | **week** 11:4 17:22 30:3 |
| **welcome** 14:17,19 | **went** 10:1 21:8,15 25:22 26:7,12 49:19 55:22 |
| **we're** 5:3 8:21 28:19 52:16,21 53:16 56:9 | **we've** 22:11 33:22 40:11 46:15 |
| **whatsoever** 27:11 | **white** 24:2,10 41:18,20 43:17 |
| **whites** 39:5 | **who've** 8:21 |

524

| | |
|---|---|
| **wide** 8:10 | **width** 8:11 |
| **Wilder** 26:16 | **William** 2:10,11 7:15 10:17 11:6 12:12 51:3 |
| **willing** 21:20 | **win** 44:5 |
| **winning** 27:22 | **Wise** 51:7 |
| **wish** 48:6 50:8 | **women** 24:12 32:18 |
| **won** 42:14 | **wondered** 23:8 |
| **word** 21:4 32:6,10 | **words** 19:12,13 25:21 |
| **work** 5:2 6:3 9:6 19:15 32:19 38:21 44:5 45:13 | **worked** 21:7 22:17 24:9 24:12,17 |
| **World** 32:18 | **wouldn't** 34:19,21,21 44:2 |
| **written** 39:21 | **wrong** 40:14 42:14 |
| **wrote** 25:11,13,21 | **Wythe** 2:15 14:8,16 15:6 |

**Y**

| | |
|---|---|
| **yards** 8:9 | **year** 27:7 48:1,3 |
| **years** 27:2,5 28:14 42:7 42:14,18 | **yield** 54:17 |
| **York** 8:10 | |

**Z**

| | |
|---|---|
| **zero** 47:3 | |

**1**

| | |
|---|---|
| **1** 1:21 | **11th** 42:1,12 44:12 |
| **12** 27:5 | **13** 37:4 |
| **14** 27:8 37:3 | **1990** 27:2 |

**2**

| | |
|---|---|
| **2** 58:13,17 59:11 | **20** 27:2 28:14 |
| **200** 8:13 | **2007** 27:22 |
| **2011** 1:8,11 6:20 | **25th** 6:20 |
| **27** 1:11 | **27th** 18:16 |

525

**3**

| | |
|---|---|
| **3** 58:7 | [74] **30** 28:14 |
| **300** 8:9 | **39** 6:21 18:13 |

**5**

| | |
|---|---|
| **5005** 18:18 19:8,15 23:21 29:2 38:18 | **501** 19:11 |
| **5025** 50:22 | **5026** 51:2 |
| **5027** 51:13 | **5028** 51:14 |
| **5029** 51:14 | **5030** 51:14 |
| **5031** 51:4 | **511** 51:6 |
| **512** 51:15 | **55** 39:8 |

**6**

| | |
|---|---|
| **6:30** 56:18,20 | **60** 1:21 8:17 |
| **61** 22:11 41:18 | **65** 22:14 |
| **66** 22:15 | |

**7**

| | |
|---|---|
| **7** 52:12,18,22 54:8 56:12 57:7 | **75th** 38:22 |

**8**

| | |
|---|---|
| **8** 57:17 | **8,000** 39:2,10 |
| **8,100** 39:15 | **80** 8:18,18 50:17,18 |
| **800** 22:12 | **81922** 1:20 |