No. 15-680

IN THE

# Supreme Court of the United States

————

GOLDEN BETHUNE-HILL, CHRISTA BROOKS, CHAUNCEY
BROWN, ATOY CARRINGTON, DAVINDA DAVIS, ALFREDA
GORDON, CHERRELLE HURT, THOMAS CALHOUN,
TAVARRIS SPINKS, MATTIE MAE URQUHART, VIVIAN
WILLIAMSON, AND SHEPPARD ROLAND WINSTON,

*Appellants,*

v.

VIRGINIA STATE BOARD OF ELECTIONS, *ET AL.*,

*Appellees.*

————

**On Appeal from the United States District
Court for the Eastern District of Virginia**

————

**JOINT APPENDIX**

**VOLUME V**

————

MARC E. ELIAS
  *Counsel of Record*
BRUCE V. SPIVA
ARIA C. BRANCH
PERKINS COIE LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C. 20005
(202) 654-6200
MElias@perkinscoie.com

*Counsel for Appellants*

PAUL D. CLEMENT
  *Counsel of Record*
ERIN E. MURPHY
MICHAEL D. LIEBERMAN
BANCROFT PLLC
500 New Jersey Avenue, NW
Seventh Floor
Washington, DC 20001
(202) 234-0090
pclement@bancroftpllc.com

*Counsel for Intervenor-Appellees*

[Additional Counsel Listed On Inside Cover]

————

**JURISDICTIONAL STATEMENT FILED NOVEMBER 20, 2015
REVIEW GRANTED JUNE 6, 2016**

KEVIN J. HAMILTON
ABHA KHANNA
RYAN SPEAR
WILLIAM B. STAFFORD
PERKINS COIE LLP
1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099
(206) 359-8000

*Counsel for Appellants*

EFREM M. BRADEN
KATHERINE L. MCKNIGHT
RICHARD B. RAILE
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
(202) 861-1504
mbraden@bakerlaw.com

*Counsel for Intervenor-Appellees*

DALTON LAMAR OLDHAM, JR.
DALTON L. OLDHAM LLC
1119 Susan Street
Columbia, SC 29210
(803) 237-0886
dloesq@aol.com

*Counsel for Intervenor-Appellees*

STUART A. RAPHAEL
    *Counsel of Record*
SOLICITOR GENERAL OF VIRGINIA
900 East Main Street
Richmond, VA 23219
(804) 786-7240
sraphael@oag.state.va.us

*Counsel for Defendant-Appellees*

TABLE OF CONTENTS

VOLUME I                                          Page

Opening Statement of Hon. Mark L. Cole,
    Chairman, Committee on Privileges and
    Elections, before Subcommittee on
    Redistricting, Virginia House of Delegates
    (Sept. 8, 2010) ............................................     1

Email from Chris Marston to Katie Alexander
    Murray re RPV Leadership Roster (Dec. 9,
    2010) ...........................................................     5

Federal Register Notice – Dept. of Justice
    Guidance Concerning Redistricting Under
    Section 5 of the Voting Rights Act, 76 Fed.
    Reg. 7470 (Feb. 9, 2011) .............................     8

Email from Kent Stigall to Chris Jones re
    District demographics, with attachments
    (March 9, 2011) ...........................................    22

Email from James Massie to Mike Wade re
    Help with Contested Election Information,
    with attachments (March 10, 2011) ............    33

Email from Chris Marston to Cortland
    Putbreses re Help with Contested Election
    Information, with attachments (March 11,
    2011) ...........................................................    35

House Committee on Privileges and Elections
    - Committee Resolution No. 1 -House of
    Delegates District Criteria (Proposed by
    Del. S. Chris Jones) (March 25, 2011) ........    36

Email from G. Paul Nardo to Caucus
    Members re Messaging on House
    Redistricting Maps, with attachments
    (March 29, 2011) .........................................    39

(i)

ii

TABLE OF CONTENTS—Continued

Page

Email from Chris Marston to Chris Jones re HD61-HD75 Dale's Options, with attachments (April 1, 2011) ........................ 42

*The Public Interest in Redistricting*, Report of the Independent Bipartisan Advisory Commission on Redistricting, Commonwealth of Virginia (April 1, 2011) .............. 43

Email from Chris Marston to Paul Haughton re FYI, with attachment (April 2, 2011)..... 115

Public Hearing: Virginia House of Delegates, Subcommittee on Redistricting, Chaired by Del. Chris Jones – Danville, Va. (April 2, 2011)............................................. 117

Email compilation among Chris Jones, Chris Marston, G. Paul Nardo, Jennifer McClellan, Kent Stigell, Kirk Showalter, Lawrence Haake, Mark Cole,and William Howell re HB5001 as Passed Senate; Status Update - House Redistricting; Redistricting fix; and, Redistricting plan comments (April 4-8, 2011) ........................ 138

Public Hearing: Virginia House of Delegates, Committee on Privileges and Elections, Subcommittee on Redistricting– Richmond, VA. (April 4, 2011) ................... 157

Transcript: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 4, 2011)................................ 190

iii

## TABLE OF CONTENTS—Continued

Page

Transcript: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 5, 2011).................................. 255

Transcript: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 27, 2011)............................. 460

Video: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 4, 2011) (Part 1 of 2) ........................ n/a

Video: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 4, 2011) (Part 2 of 2) ........................ n/a

Video: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 5, 2011)............................................. n/a

Video: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 27, 2011)........................................... n/a

**VOLUME II**

Chapter 1 of the Acts of Assembly (2011 Special Session 1), Statement of Change (2011) ........................................................... 526

Chapter 1 of the Acts of Assembly (2011 Special Session 1), Statement of Anticipated Minority Impact (2011) ........... 541

Table: HB 5005 Passed 4/28/11. House Plan – Population Totals ........................................ 575

iv

## TABLE OF CONTENTS—Continued

Page

Legislative History of 2011 Virginia General
Assembly Redistricting Plan (May 4,
2011).............................................................. 589

Legislative History of 2012 Virginia
Congressional District Plan (Jan. 26,
2012).............................................................. 603

Expert Report of Stephen Ansolabehere
(March 11, 2015)........................................... 612

Reply Report of Stephen Ansolabehere (April
24, 2015)........................................................ 704

Report of John B. Morgan Regarding
Plaintiffs' Alternative Plan and the
Enacted Plan (*Page v. State Board of
Elections*) (March 14, 2014)......................... 740

HB5001- Committee Substitute, Chart:
Political Subdivisions Split between
Districts Reports (April 9, 2011)................. 774

Workspace: House Plans>>U of R Revised
Plan (April 4, 2011) .................................... 794

HB 5002 University of Richmond House
Plans, Tables: Population Totals, Racial
Demographics, Voting Age, and Election
Data (April 4, 2011).................................... 835

Table: HB 5003 Plan (April 1, 2011).............. 844

HB 5003 J. Morrissey, Tables: Population
Totals, Racial Demographics, Voting Age
Population, and Election Data (April 18,
2011).............................................................. 883

Core Constituencies Report (March 23, 2015)  892

v

## TABLE OF CONTENTS—Continued

Page

Workspace: House Plans>>HB5005 Copy 1 Plan (4/18/2011), Table: Measures of Compactness ................................................ 915

Table: Precinct Population / Voting Data ....... 919

Compilation of Maps: (1) HB 5005 Passed 4/28/11, House Plan; (2) Percentage of Total Population that are Black by Precinct; (3) Percentage of Voting Age Population that are Black by Precinct (April 28 – May 3, 2011) ............................. 929

Compilation of Enacted District Maps (including Districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, 95) ................................... 932

Compilation of Enacted BVAP Maps (including Districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, 95) ................................... 938

Public Hearing, Virginia Senate, Committee on Privileges and Elections, Subcommittee on Redistricting, Portsmouth, VA (Dec. 2, 2010) ............................................................... 945

House of Delegates Vote Tally: HB 5001 (April 5, 2011) ............................................... 991

Transcript: 2011 Special Session I, Virginia House of Delegates, Redistricting Floor Debates (April 6, 2011) ............................... 993

House of Delegates Vote Tally: HB 5001 (April 6, 2011) ............................................... 1018

Transcript: 2011 Special Session I Virginia House of Delegates Redistricting Floor Debates (April 25, 2011) ............................. 1020

vi

TABLE OF CONTENTS—Continued

VOLUME III          Page

House of Delegates Vote Tally: HB 5005
(April 7, 2011) [NOTE: log says 4/27/2011]   1046

House of Delegates Vote Tally: HB 5005
(April 28, 2011)............................................. 1048

Governor's Veto: HB 5001 (April 15, 2011)..... 1050

Division of Legislative Services Summary of
Legislative Activity: HB 5001 (March 19,
2015)............................................................ 1054

Division of Legislative Services Summary of
Legislative Activity: HB 5005 (March 19,
2015)............................................................ 1058

Declaration of Thomas Brooks Hefeller, Ph.
D. (April 10, 2015) ....................................... 1061

Declaration of M.V. (Trey) Hood III (April 10,
2015)............................................................ 1151

Expert Report of Jonathan N. Katz (April 10,
2015)............................................................ 1203

House Committee on Privileges and Elections
Committee Resolution No. 1 (April 3,
2001)............................................................ 1248

U.S. Census Bureau News: U.S. Census
Bureau Delivers Virginia's 2010 Census
Population Totals, Including First Look at
Race and Hispanic Origin Data for
Legislative Redistricting (Feb. 3, 2011)...... 1251

Current House of Delegates Districts Tables:
District Population Summary, Demo-
graphic Population Totals, and Voting Age
Population Totals (March. 8, 2011) ........... 1257

vii

TABLE OF CONTENTS—Continued

Page

HB 5005, House Plan Tables: Population Totals, Racial Demographics, Voting Age Population, and Election Data (March. 12, 2013).............................................................. 1264

Maptitude Standardized Report: Population by District for HB 5005 as Enacted (April 9, 2015)......................................................... 1275

Maptitude Standardized Report: Population Summary by District for Current 2010 (April 9, 2015) ............................................. 1278

Maptitude Standardized Report: Population Summary by District for HB 5001 as Introduced by Delegate Chris Jones (April 9, 2015)......................................................... 1281

Maptitude Standardized Report: Population Summary by District for HB 5001 House Substitute (April 9, 2015)........................... 1284

Maptitude Standardized Report: Population Summary by District for HB 5001 Senate Substitute (April 9, 2015)........................... 1287

Maptitude Standardized Report: Population Summary by District for HB 5001 as Passed Senate (April 9, 2015) .................... 1290

Maptitude Standardized Report: Population Summary by District for HB 5002 (April 9, 2015).............................................................. 1293

Maptitude Standardized Report: Population Summary by District for HB 5003 (April 9, 2015).............................................................. 1296

viii

TABLE OF CONTENTS—Continued

Page

Maptitude Standardized Report: Population Summary by District for HB 5005 as Introduced by Del. Jones (April 9, 2015).... 1299

Maptitude Standardized Report: Population Summary by District for HB 5001 Conference (April 9, 2015).......................... 1302

Maptitude Standardized Report: Population Summary by District for HB 5005 Senate Substitute (April 9, 2015).......................... 1305

VOLUME IV

Maptitude Standardized Report: Incumbent Pairings for HB 5002 (March 17, 2015)...... 1308

Maptitude Standardized Report: Incumbent Pairings for HB 5003 (March 17, 2015)...... 1312

Benchmark Plan: Black VAP Percentages as reported by DLS and as calculated by DOJ Guidelines .................................................. 1316

Enacted Plan: Black VAP Percentages as reported by DLS and as calculated by DOJ Guidelines .................................................. 1319

Map of Virginia Counties................................. 1322

Virginia – 2010 Census Results: Total Population by County .................................. 1323

Virginia – 2010 Census Results: Percent Change in Population by County, 2000 to 2010............................................................ 1324

Virginia 2010 Census Results: Percent Change in Population by House District, 2000 to 2010................................................. 1325

ix

## TABLE OF CONTENTS—Continued

Page

Virginia Counties and Independent Cities ..... 1326

Richmond Area—2011 Plan: Racial and Political Demographics................................. 1338

2001 House Districts 2010 Deviations – Southeastern Virginia ................................. 1339

2001 House Districts 2010 Deviations – Northern Virginia........................................ 1340

2001 House Districts 2010 Deviations – Norfolk Area Virginia.................................. 1341

2001 House Districts 2010 Deviations – Richmond Area Virginia.............................. 1342

2011 House District 79 – Showing Water Crossing Between Portions of District........ 1343

2011 House District 90 – Showing Water Crossing Between Portions of District........ 1344

2001 House Districts 2010 Deviations – Norfolk Area Virginia.................................. 1345

2001 House Districts 2010 Deviations – Deviations Hampton-Newport w Pcts. ........ 1346

2001 House Districts 2010 Deviations – Deviations Richmond Area w Pcts.............. 1347

2001 House Districts 2010 Deviations – Deviations Fairfax Arlington Alexandria Area w Pcts. ................................................ 1348

2011 House District 77 – Showing Water Crossing Between Portions of District........ 1349

x

TABLE OF CONTENTS—Continued

Page

2011 House District 80 – Showing Water Crossing Between Portions of District........ 1350

2011 House District 83 – Showing Water Crossing Between Portions of District........ 1351

2011 House District 94 – Showing Water Crossing Between Portions of District........ 1352

2011 House District 76 – Showing Water Crossing Between Portions of District........ 1353

Map: The Original Gerrymander .................... 1354

Map: The Original Gerrymander – Without Water and Islands ........................................ 1355

Table: The Original Gerrymander, Measures of Compactness (June 19, 2015).................. 1356

Table: The Original Gerrymander – Without Water and Islands, Measures of Compactness (June 19, 2015)..................... 1357

Table: 2001 House Plan Deviations, Norfolk Area................................................................ 1358

Table: 2011 House Plan, Districts Not Connected by Road with Water or River Crossings.................................................... 1359

Table: 2011 House of Delegates Plan, Combined Compactness Score .................... 1360

Table: State of Virginia – 1991 House of Delegates Plan, Districts with Minor River Crossing without Roads .............................. 1363

District Maps for the Benchmark Plan (2010) and the Enacted Plan (2011)....................... 1364

xi

## TABLE OF CONTENTS—Continued

Page

Maps Showing Multi-Year Political/Racial Data for Districts: 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 ................................... 1481

Collection of Data: Virginia Department of Elections, Elections Results 2000-2015 ...... 1493

Maps of Challenged Districts – Old HDs & Enacted HDs (HB 5005) for Districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 ...................................................................... 1557

Maps of HDs 27, 62, 69, 70, 71 – Vetoed (HB 5001 Conf. Report) & Enacted HDs (HB 5005) ............................................................ 1564

Maps of Districts by Region – 2001 Plan ........ 1567

Maps of Districts by Region – 2011 Plan ........ 1569

Contrasting Silhouette Maps of Districts 5, 13, 17, 20, 22, 35, 48, and 96 for Year 2001 and 2011 Plan ............................................... 1571

Map of Statewide Deviation for Change in Seats, Population 2010 .............................. 1579

VOLUME V

Transcript –Bethune-Hill Bench Trial (July 7, 2015) (Day 1) ..................................... 1580

Opening Statement:
    Plaintiffs .................................................. 1583
    Defendant Intervenors ............................ 1590

Testimony of Jennifer Leigh McClellan ....... 1598
    Direct Examination .................................. 1598
    Cross Examination ................................... 1625

xii

TABLE OF CONTENTS—Continued

Page

Testimony of Rosalyn Dance.......................... 1633
    Direct Examination .................................. 1633
    Cross Examination ................................... 1650

Testimony of Ward L. Armstrong................. 1654
    Direct Examination .................................. 1654
    Cross Examination ................................... 1669
    Redirect Examination............................... 1681
    Recross Examination ................................ 1683

Testimony of Stephen D. Ansolabehere ....... 1684
    Direct Examination .................................. 1684
    Cross Examination ................................... 1760

Transcript –Bethune-Hill Bench Trial (July 8, 2015) (Day 2) ............................................... 1780

Testimony of Stephen D. Ansolabehere ....... 1782
    Cross Examination ................................... 1782
    Redirect Examination............................... 1796

Testimony of Steven Christopher Jones....... 1802
    Direct Examination .................................. 1803
    Cross Examination ................................... 1913

VOLUME VI

Transcript –Bethune-Hill Bench Trial (July 9, 2015) (Day 3)...................................... 1951

Testimony of Steven Christopher Jones....... 1954
    Cross Examination ................................... 1954
    Redirect Examination............................... 1995

Testimony of Jonathan Neil Katz................. 2006
    Direct Examination .................................. 2006
    Cross Examination ................................... 2043
    Redirect Examination............................... 2088

xiii

TABLE OF CONTENTS—Continued

Page

Testimony of M.V. (Trey) Hood, III .............. 2090
    Direct Examination ................................. 2090
    Cross Examination ................................. 2132
    Redirect Examination.............................. 2145

Testimony of Gerald Herbert....................... 2149
    Direct Examination ................................. 2149

Transcript –Bethune-Hill Bench Trial
(July 13, 2015) (Day 4)................................. 2156

Testimony of Thomas Hofeller..................... 2158
    Direct Examination ................................. 2159
    Cross Examination ................................. 2199
    Redirect Examination.............................. 2207

Testimony of Stephen D. Ansolabehere ....... 2214
    Direct Examination ................................. 2214
    Cross Examination ................................. 2264
    Redirect Examination.............................. 2270

Closing Arguments:
    Plaintiffs............................................... 2273
    Defendant Intervenors ............................ 2282

Members of the Court Final Questions ........ 2288

1580

[1] IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

————

Civil Action No. 3:14CV852

————

GOLDEN BETHUNE-HILL, et al.,

vs.

VIRGINIA STATE BOARD OF ELECTIONS, et al.

————

July 7, 2015

————

COMPLETE TRANSCRIPT
OF THE BENCH TRIAL

HEARD BEFORE:

THE HONORABLE ROBERT E. PAYNE
THE HONORABLE GERALD BRUCE LEE
THE HONORABLE BARBARA M. KEENAN

————

APPEARANCES:

Kevin J. Hamilton, Esquire
Perkins Coie, LLP
1201 Third Avenue Suite 4800
Seattle, Washington 98010

Bruce V. Spiva, Esquire
Aria C. Branch, Esquire
700 13th Street NW Suite 600
Washington, D.C.  20005
Counsel for the plaintiffs

————

1581

Peppy Peterson, RPR
Official Court Reporter
United States District Court

[2] APPEARANCES:   (cont'g)

Tony F. Troy, Esquire
Eckert Seamans Cherin & Mellott, LLP
707 East Main Street
Suite 1450
Richmond, Virginia 23219

Daniel A. Glass, Esquire
Eckert Seamans Cherin & Mellott, LLC
1717 Pennsylvania Avenue, NW
Suite 1200
Washington, D.C.        20006

Godfrey T. Pinn, Jr., Esquire
Harrell & Chambliss, LLP
707 East Main Street
Suite 1000
Richmond, Virginia 23219
Counsel for the Virginia State Board of Elections

E. Mark Braden, Esquire
Katherine L. McKnight, Esquire
Jennifer M. Walrath, Esquire
Richard B. Raile, Esquire
Baker & Hostetler, LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, D.C. 20036

Dalton L. Oldham, Jr., Esquire
Dalton L. Oldham, LLC
1119 Susan Street
Columbia, South Carolina 29210
Counsel for Virginia House of Delegates

1582

[3] PROCEEDINGS

THE CLERK: 3:14 civil 852, Golden Bethune-Hill, et al., versus Virginia State Board of Elections, et al., versus Virginia House of Delegates, et al.   Would counsel please note your appearances for the record.

MR. HAMILTON: Good morning. Kevin Hamilton on behalf of the plaintiffs, and with me today is Bruce Spiva, my partner, and Aria Branch.

THE COURT: Morning.

MR. TROY: Anthony Troy on behalf of the defendants State Board of Elections and the Department of Elections, and with me is my partner Dan Glass, and also Godfrey Pinn.

MR. BRADEN: Your Honors, Mark Braden with the defendant intervenors. I'll let my co-counsel introduce themselves.

MS. WALRATH: Jennifer Walrath for intervenors.

MS. McKNIGHT: Good morning, Your Honors. Kate McKnight on behalf of the defendant intervenors.

MR. RAILE: Mark Raile on behalf of defendant intervenors.

THE COURT: Anybody else?

MR. OLDHAM: Dale Oldham on behalf of defendant intervenors, Your Honors.

[4] THE COURT: As they say, we are properly lawyered up, and we can begin. We'll have opening statements which I believe – in a moment, but as I look at your – we've looked at your objections. We don't see any reason why we can't deal with those when and as they come up given that you resolved most of them, and the only thing that's really going to come up in the

1583

plaintiffs' case right away is the Exhibit 17 through 21, and you all seem to be in accord about how those can be used; that how it sits with the rest of you?

MR. HAMILTON: Yes, Your Honor.

MR. BRADEN: Yes, Your Honor.

JUDGE PAYNE: Mr. Hamilton, will you be giving the opening for the plaintiffs?

MR. HAMILTON: I am, Your Honor. Your Honor, I have a handful of demonstrative exhibits we'd like to put up on the easel if I can ask my paralegal to assist, and if I have small copies for the Court and counsel.

JUDGE PAYNE: They'll be handed up then.

MR. HAMILTON: Good morning, Your Honors. For the record, my name is Kevin Hamilton, and I appear today on behalf of the plaintiffs.

The equal protection clause of the Fourteenth Amendment forbids race-based redistricting absent a compelling state interest, and even then, only when [5] narrowly tailored to meet that state interest. The evidence will show that in 2011, the Virginia General Assembly used race as a predominate factor in drawing these 12 House of Delegates districts that are at issue in this case had no compelling interest to do so, and even if it had a compelling interest, failed to narrowly tailor those districts to that state interested.

The evidence will show that the General Assembly manipulated these 12 districts by moving voters in and out of the districts, all with the admitted goal of achieving a predetermined minimum percentage of black voters.

1584

The target, the evidence will show, was defined not by political performance but explicitly based on race. The evidence will show that race, not politics, was a predominate purpose of the redistricting plan from start to finish.

This morning, I'd like to take just a few minutes to briefly emphasize a handful of key facts that we believe will be established by the evidence during the course of the trial.

First, the evidence will show that the House of Delegates utilized a mechanical 55 percent black voting-age population rule in drawing these 12 districts. The evidence of that overtly racial rule is, frankly, overwhelming, and I've highlighted some of it in the [6] poster board here in front of the Court, and in the handout. The confirming evidence comes from a variety of different sources: Delegates will testify in this Court, emails sent during the redistricting process, testimony on the floor of the House of Delegates, and even the expert reports submitted from the *Page* litigation by one of the consultants, John Morgan, who worked on this house plan.

There, Mr. Morgan describes what happened, quote, the General Assembly enacted with strong support of bipartisan and black legislators a House of Delegates redistricting plan with a 55 percent black voting-age population as the floor for black majority districts subject to Department of Justice preclearance under Section 5, close quote. That's exactly what happened.

Second, the evidence will show that Delegate Chris Jones, the architect of the challenged districts, himself repeatedly emphasized this mechanical 55 percent black voting age threshold. Again, we've highlighted

1585

some of Delegate Jones's statements on the board before you.

Now, Delegate Jones apparently intends to come into this courtroom and testify he used a different method of calculating black voting-age population, and using that method some of the districts fell slightly below 55 percent and, therefore, couldn't have been a 55 percent rule.

[7] This is nothing but a distinction without a difference. The plaintiffs knowledge not once during any legislative hearings or debates did he make that distinction, but it really doesn't matter whether he did or didn't. The evidence will make plain that a black voting-age population rule was used and that the rule was used for no reason other than to sort voters based on the color of their skin.

No matter what method of calculation is used to implement that sort of rule, that sort of racial sorting is plainly unconstitutional. The Supreme Court's recent decision in the Alabama case, and, of course, this Court's recent decision in the *Page* case, makes it plain that that sort of racial rule is inappropriate and unconstitutional.

Third, the evidence will show that the minority preferred candidates holding these seats in these 12 districts were safe and winning reelection by large margins of victory. It's undisputed that the General Assembly did not conduct a racially polarized voting analysis prior to adopting this 55 percent black voting-age population rule, but even if they had conducted a simple review of election returns, it would have been demonstrated that such an across-the-board rule was unnecessary to prevent retrogression.

1586

Fourth, the evidence will show that the [8] 55 percent black voting-age population rule predominated over all other criteria used. The evidence will show that it was fixed and nonnegotiable. In a telling example, when the Richmond registrar asked for a slight change to avoid splitting a voting tabulation district – that's synonymous with a precinct – Delegate Jones rejected the change because it would have dropped the black voting-age population in one of the districts to 54.8 percent, just 0.2 percent below the 55 percent threshold, or as the Richmond registrar responded, a measly 0.2 percent, unquote.

One can hardly imagine clearer evidence of race predominating over traditional redistricting criteria like not splitting the VTDs. Intervenors apparently intend to present evidence that they considered political factors in drawing the map, and they may well have done so. But it was only half satisfying this nonnegotiable 55 percent racial threshold.

It's hardly an accident that every single one of these 12 legislative districts exceeded 55 percent black voting-age population. That, indeed, was the whole point of the exercise.

Fifth, the evidence will show that the intervenors cannot identify a compelling state interest to justify this explicit use of race. Intervenors contend [9] that the General Assembly's goal of complying with Section 5 justified its use of race, Section 5 of the Voting Rights Act.

The only way to survive strict scrutiny, at least sine the Supreme Court's decision in *Miller v. Johnson*, is to show that the plans were actually required by Section 5.

1587

There's no plausible argument that Section 5, properly interpreted, required at least 55 percent black voting-age population in each of these districts, all of which, the evidence will show, was already performing for the minority-preferred candidate with large winning majorities.

The question under Section 5 is whether there's been retrogression; that is under the proposed plan, would it reduce the minority voters' effective ability to elect candidates of their choice. Section 5 most assuredly does not command that a state preserve, much less increase, the preexisting minority population in the districts. If that's what the House of Delegates or the General Assembly or Delegate Jones believed, then they were wrong.

The burden is on the state to establish that it had a, quote, strong basis in evidence, close quote, for believing that Section 5 required it to draw districts with this level of black voting-age population. In the [10] absence of such a showing, the plan necessarily fails strict scrutiny.

But Delegate Jones will admit that there was no racial block analysis done, and, in fact, no analysis of racial voting patterns whatsoever was conducted in advance of drawing this plan. The evidence, instead, will show that the author simply chose to guess and adopts an unvarying racial floor that was uniform across all 12 districts regardless of political performance or population in those districts, but this guess-timation approach, no matter how well intentioned, cannot supply a strong basis in evidence for believing that Section 5 required these districts.

Now, because there's overwhelming direct evidence of that – that race predominated over politics, there

1588

is no need to examine any alternative maps as is sometimes suggested where a case involves only circumstantial evidence. But in any event, there's certainly alternative maps in the record, maps introduced in the House, maps introduced by the independent bipartisan commission, that have been convened by the Governor, and all of those maps eschewed a mechanical 55 percent or any kind of racial rule that the General Assembly used, and all of them would allow the General Assembly to achieve their after-the-fact goal of disadvantaging democrats. They could have done [11] that without using a racial rule.

Sixth, even if the defendants could identify a compelling state interest, they can't meet their burden of proving that these 12 districts and the one-size-fits-all racial rule that they used to create them is narrowly tailored to achieve that interest.

The Supreme Court, long ago, declared that a reapportion plan would not be narrowly tailored with the goal of avoiding retrogression if the state went beyond what was reasonably necessary to avoid retrogression. The evidence will show that in many of these districts, there's just no dispute that there is no polarized voting going on.

Even intervenors' expert, Dr. Katz, will admit he doesn't dispute Dr. Ansolabehere's conclusions with respect to five of the districts. He agrees with Dr. Ansolabehere's conclusions that there's no racially polarized voting in four of the remaining seven, and that there are significant differences in white cross-over voting in the three remaining districts he looked at.

In some of the challenged districts, intervenors' own expert will admit that African American's candidates

1589

received over 70 percent of the white vote. The Supreme Court, in *Miller*, wrote that the essence of the equal protection clause recognized in *Shaw* that the states used [12] race as a basis for separating voters into districts. The Shaw court condemned those plans because, quote, they threatened to carry us further from the goal of a political system in which race no longer matters, a goal of that 14th and 15th Amendment embodied to which this nation continues to aspire, close quote. So, too, will the evidence condemn the plans before you.

At the conclusion of this trial, plaintiffs will ask this Court to invalidate these 12 districts and implement appropriate immediate and effective remedies for the General Assembly's constitutional violations.

JUDGE PAYNE: Thank you. Who is going to speak for the defendants?

MR. TROY: Your Honor, on behalf of the defendants, first, as I indicated, we are representing the two defendants, State Board of Elections and the Department of Elections. I'd like to, if I may, introduce to the Court Commissioner Edgardo Cortés who is here on behalf of both defendants.

As I've mentioned previously, the defendants are administrative agencies that implement elections. They do not draw the districts. So there comes a time when there's an issue as to implementations, an issue that is currently, I believe, premature, then we will be available to assist. But beyond that, let me just state that I [13] believe the evidence will demonstrate that race –

JUDGE LEE: If you come to the podium, I'll hear you better. Thank you very much.

1590

MR. TROY: I apologize.

JUDGE LEE: We prefer using the podium up here.

MR. TROY: Yes, sir, Your Honor. Your Honors, beyond introducing Commissioner Cortés, as I indicated, we believe on behalf of the defendants that race was not the predominate factor in drawing the districts. We believe that the evidence will demonstrate that, and, thus, I believe that the Commonwealth's districts are, in fact, valid.

I know the defendant intervenors will be presenting a lot more substantive information on that, and we believe in that position.

JUDGE LEE: Thank you.

MR. TROY: Thank you.

JUDGE PAYNE: For the intervenor defendant, Mr. Braden?

MR. BRADEN: Mark Braden. May it please the Court, the plaintiffs have provided you with a trial brief and an opening statement devoid of context and devoid of history. I really cannot imagine how one can be involved in a redistricting case in the Old Dominion and not talk about history. You have to put this case in the context [14] of Virginia political and racial history.

Now, we don't have to go back very far. I think the first lesson is current history. There's not a word in their briefs, not a word in the opening statement about *Wilkins v. West*. That's the last cycle. That's the exact, for all intents and purposes, virtually the same 12 majority/minority districts. Not a word about that, the exact same claims rejected by the Virginia Supreme Court, not a word.

1591

There's not a word about Section 2 of the Voting Rights Act. There's not a word about the history of Section 2 litigation in the State of Virginia, numerous plans being thrown out and election laws being invalidated. Not a word about Section 2.

Except the defendant intervenors, the House have to comply with Section 2 and Section 5. Did we hear any discussion or see anything their briefs about the numerous rejections by the Department of Justice about prior Virginia plans and prior Virginia election laws? Not a word about that.

And, of course, not a word of Virginia's long and unattractive history of one-party rule with the suppression of African Americans. Not a word about that discussion here. So you've got to put the plan and your review of the plan in that historical context.

[15] These 12 majority/minority districts have been in existence in the state since 1991. They are, in fact, traditional representative units. Even without Voting Rights Act consideration, simply the notion of traditional status quo redistricting, these districts should be affirmed.

Now, the question before this Court, really the threshold question, is whether or not this plan is subject to strict scrutiny. The test question for that, though, is not the one posed by them. It's not whether or not this plan was drawn using race as a consideration. The answer to that question is yes, it was, absolutely clearly yes.

How could it have not been? Let's start out, drawing plans, what do you get from the federal government? You get PL 94-171 data. The government gives you the data that they tell you you should use to draw the plans. What's in that data? Population, race. I wonder

1592

why they gave us race. We get race because you have to consider race.

I would tell this Court, and I think the experts will all agree, their expert and our experts, that every state drawing state legislative lines, with the exception of maybe Vermont and Maine, use race in the process. That's 98 out of 100.

[16] The question is not whether we have a criteria as adopted by the state to comply with the Voting Rights Act. And even if that compliance is nonnegotiable, unless I missed something about the supremacy clause, it has to be nonnegotiable. The State of Virginia has to comply with the Voting Rights Act. Not just retrogression, but Section 2, too.

The question for this Court, the question you must answer to get to strict scrutiny, is whether the use of race resulted in any district which violated Virginia law or traditional redistricting criteria of the state, or, as the state did here, their specifically adopted criteria.

If there's no conflict between the use of race and those criteria, then how can race predominate? How can it subordinate, be subordinate, the criteria, if there's no conflict?

The plaintiffs will provide this Court with actually no evidence to a whole list of criteria adopted by the state. Their expert looks at race and politics and compactness, but we will present to this Court the specific criteria adopted by the state which included a whole variety of other traditional criteria which their expert didn't look at whatsoever. So how can you use his expert report to say that race is predominant over this [17] other list of criteria which nobody looks at?

1593

The architect of the plan, who we're going to bring into the courtroom, put up in the chair, can pull this Court a little bit into the political thicket because you have to be in the political thicket to do a redistricting case. You have to watch a little bit of the sausage-making.

This is a political process, so the architect of the plan, and also through the floor speeches contemporaneously with the passage of the plan, the folks in the legislator who voted for this plan will go district by challenged district to explain politics and geography of those districts and prove, I believe, clearly to this Court that race was not the predominate factor.

That is a complicated process. Normally you don't want to pull a courtroom too deep into the political process, especially legislative, because it involves some horse-trading, and it does. But at the back end of this process, an amazing thing happened. A number of us around this room have been involved in a lot of redistricting litigation. I don't think it's too bold to say that's an extremely politically contentious process. Some people will say it's the most politically contentious process for a legislative body.

This plan passed with an overwhelming majority [18] vote in the House of Delegates, a majority of the Republican caucus – we're not surprised by that – an overwhelming majority of the Democratic caucus, and an overwhelming majority of the black caucus.

Hundreds of hours were spent drawing this plan balancing different interests, following those criteria. There is no strict scrutiny unless they prove to this Court how we validated and made race more important to those criteria. These districts exist as geographic units.

1594

Now, we've got to do a belt-and-suspenders argument, so let me talk about the notion if should disagree with me and that you feel the need to look a step beyond this as to whether the plan is narrowly tailored to address compelling state interests.

I think the notion of what a compelling state interest is is a pretty simple: Compliance with the Voting Rights Act, Section 5, retrogression, true, but also Section 2 which is a very important consideration. If you don't meet Section 2, you don't have a plan that survives.

There's a long history in Virginia, as I pointed out earlier, of Section 2 litigations and districts and plans and laws being thrown out. That's our criteria. Didn't talk about retrogression, it talked about [19] compliance with the Voting Rights Act.

So we've got a compelling interest, what's narrowly tailored. Narrowly tailored isn't a magic number. I totally reject the notion it's a magic number. It's not whether it's 51.1 or 50.001, or 55, or 54, or 60. It's not a magic number. Narrowly tailoring is if you have a compelling interest, you have to use race. It's the degree to which you violate the traditional redistricting criteria. That's what counts, how far you are away from what the state has established, what the politics of the body wants. That is narrow tailoring.

They need to provide this Court with an example of a plan, an alternative that meets those goals, because the test why they need that is no one disputes in this case – again, their expert will agree with our expert – that there's a direct correlation between race and politics.

Frankly, you don't need expert witnesses. Three people on this bench know that. Every adult person in

1595

the State of Virginia that is involved in politics in any sense knows that as a fact, that there is a correlation between race and politics in Virginia.

They have no alternative plans. In the first argument to the Court, they provided the Court with suggestions that they were going to use the two plans [20] before the legislator. The Court will hear this as 5002 and 5003. Those are laughable plans. 5002 pairs 48 members of a hundred member chamber. It has a population deviation four times the population in the criteria.

The other one is much better. It only pairs 32 members of a 100-member chamber and, again, totally ignores the variety of other criteria including the population criteria besides the fact that both those plans decimate the black caucus.

The answer to this Court is not to accept this argument – I guess it's been covered up now. We have their demonstrative that talks about a 55 percent rule, and somehow or another that 55 percent rule makes this plan invalid. First of all, I think it's quite interesting, you notice on the quotes? There's a 55 percent rule at the top but not a single one of the quotes is a quote there's a rule.

There wasn't any rule. There was an aspiration to get the 55 percent. How would you draw a plan without a goal as to what a minority district ought to be? Where does that come from? It comes from the people who know the most about the voting in those districts, the black members. That's where it comes from.

It's a totally logical number from a series of hearings. You'll see the speeches on the floor. You'll [21] hear the architect, the explanation for this plan. Frankly, the explanation for the plan is the fact that it

1596

passed with only nine, nine no votes. If this plan is not constitutional, then you're going to have to put into your agenda a period where you get to draw the lines every time. This is, frankly, as good as it gets for a political process. Thank you.

JUDGE PAYNE: Are you ready with your first witness?

MR. SPIVA: Yes, Your Honor. Bruce Spiva for the plaintiffs. I just wanted to raise two matters before we call our first witness. One is that the parties have submitted a factual stipulation, and I just wanted to note that for the record.

And as Your Honor mentioned, most of the exhibits have been stipulated to, and I just wanted to verify that we can assume that those stipulated exhibits have all been admitted into evidence.

JUDGE PAYNE: They are. Does the stipulation have an exhibit number?

MR. SPIVA: I don't believe it does.

THE COURT: At the end of the day, give us a number for it so we'll know what it is.

MR. SPIVA: Will do.

THE COURT: It doesn't makes any difference what [22] it is.

MR. SPIVA: Will do, Your Honor. Are you ready for me to call the witness? Plaintiffs call Delegate Jennifer McClellan.

JUDGE PAYNE: Do you have notebooks with the exhibits that you're going to use with each witness like you did the last time?

1597

MR. SPIVA: We do, Your Honor, and also, I believe we're going to have them all appearing on the screen, so if you want, I can mention the notebooks that we're going to use in this examination. If you all –

THE COURT: Hand them up –

MR. SPIVA: They're right behind you. I believe the only notebooks are the plaintiffs' notebook that has Exhibits 1 through 42 in it, and also we will be using defendant intervenors' notebook that has Exhibit 94 in it.

JUDGE PAYNE: Shouldn't I be looking one tailored specifically for Delegate McClellan?

MR. SPIVA: No, Your Honor.

JUDGE PAYNE: We need another one through 25 for Judge Keenan. Two of us have them.

MR. SPIVA: Okay, Your Honor. Does everybody have those two notebooks, the plaintiffs' first volume and defendant intervenors' volume which has 94 in it?

JUDGE PAYNE: Now you're just going to use the [23] first volume, one through 25? You're not going to use 26 through 41.

MR. SPIVA: I'm sorry, Your Honor. We will use both volumes of plaintiffs' exhibits, and then we're also going to use the defendant intervenors' volume that has Exhibit 94 in it.

JUDGE PAYNE: Okay. We can find that. You're not going to get to that right off the bat, are you?

MR. SPIVA: Not off the bat, Your Honor, and we will show it on the screen as well. Your Honor, Mr. Hamilton has alerted me to the fact the stipulation is document number 83 – I'm sorry, docket number 83.

1598

JUDGE LEE: Thank you. You may proceed.

JENNIFER LEIGH McCLELLAN,

a witness, called at the instance of the plaintiffs, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SPIVA:

Q   Good morning, Delegate McClellan. Can you state your full name for the record.

A   Yes. Jennifer Leigh McClellan.

Q   Where are you from, Delegate McClellan?

A   I was born and raised in Petersburg and currently live in the city of Richmond.

[24] Q  And I understand that you are an attorney?

A   Yes.

Q   Where did you go to law school?

A   University of Virginia.

Q   Where did you go to college?

A   University of Richmond.

Q   And where are you currently employed?

A   Verizon Communications.

Q   What do you do there?

A   I'm assistant general counsel for the mid-Atlantic states.

Q   And I understand that you are a delegate to the Virginia House of Delegates?

A   Yes, I am.

Q   Which district do you represent?

1599

A    The 71st which is the northeast portion of the city of Richmond and one precinct in Henrico County.

Q    And just for the record, Delegate McClellan, what is your race?

A    African American.

Q    And can you tell me a little bit about where your district, District 71, is located?

A    Yes. In the City of Richmond, it starts with the Fan neighborhood, goes east through downtown. It's north of the river up into the Church Hill, the eastern end of the [25] city, all of north side except for one precinct, and one precinct in eastern Henrico County.

Q    I want to ask you a little bit about the history of the demographics of your district. Are you familiar with the terminology black voting-age population?

A    Yes.

Q    And what was the black voting-age population of your district immediately after the 2011 redistricting?

A    Right after 2011, it was slightly above 55 percent.

Q    And what was the black voting-age population of your old district immediately prior to redistricting according to the 2010 census?

A    It was slightly above 46 percent.

Q    And are you aware of what the black voting-age population of your district was at the beginning of the 2000 cycle, in 2001?

A    It was slightly above 55 percent.

Q    When were you first elected to the House of Delegates?

1600

A   2005.

Q   Did you have a primary opponent in that election?

A   Yes, I did.

Q   And what was his race?

A   African American.

Q   And what was the percentage that you prevailed by in that race?

[26] A  It was about 65 percent.

Q   Did you have an opponent in either the 2005 or 2007 general election?

A   No, I didn't.

Q   Did you have an opponent in the 2009 general election?

A   Yes, I did.

Q   What was your opponent's race in that election, in the 2009 general election?

A   He was white.

Q   And what was his party?

A   He was running as an independent.

Q   And I take it you prevailed in that race. What was the percentage that you won by?

A   About 82 percent.

Q   Did you have an opponent in the 2011 primary or general election?

A   No, I didn't.

Q   Did you have an opponent in the 2013 general election?

1601

A   Yes, I did.

Q   And who was that?

A   His name was Matt Fitch.

Q   What was his party?

A   He was running as a Republican.

Q   What was his race?

A   He was white.

[27] Q   And what was your winning percentage in that race?

A   About 87 percent.

Q   Are you currently facing a general election challenger in the 2015 election?

A   Yes, I am.

Q   And what is his race?

A   White.

Q   And party?

A   He's running as an independent.

Q   Do you have any understanding, Delegate McClellan, of the reason why you had – you haven't had an opponent in many of your races?

A   The 71st district historically has had the highest democratic performance index which is calculated based on the results of prior elections. It's always been the highest in the state, since I've been in at least. I think that might encourage or discourage general election challengers. And I guess the democrats are satisfied with my work, so I haven't had a primary challenger.

1602

Q   Were you the first African American representative to District 71?

A   No, I wasn't.

Q   Who was the first African American representative of District 71?

A   Benjamin Lambert.

[28] Q   When was he – when did he represent the district?

A   He was first elected to the House right after single member districts were adopted in the late '70s. At the time, it was District 33. He was in that office when it became District 71.

Q   And has the districting been continuously represented by an African American since Mr. Lambert was the delegate?

A   Yes. He was succeeded by Jean Cunningham, and – who represented it in the '90s; then Viola Baskerville from about '97 until 2005 when I was elected.

Q   The two individuals you mentioned in between Mr. Lambert and yourself, what was their race?

A   They were African American.

Q   Let me turn to the 2011 redistricting process. Who led the redistricting process for the House of Delegates?

A   Delegate Chris Jones.

Q   What role, if any, did you have in the 2011 redistricting process?

A   I coordinated requests from democratic members of the Richmond delegation for changes to be

1603

made to the bill as it was originally introduced by Delegate Jones.

Q    When did you get involved?

A    Shortly after that plan was published, I guess it was right after it was introduced, I looked at it and had a number of concerns, and that's when I started talking to [29] the other Richmond delegates and Delegate Jones about making changes.

Q    And tell me about the communications or conversations you had with Delegate Jones concerning those changes.

A    I expressed concerns about how the original map was drawn, and his response was, you know, he didn't know the Richmond area and that if we, meaning the Richmond delegation – had better ideas on how to draw the lines, he would be open to them but that we would have to meet two criteria. We would have to meet the one percent population deviation, and we would have to meet for the 69th, 70th, and 71st and 74th districts, we would have to meet a 55 percent black voting-age population.

Q    And when you say a one percent population deviation, that you would have to meet that, what was your understanding of what he meant by that?

A    Each district under the one-man-one-vote rule has to have equal population and that – the criteria that were adopted by the Privileges and Election Committee said that you could vary from equal representation, so about 80,000 people, by up to one percent.

Q    And you also mentioned a 55 percent BVAP rule. What was your understanding of what he meant by that, Delegate Jones?

1604

A   That the population of black individuals over the age [30] of 18 had to be 55 percent or more of the population of the district for the majority/minority districts.

Q   Did you ever hear from Delegate Jones or anyone else about a difference between so-called DOJ black or DLS black, the way that those – the DOJ defined black versus the way the DLS defined black?

A   No, and I was not aware there was a difference until today or yesterday.

Q   Were there any criteria that were formally introduced in the House by a committee that you were aware of?

A   Yes, the Privileges and Elections Committee, which is the one that the redistricting bill went to, adopted a resolution that outlines the criteria that any plan adopted by the House had to meet.

Q   Okay. Let me show you what has been marked and stipulated as Plaintiffs' Trial Exhibit 16. I believe you have a notebook, Delegate Jones, up there It's in the volume that has 16 in it. It will also appear, and actually already has appeared on your screen and, I believe, on the screens of the judges as well.

A   Okay.

Q   Are you at Plaintiffs' Exhibit 16?

A   Yes.

Q   Okay. This is a document that is titled House Committee on Privileges and Elections Committee Resolution [31] Number One, House of Delegates District Criteria, and in parentheses under that it says, Proposed By Delegate S. Chris Jones, and it says

1605

on the upper right-hand corner, approved 3/25/11 Are you familiar with this document?

A    Yes.

Q    What is it?

A    This is a copy of the resolution I mentioned that the Privileges and Elections Committee adopted.

Q    What was your understanding of how these criteria were to be applied in the redistricting process?

A    My understanding is that the priority in which they are listed, one to five, is the priority in which they would be applied, and if you look at number six, it actually says –

Q    That's on the second page of the exhibit?

A    Yes. If you look at page two, number six priority says that criteria number one and criteria number two will trump all others.

JUDGE PAYNE: Actually what it says shall be given a priority in the event of a conflict among the criteria. That's what it says. Is that what you understood it to mean?

THE WITNESS: Yes. I was paraphrasing.

JUDGE PAYNE: I understand you were, but the words are preferable as opposed to a paraphrase unless you [32] paraphrase your understanding. That's what I was trying to get at. So you understood it to mean what it says on the paper in paragraph six.

THE WITNESS: Yes.

Q    Let me direct your attention to the first page and specifically the top Roman numeral I and Roman numeral II. And what was your understanding of Roman numeral I relating to population equality?

1606

A   My understanding of number one was that each of the 100 districts had to have 80,000 people plus or minus one percent.

Q   Let me direct your attention to Roman numeral II, and actually, if I could ask you to just read the words that are there on the page for Roman numeral II.

A   "Voting Rights Act, districts shall be drawn in accordance with the laws of the United States and the Commonwealth of Virginia including compliance with protections against the unwarranted retrogression or dilution of racial or ethnic minority voting strength. Nothing in these guidelines shall be construed to require or permit any districting policy or action that is contrary to the United States constitution or the Voting Rights Act of 1965."

Q   And, Delegate McClellan, what was your understanding of the way in which that priority criteria number two was [33] to be applied in practice?

A   My understanding is the way criteria two was to be implemented was that each of the majority minority districts would have to have a black voting-age population of at least 55 percent.

Q   Where did you get that understanding?

A   Through conversations with Delegate Jones and with Legislative Services, and I think he said it on the House floor.

Q   Can you speak up a little bit?

A   I think he said it on the House floor.

Q   The "he" you are mentioning is Delegate Jones?

A   Yes.

1607

Q    I'm going to move away from that exhibit, so if you want, you can close your book, close that book.

You testified that you were involved in the process, and I wanted to ask you whether you've had conversations or interactions with other delegates in terms of your involvement with the redistricting process.

A    Yes. I spoke with and spent quite a bit of time in Legislative Services drawing maps with Delegate Betsy Carr and her legislative aid, delegate Delores McQuinn. I had some conversations with Delegate Manoli Loupassi whose district adjoins mine to the west about a precinct that would be swapped between his district and the 71st.

[34] I had conversations with Delegate Bob Brink who sat beside me on the House floor, used to be on the Privileges and Elections Committee, introduced one of the alternative bills, and he was coordinating requests from northern Virginia delegates for changes to be – or northern Virginia democrats for changes to be made to the map.

We spent some time working – we weren't working on the same map but working on maps at the same time and talking about the process.

I spoke with Delegate Jeion Ward who sits in front of me on the House floor, and we sort of discussed our views with the whole process, of our frustrations with parts of the process, and I spoke with Delegate Jones.

Q    And you mentioned that you discussed with some of these delegates your frustrations about the process. Can you tell me a little more about that?

A    Yes. I spent a lot of time – when the map was first introduced, I was very concerned about the num-

1608

ber of precincts that were split. There were neighbor-hoods that were split, and I wanted to try to reunite as much of them as possible, and –

JUDGE PAYNE: Are you talking about in your district now?

THE WITNESS: I'm talking about both my district and the other Richmond area districts.

[35] THE COURT: Which are what numbered?

THE WITNESS: Mine is 71. Betsy Carr's is 69. Delores McQuinn's is 70. Manoli Loupassi is 68. Joe Morrissey, at the time, was 74.

THE COURT: Those are the ones you were express-ing your concern about the splits in?

THE WITNESS: Most of the split precincts that I looked at were in the 71st, the 9th, and the 70th, although there was a precinct that I think the split was 68. And in particular, there were two neighbor-hoods on each end of the 71st district that –

Q   Would it be helpful to see a map as you are answering that question?

A   Yeah.

MR. SPIVA: It might be helpful to the Court, too, Your Honor –

JUDGE PAYNE: I know where it is, but the others don't.

MR. SPIVA: You are familiar with the Richmond area, Your Honor. We would actually like to use one of the defendant intervenors' exhibits, Exhibit 94, which is also in the book there and it will also appear on the screen. In fact, it just popped up.

A   94?

1609

Q    Yes, Delegate McClellan.

[36] MR. SPIVA: Your Honors, also my colleague has just pointed out that these maps are also in a big notebook that I believe you have, and I'm going to be directing Delegate McClellan to page four which is the one that shows her district the clearest. But it's in this kind of a booklet as well if you'd prefer that to the screen.

THE COURT: While you're doing that, if you wouldn't mind kind of taking hold of the examination by asking specific questions which she can answer instead of calling for narratives, it think it will be more efficient and maybe more accurate.

MR. SPIVA: Will do, Your Honor.

Q    Delegate McClellan, if you've got Defendant Intervenors' Exhibit 94, page four in front of you?

A    Uh-huh.

Q    It's also on your screen, too, depending how you prefer to look at it. Let me just establish, you know, try to establish with you what this is. I take it you have seen this before at your deposition?

A    Yes.

Q    And I take it that the yellow areas represent your current district post-2011 redistricting?

A    Yes.

Q    And the hashmarked areas that don't have any yellow [37] underneath them, those are pieces that used to be part of your district but that you no longer have in your district?

A    Yes.

1610

JUDGE LEE: I'm completely confused. Go over that again, sir.

MR. SPIVA: Yes, Your Honor.

Q   The hashmarked precincts that do not have any yellow coloring underneath them, I take it that those are precincts that used to be in your district prior to the 2011 redistricting but that are no longer part of your district?

JUDGE PAYNE: Are you talking about 301 where there's a red hash mark and then 207, because there's a whole bunch of hashmarks over yellow coloring. Why don't you use the number. I think we can understand it better.

MR. SPIVA: Okay. It's just that there are a lot of different numbers that are covered by it, Your Honor. I don't want to – I don't want to testify, but what I was going to establish with the witness was that the hashmark areas over yellow are areas that used to be part of her old district that continue to be part of her current district.

The hashmark that doesn't have yellow coloring under it are pieces that she no longer has in her district [38] that used to be in her district, and the yellow that has no hash marking are pieces that are in her current district but that she didn't have prior to the 2011 redistricting, and I can do that with the witness –

THE COURT: Is that correct?

THE WITNESS: Yes. If it helps –

THE COURT: I think we've got it unless somebody's got something.

JUDGE LEE: I don't have it. Go ahead.

1611

THE WITNESS: If you look at the map, precinct 505, the part that's white on the map, precinct 207, the Summit Court, Hilliard, and part of Stratford Hall precinct at the top, precinct 301, were in the 71st district prior to 2011 but no longer are.

Precincts 204, 604, ^ Radcliff, 701, 702, the little yellow piece of 703, were not in the 71st district prior to 2011 but currently are, and the rest of the – what you see at District 71 was in District 71 both prior to 2011 and after.

Q   So you mentioned, Delegate McClellan, that one of the things you wanted to make changes to regarded the Church Hill neighborhood. Can you explain what you meant about that?

A   Yes. When the map was originally introduced, precinct 707, which is a large part of the Church Hill [39] neighborhood, was split. It was split along Broad Street which historically has been a dividing line between where whites lived and where blacks lived, and that raised a number of concerns because I thought dividing that neighborhood in that way would be divisive, so I wanted to keep both 207, the precinct, whole, but as much of that neighborhood whole as had been before.

Q   Were you able to do that?

A   Yes.

Q   And let me ask you, was there a precinct or precincts that you wanted to keep that you were not able to keep as part of the – as a result of the redistricting process?

A   Yes.

Q   Tell me about that.

1612

A   Precinct 207 in the west, 207 and 208 are a majority of the Fan neighborhood which is the neighborhood where I live, and 207 was taken out of the 71st district both in the original map as introduced and obviously in the final one, and I wanted to keep precinct 207 in the 71st district to keep as much of that neighborhood together, and also because it was a very strong precinct for me.

It was – it is densely populated and had high voter turnout and highly democratic voter turnout and was part of my neighborhood. I have quite a base there and wanted to keep that precinct in the 71st district.

[40] Q  Tell me about the demographics of the 207 precinct.

A   It is predominantly white.

Q   Why couldn't you keep that part of the Fan, precinct 207?

A   Every possible way, and I literally, even if it meant splitting it, went street by street to see how much of that precinct I could keep, and based on the other parts of the district, any portion of 207 would push the black voting-age population below 55 percent when I moved it on the map.

Q   When you refer to moving it on the map, what are you referring to? Is this something to do with what you were doing in the DLS office?

A   Yes. In Legislative Services on the second floor, they had a conference room with computers set up that had the mapping software, and you could go in and move precincts and move streets, go block by block if you wanted, to draw the districts, and it would also show you all of the demographics associated with that district.

1613

So you could see as you added or subtracted an area, you could see what the total population, all racial populations and voting-age population were as you were doing it.

Q    So did the computer you were working on show percentages for black voting-age population?

[41] A  Yes.

Q    And why didn't you submit changes that included precinct 207 despite the fact that it lowered the BVAP below 55 percent?

A    Because I didn't believe they'd be accepted.

Q    Why was that?

A    Because the conversation that I had with Delegate Jones was that if we submitted changes that met the population deviation criteria and the 55 percent black voting-age population, he would be open to it. To me that meant the corollary, if those two criteria weren't met, then he wouldn't be.

Q    Did he say that to you?

A    Words to that effect, yes.

Q    Did you have concerns that if you kept precinct 207 in your district, that you might be open to a white challenger?

A    Not any more than I would have – 207 had been in my district when I got elected and had been in the district, I believe, both when Delegates Cunningham and Baskerville were there, and they never got a white challenger just because they had 207 in their district, from that district. So that risk wouldn't have been any greater with or without that precinct now.

1614

Q   Were there any political reasons why you couldn't get [42] 207 in your district? Was there any other reason other than this BVAP percentage?

A   Again, 207 is very densely populated, very democratic, and very high voter turnout, and so the district next to it, 68, Manoli Loupassi who got that precinct, that actually pushed more democrats into his district. So it didn't help him. Losing it ultimately didn't hurt me because my democratic performance index went up after redistricting. So I don't see any political reason why I couldn't keep precinct 207.

Q   What party is Mr. Loupassi in?

A   He's a Republican.

Q   At the time of the redistricting, was your district under or overpopulated?

A   Underpopulated.

Q   And as a result of giving up precinct 207, did you need to pick up population somewhere else?

A   Yes. You'll see precinct 204 I picked up because even though that's also demographically similar to 207 racially, it's more sparsely populated. But the combination of 204, and you'll see where precinct 505 is split –

Q   What part of the map is 505?

A   505 is south. It is split between Betsy Carr's district – you'll see her name right next to it – and [43] mine. That was split so that I got the VCU portion which is very densely populated, and she got the Oregon Hill neighborhood. So the combination of those two plus some of the new precincts I picked up in the east made up for losing the population in 207.

1615

Q   And tell me about the demographics of the precincts in the east that you picked up.

JUDGE PAYNE: Which precincts are we talking about now by number?

Q   Can you provide for the Court the number or name of the precincts in the east that you picked up?

A   Yes. It was 604, Radcliff, 701, 702, and you'll see 703, there's that blue line, and I have the little piece underneath 702 of 703. Those are the new districts in the east – new precincts in the east that I picked up.

They are heavily, heavily African American, highly – very densely populated. There are housing projects in those areas, so it's very densely populated. But they're all predominantly African American.

Q   Was it unavoidable that you would need to pick up those precincts in the east given that your district had been underpopulated at the time of the redistricting?

A   It was when – there are a couple ways you could have gone. When the map was first introduced, I went a little bit to the west. If you look up in –

[44] JUDGE PAYNE: Excuse me just a minute. I think the question was, was it avoidable, and the answer to that is yes or no, it wasn't.

THE WITNESS: Yes, I'm sorry.

JUDGE PAYNE: If he wants to know why, okay, but your answer said there were two alternatives, so I'm assuming your answer was that it was not unavoidable; is that what you meant to say?

THE WITNESS: I apologize. It was avoidable that I would go to those particular precincts.

1616

Q   Why is that, Delegate McClellan?

A   There were a number of options. When the map was first introduced, I shifted northeast – I'm sorry, northwest a little bit. If you look at the top left, I picked up Greendale, Johnson, and Glenside.

Q   Sorry to interrupt you, but when you say you picked up, you mean these were test maps that you were doing? You ultimately didn't pick them up in the final map.

A   Right. Delegate Jones's original bill included those precincts from Henrico County. It went west a little bit. I also could have kept Summit Court, Hilliard, Stratford Hall. I could have kept precinct 301. I could have shifted further to the west in the city of Richmond. I think one of – the map that had been introduced shifted me into the 100 number precincts, or I could have gone [45] east.

I don't think – I could have gone south, but Delegate Carr also had lost population, so if I had shifted south, she would have had to make that up somewhere, and traditionally the river has been a natural boundary for the 71st district, so I'm not sure it would have been good for me to go south.

Q   Okay. You mentioned that you could have gone west. I just want to make sure that I and the Court understands your answer. I take it that includes retaining the 207 precinct?

A   Yes.

Q   Now, you've testified that you had frustrations in terms of precinct splits. Were there any other issues that made you frustrated with the 55 percent BVAP requirement in terms of precinct splits?

1617

A    The two biggest frustrations were an effort to keep neighborhoods from being further split and keep precincts from being split.

Q    Was there an issue with the registrar of Richmond?

A    Yes.

Q    Can you tell us about that.

A    The Richmond and Chesterfield registrars had a number of split precincts in their jurisdictions that they wanted reunited, and they approached me to see if they could do [46] that, and the Richmond registrar, Kirk Showalter, actually came to Legislative Services, and she and I tried to draw maps that reunited as much of those precincts as possible.

Q    What happened? Were you able to make those fixes?

A    We were not.

Q    Why was that?

A    When – what they wanted to do would have pushed the black voting-age population, at least in my district, possibly others that I don't remember, would have pushed it below 55 percent of black voting-age population.

Q    By how much would it have pushed it below 55 percent?

A    For the 71st district, it would have been 54.8 percent.

Q    Let me ask you to –

JUDGE LEE: Are you saying you asked Delegate Jones to make that change and he said no?

1618

THE WITNESS: Yes and no. What happened –

JUDGE LEE: Tell me about the conversation you had. What did he say and what did you say?

THE WITNESS: Can I tell you what we did first?

JUDGE LEE: No. I want to answer my question which is whether you ever asked him to make a change for the registrars. Answer that question.

THE WITNESS: The change was submitted and was supposed to be adopted in the Senate amendment to the plan [47] and was –

JUDGE LEE: My question was very precise. Did you ask him to make that change to move – for Ms. Showalter to move the district?

THE WITNESS: I asked him why the change was not made.

JUDGE LEE: You never asked him that question, did you?

THE WITNESS: No.

JUDGE PAYNE: That is exactly an example of what I've been trying to say rather subtly. Would you not ask a question that generally allows a lot of rambling, a lot of hearsay to come in particularly where it was clear, very important what Judge Lee asked. And the question has to be precise and the answer has to be limited to yes or no, and if you want an explanation, they can get an explanation. If it calls for an explanation she can give the explanation, and we'll be here – if we allow a novel to be written we'll be here a long time and distracted from our principle purpose.

So let's get hold of the examination, if you will, and please confine your answers to what he's asked and be

1619

precise, and if he wants more information, he'll ask it, and he can get it unless there is an objection.

THE WITNESS: I apologize. I've never been on [48] this side.

JUDGE LEE: It's appropriate to ask a question based on mine which I'm sure you will.

MR. SPIVA: Yes, Your Honor. I'm going to try to get some clarity here.

Q    Delegate McClellan, when you submitted proposed changes, how did you do that? Literally, what was the manner in which you submitted those changes?

A    I drafted a map on the software and submitted that map to Legislative Services with the question that that be adopted.

Q    And when you transmitted it to Legislative Services, did that go to Delegate Jones?

A    In at least one instance, yes.

Q    And in which instance is that?

A    I don't remember whether it was when the map was still on the House side or when the map was on the Senate side, but there was a time where I met with Delegate Jones in his office, and we were looking at the maps that included changes that were requested by the original delegation –

Q    Okay.

A    – in his office.

Q    Let me ask you to turn to Plaintiffs' Exhibit 30 in your binder. I think you still have – maybe you don't have that up there. It's going to be on the screen as [49] well.

1620

A    I can look on the screen.

Q    This is Plaintiffs' Exhibit 30, and I'd like to start with the email that begins at the bottom of page three and carries over to page four of the document, and this should be an email from – I'm sorry, you are still tell me when you've got it. Like I say, it is on the screen as well.

JUDGE LEE: Exhibit 30?

MR. SPIVA: It is Exhibit 30.

JUDGE LEE: Mine does not have that page.

MR. SPIVA: Doesn't have page three and four?

JUDGE LEE: Oh, wait a minute. Yes, it does.

MR. SPIVA: Thank you, Your Honor.

JUDGE PAYNE: Is there a blue page in between?

MR. SPIVA: There may be, Your Honor, yes.

JUDGE PAYNE: So it's still part of the same document. As long as it's under the tab.

MR. SPIVA: The blue page is not part of the original document. It was produced all as one piece.

JUDGE PAYNE: All right.

Q    The email that I'd like to direct your attention to, Delegate McClellan, begins at the bottom of three from Chris Jones to Paul Nardo dated 4/7/2011, 9:42 p.m., and it says, "I followed up with Jennifer McClellan this afternoon and she reconfirmed that the request of Kirk [50] Showalter, Richmond registrar, exceeded the 55 percent threshold when they did it on the second floor for all affected districts and that she would have never requested it if it didn't. I'm not sure what got lost in translation, but the good news is it is

1621

fixed now and Jennifer will explain the Senate
amendment on the floor Monday if needed."

He's referring to a communication that he had with
you. Does this reference the issue with the precinct
splits that you were testifying about a minute ago?

A    Yes.

Q    And what is the reference to the 55, exceeding
the 55 percent threshold?

A    This is explaining what happened when we
drew a map to try to reunite those precincts. When we
were in Legislative Services doing that, we made a
mistake. We moved the wrong portion of a precinct,
and when – the voting-age population, based on that,
was above 55 percent. That was the map that was
submitted to Legislative Services to be adopted by the
Senate, because at this point, the bill was in the
Senate.

When the Senate adopted their amendment, that
change was not made because, when we discovered we
moved the wrong part of the precinct, we went back to
the right part of the precinct, and that pushed the
black voting-age [51] population below 55 percent, and
because of that, the changes to reunite those precincts
were not adopted by the Senate.

So that is what this email is referring to, is the
conversation that Delegate Jones and I had after the
Senate map was adopted and about what happened to
the changes that were requested by the Richmond and
Chesterfield registrar.

Q    And let me ask you to turn to page two of that
same exhibit, Plaintiffs' Exhibit 30, and direct your
attention to an email dated 4/8/2011 from Kirk
Showalter to you. I take it you received that email?

1622

A   Yes.

Q   And Ms. Showalter states in the email, "Dear Jennifer, I saw the new version of HB 5001 that passed the Senate. Unfortunately, (and unlike the Senate substitute version) it did not include any of the fixes to the split precincts that we worked on. Was there a particular reason for this? Should I pursue Governor's amendments to make the changes," and it goes on from there. What was Registrar Showalter asking you in that email?

A   She was asking why the map, as adopted by the Senate, did not reunite the precincts that she and the Chesterfield registrar, who is copied on the email, requested.

[52] Q  And if you could turn to page one of Plaintiffs' Exhibit 30, and directing your attention to the email that you write back to Ms. Showalter the same day at 2:14 p.m., I take it you sent that email?

A   I did.

Q   And it says, "I spoke to Chris Jones and Kent Stigall. Apparently, the changes we discussed based on the map would have pushed the voting age African American population in the 71st district down to 54.8 percent. The target criteria was 55 percent, so the change can't be made. When you and I were working in Legislative Services, we indeed moved the wrong part of Davis which is why the numbers looked correct to us," and you continue, but I want to stop there and ask you, what were you explaining to Ms. Showalter in that part of your email?

A   I was explaining to her why the Senate bill did not adopt the changes that she requested and that the reason was because of the black voting-age population

1623

in the 71st district would have fallen below 55 percent
as a result of those changes.

Q    Am I understanding correctly that the changes
were rejected?

A    Yes.

Q    Who rejected them?

A    Well, ultimately the Senate. There was a Senate
[53] substitute printed by Legislative Services which
reflected the changes, but what was adopted by the
Senate rejected that change.

Q    You go on in this email to say, "Given the time
constraints on this thing, I don't think we have enough
time to try to come up with a fix that keeps the 69th,
70th, and 71st all at 55 percent African American
voting population and within a one percent total
population deviation. We can try to do some cleanup
next year. I know that doesn't help you this election
cycle, but that may be the best we can do. Jenn." What
were you saying to Ms. Showalter in that part of your
email?

A    We were at the point in the process, the Senate
had adopted amendments to the map, to the bill. It
was coming back to the House floor, and we were going
to vote on the House floor whether to accept or reject
the Senate amendments, and given that there was not
an opportunity to offer any additional amendments,
and I was explaining to her that basically where we
were in the process, we could not make the changes
that she and Mr. Haake were requesting.

Q    And then Ms. Showalter, turning back to the
exhibit, writes back to you that same day on 4/8/11,
and she says, "Darned...so close and yet so far away.
A measly 0.2 percent. Well, at least we gave it a good

1624

try and for [54] that I must thank you," and then she continues on. I take it you received that email?

A    I did.

Q    And what was your understand of Ms. Showalter's email to you?

A    That she was frustrated that she couldn't – we couldn't reunite those precincts.

Q    I want to turn away from that exhibit and just ask you what your view was about whether a greater than 55 percent BVAP was necessary to preserve the African American community's ability to elect a candidate of choice in your district?

A    I didn't think that 55 was necessary.

Q    And why was that?

A    Because the BVAP had fallen to 46 percent, and the minority community, the African American community was electing the candidate of its choice at 46 percent, and so it probably could have stayed 46 percent.

MR. SPIVA: Thank you, Delegate McClellan. I have no further questions.

MS. McKNIGHT: Good morning, Your Honors, and Delegate McClellan. A brief point of housekeeping. I want to make sure everyone can see the board here because I might like to point out – are you able to see this board?

[55] THE WITNESS: I can –

JUDGE PAYNE: Is that 94?

MS. McKNIGHT: No, it should be 71. Pardon me. Yes, it's Exhibit 94, page four.

1625

THE COURT: The one we were looking at earlier.

MS. McKNIGHT: Correct, the same one.

THE WITNESS: I can see it, but I can't see the numbers from here.

THE COURT: Does she have a book up there with it in it? That's Intervenor Defendants' Exhibit 94.

MS. McKNIGHT: Correct.

THE WITNESS: I think these are districts, so is 94 a different map?

JUDGE LEE: Page four. Your name again?

MR. McKNIGHT: My name is Kate McKnight, and I represent defendant intervenors in the case, and good morning again, Delegate McClellan.

CROSS-EXAMINATION

BY MS. McKNIGHT:

Q   I'm going to be asking you some questions about your testimony earlier today and then about the 2011 redistricting process in general.

A   Okay. I can barely hear you.

Q   Okay.

[56] A  You and I have the same problem.

Q   Delegate McClellan, this, which is marked as Defendants' Exhibit 94, page four, is a depiction of your House District 71; is that right?

A   Yes.

Q   And you saw a map like this in your deposition; is that right?

A   Yes.

1626

Q    Now, to re-orient the Court a little bit, the area that's highlighted in yellow represents your district after the 2011 redrawing process; is that right?

A    Yes.

Q    And the area with the crosshatching – some of it is under yellow, some of it is not – that represents your district after the 2001 redrawing process; is that correct?

A    Yes.

Q    And, now, each of these areas outlined – let me see if I can highlight it for you – outlined in the thin black line, each of those areas outlined in the thin black line, is that a voter district or a VTD or what's sometimes called a precinct?

A    Yes.

Q    And I have a little bit of a shorthand for this area of Virginia. The precincts that are numbered, are those [57] in Richmond city?

A    Yes.

Q    And then the precincts with names, are those in Henrico County?

A    Yes.

Q    Now, Delegate McClellan, I'd like to ask you more questions about your map, but first just a few brief questions regarding what happened between the 2000 and 2010 censuses.

A    Okay.

Q    I believe you just testified that following the 2000 census, the 2001 district, as represented with the crosshatching, had a black voting-age population of about 55 percent; does that sound about right?

1627

A   Yes.

Q   And, now, following the 2010 census, that same
district represented by the crosshatching, that 2001
district, that had a black voting-age population of
around 46 percent; does that sound about right?

A   Yes.

Q   So the 2001 district as of the 2010 census was
no longer considered a majority-minority district; is
that right?

A   Yes.

Q   Furthermore, the 2001 district, again, the [58]
crosshatching district, as of the 2010 census was
underpopulated by close to 6,000 people; does that
sound about right?

A   Yes.

Q   A little over seven percent.

A   Yes.

Q   What was happening in the district between
2000 and 2010?

A   Well, the population was not growing as fast as
in the rest of the state, but it was shifting. There were
people moving downtown. There were a lot of areas
that in 2001 were either industrial or commercial or
vacant that by 2010 had people living in them.

It was part of VCU, the college, which is in the Fan.
It's around 211, 208, and 505, was growing quite a bit.
I think that's the bulk of what was happening
between, in those ten years.

Q   So in the 2011 redrawing, something had to be
done to, one, add population to ensure one-person-one-
vote; is that right?

1628

A   Yes.

Q   And, two, increase the black voting-age population if this district was going to continue as a majority-minority district; is that right?

A   Yes.

[59] JUDGE PAYNE: Your answer?

THE WITNESS: Yes.

JUDGE PAYNE: Thank you.

Q   Now, turning to the map of your district considering these two goals, let's see if this isn't too shaky. Looking south, here, this is Delegate McQuinn's residence; is that right?

A   The star, yes.

Q   So your district, if it had been drawn to pull in either of these precincts, it would have paired you with an incumbent, that is Delegate McQuinn; is that right?

A   Her house is in precinct 705, so if you had pulled in 705, yes, but if you had pulled in 703, no.

JUDGE PAYNE: Pulled in what?

THE WITNESS: If you pulled in precinct 705 which is where she lives, then we would be in the same district, but if you pulled in 703, we would not be in the same district.

Q   Now, on the map looking south of your district, this light blue line here, that's the James River; isn't that right?

A   Yes.

Q   I believe you just testified that's a traditional border, a southern border of District 71; is that right?

A   Yes, once you hit Belvidere Avenue.

1629

[60] Q   Now, looking at your map, if you look over here to the west, that star, that blue star right there on the border, that was Delegate Carr's residence; is that right?

A   Yes.

Q   So if you had drawn your district to pull in this district here where Delegate Carr's residence is, that would have paired you with an incumbent, that is Delegate Carr; is that right?

A   Yes.

Q   Now, looking north, there are three precincts in the northwest that are named Summit Court, Hilliard, and Stratford Hall, and those were drawn out of your district in 2011; isn't that right?

A   Yes.

Q   Those were all in Henrico County; correct?

A   Yes.

Q   And this precinct over here that says Radcliff?

A   Yes.

Q   That was added to your district; correct?

A   Yes.

Q   So after the 2011 redrawing, you had dropped three Henrico precincts from your district, and now you only had one Henrico County precinct in your district; is that right?

A   Yes.

[61] Q   Now, you just testified that an alternative plan could have picked up Greendale – I'll point you on the map, Greendale, Johnson, and Glenside up here in

1630

the northwest, but all three of those are in Henrico County; is that correct?

A   Yes, and if I can clarify what I said earlier was that the House bill 5001 as originally introduced included those precincts.

Q   And if your district had been redrawn to include those districts, that would have made your district longer; is that right?

A   Not necessarily, because as originally introduced, that map did not include all of the precincts that are currently included. So it would have shifted the district, but it wouldn't necessarily have made it longer.

Q   Now, you testified in deposition that you don't believe your district as drawn in 2011 is irregularly shaped; is that right?

A   Yes.

Q   And you testified earlier today that your district is the most democratic district in the state; is that right?

A   Yes.

THE COURT: I think at this time we'll take the morning recess for 15 minutes, and then we'll continue with your cross-examination.

[62] (Recess taken.)

NOTE: After the morning recess, the case continues as follows:

JUDGE PAYNE: All right, Ms. McKnight, you may continue.

MS. McKNIGHT: Thank you, Your Honors.

1631

BY MS. McKNIGHT: (Continuing)

Q   Delegate McClellan, you had just testified prior to the break that your district is the most democratic district in the state.

A   Yes.

Q   So the real election in your district is the primary as opposed to the general election is that fair to say?

A   Yes.

Q   And your only election /THAO was seriously contested was your first election in 2005, is that fair to say?

A   Yes.

Q   Now, in deposition you discussed former Representative Morrissey of House District 74, you mentioned him in your direct testimony as well. And he was not the preferred candidate of choice for black constituents in District 74, is that right?

A   I wouldn't say that.

Q   What would you say?

[63] A  I would say that he was the candidate of choice of a plurality of the voters in that district.

Q   So are you able to say that he was the candidate of choice for black constituents in his district?

A   Well, based on – yes, based on the most recent special election and which he won, I would say in that election for sure he was the candidate of choice of the minority population.

JUDGE PAYNE: Are you asking about the most recent election, Ms. McKnight, or some other election?

1632

MS. McKNIGHT: Your Honor, it's fine, I can leave it, I can leave the question.

JUDGE PAYNE: All right.

BY MS. McKNIGHT: (Continuing)

Q    I just have two more questions for you, Delegate McClellan. Was HB 5001 vetoed?

A    I believe originally it was.

Q    And now you voted for the plan at issue in this matter, is that correct?

A    Yes.

MS. McKNIGHT: Thank you, Delegate McClellan. Thank you, Your Honor's.

JUDGE PAYNE: Any redirect?

MR. SPIVA: No, Your Honor.

JUDGE PAYNE: All right. Can she be permanently [64] excused – do you have any?

MR. TROY: I have no questions. She is my neighbor as well.

JUDGE PAYNE: All right. Can she be permanently excused or do you need her to remain?

MR. SPIVA: She can be permanently excused, Your Honor.

JUDGE PAYNE: Is that satisfactory to you, Mr. Braden, Mr. Troy?

MR. BRADEN: Yes, Your Honor.

JUDGE PAYNE: Thank you for being with us, Delegate McClellan, you are excused to go back to your business. Thank you.

NOTE: The witness stood down.

1633

JUDGE PAYNE: Next witness.

MS. BRANCH: May it please the Court, Your Honor's, my name is Aria Branch, and I'm representing the plaintiffs. The plaintiffs call Senator Rosalyn Dance to the stand, please.

NOTE: The witness is sworn.

JUDGE PAYNE: Go ahead, Ms. Branch.

ROSALYN DANCE,

called by counsel for the plaintiffs, first being duly sworn, testifies and states:

[65] DIRECT EXAMINATION

BY MS. BRANCH:

Q   Good morning, Senator Dance.

A   Good morning.

Q   I will give you a second if you would like to pour some water.

A   Thank you.

Q   Okay. All right. Could you please state your name for the record.

A   Rosalyn R. Dance.

Q   And where are you from, Senator Dance?

A   I was born in Chesterfield County, but been in Petersburg since about the age of eight years old.

Q   Where do you currently work?

A   I am a retired health professional, but I work as Senator, State Senator in the State of Virginia.

Q   And what district do you represent?

A   I represent the 16th Senatorial District.

1634

Q    And when were you first elected to the Senate?

A    November 2014.

Q    Where did you work prior to becoming a State Senator?

A    I served as a member of the House of Delegates, Virginia House of Delegates.

Q    Which House District did you represent?

A    The 63rd District.

[66] Q  How long did you serve in the House?

A    From April 6, 2005, until elected to the Senate position in 2014.

JUDGE PAYNE:  Excuse me, what district were you in when you were in the House, Senator?

THE WITNESS: 63rd District.

JUDGE PAYNE: 3rd?

JUDGE LEE: 63rd.

BY MS. BRANCH: (Continuing)

Q    Now I would like to briefly discuss your election history with you. When were you first elected to represent House District 63?

A    I was elected in 2005.

Q    Now, you won five elections under the map of your House district prior to the 2011 redistricting. How would you describe the results of those elections?

A    I won them.

Q    And what was the percentage of one of the elections that you won, for example?

1635

A    I would start with the first, it was a primary for the special election, and I ran against two African-American gentlemen. And I don't know the exact number, but I know if you put their numbers together I still had better numbers than they did, and I won the primary.

The second one, 2005, I had to win then the [67] special election running as the democratic candidate. And that was – there were two Euro-Americans, a male and a female, and I garnered I think about 69 percent of the vote.

Q    I think you're talking about the 2005 special general election there?

A    Yes.

Q    Which parties did those two candidates that you ran against, which ones did they represent?

A    The female was chair of the local Republican party. And the male policeman, I think he was an independent.

Q    And have you ever lost an election to represent House District 63?

A    I lost an election before 2005 when I ran as an independent, but having run in the Democratic – as a Democratic candidate, no, I have not.

Q    And when was that election that you lost?

A    2001, I think. I ran as an independent.

Q    All right. And what was the race of the candidate that you lost to?

A    I lost to an African-American male who ran as a Democratic candidate.

1636

Q   Great. Now I would like to switch gears a bit to the 2011 redistricting. Now, prior to that redistricting, had you ever been involved in a redistricting process before?

[68] A  No, I had not.

Q   And what role did you play in the 2011 redistricting?

A   I was appointed to serve as one of the six members of the redistricting committee, there were like two committees, one redistricting that dealt with the House; and then there was a reapportionment that dealt with the congressional districts.

Q   Who else was on the six-person committee that you were on?

A   The one I represented for the House redistricting, there were six of us. And the other member representing and I was representing House Democrats was Delegate Algie Howell, the two of us. And then there were four Republicans. And the chair was Delegate Chris Jones. And I don't remember the names of the other members.

Q   All right. How would you – you testified that Delegate Jones was the Chair of that six-person committee. How would you describe his role in terms of the final map that was created?

A   He was the Chair, and he was the key person – he understood the mapping program that we used, he actually had one in his office. And we had one in legislative services that the rest of us used. But he had done this before. He had been a member on the one that was done, prior ten-year redistricting, and he was really good with [69] what he was doing.

1637

Q   And would you say that you deferred to his expertise during the process?

A   I did because he was, as I say, he was knowledgeable. He allowed us to ask questions, and feedback, and answered any questions we had. So I felt he did a good job with what he was doing.

Q   And you said that you asked questions. How often would you say you talked to Delegate Jones during the process?

A   It varied. I could talk with him in the halls. I could talk with him, of course, in meetings. I could call him. He made himself available to me.

We had a drop box – if we were working on something, my colleagues wanted him to look at something, I could have Legislative Services transfer it to his box so that he could look at that.

Q   Can you explain how that process worked a little more.

A   We had – the majority – we were able to use, go to Legislative Services on the second floor, use their mapping data to map out how our districts might look, if you will. And then we could then share that with the Chair because he was the one who introduced the mapping. And we were making changes to his House Bill 5001, whatever it is, we were making changes to that. And he [70] would look at that in alignment of the criteria that we had established. And that was the plus or minus 1 percent deviation from the – we went up from 74, I think it was about 74,000 we had population for each of the 100 districts to now 80,000 was the plus or minus to get there because some might have been 80,000, some might be a little bit low, a little

1638

bit over, but it was a plus or minus 1 percent deviation that we were working with.

And making sure that we were in – for me it was the 12 minority districts that I was concentrating on, that they were all within the 55 percent area.

Q   What you say within 55 percent, what are you referencing?

A   My understanding from Chris – I mean Delegate Jones is that what we were doing was going to have to be found to be approved by the Department of Justice. And that for the voting rights strength of African-Americans, that's the 12 areas that I was looking at, that we need to ensure that we had at least 55 percent.

Q   Okay. Can I please turn your attention to Plaintiffs' Trial Exhibit 16.

And we've looked at this one before, so I'm just going to zero in on the second section, which is titled Voting Rights Act.

A   Yes.

[71] Q  Now, do you recognize this document before we jump in?

A   It is House Committee on Privileges and Elections, it's the Committee resolution number 1, House of Delegates district criteria, and it is proposed by Delegate S. Chris Jones, who was the Chair. And this is the document that as part of the committee of six, this was the criteria that we recommended to be approved by the Privileges and Elections to go to the floor.

Q   Now turning our attention to the second section called Voting Rights Act, and I will just read it for the record.

1639

A    Okay.

JUDGE PAYNE: I think we've read it.

MS. BRANCH: Okay.

JUDGE PAYNE: And she can read it if she needs to.

MS. BRANCH: Okay, absolutely.

BY MS. BRANCH: (Continuing)

Q    Senator Dance, would you like to take some time to read that section?

A    I'm familiar with it.

Q    Okay. And how would you describe or how would you say that criterion about the Voting Rights Act was actually interpreted and practiced during the process?

A    This was to ensure that the voting strength of African-Americans was represented in our redistricting [72] plan. And that for me was the 12 minority – the African-American districts that we had to look at. And the voting strength that I was working on was the 55 percent.

Q    And when you say 55 percent, are you referring to African-American voting-age population?

A    It was 55 percent of African – of African-Americans that voted. Not children or whatever, it was voting African-Americans.

Q    Thank you. Can we now turn to Plaintiffs' Trial Exhibit 35.

A    Okay.

Q    Are you at Exhibit 35?

A    Yes.

1640

Q Okay. And the first page of this says 2011 Special Session 1, Virginia House of Delegates, redistricting floor debates, Tuesday, April 5, 2011. And this is a transcript of this debate.

Were you present at this debate, Senator Dance?

A Yes.

Q Can you turn your attention to page 66 of the transcript.

A I'm there.

Q I'm going to direct your attention to line 7. Where Delegate Jones is speaking, and I will read it for the [73] record once everyone is there. He says, quote: Mr. Speaker, I'd said to the gentleman of the plans that have been submitted and or circulated around that were complete and total plans, the plan that is before you, in my opinion, fully complies with the Voting Rights Act as 55 percent or higher, which is testimony that we heard during the public hearings of percentage voting-age population.

Did I read that correctly?

A Yes.

Q And now when Delegate Jones used that 55 percent number on the House floor, what did you understand him to be referring to?

A The 55 percent referred to the 12 minority African-American districts, voting districts.

Q And you testified earlier that you submitted changes to the original map that was proposed by Delegate Jones.

Did this 55 percent rule affect the changes that you made to those maps before you submitted them?

1641

A    Yes.

Q    And how so?

A    Every one of the – there were 12. And eleven was solid. The twelfth was the one that gave us a little trouble to try to get to the 55 percent.

Q    Which district was that? What are you referring to?

[74] A  That was referring to Delegate Roslyn Tyler's district, I think it was 75 that she had.

Q    Okay. And what do you mean by it gave you trouble?

A    The way her – her numbers, her African-American numbers had decreased in that area. And to get her up to the 55 percent required some drastic maneuvering to make that happen because the way her district was, it boarded North Carolina, she couldn't go across the border, and to get African-Americans if she went east or west she would run into problems. And the only way she could come was to come north.

And that was –

Q    We'll talk about that just a little bit later.

A    Yes.

Q    I just want to clarify, what was your under-standing as to why the 55 percent rule was necessary?

A    The 55 percent –

JUDGE PAYNE: We haven't established that it is a rule yet since that's the central point of the – I think everybody agrees that there was a 55 percent target. Don't you stipulate to that?

1642

MR. BRADEN: There was an aspiration or a target of 55 percent.

JUDGE PAYNE: All right. And the issue here is whether it was a hard and fast rule. And that's what [75] you're trying to show, right?

MS. BRANCH: That's correct, Your Honor.

JUDGE PAYNE: All right. Well then let the witnesses testify about whether it was or wasn't.

MS. BRANCH: Okay.

JUDGE LEE: So far only the lawyers have said the word "rule," no witness has said "rule" yet.

MS. BRANCH: Absolutely.

BY MS. BRANCH: (Continuing)

Q   Senator Dance, how would you describe how the 55 percent black voting-age population target was applied?

A   I guess you would say using the definition that it was the rule of thumb that we used to determine those 12 minority districts. Because each one of them had to be 55 percent or greater, and we were trying to get to 55 percent. And we had gotten there with eleven. The twelfth one was where the problem was, and that was Delegate Tyler's district.

Q   And what was the purpose of the 55 percent rule?

A   To –

Q   I think she testified to that?

JUDGE PAYNE: She said it was a rule of thumb.

MS. BRANCH: Rule of thumb.

1643

JUDGE PAYNE: Why don't you just ask the questions, let them answer.

[76] MS. BRANCH: I'm sorry.

BY MS. BRANCH: (Continuing)

Q    What was the purpose of the 55 percent?

A    The purpose of the 55 percent was to ensure that we met the African-American voting strength that would ensure that the Department of Justice would pass our plan. Because that's what I understand from Delegate Jones we had to do to get it passed.

Q    Okay, great. And now we're going to turn our attention to Plaintiffs' Exhibit 35, which is the exhibit we were just in. We are going to look at page 157, please.

A    I'm there.

Q    Great. And I will just direct your attention to line 2, and I will read it for the record. It says: Thank you – this is you speaking.

JUDGE LEE: Why don't you let her read it.

Q    Okay. Delegate Dance, could you read the section from line 2 to line 11, please.

A    As a member of the House Redistricting Committee, I support House Bill 5001 in its substitute form as we have before us, and it's again for more than just the one reason that it mirrors the – or doesn't mirror, but it does support the 12 minority districts that we have now and it does provide that 55 percent voting strength that I [77] was concerned about as I looked at the model and looked at the trending as far as what has happened over the last ten years.

1644

Q    Thank you. And now, around line 8 you say that you are concerned about the 55 percent voting strength.

Why were you concerned?

A    I was concerned because that was the strength that I understood – the 55 percent strength was the number that we must meet if we were going to clear the bar with the Department of Justice as far as our districting plan having met the voting strength for African-Americans.

Q    And did you support that 55 percent target?

A    Yes, I did.

Q    All right. And why?

A    Because I respect, and I still do, that Delegate Chris Jones, who was the one that was chairing the committee, expressed that this is what we needed to do. He had done this before, he had done it ten years – the plan prior to. And this is what he said we needed to do. And we were working – and we were meeting that, all but this one area, and we had to make that happen if we were going to have a plan that stood the test of the Department of Justice.

Q    Did anyone ever show you any data or analysis that would show that a 55 percent black voting-age population [78] was necessary for the plan to be cleared by the Department of Justice?

A    I don't recollect anyone showing me that.

Q    Did anyone ever show you any racially polarized voting analysis?

A    I don't recollect being shown any.

Q    Did Delegate Jones ever tell you that he relied on any expert reports in coming to the 55 percent number?

1645

A    No, I cannot remember him telling me that.

Q    Okay. And you mentioned drawing maps at the Division of Legislative Services. Did anyone ever tell you that the Division of Legislative Services calculated black voting-age population differently than the Department of Justice did?

A    No.

Q    And you talked a little bit before about Delegate Tyler's district, and she is in District 75. I would like to discuss a little bit more about that and how your district was drawn as a result of the 2011 redistricting.

Can you please turn to Defendant-Intervenor's Trial Exhibit 94, and these are the maps that we looked at earlier. We are going to look at page 1.

And the same key to the map applies here. So the yellow cross-hatching part of your district is what was in your district and what remained in your district after the [79] 2011 redistricting.

The white cross-hatching represents part of your district that was no longer part of your district after 2011.

And the bright yellow parts in the Northeast part of the map represent the precincts or the areas that were added to your district as a result of the 2011 redistricting.

Does that sound accurate?

A    Yes.

Q    And does this look like an accurate representation of your district?

A    Yes.

1646

Q   Now, which localities made up House District 63 prior to the 2011 redistricting?

A   All of the county of Dinwiddie, all of the City of Petersburg and parts of Chesterfield, in particular the Ettrick and Matoaca area of Chesterfield County.

Q   And how did your localities change as a result of the 2011 redistricting?

A   I went from three localities to five localities.

Q   And which ones were added?

A   Parts of Prince George County and parts of the City of Hopewell.

Q   And was Dinwiddie County in its entirety included in [80] your district after the redistricting?

A   After the redistricting I lost parts of Dinwiddie County, maintained Ettrick/Matoaca area of Chesterfield County, the City of Petersburg was in tact. I picked up parts of Prince George County. And then parts of the City of Hopewell.

Q   And where did the parts of Dinwiddie County that you lost, where did they go?

A   That was – it went to Delegate Tyler to try to get her number up to 55 percent.

Q   And when you say her number, what you are you referring to?

A   Of African-American voters up to 55 percent.

Q   And now why didn't Delegate Tyler's district extend to the ease or west instead of coming into Dinwiddie County, which was to the north, I think.

A   Even with all the little cities and towns that she has, it wasn't giving her African-Americans – the

1647

east and west would have been Euro-Americans, and she needed some African-Americans to get to that 55 percent.

Q   And how did you feel about giving up parts of Dinwiddie County to Delegate Tyler?

A   I was not happy.

Q   Why were you not happy?

A   Because I had all of Dinwiddie County, that was an [81] area that I knew well, the people. And I was not excited about giving up Dinwiddie County.

Q   And how did you know those voters there?

A   My professional career, which I retired from, it started in Dinwiddie County working for a facility there, Southside Virginia Training Center, where I rose from the level of nurse's aide to the point that I was interim facility director. And a lot of my employees came from Dinwiddie County.

And so, that was more than just people, they were like family. But that's a part of my job, was to get her to 55 percent and to increase from three localities to five localities because that's what it took to get her to the 55 percent strength of African-American voters.

Q   Now, as a result of losing population in Dinwiddie County, did you pick up population elsewhere?

A   Yes, I did. That was the population that I picked up in Prince George because of it being contiguous, so I picked up part of Prince George, that was to get more African-Americans. And then I picked up the concentration of African-Americans in Hopewell, the City of Hopewell.

Q   Now, which precincts did you pick up in Hopewell?

1648

A   Hopewell, it's on the map, you can see it's wards, listed as Ward 2, 6, and then part of 7.

JUDGE PAYNE: What was the last one, please, [82] ma'am?

THE WITNESS: Wards 6 and 2, and parts of Ward 7.

JUDGE PAYNE: 7. Okay, thank you.

BY MS. BRANCH: (Continuing)

Q   Now, in order to get your district to Hopewell, can you describe the route that it takes on the map.

A   To get from – the map runs smooth when you get from Petersburg, then you travel down 36 and you pick up the Route 36. You will see you pick up Prince George. And then continuing down, you cross over 295, and you're still – if you're doing a straight route, you could still get to Hopewell by 36 as well.

So you can get to Hopewell through Prince George, the way the lines were drawn, or if I traveled down 36, it would not have been a contiguous route. But if I were staying within my district to get there, then I would have gone through Prince George to get to Hopewell.

Q   And what is the racial makeup of the three precincts that you picked up in Hopewell, the two parts – or the two full precincts and the one part?

A   The high percentage is African-American in those areas.

Q   About what percentage would you say?

A   Of those precincts that I took?

Q   That are African-American?

1649

[83] A  They are African-Americans, if you ask me, right off I would say at least 60 percent African-American.

Q    Okay.

JUDGE PAYNE: Is that true, Senator, for each of the two full precincts?

THE WITNESS: The two full precincts in Hopewell.

JUDGE PAYNE: In, okay.

MS. BRANCH: I have no further questions. Thank you.

JUDGE PAYNE: When you used the term "ward," were you talking about precincts or voting tabulation districts?

THE WITNESS: In the City of Petersburg, because that is one that at one point it was under the Department of Justice and when they were voted, it's seven areas, and they are called seven wards.

And I just have – and in Hopewell, the same, they are considered – they are made up of seven wards. And so –

JUDGE PAYNE: That's the setup of the towns themselves?

THE WITNESS: Yes, right.

JUDGE PAYNE: Without anything to do with your district per se?

THE WITNESS: No. The precincts were like 27 [84] precincts that made up the locality.

JUDGE PAYNE: All right. Thank you.

MS. WALRATH: Good, I think it might actually be afternoon now, Senator Dance, and Your Honor's. I am

1650

Jennifer Walrath on behalf defendant-intervenors,
and this will be pretty brief.

JUDGE PAYNE: Could you pull that mike to you.

MS. WALRATH: I can, yes.

JUDGE PAYNE: Thank you.

MS. WALRATH: I need to improve my diaphragm.

CROSS EXAMINATION

BY MS. WALRATH:

Q    Senator Dance, I believe that you just testified
at the time of the 2011 redistricting you were a
member of the Virginia House of Delegates?

A    Yes.

Q    And that you served on the House of Delegates
Committee on Privileges and Elections?

A    Yes, I did.

Q    That was the committee that dealt with the
redistricting process in 2011?

A    That was a subcommittee of that committee.

Q    Okay. And in your capacity on that committee,
you attended various public hearings across the State
of Virginia concerning redistricting?

[85] A  Yes, I did.

Q    And we heard a bit of this earlier during your
testimony, but at this time I would like to play a video
clip from Plaintiffs' Exhibit 36. And if you wish in the
transcript, it is at Plaintiffs' Exhibit 35. It will be begin
where Delegate Dance, now Senator Dance, was
reading previously on page 157 line 2. We believe it
would be beneficial for the court to see the entire
speech.

1651

JUDGE PAYNE: What are you talking about playing, the speech?

MS. WALRATH: Yes.

JUDGE PAYNE: Okay.

NOTE: The audio clip is played into the record as follows:

DELEGATE DANCE: Thank you, Mr. Speaker. And I guess I wanted to speak to the bill, so maybe it's not the right time.

MR. SPEAKER: You want to speak to bill?

DELEGATE DANCE: Yes.

JUDGE PAYNE: You've got – you've got the floor.

DELEGATE DANCE: Thank you. As a member of the House Redistricting Committee I support House Bill 5001 in its substitute form as we have before us. And it's again for more than just the one reason that it mirrors the – or doesn't mirror, but it does support the 12 minority [86] districts that we have now and it does provide that 55 percent voting strength that I was concerned about as I looked at the model and looked at the trending as far as what has happened over the last ten years.

And one of the best examples I can give for that and most concern was the area that was mentioned prior and that is Delegate Tyler's area in the 75th. Because Delegate Tyler is an African-American that now finally sits in a minority seat that's been there for years, but there have been three tries by minorities in the past to win that seat and they were not able to do so.

And if that district is below that 55 percent voting strength, then I think she would be able to hold the seat that she now holds today. And I was really, really

1652

concerned about that. That issue was addressed and it is now in that House Bill 5001, and I'm glad it's there.

That is the – and for the rest of the House – or the minority districts, it shows 55 percent voting. And it's voting, not just people being there, but the effective opportunity for them to hold minority seats.

And not just for us incumbents that are in the seats, but for those that would come after us.

And as mentioned by Delegate Hope and he was asking about the 27th, 69th, 70, 71, they represent [87] minority seats. Not the 27, but you the 69, the 70, the 71, they represent minority seats (inaudible) even though minorities might not be in there. And if we are to preserve the rights for minorities to have a voice as to whether or not they want to have a minority serve them or someone of majority persuasion, that they have their choice. And they could lose that choice if they did not have the voting strength that we now have in this.

And I also support this bill because I am on the House side on the Democratic House side, and I know that my colleagues, because I represented them and I tried to be a voice for all of them in working with the Chair as he developed his bill, that they gave me their suggestions. I passed them on and they would look back, and the Chair did work with them directly. And I see a lot of us had a lot of voice in House Bill 5001. It's not just African-Americans. African-American, Euro-American, it represents members of my side of the House as well, have a voice in the bill that we have. And I think it's the best compromising bill that we could bring forward that truly represents Virginians. And that's the Commonwealth, not just us, but the people that will come after us.

1653

Thank you.

JUDGE PAYNE: What exhibit is that?

MS. WALRATH: That is a clip from Plaintiffs' [88]
Exhibit 36. And the transcript of that exhibit is at 35.

BY MS. WALRATH: (Continuing)

    Q   Now, Senator Dance, that was you speaking,
correct?

    A   Yes.

    Q   And the clip is accurate as to what was stated
on the floor?

    A   Yes.

    Q   And did you say anything that wasn't true?

    A   No.

    Q   And how much time did you spend with
plaintiffs' counsel preparing for today's testimony?

    A   Not that much. The only time I met with them –
do you want time? Do you want to give me –

    Q   Approximation?

    A   Maybe an hour 30 minutes, maybe up to two
hours max. You know, in a conversation or two,
whatever.

    Q   Okay. Just one last question. HB 5005, the plan
at issue here, you voted for that plan, right?

    A   Yes.

MS. WALRATH: Nothing further at this time.

JUDGE PAYNE: Any redistrict? None? Yes?

MS. BRANCH: No, Your Honor.

JUDGE PAYNE: May she be permanently excused?

1654

MS. BRANCH: Yes, she may.

MR. BRADEN: Yes, Your Honor.

[89] JUDGE PAYNE: Mr. Troy?

MR. TROY: Yes, Your Honor.

JUDGE PAYNE: Thank you, Senator, for being with us. We appreciate your testimony. And you may step down and be excused permanently to go about your business.

NOTE: The witness stood down.

JUDGE PAYNE: Your next witness.

MS. BRANCH: Plaintiffs call Ward Armstrong.

NOTE: The witness is sworn.

WARD L. ARMSTRONG,

called by counsel for the plaintiffs, first being duly sworn, testifies and states:

DIRECT EXAMINATION

BY MS. BRANCH:

Q   Good afternoon, Mr. Armstrong.

A   Good afternoon.

Q   Would you please state your name for the record.

A   Ward L. Armstrong.

Q   And where are you from?

A   I am from Martinsville, Virginia.

Q   And where do you currently work, Mr. Armstrong?

A   I'm a trial attorney. I am the senior partner in Armstrong & Armstrong, attorneys at law, 1 Walnut Street, Martinsville, Virginia.

1655

[90] Q  Are you currently a member of the House of Delegates?

A  I am not.

Q  And how long did you serve – or did you serve in the House of Delegates, I'm sorry?

A  I served for 20 years. I was elected in '91, was sworn in January 1992, and left office January 2012.

Q  What district did you represent?

A  The numbers changed. The first ten years it was House District 11. The second ten years the House District assigned or that I ran in was House District 10. And then I was defeated in my last election, I ran in House District 9 in the newly reconstituted districts after the 2011 redistricting.

Q  All right. And what leadership positions, if any, did you hold during your time in the House?

A  I was the minority leader of the House from 2007 until I left office in 2012.

Q  So you were the minority leader at the time of the 2011 redistricting?

A  I was.

Q  Now, prior to the 2011 redistricting, had you been involved in a redistricting process before?

A  Yes. I was in the House during the 2001 redistricting process.

Q  And how would you describe your role during the 2011 [91] redistricting process?

A  Very involved. As the minority leader, I would have been the person on my side of the aisle for the Democrats that would have put forth both alternative

1656

plans to the majority party as well as to make challenges to any redistricting plan that was put forth by the majority party.

Q   And did you speak with members of your caucus during the process?

A   I did.

Q   And about how often?

A   Well, during the – both the lead-up to the special session in April of 2011 and during the special session, daily.

Q   Who was the chief patron of the redistricting plan?

A   Delegate Chris Jones.

Q   Okay. Now, can we please turn to Plaintiffs' Exhibit 35. This is the same one we've been looking at. And we're going to look at page 66, please.

A   I'm sorry, counselor, what page?

Q   We're going to look at page 66 of Trial Exhibit 35.

A   All right.

Q   And I would like to direct your attention to line 7. And there – I can read it for the record. I've already read it, but I will read it if that's –

[92] JUDGE PAYNE: I think we've read it. He can read it to himself if you need to refresh his recollection, and then you can go about your questioning.

A   I have read it.

Q   Great. Now, what did you understand Delegate Jones to be referring to with the 55 percent number on line 12?

1657

A    The gentleman was referring to black voting-age population in the various minority-majority districts in the Commonwealth of Virginia.

Q    And what was your understanding as to the significance of 55 percent?

A    Well, as a result of the exchange or the colloquy that I had with Delegate Jones on the floor, 55 percent was not aspirational. It was a bright line rule. That the districts, the minority-majority districts would have to be at least 55 percent black voting-age population or he would not – or the committee would not support the plan. And that any plan coming forward would have at least a 55 percent black voting-age population or it would not be put forth to the floor.

Q    And what made you think that?

A    Repeated questioning of Delegate Jones on the floor of the House of Delegates, combined with my conversations with my colleagues off the floor of the House.

Q    Great. Did you ever advocate for increasing the [93] number of majority-minority districts?

A    Yes. The plan that was put forward by the Democrats created a thirteenth minority-majority district.

Q    And we can turn to again the same Plaintiffs' Trial Exhibit 35, turning to page 70.

A    Yes, ma'am.

Q    And I would like to read a statement made by Delegate Jones. You can see that he is the one speaking if you just turn back to 69, line 17. And I would just like to read a portion, starting on line 4 of page 70.

1658

He says, quote: I have looked at the 12 and the 13th plan, Option 1 and Option 2, and neither one of those plans met what I think, from the testimony that we heard throughout this process, that the effective voting-age population needed to be north of 55 percent. Each of those plans had a low of I think 52, 52 percent, end quote.

Can did I read that correctly?

A   You did.

Q   What was Delegate Jones referring to when he said the 12 and 13th plan Option 1 and Option 2?

A   He was referring to the democratic plan that would have created a 13th minority-majority district. And his reference was that in his opinion because some of the districts fell below 55 percent, that they would be [94] unacceptable. That's what I gleaned from his testimony, from his answer.

Q   And now the same exhibit, turning to page 72.

A   All right.

Q   On line 5, you asked the question on the House floor. Could you read that question?

A   Yes.

Q   It goes from line 5 to line 9.

A   Yes. DELEGATE ARMSTRONG: So the gentleman has stated that in his opinion nothing below a 55 percent minority-majority district would be sufficient for the minority community to elect its candidate of choice?

Q   Thank you. Now, why did you ask that question?

A   I wanted to be clear that what the Privileges and Elections Committee and what the purpose was

1659

behind HB 5001 with regard to the establishment of a percentage.

I would tell that personally I did not feel that a bright line rule was necessary in order to comply with the Voting Rights Act. But I wanted to be sure that that's what my understanding was of Delegate Jones and the Privileges and Elections Committee of HB 5001 that they were putting forth, that it had to comply with that bright line rule.

And that's what I gleaned from not only this answer, but from repeated questioning on the floor of the [95] House.

Q   And on line 12 of that same page, page 72, Delegate Jones responds to your question. And he says, quote: I'm not sure he was listening closely –

JUDGE PAYNE: Excuse me, Ma'am.

JUDGE LEE: We will take about a ten-minute release. Thank you.

NOTE: At this point a recess is taken; at the conclusion of which the case continues as follows:

JUDGE PAYNE: Mr. Armstrong, I remind you again of the same oath you took before the recess.

THE WITNESS: Thank you, Your Honor.

BY MS. BRANCH: (Continuing)

Q   So, Mr. Armstrong, you read a question that you asked on the House floor right before we took the recess. And Delegate Jones responds on page 72, line 10. He says, quote: I'm not sure he was listening closely. I said it's my opinion from the testimony that was received during our public hearings that the community felt they needed a percentage of 55 percent or better. That was my response to the gentleman.

1660

Was that Delegate Jones' response to your question?

A    It was.

Q    What was your understanding as to why the 55 percent black voting-age population was necessary?

[96] A  Well, I argue with the premise as to whether or not it's necessary. In my studies of the Voting Rights Act, I have never seen in case law a bright line rule for any percentage, 55 percent or otherwise.

I was a little surprised by the response in that most of my experiences with the general public is you walk into ten people on the street, nine of them don't know what redistricting is, much less what percentage of black voting-age population might be necessary for a majority-minority district to elect its candidate of choice.

So I was surprised that he would glean that from a public hearing, at least one in which there wasn't some form of expert testimony. And I wasn't aware of any.

Q    All right. And now we've heard the 55 percent, it's been referred to as the target. You've testified that it was a bright line rule.

Whatever label that we put on it, was it always applied during the redistricting process?

A    It was. Not just HB 5001, but to the iterations that followed. The bill that was ultimately passed, there were changes in the Senate redistricting plan, but essentially the House plan stayed in tact throughout.

Q    In the final plan that was passed, did the 55 percent, did that apply to every district?

[97] A  It did to the 12 African-American or minority-majority districts, yes.

1661

Q   And was any majority-minority district below the 55 percent?

A   It was not.

Q   All right. And you've referred to it already, but what was your understanding about what Delegate Jones relied on to create the final map?

A   Well, I questioned him about that. And the answer that I received was, well, we relied on the census data. And there were two data points in particular, is my recollection. The black voting-age population was one of the data points.

But I also asked him what retrogression analysis was performed. And was surprised to learn that there wasn't any that was done on the particular data.

And so, I had – what I had tried to question Delegate Jones is how did he arrive at the 55 percent? What basis did that have besides the anecdotal evidence that you just read from page 72 transcript, lines 10 through 15. And basically precious little empirical evidence. That he strictly, as far as I could tell, the number was almost pulled out of thin air.

Q   Okay.

A   But it was strictly adhered to. There was no plan [98] that would be considered that fell below the 55 percent, period.

Q   Could you please turn to the same Plaintiffs' Exhibit 35, page 51 of the transcript.

A   I'm sorry, the same 35, page 51.

Q   Page 51, yes, sir. A Yes, ma'am.

Q   And could you read your question which starts on line 10 and ends on line 16.

1662

A   Yes. Line 10, Delegate Armstrong: Can the gentleman share with me what data that he used in order to determine the minority-majority district voter participation? What retrogression data he would have used in consideration in adopting a plan that would have had 12 minority-majority districts?

Q   What were you trying to find out by asking that question?

A   Again, I was trying to learn how did we arrive at the 55 percent. What retrogression analysis did he have that indicated dropping below 55 would not allow minority-majority districts to elect their candidate of choice.

JUDGE PAYNE: Excuse me, do you mean what analysis about the topic of retrogression, not a retrogression analysis, is that correct?

[99] THE WITNESS: I'm sorry, would you restate that.

JUDGE PAYNE: A retrogression analysis is a term of art that is mathematically applied to find out certain data.

THE WITNESS: Yes, sir.

JUDGE PAYNE: You're not talking about that? Your saying an analysis that would determine what kind of retrogression might be in the black voting population, is what you mean, is that right?

THE WITNESS: Yes, sir.

JUDGE PAYNE: Okay, thank you.

THE WITNESS: In connection as well, Your Honor, what data did he use to support –

1663

JUDGE PAYNE: I know, but I wasn't asking that. I was just asking about the use of that term. I was concerned about whether or not there was some analysis that was possible to be done of that particular kind. And you've answered my question. Thank you.

You may resume.

BY MS. BRANCH: (Continuing)

Q   On line 17 Delegate Jones responds to your question. He says, quote: I'd say to the gentleman that I used the data as it was provided by the Census Bureau to look at percent black population and percent black voting-age population, end quote.

[100] Did I read that correctly?

A   You did. And those were the two data points that he indicated that he used.

Q   And now, can we just flip the page to page 52. You asked a question on the House floor on line 4. Could you read that question, please.

A   Beginning line 4. Delegate Armstrong: Would the gentleman agree with me that just determining – in determining a majority-minority district is more than just determining what population that one has to analyze whether or not based on past voting patterns whether or not the minority population within such district has the ability to elect its candidate of choice and that requires more than just an analysis of raw census data.

Q   What types of data were you suggesting Delegate Jones look at?

A   Well, I mean, it would seem to me that looking at voting patterns would have been a necessary examination more than just looking at the raw census data.

1664

I'm not certain that that tells you very much, just looking at that one data point.

Q   And Delegate Jones responds to your question on page 13 of the transcript. He says, quote: Mr. Speaker, I'd say to the gentleman, he may be giving me more credit than he should. What I did, I listened to testimony that [101] was provided during the process of all these public hearings that we had and I tried to respond to the community and what they thought was an effective percentage that they would need to have and effective representation of the candidate of their choice, end quote.

A   Yes.

Q   Now, what was your understanding based on that as to what data or what Delegate Jones relied on in determining whether or not the black voters in these majority-minority districts could elect their candidate of choice?

A   Well, again, it appeared to me that it was more or less anecdotal testimony at the various public hearings. And I'm not certain that that was necessary or sufficient in order to ensure that you could avoid retrogression, avoid it by the Voting Rights Act, but yet also to avoid racial packing in these districts.

I mean, yeah, you carry it to its logical conclusion, if you want to be absolutely certain, then set it at 60 or 65. I think in many cases though that –

JUDGE PAYNE: I think you need to get the question out. Please answer just the question and only the question. And then if she wants to follow up, she can follow up. I don't think speeches are helpful at this point.

[102] THE WITNESS: Yes, Your Honor.

1665

BY MS. BRANCH: (Continuing)

Q   So staying in that same exhibit, turning to page 65, please.

A   Yes.

Q   We're going to look at line 1. When you get there, if you could read your question on line 1.

A   Delegate Armstrong: Well, in determining compliance with the Voting Rights Act and whether or not these majority-minority districts are able to select its candidate of choice, did the gentleman do anything more than speak with the members that may represent those particular districts at the present time?

Q   And why did you ask that question?

A   Well, I wanted to find out what he did besides talking with the various members whose districts may be affected, the Delegate Dances, or the Delegate McClellans, or the Delegate Tylers. Did he do more than that?

Q   And on line 8 of that same page Delegate Jones responds. He says, quote: Yes, sir. I spoke with several citizens along the way who came to see me or called me, and I listened to what they had to say. We had individuals at the public hearings who stated their concern; that the dilution of the percentage of voting-age population would greatly diminish their chance to be able [103] to elect a candidate of their choice, end quote.

Did Delegate Jones ever mention relying on anything other than conversations with delegates and members of the community to determine what percent black voting-age population these majority-minority districts needed to have in order for the voters to be able to elect their candidate of choice?

1666

A    He did not.

Q    Did Delegate Jones ever mention reviewing any expert reports?

A    He did not.

Q    Did he mention reviewing any reports from a court case called Wilkins v. West?

A    He did not.

Q    Can you please turn to page 54, please, of the same exhibit.

JUDGE PAYNE: Are you saying five-four, ma'am, or six-four.

MS. BRANCH: Yes, Your Honor, five-four.

JUDGE PAYNE: Thank you.

BY MS. BRANCH: (Continuing)

Q    And can you read your question, starting on line 18.

A    Delegate Armstrong: Can the gentleman tell me whether he or any persons that worked with him in the development of the plan that resulted in House Bill 5001 took into [104] account any retrogress – it should be retrogression – analysis regarding minority performance in any of the 12 majority-minority districts that are part of HB 5001.

Q    And now just to clarify for the record, what did you mean by retrogression analysis?

A    Whether or not that he did any type of empirical data analysis that would lead him to conclude what percentage, if any, was necessary for a particular minority-majority district to elect its candidate of choice.

1667

Q   Great. Now, Ms. Moreno, if you wouldn't mind just putting the poster board up for us, please.

And we're just going to highlight Delegate Jones' response to your question about whether or not any retrogression analysis was performed.

On line 3 of the transcript on page 55 he says, quote: I would say to the gentleman, I'm not aware of any.

Do you remember him saying that to you on the floor?

A   I do. The transcript is accurate.

Q   Great. And could you please turn to page 58 of the same transcript, five-eight.

A   All right.

Q   Line 13, could you read your question, please.

A   Delegate Armstrong: Well, would the gentleman not [105] agree with me that he had available to him the resources of the Division of Legislative Services. That if the gentleman had requested a full retrogression analysis of the majority-minority districts, it could have been accomplished?

Q   What was the point you were trying to make there?

A   The Division of Legislative Services is a group of attorneys that provides support services to the General Assembly. Most of us are jack of all trades, masters of none, and we turn to them for support in the various subject matters that we are called upon to legislate. And if Legislative Services can't find an answer, they can contact people and bring in experts who can.

1668

So there was no doubt in my mind that resources were available to the Privileges and Elections Committee and Delegate Jones to conduct any type of retrogression analysis that he wanted to undertake in order to determine what would be necessary for each of the majority-minority districts to elect its candidates of choice.

Q   Have you worked with staff at the Division of Legislative Services before?

A   Frequently, daily.

Q   Do attorneys work there?

A   Yes. I probably can't tell you the number, it's probably north of three dozen.

[106] Q   And do you know if any of those attorneys have any expertise in the Voting Rights Act or any of the issues that we've discussed today?

A   Absolutely. They are – those that deal with the Privileges and Elections Committee are very well versed in the Voting Rights Act and all state statutes dealing with elections law.

Q   Were you surprised that according to Delegate Jones he did not refer to the Division of Legislative Services to perform any types of analysis?

A   I was.

MS. BRANCH: I have no further questions. Thank you.

JUDGE PAYNE: Any cross-examination?

1669

## CROSS-EXAMINATION

BY MR. RAILE:

Q    Good afternoon, Mr. Armstrong. I'm    Richard Raile, counsel for the defendant-intervenors.

A    Nice to met you, sir.

Q    You may recall that we met at your deposition in May.

A    Yes, sir.

Q    Have you had communication with plaintiffs' counsel since your deposition?

A    Limited communication, most of it of the nature of logistics as to when I would be needed to be called as a [107] witness and where the hotel would be, et cetera.

Q    Understood. You were House minority leader at the time of the 2011 redistricting, right?

A    Yes, sir.

Q    Isn't it correct that you are no longer the minority leader?

A    I am no longer the minority leader, and I am no longer a member of the House.

Q    And that is due in large part to the plan at issue in this litigation, isn't it true?

A    Well, it is due to a variety of factors. I would say that redistricting of my district in Southwest Virginia played a role in that, yes, sir.

Q    And your district was House District 10, right?

A    It was. And it was moved to Northern Virginia, I ran in House District 9.

1670

Q   Understood. And that was not actually the district that you were drawn into, right? Didn't you have to move over to that district?

A   Right. I was drawn into District 14. Basically my district was fractured amongst the three. And I decided that District 9 would be the best district to run in. It was not a correct decision, or at least I did not win.

Q   I was going to ask you that. That effort was not successful, correct?

[108] A  Right.

Q   Now, during the floor debates over the plan, you made speeches against the plan, isn't that right?

A   I did.

Q   I'm going to show the Court a clip from what is marked as Defendant-Intervenors' Exhibit 3, which I understand to be the last of those.

JUDGE LEE: We can do that right after lunch. We will recess now until 2 o'clock. Thank you.

NOTE: At this point, a lunch recess is taken; at the conclusion of which the case continues as follows:

JUDGE PAYNE: All right, Mr. Raile, you can continue. Mr. Armstrong, I remind you you are still under oath.

THE WITNESS: Yes, Your Honor.

BY MR. RAILE: (resuming)

Q   Mr. Armstrong, as I was saying before the lunch, we're going to show the Court a clip from Defendant Intervenors' Exhibit 3, and if you're following along in the transcript, that would be

1671

Defendant Intervenors' Exhibit 4 at pages two through seven.

THE WITNESS: I'm sorry, sir. I do not have Exhibit 4.

JUDGE PAYNE: What did you say, sir?

THE WITNESS: I do not have Exhibit 4.

[109] THE COURT: It will be in a different book there, intervenors defendant book. It's a black book.

THE WITNESS: Thank you, Your Honor.

JUDGE PAYNE: Do you have it now, sir?

THE WITNESS: Yes, Your Honor. What page, sir?

MR. RAILE: Two through seven.

THE WITNESS: Thank you. I'm ready.

(Video played as follows:

UNIDENTIFIED SPEAKER:  The hour is late.

Everyone in here is tired. I will be brief, but this bill will affect eight million people in this Commonwealth for next decade.

Yesterday was about legal arguments. Today we talk about policy and what's right. Last night, I had the privilege of speaking at the ^ Sorenson Institute dinner along with our speaker, the majority leader of the Senate and the minority leader, and I told a joke about my good friend from Henrico and Rorschach inkblot, and we kidded about redistricting, but one of the things that I said to the group in seriousness last night is that we are in sore need of a nonpartisan commission to draw lines.

Now, in drawing a redistricting plan in this Commonwealth when subject to the Voting Rights Act, the [110] first thing that one has to do is make it legal,

1672

and that means compliance with Section 2 and Section 5 of the Voting Rights Act, and so that was in the criteria. But we've all seen the criteria list that came out of the Privileges and Election Committee about keeping communities together and communities of interest in contiguity and population deviations.

Let's not kid ourselves. The number one criteria in the drafting of a redistricting plan, 5001 or one down the hall in the Senate, is protecting the incumbents of the majority party, and when convenient, protecting incumbents of the minority party. That's what this is about.

I was here in 2001 when it was done. Some of you were here in 1991 when it was done, some in '81 and '71 when it was done. And whether it's gerrymandering by Republicans or gerrymandering by Democrats, it's still gerrymandering. I'm not going to defend the same act when it goes on down the hall.

It is the most selfish exercise in politics, in government, one that will turn friend on friend. You know, when they train lifeguards – and you've seen on Bay Watch they have the red floats. They tell a lifeguard, when you get near a drowning person, don't touch them. They'll grab you and pull you under. Give them the float. [111] It is that much at stake.

And I suppose that it's easy to do and get away with because the public either doesn't get it or doesn't care. It's not like raising their taxes or taking away their pellet guns. In fact, I would say if you walked up to ten people on the street and said, they're doing redistricting, what's that, nine of them couldn't tell you what it was.

But it is the most basic of what we do, because it is – it affects everything we do because it affects how

1673

we select ourselves. You know, you know, some may say, well, the only reason you're standing up is because it gets you. This isn't about Ward Armstrong. You know, you can replace the president of the United States, you can replace me. I won't be remembered ten minutes after I'm gone. And at the end of the day, that doesn't matter either.

What does matter, though, is that people are able to choose for themselves their own representatives, not the other way around. We carve these districts up so the outcome is preordained, and we do it to protect ourselves.

Well, I suppose it will be what it will be. I know the outcome of this vote. There probably won't be single digits against it in a few minutes. You know who can stop this? The guy that sleeps across the street, [112] and, in fact, I'll tell you that's what it's going to take.

If Bob McDonnell said, I will veto any bill that gets to my desk that's not the result of a nonpartisan commission, it would end. Either you send a nonpartisan commission bill, or you can go to federal court, take your choice, and that would end it. But, no, we all know that that isn't going to happen.

I heard earlier today that he keeps campaign promises. Well, he doesn't keep all of them. He isn't going to keep this one.

You know, when I leave this place on a lot of days, I really feel good. The day that we passed the bill that created the new college back in Martinsville, I said, you know, I really made a difference.

Is anybody really going to feel good when you went out of here today and we've whacked these districts,

1674

that we have deprived these people, the people living there their ability to choose their own delegates?

You know, one other point that I want to make. I was laying in bed the other night, I thought about – I went around the chamber today during one of the breaks, and I counted the number of women in this chamber.

There's 18. With one fell swoop of the bill, you're going to get rid of two of them. That's ten percent of the [113] women in this chamber. As hard as it is to elect women in this state to these positions, and we're going to kick two of them out the back door in just a few minutes.

Well, I don't know, Mr. Speaker. I guess maybe at this point in time anything more I say I'm going to go to whining, but if anybody thinks that this is the General Assembly's finest hour in cutting a bill like this, well, they're sadly mistaken. Do what you will.

(End of video clip.)

Q    Mr. Armstrong, is that you in the clip?

A    It was.

JUDGE PAYNE: Pages three through seven of Exhibit 4; right?

MR. RAILE: I believe that's correct, Your Honor.

Q    Is the clip accurate to what you said?

A    It is.

Q    Was there anything you said in that speech on the House floor that was not truthful?

A    No, sir. I suppose that most of it was opinion, not fact, but.

1675

Q   You stated in the clip we just saw that there would likely be few votes against the redistricting bill; right?

A   That's correct. There were nine as I recall.

[114] Q  So your prediction proved correct?

A   I meant to say it won't get into double digit, but, yeah, I was one vote being correct.

Q   So the vote, as you say, was a foregone conclusion?

A   In my estimation, it was preordained.

Q   And didn't even most of the members of the democratic party vote in favor of the plan?

A   They did, sir.

Q   Now, you didn't have a role in drawing the plan, I assume?

A   Well, I was a sitting member of the House of Delegates and I had a vote. Was I the originator of House bill 5001, or did I alter the course of history? No, sir, I did not.

Q   There were a lot of meetings between delegates that went on behind the scenes going to that plan; isn't that correct?

A   Most assuredly.

Q   And isn't it correct that you were not part of those meetings?

A   I was not a part of most of them. The majority party did not share its internal discussions with me. I did have some conversation with members of my own party about the redistricting plan.

1676

Q   Wasn't it the case that you also had a lot of trouble [115] that was unusual, given that you were the minority leader, in getting information from Democratic party members?

A   No, sir, that was not a departure from the usual course of business on about any subject matter. I was not included in the reindeer games if that's what you are asking.

Q   That's what I'm asking. Sorry. I apologize for misdirecting you, but what I'm getting at is, isn't it correct that you didn't play a role, you didn't have a lot of inside information about what was going on behind the scenes; right?

A   That's a compound question. I feel I played a role.

I did everything that I could and should, as the minority leader, to set forth our position. Was I included in the private discussions of the majority party?No, I was not. Was I included in private discussions between members of the majority party and some members of my own party? No, I was not.

JUDGE PAYNE: I think that started out with a different question, though, and I would be interested in the answer. The first question was whether you had difficulty getting information from members of your own party about what was going on in the deliberations on the committee. That was the beginning of the question.

THE WITNESS: The answer to that question, Your [116] Honor, would be yes.

JUDGE PAYNE: Yes? Okay, sorry.

THE WITNESS: Yes, sir.

1677

JUDGE PAYNE: All right, go ahead, Mr. Raile.

MR. RAILE: Very good. Thank you, Your Honor.

Q   Now, you say that you did your best to advance the position of the democratic party in this process?

A   Well, that's a little harder to answer.

Q   I apologize. I actually thought that's what you said. I must have misunderstood you.

A   I think the Democratic party at large that I was advancing the position that most Democrats would assert me to take. Whether or not that was also the majority position of members of my own party, you could argue or debate given the outcome of the vote.

Q   We know the outcome of the vote; right?

A   Yes, we do.

Q   It would be fair to say, though, that –

JUDGE LEE: Excuse me. Did I hit alarm? I apologize for the distraction. I accidentally hit the panic alarm, so the whole world is about to descend on us. I apologize.

I accidentally hit the button I'm so sorry. It's my fault. Thank you for coming So promptly. I take full responsibility for my actions.

[117] JUDGE PAYNE: Thank you, very much.

MR. RAILE: Thank you, Your Honor.

Q   Mr. Armstrong, did the Democratic party propose an alternative plan to the one adopted?

A   Yes, sir.

Q   What was the House bill number on that?

1678

A   I don't know that I can remember the number of the bill. If you refresh my memory, I may not be able to disagree with you but it may help.

Q   Was it HB 5002?

A   That would – I would not dispute that that's not the number.

Q   Okay.

A   It had a very short shelf life, so I don't remember the number.

Q   Okay. You referred in your – in some of the testimony we heard earlier to options one and options two in a bipartisan commission redistricting report; is that correct?

A   That's correct.

Q   Do you remember the House bill numbers for those?

A   I do not.

Q   Do you remember if they were introduced formally as House bills?

A   I cannot recall that. I do know that there were [118] alternative plans that created a 13th district and that I had proposed one, yes.

Q   And did you – do you have a degree in statistics?

A   No. In fact, statistics was one of the worse courses I had at my undergraduate. I made a C.

Q   Have you ever performed a regression analysis?

A   No, sir.

Q   Do you know the difference between an ecological regression analysis and an ecological inference analysis?

1679

A   No, sir.

Q   Did the Democratic party ask anyone in the division of Legislative Services to perform a regression analysis in the preparation for the 2011 redistricting?

A   No, sir. We had our own expert.

Q   Your own expert who performed a regression analysis?

A   It was my understanding that he did perform some level of regression analysis, yes, sir. Jeff ^ Weiss.

Q   Now, Jeff Weiss is a lawyer; isn't that right?

A   He is.

Q   Does he have a degree in statistics?

A   It's been five years since I've seen his CV, and I don't know that I could tell you his educational background. I do know that he lectured at the National Conference of State Legislatures on redistricting, and he worked at the Justice Department on redistricting.

[119] Q   I asked a more narrow question, though, about whether an ecological regression analysis or an ecological inference analysis was performed leading up to the plan, and you told me that a lawyer performed it.

A   I do not – I do not know – I doubt whether the regression analysis that he did – I don't know what it would be termed, but he is the one that, working with my office, we developed the plan that had the 13th minority-majority district.

Q   Was the analysis that you are describing submitted to the legislature?

A   No, sir.

1680

Q    Mr. Armstrong, I'm going to show you a copy of your deposition in this case, and we can pull it up on the screen. We also have extra copies for the judges if need be. If you'll turn to page 109 once you have the document?

A    I have it on screen.

Q    And I am looking at the very last line starting at line 25 and carrying over to page 110, and this, I believe, was quoting you; is that correct?

A    To the best of my knowledge and belief. I haven't seen the front part of the deposition, but. . .

Q    Just to quote what you said, "I'm saying that if an inquiry had been made to Legislative Services that we need [120] data and information in order to conduct either to obtain a regression analysis or help us conduct a regression analysis, that information could have been obtained."

MS. BRANCH: Your Honor, plaintiffs would like to request that you read the full –

JUDGE PAYNE: Can you say that again?

MS. BRANCH: Plaintiffs would request that you read the question in addition to the answer.

JUDGE LEE: You'll have a chance to redirect.

MR. RAILE: That doesn't bother me either way. I was trying to save time.

JUDGE PAYNE: Go ahead with the answer.

Q    And that the next question starting on line five is, "It could have been obtained, but you never asked for it; right?

"Answer: I did not, no."

1681

And the next question is, "Did anyone from the Democratic party caucus ever ask for it?

"Answer: Not to my knowledge."

Did I read that correctly?

A   You did.

Q   And were you under oath when you said that?

A   I did. If you're asking me if the statement I made was true, I never made a request of the Division of Legislative Services for retrogression analysis. Would [121] you like to know why?

JUDGE PAYNE: All right, that will be enough now.

MR. RAILE: I'm fine with that. I thank you, Mr. Armstrong. I have no further questions at this time.

JUDGE PAYNE: Redirect.

REDIRECT EXAMINATION

BY MS. BRANCH:

Q   Mr. Armstrong, why didn't you ask the Division of Legislative Services to perform a retrogression analysis?

A   Despite the fact that I had a wonderful working relationship with most of my colleagues there, I couldn't trust that the information wouldn't be leaked to the majority party before it was ready to be disseminated to the public, so we hired our own expert.

Q   And we listened to a video that defendant intervenors put on of testimony that you gave on the House floor. You were opposed to the final map that was passed?

A   I was.

1682

Q   And was one of the reasons that you opposed the map because of the legalization of the 55 percent target or rule?

A   Yes. You'll notice that in the preceding remarks or the early part of my remarks, I said yesterday was about legal arguments where we had a great deal of discussion [122] about the 55 rule, the Voting Rights Act, et cetera.

My arguments on the floor had more to do with policy and the overarching reasons which I felt much of what was being done was unethical and possibly even immoral, but the voting rights piece of it was, in my opinion, unlawful.

But my comments on the floor were, I suppose, a mixture of both policy and my opinion about the bill in general.

MS. BRANCH: No further questions. Thank you.

JUDGE PAYNE: Can he be excused permanently?

MS. BRANCH: He may.

JUDGE PAYNE: Mr. Troy?

MR. RAILE: We have a couple redirect questions.

JUDGE PAYNE: You have what?

MR. RAILE: Just a couple redirect questions.

THE COURT: Ordinarily we don't allow recross, but we'll do it this time, and then everybody else will know that's the rule.

MR. RAILE: I apologize, Your Honor. Thank you.

JUDGE PAYNE: Those are California rules.

1683

RECROSS-EXAMINATION

BY MR. RAILE:

Q    And to be clear, so this regression analysis that you [123] had performed, you didn't want the public to see it?

A    No, sir, I didn't say that. When it's a work-in-progress, you don't want it leaked. At some point in time, just like with the introduction of the bill, you have no problem with having it being disseminated.

Q    But it was not disseminated with the bill that you proposed; right?

A    No.

Q    Did you produce this analysis with your subpoena for your deposition?

A    No, and let me be clear.

JUDGE PAYNE: Wait just a minute.

Q    It's a simple question. Did you produce –

A    No.

MR. RAILE: Thank you. Those are all my questions.

JUDGE PAYNE: All right. You may step down. You may be excused, Mr. Armstrong. All right. Thank you for giving us your testimony. You are certainly free to stay if you'd like to.

THE WITNESS: Thank you, Your Honor.

JUDGE PAYNE: Your next witness?

MR. HAMILTON: Your Honor, at this point the plaintiffs call Dr. Stephen Ansolabehere, and, Your Honor, while the Doctor is assuming the stand, I have some [124] illustrative exhibits I'd like to use with this witness, so I'd like to hand them up.

1684

JUDGE PAYNE: The other side is in agreement with them, we don't have any – Mr. Hamilton, there is no disputes over these exhibits?

MR. HAMILTON: There are no disputes. They've all been either admitted into evidence already, or they're merely for illustrative purposes and we're not offering them as substantive evidence, Your Honor.

STEPHEN D. ANSOLABEHERE,

a witness, called at the instance of the plaintiff, having been first duly sworn, testified as follows:

MR. HAMILTON: Your Honor, the parties have stipulated that Dr. Ansolabehere is an expert with respect to redistricting. May I assume the Court will accept him as an expert without further foundation?

JUDGE PAYNE: Yes.

Q   Thank you, Your Honor. I will ask a few questions about his background, but I just wanted to make sure that was clear. We're also going to be using a few slides. They're all in the handout that I just handed out to the Court.

JUDGE PAYNE: All right.

[125] DIRECT EXAMINATION

BY MR. HAMILTON:

Q   Good afternoon, Dr. Ansolabehere. Could you please state your full name and residential address for the record.

JUDGE PAYNE: He doesn't need to state his residential address because we just have to wash it out of the record.

Q   Would you state your full name then, please.

1685

A   My name is Stephen Daniel Ansolabehere.

Q   Dr. Ansolabehere, you are an expert for the plaintiffs in this litigation?

JUDGE PAYNE: Why don't you get him to spell his last name.

MR. HAMILTON: It's the usual traditional spelling.

JUDGE LEE: No, for the court reporter.

THE COURT: I just was a little unsure.

Q   Dr. Ansolabehere, could you please spell your last name.

A   A-n-s-o-l-a-b-e-h-e-r-e.

Q   Thank you. Dr. Ansolabehere, you are an expert for the plaintiffs in this litigation?

A   I am.

[126] Q   Could you please state take a look at Exhibits 50 and 51. Should be in the notebooks in front of you.

JUDGE PAYNE: Plaintiffs'?

MR. HAMILTON: Plaintiffs' Exhibits 50 and 51.

Q   And the question is, while you're looking for them, can you identify them for the Court?

A   Exhibit 50 is my expert report in this case dated March 11th, 2015. Exhibit 51 is my reply report in this case dated April 24th, 2015.

Q   I'm going to ask you to raise your voice a little bit so we can make sure everyone can hear you. What was the purpose of preparing these reports, sir?

A   The purpose for preparing these reports was to do an evaluation of the –

1686

JUDGE PAYNE: Hold on just a minute, please. Thank you.

Q   The purpose of the report, sir?

A   The purpose of the report was to perform an evaluation of the districting map passed by the Virginia State Legislature.

Q   Let's start with Exhibit 50. You said that's your initial report; correct?

A   Correct.

Q   If I could direct your attention to page 88 of that exhibit. What is that document, sir?

[127] A  That's my curriculum vitae.

Q   Is it a complete and accurate summary of your educational background and professional experience?

A   It is.

Q   The Court's already had a chance to look at it, and you've already accepted as an expert, so let me just ask you quickly, did you attend law school?

A   No.

Q   You are not a lawyer?

A   No.

Q   Where are you currently employed?

A   Harvard University.

Q   What are your principal areas of research?

A   American elections, representation, public opinion.

Q   Do you have any experience with redistricting outside of academia?

1687

A    Yes. I have served as an expert witnesses in approximately ten cases.

Q    Any other experience with redistricting outside of serving as an expert witness?

A    No.

Q    Let me ask you about one item on your résumé at page 13 of your CV. It says, CBS election decision desk, 2006 to the present. Do you see that?

A    Yes.

[128] Q  Could you describe that for the Court? What do you do in that role?

A    I work for CBS News, the national news, on election night calling elections. So as the data from the precincts and the state is coming in, we do a live projection of who is likely to have won each of the Senate seats, House seats – that's Congressional seats – and the presidential electoral college seats.

Q    Thank you, sir. Let's move on to ask specifically, what were you asked to do in this case?

A    In this case, I was asked to do three things.

Q    Is that summarized somewhere in your report?

A    Summarized on the second page of my report. Page one of the report but second page of the exhibit.

Q    Entitled Statement of Inquiry?

A    Yes.

Q    What was the first thing you were asked to do, sir?

A    I was asked to examine the geographic characteristics of the districts, the racial composition, and

1688

the voting patterns in the districts in HB 5005 and in the benchmark map.

Q   When you say the districts, you are specifically focusing on the 12 minority-majority districts?

A   Yes, the 12 challenged districts.

Q   What was the second task you were asked to perform?

[129] A   The second task I was asked to do was looking at the 12 challenged districts to examine how they were changed from the benchmark map to HB 5005.

Q   Were you asked what was the predominate purpose of some of the changes?

A   Yes. I was asked to examine the extent to which race – particular racial composition of the areas was a stronger predictor of the changes in the map and/or whether or not partisan composition or some other factor was a stronger composition.

Q   Then the third task you were asked to perform?

A   The third task I was asked to perform was to examine the voting patterns overall, and in the specific areas where the districts were located, to determine whether or not the districts were performing districts; that is districts where African Americans could elect their preferred candidates.

JUDGE PAYNE: Can you pull that mic just a little closer to you?

THE WITNESS: Sure.

Q   What materials did you review in order to prepare this report and conduct the analysis you were asked to perform?

1689

A    In preparing this report, I reviewed census data, election returns from the State Board of Elections, and I reviewed various articles pertaining to how to do election [130] analyses, court cases such as the Page case, and the recent Supreme Court case in Alabama.

Q    Do you feel you've had an opportunity to review the materials necessary to reach the conclusions that you provided in your report?

A    Yes.

Q    All right. So I'd like to take a look at some of the maps here. So I'm going to ask you to take a look at Plaintiffs' Exhibit 64, 65, 66, and 67. We'll start with 64. Are you there?

A    Yes.

Q    Can you identify what Exhibit 64 is?

A    64 is a series of maps corresponding to the benchmark and the enacted map for each of the districts in question.

Q    What is the first one, first page of Exhibit 64?

A    First page is HD 63, the benchmark map.

Q    When you say benchmark, you mean the preexisting map prior to redistricting?

A    Right. The map that was passed, I think, in 2001, yes.

Q    Page two would be the enacted map?

A    Correct.

Q    That's the one that came out of this redistricting cycle; is that right?

A    Correct.

1690

[131] Q  And then is Exhibit 64 organized like that all the way through for all of the 12 majority-minority districts?

A    Correct. For each district, first the benchmark and then the enacted map.

Q    Flip over to Plaintiffs' Exhibit 65, if you would, please, and could you explain to the Court what that is.

A    65 is a map of the entire plan.

Q    Say again?

A    65 is the map of the entire plan.

Q    And how about Exhibit 66, what is that?

A    66 are maps of each of the districts, each of the enacted districts of the 12 in question without other boundaries, just the boundary for the district.

Q    Who prepared those?

A    I prepared those.

Q    For what purpose?

A    To see more clearly where the boundaries lay without other boundaries interfering.

JUDGE PAYNE: Are we supposed to have in what you handed up anything other than 64?

MR. HAMILTON: No, Your Honor. What I handed up, we're not looking at right now. We're looking at the actual exhibits. What I've handed up and what I'll be showing on the screen is just a handful of – you know, ones we're going to be talking about in a moment.

[132] Q Last one, Exhibit 67, Plaintiff's Exhibit 67, the very next tab, what is this?

1691

A   These are maps corresponding to the maps in Exhibit 66 but with the voting tabulation districts shaded according to the percent black voting-age population in each VTD.

Q   And who prepared these?

A   I did.

Q   What was the purpose of these maps?

A   The purpose of these was to see more clearly how the lines, the boundary lines of the districts corresponded with the areas where there were higher concentrations of African Americans or higher concentrations of whites.

JUDGE LEE: You're referring to Plaintiffs' 67 right now?

MR. HAMILTON: That's right, Your Honor.

Q   All right, Dr. Ansolabehere, I'd like to turn to your opinions about the enacted plan for the 12 challenged House districts. The Court has had an opportunity to study your reports in advance of the trial and as well as the reports of the other experts, so we won't go through them in detail, but I want to examines a few of your key conclusions and opinions here.

I believe the first question you were asked was with respect to geographical compactness, racial composition, and voting patterns in the 12 challenged districts; is [133] that right?

A   That's correct.

Q   Let's start with geographical compactness, and maybe we start with, why does compactness matter?

1692

A   Compactness matters because it's a traditional districting principle. It's a principle that we commonly associate with a coherent plan and evidence of highly non-compact districts isn't taken as the be-all and end-all in many voting rights cases, but it's a red flag or signal that something happened to the district and deserves some closer inspection.

Q   Were you able to reach a conclusion with respect to the geographical compactness of these 12 districts?

A   I was.

Q   What was that opinion?

A   My conclusion was that the geographical compactness of the 12 districts in question was lowered at a faster rate than the other districts in the map. The other districts in the map – the geographical compactness score they use is Reock in this report, and the geographical compactness of the districts in question was lowered from an average Reock score of .36 to .32, and elsewhere in the map the geographical compactness was lowered from .38 to .37.

Q   We're going to back up a little bit and talk about the Reock test, and for the court reporter, that's R-e-o-c-k. [134] But let me ask you, did you also look at the number of split voting tabulation districts or counties or cities?

A   I did.

Q   And what did you find there?

A   I found that the enacted map increased the number of split towns and cities and the number of splits created by those crossings. I also found that the number of voting tabulation districts splits had increased from the benchmark map to the enacted

1693

map and that the increase was – occurred dispropor-
tionately in the challenged districts.

Q    Disproportionately in the challenged districts?

A    Correct.

Q    As compared to outside the challenged districts.

A    Correct.

Q    So let's back up and talk about that Reock test
that you mentioned a minute ago. How does a social
scientist measure compactness? What does it mean to
a social scientist?

A    There are different measures for compactness.
Reock is one that's been used since the 1960s. It's
fairly commonly used, and it measures the area of a
district or the perimeter of a district – well, generically
compactness scores measure the area or the perimeter
of a district relative to some idealized shape such as a
circle [135] or a square.

The Reock test uses a circle because that's the most
compact shape possible, and so what Reock does is it
takes the smallest inscribing circle around that dis-
trict and measures the area of that smallest inscribing
circle, and that be would the idealized or normal dis-
trict that you could reach with that basically length.
You can think about it as a diameter.

That measures the area of the actual district rela-
tive to that idealized district. Almost all the compact-
ness scores take that same approach of measuring the
actual shape compared to some idealized shape.

Q    In Reock test world, the lowest possible score is
zero?

A    Correct.

1694

Q   Highest possible score is what?

A   One.

Q   And so higher means more compact?

A   Higher means more compact, and zero would be very, very un-compact.

Q   Are there alternative ways of measuring compactness?

A   Yes, there are many.

Q   Which measure was used to report the compact-ness of these districts in this redistricting cycle in the Virginia preclearance submissions submitted to the [136] Department of Justice?

A   I believe it was Reock, Polsby-Popper, and Schwartzberg.

Q   So Polsby-Popper, that's a different method of measuring compactness in districts?

A   Correct.

Q   Can you briefly describe that one.

A   Reock measures geographic dispersion, how spread out is the district. Polsby-Popper measures kind of perimeter dispersion, how jagged is the perimeter, and Polsby-Popper takes the perimeter of the district in question and constructs a circle with that perimeter – Reock was constructing an area with that diameter – and then measures the area of the district relative to the area of the circle with that perimeter.

Q   And Schwartzberg, how does that work?

A   Schwartzberg, I'd have to look up the exact formula for Schwartzberg.

1695

Q   But it's a third alternative way of measuring compactness?

A   Yeah.

Q   Those were the three that were used by the Commonwealth of Virginia in its preclearance submission to the Department of Justice?

A   Correct.

[137] Q  All right. Do you know which measure was used by this Court in the Page decision? You mentioned you read it.

A   The experts – the Court's opinion in this case relied on figures reported by experts that used, I think, Reock, Polsby-Popper, and Schwartzberg.

Q   What criteria are generally considered to be traditional redistricting criteria? You mentioned that a moment ago.

A   Compactness is one such criterion, contiguity. Sometimes length is a criterion, equal population.

Q   Respect for local subdivision?

A   Respect for county boundaries, respect for city boundaries.

Q   Why are those traditional redistricting criteria?

A   Districting starts by representing geographic areas, and those geographic areas often correspond to certain communities represented by counties and towns and cities, and then also just wanting to keep the districts to be more coherent would be kind of informative about the extent to which the district boundaries are respecting local communities.

1696

Q   In reaching your conclusions, I believe you looked at five different areas of the Commonwealth; is that right?

A   I did.

Q   What were those? Let's start with what was the first [138] one?

A   The first one is in the area below Richmond covering Dinwiddie and Greensville Counties.

Q   Which House districts are there?

A   Those are HD 63 and HD 75.

Q   What is the second area that you looked at?

A   Second area I looked at was the Richmond area.

Q   And what districts were there?

A   HD 69, HD 70, HD 71, and HD 74.

Q   What's the third area that you looked for, looked at?

A   The Portsmouth area.

Q   What House districts are there?

A   HD 77 and HD 80.

Q   What's the fourth area you examined?

A   Norfolk.

Q   Which House districts are located in Norfolk?

A   HD 89 and HD 90.

Q   And what's the last one?  What's the last area you looked at?

A   The Hampton/Newport News area which is HD 92 and HD 95.

1697

Q   Can you explain your conclusions with respect to geography overall, and then we're going to back up and look at each individual area. So can you give us your opinion with respect to the geography and changes in the [139] district overall?

A   Overall, there was a reduction in the compactness and an increase in the split VTDs and split counties and municipalities in the challenged districts and that that increase occurred at a greater rate or at a higher incidents in the challenged districts than elsewhere in the map.

Q   So let's look at the Dinwiddie/Greensville area which you think you said was the first area. This is House district 63 and 75, and I'm going to use the handout at this point. I'm also putting them up on the screen. So let's start with House district 63. Could you tell us how this changed between these two maps.

The first one would be the benchmark, and the second map would be the enacted. So tell us a little bit about how that changed.

A   In the benchmark map which we see here, HD 63 covers all of Dinwiddie County, a little bit of Chesterfield, and city of Petersburg. The district was changed so that it no longer covered all of Dinwiddie County. It splits the county in half and has sort of an irregular cut out of the middle of it. It covers Petersburg and cuts through Prince George and reaches up and captures about half of Hopewell.

Q   How did that change the compactness or number of [140] locality splits in House district 63?

A   It decreased the compactness. Reock decreased from .63 to .26 which was the largest decrease in that compactness score on the map, and it —

1698

Q   Let me stop you there. The largest –

A   Decrease in compactness.

Q    – in the map of all hundred districts?

A   I believe so.

Q   I'm sorry. Continue.

A   And then it splits Dinwiddie County, which it didn't before, splits Prince George County, and splits Hopewell. Also splits multiple VTDs. The number of VTDs splits increase in the redrawing.

Q   How about, let's look at House district 75. Can you describe the changes between the benchmark and the enacted maps for House district 75?

A   House district 75 contained all of Greensville, all of Sussex, almost all of Southampton, cuts – extends over to Lunenburg and captures a little bit – captures Franklin city, almost all of Franklin City.

Q   And how did the changes between the benchmark and the enacted plan affect the compactness of the districts or the locality splits?

A   The compactness of HD 75 is about the same between the two plans, but there was a significant jump in the number [141] of splits. We don't see the – should we look at the other – there, that's helpful.

You can see that part of the Lunenburg area was dropped. The district now in the enacted map picks up about half of the Dinwiddie County area from 63, but it also drops parts from Sussex and extends over into Surrey, and there's some boundary shifts around Franklin city, too.

Q   All right. Let's move to the Richmond area which I think –

1699

A    This district, I think, also had the highest increase in the number of VTD splits. It had 13 VTD splits.

Q    When you say "this district," you mean House district 75?

A    In the enacted map, yes.

Q    Highest number of VTD splits in the entire map?

A    Correct.

Q    All 100 districts?

A    Correct.

Q    Let's move to Richmond. What specific House districts are located in the Richmond area?

A    HD 69, HD 70, HD 71, and HD 74.

Q    Can you explain how these districts changed from the benchmark to the enacted?

A    What we see is the benchmark version of HD 70, which [142] this district had one of the more substantial changes in the Richmond area. From the benchmark to the enacted map, the change was to pull the district substantially out of the City of Richmond and pull it into the Chesterfield area and deeper into Henrico County.

In particular – this isn't reflected in the geography, but in the population counts, a plurality of the population of this district was located in the city of Richmond under the benchmark map. It's now pulled out so a plurality is in Chesterfield. It's really substantially shifted from being an urban – plurality urban district to being a plurality suburban district. As that district got pulled out, 69 shifted over to the

1700

east, 71 picked up some of that population, 74 changed its boundary, especially up in the northern part of Richmond city.

Q   Who did that change affect the compactness or locality splits of House district 70?

A   70's compactness measure decreased somewhat from .47 to .40. The other districts in the area, compactness isn't changed substantially, but HD 74, which is the Henrico part of this area, is – was one of the least compact districts under the benchmark map and remains one of the least compact districts in this map.

Q   Let's move to the third area –

JUDGE PAYNE: Excuse me. 74 was one of the least [143] compact under the benchmark and stayed that way?

THE WITNESS: Correct.

Q   Let's move to the Portsmouth area. What specific House districts are located there?

A   HD 77 and 80.

Q   All right, can you explain how these districts changed between the benchmark and the enacted?

A   HD 77 was a very non-compact district under the benchmark map, and it became – it remained non-compact. It lost one precinct to the far west, the airport, and it extended further to the west and dropped some of its precincts right in the middle of it.

So it became – it was a long, narrow district, and it was remained a very long, narrow district. It got a little narrower in the middle.

Q   How did that affect the locality split?

1701

A   The locality splits didn't really change in 77.  It just remained very non-compact.

Q   Let's move to the Norfolk area, HD district there –

A   HD 80?

Q   I'm sorry, HD 80, yes. Can you describe how House district 80 changed between the benchmark map and the enacted map?

A   HD 80 was kind of – had a thick tail to it under the benchmark map, and then under the enacted map, it became [144] much less compact. It extends to the north of the district and then again to the west. Its compactness score dropped from .39 to .26 which is a very large compactness measure drop. It also dropped some voting tabulation districts to the east.

Q   That's House district 80 going back and forth between the benchmark and the enacted?

A   Correct.

Q   All right. Let's move to Norfolk. The House districts there are 89 and 90; is that right?

A   Correct.

Q   And can you describe how those districts changed.

A   HD 89 had a substantial reduction in its compactness from .58 to .40. It added some appendages to the – both to the west and to the south. This is the enacted map. And it hops across the river. There's a bridge connector there, but it has extensions up in the north it didn't previously have and also goes back into the east. So it got spread out much further, wider geographically.

1702

JUDGE PAYNE: Much wider what?

THE WITNESS: Geographically.

Q   How did that affect the compactness scores or measures and locality splits?

A   Its locality splits didn't really change, but the compactness measure drops considerably from .58, which it [145] made it very compact, and to the benchmark map to .40.

Q   If we look at House district 90, can you tell us how that map changed between the benchmark and the enacted?

A   House district 90 got pushed further to the east. It has a piece that extends across the river. That piece, a large part of that piece is dropped, and parts of the east is swapped in, and it just extends further into the Virginia Beach area.

Q   And how did those changes affect the compactness measure or the number of locality splits?

A   It became somewhat more compact, and the splits did not increase.

Q   All right. Let's move to Hampton. The House districts there were 92 and 95; correct?

A   Correct.

Q   Can you describe how those House districts changed?

A   92 and 95 were located at the southern points of the peninsula, city of Hampton and parts of Newport News. The most dramatic change is in 95 went from a fairly compact district with a Reock score of .43 to the least compact district in the map with a Reock score of .14.

1703

The change in the district was to extend an arm all the way up the center of the peninsula in a highly non-compact way and to create six VTD splits along the way.

[146] Q  So just pausing for a moment on House district 95, if we look back at the benchmark for a moment, what was the compactness score there?

A    .43.

JUDGE PAYNE: What?

THE WITNESS: .43.

Q    .43, and how did that change to the enacted?

A    It dropped to .14. So that is the area of the district is 14 percent of the area of an idealized circular district.

Q    And you said in sending this arm to the north-west, it split a number of VTDs?

A    Correct.

Q    How many?

A    Six.

Q    All right, let's turn to your second opinion which I think was examining the question of whether politics or race was the predominate factor in the changes to the districts. Just to orient us all, where can we find this discussion of your analysis in your report?

A    I believe it starts on page 26.

JUDGE LEE: Can I ask a question?

MR. HAMILTON: Absolutely.

JUDGE LEE: Do you intend to cover the changes in population and whether any of these districts had

1704

[147] under-population reported before the changes occurred?

MR. HAMILTON: I didn't. I'm happy to ask a few questions about that if you'd like, but most of these districts were underpopulated and needed to add population. I don't think that's in dispute.

JUDGE LEE: If you would make a record, that would help me.

MR. HAMILTON: Sure.

Q   So Dr. Ansolabehere, how did the – when the legislature was looking at the benchmark districts, population had obviously changed. That's the reason we're doing this. How – what was the task they were confronted with in terms of population changes?

A   To make the districts equal population within, I think, one percent.

Q   Did that require adding or subtracting population from these 12 districts?

A   Two of the districts had almost exactly the right amount of population –

Q   So did the –

JUDGE LEE: You didn't let him finish.

MR. HAMILTON: Okay, I'm sorry.

JUDGE LEE: You said –

THE WITNESS: Two had almost exactly the right population total, and ten were underpopulated and needed [148] to have –

JUDGE LEE: Were underpopulated –

THE WITNESS: Yeah, needed to have additional population.

1705

Q    Which were the two that had just about perfect population?

A    HD 70, which we saw before in the Richmond area, and HD 74, which is the one that's in Henrico County and extends north of Richmond.

Q    So I assume since they were already perfectly populated, the legislature just left them alone in the enacted map; right? Didn't make any changes to those districts because they didn't need to?

A    That's a possibility.

Q    Did they?

A    They made changes in those districts.  In fact, I think they took 25,000 people – the population shift of HD 70 effectively removed 25,000 people and put in 25,000 people so that the population total at the end was different by four people from the pre to the post.

Q    So 25,000 – even though the population was perfectly even and didn't need to change, they took 25,000 people out and moved 25,000 other people in?

A    Correct.

Q    In your analysis, did you look at the racial [149] composition of the groups that were removed versus the groups that were put in?

A    I did.

Q    You did. We'll get to that in just a second then.

MR. HAMILTON: Your Honor, is that a sufficient record to answer your question?

JUDGE LEE: I think so, and I'm waiting to hear what you ask him about – Delegate McClellan's district, was it 71?

1706

MR. HAMILTON: I don't know the answer to that.

JUDGE PAYNE: McClellan is 71.

JUDGE LEE: Okay. That's fine. Go on.

MR. HAMILTON: Thank you, Your Honor.

Q    Let's turn to the second question about whether race or party composition was a predominate factor. You examined the VTDs that were moved in and out of the 12 districts; correct?

A    Correct.

Q    Why were you looking at that?

A    I looked at that to see how the changes in the – shifts in the population from one version of the plan, the benchmark plan to the enacted map moved people around and whether or not those movements were sorting on racial lines or sorting on partisan lines.

Q    So how did you go about examining that question?

[150] A  Well, district – one way to think about districting is I have all these building blocks. Those are voting tabulation districts, so I'm looking at how these VTDs are moved around.

Most of the time the VTDs are kept whole, so it's just really a matter of how these VTDs get moved around. So I took the census data and the election data at the VTD level, the voting tabulation district level, and then I aggregated up how many – I figured out which VTDs were moved from one district to another, which VTDs were left in a given district, and which VTDs were moved out of a given district, and then I calculated the black percentage, black voting-age population percentage in the VTDs that were kept in the district, moved out of the district, moved into the

1707

district, or were never included in the district either under the benchmark or the enacted map, and I did the same thing with respect to vote share.

JUDGE PAYNE: Where did you get the black voting-age population that you used in that calculation?

THE WITNESS: I downloaded the data that the census provided.

THE COURT: From the census data.

THE WITNESS: Correct.

Q   Let's start with the top line conclusion. What did you find as a result of that analysis, and I'm going to [151] walk back to how you got there, but what's your conclusion?

A   I found that the areas moved into the districts, into the 12 challenged districts, had a much higher black concentration than the areas moved out, and the difference is about 12 percentage points. Comparing that with the partisan difference was about twice as big as the democratic vote share in different elections.

So race seemed to be a bigger factor, or there was more sorting along racial lines in terms of VTDs moved in and out of the districts.

Q   Why do you use the phrase racial sorting?

A   So the idea is, I'm looking at a VTD, and I have a decision to make about where I put that VTD. Suppose it's a VTD that's in one of the 12 districts in question. I could keep that VTD in that district, I can move that VTD into another African American district, I can move that VTD into a white district, or – that's the degree which sorting is occurring, and the sorting is the degree to which the movement is

1708

correlated with or a function of percent black, and then same with percent democratic. I could look at it either way.

Q   And you found that the racial composition was a more powerful explainer of where these districts were going; is that right?

[152] A  Correct. I looked at that various ways.

Q   Let's start with your table seven from your report, and it's in the handout that I handed up to the Court, and I've also put it up on the screen in a – I will admit to putting some color in an otherwise all white and black chart. So could you describe what we're looking at here?

A   This is table seven from my report, and it shows the racial composition and the voting patterns in the set of VTDs that were kept in the same districts, so if it would say VTD in HD 71 and it was left in HD 71, that would be something that's in the same district. It's not moved.

And then a VTD that was in 71 and, say, moved to 70, that would be a VTD that's moved between two African American districts. Then a VTD that's, say, in 71 and then moved to 63 or 68 or 23 or something that's not an African American district, that would be the fourth column, those are VTDs moved out of the districts.

Then if I was looking at a VTD in a district that wasn't one of the African American districts and was moved into an African American district, that would be the third column. Those are the VTDs moved into.

Finally, there are those VTDs that were never one in of the African American districts in either plan.

1709

Q   If we look at the black voting-age population, the third line down, can you explain that first column, the [153] same House district under the benchmark and the House bill 5005. You see the number 62.4, what does that mean?

A   That says if we look at the all the VTDs that were left in their African American districts, not moved between any other districts, just kept in that district, those VTDs had a black voting-age population of 62.4 percent.

Q   How about the next column over?

A   The VTDs that were moved between the African American districts, say from 70 to 71, would be – had an average black vote voting-age population of 55 percent.

Q   Okay. Next column over?

A   The areas that were moved from a non-African American district under the benchmark and into an African American district under HB 5005 were 41.6 percent black voting-age population.

Q   Next column over?

A   The areas that were – the VTDs that were in an African American district under the benchmark and moved out of an African American district had a 29 percent black voting-age population.

Q   And then finally?

A   And then the areas that were – VTDs that were never in an African American district under either plan had an average black voting-age population of 14.1 percent.

[154] Q  So can you explain the racial sorting piece, just looking at just that line, what does that tell us?

1710

A   So one way to think about – there are two ways to think about the sorting. One way to think about the sorting is as I explained earlier, I have a VTD and it's in an African American district, what am – where am I going to put it. Am I going to keep it where it is, move it to another African American district, or move it out.

The areas that were kept in the African American districts were either 62 percent black or 55 percent black. The areas that were moved out were 42 percent black. That's much lower. You are moving out areas that have lower – sorry, 29 percent black. You are moving areas out that have much, much lower black voting-age population.

The other comparison is the swaps. I'm moving out a VTD, I'm moving in a VTD. I have to gain population somehow, and the areas that are being swapped in have much higher black voting-age population than the areas that are moving out. So those two kinds of sorting are creating higher concentrations of black voting-age population in these districts and lower concentrations out of these districts.

Q   Could you display the same data in a bar graph?

A   Yes.

[155] Q  So looking at what's up on the screen, is that an example of the same data displayed with a random red line I'm not quite sure why –

A   I touched the screen by accident. I don't know if there's a way to remove that.

Q   I think I can probably erase that. Is that basically the same data displayed in a –

A   Correct. That's a bar chart corresponding to the first row of table seven.

1711

Q    Okay. Let's go back to table seven and look at the rest of the information on this table. Could you explain what you're doing with the other lines in table seven?

A    So one can look at similar comparisons, and just looking at the areas swapped in and out, the areas that I've – VTDs that were taken out of the districts versus the VTDs that were brought into the district, so the third and fourth columns.

The difference here is about six percentage points in the democratic vote share for federal offices where those offices are U.S. president and U.S. Senate. So it's about a six point difference versus a 12 point difference for black voting-age population in the row above it. So the black voting-age population difference is much larger in those swaps than the vote share for the Democrats in the federal offices, and I looked also at the governor in [156] 2013, and, again, I saw a six-point difference. So that's the extent to which the sorting along racial lines is bigger looking at those swaps than in the sorting along voting lines.

Q    So just looking at the racial composition in the political forms of these VTDs, the much more powerful explanatory factor was race, not politics?

A    Yes. By that analysis, that's the case. There are other analyses that I did to confirm that.

Q    Let's talk about the second way that you looked at that and with specific attention to page 38 to 45 of your report. This is where you are looking at what's the better explanation as to whether a VTD is included or excluded; is that right?

A    Correct.

Q    Can you explain the purpose of this analysis?

1712

A    So one analysis – so one analysis to do is simple correlations, what is the correlation between the likelihood that a VTD is moved into the district and the percent of black in that voting tabulation –

Q    Let me back you up. I think we got a little ahead of ourselves. Tell us your conclusion on this. Is the black voting-age population or political performance the more powerful explanatory factor in whether a VTD is included or excluded in one of the 12 challenged districts?

[157] A  The evidence that I looked at indicated that black voting-age population was a much more powerful indicator than partisan performance measured various ways. In fact, in some of the analyses, parties and performance wasn't statistically significant at all.

Q    So you looked at this question, I believe, from your report in several different way, and I think it's four different ways to verify this analysis. So let's talk about the first pattern that you looked at. What was that?

A    The first pattern I looked at was just the movement of areas in and out such as we just reviewed. The second sort of evidence I looked at was the raw or simple correlation between the likelihood that an area of VTD was moved into a district and its racial composition is percent black versus the correlation between the likelihood that an area was moved in and its percentage democratic.

The third type of analysis I looked at is called partial correlation. It's similar to simple correlation, but it holds constant the other factors. That is, given how democratic an area is, how much does black voting-age population correlate with the likelihood that it was moved in, and given how black an area is, how does

1713

partisan vote correlate with the likelihood that an area was moved in.

[158] Finally, I did a multiple regression analysis where I predicted which VTDs were moved in and which VTDs were not moved into the 12 challenged districts as a function of the black voting-age population, the partisan vote in the district or the voting tabulation district, and whether or not that VTD had been included in the district before.

That is allowing for some degree of inertia for the districting process, and I did that both state-wide and within each of the five areas where these districts were located.

Q   So four different patterns, we're just going to briefly walk through each one. The first one was whether the difference in black voting-age population between VTDs moved in and out was greater than the difference in democratic vote share between VTDs moved in and out; is that correct?

A   Correct.

Q   What's the democratic vote share as you used it in your report?

A   I used democratic vote share from several different offices; U.S. president in 2008, U.S. president in 2012, U.S. Senate in 2012, and governor in 2013.

Q   Where did you get that data?

A   I got that data from the website, Secretary of State, election office. Sorry.

[159] Q   And what was your – after examining the difference in black voting-age population versus democratic vote share, what did you find?

1714

A     What I concluded was that the black voting-age population difference was much larger than the average of those federal offices and much larger than the vote share for governor, the difference between the areas moved in and the areas moved out.

Q     Was that consistent with your conclusion that race rather than politics was a stronger explanatory factor?

A     Correct.

Q     What was the second pattern you examined? You said it was simple correlation. Start with what does that mean?

A     So I correlated whether a VTD was moved in or moved out, moved into one of these areas, one of these 12 challenged districts and what the percent black was and also what the percent vote for the Democrats was in those four federal offices and also the correlation to the vote for the Democrat and governor race of 2013.

Q     What did that analysis show?

A     That showed that black voting-age population was a much stronger correlate.

Q     So it was consistent with your first analysis?

A     Correct.

Q     The third, you said, was partial correlation. What is [160] that?

A     Partial correlation correlates – in the case of black voting-age population, the correlation between black voting-age population and inclusion of the VTD in the district given how democratic that VTD was.

Q     Okay. And what did that analysis show?

1715

A   That analysis showed a significant and strong correlation between black given party but no statistically significant correlation between party given black.

Q   Could you explain that?

A   That means that the correlation we observe between – any correlation we observe between party vote share and inclusion of the district, the voting tabulation district in one of the 12 challenged House districts is really being explained by the black voting share rather than the voting party share.

Q   It's a way of isolating which of these two factors is driving the decision?

A   Correct.

Q   And that conclusion, as a result of that analysis, is consistent with your other three patterns that you looked at?

A   Correct.

Q   And that conclusion was that?

A   Black voting-age population is a much stronger, much [161] stronger indicator of the inclusion of VTDs in one of the challenged districts than is party.

Q   The fourth pattern you said multiple regression which makes my palms sweat when anybody says anything like that, so could you explain to us what multiple regression analysis is and how you employed it here.

A   Multiple regression analysis predicts whether or not a VTD is in one of the challenged districts or out of one of the challenged districts, has a function of black voting-age population, party vote share, and whether that VTD was already in a challenged district. It estimates the effect of each of those things

1716

at the same time, so how much does one matter given the presence of the other factors, and it measures how much a one percent increase, say, in black voting-age population would increase the likelihood that a VTD is included in the district.

Q   And what did that pattern show, that multiple regression analysis?

A   That pattern showed state-wide, and in each of the regions, that black voting-age population was a much stronger indicator of which VTDs are included in the challenged districts or not. The state-wide analysis, without controlling for which VTDs were in the districts or not, had a coefficient of 1.0 on black voting-age population versus 0.14 for party vote.

[162] That indicated that a one percent change or one percent increase in the black voting-age population in an area would correspond with a one percent increase in the likelihood that that voting tabulation district was included in the precinct and voted in the House district. As opposed to party, a one percent increase in the party vote share would only correspond to a little more than a one-tenth of a percentage point, increase in likelihood. Seven times greater effect in that analysis.

I repeated that analysis within each of the local areas and found it consistent with state-wide analysis that black voting-age population was a very strong – consistently significant indicator of which VTDs are included in these House districts, and party was not statistically significant in any of those local area analyses.

Q   Party was not statistically significant; is that what you said?

1717

A   Right. Party given race was not significant but race given party was.

Q   And I take it that – to ask the obvious question, that is consistent with the prior three patterns you examined?

A   Correct.

THE COURT: Y'all are talking over each and I [163] can't hear what either one of you are saying. Ask your question again and wait until he answers before you give the answer if you would, please.

MR. HAMILTON: I will, Your Honor. Thank you.

Q   This fourth multiple regression analysis conclusion is consistent or inconsistent with the prior three analyses you did?

A   It's consistent. All four analyses point to the same conclusion that black voting-age population is a strong predictor of which VTDs are included in which – in each of the 12 House districts being challenged here, and party is either not an important factor or not as important as black voting-age population.

Q   In doing this analysis, Dr. Ansolabehere, did you account or control for proximity of where these VTDs were located?

A   Yes. Because I did the analysis within each of the local areas where the House districts are located, so that's controlling for which VTDs could be put into these House districts in the local areas.

Q   So, Doctor, let me ask you a hypothetical question. I want you to assume that the House of Delegates used the mechanical 55 percent black voting-age population rule in creating these 12 House

1718

of Delegates districts. Are your findings consistent with the application of that sort of [164] rule or inconsistent with the application of that sort of rule?

A   They're consistent because every one of the districts has 55 percent BVAP or higher, and the movement of population into the, each of the House districts was consistent with moving in black voting-age population to increase those numbers as one increased the population in the underpopulated districts.

Q   Thank you, Doctor. Let's turn to the third issue you were asked to examine and that is, quote, whether it was necessary to have a black voting-age population in excess of 55 percent in these districts in order to provide African Americans the ability to elect the candidates they prefer. That's your third, the third thing you examined?

A   Yes.

Q   And this is sometimes called a polarized voting analysis; is that correct?

A   A polarized voting analysis is informative about that question, yes.

Q   What's the purpose of doing that, a polarized voting analysis?

A   The purpose of studying the voting behaviors of blacks and whites and measuring to what extent they are opposed to each other or polarized is to help reach a conclusion about which districts are perform-ing districts for [165] purposes of allowing African Americans to elect their preferred candidates and also to determine what vote – what population composition would facilitate that.

1719

Q   So can it tell you the minimum number of black voting-age residents are needed in a district to pre-serve the ability to elect candidates of choice?

A   Correct.

Q   Do you know whether any racial block voting analysis was performed to the extent of your knowledge, anyone with respect to the Virginia House of Delegates redistricting in 2011?

A   Up until today, to my knowledge, no one had performed that analysis, and I just heard that I guess the Democrats had – the Democratic minority leader had enlisted someone to do that analysis.

Q   Delegate Jones and the majority as far as you know, did they do one?

A   As far as I know, no.

Q   By the way, how difficult is it to do racial block voting analysis? Is this a month-long study?

A   No. Once the data is together, couple hours.

Q   Okay. How hard is it to get this data?

A   Census data is very easy. You can just go to the census website and download the requisite files, and I think the files are at the House of Delegates web page as [166] well, and with election data, there's always data-cleaning that goes on, but it's probably not more than a couple days.

Q   Not more than a couple days to collect the data and conduct the analysis?

A   Correct.

Q   How expensive? Is this a terribly expensive thing?

1720

A   Probably not. If, as I just heard, there are onsite people at the House of Delegates who can do the analysis, it would be whatever their fees would be or whatever their time would be.

Q   So if they wanted – let's say that they didn't trust the House – the Division of Legislative Services for whatever misguided reason, and they wanted to hire an outside expert, they could hire someone like you to do it; right?

A   Correct.

Q   You are hourly rate is what?

A   400 an hour.

Q   So for two days worth of work, approximately how much money would it cost the Commonwealth of Virginia to hire you to do this?

A   I work ten-hour days, $8,000.

Q   How frequently, to your knowledge, is this kind of analysis done in connection with redistricting in states [167] that are governed by the Voting Rights Act?

A   I think all states are covered by the Voting Rights Act under Section 2, so I guess whenever there's a question involved, I think such analyses are commonly performed.

Q   Is this a form of the functional analysis called for by the Department of Justice, if you know?

A   Yes, from my experience dealing with the Department of Justice and the Texas redistricting case and also working for them on the Texas voter ID case, this kind of analysis is what they would do.

1721

Q  When these analyses are done, and putting aside litigation like this one, they're usually done before the legislature draws the maps or only after the map is drawn and about to be submitted to the Department of Justice for preclearance?

A  I think they're usually done while the map is being constructed, because this is the information you use to know which districts need to be treated which ways. Which areas in a state, you know, might require a Section 2 majority-minority district or which areas of the state do you have to avoid retrogression.

Q  Can you explain that?

A  Which part?

Q  Both parts. What do you mean by why is it – why is [168] it relevant for the drawing of the districts in states which are covered by Section 5 or in other states maybe where there's only Section 2 coverage?

A  You don't want to reduce the ability of minorities to elect in areas where they currently have that ability to elect, and one threshold that's looked at by DOJ is whether there was a majority black, say black voting-age population district and that's been reduced to not a majority black voting-age population district.

That would raise a red flag for the Department of Justice and scrutiny, but also it's not like a 50 percent or 55 percent is the single rule they would use. They would want to know how are people voting in this area, if there's enough white crossover voting, enough whites who vote for the black-preferred candidates, then maybe you don't need to create certain kinds of districts, but if the whites are really opposed to the blacks, maybe you need to create those districts or

1722

maintain those districts in order to protect African American voting rights.

Q   Your experience in this context, do those sorts of differences between white crossover voting and racially polarized voting, does that differ from district to district, or is it typically the same all the way across any given state?

A   My experience is it varies within states.

[169] Q  And did you examine the extent to which it varied here?

A   Yes, I did.

Q   And did it?

A   Yes, it varied considerably from district to district.

Q   All right. Let's back up then and let me ask you this: How do you define racially polarized voting? What does that mean?

A   Racially polarized voting starts with two components: The voting behavior of the African Americans or Hispanics perhaps, and the voting behavior of white voters and the extent to which those two groups are voting on the same side with each other for candidates consistently or opposed to each other.

So if the two groups are cohesive, say 95 percent of blacks vote for Democrats and 95 percent of whites vote for Republican candidates, that would be a pretty polarized situation. A Low polarization might be if the whites were splitting their vote 50/50 and the blacks were 95 percent for the Democrats, that would be pretty low polarization.

THE COURT: How do you know which way I vote?

1723

THE WITNESS: Which way you personally vote?

JUDGE PAYNE: Anybody? How do you know how anybody votes and whether or not – what my race is, or do [170] you just take the statistics of how many people of a different race live in a particular area and compare them to the results and sort of hypothecate between who is Democrat and who is voting Republican based on race? How do you do that?

THE WITNESS: The vote is secret, so you can't do that. If exit polls exist, we look at exit polls, but there are no exit polls in this situation. So we're looking at the correlation between the relationship between the percent black and percent white in the voting tabulation districts in a given area and the percent vote for a specific candidates, black candidate or Democrat, so it is the latter as you stipulated.

Q   So then he actually –

MR. HAMILTON: Your Honor read the very next question out of my outline, since the ballots are secret. I won't read it again since you did it better than I did.

JUDGE PAYNE: Do you know how I voted?

MR. HAMILTON: I'm not going to offer to guess.

Q   So, there's a tool, a statistical tool we can use to answer Judge Payne's question; correct?

A   Correct.

Q   And it's called?

A   We use ecological regression in this field, and it's been the standard since *Thornburg v. Gingles* which the [171] Court referenced ecological regression is acceptable evidence for measuring racial polarization and racial block voting.

1724

Q   Okay. So we know – we're trying to think about two different things here. One of them is racial information. I guess we get that from the census bureau; is that right?

A   Correct.

Q   And then voting behavior, as Judge Payne points out, is secret, but we know in VTDs – by VTD how people vote; correct?

A   Correct.

Q   So how do you put those two pieces of information together with this ecological regression in order to predict voter behavior?

A   So you look at the relationship between percent black in an area, VTD, or cross-VTDs in an area, say State of Virginia or a more localized area like a House district, and the relationship of percent black and VTDs to the percent, say, democratic in House delegates election or U.S. presidential election, and fit – find the best fitting line, and from that line you infer what the – in a 100 percent black area, what percent black – what percent of the vote would be would be won by blacks.

In a 100 percent black area, all those people are black so, therefore – if you had a precincts that was [172] 100 percent black and they voted 100 percent democratic, you know how everybody voted in that precinct.

Similarly, if you had a hundred percent white area, you project from the line, in that 100 percent white area what was the projected voting behavior, and say it was 23 percent in that 100 percent white area, that would tell you from the line, therefore, that 95 or 100

1725

percent of the blacks were voting one way and 23 percent of the whites were voting that same way.

Q    You use that tool in particular VTDs in order to assess the likelihood of voter behavior in that area?

A    Correct. You can do it state-wide or in local areas. And we usually look at either the local area surrounding a VTD or – surrounding House district or the House district itself, and my analysis looked both state-wide and at the House districts.

Q    There's some discussion about ecological inference as an alternative statistical tool; is that correct?

A    Correct.

Q    What is the difference between the two?

JUDGE LEE: It would help us if you told us what they were. You may know what it is, but I don't.

Q    That's true. Why don't we start with what's ecological inference as opposed to ecological regression?

A    They're similar. The issue with ecological regression [173] is when you get to a bound of 100 percent, you don't want to create a projection beyond 100 percent so you impose the logical bounds. You can't have more than 100 percent of the vote for the Democrats in an area.

So it just says – ecological regression says your protection for the voting behavior of the group is bounded between 100 and zero. Ecological inference imposes that bound not in the prediction stage, which is what ecological regression does, but it imposes it in the estimation stage. So VTD by VTD, it imposes a set of bounds. That's really the difference between the two. All the other assumptions are effectively the same.

1726

THE COURT: I think we'll take the afternoon recess of 15 minutes at this time.

(Recess taken.)

NOTE: After the afternoon recess is taken, the case continues as follows:

JUDGE PAYNE: All right, Mr. Hamilton.

MR. HAMILTON: Thank you, Your Honor.

BY MR. HAMILTON: (Continuing)

Q   Dr. Ansolabehere, when we left the break we were talking, I'm sure everyone was fascinated, by the difference between ecological regression and ecological [174] inference, the two statistical tools that are usable to infer voter behavior here. And you were telling us a little bit about the difference, and I'm sure that this is an important debate in academia, but out in the real world do the two tests generate significantly different answers to the question that you are asking?

A   In my analysis here I don't reach markedly different conclusions about the ability of the districts in question to perform for African-Americans; that is, for African-Americans to elect their candidates of choice.

Q   There was or was not significant difference?

A   There was not a significant difference in using either analysis in my assessment of whether any of the districts were districts in which African-Americans could elect their preferred candidates.

Q   All right. So let's talk about the primary analysis that you did, which was an ecological regression analysis. The first step, I take it, from your report of that analysis is to select some base line

1727

elections to use the data to evaluate behavior, is that correct?

A    Correct.

Q    And what elections did you select to utilize in this analysis?

A    I selected the governor election in the State of Virginia or Commonwealth of Virginia for 2013. The U.S. [175] presidential 2008 and U.S. presidential 2012. And the U.S. Senate 2012 election results in the Commonwealth.

Q    Why did you choose those elections?

A    Couple reasons. One is those elections are very commonly used to evaluate plans in redistricting cases.

And second, those elections I determined were fairly highly correlated with and had approximately the same average election return level as House of Delegates districts in the delegate districts in question.

Q    So why not, since we're asking how people behave, voters behave in House of Delegates elections, why not examine House of Delegates election results instead of these other statewide races?

A    Well, two reasons. If I went back to 2011, there wouldn't be any House of Delegate election results to use to evaluate how the elections would perform because the delegate districts would have changed and different VTDs would be in different House of Delegates districts. So you couldn't have done that analysis in 2011 on the districts that were created.

The second reason is that House of Delegates districts have a very high percentage uncompetitive or

1728

uncontested where there is no Republican party oppo-
nent or no opponent of a Republican or nonpartisan.
So there is no data to actually do an analysis if you
only looked at House [176] Delegates elections.

Q    All right. You mentioned evaluating whether
these statewide elections that you used in conducting
your analysis correlated to the actual observed voting
behavior in the contested House of Delegates elections,
is that right?

A    Correct.

Q    Did you analyze that?

A    So I took the elections where there was a contest
in 2007, '9, '11 or '13 in the contested districts and
looked at the correlation between them. I also looked
at the average vote to see if they were about the same.

Q    And what was the result, how closely correlated
were they?

A    They are very highly correlated. I  think  they
were off by – the difference in the average was off by
like less than a percentage point.

Q    And so, using – what level of confidence did you
have in using that election return data to predict voter
behavior in House of Delegates elections?

A    I thought it was an extremely good predictor. So
what likely would happen in those districts.

Q    All right. So when you did this ecological
regression analysis in the 12 challenged districts using
that election data, were you able to confirm the
existence of [177] racially polarized voting in all 12 of
these districts?

A    No, some of the districts had polarized voting
and some of them did not.

1729

Q   Which did not?

A   I would have to look at my report to flag which ones.

Q   All right. Why don't you go ahead – that would be Exhibit 50, Plaintiff's Exhibit 50.

A   Table 13 in my report, which would be page 84. Table 13, page 84.

Q   And what House districts showed no racially polarized voting?

A   The way I see – the way to look at the chart is in the middle are two columns for white voters, white VAP, and the estimated voting behavior of white voters under the benchmark plan and under HB 5005.

And looking down the columns, we see that HD 69 has over 50 percent of the whites voting for the candidate preferred by the blacks. So there is no racial polarization in that context.

And that's true under both the benchmark and under HB 5005.

Q   So let me stop you there because the first question is just which districts?

A   So they are 69, 71 –

JUDGE PAYNE: 63 is the first one or –

[178] THE WITNESS: 69 is the first one with no polarization.

BY MR. HAMILTON: (Continuing)

Q   And then I'm going to walk back and ask you how you got there, but first tell me which districts showed no racial polarization. Just the number of the House districts, please.

1730

A   69, 71, 89. And then under the benchmark map HD 70 as well.

Q   All right. So racial polarized voting means a majority of black voters are voting for a different candidate that a majority of white voters, is that right?

A   Correct. They're opposed to each other, or polarized.

Q   Polarized. So if we see a majority of white voters voting for the same candidate as the majority of black voters, that's not racially polarized voting?

A   Correct.

Q   Okay. So now, looking at the table that you have pointed us to, here Exhibit 50, page 84, Table 13, can you show us where you find – let's see, the first one you identified as racially polarized was 69, is that right?

A   Correct.

Q   Okay. Can you explain how the court can find the evidence on that with respect to House District 69?

A   With respect to House District 69 under HB 5005, [179] ecological regression estimates imply that for blacks 97.8 percent voted for the democratic candidate in the federal offices.

Q   Let me stop you there. So that's in the column under Average Federal, .978 means in 97.8?

A   Correct.

Q   Okay. Where can we see the corresponding white vote?

A   The corroborating white vote is two columns over under HB 5005, 65.4 percent of whites voted for democratic candidates in the average federal election.

1731

Q   Let me just stop you there. So what you're saying is in House District 69, 97.8 percent of the African-American community is voting the same way as 65.4 percent of the white community?

A   Correct.

Q   That's no racial polarized voting?

A   Correct.

Q   Okay. So let's find an opposite example of one where there is racially polarized voting so we can see what that looks like. Can you look us an example of that?

A   Immediately above HD 69 is HD 63.

Q   All right.

A   And in HB 5005 ecological regression estimates under those lines that 89.4 percent of blacks in those VTDs voted for the democratic candidate.

[180] Moving over two columns, 16.8 percent of whites in the VTDs in HD63 under HB 5005 voted for the democratic candidate in the average federal election.

Q   So we could flip that around and say, whatever 100 minus 16.8 is, would be the Republican vote?

A   Yeah, 83.2 percent.

Q   83.2 percent of the white voters in District 63 were voting for the Republican versus 89.4 percent of the African-Americans were voting for the Democrat?

A   Right. That's a very good, clear instance of polarization because a very large majority of whites are voting one way and a very large majority of blacks are voting another way.

1732

JUDGE PAYNE: Which page of your report are you working? Still on 84?

THE WITNESS: This table 13, page 84 of Exhibit 50.

JUDGE PAYNE: Where is the 97 percent you're talking about?

THE WITNESS: Under HD 69, so the first two rose of numbers correspond to HD 63. The second two rows of numbers correspond to HD 69.

JUDGE PAYNE: Are you using the HB 5005 and the number down there is .978 –

THE WITNESS: Correct.

[181] JUDGE PAYNE: Is that your estimate?

THE WITNESS: Correct.

BY MR. HAMILTON: (Continuing)

Q   Right. Which corresponds to 97.8 percent, is that right, Doctor?

A   Correct.

Q   And if we looked over on the same line, Your Honor, two boxes where it says .654 for HD 69, that is 65.4 percent, is that right?

A   Correct.

JUDGE PAYNE: The difference between what happened in the benchmark plan is .064, is that right?

THE WITNESS: Correct. Among the whites. So the two columns, benchmark and HB 5005, correspond to whites.

JUDGE PAYNE: Yes.

THE WITNESS: So why are they different?

1733

JUDGE PAYNE: No, I'm just asking if they're different and what the difference is. The magnitude is .064, right?

THE WITNESS: Correct.

JUDGE PAYNE: There is a shift between the benchmark and the other – and the enacted plan, is that figure, right?

THE WITNESS: Correct.

JUDGE PAYNE: Now what does that figure mean?

[182] THE WITNESS: That figure means –

JUDGE PAYNE: What does it state? Excuse me.

THE WITNESS: That figure in this case for whites in HD 69 states that the white voting tabulation districts that were included in there had slightly different voting patterns, and it differed by six-and-a-half percentage points.

JUDGE PAYNE: But not anymore than six-and-a-half percent?

THE WITNESS: Yes, among the whites.

JUDGE PAYNE: Why isn't that figure the one that you look at to determine whether there is polarization or not as between the two plans, the benchmark plan and the 2005 plan?

THE WITNESS: The agree of polarization is the comparison between the African-American voting behavior and the white voting behavior.

There is also changes that occur from plan to plan depending upon which communities are put into the districts. And an interesting example is HD 70 where the whites that were added to HD 70 were voting very

1734

differently than the whites that were in HD 70 under the benchmark.

Under the benchmark, it's estimated that 59.3 percent of the whites in the VTDs that were in [183] benchmark HD 70 voted for Democratic candidates, which is the candidate preferred by 86 percent – or, sorry, 98 percent of the blacks.

However, under HB 5005, continuing with the examination of HD 70, only 28 percent of the whites are estimated to have voted for Democratic candidates.

It's just different whites were put into that district than were included in the prior version of that map.

BY MR. HAMILTON: (Continuing)

Q   So the purpose of this analysis is to look at voting behavior between the two different populations, the population of African-American voters and the population of white voters, correct?

A   Correct.

Q   And if they are both voting the same way, there is no polarization. There is no difference between them. If they are voting differently, there is polarization, and that's what we're worried about?

A   Correct.

Q   Under the Voting Rights Act, that's why we have to create majority-minority districts, it's one of the *Gingles* factors, correct?

A   Correct.

Q   All right.

1735

[184] JUDGE PAYNE: In HD 69, under the column Black in the average federal, the difference between the bench and 5005 is .022, is that right?

THE WITNESS: That's correct.

JUDGE PAYNE: And I still go back to the question, why don't you compare .022 to the difference between what occurs in subtracting out what the performance was under HD 69 for the white vote, which was .64, and see what happens there? Why isn't that the relevant metric, I guess is what I'm trying to ask?

THE WITNESS: So there are two different questions that are commonly addressed with these data. One question, which is the focus of my analysis here, is in which of these districts performs as a district in which African-Americans can elect their preferred candidates?

So what's relevant is looking at say HB 5005, in which districts did African-Americans prefer the Democratic candidate? It turns out every one of them.

Then the question is, using these figures, you can multiple and figure out what percentage of the vote is expected to have been won by African-American preferred candidates given the white voting behavior, the other persons' voting behavior, and the black voting behavior.

There is a second analysis under Section 2 of the [185] Voting Rights Act, which is to look for racial polarization. And this is one of the *Gingles* factors that comes out of *Thornberg versus Gingles*. If there is no racial polarization, then one of the criteria under *Gingles*, established under *Gingles* for creating a majority-minority district doesn't exist. That is, you don't have to create a majority-minority district in

1736

that context in order to protect African-American voters from white voters because African-American voters – majorities of African-American voters and majorities white voters are on the same side, there is no protection needed.

However, if you have racial polarization, such as in HD 63, where a large majority of the whites are opposed to a large majority of the blacks, then you might require a majority-minority district in order to protect the African-Americans' voting rights in that area.

Those are two different questions that are addressed using these kinds of data. And it is the first question that I'm addressing in my report because I was not asked to weigh in on the Section 2 *Gingles* question.

Q    And, Dr. Ansolabehere, just to make sure that we've answered Judge Payne's question, he's saying there is a difference in the amount of racial polarization in the benchmark plan, and then there is racial polarization in the enacted plan.

[186] So why aren't we comparing how the degree of racial polarization changes from one to the other? I think that's the question –

JUDGE PAYNE: Why is it that that's not the relevant inquiry to determine what happened here? What I got from your answer is you didn't do that, and you don't do that as part of the analysis you did. That's what I interpreted from what you said.

MR. HAMILTON: And I think –

JUDGE PAYNE: And I may be wrong.

MR. HAMILTON: – at the risk of addressing the Court directly and testifying rather than asking the witness the question.

1737

BY MR. HAMILTON: (Continuing)

Q   The question that we're examining here is whether – what degree – whether 55 percent black voting-age population is necessary in order to protect the ability of the African-American community to elect a candidate of their choice, correct?

A   Correct.

Q   And for that, it doesn't matter how the district was, it only matters how it is? In other words, the change doesn't matter unless the change made it better? If there is polarization in the benchmark or there is polarization in the enacted plan, there is polarization and it doesn't [187] make it any better if it's a small change or a large change as long as there is polarization, that's the problem, right?

A   Correct.

Q   All right.

A   However, one analysis I do in my report is I do look and compare was there a change from a district where there wasn't polarization to a district where there was polarization. And that's indicative of the kind of movement of voting tabulation districts in and out of the districts in ways that are altering the fundamental voting pattern or voting alignments in the districts.

And HD 70 is an example of a district where there was a substantial change in the composition of the whites. The whites are really different under HD 70 in the benchmark – under HD 5005 than they were in the benchmark. And that's just another flag that is consistent with the kind of analysis of people being moved in and out of these districts are fundamentally

1738

different in ways that are not preserving of the districts as they were.

JUDGE PAYNE: How do you know that they are fundamentally different? I thought you could only tell how they voted?

THE WITNESS: In their voting behavior.

[188] JUDGE PAYNE: Fundamental difference in the voting behavior?

THE WITNESS: Correct.

JUDGE PAYNE: Okay. I understand. Sorry for the detour.

MR. HAMILTON: Your Honor, it's helpful. If it's a question on your mind, it's a question we would like to answer.

JUDGE LEE: Well, since you said that, Delegate McClellan said that her district started out in the 2001 plan at 55 percent, that's my recollection. Then she said that the census had changed to 46.3 percent. Which would mean it was no longer a majority-minority district. And she says that her district was so Democratic, she could get reelected on her own.

The question I have is whether, from the standpoint of the change that took place, her district was underpopulated? So the district, the people that were added to it were contiguous and were they African-American? That's two questions actually.

THE WITNESS: Okay. So the people added to her district, if we look at – there is an analysis of what populations were added to her district by district, that is parallel to the analysis we looked at before the break. And that would be contained in Tables 8 and 9.

1739

[189] So if you look at HD 70 – sorry. Oops, Table–yeah, 8 and 9, you can see that the population added to her district, that is the area moved into, was 43.8 percent BVAP.

JUDGE PAYNE: Which district?

THE WITNESS: Oh, sorry.

JUDGE PAYNE: 71.

THE WITNESS: 71, sorry, I read the wrong one.

JUDGE PAYNE: Okay.

THE WITNESS: 71 was 72 percent BVAP.

BY MR. HAMILTON: (Continuing)

Q   So let's stop there, Dr. Ansolabehere, because you're going kind of quickly. We are on Exhibit 50, page 77, which is Table 8. And you're discussing House District 71, which is in the middle of the page, is that right?

A   Correct.

Q   Let's hold on, I want to make sure that the Court is with us.

Okay. So you were just saying, the precincts – the voting tabulation districts that were moved into House District 71 had an average BVAP of 72.1 percent, is that right?

A   Correct.

Q   And we're seeing that in the column labeled Into?

A   Correct.

[190] Q  Okay. Now please continue, but just a little bit slower.

1740

A    Then the column Out Of has BVAP of 21.3 percent. So the areas moved out were 21 percent black, and the areas moved in were 72 percent black. That's a net swap in voting-age population of 50 percent. Black voting-age population is 50 percent higher in the areas moved in than in the areas moved out.

The average federal – the difference in the average federal vote is only about 16 percentage points reading across the line below it.

87 percent average federal vote in the areas moved into the District, and 70 percent average federal vote in the areas moved out.

So the change in the white voting population composition and how they were voting was due to which whites were left in the district, which whites were moved out, and which whites were moved in.

And the net effect of those was to lower the black – the white vote share in the – among Democrats in that direct from whatever it was, 58 percent or so, down to 23, whatever we had in the prior table we were looking at.

That was – that's what accounts for that change.

JUDGE KEENAN: I have one question. So the more [191] significant indicator of polarization would be the benchmark plan because then you would have to determine whether you needed to move more of the black voting-age population in or out of the district in order to make it able to elect – blacks able to elect a candidate of their choice?

THE WITNESS: Correct. If it was 2011 and we were drawing a map, we would look at the benchmark election statistics and voting patterns and the racial composition –

1741

JUDGE KEENAN: Right. So that's really what we're concerned about as far as polarization?

THE WITNESS: Right.

JUDGE KEENAN: Polarization in the benchmark, right?

THE WITNESS: Right.

JUDGE KEENAN: And what had to be moved as a result of that polarization in order to secure the ability to elect the candidate of their choice?

THE WITNESS: Correct.

JUDGE KEENAN: Okay.

JUDGE LEE: But there was underpopulation in the district, correct?

THE WITNESS: In that district, yes.

JUDGE LEE: So somebody had to make a choice [192] about which population to add and which to take away?

THE WITNESS: Correct.

JUDGE LEE: Those are all my questions. Thank you.

MR. HAMILTON: I'm happy to turn the floor over to the Court any time.

BY MR. HAMILTON: (Continuing)

Q    Let me go back to where we are here. I would like to look at – let's look at House Districts 80 and 95. And if you could tell us what your racial polarization study showed with respect to voting behavior.

Let's start with House District 80.

JUDGE LEE: Which table are you using?

1742

THE WITNESS: It is the same table, page 84 of Plaintiff's Exhibit 50, Table 13.

JUDGE LEE: Page 84, just a second. Okay, I'm there.

BY MR. HAMILTON: (Continuing)

Q   So the question is, what did you find with respect to – I am going to ask but 80 and 95, but let's start with House District 80.

A   Okay. In House District 80, under the benchmark map, 97 percent of blacks voted for Democrats in the federal elections.

Under the benchmark map, 41.5 percent of whites [193] voted for Democrats in the federal offices.

Q   Okay. How would you characterize that in terms of polarization?

A   That's fairly low polarization. A majority of whites are opposed to a majority of blacks, but there is a fair amount of what is termed crossover voting. That is, a lot of whites are voting for the black-preferred candidates.

Q   Right. So in this case 41.5 percent of the white voters would be voting for the same candidate as 97 percent of the African-American voters would be voting?

A   Correct.

Q   Okay. How about 95, what did you find there?

A   95 looks somewhat similar. There 100 percent – it is estimated that 100 percent of the blacks voted for the Democrat in the average federal election.

1743

And among the whites under the benchmark, 43.5 percent of whites voted for Democratic candidates in the federal elections on average.

Q   So in these two instances, while there is polarization, you would characterize it as weak polarization?

A   Yeah, weak polarization, or high crossover vote, both terms I've used.

Q   High crossover because there is such a large percentage of the white vote voting for the [194] African-American preferred candidate?

A   Correct, but still not a majority.

Q   So were you able to reach a conclusion whether under the benchmark maps African-Americans had the ability to elect candidates of their choice in the 12 challenged districts?

A   I have.

Q   Okay. And what is that conclusion?

A   Under the benchmark, in all 12 challenged districts African-Americans had the ability to elect their preferred candidates.

Q   In all 12?

A   In all 12.

Q   Even the House District 71 where the black voting-age population dropped to 46 percent?

A   Correct.

Q   Still had the ability to elect a candidate of their choice?

A   Correct.

1744

Q   Okay. Were there other examples of House Districts under the benchmark map where the black voting-age population dropped below 55 percent and yet still had the ability to elect African-American candidates of choice?

A   I believe there are two.

Q   Two?

[195] A   I think two additional districts where the black –

Q   When you say additional, so the first one is House District 71, we've just been talking about, right?

A   Correct.

Q   What are the other two?

A   There are two other districts in which under the benchmark map the black voting-age population was less than 55 percent. I believe they are HD 80 and HD 89.

Q   Okay. So let's look at 80, I think that's the one we were just looking at a moment ago.

A   Correct.

Q   Again, it's Plaintiff's Exhibit 50, page 84, Table 13. And that's the one where the African-American population under the benchmark was voting 97 percent of the time for the Democratic candidate, and 41.5 of the white voters were voting for the same candidate under the benchmark plan?

A   Correct.

Q   Okay. And the black voting-age population had dropped below 55 percent in that district?

A   Correct.

1745

Q   What was it?

A   It was 54 percent.

Q   Okay. How about House District 89?

A   Yes.

[196] Q   Could you describe the extent of polarization in that district. And again, we're on the same page of Exhibit 50, page 84, Table 13, for the record.

A   Ecological regression in this instance estimates that 100 percent of the blacks voted for the Democratic candidates in the average federal election. And 56.5 under the benchmark of whites voted for the Democratic candidates in those elections.

Q   And what was the black voting-age population there?

A   52.5, I think.

Q   52.5. In all three of these districts we've just been talking about, 71, 80, 89, did the African-American population have the ability to elect a candidate of their choice under the benchmark plan even with BVAP levels as low as 46 percent?

A   Yes, they did.

Q   Okay.

JUDGE PAYNE: Who were the candidates in the election you're talking about for HD 80 and 89?

THE WITNESS: For –

JUDGE PAYNE: Who were the candidates that were being voted for at that time?

THE WITNESS: In the analysis in this table?

JUDGE PAYNE: In your regression analysis, Table 13. Sorry.

1746

[197] THE WITNESS: Table 13 covers the governor candidates and the federal elections. So that would be the candidates for U.S. President in 2008, candidates for U.S. Senate in 2012, and the candidates for U.S. President in 2012.

JUDGE PAYNE: Would your analysis be any different if the candidate being considered was not African-American in that, in your estimate?

THE WITNESS: So in two of those elections, President Obama was on the ticket.

JUDGE PAYNE: Yeah.

THE WITNESS: And then the U.S. Senate and the governor elections did not have an African-American.

JUDGE PAYNE: I guess my question is, did you take into account in any way that in the elections you're using as a barometer against which to measure polarization involved an African-American candidate for President for the first time? And then you see that 100 percent of the voters vote for the African-American President.

Did you take that into account in deciding the validity vel non of the polarization conclusions that you reached?

THE WITNESS: So I looked at the correlation between the House of Delegates elections at the voting tabulation, whether they – or at the voting tabulation [198] district, the correlation between the presidential vote, the Senate vote, and the governor vote, and the House of Delegates votes for those elections where there were contested races for House of Delegates. And I found a very high correlation.

And I found that the average vote across the federal elections was about the same as the average vote for

1747

the House of Delegates elections. And that is what I took as evidence that these elections were indicative of how these races – how these seats would perform.

JUDGE LEE: But do you understand – I'm sorry.

JUDGE PAYNE: You concluded that 100 percent of African-Americans voted for the same candidate in Virginia in those elections that you considered?

THE WITNESS: In that – in the voting tabulation districts in that district, yes.

JUDGE PAYNE: And then you did the same for governor? I understand. Okay.

So the answer is, I guess, did you really take that into consideration as affecting the validity of using this polarization metric that you're using? Or are you just telling me you did some other comparisons to kind of see if it matched up and got close to the same result?

THE WITNESS: I did analysts in each of these races separately, and I report here the average of the [199] federal elections. And the analyzes were all lining up, so they were all consistent with each other.

So I concluded that there wasn't a significant effect in this area, in these districts of Obama on the top of the ticket in terms of the estimated values in this table.

JUDGE LEE: Well, I guess the question that occurs, and it may not be pertinent to your analysis, is before 2008 Virginia had never voted for a Democrat since 1964 for President. Does that figure at all?

Because 2008 was kind of unprecedented from the standpoint of voter turnout in the state, I believe.

THE WITNESS: Right. So it would have been nice to have pushed into earlier election years, but the

1748

farther back in time you go, the more different the populations are in these local areas. As we saw, you get people moving in and out of these areas.

So it's – essentially looking earlier in history would be been comparing less and less connected voters.

So when we, for example at CBS when we do election forecasts for what is likely to happen in congressional districts, U.S. Senate districts, we use past vote as we're using here, but we don't go back farther than a couple of elections.

[200] JUDGE LEE: What year was the benchmark plan?

THE WITNESS: What year was it passed?

JUDGE LEE: Yes.

THE WITNESS: It was passed in 2001.

JUDGE LEE: Okay.

THE WITNESS: But there was population change, in some areas quite substantial, from 2001 to 2010. And so, the voters in the voter tabulation – the people in the voting tabulation districts might be quite different in 2010 from the ones say in the 2010 election or the 2004 election.

JUDGE LEE: This won't be my last question, but my last question for right now. And that is whether you have here somewhere the numbers that show what the increase in the black voting-age population was per district between the 2000 census and the 2010 census? Is that in here somewhere?

THE WITNESS: In the entire state or in –

JUDGE LEE: For each of these districts. Because you focused on the changes and the increases in black

1749

voting-age population. I would like to know if there was any increase geographywise like between like Hopewell and Dinwiddie or Hopewell and–

THE WITNESS: Yeah, Table 4 presents the populations of the districts –

[201] JUDGE LEE: Are we still in Exhibit 50?

THE WITNESS: In Exhibit 50, page 72.

JUDGE PAYNE: What –

THE WITNESS: Page 72.

JUDGE PAYNE: Thank you.

BY MR. HAMILTON: (Continuing)

Q    So pause there, Dr. Ansolabehere, let the Court catch up with you on the page.

Okay, go ahead.

A    Table 4 presents the populations of each of the districts. The black voting-age population in 2010, not from 2001, but in 2010. And the black voting-age population – and the Hispanic voting-age population.

JUDGE LEE: So there is not one for 2000 that you prepared?

THE WITNESS: I did not prepare one for 2001.

JUDGE LEE: Thank you.

BY MR. HAMILTON: (Continuing)

Q    Okay. But we can look at this table, Table 4, Plaintiff's Exhibit 50, page 72, and we can see, for example, the black voting-age population of District 71 is 46.3. And that's Delegate McClellan, who we heard from this morning who we were talking about a little earlier this afternoon, correct?

1750

A   Correct. And it had a total population of 74,000, and [202] it was increased by 6,000 to make it into a legal district.

Q   So as long as we're here, looking at that table, if we just run our thumb done the benchmark district, we can see what the black voting-age population was just before the redistricting. And then under the column labeled HB 5005 we can see what the black voting-age population became after the enacted – or in the enacted plan, right?

A   Correct.

JUDGE LEE: Give me just one second.

Q   All right. So I think we've established that under the benchmark plan in all 12 districts – let me ask it this way.

Under the benchmark plan, in all 12 districts did the minority African-American community have the ability to elect a candidate of their choice?

A   They did.

Q   Okay. Was there any reason to have a 55 percent black voting-age population rule in adopting the enacted plan according to your analysis in order to preserve that ability to elect?

A   According to my analysis, 55 percent was not needed in every district in order to have the ability to elect.

JUDGE PAYNE: In how many districts was 55 percent needed?

[203]  THE WITNESS: I did a hypothetical calculation in every district the black voting-age population was lowered to 50 percent, just kept it exactly majority-minority.

1751

And in every one of those districts the expected vote share for the black-preferred candidate was at 56 percent or higher.

So it ranged from 56 percent I think up to 84 percent. So in none of those districts was it needed to maintain those as districts in which blacks have the ability to elect their preferred candidates.

JUDGE PAYNE: In no district was 55 percent needed, none of these 12, is that what your opinion was?

THE WITNESS: Yes.

BY MR. HAMILTON: (Continuing)

Q   So, Dr. Ansolabehere, I have put up on the screen an illustrative exhibit, this is not in the exhibit notebooks. It is in the handout that I passed out at the beginning of the examination though.

This is a result of – this is your ecological regression analysis, the hypothetical that you just said we lower the black voting-age population to 50 and then see what happens, is that right?

A   Correct.

Q   Okay. And so, we're looking at this now. Can you describe what we are seeing.

[204] A   So what we're seeing is the projected vote share for Democratic candidates or who are the candidates preferred by African-Americans in all of the elections studied in each of the districts from HD 63 on the far right to HD 69 on the far left.

JUDGE PAYNE: So the red line signifies what, Doctor?

THE WITNESS: 50 percent.

1752

MR. HAMILTON: The red line is actually misplaced, it is a little too high. It is should be down a little bit lower at the 50 percent mark. So there is a distortion in this. And I apologize for that, Your Honor. Obviously 50 percent is the winning margin of victory in any election.

BY MR. HAMILTON: (Continuing)

Q   And the numbers at the top of each column, Doctor, those refer to the total margin of the vote share that the Democratic candidate could be expected to receive at 50 percent black voting-age population?

A   Correct.

Q   So let's just walk through these. In HD 69, even be we drop the 55 percent black BVAP rule and we drop the population, instead of holding it at 55, we drop it down to 50, what's the winning margin here?

A   84.1 percent.

[205] Q  84 to 16?

A   Correct.

Q   Okay. How about House District 71?

A   HD 71 would be just about 80 percent to 20 percent.

Q   89?

A   77.5 to 22.5.

Q   92?

A   70.8 to 29.2.

Q   How about House District 90?

A   HD 90, the Democrat is expected to get 68.8 percent of the vote.

1753

Q   And the Republican candidate?

A   Making me do math in my head.

Q   I am making you do math?

A   31.2.

Q   How about House District 74?

A   68 percent to 32 percent.

Q   House District 80?

A   67.6 to 32.4.

Q   House District 95?

A   66.8 to 33.2.

Q   House District 70?

A   62.4 to 37.6.

Q   House District 77?

A   61.6 to 28.4.

[206] Q  House District 75?

A   59.3 to 40.7.

Q   And House District 73?

A   55.8 to 44.2.

Q   So if the General Assembly had used a 50 percent instead of a 55 percent BVAP number for these for drawing these districts, would the minority community in these 12 districts have retained the ability to elect the candidates of their choice?

A   Correct.

Q   Any of them even close?

A   Not really.

1754

Q   Now, you did this analysis using ecological regression, which you described earlier, correct?

A   Correct.

Q   What if we used the other method, ecological inference instead, and we looked only at House of Delegates elections, but dropped the BVAP to 50 percent, again the same thing, but just using the other – making two switches. Number one, dropping BVAP to 50 percent. Number two, using ecological inference. And number three, using House of Delegates elections.

Would that change the expected vote share in any material way?

A   Not in any of the House Districts in which there are [207] contested House delegate elections.

JUDGE PAYNE: Not any of the 12 at issue here?

THE WITNESS: Well, the ones for which there are estimates using the House of Delegates elections. There aren't contested House of Delegates elections, so we don't have information about those from that analysis.

BY MR. HAMILTON: (Continuing)

Q   All right. Did you prepare that sort of analysis?

A   I did.

Q   Okay. So if I put it up on the board, you are familiar with this slide?

A   Yes, I am.

Q   And could you describe what we're looking at here.

A   This is using ecological inference estimates in the districts for which there are House of Delegates

1755

elections between a Republican and a Democrat sometime between 2007 and 2013.

Q   Okay. So let's just stop there. So where there is only seven boxes here, seven elections, that's because there is only seven where there was a Democrat and a Republican running against each other?

A   Correct, in at least one of these elections. There are five in which there were no contests between a Democrat and a Republican.

Q   So if you're using – at least if you're using House [208] of Delegates elections as the base line, you're not going to be able to look at all 12, you can only look at seven?

A   Correct.

Q   All right. So tell us a little bit about this exhibit – I am sorry, this is illustrative exhibit.

A   So in this exhibit the hypothetical is constructed by lowering the black voting-age population from whatever it was under HB 5005 to 50 percent, and moving that population into the white voting-age population category. So just imagine swapping whites in for the blacks until you get to the point of a 50 percent BVAP district.

And then using the ecological inference estimates of the black, white, and other group voting behavior, project what percentage of – how many black votes there would be for the Democratic candidate, how many white votes there would be for the Democratic candidate, how many other votes there would be for the Democratic candidate, and then sum those vote shares.

So in District 69, that calculation leads to a projection of 85.37 percent for the Democratic candidate.

1756

Q   Just so that we are all understanding how you calculated this, let's just use House District 69 as the example.

Under using ecological inference, you infer that 97.3 percent of the black population are going to vote for [209] the candidate of choice, so for the Democrat?

A   Correct.

Q   And then it shows that it is multiplied times .5. Is that because that's 50 percent BVAP?

A   Correct.

Q   And so, the resulting number is 48.65. That's the share of the total vote that is going to be attributable to the African-American voters in that precinct?

A   Correct.

Q   And then the next line down, it looks like 73.1 percent of the voters – of the white voters are going to vote for that same Democratic candidate?

A   Correct.

Q   And you've dropped the BVAP level – or, I am sorry, I guess it would be the WVAP level, white voting-age population, to 40 percent?

A   Just to highlight something at the very top, it reports the BVAP level in this district under HB 5005. So it is 55.2.

So I take the 5.2, subtract it from that, and allocate it to the whites. That raises the white voting-age population to 40 percent.

So .731 times .4 is 29.24.

1757

Q   So in this House District 69, the African-American voters are going to provide out of the total votes cast in [210] the election 48.65 percent for the Democratic candidate. The white voters are going to provide another 29.24. And the other category is going to provide an additional 7.48 percent votes, all summing to 85.37?

A   Correct.

Q   Okay. And you've done that analysis all the way through for all five, or, I'm sorry, all seven of these districts?

A   Correct.

Q   Now, is there a way to display this data in a bar chart format?

A   Yes, there is.

Q   Have you done that?

A   Yes.

Q   Okay. So I've put that up, and I again apologize to the Court because our 50 percent line is a little skewed, it looks like it is at about 53 or 54.

But this is just, this bar chart is displaying the same information as the table we were just looking at?

A   Correct.

Q   And just for the record, because this is an illustrative exhibit, I just want to make sure that we have this.

HD 71 using ecological inference, and House of Delegates elections, but dropping the black voting-age [211] population down to 50, you would expect what would be the Democratic margin of victory in House District 71?

1758

A   The Democrat is predicted to win 87.2 percent of the vote.

Q   Versus the Republican?

A   12.8.

Q   Okay. And House District 69, what would be the result of the election?

A   The Democrat is protected to win 85.37 versus 14.63.

Q   Okay. And in House District 95?

A   The Democrat is expected to 75.99 percent of the vote versus 24.01.

Q   And in House District 74?

A   The Democrat is expected to win 74.53 percent of the vote versus 25.47.

Q   And House District 75?

A   Democrat is expected to win 65.15 percent of the vote versus the Republican vote share of 34.85.

Q   And in House District 90?

A   The Democrat is expected to win 64.72 percent of the vote versus 35.28.

Q   And finally in House District 80?

A   The Democrat is expected to win 63.91 percent of the vote versus 36.09 percent of the vote.

Q   So using ecological inference, the second statistical [212] tool, the other statistical tool, and the House of Delegates election data, if the General Assembly had dropped the BVAP level to 50 percent, would the minority community, the African-American community have retained its ability to elect a candidate of its choice?

1759

A   Yes.

Q   In all 12 districts?

A   In these seven districts. The ecological inference estimates are not possible given that they are for House of Delegates races for these – the other five districts.

Q   By the way, before we leave this topic, let me ask you this question. This ability to elect, is it likely to be the same in each of the 12 challenged districts?

A   No.

Q   Why?

A   Well, you have got varying degrees of white crossover voting, or even a majority of whites voting the same way as blacks. So in those case where the black-preferred candidates is winning all three groups, it's almost certain they're going to win that election.

I think the most – the districts where there is more polarization, they are less sure because the black-preferred candidate can't draw as many white voters over.

So the ability to elect is going to vary with [213] polarization, that's why polarization is informative about ability to elect.

Q   But regardless of which statistical measure we use, even if we drop the black voting-age population to 50 percent, the minority community, the African-American community in every one of the 12 challenged districts retain the ability to elect, is that your conclusion?

A   That's my conclusion.

1760

JUDGE PAYNE: Mr. Hamilton, I think we have been there and done that several times now. Can we get on with something else.

BY MR. HAMILTON: (Continuing)

Q   Does the historical record confirm your conclusion about ability to elect? That is, did you observe elections in which African-American candidates won even with less than 55 percent BVAP?

A   Well, the recent historical record concerning say District 71 where a candidate only had 46 percent BVAP in the district, but one I think 83 percent of the vote in the last contested election, is confirmatory of the same conclusion.

MR. HAMILTON: All right. Thank you, Doctor, no further questions.

JUDGE PAYNE: Mr. Braden.

CROSS EXAMINATION

[214] BY MR. BRADEN:

Q   May it please the Court. Doctor, good to see you again. Mark Braden for the defendants intervenor.

I normally like to begin at the beginning, but in this case I think I'll start at the end. If we could still look at Plaintiff's Exhibit 50 and your Table 13.

And this table, I'm correct, it lists all the challenged districts?

A   Correct.

Q   Would I be correct to characterize them as all safe Democratic districts?

A   Correct.

1761

Q   So in a general election, often the Democratic candidate wouldn't even be opposed?

A   For House of Delegates?

Q   Yes.

A   Correct.

Q   So in your chart here, do you have any primary data?

A   No.

Q   So how does this chart inform us on the difference between white and black voting in a Democrat primary?

A   It concerns general elections only. It does not concern any primary election analysis.

Q   So it provides no information to this Court on the preferred choice of the black community in a primary [215] election in these districts?

A   Correct.

Q   Were you present for Delegate McClellan's testimony?

A   Yes, I was.

Q   Did you her say that she was in one of the most Democratic districts in the state?

A   Yes, I heard that.

Q   That's one of the challenged districts, 71?

A   Yes.

Q   And did you hear her say that she had no serious race except for the one primary race at the beginning?

A   Correct.

1762

Q   So your chart in your report gives us no information on polarization between white and black voters in the Democratic primary?

A   Correct.

Q   But that's the only significant election in these districts, correct?

A   No. You still have to –

Q   Is the general election important when there is not a Republican running?

A   In some of these districts Republicans run, as referred to in another table in my report.

Q   And what would they normally get, 20 percent, 30 percent of the vote?

[216] A   It ranged from a low of 63 I think up to 88 for the Democrat, and then minus that for the Republican.

Q   And what would be the normal range of contested races that political scientists would think were seriously contested?

A   We usually look at things between 55 and 45.

Q   So none of these were seriously contested?

A   They all seem to be safe districts.

JUDGE PAYNE: Is your answer that they weren't seriously contested in views of experts who practice in your discipline?

THE WITNESS: Other things are considered when we think about serious contestation, like how much money is spent and so forth. And I haven't look at that.

JUDGE LEE: Was there a percentage that you have in mind that is acceptable among political scientists?

1763

THE WITNESS: We usually look at the range of either 55 to 45 as very competitive or competitive races, or sometimes 60/40. But usually 55/45 is the range we determine to be competitive races or competitive seats.

It doesn't mean that no candidate can be defeated. In fact, one of the first articles I published in my career was an analysis of U.S. House elections historically looking at the vote margin – the past vote margin and defeat rates. And some people who have 100 – [217] or won 80 percent last time, lose in the next election.

But the defeat rates are highest in the range 45 to 55 percent. Typically if a candidate gets between 45 and 55 percent in one election, say an incumbent wins with say 53 percent of the vote, the chance of that incumbent losing in the next election is about 20 percent.

Once you pass above 55 percent, it drops down to about 5 percent.

So 55 percent is kind of an important threshold look at projections about future elections and whether or not there is a high chance of election or defeat. It's not a guarantee, but –

BY MR. BRADEN: (Continuing)

Q   Just extremely unlikely that any Republican candidate would win in these districts in the general election?

A   Yes.

Q   So the significant election is in fact the Democrat primary, correct?

A   It might be.

1764

Q   Let me actually begin back at the beginning. Did you draft a Virginia legislative plan?

A   No, I did not.

Q   Neither this year nor any other year?

A   No.

Q   Have you been ever hired by a state to draft a [218] legislative plan?

A   I have never been hired by a state to draft a legislative plan.

Q   Have you ever been hired by a county to draft some type of redistricting plan?

A   No.

Q   Any municipality ever hired you?

A   No.

Q   Have you ever drafted a plan that was adopted by any state legislature?

A   No.

Q   And have you ever submitted a plan to a state legislature for them to review?

A   No.

Q   And have you ever been hired by a court to be a master in drafting a plan?

A   No.

Q   How many times have you been an expert witness in redistricting cases?

A   In redistricting, I think it's around ten.

1765

Q   Around ten. But you've only been an expert witness, you have never been a fact witness because you have never drawn any plans, correct?

A   Correct.

Q   Do you recognize that legislative plan drawing is [219] usually a partisan process?

A   Seems like the are parties involved most of the time. So –

JUDGE PAYNE: Well would that answer be a yes?

THE WITNESS: Yeah.

BY MR. BRADEN: (Continuing)

Q   Have you ever testified in opposition to a plan adopted by a Democratically controlled legislature?

A   Adopted by a Democratically – I've testified – I've filed expert reports against a plan for a water district in Texas that was drafted by a – yeah, it was a Democratically controlled legislature.

Q   Any state legislative plans?

A   No.

Q   So other than the water district in Texas, is that the one involving the issue of Section 5 preclearance and its constitutional?

A   No, it's one person/one vote violation. And it does have racial overtones as well because Hispanics are affected disparately.

JUDGE PAYNE: I cannot hear you.

THE WITNESS: I'm sorry. Because Hispanics are affected disparately.

JUDGE PAYNE: Pull the mike a little closer, I think that would be helpful.

1766

[220] BY MR. BRADEN: (Continuing)

Q   And have you ever worked as an expert testimony for an identifiable Republican interest in the redistricting process?

A   No.

Q   Okay. And I believe you testified that state legislatures often hire individuals to do racial bloc voting analysis before drafting plans or during the line drawing process, did I hear that testimony correct?

A   Correct.

Q   Have you ever been hired to do that?

A   No. I put in – I bid on the Massachusetts contract, but I did not receive that contract. They chose EDS.

Q   And so, EDS was hired to do the racial bloc voting analysis for Massachusetts?

A   Correct.

Q   And other than Massachusetts, what are the other states that you are familiar with who have done this and who have they hired?

A   Texas did it. I am not sure who they hired. I think it was done internally.

JUDGE PAYNE: You think who?

THE WITNESS: Pardon?

JUDGE PAYNE: You think who?

THE WITNESS: I think Texas did it internally. I [221] think the Texas legislative counsel did that analysis.

BY MR. BRADEN: (Continuing)

1767

Q   Any of the people in your field, political scientists at universities you are familiar with who you could give us a name?

A   Who do this sort of analysis?

Q   Who have done this during a state legislative drafting process.

A   I don't know names offhand. I believe Bernie Grofman worked on the Minnesota legislative – did a racial analysis in Minnesota. But who –

Q   During the drafting of the process, the lines?

A   I believe so.

Q   And have you had the opportunity – in the Virginia situation you're probably familiar with the fact that Virginia has been filing preclearance applications for these legislative plans since the passage of the Voting Rights Act?

A   Correct.

Q   Do you know whether the State of Virginia has ever submitted a racial bloc voting analysis in conjunction with those preclearances?

A   I don't know that.

Q   Did you look at the most recent preclearance in 2001 for the 2001 plan?

[222] A  I looked at some documents from the preclearance.

Q   Did you see any racial bloc voting analysis?

A   Not in the documents I looked at. I did see compactness scores.

Q   For your report, did you interview any Virginia House members?

1768

A    No.

Q    Did you interview any Virginia elected officials?

A    No.

Q    Any Virginia party officials?

A    No.

Q    Did you interview any of the legislative staff?

A    No.

Q    Did you interview any Virginia voters?

A    No.

Q    Did you read any of the news accounts of the process? It did get some coverage.

A    No.

Q    Did you review any of the racial bloc voting analysis in the prior Virginia redistricting litigation?

A    No.

Q    Did you read the West v. Wilkins case?

A    I believe I did.

Q    You did?

A    I am pretty sure I did.

[223] Q  Did you notice whether there was racial bloc voting analysis done in that?

A    I don't remember.

Q    Have you gone and – I don't know, I always wondered whether this is the right word. Have you gone and like Googled or done some type of search to see whether any of the discussion in the newspapers or maybe in the political science legislature criticizing parts of the Virginia's prior plans?

1769

A   No.

Q   Did you review any of the floor debates in the Virginia legislature?

A   No.

Q   Did you attend any of the hearings?

A   No.

Q   Did you review any of the hearing transcripts?

A   No.

Q   Did the plaintiffs – and it's been useful to us, I believe the Court, procured DVDs of all the speeches on the floor relating to the passage of this bill, and they have been put in evidence.

Have you reviewed any of these DVDs other than the ones you have seen so far today?

A   No.

Q   Do you have any specific knowledge of requests for [224] changes in districts made at a public hearing?

A   No.

Q   Of any discussions between members privately discussing changes in the plan?

A   No.

Q   Do black Virginia citizens generally vote overwhelmingly for Democratic candidates?

A   In all the evidence I've looked at, that's true.

Q   And generally, generally, Republican candidates receive a majority of white votes in the seriously contested statewide races?

A   Generally.

1770

Q   Yeah, yeah. So to use, I guess maybe this is a line from political science, there is a significant correlation between black votes and Democratic votes?

A   Yeah. The correlation is less strong because the white votes are not so reliably Democratic or Republican.

Q   And can you draw any conclusions of fact that 89 out of 100 members voted for the plan?

A   I didn't do any study of the legislative process in this case, so I can't draw a conclusion.

Q   Should we draw any conclusion from the fact that the substantial majority of the black caucus voted for the plan?

A   Again, I didn't do any study of the legislative [225] process, so I can't draw a conclusion.

JUDGE PAYNE: I think he is asking a somewhat different question now. That is to assume that certain members of the black caucus or all of it voted for the plan.

Is there anything in your mind that should be drawn or that is significant from that fact?

THE WITNESS: I think it would be a starting place for an investigation to think about, like what were their motivations? Was there a deal? Or, you know, if I was asked to dig into the legislative process, that's where I would start. But again –

BY MR. BRADEN: (Continuing)

Q   Some chance they thought it was good public policy?

A   Possibly.

1771

Q   I would like to bring up exhibit, defendant-intervenors – two exhibits actually. First Defendant-Intervenors' Exhibit No. 24. 27.

JUDGE PAYNE: What number?

MR. BRADEN: My apologies, Defendant-Intervenors' Exhibit No. 27.

And while those are being handed out, let me explain to the Court what this is. This a the criteria adopted by the Virginia legislature in 2001. Defendant-Intervenors' 27. Did it do the wrong one? It's [226] the – oh, it is part of 27.

JUDGE PAYNE: Excuse me, it is the same as plaintiffs' what? What is it, Mr. Hamilton? It is the same as plaintiffs' what?

MR. HAMILTON: I don't know, Your Honor. I'm trying to understand which exhibit we're talking about.

JUDGE PAYNE: All right.

MR. HAMILTON: Oh.

MR. BRADEN: It's an excerpt of the Defendant-Intervenors' 27, it is just part of it.

MR. HAMILTON: Your Honor, this is out of Defendant-Intervenors' Exhibit 27. This is one of the ones we've objected to.

I don't object to these two particular pages, so we can make life easy.

JUDGE PAYNE: All right.

MR. HAMILTON: And these two pages are not a problem. The rest of the thing – this is the 27 boxes of material that, you know, in 400 different electronic files that were identified as exhibits. We object to that

1772

because I think it's irrelevant. This is the criteria that was used to draw the benchmark districts. I don't think this witness has ever seen it or knows anything about it. But I will let Mr. Braden discover that for himself.

[227] But I wanted to provide that context for what this document was.

JUDGE LEE: So you don't object to these two pages?

MR. HAMILTON: Are you going to offer it?

MR. BRADEN: Yes.

MR. HAMILTON: I don't object, Your Honor.

JUDGE LEE: All right, let's go.

JUDGE PAYNE: I thought we had gotten there.

BY MR. BRADEN: (Continuing)

Q   Doctor, have you seen this before?

A   At my deposition.

Q   And I would like to go to Plaintiffs' Exhibit No. 16. I believe it's already up.

Have you seen this before?

A   I'm not sure. This looks similar to 27. So –

Q   Let me help you out here if the Court will give me leave. One is the criteria in 2001 and one is the criteria adopted in 2011.

A   I had seen the second one at my deposition, not the first.

Q   But did you review that criteria before you wrote your report?

A   No.

1773

Q   If we could just – if you will review for 30 seconds [228] the two, and notice that they are virtually identical. Would you say that's correct?

A   Yes, they are very similar.

Q   And the only principal difference benefit in two locations, one in Population Equality, and the second one is the inclusion of *Wilkins v. West* principally being the differences?

A   Yeah.

Q   So one of the criteria adopted by the State of Virginia for this process made a specific reference to the decision in *Wilkins v. West*?

A   Correct.

Q   So if I could go through the criteria here and ask you if you disagree with them. Why don't we just do the one, it would be easier to see.

JUDGE PAYNE: Which one are we working on now?

MR. BRADEN: We are working on 2011, which is Plaintiffs' Exhibit 16.

JUDGE PAYNE: All right, Plaintiffs' 16. Do you have that in front of you, Doctor?

THE WITNESS: Yes, I do.

BY MR. BRADEN: (Continuing)

Q   So there are a series of Roman numerals. You have had an opportunity to review this at your deposition, correct?

A   Correct.

[229] Q  And so the first one talks about population equality. Is there anything there that you disagree with?

1774

A   No.

Q   Roman numeral II, the Voting Rights Act, is there anything in that Roman numeral that you disagree with?

A   No.

Q   Roman numeral III, is there anything in that that you disagree with?

A   No.

Q   And Roman numeral IV, single-member districts, I think you probably will agree that the Virginia plan only has single-member districts?

A   Correct.

Q   Do you know why this criteria actually appears in here?

A   Historically some states have had multimember districts. So –

Q   Do you know whether Virginia has? A  Has currently?

Q   Has had multimember districts.

A   In the past I believe it has.

Q   And Roman numeral V is titled Communities of Interest.

A   Correct.

Q   Is communities of interest a common/ traditional redistricting criteria that people talk about?

[230] A  Yeah, it falls –

Q   Can you read that criteria and tell us if there is any that you object to on their face?

1775

A   It says: Districts shall be based on legislative consideration of the variety – or, sorry, the varied factors that can create or contribute to communities of interest. These factors may include, among others, economic factors, social factors, cultural factors, geographic factors, governmental jurisdictions and service delivery areas, political beliefs, voting trends, and incumbency considerations.

Q   Why don't we stop there because the Court, like everyone else, is probably hungry or tired. And so we will stop right there and let me ask you some questions about communities of interest.

It would appear that incumbency is one of the considerations in the adopted criteria, is that correct?

A   Correct.

Q   Okay. Did you in drafting your report examine where any of the incumbent members lived?

A   No, I did not.

Q   Did you consider incumbency in any manner?

A   No.

Q   Let me bring up an exhibit here of a representative – of a representative district. Why don't we do, let's do [231] representative Spruill's district.

JUDGE PAYNE: What are you doing? I can't hear you.

MR. BRADEN: Oh, I am sorry, I was just talking to her as to which exhibit to bring up. And this would be 94, page 8. And I believe these are the maps that were prepared by the defendant-intervenors.

I request that you've seen a map like this before?

A   I have.

1776

Q   And you were present for the discussion, so I'm guessing that you may understand to some degree how this is set up?

A   Yes.

Q   Great. So I would like to point – when you were doing your analysis, you didn't know where the incumbents lived, correct?

A   Correct.

Q   So if you look on this map, I think you will see – yeah, if you look on this map, I think you'll see that there is a marking for the incumbent member Representative Spruill.

Do you see it? It's all the way at the eastern end.

A   Correct.

Q   And you might see that if you didn't look real close [232] it might appear that he wasn't in his old district?

A   It looks like he is right on the border, but I can't tell if he is in or out.

Q   So would it be safe to say that there is a significant new area that is added to his district that appears to go around his house?

A   Potentially.

Q   Well, if it's where he lives, I assume it goes around his, or am I wrong?

A   Well, I don't know what the neighborhood looks like there. So –

Q   Okay. So if a representative were to testify or give a speech on the floor talking about this unifying

1777

the neighborhood that he lived in, you wouldn't be able to dispute that?

A   No.

Q   And that might be a reason to have done this district in this way other than race?

A   Potentially.

Q   And it might be more important to Representative Spruill than whether these districts were black or white?

A   Potentially.

Q   Yeah. And do you know the politics at the other end of the airport district?

A   No.

[233] Q  Do you know whose district it went into?

A   I don't know the name.

Q   Could you dispute if I told you it was Delegate Jones, the architect of the plan?

A   I wouldn't dispute that.

Q   And you wouldn't be surprised to hear this is an overwhelmingly Republican area?

A   I would have to look at the data. But if you tell me that, I will accept that.

Q   So, what did you do to look at the issue of communities of interest in your report?

A   The communities of interest that I looked at were geographic, the extent to which there are splits in counties and cities. To the extent that VTDs reflect communities in terms of local areas, split VTDs.

1778

Then also an analysis of Democratic vote share and an analysis of race.

Q    So you didn't look at economic factors?

A    No.

Q    Social factors?

A    No.

Q    Cultural factors?

A    No.

Q    Governmental jurisdictions you did look at?

A    Yes.

[234] Q  Are VTDs governmental jurisdictions?

A    No, but they are boundaries that are respected and might correspond to – in some locales VTDs might correspond to a town or a neighborhood. They usually are drawn – you know, sometimes they are drawn with the idea of here is like a community.

JUDGE PAYNE: I think this is a good place for us to stop.

For administrative purposes, are you through with your case in chief, Mr. Hamilton, when this witness is finished being examined?

MR. HAMILTON: After my redirect, yes, Your Honor.

JUDGE PAYNE: Yes, yes.

MR. HAMILTON: Yes, Your Honor.

JUDGE PAYNE: And are you – how much longer do you think you have got on cross-examination of Dr. Ansolabehere?

MR. BRADEN:  Probably another 45 minutes, I would guess, Your Honor.

1779

JUDGE PAYNE: And then you will be ready to present your case?

MR. BRADEN: Absolutely, Your Honor.

JUDGE PAYNE: All right, thank you. We will see you 10 o'clock in the morning.

[235]Can they leave their things in here.

COURT SECURITY OFFICER: Yes.

JUDGE PAYNE: You may leave anything you want to in here. The facilities will be locked until in the night.

We will be adjourned.

NOTE: The July 7, 2015 portion of the case is concluded.

1780

[237] IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
VIRGINIA RICHMOND DIVISION

————

Civil Action No. 3:14CV852

————

Golden Bethune-Hill, et al.,

vs.

Virginia State Board of Elections, et al.

————

July 8, 2015

————

COMPLETE TRANSCRIPT
OF THE BENCH TRIAL

HEARD BEFORE:

THE HONORABLE ROBERT E. PAYNE
THE HONORABLE GERALD BRUCE LEE
THE HONORABLE BARBARA M. KEENAN

APPEARANCES:

    Kevin J. Hamilton, Esquire
    Perkins Coie, LLP
    1201 Third Avenue
    Suite 4800
    Seattle, Washington 98010

    Bruce V. Spiva, Esquire
    Aria C. Branch, Esquire
    700 13th Street NW
    Suite 600
    Washington, D.C. 20005

    Counsel for the plaintiffs

1781

Peppy Peterson, RPR
Official Court Reporter
United States District Court

[238] APPEARANCES:   (cont'g)

Tony F. Troy, Esquire
Eckert Seamans Cherin & Mellott, LLP
707 East Main Street
Suite 1450
Richmond, Virginia 23219

Daniel A. Glass, Esquire
Eckert Seamans Cherin & Mellott, LLC
1717 Pennsylvania Avenue, NW
Suite 1200
Washington, D.C. 20006

Godfrey T. Pinn, Jr., Esquire
Harrell & Chambliss, LLP
707 East Main Street
Suite 1000
Richmond, Virginia 23219

Counsel for the Virginia State Board of Elections

E. Mark Braden, Esquire
Katherine L. McKnight, Esquire
Jennifer M. Walrath, Esquire
Richard B. Raile, Esquire
Baker & Hostetler, LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, D.C. 20036

Dalton L. Oldham, Jr., Esquire
Dalton L. Oldham, LLC
1119 Susan Street
Columbia, South Carolina 29210

Counsel for Virginia House of Delegates

1782

[239] PROCEDINGS

JUDGE LEE: Morning, counsel.

THE CLERK: 3:14 civil 852, Golden Bethune-Hill, et al., versus Virginia State Board of Elections versus Virginia House of Delegates, et al.

JUDGE LEE: I didn't mean to leave you out, Dr. Ansolabehere, and all the witnesses. Good morning, as well.

THE WITNESS: Good morning.

JUDGE PAYNE: All right, you may begin, and I remind you, Dr. Ansolabehere, that you are under the same oath that you took earlier yesterday, I guess it was.

THE WITNESS: Yes.

MR. BRADEN: Good morning, Your Honors. Good morning, Doctor.

STEPHEN D. ANSOLABEHERE,

a witness, called at the instance of the plaintiff, having been previously duly sworn, testified as follows:

CROSS-EXAMINATION

BY MR. BRADEN: (resuming)

Q   Are you familiar with public law data DL 94-171?

A   Yes.

[240] Q  And what is that?

A   That's census data that's distributed as part of redistricting.

1783

Q   And what is contained in that data set? A
Population data.

Q   And other data in that set?

A   Yeah.

Q   Race data?

A   Yeah. Race of population.

Q   So it contains race and overall population of
the–

JUDGE LEE: It would help us all if you would keep
your voices up. We're having trouble hearing you.

JUDGE PAYNE: And both of you tend to drop off at
the end of whatever you are saying. Try to keep it up,
and then it's easier to hear, please.

THE WITNESS: Okay, thank you.

MR. BRADEN: My apologies, Your Honor.

Q   It contains population data and also contains
that population data by race; correct?

A   Correct.

Q   Are there any other factors other than age in
that data?

A   Indicators of locality like census blocks and so
forth, yeah.

Q   So it's geography, population, and race?

[241] A  I believe that's correct.

Q   Why does that data set include race?

A   For purposes of redistricting in certain areas,
race is a consideration.

1784

Q   Have you ever worked in a case where race was not a consideration in drawing of the plans?

A   The *Edward Aquifer Authority* case was a one-person-one-vote case.

Q   But in drawing that, did the municipality have any racial minority groups?

A   It did.

Q   And so was race considered in the drawing of those representational districts?

A   No. It was a question of which county had more power.

Q   But in the actual drawing of the districts, not the substance of the case, but in the drawing of the districts, do you know whether race was taken into consideration?

A   Not to my knowledge.

Q   Are you aware of any plans adopted by a bipartisan commission or some type of redistricting commission that was actually adopted by a state that didn't consider race?

A   Not to my knowledge.

Q   Am I correct that you live in the Boston area?

A   I do.

[242] Q   And am I correct there still are some Irish neighborhoods in Boston?

A   Yes, there are.

Q   And in drawing city council districts in the city of Boston, would it be appropriate for the people drawing those districts to consider whether a particular

1785

neighborhood was Irish and use that fact in drawing lines?

A   It may. It depends on what Irish indicated to them, I guess.

Q   You are not a lawyer, but I'll ask you this question anyway. Nothing unconstitutional about considering whether a neighborhood is Irish or not as to whether it's a community of interest?

A   I don't know the answer to that question.

MR. BRADEN: At this time, I'd like to bring up Plaintiff Exhibit 94, page four, which is District 97. This is a map and a district this Court is already familiar with. If we can have permission to put it up on the easel here.

JUDGE PAYNE: Sure.

MR. BRADEN: That will be in map book one, District 97. I mean–yeah, District 71, map book one.

JUDGE PAYNE: It's in Exhibit 94?

MR. BRADEN: Exhibit 94, page four. Defendant Intervenors' 94. My apologies.

[243] Q   Doctor, do you recognize this district?

A   Yes, I do.

Q   And you were present for the testimony to this Court from the individual who represents that district?

A   I was.

Q   Representative McClellan. Earlier we discussed Plaintiffs' Exhibit Number 16. You may remember it being the criteria adopted by the state for the redistricting in this cycle?

1786

A   Correct.

Q   If you could also possibly turn to that page in your exhibit book, it's Plaintiffs' Exhibit 16, page one.

A   Okay.

Q   The first criteria, Roman numeral I, is population, equality; correct?

A   Correct.

Q   Is there anything in your report indicating that this district does not comply with that criteria?

A   No.

Q   Roman numeral III, contiguous and compact, is there anything in the report about this district not being contiguous?

A   No.

Q   Do you dispute whether or not this district is compact?

[244] A  The compactness score for it is in my report.

Q   Is this district not in about the mid range of all the districts in the state?

A   I think it is.

JUDGE PAYNE: The first question was, do you contend that it's not compact. What is your answer to that, yes or no?

THE WITNESS: No –

MR. HAMILTON: Your Honor, that would be a question I would object to. It's a sliding scale, and the witness has identified the numeric score. It's not a yes-or-no answer.

JUDGE PAYNE: Overruled.

1787

THE WITNESS: No, it's not among the very low compact districts.

Q   And you have no reason–there's nothing in your report that you could point to that indicates it's in conflict with either *Jameson v. Womack or Wilkins v. West*?

A   Not that I know of.

Q   Roman numeral IV, single-member district, is it a single-member district?

A   It is.

Q   Roman numeral V, communities of interest, is there anything in your report addressing economic factors in relation to this district?

[245] A  No.

Q   Anything in your report talking about social factors in this district?

A   No, not beyond race.

Q   Anything about cultural factors?

A   No.

Q   Geographic features?

A   There's some discussion about the location of the district, voting tabulation districts and so forth.

Q   If you look, do you see a blue line going through the map?

A   Correct.

Q   Do you know what that is?

A   I believe that's the–if I'm looking at the legend correctly, it's the 2011 enacted.

1788

Q   My apologies. There are lots of blues. It can be confusing. I was thinking about the James River right here.

A   Okay, yes. That's the James River.

Q   Am I correct that that's the southern border of a significant portion of the district?

A   It is.

Q   And do you know whether this has traditionally been the southern border of this district?

A   It was in the previous version as well.

[246] Q  And do you know whether it was the southern border in the 1991 district?

A   I don't know for sure.

Q   Is there anything in your report about governmental jurisdictions?

A   Yes, about cities and counties.

Q   And do you see a particular level of conflict with this district on that community of interest–I mean in that particular standard?

A   Not in particular. There are a few crossings of county lines but about the same as there were in the previous version of the district.

Q   If I could move your attention to this area right here–

JUDGE PAYNE: What area is that?

MR. BRADEN: This is the three precincts that are in Henrico County.

THE COURT: Summit Court, Hilliard, and Stratford Hall?

1789

MR. BRADEN: That's correct, Your Honor.

Q   Do you notice that there's a difference between the precincts that are numbered and the ones that have names?

A   Yes.

Q   Does it appear that these three districts are from Henrico County?

A   Correct.

Q   So am I correct that moving those districts out of this made this more of a Richmond-centric district?

A   That was swapped with a cross–a county crossing to Henrico with Ratcliffe. So the same number of county line crossings occurs.

Q   But here, we're talking about three precincts, and here we're talking about the addition of one precinct?

A   In terms of county line crossings, it's the same number of crossings. It doesn't matter how many precincts are included in the county of the crossings. It's about the same geographic area for the two.

JUDGE PAYNE: Mr. Braden, will you get somebody to move that so Judge Keenan can see the big map, where you are lasering?

JUDGE LEE: Maybe put it inside the jury box.

JUDGE PAYNE: It's going to have to be back towards you. Can you see it at all now?

JUDGE KEENAN: I'm fine.

JUDGE PAYNE: He's putting the laser on it. You know, I could hardly see it.

1790

MR. BRADEN: Sometimes I can be challenged. I'm going to venture back here and try in the future to use the screen and see if I can get it right there, too.

Q   The four precincts we've been talking about, this [248] being larger in size, isn't that likely to be less dense in population?

A   It might be. The question is why does a county line crossing matter, and one problem is just government administration of elections. The more crossings of jurisdictions, the more different kinds of ballots that the county election office has to produce and so forth.

Q   So by doing this and removing these three precincts, we made the administration of election probably easier?

A   In that specific part of the district, yes.

JUDGE PAYNE: Just so the record is clear, in that specific part, you were pointing to Summit, Hilliard, and Stratford; is that right?

THE WITNESS: Correct.

JUDGE PAYNE: And in the previous question, you were directing or responding to a question that related to Ratcliffe.

THE WITNESS: Correct.

Q   Is there anything in your report about service delivery areas?

A   No.

Q   Incumbency consideration?

A   No.

Q   You were unaware of the residency of the incumbents in the district in the adjoining districts?

1791

[249] A  Correct.

Q  I've highlighted three residents of the three incumbents, two in the adjoining districts, and the residency of Delegate McClellan. Would it be safe to say that if you were trying to avoid pairing members, that that would constrain your line-drawing process significantly?

A  In the area around precinct 554 and 20–I can't read it on here but 208 it looks like, or 204, yeah, because they are next to each other.

JUDGE PAYNE: The residence of McClellan is in 208. The one next to it that's all yellow is 204. Is that the one you are talking about, sir, or are you talking about the one above it which is 206?

THE WITNESS: The one below is 554.

JUDGE PAYNE: The one below 208 is 50; is that what you are talking about, sir?

THE WITNESS: Yes.

JUDGE PAYNE: All right, thank you.

THE WITNESS: So there is an incumbent there, and that would constrain–including that precinct potentially and District 71.

Q  Is there anything in your report indicating that incumbent considerations were not involved in drawing this district?

[250] A  No.

Q  Is it proper to consider changing demographic pattern in drawing districts?

A  I'm unclear what you mean by that.

1792

Q   Well, if you had a district where–such as downtown Richmond, where it was becoming gentrified, I guess, sort of yuppified, or whatever the correct word is now, but was changing, that was growing substantially more white, would that be an appropriate consideration as to that district? Should you consider changing demographic trends?

A   One might. I've been in other cases, especially in Texas, where the demographic trending was ultimately not allowed to be considered, so...

Q   But do you believe it's inappropriate, as an expert in redistricting, as a political scientist, is it illogical for a legislature to decide to use this changing demographic in an area in drawing their plan?

A   It depends on the circumstance. For example, if an area was increasing Hispanic population, it may be inappropriate to consider that Hispanic district because it will become a Hispanic but it's not currently an Hispanic district.

So it depends on exactly what the circumstances and what the problem is at hand, but, yeah, trends are important in evaluating elections and electoral [251] performance and such.

Q   Let's go to a specific circumstance. Downtown Richmond. Was there something inappropriate that the legislature considered the changing demographics of downtown Richmond in drawing this district?

A   I have no opinion on whether or not the legislature considered a trend in downtown Richmond. I didn't see any reports to that effect.

Q   Did you review any alternative plans and discuss them in your report?

1793

A   No, I did not. Just the benchmark and the enacted map.

Q   So you did not review HB 5002 and 5003?

A   No, I did not.

Q   Are you aware of any other plan–have you reviewed any other legislative plans other than the benchmark plan and the plan as passed?

A   As part of this litigation, no.

Q   Am I correct that you have written, coauthored an article in Harvard Law Review where you state that voting in Virginia has become more racially polarized?

A   I've published two pieces in Harvard Law Review on this matter. Are you referring to the 2010 piece or the 2012 piece?

Q   We can talk about both, but I'm just sort of asking [252] the question of, did you in either of those articles, or possibly both, indicate that you believed race, racial polarized voting was increasing in Virginia?

A   I'd have to look at the statistics and the table. My recollection offhand in those articles was that– those articles compared the covered and noncovered jurisdictions throughout the United States, and my recollection actually was that Virginia was somewhat exceptional because Obama increased his vote share compared to Kerry among whites from 2004 to 2008 and from 2004 to 2012.

Q   Do you remember me asking this question of you in your deposition?

A   I don't recall that.

1794

Q   I guess we're going–do we have a copy of his deposition? His deposition, page 197, lines four through 16. If we could go to your deposition, page 197, lines four through 16.

A   Correct.

Q   Can you read those quickly to yourself and refresh your recollection.

A   Okay.

Q   I don't know–

A   I read them.

Q   So, do you now remember that in 2001 you indicated that there was a slight degree of racial polarization in [253] Virginia in that there was a slight increase?

A   That was my recollection at that time. In part, it was because the whites were moving and the blacks were moving, so...

Q   What are VTDs?

A   Voting tabulation districts.

Q   Are they the same as precincts?

A   The terms are used interchangeably, but they're not always the same as precincts. Some states use VTDs as their election precincts. Some states and even some jurisdictions within states use different precincts for voting places.

JUDGE PAYNE: How about Virginia?

THE WITNESS: My understanding of Virginia is that voting places and precincts are sometimes somewhat different from VTDs, but the VTDs pretty much correspond to the voting precincts. The VTDs are–it

1795

was a project started by census in 1972 to try to make census data integrate more seamlessly with election data for purposes of redistricting, and states agreed to participate in that census VTD project, and I think we're at about 42 or 45 states that agree to participate in the VTD process.

Census agreement is to abide by–to create blocks, census blocks, which are a lower unit of aggregation for purposes of districting, and then the [254] states agree to try to abide by the VTDs in their districting and the blocks to make the process more seamless so that when the census produces data like the public law data that was mentioned earlier, it's easier to merge it in. There's less headache.

Q   I'll go back to the district we have up on the podium, HD 71, and simply ask a couple questions about Richmond.

Do you know how often Richmond redraws its precincts?

A   I don't know that.

Q   Did you–when you were doing your tabulations, how did you deal with the fact that the different precincts, the different years may have changed?

A   I take the precinct–there's a definition of the precinct in geographic information system which concerns the longitude and latitude of every precinct, and I overlay the longitude and latitude of every precinct on top of the longitude and latitude of the voting tabulation districts, and a lot of them align quite closely, and where there isn't alignment, an assumption is made about what percentage of the population goes into which voting tabulation district

1796

from the precinct and, therefore, what percent of the vote is assigned that.

That's a standard assumption in merging data between the census population data at the VTD level and the election data at the voting level.

[255] Q  And is that a task you perform yourself?

A    In constructing the data, I performed the task for 2013. My RA did it for 2011, but that was part of the Harvard election data archive.

Q    Approximately how long did it take you to do this?

A    About a week.

MR. BRADEN: No further questions, Your Honor.

JUDGE PAYNE: Redirect.

REDIRECT EXAMINATION

BY MR. HAMILTON:

Q    I just have a couple of questions for you, Dr. Ansolabehere. First of all, Mr. Braden asked you a series of questions yesterday about whether you interviewed House members, whether you talked to party officials, legislative staff, voters, read news accounts, those sorts of things. Do you recall those questions?

A  I do.

Q    And I believe you testified you didn't do any of that; is that correct?

A    Correct.

Q    Was any of that necessary in order for you to perform the analyses that you had been asked to prepare in order to develop an opinion for this Court?

1797

A   No.

[256] Q  Would it all have been a waste of time?

A   It would not have been informative about the analysis.

Q   Would it have been relevant to your analysis?

A   Not to the analysis that I performed.

Q   Any reason for you to spend the time or money to do that?

A   No.

Q   Thank you. Now, a moment ago, Mr. Braden showed you a copy of your dep transcript. Can you pull that up? And I believe it was on page 197, line four through 16. Could you read that aloud, both the question and your complete answer for the Court?

A   The question, "Have you attempted to determine whether or not comparing earlier results whether racial voting has become more or less polarized in Virginia since 2001?

"Answer: Since 2001, so in the Harvard Law Review article, we compare the racial polarization results in states–2004 on, and Virginia is somewhat complicated because there's a lot of variability inside the state. That's my recollection of that analysis. I think there was a slight increase in 2012 in the degree of racial polarization state-wide, but, again, I'm focusing on these districts in my analysis."

Q   Focus on the phrase "a lot of variability within the state." Can you explain what you meant, sir?

1798

[257] A  There's considerable variability in the patterns of white voting throughout the state of Virginia. So in some areas, whites vote in line with the black preferred candidates, and in some areas they're opposed which is not common in other states that were covered under Section 5, and that's what the Harvard Law Review article was about.

Q  And a lot of variability within the state, you said, is a complicating factor in Virginia; is that right?

A  Correct.

Q  And this "lot of variability within the state," is that consistent with your findings in your analysis in your expert report presented to this Court?

A  It is.

Q  Did you see a lot of variability within the state of Virginia, within the commonwealth of Virginia in the 12 specific districts that you analyzed?

A  I did.

MR. HAMILTON: Thank you, sir. No further questions, Your Honor.

JUDGE PAYNE: Can he be excused, or are you going to keep him around?

JUDGE LEE: I have a couple additional questions. Do you have table four, Exhibit 50 of the plaintiff?

THE WITNESS: Could I have that?

JUDGE PAYNE: That's his expert report?

[258] JUDGE LEE: Yes. I think it is.

JUDGE PAYNE: Your expert report, table four.

JUDGE LEE: Page 72 of Plaintiffs' 50.

1799

MR. HAMILTON: For the Court's convenience, we put that on the screen.

JUDGE LEE: That's fine. I want to ask you a question about the center where you have black voting-age population, and you have benchmark and HB 5005. What do those two columns mean?

THE WITNESS: The benchmark corresponds to the benchmark map, and HB 5005 corresponds to HB 5005 and the configuration of the districts in each of those, and the black voting-age population is black voting-age population calculated for each of the districts under each of those plans. That is the percentage of the voting-age population that is black in each of those districts.

JUDGE LEE: So then for District 69, the benchmark plan was 56.3, and under the HB 5005 it was 55.2. So it actually lowered the black population in that district; is that right?

THE WITNESS: Correct.

JUDGE LEE: The same is true for 70?

THE WITNESS: Correct.

[259] JUDGE LEE: 74, it lowered it?

THE WITNESS: Correct.

JUDGE LEE: 75 lowered it?

THE WITNESS: 75 increased by one-tenth of one percent.

JUDGE LEE: One-tenth of one percent.

THE WITNESS: That's essentially the same.

JUDGE LEE: Essentially the same, okay. The same for 92, lowered it.

1800

THE WITNESS: 92 lowered it.

JUDGE LEE: Okay. And 95 lowered it.

THE WITNESS: Correct.

JUDGE LEE: Thank you. I wanted to make sure I understood those two columns.

JUDGE PAYNE: 90 lowered also?

THE WITNESS: Yes, by three-tenths of a percent, yes.

JUDGE LEE: All of these are not 55, are they?

THE WITNESS: What do you mean?

JUDGE LEE: All of the HB 5005, all of them are not 55; is that right?

THE WITNESS: Correct. They range from 55 to 60.

JUDGE LEE: Thank you.

JUDGE PAYNE: Any questions based on what the bench asked?

MR. HAMILTON: I do actually have a couple follow-up questions at the risk of stating the obvious and [260] testing the patience of the Court.

BY MR. HAMILTON: (resuming)

Q    There are a number of other districts in which the black voting-age population was increased?

A    Yes, there are some districts where it increased.

Q    And the Court can figure that out by looking at these two columns that Judge Lee pointed out just a moment ago?

A    Correct.

Q    Are any of them below 55 percent?

1801

A   No.

Q   Is the result of HB 5005 consistent with an application of a rule requiring 55 percent black voting-age population or more in each of these districts?

A   It is.

MR. HAMILTON: Thank you. No further questions, Your Honors. Dr. Ansolabehere is—we've identified him as a rebuttal in our rebuttal case. He may be excused.

JUDGE LEE: There's no rule on witnesses; is that right?

JUDGE PAYNE: No.

MR. HAMILTON: That's correct, Your Honor.

JUDGE LEE: You can remain if you'd like, or come back later. Thank you.

JUDGE PAYNE: Do you have any other witnesses?

[261] MR. HAMILTON: We don't, Your Honor. The one thing I'd point out, would only ask, is that the parties stipulated to certain facts, and I believe it's docket entry number 80 in the Court's docket. We filed that, and I believe all parties have stipulated. They're all sort of noncontroversial, date of the election and so on, and the location residency and voting status of each of the plaintiffs, so I'd just like to ask the Court that we enter that stipulation.

We've already filed it. I just want the Court to take note that that's part of the plaintiffs' case as well, and with that, the plaintiffs rest.

JUDGE PAYNE: It will be accepted. I thought you were going to mark it as an exhibit.

MR. HAMILTON: We hadn't planned on it.

1802

JUDGE PAYNE: That's all right. We'll just–is it satisfactory to you if we just take note of–what is the docket entry?

MR. HAMILTON: The docket entry is number 83. I misspoke.

JUDGE PAYNE: Is that all right?

MR. BRADEN: Yes, Your Honor.

JUDGE PAYNE: Docket 83, all right.

MR. HAMILTON: Thank you, Your Honor.

JUDGE PAYNE: All right, Mr. Braden.

[262] MR. BRADEN: Your Honors, we would like–the defendant intervenors would like to call Delegate Chris Jones at this time. And, Your Honor, you'll be shocked to hear that we're going to have a variety of maps to talk about, so if it's permissible with the Court, one of our assistants, associates, if they could sit over there, it might facilitate the quick movement.

JUDGE KEENAN: And then, Mr. Braden, you're going to be putting the maps up on the screen as well; right?

MR. BRADEN: Yes, Your Honor.

JUDGE KEENAN: If you could please have the zoom working the way it was working yesterday, that would be very helpful.

MR. BRADEN: Great. I will make sure to have someone here that can do it right.

STEVEN C. JONES,

a witness, called at the instance of the defendants, having been first duly sworn, testified as follows:

1803

MR. BRADEN: Your Honors, we're also passing out now what we will hope will facilitate following the testimony, witness binders for everyone. Even with electronics, we managed to kill a lot of trees.

[263] DIRECT EXAMINATION

BY MR. BRADEN:

Q   Delegate, can you please tell the Court your name?

A   Yes. It's Steven Christopher Jones, Steven with a V.

Q   And could you just briefly provide the Court with a little bit of your education, background, and your work.

A   I grew up in Suffolk and Chuckatuck and actually attended John Yeates High School and then attended Randolph-Macon in Ashland, Virginia, and then I went to the Medical College of Virginia School of Pharmacy, and I graduated in 1982.

In 1985, which was 30 years last month, I opened up Bennett's Creek Pharmacy which I have been the pharmacist and president since June 24th, 1985.

JUDGE PAYNE: You might just pull that mic closer to you. It will be easier for you, and we can hear it better.

THE WITNESS: Yes, sir.

JUDGE LEE: Speak like you would on the floor. We want to hear you.

THE WITNESS: Okay. I will do that.

JUDGE PAYNE: But not as long.

1804

THE WITNESS: My wife has told me that many times in our 29 years together.

Q   Could you just briefly tell the Court your role in the [264] 2011 process.

A   Yes, sir. The speaker asked me would I consider drawing the map and carrying the bill for the redistricting process that occurs every ten years.

Q   And why were you chosen to lead the redistricting process?

A   My previously experience in 2001 as a chief patron of House bill one, which was chapter one, which were the districts, the benchmark districts that, in fact, have been mentioned over the last day and a half.

Q   And did you do some drafting in the 2001 plan?

A   Yes, I did. I was responsible for the Hampton Roads region, and then as time went on, I was given the task of doing the entire state working with then-Speaker Vance Wilkins.

Q   And so did your 2001 experience inform your 2011 decision-making in the process?

A   It did.

Q   So having worked in the 2011 process, you are familiar with some of the subsequent litigation?

A   Yes, I am.

Q   And so are you aware of the *Wilkins v. West* case?

A   I was a defendant, named defendant in that case, and I'm very familiar with that case.

Q   Are you familiar with the evidence in that case?

1805

[265] A  Yes, I am. The ^ Lohan report was a report that dealt with the issue of –

MR. SPIVA: Objection. Sorry to interrupt the witness, but this deals with one of the two reports that we have objected to, and so we object to any testimony on this and object to the admission of those reports.

JUDGE PAYNE: They haven't offered the reports yet, and we haven't gotten the answer out to the question, so maybe you'll hold your objection until we see what the answer is. He said are you familiar with it, he said yes, the Lohan report is, and that's where the objection came so–

MR. SPIVA: Okay. He sounded like he was going to testify to the substance of the report.

Q    Did that report inform your decision-making in the 2011 process?

A    It most certainly did.

MR. BRADEN: Your Honor, at this time we'd like to have Defendant Exhibit 36 submitted.

MR. SPIVA: Objection, Your Honor, since one of the two reports that we objected to, it was not produced in discovery despite the fact that we requested it. Our request for production–

JUDGE PAYNE: Your objection is it wasn't produced in discovery; is that right?

MR. SPIVA: There are several other bases, Your Honor. It's hearsay–

JUDGE PAYNE: He just said he relied on it. He took into it account and was aware of it, I think.

1806

MR. SPIVA: Right, and that is a discovery violation. It was not produced. We requested all materials that were relied upon by the mapmaker.

Number two, it's hearsay, and there's no stipulation on this unlike the expert reports that were prepared in this litigation.

Number three, it's regarding a 15-year-old map that has no relevance to this proceeding whatsoever, and so we would object on those three grounds.

JUDGE PAYNE: Your response?

MR. BRADEN: Well, I have to say I'm absolutely astounded on the notion that the prior plan is not relevant to the consideration of this Court. I think the only question here is the discovery question.

We didn't produce it because we didn't have it. Delegate Jones didn't have a copy of it, and we didn't have a copy of it. Took us quite a while and only recently obtained it.

JUDGE PAYNE: Once you obtained it, did you give it to them?

MR. BRADEN: I'm trying to remember the time frame in which we got it. We only got it very recently. [267] Let me double-check as to the exact time frame.

MR. SPIVA: Your Honor, I can produce our request–

JUDGE PAYNE: Let's do one thing at a time.

MR. BRADEN: I believe we got it the same day–we physically got copies of it the same day we produced the trial exhibits.

JUDGE PAYNE:  To them?

MR. BRADEN: Yes.

1807

JUDGE PAYNE: They produced it the same day they got it and gave it to you. What objection do you have now on the discovery question?

MR. SPIVA: Well, we subpoenaed Delegate Jones, Your Honor, so they had an obligation to produce this.

JUDGE PAYNE: But he didn't have it, Mr. Braden said.

MR. SPIVA: He had an obligation to produce anything under his custody or control, and obviously he was able to procure it. And if he relied upon it, and he was going to come into court and testify–

JUDGE PAYNE: Where did you get it?

MR. BRADEN: We got it from the court record, I believe. We eventually obtained it from–

JUDGE PAYNE: Was it under Delegate Jones's custody and control is the issue.

[268] THE WITNESS: I'd be glad to answer that, Your Honor.

JUDGE PAYNE: Let's let your lawyer ask it.

Q    Was it under your custody and control?

A    No, sir.

JUDGE PAYNE: That takes care of that. Is there anything else you've got on the discovery objection?

MR. SPIVA: Well, I guess, Your Honor, the exception to that part of it because he was able to obtain it ultimately and they produced it, you know, you know, after the cutoff, but I understand Your Honor's ruling on that.

1808

JUDGE PAYNE: So what you just did was take exception to it; is that what you were saying? You don't have to take exception in our court.

MR. SPIVA: With respect, I'm not–

JUDGE PAYNE: It's okay. Let's go to the next ground that you have.

MR. SPIVA: The other ground is it's hearsay, Your Honor. By the way, we were not able to depose the expert that they're producing this report for. It's hearsay. We haven't stipulated to its admission. It's actually also irrelevant.

I didn't say that the benchmark map was not relevant, but the report, using 15-year-old data, is [269] irrelevant.

JUDGE PAYNE: Let's take it in order. The report is hearsay. Do you agree?

MR. BRADEN: Yes, Your Honor.

JUDGE PAYNE: So you have to get it in if you're offering it as an exhibit on some other basis. What–

MR. BRADEN: Yes, we're offering it on the basis that Delegate Jones used the report to inform his decision-making. We are not necessarily offering it for the views that are contained in the report by the expert.

What's at issue before this Court, in part, is Delegate Jones' understanding of what he was doing and understanding of the issues of racial polarization.

JUDGE PAYNE: So you're offering it for a purpose not intended to be the truth of the substance of the document.

MR. BRADEN: That is correct.

1809

JUDGE PAYNE: And for a limited purpose, and you will confine your questioning about it to the particular parts of it you are talking about, and you don't want us to consider any of the opinions of the expert other than how it may have informed him; is that right?

MR. BRADEN: That is correct, and, in fact–

JUDGE PAYNE: Why, then, do you need to admit it?

MR. BRADEN: Well, really, it is, in fact–what [270] I think is useful to this Court is for this Court to be able to look at that report, and that report, if he reads it and you understand he read it, you'll be able to understand that, in fact, he was aware of racial polarizing voting.

It's not a question of whether it was accurate or not. It's really a question of what he read. He read this report–

JUDGE PAYNE: Why don't we hear his testimony about the report and then decide whether or not it's admissible or not based upon what foundation is laid in his testimony. Your objection will be reserved until that point.

MR. SPIVA: Thank you, Your Honor.

Q    Delegate Jones, did you use this report and the Virginia Supreme Court decision to inform your 2011 decision-making process?

A    I did. As a matter of fact, that was one of the differences in the resolution from 2001 to 2011. We actually mentioned the West v. Wilkins case.

Q    The criteria adopted by the House makes specific reference to this case.

A    It does. That was added in 2011.

1810

Q   And you were a defendant in that case?

A   That would be correct. I drew the maps in 2001 and [271] 2011, and I participated in the development of the criteria both in '11 and in '01.

Q   Were you aware that the State of Virginia submitted its redistricting plan in 2001 for preclearance to the Department of Justice?

A   Yes.

Q   And you were also aware that Virginia submitted its plans for legislature House of Delegates in 1991?

A   Yes.

Q   Did the process in 2001 inform your decision-making?

A   It most certainly did.

Q   Are you aware of any racial dilution or racial polarized voting analysis submitted in either of those two preclearance submissions?

A   No. I did inquire with Legislative Services after this question came up. I believe it was in the deposition I was asked by counsel about had that been done, and in reviewing the tape from the floor where Delegate Armstrong indicated that it was very easy to do, just go to the second floor and ask them, I actually asked Mary Spain, who is now retired, and Jack Austin, who is still with the Commonwealth–they both have 30-plus years experience in this process, and to their knowledge–

MR. SPIVA: Objection. This is hearsay.

JUDGE PAYNE: Excuse me, Delegate Jones. Same [272] rule for you as for Mr. Hamilton. Ask the

1811

question. Please, Delegate Jones, just answer the questions he's asked. If he wants to follow up on it, he will. If you need to explain, we will, but then we don't get into a long narrative, parts of which are objectionable as Mr. Spiva has said.

THE WITNESS: Yes, sir.

JUDGE PAYNE: So the bottom line to the question that was actually asked is, there was no--in your view, no racial dilution or racial polarization study submitted with either preclearance; is that correct?

THE WITNESS: That is correct.

JUDGE PAYNE: All right, Mr. Braden.

Q    And you were able to confirm that by actually asking the staff that has worked on that for a number of years?

A    That is correct.

MR. SPIVA: Objection, Your Honor.

JUDGE PAYNE: Withdrawn.

MR. SPIVA: Withdrawn, he's answered the question.

Q    I'd like to move now to a little bit of process. Let's start at the beginning. When did you prepare for this process? How did you prepare for this process?

A    I was appointed as the chair of the Reapportionment Committee, which is a joint committee of both chambers, in [273] 2009 or 2010.

Q    And did you need to--did you go to any conferences or other educational activities for this?

A    Yes. The speaker asked me to attend the NCSL seminar in Austin, Texas in March, I believe, of 2010.

Q    Did you have to hire staff to assist?

1812

A   No.

Q   Then during the process, when it actually begins in–did the process begin before the census data was distributed?

A   It did.

Q   And what were the first processes that you undertook for the state?

A   Well, if I may, to give a little background, we heard after 2001 they wanted more public input. So I believe for the first time ever, the Commonwealth had public hearings in the fall and winter prior to the release of the census data. We had about five public hearings around the state on the House side.

JUDGE LEE: Fall of what year?

THE WITNESS: That would be fall of 2010, Your Honor.

JUDGE PAYNE: On redistricting?

THE WITNESS: Yes, sir. We went around the state geographically, like Roanoke, northern Virginia, great [274] southwest, and south side, and Richmond city, and Hampton Roads.

JUDGE PAYNE: Those were just for the House?

THE WITNESS: Yes, sir. The Senate also did some as well, Your Honor.

Q   So were you the principal crafter of the 2001 plan? A Yes.

Q   And so when you did the 2001 plan, were you putting pen to paper?

A   I was.

Q   Or were you using the computer screen?

1813

A    I was doing both. I was using a computer screen. We used Maptitude redistricting software in 2001.

Q    And why did you use the Maptitude software?

A    It was what was recommended to us, and I don't know how that recommendation got to us, but that's what we ended up using back in 2001, and if I could, that was the first time ever that the Republicans had been in a position to draw the maps in the Common-wealth of Virginia.

Q    And it's the same software you used for drawing the 2011 plan?

A    Yes, sir, it is.

Q    I'd like to bring up Plaintiffs' Exhibit 16. Do you recognize Plaintiffs' Exhibit 16?

A    I do.

[275] Q  What is Plaintiffs' Exhibit 16?

A    It is the adopted criteria by the Privileges and Elections Committee of the House of Delegates.

Q    And I'd like to bring up Defendant Exhibit 27. This is–the Court has seen this before. This is the 2001. Is it safe to say that the 2011 criteria are based upon the 2001 criteria?

A    Yes, sir.

Q    Can you explain to the Court the difference?

A    The difference would be on the number one, Roman numeral I, we did plus or minus one percent in 2011, and we did plus or minus two percent in 2001.

We added in Roman numeral III. We had added the *West v. Wilkins* court case that I think started out as Gilmore, *West v. Gilmore*.

1814

Q   And I see that you made a change in the population deviation criteria. Why did you do that?

A   To more approximate the one-person-one-vote in the Virginia constitution.

Q   Am I correct the basic building blocks of your plan starts with census data?

A   It does.

Q   When did you receive the census data?

A   I believe we got it a little bit later this time than we did in 2001. I think it was mid to maybe the second [276] week in February.

Q   Let me bring up Defendants' Exhibit 28. What is that, Delegate Jones?

A   That is the immediate release of the census bureau–Virginia census population totals. That was February 3rd.

Q   Were you able to immediately use this census data to begin the process?

A   Well, yes and no. When the data was received, I knew immediately that there was a mistake, because one of the majority-minority districts actually was overpopulated in Hampton Roads, and subsequently what happened, when DLS did their research, they found that census had applied in a wrong census block the population for the Norfolk Naval Base, and that affected House District 80 and House District 79.

Q   So this pushed back the timing of the process to some degree?

A   Yes, sir, by a couple of weeks. Had it not been a majority-minority district, we probably could have

1815

done more work, but we had to wait to get the correct and right numbers from the census bureau.

Q   Were you concerned about timing issues?

A   Absolutely, yes, sir, I was.

Q   Why was that?

A Well, Virginia has elections in the odd year, and we [277] didn't get the data until February. We were mid February starting. Our session began in April, and we have to have preclearance by the Justice Department, and they can take up to 60 days. We contemplated that by moving back our primaries from June until August.

Q   Do you know of any state that has a shorter time frame for doing this process than Virginia?

A   There are none to my knowledge.

Q   So after the release of the census data, did you do additional hearings across the state?

A   We did. We immediately, once we got the correct data from census and it was appended in properly, we actually had five or six public hearings across the Commonwealth.

Q   And in addition to the hearings, did you have meetings with other delegates about their districts?

A   I did, yes, sir.

Q   Did you receive other communications about the line-drawing process?

A   We did. As a matter of fact, one of the complaints back in '01 was there wasn't enough public input, so as my duty as chairman of the reapportionment committee, we made sure we had a portal, a

1816

public portal where people could actually see and comment on the plans that were–not plans but the census information on the benchmark plan so they could make comments to us on the communities of [278] interest and the other items that were of importance to them.

Q   I'm sorry, I should have asked you this before. In addition to simply the timing, the need to have the plan in place prior to the primary day, which I think is self-evident, there are other considerations that make it important to get it done much earlier than that such as the circulation of petitions and, frankly, knowing what districts you could run in.

A   We had to work very closely with the Board of Elections at the time to make sure when you look at your cutoff dates for filing and signatures, and, you know, for primaries or conventions to elect a candidate of choice for the party, and then have the general election occur in November.

Q   At the beginning of this process, did you have a fixed number in mind for majority-minority district black voting-age population?

A   No.

Q   Was there a hard rule that every majority-minority district would be 55 percent?

A   No.

Q   I'd like to show Plaintiffs' Exhibit 36, and this is a video clip, a different video clip of Delegate Dance, and it's–the transcript is Plaintiffs' Exhibit 35, pages [279] 156 to 159, and while we're queuing this up, to speed the process up, what was her role in the process?

1817

A   She was a member of the Joint Reapportion-
ment Committee, a member of the P&E Committee
during the process.

(Video clip played.)

MR. BRADEN: Sorry, Your Honor.

JUDGE PAYNE: That's the one we heard yesterday.

MR. BRADEN: Yes. The advantage we have is
that Representative–Senator Dance, at that time
Representative Dance, had two different coats on, so
this is the red version. We have a black version. Our
apologies.

(Video clip played.)

MR. BRADEN: My apologies. I misspoke, undoubt-
edly not the first time nor last time. This would be
Plaintiffs' Exhibit 33. It's page 41 to 46 in the
transcript.

JUDGE PAYNE: That's in our book, too?

MR. BRADEN: Yes.

JUDGE PAYNE: Pages what?

[280] MR. BRADEN: 41 to 46.

JUDGE PAYNE: Thank you.

(Video clip resumed.)

Q   Delegate Jones, were you present for the speech?

A   I was.

Q   Anything the delegate, now-senator, said in
that speech that you disagree with?

A   Nothing.

1818

Q   Did your interviews and discussions with various members of the black caucus inform your decision-making?

A   Absolutely.

Q   Any information you received from the black caucus conflict with your understanding of the findings and holdings in *Wilkins v. West*?

A   No.

Q   The plaintiffs began this litigation with an opening argument saying that there was a 55 percent rule, that there was a 55 percent racial floor. Is that true?

A   No.

Q   In your view, not every district actually has a 55 percent black voting-age population?

A   No, and I don't want to get too deep in the weeds for the Court, but the two software systems were different. [281] In Maptitude, it only calculated the DOJ black, not the all-black. And so when I actually had the shape file and did the drawing on my computer, the shape file that I took to Legislative Services had three districts that were below 55 percent.

I was surprised when they ran their report and they had all of them above 55 percent, but that was a system that they used which included, as I subsequently found out, all black which would include Hispanic which is an ethnicity, not a race, according to census.

So that caused the confusion in the beginning and, of course, went back and forth in a deposition if you recall. I actually–if it was a rule, then I violated it, was

1819

what I actually submitted because my computer only showed DOJ black. It did not show all-black.

Q    Delegate Jones, I'd like to bring up Plaintiffs' Exhibit Number–

JUDGE PAYNE: Excuse me. Which is it that showed DOJ black?

THE WITNESS: That would be the system, Your Honor, that I used, the Maptitude, which is a specific program for redistricting only.

JUDGE PAYNE: What is the other system you are talking about that shows all black?

THE WITNESS: AutoBound.

[282] JUDGE PAYNE: AutoBound?

THE WITNESS: Yes, sir, I think that's correct.

JUDGE LEE: You said AutoBound included Hispanic along with–

THE WITNESS: It was all black, yes, sir, Your Honor.

JUDGE LEE: So for clarity, Hispanic was included in African American under the all-black?

THE WITNESS: Yes, sir, that is correct.

MR. BRADEN: Your Honors, I know it can be a little confusing, so we'd like to use Plaintiffs' Exhibit 60 to, hopefully, make this clear to the Court. I'd like to direct the Court, if we can scroll down to page 13 of Exhibit 60, the Court will notice on the plaintiffs' exhibit our favorite district, number 71, is the first column on that page.

For some reason, and I don't really know why, this column has been highlighted by the plaintiffs in their

1820

exhibit, so we thought it was useful to use this column to help explain this.

Q    Delegate Jones, do you recognize the numbers here?

A    I do, yes, sir.

Q    And can you just briefly tell the Court what it is?

A    Yep. What this is, it takes all persons that are in a district, and then it breaks down–this is voting-age [283] population. This is not all persons. Then it gives you the voting-age population white, then the percent voting age population, and then VAP black, percent VAP black, and then you get the Asian American, and then it goes Asian and it goes across. Then you have other, and you get percent Hispanic, and that was a consistent table that we saw after the bill had been introduced.

JUDGE PAYNE: Excuse me, Mr. Braden. Where did these documents come from?

MR. BRADEN: This is the plaintiffs' exhibit.

JUDGE PAYNE: I know, but are they from the census or from the Maptitude or who created them? What's the source?

Q    Delegate Jones?

A    Your Honor, this was after I took the file down to the Legislative Services, they put it into their computer system which was AutoBound, and then they produced that from my shape file.

JUDGE PAYNE: So this is produced by Legislative Services on the AutoBound system; is that right?

THE WITNESS: Yes, sir.

1821

JUDGE KEENAN: Mr. Braden, are you going to zoom in on this?

MR. BRADEN: Yes.

JUDGE KEENAN: Thank you.

[284] MR. BRADEN: Somebody is going to kick me over here. What we intend–yes, we're going to zoom in and try to enlarge it for you. I'm afraid that may be the best technology, but I think our process here may help you substantially on this, I believe.

JUDGE KEENAN: You have to keep your voice up, too, really, because I'm maybe in a dead zone here, but I'm hearing about, I don't know, I don't want to give a percentage for the record. I'm really concerned I'm not getting–

MR. BRADEN: I will absolutely pull it closer and speak louder.

JUDGE PAYNE: Are you saying you can't include this–get it up any bigger? Is that what we're saying? It's not possible?

MR. BRADEN: We can zoom in on parts of it, and we'll do part by part.

We can't make it all zoom up in one sheet because it's too broad.

JUDGE PAYNE: Okay.

MR. BRADEN: What we would like to do is do a brief demonstration, a calculation for the Court simply using these numbers on the top line.

JUDGE PAYNE: All right.

Q    Delegate Jones, we'd like to bring up a calculator and let it assist us in doing some simple math.

1822

[285] A  Yes, sir.

Q    And so if you could simply—and we are assisting you with the calculator. You don't have to take your socks and shoes off.

We'll just go through the lines and go line by line. Let's use the first column which is the total population of the district; right? We don't need to add that. That's presumably the number you're going to get when you add all the numbers up; right?

A    Correct.

Q    Let's go column by column. What is the first column?

A    Voting-age population white is 24,970.

Q    Next column?

A    Would be voting-age population black which is 36,658.

Q    Next column?

A    Would be Asian, 325.

Q    And the next column?

A    Voting-age population Asian, 3,069.

Q    And the next column?

A    Hawaiian would be 41.

Q    Next column?

A    Other is 566.

Q    And did I reach the last column?

A    You have two more.

Q    Two more. Next column?

A    Voting-age population multi is 601.

1823

[286] Q  And the next column?

A    Hispanic is 1,616.

Q    The total is?

A    67,842 which is more than the 66,230.

Q    Is this one of the problems you had with using the black population numbers from DLS?

A    It is.

Q    Why else did you decide–would you think the DOJ black numbers were important?

A    Because as I understood it, that's what the Department of Justice was going to use in their preclearance of our plan.

Q    Did you understand that the Department of Justice uses the same software that you were using?

A    That was my understanding, but I don't know that for a fact.

Q    Could you just briefly tell the Court what a block assignment file is?

A    A block assignment file takes the entire geographical area and is overlaid into a shape file, and it's got the data for each block of the number of citizens that reside there, their race, age, and–I mean there's a lot of a different data sets, combinations of racial data that's collected, but that's generally what's in there.

Q    And are they actually block assignment files the [287] geography for which you created the plan?

A    Correct. That actually is brought into the system, and then it's overlaid in the entire Commonwealth, and that tells you exactly where everybody

1824

might live. Like where my house is, it will tell me I have 110 people that live in that block assignment file.

Q   And is your understanding that this block assignment file is what you are required to submit to DOJ for preclearance?

A   Yes, sir, that is correct.

Q   So, if we can now begin going through, district by district, a discussion of the plan. First, though, I'd like to bring up Plaintiffs' Exhibit 16.

This provided the framework for the drafting of all your districts?

A   That is correct.

MR. BRADEN: I'd like now to show Plaintiffs' Exhibit 36, and this will be on the transcript, pages 31 to 33. That's Plaintiffs' Exhibit 35.

JUDGE PAYNE: I lost what you said. What do you mean? Which is 35 and which is 36?

MR. BRADEN: 36 is the video clip of Delegate Jones' floor speech. The transcript of it is Plaintiffs' Exhibit 35, pages 31–I mean page 31 to 33.

JUDGE PAYNE: Okay. Thank you, sir.

[288] (Video clip played.)

Q   Delegate Jones, was that you speaking in the floor of the legislature?

A   Yes.

Q   Did that accurately describe the population problems confronting you at the beginning of drawing the plan?

A   It did.

1825

Q   Can you actually understand the drawing of the state-wide plan by looking at any individual district's population?

A   You cannot.

Q   So drawing every district affects every other district?

A   It's a puzzle with a hundred pieces, and they have to fit together precisely.

MR. BRADEN: I'd like to bring up Defendant Intervenors' Exhibit 62.

JUDGE PAYNE: Does that have the zoom capability on it? Can you zoom in on that?

MR. BRADEN: Yes, Your Honor, we can zoom in on it.

JUDGE PAYNE: If you can make it bigger, we can see it better. No, that reduced it. We'll just look at the book.

[289] Q  Delegate Jones, can you tell us what is indicated in this map?

A   These are the census results from 2010 on a county/city population basis.

Q   And this, again, indicates some of the population pressures in the line-drawing process?

A   Correct. It's a percent change of population by county.

Q   And I'd like to bring up Defendant Exhibit 63. And can you tell the Court what this exhibit is?

A   It's the same map, but it has the House districts that were overlaid–the benchmark House districts that were overlaid on this.

1826

Q    Again, it shows you the population problems and the need to move districts?

A    It does.

MR. BRADEN: I'd like to move the Court now to regional maps. I'd like to do Defendant Intervenors' Exhibit 96 and 97. In a way of explanation, the Defendants' Exhibit 96 is a collection of four regional maps. It's map book one. We have some ring binders, large map books. This is map book one.

JUDGE LEE: What page number?

MR. BRADEN: Well, it's the–

JUDGE LEE: 96. I see it. Thank you.

[290] MR. BRADEN: What map book one is simply– we start out with the four regional maps, and we'll move to the regions, and I just wanted to get the Court the opportunity to look at those. It provides regional maps for the Court.

Q    Delegate Jones, do you recognize these maps?

A    I do.

Q    Are they–which regions are they?

A    This would be the–part Southside and the Petersburg/Dinwiddie area, and you can see on the far right, you can see part of Hampton Roads.

Q    And if we can start on Defendants' Exhibit– Defendant Intervenors' page four of 96 and 97, what area of the state does this show us?

A    This is the Richmond area showing the 2001 districts with the 2011 districts.

Q    These contain Districts 71, 69, 70, and 74?

A    That is correct.

1827

Q   I'd like to go to Defendant Intervenors' Exhibit 37, page one. Delegate Jones, do you have that?

A   I'm there, yes, sir.

Q   What does this exhibit show you?

A   This shows you the current populations in the benchmark districts.

JUDGE PAYNE: Current as of when?

[291] THE WITNESS: The census, Your Honor.

Q   So, if we can begin with what has been the most talked about district, House District 71, this is Defendant Intervenors' Exhibit 56, page two, and Defendant Exhibit 57, page two.

Can you tell us what this exhibit tells us in regards to the Richmond area districts in regards to population–

A   This shows the voting-age population, which would be on the first set–the first numbers in the second column would be the DOJ, which includes Hispanic black numbers for the districts, and you can see in the 71st on Exhibit 56, page two, that currently, according to DLS, it was 46.3, but the DOJ black number that I was working with was at 45.8.

That would be the district as it was configured when the census was inputted into the Maptitude program for the current district that existed as of 2010.

Q   So at the beginning of this process, House District 71 was significantly underpopulated?

A   Yes. I believe it was over seven percent underpopulated.

Q   And the benchmark black voting-age population was above, just above or close to 46 percent?

1828

A    That is correct.

Q    And according to the numbers that you were using, the [292] enacted black voting-age population in your new plan was 54.9?

A    That is correct.

Q    Are you familiar with where this district is?

A    I am.

Q    It's a district you can see outside your office?

A    I've got several connections to the district. I actually went to college there, MCV. I think I'm precinct–I think five–605, I think. I can't remember, but my Capitol office actually is in the center of that part of the district, and I have noticed over the years the tremendous growth that has occurred since my days at MCV in 1982.

Q    So has this, the demographic composition of this district changed over the decade?

A    This part of the district, dramatically, yes, sir.

Q    Has it grown more white?

A    It has.

Q    So at the beginning of your line-drawing process, this was no longer a majority-minority district?

A    That is correct.

Q    Did you have any reason to believe going into the future this demographic change would not continue?

A    I felt it would continue if not accelerate.

Q    So was that part of the decision-making process as to [293] what the population, the black voting-age population of this district should be?

1829

A   It was.

Q   Did you hear anything from any member of the black caucus arguing against that number in that district?

A   No one was comfortable with that number. Nobody was comfortable leaving that number at that district.

JUDGE PAYNE: What number?

THE WITNESS: Staying at the 46 percent black voting-age population in the 71st district.

JUDGE PAYNE: You mean people told you that? THE WITNESS: They felt–I would say, Your Honor, they felt that we needed to have a performing majority-minority district, and from the members that I spoke to, they felt that it needed to be north of 50 percent minimum.

JUDGE LEE: Is that an objection?

MR. SPIVA: I didn't want–to interrupt. I move to strike that. He's not identifying the person who he's giving the hearsay testimony about, so hearsay objection, Your Honor.

JUDGE PAYNE: He's offering it, I gather, for what reason?

MR. BRADEN: I think it's pretty clear he's offering it for how it informed his decision-making [294] process.

JUDGE PAYNE: He's offering not for the truth of the matter but for the views and how he got to 55 percent; right? Overruled.

MR. BRADEN: We'd like to bring up our most familiar map again of District 71.

1830

THE WITNESS: Okay.

Q   Were you present for the discussion, the testimony of Delegate McClellan?

A   Yes.

Q   And do you remember some questions that were posed to her about an email from you?

A   Yes, I do.

Q   And that was a discussion of violations or breaking precinct lines and drawing a plan in Richmond?

A   Correct.

Q   Was that discussion over this district?

A   I would say it was more over the Richmond city.

Q   Was the discussion over the plan that was enacted but vetoed that's identified as HB 5001?

A   Yes.

Q   And let me show you Defendant Intervenor Exhibit 6. It appears in the transcript on page–this is the video clip, Defendant Intervenors' 6, and it's transcript page two to page three.

[295] JUDGE PAYNE: The transcript is Exhibit 7?

MR. BRADEN: Exhibit 7, yes, Your Honor.

(Video clip played.)

Q   Is that you speaking on the floor of the House?

A   It is.

Q   Does that video clip–is that you addressing the issue that was raised in those emails?

A   Yes, sir.

1831

Q    So every issue that was raised in those emails about splitting, to the best of your knowledge, were satisfied in the changes from the 5005 plan?

A    To the best of my knowledge, yes.

Q    Do you have–you used the–

JUDGE PAYNE: Before you continue in another vein, we'll just take the morning recess. Be back at 11:45.

(Recess taken.)

NOTE: After the morning recess is taken, the case continues as follows:

JUDGE PAYNE: Before you get started, we all have sort of some clarification that needs to be made, and [296] Judge Lee is going to start the questioning. So you will mark your spot and then we'll get back to it.

JUDGE LEE: Take us back to the exhibit that had the spreadsheet of race including Asian and Hispanic.

What number was that? Number 56, Defendants' 56. No?

MR. BRADEN: We're hunting for it right now, Your Honor.

JUDGE LEE: Okay.

JUDGE PAYNE: I think you are looking at 60, the one that was done by the Legislative Services using AutoBound, and then there was another one about DOJ black, because that's the one we're looking at. Up there?

JUDGE LEE: Yes. Which one is that one?

JUDGE PAYNE: That's 60. Is that 60? On page 13.

JUDGE LEE: Is that Plaintiffs' 60?

1832

JUDGE PAYNE: Yes, Plaintiffs' 60, it's in the back there, in the back of our book.

MR. BRADEN: Sure, Plaintiffs' 60, page 13.

JUDGE PAYNE: We're confused a little bit about the difference between what we understand the answer to be and what the charts say, so help us out.

JUDGE LEE: So who made–can you tell us who made this chart?

THE WITNESS: That would have been the Division [297] of Legislative Services.

JUDGE LEE: Okay. Is this–are these the numbers that you had that you submitted to them?

THE WITNESS: No, sir. The numbers that I had would be–if I may, Your Honor.

JUDGE LEE: Please.

THE WITNESS: Would be I believe Exhibit 56. And if you look at the columns F, G, column F, that would be the number that I saw when I was drawing the individual districts on my computer using the Maptitude software.

JUDGE LEE: Hold on just one second. I want to turn back to 56.

JUDGE PAYNE: Page 2?

THE WITNESS: Yes, sir. Excuse me, yes, sir, page 2 and page 3, yes, sir, because they are the affected districts.

JUDGE PAYNE: And it says up at the top: DLS includes Hispanic black.

THE WITNESS: Yes, sir. Then if you look at–let me put my glasses on. If you look at on page 2, you will

1833

notice that you have column C and then you have column D and E, and then you have column F.

And if you compare column C to column F, that would in fact be the difference between what I was looking at and what everyone else saw when they took my shape [298] file, which is just on a thumb drive, I took it down, that was the bill, gave it to them in Legislative Services.

And then they put it into their system, in the geographic, whatever those computers do, and it took and overlaid the bloc assignment filing and it took all the assignments, the district number, and put it in their computer.

So when they generated the map that was Plaintiffs' Exhibit 60, that was from my data. But I did not have the data sets, Your Honors, that they had to do the all black. Mine was DOJ black.

And what I found after, had it been introduced, I don't want to get too deep in the weeds, and I apologize, and please cut me off if you need to--

JUDGE LEE: No, we're trying to understand–

THE WITNESS: Yeah–

JUDGE LEE: Just one question. You were using DOJ black?

THE WITNESS: That is correct.

JUDGE LEE: Can you tell us what DOJ black encompasses? What racial composition does it encompass?

THE WITNESS: It includes all black, black/white, and excludes Hispanic partial black, as I understand it.

1834

JUDGE PAYNE: When you say black/white, you mean multiracial?

THE WITNESS: Yes, sir.

[299] JUDGE PAYNE: All right.

JUDGE LEE: And then the Division of Legislative Services, DLS, which is on Exhibit 56, page 2, what software were they using?

THE WITNESS: They were using AutoBound.

JUDGE PAYNE: And they created that using the information you gave them?

THE WITNESS: Yes, sir.

JUDGE PAYNE: Because you were using DOJ black?

THE WITNESS: Correct.

JUDGE PAYNE: All right. Do you have any questions, Judge Keenan? Any more, Judge Lee?

I have one. What then is 60? What's the significance of 60, Plaintiffs' Exhibit 60, I guess it is?

Is it just to show that the census numbers were in error? Is that the only purpose we're looking at 60 for?

Help me, Mr. Braden. You all can–it's not fair for him to have to do it, but I don't understand why we're using 60 then.

MR. BRADEN: We used 60 to illustrate the problem with the DLS number. This is from–

JUDGE PAYNE: In other words, not the census data, but you had too many people, more than the total population, and you were using this exhibit to show us [300] that that's what it was and, therefore, he had to do something else, is that correct?

1835

MR. BRADEN: That is correct.

JUDGE KEENAN: But you're not using it to draw any highlights between the distinction between DOJ black and black including Hispanics? Or is that part of what you're trying to illustrate here with regard to the exhibit that's on the screen?

MR. BRADEN: With regard to the exhibits on the screen, I think what we're trying to do is to show the reasonableness of using DOJ black and the sort of misunderstanding at DLS as to the term "black voting-age pop." When you include–and this is a little difficult to follow sometimes. But the census has race and ethnicity. So when you're just–when you include Hispanic black into the black population, you then double-count them, they appear twice.

So that's when you just use the numbers as they've got here–well, to be candid with you, we're probably ethnically principally talking about Puerto Ricans. If my memory is correct on this, is generally Puerto Ricans often identify or a significant number of Puerto Ricans identify as black Hispanic.

So they would get counted twice. They would check a box saying black and they would check another [301] block. So the way it appears here is that they get counted as two different people.

JUDGE PAYNE: I think though what we're trying to sort out is that you offered us Exhibit 60 to explain– now I understand it to be two things. One is you were using Exhibit 60 to show that the census, that these, this data was in error and to show the reasonableness of using DOJ black, is that right so far?

1836

MR. BRADEN: One, we didn't create this particular exhibit. But we're using it not to show that the census data is wrong. The census data is correct.

JUDGE PAYNE: Okay.

MR. BRADEN: What is wrong is the use of the census data. Which is a mistake by DLS–now, a minor mistake, granted, but a mistake in DLS because when they simply combined non-Hispanic black into it, they're actually double-counting some people.

JUDGE PAYNE: Okay.

MR. BRADEN: So you come with more–so this is simply to illustrate basically that they made a mistake, it was a minor mistake, granted, but it is a mistake. And these weren't the numbers he was using. He was using a system that the Department of Justice uses, and to his understanding was the number that they look at.

JUDGE PAYNE: All right. Now, earlier I thought [302] Delegate Jones said that the Maptitude calculated using only DOJ black. Is that correct or not correct?

MR. BRADEN: Well, actually the Maptitude system could, if you wanted to, could show a number of different fields. With that–

JUDGE LEE: What did you do, Delegate Jones? THE WITNESS: I only used the DOJ black.

JUDGE PAYNE: And you were using what system to do that?

THE WITNESS: Maptitude.

JUDGE PAYNE: Maptitude.

1837

THE WITNESS: Because, if I may, Your Honors, when I was in Austin, it was clear that that's what the Justice Department would be using for their calculation for any preclearance map that would be submitted to them.

JUDGE PAYNE: All right. And it was AutoBound that then included Hispanics within black, is that right?

THE WITNESS: Yes, yes, sir.

JUDGE PAYNE: Any questions, Judge Keenan?

JUDGE KEENAN: No, thank you.

JUDGE LEE: Sir, you have helped us greatly. Thank you.

MR. BRADEN: Thank you, Your Honor.

JUDGE LEE: Just to understand it.

MR. BRADEN: Don't feel bad. I've got a bunch of [303] lawyers back here who didn't understand it for quite a long time either. It is complicated to figure out.

BY MR. BRADEN: (Continuing)

Q    If I could go to, back to our favorite map here. If you could look–I believe you are obviously familiar with this.

Does this map include the residence of the incumbent members at the time the plan was adopted?

A    It does.

Q    And can you tell the Court how that information informed your decision-making process?

A    Well, as you can see, and I will highlight it on the screen–

1838

JUDGE PAYNE: Excuse me just a minute. This is what exhibit? Is this 94, page 4?

MR. BRADEN: Yes, 94.

JUDGE PAYNE: Page 4.

MR. BRADEN: Yes.

JUDGE PAYNE: Use that instead of referring to it as our favorite exhibit.

MR. BRADEN: Yes. My apologies, Your Honor.

And this is also in our Map Book, Map Book 1. And we have it on a poster board.

THE WITNESS: Okay to proceed?

MR. BRADEN: As soon as–

[304] THE WITNESS: I'm sorry.

JUDGE PAYNE: Can you see it?

THE WITNESS: Yes, sir, I can.

JUDGE LEE: Restate your question.

BY MR. BRADEN: (Continuing)

Q   Delegate Jones, does this map show the residence of incumbent members at the time the plan was adopted?

A   It does.

Q   And how did their locations inform your decision making in drafting the plan?

A   Well, as you can see, and I will circle it on the map, Delegates McClellan and Carr live pretty much adjacent to one another in adjacent precincts.

And if you look to your east, you will see that Delores McQuinn lives in that precinct.

1839

And so, it did influence where they lived with how I could actually draw the map given the loss of population in the Richmond area.

Q    Was one of your criteria to avoid the unnecessary pairing of incumbents?

A    It was.

JUDGE LEE: What were their party affiliations?

THE WITNESS: They were all Democrats. And two of the three, if I might add, were African-American. But they are all three majority-minority districts.

[305] BY MR. BRADEN: (Continuing)

Q    It would appear that three precincts were removed from the district from the northern end of the district.

Could you tell us why those particular precincts were moved.

A    I was attempting to make it a more Richmond centric district if possible.

Q    Were you here for the testimony of Delegate McClellan?

A    I was.

Q    Do you remember a discussion she had of an area called The Fan?

A    I do.

Q    Are you familiar with that area?

A    I am very familiar with that area, yes, sir.

Q    Can you describe to the Court why that area is divided up the way it is in the plan.

1840

A    Well, if you look on the map, and I will point out where Delegate Loupassi lives, he lives in what is the 1st Ward of Richmond. He used to be on City Council and was actually the Council president. And his former ward abutted that precinct. And that was a priority for him, he wanted that precinct in his district. And he is a Republican member of the majority party.

JUDGE PAYNE: He wanted which precinct in his district? What number? 111?

[306] THE WITNESS: I am sorry, Your Honor, I just covered it up. Can you erase this?

JUDGE LEE: Usually there is a way to clear the screen. I am not sure. Mr. Toliver, can you show him how to clear the screen?

MR. BRADEN: I have got it.

JUDGE LEE: Oh, you did it. Okay. Thank you.

THE WITNESS: That would be 207, Your Honor.

MR. BRADEN: You can circle it again, I just cleared it off. It might be easier to spot.

JUDGE PAYNE: He wanted 207 moved from The Fan to his district?

THE WITNESS: Yes, sir.

JUDGE PAYNE: And where is that 207?

THE WITNESS: 207–

JUDGE PAYNE: I see it. Where is it in the city?

THE WITNESS: It is going to be on the Boulevard. It's adjacent to VCU's main campus. It's a very densely populated multicultural–

JUDGE PAYNE: It's from VCU to the Boulevard, did you say?

1841

THE WITNESS: Approximately, yes, sir.

JUDGE PAYNE: Okay. And that had been his ward when he was on the City Council?

THE WITNESS: It had been adjacent to his ward. [307] And I believe, Your Honor, he was concerned about getting too much of Chesterfield. And he wanted more voters in the Richmond city area which would have been more favorable to him.

JUDGE LEE: You say he was Chair of the Council?

THE WITNESS: Yes, sir, he was.

BY MR. BRADEN: (Continuing)

Q    Would it be fair to describe this as a combination of politics and personal preference?

A    It would be.

Q    Was this driven principally by race?

A    No.

MR. SPIVA: Objection, Your Honor. I have let a lot of the leading questions go without an objection, but it's really kind of getting to be a lot.

JUDGE PAYNE: You think that one was leading?

MR. SPIVA: Yes, sir, Your Honor.

JUDGE LEE: Questions that begin "did you" are leading. Stop it.

MR. SPIVA: What's that, Your Honor?

JUDGE LEE: Questions that begin "did you" are leading, they suggest the answer. Questions that begin "what, how, or describe" are not leading.

MR. SPIVA: I thought he asked was it presented predominantly based on race, I maybe misheard.

1842

[308] JUDGE PAYNE: Now you can answer the question.

THE WITNESS: No.

BY MR. BRADEN: (Continuing)

Q   But did you consider race in drawing this district?

A   Absolutely. All the districts because of the criteria in the Constitution and the supremacy clause of the Constitution, our first two criteria were plus or minus 1 percent, and then compliance with the Voting Rights Act.

Q   Did your consideration of race in this district and the drawing of this district require you to violate any of the criteria adopted by the state?

A   No.

Q   Did you do anything to comply with the Voting Rights Act that resulted in you violating any criteria in drawing this district?

A   No.

Q   If we could move on to Defendant-Intervenors' Exhibit 94, page 2. And this is again in Map Book 1.

Delegate Jones, can you tell the Court where this district is?

A   This is a Richmond city based House district. It mainly comprises on the Southside or the Manchester area of the city, but it has a handful of precincts north of the river.

Q   Is this district more Richmond centric now?

[309] A  It is.

Q   And who represents this district?

1843

A   Betsy Carr.

Q   And what is her race?

A   She is white.

Q   And what was the population of this district? Did it need to be increased in size?

A Yes. She was down almost 11 percent in population. She had to pick up I think 8,700 individuals.

Q   So that would necessarily require increasing the geography of the district?

A   It would.

Q   Is there anything in the creation of this district that required you—first, did you consider race in drawing this district?

A   Yes.

Q   Is there anything in your consideration of race in drawing this district that required you to violate any of the state's adopted criteria?

A   No.

Q   Did your efforts to comply with the Voting Rights Act, Section 2 or Section 5, result in you drawing any part of this plan that doesn't meet the requirements of the Virginia Constitution or the criteria adopted by the House?

[310] A  No.

Q   Can we head on to Defendants' Exhibit 94, page 3. Again, this is in the Map Book.

Delegate Jones, can you identify this for the Court?

A   Yeah. This is House District 70, which is a majority-minority district.

1844

Q   And was this district underpopulated at the beginning of the process?

A   Actually, it was underpopulated, but it would have fit within the plus or minus 1 percent.

Q   So you probably heard, I think the plaintiffs' attorney suggested that that might mean you wouldn't have to change that district. Was that a conceivable process?

A   No, not in my opinion having drawn maps over a ten-year period.

Q   That you would have to–this process requires–does it have a ripple effect?

A   Absolutely. If you looked at the map we had earlier about the changes in population shifts in the Commonwealth by county, you can really take notice that the population gains were in the suburbs.

And since both the 71 and 69 had about an 18 percent need for population, they were underpopulated by probably 18, 19,000 people, there was certainly a need to get additional population for those two districts. And that [311] necessitated moving south and southwest and southeast a little bit on this district.

Q   And if you could look at the map, can you identify the residency of Delegate McQuinn?

A   I can. And I will circle it on the map–on the screen, excuse me. She lives right in the northern part of the district.

Q   And how did that limit your line drawing process?

A   Well, had she not lived there, I could have actually had all of the 71st District in the city of Richmond because I could have taken these couple of

1845

precincts and there wouldn't have been any going into the Radcliffe precinct in Henrico County for 71.

Q   So one of the, am I correct, that one of the principal factors affecting the shape of this district was the residency of the incumbent?

A   Absolutely.

Q   And the population changes in this district–and the changes in this district are driven by population changes in the surrounding districts?

A   Correct.

JUDGE PAYNE: Delegate McQuinn is with what party?

THE WITNESS: Pardon me, I am sorry?

JUDGE PAYNE: What's the party for Delegate [312] McQuinn?

THE WITNESS: She is Democrat.

JUDGE PAYNE: Is she–what's her race?

THE WITNESS: She is black. And I might add, she had served on the City Council prior to her going to the House of Delegates.

BY MR. BRADEN: (Continuing)

Q   And to the best of your knowledge, does this district generally meet her requests to the committee?

A   It did. I actually sat down with her. And I believe every part of this district, I would say she was 95, 98 percent pleased with what the final product was.

Q   And she voted for the districts, passage?

A   She did.

1846

Q   If we could move to Defendant-Intervenors'
Exhibit 94, and this is pages 5 and 6, this is in the Map
Book, this is District 74.

A   I'm there.

JUDGE PAYNE: Which one are you all going to–
okay, you've got 5 on the board. Okay.

Q   And just to get some population numbers, this
is one of the districts that was not significantly, one
of the few majority-minority districts that was not
significantly underpopulated?

A   I believe this was the only one that actually had
a [313] positive population growth and didn't need any
population to meet the ideal number of 80,010 people.

Q   And what was the voting-age population of the
benchmark plan? It's in Defendant-Intervenors'
Exhibit 56.

A   It was 62.7. Which map was that?

Q   This would be District 74, Defendant-Intervenors'
56. A 56. Let me get to–I have got a lot of different
charts up here. So I apologize on that.

JUDGE PAYNE: 56 is not a map, I don't think.

MR. BRADEN: No, it's a chart.

THE WITNESS: It's a chart. I just want to get to it,
Your Honor.

Okay. The benchmark plan, it was 62.2, DOJ black.

BY MR. BRADEN: (Continuing)

Q   And the enacted voting age, the black voting-
age population of the enacted plan?

A   56.8, DOJ black.

JUDGE PAYNE: How much?

1847

THE WITNESS: 56.8, Your Honor.

JUDGE PAYNE: Are we talking about 74?

THE WITNESS: Yes, sir, 74.

JUDGE LEE: What page are you reading from?

THE WITNESS: I'm sorry?

[314] JUDGE LEE: What page are you reading him?

THE WITNESS: Okay. I went to Exhibit 57, Defendant-Intervenors' Exhibit 57.

JUDGE LEE: Oh, okay, we were looking at 56.

THE WITNESS: Page 2. My apologies.

JUDGE LEE: No, no problem. I just want to make sure we're on the same page. Hold on. Give us a minute to digest this, please.

JUDGE PAYNE: Now, help me again, we are in 74, population 60,487. And then you're going to DOJ–

THE WITNESS: Yes, sir, DOJ black.

JUDGE PAYNE: And that is 56.8 percent?

THE WITNESS: Yes, sir.

JUDGE PAYNE: But where did you get the 62.2?

THE WITNESS: I'm sorry, Your Honor, if I may. That was the benchmark plan as it existed with the census numbers for the existing House district. And that was in Exhibit–

JUDGE PAYNE: That was on Exhibit 56?

THE WITNESS: Yes, sir.

JUDGE PAYNE: And under the column DOJ black, F, right?

THE WITNESS: Yes, sir.

1848

JUDGE PAYNE: So we have to read 56 to get the benchmark. And then the other, the 5005, the House bill [315] at issue is 57?

THE WITNESS: Yes, sir, 56.8.

BY MR. BRADEN: (Continuing)

Q   So a reduction of approximately five-and-a-half black voting-age pop?

A   Right.

Q   Who represented this district at the time it was enacted?

A   Oh, gosh. In 2011?

Q   Yes.

A   Jim Morrissey. I just want to be clear because I have done two of them and I want to make sure I'm answering the question. Joe Morrissey.

Q   And what was his race?

A   White.

Q   Does this–you seemed to stumble a little bit about which district this was. Is this district substantially the same as the prior district?

A   The prior district and the one prior to that. This is essentially in the format that it was in 1991 I believe when it was created.

Q   Maybe I can help you. If we could bring up Defendants' Exhibit No. 14, page 60.

This is Defendants' Exhibit 14, page 60.

Delegate Jones, have you seen these maps before?

[316] A  I have.

1849

Q   And can you just briefly tell the Court what these maps are.

A   The top map was the map as instituted in the House bill back in 1991.

And then the middle map was the map that was created in Chapter 1 in the 2001 session.

And then the bottom map is the enacted map in House Bill 5005.

Q   And can you briefly tell the Court, do you remember–you do remember the *West v. Wilkins* litigation?

A   Yes.

Q   Am I correct that there is part of this district that was criticized by the plaintiffs?

A   Yes, sir. If I may, if you look at the 2001 district, and I will circle this on the computer screen, you can see right here there are several precincts, it is part of the map that jumps across the James river. And in the *West v. Wilkins* case there was, when they are looking at compactness and contiguity, there was an issue–they approved this, but they did denote the crossings of the James River, river crossings, I would use that term.

And so, one of my personal goals when I started the process of constructing the map in 2011 was to unwind the two river crossings that had occurred in 2001. One was in [317] House District 64 and the other was in House District 74.

So, in essence, what I do, we took the two precincts out of the House District 74, and we thickened the neck–if I can show you on the screen, right here, with about four or five precincts in 2011.

1850

So we did make changes, brought it back across the river, which I thought was the right thing to do to that district. But essentially it sits as it did in 1991, its general configuration.

Q   Did race have anything to do with the changes about the crossing of the rivers?

A   None.

Q   To use your words, the thickening of the neck, did that have anything to do with race?

A   No. Actually, I put some more good Republican precincts in there that the gentleman in the 97th did not want to lose, quite frankly.

Q   Do you know when Delegate Morrissey was first elected?

A   I believe it was 2005, or it could have been 2007.

Q   If I could bring up Defendant-Intervenors' Exhibit 93, and pages 44 and 45.

Delegate Jones, were you able to get those pages up?

A   I am here, yes.

Q   Can you tell the Court what that is.

A   These are the official results from the June [318] Democratic primary in 2007.

Q   And to the best of your recollection, that's the first time he was elected to the legislature?

A   That is correct.

Q   And what was—was it a multi-candidate race?

A   It was a five-way race, yes, sir.

Q   And do you know the race of the four other candidates?

1851

A    I believe they were African-American.

Q    And his percentage of winning vote?

A    Was 37 percent.

Q    I'd like to move on to–well, before I move on, I don't want to miss any of my districts here.

Did you use race in the drawing–did you use race in the drawing of this district, consider race?

A    I considered race.

Q    And did your use–did your use of race require you to violate any of the state criteria as adopted by the legislature or the state Constitution?

A    No.

Q    Did your efforts to comply with the Voting Rights Act require you to make any changes in this district?

A    No.

Q    Is this politically and racially the same district that's been in place since 1991 fundamentally?

A    From my perspective, yes, it is.

[319] Q    Okay. So I would now like to move to Southside. And if we could bring up Defendants' Exhibit 96 and 97. And this is page 1 of the Map Book. It's in Map Book 1.

So it's Defendants' Exhibit 96 and 97. And these are regional maps that are in Map Book 1.

So can you–

A    Bear with me. I have got too much stuff going on up here. I apologize. Page 1?

1852

Q   Yes. This is the Map Book 1, 96 and 97. This is Southside.

A   Got it.

Q   And what is Southside?

A   Southside is going to be your counties like Sussex, Southampton, Brunswick, Emporia, Greensville. Isle of Wight is considered just on the fringes of it. Southampton would be part of Southside. Otherwise known as Western Tidewater to many that live down in that area.

Q   Probably to those people who live in Tidewater.

A   Yes, right. Yeah, because you have Hampton Roads to the east. But this would be what I call Western Tidewater and Southside.

Q   Can you tell the Court how population changes in this area affected your line-drawing process.

A   Yes. I believe the 63rd and the 75th had–I think the 75th was almost 12 percent underpopulated, which meant [320] they needed 9,500 individuals. And the 63rd needed about 6,300 individuals.

So between the two of them, they had a need of almost 20, over 20 percent of population influx.

Q   So that would require increasing the size of these districts to bring in additional population?

A   Geographically you would have to expand, especially in the rural–I mean, outside of Petersburg city and Emporia, there is not a concentration really of population until you get to Franklin City.

Q   Can we go to Defendant-Intervenors' Exhibit 94, page 7. And this is our proverbial yellow map of District 75.

1853

A   Yes, sir.

Q   Page 7 of Defendant-Intervenors' Exhibit 94.

And who represented this district at the time it was drawn?

A   Delegate Tyler.

Q   And how much was this district underpopulated?

A   Almost 12 percent.

Q   Again, to assist the Court, this is–the under-population is Defendants' Exhibit 37. And the benchmark numbers for black voting-age pop is Defendants' Exhibit 56. And enacted pop is Defendants' Exhibit 57.

As we go through all–I should have done–[321] obviously I should have done this at the beginning to make it easier for the Court.

Can you tell the Court what the benchmark black voting-age population of this district was?

A   It was 55.1 DOJ black.

Q   And what the enacted black voting-age population was?

A   55.2.

Q   My addition on this one is simple, that's one-tenth of 1 percent change?

A   That would be correct.

Q   I would like to bring up Defendants' Exhibit 41.

JUDGE PAYNE: Excuse me just a second. Representative Tyler is what party?

THE WITNESS: She is Democrat.

JUDGE PAYNE: And what race?

1854

THE WITNESS: She is African-American.

JUDGE PAYNE: All right.

MR. BRADEN: We would like to go to a video clip from Plaintiffs' Exhibit 41. And this will also be on the transcripts Plaintiffs' Exhibit 40, pages 38 to 39.

JUDGE LEE: Just a second.

JUDGE PAYNE: Ready?

JUDGE LEE: Yes.

JUDGE PAYNE: Okay, we're ready. Thank you.

NOTE: The video is played.

[322] BY MR. BRADEN: (Continuing)

Q   Delegate Jones, were you present for this speech?

A   I was.

Q   And what did you understand to be Delegate Tyler's problem with the district?

A   Well, if I may, she and I had met probably half a dozen times to configure her district as she felt it needed to be configured for her best chance for re-election, best chance to elect a candidate of their choice for her district. And she was worried about too low of a black voting-age population for her to be able to be successful in an election.

JUDGE PAYNE: It was too low because the population count included 8,100 prisoners?

THE WITNESS: Yes, sir. That was the concern that she raised.

BY MR. BRADEN: (Continuing)

1855

Q And what were the constraints on you address-
ing her concerns since she needed to obviously add
significant population?

A Well, I was under the impression that she was
actually going to be voting for the bill until she stood
up on the floor.

And if you look at the map, if I may,–I don't know if
the map is up. If you look at the North Carolina [323]
border, we certainly couldn't go south.

And if you look to your north, we got population from
the north in Dinwiddie County right here. I'm circling
that on the map.

And then what I had left then was a need for
additional population. So you can see one of the
criteria was respecting jurisdictional boundaries.

And if I can for the Court, if you look in the bottom
left corner right there, the bright yellow, we made that
county whole.

And then we had two other counties whole until she
made a request between House Bill 5001 and 5005.
And I will point that out for you now if it's okay.

If you see here, the Dendron precinct and then the
Wakefield precinct, she requested that we swap those
two out. So we did.

Q And that swap was in the hope that she would
vote for the bill?

A Correct. But she had real concerns. And I recall
vividly because, you know, the VA Pilot, which is our
local paper, used to cover Western Tidewater, much
more than they do now due to their cuts in staffing,
and I remember the primary election and the general
election election when she ran in 2005. In a five-way

1856

race in a primary with two Caucasians, she won by less than 300 [324] votes.

And then in the general election in 2005, one-on-one with a Caucasian, she won, didn't break 51 percent.

Q   Let me ask a broader question. I don't want to move too much off track on the district-by-district narrative, but you brought up a discussion.

Is it correct that most of the districts involved you talking to individual members and many of changes are based upon their individual member requests?

A   I talked to at least 75 to 80 of the individual members.

Q   So this is an example of you making a change at a member request?

A   Yes, sir.

Q   And that was in the hope of getting her vote?

A   Correct.

JUDGE LEE: You mentioned that you changed Dendron. What other precincts did you mention?

THE WITNESS: Wakefield.

JUDGE LEE: Wakefield.

THE WITNESS: And if I may, she only got, there was like five or six precincts in 2005 in the primary she didn't break double digits. She only got like five votes, seven votes or eight votes. Wakefield is one of those, which is right here circled.

[325] And then below that right here is Berlin.

And then there were two precincts in Franklin City, the 1st Precinct and the 6th Precinct, where she got

1857

less than 20 votes combined I think in those two precincts.

JUDGE PAYNE: So you took Wakefield away from the original plan and substituted in its stead Dendron?

THE WITNESS: Yes, sir.

JUDGE PAYNE: And she did gotten–had performed poorly in Wakefield in the preceding election?

THE WITNESS: That's correct.

JUDGE PAYNE: Why did you choose Dendron?

THE WITNESS: It was next to it. And I can't recall, but that's one she requested. I would have never done that had it not been requested because I wanted to split as few jurisdictional boundaries as I could, that was important at the end of the day.

BY MR. BRADEN: (Continuing)

Q    If I could ask you another very specific question. There seems to be, for want of a better description, a little hand up at the northern part of this district.

Could you point that out to the Court on the map and explain to them the reasoning behind that.

A    Yes. That was negotiated between Delegate Dance, Delegate Tyler, and myself. I would have never drawn that [326] finger.

The New Hope precinct–if you can clear the screen for me. If you look at the New Hope precinct, which is right here, it is directly adjacent to the city of Petersburg. And Delegate Dance, then Delegate Dance had represented the city of Petersburg as mayor previously, and I believe a tremendous amount of her employees or constituents had family in that New

1858

Hope precinct, and she did not want to give up that precinct, that was very, very important to her.

And if my recollection is correct, she had a potential primary opponent she wanted to draw out of her district.

Q    Was there significant discussion between those two delegates and yourself over the line dividing those two predicts? They do abut, correct?

A    There was. And I would note that that line did not change between 5001 and 5005, that just stayed the same.

And that would be the bulk of, if I may, the bulk of the splits in her district are right there. And if I can show the Court, we followed the Interstate 85 line, highway boundaries here. And I forget what the other route number is a little bit north, but we did follow a reasonable route as far as the road and interstate.

Q    Did you consider race–

JUDGE PAYNE: In the original plan that you drew, [327] New Hope was in her district, Tyler's district?

THE WITNESS: No. It was in–excuse me, it was in Delegate Dance's district. And that was important to her because of its juxtaposition to Petersburg.

JUDGE PAYNE: And keeping New Hope thus resulted in the finger or the hook that appears up there near Rohoic?

THE WITNESS: Yes, sir. Because I would have put New Hope, quite frankly, in the 75th to have a more normal shape.

BY MR. BRADEN: (Continuing)

1859

Q   Delegate Jones, did you consider race in drawing this district?

A   I did.

Q   Did that consideration of race require you to draw a district that violated Virginia Constitution or any of the adopted criteria?

A   No.

Q   Did your consideration of compliance with the Voting Rights Act as you understood it require you to draw a district that violated any of the state criteria or state Constitution?

A   No.

Q   If we could move–if we could move to District 63, Defendant-Intervenors' Exhibit 94, page 1. And I will try [328] to truncate this since we obviously don't need another question about the finger.

Correct that this is a map of Senator Dance's old district?

A   It is.

Q   Can you tell the Court whether this district was underpopulated at the beginning of this process?

A   It was.

Q   Significantly?

A   Yes. It was above 7 percent, maybe almost 8, I can't remember, but I think that's right.

Q   And the bench voting age–the black voting-age population, the benchmark plan, which is on Defendants' Exhibit 56–

A   Was 57.7.

1860

Q    And the enacted voting-age population, Defendants' Exhibit 57?

A    Was 59.

Q    So her district needed to be expanded?

A    Correct.

Q    Can you briefly tell the Court about the expansion of her district.

A    Yes, I can. I took–we went to the west–we went east, I mean, northeast to pick up the precincts in the city of Hopewell that had previously been in House [329] District 74 that crossed the river. And we put Ward 6, Ward 2, and I think we split Ward 1.

And we put in several precincts from Prince George County. And that gave her the population necessary to comply with the plus or minus 1 percent.

Q    So, excuse me–I highlighted an area. Is that the area that you removed from Morrissey's district to solve the water crossing problem?

A    Yes, sir, that is.

Q    So the addition of this is in fact an effort to solve a problem in another district that you perceived?

A    Correct. And if I may, if you look at–I can probably do it here. If you look right here, you can see this is Interstate 295. And that's the connector, Rives, Courts Building, et cetera.

Q    And am I correct that now Senator Dance but then Representative Dance voted for this plan?

A    She did. She actively supported it and spoke on the floor several times, to my recollection.

1861

Q   And she played a very significant role in the drafting of this district?

A   She did. She had responsibility for the Richmond area, Petersburg, Southside.

Q   And you needed her political support to pass the plan probably?

[330] A  I felt it very important that we have support of the African-American caucus, black caucus.

Q   We can now move to the Norfolk/South Hampton Roads area. And this would be four districts, and we will look at the regional maps 96–Defendant-Intervenors' 96 and Defendant-Intervenors' 97, page 3.

A   Okay.

Q   Delegate Jones, do you recognize this area?

A   I do.

Q   And can you tell the Court what of the challenged districts that are in this area?

A   Yes, there are four. You have got on the map to the right, you have got the 77th, which is here. You have got the 80th, which is here. You have got the 89th, which is here. And the 90th, which is here.

So they are all really side by side.

Q   And is this an area of the state that has some population pressures on the line-drawing process?

A   And I want to be clear, Hampton Roads had tremendous population pressures for the greater Hampton Roads, but Southside Hampton Roads or South Hampton Roads, which is below the James River, had the loss of over one seat, we lost over 1., I think it was 1.1 or 1.08 seats in population.

1862

Q   Maybe I could help you if we brought up [331] Defendant-Intervenors' Exhibit 72.

A   Okay.

Q   Do you recognize this exhibit?

A   I do.

Q   And how does this–what does this illustrate for the Court and how does it help the Court?

A   It demonstrates the population pressures that were placed on South Hampton Roads as I mentioned earlier. In the 75th you had North Carolina to your south, which you still have here. We have the Atlantic Ocean to our east. And we have the Chesapeake Bay/James River to our north.

So we were constricted from my perspective from going across the river. And so, you can see that of all the districts that are listed, you can see the blue to the left, that is 76. That is in fact my district. I was the only district that had any significant population that exceeded what the number needed to be, so I had to give population back in certain cases. And so, in essence, had to fold away House District 87, which is at the top of the map, where it says 87, minus 10.63 percent.

Q   Essentially the district had to disappear, so it had a ripple effect, is that correct?

A   It had to, otherwise we would have had fingers that would have strung out for miles and miles.

JUDGE LEE: Go over that again.

[332] THE WITNESS: Yes, sir. If you look at the–I'll do it on the screen, Your Honor. Right here is District 87. And the entire population loss in this area starting like here back was over 80,000 people.

1863

So, in essence, we had to lose a seat because we didn't have the population to support the number of seats that we had previously.

And just as a side note in 2001, two seats moved from the Norfolk area to Northern Virginia. So 14 years ago there were five seats in Norfolk, and now there is only two.

BY MR. BRADEN: (Continuing)

Q    Safe to assume that when there are too few seats left, there are some unhappy members in the area?

A    That's correct. And that's why I started off on the floor that day about the population, demographic shifts in the Commonwealth. I couldn't make up what wasn't the truth, and we lost population to Northern Virginia.

Q    If we could go to Defendant-Intervenors' Exhibit 94, page 8 and page 9. And this is District 77. And this is obviously in the Map Book 1.

Can you tell us who represented this district?

A    Delegate Lionel Spruill.

Q    And can you tell us how much this district was underpopulated? Defendants' Exhibit 37 should have that [333] information.

A    It needed about 3,000 people.

Q    And what was the benchmark voting-age pop black?

A    I will go back. It was 57 percent.

Q    And what was the enacted black voting-age pop?

1864

A    58.2.

Q    The change was 1.2 percent?

A    That would be correct.

JUDGE PAYNE: Delegate Spruill's party is what?

THE WITNESS: He is Democrat and he is African-American, Your Honor.

BY MR. BRADEN: (Continuing)

Q    I would like to at this time bring up Plaintiffs' Exhibit 37. And the transcript is–did I say 37? Plaintiffs' Exhibit 34, which is a video clip. And the transcript of this video clip appears at Plaintiffs' Exhibit 33, pages 34 through 38.

NOTE: The video is played.

BY MR. BRADEN: (Continuing)

Q    Delegate Jones, were you present for the speech?

A    I was.

Q    Are you familiar with the concern he expressed in the division in earlier plans of Chesapeake?

A    I am.

Q    This is–you have an adjoining district to this [334] district?

A    We share, we have the most geographical area that we share between the 77th and the 76th, that is correct.

Q    Do you believe this plan addressed that concern?

A    It did. And if you look–if we get the map out, I'll demonstrate. I think there was a comment made yesterday about how it got longer.

1865

Well, of course it got longer because the gentleman from Chesapeake, Delegate Spruill, requested that we reunite the old city of South Norfolk.

Q    Can you highlight that on the map? If you could highlight it possibly.

A    I will show it. Right here.

JUDGE PAYNE: We are on page 8 of Intervenors' Exhibit 94?

MR. BRADEN: Yes, Your Honor.

JUDGE LEE: Say that again. He wanted to reunite–

THE WITNESS: He wanted to reunite what was the old city of South Norfolk. The city of Chesapeake was formed back 50 or 60, 50-or-so years ago from the county, Norfolk County and South Norfolk. And so the precincts–

JUDGE LEE: I am sorry, slow down, you're going really fast.

THE WITNESS: I'm sorry.

[335] JUDGE LEE: Chesapeake was created from South Norfolk and Norfolk.

THE WITNESS: South Norfolk and Norfolk County, part of Norfolk County, I believe.

JUDGE LEE: Thank you.

THE WITNESS: And if you look at the Tanglewood, Oaklette, Norfolk Highlands, and Indian River, they are all in the city of Chesapeake, and they were all part of South Norfolk.

And so, what I did was give those four precincts here that I circled, I took them out of the 90th and gave them to Delegate Spruill.

1866

And then I took, if you look to the left, the yellow Johnson Park, that was in the 80th, so I took those five precincts and combined them at the request of Delegate Spruill for compactness, contiguity, community of interests, and the like.

And the last thing I will show you, and I will stop to answer some of the questions, you can see Delegate Spruill actually lives right on the edge of the district in the Providence precinct, I think.

BY MR. BRADEN: (Continuing)

Q   Would it be an–we have an inset of this map on page 9 that might assist the Court in the smaller details.

A   Okay.

[336] Q  Would it be fair to say this new plan unites Delegate Spruill with a significant part of the neighborhood he lives in?

A   Absolutely.

Q   So there is no surprise that he wanted this section?

A   Not at all.

Q   What's at the western edge of this district?

A   A pretty Republican precinct called Airport.

Q   Where did that go?

A   It went into my district.

Q   That was good for you politically? A Correct.

JUDGE LEE: Can you highlight Airport? Is that on the screen?

THE WITNESS: Yes, sir, I will.

1867

JUDGE PAYNE: They have got a different map up. Page 8 is up. Airport is over to the left.

JUDGE LEE: Page 8. Oh, I see it now. Thank you.

So you drew your own line to add more to your district?

THE WITNESS: Pardon me?

JUDGE LEE: You drew your own line to add more to your district?

THE WITNESS: Yes, sir. I actually drew my [337] district at the very last, I believe I was number 100.

JUDGE PAYNE: Which ones were added at Spruill's request? Tanglewood, Norfolk Highlands, and Indian River?

THE WITNESS: Yes, sir. Oaklette.

JUDGE PAYNE: And Oaklette?

THE WITNESS: Yes, sir. And Johnson Park.

JUDGE PAYNE: And he lives right at the border of where Norfolk Highlands is and very near Oaklette and Indian River?

THE WITNESS: Yes, sir, he does.

BY MR. BRADEN: (Continuing)

Q    Delegate Jones–

JUDGE PAYNE: I think this is probably as good a place as any to break for lunch. So we will resume at 2 o'clock.

NOTE: At this point a lunch recess is taken; whereupon the case continues as follows:

1868

JUDGE PAYNE: All right, sir. I remind you, Delegate Jones, you are under the same oath that you took earlier today.

THE WITNESS: Yes, sir.

BY MR. BRADEN: (resuming)

Q   Delegate Jones, good afternoon.

A   Yes, sir.

Q   We're talking about District 77. I am correct that [338] you are in the adjoining district?

A   That is correct.

Q   So one of the predominate factors in the lines of Representative Spruill's district is their impact on you.

A   Correct.

Q   Let me ask you some questions. Did you consider race in drawing this district?

A   I did.

Q   Did your consideration of race require you to violate any of the Virginia constitutional provisions or any of the criteria adopted by the State of Virginia in drawing this line?

A   It did not.

Q   Did your effort to comply with the Voting Rights Act require you to draw this line in any manner that violated either Virginia, the Virginia constitution, or the criteria as adopted by the House?

A   No.

Q   I'd like to move now to Defendant Exhibit 94, page 12. This is District 90 in the map books. Delegate

1869

Jones, can you tell the Court who was the representative from this district when this plan was drawn?

A   Delegate Algie Howell.

Q   And can you tell the Court—and again, these are the same exhibits to help you, Defendant Intervenor 37, for [339] how much this district was underpopulated?

A   It was underpopulated by 11 point—north of 11 percent.

Q   And this is the Defendant Intervenor Exhibit 56, and the benchmark black voting-age population was?

A   For 90 was 56 percent.

Q   And the enacted voting-age population which is in Defendant Exhibit 57?

A   Was 55.6.

Q   So the enacted plan had a marginally less voting-age population; is that correct?

A   That would be correct.

Q   And how much input did you get in drawing this plan from Delegate Howell?

A   I received extensive input from Delegate Howell and then-Delegate Alexander.

Q   And is Delegate Howell an African American?

A   He is.

Q   And can you provide to this Court information about the—about how you drew the plan at the request of Delegate Howell?

1870

A    Yeah. I can. I think it might be helpful to explain what was happening in the population if we can get the regional map before and after.

Q    Yep, I think we can find you the regional map for this [340] area. Does that one assist–it's the other one. I think these are Defendant Intervenors' 96 and 97, if that would assist you.

A    If you notice on, I think it's 96, you can see in the purple or right here, that's District 87, and that district went to northern Virginia. So that caused–on the map to the left, you can see the green here, that caused District 83 to go this way, and then House District 100 came down over here, and then that left really this population here for Norfolk generally like this.

So when I had to draw House District 90, of course it needed about 9,000 individuals to get to the ideal population, and as I just mentioned, House District 77 on the easel there, we took four precincts which were Oaklette, Tanglewood, Norfolk Highlands, and Indian River out of the 90th. So 90 picked up population that used to be in the 87th in the city of Norfolk.

Q    Would it be useful for us to go back?

A    Yes, it would be. I thought it was important to show what happened to the general population shifts in that region. So as you can see here, I went north to pick up population out of parts of 87, had dropped this portion that was in Chesapeake, and then they picked up additional voters in Virginia Beach which they were already in–

1871

Q   I don't want to interrupt, but the part in Chesapeake [341] is basically what we talked about just before lunch?

A   That is correct. And then they picked up over here in the Baker side, like you go to the Hampton Roads–I mean to the Chesapeake Bay Tunnel, we added these two precincts to it.

So it got a little geographically larger, I guess might be the term, but it needed about 9,000 people to get to the ideal population.

JUDGE PAYNE: So on page 12 of Exhibit 94, you added Tanner's Creek, Sherwood School, and Coleman Place School; is that right?

THE WITNESS: Yes, sir.

JUDGE PAYNE: You've got circles around other areas, but are those the only ones that were added in that area?

THE WITNESS: Yes, sir, in that area.

JUDGE PAYNE: Then over on the far side, you added Davis Corner, and does Davis Corner go around Newtown? It looks like it's cut off by Newtown.

THE WITNESS: I believe, Your Honor, that is part of Baker precinct, because the Baker precinct was split back in 2001.

JUDGE PAYNE: Which part of Baker?

THE WITNESS: Right here. I believe this is part of Baker, part of this.

[342] JUDGE PAYNE: So the part north of Newtown is really part of Baker, not part of Davis Corner.

THE WITNESS: I believe so.

1872

JUDGE PAYNE: And you added Davis Corner to District 90.

THE WITNESS: Correct, yes, sir.

JUDGE PAYNE: Did you add that part that's circled above it at the tip also to 90 from 87?

THE WITNESS: I believe that might have come from 83. I have to go back and look at a comparison, but it came either from 83 or 87.

JUDGE PAYNE: And then you added down at the bottom Sherry Park and College Park.

THE WITNESS: Yes, sir, that's correct.

JUDGE PAYNE: What did you say about–that part of Tanglewood and all that went to 70.

THE WITNESS: Yes, sir. That was part of the request of Delegate Spruill. That would be the south Norfolk area.

JUDGE PAYNE: Excuse me?

Q   Delegate Jones, did you consider race in drawing this district?

A   I did.

Q   Did your consideration of race require you to violate any of the Virginia constitutional provisions or any [343] criteria as adopted by the House?

A   It did not.

Q   Did your consideration of the Voting Rights Act and your belief as to how to comply with the Voting Rights Act require you to draw this district in any way in conflict with the Virginia constitution or the adopted criteria of the state?

A   No.

1873

Q   And this district was drawn with the advice and, shall we say, consent of Delegate Howell?

A   Yes, sir.

Q   We'd like to go to Defendant Exhibit 94, page 11. And this is District 89. Delegate Jones, referring to the separate exhibits we've been referring to, can you tell this Court how underpopulated this district was?

A   It was about seven, a little over seven percent underpopulated.

Q   This is Defendant Exhibit 37. So about 5,700 people underpopulated; is that correct?

A   Correct.

Q   And Defendant Exhibit 56, the benchmark voting-age population was?

A   In the benchmark plan, it was 51.7 percent.

Q   And in the plan as adopted, Defendant Exhibit 57, the voting-age black population is?

[344] A  54.8.

Q   Was–the delegate that represents this district is?

A   Former–well, Senator Alexander. He was a delegate at the time.

Q   And at that time, did you get significant input from Delegate Alexander in drawing this district?

A   I did.

Q   And can you explain the reasons for the changes in the district?

A   Yes. Of course it needed population, and so did its neighbor and its neighbor to the south and to the east–I mean to the west. Well, all around needed population I should say.

1874

So we had to expand the footprint to be able to meet the ideal population of 80,010, and so we went and picked up Larchmont on the west side, northwest quadrant. You can see here, I'm circling now, Larchmont Library, Larchmont Recreation Center, and Tucker House. Those precincts, in essence, came from the 79th and, I think, the 80th, and then precincts in the southern part, they basically came from the 90th which was Delegate Algie Howell.

Q   Can I interrupt you for a second? Am I correct that this is a principal river crossing here?

A   It is. And then we did have some cuts, precinct cuts [345] up here in this part of the district, I would add, and that was at the request of now-Senator Alexander. He actually has a funeral home that's located on Granby Street, and Granby Street is this road right here that runs down the heart of the city.

Q   So am I correct to understand that you split those VTDs so–pursuant to his request to put a funeral home in his district?

A   That is my recollection, yes, sir.

Q   Any other areas of the district that you want to point out to the Court?

A You can just see on the hash, these areas here, they actually went into the other districts. And if you notice here–I've got too many circles. I apologize to the Court, but this last circle I'm drawing here, that used to be in the 87th, and that ended up going into the 100th for population reasons. That includes the Eastern Shore of Virginia which is geographically isolated in the sense that you have to go across the Bay-Bridge Tunnel to get to it.

1875

JUDGE PAYNE: So you are talking about adding Suburban Park, Wesley, and–Titustown Center to the 100?

THE WITNESS: Yes, sir.

JUDGE PAYNE: You said that you split VTD at Alexander's request to get his funeral home in a district. [346] What does that have to do with redistricting?

THE WITNESS: Well, community of interest. I know, and if I may, I'm a pharmacist, and I have represented in one form or another for almost 30 years, and I'm in the community every day. I see my constituents and service them.

They come and ask me about how my wife's doing, they have an issue with a pothole, and so he lives in the community and has, I think, two funeral homes in the city of Norfolk, and he thought he could better represent by having part of that territory in his district.

JUDGE PAYNE: People he represented in his business; is that what you are saying?

THE WITNESS: No, I think–we're a part-time citizen legislature, and I think our way of doing it in Virginia is the best way. I don't think full-time at the state level is a good way to do it, and I think we're closer to the people when we are in the community working.

JUDGE PAYNE: Thank you, sir.

Q    Delegate Jones, did you consider race in creating this district?

A    I did.

1876

Q   Did your use of race require you to violate any provisions of the Virginia constitution or the criteria as adopted by the Virginia House?

[347] A  It did not.

Q   Did your efforts to comply with the Voting Rights Act in drawing this district, did it require you to violate the Virginia constitution or any provision of the criteria?

A   No.

Q   If we could move on to Defendant Intervenors' Exhibit 94, page 11, and this is district–oh, ten.

JUDGE PAYNE: Page what?

MR. BRADEN: Page ten. Sorry. Mistake on my part. Page ten.

Q   Defendant Intervenor Exhibit 94, page ten, this is a representation of District 89?

A   No.

JUDGE LEE: 80.

JUDGE PAYNE: 80.

THE WITNESS: 80.

Q   Can you tell the Court who represented this district at the time that it was enacted?

A   The current incumbent, Matthew James.

Q   And can you inform the Court on how much this district was underpopulated?

A   Almost 12 percent. It needed over 9,400 individuals to get to the ideal population.

1877

Q    And at the time that the plan was adopted, the [348] benchmark number was, of the black voting-age pop, Defendant Exhibit 56?

A    Was 53.9.

Q    And in the enacted plan, the black voting-age population is?

A    55.8.

Q    Is there a government facility in this area that might be important to the line-drawing process?

A    Well, actually, it is. I would refer the Court, and this is not in the 80th but it is in the top corner here, this is the Norfolk Naval Base which is what I had referred to earlier when we received the census data that was incorrect.

This was the House district in question that I knew there was something incorrect with the data we had gotten from the census bureau. It was like 19,000 people in like one census block.

Q    So am I correct that if one was to understand the line-drawing process in this area, you would have to actually be aware of where the naval base was that would influence your process?

A    That is correct.

Q    Did Delegate Jones have some significant input into drafting of this district?

A    You mean Delegate James?

[349] Q  Delegate James, yep.

A    Yes, he did.

1878

Q    And can you describe to the Court, I think it's fair to say honestly that this district looks a little irregular. Can you explain as to why it has this shape?

A    Yes, I'll be glad to. The dilemma, as I mentioned earlier, was a loss of population and then how we dealt with moving from the oceanfront back towards western–move western to Suffolk, and so when we got to this district, you can see that it had a need of about 9,400 people.

Its neighbor, I think, had a need of 6- or 7,000 as well. And so what I actually did was we took the 9th and the 7th precincts here. They came out and went into the 79th, and we, in essence, traded this territory right here, which was currently in the 79th, and gave it to the 80th. This is another case of population rolls because of, you know, the suburban growth, vis-à-vis the decline in the rate of growth in the inner cities.

JUDGE LEE: I'm sorry. I could not process as fast as you said it. Could you go through it again?

THE WITNESS: The dilemma that I had was you've got the city of Portsmouth which is here, city of Norfolk which is here, then you have the city of Virginia Beach. So these three cities–

[350] Q  See if that helps. Sorry.

A    These three cities had not grown at the same rate the rest of the Commonwealth had, Your Honor. So even moving the 87th seat out of the region, we still had a need for additional population. And I did not want to cross the river.

That was one of my things that was noted in the *West v. Wilkins* case, and so I was really constricted on three sides; North Carolina, the ocean, and the James River.

1879

So what I did in working with Delegate Joannou, who is white, Democrat, who represents the 79th which is here, and Delegate Matthew James who is African American in the 80th here, on a way to roll the population around like this to make sure Delegate Joannou had a sufficient number of residents in his district.

I will note that it is a narrow neck here, but I would note if you see right here, that's where Delegate Joannou lives, and then down here to your left on the bottom is where Delegate James lives. So geographically we were somewhat restricted in that regard.

Q    You were attempting to not pair the two incumbent members?

A    Obviously I was not looking to pair the two incumbents.

Q    And that would be consistent with the criteria adopted [351] by the House committee?

A    That is correct. We only paired incumbents where we absolutely had to.

JUDGE PAYNE: It's different to say you weren't trying to pair incumbents, but were you trying not to pair incumbents in making a decision on 80?

THE WITNESS: I was trying not to pair incumbents, yes, sir.

JUDGE PAYNE: So the record is clear, what you did over here, you circled this big area. You took some– this precinct seven and precinct nine, you took those out and gave them to whom?

THE WITNESS: I gave them to Delegate Joannou.

JUDGE PAYNE: In 79.

1880

THE WITNESS: Yes, sir, that is correct.

JUDGE PAYNE: Then to compensate for that, you added the areas in where, 38, Taylor Road and Yeates?

THE WITNESS: Correct, yes, sir, and Harbor View which is right above Yeates and Taylor Road.

JUDGE PAYNE: Oh, yes, I see. You also added–

I guess there's an area called 34 and 33.

THE WITNESS: Yes, sir, that is correct.

JUDGE PAYNE: Those aren't precincts. That's by number–or are they numbered precincts?

THE WITNESS: They are precincts in the city of [352] Portsmouth.

JUDGE PAYNE: Okay. Sorry.

Q   Why don't we–we had a little discussion here regionally, so let us pull back up the regional map. This might help the Court and might help him to be able to illustrate it. Is this more useful to you, Delegate Jones?

A   I thought we had the other map that had the actual district numbers with the percent loss in population. That might be better. Do you want to do them side by side? Okay, we'll do side by side.

JUDGE LEE: Exhibit numbers?

MR. BRADEN: Exhibit 72, Defendant Intervenors' Exhibit Number 72, page one.

THE WITNESS: All right, I'm there.

Q   So does this help you illustrate for the Court the population pressures in that area?

A   Correct.

1881

Q   Thank you. If we could, let me talk real briefly, when you drew this district, did you consider race?

A   I did.

Q   Did your consideration of race in the drawing of this district require you to create any lines or any part of this district that violates the criteria as adopted by the House committee or the Virginia constitution?

[353] A  It did not.

Q   And did your compliance with the Voting Rights Act require you to violate any Virginia constitutional provision or any Virginia criteria as adopted by the House?

A   No.

Q   So let's jump over to District 89, and this is Defendant Exhibit 94, page 11.

MR. BRADEN: Wrong district. My apologies. So we are ready to swim across, drive across, boat across to the peninsula, and if we could bring up Defendant Exhibit 96 and Defendant Intervenor Exhibit 97, and page two. This will also be in the regional map books. Map book one.

THE WITNESS: What item number?

Q   This is Defendant Intervenor Exhibit 96, page two, and Defendant Intervenor Exhibit 97, page two, and it's also in that big regional map book. These are the peninsula. The two districts are 92 and 95.

A   I have them.

Q   So 96 and 97, can you briefly tell the Court what those are.

A   96 and 97, 96, page two, is the actual districts, so the benchmark districts that existed in 2010 when

1882

the census data was received, and the next map, page two, is [354] actually the districts as they existed after the passage of House bill 5005.

Q   And then can we bring up the Defendant Intervenor Exhibit 73. And what does this map show to the Court?

A   This shows the population deviations for that region, which is a peninsula, as you can see by the—I think this is the York River here and this is the James River here.

Q   And are the significant population pressures in the line-drawing process here?

A   Absolutely.

Q   I'd like to bring up Defendant Exhibit, Intervenor Exhibit 94, page 13, House District 92. Can you tell the Court what district this is.

A   This is House District 92 represented by Jeion Ward who is African American and a Democrat.

Q   And can you tell the Court using Defendant Exhibit–Defendant Intervenor Exhibit 37 how much this district was underpopulated?

A   This was one of the more underpopulated. It was almost 9,000 people.

Q   So would it be an exaggeration to say it needed quite significant changes?

A   It did, and I would note, not to go back and forth, but the district immediately to its north, 91, actually [355] had the greatest population loss, I think, in the Commonwealth, in the region I know, of almost 19 percent.

1883

Q   So to really understand the needs here, you have to look beyond the single district but the whole region.

A   I looked at all five, and it was about a 55,000 or 52,000 difference that I needed to make up to keep the number of seats on the peninsula as they existed.

JUDGE LEE: Repeat that.

THE WITNESS: Yes, sir. The way the districts existed before we started drawing the lines, if you go back to the previous map, which I think was number 73, if you can do that for me, I think that's right.

I'll show the Court, if you start going clockwise, the 91st is down 19 percent. Then you can see the 92nd is down over 11 percent. Then 95th is down 15 percent. Then you can see the 94th is down over ten percent, ten and a half percent, and then right here, the 93rd is down almost nine percent.

So those five districts together had a population need of 52- or 53,000 individuals to keep them whole. That was a dilemma that I faced when I was looking to draw the lines on the peninsula.

Q   If you'll look to Defendant Intervenors' Exhibit 56, page three, what was the benchmark voting-age population of this district?

[356] A  For 92, it was 61.1.

Q   And in the enacted plan, which is Defendant Exhibit 57-4, what was the black voting-age population?

A   It was 59.8.

Q   So it went down in this district.

A   Yes, it did.

1884

Q   And can you–did you–in the creation of this district, were you in consultation with the incumbent member?

A   I was.

Q   And can you discuss how you came up with this configuration?

A   In working with her–in working with her, it was a priority for her to reunite downtown Hampton, which is all around here, and so we took those precincts away from the 95th district, which was Delegate BaCote, and that completed that part of Hampton and made it whole. And as you can see, the incumbent member lives right here. She lived up in the top part of the existing district when it was completed.

So she had population needs and local requests as far as reuniting certain parts of the city of Hampton.

JUDGE PAYNE: You say you reunited–did the reuniting mean that you moved Kraft, Forrest, and Mallory into it?

[357] THE WITNESS: Yes, sir.

JUDGE PAYNE: Did you move anything else into it?

THE WITNESS: Wythe at the bottom.

JUDGE PAYNE: Wythe?

THE WITNESS: Yes, sir, right there.

Q   And is part of this district on ward lines or the interstate?

A   Yes.

Q   Let me clear it up for you.

1885

A    I'll show it. Clear it for me, please. The inter-state runs like this.

Q    And some of the other lines in the district reflect city ward lines?

A    Yes.

Q    In drafting this district, did you consider race?

A    I did.

Q    Did your consideration of race require you, in drafting the district, to draw any lines that resulted in a violation of the Virginia constitution or any of the criteria adopted by the House of Delegates?

A    It did not.

Q    Your consideration of compliance with the Voting Rights Act, did that require you to draw any–this district in a manner that violated the Virginia constitution or any requirements of the criteria adopted [358] by the House of Delegates?

A    No.

Q    Would it–in your opinion, is this district more compact than its prior district?

A    In my opinion it is, yes, sir.

MR. BRADEN: Can we go to District number 95. This is Defendant Intervenor 94, page 14. Would it be fair to say this district is not more compact?

A    Yes, sir, that would be safe to say.

Q    Can you tell us who the member was that lived in this district at the time it was enacted?

A    Delegate Mayme BaCote.

Q    And is that delegate an African American?

1886

A    She is, and she's a member of the Democratic party.

Q    And did she have significant input in the crafting of this district?

A    She did.

Q    And can you, by going to Defendant Exhibit, Intervenor Exhibit 37, page one, can you tell the Court how much underpopulated this district was?

A    She had a population need of over 12,000.

Q    And going to Defendant Exhibit, Defendant Intervenor Exhibit 56, page three, the benchmark black voting-age population was 60.9?

A    That is correct.

[359] Q  And the enacted voting-age population in the present plan is?

A    59.

Q    Is that a slight drop?

A    It is.

Q    Is part of the construction of this district significantly political?

A    It is.

MR. BRADEN: I'd like to bring up Defendant Exhibit, Defendant Intervenors' Exhibit 92, pages 24 and 25. And this exhibit appears in map book three. So it's a different ring binder that's behind you.

MR. SPIVA: Excuse me, Your Honor. This exhibit, I don't believe, is in evidence. I think this is one of the ones that we objected to.

JUDGE PAYNE: What was the number you objected to under?

1887

MR. SPIVA: I think it's the same number, Defendant Intervenors' 92.

JUDGE PAYNE: I thought it was 93. What are we on, 92 or 93?

MR. BRADEN: 92, Your Honor.

JUDGE PAYNE: Map book three.

MR. BRADEN: Map book three.

JUDGE PAYNE: As I understand it, you object to [360] this one?

MR. SPIVA: Well, I guess the question, if they're offering it into evidence–

JUDGE PAYNE: They haven't offered anything yet. They just identified it for us. Do you want to wait and see what comes and abide the event, and then you can make an objection if and when it's necessary to do that?

MR. SPIVA: Will do, Your Honor.

JUDGE PAYNE: Okay.

MR. BRADEN: Your Honor, we had originally proposed this as an exhibit, and we believe that it's appropriate as an exhibit, but if the Court would prefer, we're happy to offer it as a demonstrative instead to avoid the dispute.

JUDGE PAYNE: Why don't you lay your foundation. If it comes in, it comes in. If it doesn't, it doesn't.

Q    Delegate Jones, do you recognize what these maps are?

A    I do.

Q    And are these maps similar to screen maps that you saw during the drafting of the plan?

1888

A    They are.

Q    Do they appear to be screen shots from your Maptitude redistricting software?

A    They are screen shots from Maptitude software, not from mine.

[361] Q  And as part of that process, your Maptitude system had layers of partisanship?

A    That is correct.

Q    Which could be displayed by different color gradations?

A    That's correct, and that's the way that I did it when I was doing the map.

Q    You also have a screen shot here of districts showing another layer of information in your system which would be race.

JUDGE PAYNE: You are on pages 24 and 25 of this document; is that where you are?

MR. BRADEN: Yes, Your Honor.

JUDGE PAYNE: All right.

Q    So during your map-drawing process, would you have before you on the screen maps that were the same or substantively the same as these when you were drawing?

A    Yes.

Q    And what would you use these for?

A    Republican performance.

JUDGE PAYNE: What's that?

THE WITNESS: Republican performance in the general election in 2009 for governor.

1889

JUDGE PAYNE: You mean that's what page 24 was used for?

[362] THE WITNESS: Yes, sir, I'm sorry.

Q   Page 25 is race?

A   Correct.

Q   So when you were drawing the maps, you could use a map like this to determine what the good Republican areas were?

A   Absolutely.

Q   And the bad Republican areas?

A   That would be correct.

Q   When you drew this plan, were there political considerations, partisan political considerations involved in drawing this plan?

A   There were.

Q   So if you could just briefly–and I know that there's a legend there–

JUDGE PAYNE: Excuse me just a minute before you do that. This Exhibit Number 92, does it follow the same pattern, and that is that it has for each district the percent Republican as shown and the percent black BVAP as shown?

MR. BRADEN: Yes, Your Honor.

JUDGE PAYNE: Each of the districts. You are focusing your questions now on 95 because we're on 95.

MR. BRADEN: That's correct, Your Honor.

JUDGE PAYNE: All right, now I see. Yes, sir?

[363] MR. SPIVA: Your Honor, I guess I still object because he is essentially offering it for the truth. If I

1890

can voir dire the witness–because this did not exist at the time. This is not from the time when he was making the maps. This was created–

JUDGE PAYNE: He hasn't offered it yet. As best I know, he was just asking him if he used these things, and I suppose in an attempt–or something like this in an attempt to lay a foundation for this document presumably on the basis that it's similar to a document that doesn't exist anymore. I gather that's, from your briefing and his questions, what he's doing.

At that time then you can object, but he hasn't done it yet, and if he gets into asking questions that are substantive as opposed to did you see these documents, then perhaps you may have an objection, but let's wait and abide the event, if you will.

MR. SPIVA: Will do, Your Honor. Maybe I jumped the gun a little bit there.

JUDGE PAYNE: Well, all of us did at one time or another including sometimes when you sit on this side of the bench.

JUDGE LEE: That's true.

Q   Am I correct that, to your knowledge, with the exception of the color scheme, this is essentially [364] identical to the maps that you used in drawing the plan?

A   That is correct.

Q   And you understand the information to be simply census information?

1891

A   Census information on map–on page 25. On page 24, it would have been voting–political data in the sense of election data that was being considered by me from the 2009 governor's race between Governor McDonnell and Senator Deeds.

MR. BRADEN: The value of this to the Court, it seems to me, to be self-evident since it illustrates one of the key issues in the dispute before this Court, whether race predominated–

JUDGE PAYNE: Are you asking him a question?

MR. BRADEN: I'm offering it as evidence to this Court.

JUDGE PAYNE: Now it's been offered. What is your objection?

MR. SPIVA: My objection–I'd like the opportunity to voir dire, Your Honor–is that this was not produced and didn't exist at the time that he was, um, creating the map.

JUDGE PAYNE: As I understand it from your briefing papers, these documents were produced after the fact by relying on his memory, telling his lawyers what he [365] looked at, and they went or somebody went out, an assistant went out made this document. Is that what happened?

MR. SPIVA: That's what they said, yes.

JUDGE PAYNE:

Is that what happened, Mr. Braden?

MR. BRADEN: Yes, Your Honor.

THE COURT: So what is your objection? He got that real loud. About the only thing we can hear.

1892

MR. SPIVA: The objection, Your Honor, is that this was not the actual maps that he was looking at and dealing with at the time. I guess it's a relevance objection. It's also a discovery objection, because if this was actually–if this had been created at the time and existed, it would have needed to be produced to us during the discovery period.

JUDGE PAYNE: The later doesn't work.

MR. SPIVA: It's not disputed–

JUDGE PAYNE: My question is this: Was it given to you as soon as they created it?

MR. SPIVA: Yes, but that was years after–

JUDGE PAYNE: I understand that, but that's not a discovery issue. They couldn't have produced something to you that actually didn't exist. So that's not an issue. That objection is overruled. Now your objection is its relevance?

[366] MR. SPIVA: Yes, Your Honor. It's irrelevant. This was something that was created after the discovery period had ended and then was produced to us at that point. That's not proper.

JUDGE PAYNE: I think the relevance is overruled, too. I think it fits the definition of relevance, and we can take into account, in ascribing what weight we want to ascribe to it, the fact that it was prepared on the basis of his memory as he's testified, but since he's testified this replicates what he looked at, I don't see how it can be irrelevant. So the objection is overruled.

Q    Delegate Jones, I believe in addition to race and politics and geography, this map also has an indication of where the incumbents live?

A    It does.

1893

Q   And can you illustrate to the Court where the incumbents live that are in District number 94?

A   This might not be the best map to do that on, quite frankly.

JUDGE PAYNE: District 94?

MR. BRADEN: Yes.

THE COURT: What page is that on?

MR. BRADEN: That's on this page. It's the adjoining district. There's a dot right next to the border of 95 going up. It, frankly, explains why the [367] district looks that direction, goes that direction.

THE WITNESS: I can circle it for you. The incumbent in the 94 was Delegate Glenn Oder, my seat mate, right there, and then the incumbent in the 93rd lived right here. Then the incumbent in the 95th, which is Delegate BaCote, lives right here.

JUDGE PAYNE: Where you are saying these delegates live, it looks like there's a circle with two parts of it, two pieces of five colored black; is that what you are indicating?

THE WITNESS: This is not the best map, from my perspective, to be doing this exercise. If they can find the one that actually is clearer. I think what you have in 94 might be a better way to demonstrate it, in my opinion. I think it would be page 14, Defendant Intervenors' 94, page 14. Thank you.

Q   Can you point out to the Court on this map, which I think you are correct is clearer for that purpose, where the incumbents live.

A   I can. Glenn Oder lived right here. Delegate Abbott lived right here. Excuse me, I didn't mean to drag my finger.

1894

JUDGE PAYNE: Abbott is 93 and Oder is in 94?

THE WITNESS: Yes, sir. Then you can see down here, Your Honor, that Mayme BaCote is right on the edge [368] of this right here. She's down here in Newport News.

JUDGE PAYNE: She is in 95?

THE WITNESS: Yes, sir. And then just for illustrative purposes, you see that Delegate Ward in 92 is right here. So you had your four incumbents in the lower part of the city, and my thought process of not wanting to cross the river and not wanting to go across to the York River up here, you know, my dilemma was I had 50-some thousand people I needed to be able to make these four districts hold on a peninsula, and I did not feel that was probable or made sense in drawing a map for communities of interest, because it would have been strung–been very long, stringy districts had I tried to keep four in that lower part of the city.

JUDGE PAYNE: The record will reflect that Intervenor Defendant Exhibit 92 was admitted but over objection.

Q   Can I ask, did this configuration create an open district just north of 95?

A   It did.

Q   So if we can go back to Defendant Intervenors' Exhibit 92, page 24 and page 25 of the map book, the– am I correct that the lighter-colored red, yellow, orange reflect more heavily democratic areas?

A   It does.

[369] Q  And it would–am I correct that this district seems to go up the peninsula to get all–please jump in

1895

if I'm wrong–all the yellow precincts that are heavily democratic?

A   It does.

Q   And was that particular district the open seat? Did you perceive that was likely to be a swing seat?

A   I did perceive it as a swing seat. As a matter of fact, the last two elections have indicated that is, in fact, the case. A Republican won in 2011, and a Democrat won in 2013.

Q   So am I correct that stretching all the way up there resulted in a district, an open seat that was substantially more Republican than it otherwise would have been?

A   Correct.

Q   And a little further down, sort of halfway up the leg, there is an incumbent democratic member very close to the border of 95?

A   That is correct.

Q   But is not in 95.

A   I did not want to pair the two female democratic incumbents.

Q   So that decision was driven by the fact you didn't want to pair two female members.

[370] A  That is correct.

Q   If you could look at page 25, the facing page, am I correct that the darker the green is, the more African American it is?

A   Correct.

1896

Q   The very–if I could move all the way up 95 on this map, that's sort of–am I correct that's sort of medium green, for want of a better description?

A   Yes.

Q   But on page 24 at the end, that last VTD, that last precinct is very heavily democratic?

A   It is.

Q   Going down, a couple more precincts down, if you want to compare the area that's in the district versus the area that was cut out of the district using these two maps.

A   Yes. You can see that the Republican performance on the outskirts, on the border, I should say, of the lines here, on this side and that side, you can see is better Republican performing than contained within the 95th which is right there (indicating).

JUDGE PAYNE: Republican performance either side of the 95th is elevated.

THE WITNESS: Yes, sir, that is correct, and if I can, I'd like to show maybe the one that shows the interstate, because I think we followed that line when we [371] were making these precinct cuts to follow like we did in House District 63 and 75, Interstate 85.

JUDGE PAYNE: Now you are talking about Interstate 64.

THE WITNESS: Yes, sir, I am, that's correct. So if you look, you can see–earlier when I was talking about 92, interstate comes like this and goes like this and goes straight up Bland Boulevard. So you can see we followed the contour of the population to the west of Interstate 64 up here, and then I believe this is Route

1897

60 which runs up into Williamsburg, and so we used that road as our border to the far west.

And so we picked up that population using, really, 64 as our line of demarcation. And I would notice it's obvious here where we jumped over.

I had to jump over, quite frankly, so I would not include this incumbent with this incumbent here, the two female incumbents that I just mentioned.

JUDGE PAYNE: What did you jump over where to not include which incumbents? A lot of indefinite pronouns, and I didn't follow what you are saying.

THE WITNESS: My apologies, Your Honor. Sandy Bottom right here–

JUDGE PAYNE: Jumped over Sandy Bottom–

THE WITNESS: No, no. I picked up Sandy Bottom, [372] and I picked up Saunders, and then I went over and picked up, I think it's Palmer.

JUDGE PAYNE: Why did you do that?

THE WITNESS: So I would not have included right here. If I had gone straight, up I would have included Delegate Abbott in the district with Delegate BaCote.

JUDGE PAYNE: And you wanted to avoid that?

THE WITNESS: I wanted to avoid that, yes, sir. That was my objective.

JUDGE PAYNE: Those were the two females members you wanted to keep from competing against each other.

THE WITNESS: That is correct.

Q   Did you consider race in drawing this district, 95?

1898

A    I did.

Q    And did that consideration of race require you to violate any of the criteria of the state as adopted by the House or the Virginia constitution?

A    It did not.

Q    And your effort to comply with the Voting Rights Act, did that require, when you drew this district, for you to violate any criteria?

A    No.

Q    Or the Virginia constitution?

A    No.

Q    And it's long and stringy for a significant, at least [373] in part, reason. It was to create an open seat with fewer Democrats in it above it?

A    That's correct, and also, if you look at the makeup of the seat, it does have a vestige of 93. This part right here would be kind of a holdover from the 93rd, going further up, but yes.

JUDGE LEE: Which one is the open seat?

THE WITNESS: 93 which moved northwest.

JUDGE PAYNE: That's part of–which one is the open seat?

THE WITNESS: 93.

JUDGE PAYNE: 93. I thought you said 95.

THE WITNESS: 95 was Delegate BaCote's majority-minority seat which is right here.

Q    And that particular district, that was the district that was–the open seat was–is that the ferrymander district?

1899

A    Yes, it is. That was the other district that crossed the James River, and it was connected, Surry and Williamsburg, by the Jamestown/Yorktown ferry. Jamestown/Surry ferry, excuse me.

Q    So as part of drawing this plan, you eliminated that ferrymandered part?

A    I did. I took both river crossings out of play and went back across to the north and back across to the [374] south. North we went back across on the 74th, and we came south on the 64th.

Q    And that particular configuration, quote unquote, the ferrymander had been substantially criticized?

A    It had in the *West v. Wilkins* case, that is correct.

JUDGE LEE: Where is that on this map?

THE WITNESS: We can–

MR. BRADEN: We'll pull up the regional map for you, Your Honor.

Q    Does that work for you?

A    This works very well to illustrate.

JUDGE LEE: Exhibit number?

MR. BRADEN: 96, page two.

JUDGE LEE: Thank you.

JUDGE PAYNE: Just so I understand it, and I may be confused now, but are you saying that one of the things you did in creating House District 95 was to–was thatit helped to eliminate the ferrymander that previously existed, or what is the relation of the ferrymander to 95?

1900

THE WITNESS: Population. The need for population. As I mentioned earlier, Your Honor, we had about a 52,000-person deficit on the peninsula, and it was about 30,000 or so I think in the 64th, and I will show here on the screen. This part right here in the brown, tan, that's actually what's part of the 64th which is [375] basically geographically located here on the Southampton or south side of the river.

And so by moving this population over, I gave this a population available to go into 97, and 93 went from here–it won't work–to basically up here. So there was a need for population, so by undoing what was done in 2001, I picked up additional population on the peninsula that would help keep the same number of districts on the peninsula that existed prior to House bill 5005. But it necessitated me moving that 93rd district northwest because of geographical limitations on the peninsula.

JUDGE LEE: You added Williamsburg city.

THE WITNESS: Yes, sir.

JUDGE LEE: To the area including Surry.

THE WITNESS: That was back in 2001. So I unwound Williamsburg and James City County from the attachment to the south side.

MR. BRADEN: It might help the Court if we can bring up the new map side by side here, I believe.

JUDGE LEE: As long as you blow it up. I'm a grownup.

MR. BRADEN: Maybe we'll bring it up by itself. Does that help the Court? We can bring it up singly.

1901

JUDGE LEE: Bring it singly. I want to make sure [376] I understand what you are saying. I think I understand. I want to make sure.

THE WITNESS: Your Honor, this would be the new districts as they exist because of House bill 5005. So what had to occur was because of the loss of population down here, we moved the 93rd from, in essence, this part of Newport News, from here up to here. My dots won't work, to Williamsburg.

And so you can see it just moved northwest in its configuration and size, because it's not as populated, so you can see this is the new configuration of the 93rd.

What existed previously was this part basically was on this side of the river like this. I didn't mean to draw a heart, but I guess I did. My wife might like that.

JUDGE LEE: The point you are making is that you were able to use the river as a natural boundary, and then you expanded the 93rd up from Newport News up around the coast. You skipped over part of it to Williamsburg and James City.

THE WITNESS: That is correct, Your Honor.

JUDGE LEE: I understand now. Thank you.

MR. BRADEN: And I can switch gears here a little bit, Delegate Jones.

Q   Were there–in addition to the two plans that passed the House and one of which became law, HB 5005, were there [377] other plans introduced into the Virginia House? A There were.

Q   And do you remember what those two plans were?

A   There was House bill 5002, I believe, which was a University of Richmond plan. There was a contest

1902

that Governor McDonnell's redistricting commission had, I guess had all the institutions and interested parties provide maps to the commission.

Q   So there was two plans, a 5002 and a 5003? A Right.

Q   What was 5004?

A   5004, I think, was Congressional, if I remember correctly.

Q   And you had no role in the drafting of the Congressional plan?

A   None, none whatsoever.

JUDGE LEE: 5002 was University of Richmond. What did you say 5003 was?

THE WITNESS: It was George Mason, if I recall, Your Honor.

Q   And those were the only two plans introduced into the legislature as House bills?

A   That is correct.

Q   And any member who wanted to could have introduced an additional bill?

[378] A  That is correct.

JUDGE PAYNE: You mean the only two plans offered as alternatives to what was 5005; is that right?

MR. BRADEN: Your Honor, I think they were originally alternatives to 5001, the plan that was vetoed by the governor. It think it wouldn't be unfair to say that they were still alternatives to the 5005 as passed.

JUDGE PAYNE: Is that right?

THE WITNESS: Yes, sir, that's correct.

1903

Q   Could either of those plans pass, be seriously considered by the House of Delegates?

A   No.

Q   And why not?

A   Well, House bill 5002, if I recall correctly, paired, I think, 40 incumbents together.

Q   Was it 40 or 48 incumbents; do you remember?

A   I think it was 48, but it was a whole bunch.

Q   And there are only 50 members in the chamber; right? A There's a hundred, so they got almost half of us.

Q   Would it have been easy to get to a majority with 48 paired members?

A   I doubt it. And I believe they only had six majority-minority districts in the map, the bill that was presented by Delegate Brink.

Q   Do you remember whether the population deviation met [379] the two percent range in the criterion?

A   I think it–I believe it was–they had plus or minus nine percent, I believe. They were like minus 4.4, 4.7 to plus 4-something, so over nine percent deviation.

Q   Do you remember where that plan paired you with some other members?

A   Yeah. I was paired, I think, in both plans.

Q   And HB 5003, do you remember how many members were paired in that?

A   I believe it was 32, maybe, or 34, something like that.

1904

Q   And did that plan meet the requirements of the criteria for population deviation?

A   It did not.

Q   And do you remember how many majority-minority districts were in that plan?

A   Either nine or ten. It was not 12.

Q   Was any bill introduced in the legislature that you're aware of that had 13 black voting-age population House districts?

A   No.

Q   When former Delegate Ward Armstrong was talking about option one and option two, do you know what he was talking about?

A   I believe it was, again, from the commission, the [380] governor's redistricting commission. I think one might have been a 13 or maybe a 14 majority-minority seat map. It wasn't a bill. It was never introduced nor proposed.

Q   Ward Armstrong never introduced it as a bill?

A   No, never talked to me about it, never discussed it with me, period.

Q   And no other member brought this to the floor as–and presented it to the House of Delegates?

A   My recollection, there were no amendments offered to the bill which is pretty unusual in my tenure in the legislature.

1905

Q   We heard, and I don't want to mischaracterize what he said, but we heard some discussion from Delegate Armstrong that he might have commissioned some type of study on racial dilution or retrogression analysis. I don't want to mischaracterize what he said, but did Delegate Armstrong present to you anything that could be characterized as that?

A   I know he and I never, I don't think, talked to one another, period, during the entire special session.

Q   Did he present such an analysis on the floor of the House to the best of your recollection?

A   No. I think he was just merely trying to set up the debate for a court case.

Q   And to the best–did any member of–first of all, [381] during this process, you talked to a majority of the members of the House?

A   Between 75 and 80 of the members individually.

Q   That would have been a majority of the Republican members?

A   Yes.

Q   And a majority of the black caucus members?

A   Correct.

Q   And a majority of the democratic members?

A   Close to it. I didn't keep score of everyone that I talked to, but whether it's a meeting in the hallway, giving me a napkin with a precinct on it or a letter, or, you know, something of that nature, I talked to probably 75 of the members at least.

Q   And did any of those members tell you that they had had a chance to review any type of vote dilution or

1906

retrogression analysis that had been prepared for
Delegate Armstrong?

A No.

Q Do you remember how many members your
plan pairs? A I believe it pairs six, if I'm not mistaken,
six pairs. I believe we had–the second district in the
great southwest moved to Prince William, so that
member was paired, and he retired, I think, and
subsequently became–went on the bench, I believe.

[382] We paired Delegate Armstrong because his
district went to Loudoun County, House district 10. He
was paired–his district didn't exist anymore, I should
say, and then Delegate Paula Miller in the 87th in
Norfolk, her district went to Loudoun County as well.
Loudoun got two of the three seats.

JUDGE LEE: What's that House district?

THE WITNESS: 87.

JUDGE LEE: Went to Loudoun.

THE WITNESS: Yes, sir. And then, just discussed
on the peninsula, House District 93 and 94, Delegates
Oder and Abbott, and then we had two pro forma
pairings. They were Republicans, if I remember
correctly, Delegate Sherwood and Delegate Affee, he
was retiring, and then, quite honestly, I cannot
remember the sixth, but I do believe there was a sixth.

MR. BRADEN: At this time, we'd like to show
Plaintiff's Exhibit Number 36, and the transcript is
Plaintiff Exhibit 35, page 141 through 149.

JUDGE LEE: Repeat that.

MR. BRADEN: Plaintiff Exhibit 35, pages 141
through page 149.

1907

(Video clip played.)

[383] Q  Delegate Chris Jones, were you present for the speech?

A   I was.

Q   And am I correct that Delegate Spruill also voted for the passage of HB 5005?

A   He did.

Q   And just so there's no confusion, the changes from the HB 5001 and 5005 were mainly technical changes and small changes of requested members?

A   They were not just members, but the registrar in Richmond probably did a couple dozen precincts and split them, accommodated some voting–moving of voting polling places and made cuts, actually split precincts to comport with the request for the Richmond and Chesterfield County registrars.

Q   I'd like to go to Defendant Intervenor Exhibit Number 3, and this would be defendant–this would be defendant intervenor–it would be the transcript at pages eight to 13. Defendant Intervenor Exhibit 04 is the transcript. Defendant Intervenor 03 is the video clip.

MR. SPIVA: Your Honor, I object. I mean, we haven't objected to all these video clips playing, but the transcripts are in the record. A lot of this is kind of a bunch of irrelevant stuff that gets played and very little connection to the question that's asked after the video.

JUDGE PAYNE: What is the objection; I'm sorry?

[384] MR. SPIVA: Well, time and relevance, Your Honor. I mean, my concern is we were hoping this would be a three-day trial. We have a substantial cross

1908

and rebuttal case. They've got three more witnesses after Mr. Armstrong.

JUDGE PAYNE: The basis of your objection is what?

JUDGE LEE: Relevance.

MR. SPIVA: Relevance and time, Your Honor.

JUDGE PAYNE: Overruled.

JUDGE LEE: Repeat the docket we're using now.

MR. BRADEN:

This would be Defendant Intervenor Exhibit 03, and the transcript is Defendant Intervenor 04, pages eight to 13. I promise the Court we won't subject the Court, I don't believe, to any videos of any Republicans speaking in favor of this plan.

JUDGE PAYNE: 04 is not in our books, is that correct, our witness books for this witness? We'll figure it out.

(Video played.)

JUDGE PAYNE: Are you through with that evidence?

MR. BRADEN: Yes, Your Honor.

JUDGE PAYNE: We'll take the afternoon recess, 15 [385] minutes.

(Recess taken.)

NOTE: After the afternoon recess is taken, the case continues as follows:

JUDGE LEE: Mr. Braden, why don't you move along. Let's not make a federal case out of this.

1909

MR. BRADEN: Your Honor, I promise that we should be done in the next 15 or 20 minutes, no more than that, I believe.

BY MR. BRADEN: (Continuing)

Q    You have been in the legislature how long?

A    18 sessions, since 1998.

Q    In your experience, is redistricting one of the most contentious processes?

A    It can be.

Q    And often a very partisan process?

A    It can be, yes.

Q    How many hours did you spend working on the plan?

A    Two or three hundred.

Q    I would like to go to Plaintiffs' Exhibit 41. The transcript is in Plaintiffs' Exhibit 40, pages 39 to 44.

JUDGE LEE: Did you say 41 or 40?

JUDGE PAYNE: Which exhibit?

[386] MR. BRADEN: The transcript is Plaintiffs' Exhibit 41–40–oh, yes, sorry. 41 is the video clip, and Plaintiffs' Exhibit 40 is the transcript. My apologies.

JUDGE PAYNE: It's in the back of the book. Thank you.

MR. BRADEN: Those are page numbers 39 to 44.

NOTE: The video is played.

BY MR. BRADEN: (Continuing)

Q    Delegate Jones, were you present for this speech?

1910

A    I was.

Q    And did you work with this particular delegate in drafting his district?

A    Not directly. Lionel Spruill had brought to me his concerns.

MR. BRADEN: Your Honor, I would like to bring up a final video clip. I have edited, as I said, edited out the Republicans, and only have a video clip, it's Plaintiffs' Exhibit 41, and a transcript is Plaintiffs' Exhibit 40, pages 47 to 50.

NOTE: The video is played.

BY MR. BRADEN: (Continuing)

Q    Delegate Jones, were you present for this speech?

A    I was.

Q    Do you remember how many members voted against the [387] bill in final passage?

A    I believe it was nine.

Q    And the majority of the Republican caucus voted for it?

A    I believe–yes, all, I believe everyone did.

Q    And the majority of the Democratic caucus voted for the plan?

A    All except for one member, I believe.

Q    That was the black caucus?

A    The black caucus, I mean, excuse me.

Q    And the Democratic caucus voted, the majority, for the plan?

A    Yes, I think two-thirds.

1911

MR. BRADEN: Your Honor, before I step aside–

JUDGE PAYNE: The transcript says 80 ayes and nine noes. Where were the rest of them?

THE WITNESS: It was–we had some that were absent, Your Honor, if I remember correctly.

JUDGE PAYNE: The others were absent?

THE WITNESS: Yes, sir.

MR. BRADEN: Your Honor, before I dismiss the witness, I think I was remiss in not moving the admission of the Loewen Report, Defendant-Intervenors' Exhibit 36. I would move its acceptance now.

MR. SPIVA: I object, Your Honor. There was no [388] foundation laid for this report. There is the report from the previous court case in 2001. It is hearsay. It is irrelevant. And we still object.

MR. BRADEN: Your Honor, it's not being admitted for the purpose of the truth of it, although I don't doubt that. But it is being admitted because it was used by the architect of the plan to inform his decision-making process.

One of the arguments they make is that they didn't have an analysis, that he didn't do a functional analysis. And since he was a defendant in that prior plan, it doesn't seem unreasonable that he looked at an analysts of a prior court case by an expert and that informed his decision making.

MR. SPIVA: Your Honor, I forgot to mention also, it wasn't produced. But this is an analysis of a former plan using 14-year-old data. And it has no relevance to what he looked at in terms of drawing the 2011 maps. I mean, it's just–there is no connection there.

1912

JUDGE PAYNE: Well, it may or may not be relevant. The troublesome thing to me, Mr. Braden, though is that while you were given leeway to explore with him the extent to which he relied on it, there was never any real discussion about how he relied on it other than the fact that he did rely on it. And we're left then to read [389] the whole report and study it.

And as Mr. Spiva points out, there are goodly numbers of that probably don't have any relevance to this case and there may be things that do have relevance. So we do have a 403 problem here it looks to me like.

MR. BRADEN: I actually don't think you have a 403 problem because I think throughout our case and we will argue and have argued that the 12 challenged plans are essentially the same as the 12 prior plans, really only with minor population changes that were required.

These are the same 12 plans that have been in existence since 1991. That's the reason I started out talking about history. History is important here. These are the same 12 districts that existed in 1991. They are the same 12 districts that existed at the time of this litigation. And they are essentially the same politically.

MR. SPIVA: Your Honor, I have no–

JUDGE LEE: Objection sustained.

MR. SPIVA: Thank you, Your Honor.

JUDGE PAYNE: What exhibit was that, so the records reflects it?

MR. BRADEN: Exhibit 36.

JUDGE PAYNE: That is Intervenors' Exhibit 36.

MR. SPIVA: Yes, Your Honor.

1913

[390] CROSS-EXAMINATION

BY MR. SPIVA:

Q    Good afternoon, Your Honors. Bruce Spiva.

Good afternoon, Delegate Jones. You and I are from the same part of the world. I grew up in Virginia Beach, Virginia. So I know about some of those bridge crossings and things that you've talked about today, and driven down 64 more times than I can count.

I wanted to just start off, I was very interested listening to the remarks of Delegate Spruill. You recall those, you heard those on direct?

A    He had two sets of remarks.

Q    Yes. You heard both of them here today?

A    Yes.

Q    Right. And you recall that at one point he was talking about one district I guess that had previously been represented by an African-American, but was no longer represented by an African-American, do you recall that?

A    I think he was talking about two different districts as well, if I recall correctly.

Q    Yeah, right. But in one he said he is not of our persuasion, talking about the person who had replaced the African-American. Do you recall that?

A    Correct.

Q    Yeah. Now, I also was interested that we saw the clip [391] from Delegate Onzlee, I hope I am pronouncing his name correct–is that correct?

A    That is correct.

1914

Q    Okay. Mr. Onzlee, Delegate Onzlee Ware, who represents a district in the Roanoke area, in the city of Roanoke, is that fair?

A    Correct. A heavily Democratic district, yes, sir.

Q    Right. But it is not, as he said in his remarks, a majority-minority district, correct?

A    No. It is actually a heavily Democratic district.

Q    Okay. Now, if a Delegate had stood up in the well of the House of Delegates, a white delegate, and said, he's not of our persuasion, would you view that as an offensive remark?

A    I don't get into the hypotheticals, quite frankly.

Q    Well, it is not so hypothetical, right? And this is an African-American man, a delegate who is representing a non-majority district.

And really I'm asking you if someone, you know, like Delegate Spruill, except they were white, stood up in the House of Delegates of the Commonwealth of Virginia and said, he's not of our persuasion, wouldn't you view that as offensive?

JUDGE PAYNE: What issue does that go to? What relevance? Let's get on with the questions that pertain [392] to the case, if you don't mind, please.

MR. SPIVA: Okay, Your Honor, but they played a clip of that.

JUDGE PAYNE: Please.

BY MR. SPIVA: (Continuing)

Q    So, Delegate Jones, if I say the challenged districts, you'll know that I'm referring to the 12 specific House of Delegates districts that are challenged in this case?

1915

A    Correct.

Q    Okay. And if I use the terminology BVAP, you'll understand that I'm referring to black voting-age population?

A    No. You need to clarify that.

Q    You don't understand that BVAP stands for black voting-age population?

A    No. There are two different BVAP populations that have been discussed.

Q    Yeah. I think you can probably appreciate, sir, that that was not my question. I was just asking whether the initials BVAP stand for black voting-age population?

A    I would agree to that.

Q    Okay. Now, you've testified that you were a participant in the 2001 redistricting process, isn't that correct?

A    I was.

[393] Q  And you were the primary map drawer for what we've been calling–what my colleague on the other side I believe has been calling the benchmark plan, the plan that was adopted in 2001, is that fair?

A    That would be Chapter 1 of the Acts of the Assembly, yes, sir.

Q    Okay. And that was the 2001 map and plan that was enacted for the House of Delegates in the Commonwealth of Virginia, correct?

A    That is correct.

Q    And you were the primary map drawer for that map, correct?

1916

A    I was.

Q    Okay. And the benchmark plan, if I refer to it as the benchmark plan, you understand what I'm referring to, correct?

A    I will.

Q    Okay. And that included 12 majority-minority districts, isn't that right?

A    Essentially that had been existence since 1991, that is correct.

Q    Okay. But not all of those districts in 2001 had a BVAP of 55 percent or greater, isn't that correct?

A    That is correct.

Q    Okay. In fact, HD 89 in 2001 had a BVAP of [394] 53.4 percent, isn't that right?

A    My recollection, that would be correct.

Q    Okay. And HD 90, which was a majority–HD 89 was a majority-minority district, correct?

A    Correct.

Q    In 2001?

A    Correct.

Q    Okay. And HD 90 was also a majority-minority district in 2001, correct?

A    That's correct.

Q    And HD 90 in 2001 had a BVAP of 54 percent, is that fair?

A    That's fair, yes, sir.

Q    And those districts, 89 and 90, were obviously enacted into law, they became part of the benchmark plan, fair?

1917

A   They were the challenged districts in the West versus Wilkins case, yes, sir.

Q   Okay. And you were aware when you were drawing the districts that they had under 55 percent BVAP, is that fair?

A   Which plan are you talking about, sir?

Q   The 2001 plan. That in 2001, districts 89 and 90 had a BVAP of under 55 percent, you were aware of that, correct?

A   That is correct.

[395] Q   All right. And you voted to enact them, correct?

A   Being the chief patron, that would be correct.

Q   All right. And at that time you voted to enact those two districts because you thought they did comply with the Voting Rights Act, correct?

A   That would be correct.

Q   Okay. And you thought that those two districts would allow minorities to elect their candidates of choice, isn't that fair?

A   Based on the testimony that we received back in 2001, that would be correct.

Q   Okay.

A   And the fact that it was precleared by the Department of Justice.

1918

Q    Okay. I just want to make sure–I want to get back to my question. Which was, in 2001 you voted for these two districts, HD 89 and 90, which had a BVAP of under 55 percent, because you thought that those two districts would allow minorities to elect the candidates of their choice, is that correct?

A    I voted for the plan because it fully complied in my opinion with the Voting Rights Act.

Q    And that would include allowing the African-American community in those two districts to–the opportunity to elect their candidates of choice, fair?

[396] A  I think that's fair to say.

Q    Okay. An opportunity doesn't mean always elect, would you agree with that?

A    I would say that the opportunity is what the Voting Rights Act I think requires.

Q    Right. It doesn't mean 100 percent of the time, but it means–it means a fair opportunity to do so?

A    I don't know the exact term, but the Voting Rights Act says they have to have the opportunity– the effective election of their electoral exercise, or something to that effect. I can find it if you like, I know it's in the documents somewhere.

Q    Okay. No, that's fair enough. Now, I would like to turn to the 2010/2011 redistricting process. And you've already testified that you served as the Chair of the General Assembly's Joint Reapportionment Committee, that's correct, right?

A    Correct.

Q    Okay. And in that capacity, you were principally responsible for drawing the enacted plan in 2011, correct?

1919

A   No, that would not be correct. Being chairman of that commission did not indicate that I would be the chairman or I would be the one who carried the bill.

My job as the chairman of the Joint Reapportionment Committee/Commission was to make sure that we were [397] prepared to receive the PL-94 data from the Census Bureau.

Q   Okay. Yeah, maybe I might have caused confusion by linking it to the Chair role.

But you were, I think you've already testified, the architect, the chief architect of the enacted plan in 2011, is that a fair term?

A   I was.

Q   Okay. And if legislators wanted changes to the map or to their districts, they ultimately had to go through you, is that correct?

A   As with any bill in the legislature, you would go to the chief patron of that measure to receive any amendments to the bill.

And that's in fact what an adjustment to a district line, it would be an amendment to the bill itself.

Q   Okay. I just want to make sure, that was a yes, right? If legislators wanted changes to the map or to their districts, they had to go through you, correct?

A   Like any other bill, that would be correct.

Q   Correct, okay. And would you say it's fair to say that nobody else had more influence over the bill?

A   I would say that would be an accurate–

Q   And you worked, at least to some extent, with Delegate Jennifer McClellan on the districts in the Richmond area, is that true?

1920

[398] A   I worked with her, and Betsy Carr, and Delores McQuinn, yes.

Q   Okay. And in terms of Delegate McClellan, you communicated with her frequently during the process?

A   I would not use the word "frequently," no, sir.

Q   But you communicated with her?

A   We communicated.

Q   Okay. And did you communicate your goals and priorities in the redistricting to her?

A   No. I actually asked her what were we—I think she stated in her testimony on the floor, or even maybe yesterday, that I indicated that I wasn't as familiar with the Richmond neighborhoods, and I thought it important that we receive input from those delegates, just like I did in Northern Virginia to the extent that Delegate Sickles, who we just saw in the exhibit, testified.

Q   Okay. So you did not communicate to her your goals or priorities in terms, in terms of the map, in terms of–

A   I asked her what was important to her district and to the city of Richmond region.

Q   So I take it that's a no, you did not communicate your goals and priorities to her?

A   I didn't have any goals in that regard. It's not– it's just my bill with my name on it. My goal was to have a plan that was representative of the 100 members of the [399] House of Delegates. QSo that's a no?

A   If you want to take it as a no.

Q   Well, is it a no or is it a yes?

1921

A   I didn't give her my–I didn't give her any direction as to what was required, no, sir.

Q   Okay. But if she, like you've testified about any other legislator, wanted changes to the map, she ultimately had to go through you, correct?

A   Yes, sir. The only issue that was an absolute was the plus or minus 1 percent, just like it was in 2001 plus or minus 2 percent, that was the only absolute that was contained in anything that was done.

Q   I see. And you also said–I think you've already testified to this, that Senator Dance also played a role in the redistricting process?

A   She did.

Q   Okay. And she was a member of the Joint Reapportionment Committee?

A   That is correct.

Q   She went to all of the public hearings that you held around the Commonwealth over the map?

A   I don't believe she went–I don't think any member went to all. We had a regional–we had regional meetings every one weekend where certain members went to [400] the Southwest and Valley and Southside, and other members went to Richmond, Northern Virginia. So we split up those duties.

Q   Okay. But she went to several of those meetings?

A   I would–I didn't look at her attendance record, but I would say yes, she did.

1922

Q   If she testified, if the record reflects that she testified that she went to all of them, do you have a reason to doubt that?

A   I would have no reason. But you asked me did I know if she went to every one of them. I did not. So I can't represent what's not true, what I don't know to be true.

Q   Fair enough, fair enough. And did you communicate your goals and priorities to Senator–now Senator Dance?

A   We discussed what was presented at the public hearings. And we listened to the feedback. And I solicited input from the members of the black caucus.

Q   And she also submitted some proposed changes to the districts in the Southside area, is that correct?

A   That is correct.

Q   And you had to approve or disapprove those changes ultimately, correct?

A   As the patron of the bill, that would be correct.

Q   Okay. Let's discuss for a minute the criteria that you followed in creating the enacted plan.

[401] Let me ask you to turn–you should have an exhibit book, and I think we'll also have it on the screen, Plaintiffs' Exhibit 16.

JUDGE PAYNE: Are you using the exhibit book of something you handed him, or your own exhibit book?

MR. SPIVA: Our own exhibit book, Your Honor, plaintiffs' exhibit book.

JUDGE PAYNE: Thank you.

MR. SPIVA: Thank you.

1923

THE WITNESS: I have it, Your Honor.

BY MR. SPIVA: (Continuing)

Q    And this exhibit is the House Committee on Privileges and Elections, Committee Resolution No. 1 - House of Delegates District Criteria, correct?

A    That is correct.

Q    And these were proposed by you?

A    That is correct.

Q    And they were approved by–they were approved on 3/25/2011, correct?

A    That is correct.

Q    And so, this is the committee's official statement on the criteria for redrawing the House districts in 2010 and 2011, correct?

A    That is correct.

Q    Let's talk a minute about the content of the criteria. [402] As you mentioned a minute ago, population equality is the number one criteria, correct?

A    That is correct.

Q    And the number two criteria is the compliance with the Voting Rights Act?

A    And the United States Constitution supremacy clause.

Q    Right, right. Yes, that's right. Actually, why don't we just read, why don't I read this, and I will ask you if I've got it right rather than trying to paraphrase. It says, "District shall be drawn in accordance with the laws of the United States and the Commonwealth of Virginia including compliance with protections against the unwarranted retrogression or dilution

1924

of racial or ethic minority voting strength. Nothing in these guidelines shall be construed to require or permit any districting policy or action that is contrary to the United States Constitution or the Voting Rights Act of 1965."

Did I read that correctly?

A   You did.

Q   And would it be fair to say that the Voting Rights Act and compliance with the Constitution trumped everything except the number one criteria, population equality?

A   I would say yes. We stated that actually in Roman numeral VI in Priority.

Q   Okay, thank you. And it follows that because the [403] Voting Rights Act trumped everything except population equality and the Constitution–if you don't mind, I'm going to shorthand it. If you want, I can say the Voting Rights Act and the Constitution each time.

But the Voting Rights Act trumped everything except population equality. It follows that the Voting Rights Act trumped contiguity and compactness, fair?

A   That's fair, yes, sir.

Q   All right. And it trumped, the Voting Rights Act trumped communities of interest as well?

A   Yes, sir.

Q   All right. And that's consistent with the statements that you made on the floor during the House debates?

A   Yes, sir.

1925

Q   And you've already testified that you did con-
sider race in the drawing of each of the 12 challenged
districts, correct?

A   Yes, I did, as anyone else presenting a bill to the
chamber for consideration would have to do.

Q   Let me ask you to turn in the same notebook to
Plaintiffs' Exhibit 22.

A   I do not have that, Your Honor. I go from–

Q   It should be in the same notebook as the one
that you found 16 in.

A   I go from 16 to 33. I might have an abbreviated
[404] version here. I will take that one.

Q   Thanks.

JUDGE PAYNE: What exhibit are you using?

MR. SPIVA: Plaintiffs' Exhibit 22, Your Honor.

JUDGE PAYNE: Okay.

BY MR. SPIVA: (Continuing)

Q   If everybody is there, are you at the exhibit,
Delegate Jones?

A   Yes, sir.

Q   Okay. And this is an e-mail from Chris Marston
to yourself dated Friday, April 1, 2011, 10:33 p.m.

There is no reason to believe that you never received
that, correct?

A   I don't necessarily recall it, but certainly it has
got my e-mail address. So I would assume that I
received it, yes, sir.

1926

Q   And Chris Marston was somebody who was involved in consulting and aiding you in the redistricting process, is that correct?

A   He was an attorney.

Q   He is an attorney, yes. And he was hired by the speaker, by Speaker Howell to help with redistricting?

A   That is correct.

Q   And he also worked for you in the redistricting process?

[405] A   He didn't work for me. He actually worked with me. He was not employed by me. So I worked with him.

Q   Okay, fair enough. But he worked with you in assisting you in drawing the new map?

A   Correct.

Q   Okay. And let me just, let me just read the e-mail from Chris Marston to yourself, Delegate Jones. It says, "Someone's having trouble following directions. Here are the two options that Dale proposes, neither of which fully addresses Tyler's concerns. I'll try and generate another one that gets it done without dropping the percent BVAP too low."

Did I read that correctly? A   Yeah, you did.

Q   Okay. And he's referring to Delegate Tyler's district, that is District 75, is that correct?

A   That is correct, yes, sir.

Q   That's one of the majority-minority districts? A   Correct.

1927

Q   Okay. And in your view, preventing retrogression, that meant keeping the percent BVAP from dropping too low in each of the challenged districts, is that a fair statement?

A   I think that the Voting Rights Act requires that, yes, sir.

[406] Q   Okay. And in fact, you required that districts that were already above 55 percent, that they stay above 55 percent, isn't that correct?

A   That is not correct.

Q   Okay. And so, you didn't require the districts that were already above 55 percent, that they stay above 55 percent?

A   No. Actually in my introduced map I had three districts that were in the 54 percent DOJ black range.

Q   Okay. That's the DOJ black definition you're talking about?

A   That is correct. That's why I wanted to clarify earlier your BVAP black voting-age population. It was critical important in this case.

Q   Thank you for that clarification, Delegate Jones. But using the DLS definition, the one that everybody else saw, all of the districts remained above 55 percent, fair?

A   That's fair, but that's not what the Department of Justice would have been considering when they precleared the map.

Q   Okay. We'll take a look at that in a little while.

And actually, why don't we turn to your deposition. If I could get page 93 of Delegate Jones' deposition.

1928

Would Your Honors like us to hand up the hard [407] copy, or do you want see it on the screen? It's on the screen, but we can hand–

JUDGE LEE: The screen is fine.

JUDGE PAYNE: The screen is fine.

JUDGE LEE: As long as long as it's about two or three pages and not–

MR. SPIVA: No, no. And no video.

BY MR. SPIVA: (Continuing)

Q   Now, let me ask you, before we turn to the deposition, Delegate Jones, isn't it true that all–

JUDGE PAYNE: Wait a minute. The purpose of turning to the deposition is to impeach him? Is that what you're doing with the deposition?

MR. SPIVA: Well–

JUDGE PAYNE: If you do, you need to go on and do it.

MR. SPIVA: Okay.

JUDGE PAYNE: That's the question that you had on the table.

BY MR. SPIVA: (Continuing)

Q   Okay. Let me ask you to turn to page 93, Delegate Jones.

A   I'm sorry, I did not get the exhibit number. If you did–

Q   It's not an exhibit. It's up on the screen, your [408] deposition. If you want, I can hand you a hard copy. Would you prefer that?

A   That would be helpful, yes.

1929

Q    May we hand it up? And specifically–did I give you the page number? It is page 93. And specifically if I could direct your attention to line 9.

JUDGE PAYNE: You know, it might be helpful given the lapse of time and the shuffling of papers if you would posit the question again–

MR. SPIVA: Will do, Your Honor.

JUDGE PAYNE: – that you are trying to work an impeachment on. Then we will understand where you are.

MR. SPIVA: Will do, Your Honor. And we are offering this, of course, as substantive evidence as well because it is a statement of a party opponent, but why don't I ask the question–

JUDGE PAYNE: That's different, and it involves different rules. And I asked you were you using it for impeachment, you said yes, and so we want a posit there. If you're going to offer it in your case, you can offer it. If it qualifies, then we'll deal with it.

MR. SPIVA: Okay.

JUDGE PAYNE: But you didn't offer it in your case in–I guess it's in if it's not objected to.

MR. SPIVA: Yes, I believe our–

[409] JUDGE PAYNE: Then if you're going to do it, go ahead and do the impeachment the correct way, if you will.

MR. SPIVA: Okay. Thank you, Your Honor.

BY MR. SPIVA: (Continuing)

Q    Let me ask you the question, Delegate Jones, first and I will turn you to the page.

1930

Isn't it true that all of the challenged districts have at least 55 percent BVAP because you required that they all have at least 55 percent BVAP?

A   No, that is not true, no.

Q   Can I ask you to turn to page 93 of your deposition, specifically line 9. Are you there?

A   I'm there.

Q   And so the question was asked, "So you are explaining here why it is that you are trying to keep the districts above 55 percent, correct? Answer: That's correct. Question: Part of the reason that you adopted that Guideline of 55 percent was from input from other members, right? Answer: Correct."

Did I read that correctly?

A   That would be correct.

JUDGE PAYNE: You did, Mr. Spiva, but it didn't impeach the question. That's precisely why we require that impeachment match up to the question, marry it very closely, not exactly.

[410] So if you're going to use impeachment, it's sort of like the old rule, if you're going to touch the king, kill him. Okay?

MR. SPIVA: Understood, Your Honor. We would–it's in evidence, of course, and we would offer it as substantive evidence anyhow. But I take Your Honor's point.

MR. BRADEN: Your Honor, we question whether or not this is in fact in evidence.

1931

JUDGE PAYNE: We will deal with that maybe when he offers it in his case. If it is not in evidence already by virtue of the pretrial procedures. But you will make a note of that, deal with that at the time that he offers it, or raise it on your own to contend that it is not in the record.

MR. BRADEN: Yes, Your Honor.

JUDGE PAYNE: Go ahead with your examination, Mr. Spiva.

MR. SPIVA: Yes, Your Honor.

BY MR. SPIVA: (Continuing)

Q   Now, earlier Mr. Braden asked you about a transcript of a debate where you talked about fixing some precincts in several of the Richmond area districts, do you recall that?

A   I do.

[411] Q  And you also talked about splitting a precinct in anticipation of moving one of the–one of the voting–sorry. In anticipation of moving a voting place.

A   Yes. As I understood it from I think either Delegate McClellan or maybe Delegate Carr, that they were going to be moving the polling place at the War Memorial, has zero population. So we split that precinct so they would be able to vote in that precinct.

Q   Okay. And Delegate McClellan proposed a number of changes in terms of fixing precinct splits, isn't that correct?

A   She did.

Q   And a number of those came out of communications she had with the registrar of Richmond, Mr.

1932

Showalter, and the registrar of Chesterfield, is that right?

A   As I understand it, yes, sir.

Q   But sitting here today, you can't say that the changes you referred to in that transcript that you reviewed earlier, that those are the same as the precincts that Delegate McClellan testified about, that she testified about not being made, is that fair?

A   I would say the best of my recollection, the bulk of the changes that occurred between House Bill 5001 and 5005 were to address the concerns that were raised by the registrar, Delegates Carr, McClellan, and McQuinn.

[412] Q   But sitting here today, can you testify that all of the precinct changes that were requested by Delegate McClellan were made in the final HB 5005?

A   No, I don't think any member got all the requests that they had made to me. And I had literally hundreds of requests made to me by members.

Q   Okay. And sitting here today, you can't tell me that the precincts that Delegate McClellan wanted fixed at the request of Kirk Showalter, that all of those precinct fixes were made?

A   No, I don't believe I represented that.

Q   Okay. And at the time HB 5005, the 2011 map and plan, was enacted, HD 71 had a, we will call it DLS black, a DLS black BVAP of 55.3 percent, is that correct?

A   I believe that is correct. And it was a 54.9 for the DOJ black, I believe.

Q   So it was .4 percent calculated based on DOJ's method of calculating BVAP?

1933

A   For that district, yes. Some were as big as 1 percent delta in difference between.

Q   I think, Delegate, you probably appreciatethat wasn't my question. I said it was a .4 percent difference measured by the way that DOJ measures BVAP and the way that the DLS measured BVAP, is that right?

A   For the district as it was configured, yes, that is [413] correct.

Q   In 2011, right?

A   For the 5005 bill that was passed, correct.

Q   Correct. So it is the 2011 enacted plan?

A   Correct.

Q   Okay. So whatever changes were made, it did not lower the DLS BVAP below 55 percent, correct?

A   Those changes did not, correct.

Q   Let me ask you to turn to Plaintiffs' Exhibit 30, which should be in the book that you have in front of you.

JUDGE PAYNE: Is that up on the screen now? Can somebody put that on the screen? Thank you.

MR. SPIVA: It should be, Your Honor, yes. Yes, it is.

BY MR. SPIVA: (Continuing)

Q   Let me ask you to turn to page 4 of Plaintiffs' Exhibit 30. And actually if you can first look at page 3 because the e-mail I want to ask you about begins at the bottom of page 3 and continues over to page 4.

A   Did you say page 4?

1934

Q   Yes, page 3 and 4 of Exhibit 30, Plaintiffs'
Exhibit 30. Are you on Plaintiffs' Exhibit 30, Delegate
Jones?

A   It has a separator.

Q   Yes. You can ignore those separators–

[414] A Normally that means it's a different document.

Q   No, it wasn't. I can tell you it was produced
altogether to us. And it was consecutively produced.

So are you on page 3, Delegate Jones, at the bottom
of the page?

A   I am.

Q   Okay. And you see there, there is an e-mail
dated 4/7/11 from you, Chris Jones, 9:42 p.m. to G.
Paul Nardo, subject F/up. It says, "GP, I followed up
with Jennifer McClellan this afternoon and she
reconfirmed that the request of Kirk Showalter,
Richmond registrar, exceeded the 55 percent threshold
when they did on the second floor for all affected
districts, and that she would have never requested it
if it didn't. I'm not sure what got lost in translation,
but the good news is it is fixed now and Jennifer will
explain the amendment on the floor Monday if
needed."

And then you go on to discuss something else at the
bottom of the e-mail.

Did I read your e-mail correctly?

A   You did.

Q   Okay. And I take it that Mr. Nardo is the chief
of staff for Speaker–he was the chief of staff for
Speaker Howell at the time?

A   That is correct.

1935

[415] Q  Okay. And you're telling Mr. Nardo in this e-mail that you rejected a proposed change that Ms. McClellan had submitted, isn't that correct?

A   Yeah, I believe we also had to deal with the plus or minus 1 percent population threshold.

Q   Okay. But in this e-mail you mentioned that the change, that she thought that the change that she was proposing exceeded the 55 percent, do you see that?

A   Yeah, that's what she indicated I think in our conversation.

Q   And that's what you're relaying to Mr. Nardo, correct?

A   That's correct.

Q   She doesn't say anything about a 1 percent deviation–or you don't say anything about a 1 percent deviation in this e-mail, correct?

A   I do not, but I know there is one later that does speak to that.

Q   Okay. But this one does not?

A   No.

Q   Okay.

A   But I think there is a chain of e-mails that went back and forth.

Q   Okay. But you are telling Mr. Nardo that you rejected a proposal by Ms. McClellan because it did not meet the 55 percent threshold, isn't that correct?

[416] A  I did not reject anything, I don't believe.

Q   Okay. But you said that she wouldn't even have proposed the change that she was requesting if she

1936

knew that it was below the 55 percent threshold, isn't that correct?

A   That's what she represented. If I recall correctly, and there was a whole lot happening in those last several days, this was actually a Senate amendment, an amendment on the Senate side, if I'm not mistaken. And it was not anything that was done during the formation of House Bill 5005 before–5001 before it passed the House, I believe. That's my recollection, but I stand to be corrected if you can demonstrate to me that.

Q   So your testimony reading this e-mail today is you think that she is referring to a change on the Senate side?

A   Yeah. Excuse me, Your Honor, there were changes–if you recall in the sequence of the history of House Bill 5005, there was a conference report. But there were also amendments that were made in the Senate.

Q   Yes, I am aware of that. I guess I have a narrow question. Which is, you're now saying that your best recollection is that this e-mail, your e-mail to Mr. Nardo is referring to a change that Delegate McClellan requested to the Senate side of the bill?

[417] A  To the best of my recollection right now. If I have time to read the other correspondence, I would be glad to look at it. But my best recollection right now.

Q   Okay. So if that were the case though, then the transcript that you reviewed earlier talking about precincts being unsplit and one precinct being split in the House, that would have nothing to do with this then, would it?

A   No, it would be 5005.

1937

Q   Correct.

A   I think this is speaking of 5001.

Q   Okay. All right.

A   To the best of my knowledge, this is I think 5001.

JUDGE PAYNE: You're saying that the communication in Plaintiffs' Exhibit 30 pertains to House Bill 5001, not 5005, according to your recollection?

THE WITNESS: Yes, sir. To the best by recollection, but I will refresh my memory whenever we are going to be breaking today and I will come back with–

BY MR. SPIVA: (Continuing)

Q   And your recollection is that Delegate McClellan asked for a change to the Senate bill?

A   It would–excuse me, Your Honor. It would have been the House Bill, but as any piece of legislation, I don't want to get way down in the weeds, but any piece of [418] legislation has to be passed by both houses.

So what occurs is if there is any change made to a bill, then what must happen if it's not made on the chamber that it originates, when it gets to the other chamber, an amendment is there. And then if we, the other chamber, doesn't agree to the amendment, it goes into what we call–it can go into like a conference report.

Q   I am trying to understand is that she was requesting a change to the Senate districts?

A   No, sir, I did not say that. Maybe I wasn't clear. My wife says sometimes I'm not clear in my response.

What I said clearly was, I don't recall if this was a request made prior to the passage of 5001 in the House

1938

or if it was a change contemplated in the Senate to the House bill.

Your earlier question dealt with 5005, which was done later in the month because of the veto by Governor McDonnell to House Bill 5001.

Q    Correct.

A    So to my recollection, I'm trying to give you the best that I can recall on the spot looking at this document.

Q    Okay. I think I have got it clear now though. You have no quarrel with the fact that what you're discussing in your e-mail here is a requested change to House districts, you just don't recall whether it was a change [419] that would have been reflected in the Senate amendment or a Senate bill?

A    That is correct, Your Honor. So I don't know the timing.

JUDGE PAYNE: He never said they were changes to the House districts. Let's go ahead.

I think you've stepped on your own line, so go into another line of questioning, if you will.

MR. SPIVA: Okay, Your Honor. I mean, the question is whether it's–

JUDGE PAYNE: Mr. Spiva, it is a good idea to go ahead and ask a question now.

MR. SPIVA: Okay.

BY MR. SPIVA: (Continuing)

Q    Delegate Jones, this e-mail refers to changes to the House districts, correct?

A    That is correct, yes, sir.

1939

Q   And these were changes that you rejected, correct?

A   I testified a few minutes ago, I think this was a request made when the House bill was on the Senate side. That's the best of my recollection.

Q   And the 55 percent threshold that you refer to in your e-mail, you didn't say that you were–that these changes couldn't be made because they didn't meet a 55 percent BVAP aspiration, did you?

[420] A I don't recall the conversation with Delegate McClellan about this amendment. The best recollection that I have is it was on the Senate side, they were working with the registrars in Richmond and in Chesterfield, and they were working with DLS. And they confused the splits to the precincts that they made.

And my understanding was that it exceeded the plus or minus 1 percent as well.

Q   Okay.

A   And so, I do not recall having a direct conversation with Delegate McClellan about this specific request.

Q   Okay. Let me ask you to turn to page 1 of the Exhibit 30. And this is an e-mail from Jennifer McClellan to Kirk Showalter dated Friday, April 8, 2011.

1940

And her e-mail says, "Kirk, I spoke to Chris Jones and Kent Stigall. Apparently, the changes we discussed based on the map of the Davis precinct you sent would have pushed the voting-age African-American population in the 71st district down to 54.8 percent. The target criteria was 55 percent. So the change can't be made. When you and I were working in Legislative Services, we indeed moved the wrong part of Davis, which is why the numbers looked correct to us. Given the time constraints on this thing, I don't think we have enough time to try to come up with a fix that keeps the 69th, [421] 70th, and 71st all at 55 percent African-American voting population and within a 1 percent total population deviation. We can try to do some clean-up next year. I know that doesn't help you think election cycle, but that may be the best we can do."

Did I read that correctly?

A   Yes. And that does refresh my memory. I thought it did have something to do with the plus or minus 1 percent as well.

Q   Okay. And it also has to do with the fact that the changes pushed the BVAP in the 71st District down to 54.8 percent, right?

A   Obviously those two issues were being discussed by the registrar and Kent Stigall at DLS, et cetera.

Q   And you rejected that change because it pushed it down to 54.8 percent, isn't that correct?

A   I will–I don't–I won't answer once again. I did not reject the change. I believe it was on the Senate side, and it was a contemplated amendment to the bill. I think she just acknowledged that they made a

1941

mistake and they picked the wrong precinct and could not stay within the plus or minus 1 percent.

Q   Now, the e-mail we read, the first e-mail we read in this chain, your e-mail to Mr. Nardo, you said that she wouldn't have even suggested it if she thought that it [422] went below–or rather if she didn't think it exceeded the 55 percent threshold.

Do you recall that?

A   I just saw the e-mail, yes, I did.

Q   And the reason she wouldn't have even suggested it is that she knew that it wouldn't meet–that it would have been rejected if it were under 55 percent, isn't that correct?

A   That is what her e-mail, that's what she said. I would say that she indicated that it exceeded–

Q   I'm sorry, sir, that was your e-mail, right? You were describing what she said to you?

A   I am getting ready to explain, yes. She indicated to me that she would not have presented it had she known it was going to exceed the 55 percent and/or exceed the plus or minus 1 percent.

Q   Right.

A   That's the best of my recollection. So there are two pieces at work here.

Q   Right. And the reason she told you that she wouldn't have even done it if she had realized that it didn't exceed the 55 percent threshold in your words was because she knew that it would be rejected, isn't that correct?

A   That was one of the reasons.

1942

Q   Okay. Just one more on that one. Let me ask you to [423] read the–let me ask you to turn your attention to the e-mail above that one. This is Exhibit 30, page 1.

There is an e-mail from Kirk Showalter to Jennifer McClellan dated April 8, 2011. And she says, "Darned, so close and yet so far away. A measly 0.2 percent. Well, at least we gave it a good try, and for that I must thank you. I have some additional ideas how we might fix that and will work with you, Betsy, Delores, and Larry over the coming months to see if we can address it next January."

Did I read that correctly?

A   You did.

Q   Okay. And her e-mail doesn't refer to, I take it, to anything about a DOJ black percentage, BVAP percentage, does it?

A   It does not.

Q   And of course you did not make it a secret during the floor debates that a minimum 55 percent BVAP was the rule for the challenged districts, isn't that correct?

A   I never used the word "rule." I said it was aspirational based on the comments that had been received from members and from the public.

Q   So you would agree though that you did not make it a secret that there was a 55 percent aspiration, BVAP aspiration for each of the 12 challenged districts, is that correct?

1943

[424] A  I stated on the floor that based on testimony
that had been received, that that is what the commu-
nity had indicated to us that they felt would allow
them to elect the candidate of their choice.

Q   And that was the aspiration, I take it in your
view, of the comments that you heard, was that there
would be this 55 percent BVAP in each of the 12
districts, correct?

A   Correct, but there weren't. Three of the districts
did not have 55 percent DOJ black in it.

Q   Okay. Well, I'm talking about DLS black.

A   I just want to be clear what we're talking about.

Q   Okay. So three of the districts had 54 percent
BVAP according to the DOJ definition, correct?

A   Correct, according to introduction and passage,
yes, sir.

Q   All right. But using the DLS definition, all 12 of
them had 55 percent or more BVAP, correct?

A   That is correct.

Q   Okay. And that was your aspiration as well,
correct, as the principal map drawer, that each of
those 12 districts would have 55 percent or more
BVAP?

A   No. I wouldn't have introduced House Bill 5001
that had three districts below 55 percent DOJ black.

Q   Okay.

A   Because that was the number that I was using
based on [425] my time in Austin, that that's what the
Department of Justice would be looking at. And then
what would occur is that when they received the file
from DLS–I should say the Attorney General, my DOJ,

1944

they would input the shape file–I forget, it's the precinct or the census bloc data would be inputted into their system and they would come up with the DOJ black number. And in that situation, three of those districts were below 55 percent.

Q   Okay. So was it your aspiration then that each of the districts would have at least 54 percent DOJ black BVAP?

A   I felt based on the testimony that the bill as introduced would, quote unquote, meet the test of not retrogressing.

Q   Okay. Let's turn to Plaintiffs' Exhibit 35. I believe it's in the same notebook that you have, and it will appear on the screen.

This is the April 5, 2011, Special Session 1, Virginia House of Delegates, Redistricting Floor Debates.

Do you have that?

A   Yeah.

Q   I just ask you to turn to page 42 in that Exhibit 35, Plaintiffs' Exhibit 35.

And I want to read a portion of your statement on the floor beginning at line 4 of page 42.

Now, Delegate Jones, if you want to verify that [426] that is in fact you speaking, I have to tell you that you have to turn all the way back to page 31 because that's where you begin your remarks. You don't have to take my word for it if you don't–

A   No, I take your word for it.

Q   Okay, fair enough. So at page 42, starting on line 4, you say, "so that's why the testimony led me, when drawing this map, to not retrogress with the

1945

number of seats, which we didn't, and to keep an
effective voting majority within each and every dis-
trict. We had to keep the core of these districts because
I think that's very important. And because of the
population shifts, you did see a decrease in some of the
percentages, but all were above 55 percent."

Do you see that?

A   Yes.

Q   And you said that, correct?

A   I was stating factually what was before the
body, yes, sir.

Q   Okay. And you were referring to the 12
challenged districts when you made that statement,
correct?

A   That is correct, based on the DLS BVAP
population, yes, sir.

Q   Correct. You were talking about the DLS BVAP
numbers?

A   That is correct.

[427] Q   Okay. And you didn't say, but my fellow
delegates, there is another way to calculate BVAP,
there is a DOJ way, correct?

A   That's correct. I think we saw this morning how
confusing the two can be. And I felt that the DOJ when
they received the file would have the numbers in front
of them that would indicate what the percentage black
voting-age population was in there.

Q   So you didn't think your fellow delegates could
understand the difference between the DOJ black
definition and the DLS definition?

1946

A   I didn't say that. I said given the time that we have to do this, the DLS was a number that everyone was using, and that was the number that was before the body.

Q   Okay. And in this statement you didn't say, well, you know, three of these districts would actually be 54 percent BVAP if we looked at it from the DOJ BVAP perspective, did you?

A   No, I did not.

Q   Okay. Let me ask you, Delegate Jones, to turn to page 66 of that same transcript, Plaintiffs' Exhibit 35, and ask you to look, starting at line 7.

Are you there, Delegate Jones?

A   I am.

Q   And it says, "Mr. Speaker, I'd said to the gentleman [428] of the plans that have been submitted and/or circulated around that were complete and total plans, the plan that is before you, in my opinion, fully complies with the Voting Rights Act as 55 percent or higher."

Did I read that correctly?

A   You did.

Q   And you were referring there also to the challenged districts?

A   Yes. Using the DLS numbers, that is correct.

Q   The DLS BVAP number, correct?

A   Yes, sir, that's correct.

Q   And there again, you didn't alert anybody that you were–that there were three districts that if you used the DOJ number were at 54 percent?

1947

A   No, I did not think it would make any difference, quite frankly.

Q   Okay, fair enough. If you could turn to page 70. And I would ask you to look, starting at line 4. Again, this is a part of your statement on the floor. It says, "I have looked at the 12th and the 13th plan, Option 1 and Option 2, and neither one of those plans met what I think from the testimony we heard throughout this process that the effective voting-age population needed to be north of 55 percent."

Did I read that correctly?

[429] A  Yes.

Q   And you are saying on the floor during this House debate that the BVAP number needed to be north of 55 percent in each of the 12 challenged districts not to retrogress, isn't that correct?

A   What I was saying based on the testimony we had heard from the public during the process, that that would need to be north of 55 percent. That was the testimony that we heard during the public hearings.

Q   Okay. But you weren't just summarizing the testimony, you were saying based on that testimony we need to be north of 55 percent BVAP, correct?

A   Do you want to restate the question?

Q   Well, why don't I just say your words.

JUDGE PAYNE: Well, if you're going to do that, we've read them. So maybe that's enough.

MR. SPIVA: Okay, fair enough, Your Honor.

BY MR. SPIVA: (Continuing)

1948

Q   And you also said here that you looked at two other plans, the so-called Option 1 and Option 2 plans, correct?

A   Yes, sir.

Q   And that those two plans did not maintain a 55 percent threshold for each of the challenged districts, is that correct?

A   No, I believe I said each of those plans had a low of [430] I think 52 percent, 52 percent.

Q   Okay. So neither of them though were north of 55 percent, correct?

A   It would be obvious because 52–

Q   And you found them unacceptable as a result of that, isn't that fair?

A   Yes, based on the testimony and the functional analysis that I had done using the Tyler primary, for example, and the Tyler general election in 2005.

Q   Let me ask you to turn a few lines down, starting at line 11. It says, "And from my experience in 25 years of running for office, having gone door to door, I know from analyzing, quote unquote, my election results where there's a lower voter turn-out, and in my opinion based on what we had heard from testimony, something of in the 52 percent, I do not think would be an effective voting strength for that community to be able to elect their candidate of choice."

And here again, you are referring to the African-American community, Delegate Jones?

A   That is correct, that was part of my functional analysis of the plan when we were putting it together.

1949

Q    Okay. When you refer to this functional analysis, what are you referring to, Delegate Jones?

A    Well, I think in any district that you're going to [431] draw or any plan that is going to be introduced, you have a requirement to look at voter turnout, demographics, et cetera.

And based on then Senator, then Delegate Dance, and Delegate Tyler, Delegate Spruill, and one or two others, African-American members of the House, they felt strongly that it needed to be north of 55 percent.

I do recall the election with Delegate Tyler that I mentioned earlier where she had won in a five-way race with two Caucasians in the race by less than 300 votes and didn't win by–didn't get 51 percent in the general election.

So based on the testimony that had been received, my looking at election returns, and the input from the black caucus, it was felt that 52 percent would be insufficient to allow the members of the district, excuse me, the constituency to be able to elect their candidate of choice.

Q    And Delegate Tyler has represented District 75 since 2005, do you agree?

A    That's correct.

Q    Okay. And let me ask you to turn to–actually let me step back–

JUDGE PAYNE: Mr. Spiva, that's a good place to stop, I think.

[432] MR. SPIVA: Thank you, Your Honor.

JUDGE PAYNE: How much longer do you think you have so we can do some planning?

1950

MR. SPIVA: I would say probably another hour, hour and a half, Your Honor.

JUDGE PAYNE: Good. Maybe tonight you could do a little bit of honing and pruning and take a look at doing things such as don't ask people if you read things correctly. Mr. Braden is over there, and if he is asleep at the switch, he will get by with it or the witness will. You don't need to go through all that kind of stuff. Get right to the question and go.

MR. SPIVA: Thank you, Your Honor.

JUDGE PAYNE: Thank you.

NOTE: The July 8, 2015 portion of the case is concluded.

(End of proceedings.)

[433] I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____/s/_____      _____
P. E. Peterson, RPR                              Date