IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| GOLDEN BETHUNE-HILL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 3:14cv852 |
| v. | ) | |
| | ) | |
| VIRGINIA STATE BOARD OF ELECTIONS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF POSITION OF ONEVIRGINIA2021
### AS *AMICUS CURIAE*

Wyatt B. Durrette, Jr., Esquire (VSB #04719)
Christine A. Williams, Esquire (VSB #47074)
DurretteCrump PLC
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Telephone:     (804) 775-6900
Facsimile:     (804) 775-6911
wdurrette@durrettecrump.com
cwilliams@durrettecrump.com

Gregory E. Lucyk, Esquire (VSB #19754)
Attorney at Law
300 Seneca Road
Richmond, Virginia  23226
Telephone:     (804) 920-7031
gglucy@comcast.net

*Attorneys for Amicus Curiae*

1

## CORPORATE AND FINANCIAL DISCLOSURE STATEMENT

*Amicus Curiae* files this Corporate and Financial Disclosure Statement as required by Local Rule 7.1 of the Rules of the Eastern District of Virginia.

OneVirginia2021: Virginians for Fair Redistricting, is a non-profit entity that does not have a parent corporation, trust, subsidiary or other affiliate. It issues no stock, and no publicly held corporation has any stake or financial interest in *Amicus Curiae*. Therefore, *amicus* has nothing to report under Local Rule 7.1.

## INTEREST OF *AMICUS*

OneVirginia2021: Virginians for Fair Redistricting, is a nonprofit corporation formed under the laws of the Commonwealth of Virginia and granted exempt status under Sections 501(c)(3) and 501(c)(4) of the Internal Revenue Code. OneVirginia2021 was organized in 2014 to initiate a comprehensive effort to eliminate gerrymandering in all its forms from the redistricting process in Virginia. It pursues this goal through public education and outreach, participation in significant impact litigation in the state and federal courts, and by seeking an amendment to the Constitution of Virginia that would outlaw partisan gerrymandering in the Commonwealth.

OneVirginia2021 is interested in this case because gerrymandering undermines the rights of citizens of all racial, ethnic and political viewpoints. It is destructive to our constitutional democracy and concept of representation because it gives politicians drawing district lines greater influence over who represents voters than the voters themselves. OneVirginia2021 is committed to a fair system of districts that represent the viewpoints of voters no matter where they fall on the political spectrum.

The proceedings in this case raise issues of the proper role and parameters of incumbency protection as a redistricting factor, and implicate the outside limits and constitutionality of redistricting intended to establish "partisan advantage" for one political party or political viewpoint.  *Amicus* urges this Court in these proceedings on remand to recognize that government sanctioned discrimination on the basis of an individual's political views, to provide a "partisan advantage" to one group over another, is not a legitimate state interest, and that intentional partisan gerrymandering is no defense to an otherwise well-grounded claim of racial discrimination in the redistricting process.

*Amicus* submitting this brief and its counsel hereby represent that none of the parties in this case nor their counsel authored this brief in whole or in part and that no person other than *amicus* paid for or made a monetary contribution toward its preparation and submission.

## SUMMARY OF THE ARGUMENT

In its Order to the parties dated April 6, 2017, this Court directed the parties to outline their proposals for the conduct of further proceedings in this case on remand, including the extent to which this Court's factual findings and conclusions of law remain in effect following the decision of the Supreme Court of the United States.  In its earlier holding that race did not predominate in the drawing of eleven of the twelve majority-minority districts in the House of Delegates, the Court found that there were other factors at play in the creation of the districts. The Court identified a number of recognized "traditional" redistricting criteria, such as population equality, compactness, contiguity and communities of interest.  However, the Court went beyond these generally accepted traditional principles to also consider evidence of "incumbency protection" and "political deviations," i.e., partisan advantage.  The Supreme Court

