IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| GOLDEN BETHUNE-HILL, et al, <br><br> Plaintiffs, <br><br> v. <br><br> VIRGINIA STATE BOARD OF ELECTIONS, et al., <br><br> Defendants, | Civil Action No. 3:14-cv-852-REP-AWA-BMK |

**PLAINTIFFS' STATEMENT OF POSITION REGARDING
FURTHER PROCEEDINGS**

Plaintiffs respectfully submit this Statement of Position regarding the conduct of further proceedings in this case. On March 1, 2017, the United States Supreme Court concluded that this Court's Memorandum Opinion, ECF No. 108, applied an incorrect legal standard in determining that race did not predominate in 11 of the 12 Challenged Districts. In light of that conclusion, Plaintiffs maintain that this Court should order and consider merits briefing on the proper resolution of Plaintiffs' claims under the correct legal standard as applied to the existing evidentiary record, and promptly render its decision on remand without any further hearings. Below, Plaintiffs address each of the topics listed in this Court's April 6, 2017 Order, ECF No. 136.

### A.  Factual Findings

This Court ordered the parties to address "[t]he extent to which factual findings made in the MEMORANDUM OPINION (ECF No. 108) remain in effect following the decision of the Supreme Court of the United States." Order, ECF No. 136 ¶ 4(a). Plaintiffs' position is that while some factual findings remain in effect as law of the case, others are subject to review and reconsideration under the proper legal standard.

Some factual findings clearly remain in effect as law of the case. "[F]indings of fact reviewed in and relied upon in an appellate court's decision become the law of the case and, absent certain exceptional circumstances, may not be disturbed by a trial court on remand." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 948 F.2d 1573, 1576 (Fed. Cir. 1991).[1] Here, the Supreme Court reviewed and relied upon certain facts found by this Court. These facts fall into two categories: (1) facts discussed in Part I of the Supreme Court's Opinion, and (2) facts pertaining to House of Delegates District 75 ("District 75").

---

[1] *See also In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895 ) ("When a case has been once decided by this court on appeal, and remanded to the circuit court, whatever was before this court, and disposed of by its decree, is considered as finally settled. The circuit court is bound by the decree as the law of the case, and must carry it into execution according to the mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon any matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded.").

With respect to the former, the Supreme Court specifically noted, among other things, "'that the 55% BVAP figure was used in structuring the districts,'" "that the 55% criterion emerged from discussions among certain members of the House Black Caucus and the leader of the redistricting effort in the House, Delegate Chris Jones, 'based largely on concerns pertaining to the re-election of Delegate Tyler in [District] 75,'" and that "[t]he 55% figure 'was then applied across the board to all twelve' districts." Slip Opinion, ECF No. 128 ("Slip Op.") at 4 (quoting Mem. Op., ECF No. 108 at 22, 29-30). These facts, "[a]gainst" which the Supreme Court "consider[ed] the controlling legal principles in this case," *id.* at 6, are drawn largely from Section III of this Court's Memorandum Opinion, *see* ECF No. 108 at 19-31.

With respect to District 75, the Supreme Court held that "[u]nder the facts found by the District Court," the General Assembly performed a "functional analysis of District 75 when deciding upon the 55% BVAP target." Slip Op. at 14. Those factual findings include the finding that Delegate Jones met with Delegate Tyler and "incumbents from other majority-minority districts," and the finding that Delegate Jones considered "turnout rates, the results of the recent contested primary and general elections in 2005, and [District 75's] large population of disenfranchised black prisoners." *Id.* at 15. These facts, which the Supreme Court "reviewed only for clear error" and found "well supported," *id.* at 15, are drawn largely from Section IV.C.2 of this Court's Memorandum Opinion, *see* ECF No. 108 at 113-25.[2] Together, the factual findings discussed above remain in effect on remand because the Supreme Court expressly considered them in issuing its Opinion.

By contrast, the Supreme Court expressly refused to consider the factual findings underlying this Court's determination that race did not predominate in the remaining 11 districts. *See* Slip Op. at 12-13. These factual findings, found primarily in Sections IV.B, IV.C.1 and IV.C.3-12, *see* Mem. Op., ECF No. 108 at 101-13, 125-54, while not formally

---

[2] Although the Supreme Court did not explicitly reference the Court's factual findings underlying the conclusion that race predominated in District 75, the Supreme Court plainly relied on those factual findings in affirming this Court's "conclusion that the State had sufficient grounds" justifying "the race-based calculus it employed in District 75." Slip Op. at 14.

