# Exhibit A

**No. 15-680**

IN THE

# Supreme Court of the United States

————

GOLDEN BETHUNE-HILL, CHRISTA BROOKS, CHAUNCEY
BROWN, ATOY CARRINGTON, DAVINDA DAVIS, ALFREDA
GORDON, CHERRELLE HURT, THOMAS CALHOUN,
TAVARRIS SPINKS, MATTIE MAE URQUHART, VIVIAN
WILLIAMSON, AND SHEPPARD ROLAND WINSTON,

*Appellants*,

v.

VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,

*Appellees*.

————

**On Appeal from the
United States District Court for the
Eastern District of Virginia**

————

**BRIEF FOR APPELLANTS**

————

| | |
|---|---|
| KEVIN J. HAMILTON | MARC E. ELIAS |
| ABHA KHANNA | *Counsel of Record* |
| RYAN SPEAR | BRUCE V. SPIVA |
| WILLIAM B. STAFFORD | ARIA C. BRANCH |
| PERKINS COIE LLP | PERKINS COIE LLP |
| 1201 Third Avenue | 700 Thirteenth Street, N.W. |
| Suite 4900 | Suite 600 |
| Seattle, WA 98101-3099 | Washington, D.C. 20005-3960 |
| (206) 359-8000 | (202) 654-6200 |
| | MElias@perkinscoie.com |

*Counsel for Appellants Golden Bethune-Hill, Christa Brooks,
Chauncey Brown, Atoy Carrington, Davinda Davis,
Alfreda Gordon, Cherrelle Hurt, Thomas Calhoun,
Tavarris Spinks, Mattie Mae Urquhart, Vivian Williamson,
and Sheppard Roland Winston*

WILSON-EPES PRINTING CO., INC.  –  (202) 789-0096  –  WASHINGTON, D. C. 20002

# QUESTIONS PRESENTED

The questions presented are:

1.   Did the court below err in holding that race cannot predominate even where it is the most important consideration in drawing a given district unless the use of race results in "actual conflict" with traditional redistricting criteria?

2.   Did the court below err by concluding that the admitted use of a one-size-fits-all 55% black voting age population floor to draw twelve separate House of Delegates districts does not amount to racial predominance and trigger strict scrutiny?

3.   Did the court below err in disregarding the admitted use of race in drawing district lines in favor of examining circumstantial evidence regarding the contours of the districts?

4.   Did the court below err in holding that racial goals must negate *all* other districting criteria in order for race to predominate?

5.   Did the court below err in concluding that the General Assembly's predominant use of race in drawing House District 75 was narrowly tailored to serve a compelling government interest?

ii

## PARTIES TO THE PROCEEDING

The following were parties in the court below:

Plaintiffs:

> Golden Bethune-Hill, Christa Brooks, Chauncey Brown, Atoy Carrington, Davinda Davis, Alfreda Gordon, Cherrelle Hurt, Thomas Calhoun, Tavarris Spinks, Mattie Mae Urquhart, Vivian Williamson, and Sheppard Roland Winston.

Defendants:

> Virginia State Board of Elections

> James B. Alcorn, Chairman of the Virginia State Board of Elections

> Virginia Department of Elections

> Edgardo Cortes, Commissioner of the Virginia Department of Elections

> Clara Belle Wheeler, Vice-Chair of the Virginia State Board of Elections

> Singleton B. McAllister, Secretary of the Virginia State Board of Elections

Intervenor Defendants

> Virginia House of Delegates

> William J. Howell, Speaker of the Virginia House of Delegates

TABLE OF CONTENTS

Page

QUESTIONS PRESENTED ............................... i

PARTIES TO THE PROCEEDING .................... ii

TABLE OF AUTHORITIES................................ vi

OPINION BELOW ............................................. 1

JURISDICTION ................................................. 1

CONSTITUTIONAL AND STATUTORY
    PROVISIONS INVOLVED............................. 1

STATEMENT ..................................................... 2

SUMMARY OF ARGUMENT ............................ 6

ARGUMENT....................................................... 9

  I.  THE MAJORITY MISUNDERSTANDS
      AND   MISAPPLIES   THE   LAW   OF
      "RACIAL PREDOMINANCE"................. 9

      A. The   Majority's   Test   Eviscerates
         *Alabama* by Deeming the Use of
         Mechanical Racial Targets "Largely
         Irrelevant"........................................... 12

      B. The Majority's Test Negates the Role
         of Direct Evidence in Racial Gerry-
         mandering Cases ................................. 14

      C. The   Majority's   Test   Erroneously
         Requires Plaintiffs to Prove that Race
         Was    the    Only    Factor    in    the
         Legislature's Line-Drawing Decisions    17

  II.  THE MAJORITY'S APPLICATION OF
       ITS NOVEL PREDOMINANCE TEST
       HIGHLIGHTS   AND   COMPOUNDS
       THESE ERRORS ...................................... 20

iv

TABLE OF CONTENTS—Continued

Page

A. The Majority Erroneously Disre-
   garded Statewide Evidence of Racial
   Predominance .....................................    20

  1. The 55% BVAP Rule .......................    20

  2. House Criteria................................    24

  3. Virginia's          Preclearance
     Submission ....................................    25

  4. Delegate Jones' Statements...........    26

  5. Subordination   of   Traditional
     Districting Criteria ........................    27

  6. Racial Sorting.................................    28

B. The Majority Systematically Dis-
   regarded the Role of Race in
   Structuring Individual Districts.........    30

  1. Districts 63 and 75........................    30

  2. District 69.....................................    35

  3. District 70.....................................    37

  4. District 71.....................................    38

  5. District 74.....................................    42

  6. District 77.....................................    44

  7. District 80.....................................    46

  8. District 89.....................................    48

  9. District 90.....................................    51

  10. Districts 92 and 95........................    53

v

TABLE OF CONTENTS—Continued

Page

III.  THE MAJORITY ERRED IN HOLDING
      THAT DISTRICT 75 WAS NARROWLY
      TAILORED................................................   56

CONCLUSION ...................................................   60

vi

## TABLE OF AUTHORITIES

CASES                                                    Page(s)

*Ala. Leg. Black Caucus v. Alabama*,
   135 S. Ct. 1257 (2015)............................*passim*

*Backus v. South Carolina*,
   857 F. Supp. 2d 553 (D.S.C. 2012), *aff'd*,
   133 S. Ct. 156 (2012)................................. 15

*Bartlett v. Strickland*,
   556 U.S. 1 (2009)....................................... 8

*Bush v. Vera*,
   517 U.S. 952 (1996)................................. 17, 26

*Clark v. Putnam Cty.*,
   293 F. 3d 1261 (11th Cir. 2002)............... 16, 17

*Covington v. North Carolina*,
   No. 1:15-cv-399, 2016 WL 4257351
   (M.D.N.C. Aug. 11, 2016)......................*passim*

*Harris v. McCrory*,
   No. 1:13-cv-949, 2016 WL 482052
   (M.D.N.C. Feb. 5, 2016)............................ 22

*Hays v. Louisiana*,
   839 F. Supp. 1188 (W.D. La. 1993),
   *vacated on other grounds*, 512 U.S. 1230
   (1994)......................................................... 15

*Miller v. Johnson*,
   515 U.S. 900 (1995)................................*passim*

*Moon v. Meadows*,
   952 F. Supp. 1141 (E.D. Va. 1997), *aff'd*,
   521 U.S. 1113 (1997)................................. 18

*Page v. Va. State Bd. of Elections* (*Page I*),
   58 F. Supp. 3d 533 (E.D. Va. 2014).......... 3, 4

vii

TABLE OF AUTHORITIES—Continued

Page(s)

*Page v. Va. State Bd. of Elections* (*Page II*),
　No. 3:13cv678, 2015 WL 3604029 (E.D.
　Va. June 5, 2015) .....................................*passim*

*Palmer v. Thompson*,
　403 U.S. 217 (1971)...................................　14

*Shaw v. Reno* (*Shaw I*),
　509 U.S. 630 (1993).................................*passim*

*Shaw v. Hunt (Shaw II)*,
　517 U.S. 899 (1996).................................*passim*

*Smith v. Beasley*,
　946 F. Supp. 1174 (D.S.C. 1996) .............. 22, 59

*Wittman v. Personhuballah*,
　No. 14-1504, 136 S. Ct. 1732 (2016).........　4

CONSTITUTION

U.S. Const. amend XIV ................................ 1, 7, 9

STATUTES

28 U.S.C. § 1253 ...........................................　1

Voting Rights Act of 1965, 42 U.S.C.
　§ 1973 *et seq*. ............................................*passim*

Va. HB 5005 (April 29, 2011), Va. Code
　Ann. § 24.2-304.03 ...................................*passim*

OTHER AUTHORITIES

Va. HB 5001 (April 11, 2011)......................　2

## BRIEF FOR APPELLANTS

Appellants Golden Bethune-Hill, Christa Brooks, Chauncey Brown, Atoy Carrington, Davinda Davis, Alfreda Gordon, Cherrelle Hurt, Thomas Calhoun, Tavarris Spinks, Mattie Mae Urquhart, Vivian Williamson, and Sheppard Roland Winston respectfully request that the Court reverse the opinion and order holding that Virginia House of Delegates Districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 are not unlawful racial gerrymanders in violation of the Fourteenth Amendment to the United States Constitution.

## OPINION BELOW

The opinion of the three-judge court of the Eastern District of Virginia is reported at 2015 WL 6440332 (E.D. Va. Oct. 22, 2015) and is reprinted at Jurisdictional Statement Appendix ("J.S. App.") A. The court's order is unreported and is reprinted at J.S. App. B.

## JURISDICTION

The court's opinion and order were issued on October 22, 2015. J.S. App. A-B. Appellants filed their notice of appeal on October 26, 2015. J.S. App. D. This Court has jurisdiction under 28 U.S.C. § 1253.

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

This appeal involves the Equal Protection Clause of the Fourteenth Amendment, which is reproduced at J.S. App. C.

2

## STATEMENT

In March 2015, this Court condemned the "prioritiz[ation] [of] mechanical racial targets above all other districting criteria," particularly where a state's "mechanical[] rel[iance] upon numerical percentages" is untethered to any "strong basis in evidence" for sorting voters on the basis of race. *Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1267, 1273-74 (2015) (citation omitted). Just seven months later, the panel below issued an opinion that upheld, 2-1, the Virginia General Assembly's use of a "fixed racial threshold" of 55% Black Voting Age Population ("BVAP"), "prioritized 'above all other districting criteria' in 'importance,'" and applied "across the board" to all twelve of the Commonwealth's majority-minority House of Delegates districts. J.S. App. 19a, 25a, 30a. The majority's analysis flouts the clear command of *Alabama* and undermines decades of racial gerry-mandering jurisprudence dictating that assigning voters to districts primarily based on the color of their skin "demands close judicial scrutiny," *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 657 (1993).

\* \* \*

After the 2010 census, Virginia was required to redraw its House of Delegates districts. Delegate Chris Jones directed that effort. Joint Appendix ("JA") 283-84.

On April 11, 2011, the General Assembly adopted HB 5001, which set out a redistricting plan for House districts (authored by Delegate Jones) and Senate districts (which originated in the Senate). JA 598. Governor McDonnell vetoed HB 5001 based on objections to the Senate plan. *See id.* The General Assembly subsequently adopted HB 5005, which

3

included a nearly identical House plan (again authored by Delegate Jones) and a significantly revised Senate plan. JA 598-99. Governor McDonnell signed HB 5005 (the "Enacted Plan") on April 29, 2011. JA 600.

