# Exhibit B

**No. 15-680**

IN THE

# Supreme Court of the United States

————

GOLDEN BETHUNE-HILL, CHRISTA BROOKS, CHAUNCEY BROWN, ATOY CARRINGTON, DAVINDA DAVIS, ALFREDA GORDON, CHERRELLE HURT, THOMAS CALHOUN, TAVARRIS SPINKS, MATTIE MAE URQUHART, VIVIAN WILLIAMSON, AND SHEPPARD ROLAND WINSTON,

*Appellants*,

v.

VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,

*Appellees.*

————

**On Appeal from the United States District Court for the Eastern District of Virginia**

————

**REPLY BRIEF FOR APPELLANTS**

————

| | |
|---|---|
| KEVIN J. HAMILTON | MARC E. ELIAS |
| ABHA KHANNA |    *Counsel of Record* |
| RYAN SPEAR | BRUCE V. SPIVA |
| WILLIAM B. STAFFORD | ARIA C. BRANCH |
| PERKINS COIE LLP | PERKINS COIE LLP |
| 1201 Third Avenue | 700 Thirteenth Street, N.W. |
| Suite 4900 | Suite 600 |
| Seattle, WA 98101-3099 | Washington, D.C. 20005-3960 |
| (206) 359-8000 | (202) 654-6200 |
| | MElias@perkinscoie.com |

*Counsel for Appellants Golden Bethune-Hill, Christa Brooks, Chauncey Brown, Atoy Carrington, Davinda Davis, Alfreda Gordon, Cherrelle Hurt, Thomas Calhoun, Tavarris Spinks, Mattie Mae Urquhart, Vivian Williamson, and Sheppard Roland Winston*

WILSON-EPES PRINTING CO., INC.   –   (202) 789-0096   –   WASHINGTON, D. C. 20002

TABLE OF CONTENTS

Page

INTRODUCTION ................................................. 1

  I.  THE MAJORITY INVENTED AND APPLIED AN INCORRECT LEGAL STANDARD ON PREDOMINANCE ....... 2

 II.  APPELLEES DISREGARD THE SIGNIFICANCE OF THE 55% BVAP RULE IN THE CONFIGURATION OF THE CHALLENGED DISTRICTS........... 5

III.  DISTRICT-SPECIFIC ANALYSES CONFIRM THAT RACE PREDOMINATED .... 9

    A.  Southside Virginia (Districts 63 and 75)........................................................ 9

    B.  Richmond Area (Districts 69, 70, 71, and 74) ................................................ 12

    C.  South Hampton Roads (Districts 77, 80, 89, and 90) .................................... 15

    D.  North Hampton Roads (Districts 92 and 95) ................................................ 18

 IV.  DISTRICT 75 IS NOT NARROWLY TAILORED................................................ 19

CONCLUSION ................................................... 23

(i)

ii

## TABLE OF AUTHORITIES

CASES                                                      Page(s)

*Alabama Legislative Black Caucus*
   *v. Alabama*,
   135 S. Ct. 1257 (2015)..............................*passim*

*Bartlett v. Strickland*,
   556 U.S. 1 (2009).......................................   21

*Bush v. Vera*,
   517 U.S. 952 (1996)...................................   8

*Covington v. North Carolina*,
   316 F.R.D. 117 (M.D.N.C. 2016)...............   7, 15

*Hunt v. Cromartie*,
   526 U.S. 541 (1999)...................................   3

*Magnolia Bar Ass'n, Inc. v. Lee*,
   994 F.2d 1143 (5th Cir. 1993)..................   21

*Miller v. Johnson*,
   515 U.S. 900 (1995)............................ 2, 3, 8, 11

*Nipper v. Smith*,
   39 F.3d 1494 (11th Cir. 1994)..................   21

*Shaw v. Hunt*,
   861 F. Supp. 408 (E.D.N.C. 1994) ...........   3

*Shaw v. Hunt*,
   517 U.S. 899 (1996)................................ 2, 9, 11

*Shaw v. Reno*,
   509 U.S. 630 (1993)...................................   8

*Thornburg v. Gingles*,
   478 U.S. 30 (1986)....................................   20

*Uno v. City of Holyoke*,
   72 F.3d 973 (1st Cir. 1995) ......................   21

iii

TABLE OF AUTHORITIES—Continued

Page(s)

*Westwego Citizens for Better Gov't v. City of Westwego*,
   872 F.2d 1201 (5th Cir. 1989)................... 21

STATUTES

Voting Rights Act of 1965, 42 U.S.C.
   § 1973 *et seq.* ...........................................*passim*

# INTRODUCTION

Appellees argue that Appellants' case relies exclusively on the "bare fact" of the 55% Black Voting Age Population ("BVAP") threshold. Brief for Appellees ("Br.") 19. That is a strawman. In fact, Appellants argue that the General Assembly sorted voters by race to achieve a preordained BVAP floor across twelve very different districts *and that this nonnegotiable racial requirement affected the districts' contours in concrete ways*. Appellees cannot simply wish away Appellants' extensive argument and evidence regarding the actual impact of the racial threshold on the configuration of the Challenged Districts. *See, e.g.*, Plaintiffs' Post-Trial Brief 17 ("[D]irect and circumstantial evidence applicable to all of the Challenged Districts shows 'that race motivated the drawing of particular lines in multiple districts in the State.'") (quoting *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1267 (2015)); Brief for Appellants ("Opening Br.") 9 ("Both the statewide and district-specific evidence confirmed that application of the 55% BVAP rule had a direct and significant impact on the drawing of each of the Challenged Districts.").

