IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| GOLDEN BETHUNE-HILL, et al, | ) |
| Plaintiffs, | ) |
| v. | ) |
| VIRGINIA STATE BOARD OF ELECTIONS, et al., | ) Civil Action No. 3:14-cv-852-REP-AWA-BMK |
| Defendants, | ) |

**PLAINTIFFS' RESPONSE TO DEFENDANT-INTERVENORS' STATEMENT OF POSITION REGARDING FURTHER PROCEEDINGS**

What it lacks in merit, Defendant-Intervenors' statement of position makes up for in chutzpah.[1] Having first insisted upon an erroneous legal standard at trial with no basis in Supreme Court case law and convinced this Court to adopt that erroneous standard over Plaintiffs' objections, Defendant-Intervenors now profess surprise at the Supreme Court's decision, which did little more than reaffirm the settled legal standard. Perhaps worse, Defendant-Intervenors seek to capitalize on their own error by using the Supreme Court's opinion to allow them to introduce evidence they could have but chose not to proffer at trial and delay final resolution of the voting rights of tens of thousands of Virginia voters. That invitation should be firmly declined.

Defendant-Intervenors' position on predominance vacillates between two extremes: the Court should either (a) throw open the evidentiary record to allow evidence the parties

---

[1] Defendants "express no position on the specific issues" raised in the Court's April 6 Order, but generally "support a speedy resolution of the issues in this case." ECF No. 147. Plaintiffs therefore direct this response to Defendant-Intervenors' Statement of Position.

either did or could have presented at trial, or, alternatively, (b) short circuit the proper analysis of racial predominance altogether by summarily concluding that Plaintiffs cannot meet their burden on the existing record. Defendant-Intervenors assiduously avoid the most obvious and reasoned approach: that the Court should re-examine the existing record in light of the correct legal standard. Such an approach is not only consistent with the Supreme Court's guidance but also with the prompt resolution of this long-pending case.

Even if Defendant-Intervenors could allege some reason and need for additional evidence on racial predominance, they surely cannot do so with respect to strict scrutiny, because the Supreme Court affirmed the law and facts on narrow tailoring and left this Court's analysis and findings completely undisturbed. There is no basis for reopening the record in such circumstances and Defendant-Intervenors barely pretend to justify their request. Plaintiffs respectfully submit that the Court should reject Defendant-Intervenors' invitation to use the Supreme Court opinion as a "do-over" vehicle for Defendant-Intervenors to put on the case they wish they had presented at trial.

### A.   Factual Findings

As set forth in Plaintiffs' Statement of Position, ECF No. 148 ("Pls.' Statement") at 1, "Plaintiffs' position is that while some factual findings remain in effect as law of the case, others are subject to review and reconsideration under the proper legal standard." Defendant-Intervenors, meanwhile, contend that "virtually all" of the Court's factual findings "remain accurate and relevant," but are "*insufficient*" under the correct legal standard. Defendant-Intervenors' Statement of Position, ECF No. 146 ("Intervenors' Statement") at 6-7.

Based on their respective Statements, then, the parties agree on the general principles governing the Court's prior factual findings. That is, the parties agree that the Court may make additional factual findings. *Compare id. with* Pls.' Statement at 3 ("But these facts are not necessarily the universe of relevant factual findings on remand."). The parties further

agree that the Court's factual findings as stated in Section III of its Memorandum Opinion remain in effect. *Compare* Pls.' Statement at 1-2, *with* Intervenors' Statement at 6.

The only point of potential divergence on this issue is which *specific* factual findings should remain undisturbed (i.e., which remain relevant without further consideration). Of particular note, the parties disagree on the extent to which the Court's statewide and district-by-district factual findings should be reassessed by the Court on remand. Defendant-Intervenors suggest that those findings "remain applicable and are highly pertinent." Intervenors' Statement at 6. But as Plaintiffs explained in their own Statement, those findings can hardly be cast in stone where their "pertinen[ce]" was determined by an incorrect legal standard and their "applicab[ility]" hinges entirely on their role under the correct legal standard. *See* Pls.' Statement at 3-4. Because those factual findings were "'predicated on a misunderstanding of the governing rule of law,'" they are "subject to reevaluation in light of the Supreme Court's holding that the framework within which those facts were considered was legally erroneous." *Id.* at 3 (quoting *Burns v. Uninet, Inc.*, 211 F.3d 1264 (4th Cir. 2000)). Where the Court's erroneous "legal framework for analyzing a racial sorting claim provide[d] the guidepost for [these] statewide and district-by-district findings," Mem. Op., ECF No. 108 at 101, Defendant-Intervenors' assertion that they "were not impacted in any way on appeal," Intervenors' Statement at 6, is untenable.

