# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, <br><br> Defendants, <br><br> v. <br><br> VIRGINIA HOUSE OF DELEGATES, *et al.*, <br><br> Intervenor-Defendants. | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |

**Joint Statement of Stipulation Regarding Factual Findings and Conclusions of Law**

Pursuant to the Court's Order of June 2, 2017, instructing the parties to "file a Joint Statement of Stipulation identifying all relevant factual findings and conclusions of law that are no longer in dispute," the parties have conferred and present the Court with the following stipulation.

In the numbered paragraphs below, the parties specify text from the Court's October 22, 2015, Opinion (Dkt. #108, hereinafter "Opinion" or "Op.") that they agree manifests a factual finding or a legal conclusion that is no longer in dispute. The list below cites to the page of the Opinion on which the original text is found. The parties omit internal citations from the Opinion and have otherwise modified the Opinion's text as indicated to improve readability.

## I. FACTUAL FINDINGS NO LONGER IN DISPUTE

1. "This case challenges the constitutionality of twelve Virginia House of Delegates districts (the 'Challenged Districts') as racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." Op. at 1.

**A.  Procedural Background**

2. "In the wake of the 2010 census, the Virginia General Assembly sought to redraw the legislative districts for the Virginia House of Delegates ('House') and the Senate, of Virginia ('Senate')." Op. at 3.

3. "As to the 2011 redistricting, Delegate Chris Jones led this effort in the House." Op. at 4.

4. "Because Virginia was a covered jurisdiction under Section 4 of the Voting Rights Act of 1965 ('VRA') at the time the redistricting legislation was prepared, and was therefore subject to the requirements of Section 5 of the VRA, it was necessary to ensure that the plan did not result in a 'retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'" Op. at 4 (citation omitted).

5. "Delegate Jones crafted a plan containing twelve majority-minority House Districts. . . . These are the Challenged Districts: HDs 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95." Op. at 4.

6. "On December 22, 2014, Plaintiffs filed a Complaint against the Virginia State Board of Elections, the Virginia Department of Elections, and various members thereof in their official capacities ('Defendants'), alleging that the Challenged Districts were racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment and seeking declaratory and injunctive relief prohibiting Defendants from implementing or conducting further elections based on the Challenged Districts." Op. at 5 (citation omitted).

7. "The Plaintiffs are twelve citizens of the United States and the Commonwealth of Virginia who are lawfully registered voters in the Commonwealth and each of whom resides in

one of the twelve Challenged Districts." Op. at 5 (citation omitted).

8. "The Plaintiffs requested that the case be heard by a three-judge district court pursuant to 28 U.S.C. § 2284(a) on the grounds that the action 'challeng[es] the constitutionality of the apportionment of . . . [a] statewide legislative body.' That request was granted by the Chief Judge of the United States Court of Appeals for the Fourth Circuit." Op. at 5 (citations omitted).

9. "Plaintiffs filed a Corrected Amended Complaint on June 16, 2015 after one of the original plaintiffs changed residences." Op. at 5 n.3 (citation omitted).

10. "The Virginia House of Delegates and the Virginia House of Delegates Speaker William Howell ('Intervenors') moved to intervene in the case. That motion was granted." Op. at 5-6 (citations omitted).

11. "A four-day bench trial began on July 7, 2015." Op. at 6 (citation omitted).

B. Evidence Of General Application To All Districts

12. "In the Challenged Districts, the average Reock score was .320, the average Polsby-Popper Score was .192, and the average Schwartzberg score was 2.365. In the Non-Challenged Districts, the average Reock score was .360, the average Polsby-Popper Score was .243, and the average Schwartzberg score was 2.128. Under the Reock and Polsby-Popper measures, higher scores represent more compact districts. Under the Schwartzberg measure, lower scores represent more compact districts. Of the 100 House districts, seven of the Challenged Districts are in the "bottom 50" - with the lowest Reock scores - and five of the Challenged Districts are in the "top 50" - with the highest Reock scores." Op. at 106-107 (citations omitted).

### C. District-by-District Analysis

#### 1. District 63

13. "[HD 63] had Reock and Polsby-Popper scores of .61 and .48 under the Benchmark Plan and experienced a steep drop to scores of .25 and .16 under the Enacted Plan. This marks the largest Reock compactness reduction of any district in the Enacted Plan. The district's Schwartzberg score is 2.506." Op. at 109 (citations omitted).

