# Exhibit B

Page 1

```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
                   RICHMOND DIVISION

GOLDEN BETHUNE-HILL, et  )
al.,                     )
                         )
      Plaintiffs,        )
                         )
V.                       ) Civil Action No.
                         ) 3:14-cv-852-REP-GBL-BMK
                         )
VIRGINIA STATE BOARD OF  )
ELECTIONS, et al.,       )
                         )
      Defendants.        )
                         )
and                      )
                         )
VIRGINIA HOUSE OF        )
DELEGATES, et al.,       )
                         )
   Intervenor-Defendants.)


    VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF
                      CHRIS JONES
            TAKEN ON BEHALF OF THE PLAINTIFFS
                    Norfolk, Virginia
                    August 23, 2017
```

Page 2

```
 1   Appearances:
 2
 3         PERKINS COIE
           By:  KEVIN HAMILTON, ESQUIRE
 4         1202 Third Avenue
           Suite 4900
 5         Seattle, WA  98101
           khamilton@perkinscoie.com
 6         -and-
           PERKINS COIE
 7         By:  ARIA C. BRANCH, ESQUIRE
           700 13th Street, NW
 8         Suite 600
           Washington, DC  20005
 9         abranch@perkinscoie.com
           Counsel for the Plaintiffs
10
11
           BAKER HOSTETLER
12         By:  E. MARK BRADEN, ESQUIRE
           By:  STEPHANIE MALASKA, ESQUIRE
13         1050 Connecticut Avenue, NW
           Suite 1100
14         Washington, D.C. 20036-5403
           mbraden@bakerlaw.com
15         smalaska@bakerlaw.com
           Counsel for the Defendants
16
17
18   Also Present:  Roque King, Videographer
19
20
21
22
```

Page 3

```
 1                        I N D E X
 2
 3   DEPONENT                                   PAGE
 4   CHRIS JONES
 5     Examination by Mr. Hamilton                6
 6
 7
 8
 9
10                       E X H I B I T S
11   NO.     DESCRIPTION                         PAGE
12   1       Maps                                  5
13   2       House Committee on Privileges and    24
14           Elections, House Delegate District
15           Criteria
16
17
18
19
20
21
22
```

Page 4

```
            1            Videotaped deposition upon oral
            2   examination of CHRIS JONES, taken on behalf of the
            3   Plaintiffs, before Kerry E. Zahn, Registered Merit
            4   Reporter, a Notary Public for the Commonwealth of
            5   Virginia at large, taken pursuant to notice, commencing
            6   at 9:05 a.m., on August 23, 2017, at Zahn Court
            7   Reporting, 208 East Plume Street, Suite 214, Norfolk,
            8   Virginia; and this in accordance with the Federal Rules
            9   of Civil Procedure.
           10
09:05:57   11            THE VIDEOGRAPHER:  We are now on the
09:05:57   12   video record.  Here begins tape number one in the
09:06:00   13   videotaped deposition of Chris Jones in the matter of
09:06:03   14   Golden Bethune-Hill, et al., versus State Board of
09:06:06   15   Elections, et al., and Virginia House of Delegates, et
09:06:11   16   al., pending in the United States District Court for
09:06:13   17   the Eastern District of Virginia, Richmond Division,
09:06:16   18   case number 3:14-cv-852-REP-GBL-BMK.
09:06:26   19            Today's date is August 23rd, and the time
09:06:28   20   on the video monitor is 9:06 a.m.
09:06:31   21            The videographer today is Roque King,
09:06:32   22   representing Planet Depos.
```

Page 5

```
09:06:34   1         This video deposition is being taken
09:06:36   2    place at 208 East Plume Street, Norfolk, Virginia.
09:06:40   3    23510.
09:06:41   4         Will counsel please introduce themselves
09:06:43   5    for the record and state whom they represent.
09:06:45   6         MR. HAMILTON:  Sure.
09:06:46   7         Kevin Hamilton and Aria Branch from
09:06:49   8    Perkins Coie for the Plaintiffs.
09:06:51   9         MR. BRADEN:  And Mark Braden for the
09:06:54  10    Defendant Interveners.
09:06:56  11         MS. MALASKA:  And Stephanie Malaska for
09:06:58  12    the same.
09:07:00  13         THE VIDEOGRAPHER:  The court reporter
09:07:01  14    today is Kerry Zahn, representing Planet Depos.
09:07:04  15         Please swear in the witness.
09:07:13  16
09:07:13  17         CHRIS JONES was sworn and testified on
09:07:13  18    behalf of the Plaintiffs as follows:
          19
          20    (Maps marked as Jones Exhibit Number 1)
09:07:14  21
09:07:14  22
```

