# EXHIBIT A



# Transcript of **CHRISTOPHER MICHAEL MARSTON**

**Date:** May 18, 2015

**Case:** BETHUNE-HILL, ET AL v. VIRGINIA STATE BOARD OF ELECTIONS, ET AL

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

1 (Pages 1 to 4)

```
                                          1
 1      IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF VIRGINIA
 3              RICHMOND DIVISION
 4   -----------------------------------x
 5   GOLDEN BETHUNE-HILL, et al.,     :
 6        Plaintiffs,                 :
 7        v.                 : Civil Action No.
 8   VIRGINIA STATE BOARD OF ELECTIONS, : 3:14-cv-852
 9   et al.,                 : REP-GBL-BMK
10        Defendants,                 :
11        and                         :
12   VIRGINIA HOUSE OF DELEGATES, et al.,:
13        Intervenor-Defendants.      :
14   -----------------------------------x
15
16       Deposition of CHRISTOPHER MICHAEL MARSTON
17              Washington, DC
18              Monday, May 18, 2015
19                9:51 a.m.
20   Job No.: 81719
21   Pages: 1 - 154
22   Reported By: Dawn M. Hart, Notary Public, RPR/RMR/CRR
```

```
                                          2
 1       Deposition of CHRISTOPHER MICHAEL MARSTON, held
 2   at the law offices of:
 3
 4
 5       PERKINS COIE, LLP
 6       700 Thirteenth Street, NW
 7       Suite 600
 8       Washington, DC 20005
 9       (202) 654-6200
10
11
12
13
14       Pursuant to Notice, before Dawn M. Hart,
15   RPR/RMR/CRR and Notary Public in and for the District
16   of Columbia.
```

```
                                          3
 1              A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3       BRUCE V. SPIVA, ESQUIRE
 4       ARIA BRANCH, ESQUIRE
 5       PERKINS COIE, LLP
 6       700 Thirteenth Street, NW
 7       Suite 600
 8       Washington, DC 20005
 9       (202) 654-6200
10
11   ON BEHALF OF THE DEFENDANTS:
12       JEFFREY P. BRUNDAGE, ESQUIRE
13       ECKERT SEAMANS CHERIN & MELLOTT, LLC
14       1717 Pennsylvania Avenue, NW
15       Suite 1200
16       Washington, DC 20006
17       (202) 659-6600
```

```
                                          4
 1          A P P E A R A N C E S   C O N T I N U E D
 2   ON BEHALF OF THE INTERVENOR-DEFENDANTS:
 3       JENNIFER M. WALRATH, ESQUIRE
 4       E. MARK BRADEN, ESQUIRE
 5       BAKER HOSTETLER, LLP
 6       Washington Square
 7       1050 Connecticut Avenue, NW
 8       Suite 1100
 9       Washington, DC 20036
10       (202) 861-1500
11
12       DALTON L. OLDHAM, ESQUIRE
13       SOUTHEASTERN LEGAL FOUNDATION
14       1419 Pendleton Street
15       Columbia, South Carolina 29210
16       (803) 772-7729
```

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

12 (Pages 45 to 48)

---

Page 45

1  American Community Survey.
2      Q   For what purpose did you collect that data?
3      A   To support our redistricting efforts,
4  including compliance with the Voting Rights Act.
5      Q   I take it from that answer that some of the
6  data you collected was data regarding race?
7      A   Yes.
8      Q   When you say to facilitate compliance with
9  the Voting Rights Act, tell me what you mean by that.
10     A   So I mean exactly that, compliance with the
11 Voting Rights Act.  It imposes requirements on states,
12 particularly those that require or required
13 preclearance from a Court or the Department of
14 Justice, and there are a host of judicial decisions
15 and administrative guidelines from the Department of
16 Justice regarding what it requires to be precleared,
17 and you have to provide data in that process.
18     Q   The demographic data that you collected, did
19 you use that in the map drawing function?
20     A   Yes.
21     Q   In what way did you use that data, the race
22 data?

Page 46

1      A   Along with political data, population data
2  and the like, it was part of the data view we would
3  have as we would draw districts so we could have
4  descriptive characteristics of districts as we drew
5  them.
6      Q   Why did that matter, what the race data was,
7  in terms of the drawing of the districts?
8      A   The Voting Rights Act imposes various
9  requirements about racial composition of districts,
10 and we needed to know if we were complying.
11     Q   What is your understanding of the
12 requirements that the Voting Rights Act imposes in
13 terms of redistricting?
14     A   Four years on, my recollection is a little
15 rusty.  I know you can't have retrogression, and I
16 know that -- that's pretty much what I know.
17     Q   Fair enough.
18         What's your understanding of the term
19 "retrogression"?
20     A   My recollection is that it means that a
21 minority group can't have a less of an opportunity to
22 elect a candidate of their choice than under a prior

Page 47

1  plan.
2      Q   The data collection and analysis you've been
3  referring to, at least with regard to race, was that
4  aimed at determining whether the map would cause
5  retrogression?
6      A   Yes.
7      Q   How did you determine whether a minority
8  group or minority groups would have a lesser
9  opportunity to elect a candidate of their choice?
10     A   We didn't have a hard-and-fast rule to
11 determine that.  As with many things in the law, it's
12 a bit of a judgment call.
13         I don't recall how many court decisions I
14 read, but I couldn't get the same answer out of all of
15 them as to what I needed to do, so we did our best and
16 sought legal advice to see if what we were doing
17 appeared to be compliant.
18     Q   Did you do -- when I say did "you" do, I
19 mean did you do or direct or interact with one of your
20 consultants who was doing any data analysis to
21 determine whether a proposed plan would cause
22 retrogression?

Page 48

1      A   Yes.
2      Q   Tell me about that.
3      A   As we were preparing a plan and when we
4  finished a plan, we would ask our attorneys for their
5  opinion as to whether or not they thought that there
6  was retrogression and, more importantly, whether it
7  could be precleared.
8      Q   I guess I'm asking more of a factual
9  question, which is, how did you use the data to
10 determine whether or not there was retrogression?
11     A   So we would prepare a list of the 100
12 districts and their racial composition and consult
13 with our attorneys to see what they thought about
14 whether or not we could successfully get the plan
15 precleared.
16     Q   Did you do any other data analysis or
17 gathering other than creating a list of the 100
18 districts and the racial composition in terms of
19 trying to determine whether there would be
20 retrogression?
21     A   I gathered, but never used, information
22 about election contests that featured a Black and a