IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(RICHMOND DIVISION)

| | |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, <br><br> Defendants. | <br><br><br><br><br><br><br><br><br> Civil Action No. 3:14-cv-00852-REP-AWA-BMK |

**DEFENDANT-INTERVENORS' REMAND PRE-TRIAL BRIEF**

Dalton Lamar Oldham, Jr. (*pro hac vice*)
Dalton L Oldham LLC
1119 Susan Street
Columbia, SC 29210
Tel: (803) 237-0886
dloesq@aol.com

E. Mark Braden (*pro hac vice*)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates
and Virginia House of Delegates Speaker
William J. Howell*

**TABLE OF CONTENTS**

Introduction................................................................................................................1

Factual Background ...................................................................................................3

Argument ...................................................................................................................8

     I.     Race Did Not Predominate in Any of the Remaining
           Challenged Districts............................................................................8

           A.     Evidence of General Application to All Districts ....................10

           B.     District-Specific Evidence .......................................................15

     II.    All Districts Are Narrowly Tailored ...................................................26

Conclusion ...............................................................................................................30

## INTRODUCTION

In 2011, the Virginia House of Delegates passed a redistricting plan with near-unanimous support from both political parties and the House Black Caucus. This case study in political cooperation was made possible by the overriding purpose of maintaining continuity with prior plans. That was not easy: stark population shifts required that entire districts be dismantled and transported hundreds of miles to Northern Virginia, causing a ripple effect that impacted nearby districts and echoed throughout the Commonwealth. In an effort to respect local needs and concerns in the face of this population tumult, the plan sponsor, Delegate S. Chris Jones, held hearings across the state and met with about 80 of the 100 Delegates to learn about their districts. The plan resolved defects criticized in past plans, united communities of interest that had formerly been severed, and garnered praise from Democratic and Republican Delegates alike.

Delegate Jones and his colleagues, including House Black Caucus members, were also attentive to the needs of Virginia's minority voters and to Virginia's obligations the Voting Rights Act ("VRA"). To that end, the plan maintained 12 majority-minority districts that have, since at least 1991, preserved the ability of black communities in the Richmond and Hampton Roads regions to elect their preferred candidates of choice. This Court already held that (1) the House successfully maintained 11 of these districts at an effective black voting age population ("BVAP") without compromising its traditional criteria and (2) the final district, HD75, was narrowly tailored to the compelling purpose of VRA compliance.

On appeal, the Supreme Court vindicated that latter finding. As to the former, the Supreme Court directed this Court to conduct the additional inquiry of whether predominant racial motive might be shown by some means other than proof of derogation of traditional criteria. The Supreme Court warned that this inquiry does not turn on "*post hoc*" explanations for

the map that could "in theory" explain the district lines but do not "in reality"; the focus is rather on the House's "actual considerations that provided the essential basis for the lines drawn." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017).

At trial, only Defendant-Intervenors will present evidence of what those "actual considerations" were. The plan's architect, Delegate Jones, and the drafting consultant and technician, John Morgan, will testify to the reasons behind the contours of each district line, so far as anyone can recall some six-and-a-half years later. These two witnesses have far and away the best understanding of what subjective intentions prevailed in redistricting. This Court already found Delegate Jones to be a credible witness, and Mr. Morgan's testimony will confirm and supplement his testimony. This and other evidence will prove yet again that the House's racial concerns were not predominant, that local demographics supported 12 ability-to-elect districts, and that Virginia's racial considerations were reasonable in light of its heavy, affirmative burden of proving non-retrogression under VRA § 5.

In contrast, Plaintiffs stake their case on fact witnesses who had only a keyhole view of what occurred—and who tend to corroborate Delegate Jones's testimony—and experts with no knowledge of Virginia, the politics of redistricting, or basic map-drawing. Plaintiffs' principal witness, Dr. Jonathan Rodden, a professor from California with no redistricting experience, will purport to discern the House's motive from misleading dot maps that no map-drawer would use. He is less qualified to interpret Virginia House maps than a random selection of Richmond pedestrians. Before drafting his report, he neither interviewed Virginia House members or staff, nor read floor speeches or hearing transcripts, nor read any Virginia redistricting case law, nor visited any of the Challenged Districts, except as a tourist. His suppositions are so far off (such as his assertion that 55% BVAP districts in the Richmond area could not be drawn without

portions of Hopewell) that they can be disproved by even the most elementary alternative mapping (as the trial evidence will show, 55% districts could easily be drawn without Hopewell). His report is *post hoc* guesswork.

Additionally, Plaintiffs' narrow-tailoring position continues to "ask too much from state officials charged with the sensitive duty of reapportioning legislative districts." *Bethune-Hill*, 137 S. Ct. at 802. The House had an equally strong basis for maintaining 55% BVAP in all ability-to-elect districts as it did for HD75. It was Virginia's burden to prove non-retrogression under VRA § 5, and hard proof would have been required to draw districts at a bare majority or lower. Other jurisdictions, such as Texas, failed preclearance this cycle for doing what Plaintiffs say Virginia was constitutionally required to do.

And therein lies the rub: as this Court so presciently identified in its first opinion, Plaintiffs' constitutional theories and the VRA cannot coexist. The Supreme Court steered the law away from the necessary consequences of Plaintiffs' arguments—which are summarized in the *dissent* of Justice Clarence Thomas—both by declining to hold (as Plaintiffs urged) that VRA compliance is presumptively unconstitutional and by affirming HD75. The same result follows for the remaining districts, and the Court should uphold them all.

### Factual Background

Virginia redistricting occurs against the backdrop of Virginia's "history of public racial discrimination," including literacy tests, poll taxes, separation of candidate names by race on ballots, segregated schools, and a bar on interracial marriage. *See, e.g.*, *Neal v. Coleburn*, 689 F. Supp. 1426, 1428 (E.D. Va. 1988). Virginia governments are frequently sued under Section 2 of the Voting Rights Act. One example is *Henderson v. Board of Supervisors of Richmond County*, 1988 WL 86680, at *7-8 (E.D. Va. 1988), where this Court found a Section 2 violation because a

challenged plan allowed the black population in a cohesive majority-minority district to fall from above 65% to 63.1%.

Additionally, Virginia was, until *Shelby County v. Holder*, 570 U.S. 2 (2013), subject to Voting Rights Act Section 5, which required it to submit changes in voting laws to the U.S. Department of Justice ("DOJ") for preclearance or to file a declaratory judgment action in federal court. 52 U.S.C. § 10304. The burden was on Virginia to prove "the absence of discriminatory purpose and effect." *Pleasant Grove v. United States*, 479 U.S. 462, 469 (1987). Over the past four decades, DOJ has objected to numerous Virginia redistricting plans submitted for preclearance, repeatedly citing "persistent and severe polarization along racial lines," a pattern it found at times "ha[d] intensified" from previous submissions. DOJ Voting Determination Letter ("DOJ Letter"), ECF No. 72-1[1] (June 20, 1994); DOJ Letter, ECF No. 72-2 (Feb. 16, 1993). *See also, e.g.*, DOJ Letter, ECF No. 72-3 (May 19, 2003), DOJ Letter, ECF No. 72-4 (Apr. 29, 2002); DOJ Letter, ECF No. 72-5 (Sept. 28, 2001). One example is DOJ's 2002 objection to a board-of-supervisors redistricting plan that had reduced the BVAP in a majority-minority district from 55.7 percent to 55.2 percent. DOJ Letter, ECF No. 72-6 (July 9, 2002).

