# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, <br><br> Defendants. <br><br> v. <br><br> VIRGINIA HOUSE OF DELEGATES, <br><br> Intervenor-Defendants | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |

## PLAINTIFFS' TRIAL BRIEF

136908408.5

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   EXPECTED EVIDENCE AT TRIAL AND ARGUMENT........................................ 2

    A.    Background ................................................................................................ 2

    B.    Race Predominated in All the Challenged Districts ............................................. 4

        1.    Legal Standard ................................................................................. 4

        2.    The Statewide Evidence Establishes Racial Predominance..................... 5

            a.    The 55% BVAP Rule ..................................................................... 5

                (i)    Intervenors Cannot Dispute that a 55% BVAP Rule Was Used to Structure the Challenged Districts................ 6

                (ii)   The 55% BVAP Rule Was the Misguided Means by Which the General Assembly Tried to Comply With the VRA .................................................................................... 7

            b.    Subordination of Traditional Districting Criteria .......................... 9

            c.    Racial Sorting.................................................................................. 10

            d.    Politics Did Not Outweigh Race.................................................... 12

        3.    District-Specific Evidence Confirms that Race Predominated............... 13

            a.    Richmond and Tri-City ................................................................... 14

                 (i)    HD 63............................................................................... 14

                 (ii)   HD 71............................................................................... 15

                 (iii)  HD 69............................................................................... 17

                 (iv)   HD 70............................................................................... 17

                 (v)    HD 74............................................................................... 19

            b.    Tidewater .......................................................................................... 19

                 (i)    HD 77............................................................................... 20

                 (ii)   HD 80............................................................................... 21

                 (iii)  HD 89............................................................................... 22

                 (iv)   HD 90............................................................................... 23

                 (v)    HD 92 and 95 .................................................................. 24

    C.    The Challenged Districts Are Not Narrowly Tailored........................................ 26

# TABLE OF CONTENTS
## (continued)

Page

1.   Legal Standard ........................................................................... 26

2.   Virginia Did Not Have a Strong Basis in Evidence For Applying the 55% BVAP Floor to 11 Districts Based on HD 75-Specific Considerations................................................................................ 27

3.   Racial Polarized Voting Analyses Confirm that the 55% BVAP Rule Was Not Necessary to Enable African Americans to Elect Candidates of Choice ............................................................... 28

III.   CONCLUSION.......................................................................... 30

- ii -

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alabama Legislative Black Caucus v. Alabama,*
    135 S. Ct. 1257 (2015) ................................................................................................. passim

*Bethune-Hill v. Virginia State Board of Elections,*
    137 S. Ct. 788 (2017) ................................................................................................... passim

*Bush v. Vera,*
    517 U.S. 952 (1996) .................................................................................................... 11, 25

*Cooper v. Harris,*
    137 S. Ct. 1455 (2017) ................................................................................................. passim

*Miller v. Johnson,*
    515 U.S. 900 (1995) ................................................................................................. 4, 14, 26

*Ne. Ohio Coal. for the Homeless v. Husted,*
    No. 2:06-CV-896, 2016 WL 3166251 (S.D. Ohio June 7, 2016), *aff'd in part,*
    837 F.3d 612 (6th Cir. 2016) ................................................................................................ 30

*Page v. Virginia State Bd. of Elections,*
    No. 3:13CV678, 2015 WL 3604029 (E.D. Va. June 5, 2015) .............................................. 3, 7

*Shaw v. Reno* (*Shaw I*), 509 U.S. 630 (1993) ............................................................................. 26

*Shaw v. Hunt* (*Shaw II*),
    517 U.S. 899 (1996) ................................................................................................... passim

*State Indus., Inc. v. Mor-Flo Indus., Inc.,*
    948 F.2d 1573 (Fed. Cir. 1991) ............................................................................................. 6

*Wilkens v. West,*
    264 Va. 447 (2002) ............................................................................................................. 19

**STATUTES**

52 U.S.C. § 10304(b) ................................................................................................................ 26

Voting Rights Act of 1965, Pub. L. 89-110, 79 Stat. 437 .................................................... passim

- iii -

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**OTHER AUTHORITIES**

U.S. Const., amend. XIV ...........................................................................................2, 26

136908408.5

# I.    INTRODUCTION

This case involves a challenge to eleven House of Delegates ("House") districts. Following the initial trial in June 2015, this Court issued a Memorandum Opinion (Dkt. No. 108). Thereafter, the Supreme Court issued two decisions clarifying the applicable legal framework, on appeal from this case, *Bethune-Hill v. Virginia State Board of Elections*, 137 S. Ct. 788 (2017), and in a similar case from North Carolina, *Cooper v. Harris*, 137 S. Ct. 1455 (2017). Those twin decisions make clear that Plaintiffs are entitled to judgment as to the eleven remaining districts: HD 63, 69, 70, 71, 74, 77, 80, 89, 90, 92, 95 (the "Challenged Districts").[1]

During the initial trial, Intervenors advocated a very narrow legal standard, requiring Plaintiffs to show that the districts, as drawn, "conflicted with" traditional redistricting criteria. In a split decision, this Court agreed, largely embracing Intervenors' novel theory. As the Supreme Court held, that legal standard was error. Rather, this Court must apply a "holistic analysis" of a "legislature's predominant motive for the design of the district as a whole" that gives "proper weight" to "the districtwide context." *Bethune-Hill*, 137 S. Ct. at 800. The Supreme Court remanded for this Court to apply that standard in the first instance. *Id.*

Here, Plaintiffs have already established that the "context" in which each of the Challenged Districts was drawn was an overriding focus on an unjustifiable 55% black voting age population ("BVAP") floor. The existing record provides ample evidence of racial predominance of the sort demanded by *Bethune-Hill* and *Cooper*. Nothing more is required.

Plaintiffs will nonetheless present compelling *additional* evidence. Along with several delegate witnesses, Plaintiffs will call two additional experts, Dr. Jonathan Rodden and Dr. Maxwell Palmer. Dr. Rodden, a Stanford political science professor with expertise in the display and analysis of geo-spatial information, will provide the Court with population density maps, showing the surgical precision with which the General Assembly sorted black from white voters. His testimony—particularly with respect to split voting tabulation districts ("VTD")[2]—

---

[1] Plaintiffs' claims have been resolved with respect to HD 75.

[2] Each district is composed of several VTDs, or portions of VTDs. VTDs are composed of "census blocks" that are, generally speaking, the smallest geographic unit of information collection and reporting provided by the Census

speaks with powerful clarity to how racial considerations were the predominant consideration driving the construction of each Challenged District. Dr. Palmer, a political scientist from Boston University, will provide additional expert testimony, building and expanding on Dr. Stephen Ansolabehere's original analysis to show how race predominated in the shuffle of voters and VTDs into, and out of, the Challenged Districts. Dr. Palmer will also testify that the 55% BVAP floor simply was not necessary to enable black voters to elect their preferred candidates. Had the mapdrawers bothered to perform any analysis of racial voting patterns (rather than short circuit that analysis in favor of an arbitrary racial floor), they would have found no basis in the Voting Rights Act ("VRA") for their application of the 55% BVAP rule across all the Challenged Districts.

In the end, this is a simple case with an overly-complicated record. The General Assembly employed a one-size-fits-all racial target to very different districts scattered across the Commonwealth. While every other criterion used to draw districts was compromised along the way, the 55% BVAP rule was not. Mapdrawers shuffled voters from one district to another based on the color of their skin to ensure that each and every Challenged District satisfied the strict racial rule that governed all of them. None of these race-based redistricting decisions were even informed by an analysis of VRA requirements, let alone compelled by the VRA. This stark and unjustified racial sorting offends the Fourteenth Amendment. Together, the record evidence—both old and new—and the clarified legal standard compel a decision for Plaintiffs.

## II.   EXPECTED EVIDENCE AT TRIAL AND ARGUMENT

### A.   Background

As a result of the 2010 Census, Virginia redrew its House districts to balance population totals within each district. That task was taken up by Delegate Chris Jones, a member of the House. *See* Plaintiffs' Exhibit ("Pls.' Ex.") 35 at 46:18-48:21. It is undisputed that Delegate

---

Bureau. Pls.' Ex. 71 ¶ 18. Election results are reported at the district and VTD level, but not below the VTD level. As a result, no political performance data below the VTD level is available to those constructing district maps—a critically important fact when assessing Intervenors' "explanations" for the General Assembly's racial sorting. A set of maps showing evidence of racial sorting, including through VTD splits, is attached as Appendix A.

Jones was the architect of the redistricting plan under challenge here. *See* Dkt. No. 175 ¶ 3.

On April 29, 2011, Governor McDonnell signed HB 5005 (the "Enacted Plan"). *See* Pls.' Ex. 45 at 12. Like the plan adopted in 2001 (the "Benchmark Plan"), the Enacted Plan includes 12 districts in which Blacks represent a majority of the voting age population: House Districts ("HD") 63, 69, 70, 71, 74, 75, 77, 80, 89, 90, 92, and 95. *Id.* at 1. Before the Enacted Plan was passed, BVAP in the Challenged Districts ranged from 46.3% to 62.7%. *See id.*, tbl. 5.1. Under the Enacted Plan, BVAP in each of the Challenged Districts exceeded 55%. *See id.*

In 2015, reaffirming its earlier October 2014 decision, a three-judge panel of this Court struck down Virginia's third congressional district as a racial gerrymander, based largely on the use of an "ad hoc . . . [55% BVAP] racial threshold[]" to draw that district. *Page v. Virginia State Bd. of Elections* (*Page II*), No. 3:13CV678, 2015 WL 3604029, at *18 (E.D. Va. June 5, 2015). The *Page* court relied in part on the testimony of John Morgan, a consultant to the House of Delegates, to find that "the legislature enacted 'a House of Delegates redistricting plan with a 55% Black VAP as the floor for black-majority districts,'" and that it "acted in accordance with that view" when adopting its congressional plan. *Id.* at *9 (citation omitted).

