# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

|  |  |
|---|---|
| GOLDEN BETHUNE-HILL, et al.,<br><br>              Plaintiffs,<br><br>     v.<br><br>VIRGINIA STATE BOARD OF ELECTIONS,<br>et al.,<br><br>              Defendants. | Civil Action No. 3:14-cv-00852-REP-GBL-BMK |

**PLAINTIFFS' RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES TO PLAINTIFFS, DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS, AND DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS TO PLAINTIFFS**

1

**INTERROGATORY NO. 4**:

What percentage of the voting age population of a district must identify themselves as minorities for the district to be defined as a "majority/ minority district"?

**SUPPLEMENTAL RESPONSE**:  By definition and as a matter of law, the majority of the voting age population in a "majority-minority district" must consist of racial minorities. *Bartlett v. Strickland*, 556 U.S. 1, 19-20 (2009).

**INTERROGATORY NO. 5:**

Do you contend a legislature can ensure that a "majority/ minority district" does not

retrogress as is required under the VRA without considering the minority voting age population

of that district? If so, please explain how?

**SUPPLEMENTAL RESPONSE:**  The U.S. Department of Justice regulations regarding

compliance with the Voting Rights Act provide that in order to obtain preclearance, a jurisdiction

must show that a proposed redistricting plan would not have a retrogressive effect.  28 C.F.R. §

8

51.54(b).

LEGAL125405047.1

**REQUEST FOR ADMISSION NO. 13:**  Admit that Former Delegate and now Senator Dance expressed in the public hearings on redistricting that she believed that 55% African American voting age population was necessary to ensure the minority population could elect the candidate of its choice.

**SUPPLEMENTAL RESPONSE:**  Admit.

32

**REQUEST FOR ADMISSION NO. 14:**  Admit that Delegate Tyler expressed in the public hearings on redistricting that she believed that 55% African American voting age population was necessary to ensure the minority population could elect the candidate of its choice.

**SUPPLEMENTAL RESPONSE:**  Admit that Delegate Tyler made statements about the 55% African American voting age threshold in the public hearings on redistricting.  The public record speaks for itself.

**REQUEST FOR ADMISSION NO. 15:**  Admit that Mayor Brian Moore of Petersburg expressed in the public hearings on redistricting that he believed that 55% African American voting age population was necessary to ensure the minority population could elect the candidate of its choice.

**SUPPLEMENTAL RESPONSE:**  Admit that Mayor Moore made statements about the 55% African American voting age threshold in the public hearings on redistricting.  The public record speaks for itself.

Dated:  March 20, 2015

By: */s/ John K. Roche*
John K. Roche (VSB# 68594)
Marc Erik Elias (admitted *pro hac vice*)
Elisabeth C. Frost (admitted *pro hac vice*)
**PERKINS COIE** LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone: 202.654.6200
Facsimile: 202.654-6211


Kevin J. Hamilton (admitted *pro hac vice*)
Abha Khanna (admitted *pro hac vice*)
**PERKINS COIE** LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000


Attorneys for Plaintiffs

36

## CERTIFICATE OF SERVICE

On March 20, 2015, I caused to be served upon counsel of record, at the address stated below, via the method of service indicated, a true and correct copy of Plaintiffs' Responses and Objections to Defendants' First Set of Interrogatories to Plaintiffs, Defendants' First Request for the Production of Documents to Plaintiffs, and Defendants' First Set of Requests for Admissions to Plaintiffs.

VIA ELECTRONIC MAIL

Jennifer Marie Walrath
Katherine Lea McKnight
Baker & Hostetler LLP (DC)
1050 Connecticut Ave NW
Suite 1100
Washington, DC 20036
202-861-1702
Fax: 202-861-1783
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com

Efrem Mark Braden
Baker & Hostetler LLP (DC-NA)
Washington Square
Suite 1100
Washington, DC 20036
202-861-1504
Fax: 202-861-1783
mbraden@bakerlaw.com

Of counsel:
Dale Oldham, Esq.
1119 Susan St.
Columbia, SC 29210
Telephone: 803-772-7729
dloesq@aol.com

*Attorneys for Intervenor-Defendants*

Jeffrey P. Brundage
Daniel Ari Glass
Kathleen Angell Gallagher
Eckert Seamans Cherin & Mellott LLC
1717 Pennsylvania Ave NW
Suite 1200
Washington, D.C. 20006
(202) 659-6600
Fax:  (202) 659-6699
jbrundage@eckertseamans.com
dglass@eckertseamans.com
kgallagher@eckertseamans.com

Anthony F. Troy
Eckert Seamans Cherin & Mellott LLC
707 East Main Street
Suite 1450
Richmond, Virginia  23219
(804) 788-7751
Fax:  (804) 698-2950
ttroy@eckertseamans.com

*Attorneys for Defendants*

**I certify under penalty of perjury that the foregoing is true and correct.**

DATED this 20th day of March, 2015.

*/s/ John K. Roche* _____

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(RICHMOND DIVISION)

| | |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |
| VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, | |
| Defendants. | |

## DEFENDANT-INTERVENORS' RESPONSES TO PLAINTIFFS' REQUESTS FOR ADMISSION TO INTERVENOR-DEFENDANTS

Defendant-Intervenors the Virginia House of Delegates and Virginia House of Delegates Speaker William J. Howell ("Defendant-Intervenors"), through their counsel, and pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Local Civil Rule 26(C) of the United States District Court Eastern District of Virginia, and the Memorandum Order entered on July 13, 2017 (the "Order"), hereby state the following responses to Plaintiffs' Requests for Admission to Intervenor-Defendants (the "Requests for Admission").

## RESPONSES

Intervenor-Defendants respond to the Requests for Admission as follows:

**Request for Admission No. 1:** Admit that you utilized a 55% Black Voting Age Population threshold in drawing all or some of the Challenged Districts in the 2011 Virginia House of Delegates Plan.

**Response:** Denied.

**Request for Admission No. 2:**  Admit that you utilized a 55% Black Voting Age Population threshold in drawing all or some of the Challenged Districts in the 2011 Virginia House of Delegates Plan in an effort to comply with the Voting Rights Act.

    **Response:**  Denied.


**Request for Admission No. 3:**  Admit that you utilized a 55% Black Voting Age Population threshold in drawing all or some of the Challenged Districts in the 2011 Virginia House of Delegates Plan in the belief that any lower threshold (and/or Black Voting Age Population) might not have obtained preclearance from the Department of Justice.

    **Response:**  Denied.


Dated: July 26, 2017             Respectfully submitted,

                           VIRGINIA HOUSE OF DELEGATES
                           AND VIRGINIA HOUSE OF DELEGATES
                           SPEAKER WILLIAM J. HOWELL

                           By Counsel

                           */s/ Katherine L. McKnight*
                           Katherine L. McKnight (VSB No. 81482)
                           E. Mark Braden (*pro hac vice*)
                           Richard R. Raile (VSB No. 84340)
                           BAKER & HOSTETLER LLP
                           1050 Connecticut Avenue, NW Suite 1100
                           Washington, DC  20036
                           Telephone:   202.861.1500
                           Facsimile:    202.861.1783
                           kmcknight@bakerlaw.com
                           mbraden@bakerlaw.com
                           rraile@bakerlaw.com

                           Of counsel:

                           Dalton Oldham, Esq.
                           1119 Susan St.
                           Columbia, SC  29210
                           Telephone:  803-772-7729
                           dloesq@aol.com

                           *Attorneys for the Virginia House of Delegates and*
                           *Virginia House of Delegates Speaker William J. Howell*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(RICHMOND DIVISION)

GOLDEN BETHUNE-HILL, *et al.*,

        Plaintiffs,

    v.

VIRGINIA STATE BOARD OF
ELECTIONS, *et al.*,

        Defendants.

Civil Action No. 3:14-cv-00852-REP-AWA-BMK

## OBJECTIONS AND ANSWERS OF DEFENDANT-INTERVENORS TO PLAINTIFFS' INTERROGATORIES TO INTERVENOR-DEFENDANTS

Defendant-Intervenors the Virginia House of Delegates and Virginia House of Delegates Speaker William J. Howell ("Defendant-Intervenors"), through their counsel, and pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Local Civil Rule 26(C) of the United States District Court Eastern District of Virginia, and the Memorandum Order entered on July 13, 2017 (the "Order"), hereby state the following objections and answers to Plaintiffs' Interrogatories to Intervenor-Defendants (the "Interrogatories").

Defendant-Intervenors object to the number of interrogatories, including all discrete subparts, propounded by Plaintiffs as exceeding the number allowable under Federal Rule of Civil Procedure 33(a)(1) and the Discovery Order paragraph 5(c).

**Interrogatory No. 3:**  Identify the "potential primary opponent" discussed in the trial testimony of Delegate Chris Jones, *see* Trial Tr. at 326:11-12, and in the district court's October 22, 2015 opinion, *see Bethune-Hill v. Va. St. Bd. of Elections*, 141 F. Supp. 3d 505, 554 (E.D. Va. 2015).

      **Objections:** This interrogatory seeks information about testimony provided to the court

by a witness, Delegate Chris Jones, whose deposition has already been noticed in this phase of

the litigation.  Plaintiffs have the opportunity to seek this information directly from Delegate Jones.

        **Answer:** Defendant-Intervenors do not know the name of the "potential primary opponent" referenced in this interrogatory.

Dated: July 26, 2017

Respectfully submitted,

VIRGINIA HOUSE OF DELEGATES
AND VIRGINIA HOUSE OF DELEGATES
SPEAKER WILLIAM J. HOWELL

By Counsel

*/s/ Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
E. Mark Braden (*pro hac vice*)
Richard R. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC  20036
Telephone:   202.861.1500
Facsimile:    202.861.1783
kmcknight@bakerlaw.com
mbraden@bakerlaw.com
rraile@bakerlaw.com

Of counsel:

Dalton Oldham, Esq.
1119 Susan St.
Columbia, SC  29210
Telephone:  803-772-7729
dloesq@aol.com

*Attorneys for the Virginia House of Delegates and*
*Virginia House of Delegates Speaker William J. Howell*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(RICHMOND DIVISION)

GOLDEN BETHUNE-HILL, *et al.*,

   Plaintiffs,

  v.

VIRGINIA STATE BOARD OF
ELECTIONS, *et al.*,

   Defendants.

Civil Action No. 3:14-cv-00852-REP-AWA-BMK

## DEFENDANT-INTERVENORS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO INTERVENOR-DEFENDANTS

Defendant-Intervenors the Virginia House of Delegates and Virginia House of Delegates Speaker William J. Howell ("Defendant-Intervenors"), through their counsel, and pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Local Civil Rule 26(C) of the United States District Court Eastern District of Virginia, and the Memorandum Order entered on July 13, 2017 (the "Order"), hereby state the following objections and responses to Plaintiffs' First Requests for Production of Documents to Intervenor-Defendants (the "Requests").

Where noted these Objections and Responses incorporate by reference those objections and responses served by Defendant-Intervenors in response to discovery issued during the first phase of this litigation. During that phase, Defendant-Intervenors developed agreed search terms and parameters with Plaintiffs and applied those terms and parameters to working files located on the House of Delegates' document management system, as well as to House of Delegates e-mail accounts for delegates including all delegates identified as potential witnesses in the parties' witness lists. *See*, Dkt. Nos. 163, 165, and 166. Defendant-Intervenors reviewed all responsive

documents for privilege and duplication, logged privileged documents, removed any duplicate documents, and produced the remainder with all related metadata as the documents had been kept in the usual course of business.  In all, Defendant-Intervenors, made thirteen (13) productions comprised of over 18,400 pages.

## OBJECTIONS & RESPONSES

**REQUEST FOR PRODUCTION NO. 3:** For all statewide and state legislative elections held from 2008 to 2013, produce election vote counts at the level of Virginia's 2010 Census Voting Tabulation Districts (not precincts).

**Objections:** This request seeks information not maintained by the Virginia House of Delegates.  This request also is unduly burdensome. It seeks documents dated after the filing of the Complaint on December 22, 2014, and documents dated prior to when the Virginia General Assembly received census data from the U.S. Census Bureau on or about February 3, 2011.

**Response:** Subject to and notwithstanding the foregoing objections, to the extent that this information was used by expert witnesses to prepare their reports during the initial phase of this litigation that information was disclosed at the time as required by Rule 26(a)(2)(B).  To the extent that this information will be used by expert witnesses during this phase of the litigation, this request is duplicative of Defendant-Intervenors' obligations under Rule 26(a)(2)(B), and Defendant-Intervenors will respond to this request at a time in accordance with the Order.

Dated: July 26, 2017

Respectfully submitted,

VIRGINIA HOUSE OF DELEGATES
AND VIRGINIA HOUSE OF DELEGATES
SPEAKER WILLIAM J. HOWELL

By Counsel

*/s/ Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
E. Mark Braden (*pro hac vice*)
Richard R. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC  20036
Telephone:   202.861.1500
Facsimile:     202.861.1783
kmcknight@bakerlaw.com
mbraden@bakerlaw.com
rraile@bakerlaw.com

Of counsel:

Dalton Oldham, Esq.
1119 Susan St.
Columbia, SC  29210
Telephone:  803-772-7729
dloesq@aol.com

*Attorneys for the Virginia House of Delegates and*
*Virginia House of Delegates Speaker William J. Howell*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| GOLDEN BETHUNE-HILL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VIRGINIA STATE BOARD OF | ) | Civil Action No. 3:14-cv-00852-REP-AWA- |
| ELECTIONS, et al., | ) | BMK |
| | ) | |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| WILLIAM J. HOWELL, SPEAKER OF | ) | |
| THE HOUSE OF DELEGATES, and THE | ) | |
| HOUSE OF DELEGATES, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**DEFENDANTS' OBJECTIONS TO PLAINTIFFS'
JULY 19, 2017 REQUESTS FOR PRODUCTION OF DOCUMENTS**

Defendants, by counsel, hereby serve their objections to Plaintiffs' July 19, 2017 Request

for Production of Documents and state as follows:

**GENERAL OBJECTIONS**

(a)      Defendants hereby reserve any objections Defendants may have to the admission

in evidence of the information provided herein on the grounds of materiality, relevancy, or other

proper grounds for objection.

(b)      The information provided herein is not based solely on the knowledge of

Defendants, but includes knowledge of Defendants' agents, representatives, and attorneys, unless

privileged.

1

(c)     The word usage and sentence structure of the answers may be that of the attorney assisting Defendants and thus does not necessarily purport to be the precise language of Defendants.

(d)     Wherever an objection appears below, unless otherwise noted, it is based on the Response being duplicative, unduly burdensome and broad, immaterial, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence, privileged, and/or prepared in anticipation of litigation.

(e)     Defendants generally object to the July 19, 2017 Request for Production of Documents to the extent the requests seek attorney work product, privileged communication, and/or information and documents prepared in anticipation of litigation.

(f)     Defendants generally object to the extent the Requests for Production of Documents define terms and seek information which is not permissible under the Federal Rules of Civil Procedure or the Local Rules.


## RESPONSES TO SPECIFIC REQUESTS

**REQUEST FOR PRODUCTION NO. 3:** *For all statewide and state legislative elections held from 2008 to 2013, produce election vote counts at the level of Virginia's 2010 Census Voting Tabulation Districts (not precincts).*

**RESPONSE:** Defendants are unable to respond to this request as they do not maintain election vote counts at the level of Virginia's 2010 Census Voting Tabulation Districts.

