IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

----------------------------------------
                                        :
GOLDEN BETHUNE-HILL, an                 :
individual, et al.                      :     Civil Action No.
                                        :     3:14cv852
vs.                                     :
                                        :
VIRGINIA STATE BOARD OF ELECTIONS,      :     October 10, 2017
et al.                                  :
----------------------------------------

COMPLETE TRANSCRIPT OF THE BENCH TRIAL

BEFORE:   THE HONORABLE ROBERT E. PAYNE

          THE HONORABLE BARBARA M. KEENAN

          The HONORABLE ARENDA L. WRIGHT ALLEN

APPEARANCES:

Kevin J. Hamilton, Esquire
Abha Khanna, Esquire
Perkins Coie, LLP
1201 Third Avenue
Suite 4800
Seattle, Washington  98101

Aria C. Branch, Esquire
Perkins Coie, LLP
700 13th Street NW
Suite 600
Washington, D.C.  20005
Counsel for the plaintiffs

Peppy Peterson, RPR
Official Court Reporter
United States District Court

```
 1    APPEARANCES:   (cont'g)

 2    Matthew R. McGuire, Esquire
      Office of the Attorney General
 3    202 North Ninth Street
      Richmond, Virginia  23219
 4    Counsel for the defendants

 5

 6    Katherine L. McKnight, Esquire
      E. Mark Braden, Esquire
 7    Richard B. Raile, Esquire
      Baker & Hostetler, LLP
 8    Washington Square
      1050 Connecticut Avenue, NW
 9    Washington, D.C.  20036
      Counsel for intervenor defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Case No. 314-cv-852.  *Golden*

2   *Bethune-Hill, et al. v. The Virginia State Board of*

3   *Elections, et al. and the Virginia House of Delegates, et*

4   *al.*

5       The defendants are -- the plaintiffs are represented

6   by Kevin Hamilton, Abha Khanna and Aria Branch.

7       The Virginia State Board of Elections is represented

8   by Matthew McGuire.

9       The Virginia House of Delegates is represented by Amy

10  Tolbert, Mark Braden, Katherine McKnight and Richard

11  Riley.  Are counsel ready to proceed?

12          MR. HAMILTON:  We are, Your Honor.

13          MR. BRADEN:  Yes, Your Honor.

14          MR. MCGUIRE:  Yes, Your Honor.

15          JUDGE PAYNE:  Good morning.  We are ready in the

16  Bethune-Hill case.  And I believe you got the directive

17  that we'd like to hear about 15 minutes.  Is the defendant

18  going to make any argument?

19          MR. MCGUIRE:  No, Your Honor.  We have a brief

20  opening statement, but otherwise we're going to join with

21  the Defendant-Intervenors.

22          JUDGE PAYNE:  All right.

23      All right.  For the plaintiff.

24          MR. HAMILTON:  Good morning, Your Honors.  It's

25  a pleasure to be here.  My name is Kevin Hamilton, and I

1    appear today on behalf of the plaintiffs.  Thank you for

2    the opportunity to appear with you today.  During my

3    opening remarks, there's going to be a few illustrative

4    exhibits displayed on the screens.  They have been shared

5    with opposing counsel, and there's paper copies before

6    you.

7         The equal protection clause of the 14th Amendment

8    forbids race-based redistricting absent a compelling state

9    interest and even then, only when narrowly tailored to

10   meet that state interest.  The evidence will show that in

11   2011, the Virginia State General Assembly used race as a

12   prominent factor in the drawing of these 11 House of

13   Delegates districts at issue in this case, had no

14   compelling state interest for doing so, and even if it did

15   have a compelling state interest, failed to narrowly

16   tailor the districts to those -- to that state interest.

17        The Court, of course, has already held a trial in

18   this matter in 2015 and has had the opportunity to review

19   the parties' trial briefs as well as the expert reports

20   admitted on both sides.  And, of course, the Court has had

21   additional guidance from the Supreme Court which

22   emphasized the importance of examining predominance

23   district wide because focusing on particular portions in

24   isolation may obscure the significance of relevant

25   district-wide evidence such as stark splits in the racial

 1    composition of populations moved into and out of disparate

 2    parts of the district or the use of an expressed racial

 3    target, closed quote.  So in my limited time this morning,

 4    I wanted to emphasize just a few key facts that we believe

 5    will be established beyond reasonable dispute during the

 6    course of this trial and highlight some of the additional

 7    evidence that we will present to the Court.

 8        Let me start with racial predominance.  The Supreme

 9    Court called on this Court to do a holistic analysis to

10    determine whether race predominated in the challenged

11    districts.  A holistic evaluation of evidence, including

12    both direct and circumstantial evidence, shows that race

13    drove this redistricting process from start to finish.

14    Indeed, stark splits in the racial composition of

15    populations moved in and out of the disparate parts of the

16    district, and widespread and now admitted use of an

17    expressed racial target can hardly be disputed at this

18    point.

19        First, despite the all-consuming battles in the first

20    trial, there is now no dispute that Delegate Jones, the

21    principal architect of the challenged district, used a

22    55 percent black voting age population figure as an

23    expressed racial target in structuring the districts.  As

24    the interveners admitted at the pretrial conference just

25    last week, they no longer dispute this central fact, and,

1  of course, they can't, really, because the evidence is

2  just overwhelming.

3       JUDGE PAYNE:  Both the Supreme Court and this

4  court have held that it's the law of the case, and we

5  don't need to proceed with it or actually hear any

6  evidence about it, do we?

7       MR. HAMILTON:  Thank you, Your Honor.  The

8  evidence will show that a 55 percent expressed racial

9  target had a direct and significant impact on the district

10 lines.  Black voters were strategically sorted into and

11 out of the challenged districts to make sure each district

12 reached that expressed racial target.  White voters were

13 carefully shuffled around to ensure that they dilute the

14 black voting age population of any challenged district.

15 The evidence will show careful separation of white areas

16 from black areas, splitting cities like Hopewell,

17 neighborhoods like The Fan district in Richmond, counties

18 like Chesterfield and even specific VTDs throughout the

19 state.  The racial sorting that occurred in the challenged

20 districts was calculated, mechanical and extreme and it

21 was successful.  In the end, every challenged district

22 reached at least 55 percent BVAP.

23      Delegate Jones had to stray far from traditional

24 redistricting principles to ensure that all 12 very

25 different districts complied with this racial target, and

```
 1   indeed, as we will show, Delegate Jones sacrificed

 2   virtually every traditional redistricting principle when

 3   drawing the challenged districts.  And he did so far more

 4   often in the challenged districts than he did in the

 5   nonchallenged districts.  Only one rule was never broken,

 6   and that was the 55 percent expressed racial target.

 7       To help the Court understand how race drove the

 8   redistricting process, the plaintiffs will present the

 9   testimony of two additional expert witnesses.  First,

10   Dr. Rodden from Stanford University will walk the Court

11   through density maps to show precisely how the district

12   lines were drawn to capture black populations and exclude

13   white populations.  Dr. Maxwell Palmer from Boston

14   University will further demonstrate the stark racial

15   differences between the populations moved in and moved out

16   of the challenged districts and will establish that

17   partisan politics simply can't explain these district

18   lines, as well as race.

19       Plaintiffs will also present testimony from delegates

20   and former delegates, some of whom were intimately

21   involved in the redistricting process.  With that

22   evidence, this court will be able to understand how race

23   drove the redistricting process both at the macro level

24   and at the micro level.  The macro level, Delegate Jones

25   carefully sorted voters among the challenged districts by
```

1    race.  Some districts needed additional black population

2    to achieve 55 percent black voting age, and therefore,

3    Jones, Delegate Jones, carefully moved black voters from

4    other districts into these recipient districts.

5         In other cases, the districts had too many black

6    voters and they had voters to spare, and those served as

7    donor districts to the neighboring districts.  And so

8    Jones took black voters out of these and shuffled them

9    into neighboring districts in order to ensure that all the

10   districts reached 55 percent.  All of the districts were

11   governed by this nonnegotiable racial rule.  All of them

12   saw populations moved in and out in service of that rule.

13   That is precisely the sort of racial sorting that the

14   Supreme Court has relied on to find that race has

15   predominated.

16        And it's clear at the micro level, too, in the

17   illustrative display you can see that the voting

18   tabulation districts themselves were split along racial

19   lines.  The map splits populations in 32 VTDs between

20   challenges and nonchallenged districts.  In every one you

21   can see careful attention to race as the line curves and

22   snakes to separate black population from white population.

23   All of the splits are such that the higher black voting

24   age population is assigned to a challenged district and

25   the lower BVAP portion is assigned to a nonchallenged

 1    district.  This isn't an accident.  No traditional

 2    redistricting principle can explain these race-based

 3    splits.

 4         The Court will hear from interveners a variety of

 5    other factors that supposedly played some role in the

 6    redistricting process.  As an initial matter, these post

 7    hoc explanations cannot be taken at face value.  For

 8    example, Delegate Jones previously testified that many of

 9    his decisions were driven by requests from other

10    delegates, but testimony from many of those delegates that

11    we'll hear this morning will directly undercut that

12    testimony.  Moreover, even if factors other than race

13    played some role, it's irrelevant as a matter of law.

14    Race can predominate even if the legislature pursues other

15    nonracial goals in addition to its racial goals, and that

16    is exactly what happened here.  Every rule, principle or

17    criterion was compromised at some point with the sole

18    exception of the 55 percent black voting age population.

19         Let me turn to narrow tailoring and just make a

20    couple of points.  Intervenors will argue that their

21    race-based approach was narrowly tailored to serve a

22    compelling government interest; namely, compliance with

23    the Voting Rights Act, but the evidence will not support

24    that argument.  First, Delegate Jones did not tailor his

25    use of race to a compelling government interest.  It's no

1  longer disputed, as Your Honor just pointed out, that the

2  55 percent racial target was created primarily to address

3  District 75.  And then in the words of both this Court and

4  the Supreme Court, quote, applied across the board to all

5  12, closed quote, challenged districts.  That means the

6  55 percent rule served no government interest in the

7  remaining 11 districts.

8       The Court's prior opinion set out all the factors

9  that gave rise to the 55 percent rule:  Conversations

10  between Delegate Jones and Delegate Tyler, who represents

11  District 75, Delegate Jones' understanding of District

12  75's election results, the prison population in that

13  district and so on.  But when Delegate Jones turned to the

14  other districts, he didn't do anything remotely close to

15  the same analysis, which he will admit, he didn't look at

16  voter turnout.  He didn't look at racial voting patterns.

17  He didn't look at registration rates.  And with only a

18  handful of very limited and dated exceptions, he didn't

19  look at election results.  He didn't put any of the

20  districts on the table and compare them to District 75 and

21  ask do they need 55 percent black voting age population to

22  ensure that the minority population could elect a

23  candidate of their choice in that district.

24       Simply put, Delegate Jones didn't conduct any

25  meaningful analysis of the other 11 challenged districts,

1    choosing instead to sort voters by race in a

2    one-size-fits-all approach.  This is, in fact, far more

3    suspicious than the numerical target in Alabama, which was

4    at least tailored to individual districts.  This ignored

5    the differences between districts.

6         Second, the evidence will show that Delegate Jones,

7    if he had undertaken a functional analysis in the 11

8    remaining challenged districts, he would have found no

9    reason to believe that the other 11 challenged districts

10   needed 55 percent black voting age population to ensure

11   black voters had an opportunity to elect candidates of

12   their choice.  Dr. Palmer's analysis will demonstrate that

13   there was just one exception, District 75.  None of the

14   intervenors' experts will demonstrate otherwise.

15   Remarkably, in fact, despite the fact that it's

16   intervenors' burden to show narrow tailoring, their

17   experts have provided nothing but incomplete and

18   inconclusive analyses that do nothing to establish the

19   necessity of the 55 percent BVAP rule.

20        Now, in its order late last week, the Court asked the

21   parties to summarize, quote, new evidence addressing

22   factors other than race that were submitted in the

23   formation of the district.  Candidly, that won't take 15

24   minutes.  That won't take 15 seconds.

25             JUDGE PAYNE:  Fifteen minutes was the whole

```
 1   opening statement.

 2              MR. HAMILTON:   I understand, Your Honor.   There

 3   is no such evidence.   Remember, intervenors demanded a

 4   whole new round of discovery and a full-blown evidentiary

 5   trial, but they stand before the Court bereft of the very

 6   evidence the Court asked for.   In fact, plaintiff is

 7   unaware of a single document produced in this latest round

 8   of discovery that provides new evidence to support

 9   intervenors' position.

10        Now, it's possible that intervenors may try to offer

11   new evidence at trial.   For example, intervenors have

12   offered exhibits that were never produced in discovery;

13   maps, for example, that were never contemplated or

14   prepared by the legislature, never produced in discovery,

15   never testified by an expert, apparently not even prepared

16   until the last -- to the very eve of trial.   One can only

17   presume that these maps were prepared by an expert outside

18   the scope of expert discovery and in violation of Rule 26.

19   We objected.   At an appropriate time when the maps are

20   offered, we will object to those, and the Court should

21   exclude them.

22        And the intervenors may try and elicit testimony from

23   Delegate Jones that was not offered at the first trial,

24   including testimony about additional nonracial factors

25   that played a role in its decision.   These are, of course,
```

```
 1    the very post hoc justifications that the Supreme Court

 2    cautioned again after reviewing intervenors' evidence on

 3    appeal.  Justifications that the legislature, in theory,

 4    could have used, but in reality did not.  And the notion

 5    that Delegate Jones would remember more clearly today in

 6    2017 what he did not in 2015 is simply not plausible.  At

 7    the very least, the Court should treat that testimony with

 8    a healthy dose of skepticism.

 9         At the end of the day, Your Honor, this case --

10    Honors, this case is a simple case with an overly

11    complicated record.  Delegate Jones applied a

12    one-size-fits-all expressed racial target to very

13    different districts scattered across the Commonwealth.

14    While every other criterion was compromised along the way,

15    the racial target was not.  Extreme racial sorting was

16    required to comply with the rule, which is illuminated by

17    stark splits in the racial composition of the populations

18    moved in and out of disparate parts of the district.

19    Exactly what the Supreme Court calls for.  But Delegate

20    Jones had no reason to believe that that racial sorting

21    was required to avoid retrogression, let alone a strong

22    basis in evidence.  In fact, Delegate Jones admits he

23    didn't even try and assess the necessary level of black

24    voting age population in any district except District 75.

25    That mechanical and unjustified use of race offends the
```

1    14th Amendment.  The evidence, both old and new, will

2    compel a decision for the plaintiffs.  And at the

3    conclusion of the trial, plaintiffs will ask this Court to

4    invalidate these 11 districts and implement appropriate,

5    immediate and effective remedies for this General

6    Assembly's constitutional violations.  Thank you, Your

7    Honor.

8             JUDGE PAYNE:  Thank you.

9         Mr. Braden.

10            MR. BRADEN:  Good morning, Your Honors.  There

11   are two questions before this Court.  Was race a

12   predominate factor in drawing the 11 challenged districts?

13   If the answer to that is yes, which I don't believe it is,

14   but if the Court determines the answer to any of the

15   districts is yes, then you get to the second question.

16   Was that district narrowly tailored to support a

17   compelling state interest?  And the compelling state

18   interest recognized by the Supreme Court is preclearance

19   under Section 5 of the Voting Rights Act.

20        First, let me acknowledge that we were wrong.  "We"

21   being plaintiffs and defendants.  Plaintiffs were wrong in

22   this case initially because they took the position that

23   the 55 percent target goal, whatever we want to describe

24   it, was enough to prove racial predominance.  That's the

25   position of Justice Thomas and Justice Alito.  That's not

1    the position of the Supreme Court.  They rejected that as

2    the basis alone to prove predominance.  We thought that if

3    a district wasn't gerrymandered in sort of the textbook

4    traditional notion of gerrymandering, that that was enough

5    to prove compliance, and the Supreme Court has told us we

6    were wrong, too.  That's not enough.  It's strong evidence

7    and they have never invalidated a plan that did comply

8    with traditional redistricting criteria, but they said

9    that's not enough.  The Court directs this Court to do a

10   holistic analysis, not just to look where the lines look

11   strange, but to look at the whole districts and to see

12   whether or not it might be possible for there to be

13   predominance when there's not conflict.  And the Court

14   expressed significant concern over the notion of post hoc

15   justifications.  Justifications that were just theoretical

16   justifications instead of reality.  And if you look at

17   Alabama and North Carolina, racial gerrymandering cases,

18   the Court is also talking about notion of significant

19   numbers of people being transferred back and forth.  So

20   let me set forth to the Court what evidence we believe is

21   going to be presented.

22        First of all, it's important to remember where the

23   burden lies, and the burden lies with the plaintiffs.

24   It's the plaintiffs' obligation to prove to this Court

25   that race was predominant.  So it appears that the

```
1    plaintiffs, from their briefs and the reports of their

2    experts, are going to revisit the traditional

3    redistricting criteria.  We believe the Court has already

4    made a decision on those 11 districts, that those 11

5    districts did, in fact, comply with traditional

6    redistricting criteria.  But we're anxious to revisit that

7    issue, too, if the Court desires.  It seems that most of

8    their support for the notion --

9              JUDGE PAYNE:  Are you saying -- if the Court

10   desires, it's my understanding that both of you decided to

11   put that in, the plaintiffs fundamentally having

12   recognized that the rule they argued, which was 55 percent

13   is enough, doesn't work and they would fail on that

14   record.  If they -- if we were to judge this case only on

15   the record that existed, you said that you -- in your

16   opening salvo when we were deciding how to proceed, you

17   said that they lose and you win as a matter of summary

18   judgment.  You said you wanted to go ahead and augment the

19   case you had already put on about that.  As I understand

20   it, you wanted to invest those issues as did they.  Is

21   that incorrect or --

22             MR. BRADEN:  That's correct.  We're firm

23   believers in belts and suspenders.

24             JUDGE PAYNE:  All right.  Sorry.  Excuse me.

25             MR. BRADEN:  No problem, Your Honor.  The
```

 1    defendants' case is going to be everything you ever wanted

 2    to know about Virginia redistricting and more.  Let no

 3    detail of this process in your mind that's unanswered be

 4    unanswered.  Who is coming?  Our two fact -- our initial

 5    first two fact witnesses are going to be Delegate Jones,

 6    the sponsor, the drafter, I think the architect of the

 7    bill, the plan, and the consultant who worked with him,

 8    who you might -- if you think of Delegate Jones as the

 9    architect of the plan, then you should think of John

10    Morgan, who's the consultant, as sort of the carpenter,

11    the craftsman, the person who worked with Jones at his

12    direction to draft the plan.

13         We're going to have three expert witnesses who are

14    going to -- the same three expert witnesses we had before

15    to address the technical aspects of racial black voting

16    analysis, and some of the significant statistical problems

17    this Court recognized before in the analysis of the

18    plaintiffs' expert, which are repeated here.

19         And we're going to have four delegates come with a

20    narrower perspective, but their perspective on the

21    process.  Be clear, though.  There is available to this

22    Court, with the limitations of their memory, the

23    individuals who know every detail about every line who

24    aren't looking back at drawing the lines.  They're looking

25    at what they did at the time they were drawing the lines.

1    There's no post hoc justifications here.

2          So let me discuss what the testimony is going to be,

3    but first, I think it's important for this Court to frame

4    all the testimony you hear in one of the clichés familiar

5    to people involved in the redistricting process.  And it's

6    to remember that drawing a single House district or

7    drawing a single representative district is remarkably

8    easy.  You wouldn't even need a computer to do that.  We

9    could go back to the old days of magic markers and maps

10   and you'd have no problem drawing a district, a single

11   House district and making the population work and

12   following traditional redistricting criteria.  And, in

13   fact, you could go to the legislature, when they are in

14   session, and find every member there prepared to tell you

15   what their district should look like.  That's an easy

16   process.

17         What's not an easy process, what is a hard process, a

18   very difficult process, normally described as the most

19   contentious difficult process in the legislative chamber,

20   is drawing a hundred district plan.  So everyone who

21   criticizes an individual district, who tells you what's

22   wrong with that district, you have to put it in the

23   context of that's that district, that's one little keyhole

24   look at it.  Jones will provide to this Court, in any

25   level of detail that this Court desires, an outline of the

1    process.  The process in Virginia was the perfect process

2    in the sense of organizationally.  Much broader, more

3    involved than any prior process, more hearings across the

4    state, the adoption of criteria very similar to ones that

5    were done ten years before with one important change to

6    remember; the population deviations were reduced to

7    1 percent one way or another, which is very important to

8    remember because that will impact the number of VTDs split

9    in the state significantly.

10       There's a drafting process.  There's a significant

11   negotiation process.  Jones meets with 80 delegates, he

12   estimates.  A very involved process.  You'll hear floor

13   statements, not after-the-fact, looking-back statements,

14   of the role of the different groups in the legislature in

15   the line drawing process.  This plan got 80 votes, the

16   majority of the republicans -- no surprise, all the

17   republicans -- a super majority of the democrats and all

18   but one of the Black Caucus.  You'll hear in detail the

19   actual drafting, how plans are drafted.  Jones and Morgan

20   will talk about the process of using the computer

21   software.  We'll bring it up and show it to you, how the

22   plan is done.  It's done on a computer.  It's done with

23   Maptitude software.  Into that software, census data.  The

24   census includes geography.  There's an electronic map of

25   the United States.  Not much of a surprise anymore.  I

1    have to admit, it was quite a shock to me 20 years ago

2    when I saw the first one, but everybody now has one of

3    these in their cars.  But this is a detailed electronic

4    map of the United States that consists of small building

5    blocks, which are census tracks -- census blocks, which

6    are then aggregated up into VTDs, vote tabulation

7    districts, and those two things are the building blocks,

8    how you actually create the plan.  The data that's

9    available is geographic data, population data, race data

10   and political data.  Political data, contrary to what you

11   read, is available to the line drawer at the block level.

12   The data has been aggregated out to the block level for

13   Morgan's actual line drawing process, when he draws at the

14   block level.

15       But let's understand the process.  Jones is the

16   architect of the plan.  He draws the plan at the VTD

17   level, precincts.  You've got the data.  You put it

18   together, and you get the basics of a plan.  That plan is

19   done politically.  It's finished.  He's done the

20   negotiations, you know, and all the difficulty of trying

21   to herd cats in the legislature.  The actual legislative

22   process, a little bit messy, and you're going to hear the

23   messy process, but that messy process of making people

24   happy in getting the votes you need to pass.  That's

25   drawn.

1          Then -- then John Morgan comes in and goes through

2     that plan and makes sure it complies with the one person,

3     one vote criteria adopted, which is 1 percent up and

4     1 percent down.  What does he do?  That's when the VTDs

5     are split.  VTDs, precincts, aren't any type of

6     governmental subdivision.  These are simply administrative

7     convenience.  And we draw plans at the VTD level because

8     that's what we have census information on.  But to get the

9     population down to this population range, John Morgan had

10    to go through the plan and split VTDs.  Virtually -- not

11    totally, but virtually, without exception, every split VTD

12    is done to equalize population pursuant to the criteria.

13    It shows an incredible, profound misunderstanding of the

14    process for people to use that, then, as the basis to show

15    predominance.  That's just a total misunderstanding of the

16    process.  And that's not terribly surprising because look

17    at the resumes of their experts.  They have zero, zero

18    experience drawing a plan for a legislative chamber.  They

19    have no plans that they have drafted that have been

20    adopted by any legislature, much less any experience

21    drawing a plan in Virginia, much less any Virginia

22    political experience.

23         This whole VDT analysis is silly.  It's too few

24    people to be the predominant part of it.  These districts

25    are and what's going on in this plan is very simple and

1    straightforward.  It's a continuation of the prior plan.

2    These 11 challenged districts are the same challenged

3    districts the state of Virginia fundamentally had in 1991

4    and they are the same challenged districts in 2001.

5         Now, if the Court were to decide, I think wrongly,

6    that any of these districts are predominately drawn on

7    race, then we have the second question, narrowly tailored.

8    I think it's very important to think, on the narrowly

9    tailored question, what the obligation of the state was.

10   Preclearance is a different process than sort of the

11   traditional situation because the burden of proof has

12   changed.  The state has an affirmative duty to get its

13   plan precleared under Section 5 of the Voting Rights Act.

14   It has an affirmative duty to prove that the plan did not

15   retrogress the ability of the minority community to elect

16   its candidates of choice.

17        Now, how does DOJ make that determination?  Well,

18   they -- a variety of different ways.  One of the principal

19   ways, not surprisingly, is they go to the leaders of the

20   black community and the members of the legislature and ask

21   them whether the plan retrogresses.  And what do the

22   leaders of the legislature say?  We need 55 percent of the

23   majority black districts not to retrogress.  That's what

24   they say on the floor.  This is not somebody dreaming it

25   up now and bringing him here.  This is what they said at

 1   the floor during the debate.  This is what they said to

 2   Jones when he was drawing the plan.  And we don't -- this

 3   is contemporaneous videotaped floor testimony of that.

 4   That's not a post hoc analysis.

 5        As best I can tell, the plaintiffs are arguing some

 6   type of magic number analysis.  The last time we tried

 7   this case, their position was that all these districts

 8   needed to be more than 50 percent.  And now we're looking

 9   at this and they are objecting to using a goal of

10   55 percent.  Is this really a constitutional claim between

11   50 and 55 percent?  And how would we come up with that

12   magic number for each district?  And which expert would we

13   believe?  We've had a number of experts.  Six, I guess, in

14   the case now.  If we brought six more in, we'd get a

15   different number from each one as to what the magic number

16   would be.  There is no magic number.  These statistical

17   analyses are all, in the end, just estimates based upon

18   questionable data.  There needs to be a range.  The Court

19   told us that we shouldn't have a rule that ties the hands

20   of the legislature.  We should recognize this as

21   principally a legislative function.  Their argument is a

22   straightjacket, a straightjacket under Virginia, a program

23   where no legislature could get a plan passed and

24   precleared.  Thank you, Your Honor.

25             MR. MCGUIRE:  Good morning, Your Honors.  May it

1    please the Court.  Matt McGuire from the Attorney

2    General's Office.  Very briefly, on behalf of the

3    defendants, the members of the Virginia State of

4    Elections, the Department of Elections and its

5    commissioner, as this Court is aware, the defendants are

6    administrative agencies and officials that implement

7    elections but have no involvement in drawing the districts

8    being challenged.  Throughout the case, the

9    defendant-intervenors have carried the burden of

10   litigation and they will continue to do so this week.

11   Although defendants will not be presenting an independent

12   substantive case or evidence in defense of the challenged

13   districts, we join in the arguments of the

14   defendant-intervenors.

15        In the event that the Court has questions about the

16   effect that a particular ruling may have on the

17   defendants' operations or on the administration of

18   elections, the defendants will endeavor to provide the

19   Court with that information.  Thank you.

20        JUDGE PAYNE:  Thank you very much.

21      Mr. Hamilton, call your first witness.

22        MR. HAMILTON:  Your Honor, as an initial matter,

23   we'd like to offer all of the plaintiffs' exhibits that

24   have not been previously admitted.  That would be Exhibits

25   69 through 90.  There are no objections, we understand,

```
 1  from intervenors or defendants.

 2          JUDGE PAYNE:  Is that correct, no objection?

 3          MS. MCKNIGHT:  That's correct, Your Honor.

 4          JUDGE PAYNE:  Admit Exhibits -- Plaintiffs'

 5  Exhibits 69 through 90 are admitted without objection.

 6          MR. HAMILTON:  Your Honor, Exhibits 1 through 68

 7  were all admitted during the 2015 trial of this matter.

 8  We understand they already comprise the record, are a part

 9  of the record before the Court, and so I wanted to just

10  take a moment to explain the notebooks behind Your Honor

11  that have been provided.  Those all -- those include

12  certain of the exhibits that were admitted in 2015, but

13  not all of them.  On the flash drives that were provided

14  to each chambers it includes a complete, comprehensive

15  collection of all the exhibits offered by plaintiffs for

16  the convenience of the Court.

17     Finally, we'd like to offer all of the deposition

18  designation excerpts.  Those were filed last night.  They

19  have been agreed by both parties.  I believe all the

20  objections have been resolved at this point.

21          JUDGE PAYNE:  Do they have an exhibit number?

22          MR. HAMILTON:  They do not.  They were

23  entered -- they were filed last night.

