1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                      RICHMOND DIVISION

4

   ---------------------------------------
5                                          :
   GOLDEN BETHUNE-HILL, an                 :
6  individual, et al.                      :   Civil Action No.
                                           :   3:14cv852
7  vs.                                     :
                                           :
8  VIRGINIA STATE BOARD OF ELECTIONS,      :   October 11, 2017
   et al.                                  :
9                                          :
   ---------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE BENCH TRIAL

12          BEFORE:   THE HONORABLE ROBERT E. PAYNE

13                    THE HONORABLE BARBARA M. KEENAN

14                    The HONORABLE ARENDA L. WRIGHT ALLEN

15  APPEARANCES:

16  Kevin J. Hamilton, Esquire
    Abha Khanna, Esquire
17  Perkins Coie, LLP
    1201 Third Avenue
18  Suite 4800
    Seattle, Washington  98101
19
    Aria C. Branch, Esquire
20  Perkins Coie, LLP
    700 13th Street NW
21  Suite 600
    Washington, D.C.  20005
22  Counsel for the plaintiffs

23

24                   Peppy Peterson, RPR
                    Official Court Reporter
25              United States District Court

```
 1    APPEARANCES:  (cont'g)

 2    Matthew R. McGuire, Esquire
      Office of the Attorney General
 3    202 North Ninth Street
      Richmond, Virginia  23219
 4    Counsel for the defendants

 5

 6    Katherine L. McKnight, Esquire
      E. Mark Braden, Esquire
 7    Richard B. Raile, Esquire
      Baker & Hostetler, LLP
 8    Washington Square
      1050 Connecticut Avenue, NW
 9    Washington, D.C.  20036
      Counsel for intervenor defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Rodden – Cross

1              THE CLERK:  Day two.  Case No. 314-cv-852.

2                  *Golden Bethune-Hill, et al. v. The*

3    *Virginia State Board of Elections, et al. and the*

4    *Virginia House of Delegates, et al.*

5        The defendants are -- the plaintiffs are represented

6    by Kevin Hamilton, Abha Khanna and Aria Branch.

7        The Virginia State Board of Elections is represented

8    by Matthew McGuire.

9        The Virginia House of Delegates is represented by Amy

10   Tolbert, Mark Braden, Katherine McKnight and Richard

11   Raile.

12       Are counsel ready to proceed?

13              MR. HAMILTON:  We are, Your Honor.

14              MR. BRADEN:  Yes, Your Honor.

15              JUDGE PAYNE:  All right.  Dr. Rodden, I remind

16   you you're under the same oath which you took yesterday,

17   sir.

18              THE WITNESS:  Yes.  Thank you.

19              JUDGE PAYNE:  Mr. Braden.

20                    **CROSS-EXAMINATION**

21   BY MR. BRADEN:

22   Q    Good morning.

23   A    Good morning.

24   Q    In drawing your report, did you construct a complete

25   map of Virginia House districts?

Rodden - Cross

1   A    No.

2   Q    So without a complete map of Virginia House

3   districts, how can you be confident about the suggested

4   changes that you make and have recommended to the State of

5   Virginia and its plan?

6   A    I don't believe I recommended any changes to the plan

7   in my report.

8           JUDGE PAYNE:  Are you talking about the changes

9   that Mr. Hamilton was -- drew red lines on some of the

10  exhibits yesterday or are you talking about something in

11  his report?

12          MR. BRADEN:  Well, yeah, in his report.

13          JUDGE PAYNE:  All right.  Well, he answered

14  that.  He said he didn't make any recommendations.

15          MR. BRADEN:  Didn't make any.

16          JUDGE PAYNE:  I'm sorry to interrupt.

17  BY MR. BRADEN:

18  Q    What regions are the challenged districts in?

19  A    Well, in my report, I treated the regions of Richmond

20  and tri-cities, I considered that to be a region because

21  the districts all touched one another.  And then I also

22  considered the Tidewater region as one region even though

23  it kind of covers a large area.

24  Q    And is it true that there are no challenged districts

25  in Northern Virginia?

Rodden - Cross

1   A    That's correct.

2   Q    And no challenged districts in the Valley?

3   A    Correct.

4   Q    No challenged districts in the Piedmont?

5   A    Correct.

6   Q    And no challenged districts in Southwest Virginia?

7   A    Correct.

8   Q    So it's safe to say the districts are not scattered

9   across the Commonwealth?

10  A    The challenged districts are not scattered, correct.

11  Q    Okay.  Have you ever worked in the Tidewater/Hampton

12  Roads area?

13  A    No.

14  Q    Ever visited the area?

15  A    Yes.

16  Q    As a tourist?

17  A    Yes.

18  Q    Have you ever been in Richmond before?

19  A    Yes.  I've been here for work.

20  Q    And what work were you doing?

21  A    I was testifying in this courtroom in the Lee case.

22  Q    But you've never lived in Richmond?

23  A    No.

24  Q    Okay.  And the Lee case, was it a redistricting case?

25  A    No.

Rodden - Cross

1    Q    It was a voter ID case?

2    A    Yes.

3    Q    And you testified for the side that lost?

4    A    Yes.

5    Q    Did you have a chance to visit The Fan when you were

6    here?

7    A    Yes.

8    Q    Did you get a chance to visit the Robin Inn?

9    A    I still have not had the opportunity.

10   Q    You didn't happen to see the Loupassi realty signs

11   when you were there, did you?

12   A    No, I did not.

13   Q    If we could --

14        MR. BRADEN:  If we could bring up Plaintiffs'

15   Exhibit 16.

16   BY MR. BRADEN:

17   Q    Dr. Rodden, have you seen this document before?

18   A    Yes, I have.

19   Q    And can you tell us what it is?

20   A    This is the House committee on Privileges and

21   Elections Committee of Resolution No. 1, which is the

22   House of Delegates district criteria.  And this was from

23   2011.

24   Q    And did you review this document before you wrote

25   your report?

Rodden - Cross

1   A      Yes.

2   Q      And did it inform your report writing?

3   A      Yes.

4   Q      And can you see on it the range of population of the

5   deviation in Roman numeral I?

6   A      Yes.

7   Q      And can you tell the Court what that is?

8   A      This is laying out the rules for population equity.

9   And it tells us that the population deviation in the House

10  of Delegates districts should be within plus or minus

11  1 percent.

12  Q      And is that a -- an unusually small range for

13  deviation in legislative plans?

14  A      It's -- it's a relatively small range, yes.

15  Q      Have you seen plans with a smaller range of deviation

16  for legislative plans?

17  A      No.

18  Q      Would this population range necessitate the division

19  of -- when you're drawing a plan, would it necessitate

20  drawing parts of the plan at the census block level rather

21  than the VTD level?

22  A      It will usually be necessary to split one VTD in a

23  district.

24  Q      And that would be split between the district and an

25  enjoining district?

Rodden - Cross

1  A    Yes.  And so if it enjoined another district, it

2  might be necessary to split another VTD to equalize

3  population in that district.

4  Q    So if a district adjoined three or four VTDs, it's

5  conceivable you might have to split three or four VTDs?

6  A    It's conceivable.

7  Q    Do you know, in Virginia, how often vote tabulation

8  districts, or VTDs, are changed?

9  A    It's been -- it's been some time.  They have been

10 stable in Virginia for -- for a bit longer than is the

11 case in some places.

12 Q    Do you know how many have changed since the adoption

13 of the plan?

14 A    Since the adoption of HB 5005?

15 Q    Yes.

16 A    I don't know.  I don't know offhand.

17 Q    And what are vote tabulation -- VTDs?

18 A    Well, we speak of VTDs in a generic way across states

19 as a vote tabulation district.  It is a -- it is -- it

20 often corresponds to a precinct, but it is the lowest unit

21 at which votes are tabulated.

22        JUDGE PAYNE:  But in this case, a VTD is a

23 precinct, correct?

24        THE WITNESS:  Yes.  There was a decision made to

25 combine those two -- I believe at the time going back to

Rodden - Cross

1   the 2001 redistricting.  And they have been -- we can

2   speak of them interchangeably in Virginia.

3   BY MR. BRADEN:

4   Q    And they are principally or exclusively

5   administrative?

6   A    Yes.  I think that's a good description.

7   Q    Let me go to -- skip down to Roman numeral -- I have

8   to see which Roman numeral it is here.  Roman numeral III.

9   And can you tell the Court what that talks about?

10  A    This refers to contiguity and compactness.  So

11  districts shall be comprised of contiguous territory,

12  including adjoining insular territory, and contiguity by

13  water is sufficient.

14  Q    Am I correct that in your report on a number of

15  occasions you question whether or not districts are

16  contiguous?

17  A    I don't believe I questioned whether the districts

18  were contiguous.  All of the districts abide by this Roman

19  numeral III in Virginia.

20  Q    And you don't remember in 77, in your section,

21  talking about 77, whether you questioned whether the

22  district was contiguous?

23  A    I didn't question whether it was contiguous.  I

24  believe I characterized it as having a contiguity problem

25  in the sense that it was a very narrow strip.  But I

Rodden - Cross

1   didn't -- I wasn't claiming that it was unconstitutional,

2   or anything like that.

3            JUDGE PAYNE:  Excuse me.  You mean House

4   District 77?

5            MR. BRADEN:  House District 77.  Excuse me.  My

6   apology.

7   Q    And did you read any of these cases before writing

8   your report?

9   A    No.  I'm familiar with the subject matter of the

10  cases, but I did not read the case, the decisions.

11  Q    Okay.  Your report contains a series of dot density

12  maps.  Do you know whether they have ever been used by a

13  state legislature in drawing a plan?

14  A    No, I don't.

15  Q    Do you know whether they have been used by any

16  municipality drawing a plan?

17  A    No, I don't.

18  Q    And you also discuss, at various -- couple of

19  occasions, school board boundaries.  Do you know whether

20  or not Virginia had school board boundaries in its data

21  set that they used for redistricting?

22  A    No, I don't.

23  Q    And you don't know of any state that uses these types

24  of maps, to the best of your knowledge?

25  A    The school board boundaries?

Rodden - Cross

1  Q    School board boundaries, yes.

2  A    In drawing House districts?

3  Q    In drawing House districts.

4  A    I don't know.

5        JUDGE PAYNE:  Are you saying you don't know or

6  you don't know of any that do?  Do you understand the

7  distinction I'm drawing?

8        THE WITNESS:  Yes.  I don't think I know either.

9  I'm not sure -- it's conceivable to me that as a matter of

10 election administration simplicity, it would be desirable

11 to --

12       JUDGE PAYNE:  Excuse me.

13       THE WITNESS:  Yeah.

14       JUDGE PAYNE:  I'm saying do you know whether any

15 state uses these dot density maps for any purpose?

16       THE WITNESS:  He was asking me about school

17 board boundaries.

18       JUDGE PAYNE:  I know.  But I'm asking you -- you

19 answered an earlier question.  I'm asking you quite a

20 broader question.  Do you know whether any state uses

21 these dot density maps for any purpose?  And then we'll go

22 into what purpose.

23       THE WITNESS:  No.  Drawing districts usually

24 involves sitting down with Maptitude and moving around

25 census blocks.  I don't think anyone would be visualizing

Rodden - Cross

1   these kinds of dot density maps during that process.

2              JUDGE PAYNE:  All right.

3              THE WITNESS:  Hopefully that clarifies it.

4              JUDGE PAYNE:  Yes.  Thank you very much.

5   Q    And I'd like to go to Plaintiffs' Exhibit 69.  And,

6   Dr. Rodden, you recognize this as your report, your

7   initial report?

8   A    Yes.

9   Q    And if we could turn to page 11.  And if we can look

10  at the first paragraph on that page.

11             JUDGE PAYNE:  It begins "However," or the first

12  full paragraph?

13             MR. BRADEN:  First full paragraph that begins

14  with "However."

15  A    "However, on the north side of Richmond in

16  particular, the racial target necessitates splitting

17  African-American neighborhoods to avoid drawing a district

18  where the black voting age population is too high, since

19  those African-Americans are needed to bolster the black

20  voting age populations in other districts that unavoidably

21  contain too many urban whites."

22  Q    What would be too high of a black voting age

23  population?

24  A    What I'm referring to here is the necessity of

25  achieving six 55 percent districts.  So if too many of the

Rodden - Cross

1    African-Americans are concentrated in one or two

2    districts, there will not be enough in the Richmond region

3    to produce a 55 percent district, especially District 71.

4         So "too high" means that if one of the districts has

5    too many African-Americans concentrated in it and there

6    aren't enough left for District 71, that would cause

7    District 71 to fall below the threshold.

8    Q    Could you tell the Court some specific number that

9    would be too high?

10   A    I haven't calculated that number.  It would depend a

11   lot on the configuration of the districts as we're drawing

12   them.

13   Q    Should the state have a concern about too high of a

14   black voting age population in the district?

15   A    That's not the point I was making.  I don't have --

16   don't have an opinion on that.

17   Q    You've written and testified on political

18   gerrymandering cases, am I not correct?

19   A    That's correct.

20   Q    And you're familiar generally with techniques used in

21   gerrymandering, correct?

22   A    Yes.

23   Q    Is packing one of the traditional gerrymandering

24   techniques?

25   A    Yes.

Rodden - Cross

1  Q    And can you tell the Court what that technique is?

2  A    It involves trying to draw districts such that one's

3  opponent is overwhelmingly concentrated in a small number

4  of districts so that one's party has a more efficient

5  distribution of support across the remaining districts.

6  Q    And is this a concept of packing used in the context

7  of partisan gerrymandering also applicable in the context

8  of racial gerrymandering in vote dilution cases?

9  A    One could apply it that way, yes.

10 Q    So if a district had too high of a black voting age

11 population, might it not be vulnerable to a vote dilution

12 case?

13 A    That's not something I discussed in my report.  It's

14 not something I evaluated here.

15 Q    I don't think I was asking you whether you discussed

16 it in your report.  You say you're an expert on

17 redistricting and you've testified about racial

18 gerrymandering.  So I'm simply asking you a

19 straightforward question as to whether you have the

20 knowledge in the area to answer?

21       MR. HAMILTON:  Object to the form of the

22 question, Your Honor.  It calls for a legal conclusion.

23 He's asking him would it be vulnerable to this kind of a

24 legal claim.  He's not a lawyer and he's not offered as a

25 lawyer.  So I object to the form of the question.

Rodden – Cross

1      JUDGE PAYNE:  Overruled.

2  A    So the question is whether I am aware of a threshold

3  at which courts would recognize African-Americans as being

4  too concentrated which would then open them up to a vote

5  dilution challenge?

6      JUDGE PAYNE:  Dr. Rodden, wait just a minute.

7  If that's your question, say yes.

8  BY MR. BRADEN:

9  Q    Yes.  I can --

10     JUDGE PAYNE:  If not, then tell him.

11     MR. BRADEN:  That's close enough, Your Honor.  I

12 would love to have him answer it.

13     JUDGE PAYNE:  All right.  Go ahead then, sir.

14 A    Well, this does seem to ask for a legal conclusion

15 that I'm not in a good position to offer.  But if -- if an

16 inner region or say we're drawing some school board

17 elections or city council elections and all of the

18 minority group is concentrated into one district, say, out

19 of four, then that would potentially open up that

20 jurisdiction to a vote dilution challenge.

21 Q    And you were, in fact, an expert witness in Ferguson

22 dealing with exactly that issue, correct?

23 A    No.  That was -- that was an at-large district that

24 was being challenged.  It was an at-large school board

25 election in a setting where African-Americans and whites

Rodden - Cross

1    were relatively geographically dispersed.  In that report,

2    I created dot density maps to try to show to the Court

3    that the racial groups were dispersed and that the

4    introduction of single-member districts would -- would not

5    improve the representation of African-Americans, that --

6              JUDGE PAYNE:  Was the claim in that -- I think

7    his question is was the claim in that case a packing case?

8              THE WITNESS:  Not at all.

9              JUDGE PAYNE:  It was not?

10             THE WITNESS:  No.

11             JUDGE PAYNE:  So you did not opine on that

12   topic?

13             THE WITNESS:  No.

14             JUDGE PAYNE:  Okay.

15   Q    Let me move to the next paragraph.  It begins, "It is

16   not possible."  Could you just read that real quickly to

17   the Court?

18   A    "It is not possible to draw the five districts that

19   meet the 55 percent target without including the

20   African-American section of Hopewell.  It must be linked

21   in either a noncompact district that reaches all the way

22   to Richmond or it must be linked with Petersburg."

23   Q    Have you seen a map showing that that statement is

24   not true?

25   A    No.

Rodden - Cross

1   Q     Have you seen any map attempting to show that that

2   statement is not true?

3   A     Perhaps.  There was an exhibit that was distributed,

4   but I haven't been able to examine that.

5          JUDGE PAYNE:  Before you go further, in the

6   second sentence of that paragraph, in two places you use

7   the indefinite pronoun it.  What is the "it" in that

8   sentence?

9          THE WITNESS:  I'm speaking to -- about the

10  Hopewell area.

11         JUDGE PAYNE:  You're talking about just -- it

12  means Hopewell?  In other words, I would substitute

13  Hopewell must be linked in either a noncompact distinct

14  that reaches all the way to Richmond or Hopewell must be

15  linked with Petersburg?  Is that the way to read the

16  sentence?

17         THE WITNESS:  Yes.

18         JUDGE PAYNE:  All right.  Thank you.

19  Q     If that statement -- if that paragraph is not true,

20  and demonstratively not true, does that call into question

21  the rest of your report?

22  A     No, not at all.  The 55 percent target is only the

23  beginning of my -- of my analysis.  I try to understand

24  the ways in which the 55 percent target constrains the

25  redistricting process.  But if, even in spite of going

Rodden - Cross

1   beyond the 55 percent target, there was still evidence of

2   stark racial sorting that wasn't even required to reach

3   the 55 percent target, I believe that only strengths the

4   conclusion in my report that race predominated in the

5   drawing of the districts.

6   Q    So if this statement is not true, it really doesn't

7   have any effect on the credibility of your report.  Is

8   that what you're saying?

9   A    I don't believe so.

10  Q    So would you say the Courts can safely ignore this

11  paragraph?

12  A    No, that's not the claim either.

13  Q    If we can go down to the next paragraph and simply

14  the first sentence, can you read that to the Court?

15  A    "The 2001 benchmark plan already reflected an attempt

16  to draw African-American voters in the majority black

17  districts."

18  Q    Do you know whether or not the 1991 plan reflected an

19  attempt to draw African-American voters in majority black

20  districts?

21  A    I did not examine the 1991 plan.

22  Q    Do you know whether the 2011 plan was an effort to

23  attempt to draw black -- African-American voters in black

24  majority districts?

25  A    Yes.

Rodden – Cross

1   Q    Are the 1991, 2001 and 2011 plans, black districts,

2   significantly the same?

3   A    I have not examined the 1991 plan.  I think we've

4   established, everyone has agreed, that the 2001 plan, the

5   starting point was the existing districts.  And the effort

6   was made to update those districts so as to reach the

7   55 percent target.  I don't think there's any dispute

8   about that.

9   Q    Or were they updated because of the requirements of

10  the new census data?

11  A    The two goals were population equity and 55 percent

12  African-American voting age population is my

13  understanding.

14  Q    Is one of the other goals continuity?

15  A    Continuity is required by the constitution, yes.

16  Q    No.  Continuity.

17  A    Oh, I'm sorry.  It appears that that was a goal, yes.

18  Q    Does it appear that the plan is a status quo plan?

19  A    I'm not sure how we would define that.  It builds

20  upon the existing districts.  It does not start over fresh

21  and begin a new process.  It begins with the base of the

22  existing plan, which is a common strategy in

23  redistricting.

24  Q    There were significant population changes in the new

25  census, correct?

Rodden - Cross

1   A    Yes.

2   Q    And did those population changes necessitate

3   significant changes in the map?

4   A    Yes.  As I described, the northeastern part of the

5   state grew.  Some of the urban core areas lost population,

6   and there was a general suburbanization taking place in

7   the major metro areas.

8   Q    Do you know whether districts were transferred from

9   Southside and Tidewater to Northern Virginia?

10  A    I'm not sure I understand the term "districts were

11  transferred."

12          JUDGE PAYNE:  Let him explain it, then.

13  Q    I think the -- let me pull up an exhibit for that

14  purpose.  That would be -- I think you have one of the map

15  books there.  This would be Defendant-Intervenors' Exhibit

16  06.  And if I could turn you to the page that shows --

17          MR. HAMILTON:  I'm sorry, counsel.  Is it

18  Exhibit 6?

19          MR. BRADEN:  Six.  Defendant-Intervenors'

20  Exhibit 6, the large map book.  I've got the right version

21  of it.  Excuse me for just a second.

22          JUDGE PAYNE:  Are you sure it's Exhibit 6?

23          MR. BRADY:  I'm sorry.  It's 91.

24          JUDGE PAYNE:  Yeah.  That's what I thought.

25          MR. BRADEN:  My apologies.  We have some

Rodden – Cross

1   exhibits from the Vesilind case.  So if we could go to

2   District Number 10.

3           JUDGE PAYNE:  What page is that?

4   A    This must not be the right book.

5   BY MR. BRADEN:

6   Q    That is on page 21 and 20.

7           JUDGE PAYNE:  Have you got the right exhibit

8   there, Dr. Rodden?

9           THE WITNESS:  Not yet.

10          JUDGE PAYNE:  Okay.  Take your time.  And you

11  all go off the record and talk and get sorted out what you

12  need.

13      (Discussion off the record.)

14          JUDGE PAYNE:  Have you verified that you're on

15  the same page and we're all on DIX 91, page 20 and 21?

16          MR. BRADEN:  We were attempting to save a few

17  trees by recycling our exhibits, to some degree.

18  Q    Dr. Rodden --

19          MR. HAMILTON:  Excuse me.  If I could just

20  correct the record.  It's pages 19 and 20, I believe, is

21  shown on the electronic screen, and the page --

22          JUDGE PAYNE:  Is that what you're doing is 19

23  and 20?

24          MR. BRADEN:  Nineteen and 20.  House District

25  10.

Rodden - Cross

| | |
|---|---|
| 1 | MR. HAMILTON:  Thank you, Your Honor. |
| 2 | JUDGE PAYNE:  Thank you, Mr. Hamilton. |
| 3 | Q    Looking at page 19, do you recognize what that is? |
| 4 | A    Not yet.  Do we have a benchmark district and then |
| 5 | a -- |
| 6 | Q    That's correct.  This is the 2001 District 10? |
| 7 | A    That's the top -- that's page 19. |
| 8 | Q    The top page.  So you don't -- you didn't look at |
| 9 | that before preparing your report? |
| 10 | A    I looked at a map of the -- I did not memorize the |
| 11 | locations of all the nonchallenged districts. |
| 12 | Q    Okay.  That's House District 10? |
| 13 | A    Yes. |
| 14 | Q    Do you know where that's at in Virginia? |
| 15 | A    This is along the southern border. |
| 16 | Q    And if you can look at page 20, the one below. |
| 17 | A    Yes. |
| 18 | Q    And that's District 10 in the new plan, correct? |
| 19 | A    Yes. |
| 20 | Q    Do you know how far away Loudoun County is from the |
| 21 | Southside/North Carolina border? |
| 22 | A    Not offhand. |
| 23 | Q    Is this district -- would it appear to be an example |
| 24 | of a full district moving to deal with a population |
| 25 | problem? |

Rodden - Cross

1  A    The district with a number 10 is now in a different

2  location.  And that's a common occurrence in a

3  redistricting.

4  Q    And the collapsing of a single district has

5  significant ripple effects on the surrounding districts?

6  A    Of course.  I discuss that in my report.

7  Q    Yeah.  But you weren't aware as to which district got

8  moved in this area?

9  A    No.

10  Q    If you could turn to page 173.

11        JUDGE PAYNE:  That's still of Exhibit 91?

12        MR. BRADEN:  Still in Exhibit 91.

13  Q    Do you see, on page 173, District 87?  Do you

14  recognize that from your report?

15  A    Yes.

16  Q    Where is that?

17  A    This is in the Hampton Roads area heading toward

18  Virginia Beach.

19  Q    And in the HB 5005 on page 174, where does it move

20  to?

21  A    This moves all the way up into the Fairfax County

22  area.  So this was a strategy for dealing with a

23  population gain in the northeastern part of the state.

24  Q    And were you -- before me showing this to you, were

25  you aware of this change?

Rodden - Cross

1   A   Yes.

2   Q   So you knew it went up to Fairfax County?

3   A   Yes.

4   Q   I didn't happen to see that in your report anywhere.

5   Did you talk about it in your report?

6   A   No.

7   Q   And this type of move has ripple effects across other

8   districts?

9   A   Yes.

10  Q   I'd like to go back to Plaintiffs' Exhibit 69, your

11  report, page 11.  If I could go to the line in the middle

12  of the paragraph that begins, "The remaining urban

13  Richmond districts."  On page 11.

14          JUDGE PAYNE:  It's the next to the last sentence

15  on page 11.  Do you see it, Dr. Rodden?

16          THE WITNESS:  Yes.

17  BY MR. BRADEN:

18  Q   Can you just read to the Court that sentence?

19  A   "The remaining urban Richmond districts, 69, 70 and

20  71, were drawn so as to spread African-Americans rather

21  evenly across the three."

22  Q   Let's stop there.  If it was done in an alternative

23  way simply to spread the urban -- the African-Americans

24  across two districts, might that not retrogress their

25  ability to elect their candidate of choice?

Rodden - Cross

1   A    That's not something I addressed in my report.

2   Q    Do you know the answer to the question?

3   A    No.

4   Q    But to get the plan precleared, the legislature would

5   have to know the answer to that question, correct?

6   A    Yes.

7   Q    If I could go to your report beginning at page 15.

8   And on the bottom of page 15 you have a heading called

9   "District 71."  There is a heading there in your report on

10  District 71, correct?

11  A    Yes, there is.

12  Q    Okay.  And is that the section beginning your

13  discussion of District 71?

14  A    Yes.

15  Q    And would it be fair to characterize this as a

16  discussion as to why you believe that district was not

17  drafted correctly?

18  A    At no point in the report do I bring in a concept of

19  what is correct.  I don't recommend a particular set of

20  districts.  My intention is to simply explain for the

21  Court what kinds of maneuvers were necessary, in this

22  instance, to reach the 55 percent threshold and simply

23  describe those.

24  Q    So you don't have any professional objection to the

25  way this district was drawn?

Rodden - Cross

1  A    Professional objection?  That seems to require a

2  normative conception of how the district should be drawn,

3  and that's not something I was -- I had in my mind in

4  writing the report.

5  Q    But you are -- my understanding, your expertise was

6  in mapping and redistricting, using mapping for

7  redistricting purposes.  So are you not able to answer

8  that question?

9  A    What is the ideal district in 71?  No.  There are

10  just too many ways of drawing the district.  It depends on

11  what we're trying to achieve.

12         JUDGE PAYNE:  Mr. Braden, I think he was offered

13  and found to be as an expert in the following area.  Maybe

14  I've gotten it wrong.  But if I'm wrong, you tell us.

15  Geo-spacial data analysis and its application to

16  redistricting process, right?

17         MR. BRADEN:  Yes, Your Honor.

18         JUDGE PAYNE:  Okay.  That's his expertise.

19  Q    On page 17, in the middle of the page, middle

20  paragraph, do you see the sentence beginning, "From a

21  perspective of"?

22  A    Yes.  Would you like me to read it?

23  Q    Yes.

24         JUDGE PAYNE:  You know, I have to tell you, I

25  think all of us are pretty well able to read.  So we can

Rodden – Cross

1   read it.  If you'll point out the sentence, then you just

2   ask your question.  It will save some time maybe.

3           MR. BRADEN:  Yes, Your Honor.

4           JUDGE PAYNE:  Read that sentence to yourself.

5   He's going to ask you a question.

6       Okay.  Your question, Mr. Braden.

7   Q    So it would have made far more sense to expand a

8   district to the west.  Why would it have made for more

9   sense?  To who?

10  A    If the goal is to honor traditional redistricting

11  principles and examine -- and make use of city boundaries

12  and connect neighborhoods, this was an option that was

13  available.  I describe an alternative approach to the

14  district.

15      It is not my testimony that this is the optimal

16  district.  I'm not issuing a normative claim about what

17  optimal redistricting looks like.  I'm suggesting another

18  alternative.  If one was trying to maximize neighborhood

19  contiguity and the maintenance of city boundaries, this is

20  an option that was available.

21  Q    I understand it is an option that's available.  It

22  seems to me that you made a normative judgment when you

23  said it made far more sense to expand to the west.  Is

24  that not -- do I misread what that's saying?

25  A    From a traditional redistricting principles approach,

Rodden - Cross

1  it makes more sense.

2  Q    And it makes more sense to unite The Fan and museum

3  neighborhoods in 71?

4  A    From a perspective of traditional redistricting

5  principles.

6  Q    Might one change the direction they're looking and

7  think it might make more sense to unite The Fan

8  neighborhood in the museum district in 68?

9  A    In a district that is -- that reaches out to the

10  distant suburbs and kinds of reaches in and carves out a

11  bit of Richmond, it would make that district more

12  heterogeneous.  But one might have reasons for wanting to

13  do that, but that's -- and that is, in fact, what was

14  done.

15       JUDGE PAYNE:  District 68, if done that way,

16  would be "more heterogeneous" meaning what?

17       THE WITNESS:  So District 68 was a district that

18  includes part of the west -- western portion of Richmond

19  and reaches out into --

20       JUDGE PAYNE:  It includes the near West End?

21       THE WITNESS:  Yes.

22       JUDGE PAYNE:  Are you saying that The Fan and

23  the near West End would be more heterogeneous?

24       THE WITNESS:  The district as a whole, which it

25  also contains a large suburban area.

Rodden - Cross

1          JUDGE PAYNE:  The district as a whole, beginning

2    with The Fan and going to the West End of Richmond would

3    be more heterogeneous, in your judgment, if this change

4    were -- if this change were adopted the way you suggest?

5    Just so I understand what you're saying.

6          THE WITNESS:  I want to make sure I understand

7    what you're asking.

8          JUDGE PAYNE:  Well, you're asking -- you said it

9    would be more heterogeneous.  And first I want to know

10   what would be more heterogeneous, and I thought you said

11   from The Fan to the west.  And you took it from The Fan

12   all the way to the West End.  That would be The Fan, the

13   museum district, the near West End and the West End.  And

14   if that's what you mean, I need to know.  I think we need

15   to know that.  Are you saying that those would be a

16   heterogeneous district?

17         THE WITNESS:  I was arguing that 68, by taking

18   in more of The Fan, became more heterogeneous.

19         JUDGE PAYNE:  So you really weren't talking

20   about the near West End and the West End?

21         THE WITNESS:  I believe I was.

22         JUDGE PAYNE:  Do you know what I'm talking about

23   when I say "near West End and the West End"?

24         THE WITNESS:  Yes.

25         JUDGE PAYNE:  So are you including the West End

Rodden – Cross

1   and the near West End and the -- and the museum district

2   and The Fan in your heterogeneous district?

3            THE WITNESS:  What I was referring to was the

4   status of 68 as a district that is partly a suburban area,

5   it reaches through a corridor out into the suburbs and

6   includes part of the West End, and it extended further

7   into Richmond.

8            JUDGE PAYNE:  That isn't the question.  The

9   question is -- let me try it another way.  And instead of

10  rephrasing the question, just try to answer the one I'm

11  asking even though you may not think it's a good question.

12     When you're talking about a heterogeneous district,

13  are you talking about a district that includes The Fan,

14  the museum district, the near West End and the West End?

15  Yes or no.

16           THE WITNESS:  I would need to look at a map to

17  make sure I understand, but I believe the answer is yes.

18           JUDGE PAYNE:  What, then, makes it

19  heterogeneous, in your judgment, that district, as

20  composed in that fashion?

21           THE WITNESS:  The addition of more of Richmond

22  and a district that is -- that is -- already straddles

23  Richmond and the suburbs.  That was the point I was

24  making.

25           JUDGE PAYNE:  By doing what?  By -- adding more

Rodden - Cross

 1   of Richmond meaning adding what to what?

 2          THE WITNESS:   Really, I was referring -- this

 3   is -- so much of this analysis comes to VTD 207, which is

 4   really unusual.  But that's the -- that's the VTD that I

 5   was discussing in this.

 6          JUDGE PAYNE:  So what you're saying is that by

 7   adding VTD 207, it would have made the district more

 8   homogeneous?

 9          THE WITNESS:   That by adding 207 to District

10   68 --

11          JUDGE PAYNE:  Yes.

12          THE WITNESS:   -- this made District 68 more

13   urban, even though most of the district had been a lower

14   density reaching out to the suburbs.  I mean, if we look

15   at a map of 68, it's a suburban district that then comes

16   in and gets a bit of the West End and then now it kind of

17   reaches further into the City of Richmond.  And in any

18   estimation, that made it more heterogeneous.  That was the

19   point I was trying to make, and I'm sorry if that wasn't

20   clear.

21          JUDGE PAYNE:  I think I understand.

22          MR. BRADEN:  If we could bring up

23   Defendant-Intervenors' Exhibit 94, page 4.

24   Q    I believe you've seen this map before?

25   A    Yes.

Rodden - Cross

1    Q    And so you are familiar with the various coding?

2    A    Yes.

3    Q    Let me ask you a couple questions.  Do you know

4    whether 113 and 114 are in The Fan?

5    A    Yes.

6    Q    112 and 105?

7    A    I believe that's getting us beyond the boundary

8    that's typically used.

9    Q    What's the boundary that's typically used?

10   A    It's -- my understanding is there's a street that

11   runs -- well, I'm not quite sure where the street is.

12   Q    So you're not actually sure where The Fan ends going

13   that way?

14   A    I've certainly looked at a neighborhood map in the

15   past.  But looking at this map without any streets on it,

16   it's hard for me to get a bearing for right where that

17   boundary is.

18   Q    There's a street on there --

19   A    I see the interstate.

20           JUDGE PAYNE:  There's a street -- do you know

21   the street that comes from 503, in that circle, it goes

22   up, jogs to the right and goes straight out to I-95?  Do

23   you know the name of that street?

24           THE WITNESS:  I've forgotten.

25           JUDGE PAYNE:  Would it help you if I told you I

Rodden - Cross

1    think it represents the Boulevard?  Do you all agree

2    that's what it is, or does anybody know?  It looks to

3    me like that's what it is.

4              THE WITNESS:  I believe that is the Boulevard.

5    And I think that is traditionally The Fan -- that's the

6    street that cuts from The Fan from the museum district,

7    which is on the other side of the Boulevard.

8              MR. BRADEN:  Your Honor --

9              JUDGE PAYNE:  It's 113 and 114.

10             THE WITNESS:  Yes.  The museum is right there in

11   the corner of 114.  The northeast corner of 114 is where

12   the museum is located.

13             JUDGE PAYNE:  We have got it fixed now.  Go

14   ahead.

15             THE WITNESS:  I think I've got my bearings now.

16             MR. BRADEN:  And if it's useful to the Court,

17   the other map exhibit we have has some greater detail of

18   maps on them.  That's --

19             JUDGE PAYNE:  Just go ahead with your question.

20   I think he's oriented now.  That's all he was trying to

21   get, and I was trying to help him.

22   Q    Let me put a red dot.  Can you tell the Court, do you

23   recognize what that is?

24   A    That is the residential location of Delegate

25   Loupassi.

1    Q    Would it be fair to characterize that he lives

2    relatively closer to The Fan?

3    A    Yes.

4    Q    Do you know what House district he lived in growing

5    up?

6    A    What House district?

7    Q    No.  What precinct?  What area?  Did he live in The

8    Fan?  Do you know?

9    A    I don't know his childhood history.

10   Q    So by moving 207 back to 71, that would split The

11   Fan?

12   A    In a future redistricting, would moving 207,

13   extending the boundary out to Boulevard, would that split

14   The Fan?  I don't see that.

15   Q    If you moved 207 out of 68, would it not divide The

16   Fan -- parts of The Fan, 113 and 114, from other parts of

17   The Fan?

18   A    I believe you're thinking of a different neighborhood

19   map than I am.  My understanding, as we just established,

20   is that Boulevard is the boundary of The Fan neighborhood

21   and that 113 and 114 are typically referred to as the

22   museum district.

23   Q    Okay.  I guess I misunderstood the earlier testimony.

24   So you believe that The Fan ends at 207?

25   A    I do.

Rodden - Cross

1   Q    Okay.  And you believe by moving 207 into 68, that

2   violated traditional redistricting criteria?

3   A    If we were to focus on neighborhood -- on holding

4   neighborhoods together, if that was the value that we

5   were -- we were maximizing, then yes.

6   Q    Let's go --

7              JUDGE PAYNE:  I think the question was a little

8   broader, as I understood it.  I don't know if it was or

9   not, but it sounded to me like the question was in your

10  opinion, does moving VTD 207 into District 68 violate

11  traditional redistricting principles?  Was that the

12  question?

13             MR. BRADEN:  Yes, Your Honor.

14             JUDGE PAYNE:  And your answer --

15             THE WITNESS:  The answer was yes.

16             JUDGE PAYNE:  Yes.  Okay.

17  Q    If we can go to page 19.  And in the last

18  paragraph --

19             JUDGE PAYNE:  You're talking about Plaintiffs'

20  69 now?

21  BY MR. BRADY:

22  Q    Sixty-nine, your report.  I apologize.

23             JUDGE PAYNE:  Page what?

24             MR. BRADEN:  Page 19.

25  Q    And there's a sentence where you suggest it would be

Rodden - Cross

1  curious if Mr. Loupassi, Delegate Loupassi, a republican,

2  wished to undermine traditional redistricting criteria by

3  reaching into the heavily democratic City of Richmond.

4  Have you talked to Delegate Loupassi about that part of

5  Richmond?

6  A     No.

7  Q     Have you talked with anyone who talked to him about

8  207?

9  A     No.

10  Q     Do you know anything about -- I don't know whether

11  this is fair or not, but I think it is.  Do you know

12  anything about the family's -- Loupassi family's landmark

13  restaurant, Robin Inn?

14  A     I've learned about it throughout the course of the

15  case.  It looks like a nice place.

16  Q     I would suggest it's a great place.

17  A     Maybe tonight is the night.  We'll see.

18  Q     You know, I was -- I was there on Sunday night.  It

19  was great, and I could pick up "Loupassi for Delegate"

20  signs in the lobby.  There were a lot of them.

21        Do you know whether --

22           MR. HAMILTON:  Your Honor, I object to the

23  statement.  It's not -- it's not in the record, and it's

24  not a question to the witness.  Improper cross-examination

25  and I ask that it be stricken from the record.

Rodden - Cross

1      JUDGE PAYNE:  It was a gratuitous remark, which

2  probably need not be the -- the motion is granted.

3      MR. HAMILTON:  Thank you.

4  Q   Do you know if there's a Loupassi realty office in

5  207?

6  A   I believe there might be a -- an apartment building

7  that Delegate Loupassi owns in that VTD.  I have not been

8  able to find any information about a real estate office.

9  If there is one, it's not on -- it doesn't have a website.

10  Q   Have you looked at the website for the Robin Inn?

11  A   Yes, I have.

12  Q   Do you know, have you discussed with any delegates in

13  Virginia whether or not they have a desire to have their

14  family business in their district?

15  A   I have not.

16  Q   Have you discussed it with any elected officials in

17  any legislative chamber?

18  A   No.

19  Q   Does that seem like an irrational view by a member

20  wanting to have their business in their district?

21  A   No.

22  Q   If we can go to Plaintiffs' Exhibit 69, page 20.  If

23  you look at the first full paragraph, you say, "It's

24  simply not plausible that splitting The Fan district would

25  advance his political career."

Rodden - Cross

 1   A    Yes.  That was based on examination of precinct-level

 2   data.

 3   Q    Do you support any expertise in Virginia politics?

 4            JUDGE PAYNE:  He's not qualified in that area,

 5   and he can't give opinions in it for you or for the other

 6   side.

 7            MR. BRADEN:  Would -- Your Honor, the reason I

 8   asked that question is it seems to be what he's offering

 9   right here on page 20.  I was hoping that his answer to

10   that question would illuminate it to the Court that he's

11   not qualified to make that statement.

12            JUDGE PAYNE:  All right.  Go ahead.

13   Q    If we could go to page 20.

14            JUDGE PAYNE:  Did you get an answer?

15   A    Was there a question?

16   Q    Yes.  Do you have any experience in Virginia politics

17   that permits you to offer opinion about it not being

18   plausible that Loupassi's political career would be

19   advanced by having his family businesses in his district?

20   A    As a political scientist who looks at data and looks

21   at precinct-level data in particular, I have not come

22   across redistricting situations in which incumbents try to

23   put densely populated areas into their district where they

24   are very unpopular.

25            MR. BRADEN:  Your Honor, that did not seem to be

Rodden - Cross

1   responsive to my question.

2          JUDGE PAYNE:  Sustained.  Strike the answer.

3   Start again.  Do you have any basis for making that

4   statement in the area of expertise that you're qualified

5   in is the only question on the table?  The answer is yes

6   or no.

7          THE WITNESS:  I have expertise as a political

8   scientist.

9          JUDGE PAYNE:  You're not qualified as a

10  political scientist.  You're qualified in a limited area

11  of geo-spacial mapping.  So in the area you've been

12  qualified in, do you feel like you're qualified to give an

13  opinion as in that sentence; "In short, it is simply not

14  plausible that splitting up The Fan neighborhood would

15  advance Mr. Loupassi's political career."  That's the

16  question.  The answer is yes or no.

17         THE WITNESS:  I believe I'm qualified to make

18  the statement or I wouldn't have made it, but -- if the

19  determination about the area of my expertise is -- that's

20  outside of my -- that's not outside of my hands.  I don't

21  think I can -- I can determine what -- what -- that's for

22  the Court to decide, what is my area of accepted

23  expertise.  I believe that as a political scientist who

24  studies precinct level data, I'm comfortable making a

25  comment like that, but --

Rodden - Cross

1          JUDGE PAYNE:  Any further pursuit of that issue?

2          MR. BRADEN:  No, Your Honor.

3          JUDGE PAYNE:  We can deal with it in your briefs

4     as to whether he's qualified to do it, given the expertise

5     he's been qualified for.

6          MR. BRADEN:  Absolutely, Your Honor.

7          JUDGE PAYNE:  There are a lot of statements in

8     the report that go beyond the expertise, which is what I

9     told everybody before; that the Court didn't want anybody

10    to be talking about intent and speculating.  And so you

11    confine testimony to the area of your expertise.  And you

12    raised it, though, so you asked for it.  You got it.  And

13    now you may proceed.

14         MR. BRADY:  And I was happy to discover the

15    basis for it.

16    BY MR. BRADEN:

17    Q    If we could look on page 20 of that exhibit.  And you

18    opine, I would suggest, in exactly the same area, which is

19    pointing out that it would be advantageous -- what you

20    believe would be advantageous to Loupassi?

21         JUDGE PAYNE:  Where are you talking about?

22    Q    The next sentence, "In fact."  "In fact, it would

23    have been quite advantageous to Mr. Loupassi if Delegate

24    Jones would have pursued the most obvious strategy for

25    adding voters to District 71:  Adding VTD 113 and VTD

Rodden - Cross

1   114."  Do you know whether that was obvious to Loupassi?

2   A    I believed I was making a really noncontroversial

3   statement about the geography of his support.  Whether he

4   had other desires associated with furthering his business

5   interest, I have to admit, that is not something I

6   considered when writing the report.  I was speaking purely

7   about from a political reelection standpoint and any other

8   possibilities were not included in that statement.

9   Q    So a more precise statement might have been only

10  looking at election data and no other possible reasons?

11  You just simply don't have any idea what Loupassi believes

12  is advantageous?

13  A    That's correct.

14  Q    And you have no idea what Loupassi asked Delegate

15  Jones to do or not do, right?

16  A    That's correct.

17  Q    Adding VTD 113 and 114 to 71, what impact would it

18  have on the black voting age population of that district?

19  A    It most certainly would have reduced it.

20  Q    And adding, from Henrico County, the districts

21  that -- the precincts that were removed, Summit Court,

22  Hilliard Stratford Hall, what impact would that have had

23  on the black voting age population?

24  A    To add them back into 71?

25  Q    Yes.

Rodden - Cross

1    A    It would reduce the African-American voting age

2    population.

3    Q    And if you took out Ratcliffe, 604, 701, 702, what

4    would the result be?

5    A    To reduce -- yes.

6    Q    Do you know what it would be reduced to?

7    A    It would depend on what other decisions were made.

8    You mean specifically reducing those VTDs?

9    Q    Yes.

10   A    It would depend on what decisions were made to make

11   up for those to achieve population equity.  But it would

12   have lowered it below the starting point of 46 percent.

13   Q    And do you know how low it would have gotten?

14   A    No.  I haven't performed that calculation.

15   Q    And that would be a fact important to the state to

16   know, correct?

17   A    Yes.

18   Q    Because it would be required to provide that

19   information to the Department of Justice, right?

20   A    Yes.

21   Q    Do you have any estimate as to how low it would go?

22   A    No.

23   Q    What other black areas could they have gone to that

24   would have kept the number higher?

25   A    There were other VTDs in District 74 that could have

Rodden - Cross

1   been extracted.  I think they would have made perhaps less

2   sense.  There are more VTDs in the northern part of the

3   turret of District 70 that could have been extracted.

4        The point of my argument which I -- or of my claim in

5   that section was that some VTDs had to move, and it seems

6   that we're in agreement on that; that some

7   African-American VTDs had to move in order to achieve the

8   55 percent target.

9   Q    Does considering race alone make race predominant in

10  drawing a plan?

11  A    No.  Race is predominant in a plan when race explains

12  the drawing of the districts beyond other factors.  Race

13  is the most important factor in drawing the districts.

14  That's when we see predominance.

15       When race is more important than neighborhood

16  continuity, city contiguity, observing county boundaries

17  observing VTD boundaries, when we see a pattern like that,

18  that's when we see predominance.

19            JUDGE PAYNE:  Mr. Braden, it would be a good

20  idea to remember to keep control of the examination.  That

21  question could have been answered with a yes or a no and

22  nothing else.

23       And, Dr. Rodden, if you would keep please that -- if

24  somebody else wants to know it, they'll follow up on

25  redirect.

Rodden - Cross

1      Go ahead, Mr. Braden.  And you step down and keep

2   your examination moving along, please.

3   Q    Okay.  I'd like to go plaintiffs' exhibit page 22.

4          JUDGE PAYNE:  That's Exhibit 69?

5          MR. BRADEN:  Exhibit 69, 22, Figure 5.

6   Q    And can you just tell us again what that figure

7   shows?

8   A    That shows VTD 505, and it shows the boundary of the

9   enacted plan.

10  Q    And am I correct, you believe that that shows some

11  intent to move significant numbers of -- to impact the

12  racial composition of that area?  Let me put it that way.

13  A    This is an example of a VTD split that -- in a

14  district that was very close to the 55 percent threshold.

15  And without this VTD split, the numbers for both District

16  69 and 71, in terms of the 55 percent threshold, would

17  have been thrown off.  But I assume there are other ways,

18  there are other moves that could have been made to achieve

19  the same thing.

20  Q    Did you review the testimony of Delegate Jones on

21  this particular split?

22  A    I may have.  I can't remember.

23  Q    Did you view the -- any video of his speech on the

24  floor?

25  A    No.

Rodden - Cross

1  Q    If I were to represent to you that city officials

2  specifically came to him to -- for this particular split,

3  would that indicate to you that possibly it was done at

4  their request?  Was this split down at their request?  Do

5  you know?

6  A    It's possible.  I have no -- I have no reason to

7  believe otherwise.

8  Q    So that would certainly not be a post hoc

9  justification in any way if Delegate Jones said I did it

10  at the request of Virginia Richmond city officials?

11           JUDGE PAYNE:  That's not in his area of

12  expertise.  Come on.

13  Q    Let me go to page 26 of your report.  The last

14  paragraph talks about District 69 straddling the James

15  River in a way that crosses city council ward boundaries,

16  boundaries of elementary, middle and high schools.

17       Any reason to believe the state was aware of that

18  fact when they drew this plan?

19  A    No.  I don't have information about that.

20  Q    You don't know whether it was in the redistricting

21  database?

22  A    I do not.

23  Q    Do you know whether there was any testimony objecting

24  to this?

25  A    No.

Rodden - Cross

1    Q    Let me move to page 31 and Figure 4.  What's Figure

2    4?

3    A    I believe it's Figure 8.

4    Q    Oh, Figure 8.  Sorry.  District 74 on page 31.

5    A    It's a map of District 74.

6              MR. BRADEN:  Okay.  Can we bring up the exhibit

7    of the three districts, three versions of 74?  And this is

8    Defendant-Intervenors' Exhibit 14 and page 60.

9    Q    Do you recognize this exhibit?

10   A    Yes.  I've seen this before.

11   Q    And can you tell the Court basically what it is?

12   A    It's a time series map of District 74 boundaries in

13   1991, 2001 and 2011.

14   Q    And is it -- would you characterize these districts

15   as relatively the same?

16   A    Well, as I've testified before, we see the city of

17   Hopewell moves -- was in -- in 1991, was not part of the

18   district.  It then joins a district in 2001 and then is

19   removed again from the district in 2011.

20        Charles City County, the African-American part of

21   Charles City County up to the border, looks the same.  And

22   there was, in each of these cases, a -- an arm that

23   reaches up into the African-American community of Henrico

24   and connects them with the Charles City County rural

25   community.  And that -- that structure was retained in

Rodden - Cross

1  each of these districts.

2  Q    So if someone testified that the basic -- the

3  principal reason for this was continuity, would you

4  dispute that?

5  A    The basic reason for every decision of the district?

6  Q    Yeah.  The 2011 plan appears to be very similar to

7  the two earlier ones.  Someone comes in and says, Yes, I

8  drew this plan very similar and that was my intent, my

9  principal intent, would that statement be true?

10  A    I believe so.

11  Q    Do you -- the largest difference between 2001 and

12  2011 is?

13        JUDGE PAYNE:  Is that a fill in the blank

14  question?

15  Q    The most significant change between 2001 and 2011?

16  Maybe Hopewell?

17  A    I went through this in some detail yesterday.  There

18  were also changes made.  The Ratcliffe VTD was moved.

19  Q    Excuse me.  I asked you whether or not that was the

20  largest change.  So if you could respond to that, that

21  would be great.

22  A    In terms of population numbers, I'm not sure.  But

23  it's that one visually is the most noticeable.

24  Q    Do you know whether there was -- that was -- that

25  particular configuration in 2001 was subject to

Rodden - Cross

 1  litigation?

 2  A    I did not know at the time of my report.  I have

 3  subsequently learned that.

 4  Q    And you understood that that was one of the

 5  significant pieces in that litigation?

 6  A    I don't know how important it was in the litigation.

 7  Q    Do you know about whether there was any testimony at

 8  any of the hearings objecting to that split?

 9  A    I don't know.

10          MR. HAMILTON:  Object to the form, Your Honor.

11  He's not being offered -- it's beyond his area of

12  expertise.  Now he's being examined on a record in a

13  different lawsuit.

14          JUDGE PAYNE:  Any objection in that lawsuit or

15  in the plan here on --

16          MR. BRADEN:  Excuse me, Your Honor.  I meant in

17  the record.  We had a variety of hearings around the

18  state.

19          JUDGE PAYNE:  You're talking about this

20  redistricting?

21          MR. BRADEN:  This redistricting.

22          JUDGE PAYNE:  All right.  Then reframe your

23  question, because I think Mr. Hamilton is correct.  It

24  could be misunderstood to relate to the prior litigation.

25          MR. BRADEN:  Yes, Your Honor.

Rodden - Cross

1   Q    I did not mean it in the context of the prior

2   litigation.  I am aware that you had not -- were not

3   familiar with that prior to drafting your report.

4        I am asking you, though, in the context of this

5   present litigation, whether you are aware of any

6   objections to this river crossing that was discussed in

7   the whole process of --

8   A    I was not aware of that.

9   Q    And do you know whether this is the -- part of the

10  tidal estuary of the James River?

11  A    Yes, it is.

12  Q    But does the tidal estuary extend up to Richmond?

13  A    No.

14  Q    Okay.  If we could go to the plaintiffs illustrative

15  exhibits.  Well, before we do that, let's -- excuse me.

16  Let's go to page 34, Figure 10 in Plaintiffs' Exhibit 69.

17  Page 34, Figure 10.  What district is that?

18  A    District 63.

19  Q    And this is your dot density map?

20  A    Yes.

21  Q    Okay.  So we have created a demonstrative combing

22  three exhibits.  So I'd like to bring that up now, if I

23  can.

24            JUDGE PAYNE:  Are you now talking about the

25  illustrative exhibits?

Rodden - Cross

1          MR. BRADEN:  Yes.  Well, we have a separate

2     demonstrative that we've created.

3          JUDGE PAYNE:  All right.

4          MR. BRADEN:  Which consists of three -- we've

5     actually got a poster board on that, because I knew that

6     it might be difficult to see.

7          JUDGE PAYNE:  Do you need an easel?

8          MR. BRADEN:  Yep.

9     Q    And while we're putting it up, let me just ask,

10    Dr. Rodden, whether he can recognize the two maps?  Do you

11    recognize where they are from?

12    A    Yes.  I currently can't see the table at the bottom.

13    Q    Yeah.  I understand.  We were concerned about that,

14    and that's one of the reasons why we had that.  So Figure

15    11 is your dot density map?

16    A    Yes.

17    Q    And Plaintiffs-Intervenors' Exhibit 91 is the same

18    area simply in a different format without dots?

19    A    I believe so.

20    Q    And at the bottom there are, from Palmer's report,

21    three -- from page 52, Table 1 of his report, some data on

22    these districts?

23    A    Okay.

24    Q    These split VTDs.

25    A    Okay.

Rodden - Cross

1   Q    So let me ask the question of you have in your report

2   a number of dot density maps where you've gone down to the

3   block level showing simply split VTDs?

4   A    Yes.

5   Q    Do you remember how many of those you have?

6   A    No.

7   Q    How did you decide which split VTDs to show in your

8   examples?

9   A    I don't recall.  I was kind of working interactively

10  with the GIS software and zoomed in on the VTD splits

11  that -- that I could see and I selected some.

12  Q    Did you select the ones that were the most important

13  to illustrate to the Court?

14  A    I don't think so.

15  Q    So you randomly selected them?

16  A    More or less.

17  Q    You didn't select them because they appeared to fit

18  your notion of racial sorting?

19  A    No.  I think I tried to -- I tried to choose some

20  that had significant population on both sides.  There were

21  some VTD splits that had very little in the way of

22  population on one side, and there were some that had no

23  population.  There were a couple VTD splits that just, as

24  we saw in -- we haven't seen any examples of that yet, but

25  there are somewhere there's just empty space on the other

Rodden - Cross

1  side.

2  Q    And you did talk, in your earlier testimony, about

3  many of these split VTDs involving sort of surgical

4  precision -- did I misquote you? -- in the dividing up of

5  the communities?

6  A    Some of them do.

7  Q    Okay.  Going to your map, I've dotted in red, what

8  does your dot density map tell me about those census

9  blocks?

10 A    There are some after African-American census blocks

11 up there by the river, south side of the river, just

12 outside of the Hopewell city boundary.

13 Q    And do you know, if you look on the Plaintiffs'

14 Exhibit 91, can you, from that, determine which VTD that

15 area is in?  Am I correct it's in Jefferson Park?  Right

16 here.

17 A    Oh, yes.  Thank you.

18 Q    Okay.  Is Jefferson part of split VTD?

19 A    Yes.

20 Q    Did I check that block on Dr. Palmer's report?

21 Whoop.  It got moved.  Prince George, Jefferson Park.  Is

22 that the data from that particular district, that VTD dot

23 district?

24 A    It appears to be.

25 Q    Do you know whether or not that particular split VTD

Rodden - Cross

1   is the largest in population of any of the split VTDs

2   between 63 and 68?

3   A    I don't know.  Oh, I'm sorry.  We're just talking

4   this table?

5   Q    Or let's -- total.  Do you know?

6   A    No.  That's not information that I assessed.

7   Q    Okay.

8          MR. BRADY:  Can you move this down just a little

9   bit for me here and I'll -- nope.  The other way.

10  Q    Do you know how many -- from your dot density map, we

11  can't determine how many African-American voting age

12  population is in that part of that VTD?

13  A    We could add those up in the data.  I don't have

14  the -- we could add up the blocks.

15         JUDGE PAYNE:  Wait, Doctor.  I think the

16  question is can you tell it from your maps?

17         THE WITNESS:  You have to have very good eyes to

18  count up those dots.  I think that would be difficult.

19         JUDGE PAYNE:  Okay.

20  Q    But it's fair to characterize that as majority black?

21  A    I believe so.

22  Q    Okay.  And that's a split VTD that you did not bother

23  to do an illustration of?

24  A    Oh, I would have been happy to have done an

25  illustration.  The --

Rodden - Cross

1    JUDGE PAYNE:  Well, if we take the "bother" out

2    of it, maybe the question is did you make an illustration

3    of that VTD?

4           THE WITNESS:  No.

5           JUDGE PAYNE:  Yes or no.

6           THE WITNESS:  No.

7    Q    And why did you decide not to use that VTD as an

8    illustration even though it's -- I will represent to you,

9    the largest one splitting between these districts?

10   A    Because my report was very long.  I'd be happy to

11   discuss further this VTD split if you'd like, but I gather

12   you don't want me to.  But it would have been a very good

13   illustration.

14   Q    It would have been a very good illustration?

15   A    Yes.

16          MR. BRADY:  Can you move down to the data?

17   Q    Sixty-two is not one of the challenged districts,

18   correct?

19   A    Correct.

20   Q    Do you know who it's represented by?

21   A    I have forgotten the name of the delegate.

22   Q    Is it a white republican delegate?

23   A    Yes.  I do know that.

24   Q    Okay.  And 63 is one of the challenged districts?

25   A    Yes.

Rodden - Cross

1  Q    Okay.  3100 blacks were assigned in that split VTD to

2  62, correct?

3  A    Yes.

4  Q    How many blacks voting age population were assigned

5  to 63?

6  A    737.

7  Q    Roughly four times the number?

8  A    Yes.

9  Q    How is this surgical precision?

10 A    Might we move back up to the dot density map?  So

11 this is exactly why a dot density map is useful as a

12 supplement to just looking at the raw numbers.  The

13 question here is where were the lines drawn, how did the

14 lines come about.

15      If we look at this section of this VTD, we can see

16 that the VTD was split in such a way that it jogged out

17 and extracted an African-American community and jogged

18 back in in such a way as to keep, in that region, the

19 African-American community in District 63.

20 Q    Does it actually show that?

21          JUDGE PAYNE:  Excuse me.  Your answer is "this

22 section in this VTD."  And when we're reading the record,

23 they'll be no way anybody is going to remember that.  So

24 what's the "this section" and what's the "this VTD" in

25 your answer?

Rodden - Cross

1          THE WITNESS:  This is a very large VTD that --

2    the name, again, is Jefferson Park, I believe.

3          JUDGE PAYNE:  All right.

4          THE WITNESS:  So it covers a lot of ground.

5          JUDGE PAYNE:  When you say "this section"?

6          THE WITNESS:  Yes.  I'm speaking of the southern

7    end of the -- of the VTD.

8          JUDGE PAYNE:  Okay.  Of Jefferson Park VTD?

9          THE WITNESS:  It is, indeed, the case that it

10   would have been possible to have included all of VTD 62

11   and gone all the way up north to the river, but it's a

12   fairly large VTD, and that would have added a lot of

13   people.

14       So there was a -- the way this VTD was split in that

15   area, it seems to fall along racial lines.  And I don't

16   know -- I don't know why.  I can't testify as to why.  The

17   point of these dot density maps is to show the lines and

18   show the geography of race, to visualize that.

19   Q    I understand the reason.  I don't understand why this

20   doesn't illustrate exactly the opposite.  The line I just

21   drew there appears to be an area that has little or no

22   population, am I correct?

23   A    That's right.

24   Q    And so if I wanted to draw, with surgical precision,

25   blacks into the VTD, why wouldn't I go up and get that?

Rodden - Cross

1   A    If the goal was to include every African-American in

2   the region --

3   Q    It was not the question, every African-American.

4   That's a significant African-American community.  You said

5   with surgical precision.  That would seem to be a large

6   community in a white district that was left out of your

7   surgery.  Am I wrong?

8   A    I believe it's the only one that was left out.

9   Q    Right here, are there census blocks right there where

10  the incumbent -- near where the republican incumbent lives

11  there are majority minority?

12  A    The VTD --

13            JUDGE PAYNE:  Yes or no.

14  A    They have all been included in 63, as far as I can

15  tell.  We can see that the line of the district jogs up

16  into that part of Hopewell right here.

17  Q    I guess my eyes -- your eyes are better than mine.

18  When I look at the dot density map, there appears to be

19  census blocks really probably virtually in the same --

20  clearly in the same neighborhood and only probably a

21  quarter or mile less from the incumbent republican member,

22  which appear to be majority black.  Am I just wrong about

23  that?  That's what it looks like on your Figure 11.

24  A    Would you point to those, please?  Make a dot.

25            JUDGE PAYNE:  You're going to have to clear that

Rodden - Cross

 1  screen before anybody can understand what you're doing.

 2          MR. BRADEN:  Yeah.  Absolutely.

 3          JUDGE PAYNE:  What's the name of the republican

 4  whose name appears there, incumbent?  Do you have that?

 5  No?

 6          MR. BRADEN:  No, but I can get it.

 7          JUDGE PAYNE:  We'll get it later.  That's okay.

 8          MR. BRADY:  I had Jones here.  I do have him

 9  back there.

10      It's an incumbent republican member.  Yeah.  We've

11  increased it now.  And let me just put --

12          JUDGE PAYNE:  All right.  Now show him what

13  you're talking about.

14  BY MR. BRADEN:

15  Q    Right there.

16  A    So you're asking why didn't they --

17          JUDGE PAYNE:  Let me ask again.  Go ahead and

18  ask the question again.

19  Q    You said in your testimony there was surgical

20  precision to having blacks put into the black districts is

21  the way I understood it.  And I'm pointing here to another

22  area that appears to be majority census blocks that are in

23  the republican district of 62.  Am I wrong that those

24  aren't majority black census blocks?

25  A    So I heard two questions.  Are you wrong that those

Rodden - Cross

1    are majority black census blocks.  They may well be.

2    Q    Okay.

3    A    But the first question is why didn't they include

4    them, and of course, I don't know the answer.  But you

5    believe -- you seem to be suggesting that they should have

6    come around like this and that that would be more surgical

7    extraction than this.

8    Q    Or --

9    A    Yes, we will always find some additional

10   African-American census blocks that could have been added.

11   Of course, that will always be the case.  I am merely

12   showing what was done, which census blocks were added.

13   Q    But, of course --

14         JUDGE PAYNE:  Hold on just a minute.  Are you

15   basically making the point that there's no surgical

16   precision involved and that that's a pejorative term that

17   need not be used and the actual way to look at the maps is

18   to what look at what was done without the pejorative term.

19   Is that what you're trying to ask him?

20         MR. BRADEN:  Absolutely, Your Honor.

21         JUDGE PAYNE:  Okay.  And I think we all know

22   that that's the case.  So the point is made, and you can

23   go ahead and proceed without that.  I think everybody

24   understands that.

25   Q    And in -- so it was just happenstance you decided not

Rodden - Cross

```
 1   to use 62 as one of your illustrations of split VTDs?

 2   A    Yes.  I would have been happy to have included it.

 3   Q    Let's go to your demonstrative.

 4            JUDGE PAYNE:  Is that the illustrative exhibits?

 5            MR. BRADEN:  Yes, the illustrative exhibits.

 6        And if we can go to Exhibit 30.

 7        And I promise, Your Honor, I'll try not to flog the

 8   dead horse here.

 9   Q    But there, there, there, there.  Did I circle areas

10   that are probably majority black?

11   A    Those are not majority African-American VTDs, but

12   there are some majority African-American census blocks

13   that are in the middle of those VTDs, yes.

14   Q    And those could have, if you were willing to divide

15   the VTDs, been put into the black majority district?

16   A    In a way that would create rather striking

17   noncompactness, but yes.

18   Q    So that -- so -- so in that particular case, race

19   didn't predominate over compactness?

20   A    In which particular case?

21   Q    In leaving out those black majority areas.

22   A    The decision to leave out those areas --

23            JUDGE PAYNE:  I don't think he understands the

24   question, and I don't understand it.  And I wouldn't mind

25   if you'd help clarify.
```

Rodden - Cross

```
1            MR. BRADY:  Sure.  Absolutely.

2   Q    You don't actually know the reason why, as an

3   example, this and this was not put into 74?

4   A    No.  I don't know the reason why any place was placed

5   within or without a district.  I am merely showing --

6   Q    Okay.  And I've circled what appears to be -- again,

7   interpreting your map so tell me if I'm wrong -- majority

8   black census blocks?

9   A    Yes.  But they're not contiguous with the district.

10  They're isolated from the district.

11  Q    But it is possible to have drawn them into 74,

12  correct?

13  A    One of the principles that is not --

14            JUDGE PAYNE:  Yes or no, please.

15  A    Not in accordance with the constitution of Virginia.

16            JUDGE PAYNE:  Dr. Rodden, please, yes or no.

17  A    No.

18  Q    And what Virginia provision would it not --

19  constitutional provision would it not provide?

20  A    Contiguity.

21  Q    So it would not be possible to go through these

22  relatively low or no population areas and include these

23  and not move out some other area and make the population

24  work?

25  A    Oh, I see.  So you're suggesting drawing a corridor
```

Rodden - Cross

1    and grabbing these and coming back?

2    Q    Yes.

3    A    That could have been done, sure.

4    Q    Would that conflict with some principle of

5    redistricting?

6    A    In that area, it would make it less compact.

7    Q    Okay.  So that -- so a consideration of compactness,

8    rather than race, might have kept that from happening?

9    A    It might have.

10   Q    Okay.  Let's go to page 39.  Have I circled around

11   majority black area?

12   A    Yes.

13   Q    And that did -- that's in what district?

14   A    Sixty-two.

15   Q    And could it have been put in here connected to the

16   majority black district?

17   A    It would have been possible to have split ward 4 and

18   come up and make that connection, yes.

19   Q    Did I circle what appears to be at least some

20   majority black census blocks?

21   A    I believe that area in that circle is 50/50.

22   Q    Okay.  I could have excluded that easily enough?

23   A    That would have been -- that would have involved a

24   split of -- no.  Yeah, I'm not sure where the split is.

25   I'm sorry, of Jefferson Park, if Jefferson Park was

Rodden - Cross

1   already split.

2   Q    So if I did that, it might conflict with some other

3   state criteria?

4   A    The lower circle there?

5   Q    Uh-huh.

6   A    I'm sorry.  I'm trying to understand where the

7   Jefferson Park boundary is.  No, I don't think that

8   would -- I mean, the VTD was already split.  So adding

9   that split I don't think would have done much to

10  contradict any other principles.

11  Q    Have I put another dot on a black community, black

12  neighborhood?

13  A    I can't tell.

14  Q    I probably -- let me.  My finger is not the best

15  writing instrument.  Do those appear to be potentially

16  majority black census blocks?

17  A    There are -- there are one or two blocks there, yes.

18  Q    And if we wanted to divide up and put blacks in black

19  majority districts, we could have included that?  That was

20  the goal of the process?

21  A    A lot more -- ward 7 could have been carved up in

22  more places than the one, yes.

23  Q    Okay.  Let's go to demonstrative on page 47.  Does

24  that show the Court what two districts?

25  A    It shows District 92 and 95, yes.

Rodden - Cross

1  Q     Is it my understanding that you believe the lengthy

2  north expansion is a reflection of -- of racial sorting?

3  A     Yes.

4  Q     Do you know --

5          JUDGE PAYNE:  Where is the racial north

6  expansion that you're speaking of?  You've got Districts

7  94 and 95, 64 and 79 and 96 and 93 all sort of depicted

8  there, and I don't know what you're talking about.  Can

9  you circle where you're talking about the northern

10 extension?

11     All right.  It's what has previously been referred to

12 as the handle of the meat cleaver, right?

13          THE WITNESS:  When I referred to the meat

14 cleaver, I was referring to 74.  This one I haven't come

15 up with a good analogy yet.

16          JUDGE PAYNE:  Okay.  So now we know it's the

17 part that runs from --

18          THE WITNESS:  It's Warwick Boulevard.

19          JUDGE PAYNE:  Warwick Boulevard is what it is,

20 from the delegate's house there in yellow, up to the upper

21 left part, and parallels 93.  Okay.  Gotcha.

22 Q     Do you know whether it would be possible to draw two

23 majority minority districts without going that far north?

24 A     Oh, I believe it would be possible, yes.

25 Q     And have you seen maps showing that it's possible to

Rodden - Cross

1   draw majority minority districts that go no further north

2   of that?

3   A    I'm not sure if I've seen maps like that, but I

4   believe that's possible.  These ended up being 60 percent

5   African-American voting age population districts.  So

6   these are two of the districts that had the largest

7   surplus beyond the 55 percent target.

8   Q    So it's the sort of -- let me go to -- and you have a

9   number of maps relating to the area that's circled where

10  you show split precincts?

11  A    Yes.

12  Q    And where do those appear in your report?  Page 47

13  maybe?

14  A    I think Figure 16, page 47.

15  Q    Okay.  If we could go to that.

16          JUDGE PAYNE:  And we're talking about

17  Plaintiffs' Exhibit 69 now?

18          MR. BRADEN:  Yes.  Yes, Your Honor.

19          JUDGE PAYNE:  Page 47?

20          MR. BRADEN:  Page 47.

21  Q    And was it your testimony that this line right here

22  exhibited stark racial sorting?

23  A    Yes.

24          JUDGE PAYNE:  So the record is clear, you're

25  talking about the line that runs along the Epes precinct

Rodden - Cross

1    in District -- what is it 95, and the Epes precinct; is

2    that right?  To the left side of the figure and the

3    western side of Epes; is that correct?  Is that what your

4    question relates to?

5              MR. BRADEN:  Yes, Your Honor.

6              JUDGE PAYNE:  Is that what your answer related

7    to, Dr. Rodden?

8              THE WITNESS:  Yes.

9              JUDGE PAYNE:  All right.  Thanks.

10   Q    And did I understand that you testified that that was

11   the reason for the wiggly line, the nonstraight line?

12   A    The map creates that appearance.

13   Q    Do you know whether that line follows a river?

14   A    There are some places in this area where there is a

15   river involved.  I'm not sure that's one of them.

16   Q    Okay.  Do you know the answer to that?

17   A    I believe I do.

18   Q    Okay.  Where is the river?

19   A    I believe it's further -- further north.

20   Q    You don't believe there's a creek boundary or

21   anything there?  That's just --

22   A    These are residential streets.  I'm quite sure of

23   that.

24             JUDGE PAYNE:  You don't think there's a creek in

25   there feeding a reservoir?  Is that what you're saying?

Rodden - Cross

1   A    Well, there's a creek in the area.  There are several

2   creeks.

3           JUDGE PAYNE:  In Epes?

4   A    I don't believe that the creek forms the boundary

5   between -- forms the 95 boundary in Epes.  You would

6   see -- you would see the lines would move like this.

7   There are no creeks that run like that.

8           JUDGE PAYNE:  I think we've got that fixed.  You

9   can go on.

10  Q    Do you know -- which precincts are split up here?  Am

11  I correct that Reservoir is split?

12  A    Yes.

13  Q    Do you know if Reservoir was unsplit and was -- was

14  put into the adjoining House district, this one, whether

15  or not 95 would still remain more than 55 percent black?

16  A    Of course, it would.  It ended up with 60 percent.

17  Q    Same way with all the split precincts?

18  A    That's right.

19  Q    So there was no need to split any of those precincts

20  to maintain a 55 percent black voting age population in

21  that district?

22  A    No, there was not.

23  Q    Would splitting those precincts potentially have a

24  political impact?

25  A    It could.

Rodden - Cross

1    Q    Does it have a political impact?

2    A    I don't know.

3    Q    You don't know how any of those precincts vote?

4    A    I know how the -- I've looked at how the precincts

5    vote.  I don't know, below the level of the precinct, how

6    people vote.  So I don't know what the purpose would be of

7    a precinct split.  There are a lot of white democrats in

8    this area.  So I would need to know -- I would need

9    political data to understand what would be the political

10   implication of the split.

11   Q    Is that precinct overwhelmingly democratic.

12   A    The Reservoir precinct as a whole?

13   Q    Yes.

14   A    I'm afraid I don't have that memorized.

15   Q    Do you know whether this one is overwhelmingly

16   democratic?

17           JUDGE PAYNE:  What's "this one"?

18           MR. BRADEN:  The one I just checked.

19           THE WITNESS:  Epes.

20           JUDGE PAYNE:  Epes.

21   A    I don't know.  I've looked at maps of this area and I

22   recall these precincts being rather democratic, but I

23   can't give you the numbers.

24   Q    So if I were to walk down here, you wouldn't be able

25   to tell me whether that -- the inclusion of that precinct

Rodden - Cross

1   in this district or in this district would have a

2   political impact?

3   A      Would the inclusion of the entire Epes precinct in --

4   I'm sorry.  Can you recall which district this is to the

5   west?

6   Q      Yeah.  Let me --

7                JUDGE PAYNE:  I don't think this was the

8   question, in fact.  You used the word "walk," and I don't

9   think anybody really had a handle on what you were asking.

10  Maybe you ought to try again.

11  Q      I will absolutely try again.  I think it might be

12  easier if we go to Defendant-Intervenors' Exhibit 94?

13               JUDGE PAYNE:  Do you have that over there,

14  Doctor?

15               THE WITNESS:  I can see it on the screen.  Yeah,

16  I think that's good enough.

17               MR. BRADEN:  I believe he has one of the map

18  books.  I could be wrong.

19               JUDGE PAYNE:  What page?

20               MR. BRADEN:  This would be page 14.

21  Q      If you have it in front of you.  You're not able to

22  comment on the politics of Reservoir, Epes or any of these

23  districts?  You simply just don't know?

24  A      I was willing to offer that they were majority

25  democratic VTDs, but I don't know by how much.

Rodden - Cross

1    Q    And do you know District 95, who was the member at

2    the time the plan was drawn?

3    A    Delegate BaCote.

4    Q    And Glenn Oder?

5    A    Was in District 94.

6    Q    Yep.  Two of them are in that district as drawn in

7    the 2000 -- let's ask about the HB 5005.  Are there two

8    members in 94 as drawn?  Do you see the stars?

9    A    Yes.  It appears to have been drawn to force Robin

10   Abbott to compete against Glenn Oder.

11   Q    And do you know the politics of political complexion

12   of District 94 in this configuration?

13   A    I believe it's fairly competitive.

14   Q    Okay.  What about District 93 on the other side?  Do

15   you know whether that was a competitive district?

16   A    I don't recall.

17   Q    So if someone testified that 93 was a politically

18   competitive district, you just couldn't have any opinion

19   on it?

20   A    That's correct.

21   Q    No knowledge.  And if 94 was politically competitive,

22   you couldn't have any opinion on that?

23   A    No.  I testified that I was aware that that was a

24   competitive district.

25   Q    So would it be safe to say, putting these areas in,

Rodden - Cross

1  if these areas were heavily democratic, if you put them in

2  either one of these two districts, it would make them more

3  democratic?

4  A    As if they were heavily democratic, it would have

5  that effect.

6  Q    And you don't know the answer, but if someone who did

7  know the answer said that, you would not be able to

8  dispute it?

9  A    Correct.

10 Q    That would be the same thing if we were to discuss

11 the city of Hopewell, correct?  You have no idea about its

12 politics?

13 A    I have some idea about the politics, but not very --

14 not in great detail.

15 Q    What would be some idea of the politics you

16 understand?

17 A    Well, as we already discussed, there were white

18 republican incumbents on both sides of the -- of the

19 district as drawn.  But I'm afraid I don't know the recent

20 election results for those two individuals, if that's what

21 you're asking.

22 Q    So if someone --

23      JUDGE PAYNE:  I know that you're mindful of what

24 he was qualified in as an expert and that he rambled a

25 little bit into this area in his direct testimony, but he

Rodden - Cross

1    isn't qualified to testify about the politics of places at

2    this juncture.  He hasn't been accepted as an expert in

3    that area, and yet you're asking him about it.  It's

4    considerably -- it's your own cross.  We've given you some

5    leeway, but we're getting close to the old rule of thumb

6    that enough is enough.

7              MR. BRADEN:  Yes, Your Honor.  I'll take your --

8    let me tell you what the rationale is for it, and I will

9    leave, while -- while I can, leave with my shield, which

10   is he opines continuously that race is the predominant

11   reason for a variety of these activities when, in fact, as

12   the Court has already recognized in this district, the

13   principal reason was politics.  I wanted to assure that he

14   hadn't actually looked at that issue.  But if --

15             JUDGE PAYNE:  I think he isn't, hasn't looked at

16   it.  He can't qualify to testify about it, and so we don't

17   need to pursue it anymore.  And I don't think Mr. Hamilton

18   has offered him for that purpose.  Have you?

19             MR. BRADY:  So I guess my only one question,

20   Your Honor, if you permit me, it seems, if you are going

21   to say that race is predominant, the predominant factor,

22   you have to eliminate other factors.  And it appears to me

23   he's incapable of eliminating other factors.  So it seems

24   that would be the basis for proving that his predominance

25   analysis is faulty.

Rodden - Redirect

 1          JUDGE PAYNE:  I think that's entirely a good

 2   argument to make, but we're not at that stage yet.

 3          MR. BRADEN:  Thank you, Your Honor.

 4          JUDGE PAYNE:  Let's get the record in first, and

 5   then we'll hear the argument.

 6          MR. BRADEN:  Thank you, Your Honor.

 7          JUDGE PAYNE:  All right.  You don't have much in

 8   the way of redirect, do you, Mr. Hamilton?

 9          MR. HAMILTON:  Not much.  Just a few points.

10          JUDGE PAYNE:  Good.

11                  **REDIRECT EXAMINATION**

12   BY MR. HAMILTON:

13   Q    Good morning, Dr. Rodden.

14   A    Good morning.

15   Q    I'm going to do my best to try --

16          JUDGE PAYNE:  Excuse me, Mr. Hamilton.

17       Ms. Hancock, I think that we need a change over here

18   for the legal assistant.  She was signaling.  Not to you,

19   but to Ms. Hancock.  So they can get ready and help you

20   along.

21          MR. HAMILTON:  She is more important than I am.

22   That's for darn sure.  Thank you.

23   Q    Dr. Rodden, you were asked by Mr. Braden a minute ago

24   about whether splitting census blocks is sometimes

25   necessary to equalize population between two districts

Rodden - Redirect

```
 1   when you engage in redistricting.  Do you recall those

 2   questions?

 3   A     Yes.

 4   Q     And I think your answer was that sometimes --

 5              MR. BRADEN:  Your Honor, I object.  I think

 6   that's a mischaracterization.  I think I said splitting

 7   the vote tabulation districts, and I don't think anybody

 8   has ever talked about actually splitting census blocks.

 9              MR. HAMILTON:  My apology.  I'll rephrase the

10   question.

11              JUDGE PAYNE:  I think he's right about that.

12              MR. HAMILTON:  He is, indeed.

13   Q     He asked you the question about whether it's

14   sometimes necessary to split VTDs, or precincts, in order

15   to equalize population between two districts.  Do you

16   recall that?

17   A     Yes.

18   Q     Is it necessary to split VTDs along -- in such a way

19   that divides predominately African-American areas from

20   predominately Caucasian, or white areas, in order to

21   equalize population?

22   A     Of course, not.  There's any number of ways to

23   achieve population equity through the VTD splits, any

24   number of VTDs to split and any number of ways to split

25   those VTDs to achieve that.
```

Rodden - Redirect

1   Q     Thank you.  Mr. Braden also asked you about your dot

2   density maps and whether they were ever used by

3   legislatures and municipal entities in drawing plans.  Do

4   you recall those questions?

5   A     Yes.

6   Q     Are dot density maps used in your field of study

7   of geo-spacial data analysis?

8   A     Yes, of course.

9   Q     Do you use them in your expert reports in the various

10  litigations you've appeared in?

11  A     Yes, of course.

12  Q     And did -- were they considered by this Court in the

13  voter ID case that you appeared in earlier in this matter?

14  A     Yes, they were.

15  Q     And are they useful tools for analyzing the

16  distribution of race and the impact that lines have on --

17  in drawing maps and how they affect the population and

18  racial composition of different districts?

19  A     Yes.  I hope I've demonstrated that it's a useful

20  analytical tool for examining the maps and understanding

21  the incidents of race and the drawing of the boundaries.

22  Q     Now, Mr. Braden asked you whether you were aware of

23  any legislature considering those maps.  Are you aware of

24  any legislatures considering expert reports like

25  Dr. Katz's report in -- during the process of --

Rodden - Redirect

1          JUDGE PAYNE:  That's beyond the scope of

2    cross-examination.

3          MR. HAMILTON:  I don't believe it is, Your

4    Honor.

5          JUDGE PAYNE:  You can call him back and deal

6    with it later if you need to.

7          MR. HAMILTON:  Thank you, Your Honor.

8          JUDGE PAYNE:  You haven't gotten to that point

9    in the record yet.

10   Q    Mr. Braden asked you about splitting Hopewell and

11   whether you had seen a map showing that it's possible to

12   achieve 55 percent districts without splitting Hopewell.

13   Do you recall those questions?

14   A    Yes.

15   Q    Was Hopewell split?

16   A    Yes.

17   Q    How was it split?

18   A    As we've seen in the maps, it was split right along

19   the racial divide.

20   Q    So if it's possible to achieve 55 percent without

21   splitting Hopewell, what does that tell us, that they did

22   it anyway along those lines?

23   A    I believe that's stronger evidence of racial

24   predominance.  If there's a setting in which the -- the

25   set target for satisfying the DOJ preclearance -- the

Rodden - Redirect

1  understanding of the DOJ preclearance requirements and

2  there are additional splits and stark racial divides that

3  were created that were not necessary for the creation of

4  that, that seems like stronger evidence of racial

5  predominance.

6  Q    In a traditional redistricting application, would

7  city boundaries typically be respected -- would the goal

8  be to not split cities or to split cities?

9  A    Typically in drawing a districting plan, we try to

10  keep cities together.

11  Q    How about counties?

12  A    Yes.  Counties also.

13  Q    Okay.  And do we see evidence in your analysis -- did

14  you find analysis of both split cities and counties

15  demonstrating racial predominance?

16  A    Yes.  We saw split counties, split cities,

17  municipalities.  What was really striking is we even saw

18  split small cities.  Suffolk and Hopewell are cities that

19  are easy to include whole in a districting plan, but yet

20  they were split along racial lines.

21  Q    Okay.  And we had this whole conversation about VTD

22  207 in The Fan and whether this made the neighboring

23  district more or less heterogeneous.  Is your point simply

24  that when you add another piece of The Fan to -- or a

25  piece of The Fan to the suburban district that comes into

Rodden - Redirect

1   Richmond, it makes it more heterogeneous?  Is that right?

2   A    That's the point I was trying to make, and I think I

3   wasn't clear enough.

4          MR. HAMILTON:  Could we go to page 20 of Exhibit

5   69?  Could you highlight that first paragraph that begins,

6   "Indeed, since Delegate Loupassi"?  And maybe blow that

7   up, if you can.

8   Q    So you were asked a couple of questions about this,

9   the last sentence in particular.  "It simply is not

10  plausible that splitting up The Fan neighborhood would

11  advance Mr. Loupassi's political career."  That was the

12  question you were asked by Mr. Braden, but I think he left

13  out the rest of the paragraph.  And I won't ask you to

14  read it in the interest of time, but the point of this

15  paragraph is that it was a poor performing district for

16  Delegate Loupassi; is that right?

17  A    Yes.  I simply reported the data.  I didn't think

18  there was anything controversial about that.

19  Q    All right.  Thank you, sir.  And would you remind the

20  Court, your Ph.D. is in what field?

21  A    Political science.

22  Q    Thank you.  Now, on -- Mr. Braden asked you a little

23  bit about school district boundaries.  I believe this was

24  in connection with your discussion of District 69 and

25  straddling the James River, and I think he asked you, do

Rodden - Redirect

1  you know if the school district knew about school district

2  boundaries.  Why did you bring up school district

3  boundaries in your report, sir?

4  A    Yes.  I find communities of interest to be a

5  difficult thing to -- to come to grips with, and I think

6  Courts have struggled with this as well.  And my use of

7  school district boundaries comes from, in my own

8  experience, the way people think about neighborhoods and

9  the way they think about their community is often very

10  much based on the attendance zone of the schools to which

11  children attend.

12      So it is useful to me as a shorthand for thinking

13  about neighborhoods and thinking about communities of

14  interest, because we don't have maps with geo-spacial

15  boundaries of communities of interest.  And we don't

16  have -- often we don't have maps with boundaries of formal

17  neighborhoods.  In Richmond, we do.  You know, people have

18  a very good idea of where The Fan begins and ends.  But

19  beyond that, the concept of neighborhood and community of

20  interest can be difficult.

21      And so I used school attendance zones and school

22  boundaries as a way of empirically addressing the notion

23  of communities of interest.

24  Q    Thank you, sir.  So I'm calling up the illustrative

25  exhibit that Mr. Braden used a minute ago.

Rodden - Redirect

1      MR. HAMILTON:  And if we could just zoom in on

2  the table at the bottom of this and enlarge it so that

3  it's actually readable for those of us over 50.

4  Q    He asked you about Jefferson Park.

5      MR. HAMILTON:  Move it up a little bit higher,

6  if you would, please.

7  Q    He asked you about Jefferson Park and he read off the

8  number of the -- the raw numbers of the black voting age

9  population that were assigned to the two different

10 districts, point out that District 62 was assigned 3136

11 African-Americans, while District 63 was assigned only

12 737.  Do you recall those questions?

13 A    Yes.

14 Q    Okay.  Has District 62 got a larger population than

15 District 63, raw population?  It's the first column.

16 A    You're referring to the population of the districts

17 within Jefferson Park?

18 Q    Correct.

19 A    Yes.  The population within 63 is 2127.  The

20 population within 62 is 6837.

21 Q    So -- so the portion assigned to District 62 was

22 three times larger than the portion assigned to District

23 63?

24 A    Yes.

25 Q    And it's roughly the same percentage African-American

Rodden - Redirect

1    population, despite the differences in the numbers,

2    because the districts -- the portions of the raw

3    population are much larger; isn't that right?

4    A    Correct.

5    Q    Okay.  Thank you.  Now, Mr. Braden asked you, just at

6    the end of your examination, about this northern arm that

7    extends and splits the Epes and Reservoir VTDs.  I'm not

8    sure if Ms. Marino can show that to us or not.

9         And I believe he asked, would it be possible to reach

10   55 percent black voting age population without splitting

11   these VTDs up here in the northern part of that extension.

12   Do you recall those questions?

13   A    Yes.

14   Q    And is it possible to reach 55 percent without

15   splitting those VTDs?

16   A    Yes.

17   Q    Did they do it anyway?

18   A    Yes.

19   Q    And why is that significant, or is it significant?

20   A    Well, my approach to -- throughout the report, was to

21   examine the lines that were drawn and to examine the

22   racial splits that they created.  And when the entire arm

23   of that on the west side was -- was formed by VTD splits

24   and it's not possible for all those VTD splits to have

25   been necessary for population equalization.  So I found

Rodden - Redirect

1   that to be strong evidence consistent with the notion of

2   predominance.

3   Q     And -- and Mr. Braden asked you, at various points,

4   about pockets of African-American communities that were

5   not included in one or another of the challenged

6   districts.  Was every single black voter in the Richmond

7   and tri-cities area drawn into one or another of the

8   challenged districts, every single voter?

9   A     Of course not.

10  Q     Was every single predominately census block drawn in?

11  A     No.

12  Q     Okay.  Is the same true in Tidewater?  Was every

13  single voter, African-American voter in the Tidewater area

14  drawn into one of the challenged districts?

15  A     No.  That would be impossible.

16        JUDGE PAYNE:  I think we're getting into some

17  pretty extrinsic material.  So anything else that you

18  have, Mr. Hamilton?

19  Q     Does the fact that not every isolated pocket of

20  African-Americans were drawn into one of the challenged

21  districts undermine your conclusions at all?

22  A     Of course not.

23        MR. HAMILTON:  Thank you, sir.

24     No further questions, Your Honor.

25        JUDGE PAYNE:  We're going to take a recess.  But

Rodden - Redirect

 1   I'd like to say something, but only on behalf of myself.

 2   I don't purport to speak to the Court.

 3       The experts are sitting in the room and the lawyers

 4   are in the room.  I do not find it helpful for experts to

 5   be advocates, for experts to go beyond the question that

 6   is asked.  If a lawyer wants to pursue it, the lawyer will

 7   pursue it.  All that does is indicate to me, in my

 8   credibility assessment, an inability to stay to the task

 9   and perhaps an indication of advocacy, which I don't think

10   is the role of experts.

11       And in addition to that, if an expert is asked a

12   question beyond his expertise, he can't testify to it

13   because he's not qualified in it or not been accepted in

14   that.

15       The defense has an obligation and the plaintiff have

16   an obligation to keep it that way; the plaintiff by

17   questioning and the defendant by objecting.  And what's

18   happened in this particular examination is that it has all

19   become particularly protracted, and unnecessarily so,

20   beyond the bounds of what he's qualified to testify to and

21   what he's accepted to.  And both of you have a

22   responsibility to keep that from happening.  Now, I don't

23   want to assume the responsibility, and I don't think

24   anybody else on the Court does.  But just remember, that

25   when an expert becomes an advocate, it affects the

Rodden - Redirect

1    credibility of the expert.

2         All right.  We'll take a 20-minute recess.

3              MR. HAMILTON:  Thank you, Your Honor.

4              (Recess taken.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MS. KHANNA:  Your Honors, plaintiffs call Dr. Maxwell
 2   Palmer to the stand.
 3              JUDGE PAYNE:  Dr. Palmer.
 4
 5                        MAXWELL B. PALMER,
 6   a witness, called at the instance of the plaintiffs, having
 7   been first duly sworn, testified as follows:
 8                        DIRECT EXAMINATION
 9   BY MS. KHANNA:
10   Q    Good morning, Dr. Palmer.
11   A    Good morning.
12   Q    Can you please state your full name for the record.
13   A    Maxwell Benjamin Palmer.
14   Q    And can you please spell your last name.
15   A    P-a-l-m-e-r.
16   Q    Dr. Palmer, you are an expert for the plaintiffs in this
17   litigation; is that right?
18   A    Yes.
19   Q    Can you please turn -- in the notebook in front of you,
20   can you please start -- look at the exhibit, Plaintiffs'
21   Exhibit 71 and Plaintiffs' Exhibit 72.
22   A    Yes.
23   Q    Do you have that open, the binder in front of you?
24   A    71 -- yes.
25   Q    Can you please identify those two exhibits.
```

Palmer - Direct

1    A    These are my expert report and reply report for this case.

2    Q    And you have working copies of those same reports with you

3    on the stand; is that right?

4    A    Yes.

5    Q    Can I direct your attention to page 69 of Plaintiffs'

6    Exhibit 71 which is your expert report.

7    A    Yes.

8    Q    What is this document?

9    A    It is my CV.

10   Q    Is this a complete and accurate summary of your

11   educational background and professional experience?

12   A    Yes.

13   Q    Can you please summarize your educational background.

14   A    I received an undergraduate degree in mathematics and

15   government and legal studies from Bowdoin College in Maine and

16   my Ph.D. in political science from Harvard University.

17   Q    Have you ever attended law school?

18   A    No.

19   Q    You are not a lawyer?

20   A    No.

21   Q    Where are you currently employed?

22   A    I'm an assistant professor of political science at Boston

23   University.

24   Q    And what are your principle areas of research?

25   A    My research focuses on American political institutions,

Palmer - Direct

1    including Congress and redistricting, as well as local

2    political institutions and the returns to office for

3    politicians.

4    Q    What classes do you teach?

5    A    I teach an introduction to American politics for

6    undergraduates as well as a course on Congress and bureaucracy.

7    For graduate students, I teach courses on formal theory and

8    political methodology classes on political analysis and

9    research design.

10   Q    Have you ever published peer-reviewed articles or studies

11   in the area of redistricting?

12   A    Yes.

13   Q    Can you identify those articles for the Court and briefly

14   describe them?

15   A    Yes.  There are two listed on my CV.  The first is

16   "Institutional Control of Redistricting and the Geography of

17   Representation" in the *Journal of Politics* with Barry Edwards,

18   Michael Crespin, and Ryan D. Williamson, and the second is "A

19   Two Hundred-Year Statistical History of the Gerrymander" in the

20   *Ohio State Law Journal* with Stephen Ansolabehere.

21   Q    Do you have any experience with redistricting outside of

22   academia?

23   A    Yes.

24   Q    In what way?

25   A    I have worked as a litigation consultant on numerous

Palmer - Direct

1    redistricting and voting rights cases.

2    Q    Can you please describe the kind of work you performed as

3    a litigation consultant?

4    A    I collected and merged complex data sets including census

5    data and precinct-level election data.   I did geographic

6    analyses including compactness, voter -- racially polarized

7    voting analyses including ecological regression and ecological

8    inferences.

9    Q    What cases were you involved in?

10   A    They are listed in paragraph ten of my report.   They

11   include *Perez v. Perry* in the Western District of Texas; *Harris*

12   *v. McCrory* in the Middle District of North Carolina; *Guy v.*

13   *Miller* in the District Court for Nevada, and two cases in state

14   courts in Florida.

15   Q    And you mentioned in paragraph ten that you worked

16   alongside Dr. Ansolabehere on some of these cases; is that

17   right?

18   A    Yes.

19   Q    Did you do any work with Dr. Ansolabehere in this case in

20   2015?

21   A    No.

22   Q    Have you ever testified as an expert witness before?

23   A    No.

24            MS. KHANNA:   Your Honors, pursuant to ER 702, I would

25   proffer Dr. Palmer as an expert in redistricting, political

1    science, and data analysis.

2              JUDGE PAYNE:  All three areas?

3              MS. KHANNA:  I think political science and data

4    analysis particularly as it pertains to redistricting.

5              JUDGE PAYNE:  Let's get it straight what we're doing

6    now, because we don't want to get into the problem we got into

7    with the last witness with testimony going beyond what he was

8    authorized to do.  One is what; an expert in redistricting?

9              MS. KHANNA:  Yes.

10             JUDGE PAYNE:  Anything else?

11             MS. KHANNA:  Data analysis and political science.

12             JUDGE PAYNE:  Data analysis of what?

13             MS. KHANNA:  Data in the -- as it pertains to

14   redistricting.

15             JUDGE PAYNE:  Data analysis as it pertains to

16   redistricting.  Do you accept him as an expert in those two

17   areas, Ms. McKnight?

18             MS. McKNIGHT:  Yes, Your Honor, we do.

19             THE COURT:  He's accepted as an expert in those

20   areas.

21             MS. KHANNA:  And that included political science; is

22   that correct?

23             JUDGE PAYNE:  No.  Redistricting and data analysis as

24   it pertains to redistricting.

25             MS. KHANNA:  Okay.  I also wanted to clarify that

Palmer - Direct

1    he's also an expert -- we're offering him as an expert in

2    political science also as it pertains to redistricting.

3            JUDGE PAYNE:  Do you accept him as that?  What does

4    that mean?  I majored in political science and I studied a lot

5    of things, but I don't know how you get to be an expert in one

6    without -- what that really means.

7            What is political science as it pertains to

8    redistricting --

9            MS. KHANNA:  Maybe I'm unnecessarily drawing a

10   distinction here and I don't mean to be, but as I understand

11   it, he testified about his doctorate in political science and

12   his experience and teaching in political science research

13   methodologies which include the statistical analyses and the

14   data analyses that we've already discussed.

15           JUDGE PAYNE:  So it's the same thing.

16           MS. KHANNA:  I think that's right.

17           JUDGE PAYNE:  She's accepted him in redistricting and

18   data analysis as it pertains to redistricting.

19           MS. KHANNA:  Thank you, Your Honor.

20   Q    Dr. Palmer, let's turn to your work that you specifically

21   performed with respect to this case.  What were you asked to

22   do?

23   A    I was asked to do three different things.  First, I was

24   asked to examine racial predominance in the drawing of the

25   district lines; second, racially polarized voting and a

Palmer - Direct

1    necessity of the 55 percent BVAP threshold; and third, to

2    evaluate the opinions of the other experts in this case.

3    Q    What materials have you reviewed in forming the expert

4    opinions for the reports that you prepared here?

5    A    I reviewed the 2015 court opinion as well as the expert

6    reports from 2015 along with four different data sources.

7    Q    What were those data sources?

8    A    First I used U.S. census data provided by both the U.S.

9    Census Bureau and the Virginia Division of Legislative

10   Services.  Second, I used cartographic shape files; that is

11   digital map files also from the Census Bureau and Virginia

12   Division of Legislative Services for census blocks, VTDs, and

13   the districts.  Third, precinct-level election results from

14   Virginia Department of Elections, and then fourth, data files

15   and code provided by the other experts in this case.

16   Q    And you are specifically referring to the data section,

17   Section 4 of your report on page four of Plaintiffs'

18   Exhibit 71; is that right?

19   A    Yes.

20   Q    You mentioned you also reviewed the expert reports

21   submitted in the 2015 round of this case?

22   A    Yes.

23   Q    What about your reply report, what materials did you

24   examine in preparing that?

25   A    The rebuttal reports by the expert witnesses, the data and

1   code they provided with their reports, as well as additional

2   election data from the Virginia Department of Elections, and

3   additional census data using the American Community Survey.

4   Q    So you reviewed the rebuttal report provided by Dr. Katz

5   in this case?

6   A    Yes.

7   Q    And his code as well?

8   A    Yes.

9   Q    Did you review the rebuttal report provided by Dr.

10  Hofeller in this case?

11

12              (Court reporter interruption.)

13

14              THE COURT:  Both you probably need to.  You are

15  picking up the pace.

16              MS. KHANNA:  I'm sorry, you'd like us to pick up the

17  pace?

18              JUDGE PAYNE:  No.  You're talking too fast.

19              MS. KHANNA:  I just wanted to make sure.

20  Q    Did you read the -- review the rebuttal report provided by

21  Dr. Hofeller in this case?

22  A    Yes.

23  Q    Did you review any code or data provided alongside?

24  A    No, he did not provide any code or data.

25  Q    And what about with Dr. Hood, did you review his report?

Palmer - Direct

1    A    Yes.

2    Q    And did you review his code as well and his data?

3    A    I reviewed his data.  He did not provide replication code.

4    Q    Dr. Palmer, were you able to reach a conclusion regarding

5    racial predominance in the drawing of the challenged districts?

6    A    Yes.

7    Q    What did you conclude?

8    A    Across three different analyses, I found evidence of

9    racial predominance.  First I found evidence that race

10   predominated in the ways that VTDs, cities, towns, and census

11   places were split within challenged and non-challenged

12   districts.

13        Second, I found evidence of racial predominance in the way

14   that populations were moved in and out of the challenged

15   districts, and, third, I found an analysis of race versus party

16   in the assignment of VTDs to challenged districts that race

17   predominated over party and had a large and statistically

18   significant effect on the assignment of VTDs to the challenged

19   districts.

20   Q    You also mentioned you were asked to examine racially

21   polarized voting in the challenged districts.  Did you reach

22   any conclusions with respect to your racially polarized voting

23   analysis?

24   A    Yes.

25   Q    What did you conclude?

Palmer - Direct

1    A    I concluded that the 55 percent BVAP threshold in the

2    challenged districts was not necessary for these districts to

3    continue electing African-American candidates of choice.

4    Q    Let's walk first through your predominance analysis.  You

5    have mentioned three different type of analyses that you had

6    looked at, and the Court has had an opportunity to study your

7    report, so we're not going to walk through every single data

8    point.  We're just going to hit on a few key components.

9         Let's start with your analysis of split geographies which

10   is the first substantive topic that you address in your report.

11   Why did you decide to examine split geographies as part of your

12   inquiry into racial predominance?

13   A    Respecting existing political boundaries is a core

14   traditional redistricting principle, and so I looked at

15   deviations from that principle and at that -- if there were --

16   if that was driven by race.

17   Q    And what can an analysis of split geographies tell us

18   about race?

19   A    If we find a consistent pattern of division by race, that

20   would be evidence of racial predominance in the violation of

21   the traditional redistricting principle.

22   Q    Let's first discuss your analysis of split VTDs.  First,

23   did you review Dr. Ansolabehere's analysis of split VTDs from

24   the 2015 litigation in this case?

25   A    Yes.

Palmer - Direct

1  Q    And do you recall what he concluded about VTD splits?

2  A    Yes.  His primary conclusion was that VTD splits were much

3  more common in the challenged districts than in the

4  non-challenged districts.

5  Q    And how does your analysis of VTDs compare to Dr.

6  Ansolabehere's analysis?

7  A    So I take the analysis another level to look at the

8  demographic differences between the different parts of the VTDs

9  that are split between the challenged and non-challenged

10 districts.

11          JUDGE PAYNE:  Does that mean you didn't compare them

12 then, because her question was how does yours compare to his.

13 Did you compare them, or are you saying you did something else?

14          THE WITNESS:  I did something else beyond what he

15 did.

16          JUDGE PAYNE:  But you didn't compare yours and his

17 then?

18          THE WITNESS:  They're in agreement.  That is, I found

19 the same number of split VTDs, and what I'm doing here is now

20 looking within the VTDs for differences across the splits.

21 Q    Thank you.  Dr. Palmer, is racial data available at the

22 VTD level?

23 A    Yes.

24 Q    What about election data, is that available at the VTD

25 level?

Palmer - Direct

1    A    Yes.

2    Q    And where does that election data come from?

3    A    The Virginia Department of Elections.

4    Q    And VTDs are comprised of census blocks; is that right?

5    A    Yes.

6    Q    What data is available at the census block level?

7    A    Counts of population by race and ethnicity.

8    Q    What about election data, is that available at the census

9    block level?

10   A    No.

11   Q    Why not?

12   A    The smallest unit at which we have electoral data in

13   Virginia is at the VTD level, and so while we would allocate

14   votes in the same proportion across all the census blocks, we

15   can't actually see any differences across VTDs -- across census

16   blocks, excuse me, in voting behavior.

17   Q    What about party registration information, is that

18   available below the precinct or VTD level?

19   A    No.  Virginia does not have party registration on its

20   voter file.

21   Q    So based on your analysis, how many VTDs were split

22   between a challenged and a non-challenged district?

23   A    There were 32 VTDs split between a challenged and a

24   non-challenged district.

25   Q    And I think there when we're defining those, you are

Palmer - Direct

1     talking specifically about those VTDs in which there was

2     population designated to either side of the split; is that

3     right?

4     A    That's right.  There were a few VTDs that were split but

5     where part of the -- part of the VTD in one district had no

6     population in it, for instance, if it was a park or a cemetery,

7     I did not look at those splits because there's no population to

8     compare to on the one side of the split.

9     Q    Okay.  And how many of the challenged districts included a

10    VTD or a populated VTD that was split on either -- with a

11    non-challenged district?

12           JUDGE KEENAN:  Excuse me, counsel.  If you could

13    clarify it for us, when you're referring to challenged

14    districts, are you referring to 75 within that group, or is 75

15    not part of that?

16           MS. KHANNA:  Thank you, Your Honor.  I think -- I

17    think I personally am referring to 75 within that group, I

18    think just because that was part of the analysis.  It was a

19    complete analysis that included all of the majority-minority

20    districts.

21           JUDGE PAYNE:  Were you, Doctor?

22           THE WITNESS:  Yes.

23           JUDGE PAYNE:  Why?

24           THE WITNESS:  I was asked to do so.

25           JUDGE PAYNE:  How many VTDs are there in all of the

Palmer - Direct

1   challenged and unchallenged districts in Virginia?  What's the

2   total number of VTDs in Virginia?

3           THE WITNESS:  It's a little bit more than 2,000.  I

4   don't have the exact number in front of me.

5           JUDGE PAYNE:  Excuse me, go ahead.

6   Q   Just to clarify, that was a little more than 2,000 VTDs

7   across the entire state?

8   A   That's right.

9   Q   Okay, so you mentioned that there were -- you referred to

10  32 populated VTD splits between challenged and non-challenged

11  districts.  How many challenged districts were encompassed in

12  those splits?

13  A   That included ten districts that had one or more VTDs

14  split with a non-challenged district.

15  Q   One of those ten was District 75; is that right?

16  A   That's right.

17  Q   What did you find regarding the respective populations in

18  each piece of those split VTDs?

19  A   I found that in 31 of the 32 split VTDs, the BVAP

20  percentage in the area allocated to the challenged district was

21  higher than the BVAP presented in the area allocated to the

22  non-challenged districts.

23      Overall, there was a 24 percent difference in BVAP between

24  the areas in the challenged districts and the areas in the

25  non-challenged districts.

Palmer - Direct

1  Q    Let's take a look at table three of your report.  That

2  will be Plaintiffs' Exhibit 71, page 52.  What does this table

3  depict?

4  A    This table lists all of the VTD splits in the

5  Dinwiddie/Greenville area.

6  Q    Okay.  I'd like to focus on the Hopewell Ward 7 VTD split

7  here at the very bottom just as an example.  Can you walk us

8  through the numbers that are reflected on table three for that

9  VTD?

10 A    Yes.  So, first, this table shows us that the VTD is split

11 between District 63 and District 62.  The next column shows the

12 total population in each part of the split; that is, there are

13 857 people in District 63 and 2,085 people in District 62.

14     The next column shows the number of black voting-age

15 people in each part of the split.  There are 398 black

16 voting-age people in District 63 and 390, almost the same

17 number, in District 62.

18     Then the last column has a BVAP percentage for each part

19 of the split.  That is what percent of the voting-age

20 population in that area is black, and here we see a stark

21 difference.  The population -- the voting-age population in

22 District 63 is 71.6 percent black compared to only 25.5 percent

23 black in District 62.

24 Q    Thank you.  So even though the absolute number of eligible

25 black voters appears to be similar, the percentage of total

Palmer - Direct

1    population or total number of voters is much higher in

2    District 63 than 62?

3    A    That's right.  Black voters are more heavily concentrated

4    in the District 63 portion than the District 62 portion.

5    Q    Can you turn to figure three of your report which is on

6    Plaintiffs' Exhibit 71, page 31.  I'd like to focus on that top

7    left figure entitled District 63:  Hopewell/Ward 7.  What does

8    this figure reflect?

9    A    This figure is a map of Hopewell Ward 7 which is the

10   entire area mapped here with the red lines noting the division

11   between District 63 and District 62.  There are light gray

12   lines that map out the boundaries of each census block within

13   Ward 7, and then each census block is shaded by the -- by its

14   share of the black voting-age population of the whole area that

15   resides in each block.  In other words, the darker the green

16   coloring, the higher the number of black voting-age people that

17   live in that particular block.

18   Q    How does this figure correspond to table three?

19   A    So this map just maps where black voting-age people live.

20   It doesn't show any relative population differences.  What it

21   shows is that there's an area at the bottom here right

22   underneath the number 63 with the highest concentration of

23   black voting-age people in the VTD.

24        Then if you look at the District 62 portion, which are all

25   sort of roughly a similar shade, we see that a lower

Palmer - Direct

1  concentration of black people are spread across the rest of the

2  District 62 portion of the VTD.

3  Q    Okay.  So I want to take a look at that scale, that legend

4  on the bottom of the figure.  Can you please explain what that

5  represents?

6  A    Yes.  So the scale shows the percentage of the total black

7  voting-age population within the VTD that resides in any one

8  census block, and so, for example, the scale goes up to about

9  45 percent for the darkest green area, and what that means is

10  that about 45 percent of the black voting-age people in the

11  entire VTD live in that one dark green census block that's

12  right below the number 63.

13  Q    And then the remainder are scattered throughout the

14  remainder of the VTD?

15  A    That's right.

16  Q    Is this same scale used in all of the figures of your

17  report?

18  A    No.

19  Q    Why not?

20  A    Each figure is its own separate map, and the scale is set

21  so that we can perceive differences within each map and not

22  across maps.

23  Q    So just to clarify, are you making -- in the figures

24  three, four, five, six, seven, are you making any comparisons

25  across VTDs?

Palmer - Direct

1    A    No.   I'm only looking at differences within VTDs.

2    Q    So the purpose -- then this particular map would show

3    where eligible black voters are residing in the VTD relative to

4    other places within that VTD.

5    A    That's right.

6    Q    What does this figure tell us -- I guess we've already

7    kind of covered that.  What does -- can you please turn to

8    table five of your report.

9              JUDGE PAYNE:   Table five or page?

10             MS. KHANNA:   Plaintiffs' Exhibit 71, page 54.

11   Q    Can you please briefly describe what this table is.

12   A    This is the exact same as table three but for the South

13   Hampton Roads area.   That is, it lists all the VTDs split in

14   this area with the population, number of black -- people of

15   black voting-age -- black voting-age people and percentages of

16   BVAP of each area.

17   Q    Okay.   I'd like to focus in on the Virginia Beach/Aragona

18   entry here.   Can you please tell us what you conclude from

19   table three regarding this particular VTD split.

20   A    Aragona is divided between District 90 and District 85.

21   There is 1,844 people in the District 90 portion of this split

22   and 5,436 people in the District 85 portion of the split.

23   There are 788 black voting-age people in District 90 and a

24   similar number, 792 black voting-age people, in District 85,

25   but because of the relative sizes of the populations in each

Palmer - Direct

1    part here, there's a very wide difference in the share -- in

2    the BVAP share of each part of the split.  61.6 percent of the

3    voting-age population in the District 90 part of Aragona is

4    black.  Only 19 percent of the population in the District 85

5    portion of Aragona is black.

6    Q    So a higher concentration in District 90?

7    A    Yes.

8    Q    Can you take a look at the Zion Grace VTD here on this

9    table.  Can you tell me what's different about that particular

10   VTD?

11   A    Zion Grace is the only exception.  It's the only one of

12   the 32 VTDs that is not divided such that there's a higher

13   concentration of black voters in the challenged district

14   portion than the non-challenged district portion.

15   Q    Did that surprise you?

16   A    The existence of one -- of this particular one didn't

17   surprise me.  What was surprising was that it was the only one

18   split in this way.  If we're splitting VTDs to equalize

19   population, we shouldn't expect to see the same consistent

20   pattern of division by race across all of them.

21        We should expect that some VTDs have a higher share of

22   black voting-age population in the challenged districts.  Some

23   VTDs should have a lower share of black voting-age population

24   in the challenged districts.  We should not expect to see a

25   consistent pattern.

Palmer - Direct

1   Q    And you just found this one in which that was not the

2   case?

3   A    This was the only one.

4   Q    Can we turn to figure five which is on page 33 of

5   Plaintiffs' Exhibit 71.  Let's focus on that map on the right.

6   This is the Aragona VTD; is that right?

7   A    Yes.

8   Q    And what do you conclude from this figure?

9   A    This figure, as in the previous one, maps just the Aragona

10  VTD and in the same way each census block is shaded by the

11  percentage of the black voting-age population of the VTD that

12  resides in that particular block.

13        So what we see in District 90 is there's one block with an

14  especially high concentration of black voting-age people, and

15  that is put in District 90.  And then District 85 generally has

16  a relatively low number of black voters spread across the rest

17  of the VTD.

18  Q    Let's take a look at table six of your report which is

19  page 55.  Without walking through the data points, we can just

20  briefly describe what this table is about.

21  A    This is the same table as the previous ones listing split

22  VTDs except for the North Hampton Roads area.  What this table

23  shows is there are five VTDs all split between District 95 and

24  Districts 93 or 94.  In all five cases, the portions of the

25  split VTDs allocated to District 95 have a higher share of the

1   black voting-age population than the portions put in Districts

2   93 or 94.

3   Q    We just walked through your analysis of the VTDs that were

4   split between challenged and non-challenged districts.  Did you

5   draw any conclusions based on your analysis of this VTDs?

6   A    Yes.  I found a consistent pattern of division by race in

7   how VTDs were split between the challenged and non-challenged

8   districts.  Areas of higher concentrations of black voting-age

9   population were put in the challenged districts.  Areas of

10  lower concentrations of black voting-age population were put

11  into the non-challenged districts.

12  Q    Dr. Palmer, is it common to split VTDs for purposes of

13  equalizing population?

14  A    Yes.  Splitting VTDs to equalize population is very

15  common, but, as I said, what's uncommon is to see this

16  consistent pattern of splitting by race.

17  Q    What about the number of VTD splits in a given district,

18  can that tell us anything about whether the VTD splits were

19  necessary for population equality?

20  A    Generally, we should be able to only split one VTD between

21  a given pair of districts to equalize the population.

22  Q    If can you please turn back to table four which is on page

23  53 --

24         JUDGE PAYNE:  You can achieve population equality in

25  every instance only by -- and it's only then necessary to split

Palmer - Direct

1    one VTD no matter what you are doing?  Is that your principle?

2              THE WITNESS:  That should generally be the case.

3              JUDGE PAYNE:  No matter what the population of it is?

4    Suppose one is -- the goal is 81,000 and the population is 50-,

5    are you saying that in that instance, it should be necessary to

6    split only one VTD to get to 80?

7              THE WITNESS:  I'm sorry, I don't understand the

8    question.

9              JUDGE PAYNE:  Population equality is what you are

10   talking about; right?

11             THE WITNESS:  Yes.

12             JUDGE PAYNE:  The goal is 80,000.  In fact, you have

13   50,000 in the district.  Are you saying that in order to get

14   the population goal up to 80,000, all you have to do is split

15   one VTD?

16             THE WITNESS:  No.  The first thing you would do would

17   be to move many whole VTDs that are not split to get relatively

18   close to 80,000, and then once you are within a thousand or a

19   few hundred of the target, then you would split one VTD to

20   achieve equal population.

21   Q    Just to clarify, Dr. Palmer, is it your testimony that it

22   is always only one VTD that should be split for population

23   equality or that that's generally the case?

24   A    Generally the case.

25   Q    And maybe --

Palmer - Direct

1          JUDGE PAYNE:  Excuse me, but why is it generally the

2     case?  Say you have 80,000 and 70,000, why is it then necessary

3     to split only one VTD to get population equality?

4          THE WITNESS:  You could first move whole VTDs to get

5     closer to population equality before it was necessary to split

6     one to get to the actual target number.

7          JUDGE PAYNE:  Suppose you couldn't do that.

8          THE WITNESS:  I suppose there might be a rare case

9     where you wouldn't, but generally, imagine you have one

10    district at 75,000 people and one district at 85,000 such that

11    need to move 5,000 people from one VTD to the other.

12          If there are -- if there's -- if the VTDs are really

13    big, let's say there's a 10,000-person VTD, you could split

14    that one and one alone.  But if the VTDs are small, let's say

15    about a thousand people each, you could just move five whole

16    VTDs to get equal population and not have to split them all.

17    Q    Maybe it would help to look at an example.  If you could

18    turn back to table four which is on page 53 of your report.  So

19    I believe here we see three VTDs that are split between

20    District 74 and District 72; is that right?

21    A    Yes.

22    Q    Those are the Belmont, Brooklyn, and Moody VTDs.

23    A    Yes.

24    Q    Would there have been a way to unsplit some of these VTDs

25    and still achieve population equality?

Palmer - Direct

1    A    Yes.

2    Q    How?

3    A    One way to do this is to see that in the Brookland VTD,

4    only 205 people are being put into District 74, and in the

5    Moody VTD, only 594 people are being put into District 74.

6    That is a total of 799 people.

7         Another way to get 799 people put into District 74 would

8    be to look at the Belmont VTD where there's 1,239 people in the

9    72 portion.  That is, instead of splitting three VTDs, we could

10   reconfigure the Belmont VTD to take an additional 799 people

11   out of the District 72 portion and put them into District 74

12   portion.

13        And then instead of splitting Brookland and Moody, you

14   would just put those two VTDs entirely within District 72.  So

15   what that would do would be to keep the populations of each

16   district exactly the same while only having one VTD split.

17             JUDGE PAYNE:  What would it do to the BVAP population

18   in the structure you just described?

19             THE WITNESS:  I have not done that calculation.

20             JUDGE PAYNE:  Wouldn't you have to do that

21   calculation if you were doing a redistricting and trying to

22   comply with the Voting Rights Act?

23             THE WITNESS:  If it was necessary to split these

24   three VTDs in this way to achieve the --

25             JUDGE PAYNE:  That's not what I asked.  Wouldn't you

1    have to do that calculation in order to make sure you were

2    complying with the Voting Rights Act?

3              THE WITNESS:  Yes.

4              JUDGE PAYNE:  Okay.

5              MS. KHANNA:  To clarify, I understood that that -- my

6    question was really specifically about population equality to

7    the extent that the argument is being made VTDs were split not

8    for racial purposes or Voting Rights Acts purposes but for the

9    population equality purposes to see if they could have been

10   unsplit in certain ways --

11             JUDGE PAYNE:  Just ask a question.  You don't have to

12   go back and argue.

13             MS. KHANNA:  Understood, Your Honor.

14   Q    Dr. Palmer, you also provided a logistic regression

15   analysis of census block assignment to challenged districts; is

16   that right?

17   A    Yes.

18   Q    What is a logistic regression analysis?

19   A    Logistic regression analysis is a model that estimates the

20   probability that a census block within one of the split VTDs

21   will be assigned to a challenged district as a function of its

22   black voting-age population.

23   Q    So it's a predictive assessment of the likelihood a VTD

24   would be assigned to a challenged district as a function of its

25   race.

1   A     That's right.

2   Q     And is that reported anywhere -- where do you report the

3   results of that analysis?

4   A     Table two.

5   Q     That's on page 51 of your report.  And without walking

6   through each and every data point, can you just tell us what

7   you conclude from table two?

8         JUDGE PAYNE:  What page is that?  Excuse me.

9         MS. KHANNA:  Sure.  We're on page 51 of Plaintiffs'

10  Exhibit 71.

11  Q     So can you tell us what you conclude from table two?

12  A     I find a strong positive and statistically significant

13  relationship between the black voting-age population within a

14  census block and its likelihood of being assigned to a split --

15  I'm sorry, its likelihood of being assigned to a challenged

16  district.  That is, the higher the BVAP within a census block,

17  the more likely it is to be assigned to a challenged district.

18  Q     Okay, Dr. Palmer, you also examined VTDs that were split

19  between two challenged districts; is that right?

20  A     Yes.

21  Q     And is that on table seven of your report?

22  A     Yes.

23  Q     Table seven is on page 56.  Did you draw any conclusions

24  based on your analysis of VTDs that were split between two

25  challenged districts?

Palmer - Direct

1    A    Yes.   The effect of these VTD splits is to achieve the

2    55 percent BVAP threshold in one or both of the districts

3    between which they are split.

4    Q    If we could take a look at the Brambleton VTD here on

5    table seven, this is split between Districts 89 and 90; is that

6    right?

7    A    Yes.

8    Q    And what is the BVAP of District 89 under the enacted map?

9    A    Under the enacted map, the BVAP of District 89 is

10   55.5 percent.

11   Q    What is the BVAP of District 90?

12   A    56.6 percent.

13           MS. KHANNA:   And just to clarify for the Court, those

14   BVAP numbers are reflected -- the BVAP of the districts in the

15   enacted map, they're on table 22 of Dr. Palmer's report.

16   Q    So what does your analysis show about how the Brambleton

17   VTD was divided between these two challenged districts?

18   A    So this is a high BVAP VTD.   It's 96 percent BVAP.   Under

19   the benchmark map, it was entirely in District 90, and if this

20   was restored holding all else equal, such as the entire VTD

21   were put back into District 90, then BVAP in District 89 would

22   drop from 55.5 percent to 54.7 percent, below the 55 percent

23   BVAP threshold.

24   Q    Let's look at the Richmond city 505 VTD.   That's divided

25   here between Districts 6 -- actually, let me take a jump to 703

Palmer - Direct

1    first.

2              JUDGE PAYNE:  Say again.

3              MS. KHANNA:  My apologies.  I'm going to go to 703

4    before I go to 505.

5    Q    That one is divided between District 70 and 71; is that

6    right?

7    A    Yes.

8    Q    What is the BVAP of District 71 under the enacted map?

9    A    55.3 percent.

10   Q    What about the BVAP of District 70 in the enacted map?

11   A    56.4 percent.

12   Q    What does your analysis show about how VTD 703 was divided

13   between these two challenged districts?

14   A    Like Brambleton, VTD 703 is a high BVAP VTD.  It is

15   89.9 percent BVAP.  Under the benchmark map, it was entirely in

16   District 70, and if, holding all else equal, this VTD were

17   returned entirely to District 70 and not split, then BVAP in

18   District 71 would drop to 54.9 percent.

19   Q    Now let's take a closer look at the Richmond city 505 VTD.

20   That one is split between District 69 and 71.  What is the BVAP

21   of District 69?

22   A    55.2 percent.

23   Q    What about 71?

24   A    55.3 percent.

25   Q    What does your analysis show about the way this VTD was

Palmer - Direct

1  split between these two challenged districts?

2  A    This VTD is different from the previous two.  It is a very

3  low BVAP VTD, only 15 percent BVAP, and as a result, this is

4  more about the allocation of white voters and the effect of the

5  allocation of white voters on BVAP levels in the districts

6  rather than the allocation of black voters.  That is, if we

7  undid this split, holding all else equal, and put the entire

8  VTD in District 71, then the BVAP of District 71 would drop to

9  45.5 percent.

10 Q    If you put the entire VTD in 71, the BVAP of 71 would have

11 dropped; is that right?

12 A    Yes.  Similarly, if you put the entire VTD into District

13 69, then the BVAP of District 69 would drop to 54.4 percent.

14 Q    Dr. Palmer, why does the movement of white voters matter?

15 A    Achieving the 55 percent BVAP threshold can be done in two

16 ways.  One is adding more black voters, and one would be

17 removing nonblack voters.  So the addition of nonblack voters

18 reduces the overall percentage of black voters within the

19 district.

20 Q    So if this predominantly white VTD were added to either

21 one of the challenged districts entirely, then that particular

22 challenged district would have fallen below 55 percent

23 threshold; is that right?

24 A    That's right.

25 Q    Okay, Dr. Palmer, all of these VTD that we've talked

Palmer - Direct

1    about, including those that are split between challenged and

2    non-challenged and those that are split between two challenged

3    districts, could they have been divided on the basis of

4    partisanship?

5    A     No.

6    Q     Why not?

7    A     We don't have any party data below the VTD level.

8    Q     Can we take another look at figure five on page 33 of your

9    report.  I'm looking back at that Aragona VTD that we looked at

10   earlier.  This shows us where black voters live within the VTD;

11   is that right?

12   A     Yes.

13   Q     And it shows a higher concentration of black voters in the

14   District 90 portion than in the District 85 portion?

15   A     Yes.

16   Q     Now, using available election data, can you tell me where

17   the higher concentration of Democrats is in this VTD?

18   A     Using election data alone, no, I cannot.

19   Q     You couldn't draw a line between predominantly democratic

20   areas and predominantly Republican areas within the VTD, could

21   you?

22   A     No, I could not.

23   Q     But we can draw a line between predominantly black areas

24   and predominantly white areas; is that fair?

25   A     Yes.

Palmer - Direct

1   Q    Did you also --

2            JUDGE PAYNE:  Excuse me.  You do have the results of

3   Democratic/Republican, for example, in each VTD.

4            THE WITNESS:  Yes, but not within the VTD.  That is,

5   I don't know which census blocks have larger shares of

6   Democrats and which census blocks have larger shares of

7   Republicans.  I have to assume that the share is the same

8   across the entire VTD.

9            JUDGE PAYNE:  But is that a logical assumption, that

10  it's all concentrated across -- in one place in every VTD?

11           THE WITNESS:  We have no data to do it otherwise.

12           JUDGE PAYNE:  You assume it because you have no data;

13  is that what happens?

14           THE WITNESS:  The standard assumption is to allocate

15  the votes in proportion to population across the VTD.

16  Q    So the standard assumption then is that Democrats and

17  Republicans are distributed evenly across the VTD?

18  A    Yes, in the same proportion as whatever the overall VTD

19  vote shares were.

20           JUDGE PAYNE:  But the standard assumption exists

21  because you don't have data to show otherwise; is that what you

22  are saying?

23           THE WITNESS:  That's right.

24           JUDGE PAYNE:  Thank you.

25  Q    Dr. Palmer, did you examine splits in political

Palmer - Direct

1    subdivisions other than VTDs?

2    A    Yes.

3    Q    And what political subdivisions did you analyze?

4    A    I looked at a number of other places including

5    incorporated towns, incorporated cities, a military base, and

6    census places.

7    Q    Why did you look at these political subdivisions?

8    A    Respecting municipal boundaries is a traditional

9    redistricting principle, and just as with VTDs, I was looking

10   to see how these places were divided if they were divided.

11   Q    Did you draw any conclusions based on your examinations of

12   cities, towns, and other municipality splits?

13   A    Yes.  I identified 25 places including ten cities, four

14   towns, one military base, and ten unincorporated places that

15   were split between a challenged and a non-challenged district,

16   and in almost all of them, the same pattern was evident as with

17   the VTDs where areas of higher concentrations of black

18   voting-age people were put into the challenged districts and

19   areas of lower concentrations were put into the non-challenged

20   districts.

21   Q    So you found the same pattern in all of the political

22   subdivisions you analyzed as you did with VTDs.

23   A    Yes.  There was one exception, and it was seven people

24   total.

25   Q    Dr. Palmer, you also addressed the topic of population

Palmer - Direct

1   shifts in your analysis of racial predominance.  Can you tell

2   me what the purpose of that analysis is?

3   A    This is another way of looking at racial predominance

4   based on how populations are moved out of challenged districts

5   and into challenged districts.

6   Q    And can you briefly summarize the analysis and conclusions

7   that Dr. Ansolabehere provided this Court with respect to

8   population shifts in the challenged districts?

9   A    Yes.  Dr. Ansolabehere analyzed population flows between

10  districts, and he did find evidence of racial differences in

11  the areas moved in and out --

12       JUDGE PAYNE:  Why are you summarizing what

13  Ansolabehere did?  That's there, and his testimony is there,

14  and we're -- it's part of the record.  I don't know why he

15  needs to summarize what's already in the record.

16       MS. KHANNA:  Understood, Your Honor.  I'm just trying

17  to make sure he can distinguish what his analysis is that's

18  different than Dr. Ansolabehere's.

19       JUDGE PAYNE:  Why don't you just have him do what he

20  did.  If you want to draw the distinction, you can draw it

21  different.  We're just going to get things complicated if we

22  don't keep it confined to the particular expert.

23  Q    Can you please the tell the Court, what analysis did you

24  perform with respect to population shifts?

25  A    Yes.  I looked at shifts between individual districts and

1   also looked at the shifts in aggregate.  The main results are

2   in tables 18 and 19, and what I do is, I look at the shares of

3   population from the benchmark districts moved into and out of

4   the challenged districts.

5   Q    Okay.  So returning to tables 18 and 19 which are on page

6   62 of Plaintiff Exhibit 71 in your report, can you please

7   describe, what does table 18 show?

8   A    Table 18 lists the 19 non-challenged districts that

9   transferred population to one of the challenged districts under

10  the enacted map, or one or more challenged districts under the

11  enacted map.

12  Q    Did you draw any conclusions based on your analysis in

13  table 18?

14  A    Yes.  Let me just explain what the columns of table 18 are

15  first.  There's four different quantities calculated here.  The

16  first is the percentage of the population of these districts

17  that is transferred to challenged districts.

18       The second is a percentage of the black voting-age

19  population transferred out of these non-challenged districts to

20  challenged districts.

21       The third column is the percentage of the white voting-age

22  population transferred out of these districts to challenged

23  districts, and the fourth column, an estimated percentage of

24  Democratic votes moved out of these districts into challenged

25  districts.

Palmer - Direct

1   Q    And did you draw any conclusions here?

2   A    Yes.  Across all of the districts, with the exception of

3   District 100, I observed the same pattern; that is, black

4   voters are moved out of the non-challenged districts and into

5   challenged districts at a higher rate than the population as a

6   whole, at a higher rate than white voters are moved, and at a

7   higher rate than Democratic voters are moved.

8   Q    Can we take a look at table 19 on the same page.

9   A    So this table has the exact same quantities except for the

10  districts, the challenged districts that transferred population

11  to non-challenged districts.

12  Q    What did you conclude based on this analysis?

13  A    This table shows the opposite pattern.  That is, black

14  voters are moved out at a lower rate than population as a

15  whole.  They're moved out to non-challenged districts at a

16  lower rate than white voters as a whole, and they're moved out

17  at a lower rate than Democrats as a whole.

18  Q    Dr. Palmer, you also provided a race-versus-party analysis

19  in your examination of racial predominance; is that right?

20  A    Yes.

21  Q    So what prompted that analysis?

22  A    In the previous trial, Dr. Ansolabehere presented several

23  different analyses of race versus party in the assignment of

24  VTDs to challenged districts.  Dr. Katz disputed only one of

25  these analyses but presented conflicting results, and I looked

Palmer - Direct

1    at this analysis and tried to reconcile the differences between

2    the two and come to a clear answer on this question.

3    Q    So you are focusing specifically on the regression model

4    that both Dr. Ansolabehere and Dr. Katz looked at in 2015; is

5    that right?

6    A    That's right.

7    Q    And what were the differences between Dr. Ansolabehere's

8    and Dr. Katz's models for determining the predictive value of

9    race versus party in VTD assignment?

10   A    There were two differences in the models.  The first

11   difference was that Dr. Ansolabehere weighted the observations

12   which are VTDs in his models by population while Dr. Katz did

13   not use weights, and the second difference is that Dr. Katz

14   included 12 measures of distance in his models.

15   Q    Okay.  So he raised two issues, population weights and the

16   distance measure.  I'm going to talk first about population

17   weights.  Can you first explain what that means, weighting by

18   population?

19   A    In a statistical model, we sometimes weight observations,

20   and in this case each observation is a VTD in Virginia, to

21   reflect that not every observation is equally important.  And

22   in this case, we weight by population to reflect that larger

23   VTDs with more people have a larger effect on the result than

24   smaller VTDs with fewer people.

25        And we want to reflect this for a few reasons.  First,

Palmer - Direct

1    when a large VTD is assigned to a district, more people are

2    affected by that assignment than when a smaller VTD is

3    assigned.  And second, a larger VTD has a larger impact on the

4    composition of its district when it's assigned than a smaller

5    VTD.

6    Q    Okay.  Can you please turn to table 20 in your report

7    which is page 63.  So, what does this table reflect generally?

8    A    This table shows regression results from five different

9    models reflecting the impact of race versus party on the

10   assignment of VTDs to challenged districts.

11   Q    Okay.  So let's start with model one entitled

12   Ansolabehere.  What does this one show us about the predictive

13   value of race versus party on VTD assignment?

14        JUDGE PAYNE:  Excuse me.  What do you mean by

15   predictive value?  What does that mean?

16        THE WITNESS:  We're looking at the relationship

17   between black voting-age percentage in the VTD, Democratic

18   support in the VTD, between those two variables an assignment

19   to challenged districts.

20        JUDGE PAYNE:  What does predictive mean?

21        THE WITNESS:  It means --

22        JUDGE PAYNE:  What are you predicting?

23        THE WITNESS:  We're trying predict whether a VTD is

24   assigned to a challenged district or a non-challenged district.

25        JUDGE PAYNE:  That's all.  You're not trying to

Palmer - Direct

1   predict the motivation for making the assignment?

2          THE WITNESS:  We're trying to predict using this

3   data.

4          JUDGE PAYNE:  Predict the assignment, not the

5   motivation for the assignment.

6          THE WITNESS:  That's right.

7          JUDGE PAYNE:  All right.

8   Q    Is it fair to say you're trying to predict the likelihood

9   of a VTD being assigned to a challenged district based on

10  either its racial composition or its Democratic performance?

11  A    Yes.

12  Q    Let's start with model one.  Can you please explain what

13  this model tells us.

14  A    This model replicates Dr. Ansolabehere's model from his

15  original report but using the data that Dr. Katz used in his

16  report, and I used Dr. Katz's data here, the entire analysis

17  that were entirely consistent with each other.  There's no

18  differences due to different data sources or defining variables

19  in different ways.

20  Q    What conclusions can be drawn from Dr. Ansolabehere's

21  model here using Dr. Katz's date?

22  A    Dr. Ansolabehere finds a large and statistically

23  significant effect of BVAP on VTD assignment to a challenged

24  district.  He finds no such effect on average Democratic vote

25  share, and the difference between the effect of BVAP and the

Palmer - Direct

1   effective vote of Democratic vote share is also positive and

2   statistically significant.

3        What this means is that here, he finds evidence that race

4   predominated over party in the assignment of VTDs to challenged

5   districts, and there is no effect of party in this

6   assignment --

7             JUDGE PAYNE:  Slow down.  I'm having trouble

8   following you, if you don't mind.

9   Q    Can you repeat, what does that mean for model one?

10  A    It means that race predominated over party in the

11  assignment of VTDs to challenged districts and that there was

12  no effective party in the assignment of VTDs to challenged

13  districts after accounting for the effect of race.

14  Q    Okay.  Can we take a look at model two, and please

15  describe what that is.

16  A    This is Dr. Katz's baseline model.  It's the same model

17  that he has in his original report.

18  Q    What does it include?  What does that baseline reflect?

19  A    This has both of the differences from Dr. Ansolabehere's

20  model.  That is, it does not use population weights and

21  includes 12 new measures of distance that Dr. Ansolabehere did

22  not use.

23  Q    What does Dr. Katz conclude from his model?

24  A    Dr. Katz comes to a different conclusion than Dr.

25  Ansolabehere.  He finds that both race and party had positive

Palmer - Direct

1    and statistically significant effects on the assignment of VTDs

2    to challenged districts, and he does not find that there's no

3    statistically significant difference between the effect.  That

4    is, he does not find that race predominates over party or that

5    party predominates over race.

6    Q    Okay.  Can you please go to model three.  That one is

7    entitled Katz Weighted.  Can you explain what that model is?

8    A    Model three is Dr. Katz's model with the addition of his

9    12 distance measures but also with the population weights that

10   Dr. Ansolabehere uses.

11   Q    So what conclusions can be derived from that model?

12   A    Here, we gets results that are very similar to Dr.

13   Ansolabehere's original model.  That is, there is a large

14   positive and statistically significant relationship between

15   BVAP and assignment of A VTD to a challenged district.  There

16   is no such relationship between Democratic vote share and

17   assignment to a challenged district, and the difference between

18   the effect of BVAP and the effect of the average Democratic

19   vote share is positive and statistically significant.

20   Q    What does that mean?

21   A    What that means is that race predominated over party, and

22   there is no effective party on VTD assignment.

23   Q    When Dr. Katz's model includes population weights, that's

24   the conclusion that's derived?

25              JUDGE PAYNE:  Why do you use Dr. Ansolabehere's

Palmer - Direct

1    population figures in that, and what's the purpose of doing

2    that?  What are you trying to accomplish when you do that?

3                  THE WITNESS:  The purpose of population weights --

4                  JUDGE PAYNE:  No, in this analysis, not generally.

5    Why are you using Ansolabehere's weights in what is column

6    three here under Katz weighted?  Why are you doing that?

7                  THE WITNESS:  I believe that is a correct way to

8    estimate this model.  That is, the weights play an important

9    role in this calculation, and excluding them produces an

10   incorrect result.

11                 JUDGE PAYNE:  Why did you choose Ansolabehere's

12   weights instead doing your own or doing Katz's or finding them

13   from somewhere else is what I'm trying to get ought.

14                 THE WITNESS:  So the weights are very simple.  It's

15   simply the population based on census data of each VTD.

16   Calculating the weights is not sort of a part -- there's no

17   complexity to calculating the weights.  It's simply the

18   population.  Weighting by population is a standard approach

19   here and, I believe, the correct one.

20                 JUDGE PAYNE:  Thank you.

21   Q    Did Dr. Ansolabehere's model include weights by

22   population?

23   A    Yes.

24   Q    Did Dr. Katz's model include weights by population?

25   A    No.

Palmer - Direct

1    Q    Did it include weights of any kind?

2    A    Not in his original report.

3    Q    So you've added just the population weighting to Dr.

4    Katz's model here; is that right?

5    A    Yes.

6    Q    In model three.

7    A    Yes.

8    Q    Okay, you also mentioned the issue of including a distance

9    measure in these models.  Can you please explain the

10   differences between Dr. Ansolabehere and Dr. Katz's models when

11   it came respect to that distance measure?

12   A    Dr. Ansolabehere did not use any distance measure in his

13   analysis.  Dr. Katz argued that a distance measure was

14   necessary here to theoretically add some context of the

15   location of VTDs in relation to the challenged districts, and

16   so what he did was he calculated --

17   Q    I'm going to stop there one second.  I just want to make

18   clear for the Court, so Dr. Ansolabehere's model included

19   population weights.  Dr. Katz's model did not include weights

20   of any kind; is that right?

21   A    Yes.

22   Q    And Dr. Katz's model included a distance measure whereas

23   Dr. Ansolabehere's model did not include any distance measure;

24   is that right?

25   A    That's right.

Palmer - Direct

1   Q    And so --

2            JUDGE PAYNE:  Before you proceed, would you tell us,

3   refresh our recollection about what the distance was that was

4   used by Dr. Katz, the distance measure so we can understand

5   your testimony?

6            THE WITNESS:  Yes.  Dr. Katz calculated 12 measures

7   for every VTD.  The distance between the centroid, that is the

8   geographic center of each VTD, and the centroid, the geographic

9   center of each of these benchmark districts.  So he calculated

10  how far each VTD was from each of the 12 benchmark districts.

11  Q    What was your assessment of those 12 measures of distance

12  that Dr. Katz used?

13  A    Including all 12 measures produced inconsistent results in

14  his model, and -- because they're highly correlated.  That is,

15  as a VTD moves farther away from one benchmark district, it's

16  also going to move farther away from other nearby benchmark

17  districts.  So when you look at the full results of Dr. Katz's

18  original model, which I present in table 121, we see this

19  inconsistent pattern.

20  Q    So I'm going to refer the Court to table 21 of your report

21  which is on page 64 of Plaintiffs' Exhibit 71.  So can you

22  please explain what table 21 is.

23  A    Table 71 is Dr. Katz's model from his original report but

24  includes the full results of the model.  In addition to the

25  variables we've already looked at, it includes the effects of

Palmer - Direct

1    the 12 different distance measures listed here which are

2    admitted from Dr. Katz's table in his original report.

3    Q    So you mentioned an inconsistency among these 12 distance

4    measures.  Can you explain what that is or where we'd find it?

5    A    Yes.  We see it by looking across the coefficients, that

6    is the number next to each distance measure for the 12

7    districts.  What we should expect is a negative relationship

8    between distance and assignment to a challenged district.

9         That is, as a VTD gets farther away from a challenged

10   district, it should be less likely to be assigned to it.  We

11   wouldn't expect a challenged district at the far west side of

12   Virginia to be more likely to be assigned to a challenged

13   district than one on the eastern side of Virginia.  And so what

14   we see if we look across these 12 --

15              JUDGE PAYNE:  Say that again.  You didn't say

16   anything about the distance.  You said the direction.  You are

17   saying if it was on the western side, it wouldn't be a side.

18   If it's on the eastern side, it would be.  But, yet, I thought

19   you were talking about direction.  Would you help me clarify my

20   misunderstanding?

21              THE WITNESS:  Yes.  As we move -- given the location

22   of these districts in the southeast of Virginia, as we move

23   farther to the west, we're getting further away from all these

24   districts, and the distance, therefore, is increasing between

25   the VTD and the challenged districts.

1              If we move from a VTD that's right next to one of the

2      challenged districts to one far away, on the far side of the

3      state, we would see a greater -- the distance measures would

4      increase.

5              JUDGE PAYNE:  Did he do that in his report?  I'm

6      having trouble really understanding all of this.  It kind of is

7      beyond my kin, but I hear you saying that Dr. Katz assigned --

8      criticizing his report because he assigned a distance that was

9      way out of the district and all the way over on the western

10     side of the state, and I can't understand why that would be --

11     why he would do that, but if he did it, I'd like to know if he

12     did.  Or are you just saying there's an incremental distance to

13     the west or the east?

14             THE WITNESS:  He measures the distance accurately

15     between every VTD across the entire state of Virginia and each

16     of the 12 challenged districts.  So a VTD that's far to the

17     west in Virginia will have a greater distance to one of the

18     challenged districts than a VTD that's on, say, the East Coast

19     of Virginia.

20             JUDGE PAYNE:  And what function does the -- in the

21     analysis does the distance between the VTD in the western part

22     of Virginia have to do with anything in the challenged

23     district?

24             THE WITNESS:  Dr. Katz argues these 12 measures of

25     distance are critical to estimating the model properly, and I

Palmer - Direct

1   disagree with that.

2   Q    So your understanding is that a proper distance measure

3   would take into account or would reflect that a VTD farther

4   from a challenged district would be less likely to be included

5   in that challenged district; is that right?

6   A    That's right.

7   Q    And do Dr. Katz's 12 distance measures reflect that?

8   A    No, they do not.

9   Q    Tell me in what way are they inconsistent on that scale?

10  A    Some of his distance measures show a strong negative

11  relationship between distance and the likelihood of assignment

12  to a challenged district, and that's what we should expect.  As

13  you get farther away, you're less likely to be assigned to a

14  challenged district.

15       But other measures for some of the other districts show a

16  strong positive relationship between distance and VTD

17  assignment.  That is, the likelihood of being assigned to a

18  challenged district increases with distance using some of these

19  12 distance measures but not others.  That would produce

20  inconsistent predictions, inconsistent results from the model.

21       JUDGE PAYNE:  Wouldn't you need to know what the

22  distances were to make that judgment as to whether or not it

23  was really inconsistent with the model?

24       THE WITNESS:  Yes, and we have those distances in the

25  data.  So if you were to use the model to make predictions, you

Palmer - Direct

1    find in some cases being further away increased the likelihood

2    of being assigned to a challenged district.

3    Q    So you mentioned there an inconsistency in the 12 distance

4    measures that Dr. Katz used to determine his model of

5    race-versus-party prediction in the assignment of VTDs; is that

6    right?

7    A    Yes.

8    Q    Why would that inconsistency be a problem?

9    A    They make inconsistent predictions, and so we shouldn't

10   rely or trust that model.

11   Q    Did you do anything to address that problem in developing

12   your own race-versus-party analysis?

13   A    Yes.  I offered a much simpler measure of distance.

14   Q    What measure of distance did you offer?

15   A    I propose adding just the distance to the closest

16   challenged district.  That is, instead of measuring 12

17   distances for every single VTD, we just measure how far away it

18   is from the closest challenged district.

19         In other words, if we take all of Dr. Katz's 12 variables,

20   it's just the minimum value of those 12, whichever one is

21   closest, for each VTD.

22   Q    I'm going to ask you to turn back to page 63, table 20.

23   So I'm looking now at model four.  This one entitled "Closest."

24   Can you explain what this model is?

25   A    So closest reflects a model that uses this alternative

Palmer - Direct

1    distance measure I just mentioned.  This is an unweighted

2    model.  That is, it uses the Katz baseline model without

3    weights, but instead of using 12 different measures of

4    distance, it just uses one, the distance to the closest

5    challenged district.

6    Q    What do you conclude from this model?

7    A    Based on this model, there is a strong positive and

8    statistically significant relationship between race and

9    assignment VTDs to challenged districts.  There is no

10   relationship between party and VTD assignment, and if you look

11   at the coefficient on the distance to closest challenged

12   district, we find a negative and statistically significant

13   relationship there which is what we should expect.  As VTDs

14   move farther away from challenged districts, they're less

15   likely to be assigned to them.

16   Q    So can you explain in kind of more layman's terms, what

17   does that mean with respect to the coefficients of BVAP and

18   Democratic vote share?

19   A    Race predominates over party, and there is no affected

20   party.

21   Q    And take a look at model five in table 20.  This one is

22   entitled "Closest Weighted."  Can you explain what this model

23   is.

24   A    This model uses that closest distance measure once again

25   but also the proper population weights.

Palmer - Direct

1          JUDGE PAYNE:  Did you apply this model to a real

2    situation, or did you ever do that?  Did you apply the model to

3    what really happened on the ground in any particular district?

4          THE WITNESS:  The model is --

5          JUDGE PAYNE:  In other words, did you look at whether

6    or not in a particular challenged district, the model is borne

7    out by the assignment of the precinct -- of the VTD to where it

8    was assigned or was not borne out?

9          THE WITNESS:  The model is based on those actual

10   assignments.

11         JUDGE PAYNE:  Did you go back and double-check it

12   backwards is what I was trying to say.  You assume something

13   and then made the figure, as I understand it.  You made your

14   calculations, and I'm asking whether you went back and checked

15   those calculations.

16         THE WITNESS:  Um, I'm not quite understanding --

17         JUDGE PAYNE:  Let's suppose that the testimony is

18   that politics was the reason for putting some VTDs where they

19   were; all right?

20         THE WITNESS:  Okay.

21         THE COURT:  The record says that.  Let's suppose

22   that.  Did you take your model and go back and see whether or

23   not the conclusion you drew on the basis of the model that race

24   predominated, not party, and measure it to the testimony that

25   party predominated in the decision?  Did you do that

1     comparison?

2               THE WITNESS:   No.

3               JUDGE PAYNE:   Okay, thank you.

4     Q     Dr. Palmer, is any part of your analysis a response to any

5     of the fact witness testimony provided in the course of this

6     trial or the 2015 trial?

7     A     No.

8     Q     Does it take into consideration any particular reasons

9     that might be offered for drawing of any particular districts?

10    A     No.

11    Q     Now, your models here, are those kind of theoretical

12    models based on theoretical data?

13    A     No.

14    Q     What are they based on?   What are the inputs to this

15    model?

16    A     They are statistical models based on actual real data

17    about these VTDs.

18    Q     So this is based on the actual enacted map and the lines

19    as drawn; is that right?

20    A     Yes.   The variable we're predicting, whether a VTD is

21    assigned to a challenged district, is based on the actual VTD

22    assignments, and then race and party are measured using actual

23    data at the VTD level.

24    Q     And that's true for both your models and for Dr. Katz's

25    models, Dr. Ansolabehere's models, you're all looking at the

Palmer - Direct

1   enacted map in the districts as drawn?

2   A    Yes.  Dr. Katz and I are using the exact same data set.

3   Q    So can you explain to me what you conclude from model

4   five?  Let's go back to that close-up there on table 20.  If I

5   understand correctly, model five is essentially Dr. Katz's

6   model with the inclusion of population weights, as we've

7   already discussed, and the inclusion of your preferred distance

8   measure; is that right?

9   A    Yes.

10  Q    And what does model five tell us when Dr. Katz's model is

11  adjusted in those ways?

12  A    That race predominated over party, that there is no

13  relationship between party and assignment of VTDs to challenged

14  districts after accounting for these other factors.

15           JUDGE PAYNE:  What other factors?

16           THE WITNESS:  Accounting for -- there was no

17  relationship with party after accounting for race and distance

18  to the closest challenged district.

19           JUDGE PAYNE:  So you were comparing just race and

20  party, but you said taking into account these other factors,

21  and I'm trying to figure out what other factors you meant in

22  that testimony.

23           THE WITNESS:  I'm sorry.  In this particular model,

24  the other factor is distance to the closest challenged

25  district.  We're also controlling all the models for whether

1    the VTD was in a challenged district under the benchmark map.

2    Q    So then is it fair to say that under model five, which is

3    Dr. Katz's model, with population weights included and with

4    your preferred distance measure included, we see results that

5    are similar to Dr. Ansolabehere's model reflected in model one?

6    A    Yes, that's correct.

7    Q    And how would you characterize those results?

8    A    The model one and five both show that race predominated

9    over party.  There's a strong positive statistically

10   significant relationship between race and party.  No such --

11   I'm sorry, between race and VTD assignment, no such

12   relationship between party and VTD assignment, and the

13   effect -- the difference between the effect of race and the

14   effect of party is positive and statistically significant.

15   Q    In both -- in that model five, race is more predictive

16   than party of a VTD's inclusion in the challenged district; is

17   that fair to say?

18   A    Yes.

19   Q    So what conclusions did you draw from table 20 as a whole,

20   stepping back a little bit?

21   A    Overall, the conclusion I draw is that race predominated

22   over party in the assignment of VTDs to the challenged

23   districts.

24   Q    And what about with respect to Dr. Katz's original

25   race-versus-party model, any conclusions that you drew there --

Palmer - Direct

1              JUDGE PAYNE:  We've already been there now, counsel.

2      We've already been there.  You're re-plowing all the old

3      ground.  You started off with this, and now you are concluding

4      with it.  We heard it the first time.  I think if you're

5      finished, say so, and we'll proceed.  Don't re-plow old ground,

6      please.

7      Q    Dr. Palmer, this race-versus-party analysis that you

8      provide in table 20, does it purport to evaluate the extent to

9      which race predominated over any factor other than party?

10     A    No.  This particular analysis is constrained to just the

11     effects of race versus party.

12     Q    Are there any other places in your report where you

13     examine factors other than party and the extent to which race

14     predominated over those factors?

15     A    Yes.  In the previous sections of the report we already

16     discussed, we talked about how race predominated there.

17     Q    So just to clarify, this is one of several analyses that

18     you provide about racial predominance; is that right?

19     A    That's right.

20     Q    I want to move on to the last section of your report which

21     is regarding the 55 percent BVAP floor.  What is the purpose of

22     your analysis here?

23     A    The purpose of this analysis was to analyze --

24              JUDGE ALLEN:  I'm sorry, what page?

25              MS. KHANNA:  I'm not referring to any page in

 1 | particular, but I think that the last section of his report

 2 | begins --

 3 |            JUDGE PAYNE:   Section six, is that the last section,

 4 | the district demographic comparisons, or what?

 5 |            THE WITNESS:   Page 24.

 6 |            JUDGE PAYNE:   Page what?

 7 |            THE WITNESS:   24.

 8 |            JUDGE ALLEN:   Thank you.

 9 |            MS. KHANNA:   This is a section entitled "Evaluating

10 | the 55 Percent BVAP Threshold."  When I said last section, I

11 | was referring to the last section of his initial report.

12 | Q    So, Dr. Palmer, what was the purpose of this analysis?

13 | A    The purpose of this analysis was to analyze the 55 percent

14 | BVAP threshold to see if it was necessary to create districts

15 | where African Americans were able to elect their candidates of

16 | choice.

17 | Q    Where did you first hear of the 55 percent BVAP threshold

18 | in relation to the challenged districts?

19 | A    I believe in the Court opinion from 2015.

20 | Q    And what type of analysis did you conduct to evaluate the

21 | necessity of the 55 percent BVAP threshold in the challenged

22 | districts?

23 | A    I started with a racially polarized voting analysis, and

24 | then I also did a few other analyses to look at the necessity

25 | of the 55 percent BVAP.

Palmer - Direct

1   Q    What is a racially polarized voting pole?

2   A    A racially polarized voting analysis is an analysis

3   designed to measure the voting patterns for different

4   candidates across racial groups.  It is, we can't actually

5   observe how individuals vote.  We don't get to see it, see how

6   people vote, and so we try to detect different patterns across

7   racial groups using a statistical model.

8   Q    What methodology did you use to conduct your racially

9   polarized voting analysis?

10  A    I used ecological inference.

11  Q    And why did you use ecological inference?

12  A    The Court asked for it in the 2015 opinion.

13  Q    The Court ask for an ecological inference analysis?

14  A    The Court preferred it in the 2015 opinion.  Also, using

15  ecological inference here is entirely consistent with Dr.

16  Katz's approach in the previous trial.

17  Q    So there was a question about the use of ecological

18  regression or ecological inference in the last round, and Dr.

19  Katz preferred ecological inference; is that right?

20  A    Yes.

21  Q    And you also use logical inference in your analysis; is

22  that right?

23  A    Yes.

24  Q    And the reason you did so is just to eliminate the dispute

25  about methodologies; is that right?

Palmer - Direct

1   A   That's right.  There's no difference in our methological

2   approaches to measuring racially polarized voting.

3   Q   What elections did you choose to incorporate into your

4   racially polarized voting analysis?

5   A   I used two state-wide elections, the 2008 presidential

6   election and the 2009 gubernatorial election.  I also averaged

7   the results of those two elections together.

8   Q   Why did you choose those two elections?

9   A   I chose them for several reasons.  First, they were used

10  by Dr. Katz in other parts of his original report.  Second,

11  they are the most recent state-wide elections available at the

12  time of the redistricting, and, third, they allow for

13  availability of analysis across all 12 districts.  If we rely

14  only on House-of-Delegate elections, then there's several

15  districts where we just can't say or learn anything.

16  Q   So do you perform any analysis to determine the -- whether

17  there's a correlation between House-of-Delegates elections and

18  the state-wide elections that you examined?

19  A   Yes.  I looked at the relationship between state-wide

20  elections and House-of-Delegate elections and found that

21  there's a strong predictive relationship between the two.

22  Q   So please turn to page 47, figure 19 of your report.

23         JUDGE PAYNE:  You are saying that state-wide results

24  are a good predictor of individual district elections; is that

25  what you are saying?

1          THE WITNESS:  Yes.

2     Q    What does figure 19 reflect?

3     A    Figure 19 shows the correlation between state-wide

4     election results and House-of-Delegate election results for the

5     districts where we have House-of-Delegate elections.

6     Q    What did you conclude based on figure 19?

7     A    There is a strong positive linear relationship between

8     state-wide elections and House-of-Delegate elections.  That is,

9     state-wide elections serve as a good proxy and are highly

10    predictive of House-of-Delegate election results.

11    Q    Okay, Dr. Palmer, can you briefly describe how you set up

12    your ecological inference models?  What were the variables that

13    you used?

14    A    So the ecological inference models try to predict

15    district-level -- try to predict shares of the two-party vote,

16    that is what share of the vote is earned by Democratic

17    candidates and by Republican candidates as a function of the

18    demographics within each VTD, and so the demographic variables

19    I looked at were the share of the VTD of black voting-age

20    population, white voting-age population, and then all other

21    groups combined as a third group labeled other.

22    Q    And when it came to determining Democratic -- or the

23    election performance for each of these racial groups, what

24    variables did you use there?

25    A    The Democratic and Republican shares of the two-party

1   vote.

2   Q    Why did you choose to set up your ecological inference

3   analysis in this way?

4   A    This is the exact way that Dr. Katz set it up in his

5   original report which, I believe, is correct, and by doing it

6   this way, we're also entirely consistent with one another.

7            JUDGE PAYNE:  What page is this on?

8            MS. KHANNA:  You mean figure 19?

9            JUDGE PAYNE:  Yes.

10           MS. KHANNA:  Figure 19 is on page 47.  We were --

11   we've moved on from this discussion of figure 19.  We can take

12   that off the screen so it's not misleading.  I think the

13   question I had just posed was about the ecological inference

14   model that Dr. Palmer used generally to assess racially

15   polarized voting.

16   Q    And, Dr. Palmer, if I understand your testimony correctly,

17   you set up your ecological inference model the same way Dr.

18   Katz set up his ecological inference model from his 2015

19   report; is that right?

20   A    That's right.

21   Q    You did that to, again, to eliminate any dispute about

22   methodology here?

23   A    That's right.

24   Q    Can you please turn to table 23 of your report which is on

25   page 66.  Does table 23 reflect your ecological inference

Palmer - Direct

1    analysis of racial voting patterns in each of the challenged

2    districts?

3    A    Yes.

4    Q    So I see a column marked 95 percent CI.  Can you please

5    explain what that is.

6    A    Yes.  95 percent CI means the 95 percent confidence

7    interval, and a confidence interval is a measure of uncertainty

8    in the estimates.  And so what the confidence interval says is

9    that we are 95 percent certain that the true level of support

10   for a particular group of the Democratic candidate is between

11   those two numbers in the interval.

12        So, for example, if we just look at the very top row here

13   under 2008 president, we see an estimate that African Americans

14   voted for the Democratic candidate 95 percent of the time.

15   Q    In District 63; right?

16   A    In District 63.  That is 95 percent of African Americans

17   voted for the Democratic candidate, but we don't know that

18   number with perfect precision because we have to estimate it

19   using census data and election returns.  And so the 95 percent

20   confidence interval says we are 95 percent certain that the

21   true value of African-American support for the Democratic

22   candidate is between 88 percent and 99 percent.

23   Q    So are confidence intervals important to the analysis?

24   A    They're critical to the analysis.  Every statistical

25   analysis has some margin of error, some degree of uncertainty,

Palmer - Direct

1   and it's important to report the -- an appropriate measure of

2   uncertainty with the estimates.

3   Q    Okay.  So table 23 is your racially polarized voting

4   analysis using those two elections that we discussed in each of

5   the 12 challenged districts; is that right?

6   A    Yes, as well as the average of the presidential and

7   gubernatorial elections.

8   Q    I'd like to turn to figure 22 of your report which is on

9   page 49.  What does this figure reflect?

10  A    This figure plots the results from the last columns of

11  table 23, the ecological inference results using the average of

12  the 2008 presidential and 2009 gubernatorial elections.  Each

13  circle represents the point estimates; the filled circles the

14  point estimates for blacks and the open circles the point

15  estimates for whites.  Then the line going through the circles

16  represent the confidence interval, the upper and lower bound of

17  the 95 percent confidence intervals.

18  Q    So figure 22 is just a graphical representation of the

19  last column in table 23; is that right?

20  A    That's right.

21  Q    Or the last assessment of the two elections combined; is

22  that right?

23  A    Yes.

24  Q    And so were you able to draw any conclusions -- based on

25  your analysis in table 23 in figure 22, were you able to draw

Palmer - Direct

1    any conclusions about African-American voting patterns in the

2    challenged districts?

3    A    Yes.

4    Q    What did you conclude?

5    A    I concluded that African Americans supported Democratic

6    candidates at very high levels across all 12 challenged

7    districts.

8    Q    And how would you define "very high levels"?

9    A    They average 95 percent.

10   Q    Why is that important?

11   A    This is very important because it lets us clearly

12   establish that there are -- there is a clear African-American

13   candidate of choice across all 12 districts.

14   Q    So based on your analysis in table 23 and figure 22, were

15   you able to draw any conclusions about white voting patterns in

16   the challenged districts?

17   A    Yes.   Unlike African Americans which are consistently

18   supporting Democratic candidates at very high levels, there is

19   significant variation among support for Democratic candidates

20   by white voters.   District 75 has the lowest level of support.

21   Around 16 percent of white voters in District 75 are estimated

22   to support Democratic candidates.   District 71 has the highest

23   level of support among white voters estimated at 70 percent of

24   white voters supporting the Democratic candidates.

25              JUDGE PAYNE:   Are you talking about now in these

Palmer - Direct

1  particular districts?

2          THE WITNESS:  Yes.  Each set of points on the figure

3  is a separate district.

4          JUDGE PAYNE:  In the challenged districts?

5          THE WITNESS:  Among the challenged districts, yes.

6          JUDGE PAYNE:  So -- all right.  Thank you.

7  Q    And the challenged districts are listed on the bottom on

8  the X axis; is that right?

9  A    Yes.

10  Q    And so this figure allows -- figure 22 allows us to

11  examine variations in white -- the white vote share for the

12  minority-preferred candidate across each of the 12 challenged

13  districts; is that right?

14  A    Yes.

15  Q    And as I believe you just testified, you said that the

16  figure 22, table 23 reflect significant variation between the

17  12 challenged districts when it comes to white support for the

18  African-American preferred candidate; is that right?

19  A    That's right.  In some districts, we see high levels of

20  white support for the African-American preferred candidate.  In

21  other districts it's lower, and in some it's split roughly

22  50/50 between the two parties.

23          JUDGE PAYNE:  This is just Democratic vote.

24          THE WITNESS:  Yes.

25          JUDGE PAYNE:  Doesn't reflect Republican support.

1          THE WITNESS:  Republican support would just be sort

2     of flipping this.

3          JUDGE PAYNE:  I understand.  I'm talking about the

4     depiction is of the Democratic vote.

5          THE WITNESS:  That's right.

6          JUDGE PAYNE:  Of the chart, figure 22; right?

7          THE WITNESS:  Yes.  The axis is the Democratic share

8     of the two-party vote.

9     Q    Dr. Palmer, does the racially polarized voting analysis

10    that we just discussed that's reflected in figure 22 and table

11    23, does that give you the information that you would need to

12    determine whether a 55 percent black voting-age population was

13    required in any given district?

14    A    No.  It's an important first step.

15    Q    So does a district that has racially polarized voting

16    necessitate automatically a 55 percent black voting-age

17    population in order to elect the minority-preferred candidate?

18    A    No.

19    Q    How would you determine whether a district required a

20    55 percent black voting-age population in order to elect

21    minority-preferred candidates?

22    A    So I looked at this in two different ways, and if we start

23    at table 22.

24    Q    So turning to table 22, that's page 65 of your report.

25    What does this table tell us?

Palmer - Direct

1    A    The important things for this analysis here are the last

2    two columns of table 22 which show us Democratic vote shares

3    under the benchmark and enacted plans for each district using

4    the average of the 2008 and 2009 elections.

5         What this shows us is that African-American preferred

6    candidates are winning these elections by very large margins.

7    Q    Would you define "very large margins"?

8    A    The most competitive district under either plan of

9    District 75 were African-American preferred candidates are

10   winning 56 percent of the vote, a 12 percent margin.

11   Q    What's the next most competitive after District 75?

12              JUDGE PAYNE:  What column are you looking at to tell

13   us that?

14              THE WITNESS:  The last two columns both show

15   56 percent for District 75.

16   Q    The next most competitive district after that?

17   A    District 63.

18   Q    What is that, the Democratic vote share in the benchmark

19   District 63?

20   A    Under the benchmark, the vote share was 62.9 percent.

21   Q    What's the vote margin there?

22   A    About 26 percent.

23   Q    So if I'm looking at those last two columns of table 22,

24   African-American preferred candidates are winning by large

25   margins in all of the challenged districts under the benchmark

Palmer - Direct

1    plan; is that right?

2    A    Yes.

3    Q    And African-American preferred candidates are winning by

4    large margins in all the challenged districts under the enacted

5    plan; is that right?

6    A    Yes.

7    Q    And the most competitive district for African-American

8    preferred candidates is District 75.

9    A    That's right.

10   Q    What additional analysis did you perform to determine the

11   necessity of the 55 percent BVAP floor in any challenged

12   districts?

13   A    I did two difference analyses, and if we start on table

14   24.

15   Q    Table 24 on page 67 of your report?

16   A    Yes.

17   Q    What does this table show?

18   A    This table shows a very simple analysis using the

19   hypothetical case where suppose we take -- we make up the

20   shortfall, the population shortfall in the -- under the

21   benchmark maps.  We calculate the population shortfall to

22   achieve equal population and make it up with a hypothetical

23   population exclusively of voters who vote unanimously against

24   the African-American preferred candidate.

25        Now, we know this population doesn't actually exist in

Palmer - Direct

1   real life.  We can't actually find a pocket of people of the

2   right size that's completely unanimously against the

3   African-American preferred candidate, but suppose we could.

4   That's sort of the biggest shock you could make to the partisan

5   composition of the district, and what I do is I calculate how

6   many voters that would be and then calculate the estimated vote

7   share for the African-American preferred candidate if those

8   people were added to the district.

9       And what I find is that in every single challenged

10  district except District 75, African-American preferred

11  candidates would still win with large margins.

12  Q    So what did you conclude from table 24?

13  A    What table 24 shows us is it was not necessary to increase

14  the African-American voting-age populations in any of the

15  challenged districts for them to continue as districts that

16  would safely elect African-American preferred candidates.

17  Q    To make sure I'm reading it correctly, many of the

18  challenged districts fell short on population; is that right?

19  A    Yes.

20  Q    They needed to add significant numbers of people in order

21  to achieve population equality?

22  A    That's right.

23  Q    And this table assumes that all of those people added were

24  voting unanimously against African-American preferred

25  candidates; right?

Palmer - Direct

1  A    Yes.

2  Q    And even in that extreme hypothetical, African-American

3  preferred candidates are winning by large margins in all the

4  challenged districts except for District 75; is that right?

5  A    That's right.

6  Q    Was there any other analysis that you performed in order

7  to examine whether a 55 percent black voting-age population was

8  necessary in any of the challenged districts?

9  A    Yes.  There's one more analysis on table 25.

10  Q    Let's turn there to page 68, table 25.  What does table 25

11  reflect?

12  A    Table 25 shows an analysis that's informed by the

13  ecological inference estimates.  So what I do here, I say,

14  suppose a district were drawn at three different hypothetical

15  levels of BVAP; 45 percent BVAP, 50 percent BVAP, or 55 percent

16  BVAP.  I say, suppose that the African-American voting-age

17  population share is set at one of these three levels.

18       Then I hold the other -- the size of the other population

19  constant and calculate what would be the size of the white

20  voting-age population necessary to now reach 100 percent.  So,

21  for example, hypothetically, if we're saying a district is

22  45 percent BVAP and that district, say, has five percent other,

23  it would have to have 50 percent white voting-age population.

24       So I first figure out the size of those three groups, and

25  then I multiple the size of those three groups by the rates at

Palmer - Direct

 1   which they vote for African-American preferred candidates based

 2   on the ecological inference results.  What this produces is an

 3   estimate of what the vote share would be for the

 4   African-American preferred candidate in the hypothetical world

 5   where the district was drawn at one of these three levels of

 6   BVAP.

 7   Q    Did you draw any conclusions based on your analysis in

 8   table 25?

 9   A    Yes.  At 50 percent BVAP, African-American preferred

10   candidates are winning by comfortable margins, and at

11   45 percent BVAP, African-American preferred candidates are

12   winning everywhere except potentially in District 75 where the

13   lower bound of the confidence interval on this estimate is just

14   below 50 percent.

15   Q    What did you conclude about the necessity of the black

16   voting -- 55 percent black voting-age population based on your

17   analysis in table 25?

18   A    That the 55 percent BVAP threshold was not necessary to

19   create districts that would continue to elect African-American

20   preferred candidates by large margins.

21        JUDGE PAYNE:  Do either one of these three methods

22   that you just described include an analysis of turnout in the

23   districts?

24        THE WITNESS:  No.

25        JUDGE PAYNE:  So you don't know what the actual vote

Palmer - Direct

1   was of African-American voters in the district.

2              THE WITNESS:   Actual information of turnout by race?

3              JUDGE PAYNE:   Yes.   How many African Americans, how

4   many Caucasians actually voted in a particular district.   Did

5   you do that?

6              THE WITNESS:   In this report, I did not.   I did do an

7   analysis of turnout in my reply report.

8              JUDGE PAYNE:   We're not there yet, and we won't get

9   there until somebody testifies that calls your reply report to

10  get into evidence, will we?   We're not going through his reply

11  report in anticipation of what the other people are going to

12  say, are we?

13             MS. KHANNA:   I had no intention to do so, Your Honor.

14  You asked the question about turnout.   That is listed in his

15  reply report.   For the record, both his initial report,

16  Plaintiffs' Exhibit 71, and his reply report, Plaintiffs'

17  Exhibit 72, are in the record.   They were moved into the record

18  at the beginning of trial.

19             THE COURT:   I know that.

20  Q    So, Dr. Palmer, I'm not sure where we left on.   Can you

21  tell me your conclusions on table 25 generally.

22  A    That the 55 percent BVAP threshold was not necessary for

23  these districts to continue electing African-American preferred

24  candidates by safe margins.

25  Q    So is it your opinion, Dr. Palmer, that each of the

1    challenged districts should have been drawn at 45 percent black

2    voting-age population?

3    A     No.

4    Q     Or that they each should have been drawn at 50 percent

5    black voting-age population?

6    A     No.  This analysis is not intended to suggest that the

7    BVAP of the challenged districts should have been drawn at 45

8    or at 50 percent.  It's not trying to find some minimum value

9    here.  I don't solve for the minimum value of BVAP necessary

10   for these districts to continue electing African-American

11   preferred candidates.

12        What this analysis does show, there's a wide range of

13   levels of BVAP where these districts would continue to be

14   performing that could be significantly lower than 55 percent.

15   Q     When you say performing, you mean performing for the

16   African-American preferred candidates; is that right?

17   A     That's right.  Places where the African-American preferred

18   candidates could win by comfortable margins.

19   Q     So going back, Dr. Palmer, and we can take this from the

20   screen, you were asked to examine racial predominance in the

21   drawing of the challenged districts.  Can you please summarize

22   your opinions for the Court on that issue.

23   A     Yes.  Across three different analyses of racial

24   predominance, I found consistent evidence -- I found consistent

25   evidence of racial predominance.  First, looking at split

Palmer - Direct

 1    geographies, including VTDs, towns, cities, places, and a

 2    military base, I found evidence that places were divided by a

 3    race such that areas of higher concentrations of African

 4    Americans were in the challenged districts.

 5         Second, looking at population flows between challenged and

 6    non-challenged districts, I found consistent evidence that

 7    African Americans were moved into challenged districts at

 8    higher rates than the rest of the population and were moved out

 9    of challenged districts at lower rates than the rest of the

10    population, and then, third, I looked at race versus party in

11    the assignment of VTDs and found that race predominated over

12    party in predicting which VTDs were assigned to challenged

13    districts.

14              THE COURT:  That's the third time we've heard that;

15    once in his opening, once in each one of the questions that he

16    was asked, and once in the summary.  We do not need to have

17    it -- I think we're paying attention.  We don't need it three

18    times.  We're not in the Army.

19              MS. KHANNA:  Thank you, Your Honor, and thank you.  I

20    have no further questions.

21              THE COURT:  We'll take 45 minutes for lunch.

22

23              (Luncheon recess.)

24

25

Palmer – Cross

1        JUDGE PAYNE:  All right.  Ms. McKnight.

2        MS. MCKNIGHT:  Thank you, Your Honors.

3                **CROSS-EXAMINATION**

4   BY MS. MCKNIGHT:

5   Q    And good afternoon, Dr. Palmer.

6   A    Good afternoon.

7   Q    We met at your deposition.  It's nice to see you

8   again.  I'm Kate McKnight.  I'm with

9   defendant-intervenors, and I'll ask you some questions

10  today.

11       Dr. Palmer, you earned your Ph.D. three years ago; is

12  that right?

13  A    Yes.

14  Q    And have you ever worked with the legislature to help

15  it draft and pass a redistricting plan?

16  A    No.

17  Q    And have you ever worked with individual legislators

18  or even a caucus to help them draft and pass a

19  redistricting plan?

20  A    No.

21  Q    And you've never drafted a plan that was adopted by

22  any state, correct?

23  A    Correct.

24  Q    And you've never drafted a legislative plan that was

25  submitted to any state, correct?

Palmer - Cross

1   A    Correct.

2   Q    And you've never advised a state going through the

3   map drawing process; is that right?

4   A    That's right.

5   Q    Have you ever spoken with legislative map drawers

6   about the map drawing process?

7   A    No.

8   Q    Now, in preparing your reports in this matter, you

9   did not interview any Virginia house members, did you?

10  A    No.

11  Q    You did not interview any Virginia elected officials?

12  A    No.

13  Q    And you did not interview any legislative staff in

14  Virginia; is that right?

15  A    That's right.

16  Q    Now, when you prepared your report, you did not know

17  how much time the Virginia legislature had to draft and

18  pass HB 5005; is that right?

19  A    That's right.

20  Q    And when you prepared your report, you did not know

21  that Virginia was subject to the Section 5 preclearance

22  requirement; isn't that right?

23  A    That's right.

24  Q    And you didn't know what happened to the plan after

25  it was signed by the governor; is that right?

Palmer - Cross

1    A    That's right.

2    Q    Now, prior to your trip for this case, you've never

3    been to Richmond before; is that right?

4    A    That's right.

5    Q    And you've never been to southeastern Virginia

6    before; is that right?

7    A    That's right.

8    Q    Now, your report for this matter, you worked on it

9    for roughly between June and early August, and then you

10   had two weeks in August for your reply report.  Is that

11   fair?

12   A    Yes.  I began in late June.

13   Q    And now, you believe that the types of analyses a map

14   drawer could perform in advance of passing plans could

15   depend on time; meaning with more time, one could do more

16   analyses; is that correct?

17   A    Yes.

18   Q    Okay.  Now, turning to your VTD split analysis, I'd

19   like to start by drawing the Courts' attention to pages 31

20   and 39 of your initial report.  I believe that's PX 71.

21   And now, in this span of pages between 31 and 39, you show

22   a series of maps; is that right?

23   A    Yes.

24   Q    Now, how did you select the maps to be shown?

25   A    These maps are just meant to be illustrative of some

Palmer - Cross

1    of the VTD splits.  And the purpose of the tables later on

2    in the report are to document all the different VTD

3    splits.

4    Q    I see.  And I counted, and it looks like of the 19

5    maps you show here, 9 are unrelated to any districts

6    currently challenged; is that correct?

7    A    I haven't counted, but that seems plausible.

8    Q    Okay.  So, in other words, nine of your maps

9    illustrate splits with HD 75 and no other challenged

10   district, correct?

11   A    Yes.

12   Q    And while we're on this topic, could you turn to page

13   52 of your report?  Now, in looking at this table, it

14   looks to me as though 8 out of the 12 divisions identified

15   in this table relate to HD 75 and no other challenged

16   districts; is that correct?

17   A    Yes.

18   Q    Okay.  So even though the title says "challenged,"

19   you understand that HD 75 is no longer challenged in this

20   case; is that right?

21   A    I do.

22   Q    Okay.  Could you turn to page 32 of your report,

23   please?  Now, plaintiffs have alleged that your analysis

24   supports a finding that race predominated in the division

25   of certain VTDs at the census block level.  Now, in

Palmer - Cross

1    looking at the image for District 69 on page 32 of your

2    report, your analysis of these divisions does not explain

3    why some lower BVAP census blocks are included in the

4    challenged district; isn't that right?

5    A    That's not quite right.  The shading on these maps is

6    not showing the BVAP percentage of each census block.  The

7    shading on the maps shows the concentration of black

8    voting age people within the VTD.

9        And so what we can't say is we can't look at the

10   light green blocks, say, in 69 in the middle of the map

11   and say anything about the racial composition of those

12   blocks other than that not that many black people live

13   within these blocks.

14            JUDGE PAYNE:  Does that mean by not that many?

15            THE WITNESS:  A relatively small share, roughly,

16   say, 1 percent, of the black voting age population of the

17   VTD resides in each of those blocks, roughly.  What it

18   doesn't show us is how many white people, for example,

19   live in those blocks.  They could be very sparsely

20   populated or they could be densely populated.  This

21   particular map does not show us that.

22   Q    Thank you for that explanation.  I think I was asking

23   a slightly different question.  Let me frame it a little

24   differently for you.  In the color coded scale at the

25   bottom of your map, the lighter color, the lighter color

Palmer - Cross

1   green, what is that labeled in your scale?

2   A    Lower BVAP.

3   Q    Okay.  So when you see those lighter colors used in

4   these census blocks, your analysis of these divisions does

5   not explain why some of these lower BVAP census blocks are

6   included in the challenged districts; is that right?

7   A    No.  We're, again, using BVAP in two different ways.

8   As the caption on my figure states, each census block is

9   shaded based on the share of the black voting age

10  population --

11  Q    Dr. Palmer, pardon me.  I don't like interrupting

12  people, but the judges have put this duty on me to keep it

13  tight.  I think you've already provided that information

14  to the Court.

15       What I'm asking here -- and if you give me a moment,

16  I can make sure we're on the same page.  Let me ask you

17  slightly differently, Dr. Palmer.  Is it your position

18  that race predominated in the division of District 69

19  between 68 and 69?

20  A    It is my position that the effect of the way the line

21  was drawn was to divide this VTD by race.

22            JUDGE PAYNE:  Why don't you ask your question

23  again, and if you would answer it yes or no this time,

24  then we'll understand what your position is on what she

25  asked.

Palmer – Cross

1   Q    Now, your analysis of these divisions does not

2   explain why some lower BVAP census blocks are included in

3   the challenged district; isn't that right?

4   A    That's right.

5   Q    And if you turn to page 38 of your report, similarly,

6   your analysis of these districts does not explain why some

7   higher BVAP census blocks are excluded from challenged

8   districts; isn't that right?

9   A    Yes.

10  Q    While we're on the topic, I'd like to look at both

11  pages 32 and 35 of your report.  This kind of discussed

12  the scale coloring in your maps earlier.  And if you look

13  at page 35 of your report, here the scale color for

14  4.5 percent as higher BVAP is the same color as higher

15  BVAP in the map on page 32; isn't that right?

16  A    Yes.

17  Q    Even though the percentage is different?

18  A    That's right.

19  Q    Okay.  Going back to your analysis, your analysis

20  does not take into account when VTDs have been divided

21  among major thoroughfares; isn't that right?

22  A    Yes.

23  Q    And your analysis does not take into account when

24  these divisions were made along rivers; isn't that right?

25  A    That's right.

Palmer - Cross

1   Q    And your analysis does not take into account when a

2   VTD was divided at the direction of a local delegate;

3   isn't that right?

4   A    Yes.

5   Q    Now, we heard testimony yesterday that local

6   delegates suggested the splits in VTDs 505 and 703, and

7   your analysis could not have taken those requests into

8   request, correct?

9   A    Correct.

10  Q    And your analysis does not take into account when a

11  VTD was divided related to incumbent residency; is that

12  right?

13  A    That's right.

14  Q    So as an example --

15       MS. MCKNIGHT:  Could we pull up

16  Defendant-Intervenors' Exhibit 94, page 4?

17  Q    Dr. Palmer, I'd like to direct your attention to two

18  VTDs here.  One is 505.  I've put a red dot under it.  And

19  the other is 504, and I'll put a red dot beside it.  Now,

20  your reading of this map, are these the only two

21  precincts, VTDs, that are shared between 69 and 71?

22  A    505 and --

23  Q    -- and 504.

24  A    504 I have as split between 69 and 71.  I think 504

25  might be one of those unpopulated splits.

Palmer - Cross

1  Q    So my question was isn't it correct that the only two

2  VTDs shared between HD 69 and HD 71 are VTD 504 and VTD

3  505?

4  A    Yes.

5  Q    Okay.  And you testified earlier today that often

6  VTDs need to be split between bordering districts.  Is

7  that a fair representation of what you testified?

8  A    Yes.  A VTD may need to be split to achieve equal

9  population.

10  Q    And so if a map drawer were selecting between 505 and

11  504 to split between 69 and 71 and they decided not to

12  split 504 because Betsy B. Carr lives on the border

13  between 504 at that blue asterisk and the border of 71,

14  your analysis would not pick up that decision; isn't that

15  right?

16  A    That's right.

17  Q    Okay.  And your analysis does not take into account

18  when a VTD was divided for purposes of core preservation,

19  correct?

20  A    Correct.

21  Q    And now, aside from looking at cities, towns and

22  census designated places, your analysis does not take into

23  account when a VTD was divided to preserve communities of

24  interest; isn't that right?

25  A    Yes.

Palmer - Cross

1  Q    So if Senator McClellan testified yesterday that VTD

2  703 was split in a manner to preserve a community of

3  interest, your analysis would not have reflected that

4  justification; isn't that right?

5  A    Presumably, the district didn't need to be split to

6  preserve the community of interest within that VTD.

7           JUDGE PAYNE:  Is it right or not that your

8  analysis doesn't pick that question up, though, I think

9  was the question.

10 A    That's right.

11 Q    Now, your report finds that at the time of

12 redistricting, all of the districts except HD 75 would be

13 performing majority minority districts at 50 percent BVAP,

14 correct?

15 A    It also shows that District 75 would be performing at

16 50 percent BVAP.

17 Q    Okay.

18           JUDGE PAYNE:  I think her question was

19 challenged districts, and 75 isn't challenged anymore.  So

20 can -- is she correct as to the challenged districts?

21 A    Yes.

22 Q    And now, you based this assessment on an average of

23 two elections, including the 2008 presidential election

24 and 2008 gubernatorial election; is that right?

25 A    Yes.

Palmer – Cross

1   Q    Now, I heard you testify earlier that 55 percent BVAP

2   was not necessary for the challenged districts to

3   continue, you said.  You said that a number of times, to

4   continue being performing majority minority districts,

5   correct?

6   A    Yes.

7   Q    Okay.  But you did not analyze whether the challenged

8   districts would continue to be performing minority

9   districts throughout the decade at the 50 percent BVAP

10  level; isn't that right?

11  A    That's correct.  I did not do any demographic

12  forecasting.

13          JUDGE PAYNE:  I didn't hear you.

14          THE WITNESS:  I do not do any sort of

15  demographic forecasting.

16  Q    So how can you opine about whether these districts

17  could continue being effective majority minority districts

18  through the decade?

19  A    I didn't offer an opinion on that.  When I said

20  "continue," what I meant was under the benchmark map, they

21  were performing and they would continue to be performing

22  under the enacted map; that if -- the switch from one plan

23  to another would not change the status of any of these

24  districts with regards to their ability to elect

25  African-American preferred candidates.

Palmer - Cross

1    Q    So you have no opinion about how long into the future

2    your estimate could stand and these districts could remain

3    performing majority minority districts; isn't that right?

4    A    That's correct.  In my report, I have some evidence

5    that speaks towards this question.

6    Q    And you don't know what you would have advised a

7    legislature, the Virginia legislature, as to how much BVAP

8    would be needed to avoid retrogression, correct?

9    A    That's right.

10   Q    And you agree that there is no technique or science

11   to find a precise point at which a given district tips

12   from being a performing majority minority district to one

13   in which the minority community cannot elect its candidate

14   of choice, correct?

15   A    I'm sorry.  Can you repeat the question?

16   Q    Absolutely.  And you agree that there is no technique

17   or science to find a precise point at which a given

18   district tips from being a performing majority minority

19   district to one in which the minority community cannot

20   elect its candidate of choice, correct?

21   A    I agree that there is no technique to find a precise

22   point, but that does not mean that we can't find a range

23   where it can continue to perform.

24   Q    Okay.  And I'll ask you some questions about that

25   later.  So I understand that you do agree to that point

Palmer - Cross

1   for now.

2       And you agree that at best, regression analysis

3   provides estimates of voting preferences surrounded by

4   margins of error and always based on data containing

5   acknowledged errors, correct?

6   A    Yes.

7   Q    And you agree that there are errors in the census

8   data, right?

9   A    We treat the census data here as correct, but there

10  are likely errors in the collection of census data.

11  Q    And you agree that even contemporaneous regression

12  analysis based on the census will have a built-in error in

13  the independent variable; isn't that right?

14  A    Yes.

15  Q    And you agree that that inaccuracy only grows over

16  the course of the decade, correct?

17  A    Well, the census data is counting at a set point in

18  time.  And so as people change over time, we should see

19  differences from the census data.

20          JUDGE PAYNE:  Is that yes or no that you agree

21  with her?

22  A    Yes.  Because demographics have to change over time,

23  or can change over time.

24  Q    And pardon me because you're hedging your answer a

25  bit, and I was not talking about demographic shifts.  I

Palmer - Cross

1   was asking about errors in data and whether they would

2   continue to grow.  And so if you don't mind, let me reread

3   my question.

4        And you agree that the inaccuracy only grows over the

5   course of a decade, correct?

6   A    I'm sorry.  I don't understand the question.

7   Q    Okay.

8   A    Are you --

9   Q    I'll try to rephrase.  You testified that you agreed

10  that even contemporaneous regression analyses based on the

11  census will have a built-in error in the independent

12  variable.  And then I asked you, you also agree that that

13  inaccuracy only grows over the course of the decade; isn't

14  that right?

15  A    Yes.

16  Q    And your analysis did not try to find a floor because

17  you know that there is uncertainty in the data; isn't that

18  right?

19  A    Yes.

20  Q    And now, you agree that a district drawn with BVAP

21  below 50 percent is, by definition, not majority minority,

22  correct?

23  A    Yes.

24  Q    Okay.  And in this case, you were not asked to

25  identify a precise number between 50 percent BVAP and

Palmer - Cross

1   55 percent BVAP that should have been applied to any of

2   the districts, correct?

3   A     That's right.

4   Q     And, in fact, you think that finding an exact point

5   assumes precision that isn't in the data and that's why

6   you don't do it, it's why you don't think you should do

7   it, and it's why you don't make that claim; isn't that

8   right?

9   A     Yes.

10  Q     Okay.  Instead, you think it is useful to find a

11  range at which a district can perform; isn't that right?

12  A     Yes.

13  Q     And you conclude in your report that 55 percent BVAP

14  was not necessary for these districts to be performing

15  majority minority districts, correct?

16  A     Yes.

17  Q     Okay.  But you also don't believe finding a precise

18  number between 50 and 55 percent BVAP is useful; isn't

19  that right?

20  A     I don't believe the precise number.  I was not asked

21  to find a precise number, and there's no reason to believe

22  that the precise number has to be between 50 and

23  55 percent.

24        JUDGE PAYNE:  According to the information that

25  you showed us on one of your charts showing the chart from

Palmer - Cross

1   45 percent to 50 percent to 55 percent -- do you see that?

2   Do you remember that chart?

3            THE WITNESS:  Yes.

4            JUDGE PAYNE:  Is that your way of saying that a

5   range of 45 to 50 percent is appropriate in this case?

6            THE WITNESS:  I'm not saying what's appropriate

7   in this case.  I'm saying those are levels at which these

8   distributes would continue to elect African-American

9   preferred candidates.

10           JUDGE PAYNE:  Candidates of their choice?

11           THE WITNESS:  Yes.

12           JUDGE PAYNE:  So the range would be 45 to

13  55 percent?

14           THE WITNESS:  I don't find --

15           JUDGE PAYNE:  Do you agree or not?

16           THE WITNESS:  I don't find a bottom of the range

17  or obviously, if you go higher than 55 percent, a pattern

18  will continue.  I just show that within this range, that

19  is the case.

20           JUDGE PAYNE:  Okay.  Pardon me, Ms. McKnight.

21           MS. MCKNIGHT:  No.  Thank you, Your Honor.

22  Q    On this topic of VTD splits, I'd like to draw your

23  attention to page 11 of your initial report, Table 5.  So

24  this is Plaintiffs' Exhibit 71 on page 11.

25           MS. MCKNIGHT:  Oh, pardon me, Your Honor.

Palmer - Cross

1    Pardon me, Your Honors.  This is actually his reply

2    report.  So it's PX -- sorry.  What plaintiffs' exhibit

3    number?

4           MS. TOLBERT:  Seventy-two?

5           JUDGE PAYNE:  She didn't ask about his reply

6    report, did you, or did I miss it?

7           MS. KHANNA:  I did not ask any questions about

8    the reply report.

9           JUDGE PAYNE:  No.  I think I told you not to,

10   that we would wait until -- by the event.  Now, are you

11   opening the door?

12          MS. MCKNIGHT:  No, I'm not opening the door.

13   I'll wait.  If it's raised, I can address it then.

14   Q    Could you turn to page 63 of your report.  That is

15   Plaintiffs' Exhibit 71, 63.  Now, Ms. Khanna had some

16   questions for you about this chart, and I'd like to ask a

17   few more.

18       Now, just to orient the Court, I believe that the

19   rows, as identified in the furthest left column, identify

20   four different factors that were analyzed; is that right?

21   A    Yes.

22   Q    Into determining the effect of BVAP and party on

23   assignment of VTDs to challenged districts, right?

24   A    Yes.

25   Q    I'd like to draw your attention to the row titled

Palmer - Cross

1 "VTD in Challenged District in Benchmark." Dr. Palmer,

2 isn't whether a VTD was included in the benchmark district

3 a stronger predictor than BVAP as whether that VTD would

4 be included in the newly drawn district?

5 A    Yes.

6 Q    In fact, the numbers, in most cases, is nearly twice

7 as high as the numbers for BVAP; is that right?

8 A    Yes.

9 Q    So if I had to make a bet about whether a VTD would

10 be included in a challenged district and I was only

11 allowed one piece of information from your chart in Table

12 20, the piece of information I should choose is whether

13 the VTD was in the benchmark version of the district,

14 correct?

15 A    Yes.

16 Q    Now I'd like to turn your attention to page 48 of

17 your report, Figure 21. Now, plaintiffs' counsel

18 discussed parts of this analysis with you, but I don't

19 believe she asked any questions about Figure 21. Now,

20 Figure 21 of your report shows the democratic vote share

21 in an off year statewide Virginia election for governor;

22 is that right?

23 A    Yes.

24 Q    And this was the statewide election most closely

25 preceding the 2011 redrawing in time, correct?

Palmer - Cross

1    A    Yes.

2    Q    And Virginia elects its officials in odd years; is

3    that right?

4    A    Yes.

5    Q    So elections for House of Delegates are in odd years,

6    correct?

7    A    Yes.

8    Q    Now, the other figure on page 48 of your report is

9    not an odd year election, correct?

10   A    Correct.

11   Q    Now, if we could go back to Figure 21.  Now, in this

12   figure, the open circles estimate white vote shares for

13   democrats in this election in these districts, correct?

14   A    Yes.

15   Q    And the closed circles estimate the black vote share

16   for these districts in this election; is that right?

17   A    Yes.

18   Q    And the red line indicates a 50 percent vote share

19   for democrats, correct?

20   A    Yes.

21   Q    Okay.  And the vertical lines represent confidence

22   intervals; is that right?

23   A    Yes.

24   Q    Meaning you can't say with certainty where on this

25   horizontal line of a confidence interval a number falls,

Palmer - Cross

1   but assuming that all of your data is absolutely correct,

2   you can only say that your estimate likely falls within

3   that horizontal line; is that right?

4   A    That's right.

5   Q    Now, where a closed circle is above the red line and

6   the corresponding open circle for that district is below

7   the red line, that indicates polarized voting, correct?

8   A    It indicates that -- yes, it indicates that a

9   majority of African-Americans are voting differently than

10  a majority of black voters.

11  Q    So as I'm reading this chart, for 9 of the 12

12  majority minority districts; that is, HD 63, 70, 74, 75,

13  77, 80, 90, 92 and 95, your own numbers indicate that the

14  vote in this odd year race is polarized, correct?

15  A    Yes.

16  Q    And for two of the remaining three districts, HD 69

17  and 89, you can't say with certainty that polarized voting

18  is not present, correct?

19  A    Correct.

20  Q    Okay.  So that leaves HD 71.  And you can't say with

21  certainty, based on the data you reviewed for 2009, that a

22  black democrat candidate would defeat a white democrat

23  candidate in a primary in this district, can you?

24  A    I'm sorry.  Can you repeat the question?

25  Q    Sure.  You can't say with certainty, based on the

Palmer - Cross

1  data you reviewed for 2009, that a black democrat

2  candidate would defeat a white democrat candidate in a

3  primary in this district, can you?

4  A    Based on 2009 data alone, no, I cannot.

5  Q    Now, in your analysis, your definition of a preferred

6  candidate of choice is a democrat, correct?

7  A    That's not the definition.  That's what the data

8  show.

9  Q    Do you recall me asking you this question in

10  deposition?

11  A    No.

12  Q    Okay.

13          JUDGE PAYNE:  Show it to him, please, if you

14  want to pursue it.  Page and line for the other counsel.

15          MS. MCKNIGHT:  This is page -- I'll put it in

16  the mic so everyone can hear.  This is page 115 of your

17  deposition at line 20 through 116 at line 6.

18          JUDGE PAYNE:  Can you read that, Dr. Palmer?

19  There.  That's a little better now.

20  A    Can you tell me what lines again?

21  Q    Sure.  It's line 20.

22          JUDGE PAYNE:  The question begins, "And in

23  Figure 5 how do you define preferred candidate?"  Is that

24  where you are?

25          MS. MCKNIGHT:  Yes.

Palmer - Cross

1          THE WITNESS:  Can I see the next page, please.

2   A    Okay.

3   Q    Okay.  So in your analysis, your definition of a

4   preferred candidate of choice is a democrat, correct?

5   A    Yes.  But that's the definition informed by the data

6   and analysis, not some external definition.

7   Q    Correct.  And that's your definition as a political

8   scientist.  It's not a legal definition, right?

9   A    That's right.

10          MS. MCKNIGHT:  Okay.  You can take that down,

11  Amy.  Thank you.

12  Q    And now, you believe the difference between using

13  primary elections versus general elections and applying

14  your analysis is that in a general election, you're

15  comparing votes shares between a democratic and republican

16  candidate or across multiple parties and in a primary,

17  you're going to be comparing just the candidates in that

18  primary, correct?

19  A    Yes.

20  Q    And so if you only use general elections in your

21  analysis, you do not have the primary data showing whether

22  a majority minority community preferred a black democratic

23  to a white democratic, correct?

24  A    In my reply report, I address this question.

25          JUDGE PAYNE:  How about answering the question,

Palmer - Cross

1   though, yes or no?

2   A    I'm sorry.  Repeat the question.

3   Q    Sure.  If you only used general elections in your

4   analysis, you do not have the primary data showing whether

5   a majority minority community preferred a black democrat

6   to a white democrat, correct?

7   A    That's right.

8   Q    Okay.  And in your initial report, did you use

9   primary data anywhere?

10  A    No.

11  Q    Now, the election data that you used, you relied on

12  election data provided by Dr. Katz and the methodology he

13  used to do it; isn't that right?

14  A    Yes.

15  Q    And the reason you did this was in order to be

16  consistent with the way that Dr. Katz was analyzing the

17  data, correct?

18  A    Yes.

19  Q    Okay.  And you believe that any problems in the data

20  would be the same as existing in Dr. Katz's data; is that

21  right?

22  A    Yes.

23       MS. MCKNIGHT:  Thank you, Your Honors.  I have

24  no further questions.  Thank you, Dr. Palmer.

25       JUDGE PAYNE:  Redirect.  Just remember now, the

1    redirect doesn't mean going back over everything you did

2    in direct.

3              MS. KHANNA:  I understand, Your Honor.  Thank

4    you.

5                        **REDIRECT EXAMINATION**

6    BY MS. KHANNA:

7    Q    Dr. Palmer, I'm just going to ask you a few more

8    questions based on the examination that Ms. McKnight just

9    provided.  You testified on cross-examination with

10   Ms. McKnight about the number of VTDs that were split

11   between District 75 and a nonchallenged district; is that

12   right?

13   A    Yes.

14   Q    And in your report, you report that there are 32

15   populated VTD splits between a challenged district and a

16   nonchallenged district; is that right?

17   A    Yes.

18   Q    And is it fair to say, based on your Table 3 in your

19   initial report, page 52, that 8 of those 32 VTD splits

20   involved District 75; is that right?

21   A    Yes.

22   Q    So 26 of the populated VTD splits that you analyzed

23   involved the remaining challenged -- 11 challenged

24   districts; is that right?

25   A    Twenty-four.

Palmer - Redirect

1    Q    Sorry.  Twenty-four.  And how many -- out of 24 VTDs,

2    in how many of those 24 did the BVAP on one side of the --

3    on the challenged district side exceed the BVAP on the

4    nonchallenged district side?

5    A    In 23 of them.

6    Q    Twenty-three out of 24?

7    A    Yes.

8    Q    Now, the Court has already found, as Ms. McKnight

9    pointed out, that the Court has already found that race

10   predominated in the configuration of District 75; is that

11   right?

12   A    Yes.

13   Q    Did you observe any patterns of division along racial

14   lines in District 75, based on your analysis?

15   A    Yes.

16   Q    Were those same patterns apparent in the 11 remaining

17   challenged districts?

18   A    Yes.  I found the same pattern everywhere.

19   Q    Now, Ms. McKnight also pointed to the -- your figures

20   on pages 31 through 39 of your report -- or 38 of your

21   report; is that right?

22   A    Yes.

23   Q    And do you recall that she asked a question about the

24   scale under -- I think she used page 38 as an example,

25   compared to the scale used on one of the figures in page

Palmer - Redirect

1   31; is that right?

2   A    Yes.  I think it was a different figure she

3   referenced, but we were comparing scales.

4   Q    Okay.  And does your analysis draw any comparison

5   across any of these figures to one another?

6   A    No.

7   Q    Does your analysis provide any comparison across --

8   from one VTD to another?

9   A    No.

10  Q    What is the comparison that you are drawing in each

11  of your figures?  Sorry.  What is the analysis that you

12  are providing in these figures?

13  A    The figures simply serve to highlight how lines were

14  drawn, such that areas of high concentrations of black

15  voters were drawn into the challenged districts.

16  Q    So you're showing -- with each individual figure,

17  you're showing the distribution of black voters within

18  that VTD, not across VTDs; is that right?

19  A    That's right.

20  Q    So why not use a single scale for all of the figures

21  from 0 to 100?

22  A    Well, first of all, if the scale goes from 0 to 100,

23  it's unlikely to be the case that all of the black

24  population resides in a single block.  So that means that

25  the darkest possible color won't be used at all.  So then

Palmer - Redirect

1  let's just say the highest possible -- let's just say the

2  highest place is 50 percent.  So one block now, instead of

3  being dark green, will be sort of medium green, and

4  everything else will be spread out across the lighter

5  greens.  It's just harder to see where the variation is.

6       By setting the scale such that the darkest place is

7  always at the highest BVAP -- has the highest

8  concentration of black voters, it's easier to see

9  variation across the place.

10  Q    Within that VTD only, right?

11  A    Within that VTD alone.

12          JUDGE PAYNE:  In other words, you're saying you

13  chose the scale for visual impact so you would be able to

14  see it better?

15          THE WITNESS:  That's right.

16  Q    If you had used a single 0 to 100 scale in a

17  relatively low BVAP VTD, would you be able to see any

18  variations between black voter concentration in different

19  parts of the VTD?

20  A    No.  It would be very difficult to see that

21  variation.

22  Q    So Ms. McKnight asked you about Table 25.  Table 25

23  is, again, page 68 of your report.  And I believe she

24  asked you about how you calculated the democratic vote

25  share.  And if I'm correct, you responded that your -- you

Palmer - Redirect

1    averaged together the 2008 presidential statewide election

2    and the 2009 gubernatorial election; is that right?

3    A     Yes.

4    Q     Why did you average these two elections in Table 25?

5    A     Well, Dr. Katz, in his race versus party analysis,

6    used the average of these two elections in that analysis,

7    and I thought that would be appropriate to use here as

8    well.

9    Q     Do you provide a racially polarized voting analysis

10   of the 2009 gubernatorial election on its own?

11   A     Yes.  That is the -- the center column of Table 23.

12   Q     Do you have any reason to believe that your analysis

13   in Table 25 would have been different had you looked

14   only -- had you used information based on that table

15   solely on the 2009 gubernatorial election?

16   A     The numbers would have been a little bit different,

17   but I would have reached the exact same substantive

18   conclusion.

19   Q     So you have no reason to believe that it would have

20   been any different had you used only the 2009

21   gubernatorial election?

22   A     My conclusions would have been the same.

23   Q     Okay.  If -- page 48 of your report.  Ms. McKnight

24   had talked about Figures 20 and 21.  Figure 21

25   specifically plots racial voting patterns in each of the

Palmer - Redirect

1   challenged districts based on the 2009 gubernatorial

2   election; is that right?

3   A    Yes.

4   Q    And do any of these districts indicate that there is

5   racially polarized voting?

6   A    Yes.

7   Q    And racially polarized voting would say exist in

8   District 95; is that right?

9   A    Yes.

10  Q    And is that because a majority -- based on both the

11  point estimates and the confidence intervals, a majority

12  of whites are voting for a different candidates than the

13  majority of African-Americans; is that right?

14  A    That's right.

15  Q    Let's turn to Figure 22.  Now, Figure 22 is the same

16  racially polarized voting analysis except this is based on

17  the average of the 2008 presidential election and the 2009

18  gubernatorial election; is that right?

19  A    Yes.

20  Q    Tell me about what your observation is of whether or

21  not there is racially polarized voting in District 95,

22  based on Figure 22?

23  A    Yes.  There is racially polarized voting in District

24  95.

25  Q    So a majority of white voters are voting for

Palmer – Redirect

1    different candidates than a majority of African-American

2    voters?

3    A    Yes.

4    Q    Now, the fact that there is racially polarized voting

5    based on the various elections and analyzed here in

6    District 95, does that mean that District 95 requires a 55

7    black voting age population in order to elect

8    African-American preferred candidates?

9    A    No.

10   Q    How do you know?

11   A    Well, as the -- as Table 25, that analysis shows us,

12   the level of white support, while it is not a majority

13   supporting the African-American preferred candidate, it's

14   still nontrivial.  It's still around 25 percent of the

15   vote, 25 percent of the white vote, which means that

16   that's going to contribute a substantial amount to the

17   overall vote share for the African-American preferred

18   candidate in that district.  It's the level of

19   polarization that's important, coupled with the size, the

20   population size of each group that tell us whether the --

21   that tell us how the district will perform.

22   Q    So it's your understanding you have to look at the

23   level of racially polarized voting in order to know

24   whether or not there's a certain black voting age

25   population that's required in order to elect the minority

Palmer - Redirect

1   preferred candidate?

2   A    Both the level and the sizes of each population

3   group.

4   Q    So looking back at Table 25 on page 68, let's take a

5   look at District 95, which we've just been examining on

6   these figures.  And what does your analysis in Table 25

7   tell you about District 95?

8   A    It shows that at 45, 50 or 55 percent BVAP, this

9   district would continue to elect African-American

10  preferred candidates with vote shares in the 60 percent to

11  70 percent range.

12  Q    And when you're talking about the 60 percent to 70

13  percent range, are you including the confidence intervals

14  there?

15  A    Yes.  The bottom lower bound, when I estimate vote

16  share using 45 percent BVAP is 60.7 percent, and then the

17  high end of the range at 55 percent BVAP is 70.5.

18  Q    So the estimated level of uncertainty goes to low of

19  60.7 percent in favor of the African-American preferred

20  candidate; is that right?

21  A    Yes.

22  Q    Ms. McKnight asked you about whether or not in your

23  initial report you used -- you analyzed any democratic

24  primaries; is that right?

25  A    That's right.

Palmer - Redirect

1   Q   And you used only general elections in your racially

2   polarized voting analysis provided in your initial report;

3   is that right?

4   A   Yes.

5   Q   Why?

6   A   I think general elections are the most informative

7   about the ability -- about the district's ability to elect

8   African-American preferred candidates.  That is it's at

9   the general election level where the ultimate election is

10  held and the ultimate chance for an African-American

11  preferred candidate to win.

12  Q   You also testified earlier that you had examined the

13  expert reports submitted in the 2015 round of this case;

14  is that correct?

15  A   Yes.

16  Q   Were there any -- was there anyone who provided a

17  racially polarized voting analysis during -- in that phase

18  of the case?

19          JUDGE PAYNE:  That wasn't dealt with in

20  cross-examination, and you are confined, if you don't

21  mind -- and you're fairly well -- you all are now over

22  half the time we've got to trial.  So let's see if we can

23  truncate this and make it stay with what's appropriate.

24  Okay?

25          MS. KHANNA:  Understood.  Thank you, Your Honor.

Palmer - Redirect

1  Q     Dr. Palmer, was one of the reasons that you looked at

2  general elections in your initial report because both

3  Dr. Katz and Dr. Ansolabehere also only looked at general

4  elections in their racially polarized voting analysis?

5  A     Yes.

6  Q     Ms. McKnight asked you whether you would have advised

7  a legislature about a precise point at which a district

8  should have its black voting age population in order to

9  perform for minority preferred candidates.  Do you recall

10 that?

11 A     Yes.

12 Q     Would you have advised a legislature that a

13 55 percent black voting age population was necessary in

14 any of the challenged districts to perform for minority

15 preferred candidates?

16 A     No.

17 Q     Why not?

18 A     As my analysis shows, that 55 percent BVAP threshold

19 was not required for African-American preferred candidates

20 to win any of these districts by a comfortable margin.

21 Q     What if the BVAP -- what if the black voting age

22 population were to drop over time?

23 A     Given the large margins by which these candidates are

24 winning, there's substantial room for demographic changes

25 here.

Palmer - Redirect

1   Q    What if the white voting patterns were to shift and

2   more whites were to all of the sudden start voting against

3   minority preferred candidates?

4           MS. MCKNIGHT:  Your Honor, I'm going to object.

5   Dr. Palmer has already testified that he didn't do any

6   sort of analysis in order to answer these questions.

7           MS. KHANNA:  I don't -- Your Honor, I don't

8   believe that Dr. Palmer -- I'm asking him to testify

9   specifically about what would happen.  I'm testing his

10  conclusion even if these other assumptions were to take

11  place.  These are the assumptions that Ms. McKnight asked

12  him to assume.

13          JUDGE PAYNE:  Objection sustained.  Anything

14  else?

15          MS. KHANNA:  Thank you, Dr. Palmer.  I have no

16  further questions.

17          JUDGE PAYNE:  Can he be excused or are you going

18  to keep him around?  Do you want to keep him around?

19          MS. KHANNA:  Yes, we're going to keep him

20  until --

21          JUDGE PAYNE:  All right.  Thank you.  You may

22  step down.

23          (Witness stood aside.)

24          JUDGE PAYNE:  Do you have any other witnesses,

25  Mr. Hamilton?

Jones - Direct

1    MR. HAMILTON:  We do not, Your Honor.  I'd like

2  to confirm that the deposition excerpts that we discussed

3  yesterday afternoon have all been prepared by Ms. Marino

4  and placed in notebooks behind Your Honors on the bench.

5  I would just like to confirm that all of the deposition

6  excerpts from 2015, as well as 2017 have been admitted and

7  are part of the record.

8    JUDGE PAYNE:  Any position on that?  Do you

9  agree?

10    MS. MCKNIGHT:  We agree.  Yes, Your Honor.

11    JUDGE PAYNE:  Yeah.  I think that's correct.

12  Yeah.

13    MR. HAMILTON:  And with that, Your Honor, the

14  plaintiffs rest.

15    JUDGE PAYNE:  Defense.

16    MR. BRADEN:  At this time the

17  defendant-inventors will call Delegates Jones.

18    JUDGE PAYNE:  Delegate Jones.

19    MR. BRADEN:  And we have some witness binders to

20  pass out that hopefully will facilitate the testimony.

21    JUDGE PAYNE:  All right.  Thank you.

22

23              **STEVEN C. JONES,**

24    called at the instance of the defendant-intervenors,

25     having been first duly sworn, testified as follows:

Jones – Direct

**DIRECT EXAMINATION**

1

2  BY MR. BRADEN:

3  Q    Delegate Jones, would you remind the Court of your

4  name and position?

5  A    Steven, with a V, Christopher Jones.  I serve in the

6  House of Delegates, representing the 76th District, which

7  is part parts of Suffolk and Chesapeake.

8          MR. BRADEN:  Your Honor, I understand that

9  Delegate Jones has testified extensively before, and I

10 know there's a record on this.  I hope not to duplicate

11 that record in his testimony today, but there were a

12 number of issues that were brought up in the plaintiffs'

13 case that -- that challenge his credibility on some issues

14 and contradict his earlier testimony.  So we're going to

15 ask him questions and try not to be duplicative of what

16 was testified before.

17          JUDGE PAYNE:  All right.  I think we need that.

18 Q    Delegate Jones, again, can you remind the Court of

19 your role in the 2011 redistricting process in Virginia?

20 A    I was the chief architect in the patron of the bill.

21 Q    And what was your role in 2001?

22 A    I was the heavily involved and was the chief patron

23 of that bill as well, House Bill 1.

24 Q    And so one of the reasons you were chosen in 2011 was

25 because you were chosen in 2001?

Jones - Direct

1  A    That would be the case, yes, sir.

2  Q    Lucky you.

3  A    Lucky me.

4        MR. BRADEN:  If we could bring up Plaintiffs'

5  Exhibit 16.

6  Q    Do you recognize this document?

7  A    I do.

8        MR. BRADEN:  Your Honor, I won't go extensively

9  through it, but I think it's important to point out two

10  specific items.

11  Q    If you could look at Roman numeral I.  Is that one of

12  the areas that it changed from 2001 to 2011?

13  A    Yes.

14  Q    And what changed?

15  A    The population was plus or minus 1 percent from plus

16  or minus .5.

17  Q    And what effect did that -- that was a significant

18  decrease in the overall population range from the prior

19  one?

20  A    I don't believe so.

21  Q    Okay.  The prior one was plus or minus 2 percent?

22  A    It could have been.  That's been 15 years ago.

23  Q    So your role was as the principal patron and

24  architect of the plan.  Did you have a principal

25  consultant working with you?

Jones - Direct

1  A    Yes.  I had two individuals.  I had counsel, Dale

2  Oldham, and we had John Morgan, who had been working with

3  me off and on since 1997.  And he was -- if I was the

4  architect, he would have been my technical consultant.

5  Q    What was the time frame like this cycle for the

6  drawing of the plan?

7  A    It was compressed.  Virginia is one of maybe -- I

8  think the only state that has elections in November the

9  year that they receive the census.  We got it, I believe,

10 the end of February and we had a tight timeline of, I

11 believe, 1st -- we had to be to Department of Justice by

12 the 1st of May.  So it caused us to compress the time

13 frame.

14 Q    And am I correct that there was a problem with the

15 census that even more compressed the time frame?

16 A    There was.

17 Q    Okay.  Physically, how did you draft the plan?  Did

18 you do it on a computer?

19 A    I did.  I had the Maptitude software.

20 Q    Okay.  And your role was the architect.  What level

21 did you draw at?

22 A    The macro.

23 Q    So did you draw the plan at the vote tabulation

24 district?

25 A    Pretty much.  Yes, sir.

Jones - Direct

1  Q    And so that process you had available, what type of

2  data on your screen when you were drawing your part of the

3  plan?

4  A    We had, I think, the PL 94 date that came from the

5  Census Bureau.  And I think Mr. Morgan was able to bring

6  in some political data that was, I think, disaggregated

7  reaggregated.  I really don't know how that works, but

8  that was my understanding.  We had a couple of elections

9  that were included on the election results.

10  Q    So you were basically drawing the plan at the VTD

11  precinct level?

12  A    Correct.

13  Q    And then -- and you were in charge of the political

14  negotiation process?

15  A    As with any bill, you have to be able to put the bill

16  together, then to have enough support for it to pass.  And

17  this bill was a little different in the fact that we had

18  to get preclearance from the Justice Department.  And so

19  we -- the process was we took the benchmark data -- the

20  benchmark plan, excuse me, and imported the census data

21  into it.  And then that gave you a template of where you

22  stood in time and what needed to be done due to population

23  shifts in the Commonwealth.

24  Q    So the line drawing process was a technical process,

25  but in the end, it was very much a political legislative

Jones - Direct

1   process, correct?

2   A    Yes.

3   Q    You had to corral sufficient votes to get it passed,

4   correct?

5   A    I had to have a majority of votes in the House for

6   passage and also for the governor to sign it and then for

7   the Justice Department to approve it.

8   Q    And did you reach out to a majority of the members of

9   the legislature, or most of the members of the

10  legislature, to discuss the plan?

11  A    I did.

12  Q    -- and process?

13  A    Yes.

14  Q    Did many of them have suggestions as to what their

15  districts should look like?

16  A    They did.

17  Q    I -- at the beginning of this, I mentioned a cliché

18  that I think you're familiar with.  Is it easy to draw a

19  district and hard to draw a plan?

20  A    It certainly is.  If I had one district design

21  brought to me by a member, I probably had several dozens

22  of the perfect district that would fit for them.

23  Q    So you were the individual involved in the political

24  negotiations in drafting the basic plan at the VTD level.

25  What happened after that?

Jones - Direct

1   A     Well, you have to follow the criteria to make sure

2   that, in fact, you are within plus or minus 1 percent.

3   And we did have the criteria on, you know, no

4   retrogression.  We had to have -- at the time, Virginia

5   was a preclearance state.  So they were the two main

6   concerns.  That's why they were criteria number one and

7   criteria number two.

8   Q     And is there some criteria that requires VTDs to be

9   sacrosanct?

10  A     No.

11  Q     Something not to violate them?

12  A     No.

13  Q     And was it your understanding the VTDs needed to be

14  split in sections of the plan drawn at the census block

15  level that conformed to the population requirements?

16  A     Yes.

17  Q     And who drew the plan at the census block level when

18  you were dividing VTDs?

19  A     John Morgan did.

20  Q     Were you involved in dividing any of the census

21  blocks out of various VTDs of the different districts?

22  A     There might have been a couple.  I know that Richmond

23  city, for example, they had met with the registrar.  And

24  they had wanted to align their precincts with the new

25  wards.  I call them borough at home, but wards, I believe,

Jones - Direct

1   in the City of Richmond, and we tried to address that.

2   And then there were some concerns that had been raised, I

3   think, that came in through legislative services and a few

4   other areas of the Commonwealth; that people had noticed

5   that you could do this or you could do that.  It might not

6   affect the population.  It could be like a polling place

7   or something of that nature.

8   Q    And the numbers of individuals involved when you're

9   drawing at the vote tabulation district level is much more

10  significant than if you're drawing at the census block

11  level?

12  A    Oh, yes.  Your plan is built on your voting districts

13  and how they -- VTDs, if you want to call them that, and

14  how they then make the district.

15  Q    And I don't want to put words in your mouth, but

16  basically drawing at the census block level simply wasn't

17  important enough for your time?

18  A    No.  I had bigger fish to fry.

19  Q    So if someone told you that they could analyze

20  whether race was predominant by looking at VTD splits,

21  what would be your reaction to that?

22  A    Well, I would be unaware of it, number one, and would

23  be surprised, number two, because we followed a status quo

24  plan when we started as a base map.

25  Q    And the VTD splits are basically the end of the

Jones - Direct

1  process simply to equalize population, generally?

2  A    Generally, that's correct, or for a geographical

3  reason.  You might have a census -- there was one back in

4  2001 in Northern Virginia, I recall, and then one had one

5  this time with no, quote, unquote, population in it, but

6  it just made the line look cleaner.

7  Q    Do you remember a split VTD in HD 71?

8      Let me refresh your recollection.

9          MR. BRADEN:  Let me bring up Exhibit DX 6.  The

10  video, yep.  Did I get the wrong number?

11          (Video Played.)

12  Q    And that's your contemporaneous speech on the floor

13  between the vetoed bill of HB 5001 and the new bill, 5005?

14  A    Yes.

15  Q    And if -- so the split discussed in -- let me use the

16  Plaintiffs' Exhibit 69 and page 22.  This is from the

17  plaintiffs' expert report, who I believe indicated that

18  this was some indicia of racial gerrymandering.  This was

19  at the request of Richmond election officials?

20  A    Yes.  The horizontal line is, I think, the Downtown

21  Expressway.

22  Q    Did race have anything to do with this?

23  A    Absolutely not.

24          JUDGE PAYNE:  What page is that?

25          MR. BRADEN:  It's page 22.

Jones – Direct

 1         JUDGE PAYNE:  Of?

 2         MR. BRADEN:  Of Plaintiffs' 69.  It's the

 3  cemetery.  We seem to be discussing whether or not

 4  Jefferson Davis' body should be in 71 or 68, I guess.  I'm

 5  not sure that's the point.

 6         MR. HAMILTON:  Objection, Your Honor.  The

 7  commentary is inappropriate.

 8         JUDGE PAYNE:  I didn't understand it so,

 9  therefore, I disregarded it.  I think all of us did.

10         MR. HAMILTON:  Thank you, Your Honor.

11         JUDGE PAYNE:  It's extrinsic to the task at

12  hand.  Go, Mr. Braden.

13         MR. BRADEN:  Yes.

14  Q    When you look to his discussion of District 71,

15  Dr. Rodden's discussion of 71, which begins on page 15, he

16  believes that drawing -- I don't think I'm misquoting him

17  to say that he has provided testimony that there needed to

18  be extensive race-based maneuvering to create District 71.

19  Do you believe that's correct?

20  A    No.

21  Q    In fact, did you feel the need to do extensive

22  race-based maneuvering to create any of the 11 challenged

23  districts before this Court?

24  A    No.

25  Q    Drawing the plan was difficult because of population

Jones - Direct

1  changes, correct?

2  A    That made it --

3           MR. HAMILTON:  Objection.  Leading.

4           JUDGE PAYNE:  Overruled.

5  BY MR. BRADEN:

6  Q    Were the population changes providing the most

7  difficulty in the drawing of the plan?

8  A    Yes.  As they did in 2001.

9  Q    And just briefly, remind the Court what you had to do

10 to deal with the population changes.

11 A    Well, we had to shift from the southern part of the

12 Commonwealth up through -- we called it the Piedmont,

13 across to the Valley.  There were a loss of three seats

14 from Hampton Roads, south side and southwest.  Southwest

15 had House District 2, which went to Stafford, north of

16 Stafford.  We had the 10th District, which, I believe, was

17 talked about this morning, which is south side.  That

18 moved to Northern Virginia.  And then in Hampton Roads and

19 Richmond -- I mean, excuse me.  In Norfolk, House District

20 87, which I think 90 percent of that was in the city of

21 Norfolk, moved to Northern Virginia.  So those three moves

22 necessitated major changes in certain parts of the

23 Commonwealth, especially in Hampton Roads.

24 Q    Just briefly, to make sure that the Court can

25 visualize to the degree of changes, Defendant Exhibit

Jones - Direct

1  91 -- Defendant-Intervenors' Exhibit 91, and I will turn

2  to -- hopefully I have the right page this time.  Page 19

3  and 20.  And on page 19, that's the prior House District

4  10?

5  A     Correct.

6  Q     And at the bottom is the new House District 10?

7  A     That is correct.

8  Q     And how many hours would it take to drive from one to

9  the other?

10  A     Longer than I'm willing to take in a car.

11  Q     And do we have a district that you had to move out of

12  the Tidewater area to Northern Virginia?

13  A     Yes.  That was House District 87.

14  Q     And if we can turn to page 173 and 174.

15  A     Eighty-seven is on the -- of course, the base map,

16  87, was on the north side of the city.  There were, in

17  fact, three -- four districts that were based in Norfolk,

18  and we had to move one of the four to Northern Virginia.

19  And, of course, we had underpopulation in all of the

20  Hampton Roads districts, if I remember correctly, except

21  for -- I think 96 on the peninsula, I believe 78.  And

22  they were -- they weren't -- 78 was only a little bit, and

23  9, which was House District 76, which has 16 percent more

24  population than it needed, I believe.

25  Q     And these population changes are rippled through the

Jones - Direct

1  whole plan?

2  A    Yes.  And I'm going from memory, which is not always

3  the best, but I believe that the sum total in Hampton

4  Roads, we lost really the balance of a seat and a half, or

5  more, of population, which required us to move one seat to

6  Northern Virginia.

7  Q    The 11 challenged districts, are they essentially the

8  same as the benchmark districts?

9  A    In my opinion, yes.

10  Q    Let me do Defendant-Intervenors' 106.  Excuse me.

11  Defendant-Intervenors' 14.  Sorry.  Wrong tab.

12        MR. HAMILTON:  Your Honor, there's an objection

13  to this exhibit.  It has not been --

14        JUDGE PAYNE:  If you'll wait just a minute.

15        MR. BRADEN:  I have -- I'm looking for --

16        JUDGE PAYNE:  What exhibit are we talking about

17  now?

18        MR. BRADEN:  Fourteen.  Defendant-Intervenors'

19  Exhibit Number 14, page 60.

20        JUDGE PAYNE:  Is it a book or is it -- a map

21  book or is it --

22        MR. BRADEN:  Actually, technically, it comes

23  from Dr. Hofeller's report.  We actually probably have a

24  demonstrative for it, too, the same demonstrative we had

25  before.

Jones – Direct

1          JUDGE PAYNE:  I'm just trying to find it.

2   Fourteen is Declaration of Thomas Brooks Hofeller.  Is

3   that what you're talking about?

4          MR. BRADEN:  Yes.  Yes, Your Honor.  And this is

5   page 60, which turned out to have the best graphics,

6   frankly.

7          JUDGE PAYNE:  Page what?

8          MR. BRADEN:  Page 60.

9          JUDGE PAYNE:  And there's an objection?

10         MR. HAMILTON:  Not to this document.  It was the

11  one he mistakenly displayed a moment ago.

12         JUDGE PAYNE:  Yeah, because you all used this

13  one, or somebody used this one, earlier.

14         MR. HAMILTON:  No objection to this one, Your

15  Honor.

16         JUDGE PAYNE:  So page 60 of

17  Defendant-Intervenors' Exhibit 14 we're talking about now,

18  right?

19         MR. BRADEN:  Yes.

20         JUDGE PAYNE:  Okay.

21  Q    And can you tell the Court what this document is?

22  A    On this map, these three maps show House District 74

23  after the 1991, the 2001 and 2011 redistricting process.

24  They were approved by the General Assembly and submitted

25  to DOJ for preclearance.

Jones - Direct

1    Q    And these districts are -- basically the core of this

2    district is the same as it was in 1991, 2001 and 2011?

3    A    Yes.

4    Q    Okay.  From 2001 to 2011, what changes did you make?

5    A    We came across the river and picked up, I think, two

6    precincts in Hopewell.

7    Q    And then in 2011, that section of Hopewell was

8    removed from the district.  Why was that?

9    A    Well, there was a lot of discussion at the -- I guess

10    on the floor after the 2001 debate and into the balance of

11    the decade, people would come to P&E and they use this

12    example.  Not this one specifically, but House District 64

13    in Hampton Roads.  They called that the ferrymandered

14    district.  And so there was some concern about going

15    across the river where there wasn't a direct, quote,

16    unquote, you know, bridge or access point.

17        And even though it had been upheld, I believe, in a

18    court case, one of the goals that I had was to come back

19    across the river from Williamsburg to south side in Isle

20    of Wight and go back across north from Hopewell to Prince

21    George County -- I mean to -- excuse me.  I'm drawing a

22    blank.  Charles City County.  Excuse me.

23    Q    Charles City County?

24    A    My apologies.

25    Q    And that crossing was the tidal estuary of the James?

Jones - Direct

1    A    That's correct.

2    Q    Not like the James River in downtown Richmond, much

3    wider?

4    A    Correct.

5    Q    And it crosses -- Hopewell city is a city, correct?

6    A    Correct.

7    Q    And across is basically a totally rural, very lightly

8    populated area?

9    A    Yes.

10   Q    Was there any racial motivation or reason for this?

11   A    No.

12         MR. BRADEN:  If we could come up and show

13   Defendant-Intervenors' Exhibit 94, page 004.  It's our

14   yellow maps.

15         JUDGE PAYNE:  Page what?

16         MR. BRADEN:  004.

17   Q    District 207, is that in The Fan?

18   A    It is.

19   Q    And 14 and 13, are they in The Fan, too?

20   A    I have to clarify.

21         JUDGE PAYNE:  113 and 114?

22         MR. BRADEN:  Yes, 113 and 114.

23   A    I would say that's bordering The Fan with the museum

24   district.

25   Q    Okay.  I look at this map and I see a variety of

Jones - Direct

1   little blue stars.  What do those indicate?

2   A     Incumbents.

3   Q     And am I correct to say that they are all -- there's

4   a number of them in close proximity to each other?

5   A     There are four along what I call the -- from the

6   northwest to the southeast access going like down the --

7   almost expressway.  You got Manoli Loupassi in 104.  Jenn

8   McClellan in 208.  You have Betsy Carr in 504, and then

9   you've got Delores McQuinn right on the edge of 703 and

10  705.

11  Q     Is it safe to assume that that presented some

12  political difficulties in deciding how to draw this area

13  of the district?

14  A     Absolutely.  And I would add there were 3 of the 4 --

15  3 of the 4 were 3 of the 12 in the majority minority

16  districts.

17  Q     And how did you decide to put 207 into 68?

18  A     When you had to have population, I believe 71 and 69

19  were underpopulated, as was 68 and 73.  While 70 had the

20  population that it needed and 74 had its population that

21  you needed, if you just took as a district but not as a

22  plan or a map, the problem was you had a shift in the

23  demographics of House District 71.  And when you looked at

24  population --

25  Q     Excuse me.  When you say shifting of demographics,

Jones - Direct

1   how did that district change over the decade?

2   A    I believe when it was -- the benchmark plan in 2001

3   was 56 percent or 55, 56 percent, and over the balance of

4   the decade, it dropped to 46 percent African-American.

5   Q    And do you believe that, in that geographic area,

6   those same demographic trains have gone forward and been

7   the same?

8   A    It absolutely has.  Not because I have a condo down

9   here, but a couple weeks ago I was with my bride and we

10  were over across the street a couple blocks down on Grace

11  and we went into a shop.  And I always like -- being a

12  small business owner, I like to know the history behind

13  anyone and why they decided to open up a business.  And on

14  the wall was an article about the son who opened up the

15  restaurant Pop's and his mom had lived her 30 years ago.

16  She left, moved to the county to raise the son, and she

17  moved back.

18      But on the front page of the Richmond paper was

19  shifting -- city changes, and the article actually said

20  that for the first time --

21          MR. HAMILTON:  Objection, Your Honor.  A, it's

22  not responsive.  B, now he's quoting a newspaper article

23  that hasn't been produced in discovery and is obviously

24  not relevant here, and it's hearsay.

25          JUDGE PAYNE:  If you can get ahold of any one of

Jones - Direct

1   those and win on it, because you need to get one of them?

2         MR. BRADEN:  I am absolutely sure, we'll be

3   happy to produce it for the Court.  But I can rephrase the

4   question.

5         JUDGE PAYNE:  I think you should.  Sustained.

6   Q    Delegate Jones, do you believe that Richmond now is a

7   majority white city?

8   A    I do.

9   Q    Significant change from 10 years ago, or 15 years

10  ago?

11  A    I believe the population growth in Richmond has been

12  very unusual for an inner city because of the influx of

13  millennials into the city itself.

14  Q    And did you discuss directly with Delegate Loupassi

15  VTD 207?

16  A    I can't recall if it was directly or indirectly, but

17  I did know that he had relatives.

18         MR. HAMILTON:  Objection, Your Honor.  If he's

19  relating a conversation with Delegate Loupassi, it's

20  hearsay.  We were prevented from this very thing during

21  the testimony of Delegate McClellan on the same grounds,

22  hearsay.

23         MR. BRADEN:  I believe what he's testifying to

24  is that he thought he talked to him but wasn't sure but

25  was going to tell you the reason why --

Jones - Direct

1          JUDGE PAYNE:  He said he wasn't sure.  He said

2    it was direct or indirect.  And if it's direct, then

3    perhaps there's no hearsay objection because it's

4    admissible to show what he did, not for the correctness of

5    the testimony.  But if it's indirect, it's -- it may very

6    well be hearsay because he heard it from somebody else.

7    And while I guess that same reason could ultimately

8    obtain, you haven't laid a foundation for the question

9    yet.

10         MR. BRADEN:  Well, actually, I thought in the

11   sense, it was almost a foundational question why I asked

12   him --

13         JUDGE PAYNE:  Go ahead and see what you can do.

14         MR. BRADEN:  Yeah.

15   Q    Do you have an understanding whether or not Loupassi

16   wanted 207 in his district?

17         JUDGE PAYNE:  That's not an objectionable

18   question.

19         MR. HAMILTON:  As long as it's a yes or no

20   answer, Your Honor, no objection.

21         JUDGE PAYNE:  The answer is yes or no.  Do you

22   have an understanding?

23   A    I do not recall directly that conversation.

24   Q    Let me bring up Defendant Exhibit 106.  The one I

25   gave you a sneak preview to.

Jones - Direct

1              JUDGE PAYNE:  106 is what?

2              MR. BRADEN:  106 defendant-intervenors.

3              MR. HAMILTON:  And this is a document there is

4  an objection to, Your Honor.

5              JUDGE PAYNE:  Is it in the notebook?

6              MR. BRADEN:  I believe it is.  It should be

7  Defendant -- this has been -- we knew that it was objected

8  to, but it's Defendant-Intervenors' Exhibit 106.

9              JUDGE PAYNE:  All right.  It's a web page from

10  Loupassi.  Is that what it is?

11              MR. BRADEN:  Yes.  That's correct.

12              JUDGE PAYNE:  Okay.  All right.  What's the

13  objection to it?

14              MR. HAMILTON:  It's hearsay, Your Honor.  It was

15  not produced in discovery.  If it was relied upon by

16  Delegate Jones in constructing the map, it's never been --

17  we've long -- for --

18              JUDGE PAYNE:  Excuse me.  Let's start with it

19  wasn't produced in discovery.  Is that correct.

20              MR. BRADEN:  It was not produced in discovery.

21              JUDGE PAYNE:  How do you get around that?

22              MR. BRADEN:  We just created it.  We are

23  simply --

24              JUDGE PAYNE:  Basically you're supposed to

25  produce these documents in discovery.

Jones – Direct

1          MR. BRADEN:  Yeah.  And we did, in fact, produce

2      them as soon as we had the exhibit.  It is, in fact, in

3      response to their claims in regards to 207.  We are --

4      have produced all of the exhibits.  This is a new exhibit

5      simply we granted that it didn't exist at the time of

6      drawing the district, but it most certainly is readily

7      available.  There's no surprise here.

8          JUDGE PAYNE:  The question is was it produced

9      during discovery?

10          MR. BRADEN:  Yes.  He we provided it to them --

11      what date did we provide it to them?

12          JUDGE PAYNE:  All right.  It's disputed as to

13      whether it was produced during discovery.  So that's --

14          MR. BRADEN:  No, it was not produced during

15      discovery.  We did not have it in discovery.

16          JUDGE PAYNE:  But when did you -- let's try

17      again.  When did you produce it?

18          MR. BRADEN:  With the exhibits.

19          JUDGE PAYNE:  When the trial exhibits were --

20          MR. BRADEN:  Yes, with the trial exhibits.

21          JUDGE PAYNE:  And was it objected to in that

22      process?

23          MR. BRADEN:  It was objected to at that time.

24          JUDGE PAYNE:  And it wasn't raised at the

25      pretrial conference?

Jones – Direct

1          MR. HAMILTON:  It was not, Your Honor, because

2    the motion in limine wasn't filed with this or with

3    respect to any of the other exhibits.

4        We've interposed -- there's only about six documents,

5    all of which are the same -- of the same sort of nature,

6    not produced, suddenly appears on the exhibit list, never

7    produced in discovery.  Obviously, Mr. Loupassi --

8          JUDGE PAYNE:  Okay.  Excuse me.  It was objected

9    to?

10          MR. HAMILTON:  Yes.

11          JUDGE PAYNE:  So under the protocols and

12    requirements of the Court, it was to be taken up at the

13    pretrial conference so that the objection could be dealt

14    with, and I guess we just didn't take it up for some

15    reason and the objection still is open to be dealt with.

16    And that happens from time to time.  So it sounds to me

17    like you didn't produce it in discovery.

18          MR. BRADEN:  That's correct.

19          JUDGE PAYNE:  And if you're surprised or you're

20    disadvantaged by it, we've got a problem.  So I don't know

21    that you can get it in.

22          MR. BRADEN:  We'll withdraw it, Your Honor.

23          JUDGE PAYNE:  All right.  Exhibit withdrawn.

24    Q    Delegate Jones, are you aware that Delegate Loupassi

25    has a restaurant in 207?

Jones - Direct

1   A    Yes.

2   Q    Are you aware that he has a real estate business

3   there?

4   A    Yes.

5   Q    Are you aware that he -- do you know whether or not

6   he was born and grew up in 207?

7   A    I do not know that.  But I do know he used to mop the

8   floors in his dad's restaurant.

9   Q    We have -- I'll bring up -- back to Dr. Rodden's

10  Plaintiffs' Exhibit 069.

11         JUDGE PAYNE:  What are you saying, now?

12         MR. BRADEN:  069, and I'm going back to the

13  section that talks about House District 505.

14         JUDGE PAYNE:  And that page is what?

15         MR. BRADEN:  And that begins at page -- let's go

16  to page 18, which has the map of the district.

17  Q    Dr. Rodden suggests that, in his report, Summit

18  County, Hilliard and Stafford County were removed for

19  racial reasons.  What was the reasons why those were

20  removed from the district?

21         JUDGE PAYNE:  In Stafford County?

22  BY MR. BRADEN:

23  Q    I mean in Summit Court, Hilliard and Stratford Hall

24  were removed from the district.  These three precincts at

25  the top were removed from 71.  What was the reasoning

Jones - Direct

| | |
|---|---|
| 1 | behind removing those three districts? |
| 2 | A    Rotate of population from 72 to 73, and that |
| 3 | population was needed for 72. |
| 4 | Q    And what county are they in? |
| 5 | A    They are in Henrico. |
| 6 | Q    They are in Richmond?  Not in Richmond, then? |
| 7 | A    No, they are not in Richmond. |
| 8 | Q    So the line between those is the county line? |
| 9 | A    Correct. |
| 10 | Q    Dr. Rodden suggests that it will logical, under |
| 11 | traditional redistricting criteria, to have moved this |
| 12 | district west.  Is that logical to you? |
| 13 | A    No. |
| 14 | Q    Why not? |
| 15 | A    Well, you had population needs and you already had a |
| 16 | district on the west side, 68, that had what I would |
| 17 | consider more, you know -- the museum district is |
| 18 | multifamily.  It abuts part of The Fan.  207 is probably |
| 19 | is more like 114 and 113 then the other end of 208, from |
| 20 | my observation.  And moving west would have certainly been |
| 21 | problematic, in my opinion, for DOJ approval because it |
| 22 | would have further diluted what was already, in my |
| 23 | opinion -- I think DOJ is stating anything below |
| 24 | 50 percent would have a problem, and I do not believe |
| 25 | there would have been one member of the African-American |

Jones – Direct

1   caucus that would have supported the plan.

2   Q    And would this also have presented a political

3   problem for republican members of the legislature?

4   A    Yes.

5   Q    It would have brought more democratic voters into

6   their districts, potentially?

7   A    Well, if it would have went west too far, it would

8   have combined Delegate Loupassi either Delegate Carr or

9   Delegate McClellan.

10  Q    Is it your opinion that this type of redrafting would

11  effectively likely remove one majority minority performing

12  seat from the Virginia legislature?

13  A    Could -- it certainly could do that.  And like I said

14  earlier, Richmond is no longer a majority minority city.

15  Q    Is Jennifer McClellan an unusually compelling

16  candidate?

17  A    She is.

18  Q    And so how well she runs an election, would that be a

19  predictor of how well another African-American candidate

20  might run in that district?

21  A    No, not in my opinion.

22  Q    I'd like to draw your attention to page 36.  This

23  would also, I think, be of assistance if you looked, in

24  addition, at -- this is -- well, let me ask you.  This --

25  what district is illustrated in Figure 11?

Jones - Direct

1   A    Sixty-three.

2   Q    And is 63 -- who's the member of 63?

3   A    It was then Delegate Dance, now Senator Dance.

4   Q    And what role did Delegate Dance play in drawing this

5   district?

6   A    Well, she played a significant role in the districts

7   in the Richmond area.  If I recall correctly, she -- the

8   working biggest concern was with 75, and then was trying

9   to configure her district to being a forming majority

10  minority district.

11  Q    And if you look -- it might be easier to look at

12  Defendant-Intervenors' Exhibit 94, page 001, which is our

13  familiar yellow map.  There's what's been called the

14  finger right here.  Is that a configuration in the

15  district that you wanted?

16  A    No.  There would have been no reason for me to draw

17  that.  They are two similar districts side by side,

18  majority minority districts.  And the boundary, from my

19  perspective, really wasn't a highest priority.

20  Q    So the principal decision-makers there, to a large

21  degree, were the two African-American members?

22  A    Yes.  It was a request from New Hope to stay in the

23  63rd.  And with the population challenges that we had in

24  Hampton Roads moving west with North Carolina to the south

25  and the James River to the north, 75 was very challenging

Jones - Direct

1    to draw.  And so the boundaries that were drawn in

2    Dinwiddie County certainly impacted the configuration of

3    House District 63.

4              JUDGE PAYNE:  Who requested that New Hope stay

5    in District 63?

6              THE WITNESS:  Then Delegate Dance.

7    Q    And were you thinking this was probably -- or did she

8    indicate to you that she was concerned about a primary

9    challenger?

10   A    My memory -- of course, you have to -- you know, I

11   probably talked to 70 plus members in the whole process in

12   a very compressed timeline.  I thought that initially that

13   the finger had to do with a primary -- a potential primary

14   component, but my memory could be refreshed.

15        I do recall she had a specific ask to have the New

16   Hope precinct in her district, which further complicated

17   the configuration because of the population.  I think

18   that's a fairly large precinct.  Maybe over 4000 people.

19   I'm going from memory.  I don't know.  I shouldn't

20   speculate, but I think it was fairly large population

21   wise.

22   Q    And if we look down here, New Hope, what impact

23   politically would that have had if you could move it to up

24   to the republican district north of 63?

25   A    It would have certainly made it more problematic for

Jones – Direct

1    Riley Ingram reelection.

2    Q    And drawing the districts here, was this a

3    particularly different area to draw?

4    A    It was.  This was where the Richmond area and Hampton

5    Roads really kind of came together per se, because of

6    the -- trying to stay on the south side of the James all

7    the way up until we got to, you know, to Prince George

8    County.  And so the population requirements moving from

9    the west, from 75, required that 62, which was Delegate

10   Ingram, who was a former mayor of Hopewell, I believe his

11   district was in the top three of the most changed

12   districts in -- of the hundred that were drawn.  He had

13   one of the most dramatic impacts of his district of any of

14   the other members.

15   Q    There are a number of split VTD districts on 63.

16   Were you involved in drawing any of the split VTDs?

17   A    No, not in the Hopewell area.  I don't recall the

18   finger.  I might have talked to John Morgan about that,

19   but I don't specifically recall drawing that, no.

20   Q    And this would be for the same reason you testified

21   before, because the numbers involved wouldn't have been

22   sufficiently important for you to spend time on?

23   A    Correct.

24            JUDGE PAYNE:  What is your understanding as to

25   why the area that is between New Hope and Courthouse,

Jones - Direct

1    which looks like a hook or a finger, is there -- is drawn

2    that way at all?

3                THE WITNESS:  I believe initially New Hope was

4    not in the 63rd.  I believe there was an individual that

5    lived up in that tip that the individual was concerned

6    about running against him in a primary.  So the original

7    configuration looked much differently.  But at the end of

8    the process, New Hope was something that she had wanted in

9    her district.  She had worked very hard.  She was one of

10   the two point of contacts for the Black Caucus.

11       And so New Hope was inserted in there, and that

12   henced the configuration.  Because I believe that follows

13   85 on the south.  The north border of -- northwest border

14   of New Hope, I think, is Interstate 85.

15               JUDGE PAYNE:  Why is the tip or hook that you're

16   talking about in there at all?

17               THE WITNESS:  It was in there initially.

18               JUDGE PAYNE:  Why is it -- why does it appear on

19   this map as an area that was taken out of 63?

20               THE WITNESS:  Initially, I believe, it was out,

21   as was New Hope.  And so it looked more -- it was more of

22   a -- it was more like a -- I would say an upside down U.

23               JUDGE PAYNE:  All right.

24               THE WITNESS:  And then we inserted New Hope at

25   the end of the process, if I recall correctly.

Jones – Direct

```
 1          JUDGE PAYNE:  All right.

 2   Q    And let me turn to Plaintiffs' Exhibit 69, page 33.

 3   Are you there?

 4   A    Yes, sir.

 5   Q    And it may be difficult for you to orient yourself,

 6   but this is the northern part of District 74, and it's

 7   the -- do you understand what this map is, this

 8   dot-centric map?

 9   A    Well, it's the first time I've seen like this.

10   Q    Do you ever seen anything like this in the

11   redistricting process?

12   A    No.

13   Q    Can you understand how it would really be of any use

14   to you in the redistricting process?

15   A    I would be lost --

16   Q    Okay.

17   A    -- to draw a map.

18   Q    I believe that this particular page here is an

19   attempt to illustrate some split VTDs at the northern part

20   of House District 74.  Were you involved in splitting any

21   of these VTDs?

22   A    No.

23   Q    And why not?

24   A    I just had too many other things to do.  We had a

25   tight time frame.  We were delayed by a week and a half
```

Jones - Direct

1   because of the census data error, and we had to get a bill

2   through the process with our public hearings, and we

3   couldn't hold any public hearings until after we had the

4   data.  It was a census block data problem down in Hampton

5   Roads that was like a 20-some thousand person mistake.

6   And so we had to hold off on our public hearings.  So we

7   had a very tight timeline.

8   Q    And then let me turn you to Defendant-Intervenors'

9   Exhibit 94, page 008.  Do you see recognize what district

10  this is?

11  A    I do.  It's 77.

12  Q    And who represented -- who represented 77 at the time

13  it was drawn?

14  A    Delegate Lionell Spruill.

15  Q    Is Delegate Spruill still a member of the

16  legislature?

17  A    He is.  But he's serving in the Senate now.

18  Q    Okay.  It looks to be -- am I correct there are only

19  modest changes from the prior plan?

20  A    I would agree with that, yes.

21  Q    And the changes occur principally at the eastern end

22  of the district?

23  A    Yes.  We had a lot on the western end of the

24  precinct.

25  Q    And the changes on the eastern end, were those at the

Jones - Direct

1    direct request of Lionell Spruill?

2    A    They were.

3    Q    Do you know the racial composition of those

4    precincts?

5    A    I do not, but I do not believe they are -- they are

6    not majority minority precincts.  I do know that prior to

7    2001, they were in the 77th, I believe, and he requested

8    that -- that's part of south Norfolk, and he requested

9    that to be put back into his district.  His house is, I

10   believe -- got my glasses.

11   Q    It's virtually on the line?

12   A    Right.  The adjacent precinct to Norfolk Highlands.

13   Q    So in one sense, he's basically asking to get his

14   neighborhood that he lives in to his district?

15   A    Correct.

16   Q    And are those new parts in the Senate district, new

17   Senate district?

18   A    I believe so.  I'm not really this familiar with the

19   Senate map.

20   Q    At the other end is Airport?

21   A    No.  That is in my 76th District.

22   Q    Yeah.  I was going to -- that's been moved from the

23   old district to your district?

24   A    Correct.  That's correct.

25   Q    Did it have any racial implications by moving to your

Jones - Direct

1    district?

2    A    No.  It was a good republican precinct.  And moving

3    the population to the east and taking out Chittum and

4    Geneva Park, removing Airport made it work as far as the

5    almost plus or minus 1 percent.  I believe we had to -- I

6    didn't do it, but I think the split was at Lakeside.

7    There I think the -- I think the John F. Kennedy split --

8    I remember this because I represented that area -- existed

9    in the 2001 map, if I'm not mistaken.  I don't think that

10   changed.

11   Q    Can we go to Defendant-Intervenors' Exhibit page 10?

12            JUDGE PAYNE:  Ninety-four, page 10?

13            MR. BRADEN:  Yes, 94, page 10.

14   Q    Do you recognize that district?

15   A    I do.

16   Q    Who represents that district?

17   A    Matthew James.

18   Q    Was he a freshman member when this was drawn?

19   A    He was.

20   Q    Did he have actually much input into drawing the

21   plan?

22   A    I can't answer that directly.  Delegate Spruill, at

23   the time, was the point person for the six districts in

24   Hampton Roads, just like Delegate Dance was in Richmond

25   for those six.  It was my understanding that he did.

Jones – Direct

1   Q    Is the drawing of this district driven by -- in part,

2   by the interest of the former incumbent member in the

3   district just north of that?

4   A    Yes.  Delegate Joannou.

5   Q    And what district number was that?

6   A    Seventy-nine.

7   Q    Was he a democratic member?

8   A    Democrat, yes.  Very conservative democrat.

9   Q    And you drew some districts that were out of his

10  district that were democratic precincts, correct?

11  A    Let me be clear.  Do you mean I drew some VTDs?

12  Q    Yes, VTDs.

13  A    Right.  Okay.

14  Q    When you drew that District 79, Johnny lost some

15  democratic voting precincts?

16  A    He did.

17  Q    Was he unhappy about that?

18  A    No.

19  Q    Were those changes basically at his request?

20  A    Yes.

21  Q    Because he was afraid of a primary opponent?

22       MR. HAMILTON:  Objection, Your Honor.  Now he's

23  calling for hearsay.  Unless he's got personal knowledge

24  independently, he can't relate what Delegate Joannou did

25  or didn't think.  He could have come into this court and

Jones - Direct

1    testified himself.

2             MR. BRADEN:  That would have been rather

3    difficult since he's dead.

4             MR. HAMILTON:  Then it's a problem, but it's

5    still hearsay.

6             JUDGE PAYNE:  So you still haven't figured

7    out -- haven't gotten a foundation as to how he knows

8    this.

9    Q    Did you speak --

10            JUDGE PAYNE:  Do you know why Joannou wanted the

11   precincts -- those precincts moved?  Yes or no.

12            THE WITNESS:  Yes, sir.  Yes.

13            JUDGE PAYNE:  And the next question is how do

14   you know?

15   Q    How do you know.

16            JUDGE PAYNE:  From a discussion or from what?

17            THE WITNESS:  Personal conversations with

18   Delegate Joannou.

19            JUDGE PAYNE:  Joannou?

20            THE WITNESS:  Yes, sir.

21            MR. HAMILTON:  Then it's hearsay, Your Honor.

22            JUDGE PAYNE:  How does it get in?

23            MR. BRADEN:  It gets in because it formed his

24   decision making in drawing the plan.  One of the issues in

25   this case is his intentions in drawing the plan.

Jones - Direct

1   Providing information as to what people told --

2           JUDGE PAYNE:  So it's offered for a

3   nonhearsay --

4           MR. BRADEN:  Nonhearsay, yes.

5           JUDGE PAYNE:  Not for the truth of the matter?

6   Is that your point?

7           MR. BRADEN:  Not necessarily.  It's how it

8   affected his drawing of the plan.  Not whether or not it

9   was true he had a primary opponent.

10          MR. HAMILTON:  May I be heard, Your Honor?

11          JUDGE PAYNE:  Yeah.

12          MR. HAMILTON:  It is, in fact, relevant.  The

13  problem is it is exactly -- the only reason it's relevant

14  is if it's offered for the truth of the matter asserted.

15  That is, I'm a conservative democrat.  I want to lose

16  these precincts or I'm worried about my reelection.  Those

17  are all offered for the truth of the statement.  And

18  that's the only way that makes it relevant.  It's not

19  offered for state of mind.

20          MR. BRADEN:  No.  It's offered for the purpose

21  of the effect it had on him.  It doesn't matter whether

22  it's true or not.

23          JUDGE PAYNE:  You're offering it for the purpose

24  of why Delegate Jones did what he did?

25          MR. BRADEN:  Absolutely correct.

Jones - Direct

1    JUDGE PAYNE:  So it makes no difference.  Is

2  that your point?

3    MR. BRADEN:  That's absolutely correct.  It

4  doesn't matter whether it's true or not.  It's whether or

5  not he believes it's true.

6    MR. HAMILTON:  But, Your Honor, it's not --

7    JUDGE PAYNE:  Sustained.

8    MR. HAMILTON:  Thank you, Your Honor.

9  Q    Do you believe personally that the districts you

10  pulled out of his district would benefit him politically?

11  A    Yes.

12  Q    And that motivated your actions?

13  A    Correct.  He was a dear personal friend.  We served

14  on a conference for six years together, the budget

15  conference.

16  Q    If we could go to Plaintiffs' Exhibit 69.  First, let

17  me ask about page 56.  Can you recognize from this map

18  which district this is?

19  A    Yes.  House District 89.

20  Q    What is House District 89?

21  A    It's in the city of Norfolk.

22  Q    Okay.  Again, I think it might be easier to use

23  Defendant-Intervenors' Exhibit 94, page 11, the yellow

24  map.  Who represents that district?

25  A    I can't remember who represents it now, but at the

Jones - Direct

1   time it was Delegate Kenny Alexander.

2   Q    And the changes you made in the district, you added

3   these areas here, here and here, am I correct?

4   A    That's correct.

5   Q    And why is this district drawn in this manner?

6   A    We had a population need, as did its neighbor --

7   well, every district around it had a population need, to

8   include 100, 82, I think 90 and 80 and 79.  We put Berkley

9   in.  That's where the member had a business.

10  Q    Is this the location of one of the funeral homes?

11  A    Yes.

12  Q    Let's go to page 58 of Plaintiffs' Exhibit 69.

13          JUDGE PAYNE:  Page what?

14          MR. BRADEN:  Page 58 of Plaintiffs' Exhibit 69?

15  Q    Do you see what I just circled?

16  A    I do.

17  Q    And do you know what that dot is meant to indicate?

18  A    I believe that's one of his three funeral homes.

19  Q    Do you remember your testimony regarding the location

20  of that from the prior trial?

21  A    Yes, I do.

22  Q    Were you mistaken?

23  A    I was.

24  Q    You believed it was in Granby --

25  A    Grandy.

Jones – Direct

1    Q    -- Granby precinct, correct?

2    A    Yes.  I had the wrong side of the street.

3    Q    So it's across the street from where you thought it

4    was?

5    A    Correct.

6    Q    Did you have anything to do with the splitting of

7    this VTD?

8    A    No.

9    Q    So your mistaken testimony is in regards to the

10    funeral home, you believe -- do you believe now the

11    funeral home you were thinking of -- you should have been

12    talking about was the one in Berkley?

13    A    Yes.  Obviously, I was confused.

14    Q    Do you have any reason to believe race was involved

15    in any way in splitting this precinct?

16    A    No.

17    Q    And if we go to Defendant-Intervenors' 94, page 12,

18    do you recognize that district?

19    A    I do.

20    Q    Can you tell us who represented at the time this was

21    drawn?

22    A    Delegate Howell, Algie Howell.

23    Q    And where is this?

24    A    It's on the east side of Norfolk.  It has part of

25    Virginia Beach in the district.

Jones - Direct

1   Q    This area used to be in the district?

2   A    It did.

3   Q    Is that the area that went to now Senator Spruill?

4   A    Yes.

5   Q    The additional areas?

6   A    Correct.  I cannot remember the population need, but

7   I believe it was pretty substantial.

8   Q    Okay.  Let me go to Plaintiffs' Exhibit 69, page

9   60 -- page 61.  Let's do 61.  This is Dr. Rodden's

10  dot-centric map, which has a number of VTDs in District

11  90.  Let me circle for you -- can you read the name of

12  that particular vote tabulation district?

13  A    I believe it's Reon, R-E-O-N, I think.

14  Q    Were you involved in any way in the splitting of that

15  district?

16  A    No.

17  Q    Do you have any reason to believe it was split for

18  any reason other than population?

19  A    I would assume it's population because this district

20  borders three other districts, I believe, or four.

21          JUDGE PAYNE:  I think he's asking you not what

22  you assume --

23          THE WITNESS:  I'm sorry.

24          JUDGE PAYNE:  -- but whether you remember

25  whether it was split for population reasons or otherwise?

Jones - Direct

```
 1        THE WITNESS:  Population reasons.
 2   Q    Let me go to yellow map book for District 92.
 3        JUDGE PAYNE:  This is page what of?
 4        MR. BRADEN:  This is page 13 of the
 5   Defendant-Intervenors' 94.  The yellow map book.
 6   Q    Do you see recognize this map?
 7   A    I do.
 8   Q    What is this map of?
 9   A    The 92nd District in the city of Hampton.
10   Q    And is this one of the challenged districts?
11   A    It is.
12   Q    And do you know who represented it at that time?
13   A    Delegate Ward.  And she still does.
14   Q    Okay.  So can you just briefly explain the reasoning
15   behind the drafting of this district?
16   A    There was a significant population need.  Of course,
17   on the peninsula, if I remember correctly, I believe every
18   one of the districts south of 96, which is Delegate
19   BaCote, which is York County, had a pretty significant
20   population need.  Part of that was addressed when we took
21   64 back across the river and we freed up Williamsburg city
22   in the west side of James City County.  And my guess is
23   that would have been probably a third of the district.  So
24   that was probably -- I don't know -- 25 to 35,000 people.
25        So she's constricted by the James River in the
```

Jones - Direct

1    channel, our harbor channel.  So she just became more

2    compact.  And I believe this is one of the only districts

3    that doesn't have a split precinct.  I could be mistaken,

4    but I don't think there's a split precinct here.

5    Q    Then let us move on to House District 95, which is a

6    yellow map on Defendant-Intervenors's Exhibit 94, 014,

7    page 14.  This was one of the challenged districts.  Who

8    was the incumbent member at the time?

9    A    Mamye BaCote.

10   Q    Safe to say the district is a little elongated?

11   A    It is.

12   Q    What underlies that lengthy trip up the peninsula?

13   A    Well, it's a combination of the previous 93rd to the

14   north and the basic, you know, configuration of the 95th

15   as it stood in the benchmark.  But I do believe -- this

16   might have been one that had the most population or in the

17   top two of loss population of districts -- of the

18   challenged districts.

19   Q    Did you have a goal of making -- if you look just

20   north of this district, you see an indication that there's

21   a District 93.  What was your political role with 93?

22   A    Well, the reality was we had a population issue.  And

23   so if you look at Deep Creek precinct -- I don't know how

24   to work this -- I -- there you can.  Deep Creek precinct,

25   then you have Glenn Oder, who was an incumbent.  And you

Jones - Direct

1   had Robin Abbott over here, who was an incumbent in 93.

2   And so over here, we had, of course, Mamye BaCote here.

3   To her east, of course, was Hampton and that district,

4   which I believe is probably one of the more compact

5   districts that exist.

6       And so going north was really the only option unless

7   I was going to combine and go over with Gordon Helsel, and

8   Brenda Pogge, which is up here, and really have to combine

9   republicans or dramatically change their configuration of

10  their districts.  So we moved 93 and made that a more

11  competitive district, and the base of 93 was just pushed

12  up north and then we used what was left over from House

13  District 64.

14  Q    And is it now a competitive district?

15  A    It absolutely is.  2011 a republican won it.  2013 a

16  democratic won it.  2015 democratic held the seat and it's

17  a contested race.  One of the targeted races for both the

18  republicans and democrats for this year.

19          JUDGE PAYNE:  You're talking about in 93 --

20          THE WITNESS:  Yes, sir.

21          JUDGE PAYNE:  -- or in 95?

22          THE WITNESS:  Ninety-three.

23  Q    Would it have been possible to draw two majority

24  minority 55 percent plus black voting age population and

25  go no further north than here?

Jones - Direct

1  A     I didn't do that exercise, but I believe you could.

2  You could come close to doing it.  Yes, I believe so.

3  Q     And the placement of Reservoir, Epes, Denbigh into

4  District 93, would that make it substantially more

5  democratic?

6  A     It would, yes.

7  Q     And if you put those into 94, that would endanger the

8  potential reelection of the incumbent republican member

9  there?

10  A     In my opinion, it would, yes.  It would have.

11  Q     So the inclusion of those VTDs in the Northern Neck

12  of this district were predominately for political reasons?

13  A     Yes.

14  Q     Let me turn you to Plaintiffs' Exhibit 69, page 47.

15  We're back to the northern end of that district, there are

16  some split VTDs.  Rosemont, Epes.  Did you have any role

17  in splitting those VTDs?

18  A     No.

19  Q     Do you have any reason to believe they were done on a

20  racial basis?

21       MR. HAMILTON:  Objection.  Calls for

22  speculation.  If he wasn't involved, he wouldn't know.

23       MR. BRADEN:  He might have a reason to believe,

24  though.

25       JUDGE PAYNE:  What difference does that make?

Jones – Direct

1          MR. BRADEN:  I think the Court already knows the

2     answer.  I will withdraw it.

3          JUDGE PAYNE:  How much longer do you have with

4     this witness, Mr. Braden?

5          MR. BRADEN:  Not very long.  In fact, we'll cut

6     to move to the end.  I don't need to go through every

7     split --

8          JUDGE PAYNE:  I'm not trying to cut you off.

9     It's just about time to change court reporters, have the

10    afternoon break, and I was just trying to see if we should

11    wait a few minutes or we'll just go on and do it.

12         MR. BRADEN:  I think, in all honesty, it would

13    be another half hour.

14         JUDGE PAYNE:  Well, then in all honesty, we'll

15    take a 20-minute break.

16              (Recess taken.)

17

18

19

20

21

22

23

24

25

Jones - Direct

1                   JUDGE PAYNE:  All right, Delegate Jones, I remind you

2      you are under the same oath which you took earlier today.

3                   THE WITNESS:  Sure.

4                   THE COURT:  All right, Mr. Braden.

5                   MR. BRADEN:  Thank you, Your Honor.

6      Q    Delegate Jones, how did you come up with your black

7      voting-age population goal?

8      A    I was informed by previous litigation.

9      Q    And you were involved in that litigation because you were

10     the drafter of the 2001 plan?

11     A    Yes, I was a chief patron, and I was a named defendant.

12                  JUDGE PAYNE:  I'm sorry, Mr. Braden.  How did he

13     become informed as to what, though?  The population, is it

14     population --

15                  MR. BRADEN:  The black population goal because of

16     that litigation that was the underlying --

17                  JUDGE PAYNE:  The black voting-age population goal.

18                  MR. BRADEN:  Yes.

19                  JUDGE KEENAN:  Mr. Braden, it would be great if you

20     could keep your voice up.

21                  MR. BRADEN:  My apologies.

22                  JUDGE KEENAN:  Thank you.

23                  JUDGE PAYNE:  You were informed as to the BVAP goal

24     by previous litigation, and I interrupted.  What litigation are

25     you talking about?

Jones - Direct

1              THE WITNESS:  It was *Wilkins v. West*.

2    Q    And you were originally a named defendant?

3    A    Correct.

4    Q    And what specifically from that litigation informed you?

5    A    It was a report, the Loewen report.

6    Q    And did that report support your position and your goal?

7    A    It did.

8    Q    Did you receive information from anywhere else as to what

9    the goal for black voting-age population should be?

10   A    Delegate Spruill.

11   Q    I'd like to bring up now Plaintiffs' Exhibit 36.  That's

12   the --

13             JUDGE PAYNE:  What?  Oh.

14             MR. HAMILTON:  Objection, Your Honor.  Before the

15   video is played --

16             JUDGE PAYNE:  What?

17             MR. HAMILTON:  I said objection, Your Honor.  Before

18   this video is played, this is Plaintiffs' Exhibit 36.  It was

19   played during the last trial.  That appears as page 278 through

20   page 279 of the 2015 trial.  The transcript appears at

21   Plaintiffs' Exhibit 35.

22             So this transcript is in the record for the Court.

23   The video has already been played once.  We have two or three

24   of these that have been identified by the intervenors, and I

25   would object on the grounds that it is cumulative and

Jones - Direct

1    repetitive.  This is exactly -- not only a little bit

2    duplicative, it is exactly duplicative, plus we already have a

3    written transcript in the record.

4                THE COURT:  Would it have taken longer to hear it

5    than the objection?

6                MR. HAMILTON:  There's three of them.  I thought in

7    candor --

8                JUDGE PAYNE:  We're all now informed by television,

9    so let's see it quickly.

10               MR. BRADEN:  Yes, Your Honor.  Your Honor, there will

11   make everyone happy.  This is the only additional video we plan

12   on playing.

13               JUDGE PAYNE:  Good.

14

15               (Video played.)

16

17   Q    Delegate Jones, were you present for that speech?

18   A    I was.

19   Q    And did Delegate Spruill speak on other occasions in

20   support of your plan?

21   A    He did.

22   Q    Was Delegate Spruill one of your sources of your goals for

23   the black voting-age populations in the district?

24   A    He was one of two members of the Black Caucus that were

25   dealing with the other ten members.

Jones - Direct

1           JUDGE PAYNE:  The question was, was he one of the

2    sources of the 55 percent.

3           THE WITNESS:  Yes, sir.  I'm sorry.  I misunderstood

4    the question.

5    Q    Your use of a goal in drawing the plans, in your opinion,

6    outside of District 75, did it require you to violate any of

7    Virginia's traditional redistricting criteria?

8    A    It did not.

9    Q    You were involved, as we've discussed before, in the 2001

10   redistricting process as the drafter of the bill?

11   A    I was.

12   Q    At that time, did the state of the Virginia, prior to

13   drafting the bill, have any -- hire any type of political

14   science expert to do any type of racial block voting analysis?

15   A    Not that I'm aware of.

16   Q    No homogeneous or regression analysis?

17   A    No.

18   Q    In 2011, are you aware of anybody doing a racial block

19   voting analysis, homogeneous analysis, or any political

20   scientist prior to you drafting the plan in 2011?

21   A    No.

22   Q    Did any black member come to you with any type of racial

23   block voting analysis from political scientists?

24   A    No.

25   Q    NAACP?

Jones - Direct

1    A    No.

2    Q    ACLU?

3    A    No.

4    Q    Any civil rights organization?

5    A    No.

6    Q    Any member of the legislature, period, tender any document

7    like that?

8    A    Not that I recall.

9    Q    To the best of your knowledge, that's never been done; no

10   types of racial block voting analysis has ever been done in

11   Virginia prior to the adoption of the plan.

12   A    Not that I'm aware of.

13   Q    You've heard some of the discussion and been present for

14   some of the discussion, so is it fair to say you have some

15   limited degree of understanding when we talk about how you

16   develop a racial block voting analysis?

17   A    It would be limited.  I cannot tell you that I could

18   reproduce in my mind the charts that have been presented.  It

19   reminds me a lot of an obtuse class I took in college.

20   Q    So as we sit here right now, you don't know whether it

21   could even be done?

22   A    The timeframe that we had from the time that we received

23   the PO 94 data until we had to have a plan before DOJ, I do not

24   think so.

25   Q    And in the plan, there was 12 majority-minority districts.

Jones - Direct

1    That was the goal?

2    A    Correct.

3    Q    How many went up in black voting population?

4    A    Six.

5    Q    How many went down?

6    A    Six.

7    Q    Was the principle primary goal of the plan the

8    continuation of the status quo?

9    A    It was.

10            MR. BRADEN:  No more questions, Your Honor.

11            JUDGE PAYNE:  Cross-examination.

12

13                    CROSS-EXAMINATION

14   BY MR. HAMILTON:

15   Q    Good afternoon, Delegate Jones.

16   A    Good afternoon.

17   Q    Nice to see you again.

18   A    Yes, sir, likewise.

19   Q    We have to keep -- stop meeting like this.

20   A    I would agree with that.

21   Q    I bet.  Let's just start with when you sat down to start

22   with the process of redistricting, you were relying on census

23   data, weren't you?

24   A    Census data that was inputted into the benchmark map, yes,

25   sir.

Jones - Cross

1   Q    That's census data provided by the United States

2   government as part of the U.S. census that's done every ten

3   years; right?

4   A    Correct.

5   Q    You relied on it to be accurate.

6   A    I did.

7   Q    You relied on it to draw lines on the maps; right?

8   A    Correct.

9   Q    That's the only data that we have in every state in this

10  country to perform the necessary job of reapportionment; isn't

11  that true?

12  A    That is correct.

13  Q    So you didn't have any questions about the reliability of

14  this data when you sat down?

15  A    I did.  In the beginning.

16  Q    Other than the one mistake that you caught and was fixed.

17  A    Yes, but that didn't give me satisfaction that there

18  weren't other mistakes.  That was such a glaring error that

19  occurred I knew something was wrong, because I lived in that

20  area.

21  Q    Did you throw out the census data and start with a

22  different set of data?

23  A    No.  We had to use what was presented to us.

24  Q    So you had it, and you used it?

25  A    Yes.

Jones - Cross

1   Q    Thank you, sir.  Now, Mr. Morgan -- I think you were

2   described as the chief architect, Mr. Morgan was described as

3   the carpenter of this plan.  Do you agree with that?  Is that

4   an accurate description of your respective roles?

5   A    Yes.  He would be the finish carpenter.  I would probably

6   be the guy that roughs the house in, and he would be the finish

7   carpenter.

8   Q    This just keeps changing, doesn't it?  So he would be

9   doing the precinct splits, you would be doing the larger

10  movements of entire VTDs or county-level material; is that

11  right?

12  A    Yes, sir.

13  Q    And you know that below the level of VTDs, there's a whole

14  bunch of little things called census blocks; right?

15  A    Yes.

16  Q    But you weren't, for the most part, paying attention to

17  census blocks?  I think you've testified something, they're

18  below your pay grade or not important enough?

19  A    There were over 2,600, I think, precincts.  So that was

20  enough to be contending with without worrying about the number

21  of blocks that would be underneath those VTDs.

22  Q    So if we want to know why this VTD was split or

23  specifically where -- why it was split in the way that it was

24  split, we have to asked Mr. Morgan.

25  A    With certain exceptions, yes.

Jones - Cross

1    Q    Now, we just saw a video with Delegate Spruill.  Did I

2    hear you correctly to say that he still serves in the General

3    Assembly?

4    A    He does.

5    Q    Right here in Richmond?

6    A    He served in the Senate.

7    Q    In the Virginia Senate?

8    A    Yes.

9    Q    So he could have come here and testified himself.  No

10   reason not to, right?

11   A    I can't speak for what he -- he could have, yes.  He would

12   be able.

13   Q    He could have been served with a subpoena just like the

14   other witnesses who testified; right?

15   A    Correct.

16   Q    You've been sitting in this courtroom since the beginning

17   of this trial, haven't you, or most of the time?

18   A    Unfortunately, I have, yes, sir.

19   Q    He hasn't -- he didn't testify, did he?

20   A    No.

21   Q    Let me direct your attention to -- it's in the notebook,

22   the witness notebook that's there in front of you.  It's

23   Plaintiffs' Exhibit 16.  It's your reapportionment criteria.

24   A    Got it.

25   Q    Maybe we can blow up the first two numbered paragraphs,

Jones - Cross

1   population equality and the Voting Rights Act.  Compliance with

2   the one-person-one-vote principle and the Voting Rights Act

3   were the two most important principles that drove the

4   redistricting process; correct?

5   A     Correct.

6   Q     And so we can put aside right now any dispute -- it is

7   undisputed you considered race when you were drawing these

8   districts because you had to; right?

9   A     Had to, yes, sir, absolutely.

10  Q     And these two criteria were nonnegotiable.

11  A     Yes, because, from our perspective, they would not pass

12  DOJ muster, and the Constitution requires the population

13  equality.

14  Q     And there were other factors that we can look at in this

15  exhibit, but all of them would yield to these two, these two

16  criteria because they're required by either the United States

17  Constitution or the Voting Rights Act; correct?

18  A     Yes.

19  Q     And it's true that they did; so, for example, in the

20  enacted plan 5005 -- in 5005, there were counties that were

21  split; right?

22  A     Correct.

23  Q     Like Dinwiddie County, that was split?

24  A     Correct.

25  Q     Chesterfield County, that was split?

Jones - Cross

1   A     Yes.

2   Q     Henrico, that was split a number of different ways?

3   A     Right.

4   Q     Cities, those were split.  Like Hopewell, that was split;

5   right?

6   A     Correct.

7   Q     And VTDs, we had a whole bunch of VTDs that were split all

8   over the Commonwealth; correct?

9   A     Yes.

10  Q     Mr. Braden asked you something like -- this isn't a direct

11  quote, but there's nothing sacrosanct about VTDs, that they can

12  be split if you need to; correct?

13  A     Correct.

14  Q     But there's a cost to splitting a VTD, isn't there, for

15  the election administration?  Election administrators have to

16  print different ballots for that precinct, for one precinct on

17  each side of that split because they're in different districts;

18  isn't that true?

19  A     That's correct.  A good example is Taylor Road precinct is

20  now split.  It wasn't split when we passed the plan.  The city

21  decided to split it because of something that they were doing.

22  So now I have a split precinct.

23  Q     Right, and I'm sorry to interrupt, but the question is,

24  there's a cost when you split a VTD.  It imposes a burden, at

25  least an administrative burden, on not only the election

Jones - Cross

1    administrators but the voters in those split precincts because

2    they have to deal with complicated two-part ballots; right?

3    A    Yes.

4    Q    And so for that reason, we don't really -- as you sat

5    down, it wasn't one of your goals, hey, let's see how many VTDs

6    we can split across the Commonwealth?

7    A    It exactly was the opposite.  We tried to split less than

8    we did from ten years before which I think we accomplished.

9    Q    Okay, thank you.  So let's start with House District 63,

10   and maybe we can display that map.  Thank you.  The incumbent

11   here was Delegate Dance.  This is Delegate Dance's district; is

12   that right?

13   A    Yes.

14   Q    You testified a little bit earlier about this.  Delegate

15   Dance picked up this whole sort of northern arm, northeastern

16   arm that went up; isn't that right?

17   A    She did.

18   Q    She picked up Hopewell, because I think you said that you

19   dropped from House District 74; right?

20   A    Yes.

21   Q    But she only picked up part of it; right?

22   A    Right.

23   Q    She picked up the African-American part of it.

24   A    And the part that was previously in the 74th.

25   Q    Right.  You could have respected the entire city

Jones - Cross

1   boundaries of the city of Hopewell and included it in one

2   district or the other, but you chose to include half of the

3   city; isn't that right?

4   A    I kept it as it was before the split, yes, sir.

5   Q    And that split was right along racial lines?

6   A    I don't know, but if you're telling me it is, I will

7   assume you are correct.

8   Q    If we -- I think I heard you say that one of the reasons

9   that you moved Hopewell over from 74 was to fix a river

10  crossing that had been addressed in the *Wilkins v. West*

11  litigation.  Did I hear you correctly?

12  A    I didn't say directly from *Wilkins v. West*.  There

13  comments that were made over the years -- I served on the

14  Privileges and Elections Committee my entire term, and, of

15  course, after the redistricting in 2001 to the balance of the

16  decade, we would have citizens who would come to our meetings

17  and express their opinion.

18  Q    It was challenged in *Wilkins* --

19  A    It was, yes, sir.

20  Q    I think I heard you say the Supreme Court of Virginia

21  affirmed the map as it was drawn including that river split;

22  isn't that true?

23  A    I believe it was unanimous, yes, sir.

24  Q    So there certainly wasn't -- the Supreme Court of

25  Virginia -- the Virginia Constitution didn't require you to fix

Jones - Cross

1    that, it was just something you felt you wanted to do.

2    A     Correct.

3    Q     There are other river splits in the map; right?

4    A     Yes.

5    Q     And that included the Appomattox River.  There was a split

6    between House District 62 and 63 over the Appomattox.  That one

7    didn't get fixed; correct?

8    A     Right.

9    Q     And there was also water crossings in House District 68,

10   70, and 80 in the final map.  None of those got fixed, did

11   they?

12   A     No.  I think 69 -- 69 particularly --

13   Q     The question was --

14              THE COURT:  Y'all are talking over each other and

15   neither the answer -- I don't know that she got the question or

16   the answer for the last one about whether it was fixed because

17   there was talking in the middle about there being three bridges

18   somewhere, and so maybe you better start again.

19   Q     There were river crossings in House District 68, 70, and

20   80 in the final map, and none of them were fixed; isn't that

21   true?

22   A     That is true.

23   Q     Thank you, sir.  And it's true that you used the

24   55 percent black voting-age population racial target in drawing

25   House District 63; correct?

Jones - Cross

1   A     The 55 percent goal was used in drawing -- that was part

2   of the criteria in looking at House District 63, correct.

3   Q     And it was used in drawing the district; right?

4   A     Delegate Dance --

5   Q     The question is a yes or no, sir.

6   A     Yes.

7   Q     Thank you.  Other than what Delegate Dance may have said

8   to you, you didn't do any other kind of analysis to determine

9   whether that district, District 63, needed to have at least

10  55 percent black voting-age population in order to elect -- for

11  the African-American population to elect a candidate of their

12  choice; correct?

13  A     No.

14  Q     That's not correct or it is correct?

15  A     It's not correct.  I was aware, if I may, of her running,

16  I think, as an independent back in 2001.

17  Q     That's not what I asked you.  I said, other than what

18  Delegate Dance may have said to you, you didn't do any other

19  kind of analysis to determine whether it needed to have at

20  least a 55 percent BVAP, did you?

21  A     No.  Not an analysis.

22  Q     In the 2011 redistricting, District 63 was expanded into

23  the northeast into the city of Hopewell and added precincts

24  from Prince George County to address the under-population in

25  District 63.

Jones - Cross

1   A    Yes.

2   Q    Now, let's talk for a minute about this hook around the

3   city of New Hope.  I think you testified that the hook was

4   drawn in order to draw out a potential primary opponent for

5   Delegate Dance; is that correct?

6   A    That was my recollection, yes, sir.

7   Q    Because the logical thing to have done would have been to

8   stay on the northwest side of I-85; correct?

9   A    I have to put it on the map.

10          MR. HAMILTON:  Do we have a close-up?

11  Q    I don't have the location of I-85.

12  A    I assume, if I may, I assume it's here.  Is that your

13  question?

14  Q    The question is, the logical thing to have done would have

15  been to stay on the northwest side of I-85; correct?

16  A    For House District 63?

17  Q    Yes.

18  A    Yes.

19  Q    Now, you don't know who this primary opponent was; right?

20  A    No, I had, over the years -- several members asked me not

21  to put certain precincts in their district over the years.

22  Q    But the question is, you don't know the name -- as you sit

23  here today, you can't tell us the name of who that was?

24  A    No.

25  Q    And you don't know where that person lived?

Jones - Cross

1    A    No.  I would assume, it being -- I can't do that.  I'm

2    sorry.

3    Q    You didn't do any independent research or investigation to

4    figure out who that person was or where they might live; that

5    was just not a concern of yours.

6    A    No, I relied on the member.

7    Q    Now, this district also split Dinwiddie County; correct?

8    A    Correct.

9    Q    I believe the Court called that county split validly

10   racial.  Do you recall reading that in the opinion of this

11   Court after the 2015 trial?

12   A    I do not.

13   Q    And you testified in the last trial that the outline of

14   House District 63 along the Dinwiddie County split followed the

15   I-85 line; do you recall that testimony?

16   A    I don't specifically recall, but I do believe it does

17   follow 85.

18   Q    And you weren't saying that you drew the district to

19   follow the I-85 line, were you?  You were just simply providing

20   a point of reference to the Court?

21   A    Correct, yes, sir.

22   Q    Because following roads isn't a traditional

23   redistricting --

24   A    That's correct.

25   Q    Let's turn to House District 71.  You mentioned a moment

Jones - Cross

1    ago that Richmond is no longer a majority black city; is that

2    right.

3    A    Correct.

4    Q    The mayor of Richmond, as we sit here today, is Levar

5    Stoney, a Democratic; isn't that true?

6    A    Correct.

7    Q    And the -- he's African American?

8    A    Correct.

9    Q    And the mayor before him was Doug Wilder?

10   A    No.

11   Q    Dwight Jones?

12   A    Correct.

13   Q    Before him, Doug Wilder?

14   A    Correct.

15   Q    All of them African Americans?

16   A    Correct.

17   Q    When was, if you know, Doug Wilder first elected as mayor

18   of Richmond?

19   A    They changed their charter.  I think it would have been

20   late '90s, early 2000s.

21   Q    Is it fair to say that from the late '90s, early 2000s

22   until today, every mayor of Richmond has been an

23   African-American Democrat?

24   A    Yes.

25   Q    And Dwight Jones was the mayor of Richmond at the time of

Jones - Cross

1   the 2011 redistricting?

2   A    I believe he would have had to have been.  Yes, he was.

3   He left the House, I think, in 2008 or 2009.

4   Q    All of them, every one of them elected from a city that,

5   at least at this point, is not majority black.

6   A    Yes, but if you follow the last election, they put

7   pressure on people who drop out of the race so --

8   Q    That's not my question.  My question is, they were all

9   elected from a city that's no longer majority black.

10  A    That's correct.

11  Q    And it goes without saying, then, that Richmond is not

12  55 percent black voting-age population as a city.

13  A    It is not.

14  Q    In any event, the final map, HB 5005, increased the black

15  voting-age population of the House District 71 from about 46

16  percent to about 53 percent.

17  A    It restored it to where it was previously, I think, in the

18  benchmark map.

19  Q    That's yes?

20  A    Yes, yes.

21  Q    Now, you testified that changes were made to House

22  District 71 to make it more Richmond-centric; do you recall

23  that?

24  A    I do.

25  Q    And the way that was done was by removing the three VTDs

Jones - Cross                                                          531

1    in the northwest part of the district; that's Summit Court,

2    Hilliard, and Stratford Hills; is that right?

3    A    That was part of it.

4    Q    And you also moved district -- I'm sorry, VTD 207 over to

5    Delegate Loupassi's district next door.

6    A    Right, I believe I moved 204 into 71.

7    Q    There's more than one way to make House District 71 more

8    Richmond-centric; right?  You could have left 207 in the

9    district and added 113, 114, 112, or 105, or some combination

10   of those, and those all would have made House District 71 more

11   Richmond-centric; right?

12   A    You could have done it many different ways.

13   Q    And adding Ratcliffe, that's not even in the city of

14   Richmond, is it?

15   A    No.  She previously had part of Henrico County.  She moved

16   to the west -- to the eastern side.

17   Q    So that certainly didn't make it more Richmond-centric.

18   That actually went into Henrico County.

19   A    You are referencing my comment of Richmond-centric.  I

20   think the district is more Richmond-centric --

21   Q    Right, but this --

22            THE COURT:  Wait a minute.  You are talking over

23   each --

24            THE WITNESS:  And if I can please answer, Your Honor.

25            JUDGE PAYNE:  Go ahead.

Jones - Cross

1          THE WITNESS:  Your question to me was about

2   Richmond-centric and different ways that it could be drawn.  I

3   acknowledge that, but my opinion is it's more Richmond-centric

4   than what it was before, and I think the map bears that out.

5   Q     In addition to the mayoral elections that we talked about,

6   the incumbent here, Jennifer McClellan, has easily won

7   reelection in every election she's run in; isn't that right?

8   A     That's correct.

9   Q     And I believe you said that it wasn't -- in response to

10  Mr. Braden's question a moment ago, you said it wasn't logical

11  for this district to move to the west because that would have

12  diluted the black voting-age population and threatened DOJ

13  approval.  That was your testimony?

14  A     Yes, sir, it was.

15  Q     So that is -- there was a racial reason, or at least a

16  racial composition reason, not to move it to the west, because

17  that would drop the BVAP levels too low, in your opinion?

18  A     I believe we heard that this morning from one of the

19  experts.

20          JUDGE PAYNE:  I think he's asking what your opinion

21  was.

22  A     Yes.

23  Q     So part of the reason that it moved to the east was to

24  increase the black voting-age population.

25  A     Yeah, restore it to where it was previous.

Jones - Cross

1    Q    So here we can say for certainty the black -- the express

2    racial -- 55 percent racial target had an impact on the way

3    this district was drawn.

4    A    Yes.

5    Q    Let's talk about 207 just for a minute.  This is VTD 207

6    and House District 701.  I think you testified, and maybe I

7    misheard you, but I think you said VTD 207 is in The Fan, and

8    VTD 113 and 114 is bordering The Fan in the Museum District.

9    Did I hear you correctly?

10   A    Yes.

11            JUDGE PAYNE:  He said it was House District 701?

12            MR. HAMILTON:  I'm sorry, Your Honor.  If I said

13   that, I apologize.  We're in House District 71.

14            JUDGE PAYNE:  71.

15            MR. HAMILTON:  And we're discussing the movement of

16   VTD 207.

17   Q    So we're in agreement, VTD 207 is part of The Fan

18   district; correct?

19   A    Yes.

20   Q    And VTD 113 and 114 is not in The Fan district.  That's in

21   the Museum District; isn't it?

22   A    Yes.

23   Q    VTD 207 is, you'll agree with me, a very white, very

24   Democratic neighborhood; correct?

25   A    It is.

Jones - Cross

1   Q    It's about 92 percent white voting-age population; does

2   that sound about right?

3   A    I do not know.

4   Q    So Delegate Loupassi, who was in the district next door --

5   that's where 207 went, it went into Loupassi's district?

6   A    Yes.

7   Q    But it was a strong Democratic VTD; correct?

8   A    Correct.

9   Q    Leaving, at least just all other things to the side, just

10  considering the political impact, leaving VTD 207 in House

11  District 71 would have added -- would have helped both Loupassi

12  and McClellan from a share-of-the-vote perspective; correct?

13  A    Yes.  You could make that argument, yes.

14  Q    And that VTD had always been in House District 71.  This

15  is a new change; right?

16  A    I'm not sure about always, but I believe since 1991.

17  Q    A long time?

18  A    A long time.  I don't want to misspeak.

19  Q    I appreciate the concern for accuracy.  At least 20 years?

20  A    Yes.

21  Q    Now, I won't go into this, but there was nothing in the

22  transcripts of all those public hearings on the redistricting

23  process mentioned anything about any of Delegate Loupassi's

24  business interests in VTD 701; correct?

25  A    No, not that I'm aware of.

Jones - Cross

1    Q    So we can save the Court a lot of time.  The Court doesn't

2    have to go through all the transcripts that are in the record,

3    because there isn't going to be anything in there about that;

4    right?

5    A    I don't think so, but I can't say that with 100 percent

6    certainty.

7    Q    And the same thing is true, at the first trial of this

8    matter, there's no mention of Delegate Loupassi and his

9    business interests; correct?

10   A    No.

11   Q    Let's move to House District 70.  This is Delegate

12   McQuinn's district; is that right?

13   A    Yes.

14   Q    And in framing this district, race played a role; right?

15   A    Second criteria was to comply with the Voting Rights Act,

16   and preclearance, so, yes.

17   Q    And in -- you used the 55 percent black voting-age

18   population target in deciding how to frame the district; right?

19   A    Yes, with population loss; correct.

20   Q    Now, in the adopted map, among other changes, District 70

21   gave up these three VTDs, and maybe we can take a closer look

22   at that.  It's 701, 702, and 703.  Those districts were moved

23   over from Delegate McClellan's district; is that right?

24   A    It's hard to see on this map, Your Honor.  This dot or

25   whatever you call this kind of map --

Jones - Cross

1        JUDGE PAYNE:  If you can't see, that's all right.

2   Give him something he can he can see.

3   Q    How's that?  A little better?

4   A    Yes, we would have moved 702, 701 I believe were moved,

5   and 70 -- is that six or five?  I can't tell by this map.

6   Q    701 and 702, those are heavily African-American precincts;

7   isn't that right?

8   A    They are.

9   Q    And then the other -- one of the other big changes here is

10  that District 70 expanded into the Chesterfield County with the

11  addition of VTDs down at the bottom left-hand corner of the

12  screen?

13  A    Yes, already had a precinct in Chesterfield, but, yes, it

14  did expand --

15       JUDGE PAYNE:  Where did you end up on whether HD 70

16  gave up 703 or 705?  That's left up in the air.  I don't know

17  which one you are talking about.

18       MR. HAMILTON:  The map is clear, Your Honor.

19       JUDGE PAYNE:  I'm asking the witness.

20       THE WITNESS:  703 and 705 stayed in House District

21  70, Your Honor.

22       JUDGE PAYNE:  703 and 705 stayed in 70.

23       THE WITNESS:  Yes, sir.

24       JUDGE PAYNE:  That's your view.  You take a different

25  view, Mr. Hamilton?

Jones - Cross

1          MR. HAMILTON:   I believe 703 was split, Your Honor,

2    and 701 and 702 and part of 703 moved into House District 70.

3          JUDGE PAYNE:   His testimony is different than that.

4    Q    Delegate Jones, isn't it true 703 was split?

5    A    If you tell me it is, yes, sir.   This map does not give a

6    good representation.   I apologize.   I'm used to the yellow map

7    with the hash tags.   That would better for me to respond --

8          JUDGE PAYNE:   Do you have that in front of you?

9    That's Defendant Intervenors' Exhibit 94, page what?

10          MR. HAMILTON:   It's up on the -- Exhibit 94, page

11   three.   It's the map displaying House District 70, and it's on

12   the time screen.

13   A    It appears to me that 703 is split on the north side, yes.

14          MR. HAMILTON:   Is that sufficiently clear, Your

15   Honor?

16          JUDGE PAYNE:   Yes.

17   Q    Maybe we can go back to the density map.   Now, the

18   incumbent here, I think you said, is Delegate McQuinn?

19   A    Yes.

20   Q    And she lived in VTD 705; is that right?

21   A    Yes, I believe that's correct.   Right on the border, but,

22   yes, 705, I think.

23   Q    So the location of her residential address didn't require

24   keeping either Central Gardens or Masonic in the northern end

25   of that turret.   That wasn't necessary to keep those VTDs in

Jones - Cross

1  just because she lived down in VTD 705; right?

2  A    No, but she wanted them.

3  Q    Well, she also wanted 701, 702, and the northern -- the

4  western side of 703, didn't she?

5  A    That's correct.

6  Q    She didn't get to keep those?

7  A    Like probably all hundred members, they didn't get to keep

8  everything they wanted.

9  Q    I think the Rolling Stones wrote a song about that.  But

10  in this case, the reason 701 and 702 --

11

12      (Reporter interruption.)

13

14  Q    I'll omit the reference to the Rolling Stones and just

15  start from the beginning.

16          THE COURT REPORTER:   I got that part.

17  Q    The reason that 701, 702, and part of 703 moved over to

18  the west was in order to increase the black voting-age

19  population of Delegate McClellan's district, District 71;

20  correct?

21  A    Yes and no.  Yes, but also for additional population that

22  was needed for the district.

23  Q    So served both purposes at once?

24  A    It did, yes, sir.

25  Q    Because you could have picked up population in a number of

Jones - Cross

1   different areas, but this was the densest population of African

2   Americans to move.

3   A    Very similar to 602 which is adjacent to it.  It appears

4   on the map anyway.

5   Q    And Delegate McQuinn also told you she didn't want to pick

6   up those VTDs down in Chesterfield County, didn't she?

7   A    She did.

8   Q    Central Gardens, and you can't see it from this map other

9   than to notice the density of African-American population, but

10  it's about 95 percent black voting-age population, isn't it?

11  A    I do not know that, but I would take your word for it.

12  Q    It's in the record.  You don't have to take my word for

13  it.  The Court can verify that, but Masonic is the neighboring

14  VTD here just north of Delegate McQuinn's district, and that's

15  about 73 percent black voting-age population, isn't it?

16  A    I do not know.

17       MR. HAMILTON:  For the record -- I won't take the

18  time to do it, Your Honor -- it's Plaintiffs' Exhibit 63, page

19  52, line 87, and line 949 has the specific numbers in there for

20  the record, but I won't take it through because the document

21  speaks for itself.

22  Q    These two VTDs, Masonic and Central Gardens, together they

23  contain nearly 5,000 voters of voting-age -- people of voting

24  age; correct?

25  A    I do not know.

Jones - Cross

1    Q    And if we look at 701, 702, and 703 on the one hand and

2    compare them to Central Gardens and Masonic on the other hand,

3    you'll agree with me that 701, 702, and 703 are all closer to

4    Delegate McQuinn's home than either Central Gardens or Masonic?

5    A    I'll agree with that.

6    Q    So let's move to House District 69.  That's also located

7    in the Richmond area; correct?

8    A    Yes.

9    Q    And it was underpopulated by about 9,000 voters?

10   A    I believe so.

11   Q    And to the west, District 69 borders District 27?

12   A    Yes.

13   Q    And District 27 was overpopulated by about 8,000 voters?

14   A    I don't know by how much, but I know it was overpopulated.

15   Q    In your deposition, I think you said that sounds about

16   right?

17   A    I was going to say the same thing.

18   Q    At least you are consistent.  Okay, so, ostensibly, we

19   could have taken House District 69 and moved it to the west and

20   gained population from District 27; right?

21   A    Yes, you could have.

22   Q    And all other things being equal, which, of course, is a

23   big statement, that would have taken care of about 95 percent

24   of the population you needed.

25   A    Yes.  Could have done that.

Jones - Cross

1   Q    Let's look at that border between House District 69 and

2   68, if we could.  The fifth ward in Richmond is located in the

3   69th district; correct?

4   A    Yes, it is.

5   Q    So, for example, precincts 501, 503, 504, those are all

6   part of the fifth ward?

7   A    Yes.

8   Q    That's a heavily African-American area; correct?

9   A    Yes.

10  Q    And the areas immediately north of HD 69, House District

11  69, now we're looking at VTDs 114, 207, 208, those are all in

12  or near The Fan district; correct?

13  A    Yes.

14  Q    And they're mostly white?

15  A    Yes.

16  Q    And those mostly predominantly white precincts are all

17  located in Delegate Loupassi's district, HD 69; correct?

18  A    Yes.

19  Q    And the majority black districts, 501, 504, 503, those are

20  all Delegate McQuinn's district?

21  A    Yes, I think as they have been for decades.

22  Q    And -- well --

23  A    Excuse me, Your Honor.  Did you say Delegate McQuinn or

24  Delegate Carr?  I'm sorry.  I want to make sure I heard you

25  properly.

Jones - Cross

1    Q    I think I said McQuinn and meant Carr?

2    A    That kind of threw me off.  I wanted to make sure I was

3    answering the question properly.

4    Q    They were all Delegate -- let me ask the question again.

5    The majority black districts, 501, 503, 504 were all in

6    Delegate Carr's district?

7    A    Yes.

8    Q    Thank you.  Now, you mentioned a minute ago in this case

9    they had been -- they were in the benchmark.  Of course, you

10   made a lot changes in some of these -- in drawing this map, you

11   made a number of changes to the benchmark districts all across

12   the Commonwealth; isn't that true?

13   A    Yeah, and they were necessitated, I would say, 90-plus

14   percent by population.

15   Q    Sure.  Some districts just went away and then reappeared

16   in another part of the state.

17   A    Yes.

18   Q    Because population grew up north and not so much down

19   south?

20   A    Yes.

21   Q    And our districts, maybe just looking at HD 69 here, all

22   of this -- the yellow area without the hatch marks, that's all

23   new area that's been added in.

24   A    Yes.

25   Q    And you made the decisions about which ones of these

Jones - Cross

1  benchmark lines were going to stay in and which ones were going

2  to change; right?

3  A    In consultation with members of the Richmond delegation.

4  Q    Of course, the whole House of Delegates had to vote on it

5  to make it law, but as you were drawing the map -- so it's --

6  you had choices here, and you could respect a line that had

7  been there before, or you could change a line; right?

8  A    Yes, that's one of the only jobs I had.

9  Q    Let's look at House District 74.  This was Delegate

10 Morrissey's district; is that right?

11 A    Yes.

12 Q    This one, I think, has been not so kindly referred to as a

13 meat cleaver; have you heard that?

14 A    I have, but I was not the original architect of that.  I

15 want you to know.

16 Q    All right, appreciate that.  All right, now, I won't take

17 the time to recall the exhibit, but do you recall the exhibit

18 that Mr. Braden showed you that showed several iterations of

19 this district, from the 1990s, 2000s, and the 2011

20 redistricting.  Do you remember that one?

21 A    Yes.

22 Q    The real change we're talking about here, or one of the

23 significant changes here, is the city of Hopewell.

24 A    Yes.

25 Q    And this is -- we talked about this a little bit earlier

Jones - Cross

1    in your cross-examination about the reason for moving that over

2    was to fix the river crossing, or at least that was one of the

3    motivations; correct?

4    A    Correct.

5    Q    But that motivation didn't require you to split the city

6    on racial lines; right?

7    A    No, I maintained what had -- what was there before, pretty

8    much the splits that --

9    Q    You made a decision to respect that line that split the

10   city into a predominantly black half and a predominantly white

11   half and retain that division, just put it in a different

12   district?

13   A    Yes.

14   Q    Now, as a result of removing Hopewell, you needed to add

15   population to District 74; correct?

16   A    Correct.

17   Q    So one of the things you did was made a decision to add

18   the Randolph VTD?

19   A    I don't see that on the map.

20   Q    I think we might have a close-up of this.

21        JUDGE PAYNE:  I think he said he's more comfortable

22   with Defendant's Exhibit 94 and the colors.  He knows those

23   better, so maybe you can get that up and ask him about that.

24        MR. HAMILTON:  The problem is, Your Honor, I don't

25   know that it's got the detail.  If it does, it's fine.  I don't

Jones - Cross

1    think it does.

2    Q    Can you look at page 33 of Dr. Rodden's report,

3    Exhibit 69, page 33.  There's detail there.  It's a close-up of

4    the northwestern arm, page 33.  There we go.

5         So if we look up in the upper right-hand corner, there is

6    an irregular border here that goes around VTD named Randolph.

7    Do you see that?

8              JUDGE PAYNE:  Can you see it?  If you can't, there's

9    a paper --

10             THE WITNESS:  I do see it now.  It's right here.

11   Q    That was in the benchmark; correct?

12   A    Yes, I believe it was.

13   Q    So this is another example of a border, a district border

14   that you chose to keep, to retain.

15   A    Correct.

16   Q    And you can see from the dot density map, if you assume it

17   is accurately prepared, the population inside Randolph is

18   predominantly African American, and the population outside

19   Randolph is primarily white; isn't that true?

20   A    It appears to be such, yes, sir.

21             JUDGE PAYNE:  Did you decide to keep it for that

22   reason?

23             THE WITNESS:  No, sir.  If I may, you asked me about

24   Hopewell.  We also took 97 -- to go back to the other map, I

25   took three or four precincts out of 97 which then undid one

Jones - Cross

1    more jurisdictional split and came up to the north end, and we

2    tried to have a status quo map from the beginning.  So this

3    district has pretty maintained the shape for the last 20 years.

4    Q    But when you gave up Hopewell, the city was split, I think

5    you said; correct?

6    A    Correct.

7    Q    So the part of Hopewell that District 74 gave up was the

8    African-American part of Hopewell; correct?

9    A    I took them back across -- that would be correct, but that

10   was not the reason for it.

11   Q    But the effect of removing Hopewell from District 74 was

12   to drop the black voting-age population of House District 74;

13   isn't that true?  It had --

14   A    I do not have before me what the racial makeup is on a

15   percentage basis for these precincts in Hopewell to be able to

16   make that, you know, comment, sitting here today, because I

17   want to be sure when I see something what I'm referencing.

18   Q    Let's look at Plaintiffs' Exhibit 69, page 36.  And if you

19   could blow up the portion of that map that shows Hopewell.  So

20   the part of Hopewell here, that was the part of Hopewell that

21   was in House District 74 prior to the redistricting; correct?

22   A    That is correct.

23   Q    And that's the part that was removed from House District

24   74.

25   A    Correct.

Jones - Cross

1    Q    And you'll agree with me, at least if this map is an

2    accurate representation, that that's a relatively heavily

3    African-American area of that city.

4    A    I would agree.

5    Q    So when we take that population out of House District 74,

6    just simply as a matter of math, it's going to drop the

7    African-American population of House District 74; correct?

8    A    Correct, but the district had not been completed at that

9    point in time.

10   Q    Let's go back to where we were which, I think, was page 33

11   of Dr. Rodden's report.

12            JUDGE PAYNE:  Where are we, Mr. Hamilton?

13            MR. HAMILTON:  Just a moment, Your Honor.

14            JUDGE PAYNE:  Excuse me.

15   Q    The line in the upper right-hand corner of the exhibit --

16   Exhibit 69, page 33 shows the Atlee VTD just outside of the

17   northern border of District 74; correct?

18   A    Yes.  I think that's number 65; is that right?

19   Q    Yes.

20   A    Okay, yes.

21   Q    That's a predominantly white area; right?

22   A    Yes.

23   Q    And that was excluded by the line, and I believe that may

24   have been a preexisting line, but that line was left in place

25   allowing or dividing the -- defining the district in such a way

Jones - Cross

1    that the Atlee precinct in Hanover County stayed with a

2    predominantly white population outside of the district;

3    correct?

4    A    That's correct.  I don't believe the 74th has any part of

5    Hanover County.

6               JUDGE PAYNE:  What does this have to do with

7    Hopewell?  Atlee is 50 miles or better from Hopewell.  I'm not

8    following the questioning.

9               MR. HAMILTON:  Your Honor, in drawing the

10   districts --

11              JUDGE PAYNE:  And it's not even an adjacent district,

12   is it?  55 isn't adjacent to the Hopewell district, is it?

13              MR. HAMILTON:  It was in the benchmark, and it's --

14   we're talking about House District 74, Your Honor.

15              JUDGE PAYNE:  But not 55 miles away.  I'm having

16   trouble understanding why you are relating Atlee to your

17   questions about what happened to the city of Hopewell, because

18   they're probably 50 miles apart.  It's a different side of the

19   thing.

20              MR. HAMILTON:  Exactly, Your Honor.

21              JUDGE PAYNE:  Go ahead with that then.

22              MR. HAMILTON:  May I explain, or would you like --

23              JUDGE PAYNE:  You can explain later.  Go ahead and

24   ask the question and clarify if you need to.

25   Q    Atlee is a largely white VTD; correct?

Jones - Cross

1    A    Yes, in a different county.

2    Q    And it was excluded from House District 74 by the line?

3    A    That's correct.

4    Q    There were two split VTDs in House District 74, and I

5    understand you didn't split them.  So I won't -- correct?

6    A    That's correct.

7    Q    So I won't ask you why they were split.  I assume you

8    don't know; is that right?

9    A    I couldn't tell you.

10   Q    Let's move to House District 77.  That's in the Tidewater

11   region; is that right?

12   A    Yes.

13   Q    Represented by Delegate Lionel Spruill?

14   A    At the time, yes, sir.

15   Q    Who we just saw a moment ago.  That district started out

16   at 57.6 black voting-age population; is that right?

17   A    That sounds about right.

18   Q    And Delegate Spruill actually asked for a 55 percent black

19   voting-age population in his district; correct?

20   A    Yes, and he felt that was important for all of the

21   districts, yes.  That's what he represented to me.

22   Q    And you drew his district in order to comply with that

23   55 percent racial target; correct?

24   A    I drew his district to honor his request in moving the

25   precincts around, and the result of that was to comply, yes,

Jones - Cross

1   sir.

2   Q    But you knew that as a result of moving the precincts

3   around, it would affect the racial composition of the district.

4   That's the whole point of it; correct?

5   A    The whole point of it really was to move population.  He

6   had a need for population.  I had excess population, and

7   Hampton Roads itself had a need for population.  So it was a

8   request of the member for various precincts that he lived next

9   to.

10  Q    But you understood that the reason he was making the

11  request was to comply with the 55 percent BVAP.  He wanted to

12  have an end goal of 55 percent black voting-age population in

13  his district; isn't that true?

14  A    Yes, but I believe your question was the reason he asked

15  for this.  He had certain requests to move precincts in because

16  they were next to where he lived.  He wanted to get rid of a

17  precinct because there was a potential opponent in that

18  precinct.

19  Q    Sure.

20  A    I want to be clear my response is accurate to what your

21  question was.

22  Q    You understood having a 55 percent black voting-age

23  population was important to Delegate Spruill?

24  A    Yes.

25  Q    And you complied with his request to adjust the boundaries

Jones - Cross

1  to ensure it had a 55 percent black voting-age population.

2  A    Yes.

3  Q    Thank you.  So one of the things that happened here -- you

4  mentioned a moment ago the airport VTD.  That's on the far west

5  side of House District 77; correct?

6  A    Correct.

7  Q    That moved over to your district; is that right?

8  A    Yes.

9  Q    I think you said it was a good Republican district?

10  A    Yes.

11  Q    That's a largely white, predominantly white district;

12  correct?  VTD, sorry.

13  A    Yes, it's rural.

14  Q    Rural?

15  A    Yeah, rural.

16  Q    It's late, and that's a tough one.  And there were a

17  couple of split VTDs in this area.  Again, you weren't

18  responsible for splitting them, we'd have to ask Mr. Morgan

19  about that; is that right?

20  A    Yes.

21  Q    Let's move to House District 80, if we could.  The

22  incumbent here is Matthew James?

23  A    Yes.

24  Q    This was underpopulated by about 9,000 people and below

25  the 55 percent black voting-age population target; correct?

Jones - Cross

1    A    That sounds about right, yes.

2    Q    Prior to the redistricting, House District 80 was not in

3    Suffolk, was it?

4    A    No.

5    Q    In the final plan, this district crossed four city

6    boundaries; right?

7    A    Correct.

8    Q    Chesapeake, Norfolk, Suffolk, and Portsmouth?

9    A    Yes.

10   Q    And it featured two water crossings.

11   A    Yes.

12   Q    And on the far side, the far eastern side of the district,

13   the Chrysler Museum VTD was across the river from the rest of

14   the district; right?

15   A    Yes.

16   Q    So the new material that was added here, or territory that

17   was added here, or these VTDs in the sort of the western arm,

18   that's VTDs 38, Taylor Road, Yeates, 34, 33, all these out

19   here; correct?

20   A    Yes.  That would be the western part that was added to the

21   district.

22   Q    And VTDs -- the far part of this, VTDs 38, Taylor Road,

23   and Yeates, those are all Suffolk, aren't they?

24   A    They are.

25   Q    It's a different jurisdiction?

Jones - Cross

1    A    Correct.

2    Q    Let's go back to the previous map.   38, Taylor Road,

3    Yeates, those are all VTDs with significant African-American

4    population; correct?

5    A    Yes.

6    Q    And the thing that I -- at least to me is striking, when

7    looking at this, is House District 80 did not pick up these

8    districts right here in the middle which, I think, are

9    Silverwood, Churchland, Fellowship, or Nansemond.

10   A    That's correct.   That's the county I was raised in.

11   Q    Did I pronounce it correctly?

12   A    You did very well.

13   Q    And, in fact, the district seems to, like, go up right

14   around them, almost like a donut to avoid them; right?

15   A    That was a current configuration.   The western part of 80

16   was in House District 79 prior -- that was in the benchmark

17   plan of 79, and Delegate Joannou did not want to have four

18   jurisdictions.   So Matthew James picked up the configuration

19   that already existed.   So 79 and 80 flipped and switched and

20   got those precincts here, here, and like this.

21   Q    That sort of northern arc over the top of the district

22   here?

23   A    Right.

24   Q    The areas that were avoided here, the ones we just

25   mentioned, Silverwood, Churchland, Fellowship, and your home

Jones - Cross

1    town, Nansemond, those are all largely white; correct?

2    A    It's very Republican, and they're in my district, and I

3    was a patron of the bill.

4    Q    And they're also largely white?

5    A    They are.  But they are very good performing Republican

6    precincts.

7    Q    Fair enough.

8    A    I think I get 70-some percent in all of them.

9    Q    If we step back and look at the racial composition, it's

10   striking here, isn't it, the areas that were included are

11   largely white, the areas that were -- I'm sorry, the areas that

12   were included in District 80 are largely predominantly African

13   American, and the areas that were excluded are predominantly

14   white; isn't that true?

15   A    They was not excluded.  All I did was take the current

16   configuration of 79th on the western edge and use that for the

17   80th.

18   Q    Let's look at House District 89.  This is Delegate

19   Alexander's district; correct?

20   A    Yes.

21   Q    And so let's start with the -- zoom in.  Ms. Marino, I

22   think, has a close-up of the northern part of this map.  I want

23   to talk to you a little bit about this Suburban Park VTD.  The

24   Suburban Park, I think we have a different one that actually

25   shows the location of the funeral home.

Jones - Cross

```
 1        So this is page 58 of the Rodden report, figure 20 for the

 2   record.  If we look -- this is a close-up, you see Suburban

 3   Park to the right on the top half of the map?

 4   A    I do.

 5   Q    That was in the benchmark; correct?

 6   A    It was.

 7   Q    And then to the left is Granby precinct?

 8   A    That's correct.

 9   Q    Delegate Alexander owns a chain of funeral homes; is that

10   right?

11   A    He does.

12   Q    And his funeral home was in the benchmark District 89.

13   A    That one was, correct.

14   Q    And the map actually drew it out of the district by

15   dropping Suburban Park.

16   A    That is correct.

17   Q    And Suburban Park is a largely white or predominantly

18   white VTD; correct?

19   A    That is correct.

20   Q    Now, you -- I believe you testified that you're mistaken,

21   and, of course, we all make mistakes sometimes, but I thought

22   that you testified that the reason that the Granby VTD was

23   split was because of this funeral home.

24   A    I did.  I think I corrected that today and said I was

25   mistaken.
```

Jones - Cross

1    Q    So I believe --

2          MR. HAMILTON:  And Ms. Marino, perhaps you can pull

3    up the trial transcript on page 345, line six through nine.

4    Q    I think the question was, by Mr. Braden, "So am I correct

5    to understand that you split these VTDs pursuant to his request

6    to put a funeral home in his district," and your answer was,

7    "That is my recollection, yes, sir."  That was your testimony

8    at the trial the first time.

9    A    That's correct, and that was my recollection, and,

10   obviously, I was incorrect.

11   Q    Okay.  So let's go back to the map.  So what you thought

12   was that the funeral home was somewhere in this area where the

13   little pipe figure is, and that's the reason that we had to

14   split the VTD, and I know you were wrong, but I'm just asking,

15   that's the mistake we are talking about?

16   A    You have to show me where Granby Street is and I can show

17   you where I thought it was but over where Granby would be.

18   Q    I assume it's somewhere in the area where you put the X;

19   that is, in the northern half of this split of the Granby

20   precinct since if you were trying --

21         THE COURT:  He said he can't identify it unless you

22   show him the street, so show him the street.  I think this is a

23   dead horse, too.  But if it's important to you, show him the

24   street.

25   A    I'll answer yes.

Jones - Cross

```
 1              JUDGE PAYNE:  Otherwise, leave it be and go on to
 2   something else, if you would.
 3   Q    Delegate Alexander had three funeral homes, I think you
 4   testified; correct?
 5   A    Yes.
 6   Q    One of them was here in the Suburban Park VTD.
 7   A    Correct.
 8   Q    One of them was in the Berkley VTD?
 9   A    Correct.
10   Q    And one of them was in Southampton; is that right?
11   A    It's in Portsmouth somewhere.  I could not tell you which
12   precinct it is.
13   Q    But so we didn't need -- this is simply a mistake you made
14   at the time that you were drawing the map, or was this a
15   mistake you made at the time you testified before this Court in
16   2015?
17   A    I would say to the Court and to the gentlemen that I
18   believe previously I've testified during this process, a very
19   tightly compressed process I would add, I met with many, many
20   delegates along the way.  There was a request for a funeral
21   home to be added.  So I was mistaken in the northern part which
22   was on Suburban.
23        I knew that we had added a funeral, which we did, which is
24   factually correct, in Berkley.  So it was a mistake on my part.
25   I guess I was drinking too many Mountain Dews, meeting with too
```

Jones - Cross

1    many different members, and I don't mean that to be flippant.

2    But that's how quickly -- it's like a vortex when you're trying

3    to get that many things satisfied to get a bill in a position

4    to be considered by the body.  So it was an honest mistake, and

5    I've acknowledged that.

6    Q    Fair.  Thank you, sir.  I don't mean to challenge you on

7    the mistake other than try to understand how the VTD was split.

8    You didn't actually split this VTD here in Granby; that was

9    another one of Mr. Morgan's fine carpentry work; correct?

10   A    That would be correct.

11   Q    Now, one of the other changes --

12              MR. HAMILTON:  And, Ms. Marino, if we could go back

13   to the House District 89 larger map.  I think this is page 56

14   on Plaintiffs' Exhibit 69.  Page 56, Exhibit 69.

15   Q    One of the other significant changes here in this is the

16   addition of the Berkley precinct to House District 89; is that

17   right?

18   A    Yes.

19   Q    And now the Court, after the first trial, observed that

20   the Berkley VTD is relatively close to Delegate Alexander's

21   residence.  Do you recall reading that?

22   A    No, but I think by the maps I've seen, I believe it is.

23   Q    Delegate Alexander's home is actually on the opposite side

24   of the Elizabeth River from Berkley VTD, isn't it?  In the

25   Ghent Square VTD?

Jones - Cross

1    A    Yeah.  It's in Norfolk, but it is across the river, that

2    is correct.

3    Q    In any event, that's not the reason that you added the

4    Berkley VTD to the -- to House District 94?

5    A    I believe it was a request from him to add the funeral

6    home, but if -- I'm going from memory here.  I think Berkley

7    used to be in the 80th.

8    Q    So just to be clear, I need to correct what I just said

9    because I think I misstated the number of the house district.

10   It was not -- adding Berkley to House District 89 was not

11   because of the location of Delegate Alexander's home?

12   A    No.

13   Q    It was, instead, because of one of his funeral homes was

14   located there?

15   A    Correct.

16   Q    That's the Metropolitan Funeral Service?

17   A    Yes, sir, correct.

18   Q    Let's turn to House District 90, if we could.  House

19   District 90 was represented by Delegate Algie Howell during the

20   2011 redistricting; correct?

21   A    Yes.

22   Q    And it had a black voting-age population of just shy of

23   57 percent; is that true?

24   A    I believe that's correct, yes.

25   Q    And it bordered District 89 which was a little low, it had

Jones - Cross

1  about 52.5 percent black voting-age population?

2  A    I take you at your word.  That sounds right.  I believe

3  they both needed population, period.

4  Q    So one of the changes you notice right away here is that

5  Union Chapel was moved from District 90 to District 89.

6  A    Your Honor, if I may, this map does not work for me.  If

7  you'll give me a map I can keep here and look to have a

8  cross-reference.  It's just very difficult for me to follow.

9  Q    We'll get you one right away.  Is this better?

10 A    Yes, absolutely.

11 Q    Would you like a paper copy?

12 A    If you have one, that might help us.  I don't want to

13 intrude on the Court's time unnecessarily.

14            JUDGE PAYNE:  He's about through anyway.

15            THE WITNESS:  That's good.

16            JUDGE PAYNE:  You can take the paper copy.  I want

17 you to have what you need.  What is it, 94?

18            THE WITNESS:  I have one right here.  Page 11.  All

19 right, this is what I'm used to.

20 Q    So on the far west, we can see Union Chapel.

21 A    Yes.

22 Q    That was moved from District 90 to District 89; correct?

23 A    That's correct.

24 Q    90 had high black voting-age population, 89 had lower

25 black voting-age population; correct?

Jones - Cross

1   A    I think so, but I don't know for certain.  I know they

2   both had -- they needed population to get back to the ideal

3   size of 80,800.

4        JUDGE PAYNE:  Mr. Hamilton, he's established beyond

5   any question that he doesn't have present recall of what

6   exactly those figures were, so take them out of your questions,

7   if you will.  He said time after time he didn't have exact

8   recollection.  He will take you at your word.  You'll have to

9   prove that in your briefs, but it's not in the question

10  anymore.

11       MR. HAMILTON:  I don't think it's a matter that's in

12  dispute --

13       JUDGE PAYNE:  May not be, but it's just not the right

14  way to ask a question.

15       MR. HAMILTON:  Thank you.  I'll correct my form of

16  the question.  Thank you for the point.

17  Q    Union Chapel, this VTD that we're looking at, has a high

18  minority population, does it not?

19  A    Yes.

20  Q    Okay?

21  A    As do many around there, I believe.

22  Q    Let's move to House District 92, Delegate Ward's district?

23  A    Yes, sir.

24       JUDGE PAYNE:  Is that page 13?

25       MR. HAMILTON:  I'm sorry, Your Honor?

Jones - Cross

 1          JUDGE PAYNE:  I said is that page 13 to that exhibit?

 2          MR. HAMILTON:  I believe so, Your Honor.

 3   Q    District 92, I think you said, talking about this whole

 4   area, and correct me if I'm wrong, it would not be possible

 5   to -- it would be possible to draw -- Mr. Braden drew a line

 6   something like this -- it would be possible to draw two

 7   55 percent black voting-age population districts without that

 8   whole northern extension arm.

 9   A    I said I thought you could, but I did not do that

10   exercise.

11   Q    You didn't do it, but you thought you could?

12   A    But I didn't say you could.  I said I thought you could.

13   Q    Okay.  And it's certainly not what you did?

14   A    No.

15   Q    What we did, we know, is create this whole extension up

16   that added the armed House District 95; correct.

17   A    I think your question is in reference to House District

18   92.  What I did with House District 92 is draw what the

19   incumbent member wanted.  That had an impact on House District

20   95, because the questions are relating to one district out of a

21   hundred and don't operate in a vacuum.

22   Q    Of course.  House District 92 added precincts Kraft,

23   Forrest, and Mallory to House District 92; correct?

24   A    Correct.

25   Q    Those are all predominantly African-American populations;

Jones - Cross

1   right?

2   A    I think so, yes.

3   Q    And in the eastern part right here, there's a VTD called

4   Phoebus?

5   A    Correct.

6   Q    That's mostly white?

7   A    Yes.

8   Q    That was taken out?

9   A    Yes.  That appears to be taken out.  It was put with

10  Bryan, I believe, because they have a community of interest.

11  Q    Then there was a little extension here at the northern --

12  northeastern part of this district.  It was also modified.

13  That little strip was brought back; correct?

14  A    That appeared to be the case.

15  Q    That's a predominantly white area just to the east of

16  that?

17  A    Right, represented by Delegate Helsel of Poquoson.  That

18  was existing.

19  Q    Let's look at District 95.  This whole new arm -- we've

20  talking about this for a far bit of time now.  This whole

21  northern extension was added to House District 95; correct?

22  A    Correct.

23  Q    House District 95 went from an oblong shape to sort of an

24  elongated shape with the addition of VTD Sandy Bottoms,

25  Saunders, Palmer, and so up the arm?

Jones - Cross

1    A    Yes.

2    Q    Maybe we can look at the Rodden report, Exhibit 69, page

3    47, figure 16.  This is a close-up of the very tip of House

4    District 95, and it's four VTDs in a row, Jenkins, Denbigh,

5    Epes, and Reservoir.  Do you see that?

6    A    I do.

7    Q    And you didn't draw this line.

8    A    No.

9    Q    And it's -- but it's split all four of these VTDs in a

10   row, so we have to ask Mr. Morgan about that.

11   A    Yes.

12   Q    To the best of your understanding, these were split for

13   the purposes of population balance?

14   A    Correct.

15   Q    And as we evaluate the reasons for splitting these VTDs,

16   we can be clear about one thing.  There is no political

17   performance data available below the VTD level, to your

18   knowledge; correct?

19   A    I'm not aware of, but from this perspective, I would say

20   it was split for population and for political reasons.

21   Q    But there's no political performance data below the level

22   of the VTD.  You can't know where the Democrats are and where

23   the Republicans are from the census data; it's not reported.

24   A    Other than talking to members, you certainly can.  They

25   know their districts.  Delegate Oder was very informative in

Jones - Cross

1  what would work.

2  Q    Did Delegate Oder draw this line?

3  A    He did not draw the line, but he was very clear as to what

4  was Republican territory.

5  Q    Delegate Jones, in the last trial, you testified that you

6  did a functional analysis with respect to District 75.  Do you

7  remember that testimony?

8  A    I think that was my term of art.  I'm not sure it really

9  exists anywhere in the dictionary, but, yes.

10 Q    You met with Delegate Tyler on a couple occasions to

11 discuss District 75?

12 A    More than a couple, yes, sir.

13 Q    And you looked at several elections in House District 75?

14 A    I did.

15 Q    There had been a number of close races there?

16 A    Yes.  I believe she ran in 2007 or 2005 in a primary with

17 -- four- or five-wide primary with two Caucasians, and she

18 barely won the primary, and then she barely won in the general

19 election that year, if I remember correctly, November.

20 Q    And you examined turnout rates throughout District 75?

21 A    I can't say I did turnout rates, per se, but, you know,

22 talking with her, with the member, she had a real concern about

23 turnout and impact.

24 Q    And you considered the district's prison population and

25 the impact that might have on her ability to get reelected;

Jones - Cross

1    correct?

2    A    Yes.  I was informed by her that that was a real concern.

3    Q    And after the first trial, this Court concluded, and I

4    think it's undisputed, that 55 percent BVAP number came from

5    these concerns and discussions you had with Delegate Tyler and

6    then was applied across the board to the 11 other districts.

7    That's a fair statement; correct?

8    A    That's what the Court said, is what you are saying?

9    Q    Well, it's a fair statement that that 55 percent number

10   was applied across the bored to the 11 other districts;

11   correct?

12   A    Yes, but you have a two-part question, I think, so I'm

13   trying to make sure I'm answering it as I understand it.

14   Q    As you were drawing these other districts, and by that I

15   mean the districts other than 75, the challenged districts, you

16   didn't put them side by side with District 75 and compare the

17   extent to which they were the same or different than House

18   District 75?

19   A    No.

20   Q    And you didn't look at the differences or similarities in

21   racial composition between House District 75 and any of the

22   other districts?

23   A    No.

24   Q    You didn't look at the difference or similarities

25   between -- in voter turnout between House District 75 and any

 1    of the other districts?

 2    A    No.  I was just informed by the members, the individual

 3    members of their districts.

 4              MR. HAMILTON:  If we can pull up the 2017 deposition

 5    transcript at page 251, and the answer spills to 252.

 6    Q    Do you remember I took your deposition on August 23rd of

 7    this year?

 8    A    I do.

 9              THE COURT:  Can you enhance the size of it?  What

10    question and line for the opposition?

11              MR. HAMILTON:  We're looking at page 251, line 16, to

12    page 252, line one.

13    Q    So I asked, "And with respect to all of the remaining

14    districts, you didn't go through and compare the extent to

15    which they were the same or different than House District 75.

16         "Answer:  No, I did not.

17         "Question:  And that includes you didn't look at the

18    differences or similarities in racial composition, voter

19    turnout, election history, or prison populations," and your

20    answer was, "That would be correct."  Do you recall testifying

21    in that manner during your deposition?

22    A    I do.

23    Q    And you didn't look at differences or similarities in

24    election history between District 75 and any of the other

25    districts?

Jones - Cross

```
1   A    No.  I was very aware, though, of the history of -- I

2   think I was asked a question at the last trial by -- I can't

3   remember who it was, the last time an incumbent was challenged

4   and they didn't elect the candidate of choice.  I certainly was

5   aware of election results and --

6   Q    Let me --

7             JUDGE PAYNE:  Let him finish his answer.

8   Q    Were you finished with your answer?

9   A    That's how I would have been informed by those members and

10  by that information.

11  Q    Direct your attention --

12            MR. HAMILTON:  Can you pull up page 220 of 2017.

13  Q    Page 220, lines eight through 14.  And the question was,

14  "But my question is, you didn't put these two districts

15  together, 77 and 75, and, and compare the, the history of

16  elections and who was voting for whom as between the two

17  districts?

18       "Answer:  No.  Like I said earlier, I'll answer for all

19  the rest of them.  I didn't compare any to 75 in that context."

20  Did I read that correctly?

21  A    You did, because your question to me was a comparison

22  between the two.  That does not mean I did not do an evaluation

23  --

24            JUDGE PAYNE:  Just a minute, Delegate Jones.  Yes,

25  Mr. Braden.
```

Jones - Cross

1    MR. BRADEN:  I am mystified as to the inconsistency

2    that this impeachment --

3    JUDGE PAYNE:  Neither one of them has been

4    inconsistent.  I think it's because we're tired and at the end

5    of the day, but they're cross-purposes answering different

6    questions, and it wasn't inconsistent.  So let's go on, Mr.

7    Hamilton.  Do you have anything else you need to ask this

8    witness?

9    MR. HAMILTON:  I do, Your Honor.

10   JUDGE PAYNE:  How long?  I think --

11   MR. HAMILTON:  Probably about five minutes.

12   THE COURT:  You've already had about double the time

13   of direct.  I think we're going to have to put a restriction on

14   cross-examination if we have to do this in the future.  All

15   right, let's go.

16   Q    Delegate Jones, you didn't look at the actual registration

17   rates of African Americans or -- the African-American

18   population in any of these districts and compare those

19   registration rates to the white voters in the challenged

20   districts; correct?

21   A    I don't know whether that information is available to us.

22   Q    So the answer is you did not?

23   A    No, because I don't think it's available to us.

24   Q    You didn't look at differences or similarities in prison

25   populations between District 75 and any of the other districts?

Jones - Cross

1    A    No.

2    Q    You didn't compare any of these other districts to House

3    District 75 in terms of retiree populations, university

4    populations, military installations, or personnel?

5    A    I did not compare, but I certainly was aware.  We have VCU

6    in downtown Richmond.  As I attended MCV campus, I would not

7    need to compare that to House District 75.

8    Q    You didn't do any kind of racially polarized voting

9    analysis for any of these other districts, did you?

10   A    I'm not aware of it ever being done in preparing a map.

11   Q    You didn't do any kind of analysis to determine whether

12   the districts would be considered retrogressive under

13   Section 5, did you?

14   A    I talked to the members that represented the districts.

15   Q    You mentioned, Doctor, the Dr. Loewen report a moment ago.

16   Do you recall that?

17   A    I do.

18   Q    You didn't review the Dr. Loewen report during the 2001

19   redistricting process, did you?

20   A    I don't think it existed in 2001.

21   Q    I'm sorry, 2011?

22   A    I'm still keeping up this late.  I was aware of it, and I

23   was aware that it supported a 55 percent.

24            JUDGE PAYNE:  I think the question was, did you

25   review it during the process of redistricting in 2011.

Jones - Cross

1          THE WITNESS:  Yes.

2  Q   You did review it?

3  A   I reviewed only the fact -- I didn't read the entire

4  report, but I was aware it existed.  So I guess we've got a

5  difference of -- review to me might mean something different to

6  you.

7  Q   Did you read it?

8  A   I did not read it's entirety --

9  Q   Did you have a copy of it?

10         JUDGE PAYNE:  Excuse me, Mr. Hamilton.  You stepped

11  on him again.  Did you read it at all is the first --

12         MR. HAMILTON:  Let me rephrase the question maybe,

13  Your Honor.

14  Q   You didn't read the Loewen report during the 2011

15  redistricting process; isn't that true, sir?

16  A   I was informed by my counsel --

17  Q   That's not my question.

18         JUDGE PAYNE:  Mr. Hamilton.  Do you want my job?

19  Give me a minute.

20         MR. HAMILTON:  I don't think I could be confirmed,

21  Your Honor.

22         JUDGE PAYNE:  I don't think I could be either.

23  Listen to the question he's asking you, and just answer that

24  question.  If your lawyer wants to ask you something else

25  later, he can do it.  Can you go again, Mr. Hamilton.

Jones - Cross

1            MR. HAMILTON:  Yes, thank you, Your Honor.

2    Q    You did not read the Loewen report during the 2011

3    redistricting process, did you, sir?

4    A    No.

5    Q    In fact, you didn't have a copy of it.

6    A    I did not, no.

7    Q    And it's fair to say that you didn't make any

8    redistricting decisions in 2011 based on that report because

9    you hadn't even read it?

10   A    That is not true.  I was informed by my counsel.

11           MR. HAMILTON:  Your Honor, I guess I would move to

12   strike the answer.  We've been precluded by an assertion of the

13   attorney-client privilege to hear what he was informed by his

14   counsel.  We've inquired.  Mr. Braden has instructed him not to

15   answer.

16           So I would move to strike the answer because we are

17   another not allowed -- he's either going to waive the privilege

18   and we're going to get into this right now or I move to strike

19   because we haven't been allowed discovery into exactly what

20   those conversations were about.

21           MR. BRADEN:  Your Honor, he asked the question.  He's

22   entitled to answer it.

23           JUDGE PAYNE:  You opened the door and asked for it, I

24   think.  I think you're stuck with what happened.

25           MR. HAMILTON:  Actually, the question was --

Jones - Cross

1    JUDGE PAYNE:  I understand.  I think let's go on.

2  Q    You didn't make any redistricting decisions in 2011 based

3  on the report because you didn't even read it.  You didn't read

4  it, did you?  Let's start it there.

5  A    Did not read it.

6  Q    So whatever you may have known about the Loewen report, it

7  would have only been -- you would have only learned that from

8  communications from your lawyers; is that right?

9  A    That would be correct.

10  Q    And your lawyers never gave you a copy of the report.

11  We've established that; right?

12  A    Correct.

13    MR. HAMILTON:  Thank you.  No further questions, Your

14  Honor.

15    JUDGE PAYNE:  You all did resolve this issue about

16  waiver at the initial pretrial conference, and there's an order

17  that addresses it.  I don't really, frankly, remember what it

18  says.  I have to plead guilty on that.  I want you to file in

19  the morning, by seven o'clock, briefs simultaneously on whether

20  or not he has to answer the question.  I guess your question

21  is, what did your lawyer tell you.

22    MR. HAMILTON:  Well, Your Honor --

23    JUDGE PAYNE:  Or what do you want?

24    MR. HAMILTON:  I didn't ask that question here.  I

25  did ask it in a deposition before trial so that I would know

1   whether I wanted to ask it here or not.  I wasn't allowed to

2   hear the answer to the question at the time.  I think if he's

3   testified this way, I think he's waived the privilege, and

4   rather than filing briefs, I'd like to take his deposition.

5           JUDGE PAYNE:  To do what?

6           MR. HAMILTON:  Take his deposition, find out what his

7   lawyer said.

8           THE COURT:  That presumes that he's waived it.  The

9   issue we're asking you to brief is whether there's been a

10  waiver.

11          JUDGE KEENAN:  It seems to me at this point you have

12  a content-void answer.  I talked to my lawyer.  That doesn't

13  mean anything, that he talked to his lawyer.  So if you want to

14  pursue the substance, then I think we do need to have some

15  briefing on it, because that's contrary to what we understood

16  at the pretrial conference.

17          JUDGE PAYNE:  At the pretrial conference, we had

18  gotten to the point ultimately that there was really no

19  substance on the advice, but I think it had to do with Marston,

20  not with him.

21          MS. McKNIGHT:  That's correct.

22          THE COURT:  And it was a somewhat slightly different

23  issue, but it's presented in the same context here, and the

24  same basic question is presented, and that is, does the fact

25  that he said I got it from my lawyer, does that waive the

1    substance of the advice that he got from the lawyer, and that's

2    what you all were briefing in Marston, and I think you didn't

3    have the best side of that issue on that point, but if you want

4    to issue it now -- brief it and hand us in some papers in the

5    morning at 7:00, we'll get here by 8:30 or so and read them and

6    be prepared to hear you at 9:00 on whether there's been a

7    waiver.  That's where I think we are.  Do you agree, Judge

8    Keenan?

9              JUDGE KEENAN:  Yes.

10             JUDGE PAYNE:  Do you agree, Judge Allen?

11             JUDGE ALLEN:  I do.

12             MR. HAMILTON:  If I might, I'd like to discuss it

13   with my team, and if we decide we want to pursue this we'll

14   file a brief if that's acceptable to the Court.

15             JUDGE PAYNE:  It's always good to pray over things.

16             MS. McKNIGHT:  Your Honor, the only issue there is

17   that you requested simultaneous briefs, so we would need to

18   know if they plan --

19             JUDGE PAYNE:  I was coming to that.  When are you

20   going to let everybody know what you're going to do, because

21   they have an obligation, too.

22             MR. HAMILTON:  I'll let them know within an hour,

23   Your Honor.

24             JUDGE PAYNE:  Does that suit you?

25             MS. McKNIGHT:  Yes, Your Honor.

1          JUDGE PAYNE:  All right, and then you have redirect

2     in the morning; is that right?

3          MR. BRADEN:  Your Honor, I think we'll waive

4     redirect.

5          JUDGE PAYNE:  So that's the end of it then.  Is there

6     anything else we need to do tonight before we adjourn?

7          MR. BRADEN:  Excuse me, Your Honor.  Delegate Jones

8     has personal issues and does need to be released.  We believe

9     we're finished with him.  We would not endeavor to do redirect

10    with him tomorrow morning unless this issue commands that he be

11    here.

12         JUDGE PAYNE:  Well, if he's waived the privilege, he

13    has to be here, but I don't know what the personal issue is and

14    what the time schedule involved in connection with it is.

15    Maybe you'd like to talk with him about it, and it may not be

16    that -- since it's not a bench trial, it may be if he's tied up

17    in the morning and he needs to be here, then he can be here in

18    the afternoon or we can do something else.  We have a lot of

19    flexibility since it's not a jury trial.

20         MR. BRADEN:  Your Honor, can I have a moment to

21    assess the matter with our witness?

22         JUDGE PAYNE:  Yes.  Go over there and talk to him.

23         MR. BRADEN:  We're prepared for him to come back

24    tomorrow morning.

25         JUDGE PAYNE:  Okay, if need be.  You are going to do

1    redirect then?

2              MR. BRADEN:  Yes.

3              THE COURT:  And you're going to let them know within

4    an hour.

5              MR. HAMILTON:  I'll let them know right now.  I don't

6    think we need to brief the issue.  I think where it stands,

7    it's, as Judge Keenan pointed out, a content-less answer.  If

8    he goes further than yes -- but I would ask for the opportunity

9    to depose him outside of court hours so we can find out what

10   he's going to say, because, frankly, you know, this is a bit of

11   an ambush, Your Honor, where there's an assertion of a

12   privilege during discovery that prevents us from -- and then a

13   change of heart and an answer that operates to waive the

14   privilege.

15             JUDGE PAYNE:  He never got any further than the

16   question and the answer about, yes, I consulted the lawyer at

17   the trial -- I mean at the deposition.  Also, in the case of

18   Marston, was that also the situation here in connection with

19   his deposition?

20             MR. HAMILTON:  No.

21             JUDGE PAYNE:  So you just were precluded from talking

22   about it, period, here?

23             MR. HAMILTON:  Correct.

24             JUDGE PAYNE:  The record there will be -- why don't

25   we leave it -- you don't want it, and if he goes further than

1  that, you want some rights, and we'll deal with it at that

2  time.

3          MR. HAMILTON:  I'll probably be on my feet objecting.

4          JUDGE PAYNE:  And as Judge Williams says, let us

5  abide the event.

6          MR. BRADEN:  If that's where we are, then we would

7  prefer to release Delegate Jones and let him go home if that's

8  possible.  We have no longer any need to call him and we would

9  not redirect.

10          JUDGE PAYNE:  All right.

11          MR. HAMILTON:  We have no objection to him being

12  released.

13          JUDGE PAYNE:  You are released from your obligation

14  to be here -- wait a minute.  Do we have any questions?  I

15  didn't think about us.  Do you?  Okay, thank you for being with

16  us.  We'll be in adjournment, and see you at 9:00 a.m.

17

18                  (End of proceedings.)

19

20          I certify that the foregoing is a correct transcript

21  from the record of proceedings in the above-entitled matter.

22

23

24  _____/s/_____               _____

P. E. Peterson, RPR                 Date

25