1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                    RICHMOND DIVISION

4

   ---------------------------------------
5                                        :
   GOLDEN BETHUNE-HILL, an               :
6  individual, et al.                    :   Civil Action No.
                                         :   3:14cv852
7  vs.                                   :
                                         :
8  VIRGINIA STATE BOARD OF ELECTIONS,    :   October 12, 2017
   et al.                                :
9  ---------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE BENCH TRIAL

12          BEFORE:   THE HONORABLE ROBERT E. PAYNE

13                    THE HONORABLE BARBARA M. KEENAN

14                    The HONORABLE ARENDA L. WRIGHT ALLEN

15  APPEARANCES:

16  Kevin J. Hamilton, Esquire
    Abha Khanna, Esquire
17  Perkins Coie, LLP
    1201 Third Avenue
18  Suite 4800
    Seattle, Washington  98101
19
    Aria C. Branch, Esquire
20  Perkins Coie, LLP
    700 13th Street NW
21  Suite 600
    Washington, D.C.  20005
22  Counsel for the plaintiffs

23

24              Peppy Peterson, RPR
                Official Court Reporter
25          United States District Court

```
 1    APPEARANCES:  (cont'g)

 2    Matthew R. McGuire, Esquire
      Office of the Attorney General
 3    202 North Ninth Street
      Richmond, Virginia  23219
 4    Counsel for the defendants

 5

 6    Katherine L. McKnight, Esquire
      E. Mark Braden, Esquire
 7    Richard B. Raile, Esquire
      Baker & Hostetler, LLP
 8    Washington Square
      1050 Connecticut Avenue, NW
 9    Washington, D.C.  20036
      Counsel for intervenor defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE CLERK:  Day three.  Case No. 314-cv-852.
 2                    Golden Bethune-Hill, et al. v. The
 3    Virginia State Board of Elections, et al. and the
 4    Virginia House of Delegates, et al.
 5         The plaintiffs are represented by Kevin Hamilton,
 6    Abha Khanna and Aria Branch.
 7         The Virginia State Board of Elections is represented
 8    by Matthew McGuire.
 9         The Virginia House of Delegates is represented by Amy
10    Tolbert, Mark Braden, Katherine McKnight and Richard
11    Raile.
12         Are counsel ready to proceed?
13                    MR. HAMILTON:  We are, Your Honor.
14                    MS. MCKNIGHT:  Yes, Your Honor.
15                    JUDGE PAYNE:  Good morning.  Please remember
16    that the objective is to wrap this case up by the end of
17    the day today.  And I just take it, from reading the
18    expert reports, that your experts are not going to be as
19    detailed as the others, or as long.  But I'm not trying to
20    cut you off, but I do think we need to move along.  There
21    was a fair amount of repetition in the examination of
22    experts and in the cross-examination of experts yesterday
23    and the day before.
24                    MS. MCKNIGHT:  Thank you, it's well taken.  And
25    I am up here to address two administrative points,
```

 1    including one, the schedule.

 2         The second issue are exhibits.  If you don't mind, if

 3    I quickly go through exhibits for the record, and then

 4    I'll address the schedule for today, what we anticipate

 5    happening.

 6              JUDGE PAYNE:  Sure.

 7              MS. MCKNIGHT:  Okay.  Thank you.

 8    Defendant-intervenors in this case filed an exhibit list

 9    at Docket No. 187.  I'm going to identify the exhibits in

10    Docket No. 187-1 that do not have any objection to them by

11    plaintiffs or we've come to an agreement with plaintiffs

12    that an exhibit, as edited, can be submitted to the Court.

13    DI-1 --

14              JUDGE PAYNE:  How many are there?

15              MS. MCKNIGHT:  There -- I'm trying to do a rough

16    count.

17              JUDGE PAYNE:  I guess -- here's what I'm getting

18    at.  Can you just take a piece of paper and print it out

19    and checkmark the ones that you all are in agreement on,

20    and then you don't have to read them into the record?

21              MS. MCKNIGHT:  Yes, Your Honor.  We'd be happy

22    to do that.  We can have that prepared today and submit it

23    later today.

24              JUDGE PAYNE:  Sure.  Just make sure both sides

25    are signed on on that matter.  Sure.

1          MS. MCKNIGHT:  Okay.  Thank you.  On the point

2   of schedule, and I'll keep this brief, yesterday

3   plaintiffs rested their case at close to 3:00 p.m.  And

4   that is with defendant-intervenors shaving two hours off

5   of their anticipated cross-exam time.  And by our

6   calculations, plaintiffs were able to reduce their time by

7   a little under an hour.  So we are trying.  We are working

8   toward the goal.

9        Today, defendant-intervenors expect and will work

10  toward putting on six of their remaining eight witnesses.

11  Now, it will be a hustle to get through them, but we have

12  worked to hone our examinations and we will also work to

13  limit cross-examination time to at least equal to what the

14  direct is and hopefully less than what the direct is.

15       Now, we understand that the Court may have time

16  tomorrow.  We have two witnesses that we don't expect to

17  need more than an hour with, Your Honors, tomorrow

18  morning.

19          JUDGE PAYNE:  For you.

20          MS. MCKNIGHT:  Correct.  And by looking at

21  estimate from --

22          JUDGE PAYNE:  Who are they?

23          MS. MCKNIGHT:  One is Dr. Hofeller.  He's an

24  expert, and the other is Delegate Stolle.

25          JUDGE PAYNE:  Delegate who?

```
 1              MS. MCKNIGHT:  Delegate Stolle, S-T-O-L-L-E.

 2              JUDGE PAYNE:  Yeah.

 3              MS. MCKNIGHT:  He's in the Norfolk area, Your

 4   Honor.

 5        Now, by our estimates on Docket No. 209 when the

 6   parties submitted their estimates of time, plaintiffs have

 7   estimated they need the same amount of time as plaintiffs

 8   with these witnesses.  Now, both of those times may

 9   reduce, meaning we may not need a full hour and plaintiffs

10   may not need a full hour either.  Now, granted, Your

11   Honors have also asked for closing arguments of 15 minutes

12   per side, and, of course, there is a rebuttal case.

13              JUDGE PAYNE:  We can pass that.

14              MS. MCKNIGHT:  Pardon?

15              JUDGE PAYNE:  We don't need the closing

16   arguments.

17              MS. MCKNIGHT:  Okay.  So I wanted to give you an

18   alert that we need about -- defendant-intervenors need

19   about an hour of your time tomorrow, and we would

20   anticipate that plaintiffs would need no more than an hour

21   either.  But they are welcome to --

22              JUDGE PAYNE:  Do you have anything to say,

23   Mr. Hamilton?

24              MR. HAMILTON:  Yes, Your Honor.  I always have

25   something to say.
```

1          JUDGE PAYNE:  That was a silly question, wasn't

2   it?

3          MR. HAMILTON:  Dr. Hofeller, the parties

4   anticipate -- I think the intervenors anticipated

5   three-quarters of an hour on direct, and we anticipated

6   three-quarters of an hour on cross.  I can't imagine that

7   it would take three-quarters of an hours to present him or

8   to cross him, and I expect that altogether the time for

9   Dr. Hofeller is probably under an hour.  He -- the

10   report -- the supplemental report -- other than his -- you

11   know, he submitted an original report.  He's already

12   testified in this matter, and the original testimony is

13   part of the record.  The supplemental --

14          JUDGE PAYNE:  What about your rebuttal case I

15   think is what I would like to know?

16          MR. HAMILTON:  At most, an hour.

17          JUDGE PAYNE:  Okay.  Well, you may not have an

18   hour.  I don't know.  Let's see.

19      I'm picking a jury at 1:00 tomorrow, and your case

20   must be over.  It's a criminal case and it has to be tried

21   for speedy trial reasons -- or I guess, no, it doesn't.

22   It has to be tried because I don't have any other time, I

23   guess, is the correct statement.  But this case, I expect,

24   will be over in the morning.  Okay?  And you all need to

25   work that way and plan your rebuttal that way and --

Morgan - Direct

1    because I don't think we'll -- I don't think it's fair to

2    have the rebuttal case be put off three weeks or a month

3    because that will end up not helping anybody.  So let's

4    see what we can do by moving forward with an understanding

5    that we will be closed no later than noon tomorrow and

6    probably before that.

7              MS. MCKNIGHT:  Thank you, Your Honors.

8              MR. HAMILTON:  Thank you, Your Honor.

9              JUDGE PAYNE:  Okay.  Who's your witness?

10             MR. RAILE:  Your Honor, the

11   defendant-intervenors would like to call John Morgan.

12             JUDGE PAYNE:  All right.

13

14                      **JOHN B. MORGAN,**

15      called at the instance of the defendant-intervenors,

16       having been first duly sworn, testified as follows:

17             JUDGE PAYNE:  Please.

18             MR. RAILE:  Good morning, Your Honors.

19                  **DIRECT EXAMINATION**

20   BY MR. RAILE:

21   Q    Good morning, Mr. Morgan.

22   A    Good morning.

23   Q    Would you state your full name for the record and

24   spell your last name?

25   A    John Bennett Morgan, M-O-R-G-A-N.

Morgan - Direct

1   Q    What is your occupation, Mr. Morgan?

2   A    I'm a demographer.

3   Q    Can you explain to the Court what that is?

4   A    Yes.  I work with census data, political data.  I

5   work on elections, redistricting, campaigns.  I do

6   analysis and such for campaigns and redistricting.

7   Q    When did you get your start in the area of

8   redistricting?

9   A    In 1991 while I was in college.

10  Q    Where were you in college?

11  A    At the University of Chicago.

12  Q    And what was that redistricting experience during

13  college?

14  A    I worked with the Indiana General Assembly members to

15  craft some plans that were used during that process in

16  Indiana.

17  Q    And how did that experience come about?

18  A    My father was a political consultant, and while I was

19  in college, he was engaged with Indiana.  And so I was

20  able to go down to Indianapolis from Chicago and spend

21  some time redistricting with him.

22  Q    And did you graduate from the University of Chicago?

23  A    Yes, I did.

24  Q    And what was your degree in?

25  A    History.

Morgan – Direct

1  Q    Were you admitted into graduate school?

2  A    I applied to GW, George Washington, for graduate

3  school, and I was accepted, but I declined to go in the

4  fall of 1991.

5  Q    And why did you do that?

6  A    Because I was deeply involved in redistricting, and

7  that's the direction my career took.

8  Q    How many years' experience do you have in

9  redistricting?

10  A    Twenty-five years.

11  Q    And how many redistricting cycles is that?

12  A    I worked in three circles:  1991, 2001 and 2011

13  cycles.

14  Q    And do you have -- how many states, approximately, do

15  you have redistricting experience in?

16  A    I've had redistricting experience in 20 states.

17  Q    And can you just give a few examples?

18  A    Sure.  I've worked in Rhode Island, New York, New

19  Jersey, Pennsylvania, Virginia, North Carolina, South

20  Carolina, Georgia, Florida, Illinois, Ohio, Michigan,

21  Wisconsin, Iowa, Indiana, New Mexico.

22  Q    Sure.  Thank you.  Have you ever drawn a map that was

23  used for actual elections?

24  A    Yes.

25  Q    One or more than one?

Morgan - Direct

1   A      Several.

2   Q      Okay.  And do you have redistricting related

3   experience other than in drawing maps for a proposal to

4   legislative bodies?

5   A      Yes.  I've worked with local jurisdictions, with

6   counties such as Atlantic County, New Jersey.  I've worked

7   in Wake County, North Carolina, with the Wake County

8   School Board districts.  I've drawn county council --

9   county commission districts in Indiana, Muncie, Indiana.

10  Places like that.

11  Q      Do you have redistricting experience in Virginia?

12  A      Yes.

13  Q      Where did you live?

14  A      I live in Northern Virginia.

15  Q      And how long have you lived there?

16  A      Since I was 8 years old.  Since 1978.

17  Q      Have you traveled in Virginia?

18  A      Yes.  I've traveled all over Virginia.  I've been to

19  every county and independent city in Virginia.

20  Q      Do you have political experience in Virginia?

21  A      Yes.  I've worked on campaigns every odd yeared cycle

22  pretty much since 1995, '97 forward.

23  Q      And you mentioned redistricting experience in

24  Virginia.  Can you describe that briefly?

25  A      Sure.  In 2001, I was hired by the leadership of the

Morgan - Direct

1   House of Delegates, including the Speaker of the House, to

2   help draw plans for the Virginia House of Delegates.

3   Q    And what was your role in that redistricting?

4   A    At that time, I worked with the majority leader,

5   who's now in Congress, and I worked with Delegate Jones

6   and the Speaker of the House to draw plans for

7   consideration in the Virginia house.

8   Q    Is that the first time that you met Delegate Jones?

9   A    No.  I met Delegate Jones when he first ran for

10  office in 1997 in Suffolk.

11  Q    And what -- how did you meet him in that -- what was

12  the context of your meeting him?

13  A    Oh, in 1997, he was a first-time candidate, and part

14  of my election work at that time, I was helping first-time

15  candidates.

16  Q    So did you work on his campaign?

17  A    Yes, I worked on his campaign.

18  Q    And what House District was that for?

19  A    District 76.

20  Q    Okay.  What was Delegate Jones' role in the 2001

21  redistricting?

22  A    At the beginning of the process, he was one of the

23  regional leaders.  So he was responsible for drawing the

24  Tidewater area, South Hampton Roads, the peninsula.  And

25  as the process went on, his role expanded.  The Speaker

Morgan - Direct

1    had him work in other areas of the Commonwealth with other

2    delegates, and ultimately, he was chosen to carry the bill

3    in 2001 that became what we now call the benchmark plan.

4    Q    Were there criteria that governed that redistricting

5    effort?

6    A    Yes.

7    Q    Now, we could walk through that, but let me just pick

8    a few highlights so we can move on.  What was the

9    population deviation criterion used in the 2001

10   redistricting cycle?

11   A    In the 2001 redistricting cycle, the population

12   deviation was plus or minus 2 percent for House of

13   Delegates districts.

14   Q    Was that a change from the previous cycle?

15   A    I believe in the 1991 cycle, there was a higher

16   allowed deviation.  It seemed to be that way.

17   Q    Okay.  And what political party was -- had a majority

18   as of the 2001 redistricting?

19   A    In the house, the republican party had a majority in

20   2001 and elected a speaker, Vance Wilkins.

21   Q    And who had the majority in 1991?

22   A    In 1991, the democratic party had the majority.

23   Q    And had that been the case that the democratic party

24   had the majority prior to that?

25   A    Yes.  As far as I know, the democratic party had had

Morgan - Direct

1   the majority in Virginia since reconstruction.  There may

2   have been a period in the 1890s were nondemocrats had a

3   controlling majority of the chambers.

4   Q    Now, there was a criterion in the 2001 redistricting

5   for compliance with the Federal Voting Rights Act.  Am I

6   correct?

7   A    Yes.

8   Q    How many majority black districts were there in the

9   enacted 2001 plan?

10  A    There were 12 majority minority districts -- black

11  districts in 2001.

12  Q    How many were there in the 1991 plan?

13  A    There were also 12 districts.

14  Q    Were they in roughly the same regions of the state or

15  different regions?

16  A    They were in the same regions in the Richmond area

17  and the Tidewater/Hampton Roads area and also in Emporia,

18  in that region.

19  Q    And there were other criteria in the 2001

20  redistricting criteria, correct?

21  A    Yes.

22  Q    And there's a lot of similarities between those and

23  the 2011 criteria.  Is that fair to say?

24  A    Yes.  They are very similar.

25  Q    We'll talk about the 2011 criteria, but I'm just

Morgan - Direct

1   trying to move through this.

2        Were you involved in the 2011 redistricting in

3   Virginia?

4   A    Yes.

5   Q    What was your role?

6   A    I was brought in to work with the majority in the

7   House of Delegates, to work with Chris Jones and his team

8   to draw plans for the House of Delegates.

9   Q    What kind of services did you provide?

10  A    Primarily I would work with map drawing, using the

11  software and, again, working with Chris Jones, who's a

12  delegate, Rob Bell, who's a delegate, and Chris Marston.

13  Q    Were you involved in drawing district lines?

14  A    Yes.

15  Q    And were you -- where were you doing your work?

16  A    I would do my work from Delegate Jones' office, also

17  my own office in Northern Virginia and, frankly, on the

18  road sometimes.  During the redistricting process, I was

19  in many states.

20  Q    Did you ever do work on Delegate Jones' computer?

21  A    Yes, I did.

22  Q    And you also had a computer with the software; is

23  that correct?

24  A    Yes.  I had the Maptitude software on my laptop

25  computer.  Delegate Jones had it on his laptop -- or his

Morgan - Direct

1   desktop computer as well.

2   Q    Who did you understand that you were working for?

3   A    I was working for Delegate Chris Jones.

4   Q    Okay.  And what was his role in the 2011

5   redistricting?

6   A    In 2011, he was really in charge of the whole

7   process.  He was the chairman of the P&E, the Privileges

8   and Elections Committee, and he was tasked to handle the

9   entire redistricting process.

10  Q    Were there criteria governing those efforts?

11  A    Yes.

12  Q    Let's look at those.  Plaintiffs' Exhibit 16.  Do you

13  recognize this document, Mr. Morgan?

14  A    Yes.

15  Q    And what is it?

16  A    This is -- these are the redistricting criteria for

17  use in the 2011 redistricting.

18  Q    And I see the first criterion is population equality;

19  is that correct?

20  A    Yes.

21  Q    What was the population deviation selected in 2011?

22  A    It was plus or minus 1 percent from the ideal

23  population.

24  Q    And that's more restrictive than in -- in 2001; is

25  that correct?

Morgan – Direct

1    A    Yes, that's correct.

2    Q    And there's the second criterion.  It says Voting

3    Rights Act.  Do you see that there?

4    A    Yes.

5    Q    How many majority black districts were there in the

6    enacted 2011 plan?

7    A    There are 12.

8    Q    And in what regions of the state were those

9    districts?

10   A    They were in Richmond, the Tidewater, including the

11   peninsula, and then also in the Emporia/south area.

12   Q    Were there any in Northern Virginia?

13   A    No.

14   Q    Were there any in the Piedmont?

15   A    No.

16   Q    Were there any in the Valley?

17   A    No.

18   Q    Were there any in Southwest Virginia?

19   A    No.

20   Q    Do you agree that the majority black districts are

21   scattered throughout the Commonwealth?

22   A    No.

23   Q    Are many of these districts contiguous with each

24   other?

25   A    Yes, many of them are contiguous with each other.

Morgan - Direct

1   Q    Let's look at the next requirement, contiguity and

2   compactness.  Was -- this is a requirement that districts

3   shall be comprised of contiguous territory, including

4   adjoining insular territory.  Do you see that language

5   there?

6   A    Yes.

7   Q    Was this criterion applied in the 2011 redistricting?

8   A    Yes.

9   Q    Was it negotiated at any point?

10  A    No.

11  Q    Were there any districts that are not contiguous

12  within the definition of this criterion?

13  A    No, no districts are not contiguous.

14  Q    None of the 100 districts are not contiguous; is that

15  correct?

16  A    That's correct.

17  Q    And then it says, "Districts shall be contiguous and

18  compact in accordance with the Constitution of Virginia as

19  interpreted by the Virginia Supreme Court in the cases of

20  Jamerson v. Womack and Wilkins v. West; is that right?

21  A    Yes.

22  Q    Was that criterion, in your view, negotiated at any

23  of the hundred districts in the 2011 redistricting?

24  A    No.

25  Q    And what's your basis for that belief?

Morgan - Direct

1    A    The -- the districts were -- the districts were

2    constitutionally and they were contiguous.

3    Q    Were they as compact at the plans upheld by the

4    Virginia Supreme Court in those two cases?

5    A    Yes, they were.

6    Q    By the compactness scores identified in those two

7    cases?

8    A    Yes.

9    Q    Okay.  Do you -- next criterion, single-member

10   districts.  "All districts shall be single-member

11   districts."  Do you see that?

12   A    Yes.

13   Q    Was this criterion negotiated at any point during the

14   2011 redistricting?

15   A    No.

16   Q    Are there any districts that are not single-member

17   districts?

18   A    There are no districts that are not single-member

19   districts.

20   Q    Okay.  Next criterion, communities of interest.  And

21   we could sit and read through all of that, but let me just

22   ask you, how was this implemented in the 2011

23   redistricting?

24   A    Well, delegates discussed areas of -- you know, these

25   communities of interest, and they were discussed, and the

Morgan – Direct

1   delegates agreed upon the districts and took communities

2   of interest into consideration.

3   Q   Okay.  Now, on the next page we have a priority

4   almost.  "All of the foregoing criteria shall be

5   considered in districting process."  Do you see that

6   there?

7   A   Yes.

8   Q   Were they all considered?

9   A   Yes.

10  Q   "Population equality among the districts and

11  compliance with federal and state constitutional

12  requirements and the Voting Rights Act of 1965 shall be

13  given priority in the event of conflict among the

14  criteria."  Do you see that there?

15  A   Yes.

16  Q   In your view, was there ever -- let me strike that.

17  Are you aware of a situation where you believed that the

18  other criteria we just read through came into conflict

19  with the Voting Rights Act of 1965?

20  A   Not in my understanding.

21  Q   Okay.  And we'll talk about districts in the few

22  minutes here, but we can move on from this.  Now, we

23  mentioned the plus or minus 1 percent population

24  deviation.  Do you recall that?

25  A   Yes.

Morgan - Direct

1   Q     Were there challenges to implementing that?

2   A     Yes.  The plus or minus 1 percent deviation was lower

3   than the 2001 allowable deviation, and that made for some

4   more difficult rectification of the population between

5   districts.

6   Q     And was the state malapportioned going into the 2011

7   cycle?

8   A     Yes.  The districts from 2001, by the end of the

9   decade, were definitely out of population alignment around

10  the state.

11  Q     And where was the growth concentrated?

12  A     The growth was in Northern Virginia, in Loudoun

13  County, Prince William, Stafford.

14  Q     So what did you do to -- what was the global strategy

15  for resolving this problem?

16  A     Well, the other side of the equation -- you asked

17  about the growth -- was that there's relative population

18  loss in other areas of the state, in southwest, in south

19  side and in Hampton Roads.  There's relative population

20  loss.

21        So what ended up happening was three districts were

22  moved.  There were two that were moved from

23  southwest/south side and one was moved from Hampton Roads,

24  and those districts were moved to Northern Virginia.  And

25  that's how that was rectified.

Morgan - Direct

1   Q    Why did you choose to move districts in their

2   entirety across the state as opposed to some other way of

3   resolving the problem?

4   A    Well, in this case, by removing a district, it will

5   often allow surrounding districts to retain their cores

6   and there would be a larger portion of their existing

7   districts that are carried forward rather than just

8   letting the district population -- one district just added

9   to the next, to the next.  And as you go through a region,

10  you end up taking away a seat.  But in this way, you take

11  a single seat away and it allows their other seats to

12  retain their cores better.

13  Q    So you're absorbing that shock in a few districts to

14  avoid spreading it out further?

15  A    Essentially that's correct.

16  Q    Let's look at an example, which I believe the Court

17  has seen before, but we're going to talk about it in a

18  little more detail.  Intervenors' Exhibit 91 at -- I

19  believe it's 19 and 20.  We have -- I believe it's Map

20  Book 2 that has a nice before and after shot, which I find

21  very useful myself.

22        THE WITNESS:  Thank you.

23  A    Which page are you looking at?

24  Q    It may be 20 and 21.  We may be one off.

25        JUDGE PAYNE:  You said 19, but now you're saying

Morgan – Direct

1  something else.  I'm sorry.  I was turned around and

2  didn't hear you.

3          MR. RAILE:  No.  You're correct, Your Honor.  I

4  was actually right the first time.  It's 19 and 20.

5          JUDGE PAYNE:  Nineteen and 20?

6          MR. RAILE:  Yes, Your Honor.

7  Q    And what is depicted in these two images in 19 and

8  20?

9  A    The first image is a -- it shows the District 10 from

10  what we call the benchmark district plan, the 2001

11  redistricting.  And then the second image is District 10

12  in House Bill 5005, the 2011 redistricting.

13  Q    All right.

14          MR. RAILE:  So turn the screen to page 19.

15  Q    Is this -- where I'm pointing -- south of the border,

16  North Carolina?

17  A    Yes.

18  Q    All right.

19          MR. RAILE:  Flip to page 20.

20  Q    Is this -- where I'm pointing by the word Charles

21  Town -- is that West Virginia?

22  A    Yes, it is.

23  Q    It's a bit of a hike between the two districts?

24  A    Yes.  It's about a five-hour drive.

25  Q    Are there split VTDs in this district?

Morgan – Direct

1   A      Yes.  In District 10 in the enacted plan, yes.

2   Q      How many?

3   A      Just a moment.

4   Q      And, Mr. Morgan, I see you're pointing in your book.

5   Could you point on the screen so we can see?

6   A      Sure.  Let me count them.  There's one over here

7   between District 32 and District 10.  There's a split

8   voting district between 87 and 10.  There's a split voting

9   district between 33 and 10.  Another one in Clarke County

10  between 33 and 10.  And there's one split between 29 and

11  10.  So one, two, three, four, five is what I see.

12  Q      So you moved this district across the state and then

13  split five VTDs in this district; is that correct?

14  A      That's correct.

15  Q      Why so many?

16  A      Well, what I'm pointing out when I recited those was

17  that there's one split between each of the districts and

18  then there's an additional split in District 33.  So

19  there's splits to equalize the population between District

20  10 and the other districts.

21  Q      Okay.  Are there split VTDs throughout the entire

22  plan?

23  A      Yes.

24  Q      Do you know approximately how many?

25  A      A little over a hundred.

Morgan - Direct

1   Q     All right.

2   A     Maybe 115.  I don't know off the top of my head.

3   Q     Okay.  That's fair enough.  So you say there's a

4   split between this district and each -- and several

5   surrounding districts; is that right?

6   A     Yes.

7   Q     Why is that significant?

8   A     Well, it's significant because the population was

9   rectified between these districts by splitting the VTDs.

10  Q     And when you're doing that, are you just looking at

11  10?

12  A     No.  I'm looking at the other districts so that it's

13  not just the population of 10 that's equalized.  It's the

14  other districts that are rectified or equalized between --

15  by doing these splits.

16  Q     So in the split between 10 and 87, the population

17  equality issue that you may be rectifying could be in 87

18  or it could be in 10 or it could be in both?

19  A     Yes.  That's correct.

20  Q     Okay.  And so if I'm going to resolve a population

21  deviation problem with -- where 87's population is a

22  problem, then it would have to be contiguous with 87; is

23  that right?

24  A     Yes.  That's correct.  So for 87, if there's a

25  population imbalance, then the -- the VTD that would be

Morgan - Direct

 1  split would have to be contiguous with 87.

 2  Q    Okay.  And what factors, then, do you use to

 3  determine, from that starting point, where along a

 4  district boundary to do the split?

 5  A    There can be many factors that determine where the

 6  split is made.  Ultimately, when the split is made, it's

 7  split along census block lines.

 8  Q    And when it's split along census block lines, why

 9  does that matter?

10  A    Because the shape of the census blocks determine what

11  the boundary of the split in the voting district would be.

12  So the underlying census blocks that are the building

13  blocks below the level of voting districts determine what

14  the shape of the split would be.

15  Q    Do all census blocks have the same number of people?

16  A    No.

17  Q    How does that factor into the split of a VTD?

18  A    Well, each census block will have some population

19  that is counted in that census block.  In some cases,

20  there will be a census block with zero population, but

21  that's recorded as zero population.  So every census block

22  will have a population value, and, you know, ultimately,

23  those census block populations are added up, and they are

24  either in one district or the other district.

25  Q    And so do you have to find a place where those blocks

Morgan - Direct

1  work out to equalize the population on both sides to end

2  up drawing that line there?

3  A    Yes.  The population would have to work out.  You

4  could consider them a little bit like Lego blocks.  They

5  are different shapes and sizes, and there's, you know,

6  different population values.  But ultimately, those pieces

7  have to come together, and, again, the population is

8  either on one side or the other of the district.

9  Q    Sort of playing with Legos to identify where they are

10 going to fit out to make that equality work out; is that

11 right?

12 A    Yes.  That's one way of looking at it.

13 Q    Did you make a demonstrative for the Court to

14 illustrate this issue?

15 A    Yes, I did.

16 Q    Did you make one on this district here, District 10?

17 A    Yes, I did.

18 Q    Can we look at that?

19 A    Okay.

20       MR. HAMILTON:  Objection, Your Honor.  Before we

21 play this, this was not produced in discovery.  We were

22 handed it on the first day of trial on a flash drive.

23 I've never seen it before in discovery, and we never had

24 an opportunity to examine this witness on it.

25       MR. RAILE:  Your Honor, this --

Morgan - Direct

1          JUDGE PAYNE:  The rule on demonstratives is they

2   don't have to be produced in discovery.

3          MR. HAMILTON:  It's not a proper

4   demonstrative --

5          JUDGE PAYNE:  Well, then it --

6          MR. HAMILTON:  -- Your Honor.  It's a videotape.

7          JUDGE PAYNE:  Well, I don't know what it is yet.

8   What is -- tell me what it is and let's see.

9          MR. RAILE:  This is a -- a screenshot playing of

10  this VTD being assigned the blocks between these two

11  districts.  I believe it's 29 and 10.  All of that data

12  and information is in -- in the record where that line is,

13  and it's just showing the blocks being assigned.

14     And I would add, I would offer --

15          JUDGE PAYNE:  A screenshot is not a videotape.

16  He says it's a videotape.

17          MR. RAILE:  It's a moving screenshot.

18          JUDGE PAYNE:  You mean as if you were drawing a

19  cartoon?

20          MR. RAILE:  Correct.  I think I understand Your

21  Honor correctly.  And so --

22          JUDGE PAYNE:  Yeah.  That's old technology.

23  Sorry.

24     All right.  Let me -- let us see what it is first

25  because I don't -- I don't understand it.

Morgan - Direct

1          MR. RAILE:  This is the --

2          JUDGE PAYNE:  Play it -- start it playing, or

3   whatever you do, so we can get some notion of what it is.

4   Don't talk about it, Dr. Morgan.  We just want to see what

5   it is.

6          MR. RAILE:  Yes, Your Honor.  It takes a little

7   bit to get moving.  This isn't the most exciting film

8   you're ever going to watch.

9          JUDGE PAYNE:  And there's narrative to go with

10  this?  Is that what you're saying?

11         MR. RAILE:  Well, that will come from our

12  witness.

13         JUDGE PAYNE:  I understand that, but he's going

14  to talk about it?

15         MR. RAILE:  Yes, Your Honor.

16         JUDGE PAYNE:  Okay.  Do you understand what it

17  is now?  All right.  So what else?  I see what -- we see

18  what it is now.  And why is it an improper demonstrative

19  exhibit in this world?

20         MR. HAMILTON:  This is -- this is one of two or

21  three of these that we're going to see.  This one doesn't

22  involve a challenged district.  It's got all these

23  political values on the side.  Maptitude has a lot of data

24  on it.  You can see the districts selected across the top

25  of the screen.  You can see political data listed on the

Morgan - Direct

1   side of the screen.  If they were going to use an exhibit

2   by this, it's being offered as substantive exhibit.  This

3   is -- especially when we get to the ones that they're

4   going to offer with respect to the challenged districts,

5   we haven't had an opportunity to examine Mr. Morgan.

6       We had -- we took a deposition of Mr. Morgan, and we

7   had a bunch of materials that were produced.  This was not

8   in there.  So we don't have an opportunity to say, well,

9   wait a minute.  You know, you changed this filter there or

10  you changed that filter and how would that change things

11  because we never had an opportunity to examine him at the

12  time.

13          JUDGE PAYNE:  What does the pretrial order or

14  the pretrial protocol say about the exchange of

15  demonstrative exhibits?  Was there something in the order

16  that said that, when that was to be done?

17          MR. HAMILTON:  It was to be done in advance of

18  trial.  And so the parties agreed that we would exchange

19  demonstrative exhibits on the first day of trial before

20  the trial began, and we did.

21          JUDGE PAYNE:  All right.  So you agreed to this?

22          MR. RAILE:  Yes, Your Honor.

23          MR. HAMILTON:  We agreed to the change of

24  demonstrative exhibits.  We didn't agree to this exhibit.

25  We hadn't seen it before, Your Honor.

Morgan – Direct

1          JUDGE PAYNE:  Well, I understand that, but you

2   hadn't seen any of the other demonstrative exhibits that

3   they did either.

4          MR. HAMILTON:  That's correct, Your Honor.  And,

5   of course, we didn't object to them either.

6       You'll recall at the beginning of the 2015 trial

7   there was a big blowup.  I tried to use it in opening

8   statement.  Mr. Braden objected.  You said, well, he

9   objected so you can't use it.  So we put it down.

10          JUDGE PAYNE:  I ruled on that basis?  I mean,

11  that's really not a good reason; just he objected.

12          MR. HAMILTON:  I would never criticize, Your

13  Honor, for his reasoning for --

14          JUDGE PAYNE:  Here's -- I think the bottom line

15  is it doesn't have to be produced in discovery under the

16  pretrial orders that we entered in the case.  It had to be

17  produced on the first day of trial as a demonstrative, and

18  it was produced.  And so you all have agreed to that

19  schedule.  I think you're bound by it and the consequences

20  that come with it.

21          MR. HAMILTON:  Well, I would -- I completely

22  agree with that, Your Honor, if it's a proper

23  demonstrative.  I don't think this is being offered as a

24  demonstrative.  This is substantive evidence.  This is an

25  example of a document being offered for substantive

Morgan - Direct

1  purposes and being labeled as an illustrative exhibit.

2  It's not.

3          JUDGE PAYNE:  Well, he hasn't offered it yet.

4  So it's to aid this man's testimony, and I think the

5  objection is overruled.

6          MR. HAMILTON:  Thank you, Your Honor.

7          JUDGE PAYNE:  And if he offers it as a

8  substantive exhibit, you'll have a different issue

9  entirely.  And you have your objection if he does that.

10          MR. HAMILTON:  Thank you.

11          JUDGE PAYNE:  All right.  Go ahead.

12          MR. RAILE:  Can we roll the tape back?

13          JUDGE PAYNE:  Huh?

14          MR. RAILE:  Sorry.  I'm talking to -- my

15  apologies, Your Honor.

16  Q    All right.  Before we begin, can you just describe to

17  the Court what is this that's in front of them?

18  A    This is a view of the Maptitude software, and there's

19  different parts to this view.  This -- at the very top

20  there's a summary of all the districts in the plan.  And

21  I'm just going to -- if I can mark on this, I'll just

22  point where that is.

23          So at the top of the page, that is the summary of

24  information about each district.  And there's a list, and

25  I'm going to point over on the right side, you can scroll

Morgan - Direct

1   down this list to see the values for any district.  And

2   then the window where you see the map shows the map.  And

3   in this case, it's zoomed in on the area surrounding

4   District 10 in the enacted plan.  And there's just a

5   couple more pieces to describe of this.

6        Over here is a toolbox for redistricting, and what

7   this shows is how the process is done of assigning

8   geography from one district to another or if it's -- when

9   you begin a plan, you may begin with unassigned territory.

10  And then there's another toolbox that has to do more with

11  the zooming around of the -- of the map window.  And then

12  the last box here on the left side is the pending changes.

13  So you would consider this as a "what if."  So when you

14  see, in a moment, if you select geography to put from one

15  district to another, the software calculates the effect of

16  that change before you actually affirmatively click it in

17  and say make this change.  So you can see what the

18  proposed change would be and what its effect would be in

19  drawing the plan.  So those are the different parts of

20  this display.

21  Q    Okay.  Now, before we play it, I see that we're

22  looking at a similar part of the state where District 10

23  is; is that right?

24  A    Yes.

25  Q    In fact, there's District 10 in yellow; is that

Morgan - Direct

1  right?

2  A    Yes.  District 10 is in yellow, and then the outlines

3  in green show the localities, the counties and independent

4  cities.  And the blue lines in this display show the

5  boundaries of the voting districts.  And then the -- the

6  district boundaries are shown with the color theme.

7  Q    And I notice that House District 10 is mostly in its

8  final form.  Am I right?

9  A    Yes.  In this case, District 10 is in its final form

10 in the enacted plan with one exception.  On the western

11 edge of the district in Frederick County, near the city of

12 Winchester, there is one voting district, Parkins Mill

13 that is entirely assigned to District 10.  And as a result

14 of that, if you look below the number 10, you'll see that

15 the number below that is 1870.  That's the deviation over

16 the ideal.  So at this time District 10 is over the ideal

17 population by 1870 people, and then that expressed as a

18 percentage is 2.34 percent.  So that's the deviation at

19 this time is plus 2.3 percent, which in this case, is over

20 the allowable plus or minus 1 percent.  Here it's on the

21 high side.

22     And then the other district, District 29 -- and the

23 label reflects that the district label 29 is the district.

24 Below that is the population deviation.  So it's negative

25 1422 people, and then that as a percentage is negative

Morgan – Direct

1   1.78 percent.

2   Q    Now, the district is mostly in its final form.  And

3   when do VTD splits typically occur in the process?

4   A    In my experience here in Virginia, the splitting of

5   VTDs would occur later in the process.  A lot of drafts

6   and possibilities were explored and the VTDs, the voting

7   district splits, were usually done later in the process.

8   Q    So, obviously --

9             JUDGE PAYNE:  Later after what is done?

10            THE WITNESS:  After the general -- Your Honor,

11   after the general district boundaries are worked on,

12   perhaps at the voting district level or at the county

13   level, there's a general composition of the district.  And

14   it might be, at one time, outside of the population

15   deviation.  So in this case, the splitting of voting

16   districts at the census block level rectifies the

17   population.

18   Q    So by this point, have most of the major decisions

19   about this district and the surrounding districts already

20   been made?

21   A    Yes.

22   Q    And so we don't have a time machine.  We can't go

23   back and watch you draw in 2011, but is this scenario

24   where the district is mostly complete, the surrounding

25   districts are mostly complete realistic as to what you

Morgan - Direct

1  were doing then?

2  A    Yes.

3  Q    Okay.  Let's push play and watch what happens.

4  A    Do you want me to speak?  I'm sorry.  Do you want me

5  to speak while this is playing?

6  Q    What's going on here?  Let me ask you.

7  A    Sure.  In this case I'm zooming in to District 10 and

8  looking around the district boundary.  And then I'll move

9  over towards District 29.  And on the redistricting

10  toolbox, I'm selecting the district target as 29, meaning

11  that the population that I'll be selecting will ultimately

12  be going into District 29, and that's the box over here

13  where I mark a dot.

14       And then just to be clear, that I'm only going to be

15  taking population from District 10.

16  Q    Can you show us where the whole -- can we pause it

17  for a second?  Can you show us where the --

18  A    Please hold, if you would hold here for one moment.

19  Q    Okay.  What do you see here?

20  A    I just wanted to point out that at this point I've

21  selected this layer block, which allows me to bring in

22  another layer.  So I'm going to add in the census block

23  layer, and that will come up next.

24  Q    So at this moment we do not see census blocks on the

25  screen, and you're about to change that; is that correct?

Morgan - Direct

1   A    Yes.

2   Q    So let's play it and watch.  So what just happened?

3   A    Those are the census blocks that are underlying the

4   voting districts.  Those are the shapes of the census

5   block, and there's a value on them, and that's the

6   population -- total population of that census block.  And

7   I'm selecting those portions --

8   Q    Well, let's pause right here because I do have a

9   question to ask you.  What's the VTD -- is this a whole

10  VTD or what are we looking at?

11  A    The VTD Parkins Mill is here and continues on into

12  District 10.  So Parkins Mill is that entire section.  And

13  what I'm doing here is I'm selecting these census blocks

14  to assign them from 10 here to District 29, and at this

15  time they're not actually assigned.

16       So what's happening is this change box is showing me

17  that if you were to put that -- this portion of that

18  voting district, just that portion, into District 29, the

19  population and other information is here in this box.  And

20  it shows you that the new District 29 would have the

21  characteristics that are listed here on the side --

22  Q    Well, let me cut you off one second.

23  A    -- and the old District 10 would have those

24  characteristics.

25  Q    I apologize.  I just want to move through this.  I

Morgan - Direct

1    want to address one other thing before we get to the

2    change box.  This highlighted thing here, block'ish thing?

3             JUDGE PAYNE:  The highlighted thing is in

4    orange, for the record.

5             MR. RAILE:  Yes, Your Honor.

6    Q    What is that?

7             MR. HAMILTON:  Your Honor, if this is an

8    illustrative exhibit, I don't think it's in the record.

9             JUDGE PAYNE:  I thought you wanted it in the

10   record so you could see if we erred in letting it in.  I'm

11   sorry.

12            MR. HAMILTON:  No, I don't.  I don't intend --

13            JUDGE PAYNE:  I mean, okay.  If you're not going

14   to raise it on appeal, okay.

15            MR. HAMILTON:  Well, no, I'm not saying that,

16   Your Honor.  I'm saying if he hasn't offered it as an

17   exhibit, I don't want it --

18            JUDGE PAYNE:  I understand that.  But you put

19   things in the record as rejected exhibits and they are put

20   in in that way; for example, to preserve objections.  You

21   can do the same thing with the caveat that it's something

22   that can't be considered as a piece of evidence if you

23   want it in to preserve your objection.  If you don't want

24   to, forget it.  It's okay with me.

25            MR. HAMILTON:  Thank you, Your Honor.

Morgan - Direct

 1      JUDGE PAYNE:  Okay.

 2  Q    Okay.  This highlighted block in orange that has the

 3  number 15 in the middle, what is that?

 4  A    That is a single census block.

 5  Q    And this yellow highlighted thing below it that I'm

 6  drawing around right there that has the number 150 in the

 7  middle, what is that?

 8  A    That's another census block that's currently assigned

 9  to District 10, and it's not been selected for movement

10  yet.

11  Q    Okay.  And what does the number 15 mean?

12  A    That's the population of that census block.

13  Q    There was 15 people in that census block, according

14  to the 2010 census, correct?

15  A    Yes.

16  Q    And this block says 150.  What does that number mean?

17  A    That's the population of that census block.

18  Q    Okay.  So more people live in the 150 block than in

19  the 15 block; is that right?

20  A    Yes.

21  Q    Okay.  Could I --

22      JUDGE KEENAN:  Excuse me, counsel.  Could you

23  clarify for the record whether this is voting age

24  population or just simply residents of all ages?

25      MR. RAILE:  I'll let the witness answer that.

Morgan - Direct

1          THE WITNESS:  Yes, Your Honor.  This is total

2     population, and that is the variable that we would be

3     equalizing with the plus or minus 1 percent.

4     Q    Could I split this VTD like this where I'm drawing my

5     line?

6     A    It would not follow the census block boundaries, and

7     you really could not do that in the software.

8     Q    Okay.

9          JUDGE PAYNE:  When splitting it in the software,

10    you have to follow census block boundaries.  Is that what

11    you're saying?

12    Q    Is that correct?

13          THE WITNESS:  Yes, Your Honor.

14    Q    All right.  Let's keep playing and watch as more get

15    highlighted.  And what's going on here, Mr. Morgan?

16    A    More census blocks are selected for transfer from

17    District 10 to District 29.  As this is happening on the

18    change box, the numbers update as these selections are

19    made.

20          MR. RAILE:  Let's pause --

21          JUDGE PAYNE:  The purpose of this anticipated

22    transfer is population equalization?

23          THE WITNESS:  Yes, Your Honor.

24    Q    And what is the first item in this change box,

25    TOTPOP?

Morgan – Direct

1   A    Over here in the change box, this TOTPOP is the total

2   population of the district.  And there's a value for

3   District 29, 79,504.  And this is the -- the newly

4   updated, which hasn't happened yet, this would be the

5   district population for 29.  Next to it is the district

6   population for District 10, 80,964.

7   Q    And what's in the next line?

8   A    The next line shows you how much population is being

9   transferred.  It says Change in Total Population.  And so

10  it shows that 916 people are moved from District 29 --

11  yeah, from District 10, rather, to District 29.  So the

12  value is positive to District 29 and negative to District

13  10.  So it's the exchange of that many people.

14  Q    At this point in time are the districts -- are the

15  equal population problems in the district rectified?

16  A    No.  Because the next two -- the next two rows show

17  you the deviation of the proposed new district and the

18  deviation is negative 506, 506 in 29, but it's 954 on the

19  positive side for District 10.  And immediately below

20  that, it shows that it would be a negative .63 for 29,

21  which is within the population allowance.  But District 10

22  is not.  It's 1.19 percent overpopulated.  So more

23  population would need to be transferred in order to have

24  both districts within plus or minus 1 percent.

25  Q    So you're going to have to keep going to accomplish

Morgan - Direct

1   your goal, right?

2   A    Yes.  I will have to continue to add census blocks

3   and their populations to allow these districts to be

4   within plus or minus 1 percent.

5   Q    And will that determine, in part, where the final

6   line ends up?

7   A    Yes.  The shape and the geography of the census

8   blocks and the populations, in combination, determine

9   where the final line is.

10  Q    Now, this census block here that I'm pointing to with

11  the number 146, could you have chosen that?

12  A    In this case, no, because it's already in District

13  29.  So trying to add that to a -- to the district

14  wouldn't work because it's already in the district.

15  Q    Okay.  And there are a few lines here, here, here,

16  here, here.  G05L_RV and similar wording in the following

17  lines.  What are those?

18  A    Okay.  So in the change box, there's political data

19  in this area.  So the information there, G05L_RV is the

20  general election 05, 2005, L for Lieutenant Governor,

21  underscore, RV for the republican vote.  So this is the

22  republican vote estimated in that district -- or that new

23  district for Lieutenant Governor 2005.  And then down

24  below that, it says change in the republican vote in

25  that -- that section.  So effectively, it would be

Morgan - Direct

1   transferring 96 republican votes.

2        And then below that is the D vote, Lieutenant

3   Governor 05, this is Bill Bolling was the republican

4   candidate, and I believe Leslie Byrne was the democratic

5   candidate in 2005.  And so that's her vote is 6921, and

6   then the change in her vote it would be 51.  And then this

7   also shows the percentages.  So the democratic percent for

8   Lieutenant Governor is 40 percent in District 29.

9   Q    And are those numbers very similar to what you would

10  see in redistricting in all the districts in 2011?

11  A    Yes.

12  Q    Are those numbers that you took account of in drawing

13  districts in 2011?

14  A    Yes.  The political data here is -- was also in the

15  2011 redistricting software.

16  Q    Now, a few minutes ago I thought I heard you use the

17  word estimate.  What did you mean by that?

18  A    The political data is brought into the Maptitude

19  software, and the political data ranged from 2001 through

20  2010.  During that process, what we referred to as the

21  VTDs, the voting districts, may have changed so that the

22  2001 precincts are not precisely the same as the 2005,

23  2007 or 2009 precincts.

24       So an effort is made to take the precinct level data

25  and de-allocate it, or assign it to the block level, and

Morgan - Direct

1  then that block level data is available for this

2  redistricting software.

3          JUDGE PAYNE:  Block level meaning census block

4  level?

5          THE WITNESS:  Yes, Your Honor.

6  Q    So the Census Bureau doesn't report the political

7  performance data from the census block level, correct?

8  A    That's correct.

9  Q    And the way that you bring it to the census block

10  level is by deaggregating it; is that correct?

11  A    Yes.  And as I pointed out in the statement I just

12  made, the voting precincts, the voting districts are not

13  consistent for every election.  So in 2001 there may have

14  been -- there may have been, say, 20 voting districts in

15  Frederick County, but in 2009 there might be 23 voting

16  districts.  And the data for those elections are reported

17  in the new voting district boundaries.  But over the

18  decade for this redistricting software, all of that

19  information is brought into the same database.

20  Q    Now, even though it's an estimate, that number

21  appears on your screen when you're drawing as a change; is

22  that right?

23  A    Yes.

24  Q    And that's the number you're looking at in drawing

25  the districts, right?

Morgan - Direct

1    A     Yes.

2              JUDGE PAYNE:  What is that number --

3              MR. RAILE:  The political --

4              JUDGE PAYNE:  I'm asking him.

5              THE WITNESS:  Yes.  At this time we're

6    discussing the estimated political data in the portion of

7    the voting district that is going to be put into District

8    29.  And, again, the change box shows what the new

9    District 29 would look like and what the new proposed

10   District 10 would look like with that political data

11   change.

12             JUDGE PAYNE:  So in drawing VTD splits, you are

13   considering political data as you've -- the political data

14   that you just described; is that correct?

15             THE WITNESS:  Yes, Your Honor.  That data is

16   available in the software.

17             JUDGE PAYNE:  Is it considered?

18             THE WITNESS:  Yes.

19   Q     Let me ask a follow-up question.  In most split VTDs,

20   are you doing it for political reasons?

21   A     Usually that's not the case.

22   Q     Why is that?

23   A     Because at this level it's usually for population

24   equality purposes to equal out the districts.

25   Q     Are these numbers large or small that we're talking

Morgan - Direct

1    about here?

2    A    In most cases, they are small numbers of population

3    and small numbers of political data.

4    Q    So it factors in to the political performance of the

5    entire district; is that right?

6    A    Yes.  The political performance of the entire

7    district has to take into account these splits in order

8    for a value to be calculated for the entire district.

9         So, for example, in this case, there are VTD splits

10   and there is political data reported in the software and

11   the Department of Legislative Services also reported

12   political data as a summary when they did their reports on

13   the plans that were proposed during the redistricting

14   process in Virginia.

15   Q    But as to most specific splits, are the numbers large

16   enough to impact the political performance of a district

17   in a meaningful way?

18   A    Usually there would not be enough -- a lot of numbers

19   that would be moved around.  There are some large voting

20   districts, and if one were to take most of that voting

21   district in, say, you know, a large number, then it might

22   affect the political performance.  And that's how I would

23   answer that.

24   Q    So sometimes yes, but typically no?

25   A    Typically no.

Morgan – Direct

1   Q    Okay.  What's this line here, TOTVAP?

2   A    TOTVAP is the total voting age population in the

3   proposed District 29 and the proposed District 10 in the

4   change box.

5   Q    I think this goes to Judge Keenan's question a few

6   moments ago.  You have total age population available in

7   that box; is that right?

8   A    Yes.

9   Q    So that's where it appears.  What's this one BLKVAP?

10  A    That and the one above it, the BLKVAP is an

11  abbreviation for black voting age population.  And the one

12  above it is the change in total voting age population, and

13  below it is the change in the total black voting age

14  population.  And, again, this is referring to the portion

15  of the voting district that would be moved into District

16  29 from District 10.

17  Q    Do you see down here there's one that says DOJBLKVAP?

18  Do you see that there?

19  A    Yes.

20  Q    What is that.

21  A    That is the abbreviation for Department of Justice

22  black voting age population.

23  Q    You have two different calculations on your screen?

24  A    Yes.

25  Q    Are these the two different calculations you had on

Morgan - Direct

1   your screen in 2011?

2   A    Yes.  They were available from the Census Bureau.

3   Q    Do you know the difference between the two?

4   A    The black voting age population, as I understand it,

5   is black voting age population.  And then the DOJ black

6   voting age population is a combination of non-Hispanic

7   black voting age, in combination with blacks of other --

8   black and white or other races.

9   Q    Are you aware that the Virginia Division of

10  Legislative Services has a method of calculating black

11  voting age population?

12  A    Yes.

13  Q    Is that on the screen here?

14  A    No, it's not on the screen here.

15  Q    Was it on the screen in 2011 when you were drawing?

16  A    No.

17  Q    Is it anywhere in that software program?

18  A    No.

19  Q    Okay.

20       MR. RAILE:  Let's keep playing the video.

21  Q    What are we going to see next here?

22  A    Selecting more blocks, census blocks for transfer

23  from 10 to 29.

24  Q    It looks like you're zooming in there; is that right?

25  A    Yes.

Morgan - Direct

1  Q    So you just clicked one that's 15?

2  A    Yes.

3  Q    And the one next to it here is 202?

4  A    Yes.

5        JUDGE PAYNE:  Are you talking about the number

6  of the census block or are you talking about the number of

7  the votes in the census block?

8        THE WITNESS:  Your Honor, it's the population in

9  that census block.

10        JUDGE PAYNE:  Population.

11  Q    So when you click on this block, you get 15?

12  A    That's correct, 15 people.

13  Q    You click on this one, you get 202?

14  A    Correct.

15  Q    And you have to take that into account when you're

16  choosing where to go?

17  A    Yes.  That's correct.

18  Q    So you just clicked one that said 8; is that right?

19  A    Yes.

20  Q    And where are we on the deviation now?

21  A    The deviation on District 10 is positive 1.2 --

22  1.02 percent, 820 people.  And as we click in that 202

23  census block, it will be 202 people less in District 10.

24  Q    Okay.  So that will bring us to equality; is that

25  right?

Morgan - Direct

1   A     Yes.  That's correct.

2   Q     And you have a zero here and a zero here that I'm

3   pointing at?

4   A     Yes.  This is near the Interstate 81 interchange,

5   just south of the city of Winchester.

6   Q     This demonstrative is almost finished, but we're at

7   population equality.  So are you going to stop here?

8   A     In this case, as far as in the enacted plan, the

9   voting district split continued down along I-81 to the

10  border with another voting district, and that's where it

11  was stopped.

12  Q     Why did you do that?

13  A     It -- it just made sense to bring it down to the

14  voting district.  It doesn't affect a lot of people.  It

15  divides along the I-81.

16  Q     So you pick a road that you think makes sense and

17  looks esthetically pleasing to you; is that correct?

18  A     Where it's option -- where there's an option to do

19  that, yes.

20  Q     Okay.  Where might there not be an option to do that?

21  A     If these districts were both at the absolute extremes

22  of the population, there not be an option to further

23  rectify the population.  For example, if both were at

24  negative 800 and they were balanced at 800, that's at the

25  extreme of negative 1 percent.  There really wouldn't be a

Morgan - Direct

1   way to add additional population between them.  They have

2   to stay basically where they are or --

3   Q    The numbers --

4   A    Pardon me.  If there were a block that would change

5   that result is what I'm saying.

6   Q    And right.  And here we have three people and six

7   people?

8   A    Correct.

9   Q    So these are big geographic areas that have very few

10  people, right?

11  A    That's correct.

12  Q    And so this is something you can do fairly easily; is

13  that right?

14  A    Yes.

15  Q    And you just do it because it looks nice to you?

16  A    Yes.

17  Q    Did you discuss this VTD split with Delegate Chris

18  Jones?

19  A    No.

20  Q    Did you discuss many VTD splits with Delegate Chris

21  Jones?

22  A    Not many.

23  Q    Why not?

24  A    In most cases, he asked me to equalize the

25  population.  He would have the general framework of a

Morgan - Direct

 1  district, and he would say, you know, bring this up to

 2  population.

 3  Q    So that move where we saw you pick a 3 person census

 4  block and a 6 person census block, that's something that

 5  you can do on your own without authorization?

 6  A    Well, yes.  But I would clarify that I -- Chris Jones

 7  would have access to all of this.  In some cases, I would

 8  be making the changes on his computer.  So he would see

 9  the results of this work.

10  Q    Right.  So he could come in and say, I don't like the

11  way that looks, and do something different?

12  A    That's correct.

13  Q    Okay.  Are there VTD splits in the challenged

14  districts?

15  A    Yes.

16  Q    Did you use a different VTD split process in those

17  districts than the one we just saw?

18  A    No.

19  Q    Do you have a demonstrative of a split in a

20  challenged district to illustrate that?

21  A    Yes.

22           MR. HAMILTON:  Same objection, Your Honor.

23           JUDGE PAYNE:  Same ruling.

24  Q    So we have the second demonstrative up here, and I'll

25  represent --

Morgan - Direct

1    JUDGE PAYNE: Do you want to flush out your

2  objection a little bit more now that we're talking about

3  the challenged districts?

4    MR. HAMILTON: Yeah. Again, this is being

5  offered. This is not a proper illustrative exhibit. The

6  last one was simply an effort to show how it is that the

7  map works, and I can understand how that can be offered

8  for nonsubstantive purposes. He's just simply explaining

9  how it is that one uses Maptitude.

10    Now we're talking about what actually happened, but

11  this isn't what actually happened. This is like showing a

12  cartoon trying to reconstruct something in the past.

13  Mr. Morgan could have been offered as an expert. He's

14  testified before this court, you'll recall, Your Honor, in

15  the Page case as an expert, but he wasn't here. And he's

16  not an expert, at least not the purposes of his testimony.

17  So --

18    JUDGE PAYNE: So what is the objection? That's

19  still what I'm trying to get a handle on.

20    MR. HAMILTON: The objection is it's an

21  undisclosed substantive document that was never produced

22  in discovery. We never had an opportunity to examine

23  Mr. Morgan on what this is -- about what we're about to

24  hear in order to allow us to test his testimony. Instead,

25  it was, you know, marked as an illustrative exhibit and

Morgan - Direct

1  identified at the last minute at the beginning of trial.

2          JUDGE PAYNE:  But that's what you all agreed to.

3          MR. HAMILTON:  Well, we --

4          JUDGE PAYNE:  Wait a minute.  So your point is

5  that it's not really a demonstrative exhibit?  That's the

6  objection.

7          MR. HAMILTON:  That's the objection.

8          JUDGE PAYNE:  What do you have to say to that

9  now that we've got the issue crystalized?

10         MR. RAILE:  Your Honor, there's no way we can go

11 back in time and record Mr. Morgan drawing the VTDs.  He's

12 going to have to say -- and there's no way that anyone can

13 conceivably remember every single VTD split and why this

14 zigs there and that zags there.  This is a good way to say

15 this is generally how it's done.

16         JUDGE PAYNE:  Well, he told us that.

17         MR. RAILE:  The Court is capable of

18 understanding that we are not watching John Morgan split

19 this VTD in 2011.  That is not happening.  What we're

20 watching is that is how this is done.  This is the

21 considerations --

22         JUDGE PAYNE:  What are you offering it for?  We

23 know -- I think we all understand you're not trying to

24 replicate exactly what he did.  Why are you now going

25 district by district?

Morgan – Direct

1          MR. RAILE:  We are not going to do all of this.

2    I just want to show a -- in 10, this is a district where

3    no one is conceivably contending that race is a factor in

4    those VTD splits.  He is going to testify, I believe, that

5    what he did in the challenged districts is no different --

6          JUDGE PAYNE:  Well, he can testify to that.

7          MR. RAILE:  So I think having an illustrative

8    exhibit to show what that actually looks like and how

9    those considerations --

10         JUDGE KEENAN:  You're saying you want the

11   challenged districts also, you're saying.

12         MR. RAILE:  Just one.

13         JUDGE PAYNE:  To show how it was done?  Is that

14   what --

15         MR. RAILE:  To show that it's not done in any

16   different way than we just saw.

17         JUDGE KEENAN:  Well, he's already said he uses

18   the same methodology, you see.  But let me tell you what's

19   concerning me about it.  I think you've done a really good

20   job with this witness of explaining how complex this

21   process it.  It's incredibly nuanced, very fine-tuned and

22   not easy to do.  And -- and so I think you've done what

23   you need to do as far as a demonstrative exhibit to show

24   how the methodology and process works.

25         My concern is that if you're going in with the

Morgan - Direct

1    additional exhibits related to the challenged districts,

2    then you're talking about content rather than process.

3    And that's my concern.

4              JUDGE ALLEN:  I agree.

5              MR. RAILE:  Your Honor, the -- we had testimony

6    from Dr. Rodden and Dr. Palmer, to some extent, telling us

7    that the maps that they were looking at -- they weren't

8    there -- the maps that they were looking at illustrated

9    racial predominate -- racial predominance, I guess.  They

10   said it wasn't motive.  I don't understand that.  But

11   something -- predominate racial factoring or something

12   like that.

13       And what we want to show is that those zigs and those

14   zags that they are talking about are census block lines

15   and you can't just reach out and grab individual people in

16   the way that they're suggesting.  They are looking at the

17   wrong thing.  And it helps -- you can say all that and I

18   think it helps as a demonstrative to illustrate it.

19             MR. HAMILTON:  Your Honor, I mean, I think the

20   point Judge Keenan made is exactly right.  This is -- now

21   we're going to the substance of it.  The -- he's already

22   testified that the process was the same and --

23             JUDGE PAYNE:  That's not the point he's offering

24   it for now.  He wants --

25             MR. HAMILTON:  He want --

Morgan – Direct

1          JUDGE PAYNE:  Wait a minute.  He wants to have

2   something to have the witness show us that what Dr. Rodden

3   said isn't possible.  Isn't that what you're saying?

4          MR. RAILE:  Almost, Your Honor.  I would flip

5   it.  What Dr. Rodden said is impossible is, in fact,

6   possible.

7          MR. HAMILTON:  And I would have no objection,

8   Your Honor, if what we were offering -- if it was

9   something like this.  And we've seen a lot of these, and

10  they were all marked in advance.  And they were offered as

11  substantive evidence.  So if we want to show census level

12  blocks, that's not a dispute.  The map is what the map is.

13  That's not what this is.  This illustrative exhibit is a

14  video offered for substance.

15         JUDGE PAYNE:  Objection sustained.  He can talk

16  about it, but you can't use the video, or whatever this

17  thing is.

18         MR. RAILE:  Thank you, Your Honor.

19         JUDGE PAYNE:  You can ask him the question, and

20  I don't know that you have asked him the question yet.

21  You've said he's going to testify to it, but he hasn't --

22         MR. RAILE:  Agreed, Your Honor.  Just give me

23  one second to just think through the most effective way to

24  do this.

25      Let's look at Dr. Rodden's report, which is I believe

Morgan - Direct

 1   Plaintiffs' Exhibit 69.  And I believe the page I'm

 2   thinking of is 47.

 3              JUDGE PAYNE:  Do you have a copy of it over

 4   there?

 5              MR. RAILE:  We have witness binders for

 6   Mr. Morgan, and his report in that.  And 47 is the page I

 7   was thinking of.

 8              JUDGE PAYNE:  So look in your witness binder?

 9              MR. RAILE:  Mr. Morgan -- we have witness

10   binders that say John Morgan.

11              JUDGE PAYNE:  We've got them.

12              MR. RAILE:  And there is -- I believe there's a

13   Rodden report.

14              JUDGE PAYNE:  Okay.  Sixteen -- or 69, I mean.

15   A    Yes, I see this.

16              MR. RAILE:  Let's zoom in on the map.

17   A    What page again?

18   Q    Forty-seven.  Do you recognize what's in this image?

19   A    Yes.

20   Q    What is it?

21   A    This is a zoomed in view of Newport News and the

22   enacted District 95 and the surrounding territory.

23   Q    And do you recognize -- can you point to the line

24   that is the enacted district --

25   A    Sure.

Morgan - Direct

1   Q    -- on the screen?

2   A    Sure.  The only thing that this is showing with the

3   line, it doesn't show the surrounding districts.  In this

4   case, it's only showing the enacted District 95, which

5   follows this line.

6   Q    Okay.

7           JUDGE PAYNE:  This is just part of 95?

8           THE WITNESS:  Yes, Your Honor.

9           JUDGE PAYNE:  It's the northern corridor.

10          THE WITNESS:  Yes, Your Honor.

11  Q    When you are drawing the map, is that what you see?

12  A    No, that's not what I see.

13  Q    Is it even possible to produce something like this on

14  the Maptitude screen?

15  A    I did not do that.  I don't believe, in the way that

16  Dr. Rodden described it, it would have been done.

17  Q    Okay.  Could you produce an image like this?

18  A    As I understand the way he's doing this, he's

19  randomly placing dots to indicate population.  So I would

20  have some difficulty doing this if there were a function

21  that could do this, perhaps, but it's not something that I

22  would have produced.

23  Q    Is this something that you ever used in 2011?

24  A    No.

25  Q    Okay.  Where -- well, let me ask you this.  What's

Morgan - Direct

1  missing from this picture?

2  A    What's missing from this picture is the boundaries of

3  the other enacted districts and the census blocks.

4  Q    Okay.  So this doesn't show us which black dots and

5  white dots are bound to which other black dots and which

6  other white dots; is that right?

7  A    Yes.  And more to the point on this, as I understand

8  it, Dr. Rodden was saying that the dots are randomized

9  within the boundary of the census block.  So in that

10  sense, as I understand it, those dots are not showing the

11  location of population within a census block, only the

12  random distribution of a number that is represented by a

13  dot.

14  Q    So if you want to draw this person in that dot that I

15  just threw on there, do you have any way of doing that

16  when you're drawing the map?

17  A    That dot is not a population person.  It's not a

18  population value.  It's a dot representing population.

19  It's not tied to a geographic location.

20  Q    But even if it was, would you have any way of

21  grabbing that dot?

22  A    No.

23           JUDGE PAYNE:  Grabbing it?

24  Q    Grabbing it into a particular district, assigning

25  that person or that representation of a person, which

Morgan - Direct

1   isn't actually tied geography; is that right?

2   A     That's right.

3   Q     So if the census block is shaped like this, you don't

4   really have a choice about where that line is, do you?

5   A     That is correct.

6   Q     So wherever these lines end up is not something that

7   you have a lot of control over, is it?

8   A     The lines, as they are expressed here, are defined by

9   the underlying census block geography.

10  Q     Do you recall the census block shapes and sizes in

11  this north area just north of the northern boundary of the

12  district that I've marked here above the Epes precinct?

13  A     Yes.  That portion is in the Reservoir voting

14  district.

15  Q     Why did you draw the district out to the west and --

16  and by "the district," I really mean the split, because

17  Reservoir is split; is that correct?

18  A     Reservoir is split between District 93, 95 and 94.

19  Q     Why did you take this western section into 95 rather

20  than just go north?  Do you recall?

21  A     Yes, I do.  In this case, the census geography

22  immediately to the north has small populated blocks in

23  this section and larger populated blocks here.

24        In fact, this is roughly -- the second box I'm

25  drawing is roughly the boundary of a single census block

Morgan - Direct

 1  with about 900 people in it, which is more than 1 percent

 2  of a district.  So effectively, while it would be possible

 3  to take smaller population blocks down here, at some point

 4  you would encounter that larger block and it would fall

 5  out of population deviation.  Therefore, in this case, the

 6  area over to the northwest where it says Reservoir was

 7  taken in.  The underlying census geography allowed for

 8  that.

 9       And more to the point, I remember this specific

10  indentation is a single census block, and that was left

11  out of District 95.  Even though it might have been

12  possible to align it, it wasn't possible because of the

13  underlying population of that census block.

14  Q    So that census geography is actually telling you --

15  combined with the one person, one vote, plus or minus

16  1 percent deviation, combined together are actually

17  governing where you're taking this district?

18  A    Yes.

19  Q    And that tells you why this is split the way it is?

20  A    Yes.

21  Q    If you don't take that factor into account, can you

22  understand why you did what you did in 2011?

23  A    I don't think so, no.

24  Q    And that phenomenon, is that going on across 100

25  districts around the state?

Morgan - Direct

1  A    Yes.

2  Q    Including in the 12 majority black districts; is that

3  right?

4  A    Yes.

5  Q    All right.  We can move on.  All right.  Let's talk

6  about districts.  And what regions of the Commonwealth are

7  the challenged districts in?

8  A    The challenged districts are in Tidewater area,

9  including the peninsula, and Richmond and in the area

10  between -- from Petersburg down to Emporia.

11  Q    Did you understand there to be regions of the map

12  when you were redistricting in 2011?

13  A    Yes.  In redistricting, we worked with regions and

14  there would be plans drawn in regions so that people could

15  work on them simultaneously.  So one delegate or one of

16  the map drawers could work in one region and another map

17  drawer could simultaneously work in another region.

18  Q    So there's drafts going back and forth and people are

19  contributing different parts and having different input;

20  is that right?

21  A    Yes.  That's correct.

22  Q    And you're right in the thick of it; is that right?

23  A    Yes.  The -- there's a lot of activity.

24  Q    Okay.  Let's talk about the Hampton Roads region, and

25  we can look at Intervenors' Exhibit 96 to 97 to give us a

Morgan - Direct

1  start.

2          MR. RAILE:  And, Your Honors, my recommendation

3  for viewing this, what works well for me is to open Map

4  Book 1, and it actually has the 96 and 97 together so that

5  you can actually see before and after on the page.  We can

6  do that on the screen as well.

7          JUDGE PAYNE:  Ninety-six and -- Exhibit 96, page

8  1 and Exhibit 97, page 1; is that right?

9          MR. RAILE:  Yes, Your Honor.  And we're actually

10 going to flip from there to page 3.

11 A    Is this what I'm looking at?

12         JUDGE PAYNE:  We're going to what page.

13         MR. RAILE:  It's page 3.  It's South Hampton

14 Roads.

15         JUDGE PAYNE:  So we are on

16 Defendant-Intervenors' Exhibit 96, page 3.

17         MR. RAILE:  My recommendation would be to have

18 this open as we go through the region the whole time

19 because it helps to go big picture and zoom in, and we'll

20 be doing some of that.

21 Q    Mr. Morgan, what's going on in the South Hampton

22 Roads region going into the 2011 redistricting?

23 A    In the South Hampton Roads region, there was a

24 relative population loss relative to other areas of the

25 Commonwealth.  So what's essentially happening is in the

Morgan - Direct

1    region we're looking at here, which includes Norfolk, the

2    city of Norfolk, Virginia Beach, Chesapeake, Portsmouth

3    City and Suffolk City, in the page 3 map, which is the

4    benchmark district plan, if I count them up, I believe

5    there are 15 districts represented here.  I believe that's

6    the case.  Also including district 100.  And in the

7    enacted plan, there are 14 districts in that same region

8    as I defined it.

9    Q    Why is that?

10   A    There's not enough population to support the same

11   number of districts.  So in this case, rather than, for

12   example, continue to take population away from the region

13   to support 15 -- from other regions, rather, to support 15

14   districts, one district was collapsed and moved to another

15   part of the state.  And that district was District 87.

16   Q    Can you point on the screen where we have the two

17   maps side by side to District 87?

18   A    Yes.  This district here entirely in the city of

19   Norfolk along the Willoughby Spit, that's District 87.

20   Q    And, Mr. Morgan, I'm pointing to the territory

21   just -- whoops -- just to the west of 87.  What is that?

22   A    That is a portion of District 100, which in the

23   benchmark plan included the Eastern Shore entirely.  So

24   Accomack and North Hampton Counties, which comprise the

25   Eastern Shore, and a portion of the city of Norfolk, in

Morgan - Direct

1    this case, primarily the naval base of Norfolk.  And that

2    was the E benchmark District 100, which in my discussion

3    of 15 districts, I'm including in this because it is

4    connected to the Eastern Shore.

5    Q    This crosses the Chesapeake to 100, which is the

6    Eastern Shore, right?

7    A    That's correct.

8    Q    Why does it cross the Chesapeake?

9    A    Because the Eastern Shore, by itself, was not enough

10   to form a district within the plus or minus 1 or even plus

11   or minus 2 in 2001 population.  So it needed to have

12   additional territory brought in, and that had to come from

13   somewhere across the Chesapeake Bay.

14   Q    Couldn't go into Maryland; is that right?

15   A    That's right.

16   Q    Okay.  So 87 comes out, move to Loudoun County, if

17   I'm not mistaken?

18   A    Yes.  Eighty-seven was moved to the south riding area

19   of Loudoun County.

20   Q    What happens next?

21   A    I would describe this as District 87 was combined

22   with 100, or another way to look at it was the territory

23   which previously comprised benchmark District 87 has been

24   moved to other districts.  So the effect of that is that

25   there is surplus population around that area of Norfolk

Morgan - Direct

1    available to build other districts with.  And so, again,

2    in this case, the territory that was in the previous

3    District 87 was divided in the enacted plan, HB 5005,

4    between District 83, District 100 and District 79.

5    Q    Okay.  Where is District 79 in the benchmark map?

6    A    District 79 in the benchmark map in this plan is --

7    is in Portsmouth, Suffolk, Chesapeake and parts of Norfolk

8    City.  And that's where District 79 was.  It's in orange

9    on the map in front of us.

10   Q    Where does it go in the enacted plan?

11   A    In the enacted plan, District 79 leaves the portions

12   that it had in Suffolk and in Chesapeake and it goes -- it

13   retains most of its population in Portsmouth and it takes

14   more population in Norfolk, specifically around the naval

15   base in Norfolk.

16   Q    And that is the direction where there's the

17   population to spare?

18   A    Yes.

19   Q    So that's why it moves in that direction?

20   A    Yes.

21   Q    Are there political -- did you have political

22   concerns in that process?

23   A    Yes.

24   Q    What were they?

25   A    In District 79, Delegate Johnny Joannou was one of

Morgan – Direct

1   the members that Chris Jones received input from, and

2   Delegate Johnny Joannou, who's --

3            MR. HAMILTON:  Objection, Your Honor.  This is

4   hearsay.  We had this problem when Delegate Jones was

5   testifying, and as I recall, Your Honor sustained the

6   objection from Delegate Jones testifying about his

7   conversation with Johnny Joannou.

8       If Delegate Jones passed on that information to

9   Mr. Morgan, it's hearsay.  If Mr. Morgan received it from

10  Mr. Joannou, it's hearsay.  For the same reason, I object.

11  Q    The question that I asked was did you have political

12  considerations in this process?

13  A    Yes, I did.

14           JUDGE PAYNE:  The answer is yes.  And then the

15  question is what were they?

16           MR. RAILE:  And that's what I asked.

17           JUDGE PAYNE:  He's not asking the question yet,

18  Mr. Hamilton.  You wait and see what happens.  Wait and

19  see what happens.  You can always move to strike it.

20  Let's get on.

21           MR. HAMILTON:  I will, Your Honor.

22           JUDGE PAYNE:  Let's get the question on the

23  table now.

24           MR. HAMILTON:  I didn't object to the question.

25  I objected to the answer.  About halfway through, he

Morgan - Direct

1  started a sentence saying Johnny Joannou -- and I suspect

2  what he was going to answer so --

3         JUDGE PAYNE:  But he didn't answer what Johnny

4  Joannou said.  So we stopped it.  Now, get your question

5  out.  He had concerns, Mr. Morgan did.

6  BY MR. RAILE:

7  Q    Were what were those concerns?

8  A    I had concerns that taking -- taking population away

9  from Johnny Joannou in Portsmouth and putting population

10 in Norfolk would change the balance of his district.  The

11 core of his district and his political base, as I

12 understand it, was in Portsmouth.  I worked in this

13 redistricting process in 2001.  I've looked at election

14 results in that area, and I understood that Delegate

15 Joannou's base was in Portsmouth.

16       So in drawing this plan, I took the naval base

17 population into District 79, which has a lot of

18 population.  It has, in fact, 25,000 people, or more, in a

19 single voting district.  But the votes in that district

20 are not at the same -- the same numbers as the population.

21 So essentially, there are a lot of population and fewer

22 voters.  So there's fewer voters added in rounding out his

23 district.

24       And that was a consideration that I considered in

25 drawing the naval base into Delegate Joannou's district as

Morgan - Direct

1    opposed to just any a population in Norfolk.

2    Q    So this population in the naval base area helps

3    Johnny Joannou politically in your view?

4    A    Yes.

5    Q    And that comes over from House District 100?

6    A    Yes.  District 100, in the benchmark plan, had the

7    bulk of the naval base population.  And in the enacted

8    plan, the naval base population is put into District 79,

9    Johnny Joannou's district.

10   Q    100 still has to cross, doesn't it?

11            JUDGE PAYNE:  Has to what?

12            MR. RAILE:  To cross the Chesapeake.

13   Q    There's not enough people, right.

14   A    That's correct.  So the people to round out District

15   100 were taken from the center of District 87.  So if you

16   look at District 87 in the former boundaries, the central

17   section was placed in District 100 and the eastern section

18   was placed in District 83.  And that's how the population

19   of old 87 was divided.

20   Q    Can you point to the -- where 100 is in South Hampton

21   Roads in the enacted plan?

22   A    In the enacted plan on the screen, the central

23   section here is paired with the Eastern Shore counties of

24   Accomack and North Hampton.

25   Q    Okay.  What happens to --

Morgan - Direct

1    JUDGE PAYNE:  Excuse me.  On that page it's the

2  beige section is what's paired with the Northern Neck?

3    THE WITNESS:  It's --

4    JUDGE PAYNE:  I mean the Eastern Shore?

5    THE WITNESS:  Yes, Your Honor.

6  Q    What happens to House District 80?

7  A    House District 80 takes the western most portions of

8  the benchmark District 79.  So as the -- as District 79

9  moves to the naval base population, the western portions

10  of District 79 were assigned to District 80.  The outer

11  bounds of Districts -- old District 79 and new District 80

12  in Suffolk County and in Chesapeake are the same.

13  Q    Can you point on the map, both the benchmark and the

14  enacted, to show what you mean by that?

15  A    The purple district in this map is House District 76,

16  and these are the portions of the western portion of

17  District 79, which is in orange.  Those were transferred

18  to District 80.

19  Q    Why don't they go to 76?

20  A    My understanding is that Delegate Jones did not want

21  to put those precincts in his district, and he's following

22  the same line that was established in the benchmark plan

23  for his district.

24  Q    You could have -- could you have given this -- I

25  guess we'll call it a tail.  Could you have given it to

Morgan - Direct

1   another district other than 76 or 80?

2   A    It could have gone to another district on the

3   peninsula perhaps.

4   Q    So it could have crossed the river?

5   A    I suppose this tail could have been given to District

6   95.

7   Q    You could have done a river crossing here?

8   A    Yes.

9   Q    Why didn't you do that?

10  A    My understanding was that that was not to be done in

11  drafting this plan; that there would not be crossings of

12  the James River tidal estuary.

13  Q    James River tidal estuary.  Now, there are river

14  crossings in South Hampton Roads elsewhere, aren't there?

15  A    Yes.

16  Q    What's the difference?

17  A    It was something that was challenged in litigation in

18  2001 and 2003 after the 2001 plan, and Delegate Jones

19  expressed to me not to cross the James River in that way

20  again.

21  Q    And I thought I heard you say a minute ago the

22  estuary.  What is that?

23  A    That's the tidal portions of the river.

24  Q    What's the difference between a estuary and the

25  rivers down here?

Morgan - Direct

1   A     Basically, it would be the size of the crossing,

2   generally.

3   Q     This is bigger than those?

4   A     Yes.

5   Q     Okay.  So that's your understanding of the factors

6   that drove that decision; is that right?

7   A     Yes.  It was not going to happen.

8   Q     Okay.  Take -- did you ever propose a plan that did

9   that?

10  A     Yes.

11  Q     What happened?

12  A     It wasn't considered.

13  Q     Okay.  Let's take a closer look at House District 80

14  on Defendant-Intervenors' Exhibit 94, page 10.  All right.

15  So we already talked about this -- these precincts,

16  Yeates.  Taylor Road, Harbor View 38, 34, right?

17  A     Yes.

18  Q     Why was this portion put in House District 80?

19  A     Well, as I described, the population of the Norfolk

20  Naval Base was put into District 79, and District 79

21  transferred the population in that area to District 80.

22  Q     Now, the precincts 29, 28, 26, 27, 31, 19, 18, 17,

23  16, 14, 5, 21, 20, 13, that area.  Why are those in there?

24  A     Those were retained in District 80.  They were in the

25  benchmark district plan.

Morgan - Direct

1   Q    Just keeping them where they were?

2   A    Yes.

3   Q    Do you recall why the Johnson Park and Berkley

4   precincts were taken out?

5   A    Yes.

6   Q    And what's your recollection?

7   A    Johnson Park was given to Delegate Spruill.  It was

8   my understanding that he wanted that area of the district

9   in Chesapeake, that area of Chesapeake added to his

10  district.  And the Berkley voting district was added to

11  District 89.

12  Q    Old Dominion, Taylor Elementary School, why did those

13  come out?

14  A    In this sense, the voting districts in this area

15  reduced the footprint of District 80 and also Berkley.  By

16  moving those, there's less of a footprint of District 80

17  in Norfolk.

18  Q    Now, Chrysler Museum stays in, doesn't it?

19  A    Yes.

20  Q    Do you recall why?

21  A    In my opinion, it has to do with the base population

22  and the Norfolk voting population.  Essentially, as I

23  described, adding more strongly voting population to

24  Delegate Joannou was not something that was desired.

25  Q    Now, we talked about these precincts on the west.

Morgan - Direct

1    Did you read the report of Dr. Rodden in this case?

2    A    Yes.

3    Q    Do you recall where he wrote that Delegate Joannou

4    couldn't have been happy about that?

5    A    Yes.

6    Q    What's your response?

7    A    I don't agree with that.

8    Q    Why not?

9    A    Because my experience with Delegate Joannou and the

10   election results in this process inform me that Delegate

11   Joannou would like his base in Portsmouth and not too much

12   in Norfolk.

13            MR. HAMILTON:  Objection.  Your Honor, this is

14   speculation.  He has no foundation to be testifying about

15   what Joannou wanted or didn't want other than -- it's

16   either speculating or it's based on hearsay.

17            MR. RAILE:  Well, I would offer it as

18   impeachment of Dr. Rodden, who said, in his report, that

19   Delegate Joannou couldn't have been happy by that.

20            MR. HAMILTON:  It's not an exception to the

21   hearsay rule, Your Honor.

22            JUDGE PAYNE:  Well, why is it hearsay?

23            MR. HAMILTON:  Because he doesn't have a

24   foundation to testify to what Delegate Joannou --

25            JUDGE PAYNE:  He said it came from Joannou,

Morgan - Direct

 1  right, and it informed why he did what he did.  He said

 2  that Joannou told him something and Joannou -- maybe I

 3  misunderstood.  Ask the question again.  I don't -- I

 4  don't think where he got was hearsay, but I'm --

 5  Q    What's your response to Dr. Rodden's claim that

 6  Delegate Joannou couldn't have been happy with this?

 7  A    I disagree with that.

 8  Q    Why?

 9         MR. HAMILTON:  That question calls for

10  speculation, Your Honor.

11         JUDGE PAYNE:  Well, that one does unless he

12  establishes the reason for it.  He can establish a

13  foundation with his question.  Why, because of X.  You got

14  one, a question?

15  Q    You were involved in the 2011 redistricting, correct?

16  A    Yes.

17  Q    And you were there drawing maps on a daily basis in

18  the House of Delegates?

19  A    Yes.

20  Q    And you were talking with Chris Jones at the time,

21  correct?

22  A    Yes.

23  Q    You were talking with other delegates at the time; is

24  that correct?

25  A    Yes.

Morgan - Direct

1  Q    Talking with other consultants?

2  A    Yes.

3  Q    Such as Chris Marston?

4  A    Yes.

5  Q    And were you hired to provide political advice?

6  A    Yes.

7  Q    And that's because you have experience in elections

8  in Virginia in this region and other regions, correct?

9  A    Yes.  I have spent --

10  Q    In fact, you helped Delegate Jones in his election in

11  this district, correct?

12  A    I helped Delegate Jones in his district.  I've had

13  thousands of hours of experience working with election

14  data and elections and census data in the Commonwealth.

15  Q    Do you have an understanding of why this change

16  moving this out of Delegate Johnny Joannou's district

17  would benefit Delegate Joannou?

18  A    Yes.

19  Q    What is that understanding?

20  A    My understanding is that Delegate Joannou's core was

21  Portsmouth.  That was his political base.  And pairing his

22  district with some portions of Norfolk was going to

23  happen, and the portions of Norfolk that were paired were

24  primarily in the naval base and they had fewer voters that

25  would be less of a difficulty for him to contend with in a

Morgan - Direct

1    potential primary.

2    Q    So you believed, based on what we just said, that

3    this was beneficial to Delegate Joannou, correct?

4    A    Yes.

5    Q    And that is the basis on which you disagree with

6    Dr. Rodden, correct?

7    A    Yes.

8    Q    Okay.  What happened to Delegate Johnny Joannou?

9    A    I believe that Delegate Johnny Joannou was reelected

10   in 2011, and then he subsequently lost in a primary.  And

11   I believe his opponent was from Norfolk.

12   Q    Best laid plans of mice and men.  Is that this?

13   A    He lost in the primary.

14   Q    You did your best, and that didn't work?

15   A    He was a conservative democrat, and he lost to a less

16   conservative democrat in the primary.

17   Q    Did you read in Dr. Rodden's report where he says

18   that House District 80 is the lynchpin of the redesign of

19   the South Hampton Roads region?

20   A    I read that, yes.

21   Q    What's your response to that?

22   A    I disagree with that.

23   Q    Why?

24   A    Because in my experience in drafting the plan, taking

25   Delegate Joannou's concerns were an important factor at

Morgan - Direct

1   driving the redistricting process, in combination with the

2   population changes in Norfolk that we previously discussed

3   regarding District 87.

4   Q    Let's move on.  House District 77.

5   Defendant-Intervenors' page -- is Exhibit 94, page 8.

6   Mr. Morgan, what do you know about why this district is

7   configured the way it is?

8   A    District 77 was Delegate Lionell Spruill.  He's

9   somebody that I had worked with in 2001 and in 2011.  He's

10  somebody that was, in my opinion, close to Delegate Jones.

11  And Delegate Spruill wished to have these precincts over

12  an the eastern portion of his -- of the district of

13  Chesapeake added to his district, including Johnson Park,

14  and he wanted that portion of Chesapeake in his district.

15  Q    Can you point to where that is on the map?

16       JUDGE PAYNE:  That is Oaklette, Norfolk Highland

17  and Indian River?

18       THE WITNESS:  Yes, Your Honor.  And Tanglewood.

19       JUDGE PAYNE:  And Tanglewood, yeah.

20  Q    So what about -- I can read them all off.  John F.

21  Kennedy.  I believe it says White Marsh, Sunray, Camelot.

22  All of these districts -- precincts VTDs that were kept

23  in, do you know why those were kept in?

24  A    They were in his existing district.

25  Q    Is it fair to say that this district retains its

Morgan - Direct

1  core?

2  A    Yes, it retains its core.

3  Q    How long has it looked like this?

4  A    It looked like this in 1991 and in 2001.

5  Q    How long did Delegate Spruill represent this

6  district?

7  A    Since 1993.  He was first elected in 1993.

8  Q    Soon after, it assumed the bulk of its current

9  configuration; is that correct?

10  A    Yes.

11  Q    Okay.  The Airport VTD drops off of the western end.

12  Why does it do that?

13  A    The Airport VTD is put into Delegate Jones' district.

14  It is a republican voting district.  And more to the

15  point, it's required for contiguity to connect the

16  southern portion of Delegate Jones' district, which is

17  what I'm outlining here, through Deep Creek, to the

18  northern part of his district here.  Without that, his

19  district would not be contiguous.

20          JUDGE PAYNE:  Without what?

21          THE WITNESS:  Without the Airport precinct in

22  his district, his district would be cut in half.

23  Q    Let's look at that.  Intervenors' Exhibit 96 and 97.

24  It's the maps, the regional maps we have open here.  Page

25  3.  Delegate Jones represents House District 76, and

Morgan - Direct

1   that's this purple district in the benchmark plan that I'm

2   highlighting in the regional map; is that right?

3   A     That's correct.

4   Q     What happens to his district in the redistricting?

5   A     In his district, he retains most of his population in

6   the northern part of the district, including the western

7   branch of the city of Chesapeake.  He retains most of the

8   portion in this southern portion of the district.  But in

9   this context, as I understand what we're discussing is

10  this section here that I've drawn a triangle around, in

11  the southwest of his district, three voting districts --

12  which are now four, actually -- were transferred to

13  District 64.

14  Q     So do you recall if Delegate Jones' district was

15  overpopulated or underpopulated coming into the

16  redistricting?

17  A     His district was overpopulated.

18  Q     So it has to shed territory, right?

19  A     Yes.

20  Q     And it sheds it to District 64; is that right?

21  A     And also -- District 64, yes.  And also District 77.

22  Q     So show us the Airport precinct in the enacted plan.

23  A     The Airport precinct is right here.

24  Q     So if that doesn't come out of Delegate Spruill's

25  district, you have a piece here and a piece here and

Morgan - Direct

1    nothing to join them; is that right?

2    A    That's correct.  It would not be contiguous.

3    Q    So if you're not looking at this on a regional level,

4    you don't have any way to understand why that move occurs;

5    is that right?

6    A    That's right.

7    Q    Let's move on to House District 90.  Intervenors'

8    Exhibit 94, page 12.  What do you know about why this

9    district is configured the way that it is?

10   A    District 90, in the benchmark plan, was comprised of

11   population from the city of Chesapeake, city of Norfolk

12   and the city of Virginia Beach.  And in redrawing to the

13   enacted plan, the portions of Chesapeake were moved from

14   90 to Delegate Spruill's district, 77.  And so District 90

15   needed to gain additional population, and it was done by

16   getting more population in Norfolk on the north and in

17   Virginia Beach on the east and the south.

18   Q    So Sherry Park and College Park and part of Reon were

19   added; is that correct?

20   A    Yes, as well as on the north side Shell, portions of

21   shell, Davis Corner and portions of Aragona.

22   Q    Do you recall why those changes were made?

23   A    Well, as I mentioned, the area of Chesapeake was

24   removed, and District 90 was already in Virginia Beach.

25   So additional population was taken from Virginia Beach.

Morgan - Direct

1   And what I would say is that the areas that were taken

2   from District 85, which are Sherry Park, College Park,

3   Reon and Davis Corner are democratic precincts, and it

4   affected the political makeup of District 85, which is an

5   adjacent district.  By taking those democratic precincts

6   out, it affected District 85.

7       And what District 85 did is District 85 actually took

8   democratic performing precincts away from District 21,

9   which is all the way over here in the center of Virginia

10  Beach.  That district is represented by Delegate Run

11  Villanueva, District 21.  He was first elected in 2009 in

12  a swing district.

13      So some of the democratic precincts on the north end

14  of his district were transferred to District 85 to help

15  Delegate Villanueva improve his republican performance in

16  his district.  So at the same time, basically District 85

17  is taking some democratic precincts there on the north end

18  of old 21 and some democratic precincts are removed from

19  District 85, put into District 90.

20  Q   So there's --

21          JUDGE PAYNE:  Villanueva is a republican?

22          THE WITNESS:  Yes, Your Honor.  He's a

23  republican.  He's also Filipino.

24  Q   So you have political concerns two districts away

25  that are affecting this district, right?

Morgan - Direct

1   A    Yes.

2   Q    You'd have to understand those concerns to understand

3   the factors that went into the design of this district?

4   A    Yes.

5   Q    Do you recall why Barron Black comes out?

6   A    Yes.

7   Q    What's your recollection?

8   A    I've done political work in this area before.  Barron

9   Black is a republican leaning precinct.  It was added to

10  the new district for Delegate Stolle.  His district, which

11  was previously entirely in Virginia Beach, as we discussed

12  earlier, absorbed the portions of District 87.  So he was

13  getting some new territory, and this was a republican

14  leaning precinct for Delegate Stolle's new district.

15  Q    Tanners Creek, Sherwood School.  Does that say

16  Coleman Place School?

17  A    Yes.

18  Q    And those are added, right?

19  A    They are added from District 89.

20  Q    Do you know why?

21  A    I don't recall.

22  Q    It was a while ago, wasn't it?

23  A    Yes.

24  Q    There are some split VTDs in this district, correct?

25  A    Yes.

Morgan - Direct

1    Q    Where?

2              JUDGE PAYNE:  Would this be a good place, since

3    you're changing to VTDs now, to take the morning recess of

4    20 minutes?

5              MR. RAILE:  Absolutely, Your Honor.  I'd love a

6    break.

7              JUDGE PAYNE:  All right.  We'll take 20 minutes.

8              (Recess taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    JUDGE PAYNE:  All right, Mr. Raile.

2    MR. RAILE:  Thank you, Your Honor.

3  Q    Mr. Morgan, we left off on the scintillating topic of VTD

4  splits in House District 90.  There are a few different splits;

5  is that correct?

6  A    In House District 90, there are, I believe, there are four

7  splits.

8  Q    Where are they?

9  A    There's a split of the Shell VTD here which is split

10  between 83 and 90.  There is a split over here in Brambleton

11  voting district which is split between 90 and 89.  There is a

12  split between 90 and 85 in Aragona precinct, and there's also a

13  split between 85 and 90 in the Reon precinct.

14  Q    The split between HD 90 and 83 is the only VTD split

15  between those two districts; correct?

16  A    Yes.

17  Q    And why was that done?

18  A    That was done to equalize the population between

19  District 83 and District 90.

20  Q    Is it typical that when you would be splitting a VTD for

21  equal population purposes, you would have one split on the

22  border of the two adjacent districts, just one; is that

23  correct?

24  A    That is the general practice, yes.

25  Q    But -- and that's the case here in 83; right?

1    A     One split between 83 and 90.

2    Q     And that's the case on this western border; right?

3    A     Yes.  There's one split between 89 and 90 in the

4    Brambleton voting district.

5    Q     It's not the case as to HD 90 and HD 85, though, is it?

6    A     That's correct.

7    Q     What happened there?

8               JUDGE PAYNE:  Which ones?

9               MR. RAILE:  HD 90 and 85.

10              JUDGE PAYNE:  Aragona and Reon.

11              THE WITNESS:  That's correct, Your Honor.

12   Q     So there's two?

13   A     Yes, there are two.

14   Q     What happened there?

15   A     There were two splits.  The original plan, as it came out,

16   and, I believe, either it came out to the subcommittee, the

17   original bill that Delegate Jones had, or the vetoed bill did

18   not have Reon split.  There was one split over here in Aragona.

19        So there was only one split between 85 and 90, and that

20   split -- again, I'll just line it right here -- is along

21   Witchduck Road which is a recognizable major thoroughfare in

22   Virginia Beach.

23        The other split that I'm talking about here in Reon came

24   later in the process, and that was -- it was basically already

25   set, the boundary of the split, between 90 and 85 in Aragona,

1    but what happened was District 90 ended up having too much

2    population after changes were made between the vetoed bill or

3    the subcommittee bill and the enacted plan.

4         So what happened was that District 90 was overpopulation,

5    so it had to shed some population into District 85 to further

6    equalize its population.  So that was where that split was

7    made.  It was the last split in this district.

8    Q    Why didn't you go back to Aragona and rectify population

9    over there?

10   A    At this point, it just was simpler at the time to just

11   finish with Reon.  That was one of the VTDs, the voting

12   districts, that was added into District 90, so that was the

13   area that was taken out.

14   Q    Were you happy with the line in Aragona on Witchduck Road?

15   A    Yes.  It was an established understandable boundary.

16        JUDGE PAYNE:  Why did you make the split changes in

17   Brambleton/Aragona?

18        THE WITNESS:  Yes, Your Honor.  Brambleton was split

19   between 89 and 90 in the vetoed plan or the subcommittee plan.

20   There were three bills that we talk about in this process plus

21   the benchmark plan.  There was a bill that initially Chris

22   Jones had, and then he received a lot of input before it became

23   the House Bill 5001 which was vetoed, and then it moved to 5005

24   which was the enacted plan.

25        In that process, Brambleton was already split, and

1   the boundary of that split was changed between the subcommittee

2   bill that was marked up and the enacted plan.  There was a

3   change in there, and I believe -- and also with the Union

4   Chapel.  The movement of Union Chapel occurred during that

5   process from the subcommittee bill to the enacted plan, and

6   that changed the split in Brambleton.  It meant that

7   District 90 and 89 line split and Brambleton changed a little

8   bit.

9              JUDGE PAYNE:  For population reasons or something

10  else?

11             THE WITNESS:  Yes, Your Honor, the population was

12  rectified between 89 and 90.

13             JUDGE PAYNE:  What about 90 and 85?

14             THE WITNESS:  Because of the changes between 89 and

15  90, it threw District 90 out of population alignment.  So it

16  was rectified in Reon.

17  Q    So splits occurred at two different phases of the process?

18  A    Yes.  The Reon split was the last split made

19  chronologically in this process.

20  Q    And so -- and you've testified that there's three

21  different phases that we're concerned about; there's the -- is

22  it the Conference plan that you said?

23  A    On the Department of Legislative Services publicly

24  available website, they referred to that as the subcommittee

25  bill, as C. Jones subcommittee bill.  That's what I understand

1    it to be.  That would be the first working plan that Delegate

2    Jones had, you know, for work with the members on the

3    subcommittee in the process, and then that later became HB 5001

4    that we've discussed in this process which was vetoed.

5    Q    And those are publicly available on the Division of

6    Legislative Services website; correct?

7    A    Yes, and they have all of the information there on those

8    plans.

9    Q    So those would be available to, say, an expert in this

10   case?

11   A    Yes.

12   Q    When you split the Reon VTD or the Aragona VTD, did you

13   use a racial thematic on Maptitude to provide racial thematics

14   for the census blocks, at the census-block level where you're

15   drawing and doing those splits?

16   A    No.

17   Q    Did you use that theme for splitting VTDs and drawing at

18   the census-block level when you were drawing any of the

19   challenged districts?

20   A    No.

21   Q    Let's move on to House District 89, the last one in South

22   Hampton Roads.  Mr. Morgan, what do you know about why this

23   district is configured in the way that it is?

24   A    Well, we discussed some of the other districts in this

25   process that are adjacent to District 89, and, as such, they

1    have an impact on District 89.   The portions of Norfolk on the

2    west side were added to District 89, and they are primarily

3    coming from District 79.

4         So this section up here, Larchmont Library, Larchmont

5    Recreation Center, Tucker House, portions of Zion Grace were

6    added to District 89 primarily from District 79 and maybe from

7    100.   I'm not sure in this view of the district.

8         And then, as discussed earlier, Berkley was added to the

9    southern portion of the district.   This is a portion -- even

10   though it's south of the river, it is a portion of the City of

11   Norfolk.   And then we also talked about Union Chapel and

12   Brambleton.   So this illustrates the Brambleton split of the

13   VTD a little better than the previous map.   That's basically

14   Brambleton, and then Union Chapel was also split.

15   Q    Let me stop you right there.   Do you recall why those

16   splits were made?

17   A    The Brambleton split, we had already discussed that.

18   Q    Correct, and the other one?

19   A    There's another split in this district on the north end,

20   the Granby precinct, and that was split between District 100

21   and District 89.   It had previously been split in the benchmark

22   plan, and you can see this on this screen, the pink line here

23   is the outline of the benchmark plan.   So District 89 came up

24   to this pink line here, and then this was the boundary that was

25   not in District 89.

1   Q    Do you recall why that split is shaped the way it is?

2   A    Yes.

3   Q    What's your recollection?

4   A    Well, if you consider District 100 here, District 100,

5   which we discussed before, has the population from the Eastern

6   Shore, and it has, as such, no split VTDs anywhere on the

7   Eastern Shore.  It's entirely the counties of Accomack and

8   North Hampton, and then it comes into the city of Norfolk to

9   get the balance of its population.

10      So District 100 took Suburban Park as a whole voting

11   district, and it didn't have the right amount of population.

12   So the VTD which had already been split, Granby, was split

13   additionally.

14   Q    Right.  And my question is, do you recall the shape of the

15   split, why its shaped in this fashion that it's configured in?

16   A    Yes.

17   Q    What's your recollection?

18   A    When you look at the census-block geography, which is not

19   on this map, when the splitting occurred, there's a census

20   block that is on the eastern border that was taken first, and

21   the next census block is like a hat, all the way across the

22   remainder of that section.  It has about 200 people in it, and

23   then I basically took in the additional census blocks below

24   that hat to even it out to that outer boundary.

25   Q    Why didn't you go further down?

1    A    That's all that was needed.

2              JUDGE PAYNE:  To get a population equality.

3              THE WITNESS:  Yes.

4    Q    Once you get the even population, you stop?

5    A    In most cases.  Again, I was evening it out, and the top

6    census block follows the entire boundary of that portion that

7    was in Granby, and that one block is entirely the northern

8    border of the district.  And so when I filled in the remaining

9    blocks down below to square it off.

10   Q    Do you recall at what phase of the process that occurred?

11   A    That was in one of the last phases.  There were -- and I

12   think I can illustrate this here.  I mentioned Union Chapel was

13   added, one of the last pieces that was exchanged between 89 and

14   90, and, actually, a portion of Bolling Park was -- there was a

15   voting district split that was rectified between the

16   subcommittee or vetoed bill and the final bill, and that was a

17   split that was taken out in the Bolling Park area, and then I

18   mentioned we changed the Brambleton split which was already

19   split.  So that was one of the last things, and then equalizing

20   between 189.  There was a different configuration in the

21   subcommittee bill to the north of this district between 79 and

22   100.

23   Q    All right.  Let's cross the estuary and go into North

24   Hampton Roads.  To do that, let's look at the regional map,

25   Defendant-Intervenors' Exhibit 96 at pages two and three.

1    Again, that's in map book one, I believe.

2            JUDGE PAYNE:  What page are you on?  96, 97 --

3            MR. RAILE:  Your Honor, I'm in Exhibit 96 and 97, on

4    page two of each.  And, again, in map book one, they are sort

5    of consolidated so that you have before and after right here.

6    Q    Mr. Morgan, what -- in you are understanding, what were

7    the pressures brought to bear on the redistricting on North

8    Hampton Roads in 2011?

9    A    Well, this area would commonly be referred to as the

10   peninsula, and it's bounded between the James River on the

11   south and the York River on the north.  And when looking at the

12   benchmark plan, most of these districts were very

13   underpopulated.

14        District 91, which is here, was about 20 percent

15   underpopulated.  District 92, 95 were in the mid teens

16   underpopulated.  District 93 was underpopulated.  District 94

17   was underpopulated.

18        So District 91, 92, 95, 94, and 93, five of those adjacent

19   districts were underpopulated.  In the aggregate, it was about

20   half of a seat or 40,000 people under what was needed for

21   keeping those districts whole.

22   Q    Let me stop you right there.  Why didn't you collapse a

23   district here and move it somewhere else?

24   A    Okay.  Looking at the benchmark districts, you'll see that

25   the orange district here, District 64, crosses the James River

1    estuary at the ferry between Surrey and Jamestown.  And this

2    crossing was referred to previously as the ferrymander, and it

3    was my understanding, from the start of this process, that that

4    was not going to happen again.

5        As it ends up, this portion of district -- old District 64

6    is about one-third of a district.  So what ended up happening

7    was that there was about one-third of a district's worth of

8    population that was going to be available, but it's up in James

9    City County and the city of Williamsburg.  And then basically

10   you have just enough population to rectify those, but it's in a

11   different part of the peninsula.

12       So what ends up happening is rather than collapse a seat,

13   most of the districts have to be elongated towards that surplus

14   population that became available.

15   Q    So the effect that we saw in HD 87 where you picked it up

16   and moved it, a similar effect is being accomplished here by

17   taking this and moving across the river; is that fair to say?

18   A    Well, in a sense, right.  The portion of District 64 that

19   was previously -- was in Williamsburg/James City County, once

20   it was decided not to cross the river, that population becomes

21   available to fix the population problems in the peninsula, and

22   unlike District 87 where the district that was collapsed was at

23   the edge of the -- like in Norfolk, it was at the edge, and

24   then all the districts flowed towards the district that was

25   collapsed.

1    In this sense the districts are going to be flowing

2  northward to get towards the surplus population in James City

3  County and Williamsburg, and that's what happened.

4  Q    So the districts move up to take in that population; is

5  that right?

6  A    Some districts move up to take in that surplus population,

7  yeah.

8  Q    So describe to me what occurred.

9  A    Okay.  In broad brush strokes at this point, again,

10  District 91, 92, 95, 94, and 93 were all underpopulated, and so

11  District 92, which is in the city of Hampton, remained entirely

12  in the city of Hampton.  It took voting districts from 95 and

13  from 91.

14    District 91 took precincts from 96 and 92, and District 95

15  took precincts from 93 and 94.  District 94 was close to

16  population and took a little bit from District 93, and then

17  District 93 is the district that took the entirety of old

18  District 64.  So it had a substantial impact on District 93 in

19  the sense that at least one-third of 93 was new territory for

20  the new District 93.

21        JUDGE PAYNE:  It didn't take all of 64.  It took the

22  James City County/Williamsburg part of 64 north of the river;

23  is that what you are saying?

24        THE WITNESS:  Yes, Your Honor.

25  Q    Just the portion where the river crossing had been

1    eliminated; is that right?

2    A    Yes.

3    Q    Okay.  What were the reasons that it evolved in the way

4    that it did?  Let me break it down.  That's very broad.  I

5    apologize.  What was the motivation for the changes in House

6    District 93?

7    A    District 93 was represented by a freshman delegate, Robin

8    Abbott, who was a Democratic member, and what ended up

9    happening in this circumstance was her district was changed

10   dramatically, and her residence was moved out of the district.

11   She was paired with another incumbent.  Her district was

12   changed substantially and became less of a Democratic-leaning

13   district and more of a swing district.

14   Q    Are you just describing that, or was that the goal?

15   A    That was the goal.

16   Q    Okay.  So how does that work in the terms of the

17   geography?  What geographic changes accomplish that goal?

18   A    In this sense, the incumbent's residence was in the lower

19   portion of District 93 which was assigned to District 94.  A

20   middle section was assigned to District 95, and a small portion

21   was assigned to District 94.

22       The effect of that was to make the district more of a

23   swing district, and, ultimately, what happened in the next

24   election was Delegate Abbott moved her residence into the new

25   District 93 boundaries, she ran for election, and she lost.

1    Q     What is the role of House District 95 in accomplishing

2    that goal?

3    A     House District 95 went up into some of the Democratic

4    precincts in District 93, and they were transferred from 93 to

5    95, and that put the member in some jeopardy for her reelection

6    by taking that territory away from her in addition to adding

7    new territory.

8    Q     Let's take a closer look at 94, because I think it will

9    help us understand.  Intervenors' Exhibit 94, page 14.  Now,

10   you could have drawn Delegate Abbott out of 93, and you could

11   have stopped it there, couldn't you have, and accomplished the

12   goal of drawing her out of House District 93?

13   A     Yes.  She would have -- her residence would have been

14   moved in the District 94 at that time, or District 95, if what

15   I believe you are saying is the suggestion.

16   Q     Why does 95 keep going all the way up to the Reservoir

17   precinct?

18   A     In my experience and working with these elections over the

19   last decades, Reservoir, Epes, and Denbigh are strong

20   Democratic precincts.  They are basically 65 percent

21   Democratic, 75 percent Democratic, and 30 to 35 percent

22   Republican.  And Reservoir and Epes were in District 93.  So by

23   taking those away from District 93, that makes it more of a

24   swing district.  So that's why those precincts, that's way

25   District 95 goes up to that area, to take precincts out of 93.

1   Q    If you stop at Palmer, you can't take Reservoir out of

2   House District 93; is that right?

3   A    That's right.

4   Q    Now, to clarify my question, Reservoir, of course, is

5   split; is that correct?

6   A    Yes, it's split.

7   Q    In fact, it's split in more than one way, isn't it?

8   A    It's split between District 93, 94, and 95.

9   Q    Okay.  And so why did that happen?

10  A    There's less population in District 93 by splitting it in

11  that way.

12  Q    Less population of what?

13  A    Of Reservoir voting district.

14  Q    There are multiple split precincts or VTDs between 94 and

15  95; isn't that right?

16  A    Yes.

17  Q    Didn't you just say that it's typical that you only have

18  one split between two adjacent districts to equalize

19  population?

20  A    Yes, that's usually the case.

21  Q    Is this an exception?

22  A    Yes, this is an exception.

23  Q    Why is this an exception?

24  A    Because in equalizing the population, District 93 took a

25  lot of new territory, and what you'll find is unlike the other

1    districts in the area where the cores of the districts were

2    preserved, District 93 had almost all of the change.  You'll

3    find that new District 93 retains only 50 percent of its

4    original territory, and, in that sense, of all the districts in

5    Hampton Roads, its core was the least preserved of any district

6    in Hampton Roads.

7        So the political goal of changing that district and making

8    it more of a swing district and pulling the Democratic

9    territory out and population out of 93 that was previously in

10   93 is accomplished.

11   Q    If you make Jenkins whole in 95, do you have enough

12   population to get all the way to Reservoir?

13   A    No.

14   Q    If you make -- how pronounce the D one?

15   A    Denbigh.

16   Q    If you make that whole, do you get all the way up to

17   Reservoir?

18   A    No.

19   Q    If you make Epes whole, do you get all the way up to

20   Reservoir?

21   A    I don't believe so.

22   Q    So you have to kind of thin it out to get it all the way

23   up there; is that right?

24   A    Yes.  And District 94 -- except for the addition of the

25   lower portion of District 93, District 94 is relatively stable.

1  Again, the border is very similar to what it was in the

2  benchmark plan except for the addition of the area around Robin

3  Abbott's residence.

4  Q    I believe you testified that the voting in Reservoir is

5  Democratic.

6  A    Yes.

7  Q    And when you are splitting this, is this an instance where

8  political data below the census-block level matters?

9  A    Not really.  I'm looking at taking as much as possible of

10 Epes and Reservoir out of 93.

11 Q    So where do you -- how do you decide where to stop within

12 the VTD?

13 A    In this case, it had a lot to do with District 94, and

14 once District 94 was done, then that's all that it needed.  I

15 think that the political goal could be reached even more

16 effectively if all of Epes and all of Reservoir were taken out.

17 In fact, all of Epes is taken out of District 93, and most of

18 Reservoir is taken out of District 93 in addition to precincts

19 in the lower portion of 93.

20 Q    I believe you testified earlier that when you were

21 drawing -- or, excuse me.  When you were drawing at the

22 census-block level, splitting the VTDs in the challenged

23 districts, you were not looking at racial-themed census blocks

24 on Maptitude; is that correct?

25 A    That's correct.

1    Q    Is that the case here as well?

2    A    Yes.

3    Q    House District 95 gave some VTDs to House District 92; is

4    that correct?

5    A    Yes.  In looking at District 95 and the lower portion

6    here, District 95 had portions of the city of Hampton, and

7    those voting districts are with Mallory, Forrest, and Kraft,

8    those were given to District 92 so that District 95 has less of

9    a footprint in Hampton.  In fact, District 95 is 80 percent in

10   Newport News.  Even with the additional -- addition of

11   territory, all of the territory in the northern section is part

12   of the city of Newport News.

13   Q    So why were these changes made?

14   A    These changes, these VTD voting districts were added to

15   District 92, and that respects the boundary between the two

16   cities in the sense that there's -- these are not in

17   District 95.  There are still some voting districts that are

18   from Hampton, Tucker-Capps, and Bethel, and one more that I

19   can't read here.  Sandy Bottom, I believe, yeah, there it is.

20        And so by making District 92 whole, District 95 needs to

21   gain population, and it gained population as described by

22   stretching north towards where the surplus was.

23   Q    Are you aware of -- strike that.  You reviewed the report

24   of Dr. Rodden; correct?

25   A    Yes.

1    Q    And it was your understanding on reading his report that

2    his belief is the configuration of both of these districts was

3    primarily to achieve a racial target?  Is that correct?

4    A    That's what his report says.

5              JUDGE PAYNE:  What districts?

6              MR. RAILE:  Both House District 95 and 92.

7    Q    Is that your understanding?

8    A    That's my understanding, yes.

9    Q    And that target is -- in his report, he says 55 percent

10   black voting-age population; is that right?

11   A    That's what his report says, yes.

12   Q    Is that true?

13   A    Well, as I described here --

14   Q    Just answer yes or no; is that true?

15   A    No.

16   Q    How do you know that?

17   A    Because in drawing the districts, the changes were made as

18   I described for political reasons relative to District 93, and,

19   furthermore, the districts, when they were -- the

20   majority-minority districts were similar to the benchmark

21   districts in their black voting-age composition.

22   Q    Could you have drawn this in any number of ways and they

23   would have ended up above 55 percent black voting-age

24   population?

25   A    Yes.

1    Q    How do you know that?

2    A    Because I've done that.

3    Q    Let's look at Intervenors' Exhibit 108, pages four, five,

4    six, seven.

5              MR. HAMILTON:  Objection, Your Honor.

6              JUDGE PAYNE:  Do we have that exhibit in this little

7    Morgan book, or is it somewhere else?

8              MR. RAILE:  You have it in the Morgan witness binder,

9    Your Honor.

10             JUDGE PAYNE:  Exhibits what?  108, is that what we're

11   on?

12             MR. HAMILTON:  That's what we're on.  The objection

13   to this and Exhibit 111, which hasn't been identified yet but

14   will be shortly, I think, neither of these documents were

15   produced in the course of discovery.  These were identified for

16   the first time when the exhibit lists were produced.

17             They appear to be an effort to rebut Dr. Rodden, but

18   Mr. Morgan is not an expert witness.  Intervenors have

19   identified no less than three expert witnesses, all whom will

20   testify, none of whom prepared this map.  So it wasn't produced

21   in discovery.  It wasn't -- if it were expert material, then it

22   should have been produced pursuant to Rule 26, but if it's

23   not -- which, of course, that deadline was a long time ago.  If

24   it's not expert testimony, then it's a document that should

25   have been identified in discovery, and it wasn't.

1          MR. RAILE:  Could I ask the witness a few questions

2    to respond to Mr. Hamilton?

3          JUDGE PAYNE:  First let me understand the objection.

4    A, it wasn't produced in discovery?

5          MR. HAMILTON:  Correct, at any time.

6          JUDGE PAYNE:  But it was put on an the exhibit list.

7          MR. HAMILTON:  About a week ago or two weeks ago.

8          JUDGE PAYNE:  Whenever they were due, it was put on

9    the exhibit list, and you objected to it then.

10          MR. HAMILTON:  I did.

11          JUDGE PAYNE:  And the objection you made was what?

12          MR. HAMILTON:  The objection that we made at the time

13    was either Rule 26(a)(2), undisclosed expert analysis, or

14    Rule 37, failure to produce.  In addition, we voiced an

15    objection to relevance under 401 because the document wasn't

16    produced at the time and it was never considered by him at the

17    time, and 403 because it's simply -- by adding yet another

18    undisclosed, unconsidered map, it introduces unnecessary

19    confusion.

20          THE COURT:  Why didn't you produce it during

21    discovery?

22          MR. RAILE:  It didn't exist.

23          JUDGE PAYNE:  So what?  I mean, that's not much of an

24    answer.

25          MR. RAILE:  The discovery obligations do not --

```
1              JUDGE PAYNE:  You have an obligation to supplement.

2              MR. RAILE:  This was produced about as soon as it was

3    created.

4              JUDGE PAYNE:  You so supplemented.  When you did

5    that, did you say we are supplementing our response to

6    interrogatory number such and such or request such and such, or

7    what you did do?

8              MR. RAILE:  I don't know the answer to that, Your

9    Honor.

10             JUDGE PAYNE:  You can't get very far without that

11   answer as to his objection.

12             MR. RAILE:  Ms. McKnight may be able to help.  I

13   don't recall what we said.

14             MS. McKNIGHT:  Your Honor, we served them as part of

15   our exhibits in the case when the exhibits were due.

16             JUDGE PAYNE:  But not as a supplementary answer to

17   any previous document request.

18             MS. McKNIGHT:  We did not identify them specifically

19   as a supplemental answer.

20             JUDGE PAYNE:  So you didn't produce them in

21   discovery.  He's been surprised by it.  Why should he be

22   allowed to use it now?  You are offering it as an exhibit,

23   according to him, that was on the exhibit list.  If you didn't

24   produce this information in discovery, that's a threshold

25   issue, isn't it?
```

1        MR. RAILE:  Sure.  Well, if that's your

2    understanding, Your Honor, I would respect permission to use it

3    as a demonstrative.

4        MR. HAMILTON:  Same objection, Your Honor.  He's --

5    the witness has testified already, I think twice now, he can

6    draw this district in a number of different ways under

7    55 percent.  That's not actually in dispute between the

8    parties.  So maps showing that --

9        JUDGE PAYNE:  He's the problem.  What's your

10   objection to using it as a demonstrative, I think?  The fact

11   that he's talked about something before is not much of a

12   reason.  What reason have you got for objecting to it as a

13   demonstrative exhibit?

14       MR. HAMILTON:  Your Honor, it's the same reason --

15   first of all, it was never identified as a demonstrative

16   exhibit pursuant to the Court's order.

17       JUDGE PAYNE:  It hasn't been; right?

18       MR. HAMILTON:  It has not at any time.

19       JUDGE PAYNE:  Was it ever identified as a

20   demonstrative and handed over on the morning of trial or

21   whatever it was you are supposed --

22       MR. RAILE:  It handed over well in advance of that,

23   Your Honor, I think.

24       MR. HAMILTON:  As an exhibit.

25       JUDGE PAYNE:  There's a difference.  I don't think

1   you can use it.  Anybody?  I've given you every chance to say

2   how you could get it in, but I don't see how you use it.

3           MR. RAILE:  Thank you, Your Honor.

4           MR. HAMILTON:  Thank you, Your Honor.

5   Q    You didn't go back and draw several different

6   configurations of House District 95; correct?

7   A    I'm sorry, could you repeat the question, please.

8   Q    Sure.  That was not a very well-worded question.  House

9   District 95 could be drawn in any number of ways and end up

10  above 55 percent black voting-age population; correct?

11  A    Yes.

12  Q    And you actually tested that?

13  A    Yes.

14  Q    And you have four different versions of House District 95

15  that all were above that when you did that; is that right?

16  A    Yes, they were.

17  Q    The same mapping that you did in 2011?

18  A    Yes.

19  Q    Let's look at House District 92 which is Intervenors'

20  Exhibit 94 at 13.

21          JUDGE PAYNE:  At what?

22          MR. RAILE:  Page 13, Your Honor.

23          JUDGE KEENAN:  If you could please speak into the

24  microphone.  It's kind of hard to hear sometimes.

25          MR. RAILE:  Thank you, Your Honor.

1   Q     We already discussed the western boundary of this

2   district; is that right?

3   A     Yes.  We discussed the western boundary of District 92 was

4   added to in Wythe, Mallory, and Forrest and Kraft were added to

5   the district, and on the north end Sandy Bottom and Machen were

6   moved.

7   Q     And are you familiar with -- you read Dr. Rodden's report;

8   right?

9   A     Yes.

10   Q     You understand that he criticizes the decision not to

11   include Bryan in House District 92?

12   A     Yes.

13   Q     And you understand the position in his report is that

14   these decisions were made because of a goal of achieving black

15   voting-age population of 55 percent black BVAP; is that right?

16   A     That's my understanding of what he said.

17   Q     Would adding that to House District 92 drop House District

18   92 below 55 percent BVAP?

19   A     Not in my experience.

20   Q     Did you test that?

21   A     Yes.

22   Q     After you read his report?

23   A     Yes.

24   Q     And you actually mapped it?

25   A     Yes.

1    Q    And you found that adding Bryan to House District 92

2    doesn't take it --

3              MR. HAMILTON:  Objection, Your Honor, at this point,

4    he's been leading the witness all the way through.  I've

5    refrained from objecting, but at this point, he's just

6    feeding --

7              JUDGE PAYNE:  Why don't you let the witness testify.

8              MR. RAILE:  Thank you, Your Honor.

9    Q    So did adding Bryan in that exercise you performed drop

10   black voting-age population below 55 percent?

11   A    No.

12   Q    Let's turn to the Richmond area.  Again, we'll look at the

13   regional map, Intervenors' Exhibit 96 and 97, page four of

14   both, both Exhibit 96 and 97.  Again, that's map book one which

15   folds open.

16             JUDGE PAYNE:  What pages on these exhibits?

17             MR. RAILE:  Page four, Your Honor.

18             JUDGE PAYNE:  Page four on each?

19             MR. RAILE:  Yes, Your Honor.

20             JUDGE PAYNE:  Okay.

21   Q    Mr. Morgan, what is your understanding of the pressures

22   that were brought to bear on this region in the 2011

23   redistricting?

24   A    Well, pardon me about this process, because I don't have

25   the figures in front of me, but I think at this regional level,

1    there are some population considerations regarding the

2    districts being over or under in the benchmark plan.  So I'll

3    refer to the benchmark, the 2001 plan here.

4        My understanding was that some of the Richmond area seats

5    were underpopulated, and those were in the inner districts.  74

6    was not underpopulated, but I believe two of the others were,

7    and then the key point at this level that I want to point out

8    is that there was surplus population in Chesterfield County in

9    District 27 and District 66, and, to some extent, I think

10   District 62 had some surplus population.

11       And in this regional map, while I'm here because we may

12   change views, there are also two districts in Henrico, 73,

13   which is represented by Delegate O'Bannon, and 72, which is

14   represented by Delegate Massie.  So when we talk about the

15   Richmond area, those are some of the districts that I may

16   discuss during this process.

17   Q    So --

18              JUDGE PAYNE:  73 and 27 were overpopulated; is that

19   what you are saying?

20              THE WITNESS:  I wish I had the numbers in front of

21   me.

22   Q    You can look at an exhibit with the numbers, Intervenors'

23   Exhibit 134.

24              JUDGE PAYNE:  Is that in his book?

25              MR. RAILE:  Which is in his book at the end.

1              JUDGE PAYNE:  His book?

2              MR. RAILE:  Yes, Your Honor.

3              JUDGE PAYNE:  Look at the back of this black

4    notebook, Mr. Morgan.  It says Exhibit 134.  Has numbers in it.

5              THE WITNESS:  I see one map.  Are there additional

6    maps?

7              JUDGE PAYNE:  It has percentages in it the best I

8    have.  It says map 33.

9              THE WITNESS:  Northern Virginia is the one I see.

10             MR. RAILE:  Look to the one that says map 32, which,

11   I guess, is maybe Exhibit 133.

12             THE WITNESS:  Thank you.  I see it now.

13             JUDGE PAYNE:  Is that Exhibit 133?

14             MR. RAILE:  Yes, Your Honor.

15   Q    Does this refresh your recollection about the deviations

16   in the Richmond region?

17   A    Yes.

18   Q    Okay.  And so what is the trend that you see here?

19   A    We see that districts -- the districts that are closer

20   into Richmond, 73, 71, 69, and 68, are all underpopulated.  So

21   it's 11 percent in District 69; eight and a half percent in

22   District 68; seven percent in District 73; and seven percent in

23   District 71.  So, you know, looking at all of them, they're

24   about 30 percent under as a group of four districts.  To the

25   south, District 27 is overpopulated by ten percent.  District

1  66 is overpopulated by ten percent, and there's also a little

2  bit of surplus population in District 72.

3  Q    So at the global level, what was the strategy for

4  resolving these population discrepancies?

5  A    Well, in this sense, the surplus population from

6  Chesterfield was ultimately brought into the Richmond area

7  district.  So primarily this was done by bringing the

8  Chesterfield population into District 70, and that's kind of

9  the regional view of how the population equalization was

10  rectified in this region up as a whole.

11  Q    Why was it drawn into 70?

12  A    District 70 had already had a portion of Chesterfield

13  County, and, again, the population growth, the available

14  population, if you will, was in Chesterfield County.  So by

15  taking it from the Chesterfield districts, it allows the

16  districts to retain more of their core generally.

17          JUDGE PAYNE:  I thought 70 had less than one

18  percent -- was down less than one percent.

19          THE WITNESS:  Yes, Your Honor.  The benchmark

20  district was within tolerance, but the group of districts in

21  Richmond were below population.  So the population from

22  Chesterfield was brought into the Richmond area districts.

23          JUDGE PAYNE:  It was put into 70, and all the others

24  had to be adjusted because of that?

25          THE WITNESS:  Effectively at this level, that

1    discussion, that's true, yes.

2    Q    You could have done the same thing with 69; right?

3    A    Yes.

4    Q    Why didn't they?

5    A    District 79, as I said, already had a portion of

6    Chesterfield, and this was the district that absorbed the

7    additional population.

8    Q    70 was already in that county.

9    A    Yes.

10   Q    So the footprint was increased?

11   A    Yes.

12   Q    Let's begin -- well, let's stay at the regional level.

13   What other strategies are there for resolving the population

14   discrepancies at the more global level?

15   A    Well, this has been discussed before, but in the area of

16   Hopewell, District 74, which includes -- in the benchmark plan

17   included a portion of Prince George, a portion of Hopewell, all

18   of Charles City County, and Henrico, and possibly a small

19   portion of Richmond in the benchmark plan, the estuary crossing

20   of the James River was not continued into the enacted plan.  So

21   this portion of District 74 was removed from District 74, and,

22   again, at the larger regional level, that's one of the things

23   that was happening.

24   Q    So this section of the James River here is still

25   considered the estuary, in your view?

1    A    Yes.

2    Q    And we talked about the estuary a little bit further down

3    the river before?

4    A    Yes.

5    Q    Okay.  Let's turn to House District 74, Intervenors'

6    Exhibit 94.

7              JUDGE PAYNE:  You said something about 74 being

8    Henrico, but only part of 74 is in Henrico, isn't it?  I mean

9    part of Henrico is in 74.

10             THE WITNESS:  Yes, Your Honor.

11             JUDGE PAYNE:  Henrico has other VTDs in it.

12             THE WITNESS:  Yes, Your Honor.

13   Q    All right, House District 74, Intervenors' Exhibit 94 at

14   page five.  What do you know about why this district is

15   configured in the way that it is?

16   A    As I mentioned, the portion of District 74 in Hopewell

17   where it was crossing the James River, as we discussed, that

18   was something that was not going to be continuing in the new

19   districting structure.

20        That was removed from District 74, and then this portion

21   of -- this is entirely a portion of Henrico County in the

22   Chickahominy area right up to the county border, that was added

23   to District 74, and it essentially -- it thickens the neck is

24   the term I've heard, and it basically rounds out the district

25   up to the county line.

1  Q    Is that why it was done?

2  A    Yes.

3          JUDGE PAYNE:  What is why it was done?  The question

4  was, is that why it was done.  What's the "it" in that

5  sentence?

6  Q    You testified that thickening the neck is what occurred by

7  adding these VTDs; is that right?

8  A    Yes.  The VTDs were added --

9  Q    Let me stop you right there.  What I'm asking you is, are

10 you describing what happened, or are you telling me why those

11 VTDs were added?

12 A    Those VTDs were added to bring the northern fragment of

13 Henrico County into District 74 away from District 97 which was

14 primarily a Hanover and New Kent district.

15 Q    Okay.  What other changes -- would it be fair to say that

16 this district retains its core from the past decade?

17 A    Yes.  It retains the core of its district.  It's

18 principally a northern Henrico district, and, of course, it

19 connects to Charles City County which is sparsely populated.

20 Q    We saw an exhibit yesterday where we saw that it went all

21 if way back to 19991.  Were you room in the room for that?

22 A    Yes, I saw that exhibit.

23 Q    Do you agree with the testimony of Delegate Jones on that,

24 that that's the core retention since 1991?

25 A    I understand the district was largely the same from '91 to

```
 1   2001 to --
 2   Q    And I want to go through that exhibit --
 3             THE COURT:  You are stepping on him now.
 4             MR. RAILE:  I apologize, Your Honor.  I'm trying to
 5   save some time now.
 6   Q    I'm not going to go through that exhibit again, but was it
 7   your understanding that one of the purposes for why this is
 8   configured the way it is is to retain that configuration?
 9   A    Yes.
10   Q    What changes are occurring on the southern border that
11   kind of slants to the northwest in the district?
12   A    Laburnum precinct was added into District 74.  Ratcliffe
13   was removed from District 74.  301 in Richmond was added to
14   District 74.
15   Q    Let me stop you there.  Do you recall why any of those
16   changes were made?
17   A    That had to do with exchanges between District 71 and 74
18   and 70 primarily.
19   Q    Do you remember the reasons for those?
20   A    I'd have to look in more detail at the districts.
21   There's -- it was exchanging populations between the districts.
22   Q    And so keep going up the north border, Belmont, et cetera.
23   A    A portion of Belmont and Canterbury were removed from
24   District 74.  Hollybrook was added to District 74, and there
25   was also some additional VTDs, portions of which were brought
```

1   into District 74 along that line.

2   Q     There's some split VTDs in that area; right?

3   A     Yes.

4   Q     Where are they?

5   A     The VTDs are split in Belmont, Moody, and one additional

6   one.  I don't have the map that shows that.

7   Q     Sure.  Let's look at Plaintiff's Exhibit 69 at 33 which

8   has a close-in.

9   A     The split VTDs, just to fully answer your question, are

10  Belmont, Brookland, and Moody.  These are the boundaries of the

11  whole VTDs.

12  Q     Do you recall why those were split?

13  A     Yes.

14  Q     Why is that?

15  A     In building District 72, this precinct here, Canterbury

16  was a strong Republican-performing precinct, and it was

17  ultimately added to District 72, and District -- the Belmont

18  voting district was split to allow Canterbury to go to

19  District 72.

20      And the water boundary here is the boundary between

21  District 74 and 72, and one of the things that occurred in

22  drafting District 72 was, District 72 is shaped almost like an

23  upside down U.  I'm drawing the borders of District 72, and it

24  has the mirror image of this configuration on the other side.

25  So it's very much like a U-shaped district.

1      So the border in that area was following the river

2   boundary because it had a better impact on compactness for

3   District 72 which was one of the least compact districts in the

4   entire plan.

5   Q    Was it challenged in a recent court case?

6   A    Yes.  District 72 was among the challenged districts in a

7   state court case.

8   Q    Is that why you did that?

9   A    Yes.  It was to put more physical territory into

10  District 72.

11  Q    Did you discuss that with Delegate Jones?

12  A    There was discussion about the compactness of District 72.

13  Q    Do you recall discussing these specific VTD splits with

14  Delegate Jones?

15  A    Not the specific splits, but there was discussion about

16  District 72's compactness.

17  Q    Let's look at House District 71, Intervenors' Exhibit 94

18  at four.  What do you know about why this district was

19  configured as it is?

20  A    District 71 became more Richmond-centric by -- these

21  portions of Henrico County were removed from the district so

22  that the new District 71 has no portions of Henrico County in

23  that area.  And so Stratford Hall, Hilliard, and Summit Court

24  were removed.  As I also said in discussing 74 and 72, that

25  allowed Canterbury to go into the new District 72 as well.

1      And then there's been discussion about VTD 207.  That was

2  moved from District 71 to District 68, Delegate Loupassi's

3  district.  VTD 204 was brought into 71, and then on the other

4  side of the district, 701, 702, and a portion of 703 were put

5  in as well as 604 and then Ratcliffe which is also in Henrico

6  County.  And then District 301 was removed, and lastly, the

7  split VTD between 69 and 70 is VTD 505.

8  Q    Do you recall why 301 was removed?

9  A    No, not specifically.

10 Q    Do you recall why Ratcliffe was added?

11 A    That was a population -- it was a large population VTD.

12 It also did have African-American voting strength.

13 Q    Were you aware of concerns under this district under the

14 Voting Rights Act?

15 A    Yes.

16 Q    What were those concerns?

17 A    My understanding is that District 71 in the benchmark plan

18 no longer had a majority of African-American voting-age

19 population.  It was at 46 percent black voting-age population.

20 Q    Do you recall what it was at the beginning of the cycle in

21 around 2001?

22 A    I believe it was 55 percent or above.  I don't recall the

23 specific number.

24 Q    So it had fallen quite a bit over the decade?

25 A    Yes.

1    Q    Were there concerns that that would continue?

2    A    There were concerns that that would continue, and -- yeah.

3    Q    Were there any incumbency considerations in the crafting

4    of this district?

5    A    Yes.

6    Q    What were those?

7    A    This is the City of Richmond, and as it happened, the

8    incumbents live fairly close to each, and the incumbents in

9    neighboring districts lived pretty close to each other.  So

10   basically Delegate Loupassi and Delegate Carr and McClellan

11   live about three miles apart.  Delegate O'Bannon is another

12   three miles in that direction, and another three miles beyond

13   that is Delegate Massie.  So, generally speaking, these

14   incumbents were close together.

15   Q    Are there split VTDs in this district?

16   A    Yes.

17   Q    Where are those?

18   A    There's a VTD split in 703 between District 70 and -- I'm

19   sorry, District 71 in yellow and District 70, Delegate

20   McQuinn's seat, and then there's a split VTD between

21   District 69, Delegate Carr's seat, and District 70, Delegate

22   McClellan's seat, and also a small portion of District 211, VTD

23   211 is also split, although that area involves no population.

24   Q    Did you discuss any of those -- strike that.  Did Delegate

25   Jones become involved in any of those VTD splits?

1    A    Yes.

2    Q    Which one or more?

3    A    He was involved in the splitting in this region down here

4    on the border between 69 and 70.

5    Q    Why did he become involved in that?

6    A    My understanding was that he received feedback from the

7    Richmond registrar --

8              MR. HAMILTON:  Objection, hearsay.  He's repeating --

9              JUDGE PAYNE:  Just asking him for a response.

10             MR. RAILE:  Your Honor, I can withdraw that question.

11   Q    Delegate Jones became involved in that; right?

12   A    Delegate Jones was involved in that process, and it

13   happened between the vetoed bill and the enacted plan.

14             JUDGE PAYNE:  What VTD was that one that was split?

15             THE WITNESS:  VTD 505 was split in a different manner

16   in previous versions of these plans.

17   Q    Did you have an understanding of why it ended up split the

18   way it was?

19   A    Yes.

20   Q    What was your understanding?

21   A    My understanding was that there was input from the City of

22   Richmond registrar about splitting --

23             MR. HAMILTON:  Same objection.  He's repeating --

24             JUDGE PAYNE:  Let's suppose for a moment that he is

25   lying, that he got no input from the City of Richmond and that

1    he's just sitting here talking about it.  What does that do to

2    whether it's hearsay or not?  In other words, he's offering it

3    for why it is that he did what he did, not for whether or not

4    the City of Richmond guy really said that or not.

5            Even if the City of Richmond guy did not say that and

6    he's saying that's why I did it, you can later impeach him, but

7    he can still explain why he did it without it being true

8    whether the Richmond guy said it, can't he?

9            MR. HAMILTON:  I don't think so.

10           JUDGE PAYNE:  I guess we'll decide, I guess, but

11   that's my understanding of the hearsay rule.  Generally --

12           MR. HAMILTON:  I think the truth of the matter

13   asserted, we have to determine what is the matter asserted.

14   The matter asserted is, I was at the Richmond registrar,

15   provided input into the way this VTD was split.  That's the

16   matter asserted.

17           MR. RAILE:  I think the matter asserted is I drew

18   this line the way it was because that's what I was thinking at

19   that time.

20           MR. HAMILTON:  If that's what --

21           JUDGE PAYNE:  That's what he was saying, I thought.

22           MR. RAILE:  My understanding as well, Your Honor.

23           JUDGE PAYNE:  I think that's what he asked.  He drew

24   the line for a reason.  Why did you draw the line?  Because he

25   got some communication from the registrar directly or

1    indirectly.  That's why he did it.

2            MR. RAILE:  That's how I interpret it.  The witness

3    is right there.  We can ask him.

4            JUDGE PAYNE:  Ask him.

5    Q    Mr. Morgan, why did you draw the line the way it was

6    drawn?

7    A    We -- Delegate Jones and I received input from the

8    registrar of Richmond.  There were many changes that were made

9    between the vetoed bill and the enacted plan in the Richmond

10   area.  Those are all available publicly in looking at the 2011

11   redistricting, HB 5001 and HB 5005.  Changes were made in

12   Richmond.  I was brought back in to assist Delegate Jones from

13   the time that the plan was vetoed until the plan was enacted to

14   make changes such as that.

15   Q    That was your motive for drawing it that way; right?

16   A    Yes.

17   Q    I see that 207 came out and went to Delegate Loupassi's

18   district?

19   A    Yes.

20   Q    What was going on in your mind when you drew it that way?

21   A    This was additional Richmond area that was added to

22   Delegate Loupassi's district.  My understanding was that unlike

23   the previous Republican delegate, Delegate Marrs, who was from

24   Chesterfield, Delegate Loupassi is from Richmond.

25   Q    That's why you drew it in there?

1   A    Yes.

2   Q    Let's move to House District 69.  What do you know about

3   why this district was configured the way that it was

4   configured?

5   A    District 69 took in parts of the city of Richmond south of

6   the James River, VTDs 402, 508, and a portion of -- I don't see

7   it -- 609.

8   Q    And why were those changes made?

9   A    My understanding was that those VTDs were going to be

10  added to bring District 69 up to the James River, and that was

11  my understanding from the start of the process, that that was

12  going to happen.

13  Q    That was the purpose, was to bring it up to the James?

14  A    Yes.

15  Q    What other changes were made that you are aware of?

16  A    District -- voting District 811 and 903 were added in the

17  south, and then some Chesterfield VTDs were removed.  That's

18  Beaufont, Manchester, and Belmont, and, lastly, which we just

19  discussed, VTD 505 was added, and at different times more of

20  505 was in, different configurations of 505 were in, but 505

21  was added.

22  Q    Is 505 the only split between House District 69 and House

23  District 71?

24  A    Yes.

25  Q    And there is a VTD split on the western border; am I

1    correct?

2    A    I'm sorry, I don't understand.

3    Q    Are there any other VTDs split in this district?

4    A    Yes.  VTD 410 is split.  The Davis voting district is

5    split.  Also District 609, which goes all the way down here, is

6    split.

7    Q    What's your understanding of why those VTDs are split as

8    they are?

9    A    District 609, the split here along the I-95 interstate

10   involves no population, and it essentially allows better

11   contiguity for District 70, and the Davis split was done late

12   in the process, between the time the bill was vetoed and the

13   enacted plan.

14        There was a different configuration in the boundary

15   between 69 and 27, and then, lastly, VTD 410 was also split in

16   a different manner in the vetoed plan, and this split up to

17   this line at the Chippenham Parkway was done in the last stages

18   of the map-drawing.

19              JUDGE PAYNE:  Why?

20              THE WITNESS:  Your Honor, District 68, as I

21   mentioned, is a portion of the city of Richmond and the county

22   of Chesterfield.  When that district was first designed in this

23   configuration -- this goes back to 2001, but there was a

24   previous incumbent, Panny Rhodes, who represented District 68,

25   and in the redistricting process, more of Chesterfield was

1   added to her district, and she ultimately lost in the election.

2   So the current configuration of 68 has Chesterfield and

3   Richmond, and that is required for keeping those pieces

4   together in a single district for contiguity.

5   Q    And to illustrate that, let's look at Intervenors'

6   Exhibit 97 at page four.  We can just pull it up on the screen.

7   And you said the split is what makes House District 68

8   contiguous.  Can you point to that on the screen?

9   A    Yes.  VTD 410 -- could you erase that, please.  I know

10  it's generally where it is.  Thank you.  So the split VTD is

11  here, and between those two dots basically is the population of

12  68.

13  Q    Why not put the entire VTD in 68?

14  A    It had previously been in 68, and when it was adjusted, it

15  was adjusted in that direction.

16  Q    Was that for population equalization reasons?

17  A    Yes.  It's the only split between District 68 and 69.

18  Q    It's the same process that we saw illustrated and

19  discussed ad nauseam earlier?

20  A    Yes, with the additional factor that I brought that split

21  up to the Chippenham Parkway where previously, in the vetoed

22  bill, it had been split in a different manner.

23  Q    And sometimes when you're splitting the VTDs, you are

24  identifying some local landmark or road or something to make it

25  a neat split?

1    A    Yes.

2    Q    We saw that earlier in District 10.

3    A    Yes.

4    Q    House District 70, Intervenors' Exhibit 94, what do you

5    know -- this is at page three.  What do you know about why this

6    district is configured in the way that it is?

7    A    Well, a lot of the district population is in Henrico and

8    city of Richmond, but it's two different parts of the city of

9    Richmond.  It's the northern section up here where the

10   incumbent, Delegate McQuinn, lives, and then a lot of her

11   population for her district is in the southern part of Richmond

12   and also in Chesterfield County.

13       And the portion -- again, we've used these maps.  So the

14   portion that's shaded was already in her existing district and

15   remained in her existing district -- in the new district, I'm

16   sorry.

17   Q    And this, as we talked about at the beginning, was where

18   the population flow comes in from the overpopulated

19   Chesterfield County; is that right?

20   A    Yes.  The District 66 and 27 had surplus population, so,

21   in a sense, by transferring that population, it allows those

22   surrounding districts to retain more of their core, and it also

23   solves the population requirements in the city of Richmond area

24   districts.

25   Q    Were you in the room for Dr. Rodden's testimony?

1 A Yes.

2 Q Do you recall when he testified that bringing these in in

3 Chesterfield County was bringing in precincts that weren't

4 similar to the other precincts in House District 70?

5 A Yes.

6 Q And do you have a response to that?

7   JUDGE PAYNE: Excuse me. "These" meaning Falling

8 Creek, Meadowbrook, Southside, and Chippenham; is that what you

9 are asking?

10   MR. RAILE: Yes, Your Honor.

11   THE COURT: We're going to read all this stuff, and

12 we have to have something to identify. "These" doesn't help

13 much.

14   MR. RAILE: Thank you, Your Honor.

15 Q So Falling Creek, Meadowbrook, Southside, Chippenham, are

16 they different and, from a communities-of-interest perspective,

17 from the adjacent precincts?

18 A Well, they're different jurisdictions except for Drewry's

19 Bluff is in Chesterfield, but they're along the Chippenham

20 Parkway, and that area is fairly similar in my understanding.

21 Q Is this area of Henrico County, Sullivans, Mehfoud, Rolfe

22 -- did I pronounce that correctly?

23 A I think it's Rolfe.

24 Q Are those substantially different from these areas in

25 Chesterfield County?

1   A    They're not as -- they're more sparsely populated than

2   that area of Chesterfield.

3   Q    Okay.  Do you recall why Laburnum was dropped?

4   A    No.

5              JUDGE PAYNE:   Are there split VTDs in here?

6              THE WITNESS:   Yes.  I believe there are in

7   District 70.  Your Honor, we previously discussed the split in

8   703.  Up here is split between 71 and 70, and I believe the

9   Dorey VTD is split between 62, Delegate Riley Ingram's

10  district, and District 70, Delegate McQuinn's district.

11             So one split between 71 and 70, one split between 62

12  and 70, and then I don't believe there are additional splits.

13  I'm sorry, we did discuss the split here between 69 and 70 that

14  involves no population along the James River between 95 and the

15  river.

16  Q    Are each of these -- it's just one split per adjoining

17  district.  Did I hear you correctly?

18  A    Yes.

19  Q    And is that just the typical equal population split?

20  A    Yes.

21  Q    Let's look at House District 63, Intervenors' Exhibit 94

22  at one.  What do you know about why this district is configured

23  as it is?

24  A    As we discussed earlier, the city of Hopewell portions

25  that were in District 74 were available, and they were moved to

1    District 63, and portions of Hopewell and Prince George County

2    were added here along -- in Prince George County, and if I may,

3    at this point, I would like to describe District 63 as being --

4            MR. HAMILTON:  Objection, Your Honor.  He answered

5    the question.  I think it's time for another question.

6            JUDGE PAYNE:  That's correct.

7    Q    So what is your understanding of why this eastern

8    addition, including Rives, Courts Building, Hopewell precincts,

9    Jefferson Park, what's your understanding of why it's

10   configured in the way that it is?

11   A    Yes.  To better understand that, I would characterize

12   District 63 as being at the junction between Tidewater and

13   Richmond.  So in drawing this plan, this boundary changed a

14   lot.  There were many different versions of drawing District 63

15   that had different population configurations, particularly in

16   Hopewell and Prince George County.  This boundary shifted a lot

17   in drafting the plan, and I'm pointing this out because it sits

18   at the junction between Tidewater and Richmond.  To the south

19   is District 64.  To the north is District 62, and they met

20   right here.

21   Q    And are there political concerns in the area that you were

22   worried about when you draw this?

23   A    Yes.  On this map, you can see that there are three

24   incumbents visible on this map; Delegate Kirk Cox, who is from

25   Colonial Heights; Delegate Riley Ingram in Hopewell; Delegate

1    Dance who was in the city of Petersburg.  So those three

2    incumbents, each one is in a different of the smaller cities in

3    that area.  So there were definitely concerns about their

4    districts.

5    Q    Which one represents House District 62?

6    A    Delegate Riley Ingram represents House District 62.  He

7    was a Republican delegate.

8    Q    What was going on in House District 62 in the

9    redistricting?

10   A    District 62 underwent a lot of changes, not quite as

11   substantial the changes that were in District 93, but

12   substantial changes to his district.  In particular, he lost

13   the balance of Prince George County which he had previously

14   represented, and that is an area that supported him and was a

15   Republican area that he had lost.  So when his district was

16   configured, he was going to be facing a lot of change in his

17   district.

18   Q    And we can see that on Defendant-Intervenors' Exhibit 96

19   and 97.  For the sake of time, I don't want to belabor the

20   point, but -- well, you can see there the change.  What effect

21   does that have on the adjacent District 63?

22   A    So the change -- basically the Hopewell area and the

23   Prince George County area that was taken into District 63,

24   again, District 63 sits between 64 and 62 at the junction

25   between them.

1   Q     And were you concerned about the border with House

2   District 62 here?

3   A     Yes.

4   Q     What were those concerns?

5   A     Delegate Ingram was one of the last delegates on the

6   Republican side to agree to the plan.  And his district was

7   undergoing a lot of changes, so those areas of Hopewell that he

8   had not represented from 2001 to 2011 were in District 63, not

9   in District 62.  Those areas were heavily Democratic and would

10  have affected his election.  It's about ten percent of a

11  district, those two wards.

12         JUDGE PAYNE:  That's why Hopewell was put in 62 -- in

13  63 rather than 62?

14         THE WITNESS:  Yes, Your Honor.

15         JUDGE PAYNE:  Having concerns is one thing, but

16  having concerns and what impact they have in the drawing is

17  another.

18         MR. RAILE:  I appreciate that, Your Honor.  Thank

19  you.

20  Q     This new section of House District 63, the Hopewell

21  precincts that were brought into House District 63, were those

22  in House District 62 in the benchmark plan?

23  A     They were not in House District 62.  They were in House

24  District 74.

25  Q     That would have been new territory for House District 62?

1    A    Yes.

2    Q    Was that -- was the goal of avoiding putting that new

3    territory in a district that already had new territory why that

4    move was made as it was?

5    A    Yes.  And as I described, Delegate Ingram was one of the

6    last members to agree to vote for the plan, and late in the

7    process he was somebody I remember having discussions with

8    about how much his district had changed.

9    Q    Now, are you familiar with the statement of Dr. Rodden in

10   his report that these Hopewell precincts had to be added to one

11   of the Richmond area districts, whether 63 or a different

12   district, in order to have all of them at 55 percent black

13   voting-age population?  Did you read that?

14   A    I read that portion of his report, yes.

15   Q    What is your response to that?

16   A    I disagree with that.

17   Q    What is your basis of that disagreement?

18   A    As I understand it, he was talking about districts being

19   55 percent voting-age black population, and having Hopewell in

20   one of those districts is not necessary for that purpose.

21   Q    Did you map that out?

22   A    Yes.

23   Q    After you read his report?

24   A    After I read his report, yes.

25   Q    How long did it take you to do that?

1    A    Ten minutes.

2    Q    This northern boundary here involving Church Road, White

3    Oak -- I can't read this one.  I can't pronounce it.  You may

4    be able to?

5    A    Matoaca.

6    Q    And the one that starts with an E there?

7    A    Ettrick.

8    Q    Why is that boundary there?

9    A    That's the same as the benchmark plan.  District 63 had a

10   portion of Chesterfield County, and that was retained.

11   Q    Why is the New Hope precinct in House District 63?

12   A    It was already in District 63, and in some proposed plans,

13   it was removed from District 63 and assigned to District 75.

14   Q    Why was that proposal made?

15   A    District 75 needed additional population, and it took it

16   from Dinwiddie County from District 63.

17   Q    And is that reflected in this territory that I'm drawing

18   up here from Little Zion and these split precincts up into, I

19   think what we've been calling in this litigation, the finger?

20   Does that look like the right area?

21   A    That was ultimately what was done in HB 5005.  That is the

22   population that was moved from 63 to 75, yes.

23   Q    And how does New Hope, the concern about New Hope factor

24   into that?

25   A    In the original draft, or one of the original drafts in

1    this area, New Hope was included entirely in District 75.

2    Delegate Dance wanted to keep New Hope in her district, and I

3    was aware of that.  I was made very firmly aware of that.

4    Q    If you drew -- and so that proposal is rejected.

5    A    That proposal was rejected.

6    Q    So you end up with this configuration?

7    A    Yes.

8    Q    This border on the south with the jagged edge, do you know

9    why that's drawn the way that it is?

10   A    Yes.

11   Q    Why is that?

12   A    It principally follows the 85 corridor here in the split,

13   and this area was negotiated between Delegate Dance, Delegate

14   Jones, and Delegate Tyler.  Once that boundary was negotiated,

15   it was not changed.

16          MR. RAILE:  All right, Your Honors, I have no further

17   questions.

18          JUDGE PAYNE:  We'll take lunch in a minute, but if

19   it's not too much, you are the one who split the VTDs for this

20   plan, where they were split -- is that right? -- in the

21   challenged districts?  Is that right?

22          THE WITNESS:  Your Honor, in most circumstances, yes,

23   Your Honor.

24          JUDGE PAYNE:  How, if at all, did you take race into

25   account in splitting the VTDs in the challenged districts?

```
 1              THE WITNESS:  I split them in the way that was
 2   described earlier.  I really didn't take race into account in
 3   splitting the VTDs.
 4              JUDGE PAYNE:  You'll have a cross-examination after
 5   lunch.  We'll take 45 minutes for lunch.
 6
 7              (Luncheon recess.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Morgan – Cross

1     JUDGE PAYNE:  Mr. Morgan, I remind you you're

2  under the same oath which you took earlier in the day.

3     THE WITNESS:  Yes, Your Honor.

4     MR. HAMILTON:  May I proceed?

5     JUDGE PAYNE:  Please.

6                    **CROSS-EXAMINATION**

7  BY MR. HAMILTON:

8  Q    Good afternoon, Mr. Morgan.  You're not here today as

9  an expert witness, correct?

10  A    That's correct.

11  Q    Only a fact?

12  A    Yes.

13  Q    And you know the difference, correct?

14  A    Yes.

15  Q    You were an actual expert witness in the *Page v.*

16  *Virginia State Board of Elections* litigation, correct?

17  A    Yes.

18  Q    In that case you offered an opinion that race had not

19  been the predominant factor in the drawing of Virginia's

20  third congressional district?

21  A    Yes.

22  Q    You read the opinion from this Court?

23  A    I think so.

24  Q    Okay.  And in that opinion the Court rejected your

25  opinion and concluded that race, in fact, was the

Morgan – Cross

 1  predominant purpose in the drawing of the third

 2  congressional district, correct?

 3          MR. RAILE:  I object, Your Honor.  I don't

 4  think --

 5          JUDGE KEENAN:  Is that relevant, Mr. Hamilton,

 6  to this inquiry?

 7          MR. HAMILTON:  I think it is, Your Honor.  It's

 8  the same legislature doing the same redistricting at the

 9  same time.

10          MR. RAILE:  Your Honor, I -- if I may.

11          JUDGE PAYNE:  Since he's objected, I think you

12  have a right.

13          MR. RAILE:  Yeah.  I -- the -- the question

14  specifically that I'm objecting to is asking him about

15  what a court found.  That decision speaks for itself.  I

16  don't think it's Mr. Morgan's role to be telling us what a

17  court did and did not find.  We can interpret that

18  decision, which I think is a legal question, what it

19  means.

20          MR. HAMILTON:  I'll withdraw the question, Your

21  Honor.

22          JUDGE PAYNE:  All right.

23  Q    All right.  Mr. Morgan, you were paid for your

24  testimony during your deposition in this case, weren't

25  you?

Morgan - Cross

1   A      Yes.

2   Q      And you're being paid for your testimony today right

3   here in this courtroom, correct?

4   A      I expect so.

5   Q      Altogether you've been paid, at least at the time of

6   your deposition, more than $20,000 for your work in the

7   Bethune-Hill case, correct?

8   A      In the previous time, yeah.

9   Q      I'm sorry?

10  A      In the previous time, yes.

11  Q      Okay.  You haven't produced your invoices.  We

12  subpoenaed you for your invoices.  They were -- they were

13  not produced.  Can you explain why?

14          MR. RAILE:  Your Honor, I object.  I don't see

15  what that has to do with anything in the direct or why

16  he's the right person to be telling about what discovery

17  obligations were or were not complied with.

18          MR. HAMILTON:  Why don't I rephrase the

19  question.

20          MR. RAILE:  And I would just add, I don't think

21  this is the right forum to be litigating a discovery

22  dispute.

23          JUDGE PAYNE:  Are you going to withdraw that

24  line of questioning?

25          MR. HAMILTON:  I'm going to withdraw that

Morgan - Cross

1   question.

2               JUDGE PAYNE:  All right.

3   BY MR. HAMILTON:

4   Q     Since we don't have your invoices in front of us, can

5   you tell us, since the date of your deposition, how much

6   you've -- how much you've incurred that has not yet been

7   paid or that has been paid since that time?

8   A     I don't have the answer to that off the top of my

9   head.

10  Q     Okay.  All right.  During the time of the

11  redistricting, I think it's clear from your testimony, you

12  worked with Chris Jones in preparing the maps for the

13  House of Delegates?

14  A     Yes.

15  Q     You were referred to as the fine carpenter who

16  assisted the chief architect; is that right?

17  A     I heard that description, yes.

18  Q     You agree with that description?

19  A     It works, yes.

20  Q     And you've got an explanation for many of the

21  districts that are at issue here that we just heard over

22  the last three plus hours.  We had a trial in 2015.  You

23  didn't testify during that trial, did you?

24  A     I was -- I did not testify, but I was available for

25  testifying.  I believe I was required to be there during

Morgan – Cross

1   that process.

2   Q    No one called you?

3   A    Neither the plaintiffs, nor the defense called me,

4   although I was under the understanding that it was

5   possible that the plaintiffs might have called me.  That

6   was the last communication I had on that matter.

7   Q    You didn't testify in the trial?

8   A    I did not.

9   Q    Much less for three and a half hours?

10  A    That's correct.

11  Q    During your work in 2011 on this redistricting

12  project for the House of Delegates, you used Maptitude

13  software program, correct?

14  A    Yes.

15  Q    Each VTD or precinct in Virginia is made up at least

16  one or, in many cases, several census blocks.  I think you

17  testified about that on direct; is that right?

18  A    Yes.  That's right.

19  Q    And the census data released by the United States

20  Census Bureau includes population and race data by census

21  block, correct?

22  A    Yes.

23  Q    So let's talk about choices.  You said the boundaries

24  of these census blocks constrained your choices in drawing

25  some of these district boundaries, correct?

Morgan - Cross

1    A      I'm not sure I understand that.

2    Q      Well, let's see.  You had a choice of which census

3    blocks to add when you were splitting a VTD; isn't that

4    true?

5    A      Yes.

6    Q      And you had a choice of which census blocks to

7    exclude when you were splitting a VTD?

8    A      In some cases, it would have been impossible,

9    particularly in regards to contiguity.  You could select a

10   census block and then there might be others that are

11   interior to that census block.

12   Q      Sure.  But in general, there are some census blocks

13   you could include and are some census blocks you could

14   exclude?

15   A      Generally, yes.

16   Q      Okay.  And there were some census blocks, as you just

17   said, that you had a choice to just leave where they were?

18   A      Yes.

19   Q      Those are all choices when you're splitting a voting

20   tabulation district.  You can make those choices within

21   that voting tabulation district?

22   A      Yes.

23   Q      Now, election results are reported by the state of

24   Virginia State Board of Elections or local election

25   officials at the precinct or VTD level, correct?

Morgan - Cross

1   A    Generally that, is true.

2   Q    And generally, it's true that in the Commonwealth,

3   election results data is not reported at the census block

4   level, correct?

5   A    It's not reported at the census block level that I'm

6   aware of.

7   Q    Below the level of the voting tabulation district,

8   the VTD, you can't determine how any individual voter

9   voted by looking at the official election results,

10  correct?

11  A    I don't think there's any way to determine how any

12  individual voter voted.

13  Q    So for any particular VTD for any particular

14  election, we know how many votes were cast in the entire

15  VTD for the republican candidate and for the democratic

16  candidate and maybe for any third party candidates that

17  might be in the ballot for that election, correct?

18  A    Yes.

19  Q    But we won't know the number of votes cast -- won't

20  know the number of votes cast at the census block level

21  for any specific candidate, correct?

22  A    Not from the State Board of Elections.

23  Q    Right.  Not from any official election result.  You

24  won't know the number of votes cast at the census block

25  level?

Morgan - Cross

1   A    As I understand your question, no.

2   Q    And in some states, you can use political party

3   registration information to try and understand the

4   political composition of the VTD at the census block

5   level, that's right, isn't it, in other states?

6   A    I -- I think so.  I think even that would be

7   different than -- than what you're describing.

8   Q    There's no political party registration information

9   available in the state of Virginia, is there?

10  A    There's registration data available.  There's no

11  registration by party in the Commonwealth in Virginia.

12  Q    So the answer is that's correct; there's no political

13  party registration available in the Commonwealth of

14  Virginia?

15  A    That's my understanding.

16  Q    Now, you could try and examine partisan primary

17  election participation to figure out the political

18  composition of a VTD at a census block level, correct?

19  That's an option?

20  A    I don't really understand your question.  There's so

21  many ways to do what I think you're trying to describe.

22        JUDGE PAYNE:  He doesn't understand the

23  question.  Rephrase it.

24        MR. HAMILTON:  I gathered that.  I'll try again.

25  Q    You could -- there are partisan primary elections in

1    the Commonwealth of Virginia, correct?

2    A     Yes.

3    Q     And one way -- you could, theoretically, try and use

4    the information about who participated in which partisan

5    primary election to try and determine political

6    composition of a VTD at a census block level?  That's a

7    possibility, isn't it?  You described that to me in your

8    deposition, didn't you?

9              JUDGE PAYNE:  Wait a minute, now.  That's about

10   three questions that you're getting into it.  I know you

11   want the answer, but stay with them one at a time.

12   Q     Didn't you a describe for me in your deposition a

13   technique of examining partisan primary election

14   participation to try and determine the political

15   composition of a VTD at a census block level?

16   A     Not simply at a census block level.  Basically in

17   Virginia, it is possible to find out who voted in a

18   partisan primary election, where they lived.  And it's

19   easily possible in the same way that you would map an

20   incumbent's residence, you could map the residence of a

21   voter and it would be tied to a specific geographic

22   location, their street address.  And that kind of

23   indication of an individual's residence, just like we saw

24   where a funeral home was or an incumbent's residence, it

25   is possible to do that with individual voters.  And in

Morgan - Cross

```
 1  this case that you're describing, I would know whether or
 2  not that voter participated in a democrat or republican
 3  primary for an individual voter to a specific address.
 4  That can be done.
 5  Q    But so far as you know, that was not done in
 6  connection with your work on the 2011 House of Delegates
 7  districting, correct?
 8  A    There was some data in that manner --
 9  Q    Listen to my question.  The question is as far as you
10  know, that was not done in connection with your work on
11  the 2011 House of Delegates district?  Yes or no.
12  A    Some of that data was used.
13  Q    Who collected this data for you, sir, that -- the
14  political date that you're discussing?  Is that Clark
15  Bensen?
16  A    The political data that I'm discussing was collected
17  by Chris Marston.  And to answer your question, it was
18  available, but it wasn't really used in the map drawing
19  process.
20  Q    Thank you.  Now, when you do redistricting on
21  Maptitude, you can turn off -- on or off filters that show
22  different things, correct?
23  A    Yes.
24  Q    You can show counties or cities?
25  A    Yes.
```

Morgan - Cross

1   Q     You can show population?

2   A     These are slightly different points.  What you were

3   describing earlier I would describe as a layer, or a

4   boundary layer, and then the population is a data point.

5   Q     Okay.  And you can also display racial data?

6   A     Yes.

7   Q     And we saw that in the illustrative exhibit that was

8   displayed a little earlier during your direct examination;

9   is that right?  That left hand box, and when you were

10  changing -- moving VTDs from one district to another --

11  A     Yes.

12  Q     -- that data would update, correct?

13  A     Yes.

14  Q     And that would show you the racial impact of moving a

15  VTD from one district to another district?

16  A     Yes.  All the figures are updated in the way that was

17  described.

18  Q     Or one census block from one district to another

19  district?

20  A     Yes.

21  Q     And in drawing these maps, you, in fact, considered

22  race; isn't that true?

23  A     In drawing these maps, yes.

24  Q     It was not only available, but it was -- it was

25  something that, in fact, was considered to ensure

Morgan - Cross

1  compliance with the Voting Rights Act?

2  A    That was my understanding, yes.

3  Q    And it was used to achieve the 55 percent black

4  voting age population racial target?  You monitored that

5  as you went through to make sure that each of these

6  districts achieved 55 percent; isn't that true?

7  A    I would disagree with that.

8  Q    Was it an accident?  Was it just a coincidence that

9  they all hit 55 percent?

10 A    You asked about my experience.  I answered your

11 question.

12         JUDGE KEENAN:  Excuse me.  Mr. Morgan, I'm

13 having a little trouble over here hearing.

14         JUDGE PAYNE:  You might want to pull that mic a

15 little closer to you.

16         THE WITNESS:  Sure.  Sorry.

17         JUDGE PAYNE:  So you think you answered the

18 question.  Okay.

19         JUDGE KEENAN:  Could you repeat the question,

20 Mr. Hamilton, because I think I missed it.

21         MR. HAMILTON:  Sure.

22 Q    The question was you monitored that racial data in

23 Maptitude as you were building these maps in the 12

24 challenged districts to ensure that they achieved the

25 55 percent black voting age population, correct?

Morgan - Cross

1  A    No.

2  Q    And so my -- my question is you checked it at the end

3  of the process to make sure they all hit 55 percent,

4  didn't you?

5  A    No.

6  Q    Is it just an accident that they all reached

7  55 percent?

8  A    I drew the maps, and at different times in the

9  process, people would evaluate the districts.

10  Q    And then suggest or recommend changes to ensure that

11  the black voting age population reached 55 percent; isn't

12  that true?

13  A    I don't know why they would make all these changes

14  and suggestions.

15  Q    Okay.  But whatever reason they might have had, the

16  effect at the end in House Bill 5005 was that in each one

17  of the 12 challenged districts, the black voting age

18  population met or exceeded 55 percent, right?

19  A    According to the numbers from the DLS, Department of

20  Legislative Services, that was true of House Bill 5005.

21  Q    So that's a yes?

22  A    I think there's a difference between what was on my

23  map screen and the DLS numbers.

24  Q    One more topic, and then we'll talk about some of the

25  specific districts here.  Are you aware of a report

Morgan - Cross

1  prepared years ago, more than a decade ago, by a

2  Dr. Loewen in connection with a 2001 lawsuit entitled

3  *Wilkins v. West*?

4          MR. RAILE:  I object, Your Honor.  I don't think

5  this is within the scope of the direct examination.

6          JUDGE PAYNE:  It may or may not.  He's asking a

7  foundation question to begin with.  Let's see where we go,

8  and it may or may not be pertinent.  All right.  So the

9  question is are you aware of such a report, Mr. Morgan?

10  A    Yes.

11          JUDGE PAYNE:  Go ahead.  See what else you

12  you've got, Mr. Hamilton.

13  BY MR. HAMILTON:

14  Q    You didn't read the report in 2001, did you?

15  A    It didn't exist in 2001.

16  Q    2011.  You didn't read the report in 2011?

17  A    I did not.

18  Q    Or at any time prior to 2011?

19  A    That's correct.

20  Q    The first time you've read this report was just in

21  the last two years?

22  A    That's correct.

23  Q    Now, when you're drawing a district, it's sometimes

24  necessary to split a VTD to equalize population I think I

25  heard you say on direct; is that right?

Morgan - Cross

1    A    Yes.

2    Q    And when you do this, all other things being equal,

3    you can choose any VTD that's on the border of the two

4    districts you're trying to equalize, right?

5    A    Generally, I would agree with that.

6    Q    Because -- and the reason that's true is because

7    population is fungible.  It just doesn't -- if you're

8    trying to just equalize population, as long as you've got

9    a VTD that's between the two relevant districts, you can

10   split any of them, assuming all other things being equal,

11   like contiguity and so on, right?

12   A    Well, again, assuming contiguity, there are

13   circumstances where that might cause a problem.

14   Q    If the goal is to balance population, the race of the

15   population involved is irrelevant; isn't that true?

16   A    Yes.

17   Q    Now, Delegate Jones testified that when VTDs were

18   split, as a general matter, he deferred to you on where to

19   draw the particular lines that split those VTDs.  Is that

20   consistent with your recollection?

21   A    Yes.

22   Q    And you testified that there were -- I think you said

23   around a hundred VTD splits across the state during the

24   2011 House of Delegates redistricting?

25   A    I testified that I didn't have that information in

Morgan - Cross

1   front of me, and I speculated that it might be a little

2   over a hundred.

3   Q    Little over a hundred?

4   A    I don't know what the number is as I sit here.

5   Q    I won't hold you to a particular number, but it's

6   somewhere around one per district.  Does that sound about

7   right?

8   A    No.  No, it does not.

9   Q    Okay.  In the challenged districts, there were 39 VTD

10  splits in the challenged districts, weren't there?

11  A    I'm not sure how you're counting splits, whether

12  you're counting them as a split VTD or a division of a

13  VTD.

14  Q    There were 39 splits of populated VTDs.  That doesn't

15  sound in the ballpark?

16  A    That sounds in the ballpark.  I don't have the figure

17  in front of me.

18  Q    Does it sound about right that there were about three

19  times as many split VTDs in the challenged districts as in

20  the nonchallenged districts?

21  A    I have no idea.

22  Q    Now, Mr. Braden said in his opening statement -- I

23  think -- were you here for his opening statement?

24  A    Yes.

25  Q    Okay.  He said virtually all of these VTD splits were

Morgan – Cross

1   for population equality reasons.  Now, I know in your

2   direct examination there were a couple that you indicated

3   other reasons for, but as a general rule, was Mr. Braden

4   correct?

5   A    That's my understanding, yes.

6   Q    Let's take a look at a few districts.  And I'm going

7   to try not to replow the same ground we've been over three

8   or four times now, but I want to ask you some very

9   specific questions about why certain lines were drawn in

10  certain ways.  And I'm not asking you where they were

11  drawn.  I'm actually asking you why they were drawn that

12  way.  So let's start with District 71, if we might.  This

13  is the Richmond area?

14  A    Yes.

15  Q    And so I'm directing your attention to page 18 of

16  Plaintiffs' Exhibit 69.

17           MR. HAMILTON:  And for Your Honors, it's in the

18  witness notebook provided by the intervenors.  I've also

19  put it up on the screen.

20           JUDGE PAYNE:  As to Mr. Morgan?

21           MR. HAMILTON:  I'm sorry?

22           JUDGE PAYNE:  The Morgan witness notebook.

23           MR. HAMILTON:  The Morgan witness notebook,

24  right.  It's Plaintiffs' Exhibit 69, and that's the Rodden

25  report on page 18.

Morgan - Cross

1   BY MR. HAMILTON:

2   Q    This is the Richmond area, correct?

3   A    Yes.

4   Q    Do you have it there in front of you?

5   A    Yes.

6   Q    The incumbent was Jennifer McClellan?

7   A    Yes.

8   Q    And you knew she was reelected with large majorities

9   routinely?  You knew that, right?

10  A    I believe so.

11  Q    In configuring the district, one of the big -- one of

12  the changes here was adding VTD 701, 702 and part of 703,

13  correct?

14  A    Yes.

15  Q    And VTD 703 was split.  I take it you're the person

16  responsible for that split?

17  A    Yes.

18  Q    And the reason that VTD was split was to equalize

19  population between District 70 and 71.  Is that your

20  testimony?

21  A    Yes.

22  Q    And if we look at the district as a whole, by

23  dropping Summit Court, Hilliard and Stratford Hall and by

24  adding 701, 702 and 703 and then VTDs Ratcliff, which is

25  here, and 604, which is both on the eastern edge of the

Morgan - Cross

1   district, the net effect of all that would be to drop

2   white voters and add black voters, correct?

3   A    Yes.

4   Q    And Ratcliff is not part of Richmond, correct?

5   A    Correct.

6   Q    It goes into Henrico County?

7   A    Yes.

8   Q    So adding Ratcliff certainly doesn't make it any more

9   Richmond-centric, right?

10  A    Compared to the benchmark district, this district is

11  more Richmond-centric, in my opinion.

12  Q    Understood, but that's not the question I asked.  The

13  question I asked is adding VTD Ratcliff certainly didn't

14  make it more Richmond-centric since it took the

15  district -- or it added an appendage to the district that

16  wasn't even in the City of Richmond; isn't that right?

17  A    Okay.

18  Q    Let's turn to House District 69, and this is Figure 6

19  on page 25 of the Rodden report.  In reconfiguring House

20  District 69, you took some of Chesterfield County out of

21  House District 69, correct?

22  A    Yes.

23  Q    And I believe there were three areas that were

24  removed, Belmont, Manchester and Beaufont; is that right?

25  A    Yes.

Morgan - Cross

1  Q    And the change was because it was short of

2  population?

3  A    I'm sorry.  I don't understand the question.

4  Q    Well, let me ask you, Belmont, Manchester and

5  Beaufont were removed, correct?

6  A    Yes.

7  Q    And then two VTDs were added, VTD 903 and VTD 811.

8  They are right here on the map, that sort of southern

9  border of the district, correct?

10 A    Yes.  In addition to other VTDs, yes.

11 Q    Okay.  And those two VTDs are majority

12 African-American areas, correct?

13 A    That's my belief, yes.

14 Q    Okay.  And the areas that were removed in

15 Chesterfield, they all have a higher percentage of white

16 voters than VTDs 903 and 811, correct?

17 A    I think so.

18 Q    Okay.  And you also split VTD 410; is that right?

19 A    Yes.

20 Q    Can you circle that on your screen in front of you?

21 Do you see it?  Thank you.  Your eyesight is better than

22 mine.

23      That VTD was split to equalize population between

24 Districts 68 and 69 and ensure contiguity between the two

25 district; is that right?

Morgan - Cross

1    A    Yes.

2    Q    And the split just happened to divide the portion of

3    VTD 410 into a majority black portion to the south and a

4    majority white portion to the north?

5    A    No.  It was decided along Chippenham Parkway.

6    Q    Let's look at House District 70.  This is page 28,

7    Figure 7 from the Rodden report, Exhibit 69.  This is

8    Delores McQuinn's district; is that right?

9    A    Yes.

10   Q    This district was just about right on target for

11   population?

12   A    In isolation, yes.

13   Q    And relatively heavily African-American?

14   A    That's my understanding, yes.

15   Q    So what was moved out of the district was these VTDs

16   we keep talking about, 701, 702 and part of 703.  Those

17   were moved into House District 71, right?

18   A    Yes.

19   Q    And each of those areas had a very high concentration

20   of African-American voting age population, right?

21   A    Yes.

22   Q    And adding -- the addition -- excuse me.  Let me

23   start over.  In addition to balancing population, those

24   precincts were moved for the expressed purpose of

25   increasing the black voting age population in HD 71?

Morgan - Cross

1   A    Yes.  It had that effect.

2   Q    And --

3        JUDGE PAYNE:  The question was was it for that

4   purpose, not whether it had that effect.  The question was

5   whether it was for that purpose.  Is your answer still

6   yes?

7   A    I'm sorry.  Could you repeat the question, please?

8   Q    In addition to balancing population, these precincts

9   were moved for the expressed purpose to increase the black

10  voting age population in HD 71?  That was one of the

11  reasons, wasn't it?

12  A    That was one of the reasons.  As discussed, District

13  71 had 46 percent black voting age population in the

14  benchmark plan and it had a higher number in the enacted

15  plan.

16  Q    And were you here yesterday when Delegate Jones was

17  testifying?

18  A    Yes.

19  Q    And you recall him testifying that the 55 percent

20  black voting age population was the reason for that

21  change?

22  A    I recall him saying that.

23  Q    Okay.  Now, did I hear you say that -- that

24  population from District 27 went into District 70 because

25  District 70 already had some Chesterfield VTDs?  Is that

Morgan - Cross

1   what you said?

2   A     Yes.

3   Q     Okay.  And District 70 had just one VTD in

4   Chesterfield County in the benchmark, right, Drewry's

5   Bluff?

6   A     Yes.  Drewry's Bluff is adjacent to the areas that

7   were brought into District 70.

8   Q     And District 69 had four VTDs in Chesterfield County

9   in the benchmark, right; Beaumont, Davis, Belmont,

10  Manchester?  Those are all in Chesterfield County?

11  A     Yes.

12  Q     And District 69 was dramatically underpopulated at

13  the time of the redistricting, correct?

14  A     Yes.

15  Q     District 70 was right about on target, in terms of

16  population?

17  A     Yes.

18  Q     Let's move to District 74.  This is the one that sort

19  of looks like a meat cleaver.  I don't mean no disrespect

20  to your map drawing here, but -- do you recall this one?

21  A     Yes.

22  Q     This -- there are two split VTDs up in the northwest

23  tip.  And this is Figure 9 on page 33 of the Rodden

24  report.

25          MR. HAMILTON:  If we could show that.

Morgan - Cross

1   Q     Brookland and Belmont, you testified about those a

2   little bit earlier?

3   A     I did about those two.

4   Q     Let's start with Belmont.  That VTD was split in the

5   western portion of the VTD along with the Canterbury VTD

6   just in the south were both moved into District 72; is

7   that right?

8   A     Yes.

9   Q     And you don't know whether that movement was for

10  population or for some other reason, correct?

11  A     No.  I explained that Canterbury was added to

12  District 72 because it's a republican performing precinct.

13  Q     In your deposition, at least -- I gather you've

14  refreshed your recollection since your deposition because

15  you couldn't recall a specific reason then.  Do you

16  remember that?

17  A     I'm aware of the voting preferences of Canterbury

18  precinct.

19  Q     Do you recall testifying in your deposition, "I don't

20  know if there was a specific reason.  I just know that

21  that is the -- that the border ended up there"?  Do you

22  recall that?

23  A     Yes.

24  Q     Another portion of Belmont that was left in District

25  74 was primarily African-American, wasn't it?

Morgan - Cross

1   A     I'd have to look at the numbers.

2   Q     You can't tell from looking at this map?

3   A     No, I cannot tell from looking at this map.  This map

4   has no numbers.

5   Q     And the portion of Belmont that was moved into

6   District 72 is predominately white, wasn't it?

7   A     It appears so.

8   Q     And Canterbury itself is predominately white,

9   correct?

10  A     It's a senior requirement home and villas, yes.

11  Q     Well, I actually asked you about the racial

12  composition, not whether it was a senior retirement home,

13  because I assume that's sort of race neutral.  Canterbury,

14  the portion -- I'm sorry.  Canterbury itself is

15  predominately Caucasian; isn't that true?

16  A     Yes.

17  Q     Okay.  Thanks.  Now, Brooklyn to the north, that one

18  was also split, wasn't it?

19  A     Yes.

20  Q     And that split was to equalize population?

21  A     Yes.

22  Q     And the split of that one -- it's a little hard to

23  see -- but that's a small vertical line just to the left

24  of the B in Brooklyn, correct.  That's where the split of

25  that VTD is?

Morgan – Cross

1   A    Yes.  The VTD boundary is this, and the split is

2   right in the middle of that.

3   Q    Perfect.  Thank you.  The western portion is largely

4   white?

5   A    It's hard to tell from here.  Yes.  I'll say yes.

6   Sure.

7   Q    And the eastern portion is predominately

8   African-American?

9   A    I don't agree with that.

10  Q    Okay.  Now, you also fixed --

11          MR. HAMILTON:  Let's go back to the preceding

12  map, if we can.

13  Q    You also fixed a -- I think you said fixed a river

14  crossing here down at the bottom of the southern boundary

15  of District 74; is that right?

16  A    Yes.

17  Q    Now, there's also a water crossing of the Appomattox

18  River in House District 74, correct?

19  A    I don't think so.

20  Q    There are water crossings in House District 68, 70,

21  80 and 69 in the final HB 5005, correct?

22  A    I'm sorry.  You're asking me about at Appomattox

23  River and District 74?

24  Q    No.  This is actually a different question now.

25  A    Okay.

Morgan - Cross

1  Q    Because you disagreed on the Appomattox.  I'll let

2  the maps speak for themselves on that.

3       I'm just asking you now, you'll agree with me that

4  the final map had river crossings in several districts?

5  A    Yes.

6  Q    Those included House District 68, 70, 80 and 69,

7  correct?

8  A    Just a moment.  Could you repeat them slower?

9  Q    Sure.  We'll start with 68?

10 A    Yes.

11 Q    Seventy?

12 A    Yes.

13 Q    Eighty?

14 A    Yes.

15 Q    And 69?

16 A    Yes.

17 Q    Thank you.  Let's turn to House District 63.  This is

18 Delegate Dance's district?

19 A    Yes.

20 Q    Now, this district -- this southern line splits

21 Dinwiddie County, correct?

22 A    Yes.

23 Q    I think the Court called this avowedly racial.  Do

24 you remember hearing about that from the memorandum

25 opinion after the first trial?

Morgan - Cross

1  A    I've heard it mentioned in this trial.  I don't

2  remember reading that.

3  Q    Okay.  And the split that we're talking about is this

4  split right through the middle of Dinwiddie County, right?

5  A    That's the portion that's split between 63 and 75,

6  yes.

7  Q    The reconfigured House District 63 divided Fort Lee,

8  doesn't it?

9  A    Fort Lee is divided between 62, 63 and possibly 64.

10 I can't tell from this map.

11 Q    Okay.  Now, there were several VTDs that were split

12 in this area.  Let's start with the Reams VTD.  I can't

13 remember.  I think we've got a closer map.  Do you recall

14 the Reams VTD on this?

15 A    I don't see it on the map.  I do recall it, yes.  I

16 am familiar with the VTDs in this area.  I spent a lot of

17 time working in this area.

18 Q    Okay.  And one of the --

19         JUDGE PAYNE:  Would it help you to have one of

20 those bigger map books nearby to look at?

21         MR. HAMILTON:  I think they're right in front of

22 him.

23         JUDGE PAYNE:  Oh, okay.  All right.  Then if he

24 wants to, he can look at them.

25 A    Okay.  Do you want me to look at the map books?

Morgan - Cross

1   Q    Let's start and see what you can remember.  You've

2   got a pretty good memory.  So let's see where we go.  And

3   if you need to, just let me know, and I'm happy to stop

4   and --

5   A    I would be happy to see a map that shows the precinct

6   boundaries if we're going to talk about that.

7            JUDGE PAYNE:  Are those in the big map book?

8            MR. HAMILTON:  I don't know, Your Honor.  I

9   don't know.  Give me just a moment and let me look.

10           JUDGE PAYNE:  House District 63 I think is what

11  we're talking about.

12           MR. HAMILTON:  That is exactly what we're

13  talking about.

14           JUDGE PAYNE:  Mr. Raile, do you know that?

15           MR. RAILE:  This image on the screen or -- oh,

16  the regional map is Intervenors' Exhibit 96 and 97, and I

17  believe --

18           JUDGE PAYNE:  That's all right.  She's over

19  there looking to see if -- he's looking for something with

20  specific -- did you find it, Mr. Morgan?

21  A    Yes.  It's Defendant-Intervenors' Exhibit 91.  Page

22  126 is the one I'm looking at.

23           JUDGE PAYNE:  Page 126?

24           THE WITNESS:  Yes, Your Honor.

25           JUDGE PAYNE:  All right.

Morgan - Cross

 1   A    And that does show the voting district boundaries, I

 2   think.

 3   Q    All right.  I want to focus your attention on the

 4   Reams VTD.  One of the reasons this VTD was split was this

 5   is an area where two sections of the map sort of came

 6   together and you were putting those pieces together; is

 7   that right?

 8   A    Yes.  This is one of the very few points in the plan

 9   where a voting district is split between three districts;

10   between 62, 63 and 64.  On the north side of the Reams,

11   it's split at District 36 -- or Highway 36, and at the

12   lower end, it's Interstate 295.  That's what the split of

13   Reams is primarily -- or entirely.

14   Q    And the other reason this VTD was split because of

15   the census block in this area was large and the VTD was

16   split to balance population; is that right?

17   A    My answer to that is that the census blocks around

18   Fort Lee were large.  In some cases, they had large

19   population.  In some cases they had small population.  It

20   was difficult to work with census blocks in this area

21   around Fort Lee.

22   Q    And is this the here we're talking about?

23   A    No.

24   Q    Okay.  Can you point to us where we're --

25   A    We're talking about this area here.

Morgan - Cross

 1          JUDGE PAYNE:  "This area here" is in the

 2   right-hand part, including -- what are the names of these?

 3          THE WITNESS:  The voting districts are Jefferson

 4   Park, Reams, Courts Building, which are all in Prince

 5   George County.  And those are the areas -- when I talk

 6   about Fort Lee, that I'm primarily talking about those

 7   areas.  And I think, again, the Defendant-Intervenors'

 8   Exhibit 91, page 26, shows those boundaries fairly

 9   clearly.  The map on the screen is okay.

10          JUDGE PAYNE:  The map on the screen is not 94.

11   It's 94.  Is that right?

12          THE WITNESS:  Okay.

13          MR. HAMILTON:  That's right, Your Honor.

14   BY MR. HAMILTON:

15   Q    The Rohoic VTD was also split, right?

16   A    Yes.  That's in a different area of the district.

17   Q    That's this sort of finger that goes around New Hope;

18   is that right?

19   A    Yes.

20   Q    And that one was split to go around New Hope to get

21   additional population; is that right?

22   A    Essentially, yes.

23   Q    The Dinwiddie VTD was also split for population

24   balancing; is that right?

25   A    It's split along I-85, yes.

Morgan - Cross

1   Q    But the reason -- again, I'm not asking you where it

2   was split.  I'm asking you why it was split.  It was split

3   for population balancing, correct?

4   A    Yes.

5   Q    Okay.  And Chris Jones didn't direct you on how to

6   specifically split those three VTDs, Rohoic, Dinwiddie and

7   Reams, did he?

8   A    I -- what I said in my testimony earlier I'll repeat

9   here because it helps understand the situation.

10  Q    Well, why don't we start with just answering my

11  question.

12  A    Go ahead, please.

13  Q    He didn't direct you specifically how to split those

14  three VTDs?

15  A    He gave me some direction in that area.

16  Q    Did Chris Jones direct you specifically how to split

17  either Reams, Rohoic or Dinwiddie?

18  A    I'm going to say that he gave me some input on that.

19  And what I mean by that is that from my point of view as a

20  map drawer, that line was negotiated between Delegates

21  Tyler, Dance and Chris Jones, and I was -- this was the

22  line that was negotiated.

23  Q    So Chris Jones did not direct you to -- or did or

24  didn't direct you to specifically split these three VTDs?

25  A    Not specifically in this way.  But what I want to say

Morgan - Cross

1  is that once these splits were made, they were accepted by

2  the delegates and they were not changed again after that

3  point.

4  Q    Okay.  Fair enough.  Thank you for the clarification.

5  But the way that they were split was you.  Mr. Jones --

6  Delegate Jones didn't tell you, Split them this way.  That

7  was your decision?

8  A    Yes.

9  Q    Thank you.  Now, the map in this area also split

10 Jefferson Court -- I'm sorry.  Jefferson Park, Courts

11 Building and Hopewell Ward 7, correct?

12 A    Yes.

13 Q    Jefferson Park VTD was split because it was on the

14 border -- or I think you described it as the fault line

15 between the Tidewater and Richmond maps when they came

16 together and to help balance population, correct?

17 A    Yes.  And that is the voting district that primarily

18 contains Fort Lee.

19 Q    And the Court Building VTD was split in part because

20 of an island in the river, in part because of the boundary

21 between Richmond and Tidewater regions, and in part to

22 balance population; is that right?

23 A    Yes.

24 Q    And then Hopewell Ward 7 was also split?

25 A    Yes.

Morgan - Cross

1  Q    I think we have a map of that.  And I think you

2  testified that this VTD was split to equalize population

3  and it was easier to do here because the census blocks

4  within this VTD were relatively smaller; is that right?

5  A    Yes.  In this case, there are 800 people or a little

6  over 800 people, 700 or so are in one block.  But after

7  that, there's smaller blocks that allow you more

8  flexibility in -- in making census block divisions between

9  districts.

10        MR. HAMILTON:  And, Ms. Marino, can you blow up

11  the center of that right in here?  Maybe a little bit

12  further south.  There you go.

13  Q    So we can actually see the census block and I

14  apologize because they are not very clear, but these faint

15  lines, that looks like census blocks to you, doesn't it?

16  A    Yes.  That shows precisely what I'm talking about.

17  There's one census block here, which has about 700 people,

18  and then these are smaller population blocks going

19  forward.  And this one block I think comes like that.

20  Q    Right.  And there's another one here, and then

21  there's a whole bunch of them here?

22  A    Yeah.  Exactly.  Yeah.

23  Q    And there's a whole bunch of them here?

24  A    Yep.

25  Q    And you can pick any of those.  The ones you picked

Morgan - Cross

1  was this big one you drew a circle around?

2  A    No.  I couldn't pick any of those.  I could pick ones

3  that were on the border with the district that needed

4  population, which was District 63.

5  Q    And the one that you picked is -- just happens to be

6  the heaviest concentration of African-Americans in the

7  entire ward?

8  A    Yes.  It's on the border with District 63, and this

9  is the Hopewell border.  So in the last phases of this

10  process, that was one of the last splits introduced as a

11  result of changes made in District 64, 75 and the Richmond

12  area seats.  This is the junction where the districts met.

13  This was one of the last splits made in the plan.

14  Q    Sure.  And the split -- so that we're clear, the

15  split that we're talking about is -- if I can make this

16  work.  The dotted line is the Ward 7 boundary?  This is

17  the district split, correct?

18  A    Yes.

19  Q    And the pocket that's carved out here is the only

20  significant concentration of African-Americans in the

21  entire ward; isn't that true?

22  A    This map is -- shows the dots.  It doesn't show the

23  location of people.  But it has African-Americans in it,

24  yes.

25  Q    Now, you knew at the time you split this VTD in your

Morgan - Cross

1   experience, you assumed or knew that African-American

2   voters were more likely democrats; isn't that true?

3   A    In my experience, that's usually the case.

4   Q    And you knew it at the time you did the split?

5   A    Sure.

6   Q    And you knew that Ward 7 was Delegate Ingram's least

7   performing ward in the city, correct?

8   A    I knew that, yes.

9   Q    Now, you also said that Delegate Ingram didn't want

10  all of Hopewell.  Is that what I heard you say?

11  A    What I said was that he had not represented that in

12  the 2001 benchmark plan and that adding additional

13  population would lower the portion of his district that

14  was retained in the new district.

15       Furthermore, I said that Delegate Ingram was one of

16  the last delegates on the republican side to agree to

17  supporting the plan.

18  Q    So let's take a look at Figure 10, page 34 of the

19  Rodden report.  We're talking about Hopewell, the northern

20  end of House District 63, correct?

21  A    Yes.

22  Q    And Delegate Ingram represents this area up here

23  where the number 62 is.  That's his district, right?

24  A    Yes.  It goes into Chesterfield and eastern Henrico.

25  Q    And it was late in the process, he hadn't represented

Morgan - Cross

1    it before, of course, because Hopewell had been in

2    District 74 in the benchmark, right?

3    A    Yeah.  District -- those portions of Hopewell were in

4    District 74, yes.

5    Q    And so Delegate Ingram ended up only taking part of

6    Hopewell, right?

7    A    He retained the portion of Hopewell that he already

8    had, and he lost the small portion of Ward 7 that we

9    looked at earlier.  Otherwise, he retained the same

10   portions that he had in the benchmark plan.  His changes

11   were made in other parts, particularly in Chesterfield

12   where a lot of new population was added.  His district was

13   below 60 percent retained, which is one of the lower of

14   the republican members.

15   Q    Right.  But the part of Hopewell -- he didn't want to

16   take all of Hopewell, correct?

17   A    That was my understanding, yes.

18   Q    And the only part of Hopewell he didn't already have

19   was the African-American part of Hopewell?

20   A    Ward -- yeah.  Ward 2 and Ward 6.

21   Q    That's the eastern part of the city, correct?

22   A    The portion that was in District 74 he had not

23   represented in 2001, that's correct, and forward to 2010.

24   Q    Now, you said -- you testified on direct about --

25   something about Hopewell not being necessary to reach, and

Morgan - Cross

1  you didn't need to assign Hopewell to one district or

2  another in order to reach the 55 percent black voting age

3  population.  Do you recall that testimony?

4  A    Yes.

5  Q    And you said you prepared a couple of other plans and

6  it took you about 10 or 15 minutes to generate those plans

7  showing that; is that right?

8  A    In this case, it was easy to do.

9  Q    Okay.  It was easy to show that Hopewell didn't need

10  to go all the way into one district or another.  Is that

11  your testimony?

12  A    I'm not sure I understand the question.

13  Q    Your testimony is that it was -- it was easy to show

14  that Hopewell didn't need to go into one of the challenged

15  districts to reach 55 percent black voting age population,

16  the racial target, correct?

17  A    Putting Hopewell in a district other than 63 -- yes.

18  The short answer to your question is yes.

19  Q    Okay.  Thank you.  And the map, as drawn, at the risk

20  of flagellating an equine, is this one that's that split

21  the question?

22  A    Yes.

23  Q    Thank you.  Let's turn to House District 92 and 95.

24  These two are in the Tidewater region, correct?

25  A    Yes.

Morgan – Cross

1  Q    Fair to say that we have to look at these two

2  districts together as a group?

3  A    Yes.

4  Q    And District 95, the most significant change to

5  District 95 is this whole arm reaching up to the right; is

6  that right?

7  A    In my opinion, that is the most significant change,

8  yes.

9  Q    Okay.

10        MR. HAMILTON:  Could we take a look at

11 Defendant-Intervenors' Exhibits 96 and 97, page 2?  And,

12 Your Honors, this is the big book.  And we're going to put

13 them up side by side like we had them before.

14        JUDGE PAYNE:  What page?

15        MR. HAMILTON:  Page 2.

16 Q    All right.  These -- I apologize for the size of

17 these, but can you see these here?

18 A    Yes.

19 Q    Okay.  You said that most of the districts in this

20 area had to be elongated.  I think that was your testimony

21 on direct.  Is that correct?

22 A    Yes.  In this area, the districts were constrained by

23 the York River and the James River.

24        JUDGE PAYNE:  "This area" meaning the peninsula?

25        THE WITNESS:  Yes, Your Honor.

Morgan - Cross

1  Q    And that's because of the population distribution and

2  changes from -- over the course of the preceding ten

3  years, right?

4  A    Yes.

5  Q    So -- so let's -- let's look at that.  I'm going to

6  grab the paper copy because I think it's easier to see in

7  the paper copy than these small maps.  So District 94,

8  that's that one, right?

9  A    Yes.

10  Q    And so if we look on the screen, we're looking at --

11        JUDGE PAYNE:  Which one are you talking about,

12  in 2001 or the 2011?

13        MR. HAMILTON:  I was just going to clarify that

14  for the record, Your Honor.  The left-hand screen

15  corresponds to the top page of the paper copy of

16  Defendant-Intervenors' Exhibit 96.  That's page 2.  And

17  the right side of the screen that's displaying here in the

18  courtroom corresponds to Defendant-Intervenors' Exhibit

19  97, page 2, which is on the bottom of the paper copy.  So

20  if we start first with Exhibit 94, the benchmark is on top

21  or on the left-hand side and the adopted plan is on the

22  right-hand side or the bottom.

23  Q    Are we all -- do you agree with that?

24  A    Yes, I do.

25  Q    Okay.  Thanks.  So first we're going to look at House

Morgan - Cross

```
 1   District 94, and I put dots on it.  That's kind of the --
 2   boy, I'm terrible with colors, but I think it's sort of
 3   the orangey in the benchmark and it looks a little pink to
 4   me in the adopted plan.
 5           JUDGE PAYNE:  Color aficionados would probably
 6   call it salmon.
 7           MR. HAMILTON:  Salmon.  You would think I would
 8   know that color.
 9   Q    So that one didn't really become elongated, did it?
10   A    No.  In my testimony I said that --
11   Q    No.  The question is yes or no.
12   A    No, it did not become elongated in distance.  That's
13   correct.
14   Q    Okay.  Thank you.  And let's look at House District
15   92, the purple one and the sort of dusty blue one.  Maybe
16   it's gray.  That one didn't become elongated either, did
17   it?
18   A    That's correct.
19   Q    And if we look at House District 91, that one didn't
20   really become elongated.  In fact, it became sort of more
21   compact, right?
22   A    Yes.
23   Q    District 93 was already kind of elongated and
24   remained so, correct?
25   A    It became more elongated going into James City.
```

Morgan - Cross

1   That's what I was describing.

2   Q    Okay.  And then the one that changed perhaps the most

3   is, of course, District 95?

4   A    In terms of geography, District 95 and District 93

5   changed the most.

6   Q    Now, let's go back to Dr. Rodden's report.  And if we

7   could go to Figure 16 on page 47 of his report.  Now, this

8   is the northern end of this arm stretching up in House

9   District 95; is that right?

10  A    Yes.

11  Q    And I think I -- if I heard your testimony correctly,

12  this area up here in the -- in the northern part,

13  Reservoir, there was a partisan gerrymandering effort here

14  in order to move this district in such a way as to help

15  some of the republican incumbents in the area; is that

16  right?  Did I hear you right?

17  A    Reservoir was moved to District 93 -- I'm sorry --

18  from District 93 to 94 and 95, yes.  It affected District

19  93 principally.

20  Q    But if I heard you correctly, the reason for that,

21  there was a political reason for that.  You moved those in

22  order to help the republican incumbents in 94 and 93?

23  A    District 93 did not have a republican incumbent.  It

24  was drawn in such a way to make District 93 more

25  competitive for a potential new candidate.  And that was

Morgan - Cross

1   precisely why that was done.

2   Q    And precisely on a partisan gerrymandering basis?

3   A    It was -- it was an effort to move democratic

4   precinct Reservoir and Epes out of District 93, into other

5   districts.

6   Q    Okay.  And in order to do that, you had to draw this

7   arm that went all the way up, up the road here in order to

8   get to Reservoir?

9   A    Yes.  As I said earlier, District 93 incumbent lived

10  at the southern end of the district and most of her

11  population was at the north.  And so ultimately, she was

12  paired with another incumbent, but she moved around in the

13  district.

14  Q    Let me stop you there --

15  A    Sure.

16  Q    -- and ask you to listen to my question.  My question

17  is in order to get to Reservoir, you had to add all these

18  little roads to get there?

19  A    Yes.

20  Q    Sort of the road to Reservoir.  And in order to --

21  once you did that, you realized if you included all of

22  Epes or Denbigh or Jenkins, you'd have too much

23  population.  Is that what I heard you say?

24  A    Basically that's true.  If adding all of Denbigh --

25  adding all of Denbigh would not allow Epes and Reservoir

Morgan - Cross

1 to be affected and split with most of its population out

2 of 93.

3 Q    So you had to start splitting VTDs here, carving off

4 census blocks from each of these VTDs in order to equalize

5 population.  That's what you said, correct?

6 A    It does equalize the population between 95 and 94.

7 And also, as I said, it was to bring the -- less of Epes

8 into 93 in this case.  None of Epes in 93.

9 Q    Sure.  And when we got to the end, when you -- you

10 just stopped when you had enough in order to equalize the

11 population, correct?

12 A    Yes.

13 Q    And you weren't looking at race filters or racial

14 data filters on Maptitude when you did this.  It just

15 happened to be that when we carved out just enough census

16 blocks, the line just happened to end there?

17 A    Actually, as it relates to Reservoir, Reservoir was

18 split three ways and --

19 Q    But I'm not asking you about Reservoir now.

20 A    Yes, you are.  You're asking me about Reservoir, and

21 I'm answering about Reservoir.  That area you just pointed

22 to is, in fact, Reservoir, and it was split that way

23 because the underlying census geography and the population

24 figures allow it to be split in that way.  And that is

25 exactly how it's split.  This map does not have the census

Morgan - Cross

1    block boundaries.  It would be easier to show that with a

2    map that showed census block boundaries.

3    Q    So putting Reservoir aside, because I know that was

4    the target you wanted to get to, to get up to Reservoir,

5    you had to split all these other VTDs?

6    A    Reservoir, Epes, Denbigh were split.

7    Q    And Jenkins?

8    A    And Jenkins was split.  Yes.  In this area, yes.

9    Q    Thank you.  Now, you'll certainly agree with me that

10   the way the resulting line ended, however it got there,

11   neatly divides the after African-American from the white

12   population -- predominately white population, correct?

13   A    I really can't tell from this map.

14   Q    Let's move to House District 80.  This is the South

15   Hampton Roads area; is that right?  House District 80?

16   A    It is.  There's a map.

17   Q    This district was heavily underpopulated by about

18   9000 people, right?

19   A    Yes.

20   Q    And the major change was this whole west arm of the

21   district, right?

22   A    Geographically, that appears to be the major change,

23   yes.

24   Q    There's another change that we can focus in on here.

25   There's this little finger right there, and it's the VTD

Morgan - Cross

1   11 right here in the center of the district.  Do you see

2   that?

3   A    Yes.

4   Q    And that VTD was added.  That's another change here,

5   right?

6   A    Yes.

7   Q    It was not in the benchmark?

8   A    That's correct.

9   Q    And the reason that this VTD was added was to

10  equalize population between House District 79 and 80?

11  A    That's the way it was added.  It wasn't necessary to

12  equalize population in the sense of splitting VTDs like

13  the other ones were.

14  Q    Right.  But the reason that this VTD was added was to

15  equalize population between District 79 and 80?

16  A    Sure.

17  Q    It just didn't require splitting a VTD?

18  A    Right.

19  Q    And any of the VTDs that formed the border between 79

20  and 80 could have been used to equalize the population

21  between these two districts, assuming it was the same size

22  population?

23  A    Okay.

24  Q    That's right, isn't it?

25  A    Sure.  Yes.

Morgan - Cross

1   Q    The one that was chosen is heavily African-American,

2   isn't it?

3   A    It appears so.

4   Q    And, in fact, if we look at all of the VTDs that form

5   the border between Districts 79 and 80, this is the

6   single, most concentrated population of African-Americans,

7   isn't it?

8   A    I'm not sure.

9   Q    All right.  Let's move to House District 89.  This

10  one is underpopulated by about 5000 people at the time of

11  the redistricting, correct?

12  A    Yes.

13  Q    And maybe if we look at the southern part of the

14  district, fair to say it reached south and picked up a

15  number of precincts from House District 80, right?

16  A    I don't think so.

17  Q    It picked up Berkley?

18  A    Yes.

19  Q    It picked up Hunton?

20  A    Yes.  Yes.  Those are from District 80.

21  Q    It picked up Union Chapel?

22  A    That was not from District 80 that I'm aware of.

23  Q    But it picked it up?

24  A    Yes.

25  Q    And it also added part of Brambleton?

Morgan - Cross

1    A    Yes.

2    Q    And the reason for all these changes was to add

3    population, correct?

4    A    Ultimately, yes.

5    Q    And by adding the Berkley VTD, it actually created a

6    water split here that didn't exist before, right?

7    A    Okay.  It's -- Berkley is in the city of Norfolk.

8    So --

9    Q    And that's across the river from the rest of House

10   District 89?

11   A    Okay.  Yes.

12   Q    And that one, the one that was added, that's a highly

13   concentrated African-American population precinct,

14   correct?

15   A    Yes.

16   Q    Brambleton was split.  Why was -- Brambleton was

17   split for population balance reasons, correct?

18   A    Yes.

19   Q    Brambleton was a 96 percent black voting age

20   population precinct, correct?

21   A    I don't have the figures in front of me.

22           JUDGE PAYNE:  Ninety-six percent increasing?

23           MR. HAMILTON:  No.  No.  Ninety-six percent

24   black voting age population.

25           JUDGE PAYNE:  Oh.

Morgan - Cross

1   Q     The exact numbers -- I won't take the time.  I'll

2   just -- it's already in the record.  It's Plaintiffs'

3   Exhibit 63 on line 121.  Brambleton had a total black

4   voting age population of 3403, of which only 60 were

5   white.  Does that sound about right to you, sir?

6   A     Okay.

7   Q     And Brambleton was split between House Districts 89

8   and 90?

9   A     Yes.

10  Q     Both of those are among the challenged districts,

11  right?

12  A     Yes.

13  Q     And the reason for splitting Brambleton was

14  population balancing?

15  A     Yes.

16  Q     And it's fair to say that there were other choices

17  that you could have made to balance population between

18  these two districts, 89 and 90?

19  A     The split was made at the end of the process, and

20  Brambleton was already split.  So that was the one that

21  was chosen to split additionally.

22  Q     But other than population equalization, there's no

23  other reasons fore that line being where it is?

24  A     Correct.

25  Q     Let's look at the north end of that district.

Morgan – Cross

1   Rosemont was already in District 89, and Delegate Jones

2   chose to leave it in the district; is that right?

3   A    Yes.

4   Q    That's right here.  And then next-door is Suburban

5   Park.  We've been talking about that a little bit during

6   this trial.  That one was in the benchmark but taken out,

7   correct?

8   A    Yes.

9   Q    And the reason for leaving Rosemont and excluding

10  Suburban Park was population equalization again, correct?

11  A    Yes.  With District 100.

12  Q    And Rosemont is heavily African-American?

13  A    Yes.

14  Q    Black voting age population is about 82 percent?

15  Does that sound about right?

16  A    That could be right.

17  Q    Exhibit 63 has the exact numbers, but I won't take

18  the time to go there.  Suburban Park is mostly white?

19  A    I believe so.

20  Q    So let's look at the left side of this.  And I

21  believe we have a close-up view of Granby that we've been

22  looking at here.  This is the next VTD to the west from

23  Suburban Park, correct?

24  A    Yes.

25  Q    And there's a split VTD that you were talking about

Morgan - Cross

1   on direct.  That VTD is split -- I'm sorry -- in the

2   northern part, correct?

3   A    Granby was split in the benchmark plan, and it's also

4   split in the enacted plan, yes.

5   Q    Right.  And it's split in a different way in the

6   enacted plan?

7   A    Yes.

8   Q    I think you said in the adopted plan, it was split

9   something like that?

10  A    Yes.  That's correct.

11  Q    More or less, for the record sort, of a horizontal

12  line with a little bit of a jog in it?

13  A    Yes.

14  Q    And the new way it was split was to make this sort of

15  northwest corner segment that demarks the higher

16  concentration of African-American, right?  That's the way

17  it was split?

18  A    I described the way it was split earlier using census

19  blocks underlying this geography.

20  Q    You didn't discuss this split with Delegate Jones,

21  did you?

22  A    No.

23  Q    And the reason you drew this, I think you testified,

24  was population equalization between the two districts?

25  A    Yes.  District 89 and 100 needed to be equalized, and

Morgan - Cross

1  this is how it was accomplished.

2  Q    And this split had nothing to do with a funeral home,

3  right?

4  A    That's correct.  As far as I know, it did not.

5  Q    You're not one who drew it.

6  A    I drew it, yes.

7  Q    And it had nothing to do with a funeral home?

8  A    That's my understanding.

9  Q    Well, I mean, nobody else would know because you're

10  the one who did it.  So --

11  A    This is what I know, yes.

12  Q    Thank you.  Let's move to House District 90?

13          MS. MCKNIGHT:  Your Honors, I'd just like to

14  point out to the Court that we are now well beyond the

15  hour of cross-examination that plaintiffs identified on

16  their estimations in Docket 209.  Understanding we went

17  beyond our time by about 30 minutes, we wouldn't expect

18  plaintiffs to go much beyond, I don't know, an additional

19  15, which would put us at about 3:00 when they're --

20          JUDGE PAYNE:  He's already been eight minutes

21  over.  So that's as far as we've gotten.

22          MR. HAMILTON:  Your Honor, I've --

23          JUDGE PAYNE:  I'm sure he'll truncate it.

24          MR. HAMILTON:  Sure.  It was a 3 and a half hour

25  direct.  I'm not actually planning on spending more than

Morgan - Cross

1    about 15 or 20 minutes.  I'll move it long as quickly as I

2    can, Your Honor.

3              JUDGE PAYNE:  All right.

4    Q    Let's turn to House District 90.  This is down near

5    Virginia Beach; is that right?

6    A    Yes.

7    Q    There are two split VTDs here?

8    A    No.

9    Q    Aragona is split, isn't it?

10   A    Yes.

11   Q    And Reon is split?

12   A    Yes.

13   Q    And the VTD Shell is split?

14   A    Yes.  That's the third one.

15   Q    Okay.  Thank you.  Speaking first, focusing first on

16   Aragona, that one was split for population reasons?

17   A    I'm sorry.  May I correct something?

18   Q    Sure.

19   A    There was a fourth split that we discussed, it's

20   Brambleton, which is on the west side of the district.

21   Q    Thank you.  So Aragona, that one was split for

22   population equalization reasons?

23   A    Yes.

24   Q    And Shell, you split that one as well for the same

25   reason?

Morgan - Cross

1   A    Yes.

2   Q    You didn't discuss the Shell split with Delegate

3   Jones, did you?

4   A    No.

5   Q    And if we look at this, the Reon split, I think you

6   said that was the last one chronologically.

7   A    Yes.

8   Q    And I think we have a blowup of that.

9            MR. HAMILTON:  It's Figure 21 on page 59 of the

10  Rodden report.  It's Figure 23, page 61.

11           JUDGE PAYNE:  That's not the one that's up on

12  the screen, I don't think.

13           MR. HAMILTON:  I know.  We're fixing that.

14  There we go.

15           JUDGE PAYNE:  Go it now.

16           MR. HAMILTON:  Thank you.

17  Q    So the Reon VTD, you said, was the last one

18  chronologically that was split; is that right?

19  A    Yes.

20  Q    And that's right here.  And the reason it was split

21  was for population balancing as well?

22  A    Yes.

23  Q    And that's equalized population between Districts 85

24  and 90?

25  A    Yes.  What I pointed out was that in the

Morgan - Cross

1    redistricting process, at the last part of the process,

2    District 85 and 90 were out of alignment, and this was the

3    place where the population was rectified.

4    Q    Politics had nothing to do with the way you split

5    Reon?  This was just population equalization between these

6    two districts?

7    A    Yes.

8    Q    Let's turn to House District 77.

9              MR. HAMILTON:  This is Figure 24 on page 63 of

10   the Rodden report.  Actually, Figure 26, if you would, on

11   page 68 of the Rodden report.

12   Q    The far western edge of District 77, there are two

13   VTDs that were split?

14             MR. HAMILTON:  Figure 26, page 68, please.

15   Q    One was Lakeside.  That district was split, correct?

16   A    That voting district was split, yes.

17   Q    And that's near Suffolk?

18   A    It's in the town of Suffolk, yes.

19   Q    You drew the lines making that split?

20   A    Yes.

21   Q    Eastern side of that split is heavily

22   African-American?

23   A    The split was made between the border of Old Towne,

24   and then moving along the census geography towards the --

25   Q    That's not my question.  My question is the eastern

Morgan - Redirect

1  part of VTD split was heavily African-American; isn't that

2  right?

3  A     It looks like it.

4  Q     And the western part of the split was predominately

5  white; isn't that true?

6  A     It looks mixed to me.

7          MR. HAMILTON:  Thank you.  No further questions,

8  Your Honor.

9                    **REDIRECT EXAMINATION**

10  BY MR. RAILE:

11  Q     All right, Mr. Morgan.  I'll try to keep this brief.

12  I know you've been here for a while.  You answered several

13  questions about different VTD splits that Mr. Hamilton

14  asked you and I asked you.  And your testimony summed up

15  was it was for equalizing population or population

16  equalization, or language to that effect.  Do you remember

17  those answers?

18  A     Yes.

19  Q     When you answered those questions that way, did you

20  understand the phrase population equalization or

21  equalizing population to describe that process that we

22  talked about earlier this morning with the census

23  geography and so on and so forth as being included in that

24  term?

25  A     Yes.  We described it earlier as building blocks,

Morgan - Redirect

1   Legos population and the underlying census geography.

2   Yes, it's included in that answer.

3   Q    So included in that is a priority of not splitting

4   census blocks; is that right?

5   A    My understanding is it's not really possible to split

6   census blocks in the redistricting software, and I don't

7   believe that was even contemplated in any of this process

8   in Virginia.

9   Q    And Mr. Hamilton asked you if population is fungible.

10  And remind me, what's your response to that?

11  A    Population can be moved between districts.  In that

12  sense, I guess it's fungible.

13  Q    But when you're redistricting, you're using census

14  blocks; is that right?

15  A    Yes.  The --

16  Q    Are census blocks fungible?

17  A    The census blocks are the geography that they are.

18  They have a population value that reflects the population

19  that was found to be there during the census.  So it's

20  tied -- specifically, population values are tied to the

21  geography.

22  Q    A large census block with a small number of people

23  cannot be traded for a small census block with a large

24  number of people; is that right?

25  A    They wouldn't be equal in population.

Morgan - Redirect

1    Q    So let me ask you again.  Are the census blocks

2    fungible?  Can you just pick any one?

3    A    No, you can't pick any one.  You have to consider the

4    shape of the census block in the sense of the contiguity

5    issues that we've discussed and also the population of the

6    census block.  They are inextricably tied.

7    Q    Now, I believe Mr. Hamilton asked you about District

8    80 and the precinct called 11?

9    A    Yes.

10   Q    And I -- you know, for the sake of time, I don't want

11   to put up that map.  But he asked you, I believe, sort of

12   all else being equal, you could have picked any VTD from

13   79 to put into 89 to equalize population.  Do you remember

14   that question?

15   A    I do.

16   Q    And you answered that question yes, right?

17   A    I did.

18   Q    Let me ask you this.  Is all else equal?

19   A    No.  You would have to look at the population of the

20   voting district and its effect on the surrounding district

21   in the population.

22   Q    So when you testified that is for the purpose of

23   equalizing population, that's the process you're

24   describing; is that right?

25   A    Yes.

Morgan - Redirect

1   Q    And not just any VTD will do; is that right?

2   A    That's right.

3            MR. HAMILTON:  Objection.  Leading.

4            JUDGE PAYNE:  I think it's -- it is, and I know

5   we're trying to move along, but --

6            MR. RAILE:  Sure.

7            JUDGE PAYNE:  Sustained.

8   BY MR. RAILE:

9   Q    Will any VTD do?

10  A    No.

11  Q    Will any census block do?

12  A    No.

13  Q    Mr. Hamilton asked you about your attendance at trial

14  in 2015.  Do you remember that?

15  A    Yes.

16  Q    Who subpoenaed you then?

17           JUDGE PAYNE:  Do we really need to get into

18  that?  Do you think we're going to pay some attention to

19  that?  What kind of finding of fact would I make on that?

20           MR. RAILE:  Your Honor, I don't know.

21           JUDGE PAYNE:  Let's go.  No, that's a good

22  answer.

23           MR. RAILE:  If I knew, I could make this really

24  short.

25           JUDGE PAYNE:  All right.  Well, you know.

Morgan – Redirect

1   BY MR. RAILE:

2   Q     Who subpoenaed you?

3   A     I believe the plaintiffs subpoenaed me.

4   Q     So they could have called you to testify for three

5   hours in 2015?

6   A     Yes.  And Mr. Hamilton said that he might call me and

7   asked me to stay.

8   Q     How many times has Mr. Hamilton deposed you?

9   A     I believe three times.

10  Q     He could have asked you all the questions I asked you

11  this morning?

12  A     Yes.

13  Q     Finally, Mr. Hamilton asked you about -- I believe he

14  phrased it as payment for your -- for your testimony.  Do

15  you remember that?

16  A     Yes.

17  Q     Now, just to clarify the record, do you understand

18  that the payment is for your time and effort and not for

19  anything that you're saying here today?

20  A     Yes, I understand that.

21  Q     Okay.

22         MR. RAILE:  Thank you, Your Honors.  No further

23  questions?

24         JUDGE PAYNE:  I think we understand all experts

25  get paid for their time and they're not just being paid to

Morgan - Redirect

1   say -- I have a question for you.

2              THE WITNESS:  Yes, Your Honor.

3              JUDGE PAYNE:  You mentioned a number of river

4   crossings and Mr. Hamilton asked you about that were not

5   remedied, and the only one I remember was in somewhere in

6   District 68, but there were three or four of them.  Do you

7   know the river crossings I'm talking about?

8              THE WITNESS:  Yes, I do.

9              JUDGE PAYNE:  Were they in the benchmark plan?

10             THE WITNESS:  District 68 was in the benchmark

11  plan, yes.

12             JUDGE PAYNE:  How about the other river

13  crossings?

14             THE WITNESS:  District 69 was in the benchmark

15  plan, yes.  District 80 was in the benchmark plan, yes.

16  District 70 was in the benchmark plan, yes.

17             JUDGE PAYNE:  All right.  Thank you.

18             MR. RAILE:  Your Honor, I do have a follow-up

19  question on that.

20  BY MR. RAILE:

21  Q    Eighty-nine --

22             JUDGE PAYNE:  I knew I shouldn't have done it.

23  Yes.  Go ahead.

24             MR. RAILE:  I apologize.  I just wanted to

25  clarify.

                         Morgan - Redirect

1    Q    Eighty-nine wasn't; is that right?

2    A    Eighty-nine was not.  It's in the area of Norfolk.

3    Q    Is there a freeway that runs across that river in

4    that precinct that was added?

5    A    It's a tunnel, but it's a freeway.  Yeah.

6               MR. RAILE:  Okay.  Thank you.

7               JUDGE PAYNE:  What is it, 666?

8               THE WITNESS:  If I may.

9               JUDGE PAYNE:  It's all right.  It doesn't make

10   any difference.

11              THE WITNESS:  It's 264/464.

12              JUDGE PAYNE:  264.  All right.  Thank you.  Can

13   he be excused?  Do you need to keep him around?

14              MR. RAILE:  No.  He's excused from our

15   perspective, Your Honor.

16              JUDGE PAYNE:  Mr. Hamilton?

17              MR. HAMILTON:  He's excused from our

18   perspective.

19              JUDGE PAYNE:  Thank you very much for giving us

20   your testimony, Mr. Morgan.  You're excused.

21              THE WITNESS:  Thank you, Your Honor.

22        (Witness stood aside.)

23              MR. BRADEN:  I'll scoot up here.  Dr. Jonathan

24   Katz.

25

Katz – Direct

1      **JONATHAN KATZ,**

2              was sworn and testified as follows:

3              MR. BRADEN:  Your Honors, we've got witness

4  binders which I hope will enable us to move expeditiously.

5              JUDGE PAYNE:  Thank you, ma'am.

6      **DIRECT EXAMINATION**

7  BY MR. BRADEN:

8  Q    Can you tell the Court your full name?

9  A    Jonathan Neil, N-E-I-L, Katz, K-A-T-Z.

10 Q    And your present position?

11 A    I am the Kay -- K-A-Y -- Sugahara, S-U-G-A-H-A-R-A,

12 professor of social sciences and statistics at the

13 California Institute of Technology.

14 Q    And have you been an expert witness in many

15 redistricting cases before?

16 A    Yes.

17 Q    And have you testified for both republican and

18 democratic and nonpartisan stakeholders?

19 A    Yes, including plaintiffs' counsel here in previous

20 cases.

21 Q    I'd like to bring up Defendant-Intervenors' Exhibit

22 16.  Do you recognize that document?

23 A    I do.

24 Q    Can you tell the Court briefly what it is?

25 A    It's my expert report from the previous trial in

Katz - Direct

1   2015.

2           MR. BRADEN:  Your Honors, I will not ask the

3   witness to extensively discuss this document and go over

4   what's already been presented, but I do want to ask a

5   couple questions in regards to responses by the

6   plaintiffs' witnesses on this document.

7           JUDGE PAYNE:  All right.

8   Q    Dr. Katz, can you bring up page 1 of your report?

9   A    I have it.

10  Q    Okay.  And there's a series of five bullet points on

11  page 1.  Let me do the first bullet point here.

12  A    Would you like me to read it?

13  Q    Yes.  Just briefly.  Just read it to the Court.

14  A    "Dr. Ansolabehere's choice of particular compactness

15  measure used in his analysis is arbitrary and not

16  justified.  Using an alternative and more justified

17  measure of compactness, I show that HB 5005 map is as

18  compact as the benchmark map."

19  Q    And after hearing -- were you -- you've had an

20  opportunity to review the new expert reports from the

21  plaintiffs in this case.  Do they have any impact on that

22  finding?

23  A    I do not believe so.

24  Q    And did you hear any testimony that impacted that --

25  your conclusion there?

Katz - Direct

1    A    I have not.

2    Q    If we can go to bullet point number 2.

3    A    "Dr. Ansolabehere's ecological regression analysis of

4    racially polarized voting is flawed using a discredited

5    statistical method and does not examine the most relevant

6    elections, those for the House of Delegates."

7    Q    Was anything provided to the Court in the expert

8    testimony or the expert reports presented in this trial

9    that would change your mind on that?

10   A    No.

11   Q    Bullet point 3.  Let me read that to you.  Save --

12   while you get the water.  "I show that elections for the

13   Virginia House of Delegates in the contested districts

14   show substantial racially polarized voting using the

15   currently accepted statistical methods."  Anything in any

16   of the expert reports presented in this case to change

17   your mind on that?

18   A    They do not.

19   Q    Did you hear any testimony that would change your

20   mind on that?

21   A    No.

22   Q    You still believe there's substantial racial

23   polarized voting in Virginia?

24   A    I do.

25   Q    The next bullet point.  "In the contested elections,

Katz - Direct

1   my analysis shows that the black voting population of

2   55 percent predicts only an 80 percent chance of a black

3   candidate winning that election."

4          JUDGE PAYNE:  Winning that district.

5   Q    In the contested district, my analysis show that a

6   black voting age population of 55 percent predicts only an

7   80 percent chance of a black candidate winning that

8   district."  Anything presented in any of the expert

9   reports from the plaintiffs that change your opinion on

10  that?

11  A    No.

12  Q    Did you hear any testimony in this case that would

13  lead you to change your opinion on that?

14  A    No.

15  Q    We go to bullet point -- I'll read it.  "I show that

16  Dr. Ansolabehere's" -- and fortunately he's not here,

17  since I'm butchering his name.  Excuse me -- "results on

18  the inclusion of particular VTDs in the contested

19  districts is overwhelmingly predicted by its racial

20  composition and is incorrect as he did not account for

21  geographic distances in his analysis."  Anything in any of

22  the expert reports that change your mind on that?

23  A    No.

24  Q    Did you hear any testimony that changed your mind on

25  that?

Katz - Direct

1    A    No.

2    Q    And we can put that one down.  And move to current

3    times here.  Defendant-Intervenors' Exhibit 101.

4    Dr. Katz, can you tell us what that document is?

5    A    That's the supplemental report I wrote for this new

6    trial.

7    Q    First, let me -- before we discuss your report, let

8    me ask a timing question.  How much time did you have to

9    prepare this report?

10   A    A little less than two weeks.

11   Q    How does that compare with the timing you usually

12   spend preparing an expert report?

13   A    Much, much shorter than typical.

14   Q    Have you -- what's normally the time you have to

15   prepare a report?

16   A    It varies quite a bit.  Normally at least a month,

17   and typically several months.

18   Q    And so in this report, you had approximately two

19   weeks?

20   A    Just shy.  I think it was 13 days.

21   Q    And did that, in ways, restrain your ability to do

22   the report?

23   A    Yes.

24   Q    What were you asked to do here?

25   A    I guess the simple way to say it is I was asked to

Katz - Direct

 1  review the new expert reports of Dr. Rodden and Dr. Palmer

 2  as it respected my findings.

 3  Q     And let me ask the broad question.  Do you see

 4  anything in -- I think this is actually asking the same

 5  questions again, and I won't do that too often, I hope.

 6  But was there anything in any of those reports that would

 7  cause you to revise your earlier report in any way?

 8  A     No.

 9  Q     Let's go page 1.  Is this page -- the top of this

10  page a summary of your findings?

11  A     It is.

12  Q     Can -- maybe -- and I know that the Court is

13  interested in moving forward with it promptly.  Let me

14  just point -- let's just point to each one of these, and

15  you can basically explain what the finding is in your

16  first part of your summary here.

17  A     The first is some additional analysis of some

18  state -- of statewide elections.  I still find the

19  elections are relatively polarized.

20  Q     Your second bullet point?

21  A     Dr. Palmer critiqued my analysis of inclusion of

22  particular VTDs that is not overwhelmingly predicted by

23  its racial composition based on flawed statistical

24  reasoning.  That is, I don't agree with his findings --

25  his claims about weighting and/or distance measures.

Katz - Direct

1  Q    And the third bullet point?

2  A    Dr. Palmer's analysis of the inclusion of particular

3  census blocks in the contested districts based on its

4  racial composition shares the same statistical flaws as

5  Dr. Ansolabehere's analysis at the VTD level.

6  Q    And the last point is about compactness?

7  A    Right.  The vast majority of my previous findings

8  about compactness remain unchallenged in the reports of

9  Dr. Palmer and Dr. Rodden.

10 Q    And could you determine how Dr. Rodden made any

11 determinations when he talks about compactness in his

12 report?

13 A    Again, it was an odd report from my perspective.  I'm

14 used to seeing expert reports that are based on

15 statistical analyzes.  This one didn't really present much

16 in the way of quantitative evidence for its findings.

17 Q    So have you seen any report in any of the litigation

18 you've been involved in -- am I correct you've been asked

19 on many occasions to critique other experts' reports?

20 A    Yes.  That's often my role.

21 Q    Yeah.  And so have you ever critiqued a report that

22 looks like this report?

23 A    In my personal experience, no.

24 Q    Okay.  Let's move real quickly here.  There's a

25 section that has a numeral 1, Racially Polarized Voting.

Katz - Direct

1   What does this section do?

2   A    Again, it revises and revisits the racially polarized

3   voting analysis that I had done in my original report,

4   again, at the critique of Dr. Palmer that I hadn't looked

5   at any statewide elections.

6        This is an issue -- clearly the House of Delegates

7   elections are most important.  The problem is that many of

8   the House of Delegates elections in Virginia are not

9   competitive.  So that in general elections, there's no

10  real contest.  So we can't actually say how voters voted,

11  particularly in the contested districts.

12  Q    And so is Table 1 and 2 and 3 your attempt to deal

13  with that critique?

14  A    It is.

15  Q    And what do these three -- if you can just briefly

16  tell the Court what these three tables show?

17  A    They are similar to what you saw in Dr. Palmer's

18  report.  They are examining ecological inference results;

19  that is, estimates -- statistical estimates of the voting

20  behavior of African-Americans and whites in three separate

21  elections.  The ecological -- the first one, Table 1,

22  appearing on page 4 of the exhibit, is for the 2013

23  general election for Attorney General.  On page 5 of the

24  exhibit is labeled --

25            JUDGE PAYNE:  You all must have a different

Katz - Direct

1    exhibit than I have.  That Table 1 is on page 3 of mine

2    and Table 2 is on page 4.

3             THE WITNESS:  I'm sorry, Your Honor.  I was

4    actually going by the numbered page for the exhibit, not

5    my numbering.  It's my fault.  My original report didn't

6    number the title page.

7             JUDGE PAYNE:  As long as we know the pages

8    we're -- that you're referring to, that's -- you can

9    continue to refer to the bottom way.  Okay.

10            THE WITNESS:  I thought it would be easier for

11   the record if someone is looking back.

12            JUDGE PAYNE:  Gotcha.  Go ahead.  Page 5.

13   A    Page 5 includes Table 2, which is the set of results

14   for the Virginia general election for governor in 2013.

15        And then Table 3 on page 6 of the exhibit, it is

16   results for the 2013 primary election for Attorney

17   General.

18   Q    In exactly -- the process of doing the ecological

19   inference analysis, is that -- does that involve

20   significant computing time and very significant

21   sophistication of analysis?

22   A    It's a relatively sophisticated analysis.  The

23   computer time is decreasing every day with faster

24   computers.  I would say probably the first and -- first

25   big block time-consuming part of it is actually getting

Katz - Direct

1   the data together.

2   Q    And am I correct to assume that getting the data

3   together is almost an open-ended process?  The more data

4   you had, the better it would be?

5   A    Getting more data is always -- as a social scientist,

6   we always like more data.  But we're under time

7   constraints to get things done.  But yes, in general,

8   that's true.

9   Q    And the constraints here were much greater than

10  usual?

11  A    As I've already said, much tighter than usual.

12  Q    If we can go on to page 5, the heading of that

13  section is Revising the Effects of Race and Party on the

14  Likelihood of Inclusion VTDs in the Challenged Districts.

15  Can you just -- and there's a Table 4.  Can you tell us

16  what this section -- just briefly, tell us what this

17  section does and what your analysis was?

18  A    Right.  I told you, as I mentioned in my summary,

19  Dr. Palmer critiqued my critique of Dr. Ansolabehere's

20  model of predicting the inclusion of a VTD into a

21  challenged district.  And as you might recall from my

22  earlier testimony, the central concern I had is these

23  models that Dr. Ansolabehere used, and even the ones I

24  use, assume a fair bit of independence.  That's just a

25  fancy way of saying I'm free to choose any VTD to put into

Katz - Direct

1  a district.  And as I think we've heard through the

2  testimony of people who draw maps, that's not really true.

3  If I want to include, say, a district up here, I have to

4  connect the dots.  I have to create a bridge of VTDs, or

5  census blocks, to allow it.  So that's one

6  nonindependence.

7      The second form of nonindependence is that we need

8  the districts to be roughly equal sized.  Well, this means

9  that if I choose to include some VTD, say 101, making a

10 number up, then I might not be able to include another VTD

11 because the -- it's now at maximum population.  It's at

12 the top end of population deviation.

13     This creates nonindependence, which these models that

14 we've all presented here and the analysis we've all

15 presented here don't really allow it.  As I noted in my

16 initial trial -- my testimony in the original trial, I

17 have some rudimentary attempts to try and fix this, but

18 they are approximations at best.

19     The two critiques that Dr. Palmer makes of my

20 analysis from that from the previous case is that one

21 about weighting and one about distance.  And so perhaps we

22 should take them rough -- shall I take them independently?

23 Q    Absolutely.  Please explain to the Court the issue

24 that you think is involved in measuring the districts --

25 distance to challenged districts?

Katz - Direct

1   A     I was actually going to take weighting up first.  We

2   can do distance.

3   Q     Okay.  I will ask you the question about weighting

4   first.

5   A     So weighting -- again, this has come up repeatedly in

6   Dr. Palmer's testimony.  As we now know, these districts,

7   these VTDs, are different sizes.  So Dr. Palmer suggests

8   that we need to weight them in our analysis.  So he tried

9   to explain to the Court why you weight, but let me see if

10  I can take a similar stab at this, because weighting is

11  actually a pretty simple idea.

12        Normally -- the central reason we weight is because

13  we have some population that we'd like to know about; say

14  the opinions of people in the Commonwealth of Virginia.

15  So clearly I'm not going to go out and ask all the people

16  in the Commonwealth.  That's too costly.  So I take some

17  random sample.  Say sample a thousand people.  But I got

18  unlucky.  And suppose I know from census data that I got

19  way too many women in my sample.  That might skew the

20  results as men and women have different opinions on the

21  question I'm interested in.

22        Statisticians have no problem with that.  We'll just

23  reweight.  We'll downweight the women and upweight the

24  men's responses such they match the population.  And the

25  hope, from the statistician's point of view, from the

Katz - Direct

1    quantitative social scientist's point of view, is that

2    that weighting will adjust to make my sample look more

3    representative of the population we're trying to make

4    inferences about.

5         In this case, we have the entire population of VTDs.

6    There's no population -- so my sample is perfectly

7    representative because it's all of them.  There seems no

8    reason to weight since what I care about I observe all of.

9    There's no worry that my sampling frame generated a

10   mixture of too many big VTDs versus too many small VTDs.

11        So my analysis and long-winded way of showing, one,

12   that that's an argument I make in this section and then

13   show that what -- there actually are lots of weighting

14   schemes one might use, and only the weighting scheme that

15   weights by population, total population, in fact, leads to

16   the finding that Dr. Palmer has.  So it's not robust to

17   the -- if you thought weighting was a good idea, which I

18   don't, it's not robust to the choice of weighting scheme.

19   Q    And effectively, you used his -- what you think is

20   the most -- you don't think it works anyway.  But Table 4

21   basically is your -- Table 4, page 7 of your report?

22   A    Yes.  It's replicating -- I forgot the table number

23   in Dr. Palmer's report.  It's different -- it's different

24   specifications of his on -- using different weights.

25   Q    Let me ask a question.  You were present in the room

Katz - Direct

1    for Dr. Palmer's cross-examination?

2    A     I was.

3    Q     And were you present for Ms. McKnight's discussing

4    with him his Table 20?

5    A     I was.

6    Q     Let's go to Plaintiffs' Exhibit 71 and page 63?

7    A     I'm sorry.  What was that exhibit number?

8    Q     The exhibit is Plaintiffs' Exhibit 71, page 63.  Do

9    you remember Ms. McKnight's question in regards to this in

10   the context of -- of an analogy to vetting observations?

11   A     I do.

12   Q     And can you comment as to that factor, as to what's

13   really important in making a determination as to whether a

14   VTD is in a benchmark district or not?

15   A     Yes.  So although all the effort at trial was spent

16   on the first two rows, in fact, the biggest predictor;

17   that is, the predictor that has the most -- that has the

18   largest effect on whether or not a VTD is included in one

19   of the challenged districts is whether or not it was the

20   same -- in a challenged district in the previous benchmark

21   plan.  If I was only allowed one piece of information,

22   that's the one piece of information I would want.  So in

23   that sense, it's the most predictive.

24   Q     And would that finding be consistent when someone is

25   saying that the goal of their process was the status quo

Katz - Direct

1   or continuity?

2   A    That would generate that finding.

3   Q    Is there anything in Table 20 or any of your research

4   that would contradict the notion that the goal of the

5   program was continuity and status quo?

6   A    Again, I think we should be clear.  All my -- the

7   quantitative analysis that I do show that the indicator

8   for being in the previous -- being in a challenged

9   district in the previous plan is the biggest predictor.

10  And that's true across all specifications.  You basically

11  can't make that go away.

12  Q    And can we go to page 10?  There's a section titled

13  Implication of Using Census Block Level Data.

14          JUDGE PAYNE:  Page 10 of what?

15          MR. BRADEN:  Plaintiffs' -- in fact, let's skip

16  over -- I won't suggest that we subject you to another

17  regression and move over to page 12,

18  Defendant-Intervenors' Exhibit 101.  It's the section --

19  we'll go very briefly.  We'll skip to page 13.

20  Q    And what does this section discuss?

21  A    This is just going back and briefly reviewing the

22  compactness findings.  As I note, nothing in Dr. Rodden or

23  Dr. Palmer's report really challenge those claims.  And I

24  do highlight a few districts where Dr. Rodden makes claims

25  about compactness that don't -- that are not consistent

Katz - Direct

1  with the quantitative estimates I provide in my original

2  report.

3  Q    And you have not changed your view that these

4  districts conform to general -- they do not appear to be

5  outside the realm of traditional compactness for

6  legislative districts, to the best of your knowledge?

7  A    Again, my analysis wasn't so broad.  What I said in

8  my original report is that the plan seems about as compact

9  as the benchmark plan.  So we should be clear on what I

10 said.

11 Q    Yesterday Dr. Palmer testified that he used some of

12 the same data that you used.  Did you hear that?

13 A    I did.

14 Q    So in your opinion, can you, from this data, from

15 your data, and the -- sort of the precision of your

16 retrogression analysis or inference analysis, can your

17 data support identifying a precise number between 50 and

18 55 black voting age population in which the legislature

19 could have relied to assure that the plan would not --

20 your plan would not be retrogressive of the ability of the

21 black community to elect candidates of its choice?

22              JUDGE PAYNE:  Just a minute.

23              MS. KHANNA:  I'm going to object to that

24 question, Your Honor.

25              JUDGE PAYNE:  What?

Katz - Direct

1      MS. KHANNA:  It's eliciting --

2      JUDGE PAYNE:  I'm sorry.  I didn't hear you.

3      MS. KHANNA:  I'm going to object to that

4  question.  Counsel is eliciting testimony that is not

5  included anywhere in the report.

6      MR. BRADEN:  We've testified, I believe, before

7  about the precision of the process.  Basically we're

8  asking him to talk about the precision of the process from

9  Dr. Palmer's report.  He happened to be present.  We can

10  remove the reference to testifying before, but he most

11  certainly talks about the precision of the different

12  processes in the data.

13      JUDGE PAYNE:  Where does he do that?

14      MR. BRADEN:  What, Your Honor?

15      JUDGE PAYNE:  Where in his report does he do

16  that?  She says it's not in his report.  As a general

17  proposition, experts are confined to the topics that they

18  have in their report.  They don't say the exact same

19  thing.  But where -- you told me it's in his report.

20  Where is it?

21      MR. BRADEN:  Your Honor, let me ask a couple

22  questions of him and see if we can get to exactly where it

23  is in the report.

24      JUDGE PAYNE:  All right.  If you need to object,

25  get back up and alert us, if you will, please.

Katz - Direct

1   Q    Okay.  Do you discuss the precision -- is there

2   anywhere in your data that -- I mean anywhere in your

3   reports that -- where you comment on the precision of the

4   various analyses?

5              MS. KHANNA:  Objection, Your Honor.  Vague.  I'm

6   not sure what the various analyses are.  There are

7   multiple analyses --

8              JUDGE PAYNE:  Well, we're starting with that

9   one.  I don't think that's objectionable.  Do you comment

10  about the preciseness of any analyses in your report?  Yes

11  or no.

12             THE WITNESS:  All of them.

13             JUDGE PAYNE:  All right.  So now the question is

14  which ones do you comment upon?  And the answer is all of

15  them?

16             THE WITNESS:  Yes.

17             JUDGE PAYNE:  All right.  Now -- so he's talking

18  about all of them.  Now, where we are going from there we

19  don't know.

20             MS. KHANNA:  Yes, Your Honor.

21  Q    And your various statistical analyses, many of them

22  contain confidence levels?

23  A    Yes.

24  Q    And what do confidence levels indicate to you?

25  A    So confidence intervals are whenever you do a --

Katz - Direct

1   estimate a statistical model or generate a statistical

2   estimate, we don't know that for sure.  If we did, you

3   don't need me.  So that model has uncertainty because we

4   don't know things.  We're making assumptions.

5        And so I and Dr. Palmer both include confidence

6   intervals in our estimates, for example, of ecological

7   estimates of voting behavior of African-Americans and

8   white voters in various elections.

9   Q    So each one of your tables or your discussions

10  that -- where you have confidence levels shows -- they

11  exist simply to show that there is a degree of imprecision

12  in your analysis?

13  A    Yes.

14        MR. BRADEN:  Your Honor, I think that provides

15  the basis for this question.  He's absolutely indicated --

16        JUDGE PAYNE:  Well, why don't you do this.  Why

17  don't you ask the question and then see if she has an

18  objection to it, pointing to a particular imprecision to

19  which you wish to direct the Court's attention.

20  Q    Based upon your reports and the confidence levels

21  contained in them and your data and the precision of

22  either regression analysis or ecological inference

23  analysis, does your report -- does your data support

24  identifying any precise number of black voting age

25  population on which a legislative body could rely on

Katz - Direct

1 diminishing or increasing the black voting age population?

2 In other words, can this report, in your information,

3 provide you with the magical number?

4         MS. KHANNA:  Objection, Your Honor.  It seems to

5 me that counsel is asking the expert to draw a conclusion

6 based on some analyses contained in his report.  He had

7 ample opportunity to provide those conclusions in his

8 report.  I think we just walked through them in bullet

9 point fashion, and there is no conclusion about the

10 ability or inability to provide a magic number, as

11 Mr. Braden called it.

12         JUDGE PAYNE:  So do you object to the form of

13 the question?

14         MS. KHANNA:  I do, Your Honor.  I believe --

15         JUDGE PAYNE:  Sustained.  Maybe you'd like to

16 try again.  He said that there were measures -- he

17 commented upon precision.  Focus him on something and ask

18 him.  I think you're trying to do the whole thing up in

19 one big ball, and that's her objection because there is

20 no -- nothing in his report.  She's not prepared to

21 address it.

22         MR. BRADEN:  Absolutely right, Your Honor.  And

23 I was just, to be brutally candid, trying to short-circuit

24 the process.

25         JUDGE PAYNE:  Well, nobody will fault you for

Katz - Direct

1    that but her, and she's entitled to have it done that way.

2            MS. KHANNA:  Thank you.

3    BY MR. BRADEN:

4    Q    Can you explain what -- to the Court -- your report

5    contains a number of confidence levels.  Can you explain

6    to the Court how they limit the ability to use any of

7    these analyses to make firm decisions?

8    A    Okay.  So we actually --

9            MS. KHANNA:  Objection, Your Honor.  Again, I'm

10   so sorry, but it seems that again he's asking for an

11   analysis or a conclusion about what do the confidence

12   intervals in his report mean, and those conclusions are

13   already listed.

14           JUDGE PAYNE:  That's a different objection, that

15   they aren't disclosed, because now you've said they are

16   disclosed.  I don't -- I don't -- let me hear -- let us

17   hear the answer to the question, and then if you want to

18   move to strike, you can.

19           MS. KHANNA:  Thank you, Your Honor.

20           JUDGE PAYNE:  I think let's get a context and

21   then we'll go from there.  How about that?

22       Can you answer the question?

23           THE WITNESS:  Of course, Your Honor.

24           JUDGE PAYNE:  Would you?

25           THE WITNESS:  Yes.

Katz - Direct

1           JUDGE PAYNE:  Please.

2    A    So there's statistical uncertainty that comes about

3    from our models.  That was talked about in my report on

4    these estimates, and that was talked about by Dr. Palmer.

5    That means that we don't know precise numbers.  We know

6    ranges.  And on some behavior, the ranges are quite large.

7    There are other issues, but apparently I'm not to talk on

8    them.

9           JUDGE PAYNE:  So you agree with Dr. Palmer that

10   the best you can do is come up with a range?

11          THE WITNESS:  Yes.  I don't agree with his

12   range, but yes, I do.

13          JUDGE PAYNE:  You don't agree with the range

14   that he came up with?

15          THE WITNESS:  It doesn't include all the sources

16   of uncertainty in his model, but yes.  To be honest, we

17   didn't address this directly in my report.  Only

18   indirectly.

19          JUDGE PAYNE:  All right.  So that's about as far

20   as we can go, then, I think, isn't it, Mr. --

21          MR. BRADEN:  It sounds like that's as far as we

22   can go, Your Honor.  No further questions, Your Honor.

23          JUDGE PAYNE:  Remember the constraint that you

24   have.  You can't go beyond direct unless you want to adopt

25   him as your witness, which is a troublesome thing to do

Katz - Cross

1    for an expert.

2            MS. KHANNA:  Well, I will say, Your Honor, I

3    believe that this report has already been admitted into

4    the record, and I think I'm allowed to cross-examine him

5    not just on the upshot conclusions, but on the analyses

6    that under lie them.

7            JUDGE PAYNE:  Let's see where you go.

8            MS. KHANNA:  Thank you, Your Honor.

9            JUDGE PAYNE:  You still have a constraint.

10           MS. KHANNA:  I understand that.

11                   **CROSS-EXAMINATION**

12   BY MS. KHANNA:

13   Q    Good afternoon, Dr. Katz.

14   A    Good afternoon, Ms. Khanna.

15   Q    Prior to writing your supplemental report in this

16   case, you never read the 2015 memorandum opinion issued by

17   this Court; is that right?

18   A    That is correct.

19   Q    And you haven't read the 2017 Supreme Court opinion

20   either; is that right?

21   A    That's correct.

22   Q    Is it fair to say that a majority of your

23   supplemental report responds to Dr. Palmer's affirmative

24   report?

25   A    That's accurate.

Katz - Cross

1   Q    And you made the decision as to which portions of

2   Dr. Palmer's report to respond to by looking at his

3   analyses and addressing the things on which you disagreed

4   with him; is that correct?

5   A    With the caveat it was also constrained by time

6   constraints.  So yes.

7   Q    You testified at your deposition that you chose those

8   areas of his report on which you disagreed to analyze in

9   your supplemental report.  Do you recall that?

10  A    Yes.

11  Q    You provide no analysis regarding the racial

12  compositions of populations moved in and out of the

13  challenged districts; is that right?

14  A    Correct.

15  Q    Mr. Braden asked you on direct about your racially

16  polarized voting analysis from your 2015 report, correct?

17  A    Yes.

18  Q    And you testified on direct that you concluded from

19  that analysis that the challenged districts exhibit

20  substantial racially polarized voting?

21  A    Yes.

22  Q    Now, your 2015 report, there you conducted an

23  ecological inference analysis of House of Delegates

24  elections in just seven House of Delegates districts; is

25  that right?

Katz - Cross

1   A    Yes.  Those are the available ones that were

2   contested over the last decade.

3   Q    You've provided no racially polarized voting analysis

4   in any of the five remaining House of Delegates districts?

5   A    That is correct.

6   Q    And according to that 2015 analysis, you found

7   evidence of racially polarized voting in three out of the

8   seven districts you choose to analyze; is that right?

9   A    Yes.

10  Q    And one of those districts was District 75; is that

11  right?

12  A    I believe a that's correct.

13  Q    So taking District 75 off the table, is it fair to

14  say that your 2015 analysis found evidence of racially

15  polarized voting in two of the remaining 11 challenged

16  districts?

17  A    That sounds correct.

18  Q    In your 2015 report, you testified, and I believe you

19  just testified on direct, that elections for seats in the

20  Virginia House of Delegates are the only ones relevant to

21  the question of racial polarization.  Do you recall that?

22  A    Yes.

23  Q    And you criticized Dr. Ansolabehere for examining

24  statewide elections in the course of his racially

25  polarized voting analysis?

Katz - Cross

1   A      That is correct.

2   Q      And in that report, you noted that Dr. Ansolabehere

3   had failed to demonstrate a relationship between statewide

4   elections and House of Delegates elections.  Do you recall

5   that?

6   A      I do.

7   Q      Can you please turn to page 2 of your supplemental

8   report?  That's Defendant-Intervenors' Exhibit 101.

9   A      Just to get the numbering correct, is it the number

10  of exhibit or my numbering of pages?

11  Q      I'm using the exhibit numbering as well.

12          JUDGE PAYNE:  So page what of the exhibit.

13          MS. KHANNA:  Exhibit 101, page 2.

14          JUDGE PAYNE:  Page 2.  That's where the bullet

15  points are?

16          MS. KHANNA:  That's right.

17  Q      Here you note that the House of Delegates elections

18  do, however, present a challenge.  Do you see that?

19  A      I do.

20  Q      And that challenge is that few of these elections are

21  truly competitive, which makes it difficult to gauge

22  meaningful differences in voter preferences.  Did I read

23  that correctly?

24  A      That is correct.

25  Q      In no point in your 2015 report did you explain that

Katz – Cross

1    the fact that the House of Delegates elections are often

2    uncontested presents a challenge that makes it difficult

3    to gauge meaningful differences in voting preferences; is

4    that correct?

5    A    Again, I did note that we could only analyze

6    contested elections in my previous report.

7    Q    The answer to my question is?

8    A    Is no.

9    Q    At no point in your 2015 report did you explain that

10   the fact of House of Delegates -- that House of Delegates

11   elections are often uncontested presents a challenge that

12   makes it difficult to gauge meaningful differences in

13   voter preferences?

14   A    I'm reasonably sure, but I don't have the exact page,

15   that I did mention that we can only analyze contested

16   elections.

17   Q    You mentioned that you could only analyze 7 out of 11

18   districts, according to your preferred technique; is that

19   right?

20   A    Correct.

21   Q    You never mentioned that it would be difficult to

22   gauge meaningful differences in voter preferences based on

23   that analysis?

24   A    I was not as clear, correct.

25   Q    Now, in your 2017 supplemental report, you provide a

Katz – Cross

1  racially polarized voting analysis using three statewide

2  elections; is that right?

3  A    That's correct.

4  Q    And those three statewide elections were the 2013

5  gubernatorial election, the 2013 Attorney General election

6  and the 2013 democratic primary for Attorney General,

7  correct?

8  A    That is correct.

9  Q    You chose to look at general elections for governor

10 and Attorney General because those were the most recent

11 statewide elections for which we could easily gather data?

12 A    That's correct.

13 Q    I'm quoting your testimony there; is that right?

14 A    That is absolutely correct.

15 Q    Okay.  And you chose to look at the democratic

16 primary for Attorney General because neither of the two

17 statewide elections included a candidate who is

18 African-American?

19 A    Also correct.

20 Q    But the governors and the Attorney General races were

21 not only the statewide elections to took place in Virginia

22 in 2013, were they?

23 A    I'm sure not.

24 Q    There were, in fact, three statewide elections that

25 took place that year, the third being for Lieutenant

Katz - Cross

1   Governor?

2   A    Yes.

3   Q    You never examined that election?

4   A    I did not.

5   Q    And that Lieutenant Governor's race did, in fact,

6   include an African-American candidate?

7   A    I didn't know that.

8   Q    You didn't inquire about that election at all in

9   preparing your supplemental report?

10  A    I did not.

11  Q    Is it fair to say that the map drawers of HB 5005

12  would not have had access to the information about any of

13  the three elections you chose to analyze in your

14  supplemental report?

15  A    That's for sure.

16  Q    And that's because all of those statewide elections

17  took place after the 2011 map drawing process?

18  A    That is correct.

19  Q    And Dr. Hood's 2017 report analyzes the same three

20  elections that you analyzed in your report; is that right?

21  A    I didn't know.  I've never read Dr. Hood's report.

22          JUDGE PAYNE:  Nor was he asked about it on

23  direct.

24          MS. KHANNA:  Thank you, Your Honor.

25  Q    Dr. Katz, you would agree that the manner in which

Katz - Cross

1  the data is collected or merged can have an effect on the

2  accuracy of the resulting analysis, wouldn't you?

3  A     In general, of course.

4  Q     You received all of your data for your racially

5  polarized voting analysis from an individual named Clark

6  Bensen; is that right?

7  A     That is correct.

8  Q     Clark Bensen is a long-time consultant to republican

9  entities; is that right?

10  A     And academics, yes.

11  Q     It's a former employee of the Republican National

12  Committee?

13  A     I don't know his work history.  I'm sorry.

14  Q     Is it fair to say that Clark Bensen had a role in

15  deciding what specific elections and what specific

16  districts to analyze in your 2017 report?

17  A     Yes.  As I mentioned in deposition, Clark and I had

18  numerous conversations about what data he was able to get

19  on short notice.

20  Q     You only had a vague awareness of how Clark Bensen

21  originally collected the data; is that right?

22  A     Can you be a little more specific because that seems

23  very broad?  I know -- I've worked with Mr. Bensen on many

24  cases and some research examples.  So I know in general

25  how he works quite specifically.

Katz - Cross

1    Q    Did you have any awareness of how he collected the

2    data used in your report?

3    A    Again, in general terms, yes.  The specifics in this

4    case, no.

5    Q    Do you recall testifying during your deposition that

6    you were aware of -- when I asked you, Are you aware how

7    Clark Bensen originally collected the data, you replied,

8    Only in the most vague terms.  Do you recall that?

9    A    Yes.

10   Q    And the same is true for how Clark Bensen merged the

11   data; you only have a vague awareness of how he combined

12   census data with precinct level data here; is that right?

13   A    Yes.  I would probably have preferred to use the word

14   general, but yes.  That was my original testimony in

15   deposition.

16   Q    You didn't inquire into his data sources here, did

17   you?

18   A    In particular, no.

19   Q    In preparing your supplemental report, neither you

20   nor your research assistants independently gathered any

21   data from the Virginia Department of Elections; is that

22   right?

23   A    That's right.

24   Q    You relied solely on Mr. Bensen?

25   A    That is correct.

Katz - Cross

1   Q    Now, your 2017 report examines racially polarized

2   voting in four House of Delegates districts; is that

3   right?

4   A    Yes.

5   Q    And those four districts are District 69, 70, 71 and

6   89?

7   A    Correct.

8   Q    You do not provide a district-specific racially

9   polarized voting analysis of any other challenged

10  districts?

11  A    That is correct.

12  Q    Okay.  Let's take a look at that analysis for the

13  four districts you analyzed.  And I'm referring

14  specifically to your Table 2, which is

15  Defendant-Intervenors' Exhibit 101, page 5.  Do you have

16  that in front of you?

17  A    I do.

18  Q    Thanks.  Dr. Katz, isn't it a fact that based on your

19  Table 2 in all four districts in which you chose to

20  perform a district-level racially polarized voting

21  analysis, your analysis indicates no racially polarized

22  voting in the 2013 governor's election?

23  A    In those four districts, that's correct.

24  Q    Please turn to the previous page, Table 1.  Isn't it

25  a fact that based on your Table 1, three of the four

Katz - Cross

```
 1  districts in which you chose to perform a district-level

 2  racially polarized voting analysis indicate no racially

 3  polarized voting in the 2013 Attorney General election?

 4  A     Also correct.

 5  Q     The only exception is District 70 in Table 1?

 6  A     Correct.

 7  Q     And there you have a point estimate that does

 8  indicate a majority of whites are voting for the black

 9  preferred candidate; is that right?

10  A     Yes.

11  Q     But the confidence interval falls below 50 percent?

12  A     That is correct.

13  Q     And, therefore, in this district, you can draw no

14  conclusions about the existence of racially polarized

15  voting?

16  A     Correct.

17  Q     Now, Dr. Katz, in each of your tables that we've just

18  looked at, you report confidence intervals with each of

19  your ecological inference estimates; is that right?

20  A     That is true.

21  Q     Those are the numbers in the parentheses below each

22  point estimate?

23  A     Yes.

24  Q     A confidence interval a is measure of statistical

25  uncertainty about an estimate?
```

Katz - Cross

1   A     Yes.

2   Q     You would agree, wouldn't you, that the measure of

3   uncertainty is critical to any statistical analysis?

4   A     Yes, I would.

5   Q     And it's important with respect to any conclusions

6   you can draw from that statistical analysis?

7   A     Yes.

8   Q     And you've never reported ecological inference

9   estimates alone without confidence intervals in any of

10  your expert testimony in any legal case; is that right?

11  A     That's true.

12  Q     Or in any academic work?

13  A     That's definitely work.

14  Q     Because it is standard practical in political

15  science, when presenting model estimates, to provide some

16  estimator of statistical uncertainty?

17  A     That is true.

18  Q     Now, in Tables 1 and 2, you also performed a racially

19  polarized voting analysis of several regions as well; is

20  that right?

21  A     That is correct.

22  Q     And you relied on Clark Bensen to determine what

23  areas were included in each region?

24  A     That's no.  We had a long discussion about this at my

25  deposition.  It was a discussion between myself and Clark

Katz - Cross

1    Bensen about regions.

2          MS. KHANNA:  Can you please put up Dr. Katz's

3    2017 deposition starting on page 109, line 24?  It will go

4    on to the next page.

5    Q    Do you see where I asked, "These counties and

6    independent cities that define the regions that you looked

7    at, do they include suburban areas that are outside of the

8    challenged districts?"  And you responded, "Again, I don't

9    know.  The county data was provided to me as is.  I don't

10   know the geography of Virginia that well to tell you what

11   was and not included."

12         MS. KHANNA:  And go to the next question, too.

13   Q    And I said, "You relied on Clark Bensen to make that

14   determination," and your response is "yes"?

15   A    Yes.  To which exact regions were included, yes.  The

16   yes is specific to that previous question.

17   Q    My question today was you relied on Clark Bensen to

18   determine what areas were included in each region?

19   A    Oh, sorry.  Then I apologize for making this

20   elongated.  I just misheard your question.

21   Q    So the answer to my question is, yes, you relied on

22   Clark Bensen for that information?

23   A    For the exact region, the exact VTDs to include, yes.

24   Q    The exact counties to include, in fact?

25   A    The exact counties to include, yes.

Katz - Cross

1    Q    And you didn't do any analysis to determine how much

2    of these regions were actually included in the challenged

3    districts in the benchmark map; is that right?

4    A    I did not.

5    Q    Or any analysis to determine how much of these

6    regions are actually included in the challenged districts

7    under the enacted map?

8    A    That is also true.

9    Q    You would agree, wouldn't you, that a

10   district-specific racially polarized voting analysis is

11   important to the issues of racial voting patterns in the

12   challenged districts?

13   A    Yes.

14   Q    And all things being equal, you would prefer a

15   district-specific racially polarized voting analysis to a

16   regional polarized voting analysis?

17   A    Yes.

18   Q    Dr. Katz, would you agree that based on your Table 1

19   in your supplemental report, the level of racially

20   polarized voting varies throughout the Richmond region as

21   you define it?

22   A    Yes.

23   Q    And the same goes for Table 2 in your supplemental

24   report?

25   A    Yes.

Katz - Cross

1    Q      And you would agree that based on Table 1 of your

2    supplemental report, the level of racially polarized

3    voting that you find in the Richmond region generally is

4    higher than the level of racially polarized voting you

5    find in any of the four challenged districts that you

6    choose to analyze?

7    A      That would be correct.

8    Q      And the same is true for Table 2?

9    A      Yes.

10   Q      You also examined the 2013 democratic primary for

11   Attorney General; is that right?

12   A      That is correct.

13   Q      And that analysis is presented on Table 3 of your

14   supplemental report, Defendant-Intervenors' Exhibit 101,

15   page 6?

16   A      Yes.

17   Q      And, again, because this was a 2013 primary, the map

18   drawers would not have had access to data or information

19   about this particular election in 2011?

20   A      That's very true.

21   Q      And you stated that you chose to examine that

22   election because it was a race between a black candidate

23   and a white candidate, right?

24   A      Correct.

25   Q      And not because it was a primary?

Katz - Cross

1    A     Not in particular.

2    Q     The answer to that is no?

3    A     Yes.

4    Q     In fact, you would have preferred for it not to have

5    been a primary?

6    A     I would have preferred for it to be a House of

7    Delegates election.

8    Q     The answer to my question?

9    A     Yes.

10   Q     You would have preferred for it not to have been a

11   primary?

12   A     Yes.

13   Q     You would have preferred to analyze a general

14   election between a black candidate and a white candidate?

15   A     That would be correct.

16   Q     And you did not analyze any House of Delegates

17   democratic primaries for any of the challenged districts;

18   is that right?

19   A     That is correct.

20   Q     Not in your 2015 report?

21   A     No.

22   Q     And not in your 2017 report?

23   A     No.

24   Q     And you did not even look into whether there were any

25   contested democratic primaries in any of the challenged

Katz - Cross

1   districts?

2   A    That is correct.

3   Q    That is because your preference is to examine general

4   elections?

5   A    As a first cut, yes.

6   Q    Okay.  So based on your analysis of the 2013

7   democratic primary for Attorney General, you conclude in

8   your supplemental report that African-Americans

9   overwhelmingly preferred Justin Fairfax while white

10  voters, for the most part, preferred Mark Herring; is that

11  right?

12  A    Yes.

13  Q    I want to take a look at confidence intervals for the

14  white share of the vote for Justin Fairfax.  Is it fair to

15  say that the vast majority of the confidence intervals

16  straddle the 50 percent mark?

17  A    Yes.

18  Q    And this means that in those cases, you cannot

19  statistically discern which candidate a majority of whites

20  actually preferred?

21  A    That is correct.

22  Q    And, in fact, in at least six instances in Table 3,

23  your point estimate for the white share of the vote for

24  the black preferred candidate is accompanied by a

25  confidence interval between zero and 1?

Katz - Cross

1   A    Also true.

2   Q    And that's true for District 69?

3   A    Yes.

4   Q    And that means that all you can say about the white

5   share of the vote for Justin Fairfax is that it fell

6   somewhere between zero and 100 percent?

7   A    Correct.

8   Q    And in House District 70, all you can say about the

9   white share of the vote for Fairfax is that it fell

10  somewhere between 35 percent and 100 percent?

11  A    Correct.

12  Q    And in District 71, it ranges from between 19 percent

13  to 63 percent?

14  A    Correct.

15  Q    You did not analyze any other statewide democratic

16  primary since 2001 that included an African-American

17  candidate; is that right?

18  A    I did not.

19  Q    You did not analyze the 2008 democratic primary for

20  president; is that right?

21  A    I did not.

22  Q    You would agree that this is an example of a

23  democratic primary involving a black and white candidate?

24  A    Yes.  And many others.

25  Q    And many other candidates?

Katz - Cross

1    A    Yes.

2    Q    And this is a primary that took place before the 2011

3    redistricting process?

4    A    Yes.

5    Q    And therefore, map drawers would have had access to

6    this information when actually drawing the map?

7    A    In principle, yes.

8              JUDGE PAYNE:  I know we're doing a lot about the

9    2013 figures in his report.  I have been at a loss from

10   the very beginning what they have to do with what we're

11   doing here at all and why we're spending so much time on

12   it.  I'm not criticizing your examination, but I -- is

13   there some -- it's being offered just to show methodology.

14   Is that all it's being offered to show?

15             MS. KHANNA:  I believe it's being offered to

16   show the existence of racially polarized voting for

17   defendants' narrow tailoring burden, which was to show

18   that the map drawers had a strong basis in evidence for

19   drawing the districts the way they did.

20             JUDGE PAYNE:  Well, what's 2013's findings have

21   with respect to -- I mean, if we did that, we would be

22   using post hoc evidence, and I think the Supreme Court

23   might give us a little smack.

24             MS. KHANNA:  Your Honor, Dr. Katz and Dr. Hood

25   both chose to 2013 elections in their analyses.  So I'm

Katz - Cross

1  merely questioning him on his elections that he chose for

2  his --

3          JUDGE KEENAN:  Are you maintaining that it's

4  relevant to what we have in front of us today?

5          MS. KHANNA:  I'm not saying it is relevant or

6  irrelevant.  I'm not -- I haven't made an objection on

7  relevance at this point.  But I do think that it --

8          JUDGE KEENAN:  I don't mean to cut you off, but

9  tell us what -- why -- I've got the exact same problem

10  that Judge Payne has.  Why are we hearing it?  I mean,

11  we've got so much information to sift through, and if

12  something occurred over two years after the plan drawers

13  were making their significant decisions, what does it

14  show?

15          MS. KHANNA:  Well, I would agree that if the

16  Court is inclined to decide that the racially polarized

17  analyses providing by the defendant-intervenors' experts

18  based on 2013 elections is not relevant to the analysis

19  and not relevant to the narrow tailoring burden here, I

20  would -- I'll move on.

21          JUDGE PAYNE:  Well, you all didn't object.  I

22  guess the thing that troubled me when I read it, and I'm

23  having the same trouble today, I didn't hear anybody stand

24  up and say, hey, why are we doing this and none of this

25  ought to come in.  So I assumed you all thought it was

Katz - Cross

1    relevant, and I felt really kind of out of the loop.  And

2    then -- and actually, intellectually challenged because I

3    didn't follow.  Now I'm beginning to understand.

4            MS. KHANNA:  Well, to be clear, Your Honor --

5            JUDGE PAYNE:  So you're finished, about.  Are

6    you?

7            MS. KHANNA:  Well, I guess we didn't really have

8    an opportunity to object to the relevance of a portion of

9    the analysis in his expert report.  We only had the

10   ability to cross-examine him on the reliability of his

11   expert report.

12           JUDGE PAYNE:  Huh-uh.  You stand up and say that

13   whole topic is irrelevant.  That's what happens when you

14   got experts testifying and you're in the short fuse you're

15   on.  You had the chance, or you could have moved in limine

16   to stop it.  You knew what the testimony was.  So it could

17   have been done.

18           MS. KHANNA:  I'm --

19           JUDGE PAYNE:  How much more do you have so we

20   can figure out of what we're going to do and then you all

21   can tailor the next cross-examination, because they have

22   other witnesses to go and you're already beyond the length

23   of direct.

24           MS. KHANNA:  I agree, Your Honor.  I'm going to

25   move on to analyzing other parts of his analysis.

Katz – Cross

1    JUDGE PAYNE:  How long are you going move on?

2    MS. KHANNA:  I don't think I have more than ten

3  minutes, Your Honor.

4    JUDGE PAYNE:  How are you doing over there,

5  Ms. Stroh?

6    THE WITNESS:  My preference would be to push

7  through, but --

8    JUDGE PAYNE:  I'm talking to the court reporter.

9    THE WITNESS:  Oh, I'm sorry.

10    JUDGE PAYNE:  She's the most important person in

11  the courtroom.

12    THE WITNESS:  By far.

13    JUDGE PAYNE:  And they're changing.  So is this

14  a good time to take a break?

15    THE COURT REPOTER:  Let's just finish.

16    JUDGE PAYNE:  All right.  We're going to finish.

17  Now the pressure is on.

18  Q    Dr. Katz, you would agree that demographic

19  characteristics vary among the challenged districts, would

20  you not?

21  A    You mean the racial composition of the -- racial and

22  economic compositions of the districts?

23  Q    The demographic characteristics.  However, you would

24  understand that.

25  A    Yes.

Katz – Cross

1   Q    And you would also agree that voting patterns vary

2   across the challenged districts?

3   A    Yes.

4   Q    You would agree that political performance varies

5   across the challenged districts?

6   A    That's a little vague for me to agree to.

7   Performance of what?

8   Q    Well, the political performance of each district

9   varies from one district to another?

10  A    Performance means some goal.  So you have to tell me

11  what the goal you're measuring performance by.

12  Q    Do you believe that they vote in different numbers

13  for different candidates?

14  A    Yes.

15  Q    You would agree that the higher the level of racially

16  polarized voting, the more likely you're going to need a

17  larger number of black voting age population in order to

18  afford black voters an opportunity to elect their

19  preferred candidates?

20  A    Yes.

21  Q    And by the same token, if there is a lesser degree of

22  racially polarizing voting, then you're not going to need

23  as high a black voting age population to afford black

24  voters an opportunity to elect their preferred candidates?

25  A    Yes.

Katz - Cross

1    Q    You would agree, wouldn't you, that the level of

2    racially polarized voting varies among the challenged

3    districts?

4    A    With a qualification, in the districts for which we

5    can estimate it.

6    Q    Isn't it a fact, Dr. Katz, that at no point in your

7    supplemental report do you draw any conclusions about the

8    necessity of the 55 percent BVAP floor in order to afford

9    black voters an opportunity to elect their preferred

10   candidates?

11   A    I actually do in my original 2015 report.

12   Q    I asked you about your 2017 supplemental report.  And

13   the answer there is?

14   A    No.

15   Q    I want to move on briefly to your discussion of the

16   race versus party analysis in predicting VTD inclusion in

17   the challenged districts.  In your original 2015 analysis,

18   you found there to be a statistical tie between race and

19   party in terms of what better predicts VTD inclusion in

20   the challenged districts; is that right?

21   A    Correct.

22   Q    I take it that was not based on any of the testimony

23   that we've heard from Mr. Morgan or Mr. Jones or Delegate

24   Jones about why VTDs may or may not have been included?

25   A    Yes.

Katz - Cross

1   Q    And you didn't find at that time that party is a more

2   significant predictor than race in terms of VTD inclusion;

3   is that right?

4   A    Again, to be clear, they were a statistical tie in

5   their predictive abilities in this limited analysis.

6        JUDGE PAYNE:  Can you pull that mic up?  I'm

7   having a little trouble hearing you.

8        THE WITNESS:  I'm sorry, Your Honor.

9   A    They were a statistical tie in terms of their

10  predictive power in this limited analysis that I was

11  redoing of Dr. Ansolabehere.

12  Q    You heard Dr. Palmer testify yesterday that one of

13  the main differences between your model and

14  Dr. Ansolabehere's model was this issue of population

15  weights; is that right?

16  A    Yes.

17  Q    And you never mentioned that distance -- that

18  difference regarding weighting VTDs by population in your

19  2015 report; is that right?

20  A    Because, actually, it wasn't clear that

21  Dr. Ansolabehere had weighted his.  But I honestly don't

22  recall, from two years ago, the exact reasoning.

23  Q    But it was not in your report, right?

24  A    It was not in my report.

25  Q    And you indicate in your 2017 report for the first

Katz - Cross

 1  time that Dr. Ansolabehere's method of population

 2  weighting was incorrect; is that right?

 3  A    I did because Dr. Palmer raised it as a critique of

 4  my analyses.

 5  Q    You never raised it as a critique of

 6  Dr. Ansolabehere's analysis?

 7  A    No.

 8  Q    So under your preferred model, a VTD with 10 people;

 9  that is, 50 percent BVAP, would be just as likely to be

10  included in a given challenged district as a VTD with 1000

11  people that is also 50 percent BVAP?

12  A    Given the simple model, that is the finding.

13  Q    You also discussed on your direct examination the

14  inclusion of a distance measure in your race versus party

15  analysis; is that right?

16  A    That's correct.

17  Q    And on page 10 of Defendant-Intervenors' Exhibit 101,

18  in the middle of the page here, you say that one

19  reasonable approach to the distance measure question is to

20  include information detailing both the average distance

21  from the VTD to the set of challenged districts and the

22  variation in those districts; is that right?

23  A    With an important qualifier; might.

24  Q    You refer to this as a reasonable approach that might

25  include this information; is that right?

Katz - Cross

1    A     That's correct.

2    Q     And that approach is reflected into your own Table 6

3    on the following page?

4    A     Again, much like with the distance measures -- with

5    the weighting, we --

6    Q     Sorry.  Just wanted to make clear.  I'm under a very

7    limited constraint.  That approach that you reference here

8    is in Table 6 of your supplemental report?

9    A     It is.

10   Q     Can you please turn to Table 6 on page 11?

11   A     I have it.

12   Q     Here you present five specifications for your model,

13   one with Dr. Palmer's preferred distance measure and then

14   four other distance measures; is that right?

15   A     That is correct.

16   Q     And none of these are weighted by population; is that

17   right?

18   A     That is correct.

19   Q     None of these are weighted in any way?

20   A     Correct.

21   Q     Now, the BVAP coefficient is larger than the

22   democratic vote share coefficient in each of the models in

23   your Table 6; is that right?

24   A     Yes.

25   Q     And you performed no analysis of the statistical

Katz - Cross

1  significance of the difference between the BVAP

2  coefficient and the average democratic vote share

3  coefficient for any of these models?

4  A    As we did in my deposition, all that information is

5  contained within that table.

6  Q    I walked you through it in your description, but you

7  provide no conclusions to that effect in your report; is

8  that right?

9          JUDGE PAYNE:  Now, wait a minute.  Let's

10  don't -- don't be arguing with the witness.

11  BY MS. KHANNA:

12  Q    You provided no conclusions to that effect in your

13  report?

14  A    Correct.

15  Q    And would agree, wouldn't you, that what is really

16  important here, for purposes of this analysis, is the

17  difference between the coefficient for BVAP and the

18  coefficient for democratic vote share?

19  A    I think that is an issue.  I don't, actually, think

20  that's the most important issue.

21  Q    My question was you would agree that it is really

22  important here, for the purposes of this analysis, is the

23  difference between the BVAP coefficient and the defendant

24  vote share coefficient.

25  A    It is "an" important.

Katz – Cross

1   Q     You would agree with my statement?

2              JUDGE PAYNE:  He's not quibbling with your

3   answer.  You're kind of quibbling with his.  So I think

4   let's -- you're getting close to how many angels can stand

5   on the head of a pin.

6              MS. KHANNA:  Thank you, Your Honor.

7              JUDGE PAYNE:  We don't need to --

8   Q     Isn't it a fact that in each of your modules in Table

9   6, the BVAP coefficient is larger than the democratic vote

10  share coefficient?

11  A     Yes.

12  Q     And isn't it a fact that in each of the models in

13  your Table 6, the difference between those two

14  coefficients is statistically significant?

15  A     Yes.

16  Q     And so in each of the models in your Table 6, race is

17  more predictive than party of VTD assignment in the

18  challenged districts?

19  A     Correct.

20  Q     And that difference is statistically significant?

21  A     Yes.

22  Q     One last issue.  Dr. Katz, you include a section of

23  your 2017 report entitled Implications of Using Census

24  Block Level Data, and that's on page 11 of Exhibit 101; is

25  that right?

Katz - Cross

1   A     That's correct.

2   Q     And here you dispute Dr. Palmer's assertion that

3   census blocks do not contain political information as

4   absolutely incorrect; is that right?

5   A     That is true.

6   Q     And that is because race data is available at the

7   census block level and race is highly correlated with

8   party identification?

9   A     As is other demographic data, but yes.

10  Q     What other demographic data?

11  A     At the census block data, you can set statements

12  about education levels, about average income levels.

13  Q     The census block data level provides that?

14        JUDGE PAYNE:  Excuse me a minute.  Pull that mic

15  up or sit up, please.

16        THE WITNESS:  I'm sorry, Your Honor.

17  A     Yes.  You can get census block data on income and

18  age -- and education levels.

19  Q     The U.S. Census Bureau collects census data on

20  income -- what was the other variables that you mentioned?

21  A     Education.

22  Q     Education.  Anything else?

23  A     There's many.  I don't know all of them off the top

24  of my head.

25        MS. KHANNA:  Your Honor, I'd like to offer and

Katz - Cross

```
 1   introduce an exhibit, 91, as an impeachment exhibit.

 2   Copies for the Court.

 3        JUDGE PAYNE:  You generally don't introduce

 4   impeachment exhibits.  You wait until after you finish and

 5   see what you've scored or not scored, and then if there's

 6   a need for it, it's considered for admission at this time.

 7        MS. KHANNA:  Thank you, Your Honor.  I'll just

 8   identify it.

 9        JUDGE PAYNE:  The whole purpose is for

10   impeachment.  It has no substantive value --

11        MS. KHANNA:  Thank you, Your Honor.

12        JUDGE PAYNE:  -- probative value other than

13   that.  All right.

14        MS. KHANNA:  Sorry.  I think this is actually a

15   two-page exhibit.  So it might not have been --

16        JUDGE PAYNE:  Do you have two pages, Dr. Katz?

17        THE WITNESS:  I have one page.

18        JUDGE PAYNE:  You have one page that you can't

19   read?

20        THE WITNESS:  Yes.  Correct.  I have one page

21   that seems to have two documents on if.  Is that correct?

22        JUDGE PAYNE:  Can you read them?

23        THE WITNESS:  Barely.

24        JUDGE PAYNE:  I can't do very well with mine.

25   Do you have any big version of this?
```

Katz - Cross

1           MS. KHANNA:  I don't, Your Honor, but I believe

2    it's up on the screen.

3           JUDGE PAYNE:  Well, I can tell you that that

4    doesn't do me any good either.  I'm sure even if I'm close

5    to the screen, I can't see that.

6           JUDGE KEENAN:  I can't see that.

7           JUDGE PAYNE:  Okay.  We can't tell anything from

8    this.  So -- I can't -- we can't use this.  Ask him your

9    questions and see.  But if he can't read it, he doesn't

10   have to use it to answer.  That's not fair.

11          MS. KHANNA:  Okay.

12   Q    Dr. Katz, could you identify this as a sample 2010

13   census form that would be produced by the U.S. Census

14   Bureau?

15   A    The short form, yes.

16   Q    The short form?

17   A    Yes.

18   Q    Is there a longer form that you're aware of that's

19   provided in the decennial census?

20   A    Yes.  Households are randomly selected to receive

21   short or long forms.

22   Q    I believe -- are you thinking of the 2010 census or

23   any time period before that, because is it your

24   understanding that the American Community Survey Data has

25   replaced the long form census?

Katz - Cross

1    A    Oh, that's right.  I forgot the change.  My

2    apologies.  I forgot the change in 2010.  Correct.

3    Q    Dr. Katz, you just testified that other census data,

4    such as education and income, is available at the census

5    block level; is that correct?

6    A    Only from the ACS.  Sorry.  My apologies.

7              JUDGE PAYNE:  Only from what?

8              THE WITNESS:  Only from the American Community

9    Survey.

10             JUDGE PAYNE:  Okay.

11   A    Which is not part of the official census.

12   Q    And the American Community Survey is not reported at

13   the census block level, is it?

14   A    No.  It's reported at the census track level.

15   Q    So the question I asked you is whether Dr. Palmer's

16   foundational assumption that there is no political data

17   available at the census block level was wrong.  And that's

18   because race data is available at the census block level

19   and race data is highly correlated with party

20   identification; is that right?

21   A    And voting behavior.  Yes.

22   Q    And voting behavior?

23   A    Yes.

24   Q    Race data is highly correlated with voting behavior

25   and party identification?

Katz – Redirect

1   A      Correct.

2   Q      So according to your report, political information

3   could be gleaned from the race data?

4   A      Yes.

5          MS. KHANNA:  Thank you, Dr. Katz.  I have no

6   further questions.

7          JUDGE PAYNE:  All right.  Is there any redirect?

8                    **REDIRECT EXAMINATION**

9   BY MR. BRADEN:

10  Q      On how many cases have you worked with Clark Bensen

11  where he helped you prepare data?

12  A      At least a dozen.  Probably more.

13  Q      And has he helped you on your academic research at

14  various times?

15  A      He has.  He's probably the best data person I know.

16  Q      Does the inability to show racial polarization

17  because of confidence levels being too large prove the

18  reverse; that it doesn't exist?

19  A      No.

20  Q      So if one had the burden to prove to a court or DOJ

21  that racial polarization did not exist, the confidence

22  levels were such that you wouldn't be able to make that

23  assertion?

24  A      I'm a little uncomfortable.  That's sounding

25  dangerously close like a legal -- asking me a legal

Katz - Redirect

1   question, and I try very hard not to make legal statements

2   since I'm not a lawyer.

3   Q    Okay.  Would you be able to make the determination on

4   whether or not -- if you had an obligation to come into a

5   courtroom and testify affirmatively that it did not exist,

6   would you be able to do it?

7   A    No.

8          MR. BRADEN:  Thank you.

9          JUDGE PAYNE:  On page -- in Exhibit 101, page

10  10, you make the statement, "In the U.S., and especially

11  in Virginia, race data is very highly correlated with

12  party identification."  And you cite three -- three

13  references there.  "And numerous recent works present

14  evidence of this correlation within the state of

15  Virginia," citing more.  And then you added to that at

16  your last testimony "after party identification and voting

17  behavior."  Is that your opinion -- is that still your

18  opinion, notwithstanding what she asked you about what was

19  in the -- in the voting -- in the census questionnaire?

20         THE WITNESS:  Yes.  I mean, if you look at all

21  the ecological -- the analyses that I presented or

22  Dr. Palmer presented, African-Americans are voting

23  overwhelmingly for democratic candidates.  We know that.

24         JUDGE PAYNE:  But that is in Virginia

25  specifically?

```
 1            THE WITNESS:  That's in Virginia specifically.

 2    But that's true -- that's also true in other locations

 3    where there are sizable African-American populations.

 4            JUDGE PAYNE:  Anybody have any questions based

 5    on what I asked or does the Court have any other

 6    questions?

 7        We'll take a 20-minute recess.  Can he be excused?

 8            MR. BRADEN:  Yes, Your Honor.

 9            JUDGE PAYNE:  Thank you for being with us.  I

10    know you got a plane to catch from the look on your face.

11            THE WITNESS:  You are correct, Your Honor.

12            (Recess taken.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              JUDGE PAYNE:  Next witness is?

2              MR. RAILE:  Your Honor, defendant-intervenors call

3    Dr. M. V. Hood.

4              JUDGE PAYNE:  Thank you.

5

6                          **M. V. HOOD, III,**

7    a witness, called at the instance of the

8    defendant-intervenors, having been first duly sworn,

9    testified as follows:

10                        DIRECT EXAMINATION

11   BY MR. RAILE:

12   Q    Dr. Hood, would you state your name for the record.

13   A    M. V. Hood, III.

14   Q    And, Dr. Hood, you are an expert retained by

15   defendant-intervenors in this case; is that correct?

16   A    Correct.

17   Q    And you testified in this case previously; correct?

18   A    Correct.

19   Q    And that was in 2015?

20   A    Correct.

21   Q    And you filed a report previously in this case; is that

22   correct?

23   A    Correct.

24   Q    And do you have it, that report, in the witness binder in

25   front of you?  It should be the first tab.

1    A    Yes, I do.

2    Q    That's Defendant-Intervenors' Exhibit 15; is that correct?

3    A    That's correct.

4    Q    And we are not going to go through this report, but I just

5    wanted to ask you, has anything that you have seen in the other

6    expert reports or any of the testimony that you have heard,

7    either in 2015 or since, changed your views as expressed in

8    that report?

9    A    No.

10   Q    Okay.

11            JUDGE PAYNE:  Is the same true for the testimony you

12   gave at trial?

13            THE WITNESS:  Yes, Your Honor.

14            JUDGE PAYNE:  That is, it hasn't changed what you

15   testified to at trial?

16            THE WITNESS:  That's correct, Your Honor.

17   Q    So you filed a supplemental report in this case in 2017;

18   correct?

19   A    That's correct.

20   Q    And is that report in front of you as well?

21   A    Yes.

22   Q    What were you asked to do in this report?

23   A    I was asked to do two primary things, and one of them was

24   to provide a sociodemographic comparison between the challenged

25   districts and the remaining House of Delegates districts, and

1    the second was to perform my own racial block voting analyses

2    in response to Professor Palmer's report.

3    Q    And where is the -- your analysis, the first analysis you

4    described, the demographic analysis in your report?

5    A    Pages three and four.

6    Q    And --

7         JUDGE PAYNE:  Are you using, Dr. Hood, the pages at

8    the bottom of the page in bold type or the pages of your

9    pagination system?

10        THE WITNESS:  I'll use whichever pages you'd like,

11   Your Honor.

12        JUDGE PAYNE:  You choose.

13        THE WITNESS:  I'll use my page numbers.

14        JUDGE PAYNE:  That is page what of your numbers?

15        THE WITNESS:  Three and four, Your Honor.

16   Q    And could you describe very briefly what it was, the

17   analysis that you performed in this section.

18   A    Okay.  As briefly as I can, I collected census data on

19   various sociodemographic factors listed in table one, and I

20   provided a comparison on these factors between the challenged

21   districts as a group and the remaining House of Delegates

22   districts.

23   Q    And what was the purpose of that comparison?

24   A    To see if these districts were similar or alike on other

25   factors besides racial component -- racial composition, excuse

Hood - Direct

1    me.

2    Q    Are these factors that experts in your field and you,

3    yourself, use for their day job in their academic research?

4    A    Yes.

5    Q    What was your conclusion in this section?

6    A    In a nutshell, my conclusion is that the challenged

7    districts are much more alike compared to the remaining House

8    of Delegates districts on these factors.

9    Q    And the Court can go in and read the details.  I think

10    it's pretty self-explanatory.

11         JUDGE PAYNE:  Excuse me a minute, Mr. Raile, so I

12    don't get caught with my foot off base again.  This table looks

13    like it's 2015 data, and I'm not quite sure why 2015 data is

14    helpful here, what its purpose is for.  Ms. Khanna said that

15    she thought it was for narrow tailoring, these kinds of data,

16    but I don't know what we're doing here.  Can you kind of get us

17    in the picture before we get too far down the road again?

18         MR. RAILE:  Would you like me to offer an

19    explanation, or --

20         JUDGE PAYNE:  I want to know from you why you're

21    offering it, and then if you want to put some preliminary

22    testimony on to augment your point so we can understand and get

23    the context, that would be all right, too.

24         MR. RAILE:  Sure.  Our understanding of the narrow

25    tailoring inquiry, Your Honor, is that it is distinct from the

Hood - Direct

1    predominance inquiry insofar as the principle concern of the

2    predominance, and I guess the only concern is motive.  And

3    that's subjective intent.

4          And in the narrow tailoring inquiry, we are -- I

5    think the Supreme Court's opinion actually allows for more

6    consideration which -- strong basis in evidence.  We're

7    interested in what does strong mean, for instance, and that may

8    involve information that bears out to tend to help, add

9    credence to what the map-drawer's decision was in the past.

10          JUDGE KEENAN:  It wasn't in existence in 2011, this

11   table; right?

12          MR. RAILE:  Correct.

13          JUDGE KEENAN:  The data on which it is -- or from

14   which it is drawn didn't exist as well, did it?

15          MR. RAILE:  No, Your Honor.

16          JUDGE PAYNE:  Whence cometh this data, and what

17   timeframe --

18          MR. RAILE:  This is --

19          JUDGE KEENAN:  Add one more thing so you can answer

20   fully.  It seems to me that the question of narrow tailoring

21   comes down to what information did they have in front of them

22   at the time they were drawing the map that indicated that this

23   was necessary to elect a candidate of their choice.

24          And so if there's demographic information four years

25   later, how does that bear on the question of whether they had

Hood - Direct

1    information then available to them that was necessary to do

2    what they did to elect a candidate of their choice.

3              MR. RAILE:  I question the premise, Your Honor,

4    because in the Supreme Court's decision, it listed a variety of

5    evidence that it considered pertinent, and one of the evidence

6    was the racial block voting analysis provided by the

7    plaintiffs.  It actually said the plaintiffs' numbers show that

8    there's racially polarized voting in House District 75, and if

9    you look at plaintiffs' 2015 expert report, it includes at

10   least one election from 2013.

11             JUDGE PAYNE:  Does that make it any more admissible

12   because they put their foot outside the line and hit a foul

13   ball?

14             MR. RAILE:  I'm sorry, I don't understand the

15   question, Your Honor.

16             JUDGE PAYNE:  If they're wrong, how does that make --

17   does that help your case?

18             MR. RAILE:  The Court actually said that the

19   plaintiffs' own numbers support the state's case, because the

20   plaintiffs' number --

21             THE COURT:  You mean the Supreme Court.

22             MR. RAILE:  Yes, including the --

23             JUDGE KEENAN:  Could you direct us to the part of the

24   Supreme Court opinion?

25             MR. RAILE:  I would love to, Your Honor, if I had the

1    opinion in front of me.  I didn't come prepared to discuss --

2         MR. HAMILTON:  I'm happy to provide counsel with a

3    copy of the opinion.

4         MR. RAILE:  Thank you.  I appreciate it.

5         JUDGE PAYNE:  But the plaintiffs didn't object to any

6    of this, so I don't understand.  Were they laying in the weeds,

7    or what are you doing back there?  You're going to have to

8    answer this, too, in a minute, Mr. Hamilton.  All this stuff is

9    in the record now.  It's unobjected-to evidence that's in the

10   record, and I just need -- I think we need an understanding of

11   why something that has -- that is prepared in 2015 and reflects

12   data after 2011 and wasn't, apparently, considered by the

13   people who drew the maps or voted on the plan is something that

14   we can consider without running afoul of the post hoc

15   justification component of the Supreme Court's opinion.

16        JUDGE KEENAN:  And the Supreme Court specifically

17   says the question is whether the state had good reasons to

18   believe that a 55 percent BVAP floor was necessary to avoid

19   liability under Section 5.  And then this is in conducting the

20   analysis of Section 5 --

21        MR. RAILE:  Then it goes on to say --

22        JUDGE KEENAN:  Then it goes on to say the state did

23   have good reasons under these circumstances, and so the Supreme

24   Court was looking at a freeze frame in time, was it not, of

25   what the state knew at the time the state took this action?

1          MR. RAILE:  Well, I mean, I read it a little

2    differently.  I think it goes on to say the challengers,

3    moreover, over do not dispute that District 75 was an

4    ability-to-elect district or that white and black voters in the

5    area tend to vote as blocks.

6          JUDGE KEENAN:  At that time.  Do you have any

7    evidence the Supreme Court was relying on 2015 statistics in

8    making these statements?  They weren't in the record.

9          MR. RAILE:  In conceding this point, they relied on

10   the 2013 information.  But -- if I may, I would appreciate --

11   if you'd like me to move on from this section and examine the

12   professor and build a record so we can brief this, because he

13   has a plane to catch, and I would like to get done in half an

14   hour, if it would please the Court.

15         JUDGE PAYNE:  I'd like him to get done in half an

16   hour, too, but do you want to let him build a record?  I cannot

17   understand, for the life of me, how it's relevant in the case.

18   Yet, I question that whole decision, because the plaintiffs

19   didn't object to this thing, and they're offering later

20   evidence as well, and so --

21         JUDGE KEENAN:  My concern, too, is the Court isn't

22   compelled to hear this testimony just because nobody objected

23   to it properly.

24         JUDGE PAYNE:  That's right.

25         JUDGE KEENAN:  If it's not relevant and is not a

Hood - Direct

1    guidepost that the Supreme Court used that we're obligated to

2    consider, then I don't see why we have to sit here and listen

3    to it.

4              MR. RAILE:  I'll confine the examination --

5              JUDGE PAYNE:  Excuse me.  I think Ms. Khanna had

6    something.

7              MS. KHANNA:  I was going to clarify the point that we

8    provided rebuttal expert testimony on this very point saying

9    that the analysis was post-dating the 2011 redistricting

10   process.  While it was not part of the formal trial exhibit

11   objections, we have rebutted it in rebuttal reports, and I'll

12   cross-examine at least one witness on this very issue.

13             JUDGE PAYNE:  All right.  I think we're all in

14   agreement that we don't need to hear the information about the

15   demographics.  If it were 2011, it would be highly relevant.  I

16   don't have any question about that.  But now that door is

17   closed, I think.  So if you have something else to talk about,

18   that would be helpful.

19             MR. RAILE:  Thank you, Your Honor.

20   Q    Turn to page 14 of your expert report, Dr. Hood.

21   A    14, okay.

22   Q    And what is the chart at the top of the page?

23   A    Are you referring to table ten?

24   Q    Yes, sir.

25   A    Okay.  So this is a racial block voting analysis I

1  performed regarding the House of Delegates election HD 69 from

2  the 2009 Democratic primary.

3            JUDGE PAYNE:  Pardon me.  Are you on Exhibit 103?

4            MR. RAILE:  Yes, Your Honor.

5            JUDGE PAYNE:  Page 15?

6            MR. RAILE:  Page 14 in Dr. Hood's pagination.

7            JUDGE PAYNE:  In Dr. Hood's, okay.  Table eight.

8  It's at the top of the page; is that right?  Table ten, thank

9  you.

10  Q    So, Dr. Hood, what analysis did you perform here?

11  A    I performed an analysis to determine how the racial groups

12  in this particular House of Delegates district were voting for

13  these particular candidates.

14  Q    And how did you perform that analysis?

15  A    I used a technique called ecological inference.

16            JUDGE PAYNE:  Equal what?

17            THE WITNESS:  Ecological inference, Your Honor.

18  Q    And what is the purpose of that analysis?

19  A    This is an interesting case, because we have a mixture of

20  white and black candidates running in this Democratic primary,

21  and we see that the preferred candidate of choice for the black

22  community is Brown at 55.6 percent versus the preferred

23  candidate of choice for the white community who is Betsy Carr

24  who scores 81.2 percent of the white vote.

25       It's interesting because the preferred candidate in --

1   this is a majority black district as well.  The preferred

2   candidate of the black community loses in the Democratic

3   primary.

4   Q    This is a 2009 election?

5   A    Yes.

6   Q    And why is that significant of a black-preferred candidate

7   losing in the Democratic primary?

8   A    Well, you know, I probably testified to this, and I've

9   certainly talked about this before.  An absence of racially

10  polarized voting in a general election scenario is not

11  necessarily indicative that racially polarized voting doesn't

12  exist.

13       Sometimes we have to look to the Democratic primary,

14  because sometimes the preferred candidate of the black

15  community can be found in a Democratic primary.  If they win

16  the Democratic primary, they would probably also be the

17  preferred candidate of the black community in the general

18  election, but sometimes they lose the primary.  So it's

19  important to look at both primaries and general elections in my

20  opinion.

21  Q    Let's turn to page eight of your report.

22  A    Okay.

23  Q    And this is a section called Issues with Specifying Exact

24  Proportion of Black VAP, or voting-age population; is that

25  correct?

Hood - Direct

1    A    Correct.

2    Q    What's going on in this section of the report?

3    A    This is a response to Professor Palmer's report where he

4    has a discussion in his initial report about different --

5    specifying different levels of black VAP in a district and what

6    the effect is in terms of election outcomes.

7    Q    And what response do you provide in this section?

8    A    Well, I provide some critiques of that.

9    Q    And what's one critique?

10   A    Let me say one thing just from the get-go here, and that

11   is that when we're using past election results to predict some

12   future outcome, we're trying to make a prediction about

13   something.

14          MS. KHANNA:  Objection, Your Honor.  This is both

15   nonresponsive and not included in his actual report.

16          JUDGE PAYNE:  Well, I don't think the second ground

17   applies because he's setting the stage for what he's going to

18   say, but -- let's let him finish -- he's trying to put a caveat

19   and a framework on it, so go ahead.  Overruled.

20          THE WITNESS:  I'm just saying we're making a

21   prediction about a future event that hasn't occurred yet when

22   we're doing that.  That's all I wanted to say.

23   Q    So what is one criticism that this section provides to Dr.

24   Palmer?

25   A    Okay.  Well, this -- you know, some of these criticisms

Hood - Direct

1   are unavoidable, but, again, it makes it difficult to make an

2   exact prediction.  That's the point to what I'm saying around a

3   lot of this, and one of those, again, is that we derive an

4   estimate from the statistical models, and it's an estimate, and

5   it has a range of uncertainty around that estimate.

6        So, again, we can come up with a best point estimate, but,

7   again, there's a range of uncertainty around that.  We have to

8   deal with that, we have to incorporate --

9   Q    Would it be fair to say there is a margin of error?

10  A    Yes.

11  Q    That's one concern.  What's another?

12  A    Another concern is that in Virginia, specifically in

13  Virginia, we have to use voting-age population data.  In other

14  states, we may have more specific data that can give us a much

15  better idea of trying to predict vote outcome.

16       So, for instance, if we had racial registration data -- we

17  don't have that in Virginia -- or if we had even better racial

18  turnout data.  So, you know, again, we're basing an election

19  outcome, or what we think an election outcome is going to be,

20  on voting-age population.  So it's several steps removed from

21  what turnout might actually look like.  So that's another sort

22  of point of critique.

23  Q    And is that imprecision something that's captured in the

24  margin of error produced in an ecological inference analysis?

25  A    With some imprecision.  I don't think that is.  That would

1   be -- the estimate would be better if we had better data in

2   that case.

3   Q    And what we're doing in Virginia is we're comparing

4   something like black -- or, excuse me, voting-age population

5   versus election results, whereas in other states, you might be

6   considering something more precise like racial turnout data or

7   something like that?

8   A    Right.  In some states, we could get much more precise

9   estimates of actually who turned out in that election racially

10  speaking.

11  Q    What's another concern?

12  A    Turnout in general.  Again, if we're basing our election

13  estimates on, say, presidential elections or even gubernatorial

14  elections, those aren't always indicative in Virginia of these

15  odd-numbered election years some of which feature state

16  constitutional offices, and sometimes they don't.  And so, for

17  instance, in table five, we can see that turnout rates vary

18  greatly across these different types of election cycles.

19  Q    What's another concern that you have?

20  A    Well, we're using census data, and, of course, census data

21  is taken at the beginning of the decade.  If we're making

22  estimates later in the decade, we're going to have a loss of

23  precision because of shifting that's going on.

24       Another thing related to census data as well is that you

25  could create a district that's say, just hypothetically,

Hood - Direct

1   53 percent black voting-age population, but certainly it's

2   possible, over the course of a decade, a ten-year timeframe,

3   that the black VAP may shift.  It could shift down in that

4   district, for instance.

5   Q    That also create a problem if the legislature tried to do

6   some kind of a statistical study at the end of a cycle going

7   into the redistricting?

8   A    Yes.

9   Q    How so?

10  A    They wouldn't have the new census data to rely on.  They'd

11  have to use data from the previous census cycle.

12  Q    So there would be a mismatch between what the statistical

13  analysis showed them and the actual new census data and the new

14  lines and everything else?

15  A    There could be, again, depending on population shifts that

16  may have occurred.

17  Q    I notice that there is an exhibit to your expert report.

18  A    There's an attachment, yes.  It's an expert report written

19  by Professor James Loewen.

20  Q    What is that?

21  A    It's an expert report that Professor Loewen wrote.

22  Q    Why did you attach it here?

23  A    Well, I found it relevant.  Professor Loewen looked at

24  racially polarized voting patterns specifically in House of

25  Delegate elections in Virginia in the previous cycle.

Hood - Direct

1  Q    What did he find?

2  A    He found the presence of racially polarized voting, one

3  point being there's a pattern established.  Unless something

4  interrupts that pattern, it's highly likely it's probably going

5  to continue.  I think some of the work shown in my report, as

6  well as others', indicates that racially polarized voting still

7  exists in Virginia today.

8  Q    Now, you also wrote about a warming and cooling effect, I

9  believe citing Dr. Loewen; is that correct?

10  A    Right.  Those are his terms, I want to make clear, but,

11  yes, I talked about what he was discussing at various points.

12  Q    Why is that relevant to your discussion in Section, I

13  believe it's 4 B of your report?

14  A    Well, Professor Loewen's warming and cooling effects deal

15  with the percentage of black VAP in a majority-minority

16  district and the different effects it can have.  So, for

17  instance, you know, bumping up the black -- this is, again,

18  Professor Loewen describing this effect.  He says that bumping

19  up the black VAP in a district beyond a bare majority can

20  produce a warming effect for the black community.  It can

21  increase things like registration and turnout rates among black

22  voters.  It can produce better-qualified black candidates

23  entering races in that particular district, higher turnout --

24  maybe I just said that.  Higher vote percentages for black

25  candidates as well.

Hood - Direct

1     The converse can be true, too, that there can be a cooling

2  effect in that case for the white community.  You may see the

3  emergence of fewer white candidates, white turnout rates may

4  fall in that kind of district.  So his point was that sometimes

5  you may have, you know -- because of this effect, you may have

6  lopsided victories or even non-contested elections.  Professor

7  Loewen's contention was it wasn't evidence of packing

8  necessarily, though.

9  Q    How does this relate to Dr. Palmer's analysis where he

10  predicts election results at various black voting-age

11  population levels such as 55 percent, 50 percent, 45 percent?

12         JUDGE PAYNE:  Excuse me.  You said how does this

13  relate.  What are you talking about; the report or one of the

14  three or four things he was talking about?

15  Q    How does your discussion of the warming and cooling effect

16  in your report relate to Dr. Palmer's discussion of --

17  prediction of election results at various black voting-age

18  population levels?

19  A    Well, again, you may be able to produce -- he produced

20  estimates from his vote models of, you know, fairly wide

21  margins for black candidates in those instances, but, again,

22  according to Professor Loewen, you might get that effect until

23  you get down to some threshold level where there's a failure,

24  and, for instance, the preferred candidate of the black

25  community might actually lose in a district.

Hood - Direct

1   Q    And so how would you ever find out if you had reached that

2   level?

3   A    Well, you would find out, I guess, post hoc, after an

4   election happened.

5   Q    So you would -- you could drop the black voting-age

6   population in a district and then watch to find out what

7   different story lines might emerge, and then what happens then?

8           MS. KHANNA:  Leading question.

9           JUDGE PAYNE:  It sort of is, particularly with all

10  that story line in there.  Try it without leading.

11          MR. RAILE:  Yes, Your Honor.

12  Q    So you'd have to find --

13          MR. RAILE:  I think I can live with his last answer.

14  I'll move on, Your Honor.

15  Q    So you -- just to say for the record, in your report you

16  have some -- you have a racially polarized voting analysis in

17  2009.  That is a data point showing racial block voting in that

18  election; is that correct?

19  A    That's correct.

20  Q    And you have an appendix with information from the prior

21  decade showing racially polarized voting; is that correct?

22  A    Right, from Professor Loewen's report, yes.  I didn't

23  produce that data.

24  Q    And you do also have a set of 2013 elections that we won't

25  analyze here that also show racially polarized voting in

1    Virginia races; is that correct?

2    A    Yes.

3              JUDGE PAYNE:  Is that table six --

4              MR. RAILE:  It's several tables, Your Honor.

5              JUDGE PAYNE:  -- eight, and nine, Dr. Hood, that are

6    the 2013, six, seven, eight and nine?

7              THE WITNESS:  Those are some of them, Your Honor.

8              JUDGE PAYNE:  But are they all had 2013?

9              THE WITNESS:  Yes, they are, except for table ten is

10   not.

11             JUDGE PAYNE:  Ten is for 2009.

12             THE WITNESS:  Yes, Your Honor.  Tables two, three,

13   and four are for 2013 as well.

14   Q    Dr. Hood, how long did you have to prepare this report?

15   A    About two weeks.

16   Q    Is that shorter or longer than you normally have?

17   A    Shorter.

18   Q    By how much?

19   A    It varies greatly.  Sometimes I might have months to

20   prepare an expert report.  Usually not two weeks.

21             MR. RAILE:  Thank you, Your Honors.  No further

22   questions of this witness at the time.

23             JUDGE PAYNE:  Before you leave, what's the pertinence

24   of the 2013, because that may effect, or not, the

25   cross-examination?  Why do we not have the same temporal

1    problem with the 2013 comparison?

2            MR. RAILE:  I just wanted to establish that we have

3    the pattern shown.  If you think that it's not relevant, then I

4    respect that, Your Honor.  Thank you.

5            JUDGE PAYNE:  Do you think -- are you offering it

6    because you think it is relevant for us to look at -- in other

7    words, I took what you were doing as saying, Loewen said this

8    in 1991, and Dr. Hood says, this is the result in 2013, so

9    Loewen is borne out, and that 2009 is during the period.  I

10   thought that's what you were doing with the report.

11           MR. RAILE:  Yes, Your Honor.

12           JUDGE PAYNE:  That's why they didn't object to it, I

13   guess.  I'll let her cross-examine about it.

14

15                         CROSS-EXAMINATION

16   BY MS. KHANNA:

17   Q    Good afternoon, Dr. Hood.

18   A    Good afternoon.

19   Q    You provide no analysis or rebuttal in response to Dr.

20   Rodden's report in this case; is that right?

21   A    That's correct.

22   Q    And you provide no response to Dr. Palmer's analysis of

23   the racial composition of populations moved in and out of the

24   challenged districts.

25   A    That's correct.

Hood - Cross

1   Q    And you provide no response to Dr. Palmer's

2   race-versus-party analysis; is that right?

3   A    That's correct.

4   Q    And, in fact, you concluded in your 2015 report that HB

5   5005 did not seek to pack Democratic voters in the challenged

6   districts; correct?

7   A    Correct.

8   Q    And you provide no analysis in response to Dr. Palmer's

9   conclusion that if all the population needed in each

10  underpopulated district were made up of white voters who

11  unanimously voted against black-preferred candidates, the

12  black-preferred candidates would still win; correct?

13  A    That's correct.  I didn't respond to that.

14          JUDGE PAYNE:  Why don't you deal with what he did

15  respond to?  I'm sure that if he didn't respond to it, we'll

16  not hear anymore about it.

17          MS. KHANNA:  Yes, Your Honor.

18          JUDGE PAYNE:  That will maybe streamline things a

19  little bit.

20  Q    I'd like to turn your attention to table ten on page 14 of

21  your report, and I'm using your page numbers, not the

22  Exhibit 103 page numbers.  Do you see that?

23  A    Yes.

24  Q    This table reflects your point estimates of votes by

25  racial group for certain candidates in this election --

1   actually in this primary; is that right?

2   A     That's correct.

3   Q     Are you familiar with the concept of confidence intervals?

4   A     Yes.

5   Q     Is it fair to say that a confidence interval reflects a

6   band of uncertainty around a given point estimate?

7   A     Yes.

8   Q     But you don't provide confidence intervals for any of the

9   point estimates in any of your tables; is that right?

10  A     That's correct.

11  Q     And, in fact, you do not consider the confidence intervals

12  in forming your conclusions on racially polarized voting at set

13  out in your supplemental declaration; correct?

14  A     Correct.

15  Q     One of the goals of your racially polarized voting

16  analysis is to determine whether a majority of whites are

17  voting for or against African-American-preferred candidates;

18  correct?

19  A     Correct.

20  Q     So where, for instance, you have a point estimate of, say,

21  55.6, we could not know whether or not the confidence interval

22  actually falls below 50 percent; is that right?

23  A     Well, not without looking at it, no.

24  Q     We can't know based on your report; correct?

25  A     Not this table, no.

Hood - Cross

1   Q    Or in any of your tables.

2   A    That's correct.

3   Q    You would agree, wouldn't you, that it is standard

4   practice in political science, when presenting model estimates,

5   to also provide some indicator of statistical uncertainty?

6   A    Yes.

7   Q    In fact, you consider that part of the discipline?

8   A    Yes.

9           JUDGE PAYNE:  Excuse me a minute.  Is table ten a

10  model, or is it your calculation of what actually happened

11  based on the records of the election?  I'm confused.

12          THE WITNESS:  Your Honor, this is -- these are

13  estimates from a model I ran using data from the election.

14          JUDGE PAYNE:  All right, I understand.

15  Q    Dr. Hood, you testified on direct about a section starting

16  on page eight of your report entitled Issues with Specifying an

17  Exact Proportion of Black VAP; is that right?

18  A    Yes.

19  Q    And in the beginning of this section, you state that your

20  regional voting analysis from previous pages indicates that the

21  creation of a majority-minority district might be necessary;

22  correct?

23  A    Yes.

24  Q    And that regional voting analysis is based entirely on

25  2013 elections; correct?

Hood - Cross

1    A    The analysis I presented, yes.

2    Q    You then go on to note that there are a number of reasons

3    why map-drawers engaged in creating a majority-minority

4    district might find it necessary to increase minority

5    voting-age population beyond 50 percent; correct?

6    A    Correct.

7    Q    And you go on to provide a list of hypothetical reasons

8    why that might be so?

9    A    I don't know if I'd use the word hypothetical.  They are

10   all considerations that I think are important.

11   Q    I guess to be clear, this portion of your report does not

12   purport to provide actual reasons that actually drove these

13   map-drawers drawing HB 5005 to establish a 55 percent BVAP

14   floor; correct?

15   A    Yes.  I'd like to say one other thing, thought.  These are

16   all considerations that need to be taken into account any time

17   these estimates are being made.  But the answer to your

18   question specifically is yes.

19   Q    You don't know whether the map-drawers took of any these

20   considerations into account?

21   A    I don't have any knowledge of that.

22   Q    The first reason that you identify and you discussed on

23   direct as to why a map-drawer might find it necessary to

24   increase the minority voting-age population is that any

25   statistical model is accompanied by a degree or range of

Hood - Cross

```
 1   uncertainty; is that correct?

 2   A    That's correct.

 3   Q    And there are ways for statistical modeling to take into

 4   account that level of uncertainty; correct?

 5   A    Correct.  I'm just pointing that out.

 6   Q    And for ecological inference estimates, that would include

 7   confidence intervals.

 8   A    Yes.

 9   Q    Like the ones produced in Dr. Palmer's report.

10   A    Right.

11   Q    The second reason you identified as to why a map-drawer

12   might find it necessary to increase the BVAP in a

13   majority-minority district was related to turnout; correct?

14   A    Correct.

15   Q    And you specifically noted that turnout patterns can vary

16   across elections?

17   A    I would say they do vary.  They can and they do.

18   Q    So let's take a look at table five on page ten of your

19   report.

20   A    Okay.

21   Q    Table five reflects overall turnout for each election

22   listed; is that right?

23   A    That is correct.

24   Q    It does not examine turnout by race in any one election.

25   A    Right.  Virginia doesn't report turnout by race.
```

Hood - Cross

1    Q    It does not examine turnout in any region of the state?

2    A    That is correct.  Those are state-wide turnout numbers.

3    Q    And it certainly does not examine turnout in any specific

4    district in the state?

5    A    That is correct.

6    Q    So there's no way to know from table five whether black

7    turnout was higher than white turnout in any given district in

8    any given election; correct?

9    A    Not from that table, no.

10   Q    Or vice versa?

11   A    Correct.

12   Q    You also cite on page ten of your report a single

13   statistic from the most recent census survey for the 2016

14   presidential election.

15   A    Table ten?

16   Q    Sorry, I'm looking on page ten of your report.  Here you

17   cite a single census survey statistic about the 2016 election,

18   presidential election.  That's in the first paragraph?

19   A    Right.

20   Q    That reflects state-wide turnout across all of Virginia;

21   right?

22   A    Right.  That's correct.

23   Q    In the 2016 presidential election.

24   A    That is correct.

25   Q    Which did not include an African-American candidate.

Hood - Cross

1   A     No.

2   Q     And you performed no analysis to determine whether that

3   5.3 gap between black and white voter turnout state-wide for

4   the 2016 presidential election is statistically significant; is

5   that right?

6   A     Correct.

7   Q     You provide no analysis of turnout differences between

8   African Americans and whites in any of the challenged

9   districts; right?

10  A     I did not perform any turnout analyses, that's correct.

11  Q     The third reason that you identify as to why a map-drawer

12  might find it necessary to increase the BVAP in one of the

13  challenged districts is that BVAP may change over the course of

14  a decade; is that right?

15  A     It's certainly possible, yes.

16  Q     You cite as an example the fact that the BVAP of

17  District 71 has dropped seven-tenths of a percent over a

18  four-year period from 2012 to 2015.

19  A     Yes.  I cited that statistic, yes.

20  Q     You performed no other analysis of BVAP changes over time

21  in the 12 challenged districts; is that right?

22  A     Correct.

23  Q     And no analysis of whether that seven-tenths BVAP drop in

24  District 71 has had any effect on African Americans' ability to

25  elect.

Hood - Cross

1    A    That's correct.

2    Q    Or whether even a five percentage point drop in BVAP would

3    have any effect on African Americans' ability to elect in that

4    district.

5    A    That's correct.

6    Q    Another reason that you've identified as to why a

7    map-drawer might find it necessary to increase the BVAP in a

8    majority-minority district is that African Americans may not be

9    able to nominate their preferred candidates in primaries;

10   correct?

11   A    I discuss that issue.  I don't know that that's discussed

12   in this section of my report.

13   Q    You can turn to page 11.  That's included in this section

14   of your report?

15   A    Okay.  Page 11 using my page numbers?

16   Q    Yes, sorry.

17   A    Okay.  Which paragraph?

18   Q    I'm looking specifically at the paragraph that says

19   "outside of the issues discussed."  Here, you discuss primary

20   contests.

21   A    Okay, yes.

22   Q    So this is one of the reasons that you cite as to why one

23   might consider raising the BVAP in a given majority-minority

24   district?

25   A    Yes, that's correct.

1    Q    And here, to address this, you look specifically at the

2    2013 Democratic primary for Attorney General, and you do that

3    in only four House of Delegates districts; correct?

4    A    Correct.

5    Q    That's a primary, of course, that took place after the

6    2011 redistricting process?

7    A    That is correct.

8    Q    You also looked at the 2009 Democratic primary for House

9    District 69.  That's table ten on page 14 of your report.

10   A    Correct.

11   Q    You did not provide any analysis of racially polarized

12   voting in any Democratic primaries in any other challenged

13   district; correct?

14   A    This is the only one, correct.

15   Q    Instead, you chose this one primary from this one year in

16   this one district because you knew in advance that it was a

17   primary in which a white candidate had defeated a black

18   candidate; correct?

19   A    I knew that was the outcome.

20   Q    The answer is yes?

21   A    Well, that wasn't the only reason it was chosen.  One

22   reason it was chosen is because there was action in a

23   Democratic primary race between white and black candidates.

24   Q    You did not even look into how often an African-American

25   candidate drew a white challenger in a Democratic primary in

Hood - Cross

1   any of the challenged districts; correct?

2   A    That is correct, that's true.

3   Q    You did not inquire into how often an African-American

4   candidate lost a Democratic primary to a white candidate in any

5   of the other challenged districts; right?

6   A    That's true.

7   Q    But you did know of this one example in 2009 in

8   District 69?

9   A    Yes.

10  Q    Now, you wouldn't draw any conclusions based on one

11  primary in one district about racially polarized voting in

12  Democratic primaries in all of the challenged districts;

13  correct?

14  A    No, but certainly I can draw a conclusion about this

15  district.

16  Q    So you conclude from table ten that the real candidate of

17  choice for black voters was defeated back at the primary stage

18  despite the fact that blacks constituted 56 percent of the

19  voting-age population for this district; correct?

20  A    That is correct.

21  Q    And unlike any of the other elections that you analyze,

22  this 2009 Democratic primary would have been available to

23  map-drawers in 2011?

24  A    It would have been available, yes.

25  Q    So if map-drawers had wanted to consider this primary,

Hood - Cross

1    they would have known that in 2009, the white candidate was

2    pitted against a black candidate in the District 69 Democratic

3    primary; right?

4    A    Yes.

5    Q    And they would have known that the white candidate

6    defeated the black candidate in that primary.

7    A    Yes.

8    Q    Just like you knew when you chose it for your supplemental

9    report.

10   A    Yes.

11   Q    So, in your opinion, this information might have justified

12   drawing District 69 to increase its BVAP; correct?

13   A    Yes.

14   Q    I believe you have in front of you your 2015 report.  Can

15   you please turn to Defendant-Intervenors' Exhibit 15, page 14.

16   A    My page 14?

17   Q    No.  Actually here, I'm referring to the exhibit page 14.

18   It's your page 13, table eight.  Based on your table eight, can

19   you please tell me what the BVAP of District 69 was in 2009?

20   A    56.3.

21   Q    And what is the BVAP of District 69 in 2011 after

22   enactment of HB 5005?

23   A    55.2.

24   Q    So in District 69, which, according to your expert

25   testimony, the map-drawers might have had some indication of an

Hood - Cross

1   example, based on a recent primary in which an

2   African-American-preferred candidate lost a primary, the

3   map-drawers lowered the BVAP of that district; is that right?

4   A     That's what happened, yes.

5   Q     You also point out the Loewen report as part of your

6   reasons why a map-drawer might want to increase the BVAP of a

7   majority-minority district; is that right?

8   A     Yes.  Maintain the BVAP in a district.

9   Q     Counsel for intervenors alerted you to that report; is

10  that right?

11  A     I learned of the report, I think, in the first iteration

12  of this case.

13  Q     By counsel for the intervenors?

14  A     Yes.

15  Q     What is the date of that report?

16  A     2001.

17  Q     And do you know the case in which this report was offered?

18  A     Um, well, I think it's *Wilkins v. West*.  I'm not totally

19  sure of that.

20  Q     And this is not actually the final version of the report,

21  is it?

22  A     I'm not certain of that either.

23  Q     You don't know whether this is the final version of the

24  report?

25  A     No.

Hood - Cross

1    Q    You don't know whether this particular version of the

2    report was ever submitted to a court?

3    A    It's my understanding it was.

4    Q    But you don't know for sure?

5    A    That's my understanding.

6    Q    You've never spoken with James Loewen; is that right?

7    A    That is correct.

8    Q    In preparing your supplemental report, you didn't review

9    any other expert reports submitted in this particular case; is

10   that right?  The one in which the Loewen report was supposedly

11   submitted.

12   A    That is correct.

13   Q    And in preparing your supplemental report, you weren't

14   aware whether there were any critiques levied against the

15   Loewen report by any other experts in that case; correct?

16   A    Since I didn't read the other expert reports, that's

17   correct.

18   Q    And you didn't review the Court opinions in that case in

19   preparing your report; correct?

20        JUDGE PAYNE:  A lot of these are self-evident and

21   sufficiently pointed out in briefs, and they're good points to

22   make before a jury, but I don't think that's where we are, and

23   you are pretty well beyond where the direct examination went

24   any way in terms of time.  So can you wrap up?

25        MS. KHANNA:  Your Honor, I'd ask the Court's leeway

Hood - Cross

1    to ask a few more questions.

2         JUDGE PAYNE:   Very few, because you are at the point

3    where you're -- you are trenching on their time.   You had a lot

4    of time to do your case.   They get some time to do theirs.

5    You're taking up a lot of time in cross-examination and a lot

6    of it is not necessary is my point, to be direct about it.   So

7    see if you can wrap it up.

8         MS. KHANNA:   I will Your Honor.   Thank you.

9    Q    Professor Loewen, in his report, used a methodology called

10   ecological regression; is that correct?

11   A    That's correct.

12   Q    Is it your understanding that ecological regression

13   doesn't make use of all available information in conducting a

14   racially polarized voting analysis?

15   A    It's my understanding, having used both ecological

16   regression and ecological inference, that ecological inference

17   is able to make use of more facts about the data -- one of the

18   things ecological inference can do is bound the estimates

19   between zero and 100.   Sometimes ecological regression can give

20   you estimates outside of, you know, possible bounds.

21   Q    Is it your understanding that ecological regression

22   results in blatantly incorrect answers?

23   A    Are you asking for my --

24   Q    Is that your opinion, that ecological regression results

25   in blatantly incorrect answers?

Hood - Cross

1    A    I didn't say that.

2    Q    Is that a no?

3    A    No.

4         JUDGE PAYNE:  He said, I didn't say it.  Come on.

5    Let's don't quibble over things like that.  It takes up time.

6    Q    In preparing your supplemental report, you assumed that

7    Professor Loewen had used the proper data; correct?

8    A    Yes.

9    Q    You assumed that he applied ecological regression

10   properly; correct?

11   A    Yes.

12   Q    And you never replicated Professor Loewen's analysis using

13   the elections he relied upon; correct?

14   A    Correct.  I didn't have his data.

15   Q    You certainly didn't replicate that analysis using more

16   recent elections?

17   A    Well, I performed my own analyses.

18   Q    Did you replicate Professor Loewen's analysis based on

19   more recent elections?

20   A    I'm a little lost with that question.

21        JUDGE PAYNE:  So am I.  I don't know how you can

22   replicate something with different data.  So let's go ahead.

23        MS. KHANNA:  I'll clarify, Your Honor.

24   Q    On page ten of your report, you state that Professor

25   Loewen determined that a district with 50.3 percent black VAP

Hood - Cross

1   would give African Americans even orders of winning election.

2   Did I read that correctly?

3   A     You read it correctly.

4   Q     And Professor Loewen's analysis and conclusion was based

5   on elections from the 1990s; correct?

6   A     Correct.

7   Q     And you never replicated Professor Loewen's analysis using

8   those elections; correct?

9   A     I guess I would just answer I did not replicate Professor

10  Loewen's analyses.   That's true.

11  Q     You never determined another number at which African

12  Americans would have even odds of winning an election using any

13  data; correct?

14  A     I didn't make that particular calculation.   That's a

15  little bit different from replication of analyses.

16  Q     You note on page 11 of your report that Professor Loewen's

17  report indicates that of the races he analyzed in Virginia,

18  black candidates were unable to win districts that contained

19  less than 52 percent voting-age population; did I read that

20  correctly?

21  A     Yes.

22  Q     But you are certainly aware of elections in Virginia since

23  2001 in which black candidates have been able to win districts

24  that contain less than 52 percent black voting-age population,

25  aren't you?

Hood - Cross

1    A    Yes.  In a general sense, yes.

2           MS. KHANNA:  Thank you, Dr. Hood.  I have no further

3    questions.

4           THE WITNESS:  Thank you.

5           THE COURT:  Any redirect?

6           MR. RAILE:  No, Your Honor.

7           JUDGE PAYNE:  All right.  You may be excused.  Thank

8    you for giving us your evidence.

9           THE WITNESS:  Thank you, Your Honor.

10          JUDGE PAYNE:  Call your next witness.

11          MS. McKNIGHT:  Your Honor, thank you.

12   Defendant-intervenors call Delegate O'Bannon to the stand.

13

14                    **JOHN M. O'BANNON, III,**

15   a witness, called at the instance of the

16   intervenor-defendants, having been first duly sworn,

17   testified as follows:

18                    DIRECT EXAMINATION

19   BY MS. McKNIGHT:

20   Q    Good afternoon, Dr. O'Bannon.  Could you start by telling

21   the Court which house district you represent?

22   A    Yes, ma'am.  I represent the 73rd House District in the

23   House of Delegates.

24   Q    Now we'll get to the location of your district in just a

25   moment.  I have just a few questions for you before then.  How

O'Bannon - Direct

1    long have you represented HD 73?

2    A    I've represented the 73rd district for 17 years.

3    Q    And aside from your role as a delegate, what is your

4    profession?

5    A    Yes, ma'am, I'm a medical doctor.

6    Q    And is your office in your district?

7    A    Yes, ma'am, my office is in the district.

8    Q    And what about the hospital where you practice?

9    A    I have practiced at Henrico Doctors' Hospital since 1974.

10   Q    And is it in your district, too?

11   A    It is in the middle of the district, yes, ma'am.

12   Q    Now, could you describe to the Court your role in the 2011

13   redistricting process.

14   A    Yes, ma'am.  In that year, I was actually a member of the

15   Privileges and Elections Committee, so I was involved in some

16   of the public hearings, and I think we did a fly-around the

17   state, and I participated in those public hearings.

18              MS. McKNIGHT:  Now, I ask to have put on the screen

19   Defendant-Intervenors Exhibit 91 at pages 145 and 146.

20   Q    Now, starting with page 145 on the screen, Delegate

21   O'Bannon, is this a depiction of your house district prior to

22   the 2011 redistricting?

23   A    Yes, ma'am, it is.

24   Q    Turning to page 146, is this a depiction of your house

25   district after the 2011 redrawing?

O'Bannon - Direct

1   A    Yes, ma'am, it is.

2        MS. McKNIGHT:  Now I ask to have put on the screen

3   Defendant Intervenors' Exhibit 94 at page four.

4   Q    Delegate O'Bannon, I'm going to ask you some questions

5   about the changes --

6        MS. McKNIGHT:  Actually, pardon me.  Could we put

7   Defendant-Intervenors' Exhibit 91, page 146 back on.

8   Q    Now, this is your district as drawn in the 2011

9   redistricting process; correct?

10  A    Yes, ma'am.

11  Q    And, now, do you share a border with House District 71?

12  A    Yes, ma'am.

13  Q    And for the Court, could you touch the screen on the map

14  where the border is shared between District 73 and 71.

15  A    I think it's here to here (indicating).

16       MS. McKNIGHT:  Now, could we briefly go back to 145,

17  please, Amy.

18  Q    And could you show for the Court on this screen the border

19  between your district and 71 prior to the redrawing.

20  A    I think it's here and here (indicating).

21  Q    Now, it seems that there were changes made in the border

22  between your District 73 and District 17; is that right?

23  A    Yes, ma'am.

24  Q    I'm going to ask you questions about it.  Is it easier for

25  you to look at this map or the yellow colored map?

1   A    This one is fine.

2   Q    Okay.

3           MS. McKNIGHT:  If we can turn to 146 which is the

4   current district.

5   Q    Could you explain to the Court what was going on in the

6   area of your district around where it bordered other districts

7   around the time of the 2011 redistricting?

8   A    My understanding of the numbers was that many of these

9   districts, 68, 69, 71, I think 74 even had all loss population,

10  and so as a result of that, that I was going to need to be

11  moved west as they needed to get bigger.  So that is what I

12  understood.

13  Q    And, now, looking at page 146, the movement of the border

14  between 71 and 73, the change in the border, did it become

15  shorter or longer, the border?

16  A    It looks as if it became shorter.

17          JUDGE PAYNE:  So I understand it, the border is from

18  Bryan Park down to where the -- it cuts across 71, and then is

19  the other side of that little tip down there, is that part of

20  68, or is that part of yours?  I mean part of 71.

21          THE WITNESS:  This is -- this piece here is 68 now.

22  68 and 71 borders.

23          JUDGE PAYNE:  Yours is much shorter than it was

24  before.

25          THE WITNESS:  Yes, sir.

O'Bannon - Direct

1   Q    At the time these changes were made, did you understand

2   that they were made based on racial reasons?

3   A    I had no reason to suspect that, no, ma'am.

4   Q    Why not?

5   A    That was not the issue.  The issue here was I had to, you

6   know, go west because all of those areas had to grow.  Race was

7   not an issue that I with was aware of in that.

8   Q    Now, in the redistricting process, did you get everything

9   you wanted as far as your new district?

10  A    No, ma'am.

11  Q    How so?

12  A    Well, I lost some very red districts.  I gained some red

13  districts.  I gained some deep blue districts, and I gained a

14  number of districts that might be considered tween districts.

15  Q    You took some lumps along the way.

16  A    Yes, ma'am.

17  Q    Did you expect your district to be perfect in the

18  redrawing?

19  A    No, ma'am.

20  Q    Now, Delegate O'Bannon, plaintiffs have put Delegate

21  Jones' credibility at issue.  Do you have any reason to doubt

22  Delegate Jones' credibility?

23  A    I do not.

24          MS. BRANCH:  Objection, Your Honor.  I don't think

25  the fact witness can comment on credibility.  I don't

1   understand how it's relevant.

2          MS. McKNIGHT:  Your Honor, plaintiffs have put at

3   issue in a variety of pleadings as well as in trial testimony

4   Delegate Jones' credibility.  If you'd like, I can lay some

5   foundation for how well Dr. O'Bannon knows --

6          JUDGE PAYNE:  What rules does it come in under?

7   Credibility witnesses are very limited, aren't they?

8          MS. BRANCH:  Your Honor, I think this is improper

9   character evidence under Rule 404.

10         JUDGE PAYNE:  How do you get it in?

11         MS. McKNIGHT:  Your Honor, they have put his

12  credibility at issue in a variety of pleadings as well as in

13  his trial testimony, and we believe it's fair to have a fact

14  witness who knows Delegate Jones, and if I'm allowed to lay a

15  foundation with one question, I can show you how well he knows

16  Delegate Jones, and it's relevant to the Court's assessment of

17  the testimony from Delegate Jones yesterday, what kind of

18  weight to give it.

19         JUDGE PAYNE:  Your objection is under what?

20         MS. BRANCH:  Under Rule 404, Your Honor.

21         THE COURT:  What part of it?  It's a long rule with a

22  lot of subdivisions.  I want to make sure I know where you are.

23         MS. BRANCH:  Rule 404(a)(1), Your Honor.

24         JUDGE PAYNE:  "Evidence of a person's character or

25  character trait is not admissible to prove that on a particular

1  occasion the person acted in accordance with the character or

2  trait."

3          MS. BRANCH:  Your Honor, we have specifically

4  questioned some of Delegate Jones' assertions regarding the

5  2011 redistricting.  We've not questioned his character in

6  general.

7          MS. McKNIGHT:  Your Honor, this is applicable if you

8  look at Rule 608, a witness's character for truthfulness --

9          JUDGE PAYNE:  It's not 404 at all.  Rule 608.

10          MS. McKNIGHT:  And there, "a witness's credibility

11  may be attacked or supported by testimony about the witness's

12  reputation for having a character for truthfulness or

13  untruthfulness."

14          JUDGE PAYNE:  Is that what you propose to ask

15  Delegate O'Bannon?

16          MS. McKNIGHT:  That's correct.

17          JUDGE PAYNE:  How do you deal with 608(a)?

18          MS. BRANCH:  Your Honor, I would direct the Court's

19  attention to the last sentence of Rule 608(a) which says, "but

20  evidence of truthful character is admissible only after the

21  witness's character for truthfulness has been attacked."  We've

22  not attacked his character for truthfulness.  We've only

23  questioned some of the assertions that he's made based on his

24  memory.

25          JUDGE PAYNE:  You think attacking his credibility on

O'Bannon - Direct

1    a number of occasions you're not attacking his truthfulness?

2    Is that what you're saying?

3              MS. BRANCH:  Correct.

4              JUDGE PAYNE:  Overruled.  You can ask the question as

5    long as you lay the foundation.  He has to know what he's

6    talking about and show he knows what the reputation is.  If he

7    doesn't know it, just the fact he's known him a long time

8    doesn't happen.

9              MS. McKNIGHT:  I understand.

10             JUDGE PAYNE:  You have to ask some foundation.

11             MS. McKNIGHT:  I understand, Your Honor.

12   Q    Dr. O'Bannon, how long have you known Delegate Jones?

13   A    I have known Delegate Jones for 17 years.

14   Q    And in what capacity?

15   A    I have known him as a peer and a member of the General

16   Assembly and as a committee chairman and as a person who has

17   carried many very difficult, challenging, complex pieces of

18   legislation as recently as last year when he carried the RS

19   legislation and Virginia Economic Development Partnership

20   legislation which required building consensus and working with

21   all parties involved.

22        He is not known as an ideologue.  He voted for a tax

23   increase in 2004, and I watched him in his committee work.  He

24   is careful to listen to all parties concerned which is why he's

25   an effective legislator.

O'Bannon - Direct

```
 1   Q     And do you have any doubt about his character for

 2   truthfulness?

 3   A     None at all.

 4   Q     Why not?

 5   A     I think I've basically stated --

 6              JUDGE PAYNE:  I think you have to establish whether

 7   the witness has knowledge of the witnesses having any

 8   reputation for truthfulness or untruthfulness or by an opinion

 9   about the character for truthfulness.  Those are the two ways

10   you can address the issue, I think.  Is that not what 608(a)

11   says?

12              MS. McKNIGHT:  Pardon me, Your Honor.  Let me

13   rephrase my question.

14   Q     Do you have any testimony to provide about Delegate Jones'

15   reputation for having a character for truthfulness?

16   A     I can only base my testimony on what I've observed for the

17   last 17 years in working with him.

18   Q     What is your opinion about Delegate Jones' character?

19              JUDGE PAYNE:  For truthfulness.

20              MS. McKNIGHT:  For truthfulness.

21   A     I think Delegate Jones is a very truthfulness person and a

22   very truthfulness legislator.

23              MS. McKNIGHT:  Thank you very much, Delegate

24   O'Bannon.  No further questions.

25
```

CROSS-EXAMINATION

1                                   CROSS-EXAMINATION

2    BY MS. BRANCH:

3    Q    Good evening, Delegate O'Bannon.  You testified that you

4    represented the 73rd district at the time of the 2011

5    redistricting?

6    A    Yes, ma'am.

7    Q    And your district is not at issue in this case?

8    A    Yes, ma'am.

9    Q    And your district borders House District 71?

10    A    Yes, ma'am.

11    Q    And you've testified you don't know how House 71 changed

12    as a result of redistricting; isn't that right?

13    A    Other than what we've looked at here on the maps.

14    Q    Specifically talking about House District 71, you don't

15    know how it changed as a result of redistricting; correct?

16    A    No, ma'am.

17    Q    You served on the Privileges and Elections Committee, you

18    said?

19    A    Yes, ma'am.

20    Q    But you didn't play a significant role?

21    A    Not beyond what I've testified to.

22    Q    You didn't play a significant role on the P&E Committee;

23    correct?

24    A    Well, flying around the state on an airplane that almost

25    crashed, I think, probably qualifies as some significant role.

O'Bannon - Cross

1    Q    In fact, that's all you remember about the public

2    hearings; isn't that right?

3    A    That's correct.

4    Q    You don't remember anything substantive about what

5    happened at the hearings?

6    A    I don't remember any specific questions.

7    Q    Nothing substantive.

8              JUDGE PAYNE:  Ms. Branch, he really wasn't asked

9    anything about any of this on direct examination, and your

10   limit is what he was asked about on direct.  If you have

11   anything else, ask it.  Otherwise, let's let the witness go.

12             MS. BRANCH:  Yes, Your Honor.

13   Q    You did not have any input in how your district was drawn;

14   correct?

15   A    That is correct.

16   Q    And you've never communicated with any member of the Black

17   Caucus about how their districts were drawn; correct?

18   A    That is also correct.

19   Q    Never communicated with Delegate McClellan; correct?

20   A    That's correct.

21             MS. BRANCH:  No further questions.  Thank you.

22             JUDGE PAYNE:  Any redirect?

23             MS. McKNIGHT:  No, Your Honor.

24             JUDGE PAYNE:  Can he be excused?  Thank you very much

25   for being with us, Dr. O'Bannon, and giving us your testimony.

1    Do you have another witness?

2            MS. McKNIGHT:  Yes, Your Honor.  We call Delegate

3    Wright to the stand.

4

5                              **THOMAS WRIGHT**,

6    a witness, called at the instance of the

7    intervenor-defendants, having been first duly sworn,

8    testified as follows:

9                          DIRECT EXAMINATION

10   BY MS. McKNIGHT:

11   Q    Good afternoon, Delegate Wright.

12   A    Good afternoon.

13   Q    Could you start by telling the Court which district you

14   represent.

15   A    61st district.

16   Q    And how long have you represented that district?

17   A    17 years.

18   Q    And aside from your role as a delegate, what has your

19   profession been?

20   A    I taught elementary school for one year, and then I helped

21   run the family grocery business for 37 years.

22   Q    And was that grocery store in your district?

23   A    Yes, ma'am.

24   Q    What was your role in the redistricting process in 2011?

25   A    None.

1          MS. McKNIGHT:  Could you we put up

2    Defendant-Intervenors' Exhibit 91, page 124.

3    Q    Delegate Wright, I believe this is a depiction of your

4    House District 61 as it stood after the 2011 redistricting.

5    A    This is not --

6          MS. McKNIGHT:  Pardon.

7          JUDGE PAYNE:  This is 68.

8          MS. McKNIGHT:  Pardon me.  I had the wrong page

9    number.  There it is.

10         JUDGE PAYNE:  61 is on page 121.

11         MS. McKNIGHT:  Page 121, thank you, Your Honor.

12   Q    Now, does this depict your district as drawn after the

13   2011 redistricting?

14   A    You mean 2011 or 2001?

15         JUDGE PAYNE:  2001 or -- this is the benchmark or is

16   this the -- where is 61 after that?

17         MS. McKNIGHT:  Pardon me, Your Honor.  In my haste to

18   get through this, I'm getting the wrong page numbers.  Page

19   number 122, pardon me, of Defendant-Intervenors' Exhibit 91.

20   Q    Pardon me, Delegate Wright.  I didn't mean to mislead you.

21   Now, is this a depiction of your House District 61 as it stands

22   today after the 2011 redistricting?

23   A    Yes, ma'am.

24   Q    And, now, it looks to me as if your district borders both

25   HD 75 and HD 63; is that right?

Wright - Direct

1   A    Yes, ma'am, that's correct.

2   Q    Now, I'm not going to ask any questions about HD 75.  It

3   has been deemed constitutional.  I am going to focus on the

4   border with your district, between your district and

5   District 63.  Could you use the pointer to identify for the

6   Court where that borders exists on this map?

7   A    (Indicating.)

8   Q    Starts there, and where does it end?

9        JUDGE PAYNE:  Did you draw it on there or something?

10  Can you tell where the border is?

11       MS. McKNIGHT:  Can you see the red dates, Your Honor?

12  He has placed two red dots, one at the bottom of the border

13  between 61 and 63 and one at the top.

14       Now, this was just for the Court's orientation.  I

15  think it may it be easier to get testimony from Delegate Wright

16  on the map on Defendant-Intervenor's Exhibit 94, page one,

17  which depicts challenged district HD 63.

18       THE WITNESS:  Yes.

19  Q    Now, on this map, could you identify the same points on

20  the border, where the border between your district and 63

21  begins and where it ends?

22  A    Yes, ma'am.  From this point to this point (indicating).

23  Q    And could you touch the screen so that the Judges could

24  see where --

25  A    I beg your pardon.

1    Q     Delegate Wright, we've looked at these maps in this case

2    along the way, but for your reference, areas of the map that

3    are shaded in yellow and crosshatched at the same time indicate

4    areas of the map that did not change in the 2011 redrawing.

5          Does that match with your understanding that the border

6    between your district, HD 63 -- your district HD 61 and

7    District 63 did not change in the 2011 redrawing?

8    A     Yes, ma'am.

9    Q     Now, around this border, there's a word saying Amelia.   Is

10   that Amelia County?

11   A     Yes, ma'am.

12   Q     And that is in your district; correct?

13   A     Yes, ma'am.

14   Q     And what is the political performance of Amelia County?

15   A     It votes reliably strongly Republican.

16   Q     And then I believe there's a county line in the map under

17   the word Amelia.   What is the county below Amelia on the map?

18   A     Nottoway County.

19   Q     How does Nottoway County perform politically?

20   A     It is Republican voting county although not as strong as

21   Amelia.

22   Q     And Nottoway County is in your district; is that right?

23   A     Yes, ma'am.

24   Q     And then to the north of HD 63, there's a word that says

25   Chesterfield.   Is that Chesterfield County?

Wright - Direct

1    A    Yes, ma'am.

2    Q    And based on your experience, do you have an understanding

3    of the political performance in Chesterfield County?

4              JUDGE PAYNE:  You are talking about in 2011?

5              MS. McKNIGHT:  Yes, Your Honor.

6    A    Yes.

7    Q    And what is the -- what was the political performance of

8    Chesterfield County back in 2011?

9    A    It votes Republican.

10   Q    Now, moving back to the line between your district and HD

11   63, do you have any reason to believe that the border between

12   your district and District 63 was drawn for predominantly

13   racial reasons?

14   A    No, ma'am.

15             MS. McKNIGHT:  Thank you very much, Delegate Wright.

16   I have no further questions.

17

18                         CROSS-EXAMINATION

19   BY MS. BRANCH:

20   Q    Good evening, Delegate Wright.

21   A    Yes, ma'am.

22   Q    You did not communicate with Delegate Jones about

23   redistricting prior to the enactment of the 2011 map, did you?

24   A    No, ma'am.

25   Q    So you did not make any requests about, for instance,

Wright - Cross

```
 1   Nottoway County, which was mentioned on direct, with regards to
 2   your district, did you?
 3   A    No, ma'am.
 4   Q    You can describe some of the changes that were made to
 5   your district; right?
 6   A    I didn't understand the question.
 7   Q    You can describe some changes that were made to your
 8   district in 2011 as a result of the redistricting?  I'm not
 9   asking you to do so, just a yes-or-no answer.  You can describe
10   some; correct?
11   A    Yes.
12   Q    You can describe some changes that were made to House
13   District 75 during the redistricting; correct?
14   A    I can do some.
15   Q    You have that knowledge.
16   A    Yes, ma'am.
17   Q    House District 75 is no longer at issue in this case; is
18   that correct?
19   A    That's my understanding.
20   Q    Your district is no longer at issue in this case, has
21   never been an issue?
22   A    Yes, ma'am, that's correct.
23   Q    And you don't know about any changes that were made to any
24   other challenged districts in this case; is that correct?
25   A    No, ma'am.
```

```
 1              MS. BRANCH:  No further questions.  Thank you.

 2              JUDGE PAYNE:  Can he be excused permanently?

 3              MS. McKNIGHT:  He may.

 4              JUDGE PAYNE:  Thank you very much being with us and

 5    giving us your testimony.  You may be excused permanently.

 6              MS. McKNIGHT:  Your Honors, we have one final fact

 7    witness to call.  We call Delegate Peace to the stand.

 8

 9                        CHRISTOPHER K. PEACE,

10    a witness, called at the instance of the

11    intervenor-defendants, having been first duly sworn,

12    testified as follows:

13                         DIRECT EXAMINATION

14    BY MS. McKNIGHT:

15    Q    Good afternoon, Delegate Peace.

16    A    Good afternoon.

17    Q    Could you start by telling the Court which House District

18    you represent?

19    A    Sure.  I represent the 97th district which is half of

20    Hanover County, almost all of King William County, and all of

21    New Kent County.

22    Q    How long have you represented HD 97?

23    A    I've represented the 97th district since January of 2006,

24    so almost 12 years.

25    Q    And what is your profession?
```

Peace - Direct

1    A    I'm an attorney.

2    Q    And is your law office in your district?

3    A    My law office and my legislative constituent office is in

4    the district.

5    Q    What was your role in the 2011 redistricting process?

6    A    I was a member of the House of Delegates.  I voted on the

7    various pieces of legislation, whether regular or special

8    session.

9         MS. McKNIGHT:  Could we put on the display

10   Defendant-Intervenors' Exhibit 94, page five.

11   Q    Delegate Peace, you share a border with District 74, don't

12   you?

13   A    I do.

14   Q    And, in fact, that blue asterisk with your name near it,

15   does that approximate your residence in 2011?

16   A    It does.

17   Q    Now, for the Court, could you identify the start and the

18   end of the border that your district shares with HD 74 using

19   your finger to put a dot, red dot on the map at the start and

20   the end.

21   A    I'll do my best.  There are a lot of lines and a lot of

22   different colors here.  Hopefully I got that close to right.

23   Q    Thank you.  Now, could you identify for the Court the

24   changes made to the border you shared with HD 74 in House

25   Bill 5005 which was the redistricting plan passed in 2011?

Peace - Direct

1    A    Can you repeat the question?

2    Q    Sure.  Could you identify for the Court the changes made

3    to the border you shared with HD 75 in the bill, HB 5005.

4    A    I'll answer your question that this was the area that was

5    in the district prior to the redistricting.

6              JUDGE PAYNE:  Area that was Antioch, Chickahominy,

7    and Nine Mile?

8              THE WITNESS:  Yes, Your Honor.

9              JUDGE PAYNE:  It was taken out?

10             THE WITNESS:  It was in the 97th before the

11   redistricting, and it was no longer in the 97th after the

12   redistricting.

13   Q    I'm going to clear the lines just so -- I can ask you some

14   more questions, and the Judges can see some of these names.

15         Now, the line that your district shares with HD 74, does

16   that have any geographical relationship to the land?

17   A    The district on the line that I drew previously follows

18   county boundaries.  There is also the Chickahominy River which

19   separates Hanover County and Henrico County and also down

20   through New Kent County.

21   Q    And these precincts that were moved from 97 and placed in

22   74, they are now on the other side of that river line from

23   District 97, aren't they?

24   A    They have always been in Henrico County which has always

25   been on the other side of the river.

Peace - Direct

1   Q    And do you have an understanding of the political

2   performance in those districts?

3   A    I do.  They have been reliably Republican during my time

4   of office, voting more Republican in gubernatorial years than

5   Democratic.  A couple of the precincts did vote for Tim Kaine

6   for governor, but those are the only examples I can give.

7   Q    And do you believe that these changes made to move these

8   precincts on the other side of that county line, do you believe

9   that they were made for racial reasons?

10  A    I do not believe that, no.

11       MS. KHANNA:  Lack of foundation.  I'm not sure he's

12  established foundation he knew any of the reasons why any of

13  the precincts were moved.

14       JUDGE PAYNE:  Do you want to get a foundation?

15  Q    In 2011, did anyone ever tell you that these districts

16  were being -- these precincts were being moved out of your

17  district and into District 74 for racial reasons?

18       MS. KHANNA:  Objection, hearsay.

19       JUDGE PAYNE:  Overruled.

20  A    I was not told that at all, no.

21  Q    Did you understand that they were moved out of your

22  district for racial reasons?

23  A    No.

24  Q    And did you understand that the portions of your border

25  that remained the same with District 74 remained the same for

1  racial reasons?

2  A    I have no knowledge or understanding that they would have

3  been moved or remain the same for any racial reasons.

4  Q    Now, Delegate Peace, we have heard from plaintiffs' expert

5  in this case that he has taken the position that election data

6  from a presidential election in 2008 could make predictions

7  about House of Delegates races.  Based on your experience as a

8  candidate and delegate, do you agree that even-year

9  presidential elections are useful predictors of voting behavior

10  in Virginia House of Delegates elections?

11         MS. KHANNA:  Objection; calls for improper expert

12  testimony.

13         JUDGE PAYNE:  Sustained.

14  Q    Delegate Peace, based on your experience as a candidate

15  and delegate, would you ever use even-year presidential

16  elections to predict voting behavior in Virginia House of

17  Delegates elections?

18  A    I would never use --

19         JUDGE PAYNE:  Excuse me.

20         MS. KHANNA:  Same objection, Your Honor.

21         JUDGE PAYNE:  Sustained.

22         MS. McKNIGHT:  Your Honor, plaintiffs have put this

23  at issue.  The Court has heard from plaintiffs' expert, who has

24  never been in Virginia, that the presidential -- 2008

25  presidential election has reliable predictive information for

Peace - Direct

1    House of Delegates elections.

2              Virginia has a unique election cycle ignored by

3    plaintiffs' expert but well understood by this fact witness.

4    He can certainly testify as a candidate and delegate about his

5    appreciation of the --

6              JUDGE PAYNE:  It's a lay opinion; right?

7              MS. McKNIGHT:  Correct.  It's fact witness testimony.

8              JUDGE PAYNE:  Yeah, it's an opinion from a lay

9    witness; right?  He is a fact witness, but he's giving an

10   opinion.  He is not an expert.  You haven't qualified him as an

11   expert, so it's a lay opinion.  And those are admissible under

12   two conditions.  What are they?

13             MS. McKNIGHT:  Pardon me, Your Honor.  I wasn't

14   asking for his opinion.  I was asking to understand if he would

15   ever use 2008 election data to help him determine how to

16   campaign in an odd-year race.

17             JUDGE KEENAN:  That's a question asking him to opine

18   on the soundness of using that data in evaluating House of

19   Delegates race, isn't it?

20             MS. McKNIGHT:  I have taken a step away from trying

21   to get his testimony related to plaintiffs' expert testimony.

22   I'd like to elicit his testimony as a fact witness and his

23   experience in these campaigns.

24             JUDGE PAYNE:  I don't think you can do that.  Just

25   for the record, the objection was sustained.  I hope I said it

1    correctly, put it's late.  Anything else for Delegate Peace?

2              MS. McKNIGHT:  No, Your Honor.  Thank you.

3              THE COURT:  Cross-examination.  You can't have all

4    those papers up there with you.

5              MS. KHANNA:  Just his deposition, Your Honor.

6

7                        CROSS-EXAMINATION

8    BY MS. KHANNA:

9    Q    Good afternoon, Delegate Peace.  I know it's late, and I

10   promise I won't keep you long.  You represent District 97;

11   correct?

12   A    Yes.

13   Q    That borders District 74?

14   A    Yes.

15   Q    During the redistricting process, you drew no draft maps;

16   correct?

17   A    I may have had a conversation with Delegate Jones.

18   Q    Did you draw a draft map in that conversation?

19   A    I may have.

20   Q    Do you recall having your deposition taken in this case a

21   few weeks ago?

22   A    I do.

23   Q    Do you recall being asked the question of whether or not

24   you drew any draft maps during the 2011 redistricting process?

25   A    I may recall that.

Peace - Cross

1          JUDGE PAYNE:  Page and number.

2          MS. KHANNA:  Transcript, page 51, line 13 to 17.

3    Q    During your deposition, you were asked, "You, yourself,

4    did not draw draft maps during the 2010 to 2011 redistricting

5    process."  You answered, "I'm not a cartographer."

6          "Question:  So the answer is no," and you answered

7    "right"?

8    A    Right.  Thank you for refreshing my recollection.  I

9    appreciate it.

10   Q    You are not a member of the Privileges and Elections

11   Committee in 2011; correct?

12   A    I am not, no.

13   Q    You attended no public hearings on redistricting; correct?

14   A    That's correct.

15   Q    And as of your deposition a few weeks ago, you had no

16   reason to believe that Delegate Jones was the primary

17   map-drawer; correct?

18   A    He was the patron of the legislation.

19         JUDGE PAYNE:  She's asking about whether he was a

20   primary map-drawer, although I'm not quite sure why that makes

21   any difference.

22   Q    You said you met with Delegate Jones once about

23   redistricting; correct?

24   A    Yes.

25   Q    That conversation lasted about 15 minutes?

Peace - Cross

1   A    It may have.

2   Q    You never asked Delegate Jones to add or remove any

3   particular precincts to your district; correct?

4   A    Not that I can recall, no.

5   Q    You never even discussed with Delegate Jones any specific

6   precincts at all; is that right?

7   A    Not that I recall.  I remember that we were moving, and

8   certainly it would be of interest that our new home, which was

9   only just a few miles away, would remain in the district.  So I

10  wanted to let him know that that was our family's impending

11  move.

12  Q    You spoke about where your house is located.

13  A    That's correct.

14  Q    Never about any particular precincts?

15  A    Not that I recall, unless I was asked I would have

16  responded.

17  Q    You never asked Delegate Jones to keep good Republican

18  precincts in your district; correct?

19  A    I can't imagine I would say that.  I'm willing to play the

20  ball where it lies.  I believe I could win in any district.

21  Q    You never asked Delegate Jones to make your district more

22  Republican; correct?

23  A    No, I would never do that.

24  Q    You don't believe you ever looked at how District 97 was

25  performing politically, either before or after redistricting;

Peace - Cross

1    correct?

2    A    No more than the average candidate for office would be

3    interested in how his district performs, his or her district.

4    Q    You never told Delegate Jones you wanted to lose the

5    Henrico portions of your district?

6    A    I would never say that, no.

7    Q    And you never suggested to Delegate Jones that he should

8    change any other districts in any way; correct?

9    A    It would be presumptuous for me to suggest how he should

10   do his business as patron of the legislation.

11   Q    You never discussed District 74 with Delegate Jones?

12   A    I can't imagine anything specific other than how my

13   district might be drawn in the new map.

14          MS. KHANNA:   Thank you, Delegate Peace.   I appreciate

15   your time.   No further questions.

16          MS. McKNIGHT:   I have just one, a few questions.

17   I'll keep them limited, Your Honor.

18

19                    REDIRECT EXAMINATION

20   BY MS. McKNIGHT:

21   Q    Delegate Peace, you've run for office in Virginia's

22   off-year elections, haven't you?

23   A    I have.

24   Q    And about how many times?

25   A    Well, this is my seventh election, this sickle.   I also am

Peace - Redirect

1    the son of a former member of the Hanover Board of Supervisors

2    who was the first woman elected in 1975 who served four terms

3    and was a judge in the juvenile court in Hanover.  I've been

4    around politics my whole life, and I'm pretty well versed in

5    the electoral process in Virginia.

6    Q    Now, I'd like to ask you a question based on your

7    perception of running in races, in off-year races in Virginia's

8    House of Delegates.  Would you have used presidential election

9    information from an even year to help you campaign in an odd

10   year in Virginia?

11              MS. KHANNA:  Objection.  This is beyond the scope of

12   cross-examination.

13              JUDGE PAYNE:  I think it is.  Sustained.

14              MS. McKNIGHT:  Thank you, Your Honor.  No further

15   questions.

16              JUDGE PAYNE:  This is a good try at resurrection, but

17   she's right.  The rules are the rules.  All right, now, you

18   have in the morning what, one witness or two?

19              MS. McKNIGHT:  Your Honor, we have two witnesses.  We

20   have one fact witness who shouldn't take any longer than these

21   fact witnesses today, and we also have one expert witness.

22              JUDGE PAYNE:  That won't take long either.

23              MS. McKNIGHT:  That's correct, Your Honor.

24              JUDGE PAYNE:  And your rebuttal will have to come in

25   in the morning, too.

1          MR. HAMILTON:  Thank you, Your Honor.

2          JUDGE PAYNE:  If you have any.

3          MR. HAMILTON:  We do, Your Honor.

4          JUDGE PAYNE:  Are you sure you need any?

5          MR. HAMILTON:  They're going to be very brief and

6    focused on very narrow questions.

7          JUDGE PAYNE:  All right, good.  Thank you very much.

8    We'll be in adjournment.

9

10                   (End of proceedings.)

11

12

13          I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16

17   _____/s/_____                _____
     P. E. Peterson, RPR                  Date
18

19

20

21

22

23

24

25