1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                  RICHMOND DIVISION

4
   ----------------------------------------
5                                    :
   GOLDEN BETHUNE-HILL, an           :
6  individual, et al.                :    Civil Action No.
                                     :    3:14cv852
7  vs.                               :
                                     :
8  VIRGINIA STATE BOARD OF ELECTIONS, :   October 12, 2017
   et al.                            :
9  ----------------------------------------

10

11          COMPLETE TRANSCRIPT OF THE BENCH TRIAL

12       BEFORE:  THE HONORABLE ROBERT E. PAYNE

13               THE HONORABLE BARBARA M. KEENAN

14               The HONORABLE ARENDA L. WRIGHT ALLEN

15  APPEARANCES:

16  Kevin J. Hamilton, Esquire
    Abha Khanna, Esquire
17  Perkins Coie, LLP
    1201 Third Avenue
18  Suite 4800
    Seattle, Washington  98101
19
    Aria C. Branch, Esquire
20  Perkins Coie, LLP
    700 13th Street NW
21  Suite 600
    Washington, D.C.  20005
22  Counsel for the plaintiffs

23

24              Peppy Peterson, RPR
              Official Court Reporter
25           United States District Court

```
 1    APPEARANCES:   (cont'g)

 2    Matthew R. McGuire, Esquire
      Office of the Attorney General
 3    202 North Ninth Street
      Richmond, Virginia  23219
 4    Counsel for the defendants

 5

 6    Katherine L. McKnight, Esquire
      E. Mark Braden, Esquire
 7    Richard B. Raile, Esquire
      Baker & Hostetler, LLP
 8    Washington Square
      1050 Connecticut Avenue, NW
 9    Washington, D.C.  20036
      Counsel for intervenor defendants
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                THE CLERK:  Day four.  Case No. 314-cv-852.

 2                Golden Bethune-Hill, et al. v. The

 3     Virginia State Board of Elections, et al. and the

 4     Virginia House of Delegates, et al.

 5          The plaintiffs are represented by Kevin Hamilton,

 6     Abha Khanna and Aria Branch.

 7          The Virginia State Board of Elections is represented

 8     by Trevor Cox.

 9          The Virginia House of Delegates is represented by Amy

10     Tolbert, Mark Braden, Katherine McKnight and Richard

11     Raile.

12          Are counsel ready to proceed?

13                MS. MCKNIGHT:  Yes, Your Honor.

14                MR. HAMILTON:  We are, Your Honor.

15                JUDGE PAYNE:  Good morning.  I know you like

16     always to be on your toes and alert for changes so I'd

17     like to tell you about a change that we'd like to impose

18     on you all so you'll have some time during the morning

19     break to sort through it.

20          I think we would like to hear maybe about ten minutes

21     from each of you at the end of the presentation this

22     morning sort of summarizing what you -- your positions

23     are, what you think has been proved.

24          All right.  Ms. McKnight, who is your next witness?

25                MS. MCKNIGHT:  Yes.  Thank you, Your Honor.  One
```

brief administrative point.  Yesterday you asked for a

list of identifying exhibits that defendant-intervenors

have proposed and served on plaintiffs and to which

plaintiffs have not objected.  We have prepared that list.

We've shared it with plaintiffs.  We understand they do

not object to the list.  However, there are two exhibits

in there that have been edited by agreement of parties.

So plaintiffs need the opportunity to confirm that the

versions of the exhibits you have are in compliance with

the agreement.  So --

JUDGE PAYNE:  Your fine legal assistants will do

that during one of the recesses, and they can come right

up here and check it out.

MR. HAMILTON:  So long as we have permission to

approach the bench, yes, Your Honor.

JUDGE PAYNE:  There's nothing secret up here,

and if you can read any of our notes, you're really good.

MS. MCKNIGHT:  And now, Your Honor, this list

has not been prepared for filing.  It's simply to help the

court reporter or the court clerk transcribe the exhibits.

JUDGE PAYNE:  All right.

MS. MCKNIGHT:  Should I offer that now, Your

Honor?

JUDGE PAYNE:  Just hand it on up.  Thank you,

Mr. Roberts.

Stolle – Direct

1          MS. MCKNIGHT:  Thank you, sir.

2      Your Honors, I'll like to call Delegate Stolle to the

3  stand.

**CHRISTOPHER P. STOLLE,**

5   called at the instance of the defendant-intervenors,

6    having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MS. MCKNIGHT:

9  Q    Good morning, Dr. Stolle.

10  A    Good morning.

11  Q    Could you start by telling the Court which House

12  district you represent?

13  A    I represent the 83rd House District.

14  Q    And for how long?

15  A    Just about eight years now.

16  Q    And aside from your role as a delegate, what is your

17  profession?

18  A    I am a physician.

19  Q    And is your office in your district?

20  A    Yes, it is.

21  Q    Now, your district, before the 2011 redrawing,

22  bordered House Districts 89 and 90; is that right?

23  A    Correct.

24  Q    Now, as a preliminary question, did you have any role

25  in the 2011 redrawing process?

Stolle - Direct

1    A    I was -- I was asked where I live, and I think that's

2    about the only question I was asked in that process.

3    Q    And now, what was happening in the south side/south

4    Hampton area, population wise, when the map was redrawn in

5    2001?

6    A    When the map was redrawn, Hampton Roads actually lost

7    population in proportion to the rest of the state.  So

8    there was a district that was moved I believe to Northern

9    Virginia.

10   Q    Now, I'd ask the Court and, you, Dr. Stolle, to turn

11   to page -- in Map Book No. 1, turn to

12   Defendant-Intervenors' Exhibit 96 and 97, page 3.

13              JUDGE PAYNE:  Do you have it?

14              THE WITNESS:  Yes, sir, I do.

15   Q    Now, on Defendant-Intervenors' Exhibit 96, page 3,

16   does this look to you to represent your House district and

17   its area prior to the 2011 redrawing?

18   A    Yes, it does.

19   Q    And on Defendant-Intervenors' Exhibit 97, page 3,

20   does this appear to represent your district and the

21   surrounding area after the 2011 redrawing?

22   A    Yes, it does.

23   Q    Now, for the Court to orient itself, would you mind

24   looking on computer screen and using your finger, press a

25   dot -- put a dot where your district was before redrawing

Stolle - Direct

1   in 2011, and then in the other map, could you put a map on

2   where your district was after?

3        Thank you.  Now, while we're here, could you identify

4   for the Court with another dot in old map which district

5   was collapsed and moved out of this area?

6        And now, comparing the two maps, looking at your

7   district how it compares, how did your district change in

8   the 2011 redrawing?

9   A    My district went primarily from a north/south

10  orientation to a east/west orientation.  I picked up a lot

11  of communities along the Chesapeake Bay.

12  Q    Okay.  And do you think that the populations in the

13  Norfolk area explains some of this change?

14  A    I think that the 87 moving -- being moved out of that

15  area certainly caused my district to move over in that

16  direction.

17  Q    And in your new district as drawn in 2011, does it

18  make sense to you from the perspective of a community of

19  interest?

20  A    It does.  The -- I have a lot more along the

21  Chesapeake Bay right now.  The communities have very

22  similar issues, particularly with coastal flooding,

23  erosion.  And so I think that from a community of interest

24  perspective, my district, right now, is better than it was

25  before.

Stolle – Direct

1   Q     And now, you campaigned for office in both 2007 and

2   2009, right?

3   A     Correct.

4   Q     And did you sense any shift in the political climate

5   between 2007 and 2009?

6   A     Absolutely.  When I knocked on doors in 2007, it was

7   towards the end of President Bush's term.  Knocked on the

8   doors, folks would say, I'm never voting for other

9   republican.  Two years later, change of administration,

10  I'd knock on the same doors and they'd say, I'm never

11  voting for another democrat.  So I think the political

12  winds had more to do with it than individual candidates.

13  Q     Okay.  And did you win election in 2007?

14  A     No.  I lost.

15  Q     And you won election in 2009; is that right?

16  A     Correct.

17  Q     Okay.  And when you campaigned, what election

18  information was more useful to you, election information

19  from an odd year race or information from an even year

20  presidential race?

21           MS. BRANCH:  Objection, Your Honor.

22           JUDGE PAYNE:  And it is?

23           MS. BRANCH:  Eliciting improper expert

24  testimony.  She's asking him to testify about, you know,

25  which election he thinks is most important, and I -- it's

Stolle - Cross

1  to impeach experts who have already testified, it sounds

2  like.

3          JUDGE PAYNE:  So the objection is what?

4          MS. BRANCH:  Eliciting --

5          JUDGE PAYNE:  It's expert testimony?

6          MS. BRANCH:  Yes.

7          JUDGE PAYNE:  Overruled.

8  Q    Would you like me to repeat the question?

9  A    Please.

10  Q    When you campaigned, what election information was

11  more useful to you, election information from an odd year

12  race or information from an even year presidential race?

13  A    We -- we only use the odd year races.  We don't look

14  at the even year races.  The turnout between the two races

15  is so different that it's not really meaningful

16  information for us in the odd years.

17          MS. MCKNIGHT:  Thank you very much, Dr. Stolle.

18  I have no further questions.

19          JUDGE PAYNE:  Cross-examination.

20                  **CROSS-EXAMINATION**

21  BY MS. BRANCH:

22  Q    Good morning, Delegate Stolle.

23  A    Good morning.

24  Q    You testified that you didn't have a role in the

25  redistricting process; is that correct?

Stolle - Cross

1    A     That's correct.

2    Q     You weren't a member of the Privileges and Elections

3    Committee?

4    A     That's correct.

5    Q     And you weren't a member of the redistricting

6    subcommittee, correct?

7    A     That is correct.

8    Q     You testified about some changes that were made to

9    your district as a result of redistricting, correct?

10   A     Yes, I did.

11   Q     But none of those requests -- none of those changes

12   were based on requests made by you to Delegate Jones; is

13   that correct?

14   A     That is correct.

15   Q     For instance, you didn't ever discuss with him any

16   relation between communities of interest and Virginia

17   Beach and Norfolk, correct?

18   A     That's correct.

19   Q     You never discussed with him costal communities, for

20   instance?

21   A     That is correct.

22   Q     And you also testified that the 87th House District

23   was moved from South Hampton Roads to Northern Virginia,

24   correct?

25   A     I -- I know that it was moved from South Hampton

Stolle - Cross

1    Roads.  I'm not entirely sure where it was moved to.  I

2    think it was Northern Virginia.

3    Q    Right.  But you didn't know about that district

4    moving while the redistricting process was going on,

5    correct?

6    A    That is correct.

7    Q    You never discussed gaining any population from the

8    87th District with Delegate Jones; is that correct?

9    A    That is correct.

10   Q    At the time of the 2011 redistricting, you didn't

11   know which districts in South Hampton Roads wore majority

12   black; is that correct?

13   A    I did not know.

14   Q    And you've never communicated with any members of the

15   Black Caucus who represent any of the districts that

16   surround your district about redistricting, correct?

17   A    That is correct.

18            MS. BRANCH:  No further questions.  Thank you.

19            JUDGE PAYNE:  Any redirect?

20            MS. MCKNIGHT:  No, Your Honor.

21            JUDGE PAYNE:  Thank you for being us and giving

22   us your testimony --

23            THE WITNESS:  Thank you, sir.

24            JUDGE PAYNE:  -- Dr. Stolle.

25        (Witness stood aside.)

Hofeller - Direct

1              JUDGE PAYNE:  Your next witness.

2              MS. MCKNIGHT:  Your Honor, defendant-intervenors

3     call Dr. Thomas Hofeller to the stand.

4                        **THOMAS B. HOFELLER, PH.D.,**

5        called at the instance of the defendant-intervenors,

6         having been first duly sworn, testified as follows:

7                        **DIRECT EXAMINATION**

8     BY MS. MCKNIGHT:

9     Q    Good morning, Dr. Hofeller.

10    A    Good morning.

11             MS. MCKNIGHT:  I'd like to ask that

12    Defendant-Intervenors' Exhibit 14, the first page, is

13    shown on the screen.

14    A    Yes.

15    Q    And was this the report you submitted in this case in

16    2015?

17    A    It was.

18             MS. MCKNIGHT:  And I'd like to show the first

19    page of Defendant-Intervenors' Exhibit 102 on the screen.

20    Q    And is this the report you submitted in 2017 in this

21    case?

22    A    It is.

23    Q    And you were admitted as an expert in this case in

24    2015, right?

25    A    Yes.

Hofeller - Direct

1   Q    Dr. Hofeller, could you take a moment -- and I

2   realize that this could be a very long answer, but could

3   you take a moment to give the Court a brief summary of

4   your experience in the field of redistricting?

5   A    I'll try and keep it short here.  I've actually been

6   in the redistricting field for just a little bit over 50

7   years.  I actually started in 1965.  I participated in the

8   redistricting process through five decennial censuses;

9   1970, 1980, 1990, 2000 and 2010.  I've redistricted in

10  places all over the nation and am familiar with the

11  political geography pretty much in every state.

12  Q    Thank you.  And could you tell the Court what you

13  were retained to do in this case?

14  A    I was retained to look at and examine Dr. Rodden's

15  report and comment on it.

16  Q    Okay.  And could you tell the Court what you were

17  retained to do in this case in 2015?

18  A    I covered the areas of compactness and contiguity.  I

19  might add one more thing, too.  I did examine population

20  shifts.

21          JUDGE PAYNE:  When?

22          THE WITNESS:  In 2015, Your Honor.

23  Q    And could you tell the Court briefly what kind of

24  experience you have in actually drawing redistricting

25  plans?

Hofeller - Direct

1  A    I guess in my lifetime, I've probably drawn several

2  hundred redistricting plans in various states, both

3  congressional districts, legislative districts, county

4  districts, municipal districts and -- that's really it,

5  but many, many plans.  And examined many plans.

6  Q    And that is plans, not just single, stand-alone

7  districts; is that right?

8  A    Well, actually, single districts would be included

9  in -- in every plan.  But it's important always to examine

10  a plan as a whole, not just one district at a time.

11  Q    How difficult is it to draw an entire plan?

12  A    It's a very intricate task, particularly for the

13  lower house of a state legislature, because there's so

14  many districts and so many different competing interests

15  because of those districts.  You have to examine the

16  population shifts.  You have to examine the demographics.

17  You have to examine the political geography.  You have to

18  keep track of the other factors such as compactness,

19  contiguity and -- well, that's a pretty good list, I

20  think.

21  Q    What kinds of issues do map drawers normally face

22  when drawing or analyzing a map?

