# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |
| Plaintiffs, | |
| v. | |
| VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, | |
| Defendants. | |
| v. | |
| VIRGINIA HOUSE OF DELEGATES, Intervenor-Defendants, | |
| Defendants. | |

## PLAINTIFFS' POST-TRIAL BRIEF

137275235.6

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................ 1

II.  ARGUMENT ............................................................................................. 3

    A.   The Law of Racial Predominance, Clarified by the Supreme Court ..................... 3

    B.   An Overview of the Evidence of Racial Predominance ......................................... 4

        1.   Population Equality Goals Are Irrelevant to Predominance Analysis ................................................................................................... 5

        2.   The Fact that the General Assembly Used an Express Racial Target to Draw the Challenged Districts Is Undisputed ....................................... 6

        3.   The Enacted Plan Exhibits Stark Splits in the Racial Composition of Populations Moved Into and Out of the Challenged Districts .............. 7

        4.   VTD Splits Along Racial Lines Are Strong Evidence that Race Predominated ................................................................................................. 9

    C.   Race Outweighed Politics .................................................................................. 13

    D.   The Challenged Districts Are Not Narrowly Tailored ........................................ 15

        1.   Intervenors Cannot Establish a Compelling Interest .............................. 16

        2.   Intervenors' Predominant Use of Race Was Not Narrowly Tailored ...... 17

            a.   The 55% BVAP Rule Was Based on Concerns About District 75 and Was Not Tailored to Conditions in the Other Challenged Districts ........................................................... 17

            b.   Racial Polarized Voting Analyses Confirm that the 55% BVAP Rule Was Not Necessary to Elect Black-Preferred Candidates .............................................................................. 19

            c.   Intervenors' Belated Justifications for the 55% BVAP Rule Fall Short ......................................................................... 22

    E.   District-Specific Evidence Confirms that Race Predominated and the Challenged Districts Are Not Narrowly Tailored to a Compelling Government Interest ............................................................................................ 28

        1.   Richmond and Tri-City ........................................................................... 28

            a.   District 63 ...................................................................................... 28

            b.   District 71 ...................................................................................... 31

            c.   District 69 ...................................................................................... 33

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| | d. | District 70 | 35 |
| | e. | District 74 | 37 |
| 2. | | Tidewater/Hampton Roads | 39 |
| | a. | District 77 | 39 |
| | b. | District 80 | 40 |
| | c. | District 89 | 42 |
| | d. | District 90 | 44 |
| | e. | District 92 and 95 | 46 |
| F. | | The Scope of a Remedy | 48 |
| III. | | CONCLUSION | 50 |

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abrams v. Johnson,*
  521 U.S. 74 (1997) .......................................................................................48

*Ala. Legislative Black Caucus v. Alabama,*
  135 S. Ct. 1257 (2015) ............................................................................ passim

*Bethune-Hill v. Virginia State Bd. of Elections,*
  137 S. Ct. 788 (2017) .............................................................................. passim

*Bush v. Vera,*
  517 U.S. 952 (1996) ..........................................................................4, 12, 15, 16

*City of Richmond v. J.A. Croson Co.,*
  488 U.S. 469 (1989) ......................................................................................25

*Cooper v. Harris,*
  137 S. Ct. 1455 (2017) ............................................................................ passim

*Favors v. Cuomo,*
  No. 11-CV-5632 (RR)(GEL)(DLI)(RLM), 2012 WL 928223 (E.D.N.Y. Mar.
  19, 2012) .................................................................................................48

*Miller v. Johnson,*
  515 U.S. 900 (1995) ...............................................................................3, 16, 25

*Page v. Va. State Bd. of Elections (Page II),*
  No. 3:13CV678, 2015 WL 3604029 (E.D. Va. June 5, 2015) ............................1, 14

*Personhuballah v. Alcorn,* 155 F. Supp. 3d 552 (E.D. Va. 2016) .................................48

*Shaw v. Hunt (Shaw II),*
  517 U.S. 899 (1996) ..................................................................................4, 16

*Wilkins v. West,*
  264 Va. 447 (2002) ....................................................................................24, 38

*Wittman v. Personhuballah,*
  136 S. Ct. 1732 (2016) ..................................................................................1

# I.     INTRODUCTION

Given the lengthy procedural history of this case, it is worth remembering how it unfolded. In a gerrymandering case brought against Virginia's Third Congressional District, John Morgan, a redistricting consultant, testified that the General Assembly "enacted 'a House of Delegates redistricting plan with a 55% Black [Voting Age Population] as the floor for black-majority districts,'" and that it "acted in accordance with that view" when adopting its congressional plan. *Page v. Va. State Bd. of Elections* (*Page II*), No. 3:13CV678, 2015 WL 3604029, at *9 (E.D. Va. June 5, 2015) (quoting Morgan's report), *appeal dismissed sub nom. Wittman v. Personhuballah*, 136 S. Ct. 1732 (2016). Based in part on Morgan's testimony about the General Assembly's application of a fixed racial threshold, the *Page II* court ultimately declared the Third Congressional District unconstitutional. Meanwhile, having learned that the same 55% BVAP floor was used to draw the Challenged Districts, Plaintiffs filed this lawsuit.

Surprisingly, much of the first trial in this case was consumed by Intervenors' argument that there was no 55% BVAP floor. In an equally misguided argument, Intervenors asserted that race could not predominate unless Plaintiffs established an "actual conflict" between the General Assembly's racial goals, on one hand, and traditional redistricting principles, on the other hand.

On appeal, the Supreme Court rejected both arguments. Intervenors therefore stood at a decided disadvantage on remand. The law of the case already provided strong evidence of racial predominance in both the existence and the application of a fixed racial floor in structuring 12 districts (the Challenged Districts and District ("District") 75). After all, when a legislature announces a "racial target that subordinated other districting criteria and produce[s] boundaries amplifying divisions between blacks and whites," a court "could hardly . . . conclude[] anything but" that "race predominated." *Cooper v. Harris*, 137 S. Ct. 1455, 1468-69 (2017) (considering district drawn to meet "racial target" that "African–Americans should make up no less than a

majority of the voting-age population"). Equally worrisome for Intervenors, both this Court and the Supreme Court had recognized that the 55% BVAP rule was based on concerns about one district (District 75), and then "'applied across the board to all twelve' districts," *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 796 (2017) (quoting Dkt. No. 108 at 30). Thus, it was difficult to see how Intervenors could even argue that the 55% BVAP rule was narrowly tailored to local conditions in the other Challenged Districts.

Unsurprisingly, Plaintiffs were prepared to have their claims resolved through briefing on remand. Intervenors sought another round of discovery to rehabilitate their case, a request this Court granted. That strategy failed. At trial, Intervenors offered no new evidence suggesting that race did not predominate. Nor did Intervenors offer any new evidence that the General Assembly had a strong basis in evidence to believe that each Challenged District had to meet or exceed 55% BVAP to avoid retrogression, as required to meet their burden on strict scrutiny. Instead, they offered a shorter version of Delegate Jones' prior testimony, Morgan's testimony that he sought primarily to achieve population equality when drawing the map, testimony from delegates representing non-challenged districts who had no insight as to the racial considerations that went into drawing the Challenged Districts, and cursory testimony from the same experts who testified before.

For their part, Plaintiffs took advantage of the opportunity to bolster the existing record. Through direct testimony and expert analysis, Plaintiffs showed once again that the 55% BVAP rule not only existed (a point Intervenors now concede), but that it had a direct and significant impact on the boundaries of the Challenged Districts. Plaintiffs also thoroughly undermined Intervenors' principal narrow tailoring theory. According to that theory, the 55% BVAP rule originated with members of the Black Caucus, who urged Delegate Jones to apply it across the

board to all of the Challenged Districts. But Plaintiffs presented testimony from several members of the Black Caucus, each of whom soundly rejected that version of events. Notably, not a single member of the Black Caucus testified in support of Intervenors' version of events.

Ultimately, despite the voluminous record, this is a simple case. The General Assembly declared that race was the most important factor when it drew the Challenged Districts. It then sorted a substantial number of voters in and out of the Challenged Districts, based on their race, and failed to tailor its admitted use of race in favor of a one-size-fits-all approach. This Court should invalidate the Challenged Districts and order an immediate and effective remedy.

## II.     ARGUMENT

### A.     The Law of Racial Predominance, Clarified by the Supreme Court

The law of racial predominance is well-established. "[A] plaintiff alleging racial gerrymandering bears the burden 'to show . . . that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Bethune-Hill*, 137 S. Ct. at 797 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). If the plaintiff does so, the burden then shifts to the defendant to satisfy strict scrutiny by showing that the use of race was narrowly tailored to achieve a compelling government interest. *See Miller*, 515 U.S. at 920.

A plaintiff "may show predominance 'either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose.'" *Bethune-Hill*, 137 S. Ct. at 798 (quoting *Miller*, 515 U.S. at 916). "To satisfy this burden, the plaintiff 'must prove that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations.'" *Id.* at 797 (quoting *Miller*, 515 U.S. at 916).

"The ultimate object of the inquiry . . . is the legislature's predominant motive for the design of the district as a whole." *Id.* at 800. As a result, "[c]oncentrating on particular portions

- 3 -

in isolation may obscure the significance of relevant districtwide evidence, such as stark splits in the racial composition of populations moved into and out of disparate parts of the district, or the use of an express racial target." *Id.* at 799. Thus, the racial predominance inquiry requires "a holistic analysis of each district" where "any explanation for a particular portion of the lines . . . must take account of the districtwide context." *Id.* at 799, 800. Race predominates "if '[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Id.* (quoting *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 907 (1996)).

Importantly, "[t]he racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Id.* at 799. Thus, race may predominate even if, in hindsight, a district adheres to traditional districting principles, or even if such principles were considered at the time of redistricting.[1]

## B.    An Overview of the Evidence of Racial Predominance

At the first trial, Intervenors pushed the Court to accept a predominance analysis that focused myopically on "deviations" from traditional redistricting principles. On appeal, the Supreme Court held that Intervenors' legal position was erroneous, as it "foreclosed a holistic analysis of each district and led the District Court to give insufficient weight to the 55% BVAP target and other relevant evidence that race predominated." *Bethune-Hill*, 137 S. Ct. at 799.

On remand, Intervenors respond by once again urging the Court to adopt an analysis that is at odds with the Supreme Court's racial gerrymandering jurisprudence. Intervenors

---

[1] *See Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1263 (2015) (legislature "sought to achieve numerous traditional districting objectives" but "placed yet greater importance" on avoiding retrogression); *Shaw II*, 517 U.S. at 907 ("That the legislature addressed [other] interests does not . . . refute the fact that race was the legislature's predominant consideration."); *Bush v. Vera*, 517 U.S. 952, 963 (1996) (same, even though "[s]everal factors other than race were at work in the drawing of the districts").

- 4 -

(incorrectly) argue that race could not predominate because (a) various redistricting decisions were driven by population equality concerns and (b) an examination of the racial sorting patterns manifested by split voting tabulation districts ("VTDs") is not significant to the analysis because it impacts too few people. Both of these propositions are simply wrong. Under the proper legal standard, the record clearly establishes that race predominated in each Challenged District.

### 1.    Population Equality Goals Are Irrelevant to Predominance Analysis

Intervenors argue that the predominant factor motivating the Challenged Districts was the need to achieve population equality. *See, e.g.*, Tr. 21:10-15 (Braden) ("[V]irtually, without exception, every split VTD is done to equalize population pursuant to the criteria. It shows an incredible, profound misunderstanding of the process for people to use that, then, as the basis to show predominance."). This argument fails as a matter of law. Even if the mapdrawers prioritized population equality above all else, this is irrelevant to the predominance inquiry.

In *Alabama*, the district court held that race did not predominate in part because the legislature "placed in the balance, among other nonracial factors, legislative efforts to create districts of approximately equal population." 135 S. Ct. at 1270. The Supreme Court rejected that holding in no uncertain terms:

> [A]n equal population goal is not one factor among others to be weighed against the use of race to determine whether race "predominates." Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met.

*Id.* The Court went on to note that although "equal population objectives . . . may often prove 'predominant' in the ordinary sense of that word," "'predominance' in the context of a racial gerrymandering claim is special." *Id.* at 1270-71.

> It is not about whether a legislature believes that the need for equal population takes ultimate priority. Rather, it is, as we said, whether the legislature "placed" race "above traditional districting considerations in

- 5 -

> determining *which* persons were placed *in appropriately apportioned districts*." In other words, if the legislature must place 1,000 or so additional voters in a particular district in order to achieve an equal population goal, the "predominance" question concerns *which* voters the legislature decides to choose, and specifically whether the legislature predominantly uses race as opposed to other, "traditional" factors when doing so.

