IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(RICHMOND DIVISION)

GOLDEN BETHUNE-HILL, *et al.*,

     Plaintiffs,

  v.

VIRGINIA STATE BOARD OF
ELECTIONS, *et al.*,

     Defendants.

Civil Action No. 3:14-cv-00852-REP-AWA-BMK

**DEFENDANT-INTERVENORS' REMAND POST-TRIAL BRIEF**

Dalton Lamar Oldham, Jr. (*pro hac vice*)
Dalton L Oldham LLC
1119 Susan Street
Columbia, SC 29210
Tel: (803) 237-0886
dloesq@aol.com

E. Mark Braden (*pro hac vice*)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates
and Virginia House of Delegates Speaker
William J. Howell*

# TABLE OF CONTENTS

Introduction ...........................................................................................................................1

Argument ...............................................................................................................................3

    I.   Race Was Not the Predominant Factor ..........................................................................3

        A.  The Inquiry on Remand .........................................................................................4

        B.  Statewide Evidence ................................................................................................6

             1.  There Is No Actual Conflict Between Race and Traditional
                 Criteria ............................................................................................................6

             2.  There Are No Stark Racial Differences in Demographic
                 Movements .......................................................................................................8

             3.  The 55% BVAP Target Was a Minor Constraint .................................................15

             4.  The BVAP Target Was One Factor Among Many and Had
                 a Qualitatively Minor Role in District Configuration ...........................................17

        C.  District-Specific Evidence ....................................................................................19

    II.  All Districts Are Narrowly Tailored .............................................................................30

        A.  The House's Statewide Strategy Was Narrowly Tailored ...........................................31

        B.  Each District Individually Is Narrowly Tailored ......................................................43

    III. Plaintiffs' Theory, if Law, Would Gut the VRA ..............................................................47

    IV. The Court's Discretion in Remedying Any Violations Is Restricted ................................48

Conclusion ...........................................................................................................................50

## INTRODUCTION

Given the lengthy procedural history of this case, it is worth remembering how the relevant facts unfolded. In 2011, facing the most limited time of any state to accomplish "the most difficult task a legislative body ever undertakes," *Smith v. Beasley*, 946 F. Supp. 1174, 1207 (D.S.C. 1996), the Virginia House turned to Delegate Chris Jones, "a person who has carried many very difficult, challenging, complex pieces of legislation," "is not known as an ideologue," "is careful to listen to all parties concerned," and has a track record of "building consensus." 2 Tr. 879:13–25.[1] Delegate Jones spent hundreds of hours considering the opinions of Delegates from both political parties to meet local needs. His effort received bipartisan praise, including from Democratic Delegate Mark Sickles who remarked that Delegate Jones "has handled himself in such a professional matter" that "if I…had been in charge of this, I would hope that I could have handled it in as professional a manner." PEX40 at 49–50.

It also was undisputed in 2011 that "only" Delegate Jones's plan reflected "input" from the House Black Caucus. PEX35 at 141–49. Then-Vice Chair of the Black Caucus, Lionel Spruill, stated on the House floor that "mostly every member of the Black Caucus" was consulted, as were NAACP leaders in Suffolk, Chesapeake, and Virginia Beach. PEX35 at 142, 146–47. No one disagreed, and House members responded with "[a]pplause." PEX35 at 149. Delegate Rosalyn Dance said she was "proud to be a part of [the] team" sponsoring the plan, it was "truly a fair process," and the plan should pass because "it does provide the 55 percent voting strength that I was concerned about as I looked at the model and looked at the trending as far as what has happened over the last 10 years," PEX35 at 157; PEX33 at 44. Delegate Delores McQuinn wrote in 2011 to constituents that the enacted House plan is "a fair and equitable

---

[1] The first trial transcript (July 2015) is cited throughout this brief as "1 Tr. page(s):line(s)"; the second (October 2017) is cited as "2 Tr. page(s):line(s)."

1

redistricting plan." 2 TR 110:17–20. And, in response to allegations by two white Delegates that the plan "is bad for minorities," Delegate David Englin, a Democrat from Alexandria, answered that "to suggest that Democrats voting for this plan are trying to harm minorities or not sufficiently standing up for minorities is an affront and an offense that is not borne out by the facts." IEX4 at 12. Delegate Englin asserted that "an objective analysis of this plan, an analysis based on facts and reason and principle, suggests that on balance it's a fair and reasonable plan, which is why so many Democrats voted for it." IEX4 at 13. Indeed, they did—as did every Republican, nearly every Black Caucus Member, and every Delegate trial witness.

Yet, as Plaintiffs would have it, that was then, and this is now. Their case "history" begins—not in 2011—but years later in litigation over Virginia's *Congressional* plan. Pls' Post-Trial Brief, ECF No. 230, at 1 ("Br."). And the facts they rely on are—not the context and considerations when the plan was drawn—but mischaracterized litigation strategies and arguments during and after 2015. *Id.* at 1–3. Plaintiffs offer biased "expert" conjecture on motive in place of the map-drawers' direct testimony; after-the-fact equivocation by Delegates in place of what they said or did not say six years ago; and a repackaging of their obsolete *per se* argument that "a target criteria" is "the end of the analysis," 1 Tr. 841:13–21 (Hamilton), in place of a "holistic analysis" of "all of the lines of the district at issue," *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017).

This *post hoc* circus is a diversion from the Court's task on remand, assessing whether (1) Plaintiffs proved predominance "in the absence of an actual conflict," and (2) the House had "good reasons" to believe the plan needed 12 ability-to-elect districts each with a "functional working majority." *Id.* at 799, 801–802. The evidence supports the defense on both questions. First, it shows that the Voting Rights Act presented one set of considerations among many and

that other considerations were not "cast aside." *Id.* at 799. Second, it shows that the benchmark plan had 12 ability-to-elect districts, and the new plan would also need 12 with sufficient BVAP to maintain minority voting strength without reliance on crossover voting, which the House could not prove existed. The decision to draw 55% BVAP districts was reasonable.

It is as true today as in 2015 that Plaintiffs cannot distinguish the House plan from all other standard redistricting efforts, so they advocate a change in law. The Supreme Court did not oblige, and this Court should not either. It should uphold all the Challenged Districts.

## Argument

This case presents two questions: (1) whether Plaintiffs proved "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," *Bethune-Hill*, 137 S. Ct. at 797, and (2) whether the House had "'*good reasons* to believe' it must use race in order to satisfy the Voting Rights Act, even if a court does not find that the actions were necessary for statutory compliance," *id.* at 801 (quotation marks omitted). The evidence supports Defendant-Intervenors on both issues.

## I.    Race Was Not the Predominant Factor

States bear "the duty and responsibility" of redistricting. *Chapman v. Meier*, 420 U.S. 1, 27 (1975). The VRA does not abrogate that duty, and thus states' "broad discretion" extends to "drawing districts to comply with" the VRA. *League of Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006). Courts therefore "must exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Bethune-Hill*, 137 S. Ct. at 797 (quotation marks omitted). "[R]edistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines, just as it is aware of a variety of other demographic factors." *Id.* (quotation and edit marks omitted). "In light of these considerations," a racial-gerrymandering plaintiff "bears the burden to show that race was the

3

predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* (quotation marks and edits omitted) "To satisfy this burden, the plaintiff must prove that the legislature subordinated traditional race-neutral districting principles to racial considerations." *Id.* (quotation marks omitted).

## A.    The Inquiry on Remand

The Supreme Court identified two errors in this Court's prior analysis: (1) that it required proof of "an actual conflict between the enacted plan and traditional districting principles" and (2) that "it considered the legislature's racial motive only to the extent that the challengers identified deviations from traditional redistricting criteria that were attributable to race and not to some other factor." 137 S. Ct. at 797, 799. As to the first, the Supreme Court instructed this Court to assess whether predominance is evident "in the absence of an actual conflict." *Id.* As to the second, the Supreme Court instructed this Court to conduct a "holistic analysis" to "take account of the districtwide context," rather than "divorce any portion of the lines…from the rest of the district." *Id.* at 12. This Court "must consider all of the lines of the district at issue." *Id.*

Plaintiffs wrongly claim victory in this remand directive. On appeal, they asked the Supreme Court to answer the following question in the affirmative:

> Did the court below err by concluding that the admitted use of a one-size-fits-all 55% black voting age population floor to draw twelve separate House of Delegates districts does not amount to racial predominance and trigger strict scrutiny?

Appellants' Br. at (1). Only two Justices gave that affirmative answer, and the majority opinion tracks, not Plaintiffs' position, but that of the United States as *amicus curiae*, which argued:

> Because a plaintiff must show that race predominantly dictated the movement of people into separate districts, the district court correctly recognized that the existence of a racial target does not, by itself, establish predominance. A racial target may end up playing little or no role in how district lines are actually constructed. And even when a racial target is one motivating factor in the drawing of some lines, race may still not predominate over other non-racial factors in the

4

design of the district as a whole. [Plaintiffs] therefore err insofar as they suggest that the predominance standard is satisfied merely by evidence that a racial target was used in drawing the districts, without a showing that the target predominantly drove those lines.

U.S. Br. at 12 (citations omitted). The Solicitor General argued further that Plaintiffs' rule would "threaten intrusive judicial scrutiny of redistricting plans as a matter of course" and "discourage voluntary compliance with the VRA." U.S. Br. at 15. Plaintiffs argued against that view. *See* Appellants' Reply at 6–7 & n.1. And they lost. Instead of ruling that a "black voting age population floor" amounts "to racial predominance and trigger[s] strict scrutiny," Appellants' Br. at (i), the Court remanded for a "holistic analysis" of the target's *effect* on "all of the lines of the district at issue."[2] *Bethune-Hill*, 137 S. Ct. at 800. Contrary to Plaintiffs' assertions, Br. at 1, the 55% target is old news.[3] *See* 2 Tr. 6:3–6 (Judge Payne). The Court's remand task is not to determine whether the target existed, but to conduct a "holistic analysis" to assess its qualitative impact on the placement of "a significant number of voters within or without a particular district" as compared to other factors. *Bethune-Hill*, 137 S. Ct. at 800.

## B.    Statewide Evidence

The analysis proceeds district by district, but evidence "pertaining to an area that is larger or smaller than the district at issue" may be probative. *Bethune-Hill*, 137 S. Ct. at 800. Although

---

[2] The term "holistic" does not appear in Plaintiffs' Supreme Court briefing. It appears 5 times in the brief of the United States.

[3] Intervenors have always conceded a 55% target. 1 Tr. 20:18–23; 1 Tr. 860:4–7. They argued in 2015 that Delegate Jones did not initially believe he hit the target in all districts, proving it was "a *negotiable* 55 percent target." Int's Post-Trial Br., ECF No. 106, at 14–15. Although the unrebutted record supports this fact, *see* 2 Tr. 625:17–626:19, Defendant-Intervenors long ago abandoned the argument, Highlighted Memorandum Opinion, ECF No. 157-1, at 23–27, which was a minor part of their 2015 defense, *see* Int's Post Trial Br., ECF No. 106 at 15. If Plaintiffs seriously believe Defendant-Intervenors did not concede this "until the eve of trial," Br. at 7 n.2, they have not been paying attention.

the Supreme Court clarified there may be multiple ways to show predominance, none of the conceivably relevant methods supports Plaintiffs' case.

### 1.    There Is No Actual Conflict Between Race and Traditional Criteria

One form of probative evidence is "a conflict or inconstancy" between racial goals and traditional criteria. *Bethune-Hill*, 137 S. Ct. at 799. Because "legislatures that engage in impermissible race-based redistricting" generally "find it necessary to depart from traditional principles in order to do so," proof of actual conflict will "as a practical matter" be necessary "in many cases, perhaps most cases." *Id.* But the Court already found that the 55% goal did not conflict with traditional principles for the remaining Challenged Districts, and Plaintiffs' appeal did not challenge those factual findings as clearly erroneous. *See* Appellants' Br. at 6 ("This appeal challenges the legal standard the majority developed and applied in evaluating racial predominance…."). So the Court's prior findings are law of the case. *See* Int's Statement of Position, ECF No. 146, at 5; Int's Response Statement of Position, ECF No. 152, at 3.

Besides, the record confirms the Court's findings. The two most knowledgeable fact witnesses testified that racial considerations did not conflict with the House's criteria. 1 Tr. 343:3–8 (Jones); 2 Tr. 598:10–14 (Morgan). This case therefore differs from *Cooper v. Harris*, 137 S. Ct. 1455, 1468–69 (2017), which Plaintiffs' selectively quote (at 1, 8, 12), where the map-drawing consultant testified that "he sometimes could not respect county or precinct lines as he wished because 'the more important thing' was to create a majority-minority district." That did not occur here.

