# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

GOLDEN BETHUNE-HILL, *et al.*,

        Plaintiffs,

    v.

VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,

        Defendants.

    v.

VIRGINIA HOUSE OF DELEGATES, Intervenor-Defendants,

        Defendants.

Civil Action No. 3:14-cv-00852-REP-AWA-BMK

## PLAINTIFFS' POST-TRIAL REPLY BRIEF

137557119.4

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ........................................................................................................ 1

      A.   Race Predominated in the Challenged Districts..................................... 1

           1.   Intervenors Mischaracterize the Record Evidence that Traditional
                Redistricting Criteria Were Subordinated to Racial Goals ...................... 1

           2.   Intervenors Mischaracterize the Evidence of Racial Sorting.................... 2

           3.   Core Preservation Was Not the Predominant Factor ................................. 6

      B.   Intervenors' Narrow Tailoring Arguments Fail ...................................... 8

           1.   Intervenors' Erroneous Assertion that Satisfying Strict Scrutiny Is
                Like Making a Prima Facie Showing on Summary Judgment ................. 9

           2.   Intervenors' Core Narrow Tailoring Arguments Are Unavailing........... 12

                a.   The Challenged Districts Are Not Narrowly Tailored
                     Because Delegate Jones Talked to Senator Spruill..................... 12

                b.   The Data Available at the Time of Redistricting Provided
                     No Basis in Evidence for an Across-the-Board 55% BVAP
                     Rule ................................................................................................. 13

           3.   Requiring Intervenors to Meet Their Burden Would Not "Gut" the
                VRA ........................................................................................................ 16

      C.   District-Specific Evidence Confirms Racial Gerrymandering ............ 17

           1.    HD 63 ..................................................................................................... 17

           2.    HD 71 ..................................................................................................... 18

           3.    HD 69 ..................................................................................................... 19

           4.    HD 70 ..................................................................................................... 20

           5.    HD 74 ..................................................................................................... 21

           6.    HD 77 ..................................................................................................... 22

           7.    HD 80 ..................................................................................................... 22

           8.    HD 89 ..................................................................................................... 23

           9.    HD 90 ..................................................................................................... 23

           10.   HD 92 and 95 ......................................................................................... 24

      D.   The Scope of a Remedy ......................................................................... 25

**TABLE OF CONTENTS**
**(continued)**

Page

III.    CONCLUSION ............................................................................................................. 25

137557119.4

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Abrams v. Johnson,*
  521 U.S. 74 (1997)..................................................................................................15

*Ala. Legislative Black Caucus v. Alabama,*
  135 S. Ct. 1257 (2015)..................................................................................... passim

*Ala. Legislative Black Caucus v. Alabama,*
  231 F. Supp. 3d 1026 (M.D. Ala. 2017) ...................................................................7

*Bethune-Hill v. Va. State Bd. of Elections,*
  137 S. Ct. 788 (2017)....................................................................................... passim

*Bethune-Hill v. Va. State Bd. of Elections,*
  141 F. Supp. 3d 505 (E.D. Va. 2015) .......................................................................7

*Cooper v. Harris,*
  137 S. Ct. 1455 (2017).........................................................................7, 11, 13

*Covington v. North Carolina,*
  316 F.R.D. 117 (M.D.N.C. 2016) .................................................................11, 12

*Florida v. U.S.,*
  885 F. Supp. 2d 299 (D.C. 2012)...........................................................................14

*Georgia v. Ashcroft,*
  539 U.S. 461 (2003).........................................................................................10, 15

*Harris v. McCrory,*
  159 F. Supp. 3d 600 (M.D.N.C. 2016) ...................................................................25

*Johnson v. Miller,*
  864 F. Supp. 1354 (S.D. Ga. 1994)..................................................................11, 13

*League of United Latin Am. Citizens v. Perry,*
  548 U.S. 399 (2006).................................................................................................16

*Page v. Va. State Bd. of Elections,*
  No. 3:13CV678, 2015 WL 3604029 (E.D. Va. June 5, 2015)......................... passim

*Personhuballah v. Alcorn*,
  155 F. Supp. 3d 552 (E.D. Va. 2016) ....................................................................................25

*Smith v. Beasley*,
  946 F. Supp. 1174 (D.S.C. 1996)..........................................................................................12

- ii -

## I.      INTRODUCTION

The General Assembly applied a single racial floor to twelve very different districts

without conducting any substantive analysis of whether Section 5 of the Voting Rights Act

("VRA") compelled this race-based approach to redistricting. Unable to justify the facts,

Intervenors mischaracterize them, and try to rewrite the law. But under the law, as clarified by

the Supreme Court, it is clear that race predominated in each Challenged District and that the

unfounded use of a blunt 55% racial floor is antithetical to the General Assembly's obligation to

narrowly tailor the use of race to a compelling interest. The Court should hold all eleven

Challenged Districts unconstitutional and set a prompt deadline for adoption of a remedial map.

## II.      ARGUMENT

**A.      Race Predominated in the Challenged Districts**

**1.      Intervenors Mischaracterize the Record Evidence that Traditional
Redistricting Criteria Were Subordinated to Racial Goals**

Intervenors claim this Court found no conflict between race and traditional criteria in the

Challenged Districts, this is "law of the case," and the Court need only look for evidence of

predominance in the absence of conflict. *See* Dkt. No. 231 ("Br") 4, 6-8. Intervenors are wrong.

The Court's prior factual findings with regard to the Challenged Districts are not law of

the case, for reasons Plaintiffs have stated. *See* Dkt. No. 148 at 2-4. Briefly, the Supreme Court

declined to rely on or consider the Court's factual findings in any district other than District

("HD") 75. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017). Indeed, if this

Court were barred from further examination of whether traditional redistricting principles were

subordinated to race, the trial the Court just held was a pointless waste of time. Moreover,

Intervenors suggest the Court must re-adopt findings *that are concededly wrong. Compare, e.g.*,

Dkt. No. 108 at 148 (HD 80 "added a small 'pipe' . . . , which includes a funeral home owned

by" the incumbent), *with* Tr. 504:17-505:13 (Jones) (this funeral home is not in the "pipe").

Further, Intervenors' claim that the Challenged Districts do not "conflict" with traditional redistricting criteria (and that the Court so found) is inaccurate. In fact, the Court found rampant conflicts with traditional redistricting criteria in the Challenged Districts, but then assessed (and minimized) that evidence through the prism of the racial predominance test the Supreme Court rejected. The Court found "conflict" in at least 10 of the 11 districts.[1] The only district in which it arguably made no specific findings of "conflict" was HD 92. And here, as elsewhere, Plaintiffs provide ample "direct evidence of the legislative purpose and intent," including "the use of an express racial target" and "other compelling circumstantial evidence" such as "stark splits in the racial composition of populations moved into and out of disparate parts of the district," all of which was given "insufficient weight" under the Court's previous legal standard. *Bethune-Hill*, 137 S. Ct. at 800. Indeed, the circumstantial evidence of racial predominance only became *stronger* in the second trial. *See, e.g.*, Dkt. No. 230 at 46-48; *see also infra* at 17-25.

### 2. Intervenors Mischaracterize the Evidence of Racial Sorting

Intervenors claim that there are no stark racial differences between Challenged and non-challenged districts. They do not dispute the accuracy of Dr. Ansolabehere's and Dr. Palmer's analyses, but brush aside the consistent pattern of division by race set out in those analyses as "no big deal." This claim rests on a selective recitation of the evidence and basic math errors.

