IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division


GOLDEN BETHUNE-HILL, *et al.*,

     Plaintiffs,

v.                                Civil Action No. 3:14cv852

VIRGINIA STATE BOARD OF
ELECTIONS, *et al.*,

     Defendants.


MEMORANDUM OPINION


BARBARA MILANO KEENAN, Circuit Judge:

     The plaintiffs, 12 Virginia registered voters, filed this civil action in 2014, alleging racial gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment. Dkt. No. 1; Am. Compl. ¶¶ 1, 7-18. They contend that the Virginia General Assembly (the legislature) predominantly relied on race in constructing 12 majority-black Virginia House of Delegates districts during the 2011 redistricting cycle. Am. Compl. ¶¶ 1-2. According to the plaintiffs, the legislature required each of these districts to achieve a minimum 55% black voting age population (BVAP), which BVAP requirement was not necessary for black voters to elect their preferred candidates under the mandate of the Voting Rights Act of 1965 (VRA), 52 U.S.C. § 10101 through § 10702. Am. Compl. ¶¶ 2-3; 1st Trial Tr. at 5.

After holding a bench trial in 2015, this Court issued a divided opinion upholding the redistricting plan. *See Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505 (E.D. Va. 2015). The United States Supreme Court affirmed this Court's decision regarding one district, but remanded for reconsideration of the question whether race was used as the predominant factor in drawing the 11 remaining districts. *See Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788 (2017). After a second trial, and upon our consideration of the evidence presented at both trials, we hold that the plaintiffs have shown through telling direct and circumstantial evidence that race predominated over traditional districting factors in the construction of the 11 remaining challenged districts. We further hold that the intervenors have not satisfied their burden to show that the legislature's use of race was narrowly tailored to achieve the compelling state interest of compliance with Section 5 of the VRA, 52 U.S.C. § 10304.

## I.

We begin with an overview of the procedural history of this case.[1] Following the 2010 decennial census, the legislature redrew the 100 Virginia House of Delegates districts to take effect beginning with the 2011 election cycle.[2] *Bethune-Hill*, 137 S. Ct.

---

[1] For purposes of Part I of this opinion, we take many of our facts from the Supreme Court's opinion in *Bethune-Hill*, 137 S. Ct. 788. We also use the "*id.*" short form in reference to legal citations only.

[2] Elections for the Virginia House of Delegates, as well as Virginia statewide offices, are held in odd-numbered years. 1st Trial Tr. at 276.

at 795; *see* Pl. Ex. 65.  Delegate Steven Christopher Jones[3] was the chief patron of House

Bill 5005, which set forth the re-drawn districts (the 2011 plan, or the 2011 map).  Pl. Ex.

48 at 10-12; 1st Trial Tr. at 316, 376-77, 395.

Jones was the chair of the House Committee on Privileges and Elections, and

coordinated public meetings throughout the state regarding the 2011 redistricting process.

Pl. Ex. 48 at 3, 6; 2nd Trial Tr. at 112.  In this role, Jones also was the primary architect

of the 2011 plan.  1st Trial Tr. at 397.  To construct the map, Jones and others used

"Maptitude" software to move census blocks and voting tabulation districts (VTDs) in

and out of the proposed House of Delegates districts.[4]  1st Trial Tr. at 274; 2nd Trial Tr.

at 36, 61.  Maptitude reflected the demographic changes in each district resulting from

the alterations of proposed boundary lines.  1st Trial Tr. at 40.  The software also was

available for the use of other legislators on computers located in the legislature's Division

of Legislative Services office.  1st Trial Tr. at 33, 40, 420, 444.

To achieve population equality among the districts as required by the United

States Constitution, the legislature determined that each House of Delegates district was

required to have 80,000 residents, with a maximum population deviation of plus or minus

---

[3] Jones represented District 76, which is not at issue in this case.  1st Trial Tr. at 331, 764.

[4] A VTD is sometimes referred to colloquially as a voting "precinct."  1st Trial Tr. at 8; 2nd Trial Tr. at 164.  VTDs are the smallest unit at which election data is collected and reported by the Virginia Department of Elections.  2nd Trial Tr. at 371-72.  VTDs are composed of "census blocks," geographical units at which data from the federal census is reported.  Pl. Ex. 69 at 7; 2nd Trial Tr. at 372.

one percent.[5]  Pl. Ex. 16 at 1; 1st Trial Tr. at 29, 70; *see also Bethune-Hill*, 137 S. Ct. at 795.  Both the 2001 and 2011 districting plans included 12 districts in which black residents constituted a majority of the districts' voting-age population (the majority-minority districts, or the challenged districts).[6]  *Bethune-Hill*, 137 S. Ct. at 795.  These districts were located in four distinct areas of the state: the greater Richmond/Tri-City region, the Southside area located along the North Carolina border, North Hampton Roads (the peninsula), including the cities of Newport News and Hampton, and, finally, South Hampton Roads, including the cities of Norfolk, Chesapeake, and surrounding areas.  Pl. Ex. 50 at 69; Pl. Ex. 69 at 9, 41; DI Ex. 94; 1st Trial Tr. at 319.  At the time of the 2010 census, the BVAP levels in the 12 majority-minority districts ranged from between 46.3% and 62.7%.  *Id.*; Pl. Ex. 50 at 72.  Because most of the 12 districts were underpopulated according to the 80,000-person population requirement, "any new plan required moving significant numbers of new voters into these districts in order to comply with the principle of one person, one vote."  *Id.*

Under Section 5 of the VRA, 52 U.S.C. § 10304, then-applicable to Virginia's redistricting efforts, any new plan was barred from "diminish[ing] the number of districts [compared to the prior plan] in which minority groups can 'elect their preferred

---

[5] For ease of reference, we will calculate the extent of each district's over-, under-, or equal population by reference to the 80,000-person population requirement, not including the plus or minus one percent allowable deviation.

[6] As discussed further below, by the time of the 2010 census, the BVAP in one of the majority-minority districts had fallen below 50%.  *See* Pl. Ex. 50 at 72.

candidates of choice' (often called 'ability-to-elect' districts)." *Bethune-Hill*, 137 S. Ct. at 795 (quoting *Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1307 (2016)). Section 5 thus mandated that covered states "maintain a minority's ability to elect a preferred candidate of choice." *Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1272 (2015).

To comply with this "non-retrogression" requirement, the legislature determined that all 12 majority-minority districts were required to have a minimum 55% BVAP in the 2011 plan. *Bethune-Hill*, 137 S. Ct. at 795. Imposition of this racial threshold necessitated an increase in the BVAP in three districts, which had BVAP levels below 55% at the time of the 2010 census. Pl. Ex. 50 at 72. The selection of the 55% BVAP figure was based on Jones' assessment of the needs of District 75, a rural majority-minority district located along the state's southern border. *Id.* at 796; DI Ex. 94 at 7. The legislature also applied the 55% BVAP requirement to the remaining 11 majority-minority districts. *Id.*

In April 2011, the legislature passed House Bill 5005 with broad bipartisan support, as well as support from a majority of the black members of the House of Delegates (the black caucus). *Id.* After Governor Robert McDonnell signed the bill into law, the United States Department of Justice "precleared" the plan in accordance with

Section 5 of the VRA.[7] *Id.*; Pl. Ex. 48 at 10-12; *see infra* note 12 (discussion of Section 5 preclearance).

In 2014, the plaintiffs, registered voters in the 12 majority-minority districts, filed the present civil action against the Virginia State Board of Elections and some of its officials (the state defendants).[8] *See* Dkt. No. 1; Am. Compl. ¶¶ 7-22. The plaintiffs challenged their districts of residence[9] as racial gerrymanders in violation of the Equal Protection Clause. *Id.*; Am. Compl. ¶¶ 1-2. They sought declaratory and injunctive relief prohibiting the state from holding further elections based on the unconstitutional districts. Am. Compl. at 17. The initial three-judge district court, as well as the present three-judge panel, were constituted pursuant to 28 U.S.C. § 2284(a).[10] Dkt. No. 11; *see also* Am. Compl. ¶ 24.

---

[7] The first version of the 2011 plan, House Bill 5001, was vetoed by Governor McDonnell. Pl. Ex. 48 at 10. House Bill 5005, the version that ultimately passed, was substantially similar to House Bill 5001 with respect to the House of Delegates districts, with certain minor changes made at the request of current delegates and localities. Pl. Ex. 48 at 10; 1st Trial Tr. at 378, 383, 411, 418.

[8] This Court has on two occasions permitted the plaintiffs to substitute new named plaintiffs in this case, based on a prior plaintiff's change of residence or death. Dkt. No. 66-68, 71, 180, 181. The operative amended complaint was filed on June 15, 2015. Dkt. No. 71, 181.

[9] We refer to the 88 non-majority-minority districts that the plaintiffs do not challenge as the "non-challenged districts."

[10] The initial panel included United States District Judges Robert E. Payne and Gerald Bruce Lee, and United States Circuit Judge Barbara Milano Keenan. Dkt. No. 11. Following remand from the Supreme Court, the Chief Judge of the Fourth Circuit Court of Appeals replaced Judge Lee with United States District Judge Arenda Wright Allen as a member of the three-judge panel. Dkt. No. 133.

Shortly after the complaint was filed, the Virginia House of Delegates and its speaker, Delegate William J. Howell (the intervenors), who were the "parties that drew and enacted the redistricting plan at issue," filed a motion to intervene. Dkt. No. 13 at 2. We granted the motion. Dkt. No. 26. Since that time, the intervenors have borne the primary responsibility of defending the 2011 plan, with the state defendants joining the intervenors' defense but declining to present an independent substantive defense. 1st Trial Tr. at 12-13, 830; 2nd Trial Tr. at 23-24. For ease of reference, we will refer to the state defendants and the intervenors collectively as "the intervenors."

Following a bench trial in July 2015 (the first trial), a majority of this Court found that race was not the predominant factor used in the construction of 11 of the 12 challenged districts. *Bethune-Hill*, 141 F. Supp. 3d at 505, 510-11. In reaching this conclusion, the majority found that the plaintiffs had not shown that the legislature's use of race was in "actual conflict" with traditional, race-neutral districting criteria. *Id.* at 524, 553-55, 559-71 (citation omitted). With respect to District 75, however, the Court found that race had predominated, but that the legislature's use of race was narrowly tailored to achieve the compelling state interest of compliance with the VRA. *Id.* at 511. Judge Keenan filed a separate dissenting opinion, concluding that by applying a mechanical 55% BVAP quota across the board to all 12 challenged districts, race predominated over other districting criteria as a matter of law. *Id.* at 572 (Keenan, J., dissenting).

The Supreme Court affirmed this Court's holding that District 75 satisfied strict scrutiny, concluding that Jones had engaged in an adequate "functional analysis" of the

BVAP level necessary to avoid retrogression in that district. *Bethune-Hill*, 137 S. Ct. at 801. However, the Court disagreed with the majority's predominance analysis in the other 11 districts. The Court held that the plaintiffs were not required to show "actual conflict" between race and traditional districting criteria to prove predominance. *Id.* at 797-98. The Court further explained that "there may be cases where challengers will be able to establish racial predominance in the absence of an actual conflict by presenting direct evidence of the legislative purpose and intent or other compelling circumstantial evidence," considering the district as a whole. *Id.* at 799-800. Accordingly, the Supreme Court remanded the case to this Court for reconsideration of the question of predominance under the proper standard. *Id.* at 800.

On remand, we instructed the parties to file briefs regarding the impact of the Supreme Court's decision on this case, the continued viability of our prior factual findings, and the need for additional evidence to be presented. Dkt. No. 136. After considering the parties' positions, we held a four-day bench trial in October 2017 (the second trial), in which the plaintiffs and the intervenors presented substantial new evidence. Dkt. No. 224. Most relevant here, the plaintiffs offered the testimony of two new expert witnesses, and the intervenors presented a redistricting consultant who testified that he had played a significant role in drawing the 2011 plan. *See infra* discussions of testimony of Jonathan Rodden, Maxwell Palmer, and John Morgan. The parties also submitted extensive briefing following the second trial. Dkt. No. 230-33.

We now proceed to discuss the relevant legal principles, to consider the evidence presented at both trials, to make relevant credibility determinations, and to apply the Supreme Court's instructions to these factual findings.

## II.

Under the Equal Protection Clause, a legislature may not "separate its citizens into different voting districts on the basis of race," without satisfying the rigorous requirements of strict scrutiny. *Miller v. Johnson*, 515 U.S. 900, 911, 916, 920 (1995). The harm from such racial sorting is apparent. By assigning voters to districts based on race, a state "engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls." *Id.* at 911-12 (internal quotation marks omitted) (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)); *see also Bethune-Hill*, 137 S. Ct. at 797 (explaining that harm from racial sorting "include[s] being personally subjected to a racial classification as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group" (citation omitted)).

Nevertheless, legislatures often act with a "consciousness of race" in their redistricting decisions, and can do so without subjecting their actions to strict scrutiny. *Bush v. Vera*, 517 U.S. 952, 958 (1996) (principal opinion of O'Connor, J.). In assessing a claim of racial gerrymandering, courts "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Abbott v. Perez*, No. 17-586, slip

op. at 21 (U.S. June 25, 2018) (quoting *Miller*, 515 U.S. at 915-16).  Accordingly, a plaintiff alleging a racial gerrymandering claim bears the burden "to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Bethune-Hill*, 137 S. Ct. at 797 (quoting *Miller*, 515 U.S. at 916).

Race is the "predominant factor" in a redistricting decision when the legislature "subordinate[s] traditional race-neutral districting principles to racial considerations." *Alabama*, 135 S. Ct. at 1270 (emphasis and alterations omitted).  Although the application of a mandatory BVAP requirement for a district does not alone compel the conclusion that race predominated, *see generally Bethune-Hill*, 137 S. Ct. 788, such a requirement is evidence of the manner in which the legislature used race in drawing the district's boundaries, *see id.* at 800; *Alabama*, 135 S. Ct. at 1267.

For example, if a legislature made line-drawing decisions for the predominant purpose of complying with such a BVAP requirement, and the evidence shows that these race-based decisions dwarfed any independent consideration of traditional districting criteria, a court could conclude that the legislature "relied on race in substantial disregard of customary and traditional districting practices." *Miller*, 515 U.S. at 928 (O'Connor, J., concurring).  Under such circumstances, a court could conclude that race was the predominant factor in the construction of the district, because "[r]ace was the criterion that, in the State's view, could not be compromised," and the state applied traditional districting criteria "only after the race-based decision had been made." *Shaw v. Hunt*,

517 U.S. 899, 907 (1996) (*Shaw II*); *see also Alabama*, 135 S. Ct. at 1267 (explaining that when state "expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria," this use of a racial target "provides evidence that race motivated the drawing of particular lines").

As set forth by the Supreme Court, traditional districting criteria include "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation." *Alabama*, 135 S. Ct. at 1270 (citations and internal quotation marks omitted). Notably, however, the objective of achieving population equality is not a traditional districting factor, as the requirement of equal population is a "background rule against which redistricting takes place." *Id.* at 1270-71. Instead, "the 'predominance' question concerns *which* voters the legislature decides to choose, and specifically whether the legislature predominately uses race as opposed to other, 'traditional' factors when" moving voters for the purpose of equalizing population in a given district. *Id.* at 1271.

Contiguity, a description of geographical connectedness within a district, and compactness, a measure of the regularity of the shape of a district, are traditional districting criteria that also are required by the Virginia Constitution. Va. Const. art. 2, § 6; *see Shaw II*, 517 U.S. at 905-06 (explaining that shape of a district that is "highly irregular and geographically non-compact by any objective standard" is evidence of racial predominance); *Page v. Va. State Bd. of Elections*, No. 3:13cv678, 2015 WL 3604029, at *10-11, 15 (E.D. Va. June 5, 2015); *Wilkins v. West*, 571 S.E.2d 100, 109-10 (Va. 2002). Voters residing in a geographically compact district, or in a common

political subdivision, are more likely than voters who are more geographically dispersed to share similar interests that can be represented by a common legislator. Similarly, a district that is drawn with some consideration of "communities of interest" links voters who share a "common thread of relevant interests," including political, social, or economic interests. *Miller*, 515 U.S. at 919-20; *see also Bush*, 517 U.S. at 964 (principal opinion of O'Connor, J.) (communities of interest may share media outlets, public transportation, and educational and religious institutions).

Because the Equal Protection Clause "prohibits unjustified racial classifications" and not "misshapen districts," the Supreme Court has held that "a conflict or inconsistency" between a districting plan and traditional districting criteria is not required to establish predominance. *Bethune-Hill*, 137 S. Ct. at 798-99. Thus, although such a conflict or inconsistency may constitute "persuasive circumstantial evidence" of racial predominance, traditional districting criteria still may be subordinated to race without such "actual conflict." *Id.* at 799. Under a contrary rule, "a State could construct a plethora of potential maps that look consistent with traditional, race-neutral principles," while still using "race for its own sake [as] the overriding reason" for choosing the boundaries of the districts. *Id.*

For similar reasons, if a legislature uses race as a proxy for a legitimate districting criterion, such as partisan advantage or protection of incumbents,[11] this consideration of

---

[11] The Supreme Court has recognized that a goal of avoiding pairing incumbents in a single district is a legitimate districting criterion. *Bush*, 517 U.S. at 964 (principal opinion of O'Connor, J.).

race likewise is subject to strict scrutiny. *Bush*, 517 U.S. at 968-73 (principal opinion of O'Connor, J.). Using race in the service of a legitimate goal does not alter the underlying fact that the legislature has selected voters for inclusion in a district based on race. *See id.* at 972 ("[T]he fact that racial data were used in complex ways, and for multiple objectives, does not mean that race did not predominate over other considerations."). Accordingly, when a state asserts that it drew district lines on the basis of partisanship rather than race, we must conduct "a sensitive inquiry into all circumstantial and direct evidence of intent" to determine whether the plaintiffs have "disentangle[d] race from politics and prove[n] that the former drove a district's lines." *Cooper v. Harris*, 137 S. Ct. 1455, 1473 & n.7 (2017) (citation and internal quotation marks omitted).

Our predominance inquiry requires a "holistic analysis" that involves consideration of the "districtwide context" to determine "the legislature's predominant motive for the design of the district *as a whole*." *Bethune-Hill*, 137 S. Ct. at 800 (emphasis added). In conducting this inquiry, we must determine "the actual considerations that provided the essential basis for the lines drawn," and will disregard "post hoc justifications the legislature in theory could have used but in reality did not." *Id.* at 799 (emphasis omitted). Our consideration of the legislature's true motivations in drawing the districts is highly fact-specific, and involves numerous credibility findings based on our assessment of the testimony presented at trial. *See Cooper*, 137 S. Ct. at 1473-78.

If a plaintiff makes a sufficient showing of racial predominance, the burden shifts to the state to satisfy the requirements of strict scrutiny, namely, that the use of race was

narrowly tailored to achieve a compelling state interest. *Bethune-Hill*, 137 S. Ct. at 800-01 (citing *Miller*, 515 U.S. at 920). In the present case, the intervenors have asserted that compliance with Section 5 of the VRA, 52 U.S.C. § 10304, is a compelling state interest justifying the predominant use of race in the 2011 plan. *See* DI Post-Trial Br. at 29-32. Section 5 "prohibits a covered jurisdiction[12] from adopting any change that 'has the purpose of or will have the effect of diminishing the ability of [the minority group] to elect their preferred candidates of choice.'" *Alabama*, 135 S. Ct. at 1272 (quoting 52 U.S.C. § 10304(b)). Like the Supreme Court, upon a finding of racial predominance, we will assume without deciding that compliance with Section 5 is a compelling state interest, and will focus our analysis on the question whether the legislature's reliance on race was narrowly tailored to achieving that interest. *See, e.g.*, *Bethune-Hill*, 137 S. Ct. at 801; *Alabama*, 135 S. Ct. at 1272-74.

To satisfy the narrow tailoring prong of strict scrutiny, a state must show that it had a "strong basis in evidence" supporting its race-based decision. *Alabama*, 135 S. Ct. at 1274 (citation omitted). Under this standard, a state need not make a precisely accurate determination of the BVAP percentage required to satisfy the mandate of

_____

[12] The term "covered jurisdiction" within the meaning of the VRA refers to states and political subdivisions that formerly maintained a test or a device as a prerequisite to voting, and had low voter registration or turnout. *See Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612, 2619-20 (2013). Section 5 prohibited such covered jurisdictions from implementing a change in voting procedures without approval, or "preclearance," from the Department of Justice or a three-judge federal court. *Id.* at 2620-21. In 2013, the Supreme Court invalidated the formula articulated in Section 4 of the VRA for determining whether a jurisdiction was "covered" for purposes of Section 5. *See id.* at 2631.

Section 5 in a particular district. *Id.* at 1273. Instead, the state must show that it had "good reasons to believe" that its use of race was required under Section 5, even if a court later determines that the state's action was not in fact necessary to comply with the statute. *Id.* at 1274 (emphasis and citation omitted).

Notably, Section 5 "does not require a covered jurisdiction to maintain a particular numerical minority percentage" in a district. *Id.* at 1272. Instead, Section 5 imposes a "non-retrogression" standard, which requires the state "to maintain a minority's ability to elect a preferred candidate of choice." *Id.* at 1272-73. To achieve this goal, a state should not rely on a "mechanically numerical view as to what counts as forbidden retrogression," but should adopt a "purpose-oriented view" that asks simply whether a redistricting plan maintains a minority group's ability to elect its preferred candidate. *Id.* at 1273-74.

With these principles in mind, we turn to consider whether the evidence presented at the two trials in this case supports a finding that race was the predominant factor in the construction of the 11 remaining challenged districts. Upon a finding that race predominated, we will consider whether the state had a "strong basis in evidence" for its race-based decisions. *Id.* at 1274.

III.

In accordance with the Supreme Court's instruction that we employ a "holistic analysis" in determining the legislature's predominant motive, *Bethune-Hill*, 137 S. Ct. at 800, we begin by reviewing the evidence of racial motive in the plan as a whole, *see*

*Alabama*, 135 S. Ct. at 1267-68.  Although statewide evidence is not dispositive with respect to predominance in any given district, "[s]uch evidence is perfectly relevant" to our evaluation whether the plaintiffs have satisfied their burden of showing "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* at 1267 (quoting *Miller*, 515 U.S. at 916).

A.

Two factual matters presented in the prior proceedings are relevant to our predominance analysis.  First, the intervenors conceded in the first trial that the legislature was required to consider, and did consider, race in its redistricting decisions in order to comply with the VRA.  1st Trial Tr. at 403, 405.  Consistent with this admission, the House Committee on Privileges and Elections adopted a resolution (the House resolution) listing several written criteria to guide the redistricting process.  *See* Pl. Ex. 16.

The primary criterion of "population equality" mandated that each district "be as nearly equal to the population of every other district as is practicable," with population deviations in the House districts within plus-or-minus one percent.  Pl. Ex. 16 ¶ I.  After population equality, the House resolution listed the "Voting Rights Act" as the second criterion, and provided as follows:

> Districts shall be drawn in accordance with the laws of the United States and the Commonwealth of Virginia including compliance with protections against the unwarranted retrogression or dilution of racial or ethnic

minority voting strength. Nothing in these guidelines shall be construed to require or permit any districting policy or action that is contrary to the United States Constitution or the Voting Rights Act of 1965.

Pl. Ex. 16 ¶ II. The House resolution also enumerated other, less important criteria, including contiguity and compactness, single-member districts, and communities of interest. Pl. Ex. 16 ¶¶ III-VI; *see also* 1st Trial Tr. at 402-03. The House resolution further emphasized that population equality and compliance with federal and state law, and the VRA in particular, "shall be given priority in the event of conflict among the criteria." Pl. Ex. 16 ¶ VI.

A second factual matter also is now settled, namely, that the legislature employed a 55% BVAP threshold in drawing each of the challenged districts. The fact that there was a 55% BVAP requirement is contrary to the position that the intervenors maintained at the first trial. 1st Trial Tr. at 20, 280-81, 406, 409, 860. In this Court's first opinion, we described the parties' dispute regarding the fixed or aspirational nature of the 55% number, but ultimately found that "the 55% BVAP figure was used in structuring the districts," *Bethune-Hill*, 141 F. Supp. 3d at 519, a conclusion that was affirmed by the Supreme Court, *see Bethune-Hill*, 137 S. Ct. at 794 ("[T]he boundary lines for the 12 districts at issue were drawn with a goal of ensuring that each district would have a [BVAP] of at least 55%."); *see also* Dissent Op. at 118 ("It is undisputed that race was considered, and it is established that a 55% BVAP rule was employed."). Upon our review of the record of both trials, showing that the legislature achieved a 55% minimum BVAP in each district by drawing boundaries based on that threshold, we now find as a

matter of fact that the legislature employed a mandatory 55% BVAP floor in constructing all 12 challenged districts.[13]

Although the existence of the 55% threshold is not dispositive of the question of predominance, *see generally Bethune-Hill*, 137 S. Ct. 788, the fixed BVAP requirement nevertheless is evidence of the legislature's motive, *see id.* at 800; *Alabama*, 135 S. Ct. at 1267 ("That Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote) provides evidence that race motivated the drawing of particular lines in multiple districts in the State."). Moreover, race may predominate in the drawing of a particular legislative district even if that district begins with a BVAP over 55%, or if particular district lines were not necessary to achieve the 55% figure. *See, e.g.*, Dissent Op. at 123-24, 130-31. We therefore evaluate the evidentiary weight to accord the use of the 55% threshold in the context of the other evidence presented.

### B.

We turn to consider the evidence of predominance that the plaintiffs presented at the second trial. The plaintiffs offered the testimony of two experts: Dr. Jonathan

---

[13] The dissent relies heavily on certain other factual findings made in this Court's prior opinion, including the relative credibility of both lay and expert witnesses, and the legislature's motivations for drawing certain lines. *See, e.g.*, Dissent Op. at 109-12 & n.10, 128-29, 139-40, 147-48. Given that these prior findings were reached while applying an erroneous legal standard, and in light of the voluminous new evidence presented by both parties on remand, we conclude that these prior factual findings are open to reconsideration. Moreover, because this Court unanimously agreed to allow the presentation of new evidence, the Court also reopened the question of the credibility of the witnesses who testified at the second trial.

Rodden, a professor of political science at Stanford University, and Dr. Maxwell Palmer, an assistant professor of political science at Boston University.[14]  Pl. Ex. 69 at 72; Pl. Ex. 71 at 69.  We conclude that both experts provided credible testimony based on sound methodology, and we will discuss their testimony in turn.

At trial, Dr. Rodden was accepted as an expert in the field of "geo-spatial data analysis"[15] and its application to redistricting.  2nd Trial Tr. at 159.  Dr. Rodden used geo-spatial data to determine whether it was "plausible that the final shape of the districts could have emerged without race being used as the dominant consideration."  Pl. Ex. 69 at 2.  In particular, Dr. Rodden used census data to determine the geographic distribution of groups of voting-age white residents and voting-age black residents.  Pl. Ex. 69 at 8; 2nd Trial Tr. at 163-64.  He placed white "dots" representing a designated number of white voting-age residents, and black "dots" representing the same number of black voting-age residents, randomly within each census block.  Pl. Ex. 69 at 8; *see, e.g.*, Pl. Ex. 69 at 10.  The resulting "dot density maps" are a visual illustration of the density of

---

[14]  At the first trial, the plaintiffs also presented the testimony of Dr. Stephen Ansolabehere, a professor of government at Harvard University.  Pl. Ex. 50 at 88; 1st Trial Tr. at 124.  The court accepted Dr. Ansolabehere as an expert in the field of redistricting.  1st Trial Tr. at 124.  Although we rely primarily on the testimony of Drs. Palmer and Rodden, unless otherwise noted, we also consider certain opinions and findings of Dr. Ansolabehere, because we conclude that his testimony on these cited matters was credible and was based on the application of sound principles.

[15]  Dr. Rodden explained that "geo-spatial data" refers to data that can be represented geographically on a map, thereby allowing "the visualization of quantitative information" to help explain a social phenomenon.  2nd Trial Tr. at 145-48.

white and black voting-age populations in the geographic region depicted on the map.[16] Pl. Ex. 69 at 8; *see also, e.g.*, Pl. Ex. 69 at 10. Dr. Rodden examined each challenged district individually, as well as in regional groupings, noting that changes made to one district also impacted neighboring districts. 2nd Trial Tr. at 162.

Dr. Rodden concluded that the dot density maps reflected "telltale signs" of "race-based maneuvering." Pl. Ex. 69 at 4. In examining these maps, Dr. Rodden opined that the goals of population equality and a 55% BVAP could not be achieved in the challenged districts without "considerable creativity," and "in many cases . . . do[ing] considerable violence to traditional districting principles." Pl. Ex. 69 at 3. Dr. Rodden thus determined that race was the predominant factor used in constructing all 11 challenged districts. 2nd Trial Tr. at 161.

Dr. Rodden explained that, in general, expanding the underpopulated challenged urban districts into the overpopulated white suburbs would have caused the BVAP in the challenged districts to fall below the 55% threshold. Pl. Ex. 69 at 3; *see, e.g.*, 2nd Trial Tr. at 174. Given this significant underpopulation in many of the challenged districts, and the geographic distribution of white and black residents, the legislature was forced to consider the racial make-up of individual VTDs and, at times, to split VTDs according to

---

[16] Although the intervenors' expert, Dr. Thomas Hofeller, challenged the usefulness of dot density maps, Dr. Hofeller conceded that Dr. Rodden used the proper methodology in constructing the dot density maps presented in this case. 2nd Trial Tr. at 912, 940-41.

the racial composition of particular census blocks.[17]  Pl. Ex. 69 at 3-4.  Dr. Rodden further noted that boundary lines between districts frequently were small residential roads separating predominantly white and predominantly black neighborhoods.  Pl. Ex. 69 at 4. Accordingly, Dr. Rodden concluded that it was "simply not possible to devise a credible post-hoc explanation for these decisions that is not based on race."  Pl. Ex. 69 at 4.

The visual depictions of racial sorting in the dot density maps are telling.  The regional maps showed that most significant concentrations of black voters were swept into one of the challenged districts.  *See, e.g.*, Pl. Ex. 69 at 12, 42.  These maps also indicated that heavily populated black areas often were shared between multiple challenged districts, sometimes splitting municipal boundaries in the process.  *See* Pl. Ex. 69 at 43.  As Dr. Rodden observed, "[w]hen respect for county or municipal boundaries would have undermined the ability to reach the racial target, they were ignored."  Pl. Ex. 69 at 4.

The dot density maps of individual districts, and "zoomed in" portions of those districts, illustrated the precision with which district boundaries coincided directly with racial residential patterns.  *See, e.g.*, Pl. Ex. 69 at 45, 47.  The dot density map of District 80, for instance, showed a narrow "bridge" consisting of two largely white VTDs, which were used to connect geographically distinct clusters of black voters.  *See* Pl. Ex. 69 at

---

[17] Overall population figures, as well as racial and ethnic data, are available in Virginia at the census block level.  2nd Trial Tr. at 372.  However, election result data is not reported by census block, and it therefore is impossible to know in Virginia how voters in an individual census block voted.  2nd Trial Tr. at 372; *see supra* note 4; *see also infra* p. 25 (discussing use of census block and VTD data in Maptitude).

53. And as discussed further below, the maps plainly showed that VTDs in each region were split exactly along racial lines. *See, e.g.*, Pl. Ex. 69 at 38 (District 63, Hopewell Ward 7), 47 (District 95, Reservoir, Epes, Denbigh, Jenkins), 58 (District 89, Granby); 2nd Trial Tr. at 275. In one such example, the legislature excised from District 89 a single census block of predominantly white voters from the Granby VTD, and allocated those voters to a neighboring non-challenged district. Pl. Ex. 69 at 57-58. These visual depictions led Dr. Rodden to reach the unavoidable conclusion that the challenged districts were designed to capture black voters with precision. *See* 2nd Trial Tr. at 275.

Dr. Palmer was accepted as an expert in the area of redistricting and data analysis as it pertains to redistricting. 2nd Trial Tr. at 366. Dr. Palmer conducted statistical analyses regarding the populations of the challenged districts to determine whether race predominated in the construction of those districts. *See* Pl. Ex. 71 at 2. Because respect for political boundaries is an important traditional redistricting principle, Dr. Palmer focused on the manner in which VTDs and political subdivisions were split in the plan. Pl. Ex. 71 at 4 ¶ 13; 2nd Trial Tr. at 370. And as discussed further below, Dr. Palmer also evaluated the reports of other experts who previously testified in the case. 2nd Trial Tr. at 366-67.

Dr. Palmer reached several general conclusions relevant to our racial predominance inquiry. First, he observed that the number of split VTDs increased between the 2001 plan and 2011 plan, and that splitting VTDs in the 2011 plan was more

common in the challenged districts[18] than in the non-challenged districts.  Pl. Ex. 71 at 5;

*see also* Pl. Ex. 50 at 70; 2nd Trial Tr. at 371.

Second, Dr. Palmer concluded that there is "substantial evidence" that race was

the predominant factor in the manner that VTDs, cities, and other places were split

between challenged and non-challenged districts.  Pl. Ex. 71 at 2 ¶ 3; 2nd Trial Tr. at 369.

With only a few exceptions, "these areas were divided such that the portions allocated to

challenged districts had a higher BVAP percentage than the portions allocated to non-

challenged districts."  Pl. Ex. 71 at 2 ¶ 3; *see also* 2nd Trial Tr. at 381.  In particular, in

31 of the 32 VTDs that were split between challenged and non-challenged districts, the

areas assigned to the challenged districts had higher BVAPs than the areas assigned to the

non-challenged districts.  Pl. Ex. 71 at 4 ¶ 14; 2nd Trial Tr. at 374.  And, on average, the

BVAP of the portions of split VTDs assigned to challenged districts was 24% higher than

the portions assigned to non-challenged districts.  Pl. Ex. 71 at 4 ¶ 14; 2nd Trial Tr. at

374.  This pattern of higher BVAP areas being assigned to challenged districts held true

for the ten cities, four towns, one military base, and ten unincorporated places[19] split

---

[18] In conducting his analysis, Dr. Palmer considered all 12 challenged districts, including District 75.  *See* Pl. Ex. 71 at 2 ¶ 2; 2nd Trial Tr. at 373.

[19] An "unincorporated place" is "[a] census designated place with an official federally recognized name."  Pl. Ex. 71 at 13 ¶ 69.

between challenged and non-challenged districts.[20]  Pl. Ex. 71 at 4 ¶ 16, 14 ¶¶ 71-73, Tables 8-15; 2nd Trial Tr. at 392.

Dr. Palmer found that BVAP level was predictive of an area's inclusion in a challenged district, because "[a]s the BVAP of a census block increases, the probability that it is assigned to a challenged district increases." Pl. Ex. 71 at 6-7 ¶ 26; *see also* 2nd Trial Tr. at 385-86.  Dr. Palmer stated that this relationship between BVAP and assignment to a challenged district is statistically significant.  Pl. Ex. 71 at 6-7 ¶ 29; 2nd Trial Tr. at 386.  Based on this data, Dr. Palmer concluded that VTDs split between challenged and non-challenged districts "were divided by race."  Pl. Ex. 71 at 7 ¶ 29.  Dr. Palmer similarly concluded that "race predominated over the principle of keeping political subdivisions whole," because "[c]ities, towns, unincorporated places, and even a military base were all divided according to race."  Pl. Ex. 71 at 16 ¶ 82.

Splits of particular VTDs provide stark illustrations of these racial divisions.  For example, Dr. Rodden explained that District 95, located on the peninsula, was drawn to separate black and white voters with "remarkable precision."  Pl. Ex. 69 at 46; *see also* Pl. Ex. 71 at 35.  The map-drawers achieved this division by splitting four VTDs located at the northern end of the district, Jenkins, Denbigh, Epes, and Reservoir, "precisely at the point where black neighborhoods transitioned to white neighborhoods."  Pl. Ex. 69 at 47.  Epes was split between District 95 and a neighboring non-challenged district along

_____

[20] Dr. Palmer noted a single minor exception to this pattern regarding seven people from a particular census place assigned to District 70.  Pl. Ex. 71 at 14 n.14.

small residential streets, separating multi-family housing with significant black populations on one side of the street from homes occupied by white residents on the other side of the street. Pl. Ex. 69 at 47-48.

Dr. Palmer emphasized that racial disparities in the manner that VTDs were split were "especially strong evidence of racial predominance."[21]  Pl. Ex. 71 at 2 ¶ 4; *see also* 2nd Trial Tr. at 379.  Dr. Palmer and Dr. Rodden both explained that election data are not available for individual census blocks that make up the VTDs, and Virginia does not maintain political party registration data in voter files.   Pl. Ex. 71 at 2 ¶ 4; 2nd Trial Tr. at 372, 390, 954-58.  For these reasons, the Maptitude software is not capable of showing election result data at the census block level.  2nd Trial Tr. at 954-58.  Accordingly, the precision and specificity with which VTD splits separated white and black voters cannot be explained by anything other than the intentional consideration of race.  *See* Pl. Ex. 69 at 4 (Rodden: "[I]t is simply not possible to devise a credible post-hoc explanation for these decisions that is not based on race."); *Bush*, 517 U.S. at 970-71 (principal opinion of O'Connor, J.) (explaining that, because mapping software applied only racial data at the block level, VTD and street-level splits supported the conclusion that race predominated).

