IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |
| Defendants. | |
| v. | |
| VIRGINIA HOUSE OF DELEGATES, | |
| Intervenor-Defendants | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT-INTERVENORS' MOTION TO STAY INJUNCTION PENDING APPEAL UNDER 28 U.S.C. § 1253**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................... 1
II. BACKGROUND ....................................................................................................... 1
III. ARGUMENT ............................................................................................................. 3
    A. Intervenors Fail to Meet Their Heavy Burden of Establishing that the Court Should Stay Implementation of the Court's Final Judgment ................. 3
        1. Intervenors Face a Significant Burden to Establish Their Entitlement to the "Extraordinary Relief" They Seek .......................... 3
        2. Courts Routinely Reject Stay Applications in Similar Cases .............. 5
        3. Intervenors Cannot Show a Likelihood of Success on the Merits ................................................................................................... 6
            a. Intervenors Have Not Made a "Strong Showing" that They Are Likely to Demonstrate that the Court Committed Clear Error in Its Predominance Analysis ............. 7
            b. Intervenors Have Not Made a "Strong Showing" that They Are Likely to Demonstrate that the Court Erred in Its Narrow Tailoring Analysis ................................................. 10
        4. Granting a Stay Will Cause Irreparable Injury to Plaintiffs and Is Contrary to the Public Interest ....................................................... 13
IV. CONCLUSION ....................................................................................................... 15

## I.     INTRODUCTION

> [O]nce a State's . . . apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.

*Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

This is not an unusual case. In its thorough and, indeed, exhaustive opinion, this Court detailed at length the mountain of evidence establishing that race was the predominant factor behind the eleven Challenged Districts and the utter dearth of justification for the General Assembly's predominant use of race.

What is unusual is the degree to which Intervenors' Motion to Stay Injunction Pending Appeal (the "Motion") patently mischaracterizes the Court's opinion, ignores Supreme Court precedent, and argues that Plaintiffs will not be harmed by a stay because, after all, their constitutional rights have already been violated for most of a decade.

Plaintiffs—and every voter in the Challenged Districts—have already been subjected to four elections under the unconstitutional plan. Intervenors ask the Court to grant a stay and delay implementation of a remedy until after the 2019 elections—the *last* regularly-scheduled election before 2020 redistricting. Stripped to its essence, then, Intervenors ask the Court to set aside its ruling on the merits and afford Plaintiffs no remedy whatsoever.

Because Intervenors cannot establish any of the prerequisites for securing a stay pending appeal, the Court should reject Intervenors' motion.

## II.    BACKGROUND

On December 22, 2014, more than three-and-a-half years ago, residents of the Challenged Districts filed this lawsuit. The lawsuit was filed in the aftermath of a decision of a three-judge panel of this Court striking down Virginia's third congressional district as a racial gerrymander, based largely on the use of an "ad hoc . . . [55% BVAP] racial threshold[]" to draw that district. *Page v. Va. State Bd. of Elections (Page II)*, No.

3:13CV678, 2015 WL 3604029, at *18 (E.D. Va. June 5, 2015). The court relied in part on the testimony of John Morgan, a consultant to the House of Delegates, to find that "the legislature enacted 'a House of Delegates redistricting plan with a 55% Black VAP as the floor for black-majority districts,'" and that it "acted in accordance with that view" when adopting its congressional plan. *Id.* at *9 (citation omitted).

The case went to trial in July 2015. The Court issued its decision on October 22, 2015. A two-judge majority found that race predominated only in House District ("HD") 75, but that HD 75 was narrowly tailored. Dkt. No. 108. Plaintiffs appealed. On March 1, 2017, the Supreme Court rejected the majority's racial predominance analysis and remanded for further proceedings. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 797-800 (2017). The Supreme Court affirmed the majority's conclusion as to HD 75, reiterating this Court's conclusion that Delegate Jones performed an HD 75-specific "functional analysis" in support of the application of a 55% BVAP floor to HD 75, *id.* at 801-02, and that "[t]he 55% figure 'was then applied across the board to all twelve' districts." *Id.* at 796 (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505, 522 (E.D. Va. 2015)).

Two days later, Plaintiffs filed a motion seeking to establish an expedited briefing schedule that would allow for implementation of a remedy (should Plaintiffs prevail) in advance of the 2017 elections. *See* Dkt. No. 125. Intervenors opposed the motion, arguing that it was "too late for this case to influence elections in 2017." *See* Dkt. No. 127 at 1.

