IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| Golden Bethune-Hill, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Virginia State Board of Elections, *et al.* <br><br> Defendants. | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |

**Reply Brief in Support of Motion for Stay**

By steering the law of racial gerrymandering in a new direction, allowing a finding of predominance where the Supreme Court "to date" had never found it, *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017), the Supreme Court left legal questions open as to how the predominance test works. This court had no choice but to make rulings on those questions in finding predominance in this case. Because the Supreme Court has shown an interest in clarifying the test and because this Court's determinations cut against the Supreme Court's concern that an analysis be "holistic," *id.* at 799, there is a likelihood that Intervenors' appeal will be heard on the merits and will succeed. Plaintiffs' arguments to the contrary are unpersuasive, as are their arguments on strict scrutiny, which fail to account for the burden applicable in Section 5 preclearance proceedings.

Defendants' arguments on standing are also meritless. The Virginia House has an interest both in its own district lines, *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 194 (1972), and in state statutes the executive declines to defend, *Karcher v. May*, 108 S. Ct. 388 (1987). It therefore has standing to appeal this Court's invalidation of its voting districts.

For these reasons, and those stated below, the Court should stay its order invalidating the 11 remaining Challenged Districts pending appeal.

## Argument

All of the elements of the stay inquiry, however construed, weigh in Intervenors' favor.[1]

### I. Intervenors Have a Substantial Likelihood of Success

As Intervenors explained in their opening brief, the forthcoming appeal will raise questions of law that remain unresolved and fall within the Supreme Court's appellate jurisdiction, as well as questions of fact. Defendants respond that Intervenors lack standing to appeal. Plaintiffs respond that the appeal will raise only factual questions for clear-error review. Both contentions are incorrect.

---

[1] Plaintiffs oddly contend (at 4) that the stay factors courts of appeal consider in proceedings before them should apply, even though the appeal here is to the Supreme Court. *Compare Nken v. Holder*, 556 U.S. 418, 425 (2009) (discussing the standard a court of appeals should apply) *with Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (stating standard to "obtain a stay pending the filing and disposition" of an appeal to the Supreme Court). In any event, the standards address the same concepts, and the dispute is academic.

2

## A. Defendants' Arguments Are Meritless

The Attorney General's decision not to defend Virginia law, Def's Br. at 1–2, creates the familiar scenario in redistricting litigation where "executive branch defendants," for political reasons, favor the plaintiffs' position, thereby creating "two sets of 'plaintiffs' asserting unconstitutionality of the state apportionment system." Robert G. Dixon, Democratic Representation: Reapportionment in Law and Politics 153 (1968). In those cases, defense of the law "is left to such additional defendants as may have been allowed to intervene earlier in the litigation." *Id.* This state of affairs—though unfortunate—is hardly unusual, and the House's standing to continue the defense of the law through an appeal is well founded in two independently sufficient legal doctrines.

### 1. The House's Interest in Its Own Composition

The House has a concrete and particularized interest in the boundaries of districts defining its own composition, the interest was injured by the court's invalidation of those lines, and the injury is redressable through an appeal seeking vacatur of the court's injunction; hence, the House has standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (elements of standing).

That is plain from precedent. In *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 194 (1972), a district court invalidated a redistricting law governing the Minnesota senate's district boundaries and imposed a new apportionment scheme based in part on recommendations by the governor, who accordingly did not appeal. *Id.* at 192. The senate, a district-court intervenor, appealed alone—which was unsurprising, since the governor favored the district

3

court's ruling. The appellees moved for dismissal claiming the senate lacked standing, and the Supreme Court denied the motion, holding "certainly the Senate is directly affected by the District Court's orders" invalidating its voting districts. *Id.* at 194. That interest conferred on the senate standing to appeal.

This case is not materially different. As in *Beens*, the Virginia House intervened in the proceedings; as in *Beens*, the district court invalidated a redistricting plan; as in *Beens*, that impacts the internal affairs of the Virginia House; as in *Beens*, the Virginia House alone appealed. And, as in *Beens*, the Virginia House "certainly…is directly affected by the District Court's orders" invalidating its voting districts. "That a legislative body has a personalized and concrete interest in its composition is far from a novel concept." *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 86 (D.D.C. 1998).

