IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| Golden Bethune-Hill, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Virginia State Board of Elections, *et al.*, <br><br> Defendants. | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |

**Defendant-Intervenors' Response In Opposition
To Motion To Modify This Court's June 26, 2018 Order**

Defendants' motion for modification of this Court's June 26 Order, ECF No. 257 at 1, is part of an attempt to use this Court's equitable powers for perceived partisan gain. The motion is founded entirely on public posturing by Virginia Democratic leadership and in no way reflects the realities of the ongoing political process necessary to prepare and pass a remedial plan. That process is proceeding according to, and informed by, the deadline this Court imposed, and the law requires that the Court "defer" in the meantime. *Growe v. Emison*, 507 U.S. 25, 33 (1993). No impasse exists, and House leadership is working on preparing and negotiating a plan to satisfy its duty to remedy the violations this Court has identified.[1] With approximately 170 days between now and the point in the election

---

[1] The House, of course, does not concede any legal violations. Language relating to the Court's finding of any violations is for the sake of argument only pending disposition of the House's appeal, which has now been perfected.

timeline when the Virginia House even had data to redistrict in 2011, Defendants cannot show that it is not "practicable" to afford the political process the opportunity to work. *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). The motion is baseless and should be denied.

## The Governing Legal Standards

Defendants' motion makes no reference to governing law. They therefore bypass the two sets of legal principles that govern their request for relief.

First, their motion seeks to change an interlocutory order and amounts to a motion for reconsideration under Federal Rule of Civil Procedure 54(b). *See Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1469 (4th Cir. 1991). Although not subject to the rigorous standards of a motion to amend a judgment, *see id.*, a Rule 54(b) reconsideration motion is disfavored:

> The motion to reconsider would be appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.

*Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983); *McAfee v. Boczar*, 2012 WL 2505263, at *2 (E.D. Va. June 28, 2012) (same). The motion is not a proper vehicle "to ask the Court to rethink what the Court had already thought through—rightly or wrongly." *Above the Belt, Inc.*, 99 F.R.D. at 101.

Second, Defendants ignore the body of law governing redistricting remedies. "When a federal court declares an existing apportionment scheme unconstitutional,

it is…, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978). This principle recognizes "that legislative reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds v. Sims*, 377 U.S. 533, 586 (1964).

## Argument

At the end of trial, this Court requested the parties to address, as part of their post-trial briefing, the question of remedial procedure, should it be necessary. 2 Tr. 1003:17–1005:8. Plaintiffs and Intervenors both stated their positions on that issue in their post-trial briefs, and both agreed that the legislature must "be afforded the first opportunity to adopt a remedial map." Pl's Post-Trial Reply, ECF No. 233, at 25; Int's Post-Trial Br. at 48–49. Defendants' post-trial brief stated only that they "join the arguments offered by Defendant-Intervenors." Def's Post-Trial Br., ECF No. 232 at 1.

Defendants did *not* indicate what remedial opportunity they believed would be excessive for legislative action or at what point it would be too late in the process to allow the legislative process to work. Based on the parties' filings, the Court determined to "afford the Virginia General Assembly a reasonable opportunity" to draw a remedial map, Memorandum Opinion, ECF No. 234, at 92, and made an

3

informed judgment to set October 30, 2018, as the deadline for legislative action, June 26 Order, ECF No. 235, at 4.

That is the Order Defendants ask this Court to reconsider. But they have not shown a "significant change in the law or facts," *Above the Belt*, 99 F.R.D. at 101, indicating that it is no longer "practicable" to afford the General Assembly "a reasonable opportunity" to redistrict, *Wise*, 437 U.S. at 540. Their first set of arguments are mischaracterized statements about political posturing that do not accurately reflect the ongoing legislative redistricting effort. Their second set of arguments are unpersuasive recitations of election timelines that were well known to Defendants long ago, could have formed the basis of briefing before this date, and, besides, fail to show that the current timeline is infeasible. In fact, the House lacked even data to redistricting in 2011 could not begin until the end of February of that election year.

### A.   The Redistricting Effort Is Ongoing, and There Is No Impasse

Defendants' contention that "the General Assembly does not intend to avail itself of the opportunity provided by the Court" is flat wrong. ECF No. 258 at 2. The assertion is based entirely on statements of public posturing by Democratic leadership and out-of-context snippets from briefing and public press releases. But redistricting "is primarily a political and legislative process," *Gaffney v. Cummings*, 412 U.S. 735, 749 (1973), and that process does not occur principally through press releases and public posturing. Contrary to Defendants' misrepresentations, the legislative process is proceeding, and no impasse exists. In fact, the redistricting time frame has been informed by the date this Court set, so setting a new date now

would be arbitrary and frustrate the potential compromises that are just now beginning to emerge.

