## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |  |
|---|---|---|
| _____ | ) | |
| GOLDEN BETHUNE-HILL, *et al.*, | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | Civil Action No. 3:14-cv-852 |
| VIRGINIA STATE BOARD OF | ) | |
| ELECTIONS, *et al.*, | ) | |
|  | ) | |
| Defendants, | ) | |
|  | ) | |
| _____ | ) | |

## BRIEF IN SUPPORT OF THE PROPOSED LEGISLATIVE REDISTRICTING PLAN SUBMITTED BY THE VIRGINIA STATE CONFERENCE OF NAACP BRANCHES

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF INTEREST OF NON-PARTY THE VIRGINIA NAACP ............................ 2

SUMMARY OF THE VIRGINIA NAACP'S REMEDIAL PLAN ............................................ 4

GUIDING PRINCIPLES UNDERLYING THE DEVELOPMENT OF THE VIRGINIA NAACP REMEDIAL PLAN ............................................................................................................. 7

The Virginia NAACP's Remedy for the Districts this Court Found Unconstitutional ............... 10

    A.    Richmond/Tri-City Region – Districts 63, 69, 70, 71 & 74 ........................................ 11

        i.    District 74 ................................................................................................................ 11

        ii.    District 71 ............................................................................................................... 13

        iii.    District 70 .............................................................................................................. 14

        iv.    District 69 .............................................................................................................. 15

        v.    District 63 ............................................................................................................... 16

    B.    North Hampton Roads Region – Districts 95 & 92 ..................................................... 17

    C.    South Hampton Roads – Districts 77, 80, 89 & 90 ..................................................... 18

        i.    District 77 ................................................................................................................ 19

        ii.    District 80 ............................................................................................................... 19

        iii.    District 89 .............................................................................................................. 20

        iv.    District 90 .............................................................................................................. 21

Additional Opportunities for Voters of Color ............................................................................ 22

    A.    Richmond/Tri-City Region – District 27 ................................................................... 23

    B.    Richmond/Tri-City Region – District 62 ................................................................... 23

    C.    North Hampton Roads Region – District 94 ............................................................... 24

    D.    South Hampton Roads Region – District 76 & 85 ...................................................... 24

CONCLUSION ................................................................................................................... 25

Certificate of Service .......................................................................................................... 27

## **INTRODUCTION**

Unfortunately, for the better part of this decade, election outcomes in too many of the districts for the Virginia House of Delegates haVE not been dictated by the will of the people, but by the illegal and manipulative ways in which Virginians have been grouped into electoral districts.  Indeed, the process of drawing electoral districts has determined which interests are represented and which voices are silenced.  In 2011, the Virginia legislature drew legislative districts that packed a disproportionate number of black voters into a select few districts.  This practice has allowed black voters to elect only a minimal number of their candidates of choice to the House of Delegates, effectively guaranteeing that black voters will continue to be underrepresented overall in the House of Delegates.  The Virginia legislature accomplished this outcome by setting a mechanical 55% Black Voting Age population target for select districts, often at the subordination of traditional redistricting principles.

More than any legislative redistricting plan in decades, the Virginia State Conference of NAACP Branches' ("the Virginia NAACP") remedial redistricting plan faithfully employs traditional redistricting principles and draws districts where black voters can elect their candidate of choice, thus ensuring that the interests of their communities are adequately represented in policy-making, without unnecessarily packing them into those districts.  In drawing the remedial plan described below, the Virginia NAACP implemented feedback from its members in the affected districts so that the plan reflects on-the-ground knowledge and interests of communities of color.

The Virginia NAACP respectfully submits this brief and the accompanying propiosed legislative redistricting plan for the Court's consideration during the Virginia House of Delegates remedial redistricting process.

## STATEMENT OF INTEREST OF NON-PARTY THE VIRGINIA NAACP

The National Association for the Advancement of Colored People ("NAACP"), one of the premier grassroots civil rights organizations in the United States, has been a leading force for equality since its inception in 1909.  Under the umbrella of the national NAACP, the Virginia State Conference of the NAACP Branches, headquartered in Richmond, Virginia, has more than one hundred active branches and approximately 16,000 members throughout the Commonwealth, including in each of the House of Delegate districts at issue in this litigation.

The Virginia NAACP is a nonpartisan, nonprofit membership organization whose core mission includes advancing and defending the rights of African-American voters to be free from racial discrimination in voting and to elect candidates of their choice to all levels of political office in Virginia.  In furtherance of this mission, the Virginia NAACP and its members regularly engage in voter education, community-based advocacy, and litigation to protect African-American voters' equal opportunity to participate in the political process.  The Virginia NAACP and its members have regularly participated in litigation in Virginia courts and in the Eastern District of Virginia to challenge government decisions and policies that might diminish the voting strength of people of color, including several racial gerrymandering and other voting rights cases.[1]  Of note, during the remedial phase of *Cantor v. Personhuballah*, the Virginia

---

[1] For example, the Virginia NAACP participated as *amicus curiae* in support of plaintiffs-appellants in this case during appeal to the United States Supreme Court.  *See generally Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788 (2017).  The Virginia NAACP also participated in the litigation challenging the constitutionality of Virginia's Third Congressional District and the remedial phase that followed.  *See generally Wittman v. Personhuballah*, 136 S. Ct. 1732 (2016); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552 (E.D. Va. 2016); *Page v. Va. State Bd. of Elections*, No. 3:13-cv-678, 2015 U.S. Dist. LEXIS 73514 (E.D. Va. June 5, 2015).  More recently, the Virginia NAACP participated as *amicus curiae* in support of plaintiff-appellants in *Lecky v. Virginia State Bd. of Elections*, No. 18-1020, 285 F. Supp. 3d 908 (E.D. Va. 2018), submitting a brief that explained how the unnecessary splitting of precincts had a disproportionate, negative impact on black voters.

