IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| Golden Bethune-Hill, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Virginia State Board of Elections, *et al.*, <br><br> Defendants. | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |

## Defendant-Intervenors' Proposed Remedial Plans

Pursuant to this Court's order of October 19, 2018, ECF No. 278 at 1, requiring the parties and other interested persons to file on November 2, 2018, "proposed remedial plans and maps with supporting data and briefs explaining their respective proposals," Defendant-Intervenors provide two remedial proposals, which are described in the following brief.

## The Legal Standard

The court is faced with the "unwelcome obligation" off fashioning a remedial districting plan. *Connor v. Finch*, 431 U.S. 407, 415 (1977). "[T]he court's task is inevitably an exposed and sensitive one that must be accomplished circumspectly, and in a manner free from any taint of arbitrariness or discrimination." *Id.* (quotations omitted).

"In discharging this duty, the district courts will be held to stricter standards than will a state legislature." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (internal

quotations and edits omitted). In that regard, the Court has no authority to make "policy judgments." *Perry v. Perez*, 565 U.S. 388, 393 (2012). "The only limits on judicial deference to state apportionment policy" are "the substantive constitutional and statutory standards to which such state plans are subject." *Upham v. Seamon*, 456 U.S. 37, 42 (1982). Consequently, a district court errs where, "in choosing between two possible court-ordered plans, it fail[s] to choose that plan which most closely approximate[s] the state-proposed plan." *Id.* at 42. "In fashioning a reapportionment plan or in choosing among plans, a district court should not preempt the legislative task nor intrude upon state policy any more than necessary" to remedy the violation. *White v. Weiser*, 412 U.S. 783, 795 (1973) (quotations omitted).

## Defendant-Intervenors' Proposals

Defendant-Intervenors offer two proposed remedial plans for the Court's consideration. Both were introduced in the recently (and, in Defendant-Intervenors' view, prematurely) aborted legislative remedial effort as HB7002 and HB7003, respectively. Because these proposals were introduced to the legislature, they have been uploaded on the website of the Virginia Divisions of Legislative Services ("DLS Website").[1] Accordingly, paragraph 3 of the Court's order governing this filing, *see* ECF No. 279, requiring that shape files and block equivalency files be delivered to

---

[1] HB 7002 materials are located at:
http://redistricting.dls.virginia.gov/2010/RedistrictingPlans.aspx#45.
HB 7003 materials are located at:
http://redistricting.dls.virginia.gov/2010/RedistrictingPlans.aspx#44.

DLS, has already been accomplished. Similarly, in compliance with paragraph 4 of the Court's order, all counsel of record for parties and counsel of record for non-parties known to be involved in this matter have access to the shape files and block equivalency files located on the DLS website.[2] Finally, color copies of the maps of HB7002 and HB7003 are too large to be filed with the Court but are available on the DLS Website,[3] and hard copies are being delivered to the Court, in compliance with paragraph 5.

## I. HB7002

HB7002 was introduced to the Virginia House of Delegates under the sponsorship of Delegate Robert Bell, who represents HD58. Exhibit A, Bell Declaration, ¶¶ 2, 4. Delegate Bell oversaw, controlled and implemented HB7002's creation. *Id.* ¶ 5.

Delegate Bell created HB7002 with two overarching purposes. The first was to remedy the violation,[4] and the second was to honor state policy.

### A. Remedial Purpose

Delegate Bell sought to remedy the constitutional violations this Court found in its memorandum opinion. *Id.* ¶ 7. The Court found liability under a single equal-protection theory of unjustified racial predominance under *Shaw v. Reno*, 509 U.S. 630 (1993), and its progeny. *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F.

---

[2] *Id.*

[3] *Id.*

[4] As with prior filings since the Court issued its permanent injunction, Defendant-Intervenors assume a "violation" for the sake of argument only and continue to contest the liability ruling and injunction in their ongoing appeal.

Supp. 3d 128, 140–43 (E.D. Va. 2018). As applied to this case, the Court concluded that the Virginia House "employed a 55% BVAP threshold in drawing each of the challenged districts" and that the use of this threshold resulted in "race-based maneuvering" of district lines that amounted to predominance in the 11 majority-minority districts the Court was tasked with evaluating. *Id.* 144, 46 (quotations omitted). The Court further concluded that the target was not narrowly tailored under Voting Rights Act § 5. *Id.* at 175–80.

To remedy violations found under this theory, Delegate Bell began with the 2011 plan and reworked lines in each invalidated district to counteract what the Court identified as race-based maneuvers. Bell Declaration ¶¶ 9–11. For example, where the Court believed racial predominance resulted in a precinct or political-subdivision split, Delegate Bell attempted to reunite the precinct or political-subdivision. *Id.* ¶ 10. A list of race-based decisions identified by the Court are attached to Delegate Bell's declaration for the Court's review.

