IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, <br><br> Defendants. | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |

**PLAINTIFFS' MEMORANDUM IN SUPPORT
OF THEIR PROPOSED REMEDIAL PLANS**

**TABLE OF CONTENTS**

                                                                                                                 **Page**

I. INTRODUCTION ............................................................................................................. 1  
II. BACKGROUND .............................................................................................................. 2  
III. ARGUMENT .................................................................................................................... 2  
      A. The Court Need Not—and Should Not—Defer to Proposed Remedial Plans Presented by Either Defendants or Intervenors ....................................... 3  
      B. Plaintiffs' Proposed Remedial Plans Fix the General Assembly's Racial Gerrymander of the Challenged Districts ............................................... 4  
      C. Plaintiffs' Proposed Remedial Plans Achieve Population Equality ................. 7  
      D. Plaintiffs' Proposed Remedial Plans Better Adhere to Traditional Redistricting Criteria Than the Enacted Plan ..................................................... 7  
            1. Plaintiffs' Remedial Plans Reflect Greater Respect for Political Subdivisions than the Enacted Plan ....................................................... 7  
            2. Plaintiffs' Remedial Plans Create Compact Districts .......................... 8  
IV. CONCLUSION ............................................................................................................... 11

I.  **INTRODUCTION**

Plaintiffs respectfully submit this memorandum in support of their proposed remedial plans pursuant to the Court's Order dated October 19, 2018 (Dkt. No. 278). The plans—labeled Plaintiffs' Remedial Plan A ("Plan A") and Plaintiffs' Remedial Plan B ("Plan B")—are attached to the accompanying Declaration of Kevin J. Hamilton.[1]

Given the number of districts at issue and the strict 1% population equality standard utilized by the General Assembly—which Plaintiffs follow here—there is admittedly no single and perfect solution to the racial gerrymander of Districts 63, 69, 70, 71, 74, 77, 80, 89, 90, 92, and 95 (the "Challenged Districts"). Plaintiffs offer two remedial maps that are broadly similar, but which tackle the challenge of redressing the baseless application of the 55% Black Voting Age Population ("BVAP") rule to the Challenged Districts in a handful of different ways.

Both proposed remedial plans cure the unconstitutional racial gerrymander of the Challenged Districts and rebalance the population of affected house districts while respecting traditional redistricting criteria. Plaintiffs' remedial plans are both more compact than the existing plan and split far fewer political subdivisions. The ease with which the Challenged Districts and the surrounding districts can be redrawn in more sensible configurations illustrates the unnecessary lengths to which the General Assembly went to enforce the mandatory 55% BVAP floor in the Challenged Districts in the first place. For all the reasons stated below, Plaintiffs respectfully ask the Court to adopt one of their proposed remedial plans.[2]

---

[1] Plaintiffs have separately filed with the Court hard copies of Plaintiffs' proposed remedial maps with accompanying data files.
[2] Plaintiffs do not have a strong preference between the two alternatives. The primary difference between the two proposed plans is set out on page 3 *infra*.

## II. BACKGROUND

Following a second bench trial in this matter on remand from the United States Supreme Court, on June 26, 2018, the Court found in Plaintiffs' favor on the merits of their claim that Virginia's current house legislative districting plan violates the equal protection clause of the Fourteenth Amendment to the United States Constitution. Dkt. Nos. 234, 235. Accordingly, the Court ordered that the "Commonwealth of Virginia is hereby enjoined from conducting any elections after [June 26, 2018] for the office of Delegate in the Commonwealth's House of Delegates in the Challenged Districts until a new redistricting plan is adopted." Dkt. No. 235. The Court gave the political branches until October 30, 2018, to adopt a new remedial plan, although it instructed "[t]he Virginia General Assembly . . . to exercise this jurisdiction as expeditiously as possible." *Id.*

After the General Assembly failed to adopt a new districting plan by this deadline,[3] the Court ordered the parties to submit proposed remedial plans no later than November 2, 2018. *See* Dkt. No. 278.

## III. ARGUMENT

Accompanying this memorandum, Plaintiffs provide the Court with their proposed remedial plans, maps of Plaintiffs' proposed versions of the Challenged Districts and surrounding environs, and reports of the basic demographic details of Plaintiffs' proposals.

