**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

GOLDEN BETHUNE-HILL, *et al.*,

                    *Plaintiffs*,

v.

VIRGINIA STATE BOARD OF
ELECTIONS, *et al.*,

                    *Defendants*.

Civil Action No. 3:14cv852

**BRIEF OF NEW VIRGINIA MAJORITY IN RESPONSE TO DEFENDANT-
INTERVENORS' PROPOSED REMEDIAL PLAN**

Jeffrey A. Breit (VSB No. 18876)
BREIT DRESCHER IMPREVENTO, P.C.
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Telephone: 757.622.6000
Facsimile: 757.670.3939
Email: Jeffrey@breit.law

*Counsel for Amicus Curiae New
Virginia Majority*

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF NON-PARTY NEW VIRGINIA MAJORITY ..................... 1

SUMMARY OF ARGUMENT ........................................................................................... 2

ARGUMENT ................................................................................................................... 3

    I.     An Effective Remedy for a Racial Gerrymander May Consider Race to Ensure that Minority Voters Have the Opportunity to Elect the Representatives of Their Choice. ..................................................................3

          a.     Courts May Permissibly Consider Race in Remedying a Racial Gerrymander. ....................................................................................3

          b.     Using Permitted Racial Data Helps Ensure an Effective Remedial Map. ...................................................................................6

    II.    An Effective Remedy for a Racial Gerrymander Should Use Traditional Redistricting Principles that Are Expressly Neutral Towards Partisan Outcomes, Take Account of Total Population, and Accurately Define and Protect Communities of Interest. ..........................................................7

          a.     The Best Remedy Should Be Drawn Without Consideration of Incumbent Protection or Partisan Effects. ..................................8

          b.     State Legislative Districts Should Be Drawn Based on Total Population. .................................................................................10

          c.     A Nuanced Understanding of Communities of Interest at a Granular Level is an Essential Element of an Effective Remedy. ...........................12

    III.    New Virginia Majority's Example Remedial Map Provides Real World Examples of Best Practices in Remedial Redistricting.........................................16

CONCLUSION...................................................................................................... 19

CERTIFICATE OF SERVICE ................................................................................ 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Johnson*,
  521 U.S. 74 (1997).................................................................................................5

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  135 S. Ct. 2652 (2015)...........................................................................................7

*Dillard v. City of Greensboro*,
  956 F. Supp. 1576 (M.D. Ala. 1997) .....................................................................4

*Elrod v. Burns*,
  427 U.S. 347 (1976)...............................................................................................6

*Evenwel v. Abbott*,
  136 S. Ct. 1120 (2016)....................................................................................10, 11

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)...........................................................................................6

*Johnson v. Mortham*,
  926 F. Supp. 1540 (N.D. Fla. 1996).......................................................................6

*Larios v. Cox*,
  314 F. Supp. 2d 1357 (N.D. Ga. 2004) ..................................................................4

*League of United Latin American Citizens v. Perry*,
  548 U.S. 399 (2006).........................................................................................12, 13

*League of Women Voters v. Detzner*,
  172 So.3d 363 (Fla. 2015).....................................................................................13

*Legislature v. Reinecke*,
  516 P.2d 6 (Cal. 1973) ..........................................................................................15

*Miller v. Johnson*,
  515 U.S. 900 (1995)......................................................................................3, 5, 12

*North Carolina v. Covington*,
  138 S. Ct. 2548 (2018).......................................................................................3, 5

*Personhuballah v. Alcorn*,
  155 F. Supp. 3d 552 (E.D. Va. 2016) .....................................................................5

*Rodriguez v. Pataki*,
    No. 02 CIV.3843, 2002 WL 31430324 (S.D.N.Y. Oct. 24, 2002) ...................................15, 16

*Romo v. Detzner*,
    No. 2012-CA-000412, 2014 WL 3797315 (Fla. Cir. Ct. July 10, 2014)...........................12, 13

*Shaw v. Reno*,
    509 U.S. 630 (1993)......................................................................................................................6

*Vieth v. Jubelier*,
    541 U.S. 267 (2004)................................................................................................................7, 10

*Wesberry v. Sanders*,
    376 U.S. 1 (1964).......................................................................................................................11

## Constitutions

U.S. Const., Fourteenth Amendment ................................................................................10, 11, 12

Cal Const. art. XXI, § 2(d)(4) .............................................................................................................14

Cal Const. art. XXI, § 2(e) ..................................................................................................................8

Fla. Const. art III, §§ 20(a), 21(a) .......................................................................................................9

Haw. Const. art IV, § 6(2)....................................................................................................................9

