**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

Richmond Division

| | | |
|---|---|---|
| GOLDEN BETHUNE-HILL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VIRGINIA STATE BOARD OF ELECTIONS, et al., | ) ) | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |
| | ) | |
| Defendants, | ) | |
| and | ) | |
| | ) | |
| M. KIRKLAND COX, SPEAKER OF THE HOUSE OF DELEGATES, and THE HOUSE OF DELEGATES, | ) ) ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

**Response to Remedial Plans, Maps, and Briefs submitted on November 2, 2018**

Although judicial redistricting is "an unwelcome obligation," *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 561 (E.D. Va. 2016), this Court has recent experience to help guide its analysis.

1. In *Personhuballah*, this Court was tasked with remedying a racial gerrymander of Virginia's third congressional district. 155 F. Supp. 3d at 555. The Court identified two requirements for a judicially crafted plan: (1) "equal population districts," *id.* at 561;[1] and (2) use of "[t]raditional districting principles in Virginia," such as "compactness and contiguity," "respect for political subdivisions," and "communities of interest," *id.* (internal quotation marks and citations omitted). The Court also stated that a judicial "remedial plan should be guided by

---

[1] The Special Master has said that he intends to comply with the mandatory criterion to maintain equal population districts. See Doc. No. 284 (stating that the Special Master intends to recommend a plan keeping districts within +/- 1%).

1

the legislatives policies underlying the existing plan, to the extent those policies do not lead to violations of the Constitution or the Voting Rights Act." *Id.* at 563 (internal quotation marks and citation omitted). The Court sought to limit the scope of any remedial plan to the unconstitutional district "and those abutting it," but recognized the need to potentially "make substantial changes to those districts." *Id.* The Court found that it was "appropriate to implement a plan that complies with federal policy disfavoring discrimination against minority voters," *id.* at 564 (referencing Section 2 and Section 5 of the Voting Rights Act), but expressly declined to consider whether the state legislature intended to entrench a particular partisan split. See *id.* at 563–64.

The Court should apply the same framework used in *Personhuballah* in deciding how to remedy the racial gerrymander in this case. Accordingly, we explain below why several of the proposed remedial plans submitted in response to the Court's October 19, 2018 order fail to satisfy the requirements identified in *Personhuballah* and thus should not serve as the basis for the remedial plan in this case.

2. Seven remedial plans were submitted in response to the Court's October 19, 2018 order: two by plaintiffs; two by intervenor-defendants; one by the Virginia State Conference of NAACP Branches (Virginia NAACP); and two from the College of William & Mary and the William & Mary Law School. We have reviewed the narrative submissions provided by the proponent of the various plans to determine whether the relevant map was created in a way that is consistent with *Personhuballah*.

a. The two remedial plans proposed by intervenor-defendants, see generally Doc. No. 291, appear to have been crafted in a manner that is inconsistent with *Personhuballah*.

*First*, intervenor-defendants do not address whether their proposals "compl[y] with federal policy disfavoring discrimination against minority voters." *Personhuballah*, 155 F. Supp.

2

3d at 564. Indeed, intervenor-defendants' first proposal (HB 7002) explicitly *disclaims* any consideration of "racial data" on the theory that "[o]ne set of racial goals should not be replaced by another." Doc. No. 291 at 5. That approach is inconsistent with the court's analysis in *Personhuballah*, which expressly considered whether the remedial plan maintained "the ability" of "minority voters . . . to elect their preferred candidate." 155 F. Supp. 3d at 565 (internal quotation marks and citation omitted), and relied on a racially polarized voting analysis for the conclusion that the remedial plan in that case was consistent with Section 2 and Section 5 of the Voting Rights Act. See *id.* at 565. Intervenor-defendants do not refer to any such analysis in their narrative submission. As a result, the black voting age population in the redrawn districts under intervenor-defendants' plans is unjustified because it is unknown whether the plans proposed by intervenor-defendants remedy the unconstitutional racial gerrymander in a manner that vindicates the purposes of the Voting Rights Act.

*Second*, intervenor-defendants expressly sought to preserve the General Assembly's preferred partisan split. Doc. No. 291 at 8 (stating that, for HB 7002, "changes necessitated by the Court's opinion . . . were conducted to preserve the political makeup of neighboring districts"); accord *id.* at 10 (stating that HB 7003 "preserv[es] the political makeup of the neighboring districts"). In *Personhuballah*, however, this Court expressly declined to attach any weight to partisan political considerations. See *Personhuballah*, 155 F. Supp. 3d at 564 ("[The court] ha[s] found no case holding that we must maintain a specific political advantage in drawing a new plan . . . ."); accord *id.* at 566-67 (Payne, J., concurring) (explaining why "a district court cannot" be "obligated to maintain [a specific] partisan split" and thereby "effect a political gerrymander"). Because partisan balance is the baseline against which intervenor-

3

defendants' crafted their proposals, the court and the special master should disregard these proposed remedial plans.

  b. Unlike the plans submitted by intervenor-defendants, plaintiffs' two proposed plans, see Doc. No. 292, appear to have been developed based on the factors identified in *Personhuballah*. See *id.* at 5 ("Plaintiffs followed the basic approach that Special Master Dr. Bernard Grofman followed in the [*Personhuballah*] litigation.").

