IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| Golden Bethune-Hill, *et al.*,<br><br>         Plaintiffs,<br><br>    v.<br><br>Virginia State Board of Elections, *et al.*,<br><br>         Defendants. | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |

**Defendant-Intervenors' Objections to Proposed Remedial Plans**

Pursuant to this Court's order of October 19, 2018, ECF No. 278 at 1, requiring the parties and other interested persons to "submit their objections to, if any, and briefs in response to the remedial plans, maps, and briefs submitted on November 2, 2018," Defendant-Intervenors respectfully object to the proposed plans submitted to the Court.

**Preliminary Objection to Remedial Proceedings**

The Supreme Court has now taken this case for plenary review, which will involve district-by-district scrutiny of each of the 11 districts subject to this Court's injunction and *de novo* review of its predominance and narrow-tailoring legal tests. There is no reason to proceed with further remedial proceedings because a map issued at this time will be of no use. If the Supreme Court reverses on even one district, a remedial map issued at this time would need to be redone after the Supreme Court's order. The effort is therefore futile. Moreover, Defendant-

Intervenors object to issuance of a map this late in the decade, with outdated census data for the purpose of only impacting one election.

## Summary of Objections

As stated in Defendant-Intervenors brief in support of their remedial proposals, the governing principle is that the Court must "choose that plan which most closely approximate[s] the state-proposed plan," once the would-be violation is remedied.[1] *Upham v. Seamon*, 456 U.S. 37, 42 (1982). Of the maps proposed, HB7002 must be selected because it most closely approximates state policy while addressing the Court's memorandum opinion in full. That is because the map is narrowly tailored to address the precise lines the Court criticized as evidencing racial motive, without considering racial data in any way. Accordingly, of the plans submitted, HB7002 presents the least change from the 2011 Plan, while remedying in full the supposed racial impact on lines.

The other proposed maps make freewheeling policy choices based on abstract notions of good districting, but they pay little head to the *valid* policy choices actually reflected in the 2011 plan.[2] Worse, the plans do not remedy the would-be

---

[1] Defendant-Intervenors continue to contest liability and reference legal violations for the sake of argument only.

[2] That is where the brief of the group "New Virginia Majority" goes wrong. *See* ECF No. 299. The brief is a wish list of someone's notion of good redistricting ideas. But the Court is not free to implement whatever it may view as good ideas. It is restricted to state policy except as necessary to remedy the violation. The Court should not consider New Virginia Majority's proposed plans because the organization missed the deadlines, and Defendant-Intervenors (and other case participants) have not had an opportunity to analyze the proposals.

violation because the other participants either admit that race was considered or say nothing on the subject, but provide no basis for evaluating the *degree* of racial consideration and impact on lines or the strong basis in evidence required to support district-specific racial choices. The Court and other participants are left to take on faith the boilerplate representations that race did not predominate and that the use of race was tailored. If that were the appropriate level of analysis, the 2011 Plan would have passed because its proponents did not believe race predominated (it did not) and they believed their use of race was tailored under VRA § 5 (it was), a compelling state interest in 2011. The same level of scrutiny applies to the proposed maps, and without further information, the Court can neither approve nor rely on any of them. Only HB7002 is supported by sworn testimony that race received *no* weight and therefore could not have predominated.

Moreover, some of the plans suffer from blatant defects. The NAACP's plans have already been identified by the Court as containing problems that must be fixed. Because NAACP will resubmit amended plans at a later date, Defendant-Intervenors reserve objections to any such plans until they are re-submitted. The plans submitted by William & Mary Law School are also defective because they use the wrong census data and fail to comply with the plus-or-minus one percent deviation requirement.

Accordingly, because HB7002 is the only plan that remedies what the Court deemed to be violations and involves the least change from the 2011 Plan, the Court is legally obligated to adopt it, if it even acts at this time.

## I. Specific Objections to William & Mary Law School Proposals

William & Mary Law School submitted two remedial proposals that, while commendable efforts from an education gem of our Commonwealth, do not merit consideration here. Their most obvious defect is that they are only partial plans and therefore cannot serve the entire Commonwealth.

Another obvious defect is that they use the wrong census data. As Delegate Jones testified at trial, the Census Bureau's initial release of decennial census numbers was defective because the Bureau miscoded census blocks in the Norfolk area and allocated tens of thousands of residents into the wrong census blocks. 1 Tr. 276:4–22. This means that anyone using that census data would wrongly believe that thousands of persons were placed in one district when they were actually in a different district. As Delegate Jones testified, redistricting could not proceed under that error. Thus, the Census Bureau reissued corrected data that formed the basis of the 2011 Plan.

The William & Mary Law School proposals, however, use the incorrect data. Even though the map-drawers believed they had the correct data, both of these partial non-statewide plans, once integrated into the base of the enacted plan, had numerous districts that were beyond plus-or-minus one percent of the ideal population. The maps therefore fail under the plus-or-minus one percent criterion.

