IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

GOLDEN BETHUNE-HILL, *et al.*,

      Plaintiffs,

  v.

VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,

      Defendants.

Civil Action No. 3:14-cv-00852-REP-AWA-BMK

## PLAINTIFFS' OBJECTIONS AND RESPONSES TO PROPOSED REMEDIAL PLANS SUBMITTED BY INTERVENORS AND NON-PARTIES

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................. 2

III.    ARGUMENT ...................................................................................................... 3

    A.      The Court Should Reject Intervenors' Proposed Plans ................................... 3

        1.      The Court Should Reject Intervenors' Request that the Court Adopt a Remedial Plan Designed with the Overriding Purpose of Advancing Political Goals .............................................................. 4

        2.      Intervenors' Claim that the 2011 Legislature Enacted a Plan to Ensure Districts Had a Specific Political Outcome Is Unsupported by the Record .................................................................. 6

        3.      Intervenors' Narrow Emphasis on Modifying Specific Lines Discussed in the Court's Memorandum Opinion Fails to Remedy the Underlying Constitutional Violation .............................. 9

        4.      Both of Intervenors' Proposed Remedial Plans Are Objectively Inferior to Plaintiffs' Proposed Remedial Plans ................................ 10

            a.      Intervenors' Proposals Split Far More Political Subdivisions Than Plaintiffs' Proposed Plans ....................... 10

            b.      Intervenors' Proposed Districts Are Not as Compact as Those in Plaintiffs' Plans ...................................................... 12

    B.      The Court Should Choose Plaintiffs' Proposal Over the Plans Submitted by Non-Parties .................................................................... 14

        1.      The Court Should Reject Plans That Were Not Timely Served Pursuant to the Court's October 23, 2018 Order and That Do Not Comply with Basic Redistricting Requirements ........................ 14

        2.      The NAACP Plan ................................................................... 15

IV.     CONCLUSION .............................................................................................. 17

## I. INTRODUCTION

Plaintiffs respectfully submit this memorandum to address the proposed remedial plans submitted by Intervenor-Defendants ("Intervenors") and non-parties pursuant to the Court's Order dated October 19, 2018 (Dkt. No. 278).

Intervenors offer two plans that were proposed by Republican delegates in the recent special session that were not passed (or even voted on) by the House. Both are fatally flawed, as they are premised on the contention that the primary objective of HB 5005 (the enacted plan) was to create a particular partisan composition in particular districts, and the Court must preserve that same partisan composition in a remedial plan. But as a three-judge panel of this Court unanimously determined in *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552 (E.D. Va. 2016), following well-established law, courts drawing remedial plans should not and cannot strive to achieve particular partisan ends. Further, this claim is not factually supported—it is at odds with the 2011 House criteria and finds no support in either the trial evidence or the evidence Intervenors submit in support of their plans.

Even if Intervenors' proposals were not premised on a fundamentally flawed central conceit, neither of Intervenors' proposals should be adopted. Intervenors' approach to the remedial process—reversing only the discrete deviations from traditional districting principles specifically identified by the Court as evidence of the racial gerrymander—misunderstands both the nature of the violation and the purpose of a remedy. Additionally, given their overriding focus on pursuit of their political goals, Intervenors stray significantly from traditional redistricting principles, showing in particular the same disregard for political subdivisions that the Court strongly criticized in its Memorandum Opinion. By contrast, Plaintiffs' proposed remedial maps outperform both of Intervenors' proposals with respect to respect for political subdivisions and compactness. The Court should reject Intervenors' proposals in favor of one of Plaintiffs' remedial plans.

Two non-parties submitted proposals—the Virginia State Conference of NAACP Branches ("NAACP") and two teams of students at William and Mary Law School. As to the student proposals, the data files for the plan were not timely served on Plaintiffs as required by the Court and, in any event, both plans contain non-contiguous territory and fail to adhere to the 1% population deviation standard that the Special Master has indicated he will follow barring unusual circumstances, which do not exist here. As to the NAACP Plan, there is frankly much to like. The analytical framework used by the NAACP follows the approach of the Special Master in *Personhuballah*. The resulting districts remedy the racial gerrymander for reasons the NAACP describes in its brief. While, on balance, Plaintiffs believe their plans offer the best remedial path forward, they would not object to use of the NAACP Plan as a starting point for the Court's remedial map, although it appears the NAACP Plan has some technical issues and shortcomings that the Special Master should or would need to address.

