IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |
|---|---|
| Golden Bethune-Hill, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Virginia State Board of Elections, *et al.*,<br><br>Defendants. | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |

**Memorandum in Support of Renewed Motion for Stay Pending Appeal and Motion for Order Resetting Virginia House Election Dates**

Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*

# Table of Contents

Memorandum in Support of Renewed Motion for Stay Pending
    Appeal and Motion for Order Resetting Virginia House
    Election Dates ................................................................................ 1

Background ............................................................................................... 3

    A.    Posture of the Case ............................................................... 3

    B.    The Upcoming Elections ...................................................... 6

    C.    Defendant-Intervenors' Efforts To Resolve This
        Issue ................................................................................... 11

Argument ............................................................................................... 11

    I.    There Is at Least a "Fair Prospect" That a Majority
        of the Supreme Court Will Reverse the Decision
        Below ................................................................................. 11

    II.    Irreparable Harm Is Likely To Result from a
        Denial of the Stay, and the Balance of Equities
        Favors a Stay ..................................................................... 17

    III.    The Court Should at a Minimum Exercise Its
        Equitable Powers To Reset Election Dates ...................... 20

        A.    The Court Has Power To Change Election
            Dates, and All Equitable Factors Support a
            Change ........................................................................ 21

        B.    A Change in Election Dates Is Workable, and
            the Concerns of State Elections Officials Can
            Be Resolved ............................................................... 25

        C.    Defendant-Intervenors' Proposed Timeframe
            Addresses the Needs of the Case and
            Competing Interests ................................................. 28

Conclusion ............................................................................................. 30

**Memorandum in Support of Renewed Motion for Stay Pending Appeal and Motion for Order Resetting Virginia House Election Dates**

On November 13, the Supreme Court set Defendant-Intervenors' appeal in this matter for briefing and oral argument, which is likely to occur in the Court's February 2019 sitting. That decision changed the nature of this case and the ongoing remedial proceedings. In light of that significant development, Defendant-Intervenors respectfully request that this Court stay the Special Master's efforts to draw a new map pending the disposition of the ongoing appeal.

By ordering briefing and argument on the appeal, the Supreme Court has indicated that the appeal presents substantial federal questions. There are numerous bases on which the Court may reverse as to any of the 11 districts under scrutiny, each of which rises and falls on its own merits. This creates over a thousand ultimate possible outcomes, only one of which is total affirmance. But given the timing, the Court is unlikely to issue a decision in time to implement it before the June primaries should the Court do anything other than affirm. Accordingly, without a stay, there is a substantial risk that primary elections may proceed in June 2019 under a court-ordered map that would have no legal foundation. There is also a substantial risk that any map the Special Master may draw would have to be redone even if the Court were to affirm in some respects, as any result other than complete affirmance would require at least some measure of alteration to take the Court's ruling into account. Under those circumstances, it makes far more sense to stay the Special Master's efforts to fashion a remedy than

to put out a second map that is likely to need to be redrawn, and in the meantime will create substantial voter confusion.

Given that the Supreme Court has now confirmed that the appeal presents substantial questions, Defendant-Intervenors respectfully submit that the equities strongly favor allowing the General Assembly's duly enacted map to remain in place pending the conclusion of the Court's proceedings. But to the extent this Court is concerned that a stay might irreparably harm Plaintiffs, it can resolve the competing interests by postponing Virginia's primary elections and nominating events until September 2019. Indeed, the only reason to issue a remedial map on an expedited basis is the impending June primaries. If those primaries are moved, that will ensure that, however the Supreme Court rules, its judgment (and any judgment this Court will need to render on remand) can be effectuated in time to have practical effect without throwing the 2019 House elections into chaos. This solution would benefit all litigants, all Delegates and potential candidates, and every affected Virginia voter.

Plaintiffs agree that the Court's powers include "postponing various election deadlines, including the candidate filing deadline, when necessary to implement an appropriate remedy." ECF No. 261 at 4. But, when Defendant-Intervenors proposed this alternative solution to Plaintiffs and Defendants, they rejected it. Their position assumes that it is somehow better for the Court to issue an order "postponing various election deadlines" after those deadlines have passed rather than before the Commonwealth's entire election apparatus proceeds in reliance on

2

them. But it is clear *now* that an order and opinion from the Supreme Court will be issued during or around May 2019, so the Court can and should act *now* to accommodate that schedule. Indeed, Virginia is no stranger to postponed primaries: every redistricting year in recent memory (including 2011) has seen a schedule along the lines of what Defendant-Intervenors propose.

Accordingly, Defendant-Intervenors respectfully renew their motion to stay the Court's injunction and ongoing remedial proceedings pending appeal. Alternatively, Defendant-Intervenors respectfully request that the Court order the Virginia State Board of Elections and Commissioner of Elections to conduct the House of Delegates primaries and nominating conventions in September 2019 and that related deadlines, including federal-law deadlines, be postponed as well. In all events, the Court should delay the Special Master's issuance of his proposed remedial map until after the Supreme Court has the opportunity to address any appeal from the Court's ruling on this motion.

