IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| Golden Bethune-Hill, *et al.*, | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |
| Plaintiffs, | |
| v. | |
| Virginia State Board of Elections, *et al.*, | |
| Defendants. | |

**Defendant-Intervenors' Objections to
Special Master's Proposed Remedial Plans**

Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates
and Virginia House of Delegates Speaker M.
Kirkland Cox*

## **Table of Contents**

Defendant-Intervenors' Objections to Special Master's Proposed
Remedial Plans ..................................................................................... 1

Preliminary Objection to Remedial Proceedings ................................... 1

Summary of Objections ......................................................................... 1

Objections .............................................................................................. 3

    I.    Inability To Adequately Vet the Special Master's
Work ....................................................................................... 3

    II.    Substantive Objections ......................................................... 7

        A.    Racial Predominance ............................................. 7

        B.    Racial Narrow Tailoring ...................................... 13

        C.    Remedying the Violation ..................................... 19

        D.    Gratuitous Imposition of Redistricting
Criteria Not Used by the Legislature ................... 22

Conclusion ........................................................................................... 26

## Defendant-Intervenors' Objections to
## Special Master's Proposed Remedial Plans

Pursuant to this Court's order of October 19, 2018, ECF No. 278 at 1,

requiring the parties and other interested persons to "submit their objections to, if

any, and briefs in response to the remedial plan, maps, and briefing submitted by

Dr. Grofman," Defendant-Intervenors respectfully object to the proposed plans the

Special Master submitted to the Court.

## Preliminary Objection to Remedial Proceedings

The Supreme Court has now taken this case for plenary review, which will

involve district-by-district scrutiny of each of the 11 districts subject to this Court's

injunction and *de novo* review of its predominance and narrow-tailoring legal tests.

There is no reason to proceed with further remedial proceedings because a map

issued at this time will likely be of no use. If the Supreme Court reverses on even

one district, a remedial map issued at this time would need to be redone after the

Supreme Court's order. Moreover, Defendant-Intervenors object to issuance of a

map this late in the decade, with outdated census data for the purpose of only

impacting one election.

## Summary of Objections

The Special Master's smorgasbord of districting options misses the mark

entirely, both by failing to remedy the "*Shaw*" violation the Court believes exists

and by imposing a set of redistricting ideas foreign to the Commonwealth. The

Special Master began from the wrong starting point of attempting to remedy a vote-

dilution "packing" claim rather than the "analytically distinct" *Shaw* claim the

1

parties actually litigated and the Court adjudicated. Then, the Special Master wandered further afield by assuming the Court's findings require a remedy by means of a 55% BVAP *ceiling* to replace what the Court believed was a 55% BVAP *floor*—as if a ceiling is somehow not a racial quota and a floor is. The Special Master then apparently used race-driven maneuvers to ensure that naturally occurring districts of high BVAP would fall below that ceiling, even while Plaintiffs themselves concede that the supposed violation can be remedied by districts above 55% BVAP. The Special Master made no effort to justify a 55% BVAP ceiling under a compelling interest, and his references to racial voting strength only hurt, rather than help, his proposals, given that he has drawn formerly viable minority districts at around 40% BVAP on the view that Barack Obama could win them. Thus, the Special Master has engaged in the very racial gerrymandering, unjustified predominantly racial line drawing, he was assigned to cure.

As for the other districts, the Special Master ignored Virginia redistricting criteria that the Commonwealth implemented in 2011, and he applied a new set of criteria he admits are his own invention—such as the goal of avoiding "fracking," a term he "coined" and that appears nowhere in the record of this four-year-old case. The Special Master then claims that only his districts are "narrowly tailored" because they satisfy an artificial definition of narrow tailoring—changing as few districts as possible—and he ignores that HB7002 moves far fewer constituents than his plans move. But narrow tailoring is not a simplistic measure of the number of districts changed but rather turns on the number of residents moved. Ignoring

2

this, the Special Master targets a narrow set of non-challenged districts and does violence to them, whereas altering a few additional districts could allow them all to absorb the shock more evenly and with less stress on well-developed incumbent/constituent relationships. And, from that perspective, the Special Master's proposals exhibit no deference to the legitimate state policy of incumbency protection. Quite the opposite, the Special Master's proposals have an uncanny inclination to target House of Delegates leaders, including the House Speaker, whose districts any legislature of any political composition would rightly be expected to preserve.

For all of these reasons, and those discussed below, Defendant-Intervenors submit that the Court should—if it chooses to proceed at all—reject the Special Master's proposals in full and either adopt HB7002 or order the Special Master to try again with different criteria.

