# EXHIBIT C

# EXCERPTS FROM OPINION

*BETHUNE-HILL, ET AL. V. VIRGINIA STATE BOARD OF ELECTIONS, ET AL.*
3:14-cv-00852-REP-AWA-BMK Document 234 Filed 06/26/18

## TABLE OF CONTENTS

Page

Richmond/Tri-Cities Region..............................................................................................................2

    HD71 ...............................................................................................................................................3

    HD70 ...............................................................................................................................................5

    HD69 ...............................................................................................................................................6

    HD74 ...............................................................................................................................................7

    HD63 ...............................................................................................................................................8

South Hampton Roads Region.........................................................................................................10

    HD80 .............................................................................................................................................11

    HD89 .............................................................................................................................................13

    HD77 .............................................................................................................................................15

    HD90 .............................................................................................................................................17

North Hampton Roads Region.........................................................................................................18

    HD95 .............................................................................................................................................19

    HD92 .............................................................................................................................................21

## TRADITIONAL DISTRICTING CRITERIA

As set forth by the Supreme Court, traditional districting criteria include "compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, incumbency protection, and political affiliation." Opinion at 11.

| Richmond/Tri-Cities Region<br><br>Op. at 37-54 | • Since the 2001 redistricting cycle, the black population in Richmond had increasingly spread from the city limits into the surrounding suburbs. The largely urban districts under the 2001 plan, Districts 69 and 71, had lost population, while both challenged and non-challenged suburban districts either were at the target population level, or were overpopulated.<br><br>• Accordingly, to achieve a 55% BVAP in all five challenged districts, the legislature made numerous decisions motivated by race, including using Districts 70 and 74, which had a surplus of BVAP and adequate population, as "donors" of BVAP to other challenged districts.<br><br>• At the end of the 2011 redistricting process, every majority-black VTD in the Richmond/Tri-City region was either wholly or partially within a challenged district. And in the final 2011 plan, the Richmond City portions of Districts 69, 70, 71 and 74 had a combined BVAP of 56.2%, whereas the Richmond City areas in non-challenged District 68 had a 6.8% BVAP. |

| HD71 | |
|---|---|
| Op. at 38-43 | • Because of this low starting BVAP, Jones conceded that the 55% BVAP threshold impacted the way the district was drawn. |
| | • To increase the district's BVAP by nearly nine percentage points, more than 11,000 people with a 21.3% BVAP were moved out of District 71, and more than 17,000 people with a noticeably higher 72.1% BVAP were moved into District 71. |
| | • Notably, areas moved out of District 71 into non-challenged districts had an extremely low 6.6% BVAP. |
| | • The district added several heavily populated, high BVAP Richmond VTDs to its eastern edge, which VTDs previously were located in Districts 70 and 74: VTD 604 (91% BVAP), VTD 701 (97% BVAP), VTD 702 (94% BVAP), and a portion of VTD 703 (90% BVAP). |
| | • VTDs 701, 702, and part of 703 were removed from neighboring District 70 over the objection of the District 70 incumbent, Delegate Delores McQuinn, who resided nearby and had long represented these areas as a delegate and, earlier, as a member of the school board |
| | • [T]his eastward move into District 70 was required to ensure that District 71 had sufficient BVAP to meet the 55% number and, thus, that the 55% BVAP threshold impacted the drawing of the district's lines. |
| | • District 74 lost a group of nearly 8,000 people who were moved into challenged District 71, which needed a significant influx of black voters to reach the 55% threshold. |
| | • [D]espite Jones' contention that he sought to make District 71 more "Richmond centric" by removing three predominantly white Henrico County VTDs at the northwest edge of the district,30 he proceeded to add the Ratcliffe VTD from Henrico County to the eastern end of District 71. 1st Trial Tr. at 305; 2nd Trial Tr. at 177-78, 531. Ratcliffe, unlike the three predominantly white Henrico County VTDs removed from District 71, had an 83% BVAP. |
| | • VTD 207, part of the Fan neighborhood of Richmond, was removed from District 71 and transferred into District 68, represented by then-incumbent Republican Delegate Manoli Loupassi. As a result, the Fan neighborhood, which previously was contained primarily within District 71, was split between District 71 and more-suburban District 68. |
| | • Dr. Palmer's report showed that District 71 and District 68 swapped populations of about 3,000 people. However, the BVAP of the areas moved into District 71 from 68 was about ten percentage points higher than the |

