**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| GOLDEN BETHUNE-HILL, et al., | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |
| Plaintiffs. | |
| v. | |
| VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' STATEMENT OF POSITION REGARDING SPECIAL MASTER REPORT**

I. **INTRODUCTION**

Pursuant to the Court's Order dated October 19, 2018 (Dkt. No. 278), Plaintiffs respectfully submit this statement of position regarding the Report of Special Master Bernard Grofman. *See* Dkt. No. 323 ("Report"). For the reasons set out below and in their prior remedial phase briefs, *see* Dkt. Nos. 292, 305, Plaintiffs ask the Court to adopt Plaintiffs' Proposed Remedial Plan A or B. As between the various modules developed by the Special Master, Plaintiffs submit that the Court should adopt Petersburg 2, Richmond 1A, Peninsula 2, and Norfolk 1A.

II. **ARGUMENT**

    A. **The Court Should Adopt One of Plaintiffs' Proposed Remedial Plans**

As Plaintiffs explained in their earlier briefing (Dkt. No. 292), Plaintiffs' proposed remedial plans cure the fundamental constitutional deficiencies in the eleven Challenged Districts while at the same time preserving the basic structure of the existing districts under the current plan and improving that plan with respect to every objective metric. Plaintiffs have thoroughly described their proposed remedial plans and will not repeat that full discussion here. In brief, Plaintiffs submit that their remedial plans accomplishes the remedial task before the Court in an appropriately neutral, objective, and circumspect fashion, as is appropriate for a map to be adopted by a court overseeing the redistricting process.

The Special Master's primary reason for rejecting Plaintiffs' proposed remedial plans does not prohibit this Court from adopting either one of them. Specifically, the Special Master faults Plaintiffs' proposed plans for altering more districts than necessary. *See* Report at 5, 119. But there is nothing talismanic about keeping the total number of affected districts to an absolute minimum in drawing a remedial plan. Rather, as the Special Master acknowledges, this is just one factor in a series of "potential tradeoffs among traditional redistricting criteria," *id.* at 5, that may reasonably be considered in remedying the

constitutional violation. While Plaintiffs agree that the Court should avoid changing non-Challenged districts based solely on reasons *unrelated* to the remedy of the unconstitutional Challenged Districts, where changes to adjacent districts flow from a full and effective remedy to the constitutional violation, consideration of traditional districting criteria (e.g., minimizing locality splits, compactness, etc.) may warrant alterations to a greater number of districts. For instance, in remedying a certain unconstitutional district, the Court may choose to make relatively modest changes to two adjacent districts rather than more significant changes to one adjacent district, particularly where the end result would minimize locality splits among all three.

In short, Plaintiffs maintain that their preferred plans make appropriate tradeoffs—in particular minimizing locality and VTD splits—while limiting the degree to which changes are made to the areas surrounding the unconstitutional districts. Accordingly, Plaintiffs urge the Court to adopt one of Plaintiffs' proposed remedial plans.

**B.    Alternatively, the Court Should Adopt a Plan Comprised of the Special Master's Proposed Petersburg 2, Richmond 1A, Peninsula 2, and Norfolk 1A**

While Plaintiffs maintain that either of their proposed remedial plans constitute viable and effective remedies, they have also reviewed the Report and accompanying data files. For the reasons that follow, the Court should adopt the following "modules" proposed by the Special Master: Petersburg 2, Richmond 1A, Peninsula 2, Norfolk 1A. These options best remedy the unconstitutional racial gerrymanders of the Challenged Districts while making sensible changes to surrounding districts as needed to effect the remedy.

**1.    Petersburg**

In Petersburg, the Court should adopt the Special Master's proposed Plan 2.

The primary differences between the proposals derive from the way the Special Master addressed Dinwiddie County. The Court found that, in the Enacted Plan, Dinwiddie County was split between District 75 and District 63 for "avowedly racial" reasons as part of

the significant "maneuvering" undertaken by the General Assembly to comply with the 55% BVAP floor. Dkt. No. 234 ("Mem. Op.") at 49. Thus, the Dinwiddie split, along with the other "departures from traditional districting principles" that followed from it, *id.* at 48, provided strong evidence that race predominated in District 63. *Id.* at 49-50.

Two of the three alternatives offered by the Special Master, however, preserve the Dinwiddie split. Petersburg 1A appears to maintain the Dinwiddie split precisely in its current form. Petersburg 1B changes the particulars, but also splits Dinwiddie between District 63 and 75.

