IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

GOLDEN BETHUNE-HILL, *et al.*,

Plaintiffs,

v.

VIRGINIA STATE BOARD OF ELECTIONS, *et al.*,

Defendants.

Civil Action No. 3:14cv852

SECOND ADDENDUM TO THE REPORT OF THE SPECIAL MASTER

December 28, 2018

Bernard Grofman*
Special Master

*Bernard Grofman is Distinguished Professor of Political Science and Jack W. Peltason Endowed Chair of Democracy Studies at the University of California, Irvine, and former Director of the UCI Center for the Study of Democracy.

This addendum provides comments on the Responses to the December 7 Report of the Special Master that were filed on December 14.

1. I have read and reviewed Responses to the December 7 Report of the Special Master that were filed on December 14 by the Plaintiffs, the Defendant, the Defendant-Intervenors, the Virginia State Conference of NAACP Branches (which I henceforth simply refer to as the NAACP), and the Princeton Gerrymandering Project.

2. The Plaintiffs, the Defendant-Intervenors, and the NAACP each reiterate that their preferred solution is for the Court to adopt a plan they have previously offered to the Court as a remedy. For the multiple reasons already elaborated on in my December 7 Report and the Appendix thereto, I cannot recommend any of those previously submitted plans for adoption by the Court. Nothing in any of the submitted briefs affects my previous reasons for not recommending adoption of these plans.

3. Nothing that is said in any of the responses received on December 14 has convinced me to make new recommendations to the Court for illustrative map modules. I do expect, however, that whatever plan the Court ultimately does adopt will require some minor technical corrections. For example, if the Court were to adopt some combination of my illustrative modules, I would expect to review that

illustrative map and seek to reduce still further the already low number of VTD splits for the final map. But such technical corrections, or any other form of improvements to submitted maps or illustrative modules, can wait until I have been given further specific instructions by the Court as to final map drawing after January 10. This will allow all parties to respond, at the hearing of January 10 or as of January 4, with comments on my illustrative modules in the form that these illustrative modules have been specified in my December 7 Report. As noted in that Report, with the aid of legislative staff, once I have the Court's instructions as to how to proceed, I expect to be able to offer the Court a final map in a timely fashion.

4. The Defendant offers no map of its own and Defendant's Response of December 14 indicates that the Court's choice of <u>any</u> of the illustrative modules would be acceptable as a constitutional remedy. For reasons specified in its Response, the Defendant regards each illustrative module as fully satisfying the narrowly tailoring standard needed for a court-ordered remedy and trusts the Court to choose the most appropriate final map. For each of the other groups to file Responses on December 14, I have assessed preferences among the various illustrative modules based on my reading of their Response Briefs to the best of my ability, using in all cases the labels for the modules given in my December 7 Report. [1] If my assessment

---

[1] I apologize to the Court and to all parties that, for the Norfolk area, I have inadvertently generated confusion with respect to the ability of parties to express relative preferences among the three illustrative modules for Norfolk, because the labeling of Norfolk 1A and Norfolk 1C appears to have been reversed in the shape files relative to the correct labeling of these illustrative modules on my Report. In

of the views expressed in the various Response Briefs about their most preferred

option <u>when choice is confined to my illustrative models</u> is erroneous, the parties

may inform the Court of my error at the January 10 hearing -- or sooner, at their

convenience. [2] Receipt of this information will not affect anything I do prior to the

January 10 hearing.


5. In the event that the Court does not accept one of the Plaintiffs' proposed

remedial maps, I believe that Plaintiffs indicate that they would prefer the Court to

adopt Richmond Illustrative Module 1A, Petersburg Illustrative Module 2,

Peninsula Illustrative Module 2, and Norfolk Illustrative Module 1A, [3] with

whatever further changes, might be directed by the Court.

---

this Addendum I will use the same labeling for the three Norfolk illustrative
modules as in my December 7 Report, since all the tables in that Report match with
this labeling, and this is what I regard as the correct labeling. In this correct
labeling, Norfolk 1A is the plan which changes the most districts in the Norfolk
area; Norfolk 1C is the plan that changes the fewest districts in the Norfolk area;
and Norfolk 1B is intermediate between the two, changing one more district than
Norfolk 1C and one less district than Norfolk 1A. Labeling was an issue only for two
of the three Norfolk illustrative modules, and was not an issue in the other regions
of the state. Since only the <u>naming</u> of two of the three Norfolk modules is affected,
and to the best of my knowledge, the data on the shape files is correct, this should
not impact the ability of parties to carry out analyses of any of these modules or to
propose improvements in them.

[2] See footnote 1 re the labeling of illustrative modules in the Norfolk area.

[3] See footnote 1 re the labeling of illustrative modules in the Norfolk area.

6. In the event that the Court does not accept the remedial map proposed by the NAACP, my reading of the NAACP Response indicates that they would prefer the Court to adopt Richmond Illustrative Module 1B, Petersburg Illustrative Module 2, Peninsula Illustrative Module 2, and Norfolk Illustrative Module 1B, [4] with whatever further changes, might be directed by the Court.

7. In the event that the Court does not accept Defendant-Intervenors 7002 as a remedial map, Defendant-Intervenors provide no preference among any of the illustrative modules provided to the Court by the Special Master.

8. The Response Brief filed on December 14 by the Princeton Gerrymandering Project, a non-partisan and academically-based group, does not offer a map to be given consideration by the Court. The illustrative map they discuss is simply an illustration of what might be possible were no attention paid to avoiding the pairing of incumbents,[5] and no attention paid to limiting the number of redrawn districts in

---

[4] See footnote 1 re the labeling of illustrative modules in the Norfolk area.

[5] As is noted in the December 14 Response Brief by the Princeton Gerrymandering Project: "One key difference in the methods of construction between the Princeton Plan and the plans drawn by Prof. Grofman is the consideration of incumbency: while Prof. Grofman sought to avoid pairing incumbents without degrading other criteria, the creators of the Princeton Plan neither had access to such information" (footnote 2). (Here I assume that the word 'neither' is a typo. The clear meaning of the quote above is that the Princeton Gerrymandering Group did not have access to incumbency location information.) Because of this lack of information about incumbencies the Princeton Gerrymandering map pairs many incumbents in a single district: (91 and 92), (93 and 95), (83 and 85), (78 and 81), (63 and 66), (70 and 71), and (72 and 74), and even has a triplet of incumbents in a single district

a remedial map.[6] If illustrative modules proposed by the Special Master were to be
ordered by the Court, my reading of their response indicates that they would prefer
the Court to adopt Richmond Illustrative Module 1B, Petersburg Illustrative
Module 2, Peninsula Illustrative Module 2, and Norfolk Illustrative Module 1A,[7]
with whatever further changes, might be directed by the Court.

9A. If we compare the evaluations of the Special Master's illustrative modules
across the various Response Briefs, <u>and</u> we disregard each group's primary support
of its own plan or plans, there appears to be substantial agreement on two of the
illustrative modules. The Plaintiffs, the NAACP, and the Princeton
Gerrymandering Project all endorse Petersburg illustrative module 2 and Peninsula
illustrative module 2 in preference to any other of my illustrative modules within
those two geographic regions, while the Defendant (with no stated preference
among the modules within any given geography, but clearly expressed support for
whichever of the illustrative modules the Court might choose) would also accept the
choice of these two modules. That leaves only the Defendant-Intervenors, but they
have expressed no preference among modules, simply rejecting all of them.

