**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 3:14-cv-852 |
| VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| | ) |

**SUPPLEMENTAL BRIEF OF THE VIRGINIA STATE CONFERENCE OF NAACP
BRANCHES IN RESPONSE TO THE SPECIAL MASTER'S PROPOSED
LEGISLATIVE REDISTRICTING PLAN AND FIRST AND SECOND ADDENDUMS**

## INTRODUCTION

The Virginia State Conference of NAACP Branches ("the Virginia NAACP"), pursuant to the Court's Order of December 18, 2018 (ECF No. 330), respectfully submits this supplemental briefing in response to the Report of the Special Master and the First and Second Addendums (ECF Nos. 323, 324, & 330) (the "Grofman Plan").  This supplemental response is intended to offer additional analysis and data in support of the concerns and objections articulated in the Virginia NAACP's Response to the Special Master Report (ECF No. 329) ("Response Br.") regarding the Grofman Plan and addresses some of the points made by the Special Master in response to the Virginia NAACP's critique.

As previously argued, the Virginia NAACP believes that the Grofman Plan, through its weighting of certain remedial redistricting criteria—specifically, its strict adherence to a "narrow tailoring" principal, which is, at its core, a commitment to making only minimum changes to a broadly unconstitutional redistricting plan—failed to fully correct the identified constitutional flaws in the 2011 Enacted Plan.  *See generally* Response Br. 1-4.  While much of the Virginia NAACP's initial response to the Grofman Plan sought to highlight this failure by scrutinizing the unsatisfactory way in which the Grofman Plan unpacked black voters and the relatively small increases and decreases of BVAP in the challenged and surrounding districts, there are additional bases in the record for concluding that the Grofman Plan fails to fully remedy the unconstitutional use of race that occurred in the drawing of the affected districts in 2011.  Those factors, such as racial demographic data and the race of individuals added to or subtracted from the benchmark unconstitutional district, the geographic compactness of the district and whether it has an odd shape, and whether the district's core is maintained, tell the same story: that the Grofman Plan simply retains too many of the characteristics of the districts declared by this

1

Court to be unconstitutional to be accepted as a fully remedy for those numerous findings of unconstitutionality.

Thus, for illustrative purposes, this supplemental brief is limited to analysis of the changes made to the unconstitutional districts (and those surrounding them) within the Richmond Module (Grofman Plan 69-75) to highlight the evidence in the record supporting the persistence of the racial gerrymander in the Grofman Plan.

## ARGUMENT

### I.     The Court Must Ensure that it Adopts A Remedial Plan that Fully Remedies the Constitutional Violations Suffered by Plaintiffs.

As an initial matter, it is important to stress that this Court has both the authority and the responsibility to ensure that the redistricting plan it adopts is in fact a true and legal remedy. *See Chapman v. Meier*, 420 U.S. 1 (1975) (reversing the lower court's approval of remedial legislative districts that violated the one-person, one-vote requirement). Indeed, "while a court must not overreach when fashioning a remedy of its own, it must determine whether the legislative remedy enacted at its behest is in fact a lawful substitute for the original unconstitutional plan." *Harris v. McCrory*, No. 13-cv-949, 2016 U.S. Dist. LEXIS 71853, at *5 (M.D.N.C. June 2, 2016). *See also, Wilson v. Jones*, 130 F. Supp. 2d 1315, 1322 (S.D. Ala. 2000), *aff'd sub nom. Wilson v. Minor*, 220 F. 3d 1297 (11th Cir. 2000) ("When … the districting plan is offered as a replacement for one invalidated by the court and will be implemented solely by virtue of the court's power, the court has an independent duty to assess its constitutionality and cannot ignore substantial evidence of improper racial motivation.").[1]

---

[1] Of course, the Virginia NAACP is not alleging that Dr. Grofman had any improper racial motivation.  But as found by this Court, the Virginia General Assembly did have such improper motivation when it enacted certain districts in the House of Delegates plan in 2011.  And by failing to substantially modify those unconstitutionally motivated districts, Dr. Grofman may be inadvertently perpetuating the legislature's 2011 improper racial motivation.

It is widely understood that a remedial plan which itself fails constitutional muster is afforded no deference. *See, e.g., White v. Weizer*, 412 U.S. 783, 797 (1973) (reviewing court "should defer to state policy in fashioning relief only where that policy is consistent with constitutional norms"). Courts have appropriately refused to implement legislative remedies that are themselves unlawful or fail to remedy the original violation. *See, e.g., Harvell v. Blytheville Sch. Dist. No. 5*, 126 F.3d 1038, 1040 (8th Cir. 1997) (affirming district court's rejection of school board's remedial plan because the plan did not completely remedy the violation); *Buchanan v. City of Jackson*, 683 F. Supp. 1537, 1541 (W.D. Tenn. 1988) (rejecting commissioners' remedial plan).

