IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

Golden Bethune-Hill, *et al.*,

       Plaintiffs,

    v.

Virginia State Board of Elections, *et al.*,

       Defendants.

Civil Action No. 3:14-cv-00852-REP-AWA-BMK

## Defendant-Intervenors' Supplemental Objections to Special Master's Proposed Remedial Plans

Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates
and Virginia House of Delegates Speaker M.
Kirkland Cox*

# Table of Contents

Defendant-Intervenors' Supplemental Objections to Special
Master's Proposed Remedial Plans .................................................................. 1

Preliminary Objection to Remedial Proceedings ..................................................... 1

Summary of Objections ............................................................................................ 1

Objections ................................................................................................................. 4

    I.    Racial Motive ................................................................................ 4

        A.    Racial Predominance ....................................................... 4

        B.    Vote Dilution ................................................................. 17

    II.    Racial Narrow Tailoring ........................................................... 20

    III.    Remedying the Violation ............................................................ 23

    IV.    Gratuitous Imposition of Redistricting Criteria Not
        Used by the Legislature .............................................................. 24

Conclusion ............................................................................................................. 26

## Defendant-Intervenors' Supplemental Objections to Special Master's Proposed Remedial Plans

Pursuant to this Court's order of December 18, 2018, ECF No. 330, allowing the parties to file supplemental responses to the Report of the Special Master and its addendum, Defendant-Intervenors respectfully submit these supplemental objections to the proposed plans the Special Master submitted to the Court.

## Preliminary Objection to Remedial Proceedings

The Supreme Court has now taken this case for plenary review, which will involve district-by-district scrutiny of each of the 11 districts subject to this Court's injunction and *de novo* review of its predominance and narrow-tailoring legal tests. There is no reason to proceed with further remedial proceedings because a map issued at this time will likely be of no use. If the Supreme Court reverses on even one district, a remedial map issued at this time would need to be redone after the Supreme Court's order. Moreover, Defendant-Intervenors object to issuance of a map this late in the decade, with outdated census data for the purpose of only impacting one election.

## Summary of Objections

The Special Master's proposals bring this case full circle, adding a strong dose of irony, if nothing else, to this long-running piece of litigation.

When the General Assembly was accused of racially predominant intent in drawing the House of Delegates' majority-minority districts, the lead map-drawer denied predominance. The Special Master now denies predominance as well. The House also contended that race could not have predominated because the plan

1

followed traditional districting principles, and the Court's initial decision sided with the House on this factual question. The Special Master now also claims that race could not have predominated because he followed his version of traditional criteria (which involve a series of bizarre and contorted configurations). Similarly, the Special Master brushes aside VTD splits in his proposed plans as mere technicalities, too small to reflect racial motive or anything else of import. Defendant-Intervenors sympathize: been there, done that.

The House, in addition, advanced the argument that the 55% BVAP figure utilized in 2011 was not a hard-and-fast-rule. It was, in fact, negotiable and yielded to other considerations. By the calculation the lead map-drawer used, several districts fell below 55% BVAP. The Court's 2015 opinion disagreed, concluding that the lead map-drawer miscalculated BVAP and that all exceeded 55% BVAP.

Now, four years later, the Special Master also uses a calculation of BVAP by which districts in the enacted plan are below 55%. His reports contain multiple charts reflecting BVAP in the enacted majority-minority districts—yes, the districts invalidated by this Court—as falling below that supposed racial "floor." *See, e.g.*, ECF No. 323 at 323 at 69 (showing enacted HD69 at 54.78% BVAP and HD71 at 54.87% BVAP); ECF No. 331 at 28 (showing HD89 at 54.98% BVAP). Thus, a Distinguished Professor of Political Science and Jack W. Peltason Endowed Chair of Democracy Studies at the University of California, Irvine, ECF No. 323 at 1, who was appointed by the Court because of his renowned expertise in redistricting, has confirmed that Delegate Jones was right all along. Nevertheless, the Special Master

2

persists in criticizing the legislature for employing an "arbitrary 55% BVAP threshold," ECF No. 331 at 10, that his own report shows did not exist. And he claims that, e.g., his version of HD89 remedies the violation because it is drawn at 54.98% when his own chart shows that the enacted HD89 is drawn at precisely the same BVAP: 54.98%. ECF No. 331 at 28.

