county not contained within the unconstitutional districts have populations that are racially distinct from the portion(s) of the county found inside the unconstitutional districts. Thus, remedying the unconstitutionality of the eleven districts will, necessarily, require changes in the district boundaries of some of the additional districts containing the counties found within the unconstitutional eleven.   In terms of this straightforward geographic logic, as many as 34 districts might need to be redrawn.

ii.  However, on the one hand, not all of these 34 districts are adjacent to one of the unconstitutional districts. And, on the other hand, not all of the districts not found to be unconstitutional that lie adjacent to the unconstitutional districts contain pieces of one or more of the counties found in an unconstitutional district.  In particular, there are three other districts that are adjacent to one or more of the unconstitutional districts, but which do not contain a piece of any of the 15 counties found in whole or part within the unconstitutional districts (districts 55, 96, 97). And there are five other districts that are not adjacent to  one or more of the unconstitutional districts, but which do not contain a piece of at least one of the 15 counties found in whole or part within the unconstitutional districts (districts 21, 56, 65, 82, 84).

Recognition of these two distinct sets of constraints on narrowly tailoring led me to seek to limit boundary changes in my illustrative remedial maps to the unconstitutional districts and to those that satisfy both a "district adjacency

constraint" and a "potentially implicated county" constraint, i.e. districts that lie in the intersection of these two sets of constraints.  There are 30 such districts, with 19 districts that are both adjacent to one or more the unconstitutional ones  and also containing a piece of at least one of the 15 counties found in whole or part within the unconstitutional districts (61, 62, 64, 66, 68. 72, 73, 75, 76, 78, 79, 81, 83, 85, 91, 93, 94, 96, 100).

*iii.* In other jurisdictions, with other sets of factual circumstances, to fully resolve the constitutional infirmities, it might be necessary to effectuate a remedy that included the union[44] rather than the intersection of these two sets of constraints. Here however, after careful review of districting alternatives, I am satisfied that both constraints can be simultaneously satisfied so as to create narrowly tailored remedial plans.  Thus, in my view, changes to the enacted plan should be limited to no more than 30 districts at maximum.[45]

*iv.* In my view changing even as few as 30 districts involves changing more districts than are actually needed to implement a constitutional and narrowly tailored redrawing. A careful investigation of redistricting options demonstrates that the

---

[44] There are 38 districts that lie in the union of the "adjacency" and "affected county" constraint.

[45] The only possible expansion to make changes in districts not in this set would occur if there are Section 2 issues that would require including contiguous minority populations in other areas as part of a compactly drawn majority minority district. But, given the factual circumstances in this case, I do not believe that issues of this type are relevant.

number of districts that need to be redrawn in the 2011 enacted map to effectuate a narrowly tailored constitutional map is actually lower than 30.   In other words, in my view, not all the districts that are both adjacent to the unconstitutional ones <u>and</u> contain portions of counties found within the unconstitutional districts need to be redrawn in order to construct a remedy that is narrowly tailored.

*v*. Complete maps that affect only 21 districts or that affect only 26 districts can be drawn based on the geographically defined illustrative remedial modules I provide to the Court. Because there are potential tradeoffs among traditional redistricting criteria, and minimization of unnecessary county splits is not the only aspect of narrow tailoring (e.g., improving compactness, or reducing splits among counties might also be taken into account) other plan feature comparisons may lead the Court, under the totality of circumstances, to a preference for a remedy that changes more than 21 districts.

*vi*. I have presented alternative illustrative maps that address tradeoffs among traditional redistricting criteria in slightly different ways. The details are provided later in the Report. But, a remedial plan relying on traditional districting criteria that is seeking to be narrowly drawn, should not, in my view, redraw more than 26 districts.

