1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF VIRGINIA

3                    RICHMOND DIVISION

4

5     ---------------------------------------
                                          :
6                                         :
      GOLDEN BETHUNE-HILL, et al.,        :    Civil Action No.
7                                         :    3:14CV852
      vs.                                 :
8                                         :
      VIRGINIA STATE BOARD OF ELECTIONS,  :    January 10, 2019
9     et al.                              :
                                          :
10    ---------------------------------------

11

12            COMPLETE TRANSCRIPT OF THE EVIDENTIARY HEARING

13        HEARD BEFORE:   THE HONORABLE ROBERT E. PAYNE
                          THE HONORABLE ARENDA L. WRIGHT ALLEN
14                        THE HONORABLE BARBARA MILANO KEENAN

15

16    APPEARANCES:

17    Kevin J. Hamilton, Esquire
      Perkins Coie, LLP
      1201 Third Avenue
18    Suite 4800
      Seattle, Washington  98101
19
      James M. Snyder, Esquire
20    McCandlish Holton
      1111 East Main Street
21    Post Office Box 8088
      Richmond, Virginia  23223
22    Counsel for the plaintiff

23

24                    Peppy Peterson, RPR
                     Official Court Reporter
25                 United States District Court

```
 1   APPEARANCES:   (cont'g)

 2   Toby J. Heytens, Esquire
     Office of the Attorney General
 3   202 North Ninth Street
     Richmond, Virginia  23219
 4   Counsel for the defendants

 5

 6   E. Mark Braden, Esquire
     Katherine L. McKnight, Esquire
 7   Richard B. Raile, Esquire
     Baker & Hostetler, LLP
 8   Washington Square
     1050 Connecticut Avenue, NW
 9   Washington, D.C.  20036

10   Dalton L. Oldham, Jr., Esquire
     Dalton L. Oldham, LLC
11   1119 Susan Street
     Columbia, South Carolina  28210
12   Counsel for the intervenor defendants

13

14   Allison J. Riggs, Esquire
     Jeff Loperfido, Esquire
15   Southern Coalition for Social Justice
     1415 W. Highway 54
16   Suite 101
     Durham, North Carolina  27707
17
     David O. Prince, Esquire
18   411 East Franklin Street
     Suite 504
19   Richmond, Virginia  23219
     Counsel for Virginia State Conference of NAACP Branches
20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S

 2

 3            THE CLERK:  Case number 3:14CV852, Golden

 4   Bethune-Hill, et al., versus Virginia State Board of Elections,

 5   et al.  The plaintiffs are represented by James Snyder and

 6   Kevin Hamilton.  The defendants are represented by Toby

 7   Heytens, Stephen Cobb, and Michelle Kallen.  The intervenor

 8   defendants are represented by Katherine McKnight, Mark Braden,

 9   and Richard Raile.

10            The independent party Virginia State Conference of

11   NAACP Branches is represented by David Prince, Allison Riggs,

12   and Jeff Loperfido.  The special master is Dr. Bernard Grofman.

13   Are counsel ready to proceed?

14            MR. HAMILTON:  Ready, Your Honor.

15            MS. McKNIGHT:  Yes, Your Honor.

16            JUDGE PAYNE:  Good morning.  Happy to have you, and

17   we issued an order that allowed the parties to ask questions of

18   the special master before we hear any argument.  Does anybody

19   wish to avail themselves of that opportunity?  Mr. Hamilton?

20            MR. HAMILTON:  No, Your Honor, although I may have

21   some follow-up questions if there are others who ask questions

22   of the special master, but at this point, no.

23            JUDGE PAYNE:  Ms. McKnight?

24            MS. McKNIGHT:  Yes, Your Honor, we would.

25            JUDGE PAYNE:  Mr. Heytens?
```

1          MR. HEYTENS:  Not at this time, Your Honor.  Again,

2    we may have follow-up questions, but we have none at this time.

3          JUDGE PAYNE:  Mr. Prince.

4          MS. RIGGS:  On behalf of the NAACP, Your Honor.

5    Allison Riggs.

6          JUDGE PAYNE:  Ms. Riggs.

7          MS. RIGGS:  Likewise, we'll wait to see if there are

8    any questions instigated by any other parties' questions.

9          JUDGE PAYNE:  Mr. Breit?  Not here.  Dr. Wang.  Not

10   here.  All right.  Let's have Dr. Grofman come to the witness

11   stand and be sworn, and then, Ms. McKnight, you may ask the

12   questions that you have to ask.

13          You can go ahead and set your stuff down up there,

14   Dr. Grofman, get comfortable, and then we will take the oath.

15   And do you need to set up anything in order to answer questions

16   such as a computer?

17          DR. GROFMAN:  I don't know the answer to that

18   question, Your Honor, until I hear the questions.

19          JUDGE PAYNE:  Well, you are starting off right

20   answering the right way that you don't know the answer to

21   something.  If you don't know it, that's great.  We'll

22   administer the oath then.  Do you swear or affirm?

23          DR. GROFMAN:  I swear.

24

25

1              **BERNARD N. GROFMAN,**

2    a witness, called at the instance of the intervenor defendant,

3    having been first duly sworn, testified as follows:

4

5              THE WITNESS:  The computer is not yet set up in the

6    event that I would need it, so there would be some time pause

7    if I have to respond by checking something, but otherwise I'm

8    certainly prepared to respond to any questions.

9              JUDGE PAYNE:  Let me ask you the most basic question

10   that reveals my ignorance of computers.  Can you take care of

11   getting it set up, or do you need our IT people up here to set

12   it up?

13             THE WITNESS:  It's simply a question, Your Honor, of

14   a plug.

15             JUDGE PAYNE:  Mr. Robinson, can you take care of that

16   and help him with that.

17

18             (Discussion off the record.)

19

20             THE WITNESS:  Yes, the commuter is, in fact, set up.

21             JUDGE PAYNE:  All right, Mr. Braden, please proceed.

22

23                    DIRECT EXAMINATION

24   BY MR. BRADEN:

25   Q    Good morning, Dr. Grofman.  I have copies, hard copies of

1    all your reports and addendums.  I'm happy to provide them to

2    you if that would be more convenient or if you'd want to use

3    your computer.

4    A    It might be more convenient for me to have the hard

5    copies.  I do have a computer access to all these documents,

6    but there are many, many documents on my computer.  Thank you.

7    Thank you, Mr. Braden.

8                THE COURT:  Is that volume all right for everybody?

9    It was a little loud up here when we turned it down.  Can you

10   hear all right?

11               UNIDENTIFIED SPEAKER:  Yes, Your Honor.

12               THE COURT:  If you can't, will you let us know,

13   please.

14   Q    Well, Dr. Grofman, welcome to cold Virginia, much colder

15   than California.  I wanted to start with some questions in

16   regards to your fourth addendum, pages two and three.

17   A    Yes, I have the fourth addendum presently in front of me,

18   and, unfortunately, I apparently failed to provide pagination,

19   so I believe I can understand which pages you are referring to

20   in your questions.

21   Q    Yeah.  I think in the document we gave to you, at the very

22   top of it, there's a page three of five and a page two of five.

23   A    Yes.

24   Q    At the very top line.

25   A    Yes.

Grofman - Direct

1  Q    It's -- we sort of prepared this relatively quickly, so

2  I'll apologize.  I'm sure when we go through it it will be a

3  little confusing, because we probably didn't streamline it as

4  well as possible.

5      Let me draw your attention to page number three and the

6  first full paragraph which is numbered three.  Could you read

7  the last sentence there?  I understand it to indicate that you

8  used Maptitude in drawing your plans initially; am I correct?

9  A    I used Maptitude throughout.  The question was, where did

10 the racial numbers come from.  When I drew -- when I looked

11 first at the Virginia redistricting map, I did that on

12 Maptitude, and I entered into that map racial data from the

13 United States census, and the racial data that I entered, as

14 indicated in the paragraph you just referenced, is racial data

15 that is the black voting-age population, solely black, as

16 reported by the United States census.

17     Thereafter, I had access to materials that were provided

18 me by the legislative staff, and in those materials, the coding

19 scheme for how the category black was to be coded was the

20 scheme that the legislature itself used and that has been used

21 in the reports of the legislative staff.

22     As I indicated in an earlier paragraph of that report,

23 that coding scheme is different from simply looking at the

24 proportion of people who report themselves as being of

25 African-American ancestry.  Rather the way in which the

1  legislature codes race is the legislature codes African

2  American or black as the category on the census which is the

3  category for African Americans plus the category on the census

4  for those individuals who report a multiracial identity.  That

5  multi -- but only among some of the individuals who report a

6  multiracial identity.

7      The racial identity which is multiracial, which is coded

8  as African American by the legislature in its reports, is those

9  individuals who are multiracial in their self-identification on

10  the census who report themselves to be, in racial identity

11  terms, both black and white.  Am I clear?

12  Q    You are clear, although I'm not sure that was actually the

13  import of my question.  I think my question was much simpler.

14  I understood at the beginning that you did, in fact, use

15  Maptitude.

16  A    Oh, yes, throughout.

17          JUDGE PAYNE:  Excuse me.

18          THE WITNESS:  I apologize.  I want to be very precise

19  in responding.

20          JUDGE PAYNE:  Excuse me, Dr. Grofman.  I'm having

21  some difficulty understanding exactly what the reference point

22  is here, and it may be because I have in my mind the record in

23  the *Page* case, but I have a recollection that there was a great

24  debate in the *Page* case about whether or not -- which BVAP

25  figure was actually used by the General Assembly, and it

1    ultimately came out that the BVAP figure actually used by the

2    map-drawers was not the one that included African American and

3    white and Asian but the pure -- that's not the right way to do

4    it.  The statistic that the census bureau used that was only

5    African American and that that same data was used subsequently

6    in the -- in *Bethune-Hill* in the redistricting here.

7            Can counsel help set the stage on this as to your

8    understanding?  I have to tell you, I'm quite confused about

9    it, and I want to make sure we are proceeding on the same page

10   as to what the General Assembly actually did use.

11           MR. BRADEN:  Yes.  I believe the testimony of the

12   drafters of the plan, which were John Morgan under the

13   direction of Delegate Jones, their testimony was that they used

14   Maptitude to draw the plan and that they used the data which

15   appears in the first column here, not surprisingly the same

16   data that the doctor used.

17           JUDGE PAYNE:  Which is it?  Is it the census data --

18           MR. BRADEN:  It's the census data that simply is the

19   -- he described --

20           JUDGE PAYNE:  That's your understanding.

21           MR. BRADEN:  That's my understanding.  That's his

22   testimony as to what occurred.  The numbers in the first

23   column --

24           JUDGE PAYNE:  Wait a minute.  Let's stop there.  Mr.

25   Hamilton, do you agree with that record or not?

Grofman - Direct

1          MR. HAMILTON:  I'm not sure I completely understand

2     what Mr. Braden is saying.  If I can just quote from the

3     Court's opinion.

4          JUDGE PAYNE:  In what?

5          MR. HAMILTON:  Docket 108, the Court's first opinion

6     in Bethune-Hill, page 23 to 24 addressed this issue, and the

7     Court said, "At trial, two additional questions regarding the

8     55 percent figure dominated the discussion.  First, whether the

9     BVAP figure included or excluded those who identified

10    themselves in the census process as ethnically Hispanic and

11    racially black.

12          "The parties hotly debated whether the appropriate

13    measure of BVAP used in the redistricting process did or did

14    not include the individuals who identified as racially black

15    and ethnically Hispanic in the census data."  That's from the

16    Court's opinion, page 23 and 24.

17          JUDGE PAYNE:  Whoever wrote that didn't resolve the

18    issue then, did they?

19          MR. HAMILTON:  Well, it ultimately became irrelevant,

20    because Delegate Jones testified that it wasn't important

21    enough.  You will recall that Judge Lee asked, "Was there a

22    reason you did not mention on the floor the difference between

23    DLS 55 and DOJ black," and Delegate Jones testified, "Well, I

24    felt that it wasn't that big -- it was between .1 percent

25    difference or .4 or maybe .3, if I recall, Your Honor, so I

1    don't think it was statistically significant."

2              So the number, the appropriate number, I think, is

3    the DOJ census number, but, ultimately, I think the Court

4    concluded it didn't matter.

5              JUDGE PAYNE:  All right, thank you.  Sorry to

6    interrupt.

7              MR. BRADEN:  Sure.  Your Honor, I'll go through it in

8    some detail, but it does matter, because obviously what's -- we

9    simply believe, based upon Dr. Grofman's report and his

10   testimony, it will become clear to this Court that a mistake

11   was made in his original decision-making on that point.  This

12   Court appeared not to find credible the testimony of Morgan --

13             JUDGE PAYNE:  Which opinion erred; the first one or

14   the second one?

15             MR. BRADEN:  You're right about that.  Actually

16   starting with the first opinion and -- where we disputed the

17   issue extensively.  It's our view, and I think --

18             JUDGE PAYNE:  Why don't you not argue.  Just go ahead

19   and ask your questions.  Then we'll proceed from there.

20   Q    Dr. Grofman, it wouldn't be a surprise to you that an

21   individual tasked with drawing a plan in Virginia would use

22   Maptitude versus some other software?

23   A    No, it was not.

24   Q    Is Maptitude the sort of standard software that most

25   people use?

1  A     Maptitude is the standard software that is used for

2  persons who do not have access to state resources.  It varies

3  from state to state what particular computer program is used

4  for map-drawing purposes.  A number of states have specialized

5  programs that were created for that state to provide

6  map-drawing capacity along with other geographic information

7  system capacity so that those GIS systems, GIS being shorthand

8  for geographic information systems, that those GIS systems can

9  then have a multipurpose use.

10      So I would say that it really does vary across states, and

11  in particular in Virginia, the legislative staff who are

12  drawing maps do not use Maptitude.  Rather they use a program

13  that is called ArcGIS which also is one of the industry

14  standards.

15  Q     Let me interrupt you there.  Is it true that this plan was

16  initially drawn by the legislative staff, or was it initially

17  drawn by someone else?

18  A     I'm sorry, I have no knowledge on that point.

19  Q     You haven't read the actual opinion of the Court?

20  A     I've read the opinion of the Court, but I have not paid

21  particular attention to the question of which individual or

22  individuals seeks to take credit or blame for the map as it was

23  drawn.

24  Q     So you haven't read any of the record, extensive testimony

25  in the record as to --

1          JUDGE PAYNE:  Excuse me.  Just ask the question.

2    Q    You haven't read any of the record, so you're not aware of

3    who drafted the plan.

4    A    I have not read any of the record meaning the deposition

5    testimony or the trial testimony, yes, that is correct.

6    Q    Okay, let me turn --

7          JUDGE PAYNE:  Excuse me just a minute.  Dr. Grofman,

8    when you said the legislative staff in Virginia used ArcGIS,

9    were you intending to say that you understood that that was

10   what was used in the drawing of the enacted map here or that

11   that is what they were using when they were dealing with you or

12   something else?

13         THE WITNESS:  Thank you very much for that clarifying

14   question, Your Honor.  My understanding was that I was being

15   provided by the legislative staff the information used by the

16   legislature.

17         JUDGE PAYNE:  All right.  That's what you understood.

18   All right.

19   Q    So let me go to page two of five which has a little chart.

20         JUDGE PAYNE:  We're on the fourth addendum, ECF 342.

21         MR. BRADEN:  It shows at the top, page two of five.

22   Q    Am I correct these are the -- on the first column is the

23   list of all the challenged districts?

24   A    Yes, that is correct.

25   Q    And the second column is the black voting-age population?

1   A    Yes.

2   Q    And that's the numbers you came up initially using the

3   census data and the Maptitude system.

4   A    Yes, that is also correct.

5   Q    So if someone were to testify in regards to District 69

6   who used the Maptitude system and the census data that

7   District 69, when they drew it, was less than 55 percent black

8   voting-age population, would you find that testimony credible

9   based upon this chart?

10  A    I would find that testimony credible only to the extent

11  that there was a rounding.  That is to say, the number that you

12  report -- that is reported in that chart is 54.78 percent.

13  Rounded to three significant digits, that would be

14  54.8 percent.  Rounded to two significant digits, that would be

15  55 percent.

16  Q    Okay.  Leaving aside the rounding question which I think

17  we can understand now, let's go to District 71.  If someone

18  were to testify, or actually more than someone were to testify

19  that they were using the Maptitude system and the census data

20  and they drew a District 71, and they testified that they

21  believed it to be less than 55 percent voting-age population,

22  would you find that testimony credible?

23  A    Again, I will simply repeat, but using the numbers for the

24  district that you have now provided me that in that district,

25  the number that is reported is at 54.87 percent which is to say

1  rounded to three digits would be 54.9 percent which is to say

2  rounded to two digits would be 55 percent.

3  Q    So you are rounding up, but, in fact, your chart doesn't

4  round up?

5  A    That is correct.

6  Q    So a person --

7             JUDGE PAYNE:  Excuse me a minute.  The chart on page

8  two, percent BVAP, is that your calculation, Dr. Grofman?

9             THE WITNESS:  Yes.  That is also the calculation that

10 is reported in the very first -- my very first report before I

11 was provided data on race as it is coded by the legislature in

12 the reports that were provided to me by legislative staff.

13            JUDGE PAYNE:  And what is WBVAP?

14            THE WITNESS:  That would be the black proportion as

15 defined by adding those who indicate race solely African

16 American plus those whose racial identity is multiracial but

17 only some of those whose racial identity is multiracial, namely

18 those multiracial identifying individuals who list themselves

19 as being both white and black.

20            JUDGE PAYNE:  Was that figure used or not used by the

21 General Assembly, according to your understanding, in effecting

22 the enacted map?

23            THE WITNESS:  I had thought, perhaps wrongly, that

24 that was, in fact, the number which was used by the General

25 Assembly in part because the defendant intervenors noted the

1    fact that the system which I was using to define race was

2    different in the report of November -- December 7th, rather,

3    between how I reported the racial numbers for the enacted map

4    and how I reported the racial numbers for all other remedial

5    maps and all other illustrative maps.

6             JUDGE PAYNE:  Counsel, do you agree that the WBVAP

7    figures are what is referred to in the trial record as DOJ

8    black?

9             MR. BRADEN:  No, I don't believe that is, in fact,

10   DOJ black.

11            JUDGE PAYNE:  You believe this is not --

12            MR. BRADEN:  No.  I believe -- here's --

13            JUDGE PAYNE:  What do you think it is?

14            MR. BRADEN:  I think that it's just what Bernie

15   described it as.  I think what we have here is exactly what

16   happened to Delegate Jones.  His first report comes up to

17   exactly what Delegate Jones testified to.  When he drew the

18   plan on Maptitude, he came up with the numbers in the first

19   column.  He said then he was surprised when he went over to

20   Legislative Services and they put it in a bill form and it came

21   up with the second column.

22            So all this is about simply pointing out to the Court

23   the fact that they didn't find Jones' testimony credible when

24   he said, no, I didn't have a floor, I did, in fact, draw three

25   districts --

1          JUDGE PAYNE:  I understand.  Go ahead.

2          MR. BRADEN:  -- were less than 55 percent.

3          JUDGE PAYNE:  Give Mr. --

4          MR. BRADEN:  Is exactly his analysis of the numbers

5  initially until he went to the legislature and found out that

6  they used different numbers.

7          MR. HAMILTON:  I object at this point.  This is

8  argument, not questioning of the witness.

9          JUDGE PAYNE:  No, it's not questioning of the

10  witness, but he was responding to me, and I think that's fair

11  comment, but you have your opportunity.

12          MR. HAMILTON:  I also --

13          JUDGE PAYNE:  Sometimes judges wish they hadn't asked

14  questions, but then we move on.  Mr. Braden, go ahead.

15          MR. BRADEN:  Why don't we move on.  I hope that that

16  point is clear.  I think the shortcoming may well have been of

17  counsel in the first case that we didn't present it as clearly

18  as we should have to the Court, and that's the reason for the

19  confusion.

20  Q    Let me move to page 22 of your first report, and it shows

21  at the top 22 of 131.

22  A    Yes, I am now on that page.

23          JUDGE PAYNE:  Pagination, are you using his

24  pagination or the file pagination?

25          MR. BRADEN:  In this case, they happen to conform,

1  but that is only by accident.  There's 22 at the top here and

2  22 on the page, too.  Again, I apologize.  We put these

3  together, and the pagination kind of varies back and forth, and

4  I apologize for that.

5  Q    Am I correct that this is the page where you talk about

6  narrowly tailoring the remedy?  I know you talk about it in

7  other places but principally here.

8  A    Yes.  This is on pages 22, continuing on to page 23.

9  These are the -- these are the paragraphs that specifically

10  refer to narrowly tailoring, but there are also other aspects,

11  of course, as you point out, of narrow tailoring that are

12  described in the subsequent pages.

13  Q    Is that a concept that would -- is that like a least

14  change concept?  How would you describe that, or is that

15  unfair?

16  A    Narrow tailoring, at least as I have used it in my

17  reports, I've used it consistently to refer to a situation in

18  which one begins with the constitutional infirmities and seeks

19  to remedy those constitutional infirmities in a way that has

20  the least impact on the fewest districts.  So the infirmities

21  are fully remedied, but the consequences to the legislative

22  plan as enacted in terms of the number of districts in that

23  plan that were changed is reduced to the extent feasible given

24  the fact that there are competing trade-offs as to the criteria

25  that would be appropriate for a Court-ordered map, and those

1   trade-offs, as I have been very clear throughout the reports

2   that I've prepared, that ultimately my task, as I saw it, was

3   to provide to the Court options, and then the ultimate question

4   of the balancing off of trade-offs among competing criteria or

5   possibly among competing definitions of what constitutes a

6   narrowly drawn plan would, of course, be those made by the

7   Court.

8   Q    So would it be safe to characterize narrowly tailored

9   being focused on the concept of changing the fewest number of

10  districts?

11  A    I would say that narrowly tailored is focused on the

12  concept of changing the fewest districts that can be changed

13  provided that the constitutional infirmities are fully remedied

14  and provided that a variety of other criteria specified in my

15  report have been satisfied.

16  Q    Are you familiar with a term I believe that's commonly

17  used in redistricting called core retention?

18  A    Yes.

19  Q    And could you tell the Court what that is?

20  A    Core retention refers to the degree to which a district's

21  population has been retained as one moves from one

22  redistricting plan to another.  Essentially, it involves an

23  overlap, or overlay I should say, of one map on another map to

24  alternative maps for a jurisdiction and a comparison of the

25  population in the initially drawn map with the population in

1    the redrawn map in that same district to see what proportion of

2    the initial district has, in fact, been retained in population

3    terms in the redrawn district of the same number.

4    Q    And are statistics commonly available?  In other words,

5    could you create a series of statistical tables showing that?

6    A    Yes.

7    Q    And did you create any of those for this?

8    A    No.

9    Q    Why focus on number of districts rather than what I assume

10   to have been more important, the number of people moved around?

11   A    The number of districts affects the degree to which those

12   incumbents in place and those districts now existing can see

13   their district changed.  The population is necessarily going to

14   be moved when you remedy unconstitutional infirmities, and my

15   focus was on remedying the unconstitutional infirmities, and

16   insofar as there were population shifts that took place in

17   adjacent districts, that was done solely for purposes of

18   remedying the constitutional infirmities.

19   Q    I guess I'm a little bit confused.  Couldn't people

20   logically assume when you are looking at least changes one was

21   talking about either the number of people moved between

22   districts or maybe the number of geography or the number of

23   VTDs moved rather than simply a question of number of

24   districts?

25   A    This is an unusual case in that alternative maps that were

1   provided to the Court by parties to the case varied in the

2   number of districts in the enacted map which they changed.

3   That number ranged from 30 in, I believe, two of the maps to a

4   high of 33 in one of the maps that were submitted as remedial

5   maps to the Court.

6        This suggested to me that there was a need to address the

7   question of how many districts actually needed to be changed in

8   order to remedy the constitutional infirmity.  I began in my

9   very exploratory -- I'm sorry if I'm giving too long an answer

10  to this question, but to clarify, I began in my exploratory

11  analyses to look to see what would happen if one were redrawing

12  33 adjacent districts.  I then noticed after the remedial plans

13  were submitted that other parties to the case saw no need to,

14  in fact, redraw 33 remedial districts.

