## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| GOLDEN BETHUNE-HILL, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> VIRGINIA STATE BOARD OF ELECTIONS, *et al.*, <br><br> Defendants, <br><br> v. <br><br> VIRGINIA HOUSE OF DELEGATES, *et al.*, <br><br> Intervenor-Defendants | Civil Action No. 3:14-cv-00852-REP-AWA-BMK |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF REVISED SECOND MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

### I.     INTRODUCTION

By order dated September 25, 2019, the Court ordered the parties to refile briefing in support of and opposition to Plaintiffs' pending requests for an award of reasonable attorneys' fees, litigation expenses, and costs. ECF No. 399. Plaintiffs file this revised fee petition, with supporting declaration and data, in compliance with the Court's September 25 order.

This Court's order declaring 11 majority African-American Virginia House of Delegates districts unconstitutional remains untouched by the United States Supreme Court, which dismissed both of Defendant-Intervenors' ("Intervenors") appeals in this long-pending matter. Moreover, a remedial House of Delegates map, which remedied the constitutional violations, was adopted by this Court and used in the June 2019 primary elections. The remedial map will be used again in

the November general elections. Accordingly, Plaintiffs are, and remain, the prevailing parties in this litigation and are entitled to an award of attorneys' fees, expert fees, and costs under 42 U.S.C. § 1988, 52 U.S.C. § 10310(e) (formerly codified as 42 U.S.C. § 19731(e)), Fed. R. Civ. P. 54, and L.R. 54.

Plaintiffs' counsel dedicated a reasonable amount of time and resources to prevailing in this matter. Counsel litigated efficiently in light of the case's significant complexity, protracted length, and hotly contested nature. They charged rates consistent with the prevailing market rates for similar services by attorneys of comparable skill, experience, expertise, and reputation. And they exercised reasonable billing judgment as recorded in their detailed, accurate, and contemporaneous billing records submitted with this application. Plaintiffs also engaged experts to examine and explain the detailed population and electoral data, and these expert fees were reasonable and necessary to prove Plaintiffs' claims. Plaintiffs incurred other reasonable litigation expenses as well. In total, Plaintiffs seek at least $4,115,893.75 in attorneys' fees and $489,096.35 in litigation expenses. Plaintiffs also seek $223,832.06 in costs, as set out in their pending cost bill (ECF No. 388).

## II.  BACKGROUND

In April 2011, the Virginia legislature adopted, and the Governor signed into law, a new House of Delegates districting plan (the "2011 Plan"). Under the 2011 Plan, the Virginia legislature employed a 55% Black Voting Age Population ("BVAP") threshold in drawing each of the Challenged Districts. ECF No. 234 at 17. On December 22, 2014, Plaintiffs filed their Complaint, alleging that race predominated in the drawing of the Challenged Districts, and that the use of race was not narrowly tailored to serve a compelling government interest, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

2

146048847.4

ECF No. 1. The initial three-judge panel was constituted pursuant to 28 U.S.C. § 2284(a). ECF No. 133. Shortly after the complaint was filed, the Virginia House of Delegates and its speaker, Delegate William J. Howell (Intervenors) filed a motion to intervene. ECF No. 13 at 2.

Following a three-and-a-half-day bench trial in 2015, a majority of the Court found that race was not the predominant factor used in the construction of 11 of the 12 Challenged Districts. In reaching this conclusion, the majority found that Plaintiffs had not shown that the legislature's use of race was in "actual conflict" with traditional, race-neutral districting criteria. With respect to House District 75, the Court found that race had predominated, but that the legislature's use of race was narrowly tailored to achieve the compelling state interest of compliance with the Voting Rights Act of 1965. Judge Keenan filed a separate dissenting opinion.

Plaintiffs appealed this Court's holding to the United States Supreme Court. The Supreme Court affirmed this Court's holding that District 75 satisfied strict scrutiny. The Supreme Court disagreed, however, with the majority's predominance analysis in the other 11 Challenged Districts. The Supreme Court remanded the case to this Court for reconsideration of the question of predominance.

On remand, Plaintiffs contended that it was not necessary for the panel to re-open the evidentiary record and hold a second trial in this case; instead Plaintiffs argued that the Court could resolve the case based on merits briefing addressing the existing record from the first trial. ECF No. 153. Doing so would have saved the parties, and the Court, considerable time and expense. By contrast, Intervenors requested the opportunity to present the Court with an "additional factual presentation" on remand. ECF No. 152. Intervenors' position carried the day, and on June 2, 2017, this Court ordered a second three-day trial in this case, during which "the parties shall present such evidence as they shall be advised so that the Court can comply with the decision, and the remand

Order, of the Supreme Court of the United States." ECF No. 160. Plaintiffs tried their case during a second three-and-a-half day bench trial that began on October 10, 2017.

On June 26, 2018, the Court issued a Memorandum Opinion in which it held that the remaining 11 Challenged Districts were racial gerrymanders in violation of the Fourteenth Amendment. *See* ECF No. 234. Specifically, the Court held that "telling direct and circumstantial evidence" showed that race predominated over traditional districting factors in the construction of the remaining 11 Challenged Districts, and that Defendants and Intervenors did not satisfy their burden of showing that the legislature's use of race was narrowly tailored to achieve a compelling state interest. *Id*. at 2. The Court's decision relied on the evidence that Plaintiffs developed in discovery, including expert testimony from Plaintiffs' experts, Dr. Stephen Ansolabehere, Dr. Jonathan Rodden, and Dr. Maxwell Palmer, statements by the enacted architect of the 2011 Plan, testimony from fact witnesses, including members of the Black Caucus, departures from traditional redistricting criteria, and election and demographic data.

