IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

GOLDEN BETHUNE-HILL, *et al.*,

      Plaintiffs,

v.                                                                          Civil Action No. 3:14cv852

VIRGINIA STATE BOARD OF
ELECTIONS, *et al.*,

      Defendants.

MEMORANDUM OPINION

BARBARA MILANO KEENAN, Circuit Judge:

The issue presently before the Court is the plaintiffs' Revised Second Motion for Attorneys' Fees and Litigation Expenses. Dkt. No. 402. The plaintiffs seek reimbursement for their attorneys' fees and expenses as the prevailing parties in this case, pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e). After more than five years of litigation, including two trials and two appeals to the United States Supreme Court, the plaintiffs assert that they have incurred more than $4 million in attorneys' fees, as well as nearly $500,000 in litigation expenses. The plaintiffs also filed a Bill of Costs, claiming taxable costs in the amount of $223,832.06, pursuant to 28 U.S.C. § 1920. Dkt. No. 388.

Upon our review, we conclude that the intervenors, the Virginia House of Delegates and the former Speaker of the House, were "innocent" intervenors within the meaning of *Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754 (1989), and thus may not be held liable for a portion of the plaintiffs' fee award. We also conclude that the fees

and expenses that may be charged against the state defendants are reasonable and recoverable under Sections 1988, 10310(e), and 1920, with the exceptions described below. Accordingly, we hold that the state defendants are responsible for the recoverable portion of the plaintiffs' fees, expenses, and costs, totaling $4,159,609.20.

## I.

The underlying facts and procedural history of this case are set forth in detail in our liability and remedial-phase opinions, *Bethune-Hill v. Virginia State Board of Elections*, 326 F. Supp. 3d 128 (E.D. Va. 2018) (*Bethune II*), and *Bethune-Hill v. Virginia State Board of Elections*, 368 F. Supp. 3d 872 (E.D. Va. 2019) (*Bethune III*). We restate here only those facts relevant to the present motion for fees.

The plaintiffs, twelve Virginia registered voters, filed their complaint in December 2014, naming the Virginia State Board of Elections, the Virginia Department of Elections, and several officials of those agencies as defendants (the state defendants). Compl. ¶¶ 7-22. The state defendants are responsible for regulating and implementing Virginia's elections. Compl. ¶¶ 19-22. The plaintiffs claimed that the Virginia General Assembly drew twelve House of Delegates districts (the challenged districts) primarily on the basis of race during the 2011 redistricting cycle, in violation of the Equal Protection Clause of the Fourteenth Amendment. *Bethune III*, 368 F. Supp. 3d at 874; Compl. ¶¶ 103-08.

In January 2015, the Virginia House of Delegates and then-Speaker of the House, William J. Howell (collectively, the intervenors), filed a motion to intervene in this action.

2

Dkt. No. 13.  The intervenors asserted that they were the "parties that drew and enacted the redistricting plan at issue," *id.* at 2, noting that the state defendants "had no involvement in the enactment of the challenged plan" and had no "particular interest in defending the validity of the plan," *id.* at 4.  The intervenors further acknowledged that they would be affected by any order of the Court requiring that the challenged districts be redrawn.  *Id.* The plaintiffs did not object to the requested intervention, and we granted the motion to intervene in February 2015.  Dkt. Nos. 22, 26.  Immediately after entering the case, the intervenors assumed primary responsibility for defending the challenged redistricting plan.

After a trial that occurred in July 2015, we held that the legislature had not violated the Equal Protection Clause in drawing the twelve challenged districts.  *Bethune-Hill v. Va. State Bd. of Elections*, 141 F. Supp. 3d 505 (E.D. Va. 2015) (*Bethune I*).  The plaintiffs appealed, and the Supreme Court reversed our judgment with respect to eleven of the districts, concluding that we had applied the wrong standard for racial predominance. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 797-99 (2017).  The Court affirmed our determination that the composition of the twelfth district satisfied constitutional requirements and remanded the remainder of the case for our reconsideration.  *Id.* at 801-02.

On remand, we instructed the parties to submit briefs on the question of whether we should reevaluate the issue of racial predominance based on the existing factual record or reopen the record to consider additional evidence.  Dkt. No. 136.  The plaintiffs argued that additional evidence was not necessary and urged us to issue a revised opinion based on the

3

current record.  Dkt. No. 153 at 2, 5, 11.  In contrast, the intervenors sought to reopen the record, including to present new expert witness testimony.  Dkt. No. 152 at 1-11.  After considering these submissions, we held a second trial in October 2017, at which both the plaintiffs and the intervenors presented substantial additional evidence.  *Bethune III*, 368 F. Supp. 3d at 875.  As they did during the first trial, the intervenors again assumed responsibility for defending the plan, and the state defendants offered only minimal argument and no evidence of their own.