of the United States, however, in its opinion in *Bethune-Hill,* did not include these political criteria is its discussion of "traditional redistricting factors." *Bethune-Hill v. Virginia State Board of Elections.* 137 S.Ct. 788, 795 (2017). The Court mentioned "compactness, contiguity of territory, and respect for communities of interest." *Id.* In addition to those "traditional objectives," the Court also identified equal population and compliance with the Voting Rights Act as legitimate, traditional criteria. *Id.* at 794. Nowhere in the Court's opinion, however, is there any mention of incumbency protection or other partisan considerations as being traditional or legitimate redistricting factors. This should not be a surprise. As will be shown, it is clear that there is a trend in the recent decisions of the Supreme Court of the United States, and in decisions from other courts around this country, to find that partisan gerrymandering is not a legitimate state interest, and courts are now rejecting partisan motives as justification for a departure from legitimate redistricting objectives and criteria.

Even this Court, in its earlier opinion, *Bethune-Hill v. Virginia State Board of Elections,* 141 F.Supp.3d 505 (E.D. Va., Oct. 22, 2015), recognized there are limitations on the extent to which partisanship can drive redistricting, noting that "deviations from neutral districting principles on the basis of political affiliation or preference may not always be constitutionally permissible," *Id.,* at n. 21, and "as with political deviations, deviations from neutral districting principles for incumbency purposes are not always permissible. . . the Supreme Court has only sanctioned a state interest in 'incumbency pairing prevention.'" *Id.* at 543 (citations omitted). Despite acknowledging these limits on partisanship in redistricting, the Court admitted into evidence and relied upon numerous examples of extreme partisan line drawing to counter claims that race predominated. If this Court is to conduct proceedings on remand consistent with the Supreme Court's opinion in *Bethune-Hill,* then it must give little weight, if any, or otherwise

4

disregard its findings and conclusions that politics, and not race, drove the creation of the challenged districts.

## ARGUMENT

**I.     THE RECORD IN THIS CASE DEMONSTRATES UNCONSTITUTIONALLY EXCESSIVE PARTISAN GERRYMANDERING.**

This Court noted in its opinion that the Intervenor-Defendants (hereafter "Intervenors") advanced the argument that the House of Delegates intended to create "an incumbent protection plan" and this was the Intervenors' "predominant motivation." *Id.* at 541. The Court also described the strategy for implementing that plan – they would "fence in the incumbent's preferred voters or fence out the incumbent's detractors or challengers." *Id*. at 542. They targeted specific Democratic incumbents and, in turn, the voters who support them. For example, "[t]he changes on the eastern border to House District (HD) 75 were drawn to load heavily Republican precincts into the district of Democrat William Barlow, who subsequently lost to a Republican in the 2011 election . . ." Intervenor Defendants' Pre-Trial Brief at 25. Richmond precinct 207 was moved from HD 71 to HD 68 at the request of Republican Delegate Manoli Loupassi because he had "quite a base of support" in that precinct and sought to enhance his political advantage. *Bethune-Hill,* 141 F.Supp.3d at 563. Several precincts were moved from HD 74 to HD 97, represented by Republican Delegate Christopher Peace, in order to "put some more good Republican precincts in there that the gentleman in the 97th did not want to lose[.]" *Id*. at 564. The Airport District was moved from HD 77 to Republican Delegate Chris Jones' 76th District. As the Court noted, "[t]he Airport District is primarily Republican, so this transfer helped Delegate Jones." *Id*. at 566.

5

Finally, as noted in press reports, a partisan attack was waged in order to unseat Democrat Delegate Robin Abbott, who had defeated Republican Philip Hamilton in 2009 in the 93rd House District. Rather than draw a district based on traditional and neutral criteria, the district was drawn specifically to oust Delegate Abbott from the district and prevent the voters who supported her from continuing to maintain her representation in the legislature. The new lines drew Abbott out of the district completely and added additional Republican precincts. She relocated, and was now paired with Republican candidate Mike Watson in the more heavily Republican 93rd House District. For good measure, to ensure even safer districts for surrounding Republicans, the Intervenors' mappers moved several African-American precincts into the 95th, a minority district that already had a BVAP of 60% and in which the minority representative won at least 65% of the vote in every general election in the past decade. Watson defeated Abbott handily in the 2011 election. See http://wtop.com/politics/2015/07/trial-begins-challenging-va-house-of-delegates-boundaries/