2

vacated, are subject to reevaluation in light of the Supreme Court's holding that the framework within which those facts were considered was legally erroneous. *Cf. Burns v. Uninet, Inc.*, 211 F.3d 1264 (4th Cir. 2000) ("If the trial judge correctly states the law, then his findings as to whether the facts meet the legal standard will be disturbed only if they are clearly erroneous. Our review would be more searching if the district court has committed an error of law, including one that infects a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.") (quoting *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1269-70 (7th Cir. 1991)) (internal quotation marks and citations omitted). All of those factual findings were necessarily based on or at least shaped by an incorrect legal framework. *See* Mem. Op., ECF No. 108 at 101 ("The foregoing legal framework for analyzing a racial sorting claim provides the guidepost for the statewide and district-by-district findings that follow."). Moreover, the Court's threshold decision as to which factual issues required resolution was informed by an erroneous understanding of what evidence is relevant to evaluating predominance. *See, e.g.*, Slip Op. at 11 ("[T]here may be cases where challengers will be able to establish racial predominance in the absence of an actual conflict by presenting direct evidence of the legislative purpose and intent or other compelling circumstantial evidence."). Thus, these factual findings are subject to review.

As a practical matter, this means that the Court may draw upon the existing factual findings to the degree appropriate under the correct legal standard. But these facts are not necessarily the universe of relevant factual findings on remand. For instance, the Court may deem it necessary to make further factual findings where its original racial predominance determination was limited by the assumption that race predominates only where the State does not respect or comply with traditional districting principles, *see* Slip. Op. at 9,[3] or where

---

[3] *See, e.g.*, Mem. Op., ECF No. 108 at 136 ("HD 71 does not substantially disregard traditional, neutral districting principles, and that is sufficient for the Court to find that these principles were not subordinated to race. The existence of a 55% BVAP floor does not disturb that fact."); *id.* at 151 (making no findings pertaining

3

its original approach "led the [Court] to give insufficient weight to the 55% BVAP target and other relevant evidence that race predominated," such as "stark splits in the racial composition of populations moved into and out of disparate parts of the district," *id*. at 11, 12.[4] The Court may also consider some of its original factual findings no longer relevant if, for instance, they refer to "*post hoc* justifications the legislature in theory could have used but in reality did not," Slip Op. at 9,[5] or where the achievement of "some other factor" was understood to preclude a finding of racial predominance, *id*. at 11.[6] Additionally, the Court may conclude that some of its previous findings remain relevant and significant under the appropriate legal standard. *See, e.g.*, Mem. Op., ECF No. 108 at 109 (Dinwiddie County split "appears to be avowedly racial"); *id.* at 137 (District 74 "had Reock and Polsby-Popper scores of .16 and .10 under the Benchmark Plan, which remained almost identical − with scores of .16 and .12 − under the Enacted Plan"); *id.* at 144 (District 80 "winds its way around low BVAP precincts . . . to capture high BVAP precincts").[7]

In sum, Plaintiffs maintain that while the record is and should remain closed, *see infra* Section C, the Court can and should take from that record any and all facts it deems appropriate to resolve this case (to the extent they do not constitute law of the case), guided by the proper legal standard.

---

to race in District 92 where "the Court finds it hard to imagine a better example of a district that complies with traditional, neutral districting principles").

[4] *See, e.g.*, Mem. Op., ECF No. 108 at 126 (finding testimony that District 69 had to satisfy the 55% BVAP floor "largely irrelevant" where incorporation of African-American voters made the district more compact); *id.* at 135 ("[I]f the 55% BVAP goal could be achieved without subordinating neutral principles on the whole, it does not matter what Delegate McClellan's personal preferences were."); *id.* at 131-136 (no mention in District 71 analysis that average BVAP of areas moved in was more than 50 percentage points higher than average BVAP of areas moved out); *id.* at 139 (no mention in District 74 analysis that average BVAP of areas moved into Challenged Districts was nearly 50 percentage points higher than average BVAP of areas moved into non-Challenged Districts).

[5] *See, e.g.,* Mem. Op., ECF No. 108 at 110 (noting that "the artificial border provided by I-85 may provide a clear boundary to voters and candidates alike that reside in Dinwiddie precinct and wish to know their House District").

[6] *See, e.g.,* Mem. Op., ECF No. 108 at 149 (finding no predominance where deviations "could be attributable either to racial or to incumbency considerations").