Like the predecessor plan adopted in 2001 (the "Benchmark Plan"), the Enacted Plan includes twelve House districts in which African Americans constitute a majority of the voting age population: Districts 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95 (the "Challenged Districts"). JA 541. Before the Enacted Plan was passed, BVAP in the Challenged Districts ranged from 46.3% to 62.7%. JA 549. Under the Enacted Plan, BVAP in each of the Challenged Districts exceeds 55%. *Id.*

This was no coincidence. Delegate Jones insisted throughout the redistricting process that BVAP in the Challenged Districts "needed to be north of 55 percent" to comply with Section 5 of the Voting Rights Act ("VRA"). JA 299. That message was heard loud and clear by his fellow delegates, who understood that the Challenged Districts "would have to be at least 55 percent [BVAP];" otherwise, the House Committee on Privileges and Elections "would not support the plan." JA 1657; *see also* JA 1606, 1642. Delegate Jones rejected draft plans that did not meet this racial target. *See, e.g.*, JA 138.

On October 7, 2014, a three-judge panel of the Eastern District of Virginia struck down Virginia's third congressional district as an unconstitutional racial gerrymander, based in part on the General Assembly's use of an "ad hoc . . . [55% BVAP] racial threshold[]" to draw that district. *Page v. Va. State Bd. of Elections* (*Page I*), 58 F. Supp. 3d 533, 543, 553 (E.D.

4

Va. 2014).[1] The *Page I* court relied upon the expert testimony of a consultant to the House of Delegates to find that "the legislature enacted 'a House of Delegates redistricting plan with a 55% Black VAP as the floor for black-majority districts,'" and that it "acted in accordance with that view" when adopting its congressional plan. *Page I*, 58 F. Supp. 3d at 543 (citation omitted).

Less than three months later, residents of the Challenged Districts filed this case, alleging that the same General Assembly that racially gerrymandered the third congressional district also racially gerry-mandered the Challenged Districts. Compl. ¶¶ 2-3, 35, 39. The case went to trial in July 2015.

The panel issued its decision on October 22, 2015. The two-judge majority sided with Appellants on virtually all major factual disputes. In particular, the majority found that the 55% BVAP rule "was used in drawing the Challenged Districts," thereby resolving this "most important question" at trial:

> [T]he Court finds . . . that the 55% BVAP figure was used in structuring the districts and in assessing whether the redistricting plan satisfied constitutional standards and the VRA[.]

J.S. App. 19a; *see also id.* 87a ("[A] 55% BVAP floor was employed by Delegate Jones and the other

---

[1] The *Page* panel reaffirmed its opinion upon remand in light of *Alabama*. *See Page v. Va. State Bd. of Elections* (*Page II*), No. 3:13cv678, 2015 WL 3604029 (E.D. Va. June 5, 2015). District Judge Robert E. Payne, the lead author of the majority opinion here, dissented in *Page I* and *Page II*. On May 23, 2016, this Court dismissed the appeal of *Page II* on standing grounds. *Wittman v. Personhuballah*, No. 14-1504, 136 S. Ct. 1732 (2016).

5

legislators who had a hand in crafting the Challenged Districts.").

The majority further found that testimony on the "source of the 55% rule" was "a muddle," J.S. App. 23a, but ultimately determined that it was based "largely" on concerns about the re-election of a single African-American delegate in a single district, as well as "feedback" from "various groups" that did not pertain to any particular district, *id.* 25a. "That [55% BVAP] figure was then applied across the board to all twelve of the Challenged Districts." *Id.*

The majority concluded, however, that race predominated in only one Challenged District (District 75). That conclusion rested on the majority's legal determination (first posited in the lead author's dissenting opinion in *Page II*) that, notwithstanding the use of a "fixed racial threshold" to draw district lines, J.S. App. 19a, predominance demands a showing of "'*actual* conflict between traditional redistricting criteria and race that leads to the subordination of the former.'" *Id.* 30a (quoting *Page II*, 2015 WL 3604029, at *27 (Payne, J., dissenting)). Pursuant to that view, the majority articulated a novel, three-step predominance test that focuses primarily on a district's "compliance with traditional, neutral districting criteria." *Id.* 50a-51a.

This appeal challenges the legal standard the majority developed and applied in evaluating racial predominance and its conclusion that the General Assembly's predominant use of race in a single district satisfied strict scrutiny.

6

## SUMMARY OF ARGUMENT

The majority rightly found that the 55% BVAP floor "was used in structuring," "assessing," and "crafting" the Challenged Districts. J.S. App. 19a, 29a. It could hardly find otherwise given the repeated invocation of that racial rule throughout the redistricting process. The majority also rightly determined that the admitted use of a racial floor in drawing district lines constituted "significant evidence" of racial predominance in each of the Challenged Districts. *Id.* 30a.

Remarkably, however, that "significant evidence" played almost no role in the majority's actual predominance analysis. Thus, while the evidence presented made clear that (1) the General Assembly set out to achieve a predetermined 55% BVAP floor in each Challenged District, (2) the 55% BVAP rule "operated as a filter through which all line-drawing decisions had to pass," J.S. App. 138a (Keenan, J., dissenting), and (3) traditional districting principles repeatedly gave way to the 55% BVAP floor, which was uniformly achieved in every Challenged District, the majority found that race did not predominate in eleven of the twelve Challenged Districts.

In reaching that counterintuitive conclusion, the majority purported to improve upon, or "sharpen," the law of racial predominance. J.S. App. 28a. In fact, the majority's novel analysis thoroughly undermines this Court's racial gerrymandering jurisprudence and the equal protection principles it is designed to protect. Time and again, this Court has emphasized that race-based redistricting "demands close judicial scrutiny." *Shaw I*, 509 U.S. at 657. The majority's new test, in contrast, seems designed to insulate race-based

7

decisions from such scrutiny. Under that test, undisputed evidence that race was used to structure a district is insufficient; plaintiffs must also show that non-racial factors played no role. As a result, districts that exhibit no apparent deviations from "traditional, neutral districting criteria" are categorically immune from racial gerrymandering claims, even if there is overwhelming direct evidence that race predominated. Where deviations do appear, racial predominance is established only if those deviations are attributable solely to race.

This novel approach cannot stand. Most importantly, it ignores contemporaneous declarations of race-based redistricting, and it accords little weight to a state's admitted use of "mechanical racial targets" to sort voters by race. *Alabama*, 135 S. Ct. at 1267.

Furthermore, it undermines the very purpose of the Fourteenth Amendment's protection against racial gerrymandering. This Court has affirmed that people cannot be viewed first and foremost as a function of their race in determining whether to place them in one district or another, unless the state establishes a compelling interest to which that race-based decisionmaking is narrowly tailored. *See Miller v. Johnson,* 515 U.S. 900, 916 (1995). The majority's test, however, *allows* voters to be viewed as a function of race—no harm, no foul—as long as the State proffers some other justification (in addition to race) for why a district line was drawn a particular way. In other words, under the majority's test, ugly districts raise the specter of a constitutional harm, but explicitly race-based redistricting does not. That is not the law, nor should it be.

The majority's application of its new racial predominance test vividly illustrates that test's many

8

flaws. Direct evidence of "avowedly racial" line-drawing is ignored if the resulting district passes the eye test. Circumstantial evidence demonstrating that traditional districting standards were overridden in service of a predominant racial goal is brushed aside so long as the majority can identify *any* non-racial explanation for the State's line-drawing decisions, including post hoc justifications offered at trial. As a result, the majority's ever-expanding list of "neutral criteria" "form a 'backstop' for one another, . . . thus ensuring that neutral criteria are still predominating in the balance." J.S. App. 59a-60a.

The majority's narrow tailoring analysis fares no better. After determining that race *did* predominate in District 75, the majority credited Delegate Jones' bare assertion that he had a "strong basis in evidence" for subjecting the district to a predetermined 55% BVAP threshold. *Alabama*, 135 S. Ct. at 1274. Apparently satisfied that the mapdrawer uttered the words "functional analysis" on the witness stand (without any explanation or proof of what that entailed), the majority all but ignored *Alabama* by blatantly excusing the legislature's "mechanically numerical view as to what counts as forbidden retrogression." *Id.* at 1272-73 (citation omitted).

Ultimately, the majority's analysis turns a blind eye to the concrete harms of unjustified race-based districting. Here, the use of a rigid numerical floor thoroughly undermined the goals of the VRA by, for instance, rending white residents from districts where they had long joined forces with African-American voters to elect minority-preferred candidates because the BVAP in those districts was "too low," *see Bartlett v. Strickland*, 556 U.S. 1, 25 (2009) ("The Voting Rights Act was passed to foster this cooperation."), and

9

ensuring that African-American influence is limited to the Challenged Districts.

The majority opinion distorts this Court's precedents to excuse the General Assembly's constitutional violation, and in so doing, thoroughly (and wrongly) rewrites the law of racial gerrymandering. Those legal errors cannot stand.

## ARGUMENT

The majority's elaborate, often byzantine analysis belies the relative simplicity of this case. The General Assembly repeatedly declared that the 55% BVAP floor was the only nonnegotiable criterion in drawing the Challenged Districts and configured them accordingly. Both the statewide and district-specific evidence confirmed that application of the 55% BVAP rule had a direct and significant impact on the drawing of each of the Challenged Districts. The General Assembly failed to narrowly tailor its admitted use of race in favor of a one-size-fits-all approach focused on meeting or exceeding 55% BVAP in every Challenged District. As a result, the General Assembly violated the Equal Protection Clause.

## I. THE MAJORITY MISUNDERSTANDS AND MISAPPLIES THE LAW OF "RACIAL PREDOMINANCE"

Plaintiffs bringing a racial gerrymandering claim under the Equal Protection Clause must show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. The burden then shifts to defendants to satisfy strict scrutiny by demonstrating that the

10

race-based districting was narrowly tailored to a compelling government interest. *Id.* at 920.

To meet their burden, plaintiffs must show that the legislature "subordinated traditional race-neutral districting principles . . . to racial considerations" in drawing districts. *Id.* at 916. The legislature does this when it "'place[s]' race 'above traditional districting considerations in determining which persons were placed in appropriately apportioned districts.'" *Alabama*, 135 S. Ct. at 1271 (emphasis and citation omitted). Race predominates when it was "the 'dominant and controlling' consideration," and other factors were considered "only after the race-based decision had been made," *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 905, 907 (1996) (quoting *Miller*, 515 U.S. at 913)—i.e., when "[r]ace was the criterion that, in the State's view, could not be compromised," *id.* at 907.

Here, the majority found that the General Assembly used an express racial floor, that was "prioritized 'above all other districting criteria' in 'importance,'" to "structur[e] the [Challenged] [D]istricts." J.S. App. 30a (quoting *Alabama*, 135 S. Ct. at 1267). Nevertheless, the majority concluded that race predominated in only one Challenged District (District 75).

To justify its result, the majority wove out of whole cloth a new legal standard for establishing racial predominance. According to the majority, predominance demands a showing of "'*actual* conflict between traditional redistricting criteria and race that leads to the subordination of the former.'" *Id.* (quoting *Page II*, 2015 WL 3604029, at *27 (Payne, J., dissenting)).

Pursuant to this new standard, the majority articulated a three-step test for predominance that virtually ignores direct evidence of admitted racial

11

motivations and places primary—if not absolute—reliance on a district's physical appearance.

> First, the Court will review the district on the basis of its compliance with traditional, neutral districting criteria, including, but not limited to, compactness, contiguity, nesting, and adherence to boundaries provided by political subdivisions and natural geographic features.