Appellees' attempted misdirection only highlights their inability to confront the legal errors of the majority below and Appellants' exhaustive evidence of racial predominance. Indeed, once their strawman is cast aside, Appellees stand bereft of any argument on the actual legal and factual issues before the Court. Br. i (posing, as the lone Question Presented, whether the "bare fact" that the General Assembly "target[ed] a BVAP of at least 55%" in each Challenged District "trigger[s] strict scrutiny or violate[s] the Equal Protection Clause").

2

## I. THE MAJORITY INVENTED AND APPLIED AN INCORRECT LEGAL STANDARD ON PREDOMINANCE

Appellees carefully avoid any discussion—let alone defense—of the majority's predominance test. Indeed, they never once quote the majority's "actual conflict" theory or even mention the majority's novel three-part inquiry into racial predominance. J.S. App. 30a, 50a-51a. This Court, however, must confront the errors in the majority's analysis.

Under the majority's test, only "those districts that exhibit deviations from traditional, neutral districting principles" are susceptible to a racial gerrymandering claim, J.S. App. 46a; districts that exhibit no obvious "deviations" are categorically immune from constitutional review. But that rule was expressly rejected by this Court in *Shaw v. Hunt* ("*Shaw II*"):

> In his dissent, Justice STEVENS argues that strict scrutiny does not apply where a state "respects" or "compl[ies] with traditional districting principles." *That, however, is not the standard announced and applied in* Miller[.]

517 U.S. 899, 906-07 (1996) (quoting 517 U.S. at 930-31 (Stevens, J., dissenting)) (emphasis added) (citation omitted). *Shaw II* reinforced *Miller*'s holding that racial predominance may be shown "*either* through 'circumstantial evidence of a district's shape and demographics' *or* through '*more direct evidence going to legislative purpose.*'" *Id.* at 905 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)) (emphasis added); *see also Miller*, 515 U.S. at 915 (plaintiffs are not "confined in their proof to evidence regarding the district's geometry and makeup"). The majority's insistence that *Miller*'s predominance inquiry was limited to

3

"facially evident deviations from neutral districting conventions [that] could only be explained on the basis of race," J.S. App. 33a, directly contradicts this Court's summary of the predominance standard in *Cromartie I*. *See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) ("A facially neutral law . . . warrants strict scrutiny . . . if it can be proved that the law was motivated by a racial purpose or object, *or* if it is unexplainable on grounds other than race.") (emphasis added) (citations and internal quotation marks omitted).

The majority's error is more than evidentiary. The majority assumes that there is no constitutional harm unless the legislature's reliance on race caused substantial deviations from traditional districting criteria. Similarly, Appellees argue that there is no harm to voters who are sorted according to the color of their skin so long as the sorting is done neatly enough. Br. 16, 26-27. But the Equal Protection Clause condemns unjustified race-based state action—not misshapen districts. "[I]t [is] the presumed racial purpose of state action, *not its stark manifestation*, that [is] the constitutional violation." *Miller*, 515 U.S. at 913 (emphasis added). Thus, if a legislature uses a fixed racial threshold as "the 'dominant and controlling' or 'predominant' consideration in deciding 'to place a significant number of voters within or without a particular district,'" *Alabama*, 135 S. Ct. at 1264 (citation omitted), it cannot avoid constitutional scrutiny merely because it also complies with some traditional districting principles along the way. *See, e.g.*, *Shaw v. Hunt*, 861 F. Supp. 408, 431 (E.D.N.C. 1994) ("If the line-drawing process is shown to have been infected by such a deliberate racial purpose, strict scrutiny cannot be avoided simply by demonstrating that the shape and location of the districts can rationally be explained by reference to some districting principle other than

4

race, for the intentional classification of voters by race, though perhaps disguised, is still likely to reflect the impermissible racial stereotypes, illegitimate notions of racial inferiority and simple racial politics that strict scrutiny is designed to smoke out.") (citations and internal quotation marks omitted), *rev'd on other grounds*, 517 U.S. 899 (1996).

The majority's legal error is compounded by its analysis of the "underlying rationale for [district] deviations," J.S. App. 51a, which requires plaintiffs to show that racial explanations conflict with all conceivable non-racial explanations. *See id.* 96a (plaintiffs must prove that "racial considerations subordinated all other neutral and race-neutral districting criteria"); *id.* 111a ("[T]he legislature's pursuit of [the 55% BVAP floor] is not the 'predominate' criterion employed unless it subordinates all others."). As a result, plaintiffs must not only prove that race *was* the predominant factor in a line-drawing decision, but also that every imaginable "neutral" goal was *not* a factor.