Ultimately, there is little dispute that the Court has the authority—indeed, the obligation—to revisit its factual findings on the statewide and district-specific evidence of predominance in light of the proper predominance standard. Both Plaintiffs and Defendant-Intervenors agree that the Court must "reweigh[] th[at] evidence" on remand, Intervenors' Statement at 7, and determine anew whether the correct legal standard requires additional findings of fact. Likewise, Plaintiffs maintain that it is incumbent upon this Court to reevaluate its factual findings under the "guidepost" for "analyzing a racial sorting claim"

provided by the Supreme Court, Mem. Op., ECF No. 108 at 101, and modify those findings when appropriate to conform with the record evidence and the correct legal standard.[2]

B.     **Conclusions of Law**

There is no credible dispute that this Court's conclusions on racial predominance in 11 of the 12 Challenged Districts have been vacated by the Supreme Court. *See* Pls.' Statement at 5. Defendant-Intervenors bizarrely contend that those conclusions "remain partially in effect, but are incomplete and must be informed by additional fact-finding, or else the Court will be duty-bound to rule in Defendant-Intervenors' favor." Intervenors' Statement at 7. This brazen position is so blatantly at odds with the Supreme Court opinion—and common sense—it hardly merits a response. To be sure, nothing in the Supreme Court's opinion compels the conclusion that, absent a new evidentiary proceeding, race necessarily did not predominate in the remaining 11 districts. If the Supreme Court had intended to either (a) require a new evidentiary proceeding or else (b) rubberstamp this Court's Memorandum Opinion despite its fundamental legal errors, it would have said as much. *See, e.g.*, *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. __, 135 S. Ct. 1257, 1269-70 (2015) (instructing district court to permit additional evidence of standing on remand); *cf. Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (reversing and remanding for a "new trial" in part because "the [s]tate's trial evidence resemble[d] a house of cards"); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 159 (1963) ("[r]eversed in part and remanded for limited new trial").

---

[2] To the extent Defendant-Intervenors contend that the Court's ultimate "findings" on predominance with respect to any of the 11 districts remains in effect, they are demonstrably incorrect. *See* Slip Op. at 13 (ordering this Court to determine "the extent to which, under the proper standard, race directed the shape of *these 11 districts*") (emphasis added). Defendant-Intervenors' suggestion that the Court's conclusions on predominance in Districts 63, 80, and 95 "do not need to be revised because the Supreme Court did not revisit its prior decision in *Easley v. Cromartie*, 532 U.S. 234 (2001)," Intervenors' Statement at 6-7, ignores the extent to which the erroneous legal standard infected this Court's analysis of *all* of the districts. *See, e.g.*, Mem. Op., ECF No. 108 at 108-13 (confining analysis of District 63's boundaries to lines that deviated from traditional criteria; analyzing deviations and "sub-deviations" within District 63 in isolation rather than holistically; and relying on *post hoc* considerations that the legislature in theory could have used but in reality did not); *id*. at 143-47 (confining analysis of District 80's boundaries to lines that deviated from traditional criteria; obscuring the significance of the use of a 55% BVAP target; and crediting *post hoc* theory on incumbency protection never aired during the redistricting process); *id*. at 152-54 (ignoring the admitted use of a 55% BVAP target and crediting the *post hoc* theory that District 95's bizarre shape was attributable entirely to political calculations).

4

### C. Further Discovery and Evidentiary Hearings on Racial Predominance

According to Defendant-Intervenors, the Supreme Court opinion so drastically altered the state of the law on racial predominance, in a manner neither the parties nor this Court could have anticipated, that this Court must allow further discovery and evidentiary proceedings on predominance in light of this "new regime." Intervenors' Statement at 1. Defendant-Intervenors' hyperbolic contentions that the foundation of this case has been rocked by some "newly articulated standard," *id.* at 2, does not square with the Supreme Court's holding that the law on racial predominance continues to be what it has been for over 20 years. Plaintiffs submit that the existing record provides ample reason to find racial predominance in all 11 districts under that standard. In implicit recognition of this, Defendant-Intervenors demand the opportunity to submit new evidence that they obviously could have submitted previously, cloaking their desire to do so in mischaracterizations of the Supreme Court's decision, the governing law, and the record.

### 1. Defendant-Intervenors Mischaracterize the Supreme Court's Opinion

Defendant-Intervenors' argument for a new evidentiary proceeding on racial predominance is based almost entirely on their contention that "[t]he Supreme Court's decision in this case has taken the law of racial gerrymandering into . . . uncharted territory[.]" Intervenors' Statement at 1. On the contrary, the Supreme Court simply directed this Court to follow the course the Supreme Court carefully charted decades ago. *See Miller v. Johnson*, 515 U.S. 900 (1995); *Shaw v. Hunt*, 517 U.S. 899 (1996) (*Shaw II*). The Supreme Court's holding on predominance rests entirely on these precedents: "The Court reaffirms the basic racial predominance analysis explained in *Miller* and *Shaw II*[.]" Slip Op. at 16.