#### 2. District 75

14. "The district had Reock and Polsby-Popper scores of .42 and .22 under the Benchmark Plan, which shifted to scores of .41 and .19 under the Enacted Plan. The district's Schwartzberg score is 2.282." Op. at 114 (citations omitted).

#### 3. District 69

15. "[HD 69] had Reock and Polsby-Popper scores of .37 and .20 under the Benchmark Plan, which increased to scores of .52 and .34 under the Enacted Plan. The district's Schwartzberg score is 1.712." Op. at 126 (citations omitted).

#### 4. District 70

16. "[HD 70] had Reock and Polsby-Popper scores of .47 and .14 under the Benchmark Plan, which shifted to scores of .40 and .19 under the Enacted Plan." Op. at 128 (citation omitted).

17. "[HD 70's] Schwartzberg score is 2.290." Op. at 128 (citation omitted).

#### 5. District 71

18. "[HD 71] had Reock and Polsby-Popper scores of .24 and .19 under the Benchmark Plan, which increased to scores of .33 and .24 under the Enacted Plan. The district's Schwartzberg score is 2.045." Op. at 132 (citations omitted).

- 5 -

### 6.     District 74

19.    "[HD 74] had Reock and Polsby-Popper scores of .16 and .10 under the Benchmark Plan, which remained almost identical - with scores of .16 and .12 - under the Enacted Plan. The district's Schwartzberg score is 2.839. These low scores reflect the district's substantially elongated shape." Op. at 132 (citations omitted).

### 7.     District 77

20.    "[HD 77] had Reock and Polsby-Popper scores of .18 and .17 under the Benchmark Plan, which shifted to scores of .19 and .15 under the Enacted Plan. The district's Schwartzberg score is 2.542." Op. at 140 (citations omitted).

### 8.     District 80

21.    "[HD 80] had Reock and Polsby-Popper scores of .39 and .26 under the Benchmark Plan, which experienced a substantial drop to scores of .26 and .11 under the Enacted Plan. The district's Schwartzberg score is 3.054 - the highest of all the Challenged Districts." Op. at 144 (citations omitted).

### 9.     District 89

22.    "[HD 89] had Reock and Polsby-Popper scores of .58 and .31 under the Benchmark Plan, which dropped to scores of .40 and .20 under the Enacted Plan. The district's Schwartzberg score is 2.263." Op. at 148 (citations omitted).

### 10.    District 90

23.    "[HD 90] had Reock and Polsby-Popper scores of .35 and .24 under the Benchmark Plan, which shifted to scores of .46 and .20 under the Enacted Plan. The district's Schwartzberg score is 2.221." Op. at 150 (citations omitted).

### 11.    District 92

24.    "[HD 92] had Reock and Polsby- Popper scores of .28 and .15 under the

Benchmark Plan, which increased to scores of .34 and .26 under the Enacted Plan. The district's Schwartzberg score is 1.970." Op. at 151 (citations omitted).

### 12. District 94

25. "[HD 94] had Reock and Polsby-Popper scores of .43 and .28 under the Benchmark Plan, which dropped to scores of .14 and .14 under the Enacted Plan. This rendered HD 95 the least compact district on the map under the Reock metric. The district's Schwartzberg score is 2.657." Op. at 152-153 (citations omitted).

## II. LEGAL CONCLUSIONS NOT IN DISPUTE

1. "We are satisfied that race was the predominant factor in the creation of House District 75. However, we have also concluded that, in using race, the General Assembly was pursuing a compelling state interest, namely, actual compliance with federal antidiscrimination law, and that, in the process, the General Assembly used race in a manner narrowly tailored to achieve that interest." Op. at 2.