Page 6

```
           1                   EXAMINATION
09:07:14   2    BY MR. HAMILTON:
09:07:14   3     Q    Good morning, Mr. Jones.
09:07:16   4     A    Good morning.
09:07:17   5     Q    We've introduced ourselves off the
09:07:18   6    record, and of course we've been together before.
09:07:21   7     A    Yes, sir.
09:07:22   8     Q    I represent the plaintiffs in this case,
09:07:24   9    and I'm going to be asking you a few questions.
09:07:27  10         I know I deposed you once before, and we
09:07:30  11    already asked you about prior depositions.
09:07:33  12         Have you been deposed at any point since
09:07:35  13    the last time I deposed you?
09:07:37  14     A    Yes.  I believe it was sometime last year
09:07:40  15    on the Vesilind case, which was a state compactness and
09:07:46  16    contiguity case that went before the Richmond Circuit
09:07:49  17    Court.
09:07:52  18     Q    And do you recall who took your
09:07:54  19    deposition?
09:07:55  20     A    Wyatt Durrette.  And I do not remember
09:07:57  21    the other individual who was in attendance that day.
09:08:00  22     Q    How long did that deposition last?
```

Page 7

```
09:08:02   1     A    I'm thinking a couple hours.  Maybe two
09:08:04   2    or three hours.
09:08:04   3     Q    Was that here in Norfolk?
09:08:06   4     A    No, sir, it was in Richmond.
09:08:12   5     Q    Okay.  Any other depositions other than
09:08:13   6    that?
09:08:14   7     A    Not to my knowledge, other than the ones
09:08:16   8    we talked about before.
09:08:17   9     Q    Right, right.  I meant -- I meant since
09:08:18  10    the time you and I --
09:08:19  11     A    No, no, just that one.  Just that one.
09:08:22  12     Q    Your last deposition was on May 6, 2015?
09:08:24  13     A    That's correct.
09:08:25  14     Q    What did you do to prepare for today's
09:08:27  15    deposition?
09:08:28  16     A    I read my last deposition.  I read the
09:08:32  17    testimony from the trial -- my testimony, that was
09:08:35  18    all -- and then I looked at the judge's order.
09:08:41  19         Not "order."  I'm not an attorney, so my
09:08:44  20    apologies.
09:08:45  21     Q    No, no, that's fine.
09:08:46  22     A    Just the district-by-district analysis
```

Page 8

```
09:08:48   1    from Judge Payne.
09:08:49   2     Q    Okay.  Anything else?
09:08:50   3     A    No, sir.
09:08:50   4     Q    Did you read the Supreme Court opinion?
09:08:52   5     A    No.
09:08:54   6     Q    Did you meet with any of your lawyers?
09:08:55   7     A    Yes.  We met yesterday for maybe an hour
09:08:58   8    or so.
09:08:59   9     Q    Who did you meet with?
09:09:00  10     A    Stephanie and with Mark.
09:09:02  11     Q    The same lawyers here in the Court -- in
09:09:05  12    the conference room today?
09:09:06  13     A    Yes, sir.
09:09:07  14     Q    Anyone else in that prep session?
09:09:11  15     A    No.
09:09:11  16     Q    And did you review any documents during
09:09:13  17    that prep session?
09:09:14  18     A    No.
09:09:22  19         Oh.  Kate did call in when we were
09:09:25  20    talking.  So Kate McKnight did phone in, not to discuss
09:09:30  21    my preparation, but just to talk with Mark and
09:09:33  22    Stephanie about something unrelated to, to my
```

Page 321

```
03:34:46   1    A     It has been.
03:34:46   2    Q     So just to be clear, the answers to your
03:34:49   3    questions with respect to this long list is, any
03:34:51   4    conversations at any point about the redistricting
03:34:54   5    process, and you've testified about conversations with
03:34:56   6    Ingram, Knight and Loupassi, and don't recall any
03:34:59   7    specific conversations with anyone of the rest of these
03:35:01   8    at any point about redistricting?
03:35:06   9    A     And that was in developing the map, when
03:35:07   10   it was introduced, after it was introduced, and at
03:35:10   11   passage.
03:35:11   12   Q     Right.
03:35:11   13   A     It's confined to that; correct?
03:35:13   14   Q     Correct.
03:35:13   15   A     Yes, then I believe I've answered all the
03:35:17   16   questions properly.
03:35:18   17   Q     Okay.  So now, now let's go beyond that.
03:35:21   18   A     Okay.
03:35:21   19   Q     In the time period after final passage,
03:35:22   20   all the way up to yesterday or today, have you had any
03:35:26   21   other conversations with any of these people about the
03:35:28   22   redistricting process or the litigation?
```