The Challenged Districts evolved in this context. In 1981, DOJ objected to a House of Delegates plan because districts in Brunswick, Greensville, Sussex, Surry, Nottoway and Dinwiddie Counties drew multiple majority-black counties into majority-white districts. DOJ Letter, ECF No. 72-7 (July 31, 1981). DOJ then objected to a subsequent House plan's configuration of Norfolk, Newport News, Hampton, and Portsmouth, observing that multiple ability-to-elect districts of "substantial black majorities" could be drawn in the area. DOJ letter, 72-8 (March 12, 1982). In 1991, DOJ objected to that year's House plan because it submerged a

---

[1] DOJ Voting Determination Letters for Virginia are also available at http://www.justice.gov/crt/records/vot/obj_letters/state_letters.php?state=va.

compact 4,000-member black community in Charles City County into a majority-white district, when it could have been drawn into the majority-black districts in the Richmond area. DOJ Letter, 72-9 (July 16, 1991).

Accordingly, since 1991, Virginia House redistricting plans have included twelve majority-minority districts. Five of these districts (HD69, HD70, HD71, HD74, and HD63) lie in and around urban and suburban Richmond and Petersburg, one (HD75) lies in the Southside region, and six (HD77, HD80, HD89, HD90, HD92, and HD95) lie in Hampton Roads.

By 2011, population shifts required that the House map be redrawn. Because Virginia conducts odd-year elections, the House was on the tightest deadline of any state to pass a new plan: Census Data was released on February 3, 2011, and the plan was first introduced on March 29, 2011. Jointly filed Timeline of Events, ECF No. 85. The bipartisan House Committee on Privileges and Elections, after conducting months of hearings statewide, ratified redistricting criteria to govern any plan it would endorse. PEX16. The Committee adopted an equal-population goal of plus or minus 1% from the ideal. The Committee also prioritized "the laws of the United States" and declined to endorse any "policy or action that is contrary to the United States Constitution or the Voting Rights Act of 1965." *Id.* According to the criteria, districts would also be compact and contiguous, they would be single-member districts, and they would be drawn to respect communities of interest. Deviations from these criteria would be allowed in order to comply with federal law, but only "as is necessary" and "no more than is necessary." *Id.*

Delegate Chris Jones, who spearheaded the 2001 redistricting, was chosen by Republican leadership to draw on that experience and prepare a map that would obtain broad support. Delegate Jones met with most Democratic and Republican Delegates to receive their input. Trial Tr. 380:25-381:14. He spent hundreds of hours considering their opinions in an effort to tailor

districts to meet local needs and to secure widespread support for the plan. *See* Trial Tr. 385:20-21. Delegate Jones received assistance in the map-drawing process—which was conducted on computer software called "Maptitude"—from John Morgan, a consultant who also helped draw the 2001 plan and who has experience redistricting nationwide. Both Delegate Jones and Mr. Morgan will testify that the process in 2011 was, if anything, improved over 2001.[2] As the record will show, the primary goals were continuity, core retention and incumbency protection.

Delegate Jones worked with members of the House Black Caucus to protect the interests of racial minorities and satisfy Virginia's obligations under the VRA. The Black Caucus members were concerned about a trending decline in black voting-age population ("BVAP") in some districts that was likely to continue in the future. They were also concerned about low minority voter turnout and the failure in recent memory of the minority communities to elect their preferred candidates of choice in many Challenged Districts—including in multi-candidate Democratic primaries where the black vote was split among multiple candidates, allowing white minorities to elect their preferred candidate. *E.g.*, Trial Tr. 71:21-72:4, 454:1-462:11, 462:12-21, 488:15-25, 490:2-492:11; PEX32 at 23; PEX33 at 45; PEX35 at 41-42, 144-45.[3]

Avoiding retrogression was complicated by the absence of reliable information. Contested Democratic primaries provide the data necessary to determine the candidate truly preferred by minority voters. But there are too few contemporaneous contested primaries in Virginia House races "to do a meaningful analysis." Trial Tr. 761:1-15. Voter registration records in Virginia do not reference race, so it is difficult to know whether black registration is

---

[2] The Virginia Supreme Court rejected a racial-gerrymandering challenge against the 2001 majority-minority districts. *Wilkins v. West*, 264 Va. 447 (2002).

[3] Support from Black Caucus Members was critical to proving nonexistence of discriminatory intent at preclearance. *See Texas v. United States*, 831 F. Supp. 2d 244, 270–72 (D.D.C. 2011).

on par with white registration. Trial Tr. 727:3-10. And the Virginia Assembly holds odd-year elections that have different voting patterns from even-year elections, rendering data from congressional and presidential elections of limited value. Trial Tr. 516:2-19.

The Black Caucus Members and Delegate Jones determined, based on their firsthand knowledge of the Challenged Districts, that a raw BVAP majority (i.e., 50% +1) would be insufficient to prevent retrogression. But they were willing to reduce BVAP where doing so was unlikely to affect minority voting strength. They determined to hold BVAP in the Challenged Districts around or above 55%. At redistricting, nine of the twelve Challenged Districts were already above 55% BVAP; two others were at 54.4% and 52.5%, respectively. IEX15 at 14. HD71, situated in rapidly gentrifying downtown Richmond, had fallen over the decade to 46% BVAP. Trial Tr. 291:2-293:10. BVAP decreased in six districts; it increased in six. The final BVAP percentages in the Challenged Districts ranged from 55.2% to 60.7%.[4]

Only two competing plans were proposed: HB5002 and HB5003. These plans did not comport with the Committee's 2% population deviation, they paired dozens of incumbents, and they allowed several Challenged Districts to fall below 50% BVAP, thereby inviting a VRA quagmire. Neither alternative plan was deemed worthy of serious consideration in the House. Trial Tr. 376:22-379:17. HB5001 included both the Virginia House and Senate redistricting plans. The Governor vetoed it because of partisan tilt in the Senate plan. The House remained in special session and made minor alterations in the House plan, including to HD71. After substantial revisions to the Senate plan, the combined plans were submitted to the Governor as

---

[4] As the Supreme Court stated in in *Georgia v. Ashcroft*, there are different methods of calculating BVAP, depending on "whether the total number of blacks includes those people who self-identify as both black and a member of another minority group, such as Hispanic." 539 U.S. 461, 473 n.1 (2003). This Court previously expressed a preference for the calculation that includes those who self-identify as a member of another minority group, 141 F. Supp. 3d at 520–21, so it is used here.

7

HB5005, and he signed it. The plan was then submitted to DOJ for preclearance. As part of the preclearance process, DOJ considers "whether minorities are overconcentrated in one or more districts." 76 Fed. Reg. 7470, 7472 (Feb. 9, 2011). DOJ precleared the plan.

Argument

The racial-gerrymandering inquiry proceeds in two steps. First, "a plaintiff alleging racial gerrymandering bears the burden to show…that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Bethune-Hill*, 137 S. Ct. at 797 (quotation marks omitted). If the plaintiff makes this showing, the burden shifts to the State to "demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Id.* at 801. Plaintiffs' claim fails at both steps.