Shortly after the *Page* court's October 2014 decision, residents of the Challenged Districts filed this lawsuit, alleging that the same General Assembly that racially gerrymandered the third congressional district racially gerrymandered the Challenged Districts (as Mr. Morgan's own testimony confirmed). *See* Compl. ¶¶2-3, 35, 39. The case went to trial in July 2015.

This Court issued its decision on October 22, 2015. A two-judge majority found that the 55% BVAP floor "was used in structuring the [Challenged] Districts." Dkt. No. 108 at 22. The majority further found that "the 55% rule" was based "largely" on concerns about the re-election of a single black delegate in HD 75 (namely, Delegate Tyler), as well as "feedback" from "various groups," *id.* at 29. "That [55% BVAP] figure was then applied across the board to all twelve of the Challenged Districts." *Id.* at 30. The majority concluded, however, that race predominated only in HD 75, and that HD 75 was narrowly tailored and passed muster.

Plaintiffs appealed. On March 1, 2017, the Supreme Court rejected the majority's racial

- 3 -

predominance analysis and remanded for further proceedings. *Bethune-Hill*, 137 S. Ct. at 797-800. The Supreme Court affirmed the majority's conclusion as to HD 75. *Id.* at 801-02.

**B.      Race Predominated in All the Challenged Districts**

**1.      Legal Standard**

On appeal, the Supreme Court "reaffirm[ed] the basic racial predominance analysis explained in *Miller* and *Shaw II*," *Bethune-Hill*, 137 S. Ct. at 802, holding that a racial gerrymandering plaintiff "may show predominance 'either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose.'" *Id.* at 798 (quoting *Miller v. Johnson*, 515 U.S. 900, 913, 916 (1995)). The Supreme Court rejected the novel approach to the predominance inquiry created by Intervenors and adopted by the majority, holding that the majority opinion "misapplied controlling law in two principal ways." *Id.* at 797.

*First*, the majority erred by requiring "an actual conflict between the enacted plan and traditional redistricting principles." *Id.* at 797-98. The Supreme Court "reject[ed] the argument that, 'regardless of the legislature's purposes, a plaintiff must demonstrate that a district's shape is so bizarre that it is unexplainable other than on the basis of race.'" *Id.* at 798 (quoting *Miller*, 515 U.S. at 910-11). Accordingly, the Court reaffirmed the holding of *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899 (1996): "Race may predominate even when a reapportionment plan respects traditional principles . . . if '[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Id.* (quoting *Shaw II*, 517 U.S. at 907).

*Second*, the majority erred in considering the General Assembly's racial motive "only to the extent that [Plaintiffs] identified deviations from traditional redistricting criteria that were attributable to race and not to some other factor." *Id.* at 799. By confining its predominance analysis to "deviations" from traditional criteria, and requiring Plaintiffs to show that race cancelled out all other districting criteria in explaining those deviations, the majority "foreclosed a holistic analysis of each district" and gave "*insufficient weight to the 55% BVAP target and*

- 4 -

*other relevant evidence that race predominated.*" *Id.* (emphasis added). "The ultimate object of the inquiry," the Supreme Court emphasized, "is the legislature's predominant motive for the design of the district as a whole." *Id.* at 800. "[A]ny explanation for a particular portion of the lines, moreover, must take account of the districtwide context." *Id.*

These two legal errors formed the basis of the majority opinion's racial predominance test and governed the review of each Challenged District. As a result, in evaluating the evidence to be presented at trial, the Court must review *each* Challenged District to examine the evidence of racial predominance under the proper standard. As set forth below, application of the correct standard reveals that race predominated in all the Challenged Districts.

### 2.      The Statewide Evidence Establishes Racial Predominance

While a racial gerrymandering claim "applies district-by-district," *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015), statewide evidence is "perfectly relevant," *id*. at 1267, particularly where it reveals the legislature's pursuit of a "common redistricting policy toward multiple districts," *Bethune-Hill*, 137 S. Ct. at 800. The evidence will show that racial goals dominated and controlled Virginia's redistricting process from the start, *Shaw II*, 517 U.S. at 905, including "direct evidence of the legislative purpose and intent," evidence demonstrating "actual conflict" between traditional redistricting principles and race, and "other compelling circumstantial evidence," such as "stark splits in the racial composition of populations moved into and out of" the Challenged Districts. *Bethune Hill*, 137 S. Ct. at 799-800.

### a.      The 55% BVAP Rule

Perhaps the most vivid evidence in the record is the now-settled *fact* that the General Assembly adopted an across-the-board 55% BVAP rule and applied it indiscriminately to all 12 districts. Where a legislature announces a "racial target that subordinated other districting criteria and produce[s] boundaries amplifying divisions between blacks and whites" a court "could hardly . . . conclude[] anything but" that "race predominated." *Cooper*, 137 S. Ct. at 1469; *Alabama*, 135 S. Ct. at 1267 ("That Alabama expressly adopted and applied a policy of

- 5 -

136908408.5

prioritizing mechanical racial targets above all other districting criteria . . . provides evidence that race motivated the drawing of particular lines in multiple districts in the State.").

Plaintiffs will demonstrate, through direct and circumstantial evidence, that the 55% BVAP floor applied to each Challenged District had a predominating effect on the population that was excluded and included from each such district. The 55% BVAP floor was the single relevant criterion that "could not be compromised" during the redistricting process. *Shaw II*, 517 U.S. at 907.

**(i)     Intervenors Cannot Dispute that a 55% BVAP Rule Was Used to Structure the Challenged Districts**

The evidence from the first trial conclusively established that the General Assembly "prioritiz[ed] [a] mechanical racial target[]" by requiring all Challenged Districts—regardless of their unique geography, history, and racial voting patterns—to meet or exceed the same 55% BVAP target. *Alabama*, 135 S. Ct. at 1267. That a "fixed" 55% BVAP floor was "used" to "structur[e]" and "craft" each of the Challenged Districts, Dkt. No. 108 at 22, 103, is no longer up for debate. "It is undisputed that the boundary lines for the 12 districts at issue were drawn with a goal of ensuring that each district would have a [BVAP] of at least 55%." *Bethune-Hill*, 137 S. Ct. at 794; *see also id.* at 795 ("[T]he 55% BVAP figure *was used in structuring the districts*.") (quoting Dkt. No. 108 at 22) (emphasis added).

That finding was unanimous before the panel that heard the case the first time, Dkt. 108 at 22, 159-60, and was relied upon on appeal. "[F]indings of fact reviewed in and relied upon in an appellate court's decision become the law of the case and, absent . . . exceptional circumstances, may not be disturbed by a trial court on remand." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 948 F.2d 1573, 1576 (Fed. Cir. 1991). Thus, the fact that a 55% BVAP floor was used in crafting each of the Challenged Districts is now the law of this case.[3]

---

[3] Nonetheless, Intervenors continue to deny the existence of the 55% BVAP rule, refusing to stipulate to the Court's prior factual findings on this point, as affirmed by the Supreme Court. *See, e.g.*, Dkt. No. 175; *see also* Defendant-Intervenors' Response to Request for Admission No. 1 (July 26, 2017) (denying that the House "utilized a 55% Black Voting Age Population threshold in drawing all or some of the Challenged Districts in the 2011 Virginia House of Delegates Plan").

- 6 -

In any event, the evidence of the 55% BVAP rule is overwhelming, including Delegate

Jones' statements, *e.g.*, Pls.' Ex. 35 at 70:7-9 (arguing that "the effective voting age population

[in the Challenged Districts] needed to be north of 55 percent" for VRA compliance), testimony

from other delegates that no plan would even be considered unless each Challenged District met

the 55% BVAP target, *see, e.g.*, Tr. 32:23-33:9, 75:10-18, 92:10-24,[4] and the report of House

consultant John Morgan, in which he stated that the General Assembly enacted "a

House . . . redistricting plan with a 55% Black VAP as the floor for black-majority districts,"

*Page II*, 2015 WL 3604029, at *9 (quoting report). In short, the existence and use of the 55%

BVAP rule is beyond dispute. No time need be wasted relitigating that issue.[5]

> **(ii)**     **The 55% BVAP Rule Was the Misguided Means by Which the General Assembly Tried to Comply With the VRA**

Before any redistricting plans were introduced, the House Committee on Privileges and

Elections adopted criteria to govern the redistricting process. *See* Pls.' Ex. 16. The second

criterion after "Population Equality," titled "Voting Rights Act," requires that "[d]istricts shall be

drawn" to avoid "the unwarranted retrogression or dilution of racial or ethnic minority voting

strength." *Id.* at 1. All other factors are subordinate to that directive, which was to "be given

priority in the event of a conflict among the criteria." *Id.* at 2; *see also Bethune-Hill*, 137 S. Ct. at

795 ("[A]bove those traditional objectives, the committee gave priority to two other goals.").