3

By: ____/s/_____
Stuart A. Raphael (VSB #30380)
   *Solicitor General of Virginia*
Trevor S. Cox (VSB #78396)
   *Deputy Solicitor General*
Matthew R. McGuire (VSB #84194)
   *Assistant Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
sraphael@oag.state.va.us
tcox@oag.state.va.us
mmcguire@oag.state.va.us

*Counsel for Defendants*

# EXHIBIT B



Transcript of **CHRISTOPHER MICHAEL MARSTON**

**Date:** May 18, 2015

**Case:** BETHUNE-HILL, ET AL v. VIRGINIA STATE BOARD OF ELECTIONS, ET AL

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  RICHMOND DIVISION

4     ------------------------------------x

5     GOLDEN BETHUNE-HILL, et al.,          :

6              Plaintiffs,                   :

7        v.                                  : Civil Action No.

8     VIRGINIA STATE BOARD OF ELECTIONS,   : 3:14-cv-852

9     et al.,                               : REP-GBL-BMK

10             Defendants,                   :

11        and                               :

12    VIRGINIA HOUSE OF DELEGATES, et al.,:

13             Intervenor-Defendants.    :

14    ------------------------------------x

15

16         Deposition of CHRISTOPHER MICHAEL MARSTON

17                  Washington, DC

18               Monday, May 18, 2015

19                     9:51 a.m.

20    Job No.: 81719

21    Pages: 1 - 154

22    Reported By: Dawn M. Hart, Notary Public, RPR/RMR/CRR

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

28

```
 9        Q    Have you had other consulting-type

10    arrangements with any other Virginia Republican

11    entities other than what we just talked about in the

12    2009 time frame?

13        A    I have.

14        Q    Can you describe that for me?

15        A    I've had additional independent contractor

16    relationships with the House Republican Caucus as well

17    as with Dominion Leadership Trust, which is a

18    Political Action Committee of the Speaker of the

19    Virginia House of Delegates.

20        Q    I think you said an independent

21    contractor -- you have been an independent contractor

22    for the House Republican Caucus?
```

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

29

1        A     Either in my personal capacity or through

2    Election CFO, yes.

3        Q     During what time frame was that, or is that?

4        A     We've not had a contract with a term length,

5    but I've received compensation for performing work for

6    them at various times from 2009 to 2013 to the best of

7    my recollection.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

30

1      Q     Tell me more about the 2009 to 2013 period

2   and your role as a contractor with the House

3   Republican Caucus.  What were you engaged to do?

4      A     For most of 2009 I was engaged in political

5   work assisting with the election campaign in November

6   of 2009.

7            In 2010 I supported the members during the

8   legislative session.  I began to do some work relating

9   to redistricting in 2010.  That was primarily what I

10  was occupied with during the legislative session in

11  2011.

12           After that time, I continued to provide both

13  office holder and candidate support in various

14  capacities for several more years.

15     Q     Tell me what your role was in terms of the

16  2011 redistricting.

17     A     I was responsible for retaining a team of

18  consultants supporting members in their activities

19  related to planning for and executing redistricting

20  and passing a plan.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

31

1    BY MR. SPIVA:

2        Q    So let me ask you, who retained you to

3    provide the services you were just describing?

4        A    The Speaker of the House was responsible for

5    offering me a position and making the decision to

6    retain me.

7        Q    Is that Speaker Howell?

8        A    Correct.

9        Q    Were you retained in your personal capacity,

10   or were you retained through one of the entities we've

11   been talking about?

12       A    At times I was compensated through one of

13   the entities and at times personally.

14       Q    When you say one of the entities --

15       A    Election CFO.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

32

3       Q     Your employer being the House Republican

4    Caucus you mean?

5       A     Or related entities, yes.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

36

15      Q    Then what was your role in the 2010/2011

16   redistricting?

17      A    I coordinated the work of the consultants, I

18   provided some direct assistance myself in those areas,

19   and I supported both the members who were principally

20   focused on redistricting as well as assisting them in

21   dealing with other members who, of course, had an

22   interest in their own districts.

37

 5      Q     What did that entail?

 6      A     Oftentimes members would have questions

 7   about their current district; what changes might be

 8   ahead for their district, what things they would like

 9   to see included in a new district, and I would

10   sometimes facilitate that communication between the

11   principal members who were drafting and the members

12   who had questions.

13      Q     In this time period were you dealing

14   exclusively with Republican members of the House of

15   Delegates?

16      A     There were times during 2011 at which I

17   communicated with Democratic members of the House of

18   Delegates as well.  And Independents.

19      Q     During this period, this 2010/11 period, I

20   know you mentioned that you were, I guess initially,

21   retained by Speaker Howell.

22            Was he the person who you directly reported

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

38

1    to in doing the work?

2        A    I worked closely with several members.  The

3    Speaker was not the most involved of the members for

4    whom I worked.

5        Q    Who did you work for mainly?

6        A    I worked mostly with Delegate Chris Jones

7    and Delegate Rob Bell.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

40

10      Q     What was Mr. Morgan's role in terms of data

11   collection and analysis?

12      A     John Morgan is a demographer, and he

13   provided the most support in directly using data in

14   the mapping software that we used.

22      Q     I take it from something you said earlier

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

41

1   you don't consider yourself to be an expert in data

2   analysis with respect to redistricting?

3        A    I do not.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

43

8      Q    Now, was part of your role to collect data

9  in order to draw the maps or have someone draw the

10 map?

11     A    I did do some data collection.

12     Q    What type of data did you collect?

13     A    To the best of my recollection, it was all

14 related to election results and changes in electoral

15 district boundaries over the decade.

16     Q    When you say "changes in electoral district

17 boundaries over the decade," what do you mean by that?

18     A    So units of local government have control

19 over the precinct lines within their jurisdiction, and

20 it's important to know when those change because it

21 affects how you look at the data.

22          There were also some technical corrections

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

44

1    over the course of the decade in the actual

2    composition of districts and, again, relevant

3    information for purposes of drawing in the future.

4         Q    Who did you get the data from that you

5    collected?

6         A    Lots of people.  Because each of the

7    130-some jurisdictions in the Commonwealth run their

8    own elections and their own precinct boundaries, I

9    wound up communicating with Republican activists, with

10   registrars with the State Board of Elections, with

11   members of the House and other elected officials.

12        Q    Then in terms of the data regarding election

13   results, is the list of sources the same, or is that a

14   different list of sources?

15        A    The same.

16        Q    Did you or any of the consultants working

17   with you collect demographic data?

18        A    Yes.

19        Q    What kinds of demographic data did you

20   collect?

21        A    The principal demographic data was what came

22   from the census and related surveys, like the

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

45

1      American Community Survey.

2          Q    For what purpose did you collect that data?

3          A    To support our redistricting efforts,

4      including compliance with the Voting Rights Act.

5          Q    I take it from that answer that some of the

6      data you collected was data regarding race?

7          A    Yes.

8          Q    When you say to facilitate compliance with

9      the Voting Rights Act, tell me what you mean by that.

10         A    So I mean exactly that, compliance with the

11     Voting Rights Act.  It imposes requirements on states,

12     particularly those that require or required

13     preclearance from a Court or the Department of

14     Justice, and there are a host of judicial decisions

15     and administrative guidelines from the Department of

16     Justice regarding what it requires to be precleared,

17     and you have to provide data in that process.

18         Q    The demographic data that you collected, did

19     you use that in the map drawing function?

20         A    Yes.

21         Q    In what way did you use that data, the race

22     data?

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

46

1      A     Along with political data, population data

2    and the like, it was part of the data view we would

3    have as we would draw districts so we could have

4    descriptive characteristics of districts as we drew

5    them.

6      Q     Why did that matter, what the race data was,

7    in terms of the drawing of the districts?

8      A     The Voting Rights Act imposes various

9    requirements about racial composition of districts,

10   and we needed to know if we were complying.

11     Q     What is your understanding of the

12   requirements that the Voting Rights Act imposes in

13   terms of redistricting?

14     A     Four years on, my recollection is a little

15   rusty.  I know you can't have retrogression, and I

16   know that -- that's pretty much what I know.

17     Q     Fair enough.

18           What's your understanding of the term

19   "retrogression"?

20     A     My recollection is that it means that a

21   minority group can't have a less of an opportunity to

22   elect a candidate of their choice than under a prior

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

47

1    plan.

2         Q    The data collection and analysis you've been

3    referring to, at least with regard to race, was that

4    aimed at determining whether the map would cause

5    retrogression?

6         A    Yes.

7         Q    How did you determine whether a minority

8    group or minority groups would have a lesser

9    opportunity to elect a candidate of their choice?

10        A    We didn't have a hard-and-fast rule to

11   determine that.  As with many things in the law, it's

12   a bit of a judgment call.

13             I don't recall how many court decisions I

14   read, but I couldn't get the same answer out of all of

15   them as to what I needed to do, so we did our best and

16   sought legal advice to see if what we were doing

17   appeared to be compliant.

18        Q    Did you do -- when I say did "you" do, I

19   mean did you do or direct or interact with one of your

20   consultants who was doing any data analysis to

21   determine whether a proposed plan would cause

22   retrogression?

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

48

1      A     Yes.

2      Q     Tell me about that.

3      A     As we were preparing a plan and when we

4    finished a plan, we would ask our attorneys for their

5    opinion as to whether or not they thought that there

6    was retrogression and, more importantly, whether it

7    could be precleared.

8      Q     I guess I'm asking more of a factual

9    question, which is, how did you use the data to

10   determine whether or not there was retrogression?

11     A     So we would prepare a list of the 100

12   districts and their racial composition and consult

13   with our attorneys to see what they thought about

14   whether or not we could successfully get the plan

15   precleared.

16     Q     Did you do any other data analysis or

17   gathering other than creating a list of the 100

18   districts and the racial composition in terms of

19   trying to determine whether there would be

20   retrogression?

21     A     I gathered, but never used, information

22   about election contests that featured a Black and a

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

49

1    White candidate.

2        Q    Why did you gather that data about election

3    contests that featured a Black and a White candidate?

4        A    At NCSL conferences and similar places I

5    heard about something called racial block voting

6    analysis, which I couldn't really describe for you

7    except that it's about racial block voting, and I knew

8    that that data was required to complete such an

9    analysis and if that's something the members wanted to

10   be able to do, I wanted to make sure I had the

11   information to support them.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

50

8      Q     I think that you said that you gathered but

9    didn't use the information about election contests

10   that featured a Black and a White candidate.

11          Did you do any type of a racial block voting

12   analysis?

13     A     No.

14     Q     When I say "you," again I want to include in

15   that you or the consultants that were working with

16   you.

17          Did anybody in that group perform a racial

18   block voting analysis?

19     A     Not to my knowledge.

20     Q     Do you know why that was not done?

21     A     I do not.

22     Q     Did anybody request that you gather this

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

51

1    information about the election contest that featured

2    Black and White candidates?

3          A    Not to my recollection.

4          Q    That was something that you did on your own

5    initiative?

6          A    Yes.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

54

1          Did anyone ever ask you to actually run an

2    analysis once you had gathered the data regarding

3    Black and White candidates?

4        A    No.

5        Q    Did you ever ask anyone that you were

6    working with in this redistricting process whether

7    they wanted that type of analysis done?

8        A    No.  I'm sorry, I may have asked, no one

9    ever did.

10        Q    Did anyone ever explain to you why they

11    didn't want that type of analysis done?

12        A    No.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

57

10        Q     Of Virginia.

11              Further down in the e-mail, I guess it's the

12    third paragraph, it says, "The information you need is

13    whether any election, including Democrat primaries,

14    featured a Black and a White candidate."

15              I read that correctly?

16        A     You did.

17        Q     What was the purpose of gathering

18    information concerning whether any election featured a

19    Black and a White candidate?

20        A     As we discussed recently, I collected data

21    in case someone wanted to use that information to

22    conduct a racial block voting analysis.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

58

1        Q     Was that something you thought might be

2   necessary in order to comply with the Voting Rights

3   Act?

4        A     I knew some people used that analysis as

5   part of their overall analysis of redistricting.  I

6   wanted to be prepared in case the members asked me to

7   have that information available.

8        Q     I think you testified before that the racial

9   block voting analysis was not in fact ever done?

10       A     Not to my knowledge.

20       Q     Did you do anything with that information?

21       A     I don't believe I did.  I do recall

22   contacting other people to supplement that

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

59

1    information.  I'm not exactly sure what might have

2    been incomplete or whether I was just asking people to

3    recheck, but ...

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

61

3          You've said that a racial block voting

4     analysis was not, to your knowledge at least, in fact

5     done, correct?

6          A     Correct.

7          Q     I take it that that means that no type of --

8     you're familiar with the term "ecological regression"?

9          A     I've heard the term ecological regression.

10          Q     Are you aware of any ecological regression

11     having been done with respect to voting patterns in

12     Virginia?

13          A     I am not.

14          Q     Have you heard the term "ecological

15     inference"?

16          A     I've heard the two parts but not together.

17          Q     I assume the answer is the same, that to

18     your knowledge, no ecological inference analysis was

19     done with respect to Black and White voting patterns

20     in Virginia?

21          A     Not to my knowledge.

22

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

64

5      Q     I assume, to your knowledge, Mr. Ellis never

6    did actually perform a racial block voting analysis?

7      A     To my knowledge, he did not.

11     Q     I take it from your earlier answers that the

12   same is true of him, that to your knowledge,

13   Clark Bensen never performed a racial block voting

14   analysis?

15     A     Correct.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

10      Q    You state in the first paragraph, "I would

11   appreciate your help.  As part of the analysis

12   required for compliance with the Voting Rights Act, we

13   need to review results from contested elections in

14   which a Black candidate and a White candidate

15   participated."

16           What analysis required for compliance with

17   the Voting Rights Act are you referring to in that

18   e-mail?

19      A    I'm not referring to anything that's

20   required.  I -- this was the same project I was

21   working on in gathering that data, but my statement

22   that it was required for compliance is likely -- was

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

66

1    likely written to ensure that I got a response.

2         Q    Understood.

3              So I take it from that, though, that you're

4    referring to this racial block voting analysis?

5         A    Correct.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

68



```
21        Q    In the e-mail you state, "I'm still with

22   Speaker Howell and I'm supporting the Caucus on
```

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

69

1    redistricting.  To comply with the Voting Rights Act,

2    we have to do some statistical analysis.  One of the

3    things we need to look at is election returns from

4    races in which both Black and White candidates

5    competed."

6            I take it from our earlier discussion that

7    here you're referring again to -- the statistical

8    analysis you're referring to is the racial block

9    voting analysis?

10       A    Yes.

11       Q    Let me just ask this, were you intending to

12   include anything else other than racial block voting

13   analysis when you say "to comply with the Voting

14   Rights Act we have to do some statistical analysis"?

15       A    I don't have any particular recollection.  I

16   know for purposes of this e-mail that was the analysis

17   I was concerned with.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

70

8        Q    I take it the answer is still the same with

9    respect to this, that this statistical analysis --

10   racial block voting analysis, this was never actually

11   done?

12        A    That's correct, to my knowledge.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

72

8        Q    When you got the correct spreadsheet back

9    from Mr. Tyndall, what did you do with that?

10       A    I suspect I saved it along with all the

11   other data I had for that purpose.

12       Q    Did you ever provide that data to anyone

13   else?

14       A    No.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

73

4          Whose e-mail address is that?

5      A    Dale Oldham.

6          It appears that I sent it to one of his

7  e-mail addresses and either it bounced because I had

8  it wrong or he requested that I send it to another

9  one, and so I forwarded it to that address.