24          JUDGE PAYNE:  What is the ECF number?  Do you

25  know?
```

McClellan – Direct

1      MR. HAMILTON:  I don't know off the top of my

2  head.

3      JUDGE PAYNE:  We'll find that out.

4      MR. HAMILTON:  Okay.

5      JUDGE PAYNE:  And there's no objection to what

6  was filed last night, assuming we find out what was filed

7  last night, Ms. McKnight?

8      MS. MCKNIGHT:  That's correct, Your Honors.

9      JUDGE PAYNE:  All right.

10      MR. MCGUIRE:  Your Honor, it was ECF220-1.

11      JUDGE PAYNE:  220-1?  Thank you.

12      MR. HAMILTON:  And then finally, for the

13  convenience of the Court, there is a complete set of

14  transcripts from the 2015 trial in the notebooks behind

15  you for ease of reference during the presentation of

16  evidence.

17      JUDGE PAYNE:  All right.  The first witness is

18  who?

19      MR. HAMILTON:  It's Jennifer McClellan.  My

20  colleague, Aria Branch, will be doing the examination.

21

22              **JENNIFER MCCLELLAN,**

23    called at the instance of the plaintiffs, having been

24          first duly sworn, testified as follows:

25              **DIRECT EXAMINATION**

McClellan – Direct

1   BY MS. BRANCH:

2   Q    Good morning, Senator McClellan.

3   A    Good morning.

4   Q    Can you please state your name for the record?

5   A    Jennifer McClellan.

6   Q    And would you please spell your last name?

7   A    M-C-C-L-E-L-L-A-N.

8   Q    Thank you.  What district did you represent at the

9   time of the 2011 redistricting?

10  A    The 71st House District.

11  Q    And where is House District 71 located?

12  A    It is predominately in the northeast quadrant of the

13  City of Richmond, parts of The Fan through to east -- East

14  End of Richmond, most of North Side, and one precinct in

15  eastern Henrico.

16  Q    And you testified in the last trial; is that correct?

17  A    Yes.

18  Q    Can you remind the Court of the role you played in

19  the 2011 redistricting process?

20  A    Yes.  I coordinated requests to Delegate Jones for

21  changes to the map in -- as introduced from the Richmond

22  area democratic delegates.  So on behalf of myself, Betsy

23  Carr, who represented the 69th District, and Delores

24  McQuinn, who represented the 70th District.

25  Q    And did you directly communicate with Delegate Jones

McClellan – Direct

1   as part of that process?

2   A    Yes.

3   Q    Did there come a time -- or when did you first

4   approach Delegate Jones about the map?

5   A    When the original House Bill 5001 was introduced and

6   that map was made public, I looked at it and had some

7   concerns about it and went to Delegate Jones to express my

8   concerns.

9   Q    And what were those concerns?

10  A    There were two primary concerns.  The two extreme

11  ends of the district were The Fan neighborhood and the

12  Churchill neighborhood, The Fan to the west and Churchill

13  to the east.  Prior to redistricting, the majority of and

14  the core heart of The Fan neighborhood was in the 71st

15  District.  In the map, precinct 207, which made up the

16  bulk of the western portion of The Fan, was completely out

17  of the 71st District, and precinct 208, which is the

18  precinct that I lived in, was split between the 71st and

19  the 69th.  And I --

20       JUDGE PAYNE:  You're talking about in the

21  benchmark plan, the previous plan?

22       THE WITNESS:  Yes.

23  Q    You're testifying about House Bill 5001 --

24  A    Yes.

25  Q    -- is that correct?

McClellan - Direct

1    A    Yes.

2              JUDGE PAYNE:  Well, that's what I'm asking her.

3    I'm trying to understand.  Are you talking about how it

4    was before 501 was introduced or are you talking about

5    what 501 was?

6              THE WITNESS:  I'm explaining what 501 did to the

7    71st District and why I was concerned and went to Delegate

8    Jones to express those concerns.

9              JUDGE PAYNE:  When you were doing that, you used

10   the phrase several times to indicate that something was

11   existing before 501, or maybe I misunderstood you.  So

12   maybe you can sort that out.  If you're going to talk

13   about 501, say -- it's 5001.

14             THE WITNESS:  Sorry.  Yes.

15             JUDGE PAYNE:  Say what 5001 did to the former

16   district that you were concerned about so we can

17   understand your concerns.

18             THE WITNESS:  Okay.

19             JUDGE PAYNE:  Because right now, the way it

20   looks is that we're mixing what the benchmark plan was,

21   that's the former plan, with what 5001 proposed, and I'd

22   like to make sure we don't do that.  Do you understand my

23   problem?

24             THE WITNESS:  I do, and I'll try to be more

25   specific.

McClellan – Direct

1          JUDGE PAYNE:  Thank you.

2          THE WITNESS:  Thank you.

3  Q    So, Senator McClellan, the changes that you were just

4  discussing, the concerns that you expressed to Delegate

5  Jones, were those concerns in the -- about the 5001 map?

6  A    Yes.  Yes.  I --

7          JUDGE PAYNE:  I'd rather you start again with

8  them.

9          MS. BRANCH:  Okay.

10          JUDGE PAYNE:  Because asking the question that

11  way conflates the two problems; that is, talking about the

12  past plan that was in existence at the time plus 501 and

13  it's hard to separate them.  And your question just

14  conflated them again.  So start all over again, will you,

15  about the concerns?

16          MS. BRANCH:  Okay.

17          JUDGE PAYNE:  Please.

18  Q    When did you first approach Delegate Jones about the

19  map?

20  A    When I saw the map for House Bill 5001, when it was

21  first introduced and made public.

22  Q    And what were your concerns about that map?

23  A    I was concerned that House Bill 5001 split The Fan

24  neighborhood, which was the western most part of the 71st

25  District prior to 5001, it split that neighborhood and put

McClellan – Direct

1    the bulk of it in the 68th District.  In doing so, it

2    split a precinct, precinct 208.  So that was my first

3    concern.

4         On the eastern side of the district, prior to 5001

5    being introduced, precinct 707, which is the Churchill

6    neighborhood, was all in the 71st District.  Churchill was

7    split -- prior to redistricting, a small portion of

8    northern Churchill was in the 70th District.  But in House

9    Bill 5001, that line went into 707 and split 707 and the

10   Churchill neighborhood along Broad Street.  My concern

11   with that was Broad Street is the historic dividing line

12   going back to the days of segregation between white

13   Churchill, which was south of Broad Street, and black

14   Churchill, which was north and still is north of Broad

15   Street.  And that, in particular, concerned me because to

16   this day, there are still impacts in the community of that

17   traditional boundary line, and to make the boundary

18   between two House districts, that same line caused me a

19   number of concerns.

20   Q    Did you express those concerns to Delegate Jones?

21   A    Yes.

22   Q    And what was his reaction?

23   A    He said he was not very familiar with the Richmond

24   area and clearly not as familiar as those of us who

25   represented it.  If we came up with a better way to draw

McClellan – Direct

1   the districts that met two criteria, first, the 1 percent

2   population deviation, and the 55 percent black voting age

3   population criteria, that he would be open to making

4   changes that we suggested.

5   Q     And subsequent to that, did you create any maps of

6   your district?

7   A     Yes.

8   Q     And did the 55 percent black voting age target affect

9   the way you drew maps?

10  A     Yes.

11  Q     Did you have an understanding as to whether maps

12  containing majority black districts with black voting age

13  populations below 55 percent would be acceptable?

14  A     Based on what Delegate Jones told me, I believe

15  they -- any district that fell below black voting age

16  population of 55 percent would not be accepted.

17  Q     And what was the black voting age population of your

18  district prior to redistricting?

19  A     Based on the 2010 census, it was around 46 percent.

20  Q     Did you have an understanding as to whether maps that

21  contained districts that split counties would be

22  acceptable?

23  A     I assumed they would be because House Bill 5001, in

24  fact, split counties between districts.

25  Q     And did the final map also split counties, House Bill

McClellan - Direct

1  5005?

2  A    Yes.

3  Q    How about districts that split predicts?  Were they

4  acceptable?

5  A    I assumed they were because House Bill 5001, as

6  introduced, contained split precincts.

7  Q    How about districts that split communities of

8  interest?

9  A    Again, I assumed that would be acceptable because

10  House Bill 5001, as introduced, did, in fact, split

11  communities of interest.

12  Q    Let's now discuss the specific changes that were made

13  to your district.  First, at a very general level, can you

14  briefly describe how your district changed after

15  redistricting?

16  A    Yes.  It shifted east is sort of broadly what I would

17  say.  The western boundary shifted east to 2008.  And I'm

18  now talking about -- I'm sorry.  I'm talking about House

19  Bill 5005 as signed by the governor, what changes were

20  made.

21            JUDGE PAYNE:  Is that the question?

22            MS. BRANCH:  Yes.

23  A    So as signed by the governor, the bill shifted the

24  western boundary of my district in The Fan to the boundary

25  of precinct 208.  In the east, I shifted and picked up

McClellan - Direct

1   three or four precincts in the 7th council district of the

2   City of Richmond and I picked up one precinct, Ratcliffe,

3   in eastern Henrico.   To the northwest, I lost three

4   smaller precincts in Henrico County; Hilliard, Stratford

5   Hall and -- right now I'm blanking on the name of the

6   third one, and then I picked up a very small portion of

7   The Fan, precinct 204 that was a piece of The Fan, Scott's

8   Addition, and the rest was sort of industrial commercial

9   area.   And then in the north, I swapped precinct 301 for

10  precinct 604.

11  Q    And what effect did the shift east have on your

12  district?

13  A    It increased the black voting age population

14  significantly.

15  Q    Senator, let me direct your attention to

16  Defendant-Intervenors' Exhibit 94.   It's page 4 of that

17  exhibit.   You've seen this map before, right?

18  A    Yes.

19  Q    And do you know how to read this map?

20  A    Yes.

21  Q    And just so we're all on the same page, the white

22  hatched areas of this map with no yellow coloring reflect

23  the areas that were removed from your district in 2011.

24  The bright yellow areas with no hatching reflect the areas

25  that were added to your district, and the yellow hatched

McClellan - Direct

1   areas reflect the areas that were in your district prior

2   to redistricting and remained in your district after the

3   process was complete.

4   A    Okay.

5   Q    You mentioned precinct 207.  Where is that precinct

6   located on the map?

7   A    The southwest border in the white hashmark.

8   Q    And can you describe the racial and political

9   composition of precinct 207?

10  A    Yes.  That is --

11          JUDGE PAYNE:  Point to 207 on the map and your

12  little thing will come up indicting what you're talking

13  about.  Put a checkmark, a little, small checkmark.  Do

14  you see that?

15          THE WITNESS:  Can you see that?  I tried to do a

16  check.  I'm not sure.

17          JUDGE PAYNE:  That little red mark.  Is that it?

18          THE WITNESS:  Yes.

19          JUDGE PAYNE:  Okay.

20  A    So that is a highly densely populated portion of The

21  Fan that is almost exclusively -- I'd say probably

22  98 percent or so -- white and very democratic and was a

23  high turnout precinct traditionally.  It still is.

24  Q    Prior to 2011, how long had that precinct been in the

25  71st House District?

McClellan - Direct

1   A     At least 20 years.

2   Q     And which district was it moved to?

3   A     Sixty-eight.

4   Q     And who represents District 68?

5   A     Manoli Loupassi.

6   Q     Is he a democrat?

7   A     No.

8   Q     Did you discuss the movement of 208 with Delegate

9   Loupassi at any time?

10  A     Yes.

11  Q     Can you describe that conversation?

12  A     Yes.  I -- first, can I -- can I put that

13  conversation in context first?

14  Q     Sure.

15  A     As I was using the map software to try to put 207

16  back in the 71st District, because my goal was to keep as

17  much of The Fan together in the 71st as possible, no

18  matter how I sliced that precinct, it pushed the BVAP

19  below 55 percent if I also tried to keep Churchill united.

20  And so I became resigned to the notion that I would have

21  to give up part of The Fan.

22        So I went to Delegate Loupassi and said, You have to

23  pick up part of The Fan.  Do you have a preference as to

24  what you pick up?  His response was --

25            MS. MCKNIGHT:  Objection, Your Honor.  We'd just

McClellan – Direct

 1   ask her to tread with care here.  We're approaching a

 2   hearsay objection, a hearsay issue with a witness who is

 3   in the courtroom with us and is not testifying.

 4            JUDGE PAYNE:  Not approaching it.  The

 5   question -- that's the problem with "let me set the

 6   context" questions because there's no control over it,

 7   ruling on a question by question basis and an answer by

 8   answer basis, but it's hearsay.

 9            MS. BRANCH:  Yes, Your Honor.  I would offer

10   that it's not being offered for the truth of the matter.

11            JUDGE PAYNE:  Why are you offering it?

12            MS. BRANCH:  That it's being offered to impeach

13   Delegate Jones.  But I will -- I will rephrase the

14   question to avoid hearsay.

15   Q    Based on your conversation with Delegate Loupassi,

16   did you have an understanding as to whether he wanted

17   precinct 207 in his district?

18   A    Yes.

19   Q    And what was that understanding?

20   A    He didn't want it unless he had to have it.

21            JUDGE PAYNE:  What's the difference between that

22   and hearsay?

23            MS. BRANCH:  Well, I think it's based on --

24            JUDGE PAYNE:  -- hearsay.  So let's see if we

25   can -- why are you offering it?  You say to impeach

McClellan - Direct

1   Delegate Jones.

2           MS. BRANCH:  Defendant-intervenors have offered

3   that Delegate Jones has said that he -- that Delegate

4   Loupassi wanted -- affirmatively asked for precinct 207 to

5   be in his district, and Senator McClellan has a different

6   recollection of that conversation.

7           JUDGE PAYNE:  Well, was she a member of the

8   conversation in which Delegate Jones asked Loupassi that?

9           MS. BRANCH:  No, I don't think she was, Your

10  Honor.  But she did have conversation with Delegate

11  Loupassi about precinct 207 that I think is directly

12  relevant here.

13          JUDGE PAYNE:  I'm not sure it is at this stage.

14  You can call her back, perhaps, after Delegate Jones

15  testifies and you set the framework, but right now, I

16  think you're beyond the bound.

17          MS. BRANCH:  Thank you, Your Honor.

18  Q    Did you want to lose precinct 207, Senator McClellan?

19  A    No.

20  Q    Did you have a choice?

21  A    No, not if I wanted --

22          JUDGE PAYNE:  Did she feel like she had a

23  choice?  Is that your question?

24          MS. BRANCH:  Sure.

25  A    I felt that I didn't because --

McClellan - Direct

1      JUDGE PAYNE:  That's enough.

2      THE WITNESS:  Okay.

3  A    No, I thought I didn't have a choice.

4      JUDGE PAYNE:  If she wants to know why, she can

5  ask why.

6      THE WITNESS:  Okay.

7      JUDGE PAYNE:  And then we'll --

8  Q    And why is that?

9      JUDGE PAYNE:  It will keep the conversation

10 shorter and the examination smoother if you take it

11 question by question and move it along that way.

12     MS. BRANCH:  Yes, Your Honor.

13     JUDGE PAYNE:  Yes, ma'am.

14 Q    Why did you feel like you didn't have a choice?

15 A    Because every time I tried to draw a map that

16 included either all of 207 or a portion of 207, it pushed

17 my district's black voting age population below

18 55 percent, and I did not believe that any recommendation

19 to Delegate Jones that resulted in my district falling

20 below 55 percent would be accepted by him.

21 Q    Were Summit Court, Hilliard and Stratford Hall

22 removed from your district?

23 A    Yes.

24 Q    Where are those areas located?

25 A    Right here.  So it's the northwest portion of the

McClellan - Direct

1   district that's in white hashmarks.

2   Q    What county are they in?

3   A    Henrico.

4   Q    And what is the racial composition of those areas?

5   A    They predominately white.

6   Q    Did you ever try to move those areas back into your

7   district like you did with precinct 207?

8   A    No.

9   Q    And why not?

10  A    Because it would have been counterproductive to my

11  goal to keep 207, because if I brought those three

12  precincts back in, it would push the black voting age

13  population down.  And I've continued to try to keep as

14  much of 207, and frankly 208, as I could.  I was able to

15  keep 208 in the final map.  But if I had tried to bring

16  Summit Court, Stratford Hall and Hilliard back in the

17  district, that would have affected the black voting age

18  population if I kept 208.

19  Q    And did removing precinct 207 from your district

20  split The Fan neighborhood?

21  A    Yes.

22  Q    Was precinct --

23         JUDGE PAYNE:  Excuse me.  Did you do any

24  calculation as to what the black voting age populations

25  were if you made the changes you're talking about as to

McClellan - Direct

1  207 and the three areas in Henrico?  You said it would

2  push it down.  My question is do you recall how much it

3  would have pushed it down?

4           THE WITNESS:  I don't recall how much, because

5  once it fell below -- once it fell below, I believed it

6  wouldn't be accepted.  So I don't remember exactly how

7  far, but it was below 55 percent.

8  BY MS. BRANCH:

9  Q    Was precinct 505 partially removed from your

10  district?

11  A    Yes.

12  Q    And how was it split?

13  A    You see the blue line that's sort of a straight line

14  here and then there's like a little triangle.  The part

15  that was removed that's the white hashmarks is mostly the

16  Oregon Hill neighborhood, and the yellow part at the top

17  is mostly VCU, or is VCU, is a part of VCU.  The little

18  white triangle is not really a residential area.  It's

19  part of the bridge and the -- the war memorial.

20  Q    Was the racial composition included in your district

21  and precinct 505 higher than the racial composition that

22  was excluded?

23  A    I'm not sure I understand your question.

24  Q    Were you concerned at all about the precinct 505

25  split?

McClellan - Direct

1  A    I can't answer that with a yes or no because when the

2  map was originally introduced, 505 was split, and there

3  were attempts to reunite it and put it in the 69th

4  District, but that would have affected -- and now I can't

5  remember.  I think -- it would have affected Betsy Carr's

6  black voting age population if all of -- and the

7  population deviation if all of 505 went in 69.  And so we

8  tried to find -- if it's going to be split, let's find a

9  logical place for it to be split.

10     So the way it was finally split in map as signed by

11  the governor in 5005 was actually suggested by Delegate

12  Carr and myself.  So I don't remember exactly where the

13  line was in the map as originally introduced, but we did

14  attempt to keep 505 whole, and when we couldn't meet the

15  target criteria, we just said, well, what's the most

16  logical place to split it.

17  Q    And there -- when you say "target criteria," what are

18  you referencing there?

19  A    The 55 percent black voting age population and the

20  1 percent population deviation.

21  Q    Shifting gears to the eastern side of your district,

22  were precincts 701 and 702 added to your district?

23  A    Yes.

24  Q    And where are they located?

25  A    They are the -- they are along the boundary between

McClellan - Direct

 1   my district and Delegate McQuinn.  I've drawn a red line

 2   on the screen.  They are north of 707.

 3   Q    What's unique about those two precincts?

 4   A    They are densely populated; predominately, if not

 5   exclusively, African-American residential areas.

 6   Q    Did you discuss the addition of those two precincts

 7   with any other delegates?

 8   A    Yes.

 9   Q    Who?

10   A    First with Delores McQuinn, who represented the 70th

11   District.  She had -- she -- she very much wanted to

12   keep --

13        JUDGE PAYNE:  That's a -- I think it's a good

14   point to make the point that the question is did you

15   discuss.  The answer is yes.

16   A    Yes.

17        JUDGE PAYNE:  If he wants to ask something

18   further, she can ask it.  Then the question can be framed.

19   And if there's an objection, we'll have a basis for the

20   objection.  If there's not, then we will go on.  So if you

21   take hold of the examination, and I think it will move

22   better that way if you do that.  Rather than -- we're

23   having a lot of answers that drag on and on and aren't

24   really responsive to the questions that are being asked,

25   and some of them are helpful information.  Some of it's

McClellan – Direct

1  not particularly helpful.  So if you'd take hold, I would

2  appreciate it.

3          MS. BRANCH:  Thank you, Your Honor.

4  Q    What was Delegate McQuinn's position on the issue of

5  adding precincts 701 and 702 to your district?

6  A    She wanted to --

7          MS. MCKNIGHT:  Objection, Your Honor.  Hearsay.

8  We understand plaintiffs intend to offer Delegate McQuinn.

9  So they may elicit testimony directly from her.

10         JUDGE PAYNE:  What's your response to the

11 hearsay objection?

12         MS. BRANCH:  I'm asking Delegate -- or Senator

13 McClellan what her understanding was based on their

14 conversation.

15         JUDGE PAYNE:  I understand that, but it's still

16 hearsay.

17         MS. BRANCH:  I'll rephrase, Your Honor.

18         JUDGE PAYNE:  All right.

19         MS. BRANCH:  Thank you.

20 Q    Did you try to draw your district in a way that would

21 not have included 701 and 702?

22 A    Yes.

23 Q    And what was the effect of that?

24 A    It pushed my black voting age population below

25 55 percent.

McClellan - Direct

1   Q     Did Delegate McQuinn used to represent precinct 701

2   and 702 in any capacity?

3   A     Yes.

4   Q     And in what capacity was that?

5   A     As a delegate, as a city council member and as a

6   school board member.

7   Q     Let's now turn our attention to the Ratcliffe VTD.

8   Was that added to your district?

9   A     Yes.

10  Q     And where is Ratcliffe located?

11  A     Ratcliff is the northeast corner of the district.  I

12  drew a red line there.  And it is next to Central Gardens

13  and precinct 604.

14  Q     And what county is it in?

15  A     Henrico.

16  Q     What's the racial composition of Ratcliff?

17  A     Predominately black.

18  Q     Is there a difference between the Henrico area --

19  Henrico County areas that were moved out of your district?

20  That's Summit Court, Stratford Hall and Hilliard and

21  Ratcliffe, which was added into your district?

22  A     Yes.

23  Q     And what's that difference?

24  A     Ratcliff is predominately black.  Summit Court,

25  Stratford Hall and Hilliard are predominately white.

McClellan - Direct

```
 1   Q    Would you describe the difference between the racial

 2   populations in those two areas as stark?

 3   A    Yes.

 4   Q    Finally, where is precinct 204 located?

 5   A    204 -- I just drew a red line through -- is on the

 6   west side of the district.

 7   Q    And it was added to your district, correct?

 8   A    Yes.

 9   Q    What's the racial composition of that precinct?

10   A    Predominately white.

11   Q    And you testified earlier that you felt you couldn't

12   keep precinct 207 in your district.  Is there a difference

13   between precincts 207 and 204?

14   A    Yes.

15   Q    And what's that difference?

16   A    207 is a highly dense residential neighborhood, The

17   Fan.  204 is not densely populated with residents.  It --

18   there is one street that is part of The Fan, Monument

19   Avenue, that makes up part of that precinct.  There is --

20          JUDGE PAYNE:  Where is 204?

21          THE WITNESS:  204 is --

22          JUDGE PAYNE:  What are the boundary streets?

23   Excuse me.  I didn't ask that very clearly.

24          THE WITNESS:  Okay.  So you see in 208 where

25   there's a little star.  If you go straightly west, that
```

McClellan - Direct

 1   red line is Park Avenue.  And it goes to -- this is the

 2   Boulevard.  This is Broad Street.  I believe this is

 3   Cleland maybe.

 4            JUDGE PAYNE:  Cleveland?

 5            THE WITNESS:  I think it's Cleland.  It's either

 6   Cleveland or Cleland.

 7            JUDGE PAYNE:  Is it near Patterson, near the

 8   museum?  There is a Cleland Avenue, but I don't think it's

 9   in that area.

10            THE WITNESS:  Well, this is all closer to Broad

11   Street.  So the southern street is Park, up to the

12   Boulevard and as you go north, you have Grace and Broad,

13   and it goes beyond the Boulevard if you're on Broad.

14            JUDGE PAYNE:  To what street?

15            THE WITNESS:  Well, do you know -- I can't

16   remember the name of the street, but there's the big

17   building where Doug Wilder wanted to move the school board

18   that's right next to --

19            JUDGE PAYNE:  Atlantic Coastline -- old Atlantic

20   Coastline Railroad?

21            THE WITNESS:  I think so.  It's --

22            JUDGE PAYNE:  Apartments 3600?

23            THE WITNESS:  Yes.  Yes.  Yes.  Yes.

24            JUDGE PAYNE:  That's all -- that is all -- I'm

25   concerned because all of that -- about your testimony

McClellan - Direct

1   because, I mean, I'm confused by it.  Because from

2   Monument to Park out beyond Boulevard and up that way

3   seems to me to be fairly heavily populated --

4                THE WITNESS:  Well, in --

5                JUDGE PAYNE:  -- if you pick up all that area of

6   that little tip over there that goes all the way to Broad

7   Street.

8                THE WITNESS:  But it's not as heavily populated

9   as 207.  And that -- the question --

10               JUDGE PAYNE:  Oh, I see.

11               THE WITNESS:  -- was the difference between 207

12  and 204.  And so while 204 is populated, it does not have

13  as many people or voting age population as 207.

14  Q    Senator, if we take a step back and look at the

15  voters who moved into your district and out of your

16  district, are there any patterns?

17  A    Yes.

18  Q    How would you describe them?

19  A    The precincts -- with one exception, which I'll come

20  back to in a minute, precincts 207, Summit Court,

21  Hilliard, Stratford Hall, the part of 505 that was moved

22  out are predominately white, residential, densely

23  populated areas.  Precinct 301 was, I would say, a

24  like-for-like swap with 604.  And the 702, 701, the part

25  of 703, Ratcliffe, were heavily densely populated black

McClellan - Direct

1  neighborhoods.  So I shifted east, lost white population

2  and picked up black population.

3  Q    Let me direct your attention to Plaintiffs' Exhibit

4  30.

5  A    Is there a way to get the -- okay.  Thank you.

6  Q    Do you remember -- do you recognize this e-mail

7  string?

8  A    Yes.

9  Q    And do you remember testifying about it at the last

10  trial?

11  A    Yes.

12  Q    What is it about, briefly?

13  A    The string, in its entirety -- Kirk Showalter is the

14  voter registrar for the City of Richmond.  Larry Haake is

15  the voting registrar for Chesterfield County.

16       Kirk reached out to me, on behalf on both of them, to

17  raise concerns about split precincts in Richmond and

18  Chesterfield.  And we attempted to draw maps that reunited

19  the split precincts identified by those two individuals.

20  And we -- so that's, I think, the beginning of the string

21  that you can't see on the screen, or at least the

22  beginning of the e-mail correspondence.

23       Okay.  So it's not this document, but that was the

24  beginning of the e-mail correspondence.

25       This e-mail is -- and we are talking about House Bill

McClellan - Direct

1   5001.  We had made a change that was not included in

2   House -- in 5001 as it passed the House, and Kirk

3   Showalter was asking me why not.  And I asked Delegate

4   Jones and Kent Stigall why not and relayed the reason they

5   gave me back to Kirk Showalter.  And I think she's trying

6   to figure out how to reunite the precincts.  And the

7   reason the change was not accepted is in the e-mail.

8   Q    And what was that reason?

9   A    Because the -- this change in particular she was

10  asking about pushed the black voting age population in the

11  71st District to 54.8 percent.

12  Q    And you testified that this e-mail exchange was about

13  the House Bill that preceded the final map, which is House

14  Bill 5001; is that right?

15  A    Yes.

16  Q    And were all the precinct splits in your district

17  fixed in the final map in House Bill 5005?

18  A    No.

19  Q    Which ones were still split?

20  A    If we go back to the prior document, or if I can

21  remember off the top of my head, 505, 703 -- yeah.  Okay.

22  Thank you.

23      505, 703 are still split.  And then that e-mail was

24  not just about splits in my district.  So there were

25  precincts in other districts that remained.

McClellan - Direct

1   Q    Did you vote for House Bill 5005?

2   A    Yes.

3   Q    Why?

4   A    There is a -- an expectation in the House of

5   Delegates that I think goes back to Jefferson or Mason or

6   somebody; if you offer amendments to a bill, you are

7   expected to vote for it.  And I believed that having

8   offered suggestions that were accepted, even though they

9   all weren't, if I did not vote for House Bill 5005, as a

10  member of the minority party, I would not be able to have

11  an influence on legislation going forward, particularly

12  legislation sponsored by Delegate Jones or any other

13  member of the majority party.

14  Q    Shifting gears to talk briefly about your election

15  history.  Did you win every election you ran in to

16  represent the 71st District?

17  A    Yes.

18  Q    Were any of your House elections close?

19  A    No.

20  Q    What was the closest election you had?

21  A    My initial primary.  I won with 65 percent of the

22  vote.

23  Q    And the rest of the margins in all of your subsequent

24  election history were bigger --

25  A    Yes.

McClellan - Direct

1   Q     -- is that right?

2   A     Yes.

3   Q     How long has the 71st District being represented by

4   an African-American delegate?

5   A     Since Virginia went to single member districts.

6   Q     And do you know who that first delegate was?

7   A     Benjamin Lambert.

8   Q     Senator, did you receive electoral support from white

9   voters when you represented the 71st District?

10  A     Yes.

11  Q     And have white voters in the 71st District voted for

12  black candidates other than yourself?

13  A     Yes.

14  Q     Who?

15  A     Kim Gray, who is now the city council member for the

16  2nd council district, which is all of the 200 precincts in

17  the 71st.  She was also elected to the school board.

18           JUDGE PAYNE:  I think the question was who, and

19  I think the answer would be sufficient to give the names,

20  if you don't mind.

21  A     Okay.  Kim Gray, Jeff Bourne, Viola Baskerville,

22  Cynthia Newbille, Ellen Robertson, Barack Obama.

23  Q     That's good.  Thank you.

24  A     Okay.

25  Q     If Delegate Tyler thought that her district, House

McClellan – Direct

1   District 75, needed a black voting age population of

2   55 percent in order to preserve the ability to elect,

3   would you take that to mean that District 71 also needed a

4   55 percent black voting age population?

5   A    No.

6   Q    Are you familiar with Delegate Tyler's district at

7   all?

8   A    Yes.

9   Q    And is your district different from her district?

10  A    Yes.

11  Q    How so?

12  A    Her district is more rural, has more prisons.  So it

13  has a large population of people who cannot vote.  Mine,

14  or the 71st, is urban, very densely populated.  I think

15  that's the biggest difference.

16  Q    What's the partisan composition of your former

17  district?

18  A    It is very democratic.  It was and is the most

19  democratic district in the state when you look at the

20  democratic performance index.

21  Q    Does House District 71 have a significant student

22  population?

23  A    Yes.

24  Q    Does it have a significant retiree population?

25  A    Yes.

McClellan – Direct

1    Q    Are House Districts 71 and 75 even remotely similar?

2    A    No.

3    Q    There are significant differences between the two?

4    A    Yes.

5    Q    Did you ever express a concern to Delegate Jones or

6    anyone else about the black voting age population in your

7    district falling too low?

8    A    No.

9    Q    Did you ever express a concern to Delegate Jones or

10   anyone else about the black voting age population falling

11   too low in any other majority black district?

12   A    No.

13   Q    Did you have that concern at all?

14   A    No.

15   Q    Was a black -- a 55 percent black voting age

16   population needed for to you win reelection in the 71st?

17   A    No.

18   Q    Did you ever express a view that a certain percentage

19   of black voters was needed in your district or in any

20   other majority/minority district in order for minority

21   voters to be able to elect their candidate of choice?

22   A    No.

23           MS. BRANCH:  No further questions.  Thank you.

24           JUDGE PAYNE:  Cross-examination.

25           MS. MCKNIGHT:  Good morning, Your Honors.

McClellan – Cross

**CROSS-EXAMINATION**

1

2    BY MS. MCKNIGHT:

3    Q    Good morning, Senator McClellan.

4         MS. MCKNIGHT:  Brief point of just an

5    administrative issue.  I think we need something switched.

6    Okay.

7    Q    Good morning, Senator McClellan.

8    A    Good morning.

9    Q    We represent defendant-intervenors.  I'm going to ask

10   you some questions today about your testimony earlier

11   today and about your district.  The last we spoke was in

12   2015 trial so it's nice to see you, but I'm going to try

13   to keep this brief.

14   A    Thank you.

15   Q    First, I'll ask to have Defendant-Intervenors'

16   Exhibit 94, page 4 put up on the display.  This should

17   look familiar.  You were just testifying about this map.

18   A    Yes.

19   Q    Now, I'd like to start by drawing your attention to

20   precincts 604 and 603.

21   A    Okay.

22   Q    And I believe I may be able to draw a dot there so at

23   least folks can see.  We're talking about 604 and 603.

24        Now, it appears from the map that prior to redrawing,

25   district 603 was in your district but 604 was not; is that

McClellan - Cross

1    right?

2    A    Yes.

3    Q    And, now, you testified in deposition that uniting

4    603 and 604 made sense because of similar demographics.

5    Is that fair?

6    A    Yes.

7    Q    And now I'd like to draw your attention to precinct

8    or District 703.  Let me clear my dots.

9    A    Okay.

10   Q    Now, you had testified earlier about a split in that

11   precinct?

12   A    Yes.

13   Q    Now, I understood from your deposition testimony that

14   you testified that the split is a natural boundary between

15   communities of interest.  Is that fair?

16   A    Yes.

17   Q    Still on District 703.  I understood in your

18   deposition that testified that Delegate McQuinn had a home

19   in 703.  Is it fair to say that the asterisk next to

20   Delores L. McQuinn indicates her home in that district?

21   A    It is her home, but I -- I believe she actually lives

22   in 705.

23   Q    Okay.

24           JUDGE PAYNE:  You're talking about now or do you

25   mean at the time?

McClellan - Cross

1        THE WITNESS:  Both.

2        JUDGE PAYNE:  What?

3        THE WITNESS:  Both.

4        JUDGE PAYNE:  So you say she never lived in 703?

5        THE WITNESS:  She lives in the House that is

6   that dot, and my understanding is that dot is actually in

7   705 and not 703.

8        JUDGE PAYNE:  You mean the thing that's a star?

9        THE WITNESS:  The star, yes.  It's kind of on

10  the border, but --

11       JUDGE PAYNE:  It's split between the two or it

12  is all in one or all in the other?

13       THE WITNESS:  Her house is on the border between

14  703 and 705, but my understanding is the house itself is

15  in 705.

16  Q    And you testified at deposition in August in this

17  matter that her home was in 703; is that right?

18  A    I don't -- if you'd like to show me my transcript, I

19  don't remember if I said 703 or 705.

20       JUDGE PAYNE:  Show her the transcript.

21       MS. MCKNIGHT:  Could we put it up on the screen

22  for her to view?  That may be easiest.