23  A    Of course, as I stated somewhat before, drawing a map

24  is a little bit different than examining it because you're

25  actually creating a new map, and so you have to account

Hofeller - Direct

1   for all those factors which I mentioned before, plus the

2   other interests of the party that is actually having you

3   draw the map, be it the legislature or another political

4   body.

5   Q    Now, I understand you reviewed Dr. Rodden's report in

6   this matter; is that right?

7   A    Yes.

8   Q    Okay.  And are you familiar with the types of maps

9   Dr. Rodden put in his report?

10  A    Yes.

11  Q    And could you --

12  A    I've seen those types of maps for decades, actually.

13  It's nothing new, as he stated, too, going back clear to

14  the plague, or something like that.

15  Q    And have you ever produced a map of the type that

16  Dr. Rodden used in his report?

17  A    Only for my own use.  I find the maps to be

18  interesting, but they don't have enough detail on them for

19  me to actually either draw plans or to fully examine a

20  plan.

21  Q    I'd like to put up an example of one of his maps,

22  Dr. Hofeller, if you can give me one moment.

23       So this is Plaintiffs' Exhibit 69, page 18.  Do you

24  recall seeing this map in Dr. Rodden's report?

25  A    I do.

Hofeller - Direct

1    Q    And would you use this type of map to draw or analyze

2    a redistricting plan?

3    A    No.

4    Q    And why not?

5    A    Again, because there's not enough specificity of

6    data.  In order to know what the populations are and

7    exactly where it is, you have to start counting dots, and

8    that would be a process that would take many, many hours.

9         So for redistricting purposes, we would actually use

10   a color thematic for one factor.  And usually in the

11   center of the unit of geography, be it a county or a

12   voting district or a census block, we'd have data

13   displayed in the center of that block.  It could be

14   several pieces of data, but one of them for sure would be

15   the population -- the total population in the block.

16   Q    Okay.  And this map does not show you census block

17   boundaries; is that right?

18   A    Not this map, no.

19   Q    Okay.  And would you need census block boundaries to

20   divide VTDs?

21   A    Of course.  Because blocks in a VTD are varying

22   greatly both in population and in size and in the actual

23   shape of the block.  So you run into issues where one

24   block may block your progress across the map or be too

25   big.  So you have to be very careful, when you're

Hofeller - Direct

1    splitting blocks, to actually find a place where it's both

2    logical and where you're able to select blocks that will

3    suit the purpose of dividing that unit up.

4    Q    Based on your experience in redistricting,

5    Dr. Hofeller, can you draw an ideal district for any

6    delegate?

7    A    Anybody could draw a district that the delegate would

8    like, particularly the delegate.  One of the problems you

9    find in redistricting is that each incumbent thinks the

10   plan should start from their district and emanate outward

11   throughout the whole state.  So they have an idea of what

12   they want, but the problem with it is that it has to fit

13   into a whole map which best satisfies all of the criteria

14   for the whole plan.  So you can't -- can neither draw such

15   a map district by district in isolation from what's going

16   on in the map or do a -- a robust analysis of that plan

17   after the fact.

18   Q    And drawing and passing a map is a legislative and

19   political process; isn't that right?

20   A    Well, it's usually a legislative process.  In some

21   states it isn't a legislative process.  It's done by a

22   commission, in some cases by a court or a court master.

23   Q    I see.  And in reviewing Dr. Rodden's report for the

24   types of issues that you've described this morning, did he

25   take into account any of these various pressures on map

Hofeller - Direct

1    drawers?

2    A      Not -- not as I read his report, no.  He's merely

3    interested in looking at each district one at a time, but

4    he's not really bringing to bear all the pressures;

5    particularly in this case, pressures which involve

6    population shifts within the state, pressures which

7    involve adherence to the Voting Rights Act, pressures

8    which come from trying to maintain district cores, and

9    other factors that come into play.

10   Q      And are there any timing pressures related to the

11   Voting Rights Act that were at play in this map in 2011?

12   A      In Virginia, there was an extremely tight time frame

13   for Virginia.  Virginia, along with Texas, actually gets

14   their census data first as it's released from about

15   March 1st after the decennial census, so in the odd

16   number -- the first year, which would be '01 or '91 or

17   '81.  And they have to draw these districts very quickly.

18          And then because Virginia was a Section 5 state, in

19   the last time around, they have to prepare a fairly

20   comprehensive submission to the Justice Department to get

21   the map cleared or file a case in the D.C. District Court.

22   So they are on a very short fuse.

23              MS. MCKNIGHT:  Can we put up Plaintiffs' Exhibit

24   69, pages 36 and 37?

25   Q      To illustrate one of the points you were just making,

Hofeller - Direct

1  Dr. Hofeller, I'd like to draw your attention to the last

2  sentence on page 36 starting with, "The application of

3  traditional redistricting principles," going on to the

4  next page, "would have placed Colonial Heights, Virginia

5  State University and Petersburg in the same relatively

6  compact district and would not have segregated Hopewell."

7       Do you see that, Dr. Hofeller?

8  A    Yes.

9  Q    And in your review of Dr. Rodden's report, did you

10 see him take into account the various and numerous

11 pressures on map drawers related to traditional

12 redistricting principles?

13 A    No, I didn't.  This may be his idea of what he thinks

14 should go together, but it really has to be examined in

15 the light of the whole plan.

16 Q    And now, just to put this in context, did you account

17 for all of these pressures in your own analysis in this

18 case?

19 A    Are you talking about this phase of the trial?

20 Q    In both phases.

21 A    I certainly took them into account in looking at the

22 districts as they fit into the plan.  Probably the -- the

23 main pressure was the population shifts -- the relative

24 population shifts across Virginia which necessitated the

25 collapse of three districts and their resurrection in

Hofeller - Direct

1    Northern Virginia.  There's a reason why districts are

2    collapsed, and that's because if you don't collapse them,

3    you have to elongate districts and stretch them way out,

4    sort of like pulling taffy, and if you stretch them out

5    too far, like taffy, it will break.

6         So in order to create the least disruption on most of

7    the districts, sometimes it's necessary to move districts.

8    This causes a lot of turbulence in the boundary lines in

9    both places where you add the districts and where you

10   subtract the districts.

11   Q    Dr. Hofeller, I'd like to ask you briefly about

12   compactness issues in Virginia.  First, have you ever

13   lived in Virginia?

14   A    Yes.

15   Q    And during the time that you were living in Virginia,

16   had you drawn redistricting plans?

17   A    Yes.

18   Q    Is it safe to say that you've become well-acquainted

19   with Virginia geography and jurisdictions during that

20   time?

21   A    Yes.  Maybe not as much as John Morgan has, but I

22   lived in Virginia from 1981 to 1995 and then again from

23   1998 until 2014.  So I have lived many, many years in

24   Virginia.

25   Q    And how --

Hofeller - Direct

1        JUDGE PAYNE:  The plans that you drew during the

2   time you were living in Virginia, were they plans in

3   Virginia?

4        THE WITNESS:  I'm sorry.  I didn't quite

5   understand the --

6        JUDGE PAYNE:  She asked you while you were

7   living in Virginia, did you draw plans, and my question is

8   were those plans drawn for Virginia elections?

9        THE WITNESS:  No.  They were drawn actually to

10  support litigation and to examine for people who wanted me

11  to examine the nature of the plans and determine what was

12  going on in the map.  If you've had all this experience,

13  you know, over the years, just looking at a plan that way,

14  you can make pretty good judgments about what was going

15  on.

16  Q    And how does Virginia's geography present challenges

17  in computing compactness?

18  A    Well, I wouldn't say it was actually computing

19  compactness, but certainly the shapes in Virginia cause

20  issues in compactness.  There are a lot of river

21  boundaries.  The state has an irregular boundary.  You

22  also have trouble with compactness formulas on districts

23  which border adjoining states.  Because the way

24  compactness is measured, it doesn't take into account

25  the -- the land outside of the state when it's computing

Hofeller – Direct

 1   the factors.  Also, the counties have relatively odd

 2   shapes.

 3            MS. MCKNIGHT:  As a brief illustration, could we

 4   put up Defendant-Intervenors' Exhibit 97, page 3?

 5   Q    Now, Dr. Hofeller, does this map of the Hampton

 6   Roads/south side illustrate some of what you were just

 7   describing about the geography affecting compactness?

 8   A    I think it has to be taken in context with the

 9   Tidewater area, particularly the area south of the James

10   River estuary and, of course, the ocean and the border of

11   North Carolina, which means that all of the population

12   issues of all the districts in that area had to be

13   resolved at the eastern side of that territory.

14            MS. MCKNIGHT:  You can take that down.  Thanks,

15   Amy.

16   Q    In your review of Dr. Rodden's report, did you see

17   where he conducted his own analysis of compactness issues?

18   A    No.  He opined on it, but I don't see any compactness

19   data usually measured by common compactness tests.

20   Q    As one illustration of this, could we turn to

21   Plaintiffs' Exhibit 69, page 41?  In the section of the

22   Tidewater region, Dr. Rodden states that district were

23   highly noncompact?

24   A    Yes.

25   Q    Is there any analysis in his report to back up that

Hofeller - Direct

1  assertion?

2  A    Not that I saw.  I think it's a -- it's a judgment on

3  his part, but I don't think it's backed up with actual

4  figures.

5  Q    And would your answer be the same if I put up for you

6  every time Dr. Rodden opined on compactness?

7  A    Pretty much so.  I think he may have used what is

8  commonly called the eyeball test in making his judgments

9  on compactness.

10          JUDGE PAYNE:  What page is this that's on the

11  screen?

12          MS. MCKNIGHT:  Page 41.

13          JUDGE PAYNE:  Thank you.

14  Q    To tie this one off, you didn't see anywhere in

15  Dr. Rodden's report where he calculated compactness or

16  performed any kind of analysis regarding compactness; is

17  that --

18  A    I don't --

19  Q    -- right?

20  A    I don't recall seen it.  Excuse me.

21          MS. MCKNIGHT:  Okay.  You can take that down,

22  Amy.  Thank you.

23  Q    Now, we've heard testimony in this case that two

24  districts were moved from the south of Virginia to the

25  north of Virginia.  Could you tell the Court how

Hofeller – Direct

1   population shifts in Virginia impacted map drawing in

2   2011?

3   A      I believe it was three districts, actually.

4   Q      And how would moving any districts to a different

5   part of the state affect map drawing in the part of the

6   state where the districts were removed?

7   A      Well, where they're removed, of course, all the other

8   surrounding districts have to move in to fill the void

9   which is created by the district which has been moved.

10  And in terms of one of the main goals, which was to

11  preserve the cores of the existing districts, that has to

12  be done very carefully or some districts will be very

13  highly impacted in terms of their movement.  So there are

14  all sorts of competing population flows going on in those

15  areas.

16  Q      So why not just leave the districts there but move

17  them out to grab population as they needed?

18  A      Well, as I stated before, it would make the districts

19  even less compact.  And also, that type of a method

20  competes with the other factors, the other criteria, which

21  the legislature had set out to use.

22  Q      And did you understand that the drawing of the plan

23  was impacted by the plus or minus 1 percent population

24  limit?

25  A      Yes.  That was an added complication on top of the

Hofeller - Direct

1  changes in relative population between the districts.

2       So at the beginning of the process, each decennial

3  census, the current populations, the new populations of

4  the districts, are calculated and the deviations from the

5  ideal population are calculated so that you know where the

6  districts are have too many or too few people.

7       But narrowing the allowable deviation from the ideal

8  district size by half also creates further complications

9  because if you had a higher deviation, you could actually

10 resolve some of those population flow issues easier.  So

11 you might create some districts that are smaller and some

12 districts that are larger.  So since this was such a tight

13 allowable population deviation, that added to the

14 complexity of creating the new districts.

15 Q    And how would that tight deviation range affect the

16 number of VTDs that would be split in any district?

17 A    In my judgment, it would probably cause more VTDs to

18 have to be split, particularly in those areas where the

19 districts had been removed or the districts had been added

20 where you're much closer to that problem.  As it radiates

21 out into the other parts of the state, it isn't as big an

22 issue.

23 Q    Now, I'd like to turn to Table 12 in your original

24 report.

25           MS. MCKNIGHT:  This is Defendant-Intervenors'

Hofeller - Direct

1   Exhibit 14, and we're looking for Table 12.

2        Pardon me, Your Honor.  This is on page 82 and 83 of

3   your original report.  And 84, it would seem.  But let's

4   keep these two pages on the screen for now.

5   Q    Could you tell the Court what this shows?

6   A    Yes.  The first column, of course, is the district

7   number, going from 1 to 100.  And the next column is

8   the -- what I call the core retention percentage, which is

9   the part of the new district which was made up from the

10  old district.  So what portion of the old district showed

11  up in the new district in terms of the new district's

12  total population.

13       Those scores, of course, vary greatly.  And you can

14  see where certain districts have been collapsed, there's

15  going to be a blank spot, which is actually a zero core

16  retention.  And where the new districts are added, you'll

17  see a very low score also.

18            MS. MCKNIGHT:  And could we put up pages 83 and

19  84?

20            JUDGE PAYNE:  Excuse me.  Where are these

21  reports?

22            MS. MCKNIGHT:  Oh, pardon me.  This is

23  Defendant-Intervenors' Exhibit 14.

24            JUDGE PAYNE:  I know.  I've got that.  But where

25  are these?

Hofeller - Direct

1            MS. MCKNIGHT:   These --

2            JUDGE PAYNE:   You're using the 2015 report,

3   right?

4            MS. MCKNIGHT:   Yes.   That's right.

5            JUDGE PAYNE:   In this notebook that you all gave

6   us?

7            MS. MCKNIGHT:   Are you looking at the expert

8   witness notebook?

9            JUDGE PAYNE:   Yeah.   The expert witness

10  notebook.   You've got Hofeller and then you've got a bunch

11  of attachments, Exhibit 1.   Are we in one of the exhibits

12  or what?

13           MS. MCKNIGHT:   It should be page 84, Bates

14  number page 84 in that document.

15           JUDGE PAYNE:   Okay.   So if we just keep going

16  with the numbers through the tabs, right?   Page 80, what,

17  4?

18           MS. MCKNIGHT:   Eighty-four.

19           JUDGE PAYNE:   There.   Thank you.   Sorry.

20  A    May I add something?

21  BY MS. MCKNIGHT:

22  Q    Yes.

23           JUDGE PAYNE:   Would you go back over that again

24  because I was fishing for the exhibit.