*Id.* at 1271 (citation omitted). "Consequently," the Court held, population equality "is not a factor to be treated like other nonracial factors when a court determines whether race predominated over other, 'traditional' factors in the drawing of district boundaries." *Id.*

Here, the Virginia General Assembly adopted a requirement that all House of Delegates ("House") districts needed to be within 1% of the ideal population. Pls.' Ex. 16 at 1. The fact that districts were drawn to comport with that background requirement is taken as a given. As a result, population equality is simply not a rebuttal to Plaintiffs' abundant evidence that race was the predominant factor in the drawing of the Challenged Districts. The only relevant inquiry is *which* voters the General Assembly moved or retained to achieve population equality requirements. And, here, the record reflects overwhelming and unrebutted evidence that the mapdrawers' decision on which populations to move or retain in the Challenged Districts was based on race.

## 2.  The Fact that the General Assembly Used an Express Racial Target to Draw the Challenged Districts Is Undisputed

It is a settled fact that the General Assembly adopted an across-the-board 55% BVAP rule and applied it indiscriminately to District 75 and the Challenged Districts. As the Supreme Court put it: "It is undisputed that the boundary lines for the 12 districts at issue were drawn with a goal of ensuring that each district would have a [BVAP] of at least 55%." *Bethune-Hill*, 137 S. Ct. at 794; *see also id.* at 795 ("[T]he 55% BVAP figure *was used in structuring the districts*.") (quoting Dkt. No. 108 at 22) (emphasis added). After years of litigation, Intervenors finally conceded the point in the pretrial conference before the second trial. *See* Pretrial Conference Tr.

- 6 -

33:5-13 (9/29/2017) (Intervenor counsel, stating that "[w]e believe that [the finding of fact] on how the 55 percent figure was used . . . is a finding of fact that still applies").[2] This Court made clear that there was no need to relitigate either the existence of the 55% BVAP floor or the fact that it was applied to all Challenged Districts. Tr. 120:5-12 (Payne, J.).[3] Thus, the 2017 trial was premised on the "use of an express racial target" in drawing the Challenged Districts. *Bethune-Hill*, 137 S. Ct. at 800.

But to be clear, the fact that the General Assembly used a mechanical racial target is not less significant merely because it is no longer disputed: The admitted use of an inflexible racial threshold weighs strongly in favor of a finding of racial predominance. Indeed, as the Supreme Court has explained, when a legislature announces a "racial target that subordinated other districting criteria and produce[s] boundaries amplifying divisions between blacks and whites," a court "could hardly . . . conclude[] anything but" that "race predominated." *Cooper*, 137 S. Ct. at 1469; *see also Alabama*, 135 S. Ct. at 1267 ("That Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria . . . provides evidence that race motivated the drawing of particular lines in multiple districts in the State.").

### 3.   The Enacted Plan Exhibits Stark Splits in the Racial Composition of Populations Moved Into and Out of the Challenged Districts

At trial, Intervenors admonished the Court that redistricting is complicated, and repeatedly noted that while drawing one district is easy, drawing a map is hard. *See, e.g.*, Tr.

---

[2] Prior to the pretrial conference, Intervenors had repeatedly and explicitly refused to stipulate to the existence and use of the 55% BVAP floor. When preparing a joint stipulation of factual findings that remained in effect, Intervenors refused to stipulate to the Court's prior findings regarding the existence and use of the 55% BVAP floor, which is why the parties' submission omits such findings. *See generally* Dkt. No. 175. Intervenors then denied three Requests for Admission that they "utilized a 55% Black Voting Age Population threshold in drawing all or some of the Challenged Districts in the 2011 Virginia House of Delegates Plan." Dkt. No. 220-1, at 10-11. Only when the Court pressed the point at the pretrial conference did Intervenors finally and definitively concede the point. Their reluctance to do so—from the first trial until the eve of the second trial—is understandable given how much this factual finding undermines their defense.

[3] Citations to the transcript of the second trial are set out as "Tr." Citations to the first trial are to "1st Trial Tr."

- 7 -

18:5-24, 994:6-8 (Braden). There is no better illustration of that principle than the lengths the General Assembly had to go to in order to meet its preordained racial target in each Challenged District. The impact of the 55% BVAP floor is revealed in the racial composition of the populations included and excluded in the Challenged Districts. Plaintiffs' expert testimony illustrated a consisted pattern of racial sorting, in which black voters were drawn into—and white voters were drawn out of—the Challenged Districts.

First, Dr. Maxwell Palmer analyzed the racial composition of political subdivisions split between Challenged and non-challenged districts. At every level—cities, towns, unincorporated places, VTDs, and even a military base—there is a consistent pattern of division by race. Tr. 392:11-24 (Palmer); Pls.' Ex. 71 ¶¶ 144-45. Respect for political subdivision boundaries is a traditional districting principle, and deviations from this principle evinces racial predominance. *See, e.g.*, *Cooper*, 137 S. Ct. at 1469. But that evidence is all the more striking where political subdivisions are split—with near uniformity—along racial lines, such that higher BVAP populations are drawn into Challenged Districts and lower BVAP populations are drawn into non-challenged districts. *See* Pls.' Ex. 71, tbls. 3-6, 8-15. Indeed, this pattern is apparent even in large cities that had to be divided for population equality purposes. "There is not a single case of a city split where a non-challenged district gets a higher BVAP area of a city than a [C]hallenged [D]istrict." *Id.* ¶ 72.

Second, Dr. Palmer analyzed the aggregate racial effects of population movements between Challenged and non-challenged districts. *See id.* at pp. 16-20. His analysis revealed that across all but one of the 16 non-challenged districts that sent population to Challenged Districts, black voters were moved into the Challenged Districts "at a higher rate than the population as a whole, at a higher rate than white voters . . ., and at a higher rate than Democratic voters." Tr.

- 8 -

395:1-7 (Palmer); Pls.' Ex. 71 ¶ 100, tbl. 18. Populations moved out of the Challenged Districts, meanwhile, reflect a starkly different pattern: for each of the 11 Challenged Districts that transferred population to non-challenged districts, black voters were moved out at a lower rate than the population as a whole, white voters, and Democrats. Tr. 395:8-17 (Palmer); Pls.' Ex. 71 ¶ 104, tbl. 19. The net effect of these population swaps was to draw and retain black voters in the Challenged Districts while drawing and retaining white voters in non-challenged districts.[4]

The consequences of this pattern of racial sorting are stark indeed. For example, as Dr. Jonathan Rodden testified, "[i]n the entire region covering Richmond and the Tri-City area, there is not a single VTD with a black voting-age majority that is left out of one of *the [C]hallenged [D]istricts*." Pls.' Ex. 69 at 41. Similarly, "[i]n the entire Virginia Peninsula," the Enacted Plan "pulled the vast majority of VTDs with African American majorities into District 92 or 95." *Id.* at 50.[5]

In short, tens of thousands of people were swapped in and out of districts—or kept where they were—because of their race. This is precisely the evidence of "stark splits in the racial composition of populations moved into and out of disparate parts of the district" that the Supreme Court remanded for consideration as "relevant districtwide evidence" of racial predominance requiring "proper weight" in the analysis. *Bethune-Hill*, 137 S. Ct. at 800.

### 4.      VTD Splits Along Racial Lines Are Strong Evidence that Race Predominated

The predominant use of race comes into even sharper focus when examining the way in which the General Assembly split VTDs. Plaintiffs have presented unrebutted evidence of a

---

[4] None of Intervenors' experts even responded to, let alone disputed, Dr. Palmer's analysis of the racial disparities among the populations included in and excluded from the Challenged Districts. *See* Tr. 801:11-14 (Katz), 855:22-25 (Hood).
[5] Intervenors went to great pains to point out wherever pockets of black voters were not included in a Challenged District. *See, e.g.*, Tr. 331:1-339:22 (Rodden). It is telling they could find so few examples. In any case, the mapdrawers' failure to capture *every* last black voter is hardly rebuttal evidence against racial predominance. A plaintiff need not show that a State adopted a policy of total racial segregation to prove that race predominated.

near-uniform pattern of VTDs being split so that high-BVAP areas were placed in Challenged Districts and low-BVAP areas were placed in surrounding non-challenged districts. *See, e.g.*, Pls.' Ex. 71, tbls. 3-6.

There is no dispute that, as shown by Dr. Palmer's analysis, there are 32 VTDs split so as to distribute population between a majority-BVAP district (including District 75) and another district—and 31 of the 32 VTDs were split to assign a higher BVAP to the majority-BVAP district. Tr. 372:23-373:8, 374:9-25 (Palmer); *see also* Pls.' Ex. 71 ¶ 14. The BVAP assigned to the majority-BVAP district is, on average, *24 percentage points* higher than that assigned to non-challenged districts. Tr. 374:17-25 (Palmer); *see also* Pls.' Ex. 71 ¶ 14. Excluding District 75, 23 out of 24 VTDs split between Challenged and non-challenged districts (96%) exhibit this pattern of division by race. Tr. 455:14-456:7 (Palmer); *see also* Pls.' Ex. 71, tbls. 3-6. In short, the same pattern of division along racial lines apparent in District 75 is evident in the Challenged Districts as well. Tr. 456:13-18 (Palmer).

Dr. Palmer further identified seven VTDs split between two Challenged Districts—all of which directly enabled satisfaction of the 55% BVAP floor. In the four VTDs split between Districts 63 and 75, the higher BVAP portion consistently was assigned to the latter. Pls.' Ex. 71, tbl. 7. Eliminating those splits would have dropped District 75's BVAP to 54.7%. *Id.* ¶ 60. This same pattern is observed in the three remaining VTDs split between Challenged Districts. VTD 703 was entirely within District 70 under the benchmark plan but split between Districts 70 and 71 in the Enacted Plan. Returning this high-BVAP (89.9%) precinct to District 70 would have dropped District 71's BVAP to 54.9%. *Id.* ¶ 63. Similarly, returning the entirety of the Brambleton VTD (96% BVAP) to District 90, as it was under the benchmark plan, would result in a District 89 BVAP of 54.7%. *Id.* ¶ 64. Predominantly-white VTD 505 (15% BVAP),

meanwhile, was divided between Districts 69 and 71. Were it allocated entirely to either Challenged District, that district would have had too many white voters to satisfy the 55% BVAP floor. *Id.* ¶ 62. As a result, white voters had to be carefully spread across these two Challenged Districts to ensure neither of them fell below the 55% racial threshold that governed them both. *Id.*; Tr. 389:14-24 (Palmer).

Dr. Rodden's testimony, and his dot density maps (a selection of which are gathered in Appendix A), bring those numbers to life. He showed descriptively what Dr. Palmer showed mathematically—the 55% BVAP rule "required a careful, region-wide strategy for the distribution of African Americans across districts, as well as a laser-sharp focus on race in the selection of each VTD and census block." Pls.' Ex. 69 at 69; *see also id.* at 71 ("[I]n many areas, the goal of either including African Americans or excluding whites required the Legislature to cross rivers, bisect county boundaries, and split VTDs in order to achieve its racial targets.").

Unable to dispute the descriptive fact that VTDs were split on racial lines, Intervenors take the creative tack of arguing that all John Morgan set out to do was equalize population and it is mere happenstance that he time and again split VTDs along racial lines. As set forth above, a population equality goal is no answer to the consistent pattern of VTD splits along racial lines. *See supra* Section II.B.1. Moreover, the notion that Morgan "accidentally" divided VTDs along racial lines in almost every VTD split involving the Challenged Districts strains credulity, particularly given the undisputed fact that the 55% BVAP floor "'was used in structuring the districts,'" *Bethune-Hill*, 137 S. Ct. at 795 (quoting Dkt. No. 108 at 22), and the extent to which VTD splits often determined whether a given Challenged District would or could satisfy that 55% BVAP floor.

Intervenors went further, arguing not only that the stark pattern of racial splits is

- 11 -

coincidental, but that "[t]his whole VDT [sic] analysis is silly. It's too few people to be the predominant part of it." Tr. 21:23-24; *see also* Tr. 990:21-24 (Braden). This argument is misguided as a matter of fact and law.

First, and perhaps most importantly, it ignores clear Supreme Court precedent. More than twenty years ago, a plurality of the Supreme Court found that because "the districting software used by the State [of Texas] provided only racial data at the block-by-block level, the fact that [a district] . . . splits voter tabulation districts and even individual streets in many places suggests that racial criteria predominated over other districting criteria in determining the district's boundaries." *Bush*, 517 U.S. at 970-71 (citation omitted); *see id.* at 975 (discussing another district where "[t]he district lines correlate almost perfectly with race" and "the intricacy of the lines drawn, separating Hispanic voters from African–American voters on a block-by-block basis, betrays the critical impact of the block-by-block racial data available on the [state's redistricting software] program."). Just three years ago, the Supreme Court reaffirmed that the division of precincts provided "considerable evidence" that a legislature's goal of achieving a predetermined racial percentage "had a direct and significant impact on the drawing of at least some of [the district's] boundaries." *Alabama*, 135 S. Ct. at 1271 (noting that "drafters split seven precincts" between a majority-black and majority-white district, "with the population in those precincts clearly divided on racial lines"). Indeed, the race-based division of populations at the outermost boundaries of the Challenged Districts echoes the Supreme Court's most recent racial gerrymandering ruling. *See Cooper*, 137 S. Ct. at 1469 (affirming racial predominance finding where evidence "show[ed] an announced racial target that subordinated other districting criteria and produced boundaries amplifying divisions between blacks and whites").