To the contrary, the plan follows traditional districting norms. Six of the Challenged Districts are as or more compact than in the benchmark. PEX15 at 14. No incumbents were paired in the Challenged Districts. IEX 15 at 15. The Challenged Districts retained, on average,

approximately 3 of 4 constituents. *Id.* The number of split jurisdictions remained the same as before. *Id* at 4. And VTD splits increased by only 1%. *Id.* at 5. Dr. Hofeller concluded that "the individual majority minority districts" are "at least as compact and contiguous as the 1991 and 2001 maps and individual minority districts," that the map "is consistent with lower chamber maps in similarly situated states," that there is a "high degree of individual district core retention in 2011," and that there "was a high degree of protection extended to incumbents." IEX14 ¶¶ 76–79. And the Court previously found that political considerations explained, better than race, the deviations from traditional criteria that arguably occurred. 141 F. Supp. at 568, 570–71.

Plaintiffs rely on Dr. Rodden to prove what "applications of traditional redistricting principles would" be absent VRA compliance. PEX69 at 3. But he was certified as an expert in "geo-spatial data analysis and its application to redistricting," 2 Tr. 159:1–7, and that does not qualify him to opine on what does and does not comport with traditional criteria. His extensive conjecture about what the Virginia House should have done, *e.g.*, PEX69 at 3, 11, 13, 18–23, is unfounded. Nor is he positioned to answer the question "whether race was the predominant factor in the drawing of the map," 2 Tr. 161:19–22, because "predominant factor" means "motive," *Bethune-Hill*, 137 S. Ct. at 800, a term Dr. Rodden was not shy to use, *e.g.*, PEX69 at 66. But experts do not exist to read minds. 2 Tr. 156:24–157:3; 159:1–14.

Moreover, Dr. Rodden's report is neither "based on reliable methodology," nor does it "reliably flow from [a] methodology and the facts at issue." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999). It consists of his "personal opinions and speculations." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014). He looks at dots on maps and characterizes them, which is not expert opinion. *United States v. Brewer*, 783 F.2d 841, 843 (9th Cir. 1986) (finding expert testimony unnecessary to view photographs because a factfinder

can assess what a picture depicts); *United States v. Angelos*, 417 F. App'x 786, 797 (10th Cir.

2011) (same). He does not itemize the traditional criteria he considered, how he measured them,

or how each metric compares across a consistent data set. He mentions them *ad hoc*, randomly

stating, for example, that that HD70 is "quite non-compact" without a measurement, PEX69 at

30, or assessing other districts' compactness (such as HD71 or HD92). He instead evaluates

different districts through different *ad hoc* criteria. By contrast, Dr. Hofeller's 2015 report

provides compactness scores for *every district* in the last three Virginia cycles, as well as scores

in other states' plans and in plans challenged in notable litigation. IEX14 Tables 1–10. By that

objective method, the Court can see that HD70 is compact. IEX14 at 77–78. The Court can

objectively assess Dr. Hofeller's views; it must take Dr. Rodden's on faith.

### 2.      There Are No Stark Racial Differences in Demographic Movements

Another pertinent form of evidence suggesting predominance is "stark splits in the racial

composition of populations moved into and out of disparate parts of the district." *Bethune-Hill*,

137 S. Ct. at 800. That evidence does not exist here.

**Basic Numbers.** The district the Supreme Court scrutinized in *Alabama Legislative

Black Caucus v. Alabama* saw the addition of "15,785 individuals" of whom "just 36 were

white." 135 S. Ct. 1257, 1271 (2015). The district at issue in *Cooper* saw the addition of "tens of

thousands of additional African-American voters," in a move that "deviated from the districting

practices [the state's consultant] otherwise would have followed." 137 S. Ct. at 1469. The

numbers here pale by comparison. According to Dr. Ansolabehere, the average BVAP of

territory moved into the Challenged Districts was 47.85%, and the average BVAP of territory

moved out was 41.7%. PEX50 Table 8. According to the population data in the record, fewer

black than non-black voters on average moved in to Challenged Districts: 7,947 to 8,639.

8

Appendix A (census data listing taken from IEX33). The district-specific numbers show a random walk: more black voters than non-black voters were added in 6 districts; more black voters than non-black voters were added in 6. *Id.* BVAP increased in 6 district and decreased in 6. IEX 15 at 13. That is the opposite of "stark."

**Plaintiffs' Flawed Analyses.** Against that evidence, Dr. Rodden characterized his maps as showing "stark" racial differences in the movement of people, *see, e.g.*, 2 Tr. 202:13, but his analysis takes into account neither racial demographics nor the movement of people. There are no numbers in his report, just dots, and "[y]ou have to have very good eyes to count up these dots. I think that would be difficult." 2 Tr. 329:17–18. So his demographics views are nothing but describing maps based on his gut. And there is no assessment of population movement because Dr. Rodden does not distinguish pre-existing from new lines. *E.g.*, PEX69 at 68–69. Besides, Dr. Rodden's maps refute Plaintiffs' allegations of surgical precision in line-drawing. The lines hardly correspond with demographic splits, and the purported "divide" is "generally gray" and muddled. 2 Tr. 234:20–25 (Judge Payne). Appendix B to this brief illustrates the substantial pockets of black dots excluded from the Challenged Districts in Plaintiffs' cherry-picked examples, and most are on the borders and could easily have been included.

Dr. Palmer's numbers confirm this. As described in Intervenors' opening brief (at 13–14), the VTD and locality splits he analyzed routinely place more black voters in majority-white districts than in the Challenged Districts. Altogether, the VTD splits exclude from Challenged Districts over 20,000 black voters residing just on their outskirts. PEX71 at 52–56. And Dr. Palmer's locality-split analysis shows over 158,683 black voters placed in majority-white districts—enough black voters for more than *four additional 55% BVAP districts*. PEX71 at 59–

60.[4] Moreover, the BVAP of territory moved from non-challenged districts to Challenged Districts (including HD75) was under 50% in *14 of the 16* such shifts, placing *more non-black voters* than black voters in Challenged Districts each time. PEX71 at 60. The BVAP of areas moved from Challenged Districts to non-challenged districts was over 20% in 7 of 9 such shifts, shifting thousands of black voters out of the VRA districts. PEX71 at 61. Of the locality splits Dr. Rodden identified, over half (12 of 21) place territory of below 50% BVAP in Challenged Districts. PEX71 at 57–60. And of the VTD splits Dr. Palmer identified, 15 of 32 place territory of below 50% BVAP in Challenged Districts. PEX71 at 54–57.

Dr. Palmer finds stark differences only because most splits place a higher BVAP in Challenged Districts than non-challenged districts. But this hides tepid differences. True, the VTD called "Palmer" places a higher BVAP territory in HD95 than in HD94, but the difference is 26.6% to 17.6%. PEX71 at 5. Dr. Palmer counts that as "stark," along with minimal differences in Rives (41.2% to 38.4% and 29.4%), Courts Building (38.0% to 24.7%), Jefferson Park (52.7% to 52.2%), Forks-of-the-River (35.7% to 26.9%), Precinct 2-1 (37.1% to 13.2%), Davis (50.4% to 42.2%), Dorey (31.3% to 16.9%), Granby (35.7% to 24.8%), Reon (55.5% to 41.3%), Denbigh (62.2% to 39.5%), and Reservoir (49.8% to 39.1% and 29.0%). PEX71 at 52–56. Dr. Palmer also neglects to mention that the largest VTD split of all involving 27,380 people—nearly 20% of the individuals in his VTD-split analysis—places 6,692 black voters in majority-white HD79 and a mere 128 in majority-black HD89. PEX71 at 54. The average BVAP of split VTDs placed in the Challenged Districts is only 24% higher than the BVAP of territory placed in majority-white districts. Br. at 10.

---

[4] A 55% BVAP district requires in the vicinity of 35,000 black voting-age individuals.

Predictably, Plaintiffs can only identify three non-HD75 related VTD splits that may impact the 55% goal.[5] Br. at 10–11. So, even by their calculus, 21 of 24 splits were for non-racial reasons. And even the final three splits are irrelevant, because the presumed impact depends on "[h]olding all else constant" when eliminating the split. PEX71 at 13. But nothing in redistricting is "constant"; un-splitting the VTDs would take the district out of population alignment, thereby spurring other changes that likely would result in a district at or above 55% BVAP.

Dr. Palmer's maps do not show stark racial differences because he manipulated the shading to show stark splits that do not exist. PEX71 at 31–41. He admitted that, without manipulating the color scale, typically "the darkest possible color won't be used at all." 2 Tr. at 457:22–485:5. His justification that rigging the scale made the maps visually appealing, *id.*, is no defense because the maps measure racial differences through dark shading, so rigging the shading to ensure the darkest color is used pre-ordains the result. And Dr. Palmer manipulated the coloring further insofar as he varied the size of the displayed area—the shading reflects BVAP percentages in the depicted area—thereby excluding nearby territory considered in the map-drawing process in tandem with the displayed area and allowing a showing of dark green that would not have appeared on the computer screen used in 2011. 2 Tr. 234:20–25. The maps say far more about Dr. Palmer's motive in 2017 than the map-drawers' motive in 2011.

**Plaintiffs' VTD Arguments.** In place of an honest, fact-sensitive and holistic analysis, Plaintiffs advocate a *per se* rule that all split VTDs in majority-minority districts are racial. Br. at 12. The argument takes governing precedent completely out of context.

First, both *Bush v. Vera*, 517 U.S. 952, 956–72 (1996), and *Alabama*, 135 S. Ct. at 1271, Plaintiffs' purported authority for their position, involved multiple split VTDs between

---

[5] As discussed below, splits between HD63 and HD75 are narrowly tailored. *See infra* § I.C.

11

contiguous districts that were "perfectly tailored to maximize minority population." 517 U.S. at 971; *see also Alabama*, 135 S. Ct. at 1271 ("[T]he drafters split seven precincts between the majority-black District 26 and the majority-white District 25, with the population in those precincts clearly divided on racial lines."). In contrast, the VTDs splits here generally bear the hallmarks of a population-equalization effort. Dr. Palmer testified that "[s]plitting VTDs to equalize population is very common." 2 Tr. 381:14–363:11. John Morgan and Dr. Hofeller agreed. 2 Tr. 602:12–20; 2 Tr. 939:22–940:7. Most of the VTD splits at issue involve a single split (occasionally two) between contiguous districts and do not suggest atypical maneuvering. Mr. Morgan, who split the VTDs, discussed the exceptions at length. *See infra* § I.C.

Plaintiffs misread *Alabama* in arguing that the Court must ascribe racial motive to these splits and other moves to equalize population. *Alabama* did *not* hold that all equalization efforts are racial. The same decisions are made in majority-white districts. *Alabama* rather focused on "*which* voters the legislature decides to choose," 135 S. Ct. at 1271, and the voters in the split VTDs here were assigned to districts on a non-racial basis: by the shapes and sizes of census blocks. Because even a single census block can take a district out of population alignment, 2 Tr. 965:13–24 (Rodden), Mr. Morgan had to scan the district boundaries for census blocks that were correctly sized to bring the districts on each side of the split within the highly restrictive +/- 1% range, 2 Tr. 601:25–641:1. For example, the census block sizes on the north side of HD95 prevented Mr. Morgan from taking that top edge directly north, so he brought it west where the block sizes provided the correct numbers. 2 Tr. 639:19–640:23. The "census geography," not race, explains "*which* voters" were moved and where. And some splits were drawn based on Mr. Morgan's view of what line made aesthetic sense, *e.g.*, 2 Tr. 628:6–19, and some were drawn along roads or geographic lines, *e.g.*, 2 Tr. 665:15–22. Those are not racial considerations.

In fact, Mr. Morgan "really didn't take race into account in splitting VTDs," 2 Tr. 715:1–2, and did not use his redistricting software's "racial thematic for the census blocks" in splitting any VTDs, 2 Tr. 668:11–20. Plaintiffs ask the Court to disbelieve this, but they do not and cannot rebut it with evidence. There is *no* competing fact-witness testimony, and the expert testimony supports Mr. Morgan, both in confirming that "[s]plitting VTDs to equalize population is very common" and in demonstrating through numbers and maps that the alleged racial sorting at the census-block level was muted at best. Moreover, the maps cannot impeach Mr. Morgan because they do not test his explanation. Dr. Rodden's maps do not include census blocks, do not identify which dots are bound to which other dots, and do not provide population numbers to test whether race or block sizes better explain the placement of voters. 2 Tr 637:11–64:23. Nor do dots on Dr. Rodden's map demonstrate where any voter lives; they are placed randomly within the *invisible* census blocks. 2 Tr. 638:7–13. Dr. Palmer's maps include some blocks, but no numbers or *surrounding* blocks. PEX71 at 31–41. Mr. Morgan's testimony stands unrebutted.