Intervenors ignore much of the evidence of racial sorting, training their fire on Plaintiffs'

---

[1] *See, e.g.*, Dkt. No. 108 at 108-09 (HD 63's "deviations . . . begin with the splitting of Dinwiddie County" and include large increases in county, city, and VTD splits); *id.* at 125-27 (increased VTD splits in HD 69, which is not contiguous by land); *id.* at 130-31 (HD 70 includes a "turret" that "appears to deviate from districting norms"); *id.* at 132 (increased VTD splits in HD 71, which also shows "facially evident deviations"); *id.* at 137 (discussing HD 74's irregular "ax-shape[]"); *id.* at 140-42 (HD 77 is "thrust so far into HD76 as to nearly sever it in half," is not contiguous by land, and lacks a water crossing); *id.* at 144 (HD 80 "makes little rational sense as a geographical unit"); *id.* at 148-49 (examining a "pipe" on HD 89's border and other "deviations"); *id.* at 150 (noting HD 90's "two extensions into Virginia Beach and lack of land contiguity"); *id.* at 153 (HD 95 is the "least compact district on the map under the Reock metric," and finding no "reasonably neutral explanation for the route followed").

analysis of VTD splits. They have no response to Dr. Palmer's analysis that *at every level*—cities, towns, unincorporated places (even a military base)—with near uniformity, "areas of higher concentrations of black voting-age people were put into the [C]hallenged [D]istricts and areas of lower concentrations were put into the non-challenged districts." Tr. 392:13-20 (Palmer); *see also* Pls.' Ex. 71 ¶¶ 66-82, 144-45. Nor do they dispute that while black voters were moved *into* the Challenged Districts at a higher rate than the population as a whole, white voters, *and* Democratic voters, black voters were moved *out of* the Challenged Districts at a lower rate than all these groups. Pls.' Ex. 71 ¶¶ 100-04, tbls. 18-19; Tr. 395:1-7 (Palmer).

Intervenors' efforts to recharacterize the actual numbers reflected in Dr. Palmer's analysis misrepresent how the numbers impact the individual districts and the map as a whole.

First, Intervenors contend that "fewer black than non-black voters on average moved into Challenged Districts." Br. 8. Intervenors are simply wrong; in fact, *more* black than non-black voters on average moved into the Challenged Districts. Pls.' Ex. 50, ¶¶ 84, 86. The source of Intervenors' error is clear: They rely on the flawed Appendix A to their brief, which is not in evidence, and which *double counts* black voters who were moved from one Challenged District into another (or HD 75) by counting such voters in both the "Out of" and "In to" columns. *Id.*, Appendix A.[2] This understates the difference between the number of black voters moved into the Challenged Districts and the number moved out. Intervenors' failure to recognize—much less address—the fact that shuffling BVAP among the Challenged Districts was a key part of the mapdrawers' race-based strategy, *see* Dkt. No. 230 at 8-9, speaks volumes. Taking these transfers into account, as Dr. Palmer and Dr. Ansolabehere do, lays the pattern of racial sorting

---

[2] *Compare, e.g.*, Dkt. No. 231-1 (calculating 19,670 "TVAP Out of" HD 70), *with* Pls.' Ex. 50, tbl. 9 & Pls.' Ex. 70, fig. 15 (showing all population moved out of HD 70 was moved to other Challenged Districts).

bare. *See* Pls.' Ex. 50 ¶¶ 92, 103, tbls. 7, 9; Pls.' Ex. 71 ¶¶ 98-104, tbls. 16-17.[3]

Second, Intervenors emphasize that several areas moved into the Challenged Districts included BVAPs of less than 50%. Br. 10. But they again make a critical mathematical error. Transfers of population with BVAP less than 50% can still increase a district's BVAP overall, if the BVAP moved in is *relatively* higher than the BVAP moved out.[4]

Third, Intervenors try to diminish the significance of the evidence that VTDs were split on racial lines through the strategic deployment of adjectives. They assert that the average BVAP assigned to the Challenged Districts is "*only* 24% higher" than that assigned to the non-challenged districts, Br. 10, and that there are only "*tepid* differences" between BVAP levels in several split precincts, *id.* (emphasis added). But pointing to a handful of VTD splits in which the BVAP difference is less than 24% does not negate the many splits in which the BVAP difference is much larger. *See, e.g.*, Pls.' Ex. 71, tbls. 3-6 (percentage point differences of 46.6 in Hopewell, 39.9 in Belmont, 61.7 in John F. Kennedy, and 39.1 in Epes). Even the VTD splits Intervenors highlight reflect BVAP differences from 8.2 to 23.9 percentage points; *see* Br. 8, hardly "tepid" differences when trying to achieve a precise racial target in all Challenged Districts.

Even if no single VTD split presented a "stark" demographic difference, what *is* stark is the fact that these racial differences are seen in *all but one* VTD split between Challenged and non-challenged districts. Pls.' Ex. 71, tbls. 3-6. If the mapdrawers did not split VTDs on the basis

---

[3] Intervenors make the same "double counting" mistake in averaging the "BVAP Into" and "BVAP Out Of" columns in Dr. Ansolabehere's Table 8, which greatly understates his conclusions. *See* Br. 8. Dr. Ansolabehere actually reported a BVAP difference of 12.6 percentage points between areas moved into the Challenged Districts and areas moved out. Pls.' Ex. 50 ¶ 84. When limiting his analysis to whole VTDs, that difference grows to 17.7 percentage points. *Id.* ¶ 86.

[4] For example, consider a 50% BVAP district with 1,000 eligible voters. To achieve 55% BVAP in this district (550 black voters), mapdrawers would need to exchange 50 white voters for 50 black voters. Suppose they were to move out an area of the district with 200 voting-age persons, 30 of whom are black (15% BVAP), and move in a new area with 200 voting-age persons, 80 of whom are black (40% BVAP). This exchange increases BVAP from 500 people to 550 people, or 55%, even though the transfers in and out both have BVAPs lower than 50%. Indeed, in HD 75, which concededly was redrawn to push the BVAP over 55%, the target was achieved by swapping areas with 27.1% BVAP for areas with 37.9% BVAP. *See* Pls.' Ex. 50, tbl. 8. The same pattern is clearly evident in HD 77 and 92.

of race—if BVAP differences were, as Intervenors contend, meaningless and accidental (Br. 13)—one would expect to see roughly the same number of VTD splits in which the BVAP in the Challenged Districts was lower. *See* Tr. 379:11-25 (Palmer). Intervenors twice quote Dr. Palmer's testimony that "[s]plitting VTDs to equalize population is very common," Br. 12, 13 (quoting Tr. 381:14-15), but omit the next sentence of that testimony: "[W]hat's uncommon is to see this consistent pattern of splitting by race." Tr. 381:15-16. This omission speaks volumes.