---

[21]  We disagree with the intervenors' contention that split VTDs affect too few people to be relevant to our predominance inquiry.  2nd Trial Tr. at 990-91.  A decision to split a VTD, by definition, occurs when a map-drawer draws the outer boundary of a district, that is, when the map-drawer chooses "which voters" to include to achieve population equality.  *Alabama*, 135 S. Ct. at 1271 (emphasis omitted).  In our view, starkly racial splits of VTDs are persuasive evidence of the predominant use of race.

Third, the results of Dr. Palmer's statistical analysis showed that black voters were moved from non-challenged districts into challenged districts at a higher rate than white or Democratic voters. Pl. Ex. 71 at 2 ¶ 5; 2nd Trial Tr. at 395. Conversely, white and Democratic voters were moved out of the challenged districts and into non-challenged districts at a higher rate than black voters. Pl. Ex. 71 at 2 ¶ 5; 2nd Trial Tr. at 395. In all nine challenged districts in which population was shifted to non-challenged districts, the transferred areas had a lower BVAP than the BVAP of the district as a whole. Pl. Ex. 71 at 17 ¶ 85, 61. And, with one exception,[22] all the non-challenged districts that experienced transfers of population into challenged districts moved out areas with a higher BVAP than the non-challenged district as a whole. Pl. Ex. 71 at 16-17 ¶ 84. From these data, Dr. Palmer concluded that "race was the predominant factor in moving populations between districts." Pl. Ex. 71 at 28 ¶ 146.

Using an individual district as an example provides further illustration of these complex racial patterns in population shifts. Under the 2001 plan, District 74 in the Richmond area already had a population within the allowable one percent population deviation, and, at 62.7% BVAP, was well over the 55% BVAP threshold. *See* Pl. Ex. 50 at 69, 72. Nevertheless, the legislature removed about 16,000 voters out of District 74, and moved about 16,000 different voters in, with the BVAP of the group moved out

---

[22] The single exception was population movement out of District 100, a non-challenged district. District 100 "was uniquely constrained," due to the geography of the district on the Eastern Shore, making it extremely difficult to effect a movement of population in and out of that district. Pl. Ex. 71 at 19 ¶ 102.

17.8% higher than the group moved in.  Pl. Ex. 50 at 73, 77.  The BVAP of the areas removed from District 74 differed based on whether the receiving district was a challenged district subject to the 55% BVAP requirement.  For example, District 74 lost about 2,000 people, with a very low 3.8% BVAP, to non-challenged District 72.  Pl. Ex. 71 at 43.  In contrast, District 74 lost a group of nearly 8,000 people who were moved into challenged District 71, which needed a significant influx of black voters to reach the 55% threshold.  Pl. Ex. 71 at 43.  That group of 8,000 people moved from District 74 into District 71 had an 85.5% BVAP.  Pl. Ex. 71 at 43.  Accordingly, District 74, with its surplus of BVAP, served as a "donor" district to surrounding challenged districts with lower BVAP levels.  Pl. Ex. 69 at 15, 31.

And finally, Dr. Palmer engaged in an extensive analysis of the question whether racial composition or political party performance in a VTD was a stronger predictor that a particular VTD would be assigned to a challenged district.  2nd Trial Tr. at 398.  As part of his analysis, Dr. Palmer sought to examine the methodologies and conclusions of two experts who testified on the same subject in the first trial, namely, Dr. Jonathan Katz, a professor of social sciences and statistics at the California Institute of Technology, who was presented as a witness by the intervenors, and Dr. Stephen Ansolabehere, who was called by the plaintiffs.  Pl. Ex. 50 at 1-2; DI Ex. 16 at 1, 3; *see supra* note 14 (discussing Dr. Ansolabehere's qualifications).  Dr. Katz also testified at the second trial.

Dr. Ansolabehere concluded that race had a larger effect on the assignment of VTDs to challenged districts than did Democratic vote share.  Pl. Ex. 50 at 46-47 ¶ 130; Pl. Ex. 71 at 21 ¶ 115.  In contrast, Dr. Katz concluded that the effect of both race and

party on the assignment of VTDs was nearly equal, and that any effect was not statistically significant.[23]  DI Ex. 16 at 20; *see also* Pl. Ex. 71 at 21-22 ¶ 115.

Dr. Palmer identified two differences between the models used by Dr. Katz and Dr. Ansolabehere.  2nd Trial Tr. at 396.  Dr. Palmer concluded that these differences had an important effect on the results.  First, Dr. Katz failed to weight each VTD by total population in considering the effect of race and party on likely VTD assignment.  Pl. Ex. 71 at 22 ¶ 119; 2nd Trial Tr. at 401.  As Dr. Palmer explained, a VTD containing 5,000 people is more significant to the results of the model than a VTD containing only 50 people and, thus, population weights were an important aspect of an accurate analysis.  Pl. Ex. 71 at 22 ¶ 119; *see also* 2nd Trial Tr. at 396-97.  After adding the appropriate population weights to Dr. Katz's model, Dr. Palmer explained that the results of the analysis almost mirrored the results reached by Dr. Ansolabehere, namely, that "race, not party, is the predominant factor in the assignment of VTDs to challenged districts."  Pl. Ex. 71 at 22-23 ¶ 120; 2nd Trial Tr. at 400.

Second, in the first trial, Dr. Katz criticized Dr. Ansolabehere's analysis for failing to account for the distance between the center of VTDs and challenged districts.  *See* DI

---

[23]  In their original reports, Drs. Katz and Ansolabehere used slightly different election data to determine average Democratic party vote share in each VTD.  Pl. Ex. 71 at 21 ¶ 111.  For the sake of easier comparison between the experts' results, Dr. Palmer used in his analysis the data preferred by Dr. Katz.  Pl. Ex. 71 at 22 ¶ 116.  When Dr. Palmer replicated Dr. Ansolabehere's original analysis using Dr. Katz's data, the result was substantially the same as that reached by Dr. Ansolabehere, namely, that race rather than party was the primary predictor in the assignment of VTDs.  Pl. Ex. 71 at 22 ¶ 117; 2nd Trial Tr. at 398-99.

Ex. 16 at 20; 1st Trial Tr. at 501, 503-05. In Dr. Katz's view, because VTDs that are located farther away from a challenged district were less likely to be included in that district, proper modeling should include a measure of distance. DI Ex. 16 at 20; *see also* Pl. Ex. 71 at 21 ¶ 114. Dr. Palmer also accounted for distance in his model, but explained that the particular measure of distance that Dr. Katz used was flawed because it considered the distance from each VTD to *all 12* challenged districts. Pl. Ex. 71 at 23 ¶¶ 121-22; 2nd Trial Tr. at 403. As a result, Dr. Katz's analysis produced the illogical conclusion that, for several of the challenged districts, VTDs farther away from those districts were more likely to be assigned to a challenged district than VTDs located closer to such districts. Pl. Ex. 71 at 23 ¶ 121; 2nd Trial Tr. at 404, 406. Accordingly, Dr. Palmer incorporated into his model a different measure of distance, namely, the distance from each VTD to the nearest challenged district. Pl. Ex. 71 at 23 ¶ 122; 2nd Trial Tr. at 407. This approach produced results showing that the farther away a VTD was from the closest challenged district, the less likely it was that this VTD would be assigned to a challenged district. Pl. Ex. 71 at 23 ¶ 123; 2nd Trial Tr. at 408.

Dr. Palmer ultimately concluded that Dr. Katz's results differed from Dr. Ansolabehere's "due to errors in Dr. Katz's model." Pl. Ex. 71 at 24 ¶ 124. In light of these conclusions, including the illogical results from Dr. Katz's distance measurement,

we accept as more credible Dr. Palmer's approach and the results he reached regarding race-versus-party.[24]

Like Dr. Ansolabehere, Dr. Palmer concluded that "the effect of race is much larger than that of party in the assignment of VTDs to challenged districts," and that, therefore, race predominated over party in the assignment of VTDs to those challenged districts. Pl. Ex. 50 at 45 ¶¶ 127-29; Pl. Ex. 71 at 24 ¶¶ 123, 125; *see also* 2nd Trial Tr. at 369, 408. Moreover, "[w]hile the effect of race is large and statistically significant, there is no substantive effect of Democratic vote share on the assignment of a VTD to a challenged district." Pl. Ex. 71 at 24 ¶ 123; *see also* Pl. Ex. 71 at 63; 2nd Trial Tr. at 408. Based on Dr. Palmer's analyses, we conclude that the BVAP of a VTD was a more accurate predictor of whether that VTD would be included in a challenged district than the Democratic performance of the VTD.

---

[24] We pause to emphasize an additional, significant factor undercutting Dr. Katz's credibility. In his supplemental report prepared for the second trial, Dr. Katz asserted that because "in Virginia, race data is very highly correlated with party identification," Dr. Palmer was "absolutely incorrect" in the "foundational assumption that Census blocks do not contain political information." DI Ex. 101 at 11-12. Dr. Katz reiterated this position in his testimony. 2nd Trial Tr. at 834.

As previously discussed, using race as a proxy for political party affiliation constitutes the use of *race*, not party, in a predominance analysis. Legislators may not assume that an individual voter will vote a particular way based exclusively on her race without justifying that highly suspect race-based assumption. For this additional reason, we decline to credit Dr. Katz's testimony.

## C.

In contrast to the geo-spatial and statistical evidence presented by Dr. Rodden and Dr. Palmer, the intervenors again called Jones as a witness, and also offered testimony by demographer John Morgan. 2nd Trial Tr. at 466-67, 586-87. Morgan, who had nationwide redistricting experience in two prior redistricting cycles, was hired by the Republican House majority to assist Jones with the 2011 redistricting process. 2nd Trial Tr. at 588, 593-94. Morgan testified during the second trial that he played a substantial role in constructing the 2011 plan, which role included his use of the Maptitude software to draw district lines. 2nd Trial Tr. at 593. Morgan testified in considerable detail about his reasons for drawing dozens of lines covering all 11 challenged districts, including purportedly race-neutral explanations for several boundaries that appeared facially suspicious. Despite Morgan's alleged centrality to the 2011 redistricting process, the intervenors neglected to call Morgan to testify at the first trial. The intervenors' belated reliance on Morgan's testimony strongly suggests an attempt at post hoc rationalization. For this and the following reasons, we decline to credit Morgan's testimony.

Morgan claimed that he, rather than Jones, decided to split VTDs at the end of the map-drawing process primarily to equalize population between adjoining districts. 2nd Trial Tr. at 613, 623, 730; *see also* 2nd Trial Tr. at 473-74, 504-07. Morgan testified that he "really didn't take race into account in splitting the VTDs" in the challenged districts. 2nd Trial Tr. at 714-15.

We find that this explanation was not credible. As an initial matter, Dr. Palmer emphasized that to equalize population, typically only one VTD needed to be split

between a pair of districts. 2nd Trial Tr. at 381. Yet several of the challenged districts had multiple VTDs that were split with the same non-challenged district. Pl. Ex. 71 at 52 (three VTD splits between Districts 63 and 62, and two splits between Districts 63 and 64), 53 (three VTD splits between Districts 74 and 72), 54 (two VTD splits between Districts 89 and 79; 77 and 76; and 90 and 85), 55 (five VTD splits between Districts 95 and 94).

And notably, as discussed above, VTDs were split with exacting precision separating predominantly black and white residential areas, sometimes dividing a VTD along the middle of a street. *See* Pl. Ex. 69 at 38-39 & Figure 12, 47-48; 2nd Trial Tr. at 494. In our view, Morgan's contention, that the precision with which these splits divided white and black areas was mere happenstance, simply is not credible. 2nd Trial Tr. at 679, 748-50; *see also* 2nd Trial Tr. at 379 (Palmer: "If we're splitting VTDs to equalize population, we shouldn't expect to see the same consistent pattern of division by race across all of them.").

Similarly, Morgan asserted that he split certain VTDs at the census block level in District 95 to increase Republican voting strength in a neighboring, non-challenged district. DI Ex. 94 at 14; 2nd Trial Tr. at 675-80. This contention conflicted with the testimony of Dr. Rodden and Dr. Palmer, as well as with the testimony of the intervenors' own expert, Dr. Thomas Hofeller,[25] who uniformly stated that election results and

---

[25] Dr. Hofeller generally opined on the extent to which the challenged districts achieved certain goals, such as maintaining compactness, contiguity, and core retention. *See* DI Ex. 14. He also criticized Dr. Rodden's report for, among other things, failing to (Continued)

partisan affiliation data were not available at the census block level. Pl. Ex. 71 at 2 ¶ 4; 2nd Trial Tr. at 372, 390, 942-44, 954-58. Indeed, Morgan conceded that he could only estimate political performance at the census block level by applying election results from the VTD as a whole equally to each census block. 2nd Trial Tr. at 622. This "partisan" approach based on overall VTD performance, however, would not result in VTDs being split precisely to separate predominantly black and white neighborhoods. Accordingly, the only conclusion to draw from Morgan's testimony is that, insofar as he sought to obtain partisan political advantage by splitting VTDs in particular ways, he did so by relying on race as a proxy for political preference.[26] This assumption that members of a particular racial group vote a certain way is antithetical to the principles underlying the Equal Protection Clause. Using race as a proxy for political performance constitutes the use of *race*, not the use of *politics*, for purposes of our predominance analysis. *Bush*, 517 U.S. at 968 (principal opinion of O'Connor, J.) ("[T]o the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in

---

propose alternate boundaries for the 2011 map. *See* DI Ex. 102 at 5-7 ¶¶ 14-21. Although the evidence presented by Dr. Hofeller is relevant to the question whether the plan generally complied with traditional districting criteria, Dr. Hofeller's opinions do not alter our evaluation based on the totality of the evidence of the legislature's motivations for drawing specific district lines.

[26] Given the starkly racial nature of the VTD splits, however, we do not discount the possibility that Morgan decided which census blocks to include in challenged districts directly based on the racial composition of those blocks.

operation."). For these reasons, we conclude that Morgan did not present credible testimony, and we decline to consider it in our predominance analysis.

And finally, we observe that at the second trial, Jones had a murky recollection regarding several important topics on which he previously had testified, despite having had access to the record of his testimony in the first trial for review. *See, e.g.*, 2nd Trial Tr. at 493-94. Additionally, the testimony of multiple, credible witnesses at the second trial directly undermined much of Jones' prior key testimony. For example, Jones testified repeatedly at the first trial that he consulted most members of the House when drawing the 2011 plan, and relied heavily on input from incumbent members of the black caucus who represented the challenged districts. 1st Trial Tr. at 291-93, 324, 330, 381.

Jones stated at the first trial that he received "extensive input" on the plan from Delegate Algie Howell, who represented District 90. 1st Trial Tr. at 338-39, 343; Parties' Stipulations ¶ 17, Dkt. No. 208. At the second trial, however, Howell denied that he gave significant input into the drawing of his or any district. According to Howell, he had a single, brief conversation with Jones after the plan was drawn. 2nd Trial Tr. at 82-83. Similarly, although Jones purported to rely on "significant input" from incumbent Delegate Matthew James in the construction of District 80, 1st Trial Tr. at 347-49, James testified that he offered no input whatsoever to Jones regarding the configuration of District 80.[27] 2nd Trial Tr. at 71-73. In the face of these denials, Jones' testimony at the

---

[27] To the extent that Jones claimed that he relied on the consent of the black caucus based on comments Jones received from Delegate Lionell Spruill Sr., who represented District 77, we do not credit this explanation. *See, e.g.*, 2nd Trial Tr. at 499; (Continued)

second trial was far more equivocal than the first. When asked specifically about James' role in drawing District 80, Jones responded that he could not "answer [the question] directly," but that it was his "understanding" that James had given input.[28]   2nd Trial Tr. at 499.

We recognize that Jones offered voluminous testimony at the first trial explaining many of his line-drawing decisions. We also do not doubt that Jones considered some traditional districting factors in constructing the 2011 plan. And we do not disagree with the dissent's view that because memories may fade with time, we cannot expect witnesses' recollections to remain perfectly clear six years after the events in question.

───────────────────

Parties' Stipulations ¶ 17, Dkt. No. 208. First, and most notably, the intervenors did not call Spruill as a witness at either trial to corroborate this theory. Second, members of the black caucus did not share uniform opinions about the plan, nor did the members all express their views to Spruill. Pl. Ex. 48 at 11; DI Ex. 9; 1st Trial Tr. at 387, 800; 2nd Trial Tr. at 107. And finally, there is evidence in the record that certain delegates who spoke to Spruill about the redistricting process generally did not offer substantive opinions about the construction of their own districts. For example, James testified that he had a single telephone conversation with Spruill regarding the redistricting process generally, but that James offered no opinion on the configuration of his district to Spruill during that call. 2nd Trial Tr. at 73-74.

[28] Our colleague in dissent criticizes our reliance on the testimony of certain members of the black caucus, including Howell and James, who did not testify at the first trial. The dissent declines to "accept on principle [their] long-delayed views of what happened in 2011," particularly given the delegates' decision to vote in favor of the plan. Dissent Op. at 95-97, 102-03.   We disagree with this view. These delegate witnesses were not needed until the second trial, when the plaintiffs had the opportunity to undermine the version of events that Jones had offered at the first trial. Moreover, these witnesses did not offer legal opinions regarding the constitutionality of the plan, but instead testified about their personal knowledge of their own districts and interactions with the map-drawers.

*See* Dissent Op. at 95. However, we do not discredit Jones' testimony based solely on his faded memory. The first trial occurred more than four years after the redistricting occurred, yet Jones had a remarkably clear recollection of countless, specific line-drawing decisions. But when faced at the second trial with new witnesses challenging material aspects of his previous testimony, and having had access to the transcript of his testimony at the first trial, Jones was unable to produce convincing explanations for the discrepancies. Thus, in light of Jones' very poor memory at the second trial, as well as his inability to account for material inconsistencies in his testimony, we give little weight to Jones' testimony regarding the reasons underlying the many changes made to district boundary lines.

After considering this statewide evidence, we find that the overall racial disparities in population movement, and the splits of VTDs and geographies along racial lines, are strong evidence of racial predominance in the challenged districts. These disparities and shifts did not result from the application of traditional redistricting principles, but rather from the predominant use of race. Additionally, Dr. Palmer's conclusion that race predominated over party in predicting the likelihood that a VTD would be assigned to a challenged district further supports a finding of racial predominance. As instructed by the Supreme Court, our task now is to examine holistically the legislature's use of race in drawing each individual challenged district.

IV.

Mindful of the statewide evidence of race-based decisionmaking identified by Drs. Rodden and Palmer, we turn to examine the legislature's use of race in the construction of each of the 11 challenged districts. Because a change to the boundaries of any one district caused a ripple effect on nearby districts, we will consider the challenged districts in three regional groupings: the Richmond/Tri-City area, North Hampton Roads (the peninsula), and South Hampton Roads/Norfolk.

A.

We begin with the Richmond/Tri-City region, which includes the greater Richmond metropolitan area, as well as the cities of Petersburg, Colonial Heights, and Hopewell. Pl. Ex. 69 at 9. Five challenged districts were located in the Richmond/Tri-City region in both the 2001 plan and the 2011 plan, namely, Districts 63, 69, 70, 71, and 74. Pl. Ex. 69 at 9. Since the 2001 redistricting cycle, the black population in Richmond had increasingly spread from the city limits into the surrounding suburbs. Pl. Ex. 69 at 13. The largely urban districts under the 2001 plan, Districts 69 and 71, had lost population, while both challenged and non-challenged suburban districts either were at the target population level, or were overpopulated. Pl. Ex. 50 at 72; Pl. Ex. 69 at 13. Accordingly, to achieve a 55% BVAP in all five challenged districts, the legislature made numerous decisions motivated by race, including using Districts 70 and 74, which had a surplus of BVAP and adequate population, as "donors" of BVAP to other challenged districts. *See infra* pp. 43-45, 51-54 (discussions of Districts 70 and 74); *see also* Pl. Ex. 50 at 72.

At the end of the 2011 redistricting process, every majority-black VTD in the Richmond/Tri-City region was either wholly or partially within a challenged district. Pl. Ex. 69 at 41. And in the final 2011 plan, the Richmond City portions of Districts 69, 70, 71 and 74 had a combined BVAP of 56.2%, whereas the Richmond City areas in non-challenged District 68 had a 6.8% BVAP. Pl. Ex. 71 at 15 ¶ 78, 58.

For the reasons discussed below, we conclude that race was the predominant factor in the legislature's construction of Districts 63, 69, 70, 71, and 74.

i.

We begin with District 71. Overwhelming evidence shows the many ways in which the legislature used race as the predominant, overriding criterion in constructing the district.

Under both the 2001 plan and the 2011 plan, District 71 contained portions of the city of Richmond and Henrico County. Pl. Ex. 50 at 69, 71. The incumbent delegate, Jennifer McClellan, had represented District 71 since 2005 and had won each election thereafter by overwhelming majorities. 1st Trial Tr. at 23-27. After hearing McClellan testify consistently at both trials, we find that her testimony was highly credible and was corroborated by other evidence in the case.

Two features of District 71 at the time of the 2010 census motivated the 2011 boundary changes, and had ripple effects throughout the Richmond/Tri-City region. First, District 71 was underpopulated by about 5,800 people. Pl. Ex. 50 at 72; Pl. Ex. 69 at 15. Even more importantly, however, District 71 was racially heterogeneous and had the lowest BVAP of any of the challenged districts at 46.3%, down from about 55% in

2001. Pl. Ex. 50 at 72; 1st Trial Tr. at 25. Because of this low starting BVAP, Jones conceded that the 55% BVAP threshold impacted the way the district was drawn. 2nd Trial Tr. at 532-33.

To increase the district's BVAP by nearly nine percentage points, more than 11,000 people with a 21.3% BVAP were moved *out* of District 71, and more than 17,000 people with a noticeably higher 72.1% BVAP were moved *into* District 71. Pl. Ex. 50 at 72-73, 77. Accordingly, the difference in BVAP between the groups moved in and out of District 71 was more than 50 percentage points. Pl. Ex. 50 at 77. Notably, areas moved out of District 71 into *non-challenged* districts had an extremely low 6.6% BVAP. Pl. Ex. 50 at 79.

In addition to these racial discrepancies in population movement, three line-drawing decisions clearly illustrate the importance of race in the construction of District 71. First, the district added several heavily populated, high BVAP Richmond VTDs to its eastern edge, which VTDs previously were located in Districts 70 and 74: VTD 604 (91% BVAP), VTD 701 (97% BVAP), VTD 702 (94% BVAP), and a portion of VTD 703 (90% BVAP). Pl. Ex. 64 at 9-10; Pl. Ex. 69 at 24, 29; DI Ex. 94 at 3-5. VTDs 701, 702, and part of 703 were removed from neighboring District 70 over the objection of the District 70 incumbent, Delegate Delores McQuinn, who resided nearby and had long represented these areas as a delegate and, earlier, as a member of the school board.[29] DI

---

[29] We credit McQuinn's testimony regarding her preferences for her own district, in light of her long-standing association with the neighborhoods at issue.

Ex. 94 at 3-4; 2nd Trial Tr. at 56, 97-98, 103-04, 533. Nevertheless, McQuinn understood that she "would have to lose some of the African-American population in that area" so that District 71 would receive sufficient black voters to achieve the 55% BVAP threshold. 2nd Trial Tr. at 103-04. Jones himself conceded that this eastward move into District 70 was required to ensure that District 71 had sufficient BVAP to meet the 55% number and, thus, that the 55% BVAP threshold impacted the drawing of the district's lines. 2nd Trial Tr. at 532-33; *see also* DI Ex. 94 at 4.

Second, despite Jones' contention that he sought to make District 71 more "Richmond centric" by removing three predominantly white Henrico County VTDs at the northwest edge of the district,[30] he proceeded to add the Ratcliffe VTD from Henrico County to the eastern end of District 71. 1st Trial Tr. at 305; 2nd Trial Tr. at 177-78, 531. Ratcliffe, unlike the three predominantly white Henrico County VTDs removed from District 71, had an 83% BVAP. Pl. Ex. 69 at 21, 24; *see also* 2nd Trial Tr. at 48-49.

And finally, VTD 207, part of the Fan neighborhood of Richmond, was removed from District 71 and transferred into District 68, represented by then-incumbent Republican Delegate Manoli Loupassi. Pl. Ex. 69 at 17-19; 2nd Trial Tr. at 36, 175-76. As a result, the Fan neighborhood, which previously was contained primarily within District 71, was split between District 71 and more-suburban District 68. 2nd Trial Tr. at

---

[30] Hilliard (6% BVAP); Stratford Hall (19% BVAP); and Summit Court (8% BVAP). Pl. Ex. 69 at 21.

28, 34-36, 165.  Prior to the 2011 redistricting, the entirety of VTD 207 had been located

in District 71 for at least 20 years.  2nd Trial Tr. at 35-36.

McClellan testified that she strongly opposed removing VTD 207 and sought to

minimize splitting the Fan, the neighborhood where her own residence was located.  2nd

Trial Tr. at 28, 36, 38.  VTD 207 was heavily Democratic, had high levels of voter

turnout, and had been a strong base of support for McClellan, but had a very low 3%

BVAP.[31]  Pl. Ex. 69 at 17; 1st Trial Tr. at 39; 2nd Trial Tr. at 35, 52.  According to

McClellan, when she approached Jones with her concern, Jones stated that he would be

open to suggested revisions, provided that any changes complied with the population

equality and 55% BVAP requirements.  2nd Trial Tr. at 30-32.  McClellan later used the

Maptitude software to draft alternative versions of the plan that would retain VTD 207 in

District 71.  2nd Trial Tr. at 36, 39-41.  However, because including all or a portion of

VTD 207 in District 71 would reduce the district's BVAP below 55%, McClellan

---

[31] At the first trial, Jones testified that he moved VTD 207 into District 68 based
on Loupassi's preference, though Jones could not "recall directly" at the second trial any
specific conversation with Loupassi.  1st Trial Tr. at 305; 2nd Trial Tr. at 485.  Notably,
the intervenors did not call Loupassi as a witness to corroborate their theory regarding
VTD 207.

In light of this lack of clarity, we do not credit the contention that Loupassi
requested that VTD 207 be moved into District 68.  Although he may have had certain
business interests in the area, Loupassi never represented the neighborhood as a delegate
or as a former member of the city council, and the VTD typically voted 75% to 80%
Democratic, including in favor of McClellan.  Pl. Ex. 69 at 19; 1st Trial Tr. at 39; 2nd
Trial Tr. at 488-89.

"became resigned" to the fact that she would lose VTD 207 from her district.[32]  2nd Trial Tr. at 36, 39.

For similar reasons, predominantly white VTD 505 was split between District 71 and District 69, another challenged district located to the south.  *See* Pl. Ex. 71 at 12 ¶ 62; DI Ex. 94 at 4.  McClellan testified that, although she and Betsy Carr, the incumbent delegate in District 69, sought to keep VTD 505 wholly within District 69, doing so would have reduced the BVAP of that district below 55%.  2nd Trial Tr. at 41-42, 59; *see also* Pl. Ex. 71 at 12 ¶ 62.  Retaining all of VTD 505 in District 71 similarly would have reduced the BVAP of that district below 55%.  Pl. Ex. 71 at 12 ¶ 62; 2nd Trial Tr. at 388-89.  Accordingly, the two incumbent delegates agreed to split VTD 505 and to allocate the largely white precinct between the two challenged districts.  2nd Trial Tr. at 41-42, 59, 182; *see also* Pl. Ex. 71 at 12 ¶ 62.

After considering the credibility of the witnesses and the documentary evidence, we conclude that race predominated in the construction of District 71.  Jones conceded that the low existing BVAP in the district required significant boundary changes to raise the BVAP above 55%.  His admission that the 55% BVAP threshold affected the

_____

[32] The data support this anecdotal evidence that race motivated the removal of VTD 207 from District 71.  Dr. Palmer's report showed that District 71 and District 68 swapped populations of about 3,000 people.  Pl. Ex. 71 at 43.  However, the BVAP of the areas moved into District 71 from 68 was about ten percentage points higher than the areas moved from District 71 into 68.  Pl. Ex. 71 at 17 ¶ 91, 43.  Without this swap, the BVAP of District 71 would have dipped below 55%.  Pl. Ex. 71 at 18-19 ¶ 91.  Clearly, swapping nearly identically sized groups was not needed to promote population equality, supporting the inference that these moves were racially motivated.

42

boundaries of District 71 is compelling direct evidence of racial predominance. *See* 2nd Trial Tr. at 532-33. Additionally, the 50 percentage point differential in BVAP between the populations moved in and out of the district shows a "stark split[] in the racial composition of populations moved into and out of" District 71. *Bethune-Hill*, 137 S. Ct. at 800; *see also Alabama*, 135 S. Ct. at 1271; Pl. Ex. 50 at 77. This discrepancy further was illustrated by the swaps of majority-white for majority-black VTDs that were made contrary to the wishes of the incumbents. And finally, the testimony of McClellan and McQuinn indicates that the legislature disregarded traditional districting principles, including incumbency protection and maintaining communities of interest, in order to achieve a 55% BVAP in District 71.

ii.

We turn to consider District 70. *See* DI Ex. 94 at 3. As previously discussed, the significant race-based maneuvers required to increase the BVAP of District 71 had a substantial impact on the boundaries of District 70. For this and other reasons, we conclude that race predominated in the construction of District 70.

In both the 2001 map and the 2011 map, District 70 included portions of the city of Richmond, Chesterfield County, and Henrico County. Pl. Ex. 50 at 69, 71. The incumbent, McQuinn, lived in Richmond and had served on the Richmond City School Board and the Richmond City Council for many years before being elected to the House of Delegates in 2009. 2nd Trial Tr. at 97-99. After observing McQuinn testify at the second trial, we find that her testimony was credible.

Unlike District 71, District 70 was not underpopulated, as it was within the one percent population requirement.  Pl. Ex. 50 at 72.  District 70 also satisfied the 55% BVAP threshold with a 61.8% BVAP.  Pl. Ex. 50 at 72.  However, because of its surplus BVAP, District 70 was treated as a BVAP "donor" for other challenged districts, resulting in the transfer of high BVAP areas from District 70 to neighboring Districts 71 and 69, which needed both population and BVAP.  Pl. Ex. 69 at 29; *see also* Pl. Ex. 50 at 36 ("[I]n order to accommodate the increase in BVAP in HD 71, HD[] 70 . . . gave up areas with high concentrations of adult African Americans.").  In particular, as discussed above, District 70 "donated" to District 71 high BVAP VTDs 701, 702, and part of 703. *See supra* pp. 39-40.  And to the northwest, District 70 "donated" VTD 811 (76% BVAP) and VTD 903 (64% BVAP) to District 69.  Pl. Ex. 69 at 29; DI Ex. 94 at 2-3.

Reflecting its "donor" status and ideal population numbers, nearly 26,000 people were moved out of District 70, and a different 26,000 were moved in.  Pl. Ex. 50 at 73. The BVAP of areas moved out of District 70 was more than 16 percentage points higher than the BVAP of the areas moved in.  Pl. Ex. 50 at 77.  As a result of these population shifts, the BVAP of District 70 dropped by over five percentage points, to 56.4% in the 2011 plan.  Pl. Ex. 50 at 72.

In our view, the primary factor driving these population shifts is plain.  No changes to the boundaries of District 70 were needed to ensure adequate population in that district, yet 26,000 people were shifted in a noticeable racial pattern.  Pl. Ex. 50 at 72-73.  It is clear that the 55% BVAP threshold for the challenged districts affected the boundaries of District 70, as Jones, McClellan, and McQuinn all testified that VTDs 701,

702, and part of 703 were removed from District 70 to ensure that the BVAP of District 71 reached 55%. 2nd Trial Tr. at 44, 103-04, 532-33, 538-39. We find that these population and VTD transfers were not made to achieve traditional districting goals, but instead were done to ensure a numerical minimum BVAP level in neighboring districts. For these reasons, we conclude that race was the predominant factor used in the construction of District 70.

iii.

We next consider District 69, which included portions of the city of Richmond and crossed the James River into Chesterfield County, in both the 2001 plan and the 2011 plan.[33] Pl. Ex. 50 at 69; Pl. Ex. 69 at 26; DI Ex. 94 at 2. We conclude that race predominated in the construction of District 69, which was affected by the race-based maneuvers in the other Richmond-area challenged districts.

District 69 was significantly underpopulated in 2011, and required an addition of about 8,700 people to satisfy the population equality requirement. Pl. Ex. 50 at 72; Pl. Ex. 69 at 26. District 69 had a 56.3% BVAP under the 2001 plan, and thus could not lose much BVAP to stay above 55% BVAP in the 2011 plan. Pl. Ex. 50 at 72. Jones offered little explanation for the line-drawing decisions in District 69, other than the fact that the district was underpopulated and that the incumbents in adjacent districts lived near one another. 1st Trial Tr. at 304, 309-11; 2nd Trial Tr. at 540-43.

---

[33] The incumbent in District 69 was Betsy Carr, who did not testify at either trial. Parties' Stipulations ¶ 17, Dkt. No. 208.

The characteristics of the areas moved into District 69 illustrate the importance of race. For example, non-challenged District 27, which bordered District 69 on the west, was overpopulated by 8,000 people, close to the population deficit existing in District 69. Pl. Ex. 69 at 14, 26. Instead of collecting largely white Chesterfield County precincts from District 27, however, District 69 *lost* two predominantly white Chesterfield precincts to District 27. Pl. Ex. 69 at 26; Pl. Ex. 71 at 43; 2nd Trial Tr. at 183-84. And despite the fact that District 70 was at equal population under the 2001 plan and already was serving as a "donor" to District 71, District 69 received multiple precincts from District 70. Pl. Ex. 69 at 26; 2nd Trial Tr. at 181-84; *see supra* p. 44 (District 70 as "donor" to 71). In particular, District 69 received several predominantly white precincts from District 70, which would have decreased the BVAP of District 69 below 55%. 2nd Trial Tr. at 181-83. Accordingly, District 69 also received two high-BVAP VTDs, 811 and 903, from District 70. Pl. Ex. 69 at 26; 2nd Trial Tr. at 181-83.

In both the VTDs split between District 69 and a non-challenged district, the portion of the split VTD allocated to District 69 had a higher BVAP than the portion of the split VTD allocated to the non-challenged district. Pl. Ex. 71 at 9 ¶ 37. For example, District 69 received 77% of the population from split VTD 410, but 93% of the VTD's BVAP. Pl. Ex. 71 at 9 ¶ 37, 32; *see also* 2nd Trial Tr. at 184-85. And, as discussed above, VTD 505 was split between District 69 and District 71 to ensure that neither district would obtain too many white voters from that VTD and drop the BVAP of those districts below 55%. Pl. Ex. 71 at 12 ¶ 62; 2nd Trial Tr. at 41-42, 59.

Ultimately, the BVAP of the populations moved in and out of District 69 to achieve population equality was nearly identical. Pl. Ex. 50 at 72, 77. In the 2011 plan, District 69 had a BVAP of 55.2%, just barely satisfying the 55% BVAP threshold. Pl. Ex. 50 at 72.

Based on this evidence, we reach the inescapable conclusion that race played a significant role in the district lines in the Richmond region as a whole, and that the legislature subordinated traditional districting criteria to race. With respect to District 69, the legislature faced limited options to remedy the significant population deficit in the district while also achieving compliance with the 55% BVAP threshold. Other than District 71 to the northeast and District 70 to the southeast, District 69 was bordered by majority-white districts. *See* Pl. Ex. 69 at 14. District 71 did not have population or BVAP to spare.[34] Accordingly, like District 71, District 69 received the advantage of the ability of District 70 to "donate" BVAP, which enabled District 69 to retain a 55% BVAP. Considering the relationship among, and the racial "needs" of, Districts 69, 70, and 71, we conclude that race played a predominant role in the construction of District 69.

iv.

We turn to consider District 63. The incumbent delegate in District 63, Rosalyn Dance, testified at both trials. *See* 1st Trial Tr. at 65; 2nd Trial Tr. at 111-12. Dance

---

[34] The relatively small number of people moved from District 71 to District 69 had a mere 5.1% BVAP. Pl. Ex. 71 at 43.

served as a member of the six-person House of Delegates Committee on Privileges and Elections during the 2011 redistricting cycle. 2nd Trial Tr. at 112. After considering Dance's testimony from the first and second trials, we find that her testimony was credible. We also conclude that overwhelming evidence demonstrated that race predominated in the drawing of District 63.