Intervenors instead requested that the Court conduct a further evidentiary proceeding, and the Court set a three-day trial in October 2017. Dkt. No. 160 at 4. Thereafter, Intervenors sought to further delay proceedings, asking the Court to move back the trial until "December 2017 or January or February 2018" or perhaps to strike the trial date entirely and revisit it later. Dkt. No. 169 at 2. The Court proceeded with the trial as scheduled in October 2017. On June 26, 2018, the Court held that the enacted plan was unconstitutional and enjoined the

- 2 -

Commonwealth from conducting further elections in the Challenged Districts until a new, constitutional plan was adopted. Dkt. No 235 at 1.

In its June 26, 2018 Order, the Court gave the General Assembly the opportunity to adopt a new redistricting plan if it does so before October 30, 2018. *Id.* at 1-2. On July 6, 2018, Intervenors filed a Notice of Appeal. Dkt. No. 172. Intervenors filed the instant motion the same day, repeating their now-common refrain that it is once again too late (16 months before the November 2019 General Election) to afford Plaintiffs relief. *See* Mot. at 8.

### III. ARGUMENT

#### A. Intervenors Fail to Meet Their Heavy Burden of Establishing that the Court Should Stay Implementation of the Court's Final Judgment

Intervenors cannot establish any of the prerequisites for obtaining the extraordinary relief of a stay pending appeal. Intervenors have little likelihood of success on the merits. Plaintiffs will suffer irreparable injury if the stay is granted and they are forced to vote for the entire 2010 redistricting cycle under the unconstitutional enacted plan, and the public interest weighs heavily against the requested stay for the same reason.

Plaintiffs have voted in unconstitutional districts for nearly a decade. The 2019 election is the *last remaining regularly scheduled election* before 2020 redistricting. Intervenors seek to obtain a victory through the guise of a stay that they were not entitled to on the merits. The Court should deny the stay motion in no uncertain terms.

##### 1. Intervenors Face a Significant Burden to Establish Their Entitlement to the "Extraordinary Relief" They Seek

A stay is an exercise of judicial discretion. *See Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 125 (4th Cir. 1983). The granting of a stay pending appeal is "extraordinary relief," and the party requesting a stay bears a "heavy burden." *Winston–Salem/Forsyth Cty. Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971) (Burger, Circuit Justice); *see also Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 558 (E.D. Va. 2016) ("[A] stay is considered extraordinary relief for which the moving party bears a heavy burden.")

(quotation marks and citation omitted); *see also Harris v. McCrory,* No. 1:13CV949, 2016 WL 6920368, at *1 (M.D.N.C. Feb. 9, 2016) (same).

In determining whether to grant a stay pending appeal, the Court considers four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Long v. Robinson*, 432 F.2d 977, 979 (4th Cir. 1970).[1]

The first two factors of the test outlined above "are the most critical." *Nken*, 556 U.S. at 434; *cf. Johnson v. United States*, No. C-83-186-D, 1984 WL 738, at *2 (M.D.N.C. May 7, 1984) (a stay should be denied unless the moving party can show a strong likelihood of success on appeal, "even if this results in rendering the issues moot"). A party seeking a stay pending appeal "will have greater difficulty demonstrating a likelihood of success on the merits" than one seeking a preliminary injunction because there is "a reduced probability of error" in a decision of the district court based upon complete factual findings and legal research. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991).

The moving party, moreover, is required to show something more than "a mere possibility" of success on the merits; more than speculation and the hope of success is required. *Nken*, 556 U.S. at 434. By the same token, "simply showing some 'possibility of irreparable injury,' . . . fails to satisfy the second factor." *Id.* at 434-35 (*quoting Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 1998)).

Here, Intervenors' task is more daunting still. Not only must Intervenors make a "strong showing" they are likely to succeed on the merits of their appeal, they must do so

---

[1] Intervenors cite to the wrong standard (Mot. at 1-2), relying on authority setting out "[t]he principles that control a Circuit Justice's consideration of in-chambers stay applications" when a party has moved a Supreme Court Circuit Justice for a stay. *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980).

when the Court's decision rests on extensive factual findings—derived from two trials, 12 expert reports, 17 witnesses, and multiple rounds of briefing over the course of three years—subject to clear error review. *See Personhuballah*, 155 F. Supp. 3d at 559*; see also Harris*, 2016 WL 6920368, at *1 (defendants failed to make "strong showing" that they were likely to succeed on merits of appeal of racial gerrymandering challenge, particularly given applicable clear error review).