To be sure, the lower court in *Beens*, in addition to adopting new lines, changed the size of the senate, but the Supreme Court's reliance for its holding in *Beens* on *Silver v. Jordan*, 241 F. Supp. 576 (S.D.Cal.1964), aff'd, 381 U.S. 415 (1965), which merely involved a dispute over district lines, not the size of the body, indicates that this fact is immaterial. *Beens* therefore makes clear that "a legislative body has a judicially cognizable interest in matters affecting its composition so as to satisfy Article III, whether or not the challenged conduct will ultimately have an effect on the size of the body." *U.S. Dep't of Commerce*, 11 F. Supp. 2d at 87.

And, ignoring *Beens*, Defendants make an additional foreclosed argument regarding the resolution authorizing intervention. The House resolution authorized

4

the House and Speaker to "defend the responsibilities, authority, and prerogatives of the House of Delegates" and "to defend the responsibilities, authority, and prerogatives of the House of Delegates." Def's Br. at 7 (quoting resolution, emphasis omitted). Defendants urge the Court to find significance in the fact that the resolution references the interests of the House, not the state. *See id.* But in *Beens*, the Minnesota senate resolution authorized the senate to intervene for exactly the same reason, "to take such steps as may be necessary to represent the interests and will *of this body*"—not the state. *Beens*, 406 U.S. at 193 (quoting resolution) (emphasis added). The Supreme Court rejected a "narrow" interpretation of the resolution and declined to find that the Minnesota senate lacked standing to bring an appeal by reference to its language. *Id.* at 193. The argument is meritless.

So too is Defendants' argument suggesting that the district court's order does not affect the House because no remedial map is yet in place. Def's Br. at 4–5. This ignores both the order and its impact. The court's order finds that 11 House districts violate the Constitution and allows the General Assembly a limited time frame to construct a remedial plan to rectify the constitutional deficiencies. ECF No. 234 at 92–93. This indicates that the court intends "to have new plans ready for use" in the next elections and therefore has the practical effect of enjoining the districts. *See Abbott v. Perez*, 138 S. Ct. 2305, 2321–23 (2018). Thus, the invasion into the House's interest in its voting districts is a present injury, not a future injury, and the appeal is ripe at this time.

5

## 2. The House's Interest in Defending Laws the Attorney General Will Not Defend

The House has a second, independent interest in defending laws the Attorney General declines to defend. In *Karcher v. May*, 108 S. Ct. 388 (1987), the Supreme Court held that the New Jersey legislative leaders, in their official capacities, had standing to defend a law the executive branch refused to defend and indicated that they both had standing and were real parties in interest to take an appeal from an adverse decision in that case. The Court drew a distinction between the leaders in their official capacities on behalf of the institutional bodies, who had standing and real-party-in-interest status, and individual legislators, who had neither. *Id.* at 78–81. The Court adopted the reasoning of the lower court in allowing the legislature to intervene because "it was responsible for enacting the statute and because no other party defendant was willing to defend the statute." *Id.* at 80 (quotations omitted). That is the case here: the House has an institutional interest in seeing the redistricting plan it created and enacted not being subject to a *de facto* veto by the executive branch's choice to concede the case.

Defendants are doubly wrong in contending that *Karcher v. May* is inapplicable because state law does not (they say) allow the House to defend state law. Def's Br. at 7.

They are wrong, first, because *Karcher*'s reference to the legislature's "authority under state law" to defend statutes was not a reference to a state statutory delegation of that authority, but rather to the state supreme court's practice of "granting applications of the Speaker of the General Assembly and the

6

President of the Senate to intervene as parties-respondent on behalf of the legislature in defense of a legislative enactment." *Id.* at 82. As the Attorney General well knows, the Virginia Supreme Court also has a practice of granting applications of the Virginia House and its Speaker to intervene because it occurred very recently in *Vesilind v. Virginia State Bd. of Elections*, 295 Va. 427, 433, 813 S.E.2d 739, 742 (2018), a redistricting case challenging Virginia legislative districts drawn in 2011. Just as the Supreme Court inferred from a single redistricting case mentioning legislative intervention, *In re Forsythe*, 91 N.J. 141, 144, 450 A.2d 499, 500 (1982), that the legislature had authority to intervene, *Karcher*, 108 S. Ct. at 82, the Court here must infer the same authority.[2] *Karcher* did not invite lower courts to delve into questions of state statutory interpretation about the relevant functions of state government, so nothing in *Karcher* supports Defendants' request that the Court infer from Va. Code § 2.2-507 that the House does not have authority to do what the Virginia Supreme Court plainly allows. *See Michigan v. Long*, 463 U.S. 1032, 1039 (1983) (disclaiming federal courts' competency "to interpret state laws with which we are generally unfamiliar").