In response to the Court's request for more detail on that process, ECF No. 259 at 1, Intervenors attach correspondence from Speaker Cox to Governor Northam on the redistricting, *see* Exhibit A, which states the Speaker's position. Additionally, Intervenors describe as follows the ongoing efforts in more detail:

- Delegate Toscano introduced a redistricting Bill, HB7001, on August 29, and the House Committee on Privileges and Elections held a hearing on HB7001 on August 30. The Committee will consider whether to approve the bill by on or about September 27, 2018, and, if it supports HB7001, that bill likely would come to a vote on or around mid-October. As discussed below, the specific date will turn largely on the practical limitations on the ability of the House members to convene.

- The House leadership is in the advanced stages of preparing a redistricting plan. To that end, and prior to the Court's order issued yesterday afternoon, they have discussed potential avenues of political agreement with a number of members of the Democratic Caucus, including:

    1. Speaker Cox met with Governor Northam on August 9;
    2. Speaker Cox met with the House Democratic Leader, David Toscano, on September 11;
    3. Speaker Cox spoke by telephone with the patron of HB 7001, Delegate Lamont Bagby, on September 11;

5

4. Speaker Cox spoke by telephone with the Governor on September 11;

5. Speaker Cox spoke by telephone with Democratic Delegate Luke Torian on September 11;

6. Delegate Chris Jones met with Democratic Delegate Luke Torian on September 11;

7. Delegate Chris Jones met with Delegate Bagby on August 17;

8. Delegate Jones met with Democratic Delegates Jeffrey Borne and Mr. Torian on August 16;

9. Delegate Jones spoke by telephone with Democratic Delegate Mark Sickles on September 11;

10. Delegate Todd Gilbert met with Delegate Bagby on August 3.[2]

In many of these meetings, Republican Delegates have been informed that Democratic and Black Caucus leadership will consider House leadership's proposals. At no point have Republican Delegates in any of these and similar conversations been informed that Democratic leadership is unwilling to consider proposals.

- In the meeting of the Privileges and Elections Committee held on August 30, 2018, to consider HB 7001, the bill's patron, Delegate Bagby, stated that

---

[2] These meetings were conducted or scheduled prior to the Court's order of September 11 requesting further information from the House regarding the pendant motion.

Republican Delegate Rob Bell had identified "great starting points" for negotiation on a remedial map. Republican leadership understands from this and similar statements and discussions that there is room for agreement on the criteria to apply in preparing a remedial map.

- House members have conducted other discussions formally and informally. The goals of the House leadership are (1) to satisfy the Court's order, (2) adhere to traditional criteria, (3) avoid pairing any incumbents (Republican or Democratic), and (4) avoid substantially altering the partisan makeup of any competitive House districts. As Speaker Cox other Delegates have stated on numerous occasions, the House leadership wants the input of Democratic members in this process. The 2011 Plan was passed with overwhelming, supermajority support from the Democratic Party and the House Black Caucus. House leadership sees no reason why that cannot occur again in 2018.

- House leadership anticipates that a meeting of the Privileges and Elections Committee will be held on or about September 27 and that its plan will be proposed around that time. If the Committee supports the plan, it will be brought to the House floor. That is likely to occur on or around mid-October. As discussed below, the specific date will turn largely on the practical limitations on the ability of the House members to convene.

To be sure, pinpointing legislative timelines under these circumstances is impossible for several reasons.

First, politics is a give-and-take process that changes by the minute depending on feedback from members and the Governor. For example, House leadership hopes to solicit feedback on their plan during and after the Privileges and Elections Committee hearing, and what that feedback is will, to a large extent, dictate how the plan will proceed through the process. There is no point in bringing legislation to the floor without understanding the members' position on it and making efforts to secure passage in advance. Consequently, predicting weeks in advance with accuracy how the plan will proceed simply cannot be done.

Second, the House is composed of part-time members, many of whom have other jobs, who did not anticipate legislative matters arising in August, September and October. Therefore, there are substantial scheduling hurdles to calling sessions of the General Assembly and arranging hearing dates and even in conducting informal meetings. This was especially a problem in the month of August when many members had scheduled family commitments. These scheduling problems have made it impossible to identify a date yet for floor votes, but House leadership is optimistic that this can occur around mid-October.