Congressional racial gerrymandering case stemming from the same 2011 redistricting process, the Virginia NAACP submitted a remedial map that was considered by the court-appointed special master Dr. Bernard Grofman and served as a starting point for one of the two modified plans that Dr. Grofman created and ultimately recommended to the three-court panel. *See Personhuballah et al. v. Alcorn et al.*, No. 3:13-cv-678, Dkt. 272 at 2, 8, 13, 14, 28, 45 & 65 (E.D. Va. Nov. 15, 2015) (Report of the Special Master Bernard Grofman, dated November 15, 2015); *see also Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 555-56 (E.D. Va. 2016).

Here, like in *Personhuballah*, the Virginia NAACP believes that its proposed remedial plan offers important information and perspective that may be of assistance to the Court as it works to remedy the constitutional infirmities in the 2011 House of Delegates redistricting plan. The redistricting process has a real and dramatic consequence on voters, and because communities of color in Virginia have been historically disenfranchised and are currently facing a barrage of social, economic, and political challenges, special care and consideration should be taken to protect the interests of voters of color. The Virginia NAACP is exceptionally familiar with African-American communities and voting patterns in Virginia, and in the process of developing its proposed remedial plan, the Virginia NAACP met with and collected feedback directly from members residing in the districts at issue in this litigation. Thus, the Virginia NAACP is in the unique position to propose a House of Delegates plan that not only corrects the legal infirmities in the invalidated districts, but also has meaningful grassroots input that reflects the interests of the local communities impacted by this redistricting.

The following brief and attachments document and explain the strengths of the Virginia NAACP's proposed remedial plan.

3

## SUMMARY OF THE VIRGINIA NAACP'S REMEDIAL PLAN

Virginia's unconstitutional use of mechanical racial targets in its 2011 redistricting process segregated and stigmatized the Commonwealth's African-American voters and undermined African-American voters' ability to effectively exercise their constitutional right to vote on equal terms with all other voters.  This unconstitutional scheme limited black voters' electoral influence to a select number of districts and diminished their ability to build cross-racial coalitions and thus political power in surrounding districts, effectively guaranteeing that the voice of black voters would be minimized in the Virginia House of Delegates.  This Court recognized the constitutional flaws in this redistricting legislation in its June 26, 2018 Memorandum Opinion (Dkt. 234) (hereinafter "Opinion at __") and is now faced with the task of devising a new legislative redistricting plan that corrects the identified illegalities in the 2011-enacted plan.

The Virginia NAACP has developed a remedial House of Delegates district map that corrects the constitutional flaws identified by the Court in eleven House Districts, and as a result of unpacking those unconstitutional districts, naturally produces five districts that will either newly offer black voters the opportunity to elect their candidate of choice or enhance naturally-occurring influence districts.  The Virginia NAACP's plan also promotes the integrity of the political process by adhering to established redistricting principles and complies with all applicable state and federal laws.

The Virginia NAACP began the process of repairing the eleven unconstitutional districts by correcting three major flaws found in the 2011-enacted plan: (1) the assigning of black voters into districts on the basis of race to achieve an artificial target of 55% Black Voting Age Population ("BVAP"), (2) the splitting of VTDs and neighborhoods on the basis of race to enable

4

the separating of black voters from white voters when assigning them to districts, and (3) the constructing of districts in bizarre, non-compact shapes to connect and avoid different geographic areas using race as a predominant reason.

In developing a plan to remedy the unjustified, predominant use of race in this manner, the Virginia NAACP adhered to traditional redistricting criteria. First, the Virginia NAACP sought to reduce the number of split counties or independent cities, and to develop the resulting districts in a more compact way. Second, in respect of the federal courts' limited authority, the Virginia NAACP sought to minimize the total number of districts that were changed or altered so as to minimize any "ripple effect" on the districts adjacent and nonadjacent to those that were altered. Under the Virginia NAACP's proposed plan, only two non-adjacent districts, Districts 81 and District 84 are altered. Third, the Virginia NAACP sought to draw districts that are more compact than the 2011 plan, both in terms of how spread out from the center the shape of the districts are and the smoothness of the boundary lines—that is, ensuring by typical compactness metrics like the Reock and Polsby-Popper tests, that the Virginia NAACP's remedial districts scored better. And lastly, the Virginia NAACP plan reflects meaningful, on-the-ground knowledge of the affected communities as provided by Virginia NAACP members, and those members informed the Virginia NAACP that these districts are ones that make sense from a communities-of-interest standpoint.

By designing a plan that eliminates the arbitrary and mechanical packing of black voters, avoids splitting VTDs and neighborhoods by race, and removes non-compact appendages drawn for the purpose of adding or avoiding black population, the BVAP across the revised challenged districts most often decreased, as one would expect to occur naturally, but without, in the Virginia NAACP's legal opinion, degrading the ability of black voters to elect their candidate of

choice in those districts.  A comparison of the demographic data for the districts of interest in the 2011 and the Virginia NAACP's proposed remedial plans is shown below:

| District | 2011 Plan %NH 18+ Wht | NAACP Plan %NH 18+ Wht | 2011 Plan %NH 18+ Blk | NAACP Plan % NH 18+ Blk | 2011 Plan %H 18+ | NAACP Plan %H 18+ | 2011 Plan %NH 18+ Asn | NAACP Plan %NH 18+ Asn |
|---|---|---|---|---|---|---|---|---|
| 63 | 35.5% | 35.9% | 58.5% | 57.5% | 3.3% | 3.8% | 0.8% | 0.9% |
| 69 | 32.4% | 34.6% | 54.2% | 49.5% | 9.7% | 11.8% | 1.8% | 2.2% |
| 70 | 29.5% | 41.5% | 55.4% | 45.7% | 11.4% | 8.1% | 1.8% | 2.7% |
| 71 | 36.6% | 42.7% | 54.4% | 49.1% | 2.4% | 2.4% | 4.0% | 3.5% |
| 74 | 36.0% | 47.4% | 56.5% | 41.8% | 3.0% | 3.0% | 2.0% | 6.2% |
| 77 | 35.1% | 44.9% | 57.9% | 46.6% | 3.9% | 4.6% | 1.3% | 1.8% |
| 80 | 37.8% | 44.6% | 55.5% | 49.0% | 3.0% | 2.6% | 1.6% | 1.8% |
| 89 | 36.7% | 38.6% | 54.3% | 50.2% | 4.1% | 6.0% | 2.5% | 2.4% |
| 90 | 32.9% | 43.0% | 55.2% | 44.9% | 5.4% | 5.3% | 4.0% | 4.2% |
| 92 | 32.4% | 35.2% | 59.3% | 56.2% | 3.7% | 3.9% | 1.8% | 1.9% |
| 95 | 31.1% | 40.4% | 58.4% | 49.4% | 5.6% | 5.6% | 2.1% | 2.0% |

This unpacking process also resulted in the natural formation of five additional districts where black voters will either likely have the opportunity to elect their candidate of choice, or have their influence over the election outcomes free from artificial diminishment.  Specifically, in those districts, either non-white voters constitute a majority in the district, therefore allowing a multi-racial coalition district to form; black voters are likely to constitute a majority of the electorate in a Democratic primary; or black voters constitute a significant bloc of voters and will have increased influence in determining what representatives get elected.  Each of these districts helps restore black voters to the position they would have held had they not been unlawfully segregated and packed in the 2011 House of Delegates plan.  Demographic data for those five districts for both the 2011 plan and the Virginia NAACP's proposed remedial plan are provided below.[2]

_____

[2] Additional district statistics for the Virginia NAACP remedial plan are available at Appendix A.

| District | 2011 Plan %NH 18+ Wht | NAACP Plan %NH 18+ Wht | 2011 Plan %NH 18+ Blk | NAACP Plan % NH 18+ Blk | 2011 Plan %H 18+ | NAACP Plan %H 18+ | 2011 Plan %NH 18+ Asn | NAACP Plan %NH 18+ Asn |
|---|---|---|---|---|---|---|---|---|
| 27 | 71.6% | 63.1% | 17.9% | 24.8% | 5.4% | 7.3% | 3.3% | 2.9% |
| 62 | 65.1% | 50.0% | 23.8% | 43.1% | 6.5% | 3.5% | 2.5% | 0.9% |
| 76 | 68.7% | 52.3% | 24.7% | 42.0% | 2.4% | 2.4% | 2.5% | 1.7% |
| 85 | 66.5% | 55.8% | 18.1% | 28.1% | 5.6% | 6.7% | 6.9% | 6.5% |
| 94 | 67.9% | 59.6% | 20.1% | 28.1% | 6.2% | 6.2% | 3.1% | 3.1% |

## GUIDING PRINCIPLES UNDERLYING THE DEVELOPMENT OF THE VIRGINIA NAACP REMEDIAL PLAN

The Virginia NAACP's primary aim in this process was to remedy the racial gerrymander, which can be achieved without using race as the dominant factor in drawing district lines.   But trying to ensure that a racial gerrymander has been corrected without considering racial data is as ill-considered as a surgeon trying to excise a malignant tumor without the benefit of information from the x-ray or MRI that revealed the problem.   Indeed, the Supreme Court has long held that the consideration of racial data is not constitutionally problematic—it is only problematic when such consideration becomes the driving factor.   *See generally Bush v. Vera*, 517 U.S. 952, 958-65 (1996); *Covington v. North Carolina*, 283 F. Supp. 3d 410, 431 (M.D.N.C. Jan 19, 2018).   Black voting age population data was therefore a necessary tool in helping the Virginia NAACP determine whether its plan remedied the racial gerrymandering, however, race did not serve a predominant role in how the Virginia NAACP drew district lines.

The Virginia NAACP also considered political data to ensure that under the Virginia NAACP's plan black voters are still able to elect their candidate of choice.   In any situation in which remedial redistricting lowers the minority voting age population of a district that has previously offered voters of color the ability and opportunity to elect their candidate of choice, a map drawer must take care to ensure that the alterations to the district do not inadvertently

undermine that ability and opportunity.  This requires a very local, fact-sensitive inquiry into the political voting patterns in a region.  *See Texas v. United States*, 887 F. Sup. 2d 133, 149 (D.D.C. 2012).  There is no one set BVAP number at which that ability is maintained, and a BVAP that may be sufficient in one area of the state may not be sufficient in another area of the state. Furthermore, this kind of inquiry is also helpfully informed by talking to voters in the proposed district to understand how and if voters of color in the proposed district work together and share common interests—this will affect whether those voters are able to continue electing a candidate of their choice.

The Virginia NAACP did not alter any district lines to enhance the political performance of any district for any party and the plan is not a partisan gerrymander.  Using the efficiency gap produced by the 2016 election results—the difference between [political parties'] wasted votes, divided by the total number of votes cast in the election[3]—as one way to measure any possible partisan asymmetry in a redistricting plan, the Virginia NAACP map has an efficiency gap score of 1.34 % (slightly favoring Republicans), confirming that the proposed remedial plan does not have substantial partisan asymmetry.   Thus, because the Virginia NAACP's plan does not have any significant asymmetrical effect on Republicans or Democrats, and because it was not drawn with the intent to favor one party over another, it is plainly not a partisan gerrymander.[4]

It is this Court's responsibility to fully remedy the constitutional violations suffered by Plaintiffs.  *Brown v. Plata,* 563 U.S. 493, 571 (2011) ("Once a constitutional violation is found, a

---

[3] The efficiency gap, a measure of partisan asymmetry in a redistricting plan, is calculated by taking the total number of democratic wasted votes, subtracting the total number of republican wasted votes, and dividing that number by the total number of votes cast.  *See* Nicholas O. Stephanopoulos & Eric M. McGhee, *Partisan Gerrymandering and the Efficiency Gap*, 82 UNIV. CHICAGO L. REV. 831, 853 (2015).