Delegate Bell identified 115 discrete line-drawing decisions that the Court found to be improperly race-based, and he succeeded in remedying 93 of them. *Id.* ¶ 12. Those race-based decisions that Delegate Bell did not rectify either could not be rectified consistent with other rectifications necessitated by the Court's opinion or conflicted with intervening legitimate, non-racial state policies—e.g., the goal of not pairing incumbents elected to office since the 2011 plan was enacted or maintaining precinct lines that were re-drawn to match the 2011 plan lines. *Id.* ¶ 13.

Under the circumstances, this is the optimal method of remedying the identified violations, for two reasons.

First, this method involved no attention to racial data. *Id.* ¶ 15. The underlying legal violation is the state's predominant use of race with "a direct and significant impact on the drawing" of district lines. *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1271 (2015). By reverse engineering that "direct and significant impact" according to the Court's factual findings, Delegate Bell targeted the violation directly and in a more tailored, non-racial way than in identifying some racial target to compete with what the House used in 2011. Because "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race," *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007), the *Shaw* cause of action should not be transformed into "nothing more than a fight over the 'best' racial quota." *Alabama*, 135 S. Ct. at 1281 (Thomas, J., dissenting). One set of racial goals should not be replaced by another. Indeed, to the extent two view of minority voting strength come into conflict, the state's choice should trump that of private litigants or courts. *See Georgia v. Ashcroft*, 539 U.S. 461, 480–81 (2003) (affording states "the flexibility to choose one theory of [minority] representation over the other").

Second, this method is the best method to remedy what the Court identified as racial predominance by means of "donor" and "recipient" districts. Central to the Court's finding of liability was its view that, "[d]ue to their starting population and BVAP, some of the challenged districts were able to serve as 'donors' of BVAP and

5

population to nearby challenged districts." *Bethune-Hill*, 326 F. Supp. 3d at 174. Although Plaintiffs argued in their post-trial briefing that race-based maneuvering will be required at the remedy phase to "unpack" the majority-minority districts, ECF No. 233 at 16–17, the Court's "donor" theory refutes that view. The 55% BVAP target was, according to the Court, frequently a means whereby *BVAP was lowered* in majority-minority districts to assist neighboring districts in meeting the target. Thus, the "*effect*" was most certainly not to "pack[] black voters into a handful of districts," ECF No. 233 at 16–17, but rather to maneuver them into one majority-minority district (i.e., what the Court called the recipient district) where they would have, without the racial target, landed in a neighboring majority-minority district (i.e., what the Court called the donor district). Because identifying a "correct" BVAP level for the donors and recipients would be nonsensical and impossible,[5] the optimal method of remedying the violation is to ignore racial data altogether and remedy the "direct and significant impact" the target had on district lines directly by reverse engineering the line-drawing.[6] *Alabama*, 135 S. Ct. at 1271. That is what Delegate Bell's plan accomplishes.

---

[5] This is a view shared by Plaintiffs' experts. *See* 2 Tr. 445:24–446:9 (Dr. Palmer testifying that determining an exact BVAP percentage for a district assumes precision that is not in the data and that is why he does not do it and why he does not think anyone should do it).

[6] Under different factual circumstances, e.g., where it is clear that, without a racial target, minority VAP would be universally lower across districts, some limited consideration of race might be appropriate if tailored to remedial purposes. That is manifestly not the case here. Moreover, under different circumstances or evidentiary analysis, racial consideration could be appropriate to avoid vote dilution.

Finally, Delegate Bell's race-blind method is optimal for the additional reason that it sidesteps the thorny evidentiary questions regarding predominance and narrow tailoring. As the liability phase of this case illustrates, evaluating these issues can be time-consuming and expensive, because the map-drawer will surely attest that race was only a factor and not predominant, but circumstantial evidence (such as the methods Dr. Rodden, Dr. Palmer, and Dr. Ansolabehere utilized and the Court credited) may suggest predominance under the test the Court adopted. Any use of race in a remedial map will trigger the same level of scrutiny that the 2011 plan faced, which will require extensive proceedings to assess the impact of racial goals on district lines and the evidentiary basis for race consciousness. It is better to sidestep the issue altogether as HB7002 does by remedying the violation with *no* attention to race.

### B. State-Policy Purpose

HB7002 does not "'intrude upon state policy any more than necessary" to remedy the violation" in the manner described above. *White v. Weiser*, 412 U.S. 783, 795 (1973). Except where prompted by the Court's identified race-based lines and concomitant changes to achieve equal population, HB7002 makes no changes, and, as a result, only the Challenged Districts or those directly bordering them were altered in any way. Bell Decl. ¶ 19. In total, HB7002 changed 30 districts from the 2011 plan.