As explained below, Plaintiffs' plans cure the fundamental constitutional deficiency in the existing plan (the "Enacted Plan")—the baseless application of a flat 55% BVAP floor to the various and varied Challenged Districts regardless of their unique geography, communities, and electoral history. Plaintiffs' remedial plans preserve the structure of the Enacted Plan, but are superior to the Enacted Plan with respect to every objective metric. The remedial plans' versions of the Challenged Districts are more compact and split fewer political subdivisions than the Enacted Plan. By following traditional districting principles,

---

[3] Intervenors informed the Court on October 5, 2018, of their view that the political branches would be unable to adopt a remedial plan. *See* Dkt. No. 275-1.

Plaintiffs' remedial plans thus unravel the unconstitutional racial gerrymander while preserving the voting rights of African-American voters.

The major difference between Plaintiffs' proposed Plan A and Plan B is in the treatment of Charles City County. At present, Charles City County is part of an elongated District 74 that stretches through a thin strip of Henrico County down to Charles City County to sweep in sufficient BVAP to meet the 55% BVAP rule. Remedying District 74 is best done by drawing a more compact district centered in Henrico. That leaves Charles City County in need of a new home.

Plaintiffs offer two alternatives. In Plan A, Plaintiffs move Charles City County into District 62. In Plan B, Plaintiffs move Charles City County into District 70. Each option impacts the nearby Richmond-centered districts in different ways. Briefly stated, Plan A keeps District 70 centered in Richmond City County and Henrico County, but requires a greater split of Henrico County and other alterations of Richmond area districts for population equality reasons, whereas Plan B results in District 70 expanding further to the east but requires a less significant split of Henrico County. Both approaches are reasonable—and provide an effective remedy—but require different tradeoffs. Accordingly, Plaintiffs present both for the Special Master's and the Court's consideration.

A. **The Court Need Not—and Should Not—Defer to Proposed Remedial Plans Presented by Either Defendants or Intervenors**

In taking up the task of creating a constitutional districting plan, it is important to note at the outset that the Court has no constitutional plan before it that has been duly adopted by the political branches in Virginia. In response to the Court's Memorandum Opinion, the General Assembly did not adopt (or even hold a floor vote on) a remedial plan. Had the political branches adopted a remedial plan themselves, the task before the Court would be quite different. In that instance, the Court would likely have deferred to the map duly adopted under Virginia law. But here the political branches failed to adopt a new map manifesting

3

their judgment on the configuration of Virginia's legislative districts in the absence of an unconstitutional racial gerrymander of the Challenged Districts.

The Court therefore has no proposed remedial plan before it that is entitled to the Court's deference. The Enacted Plan is, as the Court has found, unconstitutional and so must be remedied. *See Abrams v. Johnson*, 521 U.S. 74, 85-86 (1997) (adopted redistricting plan "is not owed . . . deference to the extent the plan subordinated traditional districting principles to racial considerations" because "courts [are] to correct—not follow—constitutional defects in districting plans").

This said, in drafting their remedial plan, Plaintiffs have still sought to minimize the impact of redistricting on the existing districts. *See Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 563 (E.D. Va. 2016) (adopting remedy that altered five of eleven congressional districts and noting that the plan would "not alter any districts outside of the Third District and those abutting it, but may make substantial changes to those districts"). Plaintiffs have therefore focused alterations to the Enacted Plan to the Challenged Districts and surrounding districts to the extent possible.

### B. Plaintiffs' Proposed Remedial Plans Fix the General Assembly's Racial Gerrymander of the Challenged Districts

Plaintiffs' proposed remedial plans achieve the primary objective of the remedial phase of this litigation—curing the unconstitutional racial gerrymander of the Challenged Districts identified by the Court.

As set out in detail in the Memorandum Opinion, the enacted versions of the Challenged Districts were drawn with race as the predominant factor. What that meant for each individual Challenged District varied. As the Court notes, some Challenged Districts were used as "donor" districts, with BVAP siphoned off to bolster the BVAP in "recipient" districts that otherwise may have fallen short of the 55% BVAP floor. Thus, in some instances, a district was drawn to unite far-flung African-American communities, which

4

explains, for example, the unusual shape of District 95. *See* Dkt. No. 234 ("Mem. Op.") at 54-55. In other cases, the record shows that the general configuration of a given district (and thus the surrounding districts) was driven by racial considerations, such as Delegate Jones' acknowledgment that the "eastward move [of District 71] into District 70 was required to ensure that District 71 had sufficient BVAP to meet the 55% number." *Id.* at 40. Likewise, the record reflected that the borders between districts were drawn to split political subdivisions to achieve the General Assembly's racial ends. *See, e.g., id.* at 21-22. This explains why the Challenged Districts as a whole split more political subdivisions than the non-Challenged Districts and contributed to the majority of splits in surrounding districts. *See, e.g., id.* at 22-23.