Va. Const. art. II, § 6..........................................................................................................................13

## Statutes

52 U.S.C. § 10301(a) ..........................................................................................................................4

Voting Rights Act of 1965 ..........................................................................................................1, 3, 4

## Other Authorities

"About New Virginia Majority," http://www.newvirginiamajority.org/about.............................17

All About Redistricting, http://redistricting.lls.edu/where-tablestate.php ..................................8, 9

Andrew Prokop, "Ohio's gerrymandering reform was just approved by the state's
    voters," Vox.com (May 8, 2018),
    https://www.vox.com/2018/5/7/17302388/ohio-issue-1-gerrymandering-
    redistricting ...............................................................................................................................9

Colorado Amendment Y, Amendment Z,
    https://www.sos.state.co.us/pubs/elections/Initiatives/ballot/contacts/2018.htm
    l ...................................................................................................................................................10

Committee Resolution No. 1—"House of Delegates District Criteria," House Committee on Privileges and Elections (approved Mar. 25, 2011), http://redistricting.dls.virginia.gov/2010/Criteria.aspx ....................................................13, 14

"Communities of Interest," Brennan Center for Justice (updated Nov. 2010), https://www.brennancenter.org/sites/default/files/analysis/6%20Communities %20of%20Interest.pdf ..........................................................................................................14

Emily Moon, "How did citizen-led redistricting initiatives fare in the mid-terms?" Pacific Standard, https://psmag.com/news/how-did-citizen-led-redistricting-initiatives-fare-in-the-mid-terms (Nov. 7, 2018) ........................................................9

Michigan Proposal 18-2, https://www.michigan.gov/documents/sos/Official_Ballot_Wording_Prop_18-2_632052_7.pdf .................................................................................................................10

Nat'l Conf. of State Legislatures, http://www.ncsl.org/research/redistricting/the-iowa-model-for-redistricting.aspx (Apr. 6, 2018)......................................................9

Robin Opsahl, "Ohio Passes Bipartisan Redistricting Ballot Initiative to Curb Gerrymandering," Roll Call (May 10, 2018)...........................................................8

## STATEMENT OF INTEREST OF NON-PARTY NEW VIRGINIA MAJORITY

Non-party New Virginia Majority ("NVM") is a Virginia non-profit organization.  Since 2007, NVM has used mass organizing, leadership development, and strategic communications to champion the voices of communities of color, women, working people, LGBTs, and youth in Virginia.  New Virginia Majority has visited over 800,000 voters, and developed into Virginia's leading progressive civic engagement organization.  New Virginia Majority's voter participation program builds relationships with community residents and brings neighbors together to create change, whether or not there is an election on the horizon.  The organization works with residents to organize their own neighborhoods in an effort to win policy victories and educate their friends and families about critical issues.  It engages citizens on how to make Virginia's redistricting process more open and transparent.  In 2011, NVM sought to prevent Prince William County from opting out of the review of its redistricting process under the Voting Rights Act of 1965.

This Court, in its October 19, 2018 order, invited "any non-parties desiring to do so" to "submit their objections to, if any, and briefs in response to the remedial plans, maps, and briefs submitted on November 2, 2018."  Dkt.  278.  NVM has grave concerns about the remedial maps proposed by Defendant-Intervenors.  In particular, NVM believes strongly that the Defendant-Intervenors' refusal to consider race in formulating their proposed plans is unwarranted, and that the Special Master can properly consider the racial impact of its plan in redrawing district boundaries.

NVM respectfully submits this brief for the Court's consideration in formulating a remedy for redistricting the Virginia House of Delegates.

## SUMMARY OF ARGUMENT

The plans proposed by both Democrats and Republicans in the House of Delegates do not adequately remedy the unconstitutional racial gerrymanders found by the Court.  The New Virginia Majority ("NVM") respectfully submits this brief to outline the considerations that we believe should guide the Court's consideration of those plans and development of its own plan.

First, the plans proposed by Defendant-Intervenors are inadequate because they explicitly fail to take into account the racial impact of their plans.  Race-based harm requires a race-conscious remedy.  This principle finds ample support in decisions of the Supreme Court, as well as in prior redistricting litigation in this district.  Proposed remedies that purport to ignore their racial impact pose a real risk of simply placing minority voters back in the same spot they were in before: with a diluted vote that deprives them of the right to fair representation.

But race is just one of the many considerations that should go into the development of a proper remedy.  As outlined below, there are other important principles of fair representation that should be taken into account, including partisan neutrality and careful protection of communities of interest, in arriving at an appropriate remedial plan.