  Specifically, plaintiffs expressly considered whether reducing black voting age population in the challenged districts would lead to "retrogression in the ability of African Americans to elect candidates of choice." Doc. No. 292 at 6. Although it is not clear whether plaintiffs conducted a racially polarized voting analysis for either of their proposals, plaintiffs do reference an analysis that was conducted by Dr. Maxwell Palmer at the merits phase. *Id.* Plaintiffs do not, however, address how their proposals further the purposes of Section 2 of the Voting Rights Act. See *Personhuballah*, 155 F. Supp. 3d at 564–65 (discussing Section 2-related considerations).

  Plaintiffs did not include partisan composition as an express consideration in crafting their plans. Plaintiffs did, however, ensure that incumbents would not be paired together in a single district. See Doc. No. 292 at 5, 10 n.6. That step is consistent with *Personhuballah*, where the court ordered the special master to avoid pairing incumbents. See Order at 2, *Personhuballah v. Alcorn*, No. 3:13–cv–678 (E.D. Va. Oct. 22, 2015), Doc. No. 263; see also Report of Special Master at 23, *Personhuballah v. Alcorn*, No. 3:13–cv–678 (E.D. Va. Nov. 16, 2015), Doc. No. 272.

  c. Virginia NAACP's proposed plan likewise appears to comply with *Personhuballah*.

Compared to other proposals, Virginia NAACP's proposal focused on communities of interest. Doc No. 286 at 5. Specifically, the Virginia NAACP incorporated "meaningful, on-the-ground knowledge of the affected communities as provided by Virginia NAACP members," who "informed the Virginia NAACP that the[ ]" proposed districts "make sense." *Id.* Accounting for communities of interest is consistent with the criteria used in *Personhuballah*. See 155 F. Supp. 3d at 561 (referring to "communities of interest" as a "[t]raditional districting principle[ ] in Virginia") (internal quotation marks and citation omitted).

Moreover, the Virginia NAACP's plan reduces the black voting age population across the challenged districts in a way that the Virginia NAACP states will not "degrad[e] the ability of black voters to elect their candidate of choice in those districts." Doc. No. 286 at 5–6. As discussed, preserving the minority's ability to elect a candidate of choice is an important consideration for the Court in deciding on the appropriate remedial plan. See *Personhuballah*, 155 F. Supp. 3d at 564–65 (stating that it is appropriate to ensure that a remedial plan "honors the principles underlying Section 2 and 5 of the Voting Rights Act"). We note, however, that the Virginia NAACP does not directly refer to a racially polarized voting analysis to support its "legal opinion" that the proposed plan will not harm black ability to elect a candidate of choice. Doc. No. 286 at 5. Indeed, Virginia NAACP appears to be relying on anecdotal evidence that the changes to the black voting age population in the challenged districts will not prevent minority voters from electing a candidate of choice. *Id.* at 8 ("[T]his kind of inquiry is also helpfully informed by talking to voters in the proposed district to understand how and if voters of color in the proposed district work together and share common interest . . . ."). Although there is no obvious reason to doubt the correctness of Virginia NAACP's statements, our view is that a

racially polarized voting analysis is necessary to determine whether a proposed remedial plan is consistent with the goals of the Voting Rights Act.

D. Lastly, the College of William & Mary and the William & Mary Law School submitted two proposed plans. The narrative explanations for these plans were not filed through CM/ECF, but are accessible through the submissions posted by DLS.[2]

With respect to the "Team Owens Redistricting Plan," the plan "generally ignore[s] incumbent residency." Team Owens Narrative at 2. As noted earlier, that is a departure from what the court required in *Personhuballah*. The Team Owens proposal did, however, consider compliance with the Voting Rights Act after first drawing the map without consideration of race. Team Owens Narrative at 2, 4. That approach is consistent with *Personhuballah*, and it appears that the proposal was generally supported by an analysis roughly akin to a racially polarized voting analysis. *Id.* at 4.

With respect to the "Team Democracy Redistricting Plan," the narrative submission is insufficient to determine whether the proposal complies with the criteria established in *Personhuballah*. For example, it is unclear whether the proposal pairs incumbents, was concerned with partisan balance, or was evaluated in connection with a racially polarized voting analysis.

\* \* \*

In sum, our view is that the Court should follow the approach laid out in *Personhuballah* for selecting a remedial plan in this case. Based on an initial assessment of the narratives accompanying the various proposals, we submit that the plans created by the intervenor-defendants and "Team Democracy" are inconsistent with the requirements established in

---

[2] http://redistricting.dls.virginia.gov/2010/court-ordered-redistrictingH.aspx.

*Personhuballah* and should generally be disregarded. The remaining plans, however, appear to generally be consistent with *Personhuballah* and warrant further scrutiny by the special master.

              Respectfully submitted,

          By:   /s/
            Matthew R. McGuire, VSB # 84194
            Principal Deputy Solicitor General
            Office of the Attorney General
            202 North Ninth Street
            Richmond, Virginia 23219
            (804) 786-7773 – Telephone
            (804) 371-0200 – Facsimile
            mmcguire@oag.state.va.us

Mark R. Herring
Attorney General of Virginia

Toby J. Heytens, VSB # 90788
Solicitor General
E-mail: theytens@oag.state.va.us

## CERTIFICATE OF SERVICE

      I hereby certify that on November 16, 2018, a true and accurate copy of this paper was filed electronically with the Court's CM/ECF system, which will then send a notification of such filing to the counsel of record in this case

                                      By:  /s/
                                               Matthew R. McGuire