A further problem is that the William & May Law School proposals are supported with only cursory explanations of purpose that afford no basis to ensure that race did not predominate and that any predominant use of race is narrowly tailored. For example, the "Team Owens" plan references instances where "BVAP

4

needed to be increased" and suggests the intentional creation of "influence districts" where race was considered in some unknown way. *See* Team Owens Narrative at 2 and 4.[3] There is no explanation of why creating influence districts is required by the Voting Rights Act or by an adopted Virginia state policy, and the evidence in this case and the legal doctrine under the Voting Rights Act all suggest to the contrary. And, to the extent VRA § 5 is the basis for race-based maneuvers, there is no explanation of why that is a compelling state interest when Virginia is no longer a § 5 covered jurisdiction. The Team Democracy Plan, meanwhile, has only a cursory narrative with information of no use to this Court.

For these reasons, there is too little information to assess predominance or narrow tailoring. And that information cannot be gleaned from looking at the plan or analyzing its metrics because the type of legal violation at issue here manifests itself in "racial purpose" not "its stark manifestation." *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 798 (2017).

It is clear, however, that the maps reflect no effort to address, line-by-line, the Court's opinion as HB7002 does. And, by other objective metrics, the William & Mary Law School plans are exceptionally weak. For example, each plan splits over 250 VTDs, compared to 99 split VTDs in HB7002. And the plans pair 14 and 10 incumbents, respectively. *See* Exhibits A and B, Incumbent Pairings for Respective

---

[3] Statements on the William & Mary Law School plans appears not to have been submitted to the Court or served on Defendant-Intervenors' counsel, and was only discovered by counsel online late in the process for review.

William & Mary Plans. Some districts in these plans are quite non-compact, resulting in single-digits for Polsby-Popper, which are meaningfully below the scores approved in Virginia Supreme Court precedent.

These maps do not meet the legal requirements necessary for a remedial plan, and the Court should neither adopt nor rely on them.

## II. Specific Objections to Plaintiffs' Proposals

Plaintiffs propose two maps that are likewise inferior to HB7002.

First, as to remedying the violation, neither of Plaintiffs' proposals even purports to target the issues identified in the Court's Memorandum Opinion. Instead, Plaintiffs state vaguely that they tried to achieve "good government criteria." ECF No. 292 at 7 (quotations omitted). But the remedial phase is not an opportunity for everything "good" in "government." "The Constitution does not mandate regularity of district shape." *Bush v. Vera*, 517 U.S. 952, 962 (1996). And, because suspect racial motive can exist independent of district shape, *Bethune-Hill*, 137 S. Ct. at 798, remedying improper motive is not simply a matter of drawing tidy districts. The remedy must target the "direct and significant impact" racial motive allegedly had on lines. *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1271 (2015). HB7002 does that by addressing the Court's actual concerns, not by shooting for abstract "good government" ideals.

Plaintiffs' approach is even worse because Plaintiffs represent that the undisclosed map-drawers *used race* in the remedial plan. ECF No. 292 at 7 ("Plaintiffs then…did basic backstopping of the resulting maps by ensuring the resulting maps were non-retrogressive"). This reference is simply too vague for the

6

Court to evaluate Plaintiffs' assertion that race did not predominate. Which lines were changed because of racial motive? When were they changed? Why were they changed? The Court is left to guess from the maps themselves, which do not necessarily answer that question. *Bethune-Hill*, 137 S. Ct. at 798.

Plaintiffs' proposal is, then, unlike HB7002 as to which the Court has sworn testimony from the map-drawer (Delegate Bell) that he did not use racial data to draw the map. Plaintiffs' proposal has been prepared by an unknown cartographer who admits to using race with no further detail, on the expectation that the Court take vague statements of non-predominance on faith.

Furthermore, it is unclear why race was used. Apparently, Plaintiffs believe some type of "non-retrogression" standard applies. ECF No. 292 at 7. But they would need to identify "good reasons" for the Court to believe a violation of VRA § 5 would result from a race-blind plan. *Bethune-Hill*, 137 S. Ct. at 800. It is anyone's guess what those "good reasons" might be when Virginia is no longer a covered jurisdiction under VRA § 5. And, if VRA § 5 does apply, Plaintiffs have failed to show non-retrogression because the analysis they rely on does not prove that their BVAP levels preserve the ability of black voters to elect their preferred candidates as compared to the benchmark districts. The analysis they cite did not purport to identify the levels necessary for that purpose.

Second, Plaintiffs' proposals fare worse than HB7002 in honoring the legitimate state policies of the 2011 plan. HB7002, on average, has better retention of Virginia residents in their same districts as compared to both of Plaintiffs'

proposals, meaning Plaintiffs' districts change more than those in HB7002. *Compare* Exhibits C and D, Population Changes for Plaintiffs' Proposals *with* Exhibit E, Population Changes for HB7002. Further, Plaintiffs' proposals change more total districts (33 and 32, respectively) than HB7002 changes (30). HB7002 includes no district changed by more than 50%; both of Plaintiffs' proposals contain districts with over 50% change. And, in HB7002, 8 districts have less than 10% change. HB7002 accomplishes all of this by maintaining similar compactness scores with Plaintiffs' proposals and with no use of race.

Accordingly, HB7002 is the most tailored option of the three proposals. Its lines directly address the Court's memorandum opinion, and change the least from legitimate policy choices. It therefore meets the governing legal test as the necessary plan for adoption. At a minimum, it merits extensive consideration in the special master's preparation of his remedial plan.

## Conclusion

The Court should adopt HB7002 or HB7003, not any other plan proposed in this matter.

Dated: November 16, 2018

Respectfully Submitted,

*/s/ Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of November, 2018, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.

/s/ Katherine L. McKnight
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*