For all the reasons stated below and in their opening memorandum, Plaintiffs respectfully ask the Court to adopt one of their proposed remedial plans.

## II.      BACKGROUND

The Court ordered the parties and interested non-parties to submit proposed remedial plans by no later than November 2, 2018, with accompanying data and supporting memoranda. *See* Dkt. No. 278. Defendants elected not to submit a proposed remedial plan. *See* Dkt. No. 290. Plaintiffs submitted two proposed remedial plans. Dkt. No. 292. So did Intervenors, who offered House Bills 7002 and 7003 as introduced during a 2018 special session. *See* Dkt. No. 291.

Two non-parties also introduced proposed remedial plans. The NAACP submitted a plan along with a supporting brief. Dkt. No. 286. Two teams of students from William and Mary Law School apparently provided data files to the Court on November 2, although they did not and have not served Plaintiffs (and presumably others), as required by the Court's Order. Dkt. No. 278 ¶ 4.

2

The Court's Order provided an opportunity for those submitting proposed remedial plans to respond to the other remedial plans submitted. Dkt. No. 278 ¶ 2. Plaintiffs provide this response to the other proposed remedial plans submitted to the Court.

## III.    ARGUMENT

Plaintiffs first address the two proposed remedial plans submitted by Intervenors. Plaintiffs then address the plans submitted by non-parties. Other than Plaintiffs' proposed remedial plans, the only other plan that merits the Court's and the Special Master's consideration as a remedy to the unconstitutional gerrymander is that submitted by the NAACP. For the reasons set forth below, all other proposals should be rejected out of hand.

### A.    The Court Should Reject Intervenors' Proposed Plans

Intervenors "assume a 'violation' for the sake of argument only" as they continue to dispute the Court's finding that the Challenged Districts are unconstitutional racial gerrymanders. Dkt. No. 291 at 3 n.4. The proposed remedial plans they reluctantly offer are distinctly unsuited for the task before the Court. Intervenors offer two plans—HB 7002 and HB 7003—introduced in the recent special session by Republican delegates. Neither was passed by the House.

While Plaintiffs maintain that neither plan offered by Intervenors provides an appropriate remedy, Intervenors themselves express a strong preference for HB 7002 over HB 7003. Indeed, Intervenors' brief indicates even *they* do not support HB 7003, suggesting it has "potential flaws for racial gerrymandering," is based on a plan that "is wrong as a remedial approach," and embodies an unknown "racial purpose." Dkt. No. 291 at 10-11. Not only does HB 7003 fail Intervenors' preferred litmus test, Delegate Jones' efforts to refine the plan to "preserve[] the 2011 map's partisan balance," *id.* at 10, renders it objectively inappropriate as a court-ordered remedy, as discussed further below.

HB 7002 fares no better. The plan starts with a flawed premise and then goes from bad to worse. Intervenors candidly admit that the *way* they effected "changes necessitated by

3

the Court's Order" was done "to preserve the political makeup of neighboring districts" so as to "preserve the composition the legislature established in 2011." Dkt. No. 291 at 8. That is, Intervenors drew HB 7002 (and HB 7003) to achieve specific partisan outcomes in specific districts. Then, too, Intervenors did not set out to reverse the problem found by the Court— that the Challenged Districts were drawn with an unjustified and predominant racial purpose. Rather, Intervenors instead made cosmetic alterations to tidy up the *circumstantial evidence* of that racial purpose by altering some of the specific lines discussed by the Court in its Opinion.

The Court should reject this approach, which is wrong as a matter of law, unsupported as a matter of fact, and was rejected by Special Master Grofman and a three-judge panel of this Court in *Personhuballah*. Adopting either of Intervenors' proposed plans would propel the Court deep into the political thicket to make fine-tuned political calculations. Moreover, Intervenors' predominant political purpose manifests in unnecessary departures from traditional good government criteria.