## Background

### A.   Posture of the Case

On June 26, 2018, the Court issued a 2–1 decision ruling that 11 of 12 majority-minority districts in the 2011 House of Delegate districting plan are unconstitutional. ECF No. 234. It issued a permanent injunction forbidding the use of all 11 districts in future elections. ECF No. 235. The Court also directed the General Assembly to attempt to pass a remedial map and set deadlines for a court-run remedial proceeding should that attempt fail.

3

On July 6, Defendant-Intervenors filed a notice of appeal to the Supreme Court. ECF No. 237. The same day, they moved to stay this Court's injunction pending appeal. ECF No. 237. On August 30, the Court denied Defendant-Intervenors' motion. ECF No. 256.

On September 4, Defendant-Intervenors filed their jurisdictional statement on this case before the Supreme Court, which perfected the appeal. *See* Sup. Ct. R. 18.3. The jurisdictional statement identifies six questions presented (many with subparts) regarding both the Court's predominance and narrow-tailoring rulings. Each question presented implicates each of the 11 districts this Court invalidated.

Because "the basic unit of analysis for racial gerrymandering claims…is the district," not the entire plan, *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 800 (2017), the Supreme Court will analyze these questions as to each district. The Court may therefore reverse this Court's ruling on any one district and any combination of districts and affirm any one district and any combination of districts. As just one example, it could strike down HD69, HD71, and HD74 and uphold the rest or uphold HD69, HD71, and HD74 and strike down the rest. The Court could also strike down HD77 and HD95 and uphold the rest or vice versa. The Court need not use much imagination to see that the number of possible outcomes is

unmanageable. That is because there are over one thousand mathematically possible outcomes.[1] Only one of those possible outcomes is complete affirmance.

On November 13, the Supreme Court issued an order setting the appeal for briefing and argument. The Supreme Court did not limit the questions presented in Defendant-Intervenors' jurisdictional statement. It added the additional question (based on Defendants' contention that only the Virginia Attorney General may defend state law) of whether Defendant-Intervenors have standing to appeal from the Court's injunction.

Meanwhile, Virginia's Governor announced that he does not believe the General Assembly should redistrict and will not sign any remedy the General Assembly enacts. That brought the legislative remedial process to an impasse. ECF No. 275. The Court then appointed a special master, Dr. Bernard Grofman, to prepare a remedial map and accepted proposals and objections to proposals from parties and non-parties. All of the proposals and the remedial-phase order are oriented towards a single possible outcome of this case: complete affirmance in the Supreme Court. Dr. Grofman is currently scheduled to issue a report and recommendation on or before December 7. The Court scheduled a hearing for January 10.

_____

[1] Calculating the number of ways to partition n objects (e.g., districts) into k sets (e.g., valid or invalid) is done by a "Stirling set." Eric W. Weisstein, Stirling Number of the Second Kind, MathWorld, http://mathworld.wolfram.com/StirlingNumberoftheSecondKind.html (last visited Nov. 28, 2018).

The Supreme Court's 2018 term is well under way, and Defendant-Intervenors' appeal will be briefed and argued this term. The term is scheduled to end the week of June 24. The Supreme Court regularly issues opinions through the last day of the term. Only the justices know beforehand on what day an opinion will issue, and only the justices can determine when that will occur. The Supreme Court, however, has in past cases signaled concern for election-administration challenges and acted to issue decisions to accommodate these challenges. Defendant-Intervenors accordingly intend to inform the Supreme Court that a decision by early May would best facilitate an orderly election process.

### B.    The Upcoming Elections

Virginia state elections occur in odd-numbered years, and elections will be conducted for all House seats in 2019. The 2019 general election date will be November 5, 2019. Political parties may elect to conduct a primary election or nominating event, such as a convention, to place candidates on the ballot. *See* Va. Code § 24.2-509(A), (B).

If a party chooses a primary, it must notify the State Board of Elections between February 6 and February 26, *see* Va. Code § 24.2-516, and conduct the primary on June 11, *see* Va. Code § 24.2-515. Candidates must obtain signatures and meet other requirements to have their names placed on the primary ballot. Va. Code §§ 24.2-521, 24.2-525. The deadline to meet these requirements is 75 days before the primary, Va. Code § 24.2-522(A), or, in 2019, by March 28. Party officials

must certify primary candidates to the State Board of Elections no later than 70 days before the primary, Va. Code § 24.2-527, or, in 2019, by April 2.

If a party elects a non-primary nominating event, it must conduct the event no earlier than April 25 and no later than June 11. Va. Code § 24.2-510. It must certify candidates for the general election by June 16. Va. Code § 24.2-511(A).

As part of the elections process, Virginia normally sends ballots to Virginia-resident service members stationed out of Virginia in alignment with the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA). 52 U.S.C. §§ 20301 *et seq.* UOCAVA contains a provision requiring absentee ballots to be sent to absent service members at least 45 days prior to an election, but the legal force of that provision reaches only elections for "*Federal* office." 52 U.S.C. § 20302(a)(8)(A). The statute defines "Federal office" to include only the presidency, vice presidency, and congressional office. 52 U.S.C. § 20310(3). Virginia law implements similar principles as those UOCAVA implements. It requires that absentee ballots be made "available" at least 45 days before an election. Va. Code § 24.2-612. It requires the state to accept federal write-in absentee ballots and process them in the manner provided by UOCAVA. Va. Code § 24.2-702.1(A). Moreover, Virginia law requires the state to accept and count UOCAVA voters' absentee ballots received after election day when the 45-day rule for sending the ballots is not honored, which functions to allow a 45-day period for absentee ballots to be counted. Va. Code § 24.2-709(B). Thus, although Virginia ordinarily follows the UOCAVA timeframe of sending ballots to absent service members 45 days prior to House of Delegates and

7

other state and local elections, no federal statute requires this. The requirements apply solely by force of state law.