## Objections

## I.   Inability To Adequately Vet the Special Master's Work

Defendant-Intervenors object on the basis that technical problems, the Special Master's choice to proceed by proposing "modules" rather than plans, and the one-week turnaround have made it impossible to closely vet the Special Master's work. The tight deadline combined with the numerous remedial districts rendered it impossible for Defendant-Intervenors' data and mapping experts to review all of the work adequately to prepare objections.

None of the plan information the Special Master provided represents a complete statewide plan of 100 districts. That poses a technical challenge for a data expert attempting to review the materials, because the proposed remedial districts must be merged with either the existing plan or other permutations of districts to load into a mapping software program or into other computer programing code a data expert may utilize to run reports on the proposed districts. The Special Master's unannounced choice to offer multiple partial modules as options means the analysis has taken much more technical time than it would have taken had the Special Master proposed one complete remedial plan or even two or three. There are many plans to be reviewed on a variety of metrics and factors, including those the Special Master cited and others he did not cite.

Moreover, although the Special Master purported to offer remedial plans for multiple regions that he proposed can be bifurcated, the two Richmond modules and the three Petersburg modules converge and affect districts situated between Richmond and Petersburg. These modules cannot be evaluated separately because, as the Special Master admits, "the configuration of district 62 must be consistent between the Richmond module and the Petersburg module." ECF No. 323 at 8 n.7. Matching these regions created additional data-preparation steps, and the modules did not match, creating further delay.

The total number of maps to evaluate comes to 36. Combining the two Richmond modules with the three Petersburg modules into a super-module means there are six choices from that region. Those six choices then must be combined

4

with two choices from the Peninsula (Newport) region and three from the Norfolk area. As a result, there were 36 maps to merge, load, verify, and review. While Defendant-Intervenors were prepared to analyze one or two maps over the course of a week, 36 maps have proven unmanageable.

What's more, there have been several technical corrections issued on the data posted on the Division of Legislative Services website. It is unclear what the changes were, and, without further information, it is impossible to verify whether Defendant-Intervenors are working with the correct data. For example, in some instances the sum of the total population or percentage black voting-age population listed in the tables in the Special Master's report do not match the numbers generated by redistricting software. Some differences are consequential. All are problematic. There should be no differences unless either the Special Master's report contains typographical errors or the data is flawed in some way.

Further problems resulted because block-assignment files were not available Friday on the DLS website. Only on Tuesday, December 11, were block-assignment files made available.[1] Even then, block-assignment files from the three Norfolk modules were incorrectly exported, as there are no delimiters between records. Thus, the files needed to be converted. There have been several instances of

---

[1] Even though shape files were served on Friday, December 7, the shape files do not include essential information cited in the Special Master's report, such as "the publicly available data on population and black voting age population in the districts." ECF No. 323 at 15.

5

discrepancies in population numbers noted in the Norfolk plans. Addressing and correcting for these errors caused further delay. Some work needed to be repeated due to additional files with technical corrections provided by the Special Master's assistant a few days after the Special Master's report was filed. Then, when the block assignment files and shape files were compared, the separate files turned out to be inconsistent, both as to format and content.

And some information has never been provided. For example, the Special Master's report represents that "[e]lection data for each of the districts in each of the modules is presented in aggregate form in the body of this Report." ECF No. 323 at 15. But no election data was submitted with the files, and no raw numbers appear in the shape files.

Defendant-Intervenors' data team diligently set to work on evaluating the Special Master's work immediately when the data was issued around 5:30pm on Friday, December 7. But the above-described problems made it impossible to prepare many basic and critical metrics by which to vet the plans until Friday, December 14, the day Defendant-Intervenors' objections are due. And not all districts the Special Master has proposed have been vetted to any meaningful degree. As a result, although Defendant-Intervenors have prepared the objections below based on the information available, these objections are necessarily incomplete. Further, the Special Master invited parties to propose alternatives to his remedial and adjacent affect districts. *See, e.g.*, ECF No. 323 at 15–16. Defendant-Intervenors intended to propose alternatives but, given the technical

6

problems, have been unable to engage in any mapping of their own—which they believe would expose further deficiencies in the Special Master's work.

Defendant-Intervenors therefore respectfully request that the Court issue an ordering enumerating one or more the following directives:

- That parties may present at the hearing of January 10 objections and proposed remedial districts based on the Special Master's report in addition to their written objections due on December 14.

- The parties may supplement their written objections to the Special Master's report up to seven days prior to the hearing of January 10.