|  | areas moved from District 71 into 68. Without this swap, the BVAP of District 71 would have dipped below 55%. <br><br> • [P]redominantly white VTD 505 was split between District 71 and District 69, another challenged district located to the south. <br><br> • [T]he significant race-based maneuvers required to increase the BVAP of District 71 had a substantial impact on the boundaries of District 70. <br><br> • VTD 505 was split between District 69 and District 71 to ensure that neither district would obtain too many white voters from that VTD and drop the BVAP of those districts below 55%. |
| --- | --- |

| **HD70**<br><br>Op. at 43-45 | • [T]he significant race-based maneuvers required to increase the BVAP of District 71 had a substantial impact on the boundaries of District 70.<br><br>• District 70 was not underpopulated, as it was within the one percent population requirement.<br><br>• [B]ecause of its surplus BVAP, District 70 was treated as a BVAP "donor" for other challenged districts, resulting in the transfer of high BVAP areas from District 70 to neighboring Districts 71 and 69, which needed both population and BVAP.<br><br>• In particular, as discussed above, District 70 "donated" to District 71 high BVAP VTDs 701, 702, and part of 703. See supra pp. 39-40. And to the northwest, District 70 "donated" VTD 811 (76% BVAP) and VTD 903 (64% BVAP) to District 69.<br><br>• Reflecting its "donor" status and ideal population numbers, nearly 26,000 people were moved out of District 70, and a different 26,000 were moved in. Pl. Ex. 50 at 73. The BVAP of areas moved out of District 70 was more than 16 percentage points higher than the BVAP of the areas moved in. Pl. Ex. 50 at 77. As a result of these population shifts, the BVAP of District 70 dropped by over five percentage points, to 56.4% in the 2011 plan.<br><br>• No changes to the boundaries of District 70 were needed to ensure adequate population in that district, yet 26,000 people were shifted in a noticeable racial pattern.<br><br>• We find that these population and VTD transfers were not made to achieve traditional districting goals, but instead were done to ensure a numerical minimum BVAP level in neighboring districts. |
|---|---|

| **HD69**<br><br>Op. at 45-47 | • [N]on-challenged District 27, which bordered District 69 on the west, was overpopulated by 8,000 people, close to the population deficit existing in District 69. Pl. Ex. 69 at 14, 26. Instead of collecting largely white Chesterfield County precincts from District 27, however, District 69 *lost* two predominantly white Chesterfield precincts to District 27. |
|---|---|
| | • And despite the fact that District 70 was at equal population under the 2001 plan and already was serving as a "donor" to District 71, District 69 received multiple precincts from District 70. |
| | • In particular, District 69 received several predominantly white precincts from District 70, which would have decreased the BVAP of District 69 below 55%. 2nd Trial Tr. at 181-83. Accordingly, District 69 also received two high-BVAP VTDs, 811 and 903, from District 70. |
| | • In both the VTDs split between District 69 and a non-challenged district, the portion of the split VTD allocated to District 69 had a higher BVAP than the portion of the split VTD allocated to the non-challenged district. |
| | • VTD 505 was split between District 69 and District 71 to ensure that neither district would obtain too many white voters from that VTD and drop the BVAP of those districts below 55%. |