While Plaintiffs are confident the Special Master did not consider race when drafting these proposals in the first instance—as he states explicitly on multiple occasions in his report (e.g., Report at 49)—the *effect* of preserving the Dinwiddie split is to carry forward the race-based construction of District 63 from the Enacted Plan. As demonstrated by Petersburg 2, which keeps Dinwiddie County whole within District 63, it is *not* necessary to split Dinwiddie—either to cure the racial gerrymander of District 63 or for population equality reasons when redrawing the map. Petersburg 2 is the superior option for this reason alone.

Moreover, taking the natural step of curing the Dinwiddie split also cures various departures from traditional redistricting principles in the Petersburg area that flowed from the race-based decision to split Dinwiddie County. For instance, curing District 63 by extending it south to the Dinwiddie County border naturally means that District 75 instead picks up population to the east, thereby unifying Sussex County, Southampton County, and Franklin City wholly within District 75. Presently, those localities are split between District 75 and District 64. Making necessary population equality adjustments to District 64 then results in District 64 consisting almost entirely of whole counties. Petersburg 2 thus splits markedly fewer counties and VTDs than the alternatives.

| Locality Splits in Petersburg Region | | |
|---|---|---|
| Plan | Number of Split Counties | Number of Split VTDs |
| Petersburg 1A | 10 | 18 |
| Petersburg 1B | 10 | 16 |
| Petersburg 2 | 4 | 10 |

Likewise, the five districts in Petersburg 2 are, on the whole, markedly more compact than the alternatives:

| Compactness of Districts in Petersburg Region (Reock measure) | | | |
|---|---|---|---|
| District | Petersburg 1A | Petersburg 1B | Petersburg 2 |
| 62 | .41 | .41 | **.48** |
| 63 | .43 | .41 | **.57** |
| 64 | **.37** | **.37** | .32 |
| 66 | .27 | .27 | **.37** |
| 75 | .41 | **.43** | .41 |
| Mean | .38 | .38 | **.43** |

In short, the simple step of remedying District 63 by fully curing the Dinwiddie County split leads naturally to a superior construction of the map in Petersburg overall. The Court should adopt Petersburg 2.

### 2. Richmond

In Richmond, the Special Master offers two plans—Richmond 1A and 1B. For the reasons that follow, the Court should adopt Richmond 1A.

As the Special Master explains, the two variants "do not differ in the shape of any of the unconstitutional districts (69, 70[,] 71, and 74)." Report at 68. Rather, the *only* difference between the two plans is "in the shapes of districts 72 and 73." *Id.* Richmond 1A preserves the basic structure of District 72 and 73: District 73 is identical to the benchmark plan, and

District 72 is near-identical, but for minor adjustments with the border with District 74. By contrast, Richmond 1B redraws District 72 and 73 nearly anew.

According to the Special Master, the reason to "consider a change in both districts [72 and 73] is that the incumbent locations in these districts are not the same in 2017 as in 2011." *Id.* Because the incumbent residences have changed, it is possible to "improve overall district compactness without affecting changes in the unconstitutional districts." *Id.* In short, the Special Master explains, one could redraw Districts 72 and 73 in 2018 to improve compactness without pairing incumbents because the current incumbents do not reside where incumbents lived in 2011. This potential change is thus independent from and *not* connected to the need to redraw the nearby unconstitutional districts, as shown by the fact that the Challenged Districts are identical in Richmond 1A and 1B.

While Plaintiffs believe that neighboring districts should be redrawn to better comport with traditional redistricting principles *where doing so is a consequence of remedying the unconstitutional districts*, they are cognizant of the fact that the task before the Court is limited to remedying constitutional violations. In this particular instance, improving the compactness of Districts 72 and 73 is entirely unrelated to that remedial task. Moreover, the changes made to Districts 72 and 73 are not modest. In Richmond 1B, roughly 42% of the population from District 72 is swapped with District 73, and vice versa. In Richmond 1A, by contrast, Districts 72 and 73 retain 97% and 100%, respectively, of their current populations. In short, Richmond 1B offers a wholesale redrawing of two non-Challenged Districts that is admittedly unconnected to the redrawing of the nearby Challenged Districts.

In these circumstances, Plaintiffs submit that the Court should adopt Richmond 1A.

### 3.     Peninsula

In the Peninsula region, the Special Master offers two alternatives—Peninsula 1 and 2. The Court should adopt Peninsula 2.