---

(68-69-73), and with this excessive number of incumbents paired it is not a
candidate for being considered as a possible remedy in this case. Still, it is useful to
examine for ideas the features of this fully incumbent blind plan drawn along
traditional districting lines by a sophisticated group of mapmakers.

[6] They redraw 33 districts.

[7] See footnote 1 re the labeling of illustrative modules in the Norfolk area.

9B. If one of my illustrative modules for Norfolk were to be adopted by the Court, based upon this reading, and using the labels for the illustrative modules given in my December 7 Report, there is no consensus among the groups that filed Responses on December 14 with respect to preferences for the Norfolk area when those preferences are limited to comparisons among my various modules for that geographic region. I believe that Plaintiffs and the Princeton Gerrymandering Project have expressed a relative preference for what my December 7 Report has labeled Norfolk 1A, i.e., for the illustrative module that changes the most districts in that region, while the NAACP has expressed a relative preference for what my December 7 Report labeled as Norfolk 1B, i.e., for what is the intermediate module in terms of number of districts changed. Defendant-Intervenors express no relative preferences across illustrative modules for Norfolk and wish to see none of them adopted, while Defendant will accept any of them.

9C. If the Court were to adopt one of my illustrative modules for the Richmond area, both the NAACP and the Princeton Gerrymandering Project prefer Richmond Illustrative Module 1B as their most preferred module among this set. Plaintiffs, in contrast, express a preference among the Richmond illustrative modules for Richmond Illustrative Module 1A. Defendant-Intervenors express no preferences across these illustrative modules, rejecting all of them; while Defendant will accept either of them.

9D. In my comments above, I am merely summarizing statements in the various Responses to the best of my present knowledge. I do not express a preference among the illustrative module options in any of the four regions. My view has consistently been that it is my responsibility as Special Master to offer options to the Court, while is only the Court that has a mandate to choose the configuration that will be used for a court-ordered map that will remedy the unconstitutionalities in these eleven districts in the narrowly tailored fashion appropriate for a court-drawn map.

Now I turn to more specific comments in the various Responses about the illustrative modules and/or the map drawing criteria used for them.

10. The Defendant affirmed the appropriateness of the criteria I used to craft my illustrative modules, involving "equal population districts," drawn according to "traditional districting principles" in a fashion that "only considered race after traditional districting criteria ha[d] been satisfied" and then "only for [the] purposes of seeking to assure that there is no violation of the 14th Amendment's Equal Protection provision vis-à-vis changes in the racial composition of the unconstitutional districts that might have inadvertently created racial vote dilution" (December 14 Response Brief at p. 1). As noted earlier, the Defendant is prepared to accept any of the illustrative modules drawn by the Special Master as a basis for remedial map drawing in that geographic area of the state.

11. In their December 14 Response Brief, while Plaintiffs express clear preferences among my illustrative modules vis-a-vis each of the regions of the state where Challenged Districts are located, and give clearly stated reasons for those preferences, Plaintiffs agree that the illustrative modules that I have submitted remedy the unconstitutional racial gerrymanders of the Challenged Districts. Plaintiffs reviewed the changes in African-American population in the illustrative modules' redrawing of the unconstitutional districts, including that in the district with lowest black voting age population (40.23%). Plaintiffs agree with my conclusion that each of these redrawn districts would provide African-American voters with an equal opportunity to elect candidates of choice (see pp. 2-7).

11A. However, Plaintiffs strongly make the point that they do not believe that the changes in districts 72 and 73 in Richmond illustrative module 1B are warranted. They point out these changes are not needed for the constitutional redrawing of any of the eleven unconstitutional districts.[8]

---

[8] I agree with Plaintiffs characterization of the extensive changes made in districts 72 and 73 in my illustrative Richmond module 1B as not being required to implement a constitutional map vis-à-vis the eleven challenged district, nor (as they correctly point out) did I ever suggest anything to the contrary in my December 7 Report. I indicated in my December 7 Report the unique reasons why I included this option for the Court, namely that the differences between this module and Richmond module 1A had been done to reflect a change in incumbent home location in this part of the state and, in the process, to substantially improve compactness for the district (district 72) which is the least compact district in the state with respect to Polsby-Popper compactness (with a P-P value of .08). Whether Richmond illustrative module 1B makes changes that go beyond the Court's mandate, or should be ruled out for other reasons is, of course, for the Court to decide.

11B. Plaintiffs, while they do not differ with the criteria I identify as traditional

redistricting criteria, and they, like me, acknowledge that drawing a narrowly

tailored remedial map requires a set of tradeoffs, also strongly express the view that

there was no need to restrict the changes in the Enacted map to as few as 26 (or 21)

districts. Here I would simply note that, as explained in much more detail in my

Report of December 7, I took my charge to be one of drawing a narrowly tailored

plan, and I took one feature of such narrow tailoring to be limiting the number of

districts changed.


11C. "The Virginia NAACP believes that each of the illustrative modularized maps

submitted to the Court by Dr. Grofman (hereinafter, the "Grofman Plan") offer

improvements upon the 2011 Enacted Plan with regard to adherence to traditional

redistricting criteria and eliminating the arbitrary 55% BVAP threshold set by the

General Assembly in 2011 for districts which elected black representatives—an

unjustified threshold which led to the unconstitutional packing of black voters"

(NAACP December 14 Response Brief, p.1). They also agree that all my illustrative

modules are ones that only took race into account "after traditional districting

criteria ha[d] been satisfied" and "only for the purpose of assuring that there was no

racial vote dilution in the reconfigured unconstitutional districts" (NAACP

December 14 Response Brief, p.2; citing to Grofman December 7 Report at p. 11).

11D. However, the NAACP Response Brief (p. 1) also takes the view that my illustrative modules do not "go far enough in remedying the numerous unconstitutional racial gerrymanders identified in the 2011House of Delegates plan." The December 14 NAACP Response Brief notes (p. 2) that "the Virginia NAACP devised a plan that, in the process of fully remedying this extreme harm [in the unconstitutional districts], resulted in the natural formation of five additional districts where black voters will either likely have the opportunity to elect their candidate of choice, or have their influence over the election outcomes free from artificial diminishment. Specifically, as a consequence of fully unpacking black voters, two legislative districts saw increases in BVAP from the low 20s to the low 40s, thus providing black voters with a real opportunity to elect their candidate of choice in those districts."[9] The two districts in the NAACP with black voting age population above 40% that are not among the 12 districts that were majority minority in the Enacted map are districts 62 and 76. And "additional opportunities for people of color," are identified as 27, 94, and 85 (see p. 22 of the NAACP November Brief).

However, focusing only the comparison districts emphasized above by the NACCP exaggerates the differences between their map and my maps, when looked at in

---

[9] The NAACP Response Brief goes on to assert (p.2) that "This result helped restore black voters to the position they would have held had they not been unlawfully segregated and packed in the 2011 Enacted Plan."

terms of black voting age population percentages in their map as to compared to the illustrative modules I have drawn. In fact, an argument can be made that the positive impact on minority representation might actually be greater in my 26 district illustrative map than in the NAACP map. [10]

I show below comparisons between the NAACP map, my 21-district change illustrative map, and my 26 district change illustrative map for the 30 districts that are changed in the NAACP map. If a district changed in the NAACP map was not changed in my map I simply report the black voting age population in the 2011 Enacted map. In this way we are comparing 30 districts in the NAACP map to the same 30 districts in different maps. If we count the number of districts other than those found unconstitutional in the 20 to 40% black voting age category used for comparison purposes by the NAACP in their December 14 Response Brief, we find that there are 8 such districts in the NAACP map, 8 such districts in my illustrative 21-district map, and 11 such districts in my illustrative 26-district map, so either there is no real difference across maps with respect to this categorization, or the 26 district illustrative module is superior with respect to this configuration.[11] On the

---

[10]This illustrative map is the combination of my illustrative modules involving exactly 26-districts that was used for analysis purposes by the Pennsylvania Gerrymandering Project in their December 14 Response Brief. The other map I will refer to is the combination of my illustrative modules involving exactly 21-districts the form that was used for analysis purposes by the Pennsylvania Gerrymandering Project in their December 14 Response Brief.