## II.   The Richmond Area (Referred to as the Richmond Module by Grofman) Retains a Significant Number of Features of the Unconstitutional Racial Gerrymanders.

Throughout his modifications to the unconstitutional districts in the Richmond, a pattern emerges in Dr. Grofman's attempts to remedy the districts—he shifts populations between the packed, racially gerrymandered districts and tries to minimize the number of adjacent, majority-white or bleached districts. This approach, while undoubtedly well-intentioned, critically misses the remedial steps that are necessary to restore black voters to the position they would have been in but for the unconstitutional segregation of them into as few districts as possible.

Focusing on how the Special Master approached the remedial process in Richmond, he offered two plans—Richmond 1A and 1B. As the Special Master explained, the two remedial variants "do not differ in the shape of any of the unconstitutional districts (69, 70[,] 71, and 74)." Grofman Report 68. Rather, the only difference between the two plans is "in the shapes of districts 72 and 73," which are adjacent, majority-white districts. *Id.* Richmond 1A preserves the basic structure of District 72 and 73: District 73 is identical to the benchmark plan, and District 72 is near-identical, but for minor adjustments with the border with District 74. By

contrast, Richmond 1B redraws District 72 and 73 nearly anew, but does so with minimal impact on the neighboring unconstitutional districts.  Both plans leave unchanged Districts 27 and 68, which are each adjacent to two unconstitutional districts (69 & 70 and 69 & 71 respectively). Additionally no changes are made to the districts to the north, west and east of this 8-district geographic region, i.e. the surrounding area that is blacked out in the Richmond Module maps. *Id*. at 69, 71, 74.

All told, the Grofman Plan's "minimum-change" approach in the Richmond Region effectively restricts any remedial changes in the region to the unconstitutional districts themselves, and, as he admits, only to adjacent districts where required by "the geographic spillovers incidental to the seeking of a narrowly tailored line drawing that would remedy [the] constitutional infirmities in the eleven unconstitutional districts," (Second Addendum 16), which, in this case, are limited.  As reflected below, this approach maintains the segregating effect of the 2011 Enacted Plan—black voters remain packed into the same number of districts and geographic areas where they were before—with no measureable improvement in the scoring of the remedial districts. Such an approach certainly cannot restore black voters to the position they would have been in had the legislature not engaged in racial gerrymandering in 2011, which is the measure of a full remedy.

### a.  District 69

The 2011 Enacted Plan version of District 69 centered around the portion of Richmond City south of the James River.  It included a single VTD from neighboring Chesterfield, but was otherwise drawn completely within Richmond City lines.  The overall compactness score for the district was 0.52 using the Reock measure and 0.34 under Polsby-Popper, which made it the most compact district within the Richmond Module.  Grofman Plan 69.  The BVAP for the

district was 54.78%.  *Id.*  Examining the racial demographics of the district (below) illustrates how the district lines were drawn to pack majority black VTDs into the district.



The Grofman Plan version of District 69 makes minimal changes to the district.  The revised district has a BVAP of 54.38%, a minor deviation from the unconstitutional version.  As reflected below, the BVAP level is maintained by swapping population from majority-black VTDs from the east side of the district with those from the south.



The core of unconstitutional District 69 is retained in the Grofman Plan, as are other features of the racially gerrymandered district, such as the borders to the north and northwest of the district. *See, e.g., Covington v. North Carolina*, 283 F. Supp. 3d 410 at 431 (M.D.N.C. Jan 19, 2018), *aff'd in part, rev'd in part on other grounds, North Carolina v. Covington*, 138 S. Ct. 2548 (2018) (rejecting districts as insufficiently remedial because they preserved the "cores" of unconstitutional districts).



Though the Grofman Plan eliminates the single VTD from Chesterfield, thus eliminating that county split, the overall effect of those changes on compactness is at best neutral: by one measure of compactness, the Reock measure, it drops from 0.52 to 0.36; under the other, Polsby-

Popper, it improves a negligible amount from 0.34. to 0.36. Moreover, the retention of the core shape of that district does nothing to remedy the unconstitutional racial gerrymandering and packing that necessitated a remedy in the first place: his version of District 69 continued use of boundary lines that tracked black population, and selected heavily black VTDs for inclusion in the district while more heavily white VTDs were excluded from the district, resulting in a configuration of District 69 that has a total BVAP of nearly 55% and minimal to no improvement on compactness and shape. Taken together, these facts are strong evidence that the racial gerrymander has not been cured.