The Special Master's proposals amount to nothing but an unnecessary attempt to remedy a racial "floor" that was no floor with districts that are no improvement under traditional criteria and adhere to a 55% BVAP ceiling that the Special Master too apparently fails to meet because he calculated BVAP incorrectly (according to the Court). And the Special Master manages to do all this by (on average) changing districts *not* invalidated more than he changes districts that *were* invalidated. The Special Master is, in short, acting as a legislature of one, attempting to operate with no meaningful oversight to exercise policy judgment in no way tethered to the will of the Virginia's elected body and to upend its valid policy decisions.

All of this, perhaps, could go down merely as a lesson in why courts should exercise "extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), rather than hasten to discredit the testimony of *elected representatives of the people* who testify to material facts under oath. But the practical impact of the Special Master's proposals extends beyond displacing the legislature's legitimate redistricting role. The proposals so thoroughly dilute the vote of the black

3

communities in Virginia as to violate the Fourteenth and Fifteenth Amendments'
prohibition on intentional vote dilution. The Special Master made the choice that
minority communities, identified by their racial composition, should be submerged
in majority-white districts where no one can credibly claim they have the
opportunity to elect their preferred candidates. Predominance aside, that is
unconstitutional vote dilution.

The Court should stop this runaway train now. It should stay its proceedings
entirely and wait for the Supreme Court to review its injunction. It should consider
issuing an indicative ruling under Federal Rule of Civil Procedure 62.1 that its
former finding that the House achieved a 55% BVAP in every challenged district
was plainly wrong and should be rescinded. And, if the Court chooses to proceed, it
should adopt HB7002, a race-blind plan that targets the concerns the Court actually
expressed about the enacted districts. At a minimum, it should order the Special
Master to start over with new criteria and provide the Court with one plan that
includes all territory in the Commonwealth and resolves all of the technical
problems inherent in his multiple partial plan scenarios.

## Objections

### I.     Racial Motive

#### A.     Racial Predominance

A closer review of the Special Master's work reveals that race predominated
in each module he proposes, if not in each district.

The Special Master's assertion in his Second Addendum that he did not use a 55% BVAP ceiling is not credible. ECF No. 331 at 26. As an initial matter, his denial of using a 55% BVAP ceiling is equivocal. He denies only that he "sought to come as close as possible to a 55% value, while still remaining below it, i.e., used a 55% value as a ceiling." *Id.* But Defendant-Intervenors do not contend that he "sought to come as close as possible to a 55% value"; they contend, based on a close review of his line drawing and his first report, that (1) he viewed any district above 55% BVAP as unacceptable and (2) this goal of drawing all districts below 55% BVAP "had a direct and significant impact on the drawing of at least some of" the proposed districts' boundaries. *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257, 1271 (2015). It is not clear whether the Special Master even denies this—or what exactly he does deny. In all events, both of these contentions are born out in the available evidence.

**The Special Master's Assertions.** The Special Master does *not* deny that he views any remedial district above 55% BVAP as an unacceptable remedy. That is plain from his first report, which goes out of its way to sell each remedial module as containing no district "with more than a 55% black voting age population." *See, e.g.*, ECF No. 323 at 68. He further contended in his initial report that he could not recommend any alternative plan—including Plaintiffs' and the NAACP's plans—because they all proposed districts above 55% BVAP. ECF No. 323 at 121. Obviously, he viewed any remedial district exceeding his ceiling as unacceptable and recommended choosing one set of districts over others on the basis of race.

5

Furthermore, the Special Master's initial report contends that, "[a]s a matter of simple geographic logic," "reconfiguring the eleven unconstitutional districts in a narrowly tailored and non-race preponderant fashion" will "necessarily reduce the minority population proportion within these districts." ECF No. 323 at 13 n.9. He repeats that assertion in his supplemental report. ECF No. 331 at 26–27 n.21. But that, in fact, is *not* so as a matter of geographic logic: drawing districts without racial predominance *could* mean drawing *higher* BVAP districts if neutral principles produced that result. As shown below, that is plainly the "simple geographic logic" in play in many regions here. This and similar statements by the Special Master indicate, not what is true as a matter of "simple geographic logic," but rather what the Special Master's intent was in line-drawing—i.e., a conscious objective of drawing lines below 55% BVAP.

**Demographics**. Both the Special Master's motive and that motive's direct and significant impact are plain from the geographic distribution of demographics and from the Special Master's fine-tuned racial line-drawing.

To begin, the Special Master's assertion that all districts fall below 55% BVAP as a result of "underlying racial demography," ECF No. 331 at 26, is wrong. As HB7002 illustrates, drawing districts with *no attention to race whatsoever* leads to multiple districts over 55% BVAP. The Special Master concedes that some districts, in fact, fall above 60% BVAP and that "DI7002 actually increased black voting age populations in four of the unconstitutional districts." ECF No. 331 at 26–27 n.21. That is strong evidence that 55%+ BVAP districts are naturally occurring.