*vii.* one element of narrow tailoring involves respect for the existing geographic centering of the districts found unconstitutional, while redrawing the district in a constitutional fashion. In nine of the eleven unconstitutional districts this is straightforward to do since the district has a preponderant (or sole) county population within it and thus can be redrawn centered within that county. In those nine districts I succeed in reconfiguring such districts to be wholly within a single county, and this is true in Norfolk (except in Norfolk Illustrative Module 1C), and in Richmond, even when this required reconfiguring two of the unconstitutional districts so that both were wholly within that County.[46]

In one of the remaining districts, district 63, there is a plurality county, Petersburg, which can used as the core of the redrawn district, though there are multiple options for how that district is to be drawn.  In the remaining district, district 70, the combination of pieces of counties in that district means that there are many different ways the district might be redrawn and most of these will involve multi-county combinations, especially if other unconstitutional districts are drawn to lie wholly are largely within given counties.

---

[46] Given Virginia geography and racial demography I do not believe that it is mathematically possible to have drawn more than nine of the eleven unconstitutional districts so that each would be located wholly within a single county.

*vi.* One possible element of a narrowly tailored plan is not changing the district

numbering scheme.  Even though the numbering scheme for the Virginia House of

Delegates reflects some historical patterns that in the present day make absolutely

no sense (see e.g., the location of district 21 adjacent to districts 78 and 84), I have

left the district numbering untouched.


(h) I would emphasize that, in all the illustrative plans I have drawn, I have sought

to be entirely neutral with respect to partisanship, with compliance with traditional

districting criteria and the remedying of unconstitutionality in a narrowly tailored

fashion dictating shapes of redrawn districts, and limiting the number of districts

that were redrawn.  In reconfiguring both the unconstitutional districts and the

redrawn district adjacent to the unconstitutional ones, I have drawn districts in a

fashion relying on traditional districting criteria and have been blind to the

implications of my line drawing for partisan outcomes. I have considered probable

electoral outcomes in the redrawn unconstitutional districts only in the

unconstitutional districts, and only with respect to avoiding potential minority vote

dilution in the redrawing process, and only after I had drawn a potential remedial

district with no concern for race. In the unconstitutional districts, electability issues

could not be avoided because of the need to assess whether a redrawn district

remained one in which the minority community realistically had an equal

opportunity to elect candidates of choice at both the primary and general election level. [47]

(i). minimizing pairing of incumbents

*i.* Minimizing pairing of incumbents is sometimes treated as a component of a "least changed" plan.[48]  However, in *North Carolina v. Covington*, 138 S. Ct. 2548 2018) the Supreme Court has held that, in a remedial plan, a state redistricting body may not rely on an otherwise legitimate redistricting consideration—such as keeping all incumbent homes in their original district— if doing so would prevent it from completely remedying an identified constitutional violation.

---

[47] As noted earlier, where not essential to provide equal protection assessment for the African-American community, I did not consider partisan outcomes.   This case does not involve any finding of partisan gerrymandering that would need to be addressed in a remedial plan.

[48] The relevant portion of Article IV. Legislature Section 4 of the Virginia Constitution, describing qualifications of senators and delegates states: "Any person may be elected to the Senate who, at the time of the election, is twenty-one years of age, is a resident of the senatorial district which he is seeking to represent, and is qualified to vote for members of the General Assembly. Any person may be elected to the House of Delegates who, at the time of the election, is twenty-one years of age, is a resident of the house district which he is seeking to represent, and is qualified to vote for members of the General Assembly. A senator or delegate who moves his residence from the district for which he is elected shall thereby vacate his office."

*ii.* Many of the districts in the 2011 Enacted plan were drawn with high levels of fragmentation of county boundaries, and this is true both for the districts found unconstitutional and those immediately adjacent to them which would need to be redrawn. This excessive fragmentation of county populations was one of the types of evidence presented at the trial as to why race was a preponderant motive. In particular, small white majority pieces of counties were disproportionately found in white majority districts, and small black majority pieces of counties were disproportionately found in black majority districts. As a consequence of this high fragmentation of county borders, often in a way that directly involved race, minimizing the fragmentation of county and locality boundaries in the unconstitutional districts and avoiding drawing districts with a racially preponderant motive becomes more complicated if there is added, as the last consideration, a concern to avoid incumbency pairing.