15       At that point, I began to consider what, in fact, might

16  make sense in the geographic and demographic context of the

17  state of Virginia in terms of looking at configurations of

18  remedial maps which changed fewer than 30, fewer than 33, fewer

19  than 30.  At that point, I proceeded in stages, ultimately got

20  to illustrative maps that were provided to the Court.

21  Q    Let me see if I can ask a relatively straightforward

22  question.  So, at every stage, you were concerned principally

23  about the number of districts changed.  You weren't looking at

24  any core retention figures.

25  A    Yes, that is essentially correct.  However, with, again,

1  clarifying an --

2        JUDGE PAYNE:  Dr. Grofman, if somebody wants to get

3  into the clarification, they can.  I think you answered the

4  question.

5        THE WITNESS:  Certainly.  In looking at the degree --

6        JUDGE PAYNE:  Go ahead and let the other lawyers

7  cross-examine on that if they want to.  Just listen to the

8  question, and answer the question if you can.

9  Q    So we're clear, your definition of least changes is

10  focused on the number of districts changed and not core

11  retention which is the notion of how many people got moved

12  around?

13  A    Yes, that is essentially correct subject to the various

14  caveats that are, in effect, already stated in my various

15  reports.

16  Q    And certainly you don't consider it illegitimate to define

17  or look at these changes in the context of how many people get

18  moved around.

19  A    The question of how best to define --

20        JUDGE PAYNE:  I think -- ask the question again.  I

21  think he wants you to answer yes or no to begin with so he can

22  understand what's going on.

23  Q    Is it illegitimate to look at least changes in the context

24  of core retention?  Isn't that commonly done by experts?

25        JUDGE PAYNE:  Those are two different questions.  One

Grofman - Direct

1   is is it illegitimate.  The other is is it commonly done, and

2   those don't necessarily mean the same thing.  So which one do

3   you want him to answer?

4   Q    Let me try the first one as to whether it's illegitimate

5   to use that as a way of doing it.

6   A    Illegitimate is a very difficult concept for me to

7   understand.  That ultimately is a --

8   Q    I was going back to --

9          THE COURT:  Let's make sure we do one at a time so

10  the court reporter can hear you both.  You let -- Dr. Grofman,

11  let him ask the question, and you make sure, Mr. Braden, to let

12  him finish his answer.  Now, start again with -- withdraw the

13  question about illegitimacy and go ahead with another question.

14  Q    Do experts in this field commonly use core retention when

15  analyzing plans?

16  A    Yes, but, and the "but" is very straightforward.  I did

17  not do so when I provided a special master report in, and I

18  will not try to butcher the name of the plaintiff, in *Alcorn*.

19  Q    And when drawing a plan, if someone were to focus on the

20  least changes in the concept of moving the fewest people

21  around, that would not be a concept that would be rejected by

22  most expert witnesses; am I correct?

23  A    That would depend on the context.  If the issue is the

24  unconstitutionality of particular districts and the remedy for

25  that unconstitutionality required population shifts, including

Grofman - Direct

1  considerable population shifts which impacted alternative --

2  sorry, adjacent districts or other districts, then I believe it

3  is fair to say that experts would reject the notion that simply

4  counting population moved would, in fact, be an appropriate way

5  to determine whether or not a particular remedial plan had or

6  had not addressed the question of a remedy which was narrowly

7  tailored.

8  Q   Okay.  I guess I was leaving aside the question whether --

9  just the question of whether narrowly tailoring in the concept

10 of core retention and go back to the --

11       JUDGE PAYNE:  Wait a minute.  That's not a question.

12 That's a reflection of what you had in mind, so if you want to

13 ask a question, go ahead and do it.

14 Q   Let me move on.  The question of moving the fewest VTDs,

15 precincts, would that also be another way to look at the notion

16 of core retention and narrowly tailoring?

17 A   VTDs, as I indicated, are administrative units.  They

18 change as new plans are built.

19       JUDGE PAYNE:  Dr. Grofman, let's go back, have the

20 question again, and if you don't mind yes or no --

21       THE WITNESS:  I will try to, Your Honor.  I

22 apologize, but these are questions which are conceptually

23 tricky, because the answer to that -- if I have to give a short

24 answer, the answer would be no because I do not believe that

25 would be an appropriate way to measure things.  But I would

1    have to clarify that to be clear as to what I meant and why.

2                    JUDGE PAYNE:  That's all right.  Go ahead.

3    Q    Let's move on, and am I correct that in all of your

4    different plans, all of the challenged districts have

5    voting-age populations of less than 55 percent?

6                    JUDGE PAYNE:  Black voting age --

7                    MR. BRADEN:  Black voting-age population --

8    A    Yes, that is correct.  To the best of my knowledge,

9    given -- please let me clarify.  Are you asking specifically

10   about whether if one were to recalculate from the DLS way of

11   representing African-American populations to one in which the

12   African-American population would only be that which was

13   exclusively African-American sole race, that all the numbers in

14   my illustrative modules would be under 55 percent?  Is that the

15   question?

16   Q    Yes.

17   A    Then the answer is yes.

18   Q    Is there any other calculation that wouldn't have them all

19   less than 55 percent?

20   A    The corrected calculation that is reflected in my fourth

21   addendum shows that there was an error.  It literally was a

22   typo because we didn't make the correction.  There was a

23   district which was 55.01 percent black under the calculation

24   using the combination of African-American population plus black

25   and white population.

1   Q    So that was a typographical error?

2   A    The fact that it was reported as below 55 percent

3   initially, yes.

4   Q    So you intended it or understood it initially to be less

5   than 55 percent?

6   A    Yes, that is correct.

7            JUDGE PAYNE:  Excuse me a minute.  Are you saying

8   there's a typographical error in the fourth supplement?

9            THE WITNESS:  No.  There's a typographical error

10  corrected in the fourth supplement.

11           JUDGE PAYNE:  For which district?

12           THE WITNESS:  I believe it's District 89, Your Honor.

13  I'd have to go double-check.  Yes.  In one of the three

14  modules, this would be -- I'll call the Court's attention to

15  page five of five using the numbering at the top in my fourth

16  addendum, and you will see that there are two numbers reported

17  on that page which reflect essentially errors on my part,

18  typographical errors on my part.

19           Those typographical errors are shown as reported and

20  correct.  Reported means that they were -- those were the

21  numbers that were reported in my third addendum.  Correct means

22  that those numbers were incorrect, and the correct numbers are,

23  in fact, shown.

24           So, for example, if you will look at Norfolk 1A, the

25  number that is reported for Norfolk 1A is 54.92 percent, but

1     the correct number is 54.95 percent.  This is District 89.

2     Similarly, if we look at Norfolk 1B in District 89, the

3     reported numbers is 54.92 percent.  The corrected number is

4     54.95 percent.  Those numbers do not effectively change whether

5     a district was or was not to be reported above or below

6     55 percent.

7            When one comes, however, to Norfolk 1C, the third of

8     the illustrative models that I prepared for the Court, then one

9     notices that the reported number is 54.98 percent, a shade

10    under 55, and the corrected number is 55.01 percent.

11           JUDGE PAYNE:  If you look at page two of the report

12    and the chart there that relates to 89, District 89, and page

13    5-5 of the fourth addendum that relates to the correction that

14    starts the -- the text of which starts on the preceding page,

15    the figure 54.98 percent and 55.01 -- excuse me.  I don't see

16    how -- what figure you are talking about out of Norfolk 1A, 1B,

17    1C in the charts on page five in the chart that appears on page

18    two as to District 89.  Page two has 54.98 percent.  Are you

19    saying that that's wrong?

20           THE WITNESS:  One of these charts -- the chart that

21    is on page two, Your Honor, is for the enacted map.  The chart

22    that is on page five is for three of my illustrative modules,

23    so, therefore, of course, the numbers that are reflected for

24    the various districts don't match between the enacted map and

25    the illustrative modules.

1     JUDGE PAYNE:  That brings me to another question.  Is

2  there in any of the reports by anybody a chart that shows the

3  BVAP for the enacted map for the options that are put out in

4  your report or the 11 districts and for all other affected

5  districts?

6     THE WITNESS:  There is not a single chart, Your

7  Honor, to the best of my knowledge, which simply lists the 11.

8  There are, however, charts provided which, for each of the four

9  regions, do provide that information both for the enacted map

10  and for the illustrative modules.  So those comparisons can be

11  made from the information that has been provided to the Court.

12     JUDGE PAYNE:  Excuse me for interrupting you.

13  Q   Can we go to your original report, page 68.  There's a

14  sentence in the middle.  There's a partial --

15     JUDGE PAYNE:  Let him get there.  Again, we're

16  looking at the numbers at the bottom of the page.

17     MR. BRADEN:  Yes.

18  A   Yes, I have found that page.

19  Q   There's a partial paragraph and then one, two, three,

20  four, five, six lines up from the end of that paragraph,

21  there's a sentence that begins, "None contain any districts

22  with more than 55 percent black voting-age population."  Do you

23  see that sentence?

24  A   Yes.

25  Q   And that's your representation that none of the districts

1    contain black voting-age population greater than 55 percent?

2    A    That appears to be an error, and I do not -- I apologize

3    to the Court and to you, because at least it shows on that

4    particular chart a statement which is inconsistent with the

5    statement in the paragraph on the previous page, because it

6    shows that in that version --

7         JUDGE PAYNE:  Excuse me a second.  Which chart are

8    you talking about that is inconsistent with the text that he

9    read?

10        THE WITNESS:  The chart that is on page 69 shows a

11   district which is 55.98 percent black voting-age population in

12   -- I'm sorry.  That's in the enacted map.  Let me look again at

13   the other modules.  I'm sorry.  It will take me a moment, Your

14   Honor, to scroll through to see whether there is, in fact, an

15   inconsistency.  I'm sorry, I do not see the inconsistency to

16   which you are referring.

17        JUDGE PAYNE:  Does that mean that you are retracting

18   the statement that the sentence "None contain any districts

19   with more than the 55 percent black voting-age population" is

20   an erroneous statement?

21        THE WITNESS:  No, I don't believe that's -- I believe

22   that statement remains correct.  The only reason -- apologies,

23   Your Honor.  The only reason I initially got confused was that

24   I was looking not at the illustrative modules that I had

25   prepared but rather at the enacted map, and in the enacted map

1    there is, indeed, a district which is above 55 percent.

2    Q    I was probably confusing in my question.  I was not

3    seeking to confirm or show any inconsistency, and, in fact, the

4    question was to show that you've been consistent.  Am I not

5    correct that basically this sentence, maybe the exact sentence

6    appears in reference to each one of your modules?

7    A    Yes, that is correct.

8    Q    So, clearly, your intent was that no district would be

9    over 55 percent.

10   A    No, that is incorrect.

11   Q    So that happened by accident?

12   A    It did not happen by accident.  It happened by the

13   geography and demography of the state of Virginia.

14   Q    Were there any other plans submitted by any party that

15   didn't have districts of more than 55 percent?

16   A    There were several plans submitted which had exactly one

17   district which was above 55 percent.  There were -- there was

18   also one plan which had seven districts which were at or above

19   55 percent using the DLS numbers and still, I believe, four

20   districts at or above 55 percent using simply racial categories

21   of black and black only, and that, of course, would be, as you

22   are aware, defendant intervenor map 702.

23   Q    So can we go to your report, page 122.

24   A    Yes, I am now on that page.

25   Q    I'm going to actually tell you that it's -- it should be

Grofman - Direct

1   page 120.  I referred to the wrong page.

2   A    I'm now on page 120 which is consistent numbering both for

3   the fax and for the page numbering that I used.

4   Q    Look at the last paragraph on page 120 that goes over to

5   page 122, and it seems to me reading that paragraph that you

6   are expressly rejecting a group of plans because they have

7   voting-age populations of greater -- and it seems every plan

8   you are rejecting it says in which any redrawn plan exceeds

9   55 percent of the black voting-age population that you are

10  rejecting those as because of that fact.  Am I reading that

11  incorrectly?

12  A    No, you are reading that sentence correctly, but, of

13  course, that sentence is only one of a variety of points that I

14  made as to the reasons why individual plans were being

15  rejected.  There were other reasons specified at some length in

16  the appendix to my first report which indicated why I believed

17  that I could not recommend any of the submitted plans to the

18  Court, and those reasons would have led me to the same

19  conclusion even were it not the case that a plan had one

20  district above a 55 percent black voting-age population,

21  because in the multiple of variance of map configurations that

22  I had drawn for the state of Virginia in seeking to draw a

23  remedial plan for the unconstitutional districts, I have never,

24  ever drawn a map which had more than, at most, one district

25  using the legislative's staff definition of race that was, in

1    fact, above 55 percent black, and that district hit

2    55.01 percent black.

3    Q    Of course, everyone else who drew plans, submitted plans

4    that were more than 55 percent, so can you reconcile those two?

5    A    I can reconcile those facts by saying that there are

6    multiple ways to draw plans for the state of Virginia.  Those

7    plans which were drawn that had one district above 55 percent

8    black, narrowly above 55 percent black, may have occurred with

9    no intent to do so, may have occurred simply by virtue of the

10   racial geography.

11        However, once one moves beyond the situation in which

12   there is a single district above 55 percent black, it is my

13   view that such a district configuration of all the

14   unconstitutional districts is simply not going to occur by

15   following traditional districting criteria and seeking to draw

16   a map which provides minorities, the African-American community

17   in particular, an equal opportunity to elect candidates of

18   choice.

19   Q    Okay.  Let's take an example of that, and let's look at

20   district number 92.  We've created a binder book that has some

21   maps in it which, I believe, we've provided to the Court, and

22   if I could, I believe it would be useful if we could provide it

23   to -- I believe we provided it to all the parties, and if I

24   can, if I could approach or ask the bailiff to provide Dr.

25   Grofman with it.  These are just map representations.  I --

Grofman - Direct

1          JUDGE PAYNE:  Do you have copies for the judges?

2          MS. McKNIGHT:  Yes, Your Honor.  These are copies

3    that were sent to judges' chambers over the past few days.

4          JUDGE PAYNE:  But I think we may have one shortage up

5    here.  Does anybody have one extra?  You have just ceded the

6    right to that property if you don't -- at least temporarily.

7    If you want it back, you have to let us know.

8          MS. McKNIGHT:  Please, take it, a gift.

9          JUDGE PAYNE:  All right.  We all have before us

10   defendant intervenors' hearing binder now, and you can proceed,

11   Mr. Braden.

12   Q    If you could turn -- have we given one to you?

13   A    No.

14         JUDGE PAYNE:  I think his is the most important one.

15         MR. BRADEN:  My apologies.

16         JUDGE PAYNE:  Do you have one for Dr. Grofman?

17         THE WITNESS:  Thank you very much.  Give me a moment

18   to get accustomed to the exhibit numbering system that is used

19   in this folder, because there are lots of tabs.

20         MR. BRADEN:  Good luck.  It confuses me, too, and I

21   did it, or worked on it.

22         THE WITNESS:  Basically we have a variety of lettered

23   tabs, and then we have some numbered tabs.

24         JUDGE PAYNE:  What is it you're referring him to?

25         MR. BRADEN:  Exhibit B.

1           JUDGE PAYNE:  E?

2           MR. BRADEN:  B as in baker.

3           JUDGE PAYNE:  About the third one down, Dr. Grofman.

4           MR. BRADEN:  It's the last group of letters.  It's

5    Exhibit B, and we'll be looking at page 21 of 24 as a starting

6    point.

7           JUDGE PAYNE:  For the record, Exhibit B in my copy is

8    a declaration of S. Chris Jones.  Is that what you're talking

9    about?

10          MR. BRADEN:  No.  Again, I apologize.  This goes back

11   to -- the heading tab is --

12          JUDGE PAYNE:  Excuse me.  There's a second Exhibit B,

13   and that's in the back.

14          MR. BRADEN:  Yes.

15          JUDGE PAYNE:  And that is a map.

16          MR. BRADEN:  Yes, Your Honor.

17          JUDGE PAYNE:  Do you see it, Dr. Grofman?

18          THE WITNESS:  Actually, I had not.  That's why I

19   noticed that there were multiple letter iterations here.  Let

20   me see if I can find the map.

21          JUDGE PAYNE:  It looks like this, Dr. Grofman.  More

22   than halfway toward the back is a whole other set of tabs in A,

23   B, C, and D and E and F and G, and we're on tab Exhibit B.

24          MR. BRADEN:  Yes.  There's a number four, and there's

25   a docket 337-1-04-19.

Grofman - Direct

1      THE WITNESS:  What I see is docket 337, so I believe

2  I'm -- I believe I am on the document that you are referring

3  to, sir.

4  Q    And it has some maps which I think --

5      JUDGE PAYNE:  Hold on a minute.  I'm not sure I've

6  got the right thing here.

7      MR. BRADEN:  This is the Exhibit B that follows

8  docket number 337-1-04-19.

9      THE WITNESS:  Yes, I now am on the map page that you

10  are calling my attention to.

11  Q    It is a Maptitude map rendition of Peninsula district HD

12  92.

13  A    And is this one of my illustrative modules, or is this the

14  enacted map?

15  Q    Well, this is one of your illustrative modules, and the

16  color combinations, for your benefit, I believe, are the same

17  color combinations we used in both the trials which show what

18  was -- appeared in the original enacted plan and what was taken

19  in and out.  It follows the same color scheme we used in the

20  original two trials.

21      JUDGE ALLEN:  What page is it?

22      MR. BRADEN:  It would be page 24.  21 of 24 at the

23  top.  Don't look at the page numbering at the bottom.

24      JUDGE ALLEN:  Our page numbers are on the side,

25  right-hand side of the exhibit.

1          THE WITNESS:  Apologies, sir.  I am now concerned as

2    to what page I should be referencing.

3          JUDGE PAYNE:  Are you saying look at the ECF number?

4          MR. BRADEN:  Yeah.  Look at the number at the top

5    where it says page 21 of 24.

6          JUDGE PAYNE:  Did you find it, Dr. Grofman?

7          THE WITNESS:  Actually, no, Your Honor, I did not.

8          JUDGE PAYNE:  If you go toward the back, as I

9    understand it -- you help me -- there's a tab that says four,

10   and then it says docket 337-1-04-19.  Then there are exhibit

11   labels under that, and the next tab -- the tab that you are

12   looking at is Exhibit B; is that right, Mr. Braden?

13         MR. BRADEN:  Yes.

14         JUDGE PAYNE:  Then you want page 21 of 24 in Exhibit

15   B; is that right?

16         THE WITNESS:  There doesn't appear to be a page 21 of

17   24 in Exhibit B, Your Honor.

18         JUDGE PAYNE:  Walk over there and show it to him.  I

19   think it would be easier.

20         THE WITNESS:  Yes, I now have before me the page with

21   the map that you are referring to.

22         MR. BRADEN:  Sorry, and I apologize.  I know the

23   numbering is confusing.  We were scrambling a little bit.

24         JUDGE PAYNE:  Just so the record is correct, it's ECF

25   337-2, and we're on page 21 of 24 of that exhibit looking at

1    the ECF numbers at the top.  At the bottom there is a number of

2    20; is that right?

3              MR. BRADEN:  Correct, Your Honor.

4              JUDGE PAYNE:  Now we have the record straight as to

5    what we're talking about.

6    Q    Dr. Grofman, do you recognize what area of the state this

7    is?

8    A    Yes.

9    Q    And could you tell us what that is?

10   A    That would be the peninsula area.

11   Q    And specifically what part of the peninsula is looked at

12   in this?

13   A    I believe we are presently looking at Hampton.  Let me

14   double check my geography to make sure, because there doesn't

15   seem to be a county label that I can recognize on this, but I

16   believe that's what we're looking at.

17   Q    I think there's a little reference to Hampton city here.

18   Let me explain to you the color scheme here.  There's a

19   little -- the reason why we're using this is this is the color

20   scheme we used in the prior litigation simply to illustrate

21   differences, and the red would be parts that were dropped from

22   the enacted plan, your remedial plan.  The yellow would be the

23   carryover, and the green would be the new.  Does that make

24   sense to you?

25   A    Yes, it does.

Grofman - Direct

1   Q    And it would appear that you essentially break out part of

2   Hampton city, Hampton city, to create your new district and

3   assign that part to 91; is that correct?

4   A    It appears to be correct, yes.

5   Q    And 91 just is -- if we look at page 20 above it, do you

6   understand that to be an illustration of District 91?

7   A    This is a comparison of the changes -- from enacted

8   District 91 to the module?

9   Q    Yes.

10  A    Yes, I understand.

11  Q    Your new District 91 would appear not to be contiguous; am

12  I incorrect?

13  A    As I indicated in my report, the answer to that depends on

14  Virginia state law, and I will defer to the Court on that

15  question.  In my -- as defined in my report, the answer to that

16  question is, yes, it is contiguous because of the way in which

17  the census defines census blocks.

18  Q    Do you know whether there's a road or any transportation

19  between these two sections other than going outside?

20  A    Yes.  The issue of contiguity has -- came up also in the

21  2015 case --

22          JUDGE PAYNE:  The question is, is there a road there.

23  Is that the question?

24          MR. BRADEN:  Yes.  It's a pretty simple question.

25  Q    Is there some way to get between these two sections other

1   than being a very strong swimmer?

2   A    No, there is not, that I'm aware of.  I do not see a

3   map -- I do not see a bridge shown.

4           JUDGE PAYNE:  In other words, number 91 is not

5   geographically contiguous, but it's contiguous because of the

6   definition of the census; is that right?

7           THE WITNESS:  Yes, that is correct, Your Honor.

8           JUDGE PAYNE:  And what definition is that?

9           THE WITNESS:  That definition is that when the census

10  blocks as they're defined by the census create contiguity that

11  the district is contiguous.  Census blocks include water areas.

12          JUDGE PAYNE:  Is that a definition that only the

13  United States government could come up with?

14          THE WITNESS:  That's not a question that I'm prepared

15  to answer, Your Honor.

16          JUDGE PAYNE:  Your objection is sustained.

17  Q    Let me start out with the simple question, so why drop out

18  that section of Hampton -- do you know how long these two parts

19  of the city were in the same district?

20  A    No, I do not.

21  Q    Why did you divide up Hampton city in this manner?  Why

22  did you break the piece off and put it into this southern piece

23  of 91?

24  A    I was not intending to split off any particular part of

25  Hampton.  I was intending in the Peninsula map to do two

Grofman - Direct

1    things.  One was to provide a district that was wholly within

2    Hampton that, in my view, remedied the constitutional

3    infirmity.

4        The second was to provide a district which was wholly

5    within Newport News that remedied the constitutional infirmity,

6    and in the process of achieving those two desirable goals as I

7    saw them, the district configuration, once I had drawn both

8    92 -- both 95, then that required changes in 92, and those, in

9    turn, required changes in 91.

10   Q    And did you believe the constitutional infirmity was that

11   the district was more than 55 percent voting age black?

12   A    I believe that the constitutional infirmity was that the

13   district did not reflect the underlying geography as I

14   understood it in that it was my view that one did not

15   necessarily create an overwhelmingly heavily black district in

16   that area simply due to the racial geography.

17   Q    So you made a conscious decision to move out part of the

18   black population?

19   A    No, I did not.  I simply decided to draw one district

20   wholly in Newport News and one district wholly in Hampton, and

21   then those lines emerged, at least in one but not all of the

22   maps that I drew, in the way shown in the map that you have

23   designated for me on page 20.

24            JUDGE PAYNE:  Pardon me, Mr. Braden.  In the two

25   pages we're talking about, page 21 of 24, the red is called

Grofman - Direct

1   Hampton city, but is that only part of Hampton -- what actually

2   is Hampton city?

3         THE WITNESS:  I'm sorry, I do not know, Your Honor.

4         JUDGE PAYNE:  So in page 20 of 24, the same piece is

5   in green.  Do we have anything in the record as to whether or

6   not Hampton city is larger than just the green?  Is that in the

7   record?

8         MR. BRADEN:  Yes, I believe it is, Your Honor.  I

9   think that we have an extensive record describing this

10  district.  I actually think the Court's original opinion

11  thought the original 92 district was a perfect example of

12  drawing a district compatible with traditional redistricting

13  criteria.