Having determined that the 2011 Plan failed to pass constitutional muster, the Court gave the General Assembly the first opportunity to create a remedial plan, providing until October 30, 2018 for the General Assembly to "remedy the constitutional violations." ECF No. 235. Intervenors immediately filed a notice of appeal with the United States Supreme Court. ECF No. 236. On July 10, 2018, Plaintiffs filed their Motion for Attorneys' Fees and Litigation Expenses. ECF Nos. 240, 241. Plaintiffs also separately filed a Bill of Costs. ECF No. 239. Because the case was on appeal to the Supreme Court, however, the Court found Plaintiffs' motion to be premature and denied it without prejudice to refiling following a decision by the Supreme Court. ECF No. 377.

146048847.4

Thereafter, this case proceeded on two tracks: the remedial phase of the litigation on the one hand; and the Supreme Court appeal on the other hand. The remedial phase required substantial and complex work on the part of Plaintiffs' counsel over a period of many months. *See, e.g.*, *generally* ECF Nos. 263-362. After the Court adopted the governing procedures and selected a Special Master, Plaintiffs developed and submitted a proposed remedial plan. *See* ECF No. 292. Plaintiffs also analyzed and prepared objections and responses to numerous remedial plans submitted by Intervenors and non-parties. *See* ECF No. 305. Plaintiffs then submitted multiple rounds of briefing on the Special Master's redistricting proposals. *See* ECF Nos. 328, 335, 358. Finally, Plaintiffs prepared for and attended a January 10, 2019 hearing before the Court on the Special Master's proposals. At the end of the remedial proceedings, the Court adopted Special Grofman's "Final Remedial Plan" to implement its opinion striking down the 11 Challenged Districts. *See* ECF No. 359.

After both this Court and the Supreme Court rejected Intervenors' request to stay the remedial proceedings, Plaintiffs also briefed and successfully argued Intervenors' appeal to the Supreme Court. On appeal, Plaintiffs argued that Intervenors lacked standing (and that their claims failed on the merits). Intervenors thereafter filed a second appeal to challenge the Court's order adopting the Final Remedial Plan. On June 17, 2019, the Supreme Court dismissed Intervenors' appeal, agreeing with Plaintiffs that Intervenors did not have standing. On July 19, 2019, the Supreme Court issued a mandate entering judgment in this matter. Plaintiffs filed their Second Motion for Attorneys' Fees and Litigation Expenses on August 2, 2019.

Pursuant to this Court's Order denying Plaintiffs' Motion without prejudice, *see* ECF No. 399, Plaintiffs now respectfully file this Revised Second Motion for Attorneys' Fees and Litigation Expenses. As instructed by the Court, this submission (a) consolidates all argument and

146048847.4

information into a single submission to the Court; (b) provides appendices setting out Plaintiffs'
fee request organized by category; (c) provides further information regarding the fee increases
requested by Plaintiffs in 2017-2019; and (d) addresses certain decisions bearing on the potential
award of fees against Intervenors. *See* ECF No. 399 ¶¶ 1-3, 10.

### III.    ARGUMENT

**A.    Plaintiffs Are Prevailing Parties**

Plaintiffs brought this action under 42 U.S.C. § 1983 and are prevailing parties within the
meaning of the fee statute, 42 U.S.C. § 1988, "if they succeed on any significant issue in litigation
which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461
U.S. 424, 433 (1983) (citation omitted); *see also Texas State Teachers Ass'n v. Garland Indep.
Sch. Dist.*, 489 U.S. 782, 789 (1989); *Bly v. McLeod*, 605 F.2d 134, 137 (4th Cir. 1979) ("It is
settled that in order to be a prevailing party one need not win on every issue in the case."). The
*Hensley* formulation is "generous," *Hensley*, 461 U.S. at 433., and designed to effectuate
Congress' purpose "to ensure 'effective access to the judicial process' for persons with civil rights
grievances." *Id.* at 429 (quoting H.R. Rep. No. 94-1558, at 1 (1976)). One need only "point to a
resolution of the dispute which changes the legal relationship between itself and the defendant."
*Texas State Teachers Association*, 489 U.S. at 792. "And [the Supreme Court] ha[s]repeatedly held
that an injunction or declaratory judgment, like a damages award, will usually satisfy that test."
*Lefemine v. Wideman*, 568 U.S. 1, 4 (2012).

Plaintiffs are the prevailing parties in this litigation. They requested a declaratory judgment
that the Challenged Districts as constructed in the 2011 Plan contravene the Equal Protection
Clause, ECF No. 1 at 17, and the Court unequivocally held in its Memorandum Opinion that the
2011 Virginia House of Delegates redistricting plan "violates the Equal Protection Clause." ECF
No. 234 at 92. Intervenors appealed the Court's decision to the United States Supreme Court, and

the Supreme Court dismissed the appeal on June 17, 2019. Plaintiffs also asked the Court to enjoin enforcement of the Challenged Districts as constructed in the 2011 Plan, including an injunction barring Defendants from conducting any further elections based on the Challenged Districts, ECF No. 1 at 17, and the Court "enjoined [Defendants from] . . . conducting any election after this date for the office of Delegate in the Commonwealth's House of Delegates in the Challenged Districts until a new redistricting plan is adopted," ECF No. 235 at 1. Finally, Plaintiffs asked the Court to order a valid plan for new House of Delegates Districts, ECF No. 1 at 17, and on February 4, 2019, the Court adopted the Special Master's Final Remedial Plan, which remedied the constitutional violations in the challenged map. That remedial plan has already been used for the 2019 primary elections, and it will be used again for the November general election. Thus, Plaintiffs have clearly prevailed in this litigation and are entitled to attorneys' fees and reasonable expenses.

**B.      Plaintiffs Are Entitled to a Fee Award**

A prevailing party "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968). "Courts have universally recognized that this 'special circumstances exception is very narrowly limited'" and "[o]nly on rare occasions does a case present such circumstances." *Doe v. Bd. of Educ. of Baltimore Cty.*, 165 F.3d 260, 264 (4th Cir. 1998) (citation omitted).