We issued our second liability opinion in June 2018.  *Bethune II*, 326 F. Supp. 3d 128.  We concluded that the legislature had used race as the predominant factor in constructing the eleven remaining challenged districts, and that this use of race was not justified by a compelling state interest.  *Id.* at 137.  In reaching this conclusion, we identified numerous instances in which members of the House of Delegates had altered district boundaries for racial reasons, ultimately concluding that "the legislature had shifted substantial groups of voters in and out of those districts primarily on the basis of race, in derogation of traditional districting criteria."  *Bethune III*, 368 F. Supp. 3d at 875 (citing *Bethune II*, 326 F. Supp. 3d at 146, 155-72, 174).  We instructed the General Assembly to redraw the districts by a specified date to remedy the constitutional deficiencies.  *Bethune II*, 326 F. Supp. 3d at 181.

On July 6, 2018, the intervenors filed a notice of appeal to the Supreme Court.  Dkt. No. 236.  However, on July 19, 2018, the state defendants notified this Court that "continued litigation would not be in the best interest of the Commonwealth or its citizens,"

4

and, thus, represented that "an appeal to the United States Supreme Court [wa]s . . . unwarranted." Dkt. No. 246 at 1.  The state defendants asserted that the Virginia Attorney General had the exclusive authority to represent the state and that, therefore, the intervenors lacked standing to appeal our judgment to the Supreme Court.  *Id.* at 2, 7.  Despite the state defendants' decision to cease defending the plan, the intervenors continued to pursue their appeal of our liability decision.

While the intervenors' appeal was pending, we continued with the remedial phase of this litigation.  Because the General Assembly had failed to pass a remedial plan by our Court-imposed deadline, we appointed a special master to assist us in redrawing the map for the House of Delegates districts.  *See Bethune III*, 368 F. Supp. at 875.  In February 2019, after considering numerous proposals presented by the parties, the special master, and the interested non-parties, we approved one of the plans proposed by the special master.  *See id.* at 876.  Although the state defendants once again declined to appeal, the intervenors nevertheless appealed our remedial decision to the Supreme Court.  Dkt. No. 363.

In June 2019, the Supreme Court dismissed the intervenors' appeal of our liability decision for lack of jurisdiction.  *See Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019).  The Court concluded that the intervenors lacked standing to appeal, because (1) Virginia law vested exclusive authority in the attorney general to represent the state and the attorney general had not delegated this responsibility to the intervenors, *id.* at 1951-52, and (2) the House of Delegates, as "one House of a bicameral legislature, resting solely on

5

its role in the legislative process," had not suffered a discrete and cognizable injury, *id.* at 1953.  The Court similarly dismissed the intervenors' appeal of our remedial decision for lack of jurisdiction.  *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 2715 (2019) (mem.).  The plaintiffs now seek reimbursement of their attorneys' fees and litigation expenses under 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).[1]

## II.

It is undisputed that the plaintiffs, as the prevailing parties in this civil rights lawsuit, are entitled to reasonable attorneys' fees and litigation expenses under 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).  *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (a plaintiff is a prevailing party under Section 1988 if he "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit" (citation omitted)); *see also Brandon v. Guilford Cty. Bd. of Elections*, 921 F.3d 194, 198 (4th Cir. 2019) ("Because the language of § 1988 and § 10310(e) are phrased in identical terms, we apply the same rule of decision under both of them." (citation and internal quotation marks omitted)).  In evaluating the plaintiffs' motion, we must answer two questions: (1) which party or parties bear responsibility for paying the fees and expenses incurred by the

---

[1] We previously denied without prejudice the plaintiffs' first motion for attorneys' fees, concluding that the motion was premature while the intervenors' appeal was pending before the Supreme Court.  Dkt. No. 377.

plaintiffs; and (2) the amount of fees and expenses that the plaintiffs are entitled to recover. We address each issue in turn.

A.

We begin with the issue of whether the intervenors may be held responsible for the fees and expenses (the challenged fees and expenses) incurred by the plaintiffs in responding to the intervention motion and in opposing the intervenors' appeal of our liability and remedial decisions to the Supreme Court.  All parties agree that the state defendants are responsible for the greatest portion of the fees and expenses sought under Sections 1988 and 10310(e).  However, as explained above, the intervenors appealed our liability and remedial decisions to the Supreme Court even after the state defendants ceased defending the plan.  As a result of those appeals, the plaintiffs incurred $562,056.50 in attorneys' fees, as well as additional expenses. Pet. at 484 (App. B at 223).  The plaintiffs also incurred about $5,600 in fees related to the entry of the intervenors into the case.  Pet. at 489 (App. C).