In sum, this case presents a simple and critical question of law that was simply brushed over in the Court's earlier opinion - that is whether gerrymandering to achieve "partisan advantage" is a legitimate state interest. It is not. It is nothing more than unconstitutional discrimination on the basis of political viewpoint. And the assertion of partisan gerrymandering as an excuse for noncompliance with other constitutional, statutory or longstanding "good government" redistricting requirements should not become a judicially sanctioned rule. Partisan gerrymandering is an abuse of legislative authority and incompatible with democratic principles. There is no rational justification for such an invidious abuse of power, and this Court should decline to recognize such viewpoint discrimination as an acceptable explanation for the use of race as a redistricting factor.

## II. PARTISAN GERRYMANDERING UNDERMINES BASIC DEMOCRATIC AND CONSTITUTIONAL VALUES.

"'[P]artisan gerrymanders,' the Supreme Court has recognized, '[are incompatible] with democratic principles.'" *Ariz. State Legislature v. Ariz. Ind. Redistricting Comm'n., et al.*, 576 U.S. ___, ___ , 135 S.Ct. 2352 (2015), *quoting Vieth v. Jubelirer*, 541 U.S. 267, 316 (2004) (Kennedy, J., concurring in judgment). Partisan gerrymandering is the deliberate manipulation of legislative district boundaries to advantage or benefit a particular party or group, or cause disadvantage or harm to an opposing party or group. It is a practice that distorts the electoral process, undermines democracy, and renders legislative elections a meaningless exercise.

Such a practice is antithetical to both the First and Fourteenth Amendments as it creates a system that devalues the voting power of individuals holding one set of political ideals and overweighs the voting power of individuals holding a different set of political beliefs. In this way it is even more offensive to the constitution than redistricting schemes that over populate some districts and under populate others arbitrarily. Those systems are unconstitutional simply because of an inequity in voting power. Partisan gerrymandering adds invidious viewpoint discrimination to the pool.

Moreover, partisan gerrymandering has other harmful effects on the democratic process.

- Partisan gerrymandering reduces and eliminates competition in elections. Unchallenged incumbents have less incentive to ascertain and represent the interests of their constituents.

- Partisan gerrymandering promotes tunnel vision and polarization. When a general election has been predetermined by district lines there is no incentive in a primary to nominate candidates that will reach out to independents or voters from the other party. The result is the election of legislators who stand at the extremes of their own parties.

- With candidates who sit on the extremes, and whose only threat to reelection is a more extreme challenger, compromise is thwarted, resulting in greater gridlock in government.

- Partisan gerrymandering increases voter apathy and confusion, and reduces voter participation – why bother to vote when the outcome is preordained?

The effectiveness of electoral manipulation in the Commonwealth of Virginia under the 2011 redistricting plan, and the harm imposed on our representative democracy, can be seen in the results of the most recent November 2015 general legislative elections. All 100 seats in the Virginia House of Delegates and all 40 seats in the Senate of Virginia were on the ballot during the last election. Of the 100 races in the House of Delegates, 62 delegates ran completely unopposed. Voters in these districts had no choice whatsoever. In an additional nine races, there was only token third party opposition, for a total of 71 essentially uncontested races. Moreover, after retirements, resignations to run for other office, and three primary contest changes, 122 incumbents sought re-election to 140 seats in the House and Senate on the November ballot. Every one of those 122 incumbents won re-election, most with double figure margins of victory.[1] Unsurprisingly, voter apathy and disinterest reached record levels in the 2015 state legislative elections and Virginia suffered one of the lowest voter turnouts on record, with only 29.1% of registered voters going to the polls.[2]

---

[1] *See* Virginia State Board of Elections, *District-by-district contests*, *available at:* http://results.elections.virginia.gov/vaelections/2015%20November%20General/Site/GeneralAssembly.html (last visited Sept. 6, 2016).