[7] The Court's credibility determinations, meanwhile, are similarly subject to re-evaluation, particularly where, for instance, two members of the Court expressed different views on the reliability of expert reports and analysis that are fully presented on the existing record. *See, e.g.*, Mem. Op., ECF No. 108 at 174-75.

4

### B. Conclusions of Law

The Court further ordered the parties to address "[t]he extent to which conclusions of law in the MEMORANDUM OPINION (ECF No. 108) remain in effect following the decision of the Supreme Court of the United States." Order, ECF No. 136 ¶ 4(b). Plaintiffs submit that the Supreme Court has definitively answered this question.

The Supreme Court's Opinion makes clear that the Memorandum Opinion's conclusion that race did not predominate in 11 out of the 12 Challenged Districts was based on a "misappli[cation] [of] controlling law," Slip Op. at 7, and is therefore vacated. Thus, any conclusion to the effect that race did not predominate in 11 of the 12 Challenged Districts is no longer valid. *See id*. at 13 (ordering this Court to determine "the extent to which, under the proper standard, race directed the shape of these 11 districts"). To be clear, this Court's conclusions with respect to predominance in 11 of the 12 Challenged Districts must be revisited even if those conclusions are characterized as findings of "fact" in the Memorandum Opinion, *see, e.g.*, Mem. Op., ECF No. 108 at 113 (holding, "as a matter of fact," that race did not predominate in a particular district), for "the ultimate conclusion to be drawn from the basic facts . . . is actually a question of law." *Hicks v. U.S.*, 368 F.2d 626, 631 (4th Cir. 1966). Under the Supreme Court's reasoning and its instructions on remand, those conclusions must be analyzed anew under the correct legal standard. If the Court finds racial predominance with respect to any of these districts, it must determine whether Defendants and Intervenors have met their burden of showing that the State's race-based redistricting was narrowly tailored to a compelling interest.

The Supreme Court's Opinion further makes clear that the Memorandum Opinion's conclusion that "the State had sufficient grounds to determine that the race-based calculus it employed in District 75 was necessary to avoid violating § 5" is not erroneous and thus remains in effect. Slip Op. at 14.

5

### C. Further Discovery and Evidentiary Hearings

The Court also ordered the parties to address "[t]he extent to which further discovery or further evidentiary proceedings may be necessary." Order, ECF No. 136 ¶ 4(c). Plaintiffs maintain that the record is closed and that no further evidentiary proceedings are necessary.

Where the purpose of an appellate court's remand is to have the district court revise its legal analysis, rather than to rectify a purportedly incomplete or inadequate factual record, a district court should decide the case on the existing record. *See Hennessy v. Schmidt*, 583 F.2d 302, 307 (7th Cir. 1978) ("What was required of the district court on remand . . . was to review the evidence in the record applying the correct standard or proof and applying the correct [legal] test. A new trial, or the taking of additional testimony, was neither required nor appropriate."). Here, the Supreme Court's vacatur and remand is based purely on "the controlling legal principles in this case." Slip Op. at 6. While it set forth the proper legal standard for evaluating racial predominance, it refused to consider or disturb the evidentiary record, let alone imply that the record was somehow insufficient. In fact, the record presented in the course of the four-day bench trial, "at which the parties presented oral testimony and offered numerous exhibits," Mem. Op., ECF No. 108 at 1, was robust; even the abridged compilation of that record selected by the parties on appeal comprised no fewer than six bound volumes totaling 2,321 pages, many of which could be folded outward to display detailed maps and data tables. *See* ECF Nos. 138-43.

Moreover, none of the factual circumstances have changed since the Court's bench trial. Nor did the Supreme Court's Opinion shift the legal landscape in some unforeseen way that might better inform what evidence the parties proffer. On the contrary, the Supreme Court simply "reaffirm[ed] the basic racial predominance analysis explained in *Miller* [*Miller v. Johnson*, 515 U.S. 900 (1995)] and *Shaw II* [*Shaw v. Hunt*, 517 U.S. 899 (1996)], and the basic narrow tailoring analysis explained in *Alabama* [*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. __ (2015)]," Slip Op. at 16; *see also id.* ("The Court's holding in this case

6

is controlled by precedent."). The parties were thus on notice of the correct legal standard when considering what evidence to put forward at trial.