> Second, the Court will examine those aspects of the Challenged District that appear to constitute "deviations" from neutral criteria . . . . [and] ascertain the underlying rationale for those deviations[, including] whether a deviation was caused in part or entirely by the need to comply with the one-person, one-vote precepts or by political circumstances such as protection of incumbents.

> Third, the Court will weigh the totality of the evidence and determine whether racial considerations qualitatively subordinated all other non-racial districting criteria.

J.S. App. 50a-51a (footnote omitted). Under this framework, district lines are immune from constitutional scrutiny if they can be explained on *any* conceivable non-racial grounds, even if—as here—the legislature unambiguously declares that its top priority is to sort voters by race according to a fixed racial threshold.

The majority's framework turns this Court's precedent on its head. Most strikingly, the majority dismisses as "largely irrelevant" the indiscriminate use of "mechanical racial targets" condemned in

12

*Alabama*. J.S. App. 107a. Indeed, it turns a blind eye to all direct evidence of race-based districting where a district otherwise comports with traditional districting principles, elevating circumstantial evidence of district geometry to a threshold requirement. It then compounds this error by demanding that race conflict with—and prevail against—each and every race-neutral explanation. The practical effect is to legalize the intentional sorting of voters on the basis of race as long as the legislature does it *neatly enough*. The majority thereby invites and excuses the very harm *Shaw* sought to prevent.

### A. The Majority's Test Eviscerates *Alabama* by Deeming the Use of Mechanical Racial Targets "Largely Irrelevant"

In *Alabama*, the legislature "expressly adopted and applied a policy of prioritizing mechanical racial targets" when drawing majority-minority districts, based on the mistaken belief that the VRA required the maintenance of a predetermined BVAP percentage. 135 S. Ct. at 1263, 1267. This Court held that the use of such "mechanical racial targets" amounted to "strong, perhaps overwhelming, evidence that race did predominate." *Id.* at 1271.

Here, the majority paid lip service to that holding, *see* J.S. App. 30a ("The *Alabama* case could not be clearer that use of racial BVAP floors constitutes . . . significant evidence . . . of predominance."), but then failed to apply it. Instead, the majority created and applied a novel, three-part predominance test that relegates *all* direct evidence of racial purpose, including the use of a fixed racial threshold, to a tertiary consideration—if it is considered at all. *See id.* 71a, 73a ("[e]vidence of a racial floor" is considered

13

only in the "final step in the predominance inquiry"). Accordingly, "evidence of such thresholds" is significant *only* "when examining those districts that exhibit deviations from traditional, neutral districting principles," and then only if the legislature fails outright to offer a non-racial explanation for such deviations. *Id.* 46a, 50a-51a.

The majority's test thus reduces racial gerrymandering cases to a beauty contest in which districts that "do[] not substantially disregard traditional, neutral districting principles" are immune from constitutional scrutiny, and *"[t]he existence of a 55% BVAP floor does not disturb that fact*." J.S. App. 114a-15a (emphasis added). Indeed, if a district is visually appealing enough, use of a racial quota plays no role whatsoever in the predominance analysis. *See, e.g.*, *id.* 127a.

There are many illustrations of this error, but none starker than the analysis of District 69. The majority explicitly found that the General Assembly used the 55% rule to draw District 69, based in part on the undisputed testimony of a delegate with direct, personal knowledge "that HD 69 had to satisfy the 55% BVAP floor." J.S. App. 107a. Nevertheless, because District 69 appeared reasonably compact and contiguous, the majority dismissed that evidence as "largely irrelevant." *Id.* In fact, the majority stated that Appellees would have been entitled to summary judgment with respect to District 69. In other words, according to the majority, a legislative *admission* of race-based redistricting did not even create a factual dispute as to whether the legislature engaged in race-based redistricting. *Id.* 108a n.39.

In short, while *Alabama* requires courts to weigh heavily the legislative use of a "mechanical racial

14

target[],'" 135 S. Ct. at 1267, the majority ignored that evidence altogether or treated it as "largely irrelevant," J.S. App. 107a. As a result, the majority "did not properly calculate 'predominance.'" *Alabama*, 135 S. Ct. at 1270. That error alone warrants reversal.

## B. The Majority's Test Negates the Role of Direct Evidence in Racial Gerrymandering Cases

The majority's misapplication of *Alabama* speaks to a deeper flaw in its reasoning: a failure to grasp the significance of direct evidence of a legislature's overt racial goals.

According to the majority, the legislature's declaration that it drew districts to carry out its intent to sort voters by race is *not* enough to establish racial predominance. *See* J.S. App. 45a (a district may not be struck down under *Shaw* "on 'racial purpose' alone" or "solely because of the motivations of the men who voted for it") (quoting *Palmer v. Thompson*, 403 U.S. 217, 224 (1971)). But this Court emphatically rejected that view in *Miller*.

In *Miller*, the defendants argued—like the majority below—"that evidence of a legislature's deliberate classification of voters on the basis of race cannot alone suffice to state a claim under *Shaw*"; rather, "regardless of the legislature's purposes, a plaintiff must demonstrate that a district's shape is so bizarre that it is unexplainable other than on the basis of race." 515 U.S. at 910. The Court held that view "misapprehends . . . *Shaw* and the equal protection precedent upon which *Shaw* relied." *Id.* at 911; *see also Shaw II*, 517 U.S. at 906-07 (rejecting dissent's argument that "strict scrutiny does not apply where a State 'respects' or 'compl[ies]' with traditional

15

districting principles,'" because that "is not the
standard announced and applied in *Miller*"). As *Miller*
explained:

> Shape is relevant not because bizarreness is
> a necessary element of the constitutional
> wrong or a threshold requirement of proof,
> but because it may be persuasive
> circumstantial evidence that race for its own
> sake, and not other districting principles, was
> the legislature's dominant and controlling
> rationale in drawing its district lines.

515 U.S. at 913. Thus, plaintiffs may show that race
predominated "*either* through circumstantial evidence
of a district's shape and demographics *or more direct
evidence going to legislative purpose.*" *Id.* at 916
(emphasis added). Accordingly, many courts have
held that racial predominance can be established
by direct evidence alone. *See, e.g.*, *Backus v. South
Carolina*, 857 F. Supp. 2d 553, 559 (D.S.C. 2012)
("Circumstantial evidence of a district's shape and
demographics is only one way of proving a racial
gerrymander."), *aff'd*, 133 S. Ct. 156 (2012); *Hays v.
Louisiana*, 839 F. Supp. 1188, 1195, 1204 (W.D. La.
1993) (if "uncontroverted *direct* trial evidence
establishes [a] racial classification" predominated,
then a court "need not even consider the kind of
indirect or inferential proof approbated in *Shaw*"),
*vacated on other grounds*, 512 U.S. 1230 (1994).

In contrast, the majority's test elevates
circumstantial evidence of a district's configuration
to a threshold showing, requiring plaintiffs to show
that a district "deviat[es] from traditional, neutral
districting principles" to establish racial pre-
dominance. J.S. App. 46a. But *Miller* made clear that
"parties alleging that a State has assigned voters

16

on the basis of race" are *not* "confined in their proof to evidence regarding the district's geometry and makeup." 515 U.S. at 915.

The majority's belief that there is no cognizable injury so long as a district generally comports with traditional districting principles betrays a fundamental misunderstanding of the constitutional harm that *Shaw* and its progeny are meant to avoid. *See* J.S. App. 34a ("[W]hen racial considerations do not entail the compromise of neutral districting norms, the basis for a racial sorting claim evaporates."). Racial classifications are "by their very nature odious to free people whose institutions are founded upon the doctrine of equality" because they "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." *Shaw I*, 509 U.S. at 643. Thus, a legislative declaration that voters were divvied among districts according to race is an acknowledgment that race had a "direct and significant impact" on redistricting, *Alabama*, 135 S. Ct. at 1271, and demands close judicial scrutiny even if it does not result in oddly shaped districts. After all, "it [is] the presumed racial purpose of state action, *not its stark manifestation*, that [is] the constitutional violation." *Miller*, 515 U.S. at 913 (emphasis added).

In sum, "strict scrutiny cannot be avoided simply by demonstrating that the shape and location of the districts can rationally be explained by reference to some districting principle other than race." *Clark v. Putnam Cty.*, 293 F. 3d 1261, 1270 (11th Cir. 2002) (citation omitted). A legislative concession that it "placed a significant number of voters within . . . a particular district," *Miller*, 515 U.S. at 916 (here, at least 33,063 black voters in each Challenged District, JA 583-84), primarily because of their race

17

demonstrates that race had a direct and significant impact on district lines.

### C. The Majority's Test Erroneously Requires Plaintiffs to Prove that Race Was the Only Factor in the Legislature's Line-Drawing Decisions

The errors that flow from the majority's "*actual* conflict" test continue to unfold in its assessment of "deviations" from traditional districting principles. It is not enough that deviations be attributable to race to find race predominated; the racial explanation must cancel out "*all* other districting criteria." *See* J.S. App. 71a, 95a, 111a (emphasis added). In other words, plaintiffs cannot demonstrate race was the *predominant* factor unless they prove it was the *only* factor.

That is not the law. It is well-established that race may predominate even when non-racial factors are addressed. *See, e.g.*, *Alabama*, 135 S. Ct. at 1263 (legislature "sought to achieve numerous traditional districting objectives," but "placed yet greater importance" on avoiding retrogression); *Shaw II*, 517 U.S. at 907 ("That the legislature addressed [other] interests does not . . . refute the fact that race was the legislature's predominant consideration."); *Bush v. Vera*, 517 U.S. 952, 963 (1996) (race predominated even though "[s]everal factors other than race were at work in the drawing of the districts"); *Clark*, 293 F.3d at 1270 ("Race may be shown to have predominated even if . . . 'factors other than race are shown to have played a significant role in the precise location and shape of those districts.'") (citation omitted); *Page II*, 2015 WL 3604029, at *13 n.23 ("[W]hen racial

18

considerations predominated in the redistricting process, the mere coexistence of race-neutral redistricting factors does not cure the defect."); *Moon v. Meadows*, 952 F. Supp. 1141, 1146-48 (E.D. Va. 1997) (race predominated where "Legislature sought to protect and indeed enhance" district's BVAP ratio, even while considering political partisanship, incumbent protection, and communities of interest), *aff'd*, 521 U.S. 1113 (1997). Plaintiffs need not show that racial considerations eclipsed all others or anticipate and refute every conceivable non-racial justification generated during the litigation process.

The majority, however, requires just that, pitting evidence of race-based districting head-to-head against each and every possible race-neutral explanation—eleven in all—to determine predominance. J.S. App. 53a-71a (listing race neutral factors).[2] The majority openly recognizes, moreover, that these "traditional" districting criteria are oftentimes "surprisingly ethereal" and "admit[] of degrees," *id.* 54a, 57a, but their malleability only weighs in their favor. *See id.* 59a-60a ("[N]eutral criteria can often form a 'backstop' for one another when one criterion cannot be fully satisfied, *thus ensuring that neutral*

---

[2] Although the majority recognized *Alabama*'s holding that population equality "is not a traditional redistricting factor that is considered in the balancing that determines predominance," J.S. App. 65a, it nonetheless expressly considered population equality in its predominance test. *Id.* 51a (considering "whether a deviation was caused in part or entirely by the need to comply with one-person, one-vote precepts"); *id.* 65a (population equality "is relevant to assessing why a district may appear to deviate from neutral criteria"); *id.* 87a (population equality is "important in assessing why certain redistricting actions were taken").

19

*criteria are still predominating in the balance*.")
(emphasis added).