The "neutral" explanations that can effectively cancel out evidence of race-based redistricting, moreover, are remarkably fluid. The majority openly admits there is no "standard" for assessing compactness or contiguity, J.S. App. 54a, 57a, and that various race-neutral justifications can "form a 'backstop' for one another," *id.* 59a-60a. In other words, these factors are so numerous and so inherently malleable that they can be manipulated to explain away even the most egregious race-based districting schemes.

Nor are the "neutral" criteria plaintiffs must disprove limited to "traditional districting principles" or even the majority's eleven categories. J.S. App. 53a-71a. According to the majority, *any* non-racial explanation

5

for misshapen lines can defeat a racial gerrymandering claim. *Id*. 93a (finding no racial predominance in light of "the artificial border provided by I-85" in District 63); *id*. 125a (same, where irregular boundaries captured area "relatively close" to incumbent's residence along with incumbent-owned funeral home).

Appellees cannot cite a single case endorsing this "any excuse will do" approach to predominance. The majority's novel and unsupported conception of the predominance standard mandates reversal.

## II. APPELLEES DISREGARD THE SIGNIFI-CANCE OF THE 55% BVAP RULE IN THE CONFIGURATION OF THE CHAL-LENGED DISTRICTS

As noted above, the vast majority of Appellees' brief attacks an argument that no one makes—that the mere existence of a racial target triggers strict scrutiny. The parade of horribles Appellees envision arising from such a rule, moreover, reflects a cynical view of the Voting Rights Act ("VRA") and ignores the many ways states may properly use race in redistricting. *See*, *e.g.*, Brief of the NAACP and Virginia NAACP ("NAACP Br.") 22-24.

In truth, it is *Appellees'* position that threatens to gut the law of racial gerrymandering. Appellees claim that use of a mechanical racial quota says little (if anything) about whether race predominated. Br. 23. The Court has already rejected that view. *See Alabama*, 135 S. Ct. at 1271 (finding "strong, perhaps overwhelming, evidence that race did predominate" where "a primary redistricting goal was to maintain [the district's] existing racial percentage[]"and the legislature achieved that goal); *id*. at 1273 (legislature's reliance upon a "mechanically numerical view" of VRA

6

compliance "can raise serious constitutional questions"). And Appellees' theory is especially indefensible here. If unflinching devotion to a preordained racial quota in twelve very different districts is not evidence of racial predominance, then what is?

It is not hard to discern why Appellees scoff at the significance of the 55% BVAP rule; minimizing its significance allows them to wave away any and all evidence of race-based line-drawing that flows from that rule. That strategy is most evident in Appellees' two-paragraph rebuttal to Appellants' statewide evidence of racial predominance. Br. 37-38.

First, Appellees dismiss the House Criteria prioritizing VRA compliance over all other factors as merely a nod to the Supremacy Clause. Br. 37. But the 55% BVAP rule was the General Assembly's sole proxy for VRA compliance, meaning that the General Assembly determined in advance that the racial floor would be "placed . . . above traditional districting considerations," *Alabama*, 135 S. Ct. at 1271 (citation and internal quotation marks omitted), and "given priority in the event of a conflict among the criteria," JA 38. Even the majority below acknowledged that such pronouncements are "relevant evidence" where, as here, "legislators held a false belief that certain artificial criteria—such as [a] fixed BVAP floor—were necessary to comply with federal law." J.S. App. 73a-74a.[1]

---

[1] The United States' dismissal of the House Criteria cannot be squared with its position in *Wittman* that "the specific means employed to achieve" VRA compliance (i.e., "use of a 55% BVAP floor") supported the district court's finding of racial predominance in Virginia's third congressional district. Brief for the United States 21, *Wittman v. Personhuballah*, No. 14-1504 (U.S. Feb. 3, 2016); *see also id*. 22 ("Statements showing that the legislature treated nonretrogression as the 'primary focus' and

7

Second, Appellees pretend that Virginia's preclearance submission simply *described* the Challenged Districts. Br. 38. In reality, it declared the legislature's *goal* of "draw[ing] a predetermined race-based number of districts, each defined by race." *Covington v. North Carolina*, 316 F.R.D. 117, 135 (M.D.N.C. 2016). *Cf.* NAACP Br. 8 ("[T]he Fourteenth Amendment prohibits legislatures from confining [African American] electoral success to a limited number of districts segregated by race."). The preclearance submission itself is hardly "irrelevant," Br. 37, as this Court regularly relies on preclearance submissions in its predominance analyses. *See* Opening Br. 26.