While Defendant-Intervenors profess to be shocked by the Supreme Court's holding on predominance, the case law has been clear and consistent from the beginning—as Plaintiffs have maintained since the filing of this lawsuit. Defendant-Intervenors cannot credibly claim surprise that, contrary to the position they advanced at trial, compliance with

5

traditional districting principles does not immunize districts from racial gerrymandering claims. After all, the Supreme Court expressly "rejected" that view in *Shaw II*. Slip Op. at 9.

> In his dissent, Justice STEVENS argues that strict scrutiny does not apply where a State "respects" or "compl[ies] with traditional districting principles." *That, however, is not the standard announced and applied in* Miller[.]

*Shaw II*, 517 U.S. at 906-07 (quoting 517 U.S. at 930-31 (Stevens, J., dissenting)) (emphasis added) (citation omitted). When Defendant-Intervenors advanced the same already-rejected rule to the Supreme Court, the Supreme Court was forced to remind them of the governing law imposed by *Shaw II*. "Race may predominate even when a reapportionment plan respects traditional principles, the Court explained, if '[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" Slip Op. at 9 (quoting *Shaw II*, 517 U.S. at 907).

The Supreme Court made clear that it was *Defendant-Intervenors*' *position*, not its holding in this case, that was unprecedented. *See id.* at 9 ("The State's theory in this case is irreconcilable with *Miller* and *Shaw II*."). Defendant-Intervenors "insist[ed]" that "the harm from racial gerrymandering lies not in racial line-drawing *per se*" but in districts that appear to deviate from traditional criteria. *Id.* "But 'the constitutional violation' in racial gerrymandering cases stems from the 'racial purpose of state action, not its stark manifestation.'" *Id.* (quoting *Miller*, 515 U.S. at 913). Defendant-Intervenors further contended that race does not predominate "if the legislature could have drawn the same lines in accordance with traditional criteria." *Id*. The Supreme Court was unequivocal: "This is incorrect. The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Id.* Defendant-Intervenors' purported understanding of the law of racial predominance was, therefore, flatly inconsistent with the Supreme Court's prior articulation of the law of racial predominance. Defendant-Intervenors' apparent

6

surprise (and evident disappointment) that the Supreme Court meant what it said in *Miller* and *Shaw II* provides no basis for a new evidentiary proceeding in this case.

Defendant-Intervenors' suggestion that the Supreme Court has never found predominance where a defendant could point to *some* traditional districting criteria explaining a district's contours further mischaracterizes the Court's precedent. Were that the case, the dissent in *Shaw II* would have prevailed. There, the Court noted that the challenged district "effectuated [the State's] interest in creating one rural and one urban district, and that partisan politicking was actively at work in the districting process." 517 U.S. at 907. But compliance with these race-neutral districting criteria did not foreclose a finding of racial predominance: "That the legislature addressed these interests does not in any way refute the fact that race was the legislature's predominant consideration." *Id.* Thus, the Supreme Court has *never* required, as the Memorandum Opinion did, that race conflict with all race-neutral criteria in order for race to predominate. See *Alabama*, 135 S. Ct. at 1263 (legislature "sought to achieve numerous traditional districting objectives" but "placed yet greater importance" on avoiding retrogression); *Bush v. Vera*, 517 U.S. 952, 963 (1996) (race predominated even though "[s]everal factors other than race were at work in the drawing of the districts").[3]

Defendant-Intervenors further claim "neither party anticipated" that the predominance inquiry required a "'holistic analysis' to 'take account of the districtwide context,' rather than 'divorce any portion of the lines . . . from the rest of the district.'" Intervenors' Statement at 1, 3-4 (quoting Slip Op. at 12). This is just wrong. Plaintiffs did not believe that the predominance analysis somehow *required* them to "divorce any portion of the lines . . . from