### A. Strict Scrutiny Analysis

#### 1. Compelling Interest

2. "In sum, we hold that Virginia's interest in actual compliance with the standards of federal antidiscrimination law - as the federal courts have interpreted them - was a compelling interest at the time the 2011 redistricting plan was designed and enacted. Apart from that question, the Court believes that an interest that is compelling at a redistricting plan's inception is capable of sustaining the plan until the next districting cycle. As the district court in Alabama stated, 'We evaluate the plans in the light of the legal standard that governed the Legislature when it acted, not based on a later decision of the Supreme Court that exempted [the State] from future coverage under section 5 of the [VRA].' See Alabama Legislative Black Caucus v. Alabama, 989 F. Supp. 2d 1227, 1307-08 (M.D. Ala. 2013) (three-judge court), vacated and

remanded, 135 S. Ct. 1257 (2015). Because the legislature possessed a compelling interest in actual compliance with federal antidiscrimination laws as interpreted by the federal courts at the time the plan was enacted, and because redistricting plans are inherently subject to periodic revision on a reasonable, decennial basis, we conclude that the compelling interest underlying the statute at enactment remains a compelling interest during its effective duration." Op. at 91-92.

### B. District-by-District Analysis

#### 1. District 75

3. "Weighing all the evidence and testimony provided on the record, the Court finds that racial considerations subordinated traditional districting principles and other non-racial districting criteria in the creation of HD 75." Op. at 118.

4. "As to HD 75, the Plaintiffs have proved (without reference to Dr. Ansolabehere's testimony) that race was the predominate criterion leading to the disregard of neutral conventions informing HD 75." Op. at 119.

5. "Based on the foregoing analysis, the Court finds that race was the predominate criterion driving the formation and configuration of HD 75; and, therefore, the legislature's decision is subject to strict scrutiny." Op. at 120.

6. "The Court finds that this burden has been satisfied and that, accordingly, HD 75 survives the Plaintiffs' challenge." Op. at 120.

7. "Because the State has provided a 'strong basis in evidence' for its use of race-based districting in its configuration of HD 75, the Court holds that HD 75 passes constitutional muster under the Equal Protection Clause of the Fourteenth Amendment." Op. at 125.

DATED: July 18, 2017

By /s/ Katherine L. McKnight
    Katherine L. McKnight (VSB No. 81482)
    E. Mark Braden (*pro hac vice*)
    Richard B. Raile (VSB No. 84340)
    Baker & Hostetler LLP
    1050 Connecticut Avenue NW, Ste. 1100
    Washington, DC 20036
    Phone: (202) 861-1500
    Fax (202) 861-1783
    Email: kmcknight@bakerlaw.com
    Email: mbraden@bakerlaw.com
    Email: rraile@bakerlaw.com

    *Attorneys for Defendant-Intervenors*

By /s/ Stuart A. Raphael
    Stuart A. Raphael (VSB No. 30380)
    Matthew R. McGuire (VSP No. 84194)
    Trevor S. Cox (VSB No. 78396)
    Office of the Attorney General
    202 North 9th Street
    Richmond, VA 23219
    Phone: (804) 786-7240
    Fax: (804) 371-0200
    Email: sraphael@oag.state.va.us
    Email: mmcguire@oag.state.va.us
    Email: tcox@oag.state.va.us

    *Attorneys for Defendants*

By /s/ Aria C. Branch
    Aria C. Branch (VSB #1014541)
    Marc E. Elias
    Bruce V. Spiva (*pro hac vice*)
    Perkins Coie LLP
    700 13th St. N.W., Suite 600
    Washington, D.C. 20005-3960
    Phone: (202) 434-1627
    Fax: (202) 654-9106
    Email: ABranch@perkinscoie.com
    Email: MElias@perkinscoie.com
    Email: BSpiva@perkinscoie.com

    Kevin J. Hamilton
    Abha Khanna (*pro hac vice*)
    William B. Stafford (*pro hac vice*)
    Ryan Spear (*pro hac vice*)
    Perkins Coie LLP
    1201 Third Avenue, Suite 4900
    Seattle, WA 98101
    Phone: (206) 359-8000
    Fax: (206) 359-9000
    Email: KHamilton@perkinscoie.com
    Email: AKhanna@perkinscoie.com
    Email: BStafford@perkinscoie.com
    Email: RSpear@perkinscoie.com

    *Attorneys for Plaintiffs*

136002528.4

- 9 -

## CERTIFICATE OF SERVICE

      I hereby certify that on the 18th day of July, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

      By */s/ Aria C. Branch*
Aria C. Branch (VSB #83682)
Perkins Coie LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
ABranch@perkinscoie.com

*Attorneys for Plaintiffs*