Page 322

```
03:35:30   1    A     No.  I think I made it clear to them when
03:35:34   2    the lawsuit was filed that if they wanted to come talk
03:35:38   3    to me, that I would not talk with them; and that they
03:35:40   4    were willing to put something into writing, they could;
03:35:43   5    they would be deposed, I'm certain; but that I would
03:35:46   6    not be responding to any questions or talking to them
03:35:49   7    about anything dealing with the redistricting process,
03:35:52   8    period.  So --
03:35:53   9    Q     And why did you say that?
03:35:54   10   A     Because.  Why wouldn't I say that when
03:35:56   11   there's a lawsuit been filed?  I mean, I'm not stupid.
03:36:00   12   Q     Well, what's wrong with having
03:36:02   13   conversations with people?
03:36:02   14   A     Because there's no need to put anybody in
03:36:05   15   harm's way, because, you know, what did he say, what
03:36:08   16   did she say?
03:36:09   17   Q     Is it fair to say you don't want to have
03:36:11   18   conversations that might be the subject of discovery
03:36:13   19   during the litigation?
03:36:14   20   A     No.  I just don't want to put someone in
03:36:17   21   a very casual way, them have to be brought into
03:36:22   22   something they don't need to be brought into.  That,
```

Page 323

```
03:36:23   1    that's, that was my whole reason for it.
03:36:25   2          I was a patron of the bill; I knew that I
03:36:27   3    was going to be, quote unquote, potentially called as a
03:36:31   4    witness and all of the above.  But I think I have an
03:36:33   5    obligation to my colleagues to let them know, full
03:36:35   6    disclosure, what it means to talk about any of the
03:36:37   7    above once something is in litigation.
03:36:40   8    Q     You indicated earlier today -- I'm just
03:36:43   9    going to switch gears on you here.
03:36:44   10         You mentioned a report by James Loewen
03:36:50   11   prepared in connection with the 2001 redistricting
03:36:54   12   effort.
03:36:54   13         Do you recall that testimony?
03:36:57   14   A     I believe I only said -- are you talking
03:36:59   15   today or before?
03:37:01   16   Q     Yeah, today.
03:37:02   17   A     That, that was my only recollection of
03:37:03   18   any polarized voting that was -- that I was aware of.
03:37:06   19   Q     Did you actually review his report during
03:37:09   20   the 2011 redistricting process?
03:37:11   21   A     I did not.  I relied on the attorneys.
03:37:15   22   Q     Did you ever discuss his report with
```

Page 324

```
03:37:17   1    anyone during the 2011 redistricting process?
03:37:20   2    A     Not to my knowledge.  I just relied on my
03:37:22   3    attorneys.
03:37:23   4    Q     Did you ever discuss the report on the
03:37:25   5    legislative record or on the floor of the legislature?
03:37:28   6    A     I don't recall.  I can -- my memory can
03:37:31   7    be refreshed, but I've said a whole lot of things over
03:37:34   8    the last 15 years --
03:37:36   9    Q     Right.
03:37:36   10   A     -- and sometimes '01 and '11 can become
03:37:40   11   the same because they are similar in --
03:37:41   12   Q     Is it -- is it fair to say it's -- it
03:37:44   13   wasn't part of your -- the basis or the record upon
03:37:50   14   which you were drawing the districts in 2011?
03:37:55   15   A     No.  I would think -- I would say that
03:37:56   16   with the attorneys, you know, being involved, being
03:38:02   17   keenly aware of that and not wanting to violate section
03:38:04   18   5 of the Voting Rights Act, I'm certain it's something
03:38:08   19   that they contemplated.
03:38:08   20   Q     But not you?
03:38:09   21   A     But not me.  I, I did -- that was not
03:38:10   22   something that I've -- I felt like I, I relied on them
```