## I.   Race Did Not Predominate in Any of the Remaining Challenged Districts

To show predominance, "the plaintiff must prove that the legislature subordinated traditional race-neutral districting principles to racial considerations." *Bethune-Hill*, 137 S. Ct. at 797 (quotation and edit marks omitted). In adjudicating this issue, "courts must exercise extraordinary caution." *Bethune-Hill*, 137 S. Ct. at 797 (quotation marks omitted). "Electoral districting is a most difficult subject for legislatures, requiring a delicate balancing of competing considerations." *Id.* "And redistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines, just as it is aware of a variety of other demographic factors." *Id.*

The parties previously offered competing tests for determining when racial considerations become "predominant." The Supreme Court rejected both. Plaintiffs argued that a 55% BVAP goal was "the end of the analysis." Trial Tr. 840. But the Supreme Court's "holistic" approach refutes this position, 137 S. Ct. at 799, and two Justices disagreed with the majority opinion on this basis, *see id.* at 803 (Opinion of Thomas, J.) ("Appellees…concede that the legislature

8

intentionally drew all 12 districts as majority-black districts….That concession, in my view mandates strict scrutiny as to each district."); *id.* (Opinion of Alito, J.) ("I would hold that all these districts must satisfy strict scrutiny.").

Defendant-Intervenors focused their prior presentation on the Challenged Districts' adherence to traditional districting principles, and provided extensive testimony that VRA compliance did not "require" the plan "to violate any of the criteria adopted by the state." *E.g.*, Trial Tr. at 308. But the Supreme Court held that "there may be cases where challengers will be able to establish racial predominance in the absence of an actual conflict." 137 S. Ct. at 799. Thus, the Supreme Court remanded to allow Plaintiffs the opportunity to prove predominance (1) "in the absence of actual conflict," and (2) by reference to "all of the lines of the district at issue" rather than merely "the conflicting portions of the lines." 137 S. Ct. at 799–801. This inquiry should focus on the House's "actual considerations," not "*post hoc*" guesswork. *Id.* at 799.

This inquiry requires the same result as before. This Court's finding that the House's racial considerations did not require "actual conflict" with traditional districting principles goes a long way towards refuting any contention that they had a "direct and significant impact on" district lines. *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1271, (2015); *see also Bethune-Hill*, 137 S. Ct. at 799 ("As a practical matter, in many cases, perhaps most cases, challengers will be unable to prove an unconstitutional racial gerrymander without evidence that the enacted plan conflicts with traditional redistricting criteria."). The evidence at trial will show that local and regional demographics supported districts with a "functional working majority," *Bethune-Hill*, 137 S. Ct. at 802, so maintaining them did not require an over-emphasis on race.

Plaintiffs' remand position reflects minimal confidence in their ability to prove predominance "in the absence of actual conflict." Instead, they are poised to focus on what they

initially failed to prove: actual conflict between racial goals and traditional criteria. Their principle witness on predominance, Dr. Jonathan Rodden, purports to identify "telltale signs" of racial intent, PEX69 at 4, but the "extent" of his analysis is assessing "the conflict between the districts as structured and traditional redistricting criteria." Ex. A, Rodden Depo. 46–47. Based on this approach—which is sufficiently lacking in objective methodology as to border on not being expert testimony, *see, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412–13 (S.D.N.Y. 2016)—Dr. Rodden challenges eyewitness testimony and this Court's prior fact-finding. Plaintiffs also intend to call fact witnesses, including former Delegates Jennifer McClellan, Ward Armstrong, and Rosalyn Dance, whose prior testimony exhausted their knowledge of the 2011 redistricting, apparently for the purpose of revisiting this Court's credibility determinations. And Dr. Maxwell Palmer will attempt to resuscitate the inherently flawed, and already rejected, analyses of Dr. Ansolabehere. None of this is within the scope of remand, and the law-of-the-case doctrine precludes reconsideration of this Court's findings on these issues. *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993); *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007); Int's Statement on Proceedings, ECF No. 152 at 2–4.[5]

A.    **Evidence of General Application to All Districts**

Although a racial-gerrymandering claim "applies to the boundaries of individual districts," statewide evidence may be relevant to indicate predominance or lack thereof in a particular district. *Alabama*, 135 S. Ct. at 1265. This Court's previous findings on generally applicable evidence, 141 F. Supp. 3d at 550–52, remain in effect, and, together with the evidence

---

[5] Although Defendant-Intervenors believe that this Court's prior findings on actual conflict, witness credibility, and expert testimony are law of the case, Plaintiffs disagree, and the Court has not weighed in on this dispute. Thus, Defendant-Intervenors have no choice but to adopt a belt-and-suspenders approach and defend this Court's prior findings with supplemental evidence.

to be presented at trial, prove that the House's racial goal did not have a "direct and significant impact" on district lines. *Alabama*, 135 S. Ct. at 1271.

**Voting Rights Act.** Plaintiffs' primary statewide evidence is the House's 55% BVAP goal, but the Supreme Court confirmed that efforts to comply with the VRA, which requires racial goals, are not presumptively unconstitutional. Six Justices agreed on this, and Plaintiffs' arguments are reflected only in the dissenting opinions of Justices Thomas and Alito, which state where Plaintiffs would take the law. Yet Plaintiffs' remand case merely repackages their 55% argument by seeking to show that, in fact, some district lines include some black communities within majority-minority districts and exclude some white communities. Obviously, compliance with the VRA requires this to some degree to allow minority communities the "ability…to elect their preferred candidates of choice." 52 U.S.C. § 10304(d). Holding that such lines are presumptively unconstitutional would lead to the same intractable conflict this Court and the Supreme Court tried to avoid. 141 F. Supp. 3d at 527.[6]

**Expert Testimony.** Plaintiffs also offer statewide evidence through their expert Dr. Palmer, but this is merely a repackaged version of the work of Dr. Ansolabehere, which this Court correctly declined to credit. 141 F. Supp. at 551–52.

First, Dr. Palmer attempts to resurrect Dr. Ansolabehere's "race v. party" voting district ("VTD") analysis through a convoluted argument about VTD weighting. PEX71 at 20–24. Dr. Katz will refute his methodology, but, "[m]ore fundamentally," the analysis does "not consider the extent to which the boundaries themselves are justifiable by neutral criteria or any other motivation besides race or political disposition." *Bethune-Hill*, 141 F. Supp. at 551; *see also*

---

[6] This Court also correctly held that the House redistricting criteria's elevation of federal law over state law "does not raise an inference of intentional discrimination; it demonstrates obedience to the Supremacy Clause." *Voinovich v. Quilter*, 507 U.S. 146, 147 (1993).

11

*Backus v. South Carolina*, 857 F.Supp.2d 553, 565 (D.S.C. 2012), sum. aff'd, 133 S.Ct. 156, 184 (2012). The analysis therefore does not address the gravamen of the House's case.