There is, of course, nothing objectionable, as a general matter, with the General

Assembly's recognition that redistricting was constrained by federal law. But as in *Alabama*, the

General Assembly's prioritization of VRA compliance is illuminating because of the *means* the

General Assembly used to comply with federal law. *See Alabama*, 135 S. Ct. at 1263 ("Alabama

believed that, to avoid retrogression under § 5, it was required to maintain roughly the same

---

[4] Citations to the trial transcript are provided with reference to page and line number. Plaintiffs will provide the Court with a courtesy copy of the complete transcript from the first trial in working notebooks.
[5] It also appears that Intervenors intend to resuscitate their failed arguments regarding the DOJ vs. DLS Black distinction (i.e., whether Black Hispanics should be included or excluded from the BVAP count). The Court also addressed this point thoroughly. Dkt. No. 108, at 23-27. Not only did the Court reject Intervenors' position, it found that the debate "generated more light than heat" and was ultimately not meaningful, as even Intervenors' counsel conceded. *Id.* at 27. This is another settled issue that the Court need not revisit given the limited trial time available.

136908408.5

black population percentage in existing majority-minority districts.").

Here, the General Assembly adopted—as its sole proxy for VRA compliance—a rule that all Challenged Districts would need to have at least 55% BVAP. *See* Dkt. No. 108 at 22-23 ("[T]he 55% BVAP figure was used . . . in assessing whether the redistricting plan satisfied constitutional standards and the VRA[.]"); *id.* at 103 (delegates believed the 55% BVAP floor was "necessary to avoid retrogression under federal law"). That means that the General Assembly determined in advance that the racial floor would be "placed . . . above traditional districting considerations," *Alabama*, 135 S. Ct. at 1271 (citation and quotation marks omitted), and "given priority in the event of a conflict among the criteria," Pls.' Ex. 16 at 2.

Delegate Jones, the principal crafter of the Challenged Districts, emphasized the primacy of race during the redistricting process. Tr. 274:6-7. For example, he declared that "the most important thing[]" to him in drawing the Enacted Plan—not counting population equality—was VRA compliance. Pls.' Ex. 35 at 35:1-5, 15-18 (emphasis added). When asked whether he had examined "an analysis of voting patterns of particular minority districts" in determining VRA compliance, Delegate Jones simply responded that the plan "fully complies with the [VRA] as 55 percent or higher." *Id.* at 66. During the first trial, Delegate Jones confirmed that his efforts at VRA compliance "trumped everything" except population equality. Tr. 402:20-22. Delegate Jones' contemporaneous testimony makes clear that the 55% BVAP rule was the uniform, blunt instrument used to define and "craft[]" all of the Challenged Districts. Dkt. No. 108 at 34.

Virginia's preclearance submission further illustrates the centrality of the 55% BVAP rule.[6] The "Statement of Minority Impact," Pls.' Ex. 45, identifies the General Assembly's two racial goals: (1) "maintain[ing] 12 black majority districts . . . despite demographic changes," and (2) ensuring that "[a]ll 12 black majority districts were maintained . . . with greater than 55% black VAP," Pls.' Ex. 48 at 11. This "announced racial target" for twelve majority-minority

---

[6] The Supreme Court routinely relies on preclearance submissions to hold that race predominates. *See, e.g.*, *Cooper*, 137 S. Ct. at 1475 & n.9 (preclearance submission "indicated a . . . determination to concentrate black voters" to uphold finding of racial predominance); *Shaw II*, 517 U.S. at 906 (submission describing "overriding purpose . . . to create two congressional districts with effective black voting majorities") (citation omitted).

districts is powerful evidence of racial predominance. *Cooper*, 137 S. Ct. at 1469.

And as further set out below, the 55% BVAP rule had a direct and predominating effect on the redrawing of each of the Challenged Districts. The 55% BVAP rule explains not only individual jots and deviations on the map, but also the *overall* way that the Challenged Districts were constructed, out of the innumerable options that existed.

### b.    Subordination of Traditional Districting Criteria

Every district in Virginia surely posed competing concerns of population requirements, incumbent requests, geographical limitations, and the like. Such considerations *always* are present during a redistricting process. The Challenged Districts were no different. What *was* different were the constraints posed by Delegate Jones' steadfast commitment to the 55% BVAP rule. *See, e.g.*, Pls.' Ex. 11 (discussing need to get the "majority minority districts locked"). That difference manifests in the fact that the Challenged Districts, considered as a whole, deviate more drastically from traditional districting principles than the remaining 88 districts.

For example, whereas the Enacted Plan is slightly less compact than the Benchmark Plan based on average Reock scores, the average compactness of the Challenged Districts dropped *five times* as much as that of the other 88 districts. Pls.' Ex. 50 ¶ 50; Dkt. No. 108 at 106-07. The Enacted Plan also increased county boundary and VTD splits in areas covered by the Challenged Districts. Pls.' Ex. 71 ¶ 17; Pls.' Ex. 50 ¶¶ 55, 60-65. Whereas the Benchmark Plan split 174 VTDs, the Enacted Plan splits 236. Pls.' Ex. 50 ¶ 61. Among the Challenged Districts, the number of VTDs that were split jumped from 30 to 52, a 73% increase, for an average of 4.3 split VTDs per Challenged District. *Id.* The remaining 88 districts saw a mere 25% increase in the number of split VTDs, with an average of 2.0 split VTDs per district. Pls.' Ex. 50 ¶ 62. The high rate of VTD splits among the Challenged Districts is telling given that no election data— only racial data—was available to mapdrawers below the VTD level. *See* Pls.' Ex. 71 ¶¶ 4, 20.

This undisputed evidence "that the enacted plan conflicts with traditional redistricting criteria," *Bethune-Hill*, 137 S. Ct. at 799, shows that the Challenged Districts were treated

- 9 -

differently than other districts and drawn predominantly on the basis of race. The subordination of traditional districting criteria apparent in the Challenged Districts, when considered as a whole, is the telltale detritus left behind by the General Assembly's predominating use of race.

### c. Racial Sorting

Plaintiffs' demographic evidence, moreover, shows that the General Assembly resorted to extensive and intricate racial sorting to ensure that all the Challenged Districts met the predetermined racial threshold. The evidence of racial sorting is stark and overwhelming.

When the General Assembly split political divisions between challenged and non-challenged districts, it did so along racial lines. Ten cities, four incorporated places, one military base, and ten unincorporated places are split between challenged and non-challenged districts. Pls.' Ex. 71 ¶ 16. In each case—*all 25 times*—the areas assigned to the Challenged Districts have a higher BVAP than the areas assigned to the non-challenged districts. *Id.*

The evidence is even starker when it comes to the way that VTDs were shuffled in and out of the Challenged Districts. In 2015, Plaintiffs' expert Dr. Stephen Ansolabehere presented evidence that the BVAP of VTDs moved into the Challenged Districts is significantly higher (by at least 17%) than the BVAP of VTDs moved out of the Challenged Districts. Pls.' Ex. 50 ¶¶ 81-109. The partisan differential, meanwhile, is less than half that amount. *Id.* ¶¶ 86-88.

Dr. Palmer will further testify that, of the 16 non-challenged districts that transferred population to a Challenged District, all but one transferred portions of the district that had a *higher* BVAP than that left behind. Pls.' Ex. 71 ¶ 84. For example, while HD 94 moved 10.7% of its population into HD 95, it transferred 24.5% of its BVAP (and only 3.6% of its white voting age population) into the Challenged District. *Id.* ¶ 101, tbl. 18. Likewise, Dr. Palmer will show that *all* nine Challenged Districts that transferred population to non-challenged districts transferred portions of the district that had a *lower* BVAP than the district as a whole. *Id.* ¶ 85. For example, while HD 80 saw 19.9% of its population moved to HD 79, 33.2% of the district's white voters were moved out, roughly three times the rate of black voters that were moved out

- 10 -

(11.5%). *Id.* ¶ 105, tbl. 19. This evidence of racial sorting, in which low BVAP areas were swapped for high BVAP areas, is powerful evidence of predominance. *See Bethune-Hill*, 137 S. Ct. at 800 (noting "the significance of relevant districtwide evidence, such as stark splits in the racial composition of populations moved into and out of disparate parts of the district").

Even more telling is the tale told by VTDs that were split between districts. Thirty-one of the 32 VTDs split between challenged and non-challenged districts were divided to assign a higher BVAP to the Challenged District. Pls.' Ex. 71 ¶ 14. On average, the BVAP of the portions of split VTDs assigned to Challenged Districts is 24% higher. *Id.*

As Dr. Rodden will explain, to meet the 55% BVAP target in each Challenged District, the General Assembly not only had "to make sure that virtually every VTD with a substantial black population [found] its way into a majority-black district," Pls.' Ex. 69 at 9, but it was also forced to split VTDs to separate black and white voters or split black neighborhoods between Challenged Districts to bolster the BVAP when necessary to meet the 55% BVAP goal, *id.* at 4, 11. Even more eloquent than Dr. Rodden are the dot density maps he provides that tell the story of racial sorting in perhaps the most vivid and graphic way possible. *See generally* Appendix A.

Again, the racial pattern revealed by split VTDs is especially probative because only racial data—and not election data—are available below the VTD level. *See* Pls.' Ex. 71 ¶ 20. This evidence strongly suggests that VTDs were split between districts to pursue racial goals at the expense of traditional criteria. *See Bush v. Vera*, 517 U.S. 952, 961, 966-67 (1996) (plurality opinion). Indeed, it is difficult to imagine other explanations for such stark racial sorting.