10     Q    The subject is race data.

11         What kind of race data is this referring to?

12     A    Based on the name of the attachment and the

13  text, it appears to be about the June 2009 Democratic

14  primary in which Betsy Carr was a candidate.

15     Q    Was this part of the data that you'd been

16  collecting for this potential racial block voting

17  analysis?

18     A    Probably, but I don't have a specific

19  recollection.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

75

```
 4        Q    Let me hand you what will be marked as

 5   Exhibit 9.

 6             (Exhibit 9 was marked for identification and

 7   is attached to the transcript.)

 8        Q    Mr. Marston, this is an e-mail that appears

 9   to be from you to J.R. Hoeft?

10        A    Hoeft.

11        Q    It is dated 3/18/2011.  Subject:  Help with

12   redistricting research.

13             Is that an e-mail that you sent to Mr. Hoeft

14   on 3/18/2011?

15        A    It is.
```

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

76

```
 9       Q    -- "I'm working on the racial voting

10    analysis for Voting Rights Act compliance.  I've got

11    to figure out races in which both Black and White

12    candidates both competed.  I'm almost done but I've

13    got two Hampton Roads races that I haven't been able

14    to figure out."

15            First question is, the racial voting

16    analysis or Voting Rights Act compliance that you

17    referred to here, I assume that's the same thing we've

18    been talking about, this potential racial block voting

19    analysis?

20       A    It is.

21       Q    When you say "I'm working on the racial

22    voting analysis," what did you mean by that?
```

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

77

1      A    That I was collecting data to support it if

2    it needed to be done.

3      Q    Was there anybody on your team that was -- I

4    understand to your knowledge it wasn't actually ever

5    done, but was there anybody on your team that was

6    tasked with doing it at some point?

7      A    I was not tasked and I did not task anyone.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

81

10      Q    In terms of the Virginia House

11  redistricting, did you provide similar data, Black

12  voting age population data, comparing one map to the

13  other to the individuals involved in that?

14      A    I'm sure that I did.

15      Q    What was the reason for providing that kind

16  of data?

17      A    It related to preclearance by Justice or the

18  Court.  That information needs to be included in

19  analysis you send along with preclearance requests.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

88

16        Q    I know you already said that you never did a

17   racially polarized voting analysis and weren't aware

18   of one having been done, but I want to ask you a

19   slightly broader question, which is, did you undertake

20   to evaluate in any way the ability of the minority

21   community in majority-minority districts to be able to

22   elect the candidates of their choice?

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

89

1       A    There was no sort of standard statistical

2    test we applied.  You know, we eyeballed it.

3       Q    In terms of eyeballing, what were you

4    looking for?

5       A    That there weren't dramatic changes in the

6    makeup of populations and districts.

13      Q    Do you recall whether there was an approach

14   that you or your group that was working on

15   redistricting took in instances where the BVAP had

16   fallen since the previous redistricting?

17      A    Our general approach was to work on, you

18   know, balancing population between districts

19   generally.  I don't recall a specific approach that we

20   said, okay, on this particular one we should do it

21   this particular way.

22      Q    Was there any sense that the

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

90

1    majority-minority districts in Virginia, that they

2    needed to maintain a certain percentage BVAP?

3         A    We didn't have any particular threshold or

4    rule that we applied.  We knew dropping to 30 would be

5    bad, but we didn't have a particular threshold.

20        Q    Did anyone ever tell you that the

21   minority-majority [sic] districts would need to

22   achieve at least a 55 percent BVAP to comply with the

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

91

1    Voting Rights Act?

2         A    No.

7         Q    I take it from that, that you never told

8    anyone that at least a 55 percent BVAP was necessary

9    in the majority-minority districts in order to comply

10   with the Voting Rights Act?

11        A    I did not.

12        Q    Was that your understanding, that at least a

13   55 percent BVAP would be necessary in the

14   majority-minority districts in order to prevent

15   retrogression?

16        A    No.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

93

16      Q    I take it that the boundaries had some

17   effect on the demographics that those districts

18   contained?

19      A    Yeah, in almost every case.  Occasionally we

20   have a zero population block that doesn't affect

21   demographics, but yes.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

94

6      Q    Do you recall whether each of the

7  majority-minority districts met a certain threshold in

8  terms of BVAP percentage after you locked them in?

9      A    I don't.

10      Q    What other considerations did you discuss in

11  terms of locking in the majority-minority districts?

12      A    I don't have a specific recollection.  We

13  generally applied the House's redistricting principles

14  to everything, but I don't have a specific

15  recollection.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

105

21          Delegate Jones never said anything to you

22     about there being any kind of a 55 percent BVAP

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

106

1    threshold in either Delegate McClellan's district or

2    anywhere else?

3         A    He did not.

22

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

120

16      A    It was the election results from the 2008

17   presidential primary.

18      Q    Why were you all collecting or reviewing

19   that data?

20      A    We were interested in all of the data that

21   would give us an indication of the political

22   propensity of a given precinct or district.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

121

1      Q     For instance, were you reviewing the

2   demographic breakdown of the vote from the 2008

3   presidential election?

4      A     No, we don't collect that data in Virginia,

5   so we can't review it.

6      Q     I see.

7            Were you reviewing the partisan breakdown of

8   the vote?

9      A     Yes, absolutely.  Although this was a

10   presidential primary, they were all Republican votes,

11   we were reviewing which candidate received how many

12   votes.

13      Q     What was the purpose of reviewing that type

14   of data?

15      A     The candidates in the 2008 presidential

16   primary fell along the spectrum of least conservative

17   to most conservative, and it was informative to us to

18   see which area supported the most conservative or the

19   least conservative or somewhere in the middle.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

122

16        A    Before you do that, can I add to the answer

17    that I gave you about presidential primary data?

18        Q    Sure.

19        A    In addition to being useful as to which

20    candidate was supported, the turnout data was

21    relevant.  If a Republican presidential primary has a

22    high turnout in one county, low turnout in another

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

123

1     county, that tells us something important about the

2     political sway of the county.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

134

6      Q    Do you recall any other plans with a 13-seat

7   majority-minority district?

8      A    I believe that other plans besides the

9   Commission's were drawn and proposed that had 13

10  majority-minority districts, but I don't recall them

11  with any specifics.

12     Q    This talks about reducing the number of

13  County and City splits.

14         Do you know whether that is in comparison to

15  the benchmark plan, or is that in comparison to the

16  2011 plan that was ultimately passed?

17     A    I have a reasonably high degree of

18  confidence it was the benchmark plan because the House

19  plan had not -- I don't believe the House plan had

20  been released at this point, and when they say

21  "current plan," I believe that means the benchmark.

22     Q    Did you conclude that you feasibly could

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

135

1     have created 13 African-American majority districts?

2        A    Yes.

3        Q    And did you recommend doing that?

4        A    I'm sorry.  I concluded that it was

5     certainly possible to create 13 majority-minority

6     districts, in the sense that there was at least a

7     majority of Black voting population, which is

8     50 percent plus 1.  This demonstrates you can do it

9     with more than one.  But my conclusion was, yes, you

10    could draw 13 majority-minority districts.

11        Q    And did you recommend doing that?

12        A    I did not.

13        Q    And this option, I take it, was ultimately

14    rejected?

15        A    All of the Commission's options were

16    rejected.

17        Q    Why was this option in particular rejected?

18        A    There wasn't a particular consideration

19    individually of each Commission recommendation; they

20    were all rejected because they didn't accomplish the

21    political objectives of the Caucus, which was to elect

22    more Republicans.

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

136

1        Q      Was there any consideration of whether the

2   Voting Rights Act required the adoption of 13

3   majority-minority districts if feasible?

4        A      Yes.

5        Q      What was the conclusion in that regard?

6        A      The Commission reached the same legal

7   conclusion that we did, which is that it's not

8   required under the non-retrogression standard.

22

DEPOSITION OF CHRISTOPHER MICHAEL MARSTON
CONDUCTED ON MONDAY, MAY 18, 2015

154

1          CERTIFICATE OF SHORTHAND REPORTER – NOTARY PUBLIC

2              I, Dawn M. Hart, the officer before whom the

3      foregoing deposition was taken, do hereby certify that

4      the foregoing transcript is a true and correct record

5      of the testimony given; that said testimony was taken

6      by me stenographically and thereafter reduced to

7      typewriting under my direction; that reading and

8      signing was not requested; and that I am neither

9      counsel for, related to, nor employed by any of the

10     parties to this case and have no interest, financial

11     or otherwise, in its outcome.

12              IN WITNESS WHEREOF, I have set my hand and

13     affixed my notarial seal this 26th day of May 2015.

14     My Commission Expires:

15     May 31, 2015

16     _____

17

18     NOTARY PUBLIC IN AND FOR THE

19     DISTRICT OF COLUMBIA

20

21

22

# EXHIBIT C

# In The Matter Of:

*Golden Bethune-Hill, et al. v.*
*Virginia State Board of Elections, et al.*

---

*Delegate Roslyn C. Tyler*
*May 19, 2015*

---



208 E. Plume Street, Suite 214
Norfolk, Virginia 23510
*tel:* 757 627 6554   *fax:* 757 625 7077
*email:* info@zahncourtreporting.com

*Original File 051915kw-tyler.txt*
*Min-U-Script® with Word Index*

```
 1              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                  RICHMOND DIVISION

 3

 4   GOLDEN BETHUNE-HILL,          )
     et al.,                       )
 5                                 )
          Plaintiffs,              )
 6                                 )Civil Action No.
     v.                            )3:14-cv-852-REP-GBL-BMK
 7                                 )
     VIRGINIA STATE BOARD          )
 8   OF ELECTIONS, et al.,         )
                                   )
 9        Defendants,              )
                                   )
10   AND                           )
                                   )
11   VIRGINIA HOUSE OF             )
     DELEGATES, et al.,            )
12                                 )
          Intervenor-Defendants.   )
13

14

15

16          DEPOSITION UPON ORAL EXAMINATION OF

17              DELEGATE ROSLYN C. TYLER

18          TAKEN ON BEHALF OF THE PLAINTIFFS

19                  RICHMOND, VIRGINIA

20                   MAY 19, 2015

21

22

23

24        Reported by:  Kimberly A. Watrous, RPR

25
```



**Delegate Roslyn C. Tyler**                                    13

```
23        Q    Do you have any formal training in
24   statistics?
25        A    Yes.
```



1        Q    Can you describe that training for me?

2        A    Well, basically my training as far as

3   statistics is my courses, my master's and my courses

4   in physical therapy.  We are required to

5   statisticize.

6        Q    Do you remember how many statistics

7   courses you took?

8        A    Probably two.

9        Q    Do you mind me asking what years or

10  approximately what years those would have been?

11       A    Probably one is around 1995/96.  The other

12  one was probably in 1983.

17       Q    Have you ever received any formal

18  redistricting training?

19       A    Formal, no.

20       Q    Sounds like maybe you received some

21  informal training?

22       A    Well, informal being on a local board of

23  supervisors in my area in Sussex.  So I've been

24  through redistricting on the local level.

25       Q    Oh, okay.  Can you tell us a little bit



**Delegate Roslyn C. Tyler**                    15

1    about that?  What was your experience with the local

2    redistricting?

3        A     Local redistricting, just getting

4    directive as far as from the county attorney when

5    they redistrict the district.  And just the

6    percentages, and try to be fairly distributed and

7    those type of population.

8        Q     Population equality among districts it

9    sounds like you're referring to?

10       A     Yes.


www.zahncourtreporting.com

14       Q     Does this map look accurate to you?

15       A     It does.  When I first initially ran in

16   2005, this was my district.

17       Q     Thank you.  You mentioned 2005.  You ran

18   in this district in that year.  And what were the

19   results of that election?

20       A     I won.

21       Q     Do you remember how much you won by?

22       A     In my first election, I won basically by

23   231 votes.

24       Q     So a pretty small percentage of the vote,

25   correct?



**Delegate Roslyn C. Tyler**                    19

1          A     Yes.

2          Q     And then did you run again in 2007?

3          A     I did.  I ran unopposed for two years.

4          Q     Okay.  So that's 2007 and 2009, correct?

5          A     Uh-huh.  And then when the map was drawn

6      again, redistricting, ever since then I've had

7      opposition.



www.zahncourtreporting.com

**Delegate Roslyn C. Tyler**                    20

```
19        Q    Okay.  Did you run in any elections under
20   the 2011 district?
21        A    Yes.
22        Q    What years were those elections?
23        A    The last two elections.  I think 2013 I
24   believe and the one previous to that.
25        Q    2011?
```



```
 1        A     2011.

 2        Q     So you ran under the 2011 district and

 3   2013, correct?

 4        A     Yes.

 5        Q     And you said you had an opponent both

 6   times?

 7        A     Yes.

 8        Q     What was the result of those elections?

 9        A     I won basically with 65 percent of the

10   vote.
```



**Delegate Roslyn C. Tyler** 22

25          Q    How would you describe the shape of your



www.zahncourtreporting.com

**Delegate Roslyn C. Tyler**                    23

```
 1   districts and its boundaries?
 2        A    Well, it's not an easy district to follow.
 3        Q    When you say it's not easy to follow, do
 4   you mean it has very irregular borders?
 5        A    That's right.  Very irregular borders.
 6        Q    Do you think it's a compact district?
 7        A    I wouldn't say that.
 8        Q    Is your district mainly rural or mainly
 9   urban?
10        A    It's rural districts.
11        Q    What are the main industries in your
12   district?
13        A    Main -- hm -- probably forestry and
14   lumber.
15        Q    How many registered voters are
16   Republicans?
17        A    I don't know.
18        Q    How many registered voters are Democrats?
19        A    I don't know the exact number really.
20        Q    That's fine.
21             Does your district have any unusual
22   geographic features?
23        A    Not really.  Just a lot of croplands,
24   dispersed populations.
25        Q    Now, does your district include any
```



**Delegate Roslyn C. Tyler**                          24

```
 1  prisons?
 2       A    Yes.  I have I believe five prisons in my
 3  district.
 4       Q    You said five prisons?
 5       A    Uh-huh.
 6       Q    Are you certain of that number?
 7       A    Let me count them.  Sussex, one; Sussex,
 8  two; Greensville; Deerfield; Brunswick.  Five.
 9       Q    Do you know the locations of all those
10  prisons?
11       A    Yes.
12       Q    Have you visited those prisons?
13       A    Most of them I have.
14       Q    How many people are in those prisons
15  collectively?
16       A    I think I looked awhile back.  I looked at
17  projection about 5,000.  I'm not sure.  I think it
18  was around that ballpark.
19       Q    Do you know when that was you looked into
20  that number?
21       A    Probably in, not the last election, but
22  the previous election.  So 2011.
23       Q    In 2011, you think the prison population
24  was in the ballpark of about 5,000?
25       A    Yeah.
```



**Delegate Roslyn C. Tyler**                          25

4          Q    Do you know how many of those prisoners

5     are white?

6          A    No.

7          Q    Do you know how many are African-American?

8          A    No.

9          Q    Are you familiar with the term "black

10    voting age population" or BVAP?

11         A    Yes.

12         Q    Do you agree that means the percentage of

13    people of voting age who identify themselves as

14    African-American?

15         A    I wasn't thinking of that.  I was just

16    thinking of that meaning that everybody 18 years and

17    older basically.  Not so much based on black

18    population.

19         Q    Right.  It's my fault for not stating it

20    well.  Let me try again.

21              BVAP means the percentage of black people

22    of voting age within a district.