23       JUDGE PAYNE:  Sure.  As long as she can see it

24  and it contains the question and the answer.  If it's

25  something incomplete or you need to see more, just say so.

McClellan - Cross

1          THE WITNESS:  Thank you.

2          MS. MCKNIGHT:  Thank you, Your Honor.

3          JUDGE PAYNE:  Will you put it up?

4          MS. MCKNIGHT:  This is page 17 of her August

5  deposition.  I mean, pardon me.  Page 47 of her

6  August 2017 deposition.

7          JUDGE PAYNE:  Can you bracket that so we can

8  read it and enlarge the question and answer you're talking

9  about, please, ma'am?

10          MS. MCKNIGHT:  Could you enlarge the lower half

11  of page 47?

12  Q    And lines -- Delegate -- pardon me.  Senator

13  McClellan, would you review lines 18 through 22, please?

14  A    Actually, can you go back up?

15  Q    Sure.

16  A    And can I see more than this, because --

17          JUDGE PAYNE:  How far -- do you need to go --

18  A    So on line 9, I say she lives in 705.  And that is

19  and has always been my understanding, because 705 is part

20  of Churchill, and if she did not live in 705, we would

21  have attempted to put 705 in the 71st District.

22          So yes, down below, I say 703, but I misspoke there.

23  Q    I understand.  Okay.  Thank you for clearing it up.

24          Okay.  Now we can go back to Plaintiffs' Exhibit 94,

25  page 4.  Now, moving south along your district to district

McClellan - Cross

1    505 --

2    A    Yes.

3              JUDGE PAYNE:  You said 505?

4              MS. MCKNIGHT:  Correct.  Precinct 505.  Pardon

5    me, Your Honor.  I've put a red dot under it just for

6    everyone's reference.

7    Q    Earlier you testified that you and Betsy Carr

8    suggested the split in 505.  Did you mean to say that you

9    suggested it to Delegate Jones?

10   A    Yes.

11   Q    And did Delegate Jones ever tell you that 505 could

12   not be placed entirely in Betsy Carr's district?

13   A    No, because the map we presented to him did not

14   include 505 in all of one district or the other because

15   when we drew a map that included 505 in one district or

16   the other, it affected the black voting age population.

17   So I never offered that as a suggestion to Delegate Jones

18   that I can recall.

19   Q    Moving back east in your district for a moment.  You

20   were discussing with Ms. Branch precinct -- a split in

21   707 -- I'm going to put a red dot under it for your

22   reference.

23   A    Yes.

24   Q    You were describing a split in 707 and a split in

25   Churchill, a division along Broad Street?

McClellan - Cross

1  A    Yes.

2  Q    And did you tell Delegate Jones that that split

3  needed to be fixed?

4  A    Yes.

5  Q    Okay.  And did he fix it?

6  A    Yes.

7  Q    Okay.  Going west in your district back to precinct

8  208.  I placed a dot under it for everyone's reference.

9  You discussed with Ms. Branch that there was a split in

10  208 --

11  A    Yes.

12  Q    -- in HB 5001?

13  A    Yes.

14  Q    And did you tell Delegate Jones you wanted that split

15  to be fixed?

16  A    Yes.

17  Q    And did he fix it?

18  A    Yes.

19  Q    You testified about precinct 207.  Did you ever go to

20  Delegate Jones and give him a proposed map that included

21  precinct 207 in HD 71?

22  A    I don't believe so, because every map that I drew

23  that included 207, either in whole or in part, pushed the

24  black voting age population of the 71st District over 55.

25  So I knew he wouldn't accept it, and I did not offer,

McClellan - Cross

1   knowingly, any recommendations that he would not accept.

2           JUDGE ALLEN:  And how many recommendations did

3   you give him, approximately, that you knew that he

4   wouldn't accept?

5           THE WITNESS:  I did not give him any that I did

6   not think he would accept.

7           JUDGE ALLEN:  Right.  So how many did you not

8   give him?

9           THE WITNESS:  Oh.  A lot.  So I sat in the

10  legislative services with the software and drew several --

11  I don't know the number, but it was a lot of different

12  versions of the boundaries to try to keep as many

13  neighborhoods together to address concerns that Delegate

14  McQuinn and Delegate Carr and the two voter registrars

15  brought to my attention to see if we could address all of

16  those concerns.  And with one exception, I did not show

17  either Delegate Jones or Kent Stigall, who was the

18  legislative services person working with him, I did not

19  give them a map that I -- that did not meet the 55 percent

20  black voting age population.  And the exception was a

21  mistake.

22          MS. MCKNIGHT:  Thank you, Your Honor.

23          JUDGE ALLEN:  Excuse me.

24          MS. MCKNIGHT:  Thank you, Your Honor.

25  Q    Now, going into the 2011 redrawing process, the

McClellan - Cross

1   neighborhood called The Fan was split three ways, wasn't

2   it?

3   A    Yes.

4   Q    And going out of the 2011 redrawing process, it was

5   split three ways, wasn't it?

6   A    A very different three ways.

7   Q    Okay.  Now, Senator McClellan, I appreciate I may be

8   testing your memory a bit here.  I'm going to be asking

9   you a question about deposition testimony that you gave in

10  this case in 2015.

11  A    The deposition was in 2015?

12  Q    Correct.

13  A    Okay.  I would appreciate it if you show me

14  transcript pages when you ask your question.

15          JUDGE PAYNE:  The technique actually doesn't do

16  that.  That's not how it it's done.  The question is you

17  ask the question.  She gives an answer.

18          THE WITNESS:  Okay.

19          JUDGE PAYNE:  If the answer that she gives is

20  inconsistent, then you show her the page and you say, In

21  2015, you were asked this question and you gave this

22  answer; is that correct?  And then we have -- and remember

23  the fundamental rule; if you touch the king, you must kill

24  him.  That means it needs to be impeachment so that we

25  don't waste time.  Okay.  That's just -- so she's going to

McClellan - Cross

1    ask you a question.  You just give the answer.  If she

2    thinks that you gave an inconsistent answer in 2015,

3    she'll show you the deposition page and ask you did you

4    say that then.

5              THE WITNESS:  Okay.

6              JUDGE PAYNE:  Okay?

7              THE WITNESS:  Thank you.

8    Q    Senator McClellan --

9    A    Yes.

10   Q    -- to determine who the candidate of choice was of

11   the majority of the minority community in your district,

12   you would probably have to look at results from primary

13   elections.  Is that fair to say?

14   A    I'm sorry.  Can you repeat that question?

15   Q    Absolutely.  In order to determine who the candidate

16   of choice was of the majority of the minority community in

17   your district, you would probably have to look at the

18   results from primary elections; is that right?

19   A    If you are talking about House of Delegate elections,

20   yes.  If you are talking about other elections, then not

21   necessarily.

22   Q    Senator McClellan, did you ever tell Delegate Jones

23   that you did not think HD 71 needed 55 percent BVAP to be

24   a performing majority/minority district?

25   A    I don't believe so, because I -- when I was told it

McClellan - Cross

1  had to meet 55 percent, I didn't argue.

2  Q    And did you ever provide Delegate Jones any analysis

3  showing that HD 71 did not have racially polarized voting?

4  A    He didn't ask for one.

5        JUDGE PAYNE:  Excuse me.  Senator McClellan,

6  there's a question on the table and then -- and the answer

7  was did he ask for it or not.  Yes or no.

8        THE WITNESS:  Okay.

9        JUDGE PAYNE:  So that's a yes or no answer.  And

10  we -- embellishment simply extends the examination.  If a

11  lawyer wants to know more, they'll ask, and if the

12  cross-examining -- your lawyer sponsoring your testimony

13  wants to ask more, they'll do it.

14        THE WITNESS:  Okay.

15        JUDGE PAYNE:  You don't need to augment it and

16  advocate.

17        THE WITNESS:  Okay.  I'm not used to being on

18  this side so I apologize.

19        JUDGE PAYNE:  You're used to questioning.  Not

20  answering.

21        THE WITNESS:  Yes.

22  Q    So I'll ask again, Senator McClellan.  Did you

23  provide Delegate Jones any analysis showing that HD 71 did

24  not have racially polarized voting?

25  A    No.

McClellan - Redirect

1   Q      And, Senator McClellan, at the time you were a

2   delegate representing HD 71, you voted for the plan as

3   enacted HB 5005; isn't that right?

4   A      Yes.

5               MS. MCKNIGHT:  Thank you very much for your

6   time.

7               JUDGE PAYNE:  Any redirect?

8               MS. BRANCH:  Yes, Your Honor.

9                     **REDIRECT EXAMINATION**

10  BY MS. BRANCH:

11  Q      Senator McClellan, you were asked on cross about

12  whether you proposed -- or whether you gave Delegate Jones

13  any maps that kept precinct 207 in the 71 District.  And I

14  think you said on cross that you did not because it would

15  have brought the BVAP above 55 percent.  Did you mean to

16  say under in 55 percent?

17  A      I meant to say under, yes.

18  Q      Thank you.  When -- you testified on cross that you

19  didn't argue with Delegate Jones about the 55 percent

20  black voting age population threshold.  Why not?

21  A      It wouldn't have done any good.  I was clearly told,

22  If you meet these two criteria, I will be open to

23  suggestions.  I took that to mean if I made suggestions

24  that did not meet 1 percent population deviation and

25  55 percent black voting age population, he wouldn't be

McClellan – Redirect

1   open to it.  I didn't want to waste my time arguing over

2   something that had already been decided.

3   Q    And was it your experience that when a map was

4   proposed that had your district at below 55 percent black

5   voting age population, it was not accepted?

6   A    Correct.

7   Q    Did Delegate Jones ask you for any racially polarized

8   voting analysis at any time during the process?

9   A    No.

10           MS. BRANCH:  No further questions.  Thank you.

11           JUDGE PAYNE:  Can she be permanently excused or

12   do you wish to recall her?

13           MS. BRANCH:  We wish to reserve the right to

14   recall her.

15           JUDGE PAYNE:  Well, then she needs -- is she

16   under subpoena or do you have her here by compulsion

17   or what?  How do we deal with that?

18           MS. BRANCH:  She is under subpoena, I believe.

19           JUDGE PAYNE:  All right.  Then you are not

20   released from your subpoena.  May she be excused

21   temporarily until you give her notice so she can go about

22   her business?

23           MS. BRANCH:  Yes, Your Honor.

24           JUDGE PAYNE:  Knowing that the onus of getting

25   ahold of her in time is on you, and if you don't do it,

McClellan - Redirect

1   that's just the way things are.

2              MS. BRANCH:  Yes, Your Honor.

3              THE WITNESS:  I'll be across the street, Your

4   Honor.

5              JUDGE PAYNE:  Just give -- make sure they know

6   to get ahold you you.

7              THE WITNESS:  Yeah, they do.  Thank you.

8              JUDGE PAYNE:  More than you want.

9              THE WITNESS:  Thank you.

10             (Witness stood aside.)

11             MS. KHANNA:  Your Honor, plaintiffs would like

12   to call Delegate Matthew James to the stand.

13             JUDGE PAYNE:  You, I hope, were listening, and

14   the witness was listening, about the previous admonitions.

15        Testimony is best presented by a question, a direct

16   answer and a follow-up, and then we don't get into

17   rambling and then having to cure errors that occur because

18   there is an extensive narrative.  And I'm asking you to

19   take the lead in that situation, even if you need to cut

20   the witness off and say all right, let me follow up or

21   whatever.

22             MS. KHANNA:  Yes, Your Honor.  Thank you.

23             JUDGE PAYNE:  Because you know what's

24   permissible and what's not.  They don't always know.

25             MS. KHANNA:  Yes, Your Honor.

James – Direct

 1          JUDGE PAYNE:  Come up and be sworn, sir.

 2                    **MATTHEW JAMES,**

 3    called at the instance of the plaintiffs, having been

 4            first duly sworn, testified as follows:

 5                    **DIRECT EXAMINATION**

 6   BY MS. KHANNA:

 7   Q     Good morning, Delegate James.

 8   A     Good morning.

 9   Q     Could you please state your name for the record and

10   spell your last name?

11   A     Matthew James.  J-A-M-E-S.

12   Q     Are you currently a delegate with the Commonwealth of

13   Virginia?

14   A     Yes, I am.

15   Q     And what district do you represent?

16   A     I represent the 80th District.

17   Q     And where did you attend high school?

18   A     Indian River High School in Chesapeake, Virginia.

19   Q     And where did you attend college?

20   A     I spent some time at the Naval Academy in Annapolis,

21   Hampton University in Hampton.

22   Q     And did you attend graduate school as well?

23   A     Yes.  I attended Northwestern University, Kellogg

24   School of Management, where I received my MBA.

25   Q     What is your current occupation other than as a

James - Direct

1   delegate?

2   A    I run a seven city/county economic development

3   organization.  We do the workforce development and

4   business expansion for the cities of Hampton, Newport

5   News, James City County, Gloucester, Poquoson, York and

6   Williamsburg.

7   Q    And what is your role there?

8   A    I'm the president and CEO of that organization.

9   Q    How long have you been in that role?

10  A    Twelve years.

11  Q    When did you first run for elected office?

12  A    I ran in 2009.

13  Q    And what district was that?

14  A    For the 80th District.

15  Q    What is your party affiliation?

16  A    I'm a democrat.

17  Q    Was there a democratic primary in 2009?

18  A    Yes.  We had a three party race.

19  Q    Do you recall who your opponents were?

20  A    Yes.  My opponent was a sitting city council person,

21  Doug Smith, and the civic league person, Buddy Sharp, of

22  the largest civic league in my district.

23  Q    And I take it that you won that three party primary?

24  A    Yes.

25  Q    Or that three candidate primary?

James – Direct

1   A    Yes.  I won with a vote total of a little south of

2   50 percent.

3   Q    Did you run in a contested general election in 2009?

4   A    Yes, I did.

5   Q    And who was your opponent then?

6   A    My opponent was Jennifer Lee.

7   Q    Was she a republican?

8   A    She was a republican.

9   Q    Do you recall approximately how much of the vote you

10  won?

11  A    I believe I won around 68 percent of the vote.

12  Q    Have you participated in a democratic primary since

13  2009?

14  A    No, I have not.

15  Q    Have you run in a contested election since 2009?

16  A    No, I have not.

17  Q    Delegate James, do you recall that in the first half

18  of 2011, the House of Delegates took up the process of

19  redistricting?

20  A    Yes, I do.

21  Q    And you were a freshman delegate at that time?

22  A    Yes.

23  Q    Do you know who was responsible primarily for the

24  2011 redistricting process for the House of Delegates?

25  A    Rephrase the question.

James - Direct

1   Q    Do you know which delegate was primarily responsible

2   for the redistricting process in 2011?

3   A    My observation was most of the conversations on the

4   floor of the House were conducted by Delegate Jones.

5   Q    Delegate James, I'll represent to you that Delegate

6   Jones has testified before this Court that you had

7   significant input into the drawing of your district.  Is

8   that correct?  Did you have significant input the

9   configuration of District 80?

10  A    As I testified in the deposition, most of my

11  conversations were with Delegate Spruill.

12  Q    Did you have significant --

13          JUDGE PAYNE:  But the question was did you have

14  significant input, even if it wasn't with Spruill -- I

15  mean with Jones?

16          THE WITNESS:  I apologize, sir.

17          JUDGE PAYNE:  Do you think you did?  Let's start

18  again.

19  Q    Would you like me to repeat that question?

20  A    Please -- I'm sorry.  I'm not -- this is my first

21  time testifying so I'm a little nervous.  I apologize.

22  Q    Did you have significant input into the drawing of

23  your district, District 80?

24  A    No, not really.

25  Q    Did you provide any input to Delegate Jones on how

James - Direct

1   your district should be configured?

2   A    Not to Delegate Jones.

3   Q    Did you tell Delegate Jones that you would like him

4   to add any areas to your district?

5   A    Not directly.

6   Q    Did you tell him indirectly?

7   A    No.

8   Q    Did you tell Delegate Jones that you didn't want him

9   to add areas from his district, District 76, to yours?

10  A    No.

11  Q    Did you express any issue -- any opinion on the issue

12  to Delegate Jones?

13  A    No.

14  Q    Did you have any conversations with Delegate Jones

15  about the number of black voters in your district?

16  A    No, I did not.

17  Q    Did you tell Delegate Jones that he should increase

18  the black voting age population of your district?

19  A    No, I did not.

20  Q    Did you have any conversations with Delegate Jones

21  about the configuration of District 80 prior to the

22  enactment of HB 5005?

23  A    Not to my recollection.

24  Q    Did you have any conversations with Delegate Jones

25  about the configuration of any other districts prior to

James - Direct

1    the enactment of HB 5005?

2    A    No, I did not.

3    Q    Did you ever have a one-on-one meeting with Delegate

4    Jones about redistricting?

5    A    No, I did not.

6    Q    Did you discuss the 2011 redistricting process with

7    anyone else prior to the enactment of the bill?

8    A    As I said, my conversations were with Delegate

9    Spruill.

10   Q    And how many conversations are you referring to?

11   A    Primarily one, based on my recollection.

12   Q    And can you tell me the circumstances of that

13   conversation?

14   A    Basically he explained to me the process, and I

15   basically said, as a freshman, I was proud and I'll serve

16   whatever my district configuration works out to be.

17   Q    And was that a formal meeting that was set up --

18   A    No.  It was a telephone call.

19   Q    He had called you?

20   A    Yes.

21   Q    And do you recall approximately how long that

22   telephone call lasted?

23   A    Maybe 8 to 12 minutes.

24   Q    Did you provide any input on the configuration of

25   your district to Delegate Spruill during that phone

James - Direct

1   conversation?

2   A    Not to my recollection, no.

3   Q    Did he ask for your input?

4   A    Not really.  I'm sorry.  No.

5   Q    Did you discuss the configuration of your district,

6   District 80, at all in the course of that conversation?

7   A    The conversation we had was primarily process.

8   Q    Did you discuss the 2011 redistricting process with

9   anyone else --

10  A    No.

11  Q    -- prior to the enactment of HB 5005?

12  A    Not to my recollection, no.

13  Q    Delegate James, can you say with certainty whether

14  you had any substantive conversations with anyone about

15  the configuration of District 80 during the redistricting

16  process?

17  A    Rephrase the question, please.

18  Q    You mentioned a few times that you don't recall --

19         JUDGE PAYNE:  Do you know what that's called?

20  Flagellating a dead equine.  Let's go.

21         MS. KHANNA:  I'll move on, Your Honor.

22         JUDGE PAYNE:  I think the point has been made.

23         MS. KHANNA:  Understood.

24      I'd like to please put on the screen

25  Defendant-Intervenors' Exhibit 94, page 10.

James – Direct

1   Q     Delegate James, I'm showing you what has been marked

2   as Exhibit 94 by defendant-intervenors.  Have you seen

3   this particular map before?

4   A     Yes, I have.

5   Q     And what is it?

6   A     This is the map showing my prior configuration of 80

7   before the redistricting and, in different colors, the new

8   redistricting boundary lines.

9   Q     So you understand how to read this map in terms of

10  the various cross-hatching and colors?

11  A     Yes, I do.

12  Q     And I won't reiterate that for the Court as long as

13  that's clear.

14        Were there changes made to District 80 during the

15  2011 redistricting process?

16  A     Yes.

17  Q     Pretty substantial changes; is that right?

18  A     They were significant.  I don't know if they were

19  substantial.

20  Q     Do you know why any of these changes were made?

21  A     It was my understanding, based on the conversation

22  that I heard on the floor of the House and in caucus

23  meetings, that this was done in order to satisfy the laws

24  of the redistricting process.

25  Q     Did you understand anything more than that?

James - Direct

1  A    I wasn't involved in the redrawing of the lines very

2  significantly.  So I made the assumption that this was

3  done in order that we had fair and equitable lines

4  throughout the Commonwealth of Virginia.

5  Q    Did you know at the time or did you have any other --

6  any understanding, specific understanding, about why any

7  specific changes were made?

8  A    It was my understanding it was based on the census --

9  Q    So --

10  A    -- demographics.

11  Q    So the question was did you know why any specific

12  changes were made?

13  A    No.  I wasn't involved.  I was not personally

14  involved in any of those details.

15  Q    And did you provide any input to anyone at any time

16  suggesting any of these changes?

17  A    No, I did not.

18  Q    Delegate James, prior to the enactment of HB 5005,

19  did you know what the black voting age population of your

20  district was?

21  A    No, I did not.

22  Q    Prior to the enactment of HB 5005, did you know -- or

23  did you have an understanding of precisely what the Voting

24  Rights Act would have required of the configuration of

25  your district?

James - Cross

1   A    No, I did not.

2   Q    Did you ever discuss with any delegates whether a

3   55 percent black voting age population would be needed in

4   your district?

5   A    No, I did not.

6   Q    Did you ever discuss with any delegates whether a

7   55 percent black voting age population would be needed in

8   any of the House of Delegates districts?

9   A    No, I did not.

10  Q    How did you vote on House Bill 5005?

11  A    I approved it.

12  Q    And why is that?

13  A    My understanding was that this was what we had to do.

14  It would satisfy the requirements.  And my focus was to

15  move forward and to reach out to my new constituents and

16  help serve them as a delegate in the House of Delegates.

17       MS. KHANNA:  Thank you, Delegate James.  I have

18  no further questions.

19       THE COURT:  Cross-examination.

20                    **CROSS-EXAMINATION**

21  BY MR. RAILE:

22  Q    Good morning, Delegate James.

23  A    Good morning.

24  Q    I'm Richard Raile and I represent the

25  intervenor-defendants, and I'll try to keep this brief.

James - Cross

1    You testified that you didn't have any discussions

2  about the configuration of HD 80; is that right?

3  A    That is correct.

4            MR. RAILE:  Can we put up Defendant-Intervenors'

5  Exhibit 94, page 10?

6  Q    Did you see, during the redistricting process, any

7  draft maps that moved District 80 west into the precincts

8  of Silverwood, Churchland, Fellowship, Balley Creek, E.W.

9  Chittum School or Jolliff Middle School?  Did you ever see

10  a version of a map that moved HD 80 into any of those

11  precincts?

12  A    I don't recall seeing that draft.

13  Q    Am I correct that you do not have any reason to think

14  that the drawing of HD 80 is racially discriminatory?

15  A    That is correct.

16            MR. RAILE:  No further questions.

17            THE COURT:  Any redirect?

18            MS. KHANNA:  No, Your Honor.

19            (Witness stood aside.)

20            THE COURT:  All right.

21            MS. BRANCH:  We would call Algie Howell to the

22  stand.

23            THE COURT:  How long is that witness' testimony

24  going to be, do you think?

25            MS. BRANCH:  Approximately 15 minutes, Your

1   Honor.

2           THE COURT:  How are you doing?  Do you need to

3   change court reporters now?  I think we'll take a

4   20-minute recess and change court reporters, then.

5           (Recess taken.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **ALGIE T. HOWELL, JR.,**

2    a witness, called at the instance of the plaintiff, having

3    been first duly sworn, testified as follows:

4                       DIRECT EXAMINATION

5    BY MS. BRANCH:

6    Q     Good morning, Mr. Howell.

7    A     Good morning.

8    Q     Can you please state your full name for the record.

9    A     Algie T. Howell, Jr.

10   Q     And can you spell your last name, please.

11   A     H-o-w-e-l-l.

12   Q     Where are you currently employed, Mr. Howell?

13   A     I'm currently retired.

14   Q     And did you once serve in the House of Delegates?

15   A     Yes, I did.

16   Q     When was that?

17   A     From 2003 to 2'14.

18   Q     To 2014?

19   A     Yes.

20   Q     Did you retire from the House in 2014?

21   A     No.

22   Q     What did you do after?

23   A     I resigned from the House of Delegates in order to be

24   appointed to the parole board for the State of Virginia.

25   Q     What district did you represent in the House of Delegates?

Howell - Direct

1   A    The 90th House District.

2   Q    And where is that located?

3   A    It's currently a part of Norfolk and Virginia Beach.

4   Q    Are you a native Virginian?

5   A    Yes, I am.

6   Q    Where were you raised?

7   A    In a little town called Holland, Virginia now a part of

8   the City of Suffolk.

9   Q    Are you a Democrat or Republican?

10  A    I'm a Democrat.

11  Q    When did you first run in an election for the House of

12  Delegates?

13  A    In 2003.

14  Q    Have you run in any democratic contested primaries?

15  A    No.

16  Q    Have you run in any primaries where you had an opponent?

17  A    Yes.

18  Q    And were any of your primary election opponents white?

19  A    Not in the primaries.

20  Q    Were they all African American?

21  A    Yes.

22  Q    Were any of your primary elections close?

23  A    No, they were not.  They were all landslides.

24  Q    What about your general elections, were those close at

25  all?

Howell - Direct

1   A     No, they were not.

2   Q     How long has the 90th House District been represented by

3   an African-American delegate?

4   A     The best I can recall was back in the '60s when Dr.

5   William P. Robinson for this seat, and he won that election.

6   Q     What was your role in the 2011 redistricting, Mr. Howell?

7   A     I did not have much of a role in the 2011 redistricting.

8   Q     Were you a member of the six-person redistricting

9   subcommittee?

10  A     Yes, I was.

11  Q     And what was your role in that committee?

12  A     It was minimum.  I didn't exactly have a role.

13  Q     Did you ever draw any maps of any House districts, yours

14  or others?

15  A     No, I did not.

16  Q     Did you ever discuss your district with Delegate Jones?

17  A     On one occasion after I had seen the redistricting map and

18  noticed that some of the areas that I had represented had been

19  removed from the 90th District.

20  Q     So you spoke with Delegate Jones after the map had already

21  been drawn; is that correct?

22  A     The best I can recall.  That's the first time that I saw

23  the map.

24  Q     And did you ever talk to Delegate Jones prior to seeing a

25  new map of your district?

Howell - Direct

1   A    Not that I can recall.

2   Q    Who initiated the conversation between you and Delegate

3   Jones?

4   A    I think I did after I saw the map, the redrawing, and I

5   was very concerned about some areas that had been removed from

6   the 90th.  That's when we had a conversation.

7   Q    How long did the conversation last?

8   A    It wasn't very long.

9   Q    Delegate Jones has testified that you had extensive input

10  into the drawing of your district.  Did you?

11  A    No.

12  Q    Did you have extensive input in the drawing of any House

13  District?

14  A    No.

15  Q    Let's discuss the changes that were made to House

16  District 90.  You mentioned earlier that you had some concerns.

17  What were those?

18  A    There -- my major concern, I guess, was Norfolk State

19  University which part of that was shifted over to the -- it was

20  split over to the 89th District, and Union Chapel, a

21  district -- well, an area that I had worked with those people

22  since the early '60s in the civil rights movement.  I knew most

23  of them.  They were very dedicated people, and also all of the

24  areas in Chesapeake had been removed from my district.

25  Q    Is Union Chapel predominantly black?

Howell - Direct

1    A    Yes.

2    Q    Did you tell Delegate Jones that you didn't agree with the

3    changes you've just described?

4    A    Yes, I did.

5    Q    And did he accommodate your concerns in the final map?

6    A    We talked about the area, basically about Norfolk State,

7    Park Avenue that was running along there which, to the right of

8    that Booker T. Washington High School was also in that area,

9    and Booker T. Washington High School was taken out of the 90th

10   District, but any changes that were made were very minor, and I

11   think there was -- it was along Park Avenue.  I'm not sure of

12   all the details.  It's been a long time.

13   Q    I understand.  Was Union Chapel removed from your district

14   in the final map?

15   A    Yes.

16   Q    Was Norfolk State University split between your district

17   and House District 89 in the final map?

18   A    Yes.

19   Q    Why did you want to keep Union Chapel in your district?

20   A    Well, I had known those people for a long time prior to

21   modern-day history.  I had been the president of the Norfolk

22   chapter of the Southern Christian Leadership Conference, an

23   organization that Dr. King headed up, and I had worked with

24   them and a number of other people, not just in Union Chapel but

25   in that surrounding area in terms of trying to make the city a

Howell - Direct

1    better place.  They were dedicated people.  I visited the

2    church out there often, and I knew most of the people, and I

3    think they knew me, too.

4    Q    Did you ultimately vote for the final redistricting plan,

5    House Bill 5005?

6    A    Yes, I did.

7    Q    Why?

8    A    I've been asking myself that question for a long time.  I

9    wondered why I did, but it would have been simply a protest

10   vote if I had voted against it because I knew the outcome, what

11   it was going to be anyway, so rather than to just try to cause

12   disruption, I just went along with it.

13   Q    Delegate Jones has testified that you supported a

14   55 percent fixed racial target.  Did you?

15   A    No.

16   Q    Did you ever express any concern to Delegate Jones or

17   anyone else about the black voting-age population in your

18   district falling too low?

19   A    No, I was never concerned about that.  I knew that I was

20   there to represent all the people, both black and whites and

21   Hispanics and others, and I was not concerned about whether or

22   not the percentage was -- the majority was black or not.

23   Q    Did you ever express concern to Delegate Jones or anyone

24   else about the black voting-age population falling too low in

25   any other House district?

Howell - Direct

1   A    Not that I can recall, no.

2   Q    Did you get electoral support from white voters?

3   A    Yes, I did.  As a matter of fact, in Virginia Beach, the

4   mayor of Virginia Beach, it was a Republican, he endorsed me,

5   and I had a number of people, whites throughout both districts

6   in Chesapeake, Norfolk, and Virginia Beach when it was three

7   areas, they supported me.  I never considered whether or not

8   there was a majority of blacks.  I wanted to represent the

9   people.

10  Q    Did you ever tell Delegate Jones that your district or any

11  other district needed a 55 percent black voting-age population

12  as a fixed racial target?

13  A    No, I did not.

14  Q    Did you ever discuss black voting-age population in any

15  context with Delegate Jones?

16  A    No.

17          MS. BRANCH:  No further questions.  Thank you.

18          JUDGE PAYNE:  Any questions?

19

20                    CROSS-EXAMINATION

21  BY MR. RAILE:

22  Q    Good morning, Delegate Howell.

23  A    Good morning.

24  Q    I understand that you had some involvement in the civil

25  rights movement?

1    A    Yes.

2    Q    What was that involvement?

3    A    I was the president of the Norfolk chapter of the Southern

4    Christian Leadership Conference.  We were in the process of --

5    as you probably recall, May 17th, 1954, when the *Brown v. Board*

6    *of Education* decision was handed down, most of the schools were

7    not desegregated, and we were working in an attempt to get them

8    integrated.

9    Q    Was that experience part of what inspired you to run for

10   the House of Delegates?

11   A    I don't think so.

12   Q    You don't think so?

13   A    No.

14   Q    Did you fight for civil rights in your time in the House

15   of Delegates?

16   A    Well, the demonstrations had just about subsided by that

17   time, but I've always supported civil rights, even as a

18   delegate, yes.

19   Q    So during your time as a delegate, you did fight for civil

20   rights; is that right?

21   A    I've always --

22        JUDGE PAYNE:  He said supported, I think.

23        MR. RAILE:  Okay.

24   Q    And your role in the 2011 redistricting was very minor; is

25   that correct?

Howell - Cross                                                    88

1   A    That's correct.

2   Q    Let's look at your district.  Let's pull up

3   Defendant-Intervenor's Exhibit 94 at page 12.  Do you recognize

4   this map?

5   A    Yes, I do.

6   Q    Do you understand how the coloring and the hatching works?

7            JUDGE PAYNE:  Why don't you tell him --

8   Q    Do you understand that the yellow portions are your

9   district after the 2011 redistricting and that the crosshatch

10  portions are the portions of your district before the 2011

11  redistricting?

12  A    What was that question again?

13  Q    Do you understand that the yellow portions of the

14  district --

15           JUDGE PAYNE:  Solid yellow.

16  Q    That's the district after the 2011 redistricting and the

17  enacted plan; is that your understanding?

18           JUDGE PAYNE:  Just the yellow part?

19           MR. RAILE:  Both the yellow and the crosshatch and

20  yellow --

21           JUDGE PAYNE:  I think that's what's confusing him.

22  Everything in yellow, whether it's plain yellow or

23  crosshatched, was what?  Was the district before redistricting;

24  right?

25           MR. RAILE:  The yellow district is the district after

Howell - Cross

1    redistricting, that's my understanding of the map.

2    Q    Does that look right to you?

3    A    I don't think so, because this is Chesapeake, is it not?

4    Those areas were --

5    Q    Let's walk around it.  Do you see this precinct, College

6    Park, that I just pointed to?

7    A    Yes, I see College Park.

8    Q    Is that in your district in the enacted plan of 2011?

9    A    I don't think so.

10   Q    You don't think so.  And Sherry Park, is that in your

11   district in the enacted plan?

12   A    I don't think so.

13   Q    You don't think so, okay.  Is Davis Corner right here in

14   your precinct after the enacted plan?

15   A    No.

16   Q    Is Barron Black in your district after the enacted plan?

17   A    No.

18   Q    Is Sherwood School in your district after the enacted

19   plan?

20   A    No.

21   Q    Let's -- actually, is Chesterfield in your district after

22   the enacted plan?

23   A    Chesterfield --

24   Q    Which I just pointed to down here.

25   A    Chesterfield Heights, I believe that is, yes.

1    Q    You believe that is, okay.  Is Union Chapel in your

2    district after the enacted plan?

3    A    No.

4    Q    Was that taken out?

5    A    That was taken out.

6    Q    That is what you just testified to; correct?

7    A    Yes.

8    Q    Is Brambleton in your district in the enacted plan?  This

9    district down here.

10   A    I'm trying to see it here.

11            JUDGE PAYNE:  Are you all in dispute about what these

12   mean, these things --

13            MR. RAILE:  I'm --

14            JUDGE PAYNE:  Wait just a minute.  I'm under the

15   impression from your indicator, your legend, that everything in

16   yellow, whether it is crosshatched or not, was the enacted

17   plan.

18            MR. RAILE:  That's my understanding, too, Your Honor.

19            JUDGE PAYNE:  And everything that's crosshatched,

20   whether it's in yellow or not, was in the old district?

21            MR. RAILE:  That's my understanding, too, Your Honor.

22   Let's look at a different map --

23            JUDGE PAYNE:  Do you agree with that, Mr. Hamilton?

24            MR. HAMILTON:  I do.  There's no dispute about the

25   map.  It's not my witness so it's not --