25           MS. MCKNIGHT:   Sure.   No problem.

Hofeller – Direct

 1          THE WITNESS:  Your Honor --

 2          MR. HAMILTON:  Well, I object to the witness

 3  just adding something without a question.  I have no

 4  problem with --

 5          JUDGE PAYNE:  I asked her if she'd go back over

 6  it again.

 7          MR. HAMILTON:  That's fine.

 8          JUDGE PAYNE:  I thought.

 9          MR. HAMILTON:  Yeah.

10  BY MS. MCKNIGHT:

11  Q    So, Dr. Hofeller, looking at pages 82, 83 and 84 of

12  Defendant-Intervenors' Exhibit 14, this is Table 12 in

13  your original report, could you tell the Court what this

14  shows?

15  A    Column 1, which is headed District, is the district

16  number.  Column 2, which says Core Retention Percentage,

17  is, once again, the percentage of the new district that is

18  made from population that was in the old district.  Column

19  3, which is African-American Majority, is really a flag

20  with a 1 in it that identifies that as a majority

21  district -- minority district.  And the last column brings

22  that figure over from column 2 to column 4 so I could

23  actually calculate the difference in core retention

24  between the plan as a whole and the African-American

25  districts.

Hofeller - Direct

1   Q    And now, when you talk about core retention, are you

2   talking about retaining people or land?

3   A    People.

4   Q    And now, you have a note on page 84 of your report.

5   What does this note offer the Court?

6   A    This was a result of my analysis of the table, and I

7   said that three districts should be considered to have

8   been collapsed, which were 2, 10 and 87, which, of course,

9   had zero retention, and that the core -- average core

10  retention across the 10 districts was 67.9 percent.  For

11  the 97 districts which were not collapsed, the average

12  retention rate was 69.09 percent.  And for the 12

13  African-American majority districts, the core retention

14  was 72.76 percent.

15  Q    And so --

16  A    So the African-American districts had a higher core

17  retention rate than the rest of the plan.

18  Q    Now, did you hear testimony by Dr. Palmer earlier

19  this week that the best predictor of whether a VTD was

20  placed in a challenged district was whether or not it had

21  been in the benchmark version of that district?

22  A    Yes.

23       MR. HAMILTON:  Objection, Your Honor.  Beyond

24  the scope of his expert report.  This expert, by his own

25  testimony this morning, was hired -- retained to comment

Hofeller - Cross

1    on Dr. Rodden, not Dr. Palmer.

2            MS. MCKNIGHT:  We'll drop it, Your Honor.

3            JUDGE PAYNE:  There's --

4            MS. MCKNIGHT:  There's no need.

5            JUDGE PAYNE:  Just a minute.  You don't need to

6    finish.

7            MS. MCKNIGHT:  We'll drop.

8            JUDGE PAYNE:  She's not going to pursue the

9    inquiry.

10           MR. HAMILTON:  Thank you.

11           MS. MCKNIGHT:  Thank you, Your Honor.  No

12   further questions.  Thank you, Dr. Hofeller.

13           THE WITNESS:  You're welcome.

14           JUDGE PAYNE:  What did you say, D. Hofeller?

15           THE WITNESS:  You're welcome.

16           JUDGE PAYNE:  Oh.

17                    **CROSS-EXAMINATION**

18   BY MR. HAMILTON:

19   Q    Good morning, Dr. Hofeller.

20   A    Good morning.

21   Q    Dr. Hofeller, you've never been employed as a faculty

22   member in any university or college, have you?

23   A    That's true.

24   Q    And you have not published a great deal of scholarly

25   articles or peer reviewed studies, correct?

                        Hofeller - Cross

1    A     That's true.

2    Q     You testified during the first trial about

3    Dr. Ansolabehere's racially polarized voting analysis.  Do

4    you recall that?

5         MS. MCKNIGHT:  Your Honor, I'd object as being

6    beyond the scope of direct.

7         JUDGE PAYNE:  She didn't ask about that that I

8    noted, Mr. Hamilton.  Time for you to drop now.

9         MR. HAMILTON:  I will.

10   Q     The -- you, in your experience in drawing maps, are

11   aware of the restrictions imposed by the Voting Rights

12   Act, correct?  You testified about that a moment ago?

13   A     I've dealt with them through many decades, yes.

14   Q     You agree with me that Section 5 of the Voting Rights

15   Act does not require the maintenance of a rigid black

16   voting age population percentage in majority minority

17   districts, correct?

18        MS. MCKNIGHT:  I'd object, Your Honor, again.

19   This is beyond the scope of direct.  I asked him about

20   timing issues related to the Voting Rights Act.  I did not

21   ask him about any particular requirements for BVAP levels.

22        MR. HAMILTON:  I think it's fairly within the

23   scope, Your Honor.  She brought it up.

24        JUDGE PAYNE:  Bringing up a topic doesn't open

25   up the whole door, particularly if she restricts.  I don't

Hofeller - Cross

1    think that she covered that.

2    BY MR. HAMILTON:

3    Q    Dr. Hofeller, you've worked for a number of

4    republican organizations over the years, haven't you?

5    A    Yes.

6    Q    You were a consultant to the National Republican

7    Congressional Committee for the 1990 redistricting cycle?

8    A    Yes.

9    Q    And the redistricting director for the Republic

10   National Committee from 1999 to 2003?

11   A    Yes.

12   Q    And then -- I'm not to be difficult here with the

13   dates --

14   A    No.  I'm just trying to remember.

15              JUDGE PAYNE:  If that's on his resume, do we

16   need to go through that?

17              MR. HAMILTON:  I think we do, Your Honor, but

18   I'm moving on.

19   Q    Since the time you've -- and then you've been a

20   redistricting consultant for the Republican National

21   Committee from 2009 to the present, correct?

22   A    That's correct.

23   Q    And since then, you've been a private consultant

24   working or various republican candidates and campaigns and

25   committees, correct?

Hofeller - Cross

1    A     I think the way you worded your question, I haven't

2    actually worked in campaigns.

3    Q     Okay.

4    A     Maybe you want to ask that again.

5    Q     Sure.   You've been a private consultant working with

6    various republican candidates and committees?

7    A     Again, I don't really think I've worked with

8    candidates.

9    Q     Mostly just the committees?

10   A     I've worked with organizations usually.

11   Q     Okay.

12   A     Either governmental or nongovernmental.

13   Q     And mostly on the republican side?

14   A     Yes.

15   Q     In fact, exclusively on republican side?

16   A     In that time period, yes.

17   Q     You have a company called Geographic Strategies,

18   correct?

19   A     I do.

20   Q     And your partner in that is one of the lawyers here

21   in the courtroom, Dale Oldham; is that right?

22   A     Correct.

23   Q     You've invoiced Mr. --

24          MS. MCKNIGHT:  Your Honor, I'd object.  This is

25   going way beyond what plaintiffs' counsel would need to

Hofeller - Cross

1   address credibility or the weight of the evidence,

2   testimony that Dr. Hofeller is going to provide.  It's not

3   clear where he's going.  He's asked a number of question

4   after telling you that he only needed a few more to get to

5   his point.

6           MR. HAMILTON:  The point, Your Honor.

7           JUDGE PAYNE:  Of that's true, but the particular

8   question at issue I think is a question that he can ask

9   about.  It has -- it's probative of bias.

10  Q    In fact, your partner in that company is one of the

11  lawyers that's right here in the courtroom, Dale Oldham;

12  isn't that right?

13  A    Yes.

14  Q    You've invoiced Mr. Braden more than $57,000 for your

15  work in connection with this case, Bethune-Hill; isn't

16  that right?

17  A    I believe that's correct.

18  Q    Okay.  You mentioned on direct that you have been

19  involved in redistricting in a number of states over the

20  course of five decade, I think.  Is that accurate?

21  A    Yes.

22  Q    And just in the 2010 cycle, you were involved either

23  in preparing for redistricting or redistricting itself or

24  after-the-fact litigation in Florida, Maryland, Virginia,

25  Mississippi, Arizona, Missouri, Nassau County, New York,

Hofeller - Cross

1   Texas and North Carolina.  Is that accurate?

2   A    I don't actually remember Florida, but I think the

3   rest of the list is accurate, yes.

4   Q    Thank you.  Your work on redistricting has been

5   described as describing wombs for his team and tombs for

6   the other guys?

7           MS. MCKNIGHT:  Objection, Your Honor.  I don't

8   see the relevance.  It sounds like hearsay.  I don't know

9   that this is even relevant to this case.  I'm not sure

10  where plaintiffs' counsel to trying to go.

11          JUDGE PAYNE:  I think he's trying to show where

12  he's heading, what his bent is, as I recall.  Is this some

13  advertisement from his firm?  Because if it is, you can

14  put it in.  But if somebody's comment -- for instance, if

15  I wrote or the Richmond Times-Dispatch wrote, then you

16  can't get in.  That's not relevant, inadmissible and it is

17  hearsay.

18          MR. HAMILTON:  It would be if I --

19          JUDGE PAYNE:  It can't even be considered on

20  direct it's so 403 ridden because it opens for a lot of

21  other information.  Now, if he said it or it's on his

22  website, have at it.  Otherwise, leave it be, if you

23  would, please.

24          MR. HAMILTON:  I'm not offering any hearsay

25  article or magazine.  I'm asking him if his work has been

Hofeller - Cross

1  described as wombs for his team --

2          JUDGE PAYNE:  I think I understood what the

3  question was when the ruling was made.  If you'll just go

4  to the next question, that would be good.

5          MS. MCKNIGHT:  Your Honor, was the objection

6  sustained?

7          JUDGE PAYNE:  I guess I used too many words.

8          MS. MCKNIGHT:  No.  Thank you.  Just for the

9  record.

10          JUDGE PAYNE:  Sustained.

11  Q    What you've said in your presentations, "Beware of

12  nonpartisan or bipartisan or staff bearing gifts.  They're

13  probably not your friends."  That's what you've said in

14  your presentations, isn't it?

15  A    I did in one presentation, yes.

16  Q    Now, in your expert report, you've attached a couple

17  of maps from North Carolina's 12th Congressional District

18  from 1992 to 2001, correct?

19          JUDGE PAYNE:  Which report, Mr. Hamilton?

20          MR. HAMILTON:  I think it was

21  Defendant-Intervenors' Exhibit 14, maps 1 and 2.

22          JUDGE PAYNE:  Thank you, sir.

23  A    That's the 1992 redistricting -- actually, I didn't

24  play a part in that.  I actually testified in the court

25  case which challenged it.

Hofeller – Cross

1          JUDGE PAYNE:  I think the question was did you

2   attach that to your report, wasn't it, Mr. Hamilton?

3          MR. HAMILTON:  That was, Your Honor.

4          THE WITNESS:  Yes, Your Honor, I did.  I'm

5   sorry.

6          JUDGE PAYNE:  All right.

7   Q    And you attached two maps.  One was from 1992, and

8   the other was from 2001; is that right?

9   A    Yes.

10  Q    What you didn't include was a copy of North

11  Carolina's 12th Congressional District from 2011, right?

12  A    That's true.

13  Q    And you're familiar with that district because you

14  actually helped to draw it in 2011; isn't that right?

15  A    The plan, you mean?

16  Q    That particular district.

17  A    Oh, I'm sorry.  I don't know which district you're

18  identifying.

19  Q    The 12th Congressional District of North Carolina.

20  A    Yes.

21  Q    Okay.  You worked really closely with Delegates Rucho

22  and Lewis in designing the congressional plans in North

23  Carolina that year?

24          MS. MCKNIGHT:  Objection, Your Honor.  Again,

25  I'd ask what relevance this has to this case and the maps

Hofeller - Cross

1    that are included in his report.  He's already testified

2    he didn't include the 2011 map in his report.

3              MR. HAMILTON:  And, Your Honor, it's a

4    calculated omission, I think.

5              JUDGE PAYNE:  Why don't you just ask him if it's

6    a calculated omission and if so -- or why he omitted it

7    maybe.

8              MR. HAMILTON:  Well, it's cross-examination.

9    I'd prefer not to ask a "why" question.  I think I know

10   what the answer is.

11             JUDGE PAYNE:  Well, I understand that, but you

12   need to get to the point, I think, because in getting to

13   the point, you're getting off base I think is her

14   objection, and she's right.

15   Q    You testified in court in the *Cooper v. Harris* case

16   in defense of Congressional District 12 in North Carolina

17   just last year, didn't you?

18             MS. MCKNIGHT:  Again, Your Honor, that is

19   related to a 2011 map.  The maps that have been attached

20   to Dr. Hofeller's reports do not include the 2011 map.

21             JUDGE PAYNE:  Well, I understand that, but

22   that's a different question now.  Overruled.

23        Did you testify in support of the 12th Congressional

24   District map that was used in *Cooper v. Harris* in 2011?

25             THE WITNESS:  Yes.

Hofeller – Cross

1   Q    And that was the map that you had drawn?

2   A    Yes.

3   Q    And the Court concluded that race had predominated in

4   that case; isn't that true?

5   A    Yes.

6   Q    Now, in Virginia you didn't actually draw the map; is

7   that right?

8   A    That's true.

9   Q    Okay.  You mentioned compactness a moment ago in the

10  direct examination.  Are you aware that the parties have

11  stipulated to the compactness scores of the districts in

12  this case?  It's no longer at issue?

13  A    No.

14  Q    All right.  Dr. Hofeller, the Commonwealth of

15  Virginia uses voting tabulation districts as a basic unit

16  of geography, correct?

17  A    It's the basic unit of geography, yes.  In most

18  states, actually.

19  Q    And it's true that, relatively speaking, there are

20  very few VTDs that are split in a given state during the

21  course of redistricting, right?

22  A    It varies from state to state.

23  Q    One reason to split a VTD might be to equalize

24  population to satisfy the one person, one vote principle,

25  right?

Hofeller - Cross

1   A      Yes.

2   Q      Another reason to split a VTD might be because of an

3   incumbency?

4   A      Yes.

5   Q      Another reason might be to maintain the core of a

6   benchmark district?

7   A      Yes.

8   Q      And looking at split VTDs can be informative

9   depending on how you use them and how you analyze them;

10  isn't that true?

11  A      Yes, depending on how you use them and analyze them,

12  yes, to a certain degree.

13  Q      So let's talk for a minute about dot density maps

14  like those prepared by Dr. Rodden.  I take it you've seen

15  those kinds of maps before?