The argument is also misguided as a matter of fact. Contrary to Intervenors' claims,

splitting VTDs on racial lines affected a substantial number of people. More than 154,000 people reside in VTDs that were split on racial lines between Challenged and non-challenged districts. *Compare* Pls.' Ex. 71, tbls. 3-6, *with Bethune-Hill*, 137 S. Ct. at 797 (plaintiffs must establish that "'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district'") (quoting *Miller*, 515 U.S. at 916). This is compelling evidence of racial predominance.

## C.      Race Outweighed Politics

States subject to racial gerrymandering claims often argue that their decisions were motivated mainly by politics, not race. Not so here.

During the redistricting process Delegate Jones and his allies *denied* that partisan politics played a substantial role. *See* Pls.' Ex. 17 at 1; *see also* Pls.' Ex. 44 at 12-13 (preclearance statement, stating that "partisan factors" were "muted" in the Enacted Plan, and that changes to partisan performance were "marginal in a majority of districts"). Delegate Jones testified that unseating Democrats "wasn't a goal." 1st Trial Tr. 483:1-2 (Jones). And Intervenors' expert testified that the Enacted Plan "did not . . . seek to pack Democratic voters" in the Challenged Districts. DI Ex. 15 at 16.

Statistical evidence confirms that politics played, at best, a minor role. *See generally* Pls.' Ex. 71 ¶¶ 107-125, tbl. 20. Dr. Palmer has shown that race, not politics, is the best predictor of which voters were sorted into and out of the Challenged Districts. *See* Pls.' Ex. 71 ¶ 120. While Dr. Katz found otherwise in his 2015 analysis, Dr. Palmer identifies two key flaws in Dr. Jonathan Katz's race-versus-party model. First, Dr. Katz failed to weight VTDs by population "to reflect that larger VTDs with more people have a larger effect on the result than smaller VTDs with fewer people," Tr. 396:19-24 (Palmer), leading to absurd results. Tr. 825:8-12 (Katz); *see also* Pls.' Ex. 71 ¶ 119. Second, Dr. Katz's 12-pronged approach to measuring

- 13 -

distance in his 2015 model creates inconsistent results. *See* Pls.' Ex. 71 ¶ 121, tbl. 21; Tr. 407:9-10 (Palmer); *see also* Pls.' Ex. 70 at 8 n.1. Correcting either of these flaws demonstrates that race predominates over party in predicting the inclusion of VTDs in the Challenged Districts under the Enacted Plan. Pls.' Ex. 71, tbl. 20.

Notably, Dr. Katz offers very little to rebut Dr. Palmer's analysis. On the contrary, Dr. Katz provides the Court four different approaches to measuring distance, *all* of which lead to the inexorable conclusion that race predominated over party. *See* DI Ex. 101 at 11; Tr. 828:8-21 (Katz).

Intervenors have, however, argued that political considerations played a role in a handful of Delegate Jones' line-drawing decisions. "It would be remarkable if they did not." *Page II*, 2015 WL 3604029, at *13. But the mere fact that political considerations helped shape a few zigs or zags does not mean that politics "predominated." The predominance inquiry assumes there are mixed motives, and "the fact '[t]hat the legislature addressed these [partisan] interests [need] not in any way refute the fact that race was the legislature's predominant consideration.'" *Id.* (quoting *Shaw II*, 517 U.S. at 907). Intervenors cannot escape a finding of racial predominance by showing that a few decisions were also informed by political concerns.

Moreover, even assuming that some Challenged Districts were drawn to achieve political *goals*, race was the *means* by which those goals were met. District 95 illustrates the point. According to Morgan, District 95 was redrawn to make neighboring District 93 less Democratic by transferring Democratic voters from District 93 to District 95. Even if that is true, Morgan achieved that political goal by sorting voters according to race. District 95 now snakes up the Peninsula, splitting four consecutive VTDs along racial lines. *See* Tr. 757:6-758:19 (Morgan); *compare* Tr. 757:20-760:6 (Morgan), *with* Pls.' Ex. 87 at 21, Pls.' Ex. 70 at 47-49. Morgan could

- 14 -

not have split those VTDs based on political data because political data is not available below the VTD level. *See* Tr. 208:6-212:10, 223:24-224:10 (Rodden); Tr. 389:25-391:22 (Palmer); Tr. 832:3-14 (Katz); Tr. 942:7-944:19 (Hofeller).

But Morgan *did* have racial data below the VTD level. Thus, if this Court takes Morgan at his word when he says that his intent in redrawing District 95 was to increase its Democratic vote share at the expense of District 93, then it must conclude that Morgan relied on race as a proxy for politics when he reconfigured District 95 (i.e., he assumed that black voters vote for Democrats and drew the lines accordingly). Indeed, Intervenors' expert Dr. Katz has testified as much. *See* DI Ex. 101 at 11 (Dr. Katz refuting Dr. Palmer's "assumption that Census blocks do not contain political information" as "absolutely incorrect" because "indirect" political information can be derived from "race data," which is "very highly correlated with party identification"). Thus, to the extent that political goals were *a* factor in drawing any given district, the record reveals that the General Assembly met political goals through racial means—a use of race as a proxy that triggers strict scrutiny.[6]

### D.    The Challenged Districts Are Not Narrowly Tailored

Once a plaintiff establishes racial predominance, "the burden shifts to the State to 'demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.'" *Bethune-Hill*, 137 S. Ct. at 800-01 (quoting *Miller*, 515 U.S. at 920). Courts "assume[] . . . that the State's interest in complying with the [Voting Rights Act is] compelling." *Id.* at 801. To satisfy strict scrutiny, a State must establish "a strong basis in evidence in support of the (race-based) choice that it has made," *Alabama*, 135 S. Ct. at 1274 (quotation marks omitted), which

---

[6] *See Cooper*, 137 S. Ct. at 1473 n.7 ("[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics."); *Bush*, 517 U.S. at 968 (addressing software where racial data was available below the precinct level, unlike political data: "[T]o the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation").

- 15 -

"exists when the legislature has "'*good reasons* to believe'" its race-based decision is required by the Voting Rights Act ("VRA"), "'even if a court does not find that the actions were necessary for statutory compliance.'" *Bethune-Hill*, 137 S. Ct. at 801 (quoting *Alabama*, 135 S. Ct. at 1274).

While a State thus is given some latitude in complying with the VRA, it must conduct a "meaningful legislative inquiry" to determine whether drawing a given district "without a focus on race but however else the State would choose, could lead to [VRA] liability." *Cooper*, 137 S. Ct. at 1471. The fact that courts do not demand mathematical exactitude does not mean that legislatures may use race indiscriminately and without adequate factual support. In the context of redistricting, "[s]trict scrutiny remains . . . strict." *Bush*, 517 U.S. at 978.

### 1.    Intervenors Cannot Establish a Compelling Interest

Here, Intervenors argue that the application of the 55% BVAP floor to all Challenged Districts was necessary because the Commonwealth feared that the Department of Justice might not preclear the Enacted Plan under Section 5 of the VRA otherwise. Tr. 998:8-11 (Braden).

But while the Supreme Court has assumed that *actual compliance* with the VRA constitutes a compelling interest, *see, e.g.*, *Cooper*, 137 S. Ct. at 1469, Virginia had no compelling interest in obtaining preclearance. The Supreme Court has "rejected the contention that complying with the Justice Department's preclearance objection could be a compelling interest." *Shaw II*, 517 U.S. at 908 n.4.; *see also Miller*, 515 U.S. at 921 ("It is . . . safe to say that the congressional plan enacted in the end was required in order to obtain preclearance. It does not follow, however, that the plan was required by the substantive provisions of the [VRA].").

While "a State may have a compelling interest in complying with the properly interpreted Voting Rights Act," it "has no such interest in avoiding meritless lawsuits." *Shaw II*, 517 U.S. at 908 n.4. Intervenors thus cannot meet their burden on strict scrutiny by asserting that the General

- 16 -

Assembly hoped to obtain preclearance. To the contrary, Intervenors must establish that Virginia had, at the time of redistricting, a strong basis in evidence to conclude that *all* Challenged Districts would violate Section 5 unless they were drawn with race as the predominant factor.

### 2.  Intervenors' Predominant Use of Race Was Not Narrowly Tailored

Even assuming Intervenors could meet their burden of establishing a compelling interest, they could not show that their use of a rigid racial threshold was narrowly tailored to achieve that interest in all the Challenged Districts.

### a.  The 55% BVAP Rule Was Based on Concerns About District 75 and Was Not Tailored to Conditions in the Other Challenged Districts

At the time of redistricting, Section 5 "barred Virginia from adopting any districting change that would 'have the effect of diminishing the ability of [members of a minority group] to elect their preferred candidates of choice.'" *Bethune-Hill*, 137 S. Ct. at 801 (quoting 52 U.S.C. § 10304(b)). Determining what BVAP percentage will satisfy that standard requires a "functional analysis of the electoral behavior within the particular . . . election district." Pls.' Ex. 9 at 3.

It is law of the case that the 55% BVAP rule was not based on an evaluation of local conditions in each of the Challenged Districts. Instead, it was "'based largely on concerns pertaining to the re-election of Delegate [Roslyn] Tyler in [District] 75.'" *Bethune-Hill*, 137 S. Ct. at 796 (quoting Dkt. 108 at 29-30); *see also* Dkt. 108 at 121. It "'was then applied across the board to all twelve' districts," *Bethune-Hill*, 137 S. Ct. at 796 (quoting Dkt. No. 108 at 30), even though they varied dramatically in terms of geography, demographics, and electoral history.

The Supreme Court's opinion sets out those District 75-specific considerations. As summarized by the Supreme Court, Delegate Jones recalled past election results in the district, spoke to Delegate Tyler around half a dozen times, and considered the impact of District 75's large prison population. *See id.* at 801; *see also* Tr. 565:10-566:2 (Jones). Thus, as affirmed by

- 17 -

the Supreme Court, Delegate Jones conducted a sufficiently meaningful legislative inquiry into what was needed to avoid retrogression in District 75, and concluded that 55% BVAP was required.

To his credit, Delegate Jones has testified truthfully that he did *not* conduct a similar analysis of the other Challenged Districts. Rather, he took a shortcut. He effectively assumed that what was necessary for one majority-minority district must be necessary for all. *See* Tr. 566:14-567:22, 569:16-570:14 (Jones). But that assumption has no basis in fact. District 75 is dramatically different from the other Challenged Districts. It has by far the lowest estimated level of white support for black-preferred candidates (16%) among the 12 original Challenged Districts. *See* Tr. 421:14-24 (Palmer).[7] Black-preferred candidates had consistently won by supermajorities of at least 60% in the other Challenged Districts under the benchmark map. *See* Pls.' Ex. 71, tbl. 22; Tr. 423:24-425:9 (Palmer). And District 75 is the only district that would be in danger of *not* electing the black-preferred candidate if its added population consisted entirely of whites who unanimously voted against black-preferred candidates. Pls.' Ex. 71, tbl. 24.

Not only did Delegate Jones fail to compare District 75 to other Challenged Districts, he failed to conduct *any* meaningful inquiry into whether a 55% BVAP floor was necessary to avoid retrogression in Challenged Districts outside District 75. He did not, for example:

- Compile election results from the Challenged Districts, *see* 1st Tr. 453:19-22 (Jones);
- Analyze black registration rates in the Challenged Districts, *see id.* 463:22-464:6 (Jones);
- Analyze black turnout rates in the Challenged Districts (with the exception of looking at one or two elections in "two or three" districts), *id.* 467:16-19 (Jones);
- Review the majority-minority Senate districts enacted at the same time as the Challenged Districts, all of which had less than 55% BVAP, *see id.* 468:10-21 (Jones);
- Analyze "voter behavior and BVAP in prior . . . Congressional districts," *id.* 468:22-25 (Jones);

---

[7] The remaining Challenged Districts, by contrast, have average levels of white support for black-preferred candidates ranging from as low as 27% to as high as 70%, *see id.*; Pls.' Ex. 71, tbl. 23, fig. 22.