Second, Mr. Morgan and Dr. Rodden testified that VTD splits occur only after the districts at issue are "relatively close to 80,000" people. 2 Tr. 381:14–363:11 (Rodden). Many were made in amendments to the originally proposed plan to adjust population for changes introduced at the very end, 2 Tr. 667:17–668:11. By this time the Challenged Districts were over 55% BVAP, and "most of the major decisions" had been made. 2 Tr. 631:18–21. The splits therefore have minimal probative value in assessing the *predominant* motive. In fact, the splits were so unimportant that neither Delegate Jones nor any other legislator was involved with them (with one or two exceptions). 2 Tr. 629:17–22 (Morgan); 2 Tr. 473:15–24 (Jones).

Again, Plaintiffs' contention that VTD splits simply *must* matter because they mattered in *Bush* and *Alabama* is not a "holistic" or fact-specific view. In *Bush*, the splits mattered because

13

they composed bizarre, racially tailored "segments" of districts and so were indicative of careful attention—and no testimony suggested otherwise. 517 U.S. 965–72. In *Alabama*, seven VTDs were split between the same two districts, indicating substantial care. 135 S. Ct. at 1271. The record here shows that the VTD splits, with a few exceptions, were an afterthought.

Third, the Supreme Court in *Bush* found that the VTD split created district segments that were "far from the shape that would be necessary to maximize the Democratic vote in the area." 517 U.S. at 971. It did not *assume*, as Plaintiffs would have it, the absence of political motive. Here, HD95, the Challenged District with the most splits, *was* configured to maximize political concerns, the district was well over 55% BVAP, and it is "not actually in dispute between the parties" that HD95 can be drawn "in a number of different ways" above 55% BVAP, meaning race did not dictate the configuration. 2 Tr. 685:4–8 (Hamilton); 2 Tr. 686:7–18 (Morgan). Political motive is further relevant here because of testimony from all sides that political data *was* available at the block level, and that it factored into the political performance numbers the House actually used.[6] 2 Tr. 957:6–12; 964:19–22 (Rodden); 2 Tr. 623:15–18 (Morgan). Plaintiffs respond that these numbers are not as accurate as racial data, 2 Tr. 958:9–12, but the predominance analysis measures *subjective motive*, not data accuracy. The data here is relevant to motive, even though it was not in *Bush* or *Alabama*.

### 3.      The 55% BVAP Target Was a Minor Constraint

Another relevant consideration is how the selected minority-percentage target compares with local demographics. A high target percentage as compared with minority population would suggest a high degree of racial attention; a comparable percentage would suggest a low degree.

---

[6] Plaintiffs correctly emphasize that *Bush v. Vera* was decided "[m]ore than twenty years ago," Br. at 12, at which time popular computer games were Pong, Minesweeper, and Super Mario All-Stars. The Court can take judicial notice that technology has progressed since then.

The targets in *Alabama* were at or above 70% BVAP. 135 S. Ct. at 1263. The target here was 55% BVAP, BVAP was already near or above—often substantially above—that level in 10 of the 11 Challenged Districts, and a large number of black voters resided in the relevant areas.

As the Solicitor General observed on appeal, "if local demographics are such that any reasonably compact district that respects political boundaries and other relevant districting principles will exceed a racial target, then race will not predominate because the actual lines will be determined by non-racial considerations." U.S. Br. at 13. That is the case here, where Dr. Rodden agreed that, "*in most instances*," there were "other ways to get" to 55% BVAP. 2 Tr. 162:24–163 (emphasis added). Mr. Morgan testified to this as well. 2 Tr. 686:7–17. The numbers confirm that tens of thousands of black voters, enough for multiple new 55% BVAP districts, resided next to the Challenged Districts in the same cities and counties. *See* Supra B.2.

Dr. Rodden, however, asks the Court to cast reason and facts aside in favor of blind superstition, urging that "if it's possible to achieve 55 percent without" the selected configuration then "that's stronger evidence of racial predominance" because the legislature "did it anyway." 2 Tr. 352:20–23. But "anyway" connotes *non*-racial reasons. After all, the House is accused of achieving a 55% BVAP target, not some other racial goal, by "paying extremely careful attention to the race of each voting tabulation district ("VTD") and census block under consideration." PEX69 at 3. But that inference does not follow where the 55% target did not meaningfully constrain the legislature. Dr. Rodden's contrary "method" conveniently makes every conceivable redistricting move proof of racial motive:

- If a configuration was, in his view, necessary to achieve 55% BVAP, race predominated. Tr. 162:5-6; 163:1-4; 176:15-17; 177:6-10, 177:23-178:25; 178:12-19; 182:10-16; 185:19-25; 214:3-9; 217:19-23; 222:8-11; 228:14-25; 231:10-17; 232:18-21; 234:7-12; 238:8-12; 265:3-9; 267:3-24; 269:2-9; 271:1-3; 274:3-8; *see also* PEX69 at 11; 13; 16; 23; 27; 32; 37; 39; 40; 45; 46; 48; 51; 52; 61; 64; 65; 66; 69; 71.

15

- If a configuration was, in his view, not necessary to achieve 55% BVAP, race predominated. Tr. 162:5-6; 163:1-4; 184:15-18; 202:13-20; 206:21-25; 214:18-21; 215:20-25; 226:6-12; 239:19-24; 275:10-15; *see also* PEX 69 at 21; 40.

- If a configuration moved black voters into a Challenged District, race predominated. Tr. 174:13-17; 175:1-5, 20-15; 182:20-23; 183:6-9; 191:5-8; 192:1-8; 198:3-7; 11-18; 226:17-19; 231:18-23; 242:6-13; 246:1-11; 247:10-13; 248:23-249:2; 253:16-21; *see also* PEX 69 at 11; 15; 16; 24; 26; 29; 31; 36; 41; 44; 46; 48; 52; 55; 56; 62; 66; 70.

- If a configuration moved black voters out of a Challenged District, race predominated. Tr. 182:20-23; 199:14-17; *see also* PEX 69 at 29; 55; 59-60; 62; 70.

- If a configuration kept black voters in a Challenged District, race predominated. Tr. 190:15-22; 205:13-16; 223:20-23; 227:9-11; 244:5-13; 245:10-14; 245:22-23; 252:17-20; 262:24-263:5; *see also* PEX 69 at 32; 52; 67; 70.

- If a configuration kept black voters in a non-challenged district, race predominated. Tr. 204:13-20; 213:10-15; 215:13-15; 219:13-18; 250:3-5; *see also* PEX 69 at 35; 49-51.

In Dr. Rodden's analysis, no decision touching or concerning the Commonwealth's black residents was available that would not condemn the resulting district. The Court can safely ignore that view.[7]

Contrary to Dr. Rodden's assertions, 55% BVAP was not a bridge too far. This is not a case like the max-black gerrymandering cases in the 1990s, where legislatures created new majority-minority districts wherever remotely conceivable, *see Miller v. Johnson*, 515 U.S. 900, 907, 917 (1995); nor is it like *Alabama*, where the legislature insisted on cartoonish BVAP levels in the 70% range, 135 S. Ct. at 1273; nor is it like *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), where the collective legislative chambers saw an increase from 9 to 27 majority-black districts, *id.* at 125–128. Here, there were 12 majority-black districts in the 1991 House Plan, 12 majority-black districts in the 2001 House Plan, and 12 majority-black districts in the 2011 House Plan. BVAP as of 2009 ranged from 46.3% to 62.7%; it ranged in the enacted

---

[7] Dr. Rodden does not attribute a single district line to non-racial considerations, an impossible conclusion given that Plaintiffs concede "all sorts of local considerations" went "into drawing these districts." 1 Tr. 832:14–18 (Hamilton).

plan from 55.1% to 60.1%. IEX15 at 143. The average BVAP went from 57.1% to 57.2%. *Id.* If

that is suspect, then redistricting under the VRA is always suspect. *See infra* § III.

### 4.     The BVAP Target Was One Factor Among Many and Had a Qualitatively Minor Role in District Configuration

Another relevant consideration is whether race was the sole "criterion that, in the State's

view, could not be comprised" and whether other considerations "came into play only after the

race-based decision had been made." *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (*Shaw II*). If non-

racial factors "had a qualitatively greater influence on the drawing of district lines," *Bush*, 517

U.S. at 1956, or, in the Solicitor General's words, "if a racial target is but one factor in the

drawing of district boundaries and the legislature also places substantial weight on non-racial

factors," then "race will not predominate because it will not be the 'dominant and controlling'

rational for the district's lines." U.S. Br. at 13 (quoting *Miller*, 515 U.S. at 913).

Here, both the ordering of concerns and the substantial weight on non-racial factors

disproves racial predominance. Mr. Morgan testified that, in the course of drawing district lines,

he did not monitor the racial data; analysis of VRA compliance was done later by others. 2 Tr.

727:22–728:9. This was not a case where "other considerations came into play" only after the

districts were drawn at 55% BVAP; they were in play from the beginning, and race was

evaluated at the end. Moreover, the 55% goal was not the one criterion that could not be

compromised; there were many. One, for instance, was a policy that crossing the "James River

tidal estuary" was "not going to happen," and Mr. Morgan's proposal contradicting that policy

"wasn't considered." 2 Tr. 650:2–651:7 (Morgan). There was also a bar on districts with

compactness scores below those approved by the Virginia Supreme Court, non-contiguous

districts, and multi-member districts. 2 Tr. 596:1–598:19 (Morgan). And multiple district-

specific criteria were also non-negotiable. It was, for example, mandatory that the New Hope

VTD be drawn in HD63 because of Delegate Dance's concern for keeping a constituent named Alvin Blaha, 2 Tr. 121:17–122:4, so a contrary proposal "was rejected." 2 Tr. 713:11–714:7. It was also non-negotiable that certain incumbents not be paired, *e.g.*, 2 Tr. 699:3–14, and that certain incumbents *be* paired, 2 Tr. 758:3–13.

Moreover, neutral considerations had a qualitatively greater role in district configurations than did the 55% goal, as Delegate Jones and Mr. Morgan testified to at length, and Dr. Palmer's statistical analyses confirm. He provides several statistical models predicting the likelihood of VTD placement in or out of the Challenged Districts both by race and by partisanship. PEX71 at 6–7, 20–24. With one exception, the analyses fail to meaningfully compare race with traditional criteria.[8] *Backus v. South Carolina*, 857 F. Supp. 2d 553, 565 (D.S.C. 2012). And the one exception *disproves* Dr. Palmer's conclusions. Core retention, the one traditional criterion he measured, far and away predominates over race:

> Q: So if I had to make a bet about whether a VTD would be included in a challenged district and I was only allowed one piece of information from your chart in Table 20, the piece of information I should choose is whether the VTD was in the benchmark version of the district, correct?
>
> A: Yes.

2 Tr. 448:25–449:15; 2 Tr. 791:12–23 (Katz). Core retention is a neutral principle that may disprove predominance.[9] *See, e.g.*, *Comm. for a Fair & Balanced Map v. Illinois State Bd. of Elections*, 835 F. Supp. 2d 563, 590 (N.D. Ill. 2011). Delegate Jones testified that the most important consideration was retaining continuity. 2 Tr. 517:7–8; *see also* 2 Tr. 695:6–9

---

[8] The analyses on pages 6 and 7 of Dr. Palmer's report do not overcome the problem identified in *Backus* that traditional criteria are not accounted for, because they *also do not account for traditional criteria*. The comparison is black versus white, which does not include other factors.

[9] Race was found not to predominate in the Challenged Districts in 2002, *Wilkins v. West*, 264 Va. 447(2002), so a claim that preserving cores preserved discrimination is untenable.

(Morgan). And Dr. Palmer's analysis proves that this desire had a qualitatively greater impact on the district lines than did race. Race was not "dominant and controlling." *Miller*, 515 U.S. at 913.

### C.     District-Specific Evidence

**HD63**. The Court is tasked with reviewing only a small portion of HD63. Its western border was preserved from the benchmark and follows the county line. 2 Tr. 886:1–87:14. Plaintiffs presented no evidence on the northern lines between HD63 and HD66, which also remain unchanged. IEX94 at 1. Plaintiffs argue that the line between HD63 and HD75 condemn HD63, 2 Tr. 984:2–8, but they concede that the line, including its VTD splits, was necessary to keep HD75—not HD63—above 55%. Br. at 10. Creating HD75 at 55% BVAP was lawful, so the Court cannot strike down HD63 based on what was needed in HD75—or else narrowly tailored districts would always result in unconstitutional contiguous districts.