Fourth, Intervenors suggest that this pattern of division by race in VTDs split between Challenged and non-challenged districts is irrelevant without evidence that, but for those splits, a district would not have met the 55% BVAP target. Br. 11. But Plaintiffs need only show that race predominated in the drawing of each district as a whole, not that any one violation of traditional principles was the "but for" way in which the racial target was met. *Bethune-Hill*, 137 S. Ct at 800. And to be sure, Dr. Palmer did show that every VTD split between Challenged Districts, which Intervenors admit was the final step in the process, Br. 13, enabled satisfaction of the 55% BVAP floor. *See* Dkt. No. 230 at 10-11. Intervenors' only rebuttal is that "un-splitting the VTDs would take the district out of population alignment, thereby spurring other changes that likely would result in a district at or above 55% BVAP." Br. 11. This response is puzzling, to say the least, because it amounts to a concession that mapdrawers would have found other ways to satisfy the rigid racial rule if those VTD splits had not done the trick. In other words, Intervenors' argument only confirms that race *did* predominate in the way the lines were drawn.[5]

Next, Intervenors congratulate themselves for excluding "over 158,683 black voters"

---

[5] Intervenors launch ad hominem attacks on Dr. Palmer's "motive" in mapping the VTD splits listed in his tables, accusing him of "manipulat[ing] the shading" and "rigging the scale." Br. 11. But Dr. Palmer hardly hides the ball. He testified that each figure has its own scale so as to illuminate "differences within each map and not across maps." Tr. 377:16-22. The purpose is to "show where eligible black voters are residing in the VTD relative to other places within that VTD," *id.* 378:2-5, and they accurately depict that higher concentrations of black voters are consistently drawn into the Challenged Districts. Indeed, Dr. Palmer already laid bare those numerical differences in his tables, Pls.' Ex. 71, tbls. 3-7, which Intervenors do not dispute, *see* Pls.' Ex. 71, figs. 3-7.

from the Challenged Districts. Br. 9. Effectively, they argue that their failure to institute total racial segregation negates any claim of racial predominance. Br. 9. But predominance does not mandate that every last black voter be drawn into a challenged district; were that true, no racial gerrymandering case would survive. If the mapdrawers had not been driven by an arbitrary 55% racial floor, then many more black voters would have been placed in other districts and, together with the other "158,683 black voters," had greater voting strength across the map. The effect of the 55% BVAP rule was, as alleged by Plaintiffs, to minimize the influence of black voters in surrounding districts. *See* Compl., Dkt. No. 1 ¶ 3. This is hardly a reason to laud or uphold the Challenged Districts.

Finally, Intervenors argue that because it was *possible* for the General Assembly to meet the 55% BVAP floor in the Challenged Districts in other ways, it is *impossible* for race to have predominated. Br. 14-17. That is, Intervenors argue that if a state could racially gerrymander in *multiple* ways, then it can racially gerrymander in *any* way it chooses. At a fundamental level, this argument makes little sense. If race predominates in the map as drawn, then it does not matter whether another map could be drawn in which race also would predominate.

### 3.    Core Preservation Was Not the Predominant Factor

Intervenors' next primary contention is that "core preservation . . . far and away predominates over race." Br. 18. There are, again, several fatal flaws with this contention.

First, it makes no sense given the record. HD 75 retained 78.8% of its core and the Court found that race predominated. *See* DI Ex. 15 at 16. That is a *higher* retention percentage than all but three Challenged Districts (Districts 63, 71, and 74, which retained about 80% of their cores). *See id.* The fact that the Challenged Districts retained as much or less of their core than a district where race predominated suggests, if anything, that race predominated in those districts as well.

Second, this core retention argument is an invitation to disregard the Supreme Court's

- 6 -

admonition of the need to consider "the significance of . . . stark splits in the racial composition of populations moved into and out of disparate parts of the district." *Bethune-Hill*, 137 S. Ct. at 800. The predominance analysis does not focus on what a district looked like *before*; the predominance analysis asks why a district looks the way it looks *now*. *See, e.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505, 544-45 (E.D. Va. 2015) ("'That's the way we've always done it' may be a neutral response, but it is not a meaningful answer."), *aff'd in part, vacated in part*, 137 S. Ct. 788. The Supreme Court recently rejected a similar argument that race did not predominate where the legislature focused on "preservi[ng] the core of the existing [d]istrict." *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1271 (2015).[6] Courts routinely find that race predominates where a district was drawn in the benchmark's footprint. *See, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1474 (2017) (race predominated where the legislature "further slimm[ed] the district and add[ed] a couple of knobs to its snakelike body").

Indeed, this Court rejected the same defense in the challenge to the Third Congressional District ("CD 3"). *Page v. Va. State Bd. of Elections*, No. 3:13CV678, 2015 WL 3604029, at *18 (E.D. Va. June 5, 2015). In *Page*, the intervenors argued that CD 3 could be explained by "core preservation" as it maintained 83.1% of the core. *See Page*, Dkt. No. 106 (Ints.' Post-Trial Br.) at 18-19. In finding that race predominated, the Court found it "telling" that with regard to the 17% of CD 3 that was *not* maintained, whites were disproportionately moved *out* of CD 3 and blacks *into* it. *Page*, 2015 WL 3604029, at *12. That is precisely the kind of racial sorting evident here.

Third, Intervenors' claim that "core preservation" predominates if an undefined portion of a district's core is kept would lead to absurd results. Few mapdrawers rip up the benchmark map entirely. By Intervenors' logic, a legislature could announce that a district wherein 80% of

---

[6] On remand, the district court held that race predominated despite the effort to preserve the core of a benchmark district. *Ala. Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1129, 1140 (M.D. Ala. 2017).

137557119.4

the core was "preserved" would be "filled" only with voters of a certain race, and race could not predominate. They cite no authority to support that proposition. For good reason: There is none.

Fourth, in ignoring the undisputed predominance of race over party in VTD assignment, *see* Pls.' Ex. 71 ¶¶ 123-25, tbl. 20; Tr. 828:16-21 (Katz), Intervenors misunderstand the model used by Dr. Palmer and Dr. Katz, Br. 18. The variable labeled "VTD in Challenged District in Benchmark" reflects only whether a VTD remained in *a* Challenged District, *see* Pls.' Ex. 71 ¶ 112, not the *same* Challenged District. Intervenors' suggestion that the Challenged Districts should be viewed as one unit, such that shuffling of black voters between them equates to "core preservation," only underscores the constitutional flaws in the General Assembly's approach.

In any event, the record does not support Intervenors' post hoc attempt to elevate core preservation to the predominant consideration. To the contrary, the record shows that core preservation was subordinated to meeting the General Assembly's overriding racial goals. The House Criteria place compliance with the VRA (which the General Assembly equated with the 55% BVAP rule) above all other factors in importance other than population equality. Pls.' Ex. 16. "Core preservation," meanwhile, appears nowhere in the Criteria. *Id.* Intervenors ask the Court to believe that the most important factor behind the drawing of each Challenged District is a factor that the General Assembly did not include in the Criteria that guided redistricting. It is no surprise that any interest in preserving existing districts was compromised time and again.[7]

## B.    Intervenors' Narrow Tailoring Arguments Fail

Of course, it is not *Plaintiffs'* burden to *disprove* that the Challenged Districts are narrowly tailored. Rather, it is *Intervenors'* burden to *prove* that the General Assembly had a

---

[7] *See, e.g.*, Tr. 35:8-36:11 (McClellan) (precinct removed from HD 71 to meet the 55% BVAP rule); *id.* 39:21-46:3 (area removed from HD 70 that Delegate McQuinn had represented for years); *id.* 82:16-83:8, 83:15-85:3 (Howell) (areas removed from HD 90 over Delegate Howell's objections); *id.* 113:8-15 (Dance) ("sizeable amount of Dinwiddie County" removed from HD 63 and added to HD 75 to satisfy 55% BVAP rule); *id.* 115:23-116:10 (Dance) (discussing new areas added to HD 63 to make up for loss of BVAP to HD 75).

137557119.4

strong basis in evidence to conclude that all the Challenged Districts would have violated Section 5 unless they were drawn using a 55% BVAP floor.