In the 2001 map, District 63 included portions of Chesterfield County, and all of Dinwiddie County and the city of Petersburg. Pl. Ex. 50 at 69. In the 2011 plan, District 63 still included part of Chesterfield County, added part of Prince George County and part of the city of Hopewell, and split Dinwiddie County with District 75. Pl. Ex. 50 at 69; Pl. Ex. 71 at 57. In addition to these new split geographies, eight VTDs were split in the 2011 plan, compared with zero split VTDs in the 2001 plan. Pl. Ex. 50 at 70. District 63 also experienced a drastic reduction in compactness between the 2001 plan and the 2011 plan. Pl. Ex. 50 at 70.

These departures from traditional districting principles were driven largely by the population and BVAP "needs" of neighboring District 75, which was located in the Southside area of Virginia. DI Ex. 94 at 6. As discussed above, this Court concluded after the first trial that race predominated in the drawing of District 75 but that the use of race there satisfied strict scrutiny, which decision the Supreme Court affirmed. *See Bethune-Hill*, 137 S. Ct. at 800-02.

The legislature faced several challenges in re-drawing District 75, which was underpopulated by more than 9,000 people and began with a BVAP of only 55.3%. Pl. Ex. 50 at 72. Because "[v]irtually all" the rural majority-black VTDs in the area already

were included in District 75, "drastic maneuvering" was required to ensure that the BVAP of District 75 remained above 55%. *Bethune-Hill*, 141 F. Supp. 3d at 555; *see also Bethune-Hill*, 137 S. Ct. at 796-97; Pl. Ex. 69 at 35. These maneuvers included the "avowedly racial" decision to split Dinwiddie County between District 75 and District 63. *Bethune-Hill*, 141 F. Supp. 3d at 553; Pl. Ex. 50 at 69; 1st Trial Tr. at 80-81.

Before these changes benefitting District 75 were made, District 63 also was significantly underpopulated and, as a result of the split of Dinwiddie County, lost considerable additional population and BVAP. Pl. Ex. 50 at 72; Pl. Ex. 69 at 35. Dance testified that, to compensate for this loss of BVAP, District 63 received the heavily black areas of the city of Hopewell and Prince George County, for the express purpose of increasing the district's BVAP to comply with the 55% BVAP requirement.[35] 2nd Trial Tr. at 116-17. The data corroborate Dance's explanation, showing, for example, that the division of Hopewell plainly tracked racial residential patterns, with the white portion of Hopewell assigned to non-challenged District 62. Pl. Ex. 71 at 15 ¶ 75, 37. Notably, the BVAP of the portion of Hopewell assigned to District 63 was *three times higher* than the portion of Hopewell assigned to District 62. Pl. Ex. 71 at 15 ¶ 75, 57.

---

[35] Dance testified that she asked to retain in her district the New Hope VTD, where a long-time supporter lived. 2nd Trial Tr. at 115, 121-22, 126-27. Dance also testified that, contrary to Jones' claim at the first trial that she requested an oddly shaped "hook" around New Hope to draw out a primary challenger, she had no such challenger in 2011 and had made no such request. 1st Trial Tr. at 326; 2nd Trial Tr. at 118. Although Dance faced a primary opponent in 2013, that candidate did not live in the affected "hook" area. 2nd Trial Tr. at 118. Jones equivocated on this issue in his testimony at the second trial. 2nd Trial Tr. at 493. We credit Dance's explanation over the account given by Jones.

The split of a particular VTD in Hopewell further illustrates the precision with which the map-drawers sought to separate black and white voters. Hopewell Ward 7 was split between Districts 63 and 62 along racial lines, following the boundaries of black and white neighborhoods. *See* Pl. Ex. 71 at 31. As a result, although District 63 received 29% of the total population of the Ward 7 VTD, District 63 received 51% of the BVAP of that VTD. *See* Pl. Ex. 69 at 38; Pl. Ex. 71 at 8 ¶ 32. This same pattern, in which District 63 received higher BVAP sections of split VTDs, was true for all four VTDs split between District 63 and a non-challenged district. Pl. Ex. 71 at 8 ¶ 32.

It is clear that the role of race in the construction of District 63 was inextricably intertwined with the race-based population shifts of District 75. After District 63 lost significant BVAP from Dinwiddie County to District 75, the map-drawers disregarded traditional districting principles to ensure that District 63 continued to comply with the 55% BVAP threshold. *See* 2nd Trial Tr. at 117. The map-drawers split geographies and VTDs precisely according to race. *See Bush*, 517 U.S. at 970-71 (principal opinion of O'Connor, J.) ("Given that the districting software used by the State provided only racial data at the block-by-block level, the fact that [the district] . . . splits voter tabulation districts and even individual streets in many places . . . suggests that racial criteria predominated . . . ." (internal citations omitted)). We therefore find that the configuration of District 63 cannot be explained by traditional, race-neutral districting principles. In light of this evidence, we conclude that race was the predominant factor in the construction of District 63.

v.

Finally, we consider the role of race in the configuration of District 74. District 74 experienced the ripple effect of the race-based decisions in the Richmond City districts as well as in District 63, to the southwest. *See* Pl. Ex. 69 at 14. Like the other Richmond/Tri-City districts, we conclude that race predominated in the construction of District 74.[36]

Under the 2001 plan, District 74 included Charles City County, and portions of Henrico County, the city of Hopewell, Prince George County, and the city of Richmond. Pl. Ex. 50 at 69. District 74 lost its portions of Prince George County and the city of Hopewell under the 2011 plan. Pl. Ex. 50 at 69. The 2001 version of the district was shaped like an axe with a long handle and was the least compact of all the challenged districts. Pl. Ex. 50 at 70; DI Ex. 94 at 5. The district maintained the same bizarre shape and low compactness score under both the 2001 and 2011 plans.[37] Pl. Ex. 50 at 70; DI Ex. 94 at 5.

District 74 was slightly overpopulated under the 2001 plan, but was still within the one percent population deviation allowance. Pl. Ex. 50 at 72. District 74 also had a very high BVAP of 62.7%. Pl. Ex. 50 at 72. Accordingly, like District 70, District 74 served as a "donor" district to surrounding challenged districts that needed an influx of BVAP to

---

[36] The incumbent in District 74, Joseph Morrissey, did not testify at either trial. Parties' Stipulations ¶ 17, Dkt. No. 208.

[37] Although District 74 retained the same compactness score after the 2011 redistricting, District 95 experienced a severe reduction in compactness, causing it to become the least compact of the challenged districts in the 2011 map. Pl. Ex. 50 at 70.

reach the 55% BVAP threshold. Pl. Ex. 69 at 15, 31-32. In furtherance of this goal, as discussed above, 16,414 people were moved out of District 74, and 15,855 were moved into that district. Pl. Ex. 50 at 73. Notably, the BVAP of the areas removed from District 74 and transferred to other challenged districts was 69%, whereas the BVAP of areas moved from District 74 to non-challenged districts was only 20.5%. Pl. Ex. 50 at 79. *See supra* p. 27 (noting that BVAP of areas sent from District 74 to challenged District 71 was 85.5%, but BVAP of areas sent from District 74 to non-challenged District 72 was 3.8% (citing Pl. Ex. 71 at 43)).

We pause to highlight some of the familiar areas that other challenged districts in the Richmond/Tri-City region received from District 74. For example, the high BVAP Ratcliffe VTD in Henrico County was "donated" to District 71 as part of that District's eastward shift to gain additional BVAP.[38] *See* Pl. Ex. 69 at 31-32; DI Ex. 94 at 4. District 74 also "donated" the high BVAP areas of Hopewell to District 63 to replace

---

[38] The intervenors assert that District 74 was not truly a "donor" district, because District 71 also had transferred a high BVAP population into District 74. DI Post-Trial Br. at 20. We observe, however, that District 74 "donated" about 5,500 *more* people to District 71 than District 74 received from 71. Pl. Ex. 71 at 43. Accordingly, although the BVAP percentage of the populations moved in and out of District 74 was about equal, more black voters were moved from District 74 into 71 than from District 71 into 74. Pl. Ex. 71 at 43. We also note that the term "donor" district does not suggest that those particular districts exclusively removed population, as even those districts had to retain population equality and 55% BVAP. Instead, the term "donor" is intended to describe the general phenomenon occurring between challenged districts with relatively high and low starting BVAP levels.

some of the BVAP that District 63 had lost to District 75 in Dinwiddie County.[39]  Pl. Ex. 69 at 31-32; 1st Trial Tr. at 80-83.

Moreover, in all three VTDs split between District 74 and a non-challenged district, the portion of the VTD allocated to District 74 had a higher BVAP than the portion allocated to a non-challenged district.  Pl. Ex. 71 at 9 ¶ 41, 53.  For example, District 74 retained 38% of the population of the Moody VTD, but received 85% of the VTD's BVAP.  Pl. Ex. 71 at 9 ¶ 41, 32.  In other words, the portion of the Moody VTD in District 74 had a 41.7% BVAP, whereas the BVAP of the portion of the Moody VTD in District 72 was only 4.3%.  Pl. Ex. 71 at 53.

As with the other Richmond/Tri-City region districts, we conclude that race predominated in the construction of District 74.  The irregular shape of the district is circumstantial evidence that the legislature subordinated traditional districting criteria to race.  *See Miller*, 515 U.S. at 913 (explaining that the bizarre shape of a district "may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines").  Additionally, we find that the line-drawing decisions in District 74 were made in

---

[39] Jones claimed that the city of Hopewell was moved into District 63 in order to remove a water crossing of the James River in District 74, and that the change was completely unrelated to race.  *See* DI Ex. 94 at 6; 1st Trial Tr. at 316-17; 2nd Trial Tr. at 480-81.  As discussed above, however, we conclude that high BVAP areas of Hopewell were given to District 63 for the purpose of increasing that district's BVAP. Nevertheless, even if we were to credit Jones' explanation, the attainment of a traditional districting principle, such as reducing water crossings, can co-exist with the predominant use of race.  *See Bethune-Hill*, 137 S. Ct. at 798-99.

response to the pressures of population and BVAP deficits in Richmond District 71, as well as the extreme population and BVAP "needs" of District 63, and were not made to pursue traditional districting goals. Accordingly, District 74 acted as a "donor" to other challenged districts, transferring population and geographic areas on a plainly racial basis and subordinating traditional districting criteria in the process.

B.

We turn to consider the North Hampton Roads region, otherwise known as "the peninsula," located in the Tidewater area of Virginia. Pl. Ex. 69 at 41; *see, e.g.*, Pl. Ex. 71 at 11. Challenged Districts 92 and 95 were located on the peninsula and included portions of the cities of Hampton and Newport News. Pl. Ex. 50 at 15 ¶ 37, 69; Pl. Ex. 69 at 41. Between 2001 and the 2010 census, the peninsula lost substantial population, resulting in severe underpopulation in Districts 92 and 95. Pl. Ex. 50 at 72; Pl. Ex. 69 at 46; DI Ex. 62. In addition to being bordered by bodies of water, Districts 92 and 95 were adjacent to large concentrations of white residents in other districts. Pl. Ex. 69 at 42-44; DI Ex. 94 at 13-14. Thus constrained by both geography and demographics, the legislature was required to add substantial population to Districts 92 and 95, while retaining a 55% BVAP in each. *See* Pl. Ex. 69 at 46.

Accordingly, the legislature undertook several patently race-based maneuvers to equalize population in these districts. Most notably, the legislature added a long, narrow appendage to District 95, which on its face disregarded traditional districting criteria. *See* Pl. Ex. 69 at 46-47. The appendage also split several VTDs, causing separation of predominantly black neighborhoods from predominantly white neighborhoods with

54

striking precision.  *See* Pl. Ex. 69 at 47.  Dr. Rodden could not "fathom" an explanation for these changes other than race.   Pl. Ex. 69 at 48.

In addition to these plainly racial splits of VTDs, the data also show more general illustrations of race-based line-drawing on the peninsula.   In the 2011 plan, all the majority-black VTDs in the vicinity of Districts 92 and 95 were included in one of those districts.  2nd Trial Tr. at 247.  The portions of the cities of Hampton and Newport News assigned to Districts 92 and 95 had substantially higher BVAP levels than the portions of those cities assigned to neighboring non-challenged districts.  Pl. Ex. 71 at 60.   For example, the portion of Hampton assigned to District 92 had a 60.7% BVAP, compared to the 27.9% BVAP in the areas of Hampton assigned to non-challenged District 91.  Pl. Ex. 71 at 60.

After considering the evidence as discussed below, we easily conclude that race was the predominant factor in the construction of Districts 92 and 95.

i.

We begin with District 95, which contained portions of the cities of Hampton and Newport News under both the 2001 and 2011 plans.[40]   Pl. Ex. 50 at 69, 71.  We conclude that the evidence overwhelmingly showed that race predominated in the construction of District 95.

---

[40] The incumbent in District 95, Mamye BaCote, did not testify at either trial. Parties' Stipulations ¶ 17, Dkt. No. 208.

Although District 95 had a high 61.6% BVAP, that district was the most underpopulated of all the challenged districts at the time of the 2010 census, with a population deficit of about 12,000 people. Pl. Ex. 50 at 72; Pl. Ex. 69 at 44. To add the thousands of residents required to equalize population, while still maintaining a minimum 55% BVAP, the legislature added a lengthy, narrow appendage to the northwest edge of the district. Pl. Ex. 69 at 46. This appendage caused a significant reduction in the compactness of District 95, leading to the worst compactness score in the entire 2011 plan. Pl. Ex. 50 at 8 ¶ 16, 70; DI Ex. 94 at 14.

Overall, the addition of the narrow appendage increased the number of split VTDs in District 95 from one in the 2001 plan to five in the 2011 plan.[41] Pl. Ex. 71 at 11, 50, 55. In all five instances, the BVAP of the portion of those VTDs allocated to District 95 was higher than the BVAP of the area allocated to a neighboring non-challenged district. Pl. Ex. 71 at 11 ¶ 54, 55. Accordingly, Dr. Palmer calculated a strong positive and statistically significant relationship between BVAP and the likelihood that a census block would be assigned to District 95. Pl. Ex. 71 at 11 ¶ 55. Dr. Palmer explained that a census block with a 75% BVAP was three times "more likely to be assigned to District 95" than a census block with a 25% BVAP. Pl. Ex. 71 at 11 ¶ 55. Dr. Palmer further determined that black residents previously located in non-challenged District 94 were

---

[41] We observe that Dr. Ansolabehere found that District 95 had six split VTDs in the 2011 plan, compared to the five split VTDs noted by Dr. Palmer. *See* Pl. Ex. 50 at 16, 70. This discrepancy has no effect on our analysis, and we thus proceed to consider the data provided by Dr. Palmer.

seven times more likely to be moved into District 95 than white residents. Pl. Ex. 71 at 19 ¶ 101.

To achieve these racial disparities, this appendage followed a "narrow corridor through white neighborhoods in order to reach a corridor" of black residents along a major highway and an additional thoroughfare. Pl. Ex. 69 at 46. The legislature split nearly every VTD at the northern end of this corridor, separating white and black voters "with remarkable precision." Pl. Ex. 69 at 46. As Dr. Rodden explained, the legislature split the four northernmost VTDs in the new appendage, namely, Jenkins, Denbigh, Epes, and Reservoir, "precisely at the point where black neighborhoods transitioned to white neighborhoods." Pl. Ex. 69 at 47. Indeed, the legislature drew the boundary in some cases along small residential streets, with the effect of including in District 95 multi-family housing occupied by black residents on one side of a street while excluding white residents living on the other side of the same street. Pl. Ex. 69 at 48. The dot density maps produced by Dr. Rodden plainly illustrate the precision with which these VTDs were split by race. *See* Pl. Ex. 69 at 47. As previously explained, only population, race, and ethnicity data were available at the census block level to aid in the division of VTDs by census block, precluding any conclusion that these VTDs were split on any basis other than race.[42]

---

[42] Morgan testified at length about his decisions to split the Reservoir, Epes, Denbigh, and Jenkins VTDs at the northern end of the narrow appendage. According to Morgan, his decisions were governed by two primary goals: (1) the need to equalize population in District 95, and (2) his desire to decrease Democratic voting strength in neighboring non-challenged District 93, by moving some heavily Democratic precincts (Continued)

The narrow appendage added significant black population to District 95, which allowed the district to "donate" BVAP to neighboring challenged District 92. Pl. Ex. 69 at 45, 48; 2nd Trial Tr. at 231. Accordingly, despite the 12,000-person population deficit in District 95, that district still *transferred* over 18,000 people into District 92. Pl. Ex. 50 at 72; Pl. Ex. 71 at 45. As discussed further below, the legislature moved three heavily black VTDs from District 95 into District 92, which shift included over 6,000 black residents of voting age, allowing District 92 both to achieve population equality and to satisfy the 55% BVAP threshold. Pl. Ex. 63 at 113; Pl. Ex. 69 at 48-49; 2nd Trial Tr. at 242.

In light of this evidence, we conclude that race was the predominant factor underlying the construction of District 95. The shape of the district, including the drastic reduction in compactness from the 2001 plan, is suspicious on its face. *See Miller*, 515 U.S. at 913 (explaining that the bizarre shape of a district "may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines"). More importantly, however, we cannot conceive of any race-neutral explanation for the

––––––––––––––––––––

from District 93 into District 95. 2nd Trial Tr. at 639-40, 675-79. Our prior conclusion that Morgan's testimony was not credible is well-illustrated here by the precision with which the VTDs in District 95 were split along racial lines, leaving no doubt that race was the legislature's predominant consideration.

added appendage, in which multiple VTDs were split precisely with the effect of dividing neighborhoods based on race.[43]

ii.

We turn to consider District 92,[44] which was contained wholly within the city of Hampton in both the 2001 and 2011 plans. Pl. Ex. 50 at 69. We conclude that race predominated in the construction of District 92.

Like District 95, District 92 had a starting BVAP of over 60%, but was significantly underpopulated by about 9,000 people. Pl. Ex. 50 at 72; Pl. Ex. 69 at 46. At first glance, compliance with certain traditional districting factors improved in District 92 after the 2011 redistricting. In particular, the district's compactness score improved from the 2001 plan, and the number of split VTDs declined from three to zero. Pl. Ex. 50 at 70. However, this lack of actual conflict with traditional districting criteria is not dispositive of our predominance inquiry. *See Bethune-Hill*, 137 S. Ct. at 797-99 (rejecting proposition that "actual conflict" with traditional districting principles is a threshold requirement for a finding of predominance). Here, we have "compelling

---

[43] In reaching this conclusion, we emphasize that race still may predominate even when a district has a starting BVAP considerably higher than 55%, as in Districts 92 and 95. As Dr. Rodden acknowledged, in such circumstances, there may be "many different ways to achieve the 55 percent target." 2nd Trial Tr. at 244. In the case of District 95, for example, the availability of other options to achieve the legislature's racial goal does not diminish our conclusion, based on stark circumstantial evidence, that the legislature added the appendage and split several VTDs predominantly on the basis of race.

[44] Jeion Ward was the incumbent delegate in District 92. Parties' Stipulations ¶ 17, Dkt. No. 208. She did not testify at either trial.

circumstantial evidence" of the legislature's predominant use of race in District 92. *Id.* at 799.

The evidence showed that the construction of District 92 was "intimately connected" with the plainly race-based decisions made in District 95. 2nd Trial Tr. at 229. As Dr. Rodden explained, we cannot "understand the districting decisions of one without thinking about the implications for the other" of the two districts, with respect to the need for population as well as the fixed 55% BVAP threshold. 2nd Trial Tr. at 229.

Despite the severe underpopulation of both districts, District 92 received population exclusively from District 95. Pl. Ex. 50 at 73; Pl. Ex. 71 at 45. After District 95 gained additional population and BVAP from its racially designed northward appendage, three VTDs with high BVAPs were moved from District 95 into District 92, totaling nearly 16,000 people.[45] Pl. Ex. 63 at 112; Pl. Ex. 71 at 45; 2nd Trial Tr. at 242. This transfer of the Mallory, Forrest, and Kraft VTDs was sufficient on its own to rectify the population deficit in District 92, and, as noted above, included over 6,000 black voting-age residents. Pl. Ex. 63 at 113; 2nd Trial Tr. at 242. Without this donation of significant population from District 95, the legislature would have been forced to expand the boundaries of District 92 into heavily white precincts, negatively impacting the BVAP level of District 92. *See* Pl. Ex. 69 at 46, 48 (Rodden: "[A]ny approach that was even remotely based on traditional redistricting principles would have ended up adding a

---

[45] The Wythe VTD also was transferred from District 95 to District 92. *See* DI Ex. 94 at 13-14. Wythe had a total population of 2,330, with a 17.6% BVAP. Pl. Ex. 63 at 113-14.

very substantial number of whites . . . [which] would have imperiled the 55 percent BVAP target.").

In sum, patently race-based maneuvers allowed District 95 to serve as a "donor" of population and BVAP to District 92, ensuring that the addition of thousands of people to District 92 would not decrease the BVAP of that district below 55%. Although District 92 appears to comply with certain traditional districting criteria, we find that race was "the actual consideration[] that provided the essential basis for the lines drawn." *Bethune-Hill*, 137 S. Ct. at 799. Accordingly, because the population moved into District 92 was controlled by the race-based decisions in District 95, we conclude that race was the predominant factor in the construction of District 92.

## C.

And finally, we turn to consider the four remaining challenged districts, Districts 77, 80, 89, and 90, which were located in the South Hampton Roads area of Tidewater. Pl. Ex. 69 at 41. These four districts included all or parts of the cities of Chesapeake, Norfolk, Portsmouth, Suffolk, and Virginia Beach. Pl. Ex. 50 at 69.

The legislature faced a unique challenge in re-drawing the districts in South Hampton Roads. One of the non-majority-minority districts in the 2001 map, District 87, was moved from the Tidewater area to Fairfax County in Northern Virginia to compensate for population growth in that region. 2nd Trial Tr. at 298-99. Additionally, like the challenged districts on the peninsula, Districts 77, 80, 89, and 90 were underpopulated, with limited options to gain significant population while retaining a

BVAP over 55%.  Pl. Ex. 50 at 72; Pl. Ex. 69 at 52.  Districts 80 and 89 also had BVAP

levels under 55% at the time of the 2010 census.  Pl. Ex. 50 at 72.  Accordingly, the

legislature engaged in complicated population-shifting maneuvers to sweep

concentrations of black residents into one of the challenged districts, and to respond to

the ripple effects of such population shifts throughout the region.

As in the Richmond/Tri-City region and on the peninsula, the prominent role of

race in drawing the challenged districts in South Hampton Roads is apparent.  Five cities

in the region were split between a challenged and a non-challenged district.  Pl. Ex. 71 at

16 ¶ 80.  In all five cases, the portion of the city allocated to a challenged district had a

"substantially higher BVAP" than the portion assigned to a non-challenged district.  Pl.

Ex. 71 at 16 ¶ 80, 59.  In total, the areas of these five cities assigned to challenged

districts had a 56.8% BVAP, whereas the areas of the cities assigned to non-challenged

districts had a 20% BVAP.  Pl. Ex. 71 at 16 ¶ 80.  And under the 2011 plan, one

neighborhood in downtown Norfolk was divided into three districts, and included a half-

mile stretch of roadway running through District 89, into 90, returning to 89, moving into

80, and ending in 90.  Pl. Ex. 69 at 51.  This bizarre configuration plainly disregarded

traditional districting principles.

Additionally, in five of the six cases involving the transfer of population from non-

challenged districts to challenged districts, the area sent to a challenged district had a

higher BVAP than the area retained in the non-challenged district.  Pl. Ex. 71 at 18 ¶ 93.

And conversely, in all four instances in which a challenged district had population

transferred to a non-challenged district, the area moved out of the challenged district had

a lower BVAP than that of the area retained in the challenged district. Pl. Ex. 71 at 18 ¶ 94.

The intervenors have offered numerous race-neutral explanations for certain line-drawing decisions in South Hampton Roads that otherwise appear racially motivated. As discussed further below, we decline to credit the majority of these post hoc justifications because they are belied by the record. After reviewing the evidence, we conclude that race predominated in the construction of Districts 77, 80, 89, and 90.

i.

We first consider District 80, which was the "lynchpin" to the redistricting of South Hampton Roads. Pl. Ex. 69 at 52. We conclude that race was the predominant factor underlying the drawing of District 80.

In the 2001 plan, District 80 included portions of the cities of Chesapeake, Norfolk, and Portsmouth. Pl. Ex. 50 at 69. As a result of the 2011 redistricting, District 80 also gained a portion of the city of Suffolk, thereby spanning four split municipalities. Pl. Ex. 50 at 69, 71. James, the incumbent delegate representing District 80, testified at the second trial. 2nd Trial Tr. at 68. After observing his demeanor and considering his testimony, we find that James testified credibly.

At the time of the 2010 census, District 80 was underpopulated by more than 9,000 people, and had a BVAP of 54.4%. Pl. Ex. 50 at 72; Pl. Ex. 69 at 52. The geography and demographics of the surrounding area hampered the legislature's ability to replenish the needed population while achieving the 55% BVAP requirement. At that time, District 80 was surrounded by largely white areas along the water and to the west of

the district.  Pl. Ex. 64 at 15; Pl. Ex. 69 at 52-53; *see also* 2nd Trial Tr. at 249.  On the eastern side of the district, District 80 shared a border with challenged District 89, and a border with challenged District 77.  Pl. Ex. 69 at 43; DI Ex. 94 at 8, 10.  District 89 had a significant population deficit and an even lower BVAP than District 80.  Pl. Ex. 50 at 72; *see also* 2nd Trial Tr. at 249-50.

To accommodate the interrelated needs of these challenged districts, the legislature removed more than 22,000 people from District 80, and replaced them with over 32,000 new residents.  Pl. Ex. 50 at 73.  As part of this population shift, the district shed about 14,000 people to neighboring non-challenged District 79.  Pl. Ex. 71 at 20 ¶ 105.  In that transfer, white residents were moved from District 80 to 79 at *three times the rate* of black residents, with a 29.4% BVAP in the transferred population.   Pl. Ex. 71 at 20, 44.  Overall, these huge population shifts decreased the compactness of District 80 and rendered the shape of the district bizarre on its face, resembling a sideways "S."  *See Miller*, 515 U.S. at 913 (explaining that bizarre shape of a district may be "persuasive circumstantial evidence" of racial predominance); Pl. Ex. 50 at 70; DI Ex. 94 at 10.

To create this sideways "S," District 80 added Portsmouth VTDs 33 and 34, which were predominantly white.  Pl. Ex. 63 at 124-25; DI Ex. 94 at 10.  VTDs 33 and 34 acted as a westward "bridge" into the VTDs of 38, Taylor Road, Yeates, and Harbour View, located in Portsmouth, Chesapeake, and Suffolk respectively, all of which had large

BVAP concentrations.[46] Pl. Ex. 63 at 106-07, 124-25, 127-28, 133-34; Pl. Ex. 69 at 53; DI Ex. 94 at 10; 2nd Trial Tr. at 252. As Dr. Rodden explained, this "bridge" "correspond[ed] directly to race," and reached these black neighborhoods in the four other identified VTDs "by bringing in the smallest possible number of whites." *See* Pl. Ex. 69 at 53-54; DI Ex. 94 at 10. The westward extension also added an additional water crossing to the district. DI Ex. 94 at 10; 2nd Trial Tr. at 252. We find that this oddly shaped westward extension of District 80 was constructed primarily on the basis of race, and cannot be explained otherwise as reflecting the application of traditional redistricting principles.

Although District 80 had only one populated VTD that was split in the 2011 plan, the nature of that split exhibited a stark racial division. Pl. Ex. 50 at 70; Pl. Ex. 71 at 54. The BVAP of the portion of VTD Nine assigned to District 80 was over 98%, whereas the BVAP of the portion of that VTD assigned to District 79 was more than 30 percentage points lower. Pl. Ex. 71 at 54.

And finally, as previously discussed, we reject Jones' contention at the first trial that the incumbent James offered "significant input" regarding the drawing of District 80. 1st Trial Tr. at 348-49. James flatly contradicted this assertion at the second trial, testifying credibly that he had no input in the redistricting process. 2nd Trial Tr. at 71-

---

[46] The dissent correctly notes that the Taylor Road and Harbour View VTDs had BVAP levels slightly under 50%. Dissent Op. at 166-67 & n.42. Although these two VTDs were not majority-black, the BVAPs of these VTDs nevertheless far surpassed the single-digit BVAPs of the "bridge" VTDs. *See* Pl. Ex. 63 at 106-07, 124-25, 133-34.

73.  Moreover, Jones equivocated at the second trial regarding the extent to which the wishes of James influenced the line-drawing decisions in District 80.[47]  2nd Trial Tr. at 499.

In sum, after the 2011 redistricting, District 80 exhibited a shape that was bizarre on its face, experienced a significant reduction in compactness, and underwent massive population shifts showing distinct racial patterns.  We find that the intervenors' proffered justifications for these apparently racially motivated changes are not credible.[48]  We therefore conclude that race predominated in the drawing of District 80.

ii.

We turn to consider District 89,[49] which was contained entirely within the city of Norfolk in both the 2001 and 2011 plans, but nevertheless experienced a significant reduction in compactness after the 2011 redistricting.  Pl. Ex. 50 at 69-70.  We conclude that race was the predominant factor in the construction of District 89.

---

[47] We also observe that certain of the changes to District 80 plainly were not beneficial to James, such as the loss of the Berkley VTD discussed further below, where James most recently had won 96% of the vote.  2nd Trial Tr. at 251-52.

[48] Morgan also testified that certain decisions regarding the boundaries of District 80 were based on the preference of the incumbent in District 79, Johnny Joannou, who did not testify at the first trial and had died by the time of the second trial.  2nd Trial Tr. at 653-56.  Although, as previously explained, we do not credit Morgan's testimony, an incumbent's preference is not mutually exclusive with a finding of racial predominance.

[49] District 89 was represented by incumbent Delegate Kenneth Alexander, who did not testify at either trial.  Parties' Stipulations ¶ 17, Dkt. No. 208.

As in District 80, District 89 began with a BVAP under the 55% threshold. Pl. Ex. 50 at 72. Indeed, at the time of the 2010 census, District 89 had the lowest BVAP of any challenged district in the entire South Hampton Roads region, at 52.5%. Pl. Ex. 50 at 72. Also like District 80, District 89 was significantly underpopulated, and needed more than 5,700 additional people. Pl. Ex. 50 at 72; Pl. Ex. 69 at 55. The legislature therefore made several decisions to bolster both the overall population and the BVAP level of District 89, ultimately achieving a BVAP of only 55.5%. Pl. Ex. 50 at 72.

As a result of the legislature's race-based maneuvers, there was a strong positive and statistically significant relationship between the BVAP of a census block and its likelihood of being assigned to District 89. In particular, a census block with a 75% BVAP was 2.9 times more likely to be allocated to District 89 than a census block with only a 25% BVAP. Pl. Ex. 71 at 11 ¶ 52, 51.

As in many other challenged districts, the legislature demonstrated its racial motive in the way certain VTDs were split. In two of the three VTDs split between District 89 and a neighboring non-challenged district, the portion of the VTD allocated to District 89 had a higher BVAP than the portion allocated to the non-challenged district.[50] Pl. Ex. 71 at 10 ¶ 50. The 2011 plan also split the Brambleton VTD between challenged Districts 89 and 90. Pl. Ex. 71 at 56. This change resulted in over 4,000 people, with a

---

[50] The single exception to this pattern is the Zion Grace VTD, in which the portion of the VTD assigned to District 89 had a lower BVAP than the portion assigned to non-challenged District 79. Pl. Ex. 71 at 11 ¶ 51. Notably, however, the Zion Grace VTD assigned a very small portion of its population to District 89. Pl. Ex. 71 at 11 ¶¶ 51, 54.

96% BVAP, being split between the two challenged districts, and more than 1,000 black voting-age residents being moved into District 89. Pl. Ex. 71 at 12-13 ¶ 64, 56. Although the Brambleton VTD previously was contained entirely within challenged District 90, this split was required for District 89 to achieve the 55% BVAP threshold. Pl. Ex. 71 at 12-13 ¶ 64. As Dr. Palmer explained, if District 89 had not received its portion of Brambleton, the BVAP of the district would have fallen to 54.7%. Pl. Ex. 71 at 12-13 ¶ 64.

In addition to Brambleton, District 89 received the predominantly black Berkley VTD from District 80. Pl. Ex. 63 at 121-22; Pl. Ex. 69 at 55; DI Ex. 94 at 11; 2nd Trial Tr. at 260. District 89 had been located entirely north of the Elizabeth River in the 2001 plan. Pl. Ex. 69 at 55; DI Ex. 94 at 11. The addition of Berkley to District 89, however, added a water crossing to District 89 in order to reach that single VTD. Pl. Ex. 69 at 55; DI Ex. 94 at 11. In our view, the reason for the transfer of the Berkley VTD is clear: Berkley had a BVAP of over 95%, totaling over 2,200 voting-age black residents. Pl. Ex. 63 at 121-22.

In contrast to gaining the heavily black Berkley VTD on the south side of the district, District 89 lost the largely white Suburban Park VTD on the north side. *See* Pl. Ex. 63 at 121-22; DI Ex. 94 at 11; 2nd Trial Tr. at 255. These two VTDs had similar overall populations, but differed in their racial composition. Pl. Ex. 63 at 121. Additionally, the legislature split the Granby VTD, which bordered Suburban Park, with minute precision to include black residents in District 89 while excluding white Granby residents. Pl. Ex. 69 at 58; 2nd Trial Tr. at 256-57. This race-based population split was

accomplished in the Granby VTD by the legislature adding to District 89 an appendage encompassing significant numbers of black residents, while carving a sliver out of the middle of the Granby VTD to exclude a narrow band of white residents.[51]  Pl. Ex. 69 at 57-58; DI Ex. 94 at 11.  We agree with Dr. Rodden's assessment that it was "very unlikely" that the legislature would have achieved this precise racial split of the Granby VTD as a coincidental side effect of equalizing population.  2nd Trial Tr. at 256.

In conclusion, like many other challenged districts, the legislature moved VTDs in and out of District 89 based on racial composition, and split VTDs clearly along racial lines, in order to achieve the 55% BVAP threshold.  We find that these racial patterns were not coincidental to the attainment of traditional districting goals, but that the legislature was motivated primarily by race in drawing the boundaries of District 89.  For these reasons, we conclude that race was the predominant factor in the construction of District 89.

iii.

We now consider the role of race in the configuration of District 77, the third challenged district in South Hampton Roads.  Like Districts 80 and 89, we conclude that race predominated in the construction of District 77.

---

[51] Although Jones testified at the first trial that he drew this oddly shaped northern boundary of District 89 to include a business owned by the incumbent, that business was actually located in the Suburban Park VTD that was removed from the district.  2nd Trial Tr. at 257.  Jones conceded at the second trial that he was mistaken about the location of the business.  2nd Trial Tr. at 504-05.

In both the 2001 plan and the 2011 plan, District 77 included portions of the cities of Suffolk and Chesapeake, connected by a narrow east-west corridor in the middle of the district. Pl. Ex. 50 at 69; DI Ex. 94 at 8. District 77 already had an odd shape and an extremely low compactness score under the 2001 plan. Pl. Ex. 50 at 70; DI Ex. 94 at 8. The boundaries of the 2001 version of District 77 extracted black residents from Chesapeake, "divide[d] [black residents] in suburban Portsmouth into two segments so as to share them between Districts 77 and 80," and extended into Suffolk so that black residents "on one side of town were separated from whites on the other." Pl. Ex. 69 at 62; *see also* 2nd Trial Tr. at 266. District 77 retained this general shape and low compactness score in the 2011 plan. Pl. Ex. 50 at 70; DI Ex. 94 at 8.

At the time of the 2010 census, District 77 had a BVAP of 57.6%, and was the least underpopulated of the challenged districts in Hampton Roads, with a population deficit of about 3,000 people. Pl. Ex. 50 at 72. Despite this relatively minor underpopulation, the legislature moved more than 18,000 people out of District 77, and replaced them with about 21,000 others. Pl. Ex. 50 at 73. The legislature engaged in this large population shift to account for the ripple effect of the 55% BVAP threshold throughout South Hampton Roads, and particularly to ensure that both District 77 and neighboring challenged District 90 met the 55% BVAP requirement.

Initially, four largely white Chesapeake VTDs in District 90 were transferred to District 77, namely, Oaklette, Tanglewood, Indian River, and Norfolk Highlands. Pl. Ex. 63 at 106-07; 2nd Trial Tr. at 266-68. This removal of white residents from District 90 was necessary for that district to attain a 55% BVAP. Pl. Ex. 69 at 64-65, 67.