Under these well-established standards, Intervenors cannot begin to meet their burden of showing a stay is appropriate.

### 2. Courts Routinely Reject Stay Applications in Similar Cases

At the outset, contrary to Intervenors' implication that stays in redistricting cases should be granted as a matter of course so "at least one court" can review the district court's decision (Mot. at 10), district courts routinely deny motions to stay implementation of court-adopted remedial redistricting plans. *See, e.g.*, *Personhuballah*, 155 F. Supp. 3d at 557-60 (order denying motion to stay order during pendency of Supreme Court review); *see also Harris v. McCrory*, 2016 WL 6920368, at *1; *Larios v. Cox*, 305 F. Supp. 2d 1335, 1336-37 (N.D. Ga. 2004) (same, and collecting cases). Indeed, Intervenors' current suggestion that the Court's opinion means little until another court reviews it stands in stark contrast to Intervenors' acknowledgment, prior to trial, that "'[t]he District Court is best positioned to determine in the first instance' both the questions of predominance and narrow tailoring, in part because it can weigh testimony and assess credibility." Dkt. No. 146 at 9 n.4 (quoting *Bethune-Hill*, 137 S. Ct. at 800).

*Personhuballah*, dealing with a congressional district drawn by the same General Assembly at issue here, is highly instructive. There, as here, the losing party (intervenors) moved the Court to stay its decision. *See Personhuballah*, 155 F. Supp. 3d at 557. As here, intervenors argued that it was simply "too late" to implement a remedial plan in advance of the next election. *Id.* at 560. The *Personhuballah* court denied the stay motion, noting that

"[t]here is no authority to suggest that this type of relief [a stay] is any less extraordinary or the burden any less exacting in the redistricting context." *Id.* at 558-59 (citation omitted).

Thereafter, intervenors made a direct application for stay to Circuit Justice Roberts. Circuit Justice Roberts referred the application to the full Supreme Court, which denied the application. *Wittman v. Personhuballah*, 136 S. Ct. 998 (2016).

Precisely the same sequence played out in North Carolina. After a three-judge panel struck down two North Carolina congressional districts as racial gerrymanders in 2016, defendants moved for an emergency stay. The panel denied the motion, concluding that all relevant factors weighed against issuance of a stay. *Harris*, 2016 WL 6920368, at *1-2. Thereafter, the Supreme Court denied the defendants' direct application for a stay. *McCrory v. Harris*, 136 S. Ct. 1001 (2016).

As the following discussion of Intervenors' specific arguments demonstrates, precisely the same result should obtain here.

### 3. Intervenors Cannot Show a Likelihood of Success on the Merits

First, and perhaps most obviously, Intervenors cannot establish a likelihood of success on the merits. A districting plan fails constitutional muster if it uses race as the predominant factor in determining whether to place a significant number of voters within or without a district unless the use of race is narrowly tailored to a compelling government interest. *Bethune-Hill*, 137 S. Ct. at 797, 800.

At the outset, Plaintiffs note that the State Defendants have, within the last 24 hours, (a) indicated they will not appeal because, among other things, there is little chance of success on the merits given the standard of review on appeal and (b) raised serious questions about Intervenors' standing. *See* Dkt. No. 246. There thus appears to be a strong likelihood that the Supreme Court will not even *reach* the merits, let alone resolve them in Intervenors' favor.

Here, the Court held that race was the predominant factor undergirding the Challenged Districts and that the General Assembly's use of race to draw these districts was not narrowly tailored. The Court's lengthy and exhaustive Memorandum Opinion speaks for itself. Plaintiffs will not repeat the substance of that Opinion here. Suffice to say, the Court applied well-established law and made well-supported factual determinations. Intervenors offer nothing new in the present motion, instead rehashing versions of arguments they already advanced unsuccessfully in their post-trial briefing. They do not make a strong showing they are likely to prevail on the merits of their appeal.