Defendants' interpretation of *Karcher* is wrong, second, because the discussion of authority to intervene they rely on is not controlling on the question of Article III standing, as is evident from numerous cases Defendants ignore, like

---

[2] In *In re Forsythe*, the legislature defended the challenged redistricting plan "with the Attorney General," 91 N.J. at 144, so it is of no significance that, in *Vesilind*, the Attorney General and the House both defended the statute.

7

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664–65 (2015), *Coleman v. Miller*, 307 U.S. 433 (1939); *I.N.S. v. Chadha*, 462 U.S. 919, 929 (1983), and *United States v. Windsor*, 570 U.S. 744, 761 (2013), which all recognize a legislature's institutional interest in defending laws over which the executive intends to exercise a *de facto* veto by declining to defend in court. Instead, Defendants rely on *Hollingsworth v. Perry*, 570 U.S. 693, 724 (2013), which concerned citizen supporters of a state law, not a legislature as "an institutional plaintiff asserting an institutional injury." *Arizona State Legislature*, 135 S. Ct. at 2664. The comparison is unfounded; the right comparison is *Karcher*, *Coleman*, *INS*, and *Windsor*. Defendants' standing arguments are meritless.

### B. Plaintiffs' Arguments Are Meritless

Plaintiffs' contentions hinge on their assertion that Intervenors' appeal raises only questions of fact, given that this Court made "dozens of pages" of "factual findings." Pl's Br. at 7. But the presence of factual findings does not render any conceivable appeals challenge a clear-error review of their adequacy or accuracy. Legal principles determine which facts are relevant, which are not, and how they should figure in to the ultimate conclusion. Plaintiffs know this well because they argued for *de novo* review of the district court's first decision in this matter, which held "as a matter of fact" that race did not predominate in the 11 Challenged Districts here. *See, e.g.*, *Bethune-Hill v. Virginia State Bd. of Elections*, 141 F. Supp. 3d 505, 555 (E.D. Va. 2015), *aff'd in part, vacated in part*, 137 S. Ct. 788 (2017). The legal significance and scope of the decision's inquiry were predicated on an erroneous legal view of what was relevant and what was not relevant for

8

consideration. *See, e.g.*, *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017).

Intervenors' appeal raises a similar set of legal questions regarding this court's opinion, which weighed some factors and discounted others in the legal framework it inferred from the Supreme Court's precedent. It is therefore a legal question whether the court correctly discounted the Challenged Districts' core retention, *see* ECF No. 231 at 18, the population flows based on where geographically the Commonwealth's population loss occurred, *e.g.*, *id.* at 23, the role of shapes and sizes of census blocks in splitting VTDs, *id.* at 12–13, the relevance of previously found facts, *id.* at 6, and so forth. And questions of what role these considerations play in the predominance analysis, much like the question of what role the equal-population rule played before *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015), remain open questions for the Supreme Court.[3] Moreover, like the district court's prior legal error in focusing solely on portions of the district exhibiting "actual conflict," the court's decision not to consider these

---

[3] Plaintiffs read into one sentence from *Alabama* a definitive legal resolution on the role of core retention, but the statement is dictum regarding potential factual resolution of issues on remand and hardly conclusive. By comparison, the Supreme Court had stated in passing on several occasions prior to *Alabama* that the equal-population rule was a traditional districting principle to be weighed in the predominance inquiry, *see Lawyer v. Dep't of Justice*, 521 U.S. 567, 582 n.10 (1997), *Easley v. Cromartie*, 532 U.S. 234, 256 (2001), before finding as a matter of law that it is not, 135 S. Ct. at 1270. The Supreme Court previously identified core retention as a traditional districting principle, *Karcher v. Daggett*, 462 U.S. 725, 740 (1983), so there is a likelihood that it will reach the same conclusion here.

factors "foreclosed a holistic analysis of each district." *Bethune-Hill*, 137 S. Ct. at 799.

For similar reasons, the Court's strict-scrutiny analysis applied an improper framework because the question whether the districting scheme is tailored under Section 5 necessarily requires an assessment of how Section 5 operated, especially considering the conditions under which the House was working. As explained in Intervenors' post-trial brief, ECF No. 231 at 30–46, this requires taking into account at a granular level what the burden was in an administrative or judicial preclearance proceeding and what types of evidence would (and would not) be deemed to show non-retrogression in those proceedings. That framework presents a legal question, and the Court's treatment of the relevant facts did not take into account the correct benchmark comparison to the prior districts and the information Intervenors provided in the evidentiary showing and briefing. *See, e.g.*, ECF No. 231 at 43–46.