Third, all members are entitled to participate in the process, leaving the possibility open for multiple competing pieces of legislation and compromises between and among those. For example, Speaker Cox has communicated to Delegate Toscano concerns the Speaker has with HB7001. Delegate Toscano is free to accept that feedback, make alterations to his proposal, and submit a new proposal. Delegate Toscano, like most members, is not represented in this

8

proceeding in his capacity as an individual legislator, so no attorney can speak for the number of avenues he and other members may take.

These are all reasons the Supreme Court precedent requires this Court to "stay[] its hand" during this process. *Growe v. Emison*, 507 U.S. 25, 33 (1993) (quoting *Scott v. Germano*, 381 U.S. 407, 409 (1965) (per curiam)). The Supreme Court's decisions do not place federal courts in the position of micromanagers to be constantly inspecting the day-to-day workings of the legislature to assess progress, but rather to stand aside to allow the process a chance to work on its own terms. Here, no impasse exists. It bears emphasizing that the legislative process has progressed according to the schedule the Court set. It is unreasonable to expect a complex, multifaceted legislative process to have progressed further when House members have acted in reasonable reliance on the timeline the Court established— *with no objection from Defendants.*

This motion appears to reflect an attempt by Democratic interests to leverage this Court's power to achieve a strategic advantage in this quintessentially political affair. Though Intervenors can only guess what that perceived advantage might be, it seems that the Governor may be unwilling even to consider a plan the General Assembly passes but, at the same time, wishes to avoid the political detriment of stating so publicly, even before seeing House leadership's plan.[3] This motion may

---

[3] Even if the Governor declared that he would veto anything passed from the General Assembly under any circumstances, the General Assembly can override his veto.

9

well be an effort to use this Court to impose an impasse that does not currently exist without costing the Governor the political capital necessary for him to state that he is not willing to entertain proposals. Obviously, if the Governor has no interest in doing the people's work, that would be disappointing. House leadership hopes that is not the case and urges the Court not to impose an impasse that does not exist in fact.

Regardless, the process is ongoing, there is no way for the Court to intervene at this time without declaring political winners and losers, and there is no basis for reconsidering the time frame it set based on the input of all parties willing to take a stand in their briefing. The law is clear; the Court's obligation is to defer at this time.

### B. Defendants' Election-Administration Concerns Are Facially Meritless

Defendants' second basis for seeking reconsideration is a set of election-administration dates known to Defendants long ago. This is not a "significant change in the…facts." *Above the Belt*, 99 F.R.D. at 101. If Defendants believed a deadline before October 30, 2018, was appropriate, they could have said so when the Court expressly asked for their view. If nothing else, they were aware of this timeline as of June 26, and could have promptly requested that the Court reconsider then. Defendants' arguments say far more about the purposes in bringing this motion than about election-administration needs.

Indeed, no one previously viewed a redistricting deadline of October 30 as a problem because it is not a problem. That much is obvious insofar as the General

10

Assembly normally redistricts much later in the process. In 2011, census data was not available until the end of February of that election year, redistricting did not begin in earnest until March, and the plan was not passed until April. Moreover, Virginia was, at that time, subject to the preclearance requirement of Voting Rights Act § 5, which involved yet another hurdle in the process, so redistricting now is less difficult than in 2011. Defendants' suggestion that it is already too late for a legislative redistricting is baseless.

To be sure, an alteration in the districts at this time is not ideal, but federal-court intervention in redistricting is *never* ideal. The question at this stage is whether affording a legislative remedial opportunity is "practicable," *Wise*, 437 U.S. at 540, not whether it is ideal. It is obviously practicable when redistricting normally occurs in Virginia much closer to election dates than the Court's order proposes.

## Conclusion

The Court should not accept Defendants' invitation to delve into the "political thicket" of the ongoing redistricting process, *Gaffney*, 412 U.S. at 74950, and make a political judgment about the likely course of legislative proceedings. The process may succeed; it may not succeed. But the only way to know is to allow it to unfold as the Court's Order allows. If a true impasse is reached, the House will inform the Court. Defendants' motion should be denied.

Dated: September 12, 2018                              Respectfully Submitted,

/s/  Katherine L. McKnight
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of September, 2018, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.

/s/ Katherine L. McKnight
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*