[4] In the case of legislative chambers, an efficiency gap threshold of 8 percent is the threshold at which a troubling partisan asymmetry has been produced, and observers should look at other factors to determine whether the plan is a partisan gerrymander.  *Id.* at 877.

federal court is required to tailor the scope of the remedy to fit the nature and extent of constitutional violation.") (internal citations omitted).  However, "[t]he remedial powers of an equity court must be adequate to the task, but they are not unlimited," *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971).  The Virginia NAACP's first priority in drafting a remedial plan was to fix the racial gerrymandering, but the Virginia NAACP plan nonetheless displays appropriate deference for the limited role of the federal courts in remedying unconstitutional districts by minimizing the changes to districts not ruled unconstitutional.  The plan contains changes only to the unconstitutional districts and those adjacent to the unconstitutional districts because, in this situation, the Virginia NAACP determined that the racial gerrymandering could be fixed with these minimal changes.[5]  Changes to districts within any one region, the Tri-City/Richmond Area, North Hampton Roads, and South Hampton Roads, do not affect districts within another region.

The Virginia NAACP's proposed plan embodies a commitment to traditional redistricting criteria as a critical aspect in the redistricting process, which safeguards the interests of a changing electorate.  As this Court is aware, these criteria include, "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation."  *Ala. Legis. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1270 (2015); *see also* Opinion at 11-12.  Adherence to the traditional redistricting criteria of compactness and continuity is not only a good governance policy, but it is mandated under the Virginia state constitution.  *See* Va. Const. Art. 2 §6.

Moreover, the Virginia NAAACP plan does not pair incumbents.  The Virginia NAACP does not advocate for a rule that in drawing a remedy plan, affirmative efforts must always be

---

[5] In other cases, more extensive changes to more districts may be necessary to fully remedy the constitutional violation.

taken to avoid the pairing of incumbents. Indeed, such a requirement does, in some cases, cement the illegal effects of a racial gerrymander—that is, it protects the incumbents produced by an illegal plan. But here, the Virginia NAACP was able to remedy the unconstitutional aspects of invalidated districts and produce a plan that had no incumbents paired. The Virginia NAACP is confident that this plan does not cement the ill-gotten gains of the 2011 House of Delegates plan, but cannot say that other proposed remedial plans in this case that might take extreme measures to avoid the pairing of incumbents or to draw districts in which incumbents are likely to win would actually correct the racial gerrymandering identified by the Court. *See, e.g.*, *Covington v. North Carolina*, 283 F. Supp. 3d 410 at 431 (M.D.N.C. Jan 19, 2018), *aff'd in part, rev'd in part on other grounds, North Carolina v. Covington*, 138 S. Ct. 2548 (2018) (affirming that a state redistricting body may not rely on an otherwise legitimate redistricting consideration—such as seeking to ensure incumbents will prevail in their remedial districts—if doing so would prevent it from completely remedying identified constitutional violation).

Lastly, the districts in the Virginia NAACP plan respect the plus or minus 1% population deviation policy the legislature followed in its construction of the 2011 plan. *See* Appendix A. While perhaps not necessary as a matter of law, this ensures that the same rule from the 2011 plan applies to all of the changed districts, creating consistency across all of Virginia's House of Delegates districts.

### The Virginia NAACP's Remedy for the Districts this Court Found Unconstitutional

The Virginia NAACP constructed its proposed plan by repairing the eleven unconstitutional districts one region at a time in recognition of the fact that a change to the boundaries of any one district can cause a ripple effect on nearby districts. Following the regional framework this Court outlined in its June 26, 2018 opinion, the Virginia NAACP

proposed remedial plan is organized by three major regional groupings: Richmond/Tri-City Area, North Hampton Roads (the peninsula), and South Hampton Roads/Norfolk.  *See* Opinion at 37.  A map of the modified regions is available at Appendix B.  The Virginia NAACP began its remedial work in the Richmond/Tri-City Area because it contained the highest number of unconstitutional districts (5) and then worked east and south.

A explanation of the adjustments made to each of the eleven districts follows below.

### A.       <u>Richmond/Tri-City Region – Districts 63, 69, 70, 71 & 74</u>

The Virginia NAACP began constructing its remedial plan by first addressing the Richmond/Tri-City region, which includes the greater Richmond metropolitan area, as well as the cities of Petersburg, Colonial Heights, and Hopewell.  Five of the unconstitutional districts from the 2011 plan—Districts 63, 69, 70, 71, 74—are located within this region.  The legislature made numerous decisions motivated by race in order to achieve the arbitrary 55% BVAP threshold for these challenged districts.  Given the surplus of BVAP and adequate population in Districts 70 and 74, the legislature used these districts as "donors" of BVAP to other challenged districts and routinely split or moved VTDs based on race such that in the 2011 plan every majority-black VTD in the Richmond/Tri-City region was either wholly or partially within a challenged district.  Opinion at 37-38.  To the greatest extent possible, the Virginia NAACP plan reunites split VTDs and communities of interest, respects county and municipal boundaries, and addresses population imbalances resulting from these changes using traditional redistricting criteria in a race-neutral manner.

### i.       **District 74**

The Virginia NAACP used District 74, due to its size, as the starting point for remedying the constitutional flaws in the Richmond/Tri-City region.  In the 2011 plan, District 74 contained

all of Charles City County and included a finger-like appendage that went north and west crossing Henrico County and ending in the Richmond metropolitan area.  As drawn, the district spanned roughly 45 miles from end to end and split three VTDs: Belmont, Brookland, and Moody.