Thus, HB7002 takes the 2011 plan as its starting point and makes only changes tailored to remedying the violation as described above. *Id.* ¶ 19. Additionally, to the extent changes were necessary, HB7002 avoids pairing

7

incumbents, preserves the compactness and contiguity of the 2011 plan, and achieves a plus or minus 1% deviation from the ideal, all in accord with the House redistricting criteria. *Id.* ¶ 17. Furthermore, changes necessitated by the Court's opinion (and, by consequence, the equal-population rule), were conducted to preserve the political makeup of neighboring districts. *Id.* ¶ 18. This goal was not to help or hurt either political party but to preserve the composition the legislature established in 2011 by an overwhelming bi-partisan vote. *Id.* Bi-partisan political compromise is a legitimate state policy, *Gaffney v. Cummings*, 412 U.S. 735, 754 (1973), that should be preserve if possible in remedial plan, *Upham*, 456 U.S. at 42 ("The *only* limits on judicial deference to state apportionment policy" are "the substantive constitutional and statutory standards to which such state plans are subject.") (emphasis added). Because Plaintiffs did not prove—and, indeed, expressly disclaimed—a claim of partisan gerrymandering, they are not entitled to a Court-ordered alteration of the political composition of the districts in favor of any one political party, and the Court should preserve the policies implemented in 2011.

## II.     HB7003

In case the Court disagrees with the remedial approach outlined above, Defendant-Intervenors also propose HB7003. This plan, prepared and sponsored by Delegate Jones, is largely founded on a map proposed by Delegate David Toscano, the Virginia House of Delegates Democratic Leader, and Delegate Lamont Bagby, Chair of the Legislative Black Caucus. Exhibit B, Declaration of Delegate Jones, ¶¶ 4–6. The purpose of HB7003 was to match the remedial efforts of the

Toscano/Bagby plan in a plan that better comports with state policy and partisan neutrality.

The Toscano/Bagby plan was introduced to the House as HB7001 and was advertised as a plan that purports to remedy the violations the Court identified. It remains unclear how it purports to do that, but vague public statements suggest that HB7001 implements Plaintiffs' "unpacking" theory by the intentional use of racial data to drop BVAP in the remedial districts into the low-50% to mid-40% range, apparently on the assumption that, without the use of race, BVAP would have landed within that range (a dubious and entirely unsupported presumption, as discussed above). Moreover, based on discussions within the legislature, Defendant-Intervenors believe the law firm that represents Plaintiffs here, advised on and may have orchestrated preparation of the Toscano/Bagby plan (which would explain the underlying remedial theory of "unpacking").

Whatever the precise goals, the Toscano/Bagby plan dramatically departs from state policy by pairing four Republican incumbents and changing the surrounding districts substantially to favor the Democratic Party's political fortunes. Jones Decl. ¶ 5. Although Delegate Toscano had very little information about how the Toscano/Bagby plan was drawn, its underlying purpose, or how it remedied the violation, *id.*, Delegate Toscano was well aware of the departure from state policy, as he had no qualms about stating directly in a publicly released letter that his purpose of using racial data to "unpack" the majority-minority districts would benefit the Democratic Party and that the Democratic Party is legally

9

entitled to such a remedy. *See* Exhibit C, Letter from Delegate Toscano to Speaker Cox, at 2 ("when you unpack the 11 districts, it is only natural that there will be more Democratic voters in adjacent districts and the partisan makeup with therefore change"). But, as this Court recognized, using race as a proxy for politics is subject to strict scrutiny. *Bethune-Hill*, 326 F. Supp. 3d at 142. Besides, even if that course of action were appropriate for a legislature, handing the minority party a political win does not fit within this Court's remedial power. Its role is to *preserve* the 2011 plan's policies, not rewrite them.

HB7003 shows how—aside from potential flaws for racial gerrymandering—the Toscano/Bagby plan is wrong as a remedial approach because it unnecessarily creates new policy. In creating HB7003, Delegate Jones began with the "footprint" of HB7001's remedial districts (i.e., replacements of the invalidated districts) and, working almost exclusively with the surrounding districts, avoids any incumbent pairings and preserves the 2011 map's partisan balance. Jones Decl. ¶ 7. Hence, the presumption that "unpacking" the majority-minority districts is an entitlement to Democratic Party gains is simply not true. And, to the extent the Court is persuaded by forthcoming justifications for the use of race in HB7001 (or a similar proposal predicated on "unpacking"), HB7003 demonstrates that these goals can be accomplished while better adhering to state policy, including by preserving the political makeup of the neighboring districts.

To be sure, HB7003 makes minor departures from the HB7001 remedial "footprint" districts. HB7003 alters remedial districts in Hampton Roads based on

discussions Delegate Jones had with Legislative Black Caucus members and which he understood garnered their support. Jones Decl. ¶ 9. HB7003 also alters the Tascano/Bagby version of HD95 to improve the district's compactness (a central target of this Court's criticism) and to ensure that no political advantage would accrue to Republican Delegate David Yancey in HD94, which he won after a dead-even race by a random draw. *Id.* ¶ 10. The Richmond area districts, however, are entirely unchanged from the Tascano/Bagby footprint, and the BVAP levels in all challenged districts nearly match those in the Tascano/Bagby plan. HB7003 therefore provides a means of implementing the "unpacking" purpose—or whatever racial purpose the Tascano/Bagby plan implements—while adhering to state policy.

## CONCLUSION

The Court should adopt HB7002 or, in the alternative, HB7003 as its remedial plan.

Dated: November 2, 2018

Respectfully Submitted,

*/s/ Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of November, 2018, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.

/s/ Katherine L. McKnight
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*