To address these issues in the configuration of the Challenged Districts, Plaintiffs followed the basic approach that Special Master Dr. Bernard Grofman followed in the *Personhubballah* litigation. *See Personhuballah v. Wittman*, No. 3:13-cv-00678, Report of the Special Master, Dkt. No. 272 (Nov. 15, 2015). That is, rather than using race as the predominant factor (as under the Enacted Plan), Plaintiffs' remedial maps were drawn "according to good government criteria." *Id.* at 3. Plaintiffs then—like Dr. Grofman did in *Personhubballah*—did basic backstopping of the resulting maps by ensuring the resulting maps were non-retrogressive and making adjustments to maintain the residences of present incumbents in their districts. *Personhuballah v. Wittman*, No. 3:13-cv-00678, Supplemental Comments to the Report of the Special Master, Dkt. No. 294 at 4-5, 15 (Dec. 11, 2015).[4]

The merits of this approach are evident in the results. Indeed, Plaintiffs' proposed remedial plans are superior to the Enacted Plan in every meaningful respect. As explained below, Plaintiffs split markedly fewer political subdivisions, and they improve the compactness of the Challenged Districts significantly.

---

[4] To the best of Plaintiffs' knowledge, based on address information they were able to locate, Plaintiffs' proposed plans do not pair incumbents or draw incumbents out of their existing districts.

5

The natural consequence of doing so was, generally speaking, to lower the BVAP in various Challenged Districts where the BVAP had been artificially inflated through application of the across-the-board 55% BVAP floor. While the BVAP of all but one district in each plan has been reduced, *see* Hamilton Decl., Ex. C, H,[5] this approach also avoids retrogression in the ability of African Americans to elect candidates of choice. As reflected in Dr. Palmer's analysis, as credited and explicated by the Court in its Opinion, 55% BVAP was not remotely necessary "in order for black voters to be able to elect their preferred candidates" in any of the Challenged Districts. Mem. Op. at 88. Indeed, even a 45% BVAP would have resulted in victory for African-American preferred candidates in all 11 Challenged Districts ranging from 59.4% to 81% of the vote. *Id.* Plaintiffs' proposed plans do not result in a BVAP lower than 46% in any Challenged District, Ex. C, H, meaning that African-American preferred candidates can be expected to win each of these districts by a supermajority or more.

| District | Current District BVAP | Plaintiffs' Plan A BVAP | Plaintiffs' Plan B BVAP |
|---|---|---|---|
| 63 | 60.1% | 56.2% | 56.2% |
| 69 | 55.9% | 51.4% | 50.0% |
| 70 | 57.1% | 59.2% | 54.8% |
| 71 | 56.1% | 51.6% | 51.6% |
| 74 | 57.9% | 52.9% | 59.6% |
| 77 | 59.4% | 47.6% | 47.6% |
| 80 | 57.0% | 52.5% | 52.5% |

---

[5] In Plaintiffs' Plan A, the BVAP of District 70 increases modestly. The same is true of District 74 in Plaintiffs' Plan B. Both District 70 and District 74 were used as "donor" districts in the Enacted Plan, Mem. Op. 37, and so it is not surprising that in remedying the existing racial gerrymander by following traditional districting principles, these districts increased in BVAP under some plan configurations.

| District | Current District BVAP | Plaintiffs' Plan A BVAP | Plaintiffs' Plan B BVAP |
|---|---|---|---|
| 89 | 56.2% | 52.4% | 52.4% |
| 90 | 57.5% | 46.1% | 46.1% |
| 92 | 61.9% | 59.3% | 59.3% |
| 95 | 61.2% | 50.2% | 50.2% |

As further explained below (and reflected in the maps submitted along with this brief), Plaintiffs unraveled the racial gerrymander of the Challenged Districts by uniting political subdivisions that were split in the Enacted Plan and otherwise adhering to traditional districting principles. Plaintiffs did not seek to adhere to a BVAP target or floor in redrawing the Challenged Districts. Indeed, Plaintiffs' plans demonstrate that no such racial threshold was necessary to maintain African-American voting strength in the Challenged Districts.

**C.** **Plaintiffs' Proposed Remedial Plans Achieve Population Equality**

The ideal population for each Virginia House district following the 2010 census is 80,010 persons. Plaintiffs' proposed districts are of equal population, with no more than +1% or -1% variance between districts. *See* Hamilton Decl., Ex. C, H.