New Virginia Majority has demonstrated that this is a workable approach.  Working with skilled map-makers, NVM has developed an Example Remedial Map which implements the approach outlined in this brief.  A copy of that map is attached as an appendix to this brief.  We do not submit this map as a proposed plan for the Court to consider adopting, but merely to demonstrate that the policy approaches outlined in this brief are feasible for the Court to implement.  Unlike the maps submitted by Defendant-Intervenors, NVM's proposed approach achieves fair and equal representation for voters of all races, all political persuasions, and all relevant regions of the Commonwealth.

## ARGUMENT

I.     **An Effective Remedy for a Racial Gerrymander May Consider Race to Ensure that Minority Voters Have the Opportunity to Elect the Representatives of Their Choice.**

In a case where the legislature's districting has been determined to be a racial gerrymander that unconstitutionally undermines the political rights of a racial minority, any attempt at a remedy that is totally race-blind presents a great risk that it will fail to cure the problem.  Racial data is both a permissible and important part of remedial map-making, and should be given full consideration in this case.

### a.   Courts May Permissibly Consider Race in Remedying a Racial Gerrymander.

The use of racial data by courts in remedying racial gerrymanders is well-established practice.  The Supreme Court has unequivocally held that it is *permissible* to use racial data to remedy a racial gerrymander.  In *North Carolina v. Covington*, 138 S. Ct. 2548 (2018), the Supreme Court recently affirmed the use of a special master's remedial plan, over the defendants' objections that the plan was "expressly race-conscious" because the district court had instructed the special master to "consider data identifying the race of individuals or voters to the extent necessary to ensure that [the] plan cures the unconstitutional racial gerrymanders."  *Id.* at 2554. As the Supreme Court explained, "this Court has long recognized the distinction between being aware of racial considerations and being motivated by them."  *Id.* (citing to *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).  Considering race to ensure that a plan cures any racial gerrymandering "does not amount to a warrant for 'racial quotas.'"  *Id.*  In other words, it is entirely proper for a special master to consider race when engaged in remedial districting to cure a racial gerrymander.

The use of racial data to remedy a racial gerrymander is also consistent with the Voting Rights Act.  The Voting Rights Act ("VRA") prohibits a state or political subdivision from enacting election policies or procedures that result in "a denial or abridgement of the right of any

citizen of the United States to vote on account of race or color."  52 U.S.C. § 10301(a).  As a general matter, the VRA and its legal progeny support the conclusion that consideration of racial data is permissible in the process of creating responsive remedial maps that do not disproportionately hamper the ability of racial and language minorities to elect their candidates of choice.  The proper consideration of racial data in mapmaking in compliance with the VRA serves as a check on the legislature or other mapmaking entity.

The decision in *Dillard v. City of Greensboro*, 956 F. Supp. 1576 (M.D. Ala. 1997), provides an instructive example of the permitted use of racial data in remedying a racial gerrymander.  In *Dillard*, the District Court for the Middle District of Alabama appointed a special master to draw maps to remedy a racial gerrymander.  The court instructed the special master to undertake a three-step process.  *Id.* at 1578.   First, the special master was instructed to attempt to remedy the racial gerrymander by using only race-neutral criteria.  If he was unable to do so, he was instructed to next "see if a plan could be drawn where race is not the dominant factor."  If he was unsuccessful, only then was he instructed to "not only consider race, but give it dominant consideration."  *Id.* (internal quotations and citations omitted).  While the special master in *Dillard* was successfully able to remedy the racial gerrymander solely by using race-neutral districting criteria, the district court's approach, including its explicit endorsement of considering race as necessary, provides a useful framework.  *See also Larios v. Cox*, 314 F. Supp. 2d 1357, 1360 (N.D. Ga. 2004) (special master "directed to ensure that the plans neither diluted voting strength on the basis of race, color, or membership in a language minority group, nor led to retrogression in the position of racial minorities" (internal citations omitted)).