1. **The Court Should Reject Intervenors' Request that the Court Adopt a Remedial Plan Designed with the Overriding Purpose of Advancing Political Goals**

Intervenors assert that their proposed remedial plans were drawn "to preserve the political makeup of neighboring districts." Dkt. No. 291 at 8. While the purported basis of this invented criterion is unclear, Intervenors seem to contend that the General Assembly passed the enacted plan to advance the specific political goal of drawing particular districts to achieve specific political outcomes. *See id.* ("This goal was . . . to preserve the composition the legislature established in 2011 by an overwhelming bi-partisan vote."). Intervenors go on to suggest that the purported partisan predilections of the 2011 legislature must be preserved by any court-ordered remedy. *Id.* Even if Intervenors' position was supported by the facts (which as discussed in the next section, is not the case), it is not supported by the law: Courts

do not put politics at the forefront and draw remedial maps designed with the overriding objective of achieving defined partisan ends.

Indeed, all three members of the three-judge panel in *Personhuballah* rejected precisely the argument Intervenors advance here. In that case, as here, the intervenors argued that the Court was required to adopt a remedial plan that would achieve the same partisan balance as under the enacted plan. Special Master Grofman, in articulating different conceptions of a "least change" plan, considered and rejected the argument that it was "obligatory for [him] to propose to the Court plans that were intended to freeze into place partisan political outcomes" inuring under the enacted plan. *See Personhuballah v. Wittman*, No. 3:13-cv-00678, Report of the Special Master, Dkt. No. 272, at 24-25 (Nov. 15, 2015).

All three members of the three-judge panel embraced that conclusion. *See Personhuballah*, 155 F. Supp. 3d at 563-64 (rejecting claim that "adopting a plan consistent with the General Assembly's policies requires maintaining" the existing political performance of districts). Judge Payne, writing separately and concurring on this point, explained at length why a court cannot "effect a political gerrymander" in the circumstances presented here. As Judge Payne noted, the "courts have unanimously agreed that political considerations 'have no place in a plan formulated by the courts.'" *Id.* at 566-67 (Payne, J., dissenting in part and concurring in part) (quoting *Wyche v. Madison Parish Police Jury*, 769 F.2d 265, 268 (5th Cir. 1985)).[1] To avoid "political entanglements," even limited political considerations like avoiding pairing incumbents are to be treated as "distinctly subordinate"

---

[1] *See also Larios v. Cox*, 306 F. Supp. 2d 1214, 1218 (N.D. Ga. 2004) ("[I]n the process of adopting reapportionment plans, the courts are 'forbidden to take into account the purely political considerations that might be appropriate for legislative bodies.'") (quoting *Wyche*, 635 F.2d at 1160); *Peterson v. Borst*, 789 N.E.2d 460, 463 (Ind. 2003) ("A court . . . must . . . determine whether adoption of one of the plans would improperly introduce political considerations into the judicial process."); *Smith v. Clark*, 189 F. Supp. 2d 529, 537 (S.D. Miss. 2002) ("[P]olitical considerations are inappropriate for a federal court to consider when drafting a congressional redistricting plan."); *Corbett v. Sullivan*, 202 F. Supp. 2d 972, 973-74 (E.D. Mo. 2002) (noting that plan adopted by the court "does not consider the political consequences because that is not the proper role for a Court); *Below v. Gardner*, 963 A.2d 785, 793 (N.H. 2002) ("[P]olitical considerations may be permissible in legislatively-implemented redistricting plans, [but] they have no place in a court-ordered remedial plan.").

to neutral redistricting criteria. *Id.* at 567 (quoting *Larios v. Cox*, 314 F. Supp. 2d 1357, 1361 (N.D. Ga. 2004)).

Indeed, it would be particularly inappropriate to torture the lines of a remedial plan to achieve the 2011 legislature's supposed political objectives given the Court's finding that race was used as a proxy for political ends in the enacted plan. Dkt. No. 234 ("Mem. Op.") at 33; *see also id.* at 81 ("[W]e hold that the legislature's reliance on race as a proxy for political affiliation is subject to strict scrutiny."). "Remedying" such a racial gerrymander by tweaking a few lines that evinced the legislature's use of race while calcifying the political advantage wrought by the improper use of race is akin to "remedying" a jewel heist by having the thief tidy up the crime scene but keep the pilfered diamonds.

In sum, even assuming the legislature had an overriding goal in 2011 of drawing districts to achieve particular partisan ends, the only way to incorporate such political considerations in a remedial plan is if the legislature enacted a remedy. Here it did not. The Court should not remedy the constitutional violation by reference to Intervenors' *post hoc* claims about the General Assembly's supposed political goals. This Court should decline Intervenors' invitation to embroil itself in partisan political machinations.