Election efforts normally begin in December of the proceeding even-numbered year. Around that time, officeholders and prospective candidates establish committees in their respective electoral districts to assist candidates in meeting the legal requirements to be on the printed ballots and to obtain support and funding from the public. A potential candidate will normally choose to run in a legislative district only after knowing where the district lines fall. Candidates must reside in the districts they seek to represent, so potential candidates typically evaluate whether their district of residency is one in which they can be competitive, such as by assessing whether their base of support or local community is in their district of residence, whether voters who are likely to disfavor them are in the district, and whether a potential opponent may perform strongly in the district or portions of it. Naturally, candidates expect district lines to remain constant throughout the process, and redistricting can make the difference in the choice to run or not.

By consequence, political parties make decisions about candidate recruitment and funding based on district lines. And voters and supporters of candidates also typically expect continuity from election to election, as they become familiar with incumbents and district residents who express political ambitions.

Accordingly, redistricting in election years presents a public-policy problem. And Virginia is no stranger to this problem because the Census Bureau releases census data between January and March of odd-numbered years, requiring

8

redistricting during Virginia's election year. Moreover, Virginia has for decades been a covered jurisdiction under Section 5 of the Voting Rights Act. So, not only did its plans need to be redrawn through a complex legislative effort after January of the election year, but the Commonwealth also was prohibited from using any districts without obtaining affirmative preclearance from the Department of Justice or the U.S. District Court for the District of Columbia.

Virginia has previously responded to this problem by moving primary elections and nominating events from June to August or September. In 2011, the General Assembly moved the primaries and nominating events scheduled for June 14 to August 23. HB 1507 (Feb. 7, 2011).[2] In 2001, the General Assembly moved the primaries and nominating events scheduled for June 12 to no later than September 11. HB 1536 (April 9, 2000).[3] These bills moved related qualifying and certification deadlines and authorized the Department of Elections to set appropriate deadlines to administer the elections. This process allowed the redistricting and preclearance processes to unfold *before* the election process commenced so that candidates, parties, and voters would have sufficient time prior to elections to understand the

---

[2] Virginia General Assembly, HB 1507 Primary schedule in 2011; moves primary date to August 23, 2011, in anticipation of redistricting, Virginia Legislative Information System, http://lis.virginia.gov/cgi-bin/legp604.exe?111+sum+HB1507

[3] Virginia General Assembly, HB 1536 Primary schedule in 2001, Virginia Legislative Information System, http://lis.virginia.gov/cgi-bin/legp604.exe?001+sum+HB1536

9

new voting districts. The 2011 bill described the state of affairs as "an emergency." HB 1507 § 11(3) (Feb. 7, 2011).

### C.    Defendant-Intervenors' Efforts To Resolve This Issue

To reset election deadlines requires legislation and, consequently, gubernatorial support or acquiescence or veto-proof majority of legislative support. Accordingly, House leadership recently proposed to Governor Northam that the political branches resolve the practical problems confronting the Commonwealth by legislating a solution along these lines. Members of the House presented possible solutions to the Governor and the Commissioner of Elections, who responded that the proposals were, in their view, unacceptable. Among their arguments is that the UOCAVA 45-day deadline for mailing absentee ballots conflicts with officials' ability to implement a primary on a curtailed timeframe in 2019. Members of the House requested counter-proposals to address these issues, but this request was not fulfilled. House leadership never received an alternative proposal for resolving these issues.[4]

Counsel for Defendant-Intervenors contacted counsel for Plaintiffs and Defendants in advance of making this motion and learned that Plaintiffs and Defendants oppose the requested relief in full.

---

[4] Discussions on this topic took well over a week, and the effort to succeed without going to court dictated the timing of this motion.

## ARGUMENT

A stay pending appeal to the Supreme Court is warranted when there is: (1) "a 'reasonable probability' that four Justices will consider the issue sufficiently meritorious to grant certiorari or to note probable jurisdiction"; (2) "a fair prospect that a majority of the Court will conclude that the decision below was erroneous"; and, (3) "a demonstration that irreparable harm is likely to result from the denial of a stay." *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers); *accord Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam). Further, "[i]n close cases[,] the Circuit Justice or the Court will balance the equities and weigh the relative harms to the applicant and to the respondent." *Hollingsworth*, 558 U.S. at 190.

The first element is now satisfied: the Supreme Court has set the case for briefing and argument. The other elements too are met. The Supreme Court has issued stays in cases like this, *see, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 910 (1995); *Abbott v. Perez*, 138 S. Ct. 2305, 2319 (2018), and a stay is warranted.

## I.    There Is at Least a "Fair Prospect" That a Majority of the Supreme Court Will Reverse the Decision Below

The "fair prospect" standard is met for many reasons, many of which Defendant-Intervenors addressed in their initial stay briefing. ECF No. 237 at 3–5, ECF No. 249 at 2–11. Defendant-Intervenors incorporate those arguments and summarize and supplement them here.