- The parties are permitted to contact the Special Master directly, with communications copying counsel of record for other parties to this case, for assistance in processing the Special Master's data.

- The parties are permitted to file post-hearing briefs up to seven days after the remedial hearing.

Unless the Court takes these or other remedial steps, Defendant-Intervenors will be denied due process in their ability to assess and object to the Special Master's plans.

## II.    Substantive Objections

### A.    Racial Predominance

The Special Master concedes that he used a 55% BVAP figure as a fixed, predetermined and non-negotiable number to structure the districts he drew. To be sure, he used it as a *ceiling*, not a floor, but what matters is that he used the

7

number in structuring his remedial districts. *See, e.g.*, ECF No. 323 at 68. Indeed, he chose not to work from or recommend *any* remedial plans by *any* of the parties or non-parties because *all* other participants proposed some remedial districts that exceeded 55% BVAP. ECF No. 323 at 121. That should sound familiar. *See, e.g.*, Plaintiffs' Motion to Affirm, *Va. House of Delegates v. Bethune-Hill* at 17 Case No. 18-281 (U.S. Filed Oct. 9, 2018) ("Delegate Jones rejected alternative maps that did not guarantee at least 55% BVAP in every Challenged District"). Consequently, one indicative element of racial predominance, the existence of a 55% BVAP ceiling, is conceded. And the express rejection of maps that exceed the ceiling on that basis alone is further evidence of racial predominance. *See, e.g.*, *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017) ("By deploying those factors in various combinations and permutations, a State could construct a plethora of potential maps that look consistent with traditional, race-neutral principles. But if race for its own sake is the overriding reason for choosing one map over others, race still may predominate.").

And, even on the truncated schedule plagued with technical problems, Defendant-Intervenors have identified evidence that the Special Master's use of a fixed, one-size-fits-all 55% BVAP ceiling "had a direct and significant impact on the drawing of at least some of" the proposed districts' boundaries. *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1271 (2015). For one thing, the fact that every other participant in the remedial phase proposed districts exceeding 55% BVAP—including Plaintiffs, who are no admirers of that figure—is powerful

8

evidence that 55% BVAP districts are naturally occurring without intentional efforts to manipulate district boundaries. Furthermore, HB7002, proposed by Defendant-Intervenors, demonstrates a plan that fixes specific lines the Court identified in its opinion as race based, and that plan includes districts over 55% BVAP, with *no* consideration of race—further indicating that meaningful manipulation of lines to adhere strictly to a 55% BVAP ceiling is essential to honor it in all districts.[2] In addition, the Court's factual findings show that 55% BVAP was not difficult to meet in many districts and that "predominance" in those districts resulted not from ratcheting BVAP up but from drawing it down to afford BVAP for lower-BVAP districts. The Court called these "donor" districts. Thus, the Court's findings prove beyond cavil that districts exceeding 55% BVAP are naturally occurring. Achieving a 55% BVAP ceiling simply had to have required close attention to racial data—i.e., racial sorting.

And, even after a cursory review of districts, Defendant-Intervenors identified overwhelming evidence of race-based maneuvering to draw down BVAP where traditional districting principles would not on their own result in the levels the Special Master achieved. Take, for example, the proposed remedial HD92. *See* Exhibit A (map of proposed HD92). The proposal fragments the geographically concentrated minority population in downtown City of Hampton. And it splits *three*

---

[2] Of course, Defendant-Intervenors are continuing to prosecute their Supreme Court challenge to the Court's opinion and assume its legal and factual accuracy for the sake of argument only.

VTDs to accomplish this—even though the Court has found a split of more than *one* to be overwhelming evidence of racial predominance. Worse, the VTDs, Thomas, City Hall, Hampton Library, and East Hampton, are all split with *one district*, HD91, which is even further evidence of predominance. *Bush v. Vera*, 517 U.S. 952, 956–72 (1996); *Alabama*, 135 S. Ct. at 1271.

Then, to confirm predominance, the Special Master's plan creates a bizarre configuration of neighboring HD91. *See* Exhibit A. The district is separated by an enormous body of water that is not connected by a road. HD91 was a recipient district of BVAP in HD92, which the Special Master treated as a "donor" by drawing down BVAP, and aside from the bizarre configuration—resembling two independent and unrelated seashells on a beach—HD91 was drawn into Poquoson City. The recipient district, like the HD92 donor, was plainly drawn for predominantly racial reasons of accepting BVAP from HD92. In the 2011 enacted plan, HD92 split *no* VTDs, crossed no jurisdictional boundaries, was highly compact, and ended up above 60% BVAP. The Special Master's choice to ratchet BVAP down to approximately 53% BVAP could not have been done without with race overwhelming the line-drawing process—subordinating traditional districting principles to racial considerations.