| **HD74**<br><br>Op. at 51-54 | • The district maintained the same bizarre shape and low compactness score under both the 2001 and 2011 plans….The irregular shape of the district is circumstantial evidence that the legislature subordinated traditional districting criteria to race.<br><br>• District 74 was slightly overpopulated under the 2001 plan, but was still within the one percent population deviation allowance.<br><br>• [L]ike District 70, District 74 served as a "donor" district to surrounding challenged districts that needed an influx of BVAP to reach the 55% BVAP threshold.<br><br>• In furtherance of this goal, as discussed above, 16,414 people were moved out of District 74, and 15,855 were moved into that district.<br><br>• Notably, the BVAP of the areas removed from District 74 and transferred to other challenged districts was 69%, whereas the BVAP of areas moved from District 74 to non-challenged districts was only 20.5%.<br><br>• [T]he high BVAP Ratcliffe VTD in Henrico County was "donated" to District 71 as part of that District's eastward shift to gain additional BVAP.<br><br>• District 74 also "donated" the high BVAP areas of Hopewell to District 63 to replace some of the BVAP that District 63 had lost to District 75 in Dinwiddie County.<br><br>[I]n all three VTDs split between District 74 and a non-challenged district, the portion of the VTD allocated to District 74 had a higher BVAP than the portion allocated to a non-challenged district. |
|---|---|

| | |
|---|---|
| **HD63**<br><br>Op. at 47-50 | • In the 2001 map, District 63 included portions of Chesterfield County, and all of Dinwiddie County and the city of Petersburg. In the 2011 plan, District 63 still included part of Chesterfield County, added part of Prince George County and part of the city of Hopewell, and split Dinwiddie County with District 75.<br><br>• In addition to these new split geographies, eight VTDs were split in the 2011 plan, compared with zero split VTDs in the 2001 plan.<br><br>• District 63 also experienced a drastic reduction in compactness between the 2001 plan and the 2011 plan.<br><br>• These departures from traditional districting principles were driven largely by the population and BVAP "needs" of neighboring District 75, which was located in the Southside area of Virginia. As discussed above, this Court concluded after the first trial that race predominated in the drawing of District 75 but that the use of race there satisfied strict scrutiny, which decision the Supreme Court affirmed.<br><br>• Because "[v]irtually all" the rural majority-black VTDs in the area already were included in District 75, "drastic maneuvering" was required to ensure that the BVAP of District 75 remained above 55%.<br><br>• These maneuvers included the "avowedly racial" decision to split Dinwiddie County between District 75 and District 63.<br><br>• Before these changes benefitting District 75 were made, District 63 also was significantly underpopulated and, as a result of the split of Dinwiddie County, lost considerable additional population and BVAP. Dance testified that, to compensate for this loss of BVAP, District 63 received the heavily black areas of the city of Hopewell and Prince George County, for the express purpose of increasing the district's BVAP to comply with the 55% BVAP requirement.<br><br>• The data corroborate Dance's explanation, showing, for example, that the division of Hopewell plainly tracked racial residential patterns, with the white portion of Hopewell assigned to non-challenged District 62. Notably, the BVAP of the portion of Hopewell assigned to District 63 was three times higher than the portion of Hopewell assigned to District 62.<br><br>• The split of a particular VTD in Hopewell further illustrates the precision with which the map-drawers sought to separate black and white voters. Hopewell Ward 7 was split between Districts 63 and 62 along racial lines, following the boundaries of black and white neighborhoods. |

|  | • As a result, although District 63 received 29% of the total population of the Ward 7 VTD, District 63 received 51% of the BVAP of that VTD. <br><br> • This same pattern, in which District 63 received higher BVAP sections of split VTDs, was true for all four VTDs split between District 63 and a non-challenged district. <br><br> • After District 63 lost significant BVAP from Dinwiddie County to District 75, the map-drawers disregarded traditional districting principles to ensure that District 63 continued to comply with the 55% BVAP threshold. The map-drawers split geographies and VTDs precisely according to race. |
|---|---|