In the Enacted Plan, District 95 snakes up the Peninsula to scoop up far-flung pockets of African-American voters. *See* Mem. Op. at 57. Any remedy will necessarily significantly redraw District 95 and center the district in Hampton, as the "long, narrow appendage" that was added to District 95 to accomplish the General Assembly's racial goals must be eliminated. *Id*. at 54. This, in turn, means that significant changes to the districts surrounding to District 95 are required. The most noteworthy difference between the two plans is in how changes made to remedy District 95 impact surrounding non-Challenged Districts 93 and 94.

In Peninsula 2, the Special Master keeps the basic structure of District 93 and 94 the same. By contrast, in Peninsula 1, District 94 is greatly elongated to the north, extending all the way to Williamsburg. This results in an iteration of District 94 that is nearly half as compact (.24) under the Reock measure than its counterpart in Peninsula 2 (.45). Moreover, moving Williamsburg into District 94 also results in more sweeping changes to District 93; District 93 retains 81.85% of its current population in Peninsula 2 as compared to 52.23% in Peninsula 1. District 94, meanwhile, retains 61.07% of its current population in Peninsula 2 as compared to 50.07% in Peninsula 1.

In short, Peninsula 2 fully remedies the unconstitutional racial gerrymander of District 95 (and 92), without requiring the degree of change to Districts 93 and 94 contained in Peninsula 1. The Court should adopt Peninsula 2.

### 4. Norfolk-Chesapeake-Portsmouth

Finally, in Norfolk-Chesapeake-Portsmouth, the Special Master offers three alternatives for the Court's considerations—Norfolk 1A, 1B, and 1C. The Court should adopt Norfolk 1A.

As the Special Master explains, these plans contain "very minor variations." Report at 91. The primary difference between these plans is in the treatment of Challenged District 77. In the Enacted Plan, District 77 is a noncompact district connecting Suffolk in the west to the

eastern edge of Chesapeake by a "narrow east-west corridor" to connect far-flung pockets of African-American voters. Mem. Op. at 70.

In Norfolk 1A, the Special Master draws a highly compact version of District 77 centered in Chesapeake. The compactness of the district is nearly tripled, from .19 to .55 under the Reock measure. The only concern Plaintiffs would have in the abstract is that a consequence of this change is to reduce the BVAP of the district to 40.23%. But the Special Master analyzed the various iterations of the proposed Challenged Districts and concluded that all would provide African-American voters with an equal opportunity to elect candidates of choice. *See, e.g.*, Report at 40-49. Given the additional analysis conducted by the Special Master to reach this conclusion, Plaintiffs are satisfied that the version of District 77 contained in Norfolk 1A would remedy the racial gerrymander without compromising African-American voters' opportunity to elect their candidate of choice.

Given that conclusion, Norfolk 1A is clearly the superior plan. Challenged District 77 is more than twice as compact under the Reock measure in Norfolk 1A (.55) than it is in Norfolk 1B or 1C (.24). Differences between the compactness scores in other districts between the three plans are a wash. Each version of the plan splits the same number of counties (5), though Norfolk 1A does split one fewer VTD (12) than the alternatives (13).

The Court should therefore adopt Norfolk 1A.

### III. CONCLUSION

For the reasons stated above, in the event the Court selects between the Special Master's proposals, Plaintiffs submit that the Court should adopt Petersburg 2, Richmond 1A, Peninsula 2, and Norfolk 1A.

Dated: December 14, 2018 	Respectfully submitted,

By: */s/ Aria C. Branch*
Marc Erik Elias (admitted *pro hac vice*)
Bruce V. Spiva (admitted *pro hac vice*)
Aria Branch (VSB # 83682)
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.434.1627
Facsimile: 202.654.9106

Kevin J. Hamilton (admitted *pro hac vice*)
Abha Khanna (admitted *pro hac vice*)
Ryan Spear (admitted *pro hac vice*)
William B. Stafford (admitted *pro hac vice*)
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

      I hereby certify that on the 14th day of December, 2018, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

      Respectfully submitted,

      By /s/ *Aria C. Branch*
      Aria C. Branch (VSB# 83682)
      Perkins Coie LLP
      700 13th St. N.W., Suite 600
      Washington, D.C. 20005-3960
      Phone: (202) 654-6338
      Fax: (202) 654-9106
      Email: ABranch@perkinscoie.com

      *Attorneys for Plaintiffs*