[11] There are seven such districts in the 2011 Enacted Map.

other hand, if we look at districts adjacent to the unconstitutional districts that have been changed to now be over 40%, there are two such districts in the NAACP map, 62 and 76, and only one in my illustrative map, District 76.[12]

---

[12] There are no such districts in the 2011 Enacted map.

Black Voting Age Percentage Comparison Across Different Proposed or Illustrative Remedial Maps

| | District | NAACP | SM21 | SM26 | ENACTED |
|---|---|---|---|---|---|
| **HIGHEST BVAP ↑** | 63 | 58.52% | 51.81% | 47.47% | 59.53% |
| | 92 | 57.60% | 53.87% | 53.87% | 60.72% |
| | 75 | 54.60% | 55.43% | 52.45% | 55.43% |
| | 89 | 52.12% | 54.98% | 54.92% | 55.46% |
| | 95 | 50.67% | 47.48% | 47.36% | 59.97% |
| | 69 | 50.37% | 54.38% | 54.38% | 55.19% |
| | 71 | 49.95% | 54.01% | 54.01% | 55.35% |
| | 80 | 49.72% | 51.38% | 51.38% | 56.30% |
| | 77 | 47.51% | 47.03% | 40.23% | 58.78% |
| | 70 | 46.49% | 52.29% | 52.29% | 56.37% |
| | 90 | 45.97% | 48.91% | 41.93% | 56.59% |
| | 62 | 43.83% | 29.23% | 27.22% | 24.56% |
| | 76 | 42.53% | 42.40% | 42.89% | 25.14% |
| | 74 | 42.49% | 54.37% | 54.37% | 57.24% |
| | 79 | 32.52% | 32.00% | 31.46% | 29.46% |
| | 85 | 29.40% | 22.32% | 21.29% | 18.93% |
| **LOWEST BVAP ↓** | 94 | 29.34% | 16.79% | 31.13% | 21.02% |
| | 27 | 25.51% | 18.44% | 18.44% | 18.44% |
| | 64 | 24.84% | 24.24% | 27.38% | 24.24% |
| | 84 | 22.99% | 20.45% | 20.45% | 20.45% |
| | 91 | 22.42% | 32.52% | 32.52% | 19.61% |
| | 21 | 21.94% | 23.86% | 23.86% | 23.86% |
| | 78 | 18.24% | 17.14% | 16.85% | 17.14% |
| | 66 | 17.42% | 25.81% | 32.31% | 16.06% |
| | 68 | 16.91% | 7.25% | 7.25% | 7.25% |
| | 72 | 16.53% | 15.38% | 19.49% | 13.40% |
| | 83 | 16.23% | 15.12% | 23.10% | 15.12% |
| | 65 | 15.56% | 14.63% | 14.63% | 14.63% |
| | 81 | 14.35% | 19.05% | 25.34% | 18.60% |
| | 73 | 7.63% | 13.55% | 9.32% | 13.55% |

Since the black voting age population percentages in the various remedial versions of district 76 are essentially indistinguishable between my illustrative maps and the NAACP map (42.5% in the NAACP plan, 42.4% in my 21-district illustrative map, and 42.9% in my 26 district illustrative map), and since my illustrative maps do as good or better in creating/maintaining districts that are in the 20% to 40% black voting age population range, the argument for why the NAACP map should be preferred in racial representation terms seems to comes down to a claim that I should have drawn district 62 with above a 40% level of black voting age population.[13] In my 21-district illustrative map and my 26 district illustrative map, district 62 is drawn with substantial minority population (at 27.2% and a 29.2% black voting age population level, respectively) -- values somewhat higher than what is found in the 2011 Enacted map (24.6%).

The reason that, in none of my modules, is district 62 drawn as a district with an above 40% black population is straightforward. As the NAACP has correctly explained, the exploratory and illustrative maps that I drew in the process of proposing narrowly tailored remedial plans to the Court addressed the unconstitutional violations in the eleven districts that were found to be

---

[13] It was not clear to me whether the NAACP is asserting that, as a matter of law, under Section 2 of the Voting Rights Act or the 14th Amendment, it was obligatory for me to have created a seventh (new) minority opportunity districts in the Richmond-Petersburg area, even though that district did not have a black voting age majority or a showing that such a seventh black voting age majority district could be drawn. If that is the claim, then it is a legal question for the Court.

unconstitutional. The changes in my various modules in black population levels in districts not found to be unconstitutional but adjacent to redrawn unconstitutional districts were limited to those that resulted simply from the geographic spillovers incidental to the seeking of a narrowly tailored line drawing that would remedy constitutional infirmities in the eleven unconstitutional districts.[14]

While the NAACP version of district 62 is a district which contains all of Hopewell City, it is no longer centered in Chesterfield. In the 2011 Enacted map, 62% of the population in district 62 is from Chesterfield (49,193) while in the NAACP map there only 3,961 people from Chesterfield, i.e., around 5% of the district, and the center of gravity of the district has been completely shifted to Henrico, which provides about 56% of its population. In contrast, district 62 in my illustrative modules it still very much a Chesterfield based district, with between 42,075 and 52,051 people from that County (53-65% of the district).

---

[14] The only exceptions to the observation that changes in districts adjacent to unconstitutional districts stem entirely from changes in the unconstitutional districts (while taking into account traditional districting criteria and avoidance of incumbency pairing) are the changes made in districts 72 and 73 in illustrative Richmond module 1B. These changes are discussed above and in my December 7 Report, where I have made explicit the reasons why I offered a module with such changes to the Court -- and why I regarded this as a unique case. My changes in districts 72 and 73 in illustrative Richmond module 1B did not require changes in the redrawn Richmond area unconstitutional districts.

While I have made extensive changes in some unconstitutional districts for purposes of remedying the unconstitutionality in a fashion consistent with traditional districting principles, and this has had spillover consequences that has also led to extensive changes for some adjacent districts, I have never made extensive changes in adjacent districts solely to improve the racial percentages in those districts. No matter my personal views as a citizen, as an agent of the Court I do not believe that it falls within my task of crafting a narrowly tailored remedy for the constitutional infirmities in the eleven unconstitutional districts to make such extensive changes in an adjacent district without these being ancillary spillover effects from my reconfiguring of unconstitutional districts.