### b. District 71

The 2011 Enacted Plan version of District 71 centered around the portion of Richmond City north of the James River. It included a single VTD from neighboring Henrico, but was otherwise drawn completely within Richmond City lines. The overall compactness score for the district was 0.33 using the Reock measure and 0.24 under Polsby-Popper, which made it one of the least compact districts within the Richmond area. Grofman Plan 69. The BVAP for the district was 54.87%. *Id.* Like with District 69, examining the racial demographics of this district (below) also illustrates how the district lines were drawn to pack majority black VTDs into the district.



The Grofman Plan version of District 71 makes minimal changes to the district.  The revised district has a BVAP of 54.01%, a minor deviation from the unconstitutional version.  As reflected below, the BVAP level is maintained by swapping population from majority-black VTDs from the east side of the district with those from the south—that is, by swapping black voters from one racially-gerrymandered district to another.[2]

---

[2] Because there are no variations between the unconstitutional districts in Richmond 1A and Richmond 1B, we are using Richmond 1A maps to reflect the changes in the Grofman Plan.



The core of unconstitutional District 71 is retained in the Grofman Plan's, as are other features of the racially gerrymandered district, such as the line drawing to the north and west of the district.



Though the Grofman Plan eliminates the single VTD from Henrico, thus eliminating that county split, the overall effect of those changes on compactness is negative: the Reock score drops from from 0.33 to 0.20 while the Polsby-Popper score decreases from 0.24. to 0.17.

In sum, the Grofman Plan retains the core shape of the unconstitutional version of District 71, continues to use boundary lines that track black population in a racially predominant way, and selects heavily black VTDs for inclusion in the district while more heavily white VTDs

are excluded.  The result is a less compact configuration of District 71 that still has a total BVAP of nearly 55%.  This is strong evidence that the racial gerrymander has not been cured.

### c.   District 70

The 2011 Enacted Plan version of District 70 centered on the intersection of Chesterfield, Henrico, and Richmond City, containing significant population totals from the three political subdivision (33,281; 28,615; and 17,486 respectively).   Grofman Plan 70.   The overall compactness score for the district was 0.40 using the Reock measure and .19 using Polsby-Popper.  *Id.* at 69.   The BVAP for the district was 55.99%.  *Id.*   Examining the racial demographics of the district (below) illustrates how the legislature drew lines that reached into each of the three political subdivisions to pull in for inclusion to that single district VTDs that were majority black.



12

While District 70 in the Grofman Plan contains less of Chesterfield and Richmond City, and retains Henrico, it adds to the district a fourth political subdivision, the entirety of Charles City. The revised district has a BVAP of 54.38%, a slight deviation from the unconstitutional version. As reflected below, the BVAP level is maintained by adding majority-black VTDs from the north side of the district in Henrico and those within Chester City to replace majority-black VTDs ceded to neighboring districts in the southern part of Richmond City (see Grofman Plan District 69) and the northeastern part of Chesterfield (see Grofman Plan Petersburg Module). The new irregular shape of the district continues to follow the racial demographics of the region with no consideration for the interests in the communities of those regions.[3]  And just as problematically as in the 2011 plan, the Special Master's Plan continues to excessively divide the community of Churchill.  The 2011 legislative redistricting plan carved Churchill straight through the middle, thereby dividing the neighborhood into two legislative districts, 71 and 70. The Special Master's map does essentially the same thing.

---

[3] As noted in the Virginia NAACP Plan, Virginia NAACP members from those communities noted that there was no natural network between voters in Henrico County and Charles City County and that having districts drawn primarily within one county or the other would eliminate voter confusion and allow representatives to be more responsive to the needs of their constituents.  Virginia NAACP Proposed Plan (ECF No. 286) at 12. The Grofman Plan like the 2011 Enacted Plan continues to place black residents in Charles City into a district with black residents from Henrico, without regard to any substantial differences between these communities.



As reflected below, while the Grofman Plan significantly changes the shape of District 70 as compared with the unconstitutional version, these changes, however, do not improve the district with regard to any conventional redistricting measure and do not cure the unconstitutional racial gerrymandering.  The revised District 70 scores worse with regard to county splits (from 3 to 4), on compactness (from Reock 0.4 to 0.29 and Polsby-Popper 0.19 to 0.16), and from an eye-ball test.