6

Bizarrely, the Special Master alleges that HB7002 comes with no evidence that "such a configuration was compelled by geographic or demographic factors." *Id.* That is false. HB7002 comes supported with a sworn declaration by the map-drawer that he used *no* racial data in configuring the districts—neither to *raise* nor to *drop* BVAP. The Special Master cannot say that of his own plan. HB7002's BVAP levels then, of necessity, resulted from geography and demographics. Moreover, HB7002's BVAP levels are particularly powerful evidence because HB7002 was drawn to undo the line-drawing maneuvers this Court identified as manifestations of racial intent in the enacted plan. In other words, HB7002 as near as possible—and far nearer than anything else proposed—identifies the "baseline" non-racial map the Court impliedly used to judge the enacted plan—i.e., the districts the Court believed would have resulted in the absence of racial predominance. Those districts, as geography and demographics dictate, turn out to exceed 55% and even 60% BVAP in some instances. That is further proof that 55% BVAP districts are naturally occurring.

**The Court's Opinion**. The Court's opinion supports that conclusion. The Court's overarching factual determination was that "the 11 remaining challenged districts were inextricably intertwined" because, "[d]ue to their starting population and BVAP, some of the challenged districts were able to serve as 'donors' of BVAP and population to nearly challenged districts" and others, "faced with deficits in these areas, received BVAP and population from other districts in order to achieve a 55% BVAP." ECF No. 234 at 79. From that premise, it is not at all logical that

"redrawing" these districts in a "non-race preponderant fashion" will "necessarily reduce the minority population proportion within these districts." ECF No. 323 at 13 n.9. To the contrary, because racial predominance resulted in BVAP *reductions* in the donor districts, non-racial predominant line-drawing will likely result in BVAP increases in those districts as compared to their enacted-plan analogues—as occurs in HB7002. This is confirmed further still in the remedial proposals of all other remedial-phase participants who, even while admitting to the use of race to draw down BVAP, could not achieve BVAPs below 55% in all districts.[1] Thus, the Court's own opinion is powerful evidence that intensive race-based maneuvering was required to achieve uniform BVAP levels below 55%.

**The Line-Drawing**. Perhaps the most powerful evidence of racial predominance is the maps themselves, which reveal just how the 55% BVAP ceiling dictated discrete and substantial line-drawing decisions, proving beyond cavil both that there was a 55% BVAP ceiling and that it had a direct and significant impact on district lines.

---

[1] To be sure, Defendant-Intervenors believe race likely predominated (under the definition of predominance utilized in the Court's memorandum opinion) in many or all of these plans as well, but the information available on those plans is not available because the other parties have not been forthcoming in their use of race. If the Court is inclined to use those plans or portions of them, it should notify the parties to allow further discovery into them, given that racial predominance can occur in ways that are not facially obvious and that the other parties admit that race was an important criterion in their map-drawing.

For example, on the Peninsula, the Special Master plainly placed a predominant weight on race in drawing at least HD92, which could only fall below 55% BVAP with careful race-based maneuvering to split Hampton's black community—in an intentional effort to dilute its voting power—resulting in odd configurations of both HD91 and HD92.

The benchmark (i.e., pre-2011) version of HD92 was over 60% BVAP. ECF No. 234 at 59. The enacted version of HD92 was also over 60% BVAP. HB7002, which reconfigures HD92 to achieve the Court's notion of how it would have been drawn without racial predominance, draws HD92 above 55% BVAP (55.3%). If there were any doubt that HD92 naturally falls above 55% BVAP, Defendant-Intervenors provide three more examples of how it might be configured as Exhibit A. All three are highly compact districts within Hampton City, and they fall, respectively, at 58.73%, 60.28%, and 60.72% BVAP.

The Special Master, however, manages to find perhaps the only possible configuration that falls below 55% BVAP. He does this by removing HD92 from the eastern portion of Hampton City and into the northern side of Hampton City, as showing in Exhibit B at 20, which identifies the portions removed from HD92 in red, those added in green, and those remaining the same in yellow. A racially coded map shows that this maneuver removed heavily black precincts and picked up whiter precincts. Ex. D at 11. Moreover, the Special Master splits three heavily black VTDs in a row, City Hall, Hampton Library, and East Hampton, to dilute their presence in HD92. Including them whole in HD92 would have drawn its BVAP

9

above 55%. Instead, the Special Master achieved a 53% BVAP. In the process, he split downtown Hampton and the city's black community in two, relegating a significant portion of it to HD91 with a 32% BVAP—which no one can credibly contend affords it a meaningful opportunity to elect its preferred candidates. (For more on that vote-dilution problem, *see* below § I.B.)