*iii.* For example, in the 2011Enacted Plan, there are pieces of Richmond in 6 districts, and there are four 2011 incumbents with homes located in Richmond, all residing north of the river, even though the County population is only the equivalent of slightly more than two and a half legislative districts. In 2017 there are still four incumbents residing in Richmond. Thus, if, in a remedial plan, Richmond is divided into only three pieces, it is simply mathematically impossible to avoid pairing at least two of the four Richmond based incumbents. The only way to avoid pairing some of the four present incumbents with homes is Richmond is to

divide Richmond into four pieces.  This is the approach taken in the illustrative modules I have drawn in the Richmond area. However, some of the five submitted remedial plans unnecessarily split Richmond into more than four pieces.

*iv*. My initial line drawing did not take present incumbencies into account.

*v*. Prior to November 30, the only information available to the staff of the House of Delegates in the form of a geocoding mapping layer was the home addresses for 2009/2011 incumbents.

*vi*. After I had generated plans that respected the geographic centering of the unconstitutional districts to the extent feasible, without taking any information about incumbent locations into account, I explored plans that did not pair any of the 2009/2011 incumbents.  Those map explorations convinced me that one could draw constitutional maps that avoided the pairing of the incumbents who were in place as of the creation of the 2011 Enacted map – though avoiding incumbent pairings did come at the cost of some additional county pieces being created, and doing so reduced the compactness of some districts.

*vii*. In late November, I requested a Court Order to obtain the present addresses of House of Delegates incumbents in a geocoded fashion that allowed me to overlay present incumbent addresses on maps. After correcting an error in the home

location of one of the incumbents, I then created reconfigured illustrative remedial plans in which all present incumbents had their home in their present districts.

*viii.* Comparing the exploratory maps I drew without taking incumbency protection into account, drawn solely for the purpose of creating illustrative narrow tailored maps that followed traditional districting criteria, and the illustrative remedial maps I am presenting to the court that do avoid any incumbency pairing, I believe that avoiding incumbency pairing has been accomplished in my illustrative modules in a way that remedies constitutional infirmities in the unconstitutional districts. Moreover, while my map explorations suggest that maps that do not pair incumbents are, on average, marginally less compact and divide counties into somewhat more pieces than maps that pay no attention to incumbent locations, nonetheless, as demonstrated by my illustrative remedial maps, it is possible to create narrowly tailored means of remedying constitutional infirmities in a way that avoids a race preponderant motive while still avoiding the pairing of any incumbents.

IV. Basic features of the illustrative plans developed by the Special Master, with review of potential districts organized according to four geographic modules, and the criteria enumerated above

1. There are two especially useful ways to classify the eleven unconstitutional districts before commencing the process of remedial line drawing. The first is in

terms of the types of   changes that will be needed to make the district constitutional (see discussion in the body of the Report); the second is in terms of the geographic area of the state in which the unconstitutional district is located.

(a) By partitioning the unconstitutional districts by geography, it is possible to partition the task of line drawing in multiple smaller separable tasks, involving only one or a few unconstitutional districts that need to be drawn in each segment. By this modularization of the redistricting task we can consider alternative plans for each geographic area that involve redrawing the unconstitutional districts and some of the adjacent districts taken as a group without concern for the configuration of districts outside of those in the selected module.  The Court can then pick a preferred remedial plan for each geography, and combine the chosen separate geographic components so as to create a viable narrowly tailored constitutional plan for the entire state

(b) The geographic partitioning I made use of involved four geographic areas within which particular unconstitutional districts were redrawn: (1) the Richmond and Henrico area (containing unconstitutional districts 69, 70, 71, 74), the Petersburg area ( containing unconstitutional district 63),  and the Norfolk-Portsmouth-Chesapeake area ( containing unconstitutional districts  79, 80, 89, 90), and (4) the Hampton-Newport News area, also referenced as the Peninsula (containing unconstitutional districts 92 and 95). This modularized approach to line drawing

70

allows the parties and intervenors to comment on how they might propose particular geography be redrawn without forcing a ripple of changes in other geographic areas of the state.[49]