14        JUDGE PAYNE:  I guess the question is, if you look at

15  this map and page 20 of Exhibit B, which is 377-2, is the city

16  of Hampton the green and yellow on the right-hand side?

17        MR. BRADEN:  Your Honor, we will be able to go to the

18  record and identify those maps in the record or supplement,

19  although I don't think we will need to supplement, a map that

20  would show exactly the lines.

21        JUDGE PAYNE:  My knowledge, personal experience is

22  that the red and the green parts respectively on these maps is

23  not all of Hampton city, and one of your questions was, did you

24  deliberately split Hampton city, and I think the answer -- I'd

25  like to know the answer.  In making the decision, did you or

Grofman - Direct

1    did you not deliberately split the city of Hampton?

2            THE WITNESS:  No, I did not deliberately split the

3    city of Hampton.

4    Q    Did you split the city of Hampton?

5    A    It appears that I did from the map that you have shown

6    assuming that I have in front of me the actual configuration of

7    the city, because I don't see on this map the city boundaries.

8            JUDGE PAYNE:  Why did you split it, I guess, is the

9    next question.

10           THE WITNESS:  I think the only way I can respond to

11   that, Your Honor, is --

12           MR. HAMILTON:  I would object to the Court's

13   question, because the witness doesn't have a map showing the

14   actual city boundaries, and so he's not certain he actually

15   split it.

16           JUDGE PAYNE:  I thought he answered Mr. Braden that

17   he did split the city, he just didn't know exactly how much of

18   it.  Did you --

19           THE WITNESS:  Insofar as I relied on Mr. Braden's

20   characterization of where the city is, then I would say that I

21   split it.  If I -- I did not do so intentionally, Your Honor,

22   nor do I presently know the boundaries of that city except

23   insofar as Mr. Braden has referred to them.

24           JUDGE PAYNE:  Let's assume for the moment that it was

25   split.  Why was it split?  Why was the city of Hampton split at

Grofman - Direct

43

 1   all?

 2         THE WITNESS:  I honestly do not know a specific

 3   answer to that question other than to reiterate that it was not

 4   split for racial purposes.

 5         JUDGE PAYNE:  At the break, you all agree what the

 6   boundaries of the city are, please.

 7         MR. BRADEN:  Yes, Your Honor.  I believe we have, and

 8   I don't have the exhibit numbers, but we can --

 9         JUDGE PAYNE:  Go ahead.  You can do it later.  Go

10   ahead with your questions.

11   Q    Do you know the racial composition of the red part that

12   you took out?

13   A    No, I do not.

14   Q    And the green part that you put in?

15   A    No, I do not.

16   Q    Let me turn to page 13 of 14.

17         JUDGE PAYNE:  Of the same exhibit?

18         MR. BRADEN:  Of the same exhibit.

19         THE WITNESS:  Yes, I am now on that page.

20   Q    And do you recognize what type of map this is?

21   A    This is, I believe, is a map of one of my illustrative

22   modules with comparisons to the enacted map.  I believe that is

23   correct.

24   Q    Do you recognize that it's color-coded by black voting-age

25   population?

1   A    No, I do not.  I do not -- I am not sufficiently

2   familiar --

3             JUDGE PAYNE:  Are you talking about page 13 or 14?

4             MR. BRADEN:  I'm talking about page 13 of Exhibit D,

5   like dog.

6             THE COURT:  We're not on the same document then.

7             MR. BRADEN:  I am afraid that's correct.  This goes

8   back -- instead of Exhibit B, we're now at Exhibit D, like dog.

9   Sorry.

10            JUDGE PAYNE:  And that is ECF 337-4; is that correct?

11            MR. BRADEN:  Yes.

12            JUDGE PAYNE:  And we're on page 13 of that exhibit.

13            THE WITNESS:  I am now to be in Exhibit D; is that

14  correct?

15  Q    Yes, Exhibit D, page 13 of 14.

16  A    We're now in Richmond?

17  Q    No, no, no.  This is Exhibit D, dog, page 13 of 14.  It's

18  Newport News.  It's a racial map of the same map we've been

19  looking at simply in a racial representation.

20  A    Yes.  I am now on that page.

21  Q    Now that I've hopefully unconfused the record, do you

22  recognize this map, that it's what it is?

23  A    Yes.  Apparently it appears to be, and I assume correctly,

24  a map reporting black voting-age population by census block for

25  the peninsula area in the area around District 92.

45

1    Q    And so if you look at this map, am I correct or would it

2    be a fair characterization to say that the eastern boundary of

3    District 92 seems to divide up a black community in Hampton

4    city, large black community, heavily black community, divides

5    it in half or so?

6               JUDGE PAYNE:  That's about a combination of three

7    questions.  Can you kind of get it down to one?

8               MR. BRADEN:  Sure.

9    Q    Do you recognize the line going through Hampton city for

10   District 92?

11   A    Yes, I recognize the line going through what you are

12   characterizing as Hampton city and which characterization I

13   will accept, and you are correct that in that line, there is a

14   black, heavily black area on the left-hand western side of that

15   line, and there is heavily black area on the eastern side of

16   that line.

17   Q    And so you are testifying there was no conscious effort

18   here to move the black population from the one district to the

19   other?

20   A    Yes, that is exactly correct.

21   Q    And that your, to use your terminology, is a -- 92 is a

22   naturally occurring district?

23   A    Insofar as I was looking at maps based on census block

24   data, yes, that is indeed correct.

25   Q    91 is a naturally occurring district?

1    A    Insofar as I was examining maps using census block data

2    which show not the water boundaries but rather show census

3    blocks, that map is, indeed, something which is naturally

4    occurring, at least in my view.

5    Q    Do you know what the black population is of Hampton city?

6    A    Not off the top of my head.

7    Q    Do you know whether the city's -- I'm assuming you also

8    don't know whether or not the total population of the city is

9    larger than the district?

10   A    I believe it must be, because it is not confined to a

11   single district.  There is a district which is entirely within

12   Hampton, and I believe that there is a portion of a district

13   which is only partly in Hampton.  So by definition or

14   mathematical logic, it must be the case that the Hampton

15   population is larger than necessary for a single district.

16   Q    And, again, maybe I asked this.  You don't know what the

17   black population of Hampton -- what the percentage is?

18   A    I do not as I am presently sitting here on the witness

19   stand, no.  Did I at some point know?  Yes.

20   Q    And looking at our exhibit on page 13 of 14, it would

21   appear on that representation -- am I correct? -- that it's a

22   heavily black city?

23   A    Assuming that we have the city configuration, yes, the

24   answer would be that if the heavily black area to the west of

25   the line and heavily black city to the right of the district

 1   boundary line are both within the city, that it would be a

 2   heavily black city.

 3            JUDGE PAYNE:  I'm not sure what lines you are talking

 4   about.  There's a line to the right which separates District 92

 5   and 91, and to the east and west of that line, there appears to

 6   be a very heavy area of black population, black voting-age

 7   population.  Then there's another line on the left-hand side of

 8   the District 92 which separates 92 from 95, and it, too, has,

 9   east and west of the line, heavy black voting-age populations.

10   Am I reading that correctly?

11            THE WITNESS:  Yes, Your Honor, you are.

12            JUDGE PAYNE:  And do we know whether or not -- can

13   anybody tell us how far Hampton city extends toward the left

14   part of the page?  Does anybody know that?  You know -- you

15   don't know it, Dr. Grofman?

16            THE WITNESS:  No, I do not, sir.

17            JUDGE PAYNE:  That's something you all need to focus

18   on, Mr. Braden.

19            MR. BRADEN:  Your Honor, we can certainly supplement

20   the record and overlay a municipal map.  We have those in the

21   record.  I just don't know where they are.

22            JUDGE PAYNE:  You can find them at the break.

23   Q    So let me go to Exhibit C which is on page two of two,

24   Exhibit C, and it's document 337-3.

25   A    Yes, I am now on that page.

1  Q    And, again, just familiarize yourself.  I think the Court

2  is familiar.  The green portion -- the yellow portion is the

3  existing enacted plan.  The red portion is the portion that's

4  dropped out, the green portion is the portion that's been

5  added.

6  A    Yes.

7            JUDGE PAYNE:  Well, the yellow portion is the part

8  that is common to both plans.  The yellow and the red was the

9  enacted; is that correct?

10            MR. BRADEN:  This is the comparison to -- sorry.

11  Q    This is the comparison to 7002 or the proposals from the

12  plaintiffs.  Sorry.  I'm confused by my own Exhibit.  7002, not

13  to the enacted plan just to show the difference between our

14  proposal and your proposal?

15  A    Yes, I see the red, green, and yellow areas to which you

16  are referring.

17  Q    And if you look at your enacted plan, do you see the

18  heading of Chesterfield?  It's right at the top in the -- above

19  where the red --

20  A    I see the heading to which you are referring, sir.

21  Q    Do you know what that's in reference to?

22  A    I believe that would be a county.

23  Q    So if you look at Exhibit D, dog --

24  A    Yes.

25  Q    -- and you look at page three of 14, do you recognize what

1  that map is?

2  A    Where are we?

3  Q    Page three of 14, Exhibit D, like dog.

4         JUDGE PAYNE:  That's 337-4, page what number?

5         MR. BRADEN:  Page three of 14.

6  A    Yes, I am now on that page.

7  Q    And do you recognize on page three district number 63?

8  A    Yes.

9  Q    And is that one of your proposed districts?

10 A    It is one of my illustrative districts, yes.

11 Q    And if you look at Chesterfield --

12 A    Yes, I see now the heading for Chesterfield.

13 Q    Do you know how many Chesterfield VTDs are included, not

14 included in 63?

15 A    How many VTDs from Chesterfield?  No, I do not know the

16 answer to that question.

17        JUDGE PAYNE:  The question is, from the county of

18 Chesterfield, how many VTDs are included in 63, and your answer

19 is you don't know?

20        THE WITNESS:  The answer is I do not know the answer,

21 yes.

22 Q    Do you know why -- looking at three of 14, the exhibit, it

23 appears that there's a line going through Chesterfield which

24 seems to carve out the city of Chesterfield -- some VTDs in

25 Chesterfield that are substantially black, according to this

1  map, and place them into 62.  Is that accurate?

2         MR. HAMILTON:  I object to the question, Your Honor.

3  When he says carve out, it suggests that -- this is a

4  comparison between what Mr. Braden has proposed versus what the

5  special master is proposing.  There's no carving out from an

6  adopted map.

7         JUDGE PAYNE:  Object to the form of the question?

8         MR. HAMILTON:  So I object to the question.

9         JUDGE PAYNE:  Sustained.  You can rephrase it.

10  Q    Do you know why this line was drawn in the manner it was

11  which appears to have different parts of Chesterfield in one

12  district versus the other?

13  A    Yes.  It was -- this particular configuration, I

14  believe -- this is Petersburg 2 -- if you'll give me a moment.

15  Q    This is Petersburg 2.

16  A    If you'll give a moment just to check, because there are

17  different Petersburg configurations.  Yes, to the best of my

18  recollection, this was done as a modification of plans that I

19  had drawn originally to take into account the location of

20  incumbents in Districts 62 and 66 such that taking into account

21  those incumbent locations required a way of drawing District 63

22  that had to pick up necessary population but had to do so in a

23  way that did not interfere with the avoidance of incumbency

24  pairing.

25  Q    Do you know whether this particular geographic area I'm

1    talking about here involved splitting of a VTD?

2    A    District 63, that one will take me a moment to respond to.

3    There was a VTD split in the original enacted 2011 map which

4    is, in fact, perpetuated in this map.  I'll have to do a quick

5    check to see whether there are any other VTD splits that would

6    be relevant, if you'll just please excuse me for a moment.

7              JUDGE PAYNE:  You can have a moment to do that.  How

8    much longer do you have?  I'm not trying to rush you.

9              MR. BRADEN:  Maybe another 15 minutes.

10             JUDGE PAYNE:  Why don't we take a recess for

11   20 minutes.  The court reporter has right heavy duty here.  We

12   will be in recess for 20 minutes.

13

14             (Recess taken.)

15

16             JUDGE PAYNE:  Mr. Braden.

17   Q    Dr. Grofman, did you conduct a racial block voting

18   analysis before drafting your remedial plan?

19   A    Specifically racial block voting analysis, the answer

20   would be no.  Again, I apologize, I have to do a but, but I did

21   indeed examine the projected outcomes into the various

22   districts in the illustrative modules in terms of the vote for

23   Mr. Fairfax in, I believe it's 2013, and also the vote for Mr.

24   Obama in 2012.

25   Q    So the answer is no, but you looked at some election

1   numbers?

2   A     Yes, that is correct.

3   Q     So what provides your strong basis in evidence supporting

4   the creation of these majority-minority districts?

5   A     The strong basis in evidence is that the combination of

6   the information that I have available to me that was provided

7   to the Court in terms of the likelihood of minority success in

8   choosing a candidate of choice within the Democratic primary,

9   which is the primary in which African Americans are most likely

10  to vote, combined with the likelihood that the district, if it

11  elects an African-American candidate in a primary, would then

12  be able to elect an African American in the general election

13  with the combination of votes from the African-American

14  community, other minority communities, and others including

15  whites who might, in their affiliation with the Democratic

16  party, support a candidate of that party regardless of the race

17  of that candidate.

18  Q     Did you talk to any members of the Virginia legislature?

19  A     No, I did not.

20  Q     Did you talk to any members, any Black Caucus members?

21  A     No, I did not.

22  Q     Did you talk to any Virginia voters about the plan?

23  A     No, I did not.

24  Q     And the two elections -- and I understand your testimony

25  to be the strong basis is based upon the Obama results and

1  another race, Fairfax?

2  A    The other race is the Fairfax race, and the reason for

3  my -- at least one reason for my confidence in the usefulness

4  of those races for predictive purposes is that I made use of

5  those contests in seeking to determine the reconfiguration of

6  Congressional District 3 in the 2000 remedial maps that were

7  proposed to the *Alcorn* court, and the prediction that I gave

8  that the district, as reconfigured, even though it was a

9  district with substantially reduced minority population, would,

10  nonetheless, continue to elect a minority candidate of choice

11  and continue to provide a minority opportunity district.  That

12  prediction was borne out by the elections that were held

13  subsequent to the adoption by the *Alcorn* court of a remedial

14  map which was one of the two maps I had provided to that Court.

15  Q    Is there a difference in turnout between different

16  communities in a presidential election year than in years where

17  there's not a presidential or any federal elections?

18  A    Yes.

19  Q    Significant difference?

20  A    Yes.

21  Q    Any members of the legislature being elected the same year

22  as Obama?

23  A    No, there were not, because Virginia elections to the

24  legislature take place in odd-numbered years.

25  Q    Wouldn't that have been more probative to look at the

1    elections in the years, the same years as they're actually run?

2    A    As I indicated in my inventory of best practices, one of

3    the characteristics that is very important in best practices is

4    if one is going to be analyzing elections which are potentially

5    biracial in their contests, it is appropriate to analyze

6    elections for comparison purposes which are also biracial.

7    Q    When the plan was enacted in 2011, do you know how many

8    majority black districts were represented by white elected

9    officials?

10   A    No, I do not.

11   Q    Have you ever inquired about that number?

12   A    No, I have not, because all of my concern is the ability

13   of the minority community to elect a candidate of choice.

14   Q    If we could turn to --

15            JUDGE PAYNE:  Excuse me.  Fairfax election in

16   Virginia, are you talking about the lieutenant governor?

17            THE WITNESS:  Yes.

18            JUDGE PAYNE:  What year was that?

19            THE WITNESS:  I believe 2013, Your Honor.

20            THE COURT:  And Obama?

21            THE WITNESS:  2012.  I didn't mean to answer a

22   question you haven't yet asked, Your Honor, but I indicated in

23   my report why I was using the Obama 2012 data rather than the

24   Obama 2008 data.  There would have been no difference if I used

25   the 2008 data.  Obama actually did less well in 2012.

1           JUDGE PAYNE:  I don't recall Fairfax being in 2013.

2           THE WITNESS:  It was not the general election --

3           JUDGE PAYNE:  You're talking about the democratic

4    primary.

5           THE WITNESS:  That is my understanding, Your Honor.

6           JUDGE PAYNE:  So that is correct.  All right.

7    Q     If I could turn to Exhibit F, it's document 337-6.

8    A     Yes, I have available to me that document.

9    Q     And let me indicate to you and to the Court, I'm not

10   asking you to verify this document.  I'm only using it as a

11   device to assist us in moving rapidly through what I think are

12   going to be relatively simple questions.

13         My understanding is that you have or have not read the

14   Court's opinion?

15   A     I have read the Court's opinion.

16   Q     And would it be a fair characterization that the Court has

17   some series of very specific criticisms of each of the

18   districts which it found to be unconstitutional?

19   A     My understanding is that it had, yes.

20   Q     Did you use that as a device to assist you in drawing your

21   plan?

22   A     No, because I was drawing a plan that was intended to be a

23   plan which began without race as a preponderant motive, used

24   racially neutral criteria, that is to say the preservation of

25   county boundaries, and was drawn with no intent to either harm

Grofman - Direct

1    or help the members of any political party, and that was what I

2    was primarily making use of.  Plus I sought to avoid splitting

3    of VTDs because that was also something which the Court was

4    concerned about, especially insofar as those VTD splits

5    indicated a racial preponderance.

6    Q    So is it fair to deduce from that that you did not

7    perceive that the Court's actual observation on the existing

8    plan and specific things which were indicia of racial

9    predominance simply weren't relevant to your consideration?

10   A    No, that is certainly not the case.  I took, in general,

11   the Court's considerations to be the existence in the previous

12   map, in the enacted map, of a pattern and practice of taking

13   particular pieces of geography from what were essentially

14   white, heavily white districts and moving portions of that

15   geography with heavily black population into already

16   substantially black districts in such a fashion as to increase

17   their population toward, if not actually achieving, 55 percent.

18       I also took from the Court's documents, the Court's

19   opinion, the views that the Court expressed that in looking at

20   the way in which VTDs had been split in the enacted map, there

21   appeared to be a pattern and a practice of racial splitting of

22   VTDs in a way that took VTDs which crossed county lines and

23   moved populations in those -- sorry, VTDs which basically were

24   near county lines and split those VTDs in a fashion that

25   appeared to have a racial purpose.

Grofman - Direct

1    Q    Okay.  Do you know how many VTDs that the Court complained

2    about were split on that basis that you maintained in your

3    plan?

4    A    Yes.  Actually I believe I can answer that question.

5    Q    Yes, please do.

6    A    Of the VTDs that the Court complained were split, I

7    believe the correct answer to that question is that holding the

8    enacted map -- I'm sorry, I cannot answer that question fully.

9    I can only answer that question with respect to districts that

10   were in the enacted map, and in the enacted map there are --

11   let me find the right piece of paper here.

12        There are ten districts which were in the enacted map --

13   sorry, ten VTDs which were in the enacted map which are --

14   which were split in the enacted map, and those VTDs are also

15   split in the 26 district composite configurations based on my

16   illustrative models, but of those ten districts which overlap

17   VTD splits that took place -- that were found in the enacted

18   map, I believe that only two of these ten VTD splits actually

19   involve districts which the Court found unconstitutional.

20        So two out of the ten VTD splits which remain from the

21   enacted map, exactly two of those ten are VTD splits -- to best

22   of my present knowledge and understanding are VTD splits which

23   possibly could have been ones which the Court referenced in

24   it's document, because those VTD splits did, indeed -- of the

25   ten, those two did, indeed, involve districts which were held

Grofman - Direct

1   by the Court to be unconstitutional.

2   Q    So are you saying that you went back through the Court's

3   opinion and determined which VTDs they objected to, and then

4   you determined whether or not they were split in your plans?

5   A    No.  What I did was to look at the 34 VTDs which, as

6   indicated in, I believe addendum number four, but I could be

7   wrong as to which addendum it is, but the 34 VTDs which are

8   split in the 26 district changed configuration.  I looked to

9   see which of those 34 districts actually involved

10  unconstitutional districts, and I determined, when I did that

11  analysis late last night knowing that, in fact, I was going to

12  be on the witness stand today, when I did that analysis late

13  last night, I determined that of the 34 VTDs which are split in

14  the 26 district configuration, most of these VTDs are, in fact,

15  not VTDs which are involved with unconstitutional districts.

16  As I just indicated, of the ten VTD splits that occur that were

17  found in the previous map, the unconstitutional map, exactly

18  two of those, to the best of my present understanding very late

19  last night, are ones which, in fact, involve unconstitutional

20  districts.

21  Q    I'm not sure my understanding is exactly the same, but

22  we'll move on from there, and we can supplement the record on

23  that.  If you would turn to Exhibit F, this is document 337-6,

24  page four of nine --

25  A    Document 337-6, okay, page four of nine.

1  Q    Yes.  It's a few pages of a chart.

2  A    Yes.

3  Q    Let me ask you a preparatory question, and then I'll

4  describe what the chart is and then ask you some questions.

5  Are you familiar with The Fan neighborhood in Richmond?

6  A    No, I am not.

7  Q    What this chart does, we think -- well, but maybe not --

8  is to take language from the Court's opinion based upon the

9  various districts and the very specific criticisms that the

10  Court had on those districts which they indicated showed racial

11  predominance.  Let me represent to you, and someone can correct

12  me, that the issue of the division of the neighborhood in

13  Richmond called The Fan was quite contentious in, I believe,

14  both litigations.

15  A    I accept your characterization of the litigation.  I did

16  not review that element of the litigation.

17  Q    So let me describe what I believe accurately what the

18  Court said and ask you if you know whether or not you dealt

19  with it.  So there's a VTD in The Fan, 207, that was removed

20  from District 71 and transferred into District 68 that was

21  represented by then incumbent Republican Loupassi, and as a

22  result, The Fan district, which was previously contained

23  primarily in District 71, was split between District 71 and 68.

24  The Court held that as evidence of racial predominance.  Did

25  you correct that or change that in your plan?

Grofman - Direct

1    A    No, I did not.  As I stated explicitly, this is one of the

2    few VTD splits which I did actually specifically reference in

3    my initial report and subsequent addenda.  That VTD split, to

4    correct, would require changing the boundaries of District 68.

5    As I specifically stated in my report, were the Court to

6    instruct me to change the boundaries of District 68, which are

7    presently left unchanged, that would, indeed, allow me, in a

8    plan proposed to the Court, to correct that VTD split.

9    Q    I think that's actually a slightly different question than

10   what I asked you.  I was really talking about the removal of a

11   VTD here out of The Fan.  I think you answered a different

12   question.  Your question probably was about --

13               JUDGE PAYNE:  Just ask it again.

14   Q    Here's the question:  There was a good deal of dispute

15   over VTD 207, its removal from District 71 and transferred to

16   District 68.  There was the dispute over whether that was done

17   at the request of the incumbent member -- he has a restaurant

18   there -- or whether it was part of a racial decision-making.

19   So you have the same location in your plan.  It's not a split

20   VTD.  It's the moving of the VTD.

21   A    Apologies.

22               JUDGE PAYNE:  Wait a minute.  That's not a question

23   yet.  That's a statement.

24   Q    You answered a different question; right?

25   A    So let me respond --

1    Q    You were answering my next question about the split VTD

2    which contained the same.

3          JUDGE PAYNE:  I'm sure that helps you all understand

4    what you are talking about, but that series of exchanges

5    doesn't help me understand what you are trying to make.  The

6    bottom line is, ask two different questions, but ask them in

7    simple, straightforward ways so that I can understand the

8    answer and he can give in a simple, straightforward way.

9          MR. BRADEN:  My apologies.  That was remarkably

10   confusing, I agree, Your Honor.

11   Q    Do you know whether your plan has VTD 207 in The Fan in

12   the identical manner as the enacted plan?

13   A    Insofar as this plan has exactly the same configuration of

14   68 as in the enacted map, then any feature of that

15   configuration would, indeed, carry over into the illustrative

16   Richmond area modules I drew, so the answer is yes.

17   Q    Then I'll ask the question that you've already answered,

18   but I'll ask it because it's going to be hard to figure out

19   from the record.  So predominantly white VTD 205 was split

20   between District 71 and District 69, another challenged

21   district.  The Court criticized the legislature for doing this

22   and saying it was a racially based split.  It appears to us

23   that your plan has exactly the same split.  Is that wrong?