Federal courts employ the familiar lodestar method to calculate the reasonableness of attorneys' fees under the civil rights fee-shifting statutes. *Hensley*, 461 U.S. at 433; *McAfee v. Boczar*, 738 F.3d 81, 88 (4th Cir. 2013). The lodestar equals "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433; *see also Blum v. Stenson*, 465 U.S. 886, 888 (1984). There is a "'strong presumption' that the lodestar number represents a reasonable attorney's fee." *McAfee*, 738 F.3d at 88-89 (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010)).

7

Although the lodestar amount is presumed reasonable, the Court may "adjust the fee upward or downward" upon consideration of a 12-factor test, the most crucial factor being the extent of the plaintiff's success. *Hensley*, 461 U.S. at 434; *see also McAfee*, 738 F.3d at 88 n.5 (setting out 12-factor test that governs adjustment to the lodestar amount).[1]

### 1.     Counsel for Plaintiffs Spent a Reasonable Number of Hours and Exercised Appropriate Billing Judgment

This Court has discretion to award fees for time "reasonably expended" in this litigation. *Hensley*, 461 U.S. at 435. Plaintiffs seek compensation for 9,262.15 hours of attorney and paralegal time totaling $4,115,893.75. Provided as Appendix A to this motion is a consolidated spreadsheet—organized by date—that describes the specific tasks performed by every timekeeper on a daily basis, the number of hours spent on those tasks, the fees associated with each entry, and the topical category a given entry falls within. Provided as Appendix B to this motion is a spreadsheet of the same data, re-sorted by category of work (and then date) to facilitate the Court's review of the work done by Plaintiffs with regard to different types of work. Appendix C provides summary level information about the time spent and fees attributable to each category of work. Plaintiffs' fee request runs for thousands of entries, with many timekeepers recording time spent on an array of different tasks on the same day. Upon reviewing the Court's September 25 order and their fee entries, Plaintiffs believe that the most useful approach to categorizing this work is to break apart entries into case phases; for example, fact discovery and expert discovery leading

---

[1] The twelve factors are: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *McAfee*, 738 F.3d at 88 n.5.

146048847.4

up to the first trial, and then again fact discovery and expert discovery leading up to the second trial. Given the long life of this case, and the host of different individual tasks performed by Plaintiffs' counsel, Plaintiffs believe it would be less useful to the Court to review potentially dozens or hundreds of different categories of entries reflecting time spent on hyper-individualized tasks. Plaintiffs generated Appendices A, B, and C from contemporaneously recorded time records. *See* Declaration of Kevin J. Hamilton (October 28, 2019) ("Hamilton Decl.") ¶¶ 10-11.

The figure requested by Plaintiffs is reasonable in light of the complexity and lengthy duration of this case and the results obtained, and also reflects counsel's exercise of appropriate billing judgment to the lodestar amount. Plaintiffs provide more detail in support of their request below, but submit that the reasonableness of their overall fee request is apparent on the face of things. Indeed, between the State Defendants (the executive branch) and the Defendant-Intervenors (the House of Delegates), at the time that Plaintiffs filed their first fee petition, the Commonwealth had already spent roughly five million dollars defending this case.[2] That is, the Commonwealth had *already spent more defending the case a year ago* than Plaintiffs seek recovery for now.

A fuller analysis bolsters the point. This case, like most redistricting cases, presented complex issues and required a considerable amount of attorney time and expertise. Plaintiffs' claims raised a number of important legal questions related to the power of federal courts, the Voting Rights Act, and racial gerrymandering claims. Cases of this nature require analysis and presentation of a wide array of evidence, including complex expert testimony. Discovery was

---

[2] See Press Release, *Mark R. Herring, Att'y Gen. Herring Urges General Assembly to Eliminate Racial Gerrymandering in House of Delegates Districts as Quickly as Possible* (July 19, 2018), https://www.oag.state.va.us/media-center/news-releases/1233-july-19-2018-herring-urges-general-assembly-to-eliminate-racial-gerrymandering-in-house-of-delegates-districts-as-quickly-as-possible (House of Delegates has spent "more than 4 million" and the Office of the Attorney General "approximately $877,000").

complicated by Intervenors' invocation of the legislative privilege. The fact-intensive nature of Plaintiffs' claims—implicating twelve separate legislative districts and their bordering districts—required many hours of work by different attorneys to meet the case's schedule. Moreover, three separate appeals to the U.S. Supreme Court were filed in these matter—all of which Plaintiffs prevailed on in whole or substantial part.

Because this case has at this point spanned nearly five years, various counsel worked on the case at different points. And because Plaintiffs needed to consider the voluminous record from the first trial—and this Court's lengthy original opinion and the Supreme Court's subsequent opinion on appeal—in preparing and presenting their case on remand, preparation for the second trial was considerably more complicated than in the ordinary case. Plaintiffs' counsel then spent significant time preparing for and successfully obtaining a victory on Intervenors' appeals to the Supreme Court. The final step of this litigation—the remedial phase—also required significant time spent by experienced counsel to litigate the complex issues that were raised; analyze and respond to the multiple remedial proposals put forward by Intervenors and non-parties; and analyze, respond to, and prepare for a hearing on the Special Master's proposals. These complex circumstances—coupled with Plaintiffs' significant success—establish the reasonableness of the hours that Plaintiffs' attorneys spent on this case.

The attached Hamilton declaration supports this conclusion. The declaration certifies that the hours expended by Plaintiffs' counsel, as set out in Appendices A, B, and C, were actually expended as described. The declaration attests that all attorneys participating in the case maintained detailed, contemporaneous, and accurate records of time devoted to this matter throughout the entire course of representation. Hamilton Decl. ¶ 10. The declaration further attests that all billing attorneys efficiently discharged their duties in litigating this case, notwithstanding

146048847.4

its complexity. *Id.* ¶ 22. All hours submitted were devoted to necessary litigation tasks, including extensive briefing, discovery, work with experts, coordination with counsel and the Court, and preparation for and attendance at numerous hearings, depositions, and two separate trials, and three Supreme Court appeals.[3] Counsel for Plaintiffs have exercised reasonable billing judgment and excluded from their calculations any hours that were arguably "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434.