Nevertheless, we are constrained to conclude that the House of Delegates and its former Speaker are not liable for payment of the challenged fees and expenses, despite the intervenors' evident complicity in enacting the unconstitutional redistricting plan.  The Supreme Court, in *Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754 (1989), and the Fourth Circuit, in *Brat v. Personhuballah*, 883 F.3d 475 (4th Cir. 2018), have established a categorical rule severely limiting intervenor liability for a prevailing party's attorneys' fees and costs.  The broad language in those decisions generally shields

7

intervenors from fee liability, including in the circumstances presented here, by limiting fee liability to defendants who have been found liable on the merits of the case unless the intervenors' actions are deemed "frivolous, unreasonable, or without foundation." *Zipes*, 491 U.S. at 761; *Brat*, 883 F.3d at 481.  In imposing such a restrictive test, this precedent effectively prevents a district court from assessing fee liability against an intervenor who, though not liable for relief on the merits, nevertheless participated in violating the plaintiffs' civil rights and forced the plaintiffs to incur additional fees in litigating their case to a successful conclusion.

The Supreme Court initially crafted this rule shielding intervenors from fee liability in a context very different from the one presented here.  *Zipes* was an employment discrimination case in which a union representing employees of the defendant intervened to challenge a proposed settlement agreement that would have adversely affected non-plaintiff employees.  491 U.S. at 755-57.  The Court held that the union was not responsible for the plaintiffs' attorneys' fees under a civil rights fee-shifting statute, reasoning that the union's "good faith" intervention had protected the legal rights of innocent employees and had advanced the adversarial process.  *Id.* at 764-66.  The Court explained that when a plaintiff has prevailed in a lawsuit, "there will also be a losing defendant who has committed a legal wrong," and thus "the party legally responsible for relief on the merits" is exclusively responsible for the plaintiffs' attorneys' fees.  *Id.* at 761, 763 (citation omitted).  Accordingly, the Court held that attorneys' fees may be awarded against losing

intervenors, who were "blameless" with respect to the legal wrong, "only [when] the intervenors' action was frivolous, unreasonable, or without foundation." *Id.* at 761.

In *Brat v. Personhuballah*, 883 F.3d 475, the Fourth Circuit applied the *Zipes* rationale to a case in which members of Virginia's congressional delegation had intervened to defend Virginia's congressional redistricting map against a challenge brought by individual voters. The Fourth Circuit repeatedly emphasized *Zipes*' "categorical" rule limiting liability for fees and costs to "the party legally responsible for relief on the merits." *Brat*, 883 F.3d at 481-83 (quoting *Zipes*, 491 U.S. at 761, 763) (alteration omitted). The court in *Brat* observed that the congressional intervenors were "incapable of adopting a new redistricting plan," which was the relief awarded on the merits of the case, and concluded that their intervention was not "frivolous, unreasonable, or without foundation." *Id.* at 481-82 (quoting *Zipes*, 491 U.S. at 761). Thus, the court held that the intervenors could not be held responsible for any fees incurred by the plaintiffs, explaining further that limiting fee liability to the "losing defendant who has committed a legal wrong" advances the purpose of civil rights fee-shifting statutes, namely, (1) making plaintiffs whole, and (2) deterring potential wrongdoers from future civil rights violations. *Id.* at 482-83 (quoting *Zipes*, 491 U.S. at 761).

This functional distinction, responsibility for relief on the merits of the case, was the consistent analytical platform employed in *Brat* for rejecting the plaintiffs' request for attorneys' fees and costs. For example, contrary to the *Brat* plaintiffs' position, the Fourth Circuit distinguished the congressional intervenors from intervenors in two other cases,

9

*Planned Parenthood of Central New Jersey v. Attorney General of New Jersey*, 297 F.3d 253 (3d Cir. 2002), and in *Mallory v. Harkness*, 923 F. Supp. 1546 (S.D. Fla. 1996). *See Brat*, 883 F.3d at 483-84. In those decisions, the courts had held that the state legislature and state attorney general, respectively, who had intervened to defend state laws, were responsible for payment of the plaintiffs' attorneys' fees. *Planned Parenthood*, 297 F.3d at 272-73; *Mallory*, 923 F. Supp. at 1552-53. The opinion in *Brat* distinguished *Planned Parenthood* and *Mallory* on the basis that "the intervening party was a representative of the State responsible for enacting or enforcing the challenged statute." *Brat*, 883 F.3d at 484 (emphasis omitted). And, as stated above, the court in *Brat* ultimately rested its decision on the fact that the congressional intervenors could not be held liable for providing the relief sought. *Id.* at 481-82.