[2] *See* Virginia State Board of Elections, *Voter turnout statistics,* available *at:* http://elections.virginia.gov/resultsreports/registration-statistics/registrationturnout-statistics/ (last visited Sept. 6, 2016).

### III. THE FIRST AMENDMENT REQUIRES THAT REDISTIRCTING BE DONE IN A VIEWPOINT NEUTRAL FASHION.

Many different legitimate motivations, some of which involve political considerations, may shape redistricting plans, but the First Amendment makes clear that the legitimacy of any politically related criteria turns on its viewpoint neutrality. "A burden that falls unequally" on the voters of different viewpoints "impinges by its very nature on … the First Amendment." *Anderson v. Celebrezze,* 460 U.S. 780, 793 (1983); *see also Vieth v. Jubelirer*, 541 U.S. 267, 315 (2004) (Kennedy, J., concurring in judgment) ("If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest."); *Tashjian v. Republican Party*, 479 U.S. 208, 217 (1986) (holding that States authority over administering elections "does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens.").

Thus, there are instances in which political criteria, neutrally applied, may constitute a legitimate government interest. For instance, the Court has recognized that the pursuit of political balance may justify district lines. *See Bush v. Vera,* 517 U.S. 952, 964-65 (1996) (citing *Gaffney v. Cummings,* 412 U.S. 735, 757 (1973) (noting that states "may draw irregular district lines in order to allocate seats proportionately to major political parties"); Michael Parsons, *Clearing the Political Thicket: Why Political Gerrymandering for Partisan Advantage is Unconstitutional,* 24 Wm. & Mary Bill Rts. J. 1107, 1139-42 (2016). But the Intervenors' express objective here of manipulating numerous district lines in order to disadvantage much of the electorate because of their political views does not pursue "political balance" or any other viewpoint neutral purpose. The plan is intended to achieve the map drawers own partisan

9

advantage, and specifically to erect barriers in the political process for a large class of its citizens.

In the case at hand, it is especially concerning that Intervenors throughout these proceedings have repeatedly referred to "incumbency protection" as a redistricting objective and consider it to be a neutral and legitimate redistricting practice. However, incumbency protection has never been construed to mean that districts may be drawn with the goal of ensuring the same politicians will be elected and re-elected year after year. At best, incumbency protection means that map makers should not deliberately draw incumbents out of their districts or pair two or more incumbents together in one district in order to eliminate one of them altogether. *See, e.g., Karcher v. Daggett*, 462 U.S. 725, 740(1983) ("Any number of consistently applied legislative policies" can qualify as a rational state policy in this context, "including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and *avoiding contests between incumbents*.") (Emphasis added.) *See also Bush v. Vera*, 517 U.S. 952 (1996) ("And we have recognized incumbency protection, at least in the limited form of 'avoiding contests between incumbents,' as a legitimate state goal.").

In this way "incumbency protection" is a misnomer. What the Court has sanctioned is the recognition of voters' previous choices rather than incumbents' right to be reelected. Having shown preference for certain candidates in the past, it is rational and viewpoint-neutral to allow voters the option to send back to the legislature their prior choices by not drawing them out of their districts or pairing them against one and other. Contrary to Intervenors' argument, the Court has never sanctioned guaranteed re-election or providing continuing tenure for elected representatives in order to ensure a particular party controls the legislature.

## IV. PARTISAN ADVANTAGE IS NOT A LEGITIMATE REDISTRICTING OBJECTIVE, AND SHOULD NOT BE ACCEPTED TO EXCUSE UNCONSTITUTIONAL RACIAL DISCRIMINATION.