Equally important, allowing further discovery and evidentiary proceedings is a recipe for delay that will almost guarantee that the residents of Virginia will be forced to live under an unconstitutional districting system for at least another election cycle. Over two years after Plaintiffs first filed suit, despite diligently pursuing and preparing for a trial less than seven months after doing so, Plaintiffs stand without a final determination of their racial gerrymandering claims in 11 of 12 districts. Should the Court conclude, on remand, that some or all of those districts are unconstitutional, citizens within those districts will have suffered irreparable injury for the better part of a decade. Prior to a decision on the merits on remand, the Court is not in a position to decide whether or how it might effectuate a remedy should it find liability on the merits. Further delaying this case to allow new evidence and hearings after having had a full and fair trial would not only be duplicative and wasteful, it would favor no one – certainly not the aggrieved Virginia voters.

### D. Amicus Brief of Political Scientists

Finally, the Court ordered the parties to address "[w]hether the analysis required by the decision of the Supreme Court of the United States would be assisted by expert evidence on the topics discussed in the BRIEF OF POLITICAL SCIENTISTS THOMAS L. BRUNELL, CHARLES S. BULLOCK III, AND RONALD KEITH GADDIE AS *AMICI CURIAE IN SUPPORT OF APPELLEES* filed in the Supreme Court of the United States." Order, ECF No. 136 ¶ 4(d). Plaintiffs maintain that this brief (the "Amicus Brief") has no bearing on the resolution of this case and thus should not inform further proceedings.

As an initial matter, a total of eight amicus briefs were filed with the Supreme Court in this case (not including the brief filed by the United States) – four in support of Plaintiffs/Appellants, one in support of neither party, and three in support of Intervenors/Appellees. The Supreme Court's Opinion cited none of them. There is no reason

7

to believe that any single amicus brief, especially one that was not filed before this Court and not mentioned by the Supreme Court, warrants this Court's special consideration on remand.

Nor is there any basis to invite new expert testimony on narrow tailoring, which is the only issue on which the Amicus Brief opines. It was and remains the burden of Defendants and Intervenors to prove narrow tailoring. This Court conducted a full trial, during which Defendants and Intervenors presented no fewer than three testifying experts. It would be inappropriate to reopen the record now to allow expert evidence Intervenors could have, but chose not to, offer.[8]

In any case, inviting further testimony along the lines in the Amicus Brief would be useless at best and misleading at worst because the premise of the Amicus Brief is false. According to the Amicus Brief, Plaintiffs "are demanding" that the State "precise[ly] guess[]" the "exact threshold required to ensure that minority voters' voting power is not undermined." Amicus Br. at 6, 8. Tellingly, the Amicus Brief does not include a single citation to Plaintiffs'/Appellants' merits brief for that claim. In fact, Plaintiffs argued that District 75 was not narrowly tailored because the mapdrawer lacked a "strong basis in evidence" for the 55% BVAP rule – the same standard recently articulated by the Supreme Court. *Alabama Leg. Black Caucus v. Ala.*, 135 S. Ct. 1257, 1274 (2015). Specifically, Plaintiffs pointed out that Delegate Jones said on the legislative record that he was "not aware of any . . . retrogress[ion] analysis regarding minority performance in any of the 12 majority-minority districts," but then testified to the contrary on the witness stand. Plaintiffs also pointed out that reliance upon vague assertions of other delegates does not constitute a strong basis in evidence, and that Delegate Jones' decision to look to a single election was insufficient under the governing standard. *See* Exhibit A, Brief for Appellants at 56-59, *Golden Bethune-Hill et al. v. Virginia State Board*

---

[8] Notably, Intervenors represented to the Court that they had consulted with Dr. Brunell and intended to call him as a testifying expert, *see* ECF No. 34 (Transcript of Feb. 24, 2015 Conference Call) at 27:14-17 ("Dr. Brunell is most certainly locked in and is prepared to testify on these dates and have his expert report done in the manner set forth in the proposed order."), but ultimately did not do so.

8

*of Elections, et al.*, No. 15-680 (U.S. Sep. 7, 2016); Exhibit B, Reply Brief for Appellants at 19-22 *Golden Bethune-Hill et al. v. Virginia State Board of Elections, et al.*, No. 15-680 (U.S. Nov. 16, 2016).