The majority thus nimbly deflected all types of circumstantial evidence that supported a finding that race predominated. Where a district's shape "arouses some suspicion," the majority admonished Appellants that "predominance is not merely a beauty contest," and found another race-neutral justification for the odd configuration. J.S. App. 115a-17a (District 74). Where a deviation indicated a clear racial purpose for a district, the majority credited a post-hoc, race-neutral justification found nowhere on the legislative record. *Id*. 93a (District 63). When faced with multiple explanations for a particular deviation, the inquiry ended in favor of legislators' "good faith" and ignored direct evidence of racial purpose. *Id*. 120a (District 77). In short, the majority's baffling, shape-shifting analysis explained away almost every single deviation from traditional districting principles in the Challenged Districts.

This is simply not how courts analyze "circumstantial evidence of a district's shape and demographics." *Miller*, 515 U.S. at 916. The predominance inquiry is not a fencing match in which courts try to parry every blow to a district's configuration with various race-neutral justifications, including ones never mentioned during the redistricting process. Appellants presented—but the majority disregarded—just the kind of circumstantial evidence courts routinely rely on to find predominance. *See, e.g.*, *Alabama*, 135 S. Ct. at 1271; *Shaw II*, 517 U.S. at 905-06; *Page II*, 2015 WL 3604029, at *10-13.

20

## II. THE MAJORITY'S APPLICATION OF ITS NOVEL PREDOMINANCE TEST HIGH-LIGHTS AND COMPOUNDS THESE ERRORS

The evidence at trial overwhelmingly demonstrated that race predominated. The majority's failure to properly consider the evidence below only highlights—and further compounds—the fundamental flaws in its predominance test.

### A. The Majority Erroneously Disregarded Statewide Evidence of Racial Predominance

While a racial gerrymandering claim "applies district-by-district," *Alabama*, 135 S. Ct. at 1265, statewide evidence is "perfectly relevant," *id.* at 1267, particularly where it reveals the legislature's racial motivation in drawing a "specific set of individual districts" like the Challenged Districts, *id.* at 1266.

At trial, Appellants presented abundant statewide evidence that the General Assembly's racial goals "domina[ted] and control[ed]" the redistricting process from the beginning. *Shaw II*, 517 U.S. at 905 (citation omitted). Pursuant to its invented standard, however, the majority either ignored that evidence or failed to give it the weight required by this Court's precedents.

#### 1. The 55% BVAP Rule

The evidence conclusively established that the General Assembly "prioritiz[ed] mechanical racial targets" by requiring all Challenged Districts—regardless of their unique geography, history, and racial voting patterns—to meet or exceed the same 55% BVAP target. *Alabama*, 135 S. Ct. at 1267. The majority was unequivocal on this score, emphasizing

21

that the 55% BVAP floor was "fixed," J.S. App. 19a, and "used" to "structur[e]" and "craft[]" each of the Challenged Districts, *id.* 29a; *see also id.* 87a ("[A] 55% BVAP floor was employed by Delegate Jones and the other legislators who had a hand in crafting the Challenged Districts."); *id.* 115a n.40 ("[A] firm 55% BVAP rule was employed[.]").

The majority could hardly find otherwise given the lead mapdrawer's fervent defense of that racial target during the redistricting process, *see*, *e.g.*, JA 299 (Delegate Jones arguing that "the effective voting age population [in the Challenged Districts] needed to be *north of 55 percent*" in order to comply with the VRA) (emphasis added), undisputed testimony from three other participants in the redistricting process that the 55% BVAP target was a primary consideration,[3] and the expert report submitted in *Page II* in which the House's consultant stated that the General Assembly enacted "a House of Delegates redistricting plan with a 55% Black VAP as the floor for black-majority districts," *Page II*, 2015 WL 3604029, at *9 (quoting report). In short, the existence and immutability of the 55% rule is beyond dispute.

As the majority acknowledged, "a substantial amount of time at trial was devoted to questions

---

[3] Delegate Jennifer McClellan testified that her "understanding . . . was that each of the majority minority districts would have to have a black voting-age population of at least 55 percent." JA 1606. Similarly, former delegate (now Senator) Rosalyn Dance testified that each of the Challenged Districts "had to be 55 percent or greater." JA 1642. And former delegate Ward Armstrong testified that he understood that "the minority-majority districts would have to be at least 55 percent black voting-age population or . . . the committee would not support the plan." JA 1657.

22

related to this factual topic." J.S. App. 19a. That is because Appellees zealously denied the existence of a fixed racial floor. *See, e.g.*, JA 1595 ("There wasn't any rule."); JA 1816 (Delegate Jones denying that he had "a fixed number in mind for majority-minority district black voting-age population" or that there "[w]as a hard rule that every majority-minority district would be 55 percent"); JA 1955 (Appellees objecting to demonstrative exhibit referring to the 55% "rule"). And for good reason. Appellees recognized that the application of a fixed, nonnegotiable racial floor to twelve districts across the Commonwealth severely compromised their defense of the Challenged Districts. *See Alabama*, 135 S. Ct. at 1267 ("That Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria . . . provides evidence that race motivated the drawing of particular lines in multiple districts in the State."); *see also Page II*, 2015 WL 3604029, at *9 (race predominated where legislators "were conscious of maintaining a 55% BVAP floor"); *Harris v. McCrory*, No. 1:13-cv-949, 2016 WL 482052, at *7 (M.D.N.C. Feb. 5, 2016) ("A . . . district necessarily is crafted because of race when a racial quota is the single filter through which all line-drawing decisions are made, and traditional redistricting principles are considered, if at all, solely insofar as they did not interfere with this quota."); *Smith v. Beasley*, 946 F. Supp. 1174, 1210 (D.S.C. 1996) (race predominated where legislature "insist[ed] that all majority-minority districts have at least 55% BVAP").

Indeed, while every "traditional, neutral" criterion gave way at some point in drawing the Challenged Districts, *see, e.g.*, J.S. App. 92a (District 63 not compact); *id*. 121a (District 80 lacks land contiguity

23

and includes no water crossing); *id*. 128a (District 95 split multiple precincts), the 55% BVAP rule was never once compromised. JA 669; *see also Covington v. North Carolina*, No. 1:15-cv-399, 2016 WL 4257351, at *17 (M.D.N.C. Aug. 11, 2016) ("[E]ven where county groupings or county lines played some role in the eventual shape of the enacted district, what was never compromised was the . . . BVAP target.").

The majority further found that this racial threshold was "applied across the board to all twelve of the Challenged Districts." J.S. App. 25a. Far from conducting an individualized assessment of minority voting opportunities in each district, the legislature viewed all Challenged Districts as a single unit, defined by a single racial metric. *Cf. Miller*, 515 U.S. at 911-12 ("When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'") (quoting *Shaw I*, 509 U.S. at 647). Thus, where one Challenged District had "excess" black voters, those voters were carefully siphoned to surrounding Challenged Districts to boost their BVAP above 55%. *See*, *e.g.*, *infra* II.B.1. In short, the Challenged Districts were treated differently from all others and uniformly among themselves, judged by an "across the board" racial percentage.

The majority conceded that this Court's precedent "could not be clearer that use of racial BVAP floors constitutes . . . significant evidence . . . of predominance," J.S. App. 30a, and that use of a "fixed racial threshold can have profound consequences for the Court's predominance . . . inquir[y]," *id*. 19a. But the majority failed to give that evidence the weight it

24

deserved. In fact, the use of a fixed racial threshold played almost no role whatsoever in the majority's analysis. *See*, *e.g.*, *id.* 107a (District 69: 55% BVAP floor "is largely irrelevant"); *id.* 114a-15a (District 71: existence of a 55% BVAP floor "does not disturb" predominance finding based on "traditional, neutral districting principles"); *id.* 127a (District 92: no mention of 55% BVAP floor). The majority's approach effectively nullified the impact of the undisputed racial threshold, warranting reversal as a matter of law.

## 2. House Criteria

Before any redistricting plans were introduced, the House Committee on Privileges and Elections adopted official criteria to govern the redistricting process. *See* JA 36-38. The second criterion after "Population Equality," titled "Voting Rights Act," requires that "[d]istricts shall be drawn" to avoid "the unwarranted retrogression or dilution of racial or ethnic minority voting strength." JA 36. All other factors—including compactness, incumbency, and "political beliefs"—are subordinate to that prime directive, as the General Assembly decreed that this factor "shall be given priority in the event of a conflict among the criteria." JA 37-38.

The predominance inquiry asks whether "the legislature 'placed' race 'above traditional districting considerations.'" *Alabama*, 135 S. Ct. at 1271 (citation omitted). That is precisely what the House Criteria do. Indeed, these criteria are virtually indistinguishable from the redistricting guidelines described in *Alabama*, which also listed "compliance with . . . the Voting Rights Act" as the second most important criterion after population equality. *Id.* at 1263.

25

The majority found that the House criteria "do[] not lend any weight in the predominance balance." J.S. App. 73a. But, as in *Alabama*, the General Assembly's prioritization of VRA compliance is illuminating because of the *means* the General Assembly used to achieve that objective. *See Alabama*, 135 S. Ct. at 1263 ("Alabama believed that, to avoid retrogression under § 5, it was required to maintain roughly the same black population percentage in existing majority-minority districts.").

Here, the 55% BVAP floor was used as a proxy for VRA compliance. *See* J.S. App. 19a ("[T]he 55% BVAP figure was used . . . in assessing whether the redistricting plan satisfied constitutional standards and the VRA[.]"); *id.* 87a (delegates believed the 55% BVAP floor was "necessary to avoid retrogression under federal law"). In fact, even the majority acknowledged that "if evidence is provided that demonstrates legislators held a false belief that certain artificial criteria — such as fixed BVAP floor [sic] — were necessary to comply with federal law, then statements by those particular legislators regarding compliance are relevant evidence in the predominance inquiry." *Id.* 73a-74a.

Remarkably, however, the House Criteria are given no weight in the analysis. This reflects the majority's erroneous fixation on circumstantial evidence of a district's appearance to the exclusion of all else, including direct evidence that the legislature prioritized a "false" understanding of the VRA.

### 3. Virginia's Preclearance Submission

Virginia's preclearance submission provided further evidence of race's central role in the redistricting process. In its "Statement of Minority Impact," JA 541,

26

Virginia identified the General Assembly's two racial goals: (1) "maintain[ing] 12 black majority districts . . . despite demographic changes," and (2) ensuring that "[a]ll 12 black majority districts were maintained . . . with greater than 55% black VAP," JA 600.

Courts have found that race predominated where, as here, a preclearance submission indicates legislative intent to achieve a fixed number of race-based districts. *See Bush*, 517 U.S. at 960 (submission noted "three new congressional districts should be configured in such a way as to allow members of . . . minorities to elect Congressional representatives") (citation omitted); *Shaw II*, 517 U.S. at 906 (submission described legislature's *"overriding* purpose . . . to create two congressional districts with effective black voting majorities") (citation omitted). Here, not only did the General Assembly determine in advance that there would be twelve majority-minority districts, it determined that those districts would achieve a specific racial target. *See Covington*, 2016 WL 4257351, at *13 ("[T]he overriding priority of the redistricting plan was to draw a predetermined race-based number of districts, each defined by race.").

The majority, however, *made no mention* of this evidence. Its failure to even consider direct evidence of racial predominance such as this warrants reversal.