Third, Appellees discount Delegate Jones' statements on the House floor regarding the primacy of race. Br. 38. In his own words, the 55% BVAP floor "trumped everything," JA 1923-25, and was so important that it had to be achieved in each Challenged District regardless of its unique geography, demographics, or voting patterns. Delegate Jones' contemporaneous testimony makes clear that the 55% BVAP rule was the uniform, blunt instrument "use[d]" to define and "craft[]" all of the Challenged Districts. J.S. App. 29a.

Fourth, Appellees shrug off statistical evidence showing that high BVAP areas were consistently moved into and among the Challenged Districts while low BVAP areas were just as consistently moved out, arguing that proves nothing but the existence of the racial target. Br. 38-39. But the "separat[ion of] voters into different districts on the basis of race" is the

_____

'paramount concern[]' . . . took on significance because the legislature had interpreted Section 5 to require adherence to unsupported and mechanical racial targets.").

8

very essence of racial gerrymandering. *Shaw v. Reno* ("*Shaw I*")*,* 509 U.S. 630, 649 (1993). And, as this Court has explained, "the story of racial gerrymandering" often "becomes much clearer" upon examination of the "racial and population densities" moved between and among districts. *Miller*, 515 U.S. at 917; *see also Alabama*, 135 S. Ct. at 1271.

Finally, Appellees ignore Appellants' statewide evidence of deviations from traditional districting criteria, even though that evidence thoroughly undermines Appellees' claim that the 55% rule "caused [no] departures from" such criteria. Br. 14. The Challenged Districts, as a whole, are less compact and split more Voting Tabulation Districts ("VTDs") than the remaining 88 districts. Opening Br. 27-28. Especially given that only racial data—and not political data—are available below the VTD level, *see Bush v. Vera*, 517 U.S. 952, 961 (1996); Brief for the United States ("U.S. Br. 27"), that evidence strongly suggests that Delegate Jones' racial goals were achieved at the expense of traditional criteria like compactness and respect for political boundaries.

In fact, while the General Assembly's purported race-neutral goals gave way time and again, *see*, *e.g.*, J.S. App. 92a (District 63 not compact); *id*. 121a (District 80 lacks land contiguity and water crossing); *id*. 128a (District 95 split multiple precincts); JA 39 (ten incumbents paired), the 55% BVAP rule was never compromised.

To the contrary, that unyielding racial threshold dictated district lines from start to finish. Delegate Jones rejected alternative maps that did not guarantee at least 55% BVAP in every Challenged District, JA 299, and he rejected proposals for specific districts if they threatened to cause even minor deviations from that rule, JA 138-39. Far from a mere "aspiration" Delegate

9

Jones hoped to achieve if conditions permitted, the 55% BVAP rule was an immutable principle that drove the redistricting process and was uniformly achieved, regardless and in spite of other districting considerations.

Ultimately, the predominance analysis in this case is quite simple. Imagine that a legislature announced, at the outset of the redistricting process and repeatedly throughout the process, that it was determined to achieve a preordained compactness score (say, 0.2 on the Reock scale) in a specific subset of districts. Imagine further that (1) each district was, in fact, drawn to meet that threshold, sacrificing other districting considerations along the way; (2) the compactness scores of some districts were reduced as necessary to ensure neighboring districts met that threshold; and (3) proposed districts with Reock scores of 0.19 were rejected outright, regardless of the competing reason. There would be little doubt that compactness predominated in that redistricting process.

Similarly here, the General Assembly adopted an ex ante target of 55% BVAP for every Challenged District. And that 55% BVAP rule was the single, nonnegotiable criterion that dictated the configuration of the Challenged Districts. Race therefore predominated. *See Shaw II*, 517 U.S. at 907 (race predominates when "[r]ace was the criterion that, in the State's view, could not be compromised").

### III. DISTRICT-SPECIFIC ANALYSES CONFIRM THAT RACE PREDOMINATED

#### A. Southside Virginia (Districts 63 and 75)

Appellees' discussion of Districts 63 and 75 is cursory and buried deep in their brief. Their desire to ignore these districts is understandable given the overwhelming evidence of racial predominance.

10

District 75 sits below District 63. Before redistricting, District 63 encompassed all of Dinwiddie County. Delegate Jones pushed District 75's northern border into the heart of Dinwiddie County, thereby transferring high BVAP areas in Dinwiddie County out of District 63 and into District 75. JA 1557.[2]

There is no real dispute as to *why* Delegate Jones "chopp[ed] Dinwiddie County in half" when he redrew District 75. J.S. App. 92a. As former delegate (now Senator) Rosalyn Dance testified, the purpose of that "drastic maneuvering" was "to try to get [District 75's] number . . . [o]f African American voters up to 55 percent." *Id*. 97a-98a. The majority agreed, holding that the Dinwiddie County split was "avowedly racial," *id*. 93a, and that "race was the predominate criterion driving the formation and configuration of HD 75," *id*. 102a. Appellees do not even mention that holding, let alone try to rebut it, leaving no dispute that race predominated in District 75.