---

[3] Numerous district courts, including in the Eastern District of Virginia, have faithfully applied this precedent without the benefit of the Supreme Court's opinion in this case. *See, e.g.*, *Clark v. Putnam Cty.*, 293 F.3d 1261, 1270 (11th Cir. 2002) ("Race may be shown to have predominated even if . . . 'factors other than race are shown to have played a significant role in the precise location and shape of those districts.'") (citation omitted); *Page v. Va. State Bd. of Elections*, No. 3:13CV678, 2015 WL 3604029, at *13 n.23 (E.D. Va. June 5, 2015) ("*Page II*") ("[W]hen racial considerations predominated in the redistricting process, the mere coexistence of race-neutral redistricting factors does not cure the defect."), *appeal dismissed sub nom. Wittman v. Personhuballah*, 136 S. Ct. 1732 (2016); *Moon v. Meadows*, 952 F. Supp. 1141, 1146-49 (E.D. Va. 1997) (race predominated where "Legislature sought to protect and indeed enhance" district's BVAP ratio, even while considering partisanship, incumbent protection, and communities of interest), *aff'd*, 521 U.S. 1113 (1997).

the rest of the district" or "[c]oncentrat[e] on particular portions in isolation." Slip Op. at 12. Such an analysis would have no basis in Supreme Court precedent. The Supreme Court has consistently relied upon a districtwide analysis to determine predominance on a district-by-district basis. *See id.* at 11-12 (citing *Miller* and *Alabama*); *see also Page II*, 2015 WL 3604029, at *7 n.17 ("[W]e do not view any of these factors in isolation. We consider direct evidence of legislative intent . . . in conjunction with the circumstantial evidence supporting whether the 2012 Plan complies with traditional redistricting principles.").[4]

"The [Supreme] Court's holding in this case is controlled by precedent." Slip Op. at 16. Defendant-Intervenors' claim that the Court must conduct a new evidentiary proceeding because the Supreme Court broke new legal ground on racial predominance is at odds with that holding. The Supreme Court remanded so that this Court could apply well-established "principles" to the predominance inquiry. *Id.* at 16-17.

### 2. Defendant-Intervenors Mischaracterize the Memorandum Opinion

Next, Defendant-Intervenors claim that a new evidentiary proceeding is required because the existing Memorandum Opinion mandates summary affirmance in the absence of new evidence. Defendant-Intervenors' tortured logic—that they would prevail on remand in the absence of new evidence so they need to present new evidence—is hard to follow. Regardless, it is based on a gross mischaracterization of the Memorandum Opinion.

Defendant-Intervenors repeatedly assert that this Court found "no conflict between race and traditional criteria in the 11 Challenged Districts." Intervenors' Statement at 6; *see also id.* at 2 ("[T]his Court has already found that no actual conflict exists."). On the contrary, this Court found multiple instances of "actual conflict" between race and traditional districting criteria in at least 10 of the 11 districts. *See, e.g.*, Mem. Op, ECF No. 108 at 108-

---

[4] Indeed, Plaintiffs presented extensive "districtwide" evidence, including "stark splits in the racial composition of populations moved into and out of disparate parts of the district, [and] the use of an express racial target." Slip Op. at 12. Defendant-Intervenors' failure to effectively rebut Plaintiffs' districtwide evidence is attributable to their strategic decision to downplay, or "obscure," the significance of such evidence, *id.*, not to legal precedent directing them to adopt such a myopic approach to predominance.

09 (District 63's "deviations from neutral redistricting criteria begin with the splitting of Dinwiddie County" and include 400% increase in county and city splits and 800% increase in VTD splits); *id.* at 125-27 (redistricting doubled the number of VTD splits in District 69, which is not contiguous by land); *id.* at 130-31 (District 70 includes a "turret" that "appears to deviate from districting norms"); *id.* at 132 (redistricting tripled the number of VTD splits in District 71, which exhibits "facially evident deviations" along District 71's eastern border); *id.* at 137 (District 74's irregular "ax-shape[]" "arouses some suspicion"); *id.* at 140-42 (District 77 is "thrust so far into HD76 as to nearly sever it in half," is not contiguous by land, and lacks a water crossing); *id.* at 144 (District 80 "makes little rational sense as a geographical unit"); *id.* at 148-49 (examining a "pipe" on the northernmost border of District 89, in addition to other "small deviations"); *id.* at 150 (noting District 90's "two extensions into Virginia Beach and lack of land contiguity"); *id.* at 153 (observing that District 95 is the "least compact district on the map under the Reock metric," and that "[i]f there is any reasonably neutral explanation for the route followed, this Court was not informed").

The only district in which the Memorandum Opinion arguably included no specific findings of "conflict" was District 92. And here, as in the other Challenged Districts, the existing record provides ample "direct evidence of the legislative purpose and intent," including "the use of an express racial target" as well as "other compelling circumstantial evidence" such as "stark splits in the racial composition of populations moved into and out of disparate parts of the district," all of which was given "insufficient weight" or otherwise "obscure[d]" under the erroneous legal standard applied in the Memorandum Opinion. Slip Op. at 11, 12. *See, e.g.*, Mem. Op., ECF No. 108 at 22 ("[T]he Court finds . . . that the 55% BVAP figure was used in structuring" the Challenged Districts.); Pls.' Ex. 35 at 153 (Delegate Jones' primary goal in redrawing Districts 92 and 95 was to "try to maintain the voting strength for the black voting percentage"); Pls.' Ex. 67 at 11 (boundaries of District 92 divide high-BVAP areas from lower BVAP areas to the north and southeast); Pls.' Ex. 50,

tbl. 8 (BVAP of areas moved into District 92 was over 10 percentage points higher than BVAP of areas moved out).