Page 325

```
03:38:15   1    and their advice.
03:38:16   2         Q    You didn't even read it?
03:38:17   3         A    No.
03:38:18   4         Q    You didn't have a copy of it?
03:38:19   5         A    No.  No.  And I know I might sound a
03:38:22   6    little odd, but I rely on people to do a job you hire
03:38:25   7    them to do.
03:38:26   8         Q    And you didn't make any redistricting
03:38:28   9    decisions in 2011 based on that report because you
03:38:31  10    didn't even read it?
03:38:33  11         A    Not that I would be aware of, but I'm
03:38:37  12    certain we were not -- if I was not following what the
03:38:40  13    report said, I would have been informed by the
03:38:42  14    attorneys that we had on --
03:38:44  15         Q    Well, the report didn't say anything
03:38:45  16    about --
03:38:46  17         A    No.
03:38:47  18         Q    -- the conditions on the ground in
03:38:48  19    Virginia ten years later, 2011, did it?
03:38:53  20         A    I don't -- I believe it spoke to the
03:38:55  21    existence -- the existence of racial polarized voting
03:38:59  22    in Virginia, I think.
```

Page 326

```
03:39:00   1         Q    In 2001?
03:39:02   2         A    But that's in Virginia.
03:39:03   3         Q    In Virginia in 2001.  That's what the
03:39:06   4    report was discussing?
03:39:07   5         A    Right.
03:39:07   6         Q    Not the conditions and the existence or
03:39:10   7    absence of polarized voting in 2011?
03:39:14   8         A    I would say that's probably true, yes.
03:39:16   9         Q    Okay.  You also mentioned John Morgan.
03:39:19  10    Who is John Morgan?
03:39:20  11         A    John Morgan is a consultant.
03:39:22  12         Q    When did you first learn of him or hear
03:39:25  13    of him?
03:39:25  14         A    In 1997, 20 years ago probably this
03:39:30  15    month.
03:39:30  16         Q    And in what connection?
03:39:32  17         A    When the caucus insisted that they give
03:39:35  18    me some kind of support when I was running for
03:39:37  19    reelection, to give in-kind services as to what I
03:39:40  20    needed to do to win my district.
03:39:42  21         Q    And he was a political consultant at the
03:39:43  22    time?
```

Page 327

```
03:39:43   1         A    I guess to the caucus, yeah, he would.
03:39:43   2    Like a GOPAC maybe.  I really don't have a clue.
03:39:47   3         Q    And was he involved in the 2001
03:39:50   4    redistricting process?
03:39:52   5         A    He was.
03:39:52   6         Q    And what was his role there?
03:39:53   7         A    Similar to what it was in 2011.
03:39:55   8         Q    And what was that?
03:39:56   9         A    Just as a consultant, to look at the
03:40:02  10    political data.
03:40:04  11         Q    From your testimony in this deposition,
03:40:06  12    it sounds like he did more than just look at political
03:40:09  13    data.  He actually helped draw some of the lines.
03:40:12  14         A    He did, yes.  He had the technical
03:40:14  15    expertise to do that.
03:40:16  16         Q    Where were the maps -- was the data in
03:40:17  17    the maps stored at, actually, physically, on computers?
03:40:20  18         A    That was on a computer that was in my
03:40:21  19    office, I believe.
03:40:22  20         Q    And, so, Mr. Morgan came into your office
03:40:24  21    to do the work there?  Or did he have a copy in his
03:40:27  22    office?
```

Page 328

```
03:40:31   1         A    I can't speak to that, I don't know.
03:40:32   2         Q    You don't know?
03:40:33   3         A    I don't know.
03:40:33   4         Q    Did he spend a lot of time in your
03:40:36   5    office?
03:40:36   6         A    When we were -- when we were doing the
03:40:38   7    redistricting, yes, he was in my office.  I mean, when
03:40:39   8    you -- you get, you get geared up and you go, and it's
03:40:42   9    a very time-intensive, 15-hour, 16-hour day process for
03:40:46  10    about a six week period.
03:40:49  11         Q    Would he sometimes be sitting at the
03:40:52  12    computer working on the maps when you weren't there?
03:41:00  13         A    Yes, I would assume, yeah.
03:41:01  14         Q    And then you'd come in and he would show
03:41:03  15    you what he did?
03:41:04  16         A    Yeah, he would make tweaks, I guess, to
03:41:06  17    the -- on the edges.
03:41:07  18         Q    Who hired him?
03:41:08  19         A    I believe he was hired by the Speaker.
03:41:11  20         Q    By the -- and was he paid for -- or did
03:41:14  21    the Commonwealth pay for that or did the Republican
03:41:16  22    caucus pay for that?
```