Second, Dr. Palmer offers a "population-shift" analysis, PEX71 at 16–20, that, like Dr. Ansolabehere's, obfuscates more than it illuminates. Identifying "stark splits in the racial composition of populations moved into and out of" districts is one way to show racial predominance. *Bethune-Hill*, 137 S. Ct. at 800. But here, the average BVAP of territory moved into the remaining Challenged Districts was 47.85%, and the average BVAP of territory moved out was 41.79%. PEX50 Table 8. Only 41% of voting age population moved into Challenged Districts from non-challenged districts was black, PEX50 Table 7; in 10 of the 11 Challenged Districts, the proportion of the BVAP moved into these districts was 53% or less; and, in 9 of the 11 Challenged Districts, the proportion of the BVAP moved out of these districts was 36% or more, PEX50 Table 8. Dr. Palmer attempts to hide these insipid numbers through a series of confusing and irrelevant comparisons, such as those between voting behavior and relative demographic percentages.[7] That all is beside the point because the numbers, freed from Dr. Palmer's complications, are not "stark." *See Alabama*, 135 S. Ct. at 1271 ("Of the 15,785 individuals that the new redistricting laws added to the population of District 26, just 36 were white."). The ratio of BVAP moved into versus moved out of the Challenged Districts is only 1.15, meaning that, on average, there were only 15% more black voters moved in than moved out of these districts. Clearly, this reflects non-racial concerns.

---

[7] In fact, many of these comparisons also refute the racial-sorting hypothesis. Dr. Palmer shows that the BVAP of territory transferred from Challenged Districts to non-challenged districts exceeded 20% in 7 of the 9 instances where such an exchange occurred, and BVAP of territory transferred from non-challenged districts to Challenged Districts was at or below 25% in 14 of the 16 instances where such an exchange occurred. PEX71 at 61–62.

Third, Dr. Palmer "extend[s] the VTD split analysis in the Ansolabehere Report," PEX71 at 5, but this builds on a foundation of sand. *See Bethune-Hill*, 141 F. Supp. 3d at 551–52 (discrediting the prior VTD analysis). As an initial matter, of the 32 VTD splits he identifies between a Challenged District and non-challenged district, 8 are in HD75, which is no longer at issue. PEX71 at 50. Because the remaining Challenged Districts contain substantially fewer splits, *see id.*, Dr. Palmer's aggregate split analysis gives more weight to a district that is not at issue than to any district that is at issue. Moreover, the VTD analysis concerns a miniscule portion of approximately 80,000 people per district and sheds little light on the House's "decision to place a *significant* number of voters within or without a particular district." *Bethune-Hill*, 137 S. Ct. at 797 (quotation marks omitted) (emphasis added). It also ignores the obvious race-neutral explanation that, in splitting a VTD, the map-drawer will bring the *contiguous* side of each VTD into its adjacent district, and BVAP in VTDs on the edges of majority-minority districts will tend be concentrated closer to those districts than majority-white districts.

Delegate Jones and Mr. Morgan will testify that almost all split VTDs were an afterthought not created by any Member's careful calculation, but by Mr. Morgan at the conclusion of drawing as a simple population-equalization process. The VTDs split were chosen because they were contiguous with other districts with correctly sized census blocks for resolution of equal-population math (plus-or-minus 1%). Dr. Palmer's analysis therefore wrongly posits the VTD-split tail as wagging the redistricting dog.

Fourth, both Dr. Palmer's split-VTD and split-political-subdivision analyses, even taken at face value, show that demographics *supported* 55% BVAP districts. Of the 32 VTD splits between Challenged and Non-Challenged Districts listed in his tables, Dr. Palmer finds a near-even division: in 17 splits, the BVAP of territory assigned to the Challenged District is over 50%

and, in 15, it is under 50%. PEX71 at 55. Similarly, the VTD splits between HD63 and non-challenged districts place 3,800 black voters in *non*-challenged districts and 2,895 black voters in HD63, PEX71 at 52; the splits between HD89 and non-challenged districts place 8,300 black voters in *non*-challenged districts and 1,938 black voters in HD89, PEX71 at 54; and the splits between HD80 and non-challenged district HD79 places 1,371 black voters in the *non*-challenged district and 265 black voters in HD80, *id.* Dr. Palmer's split-subdivision analysis shows similar racial balance, from the 52,126 black voters in Virginia Beach included in majority-white districts (11,051 were placed in Challenged District HD90), PEX71 at 59, to the 9,914 black voters in split Richmond "unincorporated places" included in various majority-white districts (9,038 were placed in Challenged Districts), PEX71 at 58, to the 2,389 black voters in Hopewell included in majority-white HD62 (3,395 were placed in majority-black HD63), PEX71 at 57. Over 45% of black voters in Chesapeake, 43% of black voters in Suffolk, 28% of black voters in Portsmouth, and 27% of black voters in Norfolk were placed in majority-white districts.[8] PEX71 at 59. This is *not* a case where the majority-minority districts scooped up every last black voter in the region.

Dr. Palmer attempts to dilute the facts with color-coded maps that misleadingly attach *different* racial percentages to the *same* colors and shades, thereby misconstruing population concentrations. PEX71 at 31–41. One might, for instance, be confused into thinking his Figure 7 shows precise inclusion of dark green (hence, black) neighborhoods in HD95, but the darkest portions of green reflect **4.5% BVAP** "of the area residing in the block." PEX71 at 35. By this method, a map of rural Iowa could be made to show the same dark shade of green. Figure 6 zooms in on one segment of the HD95 territory presented in Figure 7, allowing the scale to

---

[8] Dr. Rodden's analysis also fails to distinguish between new splits and splits that existed in the prior plan; preserving the prior configurations explains preexisting splits.

ratchet up BVAP "residing in the block" to 26%, but the same territory is represented as 4.5% BVAP on Figure 7. Zooming out would require dropping that number. Indeed, the darkest shade of green reflects anywhere from 4%, 7%, and 11% BVAP on the low end to 45% and 50% BVAP on the high end. And there is another catch: the highest BVAP levels indicated involve HD75, which is not at issue on remand. PEX71 at 31, 39. Meanwhile, the maps of jurisdictional splits contain *no numbers* and merely record "lower" and "higher" BVAP, leaving it a mystery of what BVAP percentages or numbers are indicated. PEX71 at 40-41. The maps also fail to show the number of people in each depicted census block, which is the information a map-drawer would identify in attempting to rectify population deficiencies and which is critical to assess why specific blocs were included or excluded. Besides, the maps are a sample and do not show even *half* the splits Dr. Palmer addresses. Omissions of that nature tend to be on purpose.

## B.    District-Specific Evidence

The Virginia House entered this decade badly malapportioned due to population growth in the Washington, D.C., suburbs. Trial Tr. 289–291. The plan therefore had to collapse districts in Hampton Roads and Southwest Virginia and move them to Northern Virginia. This created a "ripple effect" on the remaining districts, which crawled towards the needed population in waves, thereby impacting all districts, including those above, at, and below population equality. Trial Tr. 688–89.[9] That wave impacted Hampton Roads districts and ran all the way through

---

[9] This Court correctly held that population shifts are "important in assessing why certain redistricting actions were taken." 141 F. Supp. 3d at 551. The ripple effect was not merely a product of population inequality, but rather resulted from the House's desire to maintain compact and contiguous districts and, in some cases, to respect natural or political boundaries. Non-contiguous or bizarre districts could have avoided the ripple effect through tentacles or physically separate district territory designed to leave equi-populous districts alone. The decision against such oddities explains "which voters the legislature decides to choose" to place in or out of a given district, and the evidence must be weight as a traditional-districting factor, not the equal-population non-factor. *Alabama*, 135 S. Ct. at 1270–71.