Delegate Jones will disclaim any responsibility for determining whether and how to split particular VTDs and testify that he outsourced such decisions to consultant John Morgan. With a handful of exceptions, Morgan will claim that he split VTDs for the purpose of achieving population equality between districts and for no other reason. His testimony, then, is that it is mere happenstance that, with near uniformity among the Challenged Districts, he created VTD splits in which high BVAP areas were drawn into Challenged Districts and low BVAP areas were drawn in non-challenged districts. *See, e.g.*, Appendix A at 2 (Pls.' Ex 69, fig. 12).

- 11 -

No more eloquent rebuttal of Morgan's testimony will be found than that of Intervenors' own expert, Dr. Jonathan Katz. Seeking to rebut Dr. Palmer's testimony, Dr. Katz claims that "indirect" political data *does* exist below the VTD level because "race data is very highly correlated with party identification" in Virginia. Defendant-Intervenors' Exhibit ("DI Ex.") 101 at 10. He thus suggests the General Assembly used race as a proxy for politics to determine which VTDs to split. This, of course, is expressly forbidden. "[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 137 S. Ct. at 1473 n.7.[7]

### d.    Politics Did Not Outweigh Race

Finally, to the extent that Intervenors attempt to argue that politics, not race, was the predominant consideration in the drawing of the Challenged Districts, as suggested by the report of their expert Dr. Katz, that argument would fail as well.

*First*, to the extent that this defense amounts to a claim that the General Assembly purposely targeted White Democrats, it is nothing less than *another* admission that race was the General Assembly's predominant consideration. *See* Pls.' Ex. 68 at 28:21-24 (Defendants' counsel arguing that the "vast majority of the incumbents got reelected except for *a few democratic white members lost. That's the predominant purpose of the plan*.") (emphasis added); DI Ex. 15 at 11, 19 (discussing apparent targeting of White Democrats).

*Second*, the record simply does not support that politics was the aim. Again, there is clear evidence that race was the most important factor in the configuration of the Challenged Districts. In contrast, nothing in the record suggests that politics was the predominant consideration. In fact, the record makes clear that political factors played a marginal role at best. For example:

- The House Criteria subordinate political considerations to racial considerations.
- Virginia's Preclearance Submission makes clear that "partisan factors were present

---

[7] Even if population equality was the driving motivation of these VTD splits, "an equal population goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates.'" *Alabama*, 135 S. Ct. at 1270. The question is "whether race, or other factors, predominate in" the "determination as to *how* equal population objectives will be met." *Id.* Here, the mapdrawers chose to split VTDs on racial grounds.

*but muted* in establishing new districts." Pls.' Ex. 44 at 12 (emphasis added).

- While the record is replete with statements about a rigid *racial* threshold, nothing in the record even hints at *partisan* thresholds, targets, or quotas.

- During the redistricting process, neither Delegate Jones nor his political allies emphasized politics. On the contrary, they downplayed politics. *See, e.g.*, Pls.' Ex. 17.

Finally, Dr. Palmer will testify that, even when accounting for contiguity in VTD selections, *see* Dkt, No. 108 at 104, race is by far the more powerful predictor of which VTDs were placed in the Challenged Districts, while partisan considerations are not. Pls.' Ex. 71 ¶¶ 123-25. Indeed, Dr. Palmer concludes that there is a large and significant relationship between BVAP and VTD assignment, but no such relationship between Democratic vote share and VTD assignment. In response, Intervenors' expert Dr. Katz offers four different models for assessing the effects of race and party on VTD assignment, *all* of which confirm that race is a far better predictor of VTD assignment than politics. *See* DI Ex. 101, tbl. 6; Pls.' Ex. 72 ¶ 25.

### 3.    District-Specific Evidence Confirms that Race Predominated

Plaintiffs will also present extensive district-specific evidence showing how race determined the final shape of each Challenged District. At least some of this evidence was downplayed or ignored by the majority. Evaluated under the correct legal standard, the district-specific evidence confirms that race had a "direct and significant impact" on each Challenged District, *Alabama*, 135 S. Ct. at 1271, and that race therefore predominated.

Dr. Rodden, an expert in geo-spatial display and analysis, will testify about the broader context underlying Dr. Palmer's data analysis. As he will testify, it was not easy for Delegate Jones to meet his racial goals. Rather, in each of the two major regions at issue (Richmond/Tri-City) and Tidewater (including the Peninsula), "considerable creativity" was needed to achieve "population equality while also achieving the racial target." Pls.' Ex. 69 at 3. Some Challenged Districts were recipient districts that received an influx of black voters to achieve 55% BVAP. Others were treated as "donor" districts that were raided to bolster the BVAP elsewhere. And because most Challenged Districts were underpopulated, a limited pool of black voters had to be spread artfully among the Challenged Districts to achieve the General Assembly's racial goals.

- 13 -

a.      **Richmond and Tri-City**

The Richmond and Tri-City region includes HDs 63, 71, 69, 70, and 74 and three large black population clusters: (1) north Richmond, (2) Richmond on the south side of the river, and (3) in and around Petersburg. Pls.' Ex. 69 at 9. There is a smaller black community on the south side of Hopewell. *Id.* The BVAP was sliced up to achieve the 55% target in each Challenged District. Specifically, Delegate Jones removed black voters from HD 70 and 74 (which were not overpopulated) to add BVAP to HD 71, 63, and 69. *Id.* at 15. As a result, "[i]n the entire region covering Richmond and the Tri-City area, there is *not a single VTD with a black voting-age majority that is left out of one of the* [C]hallenged [D]istricts." *Id.* at 41 (emphasis added).

(i)      **HD 63**

HD 63 was underpopulated by 6,000, but Delegate Jones had few options to redraw the district while meeting his racial goals: HD 63 was largely surrounded by heavily white communities, while HD 75, to the south, was also underpopulated and in need of an infusion of black voters to comply with the 55% BVAP rule. Pls.' Ex. 69 at 34-35.

Before redistricting, HD 63 included all of Dinwiddie County, which included several high-BVAP areas near HD 75. To boost the BVAP of HD 75 above 55%, Delegate Jones sliced Dinwiddie County in half and moved high BVAP areas in the southern part of the county into HD 75. *See* DI Ex. 94 at 2. Former delegate Rosalyn Dance (who helped Delegate Jones redraw HD 63) will confirm her prior testimony that Delegate Jones split Dinwiddie County for a racial reason: "to get [HD 75's] number . . . [o]f African American voters up to 55 percent." Tr. 80:9-10. This Court, of course, has *already* found that the split was "avowedly racial." Dkt. No. 108 at 109; *id.* at 171 (Keenan, J., dissenting).[8]

To ensure that the Dinwiddie County split did not cause HD 63's BVAP to fall below 55%, Delegate Jones added a new, snake-like appendage to HD 63's northeastern corner. That

---

[8] Given that Dinwiddie County was split for the "avowedly racial" purpose of moving black voters out of HD 63 and into HD 75, the split shows racial predominance in *both* districts. *Cooper*, 137 S. Ct. at 1469 n.3 (race predominated where counties were split along racial lines); *Bethune-Hill*, 137 S. Ct. at 800 (same, as to "stark splits in the racial composition of populations moved into and out of" district); *Miller*, 515 U.S. at 916 (same, when race drives the "decision to place a significant number of voters *within or without* a particular district") (emphasis added).

- 14 -

appendage winds through Prince George County, picking up high BVAP areas there, and splits Hopewell to extract much of its BVAP. *See* Appendix A at 1 (Pls.' Ex. 69, fig. 11). The overriding purpose of that tentacle is clear: It was added to replace black voters lost when Delegate Jones split Dinwiddie County, thereby ensuring that HD 63 would comply with the 55% BVAP rule. Pls.' Ex. 69 at 35-39. Former delegate Dance will confirm that the appendage allowed HD 63 to "pick[] up parts of Prince George . . . to get more African-Americans" and also "picked up the concentration of African-Americans in Hopewell[.]" Tr. 81:18-21.

The circumstantial evidence tells the same story. The appendage reaches out to grab areas around Hopewell (Wards 2, 6, and part of 7) that are well over 60% BVAP. It avoids other areas around Hopewell (Wards 1, 3, 4, 5, and part of 7) with a mere 21.7% BVAP. *See* Pls.' Ex. 50, tbl. 9; Pls.' Ex. 63 at 115-16; Pls.' Ex. 71 ¶ 32. The split of the Hopewell Ward 7 VTD is telling: The mapdrawer carved out predominantly black census blocks in the southern corner of the VTD to place in HD 63. *See* Appendix A at 2 (Pls.' Ex. 69, fig. 12) and 3 (Pls.' Ex. 71, fig. 3).

The end result of the "drastic maneuvering" required to donate BVAP to HD 75 while remaining HD 63 above 55% BVAP itself was an "unusually shaped" district with little respect for neutral districting principles. Dkt. No. 108 at 108; *see also* Appendix B, tbl. 1. Indeed, HD 63 suffered "the largest Reock compactness reduction of any district in the Enacted Plan." Dkt. No. 108 at 109. In addition, the number of split VTDs shot up "from 0 to 8." *Id.* at 108.