23         A    Okay.  I never paid attention to that

24    exactly.



3        Q    Do you know the BVAP of the prisoners in

4   your district?

5        A    No.

6        Q    Have you ever tried to calculate that?

7        A    No.





15      Q    Let's say you didn't count any prisoners
16  in your district in calculating the BVAP of your
17  districts.  What would the BVAP of your district be
18  then?
19          A    If you didn't count prisons?
20          Q    Yeah.  Correct.
21          A    I don't know how much it would be, but I'm
22  quite sure my district numbers would probably be
23  more.
24          Q    I'm sorry?
25          A    I was saying that my district numbers



1  would probably be more.  I don't know what it would

2  be.

3      Q     When you say your district numbers would

4  be more --

5      A     If you -- I guess I'm getting it wrong.

6  Well, because the prison population is included in

7  the census.

8      Q     Correct.

9      A     So that's there.  But as far as voting

10 percentage, it wouldn't be a significant increase

11 because they can't vote.

12     Q     So are you saying that, if we subtracted

13 all of the prisoners from the calculations, it

14 wouldn't change the BVAP of your district

15 significantly?

16     A     It would.

17     Q     It would?  In what way?

18     A     I guess with counting the number of

19 persons that would be eligible to vote, it would

20 have an impact.

21     Q     So it would reduce the number of people

22 who are of voting age?

23     A     That's right.

24     Q     Would it reduce the number of black people

25 of voting age?



**Delegate Roslyn C. Tyler**                    31

1          A    Yes.

2          Q    Do you think it would reduce significantly

3     the black voting age population in the district as a

4     whole?

5          A    As a whole.

6          Q    Do you know how much?

7          A    I don't know.

8          Q    Have you ever tried to calculate that?

9          A    No.


www.zahncourtreporting.com



```
20        Q    Okay.  So just to be clear, would you say

21   it's fair to say that Delegate Jones was the

22   architect of the redistricting plans during this

23   time period?

24        A    That's fair to say.

25        Q    Nobody else had more responsibility for
```



```
 1   drawing the lines?

 2        A    Correct.

 3        Q    How about on the Democratic side?  Who

 4   were the main players?

 5        A    Probably Delegate Dance and Lionell

 6   Spruill, Delegate Spruill.

 7        Q    What were their roles?

 8        A    Well, their role was to get our input in

 9   redistricting some of the lines.

10        Q    And you say our input.  Who are you

11   referring to there?

12        A    Black Caucus.

13        Q    So the folks who -- is it fair to say the

14   folks who represent the 12 majority-minority

15   districts?

16        A    Uh-huh.

17        Q    So Delegate Spruill and Delegate Dance

18   worked to gather input --

19        A    That's correct.

20        Q    -- from those delegates with respect to

21   the redrawing of their districts?

22        A    That's right.

23        Q    So did you interact with Delegate Spruill

24   and Delegate Dance?

25        A    Delegate Spruill and Delegate Dance.
```



```
 1        Q     What kind of conversation did you have
 2   with Delegate Spruill?
 3        A     I was trying to keep my same district as I
 4   possibly could.
 5        Q     So you were hoping to keep your district
 6   as similar as possible to the previous districts?
 7        A     Correct.
 8        Q     How about your conversations with Senator
 9   Dance?
10        A     The same.
11        Q     Were they -- did they have slightly
12   different roles?  I ask just because I suspect they
13   weren't both doing the exact same thing.  So were
14   they working with different people or --
15        A     Well, they were communicating back and
16   forth with Chris Jones.  So --
17        Q     Okay.
18        A     -- and that's how they were communicating
19   as far as what district did we have and where we
20   were going.
21        Q     So Delegate -- again, is it fair to say
22   Delegate Spruill and now Senator Dance would go and
23   talk to members of the Black Caucus --
24        A     Uh-huh.
25        Q     -- gather their input and their concerns
```



**Delegate Roslyn C. Tyler**                    36

```
 1   about the redistricting process --
 2        A    Uh-huh.
 3        Q    -- and bring those concerns back to
 4   Delegate Jones?
 5        A    That's right.
 6        Q    So did you understand, if you were talking
 7   with Delegate Spruill or Senator Dance, that you
 8   were, in essence, talking to Delegate Jones when it
 9   came to redistricting?
10        A    Probably, yes.  Probably so.
11        Q    So do you think it's fair to say that
12   Delegate Spruill and Senator Dance understood the
13   requirements and the criteria that Delegate Jones
14   was using to draw the map?
15        A    Yes.  Probably more so than anybody else.
16        Q    More so than anybody else?
17        A    Yeah.
18        Q    So it's likely that Delegate Spruill and
19   Senator Dance communicated directly with Chris
20   Jones?
21        A    Yeah.
22        Q    And it was your impression that Delegate
23   Jones was telling them how the maps were going to be
24   drawn?
25        A    Or kind of giving the configuration,
```



**Delegate Roslyn C. Tyler**                    37

```
 1   similar configuration how it would be drawn.
 2        Q    So maybe he wasn't telling them exactly
 3   where the lines might be?
 4        A    That's right.
 5        Q    But he was telling them what the
 6   consideration and requirements were?
 7        A    Or getting the input saying what could be
 8   done and what could not be done.
 9        Q    Right.  Thank you.
10             How about Ward Armstrong?  Was he involved
11   in any way?
12        A    Not so much.  I know Ward was caucus
13   leader during that time.  He would just say that you
14   probably need to discuss, you know, and follow your
15   lines as the redistricting process progresses.
16   Uh-huh.
17        Q    Did you talk with Ward Armstrong during
18   the time about the redistricting process?
19        A    No.
20        Q    You had no conversations?
21        A    No.
```



**Delegate Roslyn C. Tyler**                    38

1          Q     How about Delegate Jennifer McClellan?

2          A     No.

3          Q     No conversations with Delegate McClellan?

4          A     No.



**Delegate Roslyn C. Tyler**                    41

2          Q    No.   Sorry.   I probably didn't speak

3     clearly.   I said racially polarized voting analysis.

4     And what I'm referring to there -- and this is my

5     personal understanding; different lawyers might have

6     a different understanding -- is it's a statistical

7     analysis of racial voting patterns.   And the point

8     of it is to determine whether, for example, white

9     people in one district vote similarly or differently

10    to black people in the same district.

11         A    No.

12         Q    So you didn't perform any such analysis?

13         A    No.

14         Q    Of your district or any other district?

15         A    Not that I can recall.   Because my

16    district probably changed from a Democratic

17    performance district to a more Republican district.

18         Q    Do you mind if I ask why you say that, how

19    you know that?

20         A    I say that because the further you go out

21    west, it's more a Republican district, more so than

22    what I had initially.

23         Q    I see.

24         A    So my frame of mind that I knew I was

25    going out into a more Republican district by going



**Delegate Roslyn C. Tyler**                          42

```
 1    out west.
 2        Q    I see.  But it sounds like -- and correct
 3    me if I'm wrong -- you didn't do any statistical
 4    analysis to determine whether, in fact, moving your
 5    district out west made it more Republican.  That was
 6    just --
 7        A    Observation and knowing the district.
 8        Q    Observation, gut feeling --
 9        A    And knowing the district.  And knowing
10    where you had to go to pick up the numbers as far as
11    population.
12        Q    Okay.  But, again, no formal analysis
13    performed to determine the political change?
14        A    No.
15        Q    Okay.  Thank you.
16             And did anyone ever show you any such
17    analysis of the political changes in your district?
18        A    No.
19        Q    Do you know if anybody performed such an
20    analysis?
21        A    No, sir.
22             MR. SPEAR:  I'm handing the court reporter
23        a document that she will mark as Exhibit 6.
24             (Tyler Exhibit 6 marked for
25        identification.)
```



**Delegate Roslyn C. Tyler**                    43

```
21          Do you recognize this document?

22     A    No.

23     Q    Have you seen this document before?

24     A    I could have, but I haven't read it.
```



2              (Tyler Exhibit 7 marked for

3         identification.)


www.zahncourtreporting.com

**Delegate Roslyn C. Tyler**                                48

13        Q    Do you recall being at this floor debate?

14        A    I guess.

15        Q    Did you say "yes" or "I guess"?

16        A    I'm quite sure.  I don't miss sessions.

17   So I had to be there.

18        Q    Okay.  But you don't specifically remember

19   being there?

20        A    No.



**Delegate Roslyn C. Tyler**                              52

7          Q    Okay.  To your knowledge, are these the

8     criteria that Delegate Jones and others used to draw

9     the new districts?

10         A    I believe so, as much as possible.

11         Q    Did you ever discuss with Mr. Jones -- I'm

12    sorry -- with Delegate Jones what criteria to use to

13    draw the new districts?

14         A    No.



**Delegate Roslyn C. Tyler**                     53

```
 5        Q    And did you understand, at the time of the

 6   2010 redistricting cycle, that Virginia was subject

 7   to Section 5 of the VRA such that its districts

 8   would have to be precleared by the Department of

 9   Justice?

10        A    Yes.

11        Q    You do understand that?

12        A    Yes.

13        Q    Now that we've talked about that, does

14   that refresh your memory that that approval process

15   is called preclearance?

16        A    Yes.

17        Q    So because of the preclearance

18   requirement, compliance with the VRA had to be a

19   very important consideration, correct?

20        A    Correct.

21        Q    Because you all knew that DOJ was going to

22   review your work basically?

23        A    Correct.

24        Q    And for that reason, compliance with the

25   VRA was essential?
```



```
 1        A     Yes.

 2        Q     Nonnegotiable?

 3        A     Yes.

 4        Q     I think Delegate Jones said of the utmost

 5   importance?

 6        A     Uh-huh.

 7        Q     You have to say "yes."

 8        A     Yes.

 9        Q     Sorry.  It's not pleasant to remind people

10   of that either I promise you.

11        A     That's all right.

12        Q     Now, at the time of the 2010 redistricting

13   cycle, Virginia had 12 majority-minority districts,

14   correct?

15        A     Yes.  I believe so.

16        Q     And your district was one of those

17   districts?

18        A     Yes.

19        Q     Now, do you understand that, under the

20   VRA, those districts couldn't be drawn in a way that

21   caused retrogression?

22        A     I didn't understand that, that it couldn't

23   be reduced, but okay.

24        Q     I'm sorry.  Could you repeat that?

25        A     You said retrogression means decrease the
```



 1   number of black minority votes in that area.

 2       Q    Let's focus on that for a minute.

 3       A    Okay.

 4       Q    So I will represent to you that in certain

 5   context the VRA prohibits retrogression.  So let me

 6   ask you what you think retrogression means.

 7       A    Decreasing the number of voters.

 8       Q    Okay.  So, for example, if the BVAP of a

 9   district is 56 percent, and you take it down to

10   55 percent, you think that's retrogression?

11       A    Right.

12       Q    So another way to put that would be any

13   reduction in minority voting age population equals

14   retrogression?

15       A    Okay.  I got you.

16       Q    Just to be clear, I'm asking you for your

17   view there.

18       A    Okay.

19       Q    I'm not representing that that's the

20   complete answer.  But that's what I'm getting at.

21            Now, Delegate Tyler, during the 2010

22   redistricting cycle, did anyone ever tell you that

23   there's a predetermined fixed BVAP level that all

24   the majority-minority districts had to have?

25       A    No.  I've heard the percentage 55 percent



**Delegate Roslyn C. Tyler**                    56

1  tossed around.  But then Chris Jones, with his

2  conversations, he always talked about plus and

3  minus.  I forgot whether it was 5 or 1 percent.  But

4  that plus-5 or plus-or-minus-1 deviation, that's

5  what I've heard most of the time during the process.

6      Q    So when you say plus-or-minus-1 deviation,

7  that sounds like you're talking about population

8  equality?

9      A    Yes.  That's what I heard most of the time

10  during the process.

11     Q    Thanks.  Then you also said you also heard

12  the number 55 percent with respect to BVAP?

13     A    I heard 55 percent.  I don't know if it

14  was related to BVAP or not.  I heard that

15  percentage.

16     Q    Who did you hear that 55 percent from?

17     A    Just overall, because there was some

18  discussion and in caucus and stuff, and they was

19  talking about a 55 percent.  But when it came to

20  drawing the lines, they was more deviation stuff

21  than anything else.

22     Q    Oh, I see.  You're saying that you thought

23  that there was more discussion about the --

24     A    Deviation population.

25     Q    -- deviation than the 55 percent BVAP?



**Delegate Roslyn C. Tyler**                    57

```
 1        A     Yeah.
 2        Q     Okay.  Well, you said you just heard about
 3   the 55 percent threshold from many people.  Do you
 4   remember specifically talking about it?
 5        A     Well, when you're talking to Lionell or
 6   someone, they would say maybe 55 percent.  But when
 7   you talk to Chris Jones, he talked about the
 8   population deviation.
 9        Q     So Chris Jones never said anything to you
10   about a 55 percent BVAP threshold?
11        A     No.
12        Q     Did Lionell Spruill say something to you
13   about that?
14        A     Lionell talked about it in discussion
15   about 55 percent.  But what that meant, I don't know
16   what it meant.  But my conversation was more the
17   percentage deviation, plus and minus of 5 or
18   whatever it was.
19        Q     So when Delegate Spruill talked to you
20   about this 55 percent figure, you're saying you
21   didn't understand what he was talking about?
22        A     Not as far as population.  He just kept
23   talking about 55 percent.
24        Q     Uh-huh.  And what did you think he meant
25   by 55 percent?
```



**Delegate Roslyn C. Tyler**                    58

```
 1        A    Well, Democratic performance.
 2        Q    You thought Delegate Spruill was talking
 3   about --
 4        A    More Democratic performance.  More so than
 5   black minority voters.
 6        Q    So just to be clear, when you talked to
 7   Delegate Spruill about this 55 percent figure, did
 8   he explain to you that it was a criteria or a
 9   requirement to apply to all the majority-minority
10   districts?
11        A    No.
12        Q    Okay.  So how did he characterize the
13   figure to you?
14        A    Well, he would just talk about the number
15   of districts as far as Democrats.
16        Q    Okay.  So just to make sure I have this
17   straight, and tell me if this is correct.  You
18   talked to Lionell Spruill on some occasions?
19        A    Uh-huh.
20        Q    The 55 percent figure came up?
21        A    Uh-huh.
22        Q    And you thought that he was talking about
23   Democratic performance of majority-minority
24   districts?
25        A    Yes.  Democratic performance.
```



1          Q     So you never understood the 55 percent to

2     refer to minority voting strength?

3          A     No.

4          Q     Did you discuss this with Delegate Dance?

5          A     No.

6          Q     Never had any conversations about the

7     55 percent with Delegate Dance?

8          A     No.

9          Q     How about Delegate McClellan?

10         A     No.

14               (Tyler Exhibit 8 marked for

15               identification.)