```
 1              JUDGE PAYNE:  I understand that.  Thank you.

 2              MR. RAILE:  Let's look at Intervenors' Exhibit 91 at

 3    page 180.  I'm not sure how to clear.

 4              JUDGE PAYNE:  What exhibit is this?

 5              MR. RAILE:  This is Intervenors' Exhibit 91 at page

 6    180.

 7    Q    And, Delegate Howell, do you recognize the district in

 8    this image?

 9    A    Yes, I do.

10    Q    And do you understand that this is House District 90 in

11    the enacted plan?

12    A    That's not my understanding, because Chesapeake, this area

13    here that I'm looking at, was taken out.

14    Q    Is it your belief that Chesterfield was taken out in the

15    enacted plan?

16    A    Chesterfield --

17              JUDGE PAYNE:  It's not Chesterfield, it's

18    Chesterfield -- what is it? -- Heights.  There's a difference

19    between Chesterfield and Chesterfield Heights, I think, he's

20    saying.

21    Q    Okay.  So is this -- do you understand the green area

22    here -- I'm trying to draw it to be the borders of your

23    district after the 2011 redistricting.  Does that look about

24    right to you?

25              MS. BRANCH:  Objection, Your Honor.  Object to the
```

Howell - Cross

1    form of the question.  This is not a memory test, and the map

2    is not in dispute.

3            JUDGE PAYNE:  Well --

4            MR. RAILE:  I'm trying to lay a found --

5            JUDGE PAYNE:  Excuse me just a minute.  Your

6    objection is what?

7            MS. BRANCH:  The map is not in dispute.

8            JUDGE PAYNE:  I know, but the question is.

9            MS. BRANCH:  Mr. Howell has not seen this map before.

10   This appears to just be a memory test based on his memory.

11   There's no dispute about what his district looked like after

12   redistricting.

13           JUDGE PAYNE:  What do you have to say in response to

14   her objection?

15           MR. RAILE:  My response is I'm trying to lay the

16   foundation and see if there is foundation.  I believe he

17   sought --

18           JUDGE PAYNE:  Objection overruled.  I think he's on

19   cross-examination.  It's fair game to assess whether the

20   witness knows the boundaries he's been talking about or not.

21   Q    So, again, to clarify, I'm just trying to identify whether

22   your understanding comports with my understanding which is that

23   this green border reflects the boundary of your district after

24   the 2011 redistricting.

25   A    No, I don't think it does.

Howell - Cross

1   Q    Okay.  Let me ask you a few other brief questions.  Can

2   you identify where Norfolk State University is on this map?  I

3   believe you testified about that a few minutes ago.

4   A    Yes.

5            JUDGE PAYNE:  And on this map, you are talking about

6   Defendant-Intervenors' Exhibit 91, page 180; is that what you

7   are doing?

8            MR. RAILE:  That's right.

9            THE WITNESS:  This writing here is very small.  I

10  can't see it.

11           JUDGE PAYNE:  Would it help you, sir, if I gave you a

12  book that had maybe a little bit bigger picture on it?

13           THE WITNESS:  It certainly would.

14           JUDGE PAYNE:  Why don't you take a crack at this and

15  see if it helps.  It's not a whole lot bigger, but I can read

16  it, and it has to be pretty good for me to read it.  Can you

17  read that and see it any better, because it's the same thing

18  but the print on the screen is smaller.  And I think we can get

19  you a magnifying glass if you need one.  Does the print size on

20  that help you, sir?

21           THE WITNESS:  It helps some, but I'm trying to see

22  here where Norfolk State University is, and I'm having

23  trouble -- oh yeah, I see it now.  Okay, I can see Norfolk

24  State now.

25  Q    You can see the university; is that right?

Howell - Cross

1   A     Well, I see the writing Norfolk State University.

2   Q     Are you able to point where that is on the computer screen

3   here?

4   A     It's right around here.

5   Q     We can set the map aside at this time.  Your understanding

6   is that the racial makeup in House District 90 was about the

7   same before the 2011 redistricting as it was after; is that

8   correct?

9   A     That's correct.

10  Q     Your understanding is there wasn't an influx of whites or

11  blacks into or out of your district; is that correct?

12  A     That's correct.

13  Q     Who is Delegate Lionell Spruill?

14  A     Who is he?

15  Q     Yeah, who is he?

16  A     He was a delegate that represented part of Chesapeake.

17  Q     Did he have a role in the 2011 redistricting?

18  A     I don't know.

19  Q     You don't know.  Who is Delegate Johnny Joannou?

20  A     He was a delegate in the House of Delegates.  He's now

21  deceased.

22  Q     And he was a member of the Democratic party; is that

23  correct?

24  A     That's correct.

25  Q     He often voted with the Republican delegates, though;

Howell - Cross

1    isn't that correct?

2    A    I'm not sure about that.  I don't know.

3              MR. RAILE:  You're not sure.  No further questions.

4              JUDGE PAYNE:  Any redirect?

5              MS. BRANCH:  Very brief, Your Honor.

6

7                    REDIRECT EXAMINATION

8    BY MS. BRANCH:

9    Q    I'd like to direct your attention to

10   Defendant-Intervenors' Exhibit 91, page 180.  This is the map

11   we were just looking at.

12             JUDGE PAYNE:  We need to get the book back.

13             MS. BRANCH:  We actually probably don't need the book

14   for what I'm going to do.

15   Q    Delegate Howell, this area here that I just marked, is

16   that Union Chapel?

17   A    Yes.

18   Q    And that was taken out of your district?

19   A    Yes, it was.

20   Q    Right here where I put a dot, is that Booker T. Washington

21   High School?

22   A    Yes, it is.

23   Q    Did you testify about that earlier?

24   A    Yes.

25   Q    That was removed from your district?

Howell - Redirect

1    A    Yes, it was.

2    Q    And this, that area there that I just marked, is that

3    Chesapeake?

4    A    Yes, that's Chesapeake.

5    Q    And that was removed from your district; right?

6    A    Yes.  All of Chesapeake was.

7              MS. BRANCH:  No further questions.  Thank you.

8              JUDGE PAYNE:  Can he be excused permanently?

9              MS. BRANCH:  Yes, he may, Your Honor.

10             MR. RAILE:  Yes, Your Honor.

11             JUDGE PAYNE:  Thank you very much for giving us your

12   testimony.  You're excused to go about your business, sir.  You

13   are free to remain in the courtroom if you'd like to, but you

14   don't have to.

15             THE WITNESS:  Thank you.

16             JUDGE PAYNE:  Your next witness?

17             MS. KHANNA:  Plaintiffs call Delegate Delores McQuinn

18   to the stand, please.

19

20             **DELORES L. McQUINN**,

21   a witness, called at the instance of the plaintiffs, having

22   been first duly sworn, testified as follows:

23                         DIRECT EXAMINATION

24   BY MS. KHANNA:

25   Q    Good morning, Delegate McQuinn.

McQuinn - Direct

1    A    Good morning.

2    Q    Can you please state your full name for the record.

3    A    Yes.  Delores L. McQuinn.

4    Q    Can you please spell your last name.

5    A    M-c-Q-u-i-n-n.

6    Q    Are you currently a delegate for the Commonwealth of

7    Virginia?

8    A    Yes.

9    Q    Which district do you represent?

10   A    I represent the 70th House District.

11   Q    What is your current occupation other than as a delegate?

12   A    Associate minister at New Bridge Baptist Church.

13   Q    When did you first run for elected office?

14   A    In the '90s, early '90s.  I was appointed to the school

15   board in '92 and then ran in 1993.

16   Q    Which school board was that?

17   A    Richmond city school board.

18   Q    How long were you on the school board?

19   A    From 1992 until 1998.

20   Q    Did you hold any other elected positions prior to becoming

21   a delegate?

22   A    Yes.  And then I ran for Richmond City Council.

23   Q    How long did you serve on the Richmond City Council?

24   A    For ten years.

25   Q    When did you first run for the House of Delegates?

McQuinn - Direct

1   A    In 2009.

2   Q    And that was in District 70?

3   A    Yes.

4   Q    What is your party affiliation?

5   A    Democrat.

6   Q    Was there a democratic primary in 2009?

7   A    Yes.

8   Q    And do you recall approximately what share of the vote you

9   received?

10  A    Yes.  I received 83 percent of the vote.

11  Q    Was there -- I believe that was a special primary that

12  was --

13          JUDGE PAYNE:  You all were talking over each other.

14          THE WITNESS:  Sorry.

15  Q    I was just asking, I believe the primary you just

16  mentioned was a special primary held to fill an open seat; is

17  that right?

18  A    Yes.

19  Q    Was there a special general election that followed that

20  primary?

21  A    Yes.

22  Q    And you ran unopposed in that special general election; is

23  that right.

24  A    Yes.

25  Q    Did you run for reelection then in 2009 during the regular

McQuinn - Direct

1    election cycle?

2    A    Yes.

3    Q    Was there a Democrat primary at that time?

4    A    Yes.

5    Q    There was a Democratic primary in the regular election

6    cycle after your initial --

7    A    No, I'm sorry.  Let me back up.

8    Q    Sure.

9    A    I ran in 2009 in the general election, and there was

10   opposition independent.

11   Q    There was a contested general election.

12   A    Yes.

13   Q    Your opponent was a member of the independent party; is

14   that right?

15   A    Yes.

16   Q    Run as an independent.  Do you recall approximately what

17   share of the vote you received in that election?

18   A    I think around 78 percent.

19   Q    Have you run in a contested election since 2009?

20   A    Yes.

21   Q    And when was that?

22   A    This year, 2017, in the primary in June.

23   Q    You had a contested Democratic primary.

24   A    Yes.

25   Q    Do you recall who your opponent was?

1    A    Yes, Alex Mejias.

2    Q    I take it you won that primary?

3    A    Yes.

4    Q    Do you recall approximately the percentage of the vote

5    that you received?

6    A    82 percent of the vote.

7    Q    And are you being challenged in the upcoming general

8    election in House District 70?

9    A    No.

10   Q    Delegate McQuinn, do you recall that in the first half of

11   2011, the House of Delegates took up the redistricting process?

12   A    Yes.

13   Q    And do you know which delegate was primarily responsible

14   for the 2011 redistricting process?

15   A    Yes.

16   Q    Who was that?

17   A    Delegate Chris Jones.

18   Q    Did you ever have any meeting with Delegate Jones about

19   redistricting?

20   A    I had an initial meeting with Delegate Jones and Delegate

21   Betsy Carr and Delegate Jennifer McClellan.

22   Q    Do you recall where that meeting took place?

23   A    Legislative Services, I think.

24   Q    Do you recall what was discussed during that meeting?

25   A    It was more a presentation of our lines that were drawn

McQuinn - Direct

1    and what was presented to us at that particular time.

2    Q    Anything else that you remember about the nature or the

3    substance of that meeting between -- that took place between

4    Delegate Jones, you, Delegate Carr and Delegate McClellan?

5    A    No.  I don't recall a lot that occurred in that meeting.

6    I do know that there was maybe some limited discussion, and

7    Delegate McClellan and myself had to work out some logistics

8    because of the bordering of the lines.

9    Q    Did you ever meet with Delegate Jones one on one to

10   discuss redistricting?

11   A    No.

12   Q    Did Delegate Jones ever ask for your input on how your

13   district should be configured?

14   A    Not that I recall.

15   Q    At any point, did you provide Delegate Jones input on how

16   your district should be configured?

17   A    No.

18   Q    Did you ever tell Delegate Jones that you were pleased

19   with the final product when it came to your district?

20   A    No, I don't think so.  I don't recall.

21   Q    Did you ever --

22              JUDGE PAYNE:  I'm sorry, your answer was what?

23              THE WITNESS:  I don't recall.

24              JUDGE PAYNE:  You don't recall.

25              THE WITNESS:  No.

McQuinn - Direct                                         102

1   Q    Did you ever tell him that you were displeased with the

2   final product of your district?

3   A    No.

4            MS. KHANNA:   Can we please put up

5   Defendant-Intervenor's Exhibit 94, page three.

6   Q    Delegate McQuinn, is this a map of District 70?

7   A    Yes.

8   Q    And have you seen this map before?

9   A    Yes.

10  Q    Let me just walk through what the different shaded areas

11  represent.  Anything in yellow is currently in House

12  District 70.  The portion that is yellow and crosshatched

13  existed in the district before the 2011 redistricting, and the

14  yellow portion that is plain yellow is the portions that were

15  added.

16       Those portions that are crosshatched in white are the

17  portion of the district that were excluded from the district

18  during the 2011 redistricting process.  Does that -- do you

19  feel like you can understand that --

20  A    Yes.

21  Q    So do you see at the top, toward the top of the district,

22  a little star that has your name by it?

23  A    Yes.

24  Q    Is that your residence there?

25  A    Yes.

1    Q     Do you know what VTD your residence is in?

2    A     705.

3    Q     This map reflects that certain changes were made to your

4    district during the 2011 redistricting process; is that right?

5    A     Yes.

6    Q     Did you have any concerns about those changes?

7    A     Yes.

8    Q     What was your primary concern?

9    A     My primary concern was the expanded area of Chesterfield

10   County, which would be the south of my district, and then 701

11   and 702 which I had represented a very long time.  I had

12   concerns about losing those individuals.

13   Q     Why were you concerned about losing 701 and 702?

14   A     Because they were a part of my school board and district

15   that I had represented way over probably 15 years.

16   Q     And do you know the racial composition of 701 and 702?

17   A     Predominantly African American.

18   Q     Did you ever express the concern about losing 701 and 702

19   to Delegate Jones?

20   A     No.

21   Q     Why not?

22   A     Just didn't feel like I had an opportunity to do that.

23   Q     Did you ever express your concern about losing VTD 701 and

24   702 to anybody else?

25   A     Yes.

1    Q    Who did you express it to?

2    A    To Delegate McClellan.

3    Q    Do you have an understanding about why you lost those

4    VTDs?

5    A    My understanding, in order to make her numbers work, that

6    I would have to lose some of the African-American population in

7    that area, and it would move her, I guess, further east.  Her

8    district had to move further east; therefore, I had to lose

9    some as a result of that.

10   Q    When you say we had to make her numbers work, what are you

11   referring to?

12   A    My understanding was she had lost African-American

13   population, and so the only way to sort of acquire that is to

14   move -- she would have to move further east to make that

15   happen.

16   Q    When you were talking about making her numbers work, you

17   were referring to the black population numbers?

18   A    Yes.

19   Q    And you mentioned the other concern that you had was about

20   the Chesterfield area here.

21   A    Yes.

22   Q    This area around here?

23   A    Yes.

24   Q    What was your concern about this addition to your

25   district?

McQuinn - Direct

1    A    Well, I raised the question just informal, well,

2    discussion with one of the other delegates about how -- the

3    reason for such wide expansion of that particular area.

4    Q    Do you know what district those areas were in previously?

5    A    They would -- no, I don't.

6         JUDGE PAYNE:  Are you going to relate this to the

7    redistricting process, because just casual conversations with

8    somebody don't seem to be something that we need to be

9    concerned with.

10        MS. KHANNA:  Yes, Your Honor.

11        JUDGE PAYNE:  Had a conversation with Jones or with

12   McClellan and somehow her views were related because McClellan

13   was her agent for communication, that's one thing, but a chat

14   with Joe Smith doesn't do much.  You haven't yet connected it.

15   If you can, go ahead.  If you don't, let's move on.

16        MS. KHANNA:  Understood, Your Honor.

17   Q    Delegate McQuinn, are you aware as to why those portions

18   of the -- of your district were added to District 70?

19   A    No.

20   Q    Are you aware of what the racial composition is of any of

21   the VTDs located in that Chesterfield area added to your

22   district?

23   A    Are you asking at the time or now?

24   Q    At the time, were you aware?

25   A    No.

McQuinn - Direct

1    Q    Are you aware now?

2    A    It's a mix composition.

3    Q    Did you have any other concerns about the configuration of

4    your district?

5    A    No.

6    Q    Did you ever have any discussions with then-Delegate Dance

7    specifically about the configuration of District 70?

8    A    No, I did not.

9    Q    Did you have any conversations with then-Delegate Dance

10   about any other districts?

11   A    I had some concerns about one of the other colleague's

12   districts --

13            JUDGE PAYNE:   Excuse me, Ms. McQuinn, but the

14   question was did you have discussions about it and not whether

15   you had concerns.  Do you want to ask the question again.

16            MS. KHANNA:   Sure.

17   Q    The question was, did you have any conversations with

18   then-Delegate Dance about any other of the challenged

19   districts?

20   A    Yes.

21   Q    Which district was that?

22   A    75.

23   Q    What did you discuss with Delegate Dance about your

24   concerns with 75?

25   A    Just the prison population that was included in a

McQuinn - Direct

1   particular district and a nonvoting population.

2   Q     Did you ever talk with Delegate Spruill during the course

3   of the redistricting process?

4   A     I don't recall.

5   Q     Did you have any conversations with him about the

6   configuration of District 70?

7   A     No.

8   Q     Or any other districts?

9   A     No.

10  Q     You mentioned just now that you had a discussion about

11  Delegate Tyler's district.  What district number was that?

12  A     75, I think.

13  Q     And are you familiar with that district, with Delegate

14  Tyler's district?

15  A     Somewhat.

16  Q     Do you consider your district to be different than

17  Delegate Tyler's district in any way?

18  A     Yes.

19  Q     In what way?

20  A     Delegate Tyler's district is much more rural, a more rural

21  area than mine.  Mine is more urban and suburban.

22  Q     Did you ever tell anyone that a 55 percent black

23  voting-age population would be needed in your district?

24  A     No.

25  Q     Did you ever tell anyone that a 55 percent black

McQuinn - Direct

 1   voting-age population would be needed in any House of Delegates

 2   district?

 3   A    No.

 4   Q    How did you vote on House Bill 5005?

 5   A    I voted for it.

 6   Q    Why?

 7   A    You learn to choose your battles, and I didn't have much

 8   of a say-so, so I moved forward to represent the people that

 9   had been handed me.

10        MS. KHANNA:   Thank you delegate McQuinn, I have no

11   further questions.

12

13                      CROSS-EXAMINATION

14   BY MS. McKNIGHT:

15   Q    Good morning, Delegate McQuinn.  It's nice to see you

16   again.

17   A    Good morning.

18   Q    I'll try to be brief.

19   A    Okay.

20   Q    I understood from your testimony earlier today that the

21   only meeting you recall with Delegate Jones regarding

22   redistricting was a meeting with you, Senator McClellan, and

23   Betsy Carr; is that right?

24   A    Yes.

25   Q    And I understood from deposition testimony that you gave

1    that in that meeting, Jones sought input as to the Richmond --

2    pardon me.  Delegate Jones sought your input as to the

3    districts in Richmond; is that fair?

4    A    No -- no.

5    Q    Do I understand correctly from your deposition testimony

6    that Delegate Jones suggested that between you, then-Delegate

7    McClellan, and Betsy Carr, that you could discuss the Richmond

8    issues, the districting in Richmond and work it out amongst

9    yourselves?

10   A    Yes.

11   Q    Now, were you here for the testimony that Senator

12   McClellan gave earlier today?

13   A    Yes, for part of it.

14   Q    Did you hear her describe a similar meeting in that

15   testimony?

16   A    I don't think so.

17   Q    Is it possible there were two different meetings comprised

18   of the same four people, is it?

19   A    Beg your pardon?

20   Q    Did you have just one meeting with Delegate Jones with the

21   three of you?

22   A    I only recall one meeting occurring with Delegate Jones,

23   myself, and -- Delegate Jones, Carr, McClellan, and myself,

24   yes.

25   Q    And, now, you don't recall bringing any concerns regarding

McQuinn - Cross

1    redistricting directly to Jones; is that right?

2    A    No.

3    Q    And you don't recall making any requests to Delegate Jones

4    about your district; is that right?

5    A    No.

6    Q    Did you ever tell Delegate Jones that a 55 percent BVAP

7    level was not necessary in HD 70 for it to be a performing

8    majority/minority district?

9    A    No.

10   Q    Were you aware of any analysis of HD 70 showing that there

11   was not racial polarized voting?

12   A    Could you restate the question?

13   Q    Sure.  At the time of redrawing HD 70, were you aware of

14   any analysis that showed that HD 70 did not have racial

15   polarized voting?

16   A    No.

17   Q    Now, Delegate McQuinn, you wrote a letter to your

18   constituents in the fall of 2011 that said, quote, at the last

19   redistricting session, a fair and equitable redistricting plan

20   was adopted for the House and the Senate; isn't that right?

21   A    Yes.

22   Q    And you voted for the plan; isn't that right?

23   A    Yes.

24        MS. McKNIGHT:  Thank you very much for your time.

25        THE WITNESS:  Thank you.

1          MS. KHANNA:  No redirect, Your Honor.

2          JUDGE PAYNE:  Can she be excused permanently?

3          MS. KHANNA:  She can.

4          JUDGE PAYNE:  Ms. McKnight?

5          MS. McKNIGHT:  Yes, she may, Your Honor.

6          JUDGE PAYNE:  Thank you very much for being with us,

7    Delegate McQuinn, and giving your testimony.  You may be

8    excused.

9          THE WITNESS:  Thank you, sir.

10          JUDGE PAYNE:  Your next witness.

11          MS. BRANCH:  Plaintiff calls Senator Rosalyn Dance.

12

13                    **ROSALYN R. DANCE**,

14    a witness, called at the instance of the plaintiff, having

15    been first duly sworn, testified as follows:

16                    DIRECT EXAMINATION

17    BY MS. BRANCH:

18    Q    Good afternoon, Senator Dance.

19    A    Good afternoon.

20    Q    Can you please state your name for the record.

21    A    Rosalyn R. Dance.

22    Q    And could you spell your last name, please.

23    A    D-a-n-c-e.  D as in David.

24    Q    Were you a member of the House of Delegates during the

25    2011 redistricting?

Dance - Direct

1    A    Yes.

2    Q    What district did you represent?

3    A    The 63rd District.

4    Q    What role did you play in the 2011 redistricting?

5    A    As a member of Privileges and Elections, I was one of the

6    two Democrats appointed to the six-member group that worked on

7    redistricting.

8    Q    And you referenced a six-member group.  Was that the

9    redistricting subcommittee?

10   A    Yes.

11   Q    What was your primary task as a member of that

12   subcommittee?

13   A    Being a member, I represented the Democratic side and the

14   12 minority districts that were a part of it that was to make

15   sure that we met -- everybody had to meet the equality

16   standard, the one -- the plus or minus one deviation as far as

17   getting that close to the actual number which was 80,000, I

18   think, at that time and that we had to make sure that we met

19   the Voter Rights Act as it related to the minorities having a

20   right to vote, and from our chair, Delegate Jones, if we had 55

21   percent, that would meet the Department of Justice's

22   requirement.

23   Q    Senator Dance, do you remember testifying at the last

24   trial in this case?

25   A    I know that I testified.

Dance - Direct                                                                    113

1   Q     And you testified at the last trial about needing to make

2   sure that Delegate Tyler's district achieved a 55-percent black

3   voting-age population?  Do you remember that?

4   A     Yes.

5   Q     Does your former House district border Delegate Tyler's

6   district?

7   A     Yes.

8   Q     Were any changes made to your former House district in

9   order to maintain 55 percent in Delegate Tyler's district?

10  A     Yes.

11  Q     What were those changes?

12  A     Prior to the redistricting plan, my district encompassed

13  all of Dinwiddie County.  With the new plan, it would require

14  me to give up a sizable amount of Dinwiddie County to allow

15  Delegate Tyler to get -- to attempt to get to her 55 percent.

16  Q     Senator Dance, let me direct your attention to

17  Defendant-Intervenor's Exhibit 94, page one.  Have you seen

18  this map before?

19  A     Yes.

20  Q     And do you understand how to read it?

21  A     I'm not the best, but, yes, and I can't see too good.

22  I'll try my glasses first, and then I might need the big book.

23            JUDGE PAYNE:  Let me save the time.  We'll give you

24  the big book.

25            THE WITNESS:  Thank you.

Dance - Direct                                                         114

1    Q    While you are getting the big book, I'll quickly review

2    how this map is read.  The white crosshatched areas are areas

3    that were in your district prior to redistricting and were

4    removed after.  Yellow crosshatched was in your district prior

5    to redistricting and remained in your district after.  Then the

6    bright yellow with no crosshatching represents areas that were

7    added to your district that were not in your district prior to

8    the redistricting.

9              JUDGE PAYNE:  Do you understand that to be the case,

10   ma'am?

11             THE WITNESS:  Yes.

12   Q    Senator Dance, which voters were moved out of your

13   district as a result of redistricting?

14   A    I lost -- so my Dinwiddie voters.

15   Q    I'm going to make a mark on the screen.  Is that Dinwiddie

16   County?

17   A    Dinwiddie County.

18   Q    Where I drew that red line on the screen?

19   A    Yes.

20   Q    Did you want to give up part of Dinwiddie County to

21   Delegate Tyler?

22   A    No.

23   Q    Why not?

24   A    That was one of my strongest districts, and I had all of

25   it, and I wanted to keep all of it.

Dance - Direct                                                    115

1   Q    What was your understanding as to why it was moved to her

2   district?

3   A    Delegate Tyler's district bordered up against the North

4   Carolina border, and there were not enough African Americans to

5   get her her 55 percent.  So she had to come north, and to do

6   that she would have to take more of Dinwiddie County to help

7   her get her numbers.

8   Q    I'd like to direct your attention to the New Hope

9   precinct.  I'm going to put a couple dots here.  Do you see

10  that?

11  A    Yes.

12  Q    Did you ask Delegate Jones to keep the New Hope precinct

13  in your district?

14  A    I think -- I know I specifically did not ask -- I guess

15  the answer is no, but can I clarify?

16  Q    Please clarify.

17  A    I wanted to keep one particular -- and it's one particular

18  constituent that was in that area, I thought might be in that

19  area, so I wanted to make sure, but he's already in that area.

20  He was already in that area.

21  Q    And that area was kept in your district; is that right?

22  A    Yes, uh-huh.

23  Q    I want to shift gears to talk about the voters who were

24  moved into your district.  Where did the voters who were moved

25  into your district live?

Dance - Direct

1   A    I picked up Prince George County and parts of the city of

2   Hopewell.

3   Q    Why were voters in Prince George moved into your district?

4   A    Because I had to give up a lot of my African-American

5   voters in Dinwiddie County.  To pick them up, I had to

6   travel -- I was willing to travel to Prince George and Hopewell

7   to get those numbers.

8   Q    Was Hopewell also added to your district to raise your

9   black voting-age population?

10  A    Yes.

11           JUDGE PAYNE:  Did you pick up all of Prince George

12  County and all of Hopewell?

13           THE WITNESS:  No, sir.  I had to pick up the number

14  to get me to the 55 percent, minimum 55 percent to meet the

15  standard.

16  Q    Are the areas of Prince George that were added to your

17  district predominantly African American?

18  A    Yes.

19  Q    Are the areas of Hopewell that were added to your district

20  predominantly African American?

21  A    Yes.

22  Q    Based on your conversations with Delegate Jones, did you

23  understand that your district was being extended to Hopewell to

24  fix a river crossing in House District 74?

25  A    No.

Dance - Direct

1   Q    And what wards of Hopewell were added to your district?

2   A    Wards 2, 6, and parts of Ward 7.

3   Q    Can you describe which parts of Ward 7 were added?

4   A    I picked up the, that part that had more African Americans

5   because, again, I was trying to make sure that I had my

6   55 percent plus, whatever.

7   Q    And you can set the map aside.

8            JUDGE PAYNE:  55-plus whatever?

9            THE WITNESS:  At least I had to have 55 percent to

10  make sure that we met the standard for the Department of

11  Justice review.

12  Q    Did you draw maps during the redistricting process?

13  A    I drew maps from -- yes, I drew some maps.

14  Q    Where did you draw them?

15  A    I drew them on my home computer using the sample we had on

16  website to practice.

17  Q    And did you ever draw any maps of your district that were

18  below 55 percent black voting-age population?

19  A    No.

20  Q    Why not?

21  A    I had to have 55 percent to qualify, so I designed them in

22  different configurations always looking for the 55 percent.

23  Q    And I'd like to refer back to the map we were just looking

24  at, so hopefully you still have the large book.  This is

25  Defendant-Intervenor's Exhibit 94, page one, and I'd like to

1    direct your attention -- I'm going to clear the screen -- to

2    this area here, this hook drawn around the New Hope precinct.

3    Do you see that area?

4    A    Yes.

5    Q    Delegate Jones has testified that he drew that hook around

6    New Hope at your request to draw out a potential primary

7    challenger.  Did you have a potential primary challenger who

8    lived there?

9    A    No.

10   Q    Did you tell Delegate Jones that you did?

11   A    No.

12   Q    Did you have a primary opponent in the 2011 election?

13   A    No.

14   Q    Did you have one in 2013?

15   A    Yes.

16   Q    And did she live in that hook around New Hope?

17   A    No.

18   Q    Where did she live?

19   A    She lived in Petersburg.

20   Q    Can you show where Petersburg is on the map, just put a

21   dot --

22   A    If I put my dot on this --

23   Q    I'll do it and ask you if --

24   A    Okay.  I'm here.  I think she's in Petersburg, so

25   somewhere in here.

Dance - Direct

1    Q    Thank you.  Senator Dance, did you make statements on the

2    House floor about redistricting?

3    A    Yes, I did.

4    Q    And what were your House floor statements about?

5    A    It was about the Delegate Jones' bill that we were looking

6    at passage.

7    Q    Was that House Bill 5005 and 5001?

8    A    Yes.

9    Q    Did you talk about needing a black voting-age population

10   in the majority black districts?

11   A    I did.  I was speaking to justify why there should be

12   support for that particular bill.

13            JUDGE PAYNE:  Ms. Branch, if it's in an exhibit and

14   she's already said it, it's there, and we don't need to expound

15   on it.  It's there -- that's exactly what the Supreme Court

16   told us not to do, is to be adding to the record in the fashion

17   about why somebody did something back in 2011.  So let's keep

18   it to what's relevant.

19            MS. BRANCH:  Thank you, Your Honor.

20   Q    What was your understanding as to where the 55 percent

21   black voting-age population threshold came from?

22   A    It came from our chair as far as instructions, guidance,

23   that this is what we must have, 55 percent with a plus one

24   deviate -- plus or minus one deviation to ensure for the 12

25   minority districts that we had met the standard for the

Dance - Direct

1    Department of Justice, and I thought firmly that this plan did

2    that.

3    Q    Did you come up with the 55 percent black voting-age

4    population?

5            JUDGE PAYNE:  Ms. Branch, what difference does it

6    make -- it's already been held in this case that it was applied

7    across the board, and I thought you all were in agreement you

8    weren't going to be relitigating all that.  I understand some

9    context is necessary for the questions, and we've tried to give

10   you leeway for that, but you all are now really trying to retry

11   a case that you've already -- the Supreme Court has already

12   accepted the point.  Can you go on with other things --

13           MS. BRANCH:  Yes, Your Honor, and I just specifically

14   wanted to focus on her statements that she made on the House

15   floor about 55 percent and why she made those statements.  She

16   has a specific explanation, I believe, that she will testify

17   to.  If I can just explore that briefly and then I'll move on.

18           JUDGE PAYNE:  For what they're worth.  I think the

19   Supreme Court told us you don't go back and redo the record

20   like that.  You don't paint things over again.  There being no

21   objection, I'm not going to keep it out.

22   Q    Are you a team player, Senator Dance?

23   A    Yes, I am.

24   Q    Did that affect how you approached the redistricting

25   process?

Dance - Direct                                                     121

1    A      When I stood to speak for the redistricting plan, I was

2    one of six members, and, therefore, I was one of the team that

3    presented this document even though it was a chair presenting

4    it, and when I say "I," I'm saying I as one of the six members,

5    and I speak for the six.  This is what we have, and to the best

6    of my ability, my knowledge at the time, this was the best plan

7    we had, and I was a team player, I was supporting it as I did

8    budget.  As a member of the budget, I was a team player when we

9    came to the floor.

10   Q      Apart from what Delegate Jones told you, did you

11   personally feel that a 55 percent black voting-age population

12   was needed in the black districts?

13   A      This was my first time doing redistricting.  I trust that

14   he had done this before.  He was our chair.  He normally came

15   with information, and he was decisive, and I accepted that

16   55 percent was a requirement to get the job done.

17   Q      Did you get electoral support from white voters when you

18   ran in House District 63?

19   A      Yes, I did.

20   Q      How do you know that?

21   A      Alvin Blaha was one of them.

22   Q      Who is he?

23   A      Alvin Blaha was a constituent of Dinwiddie County.  He has

24   since become deceased.

25   Q      Did he live in the New Hope precinct that we discussed

Dance - Direct

1    earlier?

2    A    Yes.

3    Q    Did you specifically ask he be retained in your district?

4    A    Yes.

5              MS. BRANCH:   No further questions.   Thank you.

6

7                        CROSS-EXAMINATION

8    BY MS. McKNIGHT:

9    Q    Good afternoon.

10   A    Good afternoon.

11   Q    Oh behalf of defendant-intervenors, I'll ask you a few

12   questions today.

13   A    Okay.

14   Q    At your deposition and in testimony you've given just now,

15   you've described a request you made to Delegate Jones to

16   include a gentleman named Alvin Blaha in your district;

17   correct?

18   A    Yes.

19   Q    And Mr. Blaha was special to you; right?

20   A    Yes.

21   Q    And you knew that this request would, quote unquote,

22   stretch your district; is that right?

23   A     I don't understand stretch.   My district -- I understood

24   that when he did the configurations, that as he so drew them,

25   because I didn't really do my last configurations, he made the

Dance - Cross

1    recommended drawings, he said if I was willing to go to Prince

2    George and Hopewell, then he could work things out.  I was

3    assuming for Delegate Tyler.  Is that what you are asking me?

4    Q    I'm asking you, I understood from your deposition

5    testimony that you used the word "stretch," but I understand

6    what you mean, that the -- and correct me if I'm wrong, that by

7    making this request it would move your district in a different

8    way, it would pull it in a different way, but you wanted Alvin

9    Blaha in your district regardless of that; is that right?

10   A    I'm not sure I understand what you are saying.

11   Q    Okay.  Do you remember testifying in deposition this

12   August for this matter?

13   A    This August, yes, uh-huh.

14   Q    And in that deposition testimony, deposition, do you

15   recall providing testimony about this request regarding Mr.

16   Blaha?

17   A    I did have -- I did answer questions in regard to this

18   request.

19            JUDGE PAYNE:  I think the question was, do you

20   remember that.

21            THE WITNESS:  No, but if you --

22            JUDGE PAYNE:  Do you want to show it to her and

23   refresh her recollection then.

24            THE WITNESS:  Thank you.

25            MS. McKNIGHT:  Could we put on page 31 of her

Dance - Cross

1    deposition transcript from this August, 2017, please.

2              THE WITNESS:  You had it a little bit bigger.  Could

3    it go back to that size?

4    Q    Please feel free to review for context, and then I'll

5    direct you to the line regarding how it would shape your

6    district.

7              JUDGE PAYNE:  Do you want her to read the whole page

8    or just down to line 14?

9              MS. McKNIGHT:  If you could scroll down so you can

10   see the bottom half of the page.

11             JUDGE PAYNE:  Give her time to read.  It's hard to

12   read when it's going too fast.  Tell them when you want them to

13   move the screen.

14             THE WITNESS:  Would you go back?  There's a question,

15   my question is do you know why it went here.  Could you tell me

16   what it is --

17             JUDGE PAYNE:  Just read it to yourself.  Read on down

18   to line 15, and then they'll move the page to the rest of the

19   page.  That way you won't have to be trying to follow it while

20   it's moving.  That's hard.

21             THE WITNESS:  Okay.

22             JUDGE PAYNE:  Move it on down.

23             THE WITNESS:  Thank you.

24   Q    And directing you to lines, roughly lines 18 to 20, does

25   that refresh your recollection about the request you made for

Dance - Cross                                                                    125

1    Alvin Blaha and the effect it would have on the shape of your

2    district?

3    A    I think I would like you to go to line 13 where it says --

4    I remember saying this:  It's not good being on this committee

5    because you end up with whatever is left over.  Everybody else

6    decides what they want, but I want to keep my one constituent.

7    His name was Alvin Blaha.

8    Q    Thank you.

9              JUDGE PAYNE:  Then it continues, and I want --

10             THE WITNESS:  -- "to keep him.  So to keep my Alvin

11   Blaha, I had to go to Hopewell.  They said they might have to

12   stretch me or whatever to pick up that area."

13             JUDGE PAYNE:  Why did you want to keep Alvin Blaha?

14   You may have said, but I didn't follow.

15             THE WITNESS:  It was -- really, he was my friend that

16   was dying, and I just wanted to be there for him and his family

17   as I was at the end, but it was just that thing of I was the

18   last one to decide, so I didn't really pick my district.

19             Because I was on the committee I was a team player, I

20   took whatever would be left for me after we took care of

21   Delegate Tyler, because I wanted her to be satisfied.  But as

22   they stretched me in whatever direction they were to take me, I

23   ask one thing in that I get to keep that one gentleman in my

24   district.

25             JUDGE ALLEN:  It sounds like you had no choice.  Did

Dance - Cross

1    you have a choice?

2              THE WITNESS:  I had no choice about having to give up

3    Dinwiddie County because -- I thought I did because my

4    colleague, Delegate Tyler, had to have 55 percent, and she was

5    very unhappy about the fact that it was very, very difficult to

6    get her there.  And so to give her that -- and that was my

7    statement.  I'm on this committee, and it's not a very good

8    thing because I get what's left over, but I accepted that

9    because I was a team player, but I asked for one thing, that I

10   could keep this one constituent in my district.  No matter how

11   they shaped me, let me keep that one constituent.

12             MS. McKNIGHT:  Thank you.

13   Q    According to your deposition testimony, you understood

14   that this movement would take your district into a populus that

15   would not, quote, give you African Americans, end quote.  Does

16   that ring a bell?

17   A    No.

18   Q    Would it refresh your recollection to see the deposition

19   transcript?

20   A    Yes, please.

21   Q    Turn to page 32.  Take your time reviewing the page, and

22   then I'll ask you a specific question about a line.

23   A    I'm sorry, did you say line 32?

24   Q    Page 32, if you could review it at least through line 13.

25   A    Okay.  Okay.

1  Q    So you understood that the request for Alvin Blaha would

2  take your district into a populus that would not give you

3  African Americans; am I quoting that correctly from your

4  transcript?

5  A    My concern was that I had to have --

6           JUDGE PAYNE:   Excuse me, Senator.   The answer to that

7  question is yes or no.   If you need to explain, you can ask for

8  it or the lawyer who called you will give you an opportunity

9  to -- ask it again.

10 Q    So, you understood that this request for adding Alvin

11 Blaha to your district would take your district into a populus

12 that was not giving you African Americans; isn't that right?

13 A    Yes.

14 Q    Alvin Blaha lived on Squirrel Level Road; is that right?

15 A    Yes.

16 Q    And Delegate Jones granted your request; right?

17 A    Actually, he was in my district.   I got to keep him, yes.

18 Q    Do you recall testifying at your deposition for this case

19 in 2015 about Delegate McClellan?

20 A    Please refresh my memory.

21 Q    Sure.   During that deposition, you discussed the fact that

22 then Delegate McClellan was a, quote unquote, unique candidate.

23 Does that ring a bell?

24 A    No.   Please refresh my memory.

25           JUDGE PAYNE:   Let her see the deposition, I think, is

Dance - Cross

1   what she's asking for; is that right, Senator?

2            THE WITNESS:  Yes.

3            JUDGE PAYNE:  What page do you want to put up?

4            MS. McKNIGHT:  Could you hold on one moment, Your

5   Honor?  Pardon me.  Pardon me, Your Honors, thank you.  I'm

6   trying to keep this as focused as possible.

7   Q    Let me paraphrase my question if you can bear with me.  At

8   the time of your deposition in 2015, do you recall testifying

9   that then -- that Delegate McClellan, at the time, was an

10  exceptional person and that she had high publicity as a

11  candidate?

12  A    No, I don't remember that, but if you can show me.

13  Q    Okay.  Could you turn to page 188, of May 21, 2015,

14  deposition.

15  A    A little larger, please.  Okay, thanks.

16  Q    If you could scroll down to -- I'm looking at lines 15

17  through 18.

18           MS. BRANCH:  Objection, Your Honor.

19           THE WITNESS:  Could I read this in context of what

20  was before us --

21           JUDGE PAYNE:  Read the whole page if you want to, to

22  yourself.  Then there'll be a question but there's an

23  objection.

24           THE WITNESS:  They have to scroll it down.

25           MS. BRANCH:  Objection is to read both the question

Dance - Cross

1   and the answer.

2          JUDGE PAYNE:  Let's remember that the correct

3   procedure is to ask, in this instance, did you think in

4   such-and-such year that Delegate McClellan was exceptional or

5   whatever, and she says, yes, THEN there's no impeachment.  If

6   she says no, then you say, do you remember testifying at your

7   deposition to the contrary.  You don't say it.  You say

8   whatever it is the answer is.  That's the way to do -- then we

9   don't ever have objections or we don't ever have impeachment.

10  So start with the question that you want and that is, is that

11  right -- when was this, in 2011?

12          MS. McKNIGHT:  2015.

13          JUDGE PAYNE:  In 2015, did you say that you thought

14  Delegate McClellan was a unique person, exceptional person, or

15  words to that effect.

16          THE WITNESS:  I defined her.  I described her, and

17  that was the end product of describing who she was, and I think

18  that that determines my response, because --

19          JUDGE PAYNE:  Is the answer to that question yes --