16  A      I've even produced them, yes.

17  Q      Okay.  And in your first supplemental report, that's

18  the 2017 report, you explain that one of the reasons

19  you've rejected these kinds of maps is because, quote, The

20  maps are difficult for many line drawers to understand and

21  to grasp the information required for actual line drawing,

22  closed quote.  That's included in your report, right?

23  A      It is.

24  Q      Of course, you're not suggesting that this court

25  can't understand or grasp the information presented in

Hofeller - Cross

1    that -- in those maps, are you?

2    A    Well, I think that's really their decision, not mine.

3    Q    Okay.  And putting aside your objections to dot

4    density maps as a category, if one were to create a dot

5    density map, there's nothing methodologically wrong with

6    the way that Dr. Rodden prepared those dot density maps in

7    his report, right?

8    A    That's true.

9    Q    Now, it's fair to say that it's your opinion that a

10   court would get a better level of comprehension using a

11   map that was shaded to show racial data rather than using

12   the dot density format.  Is that fair?

13   A    That would be my preference, certainly.

14   Q    And, of course, a court evaluating a map, like those

15   before us, could use both a shaded map like the ones

16   provided by Dr. Palmer and a dot density map like the ones

17   provided by Dr. Rodden, right?  It's not an either/or.

18   They could use both, right?

19   A    I'm not sure that I remember what Dr. Palmer's maps

20   looked like.

21   Q    And you'll agree with me that dot density maps

22   provide a court with some relevant information.  We might

23   argue about how much, but there's some relevant

24   information there, right?

25   A    It's descriptive of the geography in terms of the

Hofeller - Cross

1   factors that it has on it, yes.

2   Q     And to be clear, we can look through your reports all

3   day long, and you haven't provided the Court with either

4   dot density maps or shaded population density maps,

5   correct?

6   A     That's true.

7   Q     Now, just a couple more questions.  You'll agree that

8   the census information available to the legislature

9   included, among other things, population by census block?

10  A     Yes.

11  Q     And it also had race and ethnicity data again down to

12  the census block?

13  A     Yes.

14  Q     In Virginia, there's no political party registration,

15  true?

16  A     True.

17  Q     So political party registration is not available at

18  any level, VTD or block?

19  A     Correct.

20  Q     In Virginia, election results are reported by the

21  state election officials either at the state or local

22  level by voting tubulation district, correct?

23  A     Yes.

24  Q     And then a VTD is composed of smaller units we've

25  heard described in this trial as census blocks, right?

Hofeller - Cross

1  A      Yes.

2  Q      So let's imagine, hypothetically speaking, that you

3  have a VTD with 10 census blocks in it.  We could know, if

4  we wanted to, how the VTD as a whole voted in any given

5  election, right?

6  A      Certainly.

7  Q      And that data is available at the VTD level?

8  A      Yes.

9  Q      What you can't do at the census block level is

10 determine any political differences between different

11 census blocks, putting aside rounding errors.  The

12 political data is just going to treat them exactly the

13 same?

14 A      From that political data that is given, yes.

15 Q      In other words --

16 A      There could be ways to do it, but --

17 Q      In other words, it treats all the census blocks

18 exactly the same?

19 A      Again --

20         JUDGE PAYNE:  Excuse me.  What's the "it" in

21 that sentence -- or question?  Excuse me, Mr. Hamilton.

22 "It treats it the same."  What is the "it"?

23         MR. HAMILTON:  If we -- the political data.  I'm

24 sorry.  It's an inartfully phrased question.  Let me ask

25 it again.

Hofeller - Cross

1   Q     Political data is report at the VTD level.  I think

2   we've already established that.  All you can know at the

3   census block level is going -- the census block level is

4   going to treat -- other than rounding errors, it's going

5   to treat each census block exactly the same within that

6   VTD because that's the information that's reports; isn't

7   that true?

8   A     Except for rounding errors, yes, it would be, as if

9   all the blocks were the same as the voting district as a

10  whole.

11  Q     Okay.  So we can't make distinctions in that

12  hypothetical 10 census block VTD.  It's going to treat

13  number 1 the same as number 7 and number 3 the same as

14  number 9?

15  A     Not with the methods we use in this decade.  There

16  are methods by which it could be done.

17  Q     All right.  But not -- not here, at least as far as

18  you know?  Not in Virginia in 2011?

19  A     That's true.

20  Q     In your supplemental report you conclude, on -- in

21  paragraph 20, and I'll just read it.  "Drawing conclusions

22  regarding HB 5005, without the production of an

23  accompanying completely new, statewide sample plan,

24  accompanied by a block assignment file, does not allow

25  added substantial value to a discussion of the issues

Hofeller – Cross

1    involved in this case.  Simply stated, Dr. Rodden's report

2    does not document how his objections would change the

3    configuration of HB 5005.  Because of this, the report

4    cannot substantiate the conclusions Dr. Rodden reached."

5        That's in your conclusion of your supplemental

6    report, correct?

7    A    You've stated what I said, yes.

8    Q    And in the North Carolina litigation, the Cooper case

9    you were involved in, you know the state of North Carolina

10   took the same position; that it was necessary for the

11   plaintiff, in a racial gerrymander case, to produce an

12   alternative map to prove their case.  You know that,

13   right?

14       MS. MCKNIGHT:  Your Honor, I'd object.  He's

15   asking about what's required in the case.  This expert is

16   not a lawyer.  He's not here to opine about what's

17   required in these cases.

18       MR. HAMILTON:  Except that he just did in

19   conclusion to his report, and I think I'm entitled to

20   cross-examine him on it.

21       JUDGE PAYNE:  But there's a difference between

22   what someone is required to do by law, which has the

23   Supreme Court has held -- in this case, I think -- that an

24   alternate map is not required.  There's quite a difference

25   between that and whether an expert, in evaluating another

Hofeller - Redirect

1   expert's report, says that report is useless or of limited

2   utility because it lacks such a map.  So you were linking

3   the legal and the opinion, and her objection is sustained

4   as to the form of the question.

5        MR. HAMILTON:  Thank you, Your Honor.

6     Thank you, sir.  No further questions.

7        MS. MCKNIGHT:  Thank you, Your Honor.  Just a

8   few questions on redirect.

9                    **REDIRECT EXAMINATION**

10  BY MS. MCKNIGHT:

11  Q   Dr. Hofeller, did you hear plaintiffs' counsel say a

12  number of times that each census block is treated the

13  same?  Did you hear him say that?

14  A   Not quite that.  But yes, something very similar.

15  Q   And the number of the people is different in each

16  census block; isn't that right?

17  A   That's correct.

18       MS. MCKNIGHT:  Thank you, Dr. Hofeller.  I have

19  no further questions.

20       JUDGE PAYNE:  Mr. Hamilton, so I can make my

21  notes correspond to the exhibit, what paragraph were you

22  asking him about in his report?  I thought it was

23  paragraph 20 and it's obviously not.  The last question

24  that you were asking about a map and his assessment of

25  Dr. Rodden's report.

Hofeller – Redirect

1          MR. HAMILTON:  Paragraph 21, page 7 of

2   Dr. Rodden's first supplemental declaration.  That's his

3   2017 report, sir.

4          JUDGE PAYNE:  Oh, it was 7.

5          MR. HAMILTON:  That's from Dr. Hofeller.

6   Hofeller.

7          JUDGE PAYNE:  It's the '17 report?

8          MR. HAMILTON:  Correct.

9          JUDGE PAYNE:  I'm sorry.  I had the wrong

10  report.  Thank you.  All right.  Can Dr. Hofeller be

11  excused?

12         MS. MCKNIGHT:  Yes, he may, Your Honor.

13         JUDGE PAYNE:  Thank you very much for being with

14  us and giving us your testimony, sir.  You may be excused.

15         THE WITNESS:  You're welcome.

16      (Witness stood aside.)

17         JUDGE PAYNE:  Any other evidence by the

18  defendants or intervenor-defendants?

19         MS. MCKNIGHT:  No, Your Honor.

20  Defendant-Intervenors rest.

21         JUDGE PAYNE:  Rebuttal.

22         MR. COX:  Your Honor.

23         JUDGE PAYNE:  Excuse me.

24         MR. COX:  Defendants do not have any additional

25  case to present.  But for the record, we join the

```
 1   arguments raised by defendant-intervenors.

 2            JUDGE PAYNE:  The evidence?

 3            MR. COX:  Correct.  Yes, Your Honor.  The

 4   evidence.

 5            JUDGE PAYNE:  All right.

 6            MR. HAMILTON:  And, Your Honor, our witness

 7   appears to be momentarily indisposed.  If I can be excused

 8   for a moment, I think I know where to find him.

 9            JUDGE PAYNE:  Well, do you have another witness?

10   We can give that -- give him a reasonable break.  Does it

11   make any difference what order you put them on in?

12            MR. HAMILTON:  No, it doesn't.

13            JUDGE PAYNE:  Okay.  Go ahead with your other

14   one.  Who's going to do that, Ms. Khanna or her

15   Ms. Branch?

16            MS. BRANCH:  Your Honor, the plaintiffs call

17   Senator McClellan to the stand.

18            JUDGE PAYNE:  Here comes a witness.  Is this the

19   witness you wanted?

20            MR. HAMILTON:  That is.  Yes.

21            JUDGE PAYNE:  If Senator McClellan is going to

22   be short and you can let her go, maybe it's better to do

23   her now.  Would you prefer that, Senator McClellan.

24            SENATOR MCCLELLAN:  Yeah.

25            JUDGE PAYNE:  Okay.  Come on.
```

McClellan – Direct

1        MR. HAMILTON:  Well, thank you, Your Honor,

2   for --

3        JUDGE PAYNE:  That's called an air ball.

4        THE CLERK:  Shall we swear her again?

5        JUDGE PAYNE:  Yes because she was excused.

6

7                    **JENNIFER MCCLELLAN,**

8     called at the instance of the plaintiffs, having been

9           first duly sworn, testified as follows:

10                   **DIRECT EXAMINATION**

11        MS. BRANCH:  May I proceed?

12        JUDGE PAYNE:  Please.

13  BY MS. BRANCH:

14  Q    Good morning, Senator.

15  A    Good morning.

16  Q    Intervenors played a video of a house floor statement

17  made by Delegate Spruill during the 2011 redistricting

18  process.  I'd like to ask you a few questions about that.

19  Was Delegate Lionell Spruill the chair of the Black Caucus

20  in 2011?

21  A    No.

22  Q    Has he ever been the chair of the Black Caucus?

23  A    No.

24  Q    When one member of the Black Caucus makes a statement

25  on the House floor, does that person speak on behalf of

McClellan – Direct

1    the entire caucus?

2    A     No.

3    Q     Do you know what Delegate Spruill's position was on

4    the 55 percent BVAP target?

5    A     Yes.

6    Q     And what was it?

7    A     Delegate Spruill believed you needed a large

8    percentage to ensure that a black candidate -- a large

9    percentage of black voting age population in a district to

10   better ensure that a black candidate would be elected.

11   Q     And in your opinion, was Delegate Spruill an outlier

12   from the rest of the Black Caucus on that issue?

13   A     Yes.

14   Q     Intervenors' counsel has indicated that you testified

15   that VTD 703 was split to preserve a community of

16   interest.  Were you involved in negotiating the precinct

17   703 split in your district?

18   A     Yes.

19   Q     And did you want to split it?

20   A     No.

21   Q     Why was it split?

22   A     In order to get the numbers for my district and the

23   70th to 55 percent BVAP and one percent population

24   deviation, it needed to be split.

25   Q     And did the split of precinct 703 have anything to do

McClellan - Cross

1    with the addition or making whole a precinct 208 in your

2    district?

3    A     Yes.

4    Q     How so?

5    A     Well, to equalize the number of votes that came in

6    from 208, that made it difficult to then pick up all of

7    703 in the 71st District.  But if you put all of 703 in

8    the 70th District, then the BVAP for 71 would go down.

9    Q     And was precinct 208 majority white?

10   A     Yes.

11   Q     You testified that precinct 703 is a split on a

12   natural boundary line.  What natural boundary line is

13   that?

14   A     A major street.

15          MS. BRANCH:  No further questions.  Thank you.

16          JUDGE PAYNE:  Any questions?

17                    **CROSS-EXAMINATION**

18   BY MS. MCKNIGHT:

19   Q     Good morning, Senator McClellan.

20   A     Good morning.

21   Q     Just a few questions for you.  You would agree,

22   wouldn't you, that reasonable minds can disagree as to

23   whether -- as to the application of a 55 percent BVAP

24   goal?

25   A     Yes.

McClellan - Cross

1   Q    And did you ever say on the floor that you disagreed

2   with using a 55 percent BVAP goal?

3   A    No.

4   Q    And did you ever tell Delegate Jones that Delegate

5   Spruill did not speak for you?

6   A    No.

7           MS. MCKNIGHT:  Thank you, Senator McClellan.  No

8   further questions.

9           JUDGE PAYNE:  Can she be excused permanently?

10          MS. BRANCH:  Yes, she may, Your Honor.

11          JUDGE PAYNE:  Thank you for being with us --

12          THE WITNESS:  Thank you.

13          JUDGE PAYNE:  -- Senator McClellan.  You may go

14  about your business.

15          THE WITNESS:  Thank you.

16          (Witness stood aside.)

17          MR. HAMILTON:  Plaintiffs call Dr. Rodden to the

18  stand.

19          JUDGE PAYNE:  Dr. Rodden, you haven't been

20  excused.  I remind you you're under the same oath which

21  you took earlier in these proceedings.

22                  **JONATHAN RODDEN,**

23    called at the instance of the plaintiffs, having been

24          previously sworn, testified as follows:

25                  **DIRECT EXAMINATION**

Rodden - Direct

 1  BY MR. HAMILTON:

 2  Q     Good morning, Dr. Rodden.

 3  A     Good morning.

 4  Q     We've heard some testimony about the availability of

 5  political data at the census block level.  And I don't

 6  actually think there's much dispute, but I just want to

 7  make sure we're clear about that.  Vote share by elections

 8  in the Commonwealth of Virginia is reported at the voting

 9  tabulation district level; is that right?

10  A     Yes.

11  Q     So is it possible to de-allocate that vote share to

12  the census block level, or if you do that, what do you

13  get?

14  A     One simply spreads those votes.

15           JUDGE PAYNE:  Wait a minute.  Those are two

16  questions, and I think I'd like to hear them separately,

17  if you don't mind.

18           MR. HAMILTON:  Sure.

19  Q     Is it possible to de-allocate the vote total or vote

20  share at the VTD level down to the census block level?