- 18 -

- Review redistricting plans from other jurisdictions that had been precleared by the Department of Justice, *see id.* 469:1-4 (Jones);

- Review redistricting plans from other jurisdictions that had been rejected by the Department of Justice, *see id.* 469:10-12 (Jones); or

- Perform a racially polarized voting analysis to determine whether white voters and black voters tended to vote cohesively in the Challenged Districts as a whole or within individual Challenged Districts, *see id.* 469:16-21 (Jones); *see also* Tr. 570:8-10 (Katz).

In sum, the 55% BVAP rule was, at best, tailored to achieve a compelling interest in District 75. That ends the narrow tailoring inquiry. A rigid racial threshold developed to address unique conditions in a unique district is, by definition, *not* narrowly tailored to address different conditions in different districts. And even if each of the other Challenged Districts *did* require 55% BVAP to avoid retrogression (they did not), that would not change the outcome. Delegate Jones admits that he did not even try to learn whether a 55% BVAP floor was necessary in any district outside of District 75. Thus, he could not have had a "strong basis in evidence" to believe that the 55% BVAP floor was necessary in any district outside of District 75.

> **b.    Racial Polarized Voting Analyses Confirm that the 55% BVAP Rule Was Not Necessary to Elect Black-Preferred Candidates**

The evidence at trial demonstrated that there was no VRA justification for an across-the-board 55% BVAP rule. In the first trial, Plaintiffs offered Dr. Stephen Ansolabehere's analysis of racial voting patterns in the Challenged Districts of the type Delegate Jones eschewed. This analysis demonstrated that (1) racial voting patterns vary dramatically across the Challenged Districts, thereby undermining the mapdrawers' one-size-fits-all approach, *see* Pls.' Ex. 50 at 47-51, and (2) "none" of the Challenged Districts "required a BVAP in excess of 55 percent in order to ensure that African Americans had the ability to elect their preferred candidates," *id.* at 53-54.

Dr. Palmer elaborated on this analysis in several ways. After the 2015 trial, a majority of this Court rejected Dr. Ansolabehere's racially polarized voting analysis on two grounds, both of which were urged by Intervenors' expert Dr. Katz. First, the analysis "drew from on-year

statewide election data (rather than off-year House of Delegates elections data)." Dkt. No. 108 at

124 n.37. In 2015, Dr. Katz noted that "i[t] may be possible" to use statewide election data "to

help predict" House of Delegates elections, but criticized Dr. Ansolabehere for failing to

demonstrate a relationship between the two. DI Ex. 16 at 17. In 2017, Dr. Palmer provides just

this type of analysis, *see* Pls.' Ex. 71, fig. 19, and found that "[s]tatewide elections are highly

correlated with House of Delegates elections," *id.* ¶ 134; *see also* Tr. 417:8-9 (Palmer) ("[S]tate-

wide elections serve as a good proxy and are highly predictive of House . . . election results.").[8]

Second, the 2015 majority opinion faulted Dr. Ansolabehere for "rel[ying] on an

ecological regression analysis (rather than an ecological inference analysis)," crediting

Dr. Katz's testimony that this methodology "results in 'blatantly incorrect answers.'" Dkt. No.

108 at 124 n.37. Accordingly, Dr. Palmer's racially polarized voting analysis employs the

ecological inference methodology. Pls.' Ex. 71 ¶ 132; Tr. 415:14-416:2 (Palmer).

Based on his analysis of racial voting patterns in each of the Challenged Districts,

Dr. Palmer concluded that a 55% BVAP rule was not necessary: Each district "would have

continued electing the African-American candidates of choice by significant margins if BVAP

were reduced to lower levels." Pls.' Ex. 71 at 3. Had Delegate Jones conducted an analysis of

districts other than District 75, he would have learned that black-preferred "candidates were

winning by large margins in all of the challenged districts *except* District 75" prior to the 2011

redistricting. Pls.' Ex. 71 ¶ 138, tbl. 22. Indeed, even "[i]f all of the population needed in each

underpopulated district were made up with White voters who unanimously voted against the

African-American preferred candidates, the African-American preferred candidates would still

win by large margins in every district except District 75." *Id.* ¶ 138, tbl. 24. Dr. Palmer's analysis

---

[8] Dr. Katz's 2017 report admits, for the first time, that the dearth of competitive House elections "makes it difficult to gauge meaningful differences in voter preferences" using the elections he chose to analyze in 2015. DI Ex. 101 at 2. "Accordingly," he, too, performs a racially polarized voting analysis based on statewide elections. *Id.*

demonstrated "a wide range of levels of BVAP where these districts would continue to be performing" for black-preferred candidates below 55 percent. Tr. 430:12-18 (Palmer); *see also* Pls.' Ex. 71 ¶ 141, tbl. 25.

Intervenors' experts did not dispute these core conclusions. Dr. Katz offered a racially polarized voting analysis of his own, but since it was based on statewide elections from 2013, two years *after* the enactment of the Enacted Plan, *see* Tr. 806:11-18 (Katz), this analysis provides no information in support of Intervenors' burden to establish a "'strong basis in evidence'" for the General Assembly's "'race-based[] choice'" at the time of redistricting, *Bethune-Hill*, 137 S. Ct. at 801 (quoting *Alabama*, 135 S. Ct. at 1274).[9] Dr. Katz's 2015 racially polarized voting analysis, meanwhile, examined only seven Challenged Districts (including District 75), and found no evidence of racially polarized voting in four of them. Tr. 802:3-12; *id.* 802:13-17 (Katz) ("Q: So taking District 75 off the table, is it fair to say that your 2015 analysis found evidence of racially polarized voting in two of the remaining 11 challenged districts? A: That sounds correct.").

Dr. Katz also conceded that the Challenged Districts vary in their voting patterns, demographic characteristics, and their levels of racially polarized voting, Tr. 821:18-823:5 (Katz), wholly undermining the mapdrawers' application of a one-size-fits-all racial threshold across all Challenged Districts. Indeed, Dr. Katz admitted, as he must, that those districts exhibiting a "lesser degree of racially polarized voting" will not need "as high a black voting age population to afford black voters an opportunity to elect their preferred candidates." Tr. 822:21-25 (Katz).

Dr. Trey Hood, meanwhile, purported to provide his own racial polarized voting analysis

---

[9] Even if the Court were to credit Dr. Katz's 2017 racially polarized voting analysis, it examined only *four* Challenged Districts, Tr. 809:1-11 (Katz), and found no consistent evidence of racially polarized voting in any of them, *see* Tr. 809:18-810:16, 816:13-817:14 (Katz).

that examines the same three elections and the same four districts as Dr. Katz's report. But Dr. Hood's attempts to counter Dr. Palmer's testimony fail not only for his reliance upon demographic and election data that post-dated the 2011 redistricting process, *see* Tr. 840:10-15 (Hood); DI Ex. 103 at 5, but also because his failure to examine or report confidence intervals alongside his ecological inference estimates renders his analysis wholly unreliable. Tr. 857:8-858:8 (Hood). Intervenors' own expert, Dr. Katz, testified that confidence intervals are "critical" to the analysis and that the failure to provide "some estimate of statistical uncertainty" is inconsistent with "standard practic[e] in political science." Tr. 810:24-811:17 (Katz). Indeed, Dr. Hood himself agreed. Tr. 858:3-8 (Hood) (noting that providing a measure of statistical uncertainty is "part of the discipline").

Intervenors' experts' failure to so much as rebut Dr. Palmer's conclusions as to the necessity of the 55% BVAP floor, let alone provide an affirmative analysis on this point, is all the more striking in light of Intervenors' burden to establish a "strong basis in evidence" for the mapdrawers' one-size-fits-all racial rule. The only relevant, credible expert testimony on the issue demonstrates that the 55% BVAP floor is not narrowly tailored to maintaining the ability to elect black-preferred candidates in any of the remaining Challenged Districts.

### c. Intervenors' Belated Justifications for the 55% BVAP Rule Fall Short

Realizing that Delegate Jones' laser-like focus on District 75 dooms their narrow tailoring defense, Intervenors tried mightily to concoct other potential justifications for Delegate Jones' decision to apply the 55% BVAP rule to all the Challenged Districts. Intervenors' strained efforts to backfill the gaping evidentiary hole in their case are not persuasive.

### (i) The Loewen Report

At trial, Delegate Jones testified that an expert report authored by Dr. James Loewen in 2001 (the "Loewen Report") justified the decision to apply the 55% BVAP rule indiscriminately

137275235.6

to the remaining Challenged Districts. *See* Tr. 512:6-515:4 (Jones). For several reasons, the

Loewen Report cannot possibly serve as a strong basis in evidence justifying the 55% BVAP

rule.

     **First,** and most obviously, Delegate Jones never read the Loewen Report. *See* Tr. 572:1-4

(Jones). He did not even have a copy of it at the time of the redistricting process. *See* Tr. 572:5-6

(Jones). At most, Delegate Jones may have spoken with his attorneys about the Loewen Report.

*See* Tr. 572:7-10 (Jones). But Intervenors have failed to disclose what guidance, if any, Delegate

Jones received from his attorneys regarding the Loewen Report. *See* Tr. 573:6-9 (Jones). Thus,

even if Delegate Jones did receive (unknown) information about the Loewen Report from his

attorneys, this Court cannot rely on that (unknown) information to find that Delegate Jones had a

strong basis in evidence for applying the 55% BVAP rule to all the remaining Challenged

Districts.

     **Second,** the Loewen Report has not been received as substantive evidence in this case.

The Court excluded it in the first trial. *See* 1st Trial Tr. 387:21-389:19. And it was admitted in

this case solely because Dr. Hood appended it to his report as a basis for *his* opinions. *See* DI Ex.

103 at 21-83. It was not admitted as a document considered by Delegate Jones in developing the

55% BVAP rule.[10]

     **Third,** regardless of what counsel did or did not tell Delegate Jones, Dr. Loewen never

opined that a 55% BVAP floor was needed to avoid retrogression in the Challenged Districts. To

the contrary, Dr. Loewen has testified that there is "no one size fits all rule that would define the

proper level of black voting age population necessary for a minority population to have the

ability to elect the candidate of its choice in all districts across a state." Dkt. 220-1, Ex. D

---

[10] Nor could it have been—Intervenors did not produce the Loewen Report in response to discovery requests seeking production of all documents upon which the General Assembly relied in drawing the Challenged Districts.

(Loewen Dep. 47:16-22); *see also id.* (Loewen Dep. 50:9-51:7).

**Fourth,** Dr. Loewen himself agrees that one cannot use his *2001* report to determine the level of BVAP needed to avoid retrogression in *2011*. Dr. Loewen testified that one would need to examine more recent election results than those set out in his report (from the 1990s) to draw reliable conclusions about voting behavior in Virginia in 2011. *See* Dkt. No. 220-1, Ex. D (Loewen Dep. 41:9-21, 51:8-54:5). That is precisely what Delegate Jones did *not* do.

Notably, Dr. Hood, too, failed to conduct such an analysis in forming his conclusions based on the Loewen report, as he candidly admitted at trial. He has never spoken to Dr. Loewen. Tr. 868:6-7 (Hood). He is not aware that the version of the Loewen Report attached to his own report is a *draft. Compare* Tr. 867:20-868:5 (Hood) *with* Dkt. No. 220-1, Ex. D (Loewen Dep. 39:13-40:22). He reviewed no other information from the *Wilkins v. West* litigation—no other expert reports and no critiques of the Loewen Report. Tr. 868:8-17 (Hood). He paid no heed to the fact that Dr. Loewen used the ecological regression methodology that the Court has already rejected as "unreliable." *Compare* Tr. 869:9-870:3 (Hood) *with* Dkt. No. 108 at 124 n.37. Dr. Hood made no effort to replicate Dr. Loewen's analysis, instead simply assuming it was done correctly. Tr. 870:6-871:10 (Hood). And he admits that at least some of the conclusions Dr. Loewen reached in 2001, even if correct at the time, are *not correct* given the passage of time. Tr. 871:16-872:1 (Hood). Intervenors cannot retrofit the Loewen Report to justify the 55% BVAP rule through the simple expedient of attaching it to Dr. Hood's most recent expert report.

Respectfully, the fact that the Loewen Report is the best Intervenors could come up with to meet their burden on strict scrutiny dramatically illustrates just how little support there is for the across-the-board application of a 55% BVAP floor to 12 very different districts.

- 24 -

### (ii)     Conversations with Black Delegates

Delegate Jones also testified that his discussions with black delegates justified his decision to apply a one-size-fits-all racial threshold to 12 different districts. *See* Tr. 512:6-515:4 (Jones). This Court should reject that excuse for at least three reasons.