The only *new* territory is HD63's eastern extension. The change appears meaningful, but looks are deceiving; HD63 retains 86.59% of its core, well above the House average. IEX14 Table 11. And neutral factors had a qualitatively greater impact than race in the eastern extension. Mr. Morgan testified that HD63 could have been drawn in a variety of ways, including without Hopewell, 2 Tr. 712:9–713:1, which stands to reason given how far HD63 began and ended above 55%. The difficulty occupying the map-drawers' attention was, not race, but geographic stress from both directions, given that HD63 lies on "the junction between Tidewater and Richmond." 2 Tr. 709:7–20. As various configurations of surrounding districts in both regions were bandied about, HD63's extension "shifted a lot." *Id.* The Republican Delegates in neighboring districts, especially HD62, were concerned about changes in their districts and hesitant to pick up more new territory between Petersburg and Hopewell. 2 Tr. 709:21–713:14. Additionally, a James River estuary crossing was eliminated creating new

territory for districts on the western bank, which had not previously been in *any* district there, and Delegate Dance was "willing" to take it. 2 Tr. 711:20–712:1; 2 Tr. 122:23–123:3. There was "no racial motivation" for this. 2 Tr. 481:10–11. Nor was there racial motivation for retaining New Hope, thereby creating the "hook" between HD75 and HD63; this was to honor Delegate Dance's request to retain a constituent named Alvin Blaha. 2 Tr. 121:23–122:22; 2 Tr. 495:3–14.

Plaintiffs' evidence, per Dr. Rodden, is irrelevant. His speculation that the river crossing *should* not have been "viewed as a problem," PEX69 at 39, substitutes his own ignorance of motive for the House's policy; it *was* viewed as a problem, and that is what counts. 1 Tr. 316:10–317:9. And the reason is plausible: the crossing was the object of scorn, including in prior litigation, and the Hopewell community had little in common with the swamp land on the other side of a large estuary. 2 Tr. 480:9–481:11. Dr. Rodden criticizes the method of splitting Hopewell, 2 Tr. 218:3–219:6, but that line already existed; it was simply moved from HD74 to HD63, 2 Tr. 711:23–712:1. And Plaintiffs' argument on VTD splits ignores that non-HD75 related splits place more black voters in majority-white districts than in HD63. PEX71 at 52.

**HD74.** The overriding core-preservation purpose is also self-evident in the configuration of HD74, which has retained its basic shape since 1991, IEX14 Map 20; 2 Tr. 695:6–9, and kept nearly 80% of its core, IEX14 Table 11. The principal change was the removal of Hopewell, which was just as race-neutral in HD74 as in HD63. Conceding that more white than black voters were moved into HD74, *see* Appendix A, Dr. Rodden classifies HD74 as a "donor" district, 2 Tr. 199:14–17, but, other than HD63, the only Challenged District it "donated" to was HD71, and it exchanged with HD71 territory of 85.5% BVAP (out) for 86.3% BVAP (in). PEX71 at 43. It also obtained territory from HD70 of 52.7% BVAP, with no return territory, *id.* Neither a "donor" nor "recipient" narrative fits; non-racial factors predominated.

20

Plaintiffs present no other evidence except VTD splits between HD74 and HD72, involving about 3% of the two districts' total population, PEX71 at 53, but Mr. Morgan testified that his intent in the splits was following a water boundary between HD72 and 74, allowing the transfer of a Republican-performing precinct into HD72, and improving HD72's compactness score, which was sufficiently low that Delegate Jones took notice. 2 Tr. 696:7–697:16. Dr. Rodden's dot maps show black population on the border of HD74 that could have been drawn in, but neutral principles had a qualitatively greater impact. PEX69 at 31, 33.

**HD71.** HD71 retains 78.31% of its core, IEX 15 Table 11, above the average for the majority-minority districts (72.76%) and well above the statewide average (67.09%). IEX14 Table 12. That was remarkable given HD71's negative deviation of 7.3%, or nearly 6,000 people. IEX15 Table 8. HD71 became more compact, IEX15 Tables 5, 7, and 9, and was at the mean compactness score for all districts statewide, IEX14 Table 4. BVAP in HD71 was nearly identical to BVAP percentages in the past precleared plans (55.3% in 2011, 55.5% in 2001, and 55.4% in 1991). BVAP had diminished over the decade, and the move back to 55% maintained the status quo from prior decades. 2 Tr. 698:13–25.

Plaintiffs claim that "the obvious way of achieving population equality" in HD71 was a move westward, Br. 31, but there is nothing obvious about going west as opposed to east. In fact, contiguous districts to the west were all heavily underpopulated (-6.9% in HD73; -8.6% in HD68; -10.9% in HD69), and HD70 and HD74 to the east were at equality and adjacent to over-populated areas. IEX91 at 141; IEX37 at 1. So the "obvious" move was east.

Plaintiffs' fact witness, then-Delegate (now Senator) McClellan did *not* testify that race predominated in the new district. She testified at both trials that the concerns about the Richmond districts that she communicated to Delegate Jones were addressed and resolved. 2 Tr.

59:24–60:6 (splits in VTD 707 and Churchill neighborhood fixed after conference with Jones); 2 Tr. 60:7–18 (split VTD 208 fixed after conference with Jones). And the concerns Delegate McClellan did *not* express to Delegate Jones were *not* resolved. 2 Tr. 54:15-17; 63:22–64:1 (McClellan failing to mention her belief that 55% BVAP was unnecessary for her future electoral success); 2 Tr. 59:11–14 (McClellan failing to recommend that VTD 505 be un-split). The testimony proves that Delegate Jones is not omniscient—and not much else.

In fact, the bulk of changes to HD71 were recommended by Delegate McClellan and the Richmond delegation because they made sense in terms of uniting communities of interest and avoiding incumbent pairings. 2 Tr. 42:1–12 (the split contours in VTD 505 were recommended by Delegates McClellan and Carr); 2 Tr. 56:3–16 (uniting VTD 603 and 604, and splitting VTD 703, united areas of similar demographics and respected natural boundaries); 2 Tr. 57:13–15 (lines drawn to avoid neighboring incumbents). Neutral concerns were not "cast aside." *Bethune-Hill*, 137 S. Ct. at 799. Plaintiffs again rest their case on the split "Fan" neighborhood, but it was split three ways both before and after redistricting. 2 Tr. 61:25–62:5. The Court previously found the swap of VTDs 204 and 207 was not "obviously racial," an obvious conclusion when the VTDs are demographically similar and are overwhelmingly white. 141 F. Supp. 3d at 563. Delegate McClellan never asked Delegate Jones that VTD 207 be included in her district, leaving no basis to infer bad intent on Jones's part. The Court previously held that swap was to honor a request by Delegate Loupassi, *id.* at 563, and the record on that remains unchanged.

**HD69.** Core retention had a qualitatively unmatched impact on HD69, as over 83% of residents were retained. IEX14 Table 11. By contrast, BVAP of territory moved in and out was practically the same, PEX50 Table 8, and BVAP dropped slightly from the benchmark, IEX15 at 13. The predominant change involved bringing HD69 up to the James River bank, a non-racial

22

geographic boundary. 2 Tr. 7032–14. The district became more compact as compared to the benchmark. IEX15 at 14.

Dr. Rodden speculates that the "most rational" ways HD69 could have been drawn would "have involved adding whites," PEX69 at 13, but the way it was drawn *did* add whites, Appendix A, and Dr. Rodden has no method to identify what would have been "most rational," what demographic numerical differences would have resulted, or what was *not* rational about how HD69 was drawn; his discussion is color-commentary suggesting only that the district could have been different. PEX69 at 25–27. Plaintiffs also complain about VTD splits, but HD69 splits only three VTDs between three different adjacent districts, PEX71 at 53, 56, supporting Mr. Morgan's testimony that the purpose was population equalization and maintaining contiguity in HD68, 2 Tr. 705:17–706:3. Census geography, not race, predominated in the splits. *Id.*

**HD70.** Core retention predominantly explains HD70, which retains 2 of 3 residents. IEX14 Table 11. The changes in the district resulted from the ripple effect due to population deficiencies in Richmond and population excess in Chesterfield County. In order to absorb that effect, maximize compactness, and ensure contiguity, the plan brought Chesterfield's excess population into the Richmond districts through HD70, thereby passing its population off to the most central districts to maintain compact districts and district cores. 2 Tr. 690:18–691:16; 706:4–24. Plaintiffs respond that the House could have brought HD69 into Chesterfield County to do this, 2 Tr. 738:3–17, but the *post hoc* possibility of alternative configurations does not render the existing configuration is racial. Bringing HD69 sough into Chesterfield County would have cut the district off from its incumbent, who resided North of the James River. IEX94 at 2. And HD69 was severely underpopulated, so channeling excess population to the South through it would wreak havoc on its core. IEX15 at 13. Indeed, Dr. Rodden opines that bringing VTDs

23

Meadowbrook, Southside, and Chippenham into HD70 was racially motivated, PEX69 at 29, so Plaintiffs would no doubt have claimed their inclusion in HD69 as racially motivated.[10]

Faced with the inconvenient fact that more white than black voters were brought into HD70, Dr. Rodden applies his damned-if-you-do-damned-if-you-don't donor theory, PEX69 at 29, but the facts do not bear that out either—or else, why was the territory of nearly identical BVAP swapped between HD69 and HD70? PEX71 at 43. Race was a factor, but it cannot predominantly explain the movement of people.

**HD80.** The visual changes in HD80 are misleading, as the district preserved 2 of 3 residents. IEX14 Table 11. The changes that occurred were predominantly the result of the district being in a position to obtain the leftovers from an ambitious incumbency-protection effort in HD79. 2 Tr. 648:2–649:14. The plan placed the Norfolk Naval Base, previously in HD100, into HD79 to give Delegate Johnny Joannou—whose future prospects were viewed as fragile because being a conservative southern Democrat was increasingly behind the times— population that was largely non-voting. 2 Tr. 648:2–10. This was viewed as enhancing the voting power of Delegate Joannou's base of support in Portsmouth. 2 Tr. 647:7–23. Ultimately, the changing political trends were too much, and Delegate Joannou lost, but the predominance test concerns subjective motive, not outcome, and political motive predominated. 2 Tr. 656:8–16.

Dr. Rodden opines on credibility by reference to a purported 2009 primary where Joannou supposedly succeeded in the precincts shed to HD80. 2 Tr. 961:9–962:18. But *there was no 2009 primary* in HD79. *See* Va. Dep't of Elections, Elections Database.[11] And Dr. Rodden's

---

[10] Delegate McQuinn testified that she was concerned about the new footprint in Chesterfield, but she did *not* testify that the purpose was racial. 2 Tr. 103:9–12. Any Richmond Delegate might prefer not to increase territory in another locality, but that had to occur somewhere because Richmond was under-populated, and Chesterfield was over-populated. IEX62.

[11] Available at http://historical.elections.virginia.gov/.

opinions (with no numbers) do not comport with the 2007 primary results, such as his statement

that Delegate Joannou won a "comfortable majority" in Taylor Road, 2 Tr. 961:21–25, when he

succeeded there by only *9 votes*. Delegate Joannou's opponent also won a comfortable majority

in Harbor View, which was among the dropped VTDs. Moreover, the numbers from 2015

confirm that, as Mr. Morgan predicted, the vast majority of votes in HD79 came from

Portsmouth, not Norfolk. HD79 performed as Mr. Morgan expected, and saving Joannou simply

was not possible.

Indeed, the Court already held that political considerations predominated in HD80, 141 F.

Supp. 3d at 567, and the evidence bears that out. At one point, Mr. Morgan proposed that the

"tail" of HD79—the exact configuration it held before in a majority-white district—be drawn

into a district across the James estuary, but the crossing was untenable and "wasn't considered."

2 Tr. 650:2–651:12. It could in theory have been drawn into HD76, but Delegate Jones, its

representative, did not want heavily Democratic precincts, and drawing HD80 west as a whole

would have removed the core of Delegate Jones's political support. 2 Tr. 553:2–554:3.

Meanwhile, Dr. Rodden's maps show large segments of black population in HD79, meaning

HD80 could have been drawn over 55% BVAP in any number of ways, PEX69 at 53, and nearly

an identical number of black and non-black voters were moved in, Appendix A. The one split

VTD between HD80 and HD79 places 2,752 black voters in HD79 and only 402 in HD80.

PEX71 at 54. Finally, Plaintiffs' fact witness on HD80, Delegate James, testified that the district

was *not* drawn with racially discriminatory intent. 2 Tr. 78:12–15. Race had a minor role.