As noted in Plaintiffs' opening post-trial brief, the General Assembly applied an across-the-board 55% BVAP floor even though Delegate Jones effectively admitted that he (a) conducted no analysis of whether the 55% BVAP rule he found appropriate for HD 75 was appropriate in any other district; (b) conducted no analysis at all for the vast majority of the Challenged Districts; and (c) did no analysis in any other Challenged District other than reviewing results from one or two elections. *See generally* Dkt. No. 230 at 18-19.

Intervenors do not address the source of the 55% BVAP rule and spend no more than four pages attempting to set out the evidence that supposedly provides a "strong basis in evidence" for using an across-the-board 55% BVAP threshold in the remaining Challenged Districts. Br. 43-46. This is hardly a surprise. Intervenors simply cannot show that Delegate Jones performed the kind of "functional analysis" that he did perform with respect to HD 75. So, Intervenors instead try to convince the Court that their strict scrutiny burden is not so burdensome after all. *See id.* at 29-43, 47-48. Under any analysis, Intervenors cannot meet their burden of proof.

### 1. Intervenors' Erroneous Assertion that Satisfying Strict Scrutiny Is Like Making a Prima Facie Showing on Summary Judgment

Section 5 does not "give . . . *carte blanche* to engage in racial gerrymandering in the name of nonretrogression." *Shaw*, 509 U.S. at 655. Intervenors express a different view.

Intervenors spend many pages minimizing their narrow tailoring burden, but their position can be boiled down to the claim that a State seeking preclearance in 2011 was best served by a simple, three-step process: (1) adopt an across-the-board racial target; (2) do *not* perform a functional analysis of what is necessary to maintain black voters' ability to elect candidates of choice; and (3) argue that adoption of the racial target was narrowly tailored

- 9 -

because "[n]o one presented the [legislature] with an elections analysis to prove that white voters routinely cross over to support black-preferred candidates." Br. 35. This is because, they say, "the Section 5 narrow-tailoring burden is conceptually similar to a defendant's burden when it moves for summary judgment," which can be met "by pointing to a dearth of evidence that is required to prove the underlying claim." Br. 35 n.15 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). That is, the State can draw districts on the basis of race in perpetuity with no obligation to affirmatively determine whether its use of race is justified unless and until a third party proves otherwise. If that reasoning sounds puzzlingly backwards, that's because it is.

First, the State—not third parties—has the burden of justifying its use of race. If a State adopts a mechanical racial target that it argues it was compelled to use under Section 5, it must prove it had a strong basis in evidence for "the (race-based) choice that it has made." *Alabama*, 135 S. Ct. at 1274. A party that bears the burden of proof cannot prevail by pointing to "a dearth of evidence that is required to prove the underlying claim." Br. 35 n.15.

Second, Intervenors' heavy, newfound reliance on the dissent in *Georgia v. Ashcroft*, 539 U.S. 461 (2003), is similarly misplaced. Intervenors ignore the more recent *Alabama* decision, which clarified that Justice Souter's "dissent . . . made clear that courts should not mechanically rely upon numerical percentages but should take account of all significant circumstances." *Alabama*, 135 S. Ct. at 1273 (citing *Georgia*, 539 U.S. at 493). A "functional analysis" is called for, and it is error for a State to "rel[y] heavily upon a mechanically numerical view as to what counts as forbidden retrogression." *Id.* To be sure, a State that greatly reduced the BVAP of a district in a covered jurisdiction would need to show that such a change was not retrogressive. That certainly does not allow a State to adopt a racial quota with no analysis and call it a day.

Third, Intervenors claim that the House's interest was to employ a BVAP floor high

- 10 -

enough that it would not "invite" preclearance litigation, Br. 34, but a State does *not* have a compelling interest merely in expediting preclearance. *See, e.g.*, *Covington v. North Carolina*, 316 F.R.D. 117, 176 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017) ("[T]he Supreme Court has made quite clear that avoiding preclearance objections cannot be a compelling interest justifying the use of racial classifications. . . . Defendants wish for us to insulate them from constitutional review for any race-based classification they unilaterally determined might expedite preclearance. That we cannot do.").[8] Intervenors take issue with that well-established principle because the Supreme Court, on appeal, noted the "view of the Department of Justice." Br. 30 n.12 (quoting *Bethune-Hill*, 137 S. Ct. at 801). But the Supreme Court was quoting DOJ guidance on the meaning of a "functional analysis," *Bethune-Hill*, 137 S. Ct. at 801, not somehow silently overruling *Shaw* and *Miller*. *See* Dkt. No. 230 at 16-17.

*Fourth*, the Court should reject Intervenors' effort to shift the burden of proof to Plaintiffs. *See, e.g.*, Br. 32 (discussing Plaintiffs' supposed "suggestion" and "position" as to the BVAP the House "should have chosen"). Plaintiffs have never argued that Delegate Jones failed to pick the "perfect" BVAP level for each Challenged District and it is not their job to identify a non-retrogressive BVAP for each district. It was the *State's* job—at the time of redistricting—to do a meaningful analysis and determine if it had a strong basis in evidence for using the 55% BVAP floor in every Challenged District. *See Cooper*, 137 S. Ct. at 1471. It did not do so. Instead, Delegate Jones devised the 55% BVAP rule based on HD 75-specific concerns and applied that rule across the board to all of the districts. *Bethune-Hill*, 137 S. Ct. at 794-95.

Courts, including this one, have rejected similar attempts to justify racial gerrymandering under Section 5. In *Page*, the Court held that the "use of a BVAP threshold . . . suggests that

---

[8] This is because while "a State may have a compelling interest in complying with the properly interpreted Voting Rights Act," it "has no such interest in avoiding meritless lawsuits." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996).

voting patterns in the Third Congressional District were not considered individually." 2015 WL 3604029, at *18 (quotation marks and citation omitted); *see also Covington*, 316 F.R.D. at 175-76 (State's failure to "perform[] any analysis to determine the appropriate BVAP for the challenged districts" failed narrow tailoring); *Smith v. Beasley*, 946 F. Supp. 1174, 1210 (D.S.C. 1996) (district drawn to meet 55% BVAP threshold failed narrow tailoring).[9]

## 2. Intervenors' Core Narrow Tailoring Arguments Are Unavailing

Under any conception of Intervenors' narrow tailoring burden, the Challenged Districts fail strict scrutiny. Intervenors offer the justifications anticipated by Plaintiffs, relying mainly on the Loewen Report and Delegate Jones' current recollections of his conversations with Delegate Spruill. Plaintiffs have already refuted those justifications in their prior brief, *see* Dkt. No. 230 at 22-28, so will briefly address some of Intervenors' most blatant errors here.

### a. The Challenged Districts Are Not Narrowly Tailored Because Delegate Jones Talked to Senator Spruill

Intervenors argue that the Challenged Districts are narrowly tailored because of "the Black Caucus members' [supposed] advocacy of 55% BVAP." Br. 38. Not so.

As an initial matter, Intervenors' rhetoric regarding black delegates' supposed "advocacy" of the 55% BVAP rule rather dramatically outstrips the record evidence, as set out in Plaintiffs' opening brief. Dkt. No. 230 at 25-27. It is telling that not even a single member of the Black Caucus testified in support of Intervenors' assertions.