To compensate for this influx of white residents from District 90, District 77 lost four other majority-white VTDs, namely, Westover, Geneva Park, River Walk, and E.W. Chittum School. Pl. Ex. 63 at 106-07, 109-10; Pl. Ex. 69 at 65; DI Ex. 94 at 8; 2nd Trial Tr. at 269. By removing the Geneva Park VTD, the already-narrow corridor linking the Chesapeake and Suffolk portions of the district narrowed further, to a half-mile in width. Pl. Ex. 69 at 66. As a result of this narrowing, no east-west roads within District 77 connected the eastern and western parts of the district. Pl. Ex. 69 at 66; 2nd Trial Tr. at 271; *see Page*, 2015 WL 3604029, at *11 (explaining that the presence of "irregularities in the application" of the contiguity principle may be "circumstantial evidence . . . that contributes to the overall conclusion that the district's boundaries were drawn with a focus on race"). This east-west corridor "generate[d] the starkest possible segregation of blacks and whites." Pl. Ex. 69 at 67. District 77 needed to retain the high BVAP Suffolk VTDs of Southside, Hollywood, and White Marsh to achieve a 55% BVAP. Pl. Ex. 63 at 133-34; Pl. Ex. 69 at 66. Accordingly, District 77 had to maintain some minimal connection between the Chesapeake and Suffolk precincts to remain a contiguous district. *See* DI Ex. 94 at 8.

We reject the intervenors' contention, asserted by Jones at the first trial, that some changes to the Chesapeake portion of the district were made at the request of the District 77 incumbent, Delegate Lionell Spruill Sr. Parties' Stipulations ¶ 17, Dkt. No. 208. According to Jones, Spruill requested that the city of Old South Norfolk be reunited into District 77 by moving certain precincts into the district. 1st Trial Tr. at 334-37. In addition to our reservations about the inconsistencies and stark variations in Jones'

testimony between the first and second trials, we decline to credit this explanation given by Jones for independent reasons. First, and notably, despite relying heavily on Spruill's alleged input, the intervenors failed to call him as a witness at either trial to corroborate their theory. And second, this reunification did not actually occur. District 77 *lost* the low-BVAP Westover VTD, which also had been part of Old South Norfolk. Pl. Ex. 69 at 64; 2nd Trial Tr. at 268.

And finally, as in other challenged districts, the overall population data and race-based splits of VTDs illustrate the prominence of the legislature's racial motive. *See* 2nd Trial Tr. at 274. There was a positive and statistically significant relationship between the BVAP of a census block and the likelihood of that census block being assigned to District 77. A census block with a 75% BVAP was 2.5 times more likely to be assigned to District 77 than a census block with a 25% BVAP. Pl. Ex. 71 at 10 ¶ 45. Additionally, in both the VTDs split between District 77 and a non-challenged district, the portion allocated to District 77 had a much higher BVAP than the portion assigned to the neighboring non-challenged district. Pl. Ex. 71 at 54. For example, in the Suffolk VTD of Lakeside, the BVAP of the portion of the VTD allocated to District 77 was 79.4%, while the BVAP of the area assigned to non-challenged District 76 was 36.1%. Pl. Ex. 71 at 54. In the case of another split VTD, District 77 received 75% of the population of the John F. Kennedy VTD, but received 96% of the BVAP. Pl. Ex. 71 at 10 ¶ 44, 33.

Overwhelming evidence supports our conclusion that the legislature predominantly relied on race in constructing District 77. To the extent that the district retained lines that previously were drawn based on race, we infer that race similarly

influenced the legislature's decision to retain those lines. *See generally Miller*, 515 U.S. at 916 (explaining that the focus of the predominance analysis is whether "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district"). The creation of an exceptionally narrow corridor to connect pockets of black residents in two cities, without including an avenue for constituents or delegates to travel along that corridor, is strong evidence that the legislature subordinated traditional districting criteria to race.

iv.

We conclude our evaluation of South Hampton Roads with District 90. Because the redistricting decisions made in that district were integrally connected with the race-based decisions made elsewhere in South Hampton Roads, we conclude that race predominated in the drawing of District 90.

In the 2001 plan, District 90 included portions of the cities of Chesapeake, Norfolk, and Virginia Beach. Pl. Ex. 50 at 69. After the 2011 redistricting, District 90 lost its precincts located in Chesapeake, and thus covered only two split municipalities. Pl. Ex. 50 at 69. The district also improved in compactness in the 2011 plan, and retained the same number of split VTDs. Pl. Ex. 50 at 70.

As previously discussed with respect to District 92, however, these consistencies with traditional districting criteria do not end our analysis of racial predominance. *See Bethune-Hill*, 137 S. Ct. at 798-99. Instead of limiting our inquiry to the shape of a district, we look to "the actual considerations that provided the essential basis for the lines drawn." *Id.* at 799.

At the time of the 2010 census, District 90 was significantly underpopulated by nearly 9,000 people, and had a BVAP of 56.9%. Pl. Ex. 50 at 72; Pl. Ex. 69 at 59. District 90 shared a border with two other challenged districts, namely, Districts 77 and 89. Pl. Ex. 69 at 43; DI Ex. 94 at 12. Consistent with the pattern seen elsewhere in South Hampton Roads, more than 18,000 people were moved out of District 90, and were replaced by nearly 28,000 others. Pl. Ex. 50 at 73.

We already have discussed specific population shifts involving District 90, which we will reiterate briefly here. These shifts ensured that either District 90 or another one of the challenged districts in the area attained both population equality and a minimum 55% BVAP. 2nd Trial Tr. at 265.

First, District 90 lost the heavily white VTDs of Oaklette, Tanglewood, Indian River, and Norfolk Highlands to District 77, forcing the shedding from District 77 of other areas with significant white population. Pl. Ex. 63 at 106-07; Pl. Ex. 69 at 64-65; 2nd Trial Tr. at 266-68. The BVAP of District 90 would have dropped below 55% had District 90 retained the white population contained in these VTDs. Pl. Ex. 69 at 67.

Second, although the Brambleton VTD previously had been located wholly within District 90, the VTD was split in the 2011 plan between Districts 90 and 89. Pl. Ex. 71 at 12-13 ¶ 64. The Brambleton VTD had a large overall population and a 96% BVAP, without which District 89 could not have reached the 55% BVAP threshold. Pl. Ex. 71 at 12-13 ¶ 64. Overall, by transferring 4,000 people from District 90 to District 89, including a portion of Brambleton and a neighboring overwhelmingly black VTD,

District 89 gained population with a 94.1% BVAP.  Pl. Ex. 63 at 121-22; Pl. Ex. 71 at 44; DI Ex. 94 at 11-12.

Like many other challenged districts, the legislature also split VTDs between District 90 and non-challenged districts precisely along racial lines.  2nd Trial Tr. at 264. In all three such cases, the portion of the split VTD allocated to District 90 had a higher BVAP than the portion allocated to a neighboring non-challenged district.  Pl. Ex. 71 at 54.  Notably, for example, the BVAP of the portion of the Aragona VTD in District 90 was 61.6%, compared with the 19% BVAP in the portion of Aragona assigned to non-challenged District 85.   Pl. Ex. 71 at 54.  Dr. Rodden's dot density maps illustrate the specificity with which the Aragona, Shell, and Reon VTDs were split to separate black and white populations.  Pl. Ex. 69 at 60-61; 2nd Trial Tr. at 263-64.

And finally, we reject the intervenors' contention that any lines in District 90 were drawn at the request of Howell, the incumbent delegate.  Although Howell was a member of the House redistricting subcommittee, he testified at the second trial[52] that he played a minimal role in the 2011 redistricting process.  2nd Trial Tr. at 82.  Directly contrary to Jones' testimony at the first trial, Howell stated that he did not have "extensive input" into the drawing of his or any other district, but instead had a single discussion with Jones about District 90 only after the map was drawn.  1st Trial Tr. at 338-39, 343; 2nd Trial Tr. at 82-83.  We credit Howell's testimony on this point over Jones' account.

---

[52] Howell did not testify at the first trial.

The ripple effect of population and BVAP needs throughout South Hampton Roads heavily influenced the drawing of District 90. To ensure that District 90 and the other challenged districts all could achieve the 55% BVAP threshold, District 90 was required to incorporate population movements and split VTDs that were configured on a racial basis. Although, like District 92, District 90 appeared to comply with some traditional districting criteria, we find that the "actual considerations" the legislature used to draw District 90 were based on race, not on traditional districting goals. *Bethune-Hill*, 137 S. Ct. at 799. Accordingly, we conclude that race was the predominant factor in the drawing of District 90.

D.

Our conclusion that race predominated in the construction of the 11 remaining challenged districts is not altered by the intervenors' post hoc justifications. *See id.* ("The racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not post hoc justifications the legislature in theory could have used but in reality did not." (emphasis omitted)). As discussed above, during the first trial, the intervenors defended against the plaintiffs' assertion of racial predominance by denying the use of a fixed 55% BVAP target. *See* 1st Trial Tr. at 280-81, 406, 409. That issue has been decided against the intervenors and is now settled. *See id.* at 795-99; *supra* pp. 17-18.

Bound by the 55% BVAP requirement, the intervenors have not produced a consistent theory otherwise to explain the apparently race-based boundaries of the 11 remaining challenged districts. The intervenors rely heavily on the fact that many of the

76

challenged districts were severely underpopulated and required significant population shifts to achieve equal population. *See, e.g.*, 2nd Trial Tr. at 476. The intervenors also contend that VTDs were split at the end of the redistricting process for the purpose of equalizing population. DI Post-Trial Br. at 13.

Although the need for population redistribution in the challenged districts was undisputed, the need for population equalization does not explain why the legislature selected certain boundary lines over others. The Supreme Court has been very clear that

> an equal population goal is not one factor among others to be weighed against the use of race to determine whether race "predominates." Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met.

*Alabama*, 135 S. Ct. at 1270. Accordingly, to determine whether race predominated, we consider "whether the legislature placed race above traditional districting considerations in determining *which* persons were placed *in appropriately apportioned districts*." *Id.* at 1271 (internal quotation marks omitted). We therefore reject the intervenors' reliance on population equalization as a factor weighing against the use of race in the creation of the challenged districts.

We similarly reject the intervenors' claim, advanced at the second trial, that "core retention"[53] was the legislature's primary redistricting consideration. *See* DI Post-Trial

---

[53] At the first trial, the intervenors' expert, Dr. M.V. Hood, III, defined "core retention" as "the percentage of the new district that is comprised of the former district," or "how many constituents the member took across the election cycle with them to their new district." 1st Trial Tr. at 597, 612-13; *see also infra* note 60.

Br. at 18-19. Core retention is a necessary feature of nearly every redistricting, unless a district is moved entirely, because a new district necessarily will involve at least some change to the original geography. For example, a district with 90% core retention still may have selected the remaining 10% of its population based exclusively on race. Accordingly, core retention tells us very little about "*which* voters the legislature decides to choose" in shifting its boundaries, and thus "is not directly relevant to the origin of the *new* district inhabitants." *Id.*

### E.

In summary, after "exercis[ing] [the] extraordinary caution" required of our predominance inquiry, we find as a matter of fact that the legislature subordinated traditional districting criteria to racial considerations. *Bethune-Hill*, 137 S. Ct. at 797 (citation omitted); *see also Abbott*, slip op. at 21. We therefore conclude that race predominated in the construction of all the 11 remaining challenged districts.

In reaching this conclusion, we emphasize several salient points. Critical to our analysis is our decision not to credit Jones' testimony, and our determination that Morgan's testimony was wholly lacking in credibility. These adverse credibility findings are not limited to particular assertions of these witnesses, but instead wholly undermine the content of Jones' and Morgan's testimony. As the dissent acknowledges, our credibility findings are "outcome-determinative" in this case. Dissent Op. at 94.

We nevertheless recognize that race was not the only factor that the legislature used in fashioning the challenged districts, and that the legislature relied on traditional districting criteria in making certain line-drawing decisions. However, the existence of

race-neutral explanations for specific district lines is not dispositive of our predominance inquiry, under which we apply a "holistic analysis" to determine "the legislature's predominant motive for the design of the district *as a whole*." *Bethune-Hill*, 137 S. Ct. at 800 (emphasis added). The Supreme Court has cautioned that "any explanation for a particular portion of the lines . . . must take account of the districtwide context." *Id.* And, as discussed above, the legislature may achieve a legitimate districting goal while also predominantly relying on race, as "actual conflict" with traditional principles is not required to prove predominance. *Id.* at 797-98.

As part of our holistic analysis, we observe that the fates of the 11 remaining challenged districts in this case were inextricably intertwined. Due to their starting population and BVAP, some of the challenged districts were able to serve as "donors" of BVAP and population to nearby challenged districts. Other districts, faced with deficits in these areas, received BVAP and population from other districts in order to achieve a 55% BVAP. Sometimes, multiple challenged districts in a region split areas with substantial black populations in order to boost each district's BVAP. *See, e.g.*, Pl. Ex. 71 at 12-13 ¶ 64. Conversely, challenged districts split predominantly white areas so as to disperse the white population and not unduly dilute the BVAP of a challenged district. *See, e.g.*, Pl. Ex. 71 at 12 ¶ 62; 2nd Trial Tr. at 41-42, 59. In light of this interconnectedness between districts, we have considered the effects of racial maneuvers made in one challenged district on other challenged districts in the region.

Common to all the challenged districts, however, was the legislature's application of "an express racial target" of 55% BVAP. *Bethune-Hill*, 137 S. Ct. at 800. Although

not dispositive to our predominance determination, this fixed target is evidence of the legislature's consideration of race. *See id.*; *Alabama*, 135 S. Ct. at 1267 (explaining that when a state legislature "expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria," this use of a racial target "provides evidence that race motivated the drawing of particular lines").

The evidence presented at trial showed that this 55% BVAP threshold had a predominating impact on the manner in which lines were drawn in each of the challenged districts. In general, the legislature was constrained in its ability to achieve the 55% threshold while equalizing population in each district, given the severe underpopulation of at least one district in each region and the geographic dispersal of high-BVAP areas. Accordingly, the legislature shifted huge numbers of voters between districts, in some cases replacing thousands of voters in adequately populated districts with the same number of new voters. *See* Pl. Ex. 50 at 72-73. These population shifts frequently exhibited "stark splits in the racial composition of populations moved into and out of disparate parts of the district." *Bethune-Hill*, 137 S. Ct. at 800; *see* Pl. Ex. 50 at 77.

In addition to these overall population figures, the legislature also engaged in a distinct pattern of splitting VTDs to divide concentrations of black and white voters, assigning portions of VTDs with large concentrations of black voters to challenged districts, and allocating heavily white areas to neighboring non-challenged districts. We find entirely lacking in credibility the intervenors' explanation that these splits were made for any reason other than race. In our view, the precision with which such splits separated neighborhoods based on racial make-up, including dividing a VTD down the

middle of a street, speaks for itself.  *See* Pl. Ex. 69 at 38-39 & Figure 12, 47.  Such a precise racial segregation of voters was not the result of happenstance.

To the extent that the intervenors assert that partisan advantage rather than race explains some of these VTD splits, we also reject this argument.  We again emphasize that we do not find Morgan's explanations for his line-drawing decisions credible.  And critically, political party performance data was *not available* to the map-drawers at the census block level.  Accordingly, if the legislature sought to achieve partisan advantage by splitting VTDs, the legislature did so by using race as a proxy for political affiliation.  Indeed, the intervenors' expert Dr. Katz explicitly endorsed use of race, due to the correlation between race and political preference, as the foundation for "partisan" line-drawing decisions.  *See supra* note 24.

Moreover, we credit Dr. Palmer's unequivocal conclusion that race rather than party predominated in the challenged districts, because "the effect of race is much larger than that of party in the assignment of VTDs to challenged districts."  Pl. Ex. 71 at 24 ¶¶ 123, 125.  In fact, Dr. Palmer discovered "no substantive effect of Democratic vote share on the assignment of a VTD to a challenged district."  Pl. Ex. 71 at 24 ¶ 123; *see also* Pl. Ex. 71 at 63.  Based on this evidence, we hold that the legislature's reliance on race as a proxy for political affiliation is subject to strict scrutiny.  *Bush*, 517 U.S. at 968-73 (principal opinion of O'Connor, J.).

And finally, the plaintiffs produced credible anecdotal evidence corroborating the pattern of racial predominance illustrated by the statistical data.  Most notably, McClellan and McQuinn testified unequivocally that certain changes to Districts 71 and 70 were

made for the express purpose of increasing the BVAP of District 71 to achieve the 55% threshold. 2nd Trial Tr. at 36, 39, 103-04. Dance similarly testified that she received certain predominantly black areas, including a portion of the racially divided city of Hopewell, for the purpose of increasing the BVAP of District 63. 2nd Trial Tr. at 112, 116-17. This and similar testimony is "direct evidence going to legislative purpose," showing "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Alabama*, 135 S. Ct. at 1267 (quoting *Miller*, 515 U.S. at 916).

## V.

Because we conclude that the plaintiffs have established racial predominance, we must evaluate whether the intervenors have shown that the "districting legislation is narrowly tailored to achieve a compelling interest." *Bethune-Hill*, 137 S. Ct. at 801 (quoting *Miller*, 515 U.S. at 920). Assuming without deciding that compliance with Section 5 of the VRA is a compelling state interest, we consider whether the intervenors have met their burden to show that the legislature had a "strong basis in evidence" for its predominant use of race in the challenged districts. *Alabama*, 135 S. Ct. at 1274 (citation omitted). In other words, the intervenors were required to prove that the legislature had "good reasons to believe" that its use of race was required to comply with Section 5. *Id.* (citation and emphasis omitted).

At the time of the 2011 redistricting, Section 5 prohibited the legislature "from adopting any districting change that would 'have the effect of diminishing the ability of

[members of a minority group] to elect their preferred candidates of choice.'" *Bethune-Hill*, 137 S. Ct. at 801 (quoting 52 U.S.C. § 10304(b)). The Department of Justice mandated that the legislature engage in a "functional analysis of the electoral behavior within the particular . . . election district" to determine the proportion of black voters necessary to achieve Section 5 compliance in that district. *Id.* (quoting *Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act*, 76 Fed. Reg. 7471 (2011)). With this standard in mind, we turn to consider the evidence underlying the legislature's decision to apply the 55% BVAP requirement to the challenged districts.

As an initial matter, we find that the legislature's application of a single, "mechanically numerical" 55% BVAP requirement to all 12 challenged districts strongly suggests that the legislature did not engage in narrow tailoring. *See Alabama*, 135 S. Ct. at 1273. The 12 challenged districts were highly dissimilar in character, spanning four large geographic regions of the state, including varied urban, suburban, and rural areas. As discussed further below, the 12 districts also exhibited significant differences in Democratic voting strength, electoral history, and the extent to which white and black voters supported the same candidates. The legislature nevertheless adopted an across-the-board BVAP threshold irrespective of these defining differences.

After the first trial, this Court found that the source of the 55% threshold was "an analysis of [District] 75 itself." *Bethune-Hill*, 141 F. Supp. 3d at 558. On appeal, the Supreme Court affirmed this Court's conclusion that the intervenors adequately justified the use of the 55% BVAP in District 75, based on Jones' "functional analysis" of the conditions in that district. *See Bethune-Hill*, 137 S. Ct. at 801-02. The Supreme Court

reiterated this Court's finding that the 55% figure was chosen "based largely on concerns pertaining to the re-election of [the incumbent] in District 75." *Id.* at 796 (brackets omitted) (quoting 141 F. Supp. 3d at 522).

In contrast to this "functional analysis" of District 75, the intervenors produced no evidence at either trial showing that the legislature engaged in an analysis of *any* kind to determine the percentage of black voters necessary to comply with Section 5 in the 11 remaining challenged districts. Jones admitted as much, testifying that, among other things, he did not compile recent election results in all the challenged districts, 1st Trial Tr. at 453, did not consider that the majority-minority districts in the 2011 state Senate map all had less than 55% BVAP, 1st Trial Tr. at 468, did not examine other plans that were precleared or rejected by the Department of Justice, 1st Trial Tr. at 469, and did not conduct an analysis to determine whether white and black voters tended to vote for the same candidates, or exhibited polarized voting behavior, in any of the challenged districts, 1st Trial Tr. at 469; 2nd Trial Tr. at 570. Moreover, the intervenors did not produce a single member of the black caucus at either trial to testify that the 55% BVAP requirement was imposed to allow black voters in those districts to elect a candidate of their choice.[54]

---

[54] Jones suggested that he spoke with the incumbent delegates in the challenged districts regarding what BVAP percentage would be needed to avoid retrogression under Section 5. 2nd Trial Tr. at 570. Contrary to this contention, however, every member of the black caucus who testified stated that they never told Jones that a 55% BVAP was required in their districts. 2nd Trial Tr. at 54, 72, 85-86, 107, 110, 121, 131-32, 139. McClellan further testified that she did not believe that a 55% BVAP was necessary in District 71. 2nd Trial Tr. at 54.

(Continued)

Rather than conducting an individualized assessment of each district, Jones applied the 55% figure from District 75 across the board to all the challenged districts. 2nd Trial Tr. at 566. In doing so, Jones conceded that he did not compare the other districts with District 75 on factors relevant to black voters' ability to elect their preferred candidates. 2nd Trial Tr. at 566-68. Nor did Jones consider whether the 11 other challenged districts shared a feature of District 75 he deemed crucial to that district's BVAP needs, namely, the presence of a substantial non-voting prison population. 2nd Trial Tr. at 565-66, 569-70. Instead, Jones assumed that the BVAP required in District 75 would be appropriate in all 12 challenged districts. 2nd Trial Tr. at 566-68. This lack of an individualized assessment is strong evidence that the legislature did not have "good reasons to believe" that the 55% BVAP threshold was required in the 11 remaining districts. *See Alabama*, 135 S. Ct. at 1274.

We further observe that District 75 differed in important ways from many of the other challenged districts. Notably, District 75 was located in the very rural Southside region of the state, and was the sole challenged district that shared a border with similar rural areas of North Carolina. *See* DI Ex. 94 at 7; 1st Trial Tr. at 319. Other than District

---

To the extent that Jones relied on Spruill's views to justify the 55% BVAP threshold, we again emphasize that the intervenors declined to call Spruill as a witness at either trial. Spruill's support of a high BVAP could well have been motivated by an interest in incumbency protection, rather than a good-faith attempt to comply with the VRA. *See* Pl. Ex. 35 at 141-48. And, in any event, the personal opinion of a single delegate cannot constitute the "strong basis in evidence" necessary to satisfy strict scrutiny in 12 districts. *See Alabama*, 135 S. Ct. at 1274.

63, which bordered District 75 to the north, the remaining ten challenged districts were located in entirely different regions of the state. *See* DI Ex. 94. McClellan testified that District 71 and District 75 were not "remotely similar," pointing, among other things, to the fact that District 71 was a densely populated urban area in a city of more than 200,000 residents,[55] whereas District 75 is located in a rural region with a high population of prisoners who cannot vote. 2nd Trial Tr. at 53-54. McQuinn echoed these sentiments regarding the differences between Districts 70 and 75. 2nd Trial Tr. at 107.

Additionally, based on an ecological inference analysis conducted by Dr. Palmer, we find as a matter of fact that a 55% BVAP was not required in any of the 11 remaining challenged districts for black voters to elect their preferred candidates.[56] *See* Pl. Ex. 71 at 24 ¶ 130. Dr. Palmer's analysis examined the extent to which white and black voters in each district chose the same candidates, and accordingly whether black voters could elect their preferred candidates with a BVAP level lower than 55%. Pl. Ex. 71 at 24-25 ¶¶

---

[55] *See* U.S. Census Bureau, QuickFacts: Richmond City, Virginia, https://www.census.gov/quickfacts/fact/table/richmondcityvirginiacounty/RHI825216#viewtop (last visited June 18, 2018).

[56] We are satisfied with Dr. Palmer's methodology, including his decision to use statewide election data, rather than House of Delegates election results, to analyze racial voting patterns in the challenged districts. 2nd Trial Tr. at 416. The results of statewide elections were highly correlated with the results of House of Delegates elections. Pl. Ex. 71 at 25 ¶¶ 133-34; 2nd Trial Tr. at 416.

126, 130.  We find this testimony to be credible and adopt the following conclusions from Dr. Palmer's testimony and report.[57]

First, the 12 challenged districts, including District 75, varied widely in the extent to which white voters supported Democratic candidates, the party overwhelmingly preferred by black voters.  *See* Pl. Ex. 71 at 26 ¶ 136; 2nd Trial Tr. at 421.  Notably, in District 75, only 16% of white voters supported Democratic candidates, an extremely high level of racially polarized voting.  Pl. Ex. 71 at 26 ¶ 137, 66.  The next lowest level of white Democratic support was 27% in District 63, more than ten percentage points higher than in District 75.  Pl. Ex. 71 at 66.  And in District 71, 70% of white voters supported Democratic candidates, a high level of voting cohesion between the two racial groups.  Pl. Ex. 71 at 26 ¶ 137, 66.  This data clearly showed that District 75 differed in important ways from the remainder of the challenged districts, and that District 75 required the highest BVAP level of any district.[58]

---

[57] We do not credit Dr. Katz's analysis on the issue of narrow tailoring.  As explained more fully in this Court's prior dissenting opinion, we find unpersuasive Dr. Katz's "crude analysis" concluding that the 55% BVAP threshold was justified, because this BVAP level would produce an 80% likelihood of electing a black candidate.  *See Bethune-Hill*, 141 F. Supp. 3d at 578-79 (Keenan, J., dissenting).  Moreover, we observe that in his initial report for the first trial, Dr. Katz relied on the limited data available from House of Delegates elections only.  DI Ex. 16 at 17.  Recognizing that few such elections were competitive, making it "difficult to gauge meaningful differences in voter preferences," Dr. Katz expanded his analysis in the second trial to include statewide elections held in 2013.  DI Ex. 101 at 2-6.  We find the 2013 elections to be of limited relevance, however, as they occurred after the redistricting cycle at issue in this case.

[58] District 75 also was the only challenged district in which candidates preferred by black voters did not consistently win by large margins.  Pl. Ex. 71 at 26 ¶ 138.

Second, Dr. Palmer concluded unequivocally that a 55% BVAP was not needed in any of the 11 remaining challenged districts in order for black voters to be able to elect their preferred candidates. Pl. Ex. 71 at 27 ¶ 142; 2nd Trial Tr. at 429, 442. Indeed, even if the existing population deficits in these challenged districts had been remedied entirely with Republican voters, the Democratic vote share in each district still would well have exceeded 50%, with the lowest Democratic performance in District 63 (58%), and the highest in District 70 (79%). Pl. Ex. 71 at 67; 2nd Trial Tr. at 426-27.

Dr. Palmer also concluded, with 95% confidence, that a 55% BVAP in each of the 11 challenged districts would produce a Democratic vote share of at least 66.3% (in District 63), and as high as 83.7% (in District 71).[59] Pl. Ex. 71 at 68; 2nd Trial Tr. at 419. Even a 45% BVAP would have produced a strong Democratic majority in all 11 remaining challenged districts, ranging from 59.4% to 81%.[60] Pl. Ex. 71 at 68.

---

[59] For the sake of simplicity in discussing Dr. Palmer's results, we use the "point estimates" for Democratic vote share listed in Table 25 of his report, rather than the upper or lower bounds of the confidence interval. *See* Pl. Ex. 71 at 68; 2nd Trial Tr. at 420, 428.

[60] The intervenors offered the testimony of Dr. M.V. Hood III, a professor of political science at the University of Georgia, who critiqued Dr. Palmer's conclusions regarding racial voting patterns and the necessity of the 55% BVAP threshold. *See* DI Ex. 103. We do not credit Dr. Hood's testimony for several reasons. First, like Dr. Katz, in conducting his ecological inference analysis, Dr. Hood relied on electoral results from 2013, which elections post-dated the 2011 redistricting process. DI Ex. 103 at 6-7, 12-13; *see* 2nd Trial Tr. at 818-20, 840-44.

Moreover, in general, Dr. Hood offered vague, unsubstantiated challenges to Dr. Palmer's conclusions. Most notably, Dr. Hood criticized Dr. Palmer's analysis on the basis that "an estimate produced by a statistical model is accompanied by a degree or range of uncertainty." DI Ex. 103 at 9. Contrary to this insinuation, Dr. Palmer (Continued)

Accordingly, the 55% BVAP threshold was far greater than necessary for black voters to continue electing their preferred candidates.[61] Pl. Ex. 71 at 27 ¶¶ 141-42; 2nd Trial Tr. at 428-30.

Our conclusion is not altered by the intervenors' argument that the 55% BVAP threshold was "close enough" to the BVAP required for each district to satisfy Section 5. In the intervenors' view, the Department of Justice's preclearance of the challenged districts itself establishes that this minimum BVAP was required under Section 5, thereby satisfying the intervenors' burden to show narrow tailoring. DI Post-Trial Br. at 34.

---

expressly included confidence intervals in all of his statistical estimates. Pl. Ex. 71 at 68; Pl. Ex. 72 at 15. And ironically, Dr. Hood's *own* ecological inference results included no such measures of uncertainty. DI Ex. 103 at 7-8.

Dr. Hood also hypothesized that BVAP may drop over time in a challenged district, supporting this supposition with a single statistic about a decrease in BVAP in District 71 between 2012 and 2015. DI Ex. 103 at 111. He provided no analysis of the likelihood or extent of a decrease in BVAP expected at the time of the 2011 redistricting, or that the map-drawers employed such reasoning in 2011. Pl. Ex. 72 at 16 ¶ 42; DI Ex. 103 at 11.

[61] We reject the intervenors' attempt to rely on a report written in 2001 by Dr. James Loewen during the course of litigation following a prior redistricting cycle. DI Ex. 103 at 22-61. Although Dr. Loewen provided a deposition in the present case, he did not testify at either trial. *See* Conformed Designated Discovery Ex. D, Dkt. No. 220-1. Dr. Loewen's report was not admitted into evidence independently, but Dr. Hood attached to his supplemental report a version of the Loewen report. *See* DI Ex. 103 at 22-61; 1st Trial Tr. at 387-89; Pl. Post-Trial Br. at 23. We decline to consider the Loewen report here because, among other reasons, the underlying data was based on electoral results from the 1990s and thus was outdated for purposes of the 2011 redistricting. 2nd Trial Tr. at 867, 871.

The intervenors misapprehend the posture of this case. Their burden to show narrow tailoring is not satisfied merely by invoking the legislature's prior obligation to obtain preclearance, or by satisfying the requirements imposed by the Department of Justice. *See Miller*, 515 U.S. at 922 (explaining that the state does not have a compelling interest in "complying with whatever preclearance mandates the Justice Department issues," and holding that when a state relies on the Department of Justice's "determination that race-based districting is necessary to comply with the [VRA], the judiciary retains an independent obligation in adjudicating consequent equal protection challenges to ensure that the State's actions are narrowly tailored to achieve a compelling interest"). We do not require that the legislature "determine precisely what percent minority population § 5 demands," nor did Dr. Palmer attempt to ascertain such a figure. *Alabama*, 135 S. Ct. at 1273 (emphasis omitted); 2nd Trial Tr. at 429-30. Instead, we merely ask whether the legislature had "good reasons to believe" that its use of race was justified. *Id.* at 1274 (emphasis omitted). Selecting a BVAP figure entirely without evidentiary foundation plainly does not satisfy this burden.

For the same reasons, we reject the intervenors' contention that because "[n]o one" presented the legislature with evidence of white crossover voting at the time of redistricting, the map-drawers thought that a 55% BVAP minimum was required to ensure non-retrogression under Section 5. DI Post-Trial Br. at 35. The intervenors once again attempt to sidestep their use of an unsupported, across-the-board racial threshold, by trying to shift their burden of proof onto the plaintiffs. Because it is the intervenors' burden to justify their predominant use of race, the intervenors also are responsible for

the state's failure to seek relevant information at the time of the redistricting that would support the legislature's race-based decision. If we were to accept the intervenors' position, legislatures could pack black voters into majority-minority districts in perpetuity, claiming ignorance of the fact that high BVAP concentrations were not necessary to comply with Section 5. We decline to apply strict scrutiny in a manner that would promote a result plainly incongruous with the purposes of the VRA and the Equal Protection Clause.

Accordingly, we hold that the legislature did not have a "strong basis in evidence" for its use of the 55% BVAP threshold in the 11 remaining challenged districts. *See id.* In reaching this conclusion, we recognize the challenge the legislature faced in attempting to comply with both the VRA and the Equal Protection Clause. *See Abbott*, slip op. at 4 (noting that "a legislature attempting to produce a lawful districting plan is vulnerable to competing hazards of liability" under the VRA and Equal Protection Clause) (citation and internal quotation marks omitted). We also appreciate the "delicate balancing of competing considerations" the legislature undoubtedly was required to do when drawing a 100-district plan, and the "serious intrusion" on local functions represented by our rejection of a state redistricting plan. *Bethune-Hill*, 137 S. Ct. at 797 (quoting *Miller*, 515 U.S. at 915); *Abbott*, slip op. at 21 (quoting *Miller*, 515 U.S. at 915).

Here, however, the legislature did not undertake *any* individualized functional analysis in *any* of the 11 remaining challenged districts to provide "good reasons to believe" that the 55% threshold was appropriate. *See Alabama*, 135 S. Ct. at 1274. The legislature instead applied the 55% BVAP requirement from District 75 across the board

to 11 greatly dissimilar districts, which black-preferred candidates would have won by significant margins with far lower BVAP percentages. We thus easily conclude that the intervenors have not satisfied their burden to show that the legislature's predominant use of race was narrowly tailored to achieve a compelling state interest.

## VI.

The Equal Protection Clause ensures that states do not "engage[] in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls." *Miller*, 515 U.S. at 911-12 (internal quotation marks omitted) (quoting *Shaw*, 509 U.S. at 647). Overwhelming evidence in this case shows that, contrary to this constitutional mandate, the state has sorted voters into districts based on the color of their skin. The legislature made no effort to determine whether the mechanical 55% racial threshold was required to comply with the VRA, and instead arbitrarily applied the same racial mandate to 12 vastly dissimilar districts. This predominant use of race and disregard of narrow tailoring principles plainly are at odds with the guarantees of the Equal Protection Clause.

We therefore conclude that the 2011 Virginia House of Delegates redistricting plan violates the Equal Protection Clause. In light of the "powerful concerns for comity involved in interfering with the state's legislative responsibilities," we will afford the Virginia General Assembly a "reasonable opportunity . . . to meet constitutional requirements by adopting a substitute measure," rather than re-drawing the districts ourselves. *Page*, 2015 WL 3604029, at *18 (quoting *Wise v. Lipscomb*, 437 U.S. 535,

540 (1978)). We therefore allow the Virginia General Assembly until October 30, 2018 to construct a remedial districting plan that rectifies the constitutional deficiencies identified in this opinion.

It is so ORDERED.


_____/s/_____
Barbara Milano Keenan
United States Circuit Judge

_____/s/_____
Arenda L. Wright Allen
United States District Judge


Richmond, Virginia
Date: June 26, 2018


Robert E. Payne, Senior District Judge, dissenting

Although I respect the views of my good colleagues in the majority, I dissent because I understand the record quite differently.

First, I assess the credibility of the relevant witnesses differently. Second, I disagree with the majority's view as to whether the Court may consider evidence that a map drawer sought to equalize population. Third, I find the majority's "statewide evidence" to be of limited value. And, finally, I do not believe that Plaintiffs' District-specific evidence supports a finding of racial predominance by a preponderance of the evidence. See Bethune-Hill v. Va. State Bd. of Elections, 141 F. Supp. 3d 505, 510, 547 (E.D. Va. 2015), aff'd in part, vacated in part, 137 S. Ct. 788, 802 (2017).

## I.    The Majority's Credibility Determinations

As the majority makes clear, the resolution of this case turns on credibility determinations which we, as the triers of fact, must reach respecting whether race was the predominant reason for the design of the eleven Districts at issue on remand. I cannot subscribe to the credibility assessments that animate the majority on that outcome-determinative issue.

### A.    Delegate Steven Christopher Jones & John Morgan

The majority's conclusions as to whether race predominated in the Challenged Districts rely heavily on the fact that it declines to credit the testimony of Delegate Steven Christopher Jones and John Morgan. Maj. Op. at 78 ("Critical to our analysis is our decision not to credit Jones' testimony, and our determination that Morgan's testimony was wholly lacking in credibility."). As a result, the majority leaves no room to consider these witnesses' testimony. Maj. Op. at 78 ("These adverse credibility findings are not limited to particular assertions of these witnesses, but instead wholly undermine the content of Jones' and Morgan's testimony.").

I respectfully disagree with those credibility assessments and affirmatively find that the testimony of both Jones and Morgan was credible and supported by the record as a whole. Jones and Morgan were vitally important witnesses with critical first-hand knowledge of the 2011 redistricting process. As the majority observes, Jones was "the primary architect of the 2011 plan." Maj. Op. at 3. And, Morgan, who was hired to assist drawing District lines, was labeled "the finish carpenter" and "played a substantial role in constructing the 2011 plan." Maj. Op. at 31; 2nd Trial Tr. at 519, 593. That role included

using mapping "software to draw district lines" and, "in most circumstances," splitting the Voting Tabulation Districts ("VTDs") in the Challenged Districts (without Jones' input). Maj. Op. at 31; 2nd Trial Tr. at 519, 714.