### a. Intervenors Have Not Made a "Strong Showing" that They Are Likely to Demonstrate that the Court Committed Clear Error in Its Predominance Analysis

The Court's Opinion was a straightforward application of the Supreme Court's recent decisions. The Court applied the correct legal standard as clarified by the Supreme Court on Plaintiffs' appeal and applied in other recent racial gerrymandering cases. The General Assembly sought to comply with the Voting Rights Act ("VRA") by using a numerical "mandatory" racial threshold unfounded in any evidence whatsoever. *Compare* Memorandum Opinion, Dkt. No. 234 ("Mem. Op.") at 17-18, *with Cooper v. Harris*, 137 S. Ct. 1455 (2017), *and Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015).

The record is replete with both direct evidence of the General Assembly's race-based motives and circumstantial evidence that race was the predominant factor. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995). The Court summarizes that evidence for dozens of pages. *See* Mem. Op. at 15-82. On appeal, all of these factual findings—including "as to whether racial considerations predominated in drawing district lines"—are subject to "clear error" review. *Cooper*, 137 S. Ct. at 1465.

Intervenors' Motion lists three ways in which they disagree with the Court's factual findings and the way it weighed the evidence in the course of its predominance analysis.

Intervenors' disagreement with the Court's fact-finding is not a strong showing that the Court committed clear error.

First, Intervenors regurgitate their failed argument that "core retention" was the predominant factor behind the Challenged Districts. This argument is unavailing for multiple reasons. For starters, core retention was not even listed as a relevant consideration in the districting criteria adopted by the General Assembly, and the "core retention" in the remaining Challenged Districts is less than that in HD 75, where race concededly predominated. *See* Dkt. No. 233 at 6, 8.

Intervenors also take issue with the Court noting that core retention "'tells us very little' about why new voters were added to a Challenged District." Mot. at 5. Intervenors neglect to note that the Court was referencing *Alabama*, which held that the predominance analysis concerns "which voters the legislature decides to choose" in order to establish popularity equality and thus that "core preservation[] is not directly relevant to the origin of the *new* district inhabitants." *Alabama*, 135 S. Ct. at 1271. Indeed, the Court in *Page II* rejected a similar "core retention" argument, finding it "telling" that with regard to the 17% of Virginia's 3rd Congressional District that was not maintained, whites were disproportionately moved out of the district and blacks into it. *See Page II*, 2015 WL 3604029, at *12.

Intervenors also once again mischaracterize the testimony of Dr. Maxwell Palmer, as Plaintiffs have previously explained. *See* Dkt. No. 233 at 8 (noting that Intervenors mischaracterize a variable in Dr. Palmer's analysis which reflected whether a given VTD remained in *a* Challenged District, not the *same* Challenged District). The fact that Intervenors repeat a misunderstanding (or mischaracterization) of the evidence after it was already pointed out to them reflects only the clear error in their arguments in support of a stay, not clear error on the part of the Court.

Ultimately, Intervenors' argument boils down to their belief—asserted in a single sentence without support—that the Court "abused its discretion" in finding Plaintiffs' witnesses more credible than theirs. Mot. at 6. But gauging witness credibility is a classic prerogative of the trial court and, accordingly, "can virtually never be clear error." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985); *see also Cooper*, 137 S. Ct. at 1474 (Appellate courts "give singular deference to a trial court's judgments about the credibility of witnesses . . . because the various cues that 'bear so heavily on the listener's understanding of and belief in what is said' are lost on an appellate court later sifting through a paper record") (quoting *Anderson*, 470 U.S. at 575).[2] The Court did not commit clear error by rejecting Intervenors' *post hoc* core retention argument: That argument is legally and factually wrong.

Second, Intervenors patronizingly chide the Court for its supposed lack of "proper understanding" of how Census block geography works. Mot. at 6. Here Intervenors simply rehash their argument that achieving population equality was the predominant goal behind the Challenged Districts. *See id.* ("[T]he Census blocks were chosen based on population number and geographic location not racial makeup."). This is wrong as a matter of law — the question is not whether the General Assembly sought to achieve population equality, but *which voters* it chose to include or exclude from the Challenged Districts. *See Alabama*, 135 S. Ct. at 1271 (population equality "is a background rule against which redistricting takes place[,]" . . . not a factor to be treated like other nonracial factors when a court determines whether race predominated"). Here, the record manifested an extraordinarily consistent pattern of racial sorting. *See, e.g.*, Pls.' Ex. 71, tbls. 3-6 (reflecting nearly uniform pattern of VTD splits with high-BVAP areas in Challenged Districts and low-BVAP areas in non-