In addition, Intervenors intend to challenge findings of clear-error grounds, but Plaintiffs' suggestion that this is *ipso facto* unlikely to succeed is incorrect. The Supreme Court has not been shy to assess what types of evidence are "persuasive" in the predominance analysis, *Easley v. Cromartie*, 532 U.S. 234, 254 (2001), and the Court's opinion turns on Dr. Rodden's dot-density-map analysis. That analysis is unpersuasive for reasons stated in Intervenors' briefing. *E.g.*, ECF No. 231 at 9. Similarly, the evidence is both legally and factually unavailing insofar as it is

10

founded on a theory of predominance untethered to identifying the impact of a 55% BVAP target on the district lines. ECF No. 231 at 16.

Finally, aside from arguing about the standard of review, Plaintiffs' remaining arguments amount to criticizing Intervenors for "versions of arguments they already advanced unsuccessfully in their post-trial briefing." Pl's Br. at 7. This bizarre argument ignores the procedural rules requiring Intervenors to move for a stay in this Court before seeking a stay in the Supreme Court, Sup. Ct. R. 23.3, which means arguing positions "advanced unsuccessfully" to the tribunal that rejected them. The rule both assumes the Court can review its prior opinion and the stay arguments impartially and that the Court will move quickly to deny the stay if it is confident in its prior rulings so that the appellate-level motion may proceed expeditiously. In any event, that Intervenors are, as every appellant, appealing on issues rejected below does not mean the appeal is unlikely to succeed.

## II. The Equitable Factors Weigh in Favor of a Stay

As explained in Intervenors' opening brief, the injunction imposes irreparable harm in the form of an enjoined state statute, an expensive and time-consuming remedial process, and disruption of the election process. ECF No. 237 at 7–9. Plaintiffs respond with a straw man that Intervenors are asking for a stay pending the 2019 elections. ECF No. 247 at 13–14. In fact, Intervenors are requesting a stay pending the *appeal*, which is unlikely to extend through the 2019 elections.

Plaintiffs also argue—in direct contradiction to their argument that there is no time for the appeal to proceed before the 2019 elections—that it is too early to seek a stay. But this ignores that the Supreme Court issued stays last year around

this time frame in preparation for the 2018 elections. *See Abbott v. Perez*, 138 S. Ct. 49 (Sept. 12, 2017); *Gill v. Whitford*, 137 S. Ct. 2289 (June 19, 2017).[4] The missing link between these rulings and Plaintiffs' view that a stay is premature is the substantial remedial processes and steps the state must take *now* in reliance on a new map pending the appeal, which is likely to result in reversal.[5]

Finally, against these interests, the Plaintiffs claim an interest in the "right to vote." Pl's Br. at 13. But Plaintiffs have had the right to vote in every election since 2011 (and before), and there will be no election between now and June 2019, the latest the appeal is likely to be resolved. Moreover, Plaintiffs are simply wrong that a ruling holding a redistricting scheme unlawful can never be stayed due to irreparable harm to voters. *See Wells v. Rockefeller*, 394 U.S. 542, 547 (1969); *Kilgarlin v. Martin*, 386 U.S. 120, 121 (1967) (per curiam); *Klahr v. Williams*, 313 F. Supp. 148, 152 (D. Ariz. 1970), *aff'd sub nom. Ely v. Klahr*, 403 U.S. 108 (1971). The balance of equities weighs in Intervenors' favor.

## Conclusion

For these reasons, the Court should issue a stay of its order pending appeal.

---

[4] Notably, *Abbott* involved both racial-gerrymandering rulings that were eventually affirmed, *Abbott v. Perez*, 138 S. Ct. 2305, 2334 (2018), and fact-specific rulings on intentional discrimination involving detailed factual determinations that were eventually reversed, *id.* at 2324–34.

[5] Contrary to Plaintiffs' contentions, the House intends to attempt to redistrict, but whether this can succeed depends on political actors, including the governor. Undertaking that complex process when the Supreme Court is likely to render it unnecessary is irreparable harm.

Dated: July 25, 2019                    Respectfully Submitted,

/s/ Katherine L. McKnight
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker William J. Howell*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2017, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.

/s/  Katherine L. McKnight
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com