In the Virginia NAACP plan (see Appendix C), District 74 is wholly contained within Henrico County, resulting in a much more compact district, one that now spans less than 16 miles end to end.  This was accomplished by truncating the finger-like appendage that ran into Richmond in the northwest portion of the district and by separating the southeastern portion of the district that previously contained Charles City County.  The Henrico County portion of the district was the logical place to center revised District 74 because it could be drawn within a single county without creating any ripple effects impacting the non-challenged districts to the north and east of current District 74.  Additionally, by separating the Charles City County portion of the district into what ultimately became revised District 62 (as further discussed *infra*), black voters in Henrico County are afforded the opportunity to elect a candidate that represents their unique interest in District 72 while allowing black voters in Charles City County to do the same in District 62.  Virginia NAACP members from those communities noted that there was no natural network between voters in Henrico County and Charles City County and that having districts drawn primarily within one county or the other eliminates voter confusion and allows representatives to be more responsive to the needs of their constituents.  Under the Virginia NAACP's plan, District 74 also reunites the three aforementioned VTDs that had been split along racial lines and uses whole cities to recoup the population lost from Richmond and Charles City.  To achieve equal population and to make the district more compact, District 74 splits the

Hermitage VTD, but does so without using race as predominant factor.  Ultimately, though, the number of split VTDs in the district is reduced from 3 to 1.

In remedying these aspects of District 74, the BVAP of the district fell from 56.6% to 41.8%.  Despite that drop, based on its review of the political performance and information from voters living in the district, the Virginia NAACP fully expects that revised District 74 will still preserve the ability of African-American voters to elect a candidate of their choice.  Indeed, given the Virginia NAACP's mission, it would not have proposed any remedial district where it believed that such ability had been compromised.

### ii.    District 71

Next, the Virginia NAACP addressed District 71.  In the 2011 plan, District 71 spanned across Richmond and the Ratcliffe neighborhood of Henrico County.  District 71 also split several VTDs, including one from the Fan District, which had been wholly part of District 71 for over two decades.  As the Court noted, these changes were unexplainable other than on the basis of race.  Opinion at 38-43.

In the Virginia NAACP plan (see Appendix D), District 71 is now contained wholly within Richmond.  The Ratcliffe neighborhood, which is predominantly black and was moved into District 71 to increase BVAP, was returned to District 74 with the other parts of Henrico County.  The Virginia NAACP plan also reunited the split VTD from the Fan District and placed the Churchill neighborhood wholly within District 70.  To account for population that was moved into District 74, District 71 now extends further west and east towards the Richmond municipal lines, but remains north of the James River.  The Virginia NAACP plan splits one VTD—VTD 707—between District 71 and District 70 to adjust for equal population.  Finally, although the overall shape of District 71 is not remarkably altered from the current plan, it is

more compact, has less contortions and odd shapes in its borders, and predominantly tracks Richmond municipal lines.

### iii.    District 70

The Virginia NAACP then turned to repairing District 70, which is located south and east of Richmond.  In both the 2001 and 2011 plans, District 70 included portions of Richmond, Henrico and Chesterfield County.  Opinion at 43.  As the Court found, when drawing District 70 in 2011, despite the district already meeting the +/- 1% population deviation requirement, the legislature chose to move and replace 26,000 people from the district in a noticeably racial pattern in order to increase the BVAP in surrounding Districts 71 and 69.  *Id*. at 44.  This transfer of population came from moving in whole high-BVAP VTDs 701 and 702 and splitting VTD 703 on racial grounds.  The BVAP under the 2011 plan was 55.4%.

The Virginia NAACP plan repaired District 70 (see Appendix E) first by un-splitting VTD 703 and moving it back into District 71 and then by removing the neck-like extension that protruded into Richmond and split the Churchill neighborhood.  Churchill is a predominantly black community of interest in southeastern Richmond that was split between Districts 70 and 71 in the 2011 plan. Virginia NAACP residents of Churchill stressed the need to keep the neighborhood together so that these residents can elect a representative who can respond to the economic and development needs of that community.

Under the Virginia NAACP plan, District 70 continues to span portions of Richmond, Henrico County, and Chesterfield County, but does so in a non-racial manner and with the purpose of creating minimal changes to surrounding districts.  District 70 also shares VTD 707 with District 71 and VTD 811 with District 69 to keep population within the +/- 1% deviation. With these adjustments, the shape of revised District 70 is much more compact than in the 2011

14

plan.  These changes resulted in a remedial district with a BVAP of 45.7%, which will still allow

black voters to elect their candidate of choice.

### iv.    District 69

Next, the Virginia NAACP made adjustments to District 69, which contains portions of

Richmond and Chesterfield County.  District 69 was significantly underpopulated before the

redistricting process began in 2011.  Opinion at 43.  But the district had a BVAP of 56.3%, so

the legislature made extreme, purposeful and unjustified efforts to maintain that BVAP.  *Id.* at

45-46.  One way this was accomplished was through the race-based splitting of VTDs 410 and

505 to counterbalance the several predominantly white precincts that were moved into District

69 from District 70.

Thus, under the Virginia NAACP plan (see Appendix F), the starting point for fixing

District 69 was reuniting VTD 410 within neighboring District 68 and returning all of VTD 505

back into District 69.  Next, because the repair of District 70 removed VTDs on the east side of

District 69 and defined a new eastern boundary for that district, additional population could only

come from moving north, west, or south.  District 69 was constrained on the north because of the

revisions to District 71 and the west because of the location of District 68's incumbent.  So to

equalize population, Virginia NAACP's plan shifts District 69 further south to the Richmond

municipal line and west into Chesterfield County, splitting the Belmont VTD and VTD 811 in a

non-racial manner.  Though the district crosses the James River, citizens of Richmond are

familiar with that dynamic as the 5th Voter District for Richmond City Council is also split by the

James River.  Specifically, Virginia NAACP members from the district conveyed that the

continuity between the 5th City Council District and the House of Delegates district will help

with get-out-the-vote and voter education efforts, and will provide consistency in advocating for

the needs in this growing community.  Additionally, this iteration of District 69 keeps intact the southern portion of Manchester at its southern border, a community of interest that has experienced significant redevelopment and construction recently.