**D.** **Plaintiffs' Proposed Remedial Plans Better Adhere to Traditional Redistricting Criteria Than the Enacted Plan**

**1.** **Plaintiffs' Remedial Plans Reflect Greater Respect for Political Subdivisions than the Enacted Plan**

Plaintiffs' proposed remedial plans substantially reduce the number of split political subdivisions in both the Challenged Districts and the map as a whole.

The Challenged Districts used artful political subdivision splits as a key mechanism for achieving its racial aims. *See, e.g.*, Mem. Op. at 22-24. In comparison to the Enacted Plan, Plaintiffs' proposed remedial plans make marked improvements:

7

|  | **Enacted Plan** | **Plaintiffs' Plan A** | **Plaintiffs' Plan B** |
|---|---|---|---|
| **# of split counties** | 59 | **51** | 52 |
| **Total county splits** | 197 | **173** | 174 |
| **# of split VTDs** | 116 | **82** | 82 |
| **Total VTD splits** | 236 | 166 | **165** |

*See* Hamilton Decl., Ex. E, J (Split Political Subdivisions Report for Plan A and B). Plaintiffs' proposed plans are a substantial improvement over the Enacted Plan, even though Plaintiffs limited changes to the Challenged Districts and surrounding districts.

Thus, Plaintiffs' remedial plans manifest a greater respect for political subdivisions than the Enacted Plan. This is not surprising. Because the General Assembly used race as the predominant consideration in drawing the Challenged Districts, it paid little heed to political boundaries when drawing the Challenged Districts. Ignoring political subdivisions was one of the primary ways the General Assembly was able to meet the 55% BVAP floor in each Challenged District. In "unwinding" this racial gerrymander fully, Plaintiffs' proposed plans include districts that more closely follow Virginia's geographic and political contours, even without making radical changes to the existing plan.

### 2. Plaintiffs' Remedial Plans Create Compact Districts

The proof of the General Assembly's predominant use of race was also found in the unusual configuration of many of the Challenged Districts. From the way District 95 snaked up the Peninsula to sweep in African-American voters to the way District 80 wove its way through the South Hampton Roads region, the General Assembly disregarded traditional redistricting principles in service of its racial aims.

In restructuring the Challenged Districts, Plaintiffs improved their compactness. Indeed, with a handful of exceptions, their remedial plans either match or improve the compactness of every Challenged District. *See* Hamilton Decl., Ex. D, I (Measure of Compactness Reports for Plan A and Plan B).

Plaintiffs provide a comparison of the compactness of their proposed remedial plans and the Enacted Plan using three common compactness measures. The Reock test compares each district to an ideal circle (considering the circle the best and most compact shape possible) and computes the ratio of the area of the district to the minimum area of a circle sufficiently large to encompass the district. The Polsby-Popper test compares the ratio of a district's area with the area of a circle sharing the same perimeter. Under these two measures, a larger number means the district is more compact. The Schwarzberg measure compares the ratio of the perimeter of the district to the perimeter of a circle of an equal area to that of the district. Under this measure, a smaller number means the district is more compact.

Taken as a whole, and even given the constraint of limiting changes to the Challenged Districts and their immediate environs, Plaintiffs' proposed remedial plans match or improve on the compactness of the Enacted Plan under each of the three measures. The bolded number shows the most compact plan(s):

| Plan | Mean Reock | Mean Polsby-Popper | Mean Schwarzberg |
|---|---|---|---|
| Plaintiffs' Plan A | **0.37** | **.26** | **1.89** |
| Plaintiffs' Plan B | 0.36 | **.26** | 1.90 |
| Enacted | 0.36 | .24 | 2.00 |

The superior compactness of Plaintiffs' remedial plans manifests more clearly on a district-by-district comparison of the Challenged Districts. In all but two instances, Plaintiffs' iterations of the Challenged Districts are superior. The measurement in bold again reflects, as to each district, which iteration of the Challenged District is most compact:

9

| District | Reock | | Polsby-Popper | | Schwartzberg | |
|---|---|---|---|---|---|---|
| | Enacted | Plaintiffs | Enacted | Plaintiffs | Enacted | Plaintiffs |
| 63 | .25 | Plan A: **.59** <br> Plan B: **.59** | .16 | Plan A: **.51** <br> Plan B: **.51** | 2.31 | Plan A: **1.27** <br> Plan B: **1.27** |
| 69 | **.52** | Plan A: .46 <br> Plan B: .46 | .34 | Plan A: .35 <br> Plan B: **.37** | 1.68 | Plan A: 1.65 <br> Plan B: **1.60** |
| 70 | .40 | Plan A: **.41** <br> Plan B: .30 | .19 | Plan A: .19 <br> Plan B: **.20** | 2.19 | Plan A: 2.16 <br> Plan B: **1.78** |
| 71 | .33 | Plan A: **.38** <br> Plan B: **.38** | .24 | Plan A: **.30** <br> Plan B: .29 | 1.99 | Plan A: **1.76** <br> Plan B: 1.78 |
| 74 | .16 | Plan A: **.26** <br> Plan B: .21 | .12 | Plan A: **.22** <br> Plan B: **.22** | 2.26 | Plan A: 1.96 <br> Plan B: **1.93** |
| 77 | .19 | Plan A: **.26** <br> Plan B: **.26** | .15 | Plan A: **.25** <br> Plan B: **.25** | 2.49 | Plan A: **1.99** <br> Plan B: **1.99** |
| 80 | .26 | Plan A: **.39** <br> Plan B: **.39** | .11 | Plan A: **.28** <br> Plan B: **.28** | 2.92 | Plan A: **1.85** <br> Plan B: **1.85** |
| 89 | .40 | Plan A: **.50** <br> Plan B: **.50** | .20 | Plan A: **.43** <br> Plan B: **.43** | 2.21 | Plan A: **1.47** <br> Plan B: **1.47** |
| 90 | .46 | Plan A: **.48** <br> Plan B: **.48** | .20 | Plan A: **.46** <br> Plan B: **.46** | 2.17 | Plan A: **1.44** <br> Plan B: **1.44** |
| 92 | **.34** | Plan A: .32 <br> Plan B: .32 | .26 | Plan A: **.31** <br> Plan B: **.31** | 1.89 | Plan A: **1.74** <br> Plan B: **1.74** |
| 95 | .14 | Plan A: **.25** <br> Plan B: **.25** | .14 | Plan A: **.34** <br> Plan B: **.34** | 2.61 | Plan A: **1.69** <br> Plan B: **1.69** |
| Average | .31 | Plan A: **.39** <br> Plan B: .38 | .19 | Plan A: **.33** <br> Plan B: **.33** | 2.25 | Plan A: 1.73 <br> Plan B: **1.69** |

In sum, in the course of curing the constitutional deficiencies of the Challenged Districts and making necessary adjustments to re-achieve population equality, Plaintiffs were able to improve the compactness of the Challenged Districts and the House map as a whole. Had Plaintiffs departed more freely from the contours of the existing districts, they could have improved the compactness of the districts even further.[6]

---

[6] The same is true with regard to the final adjustments Plaintiffs made to their Plans to ensure that incumbents were not drawn out of their districts. For example, Plaintiffs found it necessary to split additional VTDs in District 70 and 89 for this purpose. In doing so, Plaintiffs followed the methodology used by Special Master Grofman in *Personhuballah*. *See supra* at 5.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court adopt either Plaintiffs' proposed Plan A or Plan B. Both remedial plans clearly and cleanly fix the unconstitutional racial gerrymander of the Challenged Districts. Moreover, though Plaintiffs did not perform radical surgery on other districts, they were still able to improve the objective characteristics of the map in the course of tweaking districts to achieve population equality. Plaintiffs therefore submit that their proposed remedial plans fairly and adequately remedy the unconstitutional gerrymander of the Challenged Districts.

Dated: November 2, 2018　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　By: */s/ Aria C. Branch*
　　　　　　　　　　　　　　　　　　　　　　Marc Erik Elias (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　　Bruce V. Spiva (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　　Aria Branch (VSB No. 83682)
　　　　　　　　　　　　　　　　　　　　　　**PERKINS COIE LLP**
　　　　　　　　　　　　　　　　　　　　　　700 Thirteenth Street, N.W., Suite 600
　　　　　　　　　　　　　　　　　　　　　　Washington, D.C. 20005-3960
　　　　　　　　　　　　　　　　　　　　　　Telephone: 202.434.1627
　　　　　　　　　　　　　　　　　　　　　　Facsimile: 202.654.9106

　　　　　　　　　　　　　　　　　　　　　　Kevin J. Hamilton (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　　Abha Khanna (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　　Ryan Spear (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　　William B. Stafford (admitted *pro hac vice*)
　　　　　　　　　　　　　　　　　　　　　　**PERKINS COIE LLP**
　　　　　　　　　　　　　　　　　　　　　　1201 Third Avenue, Suite 4900
　　　　　　　　　　　　　　　　　　　　　　Seattle, WA 98101-3099
　　　　　　　　　　　　　　　　　　　　　　Telephone: 206.359.8000
　　　　　　　　　　　　　　　　　　　　　　Facsimile: 206.359.9000

　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of November, 2018, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.