Prior decisions in this District also provide guidance as to the appropriate consideration of race in remedial redistricting.  In *Personhuballah v. Alcorn,* 155 F. Supp. 3d 552 (E.D. Va. 2016),

the district court twice found that Virginia's Third Congressional District was an unconstitutional racial gerrymander, in violation of the Equal Protection Clause. After the legislature failed to act, the court appointed Dr. Bernard Grofman, the special master also appointed in this case, as a special master. In drafting the remedial plan that was ultimately adopted by the court, Dr. Grofman explicitly considered relevant racial data. *See* Report of the Special Master (Dkt. 272) at 4–5. Specifically, Dr. Grofman used relevant data from previous election cycles to determine the threshold at which minority voters would likely be able to elect their candidate of choice. *Id.* at 29–41. In adopting Dr. Grofman's proposed remedial plan, this court endorsed his approach, and drew a comparison to the Supreme Court's approach in *Abrams v. Johnson*, 521 U.S. 74, 86 (1997): "The Court therefore approved the district court's remedial plan, which 'ma[de] substantial changes to the existing plan consistent with Georgia's traditional districting principles, and considering race as a factor but not allowing it to predominate.'" *Personhuballah*, 155 F. Supp. 3d at 563 (alterations in original). Used properly, racial data is a key component of creating responsive remedial maps that will protect minority voters.

The consideration of race in remedial redistricting is not unrestricted, of course. The Supreme Court's decision in *Covington* makes clear that court-drawn maps are bound by many of the same restrictions as legislatively drawn ones. 138 S. Ct. at 2554. The primary test for determining whether the consideration of race was impermissible is whether the court or legislature "subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller*, 515 U.S. at 916. The court has disapproved of using "race for its own sake, and not other districting principles" when drawing new district lines. *Id.* at 913. It has also cautioned against "[r]acial gerrymandering, even for remedial purposes," because such a use of race "may balkanize us into competing racial factions . . . carry[ing] us further from the goal of a political system in which race

5

no longer matters." *Shaw v. Reno*, 509 U.S. 630, 657 (1993).  But mere race-consciousness has received frequent judicial approval, especially in the context of drawing maps to remedy prior race-based injuries.

### b. Using Permitted Racial Data Helps Ensure an Effective Remedial Map.

Proper consideration of racial data in remedying an unconstitutional racial gerrymander makes it more likely that the remedial map will in fact remedy the harms to minority voters caused by the original unconstitutional map.

The goal of mapmaking should be to ensure that all voters, including minority voters, have equal opportunity to elect the representative of their choice.  Courts have recognized that "limiting the right to vote in a manner that violates the Equal Protection Clause" amounts to a "[d]eprivation of a fundamental right." *Johnson v. Mortham*, 926 F. Supp. 1540, 1543 (N.D. Fla. 1996) (citations omitted) (citing *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976)).  To be an effective remedy for a racial gerrymander, the remedial map should not leave minority voters worse off than they were under the original map.  This means that minority voters should not continue to be placed in districts where their vote is diluted, either by deliberately placing numerous minority voters in a single district ("packing") or deliberately dividing minority voters into numerous districts to nullify their voting power ("cracking").  *See Gill v. Whitford*, 138 S. Ct. 1916, 1924 (2018) (defining "cracking" and "packing").  Failing to adequately remedy a racial gerrymander not only is a recipe for ongoing and costly litigation, but it continues the harm inherent in the original map.

Through the proper use of racial data, either proactively or in an evaluative capacity, the mapmaker—in this case, the Court—can ensure that the remedial map leaves minority voters better off than under the original, unconstitutional map.  Not only is this crucial to protect the rights of minority voters, but failing to do so may open the remedial map to additional charges of racial gerrymandering, accompanied by litigation that is costly for taxpayers and may cause confusion

for voters and candidates in the challenged districts. Proper consideration of racial data increases the likelihood that the remedial map will be a remedy in the truest sense of the word.

II.     **An Effective Remedy for a Racial Gerrymander Should Use Traditional Redistricting Principles that Are Expressly Neutral Towards Partisan Outcomes, Take Account of Total Population, and Accurately Define and Protect Communities of Interest.**

An effective remedy for a racial gerrymander should implement redistricting criteria that prioritize fair representation over political considerations. While the Court has not yet established clear standards that dictate what is and is not an unconstitutional partisan gerrymander, it has made clear that, like racial gerrymanders, partisan gerrymanders "[are incompatible] with democratic principles." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2658 (2015) (alteration in original) (quoting *Vieth v. Jubelier*, 541 U.S. 267, 292 (2004). Some of the redistricting criteria that promote principles of fair representation are required by federal law, some have been identified as traditional redistricting criteria, and others find broad support among a wide range of constituencies seeking fair maps. We ask the Court to prioritize several of these criteria.

a.  **The Best Remedy Should Be Drawn Without Consideration of Incumbent Protection or Partisan Effects.**

Instilling confidence in the democratic process and drawing maps that prioritize fair representation require a candidate- and party-neutral redraw of the House of Delegates map.  We urge the Court to draw a new map with a focus on protection of Virginia communities of interest, without regard for the residence of any incumbent or the partisan composition of any district.