> ### 2. Intervenors' Claim that the 2011 Legislature Enacted a Plan to Ensure Districts Had a Specific Political Outcome Is Unsupported by the Record

As a factual matter, moreover, Intervenors' contentions about the 2011 "state policy" regarding the partisan composition of the districts are unsupported.

The Court already considered and rejected any suggestion that political rather than racial considerations predominated in the Challenged Districts (and thus in those bordering the Challenged Districts). *See, e.g.*, Mem. Op. at 81 ("[W]e credit Dr. Palmer's unequivocal conclusion that race rather than party predominated in the challenged districts[.]"). The Court could hardly have concluded otherwise.

6

For starters, the 2011 House Criteria that guided redistricting will be searched in vain for any criterion, let alone an overriding one, that particular districts were to be drawn to achieve particular political ends. Pl. Ex. 16. The House Criteria most certainly do not state overtly that the General Assembly set out in 2011 to draw districts that would roughly approximate the vote share between the two parties, which is the kind of potentially legitimate state interest that might warrant rejecting a *challenge* to an existing plan, as in *Gaffney v. Cummings*, 412 U.S. 735, 754 (1973). *Gaffney* is thus inapposite on both factual and procedural grounds. Unlike here, that case did not concern a court-ordered remedial plan. Rather, it upheld a plan from constitutional challenge where the legislature "overtly" drew districts that deviated from true population equality in part so that the overall plan would achieve "political fairness" by roughly approximating the state vote share of the two major political parties, *id.* at 738. Again, the House Criteria say nothing of the sort here.[2]

It is thus unsurprising that Intervenors cite no evidence from 2011 supporting their current *post hoc* arguments. Instead, Intervenors' evidence that this was the legislative purpose in 2011 comes from one sentence in paragraph 18 of a 2018 declaration from Delegate Bell. *See* Dkt. No. 291-01 ¶ 18. But Delegate Bell's testimony is that he sought "to preserve the political composition of competitive districts as reflected in the 2011 plan." *Id.* Thus, Delegate Bell did not state that the enacted plan was *drawn to* achieve a "political composition" in certain districts—he looked at what he believes was *reflected in* the enacted plan, i.e. he looked at the consequences. Any number of things are "reflected in" the enacted plan. But the fact that, say, a given street was included in District 76 does not reflect a

---

[2] The fact that the plan was enacted in 2011 "by an overwhelming bi-partisan vote," Dkt. No. 291 at 8, is irrelevant to whether the plan was enacted pursuant to a state policy of "political fairness" as in *Gaffney*. Whether or not members of the minority party chose to cast a protest vote in opposition to the enacted plan says nothing about the motivations of the mapdrawer.

"policy" that this street should be in District 76. That's just a *consequence*. So too, on this record, are the political *consequences* of the way the plan was drawn in 2011.[3]

Further, it would be difficult for the Court to implement Intervenors' political schemes. It is utterly unclear what Intervenors did for political reasons in what districts. Intervenors say in their brief that HB 7002 was drawn to broadly protect the partisan composition of the "neighboring districts." Dkt. No. 291 at 8. Delegate Bell, meanwhile, speaks only of "competitive districts," Dkt. No. 291-01 ¶ 18; *see also id.* ("I used political data in an effort to ensure that the political makeup of such districts was not significantly changed from the 2011 plan."), but without identifying which districts he believes are "competitive districts," the methodology he used to determine what "competitive" means, or that the General Assembly in 2011 shared the same (or any) understanding of "competitive" districts and set out to draw specific districts as "competitive."

Thus, even assuming there was any factual support for their position, Intervenors give the Court nothing to go on in actually implementing it. That is, what does it mean for the Court to "preserve" the partisan composition of a given district? For example, if 43% of voters in the district cast a ballot for President Obama in 2008, must the Court ensure the redrawn district also contains a 43% 2008 Obama vote? Could the Court draw a district with a 45% Obama vote? Does the Court look at only one election, or would it need to aggregate multiple election results before determining that it has successfully "preserved" the partisan composition of the district? As explained above, courts do not draw plans to achieve partisan outcomes precisely because they are ill-equipped to make these kinds of inherently political calculations.

---

[3] Delegate Bell's statement that he "was present during the 2011 redistricting process," moreover, says nothing about his knowledge of the "state policies" that drove the enacted plan. If Delegate Bell had specific information about the auspices of the enacted plan, he presumably would have been identified by Intervenors as a witness at trial.