**Standing**. Defendants' argument that Defendant-Intervenors lack standing to appeal is weak and likely to fail in the Supreme Court. The argument requires

11

the Supreme Court to reverse its precedent, *see, e.g.*, *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 194 (1972), to rule on state-law separation-of-powers issues contrary to the Supreme Court's practice of deferring to state-court practice, *see Karcher v. May*, 108 S. Ct. 388 (1987), and to hold that, although *any* resident of *any* district can be a redistricting plaintiff, only the state's executive branch can defend. So, in Defendants' view, if the state executive's political interest aligns with the interest of a single district resident willing to sue, the resulting redistricting litigation is an instant checkmate: the executive declines to defend, no one has standing to step into the vacuum, and the legislature that drew the districting plan and is governed by it can claim no injury-in-fact. That view of standing is nonsensical, and Defendant-Intervenors likely will prevail on this threshold question.[5]

**Predominance**. The Court's predominance holdings are vulnerable to reversal. And that is especially clear because one member of this Court dissented from the majority's rulings on each and every one of the 11 invalidated districts.

---

[5] Unsurprisingly, it is common to see legislatures or members of Congress appeal in redistricting litigation. *See, e.g.*, *Karcher v. Daggett*, 455 U.S. 1303, 1303 (1982) (Brennan, J., in chambers) (granting stay in redistricting appeal brought by "the Speaker of the New Jersey Assembly, the President of the New Jersey Senate, and eight Members of the United States House of Representatives from New Jersey"). That legislative bodies have been found to suffer *irreparable harm* from adverse redistricting injunctions and judgments, *see id.* at 1306, proves beyond cavil that they meet the less stringent injury-in-fact test.

12

There is a "fair prospect" that the Supreme Court will agree with that dissenting judge on at least *some* issues on appeal.

Moreover, Defendant-Intervenors respect that the majority views the case as solely factual, ECF No. 256 at 2, but respectfully submit that, were that the Supreme Court's view, it could have reached a summary disposition of the case. It did not. And, indeed, there is no escaping the legal underpinnings of the Court's holding because no court can reach factual conclusions without the guidance of legal standards, and the legal standards here are unsettled. Indeed, if the Court's memorandum opinion were not predicated on legal standards, that would itself be legal error.

Most plainly, the Court's holding that the predominance inquiry looks at the residents *moved* apart from those *retained* is in direct conflict with other three-judge panels, *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp. 2d 563, 590 (N.D. Ill. 2011); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 432 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004); *Robertson v. Bartels*, 148 F. Supp. 2d 443, 45456 (D.N.J. 2001), and in tension with the Supreme Court's command that courts evaluate "all of the lines of the district at issue," *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 800 (2017). "All" does not mean "all except the overwhelming majority of lines kept the same." The other parameters the Court selected to guide its review—such as its choice to ignore geographic population disparities and the relative degree of constraint the House's VRA-compliance target

13

imposed on districting decisions—similarly foreclosed the "holistic" analysis the Supreme Court's precedent requires.

But the Court need not agree with Defendant-Intervenors on these points to see why this stay factor is satisfied. Rather, it is enough to appreciate that each district rises or falls on its own merit, *Bethune-Hill*, 137 S. Ct. at 800, and there is at least a fair prospect of reversal on *some* districts. For example, the Court's opinion concedes that HD92 "had a starting BVAP over 60%" and "improved" from the benchmark under "certain traditional districting factors." ECF No. 234 at 59. The basis for the Court's predominance finding is solely that the district's configuration was "intimately connect" with HD95—which is hardly unusual when they are *contiguous*—and that HD92 received population exclusively from HD95— which is hardly surprising when they are surrounded by water at the tip of a peninsula. *Id.* at 60. But other configurations would have taken the district across political-subdivision lines, and the Court did not find that other configurations would have dropped BVAP below 55%. To say the least, this is an underwhelming example of racial gerrymandering, and there is at least a "fair prospect" that the Supreme Court will view the Court's analysis as too lenient on Plaintiffs, who bear a demanding burden.

Similarly, the Court's choice to subject "donor" districts to strict scrutiny is a departure from the norm in these cases. Although the term "donor" appears to be new in this case (an invention, it seems, of Dr. Rodden), the phenomenon is not new because "the choice to place a significant number of voters within or without a

14

particular district," *Bethune-Hill*, 137 S. Ct. at 797 (quotations omitted), frequently means that this "significant number" came *from* some *other* district, *see, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1466 (2017). The Supreme Court's rulings to date, however, have subjected only the "recipient" district, not the "donor" district, to strict scrutiny. This makes sense because the relevant motive is to reach a target in the *recipient* district, not the *donor* district. But the Court's memorandum opinion treats both donor and recipients as racial gerrymanders because the Court did not address to what degree the 55% BVAP target constrained line drawing in the donor districts. The lack of constraint is why, in the Court's theory, they are donor districts: they have BVAP to spare. This is a novel position, and there is at least a "fair prospect" that the Supreme Court will not uphold the theory or, alternatively, its application in specific districts.