There are other signs of predominance in the map. One telling is example is the proposed version of HD69: it retains 80% of the VTDs present in the enacted HD69—notwithstanding the assertion that the enacted HD69 is unconstitutional. What changed? Enough VTDs were shifted out to drop BVAP three-tenths of one

10

percent so that it would fall from slightly above 55% BVAP to slightly below 55% BVAP. It appears, then, that the Special Master did just enough to meet his target and then concluded his work was done. Similarly, the proposed version of HD74 excludes the Greenwood and Randolph VTDs, creating a notch at the northern end of the district. An alternative configuration that included these VTDs and excluded neighboring VTDs such as Mood and Brookland would have raised BVAP in HD74 above the 55% BVAP ceiling.

Because Defendant-Intervenors have identified on a cursory review "strong, perhaps overwhelming, evidence that race did predominate as a factor," the Court should scrutinize these and all other districting decisions to the same degree it scrutinized decisions of the original map-drawers after months of discovery and two trials. *See Alabama*, 135 S. Ct. at 1271 (remanding for a closer look in the face of such evidence). Indeed, as Exhibit B shows, numerous districts proposed in the Special Master's plan are bizarrely shaped, suggesting contorted line-drawing to adhere to a 55% BVAP ceiling. On the Reock compactness test, the enacted versions of HD69, HD70, and HD71 are more compact than the proposed districts. On the Poslby-Popper compactness test, enacted districts HD70 and HD71 are more compact than the proposed districts:

11

| DISTRICT | HB 5005 Enacted | | | SM Richmond 1A & 1B | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Reock | Polsby-Popper | BVAP | Reock | Polsby-Popper | BVAP |
| 069 | 0.52 | 0.34 | 55.19% | 0.36 | 0.36 | 54.88% |
| 070 | 0.40 | 0.19 | 56.37% | 0.29 | 0.16 | 52.29% |
| 071 | 0.33 | 0.24 | 55.35% | 0.20 | 0.17 | 54.01% |
| 074 | 0.16 | 0.12 | 57.24% | 0.19 | 0.18 | 54.37% |

The Special Master's boilerplate assertions that race did not predominate mean nothing more here than in any case where predominance has been denied, so the Court should give those assertions no weight whatsoever in light of his admission of a 55% BVAP ceiling and overwhelming evidence even on the most cursory of looks indicating race-based line-drawing to satisfy that ceiling. The Special Master's other defense to a claim of predominance is that he was *dropping* BVAP, not *raising* it and that he had no "minimum" BVAP in mind. ECF No. 323 at 47 (emphasis in original). But racial gerrymandering encompasses both the choice to *add* residents on the basis of race to achieve a lower-bound target and to *subtract* residents on the basis of race to achieve an upper-bound target. *Miller v. Johnson*, 515 U.S. 900, 901 (1995); *Georgia v. Ashcroft*, 539 U.S. 461, 491 (2003) (Kennedy, J., concurring).

Race therefore predominated in at least some if not all proposed districts, and the Court should scrutinize the proposals and consider ordering the Special Master to make a second set of remedial proposals without predominantly race-based maneuvers. Defendant-Intervenors will be prepared to discuss other evidence of predominance at the January 10 hearing.

12

### B.     Racial Narrow Tailoring

Racial predominance triggers the "strictest scrutiny." *Miller*, 515 U.S. at 915. The Special Master's explanations for race-based maneuvering fail to pass that scrutiny.

**Remedial Purposes**. The Special Master contends that dropping BVAP below 55% in every district is necessary to remedy a legal violation. But this misconstrues both the law and the facts.

It misconstrues the law because the Special Master appears to be under the misimpression that Plaintiffs' won a Section 2 or Fifteenth Amendment "packing" claim. *See* ECF No. 323 at 13 n.9; *see Voinovich v. Quilter*, 507 U.S. 146, 153 (1993) (discussing legal theory of vote-dilution by "packing"). But that has never been Plaintiffs' claim and is not what the Court adjudicated. The "*Shaw*" theory is "analytically distinct" from vote dilution. *Shaw v. Reno*, 509 U.S. 630, 652 (1993). By starting from the wrong definition of what (the Court believes) went wrong, the Special Master did not remedy that identified flaw.