| South Hampton Roads Region  HDs 77, 80, 89, 90  Op. at 61-76 | • Districts 77, 80, 89, and 90 were underpopulated, with limited options to gain significant population while retaining a BVAP over 55%.  • the legislature engaged in complicated population-shifting maneuvers to sweep concentrations of black residents into one of the challenged districts, and to respond to the ripple effects of such population shifts throughout the region.  • Five cities in the region were split between a challenged and a non-challenged district. In all five cases, the portion of the city allocated to a challenged district had a "substantially higher BVAP" than the portion assigned to a non-challenged district.  • And under the 2011 plan, one neighborhood in downtown Norfolk was divided into three districts, and included a half-mile stretch of roadway running through District 89, into 90, returning to 89, moving into 80, and ending in 90. |

| | |
|---|---|
| **HD80**<br><br>Op. 63-66 | • We first consider District 80, which was the "lynchpin" to the redistricting of South Hampton Roads.<br><br>• In the 2001 plan, District 80 included portions of the cities of Chesapeake, Norfolk, and Portsmouth. As a result of the 2011 redistricting, District 80 also gained a portion of the city of Suffolk, thereby spanning four split municipalities.<br><br>• At the time of the 2010 census, District 80 was underpopulated by more than 9,000 people, and had a BVAP of 54.4%.<br><br>• The geography and demographics of the surrounding area hampered the legislature's ability to replenish the needed population while achieving the 55% BVAP requirement. At that time, District 80 was surrounded by largely white areas along the water and to the west of the district.<br><br>• On the eastern side of the district, District 80 shared a border with challenged District 89, and a border with challenged District 77.<br><br>• To accommodate the interrelated needs of these challenged districts, the legislature removed more than 22,000 people from District 80, and replaced them with over 32,000 new residents.<br><br>• As part of this population shift, the district shed about 14,000 people to neighboring non-challenged District 79. In that transfer, white residents were moved from District 80 to 79 at three times the rate of black residents, with a 29.4% BVAP in the transferred population.<br><br>• [T]these huge population shifts decreased the compactness of District 80 and rendered the shape of the district bizarre on its face, resembling a sideways "S."<br><br>• To create this sideways "S," District 80 added Portsmouth VTDs 33 and 34, which were predominantly white. Pl. Ex. 63 at 124-25; DI Ex. 94 at 10. VTDs 33 and 34 acted as a westward "bridge" into the VTDs of 38, Taylor Road, Yeates, and Harbour View, located in Portsmouth, Chesapeake, and Suffolk respectively, all of which had large BVAP concentrations.<br><br>• The westward extension also added an additional water crossing to the district. We find that this oddly shaped westward extension of District 80 was constructed primarily on the basis of race[.]<br><br>• Although District 80 had only one populated VTD that was split in the 2011 plan, the nature of that split exhibited a stark racial division. The BVAP of the portion of VTD Nine assigned to District 80 was over 98%, whereas the |

| | BVAP of the portion of that VTD assigned to District 79 was more than 30 percentage points lower. |
| | • In sum, after the 2011 redistricting, District 80 exhibited a shape that was bizarre on its face, experienced a significant reduction in compactness, and underwent massive population shifts showing distinct racial patterns. |