11E. The NAACP December 14 Response Brief also objects to what they describe as the limited changes made in the Norfolk modules in district 89 in terms of black voting age percentage. They assert (p. 5) that the difference in a "mere hundreds of people does not fundamentally alter the racially-segregating effects of the unconstitutional district." But this is a mischaracterization of the degree to which district 89 has been changed, since the configuration of District 89 in my illustrative maps shifts about 35% of the population in this district from what was found in the 2011 Enacted map. And district 89 in my illustrative maps is drawn as one of <u>two</u> districts drawn wholly within Norfolk, and in a fashion that allows district 80 to be drawn wholly within Portsmouth, rather than split as in the NAACP map. While the black voting age population has not changed much, the process by which the

district was created has changed greatly. Moreover, there can be no dispute that district 89 as configured in my illustrative maps is an "opportunity to elect" district.[15]

11F. The NAACP December 14 Response Brief also objects to what they describe as the limited changes made in the Richmond modules in district 71. I agree that only about 15% of the population in district 71 in the 2011 Enacted Map was changed, but these are changes that are part of line drawing that creates two districts wholly within Richmond, and that thus helps effectuate a districting that follows traditional districting principles. In contrast, in finding a way to redraw 71 to reduce its minority population below 50%, the NAACP map has split Richmond into five pieces, rather than four, as in my modules, or the three that would be possible were one or more incumbents with homes in Richmond to be paired with other incumbents. Given the total population of the County, even taking incumbency issues into account, I did not consider any maps which cut Richmond into more than 4 pieces to be appropriate in a narrowly tailored court-ordered plan drawn according to traditional districting principles. Thus, the way in which the NAACP redrew district 71 is not one that I would recommend to the Court.

---

[15] I would also note that the differences in black voting age population between the NAACP version of 89 and district 89 as it is configured in my illustrative maps are not that large (52.12% in the NAACP plan, 54.98% in the 21-district illustrative module, and 54.92% in the 26-district illustrative module), with all three districts above 50% black voting age population.

11G. The NAACP also object to districts 68 being left untouched in all my Richmond area illustrative modules and to district 73 being left untouched in one of my modules. My reasoning for leaving district 68 untouched is spelled out in my December 7 Report and reiterated below in response to a related issue about district 68 raised by Defendant-Intervenors. In my view the issues raised are ultimately legal ones. For district 68  I refer the reader to that discussion. As for district 73, I do not see a viable argument that this district should have been changed as part of my remedial map drawing. It was a district entirely within Henrico, and it remains so; it was an overwhelmingly white district, and it remains so. Given that the unconstitutionality of the Richmond area districts could be remedied without changing its configuration, I saw no reason to change its configuration.

12. In Defendant-Intervenors December 14 Response Brief, I have identified nine claims about defects in the illustrative modules I have provided to the Court and/or the process for remedial line drawing that is specified in my Report, that were substantive enough to suggest the need for comment on my part.[16] First and

---

[16] Defendant-Intervenors also asserted in Section I of their December 14 Response Brief that they lacked sufficient time to review my illustrative modules (see pp. 2-7) and had difficulty converting them to maps (see pp. 4,5). Whatever the merits of this claim in the light of the fact that other parties were able to review the modules pursuant to the Court December 14 deadline, the Court has now extended the time for Response filing to January 4, so this point is now moot. As to alleged inconsistency across my illustrative map modules (see p. 4), I do not understand the nature of the problem. The Petersburg illustrative modules were drawn to be compatible with any of the Richmond illustrative modules. And the Norfolk illustrative modules were drawn to be compatible with any of the Peninsula illustrative modules. The apparent problem with inconsistency in black voting age

foremost, they assert that the Special Master has engaged in districting that uses race as a preponderant motive, and confused a claim of racial preponderance with one of racial vote dilution due to illegal packing of minority voting strength. Second, they assert that the Special Master has placed a legally inappropriate weight on avoiding unnecessary splits of counties and other pre-existing political subunits. Third, they argue that, the population shifts from the districts in the 2011 Enacted Map to those in my illustrative maps have been excessive. Fourth they assert that some of the unconstitutional districts, namely districts 69, 71 and 74, have not been changed enough to fully remedy the unconstitutionality. Fifth, they argue that my illustrative modules are not adequately compact. Sixth, they argue that there an

---

population numbers asserted on p. 5 of Defendant-Intervenor's December 14 Response Brief probably reflects some minor technical corrections to the Norfolk area modules made after the December 7 filing deadline and the drafting of my December 7 Report. Corrected shapefiles were filed on the next business day, on Monday, December 10. The fact that such corrections were made in the Norfolk area is noted in the previous Addendum to my Report. I do apologize for the fact that these errors (caused by some conversion issues between *Maptitude* and *ArcGIS*, and by the fact that there was an unassigned zero population census block) were not detected before the filing of my Report, but the difference are trivial and of no substantive importance, and were corrected once the legislative staff received block assignment files from my research assistant. (See, however, the issue of labeling of Norfolk 1A and 1C discussed in footnote 1 of this addendum). The claim (p. 6) that data was missing that was needed to evaluate modules is erroneous. Census data from 2010 could be combined with the module shape files to generate the same types of reports I presented in the Special Master Report. Moreover, all relevant data for each of the changed districts in each of the ten modules was reported in the Special Master report, starting on page 69.

excessive number of VTD splits in the illustrative modules prepared the Special Master. Seventh, they argue that I have invented a new and inappropriate districting criterion, avoidance of "fracking," that I should not have applied to evaluate potential court-ordered maps. Eighth, they assert that I placed essentially no weight on incumbency. Ninth, they argue (p.23) that the effect of my plans was biased by targeting "the very incumbents the legislature would be most inclined to protect," harming the re-election chances of senior legislative leaders residing in districts adjacent to those found unconstitutional.

I reject all of these claims as factually unfounded.

12A. The assertion that race was the preponderant motive in my line drawing (p.7 of the December 14 Response of Defendant-Intervenors) is flatly wrong, for the reasons carefully documented in my Report. As stated clearly in my Report, and is explicitly acknowledge in Response Briefs such as that of the NAACP, some use of racial data is unavoidable since it is necessary to determine that the districts redrawn according to traditional districting principles did not inadvertently result in violation of Section 2 of the Voting Rights Act in the way they were reconfigured.

i. Furthermore, it is simply wrong to claim that I did not distinguish between unconstitutionality due to a racial preponderant motive and the Section 2 standard for vote dilution. I am well aware of the differences, having been involved previously

in cases of each type. The remedy I sought was for the unconstitutional use of race as a preponderant motive. However, in examining potential remedies, any court-ordered remedial plan must be sensitive to the potential for causing inadvertent vote dilution. This sensitivity required my best judgment as a political science expert that these redrawn districts neither crack nor pack minority voting strength in a manner that is dilutive of minority voting strength.

I have described in detail in my Report my reasons for believing that all of the redrawn unconstitutional districts in all of my modules are ones that continue to provide minorities a realistic equal opportunity to elect candidates of choice, and that this determination includes even those districts in which the black voting age population percentage was most reduced from what it had been in the 2011 Enacted map. Assertions to the contrary by Defendant-Intervenors are unsupported by evidence drawn from empirical election analysis.

ii. As noted in my December 7 Report, in reaching my determinations about opportunity to elect, I used exactly the same criteria that I had used when serving as a Special Master in *Personhuballah* but now applied them to election data compiled in the proposed remedial legislative districts. Contrary to what is suggested by Defendant-Intervenors on p. 20 of their December 14 Response, in my view as a political science expert, the eleven unconstitutional districts remain "opportunity to elect" districts, and not merely influence districts. Since my

reasoning is laid out in full in my December 7 Report, there is no need to repeat it here. As noted earlier, Plaintiffs also characterize my redrawn unconstitutional districts as "opportunity to elect" districts; and so does the NAACP, though the NAACP also argues strongly that district 89 in Norfolk and district 71 in Richmond should each have been reconfigured so that their black voting age population was reduced. [17]

iii. Defendant-Intervenors also appear to assert that my intent was to maximize minority voting influence in districts adjacent to the unconstitutional districts. This, too, is inaccurate. My concern was for the redrawing of the unconstitutional districts in a narrowly tailored fashion to remedy their unconstitutional infirmities. Subject to the need to make use of traditional districting criteria, and my later concern to avoid pairing of incumbents if this could be done within the constraints of traditional districting criteria, what happened in the districts adjacent to the unconstitutional districts was simply the consequences of drawing a constitutional map. [18] Moreover, to keep the plan narrowly tailored to the remedy of the

---

[17] On p. 21 of Defendant-Intervenor's December 14 Response Brief they assert that Plaintiffs' Counsel rejected the need to redraw any districts below 50% black voting age population in a remedy plan. I would, however, note that whatever Plaintiffs' Counsel once asserted about not drawing maps with a black voting age population below 50%, in fact, there are three districts with a black voting age population below 50% in Plaintiffs' plan A, and four districts with a black voting age population below 50% in Plaintiffs' plan B. The NAACP map also had districts with a less than 50% black voting age population.