14



Taken together, these facts are strong evidence that the Grofman Plan has failed to cure the racial gerrymander as it relates to District 70.

### d.  District 74

The 2011 Enacted Plan version of District 74 contained Charles City, a narrow strip of Henrico running east to west on the northern border of Richmond City, and a single high-BVAP Richmond VTD.   The core of the district was based in Henrico.   The overall compactness score for the district was 0.16 using the Reock measure and 0.12 using Polsby-Popper, making it the worst performing district among those in the Richmond module.   Grofman Plan 69.   The BVAP for the district was 56.91%.   *Id*.   The district is oddly shaped, which can only be explained by

examining the way in which the legislature drew lines that stretched from Charles City to Richmond City, picking up the nearly all of the majority black VTDs in that portion of Henrico that connected the two cities.



District 74 in the Grofman Plan redraws the district entirely within the county lines of Henrico. The revised district has a BVAP of 54.37%, only a minor deviation from the unconstitutional version. As reflected below, the BVAP level is maintained by adding majority-black VTDs from the border between Henrico and Richmond City to replace majority-black VTDs from Richmond City and Charles City. But the shape change rendered by the exclusion of Charles City does not change the fact that the Grofman Plan perpetuates the core of the district in Henrico County, including the concentration of black voters on the entire eastern side of the county without respect to regional differences in community needs.



The map below demonstrates the visual effect of the decision by Dr. Grofman to exclude

Charles City from unconstitutional District 74.



This, not surprisingly, has a positive impact the district's compactness scores, with improvements of 0.19 to 0.33 under the Reock measure and 0.18 to 0.23 and Polsby-Popper. Nevertheless, the core of the district, centered in the high-BVAP portion of Henrico remains unchanged, and the shape of that portion of the district is essentially the same.

Taken together, these facts are strong evidence that the Grofman Plan has failed to cure the racial gerrymander as it relates to District 74.

### e.   Adjacent Districts 27, 68, 72 and 73

When the Legislature's districting separated voters on the basis of race, that unconstitutional act necessarily affected both the districts that were packed (were drawn

predominantly on the basis of race to include black voters) and those districts adjacent to them (that were drawn predominantly on the basis of race to exclude black voters and primarily include only white voters).  And where districts were drawn with racial quotas, the requirement that certain districts contain high populations of BVAP deprives neighboring districts of voters who may reside within them absent this intent.  Consequently, the impact of the aforementioned unconstitutional racial gerrymanders—i.e., the race-based drawing of Districts 69, 70, 71 and 74—can be seen in the sorting that occurred in neighboring Districts 27, 68, 72 and 73.  And this sorting by race cannot be remedied by refusing to alter the districts from which black voters have been purposefully excluded.

As reflected in Exhibit A, which shows racial density maps for these adjacent districts, the 2011 Enacted Plan drew Districts 27, 68, 72 and 73 as predominately white and seems to purposely include white voters and exclude black voters.  Also reflected in Exhibit A, the Grofman Plan maintains the racial segregation of those adjacent districts 27, 68, 72 and 73 in both Richmond 1A and 1B.[4]

This reluctance to address the districts from which black voters were purposefully excluded constituted additional evidence that the Grofman Plan does not go far enough in remedying the unconstitutional racial gerrymanders.

### III.    The Special Master's claim with regard to its positive impact on minority representation is overstated.

Again, though the Virginia NAACP believes that the Grofman Plan improves upon the 2011 Enacted Plan both in terms of adhering to traditional redistricting criteria and in eliminating the 55% BVAP threshold set by the General Assembly, which necessarily had the effect of positively impacting minority representation in some of the now unpacked challenged districts

---

[4] These districts were either unchanged in both modules (27 & 68) or were changed in a way that had little to no impact on the unconstitutional districts (72 and 73).