The Special Master responds, first, by contending that this district comports with traditional districting principles. But, of course, this is no defense: the enacted plan *also* comports with traditional districting principles, and the Supreme Court (and this Court on remand) found this to be no defense. *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 798 (2017). Even if the district is compact and contained wholly within one county or city, race will predominate if the special master chooses one configuration over another to achieve a 55% BVAP ceiling, which he plainly did when there are so may compact options wholly within Hampton City that exceed his 55% BVAP ceiling. Moreover, the three VTD splits— the enacted HD92 split *no* VTDs—is proof perfect of predominance. The Special Master calls the maps' VTD splits a minor, "technical" problem, ECF No. 331 at 29 n.22, but the Court rejected that argument already, calling VTD splits "strong evidence of racial predominance." ECF No. 234 at 36. They are no less probative now than they were in the Court's liability determination.

Moreover, the racial predominance creates a bizarre configuration of HD91, which is contiguous only by a massive body of water that is unconnected by a

bridge.[2] Ex. B at 19. The Special Master responds that this configuration comports with traditional districting principles because contiguity by water is technically valid. Defendant-Intervenors made that argument too, and they lost, ECF No. 234 at 234 at 65 (finding it probative that "[t]he westward extension [of HD80] also added an additional water crossing to the district" and calling this "oddly shaped"); *id.* at 68 (similar holding in HD89). With all due respect to the Special Master, he deserves no special treatment. Moreover, the question is not whether HD91 is technically compliant with traditional districting principles, which are "malleable," *Bethune-Hill*, 137 S. Ct. at 799, but whether race predominated over traditional districting principles. *See id.* at 53 n.39 ("the attainment of a traditional districting principle…can co-exist with the predominant use of race"). As the enacted plan and numerous alternatives reveal, there are plainly *better* ways to draw HD91, and the Special Master chose a manifestly worse way because those better ways resulted in an HD92 above 55% BVAP. Consequently, race predominated.

Further evidence of racial sorting is manifest in the Special Master's proposed reconfigurations of HD63. A comparison of HD63 as proposed in HB7002 with the Special Master's proposed "Petersburg 2" version illustrates the difference between racial sorting to achieve a 55% BVAP ceiling and race-neutral

---

[2] The Special Master's maneuvers on the Peninsula also create a bizarre configuration of HD94. *See* Ex. C. at 22.

11

redistricting.[3] Exhibit C shows the differences, with the yellow portion showing territory in both proposals, the green portion showing territory unique to Petersburg 2, and the red portion showing territory unique to HB7002's proposal. As shown, the cores of the two districts are markedly similar: both HB7002 and the Petersburg 2 place all of Dinwiddie County and all of Petersburg City in HD63. HB7002, however, proposes a district above 55% BVAP, while Petersburg 2 proposes a district at 47% BVAP. The difference is that HB7002 places VTDs Matoaca, Ettrick, and all of Winfrees Store in HD63 and they are heavily black VTDs contiguous with Petersburg City and contain residents who belong to the Petersburg City black community. Petersburg 2, however, proposes that Winterpock, and Cosby VTDs be drawn into HD63, which takes the district up the Appomattox River in a contorted fashion, rendering the district far less compact than HB7002 recommends.

Moreover, Petersburg 2 splits the Winfrees Store VTD, cleaving the side with more black residents off from the side with more white residents. The proposal does this with remarkable racial precision, following the racial housing pattern with near perfection and excluding the black portion from HD63. This is shown below

---

[3] Notably, Petersburg 2 is preferred by Plaintiffs, the NAACP, the Princeton Gerrymandering Project and suggested by the Special Master as a consensus option. ECF No. 331 at 6.

with HD63 to the West of the bold black line and non-challenged district 66 to the

East:



Ex. D at 1a. And Petersburg 2 omits Matoaca and Ettrick from HD63, thereby

taking these two VTDs out of a district they have belonged to since at least 2001.

*See* IEX19 at 125–26 (showing configurations of HD63 that include Matoaca and

Ettrick). These VTDs make far more sense to include with contiguous Petersburg

VTDs than with VTDs in Chesterfield County, which is demographically and

geographically different. In short, the Special Master's odd configuration achieves a

BVAP below 55% by subordinating traditional principles to race.