(c) Another useful typology I made use of in line drawing involves dividing the set of eleven unconstitutional districts into four categories that cross-cut geographic categorization:

i. This typology involves: (a) districts in which the preponderant population comes from one large county (districts 69, 71, 74, 77, 80, 90, 95), (b) districts in which the entire population comes from a single county (districts 89 and 92), (c) districts in which it is difficult to identify a clearly preponderant county (district 70), and (d) districts in which the preponderant county is a small county which is already included in the county in its entirety, and there are multiple other counties with portions in the district (district 63).

ii. It is possible to redraw in a constitutional fashion all the districts in the first and second categories such that their population now comes from a single county, rather than, as in the 2011 Enacted Plan, including (small) pieces of other counties with a

---

[49] In the central portion of the state (the Richmond-Petersburg area) district 62 touches districts 70 and 74 as well as district 63.    This creates a need for a consistent configuration of district 62 in both the Petersburg and the Richmond modules.

distinctive racial character.  For example, districts 77, 80, 89, 90 in the Norfolk area are drawn in all of my illustrative modules to lie within a single county, and two of the three unconstitutional districts in the Richmond area in these categories (districts 69 and 74) are so drawn, and I provided an illustrative module for the Peninsula in which both district 92 and district 95 lie within a single county.  Thus, I have drawn illustrative modules with the feature that a composite map can be drawn using them which will have 9 of the eleven unconstitutional districts lying entirely within a single county and thus satisfying a key traditional districting principle.  This is in remarkable contrast to the 2011 Enacted map, in which only 2 of the eleven unconstitutional districts are contained wholly within a single county.

*iii.* With respect to the second category, when remedying constitutional violations in other unconstitutional districts that are adjacent or nearby to the whole county unconstitutional district, there will necessarily be geographically and population mandated spillover effects, and these can operate in a fashion that will, concomitantly, permit change in the single county unconstitutional district so as to remedy the constitutional violation.  For example, changes in the configuration of unconstitutional district 95 to make it a district located within a single county facilitate the redrawing of the immediately proximate unconstitutional district 92 in a constitutional fashion as well.  Similarly, changes in the configuration of unconstitutional districts 80 and 90 to make each a district located within a single county facilitate the redrawing of district 89 in a constitutional fashion as well.

*iv.* With respect to the third and fourth categories, it is possible to redraw districts in that category, districts 63 and 70, in a constitutional way, though multi-county versions will still be necessary.

2. Illustrative modularized maps in hour regions of the state, with comparison to the 2011 Enacted Map

(a) Richmond area.

In the Richmond area I have offered to the Court one basic illustrative map, and three quite minor variants of that map that do not differ in the shape of any of the unconstitutional districts (69, 70 71, and 74) in this geographic region, but only in the shapes of districts 72 and 73. The only reason to consider a change in both districts is that the incumbent locations in these districts are not the same in 2017 as in 2011, and acknowledging that fact can improve overall district compactness without affecting changes in the unconstitutional districts. All of these maps in my view remedy the constitution violation found in districts 69, 70, 71, and 74. None contain any districts with more than a 55% black voting age population. Each has three to four fewer county pieces than the 2011 Enacted map. Two of the three are better than the Enacted map on both the Polsby-Popper and Reock compactness measure, and the third is almost as good on one measure and visibly better on the other. None involve any fracking.

73

A map and key statistics about each of these Richmond area variants is provided below, with comparison to the 2011 Enacted map.

# RICHMOND

### RICHMOND Enacted Map



# RICHMOND

### RICHMOND Enacted Data

| District | Population | Dev% | BVAP% | Fairfax '13 | Obama '12 | Reock | Polsby Popper |
|---|---|---|---|---|---|---|---|
| 27 | 79,381 | -0.79% | 18.44% | 57.85% | 45.79% | 0.35 | 0.25 |
| 68 | 79,611 | -0.50% | 7.25% | 40.25% | 44.70% | 0.36 | 0.25 |
| 69 | 79,386 | -0.78% | 55.19% | 61.33% | 86.08% | 0.52 | 0.34 |
| 70 | 79,382 | -0.78% | 56.37% | 66.92% | 79.82% | 0.40 | 0.19 |
| 71 | 80,322 | 0.39% | 55.35% | 50.28% | 87.02% | 0.33 | 0.24 |
| 72 | 80,764 | 0.94% | 13.40% | 41.33% | 45.26% | 0.26 | 0.08 |
| 73 | 80,135 | 0.16% | 13.55% | 41.48% | 46.75% | 0.39 | 0.15 |
| 74 | 79,594 | -0.52% | 57.24% | 57.50% | 75.06% | 0.16 | 0.12 |
| **MEAN** | *79,822* | *-0.24%* | *34.60%* | *52.12%* | *63.81%* | *0.35* | *0.20* |