24   A    The answer to that question, which is a straightforward

25   one, the answer is probably that, yes, the same split is found.

1    If you give me a moment, I will verify that that is, indeed,

2    accurate.  So this is a split between which two districts?

3    Q    71 and 69.

4            MR. HAMILTON:  Your Honor, at this point, I would

5    object to this as cumulative.  We have over a hundred different

6    bits of circumstantial evidence summarized on this chart.  I

7    think Mr. Braden has made his point.  I'm certainly prepared to

8    address the relevance of any of this, so I object both on

9    relevance, on the grounds that it is cumulative, and we're now

10   well beyond 15 minutes Mr. Braden promised to wrap this up.

11           JUDGE PAYNE:  The second part of your objection is

12   correct, you are beyond 15 minutes, but the other part of it is

13   overruled.  Go ahead and get it in the record and get it

14   straight.

15           MR. BRADEN:  Sure.

16           THE WITNESS:  Could you give me the particular VTD

17   you were talking about?

18           MR. BRADEN:  Sure.  505.

19           JUDGE PAYNE:  205, isn't it?

20           MR. BRADEN:  Now I'm talking about VTD 505.

21           JUDGE PAYNE:  505, okay.

22   A    That particular VTD basically, because the way in which

23   the configuration was drawn, certainly not for any intent, has

24   exactly 5.1 percent minority --

25           JUDGE PAYNE:  Excuse me.  The question is, where is

1   505 in your recommendation; is that right?

2          MR. BRADEN:  Yes.  It's a very simple question.

3   Q    Is not your plan the identical split as in the enacted

4   plan?

5   A    In this instance, yes.  The answer has to be yes.

6          MR. BRADEN:  Let me ask one more question.  Obviously

7   there are pages that we could waste everybody's time.  I'll ask

8   one more example because the relevance of this, I think --

9          JUDGE PAYNE:  Nobody has objected to it yet, so ask

10  the question.  You may get one, but go for it.

11         MR. HAMILTON:  I can offer it.

12  Q    Let me go to page two, HD 69.  District 69 received

13  77 percent of the population from the split of 410, but

14  93 percent of that VTD was black voting-age population.  That

15  is an observation of the Court which they, the Court,

16  determined was an indication of racial predominance in drawing

17  the plan.  Doesn't your plan have exactly the same breakdown?

18  A    Yes, but not as part of the racially preponderant plan.

19  It occurred because I drew lines on a map.  It certainly did

20  not occur because I drew lines on a map for a racially

21  preponderant purpose.

22  Q    So when you do this split, the Court should assume it's

23  not racially based.

24  A    When I minimize the total number of VTD splits, and in

25  particular minimize the number of VTD splits which cross county

Grofman - Direct

1    lines but also in general to the point that of the VTD splits

2    that I have, ten of them are in the enacted map, four of them,

3    as I remember correctly, are zero population VTD splits and,

4    therefore, not particularly relevant and easily cleaned up in a

5    perfected plan, and other of these VTD splits involve

6    essentially not racial questions because they involve white

7    populations on one side and white populations on the other

8    side, or they involve black populations on one side and black

9    populations on the other side.  By the way, one last --

10              JUDGE PAYNE:  I think that answers the question.

11              MR. BRADEN:  Your Honor, that's sufficient.

12              THE COURT:  Is there anybody --

13              THE WITNESS:  Mr. Braden, apologies, because I do

14   want to clarify for the Court before you leave in case you have

15   a further follow-up question.  I apologize to the Court.  I do,

16   indeed, get confused by Virginia nomenclature.

17              So when Mr. Braden was asking me about Hampton city,

18   I wrongly assumed that he was referring to some specifically

19   designated part of what I have been treating as Hampton County,

20   and then that changes my answer to one of the Court's questions

21   because the Court asked about the western -- I'm sorry, the

22   western boundary of District Number 92, and the correct answer

23   to that question, Your Honor, is that there are black areas on

24   both sides of that boundary line, but the boundary line is a

25   county line.

1        MR. BRADEN:  Thank you, Dr. Grofman.

2        THE COURT:  Cross-examination?

3

4                    CROSS-EXAMINATION

5   BY MR. HAMILTON:

6   Q    Good morning, Dr. Grofman.

7   A    Good morning, sir.

8   Q    Kevin Hamilton for the plaintiffs.  I have far fewer

9   questions for you.  Hopefully they're a little -- they're

10  straightforward.  You were the special master in the

11  *Personhuballah* case regarding the Virginia Congressional map;

12  correct?

13  A    Yes, I was.

14  Q    And you proposed a remedial map in that case?

15  A    Yes, I did.

16  Q    It was adopted by the Court?

17  A    Yes, it was.

18  Q    And that map has governed Congressional elections here in

19  the Commonwealth of Virginia ever since; is that right?

20  A    Right.

21  Q    Is it fair to say that you followed the same approach in

22  drawing this remedial map or these modules, as you've called

23  them, as you did in drafting the Congressional remedial map in

24  *Personhuballah*?

25  A    Yes, that is correct.

Grofman - Cross

1    Q    So let's talk about that approach.  You set out at the

2    first instance to draw districts consistent with traditional

3    redistricting principles; is that right?

4    A    Yes, that's right.  Do you want me to elaborate, or do you

5    want to continue the list?

6              JUDGE PAYNE:  No, I think let him ask and then you

7    can answer, because it may shorten things.

8    Q    So I think you said in your report, I would emphasize in

9    my line drawing I have not ever sought to achieve any

10   particular predetermined percentage of black voting-age

11   population within a district, but, rather, have drawn districts

12   in accord with traditional redistricting principles and then

13   afterward checked to make sure that unintentional vote dilution

14   was not present, close quote.  That's your report --

15   A    Exactly.  That is exactly what I said --

16             JUDGE PAYNE:  Remember, let him finish, and you

17   start, and vice versa, because the court reporter can't take

18   both of you at the same time.

19             THE WITNESS:  Sorry, my fault.

20   Q    It's okay.  You can go ahead.

21   A    I've completed my answer.

22   Q    So those traditional redistricting principles include

23   respect for political subdivision boundaries?

24   A    Yes, that is also correct.

25   Q    Like the county line you just mentioned a moment ago?

1    A    Yes.

2    Q    Attention to compactness, that's a traditional

3    redistricting principle?

4    A    Yes, it is.

5    Q    And contiguity, that's traditional --

6    A    Yes.

7    Q    -- redistricting principle?

8    A    Yes.

9    Q    You also took care to limit the geographic scope of the

10   remedial area?  That was one of the factors you took into

11   concern?

12   A    Yes.

13   Q    And in drawing districts in accordance with those

14   principles, that resulted in a set of proposed maps or proposed

15   modules in different areas of the state.

16   A    Yes, that is correct as well.

17   Q    Okay.  And then the next step of your process was you

18   checked to make sure that unintentional vote dilution was not

19   present; is that right?

20   A    Yes, that is also correct.

21   Q    Based on that approach, each of the challenged districts

22   ended up with a black voting-age population at around or below

23   55 percent --

24   A    Ranging from 43 percent to 55.01 percent using the DLS

25   racial percentages ranging from -- I've forgotten -- roughly

1    43 percent to slightly under 55 percent using the definition of

2    African-American population as mono racial.

3    Q     I think -- let me ask you this question about this whole

4    black voting-age population with or without those who identify

5    themselves as Hispanic.  Does any of that matter for the

6    purposes of your analysis in drawing these maps?

7    A     To my mind, no.  As I've indicated to the Court, I

8    provided the comparative numbers for at least the enacted map.

9    Were one to provide comparative numbers for each of the

10   illustrative modules, essentially the differences would be

11   trivial or minor.

12            JUDGE PAYNE:  Are you saying that the differences

13   between the census BVAP and the BVAP used by the Legislative

14   Services is statistically insignificant?

15            THE WITNESS:  Statistically insignificant, Your

16   Honor, with apologies, is the wrong term.

17            JUDGE PAYNE:  Why doesn't it make --

18            THE WITNESS:  It's small.  Very, very small.

19            JUDGE PAYNE:  Sometimes small differences are

20   important in life.  Why is this small difference not important,

21   in your view?

22            THE WITNESS:  Because the difference, for example,

23   Your Honor, between a 54.98 percent black voting-age population

24   and a 55.01 black voting-age population is essentially a

25   trivial difference.

1        JUDGE PAYNE:  I have a follow-up question to your

2   procedure which, I'm sorry, Mr. Hamilton, I'd like to ask now

3   so I understand it.  You did as Mr. Hamilton said, and then you

4   looked at -- you checked your work against the -- on the racial

5   basis.

6        THE WITNESS:  Yes, that is correct.

7        JUDGE PAYNE:  What, if any, change occurred in any of

8   your plans as a result of the change -- the checking that you

9   did?

10        THE WITNESS:  At the initial stage when I did the

11   checking, that was before I had looked at incumbency effect.

12   So I basically have checked twice.  I first checked when I was

13   looking at plans where I wasn't worrying about incumbency or

14   had no incumbency information.  That did not change -- to the

15   best of my recollection, that did not change anything.

16        The next issue was whether there was a change after I

17   took into account incumbency, and there, to the best of my

18   recollection, the only change that I made was in the boundaries

19   between 89 and 90 where I made some very, very minor

20   adjustments to balance population between the two districts.

21        But basically the answer to the question, sir, is

22   that because of the way in which the lines were drawn, given

23   the geography and the demography of Virginia, it was possible

24   to draw 11 districts that, in my view, ultimately the Court's

25   choice, decision, remedied the infirmities without having

1    issues of vote dilution, meaning situations where the district

2    was not sufficiently minority in population that there might be

3    a question as to whether African-American candidates of choice

4    would actually be able to be elected.

5         JUDGE PAYNE:  In the change that you did make, the

6    one change that you did make, what district was it in, and was

7    it made to achieve a racial result in whole or in part?

8         THE WITNESS:  No.

9         JUDGE PAYNE:  What district was it?

10        THE WITNESS:  89 and 90.

11        JUDGE PAYNE:  What change did you make?  You said you

12   made some changes.  What were --

13        THE WITNESS:  I did, in fact, make a one-VTD, two-VTD

14   exchange between the two -- between the two districts to more

15   equally balance population.  The VTD splits that I have done,

16   Your Honor, in general, have been between adjacent

17   overwhelmingly minority districts, and I have done some minor

18   population balancing.

19        JUDGE PAYNE:  Excuse me, Mr. Hamilton.

20        MR. HAMILTON:  Thank you, Your Honor.

21   Q    Let me just go back, because I want to just firmly put

22   this to the side, this whole dispute about how we calculate

23   black voting-age population, in your mind whether we call it

24   statistically insignificant or simply irrelevant.  It's not

25   something of importance that should distract this Court in

1  considering the difference between these plans.

2  A    I will take that as a question and to which my answer is

3  yes.

4  Q    Thank you.  So you agree with Delegate Jones when he said

5  the reason he didn't mention it on the floor was that he didn't

6  think it was statistically significant.  He's probably not

7  using that term the way you would, but you get his point?

8  A    Yes, I understand his point.

9  Q    And agree with it?

10 A    Yes.

11 Q    Thank you.  You didn't -- perhaps I'm repeating what

12 you've already said, but you didn't set out to draw districts

13 at or below 55 percent as a racial target?

14 A    No, I certainly did not.

15 Q    Or at 50 percent or at any other number?

16 A    That's right.  As I very clearly stated, there was no

17 magic number that I sought to achieve.  The racial demography

18 of the state of Virginia is very different in different parts

19 of the state, and those differences essentially drive

20 differences across the illustrative modules in the different

21 geographic regions because there are some areas of the state,

22 Richmond, for example, Norfolk, which are overwhelmingly black.

23 Q    Okay, and after you did the -- drew these maps using

24 traditional redistricting criteria, I think you said, as the

25 Court short-formed it, as you checked your work, you conducted

1    an analysis to determine that African-American voters would

2    maintain their opportunity to elect preferred candidates in the

3    challenged districts?

4    A    Yes, that is exactly right.

5    Q    And your conclusion was that there was no danger in that

6    regard based on the districts you had drawn?

7    A    Yes, that is my view.

8    Q    In reaching that conclusion, you used exactly the same

9    criteria that you used when serving as a special master in the

10   *Personhuballah* case but now applied them to election data

11   compiled in the proposed remedial legislative districts?

12   A    Yes, that is correct.

13   Q    In reaching that conclusion, you also reviewed the

14   analysis provided to this Court by Dr. Max Palmer; right?

15   A    Yes, I did.

16   Q    And you reviewed a portion of the report of Dr. Lisa

17   Handley in the *Personhuballah* case attached as an appendix to

18   the briefs submitted by the Governor of Virginia?

19   A    Yes, I did.

20   Q    And you used those materials to complement the analysis

21   that you did on your own?

22   A    Yes, along with data on actual election results in

23   Congressional District 3 and also in Congressional District 4.

24   Q    And you didn't make any adjustments to the black

25   voting-age population in any of the proposed districts or

Grofman - Cross

1    modules based on that analysis; correct?

2    A    That is correct.

3    Q    Now, in your report you wrote, and I quote -- this is from

4    your initial report on page 121, but I'll just read it to you.

5    My own illustrative configurations and the analysis I have done

6    of those configurations indicate that it is not necessary to

7    avoid vote dilution to draw maps in which any of the redrawn

8    districts exceed 55 percent black voting-age population, close

9    quote.  Is that what you wrote?

10   A    Yes.

11   Q    Now, that may be the reason why you rejected the maps

12   proposed to you by the various parties in this litigation, but

13   that belief did not drive how you drew the districts in the

14   first instance; correct?

15   A    Two things:  A, it did not drive how I drew the districts

16   in the first instance, nor, actually, to go back to the actual

17   text of my report, it was not the sole or even the major

18   factor, at least with respect to most of the submitted remedial

19   plans, in the decision that I reached not to recommend any of

20   those plans to the Court.

21            MR. HAMILTON:  Thank you, Dr. Grofman.  I have no

22   further questions, Your Honor.

23            JUDGE PAYNE:  Mr. Heytens.

24            MR. HEYTENS:  We have no questions, Your Honor.

25            THE COURT:  Any redirect?

1          MR. BRADEN:  No, Your Honor.

2          JUDGE PAYNE:  Thank you, Dr. Grofman.  You may step

3    down.  Excuse me just a minute.  Do any of the judges have

4    questions?

5          JUDGE KEENAN:  No.

6          JUDGE PAYNE:  Thank you very much.  You may remain in

7    the courtroom, Dr. Grofman, and you can take some water back

8    there with you if you need it.  You've been called upon to talk

9    a lot.

10         All right, we can hear argument at this time, and we

11   will -- our plan is to take a luncheon recess at one o'clock

12   based upon what you all told us you thought the lengths of your

13   presentation might be.  We ought to be able to proceed on

14   accord with that schedule, but before we do, I would like to

15   see, and -- I couldn't find it in the record, but I would like

16   to see the parties sit down and agree upon, put up a chart that

17   has every -- of the 11 districts and all of the changed

18   districts that have the BVAP listed for each in the enacted

19   plan, and if it makes a difference, if you all are willing to

20   stipulate it doesn't make any difference what you choose, okay,

21   you can just use one, but if you can't, the census BVAP versus

22   the -- what is it called? -- the DOJ BVAP, is that what it was?

23   And then the BVAP in each changed -- each district as changed.

24         I don't understand from the report or from anything

25   you all have filed how much change actually has occurred

```
 1   anywhere, and I think it would help, at least me, to understand
 2   if you all could present that in some kind of chart form, and
 3   since I would think it's something you could agree upon and it
 4   wouldn't take long to do, maybe.
 5           I think also we are all of the view that it would be
 6   helpful, Dr. Grofman, to have -- given the number of addenda,
 7   to have a final report that reflects all the corrections that
 8   were made in the various addenda, not making anything else but
 9   making sure that those changes appear so that there's one
10   single document -- in a way that there's one single document
11   that we can look at.  Is that satisfactory?
12           JUDGE KEENAN:  Yes.
13           JUDGE PAYNE:  Let's see, the plaintiff has the
14   burden, so you are up, Mr. Hamilton.
15           MR. HAMILTON:  Thank you, Your Honor.  This Court
16   found on June 26th, 2018, that the Virginia House of Delegates'
17   redistricting plan was a violation of the equal protection
18   clause of the 14th Amendment.  Because the political branches
19   of state government have failed to adopt a new remedial plan,
20   and both this Court and the United States Supreme Court have
21   denied a stay, it now falls to this Court to adopt an effective
22   redistricting plan to cure the unconstitutional racial
23   gerrymander unlawfully imposed on the state.
24           Plaintiffs respectfully submit that their proposed
25   remedial plans are best suited to address that task.
```

1    Plaintiff's remedial plans preserve the structure of the

2    enacted plan but are superior to the enacted plan with respect

3    to every objective measure.  Plans are both more compact and

4    split fewer political subdivisions than the enacted plan.

5         The major difference between the two variations

6    proposed by the plaintiffs' plan A and plan B are in the

7    treatment of Charles City County.  To best remedy District 74,

8    the map draws a more compact district centered in Henrico.

9    That leaves Charles City County without a home.  Plan A moves

10   the county into District 62, plan B moves the county into

11   District 70.  Either would be effective remedy maps, and we

12   propose them as alternatives.

13        The maps were all proposed and prepared using the

14   methodology adopted by Dr. Grofman in the *Personhuballah* case

15   and, of course, as he just testified in this case.  That is

16   rather than using race as a predominate factor, rather than

17   using a 55 percent racial target, plaintiffs' maps were drawn

18   using traditional redistricting criteria and only thereafter

19   examined to ensure that the maps were non-retrogressive and to

20   ensure that no incumbents were pared.

21        Plaintiffs respectfully submit that their proposed

22   remedial maps offer the best path forward to effectively remedy

23   the unconstitutional race-based gerrymander identified by the

24   Court.  It requires no further additional work, no choosing of

25   modules or other issues.

1          Dr. Grofman rejected the plaintiffs' proposed

2     remedial maps primarily because they altered more districts

3     than he judged necessary, but there's no rule of law, much less

4     redistricting principle, that requires keeping the number of

5     affected districts to an absolute minimum as Dr. Grofman

6     appears to have believed and applied.

7          Rather, as the special master himself conceded, how

8     many other districts are affected is just one factor in a

9     series of potential trade-offs among traditional redistricting

10    criteria.  That's his initial report on page five.  While

11    plaintiffs agree that the Court should avoid changing

12    non-challenged districts based solely on reasons unrelated to

13    the remedy of the unconstitutional challenged districts, where

14    changes to adjacent districts flow from a full and effective

15    remedy to the constitutional violation, then consideration of

16    traditional redistricting criteria, things like minimizing

17    locality splits and maximizing compactness, may warrant

18    alteration of a greater number of surrounding districts, and

19    that's exactly what the plaintiffs sought to achieve here in

20    proposing plans.

21          JUDGE PAYNE:  Which plan do you want of yours?

22          MR. HAMILTON:  They are equally acceptable to the

23    plaintiff.  We would propose plan A as the preferable plan if

24    we had to choose between the two.  We submit that the

25    plaintiffs' proposed plans make the appropriate trade-off while

 1    limiting the degree to which changes are made to areas

 2    surrounding the unconstitutional districts.

 3            In the alternative, the NAACP has proposed a remedial

 4    plan, and plaintiffs certainly don't object to that plan either

 5    and think it offers an effective remedial plan, and perhaps

 6    implicit in that statement, there are more than one way --

 7    there are -- there is more than one way to solve this

 8    constitutional problem adopting a traditional redistricting

 9    criteria.  As Dr. Grofman has indicated in his report, it's a

10    trade-off of compactness versus county lines versus city lines

11    and minimizing locality splits.

12            How you approach it, the overall most important

13    factor is to remedy the constitutional violation.  And so as

14    between plaintiffs' plan A, plaintiffs' plan B, we would prefer

15    plan A and, as an alternative, the NAACP plan.

16            JUDGE PAYNE:  Which of Dr. Grofman's modules do you

17    think, in combination, is best suited if neither of those

18    alternatives is adopted by the Court?

19            MR. HAMILTON:  Plaintiffs would submit that the Court

20    should adopt Richmond 1A, Petersburg 2, Peninsula 2, and

21    Norfolk 1A.  Let me just take a moment to explain why.

22    Addressing Richmond 1A first, there are two variations offered

23    with respect to the Richmond area.  Richmond 1A, we'd submit,

24    is plainly preferable.

25            Richmond 1B offers a wholesale redrawing of

1     Districts 72 and 73 to improve the overall district

2     compactness, but Dr. Grofman admits this is really unnecessary

3     to remedy the unconstitutional districts, and the changes are

4     not modest.  Roughly 42 percent of the population from

5     District 72 is swapped with District 73 and vice versa.

6             The Court's task, as I mentioned, is to address and

7     remedy the constitutional violation.  Other changes, even those

8     that might improve the map in other ways, unless they're

9     related to that remedial task, should be declined.  So for that

10    reason, Richmond 1A, which doesn't make those gratuitous

11    changes and retains nearly all of the current populations in

12    the two affected districts while remedying the racial

13    gerrymander in this area, is the preferred module.

14            In Petersburg 2, the primary difference between the

15    alternatives is the way the map addresses Dinwiddie County.  In

16    the adopted map, I'm sure the Court will recall, Dinwiddie

17    County was split, the avowedly racial split of the county,

18    split between District 75 and 63.  The other two options in

19    Petersburg proposed in the modules, Dr. Grofman's modules,

20    preserved that split and with it carry forward the race-based

21    construction of District 63 from the enacted plan.

22            As demonstrated by Petersburg 2, which keeps

23    Dinwiddie County whole within District 63, it's not necessary

24    to split Dinwiddie County either to cure the racial gerrymander

25    of District 63 or for population equality reasons when

1    redrawing the map.  Petersburg 2 is the superior option for

2    that reason alone, and I'll just note that both the NAACP and

3    the Princeton gerrymandering project also agree that that's the

4    preferred module in this area.

5          Peninsula 2, the problem in this area, as the Court

6    will recall, it was District 95 which snakes up the Peninsula

7    to scoop up far-flung pockets of African-American voters.  Any

8    effective remedy necessarily will require significant changes

9    to that district, District 95 and, as a result, to neighboring

10   Districts 93 and 94.  Peninsula 2 keeps the basic structure of

11   Districts 93 and 94 the same.

12         Peninsula 1 would impose far greater change on those

13   two neighboring non-challenged districts.  So we would submit

14   Peninsula 2 fully renders the gerrymander without imposing the

15   degree of change on the two neighboring non-challenged

16   districts, and, again, not that it's a popular vote but the

17   NAACP and the Princeton gerrymandering project also agree that

18   that's the preferred module in this area.

19         Finally, in Norfolk 1A, there are three minor

20   variations proposed by the special master.  We would submit

21   that the Court should adopt Norfolk 1A.  This variation

22   proposes a highly compact version of District 77 centered in

23   Chesapeake nearly tripling the compactness score.  While the

24   black voting-age population drops significantly, the special

25   master appropriately analyzed voting patterns in this area and

1    concluded that African-American voters would have an equal

2    opportunity to elect candidates of their choice under the

3    configuration of Norfolk 1A.  It is, accordingly, most

4    consistent with traditional redistricting principles and the

5    most appropriate remedy for the gerrymander in this area.

6              JUDGE PAYNE:  Mr. Hamilton, does plaintiff's plan A

7    or the NAACP plan or Richmond 1A, Petersburg 2, Peninsula 2,

8    Norfolk 1A as proposed by the special master change, in any

9    way, District 75 which has been affirmed by the Supreme Court?

10   If it does, what's the significance of doing that?

11             MR. HAMILTON:  I can't answer the question off the

12   top of my head.  If I can have a moment when counsel is

13   speaking, I can confirm that.  Let me address the intervenor

14   defendant's maps if I might.  They have proposed two

15   alternative maps that were introduced but not passed or even

16   voted on in the House of Delegates, House Bill 7002 and House

17   Bill 7003.

18             Both of these maps are uniquely ill-suited to the

19   task before this Court.  House Bill 7003 can be put aside at

20   the outset as even the intervenors themselves appear to oppose

21   it noting that it has potential flaws for racial gerrymandering

22   and is based on a plan that is wrong as a remedial approach and

23   embodies an unknown racial purpose.