Moreover, Plaintiffs are not seeking to recover all the fees incurred. Rather, Plaintiffs are limiting their fee petition to the members of Plaintiffs' litigation team who spent significant time working on the matter, as well as document review attorneys whose involvement was necessary given the volume of relevant materials in this matter.[4] Plaintiffs are thus excluding, among other things, the scores of hours spent by other attorneys, paralegals, and other timekeepers who assisted in deposition preparation, conducted supporting legal research, or otherwise assisted in litigating this matter. *Id.* ¶ 21. Specifically, Plaintiffs are not seeking fees for the 1,483.60 hours billed by these timekeepers over the life of this case. *Id.* ¶ 23. Moreover, although Plaintiffs strove at all times to (and did) efficiently try this complex lawsuit, in computing their lodestar amount, Plaintiffs also carefully exercised billing judgment and made reductions where time arguably could have been more efficiently spent. *Id.* ¶ 22.

Plaintiffs' counsel have written off, in total, 1,783.65 timekeeper hours, totaling $803,978.80 in fees. *Id.* ¶¶ 23-24. In other words, Plaintiffs' fee request is a conservative lodestar based on work that was reasonably and necessarily expended.

---

[3] The Supreme Court's June 17, 2019 opinion disposed of both of Intervenors' then-pending appeals, but at that point, Intervenors' second Jurisdictional Statement seeking Supreme Court review had already been fully briefed by Plaintiffs.

[4] Perkins Coie maintains a department of staff attorneys dedicated solely to document review projects, who bill at the rate of $125 per hour. Hamilton Decl. ¶ 20.

146048847.4

All the time claimed was legally and factually related to the claim as to which Plaintiffs prevailed and should be compensable. Of course, the standard for determining attorney time is "not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992); *see also Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 700 (9th Cir. 1996) (affirming fee award and noting that "although it may be easy, in hindsight, to tout this as an easy case, plaintiffs cannot be faulted for their thoroughness under the circumstances"). Here, Plaintiffs cannot be faulted for their thoroughness. Plaintiffs did not bring this case just to protect their own interests, but to address a matter of public importance and vindicate the constitutional rights of countless other Virginia citizens.

"Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 434. Counsel for Plaintiffs in this case diligently defended their clients' interests and ultimately prevailed—the fruit of many hours of culling extensive data, consulting with expert witnesses, filing multiple briefs addressing complex legal issues, and participating in numerous hearings. Plaintiffs should therefore be granted an award for all hours submitted to the Court, which, as detailed in the attached declaration, reflect only that time reasonably expended in pursuing their claims.

### 2.    Plaintiffs Seek Reasonable Hourly Rates

Courts award prevailing plaintiffs "the prevailing market rates in the relevant community." *Blum*, 465 U.S. at 895. Congress intended that fees awarded in federal civil-rights cases "be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases[,] and not be reduced because the rights involved may be nonpecuniary in nature." *Id*. at 893 (quoting S. Rep. No. 94-1011, at 6 (1976), *as reprinted in* 1976 U.S.C.C.A.N.

5908, 5913). The Fourth Circuit adopted the factors established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), for determining what constitutes a reasonable rate. *Daly*, 790 F.2d at 1075. Those factors include "the customary fee," "the experience, reputation, and ability of the attorneys," and "awards in similar cases." *Nisby v. Comm'rs. Court of Jefferson Cty.*, 798 F.2d 134, 136 (5th Cir. 1986) (listing *Johnson* factors). An analysis of these factors proves that the attorneys in this case charged a reasonable hourly rate.

Marc Elias exercised ultimate oversight responsibility for the lawyers from Perkins Coie LLP, and twice argued this case on appeal to the Supreme Court. Hamilton Decl. ¶ 4.[5] A recognized national expert in political and election law, he is the Chair of Perkins Coie's Political Law practice, and he has been involved in redistricting litigation in more than a half-dozen states in the 2010 redistricting cycle alone. *Id.* His typical hourly rate reasonably reflects his specialized knowledge and experience in redistricting matters throughout the country.

Kevin Hamilton, who tried this matter before the Court along with partners Bruce Spiva (in the first trial) and Abha Khanna (in the second trial), likewise has significant election law experience in redistricting litigation, statewide recounts, election contests, and other political law litigation. *Id.* ¶ 3. He has extensive experience litigating civil rights actions in federal and state courts across the country, *id.*, making his typical hourly rate also reasonable.

Perkins Coie partners Bruce Spiva, Abha Khanna, William B. Stafford, and Ryan Spear also contributed to Plaintiffs' success.[6] Mr. Spiva has extensive experience trying voting rights and redistricting cases, including numerous trials of such cases, and numerous preliminary

---

[5] The Hamilton declaration provides further information about the experience of the Perkins Coie timekeepers whose qualifications are summarized in this memorandum.

[6] All of these attorneys, save Mr. Spiva, were promoted to partner during the pendency of this lawsuit, and began work on it prior to their promotions.

injunction and other hearings. He also has extensive appellate experience. *Id.* ¶ 5. Prior to joining Perkins Coie, Mr. Spiva headed his own firm, The Spiva Law Firm, and was a partner at Jenner & Block. *Id.* Ms. Khanna, Mr. Stafford, and Mr. Spear have significant election law experience in redistricting litigation and other political law litigation. *See id.* ¶¶ 6-8. They each have litigated civil rights actions in federal and state courts across the country. Each of their typical hourly rates is reasonable in this case given their extensive experience litigating voting rights cases.

Counsel were assisted by additional partners, associates, and paralegals, who also have specialized expertise in redistricting litigation, and whose typical hourly rates are reasonable in this case because they are in line with the prevailing market rate of individuals with their skills and levels of experience. Hamilton Decl. ¶ 9. Collectively, Plaintiffs' counsel have litigated or are currently litigating redistricting cases in Virginia and around the country, including in North Carolina, Florida, Minnesota, Nevada, New York, Ohio, Pennsylvania, Texas, Georgia, Alabama, and Louisiana. Hamilton Decl. ¶¶ 3-8.