The court's analysis in *Brat*, including its reliance on *Zipes*, provides an ill-fitting template for determining whether the present intervenors are liable for payment of the challenged fees and expenses. Unlike the congressional intervenors in *Brat*, the present intervenors were state actors, who were legally affiliated with the government of the Commonwealth and who entered the case in their official capacities. In arguing their position to intervene in the present case, the intervenors vigorously emphasized their role as the architects of the redistricting plan that we ultimately found to be unconstitutional. *See* Dkt. No. 13 at 2-4.

Because in *Zipes* and in *Brat*, the third-party intervenors' pre-litigation conduct was not at issue, liability on the merits was inextricably intertwined with attorneys' fee liability.

*See Zipes*, 491 U.S. at 765; *Brat*, 883 F.3d at 483.  Under such circumstances, a rule against intervenor fee liability did not thwart the purposes of the civil rights fee-shifting statutes.

In contrast, due to their pre-litigation conduct in designing the unconstitutional redistricting plan, the present intervenors were directly involved in violating the plaintiffs' rights.  We made a factual determination that the House of Delegates purposefully separated voters based on their race, the heart of the constitutional violation in this case. *Bethune II*, 326 F. Supp. 3d at 144-72.  In support of our finding, we identified numerous instances in which members of the House of Delegates took specific actions to alter district lines for racial reasons.  *See, e.g.*, *id.* at 148, 151-53, 155-57, 159-60.  Thus, the House of Delegates and its former Speaker occupy a fundamentally different position than the intervenors in *Zipes* and *Brat*, making the categorical rule established in *Zipes* and *Brat* a poor fit for the circumstances presented here.  A decision shielding the present intervenors from liability for the plaintiffs' added fees is in tension with, if not inconsistent with, the above-noted purposes of civil rights fee-shifting statutes.

Despite these concerns, we are constrained by the categorical language of *Zipes* and *Brat* to conclude that the intervenors are not required to pay any portion of the plaintiffs' fees.  As discussed above, *Zipes* and *Brat* unequivocally limit fee liability to the party "legally responsible for relief on the merits."  *Brat*, 883 F.3d at 481 (quoting *Zipes*, 491 U.S. at 763).  The intervenors do not satisfy this standard.  The plaintiffs did not name the intervenors as defendants in the complaint, and we did not enter judgment against the House of Delegates or the former Speaker of the House.  *See* Compl. at 4.  Nor could we

11

have done so.  One house of a bicameral legislature and its former Speaker could not have provided the relief we ordered, namely, the enactment of a lawful redistricting plan.  *See* Dkt. No. 235.  Only the state defendants, as representatives of the Commonwealth of Virginia, could have effectuated the prescribed relief.[2]

The plaintiffs claim in passing that the intervenors acted unreasonably in appealing our liability decision to the Supreme Court, because the intervenors lacked standing to do so.  Pls. Reply at 7.  We disagree with this argument.  Without more, the mere act of asserting an unsuccessful legal position is not "frivolous, unreasonable, or without foundation."  *Brat*, 883 F.3d at 481-82.  Here, although the Supreme Court ultimately dismissed the appeal, four justices would have held that the intervenors had standing to appeal.  *See Va. House of Delegates*, 139 S. Ct. at 1956 (Alito, J., dissenting).  Given this difference of opinion among the justices regarding the intervenors' legal argument, we cannot conclude that the intervenors acted unreasonably, frivolously, or without foundation in pursuing their appeal, as required to fall within the narrow exception to *Zipes*' categorical rule.  *Brat*, 883 F.3d at 484.

Accordingly, although the intervenors designed the unconstitutional gerrymander and are "blameworthy" under any commonsense meaning of the term, we find no reasoned

---

[2] In their complaint, the plaintiffs also sought to enjoin future elections under the unconstitutional plan.  *See* Compl. at 17.  Clearly, the state defendants, who are responsible for implementing Virginia's election laws, were the only parties who could effectuate that relief.

basis for failing to apply the general rule articulated in *Zipes* and *Brat* prohibiting intervenor fee liability.  While reconsideration of this rule may be warranted in light of the new circumstances presented by this case—which do not appear to have been considered by the Supreme Court and Fourth Circuit in fashioning the rule—such a decision must be made by the Supreme Court, not this Court.

B.