Whatever the aims of the individual Intervenor legislators, it can hardly be said that the Commonwealth of Virginia itself has a legitimate state interest in drawing district lines to advantage one set of political views over another. First, partisan advantage is not a *state* interest at all. The state represents the entire body politic composed of myriad viewpoints and cannot claim an interest in which any one party should win a democratic election and ascend to power. Moreover, the reality is that claiming an interest in "partisan advantage" is the same as claiming an interest in "partisan suppression." Advantage cannot be given to one viewpoint without necessarily suppressing the others. Such suppression creates a tangible and particularized harm for each voter whose voting power has been suppressed.

Second, legislation passed for the purpose of disadvantaging a group of citizens is not *legitimate*. *See Romer v. Evans,* 517 U.S. 620, 632 (1996) (noting that when legislation cannot be explained "by anything but animus toward the class it affects[,] it lacks a rational relationship to legitimate state interests"); s*ee also Harris v. Ariz. Ind. Redistricting Comm'n.*, 136 S. Ct. 1301, 1310 (2016) ("assuming, without deciding, that partisanship is an illegitimate redistricting factor, …"). As this Court has stated, "[a] law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Romer* at 633. Legislators who openly proffer "partisan advantage" as a justification for manipulating district lines are not seeking to implement fair and effective representation; they have admitted that their plan has no desire to follow the viewpoint neutrality requirements of the First Amendment. There is no rational theory to justify such legislation when, as here, the elements of a redistricting plan are based on

facial political classifications for the express purpose of achieving partisan advantage. Thus, they must be rejected.

Justice John Paul Stevens sat for an interview shortly after he retired in 2010 on the occasion of the publication of *Five Chiefs,* his memoir on his time at the Court. The interview was conducted by one of his former Law Clerks, Stanford law professor Jeffrey Fisher and in it he discussed his view that the Court should do more to address partisan gerrymandering:

> Well, it goes back to the fundamental equal protection principle that government has the duty to be impartial. . . . Nowadays, the political parties acknowledge they are deliberately trying to gerrymander the districts in a way that will help the majority. . . . That's outrageously unconstitutional in my judgment. The government cannot gerrymander for the purpose of helping the majority party; the government should be redistricting for the purpose of creating appropriate legislative districts.
>
> \*        \*        \*        \*        \*
>
> This is one of the major disappointments in my entire career; that I was so totally unsuccessful in persuading the Court on something so obviously correct. Indeed, I think that the Court's failure to act in this area is one of the things that has contributed to the much greater partisanship in legislative bodies now.

Kali Borkoski, "An Interview with Justice Stevens," SCOTUSblog (Nov. 3, 2011, 3:10 PM), http://www.scotusblog.com/2011/11/an-interview-with-justice-stevens/.

While the Supreme Court has struggled with the difficult question of how exactly to adjudicate partisan gerrymandering claims, a majority of the Court has clearly recognized that discrimination based on political affiliation presents a justiciable constitutional harm. *See Veith v. Jubelirer, supra* at 316 (Kennedy, J., concurring in the judgment). Moreover, at least five sitting Justices now are in agreement that partisan gerrymandering is unlawful. As Justice Kennedy observed in *Vieth, Id.* at 267:

> Finally, I do not understand the plurality to conclude that partisan gerrymandering that disfavors one party is permissible. Indeed the plurality seems to acknowledge it is not. See *ante*, at 292. ("We do not disagree with [the] judgment" that "partisan gerrymanders [are incompatible] with democratic principles"); *ante*, at 293 (noting that it is the case, and that the plurality opinion assumes it to be the case, that "an *excessive* injection of politics [in districting] is *unlawful*").

541 U.S. at 316 (Kennedy, J., concurring in the judgment).

This case does not require an answer to the difficult question of how to appropriately determine when the "injection of politics" has become "excessive" such that it is a cognizable harm in and of itself. This case merely asks this Court to recognize that two wrongs do not make a right. In the face of evidence showing race-based redistricting, the state cannot defend racial sorting by claiming that it was instead partaking in viewpoint discrimination.