Even if Plaintiffs had demanded a narrow tailoring standard at odds with *Alabama*, the Amicus Brief adds nothing to the Supreme Court's definitive ruling on the issue. Ultimately, the Amicus Brief argues that the narrow tailoring standard articulated in *Alabama* should stand, *see* Amicus Br. at 6 ("The wisdom of th[e] [*Alabama*] holding cannot be overstated."), and that Appellants' supposed effort to proffer a new standard should fail, *see id.* ("Appellants in this case are demanding exactly the kind of precise 'guessing' that [the Supreme] Court disclaimed [in *Alabama*]."). Again, Plaintiffs deny that they have ever argued for a narrow tailoring legal standard at odds with *Alabama*. Regardless, the Supreme Court has "reaffirm[ed] . . . the basic narrow tailoring analysis explained in *Alabama*." Slip Op. at 16. The Supreme Court hardly relied upon Amici in reaffirming the narrow tailoring standard of *Alabama*, and this Court similarly requires no assistance from Amici in resolving this matter pursuant to that standard. On the contrary, the Supreme Court held that this Court had properly applied the narrow tailoring standard in its analysis of District 75. In short, "the analysis required by the decision of the Supreme Court of the United States," Order, ECF No. 136 ¶ 4(d), is the same analysis already performed by this Court in its Memorandum Opinion without the benefit of the Amicus Brief.

Finally, not only is this type of post-trial expert testimony unnecessary and inappropriate, it would, once again, necessitate further delay. The introduction of new expert testimony would require engaging new experts, having those experts draft reports, deposing those experts, and cross-examining those experts in a fact-finding proceeding before the Court. There is no basis for such a significant delay, especially one prompted by an amicus brief that had no bearing on the Supreme Court's Opinion remanding this case for further proceedings.

9

\* \* \*

Since the Supreme Court issued its Opinion more than six weeks ago, Plaintiffs have filed two motions requesting a briefing schedule for resolution on remand. Plaintiffs once again request that the Court accept briefing from the parties on how the Supreme Court Opinion should affect the outcome on the merits of this case, without reopening the record and without disturbing the factual findings relied upon by the Supreme Court. While the Court may find oral argument helpful after merits briefing is completed, Plaintiffs object to any further evidentiary hearings.

Finally, Plaintiffs strenuously oppose any further briefing as suggested by Paragraph (5) of the Court's April 6 order. *See* ECF No. 136 ¶ 5. As of May 1, a full two months after the Supreme Court issued its Opinion, this Court will have the benefit of three judges to consider 870 pages of trial transcript, 130 exhibits, the parties' six-volume compilation of that record before the Supreme Court, one Supreme Court opinion, and two rounds of simultaneous briefing from the parties to decide how to proceed on remand. If the parties disagree on any issues addressed herein, those disagreements will come to light in the responsive briefing and will be ripe for resolution by this Court. Setting a briefing schedule at that point to address once again issues raised in the present briefing would constitute an unnecessary waste of time and resources, all the more damaging in a case in which the fundamental rights of Virginia voters hang in the balance.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court set a briefing schedule on the proper resolution of the merits of this case on remand, without allowing further discovery or conducting any further evidentiary hearings, and render its decision on the merits consistent with the legal standard articulated by the Supreme Court.

Dated: April 17, 2017 Respectfully submitted,

By /s/ Aria C. Branch
   Aria Branch (VSB #1014541)
   Marc Erik Elias (admitted *pro hac vice*)
   Bruce Spiva (admitted *pro hac vice*)
   Perkins Coie LLP
   700 13th St. N.W., Suite 600
   Washington, D.C. 20005-3960
   Phone: (202) 434-1627
   Fax: (202) 654-9106
   Email: ABranch@perkinscoie.com
   Email: MElias@perkinscoie.com
   Email: BSpiva@perkinscoie.com

   Kevin J. Hamilton (admitted *pro hac vice*)
   Abha Khanna (admitted *pro hac vice*)
   Ryan Spear (admitted *pro hac vice*)
   William B. Stafford (admitted *pro hac vice*)
   Perkins Coie LLP
   1201 Third Avenue, Ste. 4900
   Seattle, WA 98101-3099
   Phone: (206) 359-8000
   Fax: (206) 359-9000
   Email: KHamilton@perkinscoie.com
   Email: AKhanna@perkinscoie.com
   Email: RSpear@perkinscoie.com
   Email: BStafford@perkinscoie.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

      I hereby certify that on the 17th day of April, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

      Respectfully submitted,

By /s/  Aria C. Branch
    Aria C. Branch (VSB #1014541)
    Perkins Coie LLP
    700 13th St. N.W., Suite 600
    Washington, D.C. 20005-3960
    Phone:  (202) 434-1627
    Fax:  (202) 654-9106
    Email: ABranch@perkinscoie.com

    *Attorneys for Plaintiffs*