### 4.  Delegate Jones' Statements

Perhaps the most telling direct evidence of racial predominance comes from Delegate Jones, the "principal crafter" of the Challenged Districts. JA 1812. Delegate Jones often emphasized the primacy of race during the redistricting process. For example, he declared that *"the most important thing*[]" to him in drawing the Enacted Plan—not counting population

27

equality—was VRA compliance. JA 276 (emphasis added); *see also* Pls.' Ex. 15 at 11 ("Number 2 is the Voting Rights Act . . . . This insures that we will . . . maintain the number of existing majority/minority districts, and in these districts maintain the level of minority voting strength[.]"). At trial, Delegate Jones confirmed that his efforts at VRA compliance "trumped everything" except population equality. JA 1923-25. And as noted, Delegate Jones understood "VRA compliance" to mean "meeting or exceeding a fixed racial threshold in all Challenged Districts." *See* J.S. App. 19a, 87a.

Perplexingly, the majority refused to "accept the explanation of the legislation's author as to its purpose," *Page II*, 2015 WL 3604029, at *10, omitting this significant evidence from its predominance analysis.

### 5. Subordination of Traditional Districting Criteria

In contrast to the General Assembly's steadfast commitment to the 55% BVAP rule, traditional, neutral districting principles were sacrificed time and again. Appellants provided undisputed evidence showing that, together, the Challenged Districts deviated from traditional criteria more frequently and more drastically than the remaining 88 districts.

For instance, whereas the Enacted Plan as a whole is slightly less compact than the Benchmark Plan based on average Reock scores, the average compactness of the Challenged Districts dropped five times as much as that of the other 88 districts. JA 627; J.S. App. 90a-91a. *See Miller*, 515 U.S. at 913 (compactness "may be persuasive circumstantial evidence that race . . . was the legislature's dominant

28

and controlling rationale in drawing its district lines") (citation omitted).

The Enacted Plan also increased county boundary and Voting Tabulation District ("VTD") splits in the areas covered by the Challenged Districts. JA 629. Notably, whereas the Benchmark Plan split only 174 VTDs, the Enacted Plan splits 236. *Id*. Among the Challenged Districts, the number of VTDs split jumped from 30 to 52, a 73% increase, for an average of 4.3 split VTDs per Challenged District. *Id*. The remaining 88 districts, by comparison, saw a 25% increase in the number of split VTDs, yielding an average of 2.0 split VTDs per district. JA 630. *See Miller*, 515 U.S. at 908 (division of political subdivisions in "the plan as a whole" may be evidence of racial predominance).

These undisputed facts, either shrugged off or ignored by the majority, strongly suggest that the Challenged Districts were treated differently than all other districts.

### 6. Racial Sorting

Appellants' demographic evidence, moreover, demonstrated that the General Assembly resorted to extensive racial sorting to ensure that all of the Challenged Districts met the predetermined racial threshold. *See Miller*, 515 U.S. at 917 (when district's shape is considered "in conjunction with its racial and population densities, the story of racial gerrymandering . . . becomes much clearer"). There is no dispute that the BVAP of VTDs moved into the Challenged Districts is significantly higher (by at least 17 percentage points) than the BVAP of VTDs moved out of the Challenged Districts. JA 633-43. *See Alabama*, 135 S. Ct. at 1266-67 (discussing evidence

29

"that the legislature . . . deliberately moved black voters into . . . majority-minority districts . . . to prevent the percentage of minority voters in each district from declining."). The partisan differential, meanwhile, was less than half that amount. JA 637-38. Moreover, the average BVAP of VTDs moved among the Challenged Districts is 26 percentage points higher than the BVAP of VTDs moved out of the Challenged Districts. JA 639. Appellants thus presented undisputed evidence that the General Assembly swapped low BVAP areas for high BVAP areas to ensure all Challenged Districts met the 55% BVAP target, *see* JA 633-43—precisely the kind of evidence credited in *Alabama*, 135 S. Ct. at 1266-67.

But the majority brushed aside the glaring demographic differences between the (largely African-American) populations moved into—and the (largely white) populations moved out of—the Challenged Districts. It concluded that the excision of a significant number of white voters in exchange for a significant number of black voters does not "provide evidence that changes to the district were based on race" *unless* "a district exhibits unexplained deviations from neutral principles and the population changes for that district reflect 'remarkable feats' of racial math." J.S. App. 66a n.20 (quoting *Alabama*, 135 S. Ct. at 1271). In other words, the majority believes the type of demographic evidence *Alabama* highlighted is irrelevant unless the relative number of African-American and white voters swapped between districts mirrors the lone example provided in *Alabama*. This Court cannot have intended such a literal reading in exemplifying what constitutes "considerable evidence" that racial goals impacted district lines. *Alabama*, 135 S. Ct. at 1271.

30

## B. The Majority Systematically Disregarded the Role of Race in Structuring Individual Districts

The district-specific evidence confirms that race predominated across all Challenged Districts, and provides concrete illustrative examples of the many ways in which the General Assembly's race-driven approach had a "direct and significant impact" on each Challenged District. *Alabama*, 135 S. Ct. at 1271. The majority's holding to the contrary exposes the deep-seated errors in its racial predominance test, which neutralizes direct evidence of racial motives and exonerates race-based districts where district lines happen to advance any other conceivable goal.

### 1. Districts 63 and 75

Delegate Roslyn Tyler, who represented District 75 during the redistricting process, asked Delegate Jones to increase the number of African-American voters in her district. J.S. App. 102a-03a. He agreed, even though it required "drastic maneuvering" to comply with her request. *Id.* 100a.

The most drastic change involved District 63, which borders District 75 to the north. At the time, District 63 contained all of Dinwiddie County. To increase BVAP in District 75, Delegate Jones reconfigured the border between Districts 63 and 75, slicing Dinwiddie County in half and moving high BVAP areas in the southern part of the county out of District 63 and into District 75. *See* Fig. 1 (JA 1557).

At the same time, Delegate Jones added a new, snake-like appendage to the northeastern corner of District 63, which winds through Prince George County, picking up high BVAP areas there and around the city of Hopewell. *See* Fig. 1.

31

**Figure 1: District 63**



The Dinwiddie County split indisputably was motivated by race. Former delegate (now Senator) Rosalyn Dance, who represented District 63 at the time, testified that Delegate Jones chopped Dinwiddie County in half "to try to get [District 75's] number . . . [o]f African American voters up to 55 percent." JA 1646. Circumstantial evidence tells the same story. Under the Enacted Plan, the northern Dinwiddie County VTDs of White Oak, Rocky Run, Courthouse, and Church Road remain in District 63. On average, the BVAP of those VTDs is 21%. By contrast, the southern Dinwiddie County VTDs of McKenney, Cherry Hill, Little Zion, and Reams, all of which were moved into District 75, have an average BVAP of 35%. *See* JA 919-20, 1481. As this shows, heavily African-American areas in Dinwiddie County were systematically moved out of District 63 and moved into District 75 to increase the BVAP of District 75.

Based largely on the "avowedly racial" motivation behind the Dinwiddie County split, J.S. App. 93a, the majority correctly held that "race was the

32

predomina[nt] criterion driving the formation and configuration of [District] 75." *Id.* 102a; *see also id.* 115a-16a, 118a. Remarkably, however, the majority reached a different conclusion with respect to the other half of the *same split*, inexplicably holding that race was *not* the predominant purpose of the Dinwiddie County split in District 63.

Those divergent holdings defy common sense. If Dinwiddie County was split to move African-American voters out of District 63 and into District 75 (as the majority found it was), and if the purpose of that split was "avowedly racial" (as the majority found it was), then the split is—and must be—equally indicative of racial predominance in both districts. *See, e.g., Miller,* 515 U.S. at 916 (race predominates when it "motivat[es] the legislature's decision to place a significant number of voters within *or without* a particular district") (emphasis added); *Shaw I,* 509 U.S. at 649 (race predominates when the legislature "separate[s] voters into different districts on the basis of race"). Indeed, elsewhere in its opinion, the majority recognized that "[a] district formed primarily to eject black voters would employ the same racial classification as a district formed primarily to include black voters." J.S. App. 116a.

The majority attempted to paper over this fundamental incoherence by reasoning that the Dinwiddie County split caused certain "sub-deviations" within District 63 that are attributable to non-racial factors, and that the consideration of those non-racial factors somehow outweighs the overriding racial purposes of the split. J.S. App. 93a-96a. This strained reasoning fails for at least three reasons.

First, District 63 and District 75 border each other. Thus, District 75 includes mirror images of the same

33

"sub-deviations." But those sub-deviations play no role in the majority's District 75 analysis or its conclusion that there is "no ambiguity" about the predominance of race in District 75. J.S. App. 99a. In contrast, the majority holds that the very same sub-deviations *preclude* a finding of racial predominance in District 63. The majority never explains its inconsistent treatment of the same lines. *See id.* 143a (Keenan, J., dissenting) (explaining majority should have subjected District 63 to strict scrutiny because "implementation of the 55% racial quota had a marked impact on the configuration of both Districts 63 and 75").

Second, the fixation on sub-deviations further illustrates the flaws in the majority's novel predominance test. Because the purpose behind the Dinwiddie County split was "avowedly racial," J.S. App. 93a, there was no need to go hunting for explanations for every sub-deviation within that split. Those sub-deviations would not have occurred but for the "avowedly racial" decision to split Dinwiddie County in the first place. *See Alabama*, 135 S. Ct. at 1271 (race predominates when race has a "direct and significant impact on the drawing of at least some of [the challenged district's] boundaries"). The mere fact that non-racial factors may have been considered when implementing an overriding racial goal is irrelevant. *See, e.g.*, *id.* at 1263 (race predominated when legislature "sought to achieve numerous traditional districting objectives," but "placed yet greater importance" on avoiding retrogression).

Third, even assuming that the District 63 sub-deviations are relevant (they are not), the majority's analysis does not withstand scrutiny. The majority identifies only one possible neutral explanation for the first sub-deviation (the split of Dinwiddie precinct):

34

"the artificial border provided by I-85 *may* provide a clear boundary to voters and candidates alike" who "wish to know their House district." J.S. App. 93a (emphasis added). But as the majority conceded, the use of I-85 was "not listed among the redistricting criteria, which undermines its explanatory value as a districting criterion." *Id.*; *see also Alabama*, 135 S. Ct. at 1271-72 (disparaging use of highway line as evidence that race did not predominate where highways were "not mentioned in the legislative redistricting guidelines"). Moreover, "there was no evidence that this precinct is comprised of distinct communities on either side of the highway." J.S. App. 93a.

Nonetheless, the majority "decline[d] to identify any particular rationale for this 'sub-deviation'" in the "absence of any further explanation by the Intervenors or the Plaintiffs" for this post-hoc justification. J.S. App. 93a. Not only is this a misapplication of the law, it is a remarkable misstatement of the record. Appellants *did* provide an explanation for the precinct split: It was part of the "avowedly racial" split of Dinwiddie County. *Id.*

The majority's analysis of the new appendage on District 63's northeastern corner is equally flawed. There is no real dispute about the inspiration and overriding purpose of that tentacle: It was added to replace African-American voters that were lost when Delegate Jones split Dinwiddie County, thereby ensuring that District 63 would comply with the 55% BVAP rule. As the majority put it: "Not only did [the new appendage] help satisfy the 55% threshold in District 75, it also helped maintain a substantial African-American population in District 63." J.S. App. 94a. Former delegate Dance confirmed that the

35

appendage allowed District 63 to "pick[] up parts of Prince George . . . to get more African-Americans" and also "picked up the concentration of African-Americans in Hopewell[.]" JA 1647-49. The circumstantial evidence tells the same story. The appendage reaches out to grab areas around Hopewell (Wards 2, 6, and part of 7) well over 60% BVAP. In contrast, the appendage avoids other areas around Hopewell (Wards 1, 3, 4, 5, and part of 7) with a mere 21.7% BVAP. *See* JA 674, 921-22.