The same facts show that race predominated in District 63 as well. Again, Delegate Jones used District 63 as a "donor district," moving African-American

---

[2] The average BVAP of the areas moved into District 75 was 35%—14% higher than the areas left in District 63. Opening Br. 31. Appellees suggest that this pattern does not evince a racial purpose because 35% is less than 55%. Br. 49. Appellees miss the point. When choosing precincts to move into District 75, Delegate Jones chose precincts from District 63 *and elsewhere*. Br. 50. Taken together, those precincts contained enough African-American voters to push District 75's BVAP above the 55% threshold. J.S. App. 97a. The areas extracted from District 63 represent a few crucial pieces of that complex puzzle. Appellees' attempt to reduce the redistricting process to a simple arithmetic problem belies the complex manipulation undertaken to achieve a precise racial percentage in each of the Challenged Districts. *Id*. 98a.

11

voters from the southern portion of District 63 into the northern portion of District 75 to achieve a preordained racial quota in District 75. J.S. App. 100a. That alone is enough to show that race predominated in District 63. *See*, *e.g.*, *Miller*, 515 U.S. at 916 (race predominates when it "motivat[es] the legislature's decision to place a significant number of voters within *or without* a particular district") (emphasis added).

The majority, however, concluded that the "avowedly racial" Dinwiddie County split indicated racial predominance on the District 75—but not the District 63—side of the split. J.S. App. 93a-95a. That conclusion has no basis in law or logic, Opening Br. 31-35, and, accordingly, Appellees make no effort to defend it.

The Dinwiddie County split is not the only evidence of race-based redistricting in District 63. Because Delegate Jones *removed* a substantial number of African-American voters from District 63 to increase the BVAP of District 75, he also had to *add* a substantial number of African-American voters to ensure that District 63 still met the 55% BVAP floor. He did so largely by grafting a new appendage on to the northeastern corner of District 63. As former delegate Dance explained, that appendage "picked up part of Prince George . . . *to get more African-Americans*" and also "picked up the concentration of African-Americans in Hopewell[.]" JA 1647-49 (emphasis added). Thus, the new appendage was necessitated by the "avowedly racial" Dinwiddie County split and served overtly racial goals.

Nonetheless, the majority held that the new appendage was not motivated by race because it also served "neutral" and "political" goals. J.S. App. 94a. That was error. *See, e.g.*, *Shaw II*, 517 U.S. at 907 (fact that

12

legislature "addressed [non-racial] interests" in the course of adding a snake-like appendage to capture additional African-American voters "does not in any way refute the fact that race was [the] predominant consideration"). Appellees admit as much by (again) declining to defend the majority's analysis.

Instead, Appellees offer their own half-hearted argument for why the new appendage does not suggest a racial purpose: it "maneuvers *around* the majority-black precinct of Jefferson Park." Br. 49. But that claim is both inaccurate and misleading. Appellees' claim is inaccurate because the appendage does *not* "maneuver[] around" Jefferson Park; it splits Jefferson Park, drawing high BVAP areas of Jefferson Park into District 63. JA 659, 938, 1481, 1557. Appellees' claim is misleading because it focuses only on what the appendage excludes, not what it includes. After splitting Jefferson Park (53.3% BVAP), the appendage continues to wind its way outward, capturing even more heavily African-American areas (60% BVAP or more) around Hopewell. Opening Br. 34-35. Thus, try as they might, Appellees cannot minimize the racial design of the new appendage.

## B. Richmond Area (Districts 69, 70, 71, and 74)

With respect to the Richmond-area districts, Appellees focus on a few cherry-picked details to obscure how race infused the redistricting process from start to finish. Br. 45-48.

District 74 lies at the heart of the General Assembly's Richmond-area strategy. The district was not underpopulated. Nevertheless, Delegate Jones moved approximately 16,000 voters out of District 74, then moved approximately the same number of voters back

13

into the district. JA 669. Tellingly, this unnecessary population swap had the effect of increasing the BVAP in nearby districts, thereby ensuring that they complied with the 55% rule. JA 674; *see also* J.S. App. 116a (majority below explaining that "much of the black population ceded from HD 74 went to other Challenged Districts, such as HD 63 and HD 71"). Indeed, the average BVAP of areas moved out of District 74 and into other Challenged Districts is a whopping 69.0%. JA 674. The average BVAP of areas moved into non-challenged districts, by contrast, is a mere 20.5%—a nearly 50 percentage point difference. *See id*.

Unsurprisingly, all this population shifting affected District 74's configuration. To give but one concrete example, Delegate Dance testified that Delegate Jones moved African-American voters in the Hopewell area out of District 74 and into District 63 to replace the African-American voters that Delegate Jones moved out of District 63 and into District 75. JA 1646-48. It is hard to imagine more straightforward and compelling evidence of racially motivated line-drawing. Appellees simply ignore it.

Standing alone, the systematic dispersion of African-American voters from District 74 is strong evidence of racial predominance in the Richmond area. It is even more compelling when considered in light of the systematic infusion of African-American voters into District 71.