In its analysis of the 11 districts, the Memorandum Opinion found that race did not conflict with *all* traditional districting criteria, and accordingly concluded that race could not and did not predominate.[5] But that is not—and never was—the standard. *See supra* Section C.1. The Supreme Court "agree[d]" with Plaintiffs that this Court erred in finding no predominance unless deviations were attributable to race alone "and not to some other factor." Slip Op. at 11. The Memorandum Opinion's misapprehension in this regard impacts the proper "weigh[t]" given to the evidence, not the sufficiency of the existing record. Mem. Op., ECF No. 108 at 83 ("The final step in the predominance inquiry of a racial sorting claim involves the weighing of the evidence *in toto* to determine whether the deviations attributable to race 'predominate' over *all* other districting criteria employed by the legislature, including both neutral criteria and deviations attributable to non-racial motives.") (emphasis added). In short, to conduct a proper predominance inquiry, the Court must reevaluate and reweigh the existing evidence—not hear new evidence.

### 3. Defendant-Intervenors Mischaracterize Plaintiffs' Position

Defendant-Intervenors further insist that "Plaintiffs' theory of the case" rested solely on "the existence of a 55% BVAP floor in all the Challenged Districts," and graciously offer Plaintiffs an opportunity to supplement their evidence on remand. Intervenors' Statement at 4 ("This was not the analysis that either party anticipated in conducting discovery and trial."). Plaintiffs respectfully disagree that their evidence or argument was limited to the mere existence of the 55% BVAP rule; on the contrary, the massive record in this case is replete with evidence of the extent to which the 55% BVAP rule directly impacted the Challenged

---

[5] *See, e.g.*, Mem. Op., ECF No. 108 at 112 (finding that Plaintiffs "have not yet satisfied their burden" in District 63 to show "that the racial considerations subordinated *all* other criteria, including neutral criteria and other non-racial criteria") (emphasis added); *id.* at 131 ("In weighing the evidence, the Court recognizes that Delegate McClellan testified that HD 70 was drawn to comply with the 55% BVAP floor, . . . but the legislature's pursuit of this goal is not the 'predominate' criterion employed unless it subordinates *all* others.") (emphasis added).

10

Districts' lines and "'was the criterion that, in the State's view, could not be compromised.'" Slip Op. at 9 (quoting *Shaw II*, 517 U.S. at 907).[6]

It is entirely telling that Plaintiffs, not Defendant-Intervenors, believe the Court could proceed on the existing record. That is because Plaintiffs believe they have met their burden on racial predominance for each of the 11 districts based on the existing record under the proper legal standard, as they would further demonstrate in merits briefing.

### 4. Defendant-Intervenors Mischaracterize Their Own Trial Testimony

Defendant-Intervenors represent that the Supreme Court's opinion has somehow sent them scrambling to adduce new evidence on predominance they failed to present at trial because they had no idea it was relevant. But even a cursory glance at the trial record reflects that Defendant-Intervenors already presented the exact type of evidence they claim they need an opportunity to offer now. While Plaintiffs agree that Defendant-Intervenors' evidence on predominance is sorely lacking, it is not for Defendant-Intervenors' lack of trying.

Defendant-Intervenors assert that they "are prepared to call Delegate Chris Jones to testify about all of the Challenged Districts to clarify the record as to 'all of the lines.'" Intervenors' Statement at 5. But Delegate Jones already provided extensive testimony on each and every district, including testimony on "relevant districtwide evidence," such as "the use of an express racial target," Slip Op. at 12; *see, e.g.*, Trial Tr. 322:6-12, 423:16-424:18, 490:14-20, and districtwide population considerations, *see, e.g.*, *id.* at 288:9-16, 339:22-340:17. Counsel for Defendant-Intervenors, moreover, clearly understood the relevance of districtwide evidence, as reflected in their trial briefs. *See, e.g.*, Def.-Intervenors' Pre-Trial Brief, ECF No. 72 at 14 (stating that Delegate Jones "will testify about his . . . application of the redistricting criteria on a district-by-district basis"); Def.-Intervenors' Post-Trial Brief, ECF No. 104 at 19 ("The district-by-district testimony by Delegate Jones and Defendant-Intervenors' experts—who studied in depth how the Plan fits within the real world of

---

[6] Notably, Defendant-Intervenors cite only to a single statement in counsel's closing remarks for Plaintiffs' supposed "theory of the case" rather than the actual, robust evidentiary record.