Richmond, impacting the Challenged Districts in both regions. Notwithstanding these pressures, the Challenged Districts are comparable with the 2001 districts and districts statewide on common metrics. Six districts became more compact under the Reock score, and five became more compact under Polsby-Popper. IEX15 at 15. There is minimal change under either score, *id.*, and by Dr. Katz's compactness measure, Boyce-Clark, nine Challenged Districts saw an improvement in compactness from 2001, IEX16 at 9. There is no meaningful change in split subdivisions from the 2001 Plan. PEX50 at 71. The Challenged Districts had remarkably high constituency retention under each measure experts in this case have offered. IEX14 at 81; IEX15 at 16; Trial Tr. 613:1–8. As this Court already held, the districts bear indicia of sound redistricting, and no meaningful indicia of racial predominance.

**The Richmond and Tri-City Area.** The Richmond/Tri-City region has historically had 5 majority-minority districts, HD63, HD69, HD70, HD71, and HD74. This Court already found that maintaining these districts at 55% BVAP was accomplished without derogation from traditional districting principles, and the remand evidence will show why: local demographics support districts with a "functional working majority." *Bethune-Hill*, 137 S. Ct. at 802.

Dr. Rodden contends otherwise, claiming this could not be accomplished unless "virtually every VTD with a substantial black population [found] its way into a majority-black district." PEX69 at 9. But no numbers back this up, and the statement "is connected to existing data only by the *ipse dixit* of the expert." *Lee v. City of Richmond, Va.*, 2014 WL 5092715, at *3 (E.D. Va. Sept. 30, 2014) (excluding such testimony). Dr. Rodden's "methodology" is nothing but a "visual walkthrough" of dot maps and "personal opinions and speculation" about the House's motives with color-commentary. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014) (affirming exclusion of such testimony). Reverse engineering a theory

to "achieved a desired outcome" is not a proper methodology, *see, e.g.*, *In re Mirena IUD Products Liab. Litig.*, 169 F. Supp. 3d 396, 412–13 (S.D.N.Y. 2016), nor is Dr. Rodden's "I-know-it-when-see-it" approach, *see, e.g.*, *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106–07 (7th Cir. 1994), nor is his speculation about map-drawer's motives,  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546–47 (S.D.N.Y. 2004), and credibility, *United States v. Hill*, 749 F.3d 1250, 1260 (10th Cir. 2014). Dr. Rodden is in no position as an expert to comment on legislative motive. He has never worked for a legislature, political party or candidate and never participated in the redistricting process. His maps are of extremely limited use because their demographic display does not accurately reflect what map-drawers see on redistricting software, and information on many of the "communities of interest" he discusses was not available to the House. IEX102 ¶¶ 4, 11. The entire exercise is *post hoc* conjecture.

The raw numbers show that five 55% BVAP districts were drawn in the region without much ado, and to the extent Dr. Rodden's claims are even verifiable, they prove wrong.

In HD69, the BVAP of territory moved in was 44.7%; the BVAP of territory moved out was 43.5%. PEX50 Table 8. HD69's BVAP went from 56.3% in the benchmark plan to 55.2% in the enacted plan. DIX15 at 13. HD69 "has become more compact and retained its 'core.'" *Bethune-Hill*, 141 F. Supp. 3d at 560. That is, maintaining 55% BVAP was no sweat. If that is racial sorting, then every plan nationwide, outside of Vermont and Maine, is doomed.

Ignoring this, Dr. Rodden focuses on VTD splits in Richmond precinct 410 and Chesterfield County precinct "Davis," PEX69 at 26, but neglects to mention that the portion of 410 placed in HD69 is majority-white or that the Davis split is racially balanced (50.4% BVAP territory in HD69 and 42.2% BVAP territory in HD27). PEX71 at 53. He also fails to notice that the northernmost portion of 410 had to be placed in neighboring HD68 for that district to be

17

contiguous. *See* IEX91 at 136. Mr. Morgan will testify that these splits, which involve about 4% of the approximately 240,000 residents of affected districts, were drawn to equalize population and were chosen because the math worked as between the districts at issue. The remainder of Dr. Rodden's objections is illogical color-commentary, such as that "District 69 straddles the James River in a way that crosses city council ward boundaries as well as the boundaries of elementary, middle, and high school zones"—as if the James River were created for racial reasons—and that HD69 "extends North to pick up largely African-American neighborhoods"—notwithstanding that (1) this extension follows the benchmark lines and (2) the extension includes the incumbent Delegate, Betsy Carr. PEX69 at 26; DIX94 at 2.

In HD70, the BVAP of territory moved in was 43.8%; the BVAP of territory moved out was 59.9%. PEX50 Table 8. BVAP fell from 61.8% to 56.4%. IEX15 at 13. Undeterred by this decrease in BVAP, Dr. Rodden concocts a racial explanation, calling HD70 a "donor of African Americans to other districts." PEX69 at 29. But this only shows that, whatever happens with racial demographics, Dr. Rodden will find racial predominance: if BVAP moves up, the district is "packed"; if it moves down, the district is a "donor"; if it stays the same, it was set racial cement. So his analysis has the quality of a religion that, through the eyes of faith, takes every conceivable occurrence as proof of its transcendent validity. How does Dr. Rodden explain why the BVAP of *new* territory in the supposed *donor* district is 43.8%? He declines even to mention that number.[10]

---

[10] Dr. Rodden also observes that HD70 was approximately at population equality, PEX69 at 29, but this Court has already found it "rather obvious" that equi-populous districts bordering on underpopulated districts must undergo changes. 141 F. Supp. 3d at 561–62. Otherwise, the underpopulated districts will need spider legs to reach around equi-populous districts to overpopulated districts. The argument speaks only to Dr. Rodden's credibility.

Dr. Rodden also complains that HD70 is "quite non-compact." PEX69 at 30. But his only basis is his gut; HD70 scores well under objective measures, IEX15 at 15, and this Court has already observed that "the district appears coherent and generally compact," 141 F. Supp. 3d at 561. Dr. Rodden criticizes the "Northern turret," PEX69 at 30, but ignores that the territory includes the residence of HD70's incumbent. And witnesses will confirm that the *northernmost* precinct in that territory, called "Central Gardens," was the precinct the incumbent wanted most to retain (other than her own). Thus, Dr. Rodden's unsupported assumption that "the Legislature could have turned District 69 into a more Richmond-centric district," PEX69 at 30, disregards the politics: doing that would have drawn H70's incumbent from her district and cut off her core constituency. The facts as they actually existed defeat Dr. Rodden's *post hoc* musings.

HD71 is the *only* Challenged District with even a quasi-notable discrepancy between BVAP moved in and out: BVAP was 71.2% in territory moved in and 21.3% in territory moved out. PEX50 Table 8. Yet these numbers pale in comparison to those at issue in *Alabama*, where, "[o]f the 15,785 individuals" moved in, "just 36 were white." 135 S. Ct. at 1271. BVAP rose in HD71 from 46.3% to 55.3%. IEX15 at 13. The evidence shows that the House's goals for VRA compliance were consistent with local demographics and state criteria. It is undisputed that the enacted HD71 is compact, that it was drawn to respect incumbent residencies, and that its boundaries cover its traditional territory—no one even conceived of bringing it South of the James River. Moreover, nearly 80% of HD71 is composed of residents of the benchmark district, IEX14 Table 12, and 19 of the 25 VTDs stayed put, *see* IEX94 at 4.