### (ii)     HD 71

Prior to redistricting, HD 71 was a racially heterogeneous district with a BVAP of 46%. Pls.' Ex. 69 at 15-16. That HD 71 was no longer a majority-BVAP district had no ill effects on black voters' ability to elect their candidate of choice. Delegate McClellan, the incumbent, had not faced a primary challenger since first winning election, usually ran unopposed in the general election, and in 2009 (her last contested general election), had coasted to victory with 82% of the vote. *Id.* at 16. This was hardly a district that needed additional BVAP to ensure that the black community could elect its candidate of choice. Nonetheless, in pursuit of the indiscriminate 55%

- 15 -

BVAP target, Delegate Jones performed radical surgery on HD 71 to add black and remove white voters. *Id.* Plaintiffs will present Delegate McClellan's testimony that the one overriding requirement for HD 71 and other Richmond-area districts (other than population equality) was a *racial* requirement: "*[F]or the 69th, 70th, and 71st and 74th districts, we would have to meet a 55 percent black voting-age population.*" Tr. 29:10-13 (emphasis added).

HD 71 was greatly underpopulated, and the obvious way of achieving population equality was to move HD 71 west, which would have also united the Fan and Museum districts. Pls.' Ex. 69 at 17. But adding those (predominantly white) areas would not have achieved 55% BVAP. Indeed, even if all of the population added to make up HD 71's population shortfall were made up of African Americans, the district *still* would have had a BVAP below 50%. *Id.* at 16-17.

Thus, Delegate Jones took a different course. Most notably, although Delegate McClellan hoped to keep VTD 207, a reliably Democratic (and mostly white) VTD in the Fan neighborhood that had been in her district for decades, the VTD was removed because keeping it would have dragged HD 71's BVAP below 55%. *See* Tr. 41:2-12.[9] To make up for the lost population, Delegate Jones added several new VTDs in the east that are heavily black. *Id.* 43:15-17.

In another vivid example, Delegate McClellan will confirm her testimony that she proposed "unsplitting" certain precincts at the request of local election officials. *See id.* 50:14-54:7. But in trying to do so, she inadvertently dropped HD 71's BVAP below 55%. Delegate Jones therefore rejected her proposal. Pls.' Ex. 30 at 1. While this exchange concerned HB 5001, the predecessor to HB 5005, it illustrates the effect of the 55% BVAP rule—other considerations could be addressed *only* if they did not violate the 55% BVAP rule. That is the very definition of predominance. *Bethune*, 137 S. Ct. at 798 (race predominates "if '[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play

---

[9] In the first trial, Delegate Jones claimed that he moved VTD 207 to HD 68, represented by Republican Manoli Loupassi, because Delegate Loupassi once served on the Richmond City Council and VTD 207 "had been adjacent to his ward." Tr. 305:10-307:4. On remand, it seems that Intervenors have changed their story, and Delegate Jones will now testify that Delegate Loupassi wanted VTD 207 because *his sister* owns a restaurant here. *See* Dkt No. 198 at 2-4. It strains credulity to think that Delegate Loupassi spontaneously asked for the addition of a strongly Democratic precinct from Richmond to his largely suburban district because it was near an area he had once represented or because a family member owned a business there.

only after the race-based decision had been made'") (quoting *Shaw II*, 517 U.S. at 907).

And although Delegate Jones testified in the first trial that he thought that he had fixed all of the split VTDs in question in HB 5005, in fact, several split VTDs remained in HD 71 in HB 5005, including VTD 505 which was split on racial lines. *See* Appendix A at 4 (Pls.' Ex. 69, fig. 4); Pls.' Ex. 71 ¶ 62 (explaining that the BVAP of HD 71 would be 54.5% if all of VTD 505 had been included in it rather than split). While HD 71 retains an apartment complex with a substantial black population, the largely white portion of VTD 505 is turned into an isolated island across the water from its new district (HD 69). Pls.' Ex. 69 at 22-24.

As a result of this racial sorting, the BVAP of areas moved into HD 71 was 72.1%, over *50 percentage points* higher than the BVAP of areas moved out, even though African Americans had been electing their candidates of choice handily. *See* Pls.' Ex. 50 at 35, ¶ 102.

### (iii)   HD 69

HD 69 has a BVAP of 55.2%. Pls.' Ex. 71, tbl. 22. This is not happenstance. Delegate McClellan, who helped draw the Challenged Districts, will confirm her testimony that HD 69 was drawn to comply with the 55% BVAP target. *See* Tr. 29:3-13.

The circumstantial evidence confirms that testimony. HD 69 had a benchmark BVAP of 56.3%, but was underpopulated by 8,701 people. Pls.' Ex. 69 at 26. HD 69 was bounded by white-populated areas to the west and east, and Delegate Jones chose not to add population in those directions. *Id.* As set forth above, HD 71, to the north, could not afford to lose black population. *Id.* That left one obvious option—taking BVAP from HD 70 to the south (even though HD 70 was already at the population target) to maintain HD 69 just over 55% BVAP.

That is just what Delegate Jones chose to do, expanding HD 69 outward to add additional black voters to replace those that had to be removed from the district to make up for HD 71's insufficient BVAP. *See* DI Ex. 94 at 2 (areas added); Pls.' Ex. 69, fig. 6; Pls.' Ex. 50, tbl. 9.

### (iv)   HD 70

HD 70 was not substantially underpopulated. Pls.' Ex. 69 at 29. It also had a substantial

- 17 -

BVAP (61.8%). Pls.' Ex. 50, tbl. 4. Thus, Delegate Jones treated HD 70 as a "donor" district to shore up the BVAP in other Challenged Districts, dropping HD 70's BVAP from 61.8% to 56.4% in the process. This maneuver required removing about 26,000 people and adding back 26,000 (different) people, and the racial pattern of this swap is telling. The BVAP of areas moved into HD 70 was 43.8%, while the BVAP of areas moved out was 59.9%, Pls.' Ex. 50, tbl. 8—*and all of the areas moved out were moved into other Challenged Districts*, *id.*, tbl. 9. Thus, "extra" black voters were siphoned out of HD 70 to ensure that other Challenged Districts also complied with the 55% BVAP floor. Pls.' Ex. 60 ¶ 102.

To that end, VTDs 701, 702, and part of 703 were donated to HD 71 (all with BVAP over 90%). Pls.' Ex. 69 at 29. Meanwhile, VTDs 811 (76% BVAP) and 903 (64% BVAP) were donated to HD 69. *Id.* To make up for the population lost by these donations, HD 70 was then expanded outward to encompass several nearby suburban VTDs (Meadowbrook, Southside, and Chippenham), which were the last remaining majority-black precincts in the region that were not already a part of a Challenged District. *Id.* "As the suburban black population pushed outward into the white exurbs, HD 70 expanded to pull them back in." *Id.*

The end result is a district that pays little attention to county boundaries or communities of interest, carving off three VTDs from Richmond's Southside City Council ward from the rest of that ward and the rest of the city of Richmond, *see* Pls.' Ex. 16 at 1-2 (including "governmental jurisdictions" among the "factors that can create or contribute to communities of interest"), crossing both the James River and the Henrico County boundary to bring together two non-contiguous neighborhoods of Richmond, and drawing together a heterogeneous mix of urban, suburban, and exurban communities in a single district. Pls.' Ex. 69 at 29-30.

Intervenors' attempts at post-hoc, non-racial explanations for the district fall short. In particular, Delegate Jones testified that the odd "turret" on the top of HD 70 was added to draw incumbent Delegate McQuinn's residence into the district. Dkt. No. 108 at 130-31. But Delegate McQuinn resides in the *southern* part of the turret, Pls.' Ex. 69 at 28, fig. 7, and Delegate Jones' testimony fails to explain away why two *additional* VTDs, Central Gardens (BVAP 94%) and

- 18 -

Masonic (BVAP 72%), were added to the *top* of the turret. *Id.* at 30.

**(v)      HD 74**

HD 74 was not underpopulated. Pls.' Ex. 71, tbl. 22. Nevertheless, Delegate Jones moved around 16,000 voters out of HD 74, and roughly the same number of voters back into it. Pls.' Ex. 50, tbl. 5. Tellingly, this unnecessary population swap increased the BVAP in nearby districts, in service of the 55% BVAP rule. The average BVAP of areas moved out of HD 74 and into other Challenged Districts is 69.0%. *Id.*, tbl. 9. The average BVAP of areas moved into non-challenged districts is a mere 20.5%—a nearly 50-percentage point difference. *See id.*

Delegate Jones moved black voters out of HD 74 and into neighboring Challenged Districts to accomplish two racial goals. *See* Pls.' Ex. 69 at 31-32. First, he needed to increase the BVAP of HD 71, which was below the 55% BVAP threshold. Pls.' Ex. 71, tbl. 22. Second, he needed to hold steady the BVAP of HD 63, which ceded much of its black population in the southern part of the district to HD 75. Tr. 79:19-83:5. Delegate Dance will confirm that to make up for the black voters that HD 63 lost as a result of the Dinwiddie County split with HD 75, HD 63 added a predominantly black part of Hopewell City and part of Prince George from HD 74 "to get more African-Americans." *Id*. Any changes that Delegate Jones made to HD 74 that improved the district's contiguity were incidental to achieving his racial goals.