20         Q     So as you can see, this is a transcript of

21    a Privileges and Elections Redistricting Public

22    Hearing dated April 4, 2011.

23               Have you seen this document before?

24         A     No.

25         Q     Do you remember this hearing?



**Delegate Roslyn C. Tyler**                    60

```
 1          A     No.
 2          Q     So I take it you don't remember if you
 3     attended it either?
 4          A     No.
 5          Q     Please turn to page 41.
 6                Are you there?
 7          A     Uh-huh.




14          Q     So this is you speaking at this hearing.
15                First of all, I should stop and ask, do
16     you have any reason to doubt this is you speaking at
17     the hearing?
18          A     I guess not.
19          Q     Do you normally attend these sorts of
20     hearings?
21          A     Not often.
22          Q     But no reason to doubt that this is you
23     speaking, correct?
24          A     Correct.
25          Q     So I'll read now:
```



**Delegate Roslyn C. Tyler**                    61

```
 1              Delegate Tyler:  Yes, sir.  Thank you,

 2   Mr. Chairman, members of the committee.  I'm

 3   Delegate Roslyn Tyler.  One thing that I would like

 4   the committee to take into consideration as you look

 5   at the redistricting lines is -- also, as you look

 6   at the population for minority districts, I would

 7   also like you to look at the voting population in

 8   minority districts as well.  Because even though you

 9   might draw minority districts that may be 55 percent

10   or more, but we need to actually look at the voting

11   numbers in each direct.  And I would just like to

12   recommend that to the committee because, as a

13   minority legislator representing the district, it's

14   not always included.  And I guess I'm in great

15   concern because my district includes five prison

16   populations.  The population is there, but my voter

17   population is not.  So I ask you just to take that

18   into consideration.

19              Did I read that correctly?

20        A    That's correct.

21        Q    Do you think that's what you said on that

22   date?

23        A    I believe so.  I've always been concerned

24   about the prison population in my district but

25   not -- it always looked like you have more people
```



**Delegate Roslyn C. Tyler** 62

```
 1   voting than actually are voting because of the

 2   population, including the prison population.

 3        Q    Uh-huh.  But you're not talking about

 4   55 percent Democratic performance here, are you?

 5        A    Democratic -- well, 55 percent voter

 6   population.

 7        Q    Right.  Just to make sure I understand.

 8   55 percent black voting age population is what that

 9   figure refers to here, correct?

10        A    Yes.

11        Q    Now, why were you referring to the

12   55 percent black voting age population?  Why were

13   you referring to that specific figure right there?

14        A    Probably because still with prior

15   conversation they said you had to have 55 percent

16   Democratic population votes.

17        Q    So again -- and I don't want to put words

18   in your mouth.  Tell me if I'm wrong.  Are you

19   saying that, in your mind, black voting age

20   population is the same as Democratic performance?

21   In other words, there's a one-to-one correspondence?

22        A    What I'm saying is most of the time blacks

23   vote Democratic.  So 55 percent of the population.

24   And that's what I said here.  Draws minority

25   population with 55 percent.
```



**Delegate Roslyn C. Tyler**                    63

```
 1          Q    Right.  So just to be clear.  Sorry to
 2   interrupt you.  Just to be clear, what you're
 3   referring to here, though, is 55 percent black
 4   voting age population?
 5          A    Yes.
 6          Q    You don't say 55 percent Democratic
 7   votes --
 8          A    55 percent population, correct.
 9          Q    -- correct.
10          So does that refresh your memory that
11   maybe you did talk to folks about a 55 percent black
12   voting age population --
13          A    Correct.
14          Q    -- threshold?
15          A    Yes.
16          Q    Now that does refresh your memory?
17          A    Yes.  But 55 percent voter population,
18   yes.
19          Q    Right.  But in your mind, the purpose of
20   ensuring 55 percent BVAP was to help Democrats be
21   elected?
22          A    Democratic performance, yes.  That's
23   correct.
24               MR. SPEAR:  I am handing to the court
25          reporter an exhibit, which she will mark as
```



**Delegate Roslyn C. Tyler**                    64

```
 1          Exhibit 9.
 2              (Tyler Exhibit 9 marked for
 3          identification.)
 4    BY MR. SPEAR:
 5          Q    Do you have that exhibit in front of you,
 6    Delegate Tyler?
 7          A    I do.
 8          Q    This is an email string produced by the
 9    House.  What I would like for you to do is look at
10    the very bottom of the first page.  You see where it
11    says from Chris Jones?
12          A    Uh-huh.
13          Q    You have to say "yes."
14          A    Oh.  Yes.  I'm sorry.
15          Q    That's okay.
16              Do you see where it says date April 7,
17    2011?
18          A    Yes.
19          Q    Okay.  Turn over to the next page, very
20    top of the next page.  Do you see where it says to
21    G. Paul Nardo?
22          A    Yes.
23          Q    Under subject, it says "F/up"?
24          A    Uh-huh.
25          Q    Do you understand that "F/up" means follow
```



**Delegate Roslyn C. Tyler**                    65

1  up?

2        A    Okay.

3        Q    Let me just say that that's what I think

4  it means.

5        A    Okay.

6        Q    And you're not disagreeing with that?

7        A    All right.

8        Q    Do you know who G. Paul Nardo is?

9        A    Yes.

10       Q    So I'm going to read the first paragraph

11  to you here.  This is from Chris Jones to G. Paul

12  Nardo.

13            It says:  GP, I followed up with Jennifer

14  McClellan this afternoon, and she reconfirmed that

15  the request of Kirk Showalter, Richmond Register,

16  exceeded the 55 percent threshold when they did on

17  the second floor for all affected districts and that

18  she would have never requested it if it didn't.  I'm

19  not sure what got lost in translation, but the good

20  news is it is fixed now, and Jennifer will explain

21  the Senate amendment on floor Monday if needed.

22            Did I read that correctly?

23       A    Correct.

24       Q    So when Delegate Jones is referring to the

25  55 percent threshold here --



**Delegate Roslyn C. Tyler**                                    66

```
 1         A    Yes.

 2         Q    -- do you agree that he's referring to

 3    that 55 percent BVAP threshold that we just

 4    discussed?

 5         A    Yes.

 6         Q    So is it fair to read that message as

 7    meaning that Delegate Jones thought there was a,

 8    quote, 55 percent threshold for BVAP in the

 9    majority-minority districts?

10         A    Yes.

11         Q    You do agree with that?

12         A    Uh-huh.

13         Q    And is that consistent with your

14    understanding during the redistricting process and

15    what you heard during the process?

16         A    Yes.
```



**Delegate Roslyn C. Tyler**                    67

```
 2          You recall that we looked at your comments
 3   at the April 4, 2011, public hearing.  And you
 4   explained that you were talking about a 55 percent
 5   BVAP floor.  And then we looked at this message,
 6   this email message from Chris Jones to Paul Nardo,
 7   and you saw that Chris Jones uses the phrase
 8   "55 percent threshold"?
 9       A    Uh-huh.
10       Q    Do you agree with that?
11       A    I agree.
12       Q    And that he is talking about a 55 percent
13   threshold for black voting age population, or BVAP,
14   in the majority-minority districts, correct?
15       A    Correct.
16       Q    At the end I asked you if that was
17   consistent with your understanding that there was a
18   predetermined 55 percent threshold for BVAP in all
19   of the majority-minority districts; is that correct?
20       A    I don't know whether it was 55 percent for
21   all minority districts, but 55 percent is what I
22   heard.
23       Q    55 percent is the figure you heard.  Let
24   me make sure I understand the distinction you're
25   drawing there.  Are you saying --
```



1        A    I don't know whether it was for every
2   black representative or not, but that was the number
3   that was floating, 55 percent.
4        Q    Okay.  So you weren't sure if -- so I
5   think what you're saying is you agree that there was
6   a 55 percent threshold or quota --
7        A    Uh-huh.
8        Q    -- but you're not sure if it was applied
9   to every district?
10        A    That's right.
11        Q    Some districts?
12        A    Some districts.  But I don't know whether
13   all black minority districts.  But like I said, that
14   was the percentage, 55 percent or the plus and
15   minus.
16        Q    Uh-huh.
17        A    That's the term that you kept hearing, the
18   numbers that you kept hearing all the time.
19        Q    Okay.  And the 55 percent number you
20   heard, you remembered hearing it from Delegate
21   Spruill, correct?
22        A    Yeah.
23        Q    Did you remember hearing it from Delegate
24   Dance?
25        A    No.



**Delegate Roslyn C. Tyler**                           69

```
 1        Q    Okay.  Is it fair to say, though, that you

 2   heard it so much that it seemed to be a matter of

 3   common knowledge, at least amongst people who

 4   represented the majority-minority districts?

 5        A    Probably so.  I guess it's correct to say

 6   that.  It was common knowledge.

 7        Q    So if you walked up to another delegate

 8   and said, I don't know about this 55 percent thing,

 9   they would probably know what you were talking

10   about?

11        A    They probably would, yeah.


13             MR. SPEAR:  Now I am handing the court

14             reporter another transcript she will mark as

15             Exhibit 10.

16             (Tyler Exhibit 10 marked for

17             identification.)
```



**Delegate Roslyn C. Tyler**                    70

```
 3         Q    Do you remember this hearing?

 4         A    No.

 5         Q    Do you know if you attended this hearing?

 6         A    No, I don't.

 7         Q    Please turn to page 25.

 8              Are you there?

 9         A    Uh-huh.




16         Q    Thank you.  I would like to direct your

17    attention to page 26, line 21, and this is Delegate

18    Dance speaking as we just discussed.  Again, you

19    understand Delegate Dance is former Delegate Dance?

20         A    Yes.

21         Q    She's now Senator Dance?

22         A    Correct.

23         Q    Delegate Dance says:  I can tell you that,

24    if we don't -- whatever redistricting plan comes

25    out, if we don't have at least a 55 percent variance
```



**Delegate Roslyn C. Tyler**                    71

1   as far as minorities, then we don't really stand

2   much of a chance to be able to live up to what the

3   Department of Justice says we have a right to have.

4   And that also impacts the whole state of Virginia as

5   far as how things have to be shifted.

6            Did I read that correctly?

7        A    Correct.

8        Q    So do you agree that here Senator Dance is

9   saying that all majority-minority districts had to

10  have at least 55 percent BVAP?

11       A    Correct.

12       Q    And is that consistent with your

13  understanding that there was a predetermined

14  55 percent BVAP level at least for some districts?

15       A    Right.

16       Q    And I think you testified earlier that

17  Delegate Jones spoke frequently with Senator Dance

18  about the redistricting process, correct?

19       A    Uh-huh.

20       Q    So do you think it's likely that she

21  discussed this 55 percent predetermined threshold

22  with Delegate Jones?

23       A    Yes.  I don't know for sure, but from

24  reading this.

25       Q    Okay.  Do you think it's a fair reading of



www.zahncourtreporting.com

**Delegate Roslyn C. Tyler**                    72

1    this passage to say that Delegate Dance thinks that

2    the reason the 55 percent threshold is important is

3    because it ensures compliance with the VRA?

4           A    Yes.

5           Q    Do you know if Senator Dance was a member

6    of the Privileges and Elections Committee?

7           A    Yes, she was.

8           Q    I want to go back and take a look at

9    Exhibit 7 again.  This is the transcript of the

10   April 5, 2011, debate.

11              That's the one.  Remember there's four

12   pages per page on this one.

13          A    Okay.

14          Q    Do me a favor and turn to page 66.

15              Are you there?

16          A    Uh-huh.

17          Q    Do you see on page 66, line 7, where it

18   says "Del. Jones"?

19          A    Uh-huh.

20          Q    I'll represent to you that this is

21   Delegate Jones talking about the HB 5001 bill.

22          A    Okay.

23          Q    I'm going to read to you again.

24              Delegate Jones says:  Mr. Speaker, I'd

25   said to the gentleman of the plans that have been



**Delegate Roslyn C. Tyler**                     73

1    submitted and/pr circulated around that were

2    complete and total plans, the plan that is before

3    you, in my opinion, fully complies with the Voting

4    Rights Act as 55 percent or higher, which is

5    testimony that we heard during the public hearings

6    of percentage voting age population.

7            Do you see that?

8    A    Yes.

9    Q    Did I read that correctly?

10   A    Correct.

11   Q    So do you agree that Delegate Jones is

12   saying that the Voting Rights Act requires

13   55 percent or higher, quote, percentage voting age

14   population?

15   A    Yes.

16   Q    Is that consistent with your understanding

17   that, in drawing the new map, Delegate Jones adopted

18   a policy under which all the majority-minority

19   districts had to have at least 55 percent BVAP?

20   A    Yes.

21   Q    And he did that it seems because he

22   thought the Voting Rights Act required it, correct?

23   A    Correct.

24   Q    Flip to page 70, please.

25           So Delegate Jones is still answering



ZAHN
COURT REPORTING
www.zahncourtreporting.com

1    questions about the map.

2            Take a look at line 5 on page 70.  He's

3    talking here about alternative maps I believe that

4    had been proposed by university students.  That's

5    not important but just for context.

6            He says, quote:  I have looked at the 12

7    and the 13th plan, Option 1 and Option 2, and

8    neither one of those plans met what I think from the

9    testimony that we heard throughout this process that

10   the effective voting age population needed to be

11   north of 55 percent.  Each of those plans had a low

12   of I think 52, 52 percent.

13           Did I read that correctly?

14       A   Correct.

15       Q   So again, does it seem to you that

16   Delegate Jones is saying that, under the VRA, each

17   majority-minority districts had to have a, quote,

18   effective voting age population north of 55 percent?

19       A   Yes.

20       Q   I'm going to ask the question again in a

21   much simpler form to make sure the record is clear.

22       A   Okay.

23       Q   So from this passage, you would understand

24   Delegate Jones to believe that each of the

25   majority-minority districts had to have at least



1  55 percent BVAP to comply with the VRA?

2      A    But when he says here the effective voter

3  age population needs to be north of 55 percent --

4      Q    Uh-huh.

5      A    -- what does he mean by north of

6  55 percent?  Meaning 55 percent and above?

7      Q    That's how I would read it.  How would you

8  read it?

9      A    Well, I don't know whether he meant north

10  of 55 percent or above 55 percent or more, or are he

11  talking about delegates in the northern area needing

12  55 percent?

13      Q    Do you think that's what he meant, that

14  delegates in the northern area needed more than

15  55 percent?

16      A    I'm assuming, because each of these plans

17  a low of I think 52, 52 percent.

18      Q    Well, let me just focus your attention on

19  the language that I read where he says:  We heard

20  throughout this process that the effective voting

21  age population needed to be north of 55 percent.

22          So do you think when he says north of

23  55 percent he's talking about effective voting age

24  population?

25      A    Well, I don't know whether he's talking



**Delegate Roslyn C. Tyler**                                76

1    about 55 percent population, or is he talking about

2    delegates in the northern area that needs 55 percent

3    population.  I'm not sure.

4         Q    Okay.  Did you ever hear Chris Jones or

5    anyone else say that the 55 percent threshold only

6    applied to delegates in the northern part of the

7    state?

8         A    No.

9         Q    I'm sorry.  Did you say "no"?

10        A    No.

11        Q    So just to tie this one off, from the

12   documents we've looked at, do you think it's pretty

13   fair to say that there was, at least in Delegate

14   Jones' mind, a requirement that all the

15   majority-minority districts had to have at least

16   55 percent BVAP?

17        A    Yes.

22        Q    And was it your understanding that this

23   55 percent minimum or quota was also applied to the

24   drawing of your district?  In other words, did

25   Delegate Jones try to make sure that you had at



**Delegate Roslyn C. Tyler**                     77

1   least 55 percent BVAP in your district?

2        A    I don't know whether he was trying to do

3   it for my district or -- I'm talking about my

4   district.  I don't know whether he was trying to

5   make it for my district or not, because most of my

6   conversations was with Delegate Spruill and Delegate

7   Dance.

8        Q    Uh-huh.  Did you talk with them about

9   needing to get your district above 55 percent BVAP?

10       A    I talked to them more about the 55 percent

11  BVAP or percentage, but more about the contiguous of

12  my district -- of having more of my own district

13  rather than new territory.  That was most of my

14  conversation back and forth.