20          THE WITNESS:  In the context of having defined who

21  she was as from young adulthood and what she had done as a

22  child, her role and how she was received by others because of

23  her -- the sum total of who she was as a person.

24  Q    And you were describing her in this way in the context of

25  other candidates that might follow her in HD 71; isn't that

Dance - Cross

1    right?

2    A    They would not meet her -- be the same as Jennifer

3    McClellan running for that position.

4    Q    And that they would not have as much exposure as she had;

5    is that right?

6    A    Did I put that there?

7           JUDGE PAYNE:  She's asking you the question.  That's

8    all.

9           THE WITNESS:  What I said is what I stand by.

10   Q    So do you stand by the fact that the -- the statement that

11   the average person will not have that much exposure when they

12   go forward?

13   A    In the context of the way I made that statement, that was

14   a part of that statement.

15   Q    Then you don't believe that 55 -- you don't know whether

16   52 percent BVAP would be enough for someone who is not Delegate

17   McClellan to get elected in HD 71; isn't that right?

18   A    I do not know.

19   Q    You believed that 55 percent for Jennifer McClellan was

20   exceptional, that she could do it with 50 percent; is that

21   right?

22   A    Did I say that?

23          JUDGE PAYNE:  She's asking you --

24          THE WITNESS:  I'm sorry.  You're asking me that

25   today.

Dance - Cross

1    Q    Yes.

2    A    Is that a question?

3    Q    Yes.

4    A    I do not know.

5         JUDGE PAYNE:   Take the deposition down right now.

6    It's distracting the witness from -- because it's confusing her

7    what she's being asked.

8    Q    You believed that anyone coming after Jennifer McClellan,

9    55 percent, clear the bar, was a good number?

10   A    I accepted that the chair who was experienced, had done

11   this before said --

12        JUDGE PAYNE:   Senator Dance, there's a question on

13   the floor.   If you don't understand it, say you don't

14   understand it.

15        THE WITNESS:   I don't understand it.

16        JUDGE PAYNE:   That question is easily answered yes or

17   no, and then if you need to augment it, the lawyer on your side

18   can ask that.   Ask the question again, please.

19   Q    You believed at the time of your deposition in 2015 that

20   anyone coming after Jennifer McClellan, 55 percent, clear the

21   bar, was a good number?

22   A    Yes.

23   Q    And you believed in 2015 that you -- that the 55 percent

24   number sounded sound, and you worked with it; isn't that right?

25   A    That number was given to me by the chair, and I accepted

Dance - Cross

1   it.

2       JUDGE PAYNE:  Excuse me, Senator Dance.  Ask the

3   question again, and answer it yes or no, and if you need to

4   explain it -- please stay with that approach, if you would, Ms.

5   McKnight.

6   Q    You believed in 2015 that the 55 percent BVAP number

7   sounded sound; isn't that right?

8   A    Yes.

9   Q    And you believed in 2015 that 55 percent for Jennifer

10  McClellan was exceptional, she could do it with 50 percent;

11  isn't that right?

12      MS. BRANCH:  Objection.  Asked and answered.

13  A    No.

14      JUDGE PAYNE:  It wasn't answered.  It was asked.  And

15  her answer this time was no.  Did I hear you correctly?

16      THE WITNESS:  No.

17      JUDGE PAYNE:  You felt like she couldn't do it with

18  50 percent; is that what you are saying?

19      THE WITNESS:  I didn't give a specific number.  I

20  don't know what that number might be.

21      JUDGE PAYNE:  Go ahead, Ms. McKnight.

22  Q    Do you recall testifying in this matter in May 2015 in a

23  deposition?

24      JUDGE PAYNE:  She already said, I think, she

25  remembers the deposition.  We got that.  What's the next part?

1  Q    Would it refresh your recollection to see a portion of the

2  deposition about whether -- what your belief was in 2015 about

3  the 55 percent figure and Delegate McClellan?

4  A    If I hear I said 50 percent --

5           JUDGE PAYNE:  I think her question was would it

6  help --

7           THE WITNESS:  Yes.

8           JUDGE PAYNE:  Put it up there for her, if you would,

9  please, and point her to the question and answer.  Do you need

10 some water?

11          THE WITNESS:  Yes, please.

12          JUDGE PAYNE:  You've been testifying awhile.  Maybe

13 you need some.

14 Q    Take your time reviewing.  The question begins on line

15 five, and your answer concludes on line 14.

16 A    I said that, and, yes.

17 Q    So just to make a clear record, the question was, "Given a

18 situation like Delegate McClellan's district, did you think

19 55 percent was a reasonable number for a district like hers?"

20      And your answer was, "55 percent for Jennifer McClellan

21 was exceptional.  She could do it with 50 percent, but anybody

22 coming after her, 55 percent, clear the bar, was a good number.

23 And I'm speaking about people that have been there before.

24 They've done this process before.  If they think it's a good

25 number, it's a great number."  Is that accurate?

1    A    Yes.  What's important, I think, is I'm speaking about

2    people that have been there before, they've done this process.

3    If they think it's a good number, it's a great number, and,

4    again, I was referring to Delegate Jones.  I trusted that he

5    had a good number, and I stand by this.

6    Q    And you testified in 2015 that your belief was that those

7    who had experience on redistricting, their integrity, their

8    honesty was intact, their ethics were intact.  Did that include

9    Delegate Jones?

10   A    Yes.

11   Q    Senator Dance, did you ever tell Delegate Jones that your

12   district did not need 55 percent BVAP in order to be a

13   performing majority-minority district?

14   A    No, I do not remember such a conversation.

15   Q    Were you aware of any analysis showing that in your

16   district, HD 63, there was no polarized voting?

17   A    No.

18         MS. McKNIGHT:  Your Honors, I'd like to conclude with

19   a demonstrative.  This is a video that was admitted in the 2015

20   trial as an exhibit, but it was not played.

21         MS. BRANCH:  Objection, Your Honor.  I believe that

22   defendant-intervenors are going to show a video of --

23         JUDGE PAYNE:  It might be helpful for you to get up

24   where I can hear you a little bit better.  Sorry.  Don't you

25   have mikes on those tables?

Dance - Cross

1          MS. BRANCH:  Apologies.  I believe

2     defendant-intervenors are going to show a video of some of

3     Senator Dance's statements that she made on the House floor.

4     The video is in the record, both the video itself and a

5     transcript of what she said on the video.  Those videos were

6     played at the last trial.  They are cumulative testimony and,

7     respectfully, a waste of time.  We have a finite time in which

8     to try this trial, and --

9          JUDGE PAYNE:  Your objection is duplication of

10     testimony.

11          MS. BRANCH:  Yes, not necessary.

12          JUDGE PAYNE:  Okay.  Why do you need to play that

13     again for Delegate Jones?

14          MS. McKNIGHT:  It's not exactly true that this has

15     been played.  This video has not been played before.

16          JUDGE PAYNE:  Let's assume that.  The transcript is

17     in the record, she said, and you don't quarrel with that.  We

18     can read it.  Why is it important to you to play it in the

19     presence of the witness?

20          MS. McKNIGHT:  We would like to understand whether

21     the testimony -- if her beliefs are accurate, if it accurately

22     captures what she believed at the time.  It contradicts some of

23     what plaintiffs are asserting in this case, and we think it's

24     important to show the demonstrative of the video.  It is only

25     three minutes long.

1          The judges are welcome to assess the credibility of

2    the video, and Senator Dance is here now to answer any

3    questions about it.  They also have opportunity on redirect to

4    question her about it.

5          JUDGE PAYNE:  Overruled.  But it does open up the

6    door to what Ms. Branch was attempting to do and I asked her

7    not to do, so she can follow that up on redirect examination.

8    All right, play it, please.

9          MS. McKNIGHT:  Your Honor, one more point so the

10   record is clear.  I understand you overruled the objection.  We

11   believe the Supreme Court is interested in justifications that

12   are not post hoc, meaning the Supreme Court is interested in

13   seeing the record at the time, and we believe this is the best

14   way to show the Court what that record is.

15         JUDGE PAYNE:  Judge Merhige asked me one time was I

16   trying to snatch defeat from the jaws of victory.

17         MS. McKNIGHT:  I understand, Your Honor.  This is

18   Plaintiff's Exhibit 34.

19

20              (Video played.)

21

22   Q    Senator Dance, that was you speaking; correct?

23   A    Yes.

24   Q    And the clip is an accurate recording of what you said; is

25   that right?

Dance - Cross                                                              137

1    A    On that day, yes.

2    Q    And you didn't say anything that was untrue; correct?

3    A    No.

4              MS. McKNIGHT:  Thank you.  No further questions.

5              JUDGE PAYNE:  Any redirect?

6              MS. BRANCH:  Yes, Your Honor.

7

8                     REDIRECT EXAMINATION

9    BY MS. BRANCH:

10   Q    Senator Dance, defendant-intervenors just played a video

11   of you on the House floor; right?

12   A    Yes.

13   Q    And there you talked about needing a 55 percent black

14   voting-age population?

15   A    Yes.

16   Q    Why?

17   A    I was indoctrinated at that time to the 55 percent, those

18   criteria that we had to have to get this done, and that

19   criteria had been followed, and then I wanted -- then I was in

20   my team mode of explaining enough, providing enough information

21   to ensure my colleagues understood what we had gone through,

22   they had opportunities to give input and learn, make changes

23   before the final vote, and this is what we would be presenting.

24   Q    Did you see it as part of your role as a member of the

25   six-person subcommittee on redistricting to sell the

1    redistricting plan to members of your caucus?

2    A    Yes, I did, because I was told that when we locked into

3    this, the Department of Justice would have to be interviewed,

4    everything.  Since this is a document, this is our document,

5    the six of us, this is what we take, and this is what we

6    present to the General Assembly and fight it in the Department

7    of Justice.  Those are a solid ground to work with.

8    Q    What made you think that 55 percent, clear the bar, was a

9    good number?

10   A    I worked with the software.  It's intimidating at first.

11   Took me a couple weeks before I was brave enough to get into

12   the war room, as I called it, to actually move and see exactly

13   how proficient the information was, how it dealt with just --

14   not just the age of the person but it dealt with those of the

15   voting age.

16        It could tell you in a little small segment that here's

17   what you are.  I knew that I was of the minority party.  I was

18   assured from this 55 percent that the 12 positions were there,

19   and then it expanded to other Democrats for those areas, and it

20   was political.  It was a point of what could you get from this.

21        As far as those 12 areas, they were set.  I thought that

22   55 percent, they were going to pass the Department of Justice,

23   they'd had a chance to talk with the chair who had the full

24   map, he had his own software in his office, and that he

25   listened, and this is what we were going to have and this is

1   the best deal we were going to get, because we had had a chance

2   to at least share.  Whether we got what we wanted or not, we at

3   least had an opportunity to share.

4   Q    Who was the first person who ever mentioned 55 percent

5   black voting-age population to you?

6   A    Our chair of that subcommittee, and that was Delegate

7   Jones.

8   Q    Did you ever do any analysis to show that 55 percent black

9   voting-age population was needed in any of the black districts?

10  A    I accepted 55 percent as gospel.

11  Q    Did Delegate Jones ever show you any analysis that

12  55 percent was needed?

13  A    No, I accepted it as gospel.

14  Q    Did he show you any expert reports?

15  A    No.

16        JUDGE PAYNE:  I think she accepted it as the gospel.

17        MS. BRANCH:  Understood.  Thank you, Your Honor.

18  Q    And you testified earlier about Alvin Blaha who lived in

19  your district, and he lived in the New Hope precinct; is that

20  right?

21  A    Yes.

22  Q    Could the map drawers have split the New Hope precinct to

23  include Mr. Blaha's home in your district without including the

24  entire precinct?

25  A    Sure, yes.

Dance - Redirect

1   Q    Finally, I'd like to pull up -- direct your attention to

2   Plaintiffs' Exhibit 33, page 43, and this is a transcript of

3   your House floor statement from April 4th, 2011.  This is

4   actually part of the video that was just shown, but I'm just

5   going to focus --

6   A    Can you make it larger, please.

7   Q    -- on three lines of this.  Starting on line 21, you said,

8   "In order to maintain those 12 districts, it required some

9   movement and sometimes" -- this falls on to the next page --

10  "not perfect adjustments between precincts.  There might have

11  been some split areas."  Do you see that?

12  A    Yes.

13  Q    And when you are referencing split areas, would Ward 7 in

14  your district be one of those?

15  A    Yes.

16  Q    And Ward 7, why was that split?

17  A    Because I had to pick up some African Americans, so I

18  got -- I didn't get enough, so the two wards that they gave me

19  in Hopewell wasn't enough, so I had to get out of seven.

20  Q    Who was Ward 7 split with?

21  A    Delegate Riley Ingram.

22  Q    Is he a Republican?

23  A    Yes.

24  Q    Is he white?

25  A    Yes.

Dance - Redirect

1    Q    And which part of Ward 7 was he given?

2    A    Predominantly Euro-American or white segment.

3             MS. BRANCH:  No further questions.  Thank you.

4             JUDGE PAYNE:  Can she be excused permanently?

5             MS. BRANCH:  We'll reserve the right to call her

6    during our rebuttal case.

7             JUDGE PAYNE:  You might need to be called back,

8    Senator Dance, so you need to be available.  Do you agree to

9    come back when you're called, to make yourself available at

10   their call?

11            THE WITNESS:  I do.

12            JUDGE PAYNE:  Please don't discuss your testimony

13   with anybody but the lawyers in the case.

14            THE WITNESS:  Thank you, sir.

15            JUDGE PAYNE:  All right.  Next witness.

16            MR. HAMILTON:  At this point, Your Honors, we call

17   Dr. Jonathan Rodden.

18

19                    **JONATHAN A. RODDEN**,

20   a witness, called at the instance of the plaintiffs, having

21   been first duly sworn, testified as follows:

22

23            MR. HAMILTON:  Your Honor, I would point out, there

24   was one delegate witness, Ward Armstrong, who we have decided,

25   in the interests of efficient presentation of testimony, not to

1    call, and the intervenors have released him from his subpoena.

2    So we're running on schedule.

3

4                            DIRECT EXAMINATION

5    BY MR. HAMILTON:

6    Q     Good morning, Dr. Rodden.  Can you please state your full

7    name for the record.

8    A     Jonathan Andrew Rodden, R-o-d-d-e-n.

9    Q     And, thank you.  You are an expert for the plaintiffs in

10   this case; is that right?

11   A     Yes.

12   Q     And you've prepared a couple of reports and are here this

13   morning to testify about them; is that right?

14   A     Yes.

15   Q     The Court has already had an opportunity to review those

16   reports, but let me ask you briefly a couple of questions about

17   your expertise and the focus of your scholarly work.  Where are

18   you employed, Dr. Rodden?

19   A     I'm professor of political science at Stanford University

20   and a senior fellow in the Hoover Institution at Stanford.

21   Q     What is the Hoover Institution?

22   A     It's a research-oriented group of scholars in economics,

23   political science, and some in history, also some individuals

24   who served in government in the past.

25   Q     And, Dr. Rodden, what is the Stanford Spacial Social

1    Science Lab?

2    A      This is a group of scholars and graduate students that I

3    have assembled a few years ago and put together some equipment

4    and some data, and we've been working together on a number of

5    projects using geo-spatial data from around the world to assess

6    a variety of topics across the social sciences but focusing in

7    particular on economic -- on elections and voting behavior, in

8    particular in the United States.

9    Q      So can you describe a little bit about -- just briefly

10   about the political and voting data that you use and how you

11   use it in the Spacial Social Science Lab?

12   A      Yes.  We've been collecting a lot of data at the level of

13   precincts or voting tabulation districts from around the world

14   but especially in the United States.  We put together the first

15   complete nationwide precinct-level data set for the 2008

16   election, created an online tool that other scholars can

17   download and use those data as part of the redistricting plans.

18          So we've fed in a lot of data to the analysis, study of

19   redistricting around the country, and we continue to produce

20   precinct-level data sets for other scholars to use, and, also,

21   we've created online visualization tools for those data.  We

22   also have assembled a lot of individual-level data using voter

23   files from different states.

24   Q      Your résumé is attached to your report; is that right?

25   A      Yes.

Rodden - Direct

1   Q    And could you just tell us what degrees you hold and from

2   what institutions?

3   A    Yes.  My undergraduate degree was from University of

4   Michigan in political science.  I then received a Ph.D. from

5   Yale University in political science.  I was a Fulbright

6   Scholar at the University of Leipzig in Germany.

7   Q    And can you give us a brief overview of the positions

8   you've held since you received your Ph.D. from Yale?

9        JUDGE PAYNE:  Do you accept him as an expert -- what

10   are you offering him in, Mr. Hamilton, what area?

11        MR. HAMILTON:  I am offering him as an expert in the

12   field of geo-spatial data analysis and its application to the

13   field of redistricting pursuant to Rule 702.

14        JUDGE PAYNE:  Geo-spatial data analysis and its role

15   in --

16        MR. HAMILTON:  And its application to the field of

17   redistricting.

18        JUDGE PAYNE:  Is he accepted as an expert in that

19   area, or do you challenge him?

20        MR. BRADEN:  I think we do challenge him, Your Honor.

21        JUDGE PAYNE:  Let him finish his examination, and

22   then you can do the voir dire.  All right, Mr. Hamilton, excuse

23   me.

24        MR. HAMILTON:  Thank you, Your Honor.

25   Q    So let's start with the overview of the positions you've

Rodden - Direct

1    held since you received your Ph.D. from Yale.

2    A    Yes.   I took my first job as an assistant professor at the

3    Massachusetts Institute of Technology in the political science

4    department.   I then was promoted to associate professor without

5    tenure.   I was given the title of the Ford Chair, Ford

6    associate professor of political science.   I then received

7    tenure at MIT.

8         After that, I was named as a fellow at the Center for

9    Advanced Studies in Behavioral Sciences at Stanford University.

10   That was a year-long visiting position.   During that time, I

11   was offered a job to stay at Stanford and join the faculty as a

12   full professor, and I've been a full professor at Stanford

13   since then and after that joined the Hoover Institution.

14   Q    What's the focus of your scholarly work?

15   A    I've worked on a number of things over the years, but I've

16   really been focusing in recent years on the analysis of

17   geo-spatial data, in particular related to elections, political

18   geography.   I'm doing a lot of work on representation.   A lot

19   of that work has do with the construction of districts and the

20   representation that flows from redistricting.

21   Q    Okay, let me stop you there.   Can you explain what spatial

22   data science is?

23   A    This is a field that has deep roots that really goes back

24   to the 1800s.   It's a field in which we collect data that has a

25   geo-spatial component, by which I mean we can map the data.   So

Rodden - Direct

1    we have something like boundaries, or we have something like

2    X/Y coordinates for individuals, and we're able to assemble

3    data at different levels of aggregation by the use of

4    geography.

5    Q    Does it have an application in the field of epidemiology,

6    for example, tracking diseases or locating the causes of

7    disease?

8    A    This is really where the field begins.  So it started, in

9    fact, with a generation of a map of the cholera outbreak in

10   1850 in London.  This is how John Snow, by drawing a map,

11   mapping out the deaths from cholera in London was able to

12   discover where the -- was able to discover a cluster of deaths,

13   and that's really -- view of the first moment of the field of

14   epidemiology.

15   Q    So John Snow plotted the locations of deaths across a map

16   of the city of London; is that right?

17   A    Yes, that's right.  Discovered a cluster, a clear cluster

18   of death.

19   Q    And then over the top of that map, what did he overlay?

20   A    Overlaid a number of things, but upon looking at them, saw

21   a map -- put together a map of water facilities, water pumps.

22   Q    And what was the correlation between the deaths and the

23   locations of the water pumps?

24   A    Found that the deaths were quite clustered around one of

25   the water pumps.

Rodden - Direct

1    Q    As a result, what did he do?  What did the city

2    authorities do?

3    A    They removed the handle from the pump.

4    Q    What effect did that have on the incidence of cholera

5    deaths in London?

6    A    It was a sudden stop in the cholera epidemic.

7    Q    Is that an example of the visualization of data,

8    geo-spatial data and its application?

9    A    Yes, and it's something similar to what we've been doing

10   ever since then.  I also work -- separately, some of my work is

11   in epidemiology, and it's related -- I collaborate with people

12   in the medical school and visualizing the data in space and

13   understanding spatial processes of disease propagation and

14   things likes that.

15        That's a big part of what we do in what we call spatial

16   data science, and the work on elections and using

17   precinct-level election data is a part of that.

18   Q    Do you know Dr. Edward Tufte from Yale University?  Are

19   you familiar with his work?

20   A    He was one of my professors at Yale.

21   Q    Has he published a number of books on the visualization of

22   quantitative information?

23   A    Yes.

24   Q    That's the same field?

25   A    Yes.  It's the idea that there's a lot we can learn about

Rodden - Direct

1    the world by starting with the -- a map of a social phenomenon

2    and then going from there and adding layers and trying to learn

3    more about what's happening.

4    Q    Now, in the field of election-related litigation or

5    redistricting-related litigation, have you been accepted as an

6    expert witness in other courts?

7    A    Yes.

8    Q    In state courts?

9    A    Yes.

10   Q    In federal courts?

11   A    Yes.

12   Q    Can you give us a couple examples.

13   A    I worked as an expert witness in a case related to

14   redistricting that had components of both partisan and racial

15   gerrymandering.

16   Q    Let me stop you there.  What state?

17   A    Yes, that was in the state of Florida, and it was related

18   to an amendment to the Florida constitution about

19   gerrymandering.

20   Q    That was in state court, and you were accepted as an

21   expert witness and you testified in that trial?

22   A    Yes.

23   Q    Have you testified -- been accepted as an expert witness

24   in this field in federal court?

25   A    Yes.  I worked for the defense in a case related to the

Rodden - Direct

1    Voting Rights Act and also related to redistricting and the
2    Ferguson-Florissant school district in the district court in
3    Missouri.
4                JUDGE PAYNE:  In federal court in Missouri, did you
5    say?
6                THE WITNESS:  Yes.
7    Q    How about here in Virginia, have you been accepted as an
8    expert in the Eastern District of Virginia?
9    A    Yes.  In fact, it was in this courtroom.  That was in the
10   Lee case and had to do with the voter ID.
11   Q    Do you recall who the presiding judge was?
12   A    That was Judge Hudson.
13   Q    Has your work been cited or discussed in the United States
14   Supreme Court?
15   A    Yes.  In fact, last week.  I have been working, as I've
16   been describing, doing a lot of work on geo-spatial analysis of
17   redistricting, had written a number of papers with a colleague
18   about how to disentangle partisan gerrymandering and the impact
19   of geography, and, of course, in Wisconsin, this is a very
20   important question.
21       I wrote a number of papers that were cited by both parties
22   in the case, wrote a brief that was cited by the justices,
23   several of the justices in the oral arguments last week.
24               MR. HAMILTON:  All right.  Thank you.  Your Honor, we
25   would proffer Dr. Rodden as an expert as described earlier

1    pursuant to Rule 702.  He is a witness qualified as an expert

2    by knowledge, skill, experience, and training.  I believe his

3    scientific and technical knowledge will help the trier of fact,

4    and, of course, the Courts understand the evidence and

5    determine the relationship.

6              We have a number of maps that are already in evidence

7    that display in just static shaded terms the relative racial

8    composition of the various districts.  Dr. Rodden will be

9    presenting density maps which are a familiar tool and common

10   tool in this field of expertise, and it will help illustrate

11   the actual division of the white-from-black populations at a

12   granular and, of course, at a macro level as well.

13             Ironically, those exhibits are already admitted

14   before the Court.  They're already a part of the record.  They

15   were introduced with no objection, so I find it curious that

16   there's an objection to the testimony of the author of the

17   reports that have already been admitted without objection.  So

18   I think the objection may have already been waived by the

19   admission of the underlying expert reports.

20             JUDGE PAYNE:  Mr. Braden.

21

22                    VOIR DIRE EXAMINATION

23   BY MR. BRADEN:

24   Q    Dr. Rodden, have you ever drafted a plan at the request of

25   any state legislature?

Rodden - Direct

1    A    To address a state legislature?

2    Q    Have you ever drafted a plan that you provided to a state

3    legislature?

4    A    No.

5    Q    Have you ever been requested by a state legislature to

6    ever draft a plan?

7    A    Not by a state legislature, no.

8    Q    Have you ever drafted a complete legislative plan for

9    Virginia?

10   A    Yes, I believe I have.

11   Q    You have?  Have you -- did you provide a copy to the Court

12   or to the parties?

13   A    It was not for the House of Delegates.  This is part of

14   other work.  I've drawn Congressional maps in all the states.

15              JUDGE PAYNE:  For here?

16              THE WITNESS:  I'm sorry?

17              JUDGE PAYNE:  For this Court here?

18              THE WITNESS:  Not for the Court.  In my academic

19   work, I've drawn a number of redistricting plans, but this has

20   not been done for submission and for use in -- for

21   implementation.  This is part of my academic work on

22   redistricting.

23   Q    So have you ever drafted a plan that's been considered by

24   a legislative chamber?

25   A    No.

Rodden - Direct

1   Q    Have you ever drafted a plan that's been considered by

2   city council?

3   A    No.

4   Q    Have you ever drafted a plan that's ever been considered

5   by any political body?

6   A    No.

7   Q    Have you ever been hired by a legislature to advise them

8   on the redistricting process?

9   A    No.

10  Q    Have you ever been hired by a local jurisdiction to advise

11  on a redistricting process?

12  A    As part of my work in the Ferguson-Florissant school

13  district case, there -- we generated -- my coauthor and I

14  generated a number of potential single-member district school

15  board plans, but those were not -- those were not implemented

16  in that case.  It's still ongoing, in fact.

17  Q    And, in fact, you testified for the side that lost at the

18  district court level?

19  A    Yes.

20  Q    Have you ever been hired as a master to draft any type of

21  redistricting plan?

22  A    No, I was recently asked to do that work by a federal

23  judge, but the schedule, in part because of this case, did not

24  work out, and so I'm not currently working on a map.

25         JUDGE PAYNE:  So the answer is, you have not served

Rodden - Direct

1    as a special master to help draw maps.

2              THE WITNESS:  I have not.

3    Q    Have you ever been even employed in any capacity by a

4    state legislature?

5    A    No.

6    Q    Or even been an intern in a legislative chamber?

7    A    No.

8    Q    Ever worked for any elected officials?

9    A    No.

10   Q    Ever worked for any political campaign?

11   A    No.

12   Q    Worked for any political party?

13   A    No.

14   Q    Ever worked on a preclearance submission to the DOJ?

15   A    No.

16   Q    Ever worked for the voting rights section of the

17   Department of Justice?

18   A    No.

19   Q    Have you ever been a fact witness in a redistricting case?

20   A    No.

21   Q    Does your report that you submitted in this case bear any

22   resemblance to the expert reports you've submitted in other

23   cases?

24   A    I think so.

25   Q    So in other cases, you speculated about the motives of the

Rodden - Direct

1    legislature in drafting the plan?

2    A    That's not how I would interpret what I've done in this

3    report.  I did not speculate about the motives of the

4    individuals drawing the plan.  I laid out for the Court what

5    decisions were made, in parts very descriptive fashion, so that

6    the Court could understand how the drawers of the plan went

7    about achieving the 55 percent target that they had set out for

8    themselves.

9    Q    And your position is, to read your report, "This report

10   explains the nuts and bolts of how the legislature achieved the

11   55 percent racial target."

12   A    Yes.

13   Q    So you purport to explain the nuts and bolts?

14   A    I show visually and descriptively how the lines were

15   moved, how VTDs were moved, what were the implications of those

16   moves.  I demonstrate how VTDs were split and what was the

17   implication of those splits, all of which I believe is the kind

18   of information that the Supreme Court appeared to be asking for

19   when calling for a holistic analysis --

20   Q    Before writing your report, did you interview any members

21   of the legislature?

22   A    No.

23   Q    Any staff members?

24   A    No.

25   Q    Talk to any Virginia elected officials?

Rodden - Direct

1   A    No.

2   Q    Any Virginia appointed officials?

3   A    No.

4   Q    Have you ever lived in Virginia?

5   A    No.

6   Q    Did you read any of the floor debates?

7   A    I've -- I think I've testified before, I saw some of that

8   when I first started the case to try to familiarize myself with

9   it, but I have not read in detail the floor debates.

10  Q    Did you watch any of the videos of the floor debates other

11  than what you saw today?

12  A    I have now, but not before.

13  Q    Did you go to any of the hearings?

14  A    No.

15  Q    Did you interview anyone who testified at any of the

16  hearings?

17  A    No.

18          MR. BRADEN:  Your Honor, if you look at the report

19  that was submitted in this case, it is based upon simply him

20  speculating on legislative desires, and he's not qualified to

21  do that since he lacks a background in that area.

22  Q    Have you ever written anything about the legislative

23  process?

24  A    As a political scientist, yes.

25  Q    You've talked about state legislation.  What publications

Rodden - Direct

1    would that be in?

2    A    Have I talked about --

3    Q    In your publications, in your peer-reviewed articles, do

4    you have discussions of the state legislative process?

5    A    I'm quite sure that there are some discussions in the

6    context of redistricting with the legislative process behind

7    it, yes.

8    Q    Do you purport to be an expert on legislative process in

9    Virginia?

10   A    No, sir.

11        MR. BRADEN:  I think the Court should reject his

12   testimony.

13        JUDGE PAYNE:  What's the effect -- I'm sorry.  I was

14   making a note.  Mr. Braden, what's the effect of your having

15   not objected to his report into evidence as it pertains to his

16   ability to testify about the report?

17        MR. BRADEN:  That's an interesting question, Your

18   Honor.  We may have, in fact, waived it.  We don't think that

19   we necessarily waived it.  We have no problems with the Court

20   seeing the maps, but if we're being asked whether or not we

21   believe this gentleman is an expert, we most certainly do not.

22   He lacks the experience to testify as to the motives and

23   actions of the legislative --

24        JUDGE PAYNE:  He can't testify to motives anyway.

25   That's not his business.  That's not the topic of expert

1    testimony and won't help the trier of fact, and I hope they're

2    not going to offer that.  I didn't sense from Mr. Hamilton's

3    remarks he was, but -- anything else that you have to say?

4              MR. BRADEN:  No, Your Honor.

5              JUDGE PAYNE:  Anything else you have to say, Mr.

6    Hamilton?

7              MR. HAMILTON:  Yes, Your Honor.  First of all,

8    virtually the entire voir dire examination that we just heard,

9    if that's a basis for excluding an expert, then most of the

10   experts that have been admitted across the courts in all of

11   these redistricting cases would have been rejected because

12   they'll all academics.

13             Of course, they haven't been employed by

14   legislatures, and most of them haven't drawn maps themselves.

15   That hardly makes their testimony not helpful within the

16   meaning of Rule 702.

17             Second, I simply don't understand the position that

18   an expert could submit a report which usually, of course, is

19   not admissible, but the testimony which usually is admissible

20   can't be.  It's exactly the reverse.  I applaud intervenors for

21   stipulating to the admission of not one but two of Dr. Rodden's

22   reports.  It helps speed along the process of this case.

23             We've stipulated to the admission of their reports

24   both in 2015 and in 2017.  So I think that the argument here is

25   clever, it's a great demonstration of a technique of trying to

Rodden - Direct

1    get a little bit of the cross in in the middle of the

2    testimony, but I think the argument should be rejected.  It's

3    been waived, and Rule 702 provides ample authority for the

4    Court to admit it.

5             JUDGE PAYNE:  As Judge Williams once said at a

6    juncture similar to this in a trial, let us chew on this over

7    lunch, and we will resume in 45 minutes.

8             MR. HAMILTON:  Thank you.

9

10            (Luncheon recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rodden - Direct

1        JUDGE PAYNE:  We've determined that the

2   objection is overruled.  The witness will be accepted as

3   an expert in the tendered area, geo-spacial data analysis

4   and its application to redistricting.  However, I think we

5   are all of the view that we do not need the assistance of

6   any expert in giving us the motivations and intent of

7   anybody.

8        MR. HAMILTON:  Of course not, Your Honor.

9        JUDGE PAYNE:  And I will say that I understand

10  Mr. Brady's concern because in the report, there's a fair

11  amount of gratuitous comment along those lines that is not

12  particularly helpful in analyzing anything.  So we'll --

13  if we'll keep that out, I would appreciate it.  All of us

14  will.

15       MR. HAMILTON:  I will do my best, Your Honor.

16       JUDGE PAYNE:  And, Dr. Rodden, you need to

17  remember that admonition, too --

18       THE WITNESS:  Certainly.

19       JUDGE PAYNE:  -- and not gravitate into it.  All

20  right.

21       MR. HAMILTON:  May I proceed, Your Honor?

22       JUDGE PAYNE:  Please.

23  BY MR. HAMILTON:

24  Q    Dr. Rodden, let me direct your attention to

25  Plaintiffs' Exhibit Number 69.  It's in the binders in

Rodden - Direct

1    front of you.  Is this a copy of your initial report?

2    A    Yes.

3    Q    And Exhibit 70, is that a copy of a reply report?

4    A    Yes.

5    Q    Now, do you have working copies of those two exhibits

6    in front of you?

7    A    Yes.

8    Q    Is that identical to the admitted trial exhibits?

9    A    Yes.

10   Q    Is it easier to work with the smaller notebook?

11   A    Yes.

12   Q    Okay.  Now, do you also have Table 4 from

13   Dr. Ansolabehere's expert report in this matter, which is

14   Plaintiffs' Exhibit 50, page 72?  And what is that?

15   A    This is simply a table of population and racial

16   composition of the challenged districts and --

17   Q    Is it helpful to have that with you as you testify

18   here today?

19   A    Yes.

20   Q    Okay.  Let's look at your initial report first.  Can

21   you explain what you were asked to do?

22   A    Yes.  I was simply asked to assess whether race was

23   the predominant factor in drawing the 12 current districts

24   that are being challenged for the Virginia House of

25   Delegates.

Rodden - Direct

1   Q    And how did you approach that question?

2   A    Well, I collected and used all the available

3   geo-spacial data to provide an analysis of the

4   construction of those districts.  For each of the regions

5   that contain the 12 districts at hand, I examined whether

6   it was plausible that we would see the final shape of

7   those districts without extensive use of race being used

8   as the dominant consideration in drawing the districts.

9   Q    And what was your conclusion after looking at these

10  12 districts, sir?

11  A    That race was the predominant factor in drawing those

12  districts.

13  Q    All right.  Before we walk through how you reached

14  that conclusion, Dr. Rodden, let me ask you right from the

15  beginning, was any part of your analysis an examination of

16  whether this plan was drawn with racially discriminatory

17  intent?

18  A    No.  That's not part of my analysis.

19  Q    Okay.  You were only looking at whether race was the

20  predominant factor in the drawing of the map; is that

21  right?

22  A    Correct.

23  Q    Okay.  So let's move to the substance of your

24  analysis.  There are 11 House districts at issue in this

25  litigation.  Did you approach your study of these

Rodden - Direct

1    districts in a -- on a regional basis?

2    A    Yes.  I divided the study into two regions, the first

3    of which was Richmond but also extending to the tri-city

4    area, because all those districts touch one another and,

5    as I try to describe in the report, every move that's made

6    in one has an effect on the other.  So I take that region

7    as a whole --

8    Q    Okay.  And is there a second region that you examined

9    as well?

10   A    Yes.  And then the Tidewater region I also treat as a

11   separate analysis.

12   Q    Did you consider the implications of the use of an

13   expressed racial target of 55 percent black voting age

14   population?

15   A    Yes.  In some respects, that was the start point for

16   my analysis.  That had already been determined, and the

17   first thing I was doing in my analysis is trying to

18   understand the implications of using that target.

19   Q    Is it your opinion that every districting decision

20   had to be done exactly the way it was done in order to

21   achieve that 55 percent goal?

22   A    No.  Of course not.

23   Q    There are alternatives?

24   A    Yes.  And what I try to describe in the report is

25   that there are -- there are parts of the -- of these

Rodden - Direct

1  regions where, in fact, the 55 percent target was very

2  constraining, and it really was quite difficult to reach

3  the target, and there are others where it was somewhat

4  less so.

5      But in most instances, yes, there are other ways to

6  get there, and my job was to describe how the VTDs and

7  blocked were moved in order to get there.

8  Q   So let's look first --

9          JUDGE PAYNE:  In order to get where?

10         THE WITNESS:  To get to the 55 percent target.

11 BY MR. HAMILTON:

12 Q   Let's look first at the Richmond and tri-city area.

13 I believe the discussion begins on page 9 of your report;

14 is that right?

15 A   Yes.

16 Q   Okay.  And what House districts are in this area?

17 A   Seventy-one, 69, 70, 74 and 63.

18 Q   So let me direct your attention to page 10 of your

19 report, Figure 1, and I think we can put it here on the

20 screen.  What is this map?  Can you describe what it is

21 and how it's used?

22 A   Yes.  This is a dot density map, and it's something

23 that I use extensively in my reports.  This is one that

24 zooms out to the entire Richmond and tri-city area.  And

25 what I'm doing in creating this map is taking census data

Rodden - Direct

1    at the level of census blocks and creating dots that

2    capture individuals from the census data; in this case,

3    voting age individuals.  And I'm representing the race of

4    those individuals with the color of the dot.

5         And in this particular map, one dot captures ten

6    individuals.  And we'll see some maps later in the report

7    in which I zoom in further and one dot might capture five

8    individuals, or if we zoom in very, very fine grained

9    analysis, we'll see one dot corresponding to one

10   individual.

11        And I want to clarify that these are not based on

12   individual level data.  So we don't know the addresses of

13   the individuals.  We know the blocks, and the blocks are

14   very small, maybe something like a hundred people.

15   Q    This is a census block?

16   A    Yes.

17   Q    And each voting tabulation district is composed of a

18   number of census blocks; is that right?

19   A    Yes.

20   Q    Okay.  And a voting tabulation district is similar to

21   a precinct, at least in Virginia?

22   A    Yes.  At this time in Virginia it is.

23   Q    Okay.  Is this a common tool in the field of

24   geo-spacial analysis?

25   A    Yes.  A dot density map is a way to show a couple of

Rodden - Direct

1    important things at the same time.  So we're showing not

2    only the racial composition of an area, but we're showing

3    the population density of that area.  And we're showing

4    the precise location of individuals within a VTD, or

5    within a district.  And that can be very important beyond

6    just kind of treating the VTD as a whole.  Because as was

7    described I think by a couple of fact witnesses, many

8    census blocks are unpopulated.  So we have census blocks

9    that are --

10           JUDGE PAYNE:  You're at the point where you're

11   talking beyond the question, and I think we'll get where

12   we're going faster if Mr. Hamilton asks a question, you

13   answer just the question that you're asked.  If he wants

14   more, that will be fine.

15           THE WITNESS:  Okay.  Thank you.

16           JUDGE PAYNE:  But before you do that, you're

17   saying that you used the census block and you took the

18   data from the census; is that right?

19           THE WITNESS:  Yes.

20           JUDGE PAYNE:  And a census block is what?

21           THE WITNESS:  A census black is just what it

22   sounds like.  In a city, just think of a city block.  So

23   it's just very small geography that covers one block.  And

24   so it can be often fewer than a hundred people.  But what

25   sometimes happens is there are many blocks that are

Rodden - Direct

1    unpopulated.

2              JUDGE PAYNE:  Or thousands of people if there

3    were highrises?

4              THE WITNESS:  If there were highrises, it might

5    be a thousand.

6              JUDGE PAYNE:  And you got the race from the

7    census data in each block?

8              THE WITNESS:  Yes.

9              JUDGE PAYNE:  And then you plotted on this

10   exhibit where the black and the white races were?

11             THE WITNESS:  Yes.  And so we don't see the

12   block boundaries on this map because that would take

13   over -- all you would see is a tangible of boundaries.

14   But we can think of -- every time we see one of these

15   maps, we can think about all these dots are placed inside

16   the boundaries of the block.  That's how they get placed

17   where they are.

18   Q    So maybe I can ask a couple of clarifying questions.

19   When we're at the census block level, you've got data

20   that's reported from the United States Census, correct?

21   A    Yes.

22   Q    And that data includes population?

23   A    Yes.

24   Q    And it includes the race and ethnicity of the

25   individuals who live within that block?

Rodden - Direct