21  A     Yes.

22  Q     And if you do that, what do you get?

23  A     One simply spreads those votes from the VTDs into the

24  blocks evenly according to population.  So, in other

25  words, one takes 60 percent democratic vote share and

Rodden - Direct

1    simply spreads those votes evenly across the blocks.

2    That's what the Maptitude software does when one inputs

3    VTD level, political data and wants to examine it at the

4    block level.

5    Q    Does that actually reflect the vote share within

6    those census blocks that were actually cast in those

7    census blocks?

8    A    No.

9    Q    Why not?

10   A    Because we don't have any data at the block level,

11   we're simply imagining -- we're making an assumption that

12   democrats are evenly distributed throughout the VTD.  When

13   I say "we," I mean anyone using Maptitude.

14   Q    And would that be a fair assumption or an accurate

15   assumption?

16   A    Not in my experience, no.

17   Q    And why not?

18   A    Because democrats and republicans tend to be -- tend

19   to live in different parts of VTDs in many cases.

20            JUDGE PAYNE:  What's that?

21            THE WITNESS:  Democrats and republicans are not

22   evenly distributed within VTDs in many cases.  They can be

23   clustered by neighborhood.  Say if the VTD has a railroad

24   track running through it or there's a different type of

25   neighborhood on one side of that track or highway or

Rodden - Direct

1   whatever it might be, then we can receive very different

2   political behavior on different sides.

3   Q      Maybe this is a different way.  Let's imagine a world

4   in which election results were only reported by

5   legislative districts, like so the whole House District 71

6   was reported just at that level.  Would that tell you

7   anything about which VTDs were more democratic or less

8   democratic than other VTDs?

9   A      No.

10  Q      Is that sort of same thing that's happening here,

11  just at a smaller level?

12  A      Yes.  The problem is when we try to disaggregate

13  something where we don't actually have the disaggregate

14  data, we have to make some really bold assumptions.

15  Q      And we've seen in this case some pretty significant

16  differences in the political performances of different

17  VTDs within these specific challenged districts; is that

18  right?

19  A      Yes.

20         JUDGE PAYNE:  Excuse me.  You're making bold

21  assumptions to do what, now?

22         THE WITNESS:  If I want to take VTD-level

23  election results and assume that every census block within

24  that VTD exhibits the same political behavior, I consider

25  that to be a bold assumption.

Rodden - Direct

1          JUDGE PAYNE:  What does a bold assumption mean

2    in your world, in terms of how useful it is?  In my world,

3    a bold assumption is not of any utility.  I'm curious

4    about in your world, what -- of what utility an assumption

5    of that nature is?

6          THE WITNESS:  Yes.  Sometimes it's useful to

7    make an assumption if we have no other alternative.

8          JUDGE PAYNE:  You mean even a bold assumption?

9          THE WITNESS:  Sometimes.  So in this situation,

10   what is happening is someone is sitting at a computer and,

11   as we saw in those demonstrations, moving around census

12   blocks.  And one wants to then add up the votes for

13   democrats and republicans in the new district.  So one

14   doesn't want to get an error, one doesn't want to get a

15   message that says I don't know how many democrats there

16   are, one wants a number even if that number is based on a

17   bold assumption.

18         JUDGE PAYNE:  What's wrong with just accepting

19   the fact that we don't know and living with that in

20   whatever analysis that needs to be made, whether in the

21   legal world or your world?

22         THE WITNESS:  The -- what's wrong with making

23   the assumption?

24         JUDGE PAYNE:  What's wrong with accepting the

25   fact that you shouldn't make an assumption except for

Rodden - Direct

1    generally accepted reasons and leaving it be and doing the

2    analysis without considering the bold assumption that you

3    make --

4              THE WITNESS:  Because if we didn't make --

5              JUDGE PAYNE:  -- in your world.

6              THE WITNESS:  -- any assumption -- if I was in

7    the role of Dr. -- of Mr. Morgan and I was drawing a

8    district and I wanted to report to Delegate Jones the

9    political values -- the democratic performance score

10   associated with a district that I had just created that I

11   was proud of, I wanted to say, This is the score of this

12   district and that district had some --

13             JUDGE PAYNE:  That's not what I asked you.  I

14   asked you in your world, in your analysis, that's wrong

15   with just accepting that a bold assumption cannot be made

16   and you ought to use the tools that you do have instead of

17   assuming?

18             THE WITNESS:  In my work, in my report, I didn't

19   make any assumptions about -- about this.  This -- I was

20   asked about how --

21             JUDGE PAYNE:  I take it that you can't answer

22   the question about whether you should do it or not do it?

23   You just shifted from whether you should or could to

24   whether you did, and those are two different questions.

25             THE WITNESS:  If I was trying to draw districts

Rodden - Direct

1    and report to someone the political score for that

2    district, I would need to make that assumption in order to

3    report a score.  Otherwise, I would say I don't know

4    because the VTD was split.  I don't know how many

5    democrats are in my new district that I just created

6    because the VTD was split.

7            JUDGE PAYNE:  All right.

8            THE WITNESS:  So if I want that score --

9    Q    Let me ask a clarifying question or two.  That

10   assumption is just wrong, isn't it?  The assumption that

11   democrats and republicans are evenly split?

12   A    Yes.

13   Q    And, in fact, Judge Payne is correct.  We don't

14   actually know.  And so for the purposes -- if you

15   really -- if you had to put your hand on that Bible and

16   swear how many democrats, how many republicans are in that

17   census block, you'd have to say I don't know?

18   A    Correct.

19   Q    Because none of us do?

20   A    Correct.

21   Q    And if Maptitude generates something, it's just

22   diluting you because it's not an actual real value that

23   has any data that's reliable beneath it?

24   A    Because you want a number, and it gives you a number

25   based on an assumption.

Rodden – Direct

1   Q    That's wrong?

2   A    Correct.

3   Q    All right.  Let's -- let's move on to census block

4   geography.  We've heard testimony that the geography of

5   these census blocks and the size and shape and placement

6   of them imposed meaningful restrictions in how these VTDs

7   were split.  Do you recall hearing that?

8   A    Yes.

9   Q    Is that true?

10  A    No.  The census blocks are very small, and there are

11  some of them and quite -- and many of them along the

12  relevant borders.  So the number of options that one had

13  in splitting those VTDs were very, very high.  A very

14  large number of options, very few constraints.

15  Q    And how do you know that?

16  A    I've explored the data.  I've stared at the VTD and

17  block boundaries and tried to -- tried to think about all

18  the different ways that these VTDs could be split.

19  Q    And when you did that, you were able to look at the

20  same maps you generated but with the VTD boundaries

21  along --

22  A    Yes.  The only reason I didn't include the VTD

23  boundaries in all of the maps is because it's an esthetic

24  decision.  We -- the human eye can only take in so much

25  information, and if I had placed all those block

Rodden - Direct

1   boundaries on the map, it would have been overwhelming.

2   They were already, I think, very difficult to see.  We had

3   trouble squinting at the VTD names and so forth.  I

4   couldn't have put all that additional ink on the map.

5   Q    So let me ask you this.  Does the geography or the

6   size, shape and placement of those census blocks require

7   that VTDs be split along racial lines?

8   A    No.

9   Q    All right.  There were some questions about House

10  District 80.  And maybe we can call up for a moment

11  illustrative 58, House District 80.

12          JUDGE PAYNE:  This is Plaintiffs' Exhibit 69?

13          MR. HAMILTON:  That's correct, Your Honor.  And

14  page 53, it's Figure 18.  And in the illustrative notebook

15  that I had prepared at the beginning, it's on page 58.

16  That's just a larger image of the same document.

17  Q    This -- we heard some testimony about a delegate name

18  Johnny Joannou?  Did you recall hearing that?

19  A    Yes.

20  Q    And I believe -- he was the incumbent in which

21  district?

22  A    Seventy-nine.

23  Q    And can you -- is the location of his residence

24  plotted on this map?

25  A    Yes.  It's the yellow dot.

Rodden - Direct

1   Q    Can you circle it?

2   A    It is located in the VTD numbered 35.

3   Q    Okay.  That's sort of, more or less, dead center of

4   this map; is that right?

5   A    Yes.

6   Q    He lived -- so is that -- that's the north side of

7   the -- that the Elizabeth River there?

8   A    Yes.

9   Q    When he was challenged in a primary in 2009 just

10  before redistricting, how did he do in precinct 35?

11  A    That was his home, his home precinct.  He got a large

12  majority.

13  Q    Okay.  How about precinct 34, immediately next to his

14  district?

15          JUDGE PAYNE:  What year are we talking about,

16  Mr. Hamilton?

17          MR. HAMILTON:  2009.

18          JUDGE PAYNE:  Thank you.

19  A    That's right next to his home, and he also got a

20  large majority in that precinct.

21  Q    And how did he do in precinct 38?  That's the next

22  one moving north.

23  A    Also a comfortable majority.

24  Q    And then how did he do in Taylor Road?

25  A    The same.

Rodden - Cross

1   Q    And how did he go in Yeates?

2   A    The same.

3   Q    And these are all -- excuse me.  This is in a

4   democratic -- pardon me, Your Honor.

5            JUDGE PAYNE:  Get some water if you need it.

6            MR. HAMILTON:  That's okay.  I think I'm all

7   right, but thank you.

8   Q    This is in a democratic primary in 2009; is that

9   right?

10  A    Yes.

11  Q    What happened to all four of those precincts?

12  A    They were moved into District 80.

13  Q    So they were taken out of his district, Johnny

14  Joannou's district?

15  A    Yes.

16  Q    And then what happened in the primary election in

17  2013?

18  A    He was defeated.

19  Q    And who did he lose to?  Where did that candidate

20  come from?

21  A    That was a candidate from the other side of the

22  Elizabeth River.

23           MR. HAMILTON:  Thank you, sir.  No further

24  questions.

25           JUDGE PAYNE:  Cross-examination.

Rodden – Cross

1                           **CROSS-EXAMINATION**

2      BY MR. BRADEN:

3      Q    Good morning.

4      A    Good morning.

5                MR. BRADEN:  If we could bring up the

6      demonstrative.

7                JUDGE PAYNE:  What demonstrative is it?

8                MR. BRADEN:  And it is -- do we have a number on

9      it?

10               JUDGE PAYNE:  Was this one of the ones that was

11     excluded on objection?

12               MR. BRADEN:  No.  It is not --

13               JUDGE PAYNE:  This is the one that was admitted?

14               MR. BRADEN:  This is the one that was admitted.

15               JUDGE PAYNE:  All right.

16               MR. BRADEN:  This one was used by Mr. Morgan.

17     He was disusing Mr. Morgan.  I wanted to ask him --

18               MR. HAMILTON:  Before you do that, just for the

19     record, this was not admitted.  This is an illustrative

20     exhibit so it's not part of the record.  I just want to

21     make sure that's clear.  I think counsel may have just

22     misspoke.

23               JUDGE PAYNE:  Yeah, I think so.  It's an

24     illustrative exhibit.  It was -- or a demonstrative, and

25     it was not admitted.  It was used to help Delegate --

Rodden - Cross

1   Mr. Morgan in his testimony.

2   Q    And I believe you just testified to how the software

3   that was used by Morgan and was used by Delegate Jones

4   would, during this process, deaggregate election data out

5   to census blocks, correct?

6   A    Yes.

7   Q    And then -- so that would then create a screen, a

8   number, when you move the census blocks, out for all the

9   political values contained in the little box here?

10  A    Yes.

11  Q    So when I move -- when I divided a VTD in two pieces

12  and put one into, say, District 10 on the map here,

13  correct, that would then show the Obabma vote versus --

14  the democrat versus republican vote in all of those

15  categories?  It would change and show a different value?

16  A    When a VTD was moved?

17  Q    Yes.

18  A    Yes.

19  Q    And if I had the obligation to present a plan to a

20  delegate to attempt to convince him to vote for that plan,

21  do you think that data would be of importance?

22  A    I believe so.

23  Q    So the process, then -- do you have any reason to

24  believe many delegates would understand the deaggregation

25  being possibly challengeable by a statistician like

Rodden - Cross

1  yourself?

2  A    Do I believe that the delegates would be concerned

3  about --

4  Q    Do you think they would understand your position that

5  this is not the best data available -- I mean may have

6  some data questions?

7  A    No.  They would like to have a number.  That's why

8  the software produces one for them.

9  Q    And so this number is very important -- am I

10  correct -- would you view this number important to

11  achieving the political goal of getting the plan passed?

12  A    Yes.

13  Q    How large can census blocks be, in population

14  numbers?

15  A    There's a range.  I think they sometimes can be as

16  high as a thousand.

17  Q    So a census block with a thousand persons in it total

18  pop would be larger than the 1 percent range in the -- the

19  range here would be -- the variation is 1 percent plus or

20  minus.  So would a census block of a thousand person alone

21  be enough if you had perfect population?  If you moved one

22  census block of a thousand people, it would take it out of

23  the population range, right?

24  A    Yes.

25            MR. BRADEN:  No further questions.

                        Palmer - Redirect

1              JUDGE PAYNE:  Any redirect, Mr. Hamilton?

2              MR. HAMILTON:  Just briefly.

3              JUDGE PAYNE:  I thought you were going to

4    surprise any.

5              MR. HAMILTON:  What's that?

6              JUDGE PAYNE:  I thought we weren't going to have

7    any for a minute.

8              MR. HAMILTON:  I have no notes, Your Honor.

9                    **REDIRECT EXAMINATION**

10   BY MR. HAMILTON:

11   Q     This Maptitude software we've been discussing --

12   A     Yes.

13   Q     -- is this the same in every state?  Obviously,

14   there's different data fed into it, but the program is the

15   same in every state?

16   A     Yes.

17   Q     So the Maptitude program you use to redistrict, say,

18   the state of Alabama is the same software used to

19   redistrict the state of Virginia?

20   A     Yes.

21   Q     Same in North Carolina?

22   A     Yes.

23   Q     Same in Ohio?

24   A     Yes.

25              MR. HAMILTON:  Thank you.  No further questions.

Rodden - Recross

1          JUDGE PAYNE:  You're frowning and complaining,

2    Mr. Braden.  What's the problem here?  Is that an

3    objection or what?  I haven't ever seen a frown objection.

4          MR. BRADEN:  I don't think the Court is going to

5    let me ask him any more questions.  I think he may

6    have misspoke.

7          JUDGE PAYNE:  Well, let's get it straight so go

8    ahead.  That gives Mr. Hamilton a recross, but let's get

9    it straight.  Come up here where they can hear you and I

10   can hear you and the court reporter can hear you.