**First,** the gravamen of this argument is that Delegate Jones' casual conversations with his colleagues, standing alone, justify the use of an expressly racial rule. *See, e.g.*, Tr. 570:11-14 (Jones) ("Q: You didn't do any kind of analysis to determine whether the districts would be considered retrogressive under Section 5, did you? A [Delegate Jones]: I talked to the members that represented the districts."). A legislature cannot justify race-based redistricting simply by declaring that race-based districting is justified. *See, e.g.*, *Miller*, 515 U.S. at 922 ("When a state governmental entity seeks to justify race-based remedies . . . , we do not accept the government's mere assertion that the remedial action is required. Rather, we insist on a strong basis in evidence of the harm being remedied."); *cf. City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501 (1989) ("[B]lind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis.").

**Second,** Delegate Jones' purported reliance on others is not supported by the record. For example, Intervenors pointed to Senator Dance as a source of the 55% BVAP rule. 1st Trial Tr. 431:4-7 (Jones). But Senator Dance testified that *Delegate Jones told her* that the 55% BVAP floor was necessary to achieve preclearance—not the other way around. *See* Tr. 119:20-121:2 (Dance). And to the extent that Senator Dance advocated for the 55% BVAP rule, she did so only because Delegate Jones, the chairperson of the committee on which Senator Dance served, told her it was necessary. *See* Tr. 112:4-22, 120:22-121:16 (Dance). As far as Senator Dance was concerned, the 55% BVAP rule was the "gospel" announced by Delegate Jones. Tr. 139:10-16 (Dance). This testimony went unrebutted.

- 25 -

Intervenors have also pointed to former Delegate (now Senator) Lionel Spruill as a source of the 55% BVAP rule. *See* Tr. 513:8-10 (Jones). According to Delegate Jones, Senator Spruill asked Delegate Jones to draw Senator Spruill's district (District 77) to comply with the 55% BVAP rule, and Senator Spruill told Delegate Jones that all the Challenged Districts should have at least 55% BVAP. Tr. 549:18-21 (Jones). Notably, Intervenors did not call Senator Spruill as a witness to corroborate Delegate Jones' testimony on that score.

In any case, contrary to Intervenors' insinuations, Delegate Spruill did not speak for the Black Caucus when it came to the 55% BVAP rule. Delegate Spruill was not (and never has been) the Chair of the Black Caucus. Tr. 949:16-23 (McClellan). Plaintiffs offered unrebutted testimony that Delegate Spruill was "an outlier from the rest of the Black Caucus" in believing that a black candidate needed "a large percentage of black voting age population in a district to better ensure that a black candidate would be elected." Tr. 950:2-13 (McClellan). And Intervenors have offered no evidence that Senator Spruill had any basis whatsoever—let alone one he disclosed—to believe that *any* Challenged District (let alone every Challenged District) needed at least 55% BVAP to avoid retrogression. Nor is that surprising, because Senator Spruill's public statements strongly suggest that he was not concerned about avoiding retrogression but, rather, protecting black incumbents. Pls.' Ex. 35 at 148:4-7 (Delegate Spruill praising Delegate Jones' redistricting plan because "[w]hat other plan, what other group has come to the Black Caucus and [said], 'Hey, we have a plan to increase the black minority votes. We have a plan to make sure that you're safe.'").

More generally, the record on remand suggests that Delegate Jones' memory is not reliable when it comes to his conversations with black delegates. Consider:

- At the first trial, Delegate Jones claimed that he spoke with numerous members of the Black Caucus, all of whom supported the 55% BVAP rule. That included **Delegate Matthew**

137275235.6

**James**, who represents District 80, and who Delegate Jones claimed had "significant input" in redrawing District 80. 1st Trial Tr. 348:23-349:2 (Jones). But at the second trial, Delegate James testified that he provided no input and never discussed the 55% BVAP rule. *See* Tr. 75:14-77:9 (James).

- At the first trial, Delegate Jones recounted input he purportedly received from Delegate McQuinn, who represents District 70. But at the second trial, **Delegate McQuinn** testified that she attended a single meeting at which Delegate Jones presented the changes he had made. She never met with Delegate Jones one-on-one, never provided him with any input regarding how her district should be configured, and never told anyone that a 55% BVAP threshold was necessary in her district or any other. *See* Tr. 100:18-101:17, 107:22-108:3 (McQuinn).

- At the first trial, Delegate Jones testified that former **Delegate Algie Howell**, who represented District 90, provided "extensive input" in the redrawing of District 90. 1st Trial Tr. 339:13-18 (Jones). In fact, as Delegate Howell explained at the second trial, he did not. Far from it. He had a single, short conversation with Delegate Jones (which Howell initiated) and neither supported a 55% BVAP floor nor told Delegate Jones that he did. *See* Tr. 82:16-83:14, 85:13-86:1 (Howell).

One need not question Delegate Jones' truthfulness to question the reliability of his memory when it comes to purported conversations he had with his colleagues nearly a decade ago. Many of those recollections have been faulty or incomplete. And it is telling that Intervenors have not produced a single member of the Black Caucus to corroborate Delegate Jones' accounts. Thus, this Court could not and should not find that Delegate Jones' purported consultations with black delegates provided a strong basis in evidence to believe that every Challenged District required at least 55% BVAP to avoid retrogression.

**Third,** and finally, even if a handful of Black Caucus members did ask for 55% BVAP in their districts, that does not justify applying the same figure to every district. Intervenors took pains to argue that redistricting is complex and driven in part by individual delegates' unique interests and needs. To that end, Intervenors presented the testimony of delegates, each of whom testified to the various requests they made to Delegate Jones and his attempts to accommodate those requests. As that shows, what is true for one delegate is surely not true for another. A legislature therefore does not have a "strong basis in evidence" to assume that one or a handful

- 27 -

of delegates representing majority-black districts speaks for *all* delegates representing majority-black districts, let alone for all black voters protected by the VRA.

**E.    District-Specific Evidence Confirms that Race Predominated and the Challenged Districts Are Not Narrowly Tailored to a Compelling Government Interest**

In their pretrial brief, Plaintiffs laid out, in great detail, district-specific evidence showing how race determined the final shape of each Challenged District. Dkt. No. 205 at 14-26. Below, Plaintiffs consolidate the relevant evidence regarding each Challenged District.

**1.    Richmond and Tri-City**

The Richmond and Tri-City region includes Districts 63, 71, 69, 70, and 74. Delegate Jones sliced up the black population clusters in this region to achieve the 55% BVAP target in each Challenged District. Specifically, Delegate Jones removed black voters from District 70 and 74 to add black voters to District 71, 63, and 69. *See* Pls.' Ex. 69 at 15. As a result, "[i]n the entire region covering Richmond and the Tri-City area, there is *not a single VTD with a black voting-age majority that is left out of one of the* [*C*]*hallenged* [*D*]*istricts.*" *Id.* at 41 (emphasis added).

**a.    District 63**

District 63 was underpopulated by 6,000, but Delegate Jones had few options to redraw the district while meeting his racial goal: District 63 was largely surrounded by heavily white communities, while District 75, to the south, was also underpopulated and in need of an infusion of black voters to comply with the 55% BVAP rule. Pls.' Ex. 69 at 34-35; *see also* Tr. 115:1-7 (Dance). Accordingly, Delegate Jones moved black voters out of District 63 to District 75 to ensure that District 75 met the 55% BVAP floor, and then sought to replenish the black voters that District 63 lost to District 75. *Cf.* Tr. 525:23-526:6 (Jones) (confirming that "[t]he 55 percent goal was used in drawing . . . House District 63").

- 28 -

Before redistricting, District 63 included all of Dinwiddie County, which included several high-BVAP areas near District 75. To boost the BVAP of District 75 above 55%, Delegate Jones sliced Dinwiddie County in half and moved high BVAP areas in the southern part of the county into District 75. *See* DI Ex. 94 at 2. At trial, former delegate Rosalyn Dance (who helped Delegate Jones redraw District 63) confirmed that Delegate Jones split Dinwiddie County for a racial reason. Tr. 113:13-15 (Dance); Dkt. No. 108 at 171 (Keenan, J., dissenting) ("As a result of the 'drastic maneuvering' required to reach a 55% BVAP in District 75, portions of a county previously in District 63 were shifted into District 75, a move that the majority agrees was 'avowedly racial.'") (citations omitted). She had no choice in the matter. Tr. 126:2-4 (Dance).

To ensure that the Dinwiddie County split did not cause District 63's BVAP to fall below 55%, Delegate Jones added a new, snake-like appendage to District 63's northeastern corner, which winds through Prince George County, picking up high BVAP areas there, and splits Hopewell to extract much of its BVAP. *See* Appendix A at 1 (Pls.' Ex. 69, fig. 11). The overriding purpose of that tentacle is clear: It was added to replace black voters lost when Delegate Jones split Dinwiddie County. Pls.' Ex. 69 at 35-39. Senator Dance confirmed that fact at trial. Tr. 116:3-7 (Dance).

Indeed, the appendage reaches out to grab areas around Hopewell (Wards 2, 6, and part of 7) that are well over 60% BVAP. It avoids other areas around Hopewell (Wards 1, 3, 4, 5, and part of 7) with a mere 21.7% BVAP. *See* Pls.' Ex. 50, tbl. 9; Pls.' Ex. 63 at 115-16; Pls.' Ex. 71 ¶ 32. The split of the Hopewell Ward 7 VTD is particularly telling: Predominantly black census blocks in the southern corner of the VTD were placed in District 63. *See* Appendix A at 2 (Pls.' Ex. 69, fig. 12) and 3 (Pls.' Ex. 71, fig. 3). Again, Senator Dance confirms that Ward 7 was split purposefully to add black voters to District 63 and pull predominantly White areas out of District

- 29 -

63. Tr. 140:16-141:2 (Dance).

The end result of the "drastic maneuvering" required to donate BVAP to District 75 while remaining District 63 above 55% BVAP, 1st Trial Tr. 73:25-74:14 (Dance), was an unusually shaped district with little respect for neutral districting principles. *See* Appendix B, tbl. 1. Indeed, District 63 suffered the largest Reock compactness reduction of any district in the Enacted Plan. 1st Trial Tr. 140:7-9 (Ansolabehere); Pls.' Ex. 50, tbl. 1. In addition, the number of split VTDs shot up from 0 to 8. Pls.' Ex. 50, tbl. 1.

The use of race in District 63 was not narrowly tailored. Delegate Jones conducted no meaningful legislative inquiry. He spoke to then-Delegate Dance, but the record is clear that he—not she—is the one who proclaimed that the 55% BVAP floor was required. Tr. 119:20-121:16 (Dance). Delegate Jones looked at the 2001 primary election in which Delegate Dance ran as an independent and lost to a Democratic candidate. *Compare* 1st Trial Tr. 467:20-468:9 (Jones), *with* Pls.' Ex. 75 at 4. But Delegate Jones has not testified that he believed that Dance was the black-preferred candidate in this election.[11] Delegate Jones did not examine turnout rates in District 63. 1st Trial Tr. 466:18-20 (Jones).

Nothing in any inquiry he did conduct provided a strong basis in evidence to conclude that 55% BVAP was necessary to avoid retrogression in District 63. To Delegate Jones' knowledge, the last time a minority-preferred candidate lost in District 63 was the 1993 primary election. 1st Trial Tr. 455:21-456:2 (Jones). And under the benchmark, the Democratic vote share was 66.3%. Pls.' Ex. 71, tbl. 22.[12] With a BVAP as low as 50%, District 63 would be expected to elect the black-preferred candidate by 63%. Pls.' Ex. 71, tbl. 25. Even with a BVAP

---

[11] Running as an independent, Delegate Dance lost to the Democratic candidate, former delegate Fenton Bland, who is also African American. *See* 1st Trial Tr. 456:4-8 (Jones).

[12] Dr. Palmer established (and it is undisputed) that Democratic candidates have been the black candidates of choice in the Challenged Districts. *See* Pls.' Ex. 71 ¶ 136.

as low as 45%, the black-preferred candidate would win by a margin of more than 18 percentage points. *Id.*

### b.    District 71

Intervenors have effectively conceded that race predominated in District 71. Delegate Jones testified that it was not "logical" to expand District 71 to the west because doing so would have reduced District 71's BVAP. Tr. 532:9-14 (Jones). Instead, he expanded District 71 to the east "to increase the black voting-age population." Tr. 532:23-25 (Jones). Thus, Delegate Jones testified "to a certainty" that the "55 percent racial target had an impact on the way [District 71] was drawn." Tr. 533:1-4 (Jones).

The evidence bears out this concession. Prior to redistricting, District 71 was a racially heterogeneous district with a BVAP of 46%. Pls.' Ex. 69 at 15-16. To achieve the 55% BVAP target, radical surgery was done on District 71 to add black and remove white voters. *Id.*

District 71 was greatly underpopulated, and the obvious way of achieving population equality was to move District 71 west, which would have also united the Fan and Museum districts. Pls.' Ex. 69 at 17. But adding those (predominantly white) areas would not have achieved 55% BVAP. Indeed, even if all of the population added to make up District 71's population shortfall were made up of African Americans, the district *still* would have had a BVAP below 50%. *Id.* at 16-17.