**HD77.** HD77 retained over 3 of 4 residents, IEX14 Table 11, and its geographic

footprint, IEX94 at 8; 2 Tr. 658:2–10. The BVAP of territory moved in was majority white,

PEX50 Table 8, and nearly twice as many white voters were moved in than black voters,

Appendix A. The predominant movement involved a series of precinct additions on the eastern border that were overwhelmingly white, PEX71 at 44, which Delegate Spruill requested to help reunite the Old City of South Norfolk, 1 Tr. 334:2–12. Dr. Rodden opines on "racial motivation," PEX69 at 66, by reference to minor changes he claims were needed to maintain a 57.6% BVAP district over 55%. But even if his baseless guesswork were valid, the moves he describes did not have a qualitatively greater impact on district lines than the core-retention and community-of-interest purposes. PEX69 at 62–69. He also inveighs against a water crossing, PEX69 at 65, with no evidence that anyone was concerned about this in 2011. And his criticism of the split JFK VTD ignores that the VTD was oddly shaped and split in the benchmark plan to improve compactness. *See* IEX92 at 8. A second VTD was split between HD77 and HD76 to maintain continuity in the JFK split, and Mr. Morgan simply picked enough correctly sized census blocks to reach equality and stopped, 2 Tr. 770:15–771:6, which Dr. Rodden's map shows, PEX69 at 68 (line stops short of black dots) and Dr. Palmer's numbers confirm, PEX71 at 54 (split places 911 black voters in non-challenged HD76 and only 603 in HD77).

**HD90.** HD90 retained nearly 3 of 4 residents, IEX14 Table 11, and became more compact, IEX15 at 14. BVAP of territory moved in and out were practically the same, PEX50 Table 8, BVAP remained practically the same, IEX15 at 13, and more than 2,000 more non-black voters than black voters were added, Appendix A. Other than core retention, the predominant purpose of the redraw was increasing the district's footprint in Norfolk and Virginia Beach and decreasing it in Chesapeake, which was accomplished in the transfer Delegate Spruill suggested to HD77. 2 Tr. 660:10–17. Moreover, VTDs added from Virginia Beach were part of a chain of movements to improve Republican performance two districts away. 2 Tr. 660:23–662:6. The Barron Black VTD came out to help political performance in neighboring HD83. 2 Tr.

662:5–15. HD90 splits two VTDs with HD85, but this anomaly was for neutral reasons: the first VTD split was accomplished in the initial proposed plan along Witchduck Road, a major thoroughfare, and, when minor amendments brought the district out of population alignment, another VTD (with appropriately sized and placed blocks) was selected, rather than moving the first line from Witchduck Road. 2 Tr. 665:7–667:16. Dr. Rodden waxes at length about presumed racial intent, but even his maps show large pockets of black voters not included, including in Aragona (792 black voters in HD85 to 788 in HD90, PEX71 at 54). PEX69 at 59. Plaintiffs' fact witness, former Delegate Howell, testified that he was not pleased with his district, but he was confused about its boundaries, and he neither suggested the existence of racial intent nor had foundation to do so. 2 Tr. 82:10–11; 84:6–85:7.

**HD89.** HD89 retained over 82% of its core. IEX14 Table 11. BVAP of territory moved in and out was nearly the same. PEX50 Table 8. BVAP of territory moved from non-challenged districts to HD89 was below 50% in each shift (10% from HD100, 18.6% from HD79 and 49.2% from HD87), and HD89 involved the largest VTD split in the entire plan, involving 25,000 people, which placed 52 times the number of black voters in non-challenged HD79 as in HD89. PEX570 at 54. The other VTDs split between HD89 and non-challenged districts collectively placed 2,979 black voters in non-challenged districts and 1,938 black voters in HD89. *Id.* The notion that racial predominance is afoot here is absurd.

But with Dr. Rodden, where there's a will, there's a way. His narration of the district lines ignores the large pockets of excluded black voters (seen in his maps and in the raw numbers) and myopically focuses on a single VTD split in Granby—ignoring the other VTD splits that spoil his narrative. PEX69 at 56–57. Mr. Morgan testified that the shape was a result of an oddly shaped census block on the north side of Granby that "is like a hat" and, though

27

oddly shaped, had the right number of voters, and "I basically took in the additional census blocks below that hat to even it out" and stopped once the population deviation was rectified. 2 Tr. 670:18–671:22. The map shows that Mr. Morgan stopped short of easily accessible black voters, PEX69 at 58, and the numbers confirm that race was irrelevant: BVAP of the territory landing in HD89 was 35.7%; BVAP of the territory landing in HD100 was 24.8%. PEX71 at 54.

**HD92.** HD92 retained 86.70% of its core, PEX14 Table 11, and became more compact, PEX15 at 14. Fewer black voters were moved in than non-black, and about the same number of black and non-black voters were moved out. Appendix A. BVAP shifted only slightly (62.1% to 60.7%) and remained well above 55%. IEX15 at 13. The territory that shifted from HD92 to non-challenged HD91 was nearly 50% BVAP, and HD92 swapped territory of nearly identical BVAP with HD95. PEX71 at 45. Territory on the western border was brought in to bring HD92 up to the line between Hampton and Newport News, 2 Tr. 680:13–22, HD92 splits no VTDs, and HD92 otherwise remains unchanged from the benchmark. Dr. Rodden complains that a strip of coastal territory was not added to HD92, but adding that would not have brought BVAP below 55%, 2 Tr. 687:3–688:11, indicating it was not omitted for racial reasons. The BVAP target had practically no effect on this district.

**HD95.** Notwithstanding that HD95 assumed an odd shape, its core retention was high: 73.31%. IEX14 Table 11. The territory of BVAP moved in was slightly higher than that of territory moved out, PEX50 Table 8, and approximately 1,000 more non-black voters were moved in than black voters, Appendix A. Dr. Rodden conceded that "there were many different ways to achieve the 55 percent target," 2 Tr. 244:5–13, Mr. Morgan confirmed this, 2 Tr. 686:4–19, and Plaintiffs' counsel stipulated to it, 2 Tr. 685:4–8. The unrebutted testimony of *two* fact witnesses is that HD95 was drawn up the peninsula for several political purposes: (1) to cut out

highly Democratic precincts from HD93 to make it a competitive district, (2) to unseat an unpopular Democrat, and (3) to maintain HD94 as a Republican-friendly district. 2 Tr. 674:9–681:4. Not surprisingly, given the concession that the 55% BVAP target had a very minor qualitative impact on HD95, Plaintiffs have no meaningful response. They attack the VTD splits on the north end of HD95, but splitting them was necessary to allow HD95 to reach up to the Reservoir VTD to make HD93 competitive, 2 Tr. 677:16–679:19, and Plaintiffs do not—and cannot—suggest that un-splitting the VTDs would bring HD95 below 55%. Plaintiffs argue that Dr. Rodden's dot maps show careful sorting by race—or, alternatively, by race as a proxy for politics—but the map shows a sea of black dots not included in HD95, PEX69 at 47, the VTD splits place over 3,000 black voters in non-challenged districts, PEX71 at 55, both HD93 and HD96 gave majority-white territory to HD95, PEX71 at 45, and Mr. Morgan's efforts to follow census geography and to keep as little of the area in the split VTDs in HD94 and HD93 as possible—given that he would have preferred to place *none* of the territory in HD94 and HD93—explains all of this, 2 Tr. 679:11–680:2; 636:20–641:4. The court already found a predominantly political purpose, and the evidence overwhelming confirms this.

## II.    All Districts Are Narrowly Tailored

The House had "good reasons" to believe it needed 12 ability-to-elect districts with a "functional working majority." *Bethune-Hill*, 137 S. Ct. at 799, 801–802. Section 5 of the VRA, as amended, required proof of crossover voting to justify replacing functioning majority-minority districts with "crossover districts." That evidence was not available in 2011 and is unavailable today. Moreover, the House had district-specific concerns indicating that BVAP drops meaningfully below 55% would be retrogressive. The 55% BVAP target was a reasonable means of resolving the House's Section 5 challenges, "even if a court does not find that the actions were

29

necessary for statutory compliance," *id.* at 801 (quotation marks omitted), as Plaintiffs' star witness, Senator McClellan, agreed, 2 Tr. 951:19–25.

"When a State justifies the predominant use of race in redistricting on the basis of the need to comply with the Voting Rights Act, 'the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made.'" *Bethune-Hill*, 137 S. Ct. at 801 (quoting *Alabama*, 135 S. Ct. at 1247). The standard is met "when the legislature has '*good reasons* to believe it must use race in order to satisfy the Voting Rights Act.'" *Id.* (quoting *Alabama*, 135 S. Ct. at 1274). On the one hand, race-based districting is not narrowly tailored under VRA § 5 if it goes "beyond what was reasonably necessary to avoid retrogression," *Shaw v. Reno*, 509 U.S. 630, 655 (1993) (*Shaw I*), or the efforts were "quite far removed" from the VRA. *Miller*, 515 U.S. at 926. On the other hand, "[t]hat standard does not require the State to show that its action was 'actually ... necessary' to avoid a statutory violation, so that, but for its use of race, the State would have lost in court." *Id.* (quoting *Alabama*, 135 S. Ct. at 1247). The standard therefore can be met "'even if a court does not find that the actions were necessary for statutory compliance.'" *Id.* (quoting *Alabama*, 135 S. Ct. at 1247).[12]

## A.   The House's Statewide Strategy Was Narrowly Tailored

The House's efforts were neither "quite far removed" nor "beyond what was reasonably necessary to avoid retrogression." A Section 5 preclearance analysis, whether by DOJ or a federal court, assesses "the entire statewide plan as a whole." *Georgia v. Ashcroft*, 539 U.S. 261, 479 (2003). The first step is identifying how many "ability-to-elect" districts exist in the

---

[12] Plaintiffs are thus wrong in arguing (at 17) that the House must prove each district "would violate Section 5" without a 55% BVAP target. Moreover, Plaintiffs' assertion (at 17) that there is "no compelling interest in obtaining preclearance" contradicts the Supreme Court's attention to "the view of the Department of Justice." *Bethune-Hill*, 137 S. Ct. at 801.

benchmark plan, and the second is identifying how many exist in the proposed plan. *Texas v. United States*, 831 F. Supp. 2d 244, 262 (D.D.C. 2011). That can be difficult because identifying which benchmark and proposed districts afford that "ability" is an art, not a science, and DOJ does not publish its position on the question. *Harris v. Ariz. Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1055 (D. Ariz. 2014), aff'd, 136 S. Ct. 1301 (2016). But, here, it is clear that there were 12 ability-to-elect districts in the 2001 plan—no more, no less—just as there were in the 1991 plan. And it is beyond dispute that the enacted plan has only 12 ability-to-elect districts. The House was justified in not drawing *fewer* ability-to-elect districts because reducing that number would almost certainly be deemed retrogressive. *See Texas v. United States*, 887 F. Supp. 2d 133, 178 (D.D.C. 2012). Creating a *new* ability-to-elect district might go "beyond what was reasonably necessary," and the House rejected proposals to do that. *See* PEX35 at 144 (Delegate Spruill arguing "we do not need to create another black district"). Thus, the House avoided the typical pitfalls under both Section 5 (too few ability districts) and the Supreme Court's racial-sorting jurisprudence (too many).

Plaintiffs do not argue otherwise. Their sole basis to claim the House went "beyond what was reasonably necessary" is the House's choice to draw the districts at or above 55% BVAP. But, even if debatable in hindsight, drawing twelve districts at that level was not "beyond" a fair reading of VRA § 5 because 55% was a reasonable proxy to ensure a "functional working majority." *Bethune-Hill*, 137 S. Ct. at 799, 801–802. If the House had drawn the districts meaningfully lower, they would be considered crossover districts because the minority community would not be sufficiently large to elect its preferred candidates without the help of other groups (i.e., "crossover votes"). *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009). If the House had drawn crossover districts, VRA § 5 required proof *from the House* that white voters

would vote for black-preferred candidates in large numbers. The House lacked that proof, so Plaintiffs' suggestion that BVAP could drop to around or below 50% is unfounded. On the other hand, if Plaintiffs' position is that the House should have chosen slightly different numbers, say 54% BVAP, in some districts, the dispute is trivial: the House had no obligation "to determine *precisely* what percent minority population § 5 demands," *Alabama*, 135 S. Ct. at 1273. The decision was not "quite far removed" from VRA compliance. *Miller*, 515 U.S. at 926.