In any event, while it is appropriate to confer with black delegates, the retrogression analysis is not designed to protect specific black incumbents but, rather, to "maintain a minority's ability to elect a preferred candidate of choice." *Alabama*, 135 S. Ct. at 1272. The mere fact that one or more black delegates signed off on a plan does not inoculate it from

---

[9] Intervenors insinuate that their burden should be lighter because Virginia had less time to complete redistricting than other states. *See, e.g.*, Br. 1. Self-imposed time constraints do not vitiate voters' constitutional rights.

challenge. For example, in *Miller*, the DOJ twice rejected the Georgia legislature's congressional plan in large part because of the existence of an alternative, so-called "max-black" plan that was drafted for the black caucus. 515 U.S. at 907; *see also Johnson v. Miller*, 864 F. Supp. 1354, 1360 (S.D. Ga. 1994). In its third attempt to achieve preclearance, the General Assembly used the max-black plan as its benchmark and obtained preclearance. *Id.* Plaintiffs in *Miller* subsequently challenged the newly-created majority-black district as an unconstitutional racial gerrymander. The District Court found it unconstitutional and the Supreme Court affirmed.

As *Miller* shows, even if the record showed that the black caucus affirmatively demanded application of a 55% BVAP floor to all Challenged Districts, the General Assembly would not (without more) have had a strong basis in evidence justifying its use of race.

> **b.    The Data Available at the Time of Redistricting Provided No Basis in Evidence for an Across-the-Board 55% BVAP Rule**

Intervenors contend that "without *evidence to the contrary* the House had to presume polarized voting," and that mapdrawers simply had no way to "prove crossover voting." Br. 34, 36. Intervenors dramatically understate the amount of information available to the mapdrawers. If they had simply done the analysis they failed to do, they would have found no basis in evidence for subjecting all of the Challenged Districts to the exact same racial threshold.

First, the mere fact that racially polarized voting *exists* says nothing about the minority ability to elect in any Challenged District. *Cf. Cooper*, 137 S. Ct. at 1471 & n.5. As Dr. Palmer testified—and Dr. Katz agreed, Tr. 822:15-25 (Katz)—"[i]t's the level of polarization that's important." Tr. 461:18-21 (Palmer). Even if Section 5 required mapdrawers to assume *some* racially polarized voting, Intervenors do not explain why they assumed *100%* polarization.

Indeed, even a cursory review of election results in any district would confirm that a large number of white voters voted for black-preferred candidates. Benchmark HD 69, for instance,

had a BVAP of 56.3% and elected black-preferred candidates by 80.5% on average. Pls.' Ex. 71,
tbl. 22. By definition (and simple arithmetic), assuming 100% voting cohesion by black voters
and equal turnout, 24.2% of the vote came from the 43.7% non-BVAP in the district, so *at least*
55.4% of white voters were voting for black-preferred candidates. It hardly takes a Harvard-
educated statistician to discern the significant crossover voting across *all* Challenged Districts.[10]

Second, the Challenged Districts cannot all be painted with the same broad brush. For
example, Intervenors fail to mention that their own expert's analysis "found evidence of racially
polarized voting in [only] two of the remaining 11 [C]hallenged [D]istricts," Tr. 802:13-17
(Katz), and found no evidence of racially polarized voting in four others, *id.* 801:22-802:12
(Katz); 1st Tr. 590:20-591:1 (Katz).

Third, Intervenors suggest that primary data was both critical to the analysis of minority
ability to elect and unavailable. They are wrong on both counts. Their own expert, Dr. Katz,
prefers analyzing general elections to primaries, Tr. 815:10-15 (Katz), and only chose to analyze
a single (post-hoc) primary because it included a black and white candidate, Tr. 814:17-25. And
contrary to Intervenors' assertion that "Dr. Palmer analyzed no primary data," Br. 40, Dr. Palmer
analyzed the only statewide primary involving a black and white candidate to which the
mapdrawers would have had access—and established that whites consistently voted for the black
(and black-preferred) candidate across *all* of the Challenged Districts. Pls.' Ex. 72 ¶ 33, fig. 4.[11]

Fourth, Intervenors set out an impossible test for any jurisdiction to analyze racially
polarized voting in a manner consistent with Section 5. They say that the only relevant elections

---

[10] Only in HD 75 is the Benchmark BVAP close to the Benchmark vote for black-preferred candidates. *See id.*
[11] Intervenors dismiss any election involving Barack Obama based on Dr. Hood's belief that President Obama was
"a 'political superstar[]' whose success 'hardly proves' what is needed for black-supported candidates to win House
races." Br. 40 (quoting DI Ex. 103 at 18). But in a recent Section 5 case, a three-judge panel rejected Dr. Hood's
analysis in part due to his "contention that the 2008 general election was an 'outlier' that should be ignored" because
of its "'anomalous' circumstance." *Florida v. U.S.*, 885 F. Supp. 2d 299, 326 (D.C. 2012). This Court should refuse
the invitation to disregard the electoral successes of this minority-preferred candidate (and all others).

137557119.4

are endogenous elections, Br. 36, but evidence that minority-preferred candidates consistently win in those elections is "not probative of minority voting power" because of the "incumbency advantage," *id.* at 37. That argument is a "tails I win, heads you lose" proposition, and conveniently wipes away the decades of overwhelming electoral success for minority-preferred candidates in each of the Challenged Districts. *See* Pls.' Exs. 75-86; *compare Page*, 2015 WL 3604029, at *17 (relying on incumbent's success).

To the extent Intervenors profess concern about the "incumbency advantage" in endogenous elections, statewide races are a useful proxy.[12] Dr. Palmer showed—and Intervenors' experts did not dispute—that statewide elections are "highly correlated with" and "highly predictive of" House elections. Pls.' Ex. 71 ¶ 135, fig. 19; Tr. 417:8-9 (Palmer). Indeed, where Intervenors provided *two* expert reports relying on statewide election data, *see* DI Exs. 101, 103, their contention that statewide data is irrelevant rings hollow.

Finally, Intervenors try to revive the expert reports of Dr. Katz and Dr. Hood, Br. 41, which analyzed elections post-dating 2011. Tr. 806:11-18 (Katz), 840:10-15 (Hood), which the Court has already found irrelevant. *See* Tr. 818:8-819:20. The claim that the Supreme Court relied on post-2011 evidence to affirm this Court's finding on HD 75 is baseless. The Supreme Court referred to the fact that *Plaintiffs* "d[id] not dispute" that HD 75 showed high levels of racially polarized voting. *Bethune-Hill*, 137 S. Ct. at 801. It said nothing about *Intervenors'* expert analyses of "2011 and 2013 elections." Dkt. No. 108 at 123.[13]

Even if the Court accepted the experts' post-hoc analyses, neither satisfies Intervenors' burden. Dr. Katz examined only four Challenged Districts, Tr. 809:1-11 (Katz), and found no

---

[12] Courts often look to statewide elections. *Abrams v. Johnson*, 521 U.S. 74, 92 (1997). Intervenors cite the *Georgia* dissent to claim that statewide elections are irrelevant but the record there gave "no basis for assuming that voting . . . in statewide elections correlates with [local] voting behavior." 539 U.S. at 507 (Souter, J., dissenting).
[13] Indeed, the very next sentence of the Memorandum Opinion reads: "[E]*x post* statistics analyses cannot upset the State's *ex ante* judgment so long as that decision was 'reasonably necessary' based on strong evidence." *Id.* at 124.

consistent evidence of racially polarized voting in any of them, *see* Tr. 809:18-810:16, 816:13-817:14 (Katz). Dr. Hood's review of the same elections in the same districts is so flawed for its failure to provide any measure of statistical uncertainty that both he and Dr. Katz dismissed it as inconsistent with "standard practic[e] in political science." Tr. 810:24-811:17 (Katz); *see also* Tr. 858:3-8 (Hood) (providing a measure of statistical uncertainty is "part of the discipline").[14]

      **3.**     **Requiring Intervenors to Meet Their Burden Would Not "Gut" the VRA**

Finally, adopting "Plaintiffs' theories"—i.e., applying Supreme Court precedent to the facts—would hardly "gut" the VRA. Br. 47. The Court should disregard this overblown rhetoric.