### i.    Delegate Jones

With respect to Jones, the majority first determines that no aspect of his testimony was credible because, in the trial on remand, "Jones had a murky recollection regarding several important topics on which he previously had testified." Maj. Op. at 34. But, memories fade with time. I therefore cannot ascribe weight to the fact that Jones' recollection was more "murky" at the second trial (in 2017) than at the first trial (in 2015). Moreover, I find that Jones gave quite clear testimony at both trials as to the reasons for the District lines, the critical issue in the case.[1]

The majority also is of the view that Jones' testimony was not credible because "the testimony of multiple, credible witnesses at the second trial directly undermined much of Jones' prior key testimony" and Jones could not account for these "material inconsistencies." Maj. Op. at 34, 36. I cannot subscribe to this view, either. The examples of "multiple, credible witnesses" principally relied on for the majority view are Delegates Algie Howell and Matthew James. Maj. Op. at 34-35. These witnesses were members of the House of Delegates who, at the second trial, contradicted Jones' testimony, at the first trial, that they had given significant input into the redistricting plan. Maj. Op. at 34-35;

---

[1] That is demonstrated in the District-by-District analysis in Part IV below. Therefore, it is not necessary to recount here the clarity and consistency of Jones' testimony as I understand it.

2nd Trial Tr. at 71-74, 82-84; 1st Trial Tr. at 339, 348-49. And, they offered, for the first time six years after the fact, recollections of conversations which the majority finds dispositive of Jones' credibility. Maj. Op. at 34-36, 34 n.27; see also 2nd Trial Tr. at 73-74, 82-84.

As an initial matter, I cannot accept on principle these long-delayed views of what happened in 2011. These witnesses could have testified in the first trial to correct any statements that they believed misrepresented their roles in the redistricting process. They did not then come forward to say that Jones was wrong. Moreover, during the redistricting debates, Delegate Lionell Spruill Sr. openly lauded Jones on the House of Delegates floor for answering the concerns of "mostly every member of the Black Caucus," and no delegate stood to refute that praise. See Pl. Ex. 35 at 142.[2] Under those circumstances, I cannot credit the revisionist testimony James and Howell offered at the second trial.[3]

Additionally, my conclusions as to the frailty of human memory apply with equal force to every delegate who testified at the second trial. Therefore, I am far more inclined

_____

[2] Delegate Rosalyn Dance also commended Jones' extensive collaboration with other delegates during the redistricting process, describing him as "willing to listen to anything and everything we [Democrats] throw to him to consider." Pl. Ex. 33 at 43.

[3] The majority suggests that the reason why these witnesses waited to testify until the second trial is that they "were not needed until the second trial, when the plaintiffs had the opportunity to undermine the version of events that Jones had offered at the first trial." Maj. Op. at 35 n. 28. That view, I think, is wrong. As the majority opinion itself shows, the belated testimony of the delegates was directly responsive to what Jones said at the first trial about them and their Districts. See Maj. Op. at 34. The delegates therefore could have testified during Plaintiffs' rebuttal case at the first trial. Indeed, rebutting the testimony of a defendant's witnesses is the purpose of a rebuttal case.

to believe Jones' detailed and "voluminous testimony at the first trial explaining many of his line-drawing decisions," see Maj. Op. at 35, than any arguably contradictory statements offered years later.

Finally, the witnesses cited by the majority did not undermine any "key testimony" by given Jones. As detailed in my discussion of Districts 80 and 90,[4] Jones' reasons for the District lines hardly depended at all on the input of James and Howell. Thus, the majority is discrediting Jones on the basis of, at best, peripheral and inconsequential discrepancies, rather than "material inconsistencies."[5] Moreover, it is important to note that the transcripts of the regional hearings, where they do address local situations such as the design of a District or VTD splits, support the trial testimony given by Jones on those issues.

### ii. Morgan

With respect to Morgan, the majority considers his testimony unreliable for five reasons. First, it does so because his testimony included "purportedly race-neutral

---

[4] When I describe another portion of this opinion as addressing the matter presently being discussed "in greater detail" or the like, that portion of the opinion should be treated as having been incorporated in relevant part by reference. The issues in this case often cut across topics of discussion.

[5] The majority also refuses to credit any claim by Jones that he "relied on the consent of the black caucus based on comments Jones received from Delegate Lionell Spruill Sr." Maj. Op. at 34 n.27. The record, including Spruill's floor speech, his statements in the hearings, and the affirmative votes of the members of the Black Caucus, shows that Jones had the support of the Black Caucus; or, at least, reasonably thought he had. See, e.g., Pl. Ex. 32 at 12; Pl. Ex. 35 at 142; 2nd Trial Tr. at 51, 65, 77, 85, 108, 110; 1st Trial Tr. at 63, 88. In any event, the "support/consent" evidence is important only in measuring whether the majority's refusal to credit Jones' testimony is reasonable, not in assessing how the lines were drawn.

explanations for several [district] boundaries that appeared facially suspicious." Maj. Op. at 31. I cannot discern what explanations are thought to be suspicious, but, for reasons explained below in the District-by-District analysis, I think that the record reflects well-documented race-neutral explanations for how all the Challenged Districts were drawn.

Second, the majority says that "[t]he intervenors' belated reliance on Morgan's testimony [he did not testify at the first trial] strongly suggests an attempt at post hoc rationalization." Maj. Op. at 31. If that is a valid point as to Morgan, it would be equally valid to discredit the belated testimony of the delegates on whom the majority relies to discount Jones' testimony. But, unlike the situation with those delegates (who could have offered their refuting testimony at the first trial), Morgan's testimony was offered in direct response to the Supreme Court's clarification of the relevant legal standard (which was necessarily unavailable at the time of the first trial). See DI Pre-Trial Br. at 1-2. And, Plaintiffs' theory of the case at the first trial did not rely on the testimony of Dr. Rodden and his dot density maps respecting the shifts and splits in VTDs, which were offered to show "the surgical precision with which the General Assembly sorted black from white voters" and which Morgan was uniquely equipped to refute. See Pl. Pre-Trial Br. at 1-2. And, of course, Dr. Rodden's theory was central to Plaintiffs' case this go-round. So, it made eminently good sense for Intervenors to have Morgan show how Dr. Rodden's theory did not square with reality.[6]

_____

[6] In the first trial, Plaintiffs relied on the 55% threshold to prove racial predominance. See Bethune-Hill, 141 F. Supp. 3d at 523. Plaintiffs presented some expert evidence about VTD shifts and splits at the first trial, but that evidence was largely
(Continued)

Third, the majority discounts Morgan's testimony because: "Dr. Palmer emphasized that to equalize population, typically only one VTD needed to be split between a pair of districts. Yet several of the challenged districts had multiple VTDs that were split with the same non-challenged district." Maj. Op. at 31-32 (citations omitted). The majority lists several examples of multiple VTDs split between Districts. Maj. Op. at 32. But, Morgan agreed that equalizing population generally only requires a single split between Districts. 2nd Trial Tr. at 664. And, he offered reasonable justifications for most of the majority's cited examples. See 2nd Trial Tr. at 639-40, 665-66, 677-79, 696-97, 709, 740, 745, 748-50, 757-60.[7]

Fourth, the majority finds Morgan's testimony to be incredible because his "contention, that the precision with which [VTD] splits divided white and black areas was mere happenstance, simply is not credible." Maj. Op. at 32. But, many splits did not divide primarily African-American and white areas "with precision." See, e.g., Pl. Ex. 69 at 18 (505, 703), 25 (Davis, 410), 33 (Brookland), 53 (Nine), 56 (Zion Grace, Brambleton), 68 (Lakeside). And, more importantly, by the majority's logic, no witness could ever explain credibly why District lines were drawn so long as they appeared to encompass or exclude certain racial groups. Here, Morgan unequivocally testified that he

_____

quantitative and did not resemble the way in which the VTD issue was presented at the second trial through Dr. Rodden. See Pl. Ex. 50 at 6-8.

[7] The exceptions are the two splits between Districts 89 and 79 (Zion Grace and Titustown Center), the two splits between Districts 77 and 76 (Lakeside and John F. Kennedy), and two of the splits between Districts 94 and 95 (Palmer and Deer Park). See Pl. Ex. 71 at 54-55; DI Ex. 91 at 154, 178, 190. Those splits are discussed below.

did not review racial data in splitting VTDs, and he otherwise described in detail, quite credibly in my view, why VTDs were split for non-racial reasons. See, e.g., 2nd Trial Tr. at 639-40, 665-71, 677-80, 696-97, 699-702, 704-06, 708, 714-15, 740, 745, 748-50, 757-60. What else was he to say?[8]

Fifth, the majority rejects Morgan's testimony because it believes that he utilized race as a proxy for politics. It observes:

> Similarly, Morgan asserted that he split certain VTDs at the census block level in District 95 to increase Republican voting strength in a neighboring, non-challenged district. This contention conflicted with the testimony of Dr. Rodden and Dr. Palmer, as well as with the testimony of the intervenors' own expert, Dr. Thomas Hofeller, who uniformly stated that election results and partisan affiliation data were not available at the census block level. Indeed, Morgan conceded that he could only estimate political performance at the census block level by applying election results from the VTD as a whole equally to each census block. This "partisan" approach based on overall VTD performance, however, would not result in VTDs being split precisely to separate predominantly black and white neighborhoods. Accordingly, the only conclusion to draw from Morgan's testimony is that, insofar as he sought to obtain partisan political advantage by splitting VTDs in particular ways, he did so by relying on race as a proxy for political preference. This assumption that members of a particular racial group vote a certain way is antithetical to the principles underlying the Equal Protection Clause. Using race as a proxy for political performance constitutes the use of race, not the use of politics, for purposes of our predominance analysis. For these reasons, we conclude that Morgan did not present credible testimony, and we decline to consider it in our predominance analysis.

---

[8] Additionally, Morgan was willing to admit that he relied on race in general when drawing District lines. 2nd Trial Tr. at 726; see also 2nd Trial Tr. at 726-28. That he did so supports the credibility of his denial of such reliance in a specific context, VTD splitting.

Maj. Op. at 32-34 (citations omitted).

This reasoning, however, is faulty because nothing in the record indicates that Morgan relied on race as a proxy in splitting the VTDs cited by the majority in the District (95) on which the credibility determination is based. This matter is addressed in greater detail in the discussion of District 95, infra. Suffice it to say, as to the question of credibility, that the VTD splits at issue were designed to allow Morgan to extract "as much as possible" of two VTDs from District 93 for political purposes. 2nd Trial Tr. at 639-40, 675-79, 757-60. Morgan was thus not seeking to remove only specific portions of these VTDs based on their political makeup (or based on their racial makeup as a proxy for their political makeup), and, indeed, Morgan expressly testified that he was "not looking at racial-themed census blocks" in his mapping software when splitting them. 2nd Trial Tr. at 679-80. In short, the majority's view (as cited above) is based on the fact that political data are not available below the VTD level. However, one does not need to use race as a proxy for politics when splitting VTDs for political purposes if one's goal is to keep as much of a VTD as possible out of a District.

Consequently, I conclude that the majority's justifications for discrediting Morgan's testimony are unfounded. And, in my opinion, Morgan's explanations were highly credible, given his clear and articulate testimony as well as his prodigious knowledge and recollection of the redistricting process.

## B.     The Delegates Who Testified in Plaintiffs' Case

The majority opinion finds credible several of the delegates who testified on behalf of Plaintiffs (Delegates Jennifer McClellan, Delores McQuinn, Rosalyn Dance, Matthew James, and Algie Howell). Maj. Op. at 34, 38, 43, 48, 63, 75. The majority's finding of racial predominance heavily relies on these witnesses' accounts. See, e.g., Maj. Op. 34-36, 38, 43-45, 48-49, 63, 65-66, 75, 81-82.

Throughout this opinion, I often refuse to accept these witnesses' testimony on grounds specific to each delegate or to a group of delegates. I write separately here, however, to raise a point that leads me to question the credibility of all of the aforementioned delegates.

Each of these delegates voted for the 2011 redistricting plan. 2nd Trial Tr. at 51, 65, 77, 85, 108, 110; 1st Trial Tr. at 63, 88. In so doing, they publicly approved of the plan. And, more importantly, they exercised the authority vested in them by their elected office to write HB 5005 into the law of the Commonwealth of Virginia and to subject its citizens to its terms.

The delegates here, however, have now all aligned themselves with challengers to HB 5005, who oppose the plan on the ground that it violates the Constitution of the United States. If the delegates actually believed that to be the case, the time to have acted was at the time of the vote, not now. The fact that these legislators have come lately into court in support of a challenge to the plan shows either that they were willing to vote for a plan that they believed to be unconstitutional when they voted for it or that they thought the plan was lawful at the time and are now seeking to have it set aside for other reasons.

In either case, I cannot subscribe to the view that the testimony of such legislators is entitled to belief.

That conclusion is underscored by the fact that Spruill and Dance lauded HB 5001 (HB 5005's predecessor) on the House of Delegates floor during the redistricting floor debates. See Pl. Ex. 33 at 42-46; Pl. Ex. 35 at 141-49, 157-59. Although there was not universal support for the bill, none of the delegates enumerated above spoke against it or expressed any concern about a constitutional infirmity. Thus, they either believed the plan to be lawful then or impermissibly kept their concerns to themselves. Either way, I cannot find credible their belated support for an attempt to set aside the plan for which they voted.

## C.    Expert Witness Dr. Jonathan Rodden

The majority opinion determines that expert Dr. Jonathan Rodden offered credible testimony. Maj. Op. at 18-19. I disagree.

First, Dr. Rodden was more an advocate for Plaintiffs than the disinterested expert that Plaintiffs would have us find. See, e.g., 2nd Trial Tr. at 330 ("I'd be happy to discuss further this VTD split if you'd like, but I gather you [Intervenors' counsel] don't want me to. But it would have been a very good illustration."); Pl. Ex. 69 at 4 ("In most of these cases, it is simply not possible to devise a credible post-hoc explanation for these decisions that is not based on race."); Pl. Ex. 69 at 54 ("At trial, Intervenors raised the possibility that this very oddly shaped corridor, which corresponds directly to race, was constructed as an incumbent protection maneuver. But it is difficult to see how this could possibly be the case."); Pl. Ex. 69 at 69 ("Th[e legislature's 55% BVAP and equal

population goals] required a careful, region-wide strategy for the distribution of African Americans across districts, as well as a laser-sharp focus on race in the selection of each VTD and census block."); Pl. Ex. 70 at 4 ("In situations where it is quite clear that the legislature's plan deviated from traditional redistricting criteria . . . and that these had obvious racial effects, the Defendant-Intervenors provided various non-racial post-hoc explanations for these deviations."); Pl. Ex. 70 at 8 n.1 ("Furthermore, there are often occasions in the courts where opposing expert witnesses will attempt to obfuscate even the most solid statistical facts with jargon and dubious alternative statistical specifications. This case is no exception. . . . The approaches taken by [Plaintiffs' experts], by contrast, are far more in keeping with standard statistical practice.").

Second, Dr. Rodden offered legal and factual conclusions beyond his expertise, including by speculating about the motivations of the legislature. See, e.g., 2nd Trial Tr. at 266 ("[T]his is a district that I think is fairly clear is designed to combine African-American populations in Chesapeake and Suffolk."); Pl. Ex. 69 at 15 ("In other words, Delegate Jones found it necessary to switch from a strategy in which Hopewell was awkwardly joined with Richmond, to one in which it was awkwardly joined with Petersburg and points West."); Pl. Ex. 69 at 20 ("Surely Mr. Loupassi would have known that these VTDs were troublesome for him at the time of the 2011 redistricting."); Pl. Ex. 69 at 54 ("[Delegate Joannou] was forced to give up four of his most Democratic precincts, and he could not have been pleased."); Pl. Ex. 69 at 61 ("The Legislature split the district as close to the dividing line as possible in order to keep African Americans in HD90, and whites out."); Pl. Ex. 70 at 4 ("In situations where it is quite clear that the

104

legislature's plan deviated from traditional redistricting criteria . . . and that these had obvious racial effects, the Defendant-Intervenors provided various non-racial post-hoc explanations for these deviations."). Although most of this testimony was not subject to objection, it was clearly beyond the scope of the area in which he was accepted as an expert. See 2nd Trial Tr. at 159 ("The witness will be accepted as an expert in the tendered area, geo-spacial [sic] data analysis and its application to redistricting. However, I think we [the Judges of this Court] are all of the view that we do not need the assistance of any expert in giving us the motivations and intent of anybody."). And, as the trier of fact, I do not have to, and do not, accept testimony of that sort because testimony beyond the scope of expertise does not help me "to understand the evidence or to determine a fact in issue." See Fed. R. Evid. 702.

Third, Dr. Rodden's theory of racial predominance was equivocal and inconsistent. In his report, Dr. Rodden suggested that his inquiry revealed that the legislature relied heavily on race in designing the Challenged Districts because of constraints imposed by the 55% BVAP target. See Pl. Ex. 69 at 2-5, 69-71; see, e.g., Pl. Ex. 69 at 3 ("I conclude that, within each region [the goals of achieving population equality and 55% BVAP] simply cannot be achieved without paying extremely careful attention to the race of each [VTD] and census block under consideration." (emphasis added)). At trial, however, Dr. Rodden vacillated, stating that the 55% BVAP target was only "the start point for my analysis." See 2nd Trial Tr. at 162. He also observed that "there are parts . . . of these regions where, in fact, the 55 percent target was very constraining, and it really was quite difficult to reach the target, and there are others

where it was somewhat less so" and that "in most instances, yes, there are other ways to get [to 55% BVAP], and my job was to describe how the VTDs and blocked [sic] were moved in order to get there." 2nd Trial Tr. at 162-63. He further claimed that "if, even in spite of going beyond the 55 percent target, there was still evidence of stark racial sorting that wasn't even required to reach the 55 percent target, I believe that only strengths [sic] the conclusion in my report that race predominated." 2nd Trial Tr. at 293-94; see also 2nd Trial Tr. at 352-53.

That same equivocation was reflected in Dr. Rodden's descriptions of specific Districts. For example, as to Districts 95 and 92, Dr. Rodden's report stated:

> The 2010 BVAP for both districts was 62%. Both were quite under-populated, though, especially District 95, which needed to add 12,000 people. District 92 needed to add almost 9,000. As can be seen in the maps above, as well as the zoomed-in maps below, any approach that was even remotely based on traditional redistricting principles would have ended up adding a very substantial number of whites. Given the large numbers of voters that needed to be added in order to achieve population equality, the addition of too many whites would have imperiled the 55 percent BVAP target.
>
> The solution was to redraw District 95 by making a narrow corridor through white neighborhoods in order to reach a corridor of African Americans between Highway 69 and Warwick Boulevard. As can be seen in Figure 15 above and Figure 16 below, African Americans and whites were separated with remarkable precision. As in the Hopewell area, the Legislature achieved its racial goals by dispensing with the principle of keeping VTDs together. The Legislature decided to split almost every single VTD along the Northern corridor of District 95. . . .
>
> . . . .

This new tentacle pulled in a substantial number of African Americans to District 95. This was important, because District 95 was then able to donate African Americans to District 92, which needed to add around 9,000 people without adding too many whites. . . .

District 92, then, could avoid what would have been the obvious move had the districts been drawn according to traditional redistricting criteria.

Pl. Ex. 69 at 46, 48-49; see also Pl. Ex. 69 at 70 ("In a few cases, the achievement of the racial target in HB 5005 required rather dramatic alterations. For example, District 95 in Newport News reached out far to the North in order to draw in a narrow corridor of suburban African Americans and then donate African-American neighborhoods to District 92."). However, at trial, Dr. Rodden noted:

[The 55% BVAP rule] constrained [Districts 92 and 95] to some extent, but certainly I think it almost goes without saying that when the final [BVAP] numbers are 60.7 and 60 percent, then there were many different ways to achieve the 55 percent target. And, in fact, these districts ended up with [BVAP] five percent higher than that.

So it is certainly not the case that every one of these little squibbles we're looking at is somehow crucial to the achievement of the 55 percent target.

2nd Trial Tr. at 244. Furthermore, he agreed that "it would be possible to draw two majority minority districts [Districts 92 and 95] without going that far north" and that "there was no need to split any of [the VTDs in the northern portion of District 95] to maintain a 55 percent [BVAP] in that district." 2nd Trial Tr. at 340-41, 343.

In short, Dr. Rodden was unable to provide a consistent theory of racial predominance (or of the importance of the 55% BVAP target). His expert report differed

markedly from his trial testimony, both with respect to his overall theory as well as to his descriptions of individual Districts. Such an expert is neither helpful to the trier of fact nor entitled to belief.

Finally, and relatedly, Dr. Rodden overstated the points for which he advocated and minimized or set aside contrary evidence. As exemplified above, Dr. Rodden exaggerated the extent to which Districts 92 and 95 were constrained by the 55% BVAP target in his report. He similarly did so with respect to District 63. <u>Compare</u> Pl. Ex. 69 at 35, 70, <u>with</u> 2nd Trial Tr. at 215-16. And, likewise, Dr. Rodden claimed that District boundaries generally divided white and African-American populations; but, a careful review of the maps at issue reveals that this was often not the case. <u>See</u> Pl. Ex. 69 at 70-71; <u>see, e.g.</u>, Pl. Ex. 69 at 18, 25, 28, 53, 56, 68. That calls his credibility into question.

For the foregoing reasons, I find that Dr. Rodden's testimony was so lacking in credibility that it does not support the heavy, indeed dispositive, weight afforded it by the majority.

### D. The Statistical Experts

The majority determines that Plaintiffs' experts Dr. Maxwell Palmer and Dr. Stephen Ansolabehere were credible, whereas Intervenors' expert Dr. Jonathan Katz was not credible. Maj. Op. at 18-19, 19 n.14, 27-30. In my view, none of the statistical evidence offered by these experts is compelling, but the Court should generally rely on that provided by Dr. Katz.

Courts are not particularly well equipped to assess complex statistical analyses. Judges typically are not professional statisticians. And, as Dr. Rodden recognized, "there

are often occasions in the courts where opposing expert witnesses will attempt to obfuscate even the most solid statistical facts with jargon and dubious alternative statistical specifications." Pl. Ex. 70 at 9 n.1. I agree with that proposition and, hence, when complex statistical evidence is in conflict such that nuanced changes in methodology alter the relevant conclusions, the evidence is of minimal utility.

Here, we have such a situation. As the majority opinion clearly demonstrates, different statistical experts have reached different results (as to the importance of race in the assignment of locations to the Challenged Districts) based on different statistical models and methodologies. Maj. Op. at 27-30. And, each side's expert(s) considered alternative approaches to be inferior. Compare DI Ex. 16 at 19-21, and DI Ex. 101 at 6-12, with Pl. Ex. 51 at 4, and Pl. Ex. 71 at 20-24. Accordingly, it is hard to say which expert is "right." Indeed, the Court has struggled considerably with this issue. In its original opinion, it held, as to the issue of whether race or politics served as a better predictor of "the likelihood of inclusion of VTDs in one of the Challenged Districts," that Dr. Ansolabehere's approach was unreliable and that Dr. Katz's was more reliable. Bethune-Hill, 141 F. Supp. 3d at 551, 551 n.29.

Moreover, statistical evidence is also only of modest usefulness because, as Dr. Katz observed, statistical models "are a [sic] best crude approximations about how legal, demographic, political, and geographical constraints affect the inclusion (or exclusion) of a VTD into a particular legislative district." DI Ex. 101 at 10. The Court recognized this in its previous opinion:

More fundamentally, however, Dr. Ansolabehere's "race versus politics" opinions miss the mark because they do not consider the extent to which the boundaries themselves are justifiable by neutral criteria or any other motivation besides race or political disposition. The models that he employed do not, for example, consider "economic factors, social factors, cultural factors, geographic factors, governmental jurisdictions and service delivery areas."

See Bethune-Hill, 141 F. Supp. 3d at 551 (citations omitted). Thus, while statistical evidence may offer guidance as to whether race predominated, it has severe limitations when measured against direct testimony by those involved in the redistricting process about why specific District lines were drawn. And, here, we have such direct testimony (e.g., by Jones and Morgan).[9]

Notwithstanding my reservations respecting the statistical evidence in this case, it is my opinion that, among the statistical experts, Dr. Katz's findings were the most reliable. This is because the Court previously found that Dr. Katz's methodology was comparably reliable, that finding was not appealed, and, in any case, the Supreme Court found no error in the Court's credibility assessments. It is therefore not appropriate to revisit that finding. See Doe v. Chao, 511 F.3d 461, 465 (4th Cir. 2007) ("The mandate rule likewise restricts the district court's authority on remand from the court of appeals. First, 'any issue conclusively decided by this court on the first appeal is not remanded,'

---

[9] Statistical evidence is, of course, plainly relevant. See Bethune-Hill, 137 S. Ct. at 800. The point, however, is that such evidence is flawed, and those flaws should be considered as part of a holistic analysis, especially where direct evidence is available.

and second, 'any issue that could have been but was not raised on appeal is waived and thus not remanded.'" (citations omitted)).[10]

My view as to Dr. Katz is underscored by the fact that he offered reasonable responses to Dr. Palmer's critiques of his analysis (and gave good cause to question reliance on Dr. Palmer's approach and conclusions). As the majority observes in concluding that Dr. Katz's methodology was unreliable, Dr. Palmer claimed: (1) that Dr. Katz failed to weight each VTD by total population; and (2) that Dr. Katz's method of accounting for the distance between VTDs and the Challenged Districts "was flawed because it considered the distance from each VTD to all 12 challenged districts." Maj. Op. at 28-29. As to weighting, however, Dr. Katz clarified that weighting is normally required to make a sample representative of the whole; but, here, "we have the entire population of VTDs . . . . so [the] sample is perfectly representative." 2nd Trial Tr. at 789-90. And, he noted that "there actually are lots of weighting schemes one might use" but "only the weighting scheme that weights by . . . total population, in fact, leads to the finding that Dr. Palmer has." 2nd Trial Tr. at 790 (emphasis added). As to distance measurement, moreover, Dr. Katz explained that, unlike his methodology, "Dr. Palmer's approach completely neglects the possibility that a VTD near more than one challenged district may not be included in one, but could reasonably be incorporated into its second-closest neighbor" and that "in all models except for Dr. Palmer's chosen specification,

---

[10] Dr. Ansolabehere did not testify at the second trial. I find, therefore, that the Court's previous findings circumscribe any relevance of his testimony. See Bethune-Hill, 141 F. Supp. 3d at 551-52.

the average Democratic vote share remains a significant predictor of a VTD's inclusion in a challenged district." DI Ex. 101 at 9-10.[11]

In sum, the statistical evidence in this case is of limited persuasive value. However, I believe that the Court's previous credibility findings as to Dr. Katz and Dr. Ansolabehere should not be disturbed and that, among the statistical experts, Dr. Katz's conclusions were the most reliable. And, for the reasons explained above, I do not find Dr. Palmer's analysis or his critiques of Dr. Katz's approach to be credible.[12]

---

[11] The majority also determines that Dr. Katz was unreliable because he observed that census blocks contain political information insofar as race is correlated with politics. Maj. Op. at 30 n.24. This assessment is erroneous for several reasons.

First, although "using race as a proxy for political party affiliation constitutes the use of <u>race</u>, not party" under the relevant <u>legal</u> standards, <u>see</u> Maj. Op. at 30 n.24, the fact that Dr. Katz found a <u>statistical</u> correlation between race and party did not render his analysis any less valid or believable. Indeed, that correlation is quite well established. <u>See Cooper v. Harris</u>, 137 S. Ct. 1455, 1473 (2017) ("And crucially, political and racial reasons are capable of yielding similar oddities in a district's boundaries. That is because, of course, 'racial identification is highly correlated with political affiliation.'" (citations omitted)).

Second, the purpose of Dr. Katz's acknowledgment of this correlation was not to question the applicable legal doctrine but rather to, <u>inter alia</u>, undermine Dr. Palmer's statistical methodology. Dr. Katz explained that "Dr. Palmer's analysis of the inclusion of particular Census blocks in the Contested districts based on its racial composition shares <u>the same statistical flaws of Dr. Ansolabehere's analysis at the VTD level</u>." DI Ex. 101 at 2 (emphasis added). One of those flaws was that Dr. Ansolabehere did not correctly control for the relationship between race and politics. DI Ex. 16 at 20. Dr. Katz's point seems to have been that Dr. Palmer's model suffered from a similar deficiency because he adopted the "absolutely incorrect" "foundational assumption that Census blocks do not contain political information." <u>See</u> DI Ex. 101 at 11-12.

[12] The majority believes that the Court's previous factual findings, many of which are cited in this dissenting opinion, should be "open to reconsideration" "[g]iven that these prior findings were reached while applying an erroneous legal standard, and in light (Continued)

## II.    Population Equalization

Before addressing the evidence, there is one overarching point worth noting. The majority, relying on <u>Alabama Legislative Black Caucus v. Alabama</u>, holds that "the need for population equalization does not explain why the legislature selected certain boundary lines over others." Maj. Op. at 77. It thus refuses to consider Intervenors' argument that "VTDs were split at the end of the redistricting process for the purpose of equalizing population." Maj. Op. at 77. The rejection of that argument, however, I respectfully submit, is misguided.

In <u>Alabama</u>, the Supreme Court concluded:

> In our view, however, the District Court did not properly calculate "predominance." In particular, it judged race to lack "predominance" in part because it placed in the balance,

_____

of the voluminous new evidence presented by both parties on remand." Maj. Op. at 18 n.13. But, factual findings as to the credibility of witnesses are not in any way dependent upon the relevant substantive legal standard, and nothing in the record of either trial suggests to me that these findings were incorrect. And, the remaining factual findings discussed herein are equally not dependent on the relevant legal standard (e.g., findings about the legislature's <u>actual</u> motivations for drawing specific District lines) and/or are wholly supported by the record as I interpret it.

The majority also concludes that "because this Court unanimously agreed to allow the presentation of new evidence, the Court also reopened the question of the credibility of the witnesses who testified at the second trial." Maj. Op. at 18 n.13. However, although the Court did reopen the record, it never rendered a decision as to what findings were actually open to reconsideration. <u>See</u> Dkt. No. 160 at 1-2. I do not believe that the solicitation of additional testimony on remand, standing alone, allows us to wholly jettison the Court's previous credibility assessments, especially as to those assessments that were neither appealed nor arguably affected by the Supreme Court's decision (such as the findings respecting Katz). <u>See Doe</u>, 511 F.3d at 465, 467. In any case, as I explain above, nothing in the record of either trial convinces me that the Court's earlier credibility determinations were erroneous and should be reconsidered.

among other nonracial factors, legislative efforts to create districts of approximately equal population.

In our view, however, an equal population goal is not one factor among others to be weighed against the use of race to determine whether race "predominates." Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to how equal population objectives will be met.

. . . .

. . . . In other words, if the legislature must place 1,000 or so additional voters in a particular district in order to achieve an equal population goal, the "predominance" question concerns which voters the legislature decides to choose, and specifically whether the legislature predominately uses race as opposed to other, "traditional" factors when doing so.

Ala. Legislative Black Caucus v. Alabama, 135 S. Ct. 1257, 1270-71 (2015) (citations omitted). In short, the Supreme Court ruled that population equality is not to be weighed against race in assessing whether race served as the legislature's predominant consideration.

That holding does not, however, support the proposition that the need to equalize population can offer no insights into the motivations of the legislature. Where, for example, a map drawer explains that the only goal in splitting a particular VTD was to equalize population between Districts (such that no other factors were considered), a court may take that statement into account without "weighing" population equality against race. That is because the map drawer is merely asserting, in an alternative manner, that race played no role in the decision. Surely, a court is entitled to consider a map drawer's outright denial that he relied on race in designing a particular portion of a

114

District's lines because that would go directly to the issue of "which voters the legislature decides to choose" to place in a particular District. See Alabama, 135 S. Ct. at 1271. I see no difference between such a denial and a comprehensive listing of every factor that the map drawer did rely upon.

That point is of great significance here. Morgan testified that he split the VTDs in the Challenged Districts "in most circumstances"; that he typically did so without Jones' input; that he did not use race or apply a racial thematic to his mapping software when splitting VTDs; and that most VTD splits were made for population equality reasons. 2nd Trial Tr. at 629-30, 668, 714-15, 731-32. Thus, the Court can consider Morgan's testimony that he sought to equalize population in splitting most VTDs without running afoul of Alabama.

## III.    Statewide Evidence

The majority maintains that "the overall racial disparities in population movement, and the splits of VTDs and geographies along racial lines" as well as "Dr. Palmer's conclusion that race predominated over party in predicting the likelihood that a VTD would be assigned to a challenged district" constitute strong statewide evidence of racial predominance. Maj. Op. at 36. In my opinion, however, the statewide evidence on which the majority's conclusion is based is not compelling.

First, I do not view the statistical evidence as particularly helpful. Second, I adopt Dr. Katz's determination that race and party "were a statistical tie" in terms of their ability to predict which VTDs were placed within the Challenged Districts. See 2nd Trial

Tr. at 823-24; see also DI Ex. 16 at 20-21. Third, I deem Dr. Palmer's statistical analysis of the extent to which BVAP predicts a census block's inclusion in a Challenged District to be of little value, given the methodological flaws explained by Dr. Katz (i.e., Dr. Palmer's failure to control appropriately for: (1) the requirement that Districts be contiguous; and (2) the correlation between race and politics). See DI Ex. 101 at 2, 11-12; see also DI Ex. 16 at 19-21. Fourth, I consider Dr. Rodden's opinions as to racial predominance to be neither reliable nor helpful. Fifth, I find credible Morgan's testimony that he did not rely on race in splitting VTDs and that he was the person who generally split VTDs. See 2nd Trial Tr. at 668, 714-15. And, sixth, I generally view as credible Morgan and Jones' testimony respecting the reasons for the District lines.

In sum, the statewide evidence of racial predominance, as cited by the majority, is not especially persuasive, and it offers no real support for a finding that race predominated in the drawing of the eleven Challenged Districts.[13]

---

[13] Additionally, I note that the majority largely sidesteps the findings of Intervenors' expert Dr. Thomas Hofeller. Maj. Op. at 32 n.25. However, he offered credible statewide evidence that race did not predominate over traditional redistricting principles. He found, for example, that: the 2011 "map and the individual majority minority districts contained therein are at least as compact and contiguous as the 1991 and 2001 maps and individual majority minority districts which were approved under the Virginia constitutional standards in Jamerson and Wilkins"; "[t]here was a high degree of protection extended to incumbents [in the 2011 map], particular [sic] in the case of minority incumbents and Republican incumbents"; and "[t]here were no negative contiguity issues in HB 5005." DI Ex. 14 at 24. Dr. Hofeller is a profoundly knowledgeable redistricting expert, with more background and experience in the field than any other expert in this case, and I respectfully submit that summarily discounting his testimony is misguided. See DI Ex. 14 at 2-5. I therefore consider his statewide findings and conclude that they are yet another reason that the statewide evidence cited by the majority does not support a finding of racial predominance.

## IV.    District-by-District Analysis

I disagree with the majority's assessment of the District-specific evidence. For the reasons set forth below, I conclude that Plaintiffs have not proved, by a preponderance of the evidence, that race predominated in any of the Challenged Districts.[14]

---

[14] Two preliminary points are worth mentioning here. First, both this opinion and the majority's at times make inferences as to legislative motive from circumstantial evidence. That is certainly permissible. Bethune-Hill, 137 S. Ct. at 797-99. However, where multiple inferences as to predominant legislative motive are equally plausible, I do not believe that racial predominance has been established by a preponderance of the evidence.

Second, it is helpful to consider the following District-specific evidence in perspective of the fact that Virginia underwent major population shifts in the decade before the 2011 redistricting. As Dr. Hofeller explained, "Virginia had experienced significant population growth over the previous decade which caused significant overpopulation of individual districts in Northern Virginia and underpopulation on the southeastern portion of the state including the Richmond and Tidewater areas." Pl. Ex. 102 at 3. The underpopulated regions included the Challenged Districts. See Pl. Ex. 102 at 3.

These population shifts greatly affected the 2011 redistricting process and, according to Jones, "rippled through the whole plan." 2nd Trial Tr. at 476-78. Indeed, in the final map, three entire Districts were moved "from Hampton Roads, south side and southwest" to the Northern Virginia area. See 2nd Trial Tr. at 476.

I mention these demographic trends not to suggest that population equality pressures were the predominant motivation of the legislature. Indeed, it is legally impossible for that to be the case. Alabama, 135 S. Ct. at 1270. Rather, I highlight these trends to show the contextual backdrop against which the 2011 redistricting process occurred. These trends teach that the 2011 plan was not one in which it was possible for the Districts to remain unchanged.