---

[2] Notably, in arguing for a new evidentiary hearing, Intervenors invited this Court a second opportunity to assess witness credibility. *See* Dkt. No. 146 at 9 n.4 ("The appointment of a new judge to the panel overseeing this case . . . supplies an additional reason for an evidentiary hearing. 'The District Court is best positioned to determine in the first instance both the questions of predominance and narrow tailoring,' in part because it can weigh testimony and assess credibility, which Judge Wright Allen has not yet had the opportunity to do." (citing *Bethune-Hill*, 137 S. Ct. at 800). The fact that Intervenors don't agree with the credibility determinations that *they* invited the Court to make does not establish clear error.

challenged districts); 2nd Trial Tr. 456:13-18 (Palmer) (same pattern of divisions along racial lines apparent in HD 75 evident in Challenged Districts as well). John Morgan testified, in essence, that "the precision with which these splits divided white and black areas was mere happenstance." The Court found that testimony incredible. Mem. Op. at 32. Finding unbelievable testimony unbelievable is not clear error.

Finally, Intervenors complain that the Court, in conducting its predominance analysis, "ignor[ed] the contemporaneous support of the Black Caucus when the plan was passed into law." Mot. at 7. Their point is unclear. Whether a given legislator voted for or against a plan says nothing about whether race or some other factor predominated in the drawing of a particular district. Intervenors do not—because they cannot—present any authority otherwise, let alone establishing that a court commits clear error by finding racial predominance if some members of the black caucus voted for a districting plan. This is because the law is to the contrary. *See, e.g.*, *Miller*, 515 U.S. 900 (race predominated with regard to state-adopted "max-black" plan drafted for black caucus).

> b. **Intervenors Have Not Made a "Strong Showing" that They Are Likely to Demonstrate that the Court Erred in Its Narrow Tailoring Analysis**

Intervenors also claim that the Court committed "plain legal error" in finding that the General Assembly's use of a mechanical 55% BVAP threshold was not narrowly tailored. Mot. at 3.

As an initial matter, the Motion will be searched in vain for Intervenors' articulation of the "plain legal error" the Court supposedly committed. All they cite for this "legal error" is the legal standard that the Court correctly applied. *Compare* Mot. at 3, with Mem. Op. at 82 ("[T]he intervenors were required to prove that the legislature had 'good reasons to believe' that its use of race was required to comply with Section 5.").

Intervenors attempt to manufacture a non-existent legal error because their actual disagreement is with the Court's factual findings, and those are subject to clear error review.

But as to the General Assembly's supposed "good reasons," Intervenors' entire argument consists of a single sentence that baldly asserts: "The House had 'good reasons' to believe it needed 12 ability-to-elect districts with a 'functional working majority.'" Mot. at 4 (quoting *Bethune-Hill*, 137 S. Ct. at 799, 801-02). Intervenors' citation to the Supreme Court's opinion is not only misleading, it undermines Intervenors' argument that they had "good reasons" to believe a 55% BVAP threshold was necessary in any of the 11 Challenged Districts. Intervenors cite to a passage focused on the use of the 55% BVAP threshold in the *sole district from which it derived*—HD 75. *See* 137 S. Ct. at 801-02. What the Court found on remand is that (a) the Supreme Court had confirmed that the 55% BVAP threshold was derived based on HD 75-specific concerns and then applied across the board to the remaining Challenged Districts and (b) Intervenors "produced no evidence at either trial showing that the legislature engaged in an analysis of any kind to determine the percentage of black voters necessary to comply with Section 5 in the 11 remaining challenged districts." Mem. Op. at 83-84.

Simply put, the Court found that it was Intervenors' burden of proving narrow tailoring and they failed to prove that the factually-unsupported application of a single, mechanical racial target to twelve very different districts was narrowly tailored. Baldly asserting the Court got it wrong does not demonstrate clear error.

Unable to show the Court misapplied the law, Intervenors complain about the law, noting that the Equal Protection Clause prohibits unjustified racial gerrymandering and (at the time of 2011 redistricting) Section 5 of the VRA imposed a nonretrogression requirement. The mere fact that these two laws exist does not equate to "legal error" on the part of the Court. Under Intervenors' theory, any time a court finds a racial gerrymander in a covered state, it would commit "legal error." That's obviously not the case. *See, e.g.*, *Cooper*, 137 S. Ct. at 1469-70 (rejecting a State's argument that its use of race in drawing districts was justified by the VRA); *Page II*, 2015 WL 3604029, at *16–18.