>  **v.    District 63**

Last in the Richmond/Tri-City region, the Virginia NAACP remedied District 63.  Under the 2011 plan, District 63 split 8 VTDs—Dinwiddie, Edgehill, New Hope, Rohoic, Ward 7, Courts Building, Jefferson Park, and Rives—and spanned across parts of Chesterfield County, Prince George County, Hopewell City, Dinwiddie County, and all of Petersburg City.  The Court noted that this district experienced a drastic reduction in compactness between the 2001 plan and the 2011 plan, and just by visual examination, the Court observed "drastic maneuvering" was utilized to ensure District 63 and its neighboring districts maintained a BVAP exceeding 55%.  Opinion at 47-49.

The Virginia NAACP focused its repair of District 63 (see Appendix G)on eliminating the split VTDs around Hopewell and those associated with neighboring District 75.  Of note, the Virginia NAACP's plan severs the odd finger-shaped protrusion that extends from District 75 into the center of District 63 and places it into District 63.  This resulted in the reunification of previously split VTDs and a more compact District 63.  Next, to account for the increase in population from the incorporation of the aforementioned protrusion, the Virginia NAACP plan moved Hopewell City out of District 63 and wholly into District 62.  This was a logical choice because it un-split several VTDs and kept Hopewell whole within its own district.

To further equalize population, and to avoid disrupting other adjacent districts, mainly District 64, the Virginia NAACP plan moved VTDs in the western part of District 63 into neighboring District 75, thus restoring the western bounds of the district as it stood in 2010.  To

16

meet the +/- 1% deviation requirement, District 63 splits the Winfrees Store, Dinwiddie, and Courts Building VTDs in a non-racial manner, which is a reduction from the 2011 plan which splits a total of eight VTDs. These changes made for a much more compact district with a BVAP of 57.5%.

    **B.**    <u>**North Hampton Roads Region – Districts 95 & 92**</u>

The Virginia NAACP also drew remedies for the two unconstitutional districts in Hampton Roads, otherwise known as the peninsula, in Virginia's Tidewater region. *See* Appendices H & I. The two unconstitutional districts, Districts 95 and 92, include portions of Hampton and Newport News. Both districts have BVAPs exceeding 55%. As this Court noted, the peninsula experienced substantial population loss between 2001 and 2010, resulting in severe under population in Districts 95 and 92. Opinion at 54. To equalize the population and meet the 55% BVAP threshold, the "legislature undertook several patently race-based maneuvers." *Id*. One of these maneuvers was to add a long and narrow appendage with significant black population to District 95, which split VTDs and white and black neighborhoods with "striking precision," and caused District 95 to have the worst compactness score in the entire 2011 plan. *Id*. 54-56. Although District 92's construction appeared to comply with traditional redistricting criteria, its shape was fundamentally dictated by the race-based decisions made in the drawing of District 95; therefore, this Court found that race predominated in its construction as well. *Id*. at 59-61.

The Virginia NAACP began repairing the peninsula by reuniting Deer Park, Denbigh, Epes, Jenkins, Palmer, and Reservoir—the five VTDs in District 95 that were split on the basis of race. It then addressed the bizarre shape of District 95 by moving the northernmost portion of the long and narrow appendage into District 94, significantly improving District 95's overall

compactness.  District 95 in the Virginia NAACP plan continues to split Newport News and Hampton, but does so in a non-race based manner and without causing changes adjacent District 93.  To equalize population in District 92 and minimize ripple effects on adjacent non-challenged districts, the Virginia NAACP plan added VTDs located in east and north Hampton from District 91, including returning Fort Monroe, a predominantly white neighborhood that had been moved into District 91 to inflate District 92's BVAP.  Finally, to adjust the population in those districts to within +/- 1% deviation, the Virginia NAACP plan divided the Burbank VTD in Hampton in a non-racial manner between Districts 91 and 92.  After these adjustments, BVAP in Districts 95 and 92 dropped to 49.4% and 56.2% respectively.

### C.   South Hampton Roads – Districts 77, 80, 89 & 90

Lastly, the Virginia NAACP addressed the unconstitutional districts in South Hampton Roads area of Tidewater.  Five cities in the region—Chesapeake, Norfolk, Portsmouth, Suffolk, and Virginia Beach—are split between an unconstitutional district and a non-challenged district on the basis of race.  Opinion at 61.  Invariably the portions of the cities assigned to an unconstitutional district had a "substantially higher BVAP" than the portion assigned to a non-challenged district.  *Id*. at 62.  Additionally, each of the challenged districts were underpopulated with limited options to gain significant population while retaining 55% BVAP.  *Id*. at 61-62.  Thus, the 2011 plan reflects complicated population-shifting maneuvers, resulting in odd-shaped, non-compact districts and extensive splitting of VTDs and other geographies.  *Id*.

To remedy these issues, the Virginia NAACP began with District 77 and from there shifted eastward so as not to disturb the westward, nonadjacent districts.  As further discussed below, Virginia NAACP's plan reunited multiple split VTDs, made the districts more compact, and reduced the number of municipality splits.

18

### i.    District 77

District 77 includes portions of Suffolk and Chesapeake, connected by a narrow corridor in the middle of the district spanning just a half-mile wide.  This corridor connects a pocket of black residents in one city to a pocket of black residents in the other.  The resulting odd shape, which resembles a barbell, is the consequence of the legislature's decision to split VTDs and communities of interest on the basis of race to meet the 55% BVAP threshold.