Although the Supreme Court has described incumbent protection as a permissible redistricting criterion, momentum has shifted sharply in favor of reforms that remove partisan considerations from the redistricting process.  This momentum is most evident in light of the rapid acceleration of measures in many states to limit partisan considerations and the influence of elected officials in the redistricting process.

Ten states now have a state law prohibition on benefitting a party or candidate in the drawing of state legislative districts, congressional districts, or both.  *See*, *e.g.*, "Where the lines are drawn – state legislative districts" and "Where the lines are drawn – congressional districts," *on* All About Redistricting, *available at* http://redistricting.lls.edu/where-tablestate.php *and* http://redistricting.lls.edu/where-tablefed.php (identifying such laws in California, Delaware, Florida, Hawaii, Illinois, Iowa, Nebraska, Oregon, and Washington) (last visited Nov. 14, 2018); Robin Opsahl, "Ohio Passes Bipartisan Redistricting Ballot Initiative to Curb Gerrymandering," Roll Call (May 10, 2018), https://www.rollcall.com/news/politics/ohio-passes-bipartisan-redistricting-ballot-initiative-curb-gerrymandering (last visited Nov. 14, 2018).  For example, the California Constitution states that a candidate's address "shall not be considered in the creation of a map," and that "[d]istricts shall not be drawn for the purpose of favoring or discriminating against an incumbent, political candidate, or political party."  Cal Const. art. XXI, § 2(e).  Similarly, Florida's 2010 state constitutional amendments prohibit legislators from drawing a plan or district

8

"with the intent to favor or disfavor a political party or an incumbent."  Fla. Const. art III, §§ 20(a), 21(a).  And Hawaii's bipartisan politician commission is forbidden from drawing a district to "unduly favor a person or political faction."  Haw. Const. art IV, § 6(2).

Prior to the 2018 election, five states empowered independent citizen commissions with partisan balance to draw districts and one empowered nonpartisan legislative staff.  *See* "Who draws the lines?" *on* All About Redistricting, http://redistricting.lls.edu/who-fed10.php (identifying Arizona, California, Idaho, Montana, and Wyoming as states with "independent commission[s] with balanced partisan composition") (last visited Nov. 14, 2018); *see also* "The 'Iowa     Model'     for     Redistricting,"     Nat'l     Conf.     of     State     Legislatures, http://www.ncsl.org/research/redistricting/the-iowa-model-for-redistricting.aspx  (Apr.  6,  2018) (recognizing that "Iowa's districts have been drawn each decade by nonpartisan legislative staff" since 1980) (last visited Nov. 14, 2018).  In 2018, another five states placed measures on the ballot to change how redistricting is conducted; in four of those states, reform passed overwhelmingly and in Utah, where ballots are still being counted, this reform proposal is in the lead.  *See* Emily Moon, "How did citizen-led redistricting initiatives fare in the mid-terms?" Pacific Standard, https://psmag.com/news/how-did-citizen-led-redistricting-initiatives-fare-in-the-mid-terms  (Nov. 7, 2018) (listing outcomes in Colorado, Michigan, Missouri, and Utah) (last visited Nov. 14, 2018); Andrew Prokop, "Ohio's gerrymandering reform was just approved by the state's voters," Vox.com (May 8, 2018), https://www.vox.com/2018/5/7/17302388/ohio-issue-1-gerrymandering-redistricting (last visited Nov. 14, 2018).  In two of these states, Colorado and Michigan, the ballot measure proposed the creation of independent citizen commissions; in Utah, it proposed an advisory citizens' commission; in Missouri, a nonpartisan state demographer who is required to

9

draw a map and test it for partisan fairness; and in Ohio, increased bipartisan protections for drawing congressional districts.

In addition to structural changes as to who draws the districts, many states have also added prohibitions against partisan gerrymandering. For example, Michigan state law will now mandate that districts shall not "provide a disproportionate advantage to political parties or candidates." *See* Michigan Proposal 18-2, *available at* https://www.michigan.gov/documents/sos/Official_Ballot_Wording_Prop_18-2_632052_7.pdf (last visited Nov. 14, 2018). Colorado will prohibit the adoption of congressional or state legislative maps that have been "drawn for the purpose of protecting one or more incumbent members, or one or more declared candidates." *See* Colorado Amendment Y, Amendment Z, https://www.sos.state.co.us/pubs/elections/Initiatives/ballot/contacts/2018.html (last visited Nov. 14, 2018).