In sum, the notion that the 2011 legislature sought to achieve a specific partisan composition in specific (unidentified) districts is as illusory as it is improper as a criterion for a court-drawn remedy. The Court should reject Intervenors' claim that the remedial process is straightjacketed by the partisan consequences that inured from the 2011 enacted plan.

### 3. Intervenors' Narrow Emphasis on Modifying Specific Lines Discussed in the Court's Memorandum Opinion Fails to Remedy the Underlying Constitutional Violation

Intervenors' proposed plans fail not only for the flawed political premise on which they are based but also for their gross misunderstanding of the nature of the underlying violation for which a remedy is required. Intervenors' myopic approach of simply tweaking the specific twists and turns of the district boundaries identified by the Court as circumstantial evidence of the racial gerrymander fails to cure the constitutional violation inflicted by the 2011 legislature when it improperly "use[d] race as a basis for separating voters into districts," *Miller v. Johnson*, 515 U.S. 900. 911 (1995).

By their own admission, Intervenors' approach to remedying violations in the enacted plan was simply to "rework[] lines" the Court "identified as race-based maneuvers." Dkt. No. 291 at 4. After compiling a "list of race-based decisions identified by the Court," Delegate Bell attempted to "undo" as many of those line-drawing decisions as possible, "succeed[ing] in remedying" some 80% of them. *Id.*

But the racial gerrymander of the Challenged Districts is not a set of Lego instructions that can be "reverse engineer[ed]," *id.* 5, to resolve the underlying violation. Rather, the circumstantial evidence identified by the Court is just that—*evidence* of the constitutional violation, not the violation itself. *See Miller*, 515 U.S. at 914 ("[I]t is the presumed racial purpose of state action, *not its stark manifestation*, that [is] the constitutional violation.") (emphasis added). Intervenors' decision to limit their "remedy" to the specific splits and jags identified by the Court is not only underinclusive—Intervenors have no basis to assume that those line-drawing decisions comprise the universe of "race-based

maneuvers" in the Challenged Districts[4]—it also misses the mark entirely, as it improperly fixates on "particular portions of the lines" rather than the "design of the district as a whole." Mem. Op. at 79 (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. at 788, 800 (2017). Intervenors' approach to the remedy is just as "mechanical"—and just as unwarranted—as its use of race in drawing the districts in the first place, *Ala. Black Legislative Caucus v. Alabama*, 135 S. Ct. 1257, 1267 (2015).

In short, Intervenors' proposed plans attempt only to conceal the symptoms of the unconstitutional plan, not cure the constitutional violation itself. Particularly when coupled with their overt intent to cement the political ends secured through the racial gerrymander, Intervenors' singular focus on covering their tracks provides no remedy at all.

### 4. Both of Intervenors' Proposed Remedial Plans Are Objectively Inferior to Plaintiffs' Proposed Remedial Plans

Unsurprisingly, given the overriding political considerations admittedly driving their proposals, Intervenors sacrificed adherence with traditional redistricting principles where needed to achieve their political goals. The result is that Intervenors' two plans split more political subdivisions and are less compact than Plaintiffs' proposed remedial plans.

### a. Intervenors' Proposals Split Far More Political Subdivisions Than Plaintiffs' Proposed Plans

Intervenors' proposals are significantly flawed (and inferior to Plaintiffs' maps) because they split markedly more county and VTD lines. The reason is clear and admitted—while Intervenors may have sought to address particular VTD and county splits identified in the Court's order, they contorted district boundaries when necessary to serve their political goals and avoid the natural consequences of redrawing the Challenged Districts. As they explain, when making "changes necessitated by the Court's opinion (and, by consequence,

---

[4] Despite its length, the Memorandum Opinion scarcely purported to summarize *all* improper race-based maneuvers in the enacted plan, nor did it lay out the issues highlighted in the Court's first Memorandum Opinion, which, among other things, detailed at great length various deviations from traditional redistricting criteria. *See generally* Dkt. No. 108.

the equal-population rule)," Intervenors' North Star was to "preserve the political makeup of neighboring districts." Dkt. No. 291 at 9.