All of this means that, for the Supreme Court to affirm *every* predominance finding, it must agree with this Court on *every* legal conclusion, otherwise it will reverse on some districts. And this does not even account for the factual contentions Defendant-Intervenors raised, which also will have a district-by-district impact. The number of possible outcomes is unmanageable. And only *one* involves complete affirmance. There is at least a "fair prospect" that the actual result here will be one of those *other* thousand outcomes that does *not* involve complete affirmance.

**Narrow Tailoring**. The House's choice to draw districts around or above 55% BVAP is narrowly tailored because Section 5 (at a minimum) affords states the discretion to either (1) "create a certain number of 'safe' districts" or (2) "create a

15

greater number of districts in which it is likely—although perhaps not as likely as under the benchmark plan—that minority voters will be able to elect candidates of their choice." *Georgia v. Ashcroft*, 539 U.S. 461, 480 (2003). And, in fact, drawing safe districts was the better choice because, in amending Section 5, Congress chose to severely limit states' discretion to comply with Section 5 through influence districts. By finding that no district is narrowly tailored, the Court effectively held that the House either was *not* permitted to draw "safe" districts or that the House was somehow required to draw a "safe" district at, say 48% or 52% BVAP. But just as the House cannot draw a circle that is also a square, it cannot draw a 48% "safe" seat, because that simply is not what "safe" means under Section 5 as the Supreme Court has interpreted it. The Supreme Court will review this question under a *de novo* standard.

But, again, the Court need not agree with Defendant-Intervenors on this to grant relief. Like the predominance inquiry, the narrow-tailoring inquiry will proceed district by district. Evidence as to any district that at least matches the evidence supporting the Supreme Court's narrow-tailoring holding on HD75 will suffice for reversal. *See Bethune-Hill*, 137 S. Ct. at 801.

And the Court need only look to HD75's neighbor, HD63, to see that type of evidence. In 2011, Rosalyn Dance, then the Delegate in HD63, told the House that black turnout in the City of Petersburg, the population center of HD63, was lower than white turnout, PEX33 at 45, and it is undisputed that a minority-preferred candidate was defeated in HD63 in 2001, 1 Tr. 455:32–456:21, a fact Delegate Jones

16

was aware of in drawing the district, *see* 1 Tr. 462:9–11. The Court previously held that voting is highly polarized in the district as part of the same holding the Supreme Court affirmed in review of HD75. *See Bethune-Hill v. Virginia State Bd. of Elections*, 141 F. Supp. 3d 505, 559 (E.D. Va. 2015). There is no meaningful narrow-tailoring difference between HD63 and HD75, and all other districts are supported with similar evidence. *See* ECF No. 231 at 45–46. As with the predominance inquiry, the possibilities that partial affirmance and partial reversal entail are practically endless. There is at least a fair prospect of reversal on at least some districts on this basis as well, and the factor is satisfied.

## II.  Irreparable Harm Is Likely To Result from a Denial of the Stay, and the Balance of Equities Favors a Stay

The irreparable harm here is plain because the House "must either adopt an alternative redistricting plan…or face the prospect that the District Court will implement its own redistricting plan." *Karcher v. Daggett*, 455 U.S. 1303, 1306 (1982) (Brennan, J., in chambers) (granting a stay on this basis). Furthermore, the near-imminent election cycle renders the need for relief acute. The Supreme Court is unlikely to resolve this case until candidates have qualified for primaries and nominating conventions, and, although Defendant-Intervenors intend to inform the Court that a ruling by early May would best facilitate an orderly election process, that cannot be guaranteed, and elections may already have passed before the Supreme Court rules. If the 2011 plan satisfies constitutional scrutiny, as Defendant-Intervenors contend, then *that* plan, not any plan drawn by a court or

17

special master, *must* govern the 2011 elections. *Cf. Miller v. Johnson*, 515 U.S. 900, 915 (1995) (describing redistricting as "the most vital of local functions").

But if primaries are either imminent or past, the Supreme Court's order will greet the Commonwealth with confusion, uncertainty, expense, and vote-suppressing chaos. Unsurprisingly, the Supreme Court has issued stays very recently on similar timelines. *See, e.g.*, *Gill v. Whitford*, 137 S. Ct. 2268 (2017) (staying judgment invalidating districts in June 2017 in advance of 2018 elections); *Rucho v. Common Cause*, 138 S. Ct. 923 (2018) (staying judgment invalidating districts in January 2018 in advance of 2018 elections); *Abbott v. Perez*, 138 S. Ct. 49 (2017) (staying order holding districts unconstitutional in September 2017 in advance of 2018 elections). These are the "considerations specific to election cases" that courts must weigh heavily in fashioning equitable relief. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). They overwhelmingly support a stay here.