The Special Master's theory is wrong as a matter of fact because this Court's racial predominance finding was not based on a finding of ratcheting up BVAP across the board. If the Court had found that the General Assembly began with 12 districts below 55% and raised BVAP to 55% in each, it may follow that ratcheting down BVAP across the board would be a narrowly tailored use of racial data. But the Court instead found that the General Assembly began with districts well above 55% BVAP and some closer to or below 55% BVAP and transferred BVAP from the

13

high districts—"donors"—to low districts—"recipients." Using racial data to uniformly drop BVAP in *all* districts is not narrowly tailored to curing that defect. That point is proven beyond cavil insofar as Plaintiffs themselves have proposed districts above 55% BVAP as remedial districts. And Plaintiffs have in fact conceded that the Court "did not fault the House for not drawing districts at lower BVAP levels." Plaintiffs' Motion to Affirm, *Va. House of Delegates v. Bethune-Hill* at 17 Case No. 18-281 at 30 (U.S. filed Oct. 9, 2018). The Special Master does not identify the correct violation at issue—even in Plaintiffs' telling—and predictably is off base in recommending a remedy.

The only narrowly tailored way to use race to remedy a violation in the donor/recipient context would be to ratchet BVAP into the mid-60% range for districts the Court identified as "donors" and to drop BVAP in districts the Court identified as "recipients." However, Defendant-Intervenors doubt the wisdom of that approach—this all, in fact, proves that, had the House conducted a race-neutral districting, it would have unintentionally engaged in cracking and packing of minority voters in violation of the Voting Rights Act. Defendant-Intervenors instead have recommended an approach targeted at curing the specific lines the Court identified as racially impacted and not at using race for the purpose of identifying an appropriate remedial BVAP. Indeed, the Special Master has not identified an appropriate remedial BVAP for any district.

14

**Ability To Elect**. The Special Master also cited the use of race in order to preserve the ability of minority voters to elect their preferred candidates of choice, but this fails on many levels.

To begin, the Special Master's use of race is not tailored to that purpose because it confuses the *minimum* BVAP necessary to achieve minority ability to elect with a BVAP *ceiling* of 55%. In other words, the Special Master's contention is that, because he believes minority voters can elect their preferred candidates at levels *below* 55% BVAP, it is necessary to cap BVAP at that level. But the possibility that minority voters can elect below that level in no way implies the need to cap BVAP, since, if minority voters can win elections at, say, 45% BVAP, they presumably can continue to win at 55% BVAP. So long as the districts is above 45% BVAP, why does it matter how far it exceeds that number?

The implied premise of the Special Master's position is that ensuring the ability to elect requires *maximizing* minority voting power in neighboring districts, but this too errs on many levels. For starters, no civil-rights law requires maximizing voting strength of minority voters, so that goal would not be narrowly tailored to any compelling interest. *Shaw v. Hunt*, 517 U.S. 899, 913 (1996); *Miller*, 515 U.S. at 926.

Moreover, to be narrowly tailored to such a purpose if it did exist, there would need to be some reason to believe that including minority voters in neighboring districts actually enhances their voting strength. That is why the Supreme Court in *Voinovich* held that, to prove a "packing" claim, a plaintiff must

15

show the possibility of creating with the excess minority population an entirely new minority-opportunity district (over 50% BVAP). 507 U.S. at 153–54. But the Special Master disclaims any effort to draw surrounding districts to ensure actual ability or opportunity to elect in those districts. ECF No. 323 at 13 n.9. Thus, the Special Master's 55% ceiling, as far as anyone can tell, merely serves to submerge those black residents taken out of the challenged district into majority-white districts where they will be outvoted in polarized elections. In short, a 55% BVAP *ceiling* is not narrowly tailored to ensuring that districts have the *minimum* number of black voting-age persons necessary to elect their preferred candidates.

Besides, the Special Master does not make clear to what *end* his racial goals are purportedly tailored. Does he believe VRA § 5 still applies in Virginia? Does he believe the districts he drew are necessary under VRA § 2? Does he believe Special Masters are free to impose a good-government idea about how best to help minority voters without the aid of a congressional enactment? Whichever possibility it is, the use of race here fails.