| HD89<br><br>Op. at 66-69 | • District 89 […] experienced a significant reduction in compactness after the 2011 redistricting. |
|---|---|
| | • [A]at the time of the 2010 census, District 89 had the lowest BVAP of any challenged district in the entire South Hampton Roads region, at 52.5%. Also like District 80, District 89 was significantly underpopulated, and needed more than 5,700 additional people. |
| | • [T]here was a strong positive and statistically significant relationship between the BVAP of a census block and its likelihood of being assigned to District 89. In particular, a census block with a 75% BVAP was 2.9 times more likely to be allocated to District 89 than a census block with only a 25% BVAP. |
| | • [T]he legislature demonstrated its racial motive in the way certain VTDs were split. In two of the three VTDs split between District 89 and a neighboring non-challenged district, the portion of the VTD allocated to District 89 had a higher BVAP than the portion allocated to the non-challenged district. The 2011 plan also split the Brambleton VTD between challenged Districts 89 and 90. […] Although the Brambleton VTD previously was contained entirely within challenged District 90, this split was required for District 89 to achieve the 55% BVAP threshold. As Dr. Palmer explained, if District 89 had not received its portion of Brambleton, the BVAP of the district would have fallen to 54.7%. |
| | • The single exception to this pattern is the Zion Grace VTD, in which the portion of the VTD assigned to District 89 had a lower BVAP than the portion assigned to non-challenged District 79. Notably, however, the Zion Grace VTD assigned a very small portion of its population to District 89. |
| | • In addition to Brambleton, District 89 received the predominantly black Berkley VTD from District 80. |
| | • District 89 had been located entirely north of the Elizabeth River in the 2001 plan. The addition of Berkley to District 89, however, added a water crossing to District 89 in order to reach that single VTD. |
| | • In contrast to gaining the heavily black Berkley VTD on the south side of the district, District 89 lost the largely white Suburban Park VTD on the north side. |
| | • Additionally, the legislature split the Granby VTD, which bordered Suburban Park, with minute precision to include black residents in District 89 while excluding white Granby residents. |
| | • This race-based population split was accomplished in the Granby VTD by the legislature adding to District 89 an appendage encompassing significant |

|  | numbers of black residents, while carving a sliver out of the middle of the Granby VTD to exclude a narrow band of white residents<br><br>• the legislature moved VTDs in and out of District 89 based on racial composition, and split VTDs clearly along racial lines, in order to achieve the 55% BVAP threshold. We find that these racial patterns were not coincidental to the attainment of traditional districting goals[.] |
| --- | --- |

| **HD77**<br><br>Op. at 69-73 | • In both the 2001 plan and the 2011 plan, District 77 included portions of the cities of Suffolk and Chesapeake, connected by a narrow east-west corridor in the middle of the district.<br><br>• District 77 already had an odd shape and an extremely low compactness score under the 2001 plan. [ ] District 77 retained this general shape and low compactness score in the 2011 plan.<br><br>• The boundaries of the 2001 version of District 77 extracted black residents from Chesapeake, "divide[d] [black residents] in suburban Portsmouth into two segments so as to share them between Districts 77 and 80," and extended into Suffolk so that black residents "on one side of town were separated from whites on the other."<br><br>• At the time of the 2010 census, District 77 had a BVAP of 57.6%, and was the least underpopulated of the challenged districts in Hampton Roads, with a population deficit of about 3,000 people. Despite this relatively minor underpopulation, the legislature moved more than 18,000 people out of District 77, and replaced them with about 21,000 others.<br><br>• Initially, four largely white Chesapeake VTDs in District 90 were transferred to District 77, namely, Oaklette, Tanglewood, Indian River, and Norfolk Highlands. This removal of white residents from District 90 was necessary for that district to attain a 55% BVAP.<br><br>• To compensate for this influx of white residents from District 90, District 77 lost four other majority-white VTDs, namely, Westover, Geneva Park, River Walk, and E.W. Chittum School.<br><br>• By removing the Geneva Park VTD, the already-narrow corridor linking the Chesapeake and Suffolk portions of the district narrowed further, to a half-mile in width. As a result of this narrowing, no east-west roads within District 77 connected the eastern and western parts of the district.<br><br>• This east-west corridor "generate[d] the starkest possible segregation of blacks and whites." District 77 needed to retain the high BVAP Suffolk VTDs of Southside, Hollywood, and White Marsh to achieve a 55% BVAP. Accordingly, District 77 had to maintain some minimal connection between the Chesapeake and Suffolk precincts to remain a contiguous district.<br><br>• in both the VTDs split between District 77 and a non-challenged district, the portion allocated to District 77 had a much higher BVAP than the portion assigned to the neighboring non-challenged district. For example, in the Suffolk VTD of Lakeside, the BVAP of the portion of the VTD allocated to District 77 was 79.4%, while the BVAP of the area assigned to non-challenged District 76 was 36.1%. In the case of another split VTD, District |