[18] In this context, I would also reference my discussion of district 62 in the section above where I review the December 14 Response of the NAACP to my illustrative modules.

unconstitutional infirmities in eleven districts, I sought to limit the number of

adjacent districts that were redrawn to the minimum necessary to achieve this

purpose.

iv. As noted in my Report, while the constitutional infirmity in the 2011 Enacted

map is that it used race as a preponderant motive, the <u>consequences</u> of using race

as a preponderant motive were that the unconstitutional districts had levels of

minority population higher than what was needed to assure minorities of an equal

opportunity to elect candidates of choice, and in a fashion that did not recognize

geographic differences in racial demography and in patterns of electoral

polarization along racial lines. In contrast, as is apparent from examination of the

black voting age population in the redrawn unconstitutional districts in my

illustrative modules, the African-American voting age share in the redrawn

unconstitutional districts varies considerably across different parts of the state,

from 40.2% (district 70 in the 26-district configuration) to 54.98% (district 89 in the

21-district configuration) rather than being consistently near to or above 55%.

The reason that the levels of black voting age population in the districts in my

module vary so considerably is that, unlike the 2011 Enacted map, they naturally

reflect differences across geographic regions in the level of concentration of minority

voting strength. By using traditional districting criteria to drawn lines, redrawing

seven or eight of the unconstitutional districts to be whole county districts, and not

collecting small pockets of black population in neighboring counties to add to a district to achieve an arbitrary 55% level of black voting age population, virtually as a mathematical necessity, the level of minority population in the eleven unconstitutional districts would fall in any neutrally drawn map. But how far it will fall will vary dramatically across different regions of the state, depending upon the racial demography in the area.

v. In Defendant-Intervenors December 14 Response Brief (at p.7) they assert that: "The Special Master concedes that he used a 55% BVAP figure as a fixed, predetermined and non-negotiable number to structure the districts he drew. To be sure, he used it as a ceiling, not a floor, but what matters is that he used the number in structuring his remedial districts." This statement completely mischaracterizes my references to a 55% black voting age population in my Report of December 7.

I did indeed object to districts found above a 55% black voting age percentage in the various remedial plans. But the reason I did so is because my exploration of alternative configurations throughout the relevant areas of the state persuaded me that such high levels of black voting age population did not normally result from the racial geography of the state when remedial plans were drawn according to neutral criteria without concern for race. Nor was such a high level of African-American voting age population needed to avoid racial vote dilution.

Moreover, in the configurations I drew, once I imposed traditional districting criteria, black voting age proportions in redrawn unconstitutional districts naturally fell below 55% -- in some cases dramatically below, in a few other cases much closer to 55%. I can illustrate this simple point with two configurations based on my illustrative modules, a 21-district configuration and a 26-district configuration. For comparative convenience, I again use the configurations reported by the Princeton Gerrymandering Project.

It is visually apparent from inspection of the black voting age population values in the unconstitutional districts shown in the table below in the 21-district and 26-district illustrative maps that these black voting age population values are far away from what would be found if, as Defendant-Intervenors allege, I had sought to come as close as possible to a 55% value, while still consistently remaining below it, i.e., used a 55% value as a ceiling. Rather this wide range of black voting age population values reflects difference in underlying racial demography such that, in some areas of the state the black voting age populations in the illustrative remedial districts I drew are close to those of the 2011 Enacted map, while in other remedial districts they are quite distinct from those found in the 2011 Enacted map.[21] However, in all

---

[21] DI7002 is the plan currently advocated by Defendant-Intervenors as the one which the Court should choose in preference to any of my modules and to any other proposed configurations. However, the infirmities with DI7002 noted in my Report included having two districts with a 60%+ black voting age population without offering any evidence that such a configuration was compelled by geographic or

areas of the state the line drawing process I used was completely removed from the race preponderant process that led to eleven districts in the 2011 Enacted map being found unconstitutional.

---

demographic factors or was needed to avoid vote dilution. Moreover, DI7002 actually increased black voting age populations in four of the unconstitutional districts, again with no evidence that such increases were compelled by geographic or demographic factors or were needed to avoid vote dilution. For these and other reasons detailed in my Report, given what is shown in the alternative maps available to this Court, DI7002 can have no claim to be a narrowly tailored remedy.

Comparison of Black Voting Age Percentages in the Eleven Unconstitutional Districts

| District | Enacted | SM21 | SM26 |
|---|---|---|---|
| 63 | 59.09% | 51.81% | 47.47% |
| 69 | 54.78% | 54.38% | 54.38% |
| 70 | 55.99% | 52.29% | 52.29% |
| 71 | 54.87% | 54.01% | 54.01% |
| 74 | 56.91% | 54.37% | 54.37% |
| 77 | 58.44% | 47.03% | 40.23% |
| 80 | 55.94% | 51.38% | 51.38% |
| 89 | 54.98% | 54.98% | 54.92% |
| 90 | 56.10% | 48.91% | 41.93% |
| 92 | 60.14% | 53.87% | 53.87% |

vi. The inclusion of water territory in district 91 discussed in Defendant-Intervenor's December 7 Response Brief was not, as Defendant-Intervenors claim, racially driven. Instead it was simply part of a remedy to unconstitutionalities in districts 92 and 95 that came about by using neutral districting criteria for the whole peninsula, with an emphasis on drawing districts within a single county where possible. In my Report I discuss the meaning of contiguity and point out that the U.S. census often assigns portions of rivers and other water bodies to separate census blocks. District 91 is a contiguous district according to census geography.

vii. There are two main assertions in Defendant-Intervenors December 7 Response Brief about VTD splits in my modules. The first is some of these VTD splits reflect an impermissible racial purpose. The second is the claim that the number of VTD splits are excessive. Neither of these assertions is accurate.[22] In fact, the number of VTD splits in my illustrative modules is considerably fewer than in the 2011 Enacted Map and not very different from the number of VTD splits found in DI7002. Indeed, as I show later in this Addendum, there are actually fewer VTD splits in the 26-district illustrative map that can be created from my illustrative

---

[22] For example, on p.11 of their December 14 Response Brief, Defendant-Intervenors identify three VTD splits that between Districts 91 and 92 that they claim are evidence of race conscious districting. Here I would simply note that these particular splits were for compactness improvement purposes, and not at all for race conscious districting. (As with other VTD splits, if a module including these VTD splits is part of a plan adopted by the Court, they can be addressed as final technical cleanup is performed on that plan by legislative staff under my direction.)

modules than in DI7002, the map recommended by Defendant-Intervenors for
adoption by the Court.