and neighboring districts, the Virginia NAACP does not agree with the Special Master that his illustrative map changing only 26 districts does a better job of improving minority representation than the Virginia NAACP plan.  (Second Addendum at 12) The Special Master supports this argument by offering a comparison of the "number of districts other than those found unconstitutional in the 20 to 40% black voting age category" in each of his plans and that of the Virginia NAACP.  Second Addendum 12.  That comparison, however, gives short shrift to the difference between elections in which black voters can influence outcomes and elections in which black voters have a fair opportunity to elect candidates of their choice in districts with BVAPs in the 20s to mid-30s versus BVAPs in the mid-30s to 40s.  The Virginia NAACP remarked on this distinction when differentiating between the naturally forming new opportunity districts (BVAP % over 40) and increased influence districts (BVAP increasing to the mid to high-20s) in its own remedial plan.  *See* Virginia NAACP Proposed Plan (ECF No. 286) 5-6.[5]  It also gives short shrift to what kind of map would actually restore injured black voters to the position they would be in but for the General Assembly's unconstitutional actions—fully

---

[5] Further to this point, the Princeton Gerrymandering Project amicus submission, which the Special Master cites in support of his own plan, acknowledges the importance of the 37% BVAP threshold in national and Virginia-specific redistricting.  *See* ECF No. 326 at 4.  While the Special Master's 26 district change illustrative map may offer additional increased influence districts at the margins, it does not create new districts in the 20 to 40% range that pass the 37% threshold.

Relatedly, the Defendant Virginia State Board of Elections argues that it would be incumbent upon the Virginia NAACP to provide a racially polarized voting analysis to demonstrate that its proposed districts in the 40% BVAP range would actually protect black voters' ability to elect their candidates of choice.  ECF 302 at 5.  Respectfully, that kind of unsound logic is what started this problem in 2011.  No one—not the legislature, not the Board of Elections, and not the Special Master—can assume that a 50% threshold will protect black voters' ability to election, or that a 40% threshold will not provide such protection.  In the absence of a racially polarized voting analysis, black voters on the ground are best positioned, politically, to understand the districts that will protect their ability to elect candidates of choice, and that perspective should be given strong deference.

unpacking districts, without artificial "minimum change" limitations allows naturally occurring African-American opportunity districts to emerge and thus does fully remedy the harm to black voters.  Accordingly, because the Special Master acknowledge this crucial difference, his focus on the number of districts within this 20 to 40 % range does not paint a full picture between the differences between his plan and the Virginia NAACP's plan when it comes to fully remedying the constitutional harms.

IV.     **The Court Should Adopt the Virginia NAACP's Proposal, or, at a minimum, adopt the proposal as it relates to the Richmond Region over the modules Submitted by the Special Master**

The Virginia NAACP, more than any of the other proposed remedial plans, fully remedies the racial gerrymanders and thereby naturally provides African-American voters additional opportunities to elect their candidate of choice, restoring them to the position they would have occupied absent the racial gerrymandering. The Virginia NAACP does more than shift black voters from one district to another at the periphery, but unpacks black voters in manner that respects traditional redistricting criteria and respects communities of interest. As stated in its first submission to the court, the Virginia NAAP "began the process of repairing the eleven unconstitutional districts by correcting three major flaws found in the 2011-enacted plan: (1) the assigning of black voters into districts on the basis of race to achieve an artificial target of 55% Black Voting Age Population ("BVAP"), (2) the splitting of VTDs and neighborhoods on the basis of race to enable the separating of black voters from white voters when assigning them to districts, and (3) the constructing of districts in bizarre, non-compact shapes to connect and avoid different geographic areas using race as a predominant reason."  Virginia NAACP Plan at 4.     Unlike the proposed Special Master plan, which simply shuffles voters between unconstitutional packed districts to redistribute the BVAP among already packed districts, the

Virginia NAACP plan groups voters into districts that share common interests, needs, and backgrounds, while respecting traditional redistricting criteria.

Redistricting requires the delicate balancing of a number of factors, including political subdivisions and communities of interest, and community input enables maximal compliance with those factors. A remedial map does not require abandoning the balancing of these factors because remedying racial gerrymandering does not, per se, require minimum change to maps. So, for example, Grofman finds fault with the Virginia NAACP for dividing Richmond into five districts, because he split the city into only four districts. (Second Addendum at 18).  He argued that any split over four was not narrowly tailored. There is no legal subscription to the minimum number of splits of political subdivision in order to be deemed "narrowly tailored."  Rather, the weighing of this factor must be against other equally important considerations, such as a respect for communities of interest and ensuring that black voters are afforded a full remedy to the unconstitutional districting to which they have been subjected for the better part of the decade. The Virginia NAACP's plan does just that; the district lines in the Richmond reflect meaningful, on the ground knowledge of the members of those communities. For example, in district 70, residents expressed a strong preference for keeping Churchill, a predominantly black neighborhood, together as much as possible, so as to elect a representative who can respond to the economic and development needs of the community. Brief at 14. To avoid pairing incumbents, the Virginia NAACP only minimally divided Churchill and drew the majority of the Churchill neighborhood into district 70 with the southern portion of the "Gateway" region, which includes the Shocke Bottom, Blackwell, and Manchester neighborhoods. However, had the Virginia NAACP ignored incumbent addresses, it could have easily drawn the Churchill neighborhood into a district with the rest of downtown Richmond. Although an improvement

over the enacted 2011 plan, the Grofman Plan continues to substantially divide and undermine the Churchill neighborhood between two districts, 71 and 70.