13

The Special Master's other proposed configuration of HD63, Petersburg 1a, fares no better. It too proposes the odd configuration north of the Appomattox River. Drawing it south of the Appomattox River would render the district far more compact, but that would draw the district into heavier black VTDs, *see* Ex. D at 1, whereas the Special Master's proposal draws the district into whiter areas to the north, thereby sacrificing the district's compactness to racial concerns. The proposal achieves a BVAP of 51%, below the 55% ceiling. Worse, the Special Master proposes to maintain the line between HD63 and HD75, which the Court expressly criticized in its opinion.

The Special Master may believe that drawing the district to avoid Amelia County immunizes his district from a claim of predominance, but that, again, is the argument the Supreme Court rejected. The question is whether the racial motive predominated, regardless of whether some non-racial goal was also accomplished. For the same reason, the Special Master's contention that race could not have predominated because he maintained adherence to political-subdivision lines in some cases, ECF No. 331 at 47 n.23, also fails: that is just another rendition of the argument the Supreme Court rejected. What matters is the stark pattern of racial sorting, as the Special Master in two separate configurations proposes careful maneuvers to draw HD63 around predominantly black areas and into predominantly white areas.[4]

---

[4] These race-based efforts also result in an odd configuration of HD66. Ex. B at 3.

14

The Special Master's proposed reconfiguration of Richmond further shows racial predominance. HB7002 demonstrates that multiple districts in Richmond, drawn with zero attention to race and for the purpose of achieving the configurations the Court believed would exist without racial predominance, fall naturally above 55% BVAP: HD69 (54.4% BVAP), HD70 (61.8% BVAP), and HD71 (56.4% BVAP). If there were any doubt that compact districts in this region naturally fall above 55% BVAP, Defendant-Intervenors in Exhibit E show yet another configuration, in which HD69 (59.29% BVAP), HD 71 (57.19%) and HD74 (62.45% BVAP), all exceed 55% BVAP. These demographics are illustrated further in the Special Master's Richmond proposals, in which three districts barely skate under the 55% BVAP ceiling: HD70 (54.38% BVAP), HD71 (54.45% BVAP), and HD74 (54.37% BVAP). The Special Master's plans' remarkable ability to be a tad under 55% BVAP in each case is yet more evidence of racial predominance.

This racial fine-tuning was no accident. The Special Master's proposal treats the Richmond-area districts as a system, working white VAP into the system through HD70, which picks up white Richmond exurban areas in Chesterfield County, allowing it to trade territory with HD69, HD71, and HD74 to drop their BVAPs as well. For example, the Special Master proposes that overwhelmingly black VTDs near the James River be traded from HD69 to HD71, that VTDs 812 and 814 be traded from HD70 to HD69, and that VTDs 701 and 702 be traded from HD71 and HD70. Ex B at 4–6, 8. That trading between the challenged districts does little to nothing by way of improving them from the enacted districts under

15

traditional criteria, and it does (as discussed below) very little to address the Court's criticisms of the enacted districts. These maneuvers all allow the proposed remedial districts to remain under, albeit slightly under, 55% BVAP.

Similar maneuvering is evidenced in HD74, which sees changes to its northwest edges in highly populated regions that show a remarkable ability to carve out black population to the extent needed to drop the district below 55% (it lands at 54.37%). Although the Special Master claims this rendered the lines more regular under traditional criteria, the northern "mouth" he drew on HD74 belies that claim. *See* Ex. Ex. B at 8. There appears to be no reason not to include the Greenwood VTD in HD74, except that the VTD contains a black neighborhood that would have increased BVAP in HD74 over 55%. *See* Ex. D at 5. Hence, by carving out Greenwood, the Special Master created a contortion for predominantly racial reasons.

Finally, there is overwhelming evidence of predominance in Norfolk, where any naturally drawn configuration will result in at least some 55% BVAP districts, as shown by HB7002 and additional compact configurations of the region. Ex. E at 4. Bringing four districts in the enacted plan from above to below 55% BVAP was no easy feat. As in Hampton, the Special Master appears to have accomplished this by cracking black communities between his remedial districts and also between remedial districts and surrounding districts. In version "1a," HD90 splits a black community on its eastern border with HD83 and a black community on its western border with HD89. Ex. D at 10. HD89 splits a black community on its southern

16

border with HD77 and carefully drops black communities to its northeast, which the enacted plan contained. Ex. D at 9. HD80 splits several black neighborhoods with HD81. Ex. D at 8. HD77 picks up substantial white territory to the southwest and drops core territory elsewhere trading black neighborhoods for white at every turn. Ex. D at 7. These configuration result in bizarre neighboring districts. *See, e.g.*, Ex. B at 12–18. Race predominated.