### County Splits

| District | Total Counties | Charles City | Chesterfield | Henrico | Richmond City |
|---|---|---|---|---|---|
| 27 | 1 | | 79,381 | | |
| 68 | 3 | | 40,203 | 4,472 | 34,936 |
| 69 | 2 | | 4,994 | | 74,392 |
| 70 | 3 | | 33,281 | 28,615 | 17,486 |
| 71 | 2 | | | 5,221 | 75,101 |
| 72 | 1 | | | 80,764 | |
| 73 | 1 | | | 80,135 | |
| 74 | 3 | 7,256 | | 70,039 | 2,299 |

# RICHMOND

## RICHMOND 1A Map



# RICHMOND

RICHMOND 1A Data

| District | Population | Dev% | BVAP% | Fairfax '13 | Obama '12 | Reock | Polsby Popper |
|---|---|---|---|---|---|---|---|
| 27 | 79,381 | -0.79% | 18.44% | 57.85% | 45.79% | 0.35 | 0.25 |
| 68 | 79,611 | -0.50% | 7.25% | 40.25% | 44.70% | 0.36 | 0.25 |
| 69 | 79,318 | -0.86% | 54.38% | 61.18% | 86.24% | 0.36 | 0.36 |
| 70 | 79,924 | -0.11% | 52.29% | 62.48% | 72.38% | 0.29 | 0.16 |
| 71 | 79,920 | -0.11% | 54.01% | 51.45% | 86.72% | 0.20 | 0.17 |
| 72 | 79,445 | -0.71% | 15.38% | 45.32% | 46.23% | 0.26 | 0.08 |
| 73 | 80,135 | 0.16% | 13.55% | 41.48% | 46.75% | 0.39 | 0.15 |
| 74 | 79,355 | -0.82% | 54.37% | 55.98% | 74.10% | 0.19 | 0.18 |
| **MEAN** | 79,636 | -0.47% | 33.71% | 52.00% | 62.86% | 0.30 | 0.20 |

| UNCONSTITUTIONAL | CHANGED | UNAFFECTED |
|---|---|---|

County Splits

| District | Total Counties | Charles City | Chesterfield | Henrico | Richmond City |
|---|---|---|---|---|---|
| 27 | 1 | | 79,381 | | |
| 68 | 3 | | 40,203 | 4,472 | 34,936 |
| 69 | 1 | | | | 79,318 |
| 70 | 4 | 7,256 | 28,912 | 33,716 | 10,040 |
| 71 | 1 | | | | 79,920 |
| 72 | 1 | | | 79,445 | |
| 73 | 1 | | | 80,135 | |
| 74 | 1 | | | 79,355 | |

# RICHMOND

RICHMOND 1B Map



# RICHMOND

RICHMOND 1B Data

| District | Population | Dev% | BVAP% | Fairfax '13 | Obama '12 | Reock | Polsby Popper |
|---|---|---|---|---|---|---|---|
| 27 | 79,381 | -0.79% | 18.44% | 57.85% | 45.79% | 0.35 | 0.25 |
| 68 | 79,611 | -0.50% | 7.25% | 40.25% | 44.70% | 0.36 | 0.25 |
| 69 | 79,318 | -0.86% | 54.38% | 61.18% | 86.24% | 0.36 | 0.36 |
| 70 | 79,924 | -0.11% | 52.29% | 62.48% | 72.38% | 0.29 | 0.16 |
| 71 | 79,920 | -0.11% | 54.01% | 51.45% | 86.72% | 0.20 | 0.17 |
| 72 | 80,221 | 0.26% | 19.49% | 52.02% | 51.35% | 0.47 | 0.28 |
| 73 | 79,359 | -0.81% | 9.32% | 36.17% | 42.09% | 0.40 | 0.21 |
| 74 | 79,355 | -0.82% | 54.37% | 55.98% | 74.10% | 0.19 | 0.18 |
| **MEAN** | 79,636 | -0.47% | 33.69% | 52.17% | 62.92% | 0.33 | 0.23 |