24             Worse, Delegate Jones admitted that the plan was

25   designed to, quote, preserve the 2011 map's partisan balance

1   which makes it inappropriate for consideration by this Court.

2          House Bill 7002 fares no better.  The plan was

3   explicitly designed to preserve the political makeup of

4   neighboring districts so as to preserve the composition the

5   legislature established in 2011.  In short, intervenors'

6   proposed remedial plan was designed with the overriding purpose

7   of advancing political goals, something that is absolutely

8   inappropriate for Court-ordered remedial plan.  The approach is

9   wrong as a matter of law, unsupported as a matter of fact, and

10  was flatly rejected by both Dr. Grofman and the unanimous court

11  in *Personhuballah* even before this very court.

12         As Your Honor Judge Payne noted, quote, courts have

13  unanimously agreed that political considerations have no place

14  in a plan formulated by the courts, close quote.  Cases

15  supporting Judge Payne's statement are legion.  We provided a

16  small selection in our objection to the intervenors' plan at

17  docket 305, page five, footnote one, and I won't obviously

18  repeat them here.

19         JUDGE PAYNE:  Mr. Hamilton, given that the thoughtful

20  processes have occurred in the briefing here in the court, and

21  considering that the General Assembly is in session, and

22  considering that both political parties and the governor have

23  acted in a way that is inconsistent with their obligations to

24  the citizens of Virginia to do the redistricting in the first

25  place, would it be appropriate for us to take a pause and

1   remand this for immediate consideration by the General Assembly

2   of Virginia requiring all of them to come to reality and face

3   the evidence that is presented here in these reports?

4           After all, it is the responsibility of the

5   legislature and the governor to come to a process and a result.

6   We've had to do it, and we're prepared to do it, but should we

7   give them one more chance given the situation that we have now

8   in this record?

9           MR. HAMILTON:  No, Your Honor.  The short answer is,

10  this Court has been extraordinarily deferential to the

11  legislature, as it should have, gave the legislature the

12  opportunity and an extensive opportunity to address it.  Based

13  on what happened in front of the legislature, there's no reason

14  to think that the result would be any different, especially

15  under a very short timeline, number one.  Number two, the

16  intervenors have already asked this Court for a stay.

17          JUDGE PAYNE:  That's ended, because the Supreme Court

18  has denied it.

19          MR. HAMILTON:  Then they asked the Supreme Court for

20  a stay, and both courts denied the stay.  The time has come.

21  It is January 2019.  We are now in the election year, and, you

22  know, I don't want to speak for the Commonwealth election

23  machinery, but we need this map, and it falls to this Court,

24  just like it would in the event of a political deadlock map

25  where the parties, in the first instance, simply can't agree on

1    redistricting.  It happens from time to time, and it falls to

2    the federal court to draw the map.

3              It's an unwelcome burden, but that is where we are.

4    It is clear that there will never be a map adopted by this

5    legislature and this governor.

6              JUDGE PAYNE:  Not if they all act in the same

7    stubborn fashion they've been acting in.  I wasn't suggesting

8    that we stop our process.  I was suggesting that we go forward

9    and take time to do an opinion and let the governor and the

10   General Assembly take a fresh look at things and see if they

11   can't come to some reasonable resolution and fulfill the duties

12   that the law really puts upon them for the citizens of

13   Virginia.  But you say no.

14             MR. HAMILTON:  Yes.

15             JUDGE PAYNE:  I don't think you need to pursue it any

16   further then.

17             MR. HAMILTON:  Thank you.  Intervenors' proposed

18   remedial map fails for a second reason I just want to touch on,

19   and that is a gross misunderstanding of the nature of the

20   violation for which a remedy is required.

21             Rather than address the actual racial gerrymander

22   itself, the intervenors' map devotes its attention to cosmetic

23   alterations designed to tidy up the circumstantial evidence

24   identified by the plaintiffs and found by the Court to evince

25   predominant use of race in the enacted plan.  So we saw the

1    list of 111, I think he called them specific criticisms of the

2    Court.

3           With all due respect to Mr. Braden, I don't believe

4    the Court was criticizing the legislature so much as

5    identifying circumstantial evidence that, when coupled with the

6    statements on the floor of the House of Delegates and the

7    express use of the 55 percent black voting-age racial target in

8    drawing and preparing these maps, together demonstrated

9    predominate use of race in the drawing of these maps.

10          Running around the crime scene erasing fingerprints

11   and addressing the circumstantial evidence misunderstands the

12   purpose of what it is that this Court is tasked with today, and

13   that is identifying, preparing, adopting, and ordering an

14   effective remedy to the underlying racial gerrymander, not the

15   little bits of circumstantial evidence to make it more

16   difficult, more difficult to identify.

17          The intense focus on specific circumstantial evidence

18   identified by the Court entirely misses the point.  The

19   issues -- those were simply circumstantial evidence, and

20   limiting the remedy to just curing individual, specific VTD

21   splits that followed racial patterns or little weaves or divots

22   in district lines woefully and dramatically fails to address

23   the underlying constitutional issues.

24          It, in the words of this Court, improperly focuses

25   on, quote, particular portions of the line, quote, rather than,

1    quote, the design of the district as a whole, close quote.

2    That is where the focus should be.  That quote is from the

3    memorandum opinion at page 79 quoting the *Bethune-Hill* Supreme

4    Court decision at page 800.  The attempt to conceal the

5    symptoms of the violation is misguided and should be rejected

6    by the Court.

7           The task before this Court might appear complex but,

8    in fact, is straightforward.  Having found the enacted map was

9    drawn with race as its predominant purpose, the Court must now

10   unravel the improper and constitutional map and adapt an

11   effective remedial map that fully addresses and resolves the

12   unconstitutional race-based gerrymander.

13          The Court has a number of maps that accomplish that

14   task.  Plaintiffs submit that its two alternatives best

15   accomplish the goal, but the Court has other options that

16   provide acceptable remedies including the NAACP remedial map,

17   and then finally, in the alternative, although we think it's an

18   inferior remedy that doesn't go as far as it should, plaintiffs

19   would not object to the four identified modules contained in

20   the special master's report.

21          I want to thank each member of the Court for your

22   courtesy, patience, and attention throughout the proceedings.

23   It's been an honor to appear before you.  Thank you.

24          JUDGE PAYNE:  Who is going to address next?

25          MS. RIGGS:  Your Honor, would you like to hear from

1   the NAACP next or from a party?

2            JUDGE PAYNE:  If you'd like to present, you may go

3   ahead.

4            MS. RIGGS:  May it please the Court, thank you.  For

5   -- my name is Allison Riggs.  I'm with the Southern Coalition

6   for Social Justice.  I'm here with my local counsel, David

7   Prince, on behalf of the Virginia NAACP.  We appreciate your

8   indulgence in admitting me and my colleague Mr. Jeff Loperfido

9   pro hac vice.

10           We consulted with your chambers, and we have small

11  handouts, notebooks with maps that I think will help explain

12  some of my discussion.  May he approach with those notebooks?

13  We have the adequate number of copies.

14           JUDGE PAYNE:  Do you have copies for the law clerks?

15  Thank you.

16           MS. RIGGS:  We have copies for opposing counsel as

17  well.  Your Honors, we're grateful to share the perspective of

18  the Virginia NAACP.  I have three, four major objectives in

19  brief I'd like to address with you today; first, the attributes

20  of the NAACP's plan without repeating what's in our briefing.

21  We described how we developed that plan.  There's just certain

22  key points I'd like to highlight.

23           Two, I'd like to address why the NAACP's position is

24  that Dr. Grofman's plan, even with the varying modules, aren't

25  fully and effectively remedial.  I'd like to address some of

1    Dr. Grofman's criticisms of the NAACP's plan, so why he would

2    reject the NAACP's plan, and then finally just briefly I'd like

3    to address defendant intervenors' suggestion in its briefing

4    that somehow Dr. Grofman, or any plan that reduces the black

5    voting-age population in districts, somehow constitutes

6    intentional vote dilution.

7            Before I hit on those four points, though, I'd like

8    to center this discussion on why we're here in the first place

9    and that this Court is convened because it's been burdened with

10   the unwelcome duty of creating a remedial plan so that we can

11   have timely elections here in the state of Virginia.  And that

12   duty is one that requires this Court to ensure that the

13   discrimination and the violation of the 14th Amendment is

14   eliminated root and branch.

15           So it is certainly the position of plaintiffs and the

16   NAACP that Dr. Grofman's plans are better than the 2011 plan,

17   but that's not the legal standard that's applicable to this

18   Court's review and implementation of a remedial plan.  Instead,

19   when a federal court is acting in equity to impose a remedy, it

20   must restore victims of discriminatory conduct to the position

21   they would have occupied in the absence of such conduct.

22           And our position is that in the context of a racial

23   gerrymandering case, that means fully unpacking these

24   districts, allowing naturally occurring new opportunity

25   districts to occur without imposing restrictions unjustified by

1    the law such as Dr. Grofman's, what he calls narrow tailoring

2    but is, in fact, a minimum change requirement or an aversion to

3    changing nonadjacent districts or minimizing the number of

4    districts changed.

5            That does not allow black voters in this state, in

6    these distinct areas, which, in fact, amount to a large part of

7    the state, to be restored to the position that they would have

8    been had they not been segregated because of the color of their

9    skin and packed into as few districts as possible.

10           I think there's ample precedent to support this, that

11   there doesn't need to be a minimum change approach to this.   In

12   *Abrams*, on remand, the district court -- on remand from the

13   Supreme Court in -- the district court in Georgia acknowledged

14   that it was going to make widespread changes, and it

15   specifically rejected a least-changed plan noting that

16   sometimes starting from racial gerrymanders and trying to make

17   the least change just perpetuates the constitutional violation

18   to begin with.  And then --

19           JUDGE PAYNE:  Was *Abrams* a case that involved an

20   attempt to comply with Section 5 of the Voting Rights Act and

21   found to be lacking?

22           MS. RIGGS:  Section 5 and Section 2 were both

23   applicable to the Georgia legislature when it was drawn back

24   then.

25           JUDGE PAYNE:  That wasn't my question.  In *Abrams*,

1    was Georgia trying to create majority-minority districts?

2           MS. RIGGS:  If I'm correct in my recall, the Georgia

3    legislature believed that in order to comply with Section 5, it

4    needed to create additional districts.  So it thought it was

5    complying with Section 5, but even more recently, the *Covington*

6    case out of North Carolina, that court rejected a legislatively

7    proposed plan and ordered a special-master-drawn plan that did

8    not adopt a least-change approach.  The three-judge panel

9    instructed the special master to change nonadjacent districts

10   to comply with the criteria that they established, and they

11   instructed the special master to take great care not to

12   preserve the core of an unconstitutional district because that

13   would just perpetuate the unconstitutional flaw, and the

14   Supreme Court summarily affirmed that part of the *Covington*

15   decision.  So given that framework --

16          JUDGE PAYNE:  How many districts were challenged in

17   *Covington*?

18          MS. RIGGS:  There were 28 total.  There were four

19   that were -- plaintiffs accused -- plaintiffs objected to as

20   being insufficiently remedial for racially gerrymandered

21   districts that plaintiffs objected to as being insufficiently

22   remedial, and the district court agreed, ordered the special

23   master to fix them.  He did not using a least change, and the

24   Supreme Court summarily affirmed those four districts.

25          So then, turning to the attributes and benefits of

1     the Virginia NAACP map and how it was developed, we've detailed

2     that in brief.  I don't want to reiterate what you have in

3     front of you, but I want to note that the Virginia NAACP has

4     thousands of members in the challenged and affected districts,

5     and they worked collaboratively to develop a remedial plan that

6     was informed by the residents who lived there in all of the

7     affected areas and in the adjacent districts.

8          I think sometimes we lose track because of the

9     analytical framework.  The analytical framework is, of course,

10    directed at the packed district, if you will, the majority

11    black district, but racial gerrymandering is about packing

12    certain districts and then bleaching the surrounding districts,

13    and that centers and concentrates the power of white voters in

14    those surrounding districts.

15         So to say as a matter of principle I don't want to

16    touch those rounding districts, again, perpetuates the harm

17    created by the racial gerrymandering in the first place even

18    though that's not a direct part of the analytical framework.

19    My clients live in those districts, too, and so they have an

20    appreciation of what fully unpacking the affected districts and

21    moving those voters into the surrounding districts really means

22    for them politically.

23         JUDGE PAYNE:  Dr. Grofman's plan doesn't confine

24    itself to the 11 districts.  It changes something like 21 to 26

25    districts depending upon which module -- how is the principle

1    that you discuss applicable to what's really before us?

2              MS. RIGGS:  I think it will come -- I want to discuss

3    the districts that Dr. Grofman drew in the Richmond area

4    specifically, because I think that's where -- I'll be able to

5    crystallize for you why that matters.

6              JUDGE PAYNE:  That's really the nub of your argument,

7    isn't it?

8              MS. RIGGS:  It's pretty central to it, but before I

9    get there, I just want to explain that the maps drawn by the

10   Virginia NAACP comply with all legal standards and traditional

11   redistricting criteria, and they incorporate the input and

12   understanding and the political realities faced by black

13   voters.

14             So, for example, the community of Church Hill in

15   Richmond, which was split right down the middle between 70 and

16   71 in the enacted plan in 2011, is almost entirely, to the best

17   of our ability, restored in our plan, and this is going to be

18   something that puts black voters back into the place they would

19   have been where -- before they were harmed; that is, allow them

20   to effectively and politically organize just like any other

21   voter, regardless of skin color, to elect someone who will

22   effectively represent their community.

23             Likewise, you know, Dr. Grofman said, in Richmond,

24   I'm going to draw districts that don't cross the James River.

25   Well, there's one part of 69 that does cross the James River,

1    and the NAACP's feedback to us was, well, there's also a town

2    council district there that if 69 matched up pretty closely

3    with this town council district, would make a lot of sense from

4    good government perspective, from get-out-the-vote perspective,

5    from organizing perspective.

6            So this is the kind of input that you get when you

7    talk to communities and allow community to have an input.  And

8    this -- and we propose this map is what restores black voters

9    and our clients to the position they would have been but for

10   the racial gerrymandering.

11           JUDGE KEENAN:  Excuse me, Ms. Riggs.  Let me ask you

12   just one question, if I could, on that point.  It seems to me

13   you are suggesting that we should consider very granular

14   propositions; in other words, what one very small area of

15   Richmond or small area of Church Hill would be best suited for.

16   Are you asking for too much?  Are you risking the whole for the

17   benefit of the partial?

18           MS. RIGGS:  What I would say instead is that by

19   offering you this explanation, one of Dr. Grofman's criticisms

20   might be how many times the NAACP plan split Chesterfield.  All

21   I'm saying is that's the sort of neutral, arbitrary,

22   disconnected criticism, and, in fact, it's -- there's an

23   on-the-ground reality that should explain it.

24           We shouldn't put these abstract concepts above, one,

25   fully and effectively remedying the racial gerrymander,

1    restoring black voters to the place they would have been but

2    for the gerrymander, and just understanding that that's not a

3    be-all end-all requirement.  So I'm not asking this Court to

4    know all of this or do all of this, but it's explaining why we

5    might have one more cut.

6            JUDGE KEENAN:  It seems to me that you are asking us

7    to go beyond the record in this case, because what you have

8    offered to us by way of explanation, while very logical from a

9    community standpoint, doesn't appear in this record.  So are

10   you, again, risking the whole for purposes of getting

11   perfection?

12           MS. RIGGS:  I think all we're asking this Court is to

13   say Dr. Grofman might have rejected the NAACP plan because it

14   split Richmond one more time, for example.

15           JUDGE PAYNE:  The question, though, is, look, this

16   case is going to go to the Supreme Court.  We all know that.

17   We issue an order, we do what you want, there's nothing in the

18   record to support it.  I can imagine nine justices being

19   somewhat disturbed about a district court opinion that is not

20   grounded in anything in the record.

21           I think that was the question, and your answer, I

22   don't think, dealt with that.  Would you mind addressing how we

23   deal with that?  In other words, how can we do something that's

24   not based on evidence -- that's not based on the evidence in

25   the record?

1          MS. RIGGS:  Well, I think there's some remedial

2    evidence that this Court has received in the course of this

3    process that, just like the *Covington* court accepted and the

4    Supreme Court -- the *Covington* court, just last year, made

5    findings based on evidence it received in a completely

6    analogous situation.  The parties briefed, offered evidence,

7    there was a hearing, you know, and that -- the fact-finding

8    that the Court made based on that proceeding was enough to

9    satisfy --

10          JUDGE PAYNE:  Where is that evidence in this case?

11    Not in your briefs, but where is the evidence?  I don't see it,

12    and it just may be there's so much paper here that I may have

13    overlooked it.  I understand your argument, but I don't see any

14    evidentiary grounding for it in the record that we have.

15          MS. RIGGS:  I think you are right, Your Honor.

16    There's not an attachment, an exhibit that outlines the

17    neighborhood of Church Hill, but what I would say is, what's

18    more important, in my mind, is this Court saying Dr. Grofman's

19    rejection of the NAACP, simply just because of the number of

20    county splits or city splits, that, alone, doesn't make the

21    NAACP's plan illegal or illegitimate, and we may choose to

22    adopt -- and we hope you will adopt the NAACP's plan, because

23    we think this is what fully unpacks the districts.  It's what

24    makes sure that the core of unconstitutional districts isn't

25    perpetuated, and it restores black voters to the place they

1   would have been but for the unconstitutional districts.

2          So I won't repeat what my colleague Mr. Hamilton

3   said, but I would reiterate there is no legal basis for this --

4   for Dr. Grofman's belief that a map must embody the minimum

5   number of changes or be narrowly tailored.  That is just not

6   supported in the law.

7          JUDGE PAYNE:  I thought the Supreme Court told us

8   that it had to be narrowly tailored.

9          MS. RIGGS:  The use of race needs to be narrowly

10  tailored, and there's a certain --

11         JUDGE PAYNE:  No, the remedy needs to be tailored to

12  address the offense as a general proposition in equity, and I

13  think the Supreme Court has said that applies in this case.  So

14  his urging that we proceed with something that is narrowly

15  tailored, doesn't that comport with what we're told to do by

16  the Supreme Court?

17         MS. RIGGS:  I don't think so, Your Honor,

18  respectfully.  A remedial map that changed districts in

19  northern Virginia would not be narrowly tailored to addressing

20  the problems this Court has identified, but I don't think it

21  means minimum changes or you can't change -- you have to

22  minimize the number of districts changed.

23         I think the Supreme Court has also charged any court

24  acting in equity to develop a remedy to fully remedy the

25  constitutional violations.  So I think we're all narrowly

1    tailored in the sense that the districts we're proposing to be

2    changed are in the areas where this Court -- and you broke it

3    into three geographic areas.  We're focused on that.  No one is

4    proposing northern Virginia districts.

5            Ultimately with that -- and Dr. Grofman is a renowned

6    and very talented political scientist.  He's not an attorney.

7    I think based on that misunderstanding, he has inadvertently

8    preserved too much of the cores of the unconstitutional

9    districts, and I think the *Covington* decision from the U.S.

10   Supreme Court last year is consistent with what I am arguing

11   here.

12           I want to spend just a few minutes focusing on

13   Richmond in part, because I think it will crystallize some of

14   what I'm talking about, and I also think that's where most of

15   the harm is wrought in preserving the cores of the

16   unconstitutional districts and failing to allow naturally

17   occurring additional opportunity districts to emerge; that is,

18   failing to allow black voters the voice they would have had

19   were they not packed.

20           So if you'll turn with me quickly to tab one in the

21   notebook that I handed to you, this is -- these are all maps

22   that were attachments to ECF 336, and they were in our brief as

23   well.  The left side is racial density maps, and the right side

24   is just shapes so that you understand.  But, ultimately, what

25   we have here is a district that was 54.87 percent BVAP that is

1    now 54.01 percent BVAP, and the way that Dr. Grofman adjusts

2    this district is simply by swapping VTDs from one

3    unconstitutional district to another.  So you have this set

4    of --

5              JUDGE PAYNE:  Whose district is 71?

6              MS. RIGGS:  We're looking at 71 right now.

7              THE COURT:  Whose district is it?  Is that McClellan?

8              MS. RIGGS:  I'm sorry.  I don't know the incumbent.

9              JUDGE PAYNE:  It's important who it is, because the

10   incumbent won with something like 78 percent of the vote.

11   That's part of what was considered, I think.  Are you saying --

12   you seem to be saying that the BVAP figure is too low here, and

13   when the incumbent won was huge -- may not have been

14   78 percent, may have been 60 percent, but it was an

15   overwhelming percentage that the plaintiffs touted throughout

16   their case, I think.

17             MS. RIGGS:  I'm sorry if I misspoke.  I actually

18   think the BVAP is still much too high.  So it went from 54.87

19   only down to 54.01, and it's because Dr. Grofman simply swapped

20   majority black VTDs from the east of the district from majority

21   black VTDS from the south of the district -- from District 70

22   which is itself an unconstitutional district.  He eliminates

23   the Henrico VTD split, so there's one fewer county split, but

24   there's no real effect on compactness.

25             And so ultimately, across these four unconstitutional

1    Richmond districts, what you see is swapping VTDs and

2    population between the unconstitutional districts but still

3    fencing out -- fencing in black voters in these four districts.

4    So the core of the district doesn't change, the packing doesn't

5    substantially change.

6              If you'll flip with me then to tab two --

7              JUDGE KEENAN:  You are saying the core of the

8    district doesn't change, but he eliminated that whole Ratliff

9    portion of Henrico, didn't he?  That's a huge change.

10             MS. RIGGS:  Well, if you look at some of what the

11   Court in *Covington* discussed and the Supreme Court affirmed --

12             JUDGE PAYNE:  Isn't the answer to that question yes,

13   that's a big change?

14             MS. RIGGS:  I don't -- I would not quantify that as a

15   big change to the core of the district.  If you look at where

16   the VTDs, the majority black VTDs in 71 in 2011, and if you

17   look at them in the special master's 1A version, which is the

18   same as his 1B version, it's not my assessment that that is a

19   significant enough change to undermine or end the perpetuation

20   of the racial segregation of black voters in Richmond.

21             And I think it's important to view these four

22   districts together, because he tends to swap between the four

23   districts, and you still have these four districts being very

24   heavily packed and white voters not being added to these

25   districts.

1        JUDGE PAYNE:  How many additional majority-minority

2   districts does the NAACP plan create?

3        MS. RIGGS:  It creates no new additional majority

4   black districts.  It naturally creates two districts that are

5   in the mid 40 percent BVAP districts which it is our

6   assessment, looking at election results and based on the people

7   who live there, that these are two additional House of Delegate

8   districts that will elect the candidate of choice of black

9   voters.

10        I think that's consistent with what Dr. Grofman

11   testified to earlier.  It's consistent with what the Princeton

12   gerrymandering project has suggested that districts in the

13   40 percent -- I think they say 37 and above --

14        JUDGE PAYNE:  Are you saying that your plan doesn't

15   create any more than 12 majority-minority districts in

16   Virginia?

17        MS. RIGGS:  I think it creates 14 districts that will

18   provide fair opportunity for black voters to elect their

19   candidate of choice.

20        JUDGE PAYNE:  Isn't that what we're talking about?

21   We're using the shorthand majority-minority districts.  You are

22   drawing a difference.  I don't understand what the difference

23   is I guess is what my question is.

24        MS. RIGGS:  It's a legal one.  I'm not standing here

25   today telling you that the two additional districts that we

1    believe will provide black voters an opportunity to elect their

2    candidate of choice are compelled by Section 2 of the Voting

3    Rights Act, and we didn't draw them purposefully, but when we

4    fully unpacked the districts that were packed in 2011, these

5    districts naturally occurred.

6         If you go back to *Personhuballah*, the additional

7    district that Dr. Grofman drew that ended up electing another

8    African-American member to the United States Congress, he

9    didn't purposefully draw that, but when he unpacked CD 3 fully,

10   that was a district -- it was in the 40 percent BVAP range, and

11   it created an opportunity, not a guarantee but it created an

12   opportunity for black voters to elect their candidates of

13   choice.