Plaintiffs' attorneys' hourly rates are reasonable. Plaintiffs maintain that it was reasonable for them to secure representation from attorneys outside of Richmond with particularized expertise in voting rights litigation. That said, Plaintiffs agree to seek recovery at the "Richmond" rates identified by this Court in *Personhuballah v. Wittman*, No. 3:13-cv-00678, in orders dated March 11, 2015, and March 3, 2017. Hamilton Decl. ¶ 13. To the extent additional timekeepers performed work, Plaintiffs have proposed rates based on the rate for comparable attorneys identified in the *Personhuballah* court's opinions. *Id.* With respect to work performed in 2017, 2018, and 2019, Plaintiffs seek recovery at the same rates, with applicable adjustments reflecting Plaintiffs' counsels' requested 2017, 2018, and 2019 rates. *Id.* In the Hamilton Declaration, Plaintiffs provide Table A, which sets out the numerical and percentage increases for each timekeeper for each year

14

and Table B, which sets out the cumulative increase in fees resulting from these year-by-year increases (i.e., the additional fee request for each timekeeper and in the aggregate resulting from increases above 2016 rates. *See* Hamilton Decl., Table A & B. In total, Plaintiffs ask for $440,810.75 more in fees as a result of requested rate increases between 2017 to 2019. *Id.*, Table B.

The Court instructed Plaintiffs to explain why Plaintiffs' requested billing rates increased between 2017-2019. Plaintiffs provide the following further explanation:

The rates at issue were set by the *Personhuballah* court in March 2015 and reflect 2014 rates that were applied by the Court to 2015 and 2016 time as well. Thus, absent some increase in rates, the Court would be awarding Plaintiffs recovery in late in 2019 based on 2014 rates.

In fact, Plaintiffs' counsels' billing rates are raised each year to reflect the added value experience brings to the practice of law and the changing legal marketplace. Accordingly, Plaintiffs' counsel adjusted the billing rates for 2017-2019 to reflect that reality. Courts regularly recognize that attorneys' rates in fact go up over time. *United States ex rel. Ritchie v. Lockheed Martin Corp.*, No. 04-cv-01937-EWN-MJW, 2007 WL 1795865, at *4 (D. Colo. June 21, 2007) (recognizing "the familiar practice of annual attorney rate increases"); *Randolph v. Sec'y of Health & Human Servs.*, No. 15-146V, 2018 WL 1310477, at *4 (Fed. Cl. Feb. 13, 2018) (granting fee award reflecting "reasonable increase" in rates); *Ryan P. ex rel. Christine P. v. Sch. Dist. of Phila.*, No. 07-2903, 2008 WL 724604, at *5-6 (E.D. Pa. Mar. 18, 2008) (awarding annual rate increases).

The rates sought by Plaintiffs in 2017-2019 fall within "the guidelines adopted in *Vienna Metro LLC v. Pulte Home Corp.*, No. 1:10–cv–502, Dkt. No. 263 (E.D. Va. Aug. 24, 2011)," which this Court frequently considers. *Coward v. Robinson*, No. 1:10-cv-147 (LMB/MSN), 2017 WL

5195868, at *3 (E.D. Va. Nov. 9, 2017).[7] These guidelines, set out back in 2011, provided that the following rates are reasonable in this district:

> $130–350/hour for paralegals; $250–425/hour for lawyers with 1–3 years of experience; $350–600/hour for lawyers with 4–7 years of experience; $465–640/hour for lawyers with 8–10 years of experience; $520–770/hour for lawyers with 11–19 years of experience; and $505–820/hour for lawyers with 20+ years of experience.

*Id.* (citing *Vienna Metro LLC*, No. 1:10-cv-502, Dkt. No. 263 at 12).[8]

With regard to the specific rate increases sought by Plaintiffs, as set forth further in the attached Hamilton Declaration, Plaintiffs *do not* seek recovery of the full value of counsels' *actual* rate increases during these years. *See* Hamilton Decl., Table A. Counsels' rates increased more than what Plaintiffs seek recovery for here. *See id.* Rather, Plaintiffs compared their actual rate increases against the existing Richmond rates. Plaintiffs then compared the requested rate increases against the *Vienna Metro* guidelines discussed above to ensure that, with the requested fee increases, Plaintiffs' requested 2017-2019 rates remained reasonable in this district. For example, between 2016 and 2017, Aria Branch's actual billing rate increased from $430 to $665 ($235), but Plaintiffs request an increase of only $65 ($345 to $410). In 2017, Ms. Branch had five years of legal experience, meaning her requested rate is at the low end of the *Vienna Metro* guidelines for attorneys of a similar vintage.

Likewise, when considered in their entirety, the rates associated with counsel for Plaintiffs—including 2017-2019 rates—are reasonable given the complexity of this litigation, the specialized knowledge required to litigate redistricting cases, the significant experience of the

---

[7] Information regarding counsels' legal experience is set out in Exhibit A to the Declaration of Kevin J. Hamilton.

[8] While the *Vienna Metro* rates are generally considered by the Alexandria division, they have been applied to work performed by Richmond-based attorneys. *See Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 258 F. Supp. 3d 647, 665-66 n.11 (E.D. Va. 2017); *cf. Evergreen Sports, LLC v. SC Christmas, Inc.*, No. 3:12CV911-HEH, 2013 WL 6834643, at *8 & n.13 (E.D. Va. Dec. 20, 2013) (2013 case finding that counsels' rates were "reasonable and consistent with prevailing rates in the Richmond, Virginia area" where attorneys charged up to $650 per hour).

146048847.4

attorneys involved, and the prevailing market rates for attorneys of similar experience at comparable law firms. Plaintiffs continue to seek recovery at rates substantially below the actual rates charged, notwithstanding the excellent results they obtained in a hard-fought and complex case that has been litigated before this Court and the United States Supreme Court. The Hamilton Declaration, along with the data included therein, establishes that the rates sought by Plaintiffs are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," *Blum*, 465 U.S. at 895 n.11, and thus Plaintiffs should be awarded fees at their counsels' hourly rates as set out in the Hamilton Declaration. *See* Hamilton Decl. ¶ 25 (table setting out each timekeeper's hourly rate and total hours billed).