We turn to consider the amount of attorneys' fees that the plaintiffs should be awarded.[3]  We begin by multiplying "the number of hours reasonably expended on the litigation [] by a reasonable hourly rate."  *Hensley*, 461 U.S. at 433.  This "lodestar" calculation is entitled to a "strong presumption" that the resulting figure "represents a reasonable fee."  *Page v. Va. State Bd. of Elections*, No. 3:13cv678, 2015 WL 11256614, at *2 (E.D. Va. Mar. 11, 2015) (citation omitted).  We evaluate the reasonableness of hours spent and rates charged by considering:

> (1) [t]he time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

---

[3] We discuss which of these fees and expenses are chargeable to the state defendants *infra* Section II.D.

*McAfee v. Boczar*, 738 F.3d 81, 88 n.5 (4th Cir. 2013) (quoting *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 222 n.28 (4th Cir. 1978)).  These factors typically are subsumed within the lodestar calculation.[4]  *See id.* at 88-90 (citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010)).

The plaintiffs seek a total of $4,115,893.75 in fees for their attorneys and paralegals, representing more than 9,000 hours of legal work.  Pet. at 2, 261 (App. A at 227).  The plaintiffs have submitted lengthy billing records showing the tasks completed by their various attorneys and paralegals over five years of litigation, as well as the hourly rates charged by those timekeepers.  We discuss these records in more detail below.

i.

We begin by determining the number of hours that were "reasonably expended on the litigation."  *Page*, 2015 WL 11256614, at *2 (quoting *Hensley*, 461 U.S. at 433).  In assessing the reasonableness of claimed hours, we will not award fees for work that is "excessive, redundant, or otherwise unnecessary."  *Id.*  We also will reduce a fee award if

---

[4] We must subtract from the lodestar figure any fees attributable to unsuccessful claims.  *McAfee*, 738 F.3d at 91.  Although the plaintiffs did not prevail on their challenge to the configuration of District 75, *Bethune-Hill*, 137 S. Ct. at 800-02, the plaintiffs ultimately obtained a remedial plan in which all twelve challenged districts were redrawn. *Bethune III*, 368 F. Supp. 3d at 881-83; *see also* Compl. at 17; Dkt. No. 235.  Notably, no party argues that the plaintiffs' fee award should be reduced based on the outcome of their challenge to District 75.  We therefore do not adjust the award on this basis.

14

we cannot "assess the reasonableness of time spent on specific tasks" based on the supporting documentation. *Id.* at *8.

The plaintiffs seek reimbursement for 9,262.15 hours of work by attorneys and paralegals employed by Perkins Coie, a law firm with several offices around the country.[5] Pet. at 489 (App. C).  These hours cover two trials, two appeals to the Supreme Court, and the entire remedial phase of this litigation, including an evidentiary hearing.  The plaintiffs claim that they initially spent 3,801.3 hours on the case, beginning with preparing to file the complaint in late 2014 through the first trial in July 2015 and related post-trial matters; 1,330.95 hours for the first appeal to the Supreme Court, in which the plaintiffs largely were successful; 2,727.45 hours for the proceedings on remand and the second trial in October 2017, in which the plaintiffs prevailed; 304 hours for the remedial proceedings; 962.4 hours for the liability and remedial-phase appeals filed by the intervenors, which the Supreme Court dismissed for lack of jurisdiction; and 136.05 hours for preparation of the fee motions.  Pet. at 29 (App. A), 363 (App. B), 489 (App. C).  The plaintiffs assert that they have "written off," and thus do not seek reimbursement for, 1,783.65 hours of work, totaling more than $800,000 in fees.  Pet. at 11.

We conclude that the hours claimed are reasonable.  Unlike the single congressional district at issue in *Page/Personhuballah*, *see infra* note 7, the plaintiffs in the present case

---

[5] Work completed by paralegals is compensable under Section 1988.  *Missouri v. Jenkins ex rel. Agyei*, 491 U.S. 274, 285 (1989).

produced voluminous evidence regarding the redistricting process and voting patterns in twelve "vastly dissimilar" House of Delegates districts spanning four regions of the state. *Bethune II*, 326 F. Supp. 3d at 176, 180.  Given the breadth of their claims, the plaintiffs' factual presentation was complex.  The case also raised the novel issue of the proper racial predominance inquiry when the legislature had applied a strict, uniform racial threshold to those twelve districts.  The complexity of this legal issue resulted in the plaintiffs obtaining a remand from the Supreme Court in the first appeal.  *Bethune-Hill*, 137 S. Ct. 788.  For these reasons, "the novelty and difficulty of the questions raised" and "the skill required to properly perform the legal services rendered" strongly support the hours claimed by the plaintiffs.  *McAfee*, 738 F.3d at 88 n.5, 89.