This conclusion finds support in the recent decision of the Fourth Circuit in *Raleigh Wake Citizens Assoc., et al. v. Wake County Board of Elections,* 827 F.3d 333 (4th Cir. 2016), *reh. denied,* July 26, 2016. In *Raleigh Wake*, a North Carolina federal district court rejected a "one person, one vote" redistricting challenge to certain Wake County School Board and County Commissioner districts, holding after a bench trial that the plaintiffs had failed to meet their burden of negating "every conceivable legislative purpose" that might support the redistricting plan. *Id.* at 342. The United States Court of Appeals for the Fourth Circuit reversed, noting that the evidence at trial showed that the population deviations reflected the predominance of "illegitimate reapportionment factors," i.e., "an attempt to guarantee Republican victory through the intentional packing of Democratic districts." *Id*. at 346. The court distinguished *Gaffney v. Cummings, supra,* in which political considerations were considered permissible to follow a "policy of political fairness." *Id.* at 347. But in this case, the challenged redistricting "subverts political fairness and proportional representation and sublimates partisan gamesmanship." *Id.* at

13

348. The court concluded that the plaintiffs "successfully showed it to be more probable than not that the deviations at issue reflect the predominance of an illegitimate reapportionment factor rather than legitimate consideration." *Id*. Stated another way, partisan gerrymandering and viewpoint discrimination are not legitimate redistricting criteria. It is impermissible, if not unlawful, and cannot be asserted to offset or justify unconstitutional population deviations, racial sorting, or other equally impermissible redistricting abuses.

Another more recent case out of Wisconsin also supports this conclusion. In *Whitford v. Gill,* 2016 U.S. LEXIS 160811 (W.D. Wis. Nov. 21, 2016), a three-judge federal district court struck down the 2011 Wisconsin state legislative redistricting plans under the First and Fourteenth Amendments as unconstitutional partisan gerrymanders. The court found that the Wisconsin Republican legislators possessed an intent to discriminate against Democratic voters and reduce the influence of Democratic votes in the state. The court stated it was "clear" that the First and Fourteenth Amendments "protect a citizen against state discrimination. . . when that discrimination is based on the political preference[s]" of voters. *Id.* at 111.

When legislators assert, as claimed here, that political advantage was a significant motivation in establishing legislative districts, the body cannot be said to have acted legitimately or rationally on behalf of the state as a whole. Such assertions should not be allowed to explain or justify unconstitutional racial discrimination and the disregard of well-settled traditional redistricting criteria. *Amicus* simply asks this Court to recognize that openly admitting to invidious partisan discrimination cannot provide a safe harbor to a legislature that has engaged in race conscious redistricting.

## **CONCLUSION**

For the foregoing reasons, in these further proceedings on remand, this Court should rule that evidence of partisan gerrymandering or alleged incumbency protection to secure partisan advantage may not be accepted or considered to explain or justify alleged unconstitutional racial discrimination.

Dated:  April 17, 2017                              Respectfully submitted,

OneVirginia2021: Virginians for Fair Redistricting
By Counsel

  */s/   Wyatt B. Durrette, Jr.*
Wyatt B. Durrette, Jr., Esquire (VSB #04719)
Christine A. Williams, Esquire (VSB #47074)
DurretteCrump PLC
1111 East Main Street, 16th Floor
Richmond, Virginia  23219
Telephone:     (804) 775-6900
Facsimile:      (804) 775-6911
wdurrette@durrettecrump.com
cwilliams@durrettecrump.com

Gregory E. Lucyk, Esquire (VSB #19754)
Attorney at Law
300 Seneca Road
Richmond, Virginia  23219
Telephone:     (804) 920-7031
gglucy@comcast.net

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of April 2017, I will electronically file the foregoing with the Clerk of Court using the Court's CM/ECF system, which will then send a notification of such filing (NEF) to the parties in the case.

                                           /s/ Wyatt B. Durrette, Jr.
Wyatt B. Durrette, Jr., Esquire (VSB #04719)
DurretteCrump PLC
1111 East Main Street, 16th Floor
Richmond, Virginia 23219
Telephone: (804) 775-6900
Facsimile: (804) 775-6911
wdurrette@durrettecrump.com