Nonetheless, the majority held that the new appendage does not suggest racial predominance because it *also* "advanced other criteria, both neutral and political," J.S. App. 94a, and because plaintiffs failed to prove that the "racial considerations subordinated *all other criteria*," *id.* 95a (emphasis added). Here again, the result reveals the fundamental flaws in the majority's novel predominance test. The predominance inquiry does not require plaintiffs to disprove every conceivable non-racial explanation for every jot and tittle of a challenged district. And the mere fact that Delegate Jones "addressed [non-racial] interests" in the course of adding a snake-like appendage to capture additional African-American voters "does not in any way refute the fact that race was [his] predominant consideration." *Shaw II*, 517 U.S. at 907.

## 2. District 69

District 69 has a BVAP of 55.2%. JA 669. It is not happenstance that the district's BVAP is just over the nonnegotiable floor. Delegate Jennifer McClellan, who helped draw the Challenged Districts, offered unrebutted testimony that District 69 was drawn to comply with the 55% BVAP target. *See* JA 1603.

36

Circumstantial evidence confirms that non-racial factors were considered in District 69 "only after the race-based decision [to achieve 55% BVAP in all the Richmond area Challenged Districts] had been made." *Shaw II*, 517 U.S. at 907. Delegate Jones expanded the district outward to incorporate additional African-American voters to replace those that had to be removed from the district to compensate for District 71's insufficient BVAP. *See* JA 1557 (areas added); JA 1338 (BVAP of areas added); JA 674-75.

Yet the majority deemed Delegate Jones' reliance on the 55% rule "largely irrelevant." J.S. App. 107a. Indeed, it suggested that the fact that District 69 was drawn to comply with a non-negotiable racial floor did not even create a factual issue as to whether race predominated. *Id.* 108a n.39.

As with much of the majority's opinion, its analysis of District 69 illustrates the dangers of elevating form over substance. In essence, the majority holds that race could not have predominated in District 69 because the admitted use of a strict racial threshold caused no obvious deformities in district lines. J.S. App. 107a-08a. But bizarre lines are not necessary to prove racial predominance, as this Court has made plain. *See, e.g.*, *Miller*, 515 U.S. at 913 (it is "the presumed racial purpose of state action, not its stark manifestation, that [is] the constitutional violation"); *Covington*, 2016 WL 4257351, at *29 ("[T]he fact that a district is somewhat compact . . . does not foreclose the possibility that race was the predominant factor in the creation of the district.") (citing *Miller* and *Shaw II*).

Furthermore, as explained above, the 55% rule *did* have palpable effects on District 69, including the outward expansion to capture African-American

37

voters. While Appellees offered post hoc, non-racial explanations for those changes, the legislative record provides them no support. As the majority acknowledged elsewhere in its opinion, a "State cannot district predominantly on the basis of race and then insulate such racial line drawing by pointing to other non-racial goals advanced by the racial sort." J.S. App. 47a.

More fundamentally, the majority ignores that "the quota operated as a filter through which all line-drawing decisions had to pass." J.S. App. 138a (Kennan, J., dissenting). As a result, and as shown by the fact that District 69 barely exceeds the 55% BVAP threshold, every line-drawing decision, regardless of whether it resulted in gross deviations, was "necessarily . . . affected by race." *Id.* The majority's contrary conclusion invites legislative mapdrawers to "mask [their] racial sorting" with similar post hoc justifications. *Id.* 133a (Kennan, J., dissenting).

### 3. District 70

Delegate McClellan testified that District 70 was drawn to comply with the 55% BVAP rule. *See* JA 1603. And Appellants demonstrated that rule had a direct and significant impact on the district's boundaries. Because District 70 was not underpopulated, *see* JA 669, there was no need to add or remove voters for the sake of achieving population equality. Nevertheless, the Enacted Plan added about 26,000 people and removed about 26,000 people. *See* JA 669. The racial pattern is telling. The BVAP of the areas moved into District 70 was 43.8%, while the BVAP of the areas moved out was 59.9%, JA 672-73—*and all of the areas moved out were moved into other Challenged Districts*, JA 674. Thus, "extra" African-Americans voters were carefully siphoned out of District 70 to ensure that

38

other Challenged Districts—especially District 71—
*also* complied with the 55% BVAP rule. JA 641-42.

The majority made no mention of the glaring racial
patterns of this massive and unnecessary population
swap. Instead, it reduced the analysis to a beauty
contest, content to observe that, "[o]n its face, the
district appears coherent and generally compact." J.S.
App. 108a. It waved away Delegate Jones' admitted
use of a strict racial quota to construct District 70,
reasoning that "pursuit of [a specific racial
composition] is not the 'predomina[nt]' criterion
employed unless it subordinates all others." *Id.* 111a.
As such, the majority abdicated its duty to examine
the district for a potential constitutional violation in
favor of judging a book by its cover.

## 4. District 71

The evidence of racial predominance in District 71
is extensive. Delegate McClellan, who represented
District 71, testified that it was drawn to comply with
the 55% BVAP rule. *See* JA 1603 (Delegate Jones
instructed "[w]e would have to meet two
criteria[:] . . . the one percent population deviation,
and . . . a 55 percent [BVAP]").

She offered concrete examples of how racial
considerations directly affected the district's
boundaries. For example, she had hoped to keep
precinct 207, which had been in her district for
decades. *See* JA 1612. But because precinct 207 is
heavily white, keeping it in District 71 would have
dragged the district's BVAP below 55%. *See* JA 1612.
As a result, it was moved to neighboring District 68.

Delegate McClellan also testified that she proposed
"unsplitting" certain precincts at the request of local
election officials. *See* JA 1621-24. But in trying to draw

39

a map that accomplished that goal, she inadvertently dropped District 71's BVAP below 55%. Delegate Jones therefore rejected her proposal. As she explained to one election official: "I spoke to Chris Jones . . . . Apparently, the changes we discussed . . . would have pushed the [BVAP] in the 71st District down to 54.8%. The target criteria was 55%, *so the change can't be made*." JA 139 (emphasis added).

The circumstantial evidence further demonstrates how race affected the lines. In 2009, Delegate McClellan handily defeated a white challenger with more than 80% of the vote, even though the district's BVAP was only 46.3%. *See* JA 669. Thus, there was no *political* or *legal* reason to increase the BVAP in District 71.

No matter. Delegate Jones insisted that District 71 meet or exceed the same BVAP threshold as every other Challenged District. To accomplish this goal, he removed whiter areas (like precinct 207) and added areas with higher BVAP (like the Ratcliffe precinct and VTDs 604, 701, and 702 on District 71's eastern border). As a result of that intentional racial sorting, the BVAP of areas moved into District 71 was 72.1%, over 50 percentage points higher than the BVAP of areas moved out. JA 672.

Courts routinely hold that this sort of racial sorting indicates racial predominance, especially when it is accompanied by direct evidence of race-based decisionmaking like Delegate McClellan's testimony. *See, e.g., Alabama*, 135 S. Ct. at 1271; *Page II*, 2015 WL 3604029, at *12 ("Tellingly, the populations moved out of the Third Congressional District were predominantly white, while the populations moved

40

into the District were predominantly African–American.").

Not so here. The majority simply ignored the stark racial pattern of these population movements.

The majority also went to great lengths to concoct and credit benign explanations for Delegate Jones' race-based decisions. With respect to precinct 207, the majority credited Delegate Jones' claim that he moved that heavily Democratic precinct to District 68, represented by Republican Manoli Loupassi, because Delegate Loupassi once served on the Richmond City Council and precinct 207 "had been adjacent to his ward." JA 1839-41. That self-serving explanation is unsupported by any other evidence. Moreover, it strains credulity to think that Delegate Loupassi wanted Delegate Jones to add a strongly Democratic precinct (which he had not previously represented) to his district simply because it held fond memories. In fact, as Delegate McClellan testified, precinct 207 was removed because keeping it would have dropped District 71's BVAP below the 55% BVAP target.[4] This predominantly race-based decision imposed a concrete harm on the representational interests of the residents of precinct 207, who were forced to lose their chosen representative because of the color of their skin.

---

[4] The majority also offered its own theories about Delegate Jones' motives in removing precinct 207: "A local resident might wonder why the Fan straddled two House districts, but any observer of the map would *see* that precinct 207 was removed and replaced with precinct 204, making the district more compact." J.S. App. 113a.

41

Similarly, in a footnote, the majority explained away Delegate McClellan's testimony about the refusal to "unsplit" certain precincts where doing so would have dropped BVAP in District 71 below 55% because the discussion referred to an earlier version of the House plan. *See* J.S. App. 20a n.7. That misses the point. The testimony definitively demonstrated the extent to which race "was the criterion that . . . could not be compromised" in drawing the Challenged Districts. *Shaw II*, 517 U.S. at 907. Whether these specific precincts ultimately were split or joined together, the fact remains that no districting decision could even be *considered* unless it complied with the 55% BVAP target. That is the very definition of predominance

Here again, the majority's analysis can be boiled down to a simple maxim: only appearances matter. So long as District 71's boundaries *could* be understood in terms of "traditional, neutral districting principles," that was "sufficient . . . to find that these principles were not subordinated to race," and thus that race did not predominate. J.S. App. 114a. That is, the mere existence of potential non-racial explanations is sufficient to negate explicit direct and circumstantial evidence of race-based redistricting.

Even more glaring is the majority's outright dismissal of the 55% BVAP rule—supposedly "significant" direct evidence of racial predominance, J.S. App. 30a—in its analysis of District 71. According to the majority, even if precinct 207 was removed to comply with the racial floor, the district's general conformity with some neutral principles obviates that race-based decision. *Id.* 113a-14a ("[I]f the 55% BVAP goal could be achieved without subordinating neutral principles on the whole, it does not matter what Delegate McClellan's personal preferences were."); *id.*

42

114a-15a ("HD 71 does not substantially disregard traditional, neutral districting principles, and that is sufficient for the Court to find that these principles were not subordinated to race. The existence of a 55% BVAP floor does not disturb that fact."). The majority's conclusion that race would not predominate even if it motivated the decision to place a significant number of voters within or without District 71 cannot be reconciled with this Court's determination that race predominates when it "motivat[es] the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916.

### 5. District 74

The majority's finding that race did not predominate in the formation of District 74 once again required careful tip-toeing around the undisputed record evidence.

The direct evidence of racial predominance alone is striking. Delegate McClellan testified that when she consulted with Delegate Jones about how District 74 and the other Challenged Districts in the Richmond area would be drawn, he informed her that any suggestions must yield four Richmond-area districts, each with a BVAP of 55% or higher. JA 1603; *see also Shaw II*, 517 U.S. at 907 (race predominates where "[r]ace was the criterion that, in the State's view, could not be compromised," such that traditional districting principles were applied "only after the race-based decision had been made"); *Covington*, 2016 WL 4257351, at *13 ("[T]he overriding priority of the redistricting plan was to draw a predetermined race-based number of districts, each defined by race.").

43

That race-based motivation is plain on the face of District 74. As the majority conceded, District 74 "certainly does not earn high marks in a qualitative predominance analysis." J.S. App. 117a. The district's non-compact, "ax-shaped" appearance alone "arouses some suspicion," *id.* 115a, to say the least; indeed, it is the second least compact district in the entire plan. JA 667.

Moreover, despite the fact that District 74 was not underpopulated, it underwent a massive population shift exhibiting a stark racial pattern, wherein "much of the black population ceded from HD 74 went to other Challenged Districts, such as HD 63 and HD 71." J.S. App. 116a. Delegate Dance testified that the reason the African-American population in Hopewell, for example, was moved from District 74 to District 63 was to replace the African-American voters that District 63 lost to District 75. *See* JA 1641; *see also* JA 1646-48; *supra* II.B.1. African-American voters were thus carefully shuffled among the Challenged Districts in the Richmond area to ensure that each district satisfied the nonnegotiable racial target that defined all of these districts "across the board," J.S. App. 25a.