District 71 has been represented by Delegate Jennifer McClellan, an African American, since 2006. She has never lost an election, even as BVAP has declined in her district. In 2009, she defeated a white challenger with more than 80% of the vote, JA 680, even though District 71's BVAP was only 46.3%,

14

*id*. 669. Nevertheless, District 71 "saw the largest BVAP increase of all the challenged districts." Br. 46. Delegate Jones achieved that remarkable feat by systematically removing African-American voters from nearby districts (particularly District 74) and moving them into District 71. The statistics are striking. The average BVAP of the areas moved into District 71 (72.1%) is more than 50 percentage points higher than the average BVAP of the areas moved out of District 71 (21.3%). JA 672. Those stark racial patterns are powerful evidence of racial predominance. *See*, *e.g.*, *Alabama*, 135 S. Ct. at 1271 (racial patterns in population movements may indicate predominance).

Crucially, Appellees do not dispute that Delegate Jones shuffled voters around to achieve a particular (and unnecessary) racial composition in District 71. Instead, they argue that race could not have predominated in District 71 because Delegate Jones met his racial goals "without subordinating any traditional districting principles." Br. 46-47. But, as explained above, sorting voters by race for the sake of race implicates the Constitution—no matter how neatly it is done.

Districts 69 and 70 tell a similar story. District 70 played a donor role in the redrawn Richmond-area districts, while District 69 played a recipient role. District 70 was not underpopulated at the time of redistricting; nevertheless, Delegate Jones added about 26,000 people and removed about 26,000 people. JA 669. Again, the racial patterns are telling. The BVAP of the areas moved into District 70 is 43.8%, while the BVAP of the areas moved out is 59.9%, *id*. 672-73— *and all of the areas moved out were moved into other Challenged Districts*, *id*. 674. Much of the heavily African-American population moved out of District 70

15

was added to the outskirts of District 69, thereby ensuring that District 69's BVAP remained at or above 55%. JA 939, 1557-58. Thus, while District 70's BVAP dropped from 61.8% to 56.4%, *id*. 669, District 69's BVAP held steady at just above 55%, *id*. And after it was raided for African-American voters to shore up BVAP elsewhere, District 70's Reock score dropped from .47 to .40. JA 667.

Race predominates where "the overriding priority of the redistricting plan was to draw a predetermined race-based number of districts, each defined by race." *Covington*, 316 F.R.D. at 135. That is precisely the case here. Delegate Jones carefully siphoned African-American voters into, out of, and among the Richmond-area districts to comply with the 55% rule, with predictable effects on traditional districting principles. JA 641-42; *see also id*. 1603 (Delegate McClellan testifying that the "69th, 70th, and 71st and 74th districts [had] to meet a 55 percent black voting-age population"). Race therefore predominated.

## C. South Hampton Roads (Districts 77, 80, 89, and 90)

Before redistricting, District 80's BVAP hovered just below the 55% threshold at 54.4%. JA 669. Nevertheless, to ensure strict compliance with the 55% rule, Delegate Jones made drastic changes. Principally, he tacked on an irregular westward appendage that "winds its way around low BVAP precincts" in order to capture high BVAP areas in Portsmouth and Suffolk. J.S. App. 121a. As a result, District 80's compactness dropped steeply. JA 667. The District also jumps over the Elizabeth River without any crossing. The majority below summed it up nicely, observing that District 80 is "quite unusually configured" and "makes

16

little rational sense as a geographical unit." J.S. App. 121a.

Appellees (like the majority below) argue that politics explain District 80's bizarre lines. That argument fails, and not just because it has no foundation in the legislative record. Appellants' expert evidence showed that race was the stronger predictor of voter movement into and out of District 80. JA 672 (while BVAP in District 80 *increased*, Democratic vote share *decreased*); *id.* 644-45, 678 (likelihood that a VTD was included in District 80 was strongly and positively correlated with BVAP, not Democratic vote share).

In District 89, BVAP was increased from 52.5% to 55.5% to meet the 55% threshold. JA 669. Again, achieving that racial goal had numerous impacts on the district's shape. For example, Delegate Jones extended District 89 over the Elizabeth River to include the heavily African-American precinct of Berkley (95% BVAP). JA 1562. While that plainly racial maneuver served to increase District 89's BVAP, it also reduced District 89's compactness scores by over 30%, J.S. App. 124a-125a, and fractured communities of interest in Norfolk by separating Berkley from its neighboring precincts on the western side of the Elizabeth River, which are in District 80. JA 1466.

The majority below airily dismissed the racial implications of the Berkley annexation because Berkley is "relatively close" to the incumbent's residence. J.S. App. 125a. Appellees do not adopt that unconvincing theory. Instead, they seem to argue that the annexation of Berkley cannot indicate racial motives because Berkley was moved from one majority-minority district to another. Br. 45. To describe that argument is to refute it.