Virginia politics, history, and communities of interest—shows that sorting people based on race without regard to traditional criteria did not occur."). Indeed, Defendant-Intervenors' contention that Delegate Jones' testimony—which lasted two full days—was limited to deviations from traditional districting criteria is irreconcilable with their assertion that none of the districts present *any* conflict with traditional districting criteria. Under the direction of counsel, Delegate Jones had every opportunity to rebut Plaintiffs' districtwide evidence of racial predominance. Defendant-Intervenors may now be regretting their litigation strategy, but such regret is no reason to delay resolution of this case so that Delegate Jones can attempt to "clarify" his prior testimony.

Defendant-Intervenors further assert they are "reaching out to other Delegates" who can testify about why their districts were drawn as they were. Intervenors' Statement at 5. But the parties have already presented testimony from numerous Delegates. Defendant-Intervenors offer no reason why they could not have had other Delegates testify on their behalf at trial or why the Court should permit them to use remand as an excuse for supplementing their evidentiary showing.

Defendant-Intervenors also represent that their experts "are re-examining the Challenged Districts to assess the type of 'districtwide' evidence identified in the Supreme Court's opinion, such as 'stark splits in the racial composition of populations moved into and out of disparate parts of the districts,' . . . and other potentially relevant indicia showing or refuting predominance." Intervenors' Statement at 6. Defendant-Intervenors can hardly say with a straight face that such evidence became relevant only after the Supreme Court's decision. Plaintiffs' expert report plainly addressed districtwide evidence on, *inter alia*, compactness, political subdivision splits, and "stark splits in the racial composition of populations moved into and out of disparate parts of the districts." *See* Pls.' Ex. 50 at 16-22, 27-37, tbls. 2, 3, 8, 9. Defendant-Intervenors submitted no fewer than three rebuttal expert reports in response. To the extent Defendant-Intervenors' experts failed to refute Plaintiffs'

12

evidence, it was not for lack of trying, much less lack of notice that such evidence was relevant to the predominance inquiry. The Court can and should revisit its analysis of the considerable volume of *existing* expert testimony under the proper legal standard. Reopening the record at this late date will hardly add clarity to the voluminous record before this Court.

Even if Defendant-Intervenors had, contrary to the record, limited their evidence to only certain categories, they did so based on a conscious gamble that the Supreme Court would throw out over 20 years of racial predominance law and adopt the unprecedented legal standard they advanced to this Court. The Supreme Court's opinion reflects the failure of that legal strategy, and nothing in it entitles Defendant-Intervenors to a "do over."[7]

### D. Further Discovery and Evidentiary Hearings on Strict Scrutiny

Even if the Supreme Court opinion did somehow reframe the legal standard for analyzing predominance in a way that would warrant supplementation of the factual record, its holding on strict scrutiny left the law—and this Court's factual findings—undisturbed. Defendant-Intervenors do not even attempt to articulate a reasoned basis for any new factual findings—let alone a new evidentiary proceeding—on strict scrutiny.

The Supreme Court affirmed this Court's legal and factual conclusions on narrow tailoring with respect to District 75, finding "no error in the District Court's conclusion that the State had sufficient grounds to determine that the race-based calculus it employed in District 75 was necessary to avoid violating §5." Slip Op. at 14. In so holding, the Supreme Court reaffirmed "the basic narrow tailoring analysis explained in *Alabama*" requiring defendants to establish that the legislature had a "'strong basis in evidence in support of the (race-based) choice that it has made.'" *Id.* at 14, 16 (quoting *Alabama*, 135 S. Ct. at 1274). In

---

[7] Defendant-Intervenors cite the appointment of Judge Wright Allen as an additional reason warranting an evidentiary hearing. Intervenors' Statement at 9 n.4. Plaintiffs believe that, with further briefing, the vast record is sufficient for Judge Wright Allen to make the necessary factual findings, including assessments of experts and determining how the facts line up with respect to predominance in each district. That said, it is of course ultimately within Judge Wright Allen's discretion, not Defendant-Intervenors', whether she feels that she can make the requisite findings from the existing record or whether a new evidentiary hearing is necessary.

short, the Supreme Court determined that this Court properly applied the well-established strict scrutiny analysis to the facts of this case.