The fact testimony will confirm that the minor changes were not predominantly racial. Delegate Jones and former-Delegate (now-Senator) McClellan will testify that removing the Summit Court, Hilliard, and Stratford Hall precincts respected the City/County boundary. And

the addition of Richmond precincts 604, 701, and 702 united communities of interest. Dropping VTD 301 made sense given that Chamberlayne Avenue between 301 and 308 created a commonsense divide, and it made sense to add Ratcliffe, which shares similarities with the adjacent territory in HD71. Moreover, moving the district meaningfully west would have walked it into Republican territory and, as John Morgan will show, resulted in a BVAP freefall from 46% to 40%. That would guarantee preclearance denial.

Thus, the HD71 predominance inquiry once again boils down to the Fan neighborhood split, which involved a swap of precinct 204 (into HD71) for 207 (out of HD71). This Court already found that this was not for predominantly racial reasons, 141 F. Supp. 3d at 563, and the evidence at trial will validate that finding. Yet the Court may as well bypass the issue as irrelevant: the population swap between HD71 and HD68 placed territory of 3.2% BVAP out of HD71 and 12.7% BVAP into HD71. PEX71 at 43. Roughly speaking, this took 370 black voters out of HD71 and moved 100 black voters into HD71.[11] A movement of about 500 voters cannot make race the predominant factor in the creation of an 80,000-person district.

In HD74, the BVAP of territory moved in was 38.5%; the BVAP of territory moved out was 56.3%. PEX50 Table 8. BVAP fell from 62.7% to 57.2%. IEX15 at 13. Dr. Rodden finds that, aside from race, it "is difficult to think of alternative explanations for District 74's shape." PEX69 at 34. But there is the *Court's* alternative explanation that it simply retains the shape it has had *since 1991*. 141 F. Supp. 3d at 564–65. That explanation does not jibe with Dr. Rodden's worldview, so he ignores it. *But see People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537 (7th Cir. 1997) (excluding expert testimony that ignores obvious alternative causes). And, as

---

[11] Dr. Palmer's table presents *voting-age* population percentages and *total* population raw numbers. PEX71 at 43. The number of black voters cannot be calculated from that, but the numbers here are in the vicinity and, if anything, are likely on the high side.

with HD70, he applies the *post hoc* "donor" theory to explain HD74's BVAP decline and short-circuit the crisis of faith that fact would otherwise engender.

Dr. Rodden also wrongly finds racial motive in the decision to transfer "Hopewell's black neighborhood" to HD63.[12] PEX69 at 32. He baldly asserts that "[i]t is not possible to draw five districts that meet the 55 percent goal without including the African-American section of Hopewell," which was joined with HD63 in the enacted 2011 plan. PEX69 at 11. Not so: John Morgan will show the Court an alternative map of Richmond that he created, which draws HD63 to stop short of Hopewell, thereby including none of it, and maintaining that district at 57% BVAP. IEX108 at 2. That configuration does not disturb the other Richmond-area districts.

In HD63, the BVAP of territory moved in was 52.0%; the BVAP of territory moved out was 36.6%. PEX50 Table 8. BVAP rose from 58.1% to 59.5%. IEX15 at 13. Not one to let facts get in the way of a good story, Dr. Rodden ignores those (and other) numbers in favor of a dramatic narrative of the House's "solution" to the purported racial gerrymander in HD75—the one district we know for sure is constitutionally configured—of "a new tentacle, such that a corridor would reach over to Hopewell and extract its African-American neighborhood." PEX69 at 35. But, as described above, none of this was necessary to maintain 55% BVAP in HD63, which could have been drawn as Dr. Rodden describes, PEX69 at 36–37, at 57% BVAP, IEX108 at 2. Politics, not race, explain the House's rejection of Dr. Palmer's *post hoc* configuration, which would wreak havoc on the partisan makeup of Republican-performing HD62.

Dr. Rodden then resorts to commentary on witness credibility, which is uncalled for, *Hill*, 749 F.3d at 1261, and uninformed. He wonders why Delegate Jones would be so concerned

---

[12] The label "Hopewell's black neighborhood" is Dr. Rodden's; 2,389 of Hopewell's 5,784 black voters ended up in majority-*white* HD62, PEX71 at 57, and apparently are not within Dr. Rodden's definition of "Hopewell's black neighborhood." The Court should not ascribe Dr. Rodden's confused and predominantly racial thinking to the House.

about the Hopewell river crossing, but he should have noticed this Court's finding that this *specific* crossing was criticized by a *court* in prior litigation, incentivizing a change. 141 F. Supp. 3d at 564. This basic unfamiliarity with the facts stated in the most obvious place to look speaks volumes. *See Ollier*, 768 F.3d at 861. Similarly, Dr. Rodden's *post hoc* guesses about the "hook" around the New Hope VTD will be shown incorrect at trial by direct testimony.

**The Hampton Roads Area.** Six Challenged Districts, HD77, HD80, HD89, HD90, HD92, and HD95, are in Hampton Roads. HD77, HD80, HD89, and HD90 are south of the James River and include portions of Portsmouth, Norfolk, Chesapeake, and Virginia Beach. HD92 and HD95 are north of the James River on "the Peninsula," which contains Hampton and Newport News. Hampton Roads was ground zero for population-shift stress because HD87 was eliminated and moved in its entirety to Northern Virginia. This change rippled through surrounding districts and eventually North and west on the James to Richmond. HD79 moved east to subsume a substantial portion of HD87's former territory, and small portion of HD92, which in the 2001 Plan, had crossed the James River from the Peninsula. The enacted plan removed this crossing and gave the area south of the James River to HD79, which made both HD79 and HD92 more compact and contiguous than under the 2001 Plan. *See* IEX14 ¶¶ 72-73 & Tables 7, 9. The Challenged Districts were impacted by these shifts, which explain (more than race) their configuration.

In HD80, the BVAP of territory moved in was 52.9%; the BVAP of territory moved out was 47.6%. PEX50 Table 8. BVAP rose from 54.5% to 56.3%. IEX15 at 13. These tepid numbers belie Dr. Rodden's wild racial speculations. So does his dot map, which reveals pockets of black population on the doorstep of HD80 in HD79, including in VTDs Nine, Seven, Twenty-Fourth, and Thirty-Seven, that could easily have been brought into HD80 had the predominant

purpose been segregation. PEX69 at 53. Moreover, Dr. Rodden ignores the benchmark plan, under which HD79 occupied much of the territory, and a similar shape, that Dr. Rodden finds to be self-evidently racial in HD80. *See* IEX91 at 157. Yet HD79 was not a majority-minority district. When HD79 subsumed HD87's former territory, HD80 filled the void. That is the ripple effect that Dr. Rodden fails to address, and it weighs heavily against a finding of racial intent.

Dr. Rodden again delves into a credibility fight with Delegate Jones (and the Court) by speculating against Delegate Jones's (and the Court's) understanding of the political underpinnings for the configuration. Dr. Rodden declares that Delegate Johnny Joannou, representing HD79, "could not have been pleased" by the transfer of "four of his most Democratic precincts" to HD80. PEX69 at 54. But Delegate Jones will testify that Delegate Joannou was a conservative Democrat who gladly passed them off. In fact, HD79 remained heavily Democratic, and Delegate Joannou lost a Democratic primary to a more liberal candidate. Dr. Rodden also opines that HD80 should have "expanded Westward without the odd appendage," PEX69 at 55, apparently ignorant that moving HD80 westward would walk it right into Delegate Jones's district and a sea of Republican voters. Neither Jones, nor HD80's incumbent Delegate James, nor the Department of Justice would have been receptive to this unrealistic, *post hoc* idea.