Moreover, the changes made to HD 74 as a result of the siphoning of black voters out of the district conflicted with traditional districting criteria, resulting in drastic reductions of compactness in surrounding districts. For example, eliminating the river crossing in HD 74 moved the predominantly black area of Hopewell into HD 63, causing that district to suffer the greatest compactness reduction in the entire Enacted Plan. Pls.' Ex. 50 ¶ 49.[10]

**b.      Tidewater**

The Tidewater region encompasses HDs 77, 80, 89, and 90 in South Hampton Roads and

---

[10] Delegate Jones claims he eliminated the river crossing to remedy a feature critiqued by the Virginia Supreme Court in *Wilkens v. West*, 264 Va. 447 (2002). But the *Wilkins* court, which was considering a challenge to HD 74 under Virginia's state constitution, flatly rejected the challenge to HD 74, holding that "nothing . . . indicates that the District is repugnant to the constitutional principles of compact and contiguous electoral districts.". *Id.* at 466.

- 19 -

HDs 92 and 95 on the Peninsula. Over the past ten years, the districts had become severely underpopulated, the black population had become more dispersed, and the BVAP of HD 80 and 89 had dropped below 55%. Pls.' Ex. 69 at 52; Pls.' Ex. 71, tbl. 22. The evidence will show that given all this, Delegate Jones engaged in clear racial sorting in service of his predominant goal of meeting the 55% BVAP rule in each and every Challenged District.

(i)     HD 77

HD 77 can be principally explained by two requests that were made by incumbent Delegate Lionel Spruill to Delegate Jones. Delegate Spruill's first request was that his district contain at least 55% BVAP. Tr. 490:10-12.[11] Delegate Spruill's second request was to unite the old city of South Norfolk in HD 77, which meant adding several neighborhoods that contained black populations but were all majority-white precincts. To square these two requests, Delegate Jones made significant race-based changes. As a result, the BVAP of HD 77 was increased from 57.6% to 58.8%, Pls.' Ex. 71, tbl. 22, despite the fact that black voters in HD 77 had easily elected their preferred candidates for years, Pls.' Ex. 50, tbl. 14.

As the majority found, HD 77 is not compact. It is not contiguous by land and lacks a water crossing. Its "jagged and elongated" shape is constitutionally "suspect." Dkt. No. 108 at 140. Indeed, a large chunk of HD 77 juts west so that "half of the district is thrust so far into HD 76 as to nearly sever it in half." *Id*. Delegate Jones looked to this western part of HD 77 to balance out HD 77's BVAP given the addition of the majority-white precincts to the east. Almost every VTD included in the western appendage of HD 77 has a high BVAP, including Hollywood (96%), Southside (89.9%), and White Marsh (87.8%), while Airport—the only VTD *dropped* from the western part of HD 77—has a mere 31.7% BVAP. Pls.' Ex. 63 at 133-34. Delegate Jones also expanded HD 77 further into Suffolk to add heavily black areas. *See* Appendix A at 5 (Pls.' Ex. 69, fig. 26). That greatly reduced HD 77's compactness, Dkt. No. 108 at 140 (citing

---

[11] In fact, Delegate Spruill praised Delegate Jones' plan because it achieved a 55% BVAP in all twelve majority-minority districts. Pls.' Ex. 35 at 148:4-7 ("What other plan, what other group has come to the black Caucus and [said], 'Hey, we have a plan to increase the black minority votes. We have a plan to make sure that you're safe.'").

Pls.' Ex. 51 at 11, tbl. 1), and split the heavily black precincts of John F. Kennedy and Lakeside, fracturing several black neighborhoods and carving the high-BVAP portions of the precincts (69.9% and 79.4%, respectively) into HD 77; Pls.' Ex. 71, tbl. 5; Pls.' Ex. 63 at 133-34.

**(ii)    HD 80**

Because HD 80 was subject to the 55% BVAP rule, its existing BVAP of 54.4% (Pls.' Ex. 71, tbl. 22) was unacceptable, even though HD 80 had been represented by African Americans' candidates of choice for "as long as [Delegate Jones] could remember." Tr. 460:9-18. Accordingly, the BVAP of HD 80 was increased to 56.3%. Pls.' Ex. 71, tbl. 22.

This was no easy task. As the Court has previously determined, the district is "quite unusually configured," "makes little rational sense as a geographical unit," and suffered from a substantial drop in compactness in the Enacted Plan, resulting in the highest Schwartzberg score of all the Challenged Districts. Dkt. No. 108 at 144. Indeed, a glance at HD 80 before and after redistricting reveals its blatant deviations from neutral principles. *See* Appendix B, tbl. 2.

The Enacted Plan increased county and city splits in HD 80 and replaced over 40% of its core. Dkt. No. 108 at 143. Further, HD 80 "is split by water <u>twice</u> without any apparent crossing." *Id*. at 144. Race explains these deviations. To achieve 55% BVAP, Delegate Jones tacked on a western appendage that "winds its way around low BVAP precincts like Silverwood (14.9%), Churchland (8.3%), and Fellowship (14.2%) to capture high BVAP precincts such as Yeates (56.3%) and Taylor Road (48.8%)." *Id.* (quoting Pls.' Post-Trial Br. at 19).

The Court found it "just as likely that [VTDs] were selected for being highly Democratic and avoided for being highly Republican." *Id.* at 147. Plaintiffs will show, however, that race was a stronger predictor than partisan composition in explaining which VTDs were placed into the Challenged Districts, including HD 80. *See* Pls.' Ex. 50 ¶¶ 110-14; Pls.' Ex. 71 ¶¶ 117-25. While the BVAP in HD 80 was increased, its Democratic vote share *was decreased*. Pls.' Ex. 71, tbl. 22. Further, the likelihood that a VTD was included in HD 80 was strongly and positively correlated with BVAP, but the correlation with Democratic vote share was negative and not

- 21 -

statistically significant. *Id.* ¶ 120. While only 11.5% of HD 80's black voters were moved out, 17.2% of its Democratic voters was moved out, *id.* ¶ 105, undermining any claim that VTDs were selected for being highly Democratic rather than heavily black.

### (iii)  HD 89

HD 89's BVAP was increased from 52.5% to 55.5% to meet the 55% threshold. Pls.' Ex. 71, tbl. 22. According to Delegate Jones, incumbent Delegate Alexander advocated for applying the 55% threshold. Tr. 490:14-491:11. Achieving that goal had a drastic impact on HD 89 and many of the resulting changes conflicted with neutral districting criteria. *See* Appendix B, tbl. 3.

HD 89's compactness scores plummeted by over 30% as a result of several sprawling appendages and a new river crossing created to pick up one lone predominantly black population of voters across the Elizabeth River. *See* Appendix B, tbl.3; Tr. 144:22-145:1. The river crossing also fractured communities of interest in Norfolk by separating Berkley from neighboring VTDs on the western side of the Elizabeth River, which are in HD 80. Pls.' Ex. 64 at 17-18.

During the first trial, Delegate Jones tried to explain away these deviations by casting them as the mere fulfillment of incumbent requests. The majority credited these post-hoc justifications. But the record reveals Delegate Jones' explanations as mistaken at best. Most notably, he claims the Granby VTD was split to add the "pipe," Dkt. No. 108 at 148, in the northern part of HD 89 to fulfill Delegate Alexander's request to place a funeral home within HD 89. Tr. 344:23-345:9. But there is no such funeral home located in that "pipe," Pls.' Ex. 69 at 57-58, as even Delegate Jones will admit. Indeed, John Morgan, who was responsible for actually drawing the convoluted line that split the Granby VTD, will testify that population equality was the *only* reason for the pipe and that he knew nothing about any funeral home. The suggestion that this split, which separates black from white voters with startling precision, *see* Appendix A at 6 (Pls.' Ex. 69, fig. 20), was drawn for population equality alone, strains credulity.

In addition, the district leaps across water to draw in the Berkley VTD, which has a 95% BVAP; of 2,361 eligible voters, just 63 are white. Pls.' Ex. 63 at 121-22. While the Court

- 22 -

previously posited that the Berkley VTD may have been added to the district because it "is also relatively close to Delegate Alexander's residence," Dkt. No. 108 at 148, the evidence will show that Delegate Alexander does not live near the Berkley VTD at all but, rather, in the "mainland" part of HD 89, on the *opposite side* of the river from the Berkley VTD. *See* DI Ex. 94 at 11. HD 89, it is clear, was designed predominantly on account of race.

### (iv)    HD 90

HD 90 was drawn with a BVAP of 56.6%, thus meeting the preordained BVAP floor. Pls.' Ex. 71, tbl. 22. The evidence will show that HD 90 was used as a "donor" district to increase the BVAP of surrounding Challenged Districts—specifically, neighboring HD 89. Indeed, without the BVAP donation from HD 90, HD 89 would not have met the 55% target. This is just the sort of holistic analysis demanded by the Supreme Court and given insufficient weight in this Court's prior analysis. *Bethune-Hill*, 137 S. Ct. at 799.

HD 90 was underpopulated by 9,000 people, and the sweeping alterations made to the district exhibit a now familiar racial pattern. The BVAP of the areas moved out of HD 90 and into other Challenged Districts was over 15 percentage points higher than the BVAP of areas moved out of HD 90 into other districts. Pls.' Ex. 50, tbl. 9. This siphoning off of black voters into other Challenged Districts is particularly stark with respect to HD 89. For example, with a BVAP of 92%, the Union Chapel VTD was moved from HD 90 to HD 89, adding 1,510 African Americans (and 62 Whites) to HD 89. Pls.' Ex. 63 at 121-22. The predominantly black Brambleton VTD (95.7% BVAP), moreover, was split between HD 89 and 90 in order to increase District 89's BVAP above the 55% BVAP threshold. *Id.*

The pattern of split VTDs tells the same tale. Aragona, Shell, and Reon VTDs (in Virginia Beach) are all split with non-challenged districts. Pls.' Ex. 71 ¶ 48. In each case, the portion of the VTD assigned to HD 90 has a higher BVAP than the portion assigned to a non-challenged district. *Id*; *see also* Appendix A at 7-8 (Pls.' Ex. 69, figs. 22-23). In the Aragona VTD split, HD 90 gets 25% of the population, but 50% of the BVAP. Appendix A at 9 (Pls. Ex.