15       Q    Okay.  But in those conversations with

16  Delegates Dance and Spruill, did either they or you

17  talk about whether your district was going to be

18  over 55 percent black voting age population?

19       A    I think -- I think more so with Spruill.

20       Q    Okay.  So you did have those conversations

21  with Delegate Spruill?

22       A    Yeah.  As far as conversation of.  Again,

23  we was referring to Democratic performance.  And it

24  could have been he was talking about 55 percent, but

25  I was talking about 55 percent Democratic



www.zahncourtreporting.com

1  performance district.

2        Q    Okay.

3        A    And I say that because we was talking

4  about Democratic district versus Republican district

5  and that you had to have a 55 percent performance,

6  Democratic performance, district.  My mind wasn't at

7  55 percent minority voters.  My mind was at

8  55 percent Democratic performance district.

9        Q    Where do you think Delegate Spruill's mind

10 was in that conversation?

11       A    Like you said, his mind could have been

12 55 percent population, because, again, he was on --

13 him and Dance were on the electoral committee.

14       Q    Okay.  The Privileges and Elections

15 Committee?

16       A    The Privileges and Elections Committee.

17 So those two were on those committees, and they were

18 there to help us out in any way they possibly could.



**Delegate Roslyn C. Tyler**                    79

12          Do you remember any conversations with

13   Delegate Jones about your district during the

14   redistricting cycle?

15       A    I don't recall a lot of conversation with

16   Delegate Jones.

17       Q    Do you recall any?

18       A    Well, I had talked to him about my

19   district, that I particularly didn't like it.  But

20   he was only able to do what he could with my

21   district.

22       Q    And what did you tell him you didn't like

23   about your district?

24       A    Well, I didn't like the way my district

25   went out west more so than I thought it could have



**Delegate Roslyn C. Tyler**                    80

```
 1  been -- my district is three hours long.  So I was

 2  discontent with my district being three hours long.

 3      Q    That's one of the reasons you said you

 4  think it's not a compact district?

 5      A    That's right.  And three hours long is a

 6  long district.

 7      Q    I agree.  So do you remember, did you have

 8  face-to-face conversations with Delegate Jones,

 9  email conversations, other kinds?

10      A    I didn't have any emails.  I just visited

11  his office one time, and I told him I didn't like my

12  district being so long.  And he said it wasn't so

13  much that he could do, because the way the district

14  butted up against, he didn't have any choice.

15      Q    Did you ever discuss this 55 percent BVAP

16  threshold with Delegate Jones?

17      A    No.

18      Q    No?  No memory of that?

19      A    (Witness shook head.)

20      Q    I assume then that means he never

21  explained why he chose the 55 percent figure?

22      A    No.

23      Q    And you never asked?

24      A    No.
```



**Delegate Roslyn C. Tyler**                    81

```
 4              (Tyler Exhibit 11 marked for

 5         identification.)

 6   BY MR. SPEAR:

 7         Q    Do you have that exhibit in front of you,

 8   Delegate Tyler?

 9         A    Yes.
```



www.zahncourtreporting.com

**Delegate Roslyn C. Tyler**                                83

```
 1        Q    So there's a conversation involving you
 2  and Delegate Jones and Delegate Wright, correct?
 3        A    No.
 4        Q    There's not a conversation?  There wasn't
 5  a conversation amongst you?
 6        A    Not a three-way conversation, no.
 7        Q    I see.  Who was the -- who did you have a
 8  conversation with?
 9        A    It was -- I was probably talking to Dance,
10  Delegate Dance.  I didn't meet with Tommy Wright, or
11  I didn't meet with Delegate Jones.
12        Q    Okay.
13        A    It had been some discussion with Tommy,
14  because Tommy and my district butt up against each
15  other.
16        Q    Right.  And which district does he
17  represent?  Sorry to interrupt.
18        A    I don't know.  I don't know.
19        Q    That's okay.
20        A    But our district goes against each other,
21  butts up.  His is the next district next to mine.
22  And there was some discussion about trying to
23  make -- about precincts that was going to be split
24  or something.  But, uh-uh, we didn't have a meeting.
25        Q    Let me ask you about Nottoway.  Am I
```



 1   pronouncing that correctly?

 2       A    That's right.  I don't have that district.

 3   That's Delegate Wright's.

 4       Q    What is Nottoway, a precinct?

 5       A    Uh-uh.  It's a county.

 6       Q    So when Delegate Jones says "we made

 7   Nottoway whole," what does he mean?

 8       A    He didn't split the county.

 9       Q    It remains one person's district?

10       A    That's right.

11       Q    And who -- which district is that?

12       A    Delegate Wright's.  And then I took in the

13   existing precincts that were within Lunenburg and

14   Hounds Creek and Rosebud.  Part of those are in my

15   district.

16       Q    And those ended up in your district in the

17   final map; is that correct?

18       A    That's correct.  So he was trying not to

19   split the counties.  But it wasn't no meeting.  It

20   was just a discussion of areas that he was trying

21   not to split counties --

22       Q    I understand.

23       A    -- and just trying to keep them whole.

24       Q    Okay.  Fair enough.

25            And then on lines 10 through 13, Delegate



**Delegate Roslyn C. Tyler**                    85

1    Jones mentions that there's a couple -- he says,

2    quote:  A couple of trades of precincts in the

3    Sussex and Southampton areas between the 64th and

4    the 75th.

5            Did I read that correctly?

6        A    Yes.

7        Q    And the 75th is your district, correct?

8        A    75th is my district.

9        Q    So what was the purpose of those trades of

10   precincts?

11       A    It was just the way that it was trying to

12   make the line I guess a little bit more congruent

13   with the 64th district, because I split Southampton

14   and Sussex with another delegate.

15       Q    Uh-huh.  So were these trades intended to

16   increase the number of African-Americans in your

17   district?

18       A    I think it was done to not split precincts

19   in the area.

20       Q    Okay.  So you don't think it had anything

21   to do with voting age population?

22       A    No.

23       Q    Or the population of African-Americans in

24   your district?

25       A    No.



```
 2            MR. SPEAR:  I'm handing the court reporter

 3       a document that she will mark as Exhibit 12.

 4            (Tyler Exhibit 12 marked for

 5       identification.)

 6  BY MR. SPEAR:

 7       Q    Do you have that exhibit in front of you,

 8  Delegate Tyler?

 9       A    Yes.

10       Q    Do you see that it says that it's from

11  Chris Marston?

12       A    Yes.

13       Q    Do you know who Chris Marston is?

14       A    No, not really.

15       Q    Do you have any idea who Chris Marston

16  might be?

17       A    Nope.
```



**Delegate Roslyn C. Tyler**                                87

```
 1        Q     And the title is -- subject is HD61-HD75
 2   Dale's Options?
 3        A     Uh-huh.
 4        Q     And it has two attachments titled -- the
 5   first one is DLO-Southside-3.pdf, and the second one
 6   is DLO-Southside-2.pdf.
 7        A     Uh-huh.
 8        Q     I'm going to read the message to you.  It
 9   says, quote:  Someone's having trouble following
10   directions.  Here are the two options that Dale
11   proposes, neither of which fully address Tyler's
12   concerns.  I'll try and generate another one that
13   gets it done without dropping the percent BVAP too
14   low.
15              Did I read that correctly?
16        A     Yes.
17        Q     Now, where it says, Here are the two
18   options that Dale proposes, do you know who Dale is?
19        A     No.
20        Q     Could it be Attorney Dale Oldham?
21        A     I don't have the faintest idea.
22        Q     Okay.  Do you see where it says, Neither
23   of which fully address Tyler's concerns?
24        A     Uh-huh.
25        Q     Are they referring to you, Delegate Tyler?
```



**Delegate Roslyn C. Tyler**                    88

```
 1         A     They could be.  Well, I'm the only

 2   Delegate Tyler if it's Delegate Tyler.  Uh-huh.

 3         Q     Well, let me ask you this.  Had you raised

 4   some concerns with Delegate Jones about your

 5   district around this time?

 6         A     I had raised some concerns with --

 7   about -- again about the length in district of my

 8   area.




13         Q     Had you raised any concerns about the

14   percentage of BVAP in your district?

15         A     I had -- I was concerned about the

16   decrease in number of black people in my district.

17         Q     You were concerned about the decrease in

18   number of black people in your district?

19         A     Yes.

20         Q     And you raised that concern with Delegate

21   Jones?

22         A     I don't know whether it was Delegate Jones

23   or Lionell.  But I had that conversation with

24   Lionell, because Lionell did a lot of the

25   communications.  I didn't talk a lot to Chris Jones.
```



**Delegate Roslyn C. Tyler**                                    89

```
 1    I always talked to Delegate Spruill or Delegate

 2    Dance, because those are the ones who was supposed

 3    to be helping us draw our lines.  So I didn't do a

 4    lot of immediate talking to Delegate Jones.

 5         Q    I understand.  So is it your testimony

 6    that you recall talking to Delegate Spruill about

 7    concerns about the number of black people in your

 8    district?

 9         A    Yes.

10         Q    And it appears from this email he passed

11    those on to Delegate Jones?

12         A    Yes.

13         Q    So that's what Chris Marston and Chris

14    Jones are talking about in this email exchange, your

15    concerns with the level of BVAP in your district?

16         A    Evidently so, because I was concerned

17    about the length of my district, the number of

18    minority vote, people in my district.  But I always

19    talked to Lionell and Delegate Dance because those

20    were the people that they had -- that was

21    communicating on our behalf.

22         Q    Uh-huh.  To be real specific, was your

23    concern that the number of black people of voting

24    age in your district was too low?

25         A    Yes.
```



**Delegate Roslyn C. Tyler**                                    90

```
 1          Q    Is that what the concern was?

 2          A    Yeah.

 3          Q    And why did you think it was too low?

 4          A    Well, when -- in discussion, I didn't know

 5   the percentage or the lower percentage, and I was

 6   concerned of when they say 55 percent, that my

 7   district have 55 percent.  And so that was my thing,

 8   that my district have 55 percent or not, because I

 9   was going out into a more Republican district.  So

10   then what was my percentage of minority.



13          Q    So your concern -- again, just making sure

14   I'm understanding -- your concern was that you were

15   aware of the 55 percent threshold --

16          A    Uh-huh.

17          Q    -- and you wanted to make sure that your

18   district met that requirement, that it was

19   55 percent or higher?

20          A    Or close to it as possible if that was the

21   case.

22          Q    And would you have preferred that the BVAP

23   was higher than 55 percent in your district?

24          A    Well, being a young delegate and going

25   through a district, and I didn't know what 55
```



**Delegate Roslyn C. Tyler** 91

1  percent of whatever, I just wanted to be in the

2  ballpark or close to whatever it was supposed to be.

3  So, I mean, whether it was 55 percent or whether it

4  was going to be 52, 53, or whether my district was

5  going to be a swing district.

6      Q    So did you communicate to Chris Jones or

7  anyone else a percentage of BVAP that you thought

8  your district should be at?

9      A    No.

10     Q    You never identified a percentage?

11     A    No.



```
 1              CERTIFICATE OF REPORTER/NOTARY PUBLIC

 2

 3    COMMONWEALTH OF VIRGINIA AT LARGE, to-wit:

 4

 5         I, KIMBERLY A. WATROUS, RPR, the officer before

 6    whom the foregoing deposition was taken, do hereby

 7    certify that the foregoing transcript is a true and

 8    correct record of the testimony given by

 9    DELEGATE ROSLYN C. TYLER on May 19, 2015; that said

10    testimony was taken by me stenographically and

11    thereafter reduced to typewritten form under my

12    direction; that reading and signing was not

13    requested; and that I am neither counsel for,

14    related to, nor employed by any of the parties to

15    this case and have no interest, financial or

16    otherwise, in its outcome.

17         IN WITNESS WHEREOF, I have hereunto set my hand

18    and affixed my notarial seal this 28th day of May,

19    2015, at Norfolk, Virginia.

20

21                              
22         _____
                              Kimberly A. Watrous, RPR
23                            Notary Reg. No. 195088
                              My commission Expires 09-30-18
24

25
```



# EXHIBIT D



Planet Depos®

We Make It *Happen*™

# Transcript of James Loewen, Ph.D.

**Date:** September 20, 2017
**Case:** Bethune-Hill, et al. -v- Virginia State Board of Elections, et al.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3              RICHMOND DIVISION

4    --------------------------------- )

5    GOLDEN BETHUNE-HILL, et al.,        )

6              Plaintiffs,      )Civil Action No.

7        vs.                    )3:14-cv-852-

8    VIRGINIA STATE BOARD OF ELECTIONS, )REP-AWA-BMK

9    et al.,                            )

10             Defendants.       )

11   and                                )

12   VIRGINIA HOUSE OF DELEGATES, et al.,)

13             Intervenor-Defendants.  )

14   --------------------------------- )

15        DEPOSITION OF JAMES LOEWEN, Ph.D.,

16              Washington, D.C.

17            September 20, 2017

18

19

20   JOB NO.:  160623

21   PAGES:  1 - 73

22   REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                                        2

1              Deposition of JAMES LOEWEN, Ph.D., held at

2      the offices of:

3

4                    Perkins Coie, LLP

5                    700 Thirteenth St, NW

6                    Washington, D.C. 20005

7

8              Taken pursuant to notice before Tina M.

9      Alfaro, a Notary Public within and for the District

10     of Columbia.

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    14

1

2

3

4

5

6

7

8        A.   I have to say I didn't look over it

9   carefully.   I'm astounded at some of this.   7, "All

10  expert reports, analyses, affidavits, and

11  declarations that you drafted, prepared, signed, or

12  relied upon in any and all prior cases in which you

13  have been retained or have testified as an expert."

14  For me to reply to that would require my sending an

15  astounding amount of material.