```
 1   A     Yes.

 2   Q     But it doesn't tell you where each individual

 3   actually lives?

 4   A     Correct.

 5   Q     So let's say in your -- we've got a city -- a census

 6   block with a hundred people in it.  How do you plot the

 7   location of those people since we don't know exactly where

 8   they live, those hundred people within that census block?

 9   How do you deal with that?

10   A     So those dots are randomly placed within the census

11   block because --

12   Q     Is the white -- are the white dots treated any

13   differently from the black dots?

14   A     No.  They're both randomly placed within the block.

15   Q     Can you explain why that's useful?

16   A     Well, yes.  Because when we're looking at a map like

17   this, when we get down -- when we have the individuals

18   placed within the blocks, we can see not just where --

19   where the -- for instance, the African-American voting

20   percentage is high.  That's interesting, but it's more

21   interesting to know how many people are there.  So we

22   might have a place where the African-American voting age

23   population is 80 percent, but it might be a place that is

24   largely unpopulated that only has a couple of -- a little

25   sliver of population.  And these maps will show us where
```

Rodden - Direct

1    the population is located, and the density of the

2    population.

3                JUDGE PAYNE:  Including age population?

4                THE WITNESS:  Yes.  All these maps will be

5    voting age population.

6                JUDGE PAYNE:  Not the voting population?

7                THE WITNESS:  Correct.

8    Q    All right.  So let's -- so this here, we're looking

9    just at the Richmond area, and then you've plotted the --

10   in a very general level, some geographic features like

11   cities and rivers.  And then over the top of that, we see

12   dot density; is that right?

13   A    Yes.

14   Q    So in just a sentence or two, what does this overview

15   tell us as we try and draw -- or what conclusions can the

16   Court draw from -- from this map at this high level of the

17   whole region?

18   A    It simply gives us an overview of where white and

19   African-American residents of the region reside.  And it

20   gives us kind of a preview of what kinds of things have to

21   be done in order to create -- in this case, six -- well,

22   we'll really be talking about five 55 percent

23   African-American districts.  So the starting point is to

24   see that there is an African-American population in the

25   northeast of Richmond and then on the south side of the

Rodden - Direct

1   river, and then there is, of course, a concentration

2   around Petersburg and there is a much smaller

3   concentration around Hopewell, and there is a -- a

4   surrounding rural African-American over in Charles City

5   County and, as was discussed earlier, down in Dinwiddie.

6   Q    Okay.  Maybe we can go to the next slide.  This is

7   Exhibit 2 from your report.  Can you explain what this is?

8   A    This simply overlays on that geography the lines of

9   the benchmark plan.

10  Q    All right.  And if we go to the Figure 3 on page 14

11  of your report, what is this?

12  A    This overlays the lines of HB 5005 in black, and the

13  challenged districts are in bold.

14  Q    Okay.  And this is as adopted in HB 505 -- 5005?

15  A    Yes.

16  Q    So if we go back and forth between these two, we can

17  see how the map changed from the benchmark to the adopted

18  plan; is that right?

19  A    Yes.  It brings to life some of the maps that were

20  already discussed earlier today.  We see the split of

21  Dinwiddie County, and we see the movement of Hopewell from

22  74 to 63.  We see the expansion of --

23  Q    All right.  Why don't I stop you there and let me

24  direct your attention to District 71.  Let's start there.

25  It's Figure 4 on page 18 in the next slide.  I think the

Rodden - Direct

1  discussion starts on page 15 of your report.  This is

2  Jennifer McClellan's district; is that right?

3  A    Yes.

4         MR. HAMILTON:  And, Your Honors, if it's easier,

5  there's a hard copy -- there's a binder with hard copy

6  paper versions of all these maps as an illustrative

7  exhibit that's been provided to you.  I believe they are

8  on the bench, or perhaps in the bookshelves behind you.

9  BY MR. HAMILTON:

10 Q    So --

11        JUDGE PAYNE:  Are they bigger than the ones that

12 are in his report?

13        MR. HAMILTON:  Yes.

14 A    It might be helpful to zoom in on these a bit closer,

15 if that's possible.

16 Q    Well, not quite yet.

17 A    Okay.

18        JUDGE PAYNE:  Do you want yours?

19        JUDGE KEENAN:  I think I'm okay.  Thank you.

20        JUDGE PAYNE:  All right.

21 Q    All right.  So the incumbent here was Jennifer

22 McClellan.  This is downtown Richmond; is that right?

23 A    Yes.

24 Q    Is this courthouse in this district?

25 A    Yes.

Rodden - Direct

1   Q    So what was the racial and population composition of

2   this district at the time of the redistricting?

3   A    Yes.  This was a district that was well short of the

4   55 percent African-American voting age population target

5   at the time of the benchmark district.  It was

6   46.3 percent African-American, and it was also

7   underpopulated.  So it needed to gain around 6000 people.

8   Q    And had Delegate McClellan -- so is it 46 percent

9   BVAP?  Is that what you said?

10  A    Yes.  A little over that.

11  Q    Had Delegate McClellan had any trouble getting

12  reelected in this district?

13  A    No.

14  Q    Did you examine her election results?

15  A    Yes.  There's a nice website that has all of the

16  precinct level results going back historically.  So I did

17  analyze those.

18  Q    And what was her margin of victory in the most -- in

19  the 2009 election just before redistricting?

20  A    She received 82 percent of the vote in that one.

21  Q    So looking at Figure 4, which is on the screen, this

22  is House District 71 in a dot density format showing the

23  VTDs in this area?

24  A    Yes.

25  Q    So we're going to click through several slides here.

Rodden - Direct

1   So the next slide, this is the same map but with all of

2   the data stripped out of it, just showing the VTDs in the

3   area; is that right?

4   A    Yes.

5   Q    And then the next slide.  This is now showing the

6   racial distribution population within the same area?

7   A    Yes.  And the county boundary is in green as well.

8   Q    All right.  That's the green line?

9   A    And then --

10            JUDGE PAYNE:  Which one are you talking about?

11            MR. HAMILTON:  It's the illustrative exhibit --

12            JUDGE PAYNE:  Which Figure 6?  Figure 7?  What?

13            MR. HAMILTON:  It's not -- this is an

14   illustrative exhibit that we've created by taking

15   Figure -- the original figure out of his report, which was

16   Figure 4, and then stripping it for the purposes of

17   electronic display It's also in your hard copy notebook.

18   I believe Judge Allen has the page there.  So we're going

19   through page 8, 9, 10 and 11, and then, of course, on the

20   screen we're displaying it.

21            JUDGE PAYNE:  The record is going -- it's going

22   to be hard to follow the record without knowing what

23   you're talking about.  Are you on page 10 of the

24   illustrative exhibit?

25            MR. HAMILTON:  Right now, we're on page 9 of the

Rodden - Direct

 1  illustrative exhibit.

 2          JUDGE PAYNE:  Page 9.  Okay.

 3          MR. HAMILTON:  That's what's displaying on the

 4  screen.

 5          JUDGE PAYNE:  All right.  And page 9 is what?

 6          THE WITNESS:  This is simply the Richmond area

 7  with VTD boundaries in red.  The racial data that we've

 8  been discussing with black-and-white, and green is the

 9  county boundaries.

10  Q    Okay.  If we turn to the next page.

11          JUDGE PAYNE:  That's 10 in the illustrative

12  exhibit; is that right?

13          MR. HAMILTON:  That's correct, Your Honor.

14  Q    Dr. Rodden, what is this?

15  A    This is the same map but with the benchmark

16  boundaries superimposed.

17  Q    And the next slide, which is page 11, of the

18  illustrative exhibit?

19  A    That is the same map but with HB 5005 boundaries

20  superimposed.

21  Q    So if we flip back and forth between these two slides

22  on the screen, you can see how the district changed?  You

23  can do to the same thing with paper copies, but Your

24  Honors, I believe it's a little easier to see on the

25  screen when you see how it changes.  Now, in broad terms,

Rodden - Direct

1    if a map drawer wanted to achieve a 55 percent black

2    voting age population in House District 71, what did they

3    have to do to achieve that?

4    A    Well, it was necessary to add substantial population.

5    There was a broad problem that the -- that the urban

6    districts, especially 71 and 69, were underpopulated

7    relative to the suburbs.  Many of the surrounding suburban

8    districts were overpopulated.  So it was necessary to

9    increase the population of District 71 by a substantial

10   amount, but yet, at the same time, the goal was to get

11   from 46 percent African-American voting age population to

12   55 percent African-American voting age population.

13   Q    So in order to do that, you had to either add

14   African-American population or subtract white population;

15   is that right?

16   A    Well, in the report, I show that one actually has to

17   do both.  It's not possible to reach that target by only

18   adding African-American population.  So if it was possible

19   to simply add a group of completely African-American VTDs,

20   it still wouldn't be enough.  It would still not be at the

21   55 percent target.

22   Q    Okay.  And if we look at these areas, are there areas

23   of significant concentration of white voters and areas of

24   significant concentrations of black voters that were

25   moved?

Rodden - Direct

1   A      Yes.   The -- there was a general movement of the

2   district from west to east to remove some of the white

3   voters in the east and a few to the south and then pick up

4   African-American voters in the districts -- in the VTDs to

5   the east.

6   Q      Okay.   Delegate McClellan testified this morning.

7   Were you in the courtroom when she testified?

8   A      I was.

9   Q      And she testified about VTD 207.   Can you just point

10  that out, where that is on the map?   Maybe circle it with

11  your finger.

12  A      Okay.

13  Q      And what's the racial composition of that district?

14  A      It's overwhelmingly white.

15  Q      What its political performance?

16  A      It's very democratic.

17  Q      And was that -- in the benchmark, was that in House

18  District 71 or out?

19  A      That was -- in the benchmark was in HD 71.

20  Q      So this is a large VTD of largely white democratic

21  voters that was removed from Jennifer McClellan's

22  district?

23  A      Yes.

24  Q      And where was it placed?

25  A      In District 68.

Rodden - Direct

1   Q    And who was the delegate there?

2   A    Delegate Loupassi.

3   Q    Is he a democrat or republican?

4   A    Republican.

5   Q    Okay.  So white democratic voters were moved into a

6   republican district; is that right?

7   A    Yes.

8   Q    Okay.  What other -- was the removal of HD -- I'm

9   sorry -- of VTD 207 significant to your analysis?

10  A    Well, it was -- it was a very densely populated, very

11  populous white VTD.  And as I described, it was necessary

12  to add white voters, and so this was a VTD that helped

13  accomplish that.

14  Q    Add or subtract white voters?

15  A    I'm sorry.  Add white voters to the surrounding

16  district.  You had to remove the white voters from

17  District 71.

18  Q    Did that change make this district more

19  Richmond-centric?

20  A    No, not that change.  It made it a little bit less

21  so.

22  Q    Okay.  How about the movement of VTD 701, 702 and

23  part of 703?  Do you see where that is?  Can you maybe

24  circle that for us?

25  A    Yes.  It might be helpful to have the map that was --

Rodden - Direct

 1   actually, the figure in the report that has the blue lines

 2   as well to show us where the -- yes.  So here, we can see

 3   more clearly which VTDs were removed.  The blue line helps

 4   capture that.

 5   Q    Okay.

 6   A    So those were the VTDs that were heavily

 7   African-American VTDs that were taken from District 70 and

 8   placed in District 71, which had the effect of increasing

 9   the African-American voting age population of House

10   District 71.

11   Q    So this is a concentrated group of African-Americans

12   that were moved into House District 71?

13   A    Yes.

14   Q    Okay.  And then how about VTD Ratcliffe?  We heard

15   some talk about that this morning.  Can you point out

16   where that is?

17   A    That is right here.

18   Q    So that's the upper northeastern corner of the

19   district?

20   A    Yes.

21   Q    And was the addition of Ratcliffe significant to your

22   analysis?

23   A    Yes.  That's a large VTD both geographically and in

24   terms of population, and it includes a lot of

25   African-American voters.  So that was another move that

Rodden - Direct

1   helped increase the black voting age population in the

2   district.

3   Q     Did that -- was that an addition of another part of

4   Richmond or was it a different part of the area?

5   A     That move reached across the Henrico County line and

6   brought in Henrico County to that part of the district for

7   the first time.

8   Q     All right.  And I think you've already talked about

9   whites being removed from HD 71 with -- in VTD 207.  Are

10  there other examples of where white population was removed

11  from House District 71?

12  A     Yes.  The most obvious one is up here in some

13  districts that had been part of -- some VTDs that had been

14  part of District 71 that are in Henrico County.  So there

15  was a removal of three of these, Summit Court, Stratford

16  Hall and Hilliard.  So as we can see here, there were some

17  western Henrico white VTDs that were removed, and then

18  there was kind of a slightly larger number of people added

19  in Henrico to the east in the Ratcliff VTD.

20  Q     Let me direct your attention to -- maybe I should

21  erase these lines here first.  Can you point out HD -- I'm

22  sorry -- VTD 505?

23  A     Yes.  That was also discussed earlier today.  That's

24  the one down here.

25  Q     Okay.  Did you examine that in your report?

Rodden – Direct

1   A    Yes.

2   Q    Now, I'll tell you that the Court, this Court, in its

3   memorandum opinion on page 134, indicated that the

4   decision to split this VTD advanced other neutral

5   principles such as compactness.  If the goal was to

6   advance the compactness of District 71, would this VTD be

7   split the way it was split?

8   A    Well, it -- this is where I think the dot density map

9   is useful, because we can see that this VTD only has some

10  population over in the Oregon Hills neighborhood, which is

11  over here.  So it would have been possible to slice off

12  the noncompact segment without losing any voters.

13  Q    And what's in the western side of this -- of this

14  VTD?

15  A    Cemetery and some park land.

16  Q    So fair to say, no voting age population resides in

17  5005 -- in that part of 5005?

18  A    In 505, correct.

19  Q    505, right.  So if you wanted to advance compactness,

20  how would you have split the district?

21  A    Well, it seems if that was the only goal and one

22  wanted to keep the population together, it would have been

23  possible just to have included the Oregon Hills

24  neighborhood in the -- in the -- in District 71.

25  Q    All right.  Let's turn to Exhibit 69, Your Honors.

Rodden - Direct

1    This is illustrative exhibit page 12.  So this is the same
2    thing.  Am I correct?  This is Figure 6 from your report?
3    This is a composite map showing both the benchmark as well
4    as the adopted plan; is that right?
5    A    Yes.
6    Q    And this is Delegate Carr's district?
7    A    Yes.
8    Q    So if we click to the next slide, that's page 14 of
9    the illustrative exhibit, this is the same thing stripped
10   down, just the area with the VTDs; is that right?
11   A    Yes.
12   Q    And the next page, page 15.  This is the -- of the
13   illustrative exhibit.  This is the same thing now with the
14   racial density dot map added?
15   A    Yes.
16   Q    Okay.  And if we go to exhibit -- illustrative
17   Exhibit page 16, what is that?
18   A    That is the same information but with the benchmark
19   boundary.
20   Q    Okay.  And then if we go to the next page, that's
21   page 17, this is the HB 5005 as adopted map?
22   A    Yes.
23   Q    And if we click back and forth between these two, we
24   can see how this map changed?
25   A    Yes.

Rodden - Direct

1  Q    Okay.  So can you describe -- can you describe the

2  composition -- the population and racial composition of

3  this district at the time of the redistricting?

4  A    Yes.  So this one was far short of the population

5  goal.  It had a population of 71,300.  So it needed to add

6  almost 9000 individuals.  And the African-American voting

7  age population was 56 percent.  So it was just above

8  the -- above the threshold.  And so if it was -- if the

9  desire was to achieve equal population while maintaining

10 the threshold, then it was necessary to make sure that the

11 population that was moved in was roughly half

12 African-American.

13 Q    So how was -- and maybe we can go back to

14 illustrative Exhibit 12.  There we go.  I'm sorry.

15 Illustrative Exhibit 13, which is Figure 6 from your

16 expert report, which shows both the benchmark and the

17 adopted plan.  How was adding population achieved in House

18 District 69?

19 A    Well, the district expanded in a few different ways.

20 So it took in -- if we kind of go clockwise and starting

21 at the top, it took in the VTDs 402 and 508 and 609 in the

22 northeast and then -- and those came from District 70.

23 And then it also took, from District 70, the VTDs 911 --

24 Q    So why don't we start with this first area and I'll

25 just circle it on the screen here.  This took -- I think

Rodden - Direct

 1   you said 402, 508, 609.  And then did it also take part

 2   of -- the other part of 505 that we just talking about?

 3   A    Yes, that's right.  So it reached across the river

 4   and included that.

 5   Q    And what was the racial composition of this?  I think

 6   we can see from the map, but maybe you could describe it

 7   for the record?

 8   A    Yes.  That's a white neighborhood on the south side

 9   of the river.

10   Q    Now, all else being held constant, if the map drawers

11   had just added these northern white VTDs; that is, 402,

12   508, part of 505 and 609, what effect would that have had

13   standing alone on the black voting age population of House

14   District 69?

15   A    Well, that would have pushed the African-American

16   voting age population below the 55 percent target.

17   Q    So let's take a look at what other changes were made

18   to this district.  So we'll go on moving around clockwise.

19   I see that VTD 903 and 811 were added.  Could you describe

20   those?

21   A    Yeah.  Those are dense, or relatively dense, and

22   overwhelmingly African-American VTDs that had been in

23   District 70, and those were moved into District 69.

24   Q    And do you recall what the black voting age

25   population was in those two VTDs?

Rodden - Direct

1  A    903 was 64 percent, and 811 was 76 percent.

2  Q    Okay.  So both a fairly high black voting age

3  population moved in?

4  A    Yes.

5  Q    Was that significant to your analysis?

6  A    Yes.  That helped increase the African-American

7  voting age population of the district.

8  Q    And where did they come from?

9  A    Those came from District 70 to the south, which --

10  Q    And what was the -- what was the -- at the time of

11  the redistricting -- we'll look at District 70 separately.

12  But at the time of the redistricting, what was the racial

13  composition of District 70?

14  A    District 70 had one of the largest African-American

15  voting age population shares in the region.  It was at

16  62 percent, and it was already at equal population.  It

17  was within the threshold.

18  Q    Okay.  So this black population moved from 70 to 69,

19  bringing down the black voting age population of 70 and

20  increasing the black voting age population of 69; is that

21  right?

22  A    Yes.

23  Q    Okay.  Then continuing moving west, what happened

24  with Belmont, Manchester and Beaufont?

25  A    Belmont was moved into District 70, and that is --

Rodden - Direct

1    that is about a 50/50 racial breakdown in that VTD.  But

2    the -- the other two VTDs on the west were moved to

3    District 27, which had been -- previously was -- at the

4    time of the benchmark, was quite overpopulated.

5    Q    So is that significant?  Why was it being moved?

6    A    Well, there was -- there's a general -- as I

7    described, in general, the City of Richmond is -- is

8    losing population relative to the suburbs, and the

9    suburban districts are overpopulated.  So one might expect

10   to see, in that situation, that some of those -- some of

11   those suburban VTDs would make their way into 69 since it

12   was underpopulated.  And there were already some -- some

13   Chesterfield VTDs in District 69.  But in spite of that,

14   it lost some of these suburban VTDs.

15   Q    So you would have expected to see the opposite.

16   Since House District 27 was overpopulated, you would have

17   expected to see it shedding population toward District 69

18   and instead, the opposite happened; is that right?

19   A    Yeah.  In my experience, typically that's what

20   happens with these kind of spillover effects of population

21   loss in city centers.  But in this case, the population

22   really was brought in from elsewhere, from District 70.

23   Q    Let's focus on the VTD 410.  Can you point out where

24   that is?  Was that VTD split?

25   A    Yes, it was.

Rodden - Direct

1   Q    And how was it split?

2   A    Well, the VTD is kind of a long VTD that goes all the

3   way up to the river, and it has -- it has a larger

4   African-American population on the south side and then up

5   on the other side of the -- I guess on the other side of

6   the line, it's -- the population is relatively -- the

7   white population is larger.  And so you can see the split

8   there kind of happens at the narrowest part of that VTD.

9        And that also -- that also, it should be pointed out,

10  preserves a corridor for 68.  So 68 is kind of a

11  district -- this is Delegate Loupassi's district, which

12  goes from the -- kind of the west side neighborhoods of

13  Richmond and out into the suburbs.  And so by splitting

14  that VTD, it also opened up that corridor to the suburban

15  parts of District 68.

16  Q    The VTD was split.  The portion of the VTD that was

17  included in House District 69, how would you describe that

18  portion?

19  A    That was the more African-American part of the VTD.

20  Q    And the portion of this VTD that was included in

21  House District 68, how would you describe that portion?

22  A    It was relatively -- relatively white, relative to

23  the part that was kept in 69.

24  Q    So was a division of this VTD along racial lines?

25  A    Yes.

Rodden - Direct

1   Q    And what was the ending black voting age population

2   of House District 69?

3   A    It ended up at 55.2 percent.

4   Q    Okay.  Let's move to House District 70.  This is

5   Delegate McQuinn's district; is that right?

6   A    Yes.

7   Q    This is just a bit to the east of where we were just

8   looking; is that right?

9   A    Yes.

10  Q    So let's click through a few maps here.  If we turn

11  to the next page, which is the 20th page of the

12  illustrative exhibits, this is VTDs without the district

13  lines, right?

14  A    Yes.

15  Q    And page 21 of the illustrative exhibit is the same

16  thing but with the racial data distributed over the top of

17  the map?

18  A    Yes.

19  Q    And the next page is the benchmark, is that right, in

20  House District 70?

21  A    Yes.

22  Q    And then the next page is the House District 70 as

23  drawn in the final map; is that right?

24  A    Yes.

25  Q    So if we click back again between these two, we can

Rodden - Direct

1  see how this district changed between the original

2  benchmark and the adoption of the final plan; is that

3  right?

4  A    Yes.  Above all, we see kind of a westward movement

5  out in the southwest part of the district into the

6  suburbs.

7  Q    Okay.  Can you describe the population and racial

8  composition of this district at the time of the

9  redistricting?

10 A    Yes.  This one, as I believe I described earlier, was

11 already at the population threshold.  It was about 79,400.

12 And the racial composition was such that it had almost

13 62 percent black voting age population.  So it was one of

14 the largest in the Richmond area.

15 Q    And I think we already talked briefly, when we were

16 discussing House District 71, the neighbor to the west of

17 the top part of this district, VTD 701, 702 and 703.  Can

18 you point those out here on this map?

19 A    Yes.  Now, we're seeing them from a different

20 perspective, but they are right there.

21 Q    And is that the most densely populated area of

22 African-Americans that were in House District 70 to start

23 with?

24 A    I believe so.

25 Q    Okay.  And do you know what that's comprised of?  Do

Rodden - Direct

1    you know who lives there?

2    A    I -- I believe there's some public housing buildings

3    in that -- in those VTDs.

4    Q    Okay.  And you testified already, these VTDs were

5    moved from House District 70 into House District 71?

6    A    Yes.

7    Q    And the effect of -- can you describe the effect of

8    moving these two and a half VTDs from District 70 to

9    District 71, the effect on the racial composition of the

10   two districts?

11   A    Yes.  This is where it's important to understand the

12   way these districts kind of interlock and try to

13   understand the regional dynamics.  So if the goal is to

14   reach 55 percent in all of the districts, one has to be

15   very careful because District 71 needed a lot of

16   African-American voting age population and it was

17   difficult to achieve without moving some of these very

18   dense, very populous African-American VTDs.

19        And as we see here, District 70 had a -- started out

20   with a rather high African-American voting age population.

21   So it had -- it had the population that District 71

22   needed.  And so this move was -- appears to have been very

23   crucial in meeting the target in 71.

24   Q    How would you describe -- is it fair to describe that

25   area of 701, 702 and part of 703 as a stark difference

Rodden - Direct

1   between the racial composition of that VTD and the

2   surrounding VTDs around it?

3   A     Which one?   701 and 702?

4   Q     701 and 702.   Right in the center of your circle

5   there.

6   A     Well, they are in the midst of a dense

7   African-American part of Richmond, and it moved a

8   neighborhood -- you know, a heavily African-American

9   neighborhood from one district to another.

10  Q     All right.   What other VTDs were moved out of

11  District 70?

12  A     There were a couple of -- a couple of rather sparse

13  and relatively small VTDs on the -- on the eastern side of

14  the district.   But there -- as we discussed earlier, there

15  were some VTDs along the river that were -- that were

16  moved from District 70 into sixty-nine.   And then as we --

17  as we move to the west, we also discussed districts that

18  had been -- that had been moved from 70 into 69.

19  Q     So let me direct your attention to VTDs 903 and 611.

20  Can you see those on the map?

21  A     I believe it might be 811, if I -- if the -- the

22  numbers are very small.

23  Q     And can you describe the racial composition of those

24  two VTDs?

25  A     Those are majority African-American, large majority

Rodden - Direct

1  African-American VTDs.

2  Q    And I think it's 903 and 611; is that right?  I'm --

3  A    The marker is right in front of it right now so it's

4  hard to see.  Yes, I think that's right.

5           JUDGE PAYNE:  I don't see 611.  Where is it?

6           MR. HAMILTON:  611 in the blowup is right here

7  in the map.  I've just circled it on the screen, Your

8  Honor.  It's directly above 606.  Do you have it, Your

9  Honor?

10          JUDGE PAYNE:  Yeah.

11          MR. HAMILTON:  Okay.  Thank you.

12          JUDGE PAYNE:  Thank you.

13 Q    So, again, can you describe the effect on the racial

14 composition of District 70 of moving these two VTDs?

15 A    This is part of a larger -- a larger set of moves in

16 this area in which District 69, in order for it to gain

17 population, without gaining too much white population, it

18 was necessary to move some African-American population

19 from surrounding districts, and District 71 certainly

20 wasn't an option, given how difficult it was to achieve

21 the target there.  So 70 was -- was the option.  And so

22 African-Americans were moved from 70 into 69.  And that

23 had the effect of preserving that 55 percent threshold.

24 Q    In which district?

25 A    In 69.  Of course, 70 had -- had -- started out with

Rodden - Direct

 1  62 percent African-American voting age population.  So

 2  it -- if there was to be a plan that created 55 percent

 3  districts in all six, it was necessary for some of those

 4  to be removed from 70.  It couldn't have worked otherwise.

 5  Q    Okay.  So this is an instance of District 70 donating

 6  two heavily African-American VTDs to its neighbor, House

 7  District 69; is that right?

 8  A    Yes.

 9  Q    Okay.  And what effect did that movement have on the

10  population, the total population of House District 70?

11  A    Right.  So as we've been discussing, 70, in all these

12  moves we've seen so far, has been losing population.  It

13  started out at the population threshold, but then it shed

14  population up there in the northern turret.  It shed

15  population over along the river and it shed population in

16  903 and 611.  So at that point it then had to pick up some

17  population.

18  Q    And where was that population added from?

19  A    So there were a group of VTDs in the southwest of

20  District 70 that were really the only VTDs in the entire

21  Richmond area that had not previously been -- that were

22  African-American majority VTDs that had not previously

23  been included in one of the -- in one of the districts in

24  the benchmark plan.  So the district --

25  Q    Which were those, sir?

Rodden - Direct

1   A    Those were Southside, Meadowbrook, Falling Creek and

2   Chippenham.

3   Q    So this is all in the southwest corner of the map

4   that we're looking here, which is Figure 7, page 28 of

5   your report?

6   A    Circle those as well.

7   Q    All right.  This was newly added territory to the

8   district; is that right?

9   A    Yes.

10  Q    And what county was that in?

11  A    I believe that was Chesterfield.

12  Q    Had Delegate McQuinn previously represented that

13  area?

14  A    No.

15  Q    And you were here in the courtroom this morning and

16  heard Delegate McQuinn express her concern about this

17  change adding this part of Chesterfield to her district.

18  Did you hear that?

19  A    Yes.  It seems like a rather different type of area

20  from the rest of the district.

21  Q    All right.  How did this track the suburban

22  population growth in this area?

23  A    Well, one of the features that was interesting to me

24  in understanding this area was that as in many other

25  American cities, there's an ongoing process of

Rodden - Direct

1   African-American suburbanization.  And so we see the

2   African-American population moving from city centers out

3   into suburban areas.  And what we see here is that the

4   boundaries of the -- of the majority/minority district

5   simply follow the population flow and reach further out

6   and bring in these majority African-American VTDs into

7   District 70.

8   Q    Does the district --

9          JUDGE PAYNE:  Excuse me.  What are you saying --

10  you said that the one with Chippenham, Falling Creek,

11  Meadowbrook and Southside was different.  What do you mean

12  by different --

13         THE WITNESS:  Well, this is --

14         JUDGE PAYNE:  -- other than the racial

15  composition?  How else was it different?

16         THE WITNESS:  These are suburban places that are

17  in a different county.  So this is an interesting district

18  where it has -- part of the district is up in the kind of

19  south side area of Richmond and then it goes through a

20  very suburban and ex-urban part of Henrico, and then it

21  comes back into another part of -- another part of --

22         JUDGE PAYNE:  I'm sorry.  I thought you were

23  talking about it was different than what McClellan had

24  previously represented.

25         MR. HAMILTON:  Not McClellan, Your Honor.

Rodden - Direct

1  McQuinn.

2          JUDGE PAYNE:  Yeah.  Thank you.

3          THE WITNESS:  So it had these two parts of

4  Richmond and it had a part of Henrico, and now it's adding

5  a suburban part of Chesterfield.  So it's got kind of two

6  different suburban populations.

7          JUDGE PAYNE:  But you said it was different.

8  How is it different?  I don't understand that.  If you

9  know this area, if you look at the area you're talking

10  about and you look at the Henrico area, how are they

11  different other than by your dots?

12          MR. HAMILTON:  Well, and other than by being in

13  two different counties?

14          JUDGE PAYNE:  No.  Other than by your dots, how

15  are they different?

16          THE WITNESS:  I was merely pointing out that

17  these are more sparsely populated, single-family home

18  suburban areas that were being added to a district that

19  had more of a concentration in multiple family housing in

20  urban areas before.

21  Q    Maybe I can ask a couple of clarifying questions.

22  Number one, prior to this move, had Delegate McQuinn had

23  any part of her district in Chesterfield County?

24  A    No.  I don't believe so.

25  Q    Okay.  And we talked about how in 701, 702 and part

Rodden – Direct

1   of 703 there were some public housing projects with

2   densely populated African-American populations.  Do you

3   recall that?

4   A    Yes.

5   Q    Okay.  Are there any densely populated

6   African-American populations and public housing projects

7   in Chesterfield County in this area that we're talking

8   about?

9   A    No.

10          JUDGE PAYNE:  In what area?

11          MR. HAMILTON:  In Chippenham, Falling Creek,

12  Southside and Meadowbrook, Your Honor.

13          JUDGE PAYNE:  And your testimony is there are no

14  African-American housing areas, public or otherwise, in

15  that area?  Is that what you're saying?

16          THE WITNESS:  I wouldn't be able to testify

17  there are none.

18          JUDGE PAYNE:  I wouldn't think you could.

19          THE WITNESS:  I don't have that knowledge.

20  Q    Is the population density the same in the two areas?

21  A    No.  These are sparser than the urban districts,

22  which I think is clear.

23  Q    Okay.  Which is more densely populated with

24  African-American population?

25  A    The northern turret of all of these neighborhoods.

Rodden – Direct

1   That's the area that has the densest population.

2   Q    And that's where 701, 702 and 703 is?

3   A    Yes.

4   Q    And those are the portions that were given -- or

5   carved out of this district; is that right?

6   A    Yes.  That's the only observation I was trying to

7   make there.

8   Q    All right.  Thank you.  Does the way the district was

9   changed, did that adhere to traditional redistricting

10  principles, as you understand them?

11  A    Well, insofar as it crossed another county boundary,

12  and really, it's a district that combines, as I was

13  describing, some rather disparate neighborhoods.  So I

14  would say no.

15  Q    All right.  Let's turn to Exhibit -- I'm sorry.  To

16  District 74, a little further east.  This is Delegate

17  Morrissey's district; is that right?

18  A    Yes.

19  Q    And we'll go through the same set of maps quickly.

20  Page 26 on the illustrative exhibit is the area of where

21  House District 74 is located; is that right?

22  A    Yes.

23  Q    And then the next page, page 27, is adding the

24  population and race data?

25  A    Yes.

Rodden - Direct

1   Q    And the next page, page 28, shows the benchmark plan?

2   A    Yes.

3   Q    And the next page, page 29, this is the adopted plan;

4   is that right?

5   A    Yes.

6   Q    So if we go back and forth between those two last

7   slides, we can see the changes in this district?

8   A    Yes.  The main things we see are the extraction of

9   the African-American neighborhood in Hopewell to the

10  southwest, and we see the -- what I think is referred to

11  as the thickening of the neck of this district there in

12  the middle.

13  Q    Okay.  Let me start with, can you describe the

14  population and racial composition of the district at the

15  time of the redistricting?

16  A    Yes.

17           JUDGE PAYNE:  Excuse me just a minute.  I want

18  to make sure I've got the right place.  Seventy-four is

19  the benchmark, all in the blue; is that right, Doctor?

20           THE WITNESS:  The blue is the benchmark, yes.

21           JUDGE PAYNE:  And then 74 with all the black

22  around and down is the enacted one, right?

23           THE WITNESS:  Yes, Your Honor.

24           JUDGE PAYNE:  And you're saying those two differ

25  how again?  That's what I'm trying to follow.

Rodden - Direct

1      THE WITNESS:  Yes.  So that's -- they are -- the

2  differences are -- require a little bit of squinting, but

3  the southwestern part of the city of Hopewell is divided

4  right in half, right between the white population and the

5  African-American population.  So the African-American part

6  of Hopewell was in District 74, and it was -- it was -- we

7  see that it was removed and placed in District 63.  So

8  that's something that doesn't jump out at us when we first

9  look at the map, but --

10 Q    So if we go to page 25 of the illustrative exhibit,

11 which is your Figure 8 on page 31 of your expert report,

12 we can just circle that area there, and you can see that's

13 a Hopewell river crossing that was removed in the change

14 in House District 74; is that right?

15 A    Yes.

16 Q    And there were also some changes up along the --

17 what's referred to as the neck of the district?

18 A    Right.

19      JUDGE PAYNE:  That's where you said it was

20 thickening?

21      THE WITNESS:  Yes.  In the center part, we see

22 how it gets a little thicker.

23      JUDGE PAYNE:  Yeah.

24      THE WITNESS:  And then we also see over here,

25 that some of the -- there are some VTDs and actually split

Rodden - Direct

1    VTDs that are changed in the district boundaries over

2    there as well.

3    Q    All right.  When we start with -- when the map drawer

4    sat down to do House District 74, what was the population

5    and racial composition of this district at that time?

6    A    So this is -- it has a lot in common with District --

7    District 70 in the sense that it -- it started out with a

8    population -- a total population that was within the

9    threshold.  So it was 80,153.  And it also started out

10   with a very high African-American population.  Almost

11   63 percent of the voting age population was

12   African-American.  And that is, I think, the highest in

13   the Richmond/tri-cities area.

14   Q    Okay.  And in your report, you indicate that this

15   district played the role of a donor district; is that

16   right?

17   A    Yes.  I classified both 70 and 74 in that way.  And

18   then, again, this is really just the math of how we can

19   achieve six 55 percent African-American districts in the

20   region.  Some -- some African-Americans have to move out

21   of the overpopulated districts, 74 and 70.  And so that

22   is -- that is something that is happening here with 74.

23   It starts out with a very large African-American

24   population, and it gets down from 63 to around 57 percent.

25   And that's because African-Americans are being moved from

Rodden - Direct

1   74 into 71, for the most part, and also into -- into 63.

2   Q    Okay.  So let's talk specifically about that.  You

3   said in the benchmark, House District 74 had a part of the

4   city of Hopewell; is that right?

5   A    Yes.

6   Q    And which part did it have?

7   A    There's kind of a north/south or -- it's really more

8   east/west, I guess, divide in the city between whites and

9   African-Americans.  And we can see that --

10  Q    Let me just stop you and just ask the question again.

11  In which part of House District 74 -- which part of

12  Hopewell did House District 74 have in the benchmark?  Did

13  it have the black part?

14  A    Yes.  It had the eastern African-American part.

15  Q    And is that the part it gave up?

16  A    Yes.

17  Q    And where did that go?

18  A    That went to District 63.  I believe that process was

19  described this morning.

20  Q    Okay.  And did House District 63 get all of -- of the

21  city of Hopewell?

22  A    No.

23  Q    So it was -- it continued to be split?

24  A    Yes.  I believe the nature of the split was even a

25  bit more precise this time.  But there was a -- there was

Rodden - Direct

1   a split again in 63 down the middle of Hopewell.

2   Q    And when you say "even more precise," even more

3   precisely in what way?

4   A    Along racial lines.

5   Q    Okay.  And where did those two halves of the city go?

6   A    The African-American part went into District 63, and

7   the white part went into District 62.

8   Q    And 63 is one of the challenged districts?

9   A    Yes.

10  Q    And is -- what is 62?

11  A    Sixty-two is a suburban district that I believe is

12  represented by a republican delegate.

13  Q    Okay.  And isn't this just fixing a water crossing by

14  eliminating a part where House District 74 jumped the

15  river to pick up part of the city of Hopewell?

16  A    Well, it does achieve that.  But there's also a

17  crossing just to the north of the Appomattox that is not

18  changed, and there are many other -- of course each, of

19  these districts we're looking at has crossings of the

20  James.

21  Q    Let's take a little bit of a closer look at the

22  northern part of this district.  This is page 30 in the

23  illustrative exhibit.  It's Figure 9, page 33 of his

24  underlying report.  Can you describe what we're looking at

25  here?

Rodden - Direct

1   A      Yeah.  We were talking about the neck of the

2   district.  This is a district that I can't help but think

3   looks like a meat cleaver, and this is somewhere on the

4   handle of that thing toward the end.  This is the northern

5   tip of the district.  And we see in black the new district

6   boundary, the enacted district boundary, and in blue we

7   see the benchmark district boundary.

8   Q      Let me direct your attention to VTD Randolph.  Can

9   you point out where that is?

10  A      I believe it's that one.  Yes.

11  Q      What happened with this VTD?

12  A      Well, this is just a -- this is a VTD, I think, that

13  helps demonstrate what I believe is quite stark in looking

14  at this map; that the district boundary kind of follows

15  along the residential -- the line of residential

16  separation between African-Americans and whites.  So this

17  is an instance where the district kind of jogs out and

18  adds a VTD that is African-American and pushes up the

19  African-American voting age population of District 74.

20  And it kind of jogs back in and misses a white VTD.

21          JUDGE PAYNE:  Where is this Randolph that is

22  shown on Figure 30 of the illustrative exhibit on page 28

23  and page 29 of your -- of those exhibits?

24          MR. HAMILTON:  It's at the far north -- if I can

25  answer that question for, Your Honor, unless you'd like

Rodden - Direct

1   the witness to.

2           JUDGE PAYNE:  Yeah, let him.

3           MR. HAMILTON:  Okay.

4           THE WITNESS:  In which figure are we looking at?

5           JUDGE PAYNE:  There's a blow -- or Exhibit 30 --

6   or page 30 of the illustratives is a blowup of the western

7   most part of the district, and the benchmark is 74 and

8   that's on -- 74 is on page 28, and the benchmark -- I mean

9   the House Bill 5005 is on page 29.  And I'm trying to

10  figure out where on pages 28 and 29 this Randolph area is

11  that you're talking about.  Can you flip to those slides

12  so I can see where he circles it?

13          MR. HAMILTON:  The circles are gone, Your Honor,

14  but we can go back.

15      Ms. Marino, if you could go back a couple of slides

16  here.

17          THE WITNESS:  It might be possible to answer

18  your question without --

19          MR. HAMILTON:  Right there.