11                       **RECROSS-EXAMINATION**

12   BY MR. BRADEN:

13   Q    Do you actually know whether all states use

14   Maptitude?  Aren't there a number of different softwares

15   that some states use?

16   A    He asked me if Maptitude was the same in every --

17   whether they were different versions of Maptitude in

18   different states was my understanding.  And --

19   Q    I misunderstood.  I thought -- thought you had

20   answered a question saying that the state of Alabama used

21   Maptitude, but you don't know whether they did or didn't?

22   A    No.  There are competing software vendors.  I don't

23   know.

24          JUDGE PAYNE:  All right.  You have the final

25   shot.

Palmer – Direct

1         MR. HAMILTON:  Thank you, Your Honor.  And I

2    have -- I'm not frowning, and I don't need to ask any more

3    questions.  Thank you.

4         JUDGE PAYNE:  All right.  Is that the -- you can

5    step down.  Thank you, Dr. Rodden, for being here.

6         Are you all through now?

7         MS. KHANNA:  We have one more witness, Your

8    Honor.

9         JUDGE PAYNE:  About how long?  Probably not more

10   than that.  Make sure your chronometer keeps it in that

11   zone.  Will you, please?

12        MS. KHANNA:  Plaintiffs recall Dr. Maxwell

13   Palmer.

14        JUDGE PAYNE:  And, Dr. Palmer, I remind you,

15   you're under the same oath that you took earlier, you

16   haven't not been excused.

17                     **MAXWELL PALMER,**

18     called at the instance of the plaintiffs, having been

19          previously sworn, testified as follows:

20                 **DIRECT EXAMINATION**

21   BY MS. KHANNA:

22   Q    Good morning, Dr. Palmer.

23   A    Good morning.

24   Q    You submitted a reply report in this case; is that

25   right?

Palmer – Direct

1   A      Yes.

2   Q      And I believe you've already identified that on the

3   record as Plaintiffs' Exhibit 72?

4   A      Yes.

5   Q      We're not going to walk through all of the analyses

6   in the reply report since it is already in the record, but

7   I just wanted to touch upon a few key points.  You read

8   the rebuttal reports provided by Dr. Katz and Dr. Hood; is

9   that right?

10  A      Yes.

11  Q      And you heard them testify in court?

12  A      Yes.

13  Q      Did you -- did anything that you read or heard from

14  their testimony alter your conclusion regarding racial

15  predominance in any way?

16  A      No.

17  Q      Why not?

18  A      Dr. Hood did not evaluate or did not offer evidence

19  on racial predominance.  Dr. Katz only challenged one of

20  my several analyses on racial predominance; that of the

21  effect of race versus party on the assignment of VTDs to

22  challenged districts.  And, in fact, the evidence he

23  presented in his report only confirmed my -- my

24  conclusions.

25  Q      And your conclusion in terms of the race versus party

Palmer - Direct

1   analysis, what did it confirm that?

2   A    That race predominated over party in the assignment

3   of VTDs to the challenged districts.

4   Q    What about your conclusions regarding racially

5   polarized voting or the necessity of the 55 percent BVAP

6   rule?  Did anything that you heard from the testimony or

7   read in the testimony of Dr. Katz or Dr. Hood change your

8   conclusion in any way?

9   A    No.

10  Q    Why not?

11           MS. MCKNIGHT:  And, Your Honor, here I'd object.

12  Dr. Palmer's reply report, the section on racial

13  polarization, relies on data from elections postdating

14  2011.  In defendant-intervenors' direct case, we

15  understood from the Court that we were not to go into

16  elections postdating 2011.

17       So not only does this not rebut anything that was

18  said yesterday, it also deals with information that you

19  asked us to exclude from our presentation.

20           MS. KHANNA:  Your Honor, I'm asking whether he

21  has heard anything about racially polarized voting or the

22  necessity of the 55 percent threshold rule, both on topics

23  that are addressed -- were addressed during the reports

24  and testimony, whether that changed any of his

25  conclusions.  It's just the substance of his rely report.

Palmer - Direct

1              JUDGE PAYNE:  Well, the report does have a lot

2     of post 2011 material in it, and to the extent you're

3     asking about it, you can't ask about it.

4          And the problem is creating by asking this question,

5     and that is, does it change your opinion, why not.  That

6     opens the door to a ramble, and it's not -- I think you

7     just can tailor your own questions if you want them

8     answered to get to that point.

9              MS. KHANNA:  Thank you, Your Honor.

10             JUDGE PAYNE:  But then we don't have a rambling

11    answer that will implicate the 20 -- post 2011 data that

12    they were precluded from using and that you can't use

13    either.

14             MS. KHANNA:  Thank you, Your Honor.

15    Q    Dr. Hood provided some analyzes about reasons why a

16    map drawer might want to raise the black voting age

17    population in a given challenged district or majority

18    minority district.  Did any of his analyses change your

19    conclusions regarding the necessity of a 55 percent BVAP

20    floor in any of the challenged districts?

21    A    No.

22    Q    And why is that?

23             JUDGE PAYNE:  That's the problem.

24    BY MS. KHANNA:

25    Q    To what --

Palmer - Direct

1    JUDGE PAYNE:  You have to ask the question on

2  the topic that you want to ask where is here.  His whole

3  report and his whole opinion can be affected by things

4  that we can't let in or we've kept for them and they have

5  to come out for you.  So maybe you can rephrase your

6  question.

7    MS. KHANNA:  And for the record, I'm asking

8  solely Dr. Hood's suggestions as to what might motivate a

9  map drawer to draw a -- to increase the BVAP in a given

10 district.

11    JUDGE PAYNE:  Do you know of anything that might

12 motivate a map drawer?  Let's start with that.  And then

13 if the answer is yes, okay.  Then you'll follow up.

14 Q    Let me rephrase it.  Do you recall the portion of

15 Dr. Hood's report specifying reasons why a map drawer

16 might want to raise the BVAP in a given majority minority

17 district?

18 A    Yes.

19 Q    Did you hear him testify about those reasons one by

20 one yesterday?

21 A    Yes.

22 Q    Did any of those reasons change your decision -- or

23 your conclusion about the necessity of the 55 percent BVAP

24 rule?

25 A    No.  Dr. Hood raised several concerns --

Palmer – Direct

1          JUDGE PAYNE:  That's enough at this stage.  No.

2     And then she can ask any follow-up questions that she'd

3     like to ask.

4     Q    Did you see any analyses provided by Dr. Hood to

5     substantiate those concerns?

6     A    There was one analysis of a primary election in a

7     House of Delegates race from 2009 that Dr. Hood offered.

8     However, I do not find his conclusions there meaningful

9     because while Dr. Hood did an ecological inference

10    analysis, he neglected to include confidence intervals or

11    any measure of uncertainty on his own statistical

12    analysis.  And so we have no way of interpreting those

13    results to know if they are statistically significant and

14    if there are actual meaningful differences between racial

15    voting patterns between whites and African-American

16    voters.

17    Q    Dr. Palmer, in Dr. Hood's report, he suggested that

18    looking at primary elections may inform the racially

19    polarized voting analysis in some way.  Do you recall

20    that?

21    A    Yes.

22    Q    And as we've already discussed, one of the primaries

23    he looked at was a 2013 primary, and he also looked at

24    2009 primary that you just spoke about; is that right?

25    A    Yes.

Palmer - Direct

1   Q    Did you examine any primaries in response to Dr. Katz

2   or Dr. Hood's reports?

3   A    Yes.  I also looked at the 2013 democratic primary

4   for Attorney General as well as the 2008 democratic

5   primary for president.

6   Q    And I'm not going to ask any --

7            JUDGE PAYNE:  That's the problem.  You're going

8   beyond the answer, Dr. Palmer.  You just elicited on

9   objection.  Now, what is the objection?

10           MS. MCKNIGHT:  Your Honor, we'd object to any

11   testimony about any until analysis he did on data that was

12   postdating 2011.

13           MS. KHANNA:  And I will not ask any questions

14   about it, Your Honor.

15           JUDGE PAYNE:  Do you see why it's necessary to

16   listen to the question.  Just answer the question.

17   Because once you go beyond, then we have all this to deal

18   with.  All right.  So the objection is sustained.  The

19   answer is stricken.  You may start again.

20   BY MS. KHANNA:

21   Q    Dr. Palmer, did you review any primaries predating

22   2011 in response to Dr. Hood and Dr. Katz's analyses?

23   A    Yes.

24   Q    What primary did you examine?

25   A    The 2008 primary for the -- the democratic primary

Palmer - Direct

1   for president.

2   Q    And why did you look at that primary?

3   A    Dr. Katz suggests that looking at a primary where

4   there's an African-American candidate running against a

5   white candidate could be useful.  Dr. Hood suggests this

6   as well.  The 2008 democratic primary was the most recent

7   statewide primary with an African-American candidate

8   running against a white candidate available at the time of

9   the map drawing.

10  Q    That primary would have been available -- the

11  information would have been available to anyone drawing

12  maps in 2011, correct?

13  A    Yes.

14  Q    Can you please turn to page 12 of your reply report?

15  And that is Plaintiffs' Exhibit 72, page 12.  And this is

16  Figure 4.  Does this figure reflect your racially

17  polarized voting analysis of the 2008 democratic primary

18  for president?

19          MS. KHANNA:   Trish, can we make it a little

20  bigger so we can see?

21  Q    Does this figure reflect your racially polarized

22  voting analysis of the 2008 democratic primary for

23  president?

24  A    Yes.

25  Q    And is that basically all of the data points on the

Palmer - Direct

1   left side of each cell?

2   A    Yes.

3   Q    What does this figure reflect about racially

4   polarized voting in the 2008 democratic primary for

5   president?

6   A    This figure shows no evidence of racially polarized

7   voting between African-American and white voters in the

8   2008 democratic primary for president in all 12 districts.

9        In 11 of the 12 districts, I actually find strong

10  evidence that a majority of white voters were also voting

11  for the African-American preferred candidate.  Only

12  District 77 do I find inconclusive evidence of

13  polarization, and in no district do I find evidence that

14  white voters are polarized against the African-American

15  preferred candidate.

16  Q    What did you conclude from your analysis of this

17  primary?

18  A    There is broad support for African-American preferred

19  candidates in this primary, and the African-American

20  preferred candidate won this primary in all 12 districts

21  by a large margin.

22  Q    Thank you.  Dr. Palmer, you were in the courtroom

23  yesterday when both Dr. Katz and Dr. Hood were asked how

24  long they had to prepare their analyses, correct?

25  A    Yes.

Palmer - Direct

1   Q    Do you recall how long you had to prepare your reply

2   report in this case?

3   A    Two weeks.

4   Q    And how many new elections did you perform ecological

5   inference analyses on in your reply report?

6   A    Six.

7   Q    How many districts were included in each of your

8   racially polarized voting analyses?

9   A    Twelve.

10  Q    Can you tell me approximately how long it took to

11  gather election data for any of these -- for all of these

12  elections?

13  A    Only a day or two.

14          MS. MCKNIGHT:  Your Honor, I'd object here

15  again.  The data she's referring to is data postdating the

16  2011 election.

17          MS. KHANNA:  Your Honor, yesterday testimony was

18  admitted and it was not stricken or not deemed irrelevant

19  about how long it took their experts to get the

20  information they needed to provide their analyses.

21          JUDGE PAYNE:  Do you want to ask him how long it

22  took him to get his information up to 2011 elections and

23  cut out the 2013?

24          MS. KHANNA:  Your Honor, I believe the --

25          JUDGE PAYNE:  I think that -- let's -- we need

Palmer - Direct

1   to get going, and this is basically -- it is utterly

2   irrelevant how long somebody took to give you their report

3   if everybody is playing on the same field.  The fact that

4   they had little trouble with it or had to work hard is not

5   something that generally is considered by finders of facts

6   at all.  Maybe juries do it, but we don't do it.

7           MS. KHANNA:  Thank you, Your Honor.

8           JUDGE PAYNE:  Let's go.  That's not helpful to

9   us.

10  Q    Were you here during Dr. Katz's testimony yesterday

11  when he spoke about some confusion between ACS data and

12  census data?

13  A    Yes.

14  Q    Now, the decennial census, that's an actual count of

15  people; is that right?

16  A    That's right.

17  Q    And that takes place how often?

18  A    Every ten years.

19  Q    What information is provided on the census form?

20  A    For each individual, the census records age, gender,

21  race and ethnicity.

22  Q    That is the only data available on the census block

23  level?

24  A    Yes.

25  Q    What is the American Community Survey to which

Palmer - Direct

1    Dr. Katz referred, also known as the ACS, I believe?

2    A    The ACS is a survey run by the Census Bureau that

3    collects information on a large variety of demographic

4    factors.

5    Q    Like what?

6    A    Education, income, employment.  There's a very large

7    number of variables.

8    Q    And in what ways is the ACS, in terms of its --

9    sorry.  It terms of how often ACS data is collected, how

10   is that different than the census?

11   A    The ACS is I believe run every year and then new

12   information is released annually.  But this is a survey.

13   And so unlike the census, which is a count, is provided

14   only estimates, not actual counts.

15   Q    And is ACS data reported at the census block level?

16   A    No.

17   Q    So the only data that is available at the census

18   block level is census data; is that correct?

19   A    That's right.

20        MS. KHANNA:  Thank you, Dr. Palmer.  I have no

21   further questions.

22        JUDGE PAYNE:  Any cross-examination?

23        MS. MCKNIGHT:  No, Your Honors.  I have none.

24        JUDGE PAYNE:  All right.  Thank you, Dr. Palmer.

25   You're excused.

```
 1                    (Witness stood aside.)

 2                    JUDGE PAYNE:  Is that the end of your case?

 3                    MR. HAMILTON:  It is, Your Honor.

 4                    JUDGE PAYNE:  All right.  You all -- we asked

 5     you to do an argument.  We'll take a 20-minute recess,

 6     come back and hear the arguments.

 7                    MR. HAMILTON:  Thank you, Your Honor.

 8                    JUDGE PAYNE:  Will that give you enough time to

 9     pull your things together?

10                    MR. HAMILTON:  It will, Your Honor.  We

11     anticipated this.

12                    JUDGE PAYNE:  Oh, you did?

13                    MR. HAMILTON:  You know, you have to be

14     prepared.

15                    JUDGE PAYNE:  Oh, I thought we gave tells.

16                    (Recess taken.)

17                    JUDGE PAYNE:  All right.

18                    MR. HAMILTON:  Thank you, Your Honor.  On behalf

19     of the plaintiffs and the lawyers and the staff in the

20     courtroom on the plaintiffs' side, I want to thank you all

21     for your time and patience and attentiveness during the

22     course of the trial over the last few days.  It's been an

23     honor to appear before you, and I thank you for your

24     courtesy and that opportunity.

25           The evidence presented during the course of this
```

1  trial makes clear that during the course of the 2011

2  redistricting, the 11 remaining House of Delegates

3  districts, the Virginia General Assembly used race as the

4  predominant factor, had no compelling State interest for

5  doing so and in all events, failed to narrowly tailor

6  those districts to that State interest.