Thus, Delegate Jones shifted District 71 east and removed precincts in the west. These changes greatly increased the BVAP of District 71. Tr. 34:11-14 (McClellan). Most notably, although Delegate McClellan hoped to keep VTD 207, a reliably Democratic (and mostly white) VTD in the Fan neighborhood, the VTD was removed because keeping it would have dragged District 71's BVAP below 55%. *See* Tr. 35:20-36:1; 36:15-21; 39:15-20 (McClellan). To make up for the lost population, Delegate Jones added several new VTDs in the east that are heavily

137275235.6

black and densely populated. This included VTDs 701 and 702, which were moved into District 71 from District 70 to meet the 55% BVAP target in District 71. Tr. 44:20-25 (McClellan).

Moreover, while several Henrico County precincts were removed from District 71, one precinct in Henrico County was added to the district despite Delegate Jones' claim that he wanted to make District 71 more "Richmond-centric." The difference between the areas in Henrico County that were moved out of District 71 (Summit Court, Hilliard, and Stratford Hall), and that moved in (Radcliffe) is a racial one: Radcliffe is a large, predominantly black precinct, while Summit Court, Hilliard, and Stratford Hall are predominantly white—which is why they were removed from District 71. Tr. 40:10-13; 41:4-7, 45:18-25 (McClellan).

In another vivid example, McClellan confirmed her testimony that Delegate Jones rejected her efforts to accommodate local election officials' requests to "unsplit" certain precincts where doing so would have dropped the BVAP of District 71 below 55%. *See* Tr. 49:13-50:11 (McClellan); Pls.' Ex. 30 at 1. While this exchange concerned HB 5001, the predecessor to the Enacted Plan (HB 5005), it illustrates the nonnegotiable nature of the 55% BVAP rule.

And although Delegate Jones testified in the first trial that he thought that he had fixed all of the split VTDs in question in the Enacted Plan, in fact, several split VTDs remained, including split VTDs 703 and 505. Delegate McClellan testified that precinct 703 was split between District 71 and District 70 so that District 71 would meet the 55% BVAP target. Tr. 951:5-9 (McClellan). Keeping precinct 208, a majority White VTD, whole in District 71 as requested by the Richmond and Chesterfield registrars meant that District 71 had to add BVAP in another part of the district. As a result, just enough black voters from precinct 703 were added to fill that void so that District 71 would meet the 55% racial goal. Tr. 950:25-951:10 (McClellan).

As a result of this racial sorting, the BVAP of areas moved into District 71 was 72.1%, over *50 percentage points* higher than the BVAP of areas moved out. *See* Pls.' Ex. 50 at 35, ¶ 102.

District 71 is not narrowly tailored. The mapdrawers easily could have observed that the fact that District 71 was no longer a majority-BVAP district had no ill effects on black voters' ability to elect their candidate of choice. In 2009 (her last contested general election), Delegate McClellan coasted to victory with 82% of the vote. Pls.' Ex. 50, tbl. 14. Under the benchmark plan, where the BVAP had dropped to 46% by 2010, black-preferred candidates were winning by an average of 79.2%. Pls.' Ex. 71, tbl. 22. And not only did voters in District 71 overwhelmingly support Delegate McClellan, they supported other black candidates for local office, including Kim Gray, Jeff Bourne, Viola Baskerville, Cynthia Newbille, and Ellen Robertson. Tr. 55:11-22 (McClellan). This was hardly a district that needed additional BVAP to ensure that black voters had an opportunity to elect their candidates of choice. Indeed, Delegate Jones does not believe the black-preferred candidate has *ever* lost in District 71. 1st Trial Tr. 457:8-15 (Jones).

Moreover, he did no analysis of whether the 55% BVAP floor was necessary in District 71. *See* Tr. 466:25-467:1 (Jones). The record establishes that Delegate Jones failed to conduct a meaningful legislative inquiry, and that the 55% BVAP rule plainly was unnecessary to avoid retrogression.

### c.    District 69

District 69 has a BVAP of 55.2%. Pls.' Ex. 71, tbl. 22. This is not happenstance. District 69 was drawn to comply with the 55% BVAP target. *See* 1st Trial Tr. 29:3-13 (McClellan).

The circumstantial evidence confirms that fact. District 69 had a benchmark BVAP of 56.3%, but was underpopulated by 8,701 people. Pls.' Ex. 69 at 26. District 69 was bounded by white-populated areas to the west and east, and Delegate Jones generally chose not to add

population in those directions. *Id.* District 71, to the north, could not afford to lose BVAP or add much white population. *Id.* As Dr. Palmer testified, the split of VTD 505, which is majority white, between Districts 69 and 71 ensured that neither added too many white voters and both satisfied the 55% BVAP floor. Tr. 388:19-389:24 (Palmer).

The fact that District 69 could not gain significant population from the north, west, or east left one obvious option—taking BVAP from District 70 to the south (even though District 70 was already at the population target). That is what Delegate Jones chose to do, expanding District 69 to add additional black voters to replace those that had to be removed to make up for District 71's insufficient BVAP. *See* DI Ex. 94 at 2 (areas added); Pls.' Ex. 69, fig. 6; Pls.' Ex. 50, tbl. 9. As Dr. Rodden testified, VTDs 811 and 903, which are densely populated black areas, were removed from District 70 and added to District 69. Tr. 182:17-23 (Rodden). VTD 410 was split between District 69 and District 68 on racial lines, with the more heavily black part of the VTD included in District 69 and the whiter portion of the VTD being assigned to District 68. Tr. 185:16-25 (Rodden).

District 69 is not narrowly tailored. Delegate Jones is aware that the last time a minority-preferred candidate lost in District 69 was in 1993, 1st Trial Tr. 453:23-454:16, 455:9-20 (Jones), but did no analysis to determine whether a 55% BVAP rule was needed, such as examining turnout rates, 1st Trial Tr. 466:11-20 (Jones). In fact, black-preferred candidates averaged more than 80% of the vote under the benchmark. *See* Pls.' Ex. 71, tbl. 22. Given that kind of electoral success, one would assume that the BVAP of District 69 could be lowered substantially without diminishing the electoral odds of black-preferred candidates. One would be right. Drop the BVAP of District 69 to 45%, and black-preferred candidates would be expected to receive 78.8% of the vote. *See* Pls.' Ex. 71, tbl. 25.

Indeed, District 69 illustrates vividly both the lack of effort to tailor the use of race at the time and Intervenors' strained efforts to develop a post hoc record. In his supplemental report, Dr. Hood cherrypicked a single primary election to analyze, the 2009 primary in District 69, and concluded that a mapdrawer considering this election might conclude that it justified increasing the BVAP in District 69. Tr. 864:8-866:13 (Hood). The only problem is that Delegate Jones did *not* increase the BVAP of District 69—he lowered it to just above the 55% BVAP floor. Tr. 866:14-867:4 (Hood).

### d.   District 70

District 70 was not substantially underpopulated. Pls.' Ex. 69 at 29. It also had a substantial BVAP (61.8%). Pls.' Ex. 50, tbl. 4. Thus, Delegate Jones treated District 70 as a "donor" district to shore up the BVAP in other Challenged Districts, dropping District 70's BVAP from 61.8% to 56.4% in the process. This maneuver required removing about 26,000 people and adding back 26,000 (different) people, and the racial pattern of this swap is telling. The BVAP of areas moved into District 70 was 43.8%, while the BVAP of areas moved out was 59.9%, Pls.' Ex. 50, tbl. 8—*and all of the areas moved out were moved into other Challenged Districts*, *id.*, tbl. 9. Thus, "extra" black voters were siphoned out of District 70 to ensure that other Challenged Districts also complied with the 55% BVAP floor. Pls.' Ex. 50 ¶ 102.

VTDs 701, 702, and part of 703 were donated to District 71 (all with BVAP over 90%) despite the fact that Delegate McQuinn did not want to lose those precincts because she had represented them for many years. Pls.' Ex. 69 at 29; Tr. 103:13-17 (McQuinn). But Delegate McQuinn did not have a choice; those areas were added to District 71 in order to raise its BVAP. Tr. 104:3-18 (McQuinn). Meanwhile, VTDs 811 (76% BVAP) and 903 (64% BVAP) were donated to District 69. Pls.' Ex. 69 at 29. To make up for the population lost by these donations, District 70 was then expanded outward, crossing a county boundary, to encompass several

- 35 -

suburban VTDs (Meadowbrook, Southside, and Chippenham), which were the last remaining majority-black precincts in the region not already a part of a Challenged District. *Id.* "As the suburban black population pushed outward into the white exurbs, District 70 expanded to pull them back in." *Id.* Chesterfield had never before been part of District 70, Tr. 194:21-24 (McQuinn), and Delegate McQuinn testified that she was concerned about adding another county and suburban areas in Chesterfield to her district. *Id*. at 103:9-10 (McQuinn).

The end result is a district that pays little attention to county boundaries or communities of interest, carving off three VTDs from Richmond's Southside City Council ward from the rest of that ward and the rest of the city of Richmond, *see* Pls.' Ex. 16 at 1-2 (including "governmental jurisdictions" among the "factors that can create or contribute to communities of interest"), crossing both the James River and the Henrico County boundary to bring together two non-contiguous neighborhoods of Richmond, and drawing together a heterogeneous mix of urban, suburban, and exurban communities in a single district. Pls.' Ex. 69 at 29-30.

Intervenors' attempts at post-hoc, non-racial explanations for the district fall short. In particular, Delegate Jones testified that the odd "turret" on the top of District 70 was added to draw incumbent Delegate McQuinn's residence into the district. Dkt. No. 108 at 130-31. But Delegate McQuinn resides in the *southern* part of the turret, Pls.' Ex. 69 at 28, fig. 7, and Delegate Jones' testimony fails to explain away why two *additional* VTDs, Central Gardens (BVAP 94%) and Masonic (BVAP 72%), were included at the *top* of the turret. *Id.* at 30.

As with other Challenged Districts, no meaningful legislative inquiry was conducted to determine whether application of the 55% BVAP floor to District 70 was appropriate. Delegate Jones did not review minority turnout rates in District 70, 1st Trial Tr. 466:23-24 (Jones), or any other election data related to the district. In fact, the Democratic vote share for District 70 was

137275235.6

73.7% in the benchmark. Pls.' Ex. 71, tbl. 22. Even dramatic reductions in the district's BVAP would not diminish the likelihood that a Democrat would win by a supermajority. *See* Pls.' Ex. 71, tbl. 25.

### e.  District 74

District 74 was not underpopulated. Pls.' Ex. 71, tbl. 22. Nevertheless, Delegate Jones moved around 16,000 voters out of District 74, and roughly the same number of voters back into it. Pls.' Ex. 50, tbl. 5. Tellingly, this unnecessary population swap increased the BVAP in nearby districts, in service of the 55% BVAP rule. The average BVAP of areas moved out of District 74 and into other Challenged Districts is 69.0%. *Id.*, tbl. 9. The average BVAP of areas moved into non-challenged districts is a mere 20.5%—a nearly 50-percentage point difference. *See id.*

Delegate Jones moved black voters out of District 74 and into neighboring Challenged Districts to accomplish two racial goals. *See* Pls.' Ex. 69 at 31-32. First, he needed to increase the BVAP of District 71, which was below the 55% BVAP threshold. Pls.' Ex. 71, tbl. 22. Second, he needed to hold steady the BVAP of District 63, which ceded much of its black population in the southern part of the district to District 75. 1st Trial Tr. 79:19-83:5 (Dance). Delegate Dance confirmed that to make up for the black voters that District 63 lost as a result of the Dinwiddie County split with District 75, District 63 added a predominantly black part of Hopewell City and part of Prince George from District 74 "to get more African-Americans." *Id.*; *see also* Tr. 117:1-6 (Dance). Prior to the 2011 redistricting, Hopewell was split along racial lines, with the predominantly black portion of the city being included in District 74. After redistricting, Hopewell remained split along racial lines. The critical difference was that the predominantly black portion of the city was included in District 63 instead of District 74 because District 63 needed to add black voters and District 74 could still meet the 55% racial goal if it ceded some black population to other districts. Tr. 200:2-201:12 (Rodden). Any changes that

- 37 -

Delegate Jones made to District 74 that improved the district's contiguity were incidental to achieving his racial goals.

Moreover, the changes made to District 74 as a result of the siphoning of black voters out of the district conflicted with traditional districting criteria, resulting in drastic reductions of compactness in surrounding districts. For example, eliminating the river crossing in District 74 moved the predominantly black area of Hopewell into District 63, causing that district to suffer the greatest compactness reduction in the entire Enacted Plan. Pls.' Ex. 50 ¶ 49.[13]

Race also factored into Delegate Jones' decision to keep certain areas in District 74. For example, the Brookland and Belmont VTDs were split along racial lines, with the predominantly black portions of those VTDs being included in District 74 and the predominantly white portions of those VTDs being including in majority-white, non-Challenged Districts. Tr. 205:4-206:25 (Rodden).