**VRA § 5.** Section 5 imposed "strong medicine" on covered jurisdictions. *Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612, 2618 (2013). In fact, Congress made that medicine even stronger in 2006 by amending Section 5 to reverse the Supreme Court's decision in *Georgia v. Ashcroft*, 539 U.S. 461 (2003). That decision granted states discretion to dismantle districts at 60% and 55% BVAP and create 50% BVAP districts in their place—exactly what Plaintiffs want here— based on "all the relevant circumstances, such as the ability of minority voters to elect their candidate of choice, the extent of the minority group's opportunity to participate in the political process, and the feasibility of creating a nonretrogressive plan." *Id.* at 479. In amending the statute, "Congress rejected" the majority decision, and "it adopted the views of the dissent." *Alabama*, 135 S. Ct. at 1273. Section 5 now is not satisfied with "minority 'influence'"; it bars redistricting that leaves "minority voters with less chance to be effective in electing preferred candidates than they were before the change." *Ashcroft*, 539 U.S. at 494 (Souter, J., dissenting).

Under the new statute, dropping BVAP from 60% or 55% to 50% (or a number near that) would be retrogressive because a district at 60% or 55% BVAP would ensure that the minority community could elect its preferred candidates without the help of voters of other racial groups, but a 50% BVAP (or lower) district requires "crossover" votes or else the minority-preferred candidate will lose. *Texas*, 831 F. Supp. 2d at 263; *see also Texas*, 887 F. Supp. 2d at 169. To be

32

sure, the amended statute would allow such BVAP drops if, and only if, the state justified those drops by presenting affirmative proof (either to DOJ or the U.S. District Court for the District of Columbia) of reliable crossover voting—or some other evidence that the minority "ability" to elect remained as strong as in the benchmark plan. *Id.* But without that proof, dropping BVAP from around or above 55% to around or below 50% would be deemed retrogressive.

That is clear from the facts in *Ashcroft*. Districts in that case dropped from, for example, "60.58% to 50.31%"; "55.43% to 50.66%"; and "62.45% to 50.80%." 539 U.S. at 472–73. The district court denied preclearance and the Souter opinion Congress later adopted agreed. According to that opinion, the "nub" of the preclearance question was "what the evidence showed" about polarized voting, and the Georgia plan failed for lack of "anything relevant on that issue." 539 U.S. at 500. Section 5 "look[s] to the State to explain why retrogression is not present, and *to prove the absence of racially polarized voting that might diminish African American voting strength in light of several districts' decreased BVAPs*." 539 U.S. at 500 n.3 (emphasis added). In other words, in 2011, the House had to prove "the absence of racially polarized voting" before it dropped BVAP levels to around or below 50%. *Id.*

Under that standard, courts this cycle rejected plans with even minor drops in minority VAP. Texas House District 35, for instance, failed preclearance because of a drop in HCVAP from 54.6% to 52.5%.[13] *Texas*, 887 F. Supp. 2d at 168. The evidence was in equipoise because it consisted largely of exogenous races (i.e., races not involving House District 35), so even the slight drop was unjustified given that "Congress has allocated the burden to prove lack of discriminatory effect to the State." *Id.* at 167–68 & n.37. The three-judge panel also found retrogression in a district where minority VAP went up 5 percentage points, *id.* at 171, and where

---

[13] Plaintiffs' counsel were counsel in the case to parties opposing preclearance.

it was unchanged, *id.* at 155. That is in line with DOJ's position in this and prior cycles. For example, in August 2000, DOJ denied preclearance for a decrease in percentage of minority registered voters from 51.2 to 45.7 percent, because "a current racial bloc voting analysis could not be completed" and racial bloc voting had been found to exist "*[i]n 1975*." Alabaster, Shelby County Preclearance Letter (Aug. 16, 2000) (emphasis added). Virginia experienced similar preclearance denials over the decades. Int's Opening Br., ECF No. 203, at 3–5.

If Virginia had chosen, as Plaintiffs advise, to place its threshold near or below 50% BVAP, it faced an impossible preclearance battle. It would have failed to prove crossover voting, *see infra*, and the resulting Section 5 litigation would have been on all fours with *Ashcroft*. The same BVAP drops would have been at issue; the record would show the same lack of evidence; and the only difference would be the amended statute, codifying Justice Souter's views as law.

Plaintiffs say the House's choice not to invite that likely preclearance denial was not tailored without evidence of "conditions in different districts" to justify 55% BVAP. Br. at 19. The House had that evidence, and it is discussed below at § III.C. But, more importantly, this gimmickry with the burden makes the House's position impossible: what matters at preclearance is not whether the state can justify 55% BVAP, but whether it can justify dropping BVAP into the vicinity of 50%, which would require it to "prove the *absence* of racially polarized voting." *Ashcroft*, 539 U.S. at 550 n.3 (emphasis added).[14] Thus, the House's decisions are narrowly tailored if it can show in this case that, had it dropped BVAP near or below 50%, it could not have proven the "*absence* of racially polarized voting." Choosing a number 5% higher than a

---

[14] Plaintiffs' reliance on *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017), is misplaced because the case assessed narrow tailoring under VRA § 2, which places an affirmative burden on the party alleging polarized voting to prove it. *Id.*  Under VRA § 5, polarized voting is assumed, unless the party alleging it proves otherwise.

bare majority is a reasonable means of ensuring non-retrogression without proof of reliable crossover voting. In fact, the U.S. District Court for the District of Columbia this cycle set *65% minority VAP* as the appropriate number to prove non-retrogression without evidence of crossover voting. *Texas*, 887 F. Supp. 2d at 169; *Texas*, 831 F. Supp. 2d at 263. A number 10 points below that is not "beyond what is reasonably necessary."[15]

**The House's Statewide Evidence.** The trial record shows that the evidence the House needed to prove high crossover voting was not available and could not have been available in 2011. Indeed, the House was well aware of what it did not know. As discussed in more detail below, it had district-specific concerns that BVAP drops would be retrogressive. But much of the relevant evidence was the same for every district, and it confirmed that there was no way to justify BVAP drops. *See Bethune-Hill*, 137 S. Ct. at 800 (statewide evidence is probative).

No one presented the House with an elections analysis to prove that white voters routinely cross over to support black-preferred candidates. 2 Tr. 64:22–25; 2 Tr. 110:16; 2 Tr. 134:15–17, 1 Tr. 271:12–23. Assuming crossover voting would be pure speculation. *See Ashcroft*, 123 S. Ct. at 501–02 (finding "evidence of voting behavior by majority voters" essential to preclearance). It would be contrary, for example, to the "severe and persistent pattern of racially polarized voting" that this Court found in Henrico County, which provides population for 3 of the 4 Challenged Districts in the Richmond area, *McDaniels v. Mehfoud*, 702 F. Supp. 588, 593 (E.D. Va. 1988), and to other evidence the House had in 2011, including in the Loewen

---

[15] In this regard, the Section 5 narrow-tailoring burden is conceptually similar to a defendant's burden when it moves for summary judgment, which is to show the "absence of a genuine issue of material fact," and absence can be shown by pointing to a dearth of evidence that is required to prove the underlying claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Likewise, the underlying Section 5 case here—if BVAP dropped to around or below 50%—would turn on the House's ability prove the "absence of racially polarized voting." *Ashcroft*, 539 U.S. at 550 n.3 (emphasis added). Evidence that such proof did not exist would justify districts above 50%.

Report, IEX103 Ex. A, and in prior DOJ preclearance letters, Int's Pre-Trial Br. at 4. Indeed, the Loewen report observed that "voting for the Virginia legislature has customarily been marked by racial polarization" and that, accordingly, "districts 55% to 62% in black VAP cannot be considered packed" (both based on electoral evidence and on the general understanding that the term "packed" is "reserved for districts with much higher proportions of potential black voters than 53–59%"). IEX103 Ex. A at 16, 23, 36, 43. Plaintiffs contend (at 22–23) that the House did not rely on the Loewen report, but it was the expert report for the winning side in litigation naming Delegate Jones as a defendant, and Delegate Jones testified that he was generally aware that it supported the 55% target and that his lawyers relied on it. 2 Tr. 513:4–11. Plaintiffs' contention (at 25) that the report is not "substantive evidence" ignores that Delegate Jones's testimony is. And Plaintiffs' discovery objection, Br. at 23 n.10, is revisionist; the report was produced to them years ago.

Plaintiffs balk at the age of this evidence, but miss the point: without *evidence to the contrary* the House had to presume polarized voting. This evidence only fortified that presumption. In fact, this information was the best information available because of the short time frame available to redistrict (the Loewen report, after all, was prepared *after* the prior redistricting, not before) and because there was not enough endogenous data to do a "meaningful analysis." 1 Tr. 761:1–15 (Ansolobehere); 1 Tr. 697:1–17. Plaintiffs contend that exogenous races, those for offices other than House of Delegates seats, would suffice, but Justice Souter disagreed, rejecting an analysis "in statewide, not local, elections" as meeting the state's burden for legislative districts. 539 U.S. at 507. Federal races have even less probative value, because they occur in even years with different voter turnout. 2 Tr. 909:10–16. An unsupported claim by the House that voting patterns had changed would face an incredulous Voting Rights Section.

36

The House also lacked relevant data on racial registration and turnout. Plaintiffs fault Delegate Jones (at 18–19) for not examining such data, but he could not have done so, because Virginia does not record voter registration or turnout by race. 1 Tr. 727:3–10; 2 Tr. 848:11–22. Thus, there was no way to prove that high registration or turnout data would justify a BVAP drop, making a raw majority even more precarious. House members expressed anecdotal knowledge on the House floor that black registration and turnout were *below* white turnout, meaning that 50% BVAP did not ensure minority-candidate success, without crossover voting (which the House also could not show). PEX33 at 45; PEX35 at 41.

Plaintiffs suggest that the House should have justified BVAP nose-dives by the success of incumbent Delegates, but the House members shared doubts on the floor and at trial that incumbent election results, which carry an incumbency advantage, were not probative of minority voting power. PEX35 at 41–42; PEX35 at 158. Justice Souter's *Ashcroft* dissent, 123 S. Ct. at 496, and the lower-court decision he would have affirmed both echo that concern:

> Senator Robert Brown is the incumbent and has been reelected without opposition three times, and once without opposition in the general election. Most witnesses believed that incumbent Senator Brown would be re-elected under the proposed plans; however, they were especially fearful that it will be difficult to elect a candidate of choice in the proposed Senate District 26 if Senator Brown did not decide to run for re-election.

*Georgia v. Ashcroft*, 195 F. Supp. 2d 25, 91 (D.D.C. 2002); *see also id.* at 101 ("The Voting Rights Act does not protect minority incumbents; it protects minority voters. It is thus a dangerous business to conflate a politician's assessment of her own continued electoral prospects with the genuine protection of African American voting strength."). Proof of incumbent success would not carry the House's burden. In fact, House Members believed that, in open-seat races, minority-preferred candidates often lost. *E.g.*, PEX35 at 144–46.

Another bar to preclearance of 50% districts would have been the Black Caucus members' advocacy of 55% BVAP, meaning adverse Black Caucus testimony in preclearance litigation would evidence *discriminatory intent*, an independent basis to deny preclearance. *Ashcroft*, 539 U.S. at 503 (Souter, J.). Delegate Spruill stated that "mostly every member of the Black Caucus" was consulted, along with NAACP leaders in Suffolk, Chesapeake, and Virginia Beach, and he supported 55% districts. PEX35 at 142, 146–47. Delegate Dance also stated that the Black Caucus had "a lot of voice" and supported the bill because it "does provide the 55 percent voting strength that I was concerned about." PEX35 at 157; PEX33 at 44. The only Black Caucus Member to disagree wanted higher BVAP. PEX40 at 39.

Plaintiffs ask the Court to reject the House floor testimony in favor of contradictory, often equivocal, testimony offered six years later, such as testimony that Delegate Dance did not mean "I" when she said "I" (she meant "Jones"), 2 Tr. 120:22–121:16; that Delegate Howell, who fought in the civil-rights protests, did not believe a "protest vote" was worthwhile, 2 Tr. 85:8–12, 96:24–97:8; and that Delegate McClellan expected Delegate Jones to learn telepathically that she opposed a 55% BVAP target. 2 Tr. 952:1–6. None of this was before the House in 2011, so throwing out the plan on this basis would force states into the impossible position of having to predict whether Delegates who provide input on a plan will change their story later, thereby removing the justification relied on at the time. *See* PEX35 at 41 (Delegate Jones stating, in 2011, that he relied on Delegate Dance and other Black Caucus Members).