First, the fact that the General Assembly fails its narrow tailoring burden because it did not determine whether its use of race was justified would not prevent use of the VRA by parties that do have evidence to support their claims. And if a future party could *not* show a level of racially polarized voting that results in the routine defeat of black-preferred candidates, it would prove the VRA is working—that white voters are eschewing racial politics and joining with black voters on the basis of shared interests. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (A core purpose of the VRA is "to foster our transformation to a society that is no longer fixated on race") (quotation marks and citation omitted).

Second, Intervenors' doomsaying is not borne out by the best available evidence. In *Page*, after the Court adopted a plan that "unpacked" CD 3, voters elected black representatives in both CD 3 *and* CD 4 by large margins.[15] Whatever the General Assembly's *intent* when drawing the Challenged Districts, the *effect* was to diminish black voting power by packing black

---

[14] Other courts have deemed Dr. Hood's testimony unreliable or irrelevant. *See Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *24 (S.D. Ohio June 7, 2016), *aff'd in part*, 837 F.3d 612 (6th Cir. 2016) ("Dr. Hood's testimony and report were in large part irrelevant . . . and also reflected methodological errors that undermine his conclusions. Other courts have found likewise."); *id.* *24 n.11 (citing cases).

[15] http://historical.elections.virginia.gov/elections/search/year_from:2016/year_to:2016/office_id:5/stage:General. The remedial plan adopted by the Court in *Page* reduced the BVAP of CD 3 from 56.3% to 45.3% and increased the BVAP of CD 4 from 31.3% to 40.9%. *Page*, No. 3:13cv678, Dkt. No. 299 (Memorandum Opinion) at 24.

137557119.4

voters into a handful of districts. Ruling for Plaintiffs will serve—not hamper—the VRA's goals.

## C.   District-Specific Evidence Confirms Racial Gerrymandering

### 1.   HD 63

Intervenors do not grapple with the facts set out in Plaintiffs' opening post-trial brief, *see* Dkt. No. 230 at 28-31, including Delegate Jones' admission that "[t]he 55 percent goal was used in drawing . . . House District 63," Tr. 525:23-526:6. Instead, they ask the Court to ignore the "avowedly racial" border between HD 63 and HD 75. Dkt. No. 108 at 109. "Creating HD75 at 55% BVAP was lawful," Intervenors argue, "so the Court cannot strike down HD63 based on what was needed in HD75—or else narrowly tailored districts would always result in unconstitutional contiguous districts." Br. 19.

Intervenors are wrong. First, Intervenors cite no case holding that the borders between "narrowly tailored districts" and adjacent districts are immune from review, and that novel rule would violate the Supreme Court's directive to assess every district individually and holistically. *See Bethune-Hill*, 137 S. Ct. at 799-800. Second, assessing the border's "avowedly racial" purpose would not automatically invalidate HD 63. While the "avowedly racial" border evinces *racial predominance*, it does not, standing alone, establish that HD 63 is *unconstitutional*.

Intervenors also argue that the new, snake-like appendage added to HD 63's northeastern corner had nothing to do with race. *See* Br. 20. That claim is belied by Senator Dance's testimony (which Intervenors ignore). She testified that the appendage was added to increase HD 63's BVAP to compensate for the BVAP lost to District 75. *See* Tr. 116:3-7 (Dance). The appendage serves that goal by carefully picking up higher-BVAP areas and avoiding lower-BVAP areas. *See* Dkt. No. 230 at 29; *see also* Tr. 116:16-11-15 (Dance) ("JUDGE PAYNE: Did you pick up all of Prince George County and all of Hopewell? THE WITNESS: No, sir. I had to

- 17 -

pick up the number to get me to the 55 percent, minimum 55 percent to meet the standard.").[16]

Intervenors' narrow tailoring argument is equally thin. They argue that Delegate Jones believed 55% BVAP was necessary to avoid retrogression because "all signs indicat[ed] low minority turnout and polarized voting" in HD 63. Br. 43. But the only "signs" Intervenors identify are (1) a statement by Senator Dance in support of the 55% BVAP threshold, (2) post-hoc expert analyses in this case, and (3) election results "in the 90s cycle" and "in 2001." *Id.* None of those "signs" say anything significant. Senator Dance advocated for the 55% threshold only because Delegate Jones told her it was necessary, *see* Dkt. No. 290 at 25; Delegate Jones obviously did not rely on expert analysis from this case in 2011; the fact that a minority-preferred candidate last lost an election *in the 1990s* undercuts Intervenors' argument; and Intervenors' allusion to the 2001 election is spurious.[17] This is hardly a strong basis in evidence.

### 2.    HD 71

Delegate Jones effectively conceded that race predominated in HD 71, testifying that it was not "logical" to expand HD 71 to the west, as that would have reduced HD 71's BVAP. Tr. 532:9-14 (Jones). So, he expanded HD 71 east "to increase the black voting-age population," thereby showing the "impact" of the "55 percent racial target." Tr. 532:23-533:4 (Jones).

Intervenors do not address that testimony from their star witness. Instead, they emphasize that HD 71's BVAP under the Challenged Plan is "nearly identical to BVAP percentages in the past precleared plans . . . , and the move back to 55% maintained the status quo from prior

---

[16] Intervenors claim that the "hook" around the New Hope precinct resulted from Senator Dance's desire to keep that precinct. *See* Br. 20. But Intervenors' arguments about that issue have been remarkably fluid and elusive. Delegate Jones testified at the second trial that, in his first version of the map, New Hope was not included in HD 63 and was instead added at Senator Dance's request at the end of the process. Tr. 495:18-496:25. At the 2015 trial, by contrast, he testified that in the original plan, New Hope *was* included in HD 63, and that the hook was drawn because Delegate Dance asked that a potential primary opponent who lived there be drawn out of her district. 1st Trial Tr. 326:11-327:4. Senator Dance has clearly refuted the latter point. Tr. 118:5-19 (Dance).

[17] In that election, Senator Dance ran as an independent and lost to another black candidate who ran as a Democrat. Nothing in the record shows that Senator Dance was the "minority preferred candidate." Br. 43.

decades." Br. 21. That argument hurts rather than helps. Racial targets bespeak racial motives, even if those targets have a historical pedigree. *See Alabama*, 135 S. Ct. at 1271.

Intervenors argue that HD 71 retains most of its "core," Br. 21, but "core preservation . . . is not directly relevant to the origin of the *new* district inhabitants," *Alabama*, 135 S. Ct. at 1271, who, in HD 71, were selected on racial grounds. The BVAP of areas moved into HD 71 was 72.1%—*over 50 points higher* than that of areas moved out. *See* Pls.' Ex. 50 ¶ 102.