### A. The Richmond Region

#### i. District 71

##### 1. BVAP & Racial Intent

The majority initially supports its finding of racial predominance by observing that District 71 faced low BVAP (46.3%) and population numbers and, accordingly, Jones conceded that the 55% BVAP rule affected the way that the District was drawn. Maj. Op. at 39. Although it is true that Jones agreed that "part of the reason that [District 71] moved to the east [rather than to the west] was to increase [BVAP]" and that the 55% BVAP rule affected the District lines, those statements have only limited bearing on the predominance inquiry. See 2nd Trial Tr. at 532-33. It is undisputed that race was considered, and it is established that a 55% BVAP rule was employed. Maj. Op. at 17-18; 2nd Trial Tr. at 521. The relevant question, however, is not whether race was considered. It had to be considered under the Supremacy Clause. The issue is whether race was "the legislature's predominant motive for the design of the district as a whole." Bethune-Hill, 137 S. Ct. at 800.

To that point, the majority, I think, neglects to consider the legislature's other constraints and motivations in constructing District 71. And, the record reflects that there were many. For example, Jones wanted District 71 to become more Richmond-centric, which restricted District 71's ability to expand north, northwest, northeast, or east. See 2nd Trial Tr. at 530-31; 1st Trial Tr. at 305; DI Ex. 94 at 4. Furthermore, Jones believed that moving District 71 west would "have presented a political problem for republican members of the legislature." 2nd Trial Tr. at 482, 491. Similarly, Jones testified that

118

Delegate Manoli Loupassi of District 68, which was west of District 71: "was concerned about getting too much of Chesterfield. And he wanted more voters in the Richmond city area which would have been more favorable to him." 1st Trial Tr. at 306-07; DI Ex. 94 at 4. Moreover, Jones wished to avoid pairing incumbents, which constrained District 71's movement to the west and southeast. See 1st Trial Tr. at 304; see also 2nd Trial Tr. at 482, 699. That objective limited District 71's ability to move west because "if [District 71] would have went west too far, it would have combined Delegate Loupassi [sic] either Delegate [Betsy] Carr or Delegate McClellan." 2nd Trial Tr. at 491; DI Ex. 94 at 4. And, it limited District 71's expansion to the southeast because Delegate McQuinn of District 70 resided near the southeastern edge of District 71. See 1st Trial Tr. at 311; DI Ex. 94 at 4; see also 2nd Trial Tr. at 482. Finally, McClellan indicated that the James River served as a traditional natural boundary of District 71 to the south. 1st Trial Tr. at 45. A holistic analysis shows that the drawing of District 71 was determined and limited by a host of factors.

## 2. Generalized Population Data

The majority next points to overall population movements in District 71. Maj. Op. at 39. Specifically, it notes that "more than 11,000 people with a 21.3% BVAP were moved out of District 71, and more than 17,000 people with a noticeably higher 72.1% BVAP were moved into District 71." Maj. Op. at 39. And, it contends that "areas moved out of District 71 into non-challenged districts had an extremely low 6.6% BVAP." Maj. Op. at 39.

119

However, these population shifts offer few insights into racial predominance here. First, as the Court previously concluded (and as discussed in greater detail in the analysis of District 70), mere numerical population shifts are not concerning. See Bethune-Hill, 141 F. Supp. 3d at 561-62. Second, as set forth below, race-neutral factors largely explain District 71's lines. At best, the majority's data suggest that race played some role. But, that is undisputed.

### 3.    Specific Line-Drawing Decisions

The majority then emphasizes specific line-drawing decisions as evidence of racial predominance: (1) the transfer VTDs 701, 702, and part of 703 from District 70 to District 71 and the shift of VTD 604 from District 74 to District 71; (2) the transfer of VTDs Summit Court, Hilliard, and Stratford Hall from District 71 to District 72 and the move of Ratcliffe from District 74 to District 71; (3) the movement of VTD 207 from District 71 to District 68; and (4) the split of VTD 505 between Districts 71 and 69. Maj. Op. at 39-42.

### a.    Decision 1: VTDs 701, 702, 703 & 604

As to the first cited decision, the majority argues that VTDs 701, 702, 703, and 604 were heavily populated and had substantial BVAP. Maj. Op. at 39. And, it claims that McQuinn objected to the transfer of VTDs 701, 702, and 703, resided nearby, and had long represented those areas; nevertheless, she resigned herself to the fact that she would have to lose those VTDs to support District 71's BVAP, and the changes were made over her objection. Maj. Op. at 39-40. Finally, the majority repeats its assertion that

Jones conceded that the District's eastward shift was impacted by the 55% BVAP target. Maj. Op. at 40.

As an initial matter, the fact that these VTDs had substantial population and BVAP says little about racial <u>predominance</u>. Those VTDs would have needed to be included in <u>some</u> District. And, as discussed below, their movement served both neutral and racial goals.

With respect to VTDs 701, 702, and 703, the majority correctly notes McQuinn's testimony. <u>See</u> 2nd Trial Tr. at 103-04. However, her personal concerns and beliefs as to these VTDs had little relevance to the redistricting process. According to Jones' testimony at the first trial, he "sat down with" McQuinn and believed that "she was 95, 98 percent pleased with what the final product was" as to her District. 1st Trial Tr. at 312. And, McQuinn averred that she never "express[ed] [her] concern about losing 701 and 702 to Delegate Jones." 2nd Trial Tr. at 103.[15]

McQuinn <u>did</u> speak with McClellan about her concerns. 2nd Trial Tr. at 43, 103-04. And, McClellan's role in the redistricting process was to "coordinate[] requests to Delegate Jones for changes to the map in -- as introduced from the Richmond area

---

[15] McQuinn's testimony conflicted with that of Jones on several points, such as the extent of her input and interactions with Jones. <u>Compare</u> 2nd Trial Tr. at 100-03, <u>with</u> 1st Trial Tr. at 312, 398. McQuinn did not testify at the first trial, and I refuse to credit her conflicting testimony for the same reasons I refuse to credit that of James and Howell.

democratic delegates." 2nd Trial Tr. at 27. However, it does not appear that McClellan shared McQuinn's feelings with Jones. See 2nd Trial Tr. at 44, 61.[16]

Accordingly, Jones did not make these transfers over McQuinn's objections or in contravention of his understanding of that area's communities of interest. Rather, from his perspective (informed by meeting with McQuinn), VTDs 701 and 702 (as well as the District 71 portion of VTD 703, assuming for the moment that he was involved in splitting that VTD) were some of the few VTDs unencumbered by other constraints and that could be moved freely without compromising the legislature's varied goals for District 71.

Now, it is true that both Jones and Morgan acknowledged that VTDs 701 and 702 were moved from District 70 to District 71 to increase District 71's BVAP. 2nd Trial Tr. at 538, 737. However, the record clearly shows that this goal was not pursued single-mindedly and that there were other important race-neutral objectives involved in designing that region. For example, one of Jones' goals was to make District 71 more Richmond-centric. 2nd Trial Tr. at 530-31. Although there were several largely African-American VTDs in nearby Henrico County, the legislature instead selected VTDs 701, 702, and part of 703 to include in District 71, which better aligned District 71 with the Richmond border. See Pl. Ex. 69 at 18; DI Ex. 92 at 9; DI Ex. 94 at 4.

---

[16] McClellan similarly asserted that she opposed the transfer of part of VTD 703 into her District. 2nd Trial Tr. at 950. But, I can find no evidence that she voiced that concern to Jones.

Similarly, the legislature wished to avoid pairing incumbents. See 1st Trial Tr. at 304. Although VTDs 703 and 705 were predominantly African-American, only VTDs 701 and 702 were incorporated fully into District 71 because including all of 703 and 705 would have paired McQuinn with McClellan. See 1st Trial Tr. at 311; DI Ex. 92 at 9; DI Ex. 94 at 4. Thus, although race may have influenced the legislature's selection of VTDs 701 and 702, it was hardly the only or the most important factor.[17]

As to VTD 703, Morgan testified that he split that VTD and that he did so for population equality purposes. 2nd Trial Tr. at 733. Morgan did not rely on race data when he split VTDs, so this split should be deemed race neutral. See 2nd Trial Tr. at 668, 714-15. And, McClellan acknowledged that VTD 703 was split along "[a] major street" that served as "a natural boundary between communities of interest." 2nd Trial Tr. at 56, 951. That is consistent with how Morgan often split VTDs, and it shows that factors other than race were involved. See 2nd Trial Tr. at 628, 705-06, 736, 745.

I acknowledge that McClellan countered Morgan's testimony, representing that she was involved in the VTD 703 split and that VTD 703 "needed to be split" to satisfy the 55% BVAP and population equality targets. 2nd Trial Tr. at 950-51. But, her assertion is demonstrably false. The legislature could have allocated the entirety of VTD 703 to District 70 while satisfying all of District 71's myriad constraints (including the 55% BVAP and population equality requirements) simply by splitting VTD 301 (which

---

[17] As set forth below, I conclude that the split of VTD 703 was race neutral. However, even if race were involved, the foregoing analysis of VTDs 701 and 702 would apply with equal weight to VTD 703.

was in Richmond) between Districts 71 and 74. <u>See</u> Pl. Ex. 71 at 56, 65; DI Ex. 38 at 7; DI Ex. 94 at 4; <u>see also</u> Pl. Ex. 63 at 127-28.[18]

In light of this analysis, I cannot conclude that the split of VTD 703 is probative of racial predominance. Morgan indicated that he split VTD 703 on a non-racial basis. And, given that the split was not required to comply with the 55% BVAP target, I simply cannot credit McClellan's testimony, and her testimony is critical to a finding that the split was racially motivated. Furthermore, the split does not <u>appear</u> racial; it simply divided two largely African-American populations. Pl. Ex. 69 at 18. Moreover, even if race were considered in the split of VTD 703, the fact that the split was not necessary to achieve 55% BVAP teaches that race was a limited consideration. The split of VTD 703 was merely a sufficient condition for meeting 55% BVAP rather than a necessary one, and therefore some factor other than race controlled <u>which</u> sufficient option was elected.[19] Thus, I do not believe that race had anything to do with the split of VTD 703.

---

[18] For example, if 175 BVAP were added by way of splitting VTD 301, District 71's BVAP would have cleared 55% and its population would have met the population minimum (the range was 79,210-80,810). <u>See</u> Pl. Ex. 71 at 56, 65; DI Ex. 38 at 2, 7; <u>see also</u> Pl. Ex. 63 at 127-28; Maj. Op. at 3-4.

That movement also would not have risked District 74's BVAP and population targets. Reducing District 74's BVAP by 175 would have yielded a population of 79,419 and BVAP of 57.1%. <u>See</u> Pl. Ex. 71 at 65; DI Ex. 38 at 8; <u>see also</u> Pl. Ex. 63 at 127-28.

[19] I recognize that a legislature could draw Districts in a racial manner even if it were not "necessary" to comply with a BVAP requirement. I do not find that to be the case here, where the legislature is accused of using a numerical target inappropriately in attempting to comply with the Voting Rights Act. <u>See</u> Maj. Op. at 1. Accordingly, if a specific change was not mandated by the 55% BVAP rule, it suggests to me that the (Continued)

And, to the extent that it did, it served as a minimal factor.[20]

As to VTD 604, the record does not, I think, permit a finding that its addition to District 71 was primarily racial. The majority seems to base its contrary view only on the fact that VTD 604 had high BVAP. Maj. Op. at 39. But, incorporating VTD 604 patently aligned District 71 with the Richmond border and made the District more Richmond-centric, in line with one of Jones' goals. See DI Ex. 94 at 4; 2nd Trial Tr. at 530-31. And, it made District 71 more compact on its face. See DI Ex. 94 at 4. Hence, I cannot find that race predominated with respect to this VTD.[21]

In sum, as to VTDs 701, 702, 703, and 604, it is clear that, although race played some role, other significant factors impacted the drawing of the District lines. It is far from apparent that race was primary.

---

BVAP target was of limited, i.e., not predominant, importance vis-à-vis race-neutral factors.

[20] When asked on cross-examination whether VTDs 701, 702, and 703 were moved to increase District 71's BVAP, Jones responded: "Yes and no. Yes, but also for additional population that was needed for the district." 2nd Trial Tr. at 538. Given that Jones was asked a yes or no question about three separate VTDs, that Morgan testified that he split VTD 703 for population equalization purposes, and that Jones attested that part of the reason for the transfers was population equality, Jones' statement was consistent with VTD 703 having been split by Morgan to equalize population and does not alter my conclusion about VTD 703.

[21] McClellan did agree, without explanation, that she had testified during her deposition that "uniting 603 and 604 made sense because of similar demographics." 2nd Trial Tr. at 56. I do not know what she meant by that statement, so I give it no weight.

### b.      Decision 2: VTDs Summit Court, Hilliard, Stratford Hall & Ratcliffe

The second decision cited by the majority involves the addition of the predominantly African-American Ratcliffe VTD to District 71 and the removal of the largely white Summit Court, Hilliard, and Stratford Hall VTDs. Maj. Op. at 40. The majority argues that this decision evinces racial predominance because Jones removed VTDs in Henrico County that were predominantly white in order to make District 71 Richmond-centric but then added a VTD in Henrico County that was predominantly African-American. Maj. Op. at 40.

The majority's analysis, however, misses the mark because it evaluates that decision in a vacuum without considering the varied objectives and constraints of the legislature. When these are taken into account, it is clear that race was but one of several factors influencing the decision at issue.

As an initial matter, as suggested by the majority opinion, the removal of Summit Court, Hilliard, and Stratford Hall served numerous race-neutral goals. As both Jones and Morgan testified, the transfer was intended to make District 71 more Richmond-centric; and, it did so by eliminating from District 71 three VTDs in Henrico County. 2nd Trial Tr. at 490, 530-31, 697; 1st Trial Tr. at 305; see also DI Ex. 94 at 4. Furthermore, both Jones and Morgan averred that moving those VTDs into District 72 was necessary to support the needs of that District. 2nd Trial Tr. at 489-90, 697.[22]

---

[22] Jones and Morgan's testimony was ambiguous on this score. Jones stated the VTDs were moved to District 72 because population was rotated from District 73 to
(Continued)

It is true that adding Ratcliffe to District 71 incorporated a new Henrico County VTD, thereby somewhat undercutting the goal of Richmond-centrism. See DI Ex. 94 at 4. And, Morgan testified that Ratcliffe was added because it "did have African-American voting strength." 2nd Trial Tr. at 698. Nevertheless, as Jones and Morgan explained, District 71 did become more Richmond-centric; three Henrico VTDs were moved out and one Henrico VTD was moved in. See 2nd Trial Tr. at 531-32, 697, 734; DI Ex. 94 at 4. And, myriad factors influenced the addition of Ratcliffe, such as incumbent pairing constraints in the southeast, political, legislator preference, and incumbent pairing constraints in the west, geographic constraints in the south, constraints set by the goal of Richmond-centrism in the north, northwest, northeast, and east, and constraints imposed by the needs of District 72 in the north. See 2nd Trial Tr. at 482, 489-91, 530-32, 697-99; 1st Trial Tr. at 45, 305-07, 311; DI Ex. 94 at 4.

Indeed, all that the second cited decision really teaches is that it is possible for a legislature to balance and realize a variety of goals. By acting as it did, the legislature largely achieved its objectives of: (1) avoiding the pairing of incumbents; (2) supporting legislator preferences and political goals; (3) rendering District 71 Richmond-centric; (4) meeting District 72's needs; and (5) maintaining 55% BVAP. On this record, I do not

_____

District 72, "and that population was needed for 72." 2nd Trial Tr. at 489-90. Morgan contended that those VTDs allowed Canterbury, a Republican VTD, to be added to District 72, but that was not strictly correct based on the VTD geography. 2nd Trial Tr. at 697; DI Ex. 91 at 144. As shown in the analysis of District 74, however, Jones and Morgan wanted to include Canterbury in District 72 while also promoting its compactness. To accomplish both goals required the transfer of the District 71 VTDs. See DI Ex. 91 at 144. That is what I take Jones and Morgan's statements to have meant.

think that it can be found, by a preponderance of the evidence, that race was the predominant reason.

### c.     Decision 3: VTD 207

As to the third cited decision, the removal of VTD 207, the majority primarily highlights the testimony of McClellan. It claims that McClellan opposed losing VTD 207 and splitting the Fan Neighborhood. Maj. Op. at 41. And, it notes that McClellan testified that, when she approached Jones with her concerns, he said that he would be open to changes so long as they complied with the 55% BVAP and population equality targets. Maj. Op. at 41. Further, it observes that McClellan tried to draw maps that included VTD 207 in District 71 but that she could not do so without reducing her BVAP below 55%. Maj. Op. at 41-42. Finally, it maintains that VTD 207 had been in District 71 for at least 20 years, that it was heavily Democratic and supportive of McClellan, that it had low BVAP, that transferring it split the Fan neighborhood, and that it was shifted to District 68, which was more suburban and represented by a Republican delegate, Loupassi. Maj. Op. at 40-41.

The Court, however, previously addressed the precise issues raised by the majority. It found:

> And here, [McClellan's] personal preferences [as to VTD 207] appeared in conflict with those of another legislator: Delegate Loupassi. According to Delegate Jones, Delegate Loupassi used to be on the Richmond City Council and his former ward abutted precinct 207 where he had strong support, so he "wanted that precinct in his district." Delegate McClellan argued that adding precinct 207 to Delegate Loupassi's district "didn't help him" because he is a Republican, but Delegate Jones testified that Delegate

128

> Loupassi has "a broad base of support from the democratic side of the aisle" and had a personal "community of interest"—rather than partisan—connection to the area.

Bethune-Hill, 141 F. Supp. 3d at 563 (citations omitted). Nothing at the second trial, in my view, rendered that finding invalid.

In addition to the evidence on which that finding was based, Jones attested that Loupassi "was concerned about getting too much of Chesterfield" and "wanted more voters in the Richmond city area which would have been more favorable to him." 1st Trial Tr. at 307. And, he explained that Loupassi's desires prevailed because "he is a Republican member of the majority party." See 1st Trial Tr. at 305. Thus, as Jones testified, the shift of VTD 207 was not "driven principally by race" but by "politics and personal preference." 1st Trial Tr. at 307-08.

Morgan corroborated Jones' testimony (albeit with less detail). He stated that VTD 207 was moved because "unlike the previous Republican delegate, Delegate Marrs, who was from Chesterfield, Delegate Loupassi is from Richmond." 2nd Trial Tr. at 702-03.[23]

Additionally, it is hard to imagine that the transfer of VTD 207 was animated predominantly by race, given that it was replaced by VTD 204, which had a similar demographic composition to VTD 207. See 2nd Trial Tr. at 531. VTD 207 had a population of 3,182, a voting age population ("VAP") of 2,946, and a BVAP of 93,

---

[23] The majority refuses to credit Jones because he "could not 'recall directly' at the second trial any specific conversation with Loupassi" and because Intervenors did not call Loupassi. Maj. Op. at 41 n.31 (citations omitted). However, memories fade. And, the burden of proof here is on Plaintiffs, so I do not fault Intervenors for failing to call Loupassi (especially given Morgan's confirming testimony).

whereas VTD 204 had a population of 2,980, a VAP of 2,818, and a BVAP of 358. Pl. Ex. 63 at 127-28. Hence, the switch did not aid District 71 substantially in achieving 55% BVAP. And, although there is little evidence as to why VTD 204 was added, the Court previously has held that the change made District 71 more compact. Bethune-Hill, 141 F. Supp. 3d at 563.

In a footnote, the majority reaches the opposite conclusion, suggesting that the swap of VTD 207 for 204 was racially motivated because the transfer of equivalent numbers of people was not necessary for population equalization and, "[w]ithout this swap, the BVAP of District 71 would have dipped below 55%." Maj. Op. at 42 n.32. But, as set forth above, there were plainly race-neutral reasons for transferring out VTD 207 (and therefore for moving in a similar number of people). And, although switching VTDs 207 and 204 was sufficient to allow District 71 to maintain 55% BVAP, it was in no way necessary to realizing that goal. Without the swap, District 71's BVAP would only have fallen to 54.8%. See Pl. Ex. 71 at 17-18. That BVAP differential could have been addressed by adding a miniscule amount of BVAP and/or ceding of a tiny amount of non-BVAP, which could have been accomplished in any number of ways. See Pl. Ex. 63 at

127-28; Pl. Ex. 71 at 65; DI Ex. 38 at 7.[24] Accordingly, because the swap was not mandated by the 55% BVAP rule (i.e., it was sufficient and not necessary) and because there were race-neutral justifications for the change, I cannot subscribe to the view that VTD 204 replaced VTD 207 primarily for racial reasons.

Relatedly, given that VTD 207 could easily have been drawn into District 71 while maintaining 55% BVAP, I find McClellan's assertion that she was <u>unable</u> to do so to be quite dubious. <u>See</u> 1st Trial Tr. at 40 ("Every possible way, and I literally, even if it meant splitting it, went street by street to see how much of that precinct I could keep, and based on the other parts of the district, any portion of 207 would push the [BVAP] below 55 percent when I moved it on the map."). Moreover, as suggested throughout the analysis of District 71, this type of inaccuracy pervaded McClellan's testimony. Because the extent to which the 55% BVAP rule dictated the contours of the District lines is a

---

[24] If VTD 207 were retained and 204 excluded, District 71 would have had a population of 80,524 and a BVAP of 54.8%. <u>See</u> Pl. Ex. 63 at 127-28; Pl. Ex. 71 at 65; DI Ex. 38 at 7. However, if just 250 BVAP were added by, for example, splitting VTD 301 with District 74, 55% BVAP and population equality would have been preserved. <u>See</u> Pl. Ex. 71 at 65; DI Ex. 38 at 7; <u>see also</u> Pl. Ex. 63 at 127-28.

That change would not have imperiled District 74's target numbers, either. Reducing District 74's BVAP by 250 would have left District 74 with a population of 79,344 and a BVAP of 57.1%. <u>See</u> Pl. Ex. 71 at 65; DI Ex. 38 at 8; <u>see also</u> Pl. Ex. 63 at 127-28.

District 71 could also have remained at 55% BVAP and within population by ceding 200 non-BVAP. <u>See</u> Pl. Ex. 71 at 65; DI Ex. 38 at 7; <u>see also</u> Pl. Ex. 63 at 127-28. That could have been accomplished by either splitting a VTD or altering the split of VTD 505. The latter option would have reduced District 69's BVAP to 55% and increased its population to 79,586. <u>See</u> Pl. Ex. 71 at 56, 65; DI Ex. 38 at 7.

critical issue here, these inaccuracies also render her testimony as a whole highly suspect. I thus do not credit McClellan at all as to VTD 207.

In short, as to the removal of VTD 207, there is evidence in the record that race was involved. However, that evidence is largely incredible, and there is substantial reliable evidence that the primary considerations were politics and legislator preferences. And, moving VTD 207 to District 68 was not necessary to ensure 55% BVAP in District 71, which is further proof that race-neutral factors played a more important role than race. Hence, I do not view the decision as strong evidence of racial predominance.

### d.    Decision 4: VTD 505

As to the fourth cited decision, the split of VTD 505, the majority again highlights the testimony of McClellan (and cites some circumstantial evidence supporting her testimony). Maj. Op. at 42. It indicates that McClellan and Carr were unable to keep VTD 505 whole while maintaining 55% BVAP in Districts 69 and 71, so they agreed to split VTD 505 between these Districts. See Maj. Op. at 42.

As an initial matter, Morgan provided a different explanation. He attested that he drew the VTD 505 line as he did because "Delegate Jones and [he] received input from the registrar of Richmond," "[t]here were many changes that were made between the vetoed bill and the enacted plan in the Richmond area," and Morgan "was brought back in . . . to make changes such as that." 2nd Trial Tr. at 702. Although that testimony was somewhat vague, it means either that he split VTD 505 based on input from the Richmond registrar or that he did so on his own, in which case race was not considered.

See 2nd Trial Tr. at 668, 702, 714-15. Either way, the split was not as McClellan described.

More importantly, however, as with VTDs 703 and 207, I am highly skeptical of McClellan's representation that the VTD 505 split was required by and based on the 55% BVAP rule. See, e.g., 2nd Trial Tr. at 42 ("So the way it was finally split in [sic] map as signed by the governor in 5005 was actually suggested [to Jones] by Delegate Carr and myself. So I don't remember exactly where the line was in the map as originally introduced, but we did attempt to keep 505 whole, and when we couldn't meet the target criteria, we just said, well, what's the most logical place to split it."); 2nd Trial Tr. at 59 ("[W]hen we drew a map that included 505 in one district or the other, it affected the [BVAP].").

That testimony should be considered in perspective of the clear record that there were numerous alternative configurations that would have permitted VTD 505 to move entirely into District 71. The portion of VTD 505 in District 69 had a population of 1,245, a VAP of ~1,177, and a BVAP of 60. See Pl. Ex. 71 at 56. It seems that certain of District 71's predominantly white VTDs (e.g., 204, 208, 308, 309) could have been split to exclude a similar population. See Pl. Ex. 63 at 127-28; Pl. Ex. 69 at 18. Or, more simply, VTD 309 could have been ceded entirely to District 73 or District 72 and replaced by the District 69 portion of VTD 505. Doing so would have left District 71 with a BVAP of 55.5% and a population of 79,779. See Pl. Ex. 63 at 127-28; Pl. Ex. 71 at 56, 65; DI Ex. 38 at 7.

Based on that analysis (and as with VTDs 207 and 703), I cannot credit McClellan's testimony or believe that the VTD 505 split was racially motivated. That view is underscored by the fact that Plaintiffs did not call Carr to corroborate McClellan's testimony. And, Morgan suggested that the split was due to non-racial reasons. Furthermore, as with VTD 703, the split does not appear racial; it simply divided two predominantly white populations. Pl. Ex. 69 at 18. Finally, even if race were a considered, it was clearly a minimal factor, given that splitting VTD 505 was one of several options available to the legislature sufficient to meet 55% BVAP.

### 4. Conclusion as to District 71

In sum, Plaintiffs' evidence merely shows that race played a role in the design of District 71. See Pl. Post-Trial Br. at 31-32. It does not establish that race predominated. See Pl. Post-Trial Br. at 31-32. The design of District 71 was based upon numerous motivations and constraints, including political objectives, legislator preferences, avoiding incumbent pairs, making District 71 Richmond-centric, supporting the needs of adjacent Districts, and maintaining 55% BVAP. By and large, moreover, the legislature accomplished these goals with minimal compromise; it satisfied legislator preferences, it did not pair incumbents, it improved District 71's Richmond-centrism, it provided for District 72's needs, and it met 55% BVAP. And, the specific line-drawing decisions made along the way that the majority considers to be strong evidence of racial predominance, I respectfully submit, do not support their conclusions for the reasons explained above. Hence, I conclude that race did not predominate in the design of District 71. And, even if I could not go so far as to make that affirmative conclusion, I think that,

on the record as a whole, Plaintiffs have not met their burden to prove, by a preponderance of the evidence, that race was the predominant reason for drawing District 71.

### ii.    District 70

The majority treats District 70 as a BVAP "donor" District, and it points to its "donation" of VTDs 701, 702, part of 703, 811, and 903. Maj. Op. at 44. It highlights the facts that District 70 shifted nearly 26,000 people in and out; that "[t]he BVAP of areas moved out of District 70 was more than 16 percentage points higher than the BVAP of the areas moved in"; that District 70's BVAP ultimately dropped to 56.4%; and that District 70 initially required no changes to satisfy the target criteria. Maj. Op. at 44. In my view, however, Plaintiffs fail to establish racial predominance.

### 1.    "Donations" to District 71

First, as set forth in the discussion of District 71, the transfer of VTDs 701, 702, and part of VTD 703 does not support a finding of racial predominance. Even if those VTDs were transferred to District 71 on the basis of race, moreover, that would not mean that race predominated as to District 70 as a whole.

### 2.    "Donations" to District 69

Second, it is, I think, not accurate to consider the VTD transfers from District 70 to District 69 to be primarily BVAP donations. Although those transfers included VTDs 811, 903, and part of 609, which were predominantly African-American, they also included VTDs 402 and 508, which were heavily white. DI Ex. 92 at 5; DI Ex. 94 at 3. And, VTDs 402, 508, and 609 were added "to bring District 69 up to the James River,"

which associated District 69's border with a geographic boundary, made the District more compact, and "enhanced the district's alignment with a distinct political subdivision and community of interest" (Richmond). See Bethune-Hill, 141 F. Supp. 3d at 560; 2nd Trial Tr. at 703; DI Ex. 94 at 3.

The majority's theory to explain this is that, because District 69 received heavily white VTDs from District 70 to bring District 69 up to the James River, it also needed to receive VTDs 811 and 903 to maintain 55% BVAP. Maj. Op. at 46. But, if race were the predominant goal, it would be necessary to ask: why bother to transfer VTDs 402 and 508 to bring District 69 up to the James River at all? Would not the legislature have simply left District 69 alone and only incorporated high-BVAP VTDs from District 70 until it reached its population target, so as to not risk falling below 55% BVAP?

Moreover, race-neutral reasons justified the transfer of VTDs 811 and 903. Morgan testified that the Richmond-area Districts, including District 69, were underpopulated, whereas the surrounding Districts (including in Chesterfield County) were overpopulated. 2nd Trial Tr. at 690-91. This issue was corrected "by bringing the Chesterfield population into District 70," i.e., by adding to that District the VTDs of Southside, Meadowbrook, Falling Creek, and Chippenham. See 2nd Trial Tr. at 691, 707; DI Ex. 94 at 3. District 70 was selected as the "vehicle" to bring the extra population into the Richmond area because it "already had a portion of Chesterfield County" and, "by taking [population] from the Chesterfield districts, it allows . . . [surrounding non-Challenged] districts to retain more of their core generally." 2nd Trial Tr. at 691-92, 706. Further, the areas of Chesterfield County that were added to District 70 were "fairly

136

similar" to (albeit more sparely populated than) other VTDs in that District. 2nd Trial Tr. at 706-08.[25],[26]

District 69, then, needed to pick up some of the surplus population obtained by District 70. 2nd Trial Tr. at 690-91. This was partially achieved by transferring VTDs 402, 508, and 609 to bring District 69 up to the James River. See DI Ex. 94 at 2-3. VTDs 811 and 903 were also chosen, and they both injected more population into District 70 and provided distinctly race-neutral advantages. VTD 811 had been split in the benchmark plan, but it was "unsplit" by the transfer to District 69. DI Ex. 91 at 139-40; DI Ex. 94 at 3. Furthermore, VTDs 811 and 903 improved District 69's compactness (vis-à-vis other District 70 VTDs) and promoted the District's eastward shift toward the James River and its Richmond-centrism (vis-à-vis VTDs from District 27 or District 68). See Bethune-Hill, 141 F. Supp. 3d at 560; DI Ex. 94 at 2-3. And, although VTDs 811 and 903 were predominantly African-American, that fact adds little to the analysis; that was true of every VTD in District 70 that bordered District 69 in the benchmark plan (with the exceptions of VTDs 402 and 508). See DI Ex. 92 at 7; DI Ex. 94 at 2-3.

----

[25] I recognize that District 69 had several VTDs in Chesterfield County in the benchmark plan and therefore conceivably could have been chosen as the "vehicle" to pick up the surplus population. 2nd Trial Tr. at 737-38; see also 2nd Trial Tr. at 691-92. The fact that it was not so chosen, however, is of no moment. The entire District was shifted east, at least in part to align with the James River, and it lost most of its Chesterfield VTDs in the process. DI Ex. 91 at 137-40; DI Ex. 94 at 2. To have used District 69 as the vehicle for capturing population in Chesterfield County would have counteracted that eastward shift and made it less Richmond-centric.

[26] McQuinn testified that she was concerned about gaining the Chesterfield VTDs. 2nd Trial Tr. at 103-05. But, she only "raised the question just informal . . . with one of the other delegates" and did not know why the change was made. 2nd Trial Tr. at 104-05.

Finally, the majority depends entirely on Dr. Rodden's analysis to support its conclusion that VTDs 811 and 903 were moved for racial purposes. See Maj. Op. at 44, 46. I believe that the foregoing analysis shows that an inference that race did not predominate is at least as plausible as an inference that it did. And, indeed, given that I do not find Dr. Rodden to be qualified in his motive testimony or otherwise credible, I do not think that an inference based on his testimony is valid at all.

### 3. Race-Neutral Explanations for Other of District 70's Boundaries

In addition to the boundaries described above, many other of the District 70 lines were set for largely non-racial purposes.

For example, the record indicates that the Belmont VTD was transferred from District 69 to District 70 to support District 69's eastward shift from Chesterfield County toward Richmond and the James River. See DI Ex. 94 at 2-3. Belmont was in Chesterfield County and, according to Dr. Rodden, had "about a 50/50 racial breakdown." 2nd Trial Tr. at 183-84; DI Ex. 94 at 2-3. It was replaced in District 69 by a portion of VTD 410, which portion was in Richmond and, compared to Belmont, had a similar population and substantially less BVAP. See Pl. Ex. 63 at 19-20, 127-28; Pl. Ex. 71 at 53; DI Ex. 94 at 2-3. The transfer of Belmont to District 70 (and its replacement in District 69 with part of VTD 410) therefore reduced District 69's BVAP (from 55.5% to 55.2%). See Pl. Ex. 63 at 19-20; Pl. Ex. 71 at 53, 65; DI Ex. 38 at 7. It is unlikely that race played a role in that decision.

Additionally, District 70 retained its "northern turret," including the VTDs of Central Gardens, Masonic, part of 703, 705, and Montrose because: (1) McQuinn lived at the bottom of the turret; and (2) she wanted to retain the more northern VTDs. 2nd Trial Tr. at 537-38; 1st Trial Tr. at 311; see also DI Ex. 94 at 3.

Furthermore, Dorey was divided between Districts 70 and 61 in a "typical equal population split." 2nd Trial Tr. at 629-30, 708, 714-15, 731-32. For such splits, Morgan did not consider race. See 2nd Trial Tr. at 668, 714-15. And, VTD 609 was split between Districts 69 and 70 to allow "better contiguity for District 70." 2nd Trial Tr. at 704.

### 4. Generalized Population Data

The majority also points to evidence of generalized population shifts. Maj. Op. at 44. Respectfully, I do not find this evidence to be probative of racial predominance.

The majority's principal point is "nearly 26,000 people were moved out of District 70, and a different 26,000 were moved in." Maj. Op. at 44. But, the Court's previous opinion addressed that issue:

> Plaintiffs also argue that HD 70 was not under-populated before the redistricting process, but "the General Assembly added about 26,000 people and removed about 26,000 people in redrawing the district." As discussed above, if properly populated districts were presumptively required to remain untouched, then all the other districts would need to wrap around them (in substantial disregard of neutral principles) in order to achieve population equality. Nor is the substitution in population numbers particularly shocking. If a properly populated district must shift locations, then it will necessarily "remove" a large amount of people from its old location and "add" the same amount from its new location. That result seems rather obvious.

Bethune-Hill, 141 F. Supp. 3d at 561-62 (citations omitted). I remain of that view and find that race only marginally accounts for these population shifts which concern the majority.

As set out above, the majority also notes an overall decrease in District 70's BVAP and a BVAP disparity between areas shifted into and out of the District. Maj. Op. at 44. However, this offers few insights into racial predominance in light of the foregoing analysis of specific District line decisions.

### 5.     Conclusion as to District 70

In sum, although race influenced the design of District 70, the record shows that non-racial motives also played a significant role. Based on the record as a whole, I cannot find, by a preponderance of the evidence, that, among these motives, race was "the legislature's predominant motive for the design of the district as a whole," especially given that "courts must 'exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race.'" See Bethune-Hill, 137 S. Ct. at 797, 800 (citations omitted). Thus, I conclude that Plaintiffs have not met their burden to prove that race was the predominant factor in drawing District 70. See Pl. Post-Trial Br. at 35-36.

### iii.     District 69

The majority holds that race predominated based on the characteristics of the areas moved into and out of District 69. Maj. Op. at 45-47. Of course, reliance on such circumstantial evidence is permissible. But, that reliance requires making inferences as to

motive, and I respectfully submit that the inferences drawn by the majority are insufficient to establish racial predominance by a preponderance of the evidence.