- 11 -

Moreover, in advancing their analytically and grammatically dubious "between a *Shaw*-rock and a § 5-hard-place" argument, Intervenors distort the Court's decision and the record evidence. The Court held—consistent with Supreme Court precedent—that a State that seeks to deploy the VRA to justify its predominant use of race must have good reason to believe its use of race is necessary. The Court was not nit-picking the way the General Assembly balanced and weighed conflicting evidence of the "right" BVAP level in the Challenged Districts. The problem was that, as the Court found as a matter of fact, the General Assembly did *no* colorable analysis to determine whether use of a 55% BVAP target was justified in any district other than HD 75. *See* Dkt. No. 233 at 83-86. The General Assembly had no reason—let alone good reason—to believe the VRA compelled its use of that mechanical racial target. *Alabama*, 135 S. Ct. at 1273 (legislature's narrow tailoring insufficient where it "relie[s] heavily upon a mechanically numerical view as to what counts as forbidden retrogression").

The Court further held that had the General Assembly done the analysis it eschewed, it would have found "as a matter of fact that a 55% BVAP was not required in any of the 11 remaining challenged districts for black voters to elect their preferred candidates." Mem. Op. at 86. In other words, Intervenors are simply repackaging their "contention that because '[n]o one' presented the legislature with evidence of white crossover voting at the time of redistricting, the map-drawers" were justified in thinking "that a 55% BVAP minimum was required to ensure non-retrogression under Section 5." Mem. Op. at 90 (quoting DI Post-Trial Br. at 35). The Court rejected Intervenors' effort to shirk their burden of proof before. *Id.* at 90-91. Repetition has not made the argument any better. The government does not get to segregate citizens based on the color of their skin until a third party proves it should not.

Intervenors cannot show a strong likelihood of success on the merits.

### 4. Granting a Stay Will Cause Irreparable Injury to Plaintiffs and Is Contrary to the Public Interest

The other stay factors also cut against Intervenors. Plaintiffs will suffer irreparable injury if a stay is granted, and a stay is contrary to the public interest.

Plaintiffs set out a fuller analysis of this factor below, but little need be said other than repeating back what Intervenors demand. Intervenors say the Court should not implement a remedial map before the 2019 election. Mot. at 8. The 2019 election is the *last* election that will be held before the 2020 round of redistricting. Through the guise of a motion to stay, Intervenors seek ultimate victory—to leave Plaintiffs with no remedy for a decade-long violation of their constitutional rights.

There is no doubt that this would cause irreparable injury to Plaintiffs and the public. The right to vote is one of the most fundamental rights in our democratic system of government and is afforded special protection. *See Reynolds*, 377 U.S. at 554-55, 562; *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("Other rights, even the most basic, are illusory if the right to vote is undermined."). Accordingly, any illegal impediment on the right to vote is an irreparable injury. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, it is simply beyond dispute that Plaintiffs and other voters will suffer irreparable injury if they are forced to participate in a decade-worth of elections under an unconstitutional redistricting plan.[3]

Moreover, the public interest also weighs heavily in favor of denying Intervenors' motion. Where a court finds that a legislature has impermissibly used race to draw congressional districts, "the public interest aligns with the Plaintiffs' . . . interests, and thus militates against staying implementation of a remedy." *Personhuballah*, 155 F. Supp. 3d at 560. "[T]he harms to the Plaintiffs would be *harms to every voter in*" the Challenged

---

[3] *See Personhuballah*, 155 F. Supp. 3d at 560 ("To force the Plaintiffs to vote again under the Enacted Plan even if the Supreme Court affirms our finding that the Plan is unconstitutional . . . constitutes irreparable harm to them, and to the other voters in the Third Congressional District.") (citation omitted); *Larios*, 305 F. Supp. 2d at 1344 ("If the court permits a stay, thereby allowing the 2004 elections also to proceed pursuant to unconstitutional plans, the plaintiffs and many other citizens in Georgia will have been denied their constitutional rights in *two* of the five elections to be conducted under the 2000 census figures. . . . Accordingly, we find that the plaintiffs will be injured if a stay is granted because they will be subject to one more election cycle under unconstitutional plans.").