The Virginia NAACP remedied District 77 (see Appendix J) by repairing the three split VTDs—Georgetown, John F. Kennedy, and Lakeside—and truncating the western portion of the district at the Chesapeake City boundary.  This had the effect of moving the Suffolk portion of the barbell-shaped district into District 76.  The revised District 77 borders Norfolk and Portsmouth to the north and Suffolk to the west, but does not cross the city lines, allowing for the district to sit entirely within Chesapeake.  To account for the population lost from Suffolk, the Virginia NAACP added the Deep Creek North VTD and part of Greenbriar West on the south eastern side of the district, which were previously part of District 81.  These changes dramatically increased District 77's compactness and shifted BVAP from 57.9% down to 46.6%, unpacking black voters but retaining a district in which black voters will be able to elect their candidates of choice.

### ii.    District 80

Next, Virginia NAACP addressed District 80.  In the 2011 plan, District 80 wove through portions of Suffolk, Chesapeake, Portsmouth, and Norfolk and crossed water in multiple places to connect high BVAP VTDs.  The resulting bizarre sideways "S" shape allowed the legislature to achieve a BVAP of 55.5%.  Opinion at 63-66.

The Virginia NAACP plan for District 80 (see Appendix K) fixed the odd shape and low compactness score by removing the portions of the district located within Suffolk and Norfolk. Under the Virginia NAACP's version, District 80 still connects Chesapeake and Portsmouth to maintain equal population and minimize changes to surrounding districts, but it does so in a non-racialized manner. Specifically, the population lost from removing portions of Suffolk and Norfolk is offset by expanding west into Chesapeake and north into Portsmouth. To achieve equal population in District 80 and adjacent District 79, the Virginia NAACP plan splits VTD 33 in a manner that makes District 80 more compact. These changes resulted in a lower BVAP of 49% and significantly improved the shape and compactness of the district.

### iii.    District 89

In the 2011 plan, though District 89 was constructed entirely within Norfolk, its non-compact shape, its multiple water crossings, and its splitting of the VTDs of Brambleton, Granby, Titustown Center, and Zion Gate revealed the race-based decisions the legislature made to reach its racial target of 55% BVAP for the district. Opinion at 66-67. For example, in the 2001 plan, District 89 was drawn entirely north of the Elizabeth River; but in the 2011 plan, the district crossed the Elizabeth River on the south side to add the high-BVAP VTD of Berkley, but not the neighboring portion of Norfolk. Similarly, the district crossed over the Lafayette River on the north side in order to add the high-BVAP portion of the Granby VTD, but avoided crossing into the adjacent VTD, the largely white Suburban Park.

Under the Virginia NAACP's plan (see Appendix L), District 89 reunites portions of Norfolk that were previously split between Districts 79, 80, and 90. This made whole four previously split VTDs and created a more compact district, one that continues to be entirely within Norfolk's boundary. Virginia NAACP's District 89 now splits the Ballentine VTD along

20

its border with District 90 and the Old Dominion VTD along its border with District 79, but does

so in a non-racial manner and to achieve equal population.  Additionally, the revised District 89

continues to cross the Elizabeth River, but no longer splits the portion of Norfolk residing south

of the river, making District 89 much more compact.  The water crossing on the north also

remains, but the district does not extend as far as it previously did on that side of the river.  The

NAACP Virginia plan recoups the lost population from the piece of the district that was north of

the Lafayette River by extending in a race-neutral manner into the eastern part of Norfolk.  As a

result of these changes, the BVAP dropped from 54.3% to 50.2%.

### iv.    District 90

Lastly with District 90, although there was a reduction in the number of split

municipalities and an improvement in compactness in the 2011 plan as compared to the 2001

plan, the legislature used race based reasons for moving population in and out of the district.

Opinion at 73-74.  District 90 maintained the same number of split VTDs, but did so along racial

lines.  The changes enabled the legislature to achieve a BVAP of 55.2%.

The Virginia NAACP's changes to District 89 remedied the unconstitutional aspects of

District 90 (see Appendix M).  For example, District 90 was made more compact by moving the

western edge of the district into District 89, thus reuniting the racially split Brambleton VTD,

and by moving the entirety of Norfolk south of the Elizabeth River into a single district, District

89.  It was then necessary for District 90 to expand south into Virginia Beach to equalize

population, and the Virginia NAACP drew that expansion in a way that makes the district more

compact.  The Virginia NAACP drew the lines so as to avoid impacting District 100 and District

83, except to place the Shell VTD, which has previously been split along racial lines, wholly in

District 83.  District 90 still includes parts of Norfolk and parts of Virginia Beach, but does so

with fewer split VTDs in a non-race based-manner.[6]  The resulting BVAP for revised District 90 is 44.9%, which, by the assessment of the Virginia NAACP and the members it consulted in the district, will still protect the ability of black voters to elect their candidate of choice.

## ADDITIONAL OPPORTUNITIES FOR VOTERS OF COLOR

The map currently governing legislative elections in Virginia needlessly packs black voters into 11 out of the state's 100 districts and thus limits their opportunity to elect their candidate of choice in any of the adjacent districts.  The Virginia NAACP plan preserves the 11 challenged districts as districts in which black voters have the ability to elect their candidate of choice.  But by unpacking black voters from the unconstitutional districts in adherence with traditional redistricting process, five new districts in which black voters will have an increased political voice naturally formed.  In Districts 27, 62, 76, 85, and 94, one of the following now applies: (1) non-white voters constitute a majority in the district, creating opportunity for coalitions to form amongst minority voters; (2) black voters are likely to control the Democratic primary and therefore have a good chance of electing their candidate of choice; or (3) black voters constitute a significant bloc of voters in the district and will have increased influence in determining the candidate who will be elected.  *See generally* Appendices  N to R.  Without purposely creating any districts on the basis of race, the simple remedying of unconstitutionally segregated districts naturally produces districts that better allow the voice of voters, so historically discriminated against, to be more accurately heard.  Indeed, just in fixing the illegal

---

[6] The Ballentine VTD is distributed between HD 90 and HD 89 and the Homestead VTD is distributed between HD 90 and HD 21 to meet the equal population requirement.

districts, the Virginia NAACP's proposal brings the electoral power of black voters into close balance with their percentage of the state's population.[7]

### A.     Richmond/Tri-City Region – District 27

The first of these new districts, District 27, is located southwest of Richmond in Chesterfield County.  This district bordered unconstitutional Districts 69 and 70 to the east. Under the Virginia NAACP plan (see Appendix N), District 27 lost population on its eastern boundary from the reunification of VTDs that had been split based on race in Districts 69 and 70. To replace these VTDs, District 27 moved further west into Chesterfield County in a compact and non-racial manner.  The district is still wholly comprised in Chesterfield.