As the courts have recognized, the increased sophistication of redistricting technology has allowed legislators to craft districts for political advantage with surgical precision. *See*, *e.g.*, *Vieth*, 541 U.S. at 345–46 (Souter, J., dissenting). Voters across the country have responded by implementing reforms that take from legislators the power to draw districts and limit the ability of whatever entity is drawing districts to consider the interests of any candidate or party. We urge the court to follow this path as well.

### b. State Legislative Districts Should Be Drawn Based on Total Population.

Districts at all levels of government should be drawn based on total population. This approach is consistent with the intent of the Framers and the drafters of the Fourteenth Amendment to ensure that representatives effectively serve all residents.

In *Evenwel v. Abbott*, 136 S. Ct. 1120 (2016), plaintiffs sought to prohibit Texas from drawing state legislative districts based on total population, arguing that the Constitution required

the counting of only citizens.  *Id.* at 1123.  In a unanimous decision, the Court held that the states may continue to draw legislative districts based on total population.  *Id.*  Although the Court found it unnecessary to decide whether the Constitution *mandated* the use of total population, the Court detailed extensively the constitutional and policy reasons why the total population approach is preferable.  *Id.* at 1127.  Quoting from *Wesberry v. Sanders*, 376 U.S. 1 (1964), the Court explained that the "debates at the [Constitutional] Convention make at least one fact abundantly clear: that when the delegates agreed that the House should represent 'people,' they intended that in allocating Congressmen the number assigned to each state should be determined solely by the number of inhabitants."  *Evenwel*, 136 S. Ct. at 1129 (quoting *Wesberry*, 376 U.S. at 13).  The Court added that "the Framers of the Constitution and the Fourteenth Amendment comprehended [that] representatives serve all residents, not just those eligible or registered to vote," and that nonvoters "have an important stake in many policy debates—children, their parents, even their grandparents, for example, have a stake in a strong public-education system—and in receiving constituent services, such as help navigating public-benefits bureaucracies."  136 S. Ct. at 1132.  Finally, the Court explained that the use of total population "promotes equitable and effective representation" by "ensuring that each representative is subject to requests and suggestions from the same number of constituents."  *Id*.

The lesson from *Evenwel* is clear: not only is total population a permissible basis for drawing districts, it is the basis that best comports with constitutional history, long-established practice, and the goals of fair and equal representation.

### c. A Nuanced Understanding of Communities of Interest at a Granular Level is an Essential Element of an Effective Remedy.

Ignoring or failing to investigate nuanced distinctions between communities consisting primarily of racial minorities is a common symptom of gerrymanders.  Legislators string together into one district communities whose residents share a common racial heritage, regardless of whether that heritage is the only thread holding them together.  Defining communities solely by their racial heritage subverts the purportedly race-neutral map-drawing criterion of not splitting communities of shared interest across multiple districts.  A state or court is "free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests" and not simply grouping a race together based on a stereotype that the race will vote together to select a leader from the same racial group.  *Miller*, 515 U.S. at 920.  Such a stereotyped grouping violates the Equal Protection Clause of the Fourteenth Amendment.  *Id*.

Two examples illustrate the point.  In Texas, as discussed in *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ("*LULAC*"), the Texas State Legislature placed two different Latino communities in the same district to facilitate a racial gerrymander of a neighboring district, despite the fact that the two communities were "disparate communities of interest," with "differences in socio-economic status, education, employment, health, and other characteristics."  *LULAC*, 548 U.S. at 432 (internal quotations and citations omitted).  The "300-mile gap between the Latino communities" in the challenged district was matched by "a similarly large gap between the needs and interests of the two groups."  *Id.*  And in Florida, during the 2012 redistricting process, the Legislature connected "two far-flung urban populations [between Jacksonville and Orlando] in a winding district which picks up rural black population centers along the way."  *Romo v. Detzner*, No. 2012-CA-000412, 2014 WL 3797315 at *10 (Fla. Cir. Ct. July

12

10, 2014). The court cited the above portion of *LULAC*, and determined that the district violated the Florida Constitution's prohibition against partisan gerrymandering. *Id.* The Supreme Court of Florida affirmed the finding of unconstitutional intent. *League of Women Voters v. Detzner*, 172 So.3d 363, 391–93 (Fla. 2015).

Adhering to traditional redistricting principles that are candidate- and party-neutral can help accurately define communities of interest. For instance, the Virginia Constitution mandates compactness and contiguity, Va. Const. art. II, § 6, both of which are useful tools to prevent the placement of disparate and far-flung communities into the same legislative district for partisan reasons. Including some connective tissue between different parts of a district and minimizing the distance between any two points within a district make it more difficult to pack racial communities with little in common together in one district in ways that dilute their voting power.