The differences between Plaintiffs' proposals and Intervenors' are stark and compelling. When considering the remedial plans as a whole, Plaintiffs split far fewer political subdivisions:

| Number of Political Subdivisions Splits Affecting Population—Planwide | | | | |
|---|---|---|---|---|
| | **HB 7002** | **HB 7003** | **Plaintiffs' Plan A** | **Plaintiffs' Plan B** |
| **# of split counties** | 55 | 58 | **51** | 52 |
| **Total county splits** | 187 | 198 | **173** | 174 |
| **# of split VTDs** | 101 | 124 | **82** | **82** |
| **Total VTD splits** | 193 | 244 | 166 | **165** |

The same is true in the Challenged Districts:

| Number of Political Subdivisions Splits Affecting Population—Challenged Districts | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **District** | **HB 7002 County Splits** | **HB 7002 VTD Splits** | **HB 7003 County Splits** | **HB 7003 VTD Splits** | **Plaintiffs Plan A County Splits** | **Plaintiffs Plan A VTD Splits** | **Plaintiffs' Plan B County Splits** | **Plaintiffs' Plan A VTD Splits** |
| **63** | 1 | 1 | 2 | 4 | 2 | 1 | 2 | 1 |
| **69** | 2 | 2 | 2 | 2 | 2 | 0 | 2 | 0 |
| **70** | 3 | 2 | 3 | 1 | 2 | 2 | 2 | 1 |
| **71** | 2 | 2 | 2 | 3 | 0 | 1 | 0 | 1 |
| **74** | 2 | 3 | 3 | 0 | 0 | 1 | 0 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Number of Political Subdivisions Splits Affecting Population—Challenged Districts** | | | | | | | | |
| **District** | **HB 7002 County Splits** | **HB 7002 VTD Splits** | **HB 7003 County Splits** | **HB 7003 VTD Splits** | **Plaintiffs Plan A County Splits** | **Plaintiffs Plan A VTD Splits** | **Plaintiffs' Plan B County Splits** | **Plaintiffs' Plan A VTD Splits** |
| **77** | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 0 |
| **80** | 2 | 0 | 2 | 1 | 2 | 1 | 2 | 1 |
| **89** | 0 | 2 | 0 | 4 | 0 | 1 | 0 | 1 |
| **90** | 2 | 1 | 2 | 1 | 0 | 1 | 0 | 1 |
| **92** | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| **95** | 2 | 1 | 3 | 1 | 2 | 1 | 2 | 1 |
| **Total** | 16 | 16 | 19 | 16 | 10 | 9 | 10 | 7 |

Intervenors' proposals, apparently, prioritize the pursuit of political ends over respect for political subdivision boundaries. This approach is not only flawed as a legal matter, *see supra* 4-6, it produces a plan that is inferior to Plaintiffs' proposals under an objective evaluation of good government principles.

> **b.      Intervenors' Proposed Districts Are Not as Compact as Those in Plaintiffs' Plans**

If one ignores county and VTD boundaries, which are often not geometrically neat and tidy, one can often improve the compactness of a district. But, here, Plaintiffs split far fewer political subdivisions than Intervenors and *still* drew more compact districts.

When viewed in the aggregate, Plaintiffs' remedial plans are more compact than both of Intervenors' proposals. In the table below, the measurement in bold reflects the most compact plan:

| Measures of Compactness—Planwide Mean[5] | | | |
|---|---|---|---|
| **Plan** | **Reock** | **Polsby-Popper** | **Schwartzberg** |
| **Plaintiffs Plan A** | **.37** | **.26** | **1.89** |
| **Plaintiffs Plan B** | .36 | **.26** | 1.90 |
| **HB 7002** | .36 | 0.25 | 1.96 |
| **HB 7003** | .35 | 0.23 | 2.00 |

Plaintiffs' remedial plans thus are more compact on average. Given that both Plaintiffs and Intervenors limit changes to the Challenged Districts and their environs, this is because Plaintiffs' version of the Challenged Districts—the districts being remedied—are notably more compact than Intervenors' proposals:

| Measures of Compactness—Challenged District Mean | | | |
|---|---|---|---|
| **Plan** | **Reock** | **Polsby-Popper** | **Schwartzberg** |
| **Plaintiffs Plan A** | **.39** | **.33** | 1.73 |
| **Plaintiffs Plan B** | .38 | **.33** | **1.69** |
| **HB 7002** | **.39** | .24 | 2.04 |
| **HB 7003** | .36 | .21 | 2.16 |