Moreover, although two members of the Court previously concluded that "plaintiffs likely would suffer irreparable injury if [the Court] were to issue a stay" because a stay "likely would result in the 2019 elections… proceeding under unconstitutional districts," ECF No. 256 at 2, this problem is far more severe in the other direction: if the Supreme Court reverses, there is a risk that elections may proceed under a map with no legal basis because no legislature enacted it and no court is authorized to implement it. That is irreparable harm. And now that the Supreme Court has concluded that this appeal presents sufficiently substantial questions that it could not be resolved summarily, there is a much stronger basis for

18

concern that such harm for result. Furthermore, although federal courts have, with the Supreme Court's blessing, allowed elections to proceed under legislatively enacted maps found to be unlawful or unconstitutional, there appears to be no authority for federal courts to order elections to proceed under court-drawn maps when the legislatively enacted map is valid. Thus, any elections that proceed under a court-drawn plan that turns out to have been predicated on erroneous findings will be void as a matter of state law and beyond this Court's power to address in any way. *See* Va. Const. Art. II, § 6 ("[M]embers of…the House of Delegates of the General Assembly shall be elected from electoral districts *established by the General Assembly*.") (emphasis added).

Accordingly, the equities are in Defendant-Intervenors' favor, not in Plaintiffs' favor. The risk of irreparable harm to Defendant-Intervenors and the public interest is overwhelming and within the Court's ability to address now. By contrast, any harm to Plaintiffs cannot be addressed at this time because the remedial phase prior to the Supreme Court's ruling is highly unlikely to benefit them. The balance-of-equities test weighs the relative risks and benefits to both sides, *see Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (per curiam), and the likely benefit to Plaintiffs here is minimal. A plan that the Court issues now cannot account for the many potential outcomes in this case and will almost certainly need to be reworked, if not thrown out entirely, next summer. That is because a remedial map is only lawful if it changes the bare minimum necessary to remedy the violation. *Upham v. Seamon*, 456 U.S. 37, 42 (1982). If the Supreme Court reverses

19

on even one district, the remedial map must be redone to be valid, and that is so as to each possible outcome. Dr. Grofman cannot create the thousand remedial maps necessary to cover all contingencies. Implementing a remedial step now would be just one step on the way to something different, possibly *very* different. By comparison, the 2011 plan represents both the presumptively valid legislative map and the status quo.

It therefore also better serves the public interest than a court-approved remedial map. Even if a departure from the 2011 map is eventually required, there is no reason to depart from it in January 2019 only to set the stage for a *second* rupture in summer 2019. That would be confusing to the public and result in enormous expense for candidates and other affected persons. Neither the equities nor the public good favor this confusing, costly, and haphazard approach.

## III.  The Court Should at a Minimum Exercise Its Equitable Powers To Reset Election Dates

To the extent this Court remains concerned that staying the efforts to draw a remedial map could irreparably injury plaintiffs, there is a way to guard against that concern. Both sides are faced with the *same* problem—uncertainty surrounding the ultimate Supreme Court ruling, the many potential outcomes, and the imminent election season. While there is nothing this Court can do about the first two issues, it can at least address the third: the Court may issue an order resetting House of Delegates election deadlines in 2019 and, in particular, moving the 2019 primaries and nominating events from June to September. Doing so would take the

20

pressure off of having a remedial map in place as quickly as the Court's current remedial schedule contemplates, while still leaving ample time to craft a remedy should one be necessary once the Supreme Court issues its decision.

### A.    The Court Has Power To Change Election Dates, and All Equitable Factors Support a Change

Defendant-Intervenors would like to claim credit for thinking of a change in dates as a solution, but they cannot, because it is in fact Plaintiffs' idea. They represented that the Court has "broad discretion" to fashion its remedy, "which includes postponing various election deadlines, including the candidate filing deadline." ECF No. 261 at 4.[6] And Defendant-Intervenors agree with Plaintiffs that numerous precedents confirm the Court's authority to take this step. *See id.* at 4 n.1 (citing *Sixty-Seventh Minnesota State Senate v. Beens*, 406 U.S. 187, 201 (1972) (discussing election dates and pre-election deadlines: "If time presses too seriously, the District Court has the power appropriately to extend the time limitations imposed by state law."); *Larios v. Cox*, 305 F. Supp. 2d 1335, 1342-43 (N.D. Ga. 2004) (denying motion to stay in racial gerrymandering lawsuit and noting "that the court has broad equitable power to delay certain aspects of the electoral process if necessary," such as moving back a candidate qualifying period); *Petteway v. Henry*, No. CIV.A. 11-511, 2011 WL 6148674, at *3 n.7 (S.D. Tex. Dec. 9, 2011) (noting that

---

[6] Plaintiffs, of course, advanced this proposition as a means to advance their own perceived interests, *see* ECF No. 261 at 4, but Plaintiffs cannot credibly argue that the Court has power to take steps they favor but not steps they disfavor.

21

"[i]f forced to craft an interim remedy, this court has the authority to postpone . . . local election deadlines if necessary."); *Garrard v. City of Grenada, Miss.*, No. 3:04CV76-BA, 2005 WL 2175729, at *4 (N.D. Miss. Sept. 8, 2005) (postponing election from October 2005 to November 2005)).

The Court's equitable powers are more than sufficient to accomplish this task. The "parties" to be enjoined, *see* Fed. R. Civ. P. 65(d)(2), are the executive officials who administer Virginia Elections, the Virginia State Board of Elections and the Commissioner of Elections. They are within the Court's jurisdiction because they are named Defendants and, indeed, are currently bound by the Court's permanent injunction. The Court has already found a violation of law justifying an injunction, and changing election dates, as Plaintiffs' cited cases hold, is simply an equitable exercise to adjust the competing equities in cases where violations are found.[7] And, in addition to its power to "stay" its injunction pending appeal, the Court has power to "modify" it. Fed. R. Civ. P. 62(c).[8] Similarly, the Court has

---

[7] Defendant-Intervenors, of course, continue to dispute liability. The point here is not that the Court's liability finding is correct, but that it has power to issue relief until the liability finding is reversed. Any references to legal violations in this brief are for the sake of argument only.