If VRA § 5 is in play, the Special Master is woefully off because he fails to account for the amended statute that adopted the views of Justice Souter. *Alabama*, 135 S. Ct. at 1273. To satisfy VRA § 5, the Special Master would need to prove that his plan does not leave "minority voters with less chance to be effective in electing preferred candidates than they were before the change." *Ashcroft*, 539 U.S. at 494 (Souter, J., dissenting). His problem out of the starting blocks is that he makes no effort to compare minority voting strength under his plan with minority voting

16

strength under the benchmark. Section 5 does not authorize a freewheeling notion of what any one person might think is good for minority voters; it draws a benchmark and ensures that ability-to-elect does not retrogress from the benchmark. The Special Master makes no effort to compare ability-to-elect against the benchmark and ensure that the likelihood of electing a minority-preferred candidate is not diminished. And much of the Special Master's election data is akin to the data the Souter *Ashcroft* opinion identifies as unhelpful in proving the absence of retrogression, such as elections focusing on Democrats. 539 U.S. at 507–08 (Souter, J.). Accordingly, because the burden of proof is on the change to justify itself, the reduction in majority-minority districts from the benchmark to the proposal is retrogressive. Imposing a *ceiling* is the opposite of narrowly tailored under VRA § 5; it is in direct conflict with the guarantee Congress provided.

And it is hard to fathom how many of the decisions avoid retrogression. BVAP in HD77 and HD90, for example, is now barely above 40%. ECF No. 323 at 95. It was around or above 55% BVAP in the benchmark. The Department of Justice would not have precleared districts dropping 15 percentage points to well below 50%. The Special Master's justification appears to be that President Obama won these districts in 2012. But, unless President Obama plans on running in Virginia House of Delegates races sometime soon, that data is beside the point.

If VRA § 2 is in play, the Special Master fails to justify his districts under that provision because many fall below 50% BVAP. The Supreme Court could not have been clearer that VRA § 2 incorporates "an objective, numerical test: Do

17

minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009). To be sure, *Strickland* allows for a possibility that drawing minority crossover or influence districts may be appropriate "as a matter of legislative choice or discretion." *Id.* at 23. But the case does not hold that doing so for predominantly racial reasons is legitimate. More importantly, the Special Master exercises no "legislative choice or discretion." Aside from remedying the violation and complying with legal directives, the Special Master must defer to state policy. There is no evidence that, in 2011, there was a state policy of creating influence districts. Thus, the Special Master has a simple choice: either take the position that VRA § 2 is triggered by the *Gingles* factors and draw districts above 50% BVAP or take the position that VRA § 2 is not triggered and make no further effort to comply with it. The Special Master here has chosen to use race to draw districts below 50%, and it is anyone's guess what statutory prerogative he has in mind for this.

Finally, outside of the VRA or some other congressional mandate, the Special Master has no leeway to use race. To the extent race predominated, his use is obviously justified by no compelling purpose. But even if race did not predominate, the Special Master would be exercising a freewheeling policy power that is beyond the scope of an appropriate remedy. To be sure, there is a colorable argument that the Special Master may attempt to comply with the 2011 General Assembly's criteria of avoiding minority vote dilution. But, to comply with that criterion, the Special Master's plan would be required to (1) adhere to VRA standards that the

18

House identified as the basis for the criteria, which is not the case here and (2) implement the General Assembly's policy judgment on *how* to avoid vote dilution. Even if drawing districts above 55% BVAP is not necessary to do that, the General Assembly certainly did not adopt a policy of sub-50% influence districts. And the fact that Plaintiffs conceded in this case that *no* challenged districts should be drawn below 50% BVAP, it is a mystery why the Special Master believes his use of race has anything to do with anything that has happened so far in this case.  1 Tr. 818:10-15 (Plaintiffs' counsel emphatically asserting that they "are not even remotely suggesting that any of these 12 districts should have had their BVAP lowered below [50] percent. We've never made that claim, we never will make that claim.").

### C.   Remedying the Violation

Aside from being over-inclusive through the gratuitous use of racial fine tuning with no colorable connection to either the VRA or some state policy, the Special Master's remedial districts appear to be under-inclusive in failing to address districting decisions in the 2011 map that the Court identified as manifestations of racial maneuvering. Attached as Exhibit C is a list of those manifestations for each district.

The Special Master's proposed remedial districts do surprisingly little to address the lines the Court identified as problematic. For example, the Court criticized the "eastward" move of HD70, which it believed was for the racial purpose of achieving a 55% BVAP target in neighboring HD71, Ex. C at 3, but the Special

Master proposes that this eastward move be not only preserved but enhanced: the Special Master takes it even further eastward. ECF No. 323 at 71. The Court criticized the configuration of Richmond's Fan neighborhood, Ex. C at 3, but the Special Master proposing keeping that exact configuration. The Court criticized as racially motivated VTD swaps between HD71 and HD68, Ex. C at 3, and the Special Master does not propose addressing those swaps in any way. ECF No. 323 at 71. The Court criticized the boundary between HD69 and HD71 as racially split, Ex. C at 3–4, and the Special Master proposes that it remain intact, ECF No. 323 at 71.