|  | 77 received 75% of the population of the John F. Kennedy VTD, but received 96% of the BVAP.<br><br>• To the extent that the district retained lines that previously were drawn based on race, we infer that race similarly influenced the legislature's decision to retain those lines.<br><br>• The creation of an exceptionally narrow corridor to connect pockets of black residents in two cities, without including an avenue for constituents or delegates to travel along that corridor, is strong evidence that the legislature subordinated traditional districting criteria to race. |
|---|---|

| HD90 Op. at 73-76 | <ul><li>Overall, by transferring 4,000 people from District 90 to District 89, including  Because the redistricting decisions made in that district were integrally connected with the race-based decisions made elsewhere in South Hampton Roads, we conclude that race predominated in the drawing of District 90.</li><li>In the 2001 plan, District 90 included portions of the cities of Chesapeake, Norfolk, and Virginia Beach. After the 2011 redistricting, District 90 lost its precincts located in Chesapeake, and thus covered only two split municipalities.</li><li>The district also improved in compactness in the 2011 plan, and retained the same number of split VTDs […] however, these consistencies with traditional districting criteria do not end our analysis of racial predominance.</li><li>District 90 lost the heavily white VTDs of Oaklette, Tanglewood, Indian River, and Norfolk Highlands to District 77, forcing the shedding from District 77 of other areas with significant white population. The BVAP of District 90 would have dropped below 55% had District 90 retained the white population contained in these VTDs.</li><li>although the Brambleton VTD previously had been located wholly within District 90, the VTD was split in the 2011 plan between Districts 90 and 89. The Brambleton VTD had a large overall population and a 96% BVAP, without which District 89 could not have reached the 55% BVAP threshold.</li><li>a portion of Brambleton and a neighboring overwhelmingly black VTD, District 89 gained population with a 94.1% BVAP.</li><li>the legislature also split VTDs between District 90 and non-challenged districts precisely along racial lines. […] Notably, for example, the BVAP of the portion of the Aragona VTD in District 90 was 61.6%, compared with the 19% BVAP in the portion of Aragona assigned to non-challenged District 85. Dr. Rodden's dot density maps illustrate the specificity with which the Aragona, Shell, and Reon VTDs were split to separate black and white populations.</li></ul> |
|---|---|

| | |
|---|---|
| **North Hampton Roads Region**<br><br>Op. at 54-61 | • Between 2001 and the 2010 census, the peninsula lost substantial population, resulting in severe underpopulation in Districts 92 and 95. In addition to being bordered by bodies of water, Districts 92 and 95 were adjacent to large concentrations of white residents in other districts. Thus constrained by both geography and demographics, the legislature was required to add substantial population to Districts 92 and 95, while retaining a 55% BVAP in each.<br><br>• [T]he legislature undertook several patently race-based maneuvers to equalize population in these districts. Most notably, the legislature added a long, narrow appendage to District 95, which on its face disregarded traditional districting criteria.<br><br>• Most notably, the legislature added a long, narrow appendage to District 95, which on its face disregarded traditional districting criteria.<br><br>• The appendage also split several VTDs, causing separation of predominantly black neighborhoods from predominantly white neighborhoods with striking precision. Dr. Rodden could not "fathom" an explanation for these changes other than race.<br><br>• In addition to these plainly racial splits of VTDs, the data also show more general illustrations of race-based line-drawing on the peninsula. In the 2011 plan, all the majority-black VTDs in the vicinity of Districts 92 and 95 were included in one of those districts. The portions of the cities of Hampton and Newport News assigned to Districts 92 and 95 had substantially higher BVAP levels than the portions of those cities assigned to neighboring non-challenged districts. For example, the portion of Hampton assigned to District 92 had a 60.7% BVAP, compared to the 27.9% BVAP in the areas of Hampton assigned to non-challenged District 91. |