In this subsection, however, I focus on the VTD splits between district 68 and
district 69 singled out by Defendant Intervenors' December 14 Response Brief on p.
22. because these have a different cause than population balancing or compactness
concerns. These VTD splits are due to my decision that it was not necessary to
redraw district 68 in the process of remedying the unconstitutional infirmities in
the eleven districts found unconstitutional.

District 68 was not found by the Court to be an unconstitutional district, and I have
preferred to leave undisturbed the configurations of districts adjacent to the
unconstitutional districts where possible when I found no need to do so to redraw
the unconstitutional districts in a constitutional fashion. Leaving district 68
untouched also has another reason in its favor. As I noted in my Report, there are
four current incumbents with homes located in Richmond. If I maintain district 68
in its present form (or very close to it), I need not pair any of the incumbents in the
Richmond area with another incumbent.

It would be quite simple to eliminate the VTD splits between district 68 and district
69 and redraw the border using whole VTDs. But it would be easier still to redraw
these few VTDS. Moreover, if we do not opt simply for administrative change in the

configuration of these few VTDs, and instead opt for redrawing the border between

district 68 and 69 using whole VTDs, this choice increases by one the number of

legislative districts that would be changed in all my illustrative remedial maps.

Nonetheless, if the Court instructs me to eliminate the VTD splits between district

68 and district 69, and thus slightly change district 68 from its configuration in the

2011 Enacted map, of course I will do so.

12B. The claim that the Special Master has placed a legally inappropriate weight on

avoiding unnecessary splits of counties and other pre-existing political subunits is a

legal issue to be left to the Court. In Virginia, as in virtually all states, counties (or

their equivalent) are vitally important units of local government. As indicated

clearly in my December 7 Report, avoiding county splits is both a central component

of any map drawn in accordance with traditional districting criteria and one that

has been very important in court-ordered maps (including that in *Personhuballah v.

Alcorn*), and it is a criterion that the legislature itself has identified as relevant to

its concerns to avoid splitting communities of interest.[23]  Moreover, it is the only

---

[23] I would also note that the two assertions by Defendant-Intervenors identified
immediately above are very close to logically contradictory. If, as seems to be
alleged, I took preserving county boundaries (and those of other pre-existing
political subunits) as a dominant criterion in redrawing the unconstitutional
districts (after equal population) than, *ipso facto*, race was not a preponderant
motive in my line drawing. And, of course, as I have stated repeatedly in my Report,
race was not a preponderant factor in my illustrative line drawing. In that Report I
clearly laid out the process by which my illustrative modules were created, a process
in which race clearly was subordinated to traditional redistricting concerns. In this
context I would note that, in contrast to the 2011 Enacted map, where only two of
the eleven districts found unconstitutional were within a single county, either 7 and

community of interest criterion for which I had an objective indicator. In their

Response the Defendant-Intervenors do not identify other community of interest

factors that should take precedence over avoiding jurisdictional splits, and none

could outweigh the need to provide a narrowly tailored constitutional remedy. [24]


12C. The assertion that some of the unconstitutional districts, namely districts

Richmond area districts of 69, 71, and 74, have not been changed enough to fully

remedy the unconstitutionality (see Defendant-Intervenor December 14 Response

Brief at pp 19-23) is wrong. This set of Richmond area districts has been redrawn

using traditional districting criteria. A key feature of the Richmond area districts in

my illustrative modules is that now two districts are drawn wholly within

Richmond, rather than one. Even when lines were drawn in a constitutional

fashion, the racial demography in Richmond and surrounding counties was such

that these three districts would remain ones where minorities had an equal

opportunity to elect candidates of choice. I have previously addressed district 71 in

my review of the December 2018 NAACP Response Brief and refer the reader to

that discussion. My response to a complaint about failure to drastically change the

---

8 of the eleven redrawn unconstitutional districts in my illustrative modules are
drawn as whole county districts.

[24] In footnote 5, page 24 of their December 14 Response Brief, the Defendant-
Intervenors note that legislators from a county have input on judicial nominations
from that county, a fact also referenced in my December 7 Report. If this fact is
intended to support a legal claim that creating districts that span multiple counties
is a legitimate state interest, the weight to be given that claim in the context of this
case, is a matter to be left to the Court.

boundaries of districts 69 and 74 would be virtually identical to that given above for district 71. The question for me has been to determine what levels of black population occur "naturally" when we draw plans in a way that prioritizes traditional districting criteria. I do not make use of any mechanical numerical test. I expect that, when we prioritize traditional districting criteria, differences in geographic racial concentration will create different levels of black population across districts, with high levels in some of the districts drawn in areas of the state such as Norfolk, Richmond, and eastern Henrico. As I made quite clear in my December 7 Report, only after I have drawn districts do I check to make sure that I have avoided inadvertent minority vote dilution.

12D. Defendant-Intervenors call attention to the total population shifted across districts in the illustrative modules versus that in DI7002. In my view, as stated clearly in my Report, the need to redraw a constitutional map takes precedence over the maintenance of existing district lines, when district lines needed to be changed to assure a constitutional plan. And sometimes, the need to draw a narrowly tailored map according to good government criteria can lead to substantial change in unconstitutional districts that then spills over into extensive changes in other adjacent districts. Moreover, since, for the reasons stated in my Report, I do not regard DI7002 as a plan which satisfactorily addresses the constitutional violations in the eleven unconstitutional districts, the fact that it may have moved fewer people than my illustrative maps is in my view, irrelevant.

But I should also note that my illustrative modules are, in fact, very responsive to a concern to limit changes to what is constitutionally required, since they change only 21 to 26 districts rather than the 30 districts of DI 7002 and the NAACP map or the 32 of DI 7003 and Plaintiffs A, or the 33 districts changed in Plaintiffs Map B.

Moreover, the differences in population shifts between my illustrative maps and DI 7002 are not large. For comparison purposes regarding population changes, I will discuss the same two maps based on my illustrative modules that are discussed in the December 14 Response of the Princeton Gerrymandering Project, a 21-district configuration and a 26-district configuration. The proportion of state population changed across districts from the configurations found in the 2011 Enacted Map is not that different between DI7002 and my illustrative maps. For DI7002, by my calculations it is roughly 6%; for the 21-district illustrative plan that can be constructed from my illustrative modules it is a little under 7% ; for the 26-district illustrative plan my calculation it is a little under 8%.[25]

 Defendant-Intervenors (at p. 26) further objectto the fact that, in the process of remedying unconstitutionality, I made major changes in a few districts. But some of the unconstitutional districts required substantial changes (e.g., districts 77 and

---

[25] Similar figures are given in the Defendant Intervenor December 14 Response Brief, with more detail provided in Appendix D of that Response Brief.

80), and those changes had substantial spillover effects in adjacent districts once proper concern was placed on traditional districting principles appropriate for a court-ordered plan.