In the Virginia NAACP's version of district 69, citizens of Richmond expressed a preference for maintaining the district crossing of the James River so as to maintain continuity between the 5th City Council District of Richmond and the House of Delegates district, which will help with get-out-the-vote and voter education efforts, and will provide consistency in advocating for the needs in this growing community.  Thus, although the Virginia NAACP's proposed remedial plan the city of Richmond into five districts, it does so in manner that respects the communities of interest in those districts, fully remedies the harms wrought on black voters in the region, and affords deference to the perspective of the injured parties.

In addition to the discussion of the BVAP differences between the Virginia NAACP plan and the Grofman Plan, another measure of how the Virginia NAACP plan is an improvement over the enacted 2011 plan and Grofman's Plan are the compactness scores of the respective plans. The Virginia NAACP plan improves the compactness of the unconstitutional districts 70, 71, and 74. The Grofman Plan, on the other hand, has a drastic reduction in the compactness of districts 69, 70, and 71 and only slightly improves the compactness of district 74.

**Compactness Score Comparison**

| District | HB 5005 (2011) | | Richmond 1A | | Richmond 1B | | NAACP | |
|---|---|---|---|---|---|---|---|---|
| | Reock | Polsby-Popper | Reock | Polsby-Popper | Reock | Polsby-Popper | Reock | Polsby-Popper |
| 27 | 0.35 | 0.25 | 0.35 | 0.25 | 0.35 | 0.25 | 0.28 | 0.28 |
| 68 | 0.36 | 0.25 | 0.36 | 0.25 | 0.36 | 0.25 | 0.27 | 0.2 |
| **69** | 0.52 | 0.34 | 0.36 | 0.36 | 0.36 | 0.36 | 0.44 | 0.34 |
| **70** | 0.4 | 0.19 | 0.29 | 0.16 | 0.29 | 0.16 | 0.51 | 0.36 |
| **71** | 0.33 | 0.24 | 0.2 | 0.17 | 0.2 | 0.17 | 0.36 | 0.27 |
| 72 | 0.26 | 0.08 | 0.26 | 0.08 | 0.47 | 0.28 | 0.23 | 0.22 |
| 73 | 0.39 | 0.15 | 0.39 | 0.15 | 0.4 | 0.21 | 0.63 | 0.44 |
| **74** | 0.16 | 0.12 | 0.19 | 0.18 | 0.19 | 0.18 | 0.31 | 0.21 |

23

By incorporating the voices of residents of the impacted districts, the Virginia NAACP was able to draw districts that are compact, respect political subdivisions, make sense from a communities of interest standpoint and, most importantly, fully remedy the harm inflicted on black voters by the 2011 gerrymandering.   As such, the Virginia NAACP plan "not only remedies the unconstitutional districts that have been in place for almost the entire decade, but also embodies good government principles and creates unprecedented opportunity for voters of color in the state."  Virginia NAACP Proposed Plan (ECF No. 286) at 25.

Submitted this 4th day of January, 2019.

/s/ David O. Prince
David O. Prince (VA State Bar # 17044)
411 East Franklin Street
Richmond, VA 23219
princelaw@aol.com

Allison Riggs (admitted *pro hac vice* )
Jeff Loperfido (admitted *pro hac vice* )
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 W. Highway 54, Suite 101
Durham, N.C.  27707
Telephone: (919) 323-3380
Facsimile: (919) 323-3942
Email: allisonriggs@southerncoalition.org
jeffloperfido@scsj.org

*Counsel for the Virginia NAACP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of January, 2019, I have electronically filed the foregoing document with the Clerk of Court using the United States District Court, Eastern District of Virginia, Richmond Division, CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record, including Plaintiffs, Defendants, and Defendant-Intervenors.

/s/ David O. Prince
David. O. Prince, Esquire
VSB # 17044
411 East Franklin Street
Richmond, VA 23219
804-788-4861
princelaw@aol.com