### B. Vote Dilution

The Special Master's remedial approach raises an additional significant problem because it satisfies all the elements of an intentional vote-dilution violation. This injects a new racial problem into this case because even Plaintiffs have never alleged that the General Assembly acted in 2011 with a motive to dilute minority voting strength; they only alleged a violation of the "analytically distinct" claim of unjustified racial predominance by a good-faith effort at compliance with the Voting Rights Act. *Shaw v. Reno*, 509 U.S. 630, 652 (1993). But, by targeting black communities and intentionally cracking them between districts, the Special Master's approach intentionally placed black voters in districts where no one can credibly claim they will be able to elect their preferred candidates.

If a state actor redistricts by intentionally "minimizing, cancelling out or diluting the voting strength of racial elements in the voting population," it violates the Fourteenth and Fifteenth Amendments and the Voting Rights Act. *Rogers v. Lodge*, 458 U.S. 613, 617 (1982); *see also Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 481–482 (1997); *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009). Notably, the

17

"intent" standard for such a claim is not the demanding "predominance" test applicable in "*Shaw*" cases, but rather the lower substantial-factor test applicable under ordinary racial discrimination law. *See id.* at 617–18 (applying the standard of *Washington v. Davis*, 426 U.S. 229 (1976) and *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977), to a vote-dilution claim).

There appear to be instances of intentional vote dilution here. HD92 is a prime example: the Special Master proposes that a section of the black community in Hampton be carved out of an undisputedly performing majority-minority district (HD92) and into its neighbor (HD91) with BVAP of about 32% BVAP. ECF No. 323 at 87. No one could credibly claim that this group will be able to elect its preferred candidates in a 32% BVAP district. And, although unintentionally moving this community as an incident of non-racial goals would only be unlawful if VRA "effects-test" preconditions were shown, the Special Master almost certainly made this move intentionally, as shown above, to avoid including (what he regarded as) too many black voters in HD92. That is intentional racial vote dilution. And that is so even if the Special Master did not make this choice for "predominantly" racial reasons; as noted above, that he chose to carve this community out of a performing district and submerge it in an overwhelmingly white district with racial fine-tuning as a substantial motivating factor qualifies as intentional vote dilution.

To be sure, Defendant-Intervenors do not suggest that the Special Master has made this choice out of racial animus—nor need they make that allegation. The intent standard is satisfied simply because the choice was made "'because of,' not

18

merely 'in spite of,' its adverse effects." *Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). There is no required element of "race-based hatred." *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 222 (4th Cir. 2016); *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189 (2008) (explaining that "invidious" means simply "irrelevant to the voter's qualification," as race always is). The Special Master certainly may believe placing a section of Hampton's black community in an overwhelmingly white district is to their benefit (or, more likely, some abstract benefit). The problem, however, is that he did so on purpose and the Fourteenth and Fifteenth Amendments and the Voting Rights Act regard purposefully submerging racial minorities into majority-white districts as dilution.

And what is true of HD92 is true across the board. In every instance, the Special Master believes drawing BVAP, intentionally or incidentally, over 55% makes it too easy for the minority community to elect its preferred candidates, so he intentionally decreases BVAP, not to create additional minority-opportunity districts—which he admits he did not do and lacks the evidence to support—but to submerge black voters into majority-white districts, often overwhelmingly so. Setting aside the policy question of whether that is "good government" redistricting—and there is good reason to disagree with the approach as a matter of policy—the approach amounts to intentional vote dilution because the law does not assume minority voters are better off being outvoted by the majority.

19

## II.     Racial Narrow Tailoring

As explained in Defendant-Intervenor's initial set of objections, the Special Master's avowed use of race in constructing his proposed remedial districts raises more questions than it answers, and the Special Master does practically nothing to answer them.

The Special Master responds simply that "some use of racial data" occurred to ensure that districts "did not inadvertently result in violation of Section 2 of the Voting Rights Act in the way they were reconfigured." ECF No. 331 at 21. For starters, as shown above, there is overwhelming evidence that the Special Master did more than employ "some use of racial data"; he employed a BVAP ceiling and manipulated district lines throughout his proposals to avoid transgressing that hard and fast rule, at the expense of traditional districting criteria and the voting power of numerous black communities now submerged in majority-white districts.