| UNCONSTITUTIONAL | CHANGED | UNAFFECTED |
|---|---|---|

## County Splits

| District | Total Counties | Charles City | Chesterfield | Henrico | Richmond City |
|---|---|---|---|---|---|
| 27 | 1 | | 79,381 | | |
| 68 | 3 | | 40,203 | 4,472 | 34,936 |
| 69 | 1 | | | | 79,318 |
| 70 | 4 | 7,256 | 28,912 | 33,716 | 10,040 |
| 71 | 1 | | | | 79,920 |
| 72 | 1 | | | 79,445 | |
| 73 | 1 | | | 80,135 | |
| 74 | 1 | | | 79,355 | |

(b) Petersburg area

I offer to the Court two illustrative modules for the Petersburg area (district 63). The first of these has two very minor variations which differ only in how Dinwiddie is treated in the module: Petersburg illustrative module 1A and Petersburg illustrative module 1B. In one variant the Dinwiddie portion of 2011 District 63 is modified slightly so as to improve overall district compactness, and this change necessitates a slight modification of the Dinwiddie portion of District 75. In the other, the Dinwiddie configurations are left completely unchanged. Thus, one module changes only three districts, while the second changes four. In Petersburg illustrative module 2, more substantial changes are made, affecting change in five districts, rather than only three districts, or only four districts. However, this map provides the best overall compactness and it has the fewest county pieces. Moreover, while all of these maps do a good job in terms of the number of counties that are kept whole within one of the districts, it is Petersburg Module 2 that does the best job in this regard. All of these maps in my view remedy the constitution violation found in district 63. None make race a preponderant criterion. None contain any fracking.

A map and key statistics about each of these Petersburg area variants is provided below, with comparison to the 2011 Enacted map.

# PETERSBURG

PETERSBURG 2011 Enacted Map



# PETERSBURG

## PETERSBURG 2011 Enacted Data

| District | Population | Dev% | BVAP% | Fairfax '13 | Obama '12 | Reock | Polsby Popper |
|----------|-----------|------|-------|-------------|-----------|-------|---------------|
| 62 | 79,677 | 0.42% | 24.56% | 64.83% | 46.93% | 0.36 | 0.13 |
| 63 | 79,602 | 0.51% | 59.53% | 68.40% | 72.18% | 0.25 | 0.16 |
| 64 | 79,262 | 0.93% | 24.24% | 63.19% | 41.64% | 0.37 | 0.16 |
| 66 | 79,397 | 0.77% | 16.06% | 62.36% | 37.27% | 0.31 | 0.27 |
| 75 | 79,295 | 0.89% | 55.43% | 62.09% | 62.71% | 0.41 | 0.19 |
| **MEAN** | **79,447** | **0.70%** | **35.69%** | **64.17%** | **52.15%** | **0.34** | **0.18** |

| UNCONSTITUTIONAL | CHANGED | UNAFFECTED |
|------------------|---------|------------|

## County Splits

| District | Total Counties | Brunswick | Chesterfield | Colonial Heights | Dinwiddie | Emporia | Franklin City | Greensville | Henrico |
|----------|---------------|-----------|--------------|------------------|-----------|---------|---------------|-------------|---------|
| 62 | 4 | | 49,193 | | | | | | 7,877 |
| 63 | 5 | | 13,302 | | 18,117 | | | | |
| 64 | 7 | | | | | | 3,631 | | |
| 66 | 2 | | 61,986 | 17,411 | | | | | |
| 75 | 10 | 17,434 | | | 9,884 | 5,927 | 4,951 | 12,243 | |

| District | Hopewell City | Isle of Wight | Lunenburg | Petersburg | Prince George | Southampton | Suffolk City | Surry | Sussex |
|----------|---------------|---------------|-----------|------------|---------------|-------------|--------------|-------|--------|
| 62 | 15,215 | | | | 7,392 | | | | |
| 63 | 7,376 | | | 32,420 | 8,387 | | | | |
| 64 | | 34,445 | | | 19,946 | 6,110 | 7,112 | 6,374 | 1,644 |
| 66 | | | | | | | | | |
| 75 | | | 825 | 4,444 | | 12,460 | | 684 | 10,443 |