14        It's not -- no one is saying it's compelled by the

15   Voting Rights Act, but part of being fully remedial is allowing

16   compact natural districts to occur.  If you comply with

17   traditional redistricting criteria --

18             JUDGE PAYNE:  Slow down.

19             MS. RIGGS:  If you comply with traditional

20   redistricting criteria and end up with a 42 percent black

21   voting-age population district, and it elects a black candidate

22   for the House of Delegates, or to Congress in the

23   *Personhuballah* case, that is part of being fully remedial.

24             JUDGE KEENAN:  Let me ask you a question, Ms. Riggs,

25   and I'm going to ask the other lawyers the same question.  To

1   what extent in drafting the remedial plan does the Court give

2   consideration to Section 2 as well as Section 5, now-defunct

3   Section 5?  What extent do we consider either or both of those

4   in terms of our remedial plan?

5        MS. RIGGS:  I think you always have to consider

6   Section 2.  I'm not aware of any evidence in the record before

7   you that there are any additional districts required by

8   Section 2.  Now, you could have a district that violated

9   Section 2.  So, for example, one of our additional districts

10  that naturally emerged in the Richmond area was District 62,

11  and it was 43 percent .1 -- 43.1 percent black voting-age

12  population.

13       If you drew a map to purposefully frustrate the

14  natural occurrence of that district, you might have a violation

15  of Section 2 as intentional vote dilution or a 14th Amendment

16  intentional discrimination case, but under the effects clause

17  of Section 2, that district isn't compelled.  So I'm not aware,

18  and I'll admit I'm a nonparty, but I'm not aware of any

19  evidence that there are new districts required by Section 2.

20  Doesn't mean that there aren't, just there's no evidence of it.

21       Likewise, the legislature, when it drew the map in

22  2011, had a duty to comply with Section 5.  Sitting here today,

23  Section 5 is no longer applicable to the state of Virginia, but

24  I think that, again, this Court needs to -- in understanding

25  the remedy to the constitutional violation, needs to ensure

1    that because black voters were harmed by the segregated

2    districts that were drawn in 2011, that they should take care

3    to make sure that black voters don't end up in a position that

4    they're worse off than they would have been but for the

5    unconstitutional act in 2011.  So that's why I think it's

6    critically important, as Dr. Grofman testified and we agree --

7          JUDGE PAYNE:  Excuse me.  Are they worse off under

8    the plaintiffs' plan A or Dr. Grofman's plan 1A, Petersburg,

9    for Richmond 2 -- two for Petersburg, Peninsula 2, Norfolk 1A

10   than they were under the enacted plan according to you?

11         MS. RIGGS:  No.  So black voters in those 12

12   districts, the 12 districts at issue, I believe both the

13   plaintiffs' plan and Dr. Grofman's plan preserve the ability of

14   black voters to elect their candidates of choice, and so

15   they're not worse off.

16         That's a separate question, though, than whether Dr.

17   Grofman's plan fully remedies the racial gerrymandering and

18   allows these additional naturally occurring opportunity

19   districts to appear.  So it's a different question.

20         JUDGE PAYNE:  Who is worse off then?  You are saying

21   you think somebody is worse off.  Who is worse off if it's not

22   the people in the 12 districts?

23         MS. RIGGS:  It's the people in the districts

24   surrounding those 12 districts that haven't been -- at least in

25   Dr. Grofman's plan, the 12 districts haven't been sufficiently

1    unpacked, and so the people in those surrounding bleached

2    districts are worse off because they haven't been restored to

3    the position they would have been but for the segregated

4    districts.  If that answers your question.

5            JUDGE PAYNE:  I understand it's your theory.  What's

6    the evidence that supports that?  Have you got any evidence in

7    the record that would allow us to make a finding of that

8    nature?

9            MS. RIGGS:  We have evidence in the record that there

10   are additional districts now in our plan where black voters

11   would have a fair opportunity to elect candidates of their

12   choosing, and they are voters who would not have that

13   opportunity under Dr. Grofman's plan, and they didn't have that

14   opportunity under the 2011 plan.

15           JUDGE PAYNE:  I understand.

16           MS. RIGGS:  So then, to speed things along, I was

17   speaking about District 69 under tab two.  Again, this is one

18   where the 2011 version has a BVAP of 54.78 percent, and Dr.

19   Grofman's version has a BVAP of 54.38.  So this is, again, one

20   of those situations where we allege it's an insufficient

21   unpacking of this district.

22           I don't know the incumbent, but, Judge Payne, I

23   suspect you are right that whoever the incumbent is is winning

24   by enormous margins and that this district does not need to be

25   54.38 percent.  Again, what we see is in Dr. Grofman's module,

1    he swaps majority black VTDs from the east of the district and

2    switches them to ones from the south which is, again, from

3    House District 70 another unconstitutional district.

4           In tab three, we have District 70.  This is a

5    district that was 55.99 percent BVAP.  Dr. Grofman lowered the

6    BVAP to 54.38, but, again, we believe this is still an

7    insufficient unpacking of the 2011 maps.  He swaps -- makes

8    some swaps between 70 and 74.  This is a pattern we see that

9    tends to focus on making the swaps between the unconstitutional

10   districts rather than looking to the bleached surrounding

11   districts to fix the problem.

12          One way to think about it is this way:  In the

13   Richmond area, Dr. Grofman doesn't touch delegate Districts 27

14   or 68 which are each adjacent to two unconstitutional

15   districts.  So by making that judgment, by saying that that's

16   required for narrowly tailoring, you are really hamstringing

17   your ability to fully remedy these four unconstitutional

18   districts.

19          All of Dr. Grofman's districts in the Richmond area

20   have BVAPSs in excess of 52 percent, and I don't think there is

21   any evidence that that's necessary.

22          Lastly and quickly, if you'll turn with me to tab

23   four, this is a district that shape-wise has changed the most

24   significantly of the four districts in Richmond, and that's

25   because Charles City is given from District 74 to District 70

1    but, you know, from one unconstitutional district to another.

2    But what I'd point out to the Court is what I think is -- some

3    of the most damning evidence of racial predominance wasn't

4    really the inclusion of Charles City.  It was this oddly shaped

5    appendage that runs along the border between Richmond and -- in

6    Henrico along the border of Richmond city, and Dr. Grofman, he

7    lops off the Charles City portion but doesn't change that

8    really problematic part.

9         That's exactly quite similar to a house district in

10   *Covington*, house district -- I'm sorry, Senate district in

11   Guilford County where there was a lop-off of an arm, appendage,

12   but the main core, the main problematic part of the district

13   remained, and the district court there found the core of the

14   unconstitutional district was -- even though the shape got

15   better, the core was still there, so it perpetuated the harm

16   and needed to be fixed.  The Court, the Supreme Court summarily

17   affirmed that.

18        Lastly, one of Dr. Grofman's criticisms of the NAACP

19   map -- he had several, and I want to explain some of them.  You

20   know, he criticizes the NAACP map for changing 30 districts,

21   but as a matter of law, I don't think there's a minimum number.

22   If we had changed districts in northern Virginia that would be

23   a problem, but the difference between 30 and 26 and the

24   difference between creating two new districts which will likely

25   elect the candidate of choice of black voters versus only one

1    in the Grofman modules is significant enough that the

2    difference between 26 and 30 shouldn't be legally significant.

3            JUDGE PAYNE:  Do you have a case that holds that?

4            MS. RIGGS:  I think both *Abrams* and *Covington* stand

5    for that, that there isn't -- that fully remedying the

6    constitutional violation trumps minimum -- the number of

7    districts affected whether they are adjacent or nonadjacent.

8    That both of those cases stand for that proposition.

9            JUDGE KEENAN:  Aren't you trying to read too much

10   into *Covington*?  You keep reciting *Covington*, but wasn't the

11   whole point of *Covington* the fact that the concern for the

12   prohibition on mid-decade redistricting was not a fair

13   consideration of the remedial map?  Wasn't that the takeaway

14   from *Covington*?

15           MS. RIGGS:  Not at all, Your Honor.  There were two

16   parts to *Covington*, two parts that were appealed to the Supreme

17   Court.  One was that the district court had ordered the special

18   master's maps -- and I have that -- if you look at pages -- I

19   don't have the Reporter cite, but pages two and four discuss

20   the failure to racial gerrymander and the findings that the

21   district court made about the failure to correct the racial

22   gerrymander.

23           There was another part of *Covington* that isn't

24   related to this case, that it was about the prohibition on mid

25   decade redistricting.  I'm trying to focus Your Honors on the

1    first part of *Covington* which is about the Supreme Court

2    affirming the district court's decision to impose maps that

3    fully remedied the racial gerrymander.

4            JUDGE PAYNE:  Would you mind just turning to your tab

5    five and telling us what all that is about, please.

6            MS. RIGGS:  Yes.

7            JUDGE PAYNE:  How long do you think you have left,

8    because it's the lunch hour?

9            MS. RIGGS:  I think depend --

10           JUDGE PAYNE:  We don't want to arbitrarily cut off

11   people, but you've had a good slug, longer than the plaintiff.

12           MS. RIGGS:  Yes, Your Honors.  If there are minimal

13   questions, I think I have five more minutes.

14           JUDGE PAYNE:  Okay.

15           MS. RIGGS:  I want to answer the Court's questions.

16   We were somewhat confused by Dr. Grofman's chart, which is on

17   the left here, in which he essentially said, well, my maps are

18   just as good, create just as many new opportunities for black

19   voters as the NAACP's maps, and we struggled to understand.

20           All of the numbers on the right, it's a

21   demonstrative, but they all come from Dr. Grofman's chart on

22   the left.  The takeaway -- looking at this, the red highlighted

23   district numbers are the numbers that -- are the districts that

24   were unconstitutional --

25           JUDGE PAYNE:  75 wasn't.  You've got 75 in there, and

1   the Supreme Court upheld it, didn't they?

2          MS. RIGGS:  Yes, it did.  I apologize.  Maybe that

3   was challenged district --

4          JUDGE PAYNE:  Then what are the ones -- you are on

5   the right, your chart on the right, what does that mean?

6          MS. RIGGS:  So what we wanted to do was, in green,

7   our highlighting how the NAACP's map creates two new districts

8   in the forties BVAP percentage while both Dr. Grofman's 21

9   change module and 26th district change module only create one.

10          I simply wanted to point out that Dr. Grofman alleges

11   that every district that's in the 20 to 30 range is somehow a

12   benefit to black voters, and our position is that's not

13   necessarily the case, that there are lots of districts where

14   it's sort of legally and politically and practically

15   insignificant.

16          What we've done in our map is create three additional

17   of these yellow districts, but we can't tell from the data that

18   Dr. Grofman used whether any of his yellow districts are

19   actually districts that are one where black voters are having a

20   significant influence already or will have new influence that

21   they didn't have before.

22          The reason is we think that the reliance on the Obama

23   2012 election and the Fairfax 2013 election isn't that helpful,

24   in part because it's dated, in part I think, Judge Payne, it

25   was your point because those are even numbered election years,

1    not delegate election years.

2            So we talked to our clients about where in 2019, in

3    2021, where are black voters really going to have a new impact

4    where they didn't before.  So it's an apples-to-oranges

5    comparison without understanding that, and I think ultimately,

6    though, the main significance is that there are two green

7    highlighted boxes on the NAACP's plan and only one on both of

8    Dr. Grofman's.

9            To conclude -- I know I've gone long, and I

10   appreciate your tolerance -- ultimately, plaintiffs and the

11   NAACP agree that Dr. Grofman's plans are better than the 2011

12   plans, but, at bottom, that's not the burden on the Court here.

13   Court-drawn plans are held to a higher standard than

14   legislatively drawn plans.  That's the rule that's emerged from

15   *Wise v. Lipscomb* and *Johnson v. Miller*.

16           So it's this Court's duty to ensure that the maps

17   that you order into effect are fully remedial, that they

18   restore black voters to where they would be but for the

19   unconstitutional action in 2011.  We would ask that this Court

20   order the NAACP's map into effect or potentially instruct the

21   special master to go back and revise his maps in light of some

22   instructions about the legality of changing adjacent districts

23   or not having some goal to minimize the number of districts

24   changed.

25           JUDGE PAYNE:  The limit on changed districts comes

1    from the fact that you need an evidentiary base, a trial on the

2    merits as to whether or not there's an offense and what the

3    offense was, not from some arbitrary concept that the

4    limitation -- that there's a magic in limiting change, and the

5    Supreme Court has told us to do that.

6         MS. RIGGS:  Yes, that's correct, and on those 11

7    unconstitutional districts, that's right.  I'm talking about

8    the number -- I mean, redistricting is a domino game.  You

9    can't just change one district.  It's impossible.  If you

10   change one district, districts around it change, and what I

11   think Dr. Grofman misunderstood was that there was some

12   requirement that he minimize the number of surrounding

13   districts.

14        Judge Payne, you asked about District 75 of

15   plaintiffs' counsel, and I wanted to answer that very quickly

16   for you.  We do change House District 75.  It is immediately

17   adjacent to and underneath 63, and as we read this Court's

18   discussion of why race predominated in 63, we couldn't figure

19   out a way to fix that without changing 75.

20        I believe two out of the three versions of Dr.

21   Grofman's modules also change 75, and because you asked

22   plaintiffs, it's not our preference, but if we were asked to

23   select our choices of Dr. Grofman's modules, our preferred ones

24   are Richmond 1B, Petersburg 2, Peninsula 2, and Norfolk 1B.

25   Thank you, Your Honor.

1           JUDGE PAYNE:  Thank you.  We'll take one hour for

2     lunch and be back at 2:10 and hear the rest of you.

3

4           (Luncheon recess.)

5

6           JUDGE PAYNE:  All right, who is next?  Who wants to

7     go next?  Mr. Braden, Ms. McKnight?

8           JUDGE KEENAN:  Ms. McKnight, if you'd be kind enough

9     to incorporate into your comments to what extent do we consider

10    Section 2 and Section 5 of the Voting Rights Act.

11          MS. McKNIGHT:  Good afternoon, Your Honors.  We have

12    some new friends with us today.  In considering how long we

13    have been together in this case, four years, two trials, a few

14    reminders bear noting.  First, this is not a case about

15    malevolent intent.  Even plaintiffs agree that the map-drawers

16    in 2011 did their best and had no ill intent.

17          The only dispute in this case is about whether race

18    predominated in drawing that map, and, if so, whether the

19    resulting map is narrowly tailored to an appropriate end.  So

20    this also is not a case about packing black voters into one

21    voting district or cracking them among many.

22          The map at issue was not found to, quote unquote,

23    pack black voters into as many districts as possible or

24    bleaching surrounding districts.  Indeed, half the challenged

25    districts in this case going into map-drawing were above

1    55 percent BVAP, and half were below.  Let me put that another

2    way.  Half of the challenged districts in the enacted map had

3    BVAP that dropped.  Half had BVAP that increased, and that's an

4    important reminder particularly considering some of the

5    argument that we just heard before the lunch break.

6         It's also important because that was part of the

7    underpinning of this Court's finding that some of the

8    challenged districts here acted as, quote unquote, donor

9    districts, and other of the challenged districts acted as

10   recipient districts.  The only way a district could be a donor

11   district is because the BVAP was understood to be higher than

12   the BVAP it was drawn at in 2011.

13        So, again, we've seen discussions not only today but

14   in the pleadings in this remedial phase of this matter with the

15   phrase undoing packing or a focus on packing voters.  But,

16   again, packing is not what is being remedied in this case, and

17   a focus on race in order to unpack black voters commits the

18   same sin that this Court identified in June.

19        Indeed, the decision to move black voters from a

20   district where they are able to elect their candidates of

21   choice to a district where they cannot simply because they are

22   black is, itself, a violation of the Constitution and the

23   Voting Rights Act.  I will get back to this point as you will

24   see it in nearly every map proposed by others in this remedial

25   phase, and critically you see it throughout the maps proposed

1    by the special master.

2            This is also not a case where the Black Caucus and

3    the House of Delegates did not support this plan.  They did.

4    In fact, if you recall from trial, and it's in the trial

5    record, Delegate Dance and Delegate Spruill, senior members of

6    that caucus, testified rather passionately on the floor of the

7    House in 2011 not only in support of the enacted plan but in

8    support of at least 55 percent BVAP in the districts, in the

9    challenged districts.

10           Finally, this is not a case about whether the

11   challenged districts violate traditional districting

12   principles.  They do not.  This Court found they do not, and

13   the Supreme Court did not disrupt that finding on appeal.  So

14   what are we tasked with remedying here?  There appears to be,

15   and I'll venture to say there is a fundamental misunderstanding

16   of what must be remedied at this stage.

17           Let's start with the Court's own language.  Last

18   June, this Court issued an opinion finding that the equal

19   protection clause of the United States Constitution had been

20   violated because, and I quote, the state has sorted voters into

21   districts based on the color of their skin.

22           On narrow tailoring the Court found, again, quote,

23   the legislature made no effort to determine whether the

24   mechanical 55 percent racial threshold was required to comply

25   with the VRA and, instead, arbitrarily applied the same racial

1   mandate to 12 vastly dissimilar districts.

2          What this means is that any proposal that sorts

3   voters into districts based on the color of their skin is no

4   remedy here.  It also means that any proposal that applies a

5   mechanical 55 percent racial threshold to 12 vastly dissimilar

6   districts is also no remedy here.

7          The only proposal made by the special master, Dr.

8   Grofman, violate both rules and, therefore, cannot be remedies

9   here.  Dr. Grofman's proposals sort voters by race, and they

10  apply a mechanical racial threshold.

11         JUDGE PAYNE:  I thought the sorting occurred because

12  of the traditional redistricting principles, and then it was

13  verified what the consequence was.  And the consequence appears

14  to be, in part, as you say, but if the consequence is as you

15  say and there is no intentional application of race in the

16  process, how could his proposals violate the Constitution?

17         MS. McKNIGHT:  Your Honor, Dr. Grofman has denied

18  that he used a 55 percent ceiling earlier today.  But his

19  report shows otherwise.  The numbers of his districts on his

20  districts show otherwise, and the geography shows otherwise.

21         JUDGE PAYNE:  Doesn't the report show that there was

22  a ceiling, not that he arrived at that ceiling as part of the

23  process of redistricting?  Isn't that the nubbin of the whole

24  remedy issue here?

25         MS. McKNIGHT:  I see, Your Honor.  The issue is his

1    report -- Dr. Grofman takes the position that all of his

2    districts naturally fall below 55 percent.  But that is

3    contrary to the geography at issue in this case, and what I

4    mean by that is, number one, first look to the Court's own

5    opinion which found donor districts.

6            What that means when the Court finds, quote unquote,

7    donor districts is that there are areas of the state where BVAP

8    is higher than 55 percent, and the Court found that those areas

9    had to be drawn in a particular way with race predominating

10   line-drawing in order for the districts to be closer to

11   55 percent; number two, to show you examples of how geography

12   in the state naturally creates districts arriving above

13   55 percent BVAP.  An example is included -- would you like me

14   to refer to you now?  I'm happy to keep going.

15           JUDGE PAYNE:  Whatever you want to.

16           MS. McKNIGHT:  Let me reference for the record where

17   that example exists.

18           JUDGE KEENAN:  Let me also ask you as you are doing

19   that, Ms. McKnight, in order to accept your position, would we

20   have to make an adverse credibility finding regarding Dr.

21   Grofman's testimony today?

22           MS. McKNIGHT:  Let me address that first, because

23   obviously that has meaning to us as lawyers and as

24   representatives to this Court.  First let me state that we have

25   the utmost respect for Dr. Grofman.  He has an incredible

1  amount of experience in this field, and we do not seek to

2  either denigrate his character or suggest he is somehow lying.

3         I think this is best laid out in our brief, and this

4  is tab four of the binder I shared with you.  There we

5  detail -- let me pull up the page.

6         JUDGE KEENAN:  I don't think you are starting off

7  with an answer to the question.

8         MS. McKNIGHT:  The answer is no.

9         JUDGE KEENAN:  You are saying we don't have to make

10  an adverse credibility finding in order to accept your

11  position?

12         MS. McKNIGHT:  Correct.  You do not need to make an

13  adverse credibility finding.  I believe that, and I want to be

14  exact here if you'll bear with me for a moment.  We have gone

15  through his reports.  We made the assertion he's applied a

16  ceiling.  He came back in his reports and made certain

17  statements about that ceiling.

18         We think he never denied that there was a

19  consideration of 55 percent BVAP.  In fact, he said pick my

20  plan, it stays below 55 percent BVAP.  Don't pick any other

21  plans, including some of plaintiffs', including of some NAACP's

22  plan, including defendant intervenors' plans because they all

23  go above 55 percent.

24         When we read that, we see him as applying a ceiling,

25  a 55 percent ceiling.  He thinks you should pick his, avoid

1    others, because 55 percent ceiling is appropriate in this case.

2           JUDGE KEENAN:  But he did state today no intended

3    55 percent ceiling.  That was his testimony today as my notes

4    reflect.  So that's why I'm concerned.  It seems to me it might

5    be a binary choice here for the Court that you are offering to

6    us, that we have to make an adverse credibility finding if we

7    are to accept your position.  We'll check the record, of

8    course, and see whether my notes bear it out.

9           MS. McKNIGHT:  Okay, Your Honor.  Well, I will check

10   the record as well.  I see his testimony today as not very

11   different from the same testimony you heard or similar

12   testimony you heard from Delegate Jones saying that there was

13   an idea that 55 percent was important, but he did not believe

14   that all of the districts he drew exceeded 55 percent.  He

15   believed a few of them were below.  So I considered it as very

16   similar to Delegate Jones' testimony on that point.

17          JUDGE PAYNE:  But isn't it the case that we have

18   before us, both in the report of Dr. Grofman and in the

19   testimony, what he says is he drew these districts with race

20   not at issue, and he arrived at them applying good government

21   principles and the standard, the traditional redistricting

22   factors?

23          Then, after he did that, he looked at what that

24   yielded to determine what BVAP showed up there, and that's how

25   the BVAP in this case got where it got.  And that was because

1    the traditional factor application produced that result upon

2    examination.  And he was asked, after he did a check of his

3    work respecting the -- what he saw the BVAP had resulted in

4    whether he made any changes, and he answered that fully that he

5    made a couple of changes -- he had made a couple of changes

6    based on incumbency, and then after that he made no other

7    changes based on race.

8            And if that's the case, then I think what Judge

9    Keenan's question asks and what comes to my mind as well is, if

10   we are to accept your proposition that there was the

11   intentional use of race, not malevolent but intentional use of

12   race in arriving at these districts, we have no choice but to

13   disbelieve him and accept what you are arguing is the

14   circumstantial evidence that shows that notwithstanding what he

15   testified to, he really did use race, and I think that's

16   what -- I think, for me at least, that's something that I think

17   I'd like to hear you address in your remarks.

18           MS. McKNIGHT:  Thank you, Your Honor.  First of all,

19   you heard very similar testimony, if not identical testimony,

20   at trial in this case from both Delegate Jones and from John

21   Morgan which was we drew the plan, we focused on traditional

22   districting criteria, we took input from incumbents, we took

23   input from public hearings.  I could go on and on, but I think

24   you get the point.

25           JUDGE PAYNE:  Right, and I accepted that testimony as

1    credible, and the majority said that's not credible, and the

2    total -- and rejected it because of the evidence,

3    circumstantial evidence that shows up in those various points

4    that were referred to in one of Mr. Braden's examinations, and

5    in perspective -- considering those in perspective of the

6    statements that had been made on the House floor and otherwise.

7         So there, the lynchpin of this case is a credibility

8    determination -- I mean at the trial level, in essence.  So if

9    we are not to judge Dr. Grofman's testimony, credibility

10   adversely, then how do we come to accept your position I think

11   is the question.

12        MS. McKNIGHT:  Fair enough.  Your Honors, clearly,

13   and pardon me.  Clearly we did not agree with the majority of

14   this Court when they made their credibility determinations.

15   Candidly, we have a different position on what makes up a

16   credibility determination in testimony about these cases.

17        JUDGE PAYNE:  Sure, and you can talk to the Supreme

18   Court about that.  That's fine.  That's just the way it all

19   works.  Some of us reach one decision, some reach the other,

20   and that's what appellate courts sort out when trial courts

21   make those decisions.