### 3.    Paralegal Hours

Prevailing parties in civil rights cases can also recover fees for the work of paralegals, including "factual investigation, . . . assistance with depositions, interrogatories and document production; compilation of statistical and financial data; checking legal citations; and drafting correspondence." *Missouri v. Jenkins ev rel. Agyei*, 491 U.S. 274, 288 n.10 (1989); *Herold v. Hajoca Corp.*, 864 F.2d 317, 322 (4th Cir. 1988) (paralegal time is "to be included in attorney's fees").[9]

As set out in Appendices A and B, paralegals Rachel Roberts, Patricia Marino, and Michelle DePass spent 199.50, 905.25, and 39.10 hours on this case, respectively, on tasks such as preparation of exhibits and provision of pretrial and trial support. That time had a legitimate purpose, involved tasks that would otherwise have been done by the attorneys, and is compensable

---

[9] *See also Roberson v. Brassell*, 29 F. Supp. 2d 346, 353 (S.D. Tex. 1998) (allowing recovery for paralegal's time preparing exhibits, compiling witness notebooks, and conducting research); *Webster Greenthumb Co. v. Fulton Cty.*, 112 F. Supp. 2d 1339, 1367 (N.D. Ga. 2000) (same, as to document production tasks); *Coal. to Preserve Houston v. Interim Bd. of Trs.*, 494 F. Supp. 738 (S.D. Tex. 1980) (awarding fees for the work of a paralegal under the Voting Rights Act).

17

under the attorneys' fee statutes. The hourly rates sought for Ms. Roberts, Ms. Marino, and Ms. DePass are at their usual rates (in Ms. Roberts' case, as that rate is below the Richmond rate previously awarded by the Court in *Wittman*) or at the "Richmond" rate for Ms. Marino previously identified by the *Wittman* court, with reasonable upward adjustments in recent years. Hamilton Decl. ¶ 25.

## C.   Plaintiffs Should Be Awarded Reasonable Expert Fees and Litigation Expenses

In this voting rights matter, Plaintiffs are not limited to recovery of the usual kinds of costs permissible under 28 U.S.C. § 1920. Rather, 52 U.S.C. § 10310(e) expressly provides for the recovery of "reasonable expert fees, and other reasonable litigation expenses as part of the costs." *Id.*; *see also Daly*, 790 F.2d at 1083 (noting that "reasonable attorneys' fees under § 1988 must include reasonable expenses because attorneys' fees and expenses are inseparably intertwined as equally vital components of the costs of litigation") (internal quotation marks, alterations, and citation omitted).[10]

Here, Plaintiffs brought their case under the Fourteenth Amendment, and thus § 10310(e) entitles them to expert fees. Plaintiffs retained and provided expert testimony from Dr. Stephen Ansolabehere, a Professor of Government at Harvard University; Dr. Jonathan Rodden, a Professor of Political Science at Stanford University; and Dr. Maxwell Palmer, an Assistant Professor of Political Science at Boston University. Hamilton Decl. ¶¶ 27-30. Drs. Ansolabehere's, Rodden's, and Palmer's findings provided additional and important support for Plaintiffs' claims, and were

---

[10] Plaintiffs separately filed a Bill of Costs with this Court seeking those fees that are permissible under 28 U.S.C. § 1920. Plaintiffs have not duplicated a request for those fees in this motion; the fees sought by Plaintiffs here include only those not already requested in the Bill of Costs. To the extent that the Court does *not* grant the Bill of Costs in full, however, all costs recoverable under 28 U.S.C. § 1920 are *also* recoverable as reasonable litigation expenses under 42 U.S.C. § 1988.

relied upon by this Court in finding constitutional violations in the enacted districts. *See* ECF No. 234 at 18-30, 19 n.14.

Plaintiffs are also entitled to recovery of other reasonable litigation expenses pursuant to Sections 1988(b) and 10310(e). The definition of reasonable litigation expenses is broad, including such items as photocopying charges, fees of process servers, travel and related meal expenses, telephone, postage, computer research, and data hosting and processing fees. *See Jenkins*, 491 U.S. at 285 (noting that the "fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors and others whose labor contributes to the work product for which an attorney bills her client; and it must also take account of other expenses and profit"); *Evans v. Books-A-Million*, 762 F.3d 1288, 1299 (11th Cir. 2014) (collecting cases detailing types of reasonable litigation expenses); *Taylor v. Republic Servs., Inc.*, 2014 WL 325169 at *13 (E.D. Va. Jan. 29, 2014) (allowing compensation for "miscellaneous services, including costs associated with copies, facsimile, postage, Federal Express, messenger service, local travel and parking, telephone usage and legal research"); *D.G. ex rel. Strickland v. Yarbrough*, 2013 WL 1343151, at *8-9 (N.D. Okla. Mar. 31, 2013) (allowing recovery of reasonable expenses incurred in using vendors for electronic document hosting and management to the extent expenses were adequately documented).

Here, Plaintiffs seek recovery of expenses in the total amount of $489,096.35. Attached as Appendix D to this motion is a spreadsheet that provides a detailed and itemized account of all expenses requested by Plaintiffs. *See also* Hamilton Decl. ¶ 31. All the expenses were necessarily and reasonably incurred in the course of providing representation to Plaintiffs, and are recoverable as part of an award of attorneys' fees.