The state defendants nevertheless argue that the plaintiffs have not substantiated the reasonableness of the hours claimed, because the supporting records "are vague and replete with block billing."  State Defs. Resp. at 10.  "Block billing is the practice of grouping, or lumping, several tasks together under a single entry, without specifying the amount of time spent on each particular task."  *Page*, 2015 WL 11256614, at *10 (citation and internal quotation marks omitted).  The state defendants assert that plaintiffs' counsel frequently "combine multiple tasks in a single entry," such as one entry for multiple telephone conferences, or both preparing for and participating in a call or deposition.  State Defs. Resp. at 10-11.

Although we do not disagree that plaintiffs' counsel could have documented certain activities with more specificity, we decline to comb through every possibly curtailed

description with the benefit of hindsight.  Based on the records presented, we are confident that we can "weigh the hours claimed and exclude hours that were not reasonably expended," and "assess the reasonableness of time spent on specific tasks."  *Page*, 2015 WL 11256614, at *8, 10 (citation and internal quotation marks omitted).  We similarly can evaluate the time expended on the various phases of this litigation and the case overall.[6] We conclude that the 9,126.1 hours spent by the plaintiffs for all phases of this case preceding the present attorneys' fees litigation are reasonable.  *See* Pet. at 489 (App. C).

With respect to the attorneys' fees stage of this litigation, the plaintiffs seek fees in the amount of $71,413.50, representing 136.05 hours spent preparing the various fee motions.  *See* Pet. at 489 (App. C).  We conclude that this amount is "excessive" and that a "reasonable fee for this endeavor" is far less than the amount sought.  *Page*, 2015 WL 11256614, at *12 (quoting *McAfee v. Boczar*, No. 3:11cv646, 2012 WL 6623038, at *3 (E.D. Va. Dec. 19, 2012), *aff'd*, 738 F.3d 81 (4th Cir. 2013)).  Accordingly, as we did in *McAfee* and *Page*, we will award $10,000 for fees, recoverable against the state defendants, that the plaintiffs incurred in seeking reimbursement for their fees.  *See id.*

---

[6] The state defendants briefly assert in a footnote that the plaintiffs "at times billed excessive amounts of time for routine tasks."  State Defs. Resp. at 12 n.18.  We will not reduce an otherwise reasonable fee award merely because, "at times," attorneys might have been able to work more efficiently.

17

ii.

In our calculation of the lodestar figure, it is the prevailing party's burden to prove the reasonableness of the requested hourly rates charged by each attorney and paralegal. *Plyer v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990).  The party seeking fees must "produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award."  *Id.* (citations and internal quotation marks omitted).

Although plaintiffs' counsel primarily practice in Seattle and Washington, D.C., counsel have agreed to seek reimbursement at the lower "Richmond rates" that govern litigation in this district and division.  Pet. At 14, 26.  The plaintiffs further have agreed to accept the 2014 Richmond rates applied by this Court in *Personhuballah v. Alcorn*, No. 3:13cv678 (orders dated Mar. 11, 2015 & Mar. 3, 2017), for work performed in 2014, 2015, and 2016.[7]  Pet. At 14-15; Hamilton Decl. ¶ 15.  Given our approval of these Richmond rates in *Personhuballah*, the state defendants do not object to the rates requested for work performed during the first three years of this litigation.  State Defs. Resp. at 7.  We therefore adopt the rates requested for those years.

─────────────────────

[7] At the time of the March 2015 attorneys' fees opinion, the case was captioned *Page v. Virginia State Board of Elections*.  *See* No. 3:13cv678, 2015 WL 11256614 (E.D. Va. Mar. 11, 2015).  The court issued its second attorneys' fees opinion under the caption *Personhuballah v. Alcorn*, 239 F. Supp. 3d 929 (E.D. Va. 2017), *rev'd sub nom. Brat*, 883 F.3d 475.

18

Although the plaintiffs agreed to use of the Richmond rates, the plaintiffs nevertheless claim that those rates should be higher for work performed in 2017, 2018, and 2019, "to reflect the added value experience brings to the practice of law and the changing legal marketplace." Pet. At 15. In the aggregate, the plaintiffs seek a 12% increase in their fees, for a total of $440,810.75. Hamilton Decl. ¶ 19. Notably, counsel's billing rates increased more than the amount sought, for an average increase of 14.4%. Pet. At 16; Hamilton Decl. ¶ 15. After applying the changes, the plaintiffs seek hourly rates ranging from $410 for an associate to $675 for a partner in 2017, and from $400 for an associate to $750 for a partner in 2019. Hamilton Decl. ¶ 25; Frenzel Decl. ¶ 9.