The majority goes so far as to laud "the shifting of black population into HD 63 and HD 71" from District 74 because it supposedly "largely improved HD 74's compliance with neutral criteria, such as contiguity and compactness." J.S. App. 117a. This is both irrelevant and untrue. District 74's compactness did *not* improve, and the majority elsewhere conceded as much. *See id.* 115a (District 74's Reock and Polsby-Popper scores "remained almost identical"). Besides, the suggestion that neutral improvements were the legislature's lodestar is flatly contradicted by the fact

44

that the alterations made to District 74 resulted in drastic reductions of compactness in surrounding districts. For example, eliminating the river crossing in District 74 moved the predominantly African-American area of Hopewell into District 63, causing that district to suffer the greatest compactness reduction in the Enacted Plan. JA 667; *see also Covington*, 2016 WL 4257351, at *29-30 (finding racial predominance where, although certain districts were "not as sprawling or bizarre in shape as many of the other challenged districts," they compromised compactness and contiguity of surrounding districts).

Ultimately, the majority's myopic focus on neutral criteria misses the forest for the trees: the legislature meticulously reassigned African-American voters between and among the Richmond-area Challenged Districts to ensure each complied with a single, race-based metric. While that overriding racial goal affected the districts differently, it affected them all equally. The undisputed racial sorting of District 74 demands strict scrutiny.

### 6.  District 77

Despite the fact that African-American voters in District 77 have easily elected their preferred candidates for years, JA 680, the BVAP of District 77 increased from 57.6% to 58.8%. JA 669. This complied with incumbent Delegate Lionel Spruill's specific request that his district contain at least 55% BVAP, JA 1999, and explains his praise on the House floor for Delegate Jones' plan, JA 348-49 ("What other plan, what other group has come to the black Caucus and [said], 'Hey, we have a plan to increase the black minority votes. We have a plan to make sure that you're safe.'").

45

District 77 is not compact. Its "jagged and elongated" shape is constitutionally "suspect." J.S. App. 118a. Indeed, a large chunk of District 77 juts west so that "half of the district is thrust so far into HD 76 as to nearly sever it in half." *Id.* The odd configuration of District 77 is directly attributable to race. For instance, almost every VTD included in the western appendage of District 77 has an exceedingly high BVAP, including Hollywood (96%), Southside (89.9%), and White Marsh (87.8%). *See* JA 925-26. Tellingly, the only VTD *dropped* from the western part of District 77 was Airport, with a mere 31.7% BVAP. *See id.*

The racial composition of the populations added to the eastern part of District 77 further demonstrates racial predominance. District 77 was underpopulated by only 3,000 people, yet the Enacted Plan moved 21,308 persons into and 18,608 persons out of the district. *See* JA 669. More heavily African-American VTDs were systematically added to District 77, whereas predominantly white VTDs were systematically moved to majority-white districts. *See* JA 672 (reflecting over 18 percentage point difference in BVAP of areas moved into and out of District 77).

Remarkably, the majority found that Appellants' proffered evidence was too "skimpy" to draw any conclusion about "whether race, politics, or other criteria predominated in the formation of HD 77." J.S. App. 119a-20a. This conclusion demonstrates how the majority's amorphous predominance test was wielded to explain away both direct and circumstantial evidence. The district's "low compactness score" and lack of land contiguity or water crossings, *id.*, combined with the racial demographics of its deviations from neutral districting principles, *see*

46

*supra*, indicate that racial considerations dictated district lines. The district's "attainment of the 55% BVAP floor" mandated of every Challenged District, *id.* 120a, and specifically urged by the incumbent delegate, confirms that race predominated. The majority's suggestion that the circumstantial evidence could be equally explained by "race, politics, or other criteria," *id.*, defies its own recognition that the undisputed racial threshold will "lend support to the argument that race, rather than politics, can be attributed for particular deviations from neutral principles," *id.* 73a. While the majority opinion purported to appreciate the "profound consequences" of a "fixed racial threshold," *id.* 19a, this "significant" evidence of racial predominance was of no consequence at all in its analysis of District 77.

### 7.  District 80

The majority's discussion of District 80 begins with detailed descriptions of the ways in which race predominated in the district's construction. Then, just as the case for racial predominance has been plainly established, the majority's discussion abruptly veers off in search of other considerations that could explain away that evidence. In wresting a conclusion that race did not predominate from the unruly record, the majority once again erred.

Like the other Challenged Districts, District 80 was subject to the 55% BVAP rule. As a result, its existing BVAP of 54.4% was unacceptable, even though District 80 had been represented by African-Americans' candidates of choice for "as long as [Delegate Jones] could remember." JA 1973. Accordingly, the BVAP of District 80 was increased to 56.3%. JA 669.

47

This was no easy feat. The district is "quite unusually configured," "makes little rational sense as a geographical unit," and suffered from a substantial drop in compactness in the Enacted Plan, resulting in the highest Schwartzberg score of all the Challenged Districts. J.S. App. 121a. Indeed, a cursory glance at District 80 before and after redistricting reveals its blatant deviations from neutral principles.

**FIGURE 2: DISTRICT 80 BEFORE AND AFTER REDISTRICTING**

BEFORE                           AFTER



The Enacted Plan increased the number of county and city splits in District 80 and replaced over 40% of the district's core. J.S. App. 121a. Additionally, "the district is split by water *twice* without any apparent crossing." *Id.*

These deviations are explainable entirely—and only—on the basis of race. The western part of District 80 "winds its way around low BVAP precincts like Silverwood (14.9%), Churchland (8.3%), and Fellowship (14.2%) to capture high BVAP precincts such as Yeates (56.3%) and Taylor Road (48.8%)." J.S. App. 121a. As the majority recognizes, "[c]onsidering

48

the district's attainment of the BVAP floor, this is the kind of detailed explanation that might lead the Court to find that racial considerations subordinated all others." *Id.*

But not so here. Instead the majority embarked on a search for "other 'dominant and controlling' considerations." J.S. App. 122a. After an exhaustive effort, it ultimately concluded that it was "just as likely" that precincts were selected for partisan considerations. *Id.* 123a. In fact, that conclusion is irreconcilable with the record evidence. Appellants' expert demonstrated that race was a stronger predictor than partisan composition in explaining which VTDs were placed into the Challenged Districts. *See* JA 644-45. In particular, while the BVAP in District 80 was increased, its Democratic vote share was decreased. JA 672-73. Further, the likelihood that a VTD was included in either District 77 or District 80 was strongly and positively correlated with BVAP, but the correlation with Democratic vote share was negative and not statistically significant. JA 676.

Even assuming that race and politics could equally explain District 80's odd configuration, the majority never explained its conclusion that incumbency protection and politics predominated over race where evidence of a racial floor can be used to "buttress a plaintiff's argument that race was the primary reason for a deviation where race and politics would otherwise seem equally plausible." J.S. App. 73a. Once again, the majority's district-specific analysis defies its own predominance test.

## 8.   District 89

Although African-American voters in District 89 have easily elected their preferred candidate for years,

49

JA 680, the BVAP of District 89 was increased from 52.5% to 55.5%, JA 669. This was hardly an accident borne of neutral districting principles. Indeed, according to Delegate Jones, Delegate Alexander, who represented the district, advocated for applying the "55 percent aspirational threshold" in his district. JA 1999.

District 89 was accordingly reconfigured to satisfy this nonnegotiable criterion. The district's compactness scores plummeted by over 30%, J.S. App. 124a, largely as a result of several sprawling appendages and a new river crossing created to pick up one lone predominantly African-American population of voters across the Elizabeth River. JA 1701-02.

---

**FIGURE 3: DISTRICT 89 BEFORE AND AFTER REDISTRICTING**

---

BEFORE                          AFTER



---

The racial demographic evidence confirms that these deviations served the mapdrawers' overarching racial goal. Most telling, the district leapt across the water to encapsulate the Berkley VTD, with *95% BVAP*; in other words, of the 2,361 eligible voters in this precinct, just 63 are white. JA 923-24.

50

The majority was again unmoved by compelling evidence of racial sorting. For example, the majority explained away the fact that the Berkley VTD "contains a high BVAP percentage," by positing that it was added to the district because it "is also relatively close to Delegate Alexander's residence." J.S. App. 125a. This is, once again, irrelevant and untrue. The majority did not suggest that this drastic deviation was required in order to *capture* the incumbent's residence, only to encompass areas "relatively close" to his residence. In fact, Delegate Alexander lives in the "mainland" part of District 89, on the opposite side of the river from the Berkley VTD. *See* JA 1562. Similarly, the majority later points to "a funeral home owned by Delegate Alexander" to justify the deviation in District 89's northern border. J.S. App. 125a. Based on this evidence, the majority concluded that "the district's composition is predominantly attributable to traditional, neutral principles," *id.* 125a, implicitly adding proximity to incumbent residences and incumbent-owned funeral homes to the long list of purportedly "traditional, neutral principles" *id.*, that conveniently "form a 'backstop' for one another when one criterion cannot be fully satisfied, thus ensuring that neutral criteria are still predominating in the balance," *id.* 59a-60a.

Just as District 89 meanders to capture African-American voters, the majority's predominance analysis twists and turns to avoid the inexorable conclusion that race predominated. Ultimately, the record reveals no plausible basis for adding the Berkley VTD other than race. *See Alabama*, 135 S. Ct. at 1271 (race predominates when race has a "direct and significant impact on the drawing of at least some of [the challenged district's] boundaries"). This area provided just enough African-American voters to

nudge the district's BVAP over the fixed and nonnegotiable racial threshold. No more is needed to find that race predominated.

### 9. District 90

District 90 was drawn with a BVAP of 56.6%, thus meeting the General Assembly's preordained BVAP floor. JA 669. The record demonstrates that District 90 was—like District 70 in the Richmond area—used as a feeder district to increase the BVAP of surrounding Challenged Districts; specifically, neighboring District 89. The planned large scale dissection of African-American populations necessitated a conversation with Delegate Algie Howell, who represented District 90 at the time, about the 55% BVAP mandate. JA 2000.

District 90 was underpopulated by 9,000 people at the time of the redistricting process, but the General Assembly nevertheless removed 18,469 people from the district. *See* JA 669. Those sweeping alterations exhibited a now familiar racial pattern. The BVAP of the areas moved out of District 90 and into other Challenged Districts was over 15 percentage points higher than the BVAP of areas moved out of District 90 and into non-Challenged districts. JA 674. This siphoning off of African-American voters into other Challenged Districts is particularly stark with respect to District 89. For example, with a BVAP of 92%, the Union Chapel VTD was moved from District 90 to District 89, adding 1,510 African Americans (and 62 Whites) to District 89. JA 923-24.

Moreover, while the majority is quick to point out that the number of split VTDs in District 90 remained the same, J.S. App. 125a, it failed to recognize that new District 90 split *different* precincts than its

52

predecessor district. For example, in the Benchmark Plan, the predominantly African-American Brambleton VTD (95.7% BVAP) was kept whole in District 90. After redistricting, the Brambleton VTD was split between Districts 89 and 90 in order to increase District 89's BVAP above the 55% BVAP threshold. JA 923-24.