17

Race also predominated in District 77. Appellees disagree, mainly on the ground that Delegate Jones added a few heavily white precincts to District 77 at the request of the incumbent delegate. Br. 42. Appellees conveniently ignore the *other* changes that Delegate Jones made to compensate for the addition of those white precincts. Among other things, Delegate Jones expanded the district further into Suffolk to add heavily African-American areas. That expansion significantly reduced District 77's compactness, J.S. App. 118a, and split the heavily African-American precincts of John F. Kennedy and Lakeside, fracturing several predominately African-American neighborhoods and communities of interest. JA 925-26, 1451; *see also* NAACP Br. 20.

Lastly, Delegate Jones once again used a "donor district"—District 90—to increase the BVAP of surrounding districts, thereby ensuring universal compliance with the 55% BVAP rule. And, once again, he sacrificed traditional districting criteria to achieve his racial goals—this time, with absurd results. Under the enacted plan, the predominantly African-American precinct of Brambleton (95.7% BVAP) is split between Districts 89 and 90. As a result, the historically black Norfolk State University campus is now divided between District 89 and 90. JA 1468; *see also* NAACP Br. 19 ("As a result, when the district lines were drawn, a student living in Phillis Wheatley Hall on Norfolk State's campus had to leave her district every time she walked to the nearest on-campus dining hall.").[3]

---

[3] Appellees claim that District 90 could not have served as a donor district because its BVAP did not significantly decrease. Br. 42-43. That is a non sequitur. District 90's BVAP remained steady because Delegate Jones replaced the high BVAP areas

18

In short, as in the Richmond area, African-American voters in the South Hampton Roads area were carefully redistributed to ensure compliance with the 55% rule in every Challenged District. Traditional districting criteria were often abandoned, and, in any case, were considered only after the racial goal had been achieved.

## D. North Hampton Roads (Districts 92 and 95)

Evidence of racial predominance abounds on the peninsula. District 95 went from a moderately compact district to the least compact district in the entire map. J.S. App. 128a. It now features a meandering tentacle that snakes its way northward in search of predominantly African-American areas. As the majority put it, much of the district "departs from any observable neutral criteria." J.S. App. 128a. Similarly, District 92 was extended northwest to absorb heavily African-American areas. JA 672, 1563.

Appellees toss out several baseless theories to explain the bizarre configurations of these districts. For instance, they argue that District 95 was reconfigured to eliminate the "ferrymander" in District 64 and to avoid the residence of Delegate Abbott in District 93. Br. 40. But neither goal required the contorted northern tentacle, which conspicuously reaches out to grab high BVAP areas. JA 944, 1563. Appellees also invoke politics, arguing that the district was drawn to include Democratic areas and exclude Republican areas. Br. 40. (The majority found that explanation "persuasive." J.S. App. 129a.) But both the majority

---

moved to District 89 with high BVAP areas in Virginia Beach. JA 927-28.

19

and Appellees fail to notice that the district's sprawling tentacle carefully splits VTDs as it meanders its way north. *See* JA 786-87, 912-13. And while Delegate Jones could have assessed the *racial* ramifications of those VTD splits, he could not have assessed the *political* ramifications of those splits. U.S. Br. 27.

## IV. DISTRICT 75 IS NOT NARROWLY TAILORED

Appellees proclaim that Delegate Jones dutifully performed the "exceedingly complex task" of "[d]etermining what level of BVAP is necessary to prevent retrogression" in District 75. Br. 54. This is remarkable given that, when asked on the House floor whether he or any of his colleagues "took into account *any* retrogress[ion] analysis regarding minority performance in *any* of the 12 majority-minority districts," Delegate Jones responded: "*I am not aware of any.*" JA 288-89 (emphasis added).

At no point during the redistricting process did Delegate Jones offer the explanation embraced by the majority and Appellees here: that the 55% BVAP figure was the product of a functional analysis of the unique voting patterns and electoral history of District 75. Thus, it is hardly surprising that Appellees can point to no evidence—not a single document—supporting this alleged "functional analysis." Nonetheless, the majority was satisfied that, after misrepresenting the source of the 55% BVAP rule multiple times, *see* J.S. App. 24a-25a, Delegate Jones parroted the words "functional analysis" on the witness stand. This Court should not condone the majority's evisceration of the strict scrutiny standard.

20

Appellees' post hoc attempt to muster a "strong basis in evidence" for the 55% BVAP rule, moreover, fails on its face.

First, Appellees contend that Delegate Jones relied on Delegate Tyler, the incumbent in District 75, as the source of the 55% BVAP rule. But even if the unsupported concerns of an incumbent seeking to maximize her chances of re-election could satisfy Appellees' burden, *see* J.S. App. 98a-99a, Delegate Tyler professed no independent knowledge that a 55% BVAP rule was necessary for VRA compliance, testifying that her understanding on this point came from Delegate Spruill. *Id.* 24a. Delegate Spruill's view, it appears, was based on nothing more substantial than unidentified "feedback" that he received from unidentified "groups in Virginia." *Id.* 25a. Appellees cannot establish a "strong basis in evidence" based on the rumor mill.