Defendant-Intervenors do not even attempt to argue that the Supreme Court's opinion effectuated any change in the legal standard on strict scrutiny. Nor do they contend that this Court's factual findings on strict scrutiny were somehow "insufficient" or "incomplete," Intervenors' Statement at 7, as they do with respect to the racial predominance findings. Instead, they mention in passing that "a similar [narrow tailoring] analysis may yet need to be conducted as to other districts, and the Supreme Court's ruling focuses the inquiry for additional fact-finding." *Id*. at 8. But they offer no reason why they did not or could not have presented all available evidence on narrow tailoring with respect to *all* of the Challenged Districts at trial. Defendant-Intervenors did not concede predominance in District 75 and limit their narrow tailoring evidence to that district. On the contrary, Defendant-Intervenors vigorously argued that race predominated in none of the Challenged Districts and, if it did, *all* of the districts—not just District 75—satisfied strict scrutiny. *See, e.g.*, Def.-Intervenors' Pre-Trial Br., ECF No. 72 at 24 (arguing "it is inconceivable that race predominated the line-drawing" of the Challenged Districts); *id.* at 28 ("[T]he Plan would pass [strict scrutiny] because the House had a strong basis in evidence to believe the Challenged Districts should be drawn as they were to comply with Sections 2 and 5 of the Voting Rights Act."); Def.-Intervenors' Post-Trial Br., ECF No. 104 at 35 ("Having identified no district where traditional criteria were ignored *because of race*, Plaintiffs failed to meet their heavy burden of establishing racial predominance."); *id.* at 37 (arguing Delegate Jones was "justif[ied] in "drawing districts . . . [using] the target 55 percent").

More specifically, Defendant-Intervenors had every reason to adduce all available evidence justifying use of the 55% BVAP rule in each of the Challenged Districts. In fact, Delegate Jones proffered a long list of explanations as to the origins of the 55% BVAP threshold, much of which this Court deemed not credible. *See* Mem. Op., ECF No. 108 at 28

14

(noting that "the trial record does not support" Delegate Jones' "initial test[imony] that the figure was drawn from the public hearings held with the community"); *id.* at 29 (noting that Delegate Jones' original "claim[]" that the 55% figure originated from four to five African-American delegates "was then narrowed" to three delegates, and then "[a]fter further questioning," appears to have come from feedback that a single delegate received from "various groups" and "from concerns that Delegate Tyler would be unable to hold her seat in HD 75 with a lower BVAP percentage"). The Court's final factual determination on the source of the 55% BVAP rule—upheld by the Supreme Court and now law of the case—was based on its review of Delegate Jones' various proffered justifications.

Defendant-Intervenors now "intend to call Delegate Jones to testify about his discussions of other Challenged Districts with their Delegates and other Black Caucus Members." Intervenors' Statement at 8. But Delegate Jones already testified—at great length—about his alleged conversations with the delegates from the Challenged Districts and other Black Caucus members.[8] This Court reviewed all of this evidence in rendering its factual determination on the source of the 55% BVAP rule. Indeed, it would speak volumes about Delegate Jones' credibility if, two years after his sworn deposition and trial testimony and six years after the redistricting process took place, he were to suddenly recall new conversations with these delegates that just so happen to shore up Defendant-Intervenors' narrow tailoring claims in the remaining 11 districts.

---

[8] *See, e.g.*, Trial Tr. 280:11-13 (Delegate Jones' interviews and discussions with various members of the Black Caucus "absolutely" informed his decisionmaking); *id.* at 442:4-13 (Delegate Jones describing "testimony from the community" and "from the members of the black caucus"); *id.* at 452:5-13 (Delegate Jones was aware that Section 5 analysis required more than just looking at census population, which is why he "spoke directly with all the members of the black caucus"); *id.* at 380:25-381:8 (Delegate Jones spoke with a majority of Black Caucus members); *id.* at 490:5-13 (Delegate Jones testifying that "members of the black caucus," Delegate Dance, Delegate Tyler, and Delegate Spruill asked for at least 55% BVAP in the Challenged Districts); *id.* at 491:12-17 (Delegate Jones talked about the 55% threshold with "the majority of" incumbent delegates in the Challenged Districts); *id.* at 311:22-312:12 (discussion with Delegate McQuinn (District 70)); *id.* at 322:4-16 (discussion with Delegate Tyler (District 75)); *id.* at 334:8-10, 386:12-15 (discussions with Delegate Spruill (District 77)); *id.* at 339:13-16, 461:6-8 (discussions with Delegate Alexander (District 89)); *id.* at 348:23-349:2 (discussions with Delegate James (District 80)); *id.* at 354:15-356:10 (discussions with Delegate Ward (District 92)); *id.* at 358:10-17 (discussions with Delegate BaCote (District 95)).