In HD77, the BVAP of territory moved in was 44.2%; the BVAP of territory moved out was 25.9%. PEX50 Table 8. BVAP rose from 57.6% to 58.8%. IEX15 at 13. Dr. Rodden concedes that HD77's "basic arrangement was retained" from the benchmark plan, but identifies "a few flourishes." PEX69 at 63. He opines that "[it] was necessary for District 90 to shed some whites," but fails to explain why a district "close[] to the population threshold" that "already had a BVAP of 57.6 percent," PEX69 at 62-63, would need to do that. Rather than provide the

numbers and methodology, he delves back into color-commentary and credibility disputes. HD77, he says, "became a bit more convoluted" in order to divest predominantly white precincts, but this Court's view was that the "already-strange 2001 design was somewhat ameliorated," 141 F. Supp. 3d at 566, and Dr. Rodden offers no method to refute this. Dr. Rodden also does not address the heavily white precincts added to HD77's Eastern edge, PEX69 at 64, and engages in a *post hoc* criticism of road and bridge configurations, which appear to have been on no one's mind in 2011, PEX69 at 65. Moreover, Dr. Rodden's ignorance of the expressed concerns of HD77's then-representative, now-Senator Lionell Spruill, among the Black Caucus's most respected members, render his views meaningless.

In HD89, the BVAP of territory moved in was 43.9%; the BVAP of territory moved out was 41.8%. PEX50 Table 8. BVAP rose from 52.5% to 55.5%. IEX15 at 13. This Court previously held that "the district appears reasonably compact and generally follows precinct lines within Norfolk." 141 F. Supp. 3d 568. Dr. Rodden tries but fails to provide a persuasive reason for thinking a compact district where BVAP of territory moved in and out is practically identical is racially gerrymandered. He narrates the district lines, apparently believing they are racial if they are "jogging" or take a "dramatic turn to the South." PEX69 at 56–57. In fact, his map shows black population in, inter alia, the Wesley precinct of HD100 and the Tanner's Creek precinct in HD83 that could have been drawn into HD89. Additionally, Dr. Rodden takes another stab at Delegate Jones's credibility by pointing out that then-Delegate Alexander's funeral home, which Delegate Jones believed to be within the Granby precinct of HD89, ended up on the other side of Granby Street and in HD100 (along with a pocket of black residents). This near miss does

24

nothing to detract from, and does everything to confirm, the *motives* of this line, which clearly were drawn for non-racial—albeit slightly mistaken—reasons.[13]

In HD90, the BVAP of territory moved in was 43.3%; the BVAP of territory moved out was 42.7%. PEX50 Table 8. BVAP remained about the same: 56.9% before, 56.6% after. IEX15 at 13. This Court found that "the district appears to represent a reasonably compact geographic unit" and "seems to largely comply with traditional, neutral districting conventions." 141 F. Supp. at 569. Dr. Rodden's map reveals excluded pockets of black population in the precincts of, inter alia, Avalon, Reon, and Algona, PEX62 at 59, which undermines his speculation on motive.

In HD92, the BVAP of territory moved in was 47.3%; the BVAP of territory moved out was 36.8%. PEX50 Table 8. BVAP dropped from 62.1% to 60.7%. IEX15 at 13. This Court found it "hard to imagine a better example of a district that complies with traditional, neutral districting principles." 141 F. Supp. 3d at 569. Dr. Rodden finds it hard to see anything other than race-based mischief. His chief contention is that "[a]nyone attempting to add population to District 92, if not focusing on race, would have pulled in the odd coastal sliver to the East…." PEX69 at 49. He fails to explain how he knows what "anyone" would do and, more importantly, how he knows that the referenced territory would drop BVAP in HD92 below 55%. In fact, he doesn't know it, because it isn't true: Mr. Morgan will show the Court an alternative map doing precisely what Dr. Rodden advises, which leaves BVAP at 56.59%. IEX180 at 7. As usual, meeting 55% was not difficult and resulted without much effort from the House criteria, and the exclusion of this territory was for non-racial reasons.

In HD95, the BVAP of territory moved in was 43.7%; the BVAP of territory moved out was 47.3%. PEX50 Table 8. BVAP dropped from 61.6% to 60.0%. IEX15 at 13. This Court

---

[13] Evidence at trial will show that *another* location of then-Delegate Alexander's funeral service, located in the Berkley neighborhood of Norfolk, was drawn into HD89.

25

previously found that HD95's elongated shape was controlled primarily by political considerations. 141 F. Supp. 3d at 570–71. Dr. Rodden engages in an extensive would-have-could-have-should-have discussion of his dot maps and baldly states that the 55% BVAP goal explains every contour of HD95. The Court may ignore this, because the Court was right the first time and Dr. Rodden is wrong. Mr. Morgan will show the Court, not one, but *four* alternative maps maintaining HD95 at above 55% BVAP under different configurations that do all the things Dr. Rodden says the 55% BVAP goal prevented. IEX108 at 6-9. The 55% BVAP goal was only a minor factor in the district's lines and not hard to meet; the political and geographic restraints were far more complex and presented far greater challenges.

## II.    All Districts Are Narrowly Tailored

A district is narrowly tailored when "the legislature has 'good reasons to believe' it must use race in order to satisfy the Voting Rights Act." *Bethune-Hill*, 137 S. Ct. at 801. "That 'strong basis' (or 'good reasons') standard gives States 'breathing room' to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (quotations omitted). Here, the House had every reason to believe that all Challenged Districts needed "a functional working majority." *Bethune-Hill*, 137 S. Ct. at 802.

VRA § 5 requires a comparison of the enacted plan to the prior plan (also known as the "benchmark plan"). *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 478 (1997). The assessment turns on whether minorities have the same "ability to elect their preferred candidates of choice" under the enacted as under the benchmark plan. *Texas v. United States*, 831 F. Supp. 2d 244, 251 (D.D.C. 2011). Congress solidified this standard in 2006 amendments to the Voting Rights Act, which repudiated the Supreme Court's holding in *Georgia v. Ashcroft* that the "ability of a minority group to elect a candidate of its choice" was a "factor" but not "dispositive or

26

exclusive."  539 U.S. 461, 480 (2003). In amending the statute, Congress expressly adopted the ability-to-elect standard urged by Justice Souter's *Ashcroft* dissent, and, under the amended statute—which applied to Virginia in 2011—"'being able' or 'having the power' to elect…is what matters" and must not be confused with the lower "opportunity" standard of VRA § 2. *Texas*, 831 F. Supp. 2d at 260–61 (explaining the difference). Congress also clarified that Section 5 protects minority communities' ability to elect their "*preferred* candidates of choice," 52 U.S.C. § 10304(b) (emphasis added), to ensure that minority voters would not be "second class voters who can influence elections of white candidates, but who cannot elect their preferred candidates, including candidates of their own race." H.R. REP. 109-478 at 70.