- 23 -

71, fig. 5); Pls.' Ex. 71 ¶ 48. Similarly, whereas the portion of the Shell VTD assigned to HD 90 is 61.6% BVAP, that assigned to HD 85 is only 19% BVAP. *See* Pls.' Ex. 71, tbl. 5.

(v)  <b>HD 92 and 95</b>

Although black voters in both HD 92 and 95 had easily elected their preferred candidates for years, *see* Pls.' Ex. 50, tbl. 14, Delegate Jones insisted on maintaining high BVAP percentages in these districts. When asked why majority-white districts in the area experienced a "decrease among blacks," Delegate Jones' answer was simple: "So what had to happen, the population had to be picked up, *had to try to maintain the voting strength, for the black voting percentage*." Pls.' Ex. 35 at 153:4-7 (emphasis added). In other words, the BVAP of surrounding majority-white districts was drained to "maintain" the BVAP of HD 92 and 95.

This was no simple task. Both districts were severely underpopulated, short by almost 9,000 (HD 92) and more than 12,000 (HD 95) people, respectively. The Peninsula's geography made it hard to meet the 55% BVAP goal. HD 92 could not expand to the north, which had substantially lower BVAP. *See, e.g.*, Pls.' Ex. 69 at 49, fig. 15. So it moved west, absorbing heavily black portions of HD 95. As a result, HD 95 needed to be extended to the northwest.

The boundaries of HD 92 divide high-BVAP areas from lower-BVAP areas to the north and southeast. *See* Pls.' Ex. 69, fig. 15. And there is clear statistical evidence of racial sorting. The BVAP of areas moved *into* HD 92 was 47.3%; the BVAP of areas moved *out* was 36.8%. Pls.' Ex. 50, tbl. 8. While HD 92 may not appear to be as offensive to the eye as other Challenged Districts, this race-based shuffling of voters had significant effects on HD 95.

HD 95 went from a fairly compact district in the Benchmark Plan to the least compact district in the Enacted Plan, with a Reock score of 0.14. Pls.' Ex. 50 ¶¶ 48-49; *see also* Appendix B, tbl. 4. Redistricting increased HD 95's VTD splits from one to six. Dkt. No. 108 at 152 (citing Pls.' Ex. 50 at 69-70, tbls. 1, 2). HD 95's shape is bizarre, as it "encompass[es] the full width of Newport News but soon departs from any observable neutral criteria." *Id.* Indeed, Intervenors essentially conceded that HD 95 was not drawn in accordance with neutral criteria. *Id.* at 153.

- 24 -

The record shows, for example, that Newport News was divided along racial lines, with HD 95 inheriting the city's high BVAP areas while largely white areas went to HD 93 and 94. *See* Pls.' Ex. 69, fig. 16 (showing differences in racial densities of areas included in HD 95 and surrounding districts). By comparison, the partisan differences between Newport News precincts that were included in HD 95 and those included in neighboring non-challenged districts were not nearly as stark. *See* Pls.' Ex. 51 ¶ 89, tbl. 4 (BVAP differential is 55 percentage points, while partisan differential is 35 percentage points); *see also* Pls.' Ex. 71 ¶¶ 107-125.

As it meanders up the Peninsula, HD 95 traces a narrow corridor through white areas to reach a corridor of black voters between Highway 69 and Warwick Boulevard. Black and white voters were separated with precision. HD 95 pulls in nearly every sizeable pocket of black voters on the Peninsula. And because the General Assembly could not easily achieve its racial goals while adhering to the goal of maintaining political subdivision boundaries, it cast that competing goal aside. HD 95 splits the Reservoir, Epes, Denbigh, Jenkins, Palmer, and Deer Park VTDs—and includes only the heavily black portions of those split VTDs. *See* Pls.' Ex. 71, tbl. 6; *see also id.*, fig. 7; Appendix A at 10 (Pls.' Ex. 69, fig. 16).

Consultant John Morgan claims that he split these VTDs to improve the political performance of surrounding (Republican-controlled) districts. But HD 95 was constructed using split VTDs, and political data is not available below the VTD level. A mapdrawer seeking to achieve political ends using VTD splits can only do so using race as a proxy for politics. In other words, the mapdrawer must draw the border based on race, while presuming that the specific population included and excluded will vote just like the "average" black or white voter in the VTD. Such a use of race as a proxy for politics triggers strict scrutiny.[12] Thus, even if the mapdrawers drew HD 95 with political ends, they necessarily used racial means to do so.[13]

---

[12] *See, e.g., Bush*, 517 U.S. at 970-71 ("[T]he fact that District 30 . . . splits voter tabulation districts . . . suggests that racial criteria predominated over other districting criteria in determining the district's boundaries."); *see also Cooper*, 137 S. Ct. at 1473 n.7 ("[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.").

[13] Intervenors apparently intend to offer various alternative configurations of this district to show that it could have been drawn to achieve 55% BVAP in alternative ways (in a misguided effort to show that the 55% BVAP rule did not *require* that these VTDs be split precisely in this manner). The argument is entirely misplaced. The *actual*

- 25 -

## C.     The Challenged Districts Are Not Narrowly Tailored

Finally, the evidence will show that the predominant use of race in crafting the Challenged Districts was not narrowly tailored to advance a compelling state interest.

### 1.     Legal Standard

Once a plaintiff establishes racial predominance, "the burden shifts to the State to 'demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.'" *Bethune-Hill*, 137 S. Ct. at 800-01 (quoting *Miller*, 515 U.S. at 920). The Supreme Court "assumes, without deciding, that the State's interest in complying with the [VRA is] compelling." *Id.* at 801. To satisfy strict scrutiny, a State must establish "a strong basis in evidence in support of the (race-based) choice that it has made." *Alabama*, 135 S. Ct. at 1274 (quotation marks omitted). A "strong basis in evidence exists when the legislature has "good reasons to believe" it must use race in order to satisfy the VRA, 'even if a court does not find that the actions were necessary for statutory compliance.'" *Bethune-Hill*, 137 S. Ct. at 801 (quoting *Alabama*, 135 S. Ct. at 1274). While a State thus is given some latitude in complying with the VRA, it must conduct a "meaningful legislative inquiry" to determine whether redrawing a given district "without a focus on race but however else the State would choose, could lead to [VRA] liability." *Cooper*, 137 S. Ct. at 1470-71 (analyzing Section 2 defense).

Here, Intervenors have claimed a compelling interest in complying with Section 5 of the VRA. *See* Dkt. No. 108 at 89.[14] At the time of redistricting, Section 5 "barred Virginia from adopting any districting change that would 'have the effect of diminishing the ability of [members of a minority group] to elect their preferred candidates of choice.'" *Bethune-Hill*, 137 S. Ct. at 801 (quoting 52 U.S.C. § 10304(b)). Determining what minority population percentage

---

adopted map evidences stark racial sorting by splitting VTDs with surgical precision to separate white voters from black voters. That the General Assembly could have—but did not—configure the district in other ways using race to achieve 55% BVAP is interesting but irrelevant. It is the *racial sorting* that offends the Fourteenth Amendment.

[14] Intervenors also argue that Section 2 of the VRA justifies the Challenged Districts, but that argument fails for two reasons. First, it is a post hoc excuse. *See Shaw II*, 517 U.S. at 908 n.4 ("To be a compelling interest, the state must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification[.]") (citation omitted). Second, Virginia has no interest "in avoiding meritless [Section 2] lawsuits," *id.*, and it did not perform the analysis required to establish a potential Section 2 claim, *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 653 (1993). Finally, the use of race was not narrowly tailored to Section 2 for the same reasons it was not as to Section 5.

136908408.5

will satisfy that standard requires a "functional analysis of the electoral behavior within the particular . . . election district." Pls.' Ex. 9 at 3. This standard is not met by mechanically maintaining BVAP percentages at or above the benchmark districts. *Compare Bethune-Hill*, 137 S. Ct. at 802 (citing *Alabama*, 135 S. Ct. at 1273), *with* Pls.' Ex. 35 at 56-57 (describing Delegate Jones' effort "to restore" the Challenged Districts to the BVAP "levels that were existing after House Bill 1 one passed in 2001"). Thus, while a state *might* be able to justify use of a BVAP target, it can do so only if it conducts a district-specific functional analysis that provides a strong basis in evidence for use of such a target. *Id.* at 801 (discussing HD 75-specific analysis).

### 2. Virginia Did Not Have a Strong Basis in Evidence For Applying the 55% BVAP Floor to 11 Districts Based on HD 75-Specific Considerations

The evidence will show that the General Assembly generated the 55% BVAP rule based largely on considerations specific to HD 75 and then subjected all the Challenged Districts to the same predetermined 55% BVAP threshold with no effort to determine whether that threshold was actually necessary to avoid retrogression in any of the Challenged Districts.