16

17

18

19

20

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    15

```
 1

 2

 3         A.   I've testified in cases on all kinds of

 4    things.  Any and all prior cases, that's in all

 5    fields.  I've done this since 1969 and I cannot

 6    respond to this without an inordinate amount of

 7    expense and time.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19       Q.  On July 11th, a little more than two

20  months ago, you made a phone call to Mark Elias of

21  our office and he didn't return the call.  Do you

22  remember making that call?

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    17

1        A.   I remember making a call to someone who I

2    considered might know about the case and somebody

3    told me that they might and I don't remember the

4    name.  If you say it was to a man named Mark Elias,

5    I will say that's probably the case.

6        Q.   And I'll apologize on behalf of Mark for

7    not returning the call, but there's an ethical rule

8    that precludes a lawyer from speaking to an

9    individual who's represented by counsel.  Are you

10   familiar with that rule at all?

11       A.   Vaguely.

12       Q.   So rather than returning your phone call

13   we contacted the lawyers from Baker Hostetler,

14   specifically Kate McKnight, to clarify whether they

15   were your lawyers and whether they would object to

16   us returning your phone call, and in response they

17   told us several things.  First, they said you were

18   a client of the Baker Hostetler firm for the

19   purposes of this lawsuit.  I gather from your

20   testimony that's not accurate, you are not a client

21   of the Baker Hostetler firm?

22       A.   Probably at that point the conversation

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    18

1    hadn't come up and I'm not a client as far as I

2    know.

3         Q.  Have you ever been a client of Baker

4    Hostetler?

5         A.  I don't know.  Not that I know of.

6         Q.  Any idea why they were making that

7    representation?

8         A.  Well, maybe they're in the same strange

9    situation I'm in, that in a sense they have an

10   expert witness and in a sense they don't.  In a

11   sense I'm an expert witness in this case and in a

12   sense I'm not.  So I don't know.  You'd have to ask

13   them.

14        Q.  Have they told you that you're an expert

15   witness in this case?  I'll tell you why I'm asking

16   the question.

17        A.  I don't know what that means.  Let me

18   respond to that.  My report from 2001 is referred

19   to by at least one expert witness in the case I was

20   not only told, but I skimmed his report and I saw

21   that.  They contacted me because they said my

22   report was involved or important in this

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    19

1    redistricting that occurred in response to the 2010

2    census.  So in that sense I'm an expert witness in

3    this case.  I've not been engaged as an expert

4    witness in this case that I know of other than to

5    authenticate my report.  That's what I'm actually

6    talking about in terms of I am an expert witness

7    and I am not an expert witness.

8         Q.  Thank you for that explanation.  I'll just

9    tell you you have not been identified as an expert

10   witness in this case.  The federal rules have a

11   certain disclosure obligation and you've never been

12   listed as an expert witness.  So there's actually a

13   little dispute about that, which is the reason I

14   was asking.

15           You mentioned a minute ago you were

16   billing for your time.  How much are you billing

17   for your time?  What's your hourly rate?

18        A.  $350.

19        Q.  And is that your regular hourly rate?

20        A.  That's a hard question to answer because I

21   have not been an expert witness in a voting rights

22   case for more than ten years.  So I can't exactly

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    20

1    use the term regular, but in the sense that you

2    mean it, is that the rate I've been charging were I

3    charging, yes.

4          Q.  And how much have you invoiced -- first of

5    all, who are you sending the bills to?

6          A.  The firm representing -- I don't know the

7    names of these firms.

8          Q.  Baker Hostetler?

9          A.  Baker.  I have invoiced them once and it

10   was for around $200.

11         Q.  And are you collecting time now to send

12   them an additional bill for --

13         A.  Yes.

14         Q.  So are you being paid by Baker for your

15   testimony today?

16         A.  Yes.

17             MR. RAILE:  Just to clarify the record,

18   it's for the time -- the way the question was

19   phrased is for the testimony, but obviously it's

20   for the time.

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    21

1    BY MR. HAMILTON:

2        Q.  Ms. McKnight also told us that your call

3    was inadvertent -- your call to Mr. Elias was

4    inadvertent and a mistake.  Is that accurate?  Did

5    you tell her it was a mistake that you reached out

6    to Mr. Elias?

7        A.  I don't know that I had a conversation

8    with her about it.  I don't recall saying

9    inadvertent and I don't recall saying mistake.  I

10   was trying to learn something about the case.  I

11   knew I was not an expert and I haven't been

12   engaged.  So I was just trying to learn something

13   about the case.  I would call it innocent.

14       Q.  Why not ask Kate McKnight or someone else

15   from Baker Hostetler about the case?

16       A.  They had told me about the case.

17       Q.  You wanted a different perspective?

18       A.  Yes.

19       Q.  Did you alert them in advance of making

20   the phone call that you were going to call them?

21       A.  No.  I didn't even fully know that I was

22   calling the principal attorneys in the case.

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    23



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          Q.  This case -- and I'll just tell you, I

19     doubt you're aware of this, but maybe -- was tried

20     once before in 2015 and at that time your report

21     was offered into evidence and it was refused by the

22     Court, they did not admit your report the last

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    24

1    time.  Were you aware that your report was being

2    offered last time?

3         A.  No.

4         Q.  Did you have any discussions with the

5    lawyers about the use of your report, either asking

6    them not to use it or agreeing to allow them to use

7    it?

8         A.  No.

9         Q.  Did they ask you if you thought it was

10   appropriate to use it?

11        A.  No.

12        Q.  Have you been asked to testify at trial?

13        A.  In my life?

14        Q.  No.  For this trial.  Sorry.

15        A.  No.

16

17

18

19

20

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    26

1

2

3

4

5          Did you review any other expert reports

6   other than the one prepared by Professor Hood.

7          A.   I did not.

8          Q.   How did you come to choose the Hood report

9   to review?

10         A.   The Baker firm told me that they -- I

11  think they engaged Professor Hood and they shared

12  with me his second report, and I said maybe I

13  should see the first one as well.

14         Q.   And did you have any reactions to his

15  report?

16         A.   I thought it was competent.

17         Q.   Any other reactions?

18         A.   No.

19         Q.   What do you mean by competent?

20         A.   Well done, dealt with the important

21  issues, I found no errors.

22         Q.   How much time did you spend reviewing

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    27

1    Dr. Hood's report?   You said you hurriedly read it.

2         A.   Two reports.   Maybe one hour for the

3    combined reports.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    30

1

2

3

4

5

6

7

8          Q.  Fair to say you've had extensive

9     experience in redistricting litigation?

10         A.  Correct.

11         Q.  I take it you have not appeared in

12    connection with redistricting litigation in the

13    last ten years as an expert witness?

14         A.  Correct.

15         Q.  Is it fair to say that your work in this

16    case was your last major appearance as an expert

17    witness in connection with redistricting?

18         A.  I don't know for sure.  Probably.

19

20

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                          31

1

2

3

4

5

6

7

8

9          Q.   Were you asked to do any work in

10    connection with Virginia in the 2010 cycle?

11         A.   Not that I recall.

12

13

14

15

16

17         Q.   Has there been a side, Democratic versus

18    Republican, that has typically hired you in

19    connection with these redistricting cases or have

20    you worked for both parties?

21         A.   There's at least four major parties

22    involved, it's not a simple Democratic/Republican,

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                                    32

1      and I've worked for all four.

2             Q.   What are the other two?

3             A.   Well, for example, the NACP, the ACLU, the

4      City of Anchorage, Alaska.  I don't think that was

5      even a partisan election.  I don't know, but we

6      might call them Defendant side.  Although, of

7      course, Republicans can be Defendants, Democrats

8      can be Defendants.  I suppose ACLU can be a

9      Defendant.  The Department of Justice.  So now

10     we're up to five sides I think.

11            Q.   What topics have you generally offered an

12     expert opinion on?  I know what you did in this

13     case.

14            A.   You mean beyond voting rights cases?

15            Q.   In voting rights cases.

16            A.   The Virginia case would be representative

17     of what I usually testify about.

18            Q.   You're familiar with racially polarized

19     voting analyses?

20            A.   Yes.

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    37

1

2

3

4

5          Q.   You're familiar with ecological inference?

6          A.   Vaguely.

7          Q.   Have you ever used ecological inference as

8     a tool in connection with any of your expert

9     analysis?

10         A.   I have not personally done it.  I have had

11    an assistant do it under my direction once, I

12    believe.

13         Q.   Do you have a preference for using one

14    over the other?

15         A.   I think both are good tools.  I think the

16    results of the two in most cases intercorrelate

17    almost perfectly.  Ecological regression is simpler

18    to do and easier to explain to a judge or lawyers

19    or anyone else involved.  So my preference would be

20    ecological regression.  However, I think ecological

21    inference avoids certain problems that can come up

22    with unusual distributions of voting behavior, and

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    38

1    I therefore think it is appropriate to check

2    ecological regression by doing ecological inference

3    too.  If an expert witness chooses to do only the

4    latter, that is, ecological inference, that's fine.

5         Q.  In doing a racially polarized voting

6    analysis is it fair to say that you want to look

7    for election returns from recent -- look at

8    election returns from recent elections?

9         A.  Yes.

10        Q.  And we can go through it, but in your

11   report you repeatedly make that statement, recent

12   political behavior offers the best information for

13   predicting future political behavior, or you say on

14   page 12 experts look to recent contests to assess

15   whether and to what degree whites show racial bloc

16   voting and so on.  Is it fair to say that's a

17   fairly important principle?

18        A.  Yes.

19        Q.  And is that -- is it fair to say that in

20   your field in conducting racially polarized voting

21   analyses it's an accepted practice and norm to use

22   the most recently available and relevant election

1    data for the purpose of doing that kind of

2    analysis?

3         A.   I don't -- strike that.   I would add this

4    caveat.   If there are no recent contests for the

5    office in question, then you have to make due in

6    two different ways, use older election contests for

7    the office in question and sometimes make use of

8    more recent elections for offices.

9

10

11

12

13        Q.   Handing you what's been marked as Exhibit

14   No. 3.   Do you recognize this document?

15        A.   More or less.   I reviewed the same report

16   dated September 5th.   This one is dated October --

17   I mean, August 31st.

18        Q.   Well, let's start with this is a copy of

19   your expert report from the 2001 redistricting

20   cycle or a version of that report; is that right?

21        A.   Seems to be, yes.

22        Q.   Okay.   And then you've reached into your

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    40

1    briefcase and pulled out another document.  Is this

2    an updated version of that report?

3         A.  Apparently so and it's, as I mentioned,

4    dated I guess six days later.

5         Q.  Do you know if it's different in any

6    material way?

7         A.  I wouldn't know because I haven't reviewed

8    the August 31st document for 16 years, but it look

9    to be identical in the table of contents except

10   that the pagination does become different.  The

11   items -- well, let me study the items for a moment

12   before I make a statement about the items in the

13   table of contents.

14

15

16        A.  There are differences.  The document you

17   just gave me dated August 31st includes comments on

18   the Lublin report about compactness.  The document

19   I've just been reviewing, the document dated

20   September 5th does not include that in the table of

21   contents and is therefore shorter.  There may be

22   other small differences.

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                     41

1        Q.   Do you know which version of this was

2   submitted to the Court?

3        A.   I don't.

4        Q.   Are there any other versions of this

5   report other than the one you pulled out of your

6   briefcase and the one we've marked as Exhibit

7   No. 3?

8        A.   I have no idea.

9        Q.   Assuming that the data is available, that

10  is, there have been more recent elections, correct

11  me if I'm wrong, but I think what you said is you

12  would want to use the most recently available

13  electoral data for the purpose of doing a racially

14  polarized voting analysis?

15       A.   If I were an expert witness in this case I

16  would ask for a list of all elections that have

17  been held in Virginia that might possibly be

18  relevant, certainly all the elections for the two

19  offices in question, the Senate and the House, and

20  some other offices as well.  I guess that's maybe a

21  yes.

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    42

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22      Q.  So what you asked for when you did this

1    racial bloc voting analysis was for the most recent
2    ten years worth of data?
3         A.  I did.
4         Q.  And that's an appropriate data set to be
5    looking at in order to do a racial bloc voting
6    analysis, right?
7         A.  It would be appropriate.  I wouldn't have
8    asked for it if it was not appropriate.  Do you
9    mean is it sufficient?
10        Q.  You can -- sure, let's answer that
11   question.
12        A.  You didn't ask that.  I'm asking what is
13   your question?
14        Q.  Is it sufficient?  Was that a sufficient
15   data set for you, sir?
16        A.  It would depend --
17        Q.  In this instance was this a sufficient
18   data set for you to draw these conclusions?
19        A.  In some districts, for some districts, no,
20   but I did the best I could.  Generally in this
21   instance, yes.
22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    44

1

2

3

4

5

6

7

8        Q.   If a state is growing rapidly and the

9   demographics are changing rapidly, that would make

10   older electoral returns even less relevant to

11   current political behavior; isn't that true?

12        A.   It might.

13        Q.   A racially polarized voting analysis is

14   specific to a particular district, isn't it, as a

15   general proposition?

16        A.   I don't know what you mean by that.  What

17   do you mean by "specific"?

18        Q.   Racially polarized voting analysis of a

19   district, say, for example, in the Tidewater region

20   of Virginia, wouldn't tell us much about voter

21   behavior in, say, Northern Virginia in the

22   Washington, D.C. suburbs, correct?

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    45

1          A.   I find that actually hard to answer.  I

2     can't quite say correct.  I notice that you

3     changed, for instance -- let's put it this way.

4     The way that people behave in a given district is

5     likely to be the way they behave in the next

6     contiguous district.  So when you changed your

7     question you made the districts further apart.

8          Q.   I'm trying to clarify it for you, sir.

9          A.   I understand.  I'm just explaining my

10    answer.  I think that if I found -- for example, if

11    I found a black-white contest in a district that

12    showed that a black candidate was the candidate of

13    choice of the black community and the white

14    candidate was the candidate of choice of the white

15    community, I would expect then that that kind of

16    racial polarization would probably occur in other

17    districts in the state, even districts located as

18    far apart as Nova versus Tidewater.  On the other

19    hand, I would, of course, want to do that analysis

20    in Nova and see how it came out and that would be

21    the best way to estimate the racial behavior of the

22    Nova district.

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                                    46

1        Q.   You wouldn't just rely on your guess or
2   assumption?  You would want to test it empirically,
3   correct?
4        A.   If I could I would, yes.
5        Q.   A racially polarized voting analysis of a
6   urban area like Richmond wouldn't necessarily be
7   informative of voting behavior in more rural parts
8   of the state, would it?
9        A.   It would not necessarily.
10       Q.   Isn't it fair to say different districts
11  as a general rule behave differently and it depends
12  upon the makeup of the voters and voting behavior
13  within each district?  That's just true as a
14  general proposition, isn't it?
15       A.   No.  I think it's more accurate to say
16  different districts often behave about the same,
17  but you have to check it by looking at the specific
18  districts you have in mind.
19       Q.   Is it -- it's not your testimony that
20  voters in an urban area like Richmond vote the same
21  way as voters in rural parts of Virginia, is it?
22       A.   The first thing you want to -- I think

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                           47

1    we're trying to make a distinction when there is

2    none.  The very first thing you want to do is you

3    want information from the geography that you're

4    trying to estimate.

5

6

7

8

9        A.  The best way to answer that question would

10   be empirically, to get information from people -- I

11   mean, from contests in rural areas and contests in

12   Richmond and then that's an empirical question.

13       Q.  And then the contests you'd want to look

14   at are contests within at least the last ten years?

15       A.  At least the last ten years, yes.

16       Q.  There's no one size fits all rule that

17   would define the proper level of black voting age

18   population necessary for a minority population to

19   have the ability to elect the candidate of its

20   choice in all districts across a state; isn't that

21   right?

22       A.  Correct.

1        Q.   In fact, you've written "We know that the

2    proportion of a district's population that must be

3    minority in order for minorities to have a 50/50

4    chance at election of candidates of their choice is

5    and always has been an empirical question"?

6        A.   Correct.

7        Q.   And you've written that "No single rule

8    can be maintained.  It is an empirical question.