20          THE WITNESS:  Oh, okay.

21          JUDGE PAYNE:  Well, where is it?

22          MR. HAMILTON:  I think what Your Honor may be

23  asking is was this changed in the HB 5005?

24          JUDGE PAYNE:  That's what I'm getting to.

25          MR. HAMILTON:  It wasn't changed.  That was my

Rodden - Direct

1   next question.

2          JUDGE PAYNE:  Well, what difference does it make

3   if it wasn't changed was my question so I understand why

4   we're talking about it?

5   Q    So was there a choice that the map drawers made about

6   to leave certain lines and add -- and change other lines?

7   A    Certainly.  The approach I took in my report was to

8   examine the districting decisions, whether those involved

9   keeping lines or moving them.  So when I found evidence of

10  a stark racial split, I included that discussion in my

11  report.  And it -- some of those involved changes and some

12  of those involved decisions not to make changes.

13  Q    Okay.  And this was one -- in the latter category,

14  this is a stark racial line that existed in the benchmark

15  map and was maintained in the adopted map; is that right?

16  A    Yes.  And it's an important part of the analysis

17  because it's not -- in much of the region under analysis

18  here, it would not be possible to make moves that would

19  make the racial splits more stark.  They were already as

20  stark as really could be imagined.  In some places, it

21  experienced a lot of suburbanization.  There were moves

22  that were made and the lines then moved to follow, but

23  this was not one of those situations.

24  Q    Let's return to the closeup of that area we were just

25  looking at.  It's page 30 of the illustrative exhibit.

Rodden - Direct

1  It's look at the choices -- the lines that were changed in

2  this area.  May we first -- there are two split VTDs here.

3  Can you identify them?

4  A    The one to the north is called Brookland, and there

5  is one called Belmont.

6  Q    Okay.  Why don't we look at Brookland first.  How was

7  that VTD split?

8  A    It's a strangely shaped VTD.  I'm afraid this one

9  might be a bit difficult to see, but it involves -- it

10  involves -- so we can see it kind of moves around -- now

11  the circle needs to be removed.

12  Q    So the question is how was it split?

13  A    It was split such that the western side that was

14  white was kept out of the district and the inside part,

15  the eastern part that was more African-American, was kept

16  in the district.

17  Q    So I'm just going to put an arrow on the screen, and

18  you tell me if I've got this wrong.  The arrow on the

19  right is pointing to the word Brookland, and there's a

20  blue line that's right above it; is that right?

21  A    Yes.

22  Q    And then the other line on the left that I've drawn

23  is the other side of the Brookland VTD; is that right?

24  A    Yes.

25  Q    Which side has the more concentrated African-American

Rodden – Direct

1    population?

2    A     The east side.

3    Q     And where was that assigned?

4    A     Into District 74.

5    Q     And which side had the predominately white

6    population?

7    A     The west side.

8    Q     And where was that assigned?

9    A     Into District 73, I believe it is.  No.  It might not

10   be.

11   Q     The neighboring district?

12   A     Yes.

13   Q     The neighboring district; is that right?

14   A     Yes.

15   Q     Okay.  And then what other VTD was split here?

16   A     To the south, there is a district called Belmont.

17   Q     Okay.  And how was that split?

18   A     In a similar fashion.  We see that there's a dense --

19   I'm sorry.  We should --

20   Q     Is that Belmont that I've just circled on the screen?

21   A     Yes.  So we see that the line was -- the split of the

22   VTD happened using census blocks that placed an

23   African-American population right next to the boundary on

24   the east inside District 74 and white population outside

25   of the district.

Rodden - Direct

1  Q    Couldn't this have simply been done -- as a matter of

2  politics, I mean, couldn't they have just split this in

3  order to help the republicans on the white side of the

4  line?

5  A    Well, there's no -- there's no information available

6  about voting behavior below the level of the VTD.  Because

7  we have a secret ballot, that is the lowest level at

8  which -- which election information is available.  It

9  might be possible to -- to simply apply uniformly the

10  electorial behavior of the entire VTD to each census block

11  so that when one adds up political totals for a

12  hypothetical district, they get a number.  But it's not

13  possible to carve through a VTD and divide it up in that

14  way and hope to achieve something politically.

15  Q    Let me stop you, and I'm going to back you up there

16  because I think this is an important point.  Mr. Braden

17  mentioned this this morning.  Election results are

18  reported at what level?

19  A    At the precinct level.

20  Q    At the VTD level?

21  A    In our case, in Virginia, the same things as a VTD.

22  Q    So let's just pause here and look at this particular

23  one.  Belmont, I think, is what we were talking about the

24  Belmont VTD, we'll know how many votes were cast for

25  democrat and how many votes were cast for republican and

Rodden - Direct

1   how many votes were cast for independent candidates,

2   correct?

3   A    Yes.  We can get that information at the precinct

4   level for many different elections; gubernatorial,

5   presidential and so forth.

6   Q    Okay.  So the data is available at the precinct

7   level.  So you can certainly make political divisions in

8   assigning whole precincts from one district to another; is

9   that right?

10  A    Yes.

11  Q    And at the census block level, I think you said

12  election results are not available at the census block

13  level; is that right?

14  A    Correct.

15  Q    And I think you said this, but let me make sure it's

16  clear.  You could take -- let's imagine a district that

17  votes 60 percent republican and 40 percent democratic.

18  You would know that this VTD votes 60/40

19  republican/democrat; is that right?

20  A    Yes.

21  Q    Now, if you wanted to go into each VTD, you could

22  attribute that split, 60/40 split, to each single block,

23  right?

24  A    Yeah.  So one could go into Maptitude and give it a

25  60/40 number --

Rodden - Direct

1  Q    Would that treat any census block within that VTD

2  differently than any other census block within that VTD?

3  A    No.

4  Q    They'd all be the same?

5  A    Yes.  It would have to be.  We simply don't have the

6  information.

7  Q    So if we went to the far north and grabbed the

8  VTD up -- I'm sorry -- a census block up there, it would

9  look exactly the same, politically speaking, as a census

10 block in the far south?

11 A    Correct.

12 Q    And a census block in the east would look exactly the

13 same, politically speaking, as a census block in the west?

14 A    Yes.  For someone who --

15 Q    They're going to be exactly the same?

16 A    For someone who does geo-spacial analysis, this is

17 annoying.  We would like to have more fine grain data, but

18 we don't.

19 Q    So at the risk of asking an overly obvious question,

20 the data isn't available if you're going to split a VTD to

21 decide which census blocks are better or worse for you as

22 a political matter?  It's just not available at that

23 level; is that right?

24 A    No.  It's --

25 Q    That's not right?

Rodden - Direct

1   A      No.  The data are not available.  So it's correct,

2   yes.

3   Q      Thank you, sir.

4                JUDGE PAYNE:  Excuse me.  But if you take a VTD

5   and you figure it's 60/40, to use Mr. Hamilton's example,

6   and you attribute everything as 60/40, why isn't it all

7   60/40 in the north and 60/40 in the south and 60/40 in the

8   east and 60/40 in the west, if you're going to do it by

9   attribution?  Why doesn't that happen?

10               THE WITNESS:  I think that that is what happens.

11  So I think that when we take the Maptitude software and we

12  want to start subdividing VTDs, we can go ahead and take

13  the information from the VTD and attribute it in just that

14  way to every block.  So we can treat every block in that

15  VTD as 60/40.  But what that doesn't allow me to do is go

16  through and pick democratic blocks and put them on one

17  side and republican blocks on the other side because

18  they're all 60/40.

19               JUDGE PAYNE:  Well, if it's 60/40 republican and

20  60/50 democrat, don't you know then -- when you're doing

21  it 60/40, aren't you attributing 60 republican, 40

22  democrat?

23               THE WITNESS:  Yes.  So when I add up the numbers

24  for a district that I'm creating, then I can get a total

25  that will tell me the partisan composition of that

Rodden - Direct

1   district.  But what I can't understand is how we would go

2   about choosing along these lines in order to achieve a

3   political goal when we're just treating them all as the

4   same.

5   Q    In other words, you can't -- because every VTD is --

6   every census block is treated as the same in that kind of

7   analysis, you can't figure out where the democrats are and

8   the republicans are because they don't all live right next

9   to each other in an even distribution?

10  A    They're all interchangeable.  If I wanted to get 60

11  democrats, any of the blocks would give me 60 democrats.

12  I can weigh it by population, so some of them might have

13  more people.  But they're all going to be kind of

14  politically, in my view, the same as I'm picking out those

15  blocks.

16  Q    Maybe to clarify this, I'll ask another couple of

17  questions.  Let's imagine a VTD that are at 60/40 present

18  democrats and all the republicans live in the northern

19  part of the district and all of the democrats live in the

20  southern part of the district.  You're not -- I guess

21  that's -- you actually -- you would have to have that --

22  you don't have that data to do.  Let's imagine that

23  they're evenly distributed across the VTD, 60 percent

24  democrat, 40 percent -- 60 percent republican, 40 percent

25  democrat.  If you wanted to get the democrats out, you

Rodden - Direct

1   don't know where they live, right?

2   A     Precisely.

3   Q     Because the census block data treats it all the same?

4   A     Right.

5           JUDGE PAYNE:  You mean you don't know where they

6   live based on this mapping?

7           THE WITNESS:  Right.  I -- we have a secret

8   ballot so we just don't -- the VTD is just the lowest

9   level at which we know anything about the individual's

10  partisanship.

11  Q     All right.  Thank you.  Let's move to exhibit --

12  House District 63.  This is a final Richmond area

13  district.  This was Delegate Dance's district; is that

14  right?

15  A     Yes.

16  Q     And were you here for Delegate Dance's testimony this

17  morning?

18  A     Yes.

19  Q     So let's -- let's start by looking at a few of these.

20  We're on page 32 of the illustrative exhibit.  This is --

21  this is Figure 10 from page 34 of your report; is that

22  right?

23  A     Yes.

24  Q     And if we click to the next slide, this is the same

25  set of slides.  So here's the area without any race data.

Rodden - Direct

1    If we put the next one in, we can see the racial

2    distribution.   Page 35 shows the benchmark; is that right?

3    A     Yes.

4    Q     And then page 36 is the adopted map?

5    A     Yes.

6    Q     So if we click back and forth between these two, we

7    can see some of the changes here.   This is the -- I think

8    the Court called it a validly racial split of Dinwiddie

9    County; is that right?

10   A     Correct.   Yeah, to the south, we see that split come

11   in and the hook that reaches up to bring up the

12   African-American voting population of 75.   And the other

13   big noticeable change is the extension of the district to

14   the east in a way that -- that picks up African-American

15   neighborhoods in a rather -- in a rather precise way.

16   Q     All right.   So what was the population and racial

17   composition of this district at the time of the

18   redistricting?

19   A     This was another one that needed to gain population.

20   It had close to 74,000.   So it needed to add 6000

21   population.   The benchmark African-American voting age

22   population was 58 percent.   So it was -- it was a bit --

23   it was a bit above the -- above the threshold already.

24   Q     All right.   And I believe you've heard testimony that

25   HB 5005 split Dinwiddie County in half; is that right?

Rodden - Direct

1   A      Yes.

2   Q      And was that significant to your analysis?

3   A      Yes, because this created a kind of ripple effect

4   where District 63 was already short on population, and in

5   order to -- in order to achieve the 55 percent target in

6   District 75, it was necessary to reach up into Dinwiddie

7   County and take a substantial number of African-Americans

8   and to even -- it wasn't quite enough to use only the

9   sparse areas.  So there was a move up into a somewhat

10  denser area to bring up the voting age population, the

11  African-American voting population of District 75 to

12  55 percent.  So then that left District 63 in a situation

13  where it needed to gain substantial population.

14         Remember, it was already short by 6000.  So now it

15  needs to gain population, but it has a problem that's kind

16  of familiar, which is that it's surrounded by some white

17  areas.  But there was -- there was a fairly obvious

18  solution, which was to move the district to the east and

19  to snake over and extract part of Hopewell and take that

20  away from District 74, which had a very large

21  African-American voting age population in the benchmark.

22  Q      So let me stop you there.  The district just to the

23  south of the line, the District 63 border is House

24  District 75?

25  A      Yes.

Rodden - Direct

1   Q    And that was underpopulated; is that right --

2   A    Yes.

3   Q    -- at the time.

4   A    These places were often underpopulated.

5   Q    And what was the racial composition of House District

6   75 at the time of the redistricting?

7   A    It was almost exactly at 55 percent.  But it needed

8   to gain 10,000 people, and it was -- that was a challenge

9   because it was surrounded by a lot of sparse population,

10  much of which was white.  So it was -- it was difficult to

11  add that population without endangering that 55 percent

12  target.

13  Q    And so I think you -- you testified to this, but 75

14  moves north to pick up the southern part of what was House

15  District 63.  That's the first step, correct?

16  A    Yes.

17  Q    And then to compensate District 63 and add black

18  voting population, this whole right arm was extended that

19  went out to Hopewell; is that right?

20  A    Yes.  And just to be clear, the ending point -- for

21  District 63, the HB 5005 African-American voting age

22  population was 59.5 percent.  So it ended up exceeding the

23  target substantially.  So this is a situation where it

24  could have been drawn in a number of different ways to

25  reach that target, but this is -- this is the -- these are

Rodden - Direct

1   the lines that were drawn.

2   Q    All right.  Let's take a closeup look at this.  This

3   is Figure 11 from your report on page 36, and it's on page

4   37 of the illustrative exhibit, page 37.  This is the

5   eastern tentacle that moves out to the eastern end of

6   House District 63; is that right?

7   A    Yes.

8   Q    So let's start first on the western side of this

9   slide of this image of this map.  How does it treat

10  Chesterfield County?

11  A    This is -- it reaches across the river and brings in

12  an African-American neighborhood in the southern part of

13  Chesterfield County and kind of draws the line right about

14  at the line where there's a transition from

15  African-American to white population.  It comes over to

16  the boundary of Colonial Heights, and there's a very sharp

17  racial divide, we can see there, and the district line

18  follows it.

19  Q    Okay.  So in Chesterfield County, was that split by

20  HD 63 in the benchmark?

21  A    It was.

22  Q    Okay.  And the split occurred right along racial

23  lines; is that right?

24  A    Yes.  It was already that way in the benchmark.

25  Q    So the part of Chesterfield that was included in

Rodden - Direct

1   House District 63 was the African-American portion?

2   A    Yes.

3   Q    And the part that was included in House District 66

4   to the north is the white portion?

5   A    Yes.

6   Q    Okay.  Now, you mentioned Colonial Heights.  Is

7   Colonial Heights an independent city in Virginia?

8   A    Yes.

9   Q    Is that the same as Hopewell?

10  A    Yes.  They are both independent cities.

11  Q    So they are the same on that level.  Is their racial

12  composition the same or different?

13  A    Colonial Heights is overwhelmingly white.

14  Q    And how about Hopewell?

15  A    It is heterogenous, but as we can see, residentially

16  quite segregated.

17  Q    Into a black area and a white area?

18  A    Yes.

19  Q    And Colonial Heights, did the map split Colonial

20  Heights?

21  A    No, it did not.

22  Q    So it respected the borders of Colonial Heights?

23  A    Yes.

24  Q    And that's this border that deviates down and follows

25  the line around; is that right?

Rodden - Direct

1  A    Yes.  We can see the green border of Colonial Heights

2  in that image.

3  Q    And then this arm that reaches out to split Hopewell

4  divides it right along racial lines; is that right?

5  A    Yes.

6  Q    And the African-American portion of House District 63

7  is included in -- in House District 63 is the city of

8  Hopewell; is that right?

9  A    Yes.  That section of Hopewell is in 63.

10  Q    And the white portion is included in House District

11  62?

12  A    Yes.

13  Q    You said something about sharp -- the line was

14  sharpened from before.  Can you describe what you mean

15  there?

16  A    Well, I'm not sure.  I can't see here where the

17  boundary was before.  It doesn't show --

18  Q    We'll zoom in in a moment.

19  A    But in any case, the divide here between the

20  African-American -- part of the -- of Hopewell and the

21  white part, the residential divide is rather clear.  And

22  the district line really -- I think the map shows very

23  clearly that it follows that line quite precisely.

24  Q    And when you say "that line," you mean the line

25  dividing the white from the black population?

Rodden - Direct

1   A    Yes.

2   Q    And this is all new, right?  This was drawn by HB

3   5005?

4   A    Yes.  This area was not in District 63 before.  This

5   area was in District 74.  So this is all -- these are all

6   lines that were drawn in HB 5005.

7   Q    Okay.  While we're here, and looking at this part of

8   House District 63, there's this -- I think we've called it

9   the New Hope hook that kind of comes in.  Did you examine

10  that in your analysis?

11  A    I did.

12  Q    And what was the significance of that?

13  A    Mainly it appears to be an effort to bring in enough

14  African-Americans into District 75.  I did note that there

15  were a numbering of VTD splits that helped achieve that.

16  Q    Were there a number of VTD splits in this arm that

17  comes up around New Hope?

18  A    Yes.

19  Q    And what were those VTD splits, if you know?  I think

20  it's on page 37 of your report, if I'm not mistaken.

21  A    Rohoic, Rives and Dinwiddie.

22  Q    Okay.  And New Hope itself?

23  A    Yes.  I believe it might be the part of New Hope that

24  was split was an unpopulated part.

25  Q    Now, do you recall the explanation offered for why

Rodden – Direct

1  all these VTDs were split and this arm reaching around?

2  A    Well, my understanding is that there was an argument

3  about a potential challenger that was being -- was -- the

4  effort was to avoid putting that -- putting that

5  challenger into the district.

6  Q    Okay.  And you were here for the testimony this

7  morning --

8  A    Yes.

9  Q    -- with concern to that?  And I won't repeat it.  Was

10 splitting all these VTDs required for the purpose of

11 excluding that potential challenger?

12 A    I have no idea.

13 Q    Why not?

14 A    Well, I don't know where that challenger was located.

15 Q    Did you try and find that out?

16 A    I asked for that information.  It didn't seem that

17 anyone had it.

18 Q    Okay.  And regardless, did Delegate Dance have a

19 strong challenger the very next election?

20 A    Yes.

21 Q    So this was an effort to draw out a challenger from

22 her district.  I take it it was not successful?

23 A    No.

24 Q    Okay.  Is there any significance to the way that they

25 divided -- that the map divides Dinwiddie County to the

Rodden - Direct

1  south?

2  A    Well, again, I think that is a divide that the

3  Supreme Court has already determined was avowedly racial

4  and was created for the purpose of increasing the black

5  voting age population of District 75.

6  Q    All right.  Let's -- if we can zoom in on a Hopewell.

7  This is page 39 of the illustrative exhibit, and I think

8  it's Figure 12 from your report on page 38.  Can you

9  describe what this is?

10  A    This is a dot density map that zooms in on part of

11  Hopewell.  In particular, it focuses on ward 7, but we can

12  see several other wards here as well.  And these are --

13  this is such a close zoom that each dot represents one

14  individual.

15      The dotted red line corresponds to the boundary of a

16  VTD that is ward 7.  But the other VTD boundaries are in

17  solid red, but they are a little -- they are a little

18  thinner.  Another thing that's worth seeing here -- and

19  this might be kind of useful more generally is that the

20  very light gray lines are the block boundaries.  So this

21  is one map where I was zoomed in enough that I thought it

22  made sense to show the block boundaries.  So it's -- they

23  are a little difficult to see, but it hope it communicates

24  just how small are the census block.  And so when we are

25  splitting a VTD and moving blocks around, those are the

Rodden - Direct

1   building blocks.  They are very some very tiny units that,

2   in a town like this, can contain very few people, very

3   small number of people.

4        And so what we see in this --

5   Q    So let me stop you there and ask you another

6   question.  Hopewell ward 7 was split in the process here

7   of drawing this map; is that right?

8   A    Yes.  So it's a little hard to look at so let me

9   explain.  The black boundary moves right along the ward 7

10  boundary to the east.  So we see that the VTD is not split

11  as we move along the east.  And that ward boundary

12  actually corresponds rather well to a dividing line

13  between African-Americans and whites.  And that remains

14  the case until we get down over to the west side of ward

15  7.

16       And then when we get there, we see that instead of

17  following the VTD boundary, which would have -- which

18  would have placed an African-American neighborhood into

19  District 62 and would have removed it from 63, there

20  was -- there was kind of a -- the line that dips up in

21  towards 7 and extracts that African-American neighborhood

22  and places it into District 63.

23  Q    And that -- okay.  So the African-American --

24            JUDGE PAYNE:  Excuse me, Mr. Hamilton.  Is ward

25  7 is the same thing as the VTD?

Rodden - Direct

 1                 THE WITNESS:  Yes.  In the city of Hopewell, the

 2     ward -- these wards are used at VTDs.  And that's the case

 3     in a couple of other spots as well.

 4     Q    So if you wanted to -- well, let's strike that.  Let

 5     me ask first, so the African-American neighborhood that is

 6     inside this little box here that was carved out, the VTD

 7     was split in a way to move that neighborhood into House

 8     District 69 -- House District -- whichever one we're on?

 9     A    Sixty-three.

10     Q    Sixty-three; is that right?

11     A    Yes.

12     Q    And when you said a little while ago when you were

13     describing the split of this city of Hopewell, you said it

14     was a little bit more precise in the drawing of HB 5005.

15     Is this what you were referring to?

16     A    Yeah.  What I was referring to is the fact that

17     Hopewell was -- back when it was in District 74, it was

18     also divided.  But I don't believe it was -- it was -- I

19     don't believe there were VTD splits along the way.

20     Q    So this is sort of a fine tuning of that split to

21     make it even more starkly sorted between the white areas

22     and the black areas; is that right?

23     A    Yes.

24     Q    Now, maybe this is a good place to revisit our

25     discussion about political information below the VTD

Rodden - Direct

1    level.  If you -- if you -- if we're looking at the

2    district as a whole, this ward 7 as a whole, you wouldn't

3    know where the democrats live versus where the republicans

4    live within that ward, at least not from census data?

5    A    No.  If I wanted to take out a knife and cut out the

6    democrats and I only had the VTD level political

7    information perhaps transferred down to the blocks, I

8    wouldn't know where to cut unless I used race as a proxy

9    for party.  That's the only way I would be able to do

10   that.

11   Q    So let's just pause on that for a moment.  Putting

12   aside the question of whether that would be legally

13   permissible or not, it would be possible to use -- because

14   you do have race information at the census block level; is

15   that right?

16   A    It's one of the only things we have at the census

17   block level.  So those information are collected by the

18   census department for the purpose of redistricting.  But

19   we don't have much else at the level.

20   Q    So it would be possible to use race as a proxy --

21   putting aside, again, the legality, whether it's legal or

22   not, but it's possible to use race as a proxy for

23   politics?

24   A    Yes.

25   Q    I won't ask you the legal question because I think

Rodden - Direct

1   Mr. Braden will object about whether that's legal or not.

2        Let me ask you this.  Couldn't this VTD have just

3   been split to equalize population?  I think Mr. Braden

4   said these were all done at the end and every one of

5   them -- virtually every one of them was just done to

6   equalize population.

7   A    Well, I've drawn a lot of maps.  I've done a lot of

8   redistricting myself.  And, indeed, when we have a tight

9   population target, as we had in the House of Delegates in

10  Virginia, at the end, after one moves around the VTDs and

11  has the architecture, one is often off by a little bit of

12  population.  And that could be the case on two sides of a

13  boundary.  We can have two places that are a little bit

14  off.  So --

15  Q    But my question is --

16       JUDGE PAYNE:  That may be interesting, but it

17  didn't respond to the question.  Would you please just

18  listen.  Ask the question.  Just answer the question, if

19  you would, sir.

20  Q    Isn't it possible that this VTD was split in this way

21  to equalize population?  Yes or no.

22  A    It seems very unlikely for me for the reasons that I

23  was trying to explain.

24       JUDGE PAYNE:  The question was is it possible.

25  That was the first question.  In your view, yes or no, is

Rodden - Direct

1  it possible?

2          THE WITNESS:  I would have to go with

3  impossible.

4          JUDGE PAYNE:  Impossible.

5  A    Exceptionally unlikely.

6  Q    Okay.  And if we look at the screen, I've drawn a

7  line to kind of lop off the end that kind of dips down to

8  the south, you could draw a line there to split the VTD,

9  right?

10  A    You could draw the line in any number of places.

11  That's why I went with impossible.  I had to think for a

12  moment.

13  Q    And maybe this is just obvious, but in the line where

14  I drew it, it's the white population that's being moved

15  into House District 63, right?

16  A    Yes.

17  Q    And in the line where the map drawers drew it, it's a

18  black population?

19  A    Yes.

20  Q    And we could draw the line sort of like that and get

21  a little bit by both if we wanted to, right?

22  A    Yes.  The number of ways we could do it gets to be

23  very large very fast.

24  Q    And the point is when you're trying to equalize

25  population, the color of one's skin doesn't matter, right?

Rodden - Direct

1   A     No, it does not.

2   Q     Because one person is one person for equalizing

3   population?

4   A     Yes.

5   Q     Thank you.  Let me -- let me just back up here as we

6   leave the Richmond area and ask, for all of the districts

7   around Richmond that we've been discussing in this entire

8   region, did the legislature miss any majority black VTDs?

9   A     No.  All of the majority African-American VTDs are

10  either wholly within or partly within one of the

11  challenged districts in this region.

12  Q     All right.  Thank you.  Let's move to the second area

13  that I think you talked about, region.  The Tidewater

14  region; is that right?

15  A     Yes.

16  Q     And that's covered in your report starting on page

17  41.  What districts are located in the Tidewater?

18  A     Here we have Districts 92 and 95, which are in the

19  Virginia peninsula, and then we have Districts 80, 89, 90

20  and 77 in South Hampton Roads.

21  Q     All right.  And the slide on page 41 of the

22  illustrative exhibit, this is the area with just the

23  racial data overlaid over the top of the entire region?

24  A     Yes.

25  Q     Okay.  Let's turn to the next slide, which is on page

Rodden - Direct

1   42 of the illustrative exhibit.  It's Figure 13 on -- from

2   your report.  This is the Tidewater benchmark districts;

3   is that right?

4   A    Yes.

5   Q    And then the next slide on page 43, this is the

6   Tidewater districts in HB 5005; is that right?

7   A    Yes.

8   Q    So if we go back and forth, we can see the changes

9   here?

10  A    Yes.

11  Q    So 45 and -- page 45 and page 44 are probably the

12  best contrast between these two.  Fairly dramatic changes

13  in this area, right?

14  A    Yeah.  The things that are really noticeable, I

15  think, are -- perhaps three that are most noticeable.  We

16  see that large arm that comes out of 95 and follows the

17  African-American population up Warwick Boulevard.  We see

18  that there had been an African-American population kind of

19  the southern terminus of the bridge, starting right here,

20  that had not yet been brought into one of the challenged

21  districts, and it was brought into 80.  And then we see

22  again a little bit of expansion into the -- associated

23  with African-American suburbanization to the east.  So we

24  see 90 expand its boundaries out and follow the

25  African-American population a little bit more closely.

Rodden - Direct

1   And there were some changes in District 77 as well.

2   Q    All right.  Let's take a look first at House

3   Districts 92 and 95.  I believe you covered these two

4   districts together in your report; is that right?

5   A    Yes.

6   Q    And why did you do that?

7   A    These two districts are intimately connected.  It's

8   hard to understand the districting decisions of one

9   without thinking about the implications for the other when

10  it comes to both population and the 55 percent aspiration.

11  Q    All right.  Delegate Ward was the incumbent in

12  District 92?

13  A    Yes.

14  Q    And Delegate BaCote was the incumbent in District 95?

15  A    Yes.

16  Q    So let me direct your attention to Figure 15 on page

17  45 of your report, which is illustrative exhibit page 47.

18  This is the districts after redistricting, with an overlay

19  of the benchmark maps for House Districts 95 and 92; is

20  that right?

21  A    Yes.

22  Q    Let's take a quick look through the same series of

23  maps starting on page 48 of the illustrative exhibit.

24  This is the area of Districts 95 and 92; is that right?

25  A    Yes.

Rodden - Direct

1  Q    And then if we go to the next slide, page 49 of the

2  illustrative exhibit, this shows the racial distribution

3  of the population in the area?

4  A    Yes.

5  Q    And then the next slide, page 50, shows the

6  benchmarks?

7  A    Yes.

8  Q    And the next one shows the adopted plan; is that

9  right?

10 A    Yes.

11 Q    So here's one more.  If we flip back and forth

12 between the benchmark and the adopted plan, we can see

13 some pretty significant changes here; is that right?

14 A    Yes.  The main changes involve adding arm to 95,

15 moving some precincts from 95 to 92, and then some fine

16 tuning on the eastern side of 92.

17 Q    Can you describe the population and racial

18 composition of these two districts at the time of the

19 redistricting?

20 A    The 92 benchmark population was 71,000.  So it needed

21 to gain 9000 people.  Ninety-five benchmark population was

22 68,000.  So it needed to gain even more people to get up

23 to 80,000.  But both of them had a very large

24 African-American voting age population at the beginning.

25 They both had 60 percent.  Ninety-two had a bit more than

Rodden - Direct

1   60 percent.

2   Q    So -- so 95 was underpopulated by about 12,000

3   people; is that right?

4   A    Yes.

5   Q    And 92 was underpopulated by about 9000 people; is

6   that right?

7   A    Yes.

8   Q    Okay.  So let's start with Newport News and Hampton.

9   Can you describe how the map dealt with that area?

10  A    Yes.  The challenge here was to add population and

11  then again, the -- in the immediate surrounding of the

12  benchmark districts, we see there's not a lot of

13  African-American population; that if we use traditional

14  redistricting principles and we try to keep some

15  compactness and contiguity, we would have trouble with the

16  African-American voting population would fall rather

17  quickly if we had that many individuals.

18       So the -- the solution to that seems to have been to

19  bring some African-American population from 95 into 92 and

20  then avoiding the need to -- to move District 92 further

21  out into its surrounding areas.  And then the -- then 95

22  was able to -- to add African-American population by

23  moving up to the north and including that long arm.

24  Q    Okay.  So this is the northern arm extending District

25  95 sort of to the northwest; is that right?

Rodden - Direct

1    A    Yes.

2    Q    So maybe we can take a look at Figure 16 from page 47

3    of your report.  It's the next page.  It's page 56 of the

4    illustrative exhibits.  What are we looking at here?

5    A    This is simply the northern tip of that arm.

6    Q    Okay.  And there are four VTDs here, Jenkins,

7    Denbigh, Epes and Reservoir.  Do you see that?

8    A    Yes.

9    Q    Let me ask you first.  Was any of this area in the

10   benchmark map at all?

11   A    No.  This was not part of any of the challenged

12   districts before.

13   Q    So all the lines that we see here -- the reason we

14   don't see any blue lines here is because there wasn't no

15   benchmark lines up here in this district?

16   A    Correct.

17   Q    All right.  How did the map treat these four VTDs?

18   A    Well, each of these VTDs was split somewhere near the

19   middle.  But I think it's clear to see from the map that

20   they were -- they were rather explicitly split along

21   racial lines.

22   Q    So maybe we can walk through Denbigh, the -- let's

23   see.  The very -- the southern most VTD is Jenkins; is

24   that right.

25   A    Yes.  It has a funny shape.  It starts over here, but

Rodden - Direct

1    it continues all the way over to the other side.

2    Q    So there's a line that divides the eastern side of

3    Jenkins from the western side of Jenkins; is that right?

4    A    Yes.

5    Q    And it's a relatively straight line?

6    A    Yes.

7    Q    And to the east -- at the risk of just stating the

8    obvious, it pretty neatly follows exactly where the

9    residential pattern is between black and white; is that

10   right?

11   A    Yes.

12   Q    And then we go up a little bit further.  The next VTD

13   is Denbigh.  Do you see that one?

14   A    Yes.

15   Q    And how is that VTD split?

16   A    Initially, it's following the same major boulevard,

17   which was Warwick, but then it kind of jogs off to the

18   west a bit.

19   Q    Okay.  And then the next one up is -- at least as I'm

20   pronouncing it, Epes, which might be wrong for which I

21   apologize.  How does it treat Epes?

22   A    Again, we see a rather stark divide between the

23   African-American neighborhood, which, on the east side of

24   the boundary, contains a lot of multifamily houses and

25   apartment complexes that have large African-American

Rodden - Direct

1    populations.  And on the west side of that boundary are

2    more single-family homes that have a greater percentage of

3    white population.

4    Q    Did you examine this area in some detail --

5    A    Yes.

6    Q    -- in preparing your -- and what did you find?

7    A    Well, I found that the line kind of moves away from a

8    major boulevard and it starts to follow a lot of

9    residential streets and simply follows behind the

10   apartment complexes.  So it keeps the apartment complexes

11   inside of 95 and keeps the neighborhoods on the other

12   sides of these streets outside of 95.

13           JUDGE PAYNE:  I'm having trouble following what

14   you're saying about Epes.  As I understand it, Epes ends

15   at the right-hand side of the dark line that's there at an

16   angle, and across the road over there is another VTD.

17   That's -- is that right or wrong?

18           THE WITNESS:  Well, I'll circle the boundary of

19   the -- of the Epes VTD.

20           JUDGE PAYNE:  Yeah.  So I'm having trouble

21   understanding where you're saying there's a racial divide.

22   It looks like it's -- it's kind of generally gray in that

23   whole area, all of Epes, and the only area that is lighter

24   is across the road, which is in another VTD called -- I

25   can't read it.  And I'm --

Rodden - Direct

 1          MR. HAMILTON:  I think you're thinking of

 2  Nelson.

 3          THE WITNESS:  I'm speaking of the west side of

 4  this boundary.

 5          JUDGE PAYNE:  Well, where is the racial divide

 6  inside of Epes?  Draw it on there and let me see what

 7  you're saying and then I can understand it.

 8      There's a big lake there.  Isn't that where the lake

 9  is the reservoir?

10          THE WITNESS:  That's the gray part you see.

11  There's no people there because there's a reservoir.

12          JUDGE PAYNE:  I know exactly where it is.  I'm

13  trying to -- and I've been in the area.  I'm trying to

14  understand where you're saying the divide is.

15          MR. HAMILTON:  He's dawn --

16          JUDGE PAYNE:  Draw with you finger where you

17  think the racial divide is in there.

18          THE WITNESS:  I've drawn it with red dots along

19  the section of this VTD that is split.  So that's the

20  split of the VTD.

21          MR. HAMILTON:  And for the record --

22          JUDGE PAYNE:  Originally, Epes went down to the

23  Nelson line.  Is that what you're saying?

24          THE WITNESS:  Yes.  The Epes VTD extends to the

25  Nelson line.

Rodden - Direct

1              JUDGE PAYNE:  Originally.

2              THE WITNESS:  The VTD is the VTD.  It -- this --

3    what happens is the electron administrators now have to

4    print separate ballots for people who come to vote at this

5    precinct.

6              JUDGE PAYNE:  That's not what I'm asking you.

7              THE WITNESS:  It's still --

8              JUDGE PAYNE:  The black line is the end of the

9    Epes line as it stands now in your number 56.  Is that

10   correct or incorrect?

11             THE WITNESS:  The Epes VTD extends all the way

12   to the red line that separates --

13             JUDGE PAYNE:  To the Nelson line?

14             THE WITNESS:  Yes.  But the District 95 cuts

15   through and slices the Epes VTD at the point of that line.

16             JUDGE PAYNE:  Okay.  I understand.

17   Q    So maybe I can help establish the record here.  The

18   little dots that you drew, it's the black line that

19   separates Epes, that splits the VTD.  It goes from right

20   at the southern part of the Epes border and follows that

21   thick black line to the north until it jogs just a little

22   bit west and then -- and then stops there; is that right?

23   A    Yes.

24   Q    And to the east is the African-American part of Epes;

25   is that right?

Rodden - Direct

1   A     Yes.

2   Q     And to the west, there's a -- is a white or Caucasian

3   part of Epes?

4   A     Yes.

5   Q     And the border of the Epes VTD is on the far side of

6   the white population where it bumps into the Nelson or

7   borders the Nelson VTD; is that right?

8   A     Yes.

9   Q     So the split that we're talking about is that split

10  right between there; is that right?

11  A     Yes.

12  Q     And that is a division between white population and

13  black population, at least according to the United States

14  Census data?

15  A     Yes.

16          JUDGE PAYNE:  Wait a minute.  Excuse me.  Your

17  view is that where the line of 95 cuts through that VTD,

18  that the left part of the Epes, which is down to Nelson,

19  is all white?

20          THE WITNESS:  No.  I don't -- I believe --

21          JUDGE PAYNE:  That's what the answer was.  You

22  didn't mean that, though, did you?  It's mixed.

23          THE WITNESS:  Oh, I certainly didn't mean that

24  it's all white.  It's --

25          JUDGE PAYNE:  It's predominately white.

Rodden - Direct

1          THE WITNESS:  Yes.  Thank you, Your Honor.

2          JUDGE PAYNE:  I think it's better to be precise

3  in the question and the answer because the record would be

4  wrong that you just made if you did it the way you did it.

5  All right.

6          MR. HAMILTON:  Thank you, Your Honor.  I stand

7  corrected.

8  Q    So Epes was split so that the predominately

9  African-American side was to the east and the

10  predominately Caucasian side was to the west; is that

11  right?

12  A    Yes.

13  Q    And you testified it went -- okay.  So then

14  continuing north from there, it follows the Reservoir

15  border, the southern part of the Reservoir border up, and

16  then divides the Reservoir VTD as well; is that right?

17  A    Yes.  And I'm adding -- I was adding some red dots

18  there.

19  Q    Okay.

20  A    But this said divide is -- that's the line of the

21  divide for the Reservoir VTD.

22  Q    And the Reservoir VTD to the north is more

23  predominately African-American; is that right?

24  A    Yes.

25  Q    And to the southern part of the Reservoir VTD is the

Rodden - Direct

1   predominately white portion of the VTD; is that right?

2   A    Yes.

3   Q    Okay.

4         JUDGE PAYNE:  Do you have a way -- take the

5   Reservoir VTD that you just talked about.  Do you have a

6   way of quantifying what -- the number of black dots and

7   the number of white dots in the area that you're calling

8   the predominately black section and the number of white

9   dots and the number of black dots in the area that you're

10  calling the predominately white section?

11        THE WITNESS:  Dr. Palmer has the precise

12  information in his report.  So I don't have those numbers

13  in front of me, but I believe that will -- that will be --

14  that testimony will follow mine.

15        MR. HAMILTON:  I think there's an analysis of

16  the split VTDs.  I'm not certain of that.  I'll have to

17  check during the break, but I think there may be an

18  analysis of the comparative numbers here.

19  Q    So same question.  Couldn't these two VTDs have been

20  split this way just to achieve population equality between

21  the two districts?

22  A    Again, when we're trying to achieve population

23  equality between two districts, we don't need to split

24  multiple VTDs in this way.  So the answer is no.

25  Q    And for -- if it were done for political reasons,

Rodden - Direct

1    other than using race as a proxy for politics, would there

2    be any other way of determining the political composition

3    at the census block level?

4    A    No.

5    Q    Okay.

6                JUDGE PAYNE:  Is this a convenient place to take

7    a break?

8                MR. HAMILTON:  It is, Your Honor.

9                JUDGE PAYNE:  All right.  We'll take 20-minute

10   afternoon recess.

11                (Recess taken.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  JUDGE PAYNE:  All right, sir.  Do you have enough

2    water over there, Dr. Rodden?

3                  THE WITNESS:  I think so.  I've got two glasses.

4                  JUDGE PAYNE:  We're going to take one away.

5                  MR. HAMILTON:  That will be another problem.  May I

6    proceed, Your Honor?

7                  JUDGE PAYNE:  Yes.

8    Q    Sir, I want to clarify one thing.  We had this discussion

9    about where the dividing lines of the Epes VTD at the northern