7      Let's start with predominance.  So much as changed

8  since the last time I stood before this Court.  For

9  starters, the Supreme Court has now clarified the

10 governing legal standard and provided expressed, clear

11 direction for this Court.  To be clear, and contrary to

12 Mr. Braden's opening statement, the Supreme Court actually

13 agreed with plaintiffs' understanding of the governing

14 legal standard.  Specifically, the Court affirmed that

15 race predominates when, quote, race was the predominant

16 factor motivating the legislature's decision to place a

17 significant number of voters within or without a

18 particular district.

19     The Court rejected intervenors' interpretation of the

20 predominance standard.  As the Court explained, that

21 approach foreclosed a holistic analysis of each district

22 and led the District Court to give insufficient weight to

23 the 55 percent BVAP target and other relevant evidence

24 that race predominated.  The Court emphasized the

25 necessity of examining the design of the district as a

1    whole and said, quote, Concentrating on particular

2    portions in isolation may obscure the significance of

3    relevant district-wide evidence, such as stark splits in

4    the racial composition of populations moved into and out

5    of disparate parts of the district or the use of an

6    expressed racial target.  A holistic analysis is necessary

7    to give that kind of evidence its proper weight, closed

8    quote.

9         The relevant district-wide evidence called for by the

10   Court literally abounds in the record before this Court.

11   Two factors:  Stark splits in the racial composition of

12   populations moved into and out of disparate parts of the

13   district, and the expressed use of racial targets.  So

14   let's start with the second one first, the use of an

15   expressed racial target.

16        And we don't really have to spend a whole lot of time

17   on this.  It's undisputed and, in any event, law of the

18   case; a 55 percent black voting age population expressed

19   racial target was developed based largely on concerns

20   relating to House District 75 and then, in the words of

21   the Supreme Court, quote, applied across the board to all

22   12 districts, closed quote, and despite -- and that

23   despite profound differences between the 12 districts,

24   some urban, some suburban and some rural.

25        Now, intervenors would like you to think that the

1   mere existence of this 55 percent rule is plaintiffs'

2   entire case start to finish.  Mr. Braden said as much in

3   his opening statement.  But, of course, in truth,

4   plaintiff has always argued to this Court and to the

5   Supreme Court that Delegate Jones employed a rigid

6   mechanical quota and that that rigid mechanical quota had

7   a direct and significant impact on the actual boundaries

8   of the challenged districts.

9       The evidence you've heard over the last few days

10  vindicates plaintiffs' position.  Delegate Jones admitted

11  not only that he considered race, which, of course, he had

12  to, but that it dramatically affected the construction of

13  those districts.  In District 71, for example, he

14  testified that he could not move the district to the west

15  because it would, his word, dilute the black voting age

16  population too much.

17      He admitted that he added black VTDs and dropped

18  predominately white VTDs all in the service of the 55

19  percent rule.  And that rule trumped all other criteria.

20  He admitted both in principle that the 55 percent black

21  voting age population rule predominated over other

22  redistricting criteria and in practice.  And, of course,

23  he had to, again, because the evidence abounds.  The plan

24  split counties, cities, assigned whole VTDs on the basis

25  of race and, perhaps most dramatically, split VTDs

1    throughout the 11 districts.  Counties were split, and not

2    only split, but split expressly on racial lines.  The

3    Court has already found an invalidly racial split of

4    Dinwiddie County, which, by the way, defined the boundary

5    for 63.  So if it was invalidly racial for District 75,

6    then the same is necessarily true for District 63.  I

7    think that's referred to in the law as the sauce for the

8    goose is sauce for the gander problem.

9        The line splitting Chesterfield, too, divides the

10   predominately black portion from the predominately white

11   portion.  Henrico is splintered across -- in several ways,

12   with Delegate Jones admitting that he pushed District 71

13   into a sliver of Henrico by moving the Ratcliff VTD to

14   enhance the black voting age population of the district.

15       Cities, too, were split.  And not just split, but

16   divided along racial lines.  Hopewell, in District 63, is

17   perhaps the clearest example, but Richmond, too,

18   demonstrates a disregard for city boundaries.  Splintering

19   The Fan district to move a heavily white democratic VTD to

20   a republican district, that was obviously for racial

21   reasons, as Delegate Jones all but admitted.

22       Whole VTDs were moved in and out of the districts to

23   balance racial populations.  VTD 701, 702 and part of

24   703 -- this is all a heavily African-American area -- were

25   moved into District 71 for racial reasons.  VTD Suburban

1   Park, a largely white area, was moved out of District 89

2   to adjust its racial composition.  And districts lines

3   were selected, either retained from the benchmark or

4   crafted wholly out of thin air, that carefully demarcated

5   the boundaries between heavily African-American areas and

6   heavily white areas.

7        And, of course, most dramatically, VTDs were split.

8   And not just in some random way to equalize population,

9   but carefully to divide predominately African-American

10  populations from predominately white populations.  The

11  evidence on this point literally jumps off the page from

12  Dr. Rodden's dot density maps.  It's vivid, compelling

13  and, in the words of the Supreme Court, stark.  And it's

14  exactly the same evidence that the Court considered

15  particularly compelling in the *Bush v. Vera* and Alabama

16  decisions by the U.S. Supreme Court.

17       Now, the intervenors protested -- again, in the words

18  of Mr. Braden -- that these VTD splits were, quote,

19  virtually -- not totally, but virtually, without

20  exception, every split VTD is done to equalize population

21  pursuant to the criteria, closed quote.  That's from

22  Mr. Braden's opening statement.  This is simply beyond

23  belief and inconsistent with the record before the Court.

24       There are innumerable ways to split a VTD to balance

25  population, but somehow, almost every time it had to be

1    done, it was done along stark racial lines.  How is that

2    possible?  How is that credible?  We can look at several

3    examples.  Hopewell, Ward 7, we saw that split.  Granby in

4    District 89.  For the record, Hopewell is in District 63.

5    Granby, in District 89, was split along racial lines.

6    Reon, in District 90, was split along racial lines.

7    Lakeside, District 77, split along racial lines.  And

8    perhaps most dramatically, the Reservoir, Epes, Denbigh,

9    Jenkins four-way split right along racial lines.

10        Dr. Palmer testified that 23 -- in 23 out of 24 cases

11   of split VTDs, a full 96 percent of the split VTDs split

12   between challenged and nonchallenged districts followed

13   the same pattern we've seen here.  They were split along

14   racial lines such that the higher black voting age

15   population is in the challenged district and the lower

16   black voting age population is in the nonchallenged

17   district.

18        There was just a single instance where that didn't

19   happen.  If these VTDs were split solely to equalize

20   population, one would expect to see the splits divide

21   racial populations one way sometimes, racial populations

22   the other way sometimes.  You wouldn't see a consistent

23   pattern like this 96 percent of the time.

24        Now, intervenors have pointed to other nonracial

25   goals that Delegate Jones was pursuing.  But even if

factors other than race played some role, that's just irrelevant to the analysis. Race can predominate. Race does predominate even when the legislature pursues other nonracial goals in addition to its racial goals. That's, of course, obvious. No districting plan is done solely for one reason or another. And that's exactly what happened here. Every rule, every principle, every criterion was, at some point, compromised with one exception: The black voting age population 55 percent expressed racial target.

So the evidence that the Supreme Court called for in its decision in this case is overwhelming. There's an expressed use of a racial target -- that we can just take off the table since it's the law of the case -- and stark splits in the racial composition of populations moved into and out of disparate parts of the district. Using evidence that the Supreme Court itself has held in not one but two different cases is particularly relevant. That establishes predominance.

Let me turn to narrow tailoring just for a moment. It's equally clear that the General Assembly's use of race was not narrowly tailored to achieve a compelling government interest. For starters, intervenors offered no evidence that their use of a racial target served any compelling government interest. It's undisputed, and the

 1   law of the case, that the 55 percent racial target was

 2   created to address District 75 and then applied across the

 3   board to all the challenged districts.  Delegate Jones

 4   admitted that his functional analysis was limited to

 5   District 75.  And as for the remaining districts, he

 6   didn't look at voter turnout.  He didn't look at racial

 7   voting patterns.  He didn't look at registration rates.

 8   And with very few insignificant exceptions, he didn't look

 9   at election results.  That's not a strong basis in

10   evidence.

11       At the first trial, Delegate Jones tried to pin the

12   55 percent rule on other delegates who, according to

13   Delegate Jones, advocated for that number.  As you've

14   heard during the course of this trial, Senator McClellan

15   and Delegates Howell, James and McQuinn all denied that

16   they advocated for the use of a 55 percent black voting

17   age population racial target.  And Senator Dance testified

18   that the number was the gospel according to Delegate

19   Jones.  I think she said that three times until the

20   Court -- and the Court even made a joke about it.

21       Delegate Jones insisted that he derived that number

22   from members of the Black Caucus, but it's telling that

23   intervenors have been unable to produce a single member of

24   the Black Caucus to corroborate Delegate Jones' statement.

25   At the same time, plaintiffs have offered testimony from

several African-American delegates and former delegates,
all of whom dispute Delegate Jones' account.

Before this second trial, this Court asked the
parties to summarize new evidence addressing factors other
than race that were submitted in the formation of the
districts.  In the opening statement, intervenors were
unable to identify any such evidence, and not
surprisingly, during the course of this trial, they have
been unable to present any such evidence.

This is, at end of the day, a simple case.  Delegate
Jones applied an expressed racial target of 55 percent
black voting age population to 11 very different
districts.  That's not disputed.  Pervasive racial sorting
was required to comply with the 55 percent rule.  But
Delegate Jones had no reason to believe that racial
sorting was required to avoid retrogression, let alone a
strong basis in evidence.  In fact, he admits that he
didn't even try and assess the necessary level of black
voting age population in any district except for District
75.  That's also undisputed.  This mechanical and
unjustified sorting of voters, according to the color of
their skin, offends the commands of the 14th Amendment.

With respect, plaintiffs urge this Court to
invalidate the 11 remaining challenged districts and
implement appropriate, immediate and effective remedies

1    for the constitutional violation.  Thank you, Your Honors.

2         MR. BRADEN:  As I said at my opening, the

3    question before this Court, the first question -- I

4    believe, really, in the end, the only question before this

5    Court -- is whether race was the predominate -- the

6    predominate factor in drawing the challenged districts.

7    The predominate factor in drawing these challenged

8    districts is the 1991 districts and the 2001 districts.

9    These are predominately the same districts that have been

10   in place since 1991.  And this was clearly expressed by

11   Jones.  And record is replete with evidence of that.

12        So the burden is on the plaintiffs to prove to this

13   Court that race predominated.  I believe this Court has

14   already found that the plan does not, in fact, violate

15   traditional redistricting criteria.  And I believe the

16   evidence already shows that, but let's hear what the

17   experts of the other side have provided to this Court that

18   show that race is predominate.  And they've provided you a

19   VTD analysis.  That forms basically their only argument on

20   predominance.

21        I would suggest to you that that's the -- VTD tail --

22   split VTDs are the tail on the redistricting dog.  The

23   reality is that's a small part of the redistricting

24   process.  Even if you were to accept that these VTDs were

25   drawn upon race, which the evidence absolutely, I

1    believe -- direct evidence shows is not true, the numbers

2    involved are simply too small.  We're going to decide that

3    race is predominant because of, by definition, a split of

4    a VTD that would be less than 800 people.  That's

5    1 percent.  That's the range we're talking about here.  So

6    we're talking about numbers.  This VTD analysis involves

7    tiny, tiny numbers.  Not enough to be the basis of a

8    predominance finding.

9        What a shock we would find that when you divide a

10   vote tabulation district, a precinct between two

11   districts, one of which is predominately African-American

12   and one of which is white, that the VTD that goes into the

13   black district is predominately black because it needs to

14   be contiguous.  So what a surprise giving patterns of

15   residency that if you're picking a VTD between two

16   districts and you split it, the side that's closer to the

17   black district, in the black neighborhood -- let's use

18   like the reality here of what we're talking about,

19   neighborhoods.  That neighborhood is likely to have more

20   black residents than the other side, which goes into what

21   could be a majority white district.  That's what we're

22   discovering with any of these numbers, assuming that any

23   of them were a large enough number to be meaningful.  And

24   they're not.  They're just not.

25       You've seen direct testimony, first of all, that

1  Jones wasn't involved in splitting these VTDs, period.

2  He's the architect of the plan.  This -- this VTD analysis

3  is based upon numbers that weren't important enough for

4  him to be involved in or even to consider except in the

5  isolated instance of doing something in the city of

6  Richmond at the request of the Richmond government.  So

7  how can something not important enough for the architect

8  of the plan to be involved with or pay any attention be

9  the basis for this Court to determine that race was

10 predominant?

11      Then you have the testimony -- I know it was long.  I

12 know it was extensive, but you had the testimony from the

13 person who did this directly, expressly saying it wasn't

14 based upon race.  Couldn't have been clearer.  There

15 wasn't any equivocation whatsoever.  Was some of it

16 involved in politics?  Absolutely.  No one has ever denied

17 that.  District 95, up at the end of it, as this Court

18 found last time, what's happening in splitting those

19 precincts?  It's an expressed desire to create a more

20 attractive swing district on the peninsula and to preserve

21 a republican incumbent.