With respect to narrow tailoring, Delegate Jones conducted only the most rudimentary of inquiries regarding District 74, and learned nothing that would provide a strong basis in evidence for applying the 55% BVAP floor to the district. He examined a single primary, in which then-Delegate Morrissey was first elected, although he conceded that the electoral history he was aware of suggested that Delegate Morrissey was, in fact, the minority candidate of choice. 1st Trial Tr. 457:19-458:14 (Jones). In any event, the available data show that black-preferred candidates easily won under the benchmark, and would have continued to do so regardless of whether the BVAP of District 74 was 55% or higher. Pls.' Ex. 71, tbl. 22, 25.

---

[13] Delegate Jones claims he eliminated the river crossing to remedy a feature critiqued by the Virginia Supreme Court in *Wilkins v. West*, 264 Va. 447 (2002). But the *Wilkins* court, which was considering a challenge to District 74 under Virginia's state constitution, rejected the challenge, holding that "nothing . . . indicates that the District is repugnant to the constitutional principles of compact and contiguous electoral districts." *Id.* at 466. Delegate Jones acknowledged that the *Wilkins* decision did not require him to fix the river crossing in District 74. Tr. 524:24-525:2 (Jones).

### 2. Tidewater/Hampton Roads

The Tidewater/Hampton Roads region encompasses Districts 77, 80, 89, and 90 in South Hampton Roads and Districts 92 and 95 on the Peninsula. In the years preceding the 2010-2011 redistricting cycle, the districts had become severely underpopulated, the black population had become more dispersed, and the BVAP of District 80 and 89 had dropped below 55%. Pls.' Ex. 69 at 52; Pls.' Ex. 71, tbl. 22. As a result, and just like in the Richmond area, Delegate Jones had to resort to stark racial sorting to ensure that all of these districts complied with the 55% BVAP rule.

### a. District 77

District 77 can be principally explained by two requests that were made by incumbent Delegate Lionel Spruill to Delegate Jones. Delegate Spruill's first request was that his district contain at least 55% BVAP. Tr. 550:22-551:2 (Jones). Delegate Spruill's second request was to unite the old city of South Norfolk in District 77, which meant adding several neighborhoods that contained black populations but were all majority-white precincts. Tr. 497:25-498:15 (Jones).[14] To square these two requests, Delegate Jones made significant race-based changes. As a result, the BVAP of District 77 was increased from 57.6% to 58.8%, Pls.' Ex. 71, tbl. 22.

District 77 violates traditional redistricting criteria in multiple ways. It is not compact. It is not contiguous by land and lacks a water crossing. In order to travel from the eastern part of the district to the western part of the district, for example between St. Julians and the more western VTDs such as Camelot, a person would have to travel through a half-mile wide stretch that does not contains any roads. Tr. 271:7-273:3 (Rodden). District 77 is so misshapen that is

---

[14] In the end, as Dr. Rodden testified, the old city of South Norfolk was not fully reunited in District 77. The Westover VTD, which is part of South Norfolk but has a low BVAP of 11.5%, was *removed* from District 77 along with other majority-white VTDs that would have lowered the district's BVAP had they been retained. Tr. 268:21-269:1 (Rodden).

nearly severs District 76 in half. DI Ex. 94 at 8. Delegate Jones looked to this western part of District 77 to balance out District 77's BVAP given the addition of the majority-white precincts to the east. Almost every VTD included in the western appendage of District 77 has a high BVAP, including Hollywood (96%), Southside (89.9%), and White Marsh (87.8%), while Airport—the only VTD *dropped* from the western part of District 77—has a mere 31.7% BVAP. Pls.' Ex. 63 at 133-34. Delegate Jones also expanded District 77 further into Suffolk to add heavily black areas. *See* Appendix A at 5 (Pls.' Ex. 69, fig. 26). That greatly reduced District 77's compactness, Dkt. No. 108 at 140 (citing Pls.' Ex. 51 at 11, tbl. 1), and split the heavily black precincts of John F. Kennedy and Lakeside, fracturing several black neighborhoods and carving the high-BVAP portions of the precincts (69.9% and 79.4%, respectively) into District 77; Pls.' Ex. 71, tbl. 5; Pls.' Ex. 63 at 133-34; *see also* Tr. 273:20-274:14 (Rodden).

Other than talking to Delegate Spruill, Delegate Jones conducted no analysis of whether the 55% BVAP was necessary to avoid retrogression in District 77. Black voters in District 77 had easily elected their preferred candidates for years, Pls.' Ex. 50, tbl. 14. The Democratic vote share for District 77 was 69.3% in the benchmark plan. Pls.' Ex. 71, tbl. 22. The evidence shows that even with a BVAP as low as 45%, black-preferred candidates would average 63.5% of the vote. *See* Pls.' Ex. 71, tbl. 25. Even assuming that Delegate Spruill asked Delegate Jones to draw District 77 to contain at least 55% BVAP, there is absolutely no basis in evidence to conclude that was necessary to avoid retrogression under Section 5.

### b.     District 80

District 80's pre-redistricting BVAP of 54.4% did not comply with the 55% BVAP rule. *See* Pls.' Ex. 71, tbl. 22. Accordingly, Delegate Jones redrew District 80 so that its BVAP was increased to 56.3%. Pls.' Ex. 71, tbl. 22.

District 80 is, on its face, unusually configured. *See* Appendix B., tbl. 2. The changes

- 40 -

made to the benchmark version of the district resulted in substantial drops in the district's compactness scores, DI Ex. 15, tbl. 15, tbl. 9, and the highest Schwartzberg score of any Challenged District, Pls.' Ex. 51, tbl. 11. Delegate Jones also increased county and city splits in District 80. Pls.' Ex. 50, tbl. 3.

District 80 also shows how lines were drawn to achieve racial goals. Delegate Jones moved white voters out of District 80. While 19.9% of the total population was moved out of District 80 to District 79, but only 11.5% of the Black VAP was moved out—as compared to 33.2% of Whites. Pls.' Ex. 71 ¶ 105, tbl. 19.

To increase the BVAP of nearby District 89, Delegate Jones moved the Berkley VTD (95% BVAP) out of District 80 and into District 89. That maneuver cannot be explained on political grounds because Delegate Matthew James, who represents District 80, had received 96% of the vote in the Berkley precinct in his 2009 contested election. *See* Tr. 251:14-252:2 (Rodden).

Meanwhile, Delegate Jones tacked on an irregular western appendage that winds around low BVAP precincts, including Silverwood (14.9%), Churchland (8.3%), and Fellowship (14.2%), to capture high BVAP precincts such as Yeates (56.3%) and Taylor Road (48.8%). *See* Pl. Ex. 63 at 106-07, ll. 1810, 1827, 1833, 1841; *id.* at 133-34, l. 2269; *see also* Pls.' Ex. 87 at 13. At the second trial, Delegate Jones and Morgan volunteered that the western appendage was added to equalize population between District 79 and District 80. *See* Tr. 554:15-17 (Jones). As to *which* precincts were moved for population equality reasons, Intervenors maintained that District 80 swapped territory with District 79 to avoid adding "'Democratic-leaning precincts'" to Delegate Jones (in District 76). *See* Dkt. No. 108 at 146-47 (quoting Ints.' Pre-Trial Brief at 16-17). But that just begs the question at the heart of this case: *Why* did Delegate Jones and Morgan

choose to equalize population between District 79 and District 80 by adding these *specific* VTDs to District 80—VTDs that just happen to have high BVAP—rather than other nearby VTDs that had low BVAP? Intervenors had no answer at the first trial, but they tried to backfill that evidentiary gap in the second trial. Intervenors suddenly explained that the swaps between District 79 and 80 were not a function of protecting Delegate Jones but, rather, driven by Delegate Jones' desire to protect Delegate Joannou by drawing Democratic voters out of (Democratic) incumbent Delegate Joannou's district. Tr. 500:1-16 (Jones). The Court should give that post-hoc explanation precisely the weight it deserves—none.

District 80 been represented by black voters' candidates of choice for "as long as [Delegate Jones] could remember." 1st Trial Tr. 460:9-18 (Jones). And he did no analysis to determine if Section 5 compelled drawing District 80 to meet the 55% BVAP floor. *See, e.g.*, 1st Trial Tr. 467:20-468:4 (Jones). Black-preferred candidates were averaging 72.3% of the vote in District 80 under the benchmark plan, Pls.' Ex. 71, tbl. 22, and would be expected to win by a supermajority if the BVAP were dropped below 55%, *see* Pls.' Ex. 71, tbl. 25.

### c.    District 89

District 89's BVAP was increased from 52.5% to 55.5% to meet the 55% BVAP threshold. *See* Pls.' Ex. 71, tbl. 22. Achieving that goal had a drastic effect on District 89. *See* Appendix B, tbl. 3.

District 89's compactness scores dropped by over 30% because of several changes, including (1) removal of the mostly white Suburban Park VTD, *see* Tr. 254:23-255:6 (Rodden); (2) splitting of the Granby VTD to include mostly black areas of the VTD and exclude mostly white areas, *see* Tr. 255:10-256:25 (Rodden); and (3) a new river crossing created to pick up a large population of black voters across the Elizabeth River (the aforementioned Berkley VTD, which had been in District 80), *see* Tr. 253:16-20 (Rodden); *see also* Appendix B, tbl. 3; Tr.

- 42 -

144:22-145:1 (Armstrong). The river crossing also fractured communities of interest in Norfolk by separating the Berkley VTD from neighboring VTDs on the western side of the Elizabeth River, which remain in District 80. *See* Pls.' Ex. 64 at 17-18.

During the first trial, Delegate Jones tried to explain away these deviations by casting them as the mere fulfillment of incumbent requests. *See* 1st Trial Tr. 344:23-344:5 (Jones). As it turns out, however, they are not supported by the record. For example, Delegate Jones claimed that he split the Granby VTD to accommodate a request from incumbent Delegate Kenneth Alexander to keep one of Delegate Alexander's funeral homes in District 89. *See* Tr. 344:23-345:9 (Jones). But that funeral home is, in fact, located in an entirely different VTD that Delegate Jones *removed* from District 89: the predominantly white Suburban Park VTD. *See* Tr. 258:3-12 (Rodden).[15]

In addition, as noted above, District 89 now crosses the Elizabeth River to grab the Berkley VTD (95% BVAP), which had been in District 80. *See* Pls.' Ex. 63 at 121-22. In its Memorandum Opinion, the majority posited that the Berkley VTD may have been added because it "is also relatively close to Delegate Alexander's residence." Dkt. 108 at 148. But Delegate Jones made clear that the Berkley VTD was not added to District 89 because it was near Delegate Alexander's home, Tr. 559:8-12 (Jones), which, in fact, it is not, *see* DI Ex. 94 at 11; *see also* Tr. 558:23-559:17 (Jones).

At the second trial, Delegate Jones offered a new explanation for including the Berkley VTD in District 89: Another one of Delegate Alexander's funeral homes is located there. *See* Tr. 505:9-12 (Jones). There are two problems with that explanation. First, it is precisely the sort of

---

[15] John Morgan, who was responsible for drawing the convoluted line that splits the Granby VTD, testified that population equality was the *only* reason for the split. *See* Tr. 765:20-767:11 (Morgan). Respectfully, it strains credulity to believe that this split, which separates black voters from white voters with startling precision, *see* Appendix A at 6 (Pls.' Ex. 69, fig. 20), was drawn with no consideration of race whatsoever.

post hoc excuse, raised for the first time at the second trial, that the Supreme Court warned against. Second, it is thoroughly unpersuasive given that Delegate Jones removed from District 89 the Suburban Park VTD, which included a different funeral home owned by Delegate Alexander.

Indeed, even if the Court were to credit Delegate Jones' 2017 testimony, it only confirms the race-based redistricting of District 89: Where the incumbent's a funeral home was located in a predominantly white VTD (Suburban Park, which is 24% BVAP, *see* Pls.' Ex. 63 at 121-22), it was *dropped* from the district. Where a funeral home was located in a predominantly black VTD (95% BVAP), *see id.*, it was *added* to the district. To the extent the mapdrawers considered the incumbent's business interests in drawing the district, it was only to the extent those interests did not conflict with the unwavering 55% BVAP rule.

Nor is the use of race to draw District 89 narrowly tailored. As in District 80, Delegate Jones does not know the last time that a black-preferred candidate lost. 1st Trial Tr. 461:3-8 (Jones). He did no analysis of District 89. *See, e.g.*, 1st Trial Tr. 467:20-468:4 (Jones). The Democratic vote share under the benchmark was no less than 75%. Pls.' Ex. 71, tbl. 22. It is no surprise that black candidates of choice would be expected to win in District 89 at much lower BVAP levels. *See* Pls.' Ex. 71, tbl. 25.