Finally, the amended Section 5 defeats Plaintiffs' implicit argument that the House should have risked the defeat of minority-preferred candidates. To the contrary, whereas VRA § 2 is satisfied by minority "opportunity" to elect, what "matters under Section 5" is "'being able' or 'having the power' to elect." *Texas*, 831 F. Supp. 2d at 261. A plan that turned "ability"

districts into "opportunity" districts would be retrogressive. Moreover, to the extent Plaintiffs are *not* advocating for crossover districts, but rather advocating for slightly different BVAP levels— say 53% or 54%—their position is meritless. The House did not have to determine "'precisely what percent minority population § 5 demands." *Alabama*, 135 S. Ct. at 1273. The difference between these numbers is within the margin of error in any statistical analysis, and data error *not* captured in formal margins of error renders prediction of minority performance a matter of speculation that "we should all take with a grain of salt." Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 Yale LJ. 174, 2501–51 (2007); IEX 103 at 8–9. Dr. Palmer agreed that the data used in polarization analyses cannot identify appropriate district-specific BVAP levels between 50% and 55%. 2 Tr. 446:4–23. Using 55% BVAP as a proxy to ensure non-retrogression without evidence of crossover voting was not "beyond what was reasonably necessary to avoid retrogression." *Shaw I*, 509 U.S., at 655.

**Expert Evidence.** Plaintiffs' evidence confirms that the House could not prove non-retrogression in 2011. Even if the House had hired Dr. Palmer in 2011 as the *House's expert* to obtain preclearance for districts around or below 50% BVAP, and even if he had performed the same analyses he performed in this case back in 2011, the House would have likely lost the preclearance case in the U.S. District Court for the District of Columbia. That is evident because similar analyses were found insufficient to prove non-retrogression in *Ashcroft*.

First, like the analysis found insufficient in *Ashcroft*, Dr. Palmer's analysis "focuses on statistics about…Democrats," proving that white and black voters in some areas will vote in general elections for the Democratic ticket. 539 U.S. at 507–08 (Souter, J.); *compare* PEX71 at 24–27. That does not prove non-retrogression because "the minority group may well have no impact whatever on which Democratic candidate is selected to run." 539 U.S. at 507–08. Dr.

39

Palmer analyzed no primary data and only opines on *Democratic* voting strength, rather than *minority* voting strength. *See also Ashcroft*, 195 F. Supp. 2d at 93 ("Whatever success the Georgia Democratic Party may enjoy as a result of the Senate redistricting plan does not and cannot immunize the plan's racially retrogressive effects from Section 5 attack.").

Second, Dr. Palmer's racially polarized voting analyses are limited to exogenous elections and includes no analysis of House of Delegates elections. PEX71 at 24–27. The now-controlling *Ashcroft* opinion found a similar analysis insufficient to prove non-retrogression given differences in voting patterns. 539 U.S. at 507. Dr. Palmer's analysis is even worse because it depends on federal even-year *presidential* data, 2 Tr. 416:5–7, which has no probative import, 2 Tr. 909:10–16, and involved Barack Obama, a "political superstar[]" whose success "hardly proves" what is needed for black-supported candidates to win House races. IEX103 Ex. A at 18; *see, e.g.*, *Nipper v. Chiles*, 795 F. Supp. 1525, 1535 n.8 (M.D. Fla. 1992); *Nipper v. Smith*, 39 F.3d 1494, 1505 n.2, 1547 (11th Cir. 1994).

Third, like the analysis rejected in *Ashcroft*, Dr. Palmer "did not attempt to compare the proposed plan with the benchmark plan," but only "looked at racial polarization in existing" districts. *Ashcroft*, 195 F. Supp. 2d. at 85–86. To assess the data's probative value, the court would need corresponding evidence on the "overlap" of the benchmark and enacted districts. *Id.*

Fourth, Dr. Palmer's analysis *shows racially polarized voting* in Challenged Districts in the 2009 Gubernatorial race. PEX71 at 48; 2 Tr. 451:5–452:4. Faced with the burden to "prove the *absence* of racially polarized voting," *Ashcroft*, 539 U.S. at 550 n.3 (emphasis added), presenting proof that it exists would kill the effort to drop BVAP. Dr. Palmer only concludes that 55% BVAP was not "necessary" by, first, averaging statewide results with even-year elections involving Barack Obama, and, second, making a separate set of predictions about what election

results in House of Delegates elections *would* be at different BVAP levels. PEX71 at 25–27.

That reckless speculation "carries a whiff of the lamp" because no one "know[s] how

[Virginia's] voters will actually behave if the percentage of something is x, or maybe y"; "[w]e

are arguing about numerical abstractions." *Ashcroft*, 123 S. Ct. at 508 (Souter, J., dissenting).

This analysis fails to account for the impact that a BVAP change *itself* has on elections, given

that political candidates, parties, and voters will take that number into account in assessing where

to invest time and resources. IEX 103 at 11 (discussing the "warming" and "cooling" effect).

Elections do not occur in a sterilized laboratory, and the VRA does not assume they do.

Additionally, Dr. Palmer's analysis of what BVAP "ought to be" is a VRA § 2 analysis; Section

5 compares minority voting strength with the *benchmark*, *Reno v. Bossier Par. Sch. Bd.*, 528

U.S. 320, 334 (2000), which Dr. Palmer does not address, *Ashcroft*, 195 F. Supp. 2d. at 85–86.

Indeed, the analyses of Dr. Katz and Dr. Hood *confirm* the existence of polarized voting

by examining the performance of the *actual* districts the House enacted. In its previous decision,

this Court analyzed "*2011 and 2013 elections*" in finding polarized voting in HD75 and HD63.

141 F. Supp. 3d at 559 (emphasis added). The Supreme Court found "no error in the district

court's conclusion" because, inter alia, "the Challengers do not dispute that HD75 was an ability

to elect district or that white and black voters in the area tend to vote as blocks." *Bethune-Hill*,

137 S. Ct. at 801 (citing, inter alia, page 559 of this Court's opinion). Accordingly, Dr. Hood and

Katz analyzed additional elections from these years and confirmed that polarized voting

continued in the enacted plan. IEX103 at 5–7; 12–14; IEX101 at 1–5. Plaintiffs retort (at 19–22)

that some of Dr. Katz's races lack sufficient data to establish (or refute) polarized voting, and

that Dr. Hood did not provide confidence intervals. There is, however, reasonable disagreement

in the academic community as to how relevant confidence intervals are in this context, *see*

Loewen Des., ECF No. 220-1, at 191–200,[16] and gaps in the analysis do not show a means by which the House could have met its Section 5 burden of proving the "absence of racially polarized voting"; they suggest the opposite. Accordingly, Dr. Katz's analysis would prevent him from opining that polarized voting does *not* exist or exists only at low levels. 2 Tr. 834:3–7.

Indeed, five experts with the benefit of six years of hindsight have tried to do what the House had *six weeks* to accomplish, and none of them has identified a better approach. Even if the Court disagrees and determines, in hindsight, that the House could have obtained preclearance for districts with lower BVAP, the House's concerns about the absence of evidence were reasonable at the time, and it had "good reasons" to do what it did.

**The House's Discretion.** Even if the House somehow *could* have justified crossover districts, it would have been within its discretion to draw "safe" districts anyway. Both the *Georgia v. Ashcroft* majority and dissent (with significant qualifications) agreed that "a State may choose to create a certain number of 'safe' districts, in which it is highly likely that minority voters will be able to elect the candidate of their choice" or, alternatively "a greater number of districts" in which minority ability-to-elect it is "not quite as likely." 123 S. Ct. at 481–80. Section 5 could therefore be satisfied with "safe" districts *even if crossover districts were lawful*.

Indeed, the record reflects a team-of-rivals debate on the very question: Delegate Spruill "believed you needed…a large percentage of black voting age population in a district to better ensure that a black candidate would be elected," but then-Delegate McLellan believed a lower number would suffice.[17] 2 Tr 950:3–13. Senator McLellan, however, testified that "reasonable

---

[16] Dr. Loewen reviewed Dr. Hood's report and found that it was "competent," "[w]ell done," and "dealt with important issues." Loewen Des., ECF No. 220-1, at 162–63.

[17] The evidence weighs against Senator McClellan's view that Delegate Spruill is an "outlier" when both Spruill and Delegate Dance spoke in favor of 55% BVAP on the House floor, and no Black Caucus Member disagreed. 2 Tr. 951:18–952:8.

minds can disagree" on this question, 2 Tr. 951:21–25, a view she shares with the *Ashcroft* majority and (with appropriate proof) the dissent. In fact, the House deliberated on this, hearing the advocacy of two white Delegates for lowering BVAP to allow a 13th majority-black district. PEX35 at 100–141; PEX35 at 161–64. The House—including Delegate McClellan and numerous other Black Caucus members—voted for 12 "safe" districts instead. That is responsible deliberation, not unwarranted action "beyond" the VRA. *Shaw I*, 509 U.S., at 655.

### C.      Each District Individually Is Narrowly Tailored

In addition to lacking actual evidence to support *any* crossover districts, the House had district- and region-specific concerns about minority voting strength justifying 55% BVAP.

**The Richmond/Tri-City Region.** The House had "good reasons" to believe that five safe districts at 55% BVAP or higher were needed in the Richmond region.

HD63 was at 58.1% BVAP in the benchmark plan. IEX15 at 13. Delegate Dance expressed concern on the House floor that black turnout in Petersburg, the population center of HD63, was lower than white turnout, and therefore advocated a 55% BVAP target. PEX33 at 45. The Court has already held that "Plaintiffs' own expert noted that HD63 and HD75 'exhibit high rates of [racial] polarization because large majorities of Whites vote in the opposite way as large majorities of African Americans.'" 141 F. Supp. 3d at 559. Dr. Palmer's analysis also concedes high polarized voting in odd-year elections. PEX71 at 48. HD63, though long drawn as an ability-to-elect district, failed to perform in the 90s cycle, IEX103 Ex. A at 28, and a minority preferred candidate was defeated in 2001 as well, 1 Tr. 455:21–456:21.[18] Dropping HD63 below 55% BVAP from 58.1% BVAP with all signs indicating low minority turnout and polarized voting, and no way to disprove that, would have been retrogressive. Moreover, Plaintiffs contend

---

[18] Delegate Jones was aware of election histories when he drew the plan. 1 Tr. 462:9–11.

that the race-based measures in HD63 brought *HD75* above 55% BVAP, 2 Tr. 984:1–8, so *those* measures are narrowly tailored because HD75 was properly drawn above 55% BVAP.

HD74 was at 62.7% BVAP in the benchmark plan. IEX15 at 13. In 2005, the minority community failed to elects its preferred candidate when a white delegate defeated multiple black delegates in a multi-way primary, which split the black vote. 1 Tr. 457:19–458:5. Delegate Jones believed at the time that this was a loss for the minority-preferred candidate, *id.*, and Delegate Spruill expressed the same concern on the House floor in 2011, PEX35 at 144.[19] Dr. Palmer's analysis confirm odd-year polarized voting in HD74, PEX71 at 48, so a dramatic reduction from 62% to below 55% BVAP would have been retrogressive.

HD71 had experienced a dramatic fall in BVAP over the decade from over 55% BVAP, 2 Tr. 698:22–25, to about 46% BVAP, IEX15 at 13. The black community in the district had the ability to elect its preferred candidates as far back as anyone can recall, 1 Tr. 457:8–18, triggering Section 5 protection, but House members were concerned that the BVAP level sufficient to elect incumbent Jenifer McClellan—a particularly talented candidate who drew crossover votes—would not suffice to protect minority voting strength if the seat became open. 2 Tr. 127:18–134:5 (Dance); PEX40 at 46. Accordingly, the House concluded that (1) BVAP needed to be sufficiently high that the minority community's voting strength would continue after Delegate McClellan's tenure, and (2) it needed to be high enough to protect minority voting strength from the highly likely *continued decline* in BVAP. 1 Tr. 292:1–293:3; 2 Tr. 699:1–14. Drawing it at 46% BVAP would do neither. Drawing it at 50% BVAP *might* maintain the minority community's ability to elect temporarily, but it would *not* account for the future decline.

---

[19] Not surprisingly, the white representative of HD74, Delegate Joe Morrissey, advocated that black voters be taken out of his and other majority-minority districts. PEX35 at 100–141.

Drawing it at 55% BVAP accomplished both goals. Notably, Plaintiffs' alternative, PEX69 at 17, would draw HD71 *lower* than 46%, possibly to 40% BVAP, and could not be precleared.[20]

HD69 was at 56.3% BVAP in the benchmark plan. IEX15 at 13. Although generally able to elect minority-preferred candidates, the black community suffered a defeat in 2009 when a white candidate, Betsy Carr, defeated several black candidates in a multi-way primary, splitting the black vote. 1 Tr. 456:12–21. Delegate Spruill expressed concern in 2011 that this race was not a victory for the minority-preferred candidate. PEX35 at 145. Dr. Hood's analysis confirms that the 2009 race was polarized and that the minority-preferred candidate lost. IEX103 at 15. Dr. Palmer's analysis is equivocal on polarized voting, PEX71 at 48, and there is no evidence on record, even today, proving its absence.