Lastly, Intervenors argue that there were no racial motives in Delegate Jones' dissection of the Fan neighborhood. Br. 22. The record shows otherwise. Senator McClellan hoped to keep VTD 207 in the Fan but could not do so without dragging HD 71's BVAP below 55%. *See* Tr. 35:20-36:1; 36:15-21; 39:15-20 (McClellan). Intervenors continue to insist, against reason, that the heavily Democratic VTD 207 was moved to Republican Delegate Loupassi's district at his behest. Br. 22. They conspicuously failed to call him to corroborate that incredible claim.[18]

As for narrow tailoring, Intervenors argue that "House members were concerned that the BVAP level sufficient to elect incumbent Jennifer McClellan . . . would not suffice to protect minority voting strength if the seat became open." Br. 44. But Delegate Jones did no analysis to determine whether any such concerns supported a 55% BVAP floor. *See* Tr. 466:25-467:1 (Jones). In fact, voters in HD 71 have supported many black candidates, not just Senator McClellan. *See* Dkt. No. 230 at 33. And Delegate Jones himself does not believe that a minority-preferred candidate has *ever* lost an election in HD 71. 1st Trial Tr. 457:8-15 (Jones).

### 3.    HD 69

Intervenors lean heavily on the fact that HD 69 retains much of its core. *See* Br. 22. But

---

[18] "[S]ince Delegate Loupassi picked it up, precinct 207 has been one of his worst precincts." Pls.' Ex. 69 at 20. In the most recent election, Delegate Loupassi was defeated by a mere 336 votes, which can be directly attributed to the inclusion of VTD 207, which he lost by 775 votes. *See* http://results.elections.virginia.gov/vaelections/2017%20November%20General/Site/Locality/RICHMOND%20CITY/Member%20House%20of%20Delegates%20(068).html.

137557119.4

"core retention" is not a magical incantation. Voters were placed within or without HD 69 on a predominantly racial basis. The main change was an expansion to the south, which allowed HD 69 to incorporate high-BVAP areas from HD 70, including VTD 811 (76% BVAP) and VTD 903 (64% BVAP). *See* DI Ex. 94 at 2; Pls.' Ex. 69, fig. 6; Pls.' Ex. 50, tbl. 9. VTD 410 was split to put the more heavily black portion in HD 69 and the whiter portion in HD 68. *See* Tr. 185:16-25 (Rodden). Intervenors ignore the expansion and explain the VTD split only on grounds of population equality, Br. 23, which is irrelevant to predominance. *Alabama*, 135 S. Ct. at 1261.

HD 69 is not narrowly tailored. Black-preferred candidates averaged more than 80% of the vote under the benchmark, *see* Pls.' Ex. 71, tbl. 22, and Delegate Jones did no analysis to determine whether 55% BVAP was necessary, *see* 1st Trial Tr. 466:11-20 (Jones). Intervenors argue that a single election (a 2009 primary won by Delegate Carr, a white Democrat) justified the 55% BVAP floor. But that is but one election, relied on by an expert whose methods are unreliable, *supra* at 16; Dkt. No. 205 at 30 n.15, in a district where mapdrawers *lowered* the BVAP, Tr. 866:14-867:4 (Hood), and sought to protect the white incumbent, Tr. 482:3-16, 490:10-491:9, and which "generally [was] able to elect minority-preferred candidates." Br. 45.

### 4.    HD 70

Because the benchmark HD 70's BVAP exceeded 60%, Delegate Jones moved "excess" black voters to HD 69, 71, and 74 to ensure those districts complied with the 55% BVAP rule. *See* Dkt. No. 230 at 35. Intervenors deride that observation as the "damned-if-you-do-damned-if-you-don't donor theory." Br. 24. But derision is not a legal argument, and population movements are highly relevant to the analysis. *See, e.g.*, *Bethune-Hill*, 137 S. Ct. at 799-800; *Alabama*, 135 S. Ct. at 1266. Intervenors' other arguments fare no better. Intervenors claim that HD 70 was not used as a donor district because areas "swapped" between HD 70 and HD 69 had "nearly identical BVAP." Br. 24. That ignores the fact that population moved from HD 70 to HD 69 was

nearly *four times larger* than population moved the other way. *See* Pls.' Ex. 71 at 43. Intervenors also argue that changes to HD 70 were driven by population equality, core retention, and compactness. *See* Br. 23. But population equality is irrelevant, core retention is not a meaningful answer, and HD 70 became *less* compact under the Reock scale, *see* DI Ex. 15, tbl. 9.

Intervenors claim that HD 70 is narrowly tailored because Delegate Jones moved black voters from HD 70 to HD 71 to increase HD 71's BVAP and thought that necessary to avoid retrogression in HD 71. *See* Br. 45. First, this directly contradicts the claim that HD 70 was *not* used as a donor district. *Supra* at 20-21. Second, HD 71 is not narrowly tailored. *Supra* at 19. Third, even if HD 71 is narrowly tailored, there is no authority for the proposition that a donor district (HD 70) must be narrowly tailored if the donee district (HD 71) is narrowly tailored.

**5. HD 74**

The story of HD 74 is similar to the story of HD 70. Both districts were used as donor districts to increase the BVAP of other Challenged Districts. The average BVAP of areas moved out of HD 74 and into other Challenged Districts is 69.0%. The average BVAP of areas moved into non-challenged districts, by comparison, is 20.5%. *See* Pls.' Ex. 50, tbl. 9.

As Senator Dance explained, heavily black parts of Hopewell City and Prince George were moved to HD 63 to make up for the black voters lost to HD 75. *See* 1st Trial Tr. 79:19-83:5 (Dance); Tr. 117:1-6 (Dance). Intervenors ignore that testimony and insist that "the removal of Hopewell" was "race-neutral." Br. 20. Asserting it does not make it so, and the racial composition of the split is stark and compelling. Intervenors also argue that HD 74 is not a "donor" because "it exchanged with HD71 territory of 85.5% BVAP (out) for 86.3% BVAP (in)." *Id.* That ignores the fact that population transferred from HD 74 to HD 71 was roughly *three times* the size of that transferred in the opposite direction.

Intervenors offer scant argument that HD 74 was narrowly tailored. They claim that "[i]n

- 21 -

2005 . . . the minority community failed to elect its preferred candidate," and thus "a dramatic reduction from 62% [BVAP] to below 55% [BVAP] would have been retrogressive." Br. 44. But former Delegate Joseph Morrissey prevailed in 2005 and, although he is white, he was the black-preferred candidate. *See* 1st Trial Tr. 457:19-458:14 (Jones). And Intervenors do not even try to connect the dots and explain how a lone election gave a strong basis in evidence for concluding, in 2011, that HD 74 required at least 55% BVAP to avoid retrogression. Nor could they; Delegate Jones has repeatedly admitted that he undertook no such analysis.

### 6.    HD 77

Plaintiffs have explained the race-based choices that drove the configuration of HD 77, including the selective inclusion of high-BVAP areas in the western part of HD 77 (e.g., Hollywood (96%), Southside (89.9%), and White Marsh (87.8%)) and the selective exclusion of a low-BVAP area (Airport (31.7%)). Br. 40. Intervenors do not dispute those facts.

Instead, Intervenors focus on Delegate Jones' addition of several majority-white precincts in the east that, according to Delegate Jones, were added at then-Delegate Spruill's request. *See* Br. 26. But even a cursory examination of the map reveals that those changes did not have a "qualitatively greater impact" on the configuration of HD 77.

Intervenors have not shown and cannot show that HD 77 is narrowly tailored. Delegate Jones made no effort to determine the level of BVAP necessary to avoid retrogression in HD 77. *See* Br. 40. And even if then-Delegate Spruill demanded that Delegate Jones draw HD 77 at or above 55%, the district is no more narrowly tailored based on that fact alone than if Spruill had demanded a 65%, 75%, or 85% BVAP district. *Supra* at 12-13.