### 1.      VTDs Beaufont & Manchester

The majority first highlights the fact that District 69 lost two largely white VTDs to District 27 to the west, notwithstanding that District 27 was overpopulated. Maj. Op. at 46. However, as discussed in the analysis of District 70, District 69 underwent an eastward shift out of Chesterfield County and toward Richmond and the James River, which rendered District 69 more compact, aligned it with a geographic boundary, and made it more Richmond-centric. Retaining District 69's western VTDs would have undermined that exercise. See DI Ex. 94 at 2. It is at least as likely that the decision to cede VTDs to District 27 was motivated by a desire to shift District 69 east as it is that the decision was motivated by race. Indeed, the VTDs District 69 lost to District 27, Beaufont and Manchester, were replaced by VTDs along the James River (two of which were heavily white) that reduced District 69's BVAP (from 57%, albeit below the population minimum, to 55.2%). See Pl. Ex. 63 at 22-23, 127-28; Pl. Ex. 71 at 65; DI Ex. 38 at 7; DI Ex. 92 at 5.[27]

### 2.      "Donations" from District 70

The majority also notes that District 69 gained VTDs from District 70 even though District 70 was already at population. Maj. Op. at 46. But, those VTD transfers have race-

_____

[27] Beaufont and Manchester had a combined population of 7,058, VAP of 5,269, and BVAP of 2,069 (39.3%). See Pl. Ex. 63 at 22-23. VTDs 402, 508, and 609 had a combined population of 7,729, VAP of 6,560, and BVAP of 1,686 (25.7%). See Pl. Ex. 63 at 127-28.

neutral explanations, as discussed in the analysis of District 70. Again, those explanations are at least as likely as race to have motivated the legislature.

### 3.    VTD Splits

The majority additionally takes the view that, "[i]n both the VTDs split between District 69 and a non-challenged district, the portion of the split VTD allocated to District 69 had a higher BVAP than the portion of the split VTD allocated to the non-challenged district." Maj. Op. at 46. Those VTDs are 410 and Davis. Pl. Ex. 71 at 53.

As to VTD 410, it was split: (1) to equalize population; and (2) because some portion of VTD 410 needed to remain in District 68 to ensure its contiguity. See 2nd Trial Tr. at 704-06, 735-36. And, the location of the split in VTD 410 was not based on race but rather on Chippenham Parkway. 2nd Trial Tr. at 704-05, 736.[28] Moreover, Morgan chose where to split VTD 410 in HB 5005, and he did not consider race in splitting VTDs. 2nd Trial Tr. at 668, 705, 714-15, 735.[29]

As to Davis, we know little about that split. See 2nd Trial Tr. at 704. It appears, however, decidedly non-racial. The portion of Davis allocated to District 69 received

---

[28] I recognize that Alabama deemed highway lines a disfavored boundary where, as here, they were "not mentioned in the legislative redistricting guidelines." Alabama, 135 S. Ct. at 1271-72. But, Morgan's testimony was that he sometimes identified local landmarks to make a neat VTD split and that he relied on a highway line, rather than race, in splitting VTD 410. 2nd Trial Tr. at 704-06, 736. In Alabama, there was no such evidence from any map drawer. See Alabama, 135 S. Ct. at 1271-72; Ala. Legislative Black Caucus v. Alabama, 989 F. Supp. 2d 1227, 1306 (M.D. Ala. 2013), vacated, 135 S. Ct. at 1274.

[29] Morgan testified that VTD 410 had been split in a different manner in HB 5001, and he set the split along Chippenham Parkway "in the last stages of the map-drawing." 2nd Trial Tr. at 704-05.

about 84% of its population and about 86% of its BVAP. See Pl. Ex. 71 at 53. And, Dr. Rodden's dot density map of District 69 reveals that the Davis split followed no discernable racial pattern. Pl. Ex. 69 at 25. Indeed, Plaintiffs do not even discuss the Davis split, and nothing in the record suggests that this split was racially motivated. Pl. Post-Trial Br. at 33-34; see also 2nd Trial Tr. at 668, 704, 714-15. These VTD splits, therefore, do not in any way support a finding of racial predominance.

Finally, the majority points to the split of VTD 505. Maj. Op. at 46. For the reasons set forth in the discussion of District 71, however, that split is not supportive of a finding of racial predominance.

### 4. Race-Neutral Explanations for Other of District 69's Boundaries

Moreover, the record shows that other segments of District 69's lines were clearly not racially motivated. For example, for the reasons discussed in the analysis of District 70, it is hard to see how the transfer of Belmont to District 70 and its replacement with part of VTD 410 was racial. Likewise, VTD 609 was split between Districts 69 and 70 to allow "better contiguity for District 70." 2nd Trial Tr. at 704.

### 5. Conclusion as to District 69

In short, the majority, as urged by Plaintiffs, primarily infers from circumstantial evidence that race was the legislature's predominant consideration. See Pl. Post-Trial Br. at 33-34.[30] For the foregoing reasons, I respectfully conclude that such an inference is

---

[30] Plaintiffs do additionally claim that District 69 "was drawn to comply with the 55% BVAP target," citing McClellan's testimony. Pl. Post-Trial Br. at 33 (emphasis (Continued)

insufficiently supported on the record because it is at least as likely that race did not predominate as that it did. Accordingly, Plaintiffs have not carried their burden of establishing racial predominance by a preponderance of the evidence.

### iv.    District 63

The majority concludes that race predominated as to District 63 because the District's design was based largely on the BVAP and population needs of District 75, where it is established that race predominated. Maj. Op. at 48-50. Although it is true that the configuration of District 75 affected the boundaries of District 63, that is not a sufficient ground to support a conclusion of racial predominance, in perspective of the record taken as a whole. The decision to split Dinwiddie County between Districts 75 and 63 was previously determined to have had a racial purpose. Maj. Op. at 48-49; Bethune-Hill, 141 F. Supp. 3d 553-54. However, the Court's previous opinion also found that the legislature had non-racial motivations for configuring the split as it did and that the split of Dinwiddie County did not establish racial predominance as to District 63 as a whole. Bethune-Hill, 141 F. Supp. 3d 553-55. I reach the same finding here, and I have found nothing in the record that alters that conclusion.

_____

added). But, she merely indicated that District 69 (like the other Richmond Districts) was subject to the 55% BVAP rule. 1st Trial Tr. at 29. That is undisputed, and it does not, as the Supreme Court held, carry the day. In any case, as explained in the analysis of District 71, McClellan's view of whether District lines were racially motivated cannot be credited.

### 1.    The Split of Dinwiddie County

The majority focuses little on the legislative intent underlying the split of Dinwiddie County. Rather, the majority mainly highlights the fact that the Court previously deemed this split to be "avowedly racial." Maj. Op. at 48-49. But, as just noted, the Court's previous opinion did not hold that the split of Dinwiddie County was sufficient, alone, to establish racial predominance. Bethune-Hill, 141 F. Supp. 3d 553-55. And, it found that both political and racial motives were involved in the configuration of the split. Id. at 553-54.

Indeed, the only decisional aspect of the split of Dinwiddie County that the majority specifically discusses is the "oddly shaped 'hook' around New Hope." Maj. Op. at 49 n.35. It does not characterize that hook as racially motivated. Maj. Op. at 49 n.35. Instead, it merely points to an inconsistency between the testimony of Delegate Dance (of District 63) and Jones and to the fact that Jones "equivocated" as to the reason for the hook at the second trial. Maj. Op. at 49 n.35. This perceived "equivocation" consisted entirely of Jones stating: "My memory -- of course, you have to -- you know, I probably talked to 70 plus members in the whole process in a very compressed timeline. I thought that initially that the finger had to do with a primary -- a potential primary component [sic], but my memory could be refreshed." 2nd Trial Tr. at 493.

Jones otherwise offered clear testimony as to the creation of the hook, however. He testified, for instance that the reason for the hook was that Dance requested that the New Hope VTD, which borders the hook, remain in her District. 2nd Trial Tr. at 492-95; 1st Trial Tr. at 325-27. According to him, New Hope originally was not going to be in

District 63 at all, but Dance had worked very hard and so New Hope was added to it. 2nd Trial Tr. at 495. Morgan largely confirmed that statement. 2nd Trial Tr. at 713-14. The "hook," therefore, was simply what remained in District 75 after New Hope was added to District 63. 2nd Trial Tr. at 495.

Jones believed that this "remainder" was designed to draw a potential primary challenger out of District 63. 1st Trial Tr. at 326. He explained that the area "was negotiated between Delegate Dance, Delegate Tyler, and [him]," that "the boundary, from [Jones'] perspective, really wasn't a highest priority," and that otherwise he "would never have drawn" the hook. 2nd Trial Tr. at 492-95; 1st Trial Tr. at 325-26. That was corroborated by Morgan, who stated that the area including and near the hook: "was negotiated between Delegate Dance, Delegate Jones, and Delegate Tyler. Once that boundary was negotiated, it was not changed." 2nd Trial Tr. at 714.

It is true, as the majority notes, that Dance testified at the second trial that she did not request the hook or have a primary challenger who lived there. Maj. Op. at 49 n.35; 2nd Trial Tr. at 118. However, I credit Jones' testimony at the first trial over Dance's testimony at the second, given that memories fade and that Dance did not testify to that effect in the first trial. Furthermore, Jones' testimony confirms that, at minimum, he did not demand or impose the hook shape to ensure compliance with the 55% BVAP target. Rather, he perceived it to be the result of political negotiations. Even if Jones were mistaken, a mistaken political justification is still non-racial.

## 2.     Hopewell & Prince George County

The majority attempts to show that race predominated by tying the split of Dinwiddie County to the addition of areas of Hopewell and Prince George County to District 63. Maj. Op. at 48-49. It points to Dance's testimony that District 63 incorporated these areas to increase its BVAP after losing BVAP to District 75. Maj. Op. at 49. But, Dance's testimony was addressed in the Court's previous opinion:

> However, the record shows that the eastern border advanced other criteria, both neutral and political. In order to unwind the water crossing in the Benchmark HD 74, Delegate Jones decided to move precincts in Hopewell City out of HD 74 and into HD 63. Thus, HD 63's eastern configuration improved HD 74's adherence to contiguity conventions. Moreover, by placing these precincts in HD 63 rather than HD 62 or HD 64, the District's eastern boundary avoids solving the water crossing problem to the detriment of Republican districts on either side.

See Bethune-Hill, 141 F. Supp. 3d at 554 (citations omitted).

Those findings, to which I fully subscribe again, are well supported by the record. Jones testified that his motivation for moving portions of Hopewell into District 63 from District 74 was to correct a crossing of the James River Tidal Estuary in District 74. 2nd Trial Tr. at 480-81, 543-44; 1st Trial Tr. at 316-17, 328-29.[31,32] Jones further explained

---

[31] Note that certain river crossings were permitted in HB 5005. See, e.g., DI Ex. 91 at 138; see also 2nd Trial Tr. at 525. However, Morgan stated that crossings of the James River Tidal Estuary (which were larger than other crossings and had been challenged previously in litigation) were to be avoided. 2nd Trial Tr. at 650-51.

[32] Plaintiffs make much of the fact that the Supreme Court of Virginia upheld the Hopewell river crossing over a state constitutional challenge. Pl. Post-Trial Br. at 38 n.13. However, Jones clarified that he wanted to correct the river crossing, even though it had
(Continued)

that race had nothing to do with his decision to correct that crossing and that he kept the split of Hopewell as it existed in the benchmark plan. 2nd Trial Tr. at 481, 523-24; 1st Trial Tr. at 317. Morgan attested, moreover, that Hopewell remained split (now between Districts 62 and 63 rather than between Districts 62 and 74) in order to place outside District 62 the areas of Hopewell that the District 62 incumbent, Delegate Riley Ingram, had not represented from 2001 to 2011. 2nd Trial Tr. at 710-12, 751-52; see also DI Ex. 91 at 123-24. And, Morgan made clear, District 62 had already undergone major changes and the areas of Hopewell allocated to District 63 were "heavily Democratic and would have affected [Ingram's] election." 2nd Trial Tr. at 710-12. Jones confirmed that Ingram's District "was in the top three of the most changed districts" and that moving Hopewell entirely into District 62 "would have certainly made it more problematic for [Ingram's] reelection." 2nd Trial Tr. at 493-94.

A few other points respecting Hopewell are worth noting. First, if there is a correlation between race and politics, it is not surprising that a split of Hopewell along party lines would also appear racial. See Cooper v. Harris, 137 S. Ct. 1455, 1473 (2017). Second, Morgan testified that including Hopewell in District 63 was not necessary for it to achieve 55% BVAP. 2nd Trial Tr. at 712, 753. That testimony was corroborated by Dr. Rodden, who stated that District 63: "ended up exceeding the [55% BVAP] target

---

been upheld, based on political concerns. 2nd Trial Tr. at 480. People had perceived river crossings negatively (e.g., describing District 64 as the "ferrymandered district"), "so there was some concern about going across the river where there wasn't a direct, quote, unquote, you know, bridge or access point." 2nd Trial Tr. at 480.

substantially. So this is a situation where it could have been drawn in a number of different ways to reach that target." 2nd Trial Tr. at 215. On such a record, the 55% BVAP target, and hence race, cannot be found to have affected the District lines as to the eastern portion of District 63.[33]

### 3.    VTD Splits

Finally, the majority underscores VTD splits in District 63 as evidence of racial predominance. Maj. Op. at 50. Specifically, it points to the split of Ward 7 in Hopewell, and it notes a pattern of allocating more BVAP to District 63 than to non-Challenged Districts in split VTDs. Maj. Op. at 50.

Morgan, however, testified that the split of Ward 7 was to equalize population and that he chose to split Ward 7 where he did because of the geography of census blocks. 2nd Trial Tr. at 748-49. Jones maintained that he was not involved in splitting that VTD, and Morgan did not take race into account when he split VTDs alone. 2nd Trial Tr. at 494, 668, 714-15. As elsewhere, I accept the testimony of Jones and Morgan.

The other VTD splits between District 63 and non-Challenged Districts occurred in the Rives, Jefferson Park, and Courts Building VTDs. Pl. Ex. 71 at 52. As to Rives,

---

[33] Dance may well have believed that District 63 incorporated portions of Hopewell for racial reasons. See 2nd Trial Tr. at 116-17; 1st Trial Tr. at 81. As an initial matter, however, I have trouble crediting her view, for previously stated reasons. And, in any case, her position was undermined by the fact that both Morgan and Dr. Rodden testified that District 63 was not substantially constrained by the 55% BVAP target. Furthermore, Dance insisted at the second trial that, for the most part, she "didn't really pick [her] district" and "they stretched [her] in whatever direction they were to take [her]." 2nd Trial Tr. at 125. Therefore, I credit the testimony of Jones and Morgan as to the reasons for District 63's design over that given by Dance on this point.

Morgan attested that it was split among Districts 62, 63, and 64 to balance population in light of difficult census block geography and because that was an area where different geographic regions merged. 2nd Trial Tr. at 745.[34] The location of the split was set on the north side at Highway 36 and on the south side at I-295. 2nd Trial Tr. at 745. As to Jefferson Park, Morgan testified that it was split for similar reasons. 2nd Trial Tr. at 745, 748. And, as to Courts Building, Morgan explained that it was split for similar reasons and because of an island in the river. 2nd Trial Tr. at 745-46, 748. Jones had no involvement in these VTD splits, meaning that Morgan split them on his own and did not consider race. 2nd Trial Tr. at 494, 668, 714-15. Thus, these VTD splits in no way suggest that race predominated.

### 4.    Conclusion as to District 63

In short, the only confirmed racial motive in designing District 63 involved the split of Dinwiddie County. However, other motives clearly influenced District 63 as a whole, including fixing a river crossing, political considerations, and incumbent requests. On this record, it is not shown which of these factors predominated, and Plaintiffs have not met their burden to prove, by a preponderance of the evidence, that race was the predominant reason for drawing District 63 as it was drawn. See Pl. Post-Trial Br. at 28-30.

---

[34] This VTD was referred to as "Reams." 2nd Trial Tr. at 745-46. Based on the context, however, it seems that what was meant was "Rives." See 2nd Trial Tr. at 745-46; DI Ex. 91 at 126; DI Ex. 94 at 1.

##### v.    District 74

The majority takes the view that "[D]istrict 74 served as a 'donor' district to surrounding challenged districts that needed an influx of BVAP to reach the 55% BVAP threshold." Maj. Op. at 51-52. I cannot agree.

### 1.    Generalized Population Data

The majority first points to the facts that: (1) "16,414 people were moved out of District 74, and 15,855 were moved [in]"; and (2) "the BVAP of the areas removed from District 74 and transferred to other challenged districts was 69%, whereas the BVAP of areas moved from District 74 to non-challenged districts was only 20.5%." Maj. Op. at 52. The fact that people were moved into and out of a District does not, on its own, establish anything. See Bethune-Hill, 141 F. Supp. 3d at 561-62. And, the fact that more BVAP was moved from District 74 to Challenged Districts than to non-Challenged Districts is of little evidentiary value given the race-neutral explanations for the changes to District 74's boundaries detailed below.

### 2.    Specific Line-Drawing Decisions

The majority then moves on to address specific changes in the District lines. In particular, it emphasizes the move of: (1) the Ratcliffe VTD from District 74 to District 71; and (2) portions of Hopewell from District 74 to District 63. Maj. Op. at 52-53.

As to Ratcliffe, as discussed in the analysis of District 71, race was only part of the reason for adding that VTD. And, even if the transfer were entirely racial, that would not establish racial predominance as to District 74 as a whole.

The significance of the portions of Hopewell that were transferred from District 74 to District 63 is addressed in the analysis of District 63. In brief, however, that alteration was intended to correct a river crossing while minimizing political impact, and it does not suggest racial predominance. And, it is worth repeating that transferring Hopewell to District 63 was not even necessary for that District to achieve 55% BVAP. 2nd Trial Tr. at 215, 712, 753. That evidence, taken together, I think undermines the theory that District 74 "served as a 'donor' district to surrounding challenged districts that <u>needed an influx of BVAP to reach the 55% BVAP threshold</u>." Maj. Op. at 51-52 (emphasis added).

### 3. VTD Splits

Finally, the majority highlights the fact that, "in all three VTDs split between District 74 and a non-challenged district, the portion of the VTD allocated to District 74 had a higher BVAP than the portion allocated to a non-challenged district." Maj. Op. at 53. Those VTDs are Moody, Brookland, and Belmont. Pl. Ex. 71 at 53.

Morgan explained that the Belmont split was intended to allow Canterbury, "a strong Republican-performing precinct," to transfer to District 72. 2nd Trial Tr. at 696. Canterbury was on the far side of Belmont from District 72, so at least some of Belmont needed to go to District 72 to permit the transfer. <u>See</u> DI Ex. 91 at 144.

Morgan also confirmed that a river formed part of the boundary between Districts 74 and 72 in the area where these VTDs were split because that "had a better impact on compactness for District 72, which was one of the least compact districts in the entire plan." 2nd Trial Tr. at 696-97. The issue of District 72's compactness was important

enough that it was the topic of specific discussions between Morgan and Jones. See 2nd Trial Tr. at 697.

The river boundary between Districts 72 and 74 ended at the Moody-Brookland border. DI Ex. 91 at 143-44. At that point, the District 74 line followed State Road 73 for a time before splitting Brookland at its narrowest point and then continuing upwards along VTD boundary lines. DI Ex. 91 at 143-44. Thus, the "river"/compactness justification applies to Belmont and Moody but not the Brookland VTD. As to that VTD, Morgan testified that it was split for population equalization. 2nd Trial Tr. at 740. Given that the other VTDs were split along a river boundary for specific reasons, it was reasonable to split a third VTD between Districts 74 and 72 at a geographically convenient point to equalize population.

Further, Jones was not involved in splitting these three VTDs. 2nd Trial Tr. at 496-97, 697. That means that they were split by Morgan in a race-blind manner. 2nd Trial Tr. at 668, 714-15. Hence, because the splits were largely for compactness and political purposes and not racial purposes, they do not evince racial predominance and, in fact, point to the conclusion that race did not predominate.

### 4. Race-Neutral Explanations for Other of District 74's Boundaries

Additionally, other aspects of District 74's lines were clearly non-racial. For instance, Morgan testified that VTDs Nine Mile, Chickahominy, and Antioch were added to District 74's northwestern appendage to "round[] out the district up to the county line," i.e., "to bring the northern fragment of Henrico County into District 74 away from

District 97 which was primarily a Hanover and New Kent district." 2nd Trial Tr. at 693-94; see also DI Ex. 91 at 147-48. Jones similarly noted that he "took three or four precincts out of 97 which then undid one more jurisdictional split." 2nd Trial Tr. at 545-46. All of these VTDs were predominantly white, and Chickahominy and Antioch were heavily so. See DI Ex. 92 at 11; see also DI Ex. 91 at 147-48.

Likewise, District 74 extracted the heavily African-American VTD 301 from District 71, notwithstanding that District 71 "had the lowest BVAP of any of the challenged districts." See Maj. Op. at 38; Pl. Ex. at 18. That move could not have been racially motivated because the theory of racial intent is that "District 74 served as a 'donor' district to surrounding challenged districts that needed an influx of BVAP." See Maj. Op. at 51.[35]

### 5. Conclusion as to District 74

In sum, the record, viewed as a whole, does not show that race was the predominant motive in designing District 74. Thus, Plaintiffs have not met their burden to prove that it was. See Pl. Post-Trial Br. at 37-38.

### B. The North Hampton Roads Region

#### i. District 95

The majority mainly emphasizes the addition of a narrow appendage to the northwest of District 95 as the driver for its conclusion that race predominated in the

---

[35] At this point, I respectfully submit that the majority's BVAP donor theory cannot reasonably be supported. District 74 "unnecessarily" donated Hopewell to District 63 and extracted a high-BVAP area from a District 71, which had a significant "need" for BVAP.

drawing of District 95. Maj. Op. at 56. It claims that this appendage caused a significant reduction in compactness and split five VTDs (and did so such that the portions allocated to District 95 had greater BVAP). Maj. Op. at 56. It adopts Dr. Rodden's opinion that the VTDs at the top of the appendage, Jenkins, Denbigh, Epes, and Reservoir, were split precisely along racial lines. Maj. Op. at 57. And, the majority asserts that Dr. Palmer found strong positive correlations between race and the likelihood of inclusion in District 95. Maj. Op. at 56-57. The majority also rejects Morgan's explanation for the VTD splits and determines that because "only population, race, and ethnicity data were available at the census block level," the VTD splits must have been racial. Maj. Op. at 57, 57 n.42. Finally, the majority contends that District 95 used its new appendage to transfer BVAP to District 92 so that District 92 could meet the population equality and 55% BVAP targets. Maj. Op. at 58. And, it did so, transferring over 18,000 people into District 92, notwithstanding that District 95 had a population deficit of 12,000 people. Maj. Op. at 58.

Here too, as with several other Districts, the majority's conclusions are based on inferences from circumstantial evidence, and, of course, it is permissible to make decisions on the basis of circumstantial evidence. However, I find that these inferences are insufficient to establish racial predominance in light of the voluminous direct evidence of race-neutral intent.

### 1.    VTDs Transferred to District 92

Morgan and Jones made clear that VTDs from Hampton (Kraft, Forrest, Mallory, and Wythe) were transferred from District 95 to District 92 in order to reduce District 95's footprint in Hampton. See 2nd Trial Tr. at 680, 687; 1st Trial Tr. at 356-57; DI Ex.

155

94 at 14. Jones said that this result was a priority for the District 92 incumbent, Delegate Jeion Ward, and that he drew District 92 as he did for that reason. 2nd Trial Tr. at 562; 1st Trial Tr. at 356-57.

### 2.    District 95's Northern Appendage

To make those VTD transfers to District 92 feasible, "District 95 need[ed] to gain population," which it did "by stretching north towards where the surplus was." 2nd Trial Tr. at 680. But, the manner in which it did so was intended largely to accomplish political goals. Specifically, the northern appendage was primarily designed: (1) to remove Democratic VTDs (Reservoir and Epes) from District 93 to make it more of a swing District; and (2) to draw the District 93 incumbent, Delegate Robin Abbott, out of her District without pairing her with the District 95 incumbent, Delegate Mamye BaCotes. 2nd Trial Tr. at 508-10, 562, 675-78, 757-60; 1st Trial Tr. at 371-73. Additionally, as the Court previously found, "[a]ccording to Delegate Jones, the district's movement north follows heavily Democratic precincts and then narrowly jumps through two Republican precincts in order to capture another strongly Democratic voting area at its northernmost tip." Bethune-Hill, 141 F. Supp. 3d at 570; see also 1st Trial Tr. at 369-70; DI Ex. 92 at 24.

To accomplish the first goal while also complying with population requirements, it was necessary to split the VTDs leading up to Reservoir and Epes (including Jenkins, Denbigh, and Epes). 2nd Trial Tr. at 678, 757-59. Reservoir, in turn, was split among Districts 93, 94, and 95 to account for the difficult census geography of Reservoir while

also removing as much of Reservoir from District 93 as possible. 2nd Trial Tr. at 639-40, 677-79, 759-60.

This exercise in no way required Morgan to rely on racial data or to use racial data at the census block level as a proxy for politics because his goal was to "tak[e] as much as possible of Epes and Reservoir out of 93." 2nd Trial Tr. at 679. And, indeed, he succeeded, having removed all of Epes and most of Reservoir from District 93. 2nd Trial Tr. at 679.

To accomplish the second goal, it was necessary to maneuver the northern appendage around Abbot's residence, which was in Deer Park. See 1st Trial Tr. at 371-72; DI Ex. 94 at 14. Hence, according to Jones, it followed Sandy Bottom, Saunders, and Palmer instead of going "straight[] up." 1st Trial Tr. at 371-72.[36]

### 3.    The Majority's Inferences

In light of these race-neutral explanations for District 95's shape, the inferences relied upon by the majority are not persuasive that race primarily animated the design of District 95. True, District 95's compactness fell, but it did so primarily for political

---

[36] The record offers little explanation of why VTDs Deer Park and Palmer were split. It is fairly clear that the Deer Park split snaked around Abbott's residence, but it could have been "unsplit" and accomplished the same goal. See DI Ex. 94 at 14; see also DI Ex. 91 at 190. Dr. Rodden's dot density map, however, suggests that those splits had more to do with avoiding populated areas (to allow District 95 to achieve the political goals set forth above) than anything else. See Pl. Ex. 69 at 45; DI Ex. 94 at 14. According to Dr. Palmer's data, moreover, the portion of the Palmer VTD assigned to District 95 had a BVAP of 26.6%, whereas the portion assigned to District 94 had a BVAP of 17.6%; and, District 95 obtained ~64% of Palmer's population and ~73% of its BVAP. See Pl. Ex. 71 at 55. Thus, although there was some disparity, it was not substantial. Dr. Palmer did not offer any data on the Deer Park VTD split. See Pl. Ex. 71 at 55.

reasons. True, there were several VTD splits, but most were necessary to extract Epes and Reservoir from District 93 while complying with population requirements. True, the northern VTD splits appear to encompass African-American populations, but that is irrelevant if the person splitting the VTDs did not consider race data. True, there may have been a positive correlation between race and inclusion in District 95, but any general correlation is largely irrelevant if District 95's boundaries were set mainly on race-neutral bases (especially if these bases were political and there is a correlation between race and party). See Cooper, 137 S. Ct. at 1473; see also DI Ex. 101 at 2, 11-12.[37] True, political data are not available at the census block level, but that is immaterial since the map drawer was trying to remove as much of certain VTDs as possible. And, true, District 95 may have lost BVAP and population to District 92, notwithstanding its own population deficit, but it did so for race-neutral reasons.

### 4. Delegate Jones' Statements

Plaintiffs point to some additional direct evidence. Specifically, they highlight the following statement by Jones made during the redistricting floor debates:

> If you're familiar with the geography down in our neck
> of the woods, in Norcross and Suffolk to the Peninsula, all
> those districts are down in the very bottom [of population

---

[37] The majority mentions two correlations found by Dr. Palmer. The first is a "relationship between BVAP and the likelihood that a census block would be assigned to District 95." Maj. Op. at 56. The second is a finding "that black residents previously located in non-challenged District 94 were seven times more likely to be moved into District 95 than white residents." Maj. Op. at 56-57. The first correlation was flawed for the reasons illustrated by Dr. Katz. See DI Ex. 101 at 2, 11-12. The second provides no meaningful insight into the racial predominance question, given the direct evidence of race-neutral motives.

> loss]. So what had to happen, the population had to be picked
> up, had to try to maintain the voting strength for the black
> voting percentage. So naturally you would take some of
> those, those precincts and you had to move and change it to
> picked [sic] up population.

See Pl. Ex. 35 at 153; Pl. Post-Trial Br. at 46.

That statement does not alter my assessment of District 95, however. First, it was in response to a question as to why District 93 (and others) had lost BVAP (in HB 5001). Pl. Ex. 35 at 152-53. Jones' answer therefore would not have addressed the race-neutral motivations for the changes to Districts 92 and 95. Second, it is undisputed that the 55% BVAP target existed and hence in some way influenced the design of the Districts. Indeed, Jones testified that, as with every Challenged District, he considered race in drawing District 95. 1st Trial Tr. at 372; see also 2nd Trial Tr. at 521. So, a statement during a floor debate that Jones sought to preserve BVAP in response to a question about BVAP is unsurprising. And, finally, Dr. Rodden maintained that Districts 92 and 95 had high final BVAP numbers, so there "were many different ways to achieve the 55 percent target," and that there "was no need to split any of [District 95's northern] precincts to maintain [55% BVAP]." 2nd Trial Tr. at 244, 343. Morgan concurred. 2nd Trial Tr. at 681-82. Accordingly, Jones' statement does not establish that race predominated.

### 5.     Conclusion as to District 95

The record, as a whole, respecting District 95 shows that Plaintiffs have not met their burden to prove that race predominated in the design that District. See Pl. Post-Trial Br. at 46-48.

### ii.   District 92

#### 1.   District 92's Connection to District 95

The majority's holding as to District 92 is entirely based on the view that "the construction of District 92 was 'intimately connected' with the plainly race-based decisions made in District 95." Maj. Op. at 60 (citations omitted). In that regard, the majority notes that District 95 gained population and BVAP by way of its northern appendage and then transferred three high-BVAP VTDs (Kraft, Forrest, and Mallory) into District 92, totaling approximately 16,000 people. Maj. Op. at 60. And, it observes that, "[w]ithout this donation of significant population from District 95, the legislature would have been forced to expand the boundaries of District 92 into heavily white precincts, negatively impacting [BVAP]." Maj. Op. at 60.

As discussed in assessing District 95, that District was designed largely to achieve political goals. And, the shift of VTDs from District 95 to District 92 was intended to reduce District 95's footprint in Hampton. That same reasoning puts me at odds with the majority's views of District 92.

#### 2.   Other Evidence that Race Played a Minimal Role in the Design of District 92

Additionally, District 92 was not otherwise heavily influenced by racial considerations. First, as with District 95, Morgan and Dr. Rodden testified that the 55% BVAP target was not a significant constraint on the District 92 boundaries. 2nd Trial Tr. at 244, 681-82. Indeed, according to Morgan, adding the Bryan VTD to District 92, one of the "heavily white precincts" into which District 92 could have expanded, would not

have reduced BVAP below 55%. See 2nd Trial Tr. at 687-88. Second (and relatedly),

Wythe, a Hampton VTD, was added to District 92 from District 95, notwithstanding the

fact that, as the majority observes in a footnote, "Wythe had a total population of 2,330,

with a 17.6% BVAP." Maj. Op. at 60 n.45. Third, Jones explained that VTD Phoebus

was removed from District 92 to be paired with a community of interest in Bryan. 2nd

Trial Tr. at 563. And, finally, the majority acknowledges that "the district's compactness

score improved from the 2001 plan, and the number of split VTDs declined from three to

zero." Maj. Op. at 59.

### 3. Conclusion as to District 92

In my view, the record refutes a finding that District 92 was drawn predominantly

for racial reasons. At a minimum, the record, viewed as a whole, establishes that

Plaintiffs have not met their burden of proof as to District 92. See Pl. Post-Trial Br. at 46-

48.

### C. The South Hampton Roads Region

#### i. District 80

For its finding as to District 80, the majority makes the following points: (1)

22,000 people were moved out of District 80 and 32,000 were moved in; (2) white

residents were moved from District 80 to District 79 at three times the rate African-

American residents, with 29.4% BVAP in the transferred population; (3) District 80

became less compact and ultimately resembled a sideways "S"; (4) this sideways "S" was

created by adding a western appendage to the District (which included a new water

crossing and ran through several municipalities), and that decision was racially motivated

because it incorporated one primarily white VTD (Thirty-Four) to reach three largely African-American VTDs (Thirty-Eight, Taylor Road, and Yeats); and (5) although only one populated VTD was split, that split was made along racial lines. Maj. Op. at 64-65.

To me, however, those points do not support an inference of a predominantly racial motive by a preponderance of the evidence. That is because the record shows otherwise by direct, credible evidence.

### 1. Generalized Population Data & the Shape of District 80

As an initial matter, I find here (as elsewhere) that the generalized population data are not compelling. As discussed above, mere population shifts, standing alone, do not indicate racial predominance and are not even a surprising phenomenon. See Bethune-Hill, 141 F. Supp. 3d at 561-62. That is particularly so here given that the broad population movements toward Northern Virginia, described in greater detail above, especially affected the Hampton Roads region. See 2nd Trial Tr. at 476-78; 1st Trial Tr. at 350. Further, a bizarre shape does not, standing alone, demonstrate racial predominance. Bethune-Hill, 137 S. Ct. at 798 ("The Equal Protection Clause does not prohibit misshapen districts. It prohibits unjustified racial classifications."). And, the remaining generalized data are not persuasive, given my particularized analysis of District 80's lines.

### 2. District 80's Western Appendage

District 80's western appendage consisted entirely of VTDs brought in from District 79. DI Ex. 94 at 10. Jones made clear that the reason he transferred those VTDs was to benefit (and satisfy the requests of) the incumbent in District 79, Delegate Johnny

Joannou, who was a very conservative Democrat. <u>See</u> 2nd Trial Tr. at 500, 503. Jones made clear that this shift removed some Democratic VTDs from Joannou's District and that Joannou "did not want to have four jurisdictions" in his District. 2nd Trial Tr. at 500, 503, 553. Morgan similarly observed "that taking Delegate Joannou's concerns were an important factor at driving the redistricting process." 2nd Trial Tr. at 656-57.[38]

Jones also described other constraints that influenced the western segment of District 80. First, he did not want to cross the James River (Tidal Estuary) and was otherwise limited by the North Carolina border and the ocean. <u>See</u> 1st Trial Tr. at 350. Morgan corroborated Jones' desire not to cross the James River Tidal Estuary. 2nd Trial Tr. at 650-51. Second, Jones established that he did not want to move the VTDs "avoided" by the western loop of the sideways S, Silverwood, Churchland, Fellowship, and Nansemond, into District 80 because they were in Jones' District (76), they were "very Republican," and Jones "was a patron of the bill." 2nd Trial Tr. at 553-54; <u>see also</u> DI Ex. 94 at 10. Third, Jones clarified that he wanted to avoid pairing incumbents, so the residences of Joannou (in VTD Thirty-Five) and of James (in VTD Thirty-Eight) presented further limitations that affected the drawing of District 80. 1st Trial Tr. at 350; <u>see also</u> DI Ex. 94 at 10.

Jones expressly denied that he "excluded" predominantly African-American regions in drawing the western portion of District 80. 2nd Trial Tr. at 554. Rather, "[a]ll

---

[38] Relatedly, Morgan said that Jones did not want those VTDs from District 79 to transfer to <u>his</u> District (76), which was in the same region. 2nd Trial Tr. at 649; DI Ex. 91 at 160. Given that Jones perceived those VTDs to be Democratic, it is reasonable to assume that politics was the reason for that preference. <u>See</u> 2nd Trial Tr. at 500.

[he] did was take the current configuration of 79th on the western edge and use that for the 80th." 2nd Trial Tr. at 554. His testimony is supported by the record just discussed. See DI Ex. 94 at 10.

Morgan added another, similar reason for the design of the western segment. He explained that District 79 was certain to be paired with portions of Norfolk during the redistricting process. 2nd Trial Tr. at 655. However, Morgan "had concerns that . . . taking population away from Johnny Joannou in Portsmouth and putting population in Norfolk would change the balance of [Joannou's] district" because "[t]he core of his district and his political base . . . was in Portsmouth." 2nd Trial Tr. at 647. The solution on the Norfolk side of the water was to pair District 79 with the Norfolk Naval Base, which had "a lot of population and fewer voters" and "would be less of a difficulty for [Joannou] to contend with in a potential primary." 2nd Trial Tr. at 647, 655-56. To account for that pairing, District 79 transferred the western VTDs to District 80. 2nd Trial Tr. at 649, 651-53, 655-56. Morgan made clear that this change benefitted Joannou because his "core was Portsmouth." See 2nd Trial Tr. at 655-56. Indeed, the transfer removed from District 79 its only non-Portsmouth VTDs outside of Norfolk (Yeates, Harbor View, and Taylor Road). DI Ex. 94 at 10; see also DI Ex. 91 at 157-58. It therefore minimized District 79's Portsmouth losses.