Districts who are being denied their constitutional rights. *Id.* (emphasis added); *see also Harris*, 2016 WL 6920368, at *2 ("[T]he harms to North Carolina in this case are public harms. The public has an interest in having . . . representatives elected in accordance with the Constitution."). Indeed, "[a]s the Supreme Court has noted, once a districting scheme has been found unconstitutional, 'it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan.'" *Harris*, 2016 WL 6920368, at *2 (quoting *Reynolds*, 377 U.S. at 585).

Against all this, Intervenors claim that proceeding with the remedial phase of this litigation will create administrative burden, arguing that the Commonwealth will incur further expense if the Supreme Court ultimately reverses and that denying a stay would cause "voter confusion and disruption to the primary process." Mot. at 7-8. As to the former point, this amounts to an argument that all redistricting cases should be stayed pending Supreme Court rule, which is not the law. *See supra* at 5-6.

As to "disruption," Intervenors' arguments ring entirely hollow. It is many long months before the 2019 elections. Even if it were not, the Commonwealth is more than capable of adopting a new map and holding elections a few months later. In 2011, for example, the General Assembly received 2010 Census data on February 3, adopted the current districting plan on April 12, and the plan was precleared on June 17.[4] The primary was held two months later on August 23.[5] If the Commonwealth can hold a primary election four months after maps are released, there is ample time to adopt a remedial plan. It is, after all, mid-2018. If the Commonwealth somehow believes it needs more than a year before the primary to adopt a new plan, it could move the primary back to August, as it did in 2011.

Simply put, nothing is preventing the Commonwealth from adopting a remedial plan sooner rather than later, save for Intervenors' apparent unwillingness to redistrict even if

---

[4] *See* Prof. Justin Levitt, All About Redistricting - Virginia, Loyola Law School, http://redistricting.lls.edu/states-VA.php (last visited July 20, 2018).

[5] *See* HB 1507 (Va. 2011), http://lis.virginia.gov/cgi-bin/legp604.exe?ses=111&typ=bil&val=HB1507&Submit2=Go.

- 14 -

provided "infinite time" to do so. Mot. at 8. That does not engender confidence in the General Assembly's desire or ability to implement the Court's Order in good faith. If Intervenors prefer the Court implement its own remedial plan now, Plaintiffs have no objection.

Finally, any "disruption" and "voter confusion" caused by remedying the Commonwealth's violation of the constitutional rights now is vastly outweighed by the ongoing constitutional injury being done to Plaintiffs and tens of thousands of other Virginians and what would happen with further delay. Plaintiffs submit that what would "confuse" voters is if they were forced to continue to vote in districts that are unconstitutional. What would cause "disruption" is if the Court stays the remedy until after the 2019 election, the Supreme Court affirms, and the Commonwealth must *then* redistrict and hold a special election in 2020 (which would be required to afford Plaintiffs relief), before redistricting and voting *again* in 2021.

## IV.    CONCLUSION

Stripped to its essence, Intervenors' motion to stay the Court's judgment asks the Court to grant them the "fruits of victory whether or not [their forthcoming] appeal has merit." *Personhuballah*, at 155 F. Supp. 3d at 560 (citation omitted). Plaintiffs respectfully submit that the Court should be entirely "reluctant" to do so. *Id.* Intervenors cannot establish a likelihood of success on the merits, and Plaintiffs and countless other Virginians will suffer grievous and certain injury if a stay is granted. Plaintiffs respectfully submit that the Court should deny Intervenors' motion so that a remedial plan can be adopted promptly and the Commonwealth's voters can, at long last, have the opportunity to vote under a constitutional House of Delegates map.

Dated: July 20, 2018 Respectfully submitted,

By: */s/ Aria C. Branch*
Marc Erik Elias (admitted *pro hac vice*)
Bruce V. Spiva (admitted *pro hac vice*)
Aria Branch (VSB # 83682)
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.434.1627
Facsimile: 202.654.9106

Kevin J. Hamilton (admitted *pro hac vice*)
Abha Khanna (admitted *pro hac vice*)
Ryan Spear (admitted *pro hac vice*)
William B. Stafford (admitted *pro hac vice*)
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

      I hereby certify that on the 20th day of July, 2018, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

      Respectfully submitted,

By /s/ *Aria C. Branch*
  Aria C. Branch (VSB# 83682)
  Perkins Coie LLP
  700 13th St. N.W., Suite 600
  Washington, D.C. 20005-3960
  Phone: (202) 654-6338
  Fax: (202) 654-9106
  Email: ABranch@perkinscoie.com

*Attorneys for Plaintiffs*