These adjustments led to an increase in BVAP for the district from 17.9% to 24.8%.  This increase means that a candidate running in the district will have to engage with black voters if he or she wants to win.  Moreover, rather than being lumped in with Richmond, black voters restored to the revised District 27 have a better chance to elect a candidate who represents the interests of Chesterfield residents and the county's industrial-based economy.

### B.     Richmond/Tri-City Region – District 62

Next, under the Virginia NAACP plan (see Appendix O), there was a significant increase in the BVAP in District 62 after unpacking adjacent Districts 70, 71, and 74.  Simply by eliminating the long neck connecting predominantly black VTDs in Charles City with predominantly black VTDs in Henrico County, the BVAP in District 62 jumped from 23.8% to 43.1%.  Rather than splitting the city of Hopewell, District 62 now contains all of Hopewell, as well as Charles City and a small portion of Chesterfield County and Henrico County so as to

---

[7] In the 2017 American Community Survey, the total black population for Virginia was 19.8%. *See* United States Census Bureau QuickFacts, Virginia, 2017 non-Hispanic Black or African American population estimate, *available at* https://www.census.gov/quickfacts/va.

equalize population without disturbing the unchallenged districts to the southeast.  Charles City, Hopewell City, the southeast corner of Henrico County and the east corner of Chesterfield converge at the intersection of the James River and the Appomattox River, just as the James River winds its way into the city of Richmond.  This region shares a mix of industrial and agricultural industries, but has characteristics that make it a distinct community of interest— certainly very different from its previous version, that combined pockets of black population with few commonalities.  Given the demographic and political characteristics of this revised District 62, the Virginia NAACP believes that this district will provide African-American voters an ample opportunity to elect their candidate of choice.

### C.  North Hampton Roads Region – District 94

In North Hampton Roads region, the Virginia NAACP's alterations that brought Districts 95 and 92 into compliance with traditional redistricting criteria resulted in a new influence district in that region, District 94 (see Appendix P).  By removing the appendage of District 95 extending into the northern reaches of Newport News and by un-splitting VTDs along the border of Districts 95 and 84, District 94 is now much more compact.  The new District 94 is wholly contained within Newport News and thus comprises a single community of interest and amplifies the ability of that community to elect a delegate responsive to its needs.  The BVAP under the 2011 plan was 20.1% and now it is 28.1%.  This will provide black voters in the district with the opportunity to have more influence in the House of Delegates election for the district.

### D.  South Hampton Roads Region – District 76 & 85

Lastly, changes to the unconstitutional districts in South Hampton Roads resulted in the creation of two additional districts in that region, District 76 and District 85, which will fairly reflect the voices of the African-American population living there (see Appendices Q & R).

After fixing the bizarre sideways "S" shape of District 80 and the appendage of District 77 extending into Suffolk, District 76 became much more compact and wholly contained within Suffolk without altering District 76's borders with districts to the north, west, and south.   In unpacking black voters in Districts 80 and 77, the BVAP in District 76 increased from 24.7% to 42%.   This increase will very likely provide black voters with the opportunity to elect their candidate of choice.   Additionally, Suffolk voters are no longer tied into districts with other cities and can elect a candidate who represents their unique interests.

District 85 in Virginia Beach likewise became more compact after the changes made by Virginia NAACP to District 90.   In moving the western border of District 90 further south and west, District 85 also moved southeast to pick up population.   This resulted in an increase in BVAP from 18.1% to 28.1%.   Black voters in Virginia Beach will now have a stronger voice in the elections in that district, making it more likely that a candidate responsive to their interests will be elected.

### CONCLUSION

In consultation with its constituent chapters, comprised of thousands of Virginia voters, the Virginia NAACP has developed a remedial redistricting plan that not only remedies the unconstitutional districts that have been in place for almost the entire decade, but also embodies good government principles and creates unprecedented opportunity for voters of color in the state. It is a plan with districts that are compact, respects political subdivisions, and combines voters into districts that share common interests, needs, and backgrounds.   The Virginia NAACP's plan also complies with all applicable state and federal law.   The Virginia NAACP respectfully submits its map for consideration, in part or whole, by this Court in the construction of the remedial House of Delegates redistricting plan.

Submitted this 2nd day of November, 2018.

/s/ David O. Prince
David O. Prince (VA State Bar # 17044)
411 East Franklin Street
Richmond, VA 23219
princelaw@aol.com

Allison Riggs (*pro hac vice* admission pending)
Jeff Loperfido (*pro hac vice* admission pending)
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 W. Highway 54, Suite 101
Durham, N.C.  27707
Telephone: (919) 323-3380
Facsimile: (919) 323-3942
Email: allisonriggs@southerncoalition.org
jeffloperfido@scsj.org
laurawright@scsj.org

*Counsel for the Virginia NAACP*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of November, 2018, I have electronically filed the foregoing document with the Clerk of Court using the United States District Court, Eastern District of Virginia, Richmond Division, CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record, including Plaintiffs, Defendants, and Defendant-Intervenors.

/s/ David O. Prince
David. O. Prince, Esquire
VSB # 17044
411 East Franklin Street
Richmond, VA 23219
804-788-4861
princelaw@aol.com

27