Respecting political subdivisions can play a similarly crucial role by recognizing that residents of the same counties and cities may often share common concerns that justify common representation in the General Assembly. Although true communities of interest sometimes do not fit into compact districts and they may cross county and city boundaries, mandating these traditional redistricting criteria to the extent they are consistent with keeping communities of interest together is still a useful strategy for preventing the harms that occur in racial gerrymanders.

The criteria for districting adopted in Virginia recognize that communities of interest are a vital element to be considered. The non-partisan factors "that can create or contribute to communities of interest" include "economic factors, social factors, cultural factors, geographic features, governmental jurisdictions and service delivery areas." Committee Resolution No. 1— "House of Delegates District Criteria," House Committee on Privileges and Elections (approved March 25, 2011), *available at* http://redistricting.dls.virginia.gov/2010/Criteria.aspx (last visited

13

Nov. 14, 2018).   While the Virginia redistricting criteria permit partisan considerations in determining communities of interest, such factors have been repeatedly rejected by voters in recent redistricting reforms, as discussed above, and should be given far less weight.

Many other states also require the entity responsible for drawing legislative districts to keep communities of interest together to the extent practicable.  *See* "Communities of Interest," Brennan Center for Justice (updated Nov. 2010), *available at* https://www.brennancenter.org/sites/default/files/analysis/6%20Communities%20of%20Interest. pdf (last visited Nov. 15, 2018).  For example, California law defines a community of interest as "a contiguous population which shares common social and economic interests that should be included within a single district for purposes of its effective and fair representation." Cal Const. art. XXI, § 2(d)(4).  The examples given include shared interests such as "those common to an urban area, a rural area, an industrial area, or an agricultural area, and those common to areas in which the people share similar living standards, use the same transportation facilities, have similar work opportunities, or have access to the same media of communication relevant to the election process." *Id*.  The law explicitly excludes "relationships with political parties, incumbents, or political candidates" from the definition.  *Id.*  Such expansive definitions of communities of interest give map-drawers greater flexibility to consider a broad range of characteristics that are relevant to ensuring fair representation beyond racial categories.

The method for defining communities of interest is an important part of arriving at an appropriate resolution.  Too often, distinctions and commonalities between communities that should play an equal or more prominent role than race in determining the placement of residents into legislative districts receive little or no attention.  The testimony of community members as

collected through an open and transparent process is the most effective strategy for understanding a wide array of information about communities that census data cannot sufficiently portray.

Obtaining extensive public input by hosting meetings across a jurisdiction is the ideal approach for determining the borders of a community of interest at a granular level.  There is precedent for doing so even when the court has appointed a special master to lead the redrawing of districts.  In California, the state Supreme Court led the redrawing of districts following the 1970 census after the Democrat-controlled state legislature failed to agree with Republican Governor Ronald Reagan on legislation to establish new districts.  *Legislature v. Reinecke*, 516 P.2d 6, 8–9 (Cal. 1973).  The court appointed special masters to draw the maps and directed the special masters to hold public hearings to collect information.  *Id.* at 13.  The special masters then scheduled hearings in Sacramento, Los Angeles, San Diego, and San Francisco, and distributed a press release on the "times, places and purposes of the hearings" to "wire services, the major newspapers, and radio and television stations."  *Id.* at 14.  The testimony the special masters received helped them determine communities of interest in drawing new districts.  *Id.* at 23 (identifying that the people in a proposed district "share common interests in tourism incident to recreational use of Yosemite, Kings Canyon and Sequoia National Parks, in agriculture and cattle raising, and in attendant interests in the construction and maintenance of highways and the conservation and distribution of water").  The Supreme Court of California then adopted the special masters' proposal over challenges from various parties.  *Id.* at 9.

Another illustrative example can be found more recently in New York.  Following the New York legislature's failure to produce a congressional redistricting plan, the court stepped in and appointed a special master to prepare the congressional redistricting plan. *Rodriguez v. Pataki*, No. 02 CIV.3843, 2002 WL 31430324 at *1 (S.D.N.Y. Oct. 24, 2002).  In addition to appointing

nationally known redistricting experts to help him in his work—including Dr. Grofman, the special master in the present case—the special master held a public hearing and received both written and oral comments from members of the public as to their priorities in redistricting and incorporated these comments into the final plan, which was approved by the court. *Id.*

Although the timeline and circumstances of this case may preclude conducting hearings across the state and inviting Virginians to testify about their communities, there are still many other options for obtaining qualitative and quantitative data that inform this process. We urge this court to solicit informal feedback through emails, letters, and videos from community organizations and individuals in Virginia. Census data provides an invaluable demographic portrait of the United States, but it is inevitably an incomplete picture. The borders of communities based on informal social interactions such as attendance at a house of worship, work for a particular employer, commuting routes, parks where parents take their children, and many others would be difficult for a map-maker to know to consider without public testimony. The broader the court's understanding of Virginia's diverse communities, the more effectively it can undo districts drawn with no interest in those distinctions.