Plaintiffs' proposed remedial plans thus are superior to Intervenors' plans in every material respect in accomplishing the specific remedial task set by the Court. Plaintiffs followed the approach of Special Master Grofman in *Personhuballah* by addressing the racial gerrymander of the Challenged Districts, greatly reducing the number of political subdivision splits in the enacted plan, and improving compactness, all while respecting the basic contours

---

[5] Under the Reock and Polsby-Popper measures, the *higher* number indicates a more compact district. Under the Schwartzberg measure, a *lower* number indicates a more compact district.

of the existing districts. Intervenors, meanwhile, submit maps drawn to advance a political objective that is contrary to law and unsupported by the facts. This renders Intervenors' proposed plans unfit for adoption by the Court.

**B.     The Court Should Choose Plaintiffs' Proposal Over the Plans Submitted by Non-Parties**

**1.     The Court Should Reject Plans That Were Not Timely Served Pursuant to the Court's October 23, 2018 Order and That Do Not Comply with Basic Redistricting Requirements**

As an initial matter, the Court should reject and give no consideration to proposed remedial plans that were not timely served on the parties as required by the Court.

In its Order Regarding Submission of Proposed Remedial Plans (Dkt. No. 279), the Court provided the parties—and non-parties who wished to submit proposed remedial plans—with specific instruction for effecting service on the other parties. The Order reads, in relevant part, as follows:

> On November 2, 2018, all Shapefiles and Block Equivalency Files for each proposed remedial plan must be served electronically and in native format on all counsel of record for all parties and on all non-parties or their counsel.

*Id.* ¶ 4.

As of the date Plaintiffs file this memorandum, they have not been served with shapefiles or block equivalency files associated with the two plans presented by the William & Mary Law School non-parties.[6] The Court's Order was crafted carefully to provide a uniform set of rules for the submission of plans that would put all parties on the same, even playing field and provide adequate opportunity to assess and respond to all plans before the Court. Accordingly, given these non-parties' failure to comply with the terms of the Order, the Court should give no consideration to these plans.

---

[6] While Plaintiffs were not timely served on November 2, 2018 (as required by the Order) with the data files for the plans submitted by Intervenors, they were served shortly thereafter. *See* Dkt. No. 294 (ordering intervenors to re-submit their proposed remedial plans in compliance with paragraphs 3 and 4 of the Court's October 23, 2018 order by November 7, 2018).

The Court should also reject these plans due to threshold deficiencies that disqualify them for any consideration by the Court. Specifically, having reviewed data files posted on the DLS website, it appears that the William & Mary plans include multiple districts that stray from population equality by more than plus-or-minus 1%. The Special Master has indicated that "barring unusual circumstances" where he is "unable" to do so, he will propose plans that stay within plus-or-minus 1% population deviation. Dkt. No. 284. Here, as shown by the plans offered by Plaintiffs (and others) no "unusual circumstances" would preclude the Special Master from meeting a 1% population deviation maximum. Further, it appears that the William & Mary plans contain a number of non-contiguous areas. While the students who submitted these plans should be commended for their work, neither plan is an appropriate remedy.

### 2.      The NAACP Plan

The NAACP plan is similar to Plaintiffs' proposals in broad strokes, although the particulars vary. This is unsurprising based on the NAACP's description of its methodology.

As the NAACP explained, its plan was designed to "to remedy the unjustified, predominant use of race" by redrawing the Challenged Districts (and surrounding districts as necessary) to "adhere[] to traditional redistricting criteria" and reduce the number of split political subdivisions and improve compactness while "minimiz[ing] the total number of districts that were changed or altered." Dkt. No. 286 at 5. Unsurprisingly given the General Assembly's arbitrary application of the 55% BVAP rule, the result in most instances was that the BVAP of the Challenged Districts decreased, although the NAACP took care to ensure this would not degrade the opportunity for African-American voters in the Challenged Districts to elect their candidates of choice.

This is what Plaintiffs did as well, as it was the approach taken by Special Master Grofman in *Personhuballah*. It makes sense that parties and non-parties that set out to use traditional redistricting criteria to redraw the Challenged Districts (while avoiding

unnecessarily pairing incumbents) came up with broadly similar plans. But as Plaintiffs noted in their memorandum supporting their own plan, there is not only one way to serve these goals in redrawing the Challenged Districts. Tradeoffs are always needed.