[8] Jurisdiction over remedial issues appears not to have transferred to the Supreme Court because they are separable from the issues raise on appeal. *See Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 558 (E.D. Va. 2016). If the Court believes otherwise, it must immediately stay remedial proceedings because it would, in that instance, have no power to issue a remedy.

22

authority to grant this relief as a partial stay, given that the stay factors are satisfied, as discussed above.

And the equities emphatically support a change in election dates because all parties would benefit, as would the general public. The proposed date change would preclude whatever irreparable harm the Court believes Plaintiffs might suffer from a stay, and it would mitigate the harm to Defendant-Intervenors because it would allow elections to proceed under the 2011 plan if the Supreme Court reverses and obviate the need for remedial proceedings until that time.

Further, the proposed date change would benefit the general public because it would provide certainty about the path forward and prevent the inevitable confusion resulting from proceeding with the elections process now. The public would not see a series of maps paraded as controlling only to be cast in doubt by further stay motions and court rulings that are difficult for many voters (and most lawyers) to understand. Additionally, proceeding with *one* unified election schedule would benefit individuals interested in running for public office and allow them to defer spending time and money on election efforts until the Supreme Court provides final clarity next spring or summer. Ultimately, it would benefit voters more than anyone, who would be assured that their vote in the primary elections or participation in nominating events will count and not be invalidated by later court proceedings.

In fact, Plaintiffs themselves have expressed concerns about the possibility of court-ordered election changes at a late stage, ECF No. 261 at 3–4, and those

concerns are weighty. The federal courts' equitable powers possibly enable them to invalidate the results of *already completed* elections, to reset terms of office, and to order special elections at unforeseen and unorthodox times. *See North Carolina v. Covington*, 137 S. Ct. 1624, 1626 (2017) (stating that the Supreme Court has yet to address this power, which some federal courts have claimed). If the Court does not act now, there is a high likelihood that future events will necessitate litigating in this case the existence and scope of that power. Whatever the ultimate result of the forthcoming stay motion in the Supreme Court and the case on the merits, there will be room to argue that any election that has already gone forward should be invalidated, some litigant willing to seek that relief, and a direct appeal to the Supreme Court to review whatever this Court says on the subject. Although Plaintiffs and Defendants inexplicably appear to like their odds in that contest (without even knowing where their interests will then lie) there is a better way: the Court can avoid the problem altogether by ordering new election dates *now*, before exercising this power becomes extremely invasive to state affairs and painful to the general public and stakeholders. At this time, the harm is minimal, as demonstrated by Virginia's practice of resetting election dates in redistricting years.

Not to be forgotten in all this is the integrity of the judicial system. Defendant-Intervenors' proposal allows the courts to get this case right. Elections should proceed in 2019 under the legally correct map, and what that is can only be known after the Supreme Court rules. If Defendant-Intervenors are right, the legally correct map is the 2011 map. If Plaintiffs are right, it is some new yet-to-be-

24

created map. If both sides are partially right and partially wrong, it is some map that cannot even be conceived of at this time. Delaying the election process for a mere two months dramatically increases the chance—not necessarily that Defendant-Intervenors will have their way—but that the Supreme Court will have its way. That interest should take preeminence.

Indeed, Defendant-Intervenors' proposed relief is so closely intertwined with the interests of the Supreme Court and this Court in effectuating their eventual final judgments that it finds independent support in the All Writs Act, which empowers the Supreme Court and this Court to "issue all writs necessary or appropriate in aid of their respective jurisdictions." 28 U.S.C. § 1651(a). The All Writs Act allows courts "to safeguard not only ongoing proceedings, but potential future proceedings, as well as already-issued orders and judgments." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004) (footnotes omitted). The Supreme Court, for example, can issue writs necessary to issue writs "in aid of the appellate jurisdiction which might otherwise be defeated." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 603 (1966). Here, the Supreme Court and likely this Court will be required to engage in future proceedings to assess the practical impact of the Supreme Court's ruling, and an order resetting election dates is necessary and appropriate to ensure that those proceedings are not mooted as either being too late or available only via the exercise of power that may be found to be unavailable or too damaging to the public good to exercise. Indeed, some sort of a relief, whether a

25

stay or order for new election dates, may be necessary even to safeguard the *current* Supreme Court proceeding.[9]

There is therefore no reason to wait until 2019 to assess whether this type of relief is appropriate. By then, the costs of change will be much higher.

## B. A Change in Election Dates Is Workable, and the Concerns of State Elections Officials Can Be Resolved

Defendant-Intervenors have identified an elections schedule (discussed below, § III.C) that should accommodate the likely timing of the Supreme Court's future ruling and mirrors the schedules voters have seen in past redistricting years. To be sure, because Defendants, the Virginia State Board of Elections and the Commissioner of Elections, have not proposed an elections schedule, Defendant-Intervenors have been unable to obtain much helpful input from the persons who are best positioned to iron out details. Instead, Defendant-Intervenors have been confronted with two general objections to a change in dates that Defendants appear to believe render the course of action completely unworkable. That view is incorrect.