The Court criticized the split of Richmond VTD 410 between HD68 and HD69 as being done for a racial purpose. Ex. C at 6. The split of VTD 410 between HD68 and HD69 is retained in the Special Masters' proposals. The Court criticized that the Richmond City portions of HD 69, 70, 71 and 74 had a combined BVAP of 56.2% and that the Richmond City areas in non-challenged HD 68 had a BVAP of 6.8%. Ex. C at 2. The Special Master's proposed districts do exactly the same.

These and other failures to address the lines the Court believed were race-based lines indicate that the Special Master did surprisingly little to address what the Court found to be the violations. And that is underscored by the surprisingly small changes in some of the invalidated districts the Special Master proposes to remedy. For example, the Special Master's proposed versions of HD69, HD71, and HD74 retain over 80% of the VTDs contained in the enacted plan's versions of those districts. His proposed version of HD70 retains more than 60% of the VTDs contained in HD70 in the enacted plan. Again, the problem appears to be that the

20

Special Master was under the misimpression that his task was to remedy a "packing" violation under a vote-dilution theory, which is incorrect.

The Special Master's other basis to believe he remedied what the Court believes are violations is that he drew districts to comply with "traditional redistricting criteria." ECF No. 323 at 10. But the improvement on these metrics is tepid or non-existent. As to the actual remedial districts, the Special Master is correct that compactness scores are mildly improved. But this came at the expense of surrounding districts, which should also be subject to traditional districting criteria. His proposed surrounding districts bear all the tentacles and other bizarre shapes that are associated with the worst forms of gerrymandering. *See* Exhibit C. As discussed above, this is a telltale sign of race-based districting, and where the Special Master was intentionally dropping BVAP to adhere to a ceiling, it stands to reason that the oddities would be manifest in surrounding districts.

Moreover, as discussed below, the Special Master also took an overly rigid view of the degree to which surrounding districts can be impacted by a redraw: he tried to change as few districts as possible *in number*, but this means that those fewer districts change absorbed an enormous impact—hence, the odd shapes. Had the Special Master spread the change out over a few additional districts to allow them to absorb the impact, he likely would not have needed the strange maneuvers he used.

21

### D.      Gratuitous Imposition of Redistricting Criteria Not Used by the Legislature

To make matter worse, the Special Master's plan imposes on the Commonwealth a series of criteria that purport to mimic state policy but in fact are entirely foreign. Rather than adhere to the priorities the General Assembly implemented, the Special Master invented criteria and applied them rigidly without reference to context.

Most obviously, the Special Master treated political-subdivision lines (which he calls "county lines")[3] as sacrosanct by prioritizing efforts to bring districts within single political subdivisions and to impact only districts within those subdivisions. But that view directly contradicts the House criteria, which state "[l]ocal government jurisdiction and precinct lines may reflect communities of interest to be balanced, but they are entitled to no greater weight as a matter of state policy than other identifiable communities of interest." IEX 27 at 2. There is no Virginia policy of prioritizing political-subdivision lines at all costs, and the House criteria disclaim such a policy. Yet the Special Master treats political-subdivision lines as among the preeminent state policies.

From that bad starting point, the Special Master went further awry by giving practically *no* weight to "incumbency considerations," another criterion recognized under state policy. *Id*.; *see* ECF No. 323 at 28 ("I treated incumbency protection as

---

[3] Many of the lines he references as "county lines" are actually the lines of independent cities, a unique feature of Virginia political geography.

22

the least important of the criteria I took into account.") He did the bare minimum to avoid pairing incumbents, but he paid no attention to preserving the cores of their districts. Indeed, the Special Master's proposals all have the uncanny attribute of targeting the very incumbents the legislature would be most inclined to protect. For example, HD66 is the district of Speaker Kirkland Cox, and no proposed version of that district leaves it even mildly unscathed. Similarly, no proposed version of HD76, represented by the House Chairman of Appropriations, Delegate Chris Jones, allows the incumbent to be competitive in the district. And the Special Master's "1-A" version of Norfolk may render Delegate Barry Knight, the most senior member of the Norfolk delegation, uncompetitive in his own district. Apparently, the Special Master's idea of "approximat[ing] the state-proposed plan," *Upham v. Seamon*, 456 U.S. 37, 42 (1982), is making decisions the legislature itself would not have made at the expense of its senior-most members. That is not the law. *See, e.g.*, *White v. Weiser*, 412 U.S. 783, 791 (1973) (discussing the value of senior legislative leaders); *Graves v. Barnes*, 446 F. Supp. 560, 570 (W.D. Tex. 1977), *sum aff'd sub nom. Briscoe v. Escalante*, 435 U.S. 901 (1978) (same).[4]