| | |
|---|---|
| **HD95**<br><br>Op. at 55-59 | • Although District 95 had a high 61.6% BVAP, that district was the most underpopulated of all the challenged districts at the time of the 2010 census, with a population deficit of about 12,000 people.<br><br>• To add the thousands of residents required to equalize population, while still maintaining a minimum 55% BVAP, the legislature added a lengthy, narrow appendage to the northwest edge of the district. This appendage caused a significant reduction in the compactness of District 95, leading to the worst compactness score in the entire 2011 plan.<br><br>• [T]he addition of the narrow appendage increased the number of split VTDs in District 95 from one in the 2001 plan to five in the 2011 plan. In all five instances, the BVAP of the portion of those VTDs allocated to District 95 was higher than the BVAP of the area allocated to a neighboring non-challenged district.<br><br>• Accordingly, Dr. Palmer calculated a strong positive and statistically significant relationship between BVAP and the likelihood that a census block would be assigned to District 95. Dr. Palmer explained that a census block with a 75% BVAP was three times "more likely to be assigned to District 95" than a census block with a 25% BVAP. Dr. Palmer further determined that black residents previously located in non-challenged District 94 were seven times more likely to be moved into District 95 than white residents.<br><br>• To achieve these racial disparities, this appendage followed a "narrow corridor through white neighborhoods in order to reach a corridor" of black residents along a major highway and an additional thoroughfare. The legislature split nearly every VTD at the northern end of this corridor, separating white and black voters "with remarkable precision." As Dr. Rodden explained, the legislature split the four northernmost VTDs in the new appendage, namely, Jenkins, Denbigh, Epes, and Reservoir, "precisely at the point where black neighborhoods transitioned to white neighborhoods." Indeed, the legislature drew the boundary in some cases along small residential streets, with the effect of including in District 95 multi-family housing occupied by black residents on one side of a street while excluding white residents living on the other side of the same street.<br><br>• The dot density maps produced by Dr. Rodden plainly illustrate the precision with which these VTDs were split by race.<br><br>• The narrow appendage added significant black population to District 95, which allowed the district to "donate" BVAP to neighboring challenged District 92. Accordingly, despite the 12,000-person population deficit in District 95, that district still transferred over 18,000 people into District 92. As discussed further below, the legislature moved three heavily black VTDs from District 95 into District 92, which shift included over 6,000 |

| | black residents of voting age, allowing District 92 both to achieve population equality and to satisfy the 55% BVAP threshold. |
|---|---|

| HD92<br><br>Op. at 59-61 | • The evidence showed that the construction of District 92 was "intimately connected" with the plainly race-based decisions made in District 95. As Dr. Rodden explained, we cannot "understand the districting decisions of one without thinking about the implications for the other" of the two districts, with respect to the need for population as well as the fixed 55% BVAP threshold.<br><br>• Despite the severe underpopulation of both districts, District 92 received population exclusively from District 95. After District 95 gained additional population and BVAP from its racially designed northward appendage, three VTDs with high BVAPs were moved from District 95 into District 92, totaling nearly 16,000 people.<br><br>• This transfer of the Mallory, Forrest, and Kraft VTDs was sufficient on its own to rectify the population deficit in District 92, and, as noted above, included over 6,000 black voting-age residents. Pl. Ex. 63 at 113; 2nd Trial Tr. at 242. Without this donation of significant population from District 95, the legislature would have been forced to expand the boundaries of District 92 into heavily white precincts, negatively impacting the BVAP level of District 92.<br><br>• In sum, patently race-based maneuvers allowed District 95 to serve as a "donor" of population and BVAP to District 92, ensuring that the addition of thousands of people to District 92 would not decrease the BVAP of that district below 55%. |
|---|---|