12E. The Defendant-Intervenors note in their December 14 Response Brief (at p. 13) that, "on the Reock compactness test, the enacted versions of HD69, HD70, and HD71 are more compact than the proposed districts, and on the Polsby-Popper compactness test, enacted districts HD70 and HD71 are more compact than the proposed districts."[26] I have discussed compactness issues in my Report. Here I would simply note that, for the state as a whole, all remedial maps proposed to the Court are, to two significant digits, either as good as the 2011 Enacted map with respect to the Reock and the Polsby-Popper measures of compactness, or they are (marginally) better (see Table below). Since the 2011 Enacted map has already been unsuccessfully challenged in the Virginia Supreme Court as a violation of the State's compactness requirement specified in the State Constitution, the fact that

---

[26] But I believe that it is also true that four of the eleven unconstitutional districts in DI7002 are less compact than the corresponding districts in the 2011 Enacted Map on the Reock measure of compactness (districts 69, 71, 74, 90) , and three are less compact on the Polsby-Popper measure (69, 70, 90), which means that two of the redrawn unconstitutional districts in DI7002 are also less compact than their counterparts in the 2011 on both measures. But in my December 7 Report I placed no weight on these particular facts about compactness in evaluating DI7002. Rather, I asserted that all five of the complete remedial maps suggested to the Court in Briefs filed in November 2018 were, in my view, sufficiently compact, since they each were as or more compact than the 2011 Enacted map on average. And I also asserted that I saw no reason to choose among them on compactness grounds, I also noted in my Report that, in this set of five proposed remedial maps, DI7002 was not the most compact, though it was also not the least compact.

the compactness level in the 2011 map was sustained against challenge under state law (see *Veselind v. Virginia State Board of Elections,* Virginia Supreme Court, May 31, 2018) made it seem reasonable to me to use its average compactness as a benchmark in assessing the compactness of proposed remedial maps under state law standards. But that is a legal judgement best left to the Court.

| 100 districts average | Reock | Polsby-Popper |
|---|---|---|
| 2011 Enacted Map | .36 | .24 |
| DI 7002 | .36 | .25 |
| Special Master 21 | .36 | .25 |
| Special Master 26 | .36 | .26 |

12F. The Defendant-Intervenors call attention in their December 14 Response (footnote 6 at p. 24) to what they regard as an excessive number of VTD splits in some of my illustrative modules. I would again repeat the point made clearly in my Report that the configurations in the modules I present to the Court were meant to be illustrative, and further changes can be made as required by the Court. [27] As

---

[27] I would also reiterate that VTDs are simply units of administrative convenience and can be and readily are changed. While splits in VTDS can be used as one tool among many to effectuate race preponderant districting, that a large and unjustified number of VTD splits has been shown to have been, on balance, racially motivated does not mean that a few VTD splits, even ones involving some of the

noted above, once the Court has agreed on a basic map, I will ask the legislative

staff to examine the possibility of some purely technical changes to reduce still

further the VTD splits in that map. That is something which can be done very

quickly once the Court has made clear its preferences, and these minor and

essentially technical corrections can wait till then.[28] As I noted in my discussion

above, VTD splits in my illustrative modules were not for racial purposes but

involved population balancing and, in some cases, improving compactness because

of the somewhat peculiar shapes of some VTDs,[29] or they reflect decisions to avoid

---

same VTDs, are necessarily racially motivated. Avoiding all VTD splits is virtually
impossible, especially in districts whose lines cross county borders or those of other
government units. Some VTDS are irregularly shaped and/or large in population
(see discussion of VTDs in Virginia in my December 7 Report), so splits in VTDs can
be driven by reasons such as population balancing, or the desire for minor
improvements in the shape of district borders. These are the key factors for VTD
splits in my own illustrative map drawing, And, once the basic structure of a final
map has been ordered by the Court, legislative staff can undoubtedly find ways to
still further reduce VTD splits in that map.

[28] Given the need for a new map to be promptly promulgated, if the conversion
matrix between new and old VTD lines at the census block level has already been
completed by legislative staff so as to allow for updated reports of the type
presented in my December 7 Report to be created for a Court-ordered map, I expect
to use the most recent VTD map available to the legislative staff. Otherwise, I will
continue to use the 2010 VTDs, since that is one for which full census and archival
election data at the census block level is available. However, I have been informed
by legislative staff that there may be an administrative problem if new VTD lines
are used in 2019 for the House of Delegates election, but older VTD lines are used
for all other election contests. On this point I will consult further with legislative
staff after the January 10 hearing.

[29] For example, on page 11 of their Response Brief the Defendant-Intervenors point
out a "notch" in the northern part of District 74 and claim this a clear sign that I
used race as a preponderant motive. This claim is wrong. The notch is a result of an
irregularly shaped VTD and the constraints to draw a district in which it was not
necessary to pair the incumbent of district 74 with any other incumbent.

changes not ancillary to remedying the constitutional violation by limiting the

number of districts changed, thus necessarily perpetuating cross-district VTD splits

involving one of the unchanged districts and a changed district.[30]


I would also emphasize the simple fact that, in all my illustrative modules, VTD

splits are lower than in the 2011 Enacted map, sometimes much lower.

For comparison purposes regarding VTD splits I will discuss the same two maps

based on my illustrative modules that are discussed in the Response of the

Princeton Gerrymandering Project. The illustrative modules I prepared contained

39 VTD splits in the 21-district configuration (Illustrative modules Richmond 1A,

Petersburg 1A, Peninsula 1 and Norfolk 1C), and 35 VTD splits in the 26-district

configuration (Richmond Illustrative Module 1B, Petersburg Illustrative Module 2,

Peninsula Illustrative Module 2, and Norfolk Illustrative Module 1A). This

compares with 43 VTD splits in the same 21-districts in the 2011 Enacted map and

57 VTD splits in the same 26 districts in the 2011 Enacted map.


The tables below show VTD split comparisons for my 21-district illustrative map

and my 26-district illustrative map, versus the same districts in the 2011 Enacted

map, along with data on number of County Splits and numbers of County pieces in


---

[30] See earlier discussion in this Addendum of the reason for some of the VTD splits
in district 69 in my illustrative modules, namely the fact that district 68 remained
unchanged.

those changed districts in each map. As is apparent, both illustrative maps are better than the 2011 Enacted map regarding VTD splits, and as good or better concerning county splits and better in having fewer county pieces.

But I have also included comparison data in these table on DI7002. Here I would observe that my 26-district illustrative map has fewer VTD splits than found in the same 26 districts in DI7002, though the reverse is true for my 21-district illustrative map. But I would emphasize that differences across remedial maps in VTD splits are simply not large. However, that 26-district illustrative map is  not just superior to DI701 in limiting VTD splits, it is also superior to DI 7002 with respect to total number of split counties, and to total number of county splits, and with respect to the latter consideration, the differences between it and the HB7002 are more substantial.

| | 21-district Changed Plan | | |
|---|---|---|---|
| | Enacted | HB7002 | SM21 |
| Total VTD Pieces | 43 | 33 | 39 |
| County Splits | 16 | 16 | 15 |
| Total County Pieces | 41 | 38 | 31 |

| | 26 District Changed Plan | | |
|---|---|---|---|
| | Enacted | HB7002 | SM26 |
| Total VTD Pieces | 57 | 39 | 35 |
| County Splits | 22 | 19 | 14 |
| Total County Pieces | 51 | 47 | 33 |

12G. Defendant-Intervenors object to my rejection of plans that contain "fracked" districts. They assert that the "Court's injunction is not properly used as an opportunity to impose freewheeling good-government ideas neither endorsed by a political process nor tethered to what was litigated in this case or found by this Court (Defendant-Intervenor December 14 Response Brief, p. 24). Here, my Report is being completely mischaracterized. While I coined the phrase "fracking" to refer to a particular kind of discontiguity in the multiple portions of a county contained within a given district for which there was no standard term in the redistricting literature, the undesirability of this practice is actually well known. For example, in the most recent district court majority opinion in the North Carolina legislative case, *Common Cause v. Rucho* No 1:16-CV-1026 (U.S. District Court, Middle District of North Carolina, 2018, slip op at p. 105 [p. 194]), the North Carolina legislature is quoted as asserting that one of the districting criteria that it implicitly relied upon was that "a district line should not traverse a county line more than once." Of course, that is simply another way to describe what I have called "fracking".