What's more, the Special Master fails to explain what exactly he did to comply with Section 2. Where were race-based adjustments required? Why were they required? What precisely was adjusted? To what extent? What data supported the adjustments?

The Special Master's citation to Section 2 adds no clarity, only further questions. In claiming a need to use race under Section 2, the Special Master ignores that he drew most of his remedial districts below 50% BVAP—some as low as 40% BVAP. Race-based maneuvers below 50% BVAP cannot be justified under Section 2 because Section 2 incorporates a "majority-minority rule," requiring race-

based districting only to achieve a configuration *above*—not *below*—50% BVAP. *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009).[5] So, while it might make sense for a map-drawer to cite Section 2 as the basis for choosing to adjust a district from below to above 50% BVAP, the Special Master cannot credibly claim to have needed race to adjust lines *below* 50% BVAP, such as in the Special Master's proposed districts HD95 (47% BVAP), HD77 (40% BVAP), HD90 (41% BVAP).

Furthermore, Defendant-Intervenors explained in their initial set of objections that nothing in Section 2 would justify a BVAP ceiling; if "packing" were the concern, race would be used to draw a high-level BVAP district into *two* districts both *exceeding* 50% BVAP: that is how packing is avoided. The Special Master did not do that in any instance, and he has no response to this argument.

The Special Master ignores *Bartlett v. Strickland* in making the remarkable claim that his districts qualify as "opportunity to elect districts." ECF No. 331 at 23. The Special Master does very little to support this assertion. Whatever support it may find conflicts with the Supreme Court's approach to the subject, which defines districts by the actual ability they afford in raw numbers. According to its precedent, an opportunity district is one where the minority group "is sufficiently large and geographically compact to *constitute a majority* in a single-member district." *Bartlett*, 556 U.S. at 12 (quotations omitted) (emphasis added). That, in

---

[5] Legislatures, to be clear, might retain the prerogative to use race to draw districts below 50% BVAP "as a matter of legislative choice or discretion." *Bartlett* v, 556 U.S. at 23. But the Special Master exercises no "legislative choice or discretion."

21

turn, means a district at or above 50% of the minority "voting population." Anything less than that is *not* a minority-opportunity district; as the Court explained, in a district at 39% BVAP, "African–Americans standing alone have no better or worse opportunity to elect a candidate than does any other group of voters with the same relative voting strength." *Id.* at 14.

The Special Master appears to be referring to vague notions of crossover voting, but Section 2 does not require crossover districts because "[t]here is a difference between a racial minority group's 'own choice' and the choice made by a coalition." *Id.* at 15. The districts between 40% and 50% BVAP that the Special Master calls "opportunity" districts are, by definition, *not* districts in which the black community can exercise its "own choice." They are districts in which the black community is dependent on white voters to achieve effective voting power. However the Special Master regards these districts, his assertions are contrary to both law and common sense. This, in turn, leaves Virginia vulnerable to a Section 2 cause of action.

To be sure, the evidence on the record does not suffice to justify intentionally creating 50% BVAP districts, *see Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017), which is why Defendant-Intervenors are proposing a race-blind plan. But neither is there record evidence or, more importantly, legal justification for race-based maneuvers *below* 50% BVAP. The law in this area—at least if the Court's decision stands on appeal—is now clear: race may be used to draw 50%+ minority VAP districts where a strong basis in evidence exists to show such districts are required

22

under Section 2. Otherwise, a map-drawer who uses race enters a minefield in a big-box truck. That is what the Special Master has done, and his use of race is nowhere close to narrowly tailored.

## III.   Remedying the Violation

As explained in Defendant-Intervenors' first set of objections, the Special Master's remedial districts are under-inclusive because they carry forward many lines the Court criticized as manifesting unjustified racial intent. Defendant-Intervenors can now provide an approximate quantification of these omissions. Exhibit F shows the Court's criticisms of district lines and breaks them down, for the sake of convenience, into 111 specific instances of race-based line-drawing. The Special Master proposes to remedy only between 54 to 58 of those. In other words, the Special Master proposes to carry forward *half* of the racially predominant lines. By comparison, HB7002 proposes to remedy 87 of the 111 race-based maneuvers.

This is not a mere technicality. The Special Master's districts maintain many of the focal points of the Court's basis for invalidating the 2011 districts. For example, the Court was concerned that the water bridge in HD80 was created for racial reasons, and the Special Master proposes that this bridge be kept. The Court criticized VTD 410 as being improperly split in HD69, implementing racial motive, but the Special Master's proposals maintain the exact same split. The Court criticized the General Assembly for changing HD70, which was not underpopulated, but the Special Master changes nearly half the district, maintaining many portions the Court found suspect. The Court criticized a narrow appendage in HD95, which

23

allowed the district to "donate" BVAP to HD92, but the Special Master proposes that this configuration remain exactly as it was in the enacted districts.