# PETERSBURG

PETERSBURG 1A Map



# PETERSBURG

## PETERSBURG 1A Data

| | District | Population | Dev% | BVAP% | Fairfax '13 | Obama '12 | Reock | Polsby Popper |
|---|---|---|---|---|---|---|---|---|
| 🟩 | 62 | 80,445 | 0.54% | 29.23% | 65.66% | 48.64% | 0.41 | 0.19 |
| 🟥 | 63 | 79,859 | 0.19% | 51.81% | 68.11% | 63.21% | 0.43 | 0.17 |
| | 64 | 79,262 | 0.93% | 24.24% | 63.19% | 41.64% | 0.37 | 0.16 |
| 🟩 | 66 | 79,858 | 0.19% | 25.81% | 67.65% | 48.56% | 0.27 | 0.14 |
| | 75 | 79,295 | 0.89% | 55.43% | 62.09% | 62.71% | 0.41 | 0.19 |
| | **MEAN** | **79,744** | **0.55%** | **37.30%** | **65.34%** | **52.95%** | **0.38** | **0.17** |

| UNCONSTITUTIONAL | CHANGED | UNAFFECTED |
|---|---|---|

## County Splits

| | District | Total Counties | Brunswick | Chesterfield | Colonial Heights | Dinwiddie | Emporia | Franklin City | Greensville | Henrico |
|---|---|---|---|---|---|---|---|---|---|---|
| 🟩 | 62 | 3 | | 42,075 | | | | | | |
| 🟥 | 63 | 3 | | 29,322 | | 18,117 | | | | |
| | 64 | 7 | | | | | | 3,631 | | |
| 🟩 | 66 | 2 | | 62,447 | 17,411 | | | | | |
| | 75 | 10 | 17,434 | | | 9,884 | 5,927 | 4,951 | 12,243 | |

| | District | Hopewell City | Isle of Wight | Lunenburg | Petersburg | Prince George | Southampton | Suffolk City | Surry | Sussex |
|---|---|---|---|---|---|---|---|---|---|---|
| 🟩 | 62 | 22,591 | | | | 15,779 | | | | |
| 🟥 | 63 | | | | 32,420 | | | | | |
| | 64 | | 34,445 | | | 19,946 | 6,110 | 7,112 | 6,374 | 1,644 |
| 🟩 | 66 | | | | | | | | | |
| | 75 | | 825 | 4,444 | | | 12,460 | | 684 | 10,443 |

# PETERSBURG

### PETERSBURG 1B Map



# PETERSBURG

### PETERSBURG 1B Data

| | District | Population | Dev% | BVAP% | Fairfax '13 | Obama '12 | Reock | Polsby Popper |
|---|---|---|---|---|---|---|---|---|
| | 62 | 80,445 | 0.54% | 29.23% | 65.66% | 48.64% | 0.41 | 0.19 |
| | 63 | 79,891 | 0.15% | 52.71% | 68.40% | 64.52% | 0.41 | 0.24 |
| | 64 | 79,262 | 0.93% | 24.24% | 63.19% | 41.64% | 0.37 | 0.16 |
| | 66 | 79,858 | 0.19% | 25.81% | 67.65% | 48.56% | 0.27 | 0.14 |
| | 75 | 79,293 | 0.93% | 54.55% | 61.10% | 61.34% | 0.43 | 0.21 |
| **MEAN** | | 79,750 | 0.55% | 37.31% | 65.20% | 52.94% | 0.38 | 0.19 |