22        MS. McKNIGHT:  Right, and pardon me, Your Honor.

23   This is not to be pointed to the majority of the Court.  I just

24   want to lay that foundation for the next point which is to the

25   extent you are going to apply a standard to Delegate Jones that

1    his testimony is not credible on these issues, you must apply

2    the same standard to Dr. Grofman that goes through the

3    analyses, that goes through what he says was his primary intent

4    and what was his secondary or third or fourth intent.

5         So to the extent the Court is consistent with its

6    position that when someone says, I drew a map with all of these

7    other priorities in mind, and then I checked the BVAP on the

8    back end, to the extent that is not credible, you need to apply

9    that same standard to Dr. Grofman and find that his testimony

10   on that point is not credible either.

11        JUDGE KEENAN:  Ms. McKnight, I promise this will be

12   the last time I interrupt you, but Dr. Grofman didn't turn

13   District 95 into a frying pan handle with blacks and whites

14   separated by a highway with apartment buildings on one side and

15   single-family residences on the other side.  So how can you say

16   because one person said they didn't consider race and the other

17   said they didn't consider race that the application is the

18   same?

19        It seems to me we've got to look at the results, too,

20   what did Dr. Grofman do with the district as opposed to what

21   did the intervenors do with the district, don't we?

22        MS. McKNIGHT:  That's an excellent point, and as you

23   recall on the record, there were a number of other reasons why

24   District 95 was drawn that were not related to race.  Also, in

25   this remedial phase, what you'll see, and I can show you a

1    couple of examples, but its throughout his plans.  There are

2    decisions that Dr. Grofman made that are not consistent with

3    traditional districting criteria.  There are decisions he made

4    to move black communities out of performing districts and into

5    nonperforming districts.  There are decisions he made that

6    should be very concerning to this Court.

7         So just as when I talk -- you question whether we

8    should apply the same standard.  You indeed should apply the

9    same standard.  If you're going to apply that rigorous of a

10   standard to Delegate Jones who drew this map, received super

11   majority and bipartisan support in the legislature to have it

12   passed, you should apply that same rigorous standard to Dr.

13   Grofman who candidly, based on something that we asked and

14   other parties asked in this court, performed a very difficult

15   task in a very short period of time.

16        So I want to be fair to him, but that does not mean

17   you should ease the standard on him or on the map you plan to

18   adopt.

19        JUDGE PAYNE:  I don't think we should use the

20   standard at all, but, at the outset, you told us that you are

21   not attacking Dr. Grofman's credibility, and in order to follow

22   the line that you are pressing with that argument, we have to

23   make a credibility determination.  We have to find Dr. Grofman

24   did things that had racial consequences and did that

25   intentionally; right?

1          MS. McKNIGHT:  That's correct, Your Honor.

2          JUDGE PAYNE:  Okay.

3          MS. McKNIGHT:  That's correct.  Let's look at a few

4    examples.  These won't be new to you.  You looked at them

5    earlier today.  I'll try to be clear.  I will raise two

6    examples with you.  I'll identify the two pages at the outset

7    where to find them, I'll wait for you to find the pages, and

8    then I'll go on, and I'll try to keep this fairly streamlined.

9          I am looking in the hearing binder -- this is

10   defendant intervenors' hearing binder.  I am looking at tab

11   four, and I'm going to show you pages in Exhibit C and D.  So

12   if you could flip to those exhibits --

13         JUDGE PAYNE:  They are back in the back.

14         MS. McKNIGHT:  Correct, Your Honor.  This is tab

15   four, this is docket number 337, and I am looking at Exhibit C,

16   page two of two, in the ECF header.

17         JUDGE PAYNE:  That's docket 337-3.

18         MS. McKNIGHT:  Correct.  I'm also looking at Exhibit

19   D, and, here, this is document number 337-4, and I'm looking at

20   page three of 14.

21         JUDGE PAYNE:  All right.

22         MS. McKNIGHT:  You have already looked at this with

23   Dr. Grofman's examination, but let me set the stage.  Exhibit C

24   is showing you HB 7002 compared with the special master's

25   Petersburg 2.  This is meaningful because Dr. Grofman has

1    identified Petersburg 2 as somewhat of a consensus map.

2    Plaintiffs, the NAACP, and others support Petersburg 2.

3         As you know, Dr. Grofman received proposed maps from

4    other parties before he drew his map.  So he received HB 7002.

5    So when we looked at his Petersburg 2 and compared it with HB

6    7002, it was remarkable that most of his changes were identical

7    to HB 7002.  He got rid of that so-called finger that extended

8    out of HD 75 or that was in HD 63.  All of the yellow part of

9    this map is consistent between HD 7002 and the special master.

10        What is different is what I'd like the Court to focus

11   on.  HB 7002 is the portion of the map that is yellow and red.

12   It makes up a relatively tidy district.  It's highly compact,

13   both visually and by numbers.  It hits population just right.

14   Traditional districting criteria is met.  You see a lack of VTD

15   splits.

16        What's interesting is that Dr. Grofman chose to split

17   the Winfrees Store VTD -- and that is shown in Exhibit C,

18   document 337-3, page two of two -- down the line between the

19   yellow portion of the map and the red portion of the map, and

20   once he had done that and gotten rid of the red portion of the

21   map, he had to get the population from somewhere else.  And he

22   got it up in the northwest corner in a section you can see

23   marked Winterpock.  That whole green area is added to the

24   special master's plan.  As you can see, this adjustment

25   decreases compactness and splits a VTD.  Those two points

1    should be fatal.  But it's even worse.

2         If you go to Exhibit D, document number 337-4, page

3    three of 14, you'll see the same outline of the special

4    master's Petersburg 2 detailed here, and you'll see that where

5    he decided to split the VTD is precisely along the border with

6    a black community.  He has moved that community outside of HD

7    63 and, instead, reached up over into the northwest and

8    captured a large amount, large swaths of communities where

9    there are very low BVAP numbers.

10         Why did he do this?  These are the same questions the

11   Court asked of Delegate Jones at trial, and this analysis that

12   I'm walking through is the same that was done at trial.  So I

13   can appreciate that someone new to this case may feel that my

14   looking at these maps in this way is somehow unfair or

15   irrelevant.  It's just a VTD split after all.

16         But this is precisely the type of analysis that was

17   advanced by plaintiffs at trial and that was adopted by this

18   Court.  VTD splits matter.  Where they were split, why they

19   were split, they matter.  Even where the map drawer says I did

20   not split that based on race-based reasons, if the map shows

21   different, it's likely different.

22         Now, Dr. Grofman testified he minimized VTD splits.

23   He said they are minor, they are usually technical, but, again,

24   this is not enough according to this Court.  It's not enough,

25   according to plaintiffs, to show a lack of racial predominance.

1          JUDGE PAYNE:  Let's assume for the moment that upon

2     analysis, we see each of the special master's recommendations

3     as containing a racial effect that is exactly what you say it

4     is.  Is that sufficient to render it unconstitutional and,

5     therefore, an improper remedy which is what you argue?  You

6     want.  You want a remedy.  You say it's intentional.  Suppose

7     we just find, well, it happened, we buy the testimony, and we

8     say this is how it happened, but we're not going to find that

9     there's -- wasn't any intent to it.  Intervenor defendants are

10    right, that's exactly the result they argued for and said was

11    right.  What happens then in our remedy decision?

12         MS. McKNIGHT:  Pardon me, Your Honor.  What happens

13    if you decide that he did have an intent --

14         JUDGE PAYNE:  No, we can't find any evidence -- let's

15    suppose we find no evidence of intent, but there's beyond

16    question the racial effect that you talk about; that is, the

17    consequence of the split results in the racial divisions of

18    about which you speak.  Let's suppose we buy all of that, but

19    we don't find that it was accompanied by an animus.  Is that

20    sufficient to render -- you say then that because there's this

21    racial effect accompanied by intent, it's unconstitutional just

22    like the original unconstitutional finding of the majority.

23    But what happens if the intent element is not present?  What

24    happens to your argument?

25         MS. McKNIGHT:  Well, Your Honor, I think you would

```
 1   need to focus on whether -- first, whether it remedies the
 2   violations.  Is it a remedy.  Whether you agree with us about
 3   intent or not, there still needs to be a focus on do these
 4   districts remedy, and we don't think they remedy the violation.
 5         The next example I'd like to bring you to, and the
 6   final one and I'll move on, is HD 92.  We are still in tab
 7   four.  I am now going to look at Exhibit D which is document
 8   number 337-4 at page 13 of 14, and I'm going to look at Exhibit
 9   B, page 21 of 24.
10         JUDGE PAYNE:  That's Newport News?
11         MS. McKNIGHT:  Your Honor, this is District 92.
12   So --
13         JUDGE PAYNE:  Exhibit B, which page?
14         MS. McKNIGHT:  21 of 24 in the ECF header of Exhibit
15   B.
16         JUDGE PAYNE:  Page 13 for me of D is entitled Newport
17   1A-HD 92 percent black by block, and page 21 of Exhibit B is
18   Peninsula 1A-HD enacted with special master; is that right?
19         MS. McKNIGHT:  That's correct, Your Honor.  Thank
20   you.  Here, again, by reviewing these two maps, you will see
21   heavily populated higher BVAP Hampton city is removed from HD
22   92 and placed in HD 91, an admittedly, by all sides,
23   nonperforming district.  It bears noting that this portion of
24   Hampton city has been in HD 92 for decades.  So why --
25         JUDGE PAYNE:  Is it a split of Hampton city, or you
```

1    say -- one time you referred to it as a portion of Hampton

2    city, and the other time you say they moved Hampton city.

3    Which is it?

4              MS. McKNIGHT:  Your Honor, I think this may hinge on

5    our agreement with plaintiffs, after looking at the map, about

6    the boundaries of Hampton city.

7              JUDGE PAYNE:  What is your view?

8              MS. McKNIGHT:  I believe it's a majority of Hampton

9    city.  I think you see it by the map.

10             JUDGE PAYNE:  All right.

11             MS. McKNIGHT:  So why did Dr. Grofman do this?  He

12   tells us that his drawing of HD 92 naturally falls at or below

13   55 percent.  But as we've shown in our pleadings, in both

14   exhibits attached to it and in the brief itself, there are many

15   ways of drawing HD 92.  Most of them fall above 55 percent.

16   What I mean by that:  If you turn to page 11 of 30 in tab four,

17   so this is tab four, docket 337.

18             JUDGE PAYNE:  Is this 4-D?

19             MS. McKNIGHT:  This is four.  This is just the brief

20   behind tab four.

21             JUDGE PAYNE:  Oh, okay.

22             MS. McKNIGHT:  So this is page nine of the brief, but

23   docket number 337, page 11 of 30, you'll see here a description

24   of the problem of what we're trying to identify for the Court.

25   The benchmark version of HD 92 is over 60 percent.  The enacted

1   version of HD 92 was also over 60 percent.

2         Exhibit A to this brief shows you three examples of

3   highly compact districts within Hampton city that all fall

4   respectively at 58.37 percent BVAP, 60.28 percent BVAP, and

5   60.72.  I'm spending time on this point because it is important

6   to understand when Dr. Grofman talks about natural districting,

7   there are ways, natural districting ways to draw these

8   districts where they fall above 55 percent, and 92 is an

9   example of not only a way it can be done but a way where the

10  geography of the district dictates a district above 55 percent.

11  It's shown by the benchmark plan, the enacted plan, these three

12  examples.  You can look at all of them.

13        JUDGE PAYNE:  The geography meaning keeping the city

14  together.  Is that what you are talking about?

15        MS. McKNIGHT:  It's partly keeping the city together.

16  It's also partly -- and if you look at Exhibit A, the examples

17  there, what you see here are different ways to draw this

18  district where it captures parts of the city that have been in

19  HD 92, again, for decades.

20        JUDGE PAYNE:  Does it split the city?

21        MS. McKNIGHT:  I don't believe it does, Your Honor,

22  but I believe this is wholly within the city.  But, Your Honor,

23  I will need to check.

24        JUDGE PAYNE:  All right.

25        MS. McKNIGHT:  The point being that there are

1    districts, and this goes back to the Court's donor and

2    recipient finding in this case.  There are areas of this state

3    where BVAP in districts naturally falls above 55 percent.  This

4    is so in HD 92.  I'd like to ask you to turn to tab four,

5    Exhibit G.

6             Now, in this exhibit, we have spared the Court about

7    74 pages of data output from the different plans from the

8    special master and only included the page with the averages.

9    For the record, those charts are on file with the Court at this

10   docket number, 337-7, pages three through 74.  The reason I'm

11   drawing your attention to this section of the brief is because

12   it is remarkable that the special master who was asked to draw

13   a plan to remedy violations found in 11 districts has somehow

14   changed non-challenged districts more than challenged

15   districts.

16            These percentages here that he changed non-challenged

17   districts 33.53 percent and changed challenged districts

18   31.21 percent on average, which means there are a lot of

19   districts above those numbers that were changed, that were

20   changed at a rate above those numbers, represent real people.

21            In non-challenged districts, Dr. Grofman has moved

22   26,743 voters into new districts.  I want to pause here for a

23   moment.  When we talk about a core retention, we often focus on

24   district numbers, is 66 like the old 66, and we often focus on

25   incumbents.  We don't always recognize that we are talking

1    about people and where they expect to vote, who they expect to

2    vote with, and who they expect to vote for.

3            In Dr. Grofman's proposed plans, on average he moves

4    26,743 people in non-challenged districts into new districts.

5    As for the challenged districts, he moves 24,809 people.  All

6    those expectations I was just describing has just changed or

7    will change for over 24,000 people in challenged districts.

8            Now, it is possible to remedy the violation

9    identified by the Court, comply with traditional redistricting

10   criteria without disrupting the electoral expectations of so

11   many people.  It's possible to do this, too, so that more

12   changes are made within the challenged districts where people

13   know their districts are challenged and may expect some change

14   than in non-challenged districts where people do not have the

15   same understanding.

16           On this point, I'd refer you to tab four, our brief.

17   This is docket number 337, page 27 of 30.  Here, you will see

18   the numbers for HB 7002 where, on average, about 18,500

19   residents will be affected in challenged districts and about

20   14,400 in non-challenged.

21           JUDGE PAYNE:  What page did you say?

22           MS. McKNIGHT:  This is document number 337, page 27

23   of 30.

24           JUDGE PAYNE:  Using the ECF system?

25           MS. McKNIGHT:  Correct, Your Honor.

1           JUDGE PAYNE:  What plan is this?

2           MS. McKNIGHT:  This is HB 7002.  The first full

3    paragraph compares the changes made on average in the special

4    master's plan to the changes made on average in HB 7002.  We

5    urge the Court to recognize that this kind of change for voters

6    is meaningful to them and disrupts their expectations.  So

7    limiting the number of residents who are impacted by this new

8    plan is something for the Court to consider and hold as

9    important.

10          While I'm on this point, Dr. Grofman conceded this

11   morning that he did not look at core retention, and, again,

12   oftentimes people think of core retention just in terms of the

13   district's shape or the incumbent and don't consider the number

14   of voters who are affected.

15          Counsel to the NAACP discussed core retention as well

16   and had a concern about returning voters and residents to the

17   place they were without the harm that was found by the Court.

18   On this point, it's necessary to understand that core retention

19   in the enacted plan was very high, meaning that these cores

20   predate the harm that the Court found.

21          I'd like to talk briefly about HB 7002.  It addresses

22   the most violations and is the least changed plan on the

23   record.  It is our position that the only way to draw Dr.

24   Grofman's plan is by using a racial goal, a 55 percent BVAP

25   ceiling, and it's evident in at least the districts that were

1   considered donor districts and now have under 55 percent BVAP

2   in his proposed remedy.

3        His decision to draw the districts in this way had a

4   direct and significant impact on the drawing of the lines.

5   This is prohibited.  See the Alabama case out of the Supreme

6   Court.  Plaintiffs' counsel earlier today minimizes this

7   Court's detailed opinion.  He claims that defendant

8   intervenors' effort to comply with it amounted to tidying up a

9   crime scene.  Quite the opposite.  This Court's opinion details

10  the harm that it believes voters suffered in these districts.

11       The only way to alleviate that harm is to -- and to

12  place the harmed in the position they would have been in

13  without the violation, which is what counsel for the NAACP just

14  asked for, is by fixing these flaws that the Court found in its

15  June opinion.

16       JUDGE KEENAN:  But the Supreme Court also injected

17  the concept of the holistic analysis and how we have to look at

18  the district as a whole.  So in terms of a remedy, how do we

19  balance that with what you are pointing out as you see the need

20  to correct the technical or the intentional, whichever issues?

21       MS. McKNIGHT:  Thank you, Your Honor.  I don't see

22  those two as exclusive of one another.  I think the Court must

23  remedy the harm that it identified.  It would be no remedy even

24  if holistically a district looked fine, which, candidly, was

25  our position of enacted districts at trial, if that district

1    does not remedy the harm that the Court found, and in many

2    cases, there are lines that are carried over, not just any line

3    but lines that this Court identified as showing improper racial

4    motive and as harming voters and residents.  Those lines are

5    carried forward in the special master's plans, and that is a

6    concern.

7            In case it isn't clear, only HB 7002 retains 12

8    majority-minority districts.  I saw some questions of this to

9    the counsel to the NAACP about how many majority-minority

10   districts exist in the NAACP proposed plans.  The answer, by

11   our reading of their brief at docket 286, page eight of 29, is

12   three.  Three majority-minority districts.

13           JUDGE PAYNE:  Three new ones or three total?

14           MS. McKNIGHT:  Total.  Again, that's docket 286, page

15   eight of 29.  Your Honor, I just ask indulgence for a few more

16   minutes.  I believe I only have about five or ten more minutes

17   absent questions.

18           As you know, this is a case about motive, it's a case

19   about intent.  We can't go back and remedy what was in the

20   minds of map drawers in 2011 just as we can't go back and

21   remedy what was in -- remedy what was in Dr. Grofman's mind in

22   drawing his own maps.

23           The only way to remedy the harm that the Court found

24   is by addressing what the Court found to be the direct and

25   significant impact of that motive.  HB 7002 is the only

1   proposal that does this.  No other plan put before you by any

2   other party or nonparty in this remedy phase even suggests that

3   they tried to address the problems, the harms identified by

4   this Court.

5        I'd like to get to your question, Judge Keenan, about

6   Section 2 and Section 5.  I would urge the Court to go back to

7   our briefing on this matter.  As you can appreciate from

8   argument today, from the briefing, this is a complicated area,

9   and, candidly, the ground has shifted even in the past few

10  years, even since *Personhuballah*, even since 2011 when the map

11  was drawn.

12       So I urge you to rely on arguments in our briefs, but

13  let me say this:  On Section 2 -- and for reference, one of the

14  areas where we lay out where we see the burdens lying is in

15  docket 327, pages 15 to 21 of 30.

16       For your reference, this is in the hearing binder I

17  provided the Court.  It's at tab three in the hearing binder.

18  That's where our brief is.  Again, the pages are 15 of 30 to 21

19  of 30 in the ECF header.

20       Candidly, we view Dr. Grofman as having two choices

21  as to Section 2.  He can either look at the districts at issue,

22  decide that *Gingles* elements are met and draw districts at

23  50 percent BVAP or higher.  The second choice is he can look at

24  the *Gingles* elements and the factors and decide that they are

25  not met, and then he should not consider race.  Those are his

1    choices.

2           Instead, he got himself into a position of finding --

3    we believe he found them, or at least suggesting that *Gingles*

4    elements are met but then drawing districts below 50 percent.

5    Again, I urge you to look at our brief, but this is

6    problematic.

7           Now, as to Section 5, as we know, it is no longer

8    applicable, but it was certainly applicable in 2011.  And it

9    prohibits retrogression without further analysis, specifically

10   analyses of racial block voting, also racially polarized

11   voting, without that analysis.  The House of Delegates was

12   required to draw districts above 50 percent.  It could not draw

13   --

14          JUDGE PAYNE:  The retrogression provision of the VRA

15   is in Section 5; right?

16          MS. McKNIGHT:  Correct.

17          JUDGE PAYNE:  Is it dead?  Is that part of Section 5

18   dead?  If it is, why do we consider it at the remedy stage at

19   all, and what purpose is there in going through this whole

20   process of looking at BVAP if that section doesn't stay alive?

21          MS. McKNIGHT:  Well, you still need to look at BVAP

22   for Section 2.

23          JUDGE PAYNE:  But this case doesn't involve

24   Section 2.

25          MS. McKNIGHT:  For a remedy, in drawing a remedy.

```
1              JUDGE PAYNE:  But in terms of Section 5, it was one
2     thing to say the Court -- the General Assembly had to apply --
3     live by Section 5 when it submitted its plan, and we had to
4     assess whether compliance with Section 5 was a legitimate
5     state, a compelling state interest.
6              It's quite another to say that a dead section of the
7     law applies in applying a remedy, and I don't see that any of
8     you have addressed either one of those questions at all and how
9     that applies to where we stand now, or is it that the only
10    thing of Section 5 that's dead is the preclearance requirement?
11    In other words, what did Shelby County do?  Did it eliminate
12    Section 5 completely?
13             If it did, why are we even considering it in the
14    remedies stage of this hearing?  I don't see that addressed in
15    the brief, or if it is, I didn't read it right or it was
16    obliquely presented.  Can you help me out with that?  I
17    intended to ask Mr. Hamilton and neglected, but I'll give him a
18    chance later.
19             So your position is -- Mr. Braden is over there
20    shaking his head -- is that Section 5, the retrogression
21    provision, is dead and is of no effect by virtue of Shelby
22    County and we don't pay any attention to it.  Is that your
23    position or not, or do you want to go talk with him?
24             MS. McKNIGHT:  Pardon me, Your Honor.  I beg your
25    indulgence.  Sorry, Your Honor, I wanted to confirm before I
```

1    went out on a ledge I had not discussed yet.  For purposes of

2    remedy, it is dead.

3              JUDGE PAYNE:  So that means then that we do not have

4    to consider any retrogression issue at all; is that right?

5              MS. McKNIGHT:  That's our understanding.

6              JUDGE PAYNE:  But we do have to consider whether a

7    remedy operates to produce dilution of the vote in any area;

8    right?

9              MS. McKNIGHT:  Correct.

10             JUDGE PAYNE:  Nobody has talked about all this in

11   their briefs.  We talk about -- we need to adjust BVAP because

12   why?  Because you have to adjust BVAP because that prevents

13   retrogression.  But if you don't have to prevent retrogression,

14   why do you even have to deal with BVAP?  Why don't you just

15   analyze the whole thing as a dilution issue?

16             Those are questions that I have about the whole case,

17   and I didn't see it addressed in the brief.  Until you started

18   arguing, I thought, well, maybe I just didn't understand *Shelby*

19   *County*, but at least now I understand it the way you understand

20   it, or I think I do.  So I'll be quiet and give you an

21   opportunity to speak on the topic.

22             MS. McKNIGHT:  Well, thank you, Your Honor.  Your

23   points are well taken.  Candidly, I was addressing Section 5.

24   I want to address it based on a question about Section 2 and

25   Section 5.  We'll hear from Mr. Hamilton what he believes about

1    whether retrogression applies in the remedy phase.

2          As far as whether or not to look at BVAP, I do think

3    that it's still part of the analysis.  I think that Grofman

4    still -- pardon me, Dr. Grofman still has these choices and

5    still must pay attention to it.

6          JUDGE PAYNE:  That proceeds on the premise that to

7    remedy a violation in the past, one looks at the law at the

8    time of the violation; is that what we're talking about?

9          MS. McKNIGHT:  I was talking about Section 2, that

10   Section 2 still applies.

11         JUDGE PAYNE:  All right.

12         MS. McKNIGHT:  We've been talking a lot about Dr.

13   Grofman's testimony, and a lot of it sounds remarkably

14   familiar.  He denies race predominated in his map drawing, and

15   so did the 2011 map drawers.  He says he checked BVAP at the

16   back end.  So did the 2011 map drawers.  He says VTD splits are

17   too minor and technical to rise to the level of racial

18   predominance.  The 2011 map drawers said the same thing.

19         He says that race could not predominate his line

20   drawing because traditional districting criteria was met.  So,

21   too, is the enacted map.  Simply put, this is not enough, and

22   the Court must look at the lines drawn, what they look like,

23   whether an intent to draw the lines under a 55 percent BVAP had

24   a direct and substantial impact on the line drawing.  We offer

25   that it did, and the Court need look no further than the

1    districts found to be donor districts which are now drawn below

2    55 percent BVAP.