**D.     Plaintiffs' Fees Are Recoverable Against the Commonwealth—Whether Against the State Defendants Alone or Against the State Defendants and Intervenors**

Finally, the Court has directed Plaintiffs to address certain issues related to the potential issuance of a fee award against Intervenors. *See* ECF No. 399 ¶ 10. The matters identified by the Court are addressed below. At the outset, Plaintiffs note again that they have not expressly requested that the Court award their fees against any particular state entity. That is because the appropriate allocation of fees is a matter committed firmly to the Court's discretion (or to the State Defendants and Defendant-Intervenors by agreement). *See Jones v. Southpeak Interactive Corp. of Delaware*, 777 F.3d 658, 677 (4th Cir. 2015). Plaintiffs' position is that all of their fees are recoverable against the State Defendants for reasons they have explained (and set out below). To the extent that the Court does not award Plaintiffs' entire fee award against the State Defendants, however, it could apportion the fee award between the two responsible parties in this case—the State Defendants and the Defendant-Intervenors. But none of the relevant case law precludes the Court from ordering the State Defendants to pay all of Plaintiffs' requested fees.

In Plaintiffs' view, it is the Commonwealth of Virginia that violated Plaintiffs' constitutional rights when it adopted gerrymandered districts. Plaintiffs sued the Commonwealth employees and state agency responsible for implementing this unconstitutional districting plan. They obtained an injunction preventing the Commonwealth from utilizing its unconstitutional districting plan in future elections and then a court-ordered remedy. Plaintiffs' interest is in recovering the fees and expenses against the Commonwealth to which they are entitled as the prevailing parties.

As an initial matter, the State Defendants' position before the United States Supreme Court was that they would be responsible for paying plaintiffs' attorneys' fees if plaintiffs were the prevailing party. Brief of State Appellees at 43-44, *Va. House of Delegates v. Bethune-Hill, et al.*

No. 18-281 (U.S. Jan. 28, 2019) ("[The State Defendants need authority] to make appeal decisions that reflect 'the limited resources of the Government'— *particularly where, as here, the State is going to have to pay the challenging party's attorney's fees if an appeal fails*") (citation omitted) (emphasis added); *see also id.* at 9 (explaining that the Defendant-Intervenors' appeal created "the likelihood of additional fee petitions by the plaintiffs"). The Court should hold the State Defendants to their prior representations and award Plaintiffs' fee award against them. *Cf. Zinkland v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007). ("Judicial estoppel . . . prevent[s] a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court.").

But in any event, law, fact, and commonsense support a finding of awarding Plaintiffs' attorneys' fees against the State Defendants and, if the Court saw fit to do so, Intervenors.

### 1.     The Cases Identified in the Court's Order Support the Court's Authority to Award Fees Against the State Defendants and Intervenors

The Court first ordered Plaintiffs to address three cases and their applicability to the award of fees against Intervenors.

The Fourth Circuit's decision in *Brat v. Personhuballah*, 883 F.3d 475 (4th Cir. 2018), does not preclude an award of fees against either the State Defendants (with respect to work by Plaintiffs after the State Defendants decided not to appeal) or Intervenors. *Brat* concerned a fee petition filed in the aftermath of a successful racial gerrymandering challenge to Virginia's third congressional district. In that case, individuals (Republican congressional representatives) had intervened, and filed an appeal after the Commonwealth declined to do so. The intervenors were *not* Commonwealth employees acting in an official capacity—they were private individuals with a personal interest in the litigation. A three-judge panel of this Court awarded a portion of the plaintiffs' fees against these private individuals.

On appeal, the Fourth Circuit reversed, concluding that the private individuals "were 'blameless' intervenors" because they were "persons not charged with violating the law[] and therefore should not have been assessed attorneys' fees under the fee-shifting statutes in question." *Brat*, 883 F.3d at 481 (*citing Flight Attendants v. Zipes*, 491 U.S. 754, 762 (1989) (emphasizing the "crucial connection between liability for violation of federal law and liability for attorney's fees under federal fee-shifting statutes")). In *Brat*, whereas the plaintiffs had "sought relief against the Commonwealth, the only party from whom they could obtain relief" for passing an unconstitutional law, the intervenors "were not alleged to have carried out the unconstitutional delineation of congressional districts—they were federal representatives who were not charged with any responsibility in the enactment of the state law." *Id*. Rather, the intervenors "were legally unaffiliated with the government of the Commonwealth and therefore incapable of adopting a new redistricting plan" and so "were not responsible for the plaintiffs' fees." *Id*.

In reaching this conclusion, the Fourth Circuit addressed the two other cases identified by the Court in its September 25 Order (*Planned Parenthood* and *Mallory*). The Fourth Circuit found these cases "materially distinguishable" because they addressed instances where the intervenors— like defendants here—were state actors. *Id*. at 483-84. One of these cases is *Planned Parenthood of Cent. N.J. v. Att'y Gen. of N.J.*, 297 F.3d 253, 263-65 (3d Cir. 2002), where the Third Circuit awarded fees against the New Jersey legislature after it intervened to defend a statute that the New Jersey Attorney General declined to defend. The other case is *Mallory v. Harkness*, 923 F. Supp. 1546, 1552-53 (S.D. Fla. 1996), where the court awarded attorneys' fees against Florida's attorney general, who intervened to defend a Florida law imposing minority quotas on appointees to the State's judicial nominating commission where officials of the state bar refused to defend the law. The Fourth Circuit made clear that in both of those cases—*Planned Parenthood of Central New*

22

*Jersey* and *Mallory*—"*the intervening party was a representative of the State responsible for enacting or enforcing the challenged statute, not an independent third party who could not be charged with liability*" (emphasis in original). In this regard, the Fourth Circuit in *Brat* agreed with the point made by Judge Payne in his dissenting opinion as to the imposition of fees against the private intervenors in *Brat*: "[T]he common-sense principle" is "that, where an unconstitutional statute is involved, the 'blameworthy' party under *Zipes* is the state that enacted the statute." *Personhuballah*, 239 F. Supp. 3d at 961 (Payne, J., dissenting).