The state defendants argue that the plaintiffs have failed to substantiate their requested rate increases for the years 2017 through 2019. In the defendants' view, the fact that plaintiffs' counsel billed at higher rates for those years does not establish the reasonableness of those heightened fees. The defendants thus urge us to apply the 2014 rates we approved in *Personhuballah* to the entirety of this litigation. We disagree with the state defendants' position.

The plaintiffs have submitted three declarations in support of their requested rate changes.[8] The first declarant is Dion W. Hayes, a partner at McGuireWoods LLP who has

---

[8] We decline to adopt the rates set forth in the so-called "Vienna Metro Matrix," established in *Vienna Metro LLC v. Pulte Home Corp.*, No. 1:10cv502, Dkt. No. 263 (E.D. Va. 2011), sometimes cited by other courts in this district. The Vienna Metro Matrix was

practiced law in the firm's Richmond office for 28 years and currently helps set the hourly rates for attorneys in that office. Hayes Decl. ¶¶ 4-5. We accept as reliable Hayes' qualifications to opine on typical hourly rates for Richmond-based attorneys.

Hayes averred that McGuireWoods attorneys in Richmond billed between $368 for an associate and $870 for a partner in 2017, and $432 for an associate and $937 for a partner in 2019. Hayes Decl. ¶ 6. Comparing average rates charged by senior partners, junior partners, senior associates, junior associates, and paralegals at McGuireWoods with plaintiffs' counsel and paralegals at Perkins Coie, it is apparent that the rates requested by the plaintiffs are well-below those charged by each category of the Richmond counterparts at McGuireWoods. *Id.* ¶ 8. As a result, Hayes concluded that the plaintiffs' requested rates are "reasonable and at or below market rate for Richmond attorneys of similar experience and reputations for complex civil litigation of the kind at issue here," particularly "[g]iven the high quality of Perkins Coie's legal services, its expertise and efficiency," and the successful result counsel obtained for the plaintiffs. *Id.* ¶ 9.

The second declarant, Robert A. Angle, is a partner in the Richmond office of Troutman Sanders LLP who has extensive familiarity with the prevailing rates charged by

---

developed in the Alexandria Division nearly a decade ago. The plaintiffs have submitted extensive evidence of the rates currently charged by attorneys of comparable experience in Richmond. *See infra* Hayes and Angle Declarations. This evidence of current Richmond rates is a more reliable indicator of the reasonableness of the plaintiffs' requested rates than the Vienna Metro Matrix.

attorneys in the Richmond market.  Angle Decl. ¶¶ 1, 4, 9.  Angle has served as an expert witness regarding the reasonableness of attorneys' fees in this Court and in the Western District of Virginia.  *Id.* ¶ 9.  Like Hayes, we similarly accept as reliable Angle's knowledge of prevailing rates for attorneys in Richmond.

Based on the rates charged by Troutman Sanders, as well as surveys of Richmond attorneys conducted by third party companies, including PriceWaterhouseCoopers and Thomson Reuters, Angle concluded that the rates requested by plaintiffs' counsel "fall within the range of prevailing market rates for large law firms in the Richmond region" for the years 2017 to 2019.  *Id.* ¶¶ 12-13.  Angle further examined the qualifications and experience of each Perkins Coie timekeeper, and opined that the requested rates are reasonable.  *Id.* ¶ 17.

And third, the plaintiffs provided the declaration of Eugenia Frenzel, Director of Pricing and Practice Management Economics at Perkins Coie, who oversees the firm's billing rate structure.  Frenzel Decl. ¶¶ 1, 8.  After comparing the plaintiffs' requested rates to other lawyers practicing in Richmond, Frenzel averred that the 2017 to 2019 rates sought by the plaintiffs are reasonable and comparable to rates charged by similarly situated attorneys in Richmond.  *Id.* ¶ 9.

The state defendants have not submitted evidence of prevailing Richmond rates to counter the evidence offered by the plaintiffs.  Accordingly, upon our review of the declarations of Hayes, Angle, and Frenzel, we conclude that the plaintiffs have satisfied their burden to show that the rates requested for the years 2017, 2018, and 2019 are

reasonable.  The data establish that these rates fall well within the range of rates charged by Richmond attorneys of comparable experience for the years requested.  *See* Angle Decl. ¶ 16.  Plaintiffs' counsel provided high-quality representation throughout the proceedings in this case and obtained a favorable result for their clients.  We therefore approve the rates requested by each of the plaintiffs' timekeepers, as documented in Appendix A to the attorneys' fees motion.