The majority makes much of the fact that District 90's southern appendage into Virginia Beach contains a lower BVAP than other parts of the district. *See* J.S. App. 126a. This fact must be viewed, however, within the context of the General Assembly's larger racial goals, which, in the Norfolk area, primarily meant increasing District 89's BVAP to meet the threshold, and maintaining District 90's BVAP at approximately the same level as in the Benchmark Plan. In other words, District 90 did not need to capture exceedingly high BVAP areas to satisfy the racial threshold.[5] Rather, the mapdrawer's primary focus was to shift African-American voters from District 90 to District 89. By viewing District 90 in a vacuum and analyzing it only based on its apparent "deviations" in physical appearance, the majority ignores the undisputed evidence of racial sorting that caused mapdrawers to place a "significant number of voters . . . without" the district, *Miller*, 515 U.S. at 916.

---

[5] In fact, the Virginia Beach precincts the majority identifies as having "some of the lowest BVAP percentages in the entire district," J.S. App. 126a, included College Park (48% BVAP) and Davis Corner (43% BVAP), JA 927-28. Thus even the precincts with the "lowest BVAP percentages" in District 90 had BVAPs sufficient to ensure the district did not fall below the "fixed racial threshold." J.S. App. 19a.

53

### 10. Districts 92 and 95

On the Peninsula, the General Assembly took two relatively compact districts, Districts 92 and 95, and did radical surgery to keep their BVAP percentages elevated above the 55% racial threshold.

Although African-American voters in both districts had easily elected their preferred candidates for years, *see* JA 680, Delegate Jones insisted on maintaining high BVAP percentages in these districts. When asked why majority-white districts in the area experienced a "decrease among blacks," Delegate Jones' answer was simple: "So what had to happen, the population had to be picked up, *had to try to maintain the voting strength for the black voting percentage*." JA 352 (emphasis added). In other words, the BVAP of surrounding districts was drained to "maintain" the BVAP of Districts 92 and 95. The record in this case bears that out.

District 92 was substantially underpopulated at the start of redistricting. *See* JA 669. The Peninsula's geography made it hard for the General Assembly to achieve its racial goals. District 92 could not expand to the north, which had substantially lower BVAP. *See* JA 1491. So it had to move to the west in order to absorb heavily African-American portions of District 95 in order to stay above 55% BVAP. As a result, District 95 needed to be extended artfully to the northwest.

The boundaries of District 92 divide high-BVAP areas from lower-BVAP areas to the north and southeast. *See* JA 1491. And there is clear statistical evidence of racial sorting. The BVAP of areas moved *into* District 92 was 47.3%; the BVAP of areas moved *out* was 36.8%. JA 672. While District 92 may not

54

appear to be as offensive to the eye as other Challenged Districts, this race-based shuffling of voters had profound effects on District 95.

District 95 went from a relatively compact district in the Benchmark Plan to the least compact district in the entire enacted map, with a Reock score of 0.14. JA 625-27. Redistricting increased the district's number of VTD splits from one to six. J.S. App. 128a. The district's shape became extremely bizarre, as it "encompass[es] the full width of Newport News but soon departs from any observable neutral criteria." *Id*. Indeed, Appellees essentially conceded that District 95 was not drawn in accordance with neutral criteria. *Id*. 129a.

**FIGURE 4: DISTRICT 95 BEFORE AND AFTER REDISTRICTING**

BEFORE             AFTER



Contrary to the evidence, however, the majority concluded that partisan considerations dominated in the drawing of the district. To arrive at this conclusion, the majority conveniently ignored the overwhelming evidence of racial sorting that took place in deciding whether to place voters within District 95 or its

55

neighboring non-Challenged districts. For example, the majority credited Appellees' argument that District 95 divided Newport News in such a way as to tilt District 93 in favor of Republicans. But the record shows that Newport News was divided along racial lines, with District 95 inheriting the high BVAP areas of the city while the predominantly white areas went to Districts 93 and 94. *See* JA 944 (showing the differences in racial densities of areas included in District 95 as compared to surrounding districts). By contrast, the partisan differences between the Newport News precincts that were included in District 95 and those included in neighboring non-Challenged districts were not nearly as stark. *See* JA 729 (BVAP differential is 55 percentage points, while partisan differential is 35 percentage points).

What is more, District 95 extends a long arm up in the Peninsula—splitting the Reservoir, Epes, Denbigh, Jenkins, Palmer, and Deer Park VTDs—and including only the heavily African-American portions of those split VTDs. JA 729-30 (average BVAP of VTD splits included in District 95 was 44.5% while the corresponding statistic for Districts 93 and 94 was 38.9%). The partisan composition of these VTD splits, meanwhile, was nearly identical, if not a reflection that slightly *more* Democrats were included in (non-Challenged) Districts 93 and 94 than in District 95. JA 730. Indeed, while there is an extremely high correlation between a VTD's BVAP and its likelihood of inclusion in Districts 92 or 95 in Hampton, Democratic vote share is negatively correlated with inclusion in these districts. JA 678.

Even if one assumed—in defiance of the record evidence—that race and partisan performance equally explained District 95's configuration in the abstract,

56

the existence of the 55% racial floor tips the scale in favor of a finding that race, not politics, predominated. J.S. App. 72a. Even if the legislature managed to attend to political goals along the way, its nonnegotiable 55% BVAP floor in all Challenged Districts could not and would not be sacrificed.

Finally, the majority rested its conclusion on the fact that District 95 bypasses high BVAP areas in the southern part of the Peninsula in favor of high BVAP areas in the northern part of the district. The reason for this is simple: the high BVAP areas in the south were included in District 92 to ensure that its BVAP reached the requisite threshold. The General Assembly had to look north for populations of voters that would keep District 95's BVAP sufficiently elevated. JA 674, 678. Once again, the majority failed to appreciate the complex interplay between the Challenged Districts, which were yoked together based on a single racial metric.

## III. THE MAJORITY ERRED IN HOLDING THAT DISTRICT 75 WAS NARROWLY TAILORED

As noted above, the majority concluded (correctly) that race was the predominant purpose of District 75. But the majority concluded (incorrectly) that Delegate Jones' use of race was narrowly tailored, and hence lawful.

As an initial matter, the majority's legal framework for evaluating whether a district is narrowly tailored is dead wrong. The narrow tailoring inquiry is simple: did the legislature have a "'strong basis in evidence' in support of the (race-based) choice that it has made"? *Alabama*, 135 S. Ct. at 1274 (citation omitted). The

57

majority cites this standard in the first paragraph of its analysis. J.S. App. 80a.

Then, over the next six pages, it proceeds to invent a new standard of its own, ultimately concluding that "part of showing that a district is narrowly tailored" to avoid retrogression "entails showing that the district is one that a reasonable legislator could believe entailed only reasonable and minor deviations from neutral districting conventions." J.S. App. 83a-84a. That is, purely race-based and otherwise unjustified deviations from districting principles are excused as long as a reasonable legislator "could believe" those deviations are not "substantial." *Id.* 81a, 84a. This framework once again reflects the majority's myopic— and erroneous—focus on district deviations as the basis of the constitutional violation. More importantly, this standard was invented out of whole cloth and has no basis in this Court's precedent. The majority's narrow tailoring analysis fails based on this erroneous legal standard alone.

The majority's analysis also fails on its own merits. Despite testimony that the 55% BVAP figure "was 'pulled out of thin air,'" J.S. App. 24a (quoting JA 1661 (Armstrong)), the majority concluded that the rule "was based largely on concerns pertaining to the re-election of Delegate Tyler in HD 75," *id.* 25a.[6] The majority based that crucial holding on Delegate Jones' testimony "that he did not feel a 52% BVAP threshold across all districts would be acceptable 'based on . . . the functional analysis that I had done using the

---

[6] Ironically, this was the *last* in a long list of explanations proffered by Delegate Jones as to the origins of the 55% BVAP threshold, the rest of which the majority deemed not credible. *See* J.S. App. 24a-25a.

58

Tyler primary, for example, and the Tyler general election in 2005.'" *Id.* 102a (quoting JA 1948); *see also id*. 102a-03a (citing Del. Jones' testimony that Del. Tyler "felt" her district "needed to be configured for . . . [minority voters] to elect a candidate of their choice").

The majority fails to explain how individual legislators' "feelings" about the demographics necessary to achieve re-election provide a "strong basis in evidence" for determining the demographics needed to maintain an ability to elect for minority voters. Remarkably, while the majority correctly recognizes that drawing a district according to "'member requests' or performance concerns" does not inoculate it from a finding of racial predominance, J.S. App. 98a-99a, its holding on narrow tailoring suggests that a member's unsupported performance concerns are sufficient to satisfy strict scrutiny.

Moreover, Delegate Jones' bald reference to his "functional analysis" is not even facially credible. At no point did he provide any details or evidence of his alleged analysis (other than a vague reference to a single election six years prior to redistricting, *see* J.S. App. 103a n.36), and, "critically, Jones failed to provide any explanation of how his 'functional' review led him to conclude that a 55% BVAP was required in District 75 to ensure compliance with the VRA." *Id.* 145a (Keenan, J., dissenting). This is hardly surprising in light of Delegate Jones' admission during the redistricting process that he did not engage in any in-depth analysis of any Challenged District, including District 75. *See* JA 288-89 ("DEL. ARMSTRONG: Can the gentleman tell me whether he or any persons that worked with him . . . took into account any retrogress[ion] analysis regarding

59

minority performance in any of the 12 majority-minority districts . . . ? DEL. JONES: . . . *I'm not aware of any*.") (emphasis added).

In short, because Delegate Jones could articulate *some* basis for believing *something* had to be done to allow minority voters in District 75 to elect their candidates of choice, the majority held that the use of a fixed racial threshold was narrowly tailored to an interest in actual compliance with Section 5 of the VRA. But this flies in the face of *Alabama*, as Delegate Jones relied on a "mechanically numerical view as to what counts as forbidden retrogression." 135 S. Ct. at 1273. At bottom, Delegate Jones adopted a 55% BVAP floor, and none of his vague assertions regarding Delegate Tyler's re-election prospects provide *any* basis, let alone a "strong basis in evidence," for subjecting District 75 to a non-negotiable and preordained racial floor of 55% BVAP. *See, e.g.*, *Page II*, 2015 WL 3604029, at *16-17 (legislature's 55% BVAP target was not narrowly tailored).

Finally, although the majority does not reach the issue for the eleven remaining districts, it tacitly admits that, if any were drawn with race as the predominant purpose, none would survive strict scrutiny. J.S. App. 25a (the 55% BVAP floor was "based largely on concerns" pertaining to District 75 and "then applied across the board to all twelve of the Challenged Districts"). Appellants agree. *See Smith v. Beasley*, 946 F. Supp. 1174, 1210 (D.S.C. 1996) (use of race was not narrowly tailored "because of the insistence that all majority-minority districts have at least 55% BVAP").

60

## CONCLUSION

Appellants respectfully request that the Court reverse the majority opinion below.

Respectfully submitted,

KEVIN J. HAMILTON
ABHA KHANNA
RYAN SPEAR
WILLIAM B. STAFFORD
PERKINS COIE LLP
1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099
(206) 359-8000

MARC E. ELIAS
    *Counsel of Record*
BRUCE V. SPIVA
ARIA C. BRANCH
PERKINS COIE LLP
700 Thirteenth Street, N.W.
Suite 600
Washington, D.C. 20005-3960
(202) 654-6200
MElias@perkinscoie.com

*Counsel for Appellants Golden Bethune-Hill, Christa Brooks,*
*Chauncey Brown, Atoy Carrington, Davinda Davis,*
*Alfreda Gordon, Cherrelle Hurt, Thomas Calhoun,*
*Tavarris Spinks, Mattie Mae Urquhart, Vivian Williamson,*
*and Sheppard Roland Winston*

September 7, 2016