Second, Appellees congratulate Delegate Jones on his alleged analysis of the 2005 primary and general election in District 75. Even if this analysis did take place—and the Court would search the legislative record in vain for any documentation of or reference to this analysis—it hardly provides a strong basis in evidence regarding the requirements of the VRA. After all, "a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election." *Thornburg v. Gingles*, 478 U.S. 30, 57 (1986); *see also* Brief for the United States 24, *McCrory v. Harris*, No. 15-1262 (U.S. Oct. 23, 2016). Indeed, if a single close election provides sufficient justification for packing minority voters into a district, then the efforts of minority voters to build coalitions across racial lines will be

21

effectively thwarted. *See* NAACP Br. 26; *cf. Bartlett v. Strickland*, 556 U.S. 1, 25 (2009).

After extolling the complex "functional analysis" Delegate Jones supposedly performed, Appellees reverse course to contend that he could *not* "do a meaningful analysis" since there were "too few contested primaries in Virginia House races." Br. 57. But this Court has never endorsed Appellees' contention that primary election data—and "not general election data"—are "best" for assessing minority performance. *Id.* Rather, "the most probative evidence" of minority electoral opportunity "is derived from elections involving black candidates." *Nipper v. Smith*, 39 F.3d 1494, 1540 (11th Cir. 1994); *see also Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1208 n.7 (5th Cir. 1989) (same); *Uno v. City of Holyoke*, 72 F.3d 973, 988 n.8 (1st Cir. 1995) (same); *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993) (same). And there was no dearth of such election data for District 75 or any other Challenged District, all showing the same thing: minorities in each Challenged District, including District 75, had elected their candidates of choice for at least a decade, whether the BVAP was as low as 46.3% or as high as 62.7%. *See* JA 669; http://www.vpap.org/offices/house-of-delegates-75/elections/?year_and_type=2005regular. Even if contested primary data were "best," Appellees cannot justify Delegate Jones' apparent refusal to examine any other available election data in the district. Indeed, Appellees' cynical claim that in the absence of perfect data the only proper analysis is no analysis at all flies in the face of this Court's insistence on a "strong basis in evidence," *Alabama*, 135 S. Ct. at 1274 (citation omitted).

22

Appellees next contend that Appellants supported the use of a BVAP threshold at trial. Appellees grossly misrepresent the record in this regard, fixating on a single statement of counsel during closing argument. JA 2279. But as indicated by the immediate context of that statement, Appellants never offered the Court BVAP percentages that "should" have been used. *See* JA 2279-80 (VRA compliance "hardly requires applying a minimum BVAP threshold well above that needed to win a majority of minority voters"). For good reason. That was not Appellants' burden. Indeed, Appellants affirmatively presented evidence that African Americans could elect their candidates of choice in at least some of the Challenged Districts regardless of whether those districts were majority BVAP. *See, e.g.*, Pls.' Post-Tr. Br. 36; *see also* JA 737-39, 1743-45. Simply put, the precise word choice used by counsel in a single line of closing argument does not relieve the Commonwealth of its burden of meeting strict scrutiny.

Finally, Appellees' claim that the higher BVAP thresholds applied in *Alabama* render that case inapplicable, Br. 56, only reinforces Appellees' "mechanical[] rel[iance] upon numerical percentages" to the exclusion of all other "significant circumstances." *Alabama*, 135 S. Ct. at 1273. The question of how much is too much is a function of fact; in an area with high cross-over voting and low polarization, for instance, 55% BVAP could be deemed just as excessive as 70% BVAP would be in a highly polarized area. But the General Assembly made no inquiry into these facts. Instead, they "asked the wrong question with respect to narrow tailoring," *id.* at 1274, specifically: "How can we achieve at least 55% BVAP in all majority-minority districts?" Here, as in *Alabama*, "[a]sking the wrong question . . . led to the wrong answer." *Id.*

23

## CONCLUSION

Appellants respectfully request that the Court reverse the majority's opinion below.

Respectfully submitted,

| | |
|---|---|
| KEVIN J. HAMILTON | MARC E. ELIAS |
| ABHA KHANNA | *Counsel of Record* |
| RYAN SPEAR | BRUCE V. SPIVA |
| WILLIAM B. STAFFORD | ARIA C. BRANCH |
| PERKINS COIE LLP | PERKINS COIE LLP |
| 1201 Third Avenue | 700 Thirteenth Street, N.W. |
| Suite 4900 | Suite 600 |
| Seattle, WA 98101-3099 | Washington, D.C. 20005-3960 |
| (206) 359-8000 | (202) 654-6200 |
| | MElias@perkinscoie.com |

*Counsel for Appellants Golden Bethune-Hill, Christa Brooks, Chauncey Brown, Atoy Carrington, Davinda Davis, Alfreda Gordon, Cherrelle Hurt, Thomas Calhoun, Tavarris Spinks, Mattie Mae Urquhart, Vivian Williamson, and Sheppard Roland Winston*

November 16, 2016