Similarly, Defendant-Intervenors can identify no reason why they should need to supplement the record with "additional expert evidence on demographics and racially polarized voting, including elections data from the past two decades and evidence of changes in demographic data in the Challenged Districts since 2011." Intervenors' Statement at 9. First, the parties' experts already provided evidence on "demographics and racially polarized voting," *see, e.g.*, Pls.' Ex. 50 at 23-33, 45-54, tbls. 4, 13, & 14); Def.-Intervenors' Ex. 15 at 13, 18-19; Def.-Intervenors' Ex. 16 at 1, 15-19, tbl. 4, and Delegate Jones already testified to the election data he considered in developing the 55% BVAP rule, *see* Trial Tr. 453:3-22; *id.* at 459:8-18. Second, Defendant-Intervenors can hardly show the legislature had a "strong basis in evidence" for drawing race-based districts in *2011* because of *post-2011* evidence it did not consider at the time. *See* Mem. Op., ECF No. 108 at 93 (conducting strict scrutiny analysis based on facts and circumstances "at the time the plan was enacted").

Finally, while it is not surprising that Defendant-Intervenors welcome additional expert evidence on the issue of narrow tailoring as discussed in the Brief of Political Scientists Thomas L. Brunell, Charles S. Bullock III, and Ronald Keith Gaddie As Amici Curiae In Support of Appellees ("Amicus Brief"), they identify nothing in the Supreme Court's opinion that would render this type of evidence more appropriate on remand than it was at trial. Indeed, Defendant-Intervenors represent that they "have contacted Professor Brunell" to determine whether "he would be willing to present an expert report and testify in this case," Intervenors' Statement at 9, neglecting to mention that they had already enlisted Dr. Brunell's expert services in anticipation of trial two years ago but failed to proffer his testimony or introduce the type of expert evidence discussed in his Amicus Brief through any of their three testifying experts. *See* Pls.' Statement at 8 n.8. Where this Court's application of the narrow tailoring standard was upheld on appeal, there is no basis for additional expert testimony to instruct the Court on how to apply the narrow tailoring standard on remand.[9]

---

[9] Contrary to Defendant-Intervenors' claim, Intervenors' Statement at 9, Plaintiffs did not and do not propose an "ideal" BVAP for the various districts as the basis for their claim, but rather contend—as they have

16

In sum, Defendant-Intervenors can point to no basis in the Supreme Court's opinion that would warrant any new proceedings or fact finding on narrow tailoring.

\* \* \*

As stated in Plaintiffs' Statement, Plaintiffs' primary concern is the provision of meaningful relief for any constitutional injury suffered by Virginia voters as a result of the legislature's race-based redistricting efforts. To that end, Plaintiffs oppose any unnecessary delay in these proceedings, including any further briefing on how to conduct these proceedings. The Court—including the newly appointed judge—has before it all necessary arguments and information to render a decision on how to resolve this case on remand. Whether it chooses to resolve the case based on merits briefing addressing the existing record or whether it chooses to allow additional evidence on racial predominance in light of the correct legal standard, Plaintiffs respectfully request that the Court do so expeditiously, as is in the best interest of Virginia voters, who should not have to vote in another election cycle under unconstitutional maps.

---

all along—that Defendants cannot meet their burden of establishing that the legislature had a strong basis in evidence justifying application of the 55% racial threshold in each of the Challenged Districts.

Dated: May 1, 2017

Respectfully submitted,

By /s/ Aria C. Branch
   Aria Branch (VSB #1014541)
   Marc Erik Elias (admitted *pro hac vice*)
   Bruce Spiva (admitted *pro hac vice*)
   Perkins Coie LLP
   700 13th St. N.W., Suite 600
   Washington, D.C. 20005-3960
   Phone: (202) 434-1627
   Fax: (202) 654-9106
   Email: ABranch@perkinscoie.com
   Email: MElias@perkinscoie.com
   Email: BSpiva@perkinscoie.com

   Kevin J. Hamilton (admitted *pro hac vice*)
   Abha Khanna (admitted *pro hac vice*)
   Ryan Spear (admitted *pro hac vice*)
   William B. Stafford (admitted *pro hac vice*)
   Perkins Coie LLP
   1201 Third Avenue, Ste. 4900
   Seattle, WA 98101-3099
   Phone: (206) 359-8000
   Fax: (206) 359-9000
   Email: KHamilton@perkinscoie.com
   Email: AKhanna@perkinscoie.com
   Email: RSpear@perkinscoie.com
   Email: BStafford@perkinscoie.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of May, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

Respectfully submitted,

By /s/ Aria C. Branch
Aria C. Branch (VSB #1014541)
Perkins Coie LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 434-1627
Fax: (202) 654-9106
Email: ABranch@perkinscoie.com

*Attorneys for Plaintiffs*