"The question of retrogressive effect under Section 5 looks at gains that have already been realized by minority voters and protects them from future loss." *Texas*, 831 F. Supp. 2d at 262. That analysis is undertaken as to "the entire statewide plan as a whole." *Id.* at 268 (quotation marks omitted). In Virginia's House benchmark plan, there were 12 "ability to elect" districts, mandating 12 "ability to elect" districts in the new plan. The House was obliged to "use race" in each district. *Bethune-Hill*, 137 S. Ct. at 801. Its choice to include 12 districts, each with a "functional working majority," was necessary to ensure preclearance. *Id.* at 802. The House had good reasons to be concerned about voter turnout, declining BVAP trends, and defeats of minority-preferred candidates in multi-race Democratic primaries. For example, there was specific testimony on the House floor that elections in HD71 involving then-Delegate McClellan were not reliable to predict patterns after her tenure because she was an unusually talented candidate. The testimony also demonstrated the House's awareness of dramatic BVAP decline in the Richmond area, so 55% BVAP would not (they believed) endure and has not (as Dr. Hood will confirm) endured. Moreover, the House was informed by an expert report of Dr. James

27

Loewen from the prior decade's litigation, which identified racially polarized voting across the Challenged Districts, found that minority-preferred candidates had "a tossup chance" in 50% BVAP districts, and observed that 55% BVAP districts were not "packed." DIX36 at 43-48.[14]

In fact, the Court need look no further than *Plaintiffs'* expert, Dr. Palmer, who, analyzing the gubernatorial race immediately prior to redistricting, found racial bloc voting in 9 of the remaining 11 Challenged Districts, covering all relevant regions of the state. PEX71 at 48. To hide this, Dr. Palmer averaged those scores against data from the 2008 Presidential election and reported no racial bloc voting. PEX71 at 48–49. But that is social-science malpractice: the election turnout models from an even-year presidential election are dramatically different from models in an odd-year statewide election. Moreover, Dr. Palmer's analysis of the 2009 election, which involved two white candidates, underreports racial bloc voting; Drs. Hood and Katz demonstrate this by comparing the results to voting patterns in endogenous multi-race contests, which confirm widespread racial bloc voting in all districts and regions. That evidence shows "good reasons" to draw ability-to-elect districts. *Bethune-Hill*, 137 S. Ct. at 801.

Plaintiffs ask "too much from state officials charged with the sensitive duty of reapportioning legislative districts," *Bethune-Hill*, 137 S. Ct. at 802, by contending that the House should have allowed BVAP to drop to or below 50% without hard proof that 55% districts were required. The law requires the opposite: if a state is unable to prove the absence of polarized voting at preclearance, then its only choice is to maintain districts meaningful above 50% minority VAP. That is because "a minority group that constitutes a supermajority in a district will likely have the ability to elect its chosen candidate," so if a district has, say, "sixty-

---

[14] Dr. Loewen's report uses the calculation of BVAP that excludes self-identifying Hispanics and members of other ethnicities. *See* Note 4, supra. The numbers therefore reflect lower BVAP percentages than those presented in this case.

five percent" majority population, "there would be no need to make further inquiries into minority voters' ability to elect." *Texas*, 831 F. Supp. 2d at 263. But, "when there is no supermajority district, a Section 5 analysis must go beyond mere population data to include factors such as minority voter registration, minority voter turnout, election history, and minority/majority voting behaviors." *Id.* Thus, the *absence* of proof that BVAP can be at or below 50% to maintain "ability"—not merely "opportunity"—*requires* a healthy majority.

Accordingly, "[w]hen a district is close to the ability-to-elect line, even minor changes can be significant." *Texas v. United States*, 887 F. Supp. 2d 133, 168 (D.D.C. 2012). For example, the *Ashcroft* dissent—now the controlling opinion—would have denied preclearance to three districts in Georgia's 2001 Senate redistricting plan that dropped, respectively, from 60.58% to 50.31% BVAP, from 55.43% to 50.66% BVAP, and from 62.45% to 50.80% BVAP. 539 U.S. at 472-73. Likewise, Texas House District 35 failed preclearance because of a drop in HCVAP from 54.6% to 52.5%. *Texas*, 887 F. Supp. 2d at 168. For districts in the 50% to 60% range, small reductions matter.

Virginia's 55% goal scraped the bottom of the functioning-majority barrel. Clearly, BVAP levels could not have been *significantly* lower, and a dispute about whether numbers in the near vicinity would be better is the quintessence of denying states "'breathing room' to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed." *Cooper*, 137 S. Ct. at 1464. And the view implicit in Plaintiffs' position, that some different magic number of BVAP between 50% and 55% should have been chosen for each district, fails to account for the inherent imprecision involved in assessing the ability-to-elect threshold. Amicus Brief of Political Scientists Thomas L. Brunell et al., *Bethune-Hill v. Va. State. Bd. of Elections* (15-680) at 14–28. The data are far from sufficient to make that debate worthwhile,

29

and a "district specific" choice to set BVAPs in the Challenged Districts at slightly different levels would have been, at best, merely cosmetic and, at worst, unreliable. Tellingly, Plaintiffs did not ask their expert to attempt to identify such a number.

Moreover, while Plaintiffs will focus their case on showing that incumbents in the Challenged Districts were elected by healthy margins, this only confirms the heavy non-retrogression burden. Allowing BVAP in an "ability-to-elect" district to plummet so that minority communities would *struggle* to elect their candidates in *close* races would be Section 5 suicide. Virginia had "good reasons" to decline this approach.

Finally, Plaintiffs' position also fails to account for States' discretion in selecting a model of fair minority representation. Even prior to the 2006 amendments, "Section 5 accommodate[d] choices by covered jurisdictions among systems of representation when redistricting, i.e., a jurisdiction may create 'safe' majority-minority districts that may 'virtually guarantee the election of a minority group's preferred candidate.'" *Texas*, 831 F. Supp. 2d at 251 (quoting *Ashcroft*, 539 U.S. at 480-83). Thus, even if Virginia could have proved that replacing majority-minority districts with influence or crossover districts was non-retrogressive—which is wildly speculative—Virginia would have had the *option* to choose healthy majority-minority districts anyway. Plaintiffs are wrong to claim that drawing influence or crossover districts was somehow required.

**Conclusion**

The Court should enter judgement for Defendants and Defendant-Intervenors.

Dated: September 26, 2017                Respectfully Submitted,

Dalton Lamar Oldham, Jr. (*pro hac vice*)     /s/ Richard B. Raile
Dalton L Oldham LLC                   Richard B. Raile (VSB No. 84340)
1119 Susan Street                     E. Mark Braden (*pro hac vice*)
Columbia, SC 29210                 Katherine L. McKnight (VSB No. 81482)
Tel: (803) 237-0886                 BAKER & HOSTETLER LLP
dloesq@aol.com                   1050 Connecticut Ave NW, Suite 1100
                                 Washington, DC 20036
                                 Tel: (202) 861-1500
                                 Fax: (202) 861-1783
                                 rraile@bakerlaw.com
                                 mbraden@bakerlaw.com
                                 kmcknight@bakerlaw.com

*Counsel to the Virginia House of Delegates*
*and Virginia House of Delegates Speaker*
*William J. Howell*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of September, 2017, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.

Dalton Lamar Oldham, Jr. (*pro hac vice*)
Dalton L Oldham LLC
1119 Susan Street
Columbia, SC 29210
Tel: (803) 237-0886
dloesq@aol.com

/s/ Richard B. Raile
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
Katherine L. McKnight (VSB No. 81482)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
rraile@bakerlaw.com
mbraden@bakerlaw.com
kmcknight@bakerlaw.com

*Counsel to the Virginia House of Delegates and Virginia House of Delegates Speaker William J. Howell*