As set out above, the 55% BVAP rule was "'based largely on concerns pertaining to the re-election of Delegate Tyler in [HD] 75.'" *Bethune-Hill*, 137 S. Ct. at 796 (quoting Dkt. No. 108 at 29-30); *see also* Dkt. No. 108 at 121. It is law of the case that the 55% BVAP rule was devised based on HD 75-specific considerations and "'applied across the board to all twelve' districts." *Bethune-Hill*, 137 S. Ct. at 796 (quoting Dkt. No. 108 at 30).

These factual determinations are fatal on remand. A racial target designed to avoid retrogression based on concerns specific to one district including, for example, that district's large prison population, is not "narrowly tailored" to avoid retrogression in eleven other, very different, districts. Indeed, the use of that racial target is not "tailored" to those districts at all. On this basis alone, Intervenors will be unable to meet their burden of establishing that the predominant use of race as to the eleven remaining Challenged Districts was narrowly tailored.

Even if Intervenors could contest the law of the case that the 55% BVAP floor developed for HD 75 was applied across the board to all the Challenged Districts, they would be unable to

- 27 -

meet their burden on narrow tailoring. Virginia did not have a "strong basis in evidence" to believe that *all* Challenged Districts needed to meet or exceed the same BVAP target. In fact, Delegate Jones performed *virtually no analysis* on that score. For example, he:

- Did not compile election results from the Challenged Districts, Tr. 453:19-22;

- Did not analyze African-American registration rates in the Challenged Districts, *see id*. 463:22-464:6;

- Did not analyze African-American turnout rates in the Challenged Districts (with the exception of "two or three" districts), *id*. 467:16-19;

- Did not review the majority-minority Senate districts, all of which had less than 55% BVAP, *see id*. 468:10-21;

- Did not analyze "voter behavior and BVAP in prior Virginia Congressional districts," *id*. 468:22-25;

- Did not review redistricting plans from other jurisdictions that had been precleared by the Department of Justice, *see id*. 469:1-4;

- Did not review redistricting plans from other jurisdictions that had been rejected by the Department of Justice, *see id*. 469:10-12; and

- Did not perform a racially polarized voting analysis to determine whether white and black voters tended to vote cohesively in the Challenged Districts as a whole or within individual Challenged Districts, *see id*. 469:16-21.

Delegate Jones has already testified and did not claim to have conducted a district-specific "functional analysis" as to any other district other than HD 75. The Court should view with great skepticism any "new" evidence Intervenors proffer for the first time after one trial is in the books to attempt to justify the application of the 55% BVAP rule to the other Challenged Districts— and it is doubtful whether they would even attempt the task. The question is not what evidence Intervenors can gin up at the last minute. It is whether, *at the time of the 2011 redistricting*, the General Assembly had a strong basis in evidence that use of an across-the-board 55% BVAP rule to all Challenged Districts was necessary to avoid liability under the VRA.

### 3. Racial Polarized Voting Analyses Confirm that the 55% BVAP Rule Was Not Necessary to Enable African Americans to Elect Candidates of Choice

The evidence will show that there was no VRA justification for an across-the-board 55% BVAP rule. In the first trial, Plaintiffs offered Dr. Ansolabehere's analysis of racial voting

- 28 -

patterns in the Challenged Districts of the type Delegate Jones eschewed. This analysis demonstrated that (1) racial voting patterns vary dramatically across the Challenged Districts, thereby undermining the mapdrawers' one-size-fits-all approach, *see* Pls.' Ex. 50 at 47-51, and (2) "none" of the Challenged Districts "required a BVAP in excess of 55 percent in order to ensure that African Americans had the ability to elect their preferred candidates," *id*. at 53-54.

Dr. Palmer will elaborate on Dr. Ansolabehere's analysis. Dr. Palmer will testify that a 55% BVAP rule was not necessary: Each district "would have continued electing the African-American candidates of choice by significant margins if BVAP were reduced to lower levels." Pls.' Ex. 71 at 3. Dr. Palmer's analysis will demonstrate that had Delegate Jones bothered to conduct an analysis of districts other than HD 75, he would have learned that black-preferred "candidates were winning by large margins in all of the challenged districts *except* District 75" prior to the 2011 redistricting. Pls.' Ex. 71 ¶ 138. Indeed, even "[i]f all of the population needed in each underpopulated district were made up with White voters who unanimously voted against the African-American preferred candidates, the African-American preferred candidates would still win by large margins in every district except District 75." *Id.*

Intervenors' experts will not dispute these core conclusions. Indeed, while their experts attempt to introduce uncertainty around the margins, Dr. Katz, for one, will concede that there were significant differences in racial voting patterns between each of the Challenged Districts, and his analysis, in fact, largely serves to confirm Dr. Palmer's (and Dr. Ansolabehere's) conclusions. While Dr. Palmer provides a racial polarized voting analysis of each Challenged District, Dr. Katz examines just four districts using statewide elections—and finds no evidence of racial polarization in those four districts. *See* DI Ex. 101, tbls. 1-2. Indeed, Dr. Palmer's analysis reveals that in three of those four districts white voters consistently prefer the black-preferred candidate by significant margins. Pls.' Ex. 72 ¶ 32.

Dr. Hood, meanwhile, purports to provide his own racial polarized voting analysis that, remarkably, examines the same three elections and the same four districts as Dr. Katz's report. But Dr. Hood's attempts to counter Dr. Palmer's testimony will prove so slapdash as to be

- 29 -

entitled to no weight whatsoever. Indeed, Dr. Hood fails to present any measures of statistical uncertainty alongside his analysis—a failure that renders his analysis entirely unreliable.[15]

Bereft of any evidence that Delegate Jones conducted a "meaningful legislative inquiry," *Cooper*, 137 S. Ct. at 1471, into whether any Challenged District required 55% BVAP, and having failed to present any such evidence (other than with regard to HD 75), Intervenors strain to backfill the hole in their case. To that end, Intervenors will rely heavily on a report by Dr. James Loewen prepared in state court litigation 16 years ago (the "Loewen Report"). But the Loewen Report cannot come close to bearing the weight Intervenors will place on it.

**First**, Delegate Jones will admit that he did not review the Loewen Report before or during the 2011 redistricting process. **Second**, the version of the Loewen Report Intervenors have identified as an exhibit is not the final version of the document. **Third**, Dr. Loewen's analysis is based on ecological regression; Intervenors cannot have it both ways, attacking Dr. Ansolabehere for using ecological regression and then relying upon Dr. Loewen's (antiquated) ecological regression analysis as a post-hoc justification of the 55% BVAP rule. **Fourth**, the Loewen Report is 16 years old and analyzed data from the 1990s. Dr. Loewen *himself* has opined that his report could not be used to draw reliable conclusions about voting behavior in Virginia a decade later. It is thus no surprise that Intervenors did not identify Dr. Loewen as an expert witness and will not present his live testimony at trial. Simply put, if the General Assembly had conducted a meaningful legislative inquiry justifying the 55% BVAP rule, then Intervenors would not be relying so heavily on the antiquated Loewen Report.

### III. CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court invalidate the Challenged Districts and ensure that constitutional districts are adopted for House elections.

---

[15] This is not the first time Dr. Hood has offered unreliable or irrelevant testimony. *See Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *24 (S.D. Ohio June 7, 2016), *aff'd in part*, 837 F.3d 612 (6th Cir. 2016) ("Dr. Hood's testimony and report were in large part irrelevant to the issues before the Court and also reflected methodological errors that undermine his conclusions. Other courts have found likewise."); *id.* *24 n.11 (citing cases).

Dated: September 26, 2017

By: */s/ Aria Branch*
_____

Marc Erik Elias (*pro hac vice*)
Bruce V. Spiva (*pro hac vice*)
Aria Branch (VSB No. 83682)
**PERKINS COIE** LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6338
Facsimile: 202.654.9106
Email: ABranch@perkinscoie.com
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com


Kevin J. Hamilton (*pro hac vice*)
Abha Khanna (*pro hac vice*)
Ryan Spear (*pro hac vice*)
William B. Stafford (*pro hac vice*)
**PERKINS COIE** LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
Email: KHamilton@perkinscoie.com
Email: AKhanna@perkinscoie.com
Email: BStafford@perkinscoie.com
Email: RSpear@perkinscoie.com


*Attorneys for Plaintiffs*

136908408.5

## <u>CERTIFICATE OF SERVICE</u>

On September 26, 2017, I caused to be served upon counsel of record, at the address stated below, via the method of service indicated, a true and correct copy of the above Plaintiffs' Trial Brief.

VIA ELECTRONIC MAIL

Katherine L. McKnight (VSB No. 81482)
E. Mark Braden (*pro hac vice*)
Richard B. Raile (VSB No. 84340)
Baker & Hostetler LLP
1050 Connecticut Avenue NW, Ste. 1100
Washington, DC 20036
Phone: 202.861.1500
Fax: 202.861.1783
Email: kmcknight@bakerlaw.com
Email: mbraden@bakerlaw.com
Email: rraile@bakerlaw.com

Of counsel:
Dale Oldham, Esq. (*pro hac vice*)
1119 Susan Street
Columbia, SC 29210
Phone: 803.772.7729
Email: dloesq@aol.com

*Attorneys for Intervenors*

Matthew R. McGuire (VSB No. 84194)
Trevor S. Cox (VSB No. 78396)
Office of the Attorney General
202 North 9th Street
Richmond, VA 23219
Phone: 804.786.7773
Fax: 804.371.0200
Email: mmcguire@oag.state.va.us
Email: tcox@oag.state.va.us

*Attorneys for Defendants*

- 32 -

136908408.5