9    Research of the type I have done utilizing

10   correlation, overlapping percentages analysis, and

11   ecological regression is required to determine the

12   proportion that each group must be in in the

13   electorate to have a chance to prevail."  Right?

14       A.   Yes.

15       Q.   And by "empirical question" you mean it's

16   a factual question that must be examined in each

17   specific instance?

18       A.   Correct.

19       Q.   And the factual question must be examined

20   with respect to the particular geography or

21   district at issue?

22       A.   If possible.  I mean, as an expert witness

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    49

1   I would want to do my best.  I'm imagining a

2   district in which, for example, there have been no

3   contests for whatever reason, maybe an incumbent

4   has been in for 22 years or whatever and nobody has

5   contested.  So you might make a better estimate

6   than by -- rather than just throwing up your hands

7   and saying you can do nothing, it might be useful

8   to use an adjoining district or a contest for a

9   different office and use your best judgment as to

10   what you infer from that information.

11       Q.  Sure.  But if the data is available, the

12   election returns are available, the census data is

13   available, then you'd want to look at the specific

14   question relating to that particular geography and

15   those particular voters; isn't that true?

16       A.  Correct.

17       Q.  In your -- do you recall preparing an

18   expert report in the Diaz versus Silver case?

19       A.  I regret to admit that I don't always

20   remember cases by their title.  Can you tell me the

21   jurisdiction?

22       Q.  It was New York City.

1      A.   Yes.  Well, I don't know if it was that

2   case again, but yes, I did do an expert report in

3   New York City.

4      Q.   And there you wrote -- I think you already

5   answered the question, but you wrote "No single

6   rule can be maintained, it's an empirical

7   question."

8      A.   That's for sure.

9      Q.   And when you say "No single rule can be

10   maintained," you were referring at the time to a

11   65 percent -- supposed 65 percent black voting age

12   population rule; do you remember that?

13      A.   Well, I certainly have referred to that

14   rule in the past and argued that it is not a rule

15   and should never have been a rule.

16      Q.   And the same would be true for if someone

17   were to contend that there was a rule that applied

18   statewide or maybe nationwide as a 60 percent black

19   voting age population, correct?

20      A.   It's always an empirical question,

21   correct.

22      Q.   The same would be true with a 55 percent

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                              51

1    black voting age population --

2         A.  Correct.

3         Q.  -- it's an empirical question that's going

4    to depend upon the facts and circumstances in each

5    particular geography, assuming that's available,

6    correct?

7         A.  Yes.  I'll stay with yes.

8         Q.  In 2011 in Virginia the legislature

9    reconfigured the House of Delegates districts I

10   will represent to you and I'm sure you're probably

11   aware of that.  Have you ever conducted a racially

12   polarized voting analysis of those districts?

13        A.  No.

14        Q.  Do you know to what extent the 2011

15   districts were modified from the benchmark or

16   original districts from 2001?

17        A.  My only knowledge would be from the

18   sources that I skimmed which I already mentioned to

19   you.  I have no other independent knowledge about

20   those districts.

21        Q.  You didn't examine or you haven't studied

22   how many black voters were added or removed from

1    the particular districts in 2011?

2         A.  No.

3         Q.  You haven't studied voting behavior in the

4    House of Delegates districts between 2001 and 2011?

5         A.  Correct, I have not.

6         Q.  Had you been asked, I gather you could

7    have prepared a report like Exhibit 3 but in

8    connection with the 2011 redistricting effort,

9    correct, you could have done that?

10        A.  I am capable of preparing a report.

11        Q.  That's all I'm asking.

12        A.  Whether I would have said yes to the

13   request is another matter.

14        Q.  You were capable of it had you been

15   willing to?

16        A.  Yes.

17        Q.  And I take it what you would have done is

18   probably the same thing that you did in 2001, for

19   starters, you would have asked for election returns

20   from as many elections as possible over the

21   preceding ten years?

22        A.  Certainly.  I would not have to go back

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    53

1    further because I already did it.

2         Q.  But you would have looked at the last ten

3    years because that would be the most relevant data?

4         A.  I would.

5         Q.  So let's talk about Exhibit 3 a little

6    bit.  Who hired you in that case to prepare your

7    expert analysis?

8         A.   I think I answered that already, didn't I?

9    It it seems to me it was the State of Virginia.

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    55

1

2

3

4

5

6

7

8          Q.   In preparing your report, Exhibit 3, did

9     you look at census data from 1980?

10         A.   I don't remember.

11         Q.   Did you look at census data from 1990?

12         A.   Yes.  I think.

13         Q.   Did you look at census data from 2000?

14         A.   Yes.

15         Q.   You think you looked at census data from

16    1990?

17         A.   I do.

18         Q.   For what purpose?

19         A.   Because some of the elections hale from,

20    for example, 1991 and you want to use the census

21    closest to the point in time of the election.

22         Q.   How about election return data from the

1    1980s in your report in 2001?

2        A.  I don't remember.

3        Q.  Did you look at any election returns from

4    the 1990s?

5        A.  Yes.

6        Q.  I take it you had confidence in your

7    analysis at the time it was prepared?

8        A.  I did.

9        Q.  Do you still think it's reliable to

10   describe voter behavior in 2011?

11       A.  That's an empirical question.  I don't

12   know.

13       Q.  So you don't know whether -- well, strike

14   that.

15           If we wanted to know about voter behavior

16   in 2011 we'd want to look at the more recent

17   election returns, wouldn't we?

18       A.  Yes.  I would start with my report, but

19   then I would look at the most recent elections.

20       Q.  You'd want to look at the most recent

21   census information as well to determine how the

22   districts changed?

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    57

1         A.  I would.

2         Q.  And I think you've answered this question,

3    but you have not studied the 2010 census data for

4    Virginia?

5         A.  Correct.

6         Q.  And you've not studied the election data

7    for the House of Delegates elections since the date

8    of your report, which is --

9         A.  Correct.

10        Q.  -- 2001?

11            Do you know if urban whites in Richmond

12   have tended to vote for Democrats or Republicans

13   from 2001 to 2011?

14        A.  I don't.

15        Q.  Do you know how urban whites in Richmond

16   have voted at any point after 2011?

17        A.  I don't.

18        Q.  If you wanted to know that it wouldn't be

19   a difficult thing to study, correct?

20        A.  Correct.

21        Q.  The data is there, it's just you haven't

22   had occasion to take a look at it?

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    58

1        A.   So far as I know the data is there, yes.

2        Q.   Backing up more generally, do you know if

3   urban whites in Virginia have tended to vote for

4   Democrats or Republicans from 2001 to 2011?

5        A.   The only knowledge I would have about

6   urban whites in general would be coming from, for

7   example, the Washington Post discussion of

8   elections in Virginia.  In other words, it would be

9   lay knowledge.  I have not done any sociological

10  analysis of voting behavior since my report of

11  2001.

12       Q.   To your knowledge, have the demographics

13  of Virginia changed at all over the last 20 years?

14  Is this a state that's changed a lot or a little or

15  none?

16       A.   I don't exactly know what standards we

17  would employ for a lot, but sure, I have at least a

18  newspaper reader's understanding of the increase in

19  population in Nova.  Also from skimming the report

20  by --

21       Q.   Dr. Hood?

22       A.   -- Professor Hood I am aware that the

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    59

1    population in majority black districts has

2    generally decreased because those districts then

3    had to be enlarged to meet the requirements of the

4    one person, one vote mandate.  Other than that I

5    don't have any particular knowledge of population

6    shifts in Virginia.

7         Q.  Do you know whether there's been any

8    gentrification in downtown Richmond?

9         A.  No.  I would assume there has, but I have

10   no particular knowledge one way or the other.

11        Q.  You haven't looked at it, you haven't

12   studied that?

13        A.  I have not studied it.

14        Q.  And I gather, then, you don't know whether

15   more whites have moved to downtown Richmond as of

16   2017 than might have been there in 2011, for

17   example?

18        A.  I do not.

19        Q.  And you also don't know if more whites

20   have moved to downtown Richmond as of 2011 than,

21   say, in 2001?

22        A.  I do not.  I find this a little bit

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    60

1   tedious.  I mean, my answers have pretty much been

2   clear with you that I haven't done any on the

3   ground or statistical research on Virginia since

4   2001.  So I think that answers all of these

5   questions.

6

7

8

9

10

11

12

13       Q.  Let's assume for the purposes of this next

14  question that it's true that urban white voters

15  tend to vote for the same candidates as urban

16  African-American voters while the level of racially

17  polarized voting is higher in rural Virginia.  If

18  that's true, wouldn't it necessarily be true that

19  the black voting age population required for

20  African-American voters to elect the candidate of

21  their choice would be different in urban Virginia

22  than in rural Virginia?

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                          61

1          A.   It might definitely be possible that would

2     be the case, yes.  I would go further.  If the

3     candidate of choice of the white electorate in a

4     given district is often the candidate of choice of

5     the black community as well, which we can determine

6     from ecological inference and ecological

7     regression, then there is no need for a given

8     population percentage with one caveat.

9               It's true everywhere and it's definitely

10    true in Virginia that the percentage black that a

11    district is can have a warming or chilling effect

12    on the white electorate and on the black

13    electorate.  So I would want to make sure that the

14    white folks in a majority black district have not

15    been chilled, by which I mean that their behavior

16    in that district is likely to be predictive of

17    their behavior for the district to become, say,

18    25 percent black in its racial composition rather

19    than 55 percent.

20

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                          62

1        Q.   At the time of the 2011 redistricting did

2    you at any point speak with Delegate Chris Jones,

3    the principal map dropper?

4        A.   At the time of the what?

5        Q.   2011 redistricting.

6        A.   Not that I remember.

7        Q.   There's a gentleman named John Morgan who

8    assisted Delegate Jones.  Have you ever heard of

9    John Morgan?

10       A.   Not that I remember.

11       Q.   So I take it you didn't speak with him

12   either?

13       A.   Not that I remember.

14       Q.   How about staff, legislative services

15   staff in the Commonwealth of Virginia or any of the

16   lawyers involved in the redistricting process?

17       A.   Let's put it this way.  In 2010, 2011,

18   2012 I may have had a phone call from somebody, but

19   I never got engaged and I don't recall any phone

20   call from anybody.

21

22            What's a confidence interval?

1        A.   A confidence interval is an estimate you

2   place around -- excuse me.  It's an interval you

3   place around an estimate and you are either

4   95 percent sure or 99 percent sure or some other

5   percent sure that the true number of whatever you

6   are estimating lies within that interval.

7        Q.   Fair to say that a confidence interval

8   tells us how likely it is that a given estimate is

9   accurate?

10       A.   Yes.

11       Q.   The concept of a confidence interval is

12  taught in most introductory classes in statistics,

13  right?

14       A.   Correct.

15       Q.   Fair to say that a confidence interval

16  tells us the extent to which a given ecological

17  regression or ecological inference estimate is

18  statistically significant?

19       A.   No.

20       Q.   The confidence interval tells us the

21  extent to which a given ecological regression or

22  ecological inference estimate is accurate within a

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    64

1  certain range, correct?

2       A.  Not exactly.  Confidence intervals are

3  usually used to -- in situations where you are

4  sampling.  That's why you always hear a Gallup

5  poll, for instance, saying so-and-so is getting

6  49 percent of the vote but that's with a confidence

7  interval of 2 percent or 3 percent or whatever.

8       Q.  Sometimes called polling error?

9       A.  Yes.  What you are trying to say when you

10  use that confidence interval phrase is we do not

11  know, we cannot know the exact percentage of the

12  voters who are going to vote for, let's say, Donald

13  Trump.  We estimate 49 percent plus or minus, let's

14  say, 3 percent.  There is a fact out there if we

15  have full knowledge of every voter in the United

16  States as of that moment -- of course things can

17  change, we may be polling on Halloween and the

18  election is November, but as of that moment let's

19  say Donald Trump is, in fact, likely to get

20  48 percent of the vote.  We don't know that because

21  we cannot sample all these mines, but we have

22  sampled 1,400 people or whatever we sampled.  So we

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                              65

1    estimate 49 percent plus or minus 3 percent, let's

2    say.  Okay.  That's the usual and that's very

3    definitely an appropriate use of the confidence

4    interval.

5              When you're doing ecological regression

6    you are not sampling, you have the entire

7    population.  You know the voting age population and

8    you know the voting age population for each

9    district, each precinct or whatever unit you are

10   using.  The census can make mistakes I suppose, but

11   you don't -- there's no way to talk about that

12   even.  We have no idea.

13        Q.  So if --

14        A.  We also have the actual votes.  We know

15   that -- going back to Smith or Jones, our previous

16   case in Virginia, we know that Jones got X votes in

17   a precinct and we know that Smith got X votes.  So

18   the use of the confidence interval in ecological

19   regression is not common and it's not clear what it

20   does tell us.

21        Q.  If I have a hypothetical ecological

22   regression estimate of, say, 65 percent of whites

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    66

1    voting for a certain candidate with a 95 percent

2    confidence interval, does that mean anything to

3    you?

4         A.   A 95 percent confidence interval of what?

5    What is the interval?  You didn't say.

6         Q.   As low as 60 percent or as high as

7    70 percent.  That means --

8         A.   You're saying 5 percent --

9         Q.   Let me finish the question.  That means we

10   can say with 95 percent confidence that the true

11   value of white support for that candidate is

12   between 60 and 70 percent, correct?

13        A.   That's what that phrase means.  It's not

14   exactly clear to me what I would make of that

15   statement.  As I say, I don't think most people

16   using ecological regression and ecological

17   inference put that kind of percent around it, but

18   maybe some do and I wouldn't fault them for doing

19   so.  I'd have to think about what it tells us.

20   Certainly ecological estimates can be off, but

21   whether that offness is described by that kind of

22   confidence interval I'm not sure.

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                                    67

1        Q.  So Dr. Katz is another one of the

2    Intervenor's experts.  If you were to testify that

3    ecological inference estimates are always or are

4    usually reported with a confidence interval in the

5    literature, you would disagree with them on that?

6              MR. OLDHAM:  Object to form.

7

8        A.  I don't know.  I haven't reviewed this

9    literature much for the last 17 years.  So --

10       Q.  Have you done any ecological inference or

11   regression analyses in the last 17 years?

12       A.  I don't know.  Not that I recall.

13       Q.  Have you taught any ecological regression

14   or ecological inference in courses that included

15   teaching how to conduct that or report that sort of

16   estimate?

17       A.  In the last 17 years?

18       Q.  Correct.

19       A.  No.

20

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    68

1

2

3          Q.  Let me ask you some questions, Dr. Loewen,

4     about Exhibit 3, your report.  Among the things you

5     were looking at in 2001 was the extent of racially

6     polarized voting in various districts in Virginia,

7     correct?

8          A.  Yes.

9          Q.  And you were analyzing the level of black

10    voting age population that might be necessary in

11    particular districts to give African-American

12    candidates of choice even odds of winning an

13    election; is that right?

14         A.  Yes.

15         Q.  And you repeated that analysis for each of

16    a number of different districts?

17         A.  Yes.

18         Q.  The answer was different for the different

19    districts?

20         A.  As I recall, it wasn't radically

21    different.

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    70

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    Q.  Had you been engaged in 2011 or been asked

17    in 2011 about racially polarized voting in the

18    Commonwealth of Virginia in these districts, you

19    would have collected data and performed an analysis

20    similar to what we see here in Exhibit 3, correct?

21    A.  Yes.

22    Q.  You certainly wouldn't have just handed

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                    71

1    Exhibit 3 to the legislature and say this is still

2    accurate and you can rely on this?

3         A.   Correct.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of James Loewen, Ph.D.
Conducted on September 20, 2017                              73

1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2           I, TINA M. ALFARO, Registered Professional

3      Reporter, Certified Realtime Reporter, and Notary

4      Public, the officer before whom the foregoing

5      deposition was taken, do hereby certify that the

6      foregoing transcript is a true and correct record

7      of the testimony given; that said testimony was

8      taken by me stenographically and thereafter reduced

9      to typewriting under my direction; that reading and

10     signing was requested; and that I am neither

11     counsel for, related to, nor employed by any of the

12     parties to this case and have no interest,

13     financial or otherwise, in its outcome.

14          IN WITNESS WHEREOF, I have hereunto set my

15     hand and affixed my notarial seal this 21st day of

16     September, 2017.

17

18     My Commission expires October 31, 2020.

19

20     _____

21     NOTARY PUBLIC IN AND FOR THE

22     DISTRICT OF COLUMBIA