10   end of House District 95 was.  On page 56 of the illustrative

11   exhibit, which is figure 16, page 47 of your report, when we

12   look at the Epes VTD, the district boundary created by House

13   Bill 5005 for HD 95 is denoted by the heavy black line;

14   correct?

15   A    Yes.

16   Q    And the underlying VTD boundary, in this case Epes, is

17   demarked with a narrow red line; is that right?

18   A    Yes.

19   Q    Then there are places where the two overlap, and, of

20   course, you can't see the red line because the black line is

21   obscuring it; is that right?

22   A    Yes.

23   Q    Thank you.  I just wanted to make sure that was clear for

24   the record.  You mentioned earlier in your testimony the

25   transfer of African Americans from District 95 to 92?  Where

Rodden - Direct

1    did that happen?

2    A    There were VTDs called Mallory, Forrest, and Kraft, and

3    those were moved from District 95 to 92.

4    Q    Okay.  Were they densely populated?

5    A    Yes.

6    Q    And together, these three VTDs, Mallory, Forrest, and

7    Kraft, how many African-American voting-age population -- or

8    how many African-American population, put aside voting-age, did

9    that include?

10   A    Yes.  It increased the population, including

11   African-American population, by 8,000.  So just with the moves

12   of those VTDs, it was possible to approximate the population

13   threshold.

14   Q    And then the voting-age population is something slightly

15   less than that, about 6,200; is that right?

16   A    Yes.

17   Q    So if District 92 needed population -- maybe we can go

18   back to the earlier combined map.  Illustrative Exhibit 47,

19   this is your figure 15 on page 45 of your report, discuss just

20   looking at this, if District 92 needed population, how would

21   one add population without regard to race but respecting more

22   traditional redistricting criteria?  What other options were

23   there?

24   A    We see the way District 92 had been drawn before, there

25   was a strip of -- along the coast to the -- on the far east

Rodden - Direct

1   side of this map that was excluded from the districts.  So

2   there was a little strip, and so it seems that a way to

3   increase population, while also enhancing the compactness of

4   the districts in the area, would be to simply bring the

5   district boundary over and include that coastal strip.

6   Q    So if we want to compare the benchmark to the HB 5005 in

7   the way that House District 92 has changed, we would look at

8   Illustrative Exhibit 50 and 51 -- is that right? -- showing the

9   benchmark, and then the House Bill 5005, that might be an

10  easier way to look at it, at least on the screen here.

11            JUDGE PAYNE:  50 and 51?

12            MR. HAMILTON:  That's right, Your Honor.  50 is the

13  benchmark.  51 is the districts as adopted in the 5005.

14  Q    This area, this coastal sliver you were just talking

15  about, is it right there on the side of that appendage sticking

16  out in your Hampton?

17  A    Yes.  That's just one area that is noticeable that it

18  seems traditional redistricting principles would involve.  Not

19  creating that little tentacle coming down from the district

20  above.

21  Q    Anywhere else?

22  A    Seems like it might have also been straightforward to

23  straighten out this line, you know, do some things like that,

24  and all of these moves, though, given the existing lines, they

25  would have brought in white population from the surroundings.

Rodden - Direct

1   Q    Let me ask you this:  If we look at the construction of

2   these two districts, 95 and 92, is this an area where the

3   55 percent black voting-age population target constrained the

4   map drawers in a significant way?

5   A    It constrained them to some extent, but certainly I think

6   it almost goes without saying that when the final numbers are

7   60.7 and 60 percent, then there were many different ways to

8   achieve the 55 percent target.  And, in fact, these districts

9   ended up with an African-American voting-age population five

10  percent higher than that.

11       So it is certainly not the case that every one of these

12  little squibbles we're looking at is somehow crucial to the

13  achievement of the 55 percent target.

14  Q    Let's take a closer look at this eastern side of House

15  District 92.  If I can direct your attention to figure 17 on

16  page 50 of your report, and I think we have a slightly clearer

17  image on page 54 of the illustrative exhibit, 54, which is this

18  eastern appendage.  Can you describe what we're looking at

19  here?

20  A    This is just the eastern appendage we were just looking at

21  of House District 92, the enacted version.  Black line is the

22  district boundary.

23  Q    And can you describe -- we don't have one that, an

24  illustrative exhibit that shows the benchmark.  Can you

25  describe some of the changes that were made to form these

Rodden - Direct

1   boundaries in this area from the benchmark to 5005.

2   A    I believe the Phoebus VTD to the southeast, kind of near

3   the bottom of the map, that had been in the district before,

4   and it was removed.  And there was a small section up in the

5   northeast that was --

6   Q    Small section of the Ashbury?

7   A    Somewhere up there.  There was a section that was moved.

8   Q    How do the lines, as selected, correspond to the

9   African-American and white communities in this area?

10  A    Again, I think the -- this is one of those situations

11  where the VTD boundaries themselves are roughly at the border

12  between where the population transitions from being more

13  African American to more white and that the maps just highlight

14  that this is an area where that transition is relatively stark.

15  Q    I suppose you mean some of the VTD lines in this area

16  demark the lines between the African Americans and the white

17  population; correct?

18  A    That's right.  There is some VTDs --

19          THE COURT:  Predominantly, is that what you meant?

20          MR. HAMILTON:  That's what I meant, Your Honor.  I

21  apologize.

22  A    There's some VTDs where achieving a finer division would

23  have required VTD splits, and those were not pursued.

24  Q    For example, the Serna VTD, I think that's what this is --

25  Syms.  Sorry, Syms VTD just sort of in the center of the map.

Rodden - Direct

1   The northern boundary of that doesn't correspond with a

2   division between predominantly white and predominantly black

3   population areas; correct?

4   A    Correct.

5   Q    That wasn't chosen?

6   A    No.

7   Q    Instead, they chose the northern boundary of the Smith VTD

8   and the, looks like Keycogan (phonetic) VTD and the Jones VTD

9   in order to draw the boundary of this northern extension; is

10  that right?

11  A    Yes.

12  Q    Those align precisely with the division between the

13  predominantly African American and predominantly white areas;

14  correct?

15  A    Yes.

16  Q    And what about if we move to the western side of the

17  district, this VTD Tyler, was that in the benchmark like this?

18  A    Yes, I believe it was.

19  Q    And how does that align -- so I gather -- let me stop and

20  ask first, did the legislature choose to keep that Tyler VTD in

21  House District 92 or move it?

22  A    It was kept.

23  Q    How does the boundaries of that VTD align with the

24  demarcation line between the predominantly African-American

25  portions of the district and the predominantly white portions

Rodden - Direct

1    of the district?

2    A    The northern part of that line creates a rather sharp

3    divide.  On the eastern side of that little extension, the

4    African-American population does spill over a bit into the

5    surrounding VTD.

6    Q    What net effect did the changes have -- the changes drawn

7    on HD 92 have on the district?

8             JUDGE PAYNE:  On 92?

9             MR. HAMILTON:  On 92, yes.

10   A    The African-American voting-age population stayed roughly

11   similar.  It fell a bit, but it was -- the most important

12   change was the move in from -- of some of those VTDs on the

13   west from 95 to 92.

14   Q    Now, in this Court's original memorandum opinion, the

15   Court suggested that in drawing Districts 95 and 92, the

16   legislature had passed by, quote, areas that have more black

17   voters, close quote.  Were there any significant areas --

18   rather were there any areas with significant predominantly

19   African-American population that were passed by in this area?

20   A    There are kind of isolated pockets within VTDs of African

21   Americans, but there are no majority African-American VTDs that

22   could have been added in this area.

23   Q    Why is that?  Had HB 5005 already pulled in the vast

24   majority of VTDs with majority African-American population?

25   A    In the area around the cities, certainly, but not in that

Rodden - Direct

1    area that reached up to the north in 95 that we looked at.

2    Q    And how did House Bill 5005 treat that area to the north?

3    A    It created an extension that, from the maps, I think it's

4    clear that it brought in a large number of African Americans.

5    Q    Let's turn to House District 80, if we might.  Let me

6    direct your attention to figure 18 on page 53 of your report.

7    This is page five of the illustrative -- 58 of the illustrative

8    exhibit.   This is House District 80; is that right?

9    A    Yes.

10   Q    So if we click through a few slides here, illustrative

11   exhibit page 59 is just the straight VTDs of the area; is that

12   right?

13   A    Yes.

14   Q    Page 60 is the racial data overlaid; is that right?

15   A    Yes.

16   Q    61 is the benchmark?

17   A    Yes.

18   Q    And page 62 of the illustrative exhibit is the final bill;

19   is that correct?

20   A    Yes.

21   Q    So if we go back and forth between page 61 and 62, we can

22   see the changes that were made here; is that right?

23   A    Yes.  The clearest changes, just on first glance, are the

24   extension to the west, to those African-American VTDs to the

25   west that had not previously been included in the challenged

1    district, and there was a loss of the Berkley VTD on the east

2    and some other changes on the east as well.

3    Q    Can you describe the population and racial composition of

4    House District 80 at the time of the redistricting?

5    A    This is another one of those urban districts that had lost

6    relative population.  So it was -- started with 70,500

7    population roughly.  So it needed to gain roughly 9,500 people,

8    and it started with an African-American voting-age population

9    that was below 55 percent.  So it was 54.4 percent.

10   Q    What's the issue?  If we were to look at the benchmark and

11   understand that we need to add 9,000 people to this district,

12   what's the challenge?

13   A    It's a similar problem to what we saw in some of the

14   Richmond urban districts, that it is surrounded by whites and

15   it is surrounded by African Americans who are already in

16   African-American majority districts that if they would lose

17   them, they might run into trouble with the 55 percent

18   threshold.

19        So in this situation, it was necessary to be careful about

20   which VTDs were added and to find a way to bring up the

21   population substantially without bringing in too much white

22   population relative to African-American population.

23   Q    All right.  So we know from looking at the map how they

24   solved this problem which is going off to the west, picking up

25   VTDs marked 33, 34, 38, Taylor Road, Yeates, Harbor View.  Was

1   that significant to your analysis here, that extension out to

2   the west, and if so, why?

3   A     That made it possible to add African-American population

4   without taking population from any of the other districts that

5   were very close to the threshold.

6   Q     Now, in the prior trial, there was some discussion about

7   whether this was an incumbent protection effort.  Did you

8   examine that proposition?

9   A     I didn't fully understand the proposition, but I couldn't

10  find a way in which that would work.

11  Q     So the suggestion was that Delegate Joannou, the delegate

12  in District 79 just to the north wouldn't have -- he was -- he

13  wouldn't have wanted to move -- to have District 80 expand,

14  say, for example, into VTD 30, 22, 23, 24, 25, that sort of

15  middle area right in the dead center of the map.

16              JUDGE PAYNE:  Mr. Hamilton, how can he know what

17  Delegate Joannou wanted?

18              MR. HAMILTON:  I'm not asking him what Delegate

19  Joannou --

20              JUDGE PAYNE:  You said he wouldn't want it.

21              MR. HAMILTON:  Say again?

22              JUDGE PAYNE:  You said, I thought, he wouldn't want

23  that.

24              MR. HAMILTON:  I said I was repeating testimony from

25  the earlier trial.  I'll ask another question, Your Honor.

1    Q    Is it plausible -- did you examine whether it would be --

2    that would have, in fact, offered protection for Delegate

3    Joannou, if you know?

4    A    I looked at the precinct level, results of primaries, and

5    general elections that had occurred previously.

6    Q    What did that reveal?

7    A    That was a strong -- the neighborhoods that he lost were

8    strong neighborhoods for him, and there seems to be -- he

9    eventually lost in a primary to an individual who had a base

10   that was in a neighborhood that was to the east, and he lost

11   his seat.

12   Q    That was after the redistricting?

13   A    Right after redistricting, yes.

14   Q    Did you examine whether it was an incumbent protection or

15   could have been drawn this way to protect Delegate Matthew

16   James?

17   A    Yes, I considered that.

18   Q    What did you conclude?

19   A    It was hard for me, as a political scientist, to see how

20   that would work since he lost some of the neighborhoods in

21   which he had received really strong support in the past,

22   especially on the east side of the district.

23   Q    Which VTD is that?

24   A    Berkley in particular.

25   Q    And do you recall what -- in his last contested election,

1   how Delegate James faired in 2009 in the Berkley VTD?

2   A    He received 96 percent of the vote there.

3   Q    Thank you.  This extension, the westward extension, did

4   that create an additional river crossing, water crossing?

5   A    Yes.

6   Q    Can you point out where that is?  There was already one

7   water crossing here?

8   A    Yes, over -- there was already a water crossing here.

9   Q    And one of the other changes in this district is this

10  eastern segment -- I'll just circle it -- to the north, Taylor

11  Elementary School, Old Dominion.  Are those largely

12  predominantly white VTDs?

13  A    Yes.

14  Q    And those were removed from House District 80 in the

15  redistricting; is that right?

16  A    Yes.

17  Q    And then out to the west, these areas that we've just been

18  talking about, Yeates, Taylor Road, 38, are those, by

19  comparison, more heavily African-American populations there?

20  A    Yes.

21  Q    Thank you.  Let's cross the river to the north and look at

22  HD 89, and if I can direct your attention to figure 19 on page

23  56 of your report which is page 64 on the illustrative exhibit.

24  The incumbent here was Delegate Alexander?

25  A    Yes.

Rodden - Direct                                                                253

1    Q     If we click through a few slides quickly, first one is the

2    area for District 89; is that right?

3    A     Yes.

4    Q     Page 65, and then the next one on page 66 of the

5    illustrative exhibit is the population density overlaid?

6    A     Yes.

7    Q     And then the next one on page 67 of the illustrative

8    exhibit is the benchmark?

9    A     Yes.

10   Q     The next page, 68, is the final adopted plan; is that

11   right?

12   A     Yes.

13   Q     So we can flip back and forth, and we can see the changes

14   that were made here between the benchmark and the final plan;

15   is that right?

16   A     Yes.  So here we see, above all -- I believe this was also

17   discussed earlier today -- the eastward extension of 89 to take

18   some VTDs from 90, some African-American VTDs down there to the

19   south and also the extension across the river to Berkley.

20   That's on the southern side.  Then we see some changes in

21   fine-tuning to the boundaries over on the north as well.

22   Q     Can you describe the population and racial composition of

23   this district at the time of the redistricting?

24   A     This was, again, an urban district that needed population.

25   So it needed almost 6,000 additional population, and this was,

Rodden - Direct

1    perhaps, the biggest problem in the region for the 55 percent

2    BVAP target, because it started at 52.5 percent.  So it's below

3    the target, and it needs to add substantial population.

4    Q    So how did it add that population?

5    A    It added population in a few different spots, and I just

6    went over some of them briefly.  But it added those VTDs that

7    came from 90, those heavily African-American VTDs to the south,

8    and it --

9    Q    Let's see here.  Let's start with the northern part of the

10   district.  There is a VTD of Rosemont; do you see that in the

11   very north?

12            JUDGE PAYNE:  It's hard to read.

13            MR. HAMILTON:  It is.  I agree with that, Your Honor.

14   I'll circle it on the screen to make it obvious for the record.

15   It's sort of the northeastern corner of the district outlined

16   by the black line.

17   Q    Rosemont was in the benchmark to begin with; is that

18   right?

19   A    Yes.

20   Q    And it's heavily or predominantly African-American

21   population?

22   A    Yes.

23   Q    And then what's the next VTD to the west?  Is that

24   Suburban Park?

25   A    Suburban Park, yes.

Rodden - Direct

1    Q    Was that in the benchmark House District 89?

2    A    Yes, it was.

3    Q    What's the racial composition of Suburban Park?

4    A    It's predominantly white.

5    Q    And that was carved out?

6    A    Yes.

7    Q    Then we move one more VTD to the west.  The next one is

8    Granby; is that right?

9    A    Yes.

10   Q    And was the Granby VTD split?

11   A    Yes, it was.

12   Q    I think we have a closer image of that split.  Figure 20

13   in your report, page 58, it's on page 69 of the illustrative

14   exhibit.  This is a close-up of these two VTDs, Suburban Park

15   and Granby?

16   A    Yes.

17   Q    There was -- we have this strange shaped pipe in the

18   Granby precinct; do you see that?

19   A    Yes.

20   Q    Can you describe -- this is a split of this VTD; is that

21   right?

22   A    Yes.

23   Q    So the district line, again, the district line is this

24   black line that goes through the middle that forms this sort of

25   pipe area?

1    A    Yes.

2    Q    And where is the outer edges of the Granby precinct?

3    A    They're right here.

4    Q    All right.  So the black line splits the top half of the

5    Granby precinct.  Can you describe how that split is

6    effectuated?

7    A    As the split comes up Granby -- well, this district

8    boundary, the VTD boundary, both of those come up Granby Avenue

9    sort of like this, and then we see while the VTD continues up,

10   the boundary then shifts this way and kind of goes -- takes an

11   abrupt upward turn and then kind of comes back again right to

12   the south of a group of dense apartment complexes and comes up

13   again and --

14   Q    For the record, because the court reporter can't take down

15   the little dots on the screen, you've outlined on the screen

16   some little dots that outline this pipe-shaped figure that

17   forms the split of the Granby VTD right in the center; is that

18   correct?

19   A    Yes.

20   Q    Now, is it possible that this line just happened to be

21   drawn this way for the purposes of balancing population and

22   this is just a coincidence it skirts right around to carve out

23   this relatively predominantly white area out of the center of

24   the VTD?

25   A    It seems very unlikely.

Rodden - Direct

1   Q    Delegate Jones testified at trial in 2015 that this

2   appendage was added to District 89 in order to include a

3   funeral home owned by Delegate Alexander that was located right

4   in the middle of that pipe.  Let me ask you, did you examine

5   that proposition?

6   A    I examined the location of the funeral home just to see

7   where it was.

8   Q    Did you find the website for Delegate Alexander's funeral

9   homes?

10  A    Yes.

11  Q    Is there a funeral home in the Granby VTD?

12  A    It is on the other side of the street in the Suburban Park

13  VTD.

14  Q    So let me ask the question again.  Is there a funeral home

15  owned by Delegate Alexander in the pipe in the Granby precinct?

16  A    No.

17  Q    And you mentioned that there is a funeral home in the

18  Suburban Park VTD; did I hear you correctly?

19  A    Yes.

20  Q    Have you marked that on figure 20, page 58 of your report

21  with a black dot?

22  A    Yes.

23  Q    And that's in the Suburban Park VTD?

24  A    Yes.

25  Q    And you labeled it Metropolitan Funeral Home or Funeral

Rodden - Direct

1    Service?

2    A    Yes.

3    Q    So had Delegate Jones wanted to keep Delegate Alexander's

4    funeral home in his district, what would he have had to do?

5    A    The easiest thing would have been just to have kept the

6    Suburban Park VTD in the district.

7    Q    Because it was already in the district.

8    A    Yes.

9    Q    At the risk of asking a stupid question, was it necessary

10   for Delegate Jones to draw this pipe-shaped figure in Granby to

11   include the funeral home?

12   A    No.

13   Q    By the way, for the record, what is the specific street

14   address for Delegate Alexander's funeral home?

15   A    7246 Granby Street, Norfolk, Virginia.

16   Q    That's included in your report; is that right?

17   A    Yes.

18   Q    And the funeral home, that funeral home actually ended up

19   being drawn into what district?

20   A    I believe that's District 100.

21   Q    Couldn't he have just confused the name of the street with

22   the name of the neighboring VTD?

23   A    That's possible.

24   Q    And if he confused the two, would he have drawn the map

25   the way it was drawn here?  Is that possible?

Rodden - Direct

1    A    Well, no.  The funeral home is not in the part of the

2    district where the pipe is -- was drawn.

3              JUDGE PAYNE:  Where is the funeral home?  You said

4    page 58, but that didn't relate to House District 89.

5              MR. HAMILTON:  In the illustrative exhibit, Your

6    Honor, it's on page 69.  In his report, his expert report,

7    which is Plaintiff's Exhibit 69, it's on page 58.

8              JUDGE PAYNE:  So it's to the east of Granby Avenue.

9              MR. HAMILTON:  Correct.  Suburban Park, yeah.

10             JUDGE PAYNE:  And south of -- what are you calling

11   that; a pike or a pipe?

12             MR. HAMILTON:  A pipe, p-i-p-e.  I think that's the

13   way it was referred to in the memorandum opinion, but I'm not

14   sure.

15   Q    Was it difficult to find the address of this funeral home?

16   A    No.

17   Q    How did you do it?

18   A    Just found it on the internet.

19   Q    Approximately how long did it take?

20   A    30 seconds.

21   Q    Does Delegate Alexander have other funeral homes?

22   A    I believe so.

23   Q    Where else?

24   A    One is on Berkley Avenue in Norfolk, and that's in the

25   Berkley VTD as well.  And there is one on Portsmouth Boulevard

Rodden - Direct

1   in Portsmouth.

2   Q    So the location in Portsmouth was never, at any time, in

3   House District 89; is that right?

4   A    I believe that's right.

5   Q    It wasn't in the benchmark.

6   A    Right.

7   Q    Wasn't in the adopted plan.

8   A    Correct.

9   Q    The one in Berkley VTD was not in the benchmark

10  District 89; is that right?

11  A    That's correct.

12  Q    But it did end up in the district in the adopted plan.

13  A    That's correct.

14  Q    But it required adding a river crossing to get there?

15  A    Yes.

16  Q    And stripping the Berkley precinct out of District 80; is

17  that right?

18  A    Yes.

19  Q    And the third location was in Suburban Park.  That one was

20  in the benchmark District 89; is that right?

21  A    Yes.

22  Q    But was taken out by Delegate Jones in -- or by the House

23  Bill 5005; correct?

24  A    Correct.

25  Q    Let's turn our attention to District 90.

Rodden - Direct

1              MR. HAMILTON:   Your Honors, this is illustrative

2    exhibit page 70.

3    Q    District 90 is in the South Hampton Roads area; is that

4    right?

5    A    Yes.

6    Q    I can turn your attention to page 17 of the illustrative

7    exhibit, figure 21, page 59 of your report.   The incumbent here

8    was Delegate Howell; is that right?

9    A    Yes, that's right.

10   Q    So maybe we can get click through these slides quickly.

11   Page 27 of the illustrative exhibit is the VTDs.   Page 37 is

12   the VTDs with the racial data superimposed on top.   Page 47 is

13   the benchmark, and page 75 is the final map; is that right?

14   A    That's right.

15   Q    So if we go back and forth, we can see how this map

16   changed from the benchmark to the final adopted map; is that

17   right?

18   A    Yes.

19   Q    Can you describe for the Court the population and racial

20   composition of this district at the time of redistricting?

21   A    Yes.   This is another urban district that was short of

22   population.   It started out -- the benchmark district was

23   71,000 people, so it needed to add 9,000, and the

24   African-American voting-age population at the beginning was

25   56.9 percent.

Rodden - Direct                                                          262

1   Q    So let's start on the eastern edge of this district.   What

2   happened here?

3   A    On the eastern edge, the district simply expanded outward,

4   out to the east.   It included some new VTDs that had not been

5   there before.

6            MR. HAMILTON:   And I think we have a blowup of this

7   area on page 77 of the illustrative exhibit.   It's, for the

8   record, page 77 in the illustrative exhibit and figure 22, page

9   60 of his report.

10  Q    This is a close-up of this area; is that right?

11  A    Yes.

12  Q    And were VTDs split in this area?

13  A    Yes.   In this image, the Shell VTD was split as well as

14  the Aragona VTD.

15  Q    And if we look at the outer edge before we get to the

16  split VTDs, this whole outer edge was drawn by HB 5005;

17  correct?

18  A    That's right.

19  Q    The blue line is the old benchmark district that appears

20  in this figure; is that right?

21  A    Correct.

22  Q    So how was -- let's start with Shell.   How was the Shell

23  VTD split?

24  A    We can see the movement of the black line through the

25  Shell VTD, and it was split in such a way as to keep the -- the

Rodden - Direct

1  part of Shell that had a relatively large African-American

2  population, relative to the east side, was kept in the

3  district, and then the eastern part where there was a

4  relatively larger white population was kept out of the

5  district.

6  Q    And how about the Aragona VTD, you said that one was split

7  as well?

8  A    Yes.

9  Q    How was that split?

10  A    We can see that the split is on the far east there.  The

11  Aragona VTD continues all the way through -- off the area

12  covered by the map, and it's a largely -- largely predominantly

13  white area in the rest of the VTD off to the right, and the

14  area to the west of the line is predominantly African American.

15  Q    Let's take a look at the southern part -- close-up of the

16  southern part of the district now.  This is, of the

17  illustrative exhibit, page 76.  In his report, it's page 61,

18  figure 23.  So this is a close-up of the southern part of the

19  district; is that right?

20  A    Yes.

21  Q    Can you describe what this tells us, what we can learn

22  from this?

23  A    Some of this was discussed earlier today, but there is

24  population to the west in this figure that was dropped from the

25  district, and the district developed this tentacle over here to

Rodden - Direct

1    the south that crossed the river and brought in the VTDs of

2    Sherry Park, College Park, and then part of the Reon VTD.

3    Q    Was the Reon VTD split?

4    A    Yes, it was.

5    Q    How was that split?

6    A    We can see that the line dips down and around and back up

7    again and that that dip does correspond to -- a neighborhood

8    that has a condominium complex that is predominantly white that

9    is seems to be carved out of the district and kept in the

10   surrounding district.

11   Q    Was this line added as part of HB 5005, or did it exist in

12   the benchmark as well?

13   A    It was added as part of HB 5005.

14   Q    And did it have the effect of sorting the predominantly

15   white areas from the predominantly African-American areas?

16   A    Yes.

17   Q    Is that consistent with the pattern you've seen elsewhere

18   in the plan?

19   A    Yes, very similar to the other VTD splits we've been

20   looking at.

21   Q    Do the lines in District 90 reflect attention to race?

22   A    Yes.

23   Q    And how so?

24   A    Well, District 90 in general, as I believe I described --

25   and it might be helpful to zoom back out to the overall --

Rodden - Direct                                                    265

1    Q    That would be page 17 of the illustrative exhibit, figure

2    21, page 59 of the report.   That one?

3    A    Yes.  So there were VTDs to the immediate west that were

4    moved over to the District 89 to help District 89 increase its

5    African-American voting-age population, and then there were

6    VTDs that -- the VTDs we've been discussing over to the east

7    which were predominantly African American that were added, and

8    then there was some white VTDs to the southwest that were moved

9    over to District 77.

10   Q    All right.  Let's move to District 77 then, a little bit

11   to the west.  If I can turn your attention to figure 24 on page

12   63 of your report.  That's the illustrative exhibit at page 79.

13   The incumbent here was Delegate Spruill?

14   A    Yes.

15   Q    And we can click through some maps quickly here.  Page 80

16   is the base area.  81 is the area with the population

17   distribution and race information.  82 is the benchmark map,

18   and 83 is the final map.  So if we go back and forth between

19   page 82 and 83, we can see the changes that were made; is that

20   right?

21   A    Yes.

22   Q    Can you describe the changes that were made?

23   A    Some of them have already been described.  There were a

24   number of predominantly white VTDs that had been in the

25   districts we were just discussing, District 90, that were moved

Rodden - Direct

1   over to 77, and then we see that along the long strip -- this

2   is a district that I think is fairly clear is designed to

3   combine African-American populations in Chesapeake and Suffolk.

4   The line that the strip that reaches over to Suffolk changed in

5   a number of places.  And then there were some changes out in

6   the west, in the Suffolk area as well.

7   Q    Can you describe the racial and population composition of

8   this district at the time of redistricting?

9   A    Yes.  District 77 had an overall population of almost

10  77,000, so it only needed to gain -- it needed to gain some

11  population but not as much as some of the other districts.  And

12  it had an African-American voting-age population of around 57

13  and a half percent.  So it was just a bit over the target.

14  Q    Let's take a closer look at the east end of this district.

15  It's page 84 of the illustrative exhibit, figure 25 on page 64

16  of your report.  This is a close-up of the eastern edge; is

17  that right?

18  A    Yes.

19  Q    So let's focus on these four VTDs, Oaklette, Tanglewood,

20  Norfolk Highlands, and Indian River.  What were the combined

21  voting-age population of those four VTDs?

22  A    The combined voting-age population of 11,231.

23  Q    Of those, how many were African Americans?

24  A    3,169.

25  Q    So predominantly a white population in this area?

Rodden - Direct

1    A    Yes.

2    Q    And those were added to House District 77?

3    A    Yes.  They were removed from District 90 and moved over to

4    77.

5    Q    And what effect did that have on House District 90?

6    A    In and of itself, it pushed the African-American

7    voting-age population down by bringing in a large number of

8    white population.

9    Q    And how did that interact with the racial -- or with the

10   effort to reach -- if it did at all, the effort to reach the

11   55 percent black voting-age population in these two districts,

12   90 and 77?

13   A    If there aren't some compensating moves elsewhere, then it

14   creates the danger of falling below the threshold.

15   Q    So what was happening here between these two districts?

16   A    Population moved from 90, it has helped district 90 reach

17   the target, and then in District 77, it was necessary to make

18   some compensating moves.

19   Q    So this is a transfer of a large number of white

20   voting-age population from 90 to 77 in order to facilitate the

21   achievement of 55 percent black voting-age population in both;

22   is that fair?

23   A    It's possible.  There are other ways to have achieved

24   that, but that's the effect that this change had.

25   Q    Now, in this Court's original memorandum opinion, the

Rodden - Direct

1    Court commented that some of the changes reunited the old city

2    of South Norfolk.  Do you recall that observation?

3    A    Yes.

4    Q    And did you examine it?

5    A    Yes.

6    Q    And what did you find?

7    A    I simply looked for boundaries of the old city of South

8    Norfolk, and it largely corresponded to some parts -- some VTDs

9    that were already in, and by including Johnson Park, that would

10   have had the effect of unifying the old city of South --

11   Q    Let me stop.  You say that would have had the effect.  Was

12   there another change that counteracted that?

13   A    The VTD called Westover was also part of the old city of

14   South Norwalk (sic), and that removed.

15   Q    What's the racial composition of Westover VTD?

16   A    The African-American voting-age population was

17   11.5 percent.

18   Q    How does that compare to the black voting-age population

19   of Johnson Park?

20   A    Johnson Park was 41.5 percent.

21   Q    So, in the end, after adding Johnson Park and removing

22   Westover, was the city of South -- old city of South Norfolk

23   reunited or not?

24   A    Not according to the boundaries I've been able to find.

25   Q    So it continued to be split, just in a different way?

Rodden - Direct

1   A    Yes.

2   Q    So after adding the four largely white VTDs on the eastern

3   edge of the district, that's Oaklette, Tanglewood, Norfolk

4   Highlands, and Indian River, didn't that have an impact on the

5   racial composition of District 77 by pushing down the BVAP

6   levels in that district?

7   A    Yes.

8   Q    So how did District 77 deal with that?

9   A    It ended up removing a number of majority white VTDs.

10  Q    Where are those?

11  A    One I just mentioned is Westover, and I'll circle it.

12  It's down here to the south.  There's another one called River

13  Walk which is down here.  There's another one named Geneva Park

14  here.  There's another one over here called E.W. Chittum

15  School.

16  Q    So this is -- so, what's -- what do those four VTDs have

17  in common?

18  A    These are all majority white VTDs.

19  Q    Why was it necessary to remove those VTDs after the

20  addition of the four largely white VTDs in the east?

21  A    Again, it was necessary to reach the target and adding a

22  lot of white VTDs without removing some white VTDs would lead

23  to -- would lead to the BVAP falling below the 55 percent

24  target.

25              MR. BRADEN:  Your Honor, I think I object to that

1   appears as why.  He's obviously speculating on why something if

2   so.  My objection is straightforward.  It's why is speculation

3   on the reason, the motives, the decision-making is not

4   describing what happened.

5          JUDGE PAYNE:  Mr. Hamilton.

6          MR. HAMILTON:  I'm not asking about the motives.  He

7   obviously has no knowledge --

8          JUDGE PAYNE:  But he did talk about why, and why is a

9   question of motive, and he can talk about effect, but he can't

10   talk about somebody's process.

11          MR. HAMILTON:  Fair enough.  I'll rephrase the

12   question.

13          JUDGE PAYNE:  Objection sustained.

14          MR. HAMILTON:  Thank you.

15   Q   Let me ask you this then:  After adding these four VTDs

16   that were largely white on to the east that -- I think you

17   testified that drove down the black voting-age population in

18   the district as a whole; is that correct?

19   A   Yes.

20   Q   As a matter of math, without asking you for anybody's

21   motive, how would you get the black voting-age population up?

22   I suppose there's two options here.  What's one of them?

23   A   One option is to remove white VTDs.

24   Q   What's the other option?

25   A   To add African-American VTDs.

Rodden - Direct

1    Q    Which option does the map reflect?

2    A    In this section of the map, we're looking at the removal

3    of some white VTDs.

4    Q    Thank you.  So let's look at the center one here, Geneva

5    Park.  Geneva Park was in the benchmark; is that correct?

6    A    Yes.

7    Q    I'm just going to erase these circles from the screen here

8    so we can see it a little more clearly.  That created a little

9    narrow corridor just to the north of Geneva Park; do you see

10   that?

11   A    Yes.

12   Q    How wide is that?

13   A    About half a mile.

14   Q    Are there any roads through there?

15   A    No.

16   Q    If you wanted to get through there, you'd have to park

17   your car and walk if you wanted to stay in the district?

18   A    Yes, or bike --

19         JUDGE PAYNE:  Excuse me.  I'm lost about where you

20   are going from where to where that there's no road.

21         MR. HAMILTON:  If you are going from VTD St. Julian's

22   -- well, just traveling.  Traversing the district from the east

23   to the west, you have -- and if you're going to stay in the

24   district, you have to go right through that narrow corridor.

25   I'll just circle it on the screen, but it's the junction

Rodden - Direct

1    between St. Julians, and then to the west, I can't read it.

2    Just to the east of St. Julians.  Do you see that?  That's

3    about a half mile; is that what you said, sir?

4    A    Yes.

5    Q    You said it's a -- I think you testified there's no roads

6    there through.

7    A    No.

8    Q    So you had to walk or ride a bike or ride a horse if

9    you're going to go through that and stay in the district?

10   A    Yes.

11              JUDGE PAYNE:  I still am lost.  Part of St. Julians,

12   Fourteen and Five, for example, have no population.  There's a

13   reason for that.  The question -- you are talking about walking

14   from where; in Geneva Park through St. Julians?

15              MR. HAMILTON:  No, Your Honor.  Geneva Park is no

16   longer in the district.

17              JUDGE PAYNE:  So where are you talking about walking

18   from where to where --

19              MR. HAMILTON:  From St. Julians headed west trying to

20   stay within the district.

21              JUDGE PAYNE:  There are no roads, you're saying,

22   in -- to the left, and that is -- I can't read it.  I have to

23   turn back and find out what it is.

24              MR. HAMILTON:  If you stood at the border of St.

25   Julians and started marching west, you'd find no roads to walk

Rodden - Direct

1    through.

2    Q    Is that right, sir?

3    A    That's my understanding.

4              JUDGE PAYNE:   Where is the map?   77, it shows just

5    what the precincts are so you can read what they are?

6              MR. HAMILTON:   I think there's one in Intervenors'

7    Exhibit 94.   I don't know what page it is.

8              JUDGE PAYNE:   There isn't one in this book?

9              MR. HAMILTON:   In this book that you are looking at,

10   Your Honor, the two maps that -- you might find useful are page

11   83.

12             JUDGE PAYNE:   It doesn't have any names.

13             MR. HAMILTON:   It won't have the names, no, I'm

14   sorry, Your Honor.

15             JUDGE PAYNE:   Okay.   So you are walk from St. Julians

16   where the populated area is across to the one that begins --

17   the one next to it that begins with a C; okay?

18             MR. HAMILTON:   That's correct.

19             JUDGE PAYNE:   There are no roads there, okay.

20   Q    Were there any split VTDs in this area, sir?

21   A    The split VTDs in this district were further to the west.

22   Q    Okay.   So let's look at page 85 in the illustrative

23   exhibit book which is figure 26 on page 68 of your report.

24   Which two VTDs were split in this area?

25   A    John F. Kennedy VTD, and the other one is, I believe,

1    called Lakeside.

2    Q    And can you describe how they were split.

3    A    We see -- I will mark the JFK split there and the Lakeside

4    there, and it largely corresponds to the pattern we've seen

5    elsewhere where the VTD splits facilitate the division of

6    African Americans in the district, and the parts of the VTD

7    that are relatively -- have relatively smaller African-American

8    populations are outside the district.

9    Q    So this is consistent with the pattern we've seen

10   elsewhere where either the VTD choice or the split of a VTD

11   separates or falls along the line demarking the difference

12   between the predominantly African-American portion and the

13   predominantly white portion; is that right?

14   A    Yes.

15   Q    Just a couple more questions, and we'll wrap up.  Did your

16   analysis reveal stark splits in the racial composition of

17   populations moved in and out of these 12 House districts?

18   A    Yes, I did.  I believe the maps help shed light on that.

19   Q    And did your analysis reveal stark splits in the racial

20   composition of populations moved in and out of split counties?

21   A    Yes.

22   Q    How about split cities?

23   A    Yes.

24   Q    And how about the selection of which VTDs to include

25   within a district and outside a district?

Rodden - Direct

1    A    Yes.

2    Q    Did your analysis reveal stark splits in the racial

3    composition of populations moved in and out of these districts

4    as displayed in the VTD splits?

5    A    Yes.

6    Q    In your professional opinion, was the rate the predominant

7    consideration in these 11 House of Delegates districts?

8    A    Yes.

9    Q    Can you explain that?

10   A    Yes.  I started with the 55 percent target, and I explored

11   the ways in which that target shaped the decisions about which

12   VTDs had to go in and out of the various districts and examined

13   the ways in those movements of VTDs in and out of districts

14   often contrasted with or ran into conflict with traditional

15   redistricting principles.

16        I then noticed that there were often stark splits between

17   African Americans and whites at the lines that formed the

18   district boundaries and noticed that looking at -- whether I

19   was looking at counties' VTDs or splits within VTDs, that those

20   stark racial divisions kept reappearing in my analysis.  And

21   all of that led me to the conclusion that race was the

22   predominant factor in drawing these districts.

23        MR. HAMILTON:  Thank you, Dr. Rodden.  No further

24   questions.

25        JUDGE PAYNE:  All right.  I'll tell you what we'll

```
 1   do.  We'll stop for the evening and start at 9:00 in the

 2   morning.  That will give you a chance to hone your

 3   cross-examination down.  You need to -- you all filed yesterday

 4   a notice that you outlined at the beginning of the proceedings

 5   about what designated discovery you had agreed upon.  Have you

 6   delivered to the judges two copies of those?

 7               MR. HAMILTON:  I don't believe so.

 8               THE COURT:  Would you sometime before --

 9               MR. HAMILTON:  Of course.

10               JUDGE PAYNE:  I turn to you because I know who is

11   going to do it.  What is your name?

12               MR. HAMILTON:  This is Trish Marino, Your Honor.

13               JUDGE PAYNE:  We know who is going to do that.  Thank

14   you very much.  We'll be in adjournment.  See you in the

15   morning.

16

17                     (End of proceedings.)

18

19

20               I certify that the foregoing is a correct transcript

21   from the record of proceedings in the above-entitled matter.

22

23

24   _____/s/_____            _____
     P. E. Peterson, RPR              Date
25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25