22      So are all the democrats -- is there an attempt to

23 put the democrats and split the precinct to put the

24 democrats in challenged District 95?  Absolutely.  So if

25 this was a political gerrymandering claim, I might make a

```
 1    different argument.  That's not before this Court.  What's

 2    before this Court is a racial gerrymandering claim.

 3    There's no testimony of people actually involved in the

 4    process showing that any of these splits are based upon

 5    race.  The people who did them said no.  They're too small

 6    to be meaningful.

 7         My -- Kevin Hamilton stands up and says significant

 8    number of voters is what the Supreme Court is looking for

 9    being moved in and out.  The VTD analysis doesn't provide

10    a significant number of voters being moved in and out even

11    if you accepted it on race.  That's his language.

12         You need, as the Supreme Court said, to look at the

13    design as a whole.  Are they looking at the design as a

14    whole?  No.  Their expert witnesses' analysis, when you

15    look about their VTD analysis weighting back and forth as

16    to what's the best predictor of a VTD being in or out, and

17    they say race is more important than politics.  And that's

18    what their statistical analysis says.

19         And I won't -- you know, that's interesting.  But, of

20    course, the statistical analysis that everyone agrees is,

21    in fact, the strongest statistical analysis is was it in

22    the benchmark district?  If it was in the benchmark

23    district, the statistics show clearly that, by far, is the

24    best predictor of whether it will be in the new plan.  Not

25    race, not politics, was it there before.  Totally
```

1    consistent with -- totally consistent with the statements

2    of Jones and Morgan.

3        I don't believe this Court has received any evidence

4    on which it could determine that race was predominant.

5    Certainly not from the experts.  You did, in fact, receive

6    some testimony from some members.  I urge the Court first

7    to remember my admonition about drawing a district is

8    easy, drawing a plan is hard.  Most of the testimony I

9    heard from the black members were, I wasn't happy with my

10   district.  I didn't hear them -- with the exception of

11   McClellan and Dance -- talking about race.  I heard them

12   say, Oh, my district wasn't the way I wanted it to be.

13   What a surprise.  With the exception maybe of Jones,

14   nobody got exactly the district they wanted.

15       So what I would suggest to you is let's not listen to

16   the testimony here that appeared within the last few days.

17   Let's go back and listen to -- and I suggest listen.

18   Listen.  We've got the videotapes of the floor speeches of

19   these individuals.  First of all, they all voted for it.

20   But leaving that aside, go back and listen to the floor

21   speeches.  We didn't bring many of them up here of the

22   members of the Black Caucus.  And the support for this

23   bill on the floor from the Black Caucus was unanimous

24   except for one member who was unhappy that it wasn't more

25   than 55 percent.

1      We don't need post hoc testimony.  We need realtime,

2   what was your position then.  And there's lots of

3   videotape of members talking about 55 percent being the

4   appropriate number.  That was at that time.  Maybe

5   people's memories have changed as to where 55 percent came

6   from, but the reality, at the time it came from the Black

7   Caucus.

8      In my opinion, there's no data supporting a notion

9   that a significant number of black voters were moved in

10   and out of any district with the exception possibly of 71.

11   The numbers moved in and out move at a random pattern.

12   Half the districts went up in black voting age population.

13   Half the districts went down.  If you look at Rodden's

14   report, he argues that it shows racial sorting in some

15   districts because blacks were put in and in some districts

16   because blacks were taken out.  These are all challenged

17   districts.  And in some districts because they were kept

18   the same.  It's, you know, damned if you do, damned if you

19   don't, damned if you don't do anything is what Rodden's

20   report talks about.

21      The reality, there is not -- look at the numbers.

22   Not percentages, not little dots moving back and forth,

23   but the actual numbers.  The numbers are relatively modest

24   in all the districts, really, with the exception of one,

25   and that's 71, Richmond.  The benchmark plan was

1    46 percent, approximately.  The incumbent member, who's

2    now a senator, was a particularly popular candidate.

3        I thought at the last trial that the plaintiffs had

4    taken the position that all the districts needed to be

5    above 50 percent.  I believe that's what they argued to

6    this Court in that trial.  The benchmark plan was 46.  I

7    heard arguments here and briefs arguing, And we don't need

8    more than that because Senator McClellan is such a

9    popular -- you know, Senator McClellan could win so that's

10   proof that the minority candidate -- the candidate of

11   choice in the minority community -- can win.

12       And the answer is the Voting Rights Act and

13   preclearance isn't about one candidate.  It's a question

14   of whether the minority community, through the next

15   decade, will be able to elect its candidate of choice.

16       Again, it's important to understand what the

17   obligation of the State is in this circumstance.  The

18   State has this kind of bizarre situation when it goes to

19   the Department of Justice to get preclearance.  To get

20   preclearance, they have to prove that the plan would not

21   regress in the ability of the minority community to elect

22   its preferred candidate of choice.  That's an affirmative

23   duty.

24       So if you listen to their expert, his criticism of 71

25   was it didn't move west, didn't take up The Fan area and

the museum area.  Of course, if the district had moved

that direction, it would have been dropped to probably

around 40 or 41 percent African-American black population.

All those numbers are already in the record as to what

happens if you pick up his precincts.

They ask us to discount the fact that there's a

delegate who has a family business -- actually, two family

businesses and grew up in 207.  Somehow or another you're

supposed to ignore that and think that the only thing that

matters is that they weren't good republican districts.

That strikes me as incredible.

But let's not look at whether their expert whose

experience in The Fan is walking through it as a tourist

is better than Jones or Delegate Loupassi.  Let's look at

the notion of what would happen if we did what they

suggest.  You get a 40 percent -- 41 percent black voting

age population in District 71.  We would then have to go

to the Department of Justice and ask them to preclear

that.  There will have been substantial -- what does the

Department of Justice do in preclearance?  Among other

things, they call up the black members of the legislature

and black community leaders.

Does anybody in this court believe we could have

gotten this plan precleared at 40 or 41 percent black

voting age population if the Black Caucus was saying we

1   needed 55?  That's nonsense.  Absolute nonsense.

2       We've got to have a chance to draw a plan.  The State

3   should not be put in a straightjacket by the Courts.  Give

4   them a chance to draw a plan.  He had a goal of

5   55 percent.  He didn't believe he actually reached it.

6   We're not going to relitigate which black voting age

7   numbers are the correct ones, but this was a legitimate

8   effort to comply and get a plan.  The compelling State

9   interest is to get preclearance at the Department of

10  Justice.  It doesn't have to do anything, in the end, with

11  anything other than that requirement.

12      I don't know how you would advise a legislative body

13  if this plan doesn't work.  Was it partisan to some

14  degree?  Of course.  But this is a plan that got a

15  majority of the republicans.  Not a surprise, they got all

16  the republicans.  But they got a significant majority of

17  the democratic votes, and they got all but one vote from

18  the Black Caucus.

19      If this process doesn't work, then what process will?

20  What number do we have to use?  What's the magic number we

21  need?  Their argument, effectively, is I've got to hire

22  somebody from Harvard or Stanford to come in and come up

23  with some magic number, which, of course, if I hired a

24  political scientist from somewhere else would have given

25  me another number as to what the number should be.  That's

```
 1   crazy.

 2        Let the legislature have, as the Supreme Court has

 3   said, the right to do its duty, to be involved in politics

 4   and make decisions, but you've got to give them

 5   flexibility.  You can't put them in a straightjacket.

 6   This was a good-faith effort to adopt a plan.  I don't

 7   think anybody has any doubts about that.  And simply, this

 8   was a status quo effort.  What was the predominant factor

 9   involved here?  After you get -- we all know what the

10   predominant factor was; get it passed and be legal and

11   have it not lose in court.

12        But if you're wanting to know the overall goal, it's

13   really pretty clear.  It's status quo.  That's the

14   predominant factor.  Not race.  Was race considered?  Yes.

15   Was there a goal?  Yes.  But that wasn't enough at the

16   Supreme Court to make this plan subject, or any of the

17   districts in it, subject to strict scrutiny.  Thank you,

18   Your Honors.

19             JUDGE PAYNE:  Thank you.

20        On behalf of the Court, I think I'd like to express

21   appreciation to all counsel for a fine job litigating the

22   case, litigating zealously and behaving professionally in

23   all respects and presenting good cases for both sides.

24        I think that it would be remiss not to express

25   appreciation to Ms. Marino, Ms. Tolbert and Greer Smith
```

1   for the fine work that they did to get the evidence put

2   together, given to us in a useful fashion when and as we

3   asked for it.  And we weren't always easy and consistent

4   in our requests, but we appreciate it very much.  And I

5   think the last time I said that the firms ought to give

6   all of you a raise, and I think you've earned it.  And we

7   thank you very much, the legal assistants, for their fine

8   work in enabling us to go forward.

9        We need to set a briefing schedule.  You've got a

10  transcript on a daily basis, do you?

11            MR. HAMILTON:  We do, Your Honor.

12            JUDGE PAYNE:  So sometime next week you'll have

13  the -- you'll have the complete transcript.

14            MR. HAMILTON:  I think sometime tomorrow we'll

15  have the complete transcript.

16            JUDGE PAYNE:  Tomorrow.  Okay.

17            MR. HAMILTON:  We've been getting them every

18  night at about midnight.

19            JUDGE PAYNE:  So when -- you have the first go.

20  You have the burden of proof.  When do you want to file

21  yours?

22            MR. HAMILTON:  Well, we -- first of all, two

23  questions.  One, the last time I think we did this, we did

24  simultaneous opening briefs and simultaneous reply briefs.

25  And I would submit that that might be appropriate here.

```
 1              JUDGE PAYNE:  I think it led to some confusion
 2   last time, some difficulty in figuring out where things
 3   were and left the Court in sort of an unusual position.
 4   Do you agree with that?
 5              JUDGE KEENAN:  That's fine.
 6       I want to mention one thing, if I could, after you're
 7   done.
 8              JUDGE PAYNE:  Yeah.  Sure.  Sure.  On the
 9   briefing?
10              JUDGE KEENAN:  Yeah.  About the content of the
11   briefing.
12              JUDGE PAYNE:  Oh, yeah.  So I think open,
13   response, reply.
14              MR. HAMILTON:  Two weeks from Monday, perhaps,
15   would be appropriate time for an opening brief.  And I'd
16   suggest two weeks after that for the -- for the opposition
17   and then maybe two weeks after that for the reply.
18              JUDGE PAYNE:  That Monday is the 16th.  So the
19   30th you would do your opening brief?  Did you ask the
20   people who have to do this?
21              MR. HAMILTON:  I'm sorry?
22              JUDGE PAYNE:  Did you ask the people who have to
23   do this?
24              MR. HAMILTON:  I actually did, and I have the
25   note to prove it.
```

```
 1              JUDGE PAYNE:  Two weeks from Monday is the 30th.

 2    Is that what you meant?

 3              MR. HAMILTON:  Yes, Your Honor.

 4              JUDGE PAYNE:  All right.  And then two weeks

 5    from that is November 13th.  Is that what you meant?  Is

 6    that what you all meant was two weeks or is that what you

 7    want is two weeks and is the date correct?

 8              MS. MCKNIGHT:  Yes, Your Honor.  That's fine.

 9    So we understand plaintiffs will file an opening brief on

10    October 30th.  Defendant-intervenors and defendants, if

11    they'd like, will file reply briefs on November 13th.

12              JUDGE PAYNE:  And then response -- response

13    briefs.  And then they get a right of reply.  And,

14    Mr. Hamilton, when did you want to file that?

15              MR. HAMILTON:  Maybe Wednesday, November 22nd

16    would be good.  That's a little less than two weeks after

17    the opposition brief, but is --

18              JUDGE PAYNE:  Thanksgiving is the 23rd.  Does

19    that make a difference to your schedule?

20              MR. HAMILTON:  To my schedule?

21              JUDGE PAYNE:  Or who -- to those who are going

22    to carrying the laboring oar.

23              MR. HAMILTON:  I'm kidding, Your Honor.  No.

24    Wednesday the 22nd, I think, is --

25              JUDGE PAYNE:  November 22nd.
```

```
 1              MR. HAMILTON:  And if we might, given the number

 2    of different districts involved, I would ask leave to file

 3    overlength briefs, maybe 40-page opening briefs and

 4    25-page reply.

 5              JUDGE PAYNE:  Is that -- given the need to do as

 6    the Supreme Court said, which is to consider it district

 7    by district and the difficulty in doing that, I don't have

 8    any problem with a brief of that length.  Do you?

 9    Anybody?

10              JUDGE KEENAN:  That's fine.

11              JUDGE PAYNE:  Does that suit you, 40 for their

12    opening, 40 for your response, 25 for their reply?

13              MS. MCKNIGHT:  Yes, Your Honor.  That's fine.

14              JUDGE PAYNE:  All right.  And I think Judge

15    Keenan has something she'd like to say about the content

16    of briefs.

17              JUDGE KEENAN:  Yes.  I'd like to ask the parties

18    to address the alternative prospect.  This is not intended

19    to signal anything at all.  But I just want to make sure

20    all the bases are covered; that if, for some reason, the

21    Court finds the plaintiff has met its proof burden as to

22    some but not all districts, what is the consequence for

23    the remedy?  Is this regional in nature as well?  For

24    example, if a burden of proof is found to have been met in

25    Richmond but not on the peninsula or in South Hampton
```

```
 1   Roads, what does that do?  If you'd consider the universe
 2   of alternative possibilities rather than the primary
 3   position that you're arguing, and include both of those
 4   for our frame of reference, I think it would be helpful.
 5            MR. HAMILTON:  Yes, Your Honor.
 6            JUDGE PAYNE:  Do you have anything you'd like to
 7   add to that?
 8            JUDGE ALLEN:  No.
 9            MS. MCKNIGHT:  Pardon me, Your Honor.  Just --
10            JUDGE PAYNE:  Yes, ma'am.
11            MR. RAILE:  I -- just to be clear, Your Honor,
12   are you talking about the remedy if it's actually struck
13   down?
14            JUDGE KEENAN:  Where is the Court left to go?
15            MR. RAILE:  Because the burden sort of flips.
16   But you mean the ultimate they win on a district?
17            JUDGE KEENAN:  No.  What I'm saying is take --
18   we'll call the district by a number that is not in this
19   case.  Let's say they win on District 10.  What happens to
20   the other districts?
21            JUDGE PAYNE:  If the only thing they win on is
22   District 10, what happens to the other?
23            JUDGE KEENAN:  Right.
24            MR. RAILE:  I understand.  Thank you.
25            JUDGE PAYNE:  If they win on more than those
```

1   two, what do they --

2             MS. MCKNIGHT:  Thank you.

3             JUDGE PAYNE:  I think -- is that right?

4             JUDGE KEENAN:  Yes.

5             JUDGE PAYNE:  Okay.  All right.  Again, thank

6   you very much.  The case is submitted, and we'll proceed.

7   We'll let you know, after the briefing, whether we require

8   oral argument on the briefs.  We'll be in adjournment.

9             (The trial concluded at 11:52 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(End of proceedings.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____/s/_____          _____
P. E. Peterson, RPR                      Date