### d.    District 90

District 90 was drawn with a BVAP of 56.6%, thus meeting the preordained BVAP floor. Pls.' Ex. 71, tbl. 22. The evidence at the second trial showed that District 90 was used as a "donor" district to increase the BVAP of surrounding Challenged Districts—specifically, neighboring District 89. *See* Tr. 387:16-23 (Palmer). This is just the sort of holistic analysis demanded by the Supreme Court and given insufficient weight in this Court's prior analysis. *Bethune-Hill*, 137 S. Ct. at 799.

- 44 -

The sweeping alterations made to the district exhibit a now familiar racial pattern. The BVAP of the areas moved out of District 90 and into other Challenged Districts was more than 15% higher than the BVAP of areas moved out of District 90 into other districts. *See* Pls.' Ex. 50, tbl. 9. The movement of black voters out of District 90 and into District 89 is particularly stark. For example, Delegate Jones moved the Union Chapel VTD (92% BVAP) out of District 90 and into District 89, knowing that the Union Chapel VTD "ha[d] a high minority population." Tr. 561:17-19 (Jones). Delegate Jones also split the predominantly black Brambleton VTD (95.7% BVAP), further increasing District 89's BVAP. *See* Pls.' Ex. 63 at 121-22; Pls.' Ex. 71 ¶ 64.

These changes certainly were not made at the behest of the incumbent. Former Delegate Howell, who represented District 90 at the time, testified that he did not want those changes and expressed his concerns to Delegate Jones. His concerns fell on deaf ears. Tr. 83:18-84:18 (Howell).

The same pattern is apparent elsewhere in the district. On the eastern side of District 90, the Aragona, Shell, and Reon VTDs (in Virginia Beach) are split between District 90 and non-challenged districts neighboring District 90. *See* Pls.' Ex. 71 ¶ 48. In each case, the portion of the VTD assigned to District 90 has a higher BVAP than the portion assigned to a non-challenged district. *See id.*; *see also* Appendix A at 7-8 (Pls.' Ex. 69, figs. 22-23). And the Reon VTD is drawn carefully to exclude from District 90 the portion of the VTD that includes "a condominium complex that is predominantly white." Tr. 264:5-10 (Rodden).

District 90 also fails strict scrutiny. The district has been held by a minority candidate since the early 1980s. 1st Trial Tr. 461:12-18 (Jones). Delegate Jones once again examined no evidence about District 90 that would justify application of the 55% BVAP floor to the district.

- 45 -

*See, e.g.*, 1st Trial Tr. 467:20-468:4 (Jones). Under the benchmark plan, black-preferred candidates averaged 69.1%, *see* Pls.' Ex. 71, tbl. 22, and those candidates would be expected to sweep to victory with a supermajority of votes even if the BVAP were dropped well below 55%, *see* Pls.' Ex. 71, tbl. 25.

### e. District 92 and 95

Although black voters in both District 92 and 95 had easily elected their preferred candidates for years, *see* Pls.' Ex. 50, tbl. 14, Delegate Jones insisted on maintaining high BVAP percentages in these districts. When asked why majority-white districts in the area experienced a "decrease among blacks," Delegate Jones' answer was simple: "So what had to happen, the population had to be picked up, *had to try to maintain the voting strength, for the black voting percentage*." Pls.' Ex. 35 at 153:4-7 (emphasis added). In other words, the BVAP of surrounding majority-white districts was drained to "maintain" the BVAP of District 92 and 95.

This was no simple task. Both districts were severely underpopulated, short by almost 9,000 people (District 92) and 12,000 people (District 95) people. But the Peninsula's geography made it difficult to both increase population in Districts 92 and 95 and meet the 55% BVAP goal throughout the Tidewater/Hampton Roads region.

District 92 could not expand to the north, which had substantially lower BVAP. *See, e.g.*, Pls.' Ex. 69 at 49, fig. 15. Delegate Jones therefore moved District 92 to the west, absorbing portions of District 95 that were "predominantly African-American populations," including the Kraft, Forrest, and Mallory VTDs. Tr. 562:22-563:2 (Jones). At the same time, Delegate Jones removed other areas that were predominately white. *See* Tr. 245:1-23 (Rodden). As a result, the boundaries of District 92 consistently divide higher-BVAP areas from lower-BVAP areas to the north and southeast. *See* Pls.' Ex. 69, fig. 15. And there is clear statistical evidence of racial sorting. The BVAP of areas moved *into* District 92 was 47.3%; the BVAP of areas moved *out*

- 46 -

was 36.8%. Pls.' Ex. 50, tbl. 8.

Because District 92 absorbed black voters from District 95, Delegate Jones added new black voters to District 95. He did so by adding a "long arm" extending from the northwest tip of the district. Tr. 231:21-232:1 (Rodden). That long arm meanders up the Peninsula, tracing a narrow corridor through predominantly white areas to reach a corridor of predominantly black voters between Highway 69 and Warwick Boulevard. District 95 pulls in nearly every sizeable pocket of black voters on the Peninsula. For example, District 94 moved 10.7% of its total population into District 95. Pls.' Ex. 71 ¶ 101. District 94 moved 24.5% of its BVAP into District 95, more than double the rate of the general population, but only 3.6% of its white VAP. *Id.*

And because the General Assembly could not easily achieve its racial goals while adhering to the goal of maintaining political boundaries, it cast that competing goal aside. District 95 splits the Reservoir, Epes, Denbigh, Jenkins, Palmer, and Deer Park VTDs—and includes only the heavily black portions of those split VTDs. *See* Pls.' Ex. 71, tbl. 6; *see also id.*, fig. 7; Appendix A at 10 (Pls.' Ex. 69, fig. 16); Tr. 232:18-21 (Rodden) ( explaining that these VTDs "were rather explicitly split along racial lines").

The manner in which the mapdrawers divvied up the Epes VTD is particularly probative. The boundary of District 95 in the Epes VTD does not follow major streets or any other discernible landmarks. Instead, it "moves away from a major boulevard and it starts to follow a lot of residential streets and simply follows behind the apartment complexes," thereby "keep[ing] the apartment complexes"—and their high BVAP populations—"inside of 95 and keep[ing] the neighborhoods on the other sides of these streets outside of 95." Tr. 234:7-12 (Rodden). These changes and others transformed District 95 from a fairly compact district to the least compact

district in the Enacted Plan, with a Reock score of 0.14. *See* Pls.' Ex. 50 ¶¶ 48-49; *see also*
Appendix B, tbl. 4.

Consultant John Morgan claims that he split Reservoir VTD to improve the political
performance of surrounding (Republican-controlled) districts, and split Epes, Denbigh, and
Jenkins VTDs along the way merely for population equality reasons. Tr. 677:14-679:10
(Morgan). But even if that is true, as noted above, political data is not available below the VTD
level. As a result, these VTDs were obviously and starkly split on racial lines, and thus the
evidence is clear that racial means were used to accomplish political ends.

Finally, neither District 92 nor District 95 are narrowly tailored. Delegate Jones does not
know the last time a black-preferred candidate lost in either district. 1st Trial Tr. 461:19-462:8
(Jones). He examined no evidence specific to either district to determine whether,
notwithstanding this electoral history of unalloyed success, the VRA would compel drawing
either district at 55% BVAP or higher. 1st Trial Tr. 467:20-468:4 (Jones). The election data
showed that black-preferred candidates were not only winning, but winning by enormous
margins, *See* Pls.' Ex. 71, tbl. 22. Black-preferred candidates would have continued winning by
enormous margins if the BVAP in either district were reduced dramatically below 55%. *See* Pls.'
Ex. 71, tbl. 25.

## F.     The Scope of a Remedy

The Court asked the parties to brief the implications on a remedy should the Court find
that some, but not all, of the Challenged Districts are unconstitutional racial gerrymanders. In
brief, the scope of an appropriate remedy turns on the nature and scope of the constitutional
violation. *See Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 563 (E.D. Va. 2016).

In the course of redrawing the House plan, if necessary, the Court need not "defer" to that

unconstitutional plan—it must remedy it.[16] Thus, as a general matter, the Court can make all changes necessary to remedy the constitutional violation—including to districts where no constitutional violation was found—no matter how "substantial." *Personhuballah*, 155 F. Supp. 3d at 563. On the other hand, it is not appropriate to unnecessarily redraw districts "hundreds of miles away from those [unconstitutional] districts." *Id.* at 563.[17]

Here, the General Assembly adopted a planwide redistricting strategy to treat all majority-minority districts the same. The Challenged Districts were drawn with a single, broad brushstroke, and fixing the constitutional violation will likely require commensurately broad change to the Challenged Districts and surrounding areas. The Court would unquestionably find it necessary to make changes to surrounding districts in the immediate vicinity, and there may be broader "ripple effects" in nearby regions as well. As Intervenors noted (repeatedly) in trial, "drawing a district is easy, drawing a plan is hard." Tr. 994:6-8 (Braden).

To give an example: If the Court found that some, but not all, Challenged Districts in the Richmond area were unconstitutional, it would almost certainly have to substantially redraw districts in the Richmond area. That will include unconstitutional Challenged Districts, and nearby districts—whether Challenged or non-challenged—where no violation was found, as the remedy will need to "unpack" the unconstitutional districts, achieve population equality, and avoid gross violations of traditional redistricting principles.

It is possible that, in this scenario, the Court would not need to make alterations in the

---

[16] *See Abrams v. Johnson*, 521 U.S. 74, 85 (1997) (adopted redistricting plan "is not owed . . . deference to the extent the plan subordinated traditional districting principles to racial considerations" because "courts [are] to correct—not follow—constitutional defects in districting plans"); *see also Favors v. Cuomo*, No. 11-CV-5632 (RR)(GEL)(DLI)(RLM), 2012 WL 928223, at *6 (E.D.N.Y. Mar. 19, 2012) ("[T]he court owes no . . . deference to the outdated policy judgments of a now unconstitutional plan.").

[17] In *Personhuballah*, this Court oversaw the redrawing of Virginia's Third Congressional District, which required redrawing adjacent districts. Because congressional districts contain hundreds of thousands of people and large geographic areas, it is relatively easier to limit the scope of changes to surrounding districts. This case, by contrast, concerns much smaller, less-populated House districts.

- 49 -

Tidewater/Hampton Roads region. But it is possible that "ripple effects" from the remedy will need to permeate more broadly. For example, if the Court struck down District 74—which stretches horizontally across the state—a remedy may well need to impact both the Richmond area and the Tidewater/Hampton Roads region. Similarly, if the Court struck down District 92 and/or 95 on the Peninsula, geographic constraints would likely require changes in the broader Tidewater/Hampton Roads region.

Thus, though a court adopting a remedial map does not redraw districts unless necessary to effectuate the remedy, there are no artificial limitations on the Court's remedial powers.

Finally, should the Court conclude that some or all Challenged Districts are racial gerrymanders, it means that citizens within those districts have suffered irreparable injury for the better part of a decade. Every day that goes by under an unconstitutional map adds to that injury. Accordingly, Plaintiffs respectfully request that, should the Court rule in Plaintiffs' favor in whole or part, it promptly set out a framework for the swift adoption of a remedial map.

## III.    CONCLUSION

Redistricting is complicated. Delegate Jones faced many competing concerns when drawing the map. And he compromised each and every redistricting criteria save one—adherence to the 55% BVAP floor for the Challenged Districts. Race was the predominant factor in the drawing of the Challenged Districts, and the General Assembly's use of race was anything but narrowly tailored. The Challenged Districts therefore violate the Equal Protection Clause, and Plaintiffs respectfully request that this Court enter judgment for Plaintiffs.

137275235.6

Dated: October 30, 2017

By: */s/ Aria Branch*

Marc Erik Elias (*pro hac vice*)
Bruce V. Spiva (*pro hac vice*)
Aria Branch (VSB No. 83682)
**PERKINS COIE** LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6338
Facsimile: 202.654.9106
Email: ABranch@perkinscoie.com
Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com

Kevin J. Hamilton (*pro hac vice*)
Abha Khanna (*pro hac vice*)
Ryan Spear (*pro hac vice*)
William B. Stafford (*pro hac vice*)
**PERKINS COIE** LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000
Email: KHamilton@perkinscoie.com
Email: AKhanna@perkinscoie.com
Email: BStafford@perkinscoie.com
Email: RSpear@perkinscoie.com

- 51 -

**CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of October, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

By */s/ Aria C. Branch*
Aria C. Branch (VSB #83682)
Perkins Coie LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
ABranch@perkinscoie.com

*Attorneys for Plaintiffs*

- 52 -