HD70 was at 61.8% BVAP in the benchmark plan, and it was a performing ability-to-elect district. 1 Tr. 457:1–7. Dr. Palmer's analysis finds odd-year polarized voting, PEX71 at 48, and Dr. Hood concurs, IEX103 at 12. Moreover, Plaintiffs contend the race-based measures in HD70 were designed to ensure that HD71, not HD70, was above 55% BVAP, so those measures are narrowly tailored if there is a strong basis in evidence on HD71, and there is.

**Hampton Roads.** The House had every reason to believe it needed to use race as a factor in Hampton Roads because there were six ability-to-elect districts in the benchmark plan. It also had good reasons to give each a functional working majority.

HD77 was at 57.8% BVAP in the benchmark plan. IEX15 at 13. As of 2011, Delegate Spruill had represented the district since 1993, but in the prior election, the minority-preferred candidate was defeated, 1 Tr. 459:22–460:5, and concern was expressed on the House floor that elections involving Delegate Spruill did not accurately reflect what a successor minority-

---

[20] Plaintiffs' alternative would also ratchet up BVAP in HD70 to well over 60% BVAP. The layperson's terms for such a proposal are "cracking" and "packing."

preferred candidate could accomplish, PEX35 at 41–42. Delegate Jones conferred with Delegate

Spruill about minority performance in the district. 1 Tr. 467:12–15. Dr. Palmer's report shows

polarized voting in odd-year elections. PEX71 at 48.

HD90 was at 56.9% BVAP in the benchmark plan. IEX15 at 13. The minority

community saw the defeat of its preferred candidate in 2002 when Billy Robinson lost to a

*Republican* in a general election. 1 Tr. 488:15–24. Dr. Palmer's analysis shows polarized voting

in odd-year elections, PEX71 at 48, and no record evidence suggests the House could have

proven otherwise in 2011.

HD80 was at 54.4% BVAP in the benchmark plan. IEX15 at 13. It was a performing

ability-to-elect district in the benchmark plan. 1 Tr. 460:9–25. Dr. Palmer's analysis confirms

polarized voting in odd-year elections in HD80. PEX71 at 48. There is no evidence that the

House could have proved non-retrogression by allowing BVAP to fall towards or below 50%.

HD89 was at 52.5% BVAP in the benchmark plan. IEX15 at 13. It was a performing

ability-to-elect district in that plan. 1 Tr. 461:3–11. Delegate Jones discussed the district with the

incumbent Delegate Alexander, *id.*, as well as Delegate Spruill who had input in all the South

Hampton Roads districts, 2 Tr. 499:16–25. Dr. Palmer's analysis shows polarized voting in the

district in odd-year elections, PEX71 at 48, and there was no proof to the contrary.

HD92 was at 62.1% BVAP in the benchmark plan. IEX15 at 13. It was a performing

ability-to-elect district in that plan. 1 Tr. 461:22–462:2. Dr. Palmer's analysis shows odd-year

polarized voting, PEX71 at 48, and no evidence justified an 8-point dive below 55% BVAP.

HD95 was at 61.6% BVAP in the benchmark plan. IEX 15 at 13. It was a performing

ability-to-elect district in that plan. 1 Tr. 462:1–8. Dr. Palmer's analysis shows odd-year

polarized voting, PEX71 at 48, and no evidence justified a 7-point dive below 55% BVAP.

### III. Plaintiffs' Theory, if Law, Would Gut the VRA

Plaintiffs' challenge, at base, is not to the House plan, which Democrats and Republicans saw in 2011 as "fair and reasonable," IEX4 at 13, but to the VRA itself. As the Court commented previously, "the ability-to-elect standard…inherently utilizes racial floors," so a constitutional theory rendering racial targets inherently or normally suspect draws "into question" the validity of the VRA and even "the compatibility of the Fourteenth Amendment's Equal Protection Clause and the Fifteenth Amendment's Enforcement Clause." 141 F. Supp. 3d at 527 & nn. 11–13. In rejecting Plaintiffs' argument that a racial target is presumptively unconstitutional, the Supreme Court avoided this problem, but Plaintiffs' repackaging of the argument on remand, which would nearly always subject VRA compliance to strict scrutiny, revives it.[21]

Aside from laying the groundwork for striking down the VRA, Plaintiffs' theories would immediately neuter the VRA's ongoing practical impact in Virginia. A federal-court finding that polarized voting in Virginia is non-existent or legally insignificant, as Plaintiffs advise, would mean that future redistricting efforts in the Commonwealth may occur unencumbered by VRA § 2, which requires proof of polarized voting. *Growe v. Emison*, 507 U.S. 25, 40–42 (1993). In fact, the legislature going forward would be *prohibited* from drawing minority-opportunity districts. *See Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017). That occurred in North Carolina, where, after Plaintiffs' counsel persuaded a federal court that no polarized voting exists, the lines

---

[21] Predictably, legal activists who have long sought to cripple the VRA have taken notice of this case, including the lawyer who argued and won *Shelby County*. He recently filed a test case, citing this litigation and *Cooper*, against the California's Voting Rights Act and suggested in the complaint that VRA § 2 is next on his agenda. *Higginson v. Becerra*, 3:17-cv-02032, Complaint, ECF No. 1 at 6 (S.D. Cal. filed Oct. 4, 2017); see Rick Hasen, *New Lawsuit by Ed Blum Attacks Constitutionality of California Voting Rights Act*, Election Law Blog (October 4, 2017), http://electionlawblog.org/?p=95219.

were redrawn with no attention to the VRA. *See Harris v. McCrory*, 2016 WL 3129213, at *2 (M.D.N.C. June 2, 2016) (rejecting objections to new North Carolina plan).

In this regard, there is only a hair's breadth difference between Plaintiffs' position and the position of Justice Thomas that the Virginia House should have known that the data supporting VRA §§ 4 and 5 was outdated, forecast the Supreme Court's *Shelby County* decision two years in advance, and told DOJ to go pound sand. 137 S. Ct. at 803–807. In Plaintiffs' modified version, the House should have understood from Barack Obama's victories in Virginia, *see* PEX71 at 19, 24- 26, 48-49, 66, 68; PEX50 at 30, 40, 42, 48, 49, 52-53 (relying on Obama election results), that the dream of racial equality in voting had been realized and that the VRA had outlived its shelf life. Drawing that conclusion from the Obama victories would be unfounded, *see* 1 Tr. 199:7–10 (Judge Lee observing that "2008 was kind of unprecedented from the standpoint of voter turnout in the state"), as Dr. Ansolabehere has opined.[22] Using that conclusion to cut off the VRA's application to redistricting in this former flagship of the Confederacy would be an extraordinary step backward for minority voting rights.

## IV.   The Court's Discretion in Remedying Any Violations Is Restricted

A two-step process is required if Plaintiffs prevail on any Challenged Districts.

First, the Court must afford the legislature a reasonable opportunity to remedy the legal defect through a new plan. *Reynolds v. Sims*, 377 U.S. 533, 586 (1964). At the first step, this Court would be required to provide reasonable time for the General Assembly to "address [the] highly political task" of creating a new plan; during this time "federal judges" must "defer." *Growe v. Emison*, 507 U.S. 25, 33 (1993); *Scott v. Germano*, 381 U.S. 407, 409 (1965). The

---

[22] Stephen Ansolabehere *et al.*, *Race, Region, and Vote Choice in the 2008 Election: Implications for the Future of the Voting Rights Act*, 123 Harv. L. Rev. 1385, 1435–36 (April 2010) (finding that the results of the 2008 Presidential election should not be cause for transforming requirements under the VRA).

48

General Assembly's power would be limited only by the mandate to remedy the violation; otherwise its "freedom of choice to devise substitutes" must "not be restricted." *Burns v. Richardson*, 384 U.S. 73, 85 (1966). The General Assembly would be required to redraw those districts invalidate, but would not be otherwise limited. *See id.* at 83–85.

Second, if the legislature fails to pass a new plan, the Court must undertake the "unwelcome" task of creating a plan that remedies the violation. *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). The Court, however, would not be similarly situated with the legislature in this task. It would have no freedom to make its own policy, but would be required to "honor state policies" and not "unnecessarily put aside" the House's prior districting decisions. *White v. Weiser*, 412 U.S. 783, 796 (1973). The Court must choose a remedial plan "which most clearly approximate[s] the reapportionment plan of the state legislature, while satisfying constitutional requirements." *Id.*; *see also Upham v. Seamon*, 456 U.S. 37, 42–44 (1982). The state plan serves as a starting point for the district court. *Perry v. Perez*, 565 U.S. 388, 394 (2012).

In suggesting the Court indiscriminately redraw Challenged Districts, non-challenged districts, "surrounding areas," and entire "regions" where no violation is found, Br. at 49, Plaintiffs recommend a course of action the Supreme Court has rebuked. In *Upham v. Seamon*, 456 U.S. 37 (1982), the Supreme Court stayed a federal district court's districting plan issued just hours after striking down the plan put forward by the Florida legislature, and it later reversed the ruling of the district court on the merits because the court's plan departed unnecessarily legislative policy. *See also White*, 412 U.S. at 796; *Perry*, 565 U.S. at 393–99. The replacement map must be tailored to remedying violations—nothing more.

Any constitutional violation in this case would be for "unjustified racial classification," and it would be unique to any district invalidated. *Bethune-Hill*, 137 S. Ct. at 798, 799–800.

Remedying districts drawn with unjustified racial "considerations," *id.* at 799, would require replacement districts drawn *without* racial considerations. Yet Plaintiffs ask the Court to expressly *employ* racial considerations to intentionally "'unpack' the unconstitutional districts," Br. at 49, but Plaintiffs neither alleged nor proved "packing."[23] Their proposal would require racial classifications*,* and there would be no compelling interest to justify them. *See Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring). The proper remedy would be districting with *no* attention to race. And, contrary to Plaintiffs' suggestion (at 50) that the Court may follow "ripple effects" wherever they lead, the Court plan would not be to remedy population deficiencies across the state, and thus would have little in common with what occurred in 201. The remedy would be limited to the district invalidated and those "abutting it." *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 563 (E.D. Va. 2016).

Federal courts faced with drawing a plan often employ a special master under Federal Rule of Civil Procedure 53. Remedial proceedings require due process, including the opportunity for the litigants to propose and object to remedial plans. Further briefing, and possibility evidentiary proceedings, would likely be necessary at that time to assess proposals in light of the Court's forthcoming decision.

## Conclusion

For these reasons, and those stated in Defendants' and Defendant-Intervenors' other briefing in this litigation, judgment should be entered in favor of Defendants and Defendant-Intervenors, and the sole claim in this case should be dismissed.

---

[23] A packing claim would be brought under VRA § 2 and require proof that minority voters are over-concentrated in some districts, preventing them from forming an *additional* majority-minority district. *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993). Contrary to Plaintiffs' belated efforts to sneak a packing claim in, Dr. Rodden opined that the House's approach was tailored. Districts were drawn "so as to spread African Americans rather evenly." PEX69 at 11.

Dated: November 13, 2017                    Respectfully Submitted,

Dalton Lamar Oldham, Jr. (*pro hac vice*)    /s/ Katherine L. McKnight
Dalton L Oldham LLC                            E. Mark Braden (*pro hac vice*)
1119 Susan Street                               Katherine L. McKnight (VSB No. 81482)
Columbia, SC 29210                          Richard B. Raile (VSB No. 84340)
Tel: (803) 237-0886                          BAKER & HOSTETLER LLP
dloesq@aol.com                               1050 Connecticut Ave NW, Suite 1100
                                            Washington, DC 20036
                                            Tel: (202) 861-1500
                                            Fax: (202) 861-1783
                                            mbraden@bakerlaw.com
                                            kmcknight@bakerlaw.com
                                            rraile@bakerlaw.com

                                            *Counsel to the Virginia House of Delegates*
                                            *and Virginia House of Delegates Speaker*
                                            *William J. Howell*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of November, 2017, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.


Dalton Lamar Oldham, Jr. (*pro hac vice*)
Dalton L Oldham LLC
1119 Susan Street
Columbia, SC 29210
Tel: (803) 237-0886
dloesq@aol.com

/s/ Katherine L. McKnight
E. Mark Braden (*pro hac vice*)
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
mbraden@bakerlaw.com
jwalrath@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

*Counsel to the Virginia House of Delegates and Virginia House of Delegates Speaker William J. Howell*