### 7.    HD 80

There are many illustrations of racial predominance in HD 80, *see* Dkt. No. 230 at 40-42, but none so clear as the appendage tacked on to its western side. Intervenors' explanations have

- 22 -

shifted over time, *see id*. at 41-42, and they become even more convoluted, *see* Br. 24-25. They

(now) claim that Delegate Jones hoped to equalize population between HD 80 and HD 79 while

helping re-elect Democrat Delegate Joannou. Even if that is true, the map shows that the *method*

by which those goals were advanced was the systematic inclusion of higher-BVAP areas in HD

80. In other words, Delegate Jones used race as a proxy for politics. That triggers strict scrutiny.

Delegate Jones performed no analysis to determine whether HD 80 required 55% or more

BVAP. Intervenors do not disagree; they simply assert that "[t]here is no evidence that the House

could have proved non-retrogression by allowing BVAP to fall towards or below 50%." Br. 46.

But Intervenors have the burden to justify the race-based choice they made, and failed to do so.

### 8.    HD 89

According to Intervenors, "the notion that racial predominance is afoot" in HD 89 is

"absurd." Br. 27. But Plaintiffs have identified extensive evidence of racial predominance,

including compactness scores; a new river crossing designed to pick up the heavily black

Berkley VTD; and glaring flaws in Intervenors' made-for-trial post-hoc excuses. *See* Dkt. No.

230 at 42-44. Intervenors address none of those issues. Instead, they resort to *ad hominem* attacks

on Plaintiffs' expert, Dr. Rodden. *See* Br. 27. Intervenors' attempt to distract the Court is telling.

In a last-gasp effort, Intervenors appeal, again and in vain, to population equality. *See id*.

at 28. Intervenors also argue that Delegate Jones and Mr. Morgan did not attempt to include

every possible black voter within HD 89. *See* Br. 28. That is irrelevant to whether race was the

predominant factor behind which voters *were* included in the district. *Supra* at 5-6.

As for narrow tailoring, Intervenors' arguments are watered-down versions of their

arguments as to HD 77 and 80. They fail for the same reasons.

### 9.    HD 90

Intervenors address little of Plaintiffs' racial sorting evidence. *See* Dkt. No. 230 at 45.

They try to chalk up the split VTDs on the eastern side of HD 89 to the goal of population equality and "a chain of movements to improve Republican performance two districts away." Br. 26. But population equality is not relevant and Intervenors' other argument just begs the question: Why were purported *political* goals pursued by splitting VTDs along *racial* lines?

Intervenors' narrow tailoring arguments are similarly wanting. They do not argue that Delegate Jones undertook any analysis to determine whether HD 90 required 55% or more BVAP to avoid retrogression. They simply point out that a black female candidate who was a Republican beat a black male candidate who was a Democrat in one election (in 2002). *See* Br. 46. Notably, Intervenors do not show that Delegate Jones relied on that lone election when redrawing HD 90. There is no evidence in the record to support such a proposition.

### 10.   HD 92 and 95

Plaintiffs provided a detailed overview of the race-based changes that Delegate Jones made to Districts 92 and 95 to ensure that they met the 55% BVAP floor. *See* Dkt. No. 230 at 46-48. Intervenors touch on those changes only in passing. Remarkably, they do not acknowledge Delegate Jones' pre-litigation admission that race (not politics) was the overriding factor in configuring these districts. *See* Pls.' Ex. 35 at 153:4-7 ("So what had to happen, the population had to be picked up, had to try to maintain the voting strength, for the black voting percentage.").

Intervenors claim that District 95's northern appendage was drawn for political purposes. Br. 28. But they cannot explain away how many VTDs are split on clear racial lines and there is no political data available sub-VTD—meaning that VTDs were divided on racial grounds (1) for race's sake or (2) as a proxy for political affiliation. Either explanation triggers strict scrutiny.

Districts 92 and 95 do not survive strict scrutiny. Delegate Jones did no analysis to determine whether 55% or higher BVAP was necessary, and the electoral history of the districts makes clear that it was not. *See* Dkt. No. 230 at 48. Intervenors cannot salvage the districts by

137557119.4

arguing that *Plaintiffs* have not pointed to "evidence justif[ying] [a] dive below 55% BVAP."

**D.     The Scope of a Remedy**

Plaintiffs agree that Virginia would be afforded the first opportunity to adopt a remedial map, as it was in the challenge to CD 3. *See Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 555 (E.D. Va. 2016). Virginia cannot, however, use this as an opportunity for delay. Those residing in the Challenged Districts "whose constitutional rights have been injured by improper racial gerrymandering have suffered significant harm . . . [and] 'are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan.'" *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (quoting *Page*, 2015 WL 3604029, at *18).

Assuming the Court draws the remedial map, it can make whatever changes it deems necessary to remedy the constitutional violation. *See, e.g.*, *Personhuballah*, 155 F. Supp. 3d at 563 (finding that an effective remedy required the Court to make "substantial changes" to CD 3 and "those [non-challenged districts] abutting it"). Plaintiffs do not suggest that the Court should "indiscriminately redraw" the map. *Compare* Br. 49, *with* Dkt. No. 230 at 50 ("[T]hough a court adopting a remedial map does not redraw districts unless necessary to effectuate the remedy, there are no artificial limitations on the Court's remedial powers."). To be sure, Plaintiffs did not bring a "packing" claim under Section 2 of the VRA, Br. 50, but the inevitable consequence of a remedy will be to "unpack" the Challenged Districts. That is what this Court did as to CD 3. *Personhuballah*, 155 F. Supp. 3d at 565. And contrary to Intervenors' claim, the Court need not turn a blind eye to the racial ramifications of the remedy. *See id.* at 564 ("[O]ur chosen plan should be guided by . . . the Voting Rights Act").

**III.     CONCLUSION**

Plaintiffs respectfully ask the Court to hold that the Challenged Districts violate the Equal Protection Clause and set a prompt deadline by which Virginia must adopt a remedial map.

- 25 -

137557119.4

Dated: November 22, 2017          By: */s/ Aria Branch*
                                      Marc Erik Elias (*pro hac vice*)
                                      Bruce V. Spiva (*pro hac vice*)
                                      Aria Branch (VSB No. 83682)
                                      **PERKINS COIE** LLP
                                      700 Thirteenth Street, N.W., Suite 600
                                      Washington, D.C. 20005-3960
                                      Telephone: 202.654.6338
                                      Facsimile: 202.654.9106
                                      Email: ABranch@perkinscoie.com
                                      Email: MElias@perkinscoie.com
                                      Email: BSpiva@perkinscoie.com

                                      Kevin J. Hamilton (*pro hac vice*)
                                      Abha Khanna (*pro hac vice*)
                                      Ryan Spear (*pro hac vice*)
                                      William B. Stafford (*pro hac vice*)
                                      **PERKINS COIE** LLP
                                      1201 Third Avenue, Suite 4900
                                      Seattle, WA 98101-3099
                                      Telephone: 206.359.8000
                                      Facsimile: 206.359.9000
                                      Email: KHamilton@perkinscoie.com
                                      Email: AKhanna@perkinscoie.com
                                      Email: BStafford@perkinscoie.com
                                      Email: RSpear@perkinscoie.com

137557119.4

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of November, 2017, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

By */s/ Aria C. Branch*
Aria C. Branch (VSB #83682)
Perkins Coie LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
ABranch@perkinscoie.com

*Attorneys for Plaintiffs*

- 27 -

137557119.4