### 3. District 80's Eastern Segment

The design of District 80's eastern portion likewise was driven by non-racial reasons. As discussed in greater detail in the analysis of District 77, Jones and Morgan attested that the Johnson Park VTD was transferred from District 80 to District 77 as part

of a series of requests made by Delegate Spruill of District 80 "for compactness, contiguity, community of interests, and the like." 2nd Trial Tr. at 497-98, 550, 652, 657; 1st Trial Tr. at 334-37. And, Morgan testified that the Berkley, Old Dominion, Taylor Elementary School, and Hunton Y VTDs were transferred from District 80 to District 89 to "reduce[] the footprint of District 80" in Norfolk. <u>See</u> 2nd Trial Tr. at 652.[39] Additionally, Jones explained that Berkley was shifted to District 89 because the incumbent, Delegate Kenny Alexander, had a funeral home in that VTD. 2nd Trial Tr. at 504, 559.[40] Finally, Morgan confirmed that Chrysler Museum, a heavily white Norfolk VTD, remained in District 80 in order to aid Joannou by avoiding "adding more strongly voting population" from Norfolk. <u>See</u> 2nd Trial Tr. at 652; DI Ex. 92 at 17.

### 4.    Other Changes to District 80

There are certain changes to District 80 about which the record shows little, i.e., the shift of VTD Eleven into District 80 from District 79 and the shift of most of VTD Nine and all of VTD Seven into District 79 from District 80. <u>See</u> DI Ex. 94 at 10.[41]

---

[39] Hence, the fact that transferring Berkley from District 80 to District 89 created a river crossing is largely irrelevant, given that the Norfolk boundary <u>crossed the river at Berkley</u>. 2nd Trial Tr. at 763; DI Ex. 94 at 10. And, that move <u>corrected</u> a water crossing in District 80 as well. DI Ex. 94 at 10.

[40] The majority contends that the removal of the Berkeley VTD from District 80 was not beneficial to James. Maj. Op. at 66 n.47. That may well be true, but benefiting James was not the reason proffered for that removal. As set out above, the reasons were to reduce District 80's footprint in Norfolk and to move a business of the District 89 incumbent into that District.

[41] VTD Eleven may have been added to District 80 for some of the same reasons as the western appendage. Jones testified that he believed that the VTDs he pulled out of (Continued)

However, any assertion that these changes were primarily a function of racial motive raises significant questions. For example, why did District 80 lose all of VTD Seven, given that it was majority African-American and distinctly amenable to a split along racial lines? See Pl. Ex. 69 at 53; DI Ex. 92 at 17. Likewise, why was VTD Nine (the VTD the majority views as split along racial lines) divided so as to exclude a large African-American population directly adjacent the District 80 boundary? See Maj. Op. at 65; Pl. Ex. 69 at 53. These unanswered questions and the consequent evidentiary void go against Plaintiffs because they have the burden of proof.

### 5. Questions Raised by an Assertion of Racial Predominance in the Design of District 80

Any claim that race predominated as to District 80 as a whole (as opposed to just with respect to VTDs Seven, Nine, and Eleven) raises a host of similar questions. Indeed, if race were truly the predominant consideration in the drawing of District 80, why build a long, narrow corridor made up of two heavily white VTDs to reach two predominantly African-American and two predominantly white VTDs far to the west (and thus create an appendage with a total BVAP of 49.3%)? See Pl. Ex. 63 at 106-07, 124-25, 127-28, 133-34; Pl. Ex. 69 at 53; DI Ex. 92 at 17.[42] Why incorporate Harbour View and/or Taylor

------

District 79 would benefit Joannou, and he did not differentiate among them. 2nd Trial Tr. at 503.

[42] The majority characterizes the western appendage as adding two predominantly white VTD to reach four largely African-American VTDs. Maj. Op. at 64-65. However, it is clear that this appendage in fact employed two heavily white VTDs to reach two (Continued)

Road into that appendage, both of which were majority white, rather than VTD Thirty-Nine, which was predominantly African-American (and had a BVAP of 56.7%)? See Pl. Ex. 63 at 127-28; DI Ex. 92 at 17. Why not replace Harbour View with VTD Thirty-Seven, which would have raised the appendage's BVAP slightly (to 49.6%)? See Pl. Ex. 63 at 106-07, 124-25, 127-28, 133-34; Pl. Ex. 69 at 53; DI Ex. 92 at 17.[43] Why not extract more BVAP from VTDs Seven and Nine? See Pl. Ex. 69 at 53; DI Ex. 92 at 17. Why not transfer to District 79 Chrysler Museum, which required a water crossing to connect with District 80 and was heavily white? See Pl. Ex. 69 at 53; DI Ex. 92 at 17. Likewise, why not move to District 79 VTD One, which was predominantly white? See Pl. Ex. 69 at 53; DI Ex. 92 at 17. Additionally, why not move to District 76 VTD Thirty-Two, which was heavily white (and unnecessary to create the western appendage)? See Pl. Ex. 69 at 53; DI Ex. 92 at 17.

These questions indicate that it was profoundly unlikely that the legislature drew District 80's lines predominantly on the basis of race. They reveal that the legislature bypassed several simple avenues available to it to raise District 80's BVAP. And, they undercut the theory that District 80's western appendage was racially motivated, given that the appendage comprised four predominantly white VTDs and two predominantly

_____

predominantly African-American and two predominantly white VTDs. Pl. Ex. 69 at 53; DI Ex. 92 at 17; DI Ex. 94 at 10.

[43] That move would have raised District 80's population slightly above the limit, but other population could have been ceded elsewhere, such as from VTDs Chrysler Museum and/or One. See Pl. Ex. 69 at 53; Pl. Ex. 71 at 65.

African-American VTDs and that it avoided incorporating adjacent VTDs with more BVAP.

Moreover, many of these questions indicate the importance of race-neutral motivations in designing District 80. For example, the answer as to why create the western appendage is that doing so benefitted Joannou. 500, 503, 553, 647-49, 651, 655-66. Likewise, the answer to any of the questions that ask, in essence, why not incorporate from District 79 more VTDs from Portsmouth or cede to District 79 more VTDs from elsewhere, is that it would have hurt Joannou. 2nd Trial Tr. at 647-48, 652-53, 655-56. And, the answer as to why not cede VTD Thirty-Two to District 76 is that doing so would have paired James with Jones, and Jones wished to avoid pairing incumbents (presumably especially himself). See 1st Trial Tr. at 304, 350-51.

In short, the foregoing analysis reveals that District 80 was designed primarily with race-neutral considerations in mind. The record shows that straightforward methods of raising District 80's BVAP were either bypassed or actively sacrificed to race-neutral motives.

### 6.     Input by Delegate James

The majority also rejects Jones' testimony at the first trial that Delegate James, the District 80 incumbent, gave input into the District 80 lines. Maj. Op. at 65-66. However, the only discussion of James' input in Jones' first-trial testimony that the majority cites is the following:

> Q     Did Delegate Jones have some significant input
> into drafting of this district?

A       You mean Delegate James?

Q       Delegate James, yep.

A       Yes, he did.

1st Trial Tr. at 348-49. James' contradiction came years after the fact during the second trial, and I cannot credit it for the reasons explained above. See 2nd Trial Tr. at 71-73. In any event, in light of the foregoing analysis and Jones' detailed explanations of District 80's boundaries, James' belated statement would seem of little relevance.

### 7.    Conclusion as to District 80

In sum, there is significant direct evidence of race-neutral motives for District 80's design. Measured against this evidence, a finding of racial predominance based on the inferences drawn by the majority, I respectfully submit, is in error. Here too, then, I would find that Plaintiffs have not met their burden of proof, considering the record as a whole and the District as a whole. See Pl. Post-Trial Br. at 40-42.

### ii.    District 89

### 1.    Dr. Palmer's Statistical Evidence

The majority's finding of racial predominance first relies on Dr. Palmer's conclusion that "a census block with a 75% BVAP was 2.9 times more likely to be allocated to District 89 than a census block with only a 25% BVAP." Maj. Op. at 67. However, I do not view that evidence as compelling, given the significant statistical flaws in Dr. Palmer's census block analysis, discussed above, and considering the following discussion. See DI Ex. 101 at 2, 11-12.

## 2. Changes to District 89's VTDs

The majority next points to the manner in which VTDs were transferred or split as evidence of racial predominance. Maj. Op. at 67-69. For analytical clarity, I will address whole VTD shifts first and then move on to VTD splits.

### a. VTD Transfers

The majority highlights the transfer of the heavily African-American Berkley VTD into District 89 from District 80 (which added a water crossing) as a predicate for a finding of racial motive. Maj. Op. at 68. However, as discussed in the analysis of District 80, Berkley was moved to District 89: (1) to reduce the footprint of District 80 in Norfolk; and (2) because the District 89 incumbent, Alexander, owned a funeral home there. As mentioned in a footnote to that analysis, moreover, Norfolk <u>crossed the river at Berkley</u>, so it is not surprising that the move created a river crossing, and the transfer also fixed a river crossing. Consequently, even if race <u>were</u> considered in transferring Berkley, it was, at best, one of several factors that influenced the decision.[44]

The majority also notes the removal of the "largely white Suburban Park VTD" from District 89. Maj. Op. at 68. It suggests that Suburban Park was removed to make up

---

[44] Plaintiffs claim that: "[w]here the incumbent's a [sic] funeral home was located in a predominantly white VTD [i.e., Suburban Park] . . . it was <u>dropped</u> from the district. Where a funeral home was located in a predominantly black VTD [i.e., Berkley] . . . it was <u>added</u> to the district." Pl. Post-Trial Br. at 44. However, it is unclear whether Jones was aware at the time of redistricting that Alexander's funeral home was located in Suburban Park. <u>See</u> 2nd Trial Tr. at 557-58. Given that ambiguity, I am not willing to ascribe a racial motive to the removal of Suburban Park, let alone a predominant one. And, as explained below, the decision to remove Suburban Park was decidedly non-racial.

for the population added by incorporating the Berkley VTD while also altering the District's racial makeup. See Maj. Op. at 68. However, that view comes about because these two VTDs (Suburban Park and Berkley) are considered in a vacuum. Looking at District 89 as a whole, it is clear that the District gained numerous heavily white VTDs: Larchmont Library, Larchmont Recreation Center, and a large portion of Zion Grace. Pl. Ex. 69 at 56; DI Ex. 92 at 19; DI Ex. 94 at 11. Every single one of these VTDs (including the portion of Zion Grace allocated to District 89) had a lower BVAP than Suburban Park, and these VTDs had a combined population of more than double that of Suburban Park. See Pl. Ex. 63 at 121-22; Pl. Ex. 71 at 54.[45] Moreover, these VTDs were added (and Suburban Park swapped out) notwithstanding that "District 89 had the lowest BVAP of any challenged district in the entire South Hampton Roads region." See Maj. Op. at 67. And, several nearby majority-white VTDs, such as the portion of Titustown Center outside District 89, Wesley, and Larrymore all had more BVAP than the added VTDs. See Pl. Ex. 63 at 121-22; Pl. Ex. 71 at 54; Pl. Ex. 69 at 56; DI Ex. 92 at 19; DI Ex. 94 at

---

[45] Suburban Park had a population of 3,379, a VAP of 2,768, and a BVAP of 656 (23.7%). See Pl. Ex. 63 at 121-22. In contrast, Larchmont Library had a population of 1,266, a VAP of 944, and a BVAP of 11 (1.2%); Larchmont Recreation Center had a population of 4,016, a VAP of 3,440, and a BVAP of 599 (17.4%); and the District 89 portion of Zion Grace had a population of 1,524, a VAP of ~1,255, and a BVAP of 128 (10.2%). See Pl. Ex. 63 at 121-22; Pl. Ex. 71 at 54.

11.[46] That record, I submit, does not support a finding that race predominantly animated the transfer of the VTDs on which the majority bases its finding.

### b.   VTD Splits

### I.   The VTDs Split Between District 89 & Non-Challenged Districts

The majority additionally observes that, "[i]n two of the three VTDs split between District 89 and a neighboring non-challenged district, the portion of the VTD allocated to District 89 had a higher BVAP than the portion allocated to the non-challenged district." Maj. Op. at 67. The VTDs split between District 89 and non-Challenged Districts include Titustown Center, Zion Grace, and Granby. Pl. Ex. 71 at 54. As to Granby, the majority asserts that the legislature split it "with minute precision" by "adding to District 89 an appendage encompassing significant numbers of black residents, while carving a sliver out of the middle of the Granby VTD to exclude a narrow band of white residents." Maj. Op. at 68-69.

With respect to Titustown Center and Zion Grace, there is very little evidence as to why those VTDs were split. Given that Morgan was the one who split VTDs "in most circumstances," however, we can reasonably conclude that Morgan split these VTDs too, especially given that Plaintiffs, who have the burden, have not shown otherwise. See 2nd

---

[46] Wesley had a BVAP of 40.3%, Larrymore had a BVAP of 33.7%, and the District 79 portion of Titustown Center had a BVAP of 28.6%. See Pl. Ex. 63 at 121-22; Pl. Ex. 71 at 54.

Trial Tr. at 714.[47] Because Morgan did not consider race in splitting VTDs, it cannot reasonably be inferred that race played a role in the split of Zion Grace and Titustown Center. 2nd Trial Tr. at 668, 714-15. Moreover, although the District 89 portion of Titustown Center incorporated a significant African-American population, Zion Grace was split in such a way as to exclude a largely African-American area and to include mostly white individuals. Pl. Ex. 69 at 56, 58. If the goal were to add BVAP to District 89, what justified that arrangement?

With respect to Granby, there is some complexity in the record. At the first trial, Jones testified that his "recollection" was that he split Granby to comply with a request by Alexander to include one of his funeral homes in his District. 1st Trial Tr. at 345-46. At the second trial, however, Jones clarified that he had been mistaken and that he, in fact, had nothing to do with splitting that VTD. 2nd Trial Tr. at 504-05, 555-58. He indicated that he had confused the funeral home owned by Alexander in the Berkley VTD with another funeral home owned by him in Suburban Park. 2nd Trial Tr. at 504-05, 555-58.[48] Morgan corroborated that Jones was not involved in splitting Granby. 2nd Trial Tr. at 766-67.

_____

[47] There is also direct testimony that Morgan split the Granby VTD, which was in the same geographic area, without Jones' input. 2nd Trial Tr. at 505, 766-67.

[48] Jones was asked whether he had made the mistake about the funeral home's location at the time of the redistricting or just at the first trial. 2nd Trial Tr. at 557-58. His answer was ambiguous. 2nd Trial Tr. at 557-58. Nevertheless, that is largely irrelevant given that Jones thereafter unequivocally testified that Morgan alone split Granby. 2nd Trial Tr. at 558. And, in any case, making a mistake about the location of the home is hardly proof of a race-based motive.

Morgan stated that he split the Granby VTD for population equalization purposes and that the odd shape of the split was a function of the underlying census block geography. See 2nd Trial Tr. at 670-71, 766-67. With that in mind, and given that Morgan did not rely on racial data in splitting VTDs himself, the record, as a whole, does not support a finding that race was the reason for the Granby split. See 2nd Trial Tr. at 668, 714-15.

Moreover, Granby was split in such a way as to exclude a large African-American population in its northeastern corner (and near the District 89 border). Pl. Ex. 69 at 58. If the Granby split were racially motivated, one must ask why that VTD was split in such a manner? And, the portion of Granby excluded from District 89 had roughly the same population as but more BVAP than the District 89 portion of the Zion Grace VTD. Pl. Ex. 71 at 54.[49] If Morgan were splitting VTDs along racial lines, why did he do so here in a needlessly complex manner that reduced District 89's BVAP? The record therefore points to no racially-based reason for the Granby split.

## II. The VTD Split Between District 89 & District 90

Finally, the majority notes that the Brambleton VTD was split between Districts 89 and 90 so as to allow District 89 to achieve 55% BVAP (and that, without this split, District 89 would not have met that target). Maj. Op. at 67-68. However, many VTDs

---

[49] As noted above, the District 89 portion of Zion Grace had a population of 1,524, a VAP of ~1,255, and a BVAP of 128 (10.2%). See Pl. Ex. 71 at 54. The District 100 portion of Granby had a population of 1,493, a VAP of ~1,222, and a BVAP of 303 (24.8%). See Pl. Ex. 71 at 54.

along the District 89/90 border, including Brambleton, were heavily African-American, so any alternative split or configuration that resulted in at least 55% BVAP in both Districts would be deemed racially motivated under the majority's reasoning. See Pl. Ex. 69 at 56. And, again, although the split of Brambleton may have been sufficient to achieve 55% BVAP, that precise split was certainly not necessary for District 89 to do so. As noted throughout the discussion of this District, there were numerous options available to the legislature to alter District 89's BVAP (e.g., by incorporating higher-BVAP areas or excluding lower-BVAP areas).[50] In fact, if Larchmont Library, Larchmont Recreation Center, and the District 89 portion of Zion Grace were removed and Suburban Park and Wesley added, Brambleton could have been placed entirely in District 90 without bringing District 89 out of compliance with the 55% BVAP or population equality targets. See Pl. Ex. 63 at 121-22; Pl. Ex. 71 at 54, 56, 65.[51] Moreover, Morgan explained that Brambleton was split to equalize population, that the location of the split was set to equalize population in light of other changes made by the legislature towards the end of the redistricting process, and that there were no other (i.e., racial) reasons for the location of the split. See 2nd Trial Tr. at 666-67, 763-64. Considering all

---

[50] There are other options that I have not mentioned. For example, the legislature could have split Wesley and included a large African-American population near the District 89 border. See Pl. Ex. 69 at 56. It also could have split Crossroads to incorporate high-BVAP area in the south of that VTD. See Pl. Ex. 69 at 56. Likewise, it could have split Suburban Park to encompass BVAP in the west of that VTD. See Pl. Ex. 69 at 56. And, it could have split Larrymore to include a large African-American population in its northern half. See Pl. Ex. 69 at 56.

[51] The change would have yielded a District 89 population of 79,378, VAP of 60,736, and BVAP of 34,175 (56.3%). See Pl. Ex. 63 at 121-22; Pl. Ex. 71 at 56, 65.

of this evidence, I cannot find that the split of Brambleton is supportive evidence of racial predominance.

### 3.     Conclusion as to District 89

In sum, Plaintiffs have not carried their burden to prove that race predominated in the design of District 89. <u>See</u> Pl. Post-Trial Br. at 42-44.

### iii.     District 77

The majority's view as to District 77 is based on several points. I conclude that these points are not sufficient to support a finding of racial predominance.

### 1.     District 77's Benchmark Plan Configuration

The majority's first point to support a finding that race predominated in District 77 is that the District retained its general shape in HB 5005 and, in the benchmark plan: (1) had an odd shape and a low compactness score; and (2) "extracted black residents from Chesapeake, 'divide[d] [black residents] in suburban Portsmouth into two segments so as to share them between Districts 77 and 80,' and extended into Suffolk so that black residents 'on one side of town were separated from whites on the other.'" Maj. Op. at 70 (citations omitted). The majority depends entirely on Dr. Rodden for the second set of points. <u>See</u> Maj. Op. at 70.

As noted throughout this opinion, low compactness or a bizarre shape only matter for our purposes if race was the predominant motive. <u>Bethune-Hill</u>, 137 S. Ct. at 798. Furthermore, I cannot credit Dr. Rodden's conclusions as to District 77's design in the benchmark plan, for three reasons. First, given my general concerns respecting the credibility of Dr. Rodden's testimony as to the 2011 plan, I certainly cannot find reliable

his conclusions as to the 2001 plan. Second, his conclusions as to the benchmark version of District 77 involved both impermissible speculation about legislative motive and advocacy. See Pl. Ex. 69 at 62 ("[District 77 in the benchmark plan] was also already drawn to slice up Chesapeake and pull out African Americans, divide African Americans in suburban Portsmouth into two segments so as to share them between Districts 77 and 80, and stretch all the way to Suffolk, where African Americans on one side of town were separated from whites on the other."). And, third, Dr. Rodden is not qualified to testify to what animated the design of District 77 in 2001.

### 2. Generalized Population Data & Dr. Palmer's Statistical Evidence

The majority additionally observes that 18,000 people were moved out of and 21,000 people were moved into District 77, notwithstanding the fact that District 77 only needed 3,000 people to satisfy its equal population goal. Maj. Op. at 70. It also highlights Dr. Palmer's finding of a correlation between BVAP and the likelihood that a census block would be assigned to District 77. Maj. Op. at 72. As discussed above, however, numerical population shifts alone are of little help in ascertaining racial predominance here. And, for the reasons discussed earlier in this opinion, I do not find Dr. Palmer's census block evidence persuasive. See DI Ex. 101 at 2, 11-12.

### 3. Specific Line-Drawing Decisions

The majority then asserts: (1) "four largely white Chesapeake VTDs in District 90 were transferred to District 77, namely, Oaklette, Tanglewood, Indian River, and Norfolk Highlands"; (2) "[t]his removal of white residents from District 90 was necessary for that

district to attain a 55% BVAP"; (3) "[t]o compensate for this influx of white residents from District 90, District 77 lost four other majority-white VTDs, namely, Westover, Geneva Park, River Walk, and E.W. Chittum School," which constricted the "already-narrow corridor linking the Chesapeake and Suffolk portions of the district . . . to a half-mile in width" (such that "no east-west roads within District 77 connected the eastern and western parts of the district"); and (4) "District 77 needed to retain the high BVAP Suffolk VTDs of Southside, Hollywood, and White Marsh to achieve a 55% BVAP." Maj. Op. at 70-71. These points, I respectfully submit, do not establish racial predominance, by a preponderance of the evidence, when they are considered along with the race-neutral reasons in the record for the design of District 77.

### a. Delegate Spruill's Request for Oaklette, Tanglewood, Indian River & Norfolk Highlands

First, Oaklette, Tanglewood, Indian River, and Norfolk Highlands, which were on the eastern side of District 77, were added at the request of Delegate Spruill: (1) to reunite the old city of South Norfolk ("Old South Norfolk"); and (2) because Spruill lived in the area and wanted his neighborhood to be placed in his District. 2nd Trial Tr. at 497-98, 550; 1st Trial Tr. at 334-37; DI Ex. 94 at 9.[52] Morgan confirmed that those VTDs were added because Spruill "wanted that portion of Chesapeake in his district." 2nd Trial Tr. at 657. And, moving those (predominantly white) VTDs into District 77 had no

---

[52] Johnson Park was moved from District 80 to District 77 as part of this same set of requested VTDs. 2nd Trial Tr. at 657; 1st Trial Tr. at 335-37.

impact on District 77's ability to meet its 55% BVAP and equal population targets. See Pl. Ex. 63 at 106-07, 109-10; Pl. Ex. 71 at 65; DI Ex. 38 at 8; DI Ex. 92 at 15.[53]

The majority declines to credit Jones' contention that Spruill requested the VTDs added to the eastern portion of District 77 on the grounds that: (1) Intervenors did not call Spruill to corroborate Jones' testimony; and (2) Old South Norfolk was not reunited because "District 77 lost the low-BVAP Westover VTD, which also had been part of Old South Norfolk." Maj. Op. at 71-72. These points, I respectfully submit, do not support the majority's credibility determination.

As to the first point, the burden to establish racial motive is on Plaintiffs so the failure to call Spruill counts against them, not Intervenors. I therefore credit Jones' explanation because Plaintiffs' evidence does not undermine it (and because I find Jones to be credible generally). And, Morgan corroborated that Spruill wanted those VTDs. Moreover, logic and common sense support that Spruill would have made these requests; and it is doubtful that the plan would have drawn Spruill's full-throated support had the District not met with his approval. See Pl. Ex. 35 at 141-49.

As to the second point, even if Westover were technically part of Old South Norfolk, that does not affect the conclusion that Jones' goal in moving Oaklette, Tanglewood, Indian River, and Norfolk Highlands was to satisfy Spruill's requests. The

---

[53] It is true that moving Oaklette, Tanglewood, Indian River, and Norfolk Highlands in and E.W. Chittum School, Geneva Park, River Walk, and Westover out raised District 77's BVAP to 58.8% (from 57.7%). See Pl. Ex. 63 at 106-07, 109-10; Pl. Ex. 71 at 65; DI Ex. 38 at 8. But, in either case, District 77 would have had considerable BVAP above the 55% target (and would have met the population target). See Pl. Ex. 63 at 106-07, 109-10; Pl. Ex. 71 at 65; DI Ex. 38 at 8.

majority only relies on Dr. Rodden to support the proposition that the Westover VTD was part of Old South Norfolk and, hence, that reunification did not occur. See Maj. Op. at 72. But, nothing in the record suggests that Spruill specifically requested that Westover be in his District, and Jones affirmatively stated that he believed HB 5005 addressed Spruill's concerns respecting reunification. See 1st Trial Tr. at 334-37.

### b. The Needs of District 90 with Respect to Oaklette, Tanglewood, Indian River & Norfolk Highlands

Second, the fact that removing Oaklette, Tanglewood, Norfolk Highlands, and Indian River from District 90 was necessary for it to have 55% BVAP does not establish racial predominance as to District 77. See Maj. Op. at 70. It is evident that race was considered, but the record as a whole shows that race was not the predominant reason. As set forth above, these VTDs were moved largely at the request of Spruill. And, it was unnecessary to move them into District 77 based on that District's BVAP and population needs. Moreover, if race were predominant, why would not the legislature have moved these predominantly white VTDs into adjacent District 78, which was not subject to the 55% BVAP rule, rather than into District 77, which was? See DI Ex. 94 at 8; DI Ex. 92 at 15.

### c. The Removal of Westover, Geneva Park, River Walk & E.W. Chittum School & the Narrowing of the Corridor Between District 77's Eastern & Western Segments

Third, as noted above, the majority also contends that race predominated in District 77 because, in its view, the District lost four largely white VTDs (Westover, Geneva Park, River Walk, and E.W. Chittum School) to compensate for the low-BVAP

VTDs added at Spruill's request, which resulted in the eastern and western portions of District 77 being connected by a narrow corridor with no roads. See Maj. Op. at 70-71. As an initial matter, however, there is little information in the record about why those VTDs were removed. And, the majority does not consider the record about possible race-neutral motivations. See Maj. Op. at 70-71. In fact, Jones testified that one of the VTDs transferred out of District 77 was removed because Spruill wanted to draw out a potential opponent. 2nd Trial Tr. at 550 ("[Spruill] had certain requests to move precincts in because they were next to where he lived. He wanted to get rid of a precinct because there was a potential opponent in that precinct.").[54] And, each of the four removed VTDs leaned Republican in 2009, just like four of the VTDs added at Spruill's request. DI Ex. 92 at 14. To me, then, it is just as likely that these VTDs were removed to compensate for a shift in political composition (due to VTDs gained at the request of a sitting delegate) it is that they were removed to compensate for a shift in racial composition. Thus, I do not believe that the record supports a finding of racial predominance.

### d. The Needs of District 89 with Respect to the Removal of Westover, Geneva Park, River Walk & E.W. Chittum School

As to the majority's fourth point, that "District 77 needed to retain the high BVAP Suffolk VTDs of Southside, Hollywood, and White Marsh to achieve a 55% BVAP," that may well be true. See Maj. Op. at 71. But, that does not mean that retaining those VTDs

---

[54] The only VTDs removed from District 77 include Westover, Geneva Park, River Walk, E.W. Chittum School, an unpopulated portion of Georgetown, and Airport. See DI Ex. 94 at 8; Pl. Ex. 69 at 64.

was racially motivated or that, if race played a motivating role, it was a predominant one. Indeed, those VTDs were not changed in HB 5005, and District 77 has remained largely the same for over 20 years; we do not know what motivated the original District lines or the decision to retain them. See 2nd Trial Tr. at 658; DI Ex. 94 at 8.

Moreover, the only changes to the western portion of District 77 were non-racial. Morgan and Jones both showed that the Airport VTD was moved from District 77 to District 76 because it preserved District 76's contiguity in light of other changes made to that District and because it was Republican. See 2nd Trial Tr. at 498-99, 658-60. Additionally, Jones testified that the move of that VTD had no "racial implications." 2nd Trial Tr. at 498-99. Likewise, Olde Towne was added to District 77, notwithstanding that it was majority white. See DI Ex. 92 at 15. And, it was transferred into District 77 whole, notwithstanding that it was amenable to a split along racial lines. See Pl. Ex. 69 at 68. Moreover, although Olde Town did have a BVAP of 48.3%, had it been removed and replaced entirely by non-BVAP, District 77 would still have met the 55% BVAP target. See Pl. Ex. 63 at 133-34; Pl. Ex. 71 at 65; DI Ex. 38 at 8.[55] The only other change was the split of Lakeside, which was split by Morgan alone and was therefore race-blind. See 2nd Trial Tr. at 499, 668, 714-15, 770. That conclusion is underscored by the fact that the split of Lakeside failed to incorporate a large African-American population directly adjacent to the District 77 border. Pl. Ex. 69 at 68.

---

[55] Olde Towne had a population of 1,306, a VAP of 1,025, and a BVAP of 495 (48.3%). See Pl. Ex. 63 at 133-34. If all of Olde Town's population were replaced entirely by voting non-BVAP, District 77's BVAP would be 57.6%. See Pl. Ex. 63 at 133-34; Pl. Ex. 71 at 65; DI Ex. 38 at 8.

### 4.     VTD Splits

The final point raised by the majority is that, "in both the VTDs split between District 77 and a non-challenged district, the portion allocated to District 77 had a much higher BVAP than the portion assigned to the neighboring non-challenged district." Maj. Op. at 72. These VTDs include Lakeside and John F. Kennedy. Pl. Ex. 71 at 54. As just noted, however, the record does not support a finding that the Lakeside split was racially motivated. And, the John F. Kennedy split was not changed in HB 5005, so we really know nothing about that split. See 2nd Trial Tr. at 499; DI Ex. 94 at 8.

### 5.     Delegate Spruill's Request that District 77 Meet the 55% BVAP Threshold

There is one additional point, not mentioned by the majority, worth raising here. Jones testified that Spruill requested that his District meet the 55% BVAP target, which he, a leader of the Black Legislative Caucus, felt was important for all the Challenged Districts. See 2nd Trial Tr. at 513-14, 549-51; 1st Trial Tr. at 431. Jones stated that he "drew [Spruill's] district to honor his request in moving the precincts around, and the result of that was to comply [with the request to meet 55% BVAP]." 2nd Trial Tr. at 549-50. He later agreed that he "complied with [Spruill's] request to adjust the boundaries to ensure it had a 55 percent [BVAP]." 2nd Trial Tr. at 550-51. Thus, race certainly played a role in drawing District 77. However, that testimony proves nothing more than that the 55% BVAP rule applied in District 77 and affected its boundaries, which is undisputed as to all the Challenged Districts. It does not provide any insight into how significant the role of race was vis-à-vis other motivations.

### 6. Conclusion as to District 77

In sum, many of District 77's lines were patently not racially motivated. Others, the record reveals fairly little about. We do have some indication that race played a role in the design of the District, but that is undisputed as to every District and, as the Supreme Court has held, insufficient, on its own, to support a finding of racial predominance. In short, on this record, it is not really possible to make a finding about the role that race played in the construction of District 77 as compared with race-neutral considerations. And, therefore, Plaintiffs have not met their burden to prove, by a preponderance of the evidence, that race was the predominant reason for the design of District 77. See Pl. Post-Trial Br. at 39-41.

### iv. District 90

### 1. Generalized Population Data

The majority first emphasizes the fact that 18,000 people were moved out of District 90, whereas 28,000 were moved into the District. Maj. Op. at 74. Again, that tells us very little. See Bethune-Hill, 141 F. Supp. 3d at 561-62. And, the majority opinion observes that District 90 "improved in compactness in the 2011 plan, and retained the same number of split VTDs." Maj. Op. at 73.

### 2. VTDs Transferred to District 77

The majority also bases its predominance finding on the four VTDs transferred from District 90 to District 77 (Oaklette, Tanglewood, Indian River, and Norfolk Highlands). Maj. Op. at 74. It maintains that District 90's BVAP would have dropped below 55% had it retained these VTDs. Maj. Op. at 74. But, as set forth in the discussion

of District 77, even if that were true, it is apparent that neutral considerations were heavily involved in the decision to move those VTDs.

### 3. The Split of the Brambleton VTD

The majority then notes the split of the Brambleton VTD between Districts 89 and 90 and the fact that the split was necessary for District 89 to achieve 55% BVAP. Maj. Op. 74-75. However, as explained in the discussion of District 89, I do not find the Brambleton split to be persuasive evidence of racial predominance.[56]

### 4. VTDs Split Between District 90 & Non-Challenged Districts

The majority next observes that, among VTDs split between District 90 and non-Challenged Districts, "the portion of the split VTD allocated to District 90 had a higher BVAP than the portion allocated to a neighboring non-challenged district." Maj. Op. at 75. These VTDs include Aragona, Shell, and Reon. Pl. Ex. 71 at 54.

Morgan alone split each of these VTDs in order to equalize population. See 2nd Trial Tr. at 506-07, 664-66, 668, 768-70. Accordingly, these splits were race-blind (and Morgan expressly stated that he did not use racial data when splitting Reon or Aragona). See 2nd Trial Tr. at 668, 714-15. Moreover, Morgan explained that Aragona was split early in the process along Witchduck Road, "which is a recognizable major thoroughfare

---

[56] The majority also states that "by transferring 4,000 people from District 90 to District 89, including a portion of Brambleton and a neighboring overwhelmingly black VTD, District 89 gained population with a 94.1% BVAP." Maj. Op. at 74-75. However, as set forth in the discussion of District 89, that District was not particularly constrained by the 55% BVAP target and could have met that target using any number of configurations. The mere transfer of BVAP does not establish racial predominance.

in Virginia Beach" and "an established understandable boundary." 2nd Trial Tr. at 665-66. The Reon split occurred later to again equalize population after other changes were made, and Reon was chosen to be split because the Aragona line was already set and Reon "was one of the VTDs . . . that was added into District 90." 2nd Trial Tr. at 665-66. These splits are thus not probative of racial predominance.

> 5.    **Race-Neutral Explanations for Other of District 90's Boundaries**

In addition, Morgan provided non-racial explanations for the configuration of District 90 as a whole. First, he testified that the shift of VTDs to District 77 created a variety of population pressures, which were addressed "by getting more population in Norfolk on the north and in Virginia Beach on the east and the south." 2nd Trial Tr. at 660. Consequently, Sherry Park, College Park, Reon, Shell, Davis Corner, and Aragona were added because: "the area of Chesapeake was removed, and District 90 was already in Virginia Beach. So additional population was taken from Virginia Beach." 2nd Trial Tr. at 660.

Second, Morgan attested that District 85 had taken "democratic performing precincts away from District 21" to benefit the District 21 incumbent, Delegate Run Villanueva. 2nd Trial Tr. at 660-61. Hence, Sherry Park, College Park, and Reon, which

were Democratic, were moved from District 85 to District 90 to compensate. 2nd Trial Tr. at 661-62.[57,58]

Third, Morgan described that VTD Barron Black was removed to serve a political purpose. He explained that District 83 had absorbed portions of District 87 (which was entirely moved in HB 5005). See 2nd Trial Tr. at 662; DI Ex. 91 at 173-74. Thus, Delegate Christopher Stolle, a Republican, of District 83 "was getting some new territory, and [Barron Black] was a republican leaning precinct for [his] new district." See 2nd Trial Tr. at 662.[59]

### 6. Conclusion as to District 90

On the record taken as a whole, Plaintiffs have not met their burden on District 90 because the record shows that it is just as likely that non-racial factors predominated in

---

[57] When describing this political motivation, Morgan erroneously mentioned the VTD Davis Corner as originally having been in District 85. See 2nd Trial Tr. at 661; DI Ex. 91 at 165.

[58] Morgan testified that "[p]olitics had nothing to do with the way [he] split Reon." 2nd Trial Tr. at 770. That testimony was not inconsistent with his explanation for why Reon was added to District 90 in the first place; as set forth above, Reon had been added to District 90 during the redistricting process, and then it was split late in that process to equalize population. See 2nd Trial Tr. at 665-66.

[59] The majority rejects the evidence that District 90's lines were drawn at the request of Delegate Howell, the incumbent. Maj. Op. at 75. Jones testified at the first trial that he received "extensive input" from Howell. 1st Trial Tr. at 339, 343. At the second trial, Howell said that he did not provide such input, although Howell did acknowledge that he and Jones discussed the District after he saw the map. 2nd Trial Tr. at 82-85. I do not credit Howell's testimony in the second trial for the other reasons set forth above.

The input from Howell that Jones described, moreover, was vague and did not offer insights into the construction of any specific District lines. 1st Trial Tr. at 339, 343. Hence, the extent of Howell's input is largely irrelevant.

drawing the District as it is that race was the predominant factor. <u>See</u> Pl. Post-Trial Br. at 44-45.

## V.    Conclusion

For the foregoing reasons, I find that Plaintiffs' evidence is insufficient to establish, by a preponderance of the evidence, racial predominance in the drawing of the Challenged Districts. Consequently, I dissent.


_____/s/_____
Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: June 26, 2018