## III.   New Virginia Majority's Example Remedial Map Provides Real World Examples of Best Practices in Remedial Redistricting.

The suggestions made by NVM in this brief are not made in a vacuum. New Virginia Majority worked with Matt Cassidy of TargetSmart to create a remedial map that unpacked minority voters, ensured that minority voters had equal opportunity to elect representatives of their choice, and complied with traditional redistricting criteria. Our resulting map is attached as Exhibit A to this brief. We discuss this map and the process and considerations that New Virginia Majority relied upon in developing it not to ask the Court to adopt this map, but to illustrate to the Court an example of what can be accomplished based on the considerations outlined in this brief.

This map is submitted as an example only; we do not submit this map as a proposed map under the Court's order of October 19.

New Virginia Majority decided to prepare the Example Remedial Map after reviewing the maps submitted by the Republicans and Democrats in the Virginia House of Delegates.  As an organization, NVM "builds the power of marginalized communities to change the political systems that aren't working for us."  *See* "About New Virginia Majority," *at* http://www.newvirginiamajority.org/about (last visited Nov. 14, 2018).  In NVM's view, the proposed maps (1) fail to adequately remedy the unconstitutional racial gerrymander; (2) fail to adequately consider boundaries of communities of interest that share a racial, ethnic, or language background, along with other community characteristics; and (3) by explicitly using a race-blind process, fail to adequately protect the interests of minority voters.

In drawing the Example Remedial Map, New Virginia Majority's primary focus was to remedy the unconstitutional racial gerrymander and ensure that minority voters – in this case, predominately Black voters – had an equal opportunity to elect the candidates of their choice.  Secondary considerations included ensuring that the map integrated the perspectives of community members as to the characteristics that defined their communities; and ensuring compliance with traditional redistricting criteria, including contiguity and compactness.  The mapping process included input from elected officials in the altered districts and took a realistic view of political realities.

New Virginia Majority gathered community input by having discussions at three membership meetings, in which community members provided their perspectives on how they define their community, where there are official and unofficial community centers of activity, and other unifying and dividing factors.  New Virginia Majority also hosted six teleconference calls

17

and webinars with community leaders and leaders of community-based organizations to seek their input.  These community perspectives were communicated to the mapmaker and integrated into the final Example Remedial Map.

The Example Remedial Map seeks to balance several conflicting factors.  The process of unpacking racially gerrymandered districts naturally leads to a decrease in the Black Voting Age Population (BVAP) in those districts.  However, it is essential that these districts are drawn in a way that does not inflict undue damage to the ability of minority voters to elect the representatives of their choice.  Additionally, in furtherance of their mission to build power for marginalized communities, New Virginia Majority looked for opportunities where voting blocks of African-Americans that may have been severed from their former districts could combine with voting blocks of other persons of color to ensure that the Virginia legislature reflected the diversity of the Commonwealth.

## CONCLUSION

For the foregoing reasons, this Court should reject the Defendant-Intervenors' Remedial Map and follow the guidance set out in this brief, including considering the racial impact of its plan and the desirability of preserving communities of interest, in drawing its own remedial maps, so as to ensure that Virginia's diverse communities continue to have the opportunity to elect representatives of their choosing.

Dated:  November 16, 2018

Respectfully submitted,

_____/s/_____
Jeffrey A. Breit (VSB No. 18876)
BREIT DRESCHER IMPREVENTO, P.C.
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Telephone: 757.622.6000
Facsimile: 757.670.3939
Email: Jeffrey@breit.law

*Counsel for Amicus Curiae New Virginia Majority*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 16th day of November 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of filing (NEF) to all parties of record.


Dated: November 16, 2018


_____/s/_____
Jeffrey A. Breit (VSB No. 18876)
BREIT DRESCHER IMPREVENTO, P.C.
Towne Pavilion Center II
600 22nd Street, Suite 402
Virginia Beach, Virginia 23451
Telephone: 757.622.6000
Facsimile: 757.670.3939
Email: Jeffrey@breit.law

*Counsel for Amicus Curiae New Virginia Majority*

20