Plaintiffs believe the NAACP offers a plan that could be a useful starting point for the Special Master, although some technical corrections would be required. For example, it appears that the NAACP plan contains a non-contiguous area related to the Prince George Courts Building VTD, and that the NAACP plan may unnecessarily pair incumbents in HD 72 and 73 and HD 89 and 90.[7] It also appears that there may be an issue with way that the NAACP numbered districts in its plan, which the Court has directed should be fixed in an amended proposed plan. *See* Dkt. No. 298.

In addition, there are other ways in which Plaintiffs think their proposals may better navigate required tradeoffs.

Viewed in the aggregate, Plaintiffs' and the NAACP's proposals are essentially a wash in terms of compactness, but the Challenged Districts in Plaintiffs' proposals are generally more compact than the NAACP alternative:

| Measures of Compactness—Challenged District Mean | | | |
|---|---|---|---|
| **Plan** | **Reock** | **Polsby-Popper** | **Schwartzberg** |
| **Plaintiffs Plan A** | **.39** | **.33** | 1.73 |
| **Plaintiffs Plan B** | .38 | **.33** | **1.69** |
| **NAACP** | .36 | .29 | 1.80 |

In addition, Plaintiffs' proposed remedial plans split fewer political subdivisions than the NAACP plan:

---

[7] The NAACP has filed a notice addressing the pairing of incumbents in HD 72 and HD 73. According to Plaintiffs' review of available data, however, the NAACP plan also pairs incumbents in HD 89 and 90.

| Number of Political Subdivisions Splits Affecting Population—Planwide | | | |
|---|---|---|---|
| | **NAACP Plan** | **Plaintiffs' Plan A** | **Plaintiffs' Plan B** |
| **# of split counties** | 58 | **51** | 52 |
| **Total county splits** | 188 | **173** | 174 |
| **# of split VTDs** | 99 | **82** | **82** |
| **Total VTD splits** | 196 | 166 | **165** |

Thus, Plaintiffs' proposed remedial districts are generally more compact and split fewer political subdivisions than does the NAACP proposal. That said, Plaintiffs have reviewed the NAACP's detailed narrative description of the specific rationale used to redraw each Challenged District, and generally find the logic and approach used sound. Dkt. No. 286 at 11-22. In other words, the Special Master and the Court could legitimately find that the tradeoffs made by the NAACP are appropriate, even if they result in a few more splits or a bit less compactness.

For these reasons, while Plaintiffs submit that the Court should utilize one of Plaintiffs' proposed remedies instead of the NAACP's, they would not object to the Special Master drawing from the NAACP plan as a starting point in preparing a plan for the Court's consideration.

## IV.    CONCLUSION

For the reasons stated above, and in their opening memorandum, Plaintiffs respectfully request that the Court adopt one of Plaintiffs' proposed remedial districting plans and reject the proposals submitted by Intervenors and non-parties, although the NAACP Plan is a viable starting point for a remedy. Of all the proposals before the Court, Plaintiffs'

remedial plans best fix the specific unconstitutional racial gerrymander identified by the Court while improving the objective characteristics of the overall map in the course of tweaking districts to achieve population equality. Plaintiffs accordingly submit that the Court should adopt Plaintiffs' Remedial Plan A or Remedial Plan B.

Dated: November 16, 2018                     Respectfully submitted,

                                             By: */s/ Aria C. Branch*
                                                 Marc Erik Elias (admitted *pro hac vice*)
                                                 Bruce V. Spiva (admitted *pro hac vice*)
                                                 Aria Branch (VSB No. 83682)
                                                 **PERKINS COIE** LLP
                                                 700 Thirteenth Street, N.W., Suite 600
                                                 Washington, D.C. 20005-3960
                                                 Telephone: 202.434.1627
                                                 Facsimile: 202.654.9106

                                                 Kevin J. Hamilton (admitted *pro hac vice*)
                                                 Abha Khanna (admitted *pro hac vice*)
                                                 Ryan Spear (admitted *pro hac vice*)
                                                 William B. Stafford (admitted *pro hac vice*)
                                                 **PERKINS COIE** LLP
                                                 1201 Third Avenue, Suite 4900
                                                 Seattle, WA 98101-3099
                                                 Telephone: 206.359.8000
                                                 Facsimile: 206.359.9000

                                                 *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of November, 2018, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.