First, Defendants' chief concern appears to be that the 45-day UOCAVA deadline cannot square with *any* schedule accommodating the Supreme Court's needs, but UOCAVA applies by its terms *only to elections for federal office*, not to House of Delegates or other state and local races on the ballot in 2019. 52 U.S.C.

---

[9] Thus, if this Court or the Supreme Court concludes that Defendant-Intervenors' proposed order somehow is beyond judicial power, there is only one alternative solution: to stay the Court's injunction in full pending appeal.

26

§ 20302(a)(8)(A). So, although it is admirable that ballot transmission in state races normally comply with the 45-day rule as a matter of good policy, this deadline in no way restricts the Court's equitable powers to craft an appropriate remedy in this unusual case. Nor does there appear to be any reason why the Court could not lift the requirement of the statute as a remedy in this case, which involves *constitutional* issues. And, even if UOCAVA were directly applicable, the Commissioner of Elections can obtain an administrative waiver on a showing of "undue hardship," 52 U.S.C. § 20302(g), and should be ordered to attempt that route before simply concluding that allowing the Supreme Court to decide the appeal cannot work.

Second, the Commissioner of Elections also expressed the view that the state needs at least 45 days to implement any new redistricting map, but this too smacks of a lack of effort. The Commissioner does not need to implement a new map for 100 House districts; most House districts will not be affected by the Supreme Court's ruling, and the Commissioner's work on those may proceed without delay. And, indeed, the Commissioner may not need *any* new plan because the 2011 plan may be upheld in full. To the extent that changes are needed, these will be in discrete areas, which will no doubt require work, but 45 days is simply unnecessary.

Where there is a will, there is a way, and Defendants' lack of will to resolve an issue of such substantial concern to the general public and the courts is troubling. Defendant-Intervenors therefore have attempted to craft a schedule to accommodate the important concerns of absent service members and election

27

administration, but in a balanced way that allows other important interests to be served as well. Defendant-Intervenors are open to the possibility that other proposals are workable and are disappointed that neither Plaintiffs nor Defendants have taken the initiative to propose anything. If they are right that *no* solution is practical, then the Court's only option is to issue a stay pending appeal.

### C. Defendant-Intervenors' Proposed Timeframe Addresses the Needs of the Case and Competing Interests

The 2019 general election is scheduled for November 5, 2019. A primary or nominating convention occurring on Tuesday, September 10, 2019, would be almost 60 days prior to the general election and allow ample time to collect absentee ballots from the primary, print general-election ballots, and transmit ballots to absent service members at least 30, if not 45, days before the general election. Alternative dates of September 3 or August 27 would achieve similar purposes.

Although the deadline for candidates to qualify for primaries is ordinarily 75 days before the primary, Va. Code § 24.2-522(A), Defendant-Intervenors respectfully submit that a deadline approximately 55 days prior to the proposed primary date presents an appropriate balancing of the competing interests of the Court in responding to a late-May or early-June decision from the Supreme Court and the election officials in printing ballots. Defendant-Intervenors therefore propose July 17 as the deadline for candidate qualification and July 22 as the deadline for party officials to notify state election officials of the names of qualified candidates.

28

This would allow approximately 30 days before the primary for ballots to be transmitted to absent service members.

Even if the Supreme Court were to rule as late as the beginning of June, this timeline would still allow approximately 45 days for both the processing of its opinion and implementation into a new map, if necessary, and then administration of the map. Defendant-Intervenors intend to advise the Supreme Court that an earlier ruling would be beneficial, and the Court has taken such factors into consideration in past cases. Accordingly, Defendant-Intervenors are hopeful that the schedule will actually include approximately 30 more days.

This schedule is more accommodating to elections administration and transmission of overseas ballots than the 2011 schedule the General Assembly adopted, which set the primary date at August 23 and related dates throughout the summer in advance of that time frame. And the situation in 2011 was markedly similar: Virginia could not proceed under its map absent affirmative preclearance from the Department of Justice, and it was Virginia's burden to establish the prerequisites. Although a map had passed the General Assembly, state election officials had no way to know whether preclearance would be granted or denied or if the Department of Justice would request further information, triggering another 60-day preclearance period. So too here: there is a status quo map (the 2011 map) under review in a legal proceeding that election officials might assume will be used in 2019 but cannot know until the Supreme Court rules, which is likely to happen around the time preclearance was granted in 2011 (June 6).

29

As noted, other time frames may be preferable than what Defendant-Intervenors have proposed, but it cannot be that there is *no* solution. Indeed, if there really is no way to guard against the risk of irreparable injury to Defendant-Intervenors, then this Court must grant a stay.

## CONCLUSION

The Court should stay its injunction pending appeal. Alternatively, the Court should order Defendants to implement the election schedule stated above. In all events, the Court should delay the Special Master's issuance of his proposed remedial map until after the Supreme Court has the opportunity to address any appeal from the Court's ruling on this motion.

Dated: November 28, 2018                Respectfully Submitted,

/s/ *Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*

30

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of November, 2018, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.

/s/ *Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*