---

[4] In this respect, Defendant-Intervenors' do not fault the Special Master for not drawing districts "to deliberately favor or disfavor any political party or point of view." ECF No. 323 at 23. Defendant-Intervenors fault the Special Master for ignoring the state's incumbency policies and failing to preserve the cores of districts that any observer of Virginia politics would know to be a redistricting priority, regardless of the partisan composition of the body or the plan as a whole.

There is no evidence that prioritizing political-subdivision lines over incumbency or core retention honors state policy, and both the 2011 map (including and especially districts in areas of the state *not* affected by the Court's decision) indicate that core retention and incumbency preservation repeatedly yielded to a policy of honoring political-subdivision lines. ECF No. 323 at 56–57. In fact, the Special Master practically concedes this in admitting that he went to great lengths to bring districts that crossed political-subdivision lines into a single political subdivision.[5] That effort was entirely unnecessary because it in no way reflects the lawful priorities of the state.

And the Special Master gives up any pretension of adhering to state policy by stating that he prioritized "fracking," a concept he himself "coined" and cannot identify in any way as being grounded in Virginia state policy or redistricting criteria. ECF No. 323 at 50. But the Court's injunction is not properly used as an opportunity to impose freewheeling good-government ideas neither endorsed by a political process nor tethered to what was litigated in this case or found by this Court.[6]

_____

[5] The choice to do this also has unintended consequences on legislative activity. For example, delegates from any given county have the right to vote on judicial nominees in the county, and minimizing the number of delegates in the county means only a few members pick the judges with minimal input.

[6] Ironically, while contending that honoring VTD lines for "administrative convenience" should be prioritized, the Special Master ignores the fact the numerous 2010 VTDs have been modified since the 2010 Census. What splits are

The Special Master's assertion that his proposals are "narrowly tailored" fares no better. He identifies a *single* metric—the *number* of districts changed—as the be-all-end-all of that criterion. Because he claims to have only changed between 21 and 26 districts, he asserts his proposals are superior to all others. But this ignores that drawing a "least change" plan may occur in other ways—ways that make more common sense.

The most obvious alternative is to focus on the *degree* of change imposed on non-challenged districts. The Special Master assumes that changing 90% of one district is better than changing 10% of two different districts, respectively. But, in fact, the territory and constituents impacted in the latter case would be far less. And the latter change is far more palatable because it impacts incumbency-constituent relations in a way that allows *no* disruption—since the districts can absorb the change without much notice—whereas the Special Master's approach maximizes disruption—by practically ensuring that, whatever district is impacted, it will never be the same.

Thus, the Special Master has not grappled with one of the chief virtues of HB7002—that it changes *no* district by more than 50%, that it changes eight districts by less than 10%, and that it changes districts on average by 19.9%. The Special Master's various "modules" target fewer neighboring districts, but they do

---

evident in his plans do not reflect, as HB7002 did, changes based upon current precincts

25

violence to them. One set of proposed districts, which appears typical of the Special Master's proposals, changes 23 districts by an average of 34% each and changes two districts by 50% or more. In terms of total impact, HB7002 places 477,137 or 6.0% of constituents in new districts, ECF No. 304-5 at 3, and the Special Master's proposals typically place over 500,000 or over 7% of constituents in new districts. *See generally* Exhibit D (change statistics for a subset of possible plans from the Special Master). In fact, although Defendant-Intervenors' data experts have not completed their work, they have yet to find a single set of proposed districts by the Special Master that surpasses HB7002 in total retention of constituents.

The Special Master's proposals move more territory and residents than necessary, impose criteria foreign to the Commonwealth, and ignore lawful criteria implemented in the 2011 plan.

## CONCLUSION

The Court should not adopt any set of districts proposed by the Special Master. It should, first of all, stay remedial proceedings entirely. If it does not, it should implement HB7002 or order further map-drawing efforts to remedy the violations it believes exist in a manner that is actually tailored to that purpose.

Dated: December 14, 2018                    Respectfully Submitted,

26

*/s/  Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December, 2018, a copy of the

foregoing was filed and served on all counsel of record pursuant to the Court's

electronic filing procedures using the Court's CM/ECF system.

*/s/  Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates
and Virginia House of Delegates Speaker M.
Kirkland Cox*