And, further, as I said in my December 7 Report: there are two good reasons to avoid "fracking" in a court-ordered map. First, it gives the appearance of improper manipulation of district boundaries. Second, regardless of the motivation for the "fracking," it is evidence of sloppy craftsmanship that has no place in a court-ordered map.

12H. The Defendant-Intervenors claimed in their December 14 Response Brief that I have given "practically *no* weight to 'incumbency considerations'" (emphasis theirs, p. 22), and that I have "done the bare minimum" to avoid pairing incumbents. While I did not introduce incumbency considerations until after I had drawn maps satisfying traditional districting criteria, in the actual illustrative modules I have presented to the Court, I have taken great care to avoid incumbent pairing, even at the cost of some reduction in compactness and some increase in county fragmentation -- within the context, of course, of modules that are being based on traditional districting principles. In fact, to the best of knowledge no present incumbents are paired in any of my modules.

They also assert that I have "failed to preserve the cores of districts" (p. 23). It is simply wrong that no special care was taken to preserve central elements of the unconstitutional districts (see Defendant-Intervenors' December 14 Response, p. 22). As stated clearly and unequivocally in my Report, in those unconstitutional districts where there was a clearly preponderant county in terms of population (9 of the 11) I took care to assure that this County remained the predominant one in the district. In a tenth unconstitutional district, district 63, where Petersburg was the plurality county, I assured that Petersburg was kept whole in all modules involving changes in the configuration of district 63. As I have reiterated, the drawing of

adjacent districts came about as a consequence of seeking narrowly tailored remedies for the infirmities in the unconstitutional districts.

12I. The Defendant-Intervenors have claimed the Special Master's proposals all have "the uncanny attribute of targeting the very incumbents the legislature would be most inclined to protect. For example, HD66 is the district of Speaker Kirkland Cox, and no proposed version of that district leaves it even mildly unscathed. Similarly, no proposed version of HD76, represented by the House Chairman of Appropriations, Delegate Chris Jones, allows the incumbent to be competitive in the district. And the Special Master's "1-A" version of Norfolk may render Delegate Barry Knight, the most senior member of the Norfolk delegation, uncompetitive in his own district." The only response that I can give to the claim that I have "uncannily" targeted legislative leaders, with its implication that I have done so deliberately, is that this claim is not just wrong but nonsensical. I could not have targeted legislative leaders since neither I nor my research assistant had knowledge of which districts were the ones in which legislative leaders resided. The map drawing software my research assistant used at the University of California, Irvine simply showed home locations by district of incumbent, without names attached. Additionally, the initial shape of districts was done prior to receiving the current incumbent addresses, so the district designs are primarily a product of good government criteria, with emendations provided later to avoid incumbency pairings.

As stated repeatedly in my Report, I have done line drawing that is blind to politics except insofar as I needed political information to ensure that there was not unintentional vote dilution in the unconstitutional districts vis-à-vis the ability of the African-American community to elect candidates of choice. After I had information on incumbent home addresses, all incumbents were treated equally[31]. District configurations in the districts adjacent to the unconstitutional ones emerged from decisions as to how best to remedy the constitutional infirmities in the unconstitutional districts. No incumbent was intentionally favored or disfavored as I sought to create narrowly tailored remedies for the constitutional violations to be proposed as illustrative maps to the Court. As stated clearly in my Report, my map drawing was based on traditional districting criteria, including the preservation of county integrity to the extent feasible, while drawing a narrowly tailored remedy that only changed districts that were adjacent to unconstitutional districts, and that kept the number of changed districts as low as possible given the need to remedy the constitutional violation.

13. The Princeton response directly compares the 2011 Enacted map and two plans that can be created from the Special Master's modules, a 21-district plan (Illustrative modules Richmond 1A, Petersburg 1A, Peninsula 1 and Norfolk 1C)

---

[31] If Defendant-Intervenors are making the legal claim that the Special Master was required to give special deference to preserving the districting configurations in the districts where incumbents held senior legislative offices, that claim is one best left to the Court.

and a 26-district plan (Richmond Illustrative Module 1B, Petersburg Illustrative Module 2, Peninsula Illustrative Module 2, and Norfolk Illustrative Module 1A).

13A. This non-partisan and academically-based group concludes that the 26-district plan (Richmond Illustrative Module 1B, Petersburg Illustrative Module 2, Peninsula Illustrative Module 2, and Norfolk Illustrative Module 1A) offers a distribution of minority voting strength "that most closely aligns with the distribution which would be expected in race-neutral redistricting ..." and further state that this combination of illustrative modules "best eliminates the unnatural sorting of voters on the basis of race which is unlikely to have occurred by chance [in the 2001 Enacted map]." They also find that even the 21-district plan based on the Special Master's illustrative modules is not far from the 26-district plan with respect to the distribution of black voting age population across districts.

13B. Neither the Princeton Gerrymandering Project nor I are asserting that there are no other districting maps whose black voting age distribution might also provide evidence that race was not a preponderant motive in their creation. Rather, the analysis undertaken by the Princeton Gerrymandering Project offers a direct rebuttal to the completely unfounded claim by Defendant-Intervenors in the December 7 Response Brief that the illustrative modules I have drawn are instances of districting done with a race preponderant motive. Instead, the Princeton Gerrymandering characterizes my illustrative modules as exactly the

opposite. Moreover, the illustrative modules I have drawn not only avoid race as a preponderant motive, but they do so in terms of a narrowly tailored remedy with no incumbent pairings.

14. As I review the various Response briefs, I find that the responses to the illustrative maps are not at all consistent. Some Responses (or, at least, parts of these responses) criticize the illustrative modules because the changes they make from the 2011 Enacted map are too extensive (e.g., a claim that the number of voters shifted in the illustrative modules is excessive, and the associated claim that the changed illustrative districts fail to adequately protect the reelection chances of legislative leaders). On the other hand, some responses (or, at least, parts of these responses) also criticize the illustrative modules because the changes they make from the 2011 Enacted map are viewed as not extensive enough (e.g., a claim that the configuration of some unconstitutional districts should have been changed to a greater extent than was done in my illustrative modules, or a claim that the illustrative modules do not go far enough in increasing the ability of the African-American community to influence electoral outcomes in the state). On the other hand, the Defendant is willing to accept any the implementation of any of the illustrative modules.

15. As I indicated above, I have no new illustrative remedial modules to place before the Court; but I will, of course, be attentive to any suggestions for specific

improvements in any of my illustrative modules in my December 7, 2018 Report
that are provided in any further responses that might be filed on January 4, 2019. [33]

ERRATA

16. I also take this occasion to correct two typos in the December 7 Report of the
Special Master.

16A. On page 8 reads "district 73 and district 73" but should say "district 72 and
district 73"

16B. On pp. 71-74 the labeling of districts 69 and 70 was inadvertently reversed.

---

[33] I should note, however, that give the time constraints of promulgating a lawful
map, it will be impossible for me to respond to new plans not already filed pursuant
to the Court's November 2018 deadline, or to plans which make such substantial
changes to existing maps that they are, in effect, new plans.