The list of un-changed instances of predominance is long and need not be recited in full here. The Special Master responds somewhat obliquely with the claim that the various criticisms of his work run in competing directions, implying that they somehow cancel each other out. *See* ECF No. 331 at 46. Hardly. They prove just how off-base is approach is. His map incorporates what the Court concluded was improper racial intent and *adds* to it the Special Master's own racial intent. This *compounds* the predominance; it does not cancel it out. And the fact that he does so in a way to harm minority voting strength adds actual, real-world injury to this insult.

The Special Master also contends that he remedied the violations because he followed traditional districting principles. But that means very little under the (new) legal regime. The 2011 districts *also followed traditional districting criteria*, which is why Plaintiffs had to appeal to obtain a ruling that following traditional districting criteria is not a defense to a claim of racial gerrymandering. Following somewhat different criteria to achieve different policy goals with overwhelming racial intent to achieve different racial goals remedies nothing.

## IV.  Gratuitous Imposition of Redistricting Criteria Not Used by the Legislature

As Defendant-Intervenors explained in their initial objections, the Special Master's approach is further problematic insofar as it changes surrounding districts

24

in unnecessary ways and exercises policy judgments properly left to the legislature. Defendant-Intervenors can now articulate these problems in greater detail.

The Special Master's proposals are odd in that, on average, they change non-challenged districts more than they change challenged districts. In other words, they do more to alter districts not enjoined by the Court than they change districts the Court has enjoined. The Special Master on average altered challenged districts by 31.21% (or 24,809 residents) and non-challenged districts by over 33.53% (or 26,743 residents). Exhibit G. By comparison, HB7002 alters challenged districts considerably more than non-challenged districts and at substantially lower rates than the Special Master: altering challenged districts by, on average, 23.17% (or 18,501 residents) and non-challenged by 18.06% (or 14,402 residents). Dkt. 304-5.

The Special Master responds that "the need to redraw a constitutional map takes precedence over the maintenance of existing district lines," ECF No. 331 at 33, but he fails to explain why doing so requires more changes in surrounding districts than in districts found to be unlawful. His Second Addendum, however, reveals the answer: he believes his task is to draw districts according to "good government criteria." ECF No. 331 at 33. That is not legally correct. His task was to draw districts that most closely approximating the enacted plan consistent with remedying the constitutional violation. *Upham v. Seamon*, 456 U.S. 37, 42 (1982); *White v. Weiser*, 412 U.S. 783, 795 (1973) (quotations omitted). Neither the Special Master nor the Court possesses power to effectuate "policy judgments." *Perry v. Perez*, 565 U.S. 388, 393 (2012).

25

This avowed belief that the Special Master has power to redraw districts simply to comport with his own redistricting ideals apparently leads to his remarkable argument that it is "irrelevant" that HB7002 moves fewer people than every single permutation he proposes. ECF No. 331 at 33. To the contrary, the plan that both (1) remedies the violation and (2) moves the fewest constituents *must* be adopted by the Court. *White*, 412 U.S. at 795. Because HB7002 targets the actual incidents of racial predominance the Court identified, it succeeds on point (1). So the fact that it is more narrowly tailored in effectuating a remedy is not "irrelevant"; it is sufficient to satisfy point (2) ahead of the Special Master's proposals. That is dispositive in HB7002's favor.

## CONCLUSION

The Court should not adopt any set of districts proposed by the Special Master. It should, first of all, stay remedial proceedings entirely. If it does not, it should implement HB7002 or order further map-drawing efforts to remedy the violations it believes exist in a manner that is actually tailored to that purpose.

26

Dated: January 4, 2019

Respectfully Submitted,

*/s/  Katherine L. McKnight*
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2019, a copy of the foregoing was filed and served on all counsel of record pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.

/s/  Katherine L. McKnight
Katherine L. McKnight (VSB No. 81482)
Richard B. Raile (VSB No. 84340)
E. Mark Braden (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave NW, Suite 1100
Washington, DC 20036
Tel: (202) 861-1500
Fax: (202) 861-1783
kmcknight@bakerlaw.com
rraile@bakerlaw.com
mbraden@bakerlaw.com

*Attorneys for the Virginia House of Delegates and Virginia House of Delegates Speaker M. Kirkland Cox*