| UNCONSTITUTIONAL | CHANGED | UNAFFECTED |
|---|---|---|

### County Splits

| District | Total Counties | Brunswick | Chesterfield | Colonial Heights | Dinwiddie | Emporia | Franklin City | Greensville | Henrico |
|---|---|---|---|---|---|---|---|---|---|
| 62 | 3 | | 42,075 | | | | | | |
| 63 | 3 | | 29,322 | | 18,149 | | | | |
| 64 | 7 | | | | | | 3,631 | | |
| 66 | 2 | | 62,447 | 17,411 | | | | | |
| 75 | 10 | 17,434 | | | 9,852 | 5,927 | 4,951 | 12,243 | |

| District | Hopewell City | Isle of Wight | Lunenburg | Petersburg | Prince George | Southampton | Suffolk City | Surry | Sussex |
|---|---|---|---|---|---|---|---|---|---|
| 62 | 22,591 | | | | 15,779 | | | | |
| 63 | | | | 32,420 | | | | | |
| 64 | | 34,445 | | | 19,946 | 6,110 | 7,112 | 6,374 | 1,644 |
| 66 | | | | | | | | | |
| 75 | | 825 | 4,444 | | | 12,460 | | 684 | 10,443 |

# PETERSBURG

### PETERSBURG 2 Map



# PETERSBURG

### PETERSBURG 2 Data

| District | Population | Dev% | BVAP% | Fairfax '13 | Obama '12 | Reock | Polsby Popper |
|---|---|---|---|---|---|---|---|
| 62 | 79,725 | -0.36% | 27.22% | 66.89% | 48.12% | 0.48 | 0.18 |
| 63 | 79,814 | -0.25% | 47.47% | 68.50% | 59.23% | 0.57 | 0.28 |
| 64 | 80,082 | 0.09% | 27.38% | 65.50% | 43.38% | 0.32 | 0.19 |
| 66 | 79,811 | -0.25% | 32.31% | 66.39% | 53.25% | 0.37 | 0.23 |
| 75 | 79,287 | -0.90% | 52.45% | 58.23% | 59.81% | 0.41 | 0.32 |
| **MEAN** | **79,744** | **-0.33%** | **37.37%** | **65.10%** | **52.76%** | **0.43** | **0.24** |

| UNCONSTITUTIONAL | CHANGED | UNAFFECTED |
|---|---|---|

### County Splits

| District | Total Counties | Brunswick | Chesterfield | Colonial Heights | Dinwiddie | Emporia | Franklin City | Greensville | Henrico |
|---|---|---|---|---|---|---|---|---|---|
| 62 | 4 | | 52,051 | | | | | | 7,877 |
| 63 | 3 | | 19,393 | | 28,001 | | | | |
| 64 | 4 | | | | | | | | |
| 66 | 2 | | 62,400 | 17,411 | | | | | |
| 75 | 7 | 17,434 | | | | 5,927 | 8,582 | 12,243 | |

| District | Hopewell City | Isle of Wight | Lunenburg | Petersburg | Prince George | Southampton | Suffolk City | Surry | Sussex |
|---|---|---|---|---|---|---|---|---|---|
| 62 | | | | | 5,093 | | | | |
| 63 | | | | 32,420 | | | | | |
| 64 | | 35,270 | | | | 30,642 | | 7,112 | 7,058 |
| 66 | | | | | | | | | |
| 75 | | | 4,444 | | | 18,570 | | | 12,087 |

(c)  Newport News-Hampton area.

I offer to the Court two illustrative module for the Peninsula area: Newport News-Hampton illustrative Module 1 and Newport News-Hampton Illustrative Module 2. These two modules differ in how many districts are wholly drawn within Newport News (either one or two), though in both modules district 92 is entirely in Hampton, and district 95 is entirely in Newport News.  Each of these maps in my view remedies the constitution violations found in district 95 and district 92.  All are drawn in according with traditional districting criteria and do not have race as a preponderant motive. None involve any fracking.

A map and key statistics about each of these Newport News-Hampton Peninsula area variants is provided below, with comparison to the 2011 Enacted map.