3            We may have our disagreements about liability, but

4    surely we can agree this is not what the Court intended,

5    replacing one racially sorted map with another.  There are

6    problems with Dr. Grofman's plans in this case.  They are

7    serious, some rising to the level of creating new

8    constitutional causes of action for black communities who,

9    because they are black, simply because of that, have been

10   removed from performing districts and placed in districts where

11   they have no hope of electing their preferred candidates of

12   choice.

13           We ask the Court to delay issuing a remedy in this

14   case until after the Supreme Court rules and after this Court

15   has had time to resolve the various and numerous problems that

16   plague every proposed map but HB 7002.  What do I mean by that?

17   That is the only map that was drawn without race as a

18   consideration.  You have a sworn affidavit from the map drawer.

19   Every other map in this case was drawn with race as a

20   consideration, and we simply do not have the testimony or

21   briefing or evidence or exhibits on the record supporting those

22   findings of a race-based drawing -- that race-based drawing.

23           In the alternative, we ask --

24           JUDGE PAYNE:  Excuse me.  You take the view we can't

25   consider the special master's report and testimony as evidence?

1          MS. McKNIGHT:  No, Your Honor.

2          JUDGE PAYNE:  We can consider what's in the special

3     master's report as evidence, can't we?

4          MS. McKNIGHT:  Of course.

5          JUDGE PAYNE:  I misunderstood you then.

6          MS. McKNIGHT:  We just believe it shows that his line

7     drawing was governed by a 55 percent ceiling as opposed to a

8     55 percent floor that this Court found.  It's swapping one type

9     of racial sorting for another, but it's two sides of the same

10    coin, the same problem the Court identified last June.

11         Finally, we ask that in the alternative, the Court

12    adopt HB 7002 as a remedy.  Thank you very much, Your Honors.

13         JUDGE PAYNE:  What do you think about -- assuming for

14    the moment that your argument doesn't prevail as to House

15    Bill 7002.  Which of the options posited by Dr. Grofman would

16    you prefer?

17         MS. McKNIGHT:  Your Honor, I don't have an answer for

18    that right now.

19         JUDGE PAYNE:  All right.

20         MS. McKNIGHT:  Candidly, at the very least, I think

21    Petersburg 2 is highly problematic.  There are others that are

22    problematic as well.  We would prefer HB 7002, but as far as

23    prioritizing the 36 different modules, we have not done that

24    yet, Your Honor, but we would be happy to supplement the record

25    with that.

```
 1                 JUDGE PAYNE:  Thank you.

 2                 THE COURT:  All right, who is next?  Mr. Heytens?

 3     How about, Mr. Heytens, what is your view on the role, if any,

 4     of Section 5 of the Voting Rights Act in this case?

 5                 MR. HEYTENS:  Good afternoon, Your Honors, and may it

 6     please the Court, our view is that Section 5 is no longer

 7     legally operative as a result of the Supreme Court's decision

 8     in Shelby County.

 9                 JUDGE PAYNE:  And is the retrogression provision of

10     the Voting Rights Act in Section 5?

11                 MR. HEYTENS:  That is my understanding, Your Honor.

12                 JUDGE PAYNE:  Why are we considering whether or not a

13     district ought to protect against retrogression of minority

14     voting?

15                 MR. HEYTENS:  Well, Your Honor, I think it's

16     necessary to distinguish between two questions which is

17     between, first, whether Section 5 is still legally operative

18     and binding on the Commonwealth of Virginia, and I think as a

19     result of Shelby County, it is not.

20                 The second question is that what this Court needs to

21     do as part of framing an appropriate remedy to the

22     constitutional violation that the Court found.  So to the

23     extent there was a racial component to the violation, we think

24     this Court, perhaps by necessity, has to consider a racial

25     component in undoing the harm and the violation that was found,
```

1  not because Section 5, of its own accord, is applicable,

2  because I don't think it is for the reasons Your Honor has

3  said.  So that would be the reason, but not because --

4        JUDGE PAYNE:  Why?  What law says that has to happen

5  now that Section 5 is gone?

6        MR. HEYTENS:  Your Honor, I think it just fits with

7  the nature of the equity remedy is to remedy the violation

8  found by the Court.  So to the extent --

9        JUDGE PAYNE:  I can remedy the violation found by the

10 Court by following traditional redistricting policies and

11 paying no attention whatsoever to what the BVAP population is.

12 Would that be possible?  Could I do that?

13        MR. HEYTENS:  I wouldn't want to say that it would be

14 literally impossible in any case to do that, Your Honor.  I

15 have to -- under the facts and circumstances -- it would vary

16 under the facts and circumstances of the case given the nature

17 of the violation and given the nature of the Court's remedial

18 task, and I think fundamentally that is what the special master

19 said both in his report and during his testimony today that he

20 did, that he drew districts --

21        JUDGE PAYNE:  What law says that we pay attention to

22 BVAP now that Section 5 has been eliminated in your view?

23        MR. HEYTENS:  Your Honor, I'm not sure that BVAP

24 itself is necessarily a legally salient category.

25        JUDGE PAYNE:  But, Mr. Heytens, BVAP pervades almost

1   all the pages of the special master's report and all of the

2   addenda and all of the briefing in this case.

3         MR. HEYTENS:  I certainly don't take any issue with

4   that, Your Honor.  I agree with you.  I think that is, to some

5   degree, a necessary consequence of the nature of the violation

6   that the Court found in its remedial -- excuse me, in its

7   liability determination.

8         The liability determination was, as I read it,

9   insignificant measure based on the prevalent use of the

10  55 percent BVAP in the challenged districts.  So I think in

11  order to explain how those violations have been remedied, a

12  violation that was, itself, in part, a significant part, I

13  would submit, determined by the use of a BVAP threshold, that a

14  remedy would, by necessity, also require some consideration of

15  the same thing.

16        JUDGE PAYNE:  To do what?  To say we've looked at the

17  districts drawn by traditional means, and we have concluded

18  that they're satisfactory, and, by the way, they're not near

19  the BVAP levels that were involved, and that's the end of it?

20  Is that what we do?

21        MR. HEYTENS:  That's what I understand the special

22  master to have done, Your Honor, and, yes, I think that --

23  that, I think, would be an accurate characterization of how I

24  would see the law, and that's perfectly consistent with what I

25  understand the special master to have said both in his report

1    and his testimony.

2         I just have one very quick point -- I know the hour

3    is late -- that I'd like to emphasize for the Court this

4    afternoon and then, obviously, answer any questions the Court

5    has.  The point that I would like to underscore on behalf of

6    the defendants is that time is of the essence here and that

7    every day counts at this point.  So we would urge the Court to

8    adopt a final remedial plan as soon as possible and by the end

9    of January if at all possible.

10        JUDGE PAYNE:  What do you see is the timeline for an

11   opinion for the election to run smoothly under the current

12   configuration of dates?

13        MR. HEYTENS:  Well, Your Honor, we think that under

14   -- that's the reason we suggest the end of January.  We are

15   confident that a smooth -- that would allow a smooth timeline

16   under the current configuration of dates for two reasons:  One,

17   as this Court knows, Virginia's 2019 election season has

18   already begun.  It actually began last week.

19        And, second, the administrative tasks confronting

20   state and local election officials in this case will be

21   significantly larger than the task in the *Personhuballah*

22   litigation because of the number of districts involved and the

23   number of voters involved.  Having remedial maps in place by

24   the end of January will permit candidates to collect the

25   necessary signatures from voters within the correct districts.

1          THE COURT:  When do they have to tender those?

2          MR. HEYTENS:  The deadline for that, Your Honor, is

3    March 28th.  That's under Virginia Code 24.2-522.

4          JUDGE KEENAN:  They've already begun collecting the

5    signatures as of January 2nd.

6          MR. HEYTENS:  That is correct, Judge Keenan, yes.

7    The second thing that has to happen is political parties have

8    to designate their nomination method.  The deadline for that

9    that, under state law, is February 26th.  So having a map in

10   place by the end of January will allow parties a reasonable

11   amount of time to know what their districts are and to make the

12   decisions about what method of nomination to select.

13         JUDGE PAYNE:  What does having the map in place have

14   to do with deciding what method of election you want to follow

15   out of the ones that are available under the Virginia Code?

16         MR. HEYTENS:  Your Honor, I don't want to speak for

17   the decisions that different party committees may make, but I

18   can at least imagine a world where, depending on the amount,

19   nature, and extent of change to their district, that could

20   affect their assessment of what method of nomination they want

21   to use.

22         I can't say that it's impossible that that's

23   something a party committee would take into account in making

24   that determination, and this would allow them to do that.

25         Third, and relatedly, having a map in place by the

1    end of January will allow state election officials ample time

2    to verify that voters have been assigned to the correct

3    districts and to then recheck to make sure that voters are

4    assigned to the correct districts and, thus, minimize

5    challenges that happen as we move into the absentee voter

6    period which the period of making those ballots available by

7    the parties is April 27th, but there is work that has to be

8    done before that can happen on the front end by state and local

9    election officials.

10          JUDGE PAYNE:  What is the absentee ballot period that

11   you speak of?

12          MR. HEYTENS:  This is the period on which general

13   registrars must make the primary absentee ballot available.

14   I'm sorry, Your Honor.  That is April 27th is the date that

15   that has to occur by.  But we've been advised by the state

16   election officials that, of course, having them ready by that

17   date requires lead time to make sure that people can be

18   assigned to the correct place, assigned the correct ballot, and

19   that sort of thing.

20          In closing, I'll just say we recognize that that is a

21   tight turnaround time.  That is why we've suggested that if

22   necessary, and only if necessary, this Court could do what the

23   Fourth Circuit has done in at least two recent cases, both

24   captioned *Sierra Club*, in which the Court issued an order -- in

25   this case, we would submit the Court could issue an order

1    adopting a map for the reasons to be explained in a forthcoming

2    opinion.  We think that's one option the Court could follow.

3            We cited those two cases in our brief where the

4    Fourth Circuit has done so recently in cases involving, I

5    believe both involving the Mountain Valley pipeline.  Unless

6    the Court has any further questions, we respectfully yield back

7    our time.

8            JUDGE KEENAN:  Mr. Heytens, I have a question just of

9    logistics.  If this Court were to accept some or all of the

10   different configurations proposed by this special master, the

11   special master is then going to have to put it together.  The

12   parties are going to have to be able to respond to what the

13   special master has done.  So I don't know how we issue an order

14   until we consider what everybody has said about the final

15   product should we go the special master route.  Do you see the

16   problem?

17           MR. HEYTENS:  I think I do, Judge Keenan.

18   Fundamentally, as I understand, the special master is an agent

19   and officer of the Court, and the Court can direct the special

20   master as it deems appropriate.  So, Judge Keenan, one

21   possibility that occurs to me, the Court could direct the

22   special master to prepare a final proposal in light of guidance

23   from the Court, and given the extensive briefing and argument

24   the Court has heard, I'm not sure that the Court would need

25   additional argument after it directs the special master to do

1    that.  Once he prepares a proposed final map perhaps is the

2    best way to say it.  I think you are right.  The Court may deem

3    it appropriate to have a limited, we would stress, emphasize,

4    and hope, an extremely limited period of time for the parties

5    to be allowed to weigh in on that.

6         I realize there is a scheduling -- a question of how

7    the Court does that, but our fundamental submission would be to

8    urge the Court to do it in as expeditious of a manner as

9    possible mindful that this litigation has been going on for a

10   very long time and that the Court's liability decision was,

11   after all, rendered last June.  If the Court has no further

12   questions, thank you very much.

13        JUDGE PAYNE:  Excuse me.  There's another option,

14   isn't there?  Can't the Court order -- change the dates for the

15   election process in Virginia?

16        MR. HEYTENS:  We certainly don't take issue with the

17   fact that the Court would have the power to do that if the

18   Court determined that it was necessary to do so.  Our

19   submission is that at this point, there is no necessity to do

20   so and that the Court should be reluctant to do so unless there

21   is a compelling need.  Again, we think the overriding

22   compelling need here is to ensure that Virginia does not have

23   another election held under unconstitutional maps.

24        That's the overriding need, but the secondary need

25   would be to maintain the orderly election process to the

 1    greatest extent that is consistent with the need to make sure

 2    that doesn't happen.

 3         JUDGE KEENAN:  Let me follow up, if I could, on that

 4    then.  It looks to me like the first really hard date is

 5    February 26th, because the candidates have already started

 6    collecting their signatures.  So if there is any room within

 7    the schedule, since they're going to have to start over again

 8    anyway, and they have until March 28th to do it, that perhaps

 9    the wiggle room in the schedule is between today and

10    February 26th, and then the Court could keep -- I mean the

11    Commonwealth could keep on its schedule without creating any

12    disruption other than the fact that the prospective candidates

13    will have somewhat less time to reconfigure their petition.

14         MR. HEYTENS:  Judge Keenan, I certainly agree with

15    you that February 26th is the first hard deadline, 100 percent

16    agree with you on that.  I would say based on conversations

17    with the election officials, it is a complicated, interrelated

18    moving process, so every day does count.  So late February is

19    worse than early February, but I agree with you that

20    February 26th is the first hard deadline.

21         JUDGE KEENAN:  And I wasn't suggesting February 26th

22    for an opinion of the Court but only to say that perhaps

23    January 31st is not a so-called drop-dead date.

24         MR. HEYTENS:  I certainly agree with that, Judge

25    Keenan, yes.  Thank you very much.

1          JUDGE PAYNE:  Mr. Hamilton, I'm very interested in

2     your views on the effect of Section 5 and the absence in these

3     proceedings of any discussion of why we're considering BVAP

4     since retrogression isn't any longer an issue, according to

5     your opponents, and we need to consider all that under

6     Section 2.  What do you have to say with that, about that, sir?

7          MR. HAMILTON:  Black voting age population is central

8     to this case, and it has been since the very first part.  This

9     is a *Shaw* claim, and the central thesis of the plaintiffs' case

10    and I think the majority opinion was that race was the

11    predominate factor in drawing the districts.  So that explains

12    probably 90 percent of the BVAP numbers scattered throughout

13    the briefing in the record.

14          *Shelby County* invalidated the coverage formula for

15    Section 5.  It didn't invalidate Section 5 itself, but as a

16    result of the invalidation of the coverage formula, the

17    Commonwealth of Virginia is no longer covered by Section 5, and

18    I don't believe as a result it would technically apply to this

19    Court in drawing this map.  That's not to say that Dr. Grofman

20    did anything wrong in checking his work to ensure that there

21    was no vote dilution.  I do think is appropriate under

22    Section 2.

23          Judge Keenan asked to what extent should we consider

24    Section 2 and the Court should pay attention to Section 2, but

25    none of the proposals before the Court present Section 2

1    concerns.

2           JUDGE KEENAN:  You are not taking issue with the fact

3    that, for example, District 77 is -- what? -- 40-point-some

4    percent and that there may be one other that's well under 45?

5    You are not take --

6           MR. HAMILTON:  Correct, I am not.  In fact, I think

7    Dr. Grofman specifically analyzed that and looked at the

8    analysis provided by Dr. Palmer and Dr. Handley and concluded

9    that there was an ability to elect candidates of choice of the

10   African-American community, so there was no problem with vote

11   dilution.  So that addresses that issue.  Judge Payne, you also

12   asked do any of the districts affect District 75.

13          JUDGE PAYNE:  Any of the alternatives, plans.

14          MR. HAMILTON:  Correct.  I'm sorry.  The answer is

15   yes, that several of them do.  HB 7002 changes District 75

16   boundary, Petersburg 2 does.  Both of the plaintiffs' proposed

17   changes do, and, in fact, you have to if you're going to

18   address the Dinwiddie County split -- it's the split between

19   District 75 and 63.  So if you address it, you are changing it.

20          But there's no problem with changing that.  I don't

21   think anybody standing before this Court has questioned the

22   power of the Court, indeed the duty of the Court to modify

23   boundaries to remedy the constitutional violation that we have,

24   and --

25          JUDGE PAYNE:  It's not any different than any other

1   constitutional district.

2          MR. HAMILTON:  You took the words exactly right out

3   of my mouth, so I'll stop talking on that point.  Ms. McKnight,

4   I just want to address a couple points she made.  First, you

5   absolutely do have to make a credibility, adverse credibility

6   determination as to Dr. Grofman --

7          JUDGE PAYNE:  I think she acknowledged that, didn't

8   she?

9          MR. HAMILTON:  I think in the end, because Dr.

10  Grofman so clearly testified today in open court about his

11  methodology which is exactly the same methodology that he used

12  in the *Personhuballah* case.  I think the Court adopted his map

13  there.  I think the Court should adopt the map here.  I don't

14  think that anything that has been advanced makes any of that

15  suspect.

16         Ms. McKnight also raised concerns about disrupting

17  voter expectations.  I think we can spend a lot of time looking

18  through the *Shaw* jurisprudence and we won't see that a

19  legitimate factor once the Court has found a constitutional

20  violation of the 14th Amendment and is faced with the task, as

21  this Court is, of unwinding that impermissible constitutional

22  violation.

23         There may be lots of voters in the other districts

24  that were not challenged that had -- that are living in

25  districts and have been living in districts and voting in

```
 1   districts over the course of much of the last decade in what we

 2   now know are unconstitutional districts.  Their expectations,

 3   I'm sorry, whatever they may have, but those expectations are

 4   not a factor this Court should be considering.

 5        What this Court should be considering is the

 6   violation of the 14th Amendment that was inflicted upon the

 7   state by the state legislature and an appropriate remedy for

 8   it.  The Court has several appropriate alternatives to remedy

 9   that violation, and I urge the Court to adopt one.

10        JUDGE PAYNE:  How to we consider, or what, if any,

11   consideration do we give to the evidence about BVAP in deciding

12   the remedy in this case?  You said you thought it's appropriate

13   to consider in assessing Section 2 of the Voting Rights Act,

14   but how does that work?  I'm not quite sure I understand that.

15        MR. HAMILTON:  Precisely the same way Dr. Grofman

16   considered it.  He drew the districts using and applying

17   traditional redistricting criteria.  Then he looked at is there

18   vote dilution, an ability to elect here among -- in these

19   districts, or have we accidentally backed into a situation in

20   which we've completely diluted the vote and committed the what

21   would be hugely ironic and sorry situation in which in

22   remedying one constitutional violation we stripped the

23   effective franchise from African-American voters in the

24   Commonwealth.  That is not the task before the Court, and I

25   think --
```

1          JUDGE PAYNE:  Serves a function of a verification

2    process.

3          MR. HAMILTON:  Correct.  Thank you, Your Honor.

4          JUDGE PAYNE:  Do you have any other questions?

5          JUDGE KEENAN:  No.

6          JUDGE ALLEN:  No.

7          JUDGE PAYNE:  First, while I'm looking for something,

8    there's a motion for attorneys' fees that's been filed and

9    outstanding for a long time.  In the *Personhuballah* case, I

10   found, and I think all of us who had to deal with it found that

11   the presence of an outstanding attorneys' fees motion and then

12   another one and then another one created terrible briefing

13   problems.  Is there any reason we can't deny your petition for

14   attorneys' fees without prejudice to the filing of it at the

15   end of the whole case?

16         MR. HAMILTON:  Well, I think, Your Honor, perhaps the

17   better approach would be to -- if that's the inclination,

18   rather than grant the motion at this point and then do a

19   supplemental award of attorneys' fees later would be to simply

20   stay the decision on the motion until receipt of the decision

21   from the United States Supreme Court.

22         JUDGE PAYNE:  That leaves us with a problem that we

23   had in *Personhuballah* in trying to work through what were the

24   claims and what did they really mean, and the amount of time

25   that was devoted by the judges, the law clerks, and the lawyers

1   to sorting out the question of what were the fees was just

2   enormous, and it made the writing of the opinion a terrible

3   mess for Judge O'Grady.

4            I do remember that, so the way I typically deal with

5   this kind of thing is deny it without prejudice to re-filing it

6   when it's ready to be filed.

7            MR. HAMILTON:  Either way, Your Honor.  Whatever is

8   most efficient for the Court.  We certainly have no interest in

9   making it more difficult for counsel or the Court.

10           THE COURT:  We a need a date, I think, for Dr.

11  Grofman to submit a final opinion which, I believe, the Court

12  has decided would like to be in the form of a report but at the

13  end of it verified.  Am I correct on that?

14           JUDGE KEENAN:  It's really two separate ones, because

15  the first is the corrected compendium of what exists, and the

16  second is tailoring the different modules.  Do we want to set a

17  separate date for those two?  Do you see what I'm saying?  The

18  first one is to have him correct the existing group and file

19  one complete document.

20           JUDGE PAYNE:  Right.

21           JUDGE KEENAN:  The second one would be once we -- if

22  we do adopt the Grofman tailoring --

23           JUDGE PAYNE:  Yes, okay, the tweaking.  We will need

24  a report that straightens everything out that has been in

25  the -- identified in the various addenda and puts it all

1    together in one report.  Then if we use Dr. Grofman's modules,

2    we will then need to tender to him this is our choice, what, if

3    any, tweaking needs to be done to adjust it, get a second

4    report that addresses that question, and then give the parties

5    an opportunity to review it and say whatever they've got to say

6    on that; is that correct?  So how long will it take you, in

7    your judgment, Dr. Grofman, to get the first one done?

8              DR. GROFMAN:  If I may briefly address the Court.

9    Certainly it would be very quick for me to provide to the Court

10   and to the parties a full and corrected and complete version of

11   my December 7th report incorporating any corrections, typos and

12   the like, that are found in later documents.  That's relatively

13   straightforward.  Two or three days.

14             JUDGE KEENAN:  Dr. Grofman, if I could interject

15   here.  But we are interested in essentially a publication

16   quality document.  In other words, a document that encapsulates

17   everything so the addenda are now part of the single document

18   so we'll have a record for the Supreme Court to look at

19   without, perhaps, having a problem knowing exactly what we

20   relied on.

21             DR. GROFMAN:  That is exactly the way I interpreted

22   Judge Payne's comments and your --

23             JUDGE PAYNE:  We will end up with a complete report.

24             DR. GROFMAN:  Yes.  That can be done in a very short

25   window.  Three days.

1    JUDGE PAYNE:  Three days is not very likely.  I would

2    say within a week.

3    JUDGE KEENAN:  And attested, attestation.

4    JUDGE PAYNE:  Take a week and get it done, make sure

5    you are satisfied.  If you have a problem, you need to let us

6    know, and it will be tendered in the form that you did it, but

7    at the end of it, it would be attested to as a sworn document.

8    DR. GROFMAN:  Thank you, Judges, for clarifying what

9    my task would be in the remaining time.  I'm happy to, of

10   course, do whatever it is that the Court requires me to do in

11   order to help them provide a complete remedy map.

12           The question that I had for the Court is that given

13   that there are alternative modules and given that various

14   parties have expressed preferences among the various modules,

15   it would be essential for me, at least I believe it would be

16   essential for me, rather than for me to simply indicate that as

17   special master this is my preference among the modules and for

18   a complete plan, for the Court to give me guidance as to which

19   of the modules the Court wishes me to perfect.

20   JUDGE KEENAN:  I think we'll do that, Dr. Grofman.

21   We will do that -- should we adopt that course of action, we'll

22   do that after you submit your publication quality compendium of

23   everything you've done so far.

24   DR. GROFMAN:  Fine.

25   JUDGE PAYNE:  And then we will say does it need to be

1    adjusted, if it does, you adjust it.  Then the parties will

2    have a copy of it, and they will have a right to comment upon

3    it.

4            DR. GROFMAN:  I believe I understand that three-step

5    process.

6            JUDGE PAYNE:  You will hear from us as to what our

7    preference is.

8            DR. GROFMAN:  Exactly.  I believe that can be done in

9    an expeditious fashion, Your Honor.

10           THE COURT:  That's the second test.  That's an

11   entirely different date.  Is there anything else that needs to

12   be done at this time?  All right, we will be in adjournment.

13   Thank you very much.  The matter is submitted.

14

15                   (End of proceedings.)

16

17

18           I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21

22   _____/s/_____          _____
     P. E. Peterson, RPR                Date
23

24

25