The blameworthy party here is the Commonwealth. The Commonwealth can scarcely be heard to argue that it is no longer responsible for Plaintiffs' fees because of an internal disagreement in state government as to whether to pursue an appeal that, in fact, led state actors to file an appeal. This is different from *Brat*, where intervenors were not state actors. Here, intervenors are the House of Delegates—a legislative body that passed the unconstitutional map in question—and the Speaker of the House proceeding in his official capacity. This is also different from *Mallory*, where the original defendant (officials of the Florida state bar association) was fundamentally different from the intervening defendants (the state attorney general and national bar association). Here, the State Defendants are the executive branch representatives tasked with litigating claims stemming from litigation passed by the legislative branch and legislative branch representatives.

Thinking through the practicalities of a fee award drives the point home. Whether the Court awards fees solely against the State Defendants or allocates some portion of the fee award to Defendant-Intervenors, the *same entity*—the Commonwealth—is paying those fees. The only difference is a matter of the Commonwealth's internal accounting—i.e., whether one of state

23

government or another is nominally "responsible" for paying fees. The same certainly cannot be said for the fee awards in *Brat* or *Mallory*.

Finally, a refusal to award plaintiffs' attorneys' fees against the State Defendants would be unsupported by commonsense and would lead to absurd results. As recognized by the Third Circuit in *Planned Parenthood of Cent. N.J.*, the path forward for any state sued in a civil rights matter would be clear. As soon as a case is filed, have another state actor intervene. Then, have the original defendant assert that it will no longer defend the law in question, while the intervenor assumes the defense. Through this simple *presto chango* procedural magic trick, a state sued for violating a plaintiff's civil rights could immunize itself from fee awards. *See Planned Parenthood for Cent. N.J.*, 297 F.3d at 262 ("If the Legislature were deemed immune, a major loophole would be created in the statutory scheme for reimbursing plaintiffs. Original defendants, otherwise liable for fees, could remain passive in §1983 actions, leaving defense of the challenged laws to Legislatures or others claiming to possess immunity from fee liability. States, by this method, could defend constitutional challenges to their statutes without having to pay plaintiffs' fee awards, which Congress has acknowledged to be 'an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies' which the civil rights laws contain.") (citation omitted).  This cannot be, and is not, the law.

Thus, although the Court can and should award Plaintiffs' entire attorneys' fees against the State Defendants, it would be within its discretion to apportion responsibility for the fee award between the two responsible parties in this case—the State Defendants and the Defendant-Intervenors. *See Mallory*, 923 F. Supp. at 1552-53. The State Defendants here, like the Bar Defendants in *Mallory*, "are not free from liability in this matter. The Bar Defendants [similar to the State Defendants] willingly enforced the unconstitutional statute, thus directly violating the

Plaintiff's civil rights." *Id.* at 1552. And, similar to the intervenor in *Mallory*, the Defendant-Intervenors here voluntarily intervened to defend the unconstitutional House of Delegates map, and in doing so attempted to aid in the map's enforcement. Accordingly, neither the State Defendants nor the Defendant-Intervenors are "blameless" or "innocent" in terms of violating plaintiffs' (and Virginia voters') constitutional rights.

### 2. The Supreme Court's Dismissal of Intervenors' Appeal for Lack of Standing Does Not Affect Whether Intervenors May Be Subject to a Fee Award

The Court also directed Plaintiffs to address whether the Supreme Court's disposition of Intervenors' appeal for lack of standing affects the analysis of whether fees could be awarded against Intervenors. It does not.

The Supreme Court dismissed Intervenors' appeal for lack of standing for two basic reasons. First, it concluded that Intervenors did not have authority to "litigate on the State's behalf." *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019). Second, the Supreme Court concluded that Intervenors did not have standing in their own right to pursue an appeal. *Id.* at 1953.

As set out above, the rule of decision here is set out in *Zipes* and its progeny. The question is thus not whether Intervenors had authority under state law to pursue an appeal on the Commonwealth's behalf or whether state law vested that responsibility with the executive branch. Rather, *Zipes* establishes the rule that "innocent" intervenors are not subject to fee awards, whereas those that are blameworthy are subject to fee awards. *Zipes*, 491 U.S. at 762. *Brat* and the other cases cited above stand for the proposition that intervenors are not "innocent" within the meaning of *Zipes*—the House is the state actor directly responsible for Plaintiffs' constitutional injury.

Indeed, the fact that Intervenors did not have standing to appeal does not absolve Intervenors of the possibility of a fee award against them; it adds insult to injury. Under *Zipes*, one

reason to award fees against intervenors is where their "action was frivolous, unreasonable, or without foundation." *Id*. at 766. If anything, a fee award against Intervenors would be more justified given the fact that Intervenors—the state actor responsible for violating Plaintiffs' constitutional rights—continued to litigate this case even when they plainly lacked authority under state law to do so.

Again, Plaintiffs reiterate that while they think the Court *could* award fees against Intervenors, it can simply award fees against the State Defendants, and leave it to the internal workings of state government if there are further discussions to be had regarding payment of Plaintiffs' fees.

## IV.     CONCLUSION

For the reasons set forth above and supported by the accompanying declaration and exhibits, Plaintiffs respectfully request that this Court approve attorneys' fees in the amount of $4,115,893.75 and reasonable litigation expenses in the amount of $489,096.35. Plaintiffs also ask the Court to grant their pending cost bill (ECF No. 388) in the total amount of $223,832.06,

DATED: October 28, 2019

By: */s/ Aria C. Branch*
Marc Erik Elias (admitted *pro hac vice*)
Bruce V. Spiva (admitted *pro hac vice*)
Aria Branch (VSB # 83682)
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.434.1627
Facsimile: 202.654.9106

26

Kevin J. Hamilton (admitted *pro hac vice*)
Abha Khanna (admitted *pro hac vice*)
Ryan Spear (admitted *pro hac vice*)
William B. Stafford (admitted *pro hac vice*)
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

*Attorneys for Plaintiffs*

27

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of October, 2019, I filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the counsel of record in this case.

By */s/ Aria C. Branch*
Aria C. Branch (VSB #83682)
Perkins Coie LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6338
Fax: (202) 654-9106
ABranch@perkinscoie.com

*Attorneys for Plaintiffs*

146048847.4