## C.

Finally, we turn to consider the plaintiffs' request for reimbursement of their reasonable litigation expenses.  Under 52 U.S.C. § 10310€ a party who prevails on a Fourteenth Amendment claim is entitled to attorneys' fees, as well as "reasonable expert fees, and other reasonable litigation expenses as part of the costs."  The plaintiffs claim litigation expenses in the amount of $489,096.35, more than $300,000 of which was paid to the plaintiffs' three experts who testified at the two trials.  *See* Pet. At 18-19, 594-95 (App. D).  The plaintiffs also claim expenses for travel, shipping, and research, as well as other miscellaneous expenses.  *See generally* Pet. App. D.  The state defendants do not object to the nature or amount of any of the claimed expenses.  Upon our review of the

plaintiffs' request, we conclude that the claimed litigation expenses are reasonable and recoverable under 52 U.S.C. § 10310€[9]

### D.

Having concluded that the intervenors cannot be held liable for any of the plaintiffs' attorneys' fees and expenses, we must determine the amount that is recoverable against the state defendants. The state defendants argue that they cannot be held responsible for any fees and expenses attributable exclusively to the intervenors' participation in the case. State Defs. Resp. at 4. In response, the plaintiffs assert that because both the intervenors and state defendants are state actors, we may charge the state defendants with intervention-related fees. Pet. At 20-24. We disagree with the plaintiffs' position.

Our analysis is governed by the Fourth Circuit's decisions in *Brat*, 883 F.3d 475, and *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169 (4th Cir. 1994). Under this precedent, a losing defendant is not liable for fees related to the entry of intervenors into the case, or fees the plaintiffs incurred "*in actually litigating* against the intervenors' positions.*" *Brat*, 883 F.3d at 484 (citing *Rum Creek*, 31 F.3d at 178). The plaintiffs thus are required to bear such "intervention-related" fees themselves, *id.,* and we decline their

---

[9] The plaintiffs separately filed a Bill of Costs, in which they seek reimbursement for $223,832.06 in costs, pursuant to 28 U.S.C. § 1920. Dkt. No. 388. The state defendants do not object to the nature or amount of the costs sought. Accordingly, we will tax the requested costs under Section 1920 against the state defendants, less $11,067.05, the portion of costs attributable to the intervenors' appeals to the Supreme Court, as discussed further below. *See* Dkt. No. 393; State Defs. Resp. at 6.

invitation to collapse the state defendants and intervenors into one state entity responsible for all the plaintiffs' fees.  Accordingly, we will hold the state defendants liable only for those fees and expenses for which the state defendants are responsible, and deduct any intervention-related expenses from the plaintiffs' recovery.  *See id.*

Of the fees the plaintiffs have requested, $562,056.50 is attributable to the liability and remedial-phase appeals to the Supreme Court taken by the intervenors after the state defendants ceased defending the unconstitutional plan.  The plaintiffs also seek $5,674.50 in attorneys' fees related to the intervention itself, as well as $29,001.41 in expenses and $11,067.05 in costs incurred after July 19, 2018 that were not related to the remedial proceedings.  All these fees, expenses, and costs were incurred "in litigating against the entry of the [intervenors] or against [their] positions" and thus are not chargeable to the state defendants.  *Brat*, 883 F.3d at 484.

As a result, the plaintiffs are left to bear $607,799.46 of their own attorneys' fees, costs, and expenses, due to our inability to assess this amount against the intervenors.  The state defendants are liable for the remaining $3,486,749.25 in fees, $460,094.94 in litigation expenses, and $212,765.01 in costs, for a total of $4,159,609.20.


## III.

In sum, the plaintiffs' Revised Second Motion for Attorneys' Fees and Litigation Expenses is GRANTED IN PART AND DENIED IN PART.  We hold that the intervenors are not responsible for any of the plaintiffs' attorneys' fees or expenses under the rules set

forth in *Zipes* and *Brat*.  We further conclude that the plaintiffs have satisfied their burden to show that the claimed fees otherwise allowable are reasonable, with the exceptions outlined above.  Accordingly, the state defendants are liable for the $4,159,609.20 in reasonable attorneys' fees, costs, and expenses not attributable to the intervenors' participation in the case.

It is so ORDERED.


_____/s/_____                _____/s/_____
Barbara Milano Keenan                           Arenda Wright Allen
United States Circuit Judge                